UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      v.

SEAN COMBS,

              Defendant.

24-cr-542 (AS)

## <u>MEMORANDUM OF DEFENDANT SEAN COMBS<br>IN SUPPORT OF RENEWED MOTION FOR BAIL</u>

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION .................................................................................................... 1

I.    The Court's Authority ..................................................................................... 2

II.   The Proposed Updated Conditions Of Release Are Sufficient ..................................... 3

III.  The Section 3142(g) Factors Favor Release In Light Of New Evidence ................... 7

      A.    The Nature And Circumstances Of The Offense Charged ............................... 7

      B.    The Weight of the Evidence, In Light Of New Evidence ............................... 8

            i.    Communications With ███████████ Corroborate The Defense ......... 9

            ii.   The Alleged Second Victim Is Not A Victim At All ............................. 11

            iii.  The Government's Other Obstruction And Witness Tampering
                  Allegations Were False .......................................................... 12

            iv.   Testimony Of ███████████ Undermines The Government's
                  Case .............................................................................. 14

      C.    Mr. Combs' Character and History, and Other Section 3142(g)(3)(A)
            Factors ................................................................................... 14

            i.    Mr. Combs' Character ........................................................... 15

            ii.   Mr. Combs' Career and Work History ........................................ 15

            iii.  Mr. Combs' Contributions To The Community .............................. 17

            iv.   Mr. Combs' Relationships And Family ....................................... 18

IV.   Mr. Combs Cannot Adequately Prepare For Trial While Detained At MDC .......... 18

      A.    Incredibly Voluminous Discovery Makes Preparation From Prison
            Impossible ............................................................................... 18

      B.    The Conditions At MDC Specifically Frustrate Mr. Combs'
            Preparation .............................................................................. 20

      C.    Release Is Required By The Constitution .................................... 21

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Salinas v. United States*,
   522 U.S. 52 (1997).................................................................................................... 7

*Stack v. Boyle*,
   342 U.S. 1 (1951)............................................................................................... 21, 22

*United States v. Chavez*,
   710 F. Supp. 3d 227 (S.D.N.Y. 2024)...................................................................... 20

*United States v. Colucci*,
   No. 23-CR-417, 2024 WL 3643857 (E.D.N.Y. Aug. 5, 2024)................................. 20

*United States v. Dreier*,
   596 F. Supp. 2d 831 (S.D.N.Y. 2009)........................................................................ 5

*United States v. English*,
   629 F.3d 311 (2d Cir. 2011)................................................................................... 3, 6

*United States v. Fox*,
   No. 22-1043, 2022 WL 2564600 (2d Cir. July 8, 2022)............................................ 5

*United States v. Ganias*,
   824 F.3d 199 (2d Cir. 2016).................................................................................... 19

*United States v. Griffin*,
   No. 22-CR-408 (EK), 2024 WL 2891686 (E.D.N.Y. June 10, 2024) ..................... 20

*United States v. Jeffries*,
   24-cr-423 (NJC) (E.D.N.Y.), ECF 9 ........................................................................ 6

*United States v. Laurent*,
   33 F.4th 63 (2d Cir. 2022) ........................................................................................ 7

*United States v. Mattis*,
   963 F.3d 285 (2d Cir. 2020)...................................................................................... 8

*United States v. Maxwell*,
   527 F. Supp. 3d 659 (S.D.N.Y. 2021)....................................................................... 2

*United States v. Montalvo-Murillo*,
   495 U.S. 711 (1990)................................................................................................ 22

*United States v. Sabhnani*,
   493 F.3d 63 (2d Cir. 2007)........................................................................................ 5

*United States v. Salerno*,
   481 U.S. 739 (1987) ................................................................................................ 22

*United States v. Williams*,
   No. 07-CR-1102 (JSR), 2008 WL 686622 (S.D.N.Y. Mar. 12, 2008) .................................. 5, 6

**Statutes**

18 U.S.C. § 1962 ..................................................................................................................... 7

18 U.S.C. § 3142 ............................................................................................................... passim

## <u>INTRODUCTION</u>

Mr. Sean Combs, through his counsel, renews his motion for release pending trial. This renewed motion is based on a significantly updated proposed bail package, new evidence, as well as changed circumstances regarding Mr. Combs' ability to prepare for trial while detained.

*First*, Mr. Combs proposes an updated bail package that is far more robust than the previous proposal, as well as other bail packages routinely approved by courts in this Circuit. The proposed package even surpasses a bail package recently *requested by the government* in a comparable case in a neighboring district. The updated proposed conditions—which include home detention with a strict 24/7 security monitoring arrangement and near-total restrictions on Mr. Combs' ability to contact individuals other than counsel—"will reasonably assure the appearance of [Mr. Combs] as required and the safety of any other person and the community." 18 U.S.C. § 3142(g).

*Second*, new evidence received in discovery from the government undermines the primary bases on which the government initially sought—and Judge Carter ordered—detention. The evidence makes clear that the government's case is thin. It confirms the defense's initial description of the events depicted in the March 2016 video recording: The video is not evidence of a coerced "freak off," but rather a minutes-long glimpse into a complex *but* decade-long *consensual* relationship between Mr. Combs and Victim-1. Additionally, the new evidence refutes the government's proffer at the initial hearing regarding a potential second alleged victim. And the new evidence confirms that the government's obstruction and witness tampering allegations at the initial bail hearings lacked a factual basis.

*Third*, Mr. Combs' current conditions of confinement infringe his constitutional rights to participate in his defense. Given the government's amended estimate of the amount of discovery

in this case—and its unique format including voluminous video and photographic evidence—Mr. Combs' release on the proposed conditions is necessary so that he can review the discovery and prepare for trial. Despite the MDC's best efforts to facilitate the defense team's needs, the current arrangement makes trial preparation impossible—as evidenced by the recent multi-agency sweep of the facility and resulting lockdown. The Bail Reform Act and the Constitution demand more.

Accordingly, Mr. Combs moves to reopen the prior detention decision, and requests release on the proposed updated conditions detailed herein.

## I. **The Court's Authority**

The Court can revisit the prior detention order under two separate provisions of the Bail Reform Act: 18 U.S.C. § 3142(f) and 18 U.S.C. § 3142(i). Section 3142(f) permits a new bail hearing "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." Section 3142(i) expressly permits this Court to revisit a prior detention order and to release a defendant in custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."

Moreover, the Court has "inherent authority" to reopen the hearing "even when the circumstances do not match § 3142(f)'s statutory text." *United States v. Maxwell*, 527 F. Supp. 3d 659, 663 (S.D.N.Y. 2021) (collecting cases). Where, as here, the case has been reassigned,

2

"[the court] is not bound by prior rulings" and should review the record *de novo*. *United States v. English*, 629 F.3d 311, 320 (2d Cir. 2011).[1]

**II.  <u>The Proposed Updated Conditions Of Release Are Sufficient</u>**

The defense proposes the following updated bail package, which will assuage any concerns of danger and obstruction, and will ensure Mr. Combs' appearance in court:

1) A $50,000,000 bond;

   a) Co-signed by Mr. Combs, his mother, his sister, the mother of his oldest daughter, the mother of his youngest daughter, and his three adult sons;

   b) Secured by the equity in Mr. Combs' residence located in Miami, Florida—an unencumbered property appraised at about $48,000,000;

   c) Further secured by the equity of Mr. Combs' mother's home in Miami, Florida;

2) Full home detention at his residence in Miami, or at a suitable location in New York, with GPS monitoring;

   a) Counsel will travel to this location for any in-person meetings with Mr. Combs, or have counsel meetings via video;

   b) To the extent Mr. Combs' travel is necessary (to attend Court or pre-approved medical appointments) his travel will be restricted to the Southern and Eastern Districts of New York and the Southern District of Florida;

   c) Mr. Combs must pay all or part of the cost of location monitoring.

3) 24/7 monitoring by qualified security personnel approved by the government and Pretrial Services;

---

[1] On October 24, 2024, the Second Circuit granted Mr. Combs' motion to hold his bail appeal in abeyance pending decision on the instant motion. *United States v. Combs*, No. 24-2606 (2d Cir.), Dkt. 36.1. Thus, the appeal does not foreclose the relief requested here.

4)  Mr. Combs will have no access to telephones or the internet except for during calls with counsel to be arranged by security personnel;

5)  Restrict all visitors except for counsel and a pre-approved list only consisting of specific family members, with the consent of Pretrial Services and the government;

   a)  Family visits will be scheduled only with Pretrial Services' prior approval;

   b)  Security personnel will monitor family visits;

6)  Mr. Combs shall avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution;

7)  Mr. Combs will consent to provide Pretrial Services random access to the residence;

8)  Mr. Combs' passport was surrendered to his counsel on April 1, 2024, which counsel will provide to Pretrial Services;

   a)  The following family members have also already surrendered their passports to counsel—who will provide them to Pretrial Services:

      i)  Janice Combs;

      ii)  Chance Combs;

      iii) Jessie Combs; and

      iv) D'Lila Combs;

9)  Counsel will continue efforts to sell Mr. Combs' airplane;

10) The Defendant shall submit to testing for a prohibited substance if required by the pretrial services office or supervising officer. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. The defendant must not

obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of prohibited

substance screening or testing;

11) Mr. Combs must participate in a program or counseling if directed by the pretrial services

office or supervising officer;

12) All other standard conditions of pretrial release.

Additionally, for the avoidance of any doubt and as stated during the September 18, 2024

hearing, "if your Honor wants something more or different, we can do whatever your Honor

thinks is necessary" regarding release conditions.  Sept. 18, 2024 Tr.55.[2]

These proposed conditions present an extremely substantial, comprehensive bail package

for any defendant, and are plainly sufficient to warrant pretrial release under 18 U.S.C. § 3142.

For example, the Second Circuit affirmed the release on similar, but far less restrictive,

conditions of a defendant charged in multiple counts including drug trafficking, firearms, sex

trafficking and related offenses in *United States v. Fox*, No. 22-1043, 2022 WL 2564600, at *1

(2d Cir. July 8, 2022).  *Fox* is just one of many cases concluding that such conditions are

adequate.  *See United States v. Williams*, No. 07-CR-1102 (JSR), 2008 WL 686622, at *1

(S.D.N.Y. Mar. 12, 2008) (concluding similar conditions reasonably mitigated danger to

community and risk of witness tampering); *United States v. Sabhnani*, 493 F.3d 63, 77 (2d Cir.

2007) (describing comparable package as "extraordinary" and vacating and remanding for

release on stated conditions); *United States v. Dreier*, 596 F. Supp. 2d 831, 833 (S.D.N.Y. 2009)

(approving similar bail package).

---

[2] To be clear, for the reasons stated herein, the government has not met its burden of demonstrating by clear and convicing evidence that Mr. Combs is a flight risk or danger, and should the Court conclude that less restrictive conditions of release are sufficient (they are), the Court should order release on such conditions.  *See* 18 U.S.C. § 3142(c)(1)(B) (court should impose "least restrictive further condition, or combination of conditions").

Indeed, the government recently successfully *requested* pretrial release for two similarly situated defendants, including a CEO accused of sex trafficking dozens of young men, including through witness intimidation. *See United States v. Jeffries*, 24-cr-423 (NJC) (E.D.N.Y.), ECF 9. In *Jeffries*, the government sought release despite claiming the defendants "relied on the services of a security company to surveil and intimidate [witnesses], thereby securing their silence." *Id.* at 3. The conditions of release requested in *Jeffries* pale in comparison to the conditions proposed by Mr. Combs here. There, the government requested bonds of $10 million and $500,000 respectively for the two released defendants, and release to home detention with GPS monitoring. The requested conditions included no additional security or surveillance arrangement whatsoever. *Id.* at 8.

The conditions proposed here are more restrictive than in most of the other cases cited above: Mr. Combs would be in the custody of professional private security officers, whereas most of the cited cases imposed only electronic monitoring or placing the defendant in the custody of a relative alone. The proposed security monitoring is precisely the situation contemplated by the statute. It specifies that conditions may include the defendant "remain[ing] in the custody of a designated person" who "is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community." 18 U.S.C. §3142(c)(1)(B)(i). As Judge Rakoff has explained, if a defendant is "strictly confined to [an] apartment … [with] electronic monitoring, there is no meaningful likelihood [he] will engage in any conduct constituting a danger" or tamper with witnesses. *Williams*, 2008 WL 686622, at *1.

Moreover, although the Court should make its own determination *de novo*, *see English*, 629 F.3d at 320, the updated bail package proposal mitigates the specific concerns that Judge

6

Carter identified during the initial September 18, 2024 detention hearing.  During the hearing, Judge Carter's primary concern appeared to be a risk that Mr. Combs could obstruct justice and intimidate witnesses using third parties.  Specifically, that he "would still have access to employees and other individuals," and could "obstruct justice and intimidate witnesses through those folks, through even coded messages if necessary."  Sept. 18, 2024 Tr. 57.  However, under the proposed updated bail conditions, Mr. Combs would not have access to "employees and friends and the like," *id.* Tr. 47, and would not "speak with these employees," *id.* Tr. 45.

### III.  <u>The Section 3142(g) Factors Favor Release In Light Of New Evidence</u>

Reviewing the 18 U.S.C. § 3142(g) factors *de novo* in light of the new evidence demonstrates that detention is not warranted.

#### A.  <u>The Nature And Circumstances Of The Offense Charged</u>

The Indictment has three counts: (1) Racketeering Conspiracy; (2) Sex Trafficking by Force, Fraud, or Coercion; and (3) Transportation to Engage in Prostitution.[3]

The Racketeering Conspiracy count does not allege that Mr. Combs himself engaged in or conspired to commit any particular racketeering act, and the grand jury did not need to find probable cause regarding any such conduct to return a true bill.  This is because 18 U.S.C. § 1962(d) does not require proof of the commission of any racketeering act or even any overt act. *See Salinas v. United States*, 522 U.S. 52, 62-65 (1997).  Nor does the defendant have to "agree to commit or facilitate each and every part of the substantive offense," or even "the two predicate acts" of the alleged conspiratorial agreement.  *Id*. at 63-64; *accord United States v. Laurent*, 33 F.4th 63, 86 (2d Cir. 2022).  For purposes of bail, then, there has been no affirmative grand jury

---

[3] The offense charged in Count Three does not implicate danger at all, and even if the Mann Act remains a tool in the federal criminal arsenal, the court should reject any suggestion that a Mann Act charge justifies pre-trial detention.

finding that Mr. Combs committed or conspired to commit any of the acts set forth in the pattern of racketeering activity included in the Indictment at Paragraph 13(a)–(h).

Count Two alleges that Mr. Combs committed the crime of sex trafficking starting in 2009 and concluding six years ago in 2018 against a single victim, Victim 1. The indictment contains no allegation of additional victims, or minor victims.[4] There is also no allegation that any sex trafficking occurred in the last six years. Although Count Two triggers Section 3142(e)(3)(D)'s presumption of detention, it is the only charge that does so. Of course, "[e]ven in a presumption case, the government retains the ultimate burden of persuasion by clear and convincing evidence." *United States v. Mattis*, 963 F.3d 285, 291 (2d Cir. 2020).

## B.  The Weight of the Evidence, In Light Of New Evidence

Over the past six weeks, the defense has received approximately 23.5 terabytes of discovery material. The material reveals new information about the case, the evidence, and the government's previous bail contentions that was "not known to the movant at the time of the hearing." 18 U.S.C. § 3142(f). The new material demonstrates that the government previously misrepresented the weight of the evidence. And it undermines the government's claim that Mr. Combs presents a danger.

First, the discovery includes ████████████████████████████████ that refute the government's core sex trafficking allegations. Second, this new discovery negates the government's claim at the initial detention hearing that there is a potential second victim. Third, the discovery shows the government's obstruction and witness tampering allegations were

---

[4] As of the date of this submission, a total of 7 civil lawsuits brought by plaintiffs' lawyers have alleged some form of sexual activity of a minor. While this is outside the criminal case and the subject of bail, let us be clear that these allegations are absolutely false. It bears repeating that the U.S. Attorney and scores of DHS agents have been investigating Mr. Combs for almost a full year and there is no criminal charge of any conduct involving a minor.

entirely misleading.  And finally, the government failed to disclose to the court information

concerning ██████████ testimony that undermines its claims.  We take each in turn.

  **i.  Communications With** ██████████ **Corroborate The Defense**

As noted, the government's allegations of sex trafficking relate to one woman (referred to

in the Indictment as alleged "Victim 1") with whom Mr. Combs shared an eleven-year

relationship.  Included in the discovery materials are ████████████████████

████████████████████████████████████████████████████████

██████████.

    ████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████.  ████████████████████████████████

████████████████  Agnifilo Decl. Ex. 1.  ████████████████████████

████████████  *Id.*  ████████████████████████████████████

████████████████████████████.  ████████████████████████

████████████████████████████████████████████

████████████████████████████████  Agnifilo Decl. Ex. 2.  ██████

████████████████████████████████████████████████

████████████████████.  

    ██████████████████████████████████████████████████

████████████████████████████████████████████████.  █

████████████████████████████████████████████.  Agnifilo Decl. Ex. 3.  ██████

████████████████████████████████  *Id.,*  ████████████████

████████████████████████████████  Agnifilo Decl. Ex. 4.  ████████████████

████████████████████████████████████████████████████

████████████████████████ Agnifilo Decl. Ex. 5. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████.

████████████████████████████████████████████

███████████████████████████████████████████. ███████████

████████████████████████████████████████████

██████████████████████████ ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████.

The first mention of any sex trafficking or unwanted sexual contact involving alleged Victim 1 was in November 2023, five-years after the couple's 2018 breakup. The evidence shows these allegations were merely attempts to obtain a financial windfall from Mr. Combs.

In the Spring of 2023, Victim 1 revealed to one or more others that she needed money to support her small family. She told others that she had started writing a book about her relationship with Mr. Combs. In June of 2023, she texted Mr. Combs' employee that Mr. Combs should contact his lawyer to have his lawyer speak with her lawyer. She followed up on this by text on June 15, 2023.

That same day, her lawyer contacted one of Mr. Combs' lawyers, who, expecting that she might make an extortionate demand, recorded the conversation. During the approximately eight-minute recorded call, the lawyer confirmed Victim 1 was writing a tell-all type book and that Mr.

Combs could buy the exclusive rights to the book for $30,000,000 which would ensure that it was not published.  Mr. Combs and his lawyers considered this an extortionate demand and did not pay the money.

In the Fall of 2023, Victim 1 pursued a different strategy.  The Adult Survivors Act (ASA)—which suspended the traditional statute of limitations for sexual assault claims—was scheduled to expire on November 24, 2023.  In November, Victim 1 indicated in discussions between her lawyer and Mr. Combs' lawyer *for the very first time*—five years after their relationship ended—that she had been sexually abused by Mr. Combs, again demanding $30,000,000.

To be clear, the statute of limitations for non-sexual assault, battery, and other alleged offenses were subject to the typical statute of limitations for those torts.  Accordingly, the only way a plaintiff could avail herself of the ASA is by alleging sexual assault.  Thus, on November 16, 2023, days before the ASA expired, Victim 1 filed a civil complaint alleging, *inter alia*, sex trafficking.  The case settled quickly without any admission of wrongdoing.

With the release of the civil complaint, law enforcement saw an opportunity to build a criminal case against Mr. Combs.  Discovery shows that within days of the civil case settling, this investigation began.  The government recycled Victim 1's allegations, but the case requires her potential testimony, which will be refuted by years of written correspondence and other documentary evidence.

### ii.  The Alleged Second Victim Is Not A Victim At All

During the initial bail hearing the government alluded to a potential second victim, arguing that Mr. Combs' contacts with this purported victim were evidence of obstruction.  Sept. 18, 2024 Tr.21-22.  However, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

 . Despite the government's claim—██████████████████████ ████████████████████—that this woman is a sex trafficking victim, the defense has learned that the government *has not even spoken* to her.  Nor was she the target of any obstructive conduct by Mr. Combs.

The government clearly misled the court and concealed the true facts during the initial bail hearing.  For example, the government knew █████████████████████████████████ ██████████████████████████████████ The government also knew ██████████ █████████████████████████████████████████████████████ ████████████████████████████████████ But the conduct was nothing of the sort—which the government clearly knew.  Indeed, the discovery confirms ███████████████████████████████.

> iii.    **The Government's Other Obstruction And Witness Tampering Allegations
> Were False**

The discovery also undermines the government's argument that Mr. Combs attempted to tamper with other individuals, including grand jury witnesses.  During the previous bail hearing, the government outlined what it billed as obstructive communications with grand jury witnesses in June and July of 2024.  Sept. 18, 2024 Tr.20.  It further characterized Mr. Combs' September 2024 communications with another person as witness tampering.  *Id.* Tr.23-24.  Judge Carter considered this the government's most persuasive evidence, posing the questions to the defense: "If he's aware of this April 1, 2024, then, again, why is he contacting witnesses in June and July of 2024?," *id.* Tr.42, and "what would be the purpose of Mr. Combs continuing to speak to that witness after September 11?," *id.* Tr.33.

But the recent discovery now corroborates the defense arguments at the initial bail hearing.  At the hearing, Mr. Combs' counsel explained that his contacts with these people were

not in any way obstructive.  One grand jury witness contacted him, not the other way around.  *Id.* Tr.42.  The September 2024 communications were with an individual represented by counsel, who wanted to make a public statement.  *Id.* Tr.28-34.  And to the extent individuals were contacted, defense counsel explained that to conduct "a responsible defense investigation" it must of course "continue to interview witnesses."  Sept. 17, 2024 Tr.52.

In opposing these arguments, the government misled the court and concealed the actual content of the communication.  The truth, however, is that a grand jury witness—the one with whom Mr. Combs "had not spoken in several years," Sept. 18, 2024 Tr.20— ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

These statements—which the government conveniently withheld from the court—in no way evidence obstruction.

The same is true of the individual whom Mr. Combs contacted in September 2024.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████.  But during its proffer to the court, the government concealed these facts—which completely undermine its claim that the timing of the contacts with the person in September 2024 suggest obstruction.

Mr. Combs is entitled to have his counsel conduct a thorough defense investigation— indeed, his constitutional right to the *effective* assistance of counsel demands it.  At times,

counsel might also need Mr. Combs' assistance and involvement to conduct a proper investigation.  Of course, Mr. Combs has a constitutional right to participate in his defense, and if witnesses are contacted to support his defense that alone does not amount to obstruction or evidence any risk of obstruction or danger.

### iv.   <u>Testimony Of ████████████ Undermines The Government's Case</u>

Defense counsel noted at the initial hearings that based on defense interviews and investigation, several individuals associated with a male companion agency have stated to the prosecutors that they are paid for their time, not for having sex. ████████████ ████████████████████████████████████████████████ ████████████████.[5]

This is not a surprise, as the companion agency is not some secretive underground operation.  It has been operating in the open for over a decade with a website of over 10,000 followers on X (formerly Twitter) and its operations have been featured in well-known magazines.  Its CEO actively courts media attention, starred on a SHOWTIME series about male companions, and has been repeatedly interviewed on national talk shows and the national news.  According to the CEO, the company's services have exploded in popularity because of all this publicity.

In other words, the government's allegations are incredibly weak and contradicted by the testimony of its own witnesses and the discovery received to date.

### C.  <u>Mr. Combs' Character and History, and Other Section 3142(g)(3)(A) Factors</u>

The Bail Reform Act requires Courts to assess a "person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community,

---

[5] As of the date of this submission, no *Brady* disclosure on this point has been made.

community ties, past conduct, history relating to drug and alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). In addition to Mr. Combs' prior arguments regarding his cooperation to date—which we incorporate herein—we note the following:

### i.  <u>Mr. Combs' Character</u>

Mr. Combs has never run from a problem. He has had more than his share of adversity, as he does now, and he has responded to every such challenge with integrity.

Sean Combs was born on November 4, 1969 at Women's hospital in Harlem, New York. His mother, Janice Combs, was a teacher's assistant. His father, Melvin Combs, died when Sean was three years old. His mother and others told him that his father died in a car accident. It wasn't until years later, when Sean was a student at Howard University, that he researched microfiche and learned his father was murdered.

Determined not to let her only son follow in her deceased husband's footsteps, Janice was perhaps extra-protective of Sean. She raised him with a strong belief in God, religion, faith and redemption. At the age of ten, he became an alter boy at the Parish of St. Charles Borromeo at 282 West 151st Street in Harlem. He also spent his Sundays at the Shiloh Baptist Church at 2226 Adam Clayton Powell Jr. Boulevard, also in Harlem. When Sean was about 12, he and his mother moved to Mount Vernon, a small city in Westchester County bordering the Bronx. Sean attended and graduated from Mount Saint Michael Academy, an all-boys Catholic high school where he played on the football team. His ties to this community run deep.

### ii.  <u>Mr. Combs' Career and Work History</u>

While a student at Howard University in Washington D.C., Mr. Combs began working for free at Uptown Records, which was created in 1986 by Andre Harrell to be the first major hip hop music label in the world. Combs bunched his classes at Howard on Tuesdays through

Thursdays and took the train to New York to work with, and learn from, Harrell the rest of the time.  He quickly distinguished himself by his hard, tireless work.  Harrell rewarded Combs' hard work by making him an executive at the label.  However, with hard work comes drive and ambition, and Harrell fired Combs in 1993.

Instead of seeing this as a setback, Combs saw it as an opportunity.  He created Bad Boy Records that same year.   The twenty-four-year-old Combs had a vision for a new type of business, one headed by a young black executive that emphasized black excellence and achievement.  It would reflect a certain style, sound, and sensibility that was modern, hip and urban.  Before long, many of the most talented young artists signed with Bad Boy.

In June 1997, Combs wrote and sang his first hit song, "I'll Be Missing You," with Faith Evans, which was a tribute to his friend, Christopher Wallace, better known as the famous and talented "Notorious BIG" who was killed in Los Angeles three months earlier.  In February 1998, Combs' debut album, No Way Out, won a Grammy Award for the Best Rap Album.

Later that year, Combs started the clothing business Sean John, which went on to win Council of Fashion Designers of America (CFDA) awards.  Combs was the first black man awarded the CFDA Men's Designer of the Year award in 2004.

In 2002, Combs produced the MTV reality show, Making the Band.  Five years later, in 2007, Combs became the brand-ambassador and equal-share venture partner with the British multinational beverage company, Diageo, for the French beverage producer, Ciroc.  And in 2013, Combs co-founded a television network called Revolt, which carried music videos and programming related to social justice issues as well as music.  However, in the wake of the November 2023 lawsuit, he took a leave of absence from many of these ventures.

This brief review of Combs' work history shows that Combs responds to adversity by facing challenges directly and working even harder to overcome them.  He does not run from challenges, nor does he cheat or break rules in addressing them; instead, he takes them head-on, as he has already done with this challenge and as he will continue to do.

### iii.  <u>Mr. Combs' Contributions To The Community</u>

Mr. Combs is also incredibly philanthropic and cares about the community here in New York and elsewhere.  Since founding Bad Boy Entertainment, Mr. Combs has actively supported and donated millions to after school programs and organizations like the Boys & Girls Clubs of America.  He has also supported organizations including the National Foundation for Teaching Entrepreneurship, creating opportunities for young entrepreneurs.

A cornerstone of his philanthropy is education, and he fulfilled a lifelong dream when he, with a partner, opened Capital Preparatory Harlem Capital Charter School in 2016, to provide high-quality education to inner-city youth in New York City.  The success of this initiative led to the launch of Capital Preparatory Bronx Charter School in 2020, with Combs donating $1 million to support its development.  Mr. Combs has also been proactive in health and disaster relief efforts—having raised over $2 million for New York City public schools and hosting a virtual dance-a-thon that raised more than $4 million to provide personal protective equipment to healthcare workers on the front line of the COVID-19 pandemic.

Mr. Combs' philanthropic work has earned him numerous accolades throughout his career, including the Triumph Award from the National Action Network in 2016, the Superhero Award from Room to Read in 2017, the Child of America Award from the Carver Foundation in 2018 and in 2023 the Icon Award from the Apollo.

### iv.  Mr. Combs' Relationships And Family

Because the government argued that Mr. Combs is a flight risk and danger, we further address in brief fashion his history of long-term relationships and family ties.

Although Combs never married, he has had multiple significant long-term relationships that are relevant here.  He fathered his first child, Justin, who is now 30 years old, with Misa Hylton.  He was in a long-term relationship next with Kim Porter, who he called "the love of his life" after her tragic passing from lobar pneumonia in November 2018.  With Kim Porter, he shares Quincy (who he adopted), Christian, and twin daughters.  He fathered his 18-year-old daughter Chance Combs with his longtime friend Sarah Chapman.  Chance is now enrolled at Tisch School of Performing Arts at New York University.  Finally, he has a 2-year-old daughter, Love.

Mr. Combs also supports his 83-year-old mother, who recently underwent brain surgery and was in the hospital as recently as this summer with a heart issue.  Although Mr. Combs is not his mother's only caregiver, he assists with her medical care.

Sean Combs's seven children and his mother love and support him and need his love and support.  The mother of four of his children (Quincy, Christian, and his minor twin daughters), Kim Porter, passed away and his children are now left with an incarcerated father.  His minor child, now 2 years old, has not been able to see her father since he was incarcerated and misses him dearly.

## IV.  Mr. Combs Cannot Adequately Prepare For Trial While Detained At MDC

### A.  Incredibly Voluminous Discovery Makes Preparation From Prison Impossible

At the October 10, 2024 Status Conference, the government described an unprecedented volume of electronic discovery.  This includes terabytes and terabytes of data extracted from at least 96 electronic devices seized at Mr. Combs' residences in Miami, Los Angeles, and

elsewhere.  Oct. 10, 2024 Tr.10-13.  The size of the data collected from Miami alone is

"extraordinary and totals over 90 terabytes."  *Id.* Tr.12.  The data extracted from other devices

includes yet more terabytes.  Even a single terabyte of data is roughly "equivalent to the

information contained in the books on [twelve] floor[s] of a typical academic library."  *United

States v. Ganias*, 824 F.3d 199, 218 (2d Cir. 2016).  The data here is so large that the government

represented it would need to engage in further dialogue with the defense as to how exactly this

data could be transferred to the defense team.  *Id.*  Those discussions continue.

That is not all.  The government further described voluminous subpoena returns and

*Brady* disclosures, *id.* Tr.14-15, and a particularly complicated privilege review process whereby

their filter team will share initial batches of possibly privileged material with the defense for its

own review, *id.* Tr.16-17.  The government maintains that its investigation is very much

"continuing," *id.* Tr.16, caveating that more discovery is likely down the road.  It further noted

that it has yet to succeed in extracting and restoring certain devices, describing such processes as

a work in progress, some contingent on "technology advancements."  Dkt. 29 at 2; Oct. 10, 2024

Tr.11-12.  These hurdles persist and have stalled the defense's review and preparation.

The defense's recent attempts to confer with the government regarding Mr. Combs' use

of a laptop further confirm the current conditions are not tenable.  There is no way Mr. Combs

can review all this discovery during visits by his attorneys.  He needs a laptop so that he can

work on his case as often as possible on his own time.  However, even though he has been in

custody since September 16, 2024, he *still does not have a laptop.*  Defense counsel has been

working with prosecutors since Mr. Combs' arrest to supply him with a laptop that complies with

MDC's security requirements.  After numerous delays occasioned in part by the government's

misunderstanding of the MDC's rules, counsel provided a compliant laptop to the government on

October 8, 2024—nearly a month ago. Nevertheless, as of today, Mr. Combs has still not received or been able to use any such laptop, meaning he cannot review certain files while at MDC. This includes discovery that is critical to his defense and trial preparation.

The government has numerous case agents and endless resources at its disposal to conduct its review. Still, it estimates it will need at least until the end of the year to complete discovery. Much of the discovery also includes difficult-to-review evidence such as video footage and photographs subject to heightened protections under the protective order. *See* Dkt. 26. Even assuming Mr. Combs obtains a laptop and counsel is able to share critical discovery with him and visit him at the MDC every day, uninterrupted, it will be impossible for Mr. Combs to review this incredible volume of evidence under the present conditions.

### B. <u>The Conditions At MDC Specifically Frustrate Mr. Combs' Preparation</u>

The current conditions at MDC further impair Mr. Combs' ability to prepare his defense. To start, the frequent lockdowns at MDC persist. As many judges in the Southern and Eastern Districts have observed, "inmates at the MDC spend an inordinate amount of time on 'lockdown.'" *United States v. Chavez*, 710 F. Supp. 3d 227, 233 (S.D.N.Y. 2024); *United States v. Griffin*, No. 22-CR-408 (EK), 2024 WL 2891686, at *3 (E.D.N.Y. June 10, 2024) ("[I]t has been well documented that the MDC has an ongoing issue with frequent lockdowns."); *United States v. Colucci*, No. 23-CR-417, 2024 WL 3643857, at *3 (E.D.N.Y. Aug. 5, 2024) (collecting cases). Mr. Combs has not been spared from these lockdowns, which have directly frustrated his defense preparations.

Just last week, the "long-troubled facility" was the subject of a multi-agency law enforcement sweep and yet another corresponding lockdown.[6] During that sweep and lockdown, Mr. Combs was removed from his unit so officers could search its contents. He was not entitled to be present for the search. Officers ruffled through his personal notes and left them scattered, out of order and disorganized. These notes included his work product and notes reflecting communications with defense counsel. The officers also seized Mr. Combs' pens, leaving him unable to take further notes while reviewing discovery or during counseled calls. As a result of this lockdown, defense counsel was delayed in meeting with Mr. Combs, losing time for trial preparation.

Additionally, MDC does not permit counsel to provide Mr. Combs with even the basic materials necessary for trial preparation. We cannot equip him with notebooks, folders, or physical documents, for example. How is a defendant supposed to competently defend himself or consult with counsel in a case of this magnitude without such basic materials? The problem is further compounded by the fact that the laptop we provided to the government nearly a month ago still has not been given to Mr. Combs, so he has no means at all even to take notes.

C.  **Release Is Required By The Constitution**

Under the Fifth and Sixth Amendments, Mr. Combs is entitled to meaningfully participate in his defense and collaborate with counsel. The "traditional right to freedom before conviction" facilitated these rights by "permit[ting] the unhampered preparation of a defense." *Stack v. Boyle*, 342 U.S. 1, 4 (1951). "Sections 3142(e) and (f), allowing limited detention of arrestees, were enacted against this historical backdrop." *United States v. Montalvo-Murillo*, 495

---

[6] *See* New York Times, *U.S. Officials Sweep Troubled Brooklyn Prison Where 2 Were Killed* (Oct. 28, 2024), https://www.nytimes.com/2024/10/28/nyregion/doj-mdc-brooklyn-prison.html.

U.S. 711, 724 (1990) (Stevens, *J.*, dissenting).  Thus, under the Bail Reform Act, a detention

order is only lawful to the extent it "afford[s] [a] reasonable opportunity for private consultation

with counsel."  18 U.S.C. § 3142(i)(3).  And it explicitly permits pretrial release "when

necessary for preparation of the person's defense."  18 U.S.C. § 3142(i).

Although the Supreme Court has rejected facial challenges to the Act's procedures, it has

not determined "whether or not they might be insufficient in some particular circumstances,"

such as those outlined here.  *United States v. Salerno*, 481 U.S. 739, 751 (1987).  Keeping Mr.

Combs detained under the extraordinary circumstances here would leave him unconstitutionally

"handicapped in consulting counsel, searching for evidence and witnesses, and preparing [his]

defense."  *Stack v. Boyle*, 342 U.S. at 8 (Jackson, *J.*, concurring).  Indeed, it is well documented

"that pretrial custody status is associated with the ultimate outcomes of cases, with released

defendants consistently faring better than defendants in detention."  ABA Standards for Criminal

Justice: Pretrial Release 29 (3d. ed. 2007).[7]  That is even more likely to be the case here, where

detention is stripping the defendant of any real opportunity to review the evidence against him or

otherwise prepare for trial.

\* \* \*

For the foregoing reasons, and to ensure a fair trial and protect Mr. Combs' constitutional

rights, the Court should order release on the proposed conditions, or any other conditions the

Court deems appropriate.

---

[7] https://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/pretrial_release.pdf.

Date:  November 8, 2024

Respectfully Submitted,

/s/Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Shapiro Arato Bach LLP
1140 Avenue of the Americas, 17th Fl.
New York, NY 10036
(212) 257-4881
ashapiro@shapiroarato.com

Marc Agnifilo
Teny Geragos
AGNIFILO INTRATER
445 Park Ave., 7th Fl.
New York, NY 10022
646-205-4350
marc@agilawgroup.com
teny@agilawgroup.com

Anthony Ricco
Law Office of Anthony L. Ricco
20 Vesey Street
New York, NY 10007
(212) 791-3919
tonyricco@aol.com

Anna Estevao
SHER TREMONTE LLP
90 Broad St., 23rd Fl.
New York, NY 10004
(212) 202-2600
aestevao@shertremonte.com