# AGNIFILO INTRATER

November 19, 2024

**VIA ECF**
Hon. Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:     *United States v. Combs*, **24-cr-542 (AS)**

Dear Judge Subramanian:

The defense writes this letter in advance of today's hearing and in response to the Government's letter of November 18, 2024. (Dkt. 72.) The Government's letter only reinforces the fact that the Government has committed an egregious, willful, and harmful breach of the attorney client privilege, and has become privy to defendant's and defense counsel's trial strategy, including areas of expert testimony, witness strategy, and other confidential matters.

1. The Materials Provided To Defense Counsel

Defense counsel has been provided with nineteen pages of materials seized from Mr. Combs' locker at the MDC. According to the Government, these nineteen pages were given to, and are in the possession of, the trial team, which has already started using these privileged materials to its advantage, (Dkt. 72 at n.2), including its opposition to bail, (Dkt. 69 at 12, 21). Based on the materials provided as Exhibit A, it appears a government investigator ("Investigator 1") took photographs of several different items.  These include (i) intact pages from two different legal pads, (ii) pages of an address book, (iii) a ripped-out, folded-over page of a third legal pad, (iv) a ripped-out page of another legal pad and (v) a ripped-out page of yet a different legal pad, as will be described below.

The first page is a page from a folded-over, intact legal pad.[1] The second page is a copy of the first page but is partially enlarged. Pages three through eleven are pages of an address book. The twelfth page appears to be the first page of a second legal pad. The thirteenth page is a second photograph of that same page (or a different xerox copy of the same photograph). Pages fourteen, fifteen and sixteen appear to be folded over pages of that same intact legal pad.  Page 17 is a single folded piece of paper removed from yet another legal pad (this legal pad has three vertical lines down the left side whereas the other two legal pads had one line down the left side).  Page 18 is a single sheet of paper ripped out of a legal pad.  Page 19 appears to be a ripped out single sheet of paper from a fourth

---

[1] In its letter from yesterday, the Government refers repeatedly to "a notebook."  The documents provided to counsel do not show any notebook.  They show a number of legal pads.

Hon. Arun Subramanian
November 19, 2024
Page 2 of 8

legal pad. This legal pad has no vertical line on the left side. Also, this legal pad has twenty-one lines whereas the first two legal pads have thirty-five lines. Based only on the materials provided, it appears that the investigator took photos of more than only the "notebook" and address book, as represented in the Government's November 18, 2024, letter. Rather, he appears to have taken photographs of the pages of several legal pads, both pages that were intact in the legal pad as well as loose pages.

It bears reminding that these clear written statements of the defendant were not provided to the defense as part of the Government's discovery or Brady obligations. If it were not for the fact that the Government used portions of these privileged materials in an effort to hold Mr. Combs in jail, we would still never have them or even know about them.

2. The Notes Are Obviously Privileged

Of the nineteen pages provided to counsel, eleven pages are Mr. Combs' notes to and with his lawyers. These notes reflect actual conversations with his attorneys concerning aspects of his trial preparation and his efforts to be released on bail.[2] The notes refer to defense counsel by name, include discussion of defense experts and witnesses, discuss cross-examination and credibility of witnesses, and overall defense strategy. Mr. Combs' handwritten notes covering legal strategy are now in the hands of the trial prosecutors, who hope to take advantage of the breach they committed to better prepare for the May 2025 trial, bring new charges, and argue for Mr. Combs' detention.

Mr. Combs keeps his legal materials in his locker. His notes are in the form of a number of legal pads (several of which the government has photographed) as well as loose pieces of paper on which he makes notes. On top of his legal pads and notes, he has a folder marked "legal." This is to put anyone on notice that everything along with the folder marked "legal" is exactly what it says: legal attorney-client materials that he brings to his meetings with his lawyers to prepare his investigative and his trial strategy.[3] When he finishes meeting with his lawyers, he brings his legal materials back to his locker where they are kept with the clear warning, written on the folder, that these are his legal materials. So, when Investigator 1 (who we will get to in a minute) saw "a manila folder marked 'legal,'" this was his cue that all the legal pads and loose pages of legal pads that accompanied it were Mr. Combs' legal materials.

---

[2] Attached as Appendix A is a sealed, *ex parte* affirmation of Teny Geragos, Esq., explaining the context of these notes. We respectfully request that this affirmation be filed under seal and *ex parte* to prevent further disclosure of privileged information. To be clear, Mr. Combs never waived privilege over these materials and, as soon as the defense learned of the disclosure in the Government's filing, requested their return and destruction.

[3] Mr. Combs' counsel previously attempted to provide him with redwell folders to assist in organizing his legal papers, but those materials were rejected by the MDC.

Hon. Arun Subramanian
November 19, 2024
Page 3 of 8

If the warning "legal," wasn't enough, the notes are obviously legal materials that he discusses with his lawyer. They repeatedly refer to his lawyers by name. On the fourteenth page, he writes about █████████████████████████████████████████. He wrote that ████████████████████████████████ It is hard to imagine a more self-evidently privileged conversation than a trial lawyer telling a defendant about a ██████████████████████████████, and the defendant writing it down in his legal materials because it is so important. On that same page, Mr. Combs wrote about ████████████████████████████████████████. This is heartland trial strategy being expressed in detail in notes of conversations between Mr. Combs and his lawyers. The fact that a government investigator, Government taint team, and the entire prosecution team viewed this and still believed they could keep the notes and use them against Mr. Combs is unfathomable. Worse still, that the Government took notes directed to his lawyer to ████████████████ in preparation for trial, and then used those notes as a basis for claiming that he was attempting to tamper with witnesses is astonishing.

As discussed above, the notes are replete with discussions of legal strategy between Mr. Combs and his lawyers, all of which should have been obvious to everyone who looked at these notes – Investigator 1, the taint team and the trial team.

3. <u>That The Government Did Not Inform Defense Counsel That It Had Mr. Combs' Notes Is Evidence That The Government Is Acting Willfully</u>

As noted, the Government did not produce these notes of defendant's own statements to the defense as part of its discovery obligations. The opening paragraphs of Fed. R. Crim. P. 16 require the Government to disclose "defendant's written or recorded statement" to the defense. One would think this would be especially urgent when the written statements at issue are in the form of the defendant's own handwritten notes that were taken from his cell and which reflect specific conversations with his counsel. But, the Government did not produce these in discovery.

Nor did the Government's taint team, established for precisely this type of situation, contact counsel and advise counsel that it was in possession of defendant's handwritten notes. As part of the hearing and to determine what sanction is appropriate for this egregious, self-evident privilege breach, defense counsel wants to know exactly how the decision was made, and by who, to not contact defense counsel when the United States Attorney's Office came into possession of these notes.

4. <u>The Government's Explanation Of How It Took These Notes Is Riddled With Self-Contradiction and Lacks Common Sense</u>

The Government referred to "Investigator 1" whose role in these events is as mysterious as it is contradictory. The Government states that Investigator 1 was assigned by the Bureau of Prisons ("BOP") to participate in the sweep and that he is not part of the Government's investigation of the defendant. Yet, the Government also states that

3

Hon. Arun Subramanian
November 19, 2024
Page 4 of 8

Investigator 1 "has consistently monitored the defendant's communications." See Govt's Letter of Nov. 18, p.2. The Government also states that it has sent grand jury subpoenas and document requests to the BOP for the defendant's monitored communications. The letter is silent as to which BOP officials the prosecutors work with in connection with its efforts to secure defendant's monitored communications, but it would appear that the prosecutors work with, among others, Investigator 1. Under the circumstances, the hearing should encompass what connection exists between the prosecution team and Investigator 1.

Second, the Government writes that the BOP sweep was preplanned, "not in response to any particular threat or intelligence," and did not target Combs. *Id.* at 2. However, the Government also writes that there was nothing "improper about Investigator 1 taking the photographs" because "Investigator 1, who had reviewed the defendant's calls and emails…was entirely justified in inspecting the defendant's assigned bunk to recover additional evidence." The Government's position is immediately self-contradictory because the review of a particular inmate's calls and emails is "intelligence," and because acting on that intelligence in order to conduct a particular search is targeting Combs. The Government's own letter shows that Combs was treated differently from other inmates and that the search of his locker and the removal of his notes was based specifically on the intelligence that Investigator 1 developed from listening to his calls and reading his emails.

Third, the BOP sweep was purportedly related to "removing contraband at the facility." *See* U.S. Department of Justice, Federal Bureau of Prisons, Press Release from November 1, 2024. The release goes on to state, "(t)he combined operation identified and confiscated a number of electronic devices, drugs and associated paraphernalia, and homemade weapons." *Id*. Yet Investigator 1 apparently used this sweep as pretext to conduct a targeted seizure of Mr. Combs' handwritten notes about conversations with his lawyers. Tellingly, Investigator 1 did not report that he had "identified and confiscated" Sean Combs notes of conversations with his lawyer to supervisors of the multi-agency law enforcement operation. He went straight to the prosecution team.

The prosecutors have taken the position that the identification and photographing of Sean Combs handwritten notes were merely part of the multi-agency sweep to rid the MDC of drugs, electronics and home-made weapons. There are ways of proving such a contention. We can call Investigator 1 to the stand at a factual hearing. A hearing should encompass what else Investigator 1 told the prosecution team about the legal materials he rifled through. At a hearing, we could ask Investigator 1 why he called the trial prosecutors? What contact had they had beforehand? How did Investigator 1 know which notes to photograph? Did Investigator 1 photograph any notes aside from the 19 pages defense counsel was provided yesterday? What, if any, direction did Investigator 1 have from the agents conducting the pre-planned law enforcement initiative, or was he taking direction from someplace else?

The bottom line is that no multi-agency law enforcement initiative justified rifling through Mr. Combs personal handwritten notes of conversations with his lawyers, and the prosecutors' arguments to the contrary lack all credibility.

5. <u>The Evidence Shows There Was A Law Enforcement Plot to Photograph Mr. Combs' Notes, Have The Taint Team Not Advise Counsel, And Use These Plainly Privileged Materials To Keep Mr. Combs In Jail And To Gain An Unfair Trial Advantage</u>

Before Friday evening at 11:30 pm, defense counsel knew none of this. It was not until the Government attached two pages of defendant's handwritten notes to a letter to keep him in prison that defense counsel learned for the first time that, over two-weeks earlier, Mr. Combs' notes were photographed and provided to the U.S. Attorney. In the last four days, several things have become clear.

First, Investigator 1, who had been monitoring Mr. Combs' calls and emails and was absolutely targeting him, seized upon an opportunity to search his cell. He knew that there was a completely unrelated multi-agency law enforcement measure planned for October 28, 2024, one related to ridding the MDC of weapons, drugs and cell phones and having nothing to do with an inmate's notes of conversations with his lawyers. Because he had been monitoring Combs' conversations, he conducted a warrantless search of Mr. Combs papers, not looking for weapons, drugs or cell phones but for what Combs and his lawyers were discussing and what Combs' trial strategy would be. In a high-profile case such as this, where the defense has been usually outspoken about the lack of meaningful inculpatory evidence, what could be more valuable than photographing defendant's trial strategy with his lawyers?

So, he photographed pages where the defendant discussed what types of expert witnesses to call, where he identified witnesses, where he discussed his thoughts about the credibility of the most important witness in the case and other things revealing the defense trial strategy. Once he photographed these pages, he returned the legal pads and other documents to their original location so the defendant would have no idea his handwritten notes had been taken in this manner.

Then, he called the trial prosecutors in this case to aid in their investigation and because he knew he had information that would help them: defendant's trial strategy, laid out in his own handwritten notes. Whether he revealed to the prosecution team even more privileged information than what is contained in the notes remains to be seen.

Next, at the prosecution team's direction, he sent the notes to the U.S. Attorney's Office, to the taint team whose sole purpose is to ensure that attorney client privileged material is not given to the prosecution team. At no point does the taint team contact defense counsel. At no point does the taint team state that it is in possession of Sean Combs handwritten notes. At no point does the taint team ask defense counsel if anything in these

Hon. Arun Subramanian
November 19, 2024
Page 6 of 8

handwritten notes is potentially privileged. Given that there was an established protocol in place, it is inconceivable this is a mere oversight.

Similarly inconceivable is how the taint team – ostensibly trained to review for privileged material and provided with the names of all defense counsel – somehow did not see the obvious privileged nature of the notes. The notes refer to defense counsel by name, include discussion of defense experts and witnesses, discuss cross-examination and credibility of witnesses, and overall defense strategy. The taint team even recognized that portions of the notes written on the very same page contain privileged information, yet failed to realize the privileged nature of the rest of the page.

The fact that the prosecution team then received these notes from the taint team and likewise failed to understand what had come into their possession is just as egregious.

At some point, the trial team comes into possession of the nineteen pages of materials. At no point does the trial team contact defense counsel to state that there are references to particular potential witnesses, or to possible areas of expert testimony or even to the fact that Combs specifically writes that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬ The trial team didn't tell defense counsel any of this for the same reason the taint team didn't tell defense counsel and for the same reason that Investigator 1 targeted Combs and photographed these notes in the first place: because there was a plot to get these attorney client materials. And once they got them, the first thing they did was use them, specifically use them by putting them in a bail letter to keep Combs in jail.

6. A Fulsome Hearing is Required

The Government's proffered explanation for how it got this information is internally inconsistent and not credible. As a result, a hearing is required.

Respectfully submitted,

Marc Agnifilo
Teny Geragos
AGNIFILO INTRATER
445 Park Ave., 7th Fl.
New York, NY 10022
646-205-4350
marc@agilawgroup.com
teny@agilawgroup.com

Anthony Ricco
Law Office of Anthony L. Ricco
20 Vesey Street
New York, NY 10007
(212) 791-3919
tonyricco@aol.com

Alexandra Shapiro
Shapiro Arato Bach LLP
1140 Avenue of the Americas, 17th Fl.
New York, NY 10036
(212) 257-4881
ashapiro@shapiroarato.com

/s/ Anna Estevao
Anna Estevao
SHER TREMONTE LLP
90 Broad St., 23rd Fl.
New York, NY 10004
(212) 202-2600
aestevao@shertremonte.com

Hon. Arun Subramanian
November 19, 2024
Page 8 of 8

8