UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        -against-

SEAN COMBS,

                Defendant.

24-CR-542 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

    In connection with the Bureau of Prisons' October 28, 2024 to November 1, 2024 sweep of the Metropolitan Detention Center, a BOP investigator (Investigator-1) photographed nineteen pages of Combs's notes and sent them to the Government's filter team. The filter team consists of AUSAs who aren't involved in the investigation or prosecution of this case. The filter team redacted the notes and sent them to the case team. The case team consists of the agents and AUSAs investigating and prosecuting Combs.

    In November, the Government included some of what it received from the filter team in its opposition to Combs's bail application, Dkt. 69, and Combs objected, arguing that those notes contained privileged information and were obtained in violation of Combs's constitutional rights, Dkt. 70. The Court held an emergency hearing at which the Government indicated that it would not rely on the notes in opposing the bail application. *See* Dkt. 88 at 24:13–25:1. The Court ordered the case team to get rid of the notes in its possession, which it did. Dkt. 76.

    Combs has now filed a motion for an evidentiary hearing and other relief, arguing that the seizure of his notes violated the Fourth Amendment, and that the Government intentionally obtained his privileged communications in violation of the Sixth Amendment. Dkts. 97, 98. In response to the motion, the Government argues that there were no violations but also that it won't offer as evidence the notes or any fruits of the notes. Dkt. 117 at 8. In a December 20, 2024 *ex parte* letter (the contents of which were later shared with the defense), the Government outlined certain investigative steps taken upon receiving the notes, but it represented that it "will not offer the evidence obtained pursuant to these investigative steps in the prosecution of the defendant," and that it "intends to produce the evidence [obtained from these steps] to the defendant, to the extent it has not already."

    **I.   Combs's Fourth-Amendment Claim Is Moot**

    The first question is whether Investigator-1 violated Combs's Fourth Amendment rights when he searched Combs's cell and photographed the notes. The usual remedy for a Fourth Amendment violation is the suppression of evidence. *See United States v. Walker*, 965 F.3d 180, 188 (2d Cir. 2020) ("[T]he exclusionary rule—the rule that often requires trial courts to exclude unlawfully

seized evidence in a criminal trial—became the principal judicial remedy to deter Fourth Amendment violations." (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016))); *see also Hudson v. Michigan*, 547 U.S. 586, 590–91 (2006) (describing the ubiquity of the exclusionary rule but cautioning that it should be a "last resort," not a "first impulse"). Here, the Government agrees not to offer the notes, any fruits of the notes, or any evidence derived from any investigation it undertook based on the notes in this case. Of course, if the Government later tries to use evidence it has promised to exclude, then Combs can reprise his objection. But for the time being, the issue is moot. *Gobern v. United States*, 2021 WL 3774293, at *3 (S.D.N.Y. Aug. 25, 2021) (holding that "the Government's decision not to offer challenged evidence warrants the denial of a suppression motion as moot" and collecting cases).

## II.   No Remedy Is Warranted on Combs's Sixth-Amendment Claim

Relief may be warranted under the Sixth Amendment where the government intentionally seeks to obtain a defendant's privileged communications to interfere with the attorney-client relationship. *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985); *Weatherford v. Bursey*, 429 U.S. 545, 554–59 (1977). There are two questions that matter here: Did the Government intentionally invade Combs's relationship with his counsel? If so, has Combs been prejudiced? *See Ginsberg*, 758 F.2d at 833 ("[T]o make out a violation of . . . his [S]ixth [A]mendment rights, [the defendant] would need 'to establish that privileged information [was] passed to the [G]overnment or that the [G]overnment . . . intentionally invaded the attorney client relationship, and resulting prejudice.'" (fifth alteration in original) (quoting *United States v. Dien*, 609 F.2d 1038, 1043 (2d Cir. 1979))). Under the circumstances here, assuming without concluding that a portion of the unredacted notes was privileged, there are no grounds for relief.

### A.   The Government Did Not Intentionally Invade Combs's Privilege

There are numerous indications that the Government did not intentionally invade Combs's privilege. First, it is undisputed that the photographed notepads were separate and apart from a manila folder that was clearly marked "Legal." Investigator-1 didn't search that folder. While Combs initially told the Court that the photographed notepads were marked "Legal" as well, the defense retreated from this position when confusion developed over when the handwritten "Legal" labels had been added to the notepads. Second, Investigator-1 sent the photographs he took to the filter team (not the case team) to review for any privileged information. It may be that the filter team's privilege determinations were inaccurate, but nothing indicates any intent to intrude on Combs's privilege. Third, the Court notes the high-level and generic nature of the notes, and the fact that case-related commentary from Combs was often mixed in with clearly unprivileged information, like reminders about a family member's birthday and inspirational mantras. *See* Dkt. 72-1. Without the context later furnished by defense counsel's *ex parte* declaration, which explains how specific notes relate to defense strategy, and given the circumstances in which Investigator-1 discovered the notepad separate from Combs's "Legal" folder, there is no basis to infer an intentional intrusion into Combs's privilege. Finally, the Government promptly turned the photographs over to Combs, which further weighs against any inference of intentional

malfeasance. This episode illustrates why the filter team should communicate with the defense before giving Combs's case-related materials to the case team, but it does not bear the hallmarks of intentional intrusion or conduct that is "manifestly and avowedly corrupt." *United States v. Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991) (quoting *United States v. Gartner*, 518 F.2d 633, 637 (2d Cir. 1975)).

Combs further argues that even beyond the photographed notes, Investigator-1 has been "an agent of the [case] team," Dkt. 135 at 1, "feeding . . . jail communications to the prosecutors," Dkt. 120 at 1, and "an informant in the defense camp." Dkt. 98 at 10 (quoting *Weatherford*, 429 U.S. at 554 n.4). The Court ordered both the case team and Investigator-1 to furnish sworn affidavits explaining the chain of events surrounding the MDC sweep and ordered the production of all written communications between the case team and Investigator-1 for *in camera* review. Dkt. 123. A careful review of these documents confirms that there has been no intentional interference with Combs's attorney-client relationship. Affidavits by Christy Slavik, a prosecutor on the case team, and Investigator-1 give consistent narratives: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The case team then made requests for information about the communications through the proper channels, including grand jury subpoenas. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1] The BOP's Pretrial Detention Legal Access Handbook clearly states of calls to attorneys on the non-attorney phone line: "**[T]he call will not be confidential.** It will be recorded. These recordings can be listened to and shared with others in law enforcement, including the prosecutor in your criminal case." Fed. Bureau of Prisons, *Pretrial Detention Legal Access Handbook* 10, https://www.bop.gov/inmates/docs/pretrial_legal_access/pretrial_detention_legal_access_handbook_ENG.pdf. Instead, pretrial detainees are instructed to "request that [their] Unit Team set up an unmonitored call" if they wish to speak with counsel. *Id.* This is true in special housing units as well. *Id.* at 21. The Attorney Guide to the Metropolitan Detention Center similarly informs attorneys that inmates are aware that all calls on the main line are monitored and warns: "Inmates may place attorneys on their approved telephone list. However, all calls made on the [main] phone, including calls placed to an attorney, are recorded and subject to monitoring. Therefore, **inmates seeking attorney-client privileged calls must request an unmonitored telephone call**." Fed. Bureau of Prisons, *Attorney Guide to the Metropolitan Detention Center* 19–20 (2024), https://www2.fed.bop.gov/locations/institutions/bro/bro-attorney-guide.pdf?v=1.0.0 (emphasis added).

Two supervisors at the U.S. Attorney's Office were aware that the BOP planned to search Combs's unit during the security-motivated sweep, and they supported searching this unit despite delays in searching other units. Dkt. 131-1 ¶¶ 11–14. Slavik's affidavit indicates that there was no direction from any SDNY personnel that Combs be under special scrutiny during the sweep of his unit. And no one at the U.S. Attorney's Office, including the case team, knew that Investigator-1 was part of the MDC sweep until after it was over. *Id*. ¶ 12. The case team was informed of Investigator-1's role following the sweep and promptly asked for the photographed notes to be sent to the filter team. *See id*. ¶¶ 16–17. Written communications between the case team and Investigator-1, which the Court reviewed *in camera*, tell the same story.[2]

Far from an intentional, prosecution-driven invasion into Combs's relationship with his attorneys, the record shows that Investigator-1 was doing his job as a BOP intelligence analyst and followed the established channels for reporting communications that pose safety concerns. The case team was informed of these communications when appropriate and similarly followed the established channels for obtaining information and protecting Combs's privilege. Care was taken to shield Combs's communications with his attorneys from the case team. None of this suggests that Investigator-1 deliberately set out to (or was instructed to) invade Combs's attorney-client relationship and impede his defense.

### B. Combs Fails to Show Prejudice

Even if there was an intentional intrusion into Combs's attorney-client relationship (and there was not), a remedy is appropriate only if Combs is prejudiced by the intrusion. *See Schwimmer*, 924 F.2d at 447 ("[U]nless the conduct of the Government has been manifestly and avowedly corrupt, a defendant must show prejudice to his case resulting from the intentional invasion of the attorney-client privilege." (cleaned up)). The question is whether the potential intrusions into Combs's privilege "have produced, directly or indirectly, any of the evidence [to be] offered at trial." *Weatherford*, 429 U.S. at 552; *see also Saeli v. Chautauqua County*, 2024 WL 5001625, at *3 n.2 (2d Cir. Dec. 6, 2024) (observing that some circuits apply *Weatherford* in cases "involv[ing] 'jailhouse monitoring and document interception'" (citation omitted)). As discussed above, the Government has already stated that it won't offer as evidence the notes, any fruits of the notes, or any evidence derived from any investigation it undertook based on the notes. The Government also submitted an *ex parte* letter to the Court explaining what investigative steps it took, the results of which will not be used at trial, and it provided the defense with the information in the letter. Dkt. 137. The Court and the defense both now have the necessary information to flag suspect

---

[2] To the extent Combs argues that the supervisors' communications suggest that the inclusion of his unit in the search was an effort to obtain evidence against him, that would go to a potential Fourth Amendment claim. *See United States v. Cohen*, 796 F.2d 20, 24 (2d Cir. 1986) (potential Fourth Amendment claim where "search was initiated by the prosecution solely to obtain information for a superseding indictment"). The record doesn't support such a motive, but in any event, the Government has foregone any reliance on what was seized or its fruits, mooting the Fourth Amendment issue. As for the Sixth Amendment, the record shows that whatever the justification for the search, efforts were made to protect Combs's privilege, undermining any claim of an intentional interference.

evidence if the Government later attempts to use it against Combs at trial. However, at this point in the case, the "wholly conjectural" connections that Combs draws between privileged information and the Government's case—including general allegations of taint unconnected to any specific evidence to be presented at trial—are insufficient for a finding of prejudice. *Schwimmer*, 924 F.2d at 446 (quoting *United States v. Mariani*, 851 F.2d 595, 601 (2d Cir. 1988)); *see also United States v. Landji*, 2021 WL 5402288, at *27 (S.D.N.Y. Nov. 18, 2021) (summarizing Second Circuit caselaw and concluding that "this Circuit has not endorsed the taint theory . . . that the Government's thought process or questioning of witnesses may have been influenced by its access to Defendants' Documents. . . . [S]uch non-evidentiary, tangential use of Defendants' privileged material would not constitute a *Kastigar* violation" (cleaned up)).

### III.   No Hearing Is Warranted

#### A. No Hearing Is Needed to Further Investigate the Government's Alleged Misconduct

Combs argues that "[a] hearing is required to find out what really happened [with Investigator-1] and why," as "[t]he Court should not just accept the [G]overnment's say-so." Dkt. 98 at 14. At such a hearing, Combs suggests, the Court should "order the [G]overnment to produce Investigator-1's communications with the prosecutors" and "take his testimony to fully understand what he was thinking during the search" and to answer other questions, including who Investigator-1 sent the photos to and "what exactly the prosecutors knew before requesting copies of the notes." *Id.* at 15.

The Court already issued an order requiring such evidence and sworn statements to be furnished, and an evidentiary hearing on potential government misconduct is unnecessary when "the district court ha[s] a sufficient record on which to make its rulings." *United States v. Walters*, 910 F.3d 11, 28 (2d Cir. 2018). In *Walters*, a hearing was denied where the Government provided the district court with a detailed narrative based on internal interviews and a review of internal documents, and the defendant was able to respond to the Government's narrative. *Id.* at 28–29; *see also id.* at 29 ("'[T]he key determinant' in whether a hearing is required 'is whether . . . the parties had a fair opportunity to present relevant facts . . . and . . . counter the opponent's submissions.'" (citation omitted)). Here, the Government provided a lengthy affidavit by a member of the case team based on her "review of relevant communications and [her] conversations with other members of the [case] [t]eam and supervisors from the [U.S. Attorney's Office]." Dkt. 131-1 ¶ 2. Investigator-1 also submitted an affidavit. Dkt. 131-2. Together, these documents presented a clear factual narrative, which Combs then had the opportunity to respond to. Dkt. 135. The Court also had the benefit of *in camera* review of the Government's communications with Investigator-1. With such an "extensive" "paper record" to rule on, no live hearing is needed. *See Walters*, 910 F.3d at 28–29 (citation omitted).

### B. No Hearing Is Needed to Test the Government's Evidence for Taint

Combs also argues that an evidentiary hearing is necessary to determine whether any of the Government's evidence is derived from the notes. A hearing could uncover "the extent to which the [case] team used the privileged notes to develop leads or uncover new evidence" or whether other information from Investigator-1 "led the [case] team to develop new leads or gather new evidence," Combs claims. Dkt. 98 at 17. This is essentially a request for a *Kastigar* hearing in which the Government would be required to "demonstrate that the evidence it uses to prosecute an individual was derived from legitimate, independent sources." *Schwimmer*, 924 F.2d at 446; *see also Kastigar v. United States*, 406 U.S. 441, 461–62 (1972).

"[T]here is no binding Second Circuit authority on the question of whether a *Kastigar* hearing is required" when a defendant alleges an "intrusion upon the attorney-client privilege by the [G]overnment." *United States v. Tournant*, 2023 WL 5276776, at *17 (S.D.N.Y. Aug. 15, 2023). Combs relies on *United States v. Schwimmer*, where the Second Circuit remanded for a hearing to determine whether "information *derived* from [allegedly privileged] sources was used by the [G]overnment, in violation of the attorney-client privilege, to prepare for trial" even though the Government didn't use the documents directly as evidence. 892 F.2d 237, 244–45 (2d Cir. 1989). Regardless of whether a *Kastigar* hearing is an appropriate remedy in cases where attorney-client privilege is allegedly intruded upon, a defendant "ha[s] the burden of showing a 'factual relationship' between the privileged information and the prosecution" before they are entitled to the hearing. *United States v. Sharma*, 2019 WL 3802223, at *5 (S.D.N.Y. Aug. 13, 2019) (quoting *United States v. Blau*, 159 F.3d 68, 72 (2d Cir. 1998)); *see also United States v. Connolly*, 2019 WL 2120523, at *19 (S.D.N.Y. May 2, 2019) ("A defendant who seeks *Kastigar* relief must first articulate the purported violation with enough specificity to permit the Government to respond."). Combs doesn't come close to making such a showing, particularly now that the Government has disavowed use of the notes or evidence derived from them. "[A]n insubstantial and speculative possibility of taint," which is all that Combs can assert at this point, "does not trigger *Kastigar*." *Connolly*, 2019 WL 2120523, at *19 (alteration in original) (citation omitted). This failure to make the required showing is "sufficient to end the inquiry and avoid the necessity of a *Kastigar* hearing." *Blau*, 159 F.3d at 72. So "[e]ven if the Second Circuit had firmly recognized the right to a *Kastigar* hearing in such cases [involving claimed intrusions into attorney-client privilege]," Combs is not "entitled to one here because he has not made a threshold showing that the [G]overnment's evidence is tainted." *Tournant*, 2023 WL 5276776, at *18.

The generic nature of the notes makes it unlikely that any improper use of the information has or could be made. They give Combs's general thoughts on how to approach certain issues, none of which would come as a surprise. However, if a question arises closer to trial as to the use of suspect evidence and Combs can make a "threshold showing that the . . . evidence is tainted," then Combs can bring it to the Court's attention. *Id*. Until then, the Government is cautioned to be mindful of Combs's privilege and the need to abide by filter-team processes. While there is currently no demonstrated need for a special master, the Court recommends that the filter team clear potentially privileged documents with the defense before turning them over to the case team.

The Clerk of Court is directed to terminate Dkt. 97.

SO ORDERED.

Dated: February 12, 2025
New York, New York

                                                  ARUN SUBRAMANIAN
                                                  United States District Judge