P4ELComA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          24 Cr. 542 (AS)

SEAN COMBS,

    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

            Defendant.
                                        Arraignment
------------------------------x

                                        New York, N.Y.
                                        April 14, 2025
                                        2:00 p.m.

Before:

                    HON. ARUN SUBRAMANIAN,

                                        District Judge

                        APPEARANCES

MATTHEW PODOLSKY
      Acting United States Attorney for the
      Southern District of New York
BY:   EMILY JOHNSON
      CHRISTINE SLAVIK
      MADISON SMYSER
      MAURENE COMEY
      MEREDITH FOSTER
      Assistant United States Attorneys

AGNIFILO INTRATER LLP
      Attorneys for Defendant
BY:   MARC AGNIFILO
      TENY GERAGOS

Also Present: Sean Quinn, Homeland Security Investigations

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

P4ELComA

(Case called)

MS. SLAVIK:  Good afternoon, your Honor.  Christy Slavik, Emily Johnson, Madison Smyser, Meredith Foster, Maurene Comey for the United States.  We are joined at counsel table by Special Agent Sean Quinn of Homeland Security Investigations.

THE COURT:  All right.  Good afternoon.

MR. AGNIFILO:  Good afternoon, your Honor.  Marc Agnifilo, Teny Geragos with Mr. Combs here today.  Good afternoon, your Honor.

THE COURT:  Good afternoon.  And good afternoon to you, Mr. Combs.

THE DEFENDANT:  Thank you.

THE COURT:  All right.  Mr. Agnifilo, is your client prepared to be arraigned on the April 3 indictment?

MR. AGNIFILO:  Yes, your Honor.

THE COURT:  All right.  Mr. Combs, have you seen a copy of the indictment?  It's dated April 3, 2025.

THE DEFENDANT:  Yes, I have, Judge.

THE COURT:  Have you discussed it with Mr. Agnifilo?

THE DEFENDANT:  Yes, I have, Judge.

THE COURT:  Would you like me to read it or summarize it for you?

THE DEFENDANT:  No.  I am OK, Judge.

THE COURT:  So you waive its public reading?

THE DEFENDANT:  Yes, Judge.

P4ELComA

THE COURT:  Do you understand the charges in the indictment?

THE DEFENDANT:  Yes, I do.

THE COURT:  How do you plead to the charges in the indictment?

THE DEFENDANT:  Not guilty.

THE COURT:  All right.  The plea of not guilty will be accepted and entered into the court record.  Thank you, Mr. Combs.

All right.  So now the question is, what can we productively do while we are here?

Maybe, Mr. Agnifilo, you can fill me in on the discussions the parties had over the weekend that led us to being here today, if there is anything to discuss along those lines.

MR. AGNIFILO:  Yes.  I am happy to start.  I am going to turn the floor over to Ms. Geragos, who is more in the weeds on the discovery issue.

We talk with the government on a very regular basis, often more than once a day, and we spoke over the weekend.  And the first issue is that I raised the prospect that the arraignment that we just had has a very substantial new count in it, Count Four, based on conduct that was not charged in any of the prior indictments.  And what I said to my colleagues in the government is, I am not looking to stand on ceremony, but

P4ELComA

when there is a substantial new indictment -- any superseding indictment does not trigger this, but when there is something in a superseding indictment that's substantial enough, there is a requirement to have the trial within 30 days of the defendant's appearance on that.  We would have to, basically, sign something in writing.  But that wasn't really the point of the conversation, although I raised that legal issue with the government.

The point of the conversation relates more to the state of discovery at this point.  The government has been turning over a great amount of discovery, and they have been continuing to do it.  And for the most part, I don't have any issue with the way they have gone about it, but there are a couple of issues of concern.  And what I raised with the government is, to make sure that we don't have issues during the trial, to discuss the possibility of a very short, very short, like, two weeks, you know, something like that, as -- before we start the openings.

Now, one thing I am mindful of -- and I don't know where the Court is in this process, but it may very well be the case that the Court has sent out many, many hundreds of jury summonses for jurors, and I don't want to disrupt that process, and I don't ask to disrupt that process.  So the question was more related to, A, what can we do to solve some of these discovery issues?  And, quite frankly, since between Saturday

P4ELComA

and today we solved some of them.  What ones are outstanding? In regards to the ones that are outstanding, are these of a nature that it might make sense to a very -- by a matter of two weeks, you know, delay the opening or not?

And so one of the issues that we are still running down I know Ms. Geragos is more prepared to talk to the Court about, and so unless the Court has any questions for me, I would turn the floor over to my colleague.

THE COURT:  To be clear, you are not asking for anything right now; is that right?

MR. AGNIFILO:  Yeah, I think that's right.  I think that's right.  So let's do this:  It probably makes sense to get into the substance and then circle back to what ask is a reasonable ask.

THE COURT:  All right.  That's fair.

Ms. Geragos.

MS. GERAGOS:  Thank you, your Honor.  I note that I filed our letter under seal with the Court, really, because the majority of what I am talking about is marked as "Attorney's Eyes Only," and I really do not want to run afoul of the protective order in any way.

But the problem as we see it relates to -- and as Mr. Agnifilo stated, let me just back up a little bit.  There were, kind of, two discovery issues that we had identified, one relating to discovery with respect to alleged Victim-2 in the

P4ELComA

third superseding indictment, and I think that we have discussed that with our colleagues with the government.  They have -- they have disclosed to us they have finished searching all materials related to her and have handed over *Brady* related to her and all Rule 16 in its possession.  So we no longer have the issue that we were going to bring to the Court's attention related to that.  I just wanted to put that on the record because they have made that representation to us.

The second issue relates to the alleged Victim-4 in the indictment, which is the victim of the Racketeering Act forced labor predicate in the RICO charge.  She is, to set the stage for the Court, an extremely important witness for both the government and the defense.  She's not only the alleged victim of the forced labor predicate, but she kind of sets the stage, I think, for the government in terms of explaining the enterprise, explaining the racketeering acts, and was present for the majority of the charged conspiracy in this case.  She was employed there for a significant amount of time.  I don't want to put the dates on the record, for obvious reasons.

And so she is a very important witness for them, and she has been, small C, cooperating with the government, not a cooperation agreement, but working with them since the very beginning of their investigation.  And the conduct that she's discussing -- and she's been, kind of, rolling discovery out to the government since the very beginning.  We are very concerned

P4ELComA

based on our review of 3500.  And the reason I am bringing this to the Court's attention now is it's actually taken me quite a bit of time to wrap my arms around the issues, but it seems to us that the government is aware of a tremendous amount of relevant materials in her possession that they allow her to speak about and opine about and take screen shots of, and provide to them, but they are not -- they have purposely not taken possession of these items that are in her possession. And these are very important materials to both the government and the defense, and we contend that it's likely -- that there's likely *Brady* in her materials, and that they are not getting it for a specific purpose.

She is a witness who's cherry-picked materials for the government before, and that's the subject of one of our supplemental letters to the Court for the motion to suppress. She has screen-shotted messages before to them, and they used those screen-shotted messages as a basis for their warrant affidavits for the obstruction of justice part of their affidavits.  And we brought that to your Honor's attention because she, of course, left out important materials in these screen shots that would provide context as to why our client or his alleged coconspirators were not obstructing justice.  So this is somebody who has been allowed from the beginning of the investigation to cherry-pick messages, and we are seeing that she's, kind of, doing so here, and the government is allowing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P4ELComA

it.

Our problem that we are, you know -- wrapped our hands around, I think today, although I am not sure I have even gotten to the bottom of it, and I think the government and us are going to work together in order to do so, is that there's over 100,000 potentially relevant e-mails, chats, communications in her possession that the government is not asking for, not taking possession of, that are critical.  And these are personal e-mails of hers, personal communications of hers, and it's troubling to us.

What adds to the troubling nature of this is that we -- as the Court knows, Combs Global was subpoenaed back when the search warrants were first executed on Mr. Combs's residences and his person back in March of 2024.  We have been discussing with the government that we don't have this individual's -- the company didn't retain her e-mail account.  And so they know we don't have her company e-mails, the majority of her company e-mails -- ones where she is the custodian, I should say.  And then they have not taken e-mails of hers that are in her possession that she still has.  And she is an important witness, and we are kind of left here without very important materials three weeks before trial.

And so I think what the request will be of your Honor that I set forth in the letter is either an order to the government asking for them to take possession of these

P4ELComA

materials and produce them to us, or we will ask this Court to sign a Rule 17 subpoena for us. The problem that we are in is that every time we then do that for one of the alleged victims here, the government then moves to quash. And so they are kind of putting us in an untenable position for someone who is really a critical witness in this case. She is not just the witness, as I said, in the forced labor predicate. She is not there just to talk about the forced labor predicate.

The government is going to use her, and I think going to use her as a very early witness, to set the stage of the whole RICO. And that's somebody that we should have all of her personal e-mails related to this. And they are just letting her pick and choose what to give to the government. And it's actually been a problem before. It was a problem in the search warrant affidavits. That's why we put in a supplemental letter.

So we understand that our ask is something that's unusual, which is asking the Court to order the government to turn this over to us or to get it from her and then turn it over to us. But we think here, when she's been allowed in the past to cherry-pick messages, and then when she's been allowed to just turn over what she feels like turning over, here, it's actually a due process issue for our client, especially because her testimony is going to be important for the RICO, but also important to corroborate Victim-1's testimony and several other

P4ELComA

expected witnesses at this trial.

We just got -- for example, your Honor, and then I will stop, but we just got some WhatsApp chats that she had decided that she would turn over to the government last week; three screen shots related to what I would say probably will be a very important incident that several witnesses will talk about at this trial. And it looks like she created those WhatsApp chats during the course of the government's investigation, but now the government has said that she no longer has the full WhatsApp chats. So now we are left with a situation where she was allowed to screen shot certain messages, not produce over the entire WhatsApp chat, and we are left with very important text messages that we don't have the full context of.

So this is really the problem. We are trying to wrap our arms around it. We have been in constant communication with the government about this. They are producing material to us, to their great credit, as fast as possible, and we really appreciate that, but I think it really puts the defense in an untenable position here.

THE COURT: OK. Understood. You said it was an unusual request. The government says it is an unprecedented request. So do you have a case that you can cite to me? Because the government's letter that they put in right before this hearing points to several cases indicating that unless the

P4ELComA

government is actually in possession of the information, then there's simply no relief that could be had vis-a-vis the government. Now, that leaves Rule 17, of course. But do you have a case or authority you would like me to look at?

MS. GERAGOS: I want to distinguish *Avenatti*, which I think is their main case that they cite to. There, it actually also centers around WhatsApp chats. Judge Furman actually said here, there is no harm to the defendant because the defendant is actually in possession of the WhatsApp chats through his own iCloud account.

That's different here. As the government knows, we don't have possession -- we likely do not have possession of these 100,000 e-mails, because I have searched our files extensively, which is why it's taken me, you know, over a week to kind of get to the bottom of this.

And so, no. While I will say I could rely on *Kyles v. Whitley*, that the government has a duty to learn of any favorable evidence known to anybody, I don't have binding precedent for this Court to order the government to do so, which is why I am bringing this to your Honor's attention now, to say we may bring a Rule 17 subpoena and ask your Honor to sign it related to this material.

THE COURT: OK. And I read *Avenatti*, and it is true that Judge Furman noted that the defendant would have been in possession of those chats, but that's not the basis for

Judge Furman's decision.  He exhaustively cites to authorities noting that there simply is not an obligation to turn over materials under Rule 16 that the government is not actually in possession of.  And then he adds to that and says, well, there's no harm in addition to that.

And so I hear you that he does point to the fact that the defendant would be in possession of those communications, but that was one among other things that Judge Furman relied on.

MS. GERAGOS:  That's right, but I think that's a huge point.  The defendant himself was in possession of these messages, so what's the harm?  Courts are always looking for the harm to the defendant.  And here, where the harm is a very important witness who doesn't have this very important material, and the government is purposely not taking possession of it, the harm is really great.  The harm is very great to Mr. Combs.

THE COURT:  And your point is that -- let's assume for the moment that that would not be enough to require production or action on behalf of the government.  But I take it that it's your position that that would be a factor to consider when weighing the Nixon factors in evaluating the propriety of a Rule 17 subpoena.  Meaning, what you are concerned about is that you are being caught between a rock and a hard place.  You can't get the documents from the government because they chose

P4ELComA

not to take them, and then when you try to go get them from the source, the government is going to come in and say, well, you haven't made the required showing.  So they gotta allow you to get these documents one way or the other, is your point.

MS. GERAGOS:  That's right, your Honor.  You said it much better than I could have.

THE COURT:  Understood.

MR. AGNIFILO:  One thing.  When we started, I figured we might land on the Rule 17 area.  But the one thing I want to add to the analysis is the government talks about possession and custody, but Rule 16 talks about possession, custody, or control.  And the question that I don't think we have enough facts on is even though -- essentially, the government controlled this situation enough to make sure that it didn't take possession of these materials.  And so I don't know, as your Honor is going through this analytically, if possession is the whole ball game because if at the end of the day, if the totality of the circumstances are such that the government has control, and exercised that control by saying, Hey, we only want possession of these four things, not anything else, I am not sure we are so clearly outside the realm of Rule 16.

What works against us, quite frankly, on a practical level is it's an odd thing for the Court to make the government go out and do something affirmative.  But I think because of the fact that Rule 16 talks about control, I think the

P4ELComA

government is much closer than it's leading the Court to believe in this being an unprecedented situation.

That being said, I am not surprised that your Honor is looking at Rule 17 as, maybe, the more viable option.

THE COURT:  All right.  Thank you.

Ms. Slavik.

MS. SLAVIK:  Yes, your Honor.  I just want to start by providing you with a little bit more context about the background of why we are here today instead of the arraignment that had been scheduled for the end of the week.

On Saturday, obviously, the government requested the Court to arraign the defendant on the S3 indictment.  We made that request because on Saturday, the government learned that the defense was contemplating seeking an adjournment of the trial pursuant to the Speedy Trial Act because, according to the defendant, he would be entitled to an adjournment if he wasn't arraigned on the superseding indictment within 30 days of the trial.

After our conversation, the government pointed out to the defendant that the Speedy Trial Act offers no such relief. While it's true that the Speedy Trial Act does say that a trial shall not commence less than 30 days from the date on which the defendant first appears, Supreme Court precedent makes very clear that the 30-day period is not reset by a superseding indictment.  That's the *Rojas-Contreras* case.  And that's

P4ELComA

particularly true when the conduct in the superseding indictment is encompassed by a previous charging instrument, which is very much the case here.  This is not new conduct.  The conduct that forms the basis of Count Four was previously in the Count One racketeering conspiracy.  So this is not new conduct that we are talking about here.

At the time that the government spoke with the defense on Saturday, there was no discussion of any sort of discovery issue.  That was raised for the first time on Sunday.  And the defense has since advised the government, has informed the Court today, that they will seek a brief adjournment on the basis of this, what they describe as a discovery issue.

So let me address the discovery issue that the defense raised with the Court.

THE COURT:  Would the government object to an adjournment on those grounds?

MS. SLAVIK:  Yes, your Honor.  I will get into the reasons why.

THE COURT:  OK.

MS. SLAVIK:  So let me just first start by framing the discovery issue.  And before I get into the Victim-4 e-mails, I just want to make clear that we discussed with defense and confirmed with the defense that we completed our review of Victim-2's iCloud pursuant to a warrant.  So to the extent that was an open issue with the defense, the government has

P4ELComA

represented that its review of Victim-2's iCloud pursuant to a warrant is complete.

But getting into the Victim-4 issue, about a month ago, the government learned about a significant number of personal e-mails in Victim-4's possession related to her employment with the defendant. The witness did some key word searches and described to the government at a very high level what these communications were; for instance, you know, e-mails to the defendant, e-mails to other individuals.

I want to note here that these e-mails include several thousand e-mails to the defendant, so it would seem that the defense would have the other side of all of these e-mails. There are e-mails from Victim-4's personal account to the defendant. I don't know why the defense would not have access to the other side of those e-mails, just as a point.

After the government received this high-level description and the volume of these e-mails from Victim-4, the government asked her to produce certain of those communications that the government felt were particularly relevant to this case. The government has produced communications received from this witness and will continue to produce communications that it receives from this witness in the future, whenever we do come into possession of those communications.

But I want to make clear that the government is not in possession of the entire contents of the witness's e-mails, and

P4ELComA

the government is not in control of those e-mails.  There is no basis to suggest that the government controls the communications of its witnesses.  That's true of even cooperating witnesses who sign a contract with the government.  There is no basis to suggest that the government has control over these e-mails.

THE COURT:  Is there a law addressing that issue and concluding that even if the government could snap its fingers and get documents from a witness in these circumstances there is, nevertheless, no control?

MS. SLAVIK:  Yes, your Honor, and we are happy to provide that sort of law following this conference.

THE COURT:  All right.

MS. SLAVIK:  But I think what your Honor pointed out earlier is that Rule 16 is very clear that the government's discovery and disclosure obligations only extend to what it has in its possession.  The government has no obligation under *Brady* or any other authority to search for material that's not within its possession or control.

And the authority standing for that proposition is set out in the government's letter that was submitted right before this conference.

THE COURT:  What were the key words that you asked this witness to search, I mean, just generally?  I don't need to know exactly what they were.

P4ELComA

MS. SLAVIK:  I apologize.  I should make very clear that the victim's attorneys searched for -- searched the contents of these e-mails.  It was not the victim herself.

THE COURT:  Sure.

MS. SLAVIK:  But I believe the -- there were key terms, including the defendant's name, as well as a particular victim's name, and a smattering of potentially relevant terms as well.

THE COURT:  And so the witness is represented by counsel, correct?

MS. SLAVIK:  That's right.

THE COURT:  All right.  And you understand what the defense is saying here; that the government had the attorneys run these search terms and, for whatever reason, didn't just ask for whatever turned up to be turned over to the government.  You may have had a reason for that.  It might just be for efficiency sake.  But from the defense's perspective, they see the government as purposefully blocking inquiries into categories of documents, and they don't know what the back and forth was between you and the attorneys, necessarily, and so they are suspicious.  And so they say, Under these circumstances, if we are thinking about things from a functional, pragmatic perspective, why don't we just have these documents turned over so that we don't have an issue?

It may be correct that I cannot compel the government

P4ELComA

to do that under Rule 16, but the government might think that in its discretion, it might be preferable to have those documents turned over to the defense.  Maybe in your discussions with the attorneys, there's nothing there there.  And so having those documents immediately turned over would obviate a potential defense request for an adjournment, which you already indicated you would object to.

The alternative is that the defense is going to seek a Rule 17 subpoena.  That's going to go out to the attorneys.  Then you are going to move to quash.  Then we will have to deal with that.  And then if some balance of those documents need to be turned over weeks from now, then you may find yourself in a situation where the defense says, Well, now we need an adjournment because we need to look at whatever is going to be produced.

Do you understand what I am saying?

MS. SLAVIK:  I do, your Honor.  I think the reason for the government not making a request for the full contents of the e-mail, as you point out, there are efficiency and resource constraints.  The volume of e-mails that we are talking about is significant, and the -- at the defendant's insistence, the trial has been scheduled for May 12.  That's a very short time frame from arraignment on the initial indictment to trial.  And the government has expended significant resources in meeting its obligations to produce discovery and to abide by the other

P4ELComA

scheduling set by the Court, which I note it has.  So there are efficiency reasons for not getting the full volume of the e-mails, and those e-mails would take time to review.

THE COURT:  Right.  But I just want to make sure we don't lose sight of the practical issue, which is that under normal circumstances, you might hang your hat on Rule 16 and what it either requires or doesn't require.  I am saying that in this situation, the defense has raised a timing issue, and one that the government is going to oppose.

And so I guess I am just asking you a practical question.  What's the issue in just saying, All right, remember when we gave you those search terms?  Could you just give us that drive or a thumb drive with those documents?  And we are going to make them available to the defense, or you make them available to the defense, and we will get a copy.  You know, the kind of normal stuff that you might think of as often done outside of the rules, but to merely facilitate the case moving forward.

MS. SLAVIK:  So I understand the practical concerns, and let me push back with a few practical concerns from the government's perspective.

THE COURT:  Sure.

MS. SLAVIK:  First, like I said, this is a significant volume of e-mails.  Because they are e-mails related to Victim-4's employment with the defendant, those e-mails would

likely have to go through a privilege review, which has been our protocol, as your Honor knows, throughout the case.  So that would take time.

Furthermore, the two-week adjournment proposed by the defense, it's just not clear to me how in practice that would help them review some 200,000 e-mails, which is, my understanding is, that is what they request.

Now, I will say that the defense has not pointed to specific documents that they believe that they are entitled to. My understanding of their request is that they are requesting all 200,000 e-mails.  If they have specific e-mails and documents that they think that they are entitled to pursuant to Rule 17, I think that's something that we could confer about, but I don't think that Rule 17 stands for the proposition that they are entitled to these hundreds of thousands of e-mails.  I think that's exactly the sort of fishing expedition that is prohibited under Rule 17 subpoenas.

And, you know, I also just want to note that this concept of an adjournment, a two-week adjournment, you know, I think over the weekend it was on the basis of the Speedy Trial Act.  Now it's on the basis of this discovery request.  I think this evolving concept or basis for an adjournment, I think that gets at the gamesmanship that's going on here, and one of the reasons that the government opposes the defense's request.

I am happy to get into the reasons that the government

P4ELComA

would oppose such an adjournment request, if the Court would --

THE COURT:  No.  No application has been made at this time as to that.

MS. SLAVIK:  I think with respect to whether an application has been made or not, I will note for the Court that there are many pretrial deadlines that are upcoming.  The defense has already received the government's enterprise letters, which set forth the proof that the government -- government expects to present at trial.  Defense has had 3500 material for several weeks.  So I think to the extent there is contemplation of an adjournment, I think the government is prejudiced by not having that on the record as quickly as possible.

THE COURT:  All right.  So I am translating for you. Would it be fair to say that if the defense is contemplating an adjournment, put aside the reasons why, but if they are thinking about doing it, they need to make an application prior to this Friday's conference, which we had previously scheduled? Is that fair?

MS. SLAVIK:  Your Honor, I would push for even sooner. Under the Court's schedule, exhibits were initially due today, exhibits and witness lists.  Through conferring with the defense, that deadline has been pushed to Wednesday.  But the government would be disinclined to produce those items if there is an application for an adjournment.

P4ELComA

THE COURT:  OK.  Mr. Agnifilo or Ms. Geragos, you have heard the message.  Let me just tell you what we are going to do here, and then we can take it from there.

First thing, if you want to seek these documents through a Rule 17 subpoena, you should do so.

MS. GERAGOS:  OK.

THE COURT:  However, I think you should be mindful of what Ms. Slavik is saying, which is that a broad-based request for hundreds of thousands of documents will pose some issues from a logistical perspective, putting aside the requirements of Nixon.  So if you can be rifle-shot about what you are asking for and point to specific items of relevance that you believe exist and have not been turned over and are not in Mr. Combs's possession, you should do that.

One, it might help you in terms of getting those materials; two, you might be able to confer with the government, who might be able -- said it here today on the record, that they will confer with you to see if they can assist in any way in getting you access to some of those materials.  So that's what you should do just as an initial matter.

If you have authorities that would suggest that control in this context is broad enough to encompass this situation where you have a, small C, cooperating witness, who has documents, but has selectively turned over documents to the

P4ELComA

government, then you should let me know what authorities you have, and I will take a look at them for sure.

MS. GERAGOS:  Thank you, your Honor.

THE COURT:  So I think that's the way to handle that.

In terms of any potential request for an adjournment, I agree, we are a freight train moving towards trial, and so if you are really thinking about an adjournment, then you need to make that application within the next 48 hours.

MS. GERAGOS:  OK.  We understand.

THE COURT:  All right.

MS. GERAGOS:  Thank you.

THE COURT:  And Ms. Slavik, maybe you can help me out. On the subpoena -- one of the things at issue is we have these motions to quash with respect to the two pending subpoenas as to Individuals A and B, as identified in the Warner Brothers subpoena.

Are those individuals going to be on your witness list?

MS. SLAVIK:  At least one of those individuals will be, yes, your Honor.

THE COURT:  All right.  Any further issues to address with respect to the discovery issue, Ms. Slavik?

MS. SLAVIK:  Not on the discovery issue, your Honor.

THE COURT:  Ms. Geragos?

MS. GERAGOS:  Not on the discovery issue.

P4ELComA

THE COURT:  OK.  So I know we are going to pick this up on Friday, but I did have a couple of questions on the Rule 404(b), 413 issue.

Ms. Slavik, are you the right person to address some of these things?

MS. SLAVIK:  The answer is maybe.

THE COURT:  OK.

MS. COMEY:  I am happy to try, your Honor.

THE COURT:  Thank you very much.  So here is my just general question:  So we have the initial enterprise letter, right?  And as I understand it, there are -- this isn't technically accurate, but let's say three victims are identified in the initial enterprise letter.  Then we have the 404(b) notice, and you have the list there.  Then you have the subsequent enterprise letter.  I believe it's March 10.  And the addition there is so-called Victim No. 5, right?

MS. COMEY:  Yes, your Honor.

THE COURT:  And then on March 26, you have three additional victims added to that third enterprise letter.

So why did it happen in this way?

MS. COMEY:  So, your Honor, I think, as we note in each enterprise letter, the enterprise letters note that our investigation remains ongoing.  So at the points at which we have developed sufficient evidence to believe that it would be proper to admit that evidence as part of our direct case to

P4ELComA

prove up the racketeering conspiracy, that is the point at which we supplement the enterprise letter.

So at the point when we sent over the earlier enterprise letters, we were not prepared at that point in our ongoing investigation to say that we thought that this evidence would be part of our direct case in proving up the racketeering enterprise and the racketeering conspiracy.

We have endeavored to move as quickly as we can in our investigation. This case has been on a very compressed timeline, as your Honor can tell from the number of superseding indictments, and as the defense knows from the ongoing discovery productions. So given that compressed timeline, we have, as we have developed facts that we believe merit disclosure in an enterprise letter, we have endeavored to produce it as quickly as we can in the form of a supplemental enterprise letter. So that's the answer, your Honor.

THE COURT: All right. But the government was aware of all of these incidents prior to the initial enterprise letter, right?

MS. COMEY: I believe we were aware at least of some of them. I don't know how -- I would really want to check, your Honor. I don't know how thoroughly we had investigated them. I don't know how carefully we had been able to look at the facts. I don't know how deep we had gone in our interviews with these particular victims.

P4ELComA

And so I do think that as we do more investigating, that is the point at which we would add something into an enterprise letter.  So I can't speak specifically to how developed the facts were at the point when we sent over our initial enterprise letter.

THE COURT:  And help me out.  The only reason -- well, let me ask you the reason.

So in the 404(b) notice, there are five additional incidents that are identified.  Why wouldn't those count as direct evidence under the government's theory that, We have this enterprise; we are showing its purposes; we have these predicate acts?  The other incidents fall into this category, but it's not clear to me why all of them wouldn't fit into that category.

MS. COMEY:  Without having prepared for this argument, your Honor --

THE COURT:  You can defer.

MS. COMEY:  I think I know the answer, but I want to qualify it.  Off the top of my head, I believe the ones we did not include pre-dated the start of the conspiracy and the period that we plan to prove up at trial.

THE COURT:  Right.  That's correct, except -- that's correct across the board.

MS. COMEY:  My memory was right.

THE COURT:  That's what I thought the reason was, but

P4ELComA

I didn't want to ask a leading question.

All right.  So I understand that.

Is there someone who might be able to address this on the defense side?

And I am not -- I need to just -- it would be interesting to hear on some of these issues now.  I know we are going to pick it up on Friday.  Ms. Geragos, you are standing up.

MS. GERAGOS:  I think Ms. Shapiro would be upset if I took over this argument.  She is definitely the one to do this. But I want to note for the Court a few things with respect to discovery with respect to Victim-5.

The vast majority of the discovery related to the person I think we are describing -- and the victims' numbers have changed a little bit, but I think the person we are describing is Victim-5.  The vast majority of that discovery, excluding, I think, one very small production of bank records related to her, was produced by the discovery deadline of December 31.  And so the government knew about her, had investigated things related to her pretty early on in their investigation.  So I just wanted to discuss -- I just wanted to raise that point in response to your direct question about that incident.

Again, this is Ms. Shapiro's argument.  I don't --

THE COURT:  No, that's fine.  This is for Friday.

P4ELComA

What would be helpful from your side to understand is the government says as to four of these incidents, they are direct evidence.  And so they say you don't get into any of the inquiry under 413 or 404(b) or even 403, is what they are saying.

And so, putting the timing issue to the side, meaning the timing of the disclosures and the enterprise letters, I want to figure out if you have a reason, an evidentiary reason, why those incidents should be excluded.  Or are you hanging your hat on the timing of this; that it is too late as of March 26 to be telling us what's direct evidence on the RICO charge?  That's just too late?

And you have one case that you cited in your papers, but it's on a slightly different issue.  If you have more cases, that would be helpful too.

MS. GERAGOS:  We will definitely --

THE COURT:  That's from your side.  That would be helpful.

MS. COMEY:  If I may just clarify as to Victim-5. Ms. Geragos is correct about the timing of Rule 16.  I believe the 3500 material would reveal that that particular victim was interviewed multiple times in 2025, I believe much closer to the date of the revision of our enterprise letter.

And so as I mentioned, part of what we do in our ongoing investigation is we collect documents, we review them,

P4ELComA

we understand what the documents show, and then we go and we interview victims and we interview witnesses. So that is what I was talking about when I was describing our ongoing investigation.

THE COURT: All right. I understand. And, you know, what could have happened in an alternative universe is that the government could have sought approval from the Court to amend their enterprise letter, because the enterprise letter deadline was in an order from the Court. So I think one of the things that the defense is saying is that, We were just getting these enterprise letters, updating critical facts about the scope of the RICO charge, not knowing if that was really set in stone so we could prepare for trial. The last and most significant of those updates came March 26, which is nearly -- you know, basically a month before we were going to get started with jury selection.

MS. COMEY: I understand, your Honor. I apologize. I had thought that based on the fact that an enterprise letter is really an idea that is really followed in this district and in the Eastern District, which is the practice is usually to supplement it, I had not appreciated and I don't think our team appreciated that it was something the Court would want us to apply for, and that's our oversight.

I think we noted in our initial letter that our investigation was ongoing, and I think throughout this court

P4ELComA

proceeding and every conference, every letter we sent to the defense, we have made clear that the investigation is ongoing. And so I apologize, we did not realize that the Court would have expected us to apply for an application to -- or for permission to supplement the --

THE COURT: No, that's fine. And for Friday, in terms of things that would be helpful from your perspective, or whoever is going to address this, I think, assuming that we do get into Rule 404(b) as the basis for admission of this evidence, it would be what the dividing line is between intent, which I understand is the primary basis for admission of this evidence, and character evidence that would be outside the bounds of Rule 404(b). And if there are similar cases that address that line, which is a fine line, then that would be helpful to understand.

MS. COMEY: Your Honor, just so I understand the inquiry, what pops into my mind when your Honor asked that question is the concept of a limiting instruction. Is your Honor thinking about something other than using a limiting instruction to make clear to the jury that evidence is only offered for intent and not --

THE COURT: No. I am sure that we will have a lot of instructions of various kinds. Right now I am just trying to figure out if the basis for admission of the evidence is not as direct evidence in the case and, instead, it has to come in

P4ELComA

either through 404(b) or Rule 413, what the grounds are for admission of the evidence.

MS. COMEY:  Understood, your Honor.

THE COURT:  All right.  Ms. Slavik or anyone else on the government side, anything further to address today?

MS. SLAVIK:  Yes, your Honor, just very briefly, and I think the defense joins in these two points.

First, the parties have a letter due to the Court today following up on the conference from Friday.  The parties still have not received the transcript from the Friday conference, and so I think we just ask to adjourn that letter's due date until tomorrow.

THE COURT:  That's fine.

MS. SLAVIK:  OK.  And then just one other thing.  You very helpfully identified a couple of points that you have been thinking about with respect to 404(b), but in preparation for the conference on Friday, if there is any additional guidance that you could give the parties on what you expect to hear argument on, I think that would be very helpful in helping the parties prepare.

THE COURT:  That's fair.  I will put myself on the 48-hour clock for that.

MS. SLAVIK:  Appreciate that, your Honor.

THE COURT:  Mr. Agnifilo, anything further?

MR. AGNIFILO:  I have nothing else.  Thank you for

P4ELComA

your time, Judge.

THE COURT:  Thank you very much.  I really appreciate it.  We will see everyone here Friday.

(Adjourned)