P4IBCOMO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

          v.                       24 Cr. 542 (AS)

SEAN COMBS,

   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

          Defendant.

                              Oral Argument

------------------------------x

                              New York, N.Y.
                              April 18, 2025
                              11:00 p.m.

Before:

                  HON. ARUN SUBRAMANIAN,

                              U.S. District Judge

                      APPEARANCES

MATTHEW PODOLSKY
     United States Attorney for the
     Southern District of New York
BY:  EMILY JOHNSON
     MADISON SMYSER
     MITZI STEINER
     MEREDITH FOSTER
     MAURENE COMEY
     CHRISTY SLAVIK
     Assistant United States Attorneys

P4IBCOMO

APPEARANCES
(continued)


AGNIFILO INTRATER LLP
      Attorneys for Defendant
BY:  MARC AGNIFILO
      TENY GERAGOS
      ALEXANDRA SHAPIRO
      ANNA ESTEVAO
      JASON DRISCOLL


          -And-

THE STEEL LAW FIRM, P.C.
      Attorneys for Defendant
BY: BRIAN STEEL



BALLARD SPAHR, LLP
      Attorneys for Warner Brother
BY:  THOMAS SULLIVAN



ALSO PRESENT: Sean Quinn, Homeland Security Investigations

P4IBCOMO

(Case called)

THE DEPUTY CLERK:  Counsel please state your appearance for the record.

MS. JOHNSON:  Good morning, your Honor. Emily Johnson, Maurene Comey, Mitzi Steiner, Madison Smyser, Christy Slavik and Meredith Foster for the Government. We're also joined by Special Agent Sean Quinn from Homeland Security.

THE COURT:  Good morning.

MR. AGNIFILO:  Good morning, your Honor.  Marc Agnifilo, Teny Geragos, Alexandra Shapiro, Jason Driscoll.  And I'm introducing the Court to Brian Steel who's pro hac vice been granted.  So I introduce Mr. Steel to your Honor, your Honor Mr. Steel, and we're all here on behalf of Sean Combs.

THE COURT:  Good morning, Mr. Steel, and good morning Mr. Combs.

THE DEFENDANT:  Good morning.

THE COURT:  All right.  So here's what I intend to do. I'm going to go through the items that I identified in our communication with the parties, and I'm just going to go through them.  And then after I'm done, both sides will have an opportunity to react to anything that I've said, and I will hear both sides out.  And if anything needs to be modified, we can make those modifications.  I'm previewing for you that the one issue that I know I'm going to want to hear from the parties on is the motion to exclude the two experts, so just

P4IBCOMO

keep that in mind as I'm going through this.

MS. COMEY:  Your Honor, if I may.  I apologize.  If you're not going to hear argument on 413, 404(b) there's one factual issue I needed to correct for your Honor, which is when we spoke on Monday we had said that four of the victims in our enterprise letters were all within the period of the charged conspiracy.  Looking back, the conspiracy in the indictment starts in 2004.  Two of the victims incidents were alleged to happen in or around 2003.  I just wanted to correct that mistake.

THE COURT:  I saw that.  I raised that out of the blue, so I thought nothing of it.

MS. COMEY:  I just didn't want your Honor to rely on that inaccuracy if you were about to rule.

THE COURT:  No, that's okay.  Again, I'm going to say a bunch of things, and then I'll hear from the parties if there's anything that needs to be addressed.  So the first issue is as to the motion to suppress and for a Franks hearing and the motion to dismiss Counts Three and Five of the current indictment.  Those motions are denied and, orders reflecting the Court's decision will be filed on the docket on early next week.  As for the request for an adjournment, it is denied.

To put this in perspective, the defense says that they need an additional two weeks, but for reasons unrelated to preparedness to go to trial, that are under seal, that won't

P4IBCOMO

work, so instead the defense is asking for two months. This request was made just this week, with jury selection and trial set to commence imminently.  The defense points to rolling discovery related to the superseding indictment and a particular issue relating to Victim-4 as grounds for the adjournment. For the reasons stated in the Government's letter, those are insufficient reasons for the two-month adjournment under the circumstances.

The Government points out that the "new" conduct isn't new, and as to Combs's Rule 17 subpoena, whether Nixon or Tucker applies, it is plainly the kind of "general fishing expedition" that is not permitted. That isn't a basis for an adjournment. But again, to put this is perspective, Combs's real request here is for two weeks. We're still a little less than a month from opening statements, and trial is set to go one for eight to ten weeks. It's unclear why, even accepting everything Combs is saying, there isn't sufficient time to prepare, especially in light of the three and now four firms that Combs has representing him for these and the other reasons set forth in the Government's response, the motion for an adjournment is denied.

Let's go now to the Rule 413, 404(b) motion.  The motion to exclude Rule 413 and 404(b) evidence is denied as to Victim-5 and otherwise granted.  This ruling does not cover the last two incidents in the Government's 404(b), 413 notice which

P4IBCOMO

the defense has indicated can be addressed separately as a part of the omnibus motions in limine, and it was not covered in the parties' briefing on this specific item.  First as to whether what's in the notice counts as direct notice or evidence of other crimes, wrongs, and acts evidence, the court finds the distinction illusory in this context.  The government is not saying that it has to prove each of those incidents beyond a reasonable doubt in the way that might apply to the sex trafficking and other counts in the indictment.

What they're saying is that that evidence just goes to relevant issues relating to the RICO charge elements that they have to satisfy.  And notably the government does not point in its briefing to paragraph 13 in the indictment which alleges the pattern of underlying racketeering activity, but relevance to issues the government must prove is true of any other crimes wrongs evidence.  It always has to be relevant and probative of something the government has to prove.  So that distinction doesn't carry much weight here.  And as numerous cases observe, whether or not something is called direct evidence or not, it has to satisfy Rule 403.  And the Court finds this sufficient to resolve the motion.

As for Victim-5, the government's 404(b) notice in its responsive briefing explain in detail why Victim-5's alleged abuse doesn't go to just character or propensity, but rather is relevant to intent, plan or knowledge, to use the language of

P4IBCOMO

Rule 404(b).  And why the probative value is not substantially outweighed by the danger of unfair prejudice, to use the words of Rule 403.  The timeframe, context and nature of the conduct alleged in many ways matches up with the allegations relating to other victims in the indictment, and which are undisputedly part of this case.

Notably in Mr. Combs's briefing, Mr. Combs doesn't spend much of any time focusing on Victim-5, the real emphasis is on the other alleges incident in the government's 404(b) notice.  As to those other incidents, the opposite is true.  The latest incident is from two decades ago, and all but one of the incidents predates the alleged RICO charge.  The nature of the allegations are substantially different from the other incidents relating to victims in the indictment.  And as the defense notes, those incidents are potentially explosive in ways that the actually charged conduct relating to alleged victims is not, which is a key factor that the Second Circuit looks to.  And Mr. Combs's also notes that they are based on corroborated victim testimony.

These incidents would appear to go to Mr. Combs's character and propensity for sexual violence more than anything else.  And even if they were admissible under Rule 404(b) or Rule 413, the Court would exclude them under Rule 403 for these and other reasons set forth in Mr. Combs's briefing, that evidence is excluded.  While these grounds are sufficient to

P4IBCOMO

support the Court's ruling, the Court also observes the timing here. These incidents were first disclosed as evidence the government would rely on two months before trial, say for Victim-5. They write, not identify as so-call direct evidence until March 26, long after the February 1 deadline for the government's enterprise letter. The Court is sensitive to the defense's concern with so little time before trial adding additional alleged victim, especially where the underlying allegations are substantially different from what is specifically allege in the indictment and has been the focus of this case is potentially prejudicial.

Now, let's turn to the Rule 17 subpoenas. The Court applies the standard in United States v. Nixon, 418 U.S. 6683 from 1974. The key issues are relevancy and specificity. In this regard, the Court notes that while the defense urges the application of the standard in Tucker, the Second Circuit has routinely applied Nixon, including in cases like Skelos, where in the district court the defendant made the exact same argument concerning Tucker. The district court rejected Tucker's application, and the Second Circuit while it did not address Tucker directly, applied Nixon and sustained the quashing of a subpoena over the defendant's constitutional arguments.

That being said, it is unclear whether there is or needs to be a substantial difference between the Nixon and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P4IBCOMO

Tucker standards.  Nixon itself understood that the application of the standard would turn on the facts. Courts, including courts in this district, apply Nixon in varying degrees of strictness.  And even Tucker requires that the defendant show that the request is reasonably targeted to ensure the production of material evidence and not unduly oppressive for the producing party to respond.  No fishing expeditions are allowed regardless of which case the court applies.  So the Court's decision today would be the same under either standard.

Courts in the Circuit also recognize that evidence going to impeachment, bias and motive, can be sought through a Rule 17 subpoena, although often with a return date during the trial once a witness testifies.  However, it is also clear that managing discovery and the proceedings in a case is within the district court's broad discretion.  That's from United States v. Williams Dorsey, 2023 WL 8015469 at page 3, Second Circuit November 20, 2023.  And along those lines we are now at the eve of trial.

So the Court doesn't understand how compelling the production of documents at this late stage versus during trial makes any meaningful difference.  Producing them now will avoid the delays and logistical concerns that would be raised if production was made during trial after a witness testifies. The Court starts with the motion to quash the subpoena to Victim-1.  That motion is denied in part and granted in part.

P4IBCOMO

Victim-1 disclose a draft memoir to the government, and Victim-1 must produce all prior drafts of that memoir to the defense.  The defense explains the relevance of the draft memoir that was disclosed and argues that he should be able to see the full picture regarding the memoir.  Noting, among other things, that the metadata on the draft memoir that was produced has a date of 2024, which appears to be after the memoir was initially drafted.

This is a specific request for a delineated set of documents that meets the Nixon standard.  As to the timing of production, those documents should be produced by April 25, 2025.  If there's any issues with that production deadline, then Victim-1 counsel can contact the Court.  Otherwise, the motion to quash is granted.  The general request for autobiographies, narratives, diaries, journals or notes or communications about your plans to publish or threaten to publish such a document is precisely the kind of general fishing expedition that Nixon and Tucker both foreclose.  The request fails all three Nixon prongs.  The same is true for the request for bank statements which Mr. Combs suggest is related to showing Victim-1's financial condition, and presumably her motive to draft the memoir and make certain request to Mr. Combs.

Even in terms of basic materiality and relevance, it's not clear why showing those finances is relevant and admissible

P4IBCOMO

here.  And the defense doesn't address the evidence in terms of the argument that they apparently seek to make; that is, that there was outreach between Victim-1 and Mr. Combs concerning the publication of the memoir.  And they don't, and it's not clear to the Court, what the relevance of the bank statements would be in that context.  In any event, it fails the Nixon standard for the reasons pointed out in the motion to quash, and in the government's supplemental response.

Next we have a motion to quash filed by Warner Brothers discovery.  This motion is docketed, but redacted. That motion is denied.  Before I proceed, let me ask the government.  As to Individuals-A and B, are those both individuals identified in the government's witness list?

MS. JOHNSON:  Yes, your Honor.

THE COURT:  Okay.  So the motion is denied.  As the parties have resolved everything except the outtakes from two specific interviews relating to two witnesses who are on the government's witness list, and the defense points in their briefing to ways in which the interviews would be relevant to this case and why the outtakes from those interviews again in the same way that we discuss with respect to the draft memoir would be relevant and admissible to have the full story if that is presented to the jury.

Now Warner Brothers raises the reporters privilege issue.  It acknowledge that this is not confidential material

P4IBCOMO

and cites the applicable standard from Gonzalez v. NBC, 194 F.3d, page 35, Second Circuit 1998. To overcome the privilege, the party seeking to compel production has to show that the materials at issue are of likely relevance to a significant issue in the case and are not reasonably obtainable from other available sources. Warners Brothers concedes the second requirement of the materials are not obtainable from other sources.

It argues that Mr. Combs hasn't made a sufficient showing that the outtakes are of likely relevance to the significant issue in the case, but the standard for relevance to overcome the journalist privilege from non-confidential materials is low. That's In Re McCray, Richardson, Santana, Wise, & Salaam, 991 F. Supp. 2d 464, page 469, (S.D.N.Y. 2013.) The main goal is to avoid giving a litigant unfettered access to journalistic materials. But as the defense points out, they are only asking for outtakes from two specific interviews given by two people who, as the government points out, are likely to testify in the trial about central issues in the case. The cases that Warner Brothers cites to involve much broader request, and those cases are concerned with the possibility that the requested material can be cumulative with other evidence. The defense has satisfied their burden to show relevance and to overcome the limited reporters privilege for nonconfidential materials.

P4IBCOMO

Finally, earlier this week the defense moved for issuance of a Rule 17 subpoena concerning Victim-4's documents. They're asking for essentially the entire universe of documents and communications with any conceivable relationship to this case. Under either Nixon or Tucker, this request is an impermissible fishing expedition that will impose an enormous burden on Victim-4. So that motion is denied. The Court advised the defense in Monday's conference that the request should be rifle-shot and point to specific items of relevance that they believe exist and have not been turned over and are not in Mr. Combs's possession. The subpoena does not address those issues. So I'll reiterate that advice now. The defense must make a renewed motion that is more tailored to the specific evidence that they're seeking, and what they've received in the government's production, then the Court will consider that motion and act on it in an expeditious fashion.

Let's now move to the motions in limine. There are two motions in limine that the Court that the parties have advised the Court that they would appreciate an earlier ruling on, so we'll focus on those. First, the government's motion for Victims-2, three, and four to proceed under a pseudonym. The parties have resolved their dispute with respect to Victim-2. So the government's motion is granted as unopposed with respect to Victim-2, and the government's motion is also granted as to Victim-3 and 4.

P4IBCOMO

The government has pointed to numerous cases in which alleged victim in cases involving sexual violence and trafficking have been permitted to proceed under pseudonyms, even when their names were already public.  Raniere is a good example and one that did not involve solely minor victims.  There the court noted that just because some victims' names are publicly available, does not mean that the details of their experiences are already available.  And the choice of a victim to publicly discuss a crime is not analogous to being put on the stand about it.  As in court, the victim will not be able to choose how and to what level of detail she discusses the crime.

The Second Circuit affirmed the court's decision noting the risks that the government points to here that requiring victims to provide their names in public could chill their willingness to testify for fear of having their personal histories publicized.  Here, the government points to several bases for that chill, and the potential personal and economic toll of public revelation of the victims' identities and their full trial account could cause.  The defense's acknowledgment of these risk with respect to victim-2 underscores what numerous courts have recognized in high profile cases of this nature.  The government also points to the Crime Victims Rights Act exhortation that victims are to be treated with respect for their dignity. And that's from 18 U.S.C. 3771, Subsection

P4IBCOMO

(a)(8).  The government bears the burden here, and indeed it is a heavy one, and it has satisfied that burden for the reasons noted in the numerous prior cases.

As for the defense's interest, there is no clear reason why the limited relief sought by the government, no references to the victims' names, addresses or details of their current employment is needed by the defense.  The defense is aware of the victims' names and the victims' names will be furnished to the jury.  As for the defense's contention that withholding of the witnesses' names would bolter their credibility, this argument was rejected in Raniere with the Second Circuit concluding that the district court correctly addressed this concern with an appropriate jury instruction.

Now, here the jury will be furnish with the witnesses' names.  But to the extent that the defense nevertheless has a concern that the different treatment of those witnesses may have some affect on the jury's deliberation, the Court will entertain any request for an instruction, and that instruction can be given at the appropriate juncture when Victims-2, 3 and 4 take the stand.

Notably, while Mr. Combs cites to Smith and Alford in his briefing, he ignores the fact that the Second Circuit in Raniere address those cases and approved the use of pseudonyms under similar circumstances.  The defense also points to civil cases where the parties were not allowed to proceed under

P4IBCOMO

pseudonyms. But the alleged victims here are not parties. They are not using the courts to use the terms from the cases. And the defense does not point to a single criminal case where alleged victims of sexual violence were not permitted to proceed under pseudonyms. Indeed, the defense did not cite to a single criminal case, let alone a case like this one, where a request for victims to proceed under pseudonyms was denied.

Now, as for the logistics which the defense does raise in its briefing, the government notes that there are many cases that have approved the use of pseudonyms. And in those cases, many of which are high profile, complex, and lasted for multiple weeks, the courts were able to address those logistical concerns, and the Court believes that we'll be able to do that here. So that motion is granted.

All right. Now we get to the motion to exclude the testimony of Dr. Hughes and the corresponding motion to exclude the testimony of Dr. Bardey. And the parties move to exclude other's expert relating to issues of sexual abuse, coercive control, coping strategies during and in relation to sexual abuse, delayed disclosure and memory of sexual abuse.

District courts must carefully exercise a gatekeeping role to guard against the significant risk posed by expert testimony. District courts must exclude junk science by undertaking a rigorous examination of the expert's opinion to ensure they are both helpful and reliable at every step. And

P4IBCOMO

before admitting any expert, the proponent with respect to Mr. Hughes, that would be the government, must establish by a preponderance the satisfaction of the factors laid out in Federal Rule of Evidence 702.

Now, here's where I could use some help from the parties. So what the defense says, and who's going to address this from the government side?

MS. STEINER: I will, your Honor.

THE COURT: All right. So what the defense says is, you essentially have Dr. Hughes who is testifying as to the circumstances of criminal conduct without having spoken to the alleged victims, and you see that as a feature because as you point out Dr. Hughes would not be permitted to have spoken to the victims and then to testify that what they went through is consistent with the experience of victims of sexual abuse because that would be improper boltering, right?

MS. STEINER: That is correct, your Honor.

THE COURT: Now, the defense says, that is not a feature. That is evidence of the bug, right, which is, looking at Zhong, which is the Second Circuit case from 2022 which was not addressed by the government. While the court in that case did approve the admission of certain context evidence concerning the force labor conduct at issue in that case, what the defense says is, there's no way to read that opinion other than to note that court's concern with admitting this kind of

P4IBCOMO

evidence. And in Zhong the court noted the ways in which the evidence that came in through the expert crossed the line. And at the very end of that section of the opinion, I'll note that there is a portion of that where the court talks about the improper use of expert evidence to have the jury infer guilt based on the conduct of unrelated persons. And they say that's exactly what Dr. Hughes is doing in the report in the disclosure that you've received.

So your response starts out by saying, There's about 20 cases, I'm exaggerating, there's a lot of cases that allowed these kind of evidence. But the defense says, there's nothing from this Circuit, and you really need to treat the requirements of Rule 702 and the instructions from cases like Zhong carefully, especially given the recent amendment to Rule 702 which emphasized the courts gatekeeping rule. And specifically one of the things mentioned in the Advisory Committee note is that a lot of courts were saying, these issues go to weight, not admissibility. And the court said that was advocating the court's gatekeeping rule. So that's a lot, but I'll let you address Zhong and the recent amendment to Rule 702, and why you think Dr. Hughes's testimony doesn't get close to that line where we really need to be careful about what she's saying.

MS. STEINER: Thank you, your Honor, and I appreciate the comment. First to start with Zhong. Zhong is a very

P4IBCOMO

different case, which is I think for reason the government did not address it more fulsomely in its briefing.  I will start by noting that Zhong never for one moment questions that subject matter testimony can be appropriate expert testimony in a criminal case.

THE COURT:  Absolutely.

MS. STEINER:  And, in fact, makes that very plain and is very clear that it doesn't want to be understood for that proposition.  And finds that; for example, labor force context, which is the context of that case, that such testimony could be entirely appropriate.  It just wasn't relevant to the facts of this case in this particular expert testimony.

THE COURT:  That's correct, except what the defense says is that this is not about force labor campaigns in other places around the world where it would really be clear that this is outside of the ken of the average juror.  They're saying the kind of thing that Dr. Hughes is talking about is the kind of thing that an average juror would well-understand, and that's their distinction, that's how they're drawing that distinction.  I'm with you in terms of the general point in Zhong.  The first thing that the court says right out of the gate is that this type of context evidence can come in where it's this type of complex issue.  I'll let you continue from there.

MS. STEINER:  To address your Honor's point.  First

P4IBCOMO

with respect to Zhong.  I think the reason that case is distinguishable or not fully applicable here is that it does speak to an expert witness that went outside the scope of appropriate testimony. The court there found the testimony wasn't relevant stating there wasn't any evidence that workers were mentally or physically challenged or that they were members of religious minority groups in China, which is that expert was speaking to.  And also separately found that the testimony was going to be potentially improper and prejudicial because it was purporting to provide testimony about that individual's cultural background and ethnicity.  I'll leave that there.

THE COURT:  That is very different from what is at issue here.  The defense points to the line in Zhong that concerns -- DeBaca, that's the name of the expert -- said that people employ force labor due to a combination of profit maximization objectives on the one hand, and almost a pleasure that is taken in being able to have this type of control over other people.  That line, they then connect that to the last paragraph in the discussion that talks about inviting the jury to find guilt based on a defendant's associations.

So what the defense is saying is that, that's very similar to what's in the coercive control section of the Hughes' disclosure.  Now there are other parts of the disclosure, and we'll get to this, there's other part of the

P4IBCOMO

disclosure that I think are acceptable and appropriate and meet the Daubert standard. But really what the defense is talking about is that section about coercive control. They're saying that you're trying to infer Mr. Combs's guilt based on Dr. Hughes's summary of what coercive control in general looks like and the intent and motive of abusers as Dr. Hughes see it.

MS. STEINER: Understood. Maybe I can address now the point that your Honor made earlier about whether this is or is not in fact outside of the average juror. And your Honor is entirely right to start this discussion about the court's important gatekeeping responsibility in all cases including cases such as this one.

I think the reason that your Honor has noted there are so many district courts that in cases such as this one involving complex allegations of sexual abuse, complex dynamics involving interpersonal relationship in terms of romantic partners that such testimony has been admitted precisely because it is very much outside of the ken of the average juror. It is not common. And as we note in our papers, I think it's important to recognize that what the defense is arguing is exactly the concern of the government as to what the jury may be thinking, that this is just an ordinary bad relationship. People go through bad relationship. We've all had similar experiences. But in fact, coercive control, that dynamic is a very particular one, and requires the

P4IBCOMO

understanding of an expert to fully understand its scope and its application, particularly to a scheme such as this one where you have victims that are in relationships that go on for a period of years, even a decade.

The reason that coercive control is such a complicated phenomenon is because it involves so many different tactics. It involves psychological tactics, sometimes physical tactics, physical abuse, emotional subjugation.  There's really a myriad of different components of coercive control.

THE COURT:  When you talk about coercive control from the perspective of the conduct of the abuser, right, when we're looking at that aspect of it, what issue in the case does it go to?  Meaning under Rule 702(d), how is Dr. Hughes applying her expertise to the facts in this case?  What does it go to?  What issue?

MS. STEINER:  Dr. Hughes is a blind expert.  She's not aware of the particular facts of this case at all.  And whether or not her testimony matches up to the facts of this case will be entirely for the jury to decide, which is what the court really speaks to in the Ray decision, and there the court notes that of course an expert is going to provide fulsome testimony about certain dynamics in a relationship, aspects of sexual abuse, coercive control.  And it is possible that --

THE COURT:  I'm asking a more basic question.  It's literally, what does that go to?  Meaning, there's different

P4IBCOMO

parts of the Hughes's disclosure.  All right.  And so when you're talking about, let me give you an example of something that I think is firmly within bounds.  In the coercive, do you have the disclosure in front of you?

MS. STEINER:  I'm pulling it up, your Honor.  I have it.

THE COURT:  All right.  So in of the Hughes disclosure if you go to the third page, and if you go to the second full paragraph.

MS. STEINER:  As a result of the coercive control?

THE COURT:  Yes.  If you look at the last two sentences, do you see, Dr. Hughes will testify that, it's on the fifth line from the bottom?

MS. STEINER:  Yes.

THE COURT:  If you take that to the end, and you take that to the next paragraph.  What these two pieces of the disclosure talk about is why, contrary to what a juror might think, you cannot infer from the fact that a victim remains in a relationship with the other person that they have not been the victim of abuse.

MS. STEINER:  That's correct.

THE COURT:  So I understand that doesn't go to the abuser's conduct.  It doesn't go to redefining terms that the Court will instruct the jury on.  It doesn't try to infer the defendant's guilt based on the association of others.  It is

P4IBCOMO

something that I think is firmly within a complex issue that the jury would not otherwise potentially understand, and why it's the proper subject of testimony.  I understand what the relevance is to this case, because I understand what the defense, because they've articulated it many times, how they're going to approach some of the cross-examination and the issues they're going to raise, so I'm with you there.

What I'm asking about from the perspective of the abuser and characterizing the abuser's conduct as coercive control.  What issue in the case does it go to?  Is it the issue of coercion as a required element in the sex trafficking charges?

MS. STEINER:  I want to make sure I'm answering correctly. And if I'm not addressing it directly, please let me know. First of all the government will argue it will go to the credibility of witnesses, and that it will explain the nature of the dynamics that exist in these very complicated relationships.  It sounds like your Honor is from what I understand with respect to at least the expression of love and unwillingness to leave those types of relationship, but it will also speak to the nature of the abuse and the affect of that abuse on the victims.

And when taken together, the jury will be given the opportunity to assess whether or not that speaks to the credibility of these victims with respect to coercion.  I do

P4IBCOMO

want to address the defense's point in their briefing about whether or not this may lead to center of confusion potentially with respect to the terminology.  As the government includes in its notice, and as your Honor's discussing here, Dr. Hughes will be giving testimony about a concept called coercive control, which is a very defined concept that's applied in the psychological literature that is based on her extensive treatment of thousands of patients.  And that term exist in the field of psychology.  There is separately of course the legal definition of coercion, which will be part of the government's requirement to prove beyond a reasonable doubt at trial. They're not the same term, but the defense is making the argument that the jury may somehow conflate coercive control and --

THE COURT:  I share that concern.  And so Dr. Hughes, if she is permitted to testify, will not testify using that term of "coercive control."  I don't think it's necessary for her to use that term.  I think there's a way for Dr. Hughes to testify where she's talking about the actual things that she's talking about without characterizing that as something called "coercive control."  And I think that that addresses at least one objection that the defense has that the expert is using a term that is the same term that's going to come up in two of the charges that are at issue here.

MS. STEINER:  Understood, your Honor.  And she will

P4IBCOMO

certainly do so if the Court permits her testimony.  One additional distinction I want to make, and I think this may be embedded in your Honor's question, is what Dr. Hughes will and will not do with respect to opining on the defendant's subjective intent.  Of course Dr. Hughes is not permitted under the case law to speak whatsoever to the defendant's subjective intent.  She can speak as an expert to objectively how perpetrators of this type of sexual abuse, how perpetrators who implement the tools of coercive control can interact with victims, how that dynamic works functionally.

THE COURT:  So you would agree that the sentence here "Dr. Hughes's testimony is expected to explain how the overarching dynamic of victimization is an abuse of power and control where the perpetrator engages in self-centered behavior to satisfy his own goals and desires, regardless of the needs, wants and well-being of the victim."  I understand that's in the disclosure, but Dr. Hughes is not going to testify about that particular sentence, right?  Because precisely for the reasons that you're saying, she's not going to testify as to the issues of the subjective intent of anybody?

MS. STEINER:  To clarify our position, your Honor, and I'm happy to continue to address any question on that particular sentence.  Again what Dr. Hughes would be speaking to if she were to testify about it, is objectively how perpetrators engage in these types of dynamic.  And in this

P4IBCOMO

case it talks to what may motivate a perpetrator, but it's very distinct from subjectively why a defendant in this case is acting in a certain manner, which would speak to an ultimate issue that is the province of the jury, and certainly not of an expert.

THE COURT:  All right.  And explain to me the relevance to this case of the section entitled, coping strategies during and in relation to sexual abuse?  I just had a question about that section.  I've given you the two places where I think Dr. Hughes testimony would be centrally relevant and satisfy the requirements of Rule 702.  I also would agree with the government that the section on delayed disclosure, that that also, it is very clear why that is relevant.  It is very clear why that is not the ken of the average juror, and it is very clear why that satisfies the requirements of Rule 702. It's also, to address some of the concerns that the defense has raised, you'll see the footnote citing to literature that supports those points made in that section.  Those are two places where I think Dr. Hughes can give admissible expert testimony that would be relevant and helpful for the jury's appraisal.  I'm really focusing you on these other parts that I do think run very close to the line of incidents where courts have concern.

MS. STEINER:  I will just say before we move onto coping strategies.  Just on coercive control, I think that what

P4IBCOMO

we were discussing earlier, your Honor, with respect to the self-centered behavior and what maybe going on internally with a perpetrator.  That is a very small part of the testimony. And I think if your Honor is troubled by that particular component, I would just note that the broader thrust of the testimony which would not need to require that component is again this aspect of coercive control, whatever term we will use to refer to it, that concept is incredibly relevant to the elements of the charge racketeering activity and the sex trafficking activity.

THE COURT:  For present purposes, let's say that sentence is out.  I don't need it for the reason you're saying.

MS. STEINER:  Understood, your Honor.

THE COURT:  We're making some progress here.

MS. STEINER:  Onto coping strategies. I just want to make sure I understand your Honor clearly.

THE COURT:  Walk me through how this relates to the case.  Is it different in some way from the two parts of the disclosure that I've already talked to you about.  Meaning, you have this part of the disclosure that talks about why a victim of abuse would remain in a relationship with their abuser counter to what a juror might think based on the literature and based on Dr. Hughes's experience.  What is the relevance of what is discussed in the coping strategy section here?

MS. STEINER:  I agree there is some overlap in the

P4IBCOMO

sense of how and why a victim may remain if a relationship is in part how they are coping in the context of staying in that relationship, so I agree there is some overlap here.  I think specifically what's added here is additional ways, particular manners in which a victim may engage in coping in such a relationship, and I'll get to the importance of that in a moment.

Listed here are self-blame, denial, as well as the use of substances, such as drugs and alcohol, essentially in order to numb whatever painful experiences, sexual and abusive experiences they're having to be able to engage in them.  That is something that, again, will directly speak to the lack of consent that is apart of these sexual interactions between the defendant and the victims, which is important and directly relevant to the sex trafficking charge in this case that the government's required to prove, as well as to the force labor piece of this as well.  I think it also gets to what I was mentioning a moment ago, your Honor, with respect to the credibility of victims.  There will be significant victim testimony in this case about how these coping mechanisms were used, how it affected them, and particularly with respect to drug use, for example.  And the jury has the right to understand the reasoning, the purpose behind those coping strategies.

THE COURT:  Why is that outside of the ken of the

P4IBCOMO

average juror?  Let me give you an example.  A witness testifies and say my experience was so bad that the only way I could deal with it is to overdose on drugs.  I'm just giving you a hypothetical.  This is not based on anything in this case.  But under that example the witness says that, and why is that outside of the ken of the average juror to understand?

And the reason I raise this is that you've seen the defense cites to Castillo.  Castillo cites to an earlier opinion by Judge Winter that says that even in things that you might think are even more complicated, jurors can figure this stuff out, so you're going to have the witnesses talking about these things.  As to your lack of consent point, that's not addressed in this section, and I don't understand the connection between the coping strategies and any issue of lack of consent.  So again, I'm a little bit unclear as to what this goes to.  I suppose I understand the tangential relevance to credibility.  I don't understand otherwise.

MS. STEINER:  Let me try to --

THE COURT:  That's my fault.  I'm not understanding correctly.

MS. STEINER:  Maybe you're right.  I'm going to do my best.  I think directly what this speaks and what it will help explain for the jury is why victims are continuing to participate in unwanted sexual activity as part of their act of self-preservation.  That is something that is not -- something

P4IBCOMO

the jury may not otherwise be aware of. And I think in the manner in which I was describing earlier, your Honor, why the defense's argument why this is just, you know, a bad relationship, is why that actually shows we need such testimony. I think similarly here the average juror may think that, I don't know, there may be a tendency for a jury to implicate the victim for some of these coping mechanisms; the drug use and the other forms of substance abuse that may lead to certain judgments from the jury. And the jury has a right to know that in an expert's view that type of drug use and substance abuse is actually a very standard type of coping mechanism for victims in similar circumstances.

THE COURT: Same thing, you cannot infer from evidence of drug use and other conduct of that nature that the individual is not a victim of sexual abuse because there is literature, and Dr. Hughes has qualifications to show that that is just a common coping mechanism for victims of sexual abuse.

MS. STEINER: Yes, I think --

THE COURT: I didn't say it artfully.

MS. STEINER: I think the purpose is to provide that testimony to the jury so the jury can consider that when they're evaluating the testimony that they're hearing. They may come in with their own understanding. And this may provide an expert understanding to the purpose of those coping strategies, including substance abuse and drug use.

P4IBCOMO

With respect to the Castillo case that your Honor mention.  There is that line of cases in which courts have kept out testimony about how a standard drug deal may go down, and I think that is very different.  I think it is more intuitive.  I think drug deals typically go down in a certain manner that a jury may understand in a hand-to-hand like we have in Castillo. Here again we have a much more complicated framework with a coercive control dynamic where we're trying through the expert testimony to educate the jury about.  And so I don't think you can assume the same type of familiarity as we have in Castillo, with, for example, a drug by, as with particular types of coping mechanisms that have been found to be very typical in these coercive control circumstances.

THE COURT:  Okay.  And then memory which is the last section.  Essentially what Dr. Hughes is saying here is victims of sexual abuse may have fragmented memories, so they may forget a lot of things.  They may get a lot of details wrong, but that doesn't mean they're not telling the truth as to the abuse they suffered.  How is that not improperly bolstering the credibility of witnesses?  Why isn't that just Dr. Hughes saying, look, jury, it doesn't matter if these witnesses didn't know the details, that kind of stuff.  You can believe them when it comes to the important aspects of their testimony concerning the nature of abuse?

Now, it is fair game for the government to argue that

P4IBCOMO

during summations to the jury, and the jury will assess the credibility of those witnesses.  But why on any level that we look at in terms of the arguments being raised by the defense is that proper, the proper subject of expert testimony?  And why wouldn't it be prejudicial to the defense to admit that kind of testimony from an expert witness who isn't familiar with the facts of this case as the government can see it because she's not reviewed any of the evidence?  She has not talked to any of the victims here, the alleged victims.

MS. STEINER:  Thank you, your Honor.  I think that the memory component of Dr. Hughes' -- I anticipate testimony is twofold.  One is that there can just be total delayed recollection of these events, meaning a victim may go through a traumatic event and not recall it until 10, 20, 30 years later when they're sitting getting therapy or whatever trigger allows them to recall that incident.  And again, that is something that the average juror may not assume.  An average juror may have the misconception that a memory is a memory.  And if you don't remember it -- you remember an important event, so if you don't remember a traumatic incident, then it must speak again to the credibility of the witness.  And that shouldn't be the case.

The jury should be permitted to hear testimony of Dr. Hughes that there are many individuals -- in fact it's very common for victims of traumatic circumstances, traumatic events

P4IBCOMO

to suppress that memory and not recall it until many years later and only subsequently to be able to bring it to the forefront of their mind.  And that will be relevant to multiple victims in this case.  With respect to the details of memory. This is testimony that Dr. Hughes has previously given in cases such as this one, and I think for similar reasons it's important.  It certainly is not intended in any way to bolster witnesses, and it will certainly not speak to false recollections of what happened.

So I don't expect Dr. Hughes to testify that a victim of a traumatic incident could falsely recall a detail or incorrectly recall a detail; and therefore, a jury should kind of give a victim some leeway with respect to that.  Rather I think what she is going to testify to is similarly in a way that some victims don't recall anything until much later.  Some victims recall bits and pieces in flashbulbs in the way that she describes. That is a common occurrence that she's seen, again, in treating her thousands of patients that she's seen discussed in the literature.  And the jury should have the ability to assess perhaps fragmented recollections of particular victims with the aid of that testimony; that again, this is a common phenomenon for victims who are responding to traumatic incidents.

THE COURT:  All right.  Similarly, last time, two times we did this, you cannot infer from the mere fact of

P4IBCOMO

fragmented memories that the individual was not actually a victim of sexual abuse because of what the literature shows is the experience of victims and based on Dr. Hughes' experience as a general matter, without saying anything about the particular credibility of any person in this case.  You could disagree with me by the way.

MS. STEINER:  I think that's correct, your Honor.

THE COURT:  I think I understand.

MS. STEINER:  I think my colleagues are assisting me to understand.

THE COURT:  Feel free to tell me.

MS. STEINER:  You're entirely right.  I'm the one that's delayed in processing here.  I think there will be no part of her testimony or certainly no argument that the jury should infer that these individuals, these witnesses are in fact victims because they were recall memory in this manner.  Rather it is going to provide the jury, educate the jury about this frequent phenomenon that victims of abuse do experience with respect to fragmented memory and delayed memory.  Did I answer your question?

THE COURT:  Yes.  Now switching gears really quickly, and then I'll allow defense to respond.  As to Dr. Bardey.  Dr. Bardey is essentially saying none of this is really based on established literature, and you can't say these kinds of things without talking to individuals because it's an

P4IBCOMO

individual inquiry. And so having not done that, the jury should not attribute any weight to Dr. Hughes's testimony. And you respond and say, that's a problem because Dr. Hughes could not actually speak to the victims because that would be improper bolstering.

MS. STEINER: Yes, sort of a catch 22.

THE COURT: Well, I think the defense is saying it doesn't matter whether you are legally permitted to do it or not. You didn't do it. And the defense just wants to point that out, that that is apart of normal psychological inquiry. Why shouldn't they be allowed to do that? Meaning, I understand what you're saying, but I think the defense, where I started out in saying, they regard that as being the bug, the problem with Dr. Hughes's testimony, and whether it's legally permitted or not. They're saying you should be able to make the factual point that Dr. Hughes simply didn't talk to any witnesses, and that's a limitation on how she's able to address these issues.

In fact, it may be the case that if you're the one who's going to be doing the direct examination of Dr. Hughes, you might invite her to say that, that you were told that it was not permissible to talk to the victims. I understand that is a limitation here. I'm not talking about any of the witnesses in this case. I'm solely talking about the literature, and this is more general material. In which case,

P4IBCOMO

they can have Dr. Bardey respond to that and say what Dr. Bardey will.

MS. STEINER:  Of course, your Honor. First of all, the defense I'm sure will cross-examine Dr. Hughes, as they should on that point.  She hasn't interviewed the victims in this case.  She can't opine on victims in the case. That is totally fair game for cross-examination.  The problem here is, again, going back to gatekeeping.  Your Honor has the unenviable task of gatekeeping here.  And to do so, we have to look at three thing as the case law says.  We have to look at whether or not the expert is qualified, whether or not the testimony is helpful, and whether or not the testimony is reliable.

And Dr. Bardey's testimony with respect to that purported opinion, that subject matter testimony is somehow lacking fails in all three regards.  First of all, Dr. Bardey is not qualified to provide that opinion with respect to the particular context here of sexual abuse and coercive control. He has no background in that area as is plainly clear from his CV.  Moving on then to the second point of reliability. Dr. Bardey doesn't cite to any basis for his opinion that somehow because an expert is not evaluating an individual that's it's lacking or less than if they had, doesn't provide any citation for that.  And that's a problem because we have to be able to confirm.  The defense has to prove preponderance of the evidence more likely than not that this is a reliable

P4IBCOMO

opinion. And to the contrary there is much evidence that subject matter testimony is entirely appropriate and helpful and can be a way of explaining psychological dynamics. And as we note in our papers is in fact the way a lot psychological field way. The psychological field is based on group studies and diagnostics and that is a primary manner in which psychologists and other experts are able to assess particular circumstances.

And so for Dr. Bardey to be able to come up and testify as an expert without the qualifications, without any reliable source will simply confuse the jury which gets to the third point of helpfulness. It wouldn't be helpful. It will lead to jury confusion because the juror will be left to ponder as to why -- I take your Honor's point because we could have Dr. Hughes testify that she's not permitted in the case to interview the victim as a matter of law. But even so, it would undermined her credibility for another expert to be able to say that her testimony is somehow lacking because she has not conducted an individual assessment of the victim in the case.

THE COURT: I understand the point. Let me see if I can boil this down in terms of the parties' position. There's some other things here, but Dr. Hughes on one level is saying, here's the pattern that characterizes abuse in many situations, and that's all Dr. Hughes is talking about. And then you will be asking the jury to infer to make an inference, draw the line

P4IBCOMO

between that pattern and the defendant's conduct in this case. Is that generally fair?

MS. STEINER:  To see if it matches.

THE COURT:  So Dr. Bardey is saying, you can't draw that inference because as a forensic psychiatrist I can tell you that you can never.  It's not a one size fits all type situation.  Every person has to be looked at on their own terms.  Every witness has to be evaluated, and it's almost as simple as.  I'm a doctor.  I've been doing this for many years.  I would never make any kind of assumptions about particular people without having spoken to them because every person is different.

If that's what Dr. Bardey is saying, it's not undermining or attacking the credibility of Dr. Hughes for something she did or didn't say.  He's attacking the inference that the government is asking the jury to draw from Dr. Hughes's testimony, and he's saying that's a broken link because you can't make any kind of inference about particular people based on generalized evidence.  And he has the background to show that because he's been a practicing doctor for many years. Why isn't it as simple as that in terms of characterizing what the defense is saying with respect to Dr. Bardey?

MS. STEINER:  A couple of reactions.  I think, firstly, it's simply not relevant, because Dr. Hughes is not

P4IBCOMO

purporting to have interviewed the victims here.  Whether or not her testimony matches up is something that the jury is going to be doing.  It's not something that an expert needs to insert themself to tell the jury whether or not it matches up or not.  The jury should be able to say, okay, I'm taking the testimony of Dr. Hughes into account.  I'll make that assessment.  I think the larger issue here for me is that there is no reliable source for the opinion.  And the defense is required to prove again by a preponderance that the opinions that they're seeking to introduce through the expert are reliable, and we don't have that here.  So the notices simply deficient in that way, and the jury shouldn't be permitted to hear an opinion that isn't properly found to be reliable by the court.

THE COURT:  All right.  Understood.  Who from the defense will be addressing the Dr. Hughes/Dr. Bardey issue?

MS. SHAPIRO:  I will, your Honor.  Can I start by responding to counsel's argument about Dr. Bardey?

THE COURT:  Of course.

MS. SHAPIRO:  I think what government counsel is missing here with regard to Dr. Bardey is a few things, but the most basic one is, and we made this point in our brief, and I think your Honor understands is, this is rebuttal testimony.  And his testimony is design and would only come in if Dr. Hughes is allowed to testify.  And I'm really rather

P4IBCOMO

shocked that the government is questioning his qualifications as we set forth in our opposition.  He's examined hundreds if not thousands of both victims and alleged perpetrators of domestic abuse and sexual violence.  Indeed, the government itself, and prosecutors from the very unit that's prosecuting this case and another case that in 2024 for a different purpose in a sex case, so he's imminently qualified to opine on this.

And what I want to highlight is that in her prior testimony, Dr. Hughes always discusses her clinical and forensic expertise and presents the subject matter of this type of testimony as forensic psychology. And what Dr. Bardey is going to explain is this type of blind general testimony is not forensic because you can't reach forensic conclusions in a discipline without examining the individuals.  That's entirely appropriate.  He's going to make other points that you saw in the disclosure that we think are very important.  If Dr. Hughes is allowed to testify, she speaks about supposedly common and typical responses to sexual assault and domestic abuse.  And he will explain to the jurors that there is no typical response, that the science doesn't back that up.  So this is classic rebuttal testimony, and the government doesn't like it because they don't want to have another expert undermining their expert's testimony, but that's the point of rebuttal expert testimony

THE COURT:  In your briefing I think you focus

P4IBCOMO

principally, I'm not saying exclusively, but principally on Dr. Hughes's opinions concerning what they call "coercive control." Right.  That is the main focus of your attack on Dr. Hughes. And in substantial part, that is what Dr. Bardey also addresses, that the theory is not a real theory, and to show that there has been abuse that a person has been victimized, you need to talk to the people.  Is that fair?

MS. SHAPIRO:  It's fair in part, but I do want to address some of the other parts of her -- I don't think it's accurate to say that we only attack the coercive control.

THE COURT:  I didn't say that.  I said it's the principle attack.  It's what comes up in your reply briefing.  It's what you focus on, the use of recharacterizing.  Something that the Court is going to instruct the jury on, the definition of coercion.

MS. SHAPIRO:  That's right.  I did want to make some points on some of the other aspects.

THE COURT:  I understand.  That's why I asked the question the way I did.  Your primary concern, concerns the coercive control section of Dr. Hughes's opinion.  I understand you also may have issues with other parts of that opinion because you're trying to exclude it all.  I'm just trying to understand what you're primarily concerned with Dr. Hughes's testimony is?

MS. SHAPIRO:  I'm just trying to be careful because I

P4IBCOMO

want to be clear that we're objecting to the entire testimony.

THE COURT:  That's why I also just said that.  I said I understand that you are objecting to the entirety of Dr. Hughes's testimony.  I need to know what is the thing that you believe is the biggest problem in Dr. Hughes's testimony.  That's what I need to know, just so I can make sure I'm focusing and that I get all of your argument. I just want to make sure I understand.

MS. SHAPIRO:  I understand that, your Honor.  I think the answer to that is yes.

THE COURT:  All right.  Good.  I understand that.  And again, I did focus I believe on the line.  They're multiple aspects of the defendant's arguments here, but there's a few different ones that I address with the government.  One, they shouldn't be able to talk about coercive control as a psychological concept because coercion is a legal concept that we're going to be instructing the jury on.  And so that would be improperly invade the province of the Court.  That's one argument, right?

MS. SHAPIRO:  Right.

THE COURT:  And I agree with you on that argument. And so that term is not gonna be used if Dr. Hughes is permitted to testify.  Dr. Hughes is going to have to talk about the things that she's talking about without mentioning a concept of coercive control.  That's one.  Two, there is a

P4IBCOMO

sentence that you focus on in your briefing concerning the proclivities of people who are characterized as abusers. And I noted that I agree with the defense's argument there too that that should not be apart of Dr. Hughes's testimony. What else? Maybe you can help me with some of the other principal concerns you have about Dr. Hughes's opinions, understanding that you are seeking exclusion of the opinions in total.

And by the way, I accept what you are saying about not just going along with the many courts in this district who have permitted this kind of testimony. I agree with you. I have to evaluate it based on Rule 702 and the applicable Circuit precedent. To the extent that those opinions are persuasive and helpful, then of course I'll consider them, but we have to do the analysis ourselves, the hard work in every case.

MS. SHAPIRO: I understand, your Honor. And I certainly appreciate that our message in that score seems to have gone through, and we appreciate that. I guess what I did want to highlight is a couple of points just in response to the government's argument. I think one point, and this applies to several aspects of several of the topics on which your Honor was questioning the government. I think the government sort of made clear that the purpose of this is to inform the juror's assessment of the credibility of the witnesses.

And in many ways I think that makes our point which is that they're going to use this to say that this expert told

P4IBCOMO

them that essentially they should believe these people. They're going to do it without mentioning the names, and she won't have the specific facts, but they're going to get up there in summation. This is what they do with this type of testimony and Dr. Hughes's testimony, and they're going to tell the jury that. And that's the problem with this. And the other thing I do want to emphasize that particularly the amended Rule 702(d) focus the Court's attention on whether the expert's opinion reflects a reliable application on the principles and methods to the facts of the case. And she's not doing that here. And it's not the type of general testimony that is necessary because the concepts are complicated.

This isn't a securities fraud case where you need an expert to explain stock terms like a SPAC or a puts in calls to the jury. It's not DNA evidence or something like that where there might be an appropriate role for more general testimony. This is testimony about the so-called interpersonal dynamics of human relationships.

THE COURT: What's your response to Zhong which where a similar argument was made from the defense that you can't have this kind of testimony at all because force labor is force labor. If someone was forced to work, then that should be a story told by the witnesses in that case. And the testimony of the expert did focus on those interpersonal dynamics. And the court said as a general matter, that's okay to have this kind

P4IBCOMO

of pattern in a potentially unfamiliar setting?

MS. SHAPIRO:  I think the facts of Zhong are quite distinguishable because what the court was talking about was how force labor works in the context of complex organizations, and that's very different from sort of everyday human relationships.  So there's that.  I also want to highlight, because it didn't come up in your dialogue with my colleague on the other side.

As we pointed out in our briefs on a number of the topics, they're either -- and actually I think your Honor may have flagged this as to some of them.  There either is no support, empirical support that she even cites.  But on some of the other ones, including the memory issue as we point out in our brief.  The sources she cites do not support the opinions she's rendering, and the Court has to take a careful look at that.  And with regard to the coercive control, just putting aside the request to the jury instruction because I understand your Honor's ruling on the use of the term.  But her definition is so broad and amorphous as to be completely meaningless.  She admits that there's no one size fits all.  And she says things like, love bombing is a tactic of coercive control.  She says, coercive control includes any tactic "designed to attain and maintain control in a relationship, or that it includes subtle tactics like rewards, positivity, affection and normalcy.  So basically everything counts.

P4IBCOMO

And I make this point just to highlight how her testimony is so meaningless as to be useless to the jury even if it had any empirical support, which it doesn't. And just sort of to help frame this issue, and I realize this may sound like a joke, but it's not. Obviously, we would never do this. But imagine if a defendant proffered an expert, an analogous expert on the flip side of this and said, I've got this expert who's going to tell the jurors about the general and common characteristics of false accusations of sexual abuse. Accusers often have drug and alcohol problems. Accusers often are in a lower social economic status than the men they accuse. Accusers often target rich men, and so on. That would obviously be improper.

And Hughes's testimony is the same thing, just from the opposite point of view, and sort of cloaked in all this jargon and a patina of science, but it's the same thing. That's what it boils down to. And that's why we're urging your Honor to really scrutinize it carefully and consider, does this really meet 702. Is it necessary or helpful to the jury, and to weigh that against the tremendous unfair prejudice of allowing the government to proffer an expert like this and then parade the expert in their closing argument in the way that they inevitably will.

THE COURT: What if I were to limit Dr. Hughes's testimony to the two sections I had flagged, which is if you

P4IBCOMO

look in the coercive control section, you may recall that I focused the government's attention on the end of the first second full paragraphs and the following paragraph, do you see Ms. Shapiro where I'm pointing to?

MS. SHAPIRO:  I was having a little trouble following your Honor.

THE COURT:  Do you have the disclosure in front of you?

MS. SHAPIRO:  Yes.

THE COURT:  Are you on pages three?

MS. SHAPIRO:  Page three at the top?

THE COURT:  Page three at the stop.

MS. SHAPIRO:  Yes.

THE COURT:  Do you see the second full paragraph that starts, As a result?

MS. SHAPIRO:  No.

THE COURT:  Are you on Dr. Hughes's disclosure or Dr. Bardey?

MS. SHAPIRO:  The second full paragraph says coercive control also includes?

THE COURT:  I'm sorry.  It must be numbered differently.  Next page, As a result?  Go to the last two sentences.

MS. SHAPIRO:  Yes.

THE COURT:  You see, Dr. Hughes will testify?

P4IBCOMO

MS. SHAPIRO:  Yes.

THE COURT:  Let me back up and say this.  I am mindful of the concerns that you're raising.  There are two sections of Dr. Hughes's disclosure that I think -- and I've mention this to the government, would clear the 702 bar and would not be unfairly prejudicial which is, this paragraph and the following paragraph which is the main focus is, Dr. Hughes testifying that you cannot infer from the fact that an individual remained in a relationship that they were not the victims of abuse.  I think that's the boiled down version of that portion of Dr. Hughes's report.  Second, the delayed disclosure section.  There Dr. Hughes says you cannot infer from the fact that an individual did not disclose the alleged abuse from any years that the abuse did not occur.  Those two sections, what are your particular argument as to why those should be excluded?

MS. SHAPIRO:  So with regard to the first one, I don't think it's anything that's beyond the ken of an ordinary person.  I don't think it's necessary, and it's highly prejudicial.  It's bolstering of the credibility.  It has suffers from many of the same problems that we identified.  With respect to the delayed disclosure.  As I indicated and as our brief lays out in detail, this is not supported by the sources that are cited.

THE COURT:  As you would point out on cross-examination I take it?

P4IBCOMO

MS. SHAPIRO:  That is true, your Honor.  But again, the point is that that shouldn't be the answer particularly after the amendment.

THE COURT:  Well, I think what the Advisory Committee noted is that there will be incidents where the issues raised on a Daubert motion go to weight rather than admissibility. The problem that the committee was addressing and that the amendment addresses is that there were courts that the decisions are cited in the note where courts were categorically saying that attacks on experts those issues and arguments raised go to the weight rather than admissibility of the testimony.  That's why I take your point as to many aspects of this as you can tell. I'm trying to fulfill my gatekeeping role. At some level, some of these arguments may end up going to weight rather than admissibility, but I take your point.

MS. SHAPIRO:  I think we can just agree to disagree. I think going back to coercive control.  I think that this has all the same problems as all the rest of the coercive control. And I also think based on my review of some of Dr. Hughes's prior testimony that, if you allow her to talk about this topic, it's going to be very difficult to restrain her from saying all the other things in this disclosure and whatever else may come into her head when she's on the stand.

THE COURT:  Well, that's my function, and I will fulfill it.

P4IBCOMO

MS. SHAPIRO:  I understand, your Honor.  I just don't think that those two sentences don't have the same problems that all the rest of them do.

THE COURT:  All right.  Thank you.  So here's what I'm going to do.  I'm going to consider this further, and I'll issue a decision on the expert issue next week.  My preliminary view is that if any portion of Dr. Hughes's testimony is admitted, it would be those two sections that I just identified, and not any of the other portions of the alleged disclosure.  At a bear minimum there would be no inference to coercive control.

And finally, if Dr. Hughes is permitted to testify, then Dr.  Bardey will also be permitted to testify.  But depending on what the Court's ruling is, Ms. Shapiro, what I think would be necessary is a red lined or revised disclosure so that it's clear what remains in terms of the rebuttal testimony.  If some portion of Dr. Hughes's testimony is out, it may turn out that you don't find the need to have Dr. Bardey testimony.  But in any event, it should be clear what Dr. Bardey is going to testify about so that we don't run into an issue at trial.

MS. SHAPIRO:  Yes, your Honor.  We'll revise the testimony if need be.

THE COURT:  That's the last thing I have on my agenda. Ms. Steiner, I'm happy to hear you.

MS. STEINER:  If I could be heard briefly?

THE COURT:  Yes.

MS. STEINER:  I understand what your Honor's thinking. And understanding that your Honor is taking under advisement as well given today's argument.  I just wanted to make a couple of points with respect to the scope of her testimony if your Honor would be inclined to limit it.  With respect to coercive control understanding that it would be referred to by another term, and certainly would be focused on the victim's experience rather than any experience of the perpetrator.  I think it would be very difficult if not impossible to limit the testimony solely to the psychological reasons why victims stay as your Honor pointed to those two paragraphs without providing some minimal background as to what those psychological reasons are, I think again which we'll refer to whatever term your Honor is inclined to use other than coercive control.  But it is kind of those tactics and dynamics that would provide the necessary context for that testimony.

THE COURT:  Why doesn't that sentence, so the one that I think you're pointing to, this is Dr. Hughes will testify, that sentence?

MS. STEINER:  Yes, your Honor.

THE COURT:  I think Dr. Hughes in this sentence explains the psychological reasons that she is referring to. She says, There are multiple psychological reasons why victims

P4IBCOMO

may express love, tenderness or loyalty. These could include, and then she goes on to explain what reasons she's referring to.

MS. STEINER: Just to make sure I'm understanding your Honor. Within this testimony Dr. Hughes would then be permitted to explain those psychological reasons such as the tactics that I described. Am I understanding that correctly?

THE COURT: No, she can describe what's in the next sentence where she does describe them -- let me be very clear just so everyone's clear. This has been raised in the context of a motion in limine. And so what that means is, when you get my ruling, if there is some lack of clarity or if either side has issues that they want to raise with the Court. All that means is that you have to approach before you admit something that I've already ruled on, that you can just have this dialogue. If something that I say is unclear and you want clarity, all you have to do is ask. Same thing, Ms. Shapiro, for your side.

MS. STEINER: Understood. The one final thing I would flag is something that your Honor flagged earlier that there is in fact some overlap I would agree with you between those paragraph in the coercive control section and the coping strategies sections. So, for example, there's a couple of sentences in the middle of the paragraph attempting to please or placate the abuser and bargaining with the perpetrator that

P4IBCOMO

I believe would overlap with the coercive control portion that you describe. I just would want to make sure that we would be able to speak to that as well, assuming that was your Honor intent.

THE COURT: I'll be mindful of that when I issue my decision.

MS. STEINER: Thank you, your Honor.

THE COURT: So that takes care of the issues that I wanted to raise. But other than that, the expert issue, I did most of the talking. I'm happy to hear from the parties or anything else that I raised this morning hearing. Ms. Johnson, I'm happy to start with you if there's anything you wanted to address.

MS. JOHNSON: Just one moment, your Honor.

MS. SHAPIRO: Your Honor, this is very simple. I just wanted to make sure the Court was clear because you mentioned your 413 ruling. The other two 404(b) acts and the government in their brief indicated they would not offer those, so I think those are moot.

THE COURT: Thank you for the clarification. So the motion is granted as to those witnesses as well as an unopposed motion.

MS. SHAPIRO: Thank you, your Honor.

MS. COMEY: We did say in our motion that if the defense opens the door, we might seek to reconsider.

P4IBCOMO

THE COURT:  As with all of these motions in limine.

MS. JOHNSON:  We just have a few housekeeping matters.

THE COURT:  Yes.

MS. JOHNSON:  With respect to your ruling on the motion to quash for Warner Brothers.  I apologize if I missed it, your Honor, was there a deadline for production associated with that ruling?

THE COURT:  Do we have anybody from Warner Brothers here.

MR. SULLIVAN:  Tom Sullivan.

THE COURT:  How much time would you need?

MR. SULLIVAN:  Just a couple of days, your Honor.  I'm mindful that it's the afternoon of a Friday and a holiday weekend. I think if we had to, the end of next week, that be fine.

THE COURT:  That's fine.  Thank you.

MS. JOHNSON:  Your Honor with respect to the jury questionnaire that you circulated last week.  The Court had set a deadline of next Wednesday to send any edits to the Court for its consideration.  The government has spoken to defense, and we would propose instead sending the edits to you by the end of the day next Tuesday the 22nd, in the hopes that the Court would be able to finalize the questionnaire by Thursday because the government does need sometime to be able to prepare all the copies that are needed.

P4IBCOMO

THE COURT: That's fine. From the government's perspective, are there any big picture problems with the proposal? And the reason why I ask is because as you might have seen, the Court's propose jury questionnaire is largely consistent with the government's proposed questionnaire in several respects. We've taken material from the defense's propose questionnaire and merged the two. Is there something at this time that you feel like is a big issue that you want the Court to think about over the weekend?

MS. JOHNSON: I think Ms. Comey will address that.

MS. COMEY: Thank you, your Honor. The one big picture we wanted to flag for your Honor we mentioned in our letter. We are concerned about asking jurors to disclose their own experiences with sexual assault, sexual abuse, and domestic violence in writing. You can manage from a juror's perspective they don't know where this document is going to go. They don't know who is going to read it. They don't know who is going to open it. They might not feel comfortable disclosing in writing. Our proposal was that those questions be asked in the individualized in-person voir dire that your Honor is going to conduct. We also think in those moments the prospective jurors are more likely to be paying closer attention for the reasons we articulated in our letter to your Honor.

THE COURT: All right. Thank you. Mr. Agnifilo.

MR. AGNIFILO: Thank you, your Honor. So I guess

P4IBCOMO

there are differences of opinion.  I understand AUSA's Comey's view. I always had the experience that sometimes jurors are hesitant even if they're sequestered.  There's still quite a few of us, and they might be self-conscious about speaking to all of us.  I think it would be very important to assure the jurors what is done with the questionnaires, which is that they're kept utterly discrete.  They are kept and maintained confidentially by the parties and that might help them be honest.

What we want to do is foster an atmosphere where they can speak freely without concern.  And whatever is the best way to bring that about is what I would like to do.  Our thought was to do it in the questionnaire.  We thought that was the best way to bring it about, so long as they understood how we were going to handle the questionnaire.

THE COURT:  To be very clear, these questions are going to be asked, and the real issue is where and when.  The function of the questionnaire as I see it is to filter out those jurors who are no one will question not going to be appropriate jurors in this case so that we don't have to have all those people come in for the in-person voir dire.  And so to address your concern, questions are going to be asked of anyone who serves on the jury.  The question is where and when. And the government says if you ask people to write down this information, that may pose specific concerns that they've

P4IBCOMO

raised.  You may disagree with those.  It's helpful for me to understand what the concern.

MS. COMEY:  Your Honor, I have a compromise to propose which would be to add a box that says prefer to address in person.  So maybe if a prospective juror doesn't want to write this down on the questionnaire, they could instead address it in person.

THE COURT:  That sounds like a fine compromise.  I see Mr. Agnifilo nodding his head.

MR. AGNIFILO:  I'm not nodding so that your Honor can see me.

THE COURT:  Nodding noted for the record.

MR. AGNIFILO:  I'm underlining my nodding.

THE COURT:  Anything further?

MS. JOHNSON:  One additional item, your Honor.  When we were here on Monday you asked us some questions about supplemental enterprise letters that we had provided to the defense.  I wanted to seek the Court's permission to provide an additional supplemental enterprise letter to the defense related to some additional activity that we anticipate proving up at trial that the government has uncovered through careful review of the documents that its marked as exhibits in this case. One of those would be additional dates on which trafficking activity occurred.

Many dates are already set out in the letters that the

P4IBCOMO

government has given to the defense so far, and the other item would be additional allegations of forced labor.

THE COURT:  Okay.  You can certainly provide the defense with that letter, and I take it that the defense would appreciate the disclosure.  Mr. Agnifilo, if you have any objections or any issues that arise from what you see in that letter, then you can raise them with the Court, which is another way of saying I'm not ruling on anything cause I haven't seen the letter.  But I think the government, given what I said on Monday wants to make sure that I'm aware that they are providing you with a subsequent enterprise letter.

MR. AGNIFILO:  I understand and I appreciate it and I appreciate that they told us about it ahead of time.  One of the things that I think we're all mindful of here on the defense side is, your Honor set a date for the enterprise letter of February 1st.  My interpretation of why your Honor set a date, which was relatively early, is because the enterprise letter is a matter of notice to us about what the government is going to be alleging is evidence of the enterprise.  And had the government sought leave to amend the enterprise letter, the two ones they have been done so far, we might well have objected and say, Judge, that's not fair.  We're on notice and we're ready to go to trial on the enterprise letter that they submitted on the date that the enterprise letter was due.

P4IBCOMO

Your Honor, I understand.  There's nothing before either of us.  But I'm also, this is now the third change of the enterprise letter.  We are picking a jury in a matter of days.  At a certain point, this just has to stop, and they have to try the case that they told us about.

THE COURT:  Why don't we wait and see what's in the letter.  You have preserved your ability to raise the issue that you just mentioned in an application to the Court.  Let's see what it is.

MR. AGNIFILO:  Thank you, your Honor.

MS. JOHNSON:  Nothing further from the government, your Honor.

THE COURT:  Let's turn to the defense.  Mr. Geragos.

MS. GERAGOS:  Your Honor, we have two things.  With permission from the Court, I would like to address the victim anonymity issue.  I had understood that we would be able to argue it today, so that's why I didn't put further details in the letter we submitted yesterday.  So if your Honor is okay with it, I just would like to address that issue now.

THE COURT:  Absolutely.

MS. GERAGOS:  I will try to cabin my arguments today just to respond to what your Honor said on the bench. I could not write as fast as you were speaking so I may forget some things, and I would encourage the Court to ask me some questions about some things, but I really want to address the

P4IBCOMO

differences here between Victim-2 and Victim-3 and Victim-4. And then your Honor's reliance on Raniere, which we are very familiar with as Mr. Agnifilo and I tried that case, so I wanted to address the differences, distinguishable differences between this case and that case.

First, your Honor pointed out that in Raniere not all the victims were minors. That is true. But in Raniere, I think the big picture difference is that there were not blanket pseudonyms for people. People were testifying under their first names. And in one instance for an attempted sex trafficking victim, the first initial of their first name in Raniere, after the trial multiple of those victims, then came out using their full names after the trial to sue the defendant. And that posed a huge problem for the defense. So I just want to flag that, that there were no true pseudonyms in Raniere. They were first names, for one instance first initial of their first name.

Your Honor pointed out that though their stories may have been public, it's much different to have to be cross-examined at a trial. In Raniere every single alleged victim who testified under first name or first initial of their first name, none of those witnesses or none of the people who are referred to by their first name, not all of them are witnesses, had come out publicly and spoken about their experiences with the defendant. That was the huge difference I

P4IBCOMO

think between this case and that case, is none of those individuals, though their stories may have been public by press, they had not come out and put their credibility on the line in public form.  I just want to make sure that's clear to your Honor.

Additionally, it was not as much as a logistical nightmare in that case as it is here, as particularly with victim-3 and victim-4.  Victim-3, as your Honor can see I think from the -- I think it's in the superseding indictment, she was around for a very long time.  This is somebody who's going to speak not only about her experiences, but several I think of the government's witnesses on their witness list they gave to us two days ago are going to speak about her.  This is going to be a huge logistical nightmare for the defense, and I think frankly for all of the witnesses who are going to speak about here.  Same with Victim-4.

One additional point I wanted to make as to a difference between victim-2 and victim-3 is that we have done our best to balance the harm, articulable harm to the victims versus the harm to Mr. Combs and his defense.  We have spoken to the attorneys for victim-2 and for victim-3.  For victim-2 that harm is articulated to us, and is something that we took very seriously.  And as your Honor knows from the sealed letter yesterday, the harm to her would be great, separate and apart from anything harm related.  We took that seriously.  We wanted

P4IBCOMO

to protect those privacy interest. And also the kind of conduct in the case related to her is much smaller, three years as oppose to -- I'm not going to put the amount of years on the record, but related to victim-3 and victim-4.

Victim-3, I spoke to her lawyer. I've spoken to her lawyer many times about this issue. And it is not clear to me that this is something that victim-3 is really pushing. I think she, what her lawyer described to me yesterday is she feels, Meh, is the word he used, a technical term about this issue. She understands that necessary cross-examination of her would reveal public statements, and we don't want to have to curtail any cross-examination. She understands that her identity may necessarily be understood by the members of the public due to the member public statements. And your Honor didn't address this in your ruling today, but I just wanted to correct that statement. I think we did in our opposition, but in the government's brief is she hasn't made any public statements in the past. I don't want to put the number of years, but that's just not true. I want to make that very clear in terms of victim-3's argument here or her position. I spoke to her lawyer just yesterday. That's why I didn't really put it in the letter. I thought we would be able to address it today.

With respect to victim-4. I think there's a little bit of a difference between her and victim-3 in terms of

P4IBCOMO

putting out her story.  Her name is known.  She's known.  And the particularized harm with respect to Mr. Combs for her is that it would severally curtail other ability to put on a defense case.  She is somebody who -- and I think we quoted one of these cases.  I think it was Fuller.  It would seriously infringe our ability to get witnesses.  Not being able to say her name or tell other witnesses about her would lead to an inability for us to her certain defense witnesses who I know would disagree with her story, and we would be able to call to the stand and be able to say, well, you worked for Combs during this year and this year, what did you observe?  And so it would be a real problem in terms of our defense case to not be able to tell people who she is and for her not to be able to put her name behind her testimony.

THE COURT:  Didn't you also say in your briefing that, at least from your perspective, the measures, because they are so limited, that the government has proposed will be ineffective, that anyone who testifies in this case, their identities will be quickly known to everyone.  That's an argument that was made in your opposition to the government's briefs.  So if that's true, then why would that impair any interest that Mr. Combs might have here?

MS. GERAGOS:  Because she would not have to put her name behind her testimony, and our defense witnesses would, and that's a huge consideration in terms of a defense case.  And

somebody willing to come forward to testify in a defense case in this case where it's so public, we have not really encountered publicity like this in a trial.  And she would be able to hide behind a pseudonym, and all of our defense witnesses would not.

THE COURT:  Again, this goes to the limited nature of what the government is saying.  The government's application is simply for the names, addresses, and places of current employment to be obscured, not from the jury, not from the parties.  And every other aspect of the witness's testimony will be public and made in open court, which is precisely I think why you made that statement in your brief that you didn't believe that it would be effective to keep any of this private.

Putting that to the side for a moment, and that's just a response to why it doesn't seem like there would be a particularized interest in the way that the Second Circuit had noted in Raniere.  But putting that to the side for a moment, do you have any criminal case where victim anonymity was rejected.  Because I looked, and the cases that you cited arose in the civil context.  And usually in this district, application of the sealed plaintiff factors, which are not applicable here.  No one argues that those are applicable.  Those factors are applicable because when a party brings a case, there is the operation of the rules that apply under Federal Rules of Criminal Procedure and other bases for people

P4IBCOMO

who are invoking the power of the court must come forward and have their names disclosed, and that is reflected in many of the sealed plaintiff factors.  There's a different concern here in the criminal context where the individuals we are talking about are not parties to the case, but rather victims who are testifying.  Not only does that change the calculus in terms of the general standard that applies, but it also implicates the Crime Victim Rights Act, which the government has noted has a specific obligation to respect the dignity and privacy of the victims.

MS. GERAGOS:  I have many responses to your Honor.

THE COURT:  I think my question was a little long-winded.  I think the real question was, do you have a criminal case.

MS. GERAGOS:  I think it's rare for the government to ask, which is why we don't have a binding criminal case.  I know your Honor's relying on Raniere.  I want to note for the record it's a summary order.  We don't feel that it is binding on your Honor to rely on it, and that's why I also wanted to distinguish it.  I think we did in terms of this.  I'm trying to address all of your Honor's points in that question.  We did note several of the civil cases.  We understand they're not binding on the Court, but we think it's persuasive for your Honor, and that's why we noted them, especially because they relate to Mr. Comb's, and they relate to other decisions that

P4IBCOMO

other courts in this very district decided.  We did as your Honor knows there were a few U.S. Supreme Court cases that we cited to.  But in terms of the anonymity and a specific criminal case that we can rely on aside from distinguishing Raniere, aside from what we already put in our brief, I don't have anything else.

THE COURT:  All right.  From the government's side the person addressing.

MS. COMEY:  That would be me, your Honor.

THE COURT:  One thing that Ms. Geragos raised is with respect to victim-3.  She says that in consultation with her counsel, it did not appear to the defense that victim-3 really cared too much about this. So what I'll ask the government to do is to figure that out, because even the government understands the logistical issues presented by having to do this, and most of those will fall on your shoulders.

MS. COMEY:  Absolutely, your Honor.  And I think what we're also want to do is to clarify whether the Meh to quote defense counsel comes from her ambivalence about testifying, or about testifying under a pseudonym.  I suspect that if they learns that the Court is incline to grant a motion for her to testify under a pseudonym, she might be more willing to testify in this trial in general, so we'll try to parse that out.

THE COURT:  All right.  Okay.  Anything further Ms. Geragos?

P4IBCOMO

MS. GERAGOS:  Just one thing, your Honor. Our exhibit list under ECF number 125 is due on April 25th.  We gave the government a two-day extension.  I understand they would agree for a two-day extension for ours to be due on the 27th.

MR. AGNIFILO:  One issue.  I think part of the problem with the anonymity issue is, it's really only recently that this has even become a thing in criminal cases.  And I think what's lacking in the courts now, not your Honor's, but prior court analysis is that there's not enough individual considerations.  And let me explain what I mean here.  We really did take this issue very seriously, which is why we said what we said about the victim, allege victim who we agreed could testify under a different name because there were particular compelling reasons that, forgetting what you're a party on what side if you're a careful thinking human being you saw and said okay, this make sense.  The one who said, Meh. Whatever way that person wants to go, I kind of get that.  So if that person wants it, I imagine the Court will grant it.

The one alleged victim that gives me the greatest concern because I think there are constitutional implications that are individual to that person is because if -- and I realize the last thing I want to do, I don't want anyone to be embarrass or anyone inconvenience.  There's Constitutional Rights at stake -- that one of the things that happens in this case that doesn't happen in any case is whenever anything

P4IBCOMO

happens in the case, we get phone calls, oh, I know, about this because I was there.  And we send our investigator out to speak to these people.  And these people, sometimes it's worthless. Sometimes it's helpful.  And one of the things that is unique to this one person is, I think that will happen.

Now, a reasonable question would be, why you think you're going to rely on, you know, good samaritan to know a thing or two to kind of come to you with things after the fact. Don't you know a lot of this?  And the answer is we do.  But part of the reason people testify in public courtrooms in public with their names is so if they say something that's not true and someone else knows it's not true, that person can contact one of the parties and could provide contrary information.  And I don't say that I'm concerned about that with anybody else, it's just that one.

THE COURT:  When you say that one, you're referring to?

MR. AGNIFILO:  I don't want get the number wrong.

MS. GERAGOS:  We're referring to victim-4 because it's happened in this case because putting herself out there publicly it has happen.  We have ex-employee come to us and say, we can't believe this.  That's why it's a particularized concern that Mr. Agnifilo articulated it better than I could, but it's really concerning for us this particular person.  And I interrupted you.

P4IBCOMO

MS. COMEY:  Your Honor, if I may.  I think the defense may have just proven the point for us in that, victim-4's name has not been said on this record in this case.  Victim-4's name has not been put in any un-redacted filings on the docket.  And yet, the facts about victim-4 has been publicized in this case has been identifying enough for those who know the facts to reach out to the defense and say, I know about that.  And so I think that the fact that they've already had people reaching out to them saying, I know about this incident, let me tell you about it shows that the narrowly tailored pseudonym motion here will not actually undermine what the defense wants to do here and what the defense is hoping will happen here.

THE COURT:  And what's your response to Ms. Geragos's suggestion that the circumstances are different as between victim-2 for the reasons expressed in Ms. Geragos's letter and victim-3 and-4?

MS. COMEY:  I don't think that Ms. Geragos is exactly correct about what the implication of the order would be.  I do not take the order to mean that the defense cannot go to other witnesses and use the true name of these victims during interviews of other witnesses.  What I think the order would require is that when those other witnesses take the stand, they be instructed, this person you know by name A, you will now be using name B to refer to them.

So when conducting their investigation, they can

P4IBCOMO

certainly use the true names when conducting the investigation they can.  When interviewing witnesses, use the true names. It's just when a witness is put on the stand to testify, that witnesses needs to be directed to use the pseudonym instead of the true name.  I think that would address Ms. Geragos's letter.

THE COURT:  And you understand that part of it may be difficult to police 100 percent?

MS. COMEY:  We understand.  I also know that defense counsel has been operating, especially with the way they handled victim-2 recently, acknowledging the sensitivities and being careful not to circumvent the intention of the order.  So I don't think that the defense is going to go send out a blast email with these victims' names in it.  But I suspect if they go and they interview former employees who they know overlap with victim-3 or with victim-4, they will in the context of those interviews in private use the true names to gather whatever information they want to gather.

THE COURT:  And the other thing that Ms. Geragos mention is that the compelling need to protect the identities of these witnesses is not established as to victim-3 and 4, and that it is an individualized inquiry.  Why isn't that a valid argument?  Meaning in the letter, we see the circumstances with respect to victim-2, I know that in your briefing you identified the reasons why disclosure would cause problems for

P4IBCOMO

each of the witnesses, but maybe you can just help me there.

MS. COMEY:  Yes, your Honor. I agree it's an individualized assessment.  Let's start with victim-4. Victim-4 has to my knowledge never come forward publicly about the abuse she experienced. Flat out, has never said something publicly about that.  And so I think their argument about the idea she that has somehow waived her right to anonymity because she's been in public with the defendant is not applicable to the analysis here.  The harms to her would be the same harms we set out in our brief.  The embarrassment, the difficulty forming future relationships, the difficulty obtaining future employment.  Those concerns remain for her.  Those same concerns would remain for victim-3.

I think victim-3, it is true, she has made some more public statements.  As we pointed out in our papers, those statements did not disclose the full extent of the abuse she experienced by any means, and it did not cover every topic that she will testify about at trial.  And I think that the point that was made in the Raniere case applies equally to victim-3. The fact that she on her own terms decided to share part of her story in the past does not mean that she has now opened herself up to having to publicly be cross-examined by many, many more very personal and explosive details.

I would also cite for your Honor that in the Maxwell case which I tried, one of the victims who was granted the

P4IBCOMO

right to testify under pseudonym had similarly given an interview to the press about her experience being abused by Jeffrey Epstein. She had not in that interview gone into every single detail about her experience or every single detail about her abuse. And Judge Nathan in that case found that she had, like I just suggested about victim-3. Not waive her right to anonymity by giving that very narrow interview to the press.

THE COURT: Thank you very much. The motion is granted as I previously indicated. However, Ms. Comey or Ms. Johnson, as I mention in the same way that the defense agreed that victim-2 could proceed under pseudonym, I'll just ask you in the interest of logistical concerns and moving the case forward swiftly whether you inquire with victim-3 to see if that's still a necessary measure to take in this case.

MS. COMEY: We will your Honor. Thank you.

MR. AGNIFILO: Your Honor, I promise, we're going to have a long trial together. I won't do this too often.

THE COURT: Let's mark that for the record.

MR. AGNIFILO: Would your Honor just give us until Monday to give the Court an individualized assessment as to why we agree to what we agreed to and why we didn't agree. I understand your Honor's ruling, and I'm not one to do what I'm doing, but I'm doing it now. I think it would be helpful. And if the ruling remains the same, then the ruling remains the same. I clearly see where your Honor is going in part because

P4IBCOMO

you ruled.  I do think -- one my concerns is, it's apparent that I'm going to continue to do these cases is we need to have a mechanism of introducing a more individualized assessment and process.  And your Honor's very certainly tried to do that and has been very open to it today and in the past.  I think we could do this quickly.  I think it's in the form of a two-page letter.  And if it moves your Honor's assessment, fine.  If it doesn't, that's fine too.

THE COURT:  I think that's true with most things and with any motion in limine.  Anything you want to bring to my attention, I will absolutely review it, so you should do that.

MS. COMEY:  I would just ask we move as quickly as possible, your Honor.  Because unlike with other motions in limine, there's a lot of legwork to do if three different witnesses are going to testify under pseudonym.

THE COURT:  I've given you the ruling, so you can proceed on that basis of that ruling.  Let me be clear. The motion is granted, so you can proceed on that basis.  I think Mr. Agnifilo wants to make sure that he can make his record. And to the extent he tells me something that was not reflected in the papers, then as I always do, I can change my ruling.  I understand the consequences that would have, but for present purposes, you should proceed on the basis that the motion is granted.

MS. COMEY:  Thank you very much, your Honor.

P4IBCOMO

MR. AGNIFILO:  One last thing, and I think both sides --

THE COURT:  You did it twice.

MR. AGNIFILO:  I said I wouldn't do it again. Obviously at this point everyone we've been using victim, it's alleged victim.  We've both been saying it.  I think we're saying it as a matter of shorthand, so that we understand where we're coming from.  At this point there's still no trial.

THE COURT:  Absolutely.  Just in case you thought it might be unclear, Mr. Combs is presumed innocent, and these are alleged victims.  All right.  Anything further from the government?

MS. JOHNSON:  No, your Honor.

THE COURT:  I've already heard from the defense, just to be fair, I'll ask you the same question.  Anything further from the defense?

MR. AGNIFILO:  I'll check with all my colleagues. Thank you, your Honor, for your time and for the tremendous thought you put into these issues.

THE COURT:  Of course. Thank you.  We are adjourned. We'll see everybody next week.

(Adjourned)