UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

SEAN COMBS,
 a/k/a "Puff Daddy,"
 a/k/a "P. Diddy,"
 a/k/a "Diddy,"
 a/k/a "PD,"
 a/k/a "Love,"
                    Defendant.

S3 24 Cr. 542 (AS)

**THE GOVERNMENT'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
THE DEFENDANT'S MOTIONS *IN LIMINE***

MATTHEW PODOLSKY
Acting United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Maurene Comey
Meredith Foster
Emily A. Johnson
Christy Slavik
Madison Reddick Smyser
Mitzi Steiner
Assistant United States Attorneys
 *Of Counsel*

i

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 1

   I.  The Indictment ............................................................................................. 1

ARGUMENT ............................................................................................................ 3

   I.  THE COURT SHOULD ADMIT DR. HUGHES'S TESTIMONY, WHICH IS
PRECISELY THE TYPE OF EXPERT TESTIMONY ROUTINELY ADMITTED
BY COURTS IN TRIALS INVOVLING SEXUAL ABUSE ........................... 3

     A. Background ............................................................................................ 4

     B. Applicable Law ...................................................................................... 6

     C. Discussion .............................................................................................. 8

       1.  Dr. Hughes's Testimony Is Supported by Reliable Principles and Methods That
She Has Applied in This Case ............................................................ 9

       2.  Dr. Hughes's Testimony Will Properly Help the Jury Understand the Evidence 16

       3.  Dr. Hughes Will Not Opine on Any Legal Terms, and Will Make Clear that Her
Testimony Relates Only to Psychological Concepts, Not Legal Definitions ......... 19

       4.  Dr. Hughes's Testimony Easily Satisfies Rule 403 ................................ 21

   II. VIDEO FOOTAGE OF THE MARCH 2016 ASSAULT OF ██████ IS EASILY
AUTHENTICATED, EXTRAORDINARILY PROBATIVE, AND READILY
ADMISSIBLE AT TRIAL ....................................................................... 23

     A. Relevant Facts ....................................................................................... 24

     B. Applicable Law ...................................................................................... 27

       1.  Authenticity ........................................................................................ 27

       2.  The Best Evidence Rule ...................................................................... 28

       3.  Rule 403 ............................................................................................. 29

     C. Discussion .............................................................................................. 30

       1.  The Videos Are Authentic ................................................................... 31

       2.  The Videos Are Admissible Under Either Rule 1003 or 1004 ................... 36

       3.  Rule 403 ............................................................................................. 37

 III.EVIDENCE OF ██████████████████████ IS ADMISSLBE TO PROVE COERCION ............ 39

     A. Relevant Facts ....................................................................................... 39

     B. Applicable Law ...................................................................................... 42

     C. Discussion .............................................................................................. 44

       1.  Evidence of ██████████ Is Plainly Relevant ............................................ 44

       2.  The ██████████ Is Not Unduly Prejudicial Under Rule 403 ...................... 47

**IV. THE COURT SHOULD DEFER RULING ON DEFENDANT'S MOTION TO PRECLUDE SUMMARY CHARTS AND DEMONSTRATIVE EXHIBITS** ............ **48**

   **A. The Government's Summary Charts Will Comply with Rule 1006** .......................... **49**

   **B. The Parties Have Agreed to a Schedule for Disclosure of Summary Charts** ........... **50**

**V. THE COURT SHOULD ADMIT EVIDENCE OF THE DEFENDANT'S PAST ACTS OF VIOLENCE AND OBSTRUCTION ONLY IF THE DEFNESE OPENS THE DOOR AT TRIAL** ............................................... **51**

**CONCLUSION** ......................................................................................... **52**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger,*
   303 F.3d 256 (2d Cir. 2002) ................................................................................ 7, 8

*Boucher v. United States Suzuki Motor Corp.,*
   73 F.3d 18 (2d Cir. 1996) ....................................................................................... 7

*Boykin v. W. Express, Inc.,*
   No. 12 Civ. 7428 (NSR), 2016 WL 8710481 (S.D.N.Y. Feb. 5, 2016) ............... 27, 31

*Contemporary Mission, Inc. v. Famous Music Corp.,*
   557 F.2d 918 (2d Cir. 1977) ................................................................................ 42

*Daubert v. Merrell Dow,*
   509 U.S. 579 (1993) ....................................................................................... 7, 14

*Elliott v. Cartagena,*
   84 F.4th 481 (2d Cir. 2023) ...................................................................... 28, 29, 36

*Hygh v. Jacobs,*
   961 F.2d 359 (2d Cir. 1992) ................................................................................ 20

*Kumho Tire Co., Ltd. v. Carmichael,*
   526 U.S. 137 (1999) ............................................................................................. 7

*Leo v. Long Island R. Co.,*
   307 F.R.D. 314 (S.D.N.Y. 2015) ....................................................................... 32, 35

*Meledez-Rojas v. United States,*
   145 S. Ct. 316 (2024) ...................................................................................... 43, 44

*Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Grp.,*
   937 F. Supp. 276 (S.D.N.Y. 1996) ...................................................................... 43

*Nimely v. City of New York,*
   414 F.3d 381 (2d Cir. 2005) ............................................................................... 11

*Paul v. N. Cent. Bronx Hosp., No.,*
   16 Civ. 1952 (VSB), 2024 WL 1994049 (S.D.N.Y. May 6, 2024) ....................... 35

*Travelers Property & Cas. Corp. v. General Elec. Co.,*
   150 F. Supp. 2d 360 (D. Conn. 2001) ................................................................... 8

*United States v. Abu-Jihaad,*
   630 F.3d 102 (2d Cir. 2010) ............................................................................... 42

*United States v. Al-Moayad,*
   545 F.3d 139 (2d Cir. 2008) ............................................................................... 42

*United States v. Amuso,*
   21 F.3d 1251 (2d Cir. 1994) ........................................................................... 12, 13

*United States v. Batton,*
   602 F.3d 1191 (10th Cir. 2010) .......................................................................... 17

*United States v. Campbell,*
   850 F. App'x 102 (2d Cir. 2021) ......................................................................... 35

*United States v. Chapman,*
   804 F.3d 895 (7th Cir. 2015) .............................................................................. 36

*United States v. Codrington*,
  No. 07 MJ 118 (CLP), 2008 WL 1927372 (E.D.N.Y. May 1, 2008) ...................................... 36
*United States v. Condry*,
  574 F. Supp. 3d 979 (N.D. Okla. 2021) ........................................................................... 36, 37
*United States v. Dhinsa*,
  243 F.3d 635 (2d Cir. 2001) ............................................................................................... 27
*United States v. Felder*,
  993 F.3d 57 (2d Cir. 2021) ................................................................................................. 17
*United States v. Figueroa*,
  618 F.2d 934 (2d Cir. 1980) ............................................................................................... 29
*United States v. Fuentes*,
  563 F.2d 527 (2d Cir. 1977) ................................................................................... 27, 31, 38
*United States v. Gatto*,
  986 F.3d 104 (2d Cir. 2021) ................................................................................................. 7
*United States v. Gelzer*,
  50 F.3d 1133 (2d Cir. 1995) ............................................................................................... 29
*United States v. Grady*,
  645 F. App'x 1 (2d Cir. 2016) ..................................................................................... 13, 14
*United States v. Hamilton*,
  334 F.3d 170 (2d Cir. 2003) ............................................................................................... 27
*United States v. Ho*,
  984 F.3d 191 (2d Cir. 2020) ............................................................................................... 50
*United States v. Jacobs*,
  475 F.2d 270 (2d Cir. 1973) ............................................................................................... 37
*United States v. Johnson*,
  860 F.3d 1133 (8th Cir. 2017) ..................................................................................... 11, 17
*United States v. Johnson*,
  No. S5 10 CR. 431 (CM), 2014 WL 171154 (S.D.N.Y. Jan. 14, 2014) ................................ 43
*United States v. Kidd*,
  385 F. Supp. 3d 259 (S.D.N.Y. 2019) ................................................................................ 10
*United States v. Kimble*,
  54 F.4th 538 (8th Cir. 2022) ............................................................................................... 31
*United States v. Maxwell*,
  No. 20 Cr. 330 (AJN), 2021 WL 5283951 (S.D.N.Y. Nov. 11, 2021) ............................ passim
*United States v. Mejia*,
  545 F.3d 179 (2d Cir. 2008) ................................................................................... 12, 13, 17
*United States v. Melendez-Rojas*,
  No. 22 Cr. 333, 2024 WL 1881491 (2d Cir. Apr. 30, 2024) .................................. 43, 45, 47, 48
*United States v. Menendez*,
  23 Cr. 490 (SHS), 2024 WL 5103452 (S.D.N.Y. Dec. 13, 2024) ........................................ 50
*United States v. Mercado*,
  573 F.3d 138 (2d Cir. 2009) ............................................................................................... 38
*United States v. Miller*,
  954 F.3d 551 (2d Cir. 2020) ............................................................................................... 50
*United States v. Morrison*,
  153 F.3d 34 (2d Cir. 1998) ................................................................................................. 34

*United States v. Paredes*,
   176 F. Supp. 2d 192 (S.D.N.Y. 2001) ................................................. 43
*United States v. Pitre*,
   960 F.2d 1112 (2d Cir. 1992) ................................................. 29, 38
*United States v. Quinones*,
   417 Fed. App'x 65 (2d Cir. 2011) ................................................. 42
*United States v. Raniere*,
   No. 20 Cr. 3520, 2022 WL 17544087 (2d Cir. Dec. 9, 2022) ................................................. 43
*United States v. Raniere*,
   No. 18 Cr. 204 (NGG), 2019 WL 2212639 (E.D.N.Y. May 22, 2019) ................................................. passim
*United States v. Ray*,
   No. 20 Cr. 110 (LJL), 2022 WL 101911 (S.D.N.Y. Jan. 11, 2022) ................................................. passim
*United States v. Reichberg*,
   5 F.4th 233 (2d Cir. 2021) ................................................. 44, 48
*United States v. Roldan-Zapata*,
   916 F.2d 795 (2d Cir. 1990) ................................................. 29
*United States v. Ruggiero*,
   928 F.2d 1289 (2d Cir. 1991) ................................................. 13, 27
*United States v. Salameh*,
   152 F.3d 88 (2d Cir. 1998) ................................................. 43
*United States v. Schultz*,
   333 F.3d 393 (2d Cir. 2003) ................................................. 42
*United States v. Scop*,
   846 F.2d 135 (2d Cir. 1988) ................................................. 13
*United States v. Skyers*,
   787 F. App'x 771 (2d Cir. 2019) ................................................. 13
*United States v. Telles*,
   6 F.4th 1086 (9th Cir. 2021) ................................................. 11
*United States v. Tin Yat Chin*,
   371 F.3d 31 (2d Cir. 2004) ................................................. 27, 28, 30, 33
*United States v. Torres*,
   No. 20 Cr. 608 (DLC), 2021 WL 1947503 (S.D.N.Y. May 13, 2021) ................................................. 8, 10, 11, 22
*United States v. Tussa*,
   816 F.2d 58 (2d Cir. 1987) ................................................. 29
*United States v. Vayner*,
   769 F.3d 125 (2d Cir. 2014) ................................................. 27, 28, 31
*United States v. White*,
   692 F.3d 235 (2d Cir. 2012) ................................................. 42
*United States v. Whittingham*,
   346 F. App'x 683 (2d Cir. 2009) ................................................. 34, 36, 37
*Zegarelli v. Hughes*,
   3 N.Y.3d 64 (2004) ................................................. 32

## Statutes

18 U.S.C. § 1591 ................................................. 2, 20, 21
18 U.S.C. § 1962(d) ................................................. 1

18 U.S.C. § 2421(a) ................................................................................................... 2

**Rules**

Fed. R. Evid. 401 .............................................................................................. 12, 42
Fed. R. Evid. 403 .............................................................................................. 29, 43
Fed. R. Evid. 702 ................................................................................................ 7, 8
Fed. R. Evid. 901(b) ............................................................................................. 27
Fed. R. Evid. 1001(e) ........................................................................................... 28
Fed. R. Evid. 1003 ............................................................................................... 36
Fed. R. Evid. 1004 .......................................................................................... 28, 30
Fed. R. Evid. 1006 ............................................................................................... 49

**Regulations**

28 C.F.R. § 50.10(c).................................................................................... 25, 26, 37

## PRELIMINARY STATEMENT

The Government respectfully submits this omnibus memorandum of law in opposition to the defendant's five motions *in limine* in connection with the trial scheduled to begin in this case on May 5, 2025. Three of the defendant's motions variously seek to prevent the Government from admitting highly relevant evidence, including some of the most damning evidence of his sex trafficking through force and coercion. Specifically, the defendant seeks to preclude the Government from admitting (1) expert testimony from a psychologist who will provide crucial context about the behavior of victims in abusive relationships, (2) video of the defendant assaulting one of his victims when she tried to leave a hotel room where she was required to have sex with a male commercial sex worker, and (3) evidence that the defendant ███████████████████ ███████. The Court should reject these desperate attempts to prevent the jury from seeing and hearing highly probative evidence.

The defendant's remaining two motions need not be decided at this juncture. In particular, (4) the Court should defer ruling on the defendant's motion to preclude summary charts until after the Government has produced its draft charts at the time the parties have now agreed upon; and (5) the Government will not seek to admit evidence of the defendant's violent and obstructive conduct from 1999 unless the defense opens the door at trial. Accordingly, the Court need not resolve the latter two motions before trial.

## BACKGROUND

### I.    The Indictment

On April 3, 2025, the grand jury returned Indictment S3 24 Cr. 542 (AS) charging the defendant in five counts. Count One charges the defendant with participating in a racketeering conspiracy between in or about 2004 and 2024, in violation of 18 U.S.C. § 1962(d). (Dkt. No. 209 ("Indictment") ¶¶ 1-16). Among other things, Count One alleges that the defendant coerced three

female victims, identified in the Superseding Indictment as Victim-1, Victim- 2, and Victim-3, to engage in commercial sex acts. (*Id.* ¶ 12(a)). Count Two charges the defendant with sex trafficking Victim-1 by force, fraud, and coercion between in or about 2009 and 2018, in violation of 18 U.S.C. § 1591. (*Id.* ¶ 17). Count Three charges the defendant with transporting Victim-1 and male commercial sex workers interstate for purposes of engaging in prostitution between in or about 2009 and 2018, in violation of 18 U.S.C. § 2421(a). (*Id.* ¶ 18). Count Four charges the defendant with sex trafficking Victim-2 by force, fraud, and coercion between in or about 2021 and 2024, in violation of 18 U.S.C. § 1591. (*Id.* ¶ 19). Count Five charges the defendant with transporting Victim-2 and male commercial sex workers interstate for purposes of engaging in prostitution between in or about 2021 and 2024, in violation of 18 U.S.C. § 2421(a). (*Id.* ¶ 20). As detailed in the Indictment, these charges arise from the defendant's decades' long pattern of criminal conduct involving the abuse and sexual exploitation of multiple victims.[1]

As charged in the Indictment, the defendant, often assisted by other members and associates of the racketeering enterprise (the "Enterprise"), conspired to engage in numerous offenses constituting racketeering activity, including, among others, sex trafficking, forced labor, other acts of sexual and physical violence, bribery of witnesses, and obstruction. (*Id.* ¶¶ 1-14). In particular, Count One alleges that, as part of a pattern of racketeering activity, the defendant persuaded Victim-1, Victim-2, and Victim-3 through force, fraud, and coercion to participate in highly orchestrated sexual encounters that lasted for multiple hours and sometimes full days without sleep. (*Id.* ¶ 12(b)). During these commercial sex acts, the defendant distributed a variety

---

[1] An overview of the criminal conduct and the charges in the Indictment were set forth in the Government's prior briefing, and in the Government's Enterprise letters, which were submitted to the Court under seal on March 26, 2025. The Government incorporates that background by reference here.

of controlled substances to victims, in part to keep the victims obedient and compliant. (*Id.*). Count One also alleges that the defendant obtained the forced labor of all three of those same victims during the course of commercial sex acts through force and threats of serious harm and from his employees, including one who the defendant coerced into unwanted sexual activity. (*Id.* ¶ 12(i)). The evidence surrounding those victims will include detailed testimony and documentary evidence revealing years of abuse, force, false promises, and coercion that the defendant inflicted.

## ARGUMENT

### I. THE COURT SHOULD ADMIT DR. HUGHES'S TESTIMONY, WHICH IS PRECISELY THE TYPE OF EXPERT TESTIMONY ROUTINELY ADMITTED BY COURTS IN TRIALS INVOVLING SEXUAL ABUSE

The defendant asks the Court to exclude Dr. Dawn Hughes's expert testimony, despite her uncontested qualifications and anticipated testimony that has become standard within this Circuit. Dr. Hughes is a board-certified forensic psychologist and a clinical psychologist with 30 years of experience. She has repeatedly been qualified to offer expert testimony, including in multiple criminal trials, on topics of, among other things, sexual abuse and responses to such abuse, coercive control, coping strategies during and related to sexual abuse and intimate partner violence, delayed disclosure of abuse, and memory. Multiple federal judges, including within this District, have admitted her testimony and testimony from other experts like her in cases involving allegations of sexual abuse—including in cases charging sex trafficking. There is nothing controversial about this testimony; indeed, it is routinely admitted in cases involving sexual abuse and the defendant cites no case concluding otherwise. Dr. Hughes's testimony is well supported by established scientific principles, is highly relevant—including to arguments that the defendant has already previewed—and should be admitted at this trial.

3

## A. Background

Trial in this matter will include evidence of the defendant's abusive relationships with multiple female victims, including at least four statutory victims who will testify about sex acts with the defendant and/or with male sex workers for his sexual gratification that were brought about by the defendant's violence, threats, false promises, and coercion.  Three of these victims had long-term personal relationships with the defendant and the fourth was a long-time employee. The Government offers Dr. Hughes's testimony to provide context relevant to this subject matter.

Dr. Hughes is a leading expert on sexual abuse, interpersonal violence, victimization, and traumatic stress.  She maintains an independent practice in clinical and forensic psychology, and has taught, published, presented, and conducted professional legal and mental health trainings on the topics that will be the subject of her testimony.  Dr. Hughes is also the immediate past president of the Trauma Psychology Division of the American Psychological Association.  Her 30 years of practice, her trauma-based education and training, and an extensive study of the empirical data and social science literature on sexual assault, interpersonal violence, victimization, coercive control, and trauma together form the basis of her proposed testimony.

As set forth in its expert notice, the Government expects Dr. Hughes to testify regarding: (1) intimate partner violence and coercive control; (2) sexual abuse and victim responses to sexual abuse, including victim coping strategies; (3) delayed disclosure; and (4) memory of sexual abuse.

Sexual Abuse, Intimate Partner Violence, & Coercive Control:  Dr. Hughes is expected to testify that interpersonal violence "is violence or abuse committed between individuals, including rape, sexual assault, sexual harassment, or intimate partner violence, among others," and also "refers to dynamics related to coercion and emotional abuse that may not necessarily involve physical violence as commonly understood." (Ex. A at 1).  Dr. Hughes is expected to testify that

coercive control is a "strategic pattern of behavior that is designed to attain and maintain control

in a relationship." (Ex. A at 2). As understood within the relevant literature and practice of

psychology, coercive control includes physical, sexual and/or emotional tactics, including:

> [A]ctual or threatened physical violence; aggression; sexual assault and abuse,
> sexual degradation; micro-regulation; financial and economic control; control over
> reproductive health; control through the use of drugs or alcohol; physical and
> emotional isolation from preexisting support networks and external influence; use
> of collateral or damaging or compromising information; exploitation of preexisting
> psychological, traumatic, or financial vulnerability; psychological degradation and
> humiliation; gaslighting; and surveillance techniques limiting privacy and
> independent thought, and instilling the belief that the perpetrator is omnipresent.

(*Id.*). Coercive tactics are "often interspersed with rewards, positivity, affection, and normalcy,

which can create emotional attachment and psychological dependency." (Ex. A at 3). This can

cause victims to "stay with or return to, rather than leave, their abusers" and lead to a "feeling of

psychological entrapment due to deterioration of the psychological functioning of the victim."

(*Id.*). Coercive control may "caus[e] [a] victim to engage in sexual activity in which they would

not otherwise engage for fear of the negative consequences if they refused." (*Id.*).

Sexual Abuse, Responses and Coping Strategies. Dr. Hughes will testify about different

types of sexual abuse and common responses to that abuse. Dr. Hughes will testify that victims

commonly use a range of coping strategies in response to sexual abuse. These strategies may

include the following:

> [A]ttempting to please or placate the abuser, bargaining with the perpetrator,
> compliance with demands and expectations, and/or remaining silent . . . engag[ing]
> in avoidance, compartmentalization, minimization, directed forgetting, making
> excuses for others, self-blame, and denial[, . . .] seek[ing] to numb and minimize
> painful sexual and abusive experiences through the use of substances, such as drugs
> and alcohol[, . . . and] use[ing] minimizing or distancing language such as an
> unwanted or uncomfortable sexual experience.

(Ex. A at 4).

Delayed Disclosure. Dr. Hughes will testify that research reflects underreporting of sexual abuse. (Ex. A at 4). Dr. Hughes will testify about both external barriers (*i.e.*, others' perceptions and anticipated reactions) and internal barriers (*i.e.*, the victim's own feelings) to disclosure of sexual abuse. (*Id.*). Dr. Hughes will also testify that the relationship between the victim and perpetrator of sexual abuse "has been demonstrated to impact the disclosure process." (Ex. A at 5). "The closer the relationship between the victim and the perpetrator, the less likely the victim is to recognize or label what happened as sexual abuse," which further inhibits disclosure. (*Id.*). A "power differential between the perpetrator and the victim" can heighten this pattern. (*Id.*).

Memory. Dr. Hughes will testify that as a result of "traumatic stress, abuse memories can be retained but also may be lost or fragmented." (Ex. A at 5). This may impact a victim's ability to recall "peripheral details," such as details about the "sequence of events." (*Id.*). This may be the result of "defense mechanisms to trauma such as dissociation, suppression, avoidance, directed forgetting, or compartmentalization" and can "cause voluntary and involuntary forgetting and deficits in recall, even of central details." (*Id.*). Due to traumatic stress, "and particularly when a person employs dissociation during the event, memories of abuse may get encoded as flashbulbs, or fragments of memory, without a clear linear or coherent narrative" and may prevent a victim of repeat sexual abuse from "recall[ing] each isolated incident." (*Id.*). Nevertheless, "[a] victim may work to retrieve memory over time," including through "retrieval cues (i.e. other thoughts and memories), which can then trigger additional details of their victimization." (Ex. A at 6).

## B. Applicable Law

Under Federal Rule of Evidence 702, the Court may admit "[a] witness who is qualified as an expert . . . if: (a) the expert's scientific . . . knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; *see also Daubert v. Merrell Dow*, 509 U.S. 579, 592-93 (1993).  Thus, "[g]enerally, an expert may be permitted to testify if he is qualified, reliable, and helpful." *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021).  The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied. *See Daubert*, 509 U.S. at 593 n.10.

The district court plays a gatekeeping role, which requires the court to "'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Amorgianos v. Nat'l R.R. Passenger*, 303 F.3d 256, 265-66 (2d Cir. 2002) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)). In determining whether an expert's reasoning or methodology is reliable, the trial court may consider: (1) whether the theory or technique used by the expert can be, or has been, tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted within the relevant scientific community. *Daubert*, 509 U.S. at 593-94.   The Supreme Court cautioned district courts, however, that in carrying out their gatekeeper function, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

The Second Circuit has consistently applied a broad standard in determining the admissibility of expert opinion testimony under Rule 702 and Daubert. *See, e.g.*, *Boucher v.*

*United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony."); *see also Travelers Property & Cas. Corp. v. General Elec. Co.*, 150 F. Supp. 2d 360, 363 (D. Conn. 2001) (noting that a "review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule" (quoting Advisory Committee's Notes on 2000 Amendments to Fed. R. Evid. 702)).  Indeed, the Second Circuit has explained that, at bottom, the *Daubert* analysis is intended to give the district court the discretion "needed to ensure the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact."  *Amorgianos*, 303 F.3d at 267.

Applying this standard, Courts within this Circuit regularly admit expert psychologist testimony in criminal cases involving allegations of sexual abuse to explain the dynamics of abusive relationships and victim behavior in the context of such relationships.  *See, e.g.*, *United States v. Ray*, No. 20 Cr. 110 (LJL), 2022 WL 101911, at *9-13 (S.D.N.Y. Jan. 11, 2022); *United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 5283951, at *2-5 (S.D.N.Y. Nov. 11, 2021); *United States v. Torres*, No. 20 Cr. 608 (DLC), 2021 WL 1947503, at *2, 5-8 (S.D.N.Y. May 13, 2021); *United States v. Raniere*, No. 18 Cr. 204 (NGG), 2019 WL 2212639 at *7-8 (E.D.N.Y. May 22, 2019).

## C.  Discussion

Dr. Hughes's testimony fits comfortably within the parameters of Rule 702 and will be both relevant and helpful to the jury in this case.  Tellingly, the defendant points to not a single case where expert psychologist testimony like that proffered here was not allowed to be presented

in a case involving sexual abuse.  That is because such testimony is entirely proper and highly useful to juries considering allegations of sexual abuse occurring in the context of long-term relationships.

The defense raises four primary arguments in support of precluding Dr. Hughes's testimony: (i) that Dr. Hughes speaks only in general terms and has failed to apply her methodology to the facts of this case, (ii) that Dr. Hughes's testimony is within the ken of the average juror, (iii) that Dr. Hughes's testimony would usurp the role of the Court in instructing the jury on the law, and (iv) that Dr. Hughes's testimony should be precluded under Rule 403 as unfairly prejudicial and leading to juror confusion.  Each argument fails.  *First*, the defense's complaint that Dr. Hughes's testimony is general, rather than specific to the victims in this case, is entirely backwards—an expert may not testify as to a specific witness's credibility whatsoever and only subject matter testimony of this kind is permissible in a criminal case.  *Second*, as multiple courts in this Circuit have previously found, Dr. Hughes's testimony will aid the jury in understanding the complex dynamics in a relationship involving intimate partner violence and coercive control, as well as the psychological impact of sexual abuse on a victim's memory and willingness to disclose abuse.  *Third*, Dr. Hughes will make clear that her testimony is limited to psychological concepts, not legal definitions, and any risk of confusion can be cured by a limiting instruction.  *Finally*, Dr. Hughes's testimony is highly probative—including as to issues already raised by the defendant— and neither unfairly prejudicial or confusing.  Accordingly, the Court should deny the defendant's motion to preclude her testimony.

### 1.  Dr. Hughes's Testimony Is Supported by Reliable Principles and Methods That She Has Applied in This Case

As an initial matter, the defendant does not—and cannot—contest Dr. Hughes's qualifications.  Dr. Hughes is a leading expert in her field and has previously testified on these

very topics in multiple federal trials in this Circuit involving allegations of sex trafficking and other forms of sexual abuse. *See Ray*, 2022 WL 101911, at *11 ("The government has established Dr. Hughes' competence and qualifications to give that expert testimony. She has had extensive experience not only with those who have been victims of sexual abuse and has extensive training in this area, but she also maintains an independent practice that specialized in traumatic stress and interpersonal violence and has presented extensively on complex trauma generally . . . That experience and training qualify her to testify to the type of conduct that victims of sexual abuse and interpersonal violence have faced and the effect of that conduct on the victims."); *see also Raniere*, 2019 WL 2212639 at *7 (finding Dr. Hughes's testimony regarding, among other things, delayed disclosure of sexual assault by victims, to be admissible based on "her extensive study of empirical data and medical and social science literature and her substantial clinical experience."); Trial Tr. at 3913–18, *United States v. Kelly*, No. 19 Cr. 286 (AMD) (E.D.N.Y. Sept. 17, 2021), Dkt. No. 250 (Dr. Hughes testifying as to experience in trauma psychology and with victims of interpersonal violence).

Instead, the defense argues that Dr. Hughes's testimony is not reliable because she will testify only to general principles and "has not examined the alleged victims or considered the facts of the case." (Mot. at 11-13, 18). The defense's description of such blind testimony as somehow inappropriate is mistaken. Indeed, such subject matter testimony by blind experts has repeatedly been admitted within this Circuit to "help a jury understand a common set of conduct experience[d] by victims or the actions normally taken by those committing certain crimes to seduce their victims." *Ray*, 2022 WL 101911, at *10; *see also, e.g.*, *Maxwell*, 2021 WL 5283951, at *2-5; *Torres*, 2021 WL 1947503, at *6; *United States v. Kidd*, 385 F. Supp. 3d 259, 263 (S.D.N.Y. 2019); Feb. 25, 2020 Tr. at 23:15-40:15, *United States v. Randall*, 19 Cr. 131 (PAE) (S.D.N.Y.),

Dkt. No. 335; Oct. 17, 2019 Tr. at 27:1-12, *United States v. Dupigny*, No. 18 Cr. 528 (JMF) (S.D.N.Y.), Dkt. No. 198.

Moreover, while the defense continues to insist that Dr. Hughes must evaluate the victims in this case to provide reliable testimony, "[t]he Defense has the law backwards on this point." *Maxwell*, 2021 WL 5283951, at *5. As described in the Government's motion to preclude the testimony of defense expert Dr. Bardey, there are two types of testimony on these subjects that an expert can provide: subject matter testimony and individual assessment testimony. These two forms of expert testimony serve distinct functions. While the latter may be used to evaluate a complainant in a civil matter, it is strictly prohibited in the criminal context. *See Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) ("Expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible."). Indeed, "[Dr. Hughes's] testimony is appropriate because she does *not* testify as to any specific witness's credibility." *Maxwell*, 2021 WL 5283951 at *5 (emphasis in original). *See also Torres*, 2021 WL 1947503, at *7; *United States v. Johnson*, 860 F.3d 1133, 1140 (8th Cir. 2017) (explaining that an expert may testify "regarding the general characteristics that sexually abused children exhibit" but may not usurp the jury's role of assessing the credibility of any specific victim); *United States v. Telles*, 6 F.4th 1086, 1097-98 (9th Cir. 2021) (same).

The defense further argues that Dr. Hughes's testimony should be excluded because "it will mirror the testimony elicited from the alleged victims." (Mot. at 17). The defendant's argument is misguided. There is "nothing wrong with testimony that corroborates the testimony of a party's fact witnesses and thereby makes that testimony more credible or believable to the jury." *Ray*, 2022 WL 101911 at *12. Indeed, "[t]hat is a necessary condition of all admissible evidence—it has the 'tendency to make a fact more or less probable than it would be without the

11

evidence.'"  *Id.* (quoting Fed. R. Evid. 401(a)).  As Judge Liman aptly noted regarding Dr.

Hughes's proposed testimony on coercive control in *United States v. Ray*:

> [Dr. Hughes's] testimony will bolster the testimony of any particular
> victim or witness only in the sense that if the jury finds Dr. Hughes'
> testimony regarding modus operandi and the effect of sexual abuse
> on a victim to be credible and if it finds that the facts as testified to
> by a victim fit the pattern described by Dr. Hughes, it might find that
> testimony to be more credible than if Dr. Hughes had not testified.
> But the defense will be able to cross-examine both Dr. Hughes and
> the alleged victims.  If it turns out that the testimony of Dr. Hughes
> will support the testimony of the victims, that will be because the
> witnesses testify consistently with what Dr. Hughes will testify is
> victim experience generally and because the jury—after cross-
> examination—will believe both Dr. Hughes and the victims.  It will
> not be because Dr. Hughes lends an expert sheen by testifying that
> a witness is credible.  Presenting expert testimony that is consistent
> with lay witness testimony is the permissible building block for any
> case, whether it be presented by the plaintiff or by the defendant.

*Id.* at *13.  Here too, the jury will be presented with both the testimony of several victims and the

expert testimony of Dr. Hughes regarding the psychological dynamics and consequences of

intimate partner violence, coercive control, and sexual abuse.  If the jury finds that Dr. Hughes's

testimony "mirrors" that of the Government's victims, and thereby corroborates it, it will be

because "the jury—after cross-examination—will believe both Dr. Hughes and the victims,"

nothing more.  *Id.*

 In support of his contrary position, the defendant cites to inapposite cases in which courts

questioned the propriety of law enforcement officers serving as both a fact witness and expert

witness.  *See, e.g.*, *United States v. Mejia*, 545 F.3d 179, 191 (2d Cir. 2008), *United States v.

Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994).   These cases, which specifically discuss the

complications that arise when law enforcement officers testify as experts, have no bearing on the

issues presented here.  In *United States v. Mejia*, the Circuit took issue not with the case agent's

testimony with respect to matters of expert testimony, but instead about "factual testimony about

matters that required no specialized knowledge" that amounted to "a single agent simply summarizing an investigation." 545 F.3d at 196. Dr. Hughes will provide no such fact testimony; her testimony will exclusively focus on the psychological concepts about which she is an expert.

And in *United States v. Amuso*, the Circuit *affirmed* the admission of the expert testimony at issue finding "no manifest error" where a law enforcement officer testified as an expert "regarding the organization, structure, and terminology of organized crime families." 21 F.3d at 1263; *see id*. at 1264 ("Despite the prevalence of organized crime stories in the news and popular media, these topics remain proper subjects for expert testimony."). By contrast, Dr. Hughes is not a law enforcement officer with factual information about the investigation and does not run the risk of improperly bolstering the credibility of witnesses by virtue of her position or sources of information.

Further, case law recognizes a difference between testifying about a pattern of conduct and leaving the jury to determine whether the defendant's conduct fits the pattern and testifying that the defendant's conduct fits a particular pattern of conduct. *See, e.g.*, *United States v. Ruggiero*, 928 F.2d 1289, 1305 (2d Cir. 1991) (distinguishing between testimony that "a certain pattern of conduct is often found in narcotics cases, leaving it for the jury to determine whether the defendant's conduct fits the pattern, but also that such conduct fitted the pattern" (quoting *United States v. Scop*, 846 F.2d 135, 141-142 (2d Cir. 1988), *rev'd in part on rehearing*, 856 F.2d 5 (2d Cir. 1988))); *United States v. Skyers*, 787 F. App'x 771, 775 (2d Cir. 2019). Dr. Hughes will testify about the psychological dynamics of a pattern of coercive and abusive behavior leaving it for the jury to conclude whether the defendant's conduct fits the pattern. *See, e.g.*, *United States v. Grady*, 645 F. App'x 1, 4 (2d Cir. 2016) ("[The expert's] testimony did not violate Rule 704(b) because, while it could have been used by the jury to conclude that the crack cocaine in [the defendant's]

13

possession was intended for distribution rather than personal use, that final inference was left to the finder of fact."). Dr. Hughes's opinions about abusive behavior and victim reactions to such behavior are based on her general expertise and not on any specific knowledge about the facts of this case. *See id.* (noting that expert witness made clear "his opinion as to the hypothetical was based on his general experience, not on any specific knowledge of [defendant's] mental state"). The question of whether the facts of this case fit the pattern laid out by Dr. Hughes will remain entirely with the jury. Accordingly, Dr. Hughes's proposed testimony is well within the bounds of the rules governing expert testimony, as confirmed by the fact numerous courts that have allowed similar testimony from Dr. Hughes and other similarly qualified experts.

Finally, the defendant's effort to preclude Dr. Hughes's testimony by parsing literature cited in her expert disclosure is misguided. As an initial matter, Dr. Hughes's expert opinion is based on "the totality of her relevant education, training, skills, knowledge, and professional experience, including her assessment and treatment of patients, her forensic assessments, her work and consultation with professional colleagues, continuing education, and review of relevant scientific literature in her field." (Ex. A at 1); *see also Maxwell*, 2021 WL 5283951 (admitting similar expert testimony where expert had "extensive experience treating minors who have been sexually abused, and those decades of relevant experience, combined with her formal training, are an adequate basis for her to testify on methods that perpetrators of sexual abuse often use to build trust with their victims, whether that be grooming or other forms of manipulation and coercion"). Accordingly, any argument with respect to a particular piece of scientific literature does not support preclusion of an expert whose qualifications are uncontested. To the contrary, these arguments are precisely what is ripe for "vigorous cross-examination" and does not warrant exercise of the Court's gatekeeping function. *Daubert*, 509 U.S. at 596.

14

The defendant apparently does not dispute the majority of the sources cited by Dr. Hughes in support of her expert opinions on a wide range of issues, including, coercive control, delayed disclosure, and memory of sexual abuse, as he does not mention many of those sources in his motion.  In any event, the articles the defendant highlights do, in fact, support Dr. Hughes' proposed testimony.  For example, the defendant's argument regarding the DOJ's 2023 National Criminal Victimization Survey and Dr. Hughes's conclusions regarding the underreporting of sexual abuse fails to note that the report reflects a reporting rate of 21% in 2022, which is far below the reporting average for violent crime.  Indeed, prior to 2023, the reporting average for sexual assault hovered around 20% for decades.  Moreover, even the 2023 reporting rate for sexual assault of 46% remains half the rate of other petty crimes, such as motor vehicle theft.

The defendant's other qualms with articles cited by Dr. Hughes are similarly misconstrued. For example, the Dutton & Goodman article cited by the defense, (*see* Mot. at 15), which was published almost two decades ago, discusses the need to apply a broader definition of intimate partner violence, which includes not only physical abuse but also tactics of coercive control.  *See Coercion in Intimate Partner Violence: Toward a New Conceptualization*, 52 Sex Roles 743, 743 (2005).  The defendant, however, states that the authors claim that the term "coercive control" is "largely undefined," a clear mischaracterization of the article's thesis.  (Mot. at 15).  Similarly, the defendant cites to the lack of a definition of coercive control in the Diagnostic and Statistical Manual of Mental Disorders ("DSM") to support his claim that the term lacks a defined meaning. However, as is clear from the title, the DSM is a manual used for purposes of *diagnosing* psychological disorders, whereas coercive control is a category of behavior, much like sexual assault and intimate partner violence, that may result in said disorders.  This apples-to-oranges comparison is unavailing.

It also bears noting that, contrary to the defendant's claim, (*see* Mot. 17-18), Dr. Hughes will certainly, where appropriate, acknowledge limitations to her testimony, and the Government presumes that such questioning would similarly form the basis of the defendant's cross examination. Thus, while the defendant's arguments may be fair basis for cross examination, it is far from providing an adequate basis for precluding Dr. Hughes's testimony.

### 2. Dr. Hughes's Testimony Will Properly Help the Jury Understand the Evidence

The defense also argues that Dr. Hughes's testimony is "not beyond the ken of lay jurors." (Mot. at 22). This exact argument has been repeatedly rejected by courts in this Circuit. *See Ray*, 2022 WL 101911, at *11 (Judge Liman rejecting challenge to Dr. Hughes's testimony, noting that "similar arguments have been made and properly rejected in other cases, and the Court agrees with their analyses"). Judge Liman explained that "[t]his case concerns an 'unusual area of human interaction' – between abusers and victims – that involves psychological dynamics beyond the knowledge of an average juror," and that "Dr. Hughes's testimony is expected to be highly relevant to assist the jury in understanding and contextualizing the other testimony it will hear." *Id.* at *10. He further noted that "[m]ultiple courts in this District and elsewhere have admitted similar testimony where, as here, it is not offered as evidence of the defendant's intent but to help a jury understand a common set of conduct experience[d] by victims or the actions normally taken by those committing certain crimes to seduce their victims . . . and to explain seemingly counterintuitive behavior of victims or conduct not normally familiar to most jurors." *Id.* (citing cases).

In reaching this decision, Judge Liman quoted favorably the Eighth Circuit's observation that expert testimony about the dynamics of abuse is helpful to the jury whether it involves sexual abuse of children or adults: "Regardless of the victim's age, expert testimony about how

16

individuals generally react to sexual abuse—such as not reporting the abuse and not attempting to escape from the abuser—helps jurors evaluate the alleged victim's behavior." *Id.* (quoting *Johnson*, 860 F.3d at 1140); *see also Raniere*, 2019 WL 2212639, at *8 (allowing Dr. Hughes to testify as an expert regarding delayed disclosure of sexual assault victims and noting numerous courts permitted comparable expert testimony). Indeed, such testimony "concern[s] matters that the average juror is not capable of understanding on his or her own," making it an appropriate topic for expert testimony under Rule 702. *Mejia*, 545 F.3d at 194.

Similarly, in *United States v. Maxwell*, Judge Nathan recognized that expert testimony may assist a jury in several respects, including in "assessing evidence that some alleged victims repeatedly interacted with [the perpetrator], seemingly voluntarily, even after they suffered abuse"; understanding "sexual abuse's connection to substance abuse"; and explaining reasons for "delayed disclosure," all of which the court found to be "outside the ken of the average person, and so appropriate for expert testimony." *Maxwell*, 2021 WL 5283951, at *4 (quoting *United States v. Felder*, 993 F.3d 57, 72 (2d Cir. 2021)). These holdings recognize that such testimony is "specialized information [that] may very well be beyond the knowledge of many jurors." *United States v. Batton*, 602 F.3d 1191, 1201 (10th Cir. 2010) (allowing testimony on the modus operandi of perpetrators and citing similar holdings by the Seventh and Fifth Circuits).

In seeking nevertheless to preclude Dr. Hughes's testimony, the defense argues that the jury will be familiar with "experiences of relationships, good and bad" and argues that "likely every juror will know someone who has been a victim of sexual assault." (Mot. at 8). But the defense's argument highlights the need for expert testimony. While some jurors may or may have experience with "bad" relationships, or have knowledge that sexual assault exists generally, most lack understanding of the "unusual area of human interaction" present in relationships involving

17

intimate partner violence, sexual abuse, and a coercive control dynamic, as is the case here. *Ray*, 2022 WL 101911, at *10. Very few, if any, jurors will have experienced or directly witnessed a relationship involving repeated physical abuse, financial manipulation, drug use, and other forms of control resulting in a cycle of extreme sex acts in which one partner does not want to participate. The experience of such extreme and prolonged abuse is thankfully not a common one. That is why most jurors will not intuitively understand the dynamics present in such a relationship and why Dr. Hughes's testimony based on her experience working with survivors of such relationships and the academic literature will be useful to jurors.

Nor does Dr. Hughes's testimony invade the province of the jury. Dr. Hughes does not propose to testify to the subjective motivations, thought processes, or mental states of abusers in general or of the defendant specifically. The defense contends that Dr. Hughes's testimony that perpetrators of a coercive control relationship engage in "self-centered behavior to satisfy his own goals and desires regardless of the needs, wants, and well-being of the victim" will focus not on subjective mental processes but instead on observable behaviors. For example, Dr. Hughes will testify about the use of physical isolation, emotional exploitation, or threats of violence—all of which are the types of behaviors observed and experienced by victims like her patients and those studied in the relevant literature.

Dr. Hughes will not testify about the mind of an abuser generally, or the defendant specifically. Rather, she will testify about a common set of abusive behaviors experienced by those who are victims of interpersonal violence and coercive control and the psychological effect that those behaviors commonly have on those who are victims of it. *See Ray*, 2022 WL 101911, at *11. Where, as here, an expert "does not vouch for the victim by diagnosing her as a victim of

sexual abuse or express an opinion that sexual abuse has in fact occurred, the testimony does not necessarily invade the province of the jury." *Id.*; *see also Maxwell*, 2021 WL 5283951, at *5.

### 3. Dr. Hughes Will Not Opine on Any Legal Terms, and Will Make Clear that Her Testimony Relates Only to Psychological Concepts, Not Legal Definitions

Contrary to the defendant's suggestion, Dr. Hughes will not purport to explain what coercion is under the law applicable to this case; rather, she will explain the concept of coercive control as understood within academic literature and within the practice of psychology. Throughout her testimony, Dr. Hughes will make clear that the terms she uses and the concepts she explains are all used within the field of psychology, and are not legal terms or definitions. The defendant's concerns that Dr. Hughes's testimony will somehow confuse the jury about the definitions on legal terms such as coercion are thus overblown and easily addressed.

As noted above, Dr. Hughes will not purport to opine on the specific facts of this case, but instead will explain relevant concepts within her field. To be sure, one of those concepts is called "coercive control," which is a defined term within Dr. Hughes's field and which she is expected to use to describe different types of coercion observable in certain abusive relationships. To be clear, Dr. Hughes will use those words because they are technical terms used in her field, but she will also clarify that she is not defining legal concepts. Indeed, in her prior testimony, Dr. Hughes has been careful to clarify that her testimony relates only to concepts within the practice of psychology and *not* legal definitions. *See, e.g.*, March 14, 2022 Trial Tr. at 488, *Ray*, 20 Cr. 110 (LJL), Dkt. No. 514 at 156 ("Q. You mentioned a category of sexual abuse. What does that encompass? A. So in the social sciences, in psychology -- *and it's not a legal definition, I just want to be clear* -- we talk about sexual abuse and coercion as being forced to do something against your will that you do not want to do and that you are not freely consenting to do. So it can be being coerced to engage in oral, vaginal or anal sex, not with physical force; you can also be physically

forced to do that, being held down, being restrained to engage in those activities." (emphasis added)).

By no means will Dr. Hughes's testimony usurp the role of the Court in instructing the jury or the jury in determining whether the defendant committed the crimes charged. Dr. Hughes will not testify that any particular set of facts or behaviors meets the legal definition of coercion under 18 U.S.C. § 1591. Rather, she will describe a dynamic defined in the psychology space as coercive control to explain otherwise difficult to understand behaviors by victims. As discussed above, that testimony will be useful to the jury to explain otherwise seemingly inexplicable behavior by victims, such as their decisions to return to their abuser, their failure to actively resist unwanted sexual behavior, and their failure to report abuse for many years. In this regard, the defendant's reliance on *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) in support of his proposition is inapposite. (Mot. at 10-11). In that case, unlike here, the expert opined about the specific facts of the case, opined that the defendant's conduct in an excessive force case was "not justified under the circumstances," and therefore offered testimony as to the "ultimate legal conclusion in the case." *Hygh*, 961 F.2d at 364. By contrast, Dr. Hughes will not testify about any of the facts in this case at all, making it impossible for her to testify that the facts in this case constituted coercion. Her testimony will thus steer far clear of testifying to any ultimate issue in the case.

Multiple courts in this Circuit have permitted experts to testify about the concept of coercive control in criminal cases featuring a charge of sex trafficking through force, fraud, and coercion. *See, e.g.*, Trial Tr. at 479-514, *United States v. Ray*, 29 Cr. 110 (LJL) (S.D.N.Y. March 14, 2022), Dkt. No. 514 at 147-182; Trial Tr. 3927-3950, *United States v. Kelly*, No. 19 Cr. 286 (AMD) (E.D.N.Y. September 20, 2021), Dkt. No. 250 at 179-202; Trial Tr. at 3718-3733, 3735-3740, *United States v. Raniere*, 18 Cr. 204 (NGG) (E.D.N.Y. June 6, 2019), Dkt. No. 780 at 43-

58, 60-65.  Although none of those cases provided a limiting instruction regarding that expert testimony, the Government would have no objection to such an instruction here to ensure that the jury does not confuse the psychological concept of coercive control with the legal concept of coercion under 18 U.S.C. § 1591.  Such an instruction would inform the jury that although Dr. Hughes may use and define the phrase "coercive control," her testimony does not purport to provide any legal instructions; rather, the Court will instruct the jury on the legal definition of coercion to be applied when they deliberate.  *Cf.* Nov. 27, 2023 Trial Tr., *United States v. Joseph*, 23 Cr. 68 (JPO) Dkt. No. 65, at 80-81 ("I want to clarify one thing for the jurors, and that is: The charges in this case involve threats, as I mentioned in introducing the case; and a threat is a special legal term, which I'm going to explain to the jury in detail.  Mr. Friedman, as a witness, has testified using the word 'threat,' and that's fine—it's the common understanding of what a threat is something he can testify to—but I want to clarify that I will be explaining in detail the legal definition of a threat, which is a specific thing. . . . I'll be explaining in more detail how to determine whether something is a threat, and it will be up to the jury to decide, among other things, whether the threat was made in the legal sense of the term.").

### 4.  Dr. Hughes's Testimony Easily Satisfies Rule 403

Finally, the defense argues that Dr. Hughes's testimony should be excluded under Rule 403.  (Mot. at 22-23).   The defense speculates that Dr. Hughes's testimony "will telegraph to the jury that a leading expert sees enough merit in the government's case to step forward as a government witness" and will create confusion among the jury by providing a definition of "coercion" that is distinct from the legal definition.  (Mot. at 22-23).  The defense's arguments are unpersuasive.  Dr. Hughes's opinions will "speak only to concepts and will not (and indeed may not) suggest that the jury find any alleged victim witness to be credible or to find [the defendant]

guilty. The more general nature of [her] opinions . . . therefore mitigates its prejudicial effect." *Maxwell*, 2021 WL 5283951, at *5. Further, "[i]n the context of this case, [the] testimony regarding the generalities of domestic [and sexual] abuse will be no more inflammatory or prejudicial than the other evidence . . . that will be presented to the jury." *Ray*, 2022 WL 101911, at *13. Nor will the testimony be confusing. As noted above, Dr. Hughes will not provide any legal definitions or opine on the legal meaning of any terms relevant to the elements of the charged offenses.

Further, any theoretical prejudice comes nowhere close to outweighing the importance of this highly probative evidence. The expert testimony will help the jury understand the "psychological dynamic often seen in abusive relationships that leads an abuse victim to behave in counterintuitive ways, such as by declining to take opportunities to leave an abusive situation or by expressing gratitude to an abuser." *Torres*, 2021 WL 1947503, at *7. This case concerns an "unusual area of human interaction"—between abusers and victims in long-term relationships lasting multiple years and involving repeated abuse—that involves psychological dynamics beyond the knowledge of an average juror. *Ray*, 2022 WL 101911, at *10; *see also See* Feb. 25, 2020 Tr. at 39:8-9, *United States v. Randall*, 19 Cr. 131 (PAE) (S.D.N.Y.), Dkt. No. 335 ("Jurors are not apt to intuitively understand the mechanisms that may lead a woman who is not physically restrained or confined to heed the demands of a pimp to traffic herself.").

Similar to Judge Engelmayer's observations in *Randall*, jurors are unlikely to intuit how a woman who is not physically restrained comes to participate in days-long orchestrated sexual performances that she does not want and that result in physical and psychological trauma. Accordingly, Dr. Hughes's testimony is expected to be highly relevant to assist the jury in understanding and contextualizing the other testimony it will hear. The defendant's claim of

prejudice does not withstand scrutiny and, in any event, is outweighed by the relevance of the testimony that Dr. Hughes will provide. The defendant's motion to preclude the testimony of Dr. Hughes should be denied.

## II. VIDEO FOOTAGE OF THE MARCH 2016 ASSAULT OF ████ IS EASILY AUTHENTICATED, EXTRAORDINARILY PROBATIVE, AND READILY ADMISSIBLE AT TRIAL

Video footage of the defendant's brutal assault of ████ during a Freak Off at the Intercontinental Hotel in Los Angeles on or about March 5, 2016 is powerful proof of the defendant's sex trafficking of ████—conduct at the center of Counts One and Two of the S3 Indictment. The defendant, who well recognizes its significant probative value, argues that the Court should preclude admission of all video footage of his assault of ████ on authenticity, best evidence, and Rule 403 grounds.[2] These various arguments amount to the same flawed claim: that "the only available versions present an inaccurate view of the incident." (*See* Def. Video MIL at 4). As explained below, this claim is much overblown, and the footage the Government seeks to admit fairly and accurately depicts the assault, as two different witnesses will testify at trial.

Moreover, the defendant's motion is just the latest salvo in his crusade to keep the video of his assault from being used against him by any means necessary. Indeed, it is *by the defendant's own hand* that the original version of this damning footage no longer exists: it was deleted and given to the defendant as part of a cover-up orchestrated by the defendant and his co-conspirators. The Court must not reward the defendant for his actions by precluding the video that remains available despite the defendant's obstructive efforts. That is especially true here, where the

---

[2] In the alternative, the defendant requests a hearing. For the reasons described herein, a hearing is unnecessary, and the Court should deny the defendant's motion in full. In the event the Court does hold a hearing, the Government's proposed video expert will be out of the country on previously scheduled travel from on or about April 22, 2025 through May 2, 2025. Accordingly, the Government requests the Court hold such a hearing the week of May 5, 2025.

authenticity of the videos will be testified to by multiple witnesses with personal knowledge of the events they depict and any technical issues with the videos can be corrected or easily addressed through limiting instructions.  The defendant's motion to preclude this extraordinarily probative evidence should be denied.

### A.  Relevant Facts

The Government anticipates that the evidence at trial will show the following.  On March 4 and March 5, 2016, the defendant, ███████ and a male commercial sex worker participated in a Freak Off at the Intercontinental Hotel in Los Angeles, California.  During the Freak Off, the defendant physically assaulted ███████ in the hotel room.  ███████ attempted to leave the hotel room on March 5 at approximately 11:00 a.m.  The defendant quickly followed ███████ to the elevator—wearing only a towel—to stop her from leaving.  The defendant violently attacked ███████ by hitting her, kicking her, dragging her, and throwing things in her direction.  The assault was captured by hotel security cameras.

Following the attack, a hotel security guard ("Individual-3")[3] responded to the elevator lobby where the assault had taken place and accompanied ███████ to the hotel room to retrieve ███████ belongings.  ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████  ███

---

[3] The Government uses the same identifiers in this memorandum as referenced in the Enterprise Letters previously provided to the defense and the Court.

███████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

On or about May 17, 2024, CNN aired footage of the hotel surveillance video depicting the defendant's assault of ██████████  While the Government preserved the publicly available footage, Department of Justice policy prohibited the Government from issuing any compulsory legal process, including a grand jury subpoena or search warrant, to CNN to obtain a copy of the Intercontinental footage absent CNN's agreement to produce the footage voluntarily.  *See* 28 C.F.R. § 50.10(c); Justice Manual § 9-23.400A(i).  CNN declined to voluntarily produce the footage.

Within two days of the footage being aired by CNN, on May 19, 2024, the defendant posted a video on social media admitting to and apologizing for the events depicted in the video.  In his

video, the defendant stated, "I make no excuses. My behavior on that video is inexcusable. I take full responsibility for my actions in that video. Disgusted. I was disgusted then when I did it. I am disgusted now. . . . I'm so sorry." (Ex. A).

[REDACTED]

On or about March 14, 2025, the defense produced to the Government four videos that it received from CNN in response to a Rule 17(c) subpoena issued by the Court on January 28, 2025, (Def. Video MIL, Ex. E). This production included three video files containing surveillance footage from three cameras at the Intercontinental Hotel, (*id.*, Exs. I-2, I-3, I-4) (the "CNN Videos"), as well as CNN's first broadcast featuring the Intercontinental footage, (*id.*, Ex. I-1; *see also id.*, Ex. H at 1). According to defense counsel, CNN received the original video files from its source (*i.e.*, Individual-5), copied the videos to create the CNN Videos, and then deleted the original files. (*Id.*).

---

### B. Applicable Law

#### 1. Authenticity

"The requirement of authentication is . . . a condition precedent to admitting evidence." *United States v. Vayner*, 769 F.3d 125, 129 (2d Cir. 2014). Federal Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 901 generally "does not erect a particularly high hurdle," *United States v. Dhinsa*, 243 F.3d 635, 658-59 (2d Cir. 2001), and does not require the proponent to "rule out all possibilities inconsistent with authenticity, or . . . prove beyond any doubt that the evidence is what it purports to be," *Vayner*, 769 F.3d at 130. The rule is generally satisfied "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification," *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004), though "clear and convincing evidence" is required for recorded evidence because this kind of evidence "is likely to have a strong impression upon a jury and is susceptible to alteration," *Ruggiero*, 928 F.2d at 1303.

The Second Circuit "has never adopted a rigid standard for determining the admissibility of [video] recordings." *United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir. 1977); *accord United States v. Hamilton*, 334 F.3d 170, 186 (2d Cir. 2003). Instead, as with all other evidence, "[t]he proof of authentication may be direct or circumstantial." *Vayner*, 769 F.3d at 130. This evidence may include, among other things, "presenting witnesses who recall the events depicted, testimony as to the chain of custody, testimony of the person recording the events, or any other evidence tending to show the accuracy of the depictions." *Boykin v. W. Express, Inc.*, No. 12 Civ. 7428 (NSR), 2016 WL 8710481, at *5 (S.D.N.Y. Feb. 5, 2016); *see also* Fed. R. Evid. 901(b) (describing examples of evidence that satisfy the authentication requirement).

A court's finding that a piece of evidence is authentic "merely renders [the evidence] admissible, leaving the issue of [its] ultimate reliability to the jury." *Vayner*, 769 F.3d at 131. Accordingly, even after the evidence is admitted, the opposing party "remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the *weight* of the evidence—not to its *admissibility*." *Tin Yat Chin*, 371 F.3d at 38.

### 2. The Best Evidence Rule

Under Federal Rule of Evidence 1002, often referred to as the "best evidence" rule, an "original writing, recording, or photograph is required in order to prove its content unless [the Federal Rules of Evidence] or a federal statute provides otherwise." One exception to this rule is laid out in Federal Rule of Evidence 1003, which states that "[a] duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." The rules define a duplicate as "a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original." Fed. R. Evid. 1001(e). The opposing party has "the burden of demonstrating a genuine issue as to . . . the trustworthiness of the duplicate, or as to the fairness of substituting the duplicate for the original." *Elliott v. Cartagena*, 84 F.4th 481, 490 (2d Cir. 2023).

In addition, under Rule 1004, "[a]n original is not required and other evidence of the content of a writing, recording, or photograph is admissible if . . . all the originals are lost and destroyed, and not by the proponent acting in bad faith" or "an original cannot be obtained by any available judicial process." Fed. R. Evid. 1004(a)-(b). When evidence is admitted under Rule 1004, this "other evidence," "rather than being interchangeable with the original, may be probative

of the contents of the missing document, to a greater or lesser degree, depending on its persuasive power." *Elliott*, 84 F.4th at 491. Accordingly, the opposing party "may attack the secondary evidence's sufficiency," but this attack "goes not to the evidence's admissibility but to its weight and is a matter for the trier of fact to resolve." 6 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 1004.02, ed. 2009.

### 3. Rule 403

Before any evidence is admitted at trial, the Court must determine whether the probative value of the offered evidence is "substantially outweighed" by a danger of "unfair prejudice" or confusion. Fed. R. Evid. 403. The Second Circuit has found admission appropriate where the offered evidence "did not involve conduct any more sensational or disturbing than the crimes with which [the defendants were] charged." *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (quoting *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)). Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). To the extent there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendant is not on trial for any offense other than the crimes charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to mitigate prejudice to defendant).

## C.  Discussion

At trial, the Government expects to offer the Cellphone Videos and the three CNN Videos (the "CNN Videos")—five videos of the assault in total.[5]  These videos provide essential direct evidence of sex trafficking as charged in Counts One (as predicate racketeering activity) and Two (as a substantive offense). ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████.  The videos clearly depict that force, which is an element of the crimes charged.

As the facts lay bare, the defendant has been overwhelmingly concerned with the existence of the video surveillance since the assault occurred and has taken great measures to ensure it was not released.  Now facing trial, the defendant attempts to keep this devastating proof from the jury.  His grasping arguments to preclude this crushing evidence should be quickly dismissed.  The Government, through witness testimony and other evidence, easily satisfies the "minimal standards for authentication," *Tin Yat Chin*, 371 F.3d at 38, and much of the irregularities in the videos, to the extent they exist, can be addressed through use of technology.  Further, the best evidence rule presents no bar to admission because videos are admissible under Rule 1003 or 1004.  In addition, the lack of the original surveillance footage is due to the defendant, not the Government, "acting in bad faith," Fed. R. Evid. 1004(a).

---

[5] The Government does not intend to introduce the footage aired by CNN.  (Def. Video MIL, Exs. A, B, I-1).  Accordingly, the Court need not rule on the admissibility of the broadcasted footage or resolve arguments related to these files.  (*See* Def. Video MIL at 12 (arguing that videos should be precluded under Rule 403 because they allegedly were manipulated "to inflame the passions of CNN's viewing audience," including by speeding up the videos, reordering the sequence of events, and deleting certain footage).

### 1.  The Videos Are Authentic

The "bar for authentication of evidence is not particularly high," *Vayner*, 769 F.3d at 130, and both the Cellphone Videos and the CNN Videos clear that low bar.  Because there is no "rigid standard" for demonstrating authenticity, *Fuentes*, 563 F.2d at 532, there are numerous ways the Government can and would show evidence of authenticity here.[6] ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████.  *See Boykin*, 2016 WL 8710481, at *5.  The Second Circuit has recognized that this kind of testimony from a witness with knowledge is "[t]he simplest (and likely most common) form of authentication[.]"  *Vayner*, 769 F.3d at 130.  This alone is sufficient to admit the videos.

Of course, the defendant himself also authenticated the content depicted in the videos.  Following CNN's initial broadcast of footage from the Intercontinental Hotel, the defendant posted a video on his Instagram in which he admitted that he was in the video and apologized for his behavior depicted in the video.  At no point did the defendant dispute the accuracy of the video or the events it depicted—which are the same events depicted on the five videos the Government

---

[6] The defendant argues that the Court should apply a list of factors outlined by the Eighth Circuit in *United States v. Kimble*, 54 F.4th 538, 547 (8th Cir. 2022).  (Def. Video MIL at 7-8).  While the Second Circuit has acknowledged that similar factors may be helpful, it has declined to "adopt[] a rigid standard" for determining admissibility because of "the varying circumstances of particular cases[.]"  *Fuentes*, 563 F.2d at 532 & n.3.

seeks to introduce. (*See* Ex. A ("I make no excuses. My behavior on that video is inexcusable. I take full responsibility for my actions in that video.")).

In addition to calling witnesses with personal knowledge of the events or the recording, there are also other ways the Government may establish authenticity. Authenticity may also be demonstrated by expert testimony concerning whether the video "truly and accurately represents what was before the camera." *Leo v. Long Island R. Co.*, 307 F.R.D. 314, 324 n.19 (S.D.N.Y. 2015) (quoting *Zegarelli v. Hughes*, 3 N.Y.3d 64, 69 (2004)). To be clear, the Government does not believe that expert testimony on the videos is necessary in this case because, as set forth above, the videos are independently authenticated by witnesses with personal knowledge of what they depict. But in the event the Court is inclined to look to expert testimony as to the accuracy or reliability of the videos, the Court can rely on the conclusions of the Government's proffered video expert. That expert has already reviewed and assessed the Cellphone Videos and is in the process of evaluating the CNN Videos. To date, his conclusions show that the videos he has analyzed reliably depict the original footage of the assault that were captured by the Intercontinental Hotel's security system. (*See* Ex. B ("Piazza Aff.") ¶ 10). The expert based that opinion on, among other things, certain characteristics of the videos, such as the videos' frame rate and speed. (*See id.* ¶¶ 16-17, 22-25).[7]

---

[7] Because the defendant did not disclose the CNN Videos to the Government until on or about March 14, 2025, and provided late expert notice on or about April 3, 2025—despite several earlier requests by the Government for such notice, (*see* April 9, 2025 Gov't Ltr. at 1-2)—the Government's expert has not been able to complete his analysis of the videos. As described in the attached affidavit, the Government's video expert continues to review two of the remaining files produced by CNN to the defense: Defense Exhibits 1-2 and I-4. (Piazza Aff. ¶¶ 10, 22). The Government expects to provide a full set of the expert's conclusions in its rebuttal expert notice no later than April 21, 2025.

The defendant raises a variety of potential issues with the available videos, ranging from their playback speed to their time stamps, which he claims make the videos unreliable. Not only are the videos reliable (*see* Piazza Aff. ¶¶ 10, 17, 22), but the defendant's concerns are relevant only to the weight the evidence is accorded, rather than the videos' admissibility. *See Tin Yat Chin*, 371 F.3d at 38. For example, the defendant faults the CNN Videos for being sped up, for not accurately representing human movement as a result of file conversion, and for missing some footage. (Def. Video MIL at 5.) But many of these "errors" appear to be a consequence of the surveillance system's use of motion sensitive cameras and may have even existed on the surveillance system itself. (*See* Piazza Aff. ¶¶ 16, 25). And courts commonly admit footage from motion censored cameras such as these. *See, e.g.*, *United States v. Ephron*, No. 24 Cr. 418 (MMG) (admitting motion censored video); *United States v. Steven Siri-Reynoso*, No. 17 Cr. 418 (CM), Dkt. 70 at 45 (same). Further, some of the defendant's concerns, particularly the speed, may be adjusted to eliminate concerns that the video is misleading. (*See* Piazza Aff ¶ 24).

The defendant similarly claims that the Cellphone Videos do not accurately depict the incident because they cause the defendant to appear more domineering and do not depict the entire incident. (Def. Video MIL at 5.) But the Cellphone Videos, which are merely screen recordings of portions of the underlying original video, do not depict any events different from what occurred and were not intentionally manipulated by anyone. (*See* Piazza Aff. ¶¶ 11-17). Rather, any distortions of the images are minimal and attributable only to the mode of recording—*i.e.* recording on the witness's cellphone. Indeed, these kinds of videos are commonly admitted at trial, *see, e.g.*, Mar. 14, 2025 Tr. at 928:6-931:3, *United States v. Perez*, No. 23 Cr. 99 (LJL) (same); *United States v. Hampton*, No. 21 Cr. 766 (JPC), Dkt. No. 102 at 184-85 (same). Here, multiple witnesses will testify to the accuracy of the Cellphone Videos, ██████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████. This

corroborated testimony is more than sufficient to clear the low authenticity bar.

Like with the CNN Videos, some of the issues the defendant raises with the Cellphone

Videos can also be addressed by small tweaks to the videos. For instance, the Government's video

expert can edit the video files to reduce any effect of making the defendant look larger than he

already does. (*See* Piazza Aff. ¶ 18). In addition, the defendant's complaint that the Cellphone

Videos do not show the whole event is of no moment because a viewer is able to piece them

together with the various CNN Videos, in which the defendant and ██████ are wearing the same

clothing and in which the defendant is severely beating ██████ to get the full chronology. *Cf.*

Trial Tr. at 42-43, *United States v. Powell*, No. 18 Cr. 287 (PAE), Dkt. No. 145 (approving of

process of linking videos to one another to help prove authenticity); *United States v. Morrison*,

153 F.3d 34, 56 (2d Cir. 1998) ("The contents of the conversations on the challenged tapes are

coherent and flow logically, making it improbable that any material was deleted or added.").[8]

Finally, the defendant argues that the Cellphone Videos and the CNN Videos have

incorrect time stamps. But any inaccuracy in the timestamps is not a reason to wholesale preclude

the videos. Indeed, courts regularly admit videos with time stamp issues. *See United States v.*

*Whittingham*, 346 F. App'x 683, 685 (2d Cir. 2009) ("Although there was testimony that the time-

stamp [on] the video was off by as much as five minutes, this slight discrepancy does not prove

---

[8] In any event, the Cellphone Videos depict the assault and Individual-3's response; it is not clear
what events the defendant is concerned about being omitted. And even if there was footage
available showing all of the events together in one file (which there is not here because the
defendant caused it to be destroyed), the Government would nonetheless be entitled to present only
portions of the footage. Moreover, there will be no assertion by the Government that the Cellphone
Videos depict every moment of the defendant's conduct on the day in question.

fatal; indeed, this testimony may make the evidence less credible to the jury, but it does not make it inadmissible."); *see also, e.g.*, *Powell*, No. 18 Cr. 287 (PAE), Dkt. No. 145 at 45-47; *United States v. Calix*, No. 13 Cr. 582 (LAP), Dkt. No. 116 at 535-58. Further, where the time stamps are inaccurate on the video but there is a basis for correcting that time stamp elsewhere in the record, the Second Circuit has allowed it. *See United States v. Campbell*, 850 F. App'x 102, 108-09 (2d Cir. 2021). The same is true here. For example, Defense Exhibit I-2 shows the defendant placing phone calls after the assault at approximately the 11:32 a.m. time stamp. ███████ ████████

████████████████████████████████████████████████████████████

████████████ suggesting that some of those initial calls were caught on video. And even where the time stamps are not supported by other record evidence, the answer is not to preclude the video altogether, but instead issuing a limiting instruction to the jury not to rely on the time stamps for their truth. *See Paul v. N. Cent. Bronx Hosp.*, No. 16 Civ. 1952 (VSB), 2024 WL 1994049, at *4 (S.D.N.Y. May 6, 2024) (ordering that time stamps be blurred or a limiting instruction given); Trial Tr. at 45-47, *Powell*, No. 18 Cr. 287 (PAE).

The cases cited by the defendant do not change the analysis. For instance, the defendant relies extensively on *Leo v. Long Island Railway Co.*, for the proposition that admitting videos without testimony from their editor is "grossly unfair" and "potentially highly misleading." 307 F.R.D. at 326. That citation is itself misleading. All that *Leo* holds, as other courts have similarly held, is that videos are not self-authenticating and that Rule 902, which governs self-authentication, does not cover videos. *Leo*, 307 F.R.D. at 323. Further, as *Leo* acknowledged, an editor *or anyone with personal knowledge* may serve as an authentication witness. *See id.* at 323, 326. As explained above, multiple people with personal knowledge, ████████████████

35

███████ will testify that the videos are what they appear to be—clearly crossing the authenticity threshold.

### 2.  The Videos Are Admissible Under Either Rule 1003 or 1004

As described in the Piazza Affidavit, neither the CNN Videos nor the Cellphone Videos represent the original export from the Intercontinental Hotel's security footage system.  However, they qualify as "duplicates" under Rule 1003.  Electronic re-recordings, including re-recordings made with cellphone videos, can qualify as duplicates under Rule 1000(e).  *See United States v. Condry*, 574 F. Supp. 3d 979, 983-84 (N.D. Okla. 2021) (cellphone video); *United States v. Chapman*, 804 F.3d 895, 902 (7th Cir. 2015) (DVD re-recording).  In the alternative, the videos are also admissible as "other evidence" under Rule 1004.  *See Elliott*, 84 F.4th at 491-92 (admitting evidence under Rule 1004 rather than 1003).  Courts have admitted portions and/or stills of surveillance video under Rule 1004 where, as is the case here, the original surveillance video is unavailable.  *See, e.g.*, *Whittingham*, 346 F. App'x at 685 (admitting stills of surveillance video); *United States v. Codrington*, No. 07 MJ 118 (CLP), 2008 WL 1927372, at *12-15 (E.D.N.Y. May 1, 2008) (admitting portions of surveillance video), *aff'd*, No. 08 Misc. 0291 (NGG), 2009 WL 1766001 (E.D.N.Y. June 22, 2009).

The defendant has not met his burden to show a "genuine question . . . about the original's authenticity" or the circumstances making it unfair to admit the duplicate.  Fed. R. Evid. 1003.  As the Piazza Affidavit explains, there is no evidence of human manipulation in any of these videos.  (*See* Piazza Aff. ¶ 10).  The Court should therefore admit the evidence under Rule 1003.

Further, even if the CNN Videos and Cellphone Videos were not duplicates of the original surveillance video, the videos would still be admissible because the Government has not lost or destroyed the videos and has taken steps using available legal process to try to find the original

file. *See, e.g.*, *Whittingham*, 346 F. App'x at 685 (admitting surveillance video stills where third party, not the Government, lost original video). In spite of the defendant's successful efforts to make the original video unavailable, the Government has taken numerous investigative steps to attempt to secure the original, including by requesting it from CNN and subpoenaing Individual-5 multiple times, including for video specifically. But because the Government cannot issue legal process to news outlets, *see* 28 C.F.R. § 50.10(c), and █████████████████████████ ████████████████████████ the Government has no further investigative steps to take. Under these circumstances, the Court should admit the videos.

Overlaying all of the defendant's arguments against admitting the videos is the specter of the original footage's availability. As set forth above and discussed in numerous court proceedings, that footage is only unavailable because of the criminal actions of the defendant and his co-conspirators to make it so. The defendant should not benefit from his own efforts to make the original footage unavailable. Under Rule 1004, where the defendant is at fault for the destruction, alteration, and/or withholding of evidence—whether intentionally or not—the Government may introduce other evidence regarding the content of what was destroyed. *See United States v. Jacobs*, 475 F.2d 270, 285-86 (2d Cir. 1973) (admitting copy of agreement where defendants destroyed original); *Condry*, 574 F. Supp. 3d at 985 (admitting cellphone recording of original video where defendant lost original video). Accordingly, the Cellphone Videos and the CNN Videos are admissible here.

### 3. Rule 403

Finally, the defendant argues that the Court should preclude all videos of the Intercontinental assault on Rule 403 grounds. This is not persuasive because the probative value of the videos significantly outweighs any prejudice to the defendant. As explained above, the

videos constitute some of the most probative evidence in this case: they show the defendant exerting physical force over ████ who is actively trying to leave a Freak Off. In other words, the videos show sex trafficking through force and should not be withheld from the jury.

The defendant's arguments for why the prejudice introduced by these videos substantially outweighs their probative value are irrelevant and unpersuasive. As an initial matter, the defendant focuses on the reordering of the sequence of events and alleged deletion of footage in CNN's broadcast, (Def. Video MIL, Ex. A, B, I-1), but the Government is not seeking to offer the broadcast footage at trial. In addition, the defendant stresses that the CNN Videos are sped up, but despite the defendant's assertions otherwise, at least one of the CNN Videos can be slowed down, (*see* Piazza Aff. ¶ 24), and the Cellphone Videos play at the speed of the original video surveillance recording, (*see id.* ¶ 16). Even if the CNN Videos are not slowed down to reflect the speed of the original video surveillance recording, the Court could easily provide a limiting instruction to caution the jury not to rely on the speed of certain videos in making its finding as to the defendant's guilt or innocence. That is sufficient. *See United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009) (finding that district court's limiting instructions alleviated defendant's Rule 403 concern).

The defendant also claims that Rule 403 is violated because the evidence "is likely to have a strong impression on the jury." (Def. Video MIL at 12 (quoting *Fuentes*, 563 F.2d at 532)). But *Fuentas* does not hold that anything that makes a strong impression on the jury should be precluded under Rule 403—in fact, the opinion does not mention Rule 403 at all. Instead, the Second Circuit has been clear that where, as here, the evidence "did not involve conduct any more sensational or disturbing than the crimes with which [the defendants were] charged," *Pitre*, 960 F.2d at 1120, it is admissible under Rule 403. Such is the case here. The evidence, like all evidence of guilt, is prejudicial to the defendant because it is devastating proof that he committed two of the crimes

with which he is charged, but it is not *unfairly* so. The defendant is charged with racketeering conspiracy involving multiple acts of violence, and sex trafficking of multiple victims through force, fraud, and coercion. ███████████████████████████████████████████ ████████████████████████████. The jury will hear and see evidence related to the defendant's participation in kidnappings, arson, and other violent acts. This video, which provides some of the most probative direct evidence of the charges imaginable, is no more sensational than them or the other evidence the jury will see and hear at trial. The Court should reject the defense's desperate attempts to keep this powerful evidence from the jury should.

III.    **EVIDENCE OF** ██████████████████████████████████
██████████████████████ **IS ADMISSLBE TO PROVE COERCION**

The defendant's motion to preclude damning evidence of the defendant's racketeering and sex trafficking of Victim-3 should be swiftly denied. Motions *in limine* to preclude evidence should only be granted if there is no theory of admissibility. Here, the evidence at ███████████ ████████████████████████████████████████████████████████████████ ███████████████████████████—is direct, powerful proof of the coercion he repeatedly used to cause Victim-3 to do as he wished, and of the racketeering enterprise's participation in his sex trafficking of Victim-3. Because this highly probative evidence is no more prejudicial than the crimes with which the defendant is charged, the defense's motion should be denied.

### A. Relevant Facts

The Government expects that the evidence at trial will show that Victim-3 ██████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

## B.  Applicable Law

Under Federal Rule of Evidence 401, "[e]vidence is relevant if: (a) it has *any tendency* to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401 (emphasis added); *see also United States v. Quinones*, 417 Fed. App'x 65, 68 (2d Cir. 2011) ("[R]elevant evidence" is "evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (emphasis added)).

The Second Circuit has described the relevance standard as "very low." *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (quoting *United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008)). "To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010) (citing *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 927 (2d Cir. 1977) ("Evidence need not be conclusive in order to be relevant.")). "Nonconclusive evidence should still be admitted if it makes a proposition more probable than not." *United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003) (citation omitted).

Federal Rule of Evidence 403 states, in relevant part, that the Court "may exclude relevant evidence if its probative value is *substantially outweighed* by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time,

or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). However, "[p]robative evidence is not inadmissible solely because it has a tendency to upset or disturb the trier of fact." *United States v. Salameh*, 152 F.3d 88, 122-23 (2d Cir. 1998).  Furthermore, where the evidence is no "more sensational or disturbing than the crimes with which the defendant has been charged," there is no unfair prejudice.  *United States v. Johnson*, No. S5 10 CR. 431 (CM), 2014 WL 171154, at *2 (S.D.N.Y. Jan. 14, 2014), *aff'd*, 659 F. App'x 674 (2d Cir. 2016) (internal quotation marks and citation omitted).

Only when evidence is "clearly inadmissible on all potential grounds" should evidence be excluded on a motion *in limine*. *United States v. Paredes*, 176 F. Supp. 2d 192, 193 (S.D.N.Y. 2001); *see also Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996).  Balancing relevance against the risk of unfair prejudice, ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

### C.  Discussion

The Court should reject the defendant's attempt to preclude evidence of ████████. ███████.  This evidence is powerful proof of the coercive tactics used by the defendant against Victim-3 and of how the charged Enterprise enabled him to carry out his crimes.  In short, the evidence more than meets the very low threshold of relevance and is no more inflammatory than the charged offenses.

### 1.  Evidence of ███████████████ Is Plainly Relevant

Evidence of ███████████████████████████████████████████████, is powerful evidence both of the defendant's sex trafficking of Victim-3 and of other co-conspirators' participation in that trafficking.

*First*, evidence ████████████████ is highly probative of the coercion and threats that the defendant used against Victim-3—one of the elements of the sex trafficking predicate activity alleged in Count One.  The Government expects to prove at trial that the defendant used his coercive control, including physical, emotional, and financial control, over Victim-3 to force Victim-3 to engage in commercial sexual acts with the defendant.[9] ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[9] The Government's expert, Dr. Hughes, is expected to testify that coercive control tactics may include, among other things, ████████████████████████████.

.

*Second*, evidence ███████████████ is probative of the Enterprise's involvement in the defendant's coercion. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

Despite the many ways that such evidence is probative of Count One, the defendant nevertheless claims that such evidence is only minimally relevant ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

**2. The** ████████████ **Is Not Unduly Prejudicial Under Rule 403**

The probative value of such evidence is also not *substantially* outweighed by the danger of unfair prejudice.  The defendant cites a series of out of Circuit cases to claim that ████████████ ████████████████████████████████████████████ (Mot. at 2). ████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████ That same conclusion applies here. ████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

Moreover, any risk of unfair prejudice can be minimized by requiring the Government to give notice to the defendant shortly prior to its introduction of such evidence so that the parties may confer about how to keep this testimony brief and efficient. ██████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

## IV.    THE COURT SHOULD DEFER RULING ON DEFENDANT'S MOTION TO PRECLUDE SUMMARY CHARTS AND DEMONSTRATIVE EXHIBITS

After receiving the defendant's motion regarding summary charts and demonstrative exhibits, the Government conferred with defense counsel in an effort to resolve the motion. Following that productive conferral, the Government has agreed that any summary witness will only present charts summarizing voluminous exhibits consistent with Federal Rule of Evidence 1006, and the parties have agreed to a schedule for production of such exhibits. Once the defendant has had the opportunity to review the Government's proposed summary charts, he may raise any specific objections he has at a future date. Accordingly, the Court should defer ruling on the defendant's motion to preclude such evidence until the defense has raised any specific objections to the Government's proposed charts.

### A. The Government's Summary Charts Will Comply with Rule 1006

As the parties discussed during their productive conferral, this case involves a large volume of evidence that would take substantial time to review with the jury in its original form without the use of summary charts. For example, the Government expects to offer voluminous hotel records, travel records, financial records, phone records, text messages, emails, photographs, and videos as exhibits at trial. Those records total many thousands of pages and multiple hours of video, which would be highly inefficient to review piecemeal at trial.

In order to coherently and efficiently present this voluminous evidence to the jury, the Government expects to offer multiple summary charts at trial, all of which will fit comfortably within Rule 1006. That Rule provides that the Court "may admit a summary, chart, or calculation offered to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence."[10]

The charts the Government intends to offer at trial will all comply with the Rule.[11] Each chart will summarize a variety of voluminous records, totaling thousands of pages, in a cohesive

---

[10] To clarify, the 2024 amendment of Rule 1006 did not change the standard for admitting charts summarizing voluminous evidence; rather, the amendment was intended to correct courts that "have mistakenly held that a Rule 1006 summary is 'not evidence' and that it must be accompanied by limiting instructions cautioning against its substantive use." Fed. R. Evid. 1006 Advisory Committee Notes to 2024 Amendments. The amendment was also meant "to clarify that a properly supported summary may be admitted into evidence whether or not the underlying voluminous materials reflected in the summary have been admitted." *Id.* In this sense, the amendment *expanded* the admissibility of summary charts in jury trials and corrected past practice that unduly limited their use. Of course, as with all evidence, summary charts are subject to the balancing test of Rule 403, *see id.*, and here the Government will ensure that its charts accurately reflect probative information from voluminous records in a manner that is neither misleading nor argumentative.

[11] As the Government informed defense counsel when conferring on this topic, the Government does not intend to offer the type of testimony that Judge Nathan precluded in *United States v. Maxwell*, and which the defendant highlighted as objectionable in his motion. (*See* Mot. at 2-3). The proposed summary witness in *Maxwell*, which focused on conduct between 1994 and 2004 and involved far less documentary evidence than will be presented at trial here, planned only to

and chronological manner that will help the jury understand and make use of the evidence. The charts will combine different types of voluminous records together in chronological order around key dates to help the jury comprehend relevant information contained within thousands of pages of records. These types of charts fall well within the heartland of summary charts routinely admitted in this Circuit. *See, e.g.*, *United States v. Menendez*, 23 Cr. 490 (SHS), 2024 WL 5103452, at *41 (S.D.N.Y. Dec. 13, 2024) (finding summary charts reflecting timelines of messages and calls taken from voluminous records admissible, and noting that the "Second Circuit has regularly affirmed the use of such charts"); *United States v. Ho*, 984 F.3d 191, 209-10 (2d Cir. 2020) (hundreds of pages of text messages, emails, and other documents "merited the use of summary charts in a complex fraud trial," citing cases); *United States v. Miller*, 954 F.3d 551, 565 (2d Cir. 2020) (affirming admission of summary chart of "hundreds of calls and text messages" and explaining that "this information would have been difficult for the jury to synthesize and evaluate without the aid of a summary").

### B. The Parties Have Agreed to a Schedule for Disclosure of Summary Charts

Because the proposed summary charts will summarize voluminous materials offered as exhibits at trial, the Government cannot prepare the charts until it has finished marking its exhibits. In addition, the Government expects that it may need to revise some charts as trial progresses, depending on what disputed issues of fact arise. Accordingly, the parties have agreed that the Government will provide drafts of its summary charts to defense counsel before opening

---

read from and point out connections across different admitted exhibits, which were not particularly voluminous, and which did not involve the use of a summary chart. *See United States v. Maxwell*, Trial Tr. at 1979-88, 20 Cr. 330 (AJN), Dkt. No. 757 (Dec. 9, 2021). Judge Nathan's preclusion of that testimony as an improper "mini closing," *id.* at 1984, is thus inapposite to the anticipated summary charts here, which will convey information from an enormous volume of exhibits that is otherwise impossible for the jury to comprehend.

statements commence.  The defense has agreed that it will not use these draft charts to cross-examine any witnesses.  The Government will make good faith best efforts to provide final versions of its summary charts as far in advance as possible during trial.

The Government has also informed defense counsel that it does not currently expect to use any demonstrative exhibits governed by Rule 107 during trial.  Should that change, the Government will promptly notify defense counsel and confer in good faith regarding the timing of disclosures for draft and final demonstratives.

*    *    *

The Government will remain available to meet and confer should defense counsel have any questions or concerns once they have received the draft summary charts, and the Government is hopeful that any future disputes on this topic can be resolved through additional productive conferrals.  Should the defense then have specific objections to the proposed summary charts that the parties cannot resolve, the parties will ask the Court to resolve those disputes.  Until that time, however, the Government respectfully requests that the Court defer ruling on this motion so that the defense has an opportunity to review the Government's proposed summary charts.

## V.    THE COURT SHOULD ADMIT EVIDENCE OF THE DEFENDANT'S PAST ACTS OF VIOLENCE AND OBSTRUCTION ONLY IF THE DEFNESE OPENS THE DOOR AT TRIAL

At this time, the Government does not currently intend to offer evidence of ███████ ███████████████████████ unless the defense opens the door to these topics at trial.  For example, if the defense were to argue or suggest through opening statements or cross-examination that the defendant has never engaged in acts of violence, has never engaged in obstruction, or has never possessed a gun, then the Government may ask the Court to consider admitting certain evidence of the ███████████ to respond to those arguments or areas of cross-examination.

Absent such door-opening, the Government will not offer evidence of these issues at trial. Should the Government believe the defense is embarking on an argument or line of cross-examination that renders these incidents relevant, the Government will promptly notify and confer with the defense before seeking to introduce evidence of these events. The Court should accordingly reserve decision on this motion unless and until the Government seeks to admit any evidence of these events at trial.

## **CONCLUSION**

For the foregoing reasons, the Court should grant the Government's motions *in limine* in their entirety and deny the defendant's motions *in limine*.

MATTHEW PODOLSKY
Acting United States Attorney


By:    /s/_____
        Maurene Comey / Meredith Foster
        Emily A. Johnson / Christy Slavik
        Madison Reddick Smyser / Mitzi Steiner
        Assistant United States Attorneys
        (212) 637-2324/-2310/-2409/-1113/-2381/-2284