P4pWcomC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                 v.                          24 Cr. 542 (AS)
 4
     SEAN COMBS,
 5      a/k/a "Puff Daddy,"
        a/k/a "P. Diddy,"
 6      a/k/a "Diddy,"
        a/k/a "PD,"
 7      a/k/a "Love,"

 8                   Defendant.              Conference
     ------------------------------x
 9                                           New York, N.Y.
                                             April 25, 2025
10                                           11:00 a.m.
     Before:
11
                       HON. ARUN SUBRAMANIAN,
12
                                             District Judge
13
                           APPEARANCES
14
     JAY CLAYTON
15        United States Attorney for the
          Southern District of New York
16   BY:  MADISON R. SMYSER
          EMILY A. JOHNSON
17        MAURENE R. COMEY
          MEREDITH FOSTER
18        MITZI STEINER
          MARY C. SLAVIK
19        Assistant United States Attorneys

20   AGNIFILO INTRATER LLP
          Attorneys for Defendant
21   BY:  MARC A. AGNIFILO
          TENY R. GERAGOS
22        -and-
     SHER TREMONTE
23   BY:  ANNA M. ESTEVAO
          -and-
24   SHAPIRO ARATO BACH LLP
     BY:  ALEXANDRA A.E. SHAPIRO
25        JASON A. DRISCOLL
```

P4pWcomC

| 1 | (Case called) |

2          MS. SMYSER:  Good morning, your Honor.  Madison

3    Smyser, Emily Johnson, Maurene Comey, Meredith Foster, Mitzi

4    Steiner and Christy Slavik, for the government.

5          THE COURT:  Good morning.

6          MR. AGNIFILO:  Good morning, your Honor.  Marc

7    Agnifilo, Teny Geragos, Alexandra Shapiro, Jason Driscoll and

8    Anna Estevao, for Sean Combs, who's with us this morning.

9          Good morning, your Honor.

10          THE COURT:  Good morning.

11          And good morning to you, Mr. Combs.

12          THE DEFENDANT:  Good morning, Judge.

13          THE COURT:  All right.  So, we have numerous motions.

14          What I'd like to do is start, first, with the motions

15    *in limine*, work through those and then tackle the additional

16    motions that have been filed over the last few days.  And then

17    I will open it up to any issues that the parties would like to

18    address.

19          And same thing as last time.  So, I'm going to go

20    through these.  On some of these I'll give you a ruling.  On

21    some of them I might ask a few questions.  But obviously, after

22    we get through this, if there are any additional issues or any

23    party wants to be heard, then that is, of course, appropriate,

24    and we'll hear you.

25          Let's start with something that's hopefully easy.

P4pWcomC

1          This is the motion *in limine* to preclude summary

2    charts evidence and for timely disclosure, Dkt. 203.

3          My understanding is that the parties have worked out

4    an arrangement here so that this motion can be worked out as

5    moot.  But could a spokesman from the government explain what

6    the arrangement is so that it's on the record and there's no

7    disagreement.

8          MS. COMEY:  Yes, your Honor.

9          The agreement is that the government will provide

10   drafts of all of its summary charts that we will be seeking to

11   admit under Federal Rule of Evidence 1006 before opening

12   statements in this case.

13          The defense has agreed not to use those drafts to

14   cross-examine any witnesses, and the government will provide

15   final versions of its summary charts as quickly as possible and

16   the parties will continue to confer about timing of that in

17   advance of any summary witness's testimony.

18          THE COURT:  All right.  And at this time the

19   government does not expect to use any demonstrative --

20          MS. COMEY:  That's correct, your Honor.

21          THE COURT:  -- in its --

22          MS. COMEY:  That's correct, your Honor.

23          THE COURT:  OK.

24          Mr. Agnifilo, is there anything to add, or does that

25   reflect the parties' agreement?

P4pWcomC

1          MS. SHAPIRO:  Your Honor, I think the only

2   clarification, and we had noted this in our reply, is that we

3   anticipate, based on past practice in this district, that it's

4   likely that there may be disputes between the parties not only

5   about whether -- about whether the charts, in fact, qualify

6   under Rule 1006 or whether they should be treated as

7   demonstratives under Rule 107.  So we had asked the Court to

8   consider the legal issues there and provide some guidance

9   rather than denying the motion as moot.  But obviously, we

10   defer to your Honor's --

11          THE COURT:  Well, I would need to see the summaries,

12   right?

13          Well, let me ask you this.  What guidance can I

14   provide that would be helpful?  And I appreciate you bringing

15   up the issue, but if there's any guidance I can provide you at

16   this time, then I'm happy to do so.

17          MS. SHAPIRO:  There was a dispute in the briefing

18   about the scope of the rule, but it may well be that it makes

19   more sense, as your Honor's indicated, to take this up in

20   connection with specific charts.

21          THE COURT:  I think that makes sense.  So, I have the

22   rule.  I will faithfully apply it, and if there's an attempt to

23   get in something as evidence under Rule 1006 as opposed to

24   simply a demonstrative that would not go back to the jury under

25   Rule 107, then I'll hear you at that time.  But I need to look

P4pWcomC

1    at the actual summaries to make any kind of determination along

2    those lines.  And so I think, in keeping with what you

3    suggested as to several of these motions, we're going to have

4    to handle this on a line item basis.

5                MS. SHAPIRO:  Thank you.

6                THE COURT:  All right.

7            So the motion at Dkt. 203 will be denied as moot.

8            Let's move to Dkt. 205.

9            This is a motion *in limine* to preclude the testimony

10   of Dr. Dawn Hughes.  That motion is granted in part and denied

11   in part.

12           In keeping with the discussion from the last hearing,

13   the section on coercive control is out, as is the discussion of

14   any motivations or intent of abusers.  Dr. Hughes can testify

15   as to coping strategies, delayed disclosure and memory, and the

16   testimony, as articulated in those sections of her disclosure,

17   as courts have permitted that brand of testimony, including

18   those in this district, such as *Ray*, and the *Young* decision

19   from the Ninth Circuit, just to give a few examples.  I am

20   including in this category testimony concerning the reasons why

21   victims stay in relationships, which we had addressed at the

22   last hearing.

23           As for interpersonal violence, which is mentioned in

24   the government's posthearing letter, if Dr. Hughes is asked why

25   victims either stay in relationships or have delayed disclosure

P4pWcomC

1    or engage in coping strategies or have fragmented memories,

2    then she can, of course, answer those questions with the

3    reasons for that behavior, as set forth in the disclosure.  But

4    the jury can understand what abuse and violence is, and it

5    doesn't need Dr. Hughes to explain an umbrella term of

6    "interpersonal violence" or to expound at length about

7    different types of abusive conduct as a precursor to offering

8    opinions that the Court has permitted.

9            To say it more simply, what I don't want to have at

10   trial is any attempt to introduce through the different term of

11   "interpersonal violence" all of the disclosed testimony in the

12   coercive control section, and the Court will monitor those

13   lines strictly.

14           So the motion as to Dr. Hughes is granted in part and

15   denied in part, and we'll address the motion as to Dr. Bardey

16   when we get to it, shortly.

17           Next, we have the motion *in limine* to preclude Rule

18   404(b) evidence at Dkt. 239.

19           This is granted, as the government does not oppose the

20   motion absent door opening by the defense.  And that's true of

21   any of these motions.  If the other side opens the door, even

22   if the motion *in limine* is granted, I'll expect the parties to

23   ask to approach and they'll say the door's been opened and the

24   Court will consider those issues at that time.

25           As to the motion to exclude available video evidence

P4pWcomC

1    from March 5, 2016, at Dkt. 242, this motion is denied.

2              The defense can't show that the video would be

3    inadmissible on any basis.  First, the government is not

4    seeking to introduce the broadcast footage of the March 5,

5    2016, incident.  As to the remaining footage, the government

6    indicates that it has two witnesses that can authenticate that

7    the recordings accurately depict the events in question,

8    satisfying Rule 901.  In this regard I'll cite *Gill v. Arab*

9    *Bank PLC*, 893 F.Supp.2d, 542, 568, which holds that a video was

10   authenticated where two witnesses to a particular event

11   testified that the video was a fair and accurate depiction of

12   the relevant event.  The videos would further be admissible

13   under Rule 1003 or Rule 1004(a) or (b).

14             As for the Rule 403 objection, the probative value

15   here is not substantially outweighed by any unfair prejudice to

16   Mr. Combs, for the reasons explained in the government's

17   briefing.

18             Now, there is a suggestion in Mr. Combs's briefing

19   that it would be willing to work with the government to work on

20   a video, a version of the video that would address some of the

21   concerns that the defense has raised.  So maybe someone from

22   the government can explain what can be done along those lines,

23   because my understanding is that the government's video expert

24   is still looking at the videos, but there are some things that

25   can be done to address the issues that have been raised by the

P4pWcomC

1    defense.

2             MS. SMYSER:  Yes, your Honor.

3             So, the government's video expert has adjusted some of

4    the videos, and we have provided those to the defense.

5             There are two buckets here.  One is the surveillance

6    video footage that was provided by CNN.  The government's

7    expert has been able to slow that down to match the frame rate

8    that's on the cell phone video, which reflects the frame rate

9    that's on the underlying surveillance footage that was on the

10   original system.  So there are those three videos.

11            In addition, the government's expert has looked at the

12   cell phone videos which were taken by the iPhone 6, which is a

13   little bit shaky and has an altered aspect ratio, and he has

14   been able to correct those.  So we're certainly willing to

15   confer with the defense on this.  I will say especially to the

16   cell phone videos, though, the witness who actually took those

17   cell phone videos will be testifying, so we will seek to admit

18   those actual cell phone videos that he took without the

19   expert's alterations, because he's able to authenticate those

20   particular videos.

21            THE COURT:  OK.  So what I have said is without

22   prejudice to addressing any feasibility issue, and let me just

23   be clear about that.  If it turns out that there's something

24   that you can easily do to address the defense's concerns or if

25   the defense has a proposal as to something that can be easily

P4pWcomC

| | |
|---|---|
| 1 | done, then I'll hope that the parties can work that out.  If |
| 2 | they can't, come see me and I'll see if I can work it out.  But |
| 3 | I just want to make sure.  This is something, in today's day |
| 4 | and age, that I think we can eliminate at least many of the |
| 5 | defense's concerns with the use of technology.  So let's try to |
| 6 | do that. |
| 7 | MS. SMYSER:  Yes, your Honor. |
| 8 | THE COURT:  OK. |
| 9 | Next, this is the motion that is not on the docket |
| 10 | relating to a particular medical procedure, and maybe someone |
| 11 | from the government's side can walk me through not the |
| 12 | relevance of this testimony but what issue that the government |
| 13 | is actually required to prove or is seeking to prove that it |
| 14 | goes to.  And so I want to differentiate two things. |
| 15 | There's the general issue of coercion that has |
| 16 | surfaced in many of the pleadings, and I understand that.  And |
| 17 | I understand that evidence of coercion may, under Rule 401, |
| 18 | make the evidence relevant.  But coercion, as a general, |
| 19 | abstract matter is not a count that the government -- it's not |
| 20 | the claim.  If you take the 1591 claim or charge, for instance, |
| 21 | then there's coercion within a specific context.  And so I'm |
| 22 | hoping that the government can connect the dots so I understand |
| 23 | how closely tethered this evidence is to the actual things that |
| 24 | the government is trying to prove, because the defense's |
| 25 | response, even if you get past 401, is that you still have to |

P4pWcomC

1    satisfy Rule 403.  And their argument is that the unfair

2    prejudice substantially outweighs the probative value even if

3    it's relevant evidence.

4              So who can address that on the government's side?

5              MS. FOSTER:  Yes, your Honor.

6              So, here, multiple counts in this case involve sex

7    trafficking and that's sex trafficking including by coercion.

8    And here, the evidence of this medical procedure goes directly

9    to the coercive control that the defendant exercised over this

10   victim.  It shows the degree of control that he exercised over

11   her.  It also goes to consent to engage in the sexual

12   activities, both shows the harms that this victim incurred from

13   some of these sexual activities and goes to her continued

14   consent to engage in them as well as the defendant's knowledge

15   of this also goes towards his understanding and her reaction --

16   that she expressed to him -- goes to his knowledge of her

17   consent.  So it's directly relevant to this question of

18   coercion and consent that goes to sex trafficking.

19             THE COURT:  But you're not suggesting that the

20   procedure was a part of the alleged sex trafficking, right?

21             MS. FOSTER:  Well, to --

22             THE COURT:  I'm using that in a lay sense.  It wasn't

23   part of those episodes that the government has identified in

24   the indictment; it's not part of those episodes themselves.

25   You're saying that it has relevance in a more attenuated but

P4pWcomC

```
 1    not -- it has a close nexus to those events but is not part of
 2    those events.
 3              MS. FOSTER:  Well, it was, in the sense that those
 4    types of events were constructed in a way so that this type of
 5    procedure was -- resulted from it.  I would say it in some ways
 6    is tied to one of these events, and so to some extent it also
 7    describes the harms of the sex trafficking, if that makes
 8    sense.
 9              THE COURT:  All right.  Can you be a little bit more
10    specific as to what you mean in terms of connection?
11              MS. FOSTER:  Yes.  I'm trying to be somewhat careful.
12              THE COURT:  Yes, but we have motions that have been
13    filed that are not on the docket, and I understand the reasons
14    why those have not been filed on the docket, and I understand
15    why the parties have used pseudonyms and other terms in their
16    motion papers.  But we have to be able to try this case and to
17    argue these things, and I have to be able to understand your
18    position fully, so we're going to have to do --
19              MS. FOSTER:  Yes.
20              THE COURT:  As I said, we're going to have to do the
21    best we can, but at the end of the day, we have to get to the
22    heart of these issues so that we can get it right.
23              MS. FOSTER:  Yes, your Honor.
24              So, to put a finer point on this, one of the ways that
25    these -- well --
```

P4pWcomC

1          THE COURT:  Let me ask it this way, maybe to help you

2    answer the question.  Was the procedure the result of one of

3    the claimed sex trafficking events?

4          MS. FOSTER:  Yes.

5          THE COURT:  OK.  And the government will prove that

6    during trial; I mean it will elicit evidence and testimony

7    concerning that.

8          MS. FOSTER:  Can I just have one minute to confer?

9          THE COURT:  Yes.

10         MS. FOSTER:  Your Honor, we can't pinpoint exactly

11   which sexual act, you know, resulted in the procedure.

12   However, at the time when the procedure took place, there will

13   be plenty of evidence that this was during the time in which

14   the defendant was exerting coercive control over the victim and

15   using that coercive control to overcome the victim's will to

16   engage in the sexual acts.

17         THE COURT:  Got it.  So consistent with the

18   government's proposal, what you're saying is the individual's

19   going to testify and at a certain point -- what you're saying

20   right now, in terms of that close timing, the context,

21   everything will become clear.  And your proposal, as I

22   understand it from your papers, is that after having conferred

23   with the defense on the way in which this evidence would come

24   in, in a way that would be swift and not needlessly raising

25   these issues, at that point, when all the context is set, you

P4pWcomC

```
 1    would approach and say now that we've laid a foundation, we've

 2    showed the context, we've shown the relevance, we've shown how

 3    probative this is, at this point in time we would seek to

 4    elicit that testimony.  Is that a fair summary of what --

 5         MS. FOSTER:  That's entirely correct.  And we still

 6    are conferring internally about the scope of the evidence we

 7    will offer, and we will confer with the defense about that

 8    prior to offering it.

 9         THE COURT:  OK.  So, given that, I'm going to grant

10    the motion, because as I've said before, all that granting the

11    motion really does is put the onus on the government to

12    approach before they elicit that testimony.  And I think that's

13    consistent with what your proposal is anyway.  So I'm not

14    categorically saying that it's out, but I'm saying that if you

15    decide, at the end of the day, that you want to elicit that

16    testimony, you need to approach first and we'll decide whether

17    it can be admitted.

18         MS. FOSTER:  The one thing I will note, and I imagine

19    defense counsel will note this as well, is that it may --

20    whether that testimony comes up may impact voir dire and

21    whether a question is necessary at voir dire.  I imagine

22    what -- I believe we have a conference on the calendar for next

23    week, and maybe the best proposal is for us to sort of confer

24    with defense counsel in light of your Honor's ruling about what

25    type of a question would be appropriate.
```

P4pWcomC

```
 1              THE COURT:  That's fine.
 2              Ms. Shapiro or Ms. Geragos, anyone on the defense
 3    side?
 4              MS. GERAGOS:  We agree with that approach, your Honor.
 5    I think the biggest concern for both the government and the
 6    defense is voir dire with respect to this issue.  And so in
 7    light of your Honor's ruling, we would like the opportunity to
 8    confer.  We probably will put something in our proposed voir
 9    dire tonight about it, redacted.  But it is something that we
10    absolutely would like to address at the conference next week.
11              THE COURT:  Let me ask the government to do this.
12              First of all, that's fine.  We'll address it at the
13    conference, and we'll figure out how to address this in the
14    context of voir dire.
15              What I'd ask the government to do is -- so in the
16    briefing, and this is understandable, given the number of
17    issues that were raised, the nexus between the procedure and
18    the actual acts that the government claims were sex trafficking
19    was not clearly presented.  So if the government wants to
20    connect those dots in a short letter, like two pages, three
21    page, then I'll allow the government to do that.  And the
22    defense can give its response.  Because I think that, at
23    bottom, the defense is raising a Rule 403 argument, and so it's
24    a weighing between the probative value and the unfair
25    prejudice.  And to understand that, I need to know the context.
```

P4pWcomC

1    And if I can make a more categorical ruling on this by next

2    week, that will be helpful, because it will streamline voir

3    dire.  If I can't, then we'll come up with a question that we

4    can use with the potential jurors.

5              Does that make sense?

6              MS. FOSTER:  Yes, your Honor.

7              THE COURT:  OK.

8              MS. GERAGOS:  Yes.  Thank you.

9              THE COURT:  That, I believe, takes care of the

10   defense's motions.

11             As to the government's motions, as to the motion *in*

12   *limine* to admit statements by Mr. Combs's employees, agents and

13   coconspirators and the motion *in limine* to admit prior

14   consistent statements of victims and witnesses, I'll reserve on

15   that.  But maybe the government can help me with a proposal on

16   how we can address these things, because in the briefing,

17   there's, maybe, 50 pages of describing the evidence.  And I

18   understand that the government has furnished its exhibit list

19   to the defense.

20             Has there been any effort to meet and confer with the

21   defense to determine, as we would in most cases, what exhibits

22   we're talking about?  We know the basis that you're seeking the

23   admission of those exhibits, because you've identified them

24   now, and whether the defense has an objection going one by one.

25             MS. SLAVIK:  That's right, your Honor.

P4pWcomC

1          As your Honor notes, the many statements in the

2     government MILs were a nonexhaustive list of examples of the

3     types of statements that the government would seek to admit,

4     and you're absolutely right that the government has produced

5     the exhibits to the defense.  I think it makes sense for the

6     government to meet and confer with the defense prior to calling

7     witnesses through which we'd seek to admit these particular

8     statements.  I would imagine that we will agree on some of the

9     statements and we'll disagree on others.  With the statements

10    that there is disagreement over, I think the defense proposal

11    to bring that to the Court before the trial day or after the

12    trial day, I think, from our view, makes good sense.

13         THE COURT:  And is there a reason to do it -- we're

14    going to be doing that, so the answer is yes, as is done in

15    every case.  So that's going to happen.

16         But is there any reason, given that you've actually

17    disclosed a lot of this stuff and made your arguments, that we

18    can't, for instance, have a chart submitted to the Court by

19    next Friday?  Because if I just have an understanding of what

20    it is you're actually thinking at this time you're going to put

21    in and the defense has had a chance, going one by one, to

22    identify which, if any, they're objecting as not falling within

23    the scope of, for instance, 801(d)(2)(D) or (E) or which ones

24    they think, even if they come in under that rule, they would be

25    excluded under Rule 403, I can resolve those in advance of

P4pWcomC

1    trial.  And we have two weeks here, and so I would like to help

2    the parties out if I can by eliminating some of the

3    all-nighters during trial.

4         MS. SLAVIK:  Just a moment, your Honor?

5         Your Honor, at first blush, I think that's a very

6    reasonable proposal.  The question I have is whether providing

7    the Court with a chart after the government has met and

8    conferred with the defense, whether the Friday deadline is

9    feasible.

10        THE COURT:  It can be whatever the parties want.

11        MS. SLAVIK:  So if the deadline for that could be a

12   bit more of a moving target to give the government plenty of

13   time to confer with defense, I think that would be helpful.

14   But otherwise, I think that's a reasonable proposal.

15        THE COURT:  That's fine, but --

16        MS. SLAVIK:  With the understanding that this needs to

17   be resolved -- the Court needs to see this before the trial

18   commences.

19        THE COURT:  Let me say this.  The utility of this

20   diminishes as we get closer and closer to the actual

21   commencement of trial.  So if the parties can do this no later

22   than the Wednesday before trial, then I can certainly turn

23   around rulings to try to narrow what things we have to deal

24   with on a day-by-day basis, which I think is just helpful for

25   everybody.

P4pWcomC

1          MS. SLAVIK:  Understood, your Honor.

2          THE COURT:  OK.

3          As to the motion *in limine* to admit the 911 call, that

4     motion is denied.

5          To grant the motion, it must be inadmissible on any

6     basis.  While the call is not admissible, as far as the Court

7     can see, under any of the hearsay exceptions in Rule 803, the

8     call could come in as a prior consistent statement under Rule

9     801(d)(1)(B), meaning it could come in, depending on the

10    testimony that is elicited by a declaring witness in court.

11         Given that, the motion is denied, but it cannot simply

12    be used.  So you can't just put it in.  Just so everyone's

13    clear, the understanding is that if it was going to come in, it

14    would come in under Rule 801(d)(1)(B), and that has various

15    requirements that would need to be satisfied before the call

16    would be admitted.

17         As to the motion *in limine* to preclude Mr. Combs from

18    offering his own prior statements, we'll reserve on this and

19    resolve admissibility issues as they arise at trial.

20         As to the motion *in limine* to preclude evidence,

21    questions or argument about Mr. Combs's failure to commit other

22    bad acts, we'll reserve on this motion, but I will say that

23    Mr. Combs gives at least a basis for the admission of this

24    evidence, and quoting from the briefing, that the evidence

25    would, about consensual encounters would tend to disprove any

P4pWcomC

culpable knowledge or intent on the part of the other members

of the alleged RICO conspiracy and make less likely the

existence of any RICO enterprise that engaged in a pervasive,

continuing pattern of abuse.

I'm happy to hear from the government if they have a

response to that particular argument.  But that's why I'm

reserving, because the defense has articulated a basis for the

admission of this evidence, at least some of it.

MS. FOSTER:  So, just to respond to that, on the

government's part, so, we are not arguing that this RICO

conspiracy was engaged solely in criminal behavior and only

facilitated criminal actions of the defendant.  And so I think

this idea that it sort of falls into this bucket of, like, the

ceaseless criminal activity exception to when good acts

evidence can come in does not apply in this case, and there's a

host of case law that supports that just because the defendant

is charged in a long-running RICO conspiracy, that does not

turn that RICO conspiracy into that ceaseless criminal conduct

exception, whereby this type of evidence can be admissible.

And I don't -- we have no intention of saying that the

coconspirators in this case only facilitated the defendant's

bad acts.  And so in many ways, this would just be the same

type of 404(b) evidence that courts preclude by saying that

because they have facilitated all these other, noncriminal acts

of the defendant, then they must have some sort of propensity

P4pWcomC

 1    towards that type of behavior.  So I don't see, actually, how

 2    their arguments in their response papers actually get out from

 3    the sort of standard black letter law that this type of

 4    evidence is inadmissible.

 5         THE COURT:  So should I exclude the bad acts evidence

 6    relating to victim five on that same basis, using that same

 7    argument?  Because my understanding the last time we had this

 8    discussion was that the government was arguing that, sure,

 9    potentially these are other acts, but they go to the issues

10    that are identified in Rule 404(b), including knowledge and

11    intent.  And that was the government's submission there.

12         Similarly, here, the defense is arguing that certain

13    evidence of consensual encounters would undermine any inference

14    of knowledge or intent especially on the part of other members

15    of the alleged RICO conspiracy and the enterprise, because it

16    would show that perhaps they weren't members of the conspiracy;

17    there was no agreement, they didn't have knowledge, and that's

18    reflected in the fact that there was numerous events, some of

19    which the government alleges had a criminal bent and some of

20    which the government is not taking that position.

21         And so if you have that kind of constellation of

22    events, it may, in fact, be relevant that there were many

23    events that were consensual in nature.  Right?  So accepting

24    what you said, I'm just saying that there's, like, a dividing

25    line.  It's not so clear-cut, but if there are other events,

P4pWcomC

```
1   they simply don't come in under the cases that you've

2   identified.

3        MS. FOSTER:  Could you repeat what you said about

4   victim four?  I'm sorry.

5        THE COURT:  This is the mirror image of the motion

6   that was previously filed by the defense relating to the

7   government's 404(b) evidence.  And so I'm just saying that,

8   like, in the same vein, the defense is saying what's good for

9   the goose is good for the gander.  The government made these

10  arguments, where there was a close nexus between the events the

11  Court admitted the particular incident involving victim No.

12  5 -- and I'm using that term as it was used in the motion, so I

13  don't want there to be any confusion as to who I'm referring

14  to, but this is what we discussed in the last hearing.

15        But in that same way, the defense points out in their

16  briefing that as to these specific encounters there is a

17  particular way in which that evidence would go to knowledge and

18  intent relating to what the government has alleged.  And I'm

19  literally just quoting from the brief.  They say this evidence

20  would tend to disprove any culpable knowledge or intent on the

21  part of the other members of the alleged RICO conspiracy and

22  make less likely the existence of any RICO enterprise that

23  engaged in a pervasive, continuing pattern of abuse.

24        MS. FOSTER:  Understood, your Honor.  I think that to

25  the extent there is any minimal relevance here, it is far
```

P4pWcomC

1    outweighed by its likelihood to confuse the jury, and it's

2    also, here, a back-door way for them to effectively argue that

3    because a number of other women were -- it would be effectively

4    their way of getting in evidence that other women consented to

5    these acts and so, hence, the defendant was -- these acts

6    themselves are consensual encounters.

7                THE COURT:  Understood.

8                Who from the defense would like to address this issue?

9                MS. SHAPIRO:  Your Honor, if I can?

10               I think your Honor understands this, based on your

11   last questions, but I was just going to point out that

12   counsel's comments regarding the ceaseless criminal activity

13   point just fails to appreciate the relevance in terms of the

14   question as to whether the other employees had knowledge that

15   anything illegal was going on, which is obviously required to

16   prove the RICO conspiracy.  And so I think we made that point

17   clear in our briefing and your Honor understands it.

18               THE COURT:  OK.  So I think the motion is going to be

19   denied.  The motion is directed to this category of evidence,

20   right?

21               Ms. Shapiro, to the extent that you're putting in any

22   exhibits, those are going to be identified to the government,

23   and if the government has an objection on a line-by-line basis,

24   they can, of course, raise them.  But I understand the argument

25   that you've made, and I agree with that general argument.  But

P4pWcomC

1    similar to how we handled the defendant's Rule 404(b) motion,

2    there's a dividing line.  So you understand that at a certain

3    point, it is not going to meet Rule 404(b) and it will run

4    afoul of Rule 403's requirements, because the probative value

5    will be so minimal to the issues that you've identified that

6    admission would not be appropriate.

7            MS. SHAPIRO:  Understood, your Honor.  Hopefully we

8    won't have any exhibits like that.

9            THE COURT:  OK.

10           MS. FOSTER:  Your Honor, just one thing to note?

11           I think our other concern, other than admission of

12   exhibits on this topic, is also their questioning of witnesses.

13   And so to the extent they're seeking to admit this evidence as

14   sort of 404(b) evidence going to sort of the intent of the

15   members of the racketeering enterprise, we would want some form

16   of notice about that.  So for purposes of understanding what

17   they would question our witnesses about.

18           THE COURT:  Let me just make sure I understand what

19   you're saying.

20           Under 404(b), if they were trying to put in any

21   evidence or elicit testimony along those lines they would have

22   to provide notice, and they have not provided any such notice.

23           MS. FOSTER:  That's correct.

24           THE COURT:  OK.

25           Ms. Shapiro, what's the response there?

P4pWcomC

1          MS. FOSTER:  One other thing to note is that we would

2     ask -- to the extent it is admitted under 404(b), we would ask

3     for some sort of a limiting instruction along those lines as

4     well.

5          MS. SHAPIRO:  Your Honor, just to be clear, I'm not

6     sure what counsel is talking about, but we believe a lot of

7     this evidence is just direct evidence that undermines the

8     government's case that would come up in the ordinary course of

9     cross-examination.  And obviously, we don't have an obligation

10    to preview our cross-examination, but we don't really think a

11    lot of this is even 404(b) to begin with.  It's simply

12    undermining the government's case.  And 404(b) provides for

13    notice by the prosecutor.  There's no analogous provision with

14    respect to the defense.

15         THE COURT:  That appears to be what the rule says.

16         I'm going to deny the motion at this time.  But like I

17    said, the defense has to identify any exhibits it wants to use.

18         As to testimony that would go to other acts, I'll

19    allow the government -- in the letter that you're submitting on

20    the other issue, you can address that particular point, about

21    how to address testimony, because it wasn't raised in the

22    briefing.  And I want to make sure that I hear and make sure I

23    hear you on that.  And I also want to take another look at the

24    rule and see how that would map on to these circumstances.

25         And of course, the defense can respond to that.

P4pWcomC

1          MS. FOSTER:  Thank you, your Honor.

2          THE COURT:  All right.

3          The next motion *in limine* is to preclude evidence or

4   argument concerning the defendant's good acts and other

5   personal factors unconnected to guilt.

6          I think this reflects where the defense is, but this

7   is granted as to evidence or argument concerning punishment or

8   consequences but denied with respect to personal background.

9   As the defense points out, there are several aspects of this

10  that could come in as background testimony, and it may be

11  relevant to other issues in the case.  So that motion is denied

12  to that extent.

13         The next issue is motion to preclude evidence or

14  argument concerning any allegation that charges against

15  Mr. Combs are vindictive or otherwise brought for improper

16  reasons or are novel, and I believe that this is granted by

17  agreement, as the defense has no intention of making these

18  arguments.

19         MS. COMEY:  Your Honor, on that point, there's one

20  point I wanted to clarify that was not contained in the

21  defense's response to that motion, which is we move to preclude

22  also any argument or evidence about other couples or people who

23  might hire escorts.  We just wanted to make sure that the

24  defense's agreement covers that topic as well, which was part

25  of that motion.

P4pWcomC

1          THE COURT:  All right.

2          MR. AGNIFILO:  I don't believe that these two are

3    related if I understand what the government's saying now.  They

4    want to preclude us from establishing, I guess, that some of

5    this is part of a lifestyle or something along those lines, I

6    mean, if I understand what Ms. Comey is saying.

7          MS. COMEY:  I'm happy to clarify, your Honor.

8          There were two parts to this motion.  The first part

9    was essentially about suggesting that this prosecution was

10   racially motivated or improperly motivated.

11         The second part was to preclude the defense from

12   raising essentially the comparators that they raised in their

13   motion to dismiss the Mann Act counts, the comparators of other

14   people who, unrelated to this case, may have hired escorts to

15   suggest that because other people may have done something wrong

16   it makes it OK for the defendant to have done something wrong.

17         THE COURT:  I understood the defense's response that

18   they were not going to raise these issues would encompass that

19   type of evidence or argument.  But let me hear from the

20   defense.

21         MR. AGNIFILO:  So, to the extent that the government

22   is saying we can't make sort of a selective prosecution

23   argument, we agree.  And we can't say that there was sort of

24   targeting or anything along those lines.

25         What I think we absolutely can say, and have to say,

P4pWcomC

```
 1   is that it's relevant to the defendant's intent that there's a

 2   lifestyle -- call it swingers, call it whatever you will --

 3   that he was in that he might have thought was appropriate.  And

 4   part of why he would have thought that was appropriate is the

 5   same reason many people think it's appropriate.  And part of

 6   the reason people think it's appropriate is because it's

 7   common.  So I agree we can't make a selective prosecution

 8   argument in the facts.

 9            THE COURT:  OK.  You're using two extremes, which I

10   don't think is exactly what the government is referring to.

11            In the motion to dismiss briefing, there are actually

12   references to other high-profile individuals who the defense

13   argues were not prosecuted, and those are the comparators that

14   Ms. Comey is referring to.  I did not understand you to be

15   saying that you are going to call out those comparators.

16            MR. AGNIFILO:  Correct.

17            THE COURT:  That's what we're talking about.

18            MR. AGNIFILO:  That's right.  I agree.

19            THE COURT:  I think we're on the same page.

20            MS. COMEY:  I think so, your Honor.  We'll hear what

21   the arguments are and I'll see whether I think it might cross a

22   line, and I'll raise it again if I do, your Honor.

23            THE COURT:  All right.

24            I think, Mr. Agnifilo, you understand the motion's

25   been granted, so having heard the back-and-forth here, if
```

P4pWcomC

| | |
|---|---|
| 1 | you're getting close to that line, it would be prudent to raise |
| 2 | that in advance of the trial day so that we can address it as |
| 3 | opposed to having a disruptive sidebar during trial. |
| 4 | MR. AGNIFILO:  Very good, Judge.  Thank you. |
| 5 | THE COURT:  All right. |
| 6 | As to the motion *in limine* to preclude |
| 7 | cross-examination of lay and law enforcement witnesses with |
| 8 | respect to issues irrelevant to credibility, that title isn't |
| 9 | very helpful as to what we're talking about, but the parties |
| 10 | addressed this in the context of their briefing.  The defense |
| 11 | says that the motion is premature and that we're going to be |
| 12 | able to address this in advance of the trial day. |
| 13 | Mr. Agnifilo, is that fair? |
| 14 | MR. AGNIFILO:  Yes.  Yes, Judge. |
| 15 | THE COURT:  OK.  So whether we say it's granted or |
| 16 | denied, you're going to notify the government before you try to |
| 17 | put in any evidence that's identified in this category. |
| 18 | MR. AGNIFILO:  Yes. |
| 19 | THE COURT:  Or elicit any testimony along these lines. |
| 20 | MR. AGNIFILO:  Yes, Judge. |
| 21 | THE COURT:  OK.  So then we'll deal with it at that |
| 22 | time. |
| 23 | The motion -- I'm using different terminology here. |
| 24 | I'll say it's granted, because we're going to raise it and deal |
| 25 | with it in advance, but the particular disposition is |

P4pWcomC

1    irrelevant.  Everyone's on the same page in terms of how we're

2    going to handle this.

3            All right.  The next motion is motion *in limine* to

4    preclude the testimony of Dr. Bardey under Rule 702.

5            This motion is granted in part and denied in part.

6    The coercive control section is out because Dr. Hughes is not

7    talking about coercive control.  Dr. Bardey is not permitted to

8    suggest that Dr. Hughes should have interviewed the victims,

9    that she was deliberately blind or that she could have

10   interviewed the witnesses in question or reviewed any of the

11   available medical or psychological records because there's no

12   disagreement that the experts here could not have interviewed

13   the victims and then made appraisals of their credibility or

14   experiences under the law applicable in this circuit.

15           Now, to the extent that Dr. Bardey relies on his

16   experience and the literature to explain why, in the absence of

17   examination of the evidence and witnesses in this case,

18   Dr. Hughes's opinions are of limited weight, that is within

19   bounds.  Dr. Bardey makes the point that having not looked at

20   the case files or spoken to witnesses, there's no basis to

21   conclude one way or the other whether the individuals who will

22   be testifying in this case were victims.

23           And while this may be obvious, an obvious point, just

24   based on what was reviewed and what wasn't reviewed,

25   Dr. Bardey's perspective on that issue as a psychiatrist is

P4pWcomC

1  based on his expertise.  It's reliable.  In fact, it's not

2  disputed.  And it may cast a light on that issue from the

3  useful practitioner's perspective.

4          As for the coping strategies section, that is in, but

5  Dr. Bardey may not offer the testimony that women actually use

6  quite strong language to describe sexual encounters

7  particularly when they hire attorneys to bring lawsuits against

8  their further lovers or domestic partners.  This is unreliable

9  and unsupported, likely attorney-written testimony that plainly

10  runs afoul of both Rule 702 and Rule 403.

11          As for memory, Dr. Hughes is not testifying about the

12  credibility of complainants.  She doesn't -- I'm using the

13  words of Dr. Bardey -- attribute all such memory lapses to the

14  pathology of trauma or assume the credibility of complainants

15  or vouch for that credibility.  Now, if she does those things,

16  Dr. Bardey will be able to testify along these lines to address

17  those particular issues.  So Dr. Bardey need not address a

18  mischaracterization of Dr. Hughes's opinion unless the

19  government opens the door.

20          So the memory section is out except Dr. Bardey may

21  testify that generalizations cannot be used to establish

22  whether someone's memory was affected by trauma or not, which I

23  think is the basic point that Dr. Bardey's attempting to make

24  in that section.  To the extent that Dr. Bardey or defense

25  counsel suggest that Dr. Hughes or the government chose not to

P4pWcomC

1    examine the witnesses or that Dr. Bardey would be willing to

2    examine the witnesses, the defense will open the door to a

3    curative instruction from the Court, so they should just be

4    mindful of that.

5         OK.  I believe that that is the end of the motions in

6    limine, but I'll hear from both sides as to whether there's

7    anything that I missed or anything that I need to address.

8         MS. SMYSER:  The only issue is victim 4, which may

9    have been intended to address separately.

10         THE COURT:  Yes.

11         MS. SHAPIRO:  Your Honor, I hate to do this, but with

12    respect to Dr. Hughes, we put in a letter asking the Court --

13    as I understood the Court's ruling, it was expanded a little

14    bit to include that coping or parts of that coping strategies

15    section, and we did not have a chance to put in a response to

16    the government's post-argument letter.  I think we put in a

17    letter asking your Honor to give us that opportunity, if you

18    were going to consider it.  So I would just beg the Court's

19    indulgence, if we submit that letter on Monday if the Court

20    would at least review it and reconsider whether it might

21    restrict that testimony, because we did not get a chance to

22    respond to that.

23         THE COURT:  Well, what's the letter going to say?  I

24    mean what's the argument here, because we've got to rule on

25    some of these things, and these were motions that were briefed

P4pWcomC

1    a long time ago.

2            MS. SHAPIRO:  Well, I understand that, your Honor, and

3    I didn't realize this was going to come up.  But I think it's a

4    lot of the arguments that we made before, and I think the

5    problem with the coping strategies section is some of the same

6    problems that were identified before and the government was

7    just rearguing the point that we covered on Friday.

8            THE COURT:  The rulings that I've made here, as you

9    might have been able to tell, were consistent with the views

10    that the Court expressed at the last hearing.

11            MS. SHAPIRO:  That's what I was a little unclear

12    about, because maybe I just wasn't fast enough to take down

13    exactly what your Honor was saying.

14            THE COURT:  No.  At the hearing the Court expressed

15    its views and the government responded and focused attention to

16    the coping strategies section, and we had a discussion about

17    that.

18            MS. SHAPIRO:  No.  I understand that.

19            I thought that -- I had understood your Honor last

20    Friday to rule that there were two sentences from the coercive

21    control regarding why people stay in relationships as well as

22    the memory and that that was what was coming in.

23            THE COURT:  Well, I didn't make a ruling, but what I'm

24    really asking you is what's the unique issue as to coping

25    strategies that would differentiate it from what has been

P4pWcomC

previously articulated with respect to delayed disclosure and

memory that are the other two sections that fall into the

category that I believe would be properly admissible under Rule

702, would not be unfairly prejudicial under Rule 403 and is

consistent with probably at least a dozen cases from this

circuit and elsewhere.

MS. SHAPIRO:  Your Honor, if I could just have a

moment?  I don't even have the document in front of me.  I

wasn't expecting this.  I could come back to it after you cover

the other topics.

THE COURT:  Let's make it easier, because I think your

real ask is if we submit a letter on Monday, will you review

it.

I will review everything.

MS. SHAPIRO:  OK.

THE COURT:  As you can tell, I review everything that

everyone submits.  And so I will absolutely review it.

MS. SHAPIRO:  That was my request.  I apologize, your

Honor.

THE COURT:  There's no problem with that.

And remember, again -- I've said this before -- these

are motions *in limine*, so we're going to be dealing with the

testimony in real time and if you raise a concern with

testimony that's coming in and you can convince the Court that

it's inadmissible, then I'll certainly consider that.  That's

P4pWcomC

1    just how it works.

2          MS. SHAPIRO:  I appreciate that, your Honor, and the

3    reason that we're so focused on this, as I mentioned last

4    time -- and I understand the Court is going to strictly police

5    this issue -- is just having seen what has happened in some

6    other cases, we have some concerns in that regard.  But we'll

7    submit a very short letter.  Your Honor can read it and do

8    whatever you think is appropriate, and we'll continue, if we

9    need to make more objections during the testimony, we'll do

10    that.

11          THE COURT:  OK.  Good.

12          All right.  Now let's move to victim No. 4.

13          As to victim No. 4, the Court has reviewed the

14    materials that were submitted, and based on that, I don't see

15    any reason to change the Court's ruling, but I guess I'll

16    briefly hear from anyone who wants to be heard on this issue.

17    But I don't see any basis to change my decision.

18          Ms. Geragos.

19          MS. GERAGOS:  We maintain our objection, your Honor.

20          THE COURT:  OK.  Objection noted.

21          All right.  What's next?

22          MS. SMYSER:  Your Honor, we have a variety of

23    housekeeping matters that we are happy to run through.

24          THE COURT:  Before that, should we address the issue

25    concerning the enterprise letter, since the government has

P4pWcomC

1    responded?

2           MS. SMYSER:  We can do that.

3           THE COURT:  All right.

4           MS. SMYSER:  I'll turn it over to Ms. Johnson.

5           THE COURT:  OK.

6           MS. JOHNSON:  I'm happy to, your Honor.

7           THE COURT:  Well, to be fair, maybe the defense can

8    take this one, since it's their application.

9           Who is going to be addressing this from the defense's

10   side?

11          MR. AGNIFILO:  I'm going to do it, your Honor.

12          THE COURT:  All right.  Let's separate out two things,

13   because there are the additional incidents that were identified

14   relevant to the sex-trafficking charges, and the government's

15   point there is that that was always encompassed by the

16   substantive sex trafficking counts.  The dates match up.  You

17   knew for a long time that that was the time frame that the

18   government was alleging there were sex trafficking events

19   relating to those two victims, alleged victims.  And so you've

20   been on notice and you have had the documents for a long time.

21          That would seem to be a harder argument for you to say

22   that there was any particular issue with the identification of

23   those additional incidents in this most recent enterprise

24   letter.  So maybe you can take that up first.

25          Or maybe you're saying that's fair; we're really

P4pWcomC

1    focusing on the forced labor incidents.

2           MR. AGNIFILO:  So, my biggest concern -- the notice

3    issue is of concern.  But another concern is it's just not

4    clear to us what the grand jury voted as part of these counts.

5    I mean because in a racketeering conspiracy count, when I hear

6    that they're adding acts, what we don't know, because we're not

7    privy, obviously, to the grand jury process, is is this

8    something that a grand jury voted as part of the charged

9    conduct, or is this something that the prosecutors are adding

10   later as part of the charged conduct?  And if it's part and

11   parcel of the charged conduct, our position is that the Fifth

12   Amendment requires that the grand jury voted it and that

13   Mr. Combs only go to trial on the exact indictment that the

14   grand jury voted it the way the grand jury voted it.

15          So that's the first issue, because it's, in my mind, a

16   constitutional issue.  And that is something that I think only

17   the government can answer, because the government knows how it

18   presented the case to the grand jury.

19          The notice issue is somewhat of a different issue in

20   that it's not constitutional.  And what I would say on the

21   notice issue, Judge, is --

22          THE COURT:  Well, can we stop there for a second.

23          MR. AGNIFILO:  Yes, please.

24          THE COURT:  So, on the constitutional issue, are you

25   the designated constitutional law expert that can walk me

P4pWcomC

1    through that issue?

2              MR. AGNIFILO:  Yes, sir, your Honor.

3              THE COURT:  All right.  OK.

4              So I've got the indictment.

5              MR. AGNIFILO:  Yes.

6              THE COURT:  And I have the most recent enterprise

7    letter.  So what are you saying is the deficiency?

8              MR. AGNIFILO:  So what the deficiency could -- we

9    don't know if it's a deficiency because I don't know how they

10   indicted the case.  We have superseding indictments.  It may be

11   that as they superseded the indictments they had the grand jury

12   vote the forced labor and the RICO conspiracy to encompass all

13   of these acts.  And if the grand jury voted that way, then

14   there's no Fifth Amendment issue.

15             If the grand jury didn't vote it that way and if these

16   are things that the prosecutor is changing because they want to

17   put it in a new enterprise letter, then that is a problem of

18   constitutional dimension, in my view, whether it can be related

19   to the racketeering conspiracy count or the forced labor acts

20   specifically.

21             THE COURT:  You're saying that if you look at the

22   pattern of racketeering activity, it refers to multiple acts

23   relating to forced labor.

24             MR. AGNIFILO:  Correct.

25             THE COURT:  And you're saying that there is a

P4pWcomC

```
1   constitutional issue as to whether evidence of these particular

2   incidents was presented to the grand jury or not.  If it was

3   not, then you say that there's a constitutional issue.

4              MR. AGNIFILO:  Yes.

5              THE COURT:  If it, in fact, was, then there is no

6   issue.

7              MR. AGNIFILO:  Yes.  And let me give an example.

8              Let's say that the pattern that the grand jury voted

9   had three acts in it.  That's the pattern.  A grand jury in

10  this district voted a pattern based on three acts.  The

11  prosecutors say, well, we've alleged a pattern so now we can

12  add five acts; we can make it five acts or seven acts.

13             What I'm saying is they can't do that as a matter of

14  Mr. Combs's right to go to trial only on what the grand jury

15  voted.  And what I don't know the answer to and only the

16  prosecution knows the answer to is what the grand jury voted

17  specifically.  It's made a little bit more difficult whenever

18  you have a racketeering conspiracy indictment, in my

19  experience, because there's a vagueness.  I'm not talking about

20  constitutional vagueness.  There's an uncertainty to the scope

21  of the pattern of racketeering.  And so my point is if what the

22  grand jury voted was that, for instance, you know, a

23  particular, whether it be forced labor or something else,

24  embraced, encompassed, say, three actions and the prosecutor

25  then adds other actions, that would violate the Fifth
```

P4pWcomC

1    Amendment.

2                THE COURT:  OK.  The only cases you've cited in your

3    letter seem to go to a different point, which is if a

4    particular pattern is in the indictment, then that pattern

5    cannot be changed.  So do you have a case that more closely

6    reflects what you're saying now, which is it turns on the

7    underlying acts within the pattern, meaning there's patterns

8    and then there's patterns.

9                MR. AGNIFILO:  Right.

10               THE COURT:  There's a pattern that might only have

11   three acts and then there's one that might have a hundred acts.

12               MR. AGNIFILO:  Right.

13               THE COURT:  And that distinction matters for the

14   constitutional analysis.  Do you have a case --

15               MR. AGNIFILO:  Here's my proposal, because I know the

16   government submitted a letter, I think, just as we were

17   starting today, which is fine, but I haven't had a chance to

18   look at it yet.  And since we're all writing letters over the

19   weekend here on the defense side, and your Honor has to read

20   them all on Monday, I was hoping we could write a two, or

21   three-page letter addressing this issue, because there are two

22   issues as I see it.

23               There's the notice issue, which I think is a

24   significant issue and it's an issue that I think your Honor was

25   very much on top of when your Honor said I want the enterprise

P4pWcomC

1   letter on February 1.  That was very helpful to us.  And I

2   understand that there's a continuing investigation.  That's all

3   fine, but at a certain point, that continuing investigation has

4   to stop and we have to try some case.  And we can't, we

5   shouldn't have to be in a position of having substantial new

6   conduct that we have to defend.  That's a notice issue, and I

7   see that as a different type of issue than what I'm calling the

8   constitutional issue.

9           And in answer to your Honor's direct question, I will

10  find cases for the Court over the weekend.  We'll put a short

11  letter together.  We'll respond to the government's letter that

12  they submitted an hour or so ago, and we'll have this ready for

13  your Honor to make the decision one way or the other.

14          THE COURT:  Well, let's see if we can make any headway

15  now, because the second argument has to do with notice, and so

16  it doesn't have anything to do with the constitutional issue

17  you just raised.

18          MR. AGNIFILO:  Correct.

19          THE COURT:  And is it fair that the notice issue

20  really focuses on the forced labor incidents?

21          MR. AGNIFILO:  I think that's true.

22          THE COURT:  OK.  So I have the most recent enterprise

23  letter.

24          All right.  So you're focusing on items two, four and

25  five.

P4pWcomC

1              MR. AGNIFILO:  Yes, Judge, forced labor.

2              THE COURT:  All right.  And your point is the

3      government comes back and says, well, you have had evidence

4      about this for months and months and your response, I suppose,

5      is that's a great point, so why wasn't this identified in the

6      February 1 enterprise letter?  The failure to do so and the

7      failure to identify those incidents in the -- I'm going to get

8      the dates wrong, but the March 10 superseding and the

9      enterprise letter and the March 26 enterprise letter and only

10     identifying it on April 20, mere days before jury selection,

11     that's the failure of notice, and you point to Rule 16(b)(2)

12     and you say that the Court would have authority to eliminate

13     that evidence, which is not relevant to any of the other

14     charges here.  The government says it may be relevant to the

15     Mann Act charges, but we'll address that.

16             But is that a fair summary of the notice argument

17     you're making?

18             MR. AGNIFILO:  Exactly right.

19             THE COURT:  All right.

20             MR. AGNIFILO:  Very fair.

21             THE COURT:  Focusing on that, because I don't think

22     we're going to resolve the constitutional issue here at this

23     conference, but just on the notice issue, why isn't that a

24     valid objection, that, look, we had a deadline for this, this

25     isn't about the Constitution or anything else, it's just about

P4pWcomC

1    fair notice?  And so we did this to avoid the need for a bill

2    of particulars or other things that courts have utilized to try

3    to make sure that the defendants have fair notice.

4           And so, here, this is the fourth enterprise letter,

5    and as you point out, the evidence about this did not come from

6    recent interviews or anything else; it's just the government

7    was reviewing its records and then added these incidents to the

8    enterprise letter.  I think you've scored a victory on items

9    one and three, but as to two, four and five, why isn't it just

10   too late in the day to be adding additional instances of forced

11   labor?

12          MS. JOHNSON:  Your Honor, I think there is a

13   substantive difference between two and four and five, so I'd

14   like to just address those separately.

15          Two and four are incidents of forced labor which

16   directly refer back to sort of the dates and locations in one

17   and three.  And I understand the Court's point about, you know,

18   these came from review of our records.  I'd like to push back

19   on that a little bit to say that the review of this material is

20   incredibly iterative.  It is material comprising a wide swath

21   of evidence.  It's material from cell phones, material from

22   cloud counts, be it text messages, instant messages, media,

23   videos, photographs, in addition to the other sort of subpoena

24   return category, which includes travel records from a host of

25   different sources and hotel records from a host of different

P4pWcomC

1  sources, other kinds of travel records, like car services,

2  travel agency records, records from the defendant's company and

3  financial management.  And at first blush, occasionally a

4  record does not appear that it may relate until later on,

5  finding additional records, that recast that original document

6  in a new light.

7          And so in the process of marking exhibits, the

8  government, in doing that process and going through all these

9  records very carefully that we intended to use at trial, it

10  uncovered new dates that it would use in Counts Two and Four --

11  as the Court acknowledged, this is entirely appropriate -- and

12  noticed them in the enterprise letter.

13          THE COURT:  Well, I was going to ask you a question

14  about something you said --

15          MS. JOHNSON:  Of course.

16          THE COURT:  -- which is that as to two and four,

17  you're not putting in any additional evidence of any kind.  I

18  think what you're saying is the same evidence that we would put

19  in on the substantive counts, we're just saying it bears on

20  something else.

21          MS. JOHNSON:  Exactly.

22          THE COURT:  And that something else is not something

23  that would be separately on the verdict form that the jury

24  would be filling out, right?

25          MS. JOHNSON:  I think I agree with you, your Honor.  I

P4pWcomC

```
1    do think the jury form will include asking the jury to
2    determine whether certain predicate activity was part of a
3    pattern, but it wouldn't say, for example, would the jury find
4    that on or about, you know, April 25, 2025, victim one engaged
5    in forced labor.  It certainly would not be that specific.
6              THE COURT:  From your perspective.
7              MS. JOHNSON:  From our perspective.
8              THE COURT:  The defense may disagree.
9              MS. JOHNSON:  Correct, your Honor.
10             THE COURT:  But the real point is that this isn't
11   something -- not only are these individuals who have been
12   identified as part of this case, but you're saying, like, it's
13   the same evidence that we are going to put in on the
14   substantive counts.  We're just saying it bears on the RICO
15   conspiracy in a different way, and so to make sure, belt and
16   suspenders we wanted to make sure that was identified.
17             MS. JOHNSON:  Yes, that is absolutely correct, your
18   Honor.
19             THE COURT:  But five you would agree is on a different
20   footing.
21             MS. JOHNSON:  I would agree with your Honor that five
22   is on a different footing.  And I think with respect to five
23   the government does not sort of hear allegations and then
24   reflexively, you know, charge additional conduct related to
25   those.  We conduct an investigation, and I think we've made
```

P4pWcomC

1    that clear.

2           We were aware of allegations related to forced labor

3    for employee four from our first interview of her, but we've

4    done additional work.  We have collected additional documents

5    which have recently been produced to the defense, and so we

6    added it to the enterprise letter.

7           THE COURT:  OK.

8           Any last words from the defense on the notice issue?

9    And Mr. Agnifilo, I'm not going to rule on the constitutional

10   issue.

11          MR. AGNIFILO:  Understood.

12          THE COURT:  You'll put in a letter on that.

13          MR. AGNIFILO:  Yes, Judge.

14          I think in terms of No. 5 is on a different footing

15   than the other two, and that is new information -- so a new, a

16   new person, new allegations very late in the day, and I'm not

17   backing off our objection to the other part, but I think No. 5

18   does stand alone.

19          THE COURT:  OK.  The Court will exclude the evidence

20   in item five.  The other, remaining evidence is not excluded on

21   notice grounds and we'll reserve and I'll hear you on the

22   constitutional issue and we'll decide whether exclusion is

23   warranted on those grounds.

24          All right.  That takes care of the enterprise issue.

25          Now, some housekeeping, or are there other issues to

P4pWcomC

1    address?

2          MS. SMYSER:  Yes, your Honor.  I have a list, and I'm

3    happy to walk through the list with you.

4          THE COURT:  All right.

5          MS. SMYSER:  So, first, we wanted to bring up a few

6    things related to exhibits and trial.

7          The first is that the parties expect to have some

8    sealed exhibits that are very sensitive, so we just wanted to

9    flag for your Honor that we are working out a way to deal with

10   those.  In particular, some of those exhibits involve sound,

11   and so we're working on a way that the jury and the parties and

12   the Court are able to hear that sound but not the public.  So

13   we're in the process of conferring with the defense and working

14   with the Court and others to come up with a solution for that

15   issue, which we will keep the Court apprised of.

16         THE COURT:  On what basis would they be made

17   unavailable to the public?

18         MS. SMYSER:  Your Honor, these are extremely sensitive

19   exhibits.  They're going to be videos of freak-offs and would

20   show sexual encounters between victims, escorts, and sometimes

21   Mr. Combs is also seen in these videos.  And so that would be

22   the basis for sealing these very sensitive exhibits.

23         THE COURT:  And I take it that there's precedent that

24   would indicate that those concerns that you identified would

25   override the public's interest at trial of seeing the

P4pWcomC

```
 1   proceedings in open court?  Because you may field an objection

 2   from someone outside of the parties to this case.

 3          MS. SMYSER:  Yes, your Honor.  And we are aware of

 4   that, and there are cases in which this kind of material in

 5   particular has been sealed.  I mean just for example --

 6          Understood.

 7          So, yes.  We are aware that we could field an

 8   objection from other places, but the principle that this kind

 9   of sensitive material can be sealed is something that the

10   Second Circuit has spoken to, for example, in Amadeo.  And

11   we're happy to provide further briefing to the Court if that

12   becomes necessary.

13          THE COURT:  Yes, but for present purposes, you're

14   saying we're trying to work this out.

15          MS. SMYSER:  Yes.

16          THE COURT:  OK.  Good.  I appreciate the heads-up.

17          MS. SMYSER:  The other issued related to exhibits is

18   that we, of course, intend to provide the Court with exhibits

19   and 3500 in advance of trial.  Right now our plan is to provide

20   that to the Court on the Friday before trial, May 9, if that

21   works for the Court.

22          THE COURT:  That's fine.

23          MS. SMYSER:  Unrelated to exhibits, there are a few

24   things we wanted to cover.

25          First, the parties had conferred onto the scope of
```

P4pWcomC

1    some evidence related, potentially related to Rule 412.  We

2    just wanted to put the parties' agreement on the record here

3    today.

4            THE COURT:  OK.

5            MS. SMYSER:  So, the parties have agreed the defense

6    does not anticipate introducing any evidence of any alleged

7    victims' other sexual behavior or sexual predisposition, as

8    defined by Rule 412(a), and the government also does not plan

9    to introduce any evidence governed by Rule 412(a), which mooted

10   the potential motions related to that rule.

11           THE COURT:  OK.

12           MS. SMYSER:  The second item is that we would ask the

13   Court to allocute the defendant on a plea offer that was made

14   to him just to ensure that that offer was made and he was

15   advised of the offer and he rejected the offer.

16           THE COURT:  All right.  Would you like me to do that

17   now, or does it matter if I do it now or later?

18           MS. SMYSER:  I just have one further item to flag to

19   your Honor, and then I can turn over the reins to you.

20           THE COURT:  OK.

21           MS. SMYSER:  The last item is that the defense's

22   discovery deadline is supposed to be ten days after exhibits

23   were produced, which would be this Saturday.  So we just wanted

24   to put on the record that, to the extent that the defense has

25   any discovery, we would expect to receive it at that time.

P4pWcomC

```
 1          THE COURT:  And remind me.  So next week --
 2          Ms. Geragos.
 3          MS. GERAGOS:  I believe it's Sunday.  I think that's
 4   what we agreed last week, the 27th.  I would appreciate that
 5   that --
 6          THE COURT:  Yes.  Sunday, the 27th.
 7          MS. GERAGOS:  The 27th.
 8          THE COURT:  That's what I have as well.
 9          MS. GERAGOS:  I'm sorry.
10          THE COURT:  I think maybe there was confusion.
11          All right.  Ms. Smyser, next week, what's the plan of
12   action here?  So we have questionnaires.  I just want to know
13   if we're coming back, if we're going to be here.  I believe
14   that we were planning on being here next Friday.
15          MS. SMYSER:  I think it was Thursday, your Honor.
16          THE COURT:  Is it next Thursday?
17          What time?
18          THE DEPUTY CLERK:  1 p.m., your Honor.
19          THE COURT:  All right.  And at that time the plan is
20   to figure out from the questionnaires who we'll be bringing
21   back.
22          MS. SMYSER:  Yes, your Honor.
23          THE COURT:  OK.
24          Anything that the defense would like to add?
25          MS. SHAPIRO:  One quick question, your Honor.
```

P4pWcomC

```
 1              I believe today the requests to charge and verdict

 2     forms were due, and we just wanted to know if it would be all

 3     right if we deferred submitting our proposed verdict form until

 4     later in the process.

 5              THE COURT:  I don't need the verdict form.  I was

 6     going to raise the requests to charge.

 7              MS. SHAPIRO:  We were planning to file those today.

 8              THE COURT:  OK.

 9              Any issues with that, from the government's

10     perspective?

11              MS. SMYSER:  No, your Honor.

12              THE COURT:  All right.

13              Is there any reason we can't do the allocution on

14     Thursday when we come back, just for timing reasons?

15              MS. SMYSER:  No, your Honor.

16              THE COURT:  All right.  OK.  So let's plan on doing

17     that on Thursday, since we're all going to be here.  That will

18     be an additional thing that we can add to our agenda.

19              MS. SMYSER:  Great.

20              THE COURT:  All right.  Anything further from the

21     government?

22              MS. JOHNSON:  Your Honor, if I may?

23              I just wanted to clarify the scope of the Court's

24     ruling on No. 5, the enterprise letter.

25              THE COURT:  Yes.
```

P4pWcomC

1          MS. JOHNSON:  I just want to make sure I understand

2     that the Court's ruling is that the government can't argue

3     forced labor as to employee No. 4, but employee No. 4 is an

4     individual who's been on the government's witness list for

5     other testimony, and we still intend to call her and I

6     understand that the Court's ruling on this would not preclude

7     our calling her.

8          THE COURT:  That's correct.

9          MS. SMYSER:  We just have one item to raise with

10    regard to jury selection.

11          Your Honor, we just wanted to clarify if the Court

12    knew how many people you were planning to qualify.  40 people

13    will get us to 12 jurors and six alternates, but if you were

14    planning to call more, we were interested in that.

15          THE COURT:  That's what I was planning to do at this

16    time, but if there's another suggestion, I'm happy to hear it.

17          MS. SMYSER:  It may make sense to do a couple more

18    just to be safe in the event that anything happens, but --

19          THE COURT:  Well, it's better to be safe than sorry.

20          From the defense's perspective, is there any view on

21    this?

22          MR. AGNIFILO:  That's fine.  Better safe than sorry.

23          THE COURT:  We'll do a few more to make sure, in light

24    of the timing and everything else that the parties have

25    previously raised.

P4pWcomC

1          MS. SMYSER:  And one last thing, which the defense had

2     brought on our attention.

3          We typically use a people and places list in

4     connection with jury selection.  Our proposal was to get that

5     to, our proposed list to the defense on Tuesday and then to

6     submit a list to the Court on May 3.  And our ask would be that

7     that be shown to the jurors during voir dire rather than read

8     aloud to everyone.

9          THE COURT:  And did the parties agree on that

10    approach?

11         MR. AGNIFILO:  One second, Judge?

12         MS. GERAGOS:  Your Honor, I think we're looking for

13    the Court's guidance here.  I think the defense and the

14    prosecution --

15         THE COURT:  Ms. Smyser, could you please sit.

16         MS. GERAGOS:  -- have done it differently in past

17    cases, but typically what we have done is give this -- I'll

18    call it an appendix kind of list of places and people in

19    connection with the jury questionnaire, because the purpose, I

20    think, of your Honor's jury questionnaire is to identify cause

21    challenges.  And so prospective jurors could look through this

22    list of people and alert the Court and the parties whether they

23    know anybody, which I think would streamline things for the

24    week after in terms of jury selection.

25         So I think we really ought to seek the Court's

P4pWcomC

1    guidance here.  I think to do it the next week just raises some

2    concerns for us.

3            THE COURT:  Well, do you have this list?

4            MS. GERAGOS:  We have not -- we've conferred and

5    decided we'd bring it up to you today; we could do it quickly

6    over the weekend.

7            THE COURT:  Don't wait until the last minute.  OK?

8    Because now we have a logistical issue that the government may

9    have already printed all the questionnaires and delivered them

10   to the jury office, and so I think what they're saying is,

11   maybe we should have done that.  But we're still going to have

12   all of the jurors called back in the room waiting to be brought

13   in for questioning.  And so at that time we can certainly

14   furnish them with that list.  And to be honest, with all the

15   material they're already going to be doing with the

16   questionnaires, maybe it's better to just give them one list,

17   and the first question that we can ask is, you looked at the

18   people and places, do you know of any of them.

19           MS. GERAGOS:  That's fine.

20           MS. SMYSER:  Your Honor, we would propose doing that

21   in an individual voir dire.  This list is going to have the

22   true names of victims who are testifying under pseudonyms.

23   It's going to have the names of people who may not actually

24   come up at trial.

25           THE COURT:  You're saying each person comes in, we

P4pWcomC

1      hand them the list and then --

2                   MS. SMYSER:  They read it and let us know if there's

3      anyone who you know on this list, which I understand has been

4      done in other cases -- for example, in *Maxwell*.

5                   THE COURT:  Any issue with that from the defense?

6                   I mean the alternative -- see, I don't think at this

7      point we can get to the jury office the list, and so for the

8      reasons Ms. Smyser has articulated, it would seem like that

9      would be the only available option.

10                  MS. GERAGOS:  Understood, your Honor.

11                  THE COURT:  All right.  So we'll handle it that way.

12                  Any further issues from the defense's side?

13                  MS. GERAGOS:  I won't say issues.  I just wanted to

14     put some things on the record for your Honor.

15                  THE COURT:  Of course.

16                  MS. GERAGOS:  Last week you ordered that the subpoena

17     from WB would be due today.  We've conferred with their

18     counsel.  Because of the size of the production, we understand

19     that in the time it will take to put on a separate drive for

20     us, they won't be able to get it to us until Monday or Tuesday,

21     which is absolutely fine with us.  We just wanted to let your

22     Honor know.

23                  THE COURT:  That's fine.

24                  MS. GERAGOS:  OK.

25                  And the second thing is just that we'll put in a

P4pWcomC

1    clothing order, I think, by the end of the day on Monday for

2    MDC.

3              THE COURT:  That sounds good, and if there are any --

4    and you already conferred with the MDC about the parameters of

5    that order and what you need to do.

6              MS. GERAGOS:  Yes.

7              THE COURT:  OK.  If you need any assistance from us,

8    you'll let us know.

9              MS. GERAGOS:  Yes.

10             THE COURT:  But otherwise, we'll get the order and

11   we'll sign it.

12             MS. GERAGOS:  OK.

13             THE COURT:  All right.  Thank you very much.

14             If there are any issues in the interim, please let me

15   know.  I'll be looking forward to the parties' letters on

16   Monday, and then we'll be back on Thursday.

17             Ms. Johnson.

18             MS. JOHNSON:  Apologies, your Honor.  Just one

19   additional housekeeping matter with respect to jury selection.

20             Typically, if the parties show up to the courtroom in

21   jury selection, we receive from the jury office a list of the

22   names of the jurors who were present.  We understand that the

23   questionnaire would be filled out anonymously and the parties

24   will have access to the true names and the numbers assigned to

25   the venire.  We are just wondering if the Court has any

P4pWcomC

 1   information about when in the process that information would be

 2   provided to counsel.

 3            THE COURT:  That's a great question, and we'll check

 4   in.  We'll send the parties an email to let you know.

 5            MS. JOHNSON:  Thank you, Judge.

 6            THE COURT:  All right.  Thank you very much.

 7            MR. AGNIFILO:  Thank you, your Honor.

 8            THE COURT:  We are adjourned.

 9            (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25