

1140 Avenue of the Americas, 17th Floor, New York, NY 10036
phone: 212-257-4880
www.shapiroarato.com

Alexandra A.E. Shapiro
ashapiro@shapiroarato.com
Direct: 212-257-4881

June 9, 2025

**VIA ECF**

Hon. Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Combs*, 24-cr-542 (AS)

Dear Judge Subramanian:

      We oppose the government's unorthodox request to recall expert Dr. Dawn Hughes for a second appearance at a successive stage of its case-in-chief. The defense has relied throughout this trial on the commonplace supposition, articulated by the Court in its opening remarks to the jury, that each witness will be called only once. Tr.101. The defense has also relied on the Court's carefully considered pretrial rulings on the permissible scope of Hughes's testimony, as well as the Court's follow-on rulings while Hughes's testimony was in progress. It would be unfair and prejudicial to change the landscape of those rulings now, especially after the defense has already cross-examined the witness and based the content of its cross-examination on the understanding that it was addressing her for the only time during the government's case-in-chief. It sends a strange message to the jury for a witness to be recalled, with the Court's apparent imprimatur, after there has already been a lengthy attack on the witness's basic methodology and credibility. The defense cannot conduct the same cross-examination a second time. That's why it's virtually unheard of for the same witness to be called twice in the same party's case.

      The government's claimed justification for this extraordinary step does not pass muster. The government claims the defense did something wholly unexpected by calling attention to the apparent contradiction between the themes of Mia's testimony and the themes of her contemporaneous text messages and personal social media posts. This is classic cross examination and not a basis to upset judicial norms, such as the fundamental precept that each witness testifies only once. The government's rationale is all the more tenuous because the topics it now seeks to cover in Hughes 2.0 were extensively covered in Hughes 1.0. We lay this out, in detail, below. Any further testimony along the same lines would be cumulative, with limited if any additional probative value, such that it cannot outweigh the confusion and unfair prejudice that would result from the oddity of recalling the same expert witness to testify a second time, after the defense already more or less exhausted its cross-examination.

      The government made a strategic decision to call Hughes shortly after Cassie's testimony. Now the government seeks to have Hughes chime in again, after Mia and Jane's testimony. This smacks of unfairness and witness bolstering. This is not how trials usually work, it raises serious fairness concerns, and nothing in the cross-examination of Mia or in *United States v. Ray*, 2025 WL 1553327 (2d Cir., Jun. 2, 2025), warrants it. Hughes has already

offered extensive opinions in every area the government proposes to cover were she recalled. The Court should not indulge this charade.

      A.     <u>Hughes Has Already Covered Each Of The Areas Specified By The Government</u>

Hughes testified on direct for well over an hour and covered each of the four opinions the government would elicit were she recalled. Every opinion the government now claims it needs is already in its toolkit for summation.

      *1.    "The definitions of emotional and sexual abuse"*

Hughes's pretrial disclosure did not define emotional or sexual abuse and the jury hardly needed a psychological expert's definition of these terms. But we don't need to guess what Hughes might say if recalled, because she has already testified to the definition and effect of "emotional abuse":

> So, simply, emotional abuse is when we belittle, demean, and put down our partner. What that does, the result is that our partner begins to feel like a low sense of self, a low sense of esteem, not feeling like they're worthy, feeling like a piece of crap. When you feel so low about yourself, you're moving into depressive symptoms. When we have depressive symptoms, we really don't have the motivation to do other things that maybe could be helpful for us and we're still back to trying to prevent further physical violence or further psychological harm.

Tr.2092.

The same goes for "sexual abuse." Hughes was asked how "sexual abuse can cause a victim to remain in a relationship," and gave this answer:

> Yes, because sexual abuse is so inherently damaging, it's a very private harm, and it very much debilitates a person's psychological functioning. Sexual abuse is one of the highest types of traumatic stressors that we know can result in PTSD and is often met with a high degree of psychological distress. So if you're in significant psychological distress in the relationship, you're walking around injured and harmed.

Tr.2091.

Hughes was then asked "why … that effect prevent[s] a victim who's experienced sexual abuse from leaving the relationship," and gave the following answer:

> Because they experience a tremendous amount of shame, humiliation, degradation, they don't want to talk about it, they don't even want to think about it in their own brain, they don't want to hear it come out of their own mouth, and they need significant help and resources in order to get

> out of that relationship. And if it's something you can't even talk about, these unspeakable acts, it prevents them from getting that help to get out of the relationship.

Tr.2091-92.

### 2. "These forms of abuse may 'together function to control the victim.'"

Hughes gave a fulsome explanation of how different forms of abuse work together to control the victim. For example, she explained that abusers "us[e] a lot of different abusive behaviors that make a victim feel entrapped in the relationship and those abusive behaviors, it can be physical violence, but it's also psychological abuse, emotional abuse, economic abuse, surveillance behaviors, *and all of those behaviors conspire together* to keep the victim trapped in the relationship and make it feel like they can't leave." Tr.2085. She repeated at another point that "hitting is just one tool . . . The abuser uses other tools such as the psychological abuse." Tr.2087.

Hughes was subsequently asked about how the different "*types of abuse interact* to prevent a victim from leaving a relationship." She gave the following answer:

> So *they're all interacting*, they're not all happening at once, they're not all happening simultaneously, sometimes they do, sometimes they don't, and that keeps the victim on a very unstable footing because they never know what's coming at them. So if you are unstable and you don't know how and when this person is going to abuse you, you're feeling more psychological consequences, you're feeling more trapped, and you're unable to extricate yourself from that dynamic.

Tr.2094.

### 3. "These forms of abuse may create an 'environment of fear and obedience that impacts a victim's decision-making process and free will as well as manipulate the victim's emotions.'"

Hughes testified repeatedly about how various types of abuse impact a victim's ability to make decisions and plan a way out of the abusive situation.

Hughes testified, for example, that violence and sexual abuse "makes it difficult for individuals to have *higher order planning* to leave." Tr.2085-86. She then expanded on this testimony, explaining that "it's hard for us to break up with someone under the best of circumstances, and then when you have all this violence and abuse, you're just trying to live day-to-day in this micro way of trying to avoid being hit, avoid being yelled at, avoid being hurt, and *that interferes with all these other resources*. We need to *think* about how am I going to get out of this relationship." Tr.2087. This came up again and again. Hughes explained that "the brain organizes around . . . fear, and that fear is now organized around the relationship." Tr.2088. She explained that when a victim is hit "*the resources* are now being devoted to, how do I stay safe in

Hon. Arun Subramanian  
June 9, 2025

Page 4

this relationship and not over here, how do I do all these things I need to do to get out…. So fear is also a very debilitating emotion.  When you're in high-level arousal and high-level fear, *you're not really able to start thinking about these other big-deal things on your plate that you have to do*, like leaving an abusive relationship." Tr.2088.  Discussing "psychological abuse," Hughes explained not only how the abuse is "controlling" and "makes the victim feel entrapped" but how the victim devotes so much energy to "trying to keep yourself physically and psychologically safe" that she is "*not able to be thinking about how am I going to get out of this relationship*."  Tr.2090.  Later, discussing sexual abuse, Hughes similarly testified that such abuse "debilitates a person's psychological functioning," and explained how "emotional abuse" leads to "depressive symptoms" and robs victims of "motivation to do other things" such as planning to leave the abusive situation.  Tr.2091-92.

Finally, summing up the cumulative impact of various different types of abuse over time, Hughes explained:

> So the more you're exposed to traumatic events and acts of violence and sexual violence, that deteriorates, again, the psychological functioning of the individual.  So we look at … the severity … the frequency … and … the duration[.]  When those things are high, we're seeing that, you know, a victim who was, you know, *functioning to low capacity because they're so distressed and are feeling more entrapped and hopeless and helpless in this relationship*.

Tr.2095.

> 4. "These forms of abuse are 'often interspersed with rewards, positivity, affection, and normalcy, which can create emotional attachment and psychological dependency.'"

This is the only area raised in the government's letter responsive to the Mia cross-examination.  However, Hughes more than covered the waterfront on this topic.

Hughes explained toward the outset of her testimony that "in these types of relationships there is almost always love and attention and attraction and companionship, and it's those positive feeelings that when they get paired with the violence and the abuse make it very difficult for the victim to see their way out."  Tr.2805.  Hughes was then asked how "periods of positivity and neutrality … can … affect a victim's ability to leave a relationship," and gave the following answer:

> [A]s I said before, these relationships start with love and companionship and kindness, and the victim wants that, they want that back.  So when that is shown to the victim, that becomes very reinforcing.  And we see this often, it's called the honeymoon phase, that comes after that particular assaultive episode that the abuser becomes contrite, becomes apologetic, gives promises to change … so now they're sort of showering their victim with all this love and care.  That's what she or he only wanted.  So now

> you have this very difficult situation where you're trying to live with the person who's abusing you, but I want that good person back, and that creates not only psychological confusion, but also a psychological attachment to the individual, which sometimes we call a trauma bond.

Tr.2095-96.

Hughes then explained how the "trauma bond" arises from the alternation of good and bad periods:

> So a trauma bond is when somebody … loves the partner in spite of the violence and the abuse. We know when we pair violence and abuse with times of good, it creates that very strong bond. We know that from just general psychological principles of intermittent reinforcement. Things that are intermittently reinforced have greater stability and behavior, they have a better ability to change behavior. So when you're getting unpredictable abuse and unpredictable love, that creates this intermittent cycle. It's like a slot machine, you press the button … you're going to lose most of the time, but when you hit it, that's the feeling that you want and you keep going back because you want that good feeling[.]

Tr.2096.

Hughes was also asked whether victims may "still express love and loyalty to their abuser," and answered:

> Yes, and often they do. That's back to the trauma bond. Often, they still have positive and loving feelings toward their abuser, even after they've left for years, there's still a part of them that loves that initial person that they fell in love with.

Tr.2108.

      B.    <u>The Cross-Examination Of Mia Was Textbook Cross Examination, Fully Within The Scope Of The Government's Direct, And Did Not Open Any New Doors</u>

To justify the extraordinary step of recalling an expert witness, the government argues that the defense opened the door to further testimony by cross-examining Mia about social media posts and messages in which she expressed admiration and support for Combs and about "positive moments in their relationship." Dkt. 376 at 3. The government describes this as "elective questioning" as if the defense elected to transgress the bounds of what would otherwise have been appropriate questioning. *Id.* The defense did no such thing. It stayed within the bounds of Mia's direct testimony, while alerting the jury to the mismatch between the account she provided on the witness stand and various contemporaneous messages and social media posts. The government claims that this basic and to-be-expected exercise "impugn[ed] Mia's

Hon. Arun Subramanian
June 9, 2025

credibility before the jury" and thus demands further testimony from Hughes to "contextualize [Mia's] seemingly counterintuitive behavior." *Id.*

The first problem with the government's argument is that it has already elicited extensive testimony from Hughes to explain any psychodynamics that may account for Mia's behavior. Hughes has testified at length that "victims" may wait to disclose abusive behavior (so-called "delayed disclosure"). Tr.2108-13. She has also testified at length about the intermittent nature of abuse, how it may alternate with happier periods in a relationship, and even about how victims may "express love and loyalty to their abuser." Tr.2108. She has testified at length about how victims of abuse may continue to be fond of and in love with their abusers, harboring conflicting feelings that may yield counter-intuitive behaviors. Tr.2095-99. These essential teachings are already on the record. It is hard to know what Hughes would add to her prior testimony to justify the extraordinary step of letting her wax again on these same themes—especially since Mia was an employee and denied having had any romantic relationship with Combs.

Even setting this aside, Hughes's proposed testimony is not a good fit for the cross-examination it will supposedly rebut. The government's premise that Hughes's expertise is pertinent to the particular circumstances is highly questionable. Much of the cross-examination focused on Mia's admiring social media posts about Combs. The defense obviously hopes this cross-examination dented Mia's credibility, but the jury may well agree with Mia's testimony that "at this time Instagram was all about highlighting the highs of your life, not the lows of your life, and just showing people the great times that you were having." Tr.3538-39. This is not a psychological question. Hughes is a psychologist, not a social media expert, and nothing she may say about the psychology of domestic abuse survivors will elucidate Mia's social media activity.

Nor was there anything improper about the defense's cross-examination. As in any lengthy cross-examination, some questions were inartfully phrased, and the Court sustained objections based on the form of certain questions. *E.g.*, Tr.3528-29, 3561, 3661-62, 3678. At the same time, the Court repeatedly overruled numerous substantive objections. *E.g.*, Tr.3540, 3542, 3559, 3566, 3568, 3647-48, 3661. When the government complained about the cross-examination at a break, the Court stated it it had "not heard any yelling from Mr. Steel" or "anything that was sarcastic in the questions." Tr.3706. Rejecting the government's argument that the cross-examination would deter other victims, the Court flatly stated, "I don't see that this witness has been treated in any improper way." Tr.3708. Some questions, the Court found, were argumentative or contained statements, but the line between a proper leading question and one that contains a statement is a thin one, and none of counsel's questions embedded facts that should not have been put before the jury. In any event, the Court has instructed the jury that "statements, arguments, and questions by lawyers are not evidence." Tr.93; *see also United States v. Byrd*, 210 F. App'x 101, 103 (2d Cir. 2006) (prosecutor's questions were improper but "questions are not evidence").

Because questions are not evidence, the nature of the defense questioning cannot be construed as an evidentiary basis to permit recalling a prior witness, as the government argues in its letter.

Hon. Arun Subramanian
June 9, 2025

      C.      <u>The Court's Ruling On Hughes's Testimony Is Law Of The Case And The Defense Will Be Unfairly And Severely Prejudiced Were Hughes Recalled To Give Further Testimony</u>

The government's letter ignores the law of this case and the effect that upsetting prior rulings will have. The government has to ignore these principles to advance its argument, but the Court should not. The matters at issue were the subject of extensive pretrial briefing and of extensive pre-trial rulings. Indeed, the Court permitted large swathes of Hughes's anticipated testimony over defense objection. It also drew limits, which the defense relied upon in presenting its case to the jury, including in its opening statement and in subsequent witness examinations. Is the Court prepared to recall Cassie Ventura for further cross-examination if the government is now allowed to amplify certain themes? The law of the case doctrine "expresses a general reluctance, absent good cause, to reopen rulings that that the parties have relied upon." *Perry v. City of New York*, 552 F. Supp. 3d 433, 449 (S.D.N.Y. 2021) (quoting *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 564 (2d Cir. 1998)). The doctrine is "discretionary," but it teaches that "courts should not revise issues they have already ruled on absent 'exceptional circumstances.'" *Id.* The doctrine is "addressed to [the court's] good sense" and "is informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine." *Colvin v. Keen*, 900 F.3d 63, 68, 70 (2d Cir. 2018).

If Hughes is recalled to the witness stand, the jury will take note not only of the substance of her testimony, but of the extraordinary fact that she is being permitted to testify a second time —and that she is the lone witness to be afforded that privilege. The prejudice to the defense would be extraordinary. The defense conducted what it thought would be its one and only cross-examination of Hughes. It raised questions about her "blind" orientation to this case and about her credibility, suggesting that her testimony was of limited value. The jury would now see her return to the witness stand, with the Court's apparent endorsement. Meanwhile, the defense would be extremely handicapped by having already presented its major lines of critique during her first turn on the stand. A cross-examination that has already been executed once cannot simply be reprised. Hughes thus would not only be testifying a second time, but the defense, having already exhausted its principal cross-examination of her, would be ill-equipped to counter her second foray. Moreover, whatever the impact of the defense's first cross-examination, it will dim and wane as soon as she is allowed to take the stand afresh.

Moreover, recalling Hughes, in the particular circumstances of this case and given how the testimony has progressed, will telegraph to the jury that the Court is catering to Mia's own suggestions and accepting her side in her various parries with the defense. Throughout her cross-examination, Mia repeatedly fended off questions by stating that they were better posed to a psychological expert. *E.g.*, Tr.3484 ("I guess I'll leave it up to the experts to go into"); Tr.3494 ("I guess we can ask my therapist … I can describe it, but I'm not a psychiatrist or a therapist"); Tr.3558 ("Again, I can tell you what my therapist has said, but I'm not a professional to explain that."). Indeed, Mia herself used psychological terminology reminiscent of Hughes's. *E.g.*, Tr.3558 ("It's called like psychological abuse. Again, it wasn't horrible all the time…"); Tr.3588-89 ("Again, it's a pretty long, psychological explanation…"); Tr.3681-82

Page 8

Hon. Arun Subramanian
June 9, 2025

("Brainwashed meant I was in an environment where the highs were really high and the lows were really low, which created a huge confusion in me trusting my instincts."). Mia also repeatedly referred to her therapist, at one point going so far as to say "I guess we can ask my therapist" and offering the disclaimer "I'm not a psychiatrist." Tr.3494. If Hughes now unexpectedly reappears on the witness stand, the jury will put two and two together and draw the inference that Mia had this right, again to the prejudice of the defense.

As a leading treatise recognizes, courts "may refuse to permit a witness to be recalled where recall may unduly emphasize the testimony of that witness." Charles A. Wright & Arthur A. Miller, Federal Practice & Procedure Evidence § 6164 (2d ed. 2025). And because Hughes's testimony will be almost entirely repetitious of the testimony she gave before, the jury will infer that her testimony should carry more weight because she, alone among the witnesses, will have been given two opportunities to sound the same themes.

### D. *Ray* Does Not Mandate The Admission Of Further Subject Matter Testimony

Nothing in *United States v. Ray*, 2025 WL 1553327 (2d Cir., Jun. 2, 2025), took away this Court's discretion to set appropriate limits or to exercise its own judgment in tailoring the scope of Hughes's testimony to particular facts and circumstances of this case. And nothing in *Ray* mandates the unusual step of recalling Hughes, especially not to provide redundant testimony.

*Ray* held that Judge Liman did not abuse his discretion under either Rule 702 or Rule 403 in admitting Hughes's testimony under the facts of that case. *Ray* did not hold that such testimony would be admissible in every case involving allegations of sexual abuse. To the contrary, *Ray* repeatedly emphasized the discretionary nature of the district court's handling of such expert evidence. The Second Circuit therefore held that "expert testimony regarding the general dynamics of sexual abuse, including coercive control tactics, is admissible under Rule 702, *in the exercise of the district court's discretion*, when it provides jurors with information to assist them in evaluating, and placing into perspective, conduct that may be the result of complex interpersonal relationships that could be difficult for a jury to understand on its own." 2025 WL 1553327, at *8 (emphasis added). Addressing the particular testimony offered in *Ray*, and the particular, and highly unusual, facts of that case, the court explained that "the district court *did not abuse its discretion* in admitting Dr. Hughes's testimony." *Id.* at *9 (emphasis added); *see also id.* at *10 ("In sum, we conclude the district court *did not abuse its discretion* in admitting Dr. Hughes's testimony pursuant to Rule 702") (emphasis added). *Ray* also reaffirmed the critical role that Rule 403 plays in assessing such expert evidence and affirmed the district court's "*exercis[e] [of] its discretion*" in "balancing" the probative value of the testimony against the danger of unfair prejudice or confusion "in the context of this case," *id.* at **7, 9 (emphasis added). In short, the Second Circuit did not grant the government a license to call Hughes in every case, especially not after she has already extensively testified once, and especially not in contravention of prior district court rulings that the parties have relied upon and that serve as law of the case.

Hon. Arun Subramanian
June 9, 2025

Nothing in *Ray* mandates the admission of *all* psychological subject matter testimony in *all* sex abuse cases. Nothing in *Ray* mandates the admission of any particular length of such testimony. Nothing in *Ray* mandates the admission of any particular level of detail in such testimony. And nothing in *Ray* mandates the recall of an expert witness who has already testified extensively in almost every area covered both by *Ray* and by the government's proffer of anticipated further testimony. The Second Ciruit explicitly entrusted such matters to the discretion of the district court, and made its ruling with the assumption that such discretion would be exercised to set appropriate limits rather than simply opening the floodgates.

Nor did *Ray* change the law as the Court understood and applied it in carefully parsing Hughes's testimony prior to trial. The defense may have taken the position that Hughes's testimony should have been excluded in its entirety, but the Court disagreed, permitting the government to offer extensive testimony concerning delayed disclosure, all manner of coping strategies, characteristics and effects of memory, and the myriad reasons why even abused or belittled persons remain in relationships. April 25, 2025 Tr.5-6. The Court also permitted Hughes to back her opinions up with testimony concerning various tactics of abuse. *Id.* In so ruling, the Court expressly relied on Judge Liman's ruling in *Ray*. *Id.* at 5. At the same time, the Court made a finding that, in the context of this case, "the jury can understand what abuse and violence is, and it doesn't need Dr. Hughes to explain an umbrella term of 'interpersonal violence,' or to expound at length about different types of abuse conduct." *Id.* at 6. That finding was correct on April 25, and it is correct now, and nothing in *Ray* makes it incorrect.

Finally, *Ray* had no occasion to consider the unfair prejudice and confusion that would be caused by recalling an expert witness to provide further testimony that is largely or entirely repetitive of her prior testimony and in circumstances that will telegraph to the jury that the Court believes such testimony is needed lest it pay too much heed to a credibility-damaging cross-examination.

\* \* \*

For all these reasons, the Court should deny the government's request to recall Dr. Hughes, pursuant to Rule 702, Rule 403, Rule 611(a), and the law of the case doctrine.

Respectfully submitted,

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Jonathan P. Bach
Jason A. Driscoll
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Fl.
New York, NY 10036
(212) 257-4880
ashapiro@shapiroarato.com

Hon. Arun Subramanian
June 9, 2025

jbach@shapiroarato.com
jdriscoll@shapiroarato.com

Marc Agnifilo
Teny Geragos
AGNIFILO INTRATER
445 Park Ave., 7th Fl.
New York, NY 10022
(646) 205-4350
marc@agilawgroup.com
teny@agilawgroup.com

Anna Estevao
HARRIS TRZASKOMA LLP
156 West 56th St., Ste. 2004
New York, NY 10019
(212) 970-6465
aestevao@harristrz.com

Brian Steel
THE STEEL LAW FIRM, P.C.
1800 Peachtree Street, Ste. 300
Atlanta, GA 30309
(404) 605-0023

Xavier R. Donaldson
136 Madison Ave, 6th Fl. New York,
New York 10016
(646) 772-3334
xdonaldson@aol.com

Nicole Westmoreland
WESTMORELAND LAW, LLC
132 Cone Street, Suite A
Atlanta, GA 30303
(404) 446-2620
nw@westmorelandlawgroup.com