

Shapiro Arato Bach LLP

1140 Avenue of the Americas, 17th Floor, New York, NY 10036
phone: 212-257-4880
www.shapiroarato.com

Alexandra A.E. Shapiro
ashapiro@shapiroarato.com
Direct: 212-257-4881

June 15, 2025

**VIA EMAIL & ECF**
Hon. Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

  Re: *United States v. Combs*, 24-cr-542 (AS)

Dear Judge Subramanian:

  The defense submits this letter in further support of its vigorous opposition to striking Juror ▮▮ —a black man ▮▮▮▮▮▮▮▮ ▮▮▮▮. Mr. Combs would be substantially prejudiced by the dismissal of this juror, and because there is no factual basis to remove him, under *Fazio* the Court lacks discretion to do so. Moreover, if the supposed inconsistencies in his answers to the Court's questions were truly of concern, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ If the Court ▮▮ strikes Juror ▮▮, we respectfully request that a mistrial be declared. We understand that the Court has refused to find any discriminatory motive in the government's actions with respect to its peremptory strikes or this motion. However, we respectfully, and regrettably, disagree. The government's motion must be evaluated in light of the entire history of this investigation and prosecution, and not in isolation. Unfortunately, when considered against that background, it is impossible to believe that this motion is merely a good-faith attempt to raise a valid question about the juror's integrity, rather than an effort to take advantage of an opportunity to strike yet another black male from the jury.

  **A. There Is No Valid Basis To Dismiss The Juror**

  To begin with, as the Court noted during the morning session on Friday, it does not have discretion to remove a juror "where there's a bias in the removal of the juror, or where there would be prejudice to the defendant, with prejudice meaning that the discharge is without factual support or for a legally irrelevant reason." Tr.6025-26; *see generally United States v. Fazio*, 770 F.3d 160, 170 (2d Cir. 2014) (describing this standard). Here, there would be significant bias and prejudice to the defendant, and there is no factual support for dismissing the juror.

  *First*, there is no question Mr. Combs would be severely prejudiced if the juror in question were removed and replaced by the first alternate. We have previously pointed out that this juror is one of only two black men on the jury, but it should also be noted that he is the juror who is

Hon. Arun Subramanian
June 15, 2025

perhaps most similar to Mr. Combs in other important ways. He is a black man  Moreover, this case involves serious charges of sexual misconduct against women who were in relationships with Mr. Combs. As the opening statements and the witness testimony have revealed, the principal dispute between the parties is whether Cassie Ventura and Jane willingly participated in the sexual activity at issue during their relationships with Mr. Combs, for their own reasons and because they chose to do so, or whether as the government claims, they were coerced. The fairness of the trial depends in part on having jurors with backgrounds similar to Mr. Combs share their perspectives on the evidence with other jurors from diverse backgrounds during deliberations. Removing this particular juror will deprive Mr. Combs of that important perspective, and it is no answer to simply say that there are other black jurors, or other males, on the jury.

*Second*, there is no factual support for the government's position, or, respectfully, the Court's statements Friday afternoon—which were in stark conflict with the Court's apparent recognition Friday morning that the purported inconsistencies were likely completely benign. As we explained at length in our letter of June 12 on this topic, there were no material inconsistencies with respect to anything Juror ▇ said during voir dire and in the June 9 colloquies. And the juror's willingness to perform this public service and his civic duty should be considered a positive, rather than a negative, factor. There is no evidence whatsoever that he had an agenda or a bias in favor of either party, and no legitimate reason to jump to that conclusion.

Indeed, the Court had an opportunity to assess the juror's demeanor, not only during voir dire, but also at closer proximity in the robing room during the two colloquies on June 9. The Court never suggested at that time, or at any time before Friday afternoon, that it had any reason to doubt that the juror was doing his best to be forthright and honest with the Court. During Friday's morning session, after having reviewed both parties' submissions, including the government's lengthy quotes from the relevant transcripts (*see* June 11 Letter at 2-5), the Court indicated it was inclined to agree that there was "an insufficient basis" to find that the juror was being "deceitful, and intentionally so," as the government charged:

> And so the defense's submission is really that the answers, given the nature of the inquiry both in jury selection and during the current process, was vague enough so that the answers could easily be reconciled with each other. And the subject matter of what was being addressed is so far afield from the juror's performance of duties that that's not a reason to remove the juror.

> The real suggestion from the government as to the reason why the juror should be removed is because if you take the inference against the juror's credibility, there is a view that if you can't reconcile the answers and the juror was being deceitful, and intentionally so, either in jury selection or in the colloquy in the robing room, then that would be grounds to disqualify the juror.

Hon. Arun Subramanian
June 15, 2025

Page 3

> For that to happen, we would need to have a further inquiry with the juror, because **on the current record, there's an insufficient basis to make that determination**. And in terms of how we view the inquiry postjury selection, I think that there's a difference. I think that when we address these types of questions during the juror selection process, there may be an inkling or a suggestion that there's a reason to disqualify a juror for cause. And that has one standard, but it's before the exercise of peremptory challenges and impaneling of the jury. And so that has one standard.
>
> I think the defense's suggestion, and *I think it's consistent with a lot of the cases, is that that default actually flips once you have the jury actually in the box and you have a regular jury and alternates. At that point you need something more to disqualify a juror. And the cases cited by both sides have situations presented that are far more extreme than what's been presented here.*

Tr.6026-27.

Moreover, although the Court indicated a preference for further inquiry, it specifically noted: "I think that it is likely that what we will hear will be a perfectly innocent explanation for the answers. *I don't think that they're irreconcilable. I think that for the reasons that the defense has stated, there's a way to reconcile the entire record*." Tr.6028. The Court also noted that the "only reason why this situation even came up is because of a statement that was made on the juror's own volition to jury department staff in a friendly and in an offhand banter." Tr.6029. The Court further observed:

> And *there's perhaps an understandable way to reconcile all of these issues*, which is that I believe that the question that was initially asked during voir dire, during the group proceeding, was where do you live, and then kind of who do you live with? But based on the answers that were being given by the group, it could have been that the juror thought where do I live, I live in the Bronx, and that would be consistent with everything that we've heard, because he indicated that he had moved out of the Bronx in the last two weeks, and there might be some ambiguity about how much time he was spending in each place. But that's at least what he said.
>
> As to the second question he might have understood it to be who is in your family group. As to that question he indicated his fiancée and his baby daughter. And so you can reconcile these things, and given what we're talking about, which is where do you live and kind of basic questions, it would be surprising that someone would try to make up something about it. Maybe even if there was some inconsistency it wouldn't rise to the level of removal of a juror,

Hon. Arun Subramanian  
June 15, 2025
Page 4

> given the various constitutional and other rights that the defendant enjoys.

Tr. 6033-34.[1]

The defense expressed concerns about any further inquiry because of the likely negative and intimidating impact it could have on the juror, Tr.6031, especially after the government started suggesting a line of inquiry that could lead to a concern that the juror's employment was somehow in jeopardy, Tr.6035-36. In response to the Court's comments, the government ultimately stated "that the most prudent thing to do to ensure the integrity of the proceedings would be to … have additional inquiry." Tr.6035. It endorsed further fact-finding, stating that such "fact-finding" was "necessary … to ensure the integrity of the proceedings." Tr.6036. The Court said it would consider the parties' arguments and whether to conduct further inquiry later. Tr.6036-37.

In light of the discussion in the morning, the defense was stunned when the Court announced at the end of the day—in stark contrast to its extensive earlier remarks about why there was "an understandable way to reconcile" the juror's answers—that it believed the juror was either "unable to follow simple instructions and answer simple questions" or was "shad[ing] the truth or being deceptive," and would dismiss the juror without further inquiry. Tr.6223. Respectfully, there is simply no evidence to support the Court's very serious accusation, or its stated concern about the juror's ability to "fairly and impartially apply the rules of law of the court to the facts of this case, to consider the evidence in a fair way, and to follow the instructions of the Court." Tr.6225.

The Court later stated that when the juror said he had a New York license and still maintained his residence in the Bronx, this was somehow nefarious and "suggest[ed] an effort to…try to get onto the jury." Tr.6234. But the juror was already on the jury and had sat through over four weeks of trial. Having been willing to serve, which many citizens aren't, and having dutifully devoted all this time to attending the trial, why would the juror not want to complete his service? Why would he not emphasize that he is still a legal resident of New York, even if he spends several nights a week █████████████████████████████████████████████ █████? There is not a shred of evidence that he had a pre-existing agenda when responding to voir dire questions—as opposed to a willingness to do his civic duty, and the statements the Court cited were made after weeks of service, not at the outset.[2]

---

[1] This was consistent with the Court's initial impression of the juror's responses during the June 9 colloquies, when the Court had the benefit of observing the juror's demeanor. June 9 Sealed Tr.4962 ("███████████████████████████████████████████████").

[2] Additionally, the Court cited *United States v. Arline*, 660 F. App'x 35, 39-40 (2d Cir. 2016), as support, but that case involved a juror's inconsistent answers about misconduct—the juror had "listened and watched a proceeding not meant for the jury." Tr.6219. There is no reason to believe Juror ████ has failed to follow the Court's instructions not to discuss the case with others or view media reports about the case or engaged in any other prohibited conduct during the trial.

Hon. Arun Subramanian
June 15, 2025

     Should the Court exclude Juror ▮ on the current record, it will no doubt have a chilling effect on minority jurors' willingness to serve in the future—a step in the wrong direction. The government has previously argued that racial disparities in jury service exist because black and Hispanic people "disproportionately fail[] to respond to jury qualification questionnaires." *United States v. Slaughter*, 110 F.4th 569, 585 (2d Cir. 2024). But Juror ▮ answered the call and is dutifully performing what the Court stated was a "tremendously important task" recognized by "[t]he Constitution itself." Tr.102. We should invite his service—as well as the service of other potential jurors in his community—not discourage it.

     *Third*, if the bar is this low, then ▮▮▮▮▮▮▮▮▮▮▮▮▮ to avoid any "bias." *Fazio*, 770 F.3d at 170.



Hon. Arun Subramanian
June 15, 2025



June 13 Sealed Tr.6251.

June 13 Sealed Tr.6252.

June 13 Sealed Tr.6252. Tr.6259.

**B.     The Government's Motion Continues A Pattern Of Overreach, Suggesting A Discriminatory Motive In Challenging Juror** ▮

Although the Court denied our *Batson* challenge and said it found no basis to suggest the government had a discriminatory motive when it sought to strike Juror ▮, we believe that motive is supported not only by its remarkable decision to use 7 of its 9 peremptory strikes on black jurors, but also by the history of the investigation and prosecution, which has been characterized by extreme government overreach from the beginning.

1. *Peremptory Challenges During Jury Selection*

The Court accepted the government's proffered reasons for its peremptory strikes of black jurors as race neutral. Voir Dire Tr.781. Nonetheless, it is important to note that for many of these jurors, the purported reasons themselves were based on the jurors' or their relatives' interactions with law enforcement, including prior convictions. But it is well-documented that there is a long history of systemic discrimination that has led to mass incarceration of black and Hispanic people in this country, and of discrimination in how law enforcement treats them in comparison with white people. *See, e.g., Floyd v. City of New York*, 959 F. Supp. 2d 540, 561 (S.D.N.Y. 2013) (describing historic "heightened police enforcement" of black and Hispanic people in this district). Moreover, a 2022 study of 3,200 innocent defendants exonerated in the

Hon. Arun Subramanian
June 15, 2025

U.S. since 1989 revealed that "Black Americans are seven times more likely than White Americans to be falsely convicted of serious crimes."[4]

Citing a prospective juror's former conviction, or their relative's former conviction, or the fact that they have had negative interactions with the police, only reinforces the race discrimination that led to the overinvestigation and overprosecution of blacks and other minorities in this country. People should not be precluded from serving on juries because of a prior conviction, or a relative's prior conviction, or the fact that they had a bad experience when the police stopped their car on a pretext or conducted a stop-and-frisk on a pretext. Indeed, if they had a negative experience with the justice system, that is a perspective that is important and useful for a diverse jury. For these reasons, in recent years courts—like the Washington State Courts—have implemented rules foreclosing the use of a peremptory because a juror has had "prior contact with law enforcement officers" or has a "a close relationship with people who have been stopped, arrested, or convicted of a crime." Washington State Court Rules: General Rule 37(h).

Here, the government justified several of its strikes on this sort of basis. For instance, it said one reason for the first strike was that the juror "had a fiancé that served four years in prison for a drug conviction." Voir Dire Tr.775. A reason supplied for the second strike was that "he had been arrested three times, including for harassing a police officer." Voir Dire Tr.776. The fourth strike was a juror "whose ex-husband had spent 21 years in prison for attempted … murder," and "remained close with him," and "had a brother who had been incarcerated for two years based on a drug conviction." Voir Dire Tr.777. The government justified its fifth strike in part on the basis that the juror "had two brothers who each did time in prison for felony convictions." Voir Dire Tr.778. Another strike cited "inconsistent explanations of interactions with the police." Voir Dire Tr.780.

2. *History Of Investigation And Prosecution*

For starters, it is notable that Mr. Combs, one of the most successful and self-made black men in America, and a person who was an icon not just in the black community, but in the music industry, the fashion industry, and otherwise, was indicted by the SDNY's Civil Rights Unit. When the unit was established, former U.S. Attorney Damien Williams was quoted as saying: "White supremacist groups are on the march. Antisemitism is on the march. Anti-Asian violence is on the march. Abuse of the most vulnerable in our society is on the march."[5] But this prosecution has nothing to do with civil rights enforcement. What is being prosecuted is allegations about private sexual activity Mr. Combs engaged in with two of his former girlfriends and third parties.

---

[4] Study Shows Race Is Substantial Factor in Wrongful Convictions, Equal Justice Initiative (Dec. 28, 2022), https://eji.org/news/study-shows-race-is-substantial-factor-in-wrongful-convictions/.

[5] Manhattan U.S. Attorney Forms New Civil Rights Unit, New York Times (Nov. 19, 2021), https://www.nytimes.com/2021/11/19/nyregion/damian-williams-civil-rights.html?smid=nytcore-ios-share&referringSource=articleShare&sgrp=p&pvid=4E5FB94E-5CD0-422B-8A40-24293308B47E.

Hon. Arun Subramanian
June 15, 2025

Page 8

All of this was part of a coordinated effort to try to destroy one of the most successful black men in American history. All of Mr. Combs's ventures are entirely legitimate, and the government has never suggested otherwise. Instead, the government's case is all about his personal life, and what he and his romantic partners have done in the privacy of the bedroom. As the trial has shown, the most significant evidence against Mr. Combs involves domestic violence incidents normally dealt with by local authorities or family courts. Yet the prosecutors have made a federal "civil rights" case out of how Mr. Combs and his former girlfriends conducted their private sex lives. The theory of prosecution not only has nothing to do with civil rights enforcement, but it is also unprecedented. Indeed, we are unaware of any other federal criminal case charging racketeering or sex trafficking based on allegations that a man and his past long-term, adult girlfriends sometimes brought a third party—a male "escort" or "entertainer"—into their sexual relationship.

Since its inception, the case has been rife with overreach and unusually aggressive tactics normally reserved for prosecutions of violent gangs, organized crime, and terrorism:

- <u>The Purported Victims Never Complained To Law Enforcement</u>. Ms. Ventura's lawsuit was settled for $20 million, and she never made any complaint to SDNY or any other law enforcement agency. Nor did Jane—indeed, the government labeled her a "victim" in ████████████████ and bail arguments long before it had even interviewed her. And she claims to have testified only because she was compelled to by subpoena.

- <u>The Government Has Devoted Enormous Resources To This Case</u>. The undersigned are not aware of any other recent case involving more than five AUSAs, and here we have six at trial, along with two "filter team" AUSAs and multiple actively involved supervisors. Additionally, the Department of Homeland Security assigned multiple agents to the case, and numerous other agents have assisted at various points, including hundreds of heavily armed agents in combat gear who executed military-style raids, complete with armored vehicles, on Mr. Combs's Los Angeles and Miami homes in March 2024. And the government also apparently retained a highly paid jury consultant in this case, which is exceedingly rare for the government to do—a consultant who may well be advising the prosecutors in connection with the instant motion.

- <u>The SDNY Refused To Engage With Defense Counsel During The Investigation</u>. Mr. Combs's lawyers approached prosecutors as soon as they learned of the investigation (even before the warrants were executed) and requested an opportunity to meet. Yet the SDNY refused then and repeatedly refused thereafter to engage with counsel substantively throughout the investigation and leading up to Mr. Combs's arrest in September 2024. The prosecutors also refused to allow Mr. Combs to voluntarily

Hon. Arun Subramanian
June 15, 2025

surrender, presumably to create another media spectacle like the one orchestrated during the raids discussed below.[6]

- <u>The SDNY Used Misrepresentations And Material Omissions In Warrant Applications</u>. Although the Court denied our *Franks* motion, *see* Dkt.160, the defense has documented how the SDNY obtained the March 2024 warrants to search Mr. Combs's homes, person, and all his electronic devices using materially misleading applications. They omitted extensive evidence undercutting the credibility of Ms. Ventura and other witnesses the warrant applications relied on to establish probable cause. For instance, when obtaining the warrants the government completely disregarded extensive evidence then in its possession showing Mr. Combs's and Ms. Ventura's relationship was, though at times toxic, consensual and loving. The applications also relied on several other witnesses the prosecutors later admitted were not credible. These witnesses were part of a feeding frenzy of grifters who were trying to extract money from Combs after the Ventura lawsuit became public. Yet the prosecutors failed to disclose the financial motives of these witnesses and concealed exculpatory evidence that the government had in its possession when it sought the warrants.

- <u>Investigators Used Excessive Force And Created A Media Circus During The Raids Of Combs's Homes</u>. The search warrants were executed in a manner calculated to garner press attention, sensationalize the case, falsely portray Mr. Combs as dangerous, and taint any future jury pool. Agents leaked the government's plans to the press in advance to maximize media coverage and put on a show. The agents used excessive force against Mr. Combs's children, who were in his home, doing nothing wrong. One agent held a semi-automatic rifle to the head of Christian Combs, even though he was visibly complying with the agents' demands; another had a semi-automatic rifle with a laser site trained, and the orange dot visible, on the middle of the chest of Justin Combs, who was also complying with agents' instructions. The agents then handcuffed them and paraded them in front of news cameras and a TV helicopter invited by the DHS, who were waiting to get salacious footage of this staged perp walk of two innocent young men.

- <u>Investigators Leaked A Steady Drumbeat Of False And Prejudicial Information To The Press Until The Court Issued A Broad Gag Order Opposed By The Government</u>. Throughout most of 2024, DHS agents repeatedly leaked information about the investigation to the media, including extensive amounts of highly prejudicial and false information about minors, sex dungeons, cameras in bedrooms, and a host of other

---

[6] *See, e.g.*, U.S. Attorney's Office, SDNY Press Release, Sean Combs Charged In Manhattan Federal Court With Sex Trafficking And Other Federal Offenses (Sept. 17, 2024), https://www.justice.gov/usao-sdny/pr/sean-combs-charged-manhattan-federal-court-sex-trafficking-and-other-federal-offenses; Sean 'Diddy' Combs is arrested in New York after federal indictment, AP (Sept. 16, 2024), https://apnews.com/article/sean-diddy-combs-arrested-93831d646c5cf36add77a91ba668ae84.

Hon. Arun Subramanian
June 15, 2025

prejudicial information that has caused online conspiracy theories to multiply.[7] As the Court is aware, the prosecutors repeatedly denied that these leaks emanated from its "case team" by describing that team in an artificially limited way, and even opposed a request for a gag order that would prohibit all DHS agents, not just the limited few SDNY claimed were on the case team, from leaking sensitive information about the case. While this litigation was ongoing, the leaks continued unabated. It was only after the Court issued the broader gag order the defense sought that the leaks finally ceased—long after the jury pool had been deeply tainted.[8] Since then, the government has repeatedly invoked the gag order and Local Rule 23.1 to prevent the defense—which has a right to try to combat the unfair tsunami of nonstop negative coverage—from any media engagement.[9] At the same time, the government has failed to oppose in any way the numerous apparent violations of that Rule by alleged victims and their counsel.

- <u>Prosecutors Insisted On Detaining Combs Even Though He Did Not Present A Risk Of Flight Or Danger</u>. The prosecutors insisted on detaining Mr. Combs, even though he offered to surrender, traveled to New York once he learned he would be charged, and obviously was not a flight risk. They also misled the courts that held the initial detention hearings. For instance, they told the District Court the CNN video refuted Mr. Combs's account of the Intercontinental event (that the incident occurred after the couple had an argument over Mr. Combs's relationship and that involved a phone). They said that was "just not what happened" and "just another cover-up … just more lies,"[10] even though nothing in the trial evidence contradicts the claim that the fight occurred because of jealousy in the relationship. They cited a third "victim,"[11] Gina, ███████████ ███████ who the prosecutors have entirely dropped from the case.

- <u>Prosecutors Surveilled Combs In Jail And Invaded The Defense Camp</u>. The prosecutors next took advantage of Mr. Combs's incarceration to spy on him and invade the defense camp, violating his attorney-client privilege and his First Amendment rights. As the Court is aware, shortly after Mr. Combs was detained, a BOP investigator began monitoring his communications—including calls with his attorneys—and sharing information with prosecutors. During an allegedly unrelated October 2024 general sweep of MDC-Brooklyn for contraband and evidence of corruption, agents completed their search of certain parts of that facility and asked SDNY whether or not they should continue their efforts and search Mr. Combs's unit. An SDNY supervisor told them to search Mr. Combs's unit, because of the government's interest in Mr. Combs specifically, and law enforcement agents proceeded to do so. During the ensuing search the

---

[7] *See, e.g.*, Dkt.31 at 5-8; Dkt.32-8 (citing headline titled "Diddy 'as bad as Epstein,' says officer who saw his sex rooms, hidden cameras during Miami mansion raid").

[8] *See* Dkt.50.

[9] *See* Dkt.319.

[10] 9/18/24 Tr.12.

[11] *See* Dkt.69 at 21.

Hon. Arun Subramanian
June 15, 2025

investigator who had been working with the prosecutors confirmed there was no contraband among Mr. Combs's personal effects but nonetheless rifled through his possessions and photographed Mr. Combs's notes reflecting conversations with his attorneys and ideas for defense strategy. The investigator then told a member of the case team about the notes and turned them over to SDNY, which tried to use them to oppose a renewed bail application, claiming they showed Mr. Combs was trying to obstruct justice. The Court granted a defense application to order the prosecutors on the "case team" to destroy their copies of the privileged notes.[12]

- <u>Prosecutors Violated Combs's Free Speech Rights</u>. The prosecutors continued their spying and next argued that Mr. Combs's other writings and communications from MDC supposedly involved obstruction, even though these materials were clearly protected by the First and Sixth Amendments.[13] Some reflected his participation in defense efforts to obtain material that could be used to challenge the credibility of the government's witnesses. Other writings described Mr. Combs's view that the prosecution is racist and his desire to get that message out to counter all the negative media about the case. The SDNY even went so far as to claim Mr. Combs's request that his children post a happy birthday message to him on Instagram was an effort to obstruct justice—because Mr. Combs hoped it would present him in a more positive light to the public and undo some of the taint to the jury pool caused by all the negative publicity ginned up by the government and civil plaintiffs' attorneys.[14]

- <u>Prosecutors Abused A "Filter Team" To Access Privileged Material</u>. The government's invasion of the attorney-client privilege and the defense camp has not been limited to its seizure of Mr. Combs's notes. Throughout the case, SDNY has misused a purported "filter team," which was supposed to ensure that the prosecutors handling the case were not exposed to privileged materials on the numerous electronic devices and internet accounts the government has seized and searched. Following execution of the March 2024 warrants, defense counsel provided the prosecutors with the names of attorneys who had represented Mr. Combs and his businesses so that potentially privileged materials could be segregated from the case prosecutors. Our understanding was that a filter team would not provide any potentially privileged materials to the case prosecutors without first affording defense counsel the opportunity to review the materials, so that counsel could assert privilege if necessary, and so that any privilege disputes could be resolved by the Court *in camera*. Instead, the filter team has repeatedly passed along potentially privileged information without first seeking our input, requiring us to claw back privileged communications after the case team had already been tainted by exposure to these materials.

---

[12] *See* Dkt.76 (court's order).

[13] *See* Dkt.85.

[14] The Court apparently recognized that these communications were constitutionally protected but did not resolve that question, instead choosing not to rely on these arguments by the prosecutors when it continued detention. *See* Dkt.92; *see* 11/22/24 Tr.62.

Hon. Arun Subramanian
June 15, 2025

Page 12

- <u>Prosecutors Used The Grand Jury To Help Unscrupulous Plaintiffs Obtain Publicity For Wildly False Claims</u>.  After Mr. Combs's arrest, while continuing its investigation the government publicly paraded witnesses into the Grand Jury to feed nonsensical media narratives they knew were false.  This created an atmosphere of legitimacy surrounding the many false and wild claims about Mr. Combs and the media circus created by unscrupulous plaintiffs' lawyers who have encouraged people to file bogus lawsuits against Mr. Combs.

- <u>Prosecutors Attempted To Introduce Unreliable, Decades-Old, Highly Inflammatory Allegations And Used Allegations About Additional "Victims" Who Never Testified To Obtain Search Warrants And Seek Detention</u>.  The government attempted to prop up its case with old, unreliable, and highly prejudicial and inflammatory Rule 404(b) evidence, much of which the Court correctly, and fortunately, excluded in granting the defense's motion in limine.  And, although the Court denied the motion to exclude the testimony of one alleged victim—another girlfriend who had no interaction with any of Mr. Combs's employees or the alleged RICO enterprise—that individual apparently has decided not to testify.  Likewise, the government spent over a year claiming that Mr. Combs's former girlfriend Gina was a victim and used that allegation to support arguments for bail and to obtain warrants, and presumably in the grand jury, even though ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and the government did not call her as a witness.  Despite including her in the indictment, the government has not elicited any evidence at trial that could possibly support the conclusion that she is a victim.

- <u>Prosecutors Have Engaged In Other Misconduct During Trial</u>.  We recognize that the Court has denied our two mistrial motions, but as the Court is aware, we believe the government asked inflammatory and highly prejudicial questions of Inspector Jiminez to try to suggest Mr. Combs had somehow orchestrated the destruction of fingerprint evidence in 2012, and then presented testimony from Cassie Ventura and Bryana Bongolan that it knew or should have known was materially false.  *See* Dkt.381.

The government's history of these extremely aggressive tactics in this case is critical context against which its attempt to remove Juror ▮▮▮ must be evaluated.  In this case, the prosecutors have repeatedly flouted their Office's self-proclaimed "tradition of doing the right thing, the right way, for the right reasons."[15]  Their pretextual motion to dismiss Juror ▮▮▮ is just one more attempt to gain an unfair advantage at the expense of Mr. Combs's right to a fair trial—which is all we ask this Court to preserve.

*   *   *

---

[15] U.S. Attorney's Office, SDNY Press Release, U.S. Attorney Damian Williams Announces Anticipated Resignation From The Southern District Of New York (Nov. 25, 2024), https://www.justice.gov/usao-sdny/pr/us-attorney-damian-williams-announces-anticipated-resignation-southern-district-new.

Page 13

Hon. Arun Subramanian
June 15, 2025

    For the foregoing reasons, the Court should allow Juror ▮▮▮ to remain on the jury. If the Court truly believes his statements raise serious concerns about his ability to follow instructions—which we respectfully submit would be an unfair and unsupported conclusion based on what were at worst, imprecise answers to the Court's questions, then in fairness ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. If the Court dismisses Juror ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, the unfair prejudice from replacing him with the first alternate at this late stage of the proceedings warrants a mistrial.

    Respectfully submitted,

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Jason A. Driscoll
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Fl.
New York, NY 10036
(212) 257-4880
ashapiro@shapiroarato.com
jdriscoll@shapiroarato.com

Marc Agnifilo
Teny Geragos
AGNIFILO INTRATER
445 Park Ave., 7th Fl.
New York, NY 10022
646-205-4350
marc@agilawgroup.com
teny@agilawgroup.com

Anna Estevao
HARRIS TRZASKOMA LLP
156 West 56th St., Ste. 2004
New York, NY 10019
(212) 970-6465
aestevao@harristrz.com

Brian Steel
THE STEEL LAW FIRM, P.C.
1800 Peachtree Street, Ste. 300
Atlanta, GA 30309
(404) 605-0023

Hon. Arun Subramanian
June 15, 2025

                                        Xavier R. Donaldson
                                        136 Madison Ave, 6th Floor
                                        New York, New York 10016
                                        646-772-3334
                                        Xdonaldson@aol.com

                                        Nicole Westmoreland, Esq.
                                        WESTMORELAND LAW, LLC
                                        132 Cone Street, Suite A
                                        Atlanta, GA 30303
                                        Tel: (404) 446-2620
                                        nw@westmorelandlawgroup.com