

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

May 28, 2025

**BY ECF**
The Honorable Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Combs*, S3 24 Cr. 542 (AS)

Dear Judge Subramanian:

      The Government respectfully writes in response to the defendant's motion to strike portions of Mr. Mescudi's testimony, and to identify disputed evidentiary issues regarding the upcoming testimony of Deonte Nash and Mia.

## I.  Scott Mescudi Testimony

      For the reasons set for the below, the defendant's motion to strike a portion of Mr. Mescudi's testimony should be denied.  (Dkt. No. 352).  The defendant moves to strike Mr. Mescudi's testimony regarding his personal understanding of the defendant's statement to him at the end of an in-person meeting at the Soho House in or around January 2012.  This testimony was properly elicited and admissible. After recounting the circumstances leading up to his meeting with the defendant, the defendant's demeanor during the meeting, and the conversation during the meeting itself, Mr. Mescudi described on direct examination how the meeting ended:  "We stood up, shook hands, and as I was shaking his hand I said, what are we going to do about my car? I made sure to ask him right when our hands were clasped together, where he couldn't run away and I could look at him square in his eyes, and he looked right back at me, very cold stare, and said: I don't know what you're talking about." (Tr. 2372).  On cross-examination, defense counsel questioned Mr. Mescudi about his understanding of the meeting and how it ended. (*See* Tr. 2399 ("And it was an understanding, a meeting that this was about a girl, a relationship, and both of you guys were played, that's pretty much how it ended, true?")).  Following up on this line of cross-examination, the Government then inquired on re-direct examination about Mr. Mescudi's understanding of Mr. Combs' final statement to him.  (Tr. 2409 ("What was your understanding when Mr. Combs said he didn't know what you were talking about, at the end of that conversation?")).  Mr. Mescudi responded that he understood that the defendant was lying.

      Although the defendant attempts to recast Mr. Mescudi's statement as improper lay opinion testimony, it is not.  The defendant clearly opened the door to the Government eliciting Mr. Mescudi's impression of how the meeting ended by questioning Mr. Mescudi about the end of the meeting—asking whether the meeting was "about a girl, a relationship, and both of you guys were

1

played, that's pretty much how [the meeting] ended, true?" (Tr. 2399). In any event, even assuming that Mr. Mescudi's testimony characterizing the defendant's statement to him as "lying" was a lay opinion, it was permissible. Such testimony must be both rationally based on the witness's first-hand perceptions and rationally derived from those observations. *See United States v. Kaplan*, 490 F.3d 110, 119 (2d Cir. 2007). Mr. Mescudi's statement is both. Mr. Mescudi testified about the numerous contacts he had with the defendant from December 2011 until January 2012, culminating in the Soho House meeting, where he and the defendant spoke face to face, ending with Mr. Mescudi directly asking the defendant about Mr. Mescudi's car, which had recently been set on fire. Mr. Mescudi's own impression of the veracity of the defendant's response to Mr. Mescudi's inquiry about his car is based on all of Mr. Mescudi's interactions with the defendant in this time period, including the defendant's demeanor and conduct during the meeting where the statement was made. This testimony provided more than sufficient foundation for Mr. Mescudi's conclusion about the veracity of the defendant's denial. *See id.* (precluding testimony for insufficient foundation). Courts have upheld admission of such testimony, even where it goes to the ultimate issue in a case, which is does not here. *See, e.g., United States v. Keys*, 747 F. App'x 198, 210 (5th Cir. 2018) (affirming admission of detective's testimony that defendant lied about certain facts during interrogation); *United States v. Kruckel*, No. CR. 92-611 (JBS), 1994 WL 774645, at *21 (D.N.J. May 5, 1994), *aff'd*, 52 F.3d 318 (3d Cir. 1995) (affirming admission of witness testimony that defendant lied to witness).

Finally, the Court should find the motion to strike waived and deny it on that basis. The defendant objected to the Government's question to Mr. Mescudi about his impression of Mr. Combs' statement in real time, and the Court overruled his objection. To the extent the defendant intended to move to strike Mr. Mescudi's testimony, he should have done so on May 22, 2025—when Mr. Mescudi testified—not four days later on May 26, 2025. Such post hoc relitigation of witness testimony improperly prevents the proponent of the testimony from curing any potential infirmities at the time. *See* 21 Fed. Prac. & Proc. Evid. § 5037 (2d ed.) (requirement that objections be timely is to allow "proponent of the evidence [the ability to] obviate the objection if possible"); *United States v. Rose*, 525 F.2d 1026, 1027 (2d Cir. 1975) ("The court can be advised by the government of the relevant facts necessary to an informed judgment as to the admissibility of evidence only if questions as to admissibility are raised by the defendant promptly and no later than the time when the evidence is offered.").

## II. Deonte Nash

The parties have conferred regarding the anticipated testimony of Deonte Nash. As a result of those productive conferrals, the parties have narrowed the evidentiary disputes for the Court to resolve in advance of this witness. With respect to defense exhibits, the defense produced 41 exhibits that may be used during cross-examination of Mr. Nash, and the Government conveyed its objections to several of those exhibits. The Government understands that the defense only intends to offer two of the exhibits to which there remain objections. Specifically, the Government has hearsay objections to a small subset of text messages contained with in DX 1818 and DX 1820. The parties ask the Court to hear brief argument on those messages in the morning.

With respect to Mr. Nash's anticipated testimony on direct examination, the defense has indicated that they object to certain out-of-court statements, which are described in more detail

below.  For the reasons below, the Government respectfully asks the Court to overrule the objection and permit Mr. Nash to testify about the disputed statements.

### A.    Background

Deonte Nash was a stylist for and close friend of Casandra Ventura throughout her relationship with the defendant.  During their friendship, Ms. Ventura made a number of statements to Mr. Nash that are consistent with her testimony at trial, including descriptions of specific instances when the defendant was violent with her and statements indicating that the defendant was making her go to hotels and have sex with other men.  After conferring with defense counsel, the Government only plans to elicit testimony about three instances when Ms. Ventura made such statements.  The Government understands that the defense may object to some or all of these statements.  Because all three are extraordinarily probative of the coercion element of the sex trafficking charge contained in Count Two, the Government seeks their admission both as evidence of Ms. Ventura's state of mind during the alleged trafficking period and as prior consistent statements that rebut the defense's challenges to Ms. Ventura's testimony that she did not want to participate in Freak Offs and that the defendant coerced her to do so.  Specifically, the Government expects Mr. Nash will testify to the following statements that demonstrate Ms. Ventura's state of mind.

*First*, Mr. Nash will testify that on one occasion in or around approximately 2013, the defendant had a conversation with Ms. Ventura in front of Mr. Nash during which the defendant threatened to release "sex tapes" of Ms. Ventura.  Immediately afterwards, Mr. Nash and Ms. Ventura drove away from the defendant, and Ms. Ventura was visibly upset and crying.  Mr. Nash attempted to comfort Ms. Ventura by pointing out that any sex tapes of her would also show the defendant.  In response, Ms. Ventura told Mr. Nash for the first time, in sum and substance, that the videos the defendant was referencing depicted her having sex with other men and explained that the defendant was making her have sex with other men when she did not want to.

*Second*, Mr. Nash will testify that on multiple occasions during his friendship with Ms. Ventura while she was in a relationship with the defendant, Mr. Nash personally observed Ms. Ventura pack a bag and heard Ms. Ventura say that she was going to a hotel with the defendant.  On several of those occasions, Ms. Ventura told Mr. Nash, in sum and substance, that she did not want to go to the hotels with the defendant.

*Third*, Mr. Nash will testify that during Ms. Ventura's 29th birthday celebration, he witnessed the defendant berating Ms. Ventura.  That same night, Mr. Nash spoke with Ms. Ventura, who told him that the defendant was mad that she did not want "to freak off" on her birthday and was trying to make her go to a hotel.  Mr. Nash will testify that he had not heard the phrase "freak off" before that night.  Later that same night, Mr. Nash went with a small group to Ms. Ventura's apartment, where he observed the defendant state that Ms. Ventura was going to "get some dick tonight," after which Mr. Nash spoke privately with Ms. Ventura, who stated, in sum and substance, that the defendant was making her go to a hotel.

### B.      Discussion

The Court should admit Mr. Nash's testimony regarding Ms. Ventura's statements that she did not want to have sex with other men, that she did not want to go to hotels, and that the defendant was making her do so both as evidence of Ms. Ventura's state of mind pursuant to Rule 803(3), as well as prior consistent statements pursuant to Rule 801(d)(1)(B).   These statements are extraordinarily probative of the coercion and *mens rea* elements of to the sex trafficking charge alleged in Count Two of the Indictment and are not unduly prejudicial.   Accordingly, the statements are admissible under Rules 401 and 403.

Mr. Nash's testimony about Ms. Ventura's statements indicating her desire not to have sex with other men and not to go to hotels with the defendant is clearly admissible to establish Ms. Ventura's state of mind.  As this Court has repeatedly noted throughout this trial (including when admitting out-of-court statements of Ms. Ventura offered by the defendant), under Rule 803(3), "[a] statement of the declarant's then-existing state of mind" is not excluded by the rule against hearsay.  Here, each of the statements that the Government seeks to elicit speaks directly to Ms. Ventura's then-existing state of mind.  *See* Fed. R. Evid. 803(3).

First, the 2013 statement in which Ms. Ventura informed Mr. Nash that she did not want to engage in sex acts with other men, that were also recorded, speaks directly to her then-existing state of mind concerning her desire—or, here, her fervent *lack* of desire—to participate in sex acts with other men at the defendant's direction.  Similarly, Ms. Ventura's repeated statements to Mr. Nash over the course of their friendship that she did not want to go to hotels with the defendant also clearly reflect her then-existing state of mind that she had no desire to participate in the sexual activity that the jury has now heard repeatedly took place during hotel stays with the defendant.  Such evidence of Ms. Ventura's state of mind tends to prove that she was in fact coerced into participating in those same sex acts, as charged in Count Two.

Perhaps most probative of all, Ms. Ventura's statements to Mr. Nash indicating that the defendant was upset that she did not want "to freak off" and further indicating that the defendant was making her go to a hotel even though she did not want to reflect her state of mind throughout the night both that she did not want to participate in a Freak Off and that she felt coerced to do so by the defendant.   Accordingly, each of these statements falls squarely within the hearsay exception for Ms. Ventura's then-existing state of mind pursuant to Rule 803(3).  *See United States v. O'Connor*, 650 F.3d 839, 862 (2d Cir. 2011) ("portion of S.O.'s note stating that S.O. hated O'Connor—to the extent it was offered for its truth" was admissible under Rule 803(3) as a statement of the declarant's then existing state of mind or emotion); *Smith v. Duncan*, 411 F.3d 340, 347 n.4 (2d Cir. 2005).

In addition, these statements are admissible as prior consistent statements for Ms. Ventura. Throughout the trial, the defense has repeatedly challenged, both on cross examination and in its opening statement, the credibility of Ms. Ventura's testimony that she did not want to participate in Freak Offs and that the defendant coerced her to do so.  *See* Tr. 123:4-5 ("This case is about voluntary, adult choices made by capable adults and consensual relationships."); Tr. 142:16-21 ("I expect the messages to show you, was that [Ms. Ventura] was a willing participant in their sex life. That was a voluntary adult choice by two capable adults.  What Cassie may testify to this week,

six years after a breakup, is not a match for the realtime evidence that you will have. The realtime text messages I urge you to read"); Tr. 1002:23-1003:8 ("Q: After that, you say I love our FOs, right? A: Yes. . . . Q: And that's how you felt at the time, that you loved freak-offs when you both were into it, correct?"); Tr. 1003:11-22 ("Q: That's you telling Mr. Combs that you also want to freak-off right now, correct?"); Tr. 1003:25-1004:21 ("Q: He says, if you're not into [a freak off], no problem? A. Correct. . . ."); Tr. 1005:7-1009:25 ("Q: And in this exchange so far you have not said no, right? A. Correct").[1]

Where, as here, a victim's credibility is attacked, through cross-examination, insinuation, and argument, the testifying victim's prior statement is plainly admissible. *See* Fed. R. Evid. 801(d)(1)(B). Further, "the prior consistent statement need not be proffered through the testimony of the declarant but may be proffered through any witness who has firsthand knowledge of the statement," such as Mr. Nash. *United States v. Caracappa*, 614 F.3d 30, 39 (2d Cir. 2010). Similarly, the defense has argued that Ms. Ventura's statements regarding her unwillingness to participate in Freak Offs are uncorroborated. *See* Tr. 142:16-21 ("I expect the messages to show you, was that [Ms. Ventura] was a willing participant in their sex life. That was a voluntary adult choice by two capable adults. What Cassie may testify to this week, six years after a breakup, is not a match for the realtime evidence that you will have. The realtime text messages I urge you to read"). Mr. Nash's testimony that Ms. Ventura contemporaneously voiced her desire not to participate in Freak Offs and expressed that the defendant was making her do so therefore serves to directly rebut an argument put forth by the defense in opening statements to the contrary. *See United States v. Flores*, 945 F.3d 687, 705-06 (2d Cir. 2019) (admitting prior consistent statement of witness after defense's opening statement called into question the witness's credibility); *United States v. Burrell*, 43 F. App'x 403, 406 (2d Cir. 2002) (allowing prior consistent statements of cooperating witness because the defendant "argued in her opening statement that the cooperating witnesses had a motive to lie").[2]

Finally, Mr. Nash's testimony is highly probative and not unduly prejudicial. Evidence of these specific statements is critical to establishing the elements of sex trafficking in Count Two of the Indictment. To establish Count Two of the Indictment, the Government will be required to prove beyond a reasonable doubt that the defendant caused Ms. Ventura to engage in a commercial sex act "knowing, or, . . . in reckless disregard of the fact, that means of force, threats of force,

---

[1] It bears noting that the defense raised these challenges to Ms. Ventura's credibility primarily by introducing her out-of-court statements to prove her state of mind under Rule 803(3). Now that the defense has identified the admission of such statements as good for the proverbial goose, it would seem the admission of Mr. Nash's testimony about similar statements during the period charged in Count Two would be good for the proverbial gander.

[2] Admitting these statements would also be consistent with the Court's prior ruling admitting GX B-315 (an email in which Ms. Ventura relayed the defendant's past threats to release videos) under Rule 801(d)(1)(B) based on the defense's attacks on Ms. Ventura's credibility in opening statements before cross-examination. (*See* Tr. 350-51.)

fraud, coercion."[3]  *See* 18 U.S.C. § 1591.  The Government will therefore be required to establish that the defendant knew, or should have known, that Ms. Ventura in at least some instances did not consent to participate in Freak Offs.  In this regard, Mr. Nash's testimony is decidedly probative in that it firmly establishes that Ms. Ventura did not want to participate in Freak Offs and felt coerced by the defendant to do so.  This includes at least one instance where Ms. Ventura informed Mr. Nash that she did not want to engage in a Freak Off *immediately after* the defendant stated that Ms. Ventura was going to "get some dick" later that night.  Mr. Nash's testimony that Ms. Ventura expressly conveyed her view that she was not a willing participant in these sex acts is therefore critical direct evidence of Count Two.  Further, Mr. Nash's testimony is far less prejudicial than the other evidence in this case, namely, the prior testimony of Ms. Ventura regarding her unwillingness to participate in Freak Offs, and the defendant's use of force, threats of force, and coercion to cause her to do so.  Accordingly, the statement is also admissible under Rules 401 and 403.

### III. Mia

#### A.  Government Exhibits

The Government expects to offer GX 3T-107, 3T-110, and 3T-112 during Mia's testimony, to which the defense objects.[4]  For the following reasons, these exhibits should be admitted.

**GX 3T-107:**  This email chain begins with an April 21, 2012 email from Casandra Ventura to the defendant, Mia, and others involved in her career, thanking them and stating:

> With regret, I have been informed that I cannot perform on Monday due to overages in costs.  I have worked very hard, but I cannot support myself on the things that I need in order to move forward and make this show happen and run smoothly.  I appreciate everyone and I hope that you can understand.  I have tried my very best. I wish everyone the best.  Anyone not attached on this email I will contact directly so no to disrupt anyone's travel and/or schedule.

The defendant responds to Ventura's email, "Mk sure you stleven [*sic*] hill and let him know your not ready and you do wanna embarrass yourself again," to which Ventura replied, "If that were the issue, I would, so since you no longer want to support your artist I have to pull out.  No label

---

[3] Specifically, to establish Count Two of the Indictment, the Government will be required to prove the following beyond a reasonable doubt: (1) a person knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited the victim; (2) the person knew or recklessly disregarded the fact that force, threats of force, fraud, or coercion, or any combination of such means, would be used to cause the victim to engage in a commercial sex act; and (3) the person's acts were in or affecting interstate or foreign commerce.

[4] GX 3T-107, 3T-110, and 3T-112 have been attached hereto, and the Government respectfully requests that these exhibits be sealed pursuant to the Court's pseudonym order.  During Mia's testimony, the Government expects to offer unredacted versions of communications under seal and to display redacted versions for the courtroom.

support, no show, no?"  Mia then forwarded the chain to Toni Fletcher, the chief of staff, explaining that the emails were sent around 4am.

The defense objects to the admission of GX 3T-107 on hearsay grounds and argues that this email is not a prior consistent statement and that they should have had the opportunity to cross Ventura about it.  The email chain is admissible on multiple grounds.  *First*, the email from Ventura is an employee statement under Federal Rule of Evidence 801(d)(2)(D).  In this capacity, Ventura's is Combs' employee—he is the head of her label—and is speaking to him and other of his employees about "a matter within the scope of that relationship and while it existed"—specifically, a music performance.  Fed. R. Evid. 801(d)(2)(D).  *Second*, the emails are admissible to show Ventura's then-existing state of mind and intent under Rule 803(3).  *Third*, Ventura's statements that she has worked hard but has been informed that she cannot perform and does not have label support are prior consistent statements, admissible under Rule 801(d)(2)(1).  Ventura testified about the defendant's control of her career and was subject to cross-examination on this point.  In addition, the defense has elicited testimony challenging Ventura's credibility as to the statements of her career as recently as today.  (*See, e.g.*, Tr. 2701-05 (the defendant's cross-examination of Capricorn Clark, in which Clark was asked about Ventura's career, music singles, and video shoots and her personal involvement in decision-making)).  *Fourth*, the email chain is alternatively admissible not for its truth, but to show it was communicated to the defendant.

**GX 3T-110:**  GX 3T-110 are emails between Mia and Sienna Lee, another personal assistant, on December 22, 2011—the day that the defendant kidnapped Clark, broke into Scott Mescudi's home, and assaulted Ventura.  The Government expects that Mia will testify that that morning, the defendant told her that he found out that Ventura was cheating on him with Mescudi.  Mia then had to take a flight to New York and reached out to Lee and Damion Butler, a/k/a "D-Roc," to learn more about what was happening.  The Government expects that Mia will testify that she did this as part of her job in part to see if she could help Lee, who was fairly new at the time.  Lee responded to Mia that she "just snuck into Roc's room to watch the cameras . . . Can't really talk about it on email.  But he was yelling at her, they walked outside, then they came back and she was crying and he was screaming at her.  Said something about 'idk idc call your mom. . . And get out of my Fing house' Can't talk on bad boy email."  After Mia followed up, Lee further explained, "It just happened when I emailed u.  Now its just Me/PD/Rube in the house. . . I still don't know what's going on :("

The defense objects to GX 3T-110 on hearsay, speculation, and Rule 403 grounds, and also argues that they should be able to cross examine Lee.  None of these arguments should prevail.  *First*, GX 3T-110 is a present sense impression under Rule 803(1), given that Lee is describing what she just witnessed ("I just snuck into Roc's room to watch the cameras," and "It just happened when I emailed you").  In addition, these are employee statements under Rule 801(d)(2)(D), in which Mia, an employee, is having this conversation in order to see if she can assist Lee, a newer employee, which is part of Mia's job.  *Second*, the Government understands that the defense's speculation argument is targeted to an alleged lack of clarity as to who is doing what in Lee's statement.  But Mia will clarify, having just been at the defendant's home, that Lee is talking about the defendant yelling and screaming at Ventura, who is crying.  *Third*, the probative value of this email chain is high, as it corroborates witness accounts of that day, but it is not too prejudicial, given the detailed and more gruesome testimony from Ventura, Mescudi, and Clark as to the events

of that morning.  *Fourth*, the defendant does not have a right to cross Lee about her statements because they were not testimonial and therefore do not raise a Confrontation Clause issue.  *See Davis v. Washington*, 547 U.S. 813, 821-22 (2006) (holding that only testimonial statements are subject to the Confrontation Clause).

**GX 3T-112:**  GX 3T-112 is Mia's email chain with Butler from the same day, December 22, 2011.  In that chain, Mia reaches out to Butler and explains that she is "super worried about p. . . I have no clue whats going on and I don't usually care to know the details since they're usually the same but something felt WRONG this morning- this awful energy—whatever is going on- it has me sickly worried- ill call you when I land :("  Butler responded, "Yeah its crazy right now we deff need to talk.  Love u."

The defense again objects on hearsay, speculation, and Rule 403 grounds.  *First*, these statements are employee statements admissible under Rule 802(d)(2)(D), and Mia will testify that employees often discussed the defendant's mood in order to predict what the defendant may need and what would happen next.  The statements are also admissible under Rule 803(3) because they demonstrate Mia's state of mind.  *Second*, there is no speculation because Mia will explain that before she left that morning, based on what she saw and the conversation she had with the defendant described above, the mood in the defendant's home was eerie and that the employes were on edge.  *Third*, these real-time communications are probative because they both corroborate Mia's account and show that Butler—a putative racketeering co-conspirator—was fully aware of the events taking place, and there is no unfair prejudice.

### B.  Defense Exhibits

The Government objects to a number of the exhibits that the defense may use with Mia.

**Scrapbook:**  The Government understands that the defense intends to offer a physical scrapbook that Mia made for the defendant's 45th birthday.  The scrapbook contains over 100 pages of magazine clippings from 1991 to 1999, detailing the defendant's various accomplishments, and is accompanied by a letter from Mia.  Although the Government has no issue with the defense questioning Mia about the scrapbook and its contents, the Government objects to the admission of the physical scrapbook.  The magazine clippings in the scrapbook are filled with hearsay concerning the defendant's career and accomplishments in the music industry.  In addition, the Government objects on Rule 401 and 403 grounds because the scrapbook contains a myriad of articles from a decade that is not charged in the indictment, and the content plays to juror sympathies, as the magazine articles include puff pieces related to the defendant and even articles concerning the murder of Christopher Wallace, a/k/a "Biggie."  The only (minimally) relevant item from the scrapbook is Mia's one-page letter to the defendant enclosing the scrapbook.  Any probative value is vastly outweighed by the prejudice described above, given that the defense can cross Mia about the scrapbook.

**Social media posts:**  The defense has marked dozens of Mia's Instagram posts.  While the Government does not object to most of the photographs associated with these posts, the captions of the posts often contain hearsay.  *See, e.g.*, DX 1703 (describing the defendant as the  DX 1710 (stating that Mia is ███████████████"); DX 1714 (stating

that the defendant has ▓▓▓▓▓▓▓▓▓▓▓▓▓").  If the defense does not offer a proper non-hearsay purpose for the posts, the Court should exclude them.  If the defense wishes to redact the captions, or at minimum assertions from the captions, the Government will withdraw its hearsay objection.

**DX 1701, 1707, 1719, and 1726:**  The Government objects to these exhibits on Rule 401 and 403 grounds.  DX 1701 and 1726 contain numerous bottles of alcohol, DX 1707 depicts a party in which numerous people are in swimsuits in a pool while some people hold drinks and others flip off the camera, and DX 1719 features ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ prejudicial value of these posts is high, and they have little if any probative value.  For example, with regard to DX 1701, a photograph in which Mia is holding four Ciroc bottles with the caption, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ the Government understands that the defense does not intend to argue that Mia was drinking often, though that is the clear implication from the photograph, and there is a real risk that the jury may draw that conclusion.

**DX 1703, 1739, 1740, 1742 through 1745:**  These DX feature the defendant doing a variety of things for his businesses, to which the Government objects on Rule 401 and 403 grounds because the probative value is limited as they do not feature Mia, but the potential prejudice is high as they are an improper attempt to highlight the defendant's various achievements, (*see* DX 1703 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"), and business events, (*see* DX 1739 and 1740 (highlighting events for the Bad Boy Reunion Tour), unrelated to the charged conduct.  These exhibits are a transparent attempt to draw on juror sympathy and should be precluded.

**DX 1730:**  DX 1730 is an April 25, 2019 text from Mia to the defendant that contains hearsay.  In it, Mia expresses that "thousands of [her] friends are so excited" for a festival that the defendant is throwing in Mia's hometown.  Mia is explaining that she cannot be there because her grandmother was having health issues, but "[o]therwise [she] should be [t]here[.]"  The Government objects on Rule 401 and hearsay grounds.  The defense has stated that they do not intend to offer this text for its truth, but statements such as these appear to be offered for their truth, especially the assertion that Mia would be present at the festival but for her grandmother's health issue.

**DX 1733:**  DX 1733 is a text chain between Mia and the defendant, which spans from December 2018 through August 2020.  The Government objects on hearsay and Rule 401 and 403 grounds, as the text chain contains a variety of out-of-court assertions, including the text from DX 1730, and statements of memory and belief likely offered to prove a fact remembered or believed, (*see* August 29, 2020 text from Mia to the defendant recounting a variety of memories).  The text chain also includes texts related to the deaths of Kim Porter and Andre Harrell, which could play to juror sympathies with little probative value.  The Government is willing to confer with the defense about particular messages in this chain rather than the entire chain.

**DX 1734:**  DX 1734 is an Instagram post that Mia posted for one of the defendant's children on their 21st birthday.  The Government objects on Rule 401 and 403 grounds.  The defense argues that the post is relevant because it shows Mia's relationship with the defendant's

family, but any such relationship is irrelevant to the charged conduct and plays to juror sympathies by putting the defendant's children at issue.

    **DX 1735:**  DX 1735 is a text chain between Mia and Ventura to which the Government objects on hearsay, speculation, and Rule 401 and 403 grounds.  The chain contains a number of out-of-court assertions, which may be offered for their truth, including that Mia finished work and brought wine to meet Cassie.  (*See* GX 1735 at 1).  In addition, the final text in the chain contains speculation about the defendant's emotion and mental state, including that "he is clearly going through some heavy shit[.]"  The relevance of this chain is not clear from its face, and there is potential that the jury will be confused, particularly by the last speculative text in the chain.

                          Respectfully submitted,

                          JAY CLAYTON
                          United States Attorney

             By:    /s                    
                          Maurene Comey / Meredith Foster /
                          Emily A. Johnson / Christy Slavik /
                          Madison Reddick Smyser / Mitzi Steiner
                          Assistant United States Attorneys
                          (212) 637-2324/-2310/-2409/-1113/-2381/-2284

cc:      Counsel of record (by ECF)