P6pWcom1 - Corrected

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

              v.                        24 Cr. 542 (AS)

SEAN COMBS,
     a/k/a "Puff Daddy,"
     a/k/a "P. Diddy,"
     a/k/a "Diddy,"
     a/k/a "PD,"
     a/k/a "Love,"

              Defendant.               Trial
------------------------------x
                                       New York, N.Y.
                                       June 25, 2025
                                       3:00 p.m.
Before:

                     HON. ARUN SUBRAMANIAN,

                                       District Judge
                                       -and a Jury-

                          APPEARANCES

JAY CLAYTON
     Interim United States Attorney for the
     Southern District of New York
BY:  MADISON R. SMYSER
     EMILY A. JOHNSON
     MAURENE R. COMEY
     MEREDITH FOSTER
     MITZI STEINER
     MARY C. SLAVIK
     Assistant United States Attorneys

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P6pWcom1 - Corrected

APPEARANCES CONTINUED


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:  MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
HARRIS TRZASKOMA LLP
BY:  ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        CHRISTOPHER JOHNSON
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:  Lucy Gavin
               Shannon Becker
               Paralegal Specialists

               Raymond McLeod, Paralegal

P6pWcom1 - Corrected

(Trial resumed)

THE COURT:  Please be seated.

This is the most people I've ever seen at a charge conference.  Buckle in.

First, I want to apologize for the delays in timing, although in my defense, I received probably about 200 objections to various parts of each side's proposed charge, and everything from wording changes to full frontal constitutional attack on one of the statutes that's at issue.  So it took a little time to get through.  But I do apologize.

With that, we're here to go over the charge.

We'll start with the good news first.  The parties have agreed to the verdict form, is that correct?

Ms. Smyser.

MS. SMYSER:  That's correct.

THE COURT:  All right.

Anything from the defense on the verdict form?

Ms. Shapiro.

MS. SHAPIRO:  No.  No, your Honor.  Obviously we argued that some of the predicate acts shouldn't be included, but that's preserved.

THE COURT:  All right.  Very good.  I appreciate the parties' work on the verdict form, so we'll go ahead and use that.

Now let's move to the charge.

P6pWcom1 - Corrected

MS. SHAPIRO:  Your Honor, I just want to put on the record that we haven't finished reading the Court's draft charge, including some parts that we may have substantial objections to.  So I just need to put that on the record.  I'm sorry.

THE COURT:  Do you need more time?

MS. SHAPIRO:  If we could have another, like, half hour, I think that would be very helpful.

THE COURT:  Look, I want to make sure that everyone has time to review the materials, and I personally will stay here as late as we need to to make sure that we get it right.  That's actually where I was going to start, is that my main concern is making sure that we resolve the objections, but I want to make sure that this is right.  And so I'll put in the time to make sure that happens.  If you're telling me that you need a little time now to finish going over it, I'm happy to do that.

MS. SHAPIRO:  Yes.  That's all.  And I apologize.  I know that it's really the parties' fault, because we deluged you last night with a lot of new material.  But a half an hour, I think, will be sufficient and would really be helpful to us.

THE COURT:  And is that going to pose an issue on the government's side?

MS. SHAPIRO:  My client is asking for 45 minutes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6pWcom1 - Corrected

MS. SMYSER:  No, your Honor.

THE COURT:  All right.  Because I know that we have closings coming tomorrow morning, but all right.

So you want to come back at 3:45?

MS. SHAPIRO:  Yes.  That would be great.

THE COURT:  All right.  Let's do that.

MS. SHAPIRO:  Thank you.

THE COURT:  We'll come back at 3:45.

(Recess)

P6pWcom1

THE COURT:  Please be seated.

OK.  So, we've resolved the verdict form, so let's go through the charge.  I'm going to go page by page, and I'll confirm any objections that the parties have.

On page 1 is the beginning of the introductory instructions.

Any objections from the government?

MS. SMYSER:  No, your Honor.

THE COURT:  Any objections from the defense?

MS. SHAPIRO:  No, your Honor.

THE COURT:  Page 2, objections from the government?

MS. SMYSER:  No, your Honor.

THE COURT:  Any objections from the defense?

MS. SHAPIRO:  No, your Honor.

THE COURT:  On line 6, on page 2, I'm going to delete the reference to "you are the exclusive judges of the facts." I think it's in here about five times, and so I think the jury will get the point.  So I'm going to take that last reference out, as I think it's unnecessary.

Page 3, any objections from the government?

MS. SMYSER:  No, your Honor.

MS. SHAPIRO:  No, your Honor.

THE COURT:  Page 4.

MS. SMYSER:  No objections.

THE COURT:  Ms. Shapiro.

P6pWcom1

MS. SHAPIRO:  No, your Honor.

I can just, if this will speed things up, we don't have anything until page 13.

THE COURT:  OK.

MS. SHAPIRO:  So you know.

THE COURT:  Speed things up.

MS. SMYSER:  Same here, your Honor.

THE COURT:  All right.  So the parties have confirmed that there are no objections from page 4 through to page 13. So we'll move to 13.

I'll note that I'll make the references to Counts Four and Five to refer to Jane, as the government indicated, so I'll make that conforming change.

All right.  I'm on page 13.  Let me hear first from the government.

Any objections on page 13, which begins with the -- just make sure I've got the right page -- the first element.

MS. SMYSER:  So, yes, your Honor.

We have an objection toward the end of the page, the end of the conspiracy obstruction.  And here, we appreciate the Court adding in additional conspiracy language to help describe that for the jury, but there is one additional point the government would like reflected in some way.

THE COURT:  So you are on line 18; that is what you are proposing, an insertion there?

P6pWcom1

MS. SMYSER:  That would work.  I think it could also be really at the end of line 25, wherever the Court feels appropriate in the context of the conspiracy instruction.  And the language or concept we would like added is that it's not necessary for the government to show that an alleged co-conspirator was fully informed as to all the details of a conspiracy in order for the jury to be able to infer knowledge on that person's part, and to have guilty knowledge a person need not know the full extent of the conspiracy or all the activities of all of its participants; it is not necessary for a person to know every other member of the conspiracy.  In fact, a person may know only one other member of the conspiracy and still be a co-conspirator.

And this language, I think, is important, your Honor, because it was clear from the Rule 29 argument that a focus of the defense's argument is going to be on the knowledge and roles of the co-conspirators in this case, and for example, Mr. Combs lying to Ms. Khorram at various points in time or not keeping her in the full loop.  And we would anticipate argument that they have not come to an agreement and there cannot be a conspiracy there.  But I think under the law, that is just incorrect, because they don't have to have full knowledge of the law.

And I just want to cite for the Court on this point *United States v. Rastelli*, 870 F.2d 822, 828, which says,

P6pWcom1

"focusing on a RICO conspiracy, the government need not prove the conspirator-defendant agreed with every other conspirator, or knew all the other conspirators, or had full knowledge of all the details of the conspiracy.  All that we require is the defendant agree to commit the substantive racketeering offense through agreeing to participate in two predicate acts," which gets at this concept, your Honor.

THE COURT:  Understood.

Response.

MS. SHAPIRO:  Yes, your Honor.

We object to that.  It's not necessary, and that's not the argument I was even making at the Rule 29.

The law requires that a co-conspirator join the agreement with knowledge of the unlawful purposes of the conspiracy.  So if there's a factual argument and dispute about whether someone like Ms. Khorram was a co-conspirator, the issue is not whether she knew all the other co-conspirators or some of the other things that were mentioned in the language that's being requested but rather whether she understood, for example, that crimes were being committed in the hotel rooms.

The issue is the knowledge of the unlawful purposes of the alleged conspiracy, and this is just going to make the conspiracy instruction more argumentative in terms of the arguments the government plans to make.  It's really unnecessary, and the co-conspirator does have to know about the

P6pWcom1

enterprise's illegal activities.

THE COURT:  All right.  I will overrule the government's objection.  And the language that I added in response to the government's proposal from last evening came straight from the Sand treatise, so I took that language out in response to the government's fair concern that the previous language concerning the conspiracy and the agreement and the nature of the defendant's agreement has to, need a little bit more explanation as to what that would entail.  And I think that the charge does that.  And I think that to the extent that further clarification of the facts and how they meet the standard as articulated in the instructions is something that the parties can address in closings.

Anything further, Ms. Smyser, on page 13?

MS. SMYSER:  No, your Honor.

THE COURT:  Ms. Shapiro.

MS. SHAPIRO:  Yes, your Honor.

With regard to lines 22 to 25, we have an objection there.

First of all, with regard to the first sentence, "In a very real sense, then, in the context of conspiracy cases actions often speak louder than words," that sentence, although commonly given, actually is inconsistent with the general charge about circumstantial versus direct evidence, which tells the jurors that the two are on equal footing by suggesting that

P6pWcom1

circumstantial evidence could be more important than or more significant than direct evidence.

So we object to that. If the Court wants to get at that concept, instead we would propose at the end of line 21 that it could say the parties involved, including their actions and statements, which is a more neutral way to present the point that actions should be considered as well.

So that's the first point. And then I had another suggestion as well with regard to the rest of the paragraph.

And I just wanted to note that the other thing, I made this argument, for whatever it's worth, to Judge Liman in the Bruce Garelick trial last year, and he agreed with me and struck the sentence, for whatever that's worth.

THE COURT: I'll change the sentence in response to the objection. I think the concern that you raised that it may place one form of evidence above another can be addressed by just modifying the text to say "in the context of conspiracy cases, actions may speak louder than words." And that is true; it may or it may not. And then that, I think, makes it consistent with the previous text.

I think the reason you noted that this is an instruction that is commonly given is that it's, again, straight out of the Sand treatise and has been commonly given in conspiracy cases.

MS. SHAPIRO: That's true, your Honor.

P6pWcom1

And then the other suggestion that we wanted to make, if the Court is going to include this paragraph as it is, is that you also add another paragraph; we would propose that it's taken from the Sand treatise, slightly tweaked, based on case law from the Supreme Court and the Second Circuit to kind of balance it out by pointing out that -- I mean I can just hand it up.  I have a copy for the government as well.

THE COURT:  All right.  You can approach and hand that up.

All right.  I'm not going to include this language.  I think for the same reasons that I rejected much of the government's proposal and language that they had proposed that I add to this instruction, I think that the instruction as it stands is neutral and provides the framework, the right framework for the jury to make its determination on this element.  And again, if I were to add this language, then the issue would be raised whether I should also add much of the government's language that I did not add and which the defense objected to.

But that being said, as I told the government, the defense can certainly make arguments aligned with the language that's reflected here in this edit during summations to make their point, and that would be consistent with the neutral instruction that's given to the jury as reflected in the charge.

P6pWcom1

So I will reject and overrule the defense objection on that point.

I will make the other modification that I discussed in terms of the "actions speak louder than words" sentence.

Any further objections on page 13, Ms. Shapiro?

MS. SHAPIRO:  No, your Honor.

MS. SMYSER:  Your Honor, I apologize.  I had one at the bottom of page 12 that I missed.

THE COURT:  OK.

MS. SMYSER:  And it's just to the fourth element of the racketeering conspiracy, lines 23 and 24.

THE COURT:  OK.

MS. SMYSER:  I think it is more accurate to talk about the agreement here being in terms of agreeing to participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as you will define that term for them, rather than talking about the agreement in these lines to commit the two racketeering acts.  So I'm happy to read the language that we had proposed.  We just think that it is more accurate in light of Second Circuit case law and specifically *Applins*.

THE COURT:  Am I mistaken, or was this not part of the proposal that I received yesterday?  Because I don't remember it being --

MS. SMYSER:  No.  It was, your Honor.

THE COURT:  What's the proposal?

MS. SMYSER:  So, the element would reflect:  "Fourth that the defendant knowingly and willfully agreed with at least one other person that he or a co-conspirator would participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as I will define that term for you."

MS. SHAPIRO:  Your Honor, may I respond?

THE COURT:  Yes.

MS. SHAPIRO:  That's a reference to the first element. The fourth element is a separate element that requires proof that the defendant agreed that either he or another member of the conspiracy would commit two racketeering acts.  The point of *Salinas* is that it doesn't have to be the defendant himself, but it could be an agreement that some other co-conspirator would commit two racketeering acts.  But that's what the element is.

What Ms. Smyser is referring to is the nature of the agreement, which is captured by the first element.

THE COURT:  All right.  I'll overrule the government's objection.  And again, I think that that's right.  It would conflate the first and the fourth element as reflected in the charge.

I'll also note that the fourth element and the way it's stated there is, again, drawn from the Sand treatise and

P6pWcom1

with supporting authority from multiple circuits, including the Second Circuit.

Next. Anything further on page 13?

Hearing nothing, let's move to page 14.

Any objections from the government?

MS. SMYSER: No, your Honor. Sorry. Just making sure.

THE COURT: Ms. Shapiro.

MS. SHAPIRO: Yes, your Honor.

We have an objection as to line 9. I think the previous draft of the charge said "that purpose must be common to the group as a whole and cannot merely represent one individual's own personal self-interests or agenda." And we would request that that language be included.

The government objected, in its markup, based on *United States v. Kelly*, but I think they're conflating two things: One is the nature of what sort of the purpose the group has to have; and the other is *Kelly*'s holding that an individual can be distinct from the enterprise and that Cedric Kushner doesn't necessarily preclude a RICO case that is based on a purpose about promoting a particular individual. But there's a bunch of authorities we had cited, and I can go through it again. But it was in our comment. I think it says A22R21 on page 15 of the government's markup from last night, where we made the point that there is a fair amount of case law

P6pWcom1

about the common purpose and that personal enrichment or self-interest is not enough.

And so that's why we're requesting that language here, and I don't think it's inconsistent with the *R. Kelly* holding when we're talking about purpose here.

THE COURT:  All right.  Those principles that you articulated are reflected elsewhere in the charge, including that the group must have a common purpose and it cannot be simply an individual acting in his own self-interest.  However, the language that was proposed would potentially be misunderstood to suggest that if the group has a common purpose that is focused on an individual's agenda, that liability can't be found, which would be inconsistent with the *Kelly* case and the kind of understanding that a common purpose can be a number of different things, one of which could be the stature and the enrichment of a particular individual who's involved in that conspiracy.  But the purpose must be a common purpose, and that's what must be proved.

MS. SHAPIRO:  Your Honor, where else in the charge is that captured?  We had actually proposed some language in another place that your Honor did not put in the charge.  I wasn't sure where that was.

THE COURT:  In the preceding text, if you look above, it says an enterprise is a group of people or entities that have associated together for a common purpose of engaging in a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6pWcom1

course of conduct.  This group, in addition to having a common purpose, must have an ongoing organization, etc.

MS. SHAPIRO:  I understand that's the Court's ruling. I don't think that captures the point.

THE COURT:  Just to follow up on that, in the following paragraph, it says -- and this was in response to a defense proposal -- there must be an overarching relationship among the enterprise members and the enterprise must be formally or practically separate from the defendant himself.

MS. SHAPIRO:  OK.  That's fine, your Honor.

I guess we'll preserve the objection.

Would the Court consider, after the language I had proposed, "and cannot merely represent one individual's own personal self-interest or agenda, if not shared by the group as a whole"?

THE COURT:  Is there any objection by the government to that language?

MS. SMYSER:  Your Honor, I don't think it's necessary. I think it is much better than what Ms. Shapiro proposed initially, and it is certainly true that the group as a whole has to have a common purpose.  But I don't think that this should be an instruction that the jury receives, and I don't think that the cases cited by Ms. Shapiro support the point that an individual's personal agenda can't be the common purpose of an enterprise.  I think a lot of these cases were in

P6pWcom1

the motion to dismiss context in civil RICO cases, and many of them, including one cited by the defense, *Vernace*, said that we certainly did not hold in *Bruno*, one of the other cases cited, that a jury must find that all the predicate acts with personal dimensions are unrelated to charge RICO conspiracy.

So I don't think that this instruction is accurate or should be given.

THE COURT:  All right.  Can you give me the sentence again.

MS. SHAPIRO:  Sorry.  And cannot merely represent one individual's own personal self-interest or agenda, but must be shared by -- if not shared by the group as a whole.

THE COURT:  Which sentence are you adding that to?

MS. SHAPIRO:  The one on line 9 that starts "that purpose must be common to the group as a whole."  So it would read "that purpose must be common to the group as a whole and cannot merely represent one individual's own personal self-interest or agenda, if not shared by the group as a whole" -- or "the other members of the group."

THE COURT:  No.  I'm not going to insert that language.  I think it would be confusing especially because the middle clause in that sentence would be inconsistent with the first clause, and there would be no need for the third clarification, because the first clause, which says the purpose must be common to the group as a whole, gets to the point, that

P6pWcom1

there has to be a common group purpose.  And that is what must be shown.  And if the only thing that the evidence establishes is one individual's pursuit of his own individual self-interest, then there would not be sufficient evidence under the charge as given.

So I'll overrule the defense's objection as to that sentence.

MS. SHAPIRO:  OK.  I just want to put on the record -- I understand, your Honor -- that *Reves v. Ernst & Young*, the Supreme Court decision, at page 185, notes that liability depends on showing that the defendants conducted or participated in the conduct of the enterprise's affairs, not just their own affairs, which is support for that.

THE COURT:  And I think that's an argument that you can make in summations, that this is all one person -- at most, this was one person pursuing his own individual self-interest, there was no common purpose and no enterprise.

MS. SHAPIRO:  Understood.

THE COURT:  I'm sure we'll be hearing that.

If there's nothing further on page 14, let's go to page 15.

Any objections there?

Government.

MS. SMYSER:  Yes, your Honor.

We have an objection.  This is line 2, at the very

P6pWcom1

top.  The sentence that says "not that everyone involved has to be the same, but the core of the enterprise has to be the same throughout."  So I think, here, our objection is that the statement that the core of the enterprise has to be the same throughout is potentially confusing in this particular case, because the way the government has described the enterprise focuses on the defendant's inner circle, and the jury may become confused that inner circle and core being used here are the same thing, that they need to find all of these people in the inner circle are present throughout the time period, which I just don't think is accurate.  And so I think inserting something like "that some of the core of the enterprise," or something like that, would help alleviate some of that potential confusion, given the terms that are being used.

THE COURT:  So what is the core of the enterprise as alleged by the government?

MS. SMYSER:  So, I mean the core here is the chief of staff and security around the defendant, but the people who are in those roles change over time.  So for example, D-Roc is security in the beginning and Faheem is security at the end.  And I don't think it's required under the case law that D-Roc be there, present throughout the entirety of the conspiracy.  And so we want to prevent that confusion.

THE COURT:  Why don't you have enough to make those arguments given that the sentence says "this does not mean that

P6pWcom1

everyone involved has to be the same, but the core of the enterprise has to be the same throughout," meaning exactly the argument that you're making is what you can tell the jury tomorrow.

MS. SMYSER: So, I do think that the first sentence is helpful in that respect. But I think the objection is really about the terms being used and the jury conflating, mistakenly, that core would mean the entire inner circle because of how the case has been framed.

THE COURT: So what was your proposal to modify this sentence?

MS. SMYSER: The proposal is potentially "but some of the core of the enterprise has to be the same throughout."

THE COURT: Well, I think that the core -- this language is from the Sand treatise, and I think the principle is that the core, the enterprise has to be the same, or else there's no enterprise. But I think what you're, perhaps, suggesting is that the people may be different and so you should not necessarily conflate the people with what the core is. And so what I could modify the sentence to say is "this does not mean that every person involved has to be the same, but the core aspects of the enterprise have to be the same throughout."

MS. SMYSER: I think that's fine, your Honor. And I have a longer sentence that we could potentially use, but I

P6pWcom1

think that captures the concern.

THE COURT:  All right.  I'll make that change, which I think is essentially what's in the Sand treatise anyway.

MR. DRISCOLL:  Judge, can you just repeat?  Because I think it might be inconsistent with *Boyle*.

THE COURT:  This does not mean that every person involved has to be the same, so I just changed "everyone" to "every person," but the core aspects, so just adding "aspects," of the enterprise have to be the same throughout.

MR. DRISCOLL:  I'm just a little confused as to what aspects might mean here.  The core -- that's a feature of the Supreme Court's *Boyle* decision and refers to individuals in the enterprise.  So core aspects --

THE COURT:  It could be core nature.

MR. DRISCOLL:  No.  I think it has to be core individuals.  It refers to the actual people involved.

THE COURT:  OK.

MS. SMYSER:  I mean, your Honor, to potentially address this, I have a sentence.  Leaving in place what you have now, and following it with the -- or we can strike and replace it with "the members of the organization can change and participants in its affairs may come and go, but the enterprise must have a recognizable core that continues during a substantial period during the time frame charged in the indictment," which I think will address our concern and be

P6pWcom1

consistent with *Boyle*.

THE COURT:  All right.  I'm going to overrule the government's objection and go back to the original text, which I think captures what the government wants to argue.  And I think it is clear.  I think that the government is going to make its factual arguments, and we can proceed on that basis, because I'm not hearing from the defense that they are going to challenge that the government's argument that they made would be inconsistent with what the law requires, meaning that what Ms. Smyser said is that there's the chief of staff, the security and Mr. Combs, which were the core of the enterprise, but there are particular people within those units that may have changed over the period of the conspiracy.  And is the defense going to argue that that is legally insufficient to make up the conspiracy charge, if they can establish that as a factual matter?

MS. SHAPIRO:  I mean, I don't think so.  I don't think that was even the argument I was making yesterday on the Rule 29.  The point was more of a factual argument about what the government had shown with regard to the individuals they claim are the core members or the inner circle.

THE COURT:  Yeah.  I understood the argument being made yesterday was just that there wasn't an overarching conspiracy to begin with.

MS. SHAPIRO:  Right.

P6pWcom1

THE COURT:  That's in here.

MS. SHAPIRO:  Right.

THE COURT:  They have to show that.

MS. SHAPIRO:  Exactly.

THE COURT:  That's a separate argument.

OK.  So I'm going to leave the text as is because I don't think that this issue is going to serve in the same way, raise any issues.  So the original language that I had in the version submitted today will be retained.

All right.  Anything further on page 15?

From the government.

MS. SMYSER:  Not from the government.

MS. SHAPIRO:  I had one thing.

With regards to lines, the sentence -- well, the two sentences, I guess, from lines 9 to 12, obviously we recognize that under the law purely local narcotics activity can satisfy the element, but the way this is worded, it essentially directs a verdict on that element.  And there's no need to get into what Congress has determined to the jury.

THE COURT:  What's the proposal?

MS. SHAPIRO:  So, if we could get rid of "Congress has determined" and start that sentence with "even purely local narcotics activity has an effect on interstate commerce," or maybe -- yeah.  And just leave it at that.

THE COURT:  That's fine.

P6pWcom1

Does the government have an issue with that change?

MS. SMYSER:  We would propose starting the sentence at "all."  So "all narcotics activity, even purely local narcotics activity," but we don't have an objection to removing "Congress has determined."

MS. SHAPIRO:  Sorry.  I guess I wasn't clear.  I also wanted to delete the following sentence.

THE COURT:  But you don't have an objection to the "all narcotics activity," since you're leaving in even purely --

MS. SHAPIRO:  No.  If the sentence starts with "all narcotics activity" and the remaining sentence in the paragraph is deleted, we're OK with it.

THE COURT:  All right.  I'll make those changes.

MS. SMYSER:  Your Honor, I think the second sentence does capture an important point that is reflected in the case law -- that narcotics in the context of racketeering does satisfy this element.  It's not directing the jury to make a finding.  The jury would still have to find that there were drugs in order for that element to be satisfied and there were drugs in the racketeering enterprise.  But I think this is an accurate statement of the law.

THE COURT:  Well, I think precisely for the reason that you're saying -- I think this is the defense's point -- is that once we clarify for the jury that all narcotics activity,

P6pWcom1

even purely local narcotics activity, has an effect on interstate commerce, then it is for the jury to put the other pieces together to find that element satisfied. But the defense's objection was that by telling the jury that the element is satisfied that would be a bridge too far. But I'm not sure that it's of any moment, because once we give the instruction that all narcotics activity, even purely local narcotics activity, has an effect on interstate commerce, that, from the government's perspective, will allow them to say that this element is satisfied based on the instruction given.

Anything further from the government on page 15? I think we covered the government.

Anything from the defense?

MS. SHAPIRO: No, your Honor.

THE COURT: Let's go to page 16.

Anything from the government?

MS. SMYSER: No, your Honor.

MS. SHAPIRO: No, your Honor.

THE COURT: Anything on page 17?

MS. SMYSER: Yes, your Honor. Just one small thing.

So, on line 23, we're talking about the meaningful connection to the enterprise for the nexus. I think that this language in the case law comes from the *Cain* case, which says that it must have some meaningful connection to the enterprise, and so we would propose inserting the word "some" there.

P6pWcom1

THE COURT:  Any issue with that?  I think that may have been in the treatise excerpt, and I just changed "some" to "a."

MS. SHAPIRO:  No, your Honor.  That's fine.

THE COURT:  All right.  We'll make that change.

Anything from the defense on page 17?

MS. SHAPIRO:  No.

THE COURT:  Anything from the government on page 18?

MS. SMYSER:  No, your Honor.

THE COURT:  Anything from the defense on page 18?

MS. SHAPIRO:  Yes, your Honor.

I think I know what you're going to say about this, but I need to make the argument.  On line 1, after the sentence related to the activities of the enterprise, we request that the Court add the sentence "activities that are simply personal matters do not satisfy the required nexus," which comes from *Bruno* at 383 F.3d 65, 85 (2d Cir. 2004).

THE COURT:  Why isn't that captured in the entire paragraph that talks about both vertical relatedness and horizontal relatedness, because horizontal relatedness makes sure that the racketeering acts are connected to each other and not isolated acts, and then the vertical dimension of that makes sure that the racketeering acts are connected to the enterprise and thus constitute the pattern of racketeering activity?  So that gets you where you need to get.

P6pWcom1

MS. SHAPIRO:  It does partly, but it's not sufficiently specific to capture this point.  So that's why we're requesting it.

THE COURT:  You've made the objection.  I'll overrule the objection.

Anything further from the defense on this page?

MS. SHAPIRO:  No, your Honor.

THE COURT:  All right.

Let's go to page 19.

Any objections from the government?

MS. SMYSER:  No, your Honor.

THE COURT:  Anything from the defense?

MS. SHAPIRO:  On 19, yes, your Honor.

I think there were a number of changes to this first paragraph, lines 1 to 9, and the result is that it's a bit unbalanced because there's a lot of language here about the government need not prove that the defendant himself committed or agreed, and it says, "as I have said."  So it's something that the Court has already explained.

And then it says you need not find -- this is starting on line 6:  "You need not find that the object of the conspiracy involved violations of all the statutes; rather, you need only find that the object involved a violation of at least one of the statutes."  And our concern is just this new language both repeats what they need not find, which has been

P6pWcom1

made clear earlier, and is unbalanced.

THE COURT:  Do you have a proposal of how to modify this paragraph?  Because the point made by the government is that there are a number of statutes that are being referenced, and so there is at least a potential that the jury may think that they need to find all of the violations that are within the category of offenses in order to find that racketeering act was either committed or was going to be committed.

MS. SHAPIRO:  Can you give me a minute to confer?

THE COURT:  Yes.

MS. SHAPIRO:  I think the Court had removed from this paragraph the following language, right after this "in a moment" sentence, it previously said, "Before I do, let me remind you that the government must prove beyond a reasonable doubt that the defendant agreed that either he or a co-conspirator would commit two of these offenses within ten years of each other as part of the charged racketeering conspiracy."

So perhaps the Court could add that sentence back if it's going to include this other language in the paragraph.

THE COURT:  So that would resolve the objection, to add that language, to restore the balance, as you're saying?

MS. SHAPIRO:  Yes, your Honor.

THE COURT:  All right.  What is the sentence again?

MS. SHAPIRO:  It says:  "Before I do, let me remind

P6pWcom1

you that the government must prove beyond a reasonable doubt that the defendant agreed that either he or a co-conspirator would commit two of these offenses within ten years of each other as part of the charged racketeering conspiracy."

THE COURT:  All right.  Other than the fact that it repeats something that's elsewhere in the charge, is there any other objection to adding that language and then retaining the balance of the paragraph?

MS. SMYSER:  No other objection, your Honor.

THE COURT:  All right.  So we'll add that sentence, and we'll retain the balance of the paragraph.

MS. SHAPIRO:  Thank you, your Honor.

THE COURT:  Move to page 20.

Any objection from the government?

And then I have one thing to raise.

MS. SMYSER:  No, your Honor.

MS. SHAPIRO:  Oh, I'm sorry, your Honor.

Mr. Driscoll has reminded me of another suggestion we had for this paragraph.  It would be a sentence that said, "in other words, each conspirator must have specifically intended that some conspirator commit each element of the substantive offense."

THE COURT:  I'm not sure I even understand what that's supposed to mean.

MS. SHAPIRO:  It comes out of *Ocasio v. United States.*

P6pWcom1

You have to blame the Supreme Court for that, your Honor.

THE COURT:  OK.

MS. SHAPIRO:  Mr. Driscoll is perhaps better able to address it.

MR. DRISCOLL:  Judge, if I could just explain.

The government proposed some modifications to the prefatory language in each of the alleged racketeering predicates, and the Court removed the language about the government needing to prove the elements of those offenses beyond a reasonable doubt.  But in fact, in order to prove a conspiracy, the government also has to prove that the conspirators agreed to commit each element of those predicate offenses beyond a reasonable doubt.

I'm not saying that the elements themselves need to be proved, but it has to be shown that the scope of the agreement was specific to each element of the object offenses.  And that concept is no longer reflected anywhere in the charge.  And that's the proposal, that we add that back in somewhere.

THE COURT:  And you say add that back in, was that in a proposal that I received yesterday?  I'm not sure --

MR. DRISCOLL:  Yes.  Yes, it was.

So the government's redline removed the language.  We objected to it, and our redline maintained the language.  I think that's the nature of the issue.

(Continued on next page)

P6PQcom2

MS. SMYSER:  Your Honor, I just want to know.  I believe the case cited by Mr. Driscoll isn't in the context of a RICO conspiracy.  It's in the context of a Hobbs Act conspiracy.  So I think what's important here, and what has been reflected this charge, is that the government needs to prove beyond a reasonable doubt that the defendant and a co-conspirator agreed to participate in the affairs of an enterprise through a pattern of racketeering.  And that is what has been reflected, and that is what we have to prove.  I think the language suggested is not appropriate.

MR. DRISCOLL:  Your Honor, that's not correct.

THE COURT:  Let me first say that I'm looking at the defense's proposal from yesterday, and I don't see this language reflected.

MR. DRISCOLL:  It's in the prefatory language with respect -- go ahead.

MS. SHAPIRO:  Sorry.

I think what happened is this language -- language like this was at the beginning of each of the racketeering acts, and the government had proposed eliminating this prefatory language for reasons, including the fact that it was repetitive because it was there each time, but --

THE COURT:  So you're saying that under each predicate, the way that the defense had framed it, while the elements themselves need not be proved beyond a reasonable

P6PQcom2

doubt, in each case the defense had noted the government must prove that the defendant agreed that a conspirator would violate the statute.

MS. SHAPIRO:  Right.

THE COURT:  And then it would say to prove the statute.

MS. SHAPIRO:  Right.  So if you don't want to repeat that each time, which makes sense.  The charge is long and confusing just by nature the law in this area, something like that could just be added to the paragraph we were discussing at the top of page 19.

MS. SMYSER:  Your Honor, I think we don't have any problem with that concept, but it does need to be caveated that it's as to two racketeering acts.

THE COURT:  I don't think there's going to be an objection to that.

But what's the proposed language?  So after the sentence that you had proposed, which we will add, what is the further proposed sentence?

MR. DRISCOLL:  That each conspirator must have specifically intended that some conspirator commit each element of the substantive offense.

THE COURT:  Give me the full sentence and give me the line number where you think it would be added.

MS. SMYSER:  Your Honor, we are just not sure that

P6PQcom2

that's an accurate statement of the law when it comes to RICO conspiracies, the *Glecier* conspiracy that was charged here.

MR. DRISCOLL:  Your Honor, it comes from --

THE COURT:  I just need to know what the full sentence is.

MR. DRISCOLL:  I think just looking at the Court's current charge on page 19, line 4, after the words "actually occurred."

THE COURT:  Right.

MR. DRISCOLL:  You could add "that each conspirator must have specifically intended that some conspirator commit each element of the substantive offense" or, perhaps, "substantive racketeering offense."

THE COURT:  Why isn't that captured by the sentence that everyone agreed you could add that the conspirators would commit two or more of the offenses listed?  Because that would obviously --

MR. DRISCOLL:  Because it doesn't tell the jury that they have to find the conspirators agreed to each element of the substantive offense.  That's what's required, just under normal conspiracy principles.

MS. SMYSER:  Your Honor, we are not aware of a requirement that there be a specific intent as to each element of the predicate offenses in a racketeering conspiracy.  And happy to take a look at case law if the defense has it

addressing a RICO conspiracy *Glecier* here conspiracy.

THE COURT:  I'm not understanding why the sentence that was just added on consent wouldn't address this because the sentence was: "Let me remind you that the government must prove beyond a reasonable doubt that the defendant agreed that either he or a co-conspirator would commit two of these offenses within ten years of each other as part of the charged racketeering conspiracy."

Is the -- I mean, that says that there has to be agreement to commit those offenses so that would obviously include -- that's the whole reason why then there's about 25 pages of the specifications of the elements of those offenses. So I think it is encompassed in the sentences we would add back to the charge.

So for that reason, I'm not going to add the further language that you've indicated.  We'll keep the language as is, and that encompasses the concept that the defense wanted to include in the charge.

THE COURT:  Next.

Anything further on page 19?

MS. SHAPIRO:  Not from the defense.

THE COURT:  Let's go to page 20.

Anything from the government?

MS. SMYSER:  No, your Honor.

THE COURT:  Anything from the defense?

P6PQcom2

MS. SHAPIRO:  No, your Honor.

THE COURT:  Page 21.  Anything from the government?

MS. SMYSER:  No.  And, if helpful, our next suggestion is on page 29, your Honor.

THE COURT:  Anything from the defense on pages 21 through 29?

MS. SHAPIRO:  Our next objection or suggestion is to the bribery which starts on 25.

THE COURT:  What is the objection?

MS. SHAPIRO:  This relates to the issue under California law about whether the government has to prove that a -- sorry --

THE COURT:  This is the content of testimony point?

MS. SHAPIRO:  This is the whole content issue.

THE COURT:  I've reviewed the authorities that you've cited, and the government notes that that isn't the prevailing, you know, California Supreme Court law in California.

The Court got the instruction from the pattern instructions in California, which -- and that's the origin of it.  And the government noted there is another appellate authority that did not join the authority that you had cited. I would also note that you had cited to a recent California Supreme Court case that noted that the differences between the various dissuasion statute should be taken into account.  But in the very next sentence of that decision, the court says:

P6PQcom2

"But, of course, the legislature can criminalize the same conduct in different ways in different statutes."

And so you had cited the first part of that section but not the subsequent part that said that even if there are distinctions among statutes, and for that reason there may be a reason or a basis to construe things differently, the legislature can, of course, always have the same conduct criminalized in different ways, and so --

MS. SHAPIRO:  So that's true, your Honor.  However, that case doesn't directly address this issue.  And I would point out that the case the government cited from 2020 is actually from a different intermediate level court, and the intermediate level court decisions that we cited, one of which was referenced -- was cited by the California Supreme Court in the decision your Honor is referring to is actually the one from Los Angeles -- the area in Los Angeles where this conduct is alleged to have occurred.  So to the extent, you know, there's a division among California intermediate state courts, it would be the controlling one were this prosecuted in California.

THE COURT:  Well, I'm not sure it's the controlling one even there because --

MS. SHAPIRO:  It is, your Honor.  The ones that the government cited came from a different district or -- I forget what the courts are called, the division --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6PQcom2

THE COURT:  What about from *People v. Pickle*, 646 P.2d 847, 853, fn. 5 in which the Supreme Court stated:  "It is apparent that an inducement to withhold testimony is a form of influence of the testimony prohibited in this statute."

That's what the court in *People v. Reyes*, which is the authority cited by the government relied on in saying that the defense's statement of the law was not accurate because in that case the Court noted that in *People v. Pickle*, *People v. Pickle* squarely rejects the view that Section 137 applies only to attempts to influence the substance of testimony or the substance of reported information.

MS. SHAPIRO:  That decision, however, is outdated because the other case that we were just talking about postdates it, the other Supreme Court case, which cites with approval the case that we're relying on from the government's Los Angeles.

THE COURT:  That gets back to the beginning where I said the very next part of that sentence says, sure, it is relevant that there are distinctions between these statutes, but then it says that the legislature can, of course, criminalize the same conduct in different ways.  And so I don't think that that -- (1) it doesn't address the statute; and. (2) it doesn't address -- it doesn't support the defense's argument.

So in light of the pattern instruction and the

authorities I've cited, I'm going to overrule the defense's objection.

Anything further on that issue?

If not, defense you can give me your next objection.

MS. SHAPIRO:  Our next one is on page 28.

So this relates to line 17 to 20 and/or, sorry, 19 to 20.  It says:  "The question is whether the threat has a reasonable tendency to intimidate."  And the issue here is that the question is whether -- is not whether the witness was intimidated, but what the defendant was intending and trying to do.  And so we would propose adding the words:  "And whether the defendant expressed a purpose to intimidate."

THE COURT:  Is there any objection to that language?

MS. SMYSER:  I don't know that it's necessary, your Honor.  I think this is captured by what has come before; that the threat is an expression of an intention to do harm, the conspirator has to use the threats, and the threats have a reasonable tendency to intimidate.  I don't know that there is anything new added by the language.

THE COURT:  Ms. Shapiro, can you give me the sentence again?

MS. SHAPIRO:  It would say:  "And whether the defendant expressed a purpose to intimidate."

THE COURT:  Connected to which sentence?

MS. SHAPIRO:  Sorry, to the last sentence in the

P6PQcom2

paragraph.

THE COURT:  It says: "Has a reasonable tendency to intimidate" and then what's your addition?

MS. SHAPIRO:  And whether the defendant expressed a purpose to intimidate.

THE COURT:  I'm going to overrule the defense's objection.  I'm not sure that I understand that addition, and it's potentially misleading and confusing to the jury.

I agree with the government that the language that is there makes very clear what the threat would entail; that it is an expression of intention to do harm, the ways in which it can be communicated, and that it must have a reasonable tendency to intimidate.

And so I don't think that there would be any confusion as to what the threat in this context would entail, to the extent that was the reason for the defense's objection.

Anything further on 28?

If not, we'll go to 29, and the government indicated that it had an objection.

MS. SMYSER:  Yes, your Honor.

So on 29, we would probably put this around line 19, though it doesn't have to be there.  But there are two concepts that the government noticed were not included, and that we'd object to not being included.  And so the first is that the government is not required to prove that there was an ongoing

P6PQcom2

federal case or investigation for purposes of this statute. And I think that's a correct statement of the law.

For example, in *United States v. Romero*, 54 F.3d 56 (2d Cir.), there need not be an ongoing investigation or even an intent to investigate, and so we could ask that this language be included.

THE COURT:  Which -- can you give me the preceding sentence, just so I understand where the addition would go? Because now that I'm adding in material --

MS. SMYSER:  Yes, of course.  So after the sentence: "The government is not required to prove that a conspirator knew that the officer was a federal law enforcement officer."

THE COURT:  Yes.

MS. SMYSER:  I would propose saying:  Nor is the government required to prove there was an ongoing federal case or investigation.

THE COURT:  Is there any issue with that addition?

MS. SHAPIRO:  Well, there is, and it actually relates to another objection that we had which is that in the discussion of a 1512, unlike the discussion of 15 -- sorry -- 1512(b), unlike the discussion of 1512(c)(2), which comes later, there's a concept of nexus that's not captured, and we mentioned this in our comments to, I think it was the government's objections, but in the *Arthur Andersen* Supreme Court case which concerned 1512, the Court explained that even

though the statute says that a proceeding doesn't need to be pending or about to be instituted at the time of the alleged offense, that the defendant still has to have in mind a particular proceeding that will be instituted. And, therefore, I think that concept which I think both needs to be added to the 1512 instructions and also it's inconsistent with what the government is trying to add here.

THE COURT: So the objection is to -- you don't object in theory to what the government wants to add. I think what you're saying is that there has to be a particular proceeding, but that particular proceeding does not need to be pending or ongoing at the time.

MS. SHAPIRO: Yeah, I think there's language, I'm trying to find it, in connection with the 15(c)(2) on the next page. I think it's lines 21 to 24 that talks about --

THE COURT: You want to have that language moved -- copied over into the preceding section which would address both sides' objections.

MS. SHAPIRO: I think that's right, as long as it stays where it is with 1512 as well -- I mean (c).

THE COURT: Is there any objection?

MS. SMYSER: I think there is, your Honor. So we didn't have a problem with the particular proceeding language in relation to (c)(2) or to -- yeah to (c)(2), but the problem in relation to (b)(3) is that there's no official proceeding

P6PQcom2

requirement.  So *Arthur Andersen's* requirement of a nexus and having this particular proceeding in mind doesn't apply in the same way to 1512(b)(3) which is talking about the reasonable likelihood of communications to federal law enforcement officers.  It's targeting a different kind of conduct.

And I will just point out to the Court that in *United States v. Kaplan*, 490 F.3d 110, a scienter case that came after *Arthur Andersen*, they noted that the charges in *Arthur Andersen* were brought under 1512(b)(2), which explicitly included an element that the obstruction or tampering related to an official proceeding, and said it was unclear to them whether that same nexus requirement would be required for (b)(3).

They didn't decide that in that case, and so I don't think it's an appropriate thing to do here because there is no official proceeding requirement.  And the language that the government was suggesting here is that we don't have to prove that there's any ongoing federal case or investigation, and both of those things relate to the communication of information to law enforcement, which is what (b)(3) targets.

THE COURT:  What's the response to that, if (b)(3) doesn't have a proceeding element which the obstruction statute does?

MS. SHAPIRO:  But the defendant still has to -- for it to be -- the defendant -- if you're saying the defendant doesn't have to know anything about the officer, the defendant

P6PQcom2

still has to have something in mind, and all these additions just take that completely out of the equation.

THE COURT:  Why is that?  I mean -- hold on.  Why is that?  Because the statute has its elements, which is to knowingly use intimidation, threats or corruptly persuade another person, et cetera, with intent to hinder, delay or prevent the communication to a law enforcement officer or a judge.

MS. SHAPIRO:  Well, in *U. S. v. Veliz*, a 2015 Second Circuit case, 800 F.3d 63, 74, the Court held there has to be proof that the victim "plausibly might have turned to federal officials supplemented by additional appropriate evidence, such as proof that there was a federal investigation in progress at the time of the witness tampering or that the defendant had actual knowledge of the federal nature of the offense."

THE COURT:  Your point is that it may be true that it's not an express element of (b)(3), but for the same reasons indicated in *Arthur Andersen*, it wouldn't make any sense unless there was some kind of proceeding that was forecasted.

MS. SHAPIRO:  Exactly, your Honor.

THE COURT:  All right.

MS. SMYSER:  I think, your Honor, what the Court laid out -- what the Supreme Court laid out in *Fowler* is that the question here is whether there would be a communication that was reasonably likely to make it to a federal officer, and so I

P6PQcom2

think that is the nexus requirement that we should be focused on and that the Court has language about.

And I would point out that in *Veliz*, which is a Second Circuit case that Ms. Shapiro mentioned, afterwards, it does talk about ways in which you can show that there is a reasonable likelihood that the communication would make it to a federal official, and they say that that showing can be met by showing that conduct which the defendant believed would be discussed in the communications constitutes a federal offense, plus additional evidence.

And they don't explicitly define additional evidence in the case law. They provide some examples like the ones that Ms. Shapiro mentioned; for example, proof that there was a federal investigation, proof that the defendant knew of the federal nature of the offense. There's another case *Lopez* in which the defendant knew federal officials could record his conversations, but those are just examples of the way in which the nexus element is met. And so I don't think we need to get into all of that before the jury.

I think what's important is that we have the language from *Fowler* about what it means to reasonably likely -- that is reasonably likely communications would be made to a federal officer, which I think your Honor already has in the charge.

THE COURT: All right. I'm going to take a look at this particular addition. What I am going consider doing is

P6PQcom2

moving the language -- is copying over the language from the obstruction instruction into the tampering instruction, but I'm going to think about that after we're done here.

But let me ask the government, do you have any authority that indicates under Subsection (b)(3) that there is no nexus requirement of the kind indicated in *Arthur Andersen* or by the defense, or is it just kind of it hasn't been said that there's no nexus requirement but there's nothing saying that there is one?

MS. SMYSER:  I think the nexus is about the communication to a federal officer.  It's just a different kind of nexus than in (c)(2), for example, where it's talking about an official proceeding.  And I don't think that your Honor should add the language from *Arthur Andersen*.  I don't think it's appropriate.

But if that happens, I will say that it's not just a proceeding that's targeted in (b)(3); it's also an investigation.  This is a broader provision of the statute than just what *Arthur Andersen* is talking about.

MS. SHAPIRO:  Just to be clear, we're not saying that an investigation wouldn't be sufficient.  I think that is a proceeding.  It's just a different kind of proceeding.

THE COURT:  Well, I think that -- I'm looking at the following paragraphs that refer to -- and I think this is what the government is saying, is that there is a nexus here.  It's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6PQcom2

in the instruction, and it's the fact that there has to be a reasonable likelihood of communication to a federal officer. And so that would only be the case if there was at least some kind of investigation that was in the works, because otherwise there would be no reasonable likelihood of communication to a federal officer. Instead, it would be remote, outlandish or simply hypothetical. And so the additional language has no basis in the statutory text, and defense hasn't pointed me to any case indicating that in subsection (b)(3) there has to be a nexus to an actual proceeding.

MS. SHAPIRO: I think that the language in this paragraph is inconsistent also with the language describing the elements on page 28 because the second element requires that the person acted knowingly and with the intent to hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States.

But then, first of all, knowingly is defined on 4 to 5 as just to act voluntarily and deliberately and not mistakenly. But then the paragraph that starts at line 10 then goes on to say that, you know, the defendant doesn't have to prove that the conspirator knew that the officer was a federal law enforcement officer or something like that. So I think this additional language is just going to further water down the mens rea there.

THE COURT: Meaning the language that the government

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6PQcom2

would like to add?

MS. SHAPIRO:  Yes.

THE COURT:  So I'm not going to add the government's proposed language, but I'm also not going to add the further language suggested by the defense concerning the particular proceeding because I see no basis in Subsection (b)(3) for that additional language.  So we'll leave the text as is.

Anything further on page 29?  From the government?

MS. SMYSER:  No, your Honor.

THE COURT:  Anything from the defense?

MS. SHAPIRO:  I just want to preserve -- I understand your Honor's probably overruled it, but we did have an objection to this definition of knowingly and had proposed including additional words there to indicate that the person had to have conscious awareness.

THE COURT:  Conscious awareness of wrongdoing?

MS. SHAPIRO:  Yes, your Honor.

THE COURT:  All right.  But that's the *Arthur Andersen* attempting to define corruptly persuades in the context of the statute at issue in that case.  In terms of knowingly, the Court was not faced with the question of what knowingly means, and the Court has utilized throughout the instructions the standard instruction that is given in myriad cases, including in the *Sand* treatise.  At most, in *Arthur Andersen* there's resort to some dictionary definitions concerning knowing, but

P6PQcom2

I'm not even sure that those are inconsistent with the instruction that we've given, but certainly the Court was not trying to redefine knowingly in the context of these statutes. But I understand you've preserved your objection.

Next on page 30, anything from the government?

MS. SMYSER:  Yes, your Honor.

So the government is not going to proceed on 1512(c)(2) and asks the Court not to charge the jury as to that particular predicate.

THE COURT:  I take it there will be no objection to that?

MS. SHAPIRO:  Certainly not, your Honor.

THE COURT:  So we will remove obstruction and attempted obstruction instructions.

MS. SMYSER:  That's fine, your Honor.  I just want to make sure the attempt remains for the (c)(3), but it looks like it does on page 30.

THE COURT:  Sorry, (b)(3), right?

MS. SMYSER:  Correct, (b)(3).

THE COURT:  But for (c)(2), it's out.  Very good.

MS. SHAPIRO:  Just so I understand, we're deleting page 30, lines 8 to line 9 on page 31, is that right?

THE COURT:  Yes, through until Act 5 - forced labor.

MS. SHAPIRO:  Okay.

THE COURT:  So let's move to the page Act 5 - forced

P6PQcom2

labor, page 3.

Any objections from the government?

MS. SMYSER:  No, your Honor.

THE COURT:  Anything from the defense?

MS. SHAPIRO:  Not to page 31.

THE COURT:  Any objection from the government on page 32?

MS. SMYSER:  Yes, your Honor.  So on page 32, at the end of the definition of labor and services here.  So in line 3, the government would request that the Court instruct that labor or services can include sexual services, and we noted this in our papers, but I think this is supported clearly by the *R. Kelly* decision, and it's a binding Second Circuit case law here.

And I will say that the government is going to be arguing that sex, certain sex acts are labor at closing argument, including freak-offs, including hotel nights for Jane and Cassie, and including sexual assaults for Mia.  And it may not be something that the jury understands that sexual services or sexual labor can fall within the statute.

And I will note that even *Sand* itself recognized that the labor and services definition could be expanded where cases "depart from the ordinary."

And I know the defense has already talked about it in its Rule 29 argument how this is not the kind of case that the

P6PQcom2

statute was originally targeted to criminalize.  Instead, it was targeted to criminalize slavery or involuntary servitude, and that there are different things about this case, including that the victims don't come from overseas or that the victims are well off.  And so I do think that this is the kind of case where we need to make it clear to the jury that there is a different kind of labor that qualifies under labor and services.

And *Sand* even itself points to *United States v. Kaufman* which is a Tenth Circuit case in which sexual activity is addressed and falls within the definition of labor and services.  So that's the government's request.

THE COURT:  Is there any objection to that?

MS. SHAPIRO:  Yes, your Honor.

And just to be clear, the argument that was made yesterday wasn't that this was outside the heartland of forced labor because sex was involved.  Clearly, sex trafficking can constitute forced labor.  The point was simply that the typical forced labor case involves individuals who are particularly vulnerable because, for instance, they're brought here from a foreign country, they don't have legal papers, things of that nature.  They're confined.  They don't speak English, et cetera, et cetera.  That was the point.  It had nothing to do with the nature of the services.

THE COURT:  So, Ms. Smyser, can I ask you, you

P6PQcom2

referred to the *Kelly* decision.  In that case, did they address the instructions or was the question whether there was sufficient evidence to make out the claim based on services of a sexual nature?

MS. SMYSER:  So it is a sufficiency claim, your Honor, but I will say that the Court, the district court in that case did give this exact instruction that we're requesting, and the discussion in the *R. Kelly* case was one in which the defense was arguing that the sex acts in that case couldn't be labor because they were too isolated, and so it would essentially be criminalizing state law.

And the Second Circuit said, "While we understand this concern as a general matter, but we need not address the reach of the forced labor statutes at the margins, i.e., whether the statute would cover single instance of rape because this is not a marginal case," and they went on to say that sexual labor falls within the statute.

So I think it is a very clear holding of the Second Circuit that the Court can instruct the jury on.

THE COURT:  I'm going to overrule the government's objection.  I don't think there is a dispute that services of a sexual nature can, given the circumstances, count under the forced labor statute, and that's why the Court did add the additional language the government proposed:  That labor or services need not be paid for in the economic sense.  That

P6PQcom2

coupled with the broad definition of labor and services provides the foundation for the government to argue that the facts of this case would fit within the forced labor statute.

The concern with explicitly instructing the jury that sexual services can count under the statute is that they may be confused into thinking that sexual services automatically count as the labor or services that would count under the statute, and I don't believe that there's any authority.  I think it depends on the facts and circumstances of the case and the definitions that the Court is providing.

So for those reasons, I'll overrule the government's objection.

MS. SMYSER:  Just for the Court's awareness and the defendant's, the government does intend to argue in closing that the sexual labor here and the sexual services here are labor and services under the statute.

THE COURT:  Absolutely.  And I think that Ms. Shapiro has conceded that they may under certain circumstances count, so I don't think you're going to hear any dispute -- you're not going to hear any argument from the other side that as a categorical matter sexual services do not count as labor and services under the statute.  And if you do hear that, then you can object, and I will sustain the objection.

MS. SMYSER:  Thank you, your Honor.

THE COURT:  All right.

P6PQcom2

Any further objections on page 32?

MS. SHAPIRO:  Yes, your Honor.  To that same part of the page, we have two objections.

One, line 2, we object to including the language "especially when fatiguing, difficult or compulsory."  We think that's unnecessary, and it's clearly -- and I assume it was requested because it's going to mirror what the government is going to argue with what the alleged victims testified in this case, and we think it's unnecessary, and the term -- the word labor is sufficient.  It doesn't matter whether it's fatiguing, difficult or compulsory.  And you don't need to say especially because labor means the expenditure of physical or mental effort, which is an even broader term.

THE COURT:  You would agree that that is verbatim language drawn from the Second Circuit defining the --

MS. SHAPIRO:  It's language from -- the Court says that labor has its ordinary meaning and then quotes the dictionary, but it also says that it's not defined in the statute.  So my point is that that might be included, but the word "especially" just seems to highlight what they plan to argue with regard to, you know, for instance, Mia's testimony as one example.

THE COURT:  I'm going to overrule that objection given that the Court quoted directly from the Second Circuit when explaining what labor means in this context.

P6PQcom2

MS. SHAPIRO:  Understood, your Honor.

And then the other objection was to the sentence that says the government does not have to prove that labor or services were paid for in the economic sense, although that would satisfy this element.

You know, for similar reasons I think it's totally unnecessary and, indeed, often in these cases where the proof is sufficient, part of the point is that either the person wasn't paid or they were paid, you know, minimal amounts, and yet had to work way more than whatever they were compensated. So I don't think that last sentence is necessary or appropriate.

THE COURT:  All right.  I'm going to overrule that objection.  I think it's an important clarification.  In fact, I think the defense does not object as a general matter that given the origins of the statute, it was in fact designed to address situations where there was no payment for services, and so there was forced labor without the payment element.  But for the reasons stated by the government, the jury may misunderstand and think that there must be payment.

So I think that this is an important point to make that the payment or non-payment is not the critical issue.  The critical issue is whether the statutory elements have been satisfied based on the definitions provided.

Any further objections here?

P6PQcom2

MS. SHAPIRO:  Not to that page.

MS. SMYSER:  The government has one additional objection, your Honor, and that's to the instruction about warnings at lines 12 to 15, which I understand comes from *Sand*. So I think *Sand* also says that this instruction can be given if it's appropriate, and I don't believe it's appropriate here.

I don't think there has been evidence of legitimate warnings in this case.  I think the evidence that was presented by Mia, for example, was of warnings from human resources coming after instances of violence from the defendant which would not be legitimate warnings, and so I don't think that this instruction in this case is warranted.

THE COURT:  Ms. Shapiro, what's the evidence or is there evidence in this case of warnings that you believe would potentially fit into this language that you've proposed to be added?

MR. AGNIFILO:  I think that there is.  One example that comes to mind is, for instance — and obviously we're going to argue that there's a lot of fiction to the story told by Capricorn Clark — but there's an allegation some jewelry was stolen, and there's some evidence in there.

I think there's other evidence in the case, and there could be a factual dispute about the testimony of both Mia and Capricorn when they explained about disciplinary action as to whether it was valid or not.  The fact that they said that it

was without basis isn't by itself sufficient to preclude the instruction.

THE COURT:  So, in your view, the evidence is that there were warnings of some kind, and the issue of how those are construed is for the jury, and the jury should be properly informed that under certain circumstances warnings can be legitimate.  And that's really all this paragraph says.  And it ends by saying that whether any conduct would be legitimate warning as opposed to a threat is for the jury to decide based on all the fact and circumstances.

MS. SHAPIRO:  Exactly, your Honor.

THE COURT:  I'm going to overrule the government's objection there.

Next anything further on page 32 from either side?

All right.  Let's go to page 33.

Anything from the government?

MS. SMYSER:  Yes, your Honor.

We have two things.  One, I think this would fit around line 16.  And I think the government had proposed language about not needing physical restraint, and fear that can be created such that a victim feels that they cannot leave. I'm just trying to find the exact language.

The government also need not prove physical restraint in order to establish the offense of forced labor.  It is sufficient that the defendant or co-conspirator placed the

individual in fear of leaving or created circumstances such that the person did not reasonably believe that he or she could leave.

And, your Honor, I think that this is important given the cross-examinations that have happened so far with respect to Jane, especially related to June 18 and the suggestions made in Mia's cross-examination that she could leave at any time. And I think it's important to convey to the jury that these people can be placed in fear.  There can be circumstances where they do not feel that they can reasonably leave.

THE COURT:  Understood.  I'm going to overrule that objection because the concept that physical restraint is not required is reflected in the instruction as given because it is one among several options of how liability can be established. And so that is the foundation that the government needs to make clear to the jury, that a physical restraint is not required, and I don't believe the defense is going to be making that argument.  They certainly will not be making a legal argument along those lines because it would not be consistent with the instructions.

Anything further from the government on this page?

MS. SMYSER:  Yes.  Just one more which would be around the same area of line 16, your Honor.  There was a portion of our proposal in which we suggested language that if someone is compelled to do labor against his or her will by any one of the

P6PQcom2

means prohibited by the forced labor statute, then that service is involuntary, even if she is paid or compensated for the labor or services, which I think is an accurate statement of the law and is important in this case given that Mia and Capricorn are employees and are being compensated, and the jury should understand that that compensation doesn't preclude a finding that the defendant is -- that the predicate of forced labor has been made.

MS. SHAPIRO:  Your Honor, I think that's actually captured by the definition that I objected to, which says the government doesn't have to prove the labor or services were paid for in the economic sense, although that would satisfy this element.

THE COURT:  Yeah, I think that's right.  I think that provides, again, the foundation for the government to make clear that the payment for the services does not mean that it is not qualifying under the statute.

So I will overrule that objection from the government.

Anything further from the government?

MS. SMYSER:  Not on that page, your Honor.

MS. SHAPIRO:  Yes, your Honor.

**We had proposed some additional language with respect to the mens rea, and we had proposed including it right after the line 17 to 19 that talk about with respect to the third element, although if the Court wants to put somewhere else and**

P6PQcom2

**is willing to consider it, that's fine**.

The case law makes clear that in order to establish a violation of the statute, the government has to prove that the person was using one of the means discussed in the statute in order to obtain the labor or services.  In other words, the conspirator or the defendant had to have here intended to cause the person to believe that if she stopped working for him, she would suffer the sort of serious harm that would compel someone in her circumstances to keep working for him to avoid the harm.

And, you know, we cited -- this is consistent with both *Sand* and the relevant case law.  I can cite the cases to your Honor.  They include *Zong* as well as some extensive discussion in out-of-circuit cases, including the *Muchira* case, which is a Fourth Circuit case cited in *Zong*.  *United States v. Calman*, a Seventh Circuit case as well --

THE COURT:  What is the language that you want to add because the concept is reflected at several points in the instruction.  So what is the actual missing evidence?

MS. SHAPIRO:  I think it's not clear from the language that exists that these points -- there's nothing in here that ties these points together in this way that makes it clear that the person had to have intended to cause the victim to believe that if she stopped working, she would suffer the sort of harm that would compel someone in their -- reasonably compel someone in her circumstances to keep working in order to avoid the

P6PQcom2

harm.  I don't think that's anywhere else in the instruction. And we had originally proposed putting it in connection with the mens rea element because that's the way it's discussed in these cases as an intent that's required to be shown.

THE COURT:  All right.  So you want to -- first of all, let me pause.  The government doesn't disagree that this statute requires the intent that Ms. Shapiro is indicating, right?  There has to be an intent to cause the individual to believe that if the person did not perform such labor or services, the individual would suffer serious harm or physical restraint, is that right?

(Continued on next page)

P6pWcom3

MS. SMYSER:  I think that that is only potentially the case with regard to what we have said is the third element or what is the fourth prong of the statute, which is discussing a scheme, plan or a pattern intended to cause the person to believe that if the person did not perform such labor or services they would suffer serious harm.  And I would just point out that the Second Circuit case, *Zhong*, cited by the defense here, doesn't support this kind of heightened intent, the intent to make the victim believe, because what *Zhong* says is that you have to show that the defendant knowingly or intentionally engaged in harmful actions or made threats of harm that were sufficiently serious to compel a reasonable person in the worker's position to remain in their employment against their will.

So *Zhong* doesn't have this concept that the intent goes both to making the threats and to intending for the victim to believe.  And we're not aware of any forced labor cases in this district using this kind of instruction.  There does appear to be, from what the defense has cited, out-of-circuit cases that capture this additional intent requirement.  But again, those are only speaking about the scheme, plan or pattern portion of the statute.  And so to the extent the Court instructs on this, which the government thinks it should not, given that it's not reflected in Second Circuit law, and I think the concept, as your Honor was saying, is captured

already in the instructions, but to the extent there is an instruction, it should be cabined to that third element here.

THE COURT:  And that's already reflected in the instructions.

MS. SHAPIRO:  Your Honor, I think that, respectfully, Ms. Smyser is mischaracterizing the out-of-circuit cases, and I think one of the ones that *Zhong* cited, *Muchira*, is an example here.  But these other cases do not limit this requirement to, I think it's subsection (4) of the statute.  It's stated in general terms.

MS. SMYSER:  I would say that these cases are interpreting that portion of the statute, your Honor, so *Zhong*, which is, I think, the main case that is relied on, is talking about the fourth prong of the statute or the third element here.

MS. SHAPIRO:  So I'm just reading from *Muchira*.  *Dann*, is one of the main cases.  *Muchira*, the Fourth Circuit case, says Section 1589 continues an express scienter requirement, citing *Calimlim*, a Seventh Circuit case, there must be evidence -- and it's speaking generally, not just about that prong that the prosecutor's talking about -- from which the jury could find that the employee intended to cause the victim to believe that she would suffer serious harm from the vantage point of the victim if she did not continue the work.  And that's at page 618 of *Muchira v. Al-Rawaf*, 850 F.3d 605, from

P6pWcom3

2017.

THE COURT:  All right.  So, I'm looking at the statutory text, and I do believe the instruction omits one part of the statute, and I think this goes to what the defense is saying.

So, the statute reads "whoever knowingly provides or obtains the labor or services of a person by any one of or by any combination of the following means," and then it lists out the means in the statute.  And I do not believe that "by those means" part of the statutory definition is reflected in the proposed instruction.

So I think that does need to be added, and that may go to the defense's concern, because it would show that not only with respect to the fourth element, which has a separate requirement, it's not enough for there to be an employee against whom physical force is used.  It has to be that the person has attained the services of that person by those means. And so that I am willing to add to the proposed instruction.

And so the question is where would that go?  And just to move this along, because now it's getting pretty late, I'm going to make an addition that reflects that statutory text, because that's in the text, but it is not clearly reflected in the jury instruction.  So I will make that addition.

MS. SHAPIRO:  Thank you, your Honor.

THE COURT:  Anything further from the government on

P6pWcom3

page 32?

I may have asked you that.  You may have said that you didn't have anything.

MS. SMYSER:  Correct.

THE COURT:  OK.

So let's move to 33.  Anything from either side?

MS. SHAPIRO:  Your Honor, we have an objection.  I don't know if the government does.

MS. SMYSER:  I don't have an objection on page 34.

MS. SHAPIRO:  So, two things.  We've obviously argued that this statute, 1591(d), is unconstitutional for the reasons set forth in the letter.  I won't repeat that unless -- I assume the Court considered that and rejected that argument. But if that's not right, I'm happy to explain it.

But I do have an alternative argument if the Court rejected the argument.

THE COURT:  Well, the only authority that I was able to locate, because the parties have not cited any, that addressed the constitutionality of 1591(d) is a Sixth Circuit decision addressing the vagueness challenge to the statute, and relying on the Supreme Court's decision in *Staples v. United States*, the court resolved that issue by noting that the Supreme Court indicated that where there's no *mens rea* cited, that a knowing requirement is imposed under *Staples*.  And so the court then applying that rejected the vagueness challenge

to the statute.  And so that is the reason why the Court's proposed instruction includes that *mens rea* requirement.

MS. SHAPIRO:  That gets to my next, alternative proposal, which is --

THE COURT:  All right.

MS. SHAPIRO:  -- I figured that's what your Honor did here.  I guess that's on the next page, but it's lines 8 to 9. We think that that particular formulation is insufficient to cure the constitutional problems with the statute because the fact that somebody knew what they were doing doesn't show that they were acting, in this context, with a criminal *mens rea*, because the statute is so broad, interferes with or prevents the enforcement of this in any way.

For instance, some of the hypotheticals in my letter would satisfy this element but still pose serious constitutional problems.  If I advise a client to take the Fifth Amendment and not cooperate with the government and provide information about potential sex trafficking, I'm acting knowingly because I know what I'm doing.  I'm acting voluntarily and deliberately, but suddenly I'm now guilty of obstruction of justice because that could interfere with their investigation.

THE COURT:  What's the proposal?

MS. SHAPIRO:  Yes.

THE COURT:  Because you might not get any resistance

P6pWcom3

to the proposal.

MS. SHAPIRO:  OK.  Fair enough, your Honor.

I think we would propose something more like the *Arthur Andersen* standard, something like consciousness of wrongdoing.  That would satisfy us, that issue, although we obviously preserve the broader claim.

THE COURT:  Does the government have an objection to this instruction on the *mens rea* requirement, which reads: "This crime requires that the conspirator acted knowingly.  A person acts knowingly if he acts voluntarily and deliberately and not mistakenly or inadvertently.  The person must also act with consciousness of wrongdoing"?  Period.

That addition, under these circumstances, because I do not believe that the government's position is -- let me take a step back.

The government is going to argue full-throatedly that to the extent that there was obstruction of any enforcement of the sex trafficking statute, that it was absolutely done with a consciousness of wrongdoing.  I'm not understanding the government to take a different position.

The defense belatedly has raised a constitutional challenge to the 1591(d) aspect.  They say -- there's a few arguments that were raised at the absolute last minute, because the time to have raised that argument was not at 8:06 p.m. last night.  It was generally referred to, but the first time that

P6pWcom3

there was any kind of briefing of that issue was last night.

MS. SHAPIRO:  That's true, your Honor, but to be fair, we put it in our objections to the Court's charge.  There wasn't an earlier opportunity because, as we also argued, and I'm now reminded I should preserve that, this offense was not cited in the indictment.

THE COURT:  It was in the government's proposed charge, request to charge.

MS. SHAPIRO:  That's true, your Honor, but I don't think there's any obligation or rule that requires us to object to the other side's proposed request to charge unless the Court orders us to do so in advance of the --

THE COURT:  I think you were on notice that the government was taking this position, and so you had the opportunity to move to dismiss that aspect of the government's case if you wanted to.

MS. SHAPIRO:  No, because the motion to dismiss was due in February, and we didn't have any idea they were going to go here until their request to charge.

THE COURT:  All right.

MS. SHAPIRO:  In any event --

THE COURT:  I've effectively stalled.  So now can we turn to the government.

Is there any objection to that addition?  So it would give the "knowingly" instruction, and then it would just say

that the person must act with consciousness of wrongdoing.

MS. SMYSER:  Yes, your Honor, because of the cases that you cited, where the *mens rea* is not laid out.  The default is knowingly, and *United States v. Farah*, a Sixth Circuit case, and we don't think it's necessary here to heighten the *mens rea*.  And if the Court were to do so, I think we would want an instruction similar to the "willful" instruction that the defendant need not know the particular law that is being violated.  But I don't think any of that is necessary, and all the statute requires is that it be knowing.

I would also point the Court to a Ninth Circuit case, *United States v. Daly*, 788 F.App'x 551, which interpreted a vagueness challenge to 1591(d), where the defendant's actions clearly come within the statute and approved of the "knowing" instruction.

THE COURT:  Of the "knowing" instruction, is that what you said?

MS. SMYSER:  I think that was the standard in the case, but I would want to double-check for the Court.

MS. SHAPIRO:  Your Honor, if I could just respond briefly?

He has to at least know that he was interfering with a federal investigation, which isn't captured by this.  But I also just want to highlight that the issue isn't about Mr. Combs's conduct.  The *mens rea* requirement has to satisfy

P6pWcom3

the Constitution with respect to whoever it's being applied to. That's the whole purpose of a narrowing instruction, and really, just saying knowingly if he acts voluntarily and deliberately isn't sufficient for the reasons I explained with my hypothetical. I could give you a whole bunch of other hypotheticals that have the same problem.

THE COURT: Wouldn't those hypotheticals only be relevant if you were making a facial challenge? Isn't this an as-applied challenge?

MS. SHAPIRO: No, that's not right, your Honor.

THE COURT: Hold on.

As applied to the facts of this case, and the arguments that the government is going to make, it would not apply, because what they are going to be arguing to meet the knowing standard, because they said, which is correct, that's what the Supreme Court has indicated, that the facts they are going to put forward would be consistent with the view that you've put forward, which is that it would require something along the lines of consciousness of wrongdoing. Those are the facts that the government is going to put forward.

The government is just saying that the Court cannot legislate from the bench and simply change the legal standard to address a potential issue raised by the defense. It has to follow with the law. And so the Supreme Court has told us what to do where there's a missing *mens rea* element. You raised

P6pWcom3

that issue.  The Court has addressed it, consistent with the Supreme Court cases.

MS. SHAPIRO:  Your Honor, I don't think that's correct, because the case law from the Supreme Court teaches that this is a canon of instruction.  It's not just a vagueness as applied.

Just as one example, *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005), Justice Scalia for the court explains that it's a question of a canon of construction and that where a particular interpretation of a statute would raise a multitude of constitutional problems, the narrower interpretation should prevail regardless of the impact on the defendant before the court.  And the Supreme court, in many cases, has construed the statute arguably inconsistent with the text to try to solve this kind of problem, such as in the *Skilling* case, where the court essentially invented a limitation on the honest services fraud statute.

And in the *Liparota* case, which is one of the chestnuts from which all this doctrine flows, the court essentially put a knowingly requirement into the statute.  And if memory serves, that case involved, I think, stolen property. So the defendant had to know the facts that made it criminal. And here, consciousness of wrongdoing is appropriate because simply saying that kind of he knew what he was doing wouldn't satisfy the statute unless what he was doing was threatening

P6pWcom3

someone or telling them to lie to an officer or something like that.

THE COURT:  All right.  Understood.

Well, you've made the objection now, and I'm going to overrule the objection.  I think the language that the Court has added addresses the issue consistent with Supreme Court authority.  I don't believe that -- and I also believe that the other aspects of the instruction, including the definition of the underlying terms, in addition, the evidence that the government is going to make and the arguments that they've raised to date would be consistent with the constitutional applications of the statute.

And so for those reasons, the defense's objection is overruled.  But you've made the objection.

Any further objections on the 1591(d) instruction?

Ms. Shapiro.

MS. SHAPIRO:  No, your Honor.

THE COURT:  Let's move to the instruction on prostitution and inducement.

Any objection from the government?

MS. SMYSER:  So, there is, your Honor, but not on the first page.

I think the defense has one on 35.

MS. SHAPIRO:  No, we don't have anything else on page 35.

P6pWcom3

MS. SMYSER:  So this spans a few pages, your Honor. It actually may be a better objection, I think, to raise when we get to the substantive -- yeah, so I can wait on that.

THE COURT:  All right.  And just to note that in this instruction -- taking a step back.

As to the instructions we have reformulated them in the ways suggested by the government, and in this particular instruction, we did not remove the language concerning "in order for this offense to be considered a racketeering act," etc., although that was not in the government's proposal.  So should that be removed, or do the parties have no objection to retaining that?

I know the defense doesn't have an objection to retaining that.

MS. SMYSER:  Yes, your Honor.  That was an oversight on our part.

We would ask that it be edited in accordance with the remainder of the predicates.

THE COURT:  Meaning that the overall instruction has already been provided, so consistent with the way that the rest of the charge has been put together, it does not need to be specifically stated here, and if it was specifically stated here and not stated elsewhere, it would be potentially confusing.

MS. SMYSER:  Exactly.

P6pWcom3

THE COURT:  So we'll remove that language in accordance with the approach that we have taken.

Any further objections as to the prostitution racketeering act?  If not, then we'll move to the controlled substances racketeering act.

MR. DRISCOLL:  Yes, your Honor.  We do have an objection.  It's on page 37, lines 6 to 7.

THE COURT:  All right.

MR. DRISCOLL:  I just think -- I understand this comes from Sand, but we think it is a little bit too strongly worded in stating that the intent of the individuals who traveled or engaged in the illegal sexual activity is not relevant.

I think it should say is not dispositive because obviously the intent of the individuals, to the extent that it was communicated at all to Mr. Combs, can be relevant in assessing his state of mind.

THE COURT:  Would it address that issue if we changed relevant to not be at issue?

MR. DRISCOLL:  I think that's OK.

THE COURT:  All right.

Does the government have any objection to that change?

MS. SMYSER:  No, your Honor.

THE COURT:  All right.  So we'll make that change.  And let's move to --

Yes.

P6pWcom3

MR. DRISCOLL:  There's a similar instruction later on in the Mann Act instructions.

THE COURT:  Thank you for that.  We'll make the change in both places.

Let's move to the controlled substances racketeering act.

Any objections from the government?

MS. SMYSER:  So, on page 39, your Honor, a few things.

First, on line 7, there is an instruction that distribution does not require a sale.  I think the government had asked for additional language in accordance with Second Circuit law that sharing drugs with friends is direct evidence of engaging in distribution, which I think will be relevant for this case.  And it is consistent with *United States v. Wallace*, which is a Second Circuit 2008 case.  So we would ask that your Honor give that instruction.

THE COURT:  Why isn't that captured by the existing language?  Meaning that you can make that argument and it turns on the facts and circumstances, but this definition certainly provides the foundation for you to make that argument.

MS. SMYSER:  I do think the definition so far is helpful, but I think this really crystallizes the issue, and it's an accurate statement of the law, which is why we would ask that you give it to the jury.

THE COURT:  Is there an objection from the defense?

P6pWcom3

MS. SHAPIRO:  Yes, your Honor.  We think it's unnecessary and already captured by there.  Distribution doesn't require a sale, and they can make the argument.

THE COURT:  Ms. Smyser, what is the additional language?  Can you just give it to me.

MS. SMYSER:  Yes, your Honor.

That sharing drugs with friends is direct evidence of engaging in distribution.  And let me just make sure I have that correct.

MS. SHAPIRO:  It's too tailored to the facts of this case, your Honor.  This is what they can argue, but we can't have something in the jury instructions that basically makes the government's argument for them.

THE COURT:  Yes, I agree with that.  That's why I asked to understand what the addition was.  I think that that's essentially another more argumentative way of saying what's reflected in the prior two sentences.  So we will overrule the government's objection.

Anything else from the government as to the controlled substances charge?

MS. SMYSER:  Yes, your Honor.

So, on lines 18 through 23, which is an instruction about possession of drugs cannot be found solely on the ground that a conspirator was near or close to the drugs, this language appears in Sand, your Honor, though it seems that some

P6pWcom3

of the Second Circuit cases, including *Rodriguez*, do show that narcotics offenses and possession can be proven solely through circumstantial evidence, including that drugs were found in close proximity to someone.  And so we would object to this particular instruction.

THE COURT:  All right.  I'm going to overrule that objection, because I think that this captures that principle, especially in the last sentence, where it indicates that "the factors may be considered by you in connection with all other evidence in making your decision whether the conspirator possessed the drugs."

Anything further from the government?

MS. SMYSER:  Not on that page, your Honor.

THE COURT:  Anything from the defense on that page?

MS. SHAPIRO:  No, your Honor.

THE COURT:  All right.  Then we'll go back to the government.

So now, Ms. Smyser, if you could remind me which page you're on, so I can just make sure I'm there.

MS. SMYSER:  Our next objection is on page 41.

Sorry.  I believe it starts on page 40, line 21, which is about the buyer-seller instruction, and the government does not intend to argue that distribution with drug dealers is distribution in this case or a conspiracy in this case for purposes of this predicate.  So, for example, we don't intend

P6pWcom3

to argue that any assistant picking up drugs from One Stop is distribution to satisfy this predicate, because there would be a buyer-seller problem there.  But this instruction should only be given where it's appropriate and called for by the facts of the case, and because we're not intending to make those arguments, I don't think that it's appropriate to give this kind of instruction.

THE COURT:  Well, whether you make the arguments or not, there's been substantial evidence of those types of transactions, and so for that reason -- I think that's the reason why the defense proposed that language, because the nature of the evidence was such that without that clarification, the jury might remember significant testimony about those types of transactions with One Stop, Guido, etc., and then have the misunderstanding that that by itself would establish the distribution required by the statute.

And so I think that's the reason why the defense proposed the instruction, and I think I would agree that the instruction is correct.  You're saying it's not appropriate given the government's arguments, but given the evidence, it would seem to be an appropriate clarification.

MS. SMYSER:  I don't disagree that the instruction is correct.  But I think the point is if that were the standard to give a buyer-seller instruction, one would be given in almost every narcotics case.  And I think the Second Circuit has been

P6pWcom3

clear -- or the Seventh Circuit has been, is a case that we have cited, which is *Turner*, that when you're dealing with a buyer-seller instruction, that only needs to be given if the theory is supported by the evidence, because I think it can be confusing.

And so here, as I'm saying, we don't intend to make those arguments, and so I don't think that the instruction should be given.

THE COURT:  All right.

Does the defense have a response?

MS. SHAPIRO:  Yes, your Honor.

I think what you said earlier was correct, and I think there's a real risk here that the jury could make the wrong inference because there's been so much evidence about these drug dealers and there are all these texts with them.  And so even if the government is not going to make that argument, jurors are intelligent and have common sense, and if they're not specifically instructed, as this paragraph does, which is from Sand -- the government doesn't have an issue with it -- and maybe it's true that there are lots of drug cases where you wouldn't need it, but I think here, it's particularly important, given all the evidence that's come in involving these drug dealers.

THE COURT:  All right.  I'm going to overrule the government's objection.

P6pWcom3

I agree that under the circumstances of the evidentiary record here, even if the explicit argument were not made that these transactions constituted distribution, the record reflects significant evidence along those lines.

Any further objections, Ms. Smyser?

MS. SMYSER:  Your Honor, I think just as to the next paragraph, on page 41, I don't think that there is support in the case law for this particular instruction, the buyer-seller instruction.  I think you need to clear up any potential confusion with the jury is the prior paragraph, and so we would object to the inclusion of the paragraph from lines 3 to line 7, which we don't think there is support in the case law for.

THE COURT:  You mean "in addition, an agreement by one member," etc.?

MS. SMYSER:  Yes, your Honor.

MS. SHAPIRO:  There is support in the case law, if you'll just give me a moment.  I think it's cited in our letter, on page 10 of our letter that we submitted last night, the *Wexler* case, 522 F.3d 194, 208, among others.

MS. SMYSER:  Your Honor, I think on its face that the cases that the defense has cited are dealing with the buyer-seller exception, and so there's not support for this broader proposition spanning past the buyer-seller exception that seems to be articulated in this paragraph, and there is Second Circuit case law about how limited the application of

P6pWcom3

the buyer-seller exception is.

Your Honor, in *Wexler*, the court found that while there was a conspiracy to redistribute certain drugs, there was no conspiracy to redistribute the particular drug that caused a death because there was a buyer-seller relationship between the defendant-doctor prescribing the drug and his co-conspirator patient, who died.  And the circuit found that there was a buyer-seller relationship between the defendant and his co-conspirator with respect to the particular charged drug. And the case doesn't stand for the proposition that planned distributions within a conspiracy that do not meet the buyer-seller rule cannot form objects of the conspiracy.

THE COURT:  Do you have an objection to the sentence from *Wexler* that, which is an agreement that one member of a conspiracy supply another with a drug does not comprise an agreement to distribute that drug?  Suggest that sentence added to the end of the prior paragraph.

MS. SMYSER:  So, your Honor, I think it's just confusing, because, in *Wexler*, that sentence is in the context of talking about the buyer-seller exception, which should be construed narrowly.

MS. SHAPIRO:  That's the context here.

THE COURT:  All right.  I'm going to reserve on this particular issue, and if I'm going to keep this language in, I think looking at the *Wexler* decision, I would simply add that

P6pWcom3

sentence that, where the court identifies the legal principle that an agreement that one member of a conspiracy supply another with a drug does not comprise an agreement to distribute that drug, and I would add it to the paragraph on the buyer-seller issue, and -- but I want to take another look at the cases. And so that would be the change I would make. If I don't make that change, then I would remove the subsequent paragraph.

Any further issues from the government?

MS. SMYSER: No, your Honor.

THE COURT: All right.

Any further issues on the narcotics conspiracy section from the defense?

MS. SHAPIRO: No, your Honor.

THE COURT: All right.

On the special sentencing factor, any objections from the government?

MS. SMYSER: No, your Honor.

THE COURT: Anything from the defense?

MS. SHAPIRO: No, your Honor.

THE COURT: All right. Then let's move to Counts Two and Four. And let's start with the government, and you can tell me what objections you have at the beginning of the sex trafficking instruction.

MS. SMYSER: Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6pWcom3

Before we move on, I just want to make one suggestion that would be more of a global suggestion that I neglected to mention in the beginning. We had noticed that your Honor kept the language throughout referring to conspirators rather than persons, as the government had suggested. I think it would be helpful in the beginning of the instructions at some point to define a conspirator in that context to include both the defendant or a co-conspirator, because the defendant can be the person acting in these predicates, just to clear up any confusion for the jury or any assumption that it would have to be a co-conspirator.

THE COURT: I think that's fine.

I take it there's no objection to that clarification.

MS. SHAPIRO: No, as long as it -- yeah.

THE COURT: I think that is in the instructions, but I understand the government's concern that by referring solely to conspirator, there might be a misunderstanding that it is not including the defendant himself.

MS. SHAPIRO: Yeah. I think it just has to be clear. I don't know where your Honor is going to put that, but it has to be clear that that's with respect to the discussion of the racketeering acts, I guess.

THE COURT: Yes.

Now, if that doesn't work, the government's proposal was to use "person."

P6pWcom3

MS. SHAPIRO:  No.  We would object to that.

THE COURT:  And what's the reason for the objection?

MS. SHAPIRO:  Because it can't just be anyone.  It has to be either the defendant or a conspirator.  I mean it can't be just some random person that isn't a part of the RICO conspiracy.

THE COURT:  In context, wouldn't it be clear because the preceding instruction makes clear that either the defendant or a co-conspirator has to have done --

MS. SHAPIRO:  I don't think that's clear, your Honor, and that's why we objected to that.  I think it really has to say, be clear that it has to be one of the conspirators.

THE COURT:  All right.  We'll make the clarification that the government has requested.

Now we're on -- we're getting there.  Almost, almost to the finish line.

Counts Two and Four.

MS. SMYSER:  Yes, your Honor.

So, as to sex trafficking, we have a similar objection as was raised to forced labor about the instruction related to physical restraint not being required.  I assume your Honor would make the same ruling here, but we would understand that the defense would not be making that argument, as was the same case for forced labor.

THE COURT:  And the defense is not going to make that

P6pWcom3

argument, that physical restraint is required for purposes of sex trafficking.

MS. SHAPIRO:  No, your Honor.

THE COURT:  Anything else on the sex trafficking instruction from the government?

Maybe that's a better way to go about it.

MS. SMYSER:  Just on the unanimity instruction, I don't know if the defense has anything before then.

MS. SHAPIRO:  Oh, we do.

THE COURT:  OK.

MS. SHAPIRO:  So, the first one -- and this is, I think, extremely important -- is on page 43, lines 22 to 24. The Court has added, at the government's request, an instruction that it's not required that the victim ever actually performed a commercial sex act, and in the specific context of this case and the way it's been charged, the way it's been litigated and the way it's been tried, that cannot be included.

This case was charged -- in the indictment the allegations are, in Counts Two and Four, as well as paragraph 17 -- sorry, as well as 17 and 19 as well as the RICO speaking language, 12(a), (b), (d) and (e), among others, but I'd like to just focus on the charges.

Both two and four, respectively, in the "to wit" clause allege that the purpose -- that Combs recruited,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6pWcom3

enticed, etc., and willfully caused victim 1 -- and in Count Four it's victim 2, now Jane -- to engage in commercial sex acts knowing and in reckless disregard of the fact that victim 1 was engaging in commercial sex acts as a result of force, fraud and coercion.  And it's those specific charges and allegations that allowed the government to assert that conviction on either of these counts would result in a 15-year mandatory minimum sentence, which the government also used to detain Mr. Combs, etc., and the statute, in the provision that talks about the mandatory minimum, 1591(b), specifically says that the mandatory minimum applies if the offense was effected by means of force, threats of force, fraud or coercion.

I should also note that as the Court is aware, first of all, this indictment -- there are four indictments.  There were three superseders.  Each one had the language that I read that alleged in the "to wit" clause that these victims engaged in commercial sex acts.  In addition, there were multiple enterprise letters, and each one of them went through similar in much more detail.

So for instance, and I can keep going --

THE COURT:  Well, let me just clarify.

You would agree that based on the instruction that was at issue in, I believe it's *Lemire* and as reflected in the Sand treatise, those authorities, and there are cases, including from the Fifth Circuit, that indicate in terms of just the

P6pWcom3

statute, an actual commercial sex act may not have occurred.

MS. SHAPIRO:  That's correct, your Honor.

What I'm arguing is that including this here and allowing the government to argue, as they've indicated they may, for instance, I think -- I can't remember where it was alluded to, but there was discussion recently that they may just argue that it's enough that Mr. Combs, for instance, rented a house for Jane even if she never committed a commercial sex act or, similarly, rented, provided financial support to Ms. Ventura.

The argument here is that it's a constructive amendment and a heavily prejudicial variance.  Unless the Court is going to agree with me, I want to go through the record.

Not only is that the way this case was charged, it is what the government has continually told this Court and the other judges who ruled on the bail that they were going to prove.

In the enterprise letter on February 1, on pages 5 to 6, paragraph 5, they say on multiple occasions between 2009 and 2024, they're going to prove that the defendant used force, fraud and coercion to cause multiple victims to engage in commercial sex acts.  And then they go on, in paragraph 8 of the same letter, to talk about multiple occasions and list a whole bunch of dates and the locations where they say Mr. Combs and other members of the enterprise enticed, transported and

P6pWcom3

solicited victim 1 to engage in commercial sex acts, knowing or in reckless disregard of force, fraud and coercion.

In paragraph 13 of that letter, page 10, it's the same thing with a different victim. And Jane, I believe, is called victim 3 in this letter, and they go on with multiple, multiple dates where they claim that a commercial sex act was committed.

Paragraph 15 of the same letter is similar. And then when you go to the next enterprise letter, on March 10, on page 3, paragraph 3, again, talks about enticing, transporting and soliciting victim 1 to engage in commercial sex acts. And then they talk about the specific dates that they're going to prove these acts occurred.

On March 26, page 2, paragraphs 1 and 2, we have more of the same, and as well as the final enterprise letter, April 20, 2025, pages 2 to 3, paragraphs 1 and 3 again specifically allege that Mr. Combs enticed, transported and solicited victim 1 to engage in commercial sex acts and then list the alleged dates and places where these occurred, the same as in paragraph 3 with respect to, I believe it's Jane; it says victim 2, but -- and so, in addition to that, during the government's opening statement, they never said anything about any harboring or situation where there's no commercial sex acts but somehow Mr. Combs is guilty of sex trafficking.

THE COURT:  Ms. Shapiro, let me stop you for a second.

Let me hear the government's response, because I think

P6pWcom3

Ms. Shapiro has conceded that just in terms of the statute and the prevailing case law, it might be true that --

MS. SHAPIRO:  I just want to clarify, your Honor.

THE COURT:  I need to finish the sentences, or else I can't --

MS. SHAPIRO:  I'm sorry, your Honor.

THE COURT:  -- get to the point here.

That in light of the case law, there's obviously authority that a commercial sex act need not occur.  However, Ms. Shapiro's argument is that on the record of this case and what was alleged in the indictment, the government should not be permitted to make that argument because it would be prejudicial to instruct the jury that no commercial sex act must have, need have been performed, given, for instance, the "to wit" clauses in Counts Two and Four that indicate that victim, the victims were engaging in commercial sex acts.

And so I think they're -- even making just a more practical point, my understanding is that the government is absolutely going to be arguing that commercial sex acts occurred and numerous times over.  And this is simply for -- the reason that the government had asked for this instruction is not to categorically say that no commercial sex acts need have happened but really just in case there are particular instances where the jury has a question, that they would point to the statute.

P6pWcom3

It's a long-winded way of saying what do we do here?

MS. SMYSER:  I think your Honor is exactly right.  I think this is blown a little out of proportion here.  I think there are a few important points that I want to hit in response to what Ms. Shapiro said, and I don't think there should be much concern.

First, the government's not bound by "to wit" clauses in the indictment -- *Agrawal*, the Second Circuit case, says that.  We did provide an enterprise letter in this case obviously because we charged a racketeering enterprise but we also charged sex trafficking substantively, so we're not bound by the enterprise as to those particular counts.

We also charged attempt, aiding and abetting, and so it's not the case that the defense wouldn't be on notice that not every commercial sex act may be completed.

We are certainly, as the Court said, going to argue that there were completed commercial sex acts in this case, but there may be particular dates on which those sex acts were not completed or the jury may have a question.  And that shouldn't bar us from being able to argue that that's still a violation of the statute.  I don't think that the defense has a problem with that, given that they understand that this is a correct statement of the law -- the commercial sex act does not have to be completed.

And even though we're not bound by the enterprise

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6pWcom3

letter, I do want to say what we're really talking about here is not some other date.  We're talking about the dates that are in the enterprise letter where a commercial sex act may have been completed or may not have been completed, but it's not some amorphous harboring that's happening at a variety of times.  I think everyone had notice about what the government is arguing in this case, and the Court should give this instruction, which is an accurate statement of the law, that a commercial sex act doesn't need to be completed, because it may not have been completed in every instance.  And that is completely fine.

THE COURT:  And by the way, the government is going to, in fact, argue that the commercial sex acts did occur on those dates, right?  And that is going to be the government's position, or are there going to be instances in which the government is going to say no commercial sex act occurred and nevertheless there is liability under this statute?

MS. SMYSER:  So, a few points, your Honor.

The majority of times the commercial sex act is completed, but there are times, for example, you may remember, where Jane testified where an escort was sent away by Mr. Combs and so the sex act there wouldn't have been completed.

In addition, at the end of the InterContinental, Mr. Combs uses force against Ms. Ventura and attempts to drag her back to the room.  But there's not another commercial sex

P6pWcom3

act that is completed.  However, he still has the required intent at that point.  So there may be particular instances in which the commercial sex act is not completed, which is why this accurate statement of the law needs to be provided to the jury during the jury instructions.

THE COURT:  All right.  What's the case that you had cited?

MS. SMYSER:  For the "to wit" clause, *Agrawal*, 726 F.3d 235.

MS. SHAPIRO:  Your Honor --

THE COURT:  Yes.

MS. SHAPIRO:  So, a couple of points.

First of all, just to be clear, we're not conceding the statutory point, because as I mentioned, the 15-year mandatory minimum doesn't apply unless there's a commercial sex act.

That's No. 1.  No. 2 --

THE COURT:  Well, let me stop you there, because what 1591(b) says is that the offense was effected by means of force, threats of force, fraud or coercion.  And so wouldn't that just refer back to what the offense is, as stated in subsection (a)?

MS. SHAPIRO:  Right, but the difference is that (a)(1) doesn't require force, fraud and coercion necessarily, because it says "or."  And it says it will be used to cause the person

to engage in a commercial sex act.

But I really want to explain.  This is a due process issue.  It's not just a constructive amendment.  That's a grand jury clause issue, but it's also prejudicial variance, and we are going to be severely prejudiced -- and I do want to talk about what they said in the opening.  But before I do that, I just want to point out to the Court that attempt is already captured here.  So if all they want to do is say it didn't happen on every one of the dates on our chart, or something like that, and they want to claim that some of them were an attempt that was aborted or something, they can do that.

THE COURT:  What is the prejudice if that's true?

MS. SHAPIRO:  The prejudice is what I'm talking about, to not allow them to argue that it's simply a harboring offense -- and my colleague may remind me where they said this.  But they said that one of their arguments now is going to be that it would be sufficient by itself for the jury to determine that the reason, for instance, Mr. Combs rented on house for Jane was in order to engage in commercial sex acts, whether or not they ever occurred.

THE COURT:  OK.  Do you have any case that required the prosecution or a plaintiff to establish a commercial sex act as a prerequisite to the statute?  Meaning the government has pointed to -- here, there's the Sand treatise, which cites to a Fifth Circuit case that's the opposite.

P6pWcom3

Do you have a case that indicates that the performing of a commercial sex act is required under either subsection (a) or (b)?

MS. SHAPIRO:  I don't think there's a case directly on point, because all the cases I've seen that affirmed convictions involved completed commercial sex acts.  But there's no prejudice to the government if they could not argue attempt based on existing instructions.  But I'm very concerned that if this language is included here, they're going to run away from the case that has been charged and tried, which is this argument that there's a yearslong sex trafficking scheme as to these two victims and that they engaged in these freak-offs or hotel nights based on force, fraud and coercion. But now they're going to say, well, it doesn't matter if the sex even occurred.

THE COURT:  Well, I don't think they're going to say that, but I've understood your argument and I've heard you.

I'm going to at this point -- my intent is to overrule the objection and include that language.  But I'm going to think about it, and I'll let you know.

MS. SHAPIRO:  OK, your Honor.  I'll just give you the pages, but if you read page 103, page 105, page 106, page 107, page 108 --

THE COURT:  Of what?

MS. SHAPIRO:  This is the opening statement, the

transcript.  I have multiple quotes I could send you.  Maybe the most important one is on page 117.

THE COURT:  Hold on.  What do the quotes say?

MS. SHAPIRO:  They talk about -- let me start with 117, because I think that's the most relevant.

THE COURT:  Give me one, and then we're going to move on to the next issue.

MS. SHAPIRO:  OK.

So, in discussing the charges, Ms. Johnson said:  "The defendant is also charged separately," meaning apart from the RICO, "with sex trafficking Cassie and Jane through force, fraud or coercion.  Again, the judge's instructions control, but I expect you'll learn that fraud," blah blah blah, and then they say, "the defendant is charged with using alternate tactics to make Cassie and Jane participate in dayslong drug-fueled sexual encounters with male escorts against their will."

And there are many other quotes in the summation where they're talking about actual commercial sex acts that they're alleging.  There's nothing in the opening statement to indicate that the government was arguing ever that force, fraud and coercion was used but there was no commercial sex act and it doesn't matter.

THE COURT:  You're saying it's a due process, fair notice argument.

P6pWcom3

MS. SHAPIRO:  Yes, your Honor.

THE COURT:  OK.  What case do you have that you want me to look at on that issue?

MS. SHAPIRO:  I mean there are many, many cases.

THE COURT:  A case that says that --

MS. SHAPIRO:  I'll send them to you.  I don't have them off the top of my head.  We got this last night.  We had no idea this was going to come up.  It's just a basic point of due process.

The Court knows what has been going on in this litigation and what we've been defending against.

THE COURT:  Well, hold on.  The Court received numerous objections from both sides last night, and that's what the parties elected to do, despite the fact that the Court had provided the parties with the responsive proposed charge last week and had invited the parties to present their modifications by Monday.  So the fact that this was received late last night, I think, is a problem generally with the way in which the parties have approached this process.

However, we're here, and this is the time to make your objections known.  And you had the opportunity to address this specific issue yesterday in what you submitted.

MS. SHAPIRO:  Your Honor, to be honest, I thought it was so obvious.  But I spent hours and hours with this yesterday.  I think what your Honor has just said is extremely

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6pWcom3

unfair.  The Court gave us a deadline of yesterday initially at five.  The parties jointly asked to have a few more hours.

It is simply not fair to say that we are making a late objection to this.

THE COURT:  I didn't say that.  I said that I've heard the objection, and I was asking for the authority that I could look at to hear your objection.  That's what I was asking for. And so --

(Continued on next page)

P6PQcom4

MS. SHAPIRO:  Well, your Honor, if there's a specific case on point, we'll send you an email after this charge conference, but I think it's a very --

THE COURT:  Very good.

MS. SHAPIRO:  -- obvious point that's based on the way this case has been charged and litigated, and the way we defended it, which they were very well aware of what our defense was.  There have been so many briefs even before the trial started.

There was never any suggestion by the government that they would prove their case without proving an actual commercial sex act, and it was obvious that our defense was that these sex acts were consensual, not that somehow we'd have to defend against some idea that there was an un -- that these were not the commercial sex acts in question.

THE COURT:  All right.  I've heard your argument.  I don't need any further submissions from the parties.  I'm going to consider the issue, and we will send the parties the final charge tonight, and you will have our decision.  You've made your objection, and you've preserved your objection.

MS. SMYSER:  Your Honor, just briefly, could I please complete the record on this point?

So, first of all, the government does not intend to make some lengthy harboring argument that Ms. Shapiro makes.  I don't know where that came from.  We don't intend to do that

P6PQcom4

just to clear up the record.

Second, there's no constructive ad min at all in this case, even though it's not required for Count Two.  Those dates in which escorts were sent away or which the Intercontinental were in our enterprise letter, in our enterprise letter itself, doesn't say completed sex acts.  It says enticed, transported.  It uses the language in the statute.

I will say the defense has been on notice from the beginning that there may be times when the commercial sex act is not completed.  For example, from the bail arguments in the very beginning of this case, the government talked about the Intercontinental being an instance of sex trafficking, and that's an instance in which there was force followed by no completed commercial sex act.

So I don't think that there is any constructive amendment, any due process problem, any notice problem at all here, and I think it's entirely appropriate to instruct the jury on this point.

And I just want to point your Honor to one additional Second Circuit case with the holding there that the commercial sex act not be completed.  That's *United States v. Corley*, 679 F.App'x 1, it's a 2017 case.  And every other circuit to address this point has held the same based on the plain language of the statute.

MS. SHAPIRO:  I just want to add one thing in response

P6PQcom4

to that.  With regard to the Intercontinental, the government has always maintained that there was a freak-off going on that night, and so they maintain that that was a commercial sex act, so that really has nothing to do with the point I was making.

THE COURT:  Understood.  Thank you, Ms. Shapiro.

Any further objections on the sex trafficking charge?

Anything from the government?

MS. SMYSER:  Just on the unanimity instruction.

THE COURT:  Anything other than the unanimity instruction?

MS. SHAPIRO:  Yes, your Honor.

So on page 45, I'm just trying to find the paragraph.

Actually, if I could just have -- it's the paragraph from lines 12 to 18, "the fact that a person may have initially acquiesced" et cetera "does not preclude a finding that the person was later compelled to engage in a commercial sex act."

We think there are several problems with this paragraph, but, most importantly, we think that this is marshaling and making arguments for the government, and that it's unbalanced and some of the language is already captured by the previous page.  But among other problems with this page, it talks about "does not preclude a finding that the person was later compelled to engage in a commercial sex act through the use of threats fraud and coercion."  So that's not what the government has to prove, that the person was actually

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6PQcom4

compelled.

What the government has to prove is that the defendant knew or recklessly disregarded that force, fraud and coercion was what caused the person to engage in the commercial sex act.

And so, in addition to that, the last sentence is clearly just marshaling and making the government's argument regarding Jane.  "If there is just one instance that establishes the use of force, threats of force" et cetera "that that's sufficient."

And so we vigorously object to this.  And at a minimum, at an absolute minimum, if it's going to be included, it needs to be balanced by other language that we can propose that focuses on the defendant's state of mind and the fact that they have to show that if the person consented, that on other occasions that that would affect his state of mind as to whether he believed that they weren't consenting on some other occasion.  And that's clearly, you know, the evidence in the text messages and everything.

Clearly, there's so much evidence of consent and communication to Mr. Combs that a reasonable person in his shoes could -- would interpret as consent.  That the idea that we're going to have this instruction that talks about how consent on one occasion or that the person initially acquiesced doesn't preclude a finding that they were later compelled when compulsion isn't the issue.  The issue is whether Mr. Combs

P6PQcom4

believed -- knew or recklessly disregarded the fact that someone in the victim's shoes would feel compelled.  That's the issue.  So we think this shouldn't --

THE COURT:  Your ask is to remove this paragraph, right?

MS. SHAPIRO:  Well -- yes.

THE COURT:  Yes.  And your point is that the argument the government wants to make, they can make.

MS. SHAPIRO:  Exactly, your Honor.

THE COURT:  And, in fact -- and we are going to get to the unanimity instruction, but part of the purpose of the unanimity instruction is to make clear that within the time period, there just has to be an act within that time period that satisfies the elements of the statute, and so that would further reinforce that it's not just one big glom of activity.  It has to be taken occurrence by occurrence.  And you would not be arguing in closings that somehow the fact that there was an initial acquiescence means categorically that there's no sex trafficking, right?

MS. SHAPIRO:  No.  We're arguing that there's consent throughout, obviously.

THE COURT:  I'm going to remove this paragraph.  I'll hear the government briefly, but my intent is to remove this because I think the defense's argument is that it may technically be correct, but the language would need to be

P6PQcom4

modified.  And if the language were modified, there would need to be offsetting language to make some of the correct points that the defense might want to make in response to this, which is an indicator that it is argumentative and not appropriate for these neutral injury instructions.

But I'll hear from you, Ms. Smyser.

MS. SMYSER:  I have some suggested edits to help address the point, I think.

Focusing on the first sentence, first the initial acquiescence point is accurate under the case law, for example, under *United States v. Marcus*.  I think it is an important one to make because both Jane and Cassie talked about, you know, initially engaging in the first freak-off or hotel night to make their partner happy, but that doesn't mean that at some later point sex trafficking can't be found.

And so I hear the concern your Honor has about this being unbalanced, but I think that could easily be fixed.  I think we could look at line 14 and where the text says "does not preclude a finding." I think we could just say "of sex trafficking."  And that captures both the defendant's intent and the potential commercial sex act and the use of force, fraud or coercion, and it's an accurate statement of the law and not one that is unbalanced in any way, and it's one that is often given to juries, and I think it is appropriate here.

THE COURT:  You mean does not preclude a finding of a

P6PQcom4

subsequent commercial sex act?

MS. SMYSER:  What would capture everything is "sex trafficking," your Honor, which is the intent and the commercial sex act because, as which just talked about, the commercial sex act doesn't have to be completed.

MS. SHAPIRO:  Your Honor, I think it would still be unbalanced and indeed the *Marcus* case is actually a good example because the reason the conviction was affirmed in part was that there was balancing language in the sex trafficking charge which involved BDSM, and the jury instruction said the mere fact that a person was physically restrained during the course of such acts does not necessarily mean that the statute was violated.

For example, if the physical restraint was consensual, then it would not constitute a violation of the statute.  It is for you to decide based on a careful consideration of all the facts and circumstances whether the acts of physical restraint violated the statute.

So to fix this, we would need similar language appropriate to this case.  I think the better solution is to delete the paragraph, particularly because we're talking about not just that sentence but the next sentence which basically says, you know, endorses the government's theory about Jane.  So they can make all these arguments.  They're elsewhere in the charge.  There's simply no reason to add more language to help

P6PQcom4

them marshal their arguments.

THE COURT:  All right.  I'm going to remove this language from the charge, but I do believe that the language is reflected elsewhere, and the government can certainly make the arguments it wants to make, as the defense has indicated.

MS. SMYSER:  Your Honor, I think that is true, that it is reflected elsewhere as to the second sentence, but I think as to the first sentence and this point of initial acquiescence, I don't believe that is in the sex trafficking charge elsewhere, and I think that is what really needs to be reflected given the testimony that we've heard.  And the arguments that the defense is making about consent, just initial consent does not preclude a later finding of sex trafficking.  I don't think anyone here is disputing that, and I think the jury could be confused about that and needs an instruction on it.

MS. SHAPIRO:  The other thing I just want to --

THE COURT:  Hold on.

Ms. Smyser, what was -- you had said it in kind of a more concise way:  Initial consent does not preclude a finding of --

MS. SMYSER:  Sex trafficking.  We are fine with just that language, if that would be helpful.

THE COURT:  I'm going to add that language.  I understand the defense's objection to the larger paragraph and

to the second sentence, so I'm going to remove that language in that paragraph, and we will use the shorter, more concise version of the government's proposal, which I believe is consistent with the other elements of the instruction but is clarifying on an issue that has become of great moment in the case given the parties' contentions.

MS. SHAPIRO:  Well, your Honor, if you're going to include that sentence, I would respectfully request that you add another sentence to the effect that:  However, consensual activities alone are not sufficient -- sorry -- however, you may consider a person's initial acquiescence or agreement to perform commercial sex acts in determining the defendant's knowledge of potential future consent.

THE COURT:  Does the government have a problem with that argument -- with that proposal?

MS. SHAPIRO:  And that comes from *Marcus* itself, by the way, at page 45.

MS. SMYSER:  So I'm just not sure that this is accurate, your Honor, and I don't think we want to use the word "consent" here.  The question is whether there is sex trafficking, and it's not true that prior consent means that a victim is consenting on a later occasion.  So I think this can be confusing for the jury.

It doesn't mean that the defense can't argue whatever they want to argue about Mr. Combs' intent, but what the

government has asked for here is just a very simple, short instruction that no one is disputing is an accurate statement of the law.

MS. SHAPIRO:  But we are disputing that.

THE COURT:  Hold on.  We've got to keep moving here.

And so does the government have any issue with "initial consent does not preclude a finding of sex trafficking but it is a factor that you may consider along with the other circumstances of the case"?

MS. SMYSER:  I think that's fine, your Honor.

MS. SHAPIRO:  Your Honor, we would still need balancing language that --

THE COURT:  That's the balancing language.

MS. SHAPIRO:  The balancing language can be:  However, you may consider a person's initial consent in evaluating whether the defendant's knowledge of potential future consent. I mean, it's true, right?  I mean, if the victim consented or, as the original language said, acquiesced or agreed to perform a commercial sex act, that is a reasonable basis for the defendant to believe based on her conduct in the future that she's consenting.

THE COURT:  All right.  I understand the objection, and I am going to use the modified language that I proposed and the government consented to.  I understand the defense's objection to even that language.

P6PQcom4

MR. DRISCOLL:  Judge, can I just be heard on this issue?  The focus of the second element is on the defendant's knowledge or whether he recklessly disregarded a fact, and then the way the model instructions proceed is by defining the various means that the government might argue, such as fraud or coercion or threats.  And then we have this random paragraph inserted into the charge about focusing on what the victim is doing and how that might inform the jury's finding.  It's inappropriate because it doesn't match on to what the actual element is instructing the jury.  And, respectfully, I think using the phrase "sex trafficking" in the government's proposed language, it potentially is worse.

THE COURT:  All right.  I know it's late, but we're going to take a ten-minute recess, and I need to think about a couple things here.  Let's take ten minutes.

(Recess)

THE COURT:  So we're back on the record.  As to the instruction that we were discussing concerning initial consent, and we had a back and forth on that, I am going to remove that paragraph from the charge, and both sides will be able to make the arguments that they want to make concerning initial consent and the impact that that has on the allegations that are being made.

I believe that the remaining portions of the instruction accurately provide the legal context and the

P6PQcom4

foundation for both sides to make the arguments that they would like to make, and including in the unanimity instruction which I know we're going to get to.

With that, any additional objections from the government's perspective to the sex trafficking charge?

MS. SMYSER:  Not before unanimity.

THE COURT:  Anything from the defense?

MS. SHAPIRO:  Just one additional one.

On page 46 related to the reckless disregard, deliberate indifference charge.

THE COURT:  Yes.

MS. SHAPIRO:  So I think your Honor added some language suggested by the government.  This whole part of the charge starts at line 7 and continues to 15.  So we have two objections.  One is that I think although the charge adequately captures the requirement that there has to be the highest probability that force, threats of force, fraud, coercion or a combination would be used, and that the government must prove that the person deliberately closed their eyes, that actually the basic requirements of whether you want to call it conscious avoidance, deliberate indifference, reckless disregard, actually has two elements, the.  First is that high probability, but the charge is also supposed to capture the fact that the defendant has to take deliberate actions to avoid learning the facts or, at a minimum, unless the defendant

actually believes that the relevant fact; here, the threats, force, threats of force, fraud or coercion are being used, and so the first request is just we'd like to add a sentence to that effect.

And then, in addition, the lines 13 to 15 I think are unnecessary and unbalanced, because no one can avoid responsibility for a crime by deliberately ignoring what is obvious, you know, and the next sentence I think are unnecessary and kind of piling on on what needs to be established without, again, you know, pointing out that this isn't satisfied unless the defendant actually believes that the fact that has to be proven doesn't exist.

And I can give you some case law.

THE COURT:  No, I don't need the case law.  What is the additional sentence that you had proposed?

MS. SHAPIRO:  So it could say:  The government must -- this is the existing language.  The government must prove that the person deliberately closed his or her eyes to what otherwise would have been obvious to him or her and must take deliberate actions to avoid learning of that fact.  That would be one way to do it.  And then get rid of the last two sentences.

THE COURT:  I don't think that that is an accurate statement of what deliberate indifference means because if someone is deliberately indifferent, that may be based on

conduct, but that can also be based on simply closing one's eyes to events that are transpiring that are obvious.

MS. SHAPIRO:  So I'm citing -- I read that language from *Global Tech Appliances v. SEB, SA* which is a Supreme Court case at 563 U.S. 754 (2011), 769.

THE COURT:  I'm going to overrule that objection, but I will sustain it in terms of removing the sentence:  "No one can avoid responsibility for a crime by deliberately ignoring what is obvious."  So we'll remove that sentence.

Any further objections from the defense?

MS. SHAPIRO:  Sorry, I was also asking the Court to remove the next sentence as well.

THE COURT:  Keep that sentence because I think that's simply a restatement of what deliberate indifference entails.

Anything further on the sex trafficking instruction?

MS. SHAPIRO:  Just that we think that the sentence from lines 18 to 19 that says:  "The defendant need not be the person who receives the thing of value" is redundant.

And also the sentence at 16 to 17, which says:  "It can be given to or received by any person."

And then I just wanted to preserve the objection that I mentioned yesterday.  I believe that we think that commercial sex act, the term "commercial" has to mean some kind of economic component, and that the term "anything of value" has to be read with the word commercial in mind, and limited by

that word commercial.  I understand that the Second Circuit in *Raniere* rejected a similar argument, but we're preserving that commercial sex act meaning argument.

THE COURT:  Understood.

So those objections are overruled, and I've taken account of the arguments here.  I do believe the clarification that the defendant need not be the person who receives the thing of value from the sex act is an important clarification given the nature of what's being discussed, and there is no objection that that is inaccurate.  It is an accurate statement of the prevailing law, and so I think it's important to keep that, and the defense has preserved its objection based on the lack of any financial component.

Any further objections from the defense?

MS. SHAPIRO:  Not to the sex trafficking charge.

THE COURT:  Let me move to the government on the unanimity instruction.

MS. SMYSER:  Yes, your Honor.

So just a few small issues with the unanimity instruction.  I think, more broadly, the challenging part of the instruction is how to properly define "instance" or I think "occasion" is the term that the defense had used because sex trafficking, given the language in the statute, isn't necessarily just a commercial sex act, which is what the jury may think when they hear "instance."

P6PQcom4

So here we would propose on line 10 saying: "Reasonable doubt all the elements of the charge with respect to at least one specific instance of sex trafficking within that period" because sex trafficking will encompass everything your Honor has instructed the jury on, which hopefully will be that a commercial sex act doesn't have to be completed, but also the terms in the statute which are, you know, not limited to a particular day, like harboring or the many other terms that are in the sex trafficking statute.

THE COURT: All right. So it's really just a wording change. "Reasonable doubt all the elements of the charge with respect to at least one specific instance of alleged sex trafficking," right?

MS. SMYSER: Yes.

THE COURT: All right. Any objection to that change?

MS. SHAPIRO: Sorry. Can you read it again?

THE COURT: The full sentence would read: "To find the defendant guilty of these counts, you must be unanimous that the government prove beyond a reasonable doubt all the elements of the charge with respect to at least one specific instance of alleged sex trafficking within that period."

MS. SHAPIRO: Of sex trafficking.

MR. DRISCOLL: Within that period.

MS. SHAPIRO: Okay, that's fine.

We had one other, something to that particular

P6PQcom4

instruction. We wanted to suggest instead of saying "over a year's long period," that it actually be specific. So between 2009 and 2018 with respect to Count Two and 2021 to 2024 with respect to Count Four.

MS. SMYSER: We have no objection to that, your Honor.

THE COURT: We'll make that change.

Anything further on the sex trafficking charges?

MS. SMYSER: Yes, your Honor.

In this instruction, at the end on line 12, you say: "you need not agree as to the way in which all the elements are satisfied." And the government would also propose saying: "were all the details of the instance." Because, for example, if the jurors disagreed as to the particular date in which it occurred, but they're talking about the same situation and circumstances of events, that would still be sufficient to find sex trafficking in a unanimous way.

MS. SHAPIRO: I think that would introduce some potential for confusion because what does that mean "all the details"? It could mean, you know, whether the particular instance was coerced or not. I mean, I just think that's unnecessary.

THE COURT: I think the government proposed that modification because of the first part of that sentence, is that right, Ms. Smyser?

MS. SMYSER: Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6PQcom4

THE COURT:  My proposal would just be to get rid of the entire sentence because the prior sentence, especially in the way the government has modified it, clarifies that as to the charge there has to be one specific instance of alleged sex trafficking.  As to what sex trafficking entails, given the government's clarification, that is explained in the substantive explanation of the sex trafficking charge which does not indicate that, for instance, all the details have to be a unanimously agreed on.

I think the potential for confusion was in the last sentence, but the last sentence now is really -- the first part of it is really just restating what's in the prior sentence.  So my proposal to resolve the arguments that have been made would be just to just get rid of the last sentence in its entirety.

MS. SMYSER:  I think we don't have an objection to that, your Honor.

And one final point on the unanimity instruction.

THE COURT:  All right.

MS. SMYSER:  Given your Honor's earlier ruling about the prior paragraph, I think the sentence that the government had suggested about one instance of sex trafficking being sufficient to find the defendant guilty on Counts Two and Four would be appropriate here at the end of this unanimity instruction so that they understand the import of being

P6PQcom4

unanimous on one instance, that means they could find him

guilty on Counts Two and Four.

THE COURT:  Wait, isn't that what it says?

MS. SHAPIRO:  That's what I was going to say.

MS. SMYSER:  I think it just -- yeah, I think I

misread.  My apologies, your Honor.

THE COURT:  No problem.  Okay.

Anything further from the defense?

MS. SHAPIRO:  Not on that, your Honor.

THE COURT:  Let's move to the prostitution charges.

Anything from the government?

MS. SMYSER:  Yes, your Honor.

So for Counts Three and Five, I think the language

used is "would engage in prostitution."  And the government is

asking for a simple change which is that we use the term "would

engage in an act of prostitution."  And the reason for that is

because it's not required that the person who travels under

these statutes be a commercial sex worker; in other words, a

person who themselves would get paid to engage in a sex act,

they only need be engaging in an act that qualifies as

prostitution.  And the definition of prostitution that the

defense asks for, and the Court incorporated, may give the

misimpression that the person who is traveling needs to be that

commercial sex worker.

THE COURT:  So in the sentence that discusses

P6PQcom4

transportation across a state or international line, the proposed modification is "would engage in an act of prostitution"?

MS. SMYSER:  That's correct, your Honor.

THE COURT:  Any objection to that?

MS. SHAPIRO:  Only that those words aren't in the statute.  It just says "engage in prostitution."

THE COURT:  All right.  I think everyone understands that we're talking about acts of prostitution, and we're not trying to recharacterize what is in the statute.  So I think that is an appropriate proposal, and we'll make that change.

Anything further from the government?

MS. SMYSER:  No, your Honor.

MS. SHAPIRO:  Just on line 15, we would just request that your Honor make the same change you made, I think it was in the racketeering account, "the intent of the individuals who traveled or engaged in prostitution" --

THE COURT:  Is not the issue.

MS. SHAPIRO:  Right.

THE COURT:  Very good.

Is there anything further anything in the venue instruction?

MS. SHAPIRO:  Sorry.  One other thing on the unanimity for this page, just if you could use the dates instead of saying "over a year's long period."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6PQcom4

THE COURT:  Yes, we'll make that conforming change consistent with the sex trafficking unanimity instruction.

MS. SMYSER:  The same thing the government would request talking about the elements of the charge and at least one specific instance of transportation "to engage in an act of prostitution" on lines 21 and 22 to mirror the sex trafficking unanimity instruction.

THE COURT:  "To find the defendant guilty on these counts, you must be unanimous that the government prove beyond a reasonable doubt all the elements of the charge."

MS. SMYSER:  Yes.  And then delete the next several words and start "with respect to at least one specific instance of transportation to engage in an act of prostitution within that period."

THE COURT:  Okay.  Very good.  I'll make that change.

If there's nothing further, now any objections on the venue instruction?

MS. SMYSER:  No, your Honor.

MS. SHAPIRO:  No, your Honor.

THE COURT:  I'll ask the government to just give me their next objection.

MS. SMYSER:  Our next objection is to immunized witness instruction.

THE COURT:  So I received the government's submission, and heard the defense's arguments, and the reason why I am

using this charge is because it appears based on the *Sand* treatise and the prevailing circuit law, that it is consistent across the circuits that some version of this instruction is given, and the *Sand* treatise in the commentary provides examples from each and every circuit of instructions that match what is in the *Sand* treatise as the instruction to be provided as to immunized witnesses.

And so I understand that there are cases in which the instruction has not been given, but is there any case law basis in light of that litany of circuit authority indicating that this is an appropriate instruction to give when there is testimony from immunized witnesses?

MS. SMYSER:  Your Honor, we are not objecting to you giving an immunized witness instruction.  I think there is part of this instruction that we don't believe is accurate as to the immunity that was given to --

THE COURT:  Very good.  What is that?

MS. SMYSER:  -- the witnesses here.

So that is the third paragraph starting on line 20, and the real problem here is the sentence that begins on line 21:  "You should scrutinize it closely to determine whether or not it is colored in such a way as to place guilt upon the defendant."  I'm just going to skip ahead to the next page where you can see it says:  "That he can win his own freedom by helping to convict another has motive to falsify his

P6PQcom4

testimony." And, your, Honor that is simply not what is happening with the type of immunity that these witnesses were given.

The immunity that they were given is use immunity, which is different from transactional immunity. And so these witnesses were given immunity if they told the truth, their statements would not be used against them in a prosecution for perjury. They could still be prosecuted for prior conduct, including conduct that they testified about. And I want to be clear that these witnesses were only testifying because the government subpoenaed them, and the way to get them to testify and not invoke their Fifth Amendment right was to give them an order of immunity of this nature. So it's not correct to say that they are trying to win their own freedom by helping to convict another.

And just to be clear, the transactional immunity which was what they were not given, gives them protection from the entire subject matter they are testifying about, not just simply the statements that they are using.

So the government does have a proposed immunized witness instruction that addresses this kind of immunity, and so I'm happy to hand that up to the Court, and we have a copy for the defense too. And this particular instruction was used in the *Sam Bankman-Fried* case.

THE COURT: Is there any objection from the defense?

P6PQcom4

So this instruction is in contrast to 0the initial proposal from the government does indicate that the jury should examine the testimony of such a witness to determine whether or not it is colored in any way to further the witness's own interests, and so it provides the foundation for the defense to argue that because of the immunity, the witness's testimony might be colored.  However, the government indicates that the instruction that was in the proposal was inaccurate in certain respects, and there's certain language in here that's duplicative and argumentative to a certain extent.

So given all that, is there any objection to this immunized witness instruction from the *Bankman-Fried* case.

MS. SHAPIRO:  I think we would be okay with it if your Honor added one additional sentence that was in the original proposed charge, which is the sentence at lines 20 to 21: "However, the testimony of a witness who has been granted immunity should be examined by you with greater care than the testimony of an ordinary witness."

THE COURT:  All right.  If I were to add that one sentence before "you should examine," would that be fine with the government?

Let me make this simpler.  I'm going to add that sentence into the proposed instruction from the government, so we'll add that one sentence.  We will not add the remainder of the instruction.  We will use the instruction that was given in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6PQcom4

the *Bankman-Fried* case, and that will be the immunized witness instruction.

MS. SMYSER:  So sorry, your Honor.  I missed your question.  I think we are fine with that with one small modification that you -- it says: "You should examine." I think we would ask that it be "you may," otherwise it's imbalanced and putting a thumb on the scale of distrusting these immunized witnesses but we are totally fine with the concept there.

MS. SHAPIRO:  Your Honor, we don't consent to that. And I think the language in the sentence I read comes right out of Second Circuit case dealing with this type of immunity, the statutory immunity that was granted with these witnesses.

THE COURT:  I think the sentence just says it should be examined with greater care.  It doesn't say a jury should make any particular inferences based on the witness' testimony. So we'll put that sentence in.  We'll use the instruction from the *Bankman-Fried* case.

Next from the government, and then we'll move to the defense.

MS. SMYSER:  Your Honor, we just had a proposal for the implicit bias instruction.  We don't object to one being given generally.  We got this late from the defense, and I think we would propose one a little bit shorter.

MS. SHAPIRO:  I have some things before that, your Honor.

P6PQcom4

THE COURT:  Ms. Shapiro, I'll come to you next once we're done here.

MS. SMYSER:  I think this just would address our concern with the instruction.  There's a sentence in the instruction, your Honor, at line 15 that says:  "Everyone, including me, has feelings or assumptions or perceptions or fears or even stereotypes and, therefore, too implicit biases and you may not even be aware of them."

We think this, in particular drawing attention to the biases that the jurors may have, could result in tensions between the jury unnecessarily, and so I think removing those sentences would address our concern, and we would have no other objection to the implicit bias instruction.

THE COURT:  I think that's a fair objection.  The remainder of the instruction makes the point that the parties had thought about it and the defense had wanted to make, so we'll remove those two sentences.

Now, let's move to -- anything further from the government on the instructions?

MS. SMYSER:  No, your Honor.  I just have two cases I'd like to put on the record with regard to the buyer-seller issue.  I can do that now or after the defense is done.

THE COURT:  You can do it now.

MS. SMYSER:  So I'd like to point your Honor's attention to you *United States v. Parker*, 554 F.3d 230, 236

P6PQcom4

(2d Cir. 2008) which references how the buyer-seller exception is limited.  And *United States v. Hein*, 316 F.App'x 54, (2d Cir. 2009).  And that is similar.

THE COURT:  Very good.

And let me turn to Ms. Shapiro.

MS. SHAPIRO:  On page 55, the RICO statute of limitations, we just thought in re-reading the charge that that probably should be moved to the end of the RICO instruction. It seems a little out of place here because this is talking about various procedural issues.

THE COURT:  Any objection to that?

MS. SMYSER:  No.

THE COURT:  We'll make that change.

MS. SHAPIRO:  And I just had one last thing on page 58, and then I just wanted to make just a couple of small things.

So line 7 to 8, we would ask the Court to remove the sentence that says: "The duty of imposing sentence is mine and mine alone" just because, you know, the previous sentence just says that the sentence may be -- punishment may be imposed if convicted, shouldn't influence, but to go on to say that your -- there could be a suggestion that the Court is going to sentence Mr. Combs, so we would prefer to remove that sentence.

THE COURT:  That's fine.  We'll remove that sentence.

MS. SHAPIRO:  Then I had two other small requests and

P6PQcom4

then a couple quick preservation points that I won't go on at any length about.

I don't know what your Honor's intention was, but there's inconsistency in the document.  We would prefer the word government not be capitalized.

THE COURT:  That was the intent.

MS. SHAPIRO:  So maybe a find and replace could fix that.

THE COURT:  Yes.

MS. SHAPIRO:  Then the last thing, which I haven't had a chance to discuss with the government, I apologize, but it has to do with the table of contents.  Just that we would ask that if the Court plans to give the jury copies of the instructions, that you remove the table of contents in the headings.

And the reason is that I handled an appeal in which - not the trial - an issue arose because the jurors, it turned out after post trial, many of them talked to the press, that they had been misled by certain headings to believe that one of the counts or two of the counts didn't require criminal intent because they were relying on the headings.  And to avoid that problem and since there is case law, which I don't have off the top of my head, that the headings are not --

THE COURT:  That's fine.  The only reason it's in there is to aid in jurors finding things in the charge, but

P6PQcom4

they have the page numbers.  They can look at the headers as they appear in the document.  And if they have any questions, they can ask us.

MS. SHAPIRO:  Right.

And then so the last are just things I wanted to note for the record.

THE COURT:  Before you do that, the one thing that we did off the record, just because I asked the question and I want to make sure we've done that on the record, has to do with voluntary intoxication.  And so as to voluntary intoxication, you cited to the *LaFave* treatise.  I've seen what *LaFave* says.  However, that is not consistent what with what Second Circuit says in *Sewell*.  What is the instruction you propose I give consistent with *Sewell*?  I can't give a voluntary intoxication instruction unless it is correct in all respects.

MS. SHAPIRO:  So what we were suggesting was that the instruction that we had originally proposed, and I think was in the Court's initial draft, be changed to say that it could only negate the existence of the defendant's intent to commit certain crimes at issue, and then we listed the ones in our proposal that we believed the case law supported the notion that these were specific intent crimes, and we put the support for the particular crimes in the margin in the comments.

I think the government, when we were having that off-the-record exchange, said that they thought that it didn't

P6PQcom4

apply to predicate acts, but we think it does because the fourth element of the RICO requires the government to prove that the defendant agreed that either he or a conspirator would commit these offenses, and, therefore, that implies that obviously the elements -- he would have to agree that these elements were met or not -- but he would have to agree to these crimes which include the elements including the specific intent elements, so that was the basis for it.

And we also modified it to say that, you know, the jury had to first find for this to even apply that the defendant was too intoxicated specifically to form a requisite intent.

THE COURT:  In light of that explanation, is there any objection from the government?

MS. SMYSER:  Yes, your Honor.  I don't think that the voluntary intoxication charge should be given at all.  We've made the point with regard to general intent crimes under Second Circuit case law.  It's not appropriate and with regard to these specific intent crimes, first as to the predicates as Ms. Shapiro mentioned, we don't believe that's appropriate because the intent focuses on the agreement to enter the racketeering enterprise, not to commit the elements of the underlying crimes.

In addition, with regard to the specific intent crimes that the defense has highlighted, we don't believe that the

proper foundation has been laid.  And in order to even give this instruction, the Second Circuit has said that it shouldn't be read to the jury unless there is some foundation in the evidence presented at trial for the conclusion that a defendant was too intoxicated to form the specific intent to commit the charged crime.  That's *United States v. Crawley*.

And that requisite foundation has not been laid. There has been no evidence that over this multiyear period when the defendant was flying in and transporting escorts and engaging in these freak-offs and hotel nights that he was too intoxicated the entire time, which applies to the substantive counts as well as to the RICO counts.  And so we don't think it's appropriate.

And if the Court were to give this kind of instruction, we would ask that it be done in a way that is more similar to the Second Circuit in *United States v. Rahman*, which makes clear the defendant must be "intoxicated throughout the entire course of his alleged participation in the crime charged."

THE COURT:  Understood.  I'll take a look at the parties' proposals and the arguments presented and we will send the final charge with respect to that instruction.

Now, Ms. Shapiro, you've preserved everything you've raised up to this point, but is there something else you'd like to preserve?

P6PQcom4

MS. SHAPIRO:  Just two things quickly.

I wanted to note to the extent there is anything the Court overruled that we objected about, we incorporate in addition to the arguments I made and my colleagues have made today.  The requests to charge Docket 273, our supplemental requests at Docket 388, our June 24 letter at Docket, 421 as well as the proposed provisions to the Court's draft that we submitted last night by email, and our objections to the government's proposed revisions that were also sent last night by email.

And then the final point, and we discussed earlier some of the language, we had requested regarding the issue of whether a RICO enterprise could be one that was solely based on carrying out a particular individual's affairs, and to the extent that argument was precluded by the *Kelly* case that we discussed, we preserve our objection and the ability to argue that in any appeal.

THE COURT:  All right.  Very good.

Anything further from the government?

MS. SMYSER:  No, your Honor.

THE COURT:  Nothing from the defense?

Thank you Ms. Shapiro.

So we will incorporate these changes.  There are a couple of issues that I wanted to take a look at the authorities cited.  We will do that.  We will get you the final

charge tonight. And then we will see everyone here at 8:30 in the morning.

Anything further from the government before we adjourn?

MS. SMYSER: No. Thank you.

MS. SHAPIRO: Your Honor, I had one request on behalf of Mr. Agnifilo. He and I raised this with Ms. Comey. I know the government is thinking about it, but I just need to bring it up now because it relates to the timing of summations.

Mr. Agnifilo doesn't believe he's going to take more than three hours, but he strongly prefers, particularly because I understand the government will be at least four hours, that rather than having to start in the afternoon tomorrow, and (A) when people are more tired, and (B) where there might be a possibility he might have to split up his summation, he would strongly, strongly prefer to start on Friday morning.

And he believes based on the length of the summation, and my understanding from Ms. Comey that the government doesn't expect the rebuttal to be more than an hour, that there should still be time to finish summations and do the charge on Friday if we do that. So he asked me to make that request on behalf of the defense.

MS. COMEY: I've had a chance to think about it, your Honor, and discuss it with my team, and we would object. We think it's a waste of the jury's time to make them come in for

P6PQcom4

a partial day.  We are cognizant we are approaching the July 4 holiday, which the defense has pointed out repeatedly.  So we think it's a waste of the jury's time not to go ahead and start.

Mr. Agnifilo knew about the timing.  We told him we predicted approximately a four-hour main summation when he agreed to this schedule.  And if Mr. Agnifilo would like to be able to end his summation on Friday morning when everyone is bright-eyed and bushy-tailed, he's welcome to split it up.  We would not object to that.  But we don't think we should be sending the jury home early tomorrow.

MS. SHAPIRO:  I'm sure he would make it even shorter if your Honor would agree to it.

THE COURT:  Well, no, I don't think that's the issue. I think there's a problem when we're bringing in the jury for a short day, and the defense has raised the issue with the upcoming July 4 holiday.

So the problem is that moving the closings to Friday means that there will be less time for the jury to deliberate on Friday, and so that creates more of a timing concern.  But it's also an issue just with having the jury come in just for one part of the proceeding when, you know, we're trying to keep them here for the time they're supposed to be here in respect of their time.  I think it's more of an issue of that.

So -- but as Ms. Comey notes, Mr. Agnifilo would be

P6PQcom4

able to complete his closing on Friday if that is what occurs, if that is what is required.

MS. SHAPIRO:  If the government goes more than four hours, would the Court reconsider that?

THE COURT:  Well, Ms. Comey, do you have a general sense of how long.

MS. COMEY:  My general sense that it will be approximately four hours.  I think it will probably go up to the lunch break.  We will have to take the lunch break, and then it will probably finish a little after the lunch break is my guess based on what we're talking about as a team.

THE COURT:  Ms. Shapiro, you're making this application understanding that if we were to break and then have the defense closing start on Friday, then that brings us closer to the holidays, and this is an issue that the defense has raised.  You understand that?

MS. SHAPIRO:  I understand that, your Honor.  And Mr. Agnifilo is lead counsel.  He's delivering the summation, and this is his very strong preference as to the way that it's the best to do it, and it's in the defendant's best interests.

THE COURT:  So you're not taking the position that somehow the July 4 holiday is going to be some sort of prejudice to the defense because now you're asking to extend the schedule for this reason?

MS. SHAPIRO:  Well, not for this reason because

P6PQcom4

obviously we've changed our position, and we would prefer to start early on Friday morning, so ...

THE COURT:  All right.

MS. COMEY:  Your Honor, I forgot to mention my third reason that we object.  It is our concern that this is a move of gamesmanship rather than anything else.  It appears to be positioning the defense to be able to sit overnight with extra time in the afternoon with the government's summation, and that seems unfair, in addition to wasting time.

MS. SHAPIRO:  That's not what's going on, your Honor. We are genuinely concerned that, as particularly after lunch, everyone --

THE COURT:  I got you.

MS. SHAPIRO:  -- seems a little more tired, so...

THE COURT:  The only issue here, and I think it's -- I hear everything you're saying, right?  The issue is with a four-hour closing that is going to go over lunch, what is going to happen is that Mr. Agnifilo is going to have to get started, most likely, and then have to at some point stop.  And at that point the jury would have already heard multiple hours of argument.  So they are just saying come back in the morning the next day and finish it off.

So I think that that is just fair in theory, and makes a lot of sense.  That's the only reason why I would entertain the notion, because otherwise I would say press forward and try

P6PQcom4

to get it done as soon as possible.  The defense is making the application, so they understand the timing issue which they themselves have raised.  On that basis, I think it's fine for Mr. Agnifilo to start on Friday morning.

MS. SHAPIRO:  Thank you, your Honor.

THE COURT:  And, Ms. Comey, if you do not want to start at 9:00 a.m., you could start later.  That's up to you.

MS. COMEY:  If we could start a little later tomorrow, I think that would help, given how late we're here and how we need to incorporate the charge into our summation.  If Mr. Agnifilo is not going go tomorrow, maybe if we could start around 10:00, do two hours, take a lunch break, and two hours after lunch.  I say this without being the person who will be giving the main summation.  I'm speaking on behalf of Ms. Slavik.

THE COURT:  Well, assuming that Ms. Slavik agrees with you, we'll go ahead and get started at 10.  I'll ask the parties to be here — and Ms. Slavik need not be here at 9:00 — but be here at 9:00 in case there are any issues for us to address.  See everyone tomorrow.

MS. SHAPIRO:  Your Honor, I take it you are going to send us the final charge sometime tonight?

THE COURT:  Yes.

MS. SHAPIRO:  Thank you, your Honor.  Sorry to keep you so late.

P6PQcom4

(Trial continued June 26, 2025 at 9:00 a.m.)