P72Wcom1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
UNITED STATES OF AMERICA,

          v.                  24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

          Defendant.         Trial
-------------------------------x

                    New York, N.Y.
                    July 2, 2025
                    10:00 a.m.
Before:

            HON. ARUN SUBRAMANIAN,

                    District Judge
                    -and a Jury-

               APPEARANCES

JAY CLAYTON
    Interim United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
      EMILY A. JOHNSON
      MAURENE R. COMEY
      MEREDITH FOSTER
      MITZI STEINER
      MARY C. SLAVIK
      Assistant United States Attorneys

P72Wcom1

APPEARANCES CONTINUED


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:  MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
HARRIS TRZASKOMA LLP
BY:  ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:   Lucy Gavin
                Shannon Becker
                Paralegal Specialists

                Raymond McLeod, Evidence Specialist

P72Wcom1

(Trial resumed)

THE COURT:  Please be seated.

I'll ask the deputy to hand me the note.

THE DEPUTY CLERK:  Yes, your Honor.

THE COURT:  All right.  We have received a note from the jury at 9:52 a.m.  The note reads:

"We have reached a verdict on all counts."

We'll make this a court exhibit.

Anything to address from the parties before we bring our jury out?

MS. COMEY:  No, your Honor.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  No.  Thank you, your Honor.

THE COURT:  All right.

The only thing that I'll say to you to those of you who are in the courtroom and in the overflow rooms is to maintain order while the verdict is being read and until we have the jury out of the courtroom for the sanctity of the process, and there are a few things that we do need to deal with before we adjourn.  And so I just ask everyone's cooperation in maintaining order as that is done.

With that, I'll ask the deputy to bring back our jury.

THE DEPUTY CLERK:  Yes, your Honor.

(Jury present)

THE COURT:  Please be seated.

Members of the jury, we have received your most recent note, stating that you have reached a verdict.  I will ask the deputy to provide the foreperson with a microphone and I'll inquire as to the verdict.

Juror No. 5 --

THE FOREPERSON:  Yes, your Honor.

THE COURT:  -- our foreperson, have you reached a verdict?

THE FOREPERSON:  We have.

THE COURT:  Is the verdict unanimous?

THE FOREPERSON:  It is.

THE COURT:  Can you please provide the verdict form to the court deputy.

All right.  Mr. Deputy, can you please provide the verdict form back to the foreperson.

THE DEPUTY CLERK:  Yes, your Honor.

THE COURT:  To the foreperson, the deputy will inquire as to the verdict, and then we'll go through each of the jurors to ensure that the verdict is each one of your verdicts.

Mr. Deputy, you may proceed.

THE DEPUTY CLERK:  Yes, your Honor.

In the matter of the United States v. Sean Combs, 24 Cr. 542, the verdict sheet.

Count One, racketeering conspiracy.

Juror No. 2, how do you find the defendant; not guilty

P72Wcom1

or guilty?

THE FOREPERSON:  Not guilty.

THE DEPUTY CLERK:  Proceeding to the next count.

Count Two, sex trafficking of Casandra Ventura, how do you find the defendant; not guilty or guilty?

THE FOREPERSON:  Not guilty.

THE DEPUTY CLERK:  Count Three, Mann Act transportation, Casandra Ventura, how do you find the defendant; not guilty or guilty?

THE FOREPERSON:  Guilty.

THE DEPUTY CLERK:  Count Four, sex trafficking of Jane, how do you find the defendant; not guilty or guilty?

THE FOREPERSON:  Not guilty.

THE COURT:  Count Five, Mann Act transportation, Jane, how do you find the defendant; not guilty or guilty?

THE FOREPERSON:  Guilty.

THE DEPUTY CLERK:  Your Honor, I will now poll the juries individually.  If you could pass the microphone.

Juror No. 1, is this your true and correct verdict?

JUROR:  Yes.

THE DEPUTY CLERK:  Thank you.  You may pass the microphone over.

I will ask you as well.

Thank you.

Juror No. 2, is this your true and correct verdict?

P72Wcom1

JUROR:  Yes.

THE DEPUTY CLERK:  Thank you.

Juror No. 3, is this your true and correct verdict?

JUROR:  Yes.

THE DEPUTY CLERK:  Thank you.

Juror No. 4, is this your true and correct verdict?

JUROR:  Yes.

THE DEPUTY CLERK:  Thank you.

Juror No. 5, is this your true and correct verdict?

JUROR:  Yes.

THE DEPUTY CLERK:  Thank you.

Juror No. 6, is this your true and correct verdict?

JUROR:  Yes.

THE DEPUTY CLERK:  Thank you.  If you could pass the mike all the way down.

Juror No. 7, is this your true and correct verdict?

JUROR:  Yes.

THE DEPUTY CLERK:  Thank you.

Juror No. 8, is this your true and correct verdict?

JUROR:  Yes.

THE DEPUTY CLERK:  Thank you.

Juror No. 9, is this your true and correct verdict?

JUROR:  Yes.

THE DEPUTY CLERK:  Thank you.

Juror No. 10, is this your true and correct verdict?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P72Wcom1

JUROR:  That is correct.

THE DEPUTY CLERK:  Thank you.

Juror No. 11, is this your true and correct verdict?

JUROR:  Yes.

THE DEPUTY CLERK:  Thank you.

Juror No. 12, is this your true and correct verdict?

JUROR:  It is.

THE DEPUTY CLERK:  Thank you.

The verdict is unanimous, your Honor.

THE COURT:  Very good.

Counsel, is there any reason that I cannot now dismiss the jury?

MS. COMEY:  No, your Honor.

THE COURT:  Mr. Agnifilo.

MR. AGNIFILO:  With our thanks.

THE COURT:  Meaning I may dismiss the jury.

MR. AGNIFILO:  Yes.

THE COURT:  All right.

Ladies and gentlemen, in a moment I'm going to excuse you.  Before I do, I want to say a few words about the trial.

This is a case that has received considerable press. I can already tell you that members of the press will ask to speak with you.  Not only are you free to refuse to speak with anyone or disclose what went on in the jury room, but there is good reason to decline to discuss anything with the press.  Our

jury system has long been based on the notion that what happens in the jury room stays in the jury room. As the Supreme Court has explained, freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world. In that regard, I think there's an important reason to respect the privacy of your deliberations.

With that said, the choice whether to speak with others about the case and your personal views is up to you. That is your choice. All of the instructions that I gave you previously about not talking to each other about the case, not talking to anyone else about the case, not looking up anything about the case, reading anything about the case -- I probably gave you that instruction about 50 to 100 times; all of that is gone. Poof. You are not subject to those instructions any further.

What I will ask is that if you do speak to the press or anyone about the case and your involvement in it, that you respect the privacy of your fellow jurors, deliberations and views. You can speak about your own views about the case, but do not speak about what your colleagues' views were or how the deliberations played out.

I will also ask that members of the media respect this principle by refraining to question jurors about the deliberations.

P72Wcom1

Jurors, if you have any question or feel uncomfortable based on any outreach that you receive from anyone, please feel free to bring that to my attention. And in a moment, after we adjourn here, I'll provide you with the Court's contact information so that all of you can contact the Court and you have an open channel here.

I want to really thank all of you for your hard work, your patience and your dedication. I know that you've given up a lot to be here for the last over ten weeks, and it's taken a tremendous sacrifice. But I want you to know that it is inspiring to all of us. You listened. You worked together. You were here every day, rain or shine. You did so with no reward other than the reward that comes with answering the call of public service. And that should give all of us hope.

So on behalf of the parties, the Court's staff and most of all myself, I want to really thank you for your service here over these past ten or more weeks.

Now, if you're willing to wait -- I know that you've been deliberating for a while and you've been here for a very long time, and if you need to leave, then I would totally respect that. But I have a few important matters to address with the parties. After that I'd love to come back to the jury room and meet you personally and thank you personally for all the hard work that you've put into this case.

With that, I will excuse you for a second to the jury

P72Wcom1

room -- it may be more than a second; it may be a few minutes -- and then I'll be back there.  Just give me a few minutes, and I will be back there to meet you personally.

With that, all rise for the jury.

(Jury discharged)

THE COURT:  Please be seated.

All right.  I'll hear any applications, and then we can talk about a sentencing date.

Anything from the government?

MS. COMEY:  No, your Honor.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  Yes, your Honor.

In light of the fact that Mr. Combs is no longer charged with sex trafficking, which carried a rebuttable presumption of detention, or with RICO, and he remains only charged with prostitution, he should be released.  He should be released on appropriate conditions.  He should be permitted to return to his home at 2 Star Island in Florida.  We are in possession of his passport.  We will provide that to pretrial services.

In light of the charge of which he now stands convicted -- every federal crime is serious, and I'm not saying it's not a serious federal crime -- it's a crime of a vastly different nature than the racketeering offense that he was charged with, which now he's been acquitted of.  It's a crime

P72Wcom1

of a vastly different nature than the sex trafficking offense of which he's been acquitted.  So I believe that a considerable change in his conditions is warranted.

I know that, I believe that his plane has been chartered.  It's in Maui.  We found out this morning.  In the eventuality that this came to pass, I knew I'd be making a bail application.  So he does not have access to his plane.  He will absolutely -- this is his first conviction, and it's a prostitution offense.  And so he should be released on appropriate conditions.

His entire family is here.  Any one of them, any three of them, any five of them can sign on to a bond.  So it would make sense if your Honor was considering release conditions -- and I do hope your Honor does -- to do this while we have his entire family here physically together.  And so my proposal would be that he be released today; he be permitted to live at his home in Florida -- the address has been in the record, so I'm not giving anything away -- at 2 Star Island.  It would be a bond of whatever size your Honor sees fit.  I mean for a prostitution offense, maybe a million dollars.  It could be co-signed by different members of his family who are here, and that is our application, your Honor.

THE COURT:  Well, let me just make sure, because obviously, this is just coming up right now and you have not had a chance to address this with the government.  And I will

obviously hear from the government in a moment.

Is your proposal that Mr. Combs leave this courtroom and walk outside?

MR. AGNIFILO:  Whatever --

THE COURT:  I'm just asking about the mechanics of this.

MR. AGNIFILO:  That is Marc Agnifilo's proposal, yes. That is my proposal.  I know that there are things that our marshals service has to do, but that is my proposal, yes, that he has been acquitted of very, very serious charges.  He's been convicted of a far less serious charge, both in terms of its guideline exposure and its maximum sentence.  And in light of that, it is my proposal that he be permitted to walk out of the courtroom.

THE COURT:  OK.  Just for the mechanics.

And then in terms of your application, it is for a million dollar bond.

MR. AGNIFILO:  Million dollar bond.

THE COURT:  Secured by three financially responsible persons.

MR. AGNIFILO:  Correct.

THE COURT:  And Mr. Combs has already relinquished his passport.

MR. AGNIFILO:  We have physical possession of his passport, and we would give it to pretrial services.

THE COURT:  Any travel restrictions?  Limited to Florida and New York?

MR. AGNIFILO:  Florida and New York -- Florida, Los Angeles and New York.

THE COURT:  All right.

Any response from the government?

MS. COMEY:  Yes, your Honor.

The government opposes this application.

The applicable statute is Title 18, United States Code, Section 3143(a)(1), which provides that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence shall be detained unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released.

In other words, the burden is now on the defendant to demonstrate by clear and convincing evidence that he is neither a flight risk nor a danger.  Mr. Agnifilo tries to downplay the seriousness of the two counts for which he has been convicted, but the facts state otherwise.  They reflect yearslong conduct that involved not just the hiring of escorts but also physical abuse that your Honor heard extensive evidence about that the defense did not contest and that also involved the prolific use and distribution of drugs, which your Honor also heard extensive evidence about and which the defense did not contest.

P72Wcom1

We intend to seek a sentence of incarceration. The guidelines will provide for a sentence of incarceration. The maximum sentence the defendant faces is 20 years in prison under the two statutes of which he's been convicted now.

Your Honor has also heard that while the defendant was under investigation for this very case, he continued to commit a litany of crimes, suggesting that he does not have respect for the law and suggesting that even when his attorneys, I'm sure, advised him to be following the letter of the law and when he knew he was under careful, careful scrutiny and very close scrutiny from the federal government, he was not deterred from committing additional crimes, including the vicious assault of Jane that your Honor heard detailed evidence about, and the provision of drugs and the hiring of escorts. Indeed, when the defendant was here, in New York City, according to Mr. Agnifilo, waiting to surrender to federal authorities, he had drugs in his hotel room. He had all of the supplies to commit this very same crime once again. There is no reason to believe -- not to mention clear and convincing evidence to suggest -- that he will do anything different if he is released now.

Given all of the evidence your Honor has heard during this trial, it is clear that the defendant does pose a danger and that there is a real risk that he will flagrantly disregard orders from this Court, that he will commit new crimes and that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P72Wcom1

he will attempt to flee from justice, for all of the reasons that your Honor heard from the rest of my teammates during the various bail applications earlier on.  So even with not guilty verdicts on three of the charges here, the convictions here and the standard here under the statute suggest that your Honor should be detaining this defendant until sentencing.

MR. AGNIFILO:  Your Honor, if I could be heard?

THE COURT:  Well, hold on.

MR. AGNIFILO:  Yes.

THE COURT:  Ms. Comey, do you have any -- and this is a big ask, because this is just coming up right now, and I'll tell the parties that I'm not going to resolve this in this second.  We are going to resolve it while everyone is here, but I need to look at the applicable statutes and consider the views of the parties to make sure that we're making the right call here.

With that, Ms. Comey, do you have an example?  Is there another situation in which there's either been pretrial detention based solely on a Mann Act violation or based on a conviction on a Mann Act  charge, and bail was denied on those grounds?

It's a question that is unfair for me to ask you under these circumstances, and I'm happy to give you the opportunity to confer with colleagues and do what you need to do to get that information and to come back, because we're all here.  We

P72Wcom1

all plan to be here for the whole day, and I want to make sure I that hear your arguments and make sure that I get this right.

MS. COMEY:  Yes, your Honor.

I don't have an example off the top of my head of a Mann Act charge based on the transportation of adults.  I can think of instances where the Mann Act charge involved the transportation of minors.  I cannot think of an instance of transportation of adults.

I will note, however, your Honor, that we do intend to ask your Honor to consider relevant conduct when crafting this sentence, and I think it will be entirely appropriate for your Honor to consider relevant conduct.  Even setting aside acquitted conduct, the violence and the drug use that surrounded these violations are relevant conduct that your Honor will be asked to and should consider when imposing sentence in this case.  And that is why I do think that we will be seeking a substantial period of incarceration -- even setting aside whether or not your Honor considers acquitted conduct.  That's why this case is very serious, and even with the conviction on just these two charges, there is serious, serious relevant conduct here that will merit a lengthy period of incarceration.

THE COURT:  And Mr. Agnifilo, I will hear your oral application.

MR. AGNIFILO:  Yes.

P72Wcom1

THE COURT:  But what I'm thinking is we are here, and I think it would be helpful to me at least to receive even a letter from each side on these issues.

How much time, Ms. Comey, would you need to put together a letter describing in further detail the statements that you've made and the applicable law?

It's 10:30 right now.

MS. COMEY:  Your Honor, if we could have a few hours, that would be helpful.  In order to run the guidelines, in order to do a little more research on the question that your Honor asked me about, if we could have a few hours, that would be helpful in order to provide a letter to your Honor.

THE COURT:  I think that makes sense, Mr. Agnifilo.  And I understand that you don't, that Mr. Combs does not want to go back to the MDC.  All right.  He's shaking his head.

So, look, what it's going to mean is that you're going to have to cool your heels here in the courthouse for a while, but I think that makes sense, again, to just make sure that we get this right.  So by 1 p.m., could each side put in a letter on their position on the issue of bail, and then I will consider it and we will convene later in the afternoon.

MR. AGNIFILO:  That's fine, Judge.  Thank you.

THE COURT:  OK.  Very good.

And Mr. Agnifilo, I didn't want to cut you off if there's something you wanted to say in response to Ms. Comey.

MR. AGNIFILO:  I have plenty to say in light of the acquittal and all the things he's been acquitted of, most of which has been now mentioned by the prosecutor.  But we'll put all this in a letter.

THE COURT:  All right.  Very good.

So we will adjourn here until -- we'll notify the parties and let you know when we're going to come back.  But we'll await the parties' submissions at one.

With that, anything further from the government at this time?

MS. COMEY:  No, your Honor, not at this time.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  Just one last thing, and we'll put this in the letter too.

Mr. Combs has been given his life by this jury.  He was charged with counts that could have given him life in prison and he's going to get far, far less than that.  He's going to have his life.  He would be nothing short of a fool, which he is not, to do anything that would violate any condition that this Court set when this Court releases him, and I hope it does.

This is a unique set of circumstances.  This man was looking at spending the rest of his life in prison if he was convicted of the sex trafficking offenses or the RICO offenses with the racketeering activity that was part of it.  He's been

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P72Wcom2

acquitted of that conduct.  He has every reason to believe that your Honor will sentence as your Honor's done everything in this case -- with fairness and circumspection.  He treasures, I assure you, the opportunity that he has been given, and he will not run afoul of anything that this Court imposes on him.

That's the last thing I wanted to say.  We'll submit our letter by 1 o'clock.

THE COURT:  All right.  Very good.

For everyone who's in the courtroom, the only thing that I will say is please follow the instructions of court security, because we do have jurors in the back and they may have some instructions for you in terms of filing out of the courtroom, given that the jurors are still here.

With that, we will adjourn and we'll await the parties' submissions.

(Recess)

P72Wcom2

AFTERNOON SESSION

5:15 p.m.

THE COURT:  Please be seated.

I have received the parties' submissions as well as the submissions from various third parties that have been filed today.

Thank you for those.

The jury in this case convicted the defendant on Counts Three and Five, each of which charged him with knowingly transporting any individual in interstate or foreign commerce with intent that such individual engage in prostitution, in violation of 18 U.S.C. Section 2421.  Count Three charged the defendant with violations with respect to Casandra Ventura and Count Five with respect to Jane.

Following the verdict, the defendant moved for bail.

For the following reasons, bail is denied.

While the defense's letter proceeds under the assumption that 18 U.S.C. Section 3143(a)(1), applies the government correctly notes that Section 3143(a)(2) is the applicable provision, which makes detention mandatory absent circumstances not applicable here.

There is a limited safety valve for mandatory detention under 18 U.S.C. Section 3145(c).  However, it requires that the defendant, in addition to proving by clear and convincing evidence that he poses no risk of flight or a

P72Wcom2

danger to any person in the community, clearly show that there are exceptional reasons why such person's detention would not be appropriate.  The Second Circuit has made clear that exceptional circumstances exist where there is a unique combination of circumstances giving rise to situations that are out of the ordinary.  *United States v. Lea*, 360 F.3d 401, 403 (2d Cir. 2004).  The Second Circuit, in *Lea*, cited to *United States v. Lippold*, 175 F.Supp.2d 537, 540 (S.D.N.Y. 2001), which collected cases have noted that circumstances that are purely personal do not typically rise to the level of exceptional warranting release.  But those are precisely the types of circumstances that the defense points to in their second submission from today.  *See* Dkt. 438 at page 4.

For that reason, those that follow, and in the government's submission, at Dkt. 433, the limited exception to mandatory detention has not been demonstrated.  The Court disagrees with the defense's argument that the crime of conviction here does not trigger the mandatory detention statute.  It plainly does on the face of Section 3156(a)(4), which includes in the definition of crime of violence any felony under chapter 117.  There is no dispute that the crimes of conviction here arise under chapter 117.

The Court rejects the defense's invitation to override the plain text of a congressional statute based on legislative history, and there is no ambiguity that would permit the Court

P72Wcom2

to rule in the defense's favor on lenity grounds either. But even if the defendant was solely required to demonstrate by clear and convincing evidence that he is not likely to pose a danger to the safety of any other person or the community, under Section 3143(a)(1), he could not meet that burden for the following reasons as well as those articulated by the government in their submission:

The Court, first, notes that prior to trial, when detention was not mandatory and the burden was with the government rather than the defense, the Court denied bail, and the Court sees no reason to reach the opposite conclusion now, where the burden is with the defendant, and by clear and convincing standard no less.

Then we move to the trial in this case. At trial, the defense conceded the defendant's violence in his personal relationships saying it happened with respect to Cassie Ventura and Jane.

Tr. 7759, lines 18-19: "We own the domestic violence. We own it."

Tr. 7760, lines 11-12: "We own it."

Lines 14-16: "If he was charged with domestic violence, we wouldn't all be here having a trial, because he would have pled guilty, because he did that."

The defendant's concession was unnecessary, because the defendant's violence was starkly depicted in the 2016 video

of the Intercontinental Hotel incident involving Cassie Ventura. Here's what defense counsel said about that video in his closing argument:

"Imagine what that's like, because it's horrible. It's just, we're going to be real today. That's horrible for Ms. Ventura and her parents. This video comes out all over the world, and there she is. It's a terrible moment. It's a terrible moment, and she could have said anything. I'm glad she said something, but what she said rings true not only for her but for this trial, and I most respectfully submit for all of you domestic violence is the issue, is what she said." Tr. 7762, lines 9-16.

Tr. 7285: "The video is very much, very much domestic violence."

And that wasn't the only incident of violence that the defense referenced. Tr. 7795, lines 2-4, referring to the London hotel incident: "Obviously something happened. Obviously there was some physical event, and she had injuries. OK?"

And later, at Tr. 7860, line 5: "He was violent at times."

This type of violence, which happens behind closed doors in personal relationships, sparked by unpredictable bouts of anger, is impossible to police with conditions. Having conceded the defendant's propensity for violence in this way,

it is impossible for the defendant to demonstrate by clear and convincing evidence that he poses no danger to any other person or the community.

Notably, evidence of the defendant's violence includes conduct that occurred after the searches involved in this case had taken place and when the defendant was aware that he was under investigation on sex trafficking allegations.  One of the government's most striking examples of violence against Jane, as to which there was visible evidence of bruises and injuries, came from June 2024, after the searches of Combs's residences and at a time when he should have known that he needed to stay clean.  That was also one of the alleged violations of the Mann Act that the defendant was convicted on.  Contrary to the defense's suggestion that even before his offer of self-surrender, Mr. Combs demonstrated a pattern of trustworthiness and cooperation, Dkt. 432-2, this highlights a disregard for the rule of law and the propensity for violence.

The government's letter points to other examples of illegality that occurred after the defendant was aware of this investigation.  As the government observes, there was evidence at trial that the defendant engaged in a yearslong pattern of abuse and violence, including as recently as in June of 2024, and that this and other conduct documented in the government's letter shows that the defendant continues to be a danger to others and is either unable or unwilling to follow the law.

That's from the government's submission.

Now, the Court takes no position on what evidence or conduct will be relevant to the defendant's sentence on the crimes of conviction. But for present purposes, the defendant is unable to meet his burden to show by clear and convincing evidence the lack of danger to any person or the community, given the evidence admitted at trial. He certainly is not able to show exceptional circumstances warranting a departure by this Court from the mandatory detention that Congress has required. Under these circumstances, it is impossible for the defendant to show by clear and convincing evidence that he poses no danger to any person, let alone exceptional circumstances warranting a departure from mandatory detention.

The Court intimates no view as to what the appropriate sentence is in this case. No presentence report has been prepared. The defendant has not been interviewed by probation, and the parties and any alleged victims have not had the chance to put in their submissions on that score. But to put things in perspective, the defense offers that the guidelines sentence applicable to the defendant's offenses of conviction is 21 to 27 months of imprisonment. Dkt. 432-2.

The government submits that the correct calculation pins the defendant's guidelines range at least at 51 to 63 months of imprisonment. Dkt. 433-4.

To date, the defendant has served ten months in

P72Wcom2

prison, time that he will receive credit for on any ultimate sentence in this case.  The sentencing will take place in short order.  The Court proposes a sentencing date of Friday, October 3, 2025, at 10 a.m.  The Court is willing to expedite that date if the defense wishes.  In accordance with my individual rules and practices, the defense submissions are due two weeks prior to sentencing.  The government's submissions are due one week prior to sentencing.

I will direct the government to provide its statement of the offense to probation within seven days, and defense counsel must arrange for the defendant to be interviewed within the next two weeks.  As for any posttrial motions, the defense should follow the deadlines under the rules.  If the parties agree upon any alternative briefing schedule, then the Court will entertain that request.

With that, anything further from the government?

MS. COMEY:  No, your Honor.

THE COURT:  Anything further from the defense?

MR. AGNIFILO:  Yes, your Honor.

We would like an expedited sentencing schedule.  We would like a sentencing as soon as we can get a sentencing and have the Court feel that it has what it needs to sentence Mr. Combs.  I don't know what the Court is in a position to do in terms of expediting that schedule, but we would like as expedited a schedule as we can possibly have.

P72Wcom2

THE COURT:  That's fine with me.  Now, as you probably have experience with, the difficulty is in making sure that we can have a presentence report, that you have the chance to propose any changes, make appropriate objections.  That takes some amount of time.

However, I'll turn to Ms. Comey hopefully for some assistance in this regard.  Under these circumstances where an expedited sentencing is requested, in my experience the parties have usually met and conferred and then worked with probation to work out a schedule.  And I will tell you that I will make myself available on any schedule that the defense requests.  I just wanted to put those cards on the table because I understand that it's really not -- I could tell you that we could do this tomorrow, but that's not going to be feasible.  So it's really something to be worked out with probation and with the government.

MR. AGNIFILO:  If the Court was open, we'd be willing to waive a presentence investigation report.  If the Court was comfortable proceeding that way, we'd be willing to waive it.

THE COURT:  Well, I need the right information to make the decision here.  And here's what I'll say.

The one thing that I did see is that there is a great divide between the parties' views even as to the basic question as to how the sentencing guidelines apply here.  And so this is not one of those cases where there's agreement on basically

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

everything and the only question is how the 3553(a) factors apply.  As reflected in the government's submission, there is substantial dispute on that issue.

I also would want to refer to the various provisions regarding sentencing to make sure that we are acting consistently with the Federal Rules of Criminal Procedure and the requirements in that regard.  And I see Ms. Comey has her statute book open, so she's probably about to tell me that there are certain requirements that would require some amount of time here.

MS. COMEY:  That's right, your Honor.

I'm looking at Rule 32(c)(1), which requires an investigation unless your Honor makes a finding that the Court has sufficient information in the record enabling the Court to meaningfully exercise its sentencing authority under 18 U.S.C. 1353 and the Court explains that finding on the record.

I agree with your Honor, given the complexity of this trial and the wide divide between the parties, I don't know that the Court would be able to make that finding.

I will note, though, that in my experience, probation is often able to speed up the process quite a bit, and I'm happy to work with Mr. Agnifilo to contact the probation department as quickly as possible and try to find out how quickly they could finalize a report.

THE COURT:  All right.  Let me ask, given that the

P72Wcom2

Court is closed tomorrow, what I'll ask the parties to do is meet and confer, speak with probation and provide the Court with a status update by Tuesday, which is July 8, at noon.  And why don't we set a remote hearing for the afternoon.  And I'll see what the parties have proposed and we'll figure out a schedule.

And I think time is of the essence -- I know it is, because you just told me it was, Mr. Agnifilo, and so we'll have a hearing in the afternoon.  I think we can do it remotely, unless someone tells me that we need to do it in person, to work out the schedule here.

MR. AGNIFILO:  One of the reasons why I'm proposing it in this case is because your Honor sat through the trial.  I mean I think your Honor knows what it's like to sentence a case where the Court did not sit through a trial and then when it does sit through a trial, there's just so much that the Court knows that, as good as the probation reports always are in this district, and every district, your Honor has a wealth of information that only sitting through a lengthy trial could provide.  If that were not -- I would never suggest this for a trial judge who did not sit through the trial.  So I just wanted to make your Honor understand why I thought this was even a possibility and something that I was proposing.

And just very quickly, I understand that there's a divide between the parties.  The reason that we want the

P72Wcom2

sentence as soon as possible is a very quick review over the course of the day of other Mann Act cases indicates there's nothing remotely similar to this. And what I mean by similar to this is every Mann Act case that we have found involves someone who's making money through prostitution, basically in the position of being a pimp. Very often these are in the millions of dollars. Very often there's cases where minors are involved, which this case does not have.

And so one of the reasons we want to get this case to sentencing as soon as possible is we think we have very strong arguments that Mr. Combs would be entitled, under 3553(a) factors, to a below-guidelines sentence. And so we believe we have very strong arguments. Your Honor has made up your Honor's mind on the subject of bail today. I see that. And as much as I've been preparing the entire day to speak to the Court, I don't know as I -- I'm not seeing a glimmer of light coming from the Court. But I would point out one thing, because I have been preparing all day.

I think the exceptional circumstances are not primarily related to the family. That is what we wrote. And that's what we wrote because we'd been living with the current situation at that point for a total of about three and a half hours. But I think really what's different about this case is the facts. And the facts make this so drastically different.

We cited four cases in the first letter to the Court,

and the first one was *U.S. v. Dillon*.  *U.S. v. Dillon* involved a pimp.  The pimp had female adult prostitutes that he was basically making money from, and he made over $1.4 million from being a pimp in the prostitution business.  He pled guilty, and he was out pending sentence.  The same provisions would have applied to Mr. Dillon as apply here, yet he was out pending sentence.

U.S. *U.S. v. Daskal* was an Eastern District case before Judge Garaufis.  Mr. Daskal was charged with the Mann Act and other offenses.  Mr. Daskal had a long relationship with an underage girl, and he was a grown man.  And he was out after his guilty plea pending sentence.

*U.S. v. Lin* involved a massage parlor that was in essence a prostitution ring.  That person got a year and a day.  The government recommended 24 months.  That person made over $1.3 million from the business of prostitution.

*United States v. Brener*, which is the last of the four cases we cite in our first letter, involved something called the Emperors Club.  And the Emperors Club was noteworthy because the most noteworthy person who used the Emperors Club services was the sitting governor of the state of New York at the time.  The sitting governor was the person using the prostitution services, just as Mr. Combs in this case was the person using the prostitution services.

The Southern District of New York did not charge the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P72Wcom2

sitting governor.  He was doing these things while the sitting governor and because he was the user of prostitution services rather than running the business of making money from the business of prostitution.  He was not even charged, as we all know.  And I think we all know who I'm talking about.  It was 2008.  He resigned as being the sitting governor of New York after the indictment of the Emperors Club came down.

So all to say I think we have very strong arguments for a reasonable sentence in this case, and so we're going to move everything we can to try to get Mr. Combs sentenced as soon as possible.  I'm looking at your Honor's face to see if there's any glimmer of light.  And I see a smile.

THE COURT:  I do appreciate the summary, because I think you're explaining why this case presents, perhaps, a unique circumstance that would warrant a very expedited sentencing proceeding, from your perspective.

MR. AGNIFILO:  But unique and maybe even exceptional. Maybe even exceptional.

THE COURT:  On that score, you mentioned four cases, and I'll certainly give the government a chance to respond, but you're not suggesting that in those four cases the courts evaluated the safety valve under 3145, because on my reading of those cases what happened was that, after conviction, whether by guilty plea or by trial, there was simply no discussion of the issue of detention from that point on.  It wasn't opposed

by the government, and so that issue just didn't come up.

MR. AGNIFILO:  That's exactly right.

THE COURT:  There wasn't an inquiry as to whether there was exceptional circumstances that would fit the *Lea* definition.  And of course, in *Lea*, the court reversed a district court determination that the exceptional circumstances had been satisfied.  Every case presents its own circumstances.  In that case, it was, I believe, employment, the fact that the individual was a first-time offender and certain other personal circumstances.  And that's what gave rise to what *Lea* said about the nature of the exceptional circumstances exception.

MR. AGNIFILO:  I knew the Court was going to be concerned with the *Lea* case, and of course it is.  It's a Second Circuit case that cabins what exceptional circumstances can be.  But I think we not only have exceptional circumstances, I think we have unique circumstances.  I just don't know of another case where the user of prostitution services has been convicted and moving to sentence on the Mann Act.  It's always a business.  The Emperors Club was a business that made a tremendous amount of money from the business of adult prostitution.  The other cases are businesses that made a tremendous amount of money from the business of adult prostitution.

We have a conviction on the Mann Act, and that's where we're sitting today.  But I do believe that had we had more

P72Wcom2

time -- your Honor's dealing with the letters we submit to the Court. And we're doing it on an expedited basis. We get a verdict today. We get a verdict today, and we are off and running, you know, trying to figure out what are the exceptional circumstances in this case. And after we write the letter, we all say really the exceptional circumstances are the facts of the case, you know, and so had we said that to the judge, maybe your Honor would think about it differently.

So all this to say I know your Honor's worked so hard for the entire trial, and I see how the Court does things, and it's truly admirable and the time the Court takes. I think the issue here for us is I think had we had more time, I think we could have dealt with the *Lea* issues and the exceptional circumstances in a more fulsome way. I could tell that the Court was going to be concerned that the Court didn't want to run afoul of the *Lea* decision, and I don't know that we gave the Court enough in our letters to make the Court believe that there were exceptional circumstances.

THE COURT: Why would that matter given that I ruled that even if this were not a mandatory detention situation, nevertheless, you would have the burden by clear and convincing evidence to establish that the defendant posed no danger to the safety of any person and the community. And you full-throatedly in your closing argument told the jury that there was violence here. And domestic violence is violence.

And you said that this is a case that did involve violence.

Now, you told the jury that the government had failed to meet the requirements of the various charges, the sex trafficking counts and the RICO charges, and you prevailed in that respect. But as to the basic question of violence, you conceded that in your closing. Given that and given the evidence -- now, to be clear, as I said, the relevance of that evidence as to sentencing is not an issue that we're dealing with.

Here, the evidence, though, can be considered by the Court on a bail application, and you've been there. Sometimes in pretrial detention people come in and they're pointing to various facts. Here, we have a trial record, and in a situation where the defendant bears the burden to show a lack of danger to any person by clear and convincing evidence, that evidentiary record, for the reasons I said, would make it impossible to meet that standard even under the normal standard that would apply under 3143(a).

MR. AGNIFILO: Right.

So, that's absolutely true. I would note that I believe since 2018 there was one incident of violence involving -- in June of 2024. That was the subject of Jane's testimony, and your Honor remembers that testimony. I mean there's an argument -- we didn't need to make it because it was an assault case -- that Mr. Combs was defending himself. She

was very clear.  She attacked him first.  But I think more to the point, and this started to come out at the trial and I think we started to bring it up and then I think there was an objection.  We went to the side, and I think that for reasons that were the right reasons your Honor didn't think it was appropriate for the jury.  But I do think it's appropriate for today, and it's this.

Mr. Combs made efforts to get into a batterer's program, and I know of them because Ms. Geragos and I were the ones who got him into the batterer's program.  And I believe Jane helped him write the letter to get into the batterer's program.  It's called the Urban Resource Institute.  He came to New York.  He went to meetings.  He participated.  We have someone from there who I think we'll probably bring to the sentencing to tell your Honor what he did.  And then he got arrested.  And we knew he was going to get arrested.

As your Honor probably remembers, he came to New York, because when Ms. Geragos and I met with the prosecutors, we knew it was coming soon.  We told Mr. Combs it's coming soon; you should come to New York and surrender.  And so he came to New York to surrender.  So here we are all these months later, and you know, we have a man who came to New York to surrender, who gave his passport to Ms. Geragos and I in April of 2024, seven, six months before he was arrested.  We took his plane away from him and chartered it through a company.  We did all

these things, and none of them worked at the bail hearing because he was held.  And he was held in large part because he was charged with sex trafficking that has a rebuttable presumption of detention.

But he came here.  He fought for his innocence.  A jury listened to the evidence.  The jury acquitted him of the most serious charges.  He's now basically convicted of the two prostitution-related offenses, but the same drive to meet the case head on, honorably, you know, like a self-respecting, you know, businessman that he is, a serious person -- I mean I think if the trial showcases one thing, he's done remarkable things in his life.  He has these flaws in his personality, which are significant, and which have held him back, which have brought him into this courtroom and I think, honestly, which the jury has -- you know, we have our own issues with the conviction, but for the most part got right.  And he is a man who's in the process of working on himself.

He's been a model prisoner.  That's no small matter. He's been in a very difficult part of the MDC.  He's been in the unit where there are fights, where people get in trouble and go to the SHU, but he's been spotless.  He hasn't had any issues in his record, and he's been truly a remarkable prisoner.  There's been no issues whatsoever.  I don't know of any disciplinary procedures that he's been through.

And so we really do have a man who's done everything

that we could possibly ask of him, including come to New York and surrender his passport. I would call the prosecutor and say, we're happy to come down, you know, we're happy to come down. Whenever the case wants to start, just let us know. And they didn't want to do that because they wanted to be able to hold him. And I get it. Honestly, the fact that we were able to try this case with Mr. Combs in jail, arguably effectively, is a testament to him.

I want to thank the MDC. The MDC gave us good access to him. They made it work, and your Honor helped us out a great deal by giving us access to him. But this is a man who just lived up to his obligation, who's kept his word. He came here to prove his innocence, and he did, with the exception of the two prostitution counts. And I just think we should trust him. He's not going to flee. He's been given his life back. I mean this jury gave him a chance at life. He's going to have next chapters of his life. As your Honor can imagine -- I'm not going to get into conversations lawyers have with their clients, but when you're charged with racketeering conspiracy and sex trafficking, there are all sorts of the darkest conversations one can imagine  about what your life could have been and what your life became.

And you know, just on this point, and your Honor probably saw this. When I was reading the Mia message for his birthday, I had a hard time finishing it because it talked

about how glorious his life was going to be. And it wasn't, because look at all that's happened to him. But he did the right thing. You know, he did the right thing, and he came here. He faced the Court. He's been decent with the Court each and every day. And he just deserves the chance.

I mean his children are here. I know that we submitted letters to your Honor, and I don't want to pull heart strings when I shouldn't pull heart strings, but as your Honor knows, the mother of some of his children had passed away many years ago. These kids, the two daughters here sitting in the middle of your Honor's second row, you know, don't have a parent. And I know these are arguments we're going to make at sentencing as well, but it's very difficult on everybody. And here's someone who really has done the right thing, you know, did everything that our justice system would expect of him. Sat for the trial, was acquitted of the most serious charges, was convicted of prostitution charges.

I know that, your Honor, we have statutes that we contend with and I knew that the way the statute's laid out was going to make it hard for your Honor to release him. I recognized that going in. But I think the through line that would allow the Court to do just that is that this is such an unusual, I mean an exceptional set of circumstances, that the user of prostitution services is being convicted of the Mann Act and is looking to get sentenced. And all the other things

P72Wcom2

are really, I think, beside the point.  He's been acquitted of the violence, the violence to the extent that it was related to the sex trafficking; he was acquitted of that.  To the extent there was some notion that he obstructed justice, he was acquitted of that and we'll deal with that when we get closer to sentencing.

Your Honor put a great deal of thought into your Honor's decision, and I recognize that, but I'm trying to give some hope to the fact that you've let me speak as long as the Court has.  I'm asking you to trust him, Judge.

THE COURT:  OK.

MR. AGNIFILO:  And I know he wants to talk to you. Mr. Combs wants to talk to you, but let me just see what he wants to say.

THE COURT:  Yes.  Why don't you confer with your client.

And while you're doing that, Ms. Comey, if you'd like to respond, you may.

MS. COMEY:  Your Honor, the statute is clear.  Your Honor's interpretation of the statute is clear.  There's no wiggle room here.  Congress's intention was that any defendant convicted under this statute be detained, and the only things exceptional about this defendant are his wealth, his violence and his brazenness.  He is extraordinarily wealthy and capable of flight.  Any amount of time in jail is a reason to flee.  He

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

faces the almost certainty of additional jail time.

His violence, your Honor has already hit the nail on the head with that. He's an extremely violent man with an extraordinarily dangerous temper, who has shown no remorse and no regret for his violence toward multiple victims, not just Cassie and Jane but multiple other victims, who showed courage coming here and testifying about it.

And his brazenness is unmatched. As a defendant who knew he was under federal investigation for almost a year, he continued to violate the law by continuing to transport individuals for prostitution. He abused Jane viciously. The suggestion that that was self-defense is insulting. He was not engaging in self-defense when he was kicking her and hitting her after she ran away from him and went into a ball. He was not engaging in self-defense when he slapped her three times while she was naked in the shower until she collapsed to the ground. That was not self-defense. That was violence. It was brutality, and it was brazen. It was also brazen for him to continue to have drugs and clearly the supplies for another act of prostitution in the hotel room where he was inviting Jane to come until he was arrested. There is nothing exceptional about this case except for his continued criminality and his willingness to violate the law.

There is absolutely no basis to release the defendant until he is sentenced. We will work very hard with the defense

P72Wcom2

to make sure that sentencing is expedited, but there is no reason for your Honor to reconsider your ruling.

THE COURT:  All right.  Very good.

MR. AGNIFILO:  Judge, may I add one thing?

If the Court is concerned, and I've heard the Court loud and clear.  If the Court is concerned that Mr. Combs would be released to his home and then do something that intimidates, threatens, puts off another person, we can fashion conditions around that.  So the door that I'm wondering if I can keep open a crack is -- I hear your Honor's ruling; I do, and I respect it -- would the Court be open to us going back, putting together a bail package.  I'll float it by the government.  I'm listening to Ms. Comey.  I'm not very hopeful.  Listening to Ms. Comey makes me appreciate that we have juries, but I'm very happy to try a proposal and see how it goes, and maybe we can come back to your Honor with something that would address your Honor's concern.

THE COURT:  OK.  So for the reasons I indicated, the application for bail is denied.  I want to make sure that we didn't lose the thread of where I think you started, which is the reasons why in this case an expedited sentencing proceeding would be in order.  I've heard you on that.  I think the government has heard you on that.  So we'll receive hopefully a joint proposal from the parties as to how we can proceed to match that expectation of doing this in a quick fashion.  We'll

P72Wcom2

receive that on Tuesday.  We'll have a hearing that we'll set. I'll just give you the time so we can do this now.  Do it at 2 p.m. on July 8.

Does either side request that that be in person? Otherwise, I think it might make it easier to do it remotely.

MS. COMEY:  No, your Honor, but we defer to the defense on whether they waive the defendant's presence.

MR. AGNIFILO:  Remotely's fine, your Honor.

THE COURT:  All right.  So we'll do a remote conference on Tuesday at 2 p.m.

Anything further from the government?

MS. COMEY:  No.  Thank you, your Honor.

THE COURT:  Anything further from the defense?

MR. AGNIFILO:  No.  Thank you, your Honor.

THE COURT:  All right.  Thank you very much, everybody.

Have a great July 4th and an excellent weekend.

(Adjourned)