# AGNIFILO
# INTRATER

---

July 29, 2025

**VIA ECF**
The Honorable Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    <u>United States v. Sean Combs</u>, 24 Cr. 542 (AS)

Dear Judge Subramanian:

    Sean Combs, through his counsel, moves for his release on appropriate conditions in advance of his sentencing hearing, scheduled for October 3, 2025. Title 18, United States Code, Section 3145(c) gives the District Court the authority to release a person otherwise subject to detention pursuant to Section 3143(a)(2) where, among other things, "it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." *United States v. Chavez*, 22-cr-303 (JMF), 710 F. Supp. 3d 227, 230 (S.D.N.Y. Jan. 4, 2024). There are exceptional circumstances warranting a departure from mandatory detention and ensuring that Sean Combs is released.

    First, as shown below, the history of the Mann Act as well as how it has been prosecuted over the last several decades clearly indicate the exceptional, indeed unique, nature of this case, specifically the prosecution and continued incarceration of a customer of services provided by a sex worker to a third person, rather than of a defendant profiting financially from the business of prostitution. In the limited cases of Mann Act convictions from across the country that bear any similarity to Mr. Combs' case, the defendants were *released pending sentencing*. Second, Mr. Combs' conditions of confinement at the MDC qualify as "exceptional circumstances" under *United States v. Chavez*.

    To be released on conditions under Section 3145(c), two conditions must be met. First, the district court must find by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released. Second, it must be clearly shown that there are exceptional reasons why such person's detention would not be appropriate. We will first address the exceptional reasons justifying Mr. Combs release and then turn the set of proposed conditions that will assure Mr. Combs' return to Court and ensure the safety of the community.

Hon. Arun Subramanian
July 29, 2025

      1.    <u>Exceptional Reasons in This Case Justify Release Under Section 3145(c)</u>

As noted, there are several exceptional reasons justifying release. First, in the history of the statute, the Mann Act has never been applied to facts similar to these to prosecute or incarcerate any other person. Second, in any somewhat similarly situated cases to this one, all the defendants were *released pending sentencing*. Third, under *Chavez*, Mr. Combs' conditions of confinement at the MDC for the past 11 months justify release.

As Judge Furman noted in *Chavez*, the "Supreme Court has never addressed the meaning of the 'exceptional reasons' provision, and the Second Circuit has addressed it only sparingly." 710 F. Supp. 3d at 231. The provision was first addressed by the Second Circuit in *United States v. DiSomma*, 951 F.2d 494 (2d Cir. 1991), where the Court observed "[n]either that statute nor case law defines the circumstances which may qualify as exceptional reasons permitting release" and that "[t]he legislative history on the issue is sparse and uninformative." *Id.* at 497. The Court further stated that "a case by case evaluation is essential, and it is not our intention to foreclose district judges from the full exercise of discretion in these matters." *Id.*

The *United States v. Lea* decision gives a trial court "wide latitude to determine whether a particular set of circumstances qualifies as exceptional." 360 F.3d 401, 403 (2d Cir. 2006). The circumstances here are by definition exceptional in that there has never been a Mann Act prosecution remotely like this one. Clearly, this is precisely the type of exception that the Court in *Lea* was contemplating when it gave this wide latitude to the trial court.

The *Chavez* decision further noted that the "Circuit's only other published decision addressing the meaning of 'exceptional reasons in Section 3145(c) is" *United States v. DiSomma*, 951 F.2d 494 (2d Cir. 1991). There, the district court found exceptional circumstances because the defendant was a student enrolled in community college, was employed full-time and had no prior convictions. The Court of Appeals found this was a clearly erroneous interpretation of "exceptional reasons," noting that "the test under Section 3145(c) "is necessarily a flexible one, and district courts have wide latitude to determine whether a particular set of circumstances qualifies as 'exceptional.' The Court of Appeals found, however, that there was nothing exceptional about attending school or being a first-time offender. Similarly, in the unpublished decision of *United States v. Colon*, 821 F.App'x 39, 42 (2d Cir. 2020), the Court observed that supporting one's family, being employed and complying with the conditions of supervision are likewise not exceptional reasons for release.

The proffered reasons here, specifically the exceptional nature of prosecuting and incarcerating a person convicted of paying for sex services to be provided to his girlfriend, as well as the exceptional circumstances facing Mr. Combs at the MDC given the truly unique circumstances of this case, are specifically the type of exceptional reasons that justify release under Section 3145(c). Far from being routine bases typical of many defendants, the reasons here present unique circumstances that are found in virtually no other cases. We address these exceptional reasons in turn.

Hon. Arun Subramanian
July 29, 2025

        A.        The Underlying Facts Make This Prosecution and Continued Incarceration Exceptional

The prosecution and continued incarceration of Sean Combs are unique in the history of the Mann Act. There has literally never been a case like this one, where a person and his girlfriend arranged for *adult* men to have consensual sexual relations with the adult long-term girlfriend as part of a demonstrated "swingers" lifestyle and has been prosecuted and incarcerated under the Mann Act. Combs and two of his long-time girlfriends had a private, intimate life that is not uncommon today. It may not have been common on June 25, 1910, when the Mann Act, or as it was originally called, the White-Slave Traffic Act, was passed. But attitudes about sex and morality have come a long way in the last 115 years. It is worth noting that when the Mann Act was passed to protect the morals and decency of America's women, America's women were not allowed to vote. As noted below, perhaps due to the troubling background of this statute, whose history is rich with both racism and misogyny, the Department of Justice has limited its application to those people profiting financially from the business of prostitution and not using it to prosecute consensual adults for their own lifestyles.

Cassie Ventura and Sean Combs went to swingers clubs and they had threesomes. Ms. Ventura consistently expressed interest and enthusiasm in her intimate life with Combs, including what they called "freak offs." Jane and Sean Combs had threesomes too. When Jane and Combs watched pornography together, Jane testified that she contacted two different porn stars and invited them to join her and Mr. Combs. Both Ms. Ventura and Jane testified that very often they would see the same men over and over again for years. In July of 2024, Jane testified, for instance, that she suggested to Mr. Combs that they call Paul. Jane explained that she told Combs she "missed Paul."[1]  When asked why she said that, she responded, "because I did."[2] This was a lifestyle, one that both Ms. Ventura and Jane chose. One they all—as grown adults—had a right to choose. Like many aspects of sex and intimacy, it was not without its complications, its bouts of jealousy, and, at times, its frustrations. But that is a hallmark of any serious romantic relationship, and that is what these were, serious, long-term romantic relationships.

A jury listened closely to all the evidence concerning these two relationships at the center of this sprawling racketeering conspiracy indictment, and the jury acquitted Mr. Combs of all of the serious counts and almost all of the conduct charged.[3]  The jury concluded that Ms. Ventura and Jane were not forced, coerced or defrauded into having commercial sex. But it did conclude that there was prostitution, that the payment for the Cowboys4Angels, the porn stars and others amounted to sex for money, despite what the only two escorts called by the government testified.

In the lifestyle that he and other adults voluntarily chose, Mr. Combs would be called a swinger. But in the vocabulary of the Mann Act or of prostitution generally, he might—at worst—be somewhat analogous to a "john," someone who pays to have sex with a sex worker, in this case a male sex worker, more particularly a male sex worker who works for and is vetted by a well-

---

[1] Tr. at 5874:10-5874:21 (June 12, 2025) (Jane cross); Tr. at 5242:23-5243:3 (Jane Direct)
[2] Tr. at 5417:3-8, 5417:14-22 (June 10, 2025) (Jane cross)
[3] The Racketeering Conspiracy alleged numerous potential acts of sex trafficking, forced labor, and drug distribution, three kidnappings, one arson, several acts of obstruction of justice and witness intimidation. The jury convicted him of none of them.

Hon. Arun Subramanian
July 29, 2025

known agency called Cowboys For Angels, or another similar agency or who works as a paid porn star in connection with movies.

Sean Combs should not be in jail for this conduct. In fact, he may be the only person currently in a United States jail for being any sort of john, and certainly the only person in jail for hiring adult male escorts for him and his girlfriend, when he did not even have sex with the escort himself. Over the last 75 years, the White Slave Traffic Act[4] has been limited to defendants who cause interstate travel for financial gain through the business of prostitution, as reflected in the cases brought under the statute as well as the explicit enforcement policies set out in the United States Attorney Manual, more recently called the Justice Manual. That Sean Combs remains in jail for being convicted of being a customer of consensual adult sex services makes this case truly exceptional under Section 3145(c). Not only is prosecuting the users of adult prostitution services inconsistent with the Mann Act, it is inconsistent with the prosecution policies of the District Attorneys of Manhattan, and the City Attorney of Los Angeles, California, two of the three locations where this prostitution allegedly took place.[5] In addition, Mr. Combs is incarcerated while everyone else involved in this identical conduct – his girlfriends, the "cowboys," the agency's leaders, the porn stars and others – walk free, as they should. If there was ever a fact pattern that was exceptional under the Mann Act, it is this one. As a result, this Court should release him on reasonable conditions in advance of sentencing, scheduled for October 3, 2025. This fundamental factual distinction between the current case and the scores of other Mann Act and prostitution cases make this case exceptional under *Lea*, 360 F.3d at 403.

        B.      Prosecution of These Facts Is Inconsistent With Department of Justice Policy

It has been the explicit policy of the U.S. Department of Justice to charge the Mann Act in adult prostitution cases only where the defendant is motivated by commercial gain. For over 75 years, the Department of Justice has made clear through its own enforcement policies that Mann Act enforcement should be limited to cases targeting defendants who violated the statute for commercial gain.[6] For example, the 1953 version of the U.S. Attorneys' Manual stated:

> The White Slave Traffic Act makes it an offense knowingly to transport any woman or girl in interstate or foreign commerce or in

---

[4] Title 18, United States Code, Section 1961 still refers to Section 2421 as "white slave traffic" when defining it as racketeering activity under the RICO statute.

[5] D.A. Vance Ends Prosecution of Prostitution and Unlicensed Massage, A First in New York State, Manhattan District Attorney (Apr. 21, 2021), https://web.archive.org/web/20211018071917/https://www.manhattanda.org/d-a-vance-ends-prosecution-of-prostitution-and-unlicensed-massage/ (last visited July 28, 2025); Carrie Baker, LA City Attorney Hydee Feldstein Soto on Fighting Child Sex Trafficking—Because Kids' Rights Are Not for Sale, Ms. Magazine (Aug. 6, 2024, 9:14 AM), https://msmagazine.com/2024/08/06/los-angeles-california-city-attorney-hydee-feldstein-soto-child-sex-trafficking-abuse/ (last visited July 28, 2025) (stating What consenting adults do behind closed doors without involving a minor is not a priority for our office. There's a law against prostitution. I'm not nullifying the law, but my office, like so many others, has limited resources to address multiple issues, and so adult sex work is not a priority.").

[6] Archived versions of the U.S. Attorneys' Manual are available here: United States Attorneys' Manual & Resource Manual Archives, https://www.justice.gov/archive/usao/usam/index.html.

Hon. Arun Subramanian
July 29, 2025

> the District of Columbia or in any territory or possession of the United States for the purpose of prostitution, debauchery or for any other immoral purpose. Commercialism is not essential to a violation of the Act. *Caminetti* v. *United States*, 242 U.S. 470. However, **as a general rule prosecution should not be instituted in the so-called "non-commercial" cases**….
>
> As a guide to the exercise of sound discretion in noncommercial cases, consideration maybe given to prosecution in such cases as the fraudulent overreaching of previously chaste young women or girls, or cases where State laws are inadequate, involving married women with young children who are living with their husbands. Cases having the appearance of blackmail should, as far as possible, be avoided.[7]

This policy of not prosecuting "non-commercial cases" continued through the remainder of the 1900s until the focus of the statute turned to cases involving minors and/or sex trafficking in the 1980s, as discussed below. Thus, the 1961 U.S. Attorneys' Manual stated that "prosecution of persons who are not engaged in commercial prostitution enterprises as panderers, operators of houses of prostitution or call girl operations, and those who act for or in association with such persons, **should not be instituted without prior approval of the Criminal Division**."[8] The 1970 and 1984 Manuals stated the same.[9]

By 1988, enforcement priority shifted to cases involving sex trafficking and minors, yet "non-commercial cases" remained deprioritized:

> Unless minors are victims, prosecutions under 18 U.S.C. §§ 2421 and 2422 should generally be limited to persons engaged in commercial prostitution activities, even though commerciality is not an element of the offense. *See Cleveland v. United States*, 329 U.S. 14 (1946), and *Caminetti v. United States*, 242 U.S. 470 (1917). Prosecution of persons other than those engaged in commercial prostitution enterprises as panderers, operators of houses of prostitution, or call-girl operations, and of those acting for or in association with such persons, should not be instituted without consultation with the General Litigation and Legal Advice Section unless minors are victims.[10]

That directive continued through the most recent iteration of the U.S. Attorneys' Manual. *See* https://www.justice.gov/archives/usam/archives/usam-9-79000-other-criminal-division-

---

[7] 1953 U.S. Attorneys' Manual at 111, https://www.justice.gov/archive/usao/usam/1953/title2criminaldivision.pdf.
[8] 1961 U.S. Attorneys' Manual at 109, https://www.justice.gov/archive/usao/usam/1961/title2criminaldivision.pdf.
[9] 1970 U.S. Attorneys' Manual at 192, https://www.justice.gov/archive/usao/usam/1970/title2criminaldivision.pdf; 1984 U.S. Attorneys' Manual at 9-79.100, https://www.justice.gov/archive/usao/usam/1984/title9_part2.pdf.
[10] 1988 U.S. Attorneys' Manual at 9-79.100, https://www.justice.gov/archive/usao/usam/1988/title9criminaldivisionchapters71-100.pdf.

Hon. Arun Subramanian
July 29, 2025

statutes. And today, the Justice Manual, which replaced the U.S. Attorneys' Manual in 2018, makes clear that the "prosecution of customers" involved in an 18 U.S.C. § 2421 offense—like Mr. Combs here—is now limited to "prosecuting those who engage in commercial sex with victims of sex trafficking, in addition to those who otherwise perpetrate or facilitate human trafficking offenses."[11] In the absence of any sex trafficking charge, however, it is clear that the standalone Mann Act counts never would have been prosecuted.

Historically, the punishments for non-commercial Mann Act violations were similarly limited and restrained. Prior to the creation of the Sentencing Guidelines, the United States Parole Commission rated non-commercial prostitution offenses under the Mann Act to be "Category One" offenses—the lowest severity level—warranting "customary total time to be served prior to release" of less than 6 months to 12 months for "Very Good," "Good," and "Fair" defendant scores, and time up to 16 months only for "Poor" defendant scores.[12] And when the Sentencing Guidelines were first created, the Mann Act guideline, §2G1.1, provided a base offense level of 14, which—in accordance with longstanding DOJ enforcement policy—"assume[d] that the offense was committed for profit."[13] It further provided "[i]n the infrequent case where the defendant did not commit the offense for profit and the offense did not involve physical force or coercion, the Commission recommends **a downward departure of 8 levels**."[14] That application note was in force through the 1995 Sentencing Guidelines, until Amendment 538 removed the application note for non-substantive reasons as part of a consolidation of §2G1.1 with §2G1.2.[15]

In sum, for over 75 years Mann Act enforcement has been limited to cases entirely distinguishable from the instant offense of conviction—for merely paying for a person to have sex with others—and intentionally so given DOJ's explicit instructions to avoid prosecuting offenses like the instant offense of conviction. For example, the only modern era prosecutions of "johns" that we have identified involved defendants who patronized prostitutes who were vulnerable immigrants with limited English language skills who were being trafficked by brothel owners. And these cases, unlike here, did not involve defendants who paid a person but did not himself have sex with the person. Regardless, the penalties for such offenses were typically less punitive than the prison time Mr. Combs has already served.

> C. Consistent With Justice Department Policy, Mann Act Cases in Recent Years Are Focused on Defendants Profiting From the Business of Prostitution

The prosecutions by U.S. Attorney's offices in the district courts within the Second Circuit have, as expected, followed the directives provided by the Department of Justice. In the Southern

---

[11] Justice Manual, 8-3.400 - Prosecution of Customers Involved in Federal Sex Trafficking Offenses, https://www.justice.gov/jm/jm-8-3000-enforcement-civil-rights-criminal-statutes.
[12] United States Parole Commission Rules and Procedures Manual at 26, 50 (Oct. 1, 1984), https://www.ojp.gov/pdffiles1/Digitization/98125NCJRS.pdf.
[13] 1987 Guidelines Manual §2G1.1, Application Note 1, https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/Chapter_2_E-K.pdf.
[14] Id.
[15] 1995 Guidelines Manual §2G1.1, Application Note 1, https://www.ussc.gov/guidelines/2015-guidelines-manual/archive/1995-ch2ptg; see 2024 Guidelines Manual Appendix C, Amendment 538, https://www.ussc.gov/guidelines/amendment/538.

Hon. Arun Subramanian
July 29, 2025

District of New York, cases such as *United States v. Dillon*, 21-cr-423-JPC (S.D.N.Y.), *United States v. Lin*, 23-cr-469-KMK (S.D.N.Y.), *United States v. Brener*, 08-cr-533 (S.D.N.Y.), *United States v. Trochtchenkova*, 05-cr-503 (S.D.N.Y.), *United States v. Modica*, 09-cr-1243 (S.D.N.Y.), *United States v. Chang*, 10-cr-878 (S.D.N.Y.), *United States v. He*, 15-cr-730 (S.D.N.Y.), *United States v. Gong*, 16-cr-460 (S.D.N.Y.), *United States v, Green*, 16-cr-758 (S.D.N.Y.), *United States v. Randall*, 19-cr-131 (S.D.N.Y.), *United States v. Wu*, 18-cr-159 (S.D.N.Y.), *United States v. Hernandez-Velazquez*, 19-cr-306 (S.D.N.Y.) and *United States v. Jordan*, 21-cr-423 (S.D.N.Y.). each involved defendants who developed and/or maintained prostitution businesses to make a financial profit. The common element to these cases is a clear financial motive on the part of the defendant. In some of these cases, such as *Hernandez-Velazquez*, the prostitution businesses involved well-organized trafficking organizations which smuggled poor, vulnerable, young women from another country to the United States to work in brothels while the organization took the lion's share of the profit.

In the Eastern District of New York, cases such as *United States v. Cortes-Eliosa*, 06-cr-219 (E.D.N.Y), *United States v. Kim*, 06-cr-605 (E.D.N.Y.), *United States v. Brockett*, 08-cr-829 (E.D.N.Y.), *United States v. Blake*, 11-cr-183 (E.D.N.Y.), *United States v. Mendoza-Mendez*, 15-cr-640 (E.D.N.Y.) and *United States v. Osario*, 21-cr-336 (E.D.N.Y.), likewise involved defendants who operated prostitution businesses for profit. Several of these cases also involved the prostitution business moving women from another country to the United States and taking advantage of the women's immigration status. In *United States v. Jacob Daskal*, 21-cr-110 (E.D.N.Y.), the defendant had a long-term relationship with a 15-year-old girl. So, while *Daskal* was not motivated by profit, the victim in that case was a child.

Of the district courts within the Second Circuit, the only case located to date by the defense where a "john" was prosecuted under the Mann Act in an adult prostitution case was from the Western District of New York in the case of *United States v. Trowbridge*, 08-cr-74 (W.D.N.Y), where the defendant was a retired police officer who, along with a former New York State Judge, Tills, and others, hired women whom they paid to have sex with members of a male fraternal group called the Jesters. Although Tills and Trowbridge apparently made no financial profit and were merely having sex with the prostitutes and arranging for others to have sex with them, unlike the male escorts in this case, the female prostitutes being patronized by these defendants were clearly victims of sex trafficking. The victims were vulnerable and exploited by traffickers—they had been tricked into working for a brothel by the owner, who had told them they would be providing "normal" massages, rather than sexual services. Indeed, the owner pled guilty to sex trafficking and admitted "prey[ing] upon financial and ethnic vulnerabilities, immigration status," and using her relationships with public officials, including the police officer and the judge, to coerce the women to engage in commercial sex acts for her businesses. *See United States v. Chong*, 08-cr-106 (W.D.N.Y.), Dkt. 23 (Information); *id.*, Dkt. 24 at 3-6 (describing factual basis for plea). The police-officer defendant, Trowbridge, was sentenced to probation. The retired judge, Tills, who arranged the prostitution activities for the Jesters, was sentenced to 18 months in prison. Although they did not make a profit, the *Trowbridge* defendants, unlike Mr. Combs, were taking advantage of trafficking victims, and they all had sex with the prostitutes. In another Western District case, *United States v. McDonald*, 20-cr-134 (W.D.N.Y), the defendant, who was also charged with sex trafficking, operated a prostitution business and brought four different women around the country to engage in sex acts for a profit.

Hon. Arun Subramanian
July 29, 2025

In the District of Connecticut, cases such as *United States v. Briggs*, 11-cr-25 (D. Conn.) and *United States v. Paris*, 06-cr-64 each involved prostitution businesses for profit.

These cases illustrate that, with rare exceptions involving female prostitutes who were exploited and trafficked, every defendant prosecuted under the Mann Act was involved in building or maintaining a prostitution business for profit. The cases reflect the directive in the U.S. Attorney Manual/Justice Manual that the Mann Act be reserved for cases involving making profit from the business of prostitution, or some form of coercion. This non-exhaustive review of cases, as well as the policy of the Department of Justice, show the exceptional nature of the facts here, where Mr. Combs pursued a consensual lifestyle with two of his long-term girlfriends and obviously was not involved in making a profit from prostitution, which was not even alleged by the government.

        D.        Any Similarly Situated Cases Have Been Released on Their Own Recognizance Following Mann Act Convictions

Moreover, the cases which involve defendants similarly situated to Mr. Combs have been released on bond pending sentencing. In reviewing the cases across the country where the primary or sole conviction was for a violation of 18 U.S.C. 2421(a), the defendants who were not charged with running a prostitution business have been released pending sentencing.

Notably, Trowbridge was released on his own recognizance *after his plea* of guilty pending sentencing to the same offenses Mr. Combs was convicted of here. Tills similarly pled to the same offense, was also released on his own recognizance and was given a voluntary surrender date *after* his sentencing, despite being sentenced to prison time. Dkts. 4, 5. In *United States v. Stebick*, 08-cr-00206(WMS) (W.D.N.Y.) (Dkts. 4, 6), Stebick, an associated case to *Trowbidge* was given a bond after his plea of guilty.

Additionally, in *United States v. Collins, et al*, 17-cr-110 (MPM) (N.D. Miss.), the defendants, Mario Collins and Paulette Clayton were charged with sex trafficking, kidnapping, violent crime and prostitution offenses. Dkt. 1 (indictment). Like Mr. Combs, Collins was detained pending trial. Following a jury trial on all offenses, the Court ordered a mistrial because the jury could not come to an agreement on three of the four counts on the indictment. The Court ordered a mistrial, and the government indicated it would only retry the defendant on the Mann Act offense. Dkt. 41. With only the Mann Act left in the balance, Mr. Collins was released on conditions following the declaration of the mistrial. Dkts. 52, 62. The government re-tried Mr. Collins and Ms. Clayton on the Mann Act offense (Count 4 of the Indictment), and the jury convicted the defendants of that offense. Following convictions on the Mann Act, both defendants Collins and Clayton's bail was continued. Mr. Collins was even given an Order of Voluntary Surrender *post-conviction* of the Mann Act offenses. Dkt. 86.[16] That case is most similarly situated to Mr. Combs's. First, following a trial on the sex trafficking offense, where the jury could not agree on a verdict, the court in *Collins* released the top defendant. Here, Mr. Combs' jury *agreed* that Mr. Combs did not commit either count of sex trafficking (or the RICO conspiracy). The court there

---

[16] Collins' bond was revoked later, not because the Court found the Mann Act was a Section 112 offense that mandated offenses, but rather because the defendant conceded there was probable cause that he violated his release conditions. Dkt. 98.

Hon. Arun Subramanian
July 29, 2025

released the defendants despite the Mann Act apparently being a Chapter 117 offense. Second, following the defendants' conviction of the Mann Act count on their indictment the month after the mistrial, the Court continued the conditions of release and allowed defendant Collins a voluntary surrender date (Clayton was sentenced to no time). Dkt. 86. Here, following Mr. Combs' complete acquittal of sex trafficking and conviction on the Mann Act offense, the Court continued the order of detention rather than allowing release conditions. However, the precedent in *Collins* in a similarly situated case (where there was no conviction on the sex trafficking or violence offenses, but a conviction on the Mann Act offense) provides further support for release Mr. Combs on a bond.

> E. Combs's Nearly 11-Month Detention at the MDC Is an Exceptional Circumstance

Sean Combs is in an exceptional situation as a post-verdict, pre-sentence inmate at the MDC, and his conditions of confinement at the facility qualify as an "exceptional circumstance" under *Chavez*. As the Court noted in *Lea*, the test under § 3145(c) is necessarily a flexible one, and district courts have wide latitude to determine whether a particular set of circumstances qualifies as "exceptional." *DiSomma,* 951 F.2d at 497. In this District, Judge Furman in *Chavez* has already held that a prisoner's individual situation at the MDC can amount to an exceptional reason for release under Section 3145(c). 710 F.Supp.3d 234. As Judge Furman noted, "the state of affairs [at MDC] is unacceptable." *Id.* at 229. In so noting, Judge Furman concluded that the "conditions in the MDC qualify as 'exceptional reasons' under the statute justifying Chavez's continuing release." *Id.* at 230. In *Chavez*, the 70-year-old defendant argued that his age and various medical conditions constituted exceptional reasons, but the Court found that it "need not and does not decide whether that argument would suffice on its own because it concludes that the conditions at the MDC are themselves 'exceptional reasons' why Chavez's detention pending sentencing 'would not be appropriate.'" *Id.* at 233. The same is true here, where the conditions have not improved.

Judge Furman found that the conditions at the MDC are "dreadful in many respects, but three warrant particular emphasis": (1) continued reports of inordinate periods of lockdown, (2) claims that the facility provides inadequate and/or substantially delayed necessary medical care— a particular risk in this case and (3) general issues about the conditions at the facility. *Id.* at 232-34. These conditions have not abated in Mr. Combs' detention at the facility. As the Court is aware, during Mr. Combs' incarceration at the MDC, the facility was subject to an inter-agency sweep that was "designed to achieve our shared goal of maintaining a safe environment for both our employees and the incarcerated individuals housed at MDC Brooklyn." In other words, there is a significant issue at the MDC related to the safety of employees and incarcerated individuals that require outside law enforcement action from multiple agencies to address. Importantly, MDC, as a jail, has a significant law enforcement presence within its walls 24 hours per day that are equipped with investigatory and often unregulated authority. Thus, the requirement of "outside law enforcement agencies" to ensure safety within the MDC is an admission that serious violence, mayhem and chaos is occurring within the MDC that requires more than a band-aid (raid), but rather surgery. Indeed, we are aware of ongoing threats of violence and actual violence in the facility, such that Mr. Combs' safety is constantly at risk.

9

Hon. Arun Subramanian
July 29, 2025

Here, judicial decisions from this district and our neighboring district detail the "inhumane treatment at the MDC" that has continued during Mr. Combs' detention for the past 11 months. *See United States v. Colucci*, 743 F.Supp.3d 452 (Aug. 5, 2024). In the Eastern District, Judge Brown found that these issues continue to affect judicial determinations:

> In *United States v. Griffin*, No. 22-CR-408 (EK), 2024 WL 2891686, at *3 (E.D.N.Y. June 10, 2024), Judge Komitee granted a motion for compassionate release based primarily on the conditions at MDC for a defendant serving time for violating supervised release. *Cf. United States v. Santana*, No. 22 CR. 368 (VM), 2024 WL 2275037, at *2 (S.D.N.Y. May 20, 2024) ("Given the severe prison conditions that prevail at the MDC (conditions that amount to imposing harsher punishments on prisoners), this Court and others have adjusted sentences of defendants in custody there for lengthy periods."). In yet another case, Judge Cogan indicated that he might have sentenced an offender to incarceration "if not for the length of the sentence landing him in the Bureau of Prison's Metropolitan Detention Center in Brooklyn."

*Id.* at 455. Indeed, many courts in the Southern and Eastern Districts have sentenced defendants to shorter periods of incarceration, or no incarceration at all, due to the conditions of confinement at the MDC. *Id.* at 461.

Perhaps most problematic to Mr. Combs' conditions of confinement is the "unchecked violence" at the facility. *Colucci*, 743 F.Supp.3d at 458. Though Mr. Combs has been a model inmate for his nearly year-long period of confinement, the violent conditions are still very much a concern for Mr. Combs and is an unnecessary confinement risk, given the clear precedent of multiple similarly situated Mann Act convictions where defendants were released on conditions.

    2.    <u>There Is No Risk of Flight or Danger to the Community</u>

Sean Combs is not a risk of flight nor is he a danger to the community or to any specific people. Given the undisputed facts that Mr. Combs voluntarily came to New York to surrender in this case in advance of his arrest, that he surrendered his passport to his lawyers six months before his arrest, that he paid off the outstanding mortgage on his home in Miami prior to his arrest so that he would own a home free and clear to secure any bail package, and that he has now been acquitted of the Racketeering Conspiracy and Sex Trafficking Charges against him, there is no serious argument that he is a flight risk.

We turn our attention to the government's argument and the Court's statements on July 2, 2025, that he poses a danger to the community or to others due to his past violence. The Court noted that the defense admitted a history of domestic violence as to Ms. Ventura and that he struck "Jane" twice in June 2024. However, we strenuously object that Mr. Combs poses a danger to the community if released on conditions. Based on the facts developed at the trial, aside from a single instance on June 18, 2024, where Mr. Combs was provoked by Jane through her own acts of violence, there was no evidence of any acts of violence in the last seven years. Indeed, the jury notably rejected the government's argument that the June 2024 incident constituted "coercion" when it acquitted Mr. Combs of the sex trafficking charge in Count Four. Also, prior to his arrest

10

Hon. Arun Subramanian
July 29, 2025

in this case, Mr. Combs enrolled in a domestic violence program, in which he participated until he was arrested and incarcerated in connection with this case.

The Court is familiar with the trial evidence and counsel will not recite it here. The relationship with Ms. Ventura ended in 2018, and there was *no evidence at trial* of any physical altercations between Combs and *anyone else* between their breakup in 2018 and the physical altercation with Jane in June of 2024. And regarding Jane, she testified that she started the altercation by smashing his head into her kitchen counter and threw glasses and candles at him.[17] Notably, Jane and Combs dated for three years, and their relationship did not have a history of violence—there was only one incident of an alleged assault.

If released on conditions, Sean Combs will not be violent to anyone. As we said in court, this jury gave him his life back, and he will not squander his second chance at life, nor would he do anything to further jeopardize his seven children not having a father, and four of his children not having a parent at all. The Court can fashion any set of conditions, and Mr. Combs will abide by any condition, to make the Court comfortable that Mr. Combs will not be violent toward any person.

  3.  <u>Proposed Bail Package</u>

Based on the exceptional circumstances set out above, we move for release on the following conditions:

  a. Combs will sign a $50 Million bond secured my Mr. Combs' home in Miami;
  b. The bond will be co-signed by three financially responsible people;
  c. Combs will reside in his home in Miami;
  d. Combs's travel will be limited to the Southern District of Florida, the Southern District of New York for attorney meetings, as well as airports necessary to travel between the two;
  e. Defendant will be placed under the express supervision of the U.S. Pretrial Services Agency ("PTS") and must report to that agency as directed by PTS; and
  f. Combs's passport will be surrendered to Pretrial Services and he shall not apply for any other passport;

If the Court finds more extreme conditions necessary, the Court may also add any or all of the following conditions: home detention, private security approved by the Court and Pretrial Services with the cost borne by the defendant, mental health treatment, substance abuse treatment, electronic surveillance of the defendant[18] or any other condition the court deems necessary. With any and all of the conditions posed above, Mr. Combs can show by clear and convincing evidence that he does not pose a danger to the community, and he would fully surrender to supervision by Pretrial Services to ensure that the Court knows that Mr. Combs does not pose a danger to *any* person.

---

[17] Tr. at 5180:20-5181:8 (June 9, 2025) (Jane Direct), Tr. 5807:2-580:7 (June 12, 2025) (Jane cross)
[18] Mr. Combs' homes are also equipped with electronic surveillance currently and can be shared with PTS at their request in order to ensure compliance with any visitation policies that PTS sets.

Hon. Arun Subramanian
July 29, 2025

    We thank the Court for its consideration.

                                      Respectfully submitted,

                                      /s/ *Marc Agnifilo*
                                      Marc Agnifilo
                                      Teny R. Geragos
                                      Alexandra Shapiro
                                      Jason D. Driscoll
                                      Nicole Westmoreland
                                      Xavier Donaldson
                                      Brian Steel
                                      Anna Estevao

cc:    Counsel for the government (via ECF)