UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

      v.

SEAN COMBS,

              Defendant.

24-cr-542 (AS)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SEAN COMBS'S
RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR,
IN THE ALTERNATIVE, A NEW TRIAL**

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ............................................................ iii

**INTRODUCTION** .......................................................................... 1

**BACKGROUND** ............................................................................ 3

    **A. Procedural History** ............................................................ 3

    **B. History of The White Slave Traffic Act** ............................ 4

        *1. The Original Purpose Of The Statute Was Targeting Commercial Traffickers* .............................................................. 4

        *2. The Act Became A Tool For Selective Enforcement Of "Moral" Standards* .................................................................... 5

        *3. Backlash Against The Overbroad Decisions in* Caminetti *and* Cleveland *And The Act More Generally* ........................... 9

        *4. The DOJ Has Long Declined To Enforce* Caminetti *and* Cleveland ........ 10

**LEGAL STANDARDS** ................................................................. 13

**ARGUMENT** ............................................................................... 14

**I.**    **THERE WAS INSUFFICIENT EVIDENCE THAT MR. COMBS TRANSPORTED ANYONE WITH THE INTENT TO ENGAGE IN "PROSTITUTION"** ................................................ 14

    **A. The Mann Act Should Be Narrowly Interpreted To Avoid Serious Due Process, First Amendment, And Federalism Problems** ........ 14

        *1. Due Process Vagueness Problems* ................................ 16

        *2. Substantive Due Process Problems* .............................. 23

        *3. First Amendment Problems* ......................................... 24

        *4. Federalism Problems* ................................................... 24

    **B. Narrowly Construed, The Mann Act Does Not Proscribe Mr. Combs's Conduct Because He Lacked A Commercial Motive And Did Not Intend For Paid Escorts To Have Sex With *Him*** .................... 25

    **C. There Was Insufficient Evidence That Mr. Combs Transported Anyone With The Intent To Engage In "Prostitution," Even If It Includes *Any* Sex For Money** ............................................ 26

**II.     UPHOLDING THE CONVICTIONS WOULD VIOLATE THE FIRST
          AMENDMENT** ................................................................................. 32

    **A.  Paying People To Film Them In Sexual Performances Is Protected
          By The First Amendment** ..................................................... 33

    **B.  Mr. Combs's Conduct Was Protected First Amendment Activity** ..................... 36

**III.    AT A MINIMUM, A NEW TRIAL IS REQUIRED DUE TO
          SPILLOVER PREJUDICE FROM EVIDENCE THAT WOULD
          HAVE BEEN INADMISSIBLE HAD THE MANN ACT COUNTS
          BEEN TRIED ALONE** .................................................................... 42

    **A.  The Retroactive Misjoinder Doctrine** ................................................. 42

    **B.  The Government Introduced Inflammatory Evidence To Prove The
          RICO And Sex Trafficking Charges** ........................................ 45

    **C.  The Inflammatory Evidence Was Not Admissible To Prove The Mann
          Act Counts** ....................................................................... 48

    **D.  The Evidence On The Surviving Counts Was Not Strong** ................................ 49

**CONCLUSION** ........................................................................................ 50

# TABLE OF AUTHORITIES

**Cases**                                                                                 **Page(s)**

*Ahn v. State*,
   631 S.E.2d 711 (Ga. Ct. App. 2006) ....................................................................... 22

*Amadio v. United States*,
   215 F.2d 605 (7th Cir. 1954) ................................................................................ 9

*Amadio v. United States*,
   348 U.S. 892 (1954) (per curiam) ........................................................................ 9

*Ashcroft v. ACLU*,
   542 U.S. 656 (2004) ............................................................................................. 41

*Ashcroft v. Free Speech Coal.*,
   535 U.S. 234 (2002) ............................................................................................. 40

*California v. Freeman*,
   488 U.S. 1311 (1989) ........................................................................................... 34

*Caminetti v. United States*,
   242 U.S. 470 (1917) ..................................................................................... passim

*Carpenter v. People*,
   8 Barb. 603 (N.Y. Gen. Term 1850) ................................................................... 17

*Church of Latter-Day Saints v. United States*,
   136 U.S. 1 (1890) ................................................................................................. 8

*Ciminelli v. United States*,
   598 U.S. 306 (2023) ............................................................................................. 24

*Clark v. Martinez*,
   543 U.S. 371 (2005) ............................................................................................. 15

*Cleveland v. United States*,
   329 U.S. 14 (1946) ....................................................................................... passim

*Cleveland v. United States*,
   531 U.S. 12 (2000) ............................................................................................... 24

*Commonwealth v. Bleigh*,
   586 A.2d 450 (Pa. Sup. Ct. 1991) ...................................................................... 21

*Commonwealth v. Cook*,
   53 Mass. 93 (1846) .............................................................................................. 17

*Dobbs v. Jackson Women's Health Org.,*
   597 U.S. 215 (2022) ................................................................................... 23

*Eisenstadt v. Baird,*
   405 U.S. 438 (1972) ..................................................................................... 9

*Free Speech Coal., Inc. v. Paxton,*
   145 S. Ct. 2291 (2025) ......................................................................... 41, 42

*Griswold v. Connecticut,*
   381 U.S. 479 (1965) .................................................................................. 9, 23

*Johnson v. United States,*
   576 U.S. 591 (2015) ................................................................................... 16

*Kolender v. Lawson,*
   461 U.S. 352 (1983) ................................................................................... 16

*Lawrence v. Texas,*
   539 U.S. 558 (2003) ................................................................................... 23

*Lopez v. State,*
   156 S.W. 217 (Tex. Crim. App. 1913) ....................................................... 16

*Loving v. Virginia,*
   388 U.S. 1 (1967) ....................................................................................... 23

*McDonnell v. United States,*
   579 U.S. 550 (2016) ............................................................................. 15, 24

*Metwally v. City of New York,*
   215 A.D.3d 820 (2d Dep't 2023) ............................................................... 20

*Mortensen v. United States,*
   322 U.S. 369 (1944) ..................................................................................... 5

*Murphy v. Ramsey,*
   114 U.S. 15 (1885) ....................................................................................... 6

*Musacchio v. United States,*
   577 U.S. 237 (2016) ................................................................................... 13

*Obergefell v. Hodges,*
   576 U.S. 644 (2015) ................................................................................... 23

*People v. Cummons,*
   23 N.W. 215 (Mich. 1885) ......................................................................... 17

*People v. Freeman*,
    758 P.2d 1128 (Cal. 1988) ................................................................. passim

*People v. Greene*,
    110 Misc. 2d 40 (N.Y. Crim. Ct. 1981) ................................... 19, 21, 33, 34

*People v. Hill*,
    163 Cal. Rptr. 99 (Cal. Ct. App. 1980) ................................................ 20

*People v. Jin-Mai Yun*,
    2006 WL 948135 (N.Y. Crim. Ct. Apr. 4, 2006) .................................... 19

*People v. Menner*,
    53 Misc. 3d 52 (N.Y. App. Term 2016) ................................................ 20

*People v. Paulino*,
    2005 N.Y. Misc. LEXIS 3430 (N.Y. Sup. Ct. Aug. 4, 2005) ................. 18, 19, 33, 34

*Pryor v. Municipal Court*,
    599 P.2d 636 (Cal. 1979) ...................................................................... 20

*Reno v. ACLU*,
    521 U.S. 844 (1997) .............................................................................. 41

*Roe v. Wade*,
    410 U.S. 113 (1973) ................................................................................ 9

*Sable Commc'ns v. FCC*,
    492 U.S. 115 (1989) .............................................................................. 41

*Schaffer v. United States*,
    362 U.S. 511 (1960) .............................................................................. 43

*Skilling v. United States*,
    561 U.S. 358 (2010) ........................................................................ 15, 16

*Smoot v. State*,
    729 S.E.2d 416 (Ga. Ct. App. 2012) ................................................ 21, 22

*Snead v. State*,
    192 S.E.2d 415 (Ga. Ct. App. 1972) ................................................... 22

*Snyder v. United States*,
    603 U.S. 1 (2024) ......................................................................... 1, 2, 24

*Stanley v. Georgia*,
    394 U.S. 557 (1969) .............................................................................. 41

*State v. Burgess*,
    669 S.W.2d 637 (Mo. Ct. App. 1984)......................................................... 22

*State v. Clark*,
    43 N.W. 273 (Iowa 1889) ....................................................................... 16

*State v. Marsh*,
    196 N.W. 930 (Minn. 1924)..................................................................... 16

*State v. Mayfield*,
    900 P.2d 358 (N.M. Ct. App. 1995)......................................................... 22

*State v. Taylor*,
    808 P.2d 314 (Ariz. Ct. App. 1990) ......................................................... 22

*State v. Theriault*,
    960 A.2d 687 (N.H. 2008) ........................................................... 34, 35, 36

*State v. Thuna*,
    109 P. 331 (Wash. 1910)......................................................................... 16

*State v. Turnpaugh*,
    741 N.W.2d 488 (Wisc. Ct. App. 2007) ................................................... 22

*Texas v. Johnson*,
    491 U.S. 397 (1989)................................................................................ 40

*United States v. Bitty*,
    208 U.S. 393 (1908)............................................................................ 6, 17

*United States v. Blaszczak*,
    947 F.3d 19 (2d Cir. 2019)...................................................................... 13

*United States v. Broxmeyer*,
    616 F.3d 120 (2d Cir. 2010)............................................................... 27, 29

*United States v. Cassese*,
    428 F.3d 92 (2d Cir. 2005)...................................................................... 13

*United States v. Coplan*,
    703 F.3d 46 (2d Cir. 2012)...................................................................... 13

*United States v. DiNome*,
    954 F.2d 839 (2d Cir. 1993).................................................................... 43

*United States v. Ferguson*,
    49 F. Supp. 2d 321 (S.D.N.Y. 1999)....................................................... 44

*United States v. Flucas,*
  22 F.4th 1149 (9th Cir. 2022) ................................................................ 4

*United States v. Guiliano,*
  644 F.2d 85 (2d Cir. 1981) .................................................................. 44

*United States v. Hamilton,*
  334 F.3d 170 (2d Cir. 2003) ................................................................ 43

*United States v. Jones,*
  482 F.3d 60 (2d Cir. 2006) .................................................................. 43

*United States v. L. Cohen Grocery Co.,*
  255 U.S. 81 (1921) ............................................................................. 16

*United States v. Mackey,*
  --- F.4th ---, 2025 WL 1888250 (2d Cir. 2025) ................................. 13

*United States v. Mi Sun Cho,*
  713 F.3d 716 (2d Cir. 2013) (per curiam) .......................................... 32

*United States v. Miller,*
  148 F.3d 207 (2d Cir. 1998) ................................................................ 27

*United States v. O'Brien,*
  391 U.S. 367 (1968) ...................................................................... 40, 41

*United States v. Pauling,*
  924 F.3d 649 (2d Cir. 2019) ................................................................ 13

*United States v. Playboy Ent. Grp., Inc.,*
  529 U.S. 803 (2000) ........................................................................... 41

*United States v. Purcell,*
  967 F.3d 159 (2d Cir. 2020) ................................................................ 32

*United States v. Roeder,*
  526 F.2d 736 (10th Cir. 1975) ............................................................ 35

*United States v. Sam Goody, Inc.,*
  518 F. Supp. 1223 (E.D.N.Y. 1981) ................................................... 44

*United States v. Tellier,*
  83 F.3d 578 (2d Cir. 1996) ...................................................... 42, 43, 44

*United States v. Valle,*
  807 F.3d 508 (2d Cir. 2015) ................................................................ 13

*United States v. Vebeliunas,*
   76 F.3d 1283 (2d Cir. 1996) ................................................................ 43, 48

*United States v. Wapnick,*
   60 F.3d 948 (2d Cir. 1995) ................................................................ 45, 46

*Wooten v. Superior Court,*
   113 Cal. Rptr. 2d 195 (Cal. Ct. App. 2001) ...................................... 20, 21

**Statutes**

18 U.S.C. §1959 .................................................................................... 44

18 U.S.C. §2421 ............................................................................. passim

18 U.S.C. §2422 .................................................................................... 12

18 U.S.C. §2423 ............................................................................... 27, 29

18 U.S.C. §924 ...................................................................................... 44

N.Y. Penal Law §230.02 ...................................................................... 19, 20

**Rules**

Fed. R. Crim. P. 29 ......................................................................... passim

Fed. R. Crim. P. 33 ............................................................... 3, 14, 42, 43

Fed. R. Evid. 401 .................................................................................. 49

Fed. R. Evid. 402 .................................................................................. 49

Fed. R. Evid. 403 ............................................................................. 45, 49

Fed. R. Evid. 404 .................................................................................. 49

**Constitutional Provision**

U.S. Const. Amend. I ............................................................................ 40

**Other Authorities**

1953 U.S. Attorneys' Manual,
   https://www.justice.gov/archive/usao/usam/1953/title2criminaldivision.pdf .......................... 11

1961 U.S. Attorneys' Manual,
   https://www.justice.gov/archive/usao/usam/1961/title2criminaldivision.pdf .......................... 11

1970 U.S. Attorneys' Manual,
https://www.justice.gov/archive/usao/usam/1970/title2criminaldivision.pdf ......................... 11

1984 U.S. Attorneys' Manual,
https://www.justice.gov/archive/usao/usam/1984/title9_part2.pdf .......................................... 11

1988 U.S. Attorneys' Manual,
https://www.justice.gov/archive/usao/usam/1988/title9criminaldivisionchapters
71-100.pdf ...................................................................................................................................... 12

U.S. Attorneys' Manual,
https://www.justice.gov/archives/usam/archives/usam-9-79000-other-criminal-
division-statutes. ......................................................................................................................... 12

Justice Manual - Prosecution of Customers Involved in Federal Sex Trafficking
Offenses,
https://www.justice.gov/jm/jm-8-3000-enforcement-civil-rights-criminal-statutes ................ 12

2 Witkin,
Cal. Crim. Law 5th Sex Crimes (2025) ..................................................................................... 21

45 Cong. Rec. 812 (1910) ................................................................................................................. 5

45 Cong. Rec. 821 (1910) ................................................................................................................. 4

Anders Kaye,
*Why Pornography Is Not Prostitution: Folk Theories of Sexuality in the Law
of Vice*,
60 St. Louis U. L.J. 243 (2016) .................................................................................................. 18

Berkeley Davids,
*Application of Mann Act to Noncommercial Vice*,
20 Law Notes (1916) ...................................................................................................................... 7

Berto Rogers,
*The Mann Act and Noncommercial Vice*,
37 Law Notes (1933) ...................................................................................................................... 7

David J. Langum,
*Crossing Over The Line: Legislating Morality and the Mann Act* (2006) ...................... passim

H.R. Rep. 99-910 (1986)................................................................................................................. 41

H.R. Rep. No. 47,
61st Cong., 2d Sess. 9-10 (1909) .................................................................................................. 5

Harry W. Jones,
*Statutory Doubts and Legislative Intention*,
40 Colum. L. Rev. 957 (1940) ............................................................................ 7

Harry W. Jones,
*The Plain Meaning Rule and Extrinsic Aids in the Interpretation of Federal Statutes*,
25 Wash. U. L.Q. 2 (1939) .................................................................................. 7

https://www.dailymail.co.uk/femail/article-4545854/10-year-pornography-survey-
reveals-surprising-statistics.html ....................................................................... 36

Judicial Council of California,
Criminal Jury Instructions No. 1154 ("Prostitution: Soliciting Another") ............ 21

Marc J. Randazza,
*The Freedom to Film Pornography*, 17 Nev. L.J. 97 (2016) ......................... 34, 35

New York Criminal Jury Instructions & Model Colloquies,
Patronizing a Person for Prostitution in the Third Degree .............................. 19

Note, 56 Yale L.J. 718 (1947) ............................................................................. 5

NY Pattern Jury Instructions for §230.04 ......................................................... 19

Pub. L. No. 99-628 (1986) ......................................................................... passim

Sen. Rep. No. 886,
61st Cong., 2d Sess. 10 (1910) ........................................................................... 5

Sex Bias in the U.S. Code,
A Report of the United States Commission on Civil Rights (April 1977),
https://www.usccr.gov/files/historical/1977/77-009.pdf .............................. 10, 23

Sherry F. Colb,
*The Legal Line Between Porn and Prostitution*, CNN (Aug. 12, 2005),
https://edition.cnn.com/2005/LAW/08/12/colb.pornography/index.html ............. 19

The Appeal of Amateur Porn (October 14, 2011),
https://abcnews.go.com/blogs/health/2011/10/14/the-appeal-of-amateur-porn ....... 36

The People's Porn: A History of Handmade Pornography in America (July 6, 2021),
https://notchesblog.com/2021/07/06/the-peoples-porn-a-history-of-handmade-
pornography-in-america/ ................................................................................... 36

William C. Donnino,
*Prostitution*, Practice Commentaries to N.Y. Penal Law §230.00 ................... 19

## <u>INTRODUCTION</u>

Since the government arrested Sean Combs last September, it has painted him as a monster. For months, prosecutors accused him of running a 20-year racketeering enterprise and of sex trafficking multiple women. But his 2-month trial showed these charges were not supported by credible evidence, and the jury rejected them. Mr. Combs now stands convicted only of two prostitution counts under the Mann Act, which doesn't require proof of coercion, threats, or fraud. The government told the jury it had to convict so long as Mr. Combs arranged for a long-time girlfriend or a paid male escort or entertainer to travel across state lines to get together and have sex. And that is all the jury convicted him for.

To our knowledge, Mr. Combs is the only person ever convicted of violating the statute for conduct anything like this. It is undisputed that he had no commercial motive and that all involved were adults. The men chose to travel and engage in the activity voluntarily. The verdict confirms the women were not vulnerable or exploited or trafficked or sexually assaulted during the freak-offs or hotel nights. And Mr. Combs never had sex with the supposed "prostitutes." We are aware of no other case in which a person was convicted under 18 U.S.C. §2421(a) even though he made no money from the "prostitution," didn't have sex with the alleged prostitutes, and didn't arrange the "transportation" with the intent of committing sexual assault, sex trafficking, or a sex crime involving a minor. Indeed, under longstanding Department of Justice policy, Mann Act charges are not filed in similar circumstances.

In short, this conviction stands alone, but it should not stand at all.

*First*, application of the Mann Act in these circumstances is unprecedented. Construing it to reach Mr. Combs's conduct would raise serious fair notice and discriminatory enforcement concerns. *See Snyder v. United States*, 603 U.S. 1, 20-21 (2024) (Gorsuch, J., concurring)

(discussing Supreme Court precedent requiring narrow construction to avoid vagueness and ensure lenity).  "Prostitution" is not defined in the statute, and it is normally up to states and localities to regulate (and define) "prostitution"—or not.  The term has had multiple different meanings over time and depending on the jurisdiction.  And in the 2000s, multiple state courts have held that paying for "voyeurism"—to watch other people have sex—is *not* prostitution.

The lack of statutory definition, the changing and inconsistent ordinary meaning of the term, and the fact most states where the sexual activity occurred do not treat this conduct as "prostitution" creates a classic "trap[] for [the] unwary" requiring a narrow interpretation that would not sweep in Mr. Combs's conduct.  *Snyder*, 603 U.S. at 15.  The statute should apply only to defendants with a commercial motive in the "prostitution" or, if it can apply to consumers of "prostitution," should not cover consumers who do not have sex with the adult "prostitute."  Such a limiting construction is also required to avoid other serious constitutional problems of substantive due process, the First Amendment, and federalism.  Mr. Combs, at most, paid to engage in voyeurism as part of a "swingers" lifestyle.  That does not constitute "prostitution" under a properly limited definition of the statutory term.

*Second*, even if "prostitution" includes a defendant who pays to observe two other people have sex with each other, the evidence was insufficient to show that Mr. Combs had any such intent.  The proof at trial showed that he typically hired the services of male escorts or dancers advertised openly through lawful businesses, that the men were paid for their time, and that they enjoyed the activities and had friendships with Ms. Ventura and Jane and were not merely traveling to have sex for money.

*Third*, if the statute is interpreted to cover Mr. Combs's conduct, his conviction must be reversed because it violates the First Amendment.  The freak-offs and hotel nights were

performances that he or his girlfriends typically videotaped so they could watch them later. In other words, he was producing amateur pornography for later private viewing. This is protected First Amendment conduct that no substantial government interest justifies prohibiting, since the films depicted adults voluntarily engaging in consensual activity.

*Fourth*, if the Court declines to grant an acquittal, a new trial is required under Rule 33 due to severe spillover prejudice from reams of inflammatory evidence. This evidence, particularly the Intercontinental footage, was admissible only because of the RICO and sex trafficking charges. It would never have been admitted at a trial solely on the Mann Act counts, as it was irrelevant and unfairly prejudicial. Under the Second Circuit's "retroactive misjoinder" doctrine, a new trial limited to evidence admissible to prove the Mann Act charges is warranted.

Sean Combs sits in jail based on evidence that he paid adult male escorts and entertainers who engaged in consensual sexual activities with his former girlfriends, which he videotaped and later watched with the girlfriends. That is not prostitution, and if it is, his conviction is unconstitutional. The Court should grant an acquittal, or at an absolute minimum, a new trial on the Mann Act counts alone.[1]

## **BACKGROUND**

### A. Procedural History

On June 24, 2025, after the government rested, Mr. Combs moved for a judgment of acquittal on all counts under Rule 29. Tr.7352-91. The Court reserved decision. Tr.7391.

---

[1] The cumulative word count of this single memorandum of law, which covers both Mr. Combs's Rule 29 and his Rule 33 motions for the sake of efficiency, is less than two times the limit in the Court's Individual Practices.

On July 2, 2025, the jury acquitted Mr. Combs of the most serious charges. The jury found he was not guilty of the racketeering conspiracy charged in Count One, not guilty of sex trafficking Casandra Ventura as charged in Count Two, and not guilty of sex trafficking Jane as charged in Count Four. However, the jury convicted on Counts Three and Five, which charged that he knowingly "transported, aided and abetted, and willfully caused the transportation of multiple individuals, including but not limited to [Ventura and Jane, respectively,] and commercial sex workers, in interstate and foreign commerce on multiple occasions with the intent that they engage in prostitution," in violation of 18 U.S.C. §2421(a). Dkt.209, ¶¶18, 20.

This motion renews and supplements Mr. Combs's earlier Rule 29 motion.

## B. History of The White Slave Traffic Act

### 1. The Original Purpose Of The Statute Was Targeting Commercial Traffickers

The White Slave Traffic Act of 1910, now known as the Mann Act, has a troubling history. As described in Mr. Combs's motion to dismiss, Dkt.153, the statute had racist origins. It was "born out of a hysteria that 'white slavers' were preying upon young women—coercing them into prostitution through threats, intimidation, and force." *United States v. Flucas*, 22 F.4th 1149, 1166 (9th Cir. 2022) (Bybee, J., dissenting).[2] One of the bill's backers claimed that American-born girls from good homes were being tricked into prostitution, then "sold to all men who can pay the price—young men or old, clean or unclean, healthy and diseased, black or white." 45 Cong. Rec. 821 (1910).

But even with this odious history, the statute was never intended to apply to the sort of conduct for which Mr. Combs was convicted. The Act was only intended to apply to men who,

---

[2] Unless otherwise noted, citations omit internal quotation marks, footnotes, and previous alterations in the original source.

acting with a profit motive, coerced women into some form of the sex trade—"slavers"

equivalent to "pimps" in modern parlance.  The legislative history shows "the Act was

restricted" to "professional procurers."  Note, 56 Yale L.J. 718, 725-26 (1947).  As

Representative Mann described in his report to Congress:

> The legislation is not needed or intended as an aid to the states in the
> exercise of their police powers in the suppression or regulation of
> immorality in general.  *It does not attempt to regulate the practice of
> voluntary prostitution*, but aims solely to prevent panderers and procurers
> from compelling thousands of women and girls against their will and
> desire to enter and continue in a life of prostitution.

*Id.* at 726-27 (quoting H.R. Rep. No. 47, 61st Cong., 2d Sess. 9-10 (1909) and Sen. Rep. No.

886, 61st Cong., 2d Sess. 10 (1910)) (emphasis added).  Similarly, Representative Sims

described how slavers imported women for profit.  "Now, what is the man procuring this woman

for?  What does he take her from one state to another for?  For what purpose does he bring her

from a foreign country?  To make money…. in order that he may have a few more dollars to put

into his unholy pocket."  45 Cong. Rec. 812 (1910).  *See also Mortensen v. United States*, 322

U.S. 369, 377 (1944) (confirming statute's purpose was "to eliminate the 'white slave' business

which uses interstate and foreign commerce as a means of procuring and distributing its victims

and to prevent panderers and procurers from compelling thousands of women and girls against

their will and desire to enter and continue in a life of prostitution").

  *2. The Act Became A Tool For Selective Enforcement Of "Moral" Standards*

  Although the statute was enacted "in response to a popular outcry over an alleged

problem of kidnapped women and coerced prostitution," until the 1960s and 1970s it was abused

by law enforcement.  David J. Langum, *Crossing Over The Line: Legislating Morality and the

Mann Act*, 11-12 (2006).  Federal prosecutors selectively deployed the Act to "sexual activities

between consenting adults" because "a large constituency in the form of church groups, purity

organizations, and moralists… applauded the imposition of federal coercion to advance their visions of 'proper' conduct." *Id.* at 12.  Two early Supreme Court cases endorsed this overbroad view of the original version of the statute and ignored its "clear history" and "legislative intent" to extend it to noncommercial interstate transportation, *id.* at 41:  *Caminetti v. United States*, 242 U.S. 470 (1917) and *Cleveland v. United States*, 329 U.S. 14 (1946).  The government may rely on these cases to defend the convictions here, but their rationale has been repudiated by subsequent amendments to the statute and Supreme Court cases.

       a.  <u>Caminetti</u>

In *Caminetti*, a divided Court affirmed convictions of defendants who transported women across state lines so they could "become [their] mistress and concubine."  242 U.S. at 482-83.  The majority rejected the argument that the statute was "intended to reach only 'commercialized vice.'"  *Id*. at 484.  Employing moralistic language, the majority held the defendants' conduct was covered by the "immoral purpose" provision then contained in the Act:  "To say the contrary would shock the common understanding of what constitutes an immoral purpose when those terms are applied, as here, to sexual relations."  *Id*. at 486.

*Caminetti* held that the word "prostitution" should be given a broad scope, covering the general sense of immoral and promiscuous sex, regardless of whether it was for hire.  "There can be no doubt as to what class was aimed at by the clause forbidding the importation of alien women for purposes of 'prostitution.'  It refers to women who, for hire or without hire, offer their bodies to indiscriminate intercourse with men."  *Id*. (quoting *United States v. Bitty*, 208 U.S. 393, 401 (1908) (discussing analogous immigration statute)).[3]  The *Caminetti* majority thus

---

[3] *Bitty* remarked that such women were "prostitutes" because "such persons are in hostility to 'the idea of the family as consisting in and springing from the union for life of one man and one woman in the holy estate of matrimony.'"  208 U.S. at 401 (quoting *Murphy v. Ramsey*, 114 U.S.

interpreted the Act to cover anyone who transported a woman across state lines for extramarital sex.

Justice McKenna, joined by Chief Justice White and Justice Clarke, dissented. He noted that the statutory text was ambiguous. It covered anything done with an "immoral purpose," which could cover conceivably a vast amount of behavior, so it had to be limited by some judicial construction. "If it be admitted that it is limited at all, that ends the imperative effect assigned to it in the opinion of the court." *Id.* at 497. As some limitation was necessary, the statute should be limited "[b]y its context, necessarily, and the purpose of the statute." *Id.* Justice McKenna observed that Congress deemed the statute's title—the White Slave Traffic Act—particularly important. "And its prominence gives it prevalence in the construction of the statute." *Id.* Relying on that title, combined with the clear legislative history, Justice McKenna concluded the Act must be limited to "commercialized vice," that is, "immoralities having a mercenary purpose." *Id.*

b. Cleveland

Several commentators observed that *Caminetti* and other similarly broad interpretations of the Mann Act deviated from the statute's purpose.[4] Three decades later, the Court had an opportunity to reconsider the scope of the Act in *Cleveland*. But in an even more odious decision, another divided Court extended the Act to cover Mormon polygamists. The *Cleveland* majority reaffirmed *Caminetti*'s holding that "the Act . . . is not restricted to" commercialized

_____

15, 45 (1885)).

[4] *See* Berto Rogers, *The Mann Act and Noncommercial Vice*, 37 Law Notes 107 (1933); Harry W. Jones, *The Plain Meaning Rule and Extrinsic Aids in the Interpretation of Federal Statutes*, 25 Wash. U. L.Q. 2, 7-8 (1939); Harry W. Jones, *Statutory Doubts and Legislative Intention*, 40 Colum. L. Rev. 957, 961 (1940); Berkeley Davids, *Application of Mann Act to Noncommercial Vice*, 20 Law Notes 144-45 (1916).

prostitution. 329 U.S. at 18. Motivated by barely concealed hostility to the Mormon religion, the majority held polygamous practices were clearly immoral and therefore illegal. "The organization of a community for the spread and practice of polygamy is, in a measure, a return to barbarism. It is contrary to the spirit of Christianity and of the civilization which Christianity has produced in the western world." *Id*. at 19 (quoting *Church of Latter-Day Saints v. United States*, 136 U.S. 1, 49 (1890)).

Justice Rutledge concurred in the result. He stated *Caminetti* was likely wrongly decided, as Justice McKenna had "convincingly demonstrated" in his dissent. *Id*. at 21. He expressed grave doubts about "perpetuating the Court's error" in *Caminetti*. *Id*. at 22. But as *Caminetti* had not been overruled, he "acquiesce[d]" in the result. *Id*. at 24.

Justices Black and Jackson dissented. They stated: "affirmance requires extension of the rule announced in the *Caminetti* case and . . . the correctness of that rule is so dubious that it should at least be restricted to its particular facts." *Id*. at 20-21.

Justice Murphy also dissented and argued *Caminetti* should be overruled. "Today another unfortunate chapter is added to the troubled history of the White Slave Traffic Act." *Id*. at 24. "The consequence of prolonging the *Caminetti* principle is to make the federal courts the arbiters of the morality of those who cross state lines in the company of women and girls." *Id*. at 29. Like Justice McKenna, he argued the statute must be limited to the prosecution of pimps and other purveyors of coerced commercialized sex:

> The result here reached is but another consequence of this Court's long-continued failure to recognize that the White Slave Traffic Act, as its title indicates, is aimed solely at the diabolical interstate and international trade in white slaves, "the business of securing white women and girls and of selling them outright, or of exploiting them for immoral purposes."

*Id*. at 27 (quoting legislative history).

8

3. *Backlash Against The Overbroad Decisions in* Caminetti *and* Cleveland *And The Act More Generally*

*Cleveland* was also criticized by commentators, and although neither of these two decisions were ever expressly overruled, during the 1960s and 1970s some federal judges began to simply defy earlier appellate rulings. *See generally* Langum, *supra*, at 213.

Indeed, the Supreme Court itself ignored *Caminetti* and *Cleveland* in *Amadio v. United States*, the facts of which clearly supported a conviction under its prior rulings. The Seventh Circuit had affirmed the conviction based on allegations that a defendant had transported a 15-year-old from Indiana to Illinois for the immoral purpose of placing her "in employment and [an] environment . . . which would tend to cause her to give herself up to a condition of debauchery which would eventually and naturally lead to a course of sexual immorality." 215 F.2d 605, 608, 612 (7th Cir. 1954). The defendant owned a tavern where girls did lap dances and were fondled by male customers, and the girl in question was transported interstate to work in the tavern and told to prostitute herself. *Id.* at 609-11. In a terse per curiam opinion that did not mention *Caminetti* or *Cleveland*, the Supreme Court reversed and directed the dismissal of the indictment "on the ground that it does not come within the purview of the statute." 348 U.S. 892 (1954).

Subsequently, then-Professor Ruth Bader Ginsburg co-authored a government study criticizing the Mann Act as "offensive" because of the sexual stereotypes "it perpetuates," and argued that it also suffered from other constitutional infirmities:

> These prostitution proscriptions are subject to several constitutional and policy objections. Prostitution, as a consensual act between adults, is arguably within the zone of privacy protected by recent constitutional decisions. *See Griswold v. Connecticut*, 381 U.S. 479 (1965); *Eisenstadt v. Baird*, 405 U.S. 438 (1972); *Roe v. Wade*, 410 U.S. 113 (1973).
> ...
>
> The Mann Act suffers from additional problems. It prohibits the transportation of women and girls for prostitution, debauchery, or any other immoral purpose. This language, which is not confined to illegal

9

> acts but encompasses "immoral" conduct as well, appears too broad and
> vague to the point where fair notice of the activity proscribed is hardly
> supplied. Moreover, the proscription is not limited to situations in which
> there is a financial factor.  Thus, the act poses the invasion of privacy issue
> in an acute form.

Sex Bias in the U.S. Code, A Report of the United States Commission on Civil Rights 97-98

(April 1977), available at https://www.usccr.gov/files/historical/1977/77-009.pdf.

Congress eventually amended §2421 in 1986, but only in a limited way.  It replaced

gender-specific language ("woman" or "girl") with gender-neutral language ("individual") and

replaced the terms "debauchery" and "immoral purpose" with "any sexual activity for which any

person can be charged with a criminal offense."  Pub. L. No. 99-628, §5(b)(1), 100 Stat. 3510

(1986); *see also* Langum, *supra*, at 248-50.  Thus, the amendment replaced the original vague

terms "debauchery" and "immoral purpose" with an equally broad and amorphous category that

"depends almost entirely on the law of the state into which the transported individual travels in

order to undertake the sexual activity."  Langum, *supra*, at 251.  And it left the term

"prostitution"—which also has different meanings in different state and local jurisdictions, as

discussed *infra*—entirely undefined.

### 4.   *The DOJ Has Long Declined To Enforce* Caminetti *and* Cleveland

Given the intervening changes in both the statute and Supreme Court precedent, it is

highly doubtful that *Caminetti* and *Cleveland* remain good law.  In part for that reason, even

before the 1986 amendment, the government itself has long declined to prosecute non-

commercialized acts of mere voluntary prostitution.  For over 75 years, DOJ has stated that

Mann Act enforcement should be limited to cases targeting defendants who violated the statute

for commercial gain.[5]  For example, the 1953 version of the U.S. Attorneys' Manual stated:

---

[5] Archived versions of the U.S. Attorneys' Manual are available here:  https://www.justice.gov/

> The White Slave Traffic Act makes it an offense knowingly to transport any woman or girl in interstate or foreign commerce or in the District of Columbia or in any territory or possession of the United States for the purpose of prostitution, debauchery or for any other immoral purpose.  Commercialism is not essential to a violation of the Act.  *Caminetti* v. *United States*, 242 U.S. 470.  However, as a general rule *prosecution should not be instituted in the so-called "non-commercial" cases*.[6]

This policy of not prosecuting "non-commercial cases" continued through the remainder of the 1900s until the focus of the statute turned to cases involving minors and/or sex trafficking in the 1980s.  Thus, the 1961 U.S. Attorneys' Manual stated that "prosecution of persons who are not engaged in commercial prostitution enterprises as panderers, operators of houses of prostitution or call girl operations, and those who act for or in association with such persons, should not be instituted without prior approval of the Criminal Division."[7]  And in 1966, the Attorney General flatly stated that the Mann Act "is designed to deprive those engaged in commercialized prostitution of the use of the facilities of interstate commerce."  Langum, *supra*, at 238.  The 1970 and 1984 Manuals continued to require consultation or approval from Main Justice for any prosecution of individuals not running commercial prostitution enterprises.[8]

By 1988, enforcement priority shifted to cases involving sex trafficking and minors, yet "non-commercial cases" remained deprioritized:

---

archive/usao/usam/index.html.

[6] 1953 U.S. Attorneys' Manual at 111, https://www.justice.gov/archive/usao/usam/1953/title2criminaldivision.pdf (emphasis added).

[7] 1961 U.S. Attorneys' Manual at 109, https://www.justice.gov/archive/usao/usam/1961/title2criminaldivision.pdf.

[8] 1970 U.S. Attorneys' Manual at 192, https://www.justice.gov/archive/usao/usam/1970/title2criminaldivision.pdf; 1984 U.S. Attorneys' Manual at 9-79.100, https://www.justice.gov/archive/usao/usam/1984/title9_part2.pdf.

> Unless minors are victims, prosecutions under 18 U.S.C. §§ 2421 and 2422 should generally be limited to persons engaged in commercial prostitution activities, even though commerciality is not an element of the offense. *See Cleveland v. United States*, 329 U.S. 14 (1946), and *Caminetti v. United States*, 242 U.S. 470 (1917). Prosecution of persons other than those engaged in commercial prostitution enterprises as panderers, operators of houses of prostitution, or call-girl operations, and of those acting for or in association with such persons, should not be instituted without consultation with the General Litigation and Legal Advice Section unless minors are victims.[9]

That directive continued through the most recent iteration of the U.S. Attorneys' Manual. *See* https://www.justice.gov/archives/usam/archives/usam-9-79000-other-criminal-division-statutes. And today, the Justice Manual, which replaced the U.S. Attorneys' Manual in 2018, makes clear that the "[p]rosecution of [c]ustomers" involved in an 18 U.S.C. §2421 offense—like Mr. Combs here—is now limited to "prosecuting those who engage in commercial sex with victims of sex trafficking, in addition to those who otherwise perpetrate or facilitate human trafficking offenses."[10]

In short, since the mid-20th century, the government has itself recognized that cases should not be brought under the broad doctrine of *Caminetti* and *Cleveland* and that §2421 should be enforced only where the defendant has a commercial motive (i.e., is selling sex), employs coercion, or where minors are involved. Here, in the absence of any sex trafficking charge, the standalone Mann Act counts never would have been prosecuted. Indeed, in its opposition to Mr. Combs's selective prosecution motion, the government suggested as much.

---

[9] 1988 U.S. Attorneys' Manual at 9-79.100, https://www.justice.gov/archive/usao/usam/1988/title9criminaldivisionchapters71-100.pdf.

[10] Justice Manual, 8-3.400 - Prosecution of Customers Involved in Federal Sex Trafficking Offenses, https://www.justice.gov/jm/jm-8-3000-enforcement-civil-rights-criminal-statutes.

*See* Dkt. 166 at 9-10.  And now, of course, the jury has found that he did not employ force, fraud, or coercion.  He stands convicted solely of transportation in interstate commerce of adults with intent for them to engage in consensual sexual activity.

## LEGAL STANDARDS

On a defendant's motion, or on its own, after the jury's verdict, a court shall "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a), (c).[11]  Although reasonable inferences must be resolved in favor of the government, "specious inferences are not indulged," nor "are inferences based on 'conjecture' or 'pure speculation.'"  *United States v. Mackey*, --- F.4th ---, 2025 WL 1888250, at *7 (2d Cir. 2025).  "An inference is not a suspicion or a guess.  It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist."  *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019).  But inference is not the same thing as speculation.  Indeed, even reasonable speculation is insufficient.  *See id.* at 656-57.  Where a jury's finding rests only on "modest evidentiary showings, equivocal or attenuated evidence of guilt, or a combination of the three," it must be set aside.  *United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005).  In short, "the government must do more than introduce evidence at least as consistent with innocence as with guilt."  *Pauling*, 924 F.3d at 656; *accord, e.g.*, *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015); *United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012).

---

[11] The sufficiency of the evidence is assessed based on the correct interpretation of the statute of conviction, not the jury instructions at trial.  *See Musacchio v. United States*, 577 U.S. 237, 243 (2016); *United States v. Blaszczak*, 947 F.3d 19, 31 (2d Cir. 2019), *vacated on other grounds*, *Blaszczak v. United States*, 141 S. Ct. 1040 (2021).

The Court may vacate the judgment and grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The test for determining whether Mr. Combs is entitled to a new trial based on the argument asserted in this motion is set forth in Point III below.

## ARGUMENT

### I.    THERE WAS INSUFFICIENT EVIDENCE THAT MR. COMBS TRANSPORTED ANYONE WITH THE INTENT TO ENGAGE IN "PROSTITUTION"

Mr. Combs was convicted of "knowingly transport[ing] an[] individual" in interstate commerce "with intent that such individual engage in prostitution."  18 U.S.C. §2421(a).  The two counts of conviction thus require that "prostitution" was the purpose of the interstate transport.  The Mann Act does not define the term "prostitution."  A host of serious constitutional problems would be presented if the statute were interpreted to cover the conduct at issue—performances in which adult male escorts and Mr. Combs's adult girlfriends engaged in consensual sexual activity while he observed.  The evidence showed Mr. Combs experienced these performances not as a typical "john," but rather as a voyeur who filmed the performances.  To avoid these constitutional concerns, the statute should be narrowly construed to apply only to defendants who have a commercial motive or—at the very least—only to johns who pay a prostitute to have sex with the john.  Alternatively, even if "prostitution" includes paying money to watch two *other* people have consensual sex, no reasonable juror could find the trial evidence sufficient to prove beyond a reasonable doubt that Combs intended to pay the escorts or entertainers for sex, as opposed to their time.

### A.  The Mann Act Should Be Narrowly Interpreted To Avoid Serious Due Process, First Amendment, And Federalism Problems

As explained, the 1986 amendment eliminated the "immoral purpose" and "debauchery" language on which *Caminetti* and *Cleveland* were principally based.  *See supra* at 10.  Accordingly, although those cases have never been expressly overruled, their holdings that

§2421 can apply to defendants not engaged in *commercial* prostitution were effectively overruled by the 1986 amendment. That is true at least for purposes of *this* case, because the conviction was only for transportation with intent to "engage in prostitution," and not the broader category added in 1986 of intent to "engage in…any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. §2421(a). In other words, the 1986 amendment itself means that *Caminetti* and *Cleveland* do not apply to this case, and do not expand the "prostitution" clause to cover non-commercial activity by a mere consumer of prostitution services.

But even apart from the 1986 amendment's effective abrogation of *Caminetti* and *Cleveland*, the statute should be construed *not* to cover non-commercial conduct by mere johns—especially where those johns do not even intend to have sex with the "prostitute." Criminal statutes must be interpreted to avoid serious constitutional problems. *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 405-09 (2010) (adopting narrow construction to avoid finding criminal statute unconstitutionally vague); *McDonnell v. United States*, 579 U.S. 550, 574-77 (2016) (narrowly construing statute to avoid vagueness, First Amendment, and federalism concerns); *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (if one "of two plausible statutory constructions…would raise a multitude of constitutional problems, the other should prevail").

Interpreting §2421(a) to cover a person who merely transports another intending for that individual to have sex with a third person for money, paid by the defendant, would raise a host of grave constitutional concerns. To avoid those concerns, the statute's scope should be limited to defendants with a commercial interest in exchanging money for sex. At the very least, the statute should not apply to defendants who pay money to someone so that the defendant can view the

15

payee have sex with a third person—conduct that is outside the definition of "prostitution" in several of the states where the sex in this case occurred.

### 1.  Due Process Vagueness Problems

"To satisfy due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Skilling*, 561 U.S. at 402-03 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)) (alterations in *Skilling*).

The Mann Act does not define the term "prostitution."  That word has had shifting meanings over time and continues to mean different things under different state and local laws in the 21st century—and in multiple relevant states it does not apply to voyeuristic conduct like that at issue here.  "[T]he failure of 'persistent efforts ... to establish a standard' can provide evidence of vagueness."  *Johnson v. United States*, 576 U.S. 591, 598 (2015) (quoting *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 91 (1921)).  This underscores the serious fair notice and arbitrary enforcement concerns here dictating a narrow construction.

a. In the late 1800s and early 1900s, the term "prostitute" was often applied to any woman who made herself available for sex.  Numerous courts explicitly rejected the notion that various prostitution statutes only applied to women who were *paid* for sex.  *E.g.*, *State v. Marsh*, 196 N.W. 930, 931 (Minn. 1924) ("The element of hire need not be present."); *Lopez v. State*, 156 S.W. 217, 217 (Tex. Crim. App. 1913) (statutory term "prostitution" does not require "selling" but simply refers to illicit "carnal intercourse"); *State v. Thuna*, 109 P. 331, 331 (Wash. 1910) ("A woman who submits herself to indiscriminate sexual intercourse with men, without hire, is certainly as much a common prostitute as one who does so solely for hire."); *State v. Clark*, 43 N.W. 273, 273 (Iowa 1889) ("Counsel, if we understand him correctly, thinks that

prostitution consists in sexual commerce for gain.  It is sometimes so defined, but we think if a woman submits to indiscriminate sexual intercourse, which she invites or solicits by word or act, or any device, she is a prostitute."); *People v. Cummons*, 23 N.W. 215, 215 (Mich. 1885) (holding the terms "concubinage" and "prostitution" are used in their "popular" sense and thus "cover all cases of lewd intercourse"); *Carpenter v. People*, 8 Barb. 603, 610 (N.Y. Gen. Term 1850) ("[T]he word *prostitution* . . . [means] the act or practice of a female offering her body to an indiscriminate intercourse with men; the common lewdness of a female.").  Against that backdrop, it is hardly surprising that the Supreme Court in *Bitty* held that the statutory term "prostitution" referred to all those who "for hire or without hire, offer their bodies to indiscriminate intercourse with men."  208 U. S. at 401.

Even then, however, some courts took a less expansive view.  For example, in *Commonwealth v. Cook*, the court acknowledged that "the term 'prostitution' has been sometimes used in a more loose and general sense," but held that Massachusetts's prostitution statute was not "intended to embrace the offence of enticing away an unmarried female, for the sole purpose of illicit intercourse with the individual."  53 Mass. 93, 96-98 (1846).  The meaning of the term was never clearly settled in American law.

b. In modern times, the commonly understood meaning of "prostitution" is "sex for money."  But what does that actually mean?  Even that definition is overbroad because it covers some conduct not deemed "prostitution" under various state and local laws—such as simply paying to see *other* people have sex.  In multiple jurisdictions, including most of the states in which the freak-offs and hotel nights occurred, Mr. Combs's conduct would not be considered "prostitution."  Fair notice and lenity principles require that his conduct be judged under this narrower understanding of prostitution prevailing at the time of the events in question.

Specifically, a number of courts have held that "prostitution" is an individual paying another for sexual contact between the two—not an individual paying to view another have sex with a third person. There is a "traditional bilateral notion of prostitution, which entails A paying B for sexual activity to be performed on A," rather than "C (a non-participating, third party) . . . paying B for sexual activity to be performed on A"—and defining the latter as "prostitution" would be "as novel as it [would be] unjustifiably broad." *People v. Paulino*, 2005 N.Y. Misc. LEXIS 3430, at *8-9 (N.Y. Sup. Ct. Aug. 4, 2005). That is, there is a "common-sense notion that prostitution is the trading of sexual conduct with another person for a fee where the sexual conduct is performed on the person who pays the fee." *Id.* at *9.

As a result, "[c]onduct that gratifies sexual desire but does not include physical contact— such as . . . sexual performances for a viewing audience—is generally not considered prostitution." Anders Kaye, *Why Pornography Is Not Prostitution: Folk Theories of Sexuality in the Law of Vice*, 60 St. Louis U. L.J. 243, 251 (2016). Consistent with this common understanding, courts have held that "prostitution" does not occur when the paying customer does not participate in the sexual conduct and instead merely observes it.

In *Paulino*, for example, the court rejected an equal protection claim that the state was selectively prosecuting a defendant who operated an escort business for promoting prostitution while not targeting adult film distributors for similar conduct. The court concluded that the escort business was not analogous to adult film producers because "the definition of prostitution is generally confined to a bilateral exchange involving only two parties," 2005 N.Y. Misc. LEXIS 3430, at *10—a definition that often applies to engagements with escort services (although not in this case). But that "bilateral" definition of prostitution did not apply to porn. And the court refused to conclude that "the legislature had a different definition in mind," which

would have meant "capriciously attach[ing] an anomalous definition to a perfectly intuitive word in a statute" and thereby "contraven[ing] the very essence of statutory interpretation." *Id.* As one scholar commenting on *Paulino* summarized, "prostitution is generally understood as the bilateral trading of sex for money, while pornography involves the customer of an adult film paying money to watch other people have sex with each other, while receiving no sexual favors himself in return." Sherry F. Colb, *The Legal Line Between Porn and Prostitution*, CNN (Aug. 12, 2005), https://edition.cnn.com/2005/LAW/08/12/colb.pornography/index.html.

    *Paulino* is illustrative of other New York authorities. The practice commentaries to New York's prostitution statute state that "[t]he gravamen of prostitution . . . is the commercial exploitation of sex, [specifically] the *trading of sexual conduct with another person for a fee*." William C. Donnino, *Prostitution*, Practice Commentaries to N.Y. Penal Law §230.00 (emphasis added). Consistent with this understanding, the applicable prostitution offense, patronizing a person for prostitution, prohibits soliciting or paying another for that person or a third person to engage in "sexual conduct with him or her," i.e., the payor. N.Y. Penal Law §230.02; *see also* New York Criminal Jury Instructions & Model Colloquies, Patronizing a Person for Prostitution in the Third Degree (§230.04) (tracking statutory language).

    For example, in *People v. Greene*, the court dismissed an information charging the defendant with prostitution for offering to masturbate in front of an undercover officer until he ejaculated. The court observed that "the Legislature did not intend [the prostitution statute] to proscribe commercial agreements to engage in any and all kinds of sexual conduct," including "agreements by which only the accused 'prostitute' was to engage in sexual conduct, while for example, the beneficiary was to act only as voyeur." 110 Misc. 2d 40, 41 (N.Y. Crim. Ct. 1981) (cited in NY pattern jury instructions for §230.04); *accord People v. Jin-Mai Yun*, 2006 WL

19

948135, at *1 (N.Y. Crim. Ct. Apr. 4, 2006). In a more recent decision, the Second Department

held that false arrest and malicious prosecution claims could be brought when there was no

probable cause that the plaintiff patronized a prostitute because he had "made no statements and

took no actions to solicit or request that she 'engage in sexual conduct with him ... in return for a

fee.'" *Metwally v. City of New York*, 215 A.D.3d 820, 823-24 (2d Dep't 2023) (quoting

§230.02(1)(c)); *cf. People v. Menner*, 53 Misc. 3d 52, 54, 56-57 (N.Y. App. Term 2016)

(affirming conviction for attempt to patronize a prostitute when "an agreement was reached with

defendant for him to give [undercover detective] $20 in exchange for oral sex" on defendant).

In another decision, *Wooten v. Superior Court*, defendants were charged with pimping

and pandering for managing a strip club in which customers could pay to watch naked women

perform sexual acts on each other—but not the customers—in private booths. The issue was

"whether a customer's observation of sexual conduct between two dancers, in exchange for

consideration, constitutes a lewd act for purposes of prostitution." 113 Cal. Rptr. 2d 195, 200

(Cal. Ct. App. 2001). The court held that the answer was no: "Although th[e] broad definition

of prostitution [in California's statute] could plausibly be interpreted to include sexual conduct

between two dancers, for money or other consideration from a customer, [prior case law]

support[s] a different interpretation: That a lewd act, an element of prostitution, requires

touching between the prostitute and the customer, even if the customer is simply an observer of

sexual acts." *Id.* at 199-202 (relying on prior decisions in *People v. Freeman*, 758 P.2d 1128

(Cal. 1988), *Pryor v. Municipal Court*, 599 P.2d 636 (Cal. 1979), and *People v. Hill*, 163 Cal.

Rptr. 99 (Cal. Ct. App. 1980)). Since it was "undisputed that there was no sexual contact

between the dancers and the [undercover] officers," "there [could] be no prostitution," and thus

"no pimping or pandering." *Wooten*, 113 Cal. Rptr. 2d at 203.

*Wooten*'s understanding of "prostitution" is reflected in other California authorities. *See, e.g.*, Judicial Council of California, Criminal Jury Instructions No. 1154 ("Prostitution: Soliciting Another") (citing *Wooten* as "Authority" for the proposition that statutory term "lewd act" "requires touching between prostitute and customer"); 2 Witkin, Cal. Crim. Law 5th Sex Crimes §96 (2025) ("[W]here a customer merely watches two other persons engaging in sexual conduct, but there is no sexual contact between the customer and either of those persons, no act of prostitution occurs.") (citing *Wooten*).

*Commonwealth v. Bleigh*, a Pennsylvania decision, involved similar facts. An adult bookstore contained private booths in which customers could pay to watch a dancer masturbate in front of them. The booths were equipped with waste cans and rolls of toilet paper to accommodate customers who wished to masturbate, as well as telephones so they could communicate with the dancers. Two dancers were convicted for engaging in prostitution. On appeal, the state argued that because the two dancers "engaged in self-masturbation for the sexual gratification of their customers, it was sexual activity as a business and therefore prostitution." 586 A.2d 450, 453 (Pa. Sup. Ct. 1991). The court rejected this argument, reversed the dancers' convictions, and held that "self-masturbation for hire without any physical contact between performer and viewer is not the type of conduct intended to come within the purview of" Pennsylvania's prostitution statute, which instead "require[d] the physical interaction of two or more people." *Id.* Because "there was no physical interaction between the dancers and the patrons," the alleged prostitution was "more akin to commercial voyeurism." *Id*; *accord Greene*, 110 Misc. 2d at 41.

A Georgia appellate court has drawn a similar distinction between "commercial voyeurism" and prostitution. In *Smoot v. State*, the court overturned a conviction for keeping a

place of prostitution when the evidence at trial "did not exclude the reasonable hypothesis that the residence was being used *for the purpose of commercial voyeurism or some other form of adult nude entertainment not rising to the level of prostitution*."  729 S.E.2d 416, 425-26 (Ga. Ct. App. 2012) (emphasis added).  The *Smoot* Court distinguished other decisions in which a "spa" employee "offered masturbation and oral sex services" to an undercover officer, *Ahn v. State*, 631 S.E.2d 711 (Ga. Ct. App. 2006), and in which a woman "made arrangements with [an undercover officer] for sexual relations for a price of $20," *Snead v. State*, 192 S.E.2d 415 (Ga. Ct. App. 1972).

Decisions in other jurisdictions similarly hold that various forms of voyeurism do not constitute "prostitution."  *See, e.g.*, *State v. Burgess*, 669 S.W.2d 637, 639-40 (Mo. Ct. App. 1984) (erotic "table dance" for tavern patrons that included insufficient contact was not "prostitution"); *State v. Turnpaugh*, 741 N.W.2d 488, 490-91 (Wisc. Ct. App. 2007) (reversing prostitution conviction when defendant told undercover officer that "he was looking for sex and he wanted [officer] to masturbate and that he wanted to watch," and thus "only offered to give [officer] something of value in return for the voyeuristic gratification he would get from watching her masturbate"); *State v. Mayfield*, 900 P.2d 358, 361-62 (N.M. Ct. App. 1995) (reversing and remanding for new trial on prostitution counts when jury instruction allowed for conviction without alleged prostitute touching customer).  Even jurisdictions with more broadly worded prostitution laws acknowledge the "definitional and constitutional difficulties" with prosecuting "voyeurism," i.e., "watch[ing] . . . a sexually arousing show."  *State v. Taylor*, 808 P.2d 314, 318 (Ariz. Ct. App. 1990).

Given the amorphous and changing meaning of "prostitution," the term should be interpreted consistent with these more recent decisions narrowing its scope to exclude "johns" who merely pay for other consenting adults to have sex for voyeuristic purposes.

### 2. *Substantive Due Process Problems*

In the second half of the 20th century the Supreme Court began to recognize constitutional protections for consensual sexual activity between adults prohibited by the pre-amendment version of the Mann Act, as Justice Ginsburg alluded to in her 1977 report discussed above. Those protections included rights to contraception as well as related rights such as the freedom to marry a person of a different race, *see Loving v. Virginia*, 388 U.S. 1 (1967). Since that time, the law has developed even further, as the Court has expanded the liberties afforded to people's voluntary choices about sexual activity. In *Lawrence v. Texas*, 539 U.S. 558 (2003), the Supreme Court struck down Texas's law criminalizing same-sex sodomy. The Court held that citizens have constitutional rights that protect certain sexual freedoms, including generally sex acts between "consenting adults acting in private." *Id*. at 569. And in *Obergefell v. Hodges*, 576 U.S. 644 (2015), the Court recognized a constitutional right to marry a person of the same sex.[12] These decisions, and *Lawrence* in particular, are hard to square with the notion that the government can criminalize a person's decision to pay another *adult* for sex—at least if there is no coercion or minor involved.

---

[12] When the Court overruled the right to abortion, it explicitly held that its decision "does not undermine…in any way" its prior precedents recognizing substantive due process rights relating to sexual activity and marriage in *Griswold, Loving*, *Lawrence*, and *Obergefell*. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 256-57 (2022); *see also id.* at 332, 345-46, 363.

### 3.  First Amendment Problems

Part of the rationale underpinning some of the 21st century decisions holding that "commercial voyeurism" is not "prostitution," whether stated or unstated, is a concern about avoiding serious First Amendment problems.  As explained in Point II *infra*, applying the Mann Act to Mr. Combs's conduct would violate the First Amendment.  The Court should adopt a narrower construction to avoid those problems.

### 4.  Federalism Problems

The Supreme Court has repeatedly invoked federalism concerns to narrow the scope of federal criminal statutes to avoid "'plac[ing] under federal superintendence a vast array of conduct traditionally policed by the States.'"  *Ciminelli v. United States*, 598 U.S. 306, 316 (2023) (quoting *Cleveland v. United States*, 531 U.S. 12, 27 (2000)); *see also*, *e.g.*, *Snyder*, 603 U.S. at 14-15; *McDonnell*, 579 U.S. at 576-77.  Those concerns are particularly salient here, because "prostitution" is a classic area traditionally policed by state and local authorities, which have taken varying approaches to whether to regulate, and what conduct to regulate.  And, as discussed, in most of the locations in which freak-offs or hotel nights took place, paying for voyeurism (which is, at worst, what Mr. Combs did) is not "prostitution."  It is one thing for the federal government to criminalize serious crimes like sex trafficking when state lines are crossed or interstate commerce is implicated.  But federal policing of "prostitution" by a defendant with no commercial interest in the activity, just because someone traveled interstate for consensual sex, "federalizes traditionally state matters," a result that must be avoided through a narrower construction.  *Ciminelli*, 598 U.S. at 316.

**B. Narrowly Construed, The Mann Act Does Not Proscribe Mr. Combs's Conduct Because He Lacked A Commercial Motive And Did Not Intend For Paid Escorts To Have Sex With *Him***

1.     Under the properly cabined definition of prostitution, the evidence was insufficient to prove Mr. Combs transported anyone for the purpose of prostitution. Mr. Combs was not a commercial purveyor of prostitution. The evidence showed he transported the escorts or entertainers and his girlfriends interstate so they could enjoy sex together while he observed. Even assuming Combs was paying for sex, he was paying for these performances, not to participate in them directly.

The videos of freak-offs and hotel nights and the testimony of several witnesses make clear Combs observed but did not participate in these live shows. Daniel Phillip, one escort, explained that at his first such meeting, Ventura told him that "[Combs] wasn't going to try to touch [Phillip] or anything." Tr.249. "Every time [Phillip] met with Ms. Ventura and Mr. Combs," Phillip testified, "the purpose of the meeting" was "[t]o have sex with Cassie" "[i]n front of Mr. Combs." Tr.256. Sharay Hayes, the other testifying escort, said he had similar experiences during the "eight [to] 12 times" he had "encounters with Ms. Ventura in front of Mr. Combs." Tr.1896.

According to witnesses, Combs enjoyed these performances and would masturbate while watching the escorts or entertainers have sex with his girlfriends, and then he would have sex with his girlfriends (times they loved as well). *E.g.*, Tr.255; 486-87; 568; 4589; 5294-95. He was nevertheless primarily a bystander to—not a direct participant in—the sexual performances with the males. That is why the videos of freak-offs and hotel nights show Combs's girlfriends—but not Combs himself—having sexual contact with the other men. *See, e.g.*, GX BX-205; GX BX-206; GX BX-207; GX AX-101-B; GX AX-102-D; GX AX-105-C.

Ms. Ventura testified that very early in their relationship, Combs explained the concept of "voyeurism," which would involve him observing Ventura have sex with someone else.  Tr.476. In turn, Ventura would tell escorts before freak-offs that Combs was "into something called voyeurism and he likes to watch me with another man."  Tr.528.  Jane testified to the same pattern of Combs observing her with other men, although she described it not as voyeurism per se, but rather Combs being a "cuck," i.e., "a man who is in a relationship with a woman and he's turned on watching his woman have sex with another man."  Tr.5380.  Jane said Combs would tell her that "that's what he wants to see more of, is me playing with myself and play with the other man."  Tr.4624.

This distinction between participatory sex and voyeurism is typically irrelevant in Mann Act cases.  As explained, the statute's drafters targeted pimps and traffickers who prostitute vulnerable women by offering them up *to other customers*, and DOJ policy since the mid-20th century has been focused on such cases (along with situations irrelevant here involving coercion or minors).  But this is one of the extremely rare cases in which the statute is being applied against a paying customer—a john—rather than a pimp:  Combs was convicted of paying for (and transporting individuals for the purpose of) sex to be performed as part of his personal sex life.  That is not "prostitution," properly understood, and he is therefore entitled to an acquittal.

### C.  There Was Insufficient Evidence That Mr. Combs Transported Anyone With The Intent To Engage In "Prostitution," Even If It Includes *Any* Sex For Money

Even assuming arguendo that the word "prostitution" covers all situations in which someone is paid money to have sex, the evidence was insufficient to prove Mr. Combs had the requisite *mens rea*:  The government's proof failed to establish that Mr. Combs transported Ms. Ventura, Jane, or any male escorts or entertainers with the requisite intent to engage in prostitution.

26

To prove intent under §2421(a), the government must establish that a dominant purpose of the travel was to engage in prostitution. *See United States v. Miller*, 148 F.3d 207, 212-13 (2d Cir. 1998). This specific intent must "coincide with the *actus reus* of crossing state lines." *United States v. Broxmeyer*, 616 F.3d 120, 129 (2d Cir. 2010) (interpreting similarly worded 18 U.S.C. §2423(a)). Thus, the government must prove that at the time of the interstate travel, Mr. Combs intended that Ms. Ventura, Jane, and an adult male would engage in prostitution. At trial, however, the government's evidence as to Mr. Combs's intent was wholly lacking. It presented argument "based on mere speculation or guesswork" and did not present any evidence that Mr. Combs intended anyone to have sex for money. *Broxmeyer*, 616 F.3d at 125.

The evidence did not reveal any understanding on Mr. Combs's part that the transportation was for purposes of having sex for money. To the contrary, the proof showed that Combs hired the services of legitimate escorts advertised through lawful businesses offering male companionship in exchange for a fee—usually at a pre-determined rate. Ms. Ventura testified that she found escorts through "an escort service called Cowboys4Angels," which had escorts in "all the major cities in the U.S." Tr.517; *see also* Tr.4760 (Jane confirmed Cowboys4Angels was an "escort website"). Ventura communicated with Garren, an owner of Cowboys4Angels, to arrange for escorts. *See, e.g.*, Tr.521; GX B-227. Combs also corresponded with other Cowboys4Angels representatives, including Bridget, who referred him to the company's website regarding individual escorts he might hire. Tr.7046-47. Bridget and Combs even discussed rates. Tr.7047, 7057-58. The two spoke about escorts' interstate travel and Bridget made clear payment could be by cash or via apps like Venmo. GX A-103. Bridget advised that the company "has to dot every I and cross every T to make sure we stay within a specific guideline to be clear about what the agency offers and sells." Tr.7058. And she made it

clear to Combs: "Our agency provides time and companionship. You're paying for the gentleman's time." Tr.7057. Thus, she was "contractually obligated to the rates on the website for each person as that's the rate we agreed on when they signed me as their agent and at each renewal." Tr.7047. This is what the evidence showed Combs understood of the arrangement and the purpose for which he hired escorts.

Ms. Ventura also found escorts through male dancer and stripper services, Tr.524-25, including Hunk-O-Mania, which Hayes testified does not allow prostitution, Tr.1929. And Jane twice found men merely by reaching out to actors from the couple's favorite pornography. Tr.4727. No evidence showed that these men were engaging in anything more than mere sexual performances—as opposed to prostitution. The evidence revealed that from Mr. Combs's perspective, these services were entirely lawful and legitimate, operating in broad daylight for the world to see and enjoy. Indeed, Cowboys4Angels was even featured on the Showtime reality television show Gigolos. Tr.1191-92. Purchasing such an escort's time, even if sex occurs, is not prostitution, and the government presented no evidence that Combs intended these transactions to constitute prostitution.

And as explained, the evidence also demonstrated that Mr. Combs hired these escorts and entertainers not so he could have sex with them, but so he could observe them with his girlfriends. The purpose of hiring the men was for "voyeurism" and to create a scenario akin to a sexual "fantasy." Tr.528-29. These "freak-offs" were merely part of Mr. Combs's and Ms. Ventura's "swingers lifestyle." Tr.683. That is not prostitution, but "a certain type of lifestyle … that was a turn-on for [Combs]." Tr.683. Indeed, Ventura testified that escorts—including their spouses or girlfriends—occasionally joined her and Combs at sex clubs as part of this lifestyle. Tr.683-84. Jane similarly testified Combs initiated hotel nights as part of a role-

playing fantasy. Tr.4580-84. Jane even called the escorts "entertainers," confirming they were not prostitutes. Tr.4621. She testified that entertainers were paid at the end of a session, but she did not say they were paid in exchange for sex, or that she or Combs intended to pay or believed they were paying escorts for sex. Tr.4816-18. She also described a time where she paid a Cowboys4Angel entertainer even though there was no sex. DX 3187; Tr.5632.

At best for the government, Ms. Ventura gave conflicting testimony about why escorts received money. She testified the escorts were paid "to ejaculate," "[t]o entertain and to also ultimately have intercourse" with her. Tr.532-33. But "[b]efore booking any escort travel," all that Combs and Ventura discussed was "what we are doing" and "who's available." Tr.540. There is no evidence they discussed prostitution or payment for sex. That is insufficient to prove an intent to engage in prostitution, because to violate the statute, the defendant must intend *at the time of the transportation* for the travel to result in paying money for sex. *See Broxmeyer*, 616 F.3d at 130 (intent to engage in the prohibited sexual activity is "ascertained as of the moment the state line [is] crossed") (interpreting similarly worded §2423(b)). Even if sex was foreseeable during a freak-off or hotel night, that doesn't mean Mr. Combs believed or intended prostitution would occur, even if money was exchanged.

Moreover, the government's case regarding the intent element relied exclusively on circumstantial evidence and summary charts outlining when travel occurred in relation to payments to escorts. The government only called two escorts who participated in freak-offs with Ms. Ventura at trial, neither of whom even traveled interstate. And the government called no entertainers who joined hotel nights with Jane. The escorts who did testify—Daniel Phillip and Sharay Hayes—unambiguously denied engaging in prostitution or being paid for sex.

29

Phillip testified that when he was first hired, Ms. Ventura told him he was being hired because "her husband wanted to do something special for her, and so she asked [Phillip] if [he] would mind rubbing baby oil on her and giving her a massage. And, um, you know, wherever things went from there, if it went, if, you know, based on how comfortable [he] was." Tr.247-48. There was no understanding that the evening would involve prostitution, and he was not "expect[ing] to be paid for sex." Tr.273. Indeed, Phillip worked for a male stripper service that did not offer prostitution services. Tr.292. And the payment itself was consistent with that understanding. He was paid "a few thousand dollars" before the night even started, with Ventura telling him "at the end, she would tip [him]." Tr.249. He ultimately testified he "wouldn't have thought twice to think that that was prostitution." Tr.312; *see also* Tr.296.

Hayes testified similarly. He stated he was paid "to create the scene" as an experienced male entertainer. Tr.1891. He also denied engaging in any form of prostitution. Tr.1929-30. In fact, during one encounter he was asked if he wanted to orgasm, but he declined because he "was trying to be as professional as possible" and understood he "was there to create what [he] called a sexy scene." Tr.1894-95. Nevertheless, despite not ejaculating he was "handed additional monies." Tr.1895. On another occasion he got paid even when the freak-off was cancelled and thus testified it was fair to say he was being paid for his time and not for sex. Tr.1935.

Moreover, the evidence was clear that Philip and Hayes—as well as other escorts—participated in these nights not for money but because of the notoriety and status of being with Combs and his girlfriends, as well as their own positive feelings for them. Phillip testified about the times he was not paid, and why he continued his encounters with Ms. Ventura and Combs even in the absence of compensation. He stated:

> Well, I, for one, was not someone that was getting paid for sex. In my
> head, I was just excited that I was in this world and, you know, happy to,

30

> to be involved with people with such notoriety.  I didn't care if I got paid
> one way or another.  I never asked them for a single dollar.  They gave
> that to me every time that I went to see them.  So for me, it was just, you
> know, this is just something that they do. They have that kind of money.
> They want to share it with me.  I'm fine with that.

Tr.274.  Phillip even "liked Cassie Ventura romantically," Tr.379-80, and felt they had a "bond,"

Tr.368.  He "had conversations in between" meetings with Ventura and developed a "friendship"

with her.  Tr.279-80, 374.  So did Hayes, who previously said he "began to have feelings for

Ventura," which surely motivated the sexual encounters.  Tr.1924-26.  Indeed, after meeting with

Ms. Ventura about a dozen times, Hayes "felt special" that he was being chosen for their get-

togethers.  Tr.1924-25.

The evidence shows the non-testifying escorts felt similarly—they had fun and very

much enjoyed their experiences with Combs and his girlfriends and were not motivated by

money.  Ventura testified she and Jules Theodore "had our own friendship."  Tr.684.  And in

representative texts to Ventura, Theodore said it was "[g]reat seeing you again sexy," Tr.6638,

and wished her a happy birthday, Tr.6629.  Likewise, Jane testified she had a "friendship" with

Paul Arthur, that he was "warm" to her, and that she "miss[ed]" him.  Tr.5771, 5874.  Indeed,

Jane once organized a night with Arthur merely because she "miss[ed]" him.  Tr.5242-43.  Jane

also explained that the first time she met Kabrale Williams in person, he was "just really sweet"

and that they both had "little butterflies."  Tr.4733.  Williams later texted Jane that he "would

love to see [her]."  Tr.4749.  Jane described Michael Ejiawoko's behavior similarly, explaining

that he "was really nice," in a "nice mood," and "we took a liking to each other."  Tr.4769.

At most, the evidence shows that Mr. Combs intended to participate in a swingers

lifestyle in which male companions were paid for their time and sexual performances, which

were consensual, adult interactions with Combs's girlfriends while he observed.  The escorts can

31

hardly be described as prostitutes and denied working as such. Rather, they were professional entertainers who became close friends of Combs and his girlfriends (and the women's lovers).

This evidence pales in comparison to that deemed sufficient in recent Mann Act cases. In *United States v. Purcell*, for example, the defendant "oversaw and operated a commercial sex business" in which he "contacted women … through private messages on Facebook, Instagram, and dating applications such as Tinder, requesting their phone numbers and sometimes identifying himself as a 'pimp.'" 967 F.3d 159, 167 (2d Cir. 2020). He also "contacted women who were already working as prostitutes through Backpage … and attempted to persuade those women to 'choose up'—a term in the commercial sex industry for a prostitute's selection of a pimp—with him." *Id.* And in *United States v. Mi Sun Cho*, the evidence at trial established that the defendant received a call from the victim "seeking a job as a prostitute." 713 F.3d 716, 720 (2d Cir. 2013) (per curiam). The defendant then helped arrange her travel to Manhattan "so that she could work in a brothel." *Id.* In these cases, the defendant's intent in contacting and transporting the women was obvious. Here, there is no comparable evidence suggesting that Mr. Combs intended for anyone to engage in "prostitution" even under the government's broader understanding of that word.

## II.   UPHOLDING THE CONVICTIONS WOULD VIOLATE THE FIRST AMENDMENT

The evidence at trial showed that during the freak-offs and hotel nights, Mr. Combs directed and recorded live sexual performances that he later watched with his girlfriends. The trial record thus demonstrates that Mr. Combs and his girlfriends arranged these get togethers not just for the voyeuristic purpose of sexual arousal and gratification, but also to capture sexual performances on video, in a manner similar to an adult film producer. The Mann Act cannot be enforced in these circumstances without violating Mr. Combs's First Amendment rights.

### A. Paying People To Film Them In Sexual Performances Is Protected By The First Amendment

In the leading decision of *People v. Freeman*, the defendant was convicted of procuring individuals for prostitution because he paid them to perform sexual acts to be portrayed in an adult film. On appeal, the California Supreme Court reversed the defendant's convictions and held that, even assuming his conduct met the state's statutory definition of "prostitution," its application would have violated the First Amendment. Relying on both U.S. Supreme Court and state precedent, the court recited the undisputed propositions that both films and live performances are protected by the First Amendment and therefore concluded that upholding a prostitution-based conviction for a "producer and director" of a sexually explicit film would have "rather obviously place[d] a substantial burden on the exercise of protected First Amendment rights." 758 P.2d 1128, 1131-32 (Cal. 1988). The state legislature, moreover, had not "intend[ed] the anti[prostitution] law to apply" when an individual pays an actor fees to perform in a sexually explicit video. *Id.* at 1132.

New York caselaw similarly recognizes the First Amendment problems with applying prostitution laws in like circumstances. In the earlier *Greene* decision cited above, where the defendant was "accused of having agreed only to perform an autoerotic exhibition for another," the New York court held that construing the state's prostitution law as "proscribing agreements calling for sexual conduct to be performed *for* another person, as well as with another person . . . would surely intrude upon areas of behavior traditionally protected by the First Amendment." 110 Misc. 2d at 41-42. And in the later *Paulino* decision, the New York Supreme Court likewise held that the state would "bear a . . . heav[y]" constitutional burden in prosecuting adult film producers for prostitution, and that doing so would "pose[] thorny First Amendment issues." 2005 N.Y. Misc. LEXIS 3430, at *12.

33

Although *Freeman* is a California decision that, like *Greene* and *Paulino*, doesn't bind this Court, *Freeman* "has been influential outside California—far more than might be expected of a mere state supreme court case," and "no decisions [have] call[ed] it into question—anywhere—since it was entered." Marc J. Randazza, *The Freedom to Film Pornography*, 17 Nev. L.J. 97, 109, 134 (2016). In fact, a Justice of the U.S. Supreme Court expressly refused to disturb the California Supreme Court's decision in *Freeman* by denying the state's request for a stay of the judgment reversing Freeman's convictions on the ground that the Court was unlikely to grant the state's cert petition. *California v. Freeman*, 488 U.S. 1311 (1989) (O'Connor, J.).

*Freeman*'s influence is based on its reliance on well-established First Amendment principles with broad application—including to the circumstances of this case. True, the adult film producer in *Freeman* is not identically situated to Combs. For example, according to witnesses, Combs arranged freak-offs and hotel nights for sexual arousal and gratification, unlike Freeman. But the California Supreme Court was clear that Freeman's First Amendment rights would have been violated even if he had some sexual arousal purpose. *See* 758 P.2d at 1131.

Also unlike Freeman, the trial evidence showed Combs was seeking to create films not for widespread distribution, but rather primarily so he and his girlfriends could watch them later. As we argued at closing, Combs was creating "homemade porn." Tr.7864. But *Freeman*'s logic applies to small-scale porn, too—not just mass commercial adult films.

In *State v. Theriault*, for example, the defendant was prosecuted and convicted under New Hampshire's prostitution law for asking a couple if he could pay them to make films of them having sex in hotel rooms. Theriault successfully argued on appeal that the state law could not be applied "to the constitutionally protected activity of making a sexually explicit videotape." 960 A.2d 687, 688 (N.H. 2008). "To uphold the conviction in the instant case, where the only

facts adduced at trial were that the defendant offered to pay two people to have sexual intercourse while being videotaped," the New Hampshire Supreme Court concluded, "would infringe upon" constitutionally protected speech. *Id.* at 692. Although the court formally found a violation of the state's own free speech clause, it relied heavily on the well-established federal First Amendment principles announced in U.S. Supreme Court case law and applied in *Freeman*.

Both *Freeman* and *Theriault* involved state prostitution laws—not the Mann Act. *Freeman* did, however, remark that, unlike the California law applied there, the Mann Act did not "direct[ly] impact" the First Amendment and because it was directed at interstate transport for an "immoral purpose," 758 P.2d at 1134—a phrase no longer in the statute. *Freeman* was referring to a 1975 Mann Act case (decided under the old version of the statute) in which the defendant transported an individual across state lines to *engage in sexual acts with her* that would be recorded in an explicit film. In a conclusory single paragraph, the Tenth Circuit rejected the defendant's argument that "since it is a film the First Amendment not only clothes it but places it beyond the reach of the Mann Act," because "the First Amendment does not constitute a license to violate the law." *United States v. Roeder*, 526 F.2d 736, 739 (10th Cir. 1975).

In light of *Freeman*, not to mention the 1986 amendment to the Act, *Roeder* is "either no longer good law, or is limited to its facts." Randazza at 133-34. In any event, the Tenth Circuit was attacking a straw man. The point is not that otherwise illegal conduct, like sex trafficking or sex with minors, can become legal simply because the defendant wishes to film it. There would be no First Amendment defense for a defendant who paid actors to "perform" in an elaborately planned murder, kidnapping, or robbery. The difference is that Mr. Combs was convicted for paying (and transporting) adults to engage in fully consensual sex, which is legal, whereas

35

murder, kidnapping, and robbery are illegal "independent of and totally apart from any payment for the right to" record those acts. *Freeman*, 758 P.2d at 1133-34. The analysis might be different had Combs been convicted on either of the sex trafficking Counts. But he was not.

### B. Mr. Combs's Conduct Was Protected First Amendment Activity

1. According to the trial evidence, like the defendants in *Freeman* and *Theriault*, Mr. Combs was acting as a director and exercising creative control over sexual performances that involved choreographed acting and role play, outfits and costumes, and staging with very particular accoutrements. In other words, like numerous other Americans, Mr. Combs and his girlfriends were making "amateur porn"—an increasingly popular genre that has developed a massive audience in recent years.[13] Mr. Combs sought to—and did—record these performances and would watch them later with his girlfriends.

Hayes provided illustrative testimony about his experiences in freak-offs with Combs and Ms. Ventura. According to Hayes, at the first get-together, Ventura explained that his job was to create a sexy "scene" or "environment." Tr.1887, 1891, 1907-08. Hayes described these scenes as "movie[s]" in which "Combs was . . . the director," and "[Hayes] and Cassie were actors." Tr.1931. These scenes, moreover, involved a "similar pattern" including a "seated couch scenario where we would put on baby oil to kind of create a look." Tr.1902. At some point, Combs would enter the room and give "directions to Ms. Ventura based on . . . angles, lighting, positionings, and . . . the sexual activity." *Id.* These directions were given "throughout the entire

---

[13] For example, in 2017, Pornhub published data showing it receives 75 million unique daily visitors. *See* https://www.dailymail.co.uk/femail/article-4545854/10-year-pornography-survey-reveals-surprising-statistics.html; *see also* The People's Porn: A History of Handmade Pornography in America (July 6, 2021), https://notchesblog.com/2021/07/06/the-peoples-porn-a-history-of-handmade-pornography-in-america/; The Appeal of Amateur Porn (Oct. 14, 2011), https://abcnews.go.com/blogs/health/2011/10/14/the-appeal-of-amateur-porn.

. . . scene or interaction." Tr.1930.  Examples included instructions to "move the candle to the right, move it to the left, . . . position your body, sit forward."  Tr.1903.

Phillip said that when the sexual activity between him and Ventura was escalating, Combs would sometimes ask them to "slow down . . . y'all stop now, separate from each other . . . it's getting too hot, y'all."  Tr.260.  In Phillip's telling, therefore, Combs "definitely did direct us, direct Cassie to give me blow jobs, and also to rub each other down in certain ways with baby oil and stuff" and "for what to do in terms of touching each other in sexual ways."  Tr.381-82.

Ms. Ventura and Jane similarly described freak-offs and hotel nights, respectively, as highly staged performances.  A freak-off, Ventura summarized, was a "very choreographed" show during which Combs was "direct[ing]" her and an escort "on what we were doing sexually."  Tr.408, 504.  Ventura testified that "every freak-off was . . . directed by Sean.  Like, he knew specifically where he wanted everyone to be, the lighting and such."  Tr.481.  Jane described hotel nights in a similar way: sexual performances during which Combs "g[a]ve you directions about what to do."  Tr.4819.  For both freak-offs and hotel nights, witnesses said Combs would direct a "gradual," step-wise process that progressed from sexual touching, to oral sex, to intercourse.  Tr.557, 4622-25.  At least for Jane, these performances also involved "dancing" and "slow dancing" before "things . . . escalate[d]."  Tr.4622; *see also, e.g.*, 4735, 4795, 4803.

According to the testimony, the hotel rooms had to have a very particular look.  For their first hotel night, Jane remembered that "the assistants [were] setting up this room," "[t]here [were] beverages," and "[t]he lights were already red."  Tr.4584.  And as Ventura explained, Combs was "in charge" of the setup, Tr.408—from furniture placement to temperature to lighting and everything in between.  Ventura said Combs had a particular preference for "strong

smelling candles," and he would ordinarily want "six to ten" of them, placed specifically so that one "could see [Ventura] and the escort in the candlelight." Tr.509. Over time, per Ventura, Combs came to prefer studio lighting, that is, "lights that change with the music, kind of like a club light," with colors including "[r]ed, green, blue, [and] purple." Tr.510. This dramatic colored lighting is striking in several of the hotel night videos. *E.g.*, GX AX-701-65; GX AX-701-79; GX AX-703-42.

Phillip and Hayes provided illuminating testimony about these and other details regarding how the hotel rooms had to look a certain way. Phillip stated: "The curtains were always shut fully," "[t]here was always a table in front of the couch, and there w[ere] always candles on that table." Tr.259. Hayes said the set up also included "dimly lit [lighting], candles, sometimes music in the background, and always the furniture covered in sheets"—because of the large amount of baby oil used—and arranged in a specific way for him and Ventura to engage in sexual activity. Tr.1892, 1903.

The evidence showed certain supplies were another important component of freak-offs and hotel nights. The most important items for Combs, according to Ventura, were "baby oil, Astroglide, as lubricants, and condoms." Tr.501. She said everyone would "pour[] [baby oil] all over our bodies," so they were "glistening" or "shining." Tr.502-03. Ventura said that because Combs wanted the baby oil to be heated, she would "keep the cap on, put it in the sink with hot water, and let it warm up." Tr.503.

The witnesses testified that Combs was also very specific about Ventura's and Jane's appearances during the filming of freak-offs and hotel nights. Ventura said she "had to look a certain way," so she did "physical prep," including "getting a tan," "getting a wax," or "doing [her] nails," and that her nails would be polished either "white" or "French tip." Tr.458-59, 497.

As for her outfits, Ventura would ordinarily "show Sean and see what he liked the best." Tr.497. For her first freak-off, Ventura wore "an outfit from a sex store . . . with some really high platform shoes, dancing shoes." Tr.480.

Likewise, Jane testified she would usually wear "provocative lingerie" purchased from a sex store and "stripper shoes" with "really high" heels. Tr.4620. Jane said she would select outfits and show them to Combs before a final decision was made. Tr.4620-21. And Jane felt she needed to be "just be always on point as far as my glam, like I would have my nails done, my hair, my makeup, my tan[,] . . . outfits already ready, shoes, things like that." Tr.4825-26.

The outfits and wardrobes were sometimes used as part of role play. At one freak-off, Combs requested that Phillip show up wearing a NYPD uniform. Tr.306-07. On another occasion, Combs had Jane "touch" an escort while she was blindfolded. Tr.4766-67. More generally, Jane and Combs would "come up with names and scenarios and characters." Tr.4821-22. There was a "a lot of cheating role play" where they would pretend "Sean left town and I'm all alone . . . and I'm sneaking in this entertainer and . . . I'm just fantasy talking about how Sean's on a plane and I couldn't wait to get this entertainer all alone to myself." Tr.5303.

Critically, Combs was not just observing these performances—he and his girlfriends were filming them too. Combs would "set up the recording equipment" for freak-offs with Ms. Ventura. Tr.570. Early on, he would use "video cameras," but he eventually switched to "phones, iPads, [and] computers." Tr.569; *see also* Tr.266 (Phillip testifying that Combs would use "a cell phone and a camcorder device"). Similarly, Combs would film Jane during hotel nights "[a]lmost every time." Tr.4818. Combs would later watch the videos together with Ventura and Jane. Tr.569-70, 5303-04, 5540. For instance, Jane testified, "we would have these things called movie nights, where we would not have an entertainer and we would just

39

watch…one of our older tapes or newer tapes and we would just role play and fantasize. And that's what we called movie night." Tr.4923.

Capturing these sexual performances on video was a key part of the experience. On one occasion, Ventura forgot to bring the iPad to the hotel. When she asked if she should go back to retrieve it, Combs said, "yeah, fuck, right?" Tr.1010-11. Jane even got Combs a "movie screen" for his birthday to watch their videos and other porn. Tr.5386-87.

2.    When considered in its totality, the evidence presented by the government makes clear that Mr. Combs's amateur porn, like many other adult films, was creative, intricate, and highly choreographed. The videos accordingly have expressive content and are protected by the First Amendment. *See, e.g.*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 240 (2002).

That Amendment, in turn, protects against the application of all laws "abridging the freedom of speech," even those—like the Mann Act—that don't specifically target speech. U.S. Const. amend. I. Accordingly, to pass First Amendment muster, Combs's Mann Act convictions must satisfy the Supreme Court's test for regulations of conduct with expressive elements. *See Texas v. Johnson*, 491 U.S. 397, 407 (1989) (citing *United States v. O'Brien*, 391 U.S. 367 (1968)); *see also, e.g.*, *Freeman*, 758 P.2d at 1132-33 (applying *O'Brien*). Under that test, the Mann Act's application here must, among other things, "further[] an important or substantial governmental interest." *O'Brien*, 391 U.S. at 377. It does not.

The Mann Act has rarely been used to prosecute johns, and Combs is not even a typical john because he did not have sex with the escorts and entertainers himself but instead, according to the government, paid them to have sex with his girlfriends. As explained *supra*, the statute was enacted for a purpose that couldn't be more inapt: eliminating the "white slave" business. And following the changes in DOJ policy in the mid-20th century, the government has used the

40

Mann Act primarily to target financially motivated pimps who take advantage of and profit off women by offering their services to brothels, similar establishments, or other clients. Moreover, as the legislative history surrounding the Mann Act's 1986 amendment made clear, the statute was not intended to apply to transportation of fully consenting adult males. The drafters of the 1986 amendment made the law gender-neutral to protect *boys*—not adult males—from sexual exploitation. *See* Pub. L. No. 99-628 ("Child Sexual Abuse and Pornography Act of 1986"); H.R. Rep. 99-910 (accompanying house report).

This unprecedented prosecution was so removed from the Mann Act's longstanding focus that applying the Act here would not advance *any* legitimate interest, let alone one "sufficiently important" to justify burdening Mr. Combs's First Amendment rights. *O'Brien*, 391 U.S. at 376.

3.      Finally, Mr. Combs's free speech rights would be burdened not just as a producer and director of these performances, but also as a consumer of them. A line of Supreme Court decisions, including one handed down this year, make clear that adults have a First Amendment right to view adult pornography that cannot be burdened absent a sufficiently important government interest. *See Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2304-06 (2025); *Ashcroft v. ACLU*, 542 U.S. 656, 665-66 (2004); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 811-13 (2000); *Reno v. ACLU*, 521 U.S. 844, 874-75 (1997); *Sable Commc'ns v. FCC*, 492 U.S. 115, 126 (1989); *see also Stanley v. Georgia*, 394 U.S. 557, 564-65 (1969).

The sexual performances that occurred during freak-offs and hotel nights are materially indistinguishable from—and, indeed, can be considered a form of—adult pornography. This type of content is now ubiquitous on both unpaid (e.g., Pornhub) and paid (e.g., OnlyFans) channels. While Combs primarily observed these performances live, rather than on his phone or computer screen, that in no way undermines his First Amendment "right to access" them. *E.g.*,

*Paxton*, 145 S. Ct. at 2309. And Combs also watched the recordings on screens after the fact with his girlfriends—in a manner similar to typical porn consumers today.

**III.    AT A MINIMUM, A NEW TRIAL IS REQUIRED DUE TO SPILLOVER PREJUDICE FROM EVIDENCE THAT WOULD HAVE BEEN INADMISSIBLE HAD THE MANN ACT COUNTS BEEN TRIED ALONE**

In the alternative, if this Court does not grant acquittal under Rule 29, it should grant a new trial under Rule 33 due to spillover prejudice from the RICO and sex trafficking counts. As the Second Circuit has held, considering a claim of spillover prejudice: "If the RICO counts fail, prejudice on other counts is highly likely." *United States v. Tellier*, 83 F.3d 578, 582 (2d Cir. 1996). The reason for this is straightforward—RICO charges allow the government to present a wide variety of evidence that would otherwise be inadmissible and highly prejudicial. The likelihood that such evidence has an impermissible spillover effect on other counts is high.

This case starkly illustrates the point. To try to prove the sex trafficking and RICO charges, the government introduced tons of inflammatory evidence. None of this evidence would have been admissible if the Mann Act counts had been tried separately. Although the jury rejected three of the government's charges, there remains a substantial likelihood that its decision to convict on the other two charges was influenced by this inflammatory evidence. A new trial on the surviving Mann Act counts is therefore warranted.

**A. The Retroactive Misjoinder Doctrine**

The Second Circuit has adopted a three-part test for considering claims of spillover prejudice. A court must consider: (1) whether the evidence on the failed counts was inflammatory, such that it would incite the jury to convict on the other counts; (2) whether the failed and remaining counts were similar, such that evidence would have been admissible on both; and (3) whether the government's case on the remaining counts was strong. *United States*

*v. Vebeliunas*, 76 F.3d 1283, 1294 (2d Cir. 1996); *accord United States v. Hamilton*, 334 F.3d 170, 182 (2d Cir. 2003).

The Second Circuit has referred to claims of this sort as claims of "retroactive misjoinder," which "refers to circumstances in which the joinder of multiple counts was proper initially, but later developments—such as a district court's dismissal of some counts for lack of evidence or an appellate court's reversal of less than all convictions—render the initial joinder improper." *United States v. Jones*, 482 F.3d 60, 78 (2d Cir. 2006). Claims of retroactive misjoinder may be raised—and indeed commonly are raised—in Rule 33 motions, because a "trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear." *Schaffer v. United States*, 362 U.S. 511, 516 (1960); *see United States v. DiNome*, 954 F.2d 839, 844-45 (2d Cir. 1993) (holding that after RICO counts failed defendants should have been granted a new trial due to spillover prejudice). Regardless of label, the same basic legal framework applies. *See Jones*, 482 F.3d at 78-79.

In analyzing spillover prejudice, courts have noted the problems that arise in RICO or other conspiracy cases. Conspiracy charges, by their nature, allow the government to introduce a wide range of evidence. *DiNome*, 954 F.2d at 843. That necessarily increases the likelihood of spillover prejudice. As the Supreme Court held in *Schaffer*, while there is no "hard-and-fast" rule that "when a conspiracy count fails, joinder is error as a matter of law," in such situations "a trial judge should be particularly sensitive to the possibility of such prejudice." 362 U.S. at 516.

That principle underlay the Second Circuit's decision in *Tellier*. In a RICO case, the government is allowed to admit a wide array of evidence, including "evidence of criminal activities in which a defendant did not participate to prove the enterprise element." 83 F.3d at 582. When RICO charges are combined with other charges, the jury is almost always "exposed

to evidence that is irrelevant to the remaining charges." *Id*. Thus, "[i]f the RICO counts fail, prejudice on other counts is highly likely." *Id*. In *United States v. Guiliano*, the Second Circuit had earlier granted a new trial for the same reasons: "One of the hazards of a RICO count is that when the Government is unable to sustain a conviction under this statute, it will have to face the claim that the prejudicial effect of tarring a defendant with the label of 'racketeer' tainted the conviction on an otherwise valid count." 644 F.2d 85, 89 (2d Cir. 1981).

Similarly, in *United States v. Ferguson*, Judge Scheindlin granted a new trial after a partial acquittal. 49 F. Supp. 2d 321 (S.D.N.Y. 1999), *aff'd* 246 F.3d 129 (2d Cir. 2001). The defendant there faced RICO, §1959, and §924(c) charges based on certain acts of violence. He was acquitted of the RICO counts but convicted on a §1959 and related §924(c) count. *Id*. at 330. The government's proof on the RICO counts involved "weeks of testimony" about other acts of violence. *Id*. As a result of the spillover prejudice, Judge Scheindlin granted a new trial on the §1959 and §924(c) counts: "The chance that this parade of violence unfairly prejudiced Ferguson's right to a fair trial is just too great to ignore." *Id*.

Similarly, in *United States v. Sam Goody, Inc.*, 518 F. Supp. 1223 (E.D.N.Y. 1981), the defendants were charged with RICO counts as well as copyright and transportation of stolen property counts. When the RICO counts failed, the district court held that a new trial was warranted for the other counts in part because of the prejudicial impact of the evidence admitted to prove the RICO charges. "[T]he totality of the circumstances constrains us to consider important the prejudice engendered by the unsustained RICO count." *Id*. at 1226.

In short, the Supreme Court, the Second Circuit, and district courts within the circuit have all recognized the inherent problems of spillover prejudice that arise when RICO counts fail. And the problems in this case were even more severe.

### B. The Government Introduced Inflammatory Evidence To Prove The RICO And Sex Trafficking Charges

The court must first consider whether the government's evidence on the failed counts was "inflammatory" in nature. *United States v. Wapnick*, 60 F.3d 948, 953 (2d Cir. 1995). In Combs's trial, the government admitted a raft of highly inflammatory evidence aimed at proving sex trafficking and RICO conspiracy. Indeed, that evidence was the bulk of the trial.

Start with the most notorious and inflammatory piece of evidence admitted at trial: the Intercontinental videos. Those videos showed Combs engaging in a horrible act of violence. The videos were admitted to prove RICO and sex trafficking. When Mr. Combs moved to exclude the videos on Rule 403 and other grounds, the government responded: "These videos provide essential direct evidence of sex trafficking as charged in Counts One (as predicate racketeering activity) and Two (as a substantive offense)." Dkt. 270 at 30; *see also id*. at 23 (arguing that the videos were "powerful proof of the defendant's sex trafficking," the "conduct at the center of Counts One and Two"). In explaining the relevance of the videos, the government argued: "they show the defendant exerting physical force over [Ventura]," and thus "show sex trafficking through force." *Id*. at 38.

In short, the government argued that the video evidence of violence was admissible to prove sex trafficking by force and RICO conspiracy—and never even suggested the videos were admissible to prove the Mann Act charge.

The video was just one piece of evidence aimed at showing violence. Day after day, the government admitted testimony about alleged violence, including:

- Eyewitness testimony from Ventura and others including Kerry Morgan, Bryana Bongolan, Deonte Nash, Dawn Richard, "Mia," and Capricorn Clark, describing numerous instances of alleged violence against Ms. Ventura;

- Eyewitness testimony describing purported acts of violence against others, including employees and rivals, such as the Bongolan balcony incident and the Mescudi arson (*e.g.*, Tr.2360-68, 4252-53, 4281-97);

- Testimony from Clark about Mr. Combs allegedly holding a gun while stating he intended to kill Mescudi (*e.g.*, Tr.2583-87);

- Testimony regarding alleged violence by Combs towards Ventura from an escort who participated only in *intrastate* freak-offs (*see* Tr.275-77);

- Eyewitness testimony from Jane describing alleged violence by Mr. Combs on one occasion in June 2024 (*e.g.*, Tr.5172-5204);

- Photographic evidence showing bruises and other injuries that witnesses claimed resulted from Combs's violence (*e.g.*, GX B-601, GX 3S-102A, GX 3T-109, GX 9N-102, GX 9Q-101); and

- Expert testimony explaining how men use violence to keep women in abusive relationships (Tr.2082-89).

This is not a case where evidence going to the failed counts "was a relatively minor part of the government's case at trial, taking up less than three days of testimony in the three-month span of the trial." *Wapnick*, 60 F.3d at 954. The RICO and sex trafficking counts were the core of the government's case, and the evidence going to those counts completely dominated the trial.

The government used the word "violence" dozens of times in its summations. *E.g.*, Tr. 7563 ("The defendant used power, violence and fear to get what he wanted."); 7564 ("[T]hat criminal enterprise serviced the defendant's every desire through a methodical pattern of violence, coercion and manipulation."); 7610 ("Threats, drugs, lies, manipulation, and violence …."); 7643 ("[T]he defendant's assault was a brutal incident of domestic violence, the first time that he had physically struck Jane, but he didn't stop there."); 7647 ("The defendant's assault and Jane's fear of further violence is the reason that Jane had sex with the escort that night."); 7670 ("Everything that we discussed -- all the violence, the threats of violence, the other ways in which the defendant controlled Cassie, they were all part of the same pattern or scheme of

46

coercion."); 7686 ("Once someone has shown us not only the ability but the willingness to use

violence, your brain doesn't forget."); 7717 ("This is all to say that Mia saw and experienced

extreme violence at her boss' hands."); 7721 ("And like Mia, Capricorn saw and experienced

other instances of the defendant's violence."); 7732 ("And D-Roc saw violence like that too.");

7738 ("You heard from people who witnessed and experienced his violence, like Kerry Morgan

and Deonte Nash."); 7911-12 ("The defense just spent a whole lot of energy trying to blame his

victims and the U.S. government for his lies, his threats, and his violence.").

In fact, the government claimed there was so much evidence of violence, it couldn't even

cover it all in its multi-hour closing.  "We don't have time to talk about all of those violent

incidents now.  There are too many."  Tr.7663.  But it featured many and even created a chart for

the jury displaying "all these incidents of violence" that had taken place "throughout all these

years."  Tr.7664.  It argued in rebuttal:  "In a case like this, when there is so much violence,

sometimes you can lose sight of just how awful it is each individual time."  Tr. 7937.

All this evidence and argument was aimed at proving sex trafficking and the RICO

conspiracy.  "[W]hen violence is paired with unwanted commercial sex, that is exactly when it

turns into trafficking, and that's what happened here."  Tr.7951.

In addition to the evidence of alleged violent acts, the government presented other

inflammatory evidence to prove the RICO and trafficking counts.  Pages and pages of testimony,

and numerous accompanying exhibits, were devoted to attempting to prove allegations that had

absolutely nothing to do with the Mann Act counts.

For example, the government elicited testimony from Ms. Ventura's mother—who had

no knowledge relevant to the Mann Act counts—asserting that she and her husband took out a

home equity loan to pay Combs $20,000 because he was angry about Ventura's relationship with

Scott Mescudi. Tr.1871-74. Mescudi's testimony likewise covered a host of topics irrelevant to the Mann Act counts—he accused Combs of breaking into his home, ripping open Christmas presents, and locking Mescudi's dog in the bathroom, which he claimed made the dog "jittery" and "on edge." Tr.2353-56. There was also extensive testimony about how Combs allegedly bribed security officers to obtain a copy of the Intercontinental video and paid one guard $100,000 cash in a brown paper bag. Tr.3947-49. And many witnesses testified about Mr. Combs's extensive drug abuse.

    This is only a partial list, but it typifies the inflammatory evidence that formed the lion's share of the trial but would be inadmissible in a trial on only Counts Three and Five.

### C. The Inflammatory Evidence Was Not Admissible To Prove The Mann Act Counts

    The second factor the Court must analyze is whether the failed counts and counts of conviction were similar, such that "evidence introduced would have been admissible as to both." *Vebeliunas*, 76 F.3d at 1294. In other words, if the inflammatory evidence would have been admissible anyway on a separate trial for the surviving counts, then a defendant's claim of spillover prejudice likely fails.

    This is not such a case. None of the evidence of alleged violence—or many other inflammatory claims by witnesses—would have been admissible to prove the Mann Act charges. As the government told the jury, the Mann Act "simply addresses transporting people across state lines or internationally for the purposes of prostitution" and "does not require force, fraud or coercion." Tr.7696. As the Court's instructions stated, and as the government argued, force and coercion were elements of the sex trafficking and RICO charges, but they were not relevant to the Mann Act charges because consent is not a defense.

The Intercontinental videos, to take the most obvious example, could not have been admitted to prove the Mann Act charges. They would have been inadmissible under Rules 401 and 402 because they would have been irrelevant—in part because there was no interstate travel associated with the Intercontinental freak-off. And even if they had some conceivable relevance, they would have been inadmissible under Rules 403 and 404. As explained above, when the government argued for admissibility of the videos, it did not even mention the Mann Act charges—it said the videos were relevant to prove Counts One and Two only. What is true of the videos is also true of all the government's other evidence of alleged violence and other bad conduct. All of it would have been inadmissible in a trial focused only on the Mann Act counts.

In sum, if Mr. Combs had been charged solely with two Mann Act prostitution counts, this would have been a totally different trial. It would have lasted perhaps a few days, and it would have focused on escorts and entertainers who actually travelled interstate—none of whom were even called to testify at trial. And it would not have included, in the government's words, evidence of "so much violence." Tr.7937. This is precisely the kind of case where concerns about spillover prejudice are the greatest.

### D. The Evidence On The Surviving Counts Was Not Strong

The third factor is the strength of the government's evidence on the Mann Act counts. As explained above, the evidence was thin at best. Indeed, it is almost difficult to assess, because the overwhelming majority of the government's case focused on the *other* counts. The government's primary goal was to convict Combs of sex trafficking and RICO conspiracy. The Mann Act counts were a mere fallback—and indeed, would not have even been charged under DOJ policy absent the other counts.

In any event, Mr. Combs now faces additional prison time and myriad other collateral consequences based solely on convictions under the Mann Act, one of the most notorious

criminal laws in this nation's history. If this Court declines to acquit him of those charges under Rule 29, he at least deserves a new trial focused solely on those charges—a new trial *without* truckloads of otherwise inadmissible and inflammatory evidence.

## CONCLUSION

For the foregoing reasons, the Court should either grant a judgment of acquittal or, at a minimum, a new trial in which only evidence relevant to Counts Three and Five is admitted.

Date: July 30, 2025

Respectfully Submitted,

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Jason A. Driscoll
SHAPIRO ARATO BACH LLP
1140 Ave of the Americas, 17th Fl.
New York, NY 10036
(212) 257-4880
ashapiro@shapiroarato.com
jdriscoll@shapiroarato.com

Marc Agnifilo
Teny Geragos
AGNIFILO INTRATER
445 Park Ave., 7th Fl.
New York, NY 10022
(646) 205-4350
marc@agilawgroup.com
teny@agilawgroup.com

Anna Estevao
HARRIS TRZASKOMA LLP
156 West 56th St., Ste. 2004
New York, NY 10019
(212) 970-6465
aestevao@harristrz.com

Brian Steel
THE STEEL LAW FIRM, P.C.
1800 Peachtree Street, Ste. 300
Atlanta, GA 30309
(404) 605-0023

Xavier R. Donaldson
136 Madison Ave, 6th Floor
New York, New York 10016
(646) 772-3334
Xdonaldson@aol.com

Nicole Westmoreland, Esq.
WESTMORELAND LAW, LLC
132 Cone Street, Suite A
Atlanta, GA 30303
(404) 446-2620
nw@westmorelandlawgroup.com