

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

July 31, 2025

**BY ECF**

The Honorable Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Combs*, S3 24 Cr. 542 (AS)

Dear Judge Subramanian:

      Despite this Court's clear ruling that the defendant must be detained pending sentencing following his conviction on two felony counts, the defendant moves again for bail. As the Court correctly found after written and oral submissions by the parties on July 2, 2025, the defendant's detention pending sentencing is mandatory, there are no exceptional circumstances justifying his release, and even if there were, the defendant cannot demonstrate by clear and convincing evidence that he is not a danger the community. Further, following the Court's unambiguous ruling, the defendant now seeks relief without even attempting to demonstrate a reason for reconsideration. Because the defendant's motion fails to demonstrate any of the required showings, he fails to carry his burden and the motion should be swiftly rejected.

**I.    The Defendant Has Presented No Reason for the Court to Reconsider Its Detention Ruling**

      The defendant asks the Court to reconsider its July 2, 2025 ruling that the defendant must be detained pending trial, but fails to even address the proper standard for a motion for reconsideration, let alone meet it. This Court properly denied the defendant's request for bail on July 2, 2025 and the defendant has failed to present any reason for the Court to reconsider its ruling. The Court should deny the defendant's motion on that basis alone.

      **A.    Applicable Law**

      Where, as here, a defendant's bail application pending appeal was previously denied, a renewed motion for bail is properly considered as a motion for reconsideration by the court.[1] *See*

---

[1] As noted in *United States v. Auletta*, No. 86 Cr. 245 (MJL), 1988 WL 103365 (S.D.N.Y. Sept. 28, 1988), the Bail Reform Act is "silent on when or if a district judge may consider his or her own detention order pending sentence." 1988 WL 103365, at 2. *Compare* 18 U.S.C. § 3142(c)(3) ("The judicial officer may at any time amend the order to impose additional or different conditions

*United States v. Velissaris*, No. 22 Cr. 105 (DLC), 2023 WL 3018513, at *2 (S.D.N.Y. Apr. 20, 2023) (finding that since "the Court already denied the defendant's request at the sentencing proceeding for bail pending appeal, the defendant's instant [bail] motion may be properly viewed as a motion to reconsider."); *United States v. Reese*, 2022 WL 7541864, at *1 (S.D.N.Y. Oct. 12, 2022) (denying motion to reconsider detention ruling pending appeal where defendant failed to meet standard for motion for reconsideration); *Auletta*, 1988 WL 103365, at *3 (denying motion to reconsider detention ruling pending sentence where defendant failed to meet standard for motion for reconsideration).[2]

The standard for granting a motion for reconsideration is "strict." *Shrader v. CSX Transp. Inc.,* 70 F.3d 255, 256-57 (2d Cir. 1995). "Although the Federal Rules of Criminal Procedure do not provide for motions for reconsideration, Local Criminal Rule 49.1 permits such motions" under certain limited circumstances. *United States v. Parilla*, No. 13 Cr. 360 (AJN), 2014 WL 2200403, at *1 (S.D.N.Y. May 22, 2014). Rule 49.1(d) states, in relevant part:

> A motion for reconsideration of a court order determining a motion must be filed within 14 days after the court's determination of the original motion. A memorandum, no longer than 10 pages in length, setting forth concisely the matters or controlling decisions that counsel believes the court has overlooked must accompany the motion.

Prior to the adoption of Local Rule 49.1, courts in this district applied Local Civil Rules for motion for reconsideration in criminal cases, and thus "courts apply the same standard of review for motions seeking reconsideration under Local Criminal Rule 49.1 and Local Civil Rule 6.3 and the Federal Rules of Civil Procedure." *United States v. Stewart*, 02 Cr. 1435 (LAP), 2025 WL 89298, at *3 (S.D.N.Y. Jan 14, 2025).

A motion for reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *United States v. Fisher*, 587 F. Supp. 2d 635, 635-36 (S.D.N.Y. 2008). To warrant reconsideration, the moving party bears the heavy burden of showing "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." *Virgin Atlantic*

---

of release."); § 3142(f)(2) (where a judicial officer has issued a detention order following a hearing pending trial, the hearing "may be reopened . . . if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community"), *with* 18 U.S.C. § 3143(a). Nevertheless, as discussed herein, assuming the Court can reconsider its discussion under its "inherent power" to reconsider his own ruling, *Auletta*, 1988 WL 103365, at *2, the defendant has not made the requisite showing for such reconsideration.

[2] Unless otherwise noted, case text quotations omit all internal quotation marks, citations, and previous alterations.

*Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). A motion for reconsideration is not intended as "a vehicle for relitigating old issues, presenting the case under new theories . . . or otherwise taking a second bite at the apple." *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012). Indeed, reconsideration is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Mgmt. Sys. Inc. Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000).

### B. Discussion

The defendant has failed to meet the strict standard for reconsideration. As an initial matter, the defendant's motion is untimely under Rule 49.1(d). Because the motion was filed 27 days after the Court's July 2, 2025 bail determination, the defendant fails to meet Rule 49.1(d)'s 14-day deadline.

Further, the defendant fails to point to any intervening change of controlling law, new evidence, clear error, or need to prevent a manifest injustice as required. Indeed, the defense previously presented to the Court its assessment of the defendant's risk of flight and dangerousness. (*See* Dkt. No. 432 at 2-4; Trial Tr. 8155:20-8158:8). The defendant's current motion raises no new issue that the Court "overlooked" in that regard. Similarly, during the bail hearing, the defense put forth the argument that it argues here with respect to exceptional circumstances—namely, that the circumstances of the defendant's Mann Act convictions present exceptional circumstances warranting his release from custody. (*See* Dkt. No. 432 at 4; Trial Tr. 8150:19-8155:18, 8159:18-25). The Court heard defense counsel on that point and rejected its position, finding that irrespective of any exceptional circumstances, the defendant could not establish by clear and convincing evidence that he was not a danger to the community. (Trial Tr. 8154:10-8155:18). In addition, as discussed below, the defense raised the conditions at the MDC with the Court during the prior bail hearing—but stated the *opposite* of what they now claim presents extraordinary circumstances. (*See* Trial Tr. 8158:9-11 ("I want to thank the MDC. The MDC gave us good access to him. They made it work, and your Honor helped us out a great deal by giving us access to him.")). The defense cannot now claim that there was an intervening change in the conditions at the MDC to justify the Court's reconsideration. Doing so would "relitigate[e] old issues . . . or otherwise tak[e] a second bite at the apple," which is not the province of a motion for reconsideration. *Analytical Surveys, Inc.*, 684 F.3d at 52. Accordingly, since the defense has failed to carry its burden of showing controlling decisions or matters overlooked by the Court, the Court should deny the defendant's motion for reconsideration from the Court's July 2 Order.

### II. The Defendant Has Failed to Show Any "Exceptional Reasons"

Even setting aside the defendant's failure to meet—or even address—the proper standard for a motion for reconsideration, the defendant's motion still fails. As this Court previously found, because the defendant was convicted of felonies under chapter 117, his detention is mandatory pursuant to the Bail Reform Act. And once again, the defendant has not met the requirements of the so-called "safety valve" in 18 U.S.C. § 3145(c), which requires defendants to prove by clear and convincing evidence that they are not a flight risk or a danger and that "exceptional reasons" exist making detention appropriate.

The defendant's attempt to avoid the mandatory detention provision by claiming that his prosecution under the Mann Act is somehow "unique" is both incorrect and irrelevant to his motion for bail. Moreover, the defendant's arguments that the defendant faces "exceptional circumstances" at the MDC is belied by the factual record, including multiple statements made by counsel for the defendant. There are no exceptional circumstances here, and the defendant's motion can be denied on this basis as well.

### A.     There Is Nothing "Exceptional" About the Defendant's Mann Act Convictions

The defendant spills much ink explaining why the underlying facts of his convictions make his continued incarceration "exceptional." (Def. Mot. at 3-9). However, the defendant's arguments are baseless, misleading, and run counter to the clear intent expressed by Congress.

*First*, the Court should not entertain the defendant's request to override the clear intent of Congress by putting aside the mandatory detention provision in § 3143(a)(2) in favor of examining the facts underlying his convictions. The defendant points to no authority for this novel theory. Nor could he, because Congress could not have been clearer: those defendants found guilty of *any* felony under chapter 117 of the United States Code shall be detained. *See* 18 U.S.C. §§ 3143(a)(2), 3142(f)(1)(A), 3156(a)(4); *see also* Trial Tr. at 8141. Congress did not say that mandatory detention applies only to "some felonies" under chapter 117 depending on the facts underlying the conviction. Congress said that mandatory detention applies to "*any* felony" under chapter 117. 18 U.S.C. § 3156(a)(4)(C) (emphasis added). The defendant's Mann Act convictions are such felonies.

Encouraging the Court to consider the facts underlying the defendant's convictions as "exceptional reasons" under § 3145 defies Congress's clear intent to make detention mandatory with respect to certain categories of felony convictions. District courts certainly have broad discretion to consider what constitutes "exceptional reasons," but accepting the defendant's invitation would eviscerate the congressional intent underlying the mandatory detention provision contemplated by the Bail Reform Act. Instead of creating a carve-out for Mann Act convictions that follow a particular fact pattern—in direct conflict with the Bail Reform Act—the Court should consider the nature of the offense where Congress has instructed it to: in assessing the defendant's risk of flight and danger to the community. *See* 18 U.S.C. § 3142(g)(1) (directing judicial officer to consider the "nature and circumstances of the offense charged" in determining whether there are conditions of release that will assure appearance and the safety of the community).

*Second*, there is nothing unusual about a defendant being detained after being convicted only on Mann Act counts. *See, e.g.*, *United States v. Blake*, 11 Cr. 183 (E.D.N.Y.), Dkt. 6-8, 111 (defendant, charged with sex trafficking and Mann Act violations, remained detained after pleading guilty to Mann Act violation); *United States v. Kizer*, 10 Cr. 20385 (W.D. Tenn.), Dkt. 11, 34, 59 (defendant, charged with sex trafficking and Mann Act violations, remained detained after pleading guilty to Mann Act violation). Simply put, a criminal conviction—even one that the defendant erroneously suggests is novel in its application of the statute of conviction—is a far cry from the types of "exceptional reasons" sufficient to justify bail pending sentencing where mandatory remand applies. *See, e.g.*, *United States v. Bloomer*, 791 F. Supp. 100, 102 (D. Vt. 1992) ("[W]e feel that the reasons proffered by defendant, though unfortunate, are not exceptional.

Rather, we think reasons similar in gravity to those presented by defendant attend most instances in which a defendant's detention is at issue."); *see also United States v. Lea*, 360 F.3d 401, 403-04 (2d Cir. 2004) (reversing district court's finding of exceptional circumstances and explaining that "[t]here is nothing 'exceptional' about going to school, being employed, or being a first-time offender, either separately or in combination.").

The defendant cites two cases that he claims involved "similarly situated" defendants and in which the defendants were released on bond conditions following Mann Act convictions. However, even a cursory review of those cases reveals that—other than the statutes of conviction—these defendants are not even the slightest bit similarly situated to the defendant.

The defendant first points to the convictions of defendants John Trowbridge, Michael Stebick, and Ronald Tills in the Western District of New York and claims that because those three individuals were released on bonds following their guilty pleas, he too should be released on a bond. (Def. Mot. at 7). But these defendants were all far less culpable than the defendant, and, in fact, the Government never sought their detention pre-sentencing nor did the court appear to consider mandatory remand. Unlike the defendant, who transported men and women repeatedly for purposes of engaging in prostitution over the course of more than a decade, Stebick was convicted of conspiring to transport a woman across state lines for purposes of engaging in commercial sex work on a *single* occasion. Similarly, Trowbridge admitted to transporting women across state lines on *two* occasions, and Tills—who was sentenced to 18 months' imprisonment—admitted to transporting women across state lines on six occasions within a two-year period. *United States v. Trowbridge*, 08 Cr. 74 (W.D.N.Y.), Dkt. 3 (Plea Agreement); *United States v. Stebick*, 08 Cr. 206 (W.D.N.Y.), Dkt. 1 (Information), Dkt. 3 (Plea Agreement); *United States v. Tills*, 08 Cr. 242 (W.D.N.Y.), Dkt. 3 (Plea Agreement). Moreover, none of the *Trowbridge* defendants were alleged to have physically assaulted anyone in connection with the conduct, and Stebick transported the victim, but did not have any sexual contact with her. *See Stebick*, 08 Cr. 206, Dkt. 14 at 11. Further, both Trowbridge and Stebick immediately admitted to their conduct, and both provided substantial assistance to the Government, resulting in the Government moving at sentencing for a downward departure pursuant to Section 5K1.1.[3] *Trowbridge*, 08 Cr. 74, Dkt. 10; *Stebick*, 08 Cr. 206, Dkt. 15.[4]

The defendant also points to the conviction of Mario Collins who was ultimately sentenced to 24 months' imprisonment after he was convicted of a Mann Act violation for transporting a victim on a single occasion.[5] Collins was released after a mistrial was declared on the charges

---

[3] "Retired Lockport Police Detective Sentenced for Transporting a Woman from Western New York to Kentucky for the Purpose of Engaging in Prostitution," FBI (May 7, 2009), https://archives.fbi.gov/archives/buffalo/press-releases/2009/bffo050709.htm.

[4] Tills also indicated to the Government a desire to cooperate, *see Tills*, 08 Cr. 242, Dkt. 3 at 6, and the Government moved for a two-level downward departure from Tills' Guidelines range pursuant to Section 5K1.1, *id.*, Dkt. 17.

[5] "Atlanta Residents Convicted of Interstate Trafficking of a Victim for Commercial Sex Purposes," Dep't of Just. (Dec. 20, 2017), https://www.justice.gov/usao-ndms/pr/atlanta-residents-convicted-interstate-trafficking-victim-commercial-sex-purposes.

against him, including sex trafficking and Mann Act offenses, and remained on bail after his subsequent conviction on the Mann Act charge. *See United States v. Collins*, 17 Cr. 110 (N.D. Miss.), Dkt. 41. The defendant argues that he, like Collins, should be released. (Def. Mot. at 8-9). But, this case does not bear the weight that the defendant attempts to place on it. At the time that Collins was initially released after mistrial, Collins was not subject to mandatory remand because—unlike the defendant—he had not been convicted of *any* offenses. Moreover, while Collins remained on bail after his conviction, it is entirely unclear whether the Court even considered the mandatory remand provision. The conclusions that can be drawn from the court's bail decisions in that case are limited at best.

*Third*, even if the Court were to consider the facts underlying the convictions in considering exceptional circumstances, the nature of the defendant's crimes reflects aggravating—not mitigating—factors and therefore support the defendant's detention, not his release. The Court should reject the defendant's minimized version of his own conduct when he describes himself as a mere "john." Far from being an ordinary and casual consumer of commercial sex, the defendant transported individuals for the purpose of prostitution on hundreds of occasions over the course of decades, plied Cassie Ventura and Jane (as well as male commercial sex workers) with drugs to ensure their continued participation in the days-long Freak Offs, used violence against both Ms. Ventura and Jane in connection with Freak Offs, and employed a small army of personal staff to ensure that his every need was met during Freak Offs. The defendant's actions surely distinguish him from an ordinary "john."

*Finally*, the Court should reject the defendant's pages-long recitation of historic Justice Department policy as both irrelevant and misleading. In the past, the Department had a policy specifically related to enforcement of the Mann Act, which focused on prosecuting the Mann Act in the context of commercial cases. But the Department no longer has a specific policy related to the Mann Act. In fact, the Department's current guidance includes a policy titled "Prosecution of Customers Involved in Federal Sex Trafficking Offenses," in place since December 2020, which prioritizes reducing demand for sex trafficking by prosecuting those who engage in commercial sex with victims of sex trafficking—including *buyers* of commercial sex. *See* Justice Manual § 8-3.400. [6] In other words, it is squarely within the priorities of the modern-day Justice Department to charge the conduct described above under "a variety of federal statutes," including the Mann Act, which is exactly what the Government did in this case. *Id.* The defendant's suggestion otherwise—relying on defunct policies—is inaccurate and misleading.

### B.    The Defendant's Detention at the MDC Is Not Exceptional

The defendant claims that his conditions of confinement at the MDC are "exceptional circumstances" under § 3145(c). (Def. Mot. at 9). For the reasons described below, they are not.

---

[6] *See also* Oct. 17, 2019 statements by Beth A. Williams, Assistant Attorney General for the Office of Legal Policy at the 2019 JuST Conference (announcing DOJ initiative focusing on "sex trafficking demand reduction" and emphasizing the importance of "targeting demand" for commercial sex), available at https://www.justice.gov/archives/opa/speech/assistant-attorney-general-office-legal-policy-beth-williams-delivers-remarks-department.

In making this argument, the defendant relies primarily on Judge Furman's opinion in *United States v. Chavez*, 710 F. Supp. 3d 227 (S.D.N.Y. 2024). In that opinion, which was published on January 4th of last year—over eight months *before* Combs stepped foot in the MDC—Judge Furman found that the MDC's conditions at the time, in conjunction with the defendant's old age and serious medical conditions, constituted exceptional circumstances under § 3145(c). *Id.* at 237-38. In doing so, Judge Furman described the conditions at the MDC at the time, which included extensive lockdowns, inadequate medical care, and problematic physical conditions—problems attributable in large part to the MDC's staffing shortages. *See id.* at 233-37. The defendant claims, without evidence, that these conditions "have not abated" during his detention at the MDC. (Def. Mot. at 9). He is incorrect. During the defendant's stay at the MDC, the facility has made enormous strides in increasing and stabilizing their staffing levels, improving medical services, and improving physical conditions. For example:

- Staffing at the MDC has increased dramatically: the correctional services department at the MDC is staffed at 94.2%, compared to 55% in January 2024, when *Chavez* was published. Medical staffing has also increased, with the health department currently being staffed at 84.6%, as compared to 69% in January 2024.

- The staffing has decreased the lockdowns described in *Chavez*. In 2025, the MDC had not "locked down" or modified its operations for any housing unit as a result of a staffing shortage.

- Medical care has also improved. In addition to increased medical staffing, the MDC has increased its use of telehealth services for quicker and more efficient medical checks for inmates.

- The MDC has undergone facility repairs and improvements, including in the past few months. These have included repairs of emergency call buttons, upgrades of security cameras, and improvements to elevators.

Given these improvements, *Chavez* no longer provides an accurate picture of conditions at the MDC or a basis to find extraordinary circumstances under § 3145(c). Indeed, Judge Furman himself observed more than two months ago that conditions at MDC are "a lot better than when I wrote my opinion in *United States v. Chavez*," including with regard to staffing levels, medical services, and incidents of violence, described in more detail below. May 14, 2025 Tr. at 24, *United States v. Reshard*, 24 Cr. 392 (JMF) (S.D.N.Y.).

In addition to *Chavez*, the defendant also relies on *United States v. Colucci*, 743 F. Supp. 3d 452 (E.D.N.Y. 2024), in claiming there is "unchecked violence" at the MDC, which he says places his "safety . . . constantly at risk." (Def. Mot. at 9). But this too does not serve as a valid basis for a finding of exceptional circumstances. Like *Chavez*, the court in *Colucci* described violence that occurred over a year ago. Although there were instances of armed violence in the summer of 2024, those incidents have declined, and inmate contraband (though still a problem) is being addressed by the facility. Among other things, the MDC has dramatically increased staffing, as described above, and now houses more than 300 fewer inmates and detainees than in January 2024. The defendant perversely suggests that sweeping the jail for contraband and involving outside law enforcement agencies in doing so is somehow "an admission that serious violence,

mayhem and chaos is occurring within the MDC" and proves that the MDC is mismanaged and unsafe. (Def. Mot. at 9). Quite the opposite: these steps were taken to improve some of the very conditions about which the defendant complains, and they have been working. Indeed, MDC is unaware of any violent incidents in the defendant's housing unit since his arrival in September 2024.

It is also worth noting the defendant's bail motion is devoid of any claims that the defendant himself was impacted in any way by the conditions he alleges. The motion does not make any specific allegation regarding the defendant's own medical care, exposure to violence, or experience with lockdowns. In fact, the motion is the first the Government has heard of any risk to the defendant's safety, or for that matter, any issue with the defendant's treatment at the MDC aside from his requests during trial for additional time with his lawyers. To the contrary, defense counsel has repeatedly, throughout the course of this case, praised the MDC for its treatment of the defendant. (*See, e.g.*, Oct. 10, 2024 Tr. at 27 ("The MDC has been very responsive to us."); Trial Tr. 1729 ("The MDC has been very accommodating to us in many, many ways."); Trial Tr. 8158 ("I want to thank the MDC. The MDC gave us good access to him.")). By failing to raise any issue related to the defendant's experience with lockdowns, medical care, his experience with the physical facility, or his safety to the Government's attention, defense counsel—who did not hesitate to repeatedly raise issues of access to their client during trial (*see, e.g.*, Trial Tr. 1729-30, 2786-88, 3095-99, 3611-12, 4118-25, 4406-08)—has deprived the Government, as well as MDC staff and the Court, of any opportunity to investigate and remediate these alleged conditions. They should not now form the basis of a finding of exceptional circumstances.

Given the vast improvements at the MDC, there can be no finding of exceptional circumstances, particularly here, unlike in *Chavez*, where the defendant alleges no compelling personal circumstances such as significant health issues or old age. Like Judge Furman, other courts in this District have acknowledged that "the conditions at the MDC detention facility have improved, including because staffing there has been increased." May 21, 2025 Tr. at 44, *United States v. Burgos*, 24 Cr. 650 (LTS) (S.D.N.Y.); *see also* Jan. 16, 2025 Tr. at 125, *United States v. Alexander*, 24 Cr. 676 (VEC) (S.D.N.Y.) ("All of those decisions that you read about were months ago. There's a lot more staffing at the MDC. The number of defendants who are ending up in lockdown for substantial periods of time are minimal."). In addition, the defendant has not alleged anything near the individual circumstances that were relevant in *Chavez*. *See, e.g.*, Jan. 18, 2024 Tr. at 37-38, *United States v. Romero*, 23 Cr. 70 (LTS) (S.D.N.Y.) ("I find that current conditions at the MDC standing alone do not constitute such exceptional circumstances and that a desire to avoid contributing to exacerbation of those conditions with respect to one defendant, again, absent any particular personal issues as to that defendant, is not a consideration that constitutes exceptional circumstances within the meaning of Section 3145(c)."); Jan. 5, 2024 Tr. at 38, *United States v. Camacho*, 22 Cr. 548 (JLR) (S.D.N.Y.) ("I do agree that the MDC conditions are very unacceptable, especially these days. However, the opinion issued by Judge Furman with respect to Mr. Chavez is a very different situation than we have here. In *Chavez*, the individual was 70 years old, with significant health issues, and sending him to the MDC, where healthcare was limited, was seen as exceptional, and I do understand that. We don't have those situations here."). The Court cannot and should not find exceptional circumstances based on the conditions at the MDC during the defendant's stay, particularly given the defendant's failure to enumerate any relevant individual circumstances.

## III. The Defendant Has Failed to Show that He Is Not a Danger or a Risk of Flight

### A. The Defendant Poses a Danger to Others

Even supposing that extraordinary circumstances could be demonstrated, the defendant fails to establish by clear and convincing evidence that he does not pose a danger to the community. As the Court found less than one month ago, it is "impossible" for the defendant—having repeatedly conceded his propensity for violence at trial—"to demonstrate by clear and convincing evidence that he poses no danger to any other person or the community." (Trial Tr. 8143:24-8144:3; *see also* Trial Tr. 8142:14-17 (noting that "defense conceded the defendant's violence in his personal relationships"); Trial Tr. 8154:23-25 (noting that the defense "full-throatedly in [its] closing argument told the jury that there was violence here. And domestic violence is violence.")).[7] The Court properly concluded that "[t]his type of violence, which happens behind closed doors in personal relationships, sparked by unpredictable bouts of anger, is impossible to police with conditions." (Trial Tr. 8143:22-24).

The defendant presents nothing to disturb the Court's findings. Nor can he. The trial record is replete with evidence of the defendant's acts of violence towards others. The defendant's decade-long relationship with Ms. Ventura was defined by his repeated acts of violence and abuse. (Trial Tr. 405-06). The defendant's temper and violence were unpredictable. (Trial Tr. 434). The defendant frequently punched, kicked, and dragged Ms. Ventura, leaving her bruised and cut, with black eyes and busted lips. (Trial Tr. 406, 753-54). This abuse often occurred during Freak Offs, including the defendant's assault of Ms. Ventura at the InterContinental Hotel, which was captured on video surveillance. (Trial Tr. 575-83, 630-47). Ms. Ventura and other witnesses testified to numerous acts of brutality by the defendant against her. (Trial Tr. 276-77, 282-83, 576-77, 688-90, 763-64, 766-71, 777, 783, 794, 796, 1598-1603, 2980-87, 2989-90, 3004, 3251-55, 3259, 3271-72, 3278-79, GX B-247-A, GX 10C-115). In addition, the defendant was also violent toward several of Ms. Ventura's friends who witnessed his mistreatment of Ms. Ventura, including Mia, (Trial Tr. 3254, 3306-08, 3310-15); Deonte Nash, (Trial Tr. 2990, 3008-09); Bryana "Bana" Bongolan, (Trial Tr. 4252-53, 4281-87, 4289-95, 4449-4501); and Kerry Morgan, (Trial Tr. 1619). The defendant was also violent toward Virginia "Gina" Huynh, with whom the defendant was in a relationship at the same time as Ms. Ventura. (Trial Tr. 2285-88).

More recently, the defendant brutally attacked Jane in June 2024, also in the context of a Freak Off. As Jane testified at trial, after she initiated a physical confrontation with the defendant, she repeatedly locked herself in rooms in her home to protect herself from the defendant. (Trial Tr. 5182-85). The defendant kicked down each door. (*Id.*). The defendant also kicked Jane's legs out from under her; picked her up in a chokehold; punched her in the face twice; punched her and kicked her repeatedly when she was on the ground curled up in a ball; and smacked her in the face three times while she was showering resulting in Jane losing her balance and falling to the ground. (Trial Tr. 5180-5202). Jane was left with a black eye and bruising and welts on her head. (Trial Tr. 5229-33; GX E-273, GX E-333). The defendant, who is significantly larger in size than Jane, had no visible injuries from the altercation. (Trial Tr. 5201, 5229). Under these circumstances,

---

[7] The Government also submitted letters from victims of the defendant's physical and sexual violence opposing the defendant's release from custody. (*See* Dkt. Nos. 433-1, 435).

the defendant's claim that his violence against Jane was somehow "provoked" is disgraceful. (Def. Mot. at 10). Moreover, the fact that the defendant committed this vicious attack just *three months* prior to his arrest—and while he was unambiguously aware that he was under federal investigation—highlights, as the Court concluded, "a disregard for the rule of law and the propensity for violence." (Trial Tr. 8144:16-17).

The defendant contends that he does not pose a danger because the trial record does not reflect acts of violence by the defendant between 2018 (when he ended his relationship with Ms. Ventura) and 2024 (when he viciously assaulted Jane). (Def. Mot. at 11). As an initial matter, the defendant's violent attack of Jane—and his years-long proclivity towards violence against Ms. Ventura and others—is more than sufficient to establish his dangerousness. But the defendant's suggestion that he went several years without inflicting violence on another person simply is not true: the defendant *did* engage in several acts of violence between 2018 and 2024. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[8] Although this evidence was not presented at trial, the Court is free to consider it in assessing the defendant's dangerousness. *See United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (recognizing that "proffers are permissible both in the bail determination and bail revocation contexts").

The defendant's extensive history of violence—and his continued attempt to minimize his recent violent conduct—demonstrates his dangerousness and that he is not amenable to supervision. The defendant utterly fails to establish by clear and convincing evidence, as required, that he does not pose a danger to the community.

### B.    The Defendant is a Flight Risk

The defendant also fails to establish by clear and convincing evidence that he is not a flight risk. The defendant faces significant penalties for his crimes of conviction. As raised in the Government's July 2, 2025 submission, the Government's initial view was that the defendant's Guidelines range was 51-63 months. The Government is continuing to assess the Sentencing Guidelines, and expects that the appropriate Guidelines range will be substantially higher. The possibility of a substantial sentence, such as in this case, is a significant factor in assessing the risk of flight. *See United States v. Scali*, 738 F. App'x 32, 33 (2d Cir. 2018); *United States v. Fishbein*, No. 21 Cr. 296 (AS), 2024 WL 3876305, at *1 (S.D.N.Y. Aug. 20, 2024). Moreover, the defendant's endless financial means, coupled with his demonstrated ability to conceal his crimes, his past efforts to bribe security officers (Trial Tr. 186, 3905-54), as well as his general disregard for the rule of law described above, serve collectively to create a substantial risk of flight.

---

[8] Defense counsel has been aware of these incidents since at least the time that the Government produced 3500.

Accordingly, the defendant has also failed to demonstrate by clear and convincing evidence that he does not pose a flight risk.

## IV. Conclusion

For the foregoing reasons, the defendant's motion should be denied.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: __/s_____
Meredith Foster
Emily A. Johnson
Christy Slavik
Madison Reddick Smyser
Mitzi Steiner
Assistant United States Attorneys
(212) 637-2310/-2409/-1113/-2381/-2284