UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

     v.

SEAN COMBS,

                        Defendant.

24-cr-542 (AS)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT SEAN COMBS'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, A NEW TRIAL**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 1

I.      COMBS'S ARGUMENTS ARE PROPERLY BEFORE THE COURT ........................... 1

      A.      Statutory Arguments Are Properly Raised On Rule 29 ......................................... 1

      B.      Whether Acquittal Is Necessary Does Not Depend On The Jury
           Instructions Or Require A Motion To Dismiss The Indictment ............................ 3

II.     THE GOVERNMENT DID NOT PROVE COMBS TRANSPORTED
      ANYONE INTENDING TO ENGAGE IN "PROSTITUTION"................................... 5

      A.      Properly Construed To Avoid Serious Constitutional Problems,
           The Statute Does Not Prohibit Combs's Conduct................................................. 6

           1.      The Meaning Of "Prostitution" Has Changed Over Time .............................. 6

           2.      A Broad Interpretation Encompassing Combs's Conduct Would Raise
                 Serious Constitutional Problems.................................................................... 9

           3.      Narrowly Construed, The Act Does Not Proscribe Combs's Conduct .......... 10

      B.      There Was Insufficient Evidence Of Sex For Money ...........................................11

III.    THE GOVERNMENT'S FIRST AMENDMENT ARGUMENTS ARE
      MERITLESS ...................................................................................................... 13

      A.      Combs Was Producing Amateur Porn................................................................ 13

      B.      The Mann Act's Application Here Burdens Protected First
           Amendment Activity And Is Unjustified By Any Substantial
           Government Interest........................................................................................ 16

IV.     AT A MINIMUM, A NEW TRIAL IS REQUIRED DUE TO SPILLOVER
      PREJUDICE FROM EVIDENCE THAT WOULD HAVE BEEN
      INADMISSIBLE HAD THE REMAINING COUNTS BEEN TRIED ALONE............. 18

      A.      This Court Has Discretion To Order A New Trial In The Interest
           Of Justice ...................................................................................................... 18

      B.      A Claim Of Spillover Prejudice Cannot Be Summarily Rejected ....................... 19

      C.      Under The Binding Test, A New Trial Is Warranted ........................................... 20

CONCLUSION................................................................................................................... 22

## **TABLE OF AUTHORITIES**

**Cases**                                                                 **Page(s)**

*Am. Booksellers Found. v. Dean*,
    342 F.3d 96 (2d Cir. 2003) ................................................................ 16

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002) ........................................................................... 16

*Barnes v. Glen Theatre, Inc.*,
    501 U.S. 560 (1991) ........................................................................... 16

*Caminetti v. United States*,
    242 U.S. 470 (1917) ............................................................................. 8

*Ciminelli v. United States*,
    598 U.S. 306 (2023) ...................................................................... 3, 10

*City of Erie v. Pap's A.M.*,
    529 U.S. 277 (2000) ........................................................................... 16

*Clark v. Community for Creative Non-Violence*,
    468 U.S. 288 (1984) ..................................................................... 17, 18

*Cleveland v. United States*,
    531 U.S. 12 (2000) ............................................................................. 10

*Gabelli v. SEC*,
    568 U.S. 442 (2013) ............................................................................. 7

*Hansen v. Haff*,
    291 U.S. 559 (1934) ............................................................................11

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995) ........................................................................... 16

*In re Terrorist Bombings*,
    552 F.3d 93 (2d Cir. 2008) ................................................................ 19

*Jones v. Schneiderman*,
    974 F. Supp. 2d 322 (S.D.N.Y. 2013) .............................................. 17

*Kousisis v. United States*,
    145 S. Ct. 1382 (2025) .................................................................... 7, 8

*Mortensen v. United States*,
    322 U.S. 369 (1944) ............................................................................11

*Musacchio v. United States*,
    577 U.S. 237 (2016) ....................................................................... 3, 4

*Neder v. United States*,
    527 U.S. 1 (1999) ................................................................................. 7

*New Prime Inc. v. Oliveira*,
   586 U.S. 105 (2019) ........................................................................................ 7

*Old Chief v. United States*,
   519 U.S. 172 (1997) ...................................................................................... 21

*People v. Freeman*,
   758 P.2d 1128 (1988) ....................................................................... 13, 14, 18

*People v. Paulino*,
   2005 N.Y. Misc. LEXIS 3430 (N.Y. Sup. Ct. Aug. 4, 2005) ...................... 9

*Perrin v. United States*,
   444 U.S. 37 (1979) .......................................................................................... 6

*Pyett v. Pa. Bldg. Co.*,
   498 F.3d 88 (2d Cir. 2007) .......................................................................... 20

*Snyder v. United States*,
   603 U.S. 1 (2024) ......................................................................................... 10

*Spectrum WT v. Wendler*,
   --- F.4th ---, 2025 WL 2388306 (5th Cir. Aug. 18, 2025) ......................... 17

*St. Francis College v. Al-Khazraji*,
   481 U.S. 604 (1987) ....................................................................................... 7

*State v. Theriault*,
   960 A.2d 687 (N.H. 2008) .......................................................................... 14

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
   566 U.S. 560 (2012) ....................................................................................... 9

*Texas v. Johnson*,
   491 U.S. 397 (1989) ............................................................................... 17, 18

*United States v. Anderson*,
   46 F.4th 1000 (9th Cir. 2022) ....................................................................... 2

*United States v. Archer*,
   977 F.3d 181 (2d Cir. 2020) ........................................................................ 18

*United States v. Avenatti*,
   81 F.4th 171 (2d Cir. 2023) .......................................................................... 2

*United States v. Bahel*,
   662 F.3d 610 (2d Cir. 2011) .......................................................................... 2

*United States v. Benjamin*,
   95 F.4th 60 (2d Cir. 2024) ............................................................................ 5

*United States v. Bitty*,
   208 U.S. 393 (1908) ....................................................................................... 8

*United States v. Blaszczak*,
   947 F.3d 19 (2d Cir. 2019) ............................................................... 4

*United States v. Blaszczak*,
   56 F.4th 230 (2d Cir. 2022) ............................................................. 4

*United States v. Broxmeyer*,
   616 F.3d 120 (2d Cir. 2010) ....................................................11, 13

*United States v. Dawkins*,
   999 F.3d 767 (2d Cir. 2021) ............................................................. 3

*United States v. Dennis*,
   132 F.4th 214 (2d Cir. 2025) ........................................................... 4

*United States v. Epskamp*,
   832 F.3d 154 (2d Cir. 2016) ............................................................. 2

*United States v. Ferguson*,
   49 F. Supp. 2d 321 (S.D.N.Y. 1999) ............................................. 19

*United States v. Ferguson*,
   246 F.3d 129 (2d Cir. 2001) ........................................................... 19

*United States v. Fernandez*,
   104 F.4th 420 (2d Cir. 2024) ........................................................... 6

*United States v. Gu*,
   8 F.4th 82 (2d Cir. 2021) ................................................................. 2

*United States v. Hamilton*,
   334 F.3d 170 (2d Cir. 2003) ..................................................... 19, 20

*United States v. Lopez*,
   143 F.4th 99 (2d Cir. 2025) ............................................................. 2

*United States v. Morales*,
   687 F.3d 697 (6th Cir. 2012) ........................................................... 3

*United States v. O'Brien*,
   391 U.S. 367 (1968) ....................................................................... 17

*United States v. Pauling*,
   924 F.3d 649 (2d Cir. 2019) ........................................................... 12

*United States v. Pippens*,
   733 F. Supp. 3d 136 (E.D.N.Y. 2024) ........................................... 19

*United States v. Roeder*,
   526 F.2d 736 (10th Cir. 1975) ....................................................... 17

*United States v. Sam Goody, Inc.*,
   518 F. Supp. 1223 (E.D.N.Y. 1981) .............................................. 20

*United States v. Sanchez*,
    969 F.2d 1409 (2d Cir. 1992) ................................................................... 19

*United States v. Soler*,
    759 F.3d 226 (2d Cir. 2014) ....................................................................... 2

*United States v. Sullivan*,
    118 F.4th 170 (2d Cir. 2024) ..................................................................... 2

*United States v. Thompson*,
    458 F. Supp. 2d 730 (N.D. Ind. 2006) ...................................................... 17

*United States v. Various Articles of Obscene Merchandise, Schedule No. 2102*,
    709 F.2d 132 (2d Cir. 1983) ..................................................................... 16

*United States v. Wright*,
    496 F.3d 371 (5th Cir. 2007) .................................................................... 20

*Wisconsin Central Ltd. v. United States*,
    585 U.S. 274 (2018) .............................................................................. 6, 7

*Wooten v. Superior Ct.*,
    113 Cal. Rptr. 2d 195 (Cal. Ct. App. 2001) ............................................... 9

**Statute**

18 U.S.C. §2421 ............................................................................................ 5

**Rules**

Fed. R. Crim. P. 29 .............................................................................. *passim*

Fed. R. Crim. P. 33 ............................................................................... 18, 19

Fed. R. Evid. 401 ................................................................................. 21, 22

Fed. R. Evid. 403 ................................................................................. 21, 22

Fed. R. Evid. 404 ................................................................................. 21, 22

Fed. R. Evid. 413 ...................................................................................... 22

**Other Authorities**

3 Wright & Miller,
    *Fed. Prac. & Proc. Crim.* (5th ed. 2025) ................................................. 18

Judicial Council of California,
    Criminal Jury Instructions No. 1154 ........................................................ 9

N.Y. Penal Law §230.02 ............................................................................... 9

Oral Arg. Tr., *Ciminelli v. United States*,
    598 U.S. 306 (2023) ................................................................................. 3

XII *Oxford English Dictionary* (2d ed. 1989) .............................................. 9

## INTRODUCTION

The prosecution spent two months trying to prove that Sean Combs was a sex trafficker who ran a violent racketeering enterprise. It failed. The jury rejected its narrative. It found that Combs's girlfriends willingly participated in the sex, and that he was no racketeer. The remaining Mann Act charges should never have been brought—and wouldn't have been brought absent the failed charges. No other similarly-situated person has ever been charged under the Act for arranging interstate travel and paying adult males who had consensual sex with his adult girlfriends.

Combs's motion demonstrated that the term "prostitution" cannot constitutionally be construed to prohibit this conduct. The government hopes the Court will duck these issues, but that would be reversible error. Settled Second Circuit and Supreme Court precedents establish that such statutory interpretation questions must be considered under Rule 29. The government's merits arguments similarly defy controlling law—and the trial record—in multiple ways. The government misconstrues the plain meaning rule and the due process, federalism, and First Amendment caselaw. And the government's Rule 33 argument proceeds from the untenable premise that all the inflammatory evidence it told the jury was irrelevant to the Mann Act would have been admitted anyway.

Combs is entitled to acquittal, or at least a new trial.

## ARGUMENT

## I.    COMBS'S ARGUMENTS ARE PROPERLY BEFORE THE COURT

### A.    Statutory Arguments Are Properly Raised On Rule 29

The government argues "[s]tatutory [a]rguments [a]re [n]ot [p]roperly [a]sserted [u]nder Rule 29," Opp.10, and appears to contend that only factual arguments, not legal or statutory arguments, may be considered. That is nonsense.

Rule 29(a) asks whether the "evidence is insufficient to sustain a conviction"—a question that necessarily turns on first, what conduct the criminal statute prohibits and second, what the proof at trial showed.  That is because the court's task is to determine whether there is sufficient evidence to prove each statutory element of the crime.  Defendants therefore regularly raise statutory arguments in Rule 29 motions.  In *United States v. Soler*, for example, the defendant argued the evidence was insufficient to prove he violated the federal carjacking statute.  There was "no dispute" about the facts proved at trial—the sufficiency issue in both the district court and on appeal "exclusively turn[ed] on … competing interpretations of the statutory language." 759 F.3d 226, 229, 235 (2d Cir. 2014).[1]

Just weeks ago, the Second Circuit considered another case where a Rule 29 motion depended entirely on statutory arguments.  After trial, the defendants filed motions for acquittal arguing that the statute "does not criminalize the conduct alleged in this case."  *United States v. Lopez*, 143 F.4th 99, 105 (2d Cir. 2025).  The district court granted their motions.  *Id*.  The Second Circuit vacated and remanded—but not based on any principle that statutory arguments are "not properly asserted under Rule 29."  Rather, the Second Circuit considered both sides' statutory arguments and concluded the statute did cover the defendants' conduct.  *Id*. at 111-13.

Examples like this abound.  The Second Circuit regularly decides insufficiency claims that are "legal question[s]" and "matter[s] of statutory interpretation."  *United States v. Sullivan*, 118 F.4th 170, 198-99 (2d Cir. 2024); *e.g.*, *United States v. Avenatti*, 81 F.4th 171, 184-86 (2d Cir. 2023); *United States v. Gu*, 8 F.4th 82, 86-87 (2d Cir. 2021); *United States v. Epskamp*, 832 F.3d 154, 161 (2d Cir. 2016); *United States v. Bahel*, 662 F.3d 610, 626 (2d Cir. 2011).  So do other circuits.  *E.g.*, *United States v. Anderson*, 46 F.4th 1000, 1004 (9th Cir. 2022); *United States*

---

[1] Unless otherwise noted, citations omit internal quotation marks, footnotes, and previous alterations in the original source.

*v. Morales*, 687 F.3d 697, 700 (6th Cir. 2012).  We could cite dozens or even hundreds of other examples.

Indeed, the Supreme Court often resolves statutory interpretation issues in connection with sufficiency claims.  In *Ciminelli v. United States*, for example, the Court resolved a statutory construction issue raised in the context of a sufficiency claim—whether the right-to-control theory of fraud was invalid—and ruled in defendants' favor.  598 U.S. 306 (2023); *see* Ciminelli.Oral.Arg.Tr.56 (Deputy Solicitor General: "[A]s the case comes to this Court, it's just a pure sufficiency of the evidence challenge.").

Against this wall of authority—along with common practice and basic legal logic—the government cites a few unpublished district court orders.  Opp.10.[2]  None of these cases holds that statutory arguments are not "proper" in a Rule 29 motion.  If they did, they would conflict with Second Circuit and Supreme Court precedent.  There is no way to decide whether the evidence was sufficient without first determining what the statute prohibits.

### B.    Whether Acquittal Is Necessary Does Not Depend On The Jury Instructions Or Require A Motion To Dismiss The Indictment

The government's contention that arguments about statutory interpretation can only be considered if they are raised earlier—in requests for jury instructions or a motion to dismiss the indictment—is also contrary to controlling law.

The Supreme Court has held that "sufficiency review … does not rest on how the jury was instructed."  *Musacchio v. United States*, 577 U.S. 237, 243 (2016).  The government's

---

[2] *United States v. Dawkins* merely held that certain Rule 29 arguments were forfeited because different arguments were made below: "Although the defendants moved for judgments of acquittal …, they did not challenge the sufficiency of the evidence with respect to … these points."  999 F.3d 767, 780 n.12 (2d Cir. 2021).

contention that *Musacchio* doesn't address waiver is wrong.  Opp.14.  In *Musacchio*, the

defendant argued that the government forfeited its legal arguments by failing to raise them at the

instructional stage.  The Supreme Court disagreed and held that the "failure to object to [a]

heightened jury instruction … does not affect the court's review for sufficiency of the evidence."

*Id*. at 244.  Likewise, Combs's failure to raise his legal arguments at the charging stage does not

affect sufficiency review.

   Indeed, the Second Circuit has held that under *Musacchio*, a defendant need not raise

statutory arguments at the instructional stage to raise them under Rule 29.  In *United States v.*

*Blaszczak*, the defendants "did not challenge the pertinent jury instructions in the district court"

but did file "a Rule 29(a) motion for a judgment of acquittal on the ground that the evidence at

trial was insufficient to establish that CMS's information was 'property' in the hands of the

agency."  947 F.3d 19, 31 (2d Cir. 2019).  The Second Circuit held the insufficiency claim

properly preserved.  The government ignores *Blaszczak*, other than to note it was vacated—but

omits that it was vacated on other grounds, and that on the subsequent remand, the Circuit ruled

in defendants' favor on the sufficiency claim based on their statutory arguments.  *See* 56 F.4th

230 (2d Cir. 2022).

   The Second Circuit reached the same result recently in *United States v. Dennis*—which

the government also ignores.  Dennis challenged his conviction for threats, arguing that the

statute must be narrowed to accommodate First Amendment concerns.  He had not moved to

dismiss on this basis or raised this argument at the instructional phase.  132 F.4th 214, 235-36

(2d Cir. 2025).  The Second Circuit held that although his *instructional claim* was not preserved,

his *sufficiency claim* was preserved—through his Rule 29 motion.  *Id*. at 227-28.  *Dennis*

squarely forecloses the government's arguments.

Finally, the government's Second Circuit cases (Opp.13-14) merely say that if a defendant doesn't challenge the indictment or the instructions, he cannot challenge the same on appeal. They do not require defendants to challenge the indictment or instructions before filing a Rule 29 motion. Combs is not arguing for a new trial based on faulty instruction or a dismissal based on a defect in the indictment. He is moving for an acquittal, which can only be raised on Rule 29. Indeed, Combs couldn't have raised his statutory and constitutional arguments in a motion to dismiss, since they depend on the trial evidence. Indictments need only "track the language of the statute charged and state the [approximate] time and place … of the alleged crime." *United States v. Benjamin*, 95 F.4th 60, 66-67 (2d Cir. 2024).

## II. THE GOVERNMENT DID NOT PROVE COMBS TRANSPORTED ANYONE INTENDING TO ENGAGE IN "PROSTITUTION"

The government's substantive arguments fare no better and defy controlling precedent in multiple ways. The term "prostitution" is undefined in 18 U.S.C. §2421(a), and interpreting it to cover Combs's conduct would raise serious constitutional problems. The government says the word's meaning is obvious based on current dictionaries, but the Supreme Court requires statutory terms to be construed based on their ordinary meaning when the statute was enacted. And the meaning of prostitution has never been fixed or settled, was overbroad at the time of enactment, and remains hopelessly vague. The government's attempts to dismiss the substantive due process, federalism and First Amendment problems are equally spurious. To avoid these constitutional problems, the Court should hold that "prostitution" excludes paying a person to have sex with a third party. Under that properly narrowed construction, Combs is entitled to acquittal.[3]

---

[3] Contrary to Opp.16 n.3, Combs's argument applies to primary and secondary liability. The scienter element under each theory is the same and involves his own mental state. The government's theory was that Combs funded the transportation and payments, so the only question is whether he could have

The government's evidence fails even under its preferred definition.  It distorts the record, and the evidence it cites doesn't prove Combs's dominant purpose at the time of the travel was to pay escorts or entertainers for sex.

A. **Properly Construed To Avoid Serious Constitutional Problems, The Statute Does Not Prohibit Combs's Conduct**

*1. The Meaning Of "Prostitution" Has Changed Over Time*

a.     As Combs's motion explains, "prostitute" has never had a fixed meaning.  In the late nineteenth and early twentieth century, when the White Slave Traffic Act was enacted, a prostitute was a woman who had sex outside marriage.  The meaning has changed as society's sexual mores have shifted.  As Combs showed, some states have limited the reach of their prostitution laws to those who were involved in "bilateral" prostitution or actual sexual contact with the alleged prostitute.

The government elides all the history and claims prostitution has always had one simple definition: sex for hire.  Relying on "[c]urrent common dictionaries," the government says the meaning of "prostitution" is plain—sex for hire—and so there are no statutory or constitutional problems with its application.  Opp.17-18 (citing 2024 and 2025 dictionaries).  But the government's entire argument rests on an elementary mistake:  When applying the plain meaning rule, courts must ascertain the plain meaning of the words *when the statute was enacted*.

The controlling meaning is the "contemporary" ordinary meaning—the "ordinary meaning of the term … at the time Congress enacted the statute." *Perrin v. United States*, 444 U.S. 37, 42 (1979); *accord Wisconsin Central Ltd. v. United States*, 585 U.S. 274, 277 (2018); *United States v. Fernandez*, 104 F.4th 420, 427-28 (2d Cir. 2024).  For example, when the

---

intended to engage in prostitution if he merely intended to pay males to have sex with his girlfriends, regardless of whether the payments were direct or indirect.

Supreme Court interprets federal statutes enacted in the 1800s, it looks to nineteenth-century

sources. *E.g.*, *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 610-11 (1987); *Gabelli v. SEC*,

568 U.S. 442, 448 (2013).  To determine the meaning of "money" in a statute enacted in 1937,

for example, the Court consulted 1930s dictionaries. *Wisconsin Central*, 585 U.S. at 277-78.

The reason for this is obvious:  The meanings of words change over time.  When

Congress enacts a statute, it is not predicting what the words will mean 100 years later—it is

relying on what words mean at that time.  Judges must therefore apply a statute's contemporary

meaning.  "[I]f judges could freely invest old statutory terms with new meanings, we would risk

amending legislation outside" the legislative process commanded by the Constitution. *New*

*Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019).  The question is not what the plain meaning of

"prostitution" is in 2025.  The question is what the plain meaning *was* in 1910—if there was one.

b.    Combs's motion demonstrated (at 6-7) that "prostitution" in the late nineteenth

and early twentieth century did not simply mean sex for hire—it generally had a much broader

meaning covering all intercourse outside marriage.  The government does not try to refute that

history and offers no contrary authority addressing the contemporary plain meaning.  Instead, it

criticizes Combs for relying on state law authorities "from Minnesota to Massachusetts to Texas

to Washington," Opp.25, which the government contends are irrelevant.  That critique is

misguided for two reasons.

*First*, the state law authorities demonstrate what the settled legal meaning of the term

"prostitution" was in 1910.  "Where Congress uses terms that have accumulated settled meaning

under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress

means to incorporate the established meaning of these terms." *Neder v. United States*, 527 U.S.

1, 21 (1999); *accord Kousisis v. United States*, 145 S. Ct. 1382, 1392 (2025).  State law

authorities are often the best source for demonstrating what the common law was at the relevant time. For instance, in *Kousisis*, the Court examined state law cases —from Minnesota to California to Maine to Washington—to determine the common law understanding of the fraud statute at the time it was enacted. 145 S. Ct. at 1393-94.

*Second*, the common law meaning of prostitution was incorporated into federal statutes by the Supreme Court at the relevant time. Congress had enacted immigration statutes in the late-nineteenth and early-twentieth centuries prohibiting the importation of women for the "purpose of prostitution." In *United States v. Bitty*, the Supreme Court interpreted the word "prostitution," holding: "There can be no doubt as to what class was aimed at by the clause forbidding the importation of alien women for purposes of 'prostitution.' It refers to women who, for hire *or without hire*, offer their bodies to indiscriminate intercourse with men." 208 U.S. 393, 401 (1908) (emphasis added). The government tellingly ignores *Bitty*, even though the Supreme Court relied on it when interpreting the Mann Act in 1917 to hold that "prostitution" in the Mann Act also "refers to women who, for hire or without hire, offer their bodies to indiscriminate intercourse with men." *Caminetti v. United States*, 242 U.S. 470, 486-87 (1917) (quoting *Bitty*).

Accordingly, if there was any settled ordinary meaning of "prostitute" in 1910, it was a woman who has indiscriminate sex with men, whether paid or not. That was the common law meaning and the federal meaning under *Bitty* and *Caminetti*. If this Court were to apply *that* meaning, the statute would plainly be unconstitutional—which the government does not dispute.

c.    The word's meaning has changed over time and has resisted any fixed definition that could provide the constitutionally-required clear and ascertainable standard. As Combs's motion explains (at 18-22), in the last 50 years numerous state courts have narrowed prostitution

8

to exclude voyeuristic activity like that at issue here.[4]  The government offers no serious

response.  Even its arguments based on "current common dictionaries" involve cherry-picking

certain definitions and ignoring others.  The Oxford English Dictionary, "one of the most

authoritative on the English language," *Taniguchi v. Kan Pac. Saipan, Ltd*., 566 U.S. 560, 569

(2012), contains numerous different definitions.  One meaning of "prostitution" is offering sex

for money, but another broader meaning is "devotion to an unworthy or base use; degradation,

debasement, corruption."  XII *Oxford English Dictionary* 674 (2d ed. 1989).  One meaning of

"prostitute" is simply "offered or exposed to lust."  *Id*. at 673.  And so on.

Prostitution's meaning was vastly different in 1910, has changed over time, and has

various different meanings today depending on the jurisdiction.  The plain meaning rule does not

resolve the interpretive question on which Combs's motion turns.

### 2.  *A Broad Interpretation Encompassing Combs's Conduct Would Raise Serious Constitutional Problems*

All the government's constitutional arguments fail once the flaw in its statutory

interpretation approach is exposed.  The government says the notice or vagueness concerns

disappear because the 2025 meaning of the term prostitution is "unquestionably clear"—"sex for

payment."  Opp.23.  But if this Court applies the 1910 meaning of the term—indiscriminate and

lewd sex—then the due process and notice concerns are manifest.  The same is true if the Court

---

[4] The government cites certain state statutory definitions of prostitution but ignores how those definitions have been interpreted.  Opp.25 n.8.  New York law incorporates the "traditional bilateral notion of prostitution," according to which "A pay[s] B for sexual activity to be performed on A."  *People v. Paulino*, 2005 N.Y. Misc. LEXIS 3430, at *8-9 (N.Y. Sup. Ct. Aug. 4, 2005).  Accordingly, the applicable offense forbids soliciting or paying another for that person or a third person to have sex *with the payor*.  N.Y. Penal Law §230.02.  California similarly requires "touching between prostitute and customer."  Judicial Council of California, Criminal Jury Instructions No. 1154 ("Prostitution: Soliciting Another"); *e.g.*, *Wooten v. Superior Ct.*, 113 Cal. Rptr. 2d 195, 199-203 (Cal. Ct. App. 2001).

9

considers the changing meaning over time, and the many state law cases restricting prostitution to situations where the payer has sex with the alleged prostitute.

The government also says there are no substantive due process concerns because Congress may prohibit sex for hire. *See* Opp.27. But the 1910 meaning of "prostitution" covers a wide range of practices Congress may not prohibit under modern constitutional law, such as taking a mistress and polyamorous relationships. The Act can no longer be applied to such conduct because the Constitution does not allow Congress to criminalize such relationships. Moreover, it is far from clear that prohibiting sex for hire between consenting adults remains constitutional under *Griswold* and other substantive due process precedents in cases not involving minors, coercion, or commercial exploitation of sex workers. *See* Dkt.486 at 23 & n.12.

Nor does the Act's inclusion of "an interstate commerce element," Opp.28, eliminate the federalism problem. The Supreme Court has repeatedly cited federalism concerns to narrow even federal criminal statutes containing some interstate commerce element. *E.g.*, *Snyder v. United States*, 603 U.S. 1, 14-15 (2024); *Ciminelli*, 598 U.S. at 315-16. Allowing Congress to criminalize sex acts involving voyeuristic activities that aren't illegal in many states simply because participants crossed state lines would mark a "sweeping expansion of federal criminal jurisdiction." *Cleveland v. United States*, 531 U.S. 12, 24 (2000). Finally, as explained in Point III, applying the Mann Act here implicates the First Amendment.

### 3.  *Narrowly Construed, The Act Does Not Proscribe Combs's Conduct*

The government does not seriously dispute that if the Mann Act covers only commercialized pimping or excludes payments for sex with third parties, Combs must be acquitted. The government does say he was "an active participant" in the sex (Opp.3, 26-27, 29), but that misses the point. The evidence it cites relates to his sexual activities with his girlfriends,

which are irrelevant.  In the cases excluding third-party or voyeuristic situations from "prostitution," the person paying did so for sexual gratification.  The issue is not whether Combs had sex with his girlfriends during freak-offs, or whether he masturbated while the others had sex.  The issue is whether Combs had sex *with* the alleged prostitutes—the escorts and entertainers—and there was zero evidence of that, requiring acquittal.

### B.     There Was Insufficient Evidence Of Sex For Money

The government merely points to evidence showing Ventura and Jane had sex (among other activities) with escorts after they traveled, and that escorts were sometimes paid.  But that doesn't prove that when Combs or his girlfriends organized travel for freak-offs or hotel nights, they did so to engage in prostitution.

The government primarily relies on evidence about what happened *after* the interstate travel.  But the required specific intent must "coincide with the *actus reus* of crossing state lines."  Dkt.486 at 27 (quoting *United States v. Broxmeyer*, 616 F.3d 120, 129 (2d Cir. 2010)).  The evidence must reveal that the defendant's *dominant* intent at the time of travel was prostitution.  "If the purpose of the journey is not sexual intercourse, though that be contemplated, the statute is not violated."  *Hansen v. Haff*, 291 U.S. 559, 563 (1934).  "[I]mmoral conduct during or following the journey is insufficient to subject the transporter to the penalties of the Act."  *Mortensen v. United States*, 322 U.S. 369, 374 (1944).

The evidence the government cites does not satisfy the test.  For example, the government cites conversations about whether escorts were cops, which occurred "when the escorts first arrived," Opp.35, 40, or money exchanged "[a]fter the sex was complete," *id.* at 35, and negotiations regarding payment a day later, *id.* at 39.  None of that addresses the purpose of the travel at the relevant time—during or before the travel—and the government presented no evidence revealing any intent to pay escorts for sex during or before the travel.

To the extent the government mentions any evidence before travel, it mischaracterizes that evidence. For example, it cites communications with Jules Theodore about travel and a "tip," relating to Count Three. Opp.36-37. But booking an escort's services at the last minute and telling the escort that their "tip" would reflect the last-minute nature of the trip in no way proves that the purpose of the trip—or the "tip"—was for or connected to sex. Instead, it is further evidence that Combs paid escorts for their time and sometimes compensated them for reasons unrelated to sex.

Similarly, Ventura's testimony about why escorts were paid (Opp.35-36) does not help the government. She testified she "didn't have a role" "in determining how much escorts were paid" and that "[i]t wasn't [her] money." Tr.531. She stated that how much escorts were paid depended on whether Combs was "pleased by their performance"—but never explained what that meant. Tr.561. And she certainly didn't testify that escorts were paid for prostitution. Instead, she repeatedly said escorts were paid "to entertain." Tr.479; Tr.533 (same). And she described arranging freak-offs as "setting up entertainment," not booking a prostitute. Tr.1302.

Jane's testimony was similar. She characterized escorts as "entertainers," Tr.4621, and never testified that they were paid for sex. The government notes that Ventura and Jane "testified that they were present at Freak Offs or hotel nights and that the defendant paid escorts after they had sex." Opp.41. But that basic chronology is equally consistent with escorts being paid for their time as opposed to sex and does not prove the money was for sex or that any corresponding travel was for purposes of engaging in prostitution. Indeed, when Ms. Ventura first hired Daniel Phillip, she asked for a "massage" and "wherever things went from there ... based on how comfortable [he] was." Tr.247-48. Such evidence is "at least as consistent with innocence as with guilt" and is insufficient. *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019).

Lacking evidence of Combs's contemporaneous intent, the government asks the Court to infer an intent to pay for sex based on a purported pattern of freak-offs and hotel nights that sometimes involved sex and sometimes resulted in payment. But that is insufficient, and the government again overstates the proof and ignores contrary evidence. For example, it claims Kabrale Williams lived in Atlanta and always traveled for hotel nights, after which he was sometimes paid, and therefore at least one trip must have been to "engage in an act of prostitution." Opp.37-38. But the evidence revealed that escorts—including Williams—were not motivated to have sex because of any promise of payment, as opposed to spending time with the couple. *See* Dkt.486 at 30-31. Indeed, the evidence demonstrated that escorts were often paid even when there was no sexual activity and did not expect payment specifically for sex. *See* Dkt.486 at 27-30; Tr.274 (Hayes testified "I didn't care if I got paid one way or another. I never asked them for a single dollar. They gave that to me every time that I went to see them.").

The government's argument concerning the travel's purpose is "based on mere speculation or guesswork" and is insufficient to show Combs intended to pay for sex after the travel. *Broxmeyer*, 616 F.3d at 125.

## III.    THE GOVERNMENT'S FIRST AMENDMENT ARGUMENTS ARE MERITLESS

### A.    Combs Was Producing Amateur Porn

1. The government contends Combs's conduct was not protected by the First Amendment because the sexual performances during freak-offs and hotel nights involved sexual arousal and gratification. Opp.28-30. This misconstrues the applicable caselaw and conflicts with the evidence.

The same First Amendment principles apply regardless of whether the person directing or producing a pornographic film is aroused while he or she films others having sex or not. In *People v. Freeman*, the California Supreme Court made clear that an adult film producer would

13

have been protected by the First Amendment even if he had watched and recorded sex for arousal (in addition to producing the film).  The court held that even assuming the defendant had mens rea sufficient "to come within the definition of" California's prostitution statute, its application there "would impinge unconstitutionally upon First Amendment values."  758 P.2d 1128, 1131 (1988).  The court focused on Freeman's conduct as a director and producer of a sexual performance—not whether he had some arousal purpose.  *Id.* at 1131-32.

The New Hampshire Supreme Court relied on the same general free speech principles to overturn the conviction of an individual who, unlike the "commercial pornographer" (Opp.n.11) in *Freeman*, paid two people to film them having sex in a hotel room.  Although the Court suggested the result may have been different had the sexual performance been arranged solely "for the purpose of sexual arousal or gratification," *see State v. Theriault*, 960 A.2d 687, 690 (N.H. 2008), nowhere did it state that those general free speech principles would cease to apply to an individual who, like Combs, was also acting for the creative purpose of directing and filming a sexually explicit performance.

Accordingly, *Freeman*, *Theriault*, and other state decisions Combs cited were relying on the same federal constitutional law that controls here.  And none of them suggested that an amateur pornographer like Combs would be stripped of his First Amendment rights merely because, in addition to having a creative purpose of directing and filming a sexually explicit show, he also had a sexual purpose.

2.  The record shows that Combs was acting as an amateur pornographer and making "homemade porn" for later private viewing with his girlfriends.  Tr.564 (Ventura testimony about how freak-off activities were "like porn").  Producing and recording the performances was a key motivation.

The government heavily emphasized the video recordings during trial (e.g., Tr.103, 117, 7612) but now claims that recording only occurred "occasional[ly]," "incidental[ly]," and "sometimes." Opp.29-30, 33. But Jane testified Combs would film her "[a]lmost every time," Tr.4818, and Ventura testified that "freak-offs were video recorded," period, Tr.569. Indeed, the government told the jury Combs "often video recorded" both freak-offs and hotel nights, Tr.108, resulting in "multiple," "hundreds," and a "library" of videos, Tr.7628, 7653. Many of these videos were admitted into evidence and played for the jury. The evidence thus shows the sex was routinely filmed.

The government notes that two entertainers testified that they remembered Combs recording "once or twice," Tr.266 (Daniel Phillip) or "never saw any filming," Tr.1937 (Sharay Hayes). This testimony is irrelevant—the freak-offs with Phillip and Hayes didn't involve any interstate travel, and the two men were not involved in any offense conduct. *See* GX1402. The escorts and entertainers involved in sex where there was interstate travel *were* routinely filmed.

The government also contends that, unlike an adult film producer, Combs did not provide advance notice to or seek consent from his girlfriends or the escorts before filming them. But Jane testified unequivocally that she was "OK with [hotel nights] being filmed." Tr.5386. And Ventura *actively facilitated* recording of freak-offs by, for example, suggesting she go back to retrieve an iPad that she forgot to bring to the hotel one time. Tr.1010-11. Although the government identifies one entertainer who told Combs he didn't want to be filmed during a hotel night, Opp.30, Combs promptly turned the camera off on that occasion, Tr.4770—which shows entertainers *could* object to recording.

The evidence also shows Combs and his girlfriends recorded the freak-offs and hotel nights so they could watch them together later. Tr.569-70, 4923. Jane even bought Combs a

portable screen for their "movie nights."  Tr.5067.  Ventura likewise would routinely "watch [the videos] with Sean afterwards."  Tr.569.  The government ignores this and instead claims Combs used these videos to "blackmail[]" Ventura and Jane.  Opp.4, n.10.  But the jury rejected this evidence by acquitting Combs of sex trafficking.  Regardless, it is irrelevant to whether he transported anyone interstate for purposes of prostitution.

**B.      The Mann Act's Application Here Burdens Protected First Amendment Activity And Is Unjustified By Any Substantial Government Interest**

1.  The government does not dispute that Combs's amateur porn was creative, intricate, and highly choreographed, but nevertheless contends that the filming was not "expressive conduct" entitled to First Amendment protection.  Opp.30-31.  Yet pornography is generally protected unless it is obscene, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 240 (2002); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 101 (2d Cir. 2003), and the government has waived any obscenity argument by failing to raise it in its opposition.[5]

The Supreme Court has made clear that sexually explicit material need not have a "narrow, succinctly articulable message" to be expressive within the meaning of the First Amendment.  *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995).  For example, a general "erotic message" is sufficiently expressive, and nude dancing—like much adult porn—is thus constitutionally protected.  *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565-66, 570-71 (1991) (plurality opinion); *see also id.* at 581 (Souter, J., concurring in judgment); *accord City of Erie v. Pap's A.M.*, 529 U.S. 277, 291, 293-94 (2000) (plurality opinion); *see also id.* at 318 (Stevens, J., dissenting, joined by Ginsburg, J.).  The Fifth Circuit recently reiterated that the conduct need only be intended to "convey[] some message,

---

[5] Regardless, the government would bear a heavy burden to prove that Combs's amateur porn falls within this narrowly defined category of unprotected speech.  *See United States v. Various Articles of Obscene Merchandise, Schedule No. 2102*, 709 F.2d 132, 135 (2d Cir. 1983).

even if nearly opaque," and held that a drag show was also First Amendment-protected. *Spectrum WT v. Wendler*, --- F.4th ---, 2025 WL 2388306, at \*6-7 (5th Cir. Aug. 18, 2025).

The sexual performances here were choreographed to convey a "particularized message" that would be "understood by those who viewed it"—Combs and his girlfriends. *Texas v. Johnson*, 491 U.S. 397, 404 (1989). And as in the nude dancing cases, many of the hotel-night performances would even begin with Jane dancing with an entertainer. Tr.4622, 4735.

The cases the government cites to dispute expressive conduct (Opp.30-31) are inapposite. In *United States v. Thompson*, there was no evidence the defendant captured the sex on film for later viewing or choreographed it at all. 458 F. Supp. 2d 730 (N.D. Ind. 2006). *Jones v. Schneiderman* held that fighting *was* sufficiently expressive to plausibly warrant First Amendment protection. 974 F. Supp. 2d 322, 333-34 (S.D.N.Y. 2013). *Clark v. Community for Creative Non-Violence* assumed without deciding that demonstrative camping *was also* sufficiently expressive for First Amendment protection. 468 U.S. 288, 293 (1984). And *United States v. Roeder*, 526 F.2d 736 (10th Cir. 1975), is inapposite for the reasons stated in Combs's motion (at 35-36).

2. Because Combs's filming was sufficiently expressive to warrant First Amendment protection, the government must have a sufficiently important interest to justify upholding his convictions. *See United States v. O'Brien*, 391 U.S. 367, 376-77 (1968). It does not.

The government's proffered general interest in "controlling prostitution" (Opp.31) is not implicated in this unprecedented case that involves no minors, coercion, exploitation of vulnerable individuals, or pimps profiteering from sex work—but rather only grown adults engaging in fully consensual sexual conduct, and a john who didn't even have sex with the "prostitutes." No substantial government interest is furthered by applying the Mann Act in these

circumstances, which is the key inquiry.  In *Freeman*, for example, the California Supreme Court

held that "[p]unishment of a . . . producer" for making an adult film "has little if anything to do

with the purpose of combatting prostitution."  758 P.2d at 1132-33; *see also, e.g.*, *Johnson*, 491

U.S. at 407-10 (no sufficient interest asserted "in support of Johnson's conviction" under anti-

flag burning law); *Clark*, 468 U.S. at 296-99 (analyzing whether government's proffered interest

was "served by" applying regulation to demonstrative camping).

> 3.     The government does not respond to—and thus concedes—Combs's argument

that upholding the Mann Act convictions would burden his First Amendment right to view adult

pornography.  *See* Dkt.486 at 41-42.

## IV.     AT A MINIMUM, A NEW TRIAL IS REQUIRED DUE TO SPILLOVER PREJUDICE FROM EVIDENCE THAT WOULD HAVE BEEN INADMISSIBLE HAD THE REMAINING COUNTS BEEN TRIED ALONE

### A.     This Court Has Discretion To Order A New Trial In The Interest Of Justice

The government suggests Rule 33 creates a near-insurmountable hurdle regardless of the

nature of the claim for a new trial.  That is untrue.  Indeed, "Rule 33 recognizes that if a trial

court concludes *for any reason* that the trial has resulted in a miscarriage of justice, the court has

broad powers to grant a new trial."  3 Wright & Miller, *Fed. Prac. & Proc. Crim.* §581 (5th ed.

2025) (emphasis added); *see also id.* §589 (discussing numerous claims sufficient for relief under

Rule 33).

The government claims a new trial motion may only be granted in "the most

extraordinary circumstances."  Opp.44 (quoting *United States v. Archer*, 977 F.3d 181, 187 (2d

Cir. 2020)).  But it relies on cases where the judge cannot grant a new trial without second-

guessing the jury's credibility determinations.  For example, the Second Circuit made the quoted

statement from *Archer* in connection with a motion to set aside the verdict "based on the weight

of the evidence alone."  977 F.3d at 187-88.  That is obviously not the basis for the motion here.

As the Rule itself states, defendants may seek a new trial based on newly discovered evidence or "any" other ground.  Fed. R. Crim. P. 33(b).  And the applicable standard varies depending on the nature of the claim—the district court applies the same legal standard that would apply if the claim were raised on appeal.  *E.g.*, *In re Terrorist Bombings*, 552 F.3d 93, 144-45 (2d Cir. 2008) (Rule 33 motion based on alleged *Brady* violation examines whether there is a reasonable probability that the suppressed evidence would have changed the outcome); *United States v. Pippens*, 733 F. Supp. 3d 136, 156 (E.D.N.Y. 2024) (same).

Combs is not claiming the convictions are contrary to the weight of the evidence or asking this Court to weigh the witnesses' credibility to assess a claim of perjured testimony, as in *United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992) (cited Opp.43).  He is arguing retroactive misjoinder.  This Court has discretion to grant a new trial on that ground "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  Given all the inflammatory evidence admitted to prove the RICO and sex trafficking charges, the interests of justice warrant a new trial on the Mann Act counts.

### B.     A Claim Of Spillover Prejudice Cannot Be Summarily Rejected

The government agrees that the three-part test of *United States v. Hamilton*, 334 F.3d 170, 182 (2d Cir. 2003), applies to retroactive misjoinder claims.  *See* Opp.44-45.  But it claims the Court "need not…reach[]" the test and that the Court should "summarily" reject Combs's claim, because it says no court has previously granted relief on these grounds.  Opp.45, 49.  That argument fails for multiple reasons.

*First*, the government's factual premise is wrong.  There are decisions granting new trials due to spillover prejudice after a mixed jury verdict.  As Combs explained in his motion, the district courts in both *United States v. Ferguson*, 49 F. Supp. 2d 321, 330 (S.D.N.Y. 1999), and

*United States v. Sam Goody, Inc.*, 518 F. Supp. 1223, 1226 (E.D.N.Y. 1981), did exactly that. The government dismisses these decisions as "dicta" because the rulings also contained other, alternate grounds. Opp.47. According to the government's logic, anytime a court gives alternate grounds, the entire opinion is "dicta." That is wrong. "[I]t's well-settled that alternative holdings are binding, they are not dicta." *United States v. Wright*, 496 F.3d 371, 375 n.10 (5th Cir. 2007); *accord Pyett v. Pa. Bldg. Co.*, 498 F.3d 88, 92 (2d Cir. 2007), *rev'd on other grounds*, 556 U.S. 247 (2009).

*Second*, although the Second Circuit has never reversed a conviction based on spillover prejudice after a mixed jury verdict, it has squarely held that *Hamilton*'s three-part test applies, and it has applied the test whenever assessing retroactive joinder claims, rather than simply dismissing them out-of-hand. In *Hamilton* itself, the Circuit applied the three-part test—devoting several pages of analysis to the defendant's retroactive misjoinder claim. 334 F.3d at 184-86. Although the *Hamilton* Court ultimately rejected the defendant's claim, the Second Circuit has never held—in *Hamilton* or in any other case—that such claims should always be rejected regardless of the circumstances.

While new trials based on retroactive joinder after mixed verdicts are rare, there has never been a case remotely like this one.

### C.    Under The Binding Test, A New Trial Is Warranted

To the limited extent the government addresses the three-part test, it argues that a new trial isn't warranted because all the same evidence would have been admissible to prove the Mann Act counts. This is not a serious argument—indeed, it is completely inconsistent with the way the government itself argued the case to the jury. It argued in summation that the Mann Act charges were fundamentally different from the other counts because the Act "simply addresses

20

transporting people across state lines or internationally for the purposes of prostitution" and "does not require force, fraud or coercion."  Tr.7696.

The government responds with vague and conclusory language about how "some" evidence of violence would have been admissible because it "support[ed] the Mann Act charges," and that other evidence of violence "cannot be divorced" from the freak-offs that were the subject of Counts Three and Five.   Opp.49.  It certainly can be divorced—and obviously would have been divorced had Combs been tried solely on the Mann Act counts—namely, by excluding the evidence.   The government argues it was all part of the "same course of conduct." *Id*.  Apparently, the government believes dozens of otherwise unrelated incidents spanning two decades can all count as the "same course of conduct" so long as the defendant has some role in all of them.  That is plainly untrue.

Application of the Rules of Evidence yields an obvious conclusion—the vast majority of the government's evidence was admissible only to prove Counts One, Two, and Four.  Take, for example, the alleged Mescudi arson, or the alleged kidnappings of Capricorn Clark, or Mia's claims of supposed abuse.  These purported incidents had no rational connection with any elements of the Mann Act charges, or any of the supposed Mann Act violations.  None of this evidence would even pass the low relevance bar of Rule 401—much less survive Rules 403 and 404, as it was highly prejudicial and involved allegations of violence, thus raising the possibility that the jury, "uncertain of guilt… [would] convict anyway because a bad person deserves punishment."  *Old Chief v. United States*, 519 U.S. 172, 181 (1997).

The same is true of the Intercontinental videos.  The government says that was "evidence supporting the Mann Act charges"—but how?  The freak-off at the Intercontinental did not involve interstate transportation of any escort or other participant.  The only connection it had to

the Mann Act charges was that some of the same people were having sex on another occasion in a hotel.  But it does not make any element of the Mann Act charges "more or less probable than it would be without the evidence."  Fed. R. Evid. 401(a).  And even if there were some conceivable relevance, the minimal probative value would be vastly outweighed by the risk of impermissible character reasoning under Rule 404 and unfair prejudice under Rule 403.  No reasonable jurist would have admitted the Intercontinental videos to prove Counts Three and Five if those had been the only charges.

Prior to trial, this Court resolved numerous disputes about evidence of other conduct that the government proffered under Rules 413 and 404(b).  This Court carefully applied those rules and excluded some of that evidence as minimally probative and unfairly prejudicial.  If the same standard were applied to a trial on the Mann Act counts alone, significantly more evidence would have been deemed inadmissible, and the trial would have been much shorter.  Relevance and admissibility depend on the elements of the offense, and when those elements do not require violence, evidence of violence is far less likely to be admissible.

Most of the government's evidence was aimed at proving the more serious sex trafficking and RICO charges.  Huge swaths of that evidence were inadmissible to prove the simpler Mann Act counts.  There is a substantial possibility that the jury's guilty verdict on those counts was affected by spillover prejudice from all the inflammatory evidence it saw.  This Court has discretion to order a new trial for that reason, and in the interests of justice, it should.

## CONCLUSION

The Court should grant an acquittal, or at least a new trial.

Date:  September 3, 2025

Respectfully Submitted,

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Jason A. Driscoll
SHAPIRO ARATO BACH LLP
1140 Ave of the Americas, 17th Fl.
New York, NY 10036
(212) 257-4880
ashapiro@shapiroarato.com
jdriscoll@shapiroarato.com

Marc Agnifilo
Teny Geragos
AGNIFILO INTRATER
445 Park Ave., 7th Fl.
New York, NY 10022
(646) 205-4350
marc@agilawgroup.com
teny@agilawgroup.com

Anna Estevao
HARRIS TRZASKOMA LLP
156 West 56th St., Ste. 2004
New York, NY 10019
(212) 970-6465
aestevao@harristrz.com

Brian Steel
THE STEEL LAW FIRM, P.C.
1800 Peachtree Street, Ste. 300
Atlanta, GA 30309
(404) 605-0023

Xavier R. Donaldson
136 Madison Ave, 6th Floor
New York, New York 10016
(646) 772-3334
xdonaldson@aol.com

Nicole Westmoreland, Esq.
WESTMORELAND LAW, LLC
132 Cone Street, Suite A
Atlanta, GA 30303
(404) 446-2620
nw@westmorelandlawgroup.com