**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**24 Cr. 542 (AS)**

_____

**UNITED STATES OF AMERICA**

**v.**

**SEAN COMBS,**

**Defendant.**

_____

**REPLY SENTENCING MEMORANDUM ON**
**BEHALF OF SEAN COMBS**

**AGNIFILO INTRATER LLP**
445 Park Ave., 7th Fl.
New York, NY 10022
(646) 205-4350

    By:    Marc Agnifilo
           Teny R. Geragos

**THE STEEL LAW FIRM P.C**.
1800 Peachtree Street, Ste. 300
Atlanta, GA 30309
(404) 605-0023

    By:    Brian Steel

Xavier R. Donaldson
136 Madison Ave, 6th Floor
New York, NY 10016
(646) 772-3334

**SHAPIRO ARATO BACH LLP**
1140 Avenue of the Americas, 17th Fl.
New York, NY 10036
(212) 257-4880

    By:    Alexandra A.E. Shapiro
           Jason A. Driscoll

**WESTMORELAND LAW LLC**
132 Cone Street, Suite A
Atlanta, GA 30303
(404) 446-2620

    By:    Nicole Westmoreland

**HARRIS TRZASKOMA LLP**
156 West 56th St., Ste. 2004
New York, NY 10019
(212) 970-6465

    By:    Anna Estevao

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ...................................................................................................... 1

I.     THE GOVERNMENT'S DRACONIAN GUIDELINES
      CALCULATION DEFIES THE LAW AND THE FACTUAL RECORD ...................... 3

     A.  The Government Seeks A Severe Sentence Based On The Same
         Arguments That Failed To Persuade The Jury About Threats, Force,
         Fraud Or Coercion ............................................................................... 3

     B.  The Government Misinterprets The Acquitted Conduct Amendment
         And Disregards The Constitutional Law On Acquitted Conduct ................ 6

     C.  There Is No Basis For Applying The §2A3.1 Rape Cross Reference ........ 18

     D.  The Vulnerable Victim Enhancement Does Not Apply ............................ 25

     E.  There Is No Basis For An Obstruction Enhancement ............................. 29

     F.  The Government's Remaining Guidelines Arguments Are Meritless ........ 32

II.    THE GOVERNMENT'S SENTENCE DISCREPANCY ARGUMENTS
      DEPEND UPON COMPARISONS TO COMPLETELY INAPPOSITE CASES ......... 37

     A.  The Government Fails To Address The Bulk Of Mr. Combs's Arguments
         And Instead Relies Exclusively On Acquitted Conduct ............................ 38

     B.  The Government's Cases Are Completely Inapposite ................................ 39

     C.  The Government Ignores Relevant Mann Act Sentencing Data ................ 41

          1.  Ongoing & Extensive Conduct ..................................................... 42

          2.  Drugs ............................................................................................. 43

          3.  "Power Dynamics" ........................................................................ 43

          4.  Force And Violence ...................................................................... 44

          5.  The Government's Other Illusory Distinctions ............................. 46

     D.  The Government's "John" Arguments Do Not Persuade ........................... 47

III.   THE GOVERNMENT'S DISMISSAL OF MEDICAL EVIDENCE IS
      UNFOUNDED ..................................................................................... 50

CONCLUSION ...................................................................................................... 51

## TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Ashe v. Swenson,*
  397 U.S. 436 (1970) .......................................................................... 13, 16, 17

*Bissonnette v. LePage Bakeries Park St., LLC,*
  601 U.S. 246 (2024) ..................................................................................... 9

*Blakely v. Washington,*
  542 U.S. 296 (2004) .................................................................................... 17

*Bravo-Fernandez v. United States,*
  580 U.S. 5 (2016) ................................................................................... 13, 16

*Counterman v. Colorado,*
  600 U.S. 66 (2023) ..................................................................................... 32

*Fischer v. United States,*
  603 U.S. 480 (2024) .................................................................................... 31

*Flores-Figueroa v. United States,*
  556 U.S. 646 (2009) .................................................................................... 21

*Liparota v. United States,*
  471 U.S. 419 (1985) .................................................................................... 21

*McClinton v. United States,*
  143 S. Ct. 2400 (2023) ........................................................................... 8, 9, 13

*Nash v. Combs et al,*
  (Cal. Sup. Ct. Sept. 23, 2025) ..................................................................... 35

*Rehaif v. United States,*
  588 U.S. 225 (2019) .................................................................................... 21

*Russello v. United States,*
  464 U.S. 16 (1983) ...................................................................................... 25

*Snyder v. United States,*
  603 U.S. 1 (2024) ........................................................................................ 13

*Star Athletica, LLC v. Varsity Brands, Inc.,*
  580 U.S. 405 (2017) .................................................................................... 10

*United States v. Bastos,*
  1:06-cr-00395 (N.D. Ill.) .............................................................................. 44

*United States v. Bavaro,*
  20-cr-115 (E.D.N.C) .................................................................................... 40

*United States v. Beith,*
  407 F.3d 881 (7th Cir. 2005) ........................................................................ 27

*United States v. Benavidez,*
     19-cr-337 (E.D.N.C) ........................................................................................ 40

*United States v. Booker,*
     543 U.S. 220 (2005)................................................................................... 14, 18

*United States v. Brown,*
     237 F.3d 625 (6th Cir. 2001) ......................................................................... 30

*United States v. Brown,*
     321 F.3d 347 (2d Cir. 2003)........................................................................... 31

*United States v. Brown,*
     892 F.3d 385 (D.C. Cir. 2018) ....................................................................... 16

*United States v. Cabrera-Gutierrez,*
     756 F.3d 1125 (9th Cir. 2014) ....................................................................... 20

*United States v. Chong,*
     08-cr-106 (W.D.N.Y.)............................................................................... 47, 48

*United States v. Collins et al,*
     3:17-cr-00110-MPM-RP (N.D. Miss.) ........................................................... 46

*United States v. Crews,*
     19-cr-62 (E.D.N.C.) ...................................................................................... 40

*United States v. Cross et al,*
     1:10-cr-00939-GBD (S.D.N.Y.) ................................................................ 42, 46

*United States v. Doolittle,*
     17-cr-275 (E.D.N.C.) ............................................................................... 39, 40

*United States v. Dupre,*
     462 F.3d 131 (2d Cir. 2006)...................................................................... 26, 27

*United States v. Fish,*
     295 F. App'x 302 (2008) ................................................................................ 22

*United States v. Fishman,*
     --- F.4th ---, 2025 WL 2692069 (2d Cir. Sept. 22, 2025) .............................. 25

*United States v. Flaming,*
     133 F.4th 1011 (10th Cir. 2025) ............................................................... 20, 22

*United States v. Gregory,*
     No. 5:15 Cr. 189 (E.D.N.C.)..................................................................... 39, 40

*United States v. Guidry,*
     No. 2:13 Cr. 16 (E.D. Wisc.) .................................................................... 39, 40

*United States v. Hernandez,*
     83 F.3d 582 (2d Cir. 1996).............................................................................. 30

*United States v. Jimenez-Rodriguez,*
2024 WL 1199991 (E.D.N.Y. Mar. 20, 2024) ............................................. 28

*United States v. Jordan,*
21-cr-423 (S.D.N.Y.) ..................................................................................... 22

*United States v. Kerley,*
544 F.3d 172 (2d Cir. 2008) ......................................................................... 29

*United States v. Kidgell et al,*
6:13-cr-10129-EFM-2 (D. Kan.) (Defendant: Yan Zhang) ........................ 46

*United States v. King,*
3:16-cr-00351 (D. Or.) .................................................................................. 44

*United States v. Kizer,*
10-cr-20385 (W.D. Tenn.) ...................................................................... 39, 40

*United States v. Lauersen,*
348 F.3d 329 (2d Cir. 2003) ......................................................................... 37

*United States v. Lin,*
2025 WL 401105 (S.D.N.Y. Feb. 5, 2025) ................................................. 13

*United States v. Martinez,*
110 F.4th 160 (2d Cir. 2024) ....................................................................... 14

*United States v. McCall,*
174 F.3d 47 (2d Cir. 1998) ..................................................................... 27, 29

*United States v. Mendoza-Mendez,*
1:15-cr-00640-ENV (E.D.N.Y.) ................................................................... 45

*United States v. Modica et al,*
1:09-cr-01243-LAK (S.D.N.Y.) .................................................................... 42

*United States v. Montgomery,*
966 F.3d 335 (5th Cir. 2020) ....................................................................... 20

*United States v. Nabit,*
1:21-cr-00038-GLR (D. Md.) .................................................................. 43, 48

*United States v. Oppedahl,*
998 F.2d 584 (8th Cir. 1993) ....................................................................... 30

*United States v. Paige,*
923 F.2d 112 (8th Cir. 1991) ................................................................... 26, 27

*United States v. Pena,*
751 F.3d 101 (2d Cir. 2014) ......................................................................... 30

*United States v. Sabatino,*
943 F.2d 94 (1st Cir. 1991) ..................................................................... 27, 28

iv

*United States v. Sandoval,*
    506 F. Supp. 2d 582 (D.N.M. 2007) ................................................................. 23

*United States v. Scott,*
    779 F. Supp. 3d 937 (N.D. Ohio 2025) ............................................................. 13

*United States v. SEALED,*
    6:20-cr-00077-JCB-KNM (E.D. Tex.) (Defendant: Rachel Walker) .................. 46

*United States v. Smith,*
    2025 WL 751377 (2d Cir. Mar. 10, 2025) ........................................................ 36

*United States v. Spain,*
    14-cr-21 (E.D.N.C.) ........................................................................................ 40

*United States v. Stubblefield,*
    942 F.3d 666 (5th Cir. 2019) ........................................................................... 30

*United States v. Thomas-Hamilton,*
    907 F.2d 282 (2d Cir. 1990) ............................................................................ 31

*United States v. Thompson,*
    16-cr-75 (E.D.N.C.) ........................................................................................ 39

*United States v. Tills,*
    1:08-cr-00242-WMS (W.D.N.Y.) ...................................................................... 48

*United States v. Tsouroutis,*
    No. 3:07 Cr. 8 (W.D. Va.) ............................................................................... 49

*United States v. Wallace,*
    1:13-cr-00117-HSM-SKL (E.D. Tenn.) ............................................................ 42

*United States v. Watts,*
    519 U.S. 148 (1997) ........................................................................................ 14

*United States v. Whaley,*
    1:18-cr-10091-RWZ (D. Mass.) ....................................................................... 43

*United States v. Willis, Jr.,*
    3:14-cr-00033-MO (D. Or.) ............................................................................. 45

*United States v. Zitlalpopoca-Hernandez,*
    632 F. App'x 335 (9th Cir. Dec. 28, 2015) ...................................................... 23

*Yeager v. United States,*
    557 U.S. 110 (2009) ......................................................................... 13, 14, 16, 17

**Statutes**

18 U.S.C. §7 .................................................................................................................. 23

18 U.S.C. §924 ............................................................................................................... 8

18 U.S.C. §1111 ........................................................................................................ 24

18 U.S.C. §1591 ................................................................................................... 10, 29

18 U.S.C. §2242 ................................................................................................... passim

18 U.S.C. §2422 .................................................................................................. 39, 40

18 U.S.C. §3553 ........................................................................................................ 18

18 U.S.C. §3661 ........................................................................................................ 18

**Other Authorities**

3 Leonard B. Sand et al.,
   Modern Federal Jury Instructions-Criminal .................................................. 20, 21

Black's Law Dictionary (12th ed. 2024) ................................................................... 47

H. Rep. No. 99-594,
   99th Cong., 2d Sess. (May 9, 1986) ....................................................................... 18

*McClinton v. United States* (21-1557),
   Appendix D, E to Petition for Certiorari ................................................................. 9

Pub. L. 99-654,
   Nov. 14, 1986, 100 Stat. 3660 ............................................................................... 18

Robert H. Jackson,
   *The Federal Prosecutor* (April 1, 1940), https://www.justice.gov/
   sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf ........................................ 2

United States Sentencing Commission,
   Federal Register Notice of Proposed 2023-2024 Amendments,
   https://www.ussc.gov/sites/default/files/pdf/amendment-process/federal-register-
   notices/20231222_fr-proposed-amdts.pdf ............................................................. 11

*United States v. Jordan,*
   21-cr-423 (S.D.N.Y.), Sentencing Transcript ....................................................... 23

*United States. v. Shafa,*
   No. 20 Cr. 40021 (D. Mass), Sentencing Transcript ............................................ 13

USSG §1B1.1 ........................................................................................................... 25

USSG §1B1.3 ...................................................................................................... passim

USSG §1B1.4 ........................................................................................................... 18

USSG §2A1.1 ............................................................................................................. 8

USSG §2A3.1 ...................................................................................................... passim

USSG §2A4.1 ........................................................................................................... 24

USSG §2B3.1 ....................................................................................................... 8, 24

USSG §2B3.2........................................................................................................24

USSG §2D1.1........................................................................................................24

USSG §2E2.1........................................................................................................24

USSG §2G1.1 ...............................................................................................passim

USSG §2G1.1 (2003 Manual)................................................................................24

USSG §2G1.3........................................................................................................24

USSG §2G2.1........................................................................................................24

USSG §3A1.1 ..............................................................................25, 26, 28, 29

USSG §3B1.1.................................................................................................32, 33

USSG §3C1.1..........................................................................................29, 31, 32

USSG §3D1.4........................................................................................................32

USSG §3E1.1........................................................................................................32

USSG §4C1.1........................................................................................................32

USSG App...............................................................................................................7

USSG App. C Supp., amend. 826.............................................................9, 10, 11

USSG App. C, amend. 664...................................................................................24

## INTRODUCTION

As we have emphasized many times, the jury has spoken.  The government presented its best evidence to 12 citizens to try to prove Sean Combs used threats, force, fraud, and coercion to compel his girlfriends to engage in freak-offs and hotel nights, and it failed.  Mr. Combs now stands before the Court to be sentenced for much less serious offenses.  If fairness, justice, and the U.S. Constitution mean anything, the jury's verdict should be respected.  Mr. Combs should be sentenced for what he was convicted of—transporting consenting adults interstate to have sex—and nothing more.

Instead of accepting the verdict and advocating a reasonable sentence, the government has gone to extreme lengths to try to justify a draconian sentence, particularly for a 55-year-old man.  Instead of addressing the conduct for which Mr. Combs was convicted, the government has devoted 161 pages to rehashing evidence rejected by the jury and concocting far-fetched legal arguments to try to jack up the guidelines range to an absurd 360-life level—as if he had been convicted not only of the acquitted charges, but also other uncharged offenses.  It labels as "victims" numerous individuals who had nothing to do with the Mann Act charges, dredging up discredited witnesses like the woman who calls herself "Mia," Deonte Nash, Bryana Bongolan, and even Jourdan Atkinson—a person whose allegations are so incredible the government pulled her from its witness list mid-trial.  And instead of putting forth a reasonable guidelines range or addressing where this case fits within the relevant sentencing data the Court directed the parties to provide, the government asks the Court to treat it like a sexual assault or rape case that was not, and could not have been, charged.

It is not difficult to see what is going on here.  The prosecutors know full well the Court will not actually adopt all of their unduly severe enhancements or baseless arguments.  But by taking their advocacy to the extreme, they hope to persuade the Court to disregard Mr. Combs's

position, split the baby, and adopt Probation's recommendation. That would be a grave mistake. Probation made clear its recommendation is based on the premise that there was force, fraud, and coercion here—its recommendation is improperly based, in other words, on acquitted conduct. In light of the jury's acquittals, the longstanding DOJ policies, and all the *relevant* sentencing data, any sentence exceeding a modest term along the lines requested by Mr. Combs would be unreasonable and disproportionate to other Mann Act cases.

The government's advocacy in this case has gone way beyond zealous. It is indecent, and deeply troubling. It violates the revered principles so famously articulated by Attorney General Robert Jackson over 85 years ago about the proper role of the federal prosecutor. He observed that because the "prosecutor has more control over life, liberty, and reputation than any other person in America," these awesome powers must by tempered by "the spirit of fair play and decency that should animate the federal prosecutor." As he explained, "while you are being diligent, strict, and vigorous in law enforcement you can also afford to be just. Although the government technically loses its case, it has really won if justice has been done." Moreover, "A sensitiveness to fair play and sportsmanship is perhaps the best protection against the abuse of power, and the citizen's safety lies in the prosecutor who tempers zeal with human kindness, who seeks truth and not victims, who serves the law and not factional purposes, and who approaches his task with humility."[1]

The prosecutors have not lived up to these principles, and apparently do not respect the unanimous verdict 12 New Yorkers rendered in this case. But fortunately, the fate of Sean Combs is now in this Court's hands. Like all human beings, Mr. Combs is flawed, but he is the first to admit he has made many serious mistakes, and he has been working very hard to better

---

[1] Robert H. Jackson, *The Federal Prosecutor* (April 1, 1940), https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf.

himself and make the most of his time behind bars. We respectfully submit that he deserves a chance to continue his rehabilitation outside the walls of a prison, and ask the Court to be merciful and afford him that opportunity.

*    *    *

Mr. Combs has already spilled much ink and submitted voluminous materials that we hope will assist the Court in fashioning a just sentence. We submit this reply brief solely to respond to specific arguments in the government's brief as to the proper role of acquitted conduct at sentencing, certain guidelines issues, the government's sentence disparities arguments, and factual issues related to Mr. Combs's treatment and time at the MDC.

## I.    THE GOVERNMENT'S DRACONIAN GUIDELINES CALCULATION DEFIES THE LAW AND THE FACTUAL RECORD

### A.  The Government Seeks A Severe Sentence Based On The Same Arguments That Failed To Persuade The Jury About Threats, Force, Fraud Or Coercion

Hyper-technical distinctions aside, the government's argument boils down to a claim that this is not just a Mann Act case, because Casandra Ventura and Jane did not voluntarily travel to freak-offs and hotel nights. But regardless of the precise words used—force, fraud, coercion, threats, manipulation—the government's arguments for a draconian sentence for these transportation offenses are materially indistinguishable from the arguments that failed to persuade the jury Mr. Combs was guilty of sex trafficking.

At trial, the Court instructed the jury that it had to find "that force, threats of force, fraud, or coercion, or any combination of such means, would be used to cause the alleged victim to engage in a commercial sex act" in order to convict Mr. Combs of sex trafficking. Tr.8022. In defining these terms, the Court instructed that coercion includes threats of serious harm, including "both physical and nonphysical types of harm," such as "psychological, financial, or reputational harm." Tr.8024. It also instructed that such threats must be "sufficient in kind or

3

degree to overcome the will of an ordinary person having the same general station in life as that of the alleged victim, causing a reasonable belief that there was no reasonable choice except to engage in a commercial sex act as directed by the defendant." Tr.8024-25.  Coercion could also be proved, the Court instructed, "if the defendant engaged in a scheme, plan, or pattern intended to cause the alleged victim to believe that if he or she did not engage in a commercial sex act, he or she would suffer serious harm." Tr.8025.

The government repeatedly told the jury the evidence showed just that.  To take just a few examples:

- "The sex trafficking charges in this case are based on the defendant's illegal actions over the course of his relationships with Cassie and Jane: *Threats, drugs, lies, manipulation, and violence, the illegal actions that caused* Cassie and Jane to have sex with paid escorts in front of the defendant, the illegal actions that made Cassie and Jane believe that *they had no choice* but to do the freak-offs and the hotel nights even when they didn't want to." Tr.7609-10.

- "These charges are not about adults freely engaging in a sexual preference of their choice. It's not about free choices at all. As you heard both Cassie and Jane testify, at many points throughout the relationship with the defendant, Cassie and Jane did not want to have sex with escorts." Tr.7610.

- "[H]e spent the entire flight [from Cannes] holding Cassie captive and making her watch videos that he had recorded of freak-offs and *threatening* to release them. … It's no surprise that when the plane landed in New York, the defendant demanded a freak-off. Cassie complied. *She didn't believe that she had a choice*." Tr.7684-85.

- "Together with the *control* the defendant exercised over so many aspects of Cassie's life: Her livelihood, her appearance, her home, the defendant's coercive schemes ran through every part of Cassie's life. *It made it so that Cassie believed that she would suffer serious harm if she didn't do what the defendant wanted her to*." Tr.7689.

- "And look, in the first year or two, that might not have always been because of coercion or fraud. Sometimes it was, but not always. But by the time he's paying [Jane's] rent in 2023, she is doing it out of obligation. *Fear she'll lose her home if she doesn't.* You saw the texts. She said it herself way back then; *she felt she had no choice …. That's coercion*." Tr.7937.

- "He trained her not to fight back. *No was never an option for Cassie*. No could mean losing her career, her livelihood, her home, her physical safety. Those *fears* are not the kind of thing that just slip someone's mind." Tr.7938.

- "This was not about their pleasure. It was about pleasing the defendant. *He gave them drugs to keep them awake, compliant, and euphoric*. He taught them to what to do in those rooms, trained them with himself first, and then with escorts. *And by the end, they knew if they didn't perform the way he wanted, there would be consequences*." Tr.7942.

- "Sex trafficking does not require overcoming a no. *It is about getting someone to say yes through illegal means*. So when Jane said yes because she believed the defendant's lies, that was trafficking. When Jane said yes because she was *afraid* that she would lose her home if she didn't, that was trafficking. And when Jane performed oral sex on Antoine because the defendant had beaten her that same night,… that was trafficking." Tr.7944-45.

- "That text message is crucial context to the defendant's mindset when he gets [Jane] on that plane with his lies. It's just going to be us, baby. We'll go shopping. We'll go to dinner, just us. And when he's doing that, he's texting Paul Arthur and Bridget from Cowboys. *He's lying to Jane to get another hotel night*. And when he pulls the rug out from under her when she's midair, that is a completed act of sex trafficking." Tr.7949.

- "The only question that matters here is whether there was one. That is the only number you need to care about. One freak-off where the defendant knew that *force, fraud or coercion*, or any combination thereof was used to get Cassie and Jane to a yes. Of course there was one. You know you have many, many more than that, but that's all you need." Tr.7945.

The jury necessarily rejected these arguments when it acquitted Mr. Combs on the sex trafficking counts. Yet in its sentencing submission, the government now makes the same exact arguments to the Court. Again, these are just a few examples:

- "The defendant's use of *force, fraud, and coercion* was part and parcel of these encounters." Dkt.516 at 62.

- "[T]he evidence at trial showed that on a flight back from Cannes, France to New York, following the defendant's violent assault of Ventura during the 2012 Cannes Film Festival, the defendant *threatened* Ventura with Freak Off videos she thought she had deleted and demanded that Ventura engage in a Freak Off with male escorts upon landing," and calling it an "instance of *coercion*." Dkt.516 at 63.

- "He ran a scheme for approximately fifteen years that involved transporting Ventura, Jane, and escorts across the country on dozens of occasions for his

5

own sexual pleasure and gratification, and *at times involved coercion and even violence ... toward the victims*." Dkt.516 at 77.

- "The evidence at trial showed that this *coercion* took a variety of forms, including *force or threats of physical force, threats* to publicize Freak Off videos, and *control* over Ventura's career and livelihood." Dkt.516 at 78.

- "It was not until Jane was mid-air that the defendant texted Jane about entertainment for a Hotel Night—despite his earlier promises. After Jane landed in New York City, the defendant and Jane had a Hotel Night that included Kabrale Williams, an escort who traveled from Atlanta to New York, instead of the alone time that the defendant had promised Jane. This instance of travel similarly demonstrates (1) the defendant's *defrauding* of Jane in order to get her to travel to New York for a Hotel Night." Dkt.516 at 83-84.

- "The defendant knew about these vulnerabilities of Ventura and Jane before he introduced them to these nights, and then *used fraud and coercion to get them to continue to participate in them*." Dkt.516 at 96.

- "[T]he defendant exerted *control* over Ventura and Jane and exploited their vulnerabilities through years-long abusive tactics, *leaving both feeling as if* participating in the defendant's multi-day sexual fantasies *was their only option*." Dkt.516 at 126.

- "Ventura and Jane *feared* the potential consequences to not participating—the defendant taking away their homes and belongings, the defendant becoming physically violent, or the defendant making good on his *threats* to release blackmail material." Dkt.516 at 126.

- "The defendant returns yet again to the history of the Mann Act, arguing that the Government's sole focus should be prosecutions of 'commercial purveyors of prostitution . . . and others who coerce women into sex.' (Def. Mem. 139). These principles are, and remain, the Government's lodestar. And this case has always fit squarely into that rubric—the offense here involved the defendant's *use of force and coercion* of Ventura and Jane." Dkt.516 at 139.

## B. The Government Misinterprets The Acquitted Conduct Amendment And Disregards The Constitutional Law On Acquitted Conduct

1. The Sentencing Commission adopted the amendment concerning acquitted conduct in response to decades of criticism from scores of federal jurists—including Supreme Court Justices from across the ideological spectrum. The government is tone-deaf to all of that, and wants the Court to ignore the acquittals and reduce the new guideline to a nullity. Its meritless arguments

6

make a mockery of the new guideline and the constitutional and fairness principles that led to its promulgation.

The guidelines now provide that "[r]elevant conduct does not include conduct for which the defendant was *criminally charged and acquitted* in federal court." USSG §1B1.3(c) (emphasis added). In other words, acquitted conduct is conduct that is used to prove or—as applicable commentary explains—"underlies . . . an acquitted charge." *Id.* App. Note 10. No other interpretation of the amendment makes any sense, and the government offers none that does. And the record makes clear that here the acquitted conduct encompasses most of the trial evidence. *E.g.*, Dkt.510 at 68-70.

There is a narrow exception for conduct that "establishes, in whole or in part, the instant offense of conviction," but it doesn't apply here. The Mann Act counts only required proof that Mr. Combs (1) knowingly transported an individual in interstate commerce (2) with the intent that the individual engage in prostitution. Tr.8028 (jury charge). Accordingly, any evidence that does not prove either of these two narrow elements is acquitted conduct, not relevant conduct, which the Court cannot consider when determining Mr. Combs's guidelines range.

2. The government has no response to this simple and straightforward interpretation of the acquitted conduct amendment and the trial evidence. Instead, it strains to gut the amendment by interpreting the exception so broadly that it swallows the rule. According to the prosecution, nothing is acquitted conduct unless either (1) the jury found in the defendant's favor on particular factual or mixed questions using a special verdict form or (2) the factual and legal elements of an acquitted count are identical to a particular guidelines enhancement that might otherwise apply. *See, e.g.*, Dkt.516 at 42-45, 48-49. The government says none of the evidence that failed to prove the acquitted sex trafficking and RICO charges falls into either category, and

therefore all of it is fair game and can be used to more than double the offense level and increase the guidelines range ten-fold. This atextual, incoherent interpretation would read the acquitted conduct amendment out of the guidelines. It defies the amendment's drafting history and the constitutional and fairness concerns that led to its promulgation, not to mention common sense and justice.

The government's primary contention is that the various guidelines enhancements it proposes are "distinct from any question that was submitted to the jury." *Id.* at 42. It advances various supposed technical distinctions between the enhancements at issue and the elements of the acquitted counts, but these arguments reduce to nothing more than hair-splitting. At the end of the day, all these enhancements cannot be imposed without crediting the same evidence offered to prove the sex-trafficking and RICO conspiracy counts that the jury rejected. *See infra* at 18-37.

Thus, contrary to the government's argument (at 43-44, 44 n.6), this case is exactly like *McClinton v. United States* and other cases where a judge dramatically increased a defendant's guidelines range (and ultimate sentence) based on acquitted conduct. The issue is not whether the acquitted charge and the guideline enhancement are identical. The Justices in *McClinton* and numerous other judges are concerned, more fundamentally, with whether the basic conduct underlying an acquitted charge is thereafter used to enhance the defendant's sentence.

In *McClinton*, for example, the defendant was acquitted of using a firearm during and in relation to a crime of violence causing death in violation of 18 U.S.C. §924(j)(1). At sentencing, however, the government asked the court to apply a murder cross reference pursuant to USSG §§2B3.1(c) and 2A1.1. The language of this cross reference and the elements of the §924(j) charge of which the defendant was acquitted were not identical, and there was no special verdict

to determine which elements the jury may have found proven or not.  As the sentencing judge explained, "the jury acquitted Mr. McClinton of . . . causing [the victim's] death" in relation to the robbery of the victim, period, but "did not consider a charge of murder."  The judge applied the cross reference, which resulted in a drastic increase to McClinton's offense level and sentencing range.  *See* Appendix D, E for Petition for Certiorari at 28a-44a (21-1557).

When McClinton's case reached the Supreme Court, however, four Justices—Justice Sotomayor in one statement, and Justices Kavanaugh, Gorsuch, and Barrett in a separate statement—all agreed that the constitutional and fairness issues raised by McClinton's petition were troubling, and strongly suggested they would have been worth taking up for review had the Sentencing Commission not announced it would be addressing these issues.  143 S. Ct. 2400, 2400-03 (2023).  And they did so in a case that very clearly did not satisfy the government's contrived statutory-elements-guidelines-definition match test.  Moreover, it was the concerns raised by these four Justices—primarily Justice Sotomayor—that led the Commission to amend the guidelines to exclude acquitted conduct the following year.  *See* App. C Supp., amend. 826 (repeatedly citing *McClinton* in its Reason for Amendment).

Unsurprisingly, the amendment itself nowhere suggests there is any kind of exact match requirement between the acquitted charge and guideline provisions.  The Commission broadly excluded any "conduct for which the defendant was criminally charged and acquitted in federal court" from the definition of relevant conduct.  §1B1.3(c).  Nothing about this language remotely suggests the amendment is limited only to issues specifically put before the jury on a special verdict form, or that are otherwise on all fours with the pertinent guideline enhancement.  The government invented this limitation "without any guide in the text" of the amendment, *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 254 (2024), and in defiance of "the

9

basic and unexceptional rule that courts must give effect to the clear meaning of [text] as written," *Star Athletica, LLC v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017).

The clearest example of why the government's analysis is incorrect may be its comparison between the elements of the sex trafficking statute and the guideline definition for the fraud/coercion enhancement. The government claims the acquittals on the sex-trafficking counts don't matter because the statute requires threats, force, fraud, or coercion to be "used to cause the person to engage in a commercial sex act," 18 U.S.C. §1591(a), whereas the enhancement only requires that the "offense *involve[]* fraud or coercion"; because the statute has a mens rea requirement whereas the enhancement does not; and because coercion, threats, or force may be defined slightly differently in different contexts for the statute and enhancement. Dkt.516 at 80-82; *see also id.* at 91 (discussing distinctions between leadership enhancement and RICO statute). But none of these distinctions make any practical difference, and the government doesn't even try to explain why they would.

The government's stingy interpretation of the acquitted conduct amendment also conflicts with the amendment's drafting history. As the Commission explained when it promulgated the amendment, it was responding to a "persistent concern for many within the criminal justice system and . . . robust debate over the past several years," including from "[a] number of jurists" such as "current and past Supreme Court Justices" who "have urged reconsideration of acquitted-conduct sentencing" because of various constitutional and fairness issues. App. C Supp., amend. 826 (Reason for Amendment). These issues do not turn on hyper-technical questions about whether or not elements of the acquitted charge do or don't map on precisely to the definition of a guideline provision. Rather, they are broader concerns about fundamental principles like "the perceived fairness of the criminal justice system," the "historical role of the jury," "the erosion of

the jury-trial right," "the public's perception that justice is being done," and the "special weight" and "inviolate" status long accorded to acquittals. *Id.*

Indeed, as explained in Mr. Combs's sentencing memorandum (at 66), the Commission rejected the government's proposal to narrow the acquitted conduct amendment in a similar manner by excluding any conduct that "relates . . . to" the offense of conviction, and instead limited the exception to conduct that "establishes" the offense of conviction. The government completely ignores the Commission's choice to craft a very narrow carveout from acquitted conduct, while proclaiming that the exception includes any conduct "relevan[t]" to the convicted count. Dkt.516 at 45-47. The government offers no authority for this argument—it simply repeats again and again that the exception includes conduct that "establishes, *in whole or in part*" a convicted charge, as if the "in part" language dramatically expands the scope of the exception. §1B1.3(c) (emphasis added).

The "in part" language can't possibly do the work the government wants it to. That language simply demonstrates that where conduct establishes or helps to establish one or more elements of the convicted count—even if it is not by itself sufficient to establish any single element or all the elements—it can be considered relevant conduct even if it also established or help establish elements of a count of which the defendant was acquitted. Either way, to fit within the exception, the acquitted conduct must still prove or help prove the elements of the convicted count.[2]

---

[2] The government points out that the Commission had previously proposed a different definition of acquitted conduct: conduct "constituting an element of" an acquitted charge. Dkt.516 at 47 (citing United States Sentencing Commission, Federal Register Notice of Proposed 2023-2024 Amendments at 51, https://www.ussc.gov/sites/default/files/pdf/amendment-process/federal-register-notices/20231222_fr-proposed-amdts.pdf). But this history supports Mr. Combs's arguments—it shows the Commission ultimately adopted a *broader* definition of *acquitted* conduct than it had previously proposed, contrary to the government's claim that the acquitted conduct amendment has a "limited scope." Dkt.516 at 46.

Regardless, most of the evidence the government relies on would not satisfy its own overbroad interpretation of the exception—its "relevance" test.  Had the Mann Act counts ever been charged on their own, the vast majority of the government's evidence would have been excluded under Rule of Evidence 401—and certainly Rule 403.  This includes, for example, the evidence of violence against Ms. Ventura in the Intercontinental Hotel video, or Jane's testimony about the alleged violence towards her in June 2024—two incidents in which there was no interstate travel—and all the other testimony about alleged violence from several other witnesses.  *See generally* Dkt.486 at 45-50; Dkt.499 at 20-22.  None of this evidence would have come in during a standalone Mann Act trial.

As the relevant conduct guideline commentary now explains, "[t]here may be cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction," and in such cases "the court is in the best position to determine whether such overlapping conduct establishes" the offense of conviction.  §1B1.3 App. Note 10.  Probation appears to have concluded that this was such a case and relied on this commentary when it determined that much of the evidence in this case was relevant—rather than acquitted—conduct.  *See* PSR ¶70, pp.60-61.  But as the Court knows from sitting through the trial, there is very little conduct that directly overlaps with the narrow Mann Act counts, *see* Tr.8028 (Mann Act charge)—and a smaller amount still that actually "establishes" those counts.

Mr. Combs's interpretation of the acquitted conduct amendment is the only one that comports with the amendment's text and its drafting history.  Moreover, to the extent there is any doubt, it would need to be resolved in favor of Mr. Combs—not the government.  *See*, *e.g.*,

*Snyder v. United States*, 603 U.S. 1, 20-21 (2024) (Gorsuch, J., concurring) (collecting cases standing for the "ancient rule of lenity").[3]

3.   The government repeatedly argues that the Court cannot make factual inferences about what the jury did or did not find with its verdict. *E.g.*, Dkt.516 at 49-50, 70, 79-80.  The government is dead wrong.  As Justice Sotomayor explained in *McClinton*:

> The fact is that even though a jury's specific reasons for an acquittal will typically be unknown, the jury has formally and finally determined that the defendant will not be held criminally culpable for the conduct at issue. So far as the criminal justice system is concerned, the defendant has been set free or judicially discharged from an accusation; released from a charge or *suspicion* of guilt.

143 S. Ct. at 2402.  Indeed, the Supreme Court has repeatedly held that courts not only can but *must* draw precisely these types of factual conclusions based on general jury verdicts.  That is how, for example, double jeopardy collateral estoppel analysis works—the court must look to the entire record, including the pleadings, the jury charge, and the evidence and decide what the jury "necessarily decided."  *See, e.g.*, *Bravo-Fernandez v. United States*, 580 U.S. 5, 11-14 (2016); *Ashe v. Swenson*, 397 U.S. 436, 443-45 (1970); *Yeager v. United States*, 557 U.S. 110, 119-23 (2009).  Moreover, the jury's verdict was completely rational—the verdicts were not at all inconsistent.  *See* Dkt.510 at 85.

The government offers no response to this caselaw or analysis of the logic of the verdict. Instead, it instead repeatedly falls back on two cases: *United States v. Watts*, 519 U.S. 148

---

[3] The government correctly points out that "few courts" (Dkt.516 at 45 n.7) have interpreted the acquitted conduct amendment because it only became effective in November 2024.  But the few decisions it cherry picks bear no relation to this case and are irrelevant.  *See United States v. Lin*, 2025 WL 401105, at *2 (S.D.N.Y. Feb. 5, 2025) ("the offense contained in [the vacated] Count . . . was also charged in" a different count on which the defendant was convicted, so the conduct underlying the "acquitted" conduct helped "establish" the convicted count); *United States v. Scott*, 779 F. Supp. 3d 937, 942 (N.D. Ohio 2025) ("the jury's verdict of guilty on the conspiracy st[ood] in some tension with acquittal on underlying substantive offenses," and the only issue before the court was "determining the loss amount"); Sentencing Transcript for *United States. v. Shafa*, No. 20 Cr. 40021 (D. Mass), Dkt.267 at Tr.34-37 (court decided to impose fraud cross reference when it "c[ouldn't] ignore what the jury did find had been proved, which was deceit and theft"), Dkt.269 (explaining decision).

(1997), which the government cites twenty times; and *United States v. Martinez*, 110 F.4th 160 (2d Cir. 2024).

*Watts*—and the cases relying on it—are not dispositive for the numerous reasons explained in Mr. Combs's opening brief (at 74-75, 86-88), none of which the government has any response to.[4]  In *Martinez*, meanwhile, the district judge made factual inferences directly at odds with the jury's *guilty* verdicts on a series of rapes—by expressly disagreeing with those verdicts and underlying testimony establishing that these sexual encounters were *not* consensual. The Second Circuit thus ruled that the sentencing judge had made "independent factual conclusion[s] . . . *contrary* to the guilty verdicts."  110 F.4th at 174-75 (emphasis added).  By contrast, here Mr. Combs is asking the Court to do precisely the opposite: make findings entirely consistent with and necessarily implicit in the jury's verdicts.

As *Martinez* itself reiterated, the jury's verdict is entitled to "strong deference in our criminal justice system," and courts cannot "pick and choose which [verdicts] it agrees with" and "must accept all of the jury's . . . verdicts," because "[d]oing otherwise fails to accord due respect to the jury's constitutionally established role."  110 F.4th at 171, 177.  Indeed, "a jury speaks only through its verdict," *Yeager*, 557 U.S. at 121, and this jury's verdict spoke loud and clear when it acquitted Combs of everything but the extremely specific behavior establishing the government's two fallback transportation counts.  All of this is acquitted conduct, and none of it is relevant conduct for guidelines purposes.

---

[4] The lone exception is the government's argument that Mr. Combs's interpretation of *Watts* as a decision about the interplay between the guidelines and the Double Jeopardy clause "misses the clear import of *Watts*'s holding." Dkt.516 at 51.  The government is wrong because the Supreme Court said so in a landmark precedential opinion. *See United States v. Booker*, 543 U.S. 220, 240 (2005) (merits opinion) (in *Watts*, there was no "contention that the sentencing enhancement had exceeded the sentence authorized by the jury verdict in violation of the Sixth Amendment"); *id.* at 240 n.4 ("*Watts* . . . presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause, and did not even have the benefit of full briefing or oral argument.").

4. At one point, the government suggests that the jury's acquittals on the sex trafficking counts "could have been for many reasons other than a rejection of the defendant's force, fraud, or coercion, including, for example, a failure to prove that the defendant intended for his force, fraud, or coercion to cause the victim to engage in the commercial sex act." Dkt.516 at 44-45; *see also id.* at 81-82. That makes no sense because the existence of fraud or coercion was bound up with Mr. Combs's mental state.

The jury was instructed that threats, fraud and coercion were objective determinations as to whether Mr. Combs had acted knowingly or recklessly to cause Ms. Ventura or Jane to engage in sex acts against their will. *See* Tr.8023-25. The government's theory of the case was that he had, and it argued as much to the jury. *See, e.g.*, Tr.7609-11. In this context, there was no scenario in which the jury could have found that Mr. Combs engaged in fraud or coercion without also having the requisite mental state. This was not a case, for example, where the evidence showed or the government argued that the defendant didn't know fraud or coercion was being used to cause the alleged victims to engage in unwanted sex. And if that is the kind of case the government thinks this is, it should not be asking for such a draconian sentence. Obviously, if fraud or coercion was deployed but the defendant was unaware of that, he would not be culpable for that behavior.

In any event, the government misstates the mens rea standard for the sex-trafficking counts. The jury was charged on two mental states for sex-trafficking: knowledge (i.e., purpose and intent) and reckless disregard. Tr.8022-23, 8025-26. The government accordingly relied on the second, broader mental state, arguing in closing that Mr. Combs was deliberately indifferent "to facts that if considered in a reasonable manner would indicate the highest probability that force, threats of force, fraud or coercion or any combination of those things would be used to

cause the victim to engage in a commercial sex act." Tr.7608-09. By its verdict, however, the jury necessarily rejected both that broader theory and the narrower intent theory.

5. The government ignores all the fairness concerns. It does not even try to explain how sentencing Mr. Combs "in essence as if he had been convicted" of charges on which the jury found him not guilty would be the least bit fair. *United States v. Brown*, 892 F.3d 385, 415 (D.C. Cir. 2018) (Kavanaugh, J., dissenting in part). The government also ignores the chorus of federal and state jurists who have raised Fifth and Sixth Amendment concerns about acquitted conduct sentencing. *See* Dkt.510 at 71 n.17, n.18. To the extent the government addresses Mr. Combs's arguments under these constitutional provisions, it does so only in a conclusory and nonresponsive fashion.

For example, the government points to the lower burden of proof when responding to the issue-preclusion component of the Double Jeopardy Clause. Dkt.516 at 51-52. But the point was that the Double Jeopardy cases establish, as noted above, that courts can (and indeed must) make factual inferences about particular issues submitted to the jury—even when "a previous judgment of acquittal was based upon a general verdict, as is usually the case." *Ashe*, 397 U.S. at 444. As Justice Ginsburg explained in *Bravo-Fernandez*, courts can "identify what a jury in a previous trial necessarily decided" by examining the trial record, including the "evidence, charge, and other relevant matter." 580 U.S. at 359; *accord Yeager*, 557 U.S. at 119-20.

In *Ashe*, for example, the defendant was acquitted of robbing one of six poker players. The Court held that the defendant's subsequent prosecution and conviction for robbing another one of the players violated the Double Jeopardy Clause because the "single rationally conceivable issue in dispute before the jury [at the first trial] was whether the [defendant] had been one of the robbers. And the jury by its verdict found that he had not." 397 U.S. at 445.

*Ashe* rested its holding on the "extremely important principle in our adversary system of justice" prohibiting relitigation of factual issues necessarily determined by the jury and explained that this principle "is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *Id.* at 443-44.

In its subsequent *Yeager* decision involving consecutive insider trading prosecutions, the Court similarly reasoned that "if the possession of insider information was a critical issue of ultimate fact in all of the charges against petitioner, a jury verdict that necessarily decided that issue in his favor protects him from prosecution for any charge for which that is an essential element." 557 U.S. at 123. That was because "[a] jury's verdict of acquittal represents the community's collective judgment regarding *all the evidence and arguments* presented to it." *Id.* at 122 (emphasis added).

These decisions make clear that courts can (and are required to) review the trial record to determine what the jury necessarily found when it acquitted the defendant. Doing so is not speculative or inconsistent with the jury's verdict in any way. Rather, it is the only way to decide what the jury found and did not find when, as here, there was no special verdict. In other words, there is no other way for the Court to determine what constitutes acquitted conduct in this case. And contrary to the government's repeated, rote citations to *Watts*, any differential in the burden of proof between trial and sentencing is irrelevant to this kind of inquiry.

The government's response to Mr. Combs's Sixth Amendment arguments are similarly unavailing. The government tries to distinguish between "facts that increase either the statutory maximum or minimum" and facts "used to guide judicial discretion in selecting a punishment within limits fixed by law." Dkt.516 at 52-53 (quoting *Alleyne v. United States*, 570 U.S. 99, 113 n.2 (2013)). But it has no explanation for the Court's prior holding in *Blakely v. Washington*

17

that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*," 542 U.S. 296, 303 (2004), or its later teaching in *Booker* that the underlying Sixth Amendment "principles [the Court] sought to vindicate" in *Apprendi* were "[m]ore important than the language used in our holding" about statutory maxima, 543 U.S. at 238 (merits opinion).[5]

## C. There Is No Basis For Applying The §2A3.1 Rape Cross Reference

Immediately after the jury returned its verdict, the government said Mr. Combs should be sentenced pursuant to §2G1.1—the Mann Act guideline—and a base offense level of 14. Dkt.433 at 2-3. It does not appear from the draft PSR that the government initially took a different position with Probation. After Probation released the initial PSR, however, the government apparently decided §2G1.1 would not enable it to advocate a draconian enough sentence, so it switched courses and floated a totally different guideline, as if he had been convicted of a far more serious offense: the cross reference in §2G1.1(c)(1), which provides that the defendant should be sentenced pursuant to a different guideline, §2A3.1, "[i]f the offense involved conduct described in 18 U.S.C. §§2241(a) or (b) or 18 U.S.C. §2242." Application of this provision would more than double the base offense level to 30.

The cross-referenced offenses are two rape statutes enacted as part of the Sexual Abuse Act of 1986 to update and modernize the federal rape laws. *See* Pub. L. 99-654, §2, Nov. 14, 1986, 100 Stat. 3660, 3660-61; H. Rep. No. 99-594 at 6, 99th Cong., 2d Sess. (May 9, 1986).

---

[5] The government argues that, irrespective of the guidelines, acquitted conduct can be considered for purposes of the §3553(a) factors, as well as the determination of a sentence within a guidelines range under §3661 and §1B1.4. Dkt.516 at 53-54. But if, for example, the Court were to vary upward significantly based on acquitted conduct, that would implicate all the constitutional and fairness concerns raised by numerous jurists—the same concerns that led to the passage of the acquitted conduct amendment. And Guideline 1B1.4 is clear that the court cannot consider information that is "prohibited by law," obviously including constitutional law. These constitutional and fairness concerns thus prohibit consideration of acquitted conduct under these statutes just as much as they prohibit its consideration for guidelines purposes.

There is no basis for applying the Rape Cross Reference in this case, which is why Probation refused to do so and dubbed the government's argument a "stretch." PSR at 59 (discussing ¶86).

That is an understatement. The Rape Cross Reference cannot apply to this case, which involves a "john" and grown adults having fully consensual sex.

1.   The government contends Mr. Combs engaged in "conduct described in . . . 18 U.S.C. § 2242." §2G1.1(c)(1). Such conduct is defined as "engaging in, or causing another person to engage in, a sexual act with another person by *threatening or placing the victim in fear* (other than by threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping)." §2A3.1 App. Note 4(B) (emphasis added). The application note tracks the language of the statute. *See* §2242(a).

It could not be more obvious that, with its acquittals on Counts 2 and 4, the jury rejected any notion that Mr. Combs engaged in precisely this type of conduct. The government argued to the jury again and again that Mr. Combs used threats and fear to force Ms. Ventura and Jane to engage in sexual conduct against their will. *See, e.g.*, Tr.7563 ("You heard all about how the defendant again and again . . . threatened . . . [Ms. Ventura] and Jane into having sex with escorts for his own entertainment."); *id.* ("The defendant used . . . fear to get what he wanted."); Tr.7607 ("sex trafficking" "relates to the freak-offs . . . and the hotel nights . . . where the defendant used . . . threats of force . . . to cause both [Ms. Ventura] and Jane to participate in those nights"); Tr.7611 ("The sex trafficking charge is about the multiple occasions when the defendant made [Ms. Ventura] and Jane have sex when they didn't want to by threatening them . . . ."); Tr.7647 ("Jane's fear of further violence is the reason that Jane had sex with the escort that night."). The jury rejected these arguments.

Because the jury rejected this evidence and argument when it acquitted Mr. Combs on Counts 2 and 4, it is acquitted conduct, not relevant conduct, and cannot be considered for purposes of sentencing. On this basis alone, the Court should reject the government's request to more than double Mr. Combs's base offense level under §§2G1.1(c)(1) and 2A3.1.

But even if the Court could consider acquitted conduct for many of the same reasons Mr. Combs argued in his opening brief that the record does not support application of the fraud/coercion enhancement in §2G1.1—which, like the Rape Cross Reference, requires a showing of "threats." *See generally* Dkt.510 at 90-100. Moreover, to the extent that evidence of nonconsensual sexual conduct might support application of the fraud/coercion enhancement in cases unlike this one, that is not sufficient to justify applying the Rape Cross Reference. As several courts have held, §2242 "require[s] more than merely a lack of consent"—i.e., "threats or fear." *United States v. Montgomery*, 966 F.3d 335, 339 (5th Cir. 2020); *accord United States v. Cabrera-Gutierrez*, 756 F.3d 1125, 1133-34 (9th Cir. 2014). The trial evidence showed that Ms. Ventura and Jane participated in freak-offs willingly and often enthusiastically. Yet even if that weren't true, that alone would not warrant applying the Rape Cross Reference.

2.    The government focuses on the term "fear" in 18 U.S.C. §2242 and cites out-of-circuit authority to suggest this term is defined "broadly." Dkt.516 at 55-56.

Yet as even the government's own cases acknowledge, section 2242 ordinarily requires the government to prove that in connection with the offense "the defendant . . . placed [the victim] in fear of *some bodily harm* to herself (or himself) or another"—not fear of anything whatsoever. 3 Leonard B. Sand et al., Modern Federal Jury Instructions-Criminal ¶61.03 (61-18) (citing *United States v. Castillo*, 140 F.3d 874, 885-86 (10th Cir. 1998) (cited by the government at 55-56, 59, 61)); *see also United States v. Flaming*, 133 F.4th 1011, 1024 (10th Cir. 2025) (at

20

57, 61).  But here, the record is devoid of evidence of threats of bodily harm that caused anyone to participate in a freak-off or hotel night involving interstate transportation.

Again citing only out-of-circuit authority, the government argues that there is no need to show that the defendant *intended* to place the victim in fear.  Dkt.516 at 57, 61.  That is incorrect.  Section 2242 requires defendants to "*knowingly* . . . [1] cause[] another person to engage in a sexual act by [2] threatening or placing that other person in fear."  Applying the "presumption in favor of scienter," Section 2242's knowledge element applies to both causing the sexual act and placing the person in fear.  *See Rehaif v. United States*, 588 U.S. 225, 228-30 (2019); *Flores-Figueroa v. United States*, 556 U.S. 646, 650, 652 (2009) (citing *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 79 (1994) (Stevens, J., concurring) and *Liparota v. United States*, 471 U.S. 419, 433 (1985)).

The government must prove, therefore, that Combs knowingly placed Ms. Ventura or Jane in fear—with "knowingly" defined in this context as "intentionally and voluntarily."  3 Modern Federal Jury Instructions-Criminal ¶61.03 (61-17).  Thus, the government is wrong when it claims the purported victims' subjective fears are the "cornerstone" of §2242 and suggests the defendant's intent doesn't matter.  Dkt.516 at 61-62.  And even if victims' fears were relevant at all, the jury rejected the government's arguments that Ms. Ventura or Jane engaged in the sexual activity because they feared Mr. Combs when it acquitted him on the sex trafficking counts.  After all, the Court instructed the jury that, when determining whether Mr. Combs coerced Ms. Ventura or Jane through threats, it should consider whether his alleged conduct could have objectively given rise to a "reasonable belief that there was no reasonable choice except to engage in a commercial sex act."  Tr.8024-25.  Thus, by its verdict, the jury

found that neither Ms. Ventura nor Jane had any reasonable belief that they were being coerced—whether through threats or other means.

Moreover, the government's many cases only illustrate the impropriety of applying the Rape Cross Reference in the first place. In *United States v. Fish*, for example, the defendant was a commercial truck driver who threatened to leave his 13-year-old nephew on the side of the road if he did not perform sexual acts on the defendant and threatened to kill the boy's family if he told anyone about the abuse that occurred on the trip. The court explicitly recognized that other "types of threatened harm may be too trivial to satisfy §2242(1) (and hence too trivial to invoke the cross-reference in [§2G1.1])". 295 F. App'x 302, 303, 306 (2008). Similarly, in *Flaming*, the defendant threatened to kick his minor stepdaughter out of the house if she did not give him a blowjob, and had previously abused her on several occasions, including through force. The court accordingly relied on the principle that "when an older person attempts to molest a child, there is *always* a substantial risk that physical force will be used to ensure the child's compliance." 133 F.4th at 1015-16, 1024.

Rather than rely on these and other inapposite cases, the Court should look to the absence of any "Second Circuit case supporting the use of the cross-reference . . . where the defendant did not personally engage in the sexual acts." PSR at 59 (discussing ¶86). For example, and as Probation noted, the cross reference was not applied—in fact, the government did not even seek it—in a Mann Act case where the defendant ran an international prostitution ring, physically and emotionally abused his young, vulnerable prostitutes, and had "sexual interactions with the[se] victims"—including a rape during an orgy "in which the defendant participated directly," and when he would tell one victim to "just fake it" when she said she didn't want to have sex. *Id.*; *see United States v. Jordan*, 21-cr-423 (S.D.N.Y.), Dkt.47 at 1-2, 13-14 (gov't sentencing

memo).  Rather, the court applied §2G1.1(a)(2), and the defendant's base offense level was 14 as

a result.  21-cr-423, Dkt.50 at 12 (sentencing transcript).  The Court should do the same here.

Even in other Circuits, the cross reference is not applicable even if the victim "did

express fear of [the defendant] at times" but there was insufficient evidence of fear "to have

induced her to engage in" sexual conduct, *United States v. Zitlalpopoca-Hernandez*, 632 F.

App'x 335, 337 (9th Cir. Dec. 28, 2015), or when the testimony purportedly evidencing criminal

sexual abuse is "too ambiguous" or otherwise unreliable, *United States v. Sandoval*, 506 F. Supp.

2d 582, 596 (D.N.M. 2007) (applying analogous cross reference in §2A3.4(c)(1)).  This authority

also militates strongly against applying the cross reference, given the jury's clear finding that

Ms. Ventura and Jane did not participate in the sex because of fear.

3.  There is another, independent reason why the Court cannot apply the Rape Cross

Reference: the government lacked jurisdiction to charge Mr. Combs with that offense altogether,

let alone sentence him as if he had been convicted of it.

Section 2242 criminalizes conduct only "in the special maritime and territorial

jurisdiction of the United States," or in a federal prison or similar institution.  In turn, "special

maritime and territorial jurisdiction of the United States" is a highly circumscribed jurisdictional

grant that includes, among other things, "the high seas," specified vessels and aircraft, and

certain types of federal land or facilities.  §7.  Because none of the offense conduct is alleged to

have occurred in any of these locations, Mr. Combs could not have engaged in "conduct

described in . . . 18 U.S.C. §2422," as required to trigger the cross reference.  §2G1.1(c)(1).

The guideline commentary now defines "conduct described in" §2422 by reference only

to §2422's conduct elements, without any reference to the statute's jurisdictional element.

§2G1.1 App. Note 4(B). But it is clear from the guideline's history that satisfying the jurisdictional element is a prerequisite to applying the cross reference.

The prior version of the cross reference applied "[i]f the offense *involved* criminal sexual abuse," which commentary defined as "criminal sexual abuse . . . *as defined in* . . . § 2242"—i.e., including §2242's jurisdictional element. §2G1.1 (c)(2), App. Note 10 (2003 Manual) (emphasis added). When the guideline was amended to include current Application Note 4(B), the Commission did not explain the change, much less suggest it was excluding §2242's jurisdictional element from the cross reference's scope. *See* App. C, amend. 664. Rather, the Commission described its revisions to §2G1.1 as "conforming changes" in view of the promulgation of a new guideline for promoting commercial sex acts with minors. *Id.* Reason for Amendment (describing §§2G1.1 in connection with new 2G1.3).

Other guidelines with similar cross references confirm that §2G1.1(c)(1) applies only if the offense conduct occurred within §2422's restricted jurisdiction.

Several guidelines contain a cross reference to the guideline for 18 U.S.C. §1111 (USSG §2A1.1), which—similar to §2242—criminalizes murder only "[w]ithin the special maritime and territorial jurisdiction of the United States." Unlike §2G1.1(c)(1), however, these cross references direct the application of the other guideline only if an individual was "killed under circumstances that would constitute murder under 18 U.S.C. §1111 *had such killing taken place within the territorial or maritime jurisdiction of the United States*." §§2A3.1(c)(1); 2A4.1(c)(1); 2B3.1(c)(1); 2B3.2(c)(1); 2D1.1(d)(1); 2E2.1(c)(1); 2G1.3(c)(2); 2G2.1(c)(1). Unlike §2G1.1(c)(1), therefore, these cross references make clear that they apply even if the offense conduct did not occur within §1111's restricted jurisdiction. Guideline §2G1.3 is especially telling in this regard: subprovision (c) contains both the §1111 cross reference with the

24

jurisdictional language quoted above ((c)(2)), and a cross-reference analogous to the §2G1.1(c)(1) without that same jurisdictional language ((c)(3)).

The Sentencing Commission thus carefully distinguished the §2G1.1(c)(1) cross reference, which requires the satisfaction of §2242's jurisdictional element, from other similar cross references to an offense with limited jurisdiction, which do not require satisfying the jurisdictional element.  And, like Congress, when the Commission "includes particular language in one section of [the guidelines] but omits it in []other [guidelines], it is generally presumed that [the Commission] acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also United States v. Fishman*, --- F.4th ---, 2025 WL 2692069, at *5 (2d Cir. Sept. 22, 2025).

The §2G1.1(c)(1) cross reference can thus only apply if the offense conduct occurred within §2242's restricted jurisdiction—which it clearly didn't here.[6]

### D.  The Vulnerable Victim Enhancement Does Not Apply

The Court should follow Probation's recommendation and reject the government's request for a two-level enhancement under USSG §3A1.1(b)(1) on the ground that Ms. Ventura and Jane were "vulnerable victims."  This enhancement applies only if (1) "a victim of the offense was a vulnerable victim" and (2) "the defendant knew or should have known" as much. §3A1.1(b)(1).  Neither element is satisfied here.

1. Starting with the first element, a vulnerable victim is "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3

---

[6] In addition to the Rape Cross Reference, the government seeks an additional, two-point enhancement on the ground that the purported victims, Ms. Ventura and Jane, "sustained serious bodily injury."  §2A3.1(b)(4)(B).  The Court need not reach this issue because the Rape Cross Reference does not apply.  In any event, the injuries allegedly suffered by Ms. Ventura and Jane do not rise to the level contemplated by §1B1.1 App. Note 1(M)— particularly when both acquitted conduct and incidents that didn't involve interstate travel are excluded from the analysis.

(Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." §3A1.1 App. Note 2. Ms. Ventura and Jane were not vulnerable, and any evidence of any supposed vulnerability has nothing to do with the Mann Act counts of conviction and is acquitted conduct. *See* §1B1.3(c). The Court should decline to apply the enhancement on this basis alone.

Even considering the entire trial record, the evidence shows neither Ms. Ventura nor Jane were unusually vulnerable. The government does not (and cannot) contend that either of these two purported victims fall into any of the three categories identified in the guideline—i.e., age or physical or mental condition. §3A1.1 App. Note 2. Nor can it show that either of them were "otherwise particularly susceptible" to the alleged criminal conduct. *Id.* As Mr. Combs explained in his opening brief, Ms. Ventura and Jane were willing, often enthusiastic participants in their sex lives with Mr. Combs, and the trial record belies any notion of unusual vulnerability.

To take one example, Ms. Ventura completely defied whatever purported "power dynamic" (Dkt.516 at 95) existed between her and Mr. Combs by dating Scott Mescudi (among others) and concealing the relationship from Mr. Combs through, among other things, a burner phone. Tr.1037-38. Mescudi even testified that Ms. Ventura "played" him, Tr.2377, just as she had "played" Mr. Combs by dating another musical artist behind his back.

The government argues that Ms. Ventura was 19, "naïve," and "sexually inexperienced" when she met Combs. Dkt.516 at 95. But "inexperience[]" and "naïve[te]" alone do not suffice to trigger the two-level enhancement, *United States v. Paige*, 923 F.2d 112, 113-14 (8th Cir. 1991), nor does mere "gullibility," *United States v. Dupre*, 462 F.3d 131, 145 (2d Cir. 2006). And Ms. Ventura was hardly inexperienced. Her previous boyfriend was a producer 10 years her senior, and she was not "of such youthful age[] as to give rise to any presumption of unusual

vulnerability," nor had any kind of unusual "mental vulnerability."  *Paige*, 923 F.2d at 114. Moreover, Ms. Ventura was a celebrity in her own right and earned hundreds of thousands of dollars a year before even meeting Mr. Combs, and had the support of a loving, upper-middle class family.

And Jane was a mature adult and was living independently and supporting her child— whom she had from a previous relationship with a famous rapper.  She was entrepreneurial and able to make hundreds of thousands of dollars on OnlyFans.  The government claims she was assaulted in a previous relationship, but that does not constitute the type of vulnerability that would give rise to the enhancement.  As Probation explained: "The defendant's awareness of [Jane's] prior relationships and history of abuse does not make Jane a particularly vulnerable victim by definition of the Guideline."  PSR ¶118.

On this record, nothing would permit the Court to make the requisite "individualized findings," *United States v. McCall*, 174 F.3d 47, 50 (2d Cir. 1998), that Ms. Ventura or Jane was in any way "in need of greater societal protection" than other similarly situated individuals, *Dupre*, 462 F.3d at 146, or that they were somehow "less able or likely to protect themselves from criminal conduct," *United States v. Beith*, 407 F.3d 881, 891 (7th Cir. 2005).

Courts have even refused to apply the enhancement when, unlike here, the alleged victims were trafficked or prostituted out to clients.  In *United States v. Sabatino*, for example, the defendants were convicted of violating the Mann Act for running an escort business that employed "single, teenage mothers in need of a job" as prostitutes.  943 F.3d 94, 102 (1st Cir. 1991).  The First Circuit rejected the government's argument that these circumstances, even when "collectively considered," gave rise to any unusual vulnerability, because they were no different from other ordinary Mann Act victims—i.e., young, dependent, "innocent" female

27

prostitutes of the sort that concerned the statute's drafters in the early 20th century.  *Id.* at 102-03.  A judge in the Eastern District of New York reached a similar conclusion and declined to apply the enhancement when the purported victim was not unusually vulnerable "in relation to the larger class of potential victims to which . . . she belongs – here, trafficking victims."  *United States v. Jimenez-Rodriguez*, 2024 WL 1199991, at *5-6 (E.D.N.Y. Mar. 20, 2024) (citing *McCall*, 174 F.3d at 50).  That was true even though she had previously "gr[own] up in poverty and endured dangerous, illegal, and frightening work."  *Id.* at *6 n.8.

The government cannot—and does not—argue that Ms. Ventura or Jane were more vulnerable than other victims of Mann Act offenses or other commercial sex crimes.  And even a cursory review of the cases in Defense Exhibits 68 and 69 reveals that the typical Mann Act victim is far more vulnerable than Ms. Ventura or Jane.

2.  Even assuming Ms. Ventura or Jane could be considered "vulnerable," there is insufficient evidence that Mr. Combs "knew or should have known" as much.  §3A1.1(b)(1).

The government's only evidence of Mr. Combs's knowledge for Ms. Ventura are hearsay statements that Mr. Combs allegedly made roughly twenty years ago.  In particular, it cites testimony from one of Mr. Combs's assistants, David James, about how he overheard Mr. Combs telling a colleague that Ms. Ventura was "young," that he had her "right where [he] want[ed] her," and that she was "very moldable."  Dkt.516 at 95 (citing Tr.1725); *see also* Tr.1855.  This unreliable, secondhand account is ambiguous at best, and the government makes no attempt to explain how whatever Mr. Combs was describing "bear[s] some nexus to the

28

criminal conduct" at issue. *McCall*, 174 F.3d at 50; *accord United States v. Kerley*, 544 F.3d 172, 180 (2d Cir. 2008).[7]

### E.  There Is No Basis For An Obstruction  Enhancement

The government seeks a two-point enhancement for obstruction of justice, which applies only if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."  USSG §3C1.1. The government points to two instances of alleged obstruction: (1) Mr. Combs's calls to Jane after he settled a lawsuit with Ms. Ventura in November of 2023; and (2) a statement to the court by defense counsel concerning the potentially privileged status of materials in Mr. Combs's cell at the MDC.  Neither incident justifies applying the enhancement.

1.  The government argues that, after Mr. Combs settled a lawsuit against Ms. Ventura, he called Jane on November 19, 2023, purportedly to stave off a criminal investigation into his conduct.  Dkt.516 at 98-99.  But the jury rejected this evidence when it acquitted Mr. Combs of RICO conspiracy, for which this incident was charged as a predicate racketeering act of witness tampering and sex-trafficking obstruction under 18 U.S.C. §1591(d).  *See* S-3 Indictment ¶13(d), (f); Tr.7722-31 (government summation).  It therefore constitutes acquitted conduct, in no way helps "establish" the Mann Act counts, and thus cannot be considered.  *See* §1B1.3(c).  The Court should decline to impose the enhancement for this reason alone.

---

[7] Application Note 2 to §3A1.1 states that the vulnerable victim enhancement should not be applied if "the factor that makes the person a vulnerable victim is [already] incorporated in the offense guideline."  Mr. Combs objects to all the government's proposed enhancements, as well as its grouping analysis.  Yet if the Court imposes the fraud/coercion enhancement under §2G1.1(b)(1), the two-point vulnerable victim enhancement would be inapplicable for this reason as well.

In any event, as Probation notes (PSR at 58, ¶79), there is no evidence Mr. Combs was aware of either the government's (assuming it had begun) or any other law enforcement investigation at the time of the calls. This precludes any finding of obstruction. *See, e.g.*, *United States v. Stubblefield*, 942 F.3d 666, 669 (5th Cir. 2019) (per curiam) (citing *United States v. Lister*, 53 F.3d 66, 71 (5th Cir. 1995) (per curiam)); *United States v. Brown*, 237 F.3d 625, 628 (6th Cir. 2001); *United States v. Oppedahl*, 998 F.2d 584, 585-86 (8th Cir. 1993).

The record shows Mr. Combs was speaking with Jane only days after having settled Ms. Ventura's lawsuit for a significant sum ($20 million). He called Jane in response to her texts to him conveying how, after reading Ms. Ventura's lawsuit, Jane empathized with Ms. Ventura's alleged plight. As Probation found, Mr. Combs was obviously concerned about the possibility of a follow-on civil suit brought by Jane—not any kind of criminal investigation. PSR at 58, ¶79.

The government argues that Mr. Combs was worried about a criminal investigation because he suggested that he couldn't be speaking on "phones." Dkt.516 at 98. But this doesn't come close to showing that he was worried about any government wiretap, and instead reflects no more than his concern that Jane may have been collecting statements for just such a suit. In one of the calls, Mr. Combs even asks Jane, "Are you recording me?" GX C-348-ART, p.6.

Accordingly, there is no basis for the Court to find, as it must, that Combs acted with the "specific intent to obstruct justice," i.e., that Combs "consciously act[ed] with the *purpose* of obstructing justice." *United States v. Hernandez*, 83 F.3d 582, 585 (2d Cir. 1996). This intent, moreover, "must be unambiguous." *United States v. Pena*, 751 F.3d 101, 105 (2d Cir. 2014) (per curiam). The Second Circuit has repeatedly reiterated this point in holding that an obstruction enhancement was unsupported by the record. *E.g.*, *Hernandez*, 83 F.3d at 585; *Pena*, 751 F.3d at

105; *United States v. Thomas-Hamilton*, 907 F.2d 282, 285 (2d Cir. 1990); *United States v. Brown*, 321 F.3d 347, 351-52 (2d Cir. 2003).

Finally, even if the government could prove that Mr. Combs was worried about a criminal investigation rather than another civil suit, there is no evidence suggesting he was worried about an investigation into Mann Act violations in particular—that is, the "instant offense[s] of conviction." §3C1.1. Rather, the government contended that these calls constituted sex-trafficking obstruction, and that Mr. Combs was allegedly "feeding Jane lies would prevent enforcement of the sex trafficking laws." Tr.7731.

Using Mr. Combs's calls to Jane to apply the obstruction enhancement would be unjustified for other reasons as well.

*First*, the calls bear no resemblance to the illustrative examples of obstructive conduct set forth in the guideline commentary, including committing perjury, producing false documents during an official proceeding, or destroying evidence, among many other examples. §3C1.1 App. Note 4. Yet the Court is supposed to "compar[e] . . . th[ese] examples" with the conduct at issue to "determin[e] whether application of this adjustment is warranted in a particular case." *Id.* App. Note 3. The enhancement should therefore be limited to conduct that—even if not a direct match for those examples—closely resembles it. *Cf. Fischer v. United States*, 603 U.S. 480, 487 (2024) ("a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific classes . . . that precede it").

*Second*, the obstruction guideline's commentary expressly forbids "punish[ing] a defendant for the exercise of a constitutional right." §3C1.1 App Note 2. On his calls to Jane, Mr. Combs was primarily speaking to her about their romantic past—and the evidence shows he neither knew about nor was trying to obstruct any criminal investigation. Any application of the

enhancement in these circumstances would risk chilling constitutionally protected speech. *See Counterman v. Colorado*, 600 U.S. 66, 75-77 (2023) (collecting cases).

2. The government's second alleged instance of obstruction is Mr. Combs's counsel's November 19, 2024 statements to the Court concerning the potentially privileged status of notes obtained from his cell during the BOP's "sweep" at the MDC.

This incident cannot justify application of the enhancement because it is completely irrelevant to any material issue in the case, much less Mr. Combs's two "offense[s] of conviction." §3C1.1. That the government is even seeking to increase his offense level based on this non-issue only further underscores its desperation to grasp at every possible straw to enhance Mr. Combs's sentence. It is not surprising that the government only came up with this argument about two weeks before sentencing after Probation rejected both of its other arguments. *See* PSR at 58.

Moreover, Mr. Agnifilo made the comment about the legal pads at issue based on erroneous information provided by another lawyer—who is no longer on the defense team—in the middle of a hearing and on the spur of the moment. That was an inadvertent error by counsel, which counsel acknowledged on the record. Nov. 22, 2024 Tr.3-4. Contrary to the government's claims, there was no effort of any sort by Mr. Combs to provide false information to counsel, or to otherwise mislead the Court or obstruct justice in any way.

**F. The Government's Remaining Guidelines Arguments Are Meritless**

Mr. Combs will only briefly address the government's remaining arguments as to the guidelines issues already addressed in his opening brief: the fraud/coercion enhancement under USSG §2G1.1(b)(1); the role enhancement under §3B1.1; the grouping enhancement for "victims" under §3D1.4; the acceptance of responsibility guideline in §3E1.1; the zero-point offender provision in §4C1.1; and overly punitive impermissible "stacking."

32

1. As explained in Mr. Combs's opening brief (at 89-100) and in Point I *supra*, the fraud/coercion enhancement doesn't apply because any evidence of alleged fraud or coercion was rejected by the jury when it acquitted Mr. Combs on Counts 2 and 4, and this evidence thus now constitutes acquitted conduct. §1B1.3(c).

2. Similarly, Mr. Combs explained at pages 111-122 of his opening brief that no role enhancement of any sort under §3B1.1 is appropriate because (1) Mr. Combs was not a leader or organizer of any alleged criminal scheme; (2) there were no "participants" within the meaning of the guideline; and the alleged criminality was not "otherwise extensive." Moreover, as explained both in Mr. Combs's opening brief and *supra* Point I, the jury's acquittal on the RICO conspiracy count clearly precludes application of this enhancement. That includes as to the alleged "unknowing" participants, notwithstanding the government's argument to the contrary. Dkt.516 at 91. Separately, the Court should summarily reject the government's attempt to try to prove a different conspiracy—apparently composed of Ms. Ventura, Jane, and the two Cowboys 4 Angels employees discussed immediately below—from the one the jury rejected at trial. *Id.* at 91-92. The government did not allege these individuals to be RICO coconspirators at trial, and it should not now be permitted to repurpose them as leadership-enhancement conspirators in an attempt to evade the jury's acquittal on the RICO count.

The evidence doesn't support the government's belated efforts to add new knowing and unknowing "participants" to its theory anyway. The government now contends Garren and Bridget from Cowboys 4 Angels are knowing, criminal participants, Dkt.516 at 88, even though the company is a perfectly legal organization operating out in the open, which has been featured on a reality TV show and featured in mainstream media publication. There is no basis for the government to suddenly label the company a criminal organization, and the evidence shows that

it made clear to Mr. Combs that its activities complied with the law. *See* Tr.7057-58 (describing text messages between Combs and Bridget). The government offers no explanation for how Mr. Combs could have been the leader or organizer of a service when he was its customer and repeatedly engaged in arms-length negotiations with the company. Nor does the government explain how Garren or Bridget could have had the mental state required to be knowing participants, given they were merely doing their jobs for a legitimate business.

The government also now claims that Faheem Muhammad, Mr. Combs's head of security, was a knowing participant. Dkt.516 at 87. Mr. Combs refers the Court to his arguments as to why Damion Butler—the security guard identified in the PSR (at ¶73)—is not a participant. Dkt.510 at 121. Additionally, there is insufficient evidence as to Muhammad's knowledge of the alleged criminal activity, or that his involvement with Mr. Combs's cash supply had any connection to escorts—as opposed to, for example, drugs or other activity Mr. Combs engaged in that might require money.

The government also identifies a roster of Mr. Combs's assistants or butlers it now claims are "unknowing" participants. The length of this list itself belies the government's contention that their services were in any way "peculiar and necessary." Dkt.516 at 89. In any event, as with Mr. Combs's security staff, the government cannot prove that these assistants were involved in any transportation for purposes of prostitution—as opposed to, say cleaning up or setting up hotel rooms or providing supplies.

3. As Mr. Combs explained in his opening brief (at 100-11), neither Ms. Ventura nor Jane—and especially not any of the escorts—were victims within the meaning of §2G1.1, and no grouping is appropriate as a result. Among other reasons, the Court cannot merely rely on the definition of "victim" in Application Note 1 to §2G1.1, which conflicts with the meaning of the

term in multiple criminal statutes, including the restitution statute that applies to Mann Act offenses.

The government criticizes Mr. Combs for relying on statements from the identified escorts' 3500 materials despite not calling them to testify at trial. Dkt.516 at 70-72. But Mr. Combs had no obligation to call any of the escorts—and there is nothing improper about him now using statements they previously made to the government. And this argument is, to put it mildly, a bit much given the government's own misuse of unsworn statements by patently incredible witnesses who have no knowledge of the conduct underlying the Mann Act convictions. For example, the government abandoned its plan to call chef Jourdan Atkinson to testify at trial after the cross-examination of several other government witnesses exposed their utter lack of credibility. Yet it cites her false prior statements to try to enhance Mr. Combs's sentence through a "victim" impact statement. Dkt.516 at 152, n.2.

Worse, it now relies on witnesses whose testimony was either shown to be false during cross-examination, or later revealed to be untrue. Take Deonte Nash. At trial, Nash repeatedly evaded questioning about his plans to file a lawsuit against Mr. Combs. He was questioned about whether he was "considering a lawsuit," whether he "hire[d] [counsel] to pursue possible civil litigation," and whether he was "considering or retaining counsel to consider suing Mr. Combs." Tr.3034-35. He unequivocally denied any of these possibilities, responding "no," "I don't do federal court," "I have counsel to protect *me*" in "[t]his case." *Id.* He further denied telling the government that he had hired civil counsel to consider suing Mr. Combs. Tr.3036. This was all a lie. Just two months after trial, Nash himself exposed these lies by serving a demand and a draft civil complaint against Mr. Combs, demanding $18,500,000.00. He has since filed suit. *See Nash v. Combs et al*, (Cal. Sup. Ct. Sept. 23, 2025). Even if he had been a

35

victim or had anything relevant to say, it would be wrong for the Court to credit his trial testimony or consider his statements in fashioning a sentence.

    4.    Denying Mr. Combs a two-point reduction for acceptance of responsibility under §3E1.1 would unfairly penalize him for exercising his Sixth Amendment right to take this case to trial—particularly given the government's overcharging and failure to extend a reasonable plea offer during pre-trial negotiations. Dkt.510 at 126-29. The government's suggestion that Mr. Combs had "other options" to accept responsibility is laughable. Dkt.516 at 106. He would have received no benefit whatsoever had he pled guilty to the Mann Act charges before trial or declined to contest them at trial, since the government never offered him a deal involving a plea to the Mann Act counts alone. What's more, its plea offer was almost as draconian as its position now—the government insisted any plea agreement would include multiple counts, including the RICO count and enhancements for every charged racketeering act, and would require a stipulated guidelines range of 324-405 months. The government waves away its formal offer as "vague" references to discussions. Dkt.516 at 106. But the government reduced its meaningless offer to writing: on April 15, 2025, at 12:20 am, AUSA Slavik emailed Mr. Combs's defense counsel attaching a written proposed plea agreement signed by Jacqueline Kelly, former Chief of the SDNY's Civil Rights Unit, containing the terms described above, and advising that this "offer" would expire on April 18, 2025. Yet now, even though Mr. Combs was acquitted of RICO and sex trafficking, the government seeks an even higher guidelines range. If that is not a trial penalty, it's not clear what would be. Defendants should not be penalized for refusing to accept ice in winter.

    The government cites no precedent precluding the Court from relying on these pretrial developments to grant a two-level reduction. It cites only a summary order concluding—without

any analysis or elaboration—that the defendant's "failed plea negotiations" with the government did not warrant acceptance points in the context of that particular case. *United States v. Smith*, 2025 WL 751377, at *3 (2d Cir. Mar. 10, 2025).

5. Mr. Combs is entitled to an additional two-level reduction for being a zero-point offender. As explained in his opening brief (at 122-26), the Court should apply the zero-point offender provision from the 2023 Manual, along with the rest of the 2024 Manual—to avoid the constitutional concerns that would arise from applying either Manual wholesale.

6. Finally, the government's "cumulative effect" and enhancement stacking arguments only confirm Mr. Combs's position that a significant downward departure would be warranted if the Court adopts any of the enhancements the government seeks. The enhancements the government advocates plainly "substantial[ly] overlap." *United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003). The government's unreasonable, draconian positions are transparent attempts to inflate Mr. Combs's guidelines calculation to a "high sentencing range," however possible. *Id.*

## II.    THE GOVERNMENT'S SENTENCE DISCREPANCY ARGUMENTS DEPEND UPON COMPARISONS TO COMPLETELY INAPPOSITE CASES

The government's sentence disparities arguments defy reality. Once again, the government ignores the jury's clear verdict and relies on acquitted conduct and cross references that have no place in this case. Based upon these false premises, the government brushes aside all the relevant sentencing data wholesale and disregards decades of DOJ policy and sentencing practices, all of which demonstrate that, in light of the verdict, Mr. Combs's conduct is the least culpable Mann Act offense conduct possible. A 14-month sentence is clearly sufficient.

### A. The Government Fails To Address The Bulk Of Mr. Combs's Arguments And Instead Relies Exclusively On Acquitted Conduct

The government does not and cannot dispute that DOJ policy for over 75 years specifically discouraged prosecutions against "buyers" or "johns" like Mr. Combs. The government concedes that the current Justice Manual policy is that only "johns" "who engage in commercial sex with victims of *sex trafficking*" are prosecuted. Dkt.516 at 140 (emphasis added). In other words, *not Mr. Combs*, who was unambiguously acquitted of sex trafficking. The government continues to ignore that the initial versions of the Sentencing Guidelines counseled a significant 8-level downward departure for Mann Act offenses committed without a financial motive—like this one—and that the comparable pre-Guidelines Parole Commission guidance similarly weighed such offenses as the least culpable. And Defense Exhibits 68 and 69 show that, in fact, the government *does not use the Mann Act to prosecute* defendants like Mr. Combs who have no profit motive and where the transportation involves long-time girlfriends who agreed to bring other consenting adult men into their consensual sexual relationship.

The government attempts to sweep all this history and these cases aside by suggesting that Mr. Combs is not a "john" but is instead a sex trafficker who exploited and controlled women through "threats, fear, controlled substances, and physical violence." Dkt.516 at 140. For instance, it says DOJ policy is satisfied here because Mr. Combs used "force and coercion." Dkt.516 at 139. And it argues "[b]oth the downward departure provision in the 1987 Sentencing Guidelines and pre-Sentencing Guidelines Parole Commission practices contained carveouts for the presence of force or coercion." Dkt.516 at 133 n.37. But this is exactly what the jury rejected. For example, the government claims "the defendant exerted control over Ventura and Jane and exploited their vulnerabilities through years-long abusive tactics, leaving both feeling as if participating in the defendant's multi-day sexual fantasies was their only option." Dkt.516

at 126.  And it argues "Ventura and Jane feared the potential consequences to not participating—the defendant taking away their homes and belongings, the defendant becoming physically violent, or the defendant making good on his threats to release blackmail material."  Dkt.516 at 126.  These arguments are nullified by the jury's verdict.

Decades of DOJ policy, Mann Act enforcement, and sentencing history corroborate the fact that a 14-month sentence is more than sufficient in this case, and the government cannot now cite its already-rejected "force and coercion" arguments as an escape hatch from over 75 years of charging and sentencing practices.

**B. The Government's Cases Are Completely Inapposite**

Again relying exclusively on acquitted conduct, the government seeks to compare this case to Mann Act cases in which defendants were given extraordinarily high sentences up to the statutory maximum under circumstances not remotely comparable to this case.  The government's so-called "similarly situated" cases are nothing of the sort.  They are irrelevant.

First, the government's cases are, as a practical matter, all sex trafficking cases.  To be sure, the cases don't technically "involve convictions for sex trafficking," Dkt.516 at 127 n.32, but what the government fails to disclose is that most of these defendants were charged with sex trafficking and then pleaded guilty under the Mann Act only to escape sex trafficking charges and the resulting mandatory minimum sentences.  In *United States v. Thompson*, 16-cr-75 (E.D.N.C.), for example, the defendant was charged with sex trafficking by force, fraud, and coercion, and pleaded guilty in exchange for the government dropping that charge.  *See* Dkt.60. In *United States v. Guidry*, No. 2:13 Cr. 16 (E.D. Wisc.), the defendant was charged with *four* counts of sex trafficking, as well as distribution of heroin counts, and pleaded guilty to Mann Act counts and possession with intent to distribute with the understanding that the government would seek no more than 22 years' imprisonment.  *See* Dkt.106 at 7-9.  In *United States v. Gregory*, No.

5:15 Cr. 189 (E.D.N.C.), the defendant was charged with multiple sex trafficking counts, a

kidnapping count, and a 924(c) count.  In *United States v. Kizer*, 10-cr-20385 (W.D. Tenn.), the

defendant was charged with two sex trafficking counts, and in *United States v. Doolittle*, 17-cr-

275 (E.D.N.C.), the defendant was charged with two sex trafficking counts and two coercion

counts under 18 U.S.C. § 2422.  Other defendants were similarly charged with coercion under 18

U.S.C. § 2422.  *See United States v. Bavaro*, 20-cr-115 (E.D.N.C); *United States v. Benavidez*,

19-cr-337 (E.D.N.C)

Moreover, as the government admits, some of these defendants *conceded* that a more

punitive Guidelines cross-reference applied to their offense conduct.  *See* Dkt.516 at 130 (citing

*Benavidez* and *Doolittle*).  These cases are sex trafficking cases, not mere Mann Act cases, and

the resulting sentences reflect unique charging and plea strategies that should have no bearing on

the Court's analysis here.[8]  And for the avoidance of any doubt—none of the defendants in the

government's cases were *acquitted* of sex trafficking like Mr. Combs.

Second, the defendants in these cases were in meaningfully greater criminal history

categories.  *See United States v. Bavaro*, 20-cr-115 (E.D.N.C) (CHC IV); *United States v.*

*Benavidez*, 19-cr-337 (E.D.N.C) (CHC III); *United States v. Crews*, 19-cr-62 (E.D.N.C.) (CHC

III); *United States v. Doolittle*, 17-cr-275 (E.D.N.C.) (CHC III, per Dkt.80 at 5); *United States v.*

*Spain*, 14-cr-21 (E.D.N.C.) (CHC IV reduced to III at resentencing); *United States v. Kizer*, 10-

cr-20385 (W.D. Tenn.) (CHC IV); *see also United States v. Gregory*, No. 5:15 Cr. 189

(E.D.N.C.) (CHC II).[9]  In other words, while the government claims these cases were "not

---

[8] It should be telling enough that 7 of the government's 9 cases come from the Eastern District of North Carolina alone.  None are from the Second Circuit.
[9] We were unable to determine the Criminal History Category applicable in *United States v. Guidry*, No. 2:13 Cr. 16 (E.D. Wisc.).

cherrypicked" to give the appearance of more serious sentences, they clearly were. Dkt.516 at 131.

Finally, each of these defendants profited commercially from the offense conduct, including from their violent coercion of commercial sex acts—profit which the government concedes is not present here. *See* Dkt.516 at 132. As previously explained, the presence of a profit motive is a serious aggravating factor that distinguishes almost all Mann Act cases from Mr. Combs's case.

### C. The Government Ignores Relevant Mann Act Sentencing Data

The government next asks the Court to ignore clearly relevant sentencing data and disregard its statutory obligations in the process. It claims the Guidelines amount to a "reductionist mathematical formula," Dkt.516 at 126, and that the 63 cases where defendants were sentenced under §2G1.1(a)(2) and Criminal History Category I are irrelevant because none of those defendants used "manipulation, threats, and violence" to coerce the prostitution, *id.* at 133. That argument erroneously depends, once again, on the assumption that Mr. Combs is guilty of acquitted conduct. Moreover, violence is merely one aggravating factor, and the government is incorrect when arguing that there are "no significant aggravators associated with the cases cited in Defense Exhibit 68." Dkt.516 at 139. The Mann Act cases in Exhibit 68 often involved ongoing and extensive conduct carried out by professional prostitution enterprises and pimps, the presence of drugs, coercive "power dynamics," as well as other aggravating factors—again such as commercial gain to the defendant, which the government continues to ignore wholesale. As for violence, the government overlooks certain cases where allegations of violence were present, yet defendants received sentences akin to what Mr. Combs requests here.

41

### 1. Ongoing & Extensive Conduct

The government claims many of the cases in Defense Exhibit 68 involve less culpable defendants because they involve only "discrete instances" of Mann Act violations. Dkt.516 at 134. But defendants are given comparable sentences even where the conduct was ongoing and extensive. Mr. Combs already outlined the multiple cases involving large scale prostitution enterprises or brothels where defendants profited from Mann Act conduct on an ongoing and sometimes international basis. *See* Dkt.510 at 133. Take *United States v. Modica et al*, 1:09-cr-01243-LAK (S.D.N.Y.) (Defendant Porcelli) (probation), for example, where the defendant was a "mob sympathizer and enabler" who worked for the Gambino Family to operate and organize its prostitution business, sometimes taking over 100 calls a day from customers, drivers, and women who worked for the business. Dkt.195 at 3-4. After the prostitution business came to an end because the participants "learned that one of the women who worked as a prostitute was fifteen years old," the defendant attempted to "re-start the prostitution business" herself. Dkt.195 at 7. Or consider *United States v. Wallace*, 1:13-cr-00117-HSM-SKL (E.D. Tenn.) (probation), where the defendant worked as a Madam because other jobs were lower paying, established her own online escort service that operated for approximately a year, employed as many as ten prostitutes at a given time, and advertised in at least 9 different states. *See* Dkt.30 at 1-2. The defendant admitted to a prior history of unlawful conduct, including having worked for a prior escort company until that employment ended because the owner was charged with human trafficking and money laundering. *Id.* at 2.

Many cases in Defense Exhibit 68 involve multiple victims, multiple prostitution establishments and enterprises, and conduct spanning years, taking place throughout the country, in Korea, China, Canada, Central and South America, and beyond. The government attempts to claim this case is somehow significantly worse because the conduct took place over a longer *time*

span. That is only one measure, and the fact the conduct spanned so many years is more readily explained by the fact that all participants were fully consenting empowered adults who participated in the activity for non-nefarious reasons. Indeed, in this respect Mr. Combs is less culpable than a defendant who, for example, is quickly intercepted because he has truly victimized a prostitute. *See, e.g.*, *United States v. Cross et al*, 1:10-cr-00939-GBD (S.D.N.Y.) (10 months), Dkt.48 at 2 (Cross arrested with stun gun after 911 call stating "[fe]male is being sexually exploited at Metro Motel").

### 2. *Drugs*

Abuse of drugs is also common in Mann Act cases, as is the abuse of victims with drugs. In *United States v. Whaley*, 1:18-cr-10091-RWZ (D. Mass.) (12 months), for example, the defendant housed "drug-addicted victims in motels, denied them money, and provided them with food and narcotics only in exchange for the profits those victims earned through prostitution." Dkt.37 at 1. One victim described a "torturous game of hide and seek" in which the defendant would only tell the victims "where to find their next dose when a victim had earned enough money." Dkt.37 at 3. Another example is, *United States v. Nabit*, 1:21-cr-00038-GLR (D. Md.) (9 months), further discussed *infra*, where the defendant exploited victims' drug addictions by offering them money in exchange for sex, and where one victim ultimately died of a drug overdose.

### 3. *"Power Dynamics"*

The PSR and the government both cite the illusory concept of "power dynamics" to suggest that Mr. Combs is more culpable than the average case. But that is nonsense. The power dynamics at play here—to the extent they exist—are nothing compared to other cases. Mr. Combs's opening memorandum cited dozens of cases in which women were victimized because of immigration status, smuggling debts, homelessness, mental illness, and/or mental

disability.  Dkt.510 at 135-36.  The government continues to ignore them.  And the government cannot seriously contend that these factors—which it can't dispute are present in cases throughout Defense Exhibit 68—somehow give rise to less significant "power dynamics" than that those at issue in this case.  Ms. Ventura and Jane were both adults with legal status in the United States.  Ms. Ventura was a powerful celebrity in her own right from an upper-middle class family.  She earned a six-figure income before even meeting the defendant.  Jane was a mature adult and mother of a child she was able to support, and she had previously dated another high-profile rapper.  She herself was often able to earn five figures *a month* on OnlyFans.

### 4. Force And Violence

For the reasons already explained, force and violence should not guide the Court's determination of Mr. Combs's sentence.  Nevertheless, the government's opposition overlooks cases involving allegations of force and violence, including cases where defendants' sentences were comparable to the average sentence in Exhibit 68.

In *United States v. Bastos*, 1:06-cr-00395 (N.D. Ill.) (12 months and a day), for example, the Complaint alleged that the defendant "threatened" two victims "and their family if either tried to leave him or ever talked to the police," with one victim believing the defendant "would kill her and her family if she ever talked to the police" and the other victim believing he "would harm her or her daughter."  Dkt.1 at 4.  The defendant regularly carried a firearm and "threatened" the victims "with his gun," and further engaged in "physical[] abuse."  *Id.* at 7-8.  It is not clear from the docket whether the violence played any role at sentencing, but there was enough evidence of threats and violence for the government to include it in a sworn complaint.

In *United States v. King*, 3:16-cr-00351 (D. Or.) (19 months), the Complaint alleged the defendant "physically assaulted [one victim] on numerous occasions" and "she felt that she was forced to keep doing 'dates' for King because of it."  Dkt.1 at 5.  Another victim reported feeling

"compelled to do 'dates'… due to her fear that if she did not, that King would cause serious harm and assault her." *Id.* When prompted by detectives as to what would happen if they refused to engage in prostitution, both victims reported the defendant "would have gotten violent." *Id.* And at sentencing, one of the victims even testified "I know he is a danger to… others. I have been at all court dates because I wanted the violence and the abuse to stop with me. I don't want [him] to hurt any more women." Dkt.149 at 3-4. This case is included in Defense Exhibit 69 because the defendant was in Criminal History Category IV, resulting in a Guidelines range of 21-27 months. Despite clear violence, he was sentenced below the range.

In *United States v. Willis, Jr.*, 3:14-cr-00033-MO (D. Or.) (18 months), the court declined to apply the coercion enhancement based on government allegations of violence and ongoing abuse, but nevertheless credited information that the defendant "on at least one occasion … struck [a victim]," revealing the "defendant's character" and "willingness to strike a woman." Dkt.67 at 57. This case is also included in Defense Exhibit 69 because the defendant was in Criminal History Category III, resulting in a Guidelines range of 18-24 months. Again, despite credible allegations of violence, the defendant was still sentenced at the bottom of the range.

And in *United States v. Mendoza-Mendez*, 1:15-cr-00640-ENV (E.D.N.Y.) (16 months), the victim was drugged unconscious and forced to undergo an abortion by the defendant so he could continue earning money from her prostitution. While not violence per se, there is no doubt the defendant used force against the victim. As the government described it there, "she was given an injection that caused her to lose consciousness. When she woke up, [she] felt pain in her vaginal area and was bleeding." But "[s]hortly after the abortion, the defendant forced [her] to continue working despite being in pain." Dkt.19 at 1-2.

5.  *The Government's Other Illusory Distinctions*

The government also suggests the court should disregard cases because they were resolved with pleas as opposed to trials. It states the "factual record" is generally "not as developed" in plea cases and defendants who plead guilty get acceptance points. Dkt.516 at 135-56. These arguments fall flat.

First, in many cases, the defendants were charged with more serious counts such as sex trafficking and pleaded guilty to avoid mandatory minimums. In other words, they did not involve anyone acquitted of sex trafficking—they involved people who obtained a bargain to plead to lesser charges. *See, e.g.*, *United States v. Cross et al*, 1:10-cr-00939-GBD (S.D.N.Y.) (10 months); *United States v. SEALED*, 6:20-cr-00077-JCB-KNM (E.D. Tex.) (Defendant: Rachel Walker) (12.75 months); *United States v. Collins et al*, 3:17-cr-00110-MPM-RP (N.D. Miss.) (one defendant received 24 months and the other probation); *United States v. Kidgell et al*, 6:13-cr-10129-EFM-2 (D. Kan.) (Defendant: Yan Zhang) (time served (12 months)). There is thus reason to believe the offense conduct in these cases was actually more serious than that at issue here—where Mr. Combs was acquitted of sex trafficking.

Second, while the factual record is normally better developed in the wake of a trial, the government's primary goal here seems to be *distorting* the factual record with conduct of which Mr. Combs was clearly acquitted. It seeks to inflate his sentence not based on the proven or admitted facts, but based on the arguments it sought but failed to prove to the jury. That is outrageous.

As for the trial penalty the government asks the Court to impose, the plea offer made by the government here did not permit Mr. Combs to plead guilty to the Mann Act counts alone. Instead, the government wanted Mr. Combs to stipulate to a total offense level of 41 and Guidelines range of 324-405 months with no statutory cap. Mr. Combs made the correct

decision to go to trial on all counts, and trying to distinguish him from other Mann Act defendants based on acceptance points is not a productive exercise—especially since now the government is seeking a guidelines range higher than it offered in the plea agreement even though he was acquitted of sex trafficking and RICO conspiracy.

### D. The Government's "John" Arguments Do Not Persuade

Mr. Combs did not commit the instant offenses for profit, and he is at most a "john." The government says he resembles a "pimp," Dkt.516 at 140, but ignores the clear meaning of that term. *See, e.g.*, *Pimp*, Black's Law Dictionary (12th ed. 2024) ("Someone who solicits customers for a prostitute, usu. in return for a share of the prostitute's earnings"). Worse, the government argues—once again resorting to acquitted conduct—that Mr. Combs cannot be a "john" because he used "manipulation, threats, fear, controlled substances, and physical violence" to coerce sex acts. Dkt.516 at 140. For the reasons explained ad nauseum, that theory was rejected by the jury and cannot be used to enhance the sentence.

In its discussion of "john" cases, the government fails to properly weigh the relative culpability of these defendants against Mr. Combs.

For instance, the government argues that the Tills, Trowbridge, and Stebick defendants were less culpable than Mr. Combs because their victims were "exploited by a third party" and not by them directly. Dkt.516 at 142. That argument defies the record in these cases. The defendants clearly *did* directly participate in the exploitation of the victims. The whole premise of the prosecution against Tills, Trowbridge, and Stebick—as well as their cooperation with the government—was that the victims were sex trafficking victims exploited by a sex trafficking ring, and the defendants *knew it and participated anyway*.

The government's parallel argument that Tills, Trowbridge, and Stebick were not "alleged to have used manipulation, threats, or force in connection with their conduct," Dkt.516

at 142, similarly defies the facts of the case and their role in the offense. The victims lacked

legal status and owed large smuggling debts and were tricked into prostitution by defendant

Chong, who instilled fear among the victims by referencing "her close contact and relationships

with various public officials, including" a "Judge" and "Police Captain" (Tills and Trowbridge).

*United States v. Chong*, 08-cr-106 (W.D.N.Y.), Dkt.24 at 4-5. The victims engaged in the sex

acts because they were "instructed … to take special care" of Tills and Trowbridge—who were

repeat customers—and because they were told they would not be safe in the event they "did not

sexually perform in a satisfactory manner in servicing these public officials." *Id.* at 5. One of

the victims transported by Tills "spoke little English," and "was in no position to take exception

to the activities which the Jesters expected her to perform." *United States v. Tills*, 1:08-cr-

00242-WMS (W.D.N.Y.), Dkt.22 at 4-5. Individuals like Ms. Ventura, Jane, and the male

escorts and entertainers are simply not comparable. Nor is the "power and wealth" (Dkt.516 at

140) Mr. Combs purportedly wielded anything like the exploitation on which these defendants

relied.

As for *Nabit*, the government argues that Mr. Combs is significantly more culpable than

Nabit because, while the victims there were exploited "by the trafficker and Nabit," here the

"victims" were exploited by "Combs alone," who used "physical violence to do so." Dkt.516 at

143-44. Again, however, the jury rejected the government's arguments that Ms. Ventura and

Jane participated in the sex acts because of any "force, threats of force, fraud, or coercion, or any

combination of such means." Tr.8022. Nabit's victims were so financially and physically

vulnerable that Nabit was able to control them merely by providing money and drugs—all while

knowing the victims were being further victimized by their trafficker. Indeed, one of the victims

eventually died of a drug overdose. Mr. Combs's relevant conduct involves nothing comparable or as culpable and deserves a lower sentence.

The government does not dispute that Nabit knew his victims were being sex trafficked, but says "[t]his is a distinction without a difference"—as if the defendant's knowledge of the victim's status does not matter. Dkt.516 at 143. Next, it argues that Nabit's continuation of his offenses even after learning that his victims were being sex trafficked somehow "echoes" Mr. Combs's continuing to have "hotel nights" with Jane while he was under investigation for crimes "including sex trafficking." Dkt.516 at 143 n.51. But of course—*unlike* Nabit—Mr. Combs had no reason to believe Jane was a sex trafficking victim and Mr. Combs was ultimately acquitted of the charge. The government's argument is just another example in which it fails to accept the jury's clear verdict. Such sleights by the government reflect and promote disrespect for the rule of law—including the Sixth Amendment right to be tried by an impartial jury *and not by prosecutors* seeking a second bite at the apple through disingenuous arguments at sentencing.

When the acquitted conduct is put to the side, the government ultimately concedes that "Nabit's conduct is similar to Combs's conduct" and "aspect of Nabit's offense are equally applicable to Combs." Dkt.516 at 142-43. But Nabit served a 9-month sentence, and the government requests a sentence *15 times* that for Mr. Combs!

Finally, the government cites but does not discuss a fifth supposed "john" case, *United States v. Tsouroutis*, No. 3:07 Cr. 8 (W.D. Va.). That case is not comparable and is not really a "john" case at all. It involves a corrupt police officer who abused his office to coerce a prostitute to give him sexual favors in exchange for protecting her from prosecution. The defendant pleaded guilty to False Statements and Mann Act charges and received 27-month sentences on each count to run concurrently. The defendant—a Sergeant in a County Sheriff's Office—was

investigating charges against a woman who was a known prostitute detained for burglary, robbery, credit card theft, and failure to appear. The defendant took custody of the woman while extraditing her from Baltimore to a county in Virginia and told the woman "he would take care of her charges if she had sex with him." Dkt.42 at 2. He requested a provision in her bond paperwork stating that she "was to have daily contact with" him. *Id.* at 3. And he ultimately engaged in numerous sex acts with the woman over the course of three months, paying her money and keeping her out of jail when she faced new charges, and telling her "she must do what he tells her to do" or risk her freedom. *Id.* The woman "was a prisoner, a drug addict, and was barely 19 years old," and the defendant admitted to using his power and authority as a police officer to force her to have sex with him—conduct light years more culpable than what happened here. Dkt.49.

## III.    THE GOVERNMENT'S DISMISSAL OF MEDICAL EVIDENCE IS UNFOUNDED

In order to distract from the powerful evidence of Mr. Combs' rehabilitation, the government asks the Court to disregard two evaluations by renowned medical professionals at Columbia University, as "unreliable" simply because the doctors reviewed Ms. Ventura and Jane's full testimony, but not "other testimony in the case." Dkt.516 at 157. The government ignores that both experts (1) met with Mr. Combs multiple times between March and August 2025; (2) applied scientific tools to evaluate him; and (3) came to neutral findings after months of evaluations.

These evaluations were made based on thousands of pages of medical records, multiple meetings with Mr. Combs, and the under oath testimony by Cassie and Jane (which included all the text messages the government believed to be important and inculpatory). The government views Mr. Combs' statements as "untrustworthy" because he claimed:

- He and Ms. Ventura "engaged in physical fights hitting each other," which was Ms. Ventura testified to on direct examination;

- He is "in complete control of his sexual urges and behavior," which Dr. Krueger found to be true using his psychiatric and risk assessment tests;

- He was interested in "regular sex" and "15 percent of his sex life involved Freak Offs," which is accurate given the number of sexual partners Mr. Combs had and the fact that the government only called two women to testify who engaged in "freak offs";

- His conduct was due to his history of substance abuse, which is accurate given the conditions that Mr. Combs has been in for the past year, completely sober, and "without incident."

Notably, the government states it has Mr. Combs's MDC medical records (but has not produced them to counsel), which likely corroborate Mr. Combs's claims of sobriety for the past year since being incarcerated. That Mr. Combs has committed himself to rehabilitation during a year of extreme stress and difficult conditions, all while facing life in prison, shows that he is committed to rehabilitation and that his future "risk of violence is low" and he is "highly motivated" to continue treatment and programs to even further reduce any risk.

Both Dr. Kreuger or Dr. Kaplan will be present at the sentencing proceeding, and available to answer any questions the Court may have.

<u>CONCLUSION</u>

For the foregoing reasons and those in our opening brief, a sentence of no more than 14 months' imprisonment is the only reasonable and just sentence.

Dated:     New York, New York
           October 2, 2025

Respectfully submitted,

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Jason A. Driscoll
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Fl.
New York, NY 10036
(212) 257-4881
ashapiro@shapiroarato.com
jdriscoll@shapiroarato.com

_____
Marc Agnifilo
Teny R. Geragos
AGNIFILO INTRATER LLP
445 Park Ave., 7th Fl.
New York, NY 10022
(646) 205-4350
marc@agilawgroup.com
teny@agilawgroup.com

Brian Steel
THE STEEL LAW FIRM, P.C.
1800 Peachtree Street, Ste. 300
Atlanta, GA 30309
(404) 605-0023
thesteellawfirm@msn.com

Nicole Westmoreland, Esq.
WESTMORELAND LAW, LLC
132 Cone Street, Suite A
Atlanta, GA 30303
(404) 446-2620
nw@westmorelandlawgroup.com

Xavier R. Donaldson
136 Madison Ave, 6th Floor
New York, NY 10016
646-772-3334

xdonaldson@aol.com

Anna Estevao
HARRIS TRZASKOMA LLP
156 West 56th St., Ste. 2004
New York, NY 10019
(212) 970-6465
aestevao@harristrz.com