UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v.                              24 Cr. 542 (AS)

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

                Defendant.              Trial
------------------------------x
                                        New York, N.Y.
                                        May 30, 2025
                                        8:35 a.m.
Before:

                    HON. ARUN SUBRAMANIAN,

                                        District Judge
                                        -and a Jury-

                        APPEARANCES

JAY CLAYTON
        United States Attorney for the
        Southern District of New York
BY:    MADISON R. SMYSER
        EMILY A. JOHNSON
        MAURENE R. COMEY
        MEREDITH FOSTER
        MITZI STEINER
        MARY C. SLAVIK
        Assistant United States Attorneys

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:   MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
SHER TREMONTE
BY:   ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:   ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND

ALSO PRESENT:
LUCY GAVIN, AUSA Paralegal Specialist
SHANNON BECKER, AUSA Paralegal Specialist
RAYMOND MCLEOD, Defense Paralegal Specialist

P5HMCOM1

(Trial resumed; jury not present)

THE COURT:  Everyone ready to go?

MS. COMEY:  Yes, your Honor.

THE COURT:  Mr. Agnifilo.

MR. AGNIFILO:  Yes, your Honor.

THE COURT:  Can you tell me, what is the current situation in terms of your ability to speak with Mr. Combs and confer on trial days?  Give it to me.

MR. AGNIFILO:  What we tend to do, we tend to stay here in the building until 5.  We go down to the marshals' lockup on the fourth floor.  At 5, because I think of how the count works at the MDC, they take Mr. Combs back to the MDC, leaving here at 5, so we have a pretty hard cutoff at 5.

And the cutoff for visits -- if we wanted to go there and see him in person, it would take some time for him to get there, take some time for us to get there, so I would imagine, if they were there by 5:30, there might be some delay, we can probably see him between -- I'm wrong about that.  Because of the processing, we probably could not get into the MDC before the 7:30 p.m. cutoff, so we are really talking about, they bring him to the building at about 8.  We see him in the lockup from 8 until right before we come up and see your Honor, and then we obviously have breaks, and we can see him on the fourth floor.  But then after court, if we end at 3, we have two hours here.  If we end at 4, we have one hour here.

At the current time he doesn't have any minutes. That's a big issue. I understand that's a policy matter at the MDC. But like I said, every trial is a little bit different. We just need more contact of any sort, putting a premium on in-person meetings, because that's more important.

Let me just add one thing to the mix. When we see him here, other than if we see him in the back, which is very fleeting, there is a screen between us, and you can't really see documents through the screen very well, and you can't pass documents. That's really an important feature. That's the overview.

THE COURT: Help me with the minutes because the MDC says that for May Mr. Combs has used 47 of his 300 minutes, so he has extra minutes there. Maybe I'm missing something, but that is what they report. Because I have relayed everything that you have told me in terms of the distinctions between the legal calls and the social calls, the fact that the social calls are limited by minutes, and you'd like those to be augmented.

MR. AGNIFILO: Correct.

THE COURT: I'm just relaying what I hear, which is that there are available minutes. If that's not true, though, that should not be a problem.

Here is what I can do right now.

First, to the extent that there is a limitation on the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

minutes, I think we can augment those minutes so that we can facilitate phone conversations.

MR. AGNIFILO:  That would be very helpful.

THE COURT:  We can do that.  But I would like to understand what the issue is because I'm being told by the MDC that there are available minutes, so that's just a disconnect that we need to work out.

MR. AGNIFILO:  It's a disconnect.  I have no doubt that what the MDC told your Honor might be something the MDC believes.  From our end, Mr. Combs points out he tried to use the phone this morning, and he has no minutes.  We have been operating on the premise for weeks that he has no available minutes, and that's sort of a practical belief, meaning that he has tried and he has not been able to do it.

THE COURT:  We can get to the bottom of that.  If we need some augmentation of the minutes, then I think that's doable.  So we can do that.

MR. AGNIFILO:  That's helpful.  That certainly would be very, very helpful.  I know I'm being pushy.  I recognize that.  It would be very helpful, certainly for the weekend. And the reason it would be helpful for the weekend is because visiting is only between 8 a.m and -- it's 3 p.m., but they usually -- we have to wrap up before that, like sometimes 2:30, which seems like a lot of time, I recognize, but it's really not that much time, and it's just not enough time.  The minutes

over the weekend would be great.

At the risk of continuing on this path, at one point the additional in-person meetings is really going to be critical.  It's critical now, but it's going to be more critical.

THE COURT:  You stopped me in the middle.

As to the minutes, if there is a way for someone on your team to check on that, based on what I've been told, which is that there are available minutes, if there is some other allocation and I'm just not looking at the right number, then let me know, but, otherwise, you should have the minutes.  If you don't have the minutes, you have to let me know so that I can go and follow up on this.

MR. AGNIFILO:  We will do that.

THE COURT:  As to the timing, this case is pushing the boundaries, as you probably understand and appreciate, of what court security and the marshals are able to do, given even the additional staffing that has been devoted to this case, so that is putting a lot of pressure on everyone.  It's putting a lot of pressure on you too, and I appreciate that.

However, what we can do is get Mr. Combs here by 7 a.m. and afford counsel the ability to be there with him at 7 a.m. so that you have substantial time in the morning to confer with Mr. Combs.  That's on the front end.  On the back end, we can afford access for you and Mr. Combs until 6 p.m. here.  So

that's giving you, if we end at 3, and even if we have some posttrial matters to address, let's say 3:30, another two and a half hours here.

Those two things -- that's maxing out the marshal service because they have to then deal with transport back to the MDC, and then they have to be back here in the morning. So there are serious constraints doing anything longer than that. That's a lot of extra time.

Those are the things that we can implement to provide you and to provide Mr. Combs with additional access to counsel.

MR. AGNIFILO: First of all, thank you.

Here are my concerns with -- let me also say the marshal service has been wonderful to us, and I want to thank them publicly and how helpful they have been consistently.

Part of the problem that we face is the facilities that we are in, the marshal service doesn't allow us to show him documents, doesn't allow him to read documents, and there are a lot of -- it just takes time. We are constrained if we want to show him exhibits. We want him to read text messages, emails, things like that. We really can't do it in the facility we have. We would have to do that at the MDC. We can do that over the weekend.

The problem is, the trial is faster moving than that, and so things come up during the week where we really need -- I am very, very grateful for all that the marshal service has

done and all that your Honor has done, and your Honor has devoted a lot of time and attention to this. I think we really need to be able to sit with him during the week.

THE COURT: The alternative is that we arrange for earlier transport back to the MDC and potentially extend in some way the hours there. My assumption was that the problem is that just getting back to Brooklyn and the transport, the processing, everything takes so much time that it doesn't leave much of any time on the back end.

MR. AGNIFILO: That's true. That's right. The way the count works is, the count at the MDC -- we wouldn't get here by the time the count started, and so we would run into the same problem. I think the reason that the marshal service keeps him here until 5 very much coincides with the count at the MDC, which tends to clear at about 5 or 5:30. It wouldn't work to bring him back. We probably wouldn't get that much extra time. We are better off meeting here in terms of the amount of time. Why that's difficult is, we are better off meeting at the MDC in terms of the ability to sit with him at a table and show him things.

I hear the Court.

THE COURT: For present purposes we are not going to solve this all the way right now, so we got to break down the issue.

As it was presented to the Court, there was an issue

with timing.  I understand what you're saying now.  Let's see if this works in terms of timing.  And then if there is a further issue, you can raise it to me, and I can see whether there is an option there, if there is some limitation on review of documents.

MR. AGNIFILO:  I understand.

THE COURT:  Let's work on the first thing.  Let's get that in place so that you have further time access, and then on the other issue we will see what we can do.

MR. AGNIFILO:  Yes, Judge.  I'm very grateful.  I know that I keep bringing this up.

THE COURT:  I understand.

MR. AGNIFILO:  The one thing that I will sort of say is final, and then I'll sit down, and we will leave this alone. I understand the marshal staffing, and I appreciate all that they have done so far.  I think if your Honor issued an order, it would be an order.  There are all sorts of things -- in my experience, it's amazing what you have to do when you have to do it.

THE COURT:  I understand.  But it has to be an appropriate order that makes sense in the circumstances of the case.

Just so you understand, the access that you and Mr. Combs have received in this case is much greater, much, much greater than defendants in many other cases.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MR. AGNIFILO:  I recognize that.

THE COURT:  This is a unique case, for the reasons that you have said.  That may be appropriate here.

However, I need to understand in real terms what the limitations are that would require the kind of things that you're asking for in every instance.  That's the reason why we have had this back and forth and why instead of just ordering something that may be infeasible, I really need to speak with the interested parties and make sure that what we are doing makes sense.

MR. AGNIFILO:  I absolutely want that.  I want to foster that.  And I think this has been sort of a graduated process to a certain extent.  And I appreciate everyone trying to work with us and Mr. Combs.

We will do exactly what your Honor says.  We will tackle the issues that seems to be open issues, and we will come back to your Honor with a proposal that we think is necessary and hopefully feasible.

THE COURT:  Good.

Summary charts.  Who is going to address that?

MS. COMEY:  Yes, your Honor.

The chart that we would really need a ruling on is 1402, which relates to the chart of hotel reservations and then other information within the rows to basically give context to why those hotel reservations are relevant.  Those all relate to

Ms. Ventura.

We have tried to confer with the defense and they, as is their right, have maintained that their view is that these charts under no circumstances can come in under Rule 1006.

Understanding that, we took a look at defense counsel's letter, and we made some adjustments to the chart.

If I can ask Ms. Foster to pull up Government Exhibit 1402.

THE COURT:  I have it up, if that's the one that was sent earlier.

MS. COMEY:  It was the one that was sent last night. It's helpful for me to look at it as we are talking about it.

What we tried to do was change some of the way that the information is presented in order to make it as neutral as possible and not argumentative because our goal here truly is to present the information contained in hundreds, if not thousands of pages of records to the jury in an efficient way.

Our goal here is not to try to sum up through this witness.  Our goal here is not to try to make an argument.  It is to efficiently and clearly present evidence to the jury.

I don't know if we have 1402 up.  We don't have it. Then I'll take a look at it.  The way that we did that, the changes that we made, your Honor, were -- with respect to travel, the defense had fairly pointed out that just having a yes or a dash could have suggested somehow that the element of

interstate travel had been met.  So we replaced the yes with just the flight information itself and a cite to the exhibit that has that flight information.  Again, it's just conveying the information from the flight records, which is exactly what Rule 1006 contemplates.

THE COURT:  Just to be clear, when it says in the first row, GX 3A-103, that is a flight record for whom?

MS. COMEY:  That is a flight record for Jules Theodore, your Honor.  We can add that, your Honor.  We can add the name in there as well.  But it is a flight record for the escort, Jules Theodore, to show the timing of the fact that this flight happens --

THE COURT:  Understood.

MS. COMEY:  -- right around the time of the hotel reservation.

And the point of that is, we are not, through this chart -- I don't think the chart itself says that the flight must have been part of this scheme.  I think it just shows up the timing, that this flight happens right around the time of the hotel record.

And the summary witness is not going to testify or opine that Jules Theodore must have been traveling exclusively for this meeting.  All the summary witness will say is the records show that there is this hotel reservation and then that there are travel records showing that one of these individuals,

Jules Theodore, traveled around the time of the reservation.

And then also in the row around the same time of the reservation there are communications between Ms. Ventura and Mr. Combs in which the face of the messages themselves discuss a meeting and, similarly, that there are communications with or regarding one of the escorts in the escort column around the time. So it is just matching up in chronology the timing of these different exhibits.

And the reason that we need the columns to the right is because, otherwise, the columns on the left of just hotel records are meaningless. The fact that there are just hotel records doesn't on its own create any relevance to the charges in this case because I think, as the jury has heard, Mr. Combs was a very successful and very busy businessman who traveled all over the world, who stayed in hotels for all sorts of reasons, as is Ms. Ventura. They have heard that they went on tour. They have heard that they went to club appearances. So a hotel record on its own, without the context in the rest of the columns, is not necessarily relevant to this case. So that's why the columns to the right are necessary in order to explain which hotel records are in this chart.

THE COURT: Are these GX exhibits already in evidence?

MS. COMEY: Some of them are and some of them we are planning to offer before this chart is offered.

THE COURT: Why wouldn't all of those exhibits be

inadmissible if they would only be relevant to this chart connecting the dots between all these issues?

MS. COMEY:  I think they are all relevant because of the other evidence in the chart, if that makes sense, your Honor.  When we go to offer these hotel records, if there were a relevance objection, our answer would be, well, your Honor, we can pull up each of the exhibits that is in the rest of this chart to overcome our burden to prove to your Honor that the 401 relevance bar is met.

THE COURT:  I understand the positions.  I understand what is being conveyed here.

Let me hear from the defense on this exhibit.

MS. SHAPIRO:  Your Honor, I think the problem -- there are a couple of things, but the problem with the chart is not only the relevance point your Honor made, but the purpose of the chart is argumentative.

THE COURT:  Which parts are the most troublesome?

MS. SHAPIRO:  I think --

THE COURT:  Let me take a step back.  There is some part of this chart that is a proper 1006 summary.  What do you have an issue with?

MS. SHAPIRO:  For instance, if the chart simply had the date, the location, and then -- of the hotel, maybe the reservation name, those -- and summarize the ones that were relevant, we'd be fine with that.  But the problem with the

chart is, it ties together these other pieces of evidence in the way a summation is supposed to do.  So that's the problem with it.

And I should also add that my understanding from discussions with Ms. Johnson was that we actually need a ruling on the other ones as well because I think the Court's ruling will help us resolve potential disputes about the underlying records.

So if your Honor will indulge me, I want to take a step back.  For instance, there are some other exhibits that relate to some of the other charts that the defense has issues with because, for instance, there is financial records and airplane records, and they are voluminous and include -- the underlying records, that is, irrelevant materials.

What we have said to them is, a proper summary chart, for instance, as to the airline records would just extract from the voluminous documents the relevant ones that, through other evidence, the government can tie to the charges.

Instead, what they have done in this chart, as an example, they pull out things from a bunch of different pieces of evidence and put them together in a way that supports their argument to the jury about what these records show.

THE COURT:  Isn't your main argument not really on the first seven columns but really on the last four?  Because, as Ms. Comey pointed out, if you just had the initial columns,

then it would be a summary of voluminous information.  But they say that the real relevance comes into play by pointing out that, yes, there were communications between Mr. Combs and Ms. Ventura and, yes, there were communications from the escorts.

They say relevance.  You say that that's argumentative and is an attempt to prove their point through something that is regarded as evidence.  If we just had the first seven columns there and cut off the last four, why would that pose an issue under 1006?  Because I think there is a fair argument that they are voluminous materials that are being summarized here, so they would fall within the text of 1006.  Without the first four columns, there is nothing to be argumentative about.

The government will then argue in closings that these are the freak-offs, and they will point out the communications for each of these that show that these are the events that they believe constitute the sex trafficking.

MS. SHAPIRO:  Your Honor, I think that's a great step in the right direction, and we will take that, but I would still object to the escort and travel columns for similar reasons and particularly the use of the word escort.  But I think that the escort and travel columns are also --

THE COURT:  What's the issue with the travel column?

MS. SHAPIRO:  It's just that it's being connected up to the hotel -- I guess if you get rid of the escort column, then --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT:  You don't have an issue with the underlying content?  You have an issue with the characterization of the escort?

MS. SHAPIRO:  Correct, your Honor.

Obviously, this is all subject to us checking this to make sure things are connected up so these are --

THE COURT:  As to the travel, what's the grievance with the travel column?  They are travel records.

MS. SHAPIRO:  Right.  I think if we got rid of the escort column, we'd have less of a problem with that.

THE COURT:  Meaning the title.

MS. SHAPIRO:  I think the problem with using the escort and travel column is, it's a similar point, which is that they are saying that -- they are connecting up the stay in the hotel with the escort traveling to that city to go to that hotel, which is something they should be arguing or that it should be a demonstrative.

THE COURT:  If it just had the people's names and the flight records, then it's really just summarizing all the materials that are in the record.  It's not saying anything about -- an argumentative way about what those show.

MS. SHAPIRO:  They are saying that it shows that the escort went to that hotel, right?  Because if the reservation name is Frank Black or one of the other --

THE COURT:  You don't dispute that these

individuals -- that there were documents relating to those individuals that correspond to the dates in question. Because if we modified this exhibit in the way that we have been discussing, that's all this demonstrative would go to show. It wouldn't show anything else. It wouldn't even show --

MS. SHAPIRO: We don't know, without testimony about the specific date, for instance, that Jules Theodore, even if he traveled from LAX to NYC actually went to the London Hotel on that date, and then the government is going to make whatever arguments. We don't know that --

THE COURT: That's an issue with these references here. We have this column for the escorts, and then I'm seeing exhibit numbers. And I have not looked at those exhibit numbers, but I'm assuming that those correspond to the dates in question and relate to visits to those hotels. That's my assumption based on seeing this.

MS. SHAPIRO: Can I have a moment, your Honor.

I guess what I'm saying is is that the exhibits that are being cited in those two columns are travel records, as I understand it, that show that those escorts traveled to those cities on those dates. But they don't connect up to like, did that escort actually go to the hotel?

The government can make whatever arguments it wants about inferences, but my point is that on their face they are not connected up without some sort of an argument or witness

testimony.

THE COURT:  I understand what you're saying.  You're saying in the escort column those exhibits that are referenced are simply the travel records.

MS. SHAPIRO:  Yes, your Honor, correct.

THE COURT:  Fair.

Ms. Comey.

MS. COMEY:  Your Honor, it's different in each column.

Taking the conversation you just had with Ms. Shapiro piece by piece, first, we are happy to change the title escorts, understanding that that's drawing a conclusion about who these people were.  Whatever neutral title the defense wants or the Court wants that accurately conveys the information there, which is just how we identified the third party --

THE COURT:  You don't need a title.  Really you don't.  You got the name there.  If the name is there, what more do you need to summarize --

MS. COMEY:  Your Honor, I just mean at the header.  Instead of escorts, if it's just name or something, for clarity.

THE COURT:  Name.

MS. COMEY:  Something like that, that's fine, your Honor.

In terms of what the records are, it depends row by

C5HMCOM1

row.  Sometimes it's a text message saying go to room whatever in the London Hotel.  Sometimes it's a travel record.

But if I may, the other columns, I think that the Combs employees communication column, although I think there is a basis to include it, it is fair to have that removed because I think that that -- I think the defense's issue with that is it's trying to draw an inference of whether there may have been enterprise members involved in organizing those.  If we want to remove that column, I think that's fair.

The concern I have about removing video and Ventura/Combs communications and escort communications is that those three columns are part of how we identify who the name is within that column.  So either Jules Theodore appears on one of the videos or Clayton Howard appears on one of the videos whose metadata reflects that it was recorded on the date that overlaps with the hotel reservation.  Or there are text messages, like I just said, between Jules Theodore and Ms. Ventura saying, for example, meet at whatever the London Hotel room.

And the reason that the Ventura/Combs communications are relevant is that, as I think we have heard testimony about so far, Ms. Ventura was not the only woman that Mr. Combs was having these hotel nights with.  We have heard evidence that he was having hotel nights with Gina during the same time period and hotel nights with Ms. Porter during the same time period.

So part of the way we identified which hotel records under, for example, Frank Black or booked by his companies or his assistants were relevant to Ms. Ventura was, in part, based on text messages between Ms. Ventura and Mr. Combs showing that they were meeting up at those dates.

So part of the reason that we have these particular hotel records, which is a small percentage of the total hotel records over this decade long period, is because we didn't want to unintentionally include records where there was actually a meeting with Ms. Porter or with Gina or with someone else. So that's why the column regarding Ventura/Combs communications and the escort communications and the video column I think fall within the category that your Honor was discussing with Ms. Shapiro of just the purpose of them is to explain why these hotel records are in this chart, as opposed to any others.

I take Ms. Shapiro's point that she does not want us to use this through this summary witness to sum up. The summary witness will not be testifying that she knows for a fact what happened in those hotel rooms, that she knows for a fact whether in fact an escort who said he is going to room whatever at the London Hotel actually went to that hotel. All the summary witness will be saying is, there are messages that say, I'm going to the London Hotel on this date, and on that same date this was a reservation under Frank Black at that same hotel.

THE COURT:  Let me ask you a question, if I could.  On the second row --

MS. COMEY:  Yes, your Honor.

THE COURT:  Where there is no Ventura/Combs communications.

MS. COMEY:  Yes, your Honor.

THE COURT:  What does that row reflect?  Remind me what that is in terms of the government's argument.  What kind of event?  Who was involved?

MS. COMEY:  Your Honor, I think that would be a freak-off involving Jules Theodore and Mr. Combs and Ms. Ventura, and I believe the escort communications would reflect a text message or an email between Mr. Theodore and either Ms. Ventura or Mr. Combs about meeting up.

THE COURT:  Why wouldn't you be able to have date, location, the two location columns, reservation name?  I'm not really sure why extra room charge is even in here.  But no one has really raised an issue with that.  And then the next column be names and have the names of the people there, meaning Ms. Ventura, if that's Ms. Ventura and Mr. Combs.

MS. COMEY:  We would merge the communications into that column.

THE COURT:  Then in the parens have just the exhibits that go to their participation.

MS. COMEY:  We can do that, your Honor.

THE COURT:  If you can do that, then you can get rid of all the last four columns.

MS. COMEY:  We could do that.  I suppose we could put the video cite underneath the relevant name as well.

THE COURT:  Then that would be, I think, a fairer summary of exhibits, as opposed to argumentative in the way that perhaps the defense is indicating.  In the travel column, I suppose you don't even need that.  You could just put that under the person's name --

MS. COMEY:  We could, your Honor.  That would end up taking quite a bit of time.

One of the elements we do need to prove is interstate travel.  If we don't have just a column that summarizes that, we are going to need to pull up each individual record.

THE COURT:  Those are flight records.

MS. COMEY:  Those are flight records.

THE COURT:  Let's call it flight records.

MS. COMEY:  Sure, your Honor.  We can call it flight records.

I'll get a copy of the transcript and make sure I'm making all of these changes accurately.

THE COURT:  If we make those adjustments, Ms. Shapiro, that would seem -- I know you still disagree that that's a 1006 summary, but you would agree that's progress towards your view of what 1006 would permit, correct?

MS. SHAPIRO:  Yes, your Honor.  We think that's much better, and we will take what the Court gives us, but we are obviously preserving the objection.

THE COURT:  Understood.

MS. COMEY:  Your Honor, if I may, this has been very helpful.

I am going to try to make similar changes to 1406, which is the Jane chart, so that we are consistent, and we don't have to have this discussion again about that exhibit.

THE COURT:  That's 1406.

Am I right that there are just four summary exhibits left?

MS. COMEY:  No, your Honor.  We are prioritizing the ones that we are hoping to put in next week.

THE COURT:  That's 1402 and 1406.

MS. COMEY:  No, your Honor.  That's the ones related to Ms. Ventura.  So that's 1402, 1404, and 1405.  Those three are the ones that we are seeking to put in either Tuesday or Wednesday of next week.

THE COURT:  As for 1404, what is the purpose, really?  What is the 1006 basis for the first two slides?

MS. COMEY:  I am going to turn that over to Ms. Johnson.

THE COURT:  Sorry.  This is the bank account.

MS. SHAPIRO:  Your Honor, can we put those up on the

screen so we can all see what we are talking about.

That can't be what it is.

THE COURT:  1404 is the pie chart.

MS. SHAPIRO:  I'm seeing this for the first time. They have been changed quite considerably.

MS. JOHNSON:  Your Honor, we reformatted the Excel charts to make them slightly easier to understand.  All of this information was previously in the draft Excel chart that we submitted to the Court.

The slides all go together.  What is attempted to be demonstrating is summarizing various financial records.  In particular, this one would be an October 2012 Amex account and a charge from the Intercontinental Hotel for penthouse damage in the amount of $46,000 and change.  That is paid by the Sean Combs American Express statement in October of 2012.  And then --

THE COURT:  Why do you need a summary to prove that nonvoluminous underlying two-page statement if it's anything like credit card statements that we all get?

MS. JOHNSON:  The statement is many, many pages.  It's well over two pages.

THE COURT:  But somebody can just point out the line items for the Intercontinental Hotel and say for the month of October here are those line items.

Because I am going to get to the last page.  That's a

core 1006 summary.  That happens in every case.  You have bank records.  You can't look at the bank records for all these different 20 banks, that would be voluminous, so you summarize that in a chart, and that would seem permissible.

It would seem like that the only missing link is just saying the $46,786 came from the American Express statement because that's the only thing that's missing in that chain of showing that amount was paid by the various entities.  I take it the government's argument is those are all corporate entities that are part of the alleged RICO enterprise.

MS. JOHNSON:  I understand your Honor's point with respect to this first slide.

I think the second slide is important to understand the third slide to show how this American Express bill of approximately $944,000 was paid by at least like five to 10 separate corporate bank accounts.

THE COURT:  Why doesn't the last page show that?

MS. JOHNSON:  I think that the visual shows how they are paid a little bit more cleanly.  We can use the visual as a demonstrative, if the Court prefers.

THE COURT:  I am going to exclude the first two pages. This last page is a proper summary and does summarize voluminous information without being argumentative.  The first two slides are quintessential demonstratives, but I don't think you really need them.  Because once you have the American

Express statement with that exact number of $944,059, then you've got the chart that shows where the origin of all the payments was. You've got it right here.

MS. JOHNSON: Understanding the Court's ruling that those are quintessential demonstratives, I think the government would like to use at least slide 2 as a demonstrative.

THE COURT: You can absolutely use it as a demonstrative.

The other issue is whether it can go back to the jury room. This is a proper summary. It can go back to the jury room. But the other two would be illustrative aids under rule 107.

MS. JOHNSON: Understood, your Honor. We will re-mark those.

1405 is similar. It just shows different American Express payments.

THE COURT: We can make the similar --

MS. JOHNSON: We can show the funding.

THE COURT: It would be the second slide.

MS. JOHNSON: Right. This is summarizing the actual charges that hit the account that are relevant because in this case it's less complicated how the Amex is paid. At this particular time the American Express is paid only by one account, so this is just pulling out the relevant line items from what is a very voluminous American Express account

statement.

MS. SHAPIRO:  Your Honor, if I may respond on this one that the issue we have with the last page of this one is that -- the second page, it has got names on the left side.  We don't know where that's coming from.  It's just out of thin air.

MS. JOHNSON:  It's in the American Express statement because American Express statements pull point-of-sale information for flight records.  So, for example, the charge on the American Express statement shows that it was for a flight record for that person.

MS. SHAPIRO:  Is the person's name in the underlying record?  Is that what you're saying?

MS. JOHNSON:  Yes.

THE COURT:  I think some modification can be made to make it more of a summary in the way that we did with 1402.  It's tying -- I would just say what it is, meaning, if it's sale information for flight, and then you can have the exhibits that show that it's flight for a particular person in exhibits, I'm sure that you can address that issue.  That's a minor modification to this chart.

MS. JOHNSON:  OK.  We can quote the line item, if that's the easiest.

THE COURT:  Great.  That's the second slide.

Ms. Shapiro, do you have an objection to either the

first or a third slide here?

MS. SHAPIRO:  Yes, your Honor.  I would ask that the Court treat them the way it did the previous exhibit and that those should only be demonstratives.

THE COURT:  Any issue with that, Ms. Johnson?

MS. JOHNSON:  No, your Honor.

THE COURT:  That takes care of that.

Anything else, Ms. Johnson, that we should address right now concerning these summary exhibits?

MS. JOHNSON:  No, your Honor.

MS. SHAPIRO:  Your Honor, may I just have one moment to confer with Ms. Johnson?  I think there may be an issue with two more --

THE COURT:  What I'll ask, given that we are now running into the jury's time, why don't we get started.  If we need to address it on the lunch break, we can address any issues.

MS. SHAPIRO:  Thank you, your Honor.

THE COURT:  With that, can we have Mia back.

MR. STEEL:  Your Honor, while Mia is coming in, can I address this honorable Court?

THE COURT:  Yes, of course.

MR. STEEL:  I just want to make sure this comports with what I believe the Court said is a good option.

We are making binders, unredacted binders, for Mia,

the Court, all the parties, and the jurors. I believe that the numbers should work out. Then it will be shown, I believe, on the screen, with the Court's permission, to the audience redacted.

THE COURT: That's fine. Thank you for doing that. That's fine.

MR. STEEL: The only reason I bring it up now is assuming that is going to work.

THE COURT: Hold on. The witness is coming in. Why don't we close the door for just a moment.

Sorry. False alarm. One minute.

MR. STEEL: If the Court could just instruct, when it's appropriate, the witness. She will have unredacted. So don't say the name.

THE COURT: I think she will be mindful of that, but I will make sure she understands.

MR. STEEL: I don't want the Court to be in a bad position.

THE COURT: Thank you.

If Mia could please come in. Thank you.

(Jury present)

THE COURT: Welcome back, members of the jury.

Mia, you understand you're still under oath?

THE WITNESS: Yes.

THE COURT: Ms. Smyser, you may proceed when ready.

MS. SMYSER:  Thank you, your Honor.

MIA, resumed.

DIRECT EXAMINATION (cont'd)

BY MS. SMYSER:

Q.   Good morning, Mia.

A.   Good morning.

Q.   You testified yesterday about how the highs were really high and the lows were really, really low when you worked for Mr. Combs, is that right?

A.   Yes.

Q.   And at the end of the day yesterday you spoke about different times in which Mr. Combs sexually assaulted you, is that right?

A.   Yes.

Q.   Were those times some of the lowest lows?

A.   They were the lowest, yes.

Q.   Even after those things happened, did you still have some good times working for Mr. Combs?

A.   Oh, yes.

Q.   Were you close with other employees you worked with?

A.   Yes.

Q.   Did you refer to the people you worked with as family?

A.   Yes.

Q.   Why did you call them a family?

A.   That's who I was surrounded with all the time, and we went

through some horrible times together and great times together, and that's as how like everyone referred -- like we all referred to each other as.

Q. You mentioned yesterday that you dated one of Mr. Combs' employees, is that right?

A. Yes.

Q. Who was that?

A. Matt Testa.

Q. Remind us what Matt Testa's role was.

A. He was Puff's sound engineer.

Q. Is that a sound engineer for music?

A. Yes.

Q. And you also testified yesterday that you were on call virtually all the time for Mr. Combs. How did that leave time to have a relationship with Matt?

A. It wasn't really a traditional relationship. Matt was around all the time, so I guess it was just being around somebody that supported you all the time. We had an apartment together in New York, but we were rarely ever together at the same time. So it wasn't -- yeah. It wasn't like a traditional relationship.

Q. Were you all able to hang out much outside of work?

A. No.

Q. Mia, did you tell Mr. Combs at various points that you loved him, even after the sexual assaults started happening?

A.   Oh, yeah.

Q.   Why did you do that?

A.   Because that's just how we all -- that's how we talked to each other.  And when the dynamic would shift to the best friend or friend dynamic, you were just desperate to keep it there because you're safe.

Q.   Mia, I want to direct your attention to October of 2015. Where were you at that time?

A.   I was in Capetown, South Africa.

Q.   Why were you in South Africa?

A.   I was with Cassie, and she was shooting a movie.

Q.   Who instructed you to go to South Africa?

A.   Puff.

Q.   What did Mr. Combs tell you to do there?

A.   Just to help out, like be with Cass and help her out.

Q.   What was happening, from what you could see, between Mr. Combs and Cassie at this point in time?

A.   While we were there, while we were in South Africa, Cass had caught Puff cheating on her.

Q.   How had that happened?

A.   It was through a video online, I guess, during one of his -- Puff's club appearances.  She had popped up in the video.

Q.   Who had popped up in the video?

A.   Her name was Gina.

Q.   How did Cass react after seeing this video?

A.   She was devastated.

Q.   What were her interactions, from what you could see, with Mr. Combs after seeing that video?

A.   They talked on the phone or had -- they were on the phone, and then at one point she didn't want to speak to him, so she stopped answering his calls.

Q.   Remind us where Mr. Combs was at this time.

A.   He was in Miami.

Q.   What did Mr. Combs do, from what you could see, when Cassie refused to answer his calls?

A.   He had Kristina, who was his executive assistant at the time, and many others try to get Cass on the phone and then also try to get me to get Cass on the phone.  So basically I was put in the middle.

Q.   Put in the middle between Mr. Combs and Cassie?

A.   Yes.

Q.   I want to talk some more about that.

        MS. SMYSER:  Ms. Foster, can you please pull up what's in evidence as Government Exhibit C-508-R.

Q.   What is this, Mia?

A.   This is a WhatsApp messages between me and Kristina.

Q.   What's Kristina's last name?

A.   Khorram.

Q.   Could you just remind us what her role was at this time.

A. She was his -- Puff's executive assistant.

Q. How closely did Kristina work with Mr. Combs at this time?

A. Very close.

Q. Who is sending the blue messages here?

A. Kristina.

Q. What about the gray messages?

A. Me.

Q. What is the date in which the first message was sent?

A. October 26, 2015.

Q. I am largely going to read the blue messages, if you read the gray, and I'll ask you a few questions about them.

The first message says: Hey. It is KK.

Who is KK?

A. Kristina Khorram.

Q. Hey, it's KK. Do you get these? PD wants to talk to you. Sorry, messenger. Don't shoot.

Who did you understand Kristina would be referring to when she said PD wants to talk to you?

A. Puff.

Q. How did you respond?

A. She just tried to call him.

Q. Who were you talking about in this instance?

A. Cass.

MS. SMYSER: Can we please turn to the next page.

Q. I am going to read Kristina's messages here.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Can you call me.  He's trying to reach you.  Call me first, though.  Audio call not completed.  Pausing here.

What do you understand audio call not completed to mean?

A.   She tried to call me, but I didn't answer.

Q.   There is another audio call not completed.

Spiral, call me, please.  Audio call not completed.  Audio call not completed.

MS. SMYSER:  Could we turn to the next page.

Q.   Another audio call not completed.

How do you respond to this, Mia?

MS. SMYSER:  If we could zoom in on the top messages here.

A.   I just woke up.  Did you ever explain to him what time it was in Capetown because it's 7:49 a.m.  So I have missed calls all through 3:45 a.m. etc.  I will call you when we get to rehearsals.  He doesn't sound in the right mind at the moment.  So any reasoning should be in the a.m. your time.

Q.   When you mentioned rehearsals here, what were you referring to?

A.   Cassie's dance rehearsals for the movie.

Q.   You also said he doesn't sound in the right mind at the moment.

What did you mean by that?

A.   I had talked to Puff, and I was referring to him.

Q. What were you talking about when you said, he doesn't sound in his right mind?

A. He was irate, he would forget what he was talking about, and he was also slurring quite a bit and saying irrational things.  That was my assumption.

Q. In the phone calls where he was slurring his words, what kinds of things was he saying to you?

A. He was threatening my job, and then he threatened to kill me, and then he was threatening -- he was just -- lots of threats telling me that he was on the phone with HR, even though I knew that wasn't true, things like that.

Q. How did you know that wasn't true?

A. Because I believe it was like 4:15 in the morning and that wasn't office hours.

Q. When you were in South Africa, did you have other phone calls with Mr. Combs in which he was not slurring his words or forgetting what he said?

A. Yes.

Q. Did he make any threats during those calls?

A. Many.

Q. What kinds of threats did he make?

A. He threatened me and said I had to get on a plane right that moment and come back, it's like a 35-hour plane ride, or else I lost my job.  He has threatened to fire me, and he also threatened to kill me, among other things like that.

Q.  Mr. Combs had Kristina reach out to you before, Mia?

A.  Yes.

Q.  Generally, when would that happen?

A.  Whenever he wanted to get me on the phone.

Q.  I am going to read the last few messages here from Kristina.

I know.  Any chance you can call me now.  Sorry he just called me again.  And said he really needs to talk to her.  I'm really sorry.  I am trying to help here.  But honestly not sure what to do.

MS. SMYSER:  Ms. Foster, could you please zoom out and turn to page 5.

Q.  Let's focus in on the text starting with, he just called me again through the bottom of the page.

He just called me again and said he needs you to call him now.  I told him everything you said, and he does not want to listen and said you need to call him now.  Mia, I'm sorry.  I don't know what else to do.  Mia, he just told me to tell you if you don't call him in the next two minutes, you don't have a job.

What did you understand this last message to mean?

A.  That if I didn't call Puff in two minutes I was fired.

Q.  Had Mr. Combs previously threatened to fire you at this point?

A.  Many times.

Q.  And how did those threats make you feel?

A.  Panicked, desperate to make it right, and terrified and really, really sad.

MS. SMYSER:  Ms. Foster, could you now turn to page 12.

Q.  We are going to start with the message, Mia, PD wants to talk to you through the end of the page.

Mia, PD wants to talk to you.  He is aware of the time and he says he wants to talk to you now.  Please answer.

Then it looks like Kristina calls you.  How many times does she call you?

A.  Five.

Q.  Did you answer?

A.  No.

Q.  How did you end up responding?

A.  Hey, guys, I just woke up with my phone underneath me and 48 missed calls/messages.  I have never ignored you for PD or PD before, so I'm confused why you think I would start now.  I was asleep hard.  She tore something in her leg and went to bed super early.  I keep waking up to a million missed calls at 3 and 4 a.m., and I assure you we are asleep and not ignoring.  I don't hear my phone when I'm asleep ever.  Does PD know the time difference?  It's not abnormal to be asleep during the middle of the night.  Because it really, really, really sucks to wake up to this every morning, as though I'm intentionally

doing something wrong. I answer the phone all other times of the day/when I'm awake. I've been nothing but trying my hardest to make everyone happy and do whatever I'm supposed to, and I'm getting shit on from all sides, and it's really tough. I'm in a fucked-up spot, and I would just really appreciate you guys understanding that when you call and I don't answer, I'm not ignoring you. I am most likely asleep hard because I have hysterically cried myself to sleep. This is really stressful, you guys.

MS. SMYSER: Can we please go to the next page.

Q. Could you finish your text message.

A. I am not ignoring you. Remember, I am not ignoring you.

Q. What does Kristina say in response?

A. Can you call me when you get a minute.

MS. SMYSER: Let's turn to page 13.

Could you zoom in on the last text of the page, Ms. Foster.

Q. On this text Kristina says: How is it going over there today?

MS. SMYSER: Let's go to the next page to see Mia's response.

Q. How did you respond to that?

A. It's OK. I'm still pretty mentally sore, and I've been having extremely horrible night tears and anxiety so bad I can't breathe. But other than that, it's great. You?

Q.  Who are your night tears about?

A.  Puff.

Q.  Mia, was Mr. Combs also trying to reach you during the time of these text messages?

A.  Yes.

MS. SMYSER:  Ms. Foster, could we now go to Government Exhibit 3T-101-R.

Q.  What are we looking at here, Mia?

A.  This is a message between me and Puff.

Q.  Who took this screenshot?

A.  I did.

Q.  What application were you using to speak to Mr. Combs at this time?

A.  WhatsApp.

Q.  Is that what you were also using to speak to Kristina?

A.  Yes.

Q.  Why were you using WhatsApp?

A.  Because we were in South Africa and it's free to use as long as you're on Wi-Fi.

Q.  Do you have your full WhatsApp conversation with Mr. Combs from this time?

A.  No.

Q.  Why not?

A.  I switched phones many times, but also I don't save messages or chats.  Just like photos and contacts.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q. So you have gotten several new phones since then?

A. Yes.

Q. Approximately when were these messages sent?

A. October -- sorry. They were in October of 2015.

Q. And the date at the top, October 31, 2015, does that reflect the date in which you screenshot these messages?

A. Yes.

Q. Where were you at the time the messages were being sent?

A. South Africa.

Q. Who sent the messages in white?

A. Puff.

Q. Who sent the messages in green?

A. Me.

Q. I am going -- could you please read Mr. Combs' first message.

A. If you don't call me now, fuck it all, and I am gonna tell everything and don't ever speak to me again. You have two min. Fuck her. Call my house now or never speak to me again. Fuck ABC and all lawyers. Let's go to war.

Q. I want to walk through parts of this message.

Mia, in the beginning Mr. Combs says: If you don't call me now, fuck it all, and I am going to tell everything.

When he said, I am gonna to tell everything, what did you understand him to mean?

A. It was his threat that he was going to tell Cass about the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

sexual assaults, but framed differently.

Q. What you do you mean, framed differently?

A. As though it was my fault or that I was -- that I had a part in it.

Q. How did that make you feel?

A. So scared and so like a horrible person and just terrified.

Q. Had you wanted to have sex with Mr. Combs?

A. No.

Q. Mr. Combs continues here: You have two minutes. Fuck her. Call my HS now.

What did you understand call my HS to be a reference to?

A. Call my house.

Q. When he said, fuck her, who did you understand him to be referring to?

A. Cass.

Q. The next portion says: Fuck ABC and all lawyers. Let's go to war.

What did you understand Mr. Combs to be talking about when he said fuck ABC?

A. So while we were in South Africa -- I'm sorry. I had finally like created and developed and started writing a comedy TV show based on a funny version of a character like me in his world, and we had sold it to ABC. And while we were in South Africa the press broke and it was like the most exciting thing

that's ever happened in my life, so he is threatening to take that away.

Q.   Were there other times that Mr. Combs threatened the show?

A.   Yes.  All the time.

Q.   Generally, when would he do that?

A.   When he couldn't get what he wanted or couldn't get like Cass on the phone.

Q.   Did the show end up airing?

A.   No.

Q.   How did you respond to Mr. Combs?

A.   I'm inside now.  They are safety pinning a shirt on her and a fitting.  I will pull her out the second that I can.  I am trying not to say anything out loud because people are in this room and no one needs to know Puff's business, so please extend my time to nine minutes, please.  I'm begging you.

Q.   Here when you say, I will pull her out the second that I can, who are you referring to?

A.   Cass.

        MS. SMYSER:  Let's turn to the next page.

Q.   What did you say next?

A.   She just texted you.  She said she just needs the tone to change.  Please just be nice on the phone, please.

Q.   I'll read the rest of Mr. Combs' messages if you read yours.

        Call me now.  Call me now, please.  Yo.  Call me.

Call me now.  Call me now.  Call me now.  Call me now.  Call me now.

MS. SMYSER:  Can we go to the next page.

Q.  Call me.  Call me now.  Now.  Now.  I have come to the conclusion that it's best that we no longer have any dealings. Please don't call me.  I won't call you.

A.  I woke up with my phone under my face and 43 million messages and missed calls.  I have never ignored a call a day in my life, so I hope you know I sure as hell wouldn't start now.  I tried you back twice at 1 a.m., and I accidentally --

Q.  Mia, is that the end of the screenshots here?

A.  Yes.

Q.  Are these all the screenshots that you had?

A.  Yes.

MS. SMYSER:  Ms. Foster, could you please pull up Government Exhibit 3A-150-R.

Q.  What is this, Mia?

A.  This is an email from me to Puff, and then I forwarded it to Kristina.

Q.  Where were you when the email was sent?

A.  South Africa.

Q.  I want to walk through this now.  I want to direct your attention to the bottom message.

Who sent this message?

A.  I did.

Q. You sent it to Mr. Combs?

A. Yes.

Q. On what date?

A. October 17, 2015.

Q. Could you please read your message.

A. Hey, Puff. How are you. I heard that there is a lot going on, and I'm so sorry to hear that. You know I love you and would do everything for you, smiley face. I'm emailing you because I really just have to be honest with you about this.

I'm so embarrassed. But I bought my own ticket out here with my own money because I really wanted to make sure Cass was comfortable in her first couple of weeks away. She expressed to me that she was nervous, so I just went ahead and I booked it. Right now, so you know how embarrassing this is, if I change my flight I will incur a cost that I really cannot afford right now. Have I ever, ever, ever asked you about money? Embarrassing. I know that you are stressed, so I didn't want to bother you with this at all, and there is absolutely no problem with me coming back. I just can't handle the change fee. I hope this email doesn't make you upset. I've just been trying to avoid this conversation at all costs. Please let me know. I'm sorry for hitting you during this time. I wanted to make sure you were good. Never would stay away for too long. Just wanted to make sure your beauty was good. At the end of the day, regardless, I love you.

Q.  You say here, I bought my own ticket out here with my own money because I really wanted to make sure Cass was comfortable.

Why did you say that?

A.  Because he wanted me to make sure -- I was repeating back to him, like he wanted me to make sure that Cass was comfortable out there.

Q.  Were you in South Africa at Mr. Combs' direction?

A.  Yes.

Q.  Why were you sending this email to Mr. Combs?

A.  Because he had told me conflicting things, that he wanted me to get on a plane immediately.  I had to change my flight a couple of times.  Then he would tell me right before:  No, no, no, stay with her, and it was going back and forth like that.  And I didn't have -- it was expensive to keep changing.  So I wanted to make sure that's what he wanted me to do, because I couldn't afford keep going back and forth.

MS. SMYSER:  Let's go to the next message.

Q.  Mia, when do you send the next message?

A.  October 19, 2015.

Q.  What did you say next?

A.  Hey, not sure if you read the email below yet.  I know this is shitty timing too, but I need to make sure I'm following your instructions correctly because I know you said a few different things.  Do you still want me back Wednesday?  Or you

want me with CC until Mon., like before?

She is really upset and trying to get through these rehearsals, and I feel bad leaving.  She said she needs me right now, but of course I will do whatever you want.  She is really heartbroken.  I have never seen her like this.  I am not sure how I can help you guys, but know that I love you both and I'm here to help.

Either way, let me know because I need to change my flight again ASAP.  I just want to make sure I am doing what you want me to do and following your instructions.  Smiley face.

Both of your happinesses are my priority.  Love you.  Please let me know how to help.

Q.   Who is CC referring to in this text?

A.   Cass.

Q.   Why are you telling Mr. Combs, of course I'll do whatever you want?

A.   Because I had to let him think that he was the one making the decision.  Because if I had just said Cass wants this, he would have said --

MR. STEEL:  Objection.

A.   -- you work for me.

THE COURT:  Hold on.

Why don't we get a new question.

Q.   So if you had proposed a solution, what would you have

expected Mr. Combs to do?

MR. STEEL:  Objection.

THE COURT:  Sustained.

Q.  Mia, when you're having this conversation with Mr. Combs and you're talking about, I'll do whatever you want, why are you saying you'll do whatever you want -- whatever Mr. Combs wants as opposed to what Mia wants or what Cass wants?

A.  Because I felt I worked for him.  In my past experience it didn't matter what I wanted or anyone else wanted.  It matters what he wants.  And he was in charge.

Q.  So you said here:  I just want to make sure I'm following your instructions.

What were you worried would happen if you didn't follow his instructions?

A.  I would have been in big trouble.

Q.  What would you expect that trouble to consist of?

A.  Same.  I'm suspended, fired, lose my job, lose everything and have to be emotionally and possibly physically abused.

MR. STEEL:  Your Honor, we couldn't hear the last part of the answer.  I apologize.  It's not being read back on our screen.

THE COURT:  Hold on.  You didn't hear that last answer.  The last answer was:  Same.  I am suspended, fired, lost my job, and emotional or possibly physically abused.  That was the answer.

MR. STEEL:  Thank you, your Honor.

Q.  Mia, were you sending these emails before or after the sexual assaults had begun?

A.  After.

Q.  Why were you telling Mr. Combs that you love him in these emails?

A.  Because I want to stay with Cass.  I want to stay with Cass, but I don't want to make him mad.  So my personal -- I'm tip-toeing.  That's the way I would survive is tip-toe, just so I didn't make him more mad and didn't make him think that what he was doing was wrong.

Q.  Did you love Mr. Combs romantically when you were sending these messages?

A.  No.

Q.  What did you do next after sending the messages to Mr. Combs?

A.  I forwarded these to Kristina.

Q.  Why did you forward them to Kristina?

A.  Because I really needed an answer because I don't want to get on a 35-hour flight and then have to turn back around.

Q.  What did you say to Kristina?

A.  I know you get his email regardless, so can you make sure he gets the below email.  I'm in limbo.  Not sure what I'm supposed to be doing, and I can't afford to keep changing my flight last minute, because it's expensive, and I want to do

what he wants me to do and help Cass and do everything and just make sure everyone is happy, and IDK what he wants me to do.

He doesn't need to see this part, though.  Just see if he can read this email.

MS. SMYSER:  You can take that down, Ms. Foster.

(Continued on next page)

Q.   Mia, when you got back from South Africa, where were you physically working primarily?

A.   The office in LA.

Q.   And how did that differ from where you were primarily physically working before?

A.   It differed.  Before I was at his house and the office and typically wherever he was.

Q.   So were you around Mr. Combs physically as much after South Africa?

A.   No.

Q.   Was your job easier or harder when you were not physically around Mr. Combs?

A.   It was close to impossible.

Q.   What are some of the reasons that your job was close to impossible when you weren't around Mr. Combs?

A.   It was impossible to get answers from him, and there were certain -- there were certain levels I could take projects or decisions, that I was not allowed to make a massive money investment decision without his approval.  There were many things like, you know, I needed certain approvals from, and I could not get them if I wasn't next to him.

Q.   Were you able to detect what Mr. Combs' mood might be when you were not around him?

A.   No.

Q.   And how did that affect you?

A.   Severely, because then I wasn't able to figure out a way to work as far as like -- when his moods would shift, I would figure out a different strategy to work or get answers, umm -- yeah.

Q.   And how did this working situation make you feel?

A.   Defeated.  Like I was pointless, incompetent, and like I was letting other people outside of our company that I had forged real friendships and relationships with, like I was letting them down because a lot of projects were based on those relationships.  Yeah.

Q.   And why was not being around -- physically around Mr. Combs, what did that mean that you were letting down these other relationships that you had forged?

A.   Because I couldn't give them answers.  So for the most part all of these projects were us asking other established credible Hollywood decision-makers, you know, to get in on something, and then there would be a deadline.  And after doing all that work, not being able to get an answer for them, it's just pretty mortifying because I don't know how to like explain that to them.

Q.   Mia, while you were in South Africa, Mr. Combs made threats to your job, right?

A.   Yes.  Yes.

Q.   And you testified earlier that there had been times in which you were suspended from your job, right?

A.   Yes.

Q.   Who were the people who typically told you that you were suspended?

A.   Whoever Puff called.  Mostly HR or a chief of staff.

Q.   Who were the people from HR that you remember?

A.   Vashta Wilson.  At the end Sandy -- I don't remember her last name, but she didn't -- she would call me and just say, "I'm just calling you because he told me to but we're ignoring this."

Q.   And what about the chiefs of staff?

A.   Michelle James and Toni Bias Fletcher.

Q.   I'm going to show you what's marked for identification as Government Exhibit 320.  This is just for the witness, Court, and parties.

          That's fine.  We'll move on.

          Mia, what typically happened before these suspensions?

A.   There would be some sort of violent situation where I was like chased or hiding somewhere or like reacting to a violent episode of Puff's.  That was pretty much the way I reacted.

Q.   And who was violent in these situations?

A.   Puff.

Q.   Were there also times you were suspended for oversleeping?

A.   Yes.

Q.   And why would you oversleep?

A.   Because I would have accidentally fell asleep after being

awake for days.

Q. Ms. Foster, could you please display Government Exhibit 3A-119-R.

What is this, Mia?

A. This is a note -- notice from Vashta Wilson, the head of HR, to me.

Q. And what was the date on which this was sent?

A. March 31, 2011.

Q. Ms. Foster, could you please zoom in on the top two paragraphs here?

THE COURT: Ms. Smyser, can we take this document down?

MS. SMYSER: Yes.

THE COURT: I think it needs further redaction.

MS. SMYSER: Thank you, your Honor. We will do that.

Q. In the meantime, I think that document was dated the end of March, is that right?

A. Yes.

Q. What do you remember happening before you got that document from HR?

A. I was suspended without pay.

Q. What do you remember happening before you were suspended?

A. I was at Puff's house 9374 Beverly Crest Drive in LA, and Puff came in. It was morning time. I believe he was coming from a hotel, and he had asked me to get a lot of options of

certain workout clothes, which was typically the stylist's job, but he was out of town. So I laid them all out in his room. And when he came home, he was already to me not in the best of moods, and he didn't notice that I had laid all the options out on the closet floor and that I had laid some out on the dresser in the entryway to his bedroom. And he walked in and just began cursing me out and getting angrier and angrier and going in, you know, a rant about the lack of options and how he hated, you know, certain things.

And as he's yelling, I tried to point to the other options and all, and if you don't like any of these, like I can help you find something. And that made him even more irate, and it was really -- he was just screaming and cursing at me and wouldn't stop. And I don't remember what happened, but I know that something violent happened, and I...

Q. So do you not remember the details of the violence?

A. No.

Q. Ms. Foster, could you please display Government Exhibit 3T-103-R. What is this Mia?

A. This is an email between me and James Cruz.

Q. Who is James Cruz?

A. James Cruz worked for Puff in like a managerial-type role.

Q. I want to focus first on the first email of the chain. Could we flip to the last page of this exhibit.

Focusing on the bottom message, what was the date that

was sent?

A.   March 25, 2011.

Q.   So here James says, Who's handling texts for Kids Choice Awards?  I really want to take my girls.  Can you help me?

And how did you respond to this message?

A.   I said, I don't even know when that is, LOL.  I'd totally help.  I'd see Michelle, but he's currently firing me at the moment, so I'll get right back to you.  Smiley face.

Q.   Who is Michelle that you're referring to here?

A.   Michelle James, the chief of staff at the time.

Q.   What did you mean when you said he's currently firing me at the moment?

A.   I was telling him that Puff was in the middle like screaming at me that he was firing me.

Q.   Let's zoom out.

And James says, LOL.

How did you respond?

A.   No.  For real.  Sad face.

Q.   Let's zoom out again.

Can we go to the first page, please, and focus on the top two messages.

I want to direct your attention to the message that starts "he said."  What did you say in this message?

A.   He said I talked back to him when I asked him what workout gear he would specifically like since he didn't like the kind I

got.  So now he's sending me home.  I kept my mouth shut the whole time.  Sad face.  Oh well.

Q.  What were you talking about here?

A.  I was talking about Puff firing me and didn't say the situation I was in, but -- yeah.

Q.  Let's look at some more communications.  Ms. Foster, could you please display Government Exhibit 3T-105-R.

What is this, Mia?

A.  This is an email between me and D-Roc.

Q.  And who sent the first message in this chain?

A.  D-Roc.

Q.  What date did he send it?

A.  March 25, 2011.

Q.  D-Roc says here, what happened?

How do you respond?

A.  He's so psycho, D.  He's so mean.  He just went bat shit crazy on me because he didn't see all of his workout options folded and organized.  He didn't like the pants that were in there.  He said his shirt was too big.  When I asked what he liked/wore so I can get the exact stuff, since I obviously don't know, he went crazy on me.  What did he say in the car?  Give me a warning before you guys come back so I'm out of the way.

Q.  Who are you talking about in this message?

A.  Puff.

Q. And where did you understand Mr. Combs to be at this time?

A. Puff had left me and went with just D-Roc to the doctor and I think another errand.

Q. Why did you ask for a warning before they came back?

A. Because I didn't want to be there when Puff got back.

Q. And what were you worried about when Mr. Combs got home?

A. I would face the same thing I just faced, and I would be in trouble.

Q. Okay. You can take that down, Ms. Foster.

Did you end up hearing from HR after this incident?

A. Yes.

Q. Who contacted you from HR?

A. Vashta Wilson.

Q. What did HR tell you?

A. That Puff wanted me to be suspended without pay, so I was being suspended without pay.

Q. Let's look now at Government Exhibit 3A-119-R if it's ready. Could we just have one moment, your Honor?

THE COURT: Of course.

Q. Could we please pull up Government Exhibit 3A-119-R. Thank you, Ms. Foster.

Mia, is this the communication that you were referring to from Vashta?

A. This is the communication after the initial reach-out.

Q. Could we please zoom in on the first two sentences of this

document.

Mia, could you please read these two sentences?

A. On Friday, March 25, 2011, you were suspended without pay for a period of five days. We spoke verbally to document the reasons of why you were being relieved of your duties.

Q. You can zoom out.

Mia, does this memo document the reasons why you were suspended?

A. No.

Q. Do you remember Vashta telling you why you were suspended?

A. She said that Puff had said I was being insubordinate.

Q. Were you being insubordinate?

A. No.

Q. You can take this down, Ms. Foster.

Was there anything in this document that documented the reasons why you were suspended?

A. No.

Q. Were there other times, Mia, in which you got documents like this from HR?

A. Yes.

Q. Did these documents ever say anything about Mr. Combs' treatment of you?

A. Never.

Q. How did you feel when you got documents like this from HR?

A. So sad and like I was in big -- like I was in big trouble

and I did something wrong, and I didn't know what, and just -- just like I would do -- really willing to, I don't know, fix it. Just so confused but so sad.

Q. What did you think about the future of your job when you got notices like this?

A. That it was over; that it was close to being over; and that I was terrible.

Q. Mia, despite everything you've testified about so far, did you continue working for Mr. Combs?

A. Yes.

Q. Until when?

A. 2017.

Q. During this time when you worked for Mr. Combs, did you feel like you could leave your job?

A. No.

Q. Why not?

A. It definitely wasn't even -- yeah, that wasn't a thought. I had tried -- I tried to run away before, and it didn't work.

Q. Did you feel like you would be able to get other jobs?

A. Oh no. I --

Q. Why not?

A. Because he would have made sure of it.

Q. And who would have made sure of it?

A. Puff.

Q. And what do you mean by that?

A.   He would have destroyed my reputation.  Yeah, that -- I was scared of him.

Q.   Mia, you said that there was a time you tried to run away from your job, is that right?

A.   Yes.

Q.   I want to direct your attention to New Year's Eve of 2010 into 2011.  Where were you at this time?

A.   St. Barts.

Q.   Did you try to run away on this trip?

A.   Yes.

Q.   Who went with you to St. Barts?

A.   It was me, Puff, Kim, the kids, Karleen Roy, who was an executive assistant at the time, and I forgot if -- I don't remember who else like working-wise was with us.

Q.   Where were you staying in St. Barts on this trip?

A.   On a yacht that Puff had chartered.

Q.   Before you tried to leave, what, if anything, did Mr. Combs tell you to do?

A.   He called me in his room and asked me to count the money in the safe.

Q.   Did you count the money?

A.   Yes.

Q.   What did Mr. Combs do when you were counting the money?

A.   He got really angry with me and started yelling at me that I was counting to slow.

Q.   And how did you react when Mr. Combs said that?

A.   Like sort of in shock because he -- it wasn't like he just said that.  He got really irate with me.  I was trying to count the money because that wasn't my job, and I wanted to make sure that it was right, and he chased me out and cursed at me and told me you better learn to walk on water like Jesus, bitch.  Get the fuck out of here.

Q.   So you said Mr. Combs chased you out of the room?

A.   Yes.  Mmm-hmm.

Q.   Before we get to that, do you remember how much money you were counting?

A.   I don't remember.  It wasn't a hundred dollars though.

Q.   Was it more or less than a hundred dollars?

A.   Much more.

Q.   And you said it wasn't your job to count the money.  Whose job was it typically to count the money?

A.   Security.

Q.   What happened after Mr. Combs chased you out of that room?

A.   Well, I ran to hide.  I went to beg the crew to get back to the mainland, to get a tender because we were -- we were out -- we were not at a dock, but it was like a hurricane so they couldn't.  So then I ran to the third floor to hide.

Q.   And what happened when you were hiding on the third floor?

A.   Kim came up and was consoling me and telling me not to worry about it.

Q. And what happened next?

A. So the way -- so my back was to the back of the boat, and to my left was an entrance into the yacht, and then in the front of me was an entrance to the third floor like a ladder from the exterior of the yacht. And all of a sudden I saw Puff coming up the ladder in front of me, and super angry, and I ran down the stairs to my left and I hid in the crew cabin.

Q. Did there come a time when you got the crew to take you to shore in a tender boat?

A. Yes.

Q. What happened when you got to shore?

A. They got the captain or got a call or a walkie-talkie that I had to come back.

Q. And did you want to go back to the boat?

A. No.

Q. What did you want to do?

A. I just wanted to run and hide and -- and then figure out a way out of St. Barts. I just wanted to get away from him.

Q. Were you able to leave the country?

A. No.

Q. And why not?

A. Well, my passport was on the boat.

Q. Who had your passport?

A. One of Puff's staff. I don't remember who had it.

Q. After you were told by the crew that you had to go back to

the boat, did you end up going back?

A.   Yes.

Q.   Why?

A.   Because I -- I felt that I had to.  I -- I -- I obeyed Puff's orders.

Q.   What did Mr. Combs do after you got back to the boat?

A.   I don't remember seeing him when I got back to the boat.  I just remember I was instructed by his chief of staff at the time that I had to go to a car that was waiting because Puff had just changed his plans to now go on a jet to Vegas, and that I was the only one going with him.

Q.   Did you end up going to the car that the chief of staff told you to go to?

A.   Yes.

Q.   And who was in the car with you?

A.   Then Puff got in.

Q.   Did Mr. Combs make any phone calls while you were in the car?

A.   Yes.

Q.   Could you hear the phone calls?

A.   I could hear his side.

Q.   And what was Mr. Combs saying on the phone?

A.   He was talking to Michelle James, the chief of staff, and telling a story that was not true about how I needed to be suspended or we're going to talk about firing her when I get

back and was making up a story that never happened, and I interrupted.

Q. And what did you say when you interrupted what Mr. Combs was saying?

A. I was like, wait. No Puff. What do you mean? That didn't happen. And I didn't get to finish.

Q. Why did you not get to finish?

A. Because Puff screamed at me to like shut the fuck up and then told Michelle to deal with me.

Q. Did you end up talking to Michelle on the phone?

A. Yes.

Q. How did you get the phone?

A. He like gave it to me or threw it at me or something.

Q. So were you talking to Michelle James when you were in that car with Mr. Combs?

A. Yes.

Q. What, if anything, did Michelle say to you?

A. Just get on the jet, like just do what he says. I have to do what he says.

Q. What, if anything, did you say about what Mr. Combs had done?

A. I -- I didn't -- I was -- I didn't get a chance. I didn't.

Q. Did you go to Vegas on the plane?

A. Yes.

Q. Why?

A.   I -- I didn't think I had a choice.

Q.   What did you think would happen if you didn't get on that plane and go to Vegas with Mr. Combs?

A.   I was just overwhelmed with fear of I would be in huge trouble.  I would definitely be fired, and I didn't have a way out of it, I didn't think.

Q.   All right.  Mia, I want to shift to a new topic.

Earlier you testified that you left Mr. Combs' companies in 2017, is that right?

A.   Yes.

Q.   I want to direct your attention to the fall of 2016.  Did you have a conversation with anyone about leaving Mr. Combs' companies around that time?

A.   Yes.

Q.   Who did you talk to?

A.   Brian Offutt, who was the COO, based in New York.

Q.   And why were you going to have a conversation with Brian Offutt?

A.   I was in town in New York for meetings, and I was like let's meet up because I wanted to present him with the amount of projects and money I brought in to ask for a potential raise.

Q.   What kinds of projects had you been working on at this time?

A.   We were currently in the middle of or maybe we were now in

the editing process of shooting the Bad Boy documentary.  I was

producing that.  I was the -- that was the one that we were

working on.

Q.   What did Brian tell you in this conversation?

A.   Out of the blue he just said, I hate to tell you this, but

I talked to Mr. Combs, and he no longer wants to be involved

with film.  So he wants to basically end Revolt Films, and it

has nothing to do with you.  You did nothing wrong.  He loves

you.  You're great.  He's just focused on other -- other

things, and that the company was going -- going away.

Q.   How did you react when you heard this?

A.   Oh, I like think I sobbed like snot dripping out of my nose

for quite a bit, and I was in shock and didn't -- but I had

never had -- all of my previous like suspensions or false alarm

firings were not like this.  They were all based off of my

being nothing, and this -- this felt serious, and I was so

confused why I wasn't being told by Puff.  Also because Puff

had just told me weeks before that I was the only company that

was in the -- like had made money that year.  So I accepted it.

I just -- I -- yeah.

Q.   How did you feel that it wasn't Mr. Combs telling you this

news?

A.   I felt betrayed.  I felt confused.  I felt rejected.  I

felt like I had done something wrong or maybe he, you know, all

the things he -- bad things he would say about me to my face

were he believed them were true and -- yeah.

Q.   What did you do after hearing this from Brian Offutt?

A.   I just -- Brian said, you know, we'll be in touch.  Like you're not -- like you don't have to turn anything over.  You still have your office.  We'll work things out as far as negotiations and severances and your bonuses, but it was a holiday, so I just followed instructions essentially, and, umm I just --

Q.   After this, did you talk to anyone who worked for Mr. Combs?

A.   Yes.

Q.   Who did you talk to?

A.   Kristina.

Q.   And did you talk to Kristina about the documentary that you had been doing?

A.   Yes.  After -- I don't remember when it was, but it was -- I had a little bit of time to horrifically process what happened after the holidays or something.  Kristina like was like Puff's looking for you -- it was just, I'm sorry, I'm so confused about what happened, but yeah, essentially this back and forth went on that he wanted -- what are you talking about? You're still -- like he needs you to work on the documentary. You're still working on it, you know.

Q.   Did you continue to work on the documentary even after this conversation with Brian Offutt?

A.   Yes.

Q.   When approximately did you stop working on the documentary?

A.   I think maybe it was maybe around like March or April or somewhere around then.  I'm not exactly sure.

Q.   Of 2017?

A.   Yes.

Q.   And are you estimating exactly when this was?

A.   Yes.

Q.   What did you do after you were done with the documentary?

A.   I -- after the documentary, I just cried myself to sleep. I -- I packed up my stuff, and I avoided -- I was getting many phone calls from not just Puff, but Kristina and other people and Cass were reaching out for Puff, and I was too heartbroken to answer, so I just ignored everything.

Q.   Did you end up having some conversations with Kristina and Cassie at various points?

A.   I think I talked to Kristina on the phone once, but I just thought any time that -- I could never tell who was with or without Puff.  So if they were calling me, I just had to assume they were with him.  I just didn't respond.  But Kristina called me and was like he's -- Puff was really upset and hurt and couldn't believe I could go against him.

Q.   And when you say couldn't believe you could go against him, what do you mean?

A.   I was confused too, but I was advised to get -- just to

work out negotiations for like severances and getting the money I was owed for bonuses and all those sorts of things, just to get an employment attorney to handle negotiations with their people. And she said that Puff said that that was like -- that it was like he couldn't believe that I like essentially stabbed him in the back, like because I had a lawyer and I was trying to explain no, no, no, like it's not -- I was advised this through your executives. It wasn't -- I'm not coming after you. It's a negotiation situation.

Q. So after you left in 2017, did you end up getting paid any money by Mr. Combs or his companies?

A. Yes.

Q. And what was the context in which you got this money?

A. After about nine months of going back and forth and not getting paid, my attorneys proposed a mediation.

Q. If you know, did your lawyers make a monetary proposal before that mediation?

A. Yes.

Q. And do you know how much that was for?

A. I don't -- like I believe maybe they said like the offer was like $10 million.

Q. Who came up with the number?

A. My attorneys.

Q. During the mediation, did you talk about any of Mr. Combs' violence towards you?

A.   That was brought up -- so after being dragged out a few --
a few of -- yeah, I told a couple of instances.

Q.   Did you talk about all of the violence or just some of it?

A.   No, just some of it.

Q.   And why did you talk about just some of it?

A.   Because I was terrified.  I didn't even want to -- I felt
like such a -- like I was doing something horrible by even
saying that but I was -- umm --

Q.   Why did you feel like you were doing something horrible?

A.   Because I was breaking like this idea of confidentiality
and this like -- I felt like I was betraying him.  I felt like
I was telling his secrets.  I don't know.  I felt really -- I
felt really wrong and shameful for having to sort of -- yeah,
telling on him.

Q.   What, if anything, did you say about the sexual assaults
during the mediation?

A.   Nothing.

Q.   Why not?

A.   Oh no, because I was going to -- again, I was going to die
with that.  I didn't, mmm-mmm.

Q.   Was there an eventual settlement?

A.   Yes.

Q.   How much money did you receive for the settlement?

A.   Me personally, like 200 and something thousand dollars.

Q.   Do you remember the total amount of the settlement?

A. I think $400,000.

Q. Did your lawyers receive the rest of it?

A. Yes.

Q. And what was your understanding of what the money was for?

A. The bonuses that I was owed and never paid, the severance, the overtime in the past that I hadn't been paid, and just money, you know, that I spent. I mean, that's what it covered essentially.

Q. Mia, have you received any other money from Mr. Combs?

A. No.

Q. Do you have any pending lawsuits?

A. No.

Q. Would you return the money you got from the settlement if it meant that Mr. Combs never did all the things to you that we've talked about?

MR. STEEL: Objection.

THE COURT: Overruled.

A. Without -- absolutely, in a second.

Q. After the mediation, when was the next time you talked to Mr. Combs?

A. When Kim passed away.

Q. When approximately did Kim pass away?

A. In November of 2018.

Q. Did you reach out to Mr. Combs or did he reach out to you?

A. I reached out to him.

Q.  Did you stay in touch with Mr. Combs after that?

A.  I would reach out here or there, like on Kim's birthday, on Christmas, after another close person to Puff, Andre Harrell, passed away, just to -- I just felt so bad for him.  So just like that, but I didn't stay in touch.  It was just like a text, you know, a comfort text here or there.

Q.  And why did you continue to communicate with him after you left?

A.  Because I felt so -- so terrible for him and his family, and I thought that -- I believe the mediation was my fault and that it was something wrong I did was tell on him, and I just -- when these things happened, this was like real life, like this was like -- you just -- I just want to forget about everything because losing someone or people so close to you is just so tragic, I -- yeah, I just felt really, really bad for him.

Q.  Did you tell Mr. Combs that you loved him in these messages?

A.  Oh yeah, of course.

Q.  And why did you do that?

A.  Oh, the same, like that's how I would speak to him.  I just wanted to let him know like I'm here for you and I feel bad.

Q.  Mia, are you aware of a lawsuit that Cassie filed?

A.  Yes.

Q.  When approximately was that suit filed?

A.   I guess it was November 2023.  Yeah.

Q.   Have you and Cassie talked since the lawsuit was filed?

A.   Yeah.

Q.   How frequently do you speak?

A.   It depends.  Sometimes -- sometimes we'll talk all the time, and then we both -- then it will be like a long period of time, like we both do this kind of like hide from our phones, depression, retreat sort of things.  So, yeah, it's --

Q.   When was the last time you talked to Cassie?

A.   The last time I talked to her on the phone was like a few weeks -- maybe like a few weeks or a month ago, but then we've texted a couple days ago, just texted about personal stuff and just saying I love you.

Q.   Have you spoken with Cassie about the substance of your testimony?

A.   Oh, no.  No.  No.

Q.   What about the substance of her testimony, if any, have you guys talked about that?

A.   No, absolutely not.

Q.   Mia, I want to direct your attention to the end of November 2023.  Around that time, did you hear from anyone who had worked for Mr. Combs?

A.   Yes.

Q.   And who did you hear from?

A.   D-Roc.

Q.   When was the last time you had heard from D-Roc?

A.   I guess like a couple years -- like a year or two or something like that, it had been awhile.

Q.   What was your relationship with D-Roc like?

A.   He was like my big brother.  Well, that's what we called each other, and -- yeah, big brother.

Q.   Ms. Foster, could you please pull up Government Exhibit H-115-R.  You can turn to the next page.

     What is this, Mia?

A.   This is a text message between me and D-Roc.

Q.   Who is sending the messages in the blue?

A.   I am.

Q.   And what about the messages in the green?

A.   D-Roc.

Q.   You can zoom out, Ms. Foster.

     I just want to focus on the date of that first message here.  Can you read the date?

A.   October 22, 2021.

Q.   What is the date of the next message?

A.   November 30, 2023.

Q.   Did you text D-Roc between those dates, between 2021 and November of 2023?

A.   No.

Q.   Was the second text from D-Roc after Cassie's lawsuit had been filed?

A.   Yes.

Q.   In this text D-Roc says, hey, what's up, Mia?

How did you respond?

A.   D-Roc!

Q.   Why did you respond with all of the exclamation points here?

A.   Because I love exclamation points, and I'm so excited to hear from him.

Q.   Let's turn to the next page.  What did you say next?

A.   Hi.  Hi.  Hi.  How are you?  I miss you so fucking much. Ahhhh.

Q.   Why did you say you missed D-Roc?

A.   Because I did.

Q.   At this point, what did you think D-Roc's relationship was like with Mr. Combs?

A.   I believed I'd been to his like 50th birthday party a few years before, and he told me he didn't work with him any more. Not like they weren't cool or anything or friends, but he was in -- on the East Coast, and was like had a restaurant with his wife in the Poconos, and so I didn't believe he was still working with him in any capacity or -- yeah.

Q.   Could you please zoom out, Ms. Foster.

D-Roc then says, a lot has been going on.

What did you understand him to be talking about?

A.   I guess just everything in the news.

Q. And what do you mean by that?

A. Based on the lawsuit that was filed in -- yeah, everything from that.

Q. Okay. Let's turn to the next page. At the bottom of this page, D-Roc says, I'm about to call you.

What is the date of this message?

A. November 30, 2023.

Q. Did D-Roc call you?

A. Yes.

Q. What happened on that call?

MR. STEEL: Objection.

THE COURT: Grounds?

MR. STEEL: Hearsay. Very open question.

MS. SMYSER: Not for the truth, your Honor.

THE COURT: Well, why don't we rephrase the question. We'll see if there is still an objection.

Q. Mia, when you called D-Roc, what did D-Roc say to you?

MR. STEEL: Objection.

THE COURT: It's overruled.

A. D-Roc first started catching me up on his life and what was going on. It sound like a normal conversation, and then he changed it to, yeah, it's real crazy what's going on. And I thought like, yeah, it's crazy that it's in the news.

And then he started to say 'cause, you know, like Puff and Cass, they would just like fight like a normal couple. And

my like radar went off because I was like (A) that's not how D-Roc talks, and (B) D-Roc was around that a lot.

Q.  Let me just stop you right there.

When you say D-Roc was around that a lot, what are you referring to?

A.  Like he had witnessed the violence.

Q.  The violence between whom?

A.  Like from Puff to Cass.

Q.  And based on all the things that you personally observed when you were working for Mr. Combs, would you say that the fights between Mr. Combs and Cassie were normal?

A.  Absolutely not.

Q.  What did D-Roc say to you next?

A.  He kept -- he sounded nervous, and he was talking in circles saying essentially the same idea, and then said, you know, your boy Puff, he misses you.  We were just reminiscing about old family, and he started talking about other people that were around as though they agreed with the same sentiment of -- that Puff and Cass were just a normal couple that fought but sometimes it got out of control, et cetera.  And I just kept my mouth shut and let him talk because I immediately thought, oh my God --

MR. STEEL:  Objection.

THE COURT:  What's the objection to the question or that portion of the answer?

MR. STEEL:  It's not responsive.

THE COURT:  Let's have a brief sidebar.

(Continued on next page)

(At the sidebar)

THE COURT:  What's the objection?

MR. STEEL:  I believe the question was -- and please check your record -- what did D-Roc say to you.  And now she's going into my belief and is going into a narrative.

THE COURT:  Sure.

MS. SMYSER:  I'm happy to break it up.

THE COURT:  Break it up a little more and help the witness out.  Telegraph answers.  At times she might get a little off track.

MR. STEEL:  May I ask a question?  It's not an emergency, but Mr. Combs needs a bathroom.

THE COURT:  Ms. Smyser, are you almost done with your direct?

MS. SMYSER:  We're pretty close to done.  Maybe ten minutes.

THE COURT:  Can he hold out for ten minutes?

MR. STEEL:  If not, I'll mention something politely.

THE COURT:  If something happens, let me know.  Otherwise, we'll take a break.

MR. AGNIFILO:  A request for two-minute bathroom break, Judge?  Sorry.

MR. STEEL:  I just mentioned it for Sean.

THE COURT:  We got like ten minutes.

(Continued on next page)

(In open court)

THE COURT:  Ms. Smyser.

BY MS. SMYSER:

Q.  Mia, we were just talking about your phone call with D-Roc.

Did D-Roc say anything about where he was physically located at this time?

A.  Yes.

Q.  What did he say?

A.  He then said that he had just landed in Miami.

Q.  And did he say anything about where he was in Miami?

A.  He was going to be at Puff's to take care of Christian.

Q.  So where did you understand that he was when you had this phone call?

A.  At Puff's house in Miami.

Q.  And what, if anything, did D-Roc say to you on the phone about you talking directly with Mr. Combs?

A.  He said that Puff really wanted to talk to me, maybe I could say something, but he'd let Puff ask me and he was going to call me.

Q.  What did you understand D-Roc to be talking about when he said maybe you could say something?

A.  It sounded to me like they wanted me to say something publicly.

MR. STEEL:  Objection.

THE COURT:  Sustained.  Let's get a new question.

Q.   How did you respond when D-Roc asked about you talking to Mr. Combs?

A.   I pretended like, yeah, of course.  Of course, I will.  No problem, uh-huh.

Q.   Did you want to talk to Mr. Combs?

A.   No.  No.  No.

Q.   Why not?

A.   Because I was terrified of him.

Q.   How did you feel during this phone call?

A.   Terrified.  Threatened.  Scared.  Con -- just nervous, like I had to come up with a game plan because I didn't want -- I didn't want Puff to know -- I just wanted to pretend like play dumb and act like I wasn't paying attention and I didn't have any feelings, that I didn't want my life to be in danger.

Q.   Did you ever hear from Mr. Combs after that?

A.   Yes.

Q.   And how did you hear from him?

A.   He called me.

Q.   How soon after your call with D-Roc did Mr. Combs call you?

A.   Like within a couple -- like either very soon or like within a couple hours or -- yeah, very soon.

Q.   How did you react when you got that phone call?

A.   I threw my phone as far as it would go, and it went behind the couch, and I ran outside.

Q.   And why did you do that?

A.   Because it was just so triggering to see that, and I -- it was just a reaction.

Q.   Did you hear from D-Roc again after this?

A.   Yes.

Q.   Ms. Foster, could we please pull up Government Exhibit H-116-R.  Could we turn to page 2?

Who is sending these messages in the green?

A.   D-Roc.

Q.   Are these messages to you?

A.   Yes.

Q.   What is the date of the first message?

A.   December 5, 2023.

Q.   D-Roc said, your boy said to call him.  He doesn't want or need you to do anything.  He just called me.

What is your understanding of who "your boy" refers to?

A.   Puff.

Q.   How did you feel when you got this message?

A.   Like terrified.  Oh my gosh, it's not going to stop.

Q.   Did you respond?

A.   No.

Q.   Why not?

A.   Because I didn't -- I didn't know how -- I didn't know how to respond, and I was just hoping it would go away.

Q.   What is the date of the next message?

A.   February 2, 2024.

Q.   D-Roc says here, good morning.  How are you doing?  Did you ever speak to P.  He called me a couple days ago.

What is your understanding of who P refers to?

A.   Puff.

Q.   Let's zoom out.  And we can turn to the next page.

Did you respond to that earlier message, Mia?

A.   No.

Q.   Why not?

A.   For the same reason, I was just trying to ignore it.

Q.   What is the date of D-Roc's next message here?

A.   February 2, 2024.

Q.   D-Roc says, are you okay?  I can't believe you're not hitting me back.

Did you respond to this text message?

A.   Yes.

Q.   Let's zoom out.  And focusing on your response, why did you respond to this, to D-Roc's message?

A.   Because I could tell that D-Roc was getting mad, like was about to get mad, and he never got mad, but when he did, it was not okay.  And so I wanted to keep him calm, and I knew my perception was he was not going to be left alone until he got in touch with me, so I was just trying to keep the peace.

Q.   What did you say in this message?

A.   Hi D.  So sorry, I just finished scuba diving all day, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I didn't have my phone on the boat. I'm okay. I've been better, but I'm alive. Hahahaha. How are you? No, I haven't talked to him. He only tried me once, and I missed it because I don't have my phone alerts on ever, and I called back with no answer and left it at that. I have terrible service here, just in case my messages come through late. What are you up to?

Q. Was it true, as you said here, that you didn't have your phone on the boat?

A. No.

Q. You say here that you hadn't talked to P, but that you tried to call him back with no answer.

Did you in fact call Mr. Combs back?

A. No.

Q. Why were you telling D-Roc that you had called Mr. Combs?

A. Because I wanted to play neutral so that when he reported back to Puff, it wouldn't sound like I was avoiding or running or whatever to send an alert out that I was not -- yeah, I didn't want to be --

Q. Let's turn to page 5.

D-Roc says in this first message, let me know how I can send you something.

What did you understand D-Roc to be referring to here?

A. Money.

Q. Let's look at your response. And I want to look specifically at the second paragraph of your response.

What did you say there?

A.   No.   I never ask for anything.   I've never been in such a low spot/in debt but that's my problemo, and I'll figure it out one day.   I hope.   But I'm always here to help y'all out in any ventures or anything y'all need, et cetera.   Fam style duh.

Q.   What did you say at the end of the message?

A.   Love you so much D.

Q.   And how did -- let's zoom out just a second.   Focusing on D-Roc's response, D-Roc says, Okay, I will try you tomorrow. And I know you didn't ask me for anything.   I'm allowed to send my sister a gift.

What did you understand D-Roc to be referring to when he said "send my sister a gift"?

A.   Money.

Q.   Did D-Roc in fact send you money?

A.   No.

Q.   Let's turn to page 6.   I want to direct your attention to the bottom of the page.

What's the date of D-Roc's last message here?

A.   February 3, 2024.

Q.   He says, I'm going to try to call you in 15 minutes.   If I don't catch you, I will try you later or tomorrow.

Did D-Roc in fact call you?

A.   I don't remember, but I didn't talk to him.

(Continued on next page)

MS. SMYSER:  Let's turn to the next page.

Q.  Focusing on your first message, how did you respond to D-Roc?

A.  Hi, D.  Love you.  Try me mañana, of course.  I was on the little boat all day and didn't have service.

Q.  Was it true that you were on a little boat all day and didn't have service?

A.  No.

Q.  Why didn't you answer your phone?

A.  Because I was terrified, and I didn't want to -- I assumed I figured out what was happening, and I just wanted to play dumb.

Q.  Have you had any calls with D-Roc since?

A.  No.

MS. SMYSER:  You can take that down, Ms. Foster.

Q.  During this time what, if any, communications did you receive from Mr. Combs himself?

A.  Two text messages, I believe.

Q.  Before we move on to those text messages from Mr. Combs, you said you thought you figured out what was going on with D-Roc.  What were you referring to?

A.  In my experience, if Puff wanted to get someone on the phone.

MR. STEEL:  Objection.

THE COURT:  If you can try to rephrase the question.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.   Just based on your experience, when Mr. Combs wasn't able to get in touch with someone, what would he do?

MR. STEEL:  Objection.

THE COURT:  The objection is sustained.  I think we need to be talking about a particular incident, if you want to ask the question.

Q.   Speaking about what was happening in these text messages, Mia, based on your observations of the relationship between D-Roc and Mr. Combs and based on your experience in working with Mr. Combs, what did you understand was happening when D-Roc was reaching out to you?

MR. STEEL:  Objection.

THE COURT:  That's overruled.

A.   Puff wanted D-Roc to get me and make sure that I wasn't a threat.

Q.   We are going to turn to your communications with Mr. Combs.

MS. SMYSER:  Ms. Foster, can you please pull up Government Exhibit 3T-102-R.

Q.   Who sent the messages here?

A.   Puff.

Q.   Focusing on the first message, were these messages to you?

A.   Yes.

Q.   What is the date of the first message?

A.   February 4, 2024.

Q.   Could you please read the message.

A. Hey, Mia. It's Puff. Please let me know when you get 10 min. to talk. Love.

Q. How did you feel when you got this message?

A. Terrified.

Q. Did you respond?

A. No.

Q. Why not?

A. Because I was terrified and I believed that he couldn't be as aggressive as he was normally because he was perhaps under --

MR. STEEL: Objection.

THE COURT: Let's move on with a new question.

Q. What is the date of the second message here?

A. February 7, 2024.

Q. Could you please read that message.

A. Hey. I don't wanna be blowing up your phone. Just needed to talk to you for 10 minutes. Just need my memory jogged on some things. You were my right hand for years, so I just to speak to you to remember who was even around me. And it would be good to hear your voice. But if you don't want to, all good. Just let me know. Love. Hope you're well. Emojis.

Q. Did you respond to this?

A. No.

Q. Why not?

A. Because I wanted nothing to do with him or anything, and I

was -- I just didn't want anything to do with him at all.  He was the person I was traumatized by and now he's coming back.

Q.  I think earlier you said you were terrified when you got the first message.  If he was nice to you in these messages, why were you terrified?

A.  Because I knew this was a front.

Q.  Have you received any texts or calls from Mr. Combs himself since February 7 of 2024?

A.  No, I don't think so.  But my phone did.

MR. STEEL:  Objection.

THE COURT:  Just to the last part?

MR. STEEL:  Yes.

THE COURT:  Ms. Smyser.

Q.  Did you receive any other calls to your phone?

MR. STEEL:  That's objectionable.

THE COURT:  The objection is sustained.  Let's get a new question, Ms. Smyser.

MS. SMYSER:  I can move on, your Honor.

We can take this down, Ms. Foster.

Q.  We are about to wrap up, Mia.

We have talked a lot about your employment for Mr. Combs the past day.  Where do you work now?

A.  I don't.

Q.  Have you tried to work since leaving Mr. Combs?

MR. STEEL:  Objection.

A.  Yes.

THE COURT:  That's overruled.

Q.  Could you repeat your answer.

A.  Yes.

Q.  How has that turned out?

A.  I haven't been able to do it because I suffer from complex, like severe PTSD.

MR. STEEL:  Objection.

THE COURT:  Let's have a very brief sidebar.

(Continued on next page)

(At sidebar)

THE COURT:  I assume this is the last couple questions.

MS. SMYSER:  Um-hum.

THE COURT:  So we are good in terms of taking the break.

MR. STEEL:  I believe so.

THE COURT:  What's the relevance of this?

MS. SMYSER:  Your Honor, this victim is a forced-labor victim and one of the elements that we have to prove with regard to forced labor is serious harm.  She is going to testify that she was diagnosed with severe PTSD after she left her job with Mr. Combs and she has not been able to successfully work since then.

THE COURT:  Mr. Steel, given the proffer of relevance, what's your response?

MR. STEEL:  Your Honor, I would like you to consider a hearsay objection.  That's a diagnosis from a doctor.  We are not examining the doctor at all.  I would like it not to be coming through this witness.  I have no idea if she has PTSD or not.  This is a diagnosis from a doctor.  I don't know if it's truthful or not or it is being used for the truth of the matter.

THE COURT:  That's fair.

Ms. Smyser, I think you can avoid the objection by

making sure that the witness understands to not be referring to any diagnosis but just based on her feelings and experience why she is unable to have a job.  You can ask it this way.

MS. SMYSER:  Sure.

THE COURT:  All right.

(Continued on next page)

(In open court)

THE COURT:  Ms. Smyser, you may proceed.

MS. SMYSER:  Thank you, your Honor.

BY MS. SMYSER:

Q.  Mia, without referring to any particular diagnosis, just based on what you have experienced, why are you not able to hold a job?

A.  I would have to leave because I would be triggered by really normal situations with an overwhelming sense of fear, being in trouble, like overreacting to normal -- just overwhelmed me.

Q.  What are some of those normal situations that were overwhelming to you?

MR. STEEL:  Objection.

THE COURT:  Overruled.

A.  Misinterpreting simple emails or if someone said, where are you, like freaking out and thinking -- and trying to explain where I was and why I was there, and it could be someone I just wanted to see if they wanted to get coffee.  If someone called my name -- if someone said my name from across the room, all those feelings of getting in trouble would come flooding back. I have triple-guessed myself in everything I did.

Q.  Who is the person who caused those feelings in you, Mia?

A.  Puff.

MS. SMYSER:  No further questions, your Honor.

THE COURT:  Thank you, Ms. Smyser.

We are going to take a short break.  It's 10:55.  We will come back at 11:10.  Thank you, members of the jury.

All rise.

(Jury not present)

THE COURT:  Thank you, Mia.  We will be back at 11:10.

We will come back at 11:10.

(Recess)

THE COURT:  Mr. Steel, you have some binders, and you have binders for the jury as well.

MR. STEEL:  Yes, sir.

THE COURT:  If you want to speed things along, you can put the binders on the chairs, if you want to do that now.  If you want to explain what they are while the jury is here, you can also do that.

MS. GERAGOS:  We will just indicate, your Honor, to the jury, if we put something in, once it has been admitted, OK, jurors, can you please turn to tab --

THE COURT:  These have not been admitted yet.

MS. GERAGOS:  Of course not.  We wouldn't have them turn to it now.  Once we get to that point, if a photo is admitted, then Mr. Steel will indicate to the jurors, the Court, and the witness to turn to a certain tab.

THE COURT:  Understood.

Ms. Smyser, any objections to this?  And you have seen

these exhibits.  Do you anticipate any objections?

MS. SMYSER:  Your Honor, there is only one exhibit which we have continued to confer on hearsay redactions, as ordered by your Honor.  I understand Mr. Steel doesn't intend to use that exhibit before lunch, so we are continuing to talk about those.  Other than that, right now, assuming that the witness can authenticate the documents, I don't anticipate objections.

THE COURT:  Then the question for the government is, do you have an objection to the binder being provided to the jury that it contains that exhibit?

MS. SMYSER:  No.

THE COURT:  There you go.

MS. GERAGOS:  We will pass it out, your Honor.

THE COURT:  Just put it on the chairs.

MR. STEEL:  May I approach?

THE COURT:  Yes.

It would be fine if you're short binders for one or two jurors to share a binder under these circumstances.

Are we ready to proceed?

MS. SMYSER:  Your Honor, would you mind instructing the jury not to flip to tabs in the binder?

THE COURT:  I will, of course.

Mr. Steel, do we have enough binders?

MR. STEEL:  We are fine, your Honor.

MS. GERAGOS:  We just have to make one for your Honor.

MR. STEEL:  We will be OK.  We appreciate the Court going without a binder for you.  We will try to get it to the Court and an extra one for everybody.

THE COURT:  I trust there are no secret messages to the jurors embedded in the binders.

MR. STEEL:  Just one.

THE COURT:  Let's have Mia back.

(Jury present)

THE COURT:  Welcome back, members of the jury.

On your chairs you will see that there are binders. Do not look at those binders and what's in them.  You will be directed by counsel or the Court to look at particular items in the binder, but don't thumb through it right now.

With that, cross-examination.

THE COURT:  Mr. Steel, you may proceed when ready.

MR. STEEL:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. STEEL:

Q.  Because of Sean Combs you suffer a great deal?

A.  Yes.

Q.  And you worked with him from 2009 to approximately 2017, is that correct?

A.  Yes.

Q.  And in those eight years that's where you developed this

trauma, true?

A.   True.

Q.   And even as early as or as recent as February of this year, just seeing Sean Combs calling your number made you throw the phone as far as you could, right?

A.   Yes.

Q.   Made you run out of your own home, true?

A.   True.

Q.   Because that's the trauma that you have carried since meeting with, working with Sean Combs, right?

A.   Right.

Q.   And he made you, you told the jury in front of this honorable Court, do things that are unthinkable.  Is that fair to say?

A.   Yes.

Q.   And that includes sleeping in a room without a lock, right?

A.   Yes.

Q.   Coming into that room and violating you in the most unthinkable manner, true?

A.   True.

Q.   Diminishing you down so you have no confidence, right?

A.   Yes.

Q.   To the point that today, if someone even just calls out the name Mia, you panic, right?

A.   Yes.

Q.   I'd like to make sure that this is correct.  You said that Sean Combs' conduct was the worst thing that ever happened to you.

A.   Yes.

Q.   I couldn't hear you.

A.   Yes.

Q.   At times you wanted to, God forbid, kill yourself, right?

A.   Yes.

Q.   I want to ask you to do me a courtesy.  There should be a notebook within your arms' distance.  With this honorable Court's permission, if you can take a look, just you yourself and the parties, not anyone else, OK, and just take a look. They are numbered.  You will see exhibits.  If you don't mind. If you could look at the tab 1 through 10.  As you go in order, it's going to be the same question.  With the Court's permission I am going to ask you the question now.  And then as you look at it, just tell me whether this is an exhibit that you recognize, it's accurate, and that, to the best of your memory that that is true.  OK?

A.   OK.

        MR. STEEL:  Your Honor, is that OK?

        THE COURT:  You may proceed.

Q.   If you can look at number 1, if you don't mind.

A.   Yes.

Q.   I know it was a multiple question.  It's true, it's

accurate?

A.   Yes.

Q.   You recognize it?

A.   Yes.

         MR. STEEL:  Your Honor, I move for the admission of 1701, Mr. Combs exhibit.

         THE COURT:  Any objection?

         MS. SMYSER:  The prior objections we raised to these, your Honor.

         THE COURT:  Exhibit 1701 will be admitted.

         (Defendant's Exhibit 1701 received in evidence)

Q.   Can you look at tab 2 when you get a chance.

         MS. SMYSER:  Your Honor, just clarifying, these are being offered under seal.

         MR. STEEL:  That's fine.  Whatever the Court says.

         THE COURT:  1701 will be admitted under seal.

         MR. STEEL:  Your Honor, can I ask a question.  There is also a corresponding 1701-R with all these exhibits.

         THE COURT:  I assume there are redacted versions of all these exhibits.

         MR. STEEL:  Exactly.

         THE COURT:  Let's get to the end, and then I'll admit all the redacted versions not under seal.

         (Defendant's Exhibit 1701-R received in evidence)

Q.   Mia, did you look at number 2?  And I'm not rushing you.

A.  Yes.

Q.  Number 3?

A.  Yes.

Q.  Number 4?

A.  Yes.

Q.  And 5?

A.  Yes.

Q.  And 6?

A.  Yes.

Q.  7?

A.  Yes.

Q.  8?

A.  Yes.

Q.  9?

A.  Yes.

Q.  10?

A.  Yes.

MR. STEEL:  Your Honor, I move for the admission of now 1702 through 1710 and then the corresponding R numbers as well.

THE COURT:  Those exhibits will be admitted.  The nonredacted exhibits will be admitted under seal.

(Defendant's Exhibits 1702-1710 and 1702-R - 1710-R received in evidence)

MR. STEEL:  With the Court's permission, and if the

jurors can open up to 1701, and that can be put on the redacted screen for the audience.

Q. Mia, this is your personal social media account. Is that fair to say?

A. Yes.

Q. And you posted this image and the statement, true?

A. True.

Q. And this is on or around January 30, 2013.

A. That's what it says, yup.

Q. And when you post something, that is in your control, correct?

A. Yeah.

Q. And it's unlike other people, maybe Mr. Sean Combs, because you were actually hired in 2009 to manage Mr. Combs' social media account, right?

A. I'm sorry. Can you say that one more time?

Q. Of course. When you were hired in 2009, one of your duties was to manage Mr. Combs' social media accounts?

A. Yeah. It was to help. Um-hum.

Q. But this account is your personal account. That is what you are doing, right?

A. Yes.

Q. In here, can you tell the jurors what you wrote under the image that they see.

A. What we do when you're not around @iamdiddy #ciroc.

Q.  Can you explain to the jurors what it means to @iamdiddy?

A.  That is to tag another user.  So that is Puff's Instagram user name.

Q.  Everyone may understand it, but just in case somebody doesn't, what does it mean to tag?  What does that mean to the iamdiddy or Mr. Combs in this case?

A.  It's basically saying his name, but it also points to his page.

Q.  So he can get it on his social media?

A.  If he has his like tag mentions, yeah, um-hum.

Q.  So here it is approximately four years after you have started to work with Mr. Combs, right?

A.  Yes.

Q.  And you have been at this point sexually assaulted by him, you claim, right?

A.  Yes.

Q.  You've been abused by him mentally, right?

A.  Um-hum, yes.

Q.  Physically, right?

A.  Yes.

Q.  And emotionally, right?

A.  Yes.

Q.  On your personal account you are tagging him saying this is what we do when you're not around, true?

A.  True.

MR. STEEL:  Look at number 2.  I shouldn't say number 2.  Let me rephrase that.  1702 and 1702-R.

Q.  This is on the 4th of July of 2013, correct?

A.  Yes.

Q.  Whose hands are those?

A.  Me and Cass, Cassie's.

Q.  And what are you saying or what were you writing?

A.  Custom-made Cabo bracelets because it's funny @casandrae #rich as fuck.

Q.  Which is your hand in the picture?

A.  The one with the smaller ring on the right-hand side.

Q.  On the left hand, do you see two bracelets?

A.  Yes.

Q.  What is the second bracelet, the one closer to the elbow set?

A.  CC.

Q.  I couldn't hear you.

A.  CC.

Q.  What does that stand for?

A.  That is one of Cass' nicknames.

Q.  What does the nickname stand for, if you know?

A.  I don't know if it stands for anything.  It was just sort of a nickname, like CC.

Q.  Did you ever hear Cassie Combs?

A.  Actually, no, but that makes sense now.

Q.   And this is also -- you tagged Ms. Ventura, true?

A.   Yes.

Q.   And where are you when this picture is taken?

A.   Cabo.

Q.   Was that work?

A.   I mean, essentially, it didn't feel like it, but, yeah, I was told to go on vacation with Cass by Puff.

Q.   Who paid for the vacation?

A.   Puff.

Q.   And number 3, which is 1703.  Would you take a peek at that when you can.

     The date is October 2, 2013.  So, again, about four years, four years plus after you say Sean Combs has traumatized your life, right?

A.   Yup.

Q.   Can you read what you wrote here in 1703.

A.   Just the number 1 guy on the Forbes list.  Getting me a vanilla latte.  No big deal.  Regular people shit.  @iamdiddy #Starbucks.

Q.   On your personal account you post a picture of Mr. Combs?

A.   Yes.

Q.   The person who terrorizes you, fair?

A.   Yes.

Q.   You talk about him getting coffee for you even though he's number 1 on the Forbes list?

A.   Yes.

Q.   That's one of the wealthiest people in the world, right?

A.   Yes.

Q.   1704, if you can look at that.  That should be oriented the same month, October 17, 2013, right?

A.   Yes.

Q.   Explain to the jurors what you wrote, if you don't mind.

A.   #TBT, take me back.  #burningman @kerrymorganmodel @iamdiddy @casandrae.

Q.   Tell the jurors who is in the photographs, if you don't mind.

A.   That is Kerry Morgan, me, Puff, and Cass.

Q.   That's going from left to right?

A.   Yes, sir.

Q.   When you say, take me back Burning Man, you're talking about what you told the jurors about going to Burning Man with Mr. Combs?

A.   Yes.  We went multiple times.

Q.   And he made you, against your will, take drugs.  You remember telling the jurors that?

A.   Yes.  I am not sure on which occasion it was, but we went to Burning Man multiple times, so yes.

Q.   Here you say, take me back to Burning Man, right?

A.   Yes.

Q.   You're standing right next to Mr. Combs, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   Yes.

Q.   You're actually leaning towards him in the image, right?

A.   Yeah.

Q.   That's the image that you posted on your personal account?

A.   Yes.

Q.   The man who terrorized you, right?

A.   Yes.

Q.   Look at the next one, which is in evidence, 1705.

Now, this date is November 4, 2013, right?

A.   Yes.

Q.   And November 4, 2013 is a memorable date in your life, true?

A.   In his life or my life?

Q.   I guess both.

A.   It's his birthday.

Q.   When you say his birthday, Mr. Combs was born, to your knowledge, the 4th day of November 1969.  Is that true?

A.   Yes.

Q.   And this here is you're working for Mr. Combs and you're posting on your personal social media account on his birthday, right?

A.   Correct.

Q.   And can you read what you posted.

A.   Last non-bday shout-out to my mentor @iamdiddy.  Thank you for always letting me give birth to my dreams.

P5JMCOM3

Q.   Now I would like to talk to you about the image first.  OK?

A.   Um-hum.

Q.   Is that you in the hospital gown?

A.   Yes.

Q.   And replicating giving birth to a child?

A.   Yes.  It's a video shoot.

Q.   And you have here that you posted on your personal account your rapist delivering the baby, right?

A.   This was a comedy video shoot, so -- that I did not write, and this is a still of that.  But that phrasing -- could you ask me the question again.  I'm sorry.

Q.   You chose to post -- this is your personal account, right?

A.   Yes.  It was a public account.

Q.   Right.  Under your name.

A.   Yes, um-hum.

Q.   And you chose this image.

A.   Um-hum, yeah.

Q.   And it's the image of Mr. Combs being a doctor and delivering a child, your child, true?

A.   The character, yes.  It's a funny video that I was proud that I -- like Andy Samberg directed, so I was proud that I was in a funny video.

Q.   But this message is to your mentor?

A.   Um-hum.

Q.   Right?

A.   That's what it says, yes.

Q.   Who wrote that?

A.   I did.

Q.   And you tagged Mr. Combs.  That's his handle, right?

A.   Yes.

Q.   And you wrote:  Thank you for always giving me -- excuse me.  I read that wrong.  I apologize.  Thank you for always letting me give birth to my dreams.  Right?

A.   Yes.

Q.   Now, November 4 is not only memorable to Mr. Combs, but it's memorable to you, right?

A.   I'm not sure what you mean by that.

Q.   Well, you told the ladies and gentlemen of the jury that shortly after you were hired in 2009, you were at the birthday party at the Plaza Hotel for Mr. Combs?

A.   Yes.

Q.   And he's turning 40.  I know you said he was born in 1969.  So that would have been -- 40 years later would have been right when you started work in 2009, right?

A.   Yes.

Q.   And at that November 4, 2009 birthday party you find yourself alone with Mr. Combs, right?

A.   Yes.

Q.   That's what you tell the jury, right?

A.   Yes.

Q. And he tells you how excited he is to be able to work with you as a new hire, right?

A. Something along those lines.

Q. And he wants to celebrate with you your hire, his birthday, and the hopeful great work you could do together and gives you alcohol, right?

A. Yes.

Q. And you do not one but two shots with Combs, right?

A. Yes.

Q. And what you believe happened, you're not saying definitively, but the alcohol overcame you, right?

A. I definitely felt affected by it, yes.

Q. And you said you were young and the alcohol should not have had that type of effect on you, right?

A. Yes.

Q. So you believed, potentially or more than potentially, you were drugged.

A. I did not say those words. I didn't say that.

Q. I didn't ask if you said it. That's what you believe may have happened, right?

MS. SMYSER: Your Honor, can we take this exhibit down during this questioning?

THE COURT: That's fine.

A. It's a possibility, yes.

Q. And after feeling different than you believe you should

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

have felt, you feel a person you really don't know put his mouth onto your mouth without your permission.

You remember telling the jurors that?

A. Yes.

MS. SMYSER: Objection to the form, your Honor.

THE COURT: Overruled.

Q. Then you felt, without your desire or consent, Sean Combs' hands going up your dress and onto your person.

You remember that?

A. I said he put his hand up the side of my dress, yes.

Q. And all of that to you was paralyzing?

A. Yes.

Q. And you really don't even know what happened after that? You wake up in a chair and the sun is shining.

You remember telling the jurors that?

A. I said my next memory was that.

Q. And all that happened on November 4 of 2009, right?

A. Correct.

Q. But as you see on 1705, you were calling the person who sexually assaulted you on that day shout out for his birthday to your mentor, right?

A. Of course, yes.

Q. 1706. That is another same-day posting by you, right?

A. Yes.

Q. When I say same day, the anniversary of four years before

you being sexually assaulted by Sean Combs, according to your testimony, right?

A. I didn't celebrate it as an anniversary. It was his birthday to me.

Q. You remember the date that you claim that you were sexually assaulted, right?

A. It was his 40th birthday, so the date is easy to remember.

Q. Always November 4, according to you, right? That's a bad day in your life, right?

A. That was a bad experience, absolutely.

Q. And this is, again, a second post by you on your personal social media account. And tell the jurors -- please read what you wrote, please.

A. Happy anniversary to your birthday last year.

Q. Can you read a little slower, if you don't mind.

A. Sure. Happy anniversary to your birthday last year. Since this year you've changed your bday date on some real Puff Daddy shit. Thank you for constantly inspiring me and giving me an extended family for life. You are forever one of my greatest friends. Thank you also for being funny, because you're fucking funny, like really, really, really funny. I love you @iamdiddy.

Q. And you post this image of you in what I'll call a tutu. Is that correct?

A. Correct.

Q.   You're next to Mr. Combs, right?

A.   Yes, right.

Q.   The person who terrorizes you, right?

A.   Yes.

Q.   And he's holding, it looks like and please correct me, his private part in his hands.

A.   If that's what you see, I guess so.

Q.   And this is what image you picked out, right, Mia?

A.   Yeah.

Q.   You put this on your page, right?

A.   Yes.

Q.   Your friends get to see it who are on social media with you, right?

A.   Yes.

Q.   Your family gets to see it who are on social media with you, right?

A.   My family -- some of my family, yeah.

Q.   And you are proud of Mr. Sean Combs.  That's why you wrote this, right?

A.   No.  I wrote this because Instagram was a place to show how great your life was, even if it's not true, and because I had his fans following me, as well as his official Diddy fan site. And I also didn't want my family and friends to know the misery I was in.  So of course you post the great times.  The highs were high and the lows were low, and he also saw my Instagram.

Q.  You chose to write:  Thank you for constantly inspiring me and giving me an extended family for life, exclamation point. You are forever one of my greatest friends.

That's what you wrote to the man who has traumatized you, right?

A.  Yes.

Q.  Look at number 1707, if you don't mind.

This is six days later in 2013, correct?

A.  Correct.

Q.  Can you tell the jurors what you wrote.

A.  The reason I never made it out last night.  Repost @meekmill @casandrae @iamdiddy @trvisxx @ciroctwinz @thegame.

Q.  Explain to the jury what RP means.

A.  Repost.  So you're posting someone else's post.

Q.  And do you see yourself in this image?

A.  Yes.

Q.  And do you see who is directly in front of you to your right?

A.  Yes.

Q.  Are you in the center?

A.  I'm behind in the center, yes.

Q.  Who is directly in front of you to the right?

A.  Cass.

Q.  Who is directly in front of you to your left?

A.  Puff.

Q.   And you're in some type of water, right?

A.   Yeah.  It's the pool in the backyard of his Miami house, and we just posed for a photo.

Q.   And this is the picture that you chose to post?

A.   Yes, true.

Q.   1708.  Six days later, in November 2013, right?

A.   Yes.

Q.   What did you write?

A.   Happy new birthday to my mentor, inspiration, brother, and friend for life @iamdiddy.  Love you.

Q.   Who is the new birthday that you're talking about?

A.   Puff decided to change his birthday that year, so we all promoted it and it's Puff's birthday.

Q.   Who is the mentor that you're writing about?

A.   Puff.

Q.   Who is your inspiration that you're writing about?

A.   I was writing all this about Puff.

Q.   And your brother?

A.   Puff.

Q.   And friend for life.

A.   That's what I wrote, yes.

Q.   That's about Mr. Combs, right?

A.   Yes, um-hum.

Q.   And you wrote love you, right?

A.   Of course.

Q. That's to Mr. Combs, right?

A. Publicly, yup.

Q. And you did what I'll call a collage of pictures, is that true?

A. Yes.

Q. And in here these are pictures that you posted, a lot of them are you and Mr. Combs, right?

A. Yes.

Q. And you had to pick out these thumbnails to put them in this collage, right?

A. Yes.

      MR. STEEL: Let's go to the 1709.

Q. This is December 5 of 2013, is that correct?

A. Yes.

Q. Tell the ladies and gentlemen of the jury what you wrote.

A. #TBT, to before I had real friends because who let me have my hair like that.

Q. And when you are writing about your hair, you chose to pull out an image to post on your personal social media account of who in front of you?

A. Puff.

Q. Standing right next to you or right in front of you, true?

A. True.

Q. How about 1710. That's right around the holidays, December 20, 2013, right?

A.   Yes.

Q.   And what did you write?

A.   Look, Ma, I'm a billboard in Times Square with @iamdiddy.

Q.   You're talking about your mother, correct?

A.   I said:  Look, ma.  My name is in lights, so, yeah, a play on that.

Q.   You're actually on a billboard in Times Square with Mr. Combs, right?

A.   Yes.

Q.   And it's the same picture with Mr. Combs, looks like, holding his private part and you in the tutu, true?

A.   True.

Q.   Now, all of this is done voluntarily by you, true?

A.   True.

Q.   I'd like you to look at, and we are going to do the same thing with this honorable Court's permission, I would like you to look at tab 11 through 19.  I am going to just ask you the same series of questions.  And to refresh your memory, if you need it refreshed, I'd like you to just look individually at each one.  We will go one by one.  And do you recognize the exhibit?  Is it true and accurate, to the best of your memory?

        If you could start at 1711, we will go at your pace and tell us the answer to those questions.

A.   For each one?

Q.   Each one, yes.  Start at 1711, which is tab 11.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.  Yes.

Q.  12?

A.  Yes.

Q.  13?

A.  Yes.

Q.  14?

A.  Yes.

Q.  15?

A.  Yes.

Q.  16?

A.  Yes.

Q.  17?

A.  Yes.

Q.  18?

A.  Yes.

Q.  And 19.

A.  Yes.

        MR. STEEL:  Your Honor, I'd like to move for the admission of 1711, 1712, 1713, 1714, 1715, 1716, 1717, 1718, as well as 1719, and then the corresponding R.

        THE COURT:  Those exhibits will be admitted under seal, and the redacted exhibits will be admitted.

        (Defendant's Exhibits 1711-1719 and 1711-R - 1719-R received in evidence)

Q.  If you can turn to Exhibit 1711, when you get a chance.

A.   Yeah.

Q.   This is the next year, is that fair to say, 2014?

A.   Yes.

Q.   We are at May 29, 11 years from yesterday.  And tell the ladies and gentlemen of the jury, orient them as to what you wrote.

A.   Every hour should be happy.  Rose on a Thursday.  NYC approved.  Next stop . . . Istanbul, heart.  RP @casandrae.

Q.   RP you explained, same meaning, right, repost?

A.   Yes.

Q.   And who is in the photograph, if you could orient the jurors.

A.   Me and Cassie.

Q.   Where are you, based upon this posting that you wrote?

A.   We are sitting outside a restaurant in New York City about to go to Istanbul.

Q.   Who paid for you to go to Istanbul?

A.   The management team in Istanbul that made Cassie the offer for work.

Q.   Mr. Combs?

A.   No.  It was a completely different -- she had an offer from -- we were going there because she had an offer to have club appearances and things like that, so they paid for all of us, like me and her and everything.

Q.   Did Mr. Combs, to your knowledge -- if you don't know, say

P5JHMCOM3

I don't know -- did he have to approve you going on that trip?

A. Oh, a thousand percent, yes.

Q. Did Mr. Combs have to approve Ms. Ventura going on that trip?

A. Yes.

Q. If you can look at 1712. That's 6/1/2014, so a few days later. Is that true?

A. Yes.

Q. Can you explain what you wrote.

A. Istanbul . . . On the way to masquerade with @cassie, who is about to shut it down. #B4L @umita_kbulut.

Q. Can you tell the jurors what B4L --

A. It was the tag that the promoter that was paying Cassie wanted us to include on our posts.

Q. Who is in the image?

A. Me and Cassie.

Q. Where are you?

A. We are in a Sprinter van on the way to her paid club appearance.

Q. Next one is 1713.

That's June 2, 2014, is that fair?

A. Yes.

Q. Can you explain to the jurors what you wrote.

A. Versace, Versace, Versace. No flex zone. #Istanbul @cassie.

Q.   Where are you and Ms. Ventura at that time?

A.   We are at the W Hotel in Istanbul.

Q.   Mr. Combs with you?

A.   No.

Q.   Look at 1714, if you don't mind.

Can you explain to the jurors -- this is June 22, 2014 -- what they are looking at and what you wrote.

A.   Would you like me to say what I wrote first?

Q.   Sure.

A.   I have to repost this because, A, my hair is crazy; B, Puff Daddy has 4 million followers; C, it's the nicest caption ever. Thanks, Puff.  Love you.  You've shown me the world. #layingonsunset.

Q.   Explain to the jurors what you did here to repost this.

A.   What I did?

Q.   Yeah.

A.   I'm sorry.

Q.   Did you repost something here?

A.   Oh, yes.  I reposted Puff's post.

Q.   What did Mr. Combs post about you?

A.   This is my birthday.  So he said:  Beside every great man is a great woman.  Happy birthday.  Mia, love you.  P.S.  Sorry I was acting crazy last night.

Q.   You decided to repost that, true?

A.   Yes, I reposted that.  He had threatened my life on the

phone the night before and so this was, I guess, his apology.

Q. So the man who threatened your life the night before, you decided to repost on your personal social media account?

A. Yes.

Q. I'm sorry if I cut you off. Go ahead.

A. I was going to say, yes, of course.

Q. And the man who terrorized you and threatened your life the night before, you decide to write: The nicest caption ever. Thanks, Puff. Love you. You've shown me the world.

A. Yes.

Q. This is on your birthday?

A. Yes.

Q. 1715. This is August 26, 2014.

Can you tell the jurors what you wrote and then explain what you placed in the images.

A. Happy birthday to my soul sister at Cassie. Insert every cheesy friendship quote here because they all apply to how much you mean to me. I love you so much, and I can't wait to celebrate with you. #BFF #happybirthdaycassie. And this is just a collage of photos of me and Cass.

Q. Similar to what you did with Mr. Combs, the collage, true?

A. Yes.

Q. And you love Ms. Ventura, right?

A. Yes.

Q. You love her to this day?

A. Oh, yes.

Q. And you called her yesterday not only your best friend but a sister to you, true?

A. Yeah.

Q. That's how you think of her, right?

A. Yes.

Q. The next one is 9/9/14, 1716, exhibit.

Can you tell the jurors what you wrote and then what they are looking at in the picture.

A. Desert dance off, #burningman2014 @a_trono @dereksroche @iamdiddy.

Q. The jurors already heard you talk about Mr. Roche, right?

A. Yes.

Q. They know that iamdiddy is Sean Combs' social media account, one of them, right?

A. Yes.

Q. And the image that you posted, explain who these people are.

A. Derek was the stylist, but also one of my best friends. Tron was on the left --

Q. I am going to stop you, and I apologize. I am not trying to interrupt you.

Which direction are you going?

A. Should I start on the left then?

Q. Either one. Just make it clear.

A.   On the very far left, his name is Tron, one of my dear friends, but also Derek's boyfriend and also helped Derek in working for Puff.  Then there is me.  Next to me is Derek.  Then to the right of Derek is Groovy Lou, who was the one of Puff's best friends but also helped him with styling sometimes, and Puff is in the back.

Q.   This is Burning Man 2014, right?

A.   Yes.

Q.   And you enjoyed Burning Man, right?

A.   Yes.  The majority of it.

Q.   1717.

        Please orient the jurors to what you wrote.  This is June 4, 2016.  Am I correct?

A.   Yes.

Q.   Go ahead.

A.   This was one of those lucky nights where I actually called my friends and said, I was just on stage for Muhammed Ali's 70th birthday where Stevie Wonder played the piano.  Eleventy billion balloons fell from the sky and no one will believe me, so STFU.  I got to hug him.  I never tell these stories.  But if you get to experience a legendary moment of a legend, it's hard to keep it inside.  Rest in happiness, Ali.  #iamthegreatest . . . I said that even before I knew I was.

Q.   Who is the image of?

A.   Muhammed Ali and Puff.

Q. This is taken in your presence. You took this picture, right?

A. I believe I did.

Q. This is the type of things that you were doing at times in your job, true?

A. The highs were high and the lows were low, yup.

Q. And the image that you chose to put on your personal social media, not only of Muhammed Ali, but also of your mentor, right?

A. It's the photo that I took that I was personally there and he's in it, yes.

Q. You took one photo?

A. I'm sure I took multiple, but this was the best one. It was -- I didn't have -- um-hum.

Q. Let's go to 1718.

This is November 4, 2014. Jurors know that date, right. This is five years after you are sexually assaulted, right?

A. Yes.

Q. And this is also Mr. Combs' 45th birthday. Does that sound right?

A. I guess so, yes.

Q. And tell the jurors what you wrote.

A. Happy birthday, Puff Daddy. I was very close to posting an open mouth sleeping pic to return the favor for my bday post,

but you sign my paychecks.  Thank you for being the good kind of crazy and continuing to inspire me every day.  And thank you for all of the quote/unquote people write books about this shit moments.  I know there are many more to come.  And thank you for being a friend and bringing friends into my life that I can call family forever.  I love you @iamdiddy with all of my heart.  Welcome to the seventh element.  #happybirthdaypuffdaddy, #can'tstopwon'tstop, #brokepeoplesleep #happybirthdaydiddy, #imsohotimthrowingpantiesatmyself #revolt #puffdaddy.

Q.   Then you did the collage, is that right?

A.   Yes.  Like I do for everyone's birthday.

Q.   It's Sean Combs and you or Sean Combs himself in the pictures, right?

A.   Correct.

Q.   And you had Mr. Combs shirtless in two of the pictures, true?

A.   Yes.  He is always shirtless.

Q.   Next to you in four of the pictures, right?

A.   Of course.

Q.   And at this point you have taken in so much trauma from him.  That's what you told the jurors, right?

A.   I have taken in so much trauma from him.

Q.   You want me to rephrase it?

A.   Sure.  Yes, I have, but, again, it was -- when the highs

were high and the goods were good, you just fought so hard to stay in that.

Q. Mia --

A. Yes, sir.

Q. -- you have said that you were sexually assaulted so many times you can't remember.

MS. SMYSER: Objection. Misstates the testimony.

THE COURT: Mr. Steel, can you rephrase the question.

MR. STEEL: Sure.

Q. Haven't you said that you have been sexually assaulted so many times that you can't even remember?

MS. SMYSER: Same objection.

THE COURT: Sustained.

Q. Did you tell the government -- have you met with the government?

A. I'm sorry. What was the question?

Q. One more time?

A. Yes. I thought -- yes. What did you ask me?

Q. Have you met with the people or certain of the people that are sitting in the first row and half of the second row in front of you, the prosecutors and the agents?

A. Yes.

Q. And you met with them on multiple occasions, right?

A. Correct.

Q. And, in fact, you have met with them on more than 27

occasions, is that true?

A.  I didn't -- I am not sure.  I didn't count.  But I did meet with them -- like I did meet with them quite a bit, but I am not sure the exact number.

(Continued on next page)

BY MR. STEEL: (Continued)

Q. You remember telling them that the sexual assault occurred so often more times than you can count?

A. I don't remember phrasing it that way. I remember saying that there were more -- I don't remember all the times. I did have the memories I already shared, and I know it happened more, but I don't remember how many.

Q. Well, by this time on November 4 of 2014, it is five years, and you have been sexually assaulted multiple times, right?

A. I'm -- I don't know about, I'm guessing so, yeah. Yes.

Q. And this stays with you to this day. This has ruined you, right?

A. Umm, what -- what has ruined? This part?

Q. Your testimony, if I'm correct, and correct me, is that Sean Combs' conduct towards you, sexual abuse towards you, has made you broken, right?

A. Sexual abuse was part of the ways that he ruined me, yes. There were many other ways as well.

Q. Well, in addition there are other ways, but in 1718, on the fifth anniversary of the initial sexual abuse, you are saying to Sean Combs on your social media account for everyone to see: Thank you for being the good kind of crazy and continuing to inspire me every day, right?

A. Of course because I want the -- my friends and everyone else to think that -- I want to highlight the highs. I don't

think people wrote bad stuff about their life on Instagram back then.

Q. Well, why would you promote the person who has stolen your happiness in life?

A. The -- well, those are the only people I was around, so that was my life. Promoting was a part of it. You know, you had to support the things that Puff supported, and it also was a very -- I'm not a psychiatrist or psychologist, but was a very confusing like cycling of ups and downs and violence and things that I guess I'll leave up to the experts to go into.

Q. Ma'am, you testified that you were terrified every day when Sean Combs woke up because you didn't know his mood?

        MS. SMYSER: Objection. Misstates the testimony.

        THE COURT: That's sustained.

Q. You were in fear of Sean Combs every day, is that true?

A. On the days that he was calling me his best friend and treating me like that, I wasn't in fear of him.

Q. You weren't in fear of the man who took your innocence?

        MS. SMYSER: Objection.

        THE COURT: Overruled.

A. Oh. I wasn't in fear? Yes, I -- I was in fear anytime Puff was not happy, yes, because I wanted to make sure he was because then I knew I was safe.

Q. Ma'am, you have family, right?

A. Yes, I have like -- mmm-hmm, parents and a sister and ...

Q. Am I correct?

A. Yes.

Q. You have friends outside of Combs' Enterprises, right?

MS. SMYSER: Objection. Can we get a timeframe?

Q. During the time that -- may I rephrase?

THE COURT: You may.

Q. During the time that you were working with Sean Combs from 2009 until this posting on the 4th day of November 2014, you still had friends outside of the people who worked with Combs Enterprises, is that true?

A. I didn't get to see them or speak to them, but your friends don't just stop being friends with you. But no, at this point in time I did not have an external sounding board. I didn't get to see or talk to my friends and family in any capacity that made sense. Every once in awhile.

Q. You could have though, right?

A. No.

Q. Why?

A. There was absolutely no time, and I also couldn't -- didn't have -- I had to get permission to leave or do things or -- I mean, I had to beg to go to my grandma's funeral, so I don't know if that paints any sort of picture.

Q. Mia, the jurors saw an email between you and D-Roc --

A. Mmm-hmm.

Q. -- earlier today where you are criticizing Sean Combs in

writing, do you remember that?

A. Yes.

Q. You have time to think about your feelings, right?

A. No. At that point, he left me crying and sobbing, and D-Roc was, I mean, the one that I reached out to because he was the closest and just trying to make sure that I didn't do something wrong.

Q. You wrote in 1718: And thank you for being a friend and being -- bringing friends into my life that I can call family forever. I love you, in all capitalized, with a hashtag emoji. Do you see that?

A. Yes.

Q. With all of my heart emoji, all my heart, right?

A. Yes.

Q. That's what you're writing to Sean Combs, right?

A. Yes.

Q. Nobody scripted this for you. This is your writing, correct?

A. Oh, yeah, that's how I talk about and to the people in my life, mmm-hmm. Yeah.

Q. People in your life, including the person who you were terrified of. Is that what you're telling the jury?

A. Especially the person I'm terrified of, yes.

Q. With regards to 1719, can you orient the jurors what this is on November 18, 2014?

A.   My friends at Funny or Die wanted me to help arrange Rick Ross for a funny video shoot, and so I was helping them, and then they said jump in the background, so we are in the background of a Funny or Die video.

Q.   What did you write?

A.   You know you're a huge celebrity when you're in the background of a Rick Ross @Funny or Die video spraying champagne on strippers @richforever #wheresmysecurity #rossfit #mmg #blackbottleboys #hoodbillionaire.

Q.   If you can turn to tab 34, if you don't mind.  Just look at it yourself.  Tell me whether you recognize what is depicted in tab 34.  And that's Exhibit 1734?

A.   Yes.

Q.   Is it accurate?

A.   I believe so.  Mmm-hmm.

        MR. STEEL:  Your Honor, I move for the admission of Mr. Combs 1734-R.

        THE COURT:  Any objection?

        MS. SMYSER:  The objection we raised earlier, your Honor.

        THE COURT:  All right.  1734 will be admitted and 1734-R will be admitted as well.  1734 will be admitted under seal.

        (Defendant's Exhibits 1734 under seal and 1734-R received in evidence)

Q.   Can you orient the jurors to your posting on your personal social media account?  This is December 30, 2014.  Is that fair to say?

A.   Yes.

Q.   Tell the jurors what you wrote and what is this about?

A.   21?!!?!?  Stop growing up you're making me feel old!!  I love you my lil brother ... so proud of all you've become and all you're about to be.  Happy birthday @princejdc.

This is a birthday post for Justin and -- yeah, it's my birthday post for Justin.

Q.   Tell the jury who Justin is?

A.   Justin is one of Puff's sons.

Q.   And who is in the pictures?

A.   Me and Justin, Justin and Puff, and Justin and probably me --

Q.   I can't hear you.

A.   The face is blurred out, but -- and then Puff and Justin.

Q.   This is Mr. Combs' son, right?

A.   Uh-huh.

Q.   And you're wishing him a happy birthday, fair?

A.   Oh, of course.

Q.   Go to tab number 38, which is 1738, if you don't mind.  And that's November 22, 2014, correct?

A.   Yes.

Q.   And orient the jurors to what -- well, do you recognize

this posting on your social media account?

A.   Yes.

Q.   Did you write this?

A.   Yes.

Q.   Is it accurate?

A.   Yes.

          MR. STEEL:  Your Honor, I move for admission of 1738 and 1738-R.

          THE COURT:  1738 will be admitted under seal.  1738-R will be admitted.

          (Defendant's Exhibits 1738 under seal and 1738-R received in evidence)

Q.   Do me a courtesy and orient the jurors what you wrote and what this is about?

A.   Puff's Ciroc family takeover in #Times Square ... congrats@iamdiddy (And congrats to me and @diasimms because we are really killing that ratio)  #StepIntoTheCircle  #ciroc #family #nyc #hashtag.

Q.   And the photograph?

A.   The photograph as a Ciroc promo.  I forgot what was happening there, but it was something work related, and this is just a shot on the step and repeat.

Q.   And you see yourself --

A.   Yes.

Q.   -- photographed?

You see Mr. Combs?

A. Yes, I'm with -- yes.

Q. In any of these postings so far or any of your postings, do you ever, ever say anything that you can bring forth here that Mr. Combs violated you?

A. Never.

Q. If you could turn to 1742, which is tab 42. Tell me when you get a chance whether you recognize this exhibit.

A. Yes, I do.

Q. Is it posted on your personal social media account?

A. Yes.

Q. And did you do the posting?

A. I sure did.

Q. Is it accurate?

A. Yes.

MR. STEEL: Your Honor, I move for the admission of 1742 and 1742-R.

THE COURT: 1742 will be admitted under seal. 1742-R will be admitted.

(Defendant's Exhibits 1742 under seal and 1742-R received in evidence)

Q. Once you're able, can you do me a favor, just make sure the date is October 18, 2014?

A. Yes.

Q. And what did you write?

A.   Legends recognizing legends.  Puff giving Jimmy Iovine the "started from the bottom now we here award" @iamdiddy #rmc2014 #revoltmusicconference #miami.

Q.   Who is depicted in the photograph that you displayed?

A.   Puff, Jimmy Iovine and Christian, Puff's son, is at the podium.

Q.   And you wrote -- you chose the words legends recognizing legends, right?

A.   Oh, of course.

Q.   One of the legends is the person you're telling this jury that has traumatized you, right?

A.   Yes.

Q.   Sexually, right?

A.   Yes.

Q.   Emotionally?

A.   Yes.

Q.   Physically?

A.   Yes.

Q.   Financially?

A.   Yes.

Q.   That's the legend?

A.   Yes.

Q.   If you could look at Exhibit No. 44.  Tell me when you get there.  It's going to be the same series of questions.

     Is this your social media account?

A.   Yes.

Q.   Is this something that you recognize?

A.   Yes.

Q.   And did you post this and choose the picture?

A.   Yes.

Q.   And the writing?

A.   Yes.

Q.   And is does it depict accurately what you previously put on your social media account?

A.   Yes.

MR. STEEL:   Your Honor, I move for the admission of 1744 as well as 1744-R.

THE COURT:   All right.   Those exhibits will be admitted.   The redacted version will be admitted, and the non-redacted version will be admitted under seal.

(Defendant's Exhibits 1744 under seal and 1744-R received in evidence)

Q.   This is April 6 of 2016, is that fair to say?

A.   Yes.

Q.   And will you please tell the jurors, if you don't mind, what you wrote?

A.   The Diddy Door has finally been christened! #TheChrisGethardShow was def one of the most fun and unique TV appearances we've ever done - watch it and Puff tonight on Fusion at 10:00 p.m.!   #tcgs #puffdaddy.

Q. And the image?

A. The imagine is -- I forged a relationship with Chris Gethard who was a really cool, unique person in the comedy world, and Puff wanted to break into the comedy world, and I like somehow convinced him to make a door on his TV set for the entire season that -- like the Diddy Door, and like one day maybe he would show up. This is that happening, and this is me promoting our work, and -- yeah, just what happened on the show.

Q. And you again on your social media account post a picture of the person who has ruined your life, right?

A. Yes, and my boss is the person I was with all the time, yeah.

Q. Who made you post this?

A. I wouldn't say made you post, but all these postings were my life, the good moments, so this is, you know...

Q. How do you have a good moment with Sean Combs when you're terrified of him?

A. Because -- it's -- it's easy because the dynamics would shift. So when things were good, you felt really safe and you forgot -- you almost forgot about those things, so...

Q. How do you forget about being woken up with a man on top of you getting his way with you?

A. Because it's too horrible to think about, so you don't, and you don't have time to either, and you just want it to go away.

Q. You think about it all the time, you said?

A. I --

MS. SMYSER: Objection.

Q. You were in constant fear, true?

A. Constant fear. I said that when he was abusive, I was in horrific fear. I was in fear of being in trouble. I was in fear of upsetting him. I was in fear of any moments that were not the best friend good moments.

Q. How were you best friends with a person who has treated you the way that you said to the jury?

A. I mean, I guess we can ask my therapist. It was a very psychological -- it -- that's what he would also refer to me to. I have multiple best friends. These were people I was around all the time. And he was vulnerable with me quite a bit, so I would feel responsible for helping him, and then I would feel bad for him, and I don't know how to -- I mean, I can describe it, but I'm not a psychiatrist or a therapist, I don't think I'm allowed to.

Q. Ma'am, you say that Sean Combs picked up your sister, your best friend, and pile drove her into a strong, wooden --

MS. SMYSER: Objection.

Q. -- bedpost or bedframe, right?

THE COURT: Overruled.

A. Yes.

Q. How do you forget that?

A. You don't forget that. You get punished for reacting to it, and you're terrified to bring it up again, and...

Q. Look at 1745 when you get a chance. That's tab 45. I'm going to ask the same series of questions with the Court's permission. Do you recognize this Exhibit 1745?

A. Yes.

Q. And is this something that you posted on your social media account?

A. Yes.

Q. Does it fairly accurately depict what you posted?

A. Yes.

MR. STEEL: Your Honor, I move for the mission of 1745 and 1745-R.

THE COURT: 1745 will be admitted under seal and 1745-R will be admitted.

And, Mr. Steel, you've got about nine to ten minutes, and then we'll take our midday break.

(Defendant's Exhibits 1745 under seal and 1745-R received in evidence)

Q. Looking at 1745, if you don't mind, Mia.

A. Yes.

Q. Can you orient, make sure I'm correct, this is approximately eight days after Mr. Combs' birthday?

A. Yes.

Q. This is eight days after you claim that you were sexually

assaulted for the first time, right, eight days and five years?

A.   I -- yes.

Q.   And can you -- when you get a chance, can you just make sure to read what you wrote on this exhibit?

A.   Ooooo @iamdiddy did it again.  Fuck off patron there's a new tequila in town, and this one doesn't make you hate yourself the next day @deleontequila in stores now.  Every bottle comes with its very own #ddaydance video credit me #thenextlevel.

Q.   Whose image did you post on your personal social media account?  Not anybody's work social media account.

A.   It's Puff dancing with a bottle of Deleon which is his tequila.

Q.   I would like to take you through a series of tabs, 1720. It's going to be the same exact questions I've been asking you. Just tell me when you're there, and then answer these questions, if you don't mind.

     Do you recognize what is depicted in Exhibit 1720?

A.   Sorry, what tab was that?

Q.   It would be tab 20.

A.   Okay, yes.

Q.   And is that on your social media account?

A.   Yes.

Q.   Is it accurate?

A.   Yes.

MR. STEEL: Your Honor, I move for the admission of 1720.

THE COURT: 1720 will be admitted.

MR. STEEL: And I move for the admission of 1720-R, if you don't mind.

THE COURT: 1720 will be admitted under seal, and 1720-R will be admitted.

(Defendant's Exhibits 1720 under seal and 1720-R received in evidence)

Q. If you could look at tab number 21, that would be Exhibit number 1721. Same series of questions, if you don't mind.

Do you recognize this Exhibit?

A. 1720?

Q. It would be 21, tab 21.

A. Yes.

Q. Is it accurate based upon your memory?

A. Yes.

MR. STEEL: Your Honor, I move for the admission of 1721, as well as 1721-R, Mr. Sean Combs exhibit?

THE COURT: Those will be admitted under the same terms with the redacted exhibit being admitted.

(Defendant's Exhibits 1721 under seal and 1721-R received in evidence)

Q. If you could look at tab 22, which is going to be Exhibit number 1722, when you get a chance?

A.   Yes.

Q.   Same series of questions.

A.   Yes.

Q.   Do you recognize this exhibit?

A.   Yes, mmm-hmm.

Q.   Is it accurate to the best of your memory what you posted and wrote?

A.   Yes.

MR. STEEL:  Your Honor, I move for the admission of 1722 as well as 1722-R.

THE COURT:  Admitted under same terms.

(Defendant's Exhibits 1722 under seal and 1722-R received in evidence)

Q.   And then, if you don't mind, can you like at tab 23.

A.   Yes.

Q.   That should be Exhibit 1723.

A.   Yes.

Q.   It is going to be the same exact same questions, do you recognize this exhibit?

A.   Yes.

Q.   Is this something posted and wrote and put together for your social media account?

A.   Yes.

Q.   Does it appear to be accurate?

A.   Yes.

MR. STEEL:  Your Honor, I move for the admission of 1723 as well as 1723-R?

THE COURT:  It will be admitted under the same terms.

(Defendant's Exhibits 1723 under seal and 1723-R received in evidence)

Q.  Can you go back to 1720, if you don't mind, which, Mia, is in tab 20.  I'd like to discuss this with you, okay?

A.  Okay.

Q.  This is April 29 of 2015, correct?

A.  Correct.

Q.  You've been working with Mr. Combs approximately six years now, right?

A.  Yes.

Q.  And you have suffered continuously the trauma that you've expressed to this jury according to your testimony, right?

A.  Yes.

Q.  Explain what you wrote or tell us what you wrote, I guess.

A.  Hey Puff, does my hair look better in this filter or should I use Valencia.  Me in this photo/me every day @iamdiddy #rh4/f02.

Q.  And explain the photograph that you chose to put?

A.  This is on set of another comedy Funny or Die video that I had produced and put together.  That's it.

Q.  And that's Mr. Combs and you in close distance.  That's what you put on your social media account, right?

A.   He's reviewing lines and something for me, yes.

Q.   And you are actually doing the production for this show true?

A.   Well, I was helping produce it.  Funny or Die was actually doing the production, but I was getting producer credits, but the actual production was put on physically by Funny or Die.

Q.   And Mr. Combs financially back end was also a large contributor to this event, true?

A.   No.  He was just the actor.  Funny or Die paid for it.

Q.   And you were -- this was great for you and what you wanted to do in your career, true?

A.   This was fun for me, but this was great for Puff to have that sort of comedic exposure with such -- Funny or Die was held in a really high regard as well far as the comedy world goes.

Q.   Take a look at 1721, which is tab 21.  This is, God forbid, 9/11, 2015 -- well, 9/11, right?

A.   That's what it says.

Q.   September 11, right?

A.   That's what it says.

Q.   It's 2015, correct?

A.   Yeah.

Q.   And explain to the jurors what you wrote and explain the image.

A.   Watching the man burn with a man who introduced me to it

all.  Thank you Puff Daddy for giving us yet another incredible experience.  Three burns down infinity more to go.  We love you.  #BurningMan2015  #Thebreakfastclub  #superfriends.

Q.  Now, you will no longer work with Combs Enterprises after March of 2017, correct?

A.  Correct.

Q.  So this is the second to last Burning Man that you can go to, true?

A.  I don't know.  I mean, I can go to Burning Man I guess whenever I want.

Q.  With Mr. Combs?

A.  Yeah.  I'm not sure.  Are you asking -- I'm sorry, could you ask me -- are you asking me if --

Q.  Mr. Combs, you tell the jurors, forced you to take drugs, illegal drugs against your will.  Remember that testimony?

A.  I do.

Q.  And you are posting from Burning Man in 2015, right?

A.  It was after Burning Man, yes.

Q.  And you're thanking Mr. Combs for giving you and others another incredible experience, right?

A.  Yes, because -- yes, sir, mmm-hmm, we had to.

Q.  Say again?

A.  Yes.

Q.  And you wrote, we heart you! right?  Meaning, Mr. Combs, right?

A. Yes. Mmm-hmm.

Q. Do you have any evidence besides your word that Mr. Combs forced you to do drugs?

MS. SMYSER: Objection.

THE COURT: Overruled.

MS. SMYSER: Your Honor, could we get a sidebar, please?

THE COURT: Why don't we take our break and then we can address the issue.

Thank you members of the jury. Don't speak to each other about the case. Don't talk to anyone else about the case. Do not look up anything about the case. We'll be back at 1:15. All rise

(Continued on next page)

(Jury not present)

THE COURT:  Mia, we'll see you back here at 1:15.  The government folks know this, but you're not allowed to have any communications with them, all right?  See you then.

(Witness not present)

THE COURT:  Please be seated.

Ms. Smyser.

MS. SMYSER:  Your Honor, this witness has no burden to bring forth evidence of anything that she's saying.  The government has the burden, and the defense can argue at closing that the government has not met its burden, but it is totally improper in front of this jury to be suggesting that the witness in this instance should be bringing forth evidence to support her claims.

THE COURT:  Well, everything you said is true and, Mr. Steel, if you want to ask a question along these lines, I think it needs to be rephrased because I think that the reference to evidence is improper.  But if your question is directed to whether the witness herself has specific things like texts or emails that she sent, or something that she would have personal knowledge of to substantiate the things that your question was directed to, then I don't think that would run into the nature of the objection as it's been articulated by Ms. Smyser.

MR. STEEL:  Understood.

THE COURT:  Ms. Smyser.

MS. SMYSER:  Just when Mr. Steel phrases these questions, we would ask that it not be does she have anything to support or to prove her claims here.

THE COURT:  I agree.  And it's a form objection.

You understand the objection, Mr. Steel?

MR. STEEL:  Not a hundred percent, but I'm sure I will, your Honor.

THE COURT:  I think that if you're using legalistic terms, then it runs into a concern that the jury will think of the availability of evidence to the government in the absence of that evidence, which it would be improper to ask this fact witness about. So if you ask the question in terms of what she has without referring to what supports the claims, then I think you will avoid the objection.

MR. STEEL:  I think I got it.

THE COURT:  Like if you were getting a Coke from a vending machine, and you said, Do you have any email where you asked the person about the Coke?  That's the question that I think would avoid the government's objection.  A hypothetical example.

Ms. Smyser, anything else before we take our lunch break?

MS. SMYSER:  No, your Honor.

THE COURT:  Mr. Steel, anything from your side?

MR. STEEL:  No, sir.

THE COURT:  All right.

Mr. Agnifilo, anything else?

MR. AGNIFILO:  Nothing.

THE COURT:  We'll see everybody back shortly before 1:15.

(Luncheon recess)

(Continued on next page)

AFTERNOON SESSION

1:15 p.m.

(Jury not present)

THE COURT:  Ms. Smyser, anything to raise before we bring the jury back?

MS. SMYSER:  Yes, your Honor.  I have two issues to raise.

First, the defense at 1:07 turned over a video to us as Defense Exhibit 1750, which Ms. Geragos just showed me.  It appears to be a video of this victim posting singing happy birthday to Mr. Combs.  I haven't be been able to watch it closely to hear everything in the video.

Given that this was just turned over to us in violation of the Court's order, also in violation of Rule 16, I will note that none of the social media posts are things that were in the government's possession beforehand.  They've only been turned over in accordance with the Court's order a few days before her testimony.  I would ask the Court preclude this particular exhibit.

THE COURT:  Mr. Steel.

MR. STEEL:  Your Honor, it is a very short video.  It depicts this witness on the screen.  Though being any redactions were made, and it is a happy birthday to Mr. Combs.  The witness is saying that -- I understand the Court has heard all the testimony.  I was terrified of Mr. Combs.

I asked her about her social media postings. She said, well, yes, this is what I said, however, I felt obligated to do it. This is now a different means of wishing him a happy birthday. It is in year 2014 -- that's wrong. 2013. And that is what it is.

I think it's very probative to show her demeanor, her energy, her words not on a page, not from her reading today, but it is her right in the camera saying -- these are not the quote. Please don't take this quote. What a great day. Happy, happy birthday. I love you.

THE COURT: I understand why you're putting it in because there are other pieces of evidence that you've put in that go to the same issue. And so, one, it's cumulative of that other evidence. Now I understand the difference between this piece of evidence and the Instagram posts, but, for example, we had an entire proceeding about the scrapbook and the cover letter which is in the same category as this video. So the real question is why was this not turned over when the scrapbook and the other materials were turned over to the government?

MR. STEEL: I was made aware of this yesterday, and I looked at it last night, and I can't tell you the time but I can look at notes, and then we made a decision to use it based upon her testimony. I'm using it for impeachment evidence. It is different, I know the Court just said. It's visual and

audio, not just a reading, so that's why.

I was not -- I gave over. I understand the Court's concern. I understand the prosecutor's concern. I gave over everything, including impeachment, days ago. I don't do that. I know the Court doesn't know me. I don't care. My point is let's have the trial. Let's not waste time. So that was not done for gamesmanship.

THE COURT: How long is this video?

MR. STEEL: My memory is not good. Eight seconds.

MS. SMYSER: Longer than that, your Honor.

MR. STEEL: I'm told 20 seconds.

MS. SHAPIRO: Can I just add something, your Honor?

THE COURT: No. Mr. Steel, it's 20 seconds long?

MR. STEEL: Well, I really don't know, but yes, it's very short.

MS. SMYSER: Your Honor, I just want to point out. I appreciate Mr. Steel turning over most of the exhibits in advance, but this was marked Defense Exhibit 1750. They turned over to us 1749 and 1751. I'm not sure why 1750 was held back until 1:07 p.m. today, but I think that they should be precluded from using it.

In addition, as your Honor pointed out, it's cumulative. They've been asking about her birthday posts over and over again, and I think it's unnecessary and shouldn't be used.

THE COURT:  In what way would it be used for impeachment?

MR. STEEL:  Because the witness is constantly saying I felt an obligation to write this social media.  This is not -- this is a video to Mr. Combs directly that she then puts out and blasts it as well.

And I know the Court doesn't care about this, probably doesn't need to get involved in it, but I did not mark the 1749 -- I heard what the prosecution said, 1750, 1751.  I didn't pick any of those out.  I'm choosing to use it now when the prosecutor's got it.  That's what happened.

THE COURT:  I don't understand what you just said.

MR. STEEL:  The prosecution said they got it last night.  They received Exhibit 1749 and 1751.  I'm just telling the Court I didn't serve or even know about what is 1749 or 1751.  I made a decision to use 17, I guess, 50, the video now, and the prosecution got it almost immediately.

THE COURT:  Well, when did you decide that you were going to use it?

MR. STEEL:  Today.

THE COURT:  But you reviewed it last night.

MR. STEEL:  I decided I'm going to use it today.  I saw it yesterday.

THE COURT:  It's Exhibit 1750, Ms. Smyser?

MS. SMYSER:  That's correct.

THE COURT:  Exhibit 1750 is precluded.

MS. SHAPIRO:  Your Honor, I'm sorry, I really want to make a couple points here because the reason -- one of the reasons we went and found the video was because of this witness' demeanor and the way she was presenting herself to the jury.

And in addition to all the points Mr. Steel has made, if you watch this video, which I understand we were just told is 30 seconds long, you can see that her demeanor is night and day from what it has been during the direct and at times during the cross as well.  And she's trying to present herself in a certain way as being traumatized and so forth.  And this video shows her as she really is, and it is particularly probative and probative in a way that the photographs aren't and even beyond the substantive points about the fact that she's making -- wishing Mr. Combs happy birthday.  So I think we will be severely prejudiced if we can't show the video.

THE COURT:  The 20-second happy birthday video?

MS. SHAPIRO:  Yes, your Honor.

THE COURT:  Let me ask you to explain to me when was this exhibit marked with an exhibit number?

MS. SHAPIRO:  I don't know that.  I know we found it yesterday.  We had to redact it.

THE COURT:  All right.  We don't know when it was marked with an exhibit number.  When is the first time that

someone on the defense team reviewed the video to determine whether or not it would be potentially used in the cross-examination of this witness?

MS. SHAPIRO:  Yesterday, after we heard the direct.

THE COURT:  Why was it not -- well, this goes back to the question of when it was marked because there was a time when the defense marked the scrapbook and the cover letter, also to go to the exact same point that during the time that she is saying these things happened, she was also professing her lover for Mr. Combs in various ways.  And some of those are in Instagram posts.  Some of those are in a scrapbook.  Some of those are in a letter.  There are various different forms of this, so it's not just Instagram.  And are you telling me that when the defense reviewed all of those documents to use during cross-examination, they did not review this video?

MS. SHAPIRO:  Yes.  Yes, your Honor.  That's the point.  The point is --

THE COURT:  Why?  Why?  No.  No.  Why was it not reviewed?

MS. SHAPIRO:  We didn't even think of the idea until we saw the way she presented herself to the jury.

THE COURT:  You are misunderstanding my question.  You were looking at all this evidence in your possession to determine whether it would be used or not, and you're telling me here that you did not even review the video.  You didn't

know it existed until yesterday?

MS. SHAPIRO:  Yes.  Correct, your Honor.

THE COURT:  How is that possible?

MR. AGNIFILO:  Can I shed some light on this?  Can I tell you what I think happened?

THE COURT:  Let me take a step back, and I'll let you speak, okay?

MR. AGNIFILO:  Yes.

THE COURT:  The Court's order, very clear, and it said that if you don't turn over those exhibits in accordance with the order, you need to establish good cause.  That's why I'm asking these questions.

MR. AGNIFILO:  I totally understand.

THE COURT:  Because it's not just whether it's relevant or not, okay?  I agree with Ms. Smyser that its relevance, even if it would be going to demeanor, is minimal at best and cumulative of all the other evidence that you are putting in and I've allowed you to put in.  So what is the good cause, give me the explanation why it's coming up at 1:07.

MR. AGNIFILO:  I saw it for the first time yesterday.  That I know.  The reason I keep --

THE COURT:  I don't really care so much.

MS. SHAPIRO:  Your Honor, I found the video --

THE COURT:  Ms. Shapiro, this is why when you asked to speak before, I said no.  We can't have a situation where

multiple lawyers are standing up on the same issue.  It prevents a record from being made.

MS. SHAPIRO:  I understand, your Honor.

THE COURT:  Okay?

Now, Mr. Agnifilo, I don't -- I don't really care what one individual lawyer wants to know, but having come here and provided this to the government at 1:07 p.m. -- now, clearly last night you had seen this, okay.  Now when you saw it last night, did you turn it over then because you're like, oh no, we may be in a position where we need to use this tomorrow.  And it obviously doesn't go to impeachment.  You could try to use it, but you're not going to be able to use it as impeachment because if you ask the witness did you send the video, she'll probably say yes, okay?  If she says no, then you can try to put it in for impeachment purpose.  But that's not going to work.

So last night when you looked at the video, did you think to yourself, I need to turn this over so at least Ms. Smyser could have a chance to review it and we could have addressed it this morning?

MR. AGNIFILO:  So last night -- when I saw it for the first time yesterday, we saw the value in it.  We weren't sure how we were going to use it, and what we realized is the most useful part of it is her demeanor in the video because -- and I'm just saying it this way so your Honor understands.  And I

can't say it any less directly.

I believe that the jury may conclude that her affect on the stand is an act. I think that's possible. I think the jury might conclude that. And this video makes that conclusion clearer. Now, the idea was, you know, we had to see -- you know, it was a piece of evidence that came to us. We had to figure out what it was, you know, if they're are going to be have to be redactions. We had to talk to our client about it and talk as a team, and we realized today when she continued to have the same affect, which we think is false, that we wanted to use it.

THE COURT: When is the video from?

MR. AGNIFILO: It's from 2013. So what I believe happened -- what I believe happened is that -- and I told the Court that this might happen a few weeks ago. I believe someone has determined who this is and has said I have a video and sent us the video.

THE COURT: When did -- this is what I'm -- let's take a step back. Actually, let's take five minutes, and I will ask during that five minutes for the defense team to confer and give me the story of what the basis is for the failure to comply with the Court's order. That's what I'm asking. Hold on. Because I'm getting arguments about relevance, and I'm getting arguments that don't go to the good cause that I said had to be shown. Now you're telling me that somebody sent this

to the defense team. Well, look, if someone sent this to you at 1:00 a.m. yesterday, then that's something. But if you had this video in your possession for the past week, two weeks, three weeks, and you just decided to produce it now, then that's a different story, and I don't think that you thought through this. And let's hear what it is so I understand what your position is.

MR. AGNIFILO: That's perfectly reasonable. Let us talk because everyone has a different --

THE COURT: I know.

MR. AGNIFILO: -- like experience with it. So let's just get to ground on that. But one thing I will say, it's not Rule 16. It's not affirmative evidence. It's impeachment --

THE COURT: It doesn't have -- we addressed this already. I ruled in your favor on the Rule 16 issue. However, under the Court's inherent authority to keep this case moving along and running this trial in an efficient and fair manner, I had an order that came out that everyone has been complying with in large part. And that's the question: Is this in compliance with that or not?

MR. AGNIFILO: Very good. Give us some time and we'll come back.

THE COURT: I'll give you five minutes and we'll come back.

In the meantime, Ms. Smyser, what's the second issue?

That's where we started.

MS. SMYSER:  Yes, your Honor.  There is another Defense Exhibit 1733, which I had various hearsay objections to.  You had asked us to confer on that.  We have conferred, and there are still a few hearsay objections that I have that the defense do not agree to.

THE COURT:  Are they ones where you can circle them?

MS. SMYSER:  Yes.  Happy to pass it up to your Honor.

THE COURT:  Can you just circle the ones where you have the objection, and while the defense is conferring for the next five minutes, I'll take it a look at it.

MR. STEEL:  Your Honor, could we put our position, just email it to everyone?  I think we emailed it to the prosecutors, is that true?

THE COURT:  On the hearsay issue?

MR. STEEL:  On this issue, yes, sir.

THE COURT:  If you have an email, just send it to me. I'll take a look at it.

MR. STEEL:  Mr. Driscoll will do that?

Thank you, your Honor.

(Recess)

THE COURT:  The governments objections to Defense Exhibit 1733 are overruled.

Now, Mr. Agnifilo, or whoever wants to address this.

MS. SHAPIRO:  Your Honor, hopefully I can answer all

the Court's questions. These are the facts. And I apologize. I think we each saw this video at different times and -- but what happened was yesterday afternoon, in response to our observations about Mia's demeanor, myself and another member of the team found this video on the internet and then subsequently -- and we looked at it and were considering it. And then subsequently I think there were people on the internet who think they figured out who Mia is, and so Mr. Agnifilo as well as some of us also received emails or communications from random people on the internet with the same video and so we were thinking about using it. And then in her testimony -- so we were thinking about using it.

I just want to also add that the additional relevance is that, unlike the photographs, this has audio, and that is significant as well because it sheds another dimension to what you see about what she's saying and her message to Mr. Combs.

Also, this video, as far as we are aware, was not posted to her social media. And this afternoon or, rather, this morning in her testimony, Mia tried to explain away the social media posts by saying, well, that was, you know, a public thing that I was doing for my job, et cetera, and this is -- part of this is also a response to that because this was not, as far as we can tell, ever posted by her on social media. We found it on some other random website.

And also -- the other thing I'd just point out the

video is like 30 seconds long.  It's of the same nature as these photographs.  There's no prejudice to the government, but we believe that Mr. Combs' defense would be severely prejudiced by not being able to show the jurors the video because we think it's not cumulative because of what it shows about her demeanor and because of the audio component to it.  And there's no prejudice to the government.

And so for all of those reasons, your Honor, we think that there is no basis to preclude the video on this, you know, late production argument

THE COURT:  Give me just one second here.

MS. SHAPIRO:  And, your Honor, perhaps we should show the video so you can see what we're talking about.

THE COURT:  All right.  Let's see it.

MS. SMYSER:  Your Honor, can I respond to Ms. Shapiro?

THE COURT:  Can you just wait?  Hold that for a second?  Let me see the video.  And I'm looking at something, and then we'll get back to you, Ms. Smyser.

(Pause)

THE COURT:  Ms. Smyser.

MS. SMYSER:  Your Honor, a few things.  I heard from Ms. Shapiro that the defense was considering using this in cross-examination yesterday.  They should have turned it over to the government then.  And pursuant to the Court's order --and I will point out that at 7:15, around that time last night,

we got Exhibits 1751 through 1788, but we did not get Defense Exhibit 1750 and so -- you know, we got the rest of the exhibits while she was still on direct examination.

They waited until she was off of direct examination to turn this over prior to her -- in the middle of her cross-examination, and there absolutely is prejudice to this timing. If we had received this last night, we could have, for example, investigated on the internet, tried to figure out where this came from, tried to figure out what the purpose of this video was, who was filming it, what was going on in this video. But, quite frankly, I haven't had time to watch the video carefully, let alone do any of that investigation, which we could have done last night. But that -- with the timing of these events, that's just not how this shook out, and the defense should be precluded given they had this yesterday and were considering using it and likely marked it yesterday given the number of exhibits that we received. They shouldn't get to use it here. It's in violation of the Court's order.

THE COURT:  You've now had a chance to watch the video?

MS. SMYSER:  Not carefully, your Honor.

THE COURT:  How much care is required?

MS. SMYSER:  I'd like to be sure that I heard everything she says in the video.

THE COURT:  I understand.

Ms. Shapiro, when did the defense team obtain this video?

MS. SHAPIRO:  Your Honor, as I said, yesterday -- we saw it on the internet yesterday afternoon, after court.

THE COURT:  When was it marked as Defense Exhibit 1750?

MS. SHAPIRO:  I'm not sure exactly when.  I think there was some effort made to make it -- to like redact it in case we wanted to use it, I'm not sure --

THE COURT:  Was that done yesterday?

MS. SHAPIRO:  I believe it was done late last night.

MS. SMYSER:  And we received unredacted versions of the other exhibits, your Honor.  So I don't understand why we couldn't have receive an unredacted version of this.

THE COURT:  I understand.

The Court has reviewed the short birthday video clip that is Defendant's Exhibit 1750.  It is precluded.

First, having now actually viewed the short video, the relevance and probative value of this video is minimal.  While the defense argues that it is different in nature from an Instagram clip, having actually viewed the video, it is essentially a video that would be equivalent to an Instagram clip including Mia's use of hash tags at the end, #revolt. There is no content to the video that's different than the myriad Instagram clips and other materials that the defense

properly disclosed.

So even if it had been properly disclosed, had there been an objection after the number of Instagram clips and other materials that the defense would have planned to use, the Court would have excluded it on Rule 403 grounds.

However, even if that were not the case, the Defense Exhibit would be excluded for failure to adhere to the Court's clear order that indicated that by 7:00 p.m. on each trial day, the defendant will provide the government with all exhibits anticipated to be used for purposes other than impeachment or to refresh a witness's recollection for the following trial day. That was not done.

Now, even if the defense team had received and marked this as an exhibit after 7:00 p.m., based on what we've heard here in court, it was certainly done yesterday and could have been turned over to the government in an attempt to comply, although belatedly, with the Court's order. That was not done either.

Certainly, the defense would have been aware on their rationale, which the Court thinks is dubious, that the video somehow undermines any inference the jury might draw from the witness' demeanor here in court. But even accepting that, the defense was aware of that yesterday, because the witness testified all of yesterday. So they would have known yesterday that they may use this exhibit and yet they apparently elected

not to turn it over.

Even if there was some reason for that, it could have been turned over this morning.  It could have been turned over before one of the early morning breaks.

(Continued on next page)

THE COURT:  It wasn't turned over.  In fact, it was turned over after the lunch break, right before cross-examination was set to begin, in plain violation of the Court's order, so it is independently precluded on that basis.

Anything further, Ms. Smyser, before we have our jury back?

MS. SMYSER:  No, your Honor.

THE COURT:  Anything, Mr. Agnifilo?

MR. AGNIFILO:  No, your Honor.

THE COURT:  Let's have Mia back.

MR. STEEL:  Your Honor, can I ask a question.

THE COURT:  Yes, Mr. Steel.

MR. STEEL:  Thank you, your Honor.  Am I precluded from just asking the witness if she did something like that?  I don't want you to tell me it's excluded.

THE COURT:  This order does not apply to the use of documents to try to refresh a witness' recollection.  You can ask her about the video.  If she denies having sent the video, then you can attempt to introduce it on impeachment grounds.  If you can do it that way, then that's in compliance with the Court's order.

MR. STEEL:  Thank you.

Your Honor, can I just one other question?

THE COURT:  Yes.

MR. STEEL:  Shortly I am going to ask about scrapbooks

that the Court permitted.

THE COURT:  Of course.

MR. STEEL:  The prosecutor and I have a disagreement.

THE COURT:  How do you want to do it?

MR. STEEL:  I was going to hand -- there are three copies.  I was going to give one to the witness, with the Court's permission, I was probably going to hold one, and I was going to ask the Court if I could have one for the jurors to just pass around.  I thought that's what you said was OK, but I want to tell the Court.  The honorable prosecutor and I have a disagreement.  I believe the Court said any way I want to do it, including just hand it to the jurors -- not me hand it to the jurors.  The prosecutor said that that this Court did not say to ever let the jurors handle that scrapbook.

THE COURT:  Walk me through what you're planning to do with it.

What I don't want to happen, and what I think the prosecution was concerned about, is giving it to the jury so that they have an extended period of time to read all the various articles.  That's not the reason why you're putting this in.  You're putting it in to show the fact that there are a lot of articles and she put a lot of care into the creation of the scrapbook.

MR. STEEL:  That's it.

THE COURT:  I take it that you are planning to provide

one copy to the jury for them to quickly review, meaning take a few seconds and hand it around, and then within a couple of minutes you are going to ask for the binder back, right?

MR. STEEL:  That's exactly right.

THE COURT:  On that basis, you can proceed in that fashion.

MR. STEEL:  Then I have no other questions.  Thank you.

THE COURT:  Let's have Mia back, and then we will bring our jury out.

(Jury present)

THE COURT:  Welcome back, members of the jury.

Mia, you understand you are still under oath?

THE WITNESS:  Yes.

THE COURT:  Mr. Steel, when you are ready.

BY MR. STEEL:

Q.  With regards to Exhibit number 1721, it's in tab 21, my memory is, we have already been discussing that, correct?

A.  Yes.

Q.  And this is where you wrote:  Thank you, Puff Daddy, for giving us yet another incredible experience.  Three burns down. Infinity.  More to go.  We heart emoji you.  Right?

A.  Yes.

Q.  Then you wrote:  #burningman2015.  Fair?

A.  Yes.

Q.   Then you also wrote #thebreakfastclub, right?

A.   Yes.

Q.   Can you explain to the jury what, if anything, the breakfast club means to you at that time?

A.   The breakfast club was the name of our camp, I believe, and it was based from an inside, like his friends group that were still partying at breakfast essentially.

Q.   Who is his friend's group?

A.   Puff.

Q.   You were part of the breakfast club.  Is that fair to say?

A.   I guess I was invited in once, but I am not sure.

Q.   Is that your answer?

A.   Oh, yeah.  He just said that to me one time.

Q.   And here on your social media post, on September 11, 2015, you recognize that you're part of the breakfast club.  You #thebreakfastclub.  Fair?

A.   Sure.

Q.   And when you say with his friends, this is the Sean Combs that you described to the jury, right?  That's his friends that you're part of, right?

A.   Yes.

Q.   The man who has altered your life for the worst forever, right?

A.   Yes.

Q.   Let's go to the next tab, which should be 22, which is

already in evidence. Can you just make sure that this is correct. It's about a October 23, 2015 post?

A. Yes.

Q. And Mia, would you do me a favor and explain to the jury, like you have been, what you wrote and then what's in the image, if you don't mind.

A. Sure. Happy birthday @officialclubdiddy. So much love from me and @cassie from South Africa. Heart heart you. P.S.: The air I'm kissing is your face. It's definitely not my go-to duck-selfie face or anything. LOL.

Q. Who is in the image that you attached?

A. Me and Cassie.

Q. Can you explain to the jury what you're writing here, happy birthday @officialclubdiddy. Can you explain what that means?

A. Yes. That is -- that was a Puff fan club. It was a fan club run by this girl who we had a relationship with because obviously she would promote Puff shamelessly.

Q. I couldn't hear you. Apologize. She promotes and then I couldn't hear you.

A. She would promote Puff like shamelessly, like promote him a lot, so we had a relationship with her.

Q. And you were promoting her, who is promoting Mr. Combs, right?

A. I was giving her a birthday shout-out because she was so sweet.

Q.   And you're in Capetown, South Africa, is that fair to say?

A.   Yes, sir.

Q.   And is this the Capetown, South Africa trip that you referred to earlier?

A.   Yes, sir.

Q.   On, I believe it's in evidence, 1723, which would be behind tab 23, if you don't mind looking at that.

A.   Sure.

Q.   You see that?

A.   Yes.

Q.   That's, again, November 4, 2015, right?

A.   Correct.

Q.   The anniversary six years later of you starting with Mr. Combs, and he supposedly sexually assaulted you, God forbid, right?

A.   It wasn't the anniversary of when I started, but -- I, again, didn't recognize that date as a celebration.

Q.   Can I ask you a question.  If I interrupted you, go ahead.

A.   No.

Q.   I did not mean to interrupt you.

A.   It's OK.

Q.   When you say that you did not recognize Mr. Combs' birthday of November 4 of every year as significant, that he supposedly drugged you and sexually assaulted you, how did you not put that together?

MS. SMYSER:  Objection.

THE COURT:  Mr. Steel, you need to rephrase that question.

Q.  How is that not a significant date in your mind?  Please explain that to the ladies and gentlemen of the jury.

A.  It was Puff's birthday.  That is what the date was.  And I tried to forget that night and shoved it down.  I never wanted to think about it again.  I know it was Puff's birthday.

THE COURT:  Mr. Steel.

Q.  Are you finished?

A.  Yes.

Q.  In 1723 please explain to the ladies and gentlemen of the jury what you wrote.

A.  Puff Daddy.  Noun.  A larger than life cultural phenomenon known for his world changing legacies and inability to tolerate bitchassness.  Also see:  Legend, king, swag, rapper, actor, entrepreneur, cheesecake lover, Bad Boy for life, my friend.  Heart emoji.  46 years ago an extraterrestrial was born.  Happy birthday, Puff Daddy.  Thank you for showing me the path to Pluto and beyond.  I love you.  Heart heart heart.

Q.  When you wrote that on your personal social media account, you just put aside the fact that you tell this jury that you have been sexually abused by Mr. Combs.

A.  Absolutely.

Q.  You just put aside the fact that you saw Mr. Combs abuse --

P5HMCOM5

MS. COMEY:  Objection.

THE COURT:  Overruled.

Q.  -- supposedly abuse your sister or best friend, Ms. Ventura?

A.  Yes.

Q.  You put aside the fact that Mr. Combs made you go sleepless for five days where you got physically ill?

A.  Yes.

Q.  You put aside the fact that Mr. Combs made you not use the bathroom while on your time of the month where you bled out.

A.  Yes.

Q.  You put aside the fact that Mr. Combs comes into your bedroom, gets on top of you and does the unthinkable, according to you.

A.  Yes.

Q.  You put aside the fact that you say that you live in terror because of Mr. Combs.

A.  Yes.

Q.  Tell the ladies and gentlemen of the jury, on 1723, Mr. Combs' exhibit, explain these photographs that you chose. If you didn't choose them, say I didn't choose them, but correct me.

A.  I'm sorry.  Could you ask me --

Q.  Let me ask you a better question.

What is marked in this honorable court, admitted 1723

and under seal as 1723-R, did you choose this collage of photographs?

A.   I believe so.

Q.   Explain to the jurors each of these photographs and why you chose them, please.  Start, I guess, in the upper left and then go to the right.

A.   Sure.  Overall, I had to post every year for his birthday, and I just ran out of things, so I was trying to fill a collage with photos I had already posted.  The top left is me on my BlackBerry and Puff behind me.  And the second one is me sitting next to Puff at a club.  The next one are Puff and I working on a TV set of Blackish.  The next one is Puff talking to me on a video set.  The next one is the same photo of Burning Man.  The next one is the same photo of Burning Man.  The next one is the same photo of me in the Lonely Island video giving birth to a baby doll.  The next one is Puff riding his bike at Burning Man.  The next one is Puff staring at art at Art Basel.  The next one is Puff and I at the premier of the movie Dope that we coproduced.  And the next one is an image from the same post, I don't know how many ago, of onset of the comedy short for Funny or Die.

Q.   Can you turn to tab 40 and look at, just yourself and the parties, 1740, if you don't mind.

A.   Um-hum.

Q.   I am going to ask you similar questions that I have before.

Q. Do you recognize what's depicted in Mr. Combs' 1740?

A. Yes.

Q. And is this true and accurate, to the best of your memory?

A. Yes.

MR. STEEL: Your Honor, I move for the admission of 1740, I believe, under seal and then 1740-R.

THE COURT: 1740 will be admitted under seal and 1740-R will be admitted.

(Defendant's Exhibits 1740 and 1740-R received in evidence)

Q. We are still in the year 2015, is that correct?

A. Yes.

Q. It's September 19, right?

A. Correct.

Q. Can you please do me a courtesy, same kind of way we have been doing it. Read to the jurors what you wrote on your personal social media page.

A. Our brother, The Legend, @iamdiddy takes the stage tonight @iHeartradio in Vegas at 10:32 p.m. Tune in to watch the stage take fire and history be made. Heart heart you.

Q. The legend, our brother, you're referring to who?

A. Puff.

Q. And then the photograph that you chose.

A. I took it while he was on stage @iHeartradio.

Q. When you say he, that's clearly who?

A.   Puff.

Q.   Would you do me a courtesy and then just look at the next tab, 41.

A.   Sure.

Q.   That should be 1740, Defense Exhibit.  Do you recognize what's depicted in that exhibit?

A.   Yes.

Q.   And is it true and accurate, to the best of your memory?

A.   Yes.

          MR. STEEL:  Your Honor, I move for the admission of 1741, as well as 1741-R, with the same acknowledgments.

          THE COURT:  1741 will be admitted under seal and 1741-R will be admitted.

          (Defendant's Exhibits 1741 and 1741-R received in evidence)

Q.   Mia, would you do me a favor.  Once you're there, would you make sure that this is also 2015, May 20?

A.   Yes.

Q.   Can you read to the jury what you wrote.

A.   I'm such a huge producer.  Check out those headphones.  #balling.  And tune into Blackish tonight to see @iamdiddy on the season finale.

Q.   Explain what the jurors are looking at that in that image.

A.   Puff and I on the set of Blackish, which is a comedy show, and I am promoting it.

Q.   I would like you to go back, if you don't mind, to tab 24, and tell me, if you don't mind, if you look at 1724.

A.   Sure.

Q.   Tell me if you recognize that.

A.   I think so, yup.

Q.   And when you say you think so, is this on your personal social media account?

A.   Yes.

Q.   Does it look accurate?

A.   It does.

          MR. STEEL:  Your Honor, I move for the admission of 1724 and 1724-R.

          THE COURT:  1724 had been admitted under seal and 1724-R will be admitted.

          (Defendant's Exhibits 1724 and 1724-R received in evidence)

Q.   Will you do me a courtesy and look at tab 25.

          MR. STEEL:  You can remove that from the screen for now.

Q.   You see behind tab 25 1725?

A.   Yes, um-hum.

Q.   Do you recognize this posting?

A.   Yes.

Q.   Is this on your social media account?

A.   Yes.

Q.   To your knowledge, is this what you posted?

A.   Yes.

MR. STEEL:  Your Honor, I move for the admission of 1725 as well as R.

THE COURT:  1725 will be admitted under seal and 1725-R will be admitted.

(Defendant's Exhibits 1725 and 1725-R received in evidence)

Q.   Will you do me a courtesy and look at 26 tab.

A.   Sure.

Q.   That should be Mr. Combs' Exhibit number 1726.

A.   Yes.

Q.   And do you recognize what's depicted?

A.   Yes.

Q.   Does it appear to be true and accurate?

A.   Yes.

MR. STEEL:  Your Honor, I move for the admission of 1726, as well as 1726-R, the first one under seal.

THE COURT:  1726 will be admitted under seal and 1726-R will be admitted.

(Defendant's Exhibits 1726 and 1726-R received in evidence)

Q.   If you don't mind looking at 27, tab 27, and it should be behind it.  Mr. Combs Exhibit 1727.

Do you see that?

A. Yes.

Q. Would you do me a courtesy and tell me whether you recognize what's depicted in 1727?

A. Yes.

Q. And is it true and accurate, from the best of your memory?

A. Yes.

MR. STEEL: Your Honor, then I would move for the admission of 1727 under seal and then 1727-R.

THE COURT: It will be admitted on the same terms.

Q. If you go back to 24 tab, which is now admitted, 1724, tell me when you're there, if you don't mind.

A. Yes. I'm here.

Q. And you see in the third line -- don't read or anything. Do you see in the third line the center --

A. Yes.

Q. -- of that writing?

A. Um-hum.

Q. That's Mia, right?

A. I'm sorry?

Q. You understand that's Mia, the third line center?

A. Yes.

Q. Do me a courtesy. Just make sure I'm correct, but it seems to say that this is June 25, 2016, is that fair?

A. Yes.

Q. And this is your posting, same thing that the jurors have

heard a lot about, right?

A.   Yes.  I have -- it's reposted, um-hum.

Q.   And you explained a repost again to the jurors earlier?

A.   It's taking someone else's post and posting it again, so I was reposting his original post.

Q.   When you say his --

A.   I'm sorry.  Puff's.

Q.   Would you do me a courtesy and read what you wrote.  And just remember the third line center.  OK.

A.   The third line center as in like stop there or continue?

Q.   After #happy birthday and then it says @mia.  You see that?

A.   Yes.  OK.  Good thing you taught me life is a marathon and not a sprint because I'm still running with it.  #repost @iamdiddy.  #happy birthday, Mia.  You are the wind beneath my wings, an angel from above and any other Whitney Houston or Brandy line there ever was.  Now take my black card and run.  Run like the wind.  Love you.

Q.   Now, the first part before it says #repost, do you see what I'm talking about?

A.   Yes.

Q.   Who wrote that, good thing you taught me life is a marathon and not a sprint because I'm still running, with a lot of Ns with it?

A.   I did.

Q.   The second part after the repost?

A. Yes.

Q. Who would have written that?

A. Posted underneath Puff's page, but I believe I came up with the wording.

Q. You wrote that?

A. I probably did.

Q. Then you reposted your own wording?

A. Yes. Well, it's from Puff's page. I probably helped him, and I was just trying to be funny.

Q. Because that's your job, right?

A. It was part of it, but he also posted as well. But, yeah.

Q. You told the jurors yesterday that part of the reason that you never said anything about the sexual abuse, you remember you gave several reasons?

A. Yes.

Q. The supposed sexual abuse was never said?

A. You said the reasons that it was never said?

Q. Yeah. Remember you gave reasons?

A. Yes.

Q. You explained that the Me Too movement --

A. It was way before that.

Q. You stated that social media wasn't kicked in, right?

A. Not in the capacity it is now. Like there was no TikTok. There was nobody talking about sexual abuse. There was no -- at this time Instagram was all about highlighting the highs of

your life, not the lows of your life, and just showing people the great times that you were having. That's what I meant. Social media is not like it is today.

Q. Well, by 2017, the Me Too movement was viral.

A. Not until about a few months after was the initial person that was brought to the forefront for the Me Too movement was months after I left.

Q. That was October 15 of 2017. Does that sound right?

A. Correct.

Q. That's when the Me Too movement went viral, right?

A. I don't know when the Me Too movement went viral, but I know that the catalyst for it was somewhere around that time.

Q. And were you aware at that time?

A. This was after I had no better dealings -- this was after.

Q. I understand. But you were aware of that, the Me Too movement, right? That was a great movement.

A. Was I aware of the Me Too movement? Yes, of course.

Q. Now, tell the ladies and gentlemen of the jury what's in the pictures. And I think they have seen all of them before. If they have not, just explain that too.

A. Yes. Just the same recycling photos. The same photo of us in Burning Man; a photo on some video set; a photo of me giving birth in a funny video; me and Puff at a club; me, Cass, and Puff at Burning Man; me and Puff on that -- a funny video shoot; and then me and Puff on the set of Blackish.

Q. Would you agree with this, anybody so far who looks at your social media would think that you and Sean Combs are very, very close.

A. Yes.

        MS. SMYSER:  Objection.

        THE COURT:  Overruled.

Q. And that was your postings, right?

A. All of these posts were my postings?

Q. Yes.

A. Yes.

Q. Look at 1725, if you don't mind.  It's behind tab 25.  We are still in 2016.  It's August 27, right?

A. Yes.

Q. Can you read what you posted.

A. It's still technically your birthday because I'm still technically recovering from it.  Happy birthday, Casalicia.  You are my heartbeat, heart, my everything heart, my ride-or-die heart.  @cassie.

Q. That's pictures of you and Ms. Ventura?

A. Yes.  I think -- um-hum.

Q. I'm sorry.  I interrupted you.  Go ahead.

A. You're fine.

Q. You have Mr. Combs in one of those pictures?

A. Yes.

Q. That's the bottom picture, second one in from the right?

A.   Yes.

Q.   And you mean this, right?  This isn't puffing.  You love Ms. Ventura.  You already said that.  Is that fair to say?

A.   Of course.

Q.   You meant every word on your social media account, right?

A.   I didn't mean every word on my social media account, but I did mean this post a thousand percent.

Q.   Let's turn to 26.  It's behind tab 26.  This, again, is October 5, 2016.  Can you read to the jurors and then explain exactly what you're doing and the image.

A.   Sure.  LA.  Come on down to the @invisiblebully popup shop at 517 North Fairfax, where you can watch me, the live window display, talk on my Zach Morris cell phone while I play Nintendo for the next three to six hours, depending on if I beat level 4 or not.  #badboyreuniontour #big #sipchampagnewhenwethirsty #orciroc.

This was a popup shop for D-Roc's clothing brand and this was an installation on the street, and I decided to be cute and run inside side of it and have someone take a photo of me.

Q.   Who is in the first line?

A.   That is Invisible Bully, which is D-Roc.  It's his clothing brand.

Q.   Bad Boy reunion tour?

A.   Yes.

Q.   What is that?

A.   Bad Boy was -- I mean the documentary I was working on was coinciding with the Bad Boy reunion tour where Bad Boy was reuniting after 20 years and going on tour.

Q.   Do you realize all these posts so far emphasize and promote Mr. Sean Combs?

A.   Yes.

Q.   Look at number 27.  It's tab 27, but it's Exhibit 1727, if you don't mind.  When you get there, just make sure that this says 11/5/2016.

     You see that?

A.   Yes.

Q.   I want to talk to you about that date for a second.  OK?

A.   OK.

Q.   You see next to it it says 1:14 p.m. UTC minus 6?

A.   Yes.

Q.   Do you know, and if you don't, just say I don't know, that that means that the time is really six hours before, so it would be on November 4, 2016 when you posted that?

A.   Sure.

Q.   And November 4, 2016, the jurors will remember, it's the day that you remember as Mr. Combs' birthday, nothing else attached, right?

          MS. SMYSER:  Objection.

          THE COURT:  It's overruled.

A.   Now that you bring it up, I remember it, but I was always -- it was Puff's birthday to me.

Q.   And Puff's birthday to you also included you being sexually assaulted, right?

A.   It was not.  I didn't associate the two until you just brought that up today.

Q.   Read what you wrote.

A.   Happy birthday, Puff Daddy.  Thank you for the bday dinner and a movie night.  You are the coolest alien rock star unicorn pizza slice, and we fucking love you.  Emojis.

Q.   You are telling this jury that all these writings that you wrote to Mr. Combs and promoting him, it's not the way you felt?

          MS. SMYSER:  Objection.  It's argumentative, your Honor.

          THE COURT:  Sustained.

Q.   Did you feel that way when you were writing this?

A.   Did I feel like, happy birthday, Puff, thanks for the birthday dinner?  Yeah.  During this post.

Q.   How about, you are the coolest alien rock star unicorn and pizza slice, and we F'g love, with multiple Vs, you with two exclamation points?

A.   I did do a little bit of -- did I believe that he was the coolest alien rock star unicorn?  I was just trying to compliment him in a unique way.

Q. You mean we F'g loved, with multiple Vs, you, two exclamation points?

A. Yeah.

Q. Now, the photograph that you attached --

A. Um-hum.

Q. -- to the 11/4 -- I'm just calling it 11/4, but I understand it's written 11/5.

Can you do me a favor. Can you identify who these people are and then just say where you are, top row starting in the left, and say when you're in the second row, and then there is a third row or like a table row.

A. I cannot -- my eyes aren't that great, but I can -- I mean, these are all like Puff's friends and family and people that work with him. I can't see. It's not anybody else's fault, but my eyes are a little blurry. There is Groovy Lou to the left. I can't tell who that is to the left of him. Next to Groovy Lou on the right, I think that's Chisel in the back. I think that might be April, D-Roc's wife, I think, in the front of that. Then Justin. Then I can't really make out the two faces here. Behind them is Lucas. There is Mama Combs. There is Christian. D-Roc is behind them. There is Puff. There is me. Behind me is Tony DeNiro. Next to me is LaurieAnn Gibson. To the right of her is Rube --

Q. You're going so fast.

A. I'm sorry.

Q.   It's me.  I should have stopped you earlier.

Can you go back when you started to name people.  Who is Mama Combs?

A.   Puff's mom.

Q.   Where is she depicted here?

A.   In the green.

Q.   Continue from there.  Christian was next.

A.   Yes.  Christian.

Q.   Who is Christian?

A.   Puff's son.

Q.   Keep going.

A.   That's Puff.  Then behind them is D-Roc.

Q.   Let me ask you a question.  Who is directly next to Mr. Combs?

A.   Me.

Q.   Now continue.

A.   Then there is LaurieAnn to my right, Gibson.  Then to the right of that is Rube.

Q.   Who is LaurieAnn Gibson, if you know?

A.   A close friend of Puff's, but also a superstar choreographer.

Q.   Go ahead.

A.   Then to the right of that is Rube.

Q.   Jurors may remember, but if you know, who is Rube?

A.   Rube was also a close friend, but he was security.  And

then to the right of that is Faheem.

Q.  Who is that?

A.  At the time, when I was there, Faheem was a driver.  To the right of that is Kristina.

Q.  Who Kristina?

A.  Kristina at the time of this photo was an executive assistant.

Q.  OK.

A.  I can't tell who is to the right because of that -- because my eyes, and it's blurry.

Behind that is Tron.

Q.  Can you just say who is Tron?

A.  Tron was in the Burning Man photo.  He is Derek, to the left's, boyfriend, but also worked with Derek in helping style Puff.

Q.  When you say style Puff, that may be self-explanatory, but just explain what you mean.

A.  Derek was Puff's stylist, meaning he was responsible for all aspects of Puff's clothing, wardrobe, dressing him for any and every event.  That also extended to his family.  Yeah.  Anybody Puff told us to style.  Just anything clothing wise.

To the left of Derek is Tony DeNiro, who was Puff's friend.  To the left of him is D-Roc.  To the left of him is Lucas, who is Puff's good friend.

Did I get everybody that I can see?

Q.   Does that complete what you can see and what you remember?

A.   Yes.

Q.   Now, you will not be employed in any capacity by Mr. Combs or his entities come his next birthday, is that true?

A.   That is true.

Q.   Because you leave -- really on December 6 you're notified that there will be no more employment, but you get paid through and you worked through March of 2017.  Is that true?

A.   It was really confusing.  There was a notification, but then there was -- again, I was getting mixed messages from Puff and other people, and then I continued to work.  Then basically I believe in March is when I said that I will get my things out of the office in LA and leave.

Q.   If you remember, December 6 of 2016 you were officially notified that you would not be working after March or after some time, is that fair to say?

A.   I'm sorry.  Could you repeat the beginning of that.

Q.   If you recall, December 6 of 2016 is when you were officially notified that you would not be working with the company.

A.   I don't really know because that was -- again, it was -- it was such a confusing, weird situation.  I don't know what date I met with Brian Offutt that initially said that, but, again, it was muddy because I was getting phone calls from Puff and other associates asking for facts.  I don't really know.

Q.  Let's look at tab 39, if you don't mind turning to it, and behind it you will see Mr. Combs' Exhibit 1739.  Take a look at it and let me know if that is, again, on your social media.

A.  Yes.

Q.  Do you remember posting this?

A.  Yes.

Q.  Is this true and accurate, to the best of your memory?

A.  Yes.

MR. STEEL:  Your Honor, I move for the admission of 1739 sealed, 1739-R.

(Defendant's Exhibits 1739 and 1739-R received in evidence)

THE COURT:  They will be admitted on that basis.

Q.  Would you take a peek at 1743, if you don't mind, which is behind tab 43.  I apologize.

A.  Yes.

Q.  Does it look accurate, to the best of your memory, of what's depicted in 1743?

A.  Yes.

Q.  And this is what you posted and wrote on your social media.  Fair to say?

A.  Yes.

MR. STEEL:  Your Honor, I would also move for the admission of 1743, and then R, the first one to be sealed.

THE COURT:  They will be admitted.

(Defendant's Exhibits 1743 and 1743-R received in evidence)

Q.   If you could turn to tab 39.  That's Exhibit 1739, if you don't mind.

A.   Yes.

Q.   This is May 16, 2016, correct?

A.   Correct.

Q.   Your social media, fair to say?

A.   Yes.

Q.   Can you read to the jurors what you wrote.

A.   Your nostalgic goosebumps are about to be on fleekies.  Bad Boy, come out and play.  #badboyreuniontour #legends #mysquad.

Q.   Then in the picture?

A.   It is the promo for the Bad Boy family reunion tour that I was doing a documentary with.

Q.   These are the dates of the tours in the different cities, fair to say?

A.   Yes.

Q.   And the different locations or arenas.

A.   Um-hum, correct.

Q.   Promoting Mr. Combs and the tour.

A.   Promoting the tour -- yes, which I was doing the documentary on.

Q.   If you turn to Exhibit 43, if you don't mind.  Excuse me.  Tab 43.  Exhibit 1743.

A.   Yes.

Q.   That's now November 15, 2016, correct?

A.   Correct.

Q.   Can you read to the jurors what you decided to post on your personal social media.

A.   Puff's standup was on point last night.

Q.   What does that mean?

A.   I was just making a joke that he was doing a standup comedy routine during a DeLeon promotion.

Q.   The image you chose?

A.   A photo we took of Puff getting a DeLeon cake.

Q.   Again, promoting Mr. Combs?

A.   Oh, yes.  That was -- of course, um-hum.

Q.   Now, I'd like you to do me a favor.

A.   Sure.

Q.   You can put down that book, if you want to.  You can hold it too.

         With regards to this time, this will take us through, as you say, close to the time that you are going to get your separation notice.  Fair to say?

A.   Sure is.

Q.   Within four months of this date of November 4, 2016, you are severed, no longer with -- I'm not saying anything bad. You are no longer with Sean's company, Sean Combs, fair?

A.   Correct, yes, fair.

Q. And I think, and you correct me, Mia -- I just want to make sure this is fair and correct. I think you told the jurors that part of the reason that you promoted all the social media posts on your personal account was because you almost felt obligated to do so. If you didn't say that, just say that's not true.

A. I don't know if I said obligated, but everybody that worked for Puff was expected to promote what Puff was promoting or his brand.

Q. When you say it's not a hundred percent -- that's how I hear you. Just correct me -- that was part of the reasons that you made all these posts favoring Sean Combs, in spite of what you told the jurors, he has traumatized you, right?

A. Yes. Also this was my life and my world. So these are all the high points. These -- back then, at least, you didn't post the low points.

Q. But after like this birthday you are severed -- that's my word -- from Mr. Combs. Fair to say? You are not working with him anymore?

A. No.

Q. Am I correct?

A. Yes, you are correct.

Q. I am going to show you something, with the Court's permission, that may be or may not be -- actually, this is going to be marked as Mr. Combs' Exhibit 1700. Then there is a

note inside which we marked as 1700A.

MR. STEEL:  Your Honor, could I give this to the courtroom deputy to approach?

THE COURT:  You may.

Q.  Do you have what I have just announced is marked as Mr. Combs' 1700?  Were you given that?

A.  Me?

Q.  Yes.

A.  Oh, no.  Is this in this binder?

MR. STEEL:  The Court has it.  I was intending that for you, if that's OK with the Court.

THE COURT:  Here you go.

THE WITNESS:  Thank you.

Q.  I want you to look at that, and take your time.  I'm not trying to rush you at all.  My questions are going to be similar to what I asked you before.  Just take a look at it, flip through it as much as you need to.

A.  Um-hum.  I remember this.

Q.  And does this look accurate, to the best of your memory?

A.  Yes.

Q.  And is this something that you did?

A.  Yes.  So nice of me.

Q.  One more time.

A.  Yes.  I was very -- um-hum.

Q.  I'm sorry.  I heard you say it's very, and then I couldn't

hear you.

A. Sorry. Yes, I did. I was saying it was so nice of me, but I didn't mean to say that.

Q. Do you remember doing this multiple times? By that, I mean, a similar item.

A. I'm sorry. Multiple times?

Q. Let me just show you another one.

A. You mean like another birthday gift?

Q. Yes.

A. Oh, yeah.

Q. To be fair to you, let me just show you --

MR. STEEL: Your Honor, may I approach the courtroom deputy?

THE COURT: Do you mean to give this to the witness?

MR. STEEL: Yes.

THE COURT: You can give it right to the witness.

MR. STEEL: May I approach?

THE COURT: Yes, you may approach.

Q. Mia, may I approach you?

A. Sure.

Q. I'm handing you two other items. Do me a favor. I'm putting them right there. Same questions.

A. This one looks like it's a copy of the first one that you gave me, or I don't know which one is the original.

THE COURT: Mia, just take a look at the binders, and

then Mr. Steel is going to ask you some questions.

THE WITNESS:  Got it.  Sorry.  Thank you.

Q.  Just look up.  We will go one by one, if that's OK with you, but it's going to be the same questions that this honorable Court allowed, which is, do you recognize --

THE COURT:  Hold on, Mr. Steel.  Let her look through it and then we will turn to you.

A.  OK.

THE COURT:  Mr. Steel.

MR. STEEL:  Do all three of those items, which I'll now announce and mark as Mr. Combs -- 1700 will be the actual book itself, your Honor.  Then 1700(1) and 1700(2), since there is three, your Honor.  And the writing inside, your Honor, would be 1700-A for all three.  They are identical, your Honor.

THE COURT:  Are you moving for admission of --

MR. STEEL:  I am moving for the admission of all of them.  However, based upon this honorable Court's ruling, 1700, that series would be for demonstrative only and then 1700-A, yes, I'm moving into evidence, your Honor.

THE COURT:  So 1700-A is admitted, and then you are permitted to use 1700 as a demonstrative.

MR. STEEL:  Then there is a 1700-A-R, if that's OK, your Honor.

THE COURT:  Very well.  1700-A will be admitted under seal, and then 1700-A-R will be admitted.

(Defendant's Exhibits 1700-A and 1700-A-R received in evidence)

MR. STEEL:  Thank you, your Honor.

Your Honor, with the Court's permission, may I show on the screen 1700-A-R for the audience.

Is there a way to show the jurors 1700-A?

THE COURT:  You're asking me?

MR. STEEL:  We will just do A-R to everyone, your Honor, with the Court's permission.

THE COURT:  Everyone can see 1700-A-R, if you've got it queued up to be shown.  If you would like the jury to see 1700-A, you are going to have to furnish them with a copy, or otherwise if you can have a version that we can show just the jury, we can do it that way.

MR. STEEL:  We will do A-R for the Court.

If you can just blow it up, if you don't mind.  We will just go in sections.

Q.  Mia, I would like to ask you some questions.  Is that OK?

A.  Sure.

Q.  Now, do you recognize this handwriting?

A.  Yes.  It's mine.

Q.  Do you remember giving this as a birthday gift to Mr. Combs?

A.  Yes.

Q.  This would be 45th birthday.  So this would have been

November 4, 2014, is that fair to say?

A.  Yes.

Q.  And at the top you put in red, correct?

A.  Correct.

Q.  And this was going to who?

A.  Puff.

Q.  So as opposed to all of the exhibits that the jurors have already seen that have been marked and entered where it's on social media, your personal social media account, this is something that you made and you gave to Mr. Combs, fair?

A.  Yes.

Q.  And at the very top what did you write?

A.  Happy 45th birthday, Puff Daddy.

Q.  If you can go slow and read to the jury what you wrote to Mr. Combs.

A.  Puff.  Sometimes life goes by.

Q.  I am going to interrupt you, and I apologize.  Can you read slower.

A.  Sure.

Q.  Some people haven't seen this before.

A.  Sometimes life goes by at catastrophic speeds where you never get to live in and enjoy the quote/unquote now.  Things that used to feel unattainable and symbolic of success can become quote/unquote the norm and lose all of the adrenaline and excitement it used to stir up.  And life keeps going and

going, and each new height reached can lose its celebration moment in the whirlwind of getting to that next goal.

All of this to say that I hope on this day you get to sit back and actually take it all in of how much you've accomplished, how far you have gone, and are still going.

So I put together this book of magazine articles from 1991 to 1999 that I hope will stir up nostalgic feelings of when you started and how you felt and what was a dream to you then that's now an everyday reality, so your quote/unquote self can tell your quote/unquote young self how great you've become. Not that you'll ever forget your past, but I hope it reminds you of when this world made your eyes light up. Happy, happy birthday. I love you forever and eva and eva. Mia.

Q. Did you mean those words?

A. Yeah. At the time he had come to me, like just to me like upset and said, when I was looking out of a plane, he said: I used to look at the trailer world the way you did, but now that I have kind of done everything -- like it was a really -- it made me sad, like this depressed like, you know, what's left, like if I have done everything. I don't know. I was trying to -- I was basically addressing this conversation that him and I had where he felt sad to me -- yeah. It's really hard to get somebody that has a lot of money a birthday present, so I thought that this would make him happy.

Q. You say to him, when he said in his depressed mode on that

airplane, well, you made me beyond repressed and depressed.

A.   I'm sorry.  What?

Q.   You say to Mr. Combs, when he supposedly says to you on that airplane that life doesn't have the same meaning, did you say to him, well, you made my life have no meaning also?

A.   No.  That's not the kind of person I am.  If someone comes to me in a vulnerable state, regardless, I want to help, and that is just my empathic nature.  I would never say something like that.

Q.   Even the person that has, according to you, beaten you down below this earth.

          MS. SMYSER:  Objection.

          THE COURT:  Let's rephrase.

Q.   The man who you say has ruined your life.  This is what you write to him?

A.   At the time, as low as he would make me, he would also make me feel the opposite as well.  Again, I can tell you what my therapist has said, but I'm not a professional to explain that.

Q.   How is it possible that you are even around Mr. Combs after the way you say he treats you and your sister and your other loved ones?

A.   It's called like psychological abuse.  Again, it wasn't horrible all the time.  If it was, it would have been easy getting punished after reacting to his violence where then I'm confused and begging for -- to make it all better so that I

ignore what happened, like nobody around me -- no one around us ever reacted. Everyone acted like it was normal. Adults that I thought were authority figures in the office, they all upheld his behavior and punishment towards me. I didn't have like -- it is a fun recipe.

Q. You said it wasn't horrible just now. What could be more horrible than the way you described your time with Mr. Combs?

MS. SMYSER: Objection.

THE COURT: Hold on.

It's overruled.

A. I'm sorry. Could you repeat the question?

Q. What could be more horrible than how you described this supposed conduct that you endured at the hands of Mr. Combs?

MS. SMYSER: Objection. It's argumentative, your Honor.

THE COURT: Ms. Smyser, can you wait until the end of the question, because I'm trying to listen to the end of the question first. I hear the objection, and I am going to sustain the objection.

Q. You stated a moment ago that it wasn't horrible what you endured with Mr. Combs. You remember that?

A. No. I'm sorry.

Q. You just said that a minute ago. If you don't remember, that's fine.

MS. SMYSER: Objection.

THE COURT: Mr. Steel, let's get a fresh question so that you're not going to draw the objection.

Q. Explain to the jury what could be worse than what you described supposedly what you went through with Mr. Combs.

MS. SMYSER: Objection.

THE COURT: That's sustained.

Q. How did you find any goodness with Mr. Combs after what you described to the ladies and gentlemen of this jury.

A. Easily because no one in my life had ever said the mean things that he had said to me. No one in my life had treated me like that. And the second that it went back to good, I was elated. I was searching for that sort of approval because I was confused what I had done wrong. Again, I'm not a psych major. I didn't know what was happening. It's very -- but I think there is a lot of textbooks out there that will explain it very easily. It's an abusive relationship, the cycle of violence.

Q. But you're not dating Mr. Combs.

A. A relationship doesn't mean it has to be romantic. A relationship could be -- that means anything.

Q. Ma'am, why do you blame yourself when you're trying to use a bathroom on an airplane and Mr. Combs comes and confronts you and you say no, no, no, no, no, and then don't have a memory. What did you do wrong?

A. Again, I think that could be explained with any sexual

assault victim and the shame that they carry. I'm not sure in hindsight everything -- but when you're in it, I don't know how to explain it. I was young and manipulated and just eager to survive.

Again, I'm unraveling a lot of this now in therapy. Nobody told me, nobody was there to say these things were happening were wrong. There was no -- there were no streaming documentaries. There was nobody standing up. There was nobody around us that ever even flinched at his behavior, so I don't know how to explain that. I was always in trouble, and I was always just trying to find a way not to be in trouble. Then when things were great, things were so great.

Q. Did you need anyone to tell you that it was wrong when you were afraid that Mr. Combs would kill you?

A. Yes.

MS. SMYSER: Objection.

THE COURT: Overruled.

A. I'm sorry. Can you repeat the question.

Q. Did you need anyone to tell you that it was wrong that you were afraid that Mr. Combs would kill you?

MS. SMYSER: Objection.

THE COURT: That's sustained. I think you need to rephrase the question a little bit.

Q. Why would you be confused at all when Mr. Combs, according to you, would act like he was going to kill you? Why would

that be something you did wrong?

MS. SMYSER:  Objection to the form, your Honor.

THE COURT:  Can I have a brief sidebar.

(Continued on next page)

(At sidebar)

THE COURT:  First question, Mr. Steel.

How much time do you have remaining on your cross-examination?  The reason I ask is because we had thought about keeping the jury late, but if you have a lot more --

MR. STEEL:  Hours.

THE COURT:  You have hours, multiple.

Given that, should we go until 3:30?  It's Friday.  If you are going to be doing Monday anyway, I just want to make sure --

MR. STEEL:  Whatever your Court thinks makes sense.

THE COURT:  Let's do that because I anticipated, based on where we were, that it would take longer than just today, even if we went to 4 p.m.  That's the first question.

Second issue.  I don't know where these questions are going.  Ms. Smyser's form objection is well taken because the questions are vague in terms of what they are seeking, and it's not clear like where we are going right now.  Maybe you can explain, and then we can hear that now.

MR. STEEL:  My memory is that Mia stated that no one was telling her this was wrong.  That's my memory.  I'm following up on that.  Why do you need someone to tell you it was wrong?

THE COURT:  Meaning Mr. Combs' conduct?

MR. STEEL:  Yes.

THE COURT:  I think it just needs to be a little bit clearer as to what the it is when you say it was wrong because I think the witness is confused as to what you are referring to, whether it's her response or her conduct, as opposed to Mr. Combs' conduct.  I think if you can clear that up, then you can avoid the form objection.  Thank you.

MR. STEEL:  May we step back?

THE COURT:  Yes.

MR. STEEL:  Thank you.

(Continued on next page)

(In open court)

THE COURT:  Mr. Steel, you may proceed.

Q.  You stated something to the effect that no one was saying that Mr. Combs' conduct was wrong.

Do you remember something to that effect giving in your answer?

A.  Correct.

Q.  So my question is this.  Why did you need someone else saying that it was wrong of Mr. Combs to make you feel like he would kill you?

A.  I'm sorry.  Why did I need someone to tell me -- can you repeat the second part of the question.

(Continued on next page)

Q. That it was wrong when Mr. Combs made you feel, according to your testimony, that he would kill you?

A. Because the -- so if I'm looking objectively at a situation that I have no involvement with, of course. But when you're -- my logic brain and my trauma brain, my trauma brain wins all the time. I -- everybody -- I mean, eventually it becomes normalized, and you're just trying to go back to the good. I -- you make excuses for people. I'm a people pleaser. I'm an empath. I'm a rule follower. I just wanted to do -- like I just wanted to -- I just wanted to do my best and do -- and make everybody happy all the time. So I tend to take a lot more than normal people. I don't know how to explain that. I don't know if I should apologize for that. I forgive people all the time for things like that.

So after something violent or after something -- if I was ever finally pushed to the edge and happen to confront him about them, he would then say, you're right, and I need your help, and then I would feel like, oh my gosh, okay, like I'm going to help you, and I would make excuses to myself.

Q. Where is it that you confronted Mr. Combs and said, you have violated me sexually or in any other manner, and he said, you're right, I need the help?

MS. SMYSER: Objection.

THE COURT: Overruled.

A. Where's the what? Did you say where is the -- I'm sorry.

Q.   Did that ever happen?

A.   Did -- when I just said that I confronted him, I did not include those -- everything you just listed.  I did confront him after St. Barts, after that end, not about what you just listed, but I'm saying about his behavior and that it resulted in him saying I was right, and he needed my help, and then he said, in fact, I'll fly Matt to Vegas tonight and get you guys a room, and you guys can just hang with us.  And so then all's forgotten, and I'm on a mission to help, so that's an example I'm talking about.

Q.   Mia, you're not a weak person, are you?

A.   I'm not sure.  It depends.

Q.   In 2009 -- if I cut you off, I apologize.

A.   That's okay.

Q.   Were you done?

A.   Sure.

Q.   In 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016 going into March 2017, you are strong, aren't you?

A.   Strong ... I don't know what you mean by that exactly.

Q.   You gave advice to people to say stand up for yourself. You said that to Ms. Ventura, didn't you?

A.   When?

Q.   You told her that she's a super star, right?

A.   I told her she -- but I don't know about standing up.  Did I tell Cass she was a super star?  Probably.

Q. Told her that the money has to come to her just like men get the money, right?

A. I don't know. I don't remember what you're saying.

Q. Isn't it true that what you told this jury about the conduct of Mr. Combs is a lie? A misconduct?

A. I'm sorry, can you -- what?

Q. Isn't it true that Mr. Combs never had unwanted non-consensual, forcible sexual contact with you, isn't that true?

A. I'm sorry, you started with isn't that untrue, and then isn't that true? What I said in this courtroom is the truth. I have not lied to anyone at all.

Q. Isn't it true that, although unforgivable for any person to put their hands on a woman, especially a man, isn't it true that it did not happen as many times as you just said to this jury?

MS. SMYSER: Objection to form.

THE COURT: That's overruled.

A. Everything I've said in this courtroom is true.

Q. Then why would you -- if you're being sexually assaulted and your sister is being brutalized physically, why are you making a scrapbook for Mr. Combs?

A. It's a lot more complicated than the way you phrase that. It's called it's abuse on all levels and --

Q. I'm sorry, go ahead.

A.   Oh no.   I was just going to say I guess you could talk to any sexual victim advocate or any abuse victim advocate, and they could explain it to you much better than I could.

Q.   What if you're not a victim of sexual assault, then what?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

Q.   I'd like to, with the Court's permission, ask some questions about the scrapbook.  And is there any way I could, with the Court's permission, have a courtroom deputy hand two copies of the three to the jurors?

THE COURT:  You may.

MS. SMYSER:  Your Honor, I think we need to clarify that these are the same and not different.

THE COURT:  Yes.  These are the same scrapbooks, is that correct?

MR. STEEL:  That's my understanding, but I could follow up with questions.

THE COURT:  I'm going to ask the courtroom deputy to hand the two binders to the jury.  And what I'll ask the jury to do is just hand those around, take a brief look at it, and then we're going to have it handed back in a couple minutes.

MR. STEEL:  Can Mia hold one copy, and I ask some questions, your Honor, during that?  Or would you like it to be silent while the jurors are passing that around?

THE COURT:  No.  You can ask questions, but it's only

going to be a minute or two, and then we're going to get the binders back and keep going.

So let's go ahead an hand the binders over to the jury.  Let me ask the courtroom deputy to hand those binders.

Wait.

Mr. Steel, can you confirm, and we'll see if there's any objection, that the three versions of this are exactly the same?

MR. STEEL:  My belief, your Honor -- can I ask the witness a question?

THE COURT:  She did not have the time to look through every page of all three binders.

MR. STEEL:  Based on my belief, it is, and also I gave it to the prosecutors all three, three days ago, I don't remember.  So I will yield to --

THE COURT:  Ms. Smyser, any objection?  There's a representation been made that those binders are the same.

MS. SMYSER:  It is very difficult to know if they are certainly the same, your Honor.  If we could focus on one of these three copies.

THE COURT:  Now, Mia, let me ask you:  The one binder that you've been looking at, the one with the cover letter, that one, you've looked through it and that's accurate?

THE WITNESS:  Yeah.  I just kind of skimmed, they're just articles that in order that he was mentioned in those

years.

THE COURT:  Does that appear to be the scrapbook as you prepared it?

THE WITNESS:  It -- I believe so.  Of course, it was a long time ago, but it looks -- of course I remember doing this.

THE COURT:  Here is what I'm going to ask you to do. Take a quick look at the other two and make sure they're the same, as far as you can tell.  If there's any issue, you'll let us know, all right?  And we'll take a minute for that.

(Pause)

THE WITNESS:  I believe the -- yeah.  Yes.

THE COURT:  All right.  So at this point I'm going to ask the courtroom deputy to take the two copies of the binder other than the one, Mia, you were looking at, and hand those to the jury.

Members of the jury, just pass those around and take a quick look, and we'll get that back from you in a minute or two.

While we're doing that, Mr. Steel?

DEPUTY CLERK:  Your Honor, I apologize.  One moment.

THE COURT:  Let me ask.  Mr. Steel, there's one binder that has something on the front part of the binder.  Is there a reason for that?

MR. STEEL:  That's how we got it, your Honor.

THE COURT:  But in terms of what's inside, it looks

like it's consistent.  Let's give those to the jury for a second.  All right.

MR. STEEL:  Your Honor, may I ask some questions?  I know the jurors are busy, but can I do that?

THE COURT:  You may.

MR. STEEL:  Thank you.

Q.  Mia, are you looking at the exhibit now?

A.  Yes.

Q.  Okay.  Tell me when you are ready, I'm going to ask you some questions.

A.  Oh sure.  I'm ready.

Q.  All right.  Now, that was for Mr. Combs, as you explained, for his 45th birthday, correct?

A.  Yes.

Q.  So we're talking about November 4 of 2014, fair to say?

A.  Yes.

Q.  And would you tell the jurors what you did to make what is now being passed around as Exhibit Number 1740 as well as 1740-A.  I'm not talking about the writing.  I'm talking about, because the jurors saw it, I'm talking about the actual guts of the exhibit?

MS. SMYSER:  Your Honor, could we please get a sidebar?

THE COURT:  Of course.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Can we take the binders from the jury in the meantime please?

THE COURT:  No.  They can look through it let's have a quick sidebar.

(Continued on next page)

(At the sidebar)

MS. SMYSER:  They're reading -- the jurors are clearly reading the binder.  I think it just now has moved past Juror No. 1.

THE COURT:  That's okay.  They're looking through it. They're looking through it as a group.  There are three jurors who are looking at it at the same time, and they're going to take it and pass it around.  It's going to be five minutes, and they'll give it back.  We need to get through this, and we need to move this along.

Mr. Steel, you have some questions.  You understand in five minutes I'm going to take it back.

MR. STEEL:  Sure.

THE COURT:  We're going to have them look through it very quickly.  Once the jurors have a chance to take a quick look, we'll get it back.

MR. STEEL:  Over objection, but I understand.

THE COURT:  You mean the prior objections to it not being introduced into evidence?

MR. STEEL:  Exactly.

THE COURT:  You made your objection.  I overruled it.

(Continued on next page)

(In open court)

THE COURT:  Mr. Steel.

BY MR. STEEL:

Q.  Mia, may I ask you some questions, if you don't mind?

A.  Sure.

Q.  If I'm interrupting you, just tell me you can't focus.

Explain to the jury how you went about making what's now been marked and enter -- can I call it a scrapbook, by the way?  Is that a birthday gift?

A.  Sure.

Q.  It's 1740.  All of these questions are about 1740-A.

1700-A, I apologize.

Explain to the jury, if you don't mind, how you went about creating this birthday gift.

A.  I did a lot, a lot of research, and I believe I reached out to people in his company with his archives, and then -- to find in order the first mention he had in the press until I'm not sure what date.  Then I printed them out and put them in order and highlighted where he was mentioned.

Q.  And when you say archives, what is archives?  What does that mean?  Are you going to a library?

A.  No.  In his company, whoever was in charge of his archives.

Q.  Was this something that was online already or was it in form of like a, you know, what we used to have, like a printed magazine or newspaper?

A.   It was not on -- it was not online yet.  It was -- I don't remember the actual dig -- yeah, whether we got copies of it, I'm not sure of the actual format.  This was not online.  This was in his -- yeah, again, the person or people who were in charge of Puff's archives.

Q.   I can't hear you.  I apologize.

A.   Yeah, whoever was in -- there were people in his company in charge of his archives, so I kind of -- yeah, I reached out to them, and they helped.

Q.   So, I mean, I'm just trying to get a sense.  Did you actually grab like what used to be a newspaper or magazine and photocopy it or cut it out and highlight it?  Can you just explain what you did, if you don't mind.

A.   Sure.  I got them from the people that are in charge of his archives.  They had -- I'm not sure how they had it, but I'm guessing that's what they did.  They sent me -- they must have scanned them whenever they were archiving it, and sent them to me, and I printed them.

Q.   And did you read each one of those articles?

A.   I scanned for his name, yes, and then highlighted it.

Q.   And you're the person who did all this work?

A.   Yeah.

Q.   You did it all by yourself?

A.   Well, I got help from the people in the archives.

Q.   Sure.  But once you received the materials that you were

reading and highlighting, you did the rest?

A. Yeah.

Q. And why are there multiple copies of the same information? Why did you do that?

A. I didn't -- I don't remember doing that. I remember giving him one.

Q. Do you know how there are multiple copies?

A. No.

Q. And it's already in evidence it's 1700-A, that letter that was written with red on the top, it's now on the screen. Do you see this 1700-A-R is on the screen?

A. Yes.

Q. You attached that to this gift, is that true?

A. Yeah. Mmm-hmm.

Q. And did you mean what was written -- did you mean, were you being truthful what you wrote in 1700-A?

MS. SMYSER: Objection. Asked and answered.

THE COURT: Overruled.

A. I'm sorry, did I mean his birthday notecard?

Q. Correct.

A. Yeah, at the time, of course.

Q. That's a very loving card. Would you agree with that?

A. Yes, I'm a very loving person.

Q. To the person who sexually abused you?

A. Yes.

THE COURT:  Let me ask the jury.  Who has not gotten a chance to quickly look through this?  Folks on the second row. Let's go ahead, if we can pass it over.  I just wanted the jury to get a quick look at this.  Once you've gotten a chance to look at it quickly, please hand it over.

Mr. Steel.

MR. STEEL:  I am going to go to another topic, if I can, your Honor.

THE COURT:  All right.

MR. STEEL:  I'm not trying to rush.

(Pause)

MR. STEEL:  May I, sir?

THE COURT:  You're going to go to a different line of questioning?

MR. STEEL:  I'd like to.

THE COURT:  Can you give us 60 seconds?

MR. STEEL:  Yes, sir.

THE COURT:  Let's complete this.  I want to make sure all the jurors got a chance to take a look.  Everyone had a chance?  Very good.  Thank you so much.

MR. STEEL:  Your Honor, may I ask one question about the 1700?

THE COURT:  You may.

Q.  Do you have any memory of how long of an effort this was?

A.  I don't, but I barely had any time, so I'm sure it took a

while.

Q.   Now, do you -- we talked about social media and all the birthday wishes that the jurors have seen from 2013 through 2016 so far, okay?

A.   Okay.

Q.   Did you also do a video/audio happy birthday to Mr. Combs in year 2013, do you remember that?

A.   I don't know what year, but yes, I did.

Q.   And describe to the jurors what you did on that social -- on that video/audio, if you don't mind.

A.   Oh, well, again, it's hard to get somebody wealthy and famous something material, and I always try to be meaningful, and so I reached out to all of the people that I believed were important to Puff in his life and asked them for a birthday shout-out for him, and then I compiled it to a video form.

Q.   So this isn't something that you did for social media, is that true?

A.   That's correct, I did not do that for social media.

Q.   This was a gift the year before the gift that the jurors just had an opportunity to hold, right?

A.   I'm not sure of the date, but yes, it was a birthday gift for him.

Q.   And who did you reach out to, if you remember?  And if you don't remember, that's fine, just tell us who you do remember and how many people do you think that you asked to send a

message audio/video for Mr. Combs to celebrate his birthday?

A.   I don't remember, but it was quite a lot.

Q.   And how did you go about selecting or contacting these persons to ask them if they would do a favor and do an audio/video to be placed into a video for Mr. Combs?

A.   I just took a list of all of the people he always wanted at any of his parties, all the people that were close to him. Because I was with him all the time, I knew -- and that's -- that's how I -- all his friends, all his family, that's how I chose.

Q.   How did you go about collecting this data?

A.   I like emailed or texted them and just said, do you want to send Puff a birthday shout-out?  I'm making him a video.

Q.   I couldn't hear you.

A.   Oh.  I just contacted them and said, do you want to send Puff a birthday shout-out?  I'm making him a video.

Q.   And you were included in that birthday shout-out, true?

A.   True.

Q.   And you were enthusiastic?

A.   Absolutely.

Q.   And you told him you love him?

A.   Of course, probably.

Q.   And you explained to him that it's been great being with him and looking forward to more time together?

A.   I don't remember what I said, but I'm sure it was very

positive and in the same sentiment as what we've seen, yeah.

Q.   This is something that you came up with, right?

A.   Yes.

Q.   This was your gift to Mr. Combs?

A.   Mmm-hmm.

Q.   Correct?

A.   Correct.

Q.   I'd like to talk with you about some of the testimony that you have been giving here.

A.   Okay.

Q.   With regards to leaving and leaving the company and leaving Mr. Combs' company -- by that I mean, not only his business, but him himself.  I want you to look at tab number 28, if you don't mind, and that's exhibit, your Honor, 1728.  And just read it to yourself.  It should be --

MS. SMYSER:  Your Honor, I don't think this is in evidence yet, so the jurors shouldn't be looking at the binders.

MR. STEEL:  It's not --

THE COURT:  Hold off on looking at this in your binders, but just one second.

Q.   Mia, can you look at tell me when you're at tab 28, and it should be exhibit -- Mr. Combs Exhibit 1728, if you don't mind.  Tell me when you're there.

A.   When I'm -- I'm on that 1728.  I'm on that page.

Q. Can you review it?  It should be -- and it's front and back, a three-page exhibit, if you don't mind.  Total three page front and back, five.  And my question is going to be similar.

A. Okay.  I've reviewed it.

Q. And is it to your memory accurate of what it depicts?

A. To be honest, I don't remember.  I mean, how do I say this?  Like I don't like remember this, but, I mean, it is --

THE COURT:  Mr. Steel, why don't you ask some particularized questions here.

Q. Do you see -- if it's blacked out, we can get you an unblacked out copy.  It should be in your notebook, Mia.  Do you see at the top?  I'm not going to announce it.  For the last four numbers, do you recognize the number that ends in 37 --

MS. SMYSER:  Objection.

THE COURT:  Well, let's take a step back.  Is Mia's copy unredacted?

MR. STEEL:  Correct.

THE COURT:  Why don't you just ask her if she recognizes the numbers as she sees them.

Q. Can you do that?

A. Yes, I do recognize my number.

Q. And do you know who the other number belongs to?  Do you see that?

A.  I don't know it by heart, but I see what it's labeled as.

Q.  Does it appear to be a conversation in text message?

A.  Yes.

Q.  Do you have any reason to believe that it is not accurate or true?

A.  Like I don't specifically remember this, but I don't -- like -- I'm just---

Q.  I can't hear you.

A.  Sorry.  I'm just saying like if something looks --

THE COURT:  Mr. Steel, I think you need to ask some more questions or phrase it a little bit differently.

Q.  Do you see the date on this document?

A.  Yes.

Q.  Were you talking with that person whose number is there along with your number during that time?

A.  On this text message it says that, but I don't remember from like nine years ago exactly what was going on.  I mean, I could have talked to Kris -- I mean, I definitely talked to Kristina, I just don't remember.

Q.  Does this refresh your memory of the day that you found out that you were let go from Mr. Combs' employment?

A.  So I don't remember the day that Brian said that Puff wanted to get rid of -- like was done with Revolt Films.  I don't remember the exact date of that.  For some reason, I thought it was around Thanksgiving, but -- I mean, again, I

could be wrong.

Q. Do you remember giving over and seeing text messages from your phone at that time in this case?

A. Giving over --

MS. SMYSER: Objection.

THE COURT: Hold on.

Mr. Steel, is it your intent to offer this into evidence?

MR. STEEL: Correct.

THE COURT: Is there an objection?

MS. SMYSER: He can't authenticate it, your Honor, yes.

THE COURT: Anything other than that?

MS. SMYSER: It's the same objections we raised before, your Honor. I think it's a 403 problem here, but understanding the Court's ruling.

THE COURT: All right. Exhibit 1728 will be admitted. Is it -- you have a redacted version as well?

MR. STEEL: Correct.

THE COURT: 1728 will be admitted under seal. 1728-R will be admitted. Now, the jurors can go to that tab, which is what tab?

MR. STEEL: 17 -- sorry, 28. And it's 1728, your Honor. May I ask questions?

THE COURT: You may.

(Defendant's Exhibits 1728 under seal and 1728-R received in evidence)

Q.  Mia, I just want to orient the jurors to this exhibit, okay?

A.  Okay.

Q.  According to the exhibit, this is December 6, 2016, correct?

A.  Oh, with me, yes.  That's what the says in the text.

Q.  It's Mia's number in blue, is that true, according to the exhibit?

A.  Yes.

Q.  And whose number is in green?

A.  It says it's Kristina Khorram.

Q.  Is that the person also known as KK?

A.  Yes.

Q.  I'd like you to do me a courtesy.  Could you go slow, but can you read your blue, and then I will read the green, if that's okay, and we'll go in order.

A.  Sure.

      I'm going to kill myself.  My life is over.

Q.  OMG WTF.  Mia, that is not funny.

A.  I don't think so either.  Literally over.

Q.  What is wrong and don't say that.  Take it back.

A.  Watch your back here my love.

Q.  Answer your phone Mia.  This is serious.  Mia, you can't

make a statement like the first thing you said and then not answer your phone.

I'm serious. Please answer your phone. I'm gonna call ya ya if you don't call me back right now please. Mia, I'm serious. Mia WTF you cannot say that and not answer your phone.

Mia I'm serious. You know I just went through this. You need to call me back now or I'm calling your parents.

Mia, can you please answer you phone?

A. Fuck. I'm so sorry. I completely forgot. I'm so sorry. I'm with Laura Gomez. I'll call you soon.

Q. It's okay. Just wanted to make sure you were on. And then it has an asterisk, okay. Are you okay? Call me when you leave.

A. I'm not, but I'm alive, and I love you.

Q. Love you too! And just call me when you can. Need you to tell me that over the phone LOL. Just know how -- I'm not going to say it but -- f'g talented and amazing you are. And you are the legit, bound for greatness! You are a super star and everyone knows it. I'm so lucky to have you as one of my best friends and will always be here for you. Love you to death Boo Boo, with a red heart emoji.

A. Just started crying from that. Thank you so much. Love you too. I'm so heartbroken I can't breathe. I can't wait to see the light at the end of the tunnel. Right now I feel

buried and depressed and hopeless. Like just throat slit. Do I say anything? I was legit just going to just text him wow and that's it. I can't sleep and I'm not okay. I don't even know what to do. I don't understand how to make this pain go away. It hurts so fucking bad.

Q. Let's talk about that, but before we do, do you see you used the name Ms. Laura Gomez?

A. Yes.

Q. Can you just tell the jurors who that was?

A. At the time I believe she was in HR.

Q. And HR is human resources at Combs Enterprises, fair to say?

A. Yes, I believe so.

Q. Now, this is -- is it true that this is when you found out that you are severed — I'm just using my word. Whatever word you want to use — from employment with Mr. Combs' company, true?

A. Like when I lost my life? Yeah, I believe so. That's what it looks like.

Q. And you start out: I'm going to kill myself. My life is over, right?

A. Yes.

Q. And that's because of the fact that you are no longer working with Sean Combs and the other people?

A. Well, I was just given this notification out of the blue

by -- with no reason, and I'm not getting it delivered -- I have -- like I'm not getting the message delivered to me by the person who controlled me for that many years. It made no sense. And it felt horrific, like I was just -- like I had no explanation for it because he was just telling me recently like how I was the only company bringing him money, and we were in the middle of working on the Bad Boy documentary, and also this was the only world I knew like 24 hours a day for eight years. So that's like dog years, I don't know what that -- that's how many years it was. I didn't have -- that's all I knew, so it was -- yeah, very overwhelmingly horrific.

Q. You didn't want to leave the employment, did you?

A. I did not want to leave the company that I built where I was actually starting to see my dreams come to fruition that I worked so hard for, absolutely no.

Q. And you loved that position, didn't you?

A. I loved working. I loved film and television, absolutely. I loved what I was doing at the time, and I finally got there.

Q. No one forced you to work very hard, right?

A. No, that's no -- I mean, I'm a very hard worker regardless. That's my ethic, but there was not an option if I wasn't.

Q. Well, the option was you could have quit?

A. No, I didn't see that it way.

Q. Why?

A. Again, it's a pretty long, psychological explanation, but

this was not a -- this was all presented as it was a job, but this -- this was not just a job. It -- I mean, I had to ask permission to leave places for the weekend. Like this was somebody -- people I was around 24 hours a day. It was a -- this is all I knew, and I worked so hard and gone through so much, that now it's just being ripped away without an explanation.

Q. Are you telling the jury that you felt that you could not leave that employment on your own?

A. Correct.

Q. Then why were you going to, God forbid, kill yourself when you were terminated, or if that's the wrong word, I'm not -- when you were severed from that company, why wasn't that a relief?

A. I wasn't severed from the company. I was, I believe, misled about him wanting to dissolve Revolt Films, again, without my wrongdoing, I just want to make that clear.

Q. But isn't this great? I mean, you're away from your abuser?

A. No, because at the time I didn't realize that. This is absolutely the time not great. In hindsight, fantastic. But at the time, the worst thing ever.

MR. STEEL: Your Honor, I heard what you said earlier.

THE COURT: Good place to stop?

MR. STEEL: Yes, sir.

THE COURT:  Thank you, members of the jury, for all your hard work this week.  I know it's a been a long and hard week, and you've kept such close attention on the case.  And I do really appreciate that and so do the parties here.

I will give you the same instructions I always do:  Do not talk to each other about the case.  This is the hard part over a weekend.  Don't talk to anybody else about the case.  Don't look up anything about the case.  Again, hopefully, you've turned off your notifications and everything else, so you're not seeing things about the case.  But same thing as last week:  Change the channel.  Do something else.  Don't look up anything about the case.  and we will see you here on Monday to get started at 9:00.  Try to be here at 8:45.  And have a great weekend.

All rise for the jury.

(Jury not present)

THE COURT:  Thank you, Mia.  We'll see you here on Monday at 9:00 a.m.

THE WITNESS:  Thank you.

(Witness not present)

(Continued on next page)

THE COURT:  Please be seated.

Anything from the government before we adjourn for the weekend?

MS. SMYSER:  Yes, your Honor.  I want to raise an issue with this last exhibit.  The authenticity objection here is a real one, and this witness needs to understand what she is testifying about.  This exhibit itself is very confusing. There are four -- there are three numbers listed at the top and an unknown number, and it is not clear.  We can pull up Defense Exhibit 1728-R, or I can pass up a copy to your Honor if you don't have it.

THE COURT:  Either is fine.

MS. SMYSER:  I'll just pass up this copy.

THE COURT:  While you're doing that, can you just let me know what is the origin of this text messaging chain?  Who produced it?  Where did it come from?

MS. SMYSER:  Your Honor, the defense produced it to us.  I don't know for certain what electronic device this came off of, which is where the authenticity objection stems from.

MS. GERAGOS:  Your Honor, we did produce it as Defense Exhibit 1728 to the government, but it came from the government, from the extraction and warrant return of Ms. Khorram's phone.  We don't have anything of Ms. Khorram's phone that's not from the government.  They execute multiple search warrants on her devices.  We've stipulated to -- we have

not had them bring in any of the analysts that extracted Ms. Khorram's phones because we understand that the extractions of her phones are authentic.  The only ones we did not stipulate to are the Ventura devices, which is why we had the analyst come from Ms. Ventura's laptop and phones.  So this is what we got from the government.  We stamped it and gave it to the government as a Defense Exhibit.

MS. SMYSER:  Your Honor, I'm happy to shed some more light on this situation.

THE COURT:  Well, what's your objection?  You're not claiming that this is a forged email exchange given what Ms. Geragos just said, right?

MS. SMYSER:  Your Honor, I'm not saying it's forged, but there is a problem here with what the defense produces to us.  They produce things back to us in a platform that is different than what we produced it to them in.  It is very difficult for us to figure out where things come from especially when they're produced to us the night before.

Our stipulation as to authenticity, stipulate to the authenticity of particular exhibits.  We're certainly open to stipulating to defense exhibits also.  We have not engaged in those discussions, and we would need time to check the exhibits.

THE COURT:  I don't think your objection is an authenticity objection.  I think your -- isn't your objection

that the witness just didn't have an understanding of the actual substance of the communications?  Meaning, that you're not disputing that the exchange is what it appears to be, which is a text message exchange between --

MS. SMYSER:  We are as to this particular exhibit because, your Honor, if I could direct your attention to the top box here, there are multiple numbers in it, and the green messages don't have an indication of who those are coming from.  It appears to be a group chat.

THE COURT:  Let's take a step back.  So you received this and this came in yesterday, right?

MS. SMYSER:  Yes.

MS. GERAGOS:  No. Before that.

MS. SMYSER:  Before that.

THE COURT:  So if there were unanswered questions about this document, why wasn't that raised overnight when we were here at 8:30 so we could review this and get to the bottom of all this?  Because I asked probably about three or four times if there were any objections to any of these exhibits, including when the binders were handed out to the jury, and I was told that there was a hearsay objection, which the Court resolved.  And then the binders were handed out.  So at that time, why wasn't this raised?

Because the way it was raised was, there's an objection on authenticity grounds, and obviously given the

exchange, there was a lit lack -- miscommunication between Mr. Steel and the witness in terms of what he was asking, and she didn't really understand it. And I overruled the authenticity objection because this -- if you just look at it, and understanding that it was likely produced by the government, the authenticity objection would not have been well taken. But now I'm hearing like a deeper question about this document, right, so that's the reason why we're having this exchange after it's been admitted into evidence, which I don't like to do.

MS. SMYSER: I understand that, your Honor, which is why I raised the authenticity objection when I did. And we should have raised this earlier, I apologize, but because of how this trial has been going, where witnesses aren't reviewing these things ahead of time, there was a chance that Mia could authenticate these text messages. She's part of the text messages and could explain what's going on. That is not what happened in the conversation with Mr. Steel, which is why I objected.

THE COURT: I don't know if it's an authenticity objection. I think really what you're saying is that she just doesn't know who this other person is, right? She had a text message exchange with somebody, but it's not clear who that person is, fair?

MS. SMYSER: Correct.

THE COURT:  I don't know whether -- I'd have to look back at the questioning, but did she say that it was with a particular person?

MS. SMYSER:  I think Mr. Steel suggested that it was with Kristina Khorram, and Kristina Khorram, if you look at the numbers at the top, is one of the numbers listed here.  That's not the number that -- it doesn't show up on the green messages, and I think the witness was not clear about this.

THE COURT:  Okay.  Let me just go back.  Isn't that something that you would just clear up in redirect if you wanted to address this?

MS. SMYSER:  Your Honor, I think there's a problem in that this is an unknown phone number, and so I think a proffer from the defense as to who they think this is would be helpful to us as to how to address in redirect.

MS. GERAGOS:  I'd like to take a step back then.

THE COURT:  Hold on for a second.  Here's the issue.

You're saying Mr. Steel suggested the green boxes were from Ms. Khorram, right?

MS. SMYSER:  That is my memory, your Honor.

THE COURT:  But really what it appears is that there are four participants -- this must be part of a larger chain, is that fair?

MS. SMYSER:  Yes.

THE COURT:  Okay.  So the issue is -- there are four

participants in this chain.  One of them is unknown.  That's why there's no number in the green box.  And so we don't know who that person is.

So let me ask the defense, who is that person?

MS. GERAGOS:  Ms. Khorram.  I know that, and we would not be offering that if I did not know that for a fact.

THE COURT:  How do you know that for a fact?

MS. GERAGOS:  Because I spoke to Ms. Khorram's counsel, and was assured that this was Ms. Khorram.  We would not be offering it if it was not Ms. Khorram.  This came from her device.  We would not suggest it if that wasn't the case.

I had -- I insured that personally, and I just would like to take a step back that we produced this for the first time four days ago on the 26th.  This came from the government's -- from the government's extraction of her device, which was produced to us on December 31st of last year.  We've gone through it.  Yes, we are not able to review in Cellebright for multiple reasons.  The first is it, frankly, crashes our computer, so we have to put in a platform.  It breaks it down into 24 hour increments.  So this is what we have with many of the -- of Ms. Khorram's chats, it lists this other unknown participant, and I think it's because it backs up with her Gmail, and it's --

THE COURT:  In any event -- I'm just looking at the transcript.  Mr. Steel asked the witness whose number was in

green, and she identified it as being Ms. Khorram.  So the reason why I say that is because if she doesn't -- she may not have remembered this particular exchange, but if she remembered and recalled that Ms. Khorram had multiple lines that she used, including one that didn't come up on messages, she could have answered that she understood it to be Ms. Khorram.  So she was asked whose number is in green, and she said it's Kristina Khorram.  She was asked is that the person known as KK.  And her answer was yes.

So I'm not understanding why this is an admissibility issue are as opposed to an issue of just -- she doesn't know, you know, you can explore that on redirect if you want to.  The witness answered that it was Ms. Khorram.  So, Ms. Smyser, what's the response there?

MS. JOHNSON:  Your Honor, I don't mean to pull attention away from this particular exhibit, but my suspicion on your Honor's question is that the witness was speculating based on the talk.

I think the bigger picture that we want to raise with respect to the exhibits is that, as Ms. Geragos said, we produced something in a very different format than is produced back to us in defense exhibits, and I think that's where this difficulty is arising.  The government's format is called Cellebright, and I understand that the defense processes it using another platform, and it comes back to us looking

completely different.

I think something that could really help going forward is knowing the source of each of the defense exhibits so that when issues like this arise, we are able to look at our original extractions and verify how they look on our end. Because ours look completely different than this.

When we produce our exhibits, we produce them by source. So for every exhibit we have marked and produced, it shows exactly which phone or iCloud account it came from.

THE COURT: Got it. So, look, as to this particular exhibit, it's a one-off issue because nine times out of ten, this would have come up in the overnight objections, and we would have resolved this in advance. But I hear you on the larger issue. So, Ms. Geragos, is there any issue with that?

MS. GERAGOS: No we can do that. No problem.

THE COURT: So then this will not come up again.

With that, any further issue, Ms. Smyser, on this particular exhibit?

MS. SMYSER: No, your Honor.

THE COURT: Any further issues generally, Ms. Smyser?

MS. SMYSER: No.

THE COURT: From the defense -- one more issue for the government. I guess this is just to make sure that we understand what's happening because now it's come up with a couple of times. We have this exhibit disclosure deadline, and

from the government's perspective, as I understood Ms. Comey and the exchange that we had -- I know it's late on Friday. Me too.

MS. COMEY: I'm sorry, your Honor. No correspondence about the case I promise.

THE COURT: I totally understand. It's fine. Just to make sure. You don't need any -- you're not looking for advance disclosure of exhibits that go for impeachment or --

MS. COMEY: Not at all, your Honor. Not at all.

THE COURT: So to the extent -- now that wasn't the ground offered for admission of the happy birthday video.

MS. COMEY: No, your Honor.

THE COURT: Nor, especially given all the other things we looked at, would that have been properly admissible. But I just want to make sure the defense understands that if they think something properly goes to impeachment in whichever way, then that's not subject to the advance disclosure requirement. What is subject to that requirement is anything that would properly fall into the affirmative evidence category, and the best way to really describe that is that it's not going to impeachment.

So I just want to make sure the defense understands because the only thing that's covered here is affirmative evidence that is used to establish points in the defendant's favor that are unrelated to impeachment of the witnesses who

are testifying.  So I just want to make sure that that point was clear.

MS. GERAGOS:  I understand, your Honor.  If I could just make something very clear to the Court and government.  We have been over-marking things that we would use for refresh or impeachment and giving it over in advance to make sure things are running smoothly, so that proceedings aren't stopped in the middle if we haven't given it over.  This was obviously an oversight since we didn't know we were going to use it, and for that we apologize.  But I do want the Court to know that we have been by the 7:00 p.m. deadline, or sometimes a little bit later, if we decide we're going to use something later for refresh or impeach, we still give it over anyway.  We understand it's not part of the Court's order, but I do want your Honor to understand --

(Continued on next page)

P5UMCOM7

THE COURT:  I appreciate that.

MS. GERAGOS:  It's just easier for them to have it.

MS. COMEY:  I can confirm that, your Honor. Ms. Geragos has been working around the clock, I know, and she has given us far more than they end up admitting, and we do appreciate that.  And we also understand that the defense will sometimes, after 7 p.m., identify more, and we have not objected generally to things coming in to us after 7, even as late as midnight.

THE COURT:  Good.

Ms. Geragos, this is for the defense's benefit.  And I think Ms. Comey would agree that if there is a witness and you have a document not produced by the government, the government doesn't even know about it, and you plan to use it for impeachment purposes, Ms. Comey is not asking for that in advance.  You can try to offer it into evidence without having previously disclosed it to the government.  I'm just making that clear.

When you have something that you're putting in for that purpose, for impeachment, and it hasn't been previously disclosed and there is an objection raised that wasn't previously disclosed, you should be explaining to me why it goes to impeachment and not the defense's affirmative case.

I just want to make sure that the line was clear so

there is no confusion on either side.

MS. GERAGOS:  I understand.  This specific exhibit is the only one that we have encountered thus far that has not been previously disclosed.

THE COURT:  I appreciate that.

MS. GERAGOS:  The only one with every single witness. I really want to make that clear --

THE COURT:  I'm not suggesting that anyone did anything improper.  I'm really just trying to make clear -- I just want to make things clear.  We have got a lot of weeks ahead.  I want to make sure that everything is clear.

MR. AGNIFILO:  Can I add something.  I think sometimes we are overinclusive.  We are trying to give anything for any reason.

I think what I'm seeing today, I think the Court's view of impeachment might be a little bit different than our view of impeachment, and I think what the Court's view of impeachment is is that impeachment is, you confront the witness, as Mr. Steel was starting to do, the witness says something, and then you impeach that immediate testimony.

THE COURT:  No.

MR. AGNIFILO:  That's the last time --

THE COURT:  I think in the context of the happy birthday video, I think that it was not -- I think that it was not relevant and probative to any issue of the case.  I don't

know that any particular issue comes up with that particular piece of evidence, but I understand that impeachment can be evidence of bias.  It can go to undermine credibility of the witness through things like demeanor.

I am just saying that when we had the exchange about the order, it was not suggested by the defense that, well, of course we didn't turn this over.  In fact, as a courtesy we gave it to them at 1:07 p.m. because we were just going to use it at 1:08 p.m. as impeachment evidence.

Fair enough, that was not what was said by the defense?

MR. AGNIFILO:  I thought it was impeachment.  I thought it was impeachment evidence.

THE COURT:  I don't have a view into your mind.

MR. AGNIFILO:  I thought I said that.  Our argument is -- when I said that I think the jury has the right to conclude that at times, I think she didn't do it as much.

Let me just finish the thought.

Yesterday she had an affect that maybe was real --

THE COURT:  Put this particular exhibit to the side because, as I started saying, I would have deemed it inadmissible on Rule 403 grounds, in any event, and there is just very little -- that particular exhibit, put it to the side because there are other issues with that particular exhibit.

I want to make sure that you understand, moving

forward, that the disclosure requirement, which was grounded in the government's initial objection raised under Rule 16, would not apply to impeachment evidence. So if you have other evidence that goes to impeachment and -- I understand and I really appreciate that the parties are trying to disclose everything in advance so we can work out any evidentiary issues that helps you present your evidence.

But if it happens to be that there is impeachment evidence, then it would fall within the order, and the government isn't even saying that any advanced disclosure is required. I just want to make sure that everyone understands that so that when an issue comes up about disclosure, if the ground for using the exhibit is impeachment, then you will argue that, and we can focus directly on that, and we don't have to get mixed up on when was this disclosed, all the things that we talked about in the middle of the day. But I get what you're saying about the reason why. I understand. I appreciate that.

MR. AGNIFILO: It's a matter of us trying to be courteous and trying to hurry the trial along appropriately so.

But it's also, we don't want to run the risk that we viewed it as impeachment and your Honor might not, and then we end up getting it precluded on that basis.

I know your Honor wants to set the video aside. But I think the video is kind of the heart of this issue. And my

interpretation of what happened is, the Court was concerned that we had not made a timely disclosure, and so I think the Court entered --

THE COURT: I was because no one suggested it was for impeachment purposes.

MS. SHAPIRO: That's not true.

MR. AGNIFILO: When I was trying to explain that, I thought it was important to show this witness' true affect and that the affect that this witness had in front of the jury is a false one. That is certainly in the realm of impeachment. So if I didn't say the word impeachment, then that's on me, but I thought that was a self-evident impeaching characteristic. And that's the relevance of it, that she has -- she is looking right at the camera. She is speaking with command. She is speaking clearly. And because this witness has now told the jury, and your Honor struck this part of the testimony, but there is other aspects to it that she is deeply affected, that she has PTSD, which has been struck, this affect, I think, is relevant.

THE COURT: I don't think there is -- look. Again, I would put this exhibit to the side because I think there are independent grounds that it would not have been admissible. I think we went back -- you're saying that you mentioned impeachment. That certainly was not -- you may have brought it up, but that was not -- it was not the discussion that we were

having.

But to what you're arguing right now, Ms. Comey, you would agree that to the extent some piece of evidence goes to demeanor, the things that Mr. Agnifilo is talking about, that would be impeachment evidence, right?

MS. COMEY:  I think so if that is the only thing that the exhibit went to, and we would obviously potentially have 403 objections.  I think there is a world in which there could be an exhibit that the defense may say they are offering for impeachment, and we may disagree with that, and your Honor may have to referee that if they try to get closer to the line.

I think what the defense has been doing reasonably is making the strategic decision that they are going to disclose things, overdisclose at 7 p.m., because strategically they think it makes sense, given that we can't share any of these exhibits with our witnesses, to, in the abundance of caution, share with us anything that they might use, even if potentially just for impeachment in case they also want to use it as substantive evidence.  And I think they could also make the strategic decision not to, and we argue and see whether we think it's just for impeachment or not.

In terms of the big-ticket point that your Honor made, yes.  If the exhibit is purely for impeachment, we agree we are not entitled to it in advance.

MR. AGNIFILO:  Just because I just saw it on the

transcript, your Honor, I believe Mr. Steel actually said, I'm using it for impeachment. I think that's going to be in the transcript.

Can I ask -- I know that your Honor has made a ruling on this. Now that we have the weekend, can we write a short letter on this? I know I said at the beginning of the trial I wasn't going to do this more than a few times.

THE COURT: I don't know that you need a letter on this because if you want to have a discussion with the government and they have a chance to actually review this and if you have it all redacted up and everything, you might find there is just no objection, given some adequate time to review it.

Now, at the time this was raised there may have been a thought that Mia would be off the stand by the end of the day, so that was really the only chance that the government had to look at this thing. But if there is additional time, it's 20 seconds, it's a happy birthday video. I excluded it on 403 grounds because it has minimal, if any, probative value here. But the parties should meet and confer and, for the good of the order, maybe the parties come up with a proposal and it could be put in.

This is the kind of thing that I've appreciated the parties have, up to this point, worked together on because there are numerous exhibits that I think, in another universe,

the government would have had 403 objections to, and they have not raised those objections because they are focusing on other things at the time. See if there is an objection. We will raise it on Monday. We don't need an additional letter on it.

MR. AGNIFILO: Thank you. Very good.

If we could get the witness list. As soon as the government knows what it is for certainly the early part of next week and all of next week, if we can get it.

THE COURT: Do we know who the next witnesses are?

MS. COMEY: Yes, your Honor.

The next witness is Enrique Santos and then the next witness after that will be Eddy Garcia. I have been informed that Mr. Garcia's counsel has indicated that he will invoke, so we will need to use the same immunity procedures that we used for Mr. Kaplan.

I think I propose that we just do that at 8:55 a.m. on Monday so that we don't have to break between Mr. Santos and Mr. Garcia.

And his counsel has received a copy of the order and has confirmed that the order appears in order. So if your Honor signs it, Mr. Garcia will testify.

THE COURT: Very good.

MS. COMEY: After that we have Sylvia Okun, who is a custodian from a hotel, and then Frank Piazza would be our next witness.

That, together with the rest of the Mia cross, we think will take us through Monday.

We will email, if it's all right with your Honor, the rest of the week's order over the weekend.

THE COURT:  Very good.

MS. COMEY:  I wanted to flag one other issue.

I saw that during the day the defense applied for a new set of Rule 17(c) subpoenas.  We would ask to be heard on those before the Court issues those subpoenas.  We expect to oppose them for the same reason we opposed the recent subpoena to Ms. Ventura, based on essentially the same arguments, and we also expect that Ms. Ventura's counsel will want to be heard on that application as well.

THE COURT:  All right.

MS. COMEY:  Thank you, your Honor.

THE COURT:  I'm sorry.  I may have missed this.  When were you going to respond on the subpoenas?

MS. COMEY:  I understand Ms. Ventura's counsel is out of the country, so I don't know when he will.  If we could do it by the end of the day Sunday, we'd appreciate that time. Thank you, your Honor.

THE COURT:  That will work.

From the defense, anything?

MS. SHAPIRO:  Your Honor, just two quick things.

With respect to that, I am not sure why Ms. Ventura's

counsel or Ms. Ventura would have standing because that subpoena is not directed -- none of the subpoenas are directed at Ms. Ventura.

THE COURT:  The government is going to put in their response by Sunday.  We will see where we are at that point.

MS. SHAPIRO:  Then we may not need to deal with this now.

I didn't get a chance, I apologize, to talk to Ms. Johnson, but I thought we might need the Court's ruling on the two remaining charts, just because the government had advised us they wanted to introduce some of the underlying materials early next week, and we needed the Court's ruling first so we could resolve any potential objections to the underlying exhibits.

MS. SHAPIRO:  I may be wrong about that.

MS. COMEY:  Your Honor, the three charts that we are planning to offer I thought we had resolved, and I'll say it for the record.  I thought 1402 we are going to revise, consistent with the discussion we had on the record this morning, which I believe we have already begun doing, and then the two financial charts that we discussed this morning, the slides that have the pie charts will be demonstratives only and the slides that have the grids that are more traditional charts will be admissible under 1006.

THE COURT:  There is only one column that I remember

there was going to be a modification to.  There was the name column --

MS. COMEY:  Yes.  We were going to copy and paste. Thank you for the reminder, your Honor.  And I will check the transcript to make sure we do all of this.  We were going to copy and paste, essentially, the entry in the credit card bill so that we weren't characterizing the language from the financial documents.

THE COURT:  Ms. Shapiro.

MS. SHAPIRO:  I'm sorry, your Honor.  I was actually referring to two other draft exhibits, 1408 and 1409.  Could I just speak to Ms. Johnson briefly?

THE COURT:  Are those going to be admitted on Monday?

MS. COMEY:  No, your Honor, and not on Tuesday either.

THE COURT:  Why don't we pick it up at the beginning of the day Monday.  That will give you a chance to speak with Ms. Johnson.

MS. SHAPIRO:  That's fine, your Honor.  Thank you very much.

THE COURT:  Anything further from the defense?

MR. AGNIFILO:  Nothing.

Mr. Combs got some sort of confirmation that, at least as far as the MDC is concerned, he is out of minutes.  When he picks the phone up and he puts his inmate code in, he is told he is out of minutes.

What we will do, and I think we can do it before 5:00, we can call the head of the legal department in the MDC.

I guess I'm looking for guidance from the Court in this regard. If we hit ground on the minutes issue, I don't know -- and the Court --

THE COURT: Say who you're speaking with. You are speaking with Ms. Papapetru?

MR. AGNIFILO: The omnipotent Sophia Papapetru. We are going to speak with Sophia. We will give the Court an update.

What I'm not clear on, do we -- if we figure out that in fact he's out of minutes, is the Court in a position to do something about it so that we would tell you that, confirm that for you, and then some action could be taken?

THE COURT: I am in the position to order relief if relief is warranted. Obviously, what I'm trying to do is try to effectuate the relief you need, talking to the folks at the BOP and to the marshals and to everyone else, because that makes it go so much easier. Let's see if this works. If it doesn't, you will come back to me, I know you will, and we will figure it out.

MR. AGNIFILO: Thank you, Judge. Thanks so much.

THE COURT: Thank you very much. Thanks to everyone. We will see everyone here at 8:30 on Monday.

(Adjourned to June 2, 2025, at 8:30 a.m.)

INDEX OF EXAMINATION

Examination  of:                                      Page

MIA

Direct By Ms. Smyser . . . . . . . . . . . . . .3384
Cross By Mr. Steel . . . . . . . . . . . . . . .3451
                         DEFENDANT EXHIBITS

Exhibit No.                                       Received

1701    . . . . . . . . . . . . . . . . . .3454

1701-R    . . . . . . . . . . . . . . . . .3454

1702-1710 and 1702-R - 1710-R   . . . . . . .3455
1711-1719 and 1711-R - 1719-R   . . . . . . .3472
1734 under seal and 1734-R    . . . . . . . .3487

1738 under seal and 1738-R    . . . . . . . .3489

1742 under seal and 1742-R    . . . . . . . .3490

1744 under seal and 1744-R    . . . . . . . .3492

1745 under seal and 1745-R    . . . . . . . .3495

1720 under seal and 1720-R    . . . . . . . .3497

1721 under seal and 1721-R    . . . . . . . .3497

1722 under seal and 1722-R    . . . . . . . .3498

1723 under seal and 1723-R    . . . . . . . .3499

1740 and 1740-R   . . . . . . . . . . . . . . .3532
1741 and 1741-R   . . . . . . . . . . . . . . .3533
1724 and 1724-R   . . . . . . . . . . . . . . .3534
1725 and 1725-R   . . . . . . . . . . . . . . .3535
1726 and 1726-R   . . . . . . . . . . . . . . .3535
1739 and 1739-R   . . . . . . . . . . . . . . .3548
1743 and 1743-R   . . . . . . . . . . . . . . .3549
1700-A and 1700-A-R   . . . . . . . . . . . . .3555
1728 under seal and 1728-R    . . . . . . . .3585