P62sCOM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

        v.                       24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

            Defendant.          Trial
------------------------------x

                           New York, N.Y.
                           June 2, 2025
                           8:45 a.m.
Before:

               HON. ARUN SUBRAMANIAN,

                           District Judge
                           -and a Jury-

                   APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
    EMILY A. JOHNSON
    MAURENE R. COMEY
    MEREDITH FOSTER
    MITZI STEINER
    MARY C. SLAVIK
    Assistant United States Attorneys

P62sCOM1

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
      Attorneys for Defendant
BY:   MARC A. AGNIFILO
      TENY R. GERAGOS
      -and-
SHER TREMONTE
BY:   ANNA M. ESTEVAO
      -and-
SHAPIRO ARATO BACH LLP
BY:   ALEXANDRA A.E. SHAPIRO
      JASON A. DRISCOLL
      -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND

ALSO PRESENT:
LUCY GAVIN, AUSA Paralegal Specialist
SHANNON BECKER, AUSA Paralegal Specialist
RAYMOND MCLEOD, Defense Paralegal Specialist

(Trial resumed; jury not present)

THE COURT:  Welcome, everybody.  Please be seated.

Let's start.  I hope everyone had a great weekend.

MR. AGNIFILO:  Yes.  Thank you, Judge.  Hope you, as well.

THE COURT:  Let's start with doing some feedback on these mics.  We'll work on that.

Let's start with the disputed exhibits for Mia.  As to DX 1750, I agree with the government that the probative value, if any, is minimal and that it's cumulative to the 30 pages of testimony on Instagram posts that we've heard.

Mr. Steel, are you still planning to use DX 50?

MS. SHAPIRO:  Your Honor, sorry, if I may.

THE COURT:  All right.  Let's, first of all, you need to be on a mic.

Second of all, from here on out, it's perfectly fine to have an assist from another lawyer.  The problem that I've been having is that there are a lot of little, like, different people standing up on one argument.  So could you do me a favor and just, if someone is going to handle it and someone else wants to chime in or give their point, you know, what usually happens, that lawyer will go over to the lawyer who is arguing and either give them their point or have that lawyer say, Could I have this other attorney handle this part of it.

That just makes it a little bit easier, I think, for

P62sCOM1

the court reporters and everyone else to just keep track of what's going on.

With that, Ms. Shapiro.

MS. SHAPIRO:  Thank you, your Honor.

Thanks for the court's indulgence on our --

THE COURT:  That's fine.

MS. SHAPIRO:  Just to make the record complete, and I looked back at the transcript and I think we made some of these points in a general way, but I just wanted to be clear as to why the video is actually not cumulative of the photographs and the testimony that's been provided.

As we indicated, it's the defense's belief that the aspect and demeanor of the witness is essentially a false persona that she's presenting to the jury.  I wanted to just put a little more meat on the bones about why the video impeaches that and undermines it.

THE COURT:  Let me, perhaps, obviate that by saying it's fine, because I don't think that there is any substantial unfair prejudice by having this video be used.

However, Mr. Steel, I take it that you're not going to spend more than a minute or two on this video.  It's a 20-second happy birthday clip.  You're not going to be making this, like, the centerpiece of your cross-examination.

This is a couple minutes of cross-examination, at best, right?

P62sCOM1

MR. STEEL:  Agreed.

THE COURT:  OK.  DX 1750 will be admitted.

(Defendant's Exhibit DX 1750 received in evidence)

As for DX1748 and 1794.  I don't have either of these exhibits.

DX 1748 does someone have that and can put it up on the board, because the government says that this one is particularly prejudicial, but for reasons I can't tell because I haven't seen it.

Ms. Smyser, do you want to point out the part of this that is particularly prejudicial in the government's view?

MS. SMYSER:  Yes, your Honor.

As you can see in the first few text messages, Mia is expressing some of her feelings.  And this is the same time period that we were talking about at the end of the day on Friday.

THE COURT:  After the shutting down of Revolt Films.

MS. SMYSER:  Correct.

Kristina responds with a number of text messages.  And if you continue on to the next page, she accuses Mia of attacking her with all of these text messages, when Mia is expressing that she feels betrayed and back-stabbed, for example.

So we think this is prejudicial in that way.  In addition, it's cumulative given the evidence that the defense

P62sCOM1

has already admitted on this topic on Friday.

THE COURT:  All right.  Does anyone from the defense want to address this?

Do you need that those last texts here?

MR. STEEL:  Good morning, your Honor.  Good morning, everyone.

Yes, your Honor.  I would like the whole text chain to be admitted.  I believe that the part that the prosecutor just said about Mia saying -- and it should be on page three of, excuse me, 1748, the first blue circle, the first line -- I'm being betrayed and back-stabbed.  That goes to the essence of what we have here.  She is saying his highs are high and his lows are low, and I don't say anything because the highs are highs.

Here, it is around Christmas of 2016.  She has noticed that she is no longer working, yet she doesn't say anything about what is the betrayal, what is a back-stab, anything about Mr. Combs.  And I would like to use the entirety of the text.

If the court is limiting part of the text, I would like you to consider allowing that part in.

THE COURT:  Wait.  Walk me through that again.

You're saying she's talking about being betrayed and back-stabbed

MR. STEEL:  Nothing about Mr. Combs.  It's not about Mr. Combs.  Why doesn't Mr. Combs call me.  It's a friendly, to

me, obviously, the witness --

THE COURT:  Meaning you're saying that after Revolt Films had been shut down, at a point in time, she has a grievance that she's airing.  That's how you're getting this in, in the first place, to show her state of mind.  What she's not saying is, by the way, Mr. Combs did XYZ, all the horrible things that came out in the direct examination.

MR. STEEL:  Yes.

THE COURT:  Is that the emphasis?

MR. STEEL:  Yes.

THE COURT:  OK.  DX 1748 and 1794 will be admitted.

(Defendant's Exhibits DX 1748 and DX 1794 received in evidence)

Now, as to DX 1799, what is this?

MS. SMYSER:  Your Honor, it appears to be a video that was turned over late last night of Mia taking some alcoholic shots, is what it appears to be, after the time that she was employed.  It also appears to have taken place in Honduras, presumably when she was on vacation.

We don't see any probative value in this video.  And there is incredible prejudice with.  It seems to be aimed at embarrassing this witness.

THE COURT:  Does someone have it and can put it up on the screen.

MR. FERRARA:  Your Honor, may I be heard?

Michael Ferrara.  I represent the witness.  I think some of the exhibits are being shown on this screen, as well. If this video is not being admitted, I ask it not be shown here.  The whole gallery can see it.  I want to protect my client.

THE COURT:  Thank you for raising that point.

If someone has a laptop, I can look at it on that.  It doesn't need to be put up on the screen for everyone to see. This is only being shown to me.  I see the attorneys are off.

All right.  1799 is excluded for the reasons stated by the government in their submission.

MR. STEEL:  Your Honor.

THE COURT:  Yes.

MR. STEEL:  I don't mean to belabor.  I heard what you said.

THE COURT:  You can make your record.

MR. STEEL:  OK.  It is my belief that the evidence will come out maybe later -- I don't think that Mia will agree -- that she was let go from the company for alcohol abuse, inappropriate alcohol use, something to that effect.

So I think that this will assist in the jurors seeing what other people saw early when she worked, and that is my position.  I heard what you said.  I would like you to have that background as well.

THE COURT:  All right.  Understood.

OK.  Mr. Steel, having had the weekend to streamline and fortify your cross-examination, how much time do you envision that you have left?

MR. STEEL:  So, your Honor, and it's me.  I'm bad.  I believe I'm going to go -- and I told the prosecutor this -- up to lunch.  But I am terrible.  I am just telling the court.  I can't see it going into tomorrow.  I don't believe I'm going all day, but I believe I'm going to take lunch, or shortly after lunch.  If I'm shorter, I'm not trying to stop that either.  I'm giving you my best belief.

THE COURT:  All right.  We're not going to have 30 more Instagram posts?

MR. STEEL:  I can't say that, but whatever.

THE COURT:  See what you can do.  It's your examination.  See what you can do to streamline things and keep this trial moving.  That's helpful, though, in terms of understanding the timing.

As to the objections relating to Mr. Piazza.

MS. SMYSER:  Your Honor, can I raise one thing on Mia before we move on?

THE COURT:  Yes.

MS. SMYSER:  This morning, I got approximately 30 additional social media posts from the defense, which Mr. Steel informed me that he may use as impeachment material.  I have just skimmed through them.  I don't see any impeachment value

in these posts, some of which occurred in 2023, some of which show Mia in a swimsuit, for example, which raises some of the concerns we had with similar photos of Ms. Ventura.

And so we would ask that the defense be precluded from using these posts.

THE COURT:  All right.  We'll take it up as it comes up.  I mean, this is why I asked the question, Mr. Steel, about the 30 other Instagram posts.  Because, I take it, Ms. Smyser is saying that even if it wasn't totally cumulative, which the government's position is, it is cumulative to what the defense did for most of the day on Friday, there are separate concerns with these exhibits going in.  They are long after the employment ended, and the relevance to the issues in this case is unclear.  Even if the relevance was clear, the basis to say that this goes to any kind of impeachment is further unclear.

So you'll have to make that showing as to each of these that you try to use because the government is going to stand up and object each time.  You get that.

MR. STEEL:  Understood.

THE COURT:  All right.  Now, as to the Piazza objections, what is the objection?

Because this is all -- the whole reason, as I understand it, that Mr. Piazza is even testifying is because the defense plans to call Mr. McCourt.  Because, in the defense's view, despite their initial view that the video was

prejudicial and that each time the jury sees the video, it is adding to that prejudice, it is the defense's objective and their strategy to keep having the video shown to the jury through their own expert who is going to talk about the video and necessarily is going to show the video to the jury on or cross-examination. It's going to be shown even more times to the jury.

Because of that, the government is calling Mr. Piazza who, again, is going to show the video to the jury and explaining the origin of how they got to the video clips that were shown to the jury.

So if it's the defense's strategy to have the video shown to the jury 30 more times, 50 more times, then I'm not seeing what the objection really is to Mr. Piazza simply, having that be the defense's strategy and their objective in this case, for reasons that the defense is aware of.

I mean, that is their strategy. It's their call to make. Then the government is simply responding and saying, Here is how we got to the exhibits that we're using, here is why they are fair and accurate representations of what occurred, and that's it.

So what's the objection?

MS. GERAGOS: Your Honor, if I may take this, and I may have the assist from Mr. Agnifilo at some point, but I'll let you know.

We have multiple objections.  I think I would like to take the videos one by one.

We object to using the government introducing 101 and 102.  Those are Piazza's corrected cell phone videos.  We discussed those specific videos with the government prior to Mr. Flores' testimony.  They gave us the option, do you want to use the original cell phone videos or do you want to use Piazza's corrected.  We did not want to use Piazza's corrected versions.  We think there are multiple problems with those versions, and we would rather have the original fairly and accurate depiction of the cell phone videos, the iPhone videos, as they were depicted, rather than his corrected version, which we don't believe solves any of the problems that we have identified.

We do not plan on crossing Mr. Piazza on the -- I think we have a few questions on what he found to be the general issues with an iPhone video that videos a screen, essentially.

THE COURT:  Is Mr. McCourt going to raise any issue was GX 3B-101 or 3B-102?

MS. GERAGOS:  No, no.  Because we don't want them -- if they are admitted, we would have to call him to show issues.

THE COURT:  No, 3B --

MS. GERAGOS:  Sorry.  3B-101 and 3B-102.  No.

I mean, we think that Piazza is going to talk about

P62sCOM1

what he views as the quick issues, couple questions, and that's it. You know, the problems with these videos are, you know, the problem when you use an iPhone to video a screen --

THE COURT: Why don't you -- here is what I would invite.

Look, Mr. Steel has already told us his cross is going to take us until lunch. Here is something that I would just invite the defense to think about.

Ms. Comey, I take it that if the defense were not going to call Mr. McCourt, then the government may not be calling Mr. Piazza, is that fair?

MS. COMEY: I think we would significantly shorten his testimony. I don't think we would not call him at all. He's done a bit of other work in the case as well.

THE COURT: Why do you need him?

If the defense is not calling their witness who would challenge the video and the only thing you have is whatever cross has already happened on the video, why would you call Mr. Piazza?

MS. COMEY: Your Honor, I stood up because you said my name. Ms. Smyser is actually putting Mr. Piazza on.

THE COURT: Fair enough. I didn't know.

MS. GERAGOS: I don't want to interrupt. We did ask the government to call Piazza because they put in the videos through in the beginning. I don't want to put this on the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P62sCOM1

government.  We did say, I think, the first day for your Honor, we would ask that the government call Mr. Piazza.  It will be a very short cross.  That's what we said.

And so I just want to make sure that your Honor knows that we asked for this, in order for them to put in 10C-103, 104, and 105.  So that was a defense request, in order for those videos to come in.

We admitted them not subject to connection, but we just want the jury really to have an understanding how we got here with these videos.

THE COURT:  Then, yeah.  So, given that, how can you object to that -- I mean, Mr. Piazza then is going to explain exactly what the defense wanted him to explain and he has a few exhibits that show that.

MS. GERAGOS:  The whole point --

THE COURT:  Why is it prejudicial?

The only prejudice argument that I hear is perhaps with respect to GX 10C-113, which is apparently being used as a demonstrative, but it is a compilation video that focuses in on certain acts, and I don't think we need that.  So I would be prepared to exclude that particular demonstrative from being used.

But as to the others, I mean, these are just -- Piazza has to be able to explain what the defense wants him to explain, which is how did we get here?  He's going to explain

that using versions of the video has show the difference between what is in evidence and what the originals were and all of that.

MS. GERAGOS:  OK.  If your Honor would allow me, I would like to separate the kind of two issues.

One are the cell phone videos and one are the CNN production videos.  The cell phone videos, we have the originals in evidence.  Why do we need to introduce different ones now.

The jury has already seen the originals the first day of this trial through Mr. Flores.  We don't need to introduce these different ones that he has, for lack of a better term, monkeyed with.  There is no reason for it.  It's prejudicial. We don't agree with how he did them.  There's just no reason to do it.

In terms of the cell phone videos, that's 101 and 102. In terms of the -- I think it's 106, 107, and 108, I want to say -- don't quote me on the exact numbers -- those show how we got those from CNN, the sped-up versions.  The whole point of our motion in limine was we don't want the jury to see these sped-up versions.  That was the whole reason that I understood that your Honor asked the government to have an expert slow them down and make them more accurate as to the speed of these.

Why are we going to now admit a version of these videos that are extremely prejudicial for the jury?

THE COURT:  Why is it?

MS. GERAGOS:  That's what 106, 107 and 108 does. Because it still shows -- you still see on the left-hand side Mr. Combs running 30 percent faster than it is in reality.

Looking at it, it's prejudicial for anybody looking at it to see Mr. Combs looking like that.  And understood, that if the jury will understand, of course, that he slowed it down, but to have them have this in evidence when they take this back to the jury room and looking at it on the screen over and over again is prejudicial, unduly prejudicial, to him.

THE COURT:  So let me just zoom out a little bit.

You don't have a problem with Mr. Piazza talking about any of these things.

MS. GERAGOS:  No.

THE COURT:  You're just saying that your grievance is that, in talking about these things, he is also showing the versions of the video that you initially complained about.  And so it kind of undermines everything that we went through with the CNN video to now show them those things and say, OK, well, here is how we got here from that.

MS. GERAGOS:  That's right.

THE COURT:  Mr. McCourt -- and the defense on cross-examination -- is not going to challenge those things. You're not going to say, well, you didn't actually slow things down, did you, anything along those lines?

P62sCOM1

MS. GERAGOS:  Exactly.

THE COURT:  You would open the door then to the government putting everything in.

MS. GERAGOS:  That's right.

If we were to do that, then we open the door on redirect.  But we're not doing that.  I expect our cross, as we told your Honor on day one of this trial --

THE COURT:  What is your cross going to be, two minutes long?

MS. GERAGOS:  Very short.

I think Mr. Agnifilo said it would be something, like, ten minutes.  I just want to go through, for example -- I'm previewing it so your Honor knows -- this is a motion-sensored camera.  Here are all of the times that are not captured.  That is our cross.

And just depending on how much Ms. Smyser gets out on direct on all the things he did to correct it, we justs want the jury to know how we got here.  And we let Ms. Smyser know that last night.  How did we get here with these videos.  It's important for us that the jury knows that.

I think I told your Honor a couple weeks -- I frankly don't remember now when it was -- that the cross might be a little longer because we might show him the BX series of videos.  We're not going to do that with him anymore.  We will probably do that with a summary witness.  Short cross.

The point of calling him, the reason we asked the government to call him, just so the jury understands how we got here with these specific videos.  Our cross is not going to impugn his methods in any way, but really, just so the jury understands how these videos came about.

THE COURT:  So this is, just for my own curiosity, what are you going to do during the cross of Mr. McCourt when the government tries to show the videos to --

Because it would be fair for the government to show the videos to Mr. McCourt and show the jury the videos, to have Mr. McCourt, who's done an analysis on the videos, like, you know, and expresses the opinion that they are unreliable.  The government is going to show the jury the video.

MS. GERAGOS:  We --

THE COURT:  So that's why I'm not understanding what we're actually doing here, because there was extensive discussions between the parties.  There were only a couple versions of the videos that were put into evidence, so those versions are in.

But now, because the defense is putting on this, kind of, satellite case about the videos, we have these disputes about other videos coming into evidence and the InterContinental video itself being repeatedly shown to the jury.  And the defense says that's prejudicial, but the only reason any of this is happening is because the defense is

calling Mr. McCourt and making this an issue.

And the government, on cross of Mr. McCourt, you know, is likely going to be showing the jury the video, perhaps, multiple times because that is what Mr. McCourt is testifying about.  That's why I'm raising this kind of larger issue.

MS. GERAGOS:  Understood.

We -- as your Honor knows, we noticed Mr. McCourt.  We may call him.  At this point, if 101 and 102 don't come in, we probably will not call him on our defense case.

THE COURT:  Sorry.  If the 101 --

MS. GERAGOS:  If 10B-101 and 10B-102 do not come into evidence, we probably will not call him.

THE COURT:  And C?

MS. GERAGOS:  Sorry.  I'm sorry, yes.  10C-101 and 10C-102, if those don't come in, we don't --

Give me one moment.

(Counsel confer)

We agree with Mr. Piazza's methods of how he, kind of, slowed it down.  So unless this goes in a different direction that we were not anticipating, putting aside 101 and 102 which we vehemently disagree with, we are probably not going to call Mr. McCourt.

101 and 102, we really believe, were just, like, out of this case starting on day one, so we --

But that would be the reason to call him if we did.

THE COURT:  All right.  Ms. Smyser, I suppose there is an implicit offer on the table.  If you didn't use 101 and 102, then you could lose maybe half a day on this case with not having Mr. McCourt testify.

Let me hear you on 101 and 102.  I take it that's the principal objection on this.

MS. SMYSER:  Your Honor, I think this entirely depends on what the defense is going to do here.  I don't hear from them that they are going to certainly commit to not calling Mr. McCourt, if 101 and 102 don't come in.

In addition, I don't hear that they are not going to challenge the reliability or the fact that the original cell phone videos are fair and accurate in their cross-examination of Mr. Piazza or in arguments to the jury.  That is why we need 101 and 102.

So if the defense commits to all of those things, I think the government can have a discussion about whether to forego admitting them.  But I don't want to hamstring us based on half-hearted representations from the defense right now about what they are going to do by not putting in these videos.

THE COURT:  Why put them in, in the first place?

Like, why wouldn't it run afoul of Rule 403?  Prior to trial, we had these elaborate discussions about what would go in.  And what the defense was concerned about was precisely these two videos, among other things, that had, in their view,

P62sCOM1

kind of, were sped up naturally, not because of anybody's manipulation, but because of the way the videos were kind of taken.

MS. SMYSER:  I think we're talking about two different things here, your Honor.  The 101 and 102 objection is to the cell phone videos.  Those don't have a speed issue.  The only videos that are in evidence that have the, quote-unquote, speed issue are the surveillance videos.  All we admitted related to those are the slowed-down versions.

But the cell phone videos themselves also have certain, quote-unquote, issues with them, such as the aspect ratio, which the defense has said makes the defendant appear more domineering or wider.  It's shaky.  It's different lighting.

If they are going to focus on those issue, making the cell phone video not a fair and accurate representation, we should be able to put in the version of the video that corrects those issues.

THE COURT:  Understood.

So why wouldn't you just do that either on redirect, if they do it on cross or if they attempt to do it with Mr. McCourt, then you can just interject into the defense case, you can recall Mr. Piazza, and I would allow you to do that right after Mr. McCourt's testimony to then put in all this evidence.

P62sCOM1

And isn't that the best way to make sure that the defense understands, if they open the door, you're going to walk through it?

MS. SMYSER:  Your Honor, I think that's a waste of time.  Like, we have Mr. Piazza here today.  We have him prepared to put in the videos.  We also don't want to make it seem like we're hiding something from the jury here.

I think if the defense is really prepared to commit to not calling Mr. McCourt and not making arguments as to the reliability of the cell phone videos, then I would like to confer with my team before I make a final decision on 101 and 102.  We may very well be willing to not put those in.

We need a commitment on that, your Honor.

THE COURT:  All right.  Let me ask the defense, during the morning, to really come up with a firm position here.  I think what is going to happen is, even if I were to exclude these, you're going to have to watch yourself on cross, and then you could face the government putting in these videos on redirect examination.

But then if you have Mr. McCourt testify and if he runs afoul of some of these guardrails, then as I told the government, I would just allow them to put Mr. Piazza in during the defense case to address those issues and potentially put in those videos, which for the reasons the defense has indicated it does not want.

So take the morning session, figure out if there is a firm position that you can tell the government about.  Maybe we can narrow some of these disputes, and then I'll address it if there is still open issues during the lunch break.

MS. GERAGOS:  Thank you.

THE COURT:  Ms. Comey, do we have Mr. Garcia here?

MS. STEINER:  He's here, your Honor.

THE COURT:  Steiner.

All right.

MS. SMYSER:  Your Honor, before he is brought in, before you make a final decision on the compilations 112 and 113, I would like to be heard whether that is current right now or whether that is at lunch.

THE COURT:  112 and 113, do you have these and can you e-mail them to me?

MS. SMYSER:  They were presented to chambers via USAfx.  They are too big to e-mail, unfortunately.

THE COURT:  Then we have them.  So, thank you, I'll take a look.

Let me hear you just briefly on those two compilations, and that will complete the record here.

MS. SMYSER:  Just briefly, your Honor, 112 is simply a timeline of events essentially that strings together the various videos that are in evidence to show the jury in one video what happens.  Currently that compilation uses the

corrected cell phone video.

If your Honor were to preclude that corrected video, Mr. Piazza could sub in the original cell phone video, but -- that would be very helpful, I think, to the jury in showing what happened here in order. And I don't think the defense expresses any real prejudice that raised the 403 objection as to an issue with that compilation.

And it's highly probative, as I said. I think it would be very helpful to the jury and it shows the events in order. 113, your Honor, is essentially the same thing. It also shows those events in order. But Mr. Piazza has done certain enhancements and edits to that video, including zooming in and highlighting certain acts on the video.

I know your Honor noted that this may be cumulative. We may have shown this video before. But, your Honor, this is one of the most important pieces of evidence in this case, and the government should be able to highlight the relevant portions to the jury. To zoom in, for example, on things that happen in the mirror in the back of the video that are difficult to see, to give the jury a full picture of what was going on in this video. And that is what 113 does.

And as the government has said, we are only intending to use it as a demonstrative during Mr. Piazza's testimony, and so I don't think there is any real prejudice here, and I think it would be extremely probative for the jury.

THE COURT:  Understood.

Ms. Geragos, what is the objection as to 112, which is not with the circles and arrows, but just the pieced-together video?

Especially if it doesn't utilize the corrected cell phone videos, but instead, the ones that are in evidence

MS. GERAGOS:  Yes.  The originals are in evidence, your Honor.  We think that the government should just use videos and not the pieced-together compilation version, which is not original.  It's something made by an expert with different timestamps, and I think we would point this out on cross if this comes in.

We think the government, if it wants to piece together what is actually in evidence and use it during the summation, to have this be something that comes into evidence and goes back with the jury in the jury room, that is something that we think is extremely prejudicial.

I don't think we would have an objection, let me just check...

(Counsel confer)

We would not have an objection to using 112 as a demonstrative with Mr. Piazza.  But we do have an objection to it being admitted and going back into the jury room.

(Counsel confer)

Yes, of course.  If the original of the cell phone

videos are replaced at the end or at what portion that he utilizes the cell phone videos, we do have an issue. When you see 113, I think you'll see why, with even using 113 as a demonstrative, because of the red circles and zooming in.

But we would not have an issue with 112 as a demonstrative, but we do have an issue with it being a substantive exhibit.

THE COURT: And, Ms. Smyser, as to 112, I guess -- now that I'm thinking about it -- is it a proper exhibit at all?

You're hearing no objection to using it as a demonstrative. How would it be admissible as a substantive exhibit?

Because you have the cell phone videos. They are what they are. To the extent Mr. Piazza pieced together these videos in a particular sequence and put them together, even if it's reliable, why would that be an exhibit as opposed to an illustrative aid you can use during your examination, which there is no objection to?

MS. SMYSER: Your Honor, it's piecing together items that are in evidence. I think that it itself can -- there is no bar for a compilation to not come in as substantive evidence. And I think if it is not accepted as substantive evidence, it's simply going to make it more difficult for the jury during their deliberations, more unwieldy, having to open more files so see what went on. Rather than to have Mr. Piazza

P62sCOM1

testify about what he did in order to make this compilation and then have it admitted as substantive evidence.

Your Honor, I would point out, that this video goes to the heart of the issue in Count Two.  So whether there was force or coercion used in relation to sex trafficking, so it's an extremely important point of -- piece of evidence that is very probative.  And we want the jury to be able to understand the full sequence of events here, which is what 112 does.

THE COURT:  All right.  Now, I think you've already done a lot of that during Ms. Ventura's testimony and the testimony of a couple of the witnesses who testified in the first week of trial.

All right.  So here is what we're going to do. 10C-101 and 10C-102, and 10C-106 through 10C-111 are excluded, pending a door opening by the defense.

112 can be used as a demonstrative during the testimony.  113 is out.

Now, with that, let's have Mr. Garcia.

Mr. Garcia, you may take the stand.

THE DEPUTY CLERK:  Please remain standing for a moment and raise your right hand.

 EDDY GARCIA,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

Thank you.  You may be seated.

Sir, can I just ask you to give your first and last name to the court.

THE WITNESS:  Eddy Garcia.

THE COURT:  All right.  Ms. Steiner, you may proceed.

MS. STEINER:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. STEINER:

Q.  Good morning, Mr. Garcia.

A.  Good morning.

Q.  Did you receive a subpoena requiring you to testify at this trial?

A.  Yes.

Q.  And do you have an attorney who represents you in connection with this matter?

A.  Yes.

Q.  Based on your discussions with your attorney, do you intend to invoke your constitutional right not to testify and not to answer any and all questions put to you at this trial on the grounds of potential self-incrimination?

A.  Yes.

Q.  Have you also received a copy of a proposed immunity order?

A.  Yes.

Q.  And have you had the opportunity to review that proposed order with your attorney?

A.  Yes.

P62sCOM1                    Garcia - Direct

Q.  Do you understand that if the court enters an order granting your immunity, that you'll be required to answer any and all questions truthfully here today?

A.  Yes.

Q.  And do you also understand that the order will not protect you from prosecution for perjury if you make a false statement here today?

A.  Yes.

MS. STEINER:  Your Honor, I would ask, on that basis of the witness's answers to my questions, that the proposed order that we submitted to your Honor be entered.

THE COURT:  The court will enter the order and make it a court exhibit.

I'm handing this now back to the courtroom deputy.

MS. STEINER:  Thank you, your Honor.

THE COURT:  Thank you, Mr. Garcia.

All right.

(Witness temporarily excused)

Ms. Smyser, let's bring -- unless there are any other issues to address, let's bring Mia in, then we can proceed.

Anything further, Ms. Smyser, from the government?

MS. SMYSER:  No, your Honor.

THE COURT:  Mr. Steel, anything from the defense before we get started?

MR. STEEL:  Not that I know of, sir.

THE COURT:  All right.  Let's bring Mia back and then we will bring our jury in.

MR. STEEL:  Your Honor, may I put this on the podium for a moment?

THE COURT:  You may.

Welcome back.

(Continued on next page)

P62sCOM1                       Garcia - Direct

(Jury present)

THE COURT:  Please be seated.

Welcome back, members of the jury.  I hope you had a great weekend.

Mia, you understand you're still under oath?

THE WITNESS:  Yes.

MIA, resumed.

THE COURT:  Mr. Steel, you may proceed, when ready.

MR. STEEL:  With the court's permission, I would like you to be able to look at Defense Exhibit 1750, just for the witness, your Honor, and the parties.

If you need headphones, there's --

THE COURT:  That's not the exhibit you're putting up, right?  That was not the right exhibit?

MR. STEEL:  1750.

THE COURT:  OK.  What just popped up was not 1750?

MR. STEEL:  I may have said 1740.  I meant to say -- I think I said -- I want ...

Thank you, your Honor.

THE COURT:  Right now you want her to just look at the image, correct?

MR. STEEL:  No.

THE COURT:  How is the witness supposed to hear the audio?

Do you have headphones or anything else that you would

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

like the witness to use?

MR. STEEL:  That would be great, yes.

THE COURT:  Well, the court does not furnish those.

MR. STEEL:  They are coming.

THE COURT:  OK.

MS. SMYSER:  Your Honor, we renew our objection.

I don't think there is any basis to impeach with this at this time, and on 403 grounds.

THE COURT:  Mr. Steel, are you going to ask some questions to start off, or are we just going to show this video?

MR. STEEL:  I would going to ask the witness whether she can identify it, and if it's already in evidence, that's fine.  I thought that I had to lay a foundation.

THE COURT:  Yes, but you haven't laid any -- you haven't laid any kind of foundation.

So why don't we do this.  Just, let's do it this way. Let's take this video down for just the moment.  You need a second or two to get any headphones or equipment you need anyway.  But if you're going to ask questions to establish a basis for using this video in the way the defense has indicated, then you need to ask those questions first, and then you can at that point try to offer this into evidence.  OK.

MR. STEEL:  Of course.

P62sCOM1                         Mia - Cross

CROSS-EXAMINATION

BY MR. STEEL:

Q.  Let me ask you, while they are getting headphones for you, can you do me a courtesy.

Do you still have that binder in front of you?

A.  No.

MR. STEEL:  Do we have the binders?  One for the jury and for the witness.

Q.  All right.  Let me ask you some questions.  We're getting binders for you.

Can you tell the jurors, if you don't mind, where you went to school?

A.  James Madison University.

Q.  And what year did you graduate?

A.  2005.

Q.  Do you remember what your GPA would be?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

Q.  After graduating, did you go into the workforce?

A.  Eventually, yes.

Q.  And when you say eventually, did you start work immediately after graduating or shortly after graduating?

A.  After graduating, I took advantage of the study abroad program.  So I did not start working, I believe, until maybe the fall.  I'm not sure of the exact dates.

P62sCOM1                          Mia - Cross

Q.   OK.   Would that be with Pure Chemistry?

A.   No.   Pure Chemistry, I don't remember the years, but that was not my first job.

Q.   OK.   After that, did you do any work as an assistant to somebody?

A.   Yes.

Q.   And when did you do that, what years, if you remember?

A.   I -- the years?   Well, if I started in 2009, maybe 2000 -- maybe 2008 or 2007.   I'm not -- I'm not sure of the exact years.

Q.   And do you remember compiling a resume or a c.v.?

A.   I believe I -- yes, I made a resume before.

Q.   And do you remember on your resume, that you had before working with Mr. Combs and his companies, explaining that you have the ability to multitask?

A.   Sure.   Yes.

Q.   You worked well under pressure?

A.   Yes.

Q.   Using an energetic and positive approach?

A.   Yes.

Q.   You always maintained thick skin?

A.   If -- I don't know if I wrote that, but I don't remember if I wrote that.

Q.   And you're accustomed to and comfortable in a 24/7 role?

            MS. SMYSER:   Objection.

THE COURT:  It's overruled.

MS. SMYSER:  We're reading from a document not in evidence, your Honor.

THE COURT:  I understand.  It's overruled.

A.  Again, I don't remember what I exactly wrote, but...

Q.  We can show you, with the court's permission, Defense Exhibit 1753.

MR. STEEL:  Your Honor, the exhibits, the binders are coming up to the court at this time, is my understanding, for the witness and the jurors.

Q.  Do you see what's on the screen, Mr. Combs 1753R?

A.  Yes.

Q.  And do you see on the bottom, if it refreshes your memory, that you maintained thick skin?

Do you see that?  1753R, by the way.

A.  Oh, sure.  I see that.

Q.  OK.  And is this an accurate depiction of your resume or c.v.?

A.  I mean, it looks -- it looks familiar, but I don't remember the exact document from that long ago.

Q.  Well, look at the whole document and we can take out the personal, the highlighted version.

Does that look like it accurately depicts what you have previously put forth as your c.v.?

A.  It looks like it.

P62sCOM1                        Mia - Cross

MR. STEEL:  Your Honor, I would move for the admission of 1753R.

THE COURT:  Any objection?

MS. SMYSER:  No objection.

THE COURT:  All right.  1753R will be admitted.

(Defendant's Exhibit DX 1753R received in evidence)

MR. STEEL:  Then 1753 for under seal, your Honor.

THE COURT:  That exhibit under seal.

(Defendant's Exhibit DX 1753 (Sealed) received in evidence)

MR. STEEL:  May this be published, your Honor?

THE COURT:  It may.

BY MR. STEEL:

Q.  Now, here on this document, as you said, you attended and graduated from James Madison University, right?

A.  Correct.

Q.  And that is a prestigious university, would you agree with me; it's well-known?

A.  Sure, yes.

Q.  And it says that you graduated bachelor of science in May 2025 with a 3.6 grade point?

A.  2005, yes.

Q.  OK.  If I said something different, I apologize.

Then it has your majors and your activities?

A.  Yes.

Q.   And then starting at the bottom, under experience, your first experience that you list is the office manager here in New York as a designer assistant/executive assistant, fair?

A.   Fair.

Q.   And that's January 2006 to September 2006?

A.   Yes.

Q.   And in the second bullet point, you catered to celebrity clients, all their studio needs, right?

A.   Yes.

Q.   This is something that you wanted to be involved in, around the celebrity entertainment world, is that fair to say?

A.   I wanted to be in the entertainment industry, yes.

Q.   And then if there's anything else significant that you want to talk about, we will.  Otherwise, I would going to go to the job above that.

        Do you see that, also in New York, as the executive assistant production coordinator?

A.   Yes.

Q.   And you transitioned from one job to the next and you worked about nine months -- excuse me -- about just under two years, is that true?

A.   True.

Q.   And there, you acted as an in-house personal assistant to the executive?

A.   Yes.

Q.   And then you took another job from June of 2008 until September 2009, fair?

A.   Fair.

Q.   And you provided, in the first bullet point, round-the-clock support, all personal and professional needs, true?

A.   True.

Q.   And then toward the bottom, the third bullet point from the bottom, you kept the inventory of all personal possessions and documentation, including passports, driver's licenses, etc., right?

A.   Correct.

Q.   And if people went on a vacation or a trip and there were passports involved at that job, did you put all of the -- not you, but were all of the passports collected as one so they were in somebody's charge?

A.   I -- I don't exactly remember, but I didn't travel, like I did...

     So I would have given them their passports.  I don't really remember the exact process, it was so long ago.

Q.   When you worked with Mr. Combs' company, is it true that you did travel internationally at times?

A.   Oh, yes.

Q.   And other people traveled as well?

A.   Yes.

Q.  And were all the passports collected by one person to be in charge to make sure everyone's passport is not misplaced?

A.  Before -- before flying, yes.

Q.  And when you said earlier on your testimony that you couldn't leave, do you remember that testimony, that your passport was being held or housed with Mr. Combs; do you remember that testimony?

A.  Yes.

Q.  That's everyone's passport was being held or housed with the same person, right?

A.  Yes.

Q.  Now, with regards to the very last bullet point in that first job experience, supervise other assistants and manage interviewing process.

        Do you see that?

A.  I see that.

Q.  You have -- you have a personality that you are strong, is that fair to say?

        I would like you to describe yourself.  Is that fair to say?

        MS. SMYSER:  Objection.

        THE COURT:  I think you need to be a little bit more specific as to what you're asking.

Q.  You can understand and take on responsibility, true?

A.  True.

P62sCOM1                        Mia - Cross

Q.   And you can kind of govern other people?

        I don't mean that in a poor way.  I mean, you can kind of explain what you need to do and have other people follow your instruction when needed, true?

A.   I'm good at teaching others, not necessarily enforcing it, but yes.

Q.   And you're a leader; wouldn't you consider yourself a leader?

A.   Um, would I consider myself a leader?

        Um, I don't really know how to answer that.

Q.   You speak up for yourself, true?

A.   No.

Q.   You tell other people and you empower other people, is that true?

A.   I do empower other people, yes.

Q.   You try to encourage other people, right?

A.   Yes.

Q.   To be powerful and speak up for what's right, right?

A.   Yes.

Q.   Now, on the professional skills, do you see that, at the very bottom of 1753R, do you see what's highlighted?

A.   Oh, the professional skills section?

Q.   Correct.

A.   Yes, the whole section, um-hmm.

Q.   And you speak at least four languages that you can converse

P62sCOM1                        Mia - Cross

in, true?

A.   At the time, I could.

Q.   OK.   And you also, as you say, you multitask under pressure, right?

A.   Yes.

Q.   You're a positive, energetic person, right?

A.   Yes.

Q.   And you used that approach in your business, right?

A.   Yes.

Q.   And you have a thick skin?

A.   I -- I thought I did.

Q.   And that's what you wrote on your resume, right?

A.   Yes.

Q.   And on the second line, you're accustomed to and comfortable in a 24/7 role, right?

A.   Yes.

        MR. STEEL:   OK.   You can take this down if you don't mind.

        Your Honor, can we pass out to binder if, with the court's permission?

        THE COURT:   You may.   These are the same binders from Friday, is that correct?

        MR. STEEL:   I'm being told yes.   I think they are added, though, aren't they?

        Can you look at it?

(Counsel confer)

Your Honor, there are photographs that were added. I'll get the exhibit numbers.

THE COURT:  Well, if there are additions to the binder, then you need to provide Ms. Smyser with a copy so that they can review them in advance.

MR. STEEL:  She has them.  They are in the binder now. It's from this morning.  They are added.

MS. SMYSER:  Your Honor, I would like to see the binder.  And also, I would like the jury to be instructed not to turn to tabs without being instructed to do so.

THE COURT:  The second instruction I will give, but let's do this in steps.

Mr. Steel, provide Ms. Smyser a copy of the binder so she can quickly look at it and ensure there is no issue.

So, do you have a binder?  Grab one.  Give it to Ms. Smyser.  She'll take a look and we'll make sure there is no issue.

MS. SMYSER:  Your Honor, it's fine to go to the jury, as long as they don't turn to tabs.

THE COURT:  Members of the jury, these are the binders from last week.  There are tabs in the binders.  Don't look at anything in these binders, unless we tell you to, just because there is some exhibits that haven't been entered into evidence yet.  And this is just to make it easier for you to look at

P62sCOM1                    Mia - Cross

them.

Mr. Steel, you can hand out the binders now.

MR. STEEL:  Thank you, your Honor.

Could we pass them to the courtroom deputy to hand them to the jury.

THE COURT:  Just start handing them over and we'll -- that's probably the easiest way to do it.

MR. STEEL:  Directly to the jury?

THE COURT:  You can hand it directly to the jury.

All right.  Does everyone have a binder now?

Who needs a binder?

OK.  We need one more binder.  If we're missing a binder, we'll share.  OK.  We've got enough binders.

There you go.  Teamwork is good.  Thank you for your cooperation, everybody.

With that, Mr. Steel, let's proceed.

MR. STEEL:  Your Honor, may I approach?

THE COURT:  Yes.

MR. STEEL:  The courtroom deputy for the witness.

THE COURT:  Yes.  You can just hand it up.

MR. STEEL:  May I come forward?

THE COURT:  Please approach.

Why don't you lay the binder down on the podium.

THE WITNESS:  Thanks.

THE COURT:  All right.  Thank you very much.

P62sCOM1                          Mia - Cross

BY MR. STEEL:

Q.  You can turn -- excuse me, your Honor.

OK.  If you can please do me a favor.  When you get the binder in front of you, if you could please turn to 1730.  We're going to take three in a row, 1731, 1732 and 1733.  But let's go one at a time.

Behind the tab starting at 31, if you don't mind looking at that.  Behind tab 1730, rather.

Tell me if you recognize what is depicted as your text message in 1730?

A.  I'm sorry.  Did you ask me if I recognize this?

Q.  Yes, if you don't mind.

A.  Yes, I do.

Q.  Is it true and accurate?

A.  Um, yes.

Q.  Can you look at what's behind tab 31, which is 1731.  It's going to be the same question.

Do you recognize this text message sequence?

A.  It sounds like me.

Q.  And does it look true and accurate, to the best of your knowledge?

A.  Again, like, I don't remember, but it does sound like me.

Q.  Can you look at what's behind 17 -- excuse me -- what's behind exhibit tab 32, but it's 1732.  It's going to be the same question.

Do you recognize this text message exchange?

A.   Again, I don't remember it, but it does sound like me.

Q.   Would you do me the courtesy, go to the next tab, which is 33, can you look at 1733 exhibit and tell me -- it's a couple of pages.

Just tell me, again, if it looks like your text exchange, message exchange?

A.   Do I recognize?

Yes, I recognize my messages.

Q.   And that's in 1733, I believe, correct?

A.   1733, yes.

MR. STEEL:  Your Honor, I move for the admission of 1730, 1731, 1732, 1733.  And then, your Honor, the corresponding R, which would be 1730R, 31R, 1732R, 1733R, as well, and the ones without R under seal.

THE COURT:  All right.  Any objection other than those previously addressed by the court?

MS. SMYSER:  No additional objections.

THE COURT:  So those exhibits will be admitted on that basis, with the redacted exhibits admitted and the other exhibits admitted under seal.

(Defendant's Exhibits DX 1730, 1731, 1732, 1733 (Sealed) received in evidence)

(Defendant's Exhibits DX 1730R, 1731R, 1732R, 1733R received in evidence)

P62sCOM1                     Mia - Cross

MR. STEEL:  Your Honor, can we turn to 1733, if you don't mind.

THE COURT:  Yes.  You would like the jury now to turn to that exhibit?

MR. STEEL:  With the court's permission.

THE COURT:  Of course.

BY MR. STEEL:

Q.  Mia, it's on your screen, but also you have it in your booklet as well.  Make sure you're at 1733.

A.  Yes.

Q.  And just to orient the jury, you left Mr. Combs employ by March 2017, fair to say?

A.  Correct.

Q.  And this is -- well, this is a text message exchange between you and Mr. Combs, is that true?

A.  Yes.

Q.  All right.  I would like you to help me out if you don't mind.  We're talking about, if you could look at it, the first blue text exchange on the left-hand side.  This is Christmas of 2018.

Do you see that?

A.  Yes.

Q.  All right.  And tell the ladies and gentlemen of the jury what you wrote to Mr. Combs.

A.  Merry Christmas.  I love you.  So so much.

Q.   And then Mr. Combs responded to you, Same to you?

A.   Yes.

Q.   And that was two days later, is that fair to say?

A.   Yes.

Q.   And then on the next page.

A.   Happy new year.  Always so much love to you.

Q.   That's you to Mr. Combs, fair?

A.   Correct.

Q.   And that's a couple days later.

          So we're talking about New Year's Eve 2018 going into the new year of 2019, true?

A.   True.

Q.   And these are your sentences to Mr. Combs, right?

A.   Yes.

Q.   And he's not with your -- or you're not with his employ, right?

A.   Correct.

Q.   And you don't see him anymore?

A.   I had just seen him at Kim's funeral.

Q.   OK.

A.   Other than that, no, I did not see him anymore.

Q.   All right.  And you reached out wishing, you know, nicely, Merry Christmas, Happy New Year, fair?

A.   Absolutely.

Q.   And then on the next chat is 1/15, so it's January 15 in

P62sCOM1                      Mia - Cross

the New Year, 2019, fair to say?

A.  Fair to say.

Q.  And can you read to the jury what you wrote to Mr. Combs?

A.  Just thinking of you today and every day.  Also no lie, last night I had a nightmare I was trapped in an elevator with R Kelly and I screamed for you and you came to rescue me.  So thank you for that too.  Sending you love.

Q.  Now, at that time in 2019, you had -- you wrote that you had a nightmare concerning the person, the artist known as R Kelly, right?

A.  Yes.

Q.  And the person who sexually assaulted you in your dream, or nightmare rather, came to your rescue; that's what you wrote?

A.  Yes.

Q.  And you not only had that vision in your mind, but then you express it to Mr. Combs?

A.  Yes.

Q.  You had to tell him that in the text message that he's your actual savior, right?

        MS. SMYSER:  Objection.

        THE COURT:  It's overruled.

A.  Yes.

Q.  So the person who you told the ladies and gentlemen of the jury terrorized you and caused you PTSD, you wrote to that person and explained how that person saved you from the other

P62sCOM1                          Mia - Cross

person named there, right?

      MS. SMYSER:  Objection.

      THE COURT:  Sustained.  Needs to be rephrased.

Q.  Let's go to the next text message that you sent to Mr. Combs.  And just to orient, would you agree with me, this is March 8, 2019, so approximately -- I know it's not perfect -- but approximately just a week short of two months after the nightmare R Kelly text, is that fair?

A.  Yes.

Q.  All right.  Can you read this to the jury what you wrote to Mr. Combs?

A.  Just sending you all the love in the world.

Q.  With a what type of emoji?

A.  Oh, a heart emoji.

      (Continued on next page)

P62KCOM2                        Mia - Cross

BY MR. STEEL:

Q.  And you were not under the grip of Mr. Combs at that time, right?

A.  No, I still was.

Q.  Why?

A.  Psychologically, also Puff used to be my protector.  Also, these were based around after tragic events that happened in his life.  And, again, I don't know how to explain the psychology behind it.

Q.  Why can't you explain your thoughts?  You keep relying, it seems, like on psychology.  What about what you would do?

        MS. SMYSER:  Objection.

        MR. STEEL:  Okay.  I'll rephrase it right now.

        THE COURT:  Okay.

        MR. STEEL:  Thank you.

BY MR. STEEL:

Q.  Explain to the jury, if you can, why are you reaching out to Mr. Combs telling him this --

A.  Because --

Q.  -- I'm sorry, with all the love in the world, heart emoji, when you had nothing to do with him?

A.  Because he had just -- there were -- because Kim had just passed away, and I felt horrible for him.

Q.  Ma'am, that tragedy occurred — that death, that unexpected death — occurred five months earlier.

P62KCOM2                         Mia - Cross

MS. SMYSER:  Objection.

THE COURT:  That was a statement.  So, do you have a question?

BY MR. STEEL:

Q.  Is that true?

A.  Yes, it's true.

Q.  So you go to, the person who has terrorized you, the funeral of his significant other mother of his children, in November of 2018, right?

A.  Yes.

Q.  But it's five months later, and you are having thoughts that he's your savior, and you just reached out unilaterally --

MS. SMYSER:  Objection.

Q.  -- to send you all the love in the world?

THE COURT:  We've got to finish the question, and then we'll get an objection.

That question does need to be rephrased, Mr. Steel.

BY MR. STEEL:

Q.  Can you explain, besides just saying psychology, why you are reaching out to Mr. Combs when you painted this picture for the jury how he has ruined your life?

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

THE WITNESS:  Why was I reaching out?  Because I don't believe five months is really that long to get over -- I feel

that's a lifelong tragedy to recover from.  And these were specific dates.  I don't remember why, that something would have happened, for me to reach out.  The version of Puff that did treat me like the best friend, I did love that dude.  He protected me from the other versions of themselves.  And I didn't understand what happened to me until these -- until recently, as he was still being praised by everybody in the world.  So how would I have known?

Q.  You know because you told the jury that Mr. Combs suffocated you?

MS. SMYSER:  Objection.

THE COURT:  It's overruled.

THE WITNESS:  I'm sorry, what was the question?

BY MR. STEEL:

Q.  You know -- you're saying I didn't know -- I don't know, actually; I don't want to speak for you.

What didn't you know?  What didn't you understand, according to your testimony, that Mr. Combs was brutal to you, according to you?  How did that not make sense until more recently?

A.  Because I was --

MS. SMYSER:  Objection; it's argumentative, your Honor.

THE COURT:  It's overruled.

THE WITNESS:  I'm sorry, how did I not know what?

P62KCOM2                     Mia - Cross

BY MR. STEEL:

Q.   Okay.  Let's --

          THE COURT:  Mr. Steel, let's have a very brief

sidebar.

          (Continued on next page)

P62KCOM2                    Mia - Cross

(At sidebar)

THE COURT:  So, these questions need to be cleaned up because you're drawing valid form objections to these questions, and so you're going to keep drawing them, and then I'm going to have to keep telling you to rephrase the question. So just be mindful of that, because I understand the line of questioning and why the defense believes it's relevant. However, there are some times where there are statements, there are other times when there are multiple questions, and the witness is having a hard time following what you are exactly asking her.  So if you can just clean it up a little bit, then you can proceed very swiftly through this, and move to the next topic.

MR. STEEL:  Thank you.

THE COURT:  All right.

MR. STEEL:  Can we step back?

(Continued on next page)

P62KCOM2                         Mia - Cross

(In open court)

BY MR. STEEL:

Q.  Do you see on the next page, 7 of 12 of this exhibit --

A.  Yes.

Q.  -- can you see it's March 8th of 2019?  Is that true?

A.  That's true.

Q.  And that's the same date as the last text message you sent to Mr. Combs, just sending you all the love in the world heart emoji, right?

A.  Correct.

Q.  Can you read to the jurors what you wrote to Mr. Combs on the same date?

A.  Speaking of, you should watch Love on Netflix.  Judd Apatow created it.  It's superbad-esque funny.

Q.  The next post you made is the 15th day of December, 2019 — when I say post, text message to Mr. Combs — is that true?

A.  Correct.

Q.  And can you tell the ladies and gentlemen of the jury what you wrote?

A.  Sending you and the family love and prayers today.

Q.  With a heart emoji?

A.  With a heart emoji.

Q.  Just reaching out to Mr. Combs, right?

A.  Kim's birthday.

Q.  Say again?

A.   It was Kim's birthday.

Q.   And then the next page, which should be 1733, the fourth page, do you see it's New Year's Eve, December 31, 2019?

A.   Yes.

Q.   And you sent to Mr. Combs that attachment; is that true?

A.   That's true.  Someone was sending it to me over and over again asking me to forward it to him, so I did.  It was for children with cancer.

Q.   The next reach-out you made to Mr. Combs was on the same day, New Year's Eve, right?  Or, actually, that's just the metadata.

          Going to the next page, which is page 5 of this exhibit --

A.   Page 5?

Q.   It should be on your screen, on the top.

A.   Oh, okay.  Yes.

Q.   May 14, 2020 now, right?

A.   Yes.

Q.   So you had been gone from Mr. Combs' employment for three years, just three years and two months, approximately, true?

A.   True.

Q.   And you texted Mr. Combs on May 14, 2020?

A.   Yes.

Q.   Can you read it to the jury?

P62KCOM2                        Mia - Cross

A.   Puff, my heart is broken about Dre, and I have spent all week praying and crying for you as well.  I hope you know I love you so much, and I will always be here for you in every capacity.  I was fortunate enough to have Dre in my life because of you, and in my spirituality, I know when people are done with the physical world, it is because they are finished with their mission of teachings to who is supposed to pass it along.  You are one of the most influential people on the planet — a master — and he will live on through you forever, to continue on his message.  I know this is excruciating, and, again, it might be small, but I will always be there for you. I love you.

Q.   The next one is August 29, 2020.

        Do you see that?

A.   Yes.

Q.   And what did you write to Mr. Combs?

A.   Thinking of you since I heard about Chad Boseman and our sick James Brown auditions.

Q.   Tell the ladies and gentlemen what that's about.

A.   Chad Boseman passed away, and we had done this -- I don't know how to explain it.  He was auditioning for this role for the James Brown movie that Chad Boseman got, and, essentially, he put on his own production that was -- or we put on his own production for, like, a week, and it was really intense.  Yeah, that's it.

P62KCOM2                          Mia - Cross

Q.   And Mr. Combs responded to you:  How are you, with a question mark.  Yeah, life is crazy.

Is that true the same day?

A.   True.

Q.   And then Mr. Combs responds to you the same day, the next page:  Who has that tape?  I need a copy.  Laugh out loud, or LOL.  SHI was fun.

Do you see that?

A.   Yes.

Q.   Do you know what he's talking about?

A.   Yes.

Q.   Can you tell the ladies and gentlemen of the jury?

A.   The tape of his James Brown audition.

Q.   What did you respond on the same day?

A.   I was just going through my computer this week randomly, and I have so many videos, things I thought I lost.  I'll buy a hard drive and toss them over and mail it to you.

Q.   So, when you say that you were going through your computer, your videos, we live in an age, and you specifically when you were with Mr. Combs lived in an age, that things were recorded, true?

A.   True.

Q.   And you used to, in fact, carry around like a little video recorder with you at times, right?

A.   He required me to carry around a flip cam before he had

P62KCOM2                     Mia - Cross

full-time videographers back in whatever technology era that was pre-iPhones, correct.

Q.   And you knew how to use it, right?

A.   Yeah, I think so.

Q.   And you used it, right?

A.   Yes, I was required.

Q.   And you would save the data or the visual or the audio, fair?

A.   Did I -- I put -- yes, whatever was required of me to keep for him.

Q.   And you would also do that with -- like everyone can with their iPhones, right, or whatever type of phone they choose, once it had cameras and videos, right?

A.   I'm sorry, what?

Q.   You had capability of carrying around your phone with you, right?  You had a cell phone?

A.   I did have a cell phone.

Q.   And it could record, right?

A.   My iPhone could record once we got those.  I guess maybe my BlackBerry could, but...

Q.   So my question is:  Do you have any recording of Mr. Combs berating you?

          MS. SMYSER:  Objection.

          THE COURT:  Overruled.

          THE WITNESS:  No.  I would not have been allowed to

film that.  I was filming whatever he wanted me to film.

BY MR. STEEL:

Q.  But did you ever just put on your iPhone recorder to capture Mr. Combs in a moment of rage, like you described to the jury?

A.  Absolutely not.

Q.  Do you have any text message that you sent to a friend or family member of what was going on, according to you, that Mr. Combs was somehow berating you, being violent to you, humiliating you?  Do you have anything like that?

MS. SMYSER:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I would -- like I said before, I never told anybody outside, and I -- I never would have -- no, that would have been a huge break of trust, loyalty, and confidentiality.

BY MR. STEEL:

Q.  How about getting out the truth, though, preserving the truth?  My question is:  Do you have any of those in a text message form?

A.  In a text message form?  I think that they showed a text message on my direct.

Q.  Well, we'll -- what was the text message?

A.  It was Puff telling me, like, fuck everything, let's go to war, like that.

Q. I'm sorry, I didn't mean to interrupt you.

A. No.

Q. Are you done?

A. Sure.

Q. My question is different. Do you have anything where you contemporaneously wrote to a friend, a family member, police officer, anybody, and said this is what's going on, I'm being assaulted, berated, anything?

A. No. I -- the only time I reached out for help was very subtly to people in the office, but not disclosing things that other people hadn't witnessed. No, I would never.

Q. All of these messages are positive; would you agree with me?

A. Yeah.

Q. Showing almost a loving relationship from you to Mr. Combs, true?

A. Loving -- I'm sending him -- I'm sending him support and love, yes.

Q. Let's look at the next -- it's August 29, 2020. Do you see that?

A. August 29th?

Q. Yes. 2020.

A. Yes.

Q. At the bottom of that screen?

A. Yes.

Q.   Can you read to the jurors what you wrote to Mr. Combs?

A.   Life is fucking insane, and, supposedly, it all happens --

Q.   Just go a little slower.

A.   Okay.

Q.   Thank you.

A.   Life is fucking insane, and, supposedly, it all happens for a reason, in order to elevate us in our human experience, but it's rough.  I've been tapping into spirituality a lot lately, and it really makes shit make sense.  I've also been thinking about you so much and feeling your pain.  And just so you know, I love you with all my heart, and I'm still here for you forever.  We have so many hilarious ass memories and stories. OMGGGG.  I'll send you the videos and even random notes I have in my phone titled like, quote-unquote, funny shit, Puff said.

Q.   Do you have any random notes in your phone talking about being brutalized by Mr. Combs?

           MS. SMYSER:  Objection.

           THE COURT:  It's overruled.

           THE WITNESS:  I don't know.  I don't think so.

BY MR. STEEL:

Q.   How would we find out?

           MS. SMYSER:  Objection.

           THE COURT:  Sustained.

BY MR. STEEL:

Q.   Did you ever produce any random notes showing that

P62KCOM2                    Mia - Cross

Mr. Combs was anything but professional with you?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

BY MR. STEEL:

Q.  Do you have any notes that you made showing anything that Mr. Combs was nothing but professional?

MS. SMYSER:  Objection.

THE COURT:  That needs to be rephrased.

BY MR. STEEL:

Q.  Do you have any notes, like you did here, like you memorialized here in this text message, that Mr. Combs was violent towards you?

A.  I don't know.  I don't think so.  I would never have -- I don't think so.  I mean, Puff used to make me follow him around and write down all the funny stuff he said that day.  That's why I have stuff like that.

Q.  Mia, didn't you have time away from Mr. Combs where you could write a note to yourself — today, he sexually assaulted me, God forbid?

A.  No.

MS. SMYSER:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I did not -- did you ask me if I had time away to write that?

BY MR. STEEL:

Q.  Of course that's my question.

A.  No, I did not, and I would not have.

Q.  Mr. Combs responds to you -- I'm going on the next series of the same conversation, if you don't mind, and it's on page 7 of 1733, 1733R.  This is Mr. Combs responding to you on the same date, correct?  It's 8/29, which is August 29, 2020?

A.  Correct.

Q.  And he wrote to you:  I love it.  Glad you're well.  Love, with a period.  Please send me all of the footage.  Cause we're working on our doc.  And know that I only remember the good times.  Love you.  Want you to know that.

       You see that?

A.  I do.

Q.  And what's the doc?

A.  I'm not sure what -- he said he's working -- we're working on our doc.  So, this is --

Q.  A documentary, does that sound right?

A.  Oh, yes, he's working on a documentary, but I don't know anything about it.

Q.  And Mr. Combs let you go from your employment, right?

A.  Again, that was really -- I don't know if he let me go.  I don't really know what happened.

Q.  You were separated from your employment, fair?

A.  Yeah, I got a notification, and, once again, I took it as

P62KCOM2                         Mia - Cross

such, but then I was called back, so it was very confusing, but, yes, I was no longer working there.

Q.   But he says he'll only remember the good times.

You see that?

A.   Yes.

Q.   Now, did you respond to him:  You know, it's 2020.  The #MeToo movement has been strong for approximately two and a half years, and you should remember what you did to me?

Did you say that?

MS. SMYSER:  Objection.

THE COURT:  Mr. Steel, can you rephrase the question?

MR. STEEL:  Yes.

BY MR. STEEL:

Q.   When Mr. Combs wrote to you, I only remember the good times, why didn't you respond, well, I remember the bad times?

A.   Sorry.  Why didn't I say that?  Because that would have -- I would have never responded that way.

Q.   Because it's not true; is that true, Mia?

MS. SMYSER:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry, what was the question?

BY MR. STEEL:

Q.   Your testimony and statements that it was -- you were the victim at the hands of Mr. Combs' brutality and sexual assaults is not true, is it?

A.   I have never lied in this courtroom, and I never will lie in this courtroom.  Everything I've said is true.

Q.   Let's see what you wrote in response to Mr. Combs.  This is, again, just to orient the jurors.  It's August 29, 2020, and you're responding at 8:42, but it's minus seven UTC time.

So, can you read what you wrote to Mr. Combs in response to his writing to you, send me all the footage, and we're working on our documentary, I only remember the good times, love you, want you to know that.

A.   Love you, too.  And the only things to remember are the good times and --

Q.   Can you just go slower?

A.   Oh, sorry.

Love you, too.  And the only things to remember are the good times, and those are the only memories I have!!  Ha ha ha, like fucking hysterical ones!  I'll send you everything I've got!  I remember even before you had videographers with us, I carried around the little iVid thing.  I found those, too.  Completely forgot about them.  So many magical hilarious things, like drinking 1942 on the Parrot Cay Beach and champagne under the Eiffel Tower at 4:00 a.m. in the dark; and singing with Jimmy at Interscope; and Mick Jagger trying to take me home, but I ran away; and Ibiza caves, where I got a seven-inch scar; and Hawaii 5.0, when you punched that dick fuck for talking shit to me; and launching Revolt; and that

random underground Baccarat game where Jlolo wouldn't pay out and I stayed only, and you won 650 grand, and that little prick ran away from me, and Leo grabbed my pink bedazzled BlackBerry, and you said that Titanic mother fucker doesn't know shit. He won 10K, I won 650K. Ha ha ha. Gosh, there are trillions of stories that are amazing. Of course I'll send it to you. And also...what documentary without me?? I will say I reflect back, and I know I did really fucking great with Can't Stop Won't Stop. I was just bamboozled by Heather because I didn't realize how shitty people could be, and I believed everyone was good. But you taught me so much, and I appreciate that! But I have all of your doc stuff — remember the scrapbook I made you of every time you had ever been mentioned in the press from day one until ultimate fame? Just thought about that — I've got you.

Q. When you said in this message to -- communication to Mr. Combs — it's in the fifth line up from the bottom, starting in the center — I was bamboozled by Heather because I didn't realize how s-h-i-t-t-y people could be, and I believed everyone was good -- you see that?

A. Yes.

Q. -- why didn't you say, and, Mr. Combs, you bamboozled me as well?

A. Because I was still brainwashed.

Q. Who brainwashed you, Mia?

P62KCOM2                      Mia - Cross

A.   Puff.

Q.   How did he brainwash you into thinking that it's okay to be woken up from your slumber with a man's private part being inserted into your person without permission?

          MS. SMYSER:  Objection.

          THE COURT:  Sustained.

BY MR. STEEL:

Q.   How did he bamboozle you to believe it was okay when you were orienting different items in a closet?

          MS. SMYSER:  Objection, your Honor.

          THE COURT:  That's sustained.

BY MR. STEEL:

Q.   How did he bam -- why didn't you write how he — how he — was one of the people that caused you to believe that not everyone was good?

A.   Because I was brainwashed.

Q.   That's your answer?

          MS. SMYSER:  Objection.

          THE COURT:  That's sustained.

BY MR. STEEL:

Q.   What does brainwashed mean?

          MS. SMYSER:  Objection.

          THE COURT:  That's overruled.

          THE WITNESS:  Brainwashed meant I was in an environment where the highs were really high and the lows were

P62KCOM2                        Mia - Cross

really low, which created a huge confusion in me trusting my instincts.  I was punished whenever Puff would be violent or -- and I would react, therefore, again, confusing me and making me believe I had done something wrong, and then I would try so hard to get back to that good space.  And I'd work harder and be nicer, and nobody around batted an eye.  He was still praised by everyone around him and the public.  Again, I felt like I had done something horrifically -- like I had betrayed him in some way by going to mediation, and I felt horrible about it, like, again, I had done something wrong.  And I was always constantly seeking his approval.  He was my authority figure, the only authority figure.

THE COURT:  Mr. Steel?

Q.  Are you finished?

A.  Sure, yes.

Q.  You had not been with Mr. Combs on the date that you wrote this text message for approximately three years and five months.  Do you realize that?

A.  Correct.

Q.  And it is also approximately three years after you told the jurors that the #MeToo movement went viral, right?

A.  I guess.

Q.  October 15, 2017, and this is August 29, 2020, so just under, two months shy, of the #MeToo movement going viral, according to what you said, right?

P62KCOM2                        Mia - Cross

A.   One that he was --

          MS. SMYSER:  Objection.

          THE COURT:  That's overruled.  I think you can
rephrase that question, Mr. Steel.  Sorry, sustained.
Rephrase.

BY MR. STEEL:

Q.   You were aware of the #MeToo movement for years by
August 29, 2020, right?

A.   One that he was not affected by, correct.

Q.   Well, what does that mean?

A.   He was not affected by it.

Q.   I can't understand -- can you elaborate more?  For you?

          THE COURT:  No, hold on.  Mr. Steel, why don't you ask
a new question and rephrase it in a way that the witness can
understand.  Thank you.

BY MR. STEEL:

Q.   My question to you is:  You were aware of the #MeToo
movement for years by this time that you wrote this?

          MS. SMYSER:  Objection.

          THE COURT:  That's overruled.

BY MR. STEEL:

Q.   Isn't that true?

A.   I'm, sorry, can you repeat the question?

Q.   Yes.

          By August 29th of 2020, you were already aware, for

P62KCOM2                        Mia - Cross

years, of the #MeToo movement, right?

A.  Correct.

Q.  And you told the ladies and gentlemen of the jury one of the reasons you did not outcry earlier was because there was no #MeToo movement around when you worked for Mr. Combs, right?

MS. SMYSER:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I was saying back then there was no #MeToo movement, there was no social media, there was no mental health awareness -- sorry, social media as though it is today. Every adult that I reached out to within this organization or the people that witnessed what happened to me, nobody acted like what was happening to me was wrong.  And his threats about that he was going to tell Cassie what happened made me internalize, blame, and shame.

Q.  All right.  Let's talk about that for a minute.

Who threatened to tell Ms. Ventura about Mr. Combs supposedly sexually assaulting you?

A.  Puff.

Q.  So your testimony before this jury is that Mr. Combs told you — threatened you is your word — that, hey, I have a mind to tell Ms. Ventura that I sexually assault you?

MS. SMYSER:  Objection.

THE COURT:  It's overruled.

THE WITNESS:  That was not his wording.  He threatened

P62KCOM2                     Mia - Cross

to tell Cassie everything, quote-unquote.

BY MR. STEEL:

Q.  I can't hear you.

A.  The words you used were not the words he used.  He threatened -- continue.  Sorry.

Q.  No, no.

THE COURT:  No, Mia, you finish your answer, and then Mr. Steel will get the next question.

THE WITNESS:  The words that you used were not his words, but he threatened to tell Cassie, quote-unquote, everything, which made me feel like I had done something wrong. I don't know how to explain what that does to a person.

BY MR. STEEL:

Q.  Are you finished?

A.  Yes.

Q.  Why didn't you respond by saying, great, let's tell everyone what happened when you violated me?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

BY MR. STEEL:

Q.  Why didn't you respond by saying, absolutely, tell Ms. Ventura and everyone else, that would be great?

MS. SMYSER:  Objection.

THE COURT:  That's sustained, and let's move on.

P62KCOM2                      Mia - Cross

BY MR. STEEL:

Q. By 2020, August 29th, you knew, according to you what you said earlier on direct examination, that you have a moral obligation to speak up. Do you remember saying that to the jury?

MS. SMYSER: Objection.

THE COURT: That's overruled.

THE WITNESS: I now have a moral obligation, yes.

BY MR. STEEL:

Q. Why didn't this moral obligation happen in 2017?

A. You said why did it?

Q. Didn't it?

A. Why didn't it?

Q. Yes. Why didn't you have the moral obligation to say, this is my experience with Mr. Combs?

A. Because I was terrified, and I was brainwashed.

Q. Why in 2018 didn't you have the moral obligation to come forward and make these allegations against Mr. Combs, that he had sexually abused you?

MS. SMYSER: Objection.

THE COURT: It's overruled.

THE WITNESS: The same reason.

BY MR. STEEL:

Q. Why in 2019? It's the same question.

THE COURT: That's sustained. Next question.

Q.   When did the moral obligation come to your mind that you need to say this information that you are putting forth, that Mr. Combs violated you in a sexual manner and other ways?

A.   When I started witnessing him being held accountable for his actions and being told what happened to me was wrong.

Q.   When was that?

A.   When -- it began, I guess, when it all came out in the media and he was being held responsible.

Q.   That's when you first said me too?

A.   No, that's not the first moment I did.  It's been a long process.  Again, I'm still untangling these things.  I'm in therapy.  Like, there's a lot of support I've been given that I didn't have or know what to do with before.

Q.   Mr. Combs responds to you, on the bottom of that page, 1733, page 7, same date, August 29, 2020, 9:02 minus 7 for UTC time:  I gotta find that.  You got a copy.

     You see that?

A.   I see that.

Q.   You know what that's referring to?

A.   I don't remember what I just wrote in the text...

     I'm guessing he means the James Brown or any of these videos.

Q.   How about the scrapbook that the ladies and gentlemen of the jury saw?

A.   I didn't think that was -- or maybe it was.  I'm not sure.

I got to find that.  You got a copy in this page I'm just glancing at?  I'm trying to interpret.  I'm not sure.  I guess so.

Q.  Let's go to page 8 of 1733.  And you respond, August 29, 2020?

A.  Oh, yeah.

Q.  Can you read to the ladies and gentlemen of the jury what you wrote to Mr. Combs?

A.  I think I have PDFs of everything somewhere that will take me a minute to organize — I think I gave it to you for a Bday at your house on Mapleton.

Q.  Mia, I don't mean to interrupt.  Can you just read slower?

A.  Sure.

I think I have PDFs of everything somewhere that will take me a minute to organize — I think I gave it to you for a Bday at your house on Mapleton if that helps locate it?  Also remember, I customized that purple leather suit a~la Eddie Murphy so you could walk down Sunset Boulevard not giving an F. If y'all can't find it, I'll put it together again.

Q.  And you're talking about the scrapbook, right?

A.  Yes, but I don't believe I did.

Q.  You don't believe you did what?

A.  I don't believe that I ended up putting it back together.

Q.  That's fine.

But you're clearly speaking about the scrapbook

P62KCOM2                     Mia - Cross

birthday present?

A.   Oh, yes, yes, yes.

Q.   And that's the one that the ladies and gentlemen of the jury were shown that you prepared, right?

A.   Those were the three copies of it, yes, that you showed, mm-hmm.

Q.   And you kept, potentially, a PDF of them, right?

A.   I just saw it probably in my email somewhere because I forwarded things that were sent to me to, like, be able to organize.  I just assumed I probably had it somewhere in an email or on a drive somewhere.

Q.   Mia, if you're able to forward things to you while working for Mr. Combs, why didn't you forward any proof that you were in any way violated?

         MS. SMYSER:  Objection.

         THE COURT:  Sustained.

BY MR. STEEL:

Q.   Mr. Combs wrote back to you at the bottom of that exhibit: Thanks.  I'ma look also.

         Do you see that?

A.   Yes.

Q.   And that was two days later, just for the record, true?

A.   That's true.

Q.   I'd like you to go to tab, which is 30, but it's 1730 is the exhibit.

MR. STEEL:  And, your Honor, with the Court's permission, may this be displayed as 1730R, but you've already admitted it, for the sealed record, 1730 as well.

THE COURT:  All right.  You may proceed.

BY MR. STEEL:

Q.  Now, Mia, this is April 25 of 2019; fair to say?

A.  Yes.

Q.  And it's 1:10 in the morning, so it's an hour after midnight, right?

A.  That depends where I was.

Q.  Okay.  And this is written to Mr. Combs by you, right?

A.  Correct.

Q.  Can you please read this to the jury?

A.  Hey, Puff.  Heart emoji.  Thinking about you forever and as always.  Just wanted to send you the biggest gust of love and happiness and thankfulness for coming to my hometown and changing the dynamic of what happens here during, quote-unquote, beach week and, instead, making it a festival of love and togetherness.  I can't explain to you how much all thousands of my friends are so excited for this weekend and how the conversation has already changed into positivity.  Unfortunately, I just found out today that my grandma went into hospice and has maybe a day or two to live, so I just booked a flight out at 5:00 a.m. to hug her goodbye.  Otherwise I would be here and witness y'all make history.  Heart emoji.  Love you

P62KCOM2                        Mia - Cross

so much and thank you for this historic moment.  Can't believe after almost a decade with y'all.  I miss this beautiful combination of all the people I love that I grew up with and the people I love that helped me grow up (y'all.)  But as they say, c'est la vie.  Now go and do as you do best and fucking crush it and make history, heart emoji, heart emoji, heart emoji, heart emoji.

Q.  And this -- sorry about your -- deepest sympathies about your grandma.

A.  Thanks.

Q.  This beach week, can you explain that to the jury, what you're talking about?

A.  I'm from Virginia Beach.  They had a week called beach week that I believe there was some horrible things that police had done historically to Black people.  Pharrell decided to start have a festival there — we had never had a festival like that — to shift the conversation around beach week, which I guess is a spring break for colleges, maybe.  And so everybody that I grew up with was going, and, yeah, Puff was in the lineup.

Q.  And you explained that Mr. Combs' presence already makes this a positive environment.

You see that?

A.  Yeah.

Q.  And that he brings love and togetherness?

A.  Yes.

P62KCOM2                    Mia - Cross

Q. And you are disappointed that you won't be able to see him in person, right?

A. Well, that's what I'm saying, but, yes.

Q. Well, isn't it true?

A. No.

Q. Why isn't that true?

A. Because I did not want to.  I just was saying that.

Q. I can't hear you.

A. I did not want to.  I was just saying that.

Q. Mia --

A. Yes.

Q. -- who made you write this text message to Mr. Combs?

          MS. SMYSER:  Objection.

          THE COURT:  It's overruled.

          THE WITNESS:  Nobody.

BY MR. STEEL:

Q. Why would you lie in this text message that I wanted to see you, but you really didn't want to see Mr. Combs?

A. Because I didn't want to seem -- I don't know -- it provided me with, like, safety, I guess.  I didn't want to let him know -- I had never said something direct and mean to him before in my life.  I wasn't going to start.

Q. Why write this at all if you didn't want to see Mr. Combs?

A. Because he was going to be in my hometown, which, again, doesn't get that sort of -- I believe that I would have been,

P62KCOM2                           Mia - Cross

like, almost expected to be there.  That's all.

Q.  When did Mr. Combs ever expect you to be anywhere after you left his employ in March of 2017?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

BY MR. STEEL:

Q.  Would you agree with me that all of these messages that the jurors have heard that you authored, everything is positive and loving from you to Mr. Combs?  Would you agree with that?

A.  Yes.  Of course.

Q.  Let's look at it is behind your tab 31, but it's Exhibit 1731.  With the Court's permission, it will come up on your screen.

Do you see that?

A.  Yes.

Q.  And FB, do you know what FB -- Frank Black?

A.  Frank Black?  I did not have him in my phone as that, but, sure.

Q.  That's Mr. Combs; is that fair to say?

A.  Yes.

Q.  I'm sorry, I didn't mean to interrupt you.  Were you saying something?

A.  No, it's just, like, I don't memorize phone numbers, but if you said FB is Frank Black, yeah.

Q.  Can you read to the jury what you wrote?

P62KCOM2                    Mia - Cross

And just to orient everyone, this is now July 30th of 2022, correct?

A. Correct.

Q. And what did you write to Mr. Combs?

A. Hey, saw our doc on Netflix Top Ten. Congrats! Miss you.

Q. And doc, again, is the same thing, documentary?

A. Yes.

Q. All right. And then Mr. Combs says: Love, love, love, with an exclamation point?

A. Yes.

Q. And your response again?

A. And I love, love, love you.

Q. Let's go to the next tab, which should be about 32, if you don't mind. That is Exhibit 1732 that will come up on the screen as 1732R, with the Court's permission, and this is, again, you and Mr. Combs in a conversation, or text conversation, true?

A. Yes.

Q. And this is December 28, 2022?

A. Yes.

Q. Can you read what you wrote to Mr. Combs?

A. Happy holidays. I hope it's filled with love and happiness and every dream you've ever had! Tell your family and crew I love them. Heart emoji XOXO.

Q. And Mr. Combs wrote back: I'm great. Sending you life and

P62KCOM2                          Mia - Cross

love, true?

A.   True.

Q.   And you wrote?

A.   I guess I hearted it.

Q.   Okay.  Now, this is the person that you did not want to see in 2019, when coming to Virginia Beach to perform; that's what you're telling the jurors, right?

A.   Correct.

Q.   You just keep on this communication with this man who you are terrorized -- excuse my language --

          MS. SMYSER:  Objection.

Q.   -- terrified of, right?

          THE COURT:  Why don't we get a fresh question.

          MR. STEEL:  Okay.

BY MR. STEEL:

Q.   You're telling the jury that you can't see Mr. Combs, which you wrote in Exhibit No. 1730, is a lie, you did not wish to see him because you were scared of him, right?

          MS. SMYSER:  Objection.

          THE COURT:  That's sustained.

BY MR. STEEL:

Q.   Years later, you're still communicating with Mr. Combs, true?

A.   True.

Q.   Even though you're telling the jury that you couldn't --

P62KCOM2                         Mia - Cross

didn't desire to see him because you were scared of him; is that true?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.  I think it needs to be rephrased.

BY MR. STEEL:

Q.  You hold your position, Mia, that you were scared to see Mr. Combs; is that true?

A.  True.

Q.  And when I say "your position," I'm referring to now year 2022.  That's your position, right?

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

THE WITNESS:  I'm sorry, the -- what was the question?

BY MR. STEEL:

Q.  From 2019, when you told the jury that you were scared to see Mr. Combs, that same feeling is December 28, 2022, right?

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

THE WITNESS:  Yes.

BY MR. STEEL:

Q.  That's the same position that you're maintaining throughout your time with Mr. Combs, right?

MS. SMYSER:  Objection to the form, your Honor.

THE COURT:  That's sustained.

BY MR. STEEL:

Q.  Is that how you felt the entire time that you were with Mr. Combs?

A.  Is -- sorry, is --

Q.  Being scared of him.

A.  Is being scared of him?

Q.  The way you felt the entire time of your relationship with Mr. Combs.  That's my question.

A.  I was scared of him when he was scary, yes.

Q.  Now, I'd like you to listen to, privately, with the Court's permission, Exhibit No. 1750.  And tell me if you recognize this, and if it's accurate to what it depicts.

MR. STEEL:  Your Honor, can a computer be handed up to the courtroom deputy?

THE COURT:  It may.

MR. STEEL:  And headphones?

(Pause)

THE COURT:  All right, Mr. Steel.

MR. STEEL:  Thank you, your Honor.

BY MR. STEEL:

Q.  Mia, do you recognize what you just listened to and watched that has been marked as Mr. Combs' 1750?

A.  Yes.

Q.  And is it true and accurate?

A.  Yes.

P62KCOM2                    Mia - Cross

MR. STEEL:  Your Honor, can I ask the Court to consider moving into evidence 1750, but then that's under seal, I understand, and then there's also 1750R.

THE COURT:  Ms. Smyser?

MS. SMYSER:  Your Honor, we would object.  The proper basis for admission has not been established here.

THE COURT:  Let's have a very brief sidebar.

(Continued on next page)

(At sidebar)

THE COURT:  So you don't believe that this is -- that they've made the case that this goes to impeachment?

MS. SMYSER:  Correct, your Honor.

THE COURT:  What I heard, prior to us starting today, is that it goes to demeanor, meaning it shows a different demeanor than the witness has here on the stand.  And, so, why wouldn't that be sufficient, at least for admissibility purposes, and then, obviously, you can address it on redirect?

MS. SMYSER:  Speaking first to demeanor, your Honor, I think that the defense was speaking about her direct examination when she was looking down talking about the most traumatic things that had ever happened to her.  She has been more direct in responding to questions.  She has looked up and been more forceful when she's not talking about sexual assaults and violence that Mr. Combs committed against her.  So I don't think there's any basis to impeach on her demeanor.

And there's also no basis to impeach on her statement.  She hasn't said she's scared -- she was scared of him at all times, for example.  She's established this is how -- the defense has established this is how she talks to him, and these repeated text messages and social media posts, it's very cumulative, your Honor, at this point.

THE COURT:  Well, I take your point on it being cumulative.

P62KCOM2                    Mia - Cross

So, let me hear the response on impeachment, and then why isn't this cumulative, given everything that we've seen, including even text messages that go into 2022, at this point?

MR. STEEL:  Because this is a different type of means of her communication.  As the Court may remember, she's extremely positive, energetic, forward, loving, and it's different than a written word and I thought you'd ruled on already this morning.  It's the same objection.  This is a totally different piece of evidence, and it's --

THE COURT:  Other than putting the video in, what questions are you --

MR. STEEL:  I'm going to say this is accurate.  I've already established that.

THE COURT:  And you are going to establish the date on the video?

MR. STEEL:  Of course, of course.

THE COURT:  Why don't you establish the date on the video, and then it can be admitted.

MR. STEEL:  Thank you.

MS. SMYSER:  Your Honor, she's established that she's positive and loving, and her tone, when she's spoken about these text messages on the stand, has been very bubbly.  We don't think that they have shown that there's impeachment here.

THE COURT:  Understood.  The objection is overruled.

(Continued on next page)

P62KCOM2                          Mia - Cross

(In open court)

BY MR. STEEL:

Q.  Do you remember --

THE COURT:  One second.

(Pause)

THE COURT:  Mr. Steel, why don't we finish up with this exhibit, and then we'll take a short break.

Mr. Steel, you may proceed.

BY MR. STEEL:

Q.  Do you remember, in this exhibit, 1750, making this for Mr. Combs' 44th birthday?

A.  Yes.

Q.  And that date would have been November 4th of 2013, true?

A.  True.

MR. STEEL:  Your Honor, I move for the admission of Mr. Combs' 1750 for, as I understand the rule, under seal, but then 1750R, as well.

THE COURT:  It will be admitted on that basis.

(Defendant's Exhibits 1750 (Sealed) received in evidence)

(Defendant's Exhibits 1750R received in evidence)

MR. STEEL:  Can we display, your Honor?  Is that okay?

THE COURT:  You may.

(Video played)

MR. STEEL:  Thank you, your Honor.

P62KCOM2                        Mia - Cross

THE COURT:  All right.

Mr. Steel, next question.  Do you have anything else on this exhibit?  Otherwise, we'll take a break.

MR. STEEL:  What I told the Court, it's fine.

THE COURT:  All right.

Members of the jury, we're going to take a short break.  We'll be back in ten minutes.  So let's say 10:50 a.m.

All rise for the jury.

(Continued on next page)

P62KCOM2                          Mia - Cross

THE COURT:  Thank you.

We'll be back at 10:50.

(Recess)

(Continued on next page)

P62sCOM3                    Mia - Cross

THE COURT:  Let's come back.

MS. COMEY:  Your Honor, I have one issue to raise before the witness comes back, if that's all right.

THE COURT:  All right.

MS. COMEY:  Thank you, your Honor.

I wanted to expand our record on our 403 and, at this point, 611 objections to a number of questions and number of exhibits with respect to this witness.

At this point, we have been objecting and we have had a number of those objections overruled to questions, to exhibits, and this morning, to turning over private correspondence of this victim to her abuser's attorneys.

At this point, we have now sat through hours of a humiliating cross-examination for this witness, and I just wanted to put it on the record, because I don't know that the transcript will really do it justice, Mr. Steel has yelled at this witness, Mr. Steel has been sarcastic with this witness, Mr. Steel has been argumentative with this witness by injecting his own views about her testimony, calling it her position, saying things like "God forbid" after repeating things that she has said on the stand, saying things that suggest to this jury that she is lying, that he believes that she is lying through his questioning, making statements instead of questions.

And meanwhile, throughout that whole tone and approach to this cross, this witness is having to pick apart social

P62sCOM3                      Mia - Cross

media post, after social media post, after social media post, which individually, have virtually no probative value.  And I understand that individually, your Honor has found that, one by one, looking at these in isolation, there is very minimal prejudice.

But at this point, in the context of this cross-examination and the collective totality of all of these exhibits that have been allowed in, we are crossing the threshold into prejudice and into harassing and unduly embarrassing this witness under Rule 611.

That's the record that I wanted to make.

In particular, the concern is that, given the tone of the questions, the number of exhibits that have nothing to do with her credibility and that are only cumulative, we don't think it's appropriate to allow this line of cross-examination with this victim, who has carried herself with remarkable dignity and grace throughout the cross-examination.

I also wanted to note that, some of what your Honor has said, understandably, in making the rulings on one exhibit at a time and this morning in ruling that the victim would have to turn over her communications to defense counsel, is that there is no real apparent prejudice.  I just wanted to note that, in addition to the prejudice of adding to the trauma of this victim having to testify at this trial, there is a broader prejudice that eyes are on this trial and victims in other

P62sCOM3                      Mia - Cross

cases are going to see how victims in this case are treated. And they are going to see what level of privacy, respect, and dignity they would get if they decided to testify.

And so our concern is that, if this victim is not protected from further harassment, that it will deter other victims in other cases from saying, yes, I will testify and I will tell the truth.

So I just wanted to make that record, your Honor. And it is with that background that we will be continuing to object to additional cumulative exhibits and additional argumentative questioning.

THE COURT: All right. Do you have an application at this time?

I mean, look, I understand that you're making your record. I have not heard any yelling from Mr. Steel, and I have not heard anything that was sarcastic in the questions. To the extent that there were improper questions, the court has sustained numerous objections.

My understanding when Mr. Steel says "God forbid," is that he's talking about things that the witness has said that are extreme in nature. And so he's saying "God forbid" as an apology to him having to repeat that and recollect that with the witness.

That's my understanding of what he's saying. I didn't take that to be an effort to in any way intimidate or harass

P62sCOM3                    Mia - Cross

the witness.  That being said, you raised the issue of the questions that are argumentative.

And I think the problem, Mr. Steel, and this is something that --

Is Mr. Steel here?  Yes.

Here's the issue, that there are lines of questioning where if you had asked one question and moved on, that would be one thing.  But you're repeating the same question multiple times, often with an improper form.

Ms. Smyser has been objecting to those questions, so what we have is that you're repeatedly asking these questions that are -- where the tone, I agree with Ms. Comey, may be, you know, on the line, but the form is improper, so I sustained the objection.

Then you keep asking these questions, and at a certain point, I'm going to think that you're doing that just to get the question out there so the jury can hear it.  If I start to think that, I'll ask you to just move on, and you're not going to be able to ask questions on the topic you're raising.

Do you understand?

MR. STEEL:  Sure, yes.

THE COURT:  Just to address the other things, you've heard Ms. Comey talk about any kind of yelling or sarcastic commentary.  You heard what I said.  But you should be mindful, looking forward, that we're not running into any of those

P62sCOM3                    Mia - Cross

issues.  And there is no reason to do anything other than to just ask straightforward questions, get the answer, and then move on to the next topic.  Right?

MR. STEEL:  Yes, sir.

THE COURT:  All right.  Now, as to the people seeing how the witness is being treated, again, I don't see that this witness has been treated in any improper way at this point.

But I'll ask the government, Ms. Smyser, you'll let the court know if there is any conduct that's offensive on those lines, and we'll take it from there.  I hear the issue. I hear what you said, Ms. Comey, and we'll be watching from here on out.

With that, let's have Mia back.

MR. STEEL:  Your Honor, may I ask a question to speed up things?

THE COURT:  Yes.

MR. STEEL:  Let me just get to a microphone.

So, your Honor, this morning I was alerted that there were photographs.  I immediately, when I saw it and digested it, I texted the Assistant United States Attorney and I told her it would be for impeachment.  They are now marked, given to the U.S. Attorney's office, and I would like to get into these photographs.  There are --

it's a series of markings.  1799, but then it has a hyphen 1 through 25.  I just want to give the court, I think it

would be helpful for judicial economy, I understand that the court will rule on objections as they come, but can I just tell you my overall belief of why they are admissible.  And it's as follows.

THE COURT:  Can I see them?

MR. STEEL:  Of course.

Can you do it?

MS. COMEY:  Your Honor, we don't have stamped versions of these with defense exhibit stickers.

THE COURT:  Do you have the actual photographs.

MS. COMEY:  We have the photographs.  If you say a number, we won't know which photograph you're looking at.

THE COURT:  Can whoever is putting this on the screen just show me, and let's turn off the screens otherwise.

There's a series of these, Mr. Steel?

MR. STEEL:  Correct, your Honor.

THE COURT:  Let's go through them.

MR. STEEL:  Do you mind if I just stand over there and see what is being shown to the court?

THE COURT:  Yes.

MR. STEEL:  Your Honor, what I believe this to be --
this is going to encompass the entire series.

THE COURT:  Let me pause you for a second.

MR. STEEL:  Yes, sir.

THE COURT:  Are these within the binders that you gave

to the jury?

MR. STEEL:  No, they are not in the binders that we gave to the jury.

THE COURT:  Why doesn't the government have a stamped copy of these?

MR. STEEL:  I presume, for the reason I said.  We were alerted to this, this morning.  I immediately advised the prosecutor they had to be redacted and put an exhibit sticker on.  And as soon as we did that, that should have been given to the prosecutor.  Even before having the exhibit sticker and redacting, these should have been shared with the prosecutor.

THE COURT:  All right.  Let's just go through these quickly.

MR. STEEL:  Can I speak, or do you just want to look at them?

THE COURT:  I just want to look at them right now.

MR. STEEL:  OK.  Yes.

THE COURT:  Let's go to the next one.  Let's go next. Go next.  Let's go next.  Let's go next let's next.  Let's go next.  Keep going.  Keep going.  Keep going.  Keep going.  Keep going.  Keep going.  Keep going.  Let's keep going.  Keep going.  Keep going.

Just me a second with each one, and keep going, so I don't have to keep saying that to you.

Mr. Steel, what's the proffer of any kind of relevance

P62sCOM3                          Mia - Cross

to this case?

MR. STEEL:  I wanted to alert this honorable court, I've already told the prosecutor, this is for impeachment.  The way my memory of last week, which would be Friday, I asked Mia whether she alerted any family member, friend, any other person.  And her response was, as it was today, your Honor, I didn't have any time.  I couldn't do that.  I had no time to myself to do that.

I asked her that again today.  These images will show Mia I believe, as she identifies them, of course, with family and friends over a period from 20 -- approximately, I'm not looking at the exhibits -- 2012 throughout her entire stay with Mr. Combs' entity, which would be in 2017 March, as well as beyond, to show that she's still friends with these people.

That is the overall reason.  It is total impeachment. I wanted to share it with the government immediately, and I did it this morning right when I got it.  That's what happened.

THE COURT:  Why would you -- to the extent that you needed clarification on her response that she didn't have time, I don't think that's all she said.  I think there were other parts to her answers as to why there wasn't any disclosure about the things you've been asking her about, both Friday and today.

But even if you needed to probe into that, why would you need to put these into evidence?

Why do the images of Mia having, you know, spending time with her friends and family and with people who are having baby showers and things of that, have any kind of relevance even to issues of impeachment?

MR. STEEL:  Because she testified that she had no time away from Mr. Combs.

THE COURT:  Yes.

Just ask, if you want to ask a question along those lines, and just ask her, isn't it true that you spent time with friends and family throughout this time period?

Isn't it true you posted things about these friends and family?

Why do you have to show -- why do you have to put her actual posts into evidence?

MR. STEEL:  Because I would like to do the impeachment that way.  Because I think I already laid the foundation that she said that I can't speak with anybody else.  There was no time.

THE COURT:  OK.  So what's the exhibit number?

MR. STEEL:  Well, it starts with 1799, but has a hyphen, and it says 1 through 25, consecutive.

THE COURT:  Absent any further showing, Exhibit 1799 is excluded.

All right.  Anything else?

MR. STEEL:  Just my objection, your Honor.

THE COURT:  All right.

MR. STEEL:  Can we just move these in for the record, your Honor?

THE COURT:  Move what in?

MR. STEEL:  The photographs that the court just said it will not be admitted, just for the record.

THE COURT:  No.

That doesn't even make any sense.  I mean, you want to lodge them with the court so that it will be reflected in the court record?

MR. STEEL:  True.

THE COURT:  That will not be done.

That's not how we've been doing it as to any other exhibit excluded in this case, right?

MR. STEEL:  I can't say right or wrong.  I'm saying the court, if there is an appeal ...

(Counsel confer)

MS. SHAPIRO:  We can still use it.

THE COURT:  We'll handle it.  We'll make sure everyone is aware of what those numbered exhibits are.  I don't think there will be a dispute about that.

If we need to take further action, we can do that.  At this point, there nothing to move in, in terms of records.

MS. COMEY:  Your Honor, if the defense just provides us marked copies, we will maintain it in a case file, which is

what we do in every case, and if there is an appeal, we will have marked exhibits from both sides for the appeal record.

THE COURT:  All right.

MR. STEEL:  Your Honor, can I say something?

I was just handed the transcript on Mia's cross. Transcript page 3485, starting at line 18 -- excuse me, I'm sorry -- starting at line 7.

I asked Mia:  during the time that you were working with Sean Combs from 2009 until the posting on the 4th day of November 2014, you still had friends outside of people who worked with Mr. -- excuse me -- with Combs Enterprise, is that true?

Answer:  I didn't get to see them or speak to them. But your friends don't just stop being friends to you.  But no, at this point in time, I did not have an external sounding board.  I didn't get to see or talk to any friends and family in any capacity that made sense.  Every once in a while.

Question:  You could have though, right?

Answer:  No.

I asked, Why?

There was absolutely no time.  I was also -- couldn't, didn't have -- then there is a hyphen -- I had to get permission to leave or do things -- there is a hyphen -- I mean, I had to beg to go to my grandmother's funeral.  So I don't know if that paints any sort of picture.

I believe that this goes to impeach that type of direct.

THE COURT:  Yes, you can ask questions about that, if you want to, so there's no objection to that.

The objection is to putting these posts in, which the actual images and the posts themselves have no relevance to anything and are cumulative of a number of other exhibits that have been put in.

To give just one example, to the point -- to the extent you wanted to make a point along the lines of what you're saying, you already spent a lot of time on the scrapbook and cover letter, which obviously reflected -- and you asked Mia about this -- the immense amount of time that she devoted on her personal time to crafting a message on the occasion of Mr. Combs' birthday.

You could always ask questions about that scrapbook and the cover letter, if you wanted to make the point that you're talking about.  By the way, you could also do that as to a number of the other Instagram posts and other videos, the happy birthday video, etc.  You could do that through testimony.

But what I'm not hearing, I haven't heard it yet, is why the actual posts, which include things like Mia with her friends and family -- I'm guessing, I don't know who these people are -- at particular family events, why that wouldn't be

grossly prejudicial and have no relevance to the case?

What might have relevance, because you've shown me the testimony you're talking about, is you asking questions along those lines to understand what the witness' answer is.  There is no objection to that.

So that's how you should proceed.

All right.  Let's have Mia back.

(Witness resumed)

Welcome back.

(Continued on next page)

P62sCOM3                       Mia - Cross

(Jury present)

THE COURT:  Please be seated.  Mr. Steel, you may proceed when ready.

BY MR. STEEL:

Q.  You explained that you and Ms. Ventura were best friends, fair?

A.  Yes.

Q.  And that continued or that began -- excuse me -- from the time that you met her and started to learn about her and she met you and started to learn about you and you spent time together, is that fair to say?

A.  Yes.

Q.  And that would be approximately 2009 throughout the term of your employment with Mr. Combs and the businesses that he's affiliated with and you were affiliated with in March 2017, is that true?

A.  We were friends throughout that time period, yes.

Q.  Yes?

A.  Yes.

Q.  Not just friends, I mean, you describe Ms. Ventura to the jury as your sister, fair?

A.  Yes.

Q.  I mean, that, to me, connotes something, but to you, is it true that that's somebody that you love?

A.  Absolutely.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P62sCOM3                          Mia - Cross

Q.   True to your heart?

A.   Yes.

Q.   It's like a part of you?

A.   Yes.

Q.   And that relationship continued after March 2017 and actually survives today, that's the same way you feel about Ms. Ventura, is that true?

A.   Do I still feel the same way about her?

Q.   Yes, ma'am.

A.   Yes, yes.

Q.   OK.  And that never wavered, right?

A.   Never wavered, no.  But there was a time period where we didn't see each other.  But it never wavered.

Q.   OK.  Now, you would not lie to Ms. Ventura, would you?

A.   I would not lie to her -- I wouldn't lie to her -- I wouldn't lie to her from my own -- I wouldn't lie to her about, um, anything that I wasn't forced to lie to her about.

Q.   Explain that.

A.   As of current day, no, I would never lie to her.

         But when I was working for Puff, I was not allowed to tell her the truth about a lot of things.

Q.   Such as what?

A.   Where Puff was, what he was -- just anything that Puff told me, whatever story Puff told me, I had to uphold that.

Q.   Let's talk about this.

Q. Did you ever tell Ms. Ventura that -- well, was Mr. Ventura, to your observation, in love with Mr. Combs?

A. To my observation back then, I thought so.

Q. Did you ever tell Ms. Ventura that the person you're in love with sexually assaulted me?

A. Absolutely not.

Q. Did you ever tell Ms. Ventura that the person that you're in love with is -- turns eyes that are black and enrage and he beats you often; did you ever say that to her?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

Q. Did you ever discuss with Ms. Ventura your concern that she should get away from Mr. Combs?

A. Did I ever express my concerns she should get away?

Q. Yes.

A. Um, not in the way I wish I had.  Not in the way I wish I could have.

Q. And the reason you couldn't have is for the reason you stated, you made a promise to Mr. Combs, is that what you're saying?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

Q. Why couldn't you have told your sister that, you've got to get out of this relationship, if it was so bad?

A. I wasn't allowed.

P62sCOM3                      Mia - Cross

Q.  By whom?

A.  Puff.

Q.  Do you have any writing or anything else, besides your word --

        MS. SMYSER:  Objection.

Q.  -- that Mr. Combs told you that?

        THE COURT:  It's overruled.

        Wait.  Hold on.  Hold on.

        That needs to be rephrased, Mr. Steel.

        MR. STEEL:  I'll move on.

Q.  Now, do you remember a time in March 16, 2016, when Ms. Ventura told you that she was mad with Mr. Combs for being jerky?

A.  I don't remember that specific incident.

Q.  Do you recall you putting up or taking up for Mr. Combs and saying to Ms. Ventura, your sister, that Mr. Combs is dealing with heavy things?

        MS. SMYSER:  Objection.

        THE COURT:  It's overruled.

A.  I don't remember that specific because there were so many insane incidents, so ...

Q.  All right.

        THE COURT:  All right.  Mr. Steel, next question.

Q.  Do you remember telling Ms. Ventura that Mr. Combs only deals with heavy things by lashing out at the person he is

closest to and loves the most, which is Ms. Ventura?

MS. SMYSER:  Objection.

THE COURT:  It's overruled.

A.   Same answer.  I don't remember that specific incident, but I did have to take up for him.

THE COURT:  All right.  Mr. Steel.

Q.   Do you remember telling Ms. Ventura that Mr. Combs' brain needed to be re-wired, you compared him to a child throwing a tantrum?

MS. SMYSER:  Objection, your Honor.

Could we please have a sidebar?

THE COURT:  We may.

(Continued on next page)

(At the sidebar)

MS. SMYSER:  Your Honor, this is from an exhibit you ruled was not coming into evidence, yet Mr. Steel is reading every line of the text message conversation, so I think that is inappropriate.

THE COURT:  These are in the exhibit.  These are statements by?

MS. SMYSER:  By Mia to Ms. Ventura.

THE COURT:  Why wouldn't he be able to ask the witness whether she made those statements?

What's the objection?

MS. SMYSER:  Because the objection is --

THE COURT:  Which rule?

MS. SMYSER:  -- one on personal knowledge and --

THE COURT:  How would she not have person knowledge of her own statements?

MS. SMYSER:  She would have personal knowledge of her own statements.  The statements go to whether she's speculating about what is in Mr. Combs' mind at that time, your Honor.

THE COURT:  Right now Mr. Steel only asked her if she made those statements and she said she doesn't know, then he's moved on.

So what's the objection?

MS. SMYSER:  I think it's an end run around your prior ruling that this particular exhibit was not coming into

evidence.

THE COURT:  It is not coming into evidence, if we made a ruling on it.

MS. SMYSER:  OK.

THE COURT:  Then what's the nature of the objection?

MS. SMYSER:  Your Honor, it's 403 objection and --

THE COURT:  OK.

MS. SMYSER:  -- a hearsay objection because he's reading from something that is not in evidence that you already ruled was not coming into evidence.

THE COURT:  All right.  Well, Mr. Steel, I don't know if you had this exhibit up there, but it should not be -- that's not how you ask the witness if they made prior statements, even if you're planning to try to impeach with a prior inconsistent statement.  If you're reading up there from something, you're not supposed to do that.

MR. STEEL:  I'm not reading from anything.

This is my memory what she told Mr. Combs -- I'm sorry -- Ms. Ventura.  She said, I'm taking up for Mr. Combs.

Obviously, I'm going to ask a series of questions.

THE COURT:  You're moving on from this, at this point, now that we've asked a few questions.

MR. STEEL:  There might a couple more questions.

THE COURT:  All right.  Let's do that and move on.

MR. STEEL:  All right.

Can we step back?

THE COURT:  All right.

(Continued on next page)

P62sCOM3                          Mia - Cross

(In open court)

THE COURT:  All right.  Mr. Steel, you may proceed.

BY MR. STEEL:

Q.  Do you remember telling your sister, Ms. Ventura, while sticking up for Mr. Combs, that Mr. Combs --

THE COURT:  You need to rephrase the question.

MR. STEEL:  OK.

Q.  Do you remember telling Ms. Ventura that Mr. Combs just throws a tantrum and kicks and screams like to a mother, the one person who loves the child the most, and the child loves the most?

Do you remember saying that?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

Q.  Do you remember telling Ms. Ventura, don't listen to any negativity --

THE COURT:  Let's move on.

Q.  Why would you stick up for Mr. Combs, knowing what you are saying you have knowledge of, this brutality?

Why would you do that when Ms. Ventura said he's being jerky?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

You can rephrase that series of questions to try to ask one question.

P62sCOM3                          Mia - Cross

MR. STEEL:  OK.

Q.  At the time of telling Ms. Ventura, or I think your word --
let me rephrase.

You said to the jury a short while ago, you were
sticking up for Mr. Combs, or something to that effect.

Do you remember that?

A.  Did I use the word sticking up?

Q.  Whatever word you used, do you remember that?

A.  Do I ever remember what word I used?

That's a weird question.  Sorry.  Can you --

Q.  Why would you go to bat for Mr. Combs to your friend
Ms. Ventura?

A.  I wouldn't call it going for bat, but -- going to bat for
him, but I was required, which I believe I testified about the
other day, about one of the worst parts was being put in the
middle and having to cover up or cover up for Puff to Cass,
which he forced me to do constantly.

Q.  Are you done?

A.  Yes.

Q.  Mia, my question is -- this is nothing in the middle.
Ms. Ventura, you remember, came to you and your response is,
you are telling her that Mr. Combs is just misunderstood.

Do you remember saying that?

MS. SMYSER:  Objection.

THE COURT:  Hold on.

You've got to rephrase that question, Mr. Steel.

Q. Why would you ever say something to lead Ms. Ventura to believe that you think it's OK the way Mr. Combs acts?

MS. SMYSER:  Objection.

THE COURT:  You've got to rephrase that question. We've got to take a step back before you can ask a question of that nature.

Q. Did you tell Ms. Ventura that she needs to stay with Mr. Combs?

A. I don't remember using those words.

Q. Do you remember words to that effect?

A. I do not remember words to that effect.

Q. Do you remember sticking up for Mr. Combs to Ms. Ventura?

A. I remember covering for him when he forced me to and feeling terrible about it.  However, if I didn't, he would have taken me away from her.

Q. How would Mr. Combs have even known about this communication between you and your friend?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

Q. How do you believe Mr. Combs would ever find out about a private communication between you and Ms. Ventura?

MS. SMYSER:  Objection, your Honor.

THE COURT:  This question needs to be rephrased.

I think there is a threshold problem with the way

you've asked this problem.

BY MR. STEEL:

Q.   Was Mr. Combs present when Ms. Ventura confided in you that she didn't like the way that he was acting?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

Q.   Ma'am, when you say that Mr. Combs would find out what you said to Ms. Ventura, explain to the jury how he would ever find out?

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

A.   He has stolen my phone many times.  He's stolen Cassie's phone many times.  He's put tracking devices on her car.  I'm not sure what he is capable of.  I was terrified.

Q.   Haven't you been alone with Ms. Ventura where you both can speak without Mr. Combs present or anyone else?

A.   Yes.

Q.   Now, you were discharged or separated or no longer working with Mr. Combs and his company clearly in March 2017, right?

A.   Once again, I wasn't discharged.  But yes, we parted ways that date.

Q.   And do you remember, during that time of parting ways, that you actually obtained a lawyer?

A.   Yes.

Q.   And that would be almost immediately in the beginning of

2017, true?

A. I'm not sure when I -- it wasn't immediately after the initial conversation. But yes, I did get a lawyer. I just don't remember the dates.

Q. Do you remember having a lawyer before you left the employment of Combs Enterprises, Revolt, or anything to do with Mr. Combs in March 2017?

A. Oh, yes, because they were supposed to negotiate my severance. So yes, it would have been before.

Q. So with all of these parameters that Mr. Combs put on you, you went to a lawyer in the beginning of 2017 and you end working there 2017 March, right?

           MS. SMYSER: Objection.

           THE COURT: Why don't you ask the question without the preamble.

Q. You end up using that lawyer, very fine lawyer, and you bring a suit against Mr. Combs and the company, is that true?

A. I got that lawyer -- I'm sorry.

           Could you ask me one more time?

Q. Yes. You spoke about your lawyer -- I don't know want to know what you discussed.

           You spoke with the lawyer, and the upshot of that, there was a lawsuit, right?

A. There was a mediation.

Q. OK. And that's a claim that you were making, true?

P62sCOM3                      Mia - Cross

A.   That was a claim I was making?

          Yes.  We were going to mediation to negotiate, yes.

Q.   And you asked for, you told the jury, or your lawyer asked for $10 million, right?

A.   I think -- I believe my lawyer started that as the negotiation, the start of the negotiation.

Q.   And the negotiations happened and mediation happened, right?

A.   The mediation happened, yes.

Q.   And during that time you had to articulate through your lawyer why you were owed this money, right?

A.   Yes.

Q.   And it included anything dealing with Mr. Combs or his businesses, why you were wronged, right?

          MS. SMYSER:  Objection.

          THE COURT:  That's sustained.

Q.   You never mentioned at that mediation anything about sexual assault, is that true?

A.   In the mediation itself?

Q.   Or any part of it?

A.   I'm sorry.  Well, the answer is no.  I just don't know if I'm talking about something privileged.  I'm not a lawyer.  I want to make sure ...

Q.   You mentioned, when the prosecutor asked you questions, that you never mentioned anything about sexual assault when you

had your lawyer during the mediation and you're suing Mr. Combs or wanted money from Mr. Combs and the enterprise, and his businesses, right?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

Mr. Steel, I think you need to clean that question up.

Q.  Is it true that you never mentioned, as part of this seeking of $10 million, that you were sexually assaulted?

A.  True.

Q.  Now, by the time that this mediation ended, were you aware of the #MeToo movement?

A.  No.

Q.  Did this mediation end, if you remember, October 2017?

A.  I believe the mediation was before that, because I remember specifically, it was a few months after that, that the catalyst, the article had came out about the person who the #MeToo movement was from.

Q.  All right.  I would like to show you --

Oh, you mentioned already, you received about a $400,000 settlement with Mr. Combs and the companies, right?

A.  I received over 200,000, and my lawyers received the rest, correct.

Q.  And that was the upshot of making you whole from your time with Sean Combs?

A.  I'm sorry.  What --

P62sCOM3                        Mia - Cross

I didn't understand.

Q. That was the settlement agreement, right?

A. That was the settlement agreement.

Q. Correct?

A. Are you --

Q. I'm asking you.

A. You're asking me if that was the settlement agreement in the mediation?

Q. Correct.

A. Yes.

Q. All right. Now, I would like you --

I would like to ask you about and like you to turn to in your book, if you could, just for you and the parties, tab number 37.

Tell me if you recognize that.

A. I recognize the photo.

Q. Do you recognize the posting and what you wrote?

A. I don't recognize that -- I mean, I don't remember this, but I do recognize the photo.

Q. Is this your social media account?

A. No.

Q. Are you look at 1737?

A. Yes, sir. That's --

It looks like it's a text message.

Q. I think we're looking at different items.

P62sCOM3                        Mia - Cross

A.  This one said 1737.  It's behind tab number 37.

Q.  Can you look at the screen?

        It will be for you.

A.  Yes, that's not my social media.  It looks like a text message.

Q.  OK.  Is it your text message?

A.  I don't remember that, but it sounds like me.

        MR. STEEL:  OK.  Your Honor, I'll move for the admission of 1737 under seal, but 1737R for the court.

        THE COURT:  All right.  They will be admitted on that basis.

        (Defendant's Exhibit DX 1737 (Sealed) received in evidence)

        (Defendant's Exhibit DX 1737R received in evidence)

        MR. STEEL:  Can it be shown, your Honor?

BY MR. STEEL:

Q.  Do you see 1737 in your booklet?

A.  I see --

        Yeah, I see the text message in the booklet.  I don't remember this.

Q.  OK.  And this is your message to Mr. Combs, right?

A.  Once again, I don't remember this text message specifically.

Q.  Dated November 4, 2023, right?

A.  That's -- I don't remember that date.  I don't remember

P62sCOM3                          Mia - Cross

sending this.

Q.   And what is written on it?

A.   It says Happy birth-yay Puff Daddy, with a black heart, with a black heart emoji.

Q.   And that is Mr. Combs' birthday?

A.   November 4 is Puff's birthday.  However, again, I don't remember sending this --

Q.   And this --

A.   -- on this date.

Q.   I'm sorry.  Go ahead.

A.   I do not remember sending this on this date.

Q.   And this is consistent with other birthdays where you did send on birthdays, you testified before the jury, happy birthday to Mr. Combs, true?

A.   Other birthdays, 1000 percent, it's on brand.  But, again, I don't remember this specific one.

Q.   Now, this is a picture that the jurors have seen before, right?

A.   Correct.

Q.   That's you on the left with the tutu?

A.   Yep.

Q.   That's Mr. Combs, presumably, appearing as if he's holding his private part, true?

A.   True.

Q.   Now, 12 days after November 4, 2023, do you remember

November 16, 2023, Ms. Ventura's lawsuit was made public?

A.   I do remember her lawsuit was made public around that time, correct.

Q.   And do you remember in that lawsuit that Ms. Ventura alleged sexual abuse at the hands of Mr. Combs?

A.   Yes.

Q.   And by the 16th day of November of 2023, you were aware of the #MeToo movement, true?

A.   True.

Q.   And by November 16, 2023, social media had billions of users, true?

A.   True.

Q.   And by November 16 of 2023, you are no longer with Mr. Combs in any type of everyday or even casual relationship where you would see him, true?

A.   Correct.

Q.   And you've already sued Mr. Combs six years earlier?

        MS. SMYSER:  Objection.

Q.   Is that true?

        THE COURT:  Sustained.

        If you can rephrase the question.

Q.   You already went to mediation with Mr. Combs approximately six years and one month earlier, right?

A.   Yes, I did go to mediation.

Q.   And there is strength in numbers for people who have been

P62sCOM3                          Mia - Cross

truly victimized of sexual assault?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

Q.  Did you tell your sister, Ms. Ventura, after reading the lawsuit and her claims of sexual assault, me too?

THE COURT:  That's sustained.

You've got to rephrase the question.

Q.  Did you call Ms. Ventura after reading her allegations against Mr. Combs of being sexually abused?

A.  Are you done?

Are you just asking did I call her after her article?

Q.  Correct.

A.  Did I call her?

Q.  Or communicate with her?

A.  Oh, yes, um-hmm.  She called me afterwards.

Q.  Did you advise Ms. Ventura in November of 2023 what you allege Mr. Combs supposedly did to you?

MS. SMYSER:  Objection.

THE COURT:  Overruled.

A.  Did I tell her then?

Q.  That's my question.

A.  Absolutely not.

Q.  Why?

A.  Just because you find out something doesn't mean you just immediately snap out of it.  I was still deeply ashamed and

P62sCOM3                    Mia - Cross

wanted to die with this.  I never wanted to tell anybody ever.

Q.  You were so deeply ashamed and, God forbid, wanted to die, why didn't you -- why did you, with all of these messages that the jurors have seen, still communicate with Mr. Combs?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

Let's rephrase the question, please.

Q.  December 2023, did you learn that the United States Attorney's office and federal agents were looking into an investigation concerning Mr. Combs, which included sexual assault?

A.  I'm not sure when I learned about the investigation, but I did learn about the investigation.

Q.  And do you remember meeting with the prosecutors, some of them are here, as well as federal agents, on January 5 of 2024?

A.  I don't remember the date, but yes, I remember meeting with them.

Q.  Let me just show you something that, with the court's permission, may refresh your memory on the date.  OK?

A.  OK.

MR. STEEL:  Your Honor, may we show to, with the court's permission, the witness and the parties only, 3504 002. First line.  No, 002.  Should be page two of eight.

Sorry, the very first.

Q.  Could you do me a favor and read that to yourself and tell

me if you remember meeting with members of the federal
authorities, agents for the federal government, as well as
United States Attorney's office on January 5, 2024,
approximately 4:00 o'clock in the afternoon?

A.  I definitely remember meeting with them at 4:00 o'clock in
the afternoon.  That could be the date, I just don't remember
the date, but I definitely remember meeting with them.

Q.  Now, when you met with the U.S. Attorney's office in
January 5, 2024, you never -- or you told them -- excuse me --
about this supposed sexual assault, right?

A.  I'm sorry.  Could you --

Did you ask me if I did the first time, or I did not?

Q.  I asked, did you?

A.  Did I?  No.

Q.  I would like you to tell the ladies and gentlemen of the
jury whether you remember, just three days later, again
discussing with members of the United States Attorney's office
of the Southern District of New York, as well as federal
agents, on January of 2024, at approximately 12:30 p.m., their
investigation and your knowledge of same?

A.  I'm so sorry.  I didn't -- I didn't understand the
question.

Q.  Do you remember meeting on the same topic three days later
with the federal agents aunt the federal prosecutors?

A.  I don't remember the timing of things or the dates, but I

do remember meeting with them again.

Q.  Can you please, with the court's permission, look at 3504-004, first paragraph, page two of five.

Can you read that to yourself.

A.  Sure.  Yeah, I remember meeting with them.

THE COURT:  Hold on, Mia.

Let's take this down.  Mr. Steel, your next question.

Q.  You remember meeting, three days later, January 8, 2024, with the same agents and prosecutors about Mr. Combs and their investigation?

A.  I definitely remember meeting with them again.  I'm so sorry.  I just don't know the exact timing, but I 1000 percent remember meeting with them again.

Q.  Did you tell, on the second occasion that you met with the prosecutors, that Mr. Combs sexually assaulted you?

A.  I don't remember when that happened.  I don't remember when I told, but I know it wasn't the first time, and it could also not have been the second time.  I just don't remember when.

Q.  Would it refresh your memory to look at notes from that meeting that you had the second time, whether you told anything about Mr. Combs' supposedly sexual assaulting you?

A.  Oh, I'm not doubting --

THE COURT:  Hold on.

THE WITNESS:  I'm sorry.

THE COURT:  First of all, that's not the right way to

ask the question.

So do you want to show the witness something?

MR. STEEL:  If needed, sure.

THE COURT:  Well, let's ask a new question, and then if you want to show the witness something, then you can show it to the witness.

Next question.

BY MR. STEEL:

Q.  In your mind right now, can you tell the jury whether you mentioned anything about a supposed sexual assault at the hands of Mr. Combs when you met with the prosecutors the second time on January 2024?

A.  I don't remember when I disclosed.  I remember -- I don't remember how many times I met with them before I had legal representation.  So I don't know.  I don't remember the contents of those meetings.  I do remember meeting with them. I definitely did not tell them before I had representation.

Q.  All right.  Well, at the second meeting, you didn't have representation, or you don't remember?

We could show you a document, with the court's permission, to refresh your memory if you don't know.

A.  Oh, yeah.  I'm just saying I don't remember.  I'm not, like, trying to be argumentative at all.

Q.  Do you remember meeting with the prosecution March 19, 2024?

A.  I don't remember the dates.  I remember I met with them.

Q.  Do you remember for the first time on that third meeting that you had a lawyer?

A.  Again, I don't know how many times it was, but I did, at some point, get a lawyer, yes.

Q.  Let me show you --

Once you had a lawyer, your lawyer went with you to these meetings, is that fair to say?

A.  Yes.

Q.  Let me show you what you've already looked at, with the court's permission, 3504-004, page two, first paragraph.

Do you see any mention of a lawyer with you at that meeting?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

Q.  Well, read it to yourself.

A.  Um --

THE COURT:  Hold on.  Let's take it down.

Mr. Steel.

Q.  Does that refresh your memory whether you do not have a lawyer at that second meeting?

A.  That was the second meeting?

Oh, I didn't mention a lawyer, so, I guess, no.

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

The jury should disregard the witness's last answer.

Mr. Steel.

(Continued on next page)

P62KCOM4                        Mia - Cross

BY MR. STEEL:

Q.  On March 19, 2024, do you remember meeting with the
U.S. Attorney's Office officials, as well as the federal
agents, along with your lawyer, Shawn Crowley, C-r-o-w-l-e-y?

A.  I do remember meeting with everybody and my lawyer.  I just
don't remember the dates.

Q.  Let me show you, with the Court's permission, the document,
to see if it refreshes your memory, 3504-008, page 2, the first
paragraph.

    Can you read that to yourself.

A.  Yes.

Q.  Does this refresh your memory that -- did you read it?

A.  I did read it.

Q.  Does that refresh your memory the first time that you were
ever represented on this case by Shawn Crowley or another
lawyer?

A.  I remember the meeting.  Again, I'm just not good with
dates.  So, yes, I remember the meeting a thousand percent.  I
just don't want to say I remember exact dates if I don't.
That's all.

Q.  Now, when you brought your lawyer, Shawn Crowley, that was
your lawyer of choice, right?

A.  No.  I'm --

Q.  She represented you, right?

A.  She did represent me.

P62KCOM4                    Mia - Cross

Q. And were you aware that just 45 days earlier, she obtained a gigantic 83 --

MS. SMYSER: Objection, objection.

THE COURT: Sustained.

Q. -- that she represented?

THE COURT: Hold on. When it's sustained, that means you move on to the next question. It doesn't mean you keep asking the same question.

BY MR. STEEL:

Q. Were you aware, when you hired her, that she had just finished a trial?

MS. SMYSER: Objection, your Honor.

THE COURT: Hold on. That's sustained. Let's move on. Next question.

BY MR. STEEL:

Q. Why did you hire Ms. Crowley?

MS. SMYSER: Objection.

THE COURT: That's sustained, as well. Let's move on.

BY MR. STEEL:

Q. Do you realize, or do you remember, the first time you ever made a claim that Mr. Combs ever sexual assaulted you was on June 18th of 2024?

A. Again, I don't remember the dates, but I do remember that horrible conversation.

Q. And June of 2024 — and if you need anything to refresh your

memory, let us know — that is seven months after Ms. Ventura's lawsuit went viral, right?

A.   I don't know the timing of stuff, but it was after her lawsuit went viral.

Q.   Why did it take seven or eight months for you to tell the U.S. Attorney's Office and the federal government --

MS. SMYSER:  Objection.

Q.   -- that Mr. Combs supposedly sexual assaulted you?

THE COURT:  You've got to rephrase these questions, please.

BY MR. STEEL:

Q.   You didn't tell the U.S. Attorney's Office before June 2024 anything about Sean Combs supposedly violating you in a sexual manner, did you?

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

THE WITNESS:  Sir, once again, I don't remember the timing of things, but I absolutely remember I did not tell them, the government, anything until I had representation.  And I can't go into why because, apparently, that's privileged.

MS. SMYSER:  Objection.

THE COURT:  All right.  Let's move on to the next question.

BY MR. STEEL:

Q.   Ma'am, you had representation in March of 2024, and you did

P62KCOM4                        Mia - Cross

not mention anything about sexual assault --

              MS. SMYSER:  Objection, your Honor.

              THE COURT:  That's sustained.

BY MR. STEEL:

Q.   -- to the United States Attorney's Office?

              THE COURT:  Hold on.  Let's have a brief sidebar.

              (Continued on next page)

(At sidebar)

THE COURT:  So, this is exactly what I was talking about before we brought the witness back in — that the questions are being asked using an improper form.  And I am getting the sense that they are being asked not so much to elicit any answer, but merely to have you, Mr. Steel, testify for the jury.  So that's going to end right now or I will end this cross-examination.

There are ways to ask these questions that you are asking in a proper way that does not violate the rules.  You can do it that way, and I know you know how, but you're not doing it that way.  Instead, you're re-asking the same questions so that the jury hears your questions, and then there's an objection, which I sustain, and then you try to keep re-asking the same question in the same improper way.  So what's going on?

MR. STEEL:  I would not do that, and I did not do that.  My questions go to the fact that Mia does not outcry at all.  She then hires a lawyer 45 days after a gigantic verdict was reached by the lawyer.  That goes --

THE COURT:  Put that last part to the side, but the first part, you can inquire about.  It's just that you are not actually inquiring about that in a proper way.  So why don't you try to do it in a proper way, and please do not introduce any kind of situation where it appears — and it might not be

your intent — but it appears as if you're trying to abuse the questioning format in order to testify yourself in front of the jury.

That would be improper, you'd agree, right?

MR. STEEL:  I'm not doing that, and, yes, I would agree that it would be improper.

But to exclude the lawyer and what the lawyer just did prior — receiving an $83 million verdict — it goes to this witness' motive, interest, and bias, and that she will be receiving money.  That's why I'd like to ask her questions, why did you hire that lawyer.  I'm not asking her any attorney-client privilege.  Why did you hire this lawyer.

THE COURT:  That's a separate line of questioning.  If you want to ask the witness whether she has retained an attorney with the intent of obtaining any kind of civil judgment or settlement from Mr. Combs, you can ask those questions, but that is not presently what you are asking about.

MR. STEEL:  I want to ask about this lawyer, and that this lawyer, she knows her reputation, and they just got a judgment in this city for $83 million 45 days --

THE COURT:  We can pick that particular issue up, which I imagine the government will have some pointed objections to, at the break, but, right now, we're just going to go through what should be a fairly routine effort — we've done it countless times in this case — establishing the

P62KCOM4                    Mia - Cross

chronology of when particular witnesses told particular things to the government.  And we've done that, and there haven't been any objections from either side in terms of doing that.  This particular effort to do it seems like we're running into some problems that we don't need to run into.  So let's try to do it the right way, and let's proceed.  All right?

            MR. STEEL:  Yes, sir.

            MS. COMEY:  Your Honor, may I ask that we have a shorter lunch today, given the delays we had with this witness' cross?

            THE COURT:  We're going to do that.

            MS. COMEY:  Thank you, your Honor.

            THE COURT:  Let's go.

            (Continued on next page)

(In open court)

THE COURT:  All right, Mr. Steel.  You may proceed.

BY MR. STEEL:

Q.  Do you remember stating that you never told anyone that Sean Combs supposedly sexual assaulted you before you did so in June of 2024?

A.  I don't remember the date, but, yes, I had never told anybody before that.

Q.  And that includes, you said, you didn't tell any family members, right?

A.  Correct.

Q.  Roommate?

A.  Correct.

Q.  Friends?

A.  Correct.

Q.  Therapist?

MS. SMYSER:  Objection.

MR. STEEL:  That was said.  Excuse me.

THE COURT:  That's overruled.

THE WITNESS:  I'm not sure when I disclosed it to my therapist, but probably before that.  I'm not sure.

BY MR. STEEL:

Q.  Do you remember your lawyers, as your agent, being asked whether you would release your therapy notes?

THE COURT:  Sustained.  Let's move on.

P62KCOM4                          Mia - Cross

Q.  Do you remember telling --

MR. STEEL:  Well --

THE COURT:  That's sustained.  Let's move on to the next question.

BY MR. STEEL:

Q.  I want to ask you about the Prince party that you talked about.

A.  Okay.

Q.  Now, you explained that you and Ms. Ventura wrestled with the idea whether you can go out to the party.  Do you remember that?

A.  Yes.

Q.  The reason for that is you had no permission to attend that party, that's what you said, right?

A.  We had no permission to leave the hotel from Puff.

Q.  Is that true?

A.  Yes.

Q.  And you and Ms. Ventura decided, well, we will go to the party, right?

A.  Yes.

Q.  And it's a Prince, the performer, party, and, presumably, you knew that Mr. Combs would know people there, true?

A.  True.

Q.  Yet you're telling the jury that you and Ms. Ventura went to this party even knowing that you'd be uncovered, true?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.  It needs to be rephrased.

BY MR. STEEL:

Q.  Did you go in any type of disguise to this party?

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

THE WITNESS:  No.

BY MR. STEEL:

Q.  And then Mr. Combs comes to the party, right?

A.  Yes.

Q.  And you talked to the jurors about this big chase that occurred, and violence, right?

A.  Yes.

Q.  Is there any photograph of that big chase --

MS. SMYSER:  Objection.

Q.  -- or violence that you know about?

THE COURT:  It's overruled.

THE WITNESS:  Not that I know about.

BY MR. STEEL:

Q.  Do you know if there's any video of that big chase and violence that you can tell us about?

A.  I'm not aware of any, but I don't work at Prince's security, so...

Q.  You told the jurors that on one occasion, you and

P62KCOM4                       Mia - Cross

Ms. Ventura were so scared of Mr. Combs, that you got into a pedal boat and went out into a storm, or something to that effect.  Do you remember that?

A.  We were on paddleboards, and the storm didn't come until we were out there, correct.

Q.  And while, as you say, out there, it was your decision, you told the jurors, do I continue to dare Mother Nature or go back to the shore to dare Sean Combs.  Do you remember that type of testimony?

A.  Yes.

Q.  Is there any reporting of that, that you're aware of?

A.  No.

Q.  Any type of note or text message or anything of that effect to prove that that happened?

            MS. SMYSER:  Objection.

            THE COURT:  That needs to be rephrased.

BY MR. STEEL:

Q.  Are you aware of any type of text message or email or other recording that that incident happened?

A.  I don't think so.

Q.  Any photographs?

A.  No.  We were on paddleboards.

Q.  Mia, was that just made up by you?

            MS. SMYSER:  Objection.

            THE COURT:  That's overruled.

THE WITNESS:  No.

BY MR. STEEL:

Q.  How is it that all of these events have no photograph or text message or email from you?  Can you explain that, please?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

BY MR. STEEL:

Q.  With regards to you having no time with friends or family while working with Mr. Combs so you could speak with them meaningfully -- do you remember that type of testimony?

A.  Yes.

Q.  -- did you ever go to events with your family or friends during the time that you were working with Mr. Combs that was outside of people who worked with Mr. Combs?

A.  Over the course of eight years, I definitely got to go every sporadic times to see -- yeah, I definitely saw people every once in a while, but, like, very, very few and far between.

Q.  Did you go to weddings?

A.  I was permitted to go to a few weddings of my sister and best friend, I believe, over eight years, yeah.

Q.  Did you go to birthday parties of friends and family?

A.  I don't remember.

Q.  Halloween celebrations with friends and family?

A.  I don't -- I don't really remember.  I mean, I did a lot of

P62KCOM4                          Mia - Cross

Halloweens with Puff.  I don't think so, but I could be wrong.

Q.  Vacations with friends and family?

A.  I'm sure -- I'm sure there was, yes.

Q.  You had time outside of the grip of Mr. Combs to be with people that you trusted and you could open to; is that true?

MS. SMYSER:  Objection.

THE COURT:  It's overruled.

THE WITNESS:  Did I have time?  I wasn't outside of his grip because I still had to be in constant communication 24/7.  In fact, one time -- I won't tell that story, never mind.  But I was never outside of his grip.

BY MR. STEEL:

Q.  When you were with your family or friends outside of Mr. Combs' presence and outside of your work environment, why wasn't that time to explain the horror that you're describing to this jury?

A.  Because it's way more complex than that.  Again, the highs were super high, the lows were super low, the dynamics shifted all the time.  I was completely entrenched in his world.  It wasn't -- I mean, if it was horrible all the time, like, of course.  I mean, there's so many reasons.

Q.  Is one of the reasons because Mr. Combs actually was pleasant for you to be around?

A.  All the time?  No, absolutely not.  Was there a version -- was there one of his personalities?  Yes, of course.  The rest

of them?  No.

Q.  Isn't it true that, except on the rare occasion that
Mr. Combs was violent to Ms. Ventura, which is not ever fair or
accurate or correct to do, you enjoyed being around Mr. Combs?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.  The question needs to
be rephrased.

BY MR. STEEL:

Q.  Isn't it true that Mr. Combs, on rare occasions, was
violent towards Ms. Ventura?

A.  The opposite.

Q.  And you never said to Ms. Ventura, this is crazy, we gotta
go?  That never occurred to you?

A.  Yes, I did.  I had to support her.

Q.  Support her in what way?

A.  In any way that she was willing to receive it.

Q.  All of these times that Mr. Combs -- there is nothing,
until you get a lawyer, to say that Mr. Combs was ever, in any
way, sexually violent to you; is that true?

MS. SMYSER:  Objection.

THE COURT:  That needs to be rephrased.

BY MR. STEEL:

Q.  Until you get a lawyer, in 2024, you never ever claimed, to
anyone, that Mr. Combs was sexually violent to you; is that
true?

P62KCOM4                         Mia - Cross

A.  Unless it was to my privileged therapist, you're correct.

Q.  When you say your privileged therapist, could you waive that privilege --

THE COURT:  Let's move on.

MS. SMYSER:  Objection.

THE COURT:  Let's move on to the next question.

BY MR. STEEL:

Q.  With regards to you being here today, you're still represented by counsel, true?

A.  True.

Q.  And isn't it true that you sought a lawyer because you wanted to sue Mr. Combs for money?

A.  No.

Q.  And that you joined the #MeToo money grab against Sean Combs; is that true?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

BY MR. STEEL:

Q.  Is it true that you knew that Ms. Ventura, by making this claim against Mr. Combs in November 2023, you knew that she received money?

A.  There was public -- there was a settlement, but I'm not sure how that would...

Q.  I'm sorry, are you finished?

A.  Sure.

Q.   My question to you is:  You were aware, before you got a lawyer, and before you made any claim that Mr. Sean Combs in any way sexually assaulted you, that Ms. Ventura received money from her lawsuit, true?

A.   Yes, she received a settlement, I believe.

Q.   Well, you know that because you speak with her, right?

A.   Well, it was public information.

Q.   And it was public and you speak with her, right?

A.   I do speak with her, yes.

Q.   Now, when you would meet with the government, is it true that you were still speaking with Ms. Ventura, in 2023 going into 2024?

A.   Never about the substance of anything that we were discussing with the government.

Q.   How would we know that?

         MS. SMYSER:  Objection.

         THE COURT:  That's sustained.

BY MR. STEEL:

Q.   Did Ms. Ventura discuss with you her meetings with the government?

A.   No.

Q.   The times that you met with the government, was it 27 times?

A.   Oh, again, I don't know how many times, but I definitely met with them quite a bit.

P62KCOM4                    Mia - Cross

Q.  Well, I'm going to show you some documents that may refresh your memory how many times you met with them.  Okay?

A.  Oh, okay.

Q.  Look on your screen and tell me if this refreshes your memory.

2304-002, I'd like you to look at that document, and I'd like you to read it to yourself, and tell me if you remember the date and the topics discussed.  Just read it to yourself.

(Pause)

MR. STEEL:  Your Honor, while she's doing that, can we have a sidebar?

THE COURT:  You may.

(Continued on next page)

(At sidebar)

MR. STEEL:  Your Honor, in the interests of time, with the Court's permission and the U.S. Attorney's Office nonobjection, can we just give a hard copy of the 3500s to the witness during a break?

THE COURT:  That's what I was going to suggest.  I think that's a better way to do this.

MS. SMYSER:  Your Honor, I have a proposal that may help short-circuit this.  I need to check the number of meetings, but we'd probably be willing to stipulate to the number, to not have to read all of them.

THE COURT:  Perfect.

MR. STEEL:  I'd also like to have her read for when she first alerted of any sexual assault.  I know when it is, the government knows when it is, but she needs to read the document, or stipulate, whatever you want.

THE COURT:  All right.  During the break, if she wants to just review those documents to refresh her recollection, then you can ask her questions about that after that.

MR. STEEL:  How do we -- okay.  We'll figure out a way to get to it.

THE COURT:  All right.

Anything further?

MR. STEEL:  I would like to ask a series of questions, but I'd like her to --

THE COURT:  Is this a good time for us to take our lunch break?

MR. STEEL:  Yes, because then I can ask her questions.

THE COURT:  All right.  Very good.

(Continued on next page)

(In open court)

THE COURT:  All right.  Members of the jury, this is a good time for us to take our lunch break.  As I always tell you, don't have any discussions with each other about this case and don't speak with anyone else about this case.

With that, enjoy your lunch, and we'll be back at 12:50.

All rise.

(Continued on next page)

(Jury not present)

THE COURT:  All right.  Please be seated.

Mia, during the lunch break -- as you can remember, because it just happened, you were asked some questions about your discussions with the government in 2023 and 2024.  What's going to happen during the lunch break is that you're going to be given copies of some documents that you should read over during the lunch break and see if they refresh your recollection, and then when we come back, you'll be asked some questions, to just follow up on that, okay?

THE WITNESS:  Okay.

THE COURT:  Other than that, have a good lunch, and we'll be back here at 12:50.  Thank you.

(Witness temporarily excused)

THE COURT:  Anything further to address before we adjourn for the lunch break?

Ms. Smyser or Ms. Comey?

MS. SMYSER:  No, your Honor.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  Nothing from us, Judge.  Thank you.

THE COURT:  All right.

Now, there was some issue raised about some line of inquiry concerning the retention of counsel.  Have we got past that?

MR. AGNIFILO:  We're --

THE COURT:  During the sidebar, there was a suggestion from Mr. Steel that he was going to ask questions about some prior litigation result obtained by an attorney that Mia retained.

Is that still an issue?

MR. AGNIFILO:  I'd like to -- yes.  We have the lunch break.  Let's talk to the government about it, and we'll come back to the Court, and if we could agree, great; if not, we'll tee the issue up for your Honor.

THE COURT:  Very good.

We'll be back at 12:45 to address that issue, and we'll seek to restart at 12:50.

(Luncheon recess)

AFTERNOON SESSION

12:45 PM

(Trial resumed; in open court; jury not present)

THE COURT:  Anything further to address before we bring the witness and the jury back?

MS. COMEY:  I'll just note for the record, your Honor, that during the lunch break, with defense counsel's permission, we shared an iPad containing some of the 3500 material with Mia.  I understand she wasn't able to read through everything the defense wanted her to, but with the defense's permission, we directed her to 3500 from her June 2024 meeting, which I think is the focus of the inquiry.

THE COURT:  All right.  Very good.

So, with that, Mr. Agnifilo -- and you have to get on a microphone or you have to speak --

MR. AGNIFILO:  No, I'm just speaking with my colleagues for a second.

THE COURT:  Okay.

(Pause)

MR. AGNIFILO:  We think we resolved the lawyer issue.

MS. COMEY:  Your Honor, Mr. Agnifilo just said we've conferred, and we believe that there will not be an objection if Mr. Steel asks Mia why she engaged the lawyer that represents her today.

THE COURT:  All right.  Very good.

Anything further from the defense?

MR. AGNIFILO:  Nothing, nothing, Judge.  Thank you.

THE COURT:  All right, Mr. Steel.  Are you prepared to proceed at this time so we can bring the witness and the jury back?

MR. STEEL:  Yes.  Once the witness is ready, I guess, if she is ready.

MS. COMEY:  I can go check, your Honor.

In the meantime, I think the government counted over the lunch break and is prepared to orally stipulate, when the jury comes back, that this witness met with the prosecutors 28 times in total.

THE COURT:  All right.  So let's check and make sure Mia is ready.  If she is, then she can return to the stand.

(Pause)

THE COURT:  All right.  Everyone, get ready.

(Continued on next page)

P62KCOM4                         Mia - Cross

(Jury present)

THE COURT:  Please be seated.

Welcome back, members of the jury.

Mia, you understand you are still under oath?

THE WITNESS:  Yes.

THE COURT:  Now, Mr. Steel, are you ready to proceed?

MR. STEEL:  Correct.

MIA,

CROSS-EXAMINATION CONTINUED

BY MR. STEEL:

Q.  Were you able, over the break, to review the notes of your interviews, or some of your interviews, with federal agents and the federal prosecutors?

A.  I was able to skim through them, yes.

Q.  Isn't it true that you did not mention anything of any type of sexual abuse until June 28, 2024?

A.  Again, I'm not sure of the dates of whenever I first mentioned it.

Q.  Did you look at the documents that the Honorable Court let you review during the lunch break and the date?

A.  I reviewed the first and second one and the dates -- sorry, I don't remember the dates.

Q.  You didn't review the June 28, 2024?

A.  Was that the one with the handwriting?

Q.  Correct?

P62KCOM4                      Mia - Cross

A.   I did review that.

Q.   And is it fair to say that's the first time that you ever mentioned anything about sexual abuse?

A.   Oh, again, I'm not sure.

Q.   Well, you didn't see it in the three previous notes, did you?

A.   I just saw one -- no, actually, the two that I reviewed both mentioned -- both of them mentioned it.

Q.   Mentioned you being abused by Sean Combs sexually?  Is that what you're telling the jury?

A.   The two that I just reviewed both mentioned -- wait, did the first one mention it?

     I believe -- I believe so.

Q.   Ma'am, we're going to come right back to that, but I'd like to put up, with the Court's permission, admitted Government Exhibit 3T109.

     Do you remember viewing this and discussing this photograph that's memorialized in 3T109, Government Exhibit?

A.   Yes.

Q.   You said that there's bruises on the arm of Ms. Ventura.

     Do you remember saying that?

A.   Yes.

Q.   And where are these -- this is right after Ms. Ventura's what, according to you?

A.   This is right before her movie premiere.

Q.  And when did the bruise supposedly occur?

A.  I believe the night before.

MR. STEEL:  Show the jury — and we're going to blow it up with the Court's permission — the arm.

Q.  Are you talking about the right or the left arm?

A.  The one that's closest.

MR. STEEL:  3T109, with the Court's permission, can it be enhanced on the arm, your Honor?

THE COURT:  All right.

Q.  Where on that arm do you see this bruise?

A.  On the top right, underneath where the light hits.

Q.  That's the bruise you're referring to?

A.  Yes.

Q.  You also mentioned eyes of Ms. Ventura --

A.  Correct.

Q.  -- were covered up in makeup; is that true?

A.  Yes.

Q.  Can you focus on the facial part of that exhibit, 3T109.

Do you see the eyes are partially -- see the eyes of Ms. Ventura?

A.  Yes.

Q.  Do you see any redness in the pupils area?

A.  Redness in the -- no, not in the pupil area.

Q.  All right.  Now --

MR. STEEL:  You can take that down if you don't mind.

Q.   -- do you have any photographs of Ms. Ventura's bruising from anything that you witnessed?

A.   I'm not sure.

          (Continued on next page)

P62sCOM5                          Mia - Cross

BY MR. STEEL:

Q.  Well, would you have turned them over if you did?

            MS. SMYSER:  Objection.

            THE COURT:  That's sustained.

Q.  Did you turn them over?

            MS. SMYSER:  Objection.

            THE COURT:  Sustained.

Q.  Why are you unsure?

A.  Because I'm not sure.

Q.  Didn't you look at your devices, electronic devices, and computers and hard drives for any evidence that was relevant in this matter?

            MS. SMYSER:  Objection.

            THE COURT:  Sustained.

Q.  Did you ever look for any type of bruises that you would have of Ms. Ventura in any electronic form?

            MS. SMYSER:  Objection.

            THE COURT:  I think you might need to just rephrase that last question.

Q.  Did you search for any --

            Did you search your devices in order to look at evidence that may be relevant to this case?

            When I say evidence, anything related to Sean Combs, Ms. Ventura, her bruisings, your supposed outcries, anything like that?

P62sCOM5                    Mia - Cross

MS. SMYSER:  Objection.

THE COURT:  There was a lot in there, Mr. Steel.
Maybe you can rephrase it.

Q.  Did you search your computers or your devices for any photographs of Ms. Ventura being bruised that you may have?

A.  I gave everything to my attorneys and I searched --

I mean, I did look through things, but I wasn't specifically looking for that.

Q.  Did you ever give over screenshots from your devices to the government or have your attorneys do that?

MS. SMYSER:  Objection.

THE COURT:  It's overruled.

A.  Again, I gave everything to my attorneys and they handed things over to the government.

Q.  Do you know whether you prevented -- or your agents on your behalf, your lawyers -- the government from searching your devices?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

Q.  I would like to show you what you already reviewed during the break, January 5, 2024, notes from your meeting with the government.  That would be 3404-002, starting page two.

You reviewed this during the break, you stated?

A.  I reviewed two of them, so this one -- yes, I did.

Q.  You can review it again, if you need to.

But where in here does it say anything about sexual abuse on January 5, 2024, meeting with the government?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

Q.  Looking here, review it to yourself, and then I'm going to ask you a series of questions based upon what you said.

Just tell us to turn the page.

A.  You can turn the page.

Q.  You're looking for anything about sexual --

MS. SMYSER:  Objection.

THE COURT:  Hold on.  Hold on.  Hold on.

You can just let us know when you want the page turned.

THE WITNESS:  Oh, sorry.

Yes, the page can turn.

THE COURT:  OK.  Same thing when you're done with this page, just let us know.

THE WITNESS:  You can turn the page.

You can turn the page.

You can turn the page.  OK.

BY MR. STEEL:

Q.  On January 5 of 2024, did you ever tell the government anything about your being sexual abused, to your memory --

MS. SMYSER:  Objection.

Q.  -- to your memory, if it's refreshed, or your memory?

P62sCOM5                          Mia - Cross

THE COURT:  Why don't we reask that question.

Q.  Do you agree or disagree that, on January 5, 2024, you never told the government anything about a sexual abuse allegation against Mr. Combs?

MS. SMYSER:  Objection, your Honor.  This is improper.

THE COURT:  Grounds?

MS. SMYSER:  It's improper refreshment.

THE COURT:  OK.  Well, it's overruled.

But because we have the exchange, Mr. Steel, why don't you ask the question again, please.

MR. STEEL:  Sure.

BY MR. STEEL:

Q.  Do you agree that, on January 5, 2024, you never mentioned anything about sexual abuse at the hands of Mr. Combs to the government?

A.  Again, I don't remember dates.  But if it was the first meeting, then I absolutely did not mention it.

Q.  OK.  Look at 3504, if you don't mind, 004, starting on page two.

You reviewed this during the break, do you remember that?

THE COURT:  You don't have anything up.

Do you want the witness to review this?

MR. STEEL:  Just for a moment, yes.

THE COURT:  All right.

BY MR. STEEL:

Q.  Do you remember reviewing this during the break, the honorable court let you do this and you reviewed it?

THE COURT:  Hold on.

Mia, take your time.  Take a look at what you're seeing.  If you need to see anything more, let you know, and look up when you're done.

THE WITNESS:  OK.  OK.

Q.  Do you need the next page, or your memory is refreshed?

A.  No, I only reviewed two documents.

Q.  Go ahead.

THE COURT:  Let's go to the next page.

Did you see this page?

You've got it up here.  All right.

A.  OK.  Next page.  OK.

Q.  Do you agree that, on January of 2024, you never told the government anything that you were supposedly sexually abused by Mr. Combs, is that true?

MS. SMYSER:  Objection.

THE COURT:  It's overruled.

A.  Again, I don't remember the dates, but based on those notes, no.

Q.  Am I correct --

THE COURT:  Well, hold on.

Mr. Steel, you asked the witness to look at some

documents to refresh the witness's recollection, is that correct?

MR. STEEL:  True.

THE COURT:  All right.  So why don't you phrase your question in that way so that there is no confusion as to what you're asking.

BY MR. STEEL:

Q.  With your memory refreshed, am I correct when I say that you did not tell the government anything about the supposed sexual abuse on January 8, 2024 --

MS. SMYSER:  Objection.

Q.  -- as that document just was shown?

THE COURT:  That's overruled.

A.  Again, I don't remember the dates, and I don't remember each specific meeting or what was said in each meeting.

But I did not tell the government the first time. More than likely, whenever I had representation.  Before that, I did not.

Q.  Well, let's go to 3504-004.  You may have reviewed this on the break.

That's wrong.  That's wrong.  3504-008.

Did you review this document?

If not, just let us know, and review it to yourself. If you have already done it, just tell us when you're ready and you need the next page.

A.   Next page.  Next page, please.  Next page.  OK.

Q.   And in this document that you just reviewed to refresh your memory --

THE COURT:  Hold on.  Just so we're clear on what the form of the question should be, you should ask the witness if her memory was refreshed, whatever it is you're asking about.

Q.   Did what you just read, did that refresh your memory of the March 19, 2024, meeting with the government?

A.   It did not refresh my memory to the specific meeting, because I -- it does not refresh my memory to a specific meeting.

Q.   Did it refresh your memory that, in that meeting, you never mentioned any type of sexual abuse at the hands of Mr. Combs, true?

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

A.   Again, I don't remember -- I don't remember, like, dates or what was said in each meeting.  So it doesn't refresh my memory, if that's what you're asking.

Q.   And in this document, you were represented by a lawyer, Shawn Crowley, correct?

A.   That's what it said on the paper, yes.

MS. SMYSER:  Objection.

THE COURT:  It's overruled.

Q.   Then I would like you to look at what you mentioned

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

earlier, if you need it, 3504-014.

Remember you saw the handwritten notes?

A.  Yes.

Q.  OK.  You've reviewed these during the break, I presume?

A.  As best as I could, yes.

Q.  And this --

You can take it down.  If you need to see it again, let us know.

This will be the first time you ever mentioned that Sean Combs ever supposedly sexual assaulted you, correct?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

Q.  Do you deny this is the first time that you ever mentioned to anyone that Sean Combs sexually assaulted you?

MS. SMYSER:  Objection.

THE COURT:  Yes.

What is the "this?"

MR. STEEL:  June 18, 2024.

THE COURT:  Let's get a new question, and we just need to be a little clearer what we're talking about here.

BY MR. STEEL:

Q.  Isn't it true that the June 18, 2024, meeting with the government and the agents was the first time that you ever mentioned anything about sexual abuse at the hands of Sean Combs?

A.  I have no idea when I first mentioned it.  I didn't see --
I have no idea when I first mentioned it, except for it was
after I had representation.

Q.  All right.  Now, you do intend to sue Mr. Combs for
monetary gain based upon your allegations, isn't that true?

A.  No, that's not my intention.

          THE COURT:  Mr. Steel.

Q.  You want money from Mr. Combs based upon your testimony,
true, don't you?

A.  No, no, no.

Q.  After leaving Mr. Combs' employment in March of 2017, have
you worked since?

A.  I have worked since then?  Yes.

Q.  Have you worked in this same industry?

A.  Yes.

Q.  Who did you work with?

A.  Madonna.

Q.  And what did you do with Madonna, the artist Madonna?

A.  A myriad of things.  I was hired to help lead her film
division.  She also needed help restructuring her internal
executive team, then it morphed into multiple roles.

Q.  What type of roles, if you can make it simple, if you don't
mind?

A.  I did --

Q.  Give us an idea.

A.  Sure.  I also operated, like, in an assistant capacity.

Q.  Did you work directly with the artist Madonna?

A.  Yes.

Q.  And how long were you employed?

A.  I left -- initially, I said I was there for three months. I think I allowed it to extend to eight.

Q.  And when was the term?  What dates, if you best remember?

A.  It was April of -- I don't remember what year.  I guess 20- -- I don't know if it was 2018 or 2019 until, I think, like, October the next year.

Q.  And --

A.  I'm sorry.  The same year.

Q.  And when you were doing that position, to your knowledge -- if you don't know, just say I don't know -- did Mr. Combs assist you in getting that job?

A.  Absolutely not.

Q.  OK.  This is after you sued Mr. Combs and no longer worked with him that you worked with Madonna, right?

        MS. SMYSER:  Objection.

        THE COURT:  Sustained.

        It just needs to be rephrased.

Q.  After March 2017, you just gave us the dates, you worked with Madonna for the eight months, fair, is that true?

A.  After my employment with him, yes.

Q.  Do you have any evidence to share with this jury that you

P62sCOM5                        Mia - Cross

were somehow blacklisted?

MS. SMYSER:  Objection.

THE COURT:  Overruled.

A.  Blacklisted?

Oh, she didn't care about that, but no, I -- of course not.

Q.  No retribution or retaliation by Mr. Combs even after you went to mediation with him, true?

MS. SMYSER:  Objection.

Q.  To your knowledge?

THE COURT:  It's overruled.

A.  Yeah.  He took away the TV show that I had created, he took away the credit that I was promised in the documentary, and other projects that I was working on.

Q.  Ma'am, you told the jury that you were surprised you were let go from your position with Mr. Combs' entities.

Do you remember that?

A.  Yes.

Q.  You really didn't understand why?

A.  Correct.

Q.  Isn't it true that you were let go for failing to arrive on time and for drinking?

A.  Absolutely not.

MS. SMYSER:  Objection.

THE COURT:  It's overruled.

P62sCOM5                        Mia - Cross

A. Absolutely not.

Q. You were never told that?

A. No.

Q. Now, I want to talk with you about Ms. Ventura's career. OK?

A. OK.

Q. In Ms. Ventura's career, are you aware of *Official*, called *Girl* video 2009.

Do you remember that?

A. I'm sorry. Could you ask that again?

Q. Yes.

Are you aware of a video, musical video, *Official Girl*, and the music, 2009?

A. Um, I -- I knew the song.

Q. OK. Is that Ms. Ventura on the song?

A. Yes.

Q. Along with a performer, did you ever hear of Lil' Wayne?

A. Yes.

Q. Would you consider him a well-known accomplished performer, musical performer?

A. Sure.

Q. Are you familiar with Ms. Ventura's music *King of Hearts*?

A. Yes.

Q. Do you remember the year about 2012?

A. I don't know the year. Yes, I'm familiar with it.

Q. Tell the jurors what you remember about that, if you don't mind, what that is?

A. It was one of Cassie's songs.

Q. Do you remember anybody on the song with her?

A. Not off the top of my head.

Q. Do you remember that song being released?

A. I know the song was released.

Q. 2012, do you remember a musical and a video *The Boys*?

A. Cassie's song -- Cassie's song.

Cassie's song?

Q. Yes?

A. Yes, I do remember that song.

Q. Do you remember any artists, well-known artists, that performed with Ms. Ventura on that song and the video?

A. Yes.

Q. Who would that person be?

A. Nicki Minaj.

Q. Is Nicki Minaj also an internationally known bright light in the entertainment industry, musical industry?

A. Yes.

Q. How about 2013, do you remember a mix tape being released with Ms. Ventura, *RockaByeBaby*?

A. I do remember that mix tape.

Q. Can you explain to the jury what a mix tape is and what was on it with Ms. Ventura, if you do?

Do you remember?

A.  I don't remember everybody or who exactly who was on it. The mix tape was just her way to present her music.

Q.  That was released to the public, true?

A.  I believe so, yes.

Q.  The same year, 2013, do you remember music and video *Paradise* that Ms. Ventura released?

A.  Not off the top of my head.

Q.  Did you ever know Ms. Ventura to work with a very well-known artist Whiz Khalifa?

A.  Yes.

Q.  That was released to the public, fair to say?

A.  Yeah.

Q.  How about 2013, music video, Ms. Ventura released *Numb*, do you remember that one?

A.  I don't remember off the top of my head.

Q.  Do you remember a gentleman, I think there were pictures in your social media, the jurors have seen Rick Ross.

Do you know who that is?

A.  Yes.

Q.  Tell the jurors who that is.

A.  He's also an artist.

Q.  Fabulously famous, true?

A.  Sure.

Q.  And he was on that with Ms. Ventura, that song, true?

P62sCOM5                    Mia - Cross

A.  I don't remember.

Q.  OK.  Do you remember *Numb* being released to the public?

A.  I don't remember.

Q.  How about 2013, *I Know What You Want*, do you remember that musical video?

A.  Again, like, if I saw it, maybe.  But I don't remember off the top of my head.

Q.  Do you remember 2013, *I Love It*, a song, video by Ms. Ventura released?

A.  Again, off the top of my head, I don't remember, but...

Q.  Do you remember an artist being featured on that, Fabolous?

A.  Yeah.  I would have to see it to remember it.  I just can't -- I'm not good, with, like, titles of things, I guess.

Q.  About 2016, do you remember Bad Boy Reunion tour?

A.  Yes.

Q.  Do you remember Ms. Ventura being part of that tour and that video release and musical release?

A.  Yes.

Q.  And then in 2017, do you remember the song *Love a Loser*, the video as well?

A.  I don't.

Q.  Do you remember, starting in 2011, Ms. Ventura being in the studio a great deal with a gentleman, performer known as Kid Cudi?

A.  Again, I don't know the years of things.  I do know Cass --

I mean, I've been to the studio with Cass multiple times.  I just don't remember, like, the schedule.

Q.  Do you remember Ms. Ventura also working with performer, well-known performer, G-Eazy?

A.  I -- not off the top of my head.

Q.  French Montana?

A.  Yes.

Q.  And Mr. Combs himself?

A.  Yes.

Q.  Do you remember Ms. Ventura being promoted and appearing at an editorial, photo shoots, and modeling opportunities throughout the years that you worked with her and even when you maintained your friendship with her?

A.  Do I remember --

        Sorry.  do I remember what?

Q.  Photo shoots?

        THE COURT:  Sustained.

Q.  Modeling?

        THE COURT:  Rephrase.

Q.  Do you remember Ms. Ventura being a participant in photo shoots throughout the years?

A.  Yes.

Q.  Modeling throughout the years --

A.  Yes.

Q.  -- that she was with Mr. Combs.

P62sCOM5                        Mia - Cross

How about being in movies?

A. Yes, she was in movies.

Q. *Perfect Match*, released 2016, true?

A. True.

Q. *Honey 3*, filmed fall of 2016 in South Africa, right?

A. Yes.

Q. Who else was in that film?

A. In *Honey 3*?

Q. Correct.

A. Oh, there was a bunch of people. I don't -- I don't have, like, a call sheet to say all their names, but...

   It as a dance movie, so there were a lot of dancers.

Q. Did you ever go to South Africa with Ms. Ventura?

A. Yes.

Q. Did you spend approximately 30 days or more with her there?

A. That sounds right.

Q. And was there other artists there making the movie?

A. I don't remember.

Q. Michael B. Jordan?

A. No.

Q. OK. Nearly every year, did you attend or know if Ms. Ventura, personally know Ms. Ventura attended events, such as film festivals?

A. We went to Cannes together.

Q. Tell the ladies and gentlemen what you did there.

P62sCOM5                     Mia - Cross

A.   That was the film festival that we were at because Puff and I -- well, we had coproduced a movie that was there.  So Cass was with us as well.

Q.   OK.  How about Met Gala?

A.   Did Cass go, is that what you're asking?

Q.   That's true.

A.   Yes.

Q.   Can you tell the jurors what that is?

A.   That is an exclusive gala every May that's run by Vogue.

Q.   How about Paris Fashion Week?

A.   Are you asking if we've been?

Q.   Yes, and Ms. Ventura.

A.   Yes.

Q.   And Grammy Awards events?

A.   Yes.

Q.   And Ms. Ventura was there with you, as well?

A.   Yes.

Q.   What's VMAs?

A.   VMAs.

Q.   Yes.

        Tell the jurors.

A.   It's the Video Music Awards from MTV.

Q.   Were you, all of this that you just referred to, and I'm not limiting to it, but all of this, if you know, was with the knowledge, permission, and consent of Sean Combs to promote

P62sCOM5                          Mia - Cross

Ms. Ventura, is that true?

            MS. SMYSER:  Objection.

            THE COURT:  That's overruled.

A.  I'm sorry.  What --

            could you ask that again?

Q.  What you just articulated to the jury about Ms. Ventura's
career, all of that was promoted by Mr. Sean and encouraged by
Mr. Sean Combs, true?

A.  Was all of it promoted?  Was --

            Did he promote some of her -- did he promote her at
all throughout the years?

Q.  Yes, that's my question.

A.  Yes.

Q.  Now, you mentioned several times throughout your testimony
that you were a part of creating certain ideas and bringing it
to life at Revolt Films, is that true?

A.  Yes.

Q.  Can you tell the ladies and gentlemen of the jury some of
the things that you, you, helped create along with Mr. Combs?

A.  I helped create -- I mean, I helped create the TV show that
we had sold --

Q.  You've got to go slower.  I apologize for stopping you.

            Go ahead.

A.  I helped create the TV show that we sold to ABC.  I helped
create a partnership --

P62sCOM5                    Mia - Cross

Q.   What was that TV show about?

A.   That was about a comedic version of my life in his world

Q.   The show's essence really focused on, through your eyes, how a person from a smaller town lived with such a significant person in the entertainment and business industry as Mr. Combs, is that a fair way to say it?

A.   Yes, the comedic version.

Q.   And you were saying that there is other films that you helped create the idea for?

A.   Yes, like --

Q.   Go ahead.

A.   No.  I'm saying there were other films that we partnered and coproduced.

Q.   Yeah.  Tell us what they were, please.

A.   I wouldn't come up with the idea for the film, just about the partnerships.  There was a movie called *Dope* that we coproduced.

Q.   Is *Dope*, you say dope, d-o-p-e?

A.   Yes.

Q.   Go ahead.

A.   There was a movie called *Lawless* that we coproduced.  There was a movie called *Undefeated* that we coproduced.  And then the documentary, which we did all on our own.

Q.   You also mentioned that, through your work and your efforts, the company was making money.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P62sCOM5                          Mia - Cross

Do you remember saying that?

A.  Yes.

Q.  There was a profit, I mean, right?

A.  Yes.

Q.  And you thoroughly enjoyed working on these projects, right?

A.  Oh, yeah.

Q.  And you explained to the jury that you thoroughly enjoyed meeting the people from your inception.  I'm saying the first day of hire through the conclusion and even beyond, some of the people that you met working with and for Mr. Combs, true?

MS. SMYSER:  Objection.

THE COURT:  It's overruled.

A.  Did I enjoy meeting who?

Q.  The people that you met, you had great relations with certain people at the job, true?

A.  Yeah.

Q.  And, in fact, you call them, like, a second family, right?

A.  Yes.  We all called each other family.

Q.  And you're still very close with a lot of those people, is that fair?

A.  Not a lot of them.

Q.  Some of them, fair to say?

A.  Like, a few.

Q.  OK.  And through all of that, you also respected Mr. Combs

P62sCOM5                           Mia - Cross

when working with him, right?

A.  Yes.

Q.  You also thought that he is a genius, to use your word, true?

A.  At the time, yes.

Q.  You also thought that he had insight into what was relevant and impactful to the community at large, true?

A.  Back then, yeah.  I guess so.

Q.  And you're telling the jury, you use this term, the highs were highs, the lows were lows.

        Do you remember saying that multiple times?

A.  The highs were super high and the lows were super low, correct.

Q.  But my question I would like you to answer, if you don't mind, is:  How could any high cover up the lows that you talked about, by being threatened with your life?

        MS. SMYSER:  Objection.

        THE COURT:  That's overruled.

A.  Oh, because you -- I felt safe and I felt, like, everything was great again.

Q.  And being, God forbid, seen actually abused, according to you, same question?

        MS. SMYSER:  Objection.

        THE COURT:  That's sustained.

Q.  Ma'am, would you agree with me that the reason you wrote

that text message exchange on December 6, 2017, that the jurors had seen saying, I'm going to kill myself, was because you were told that you're no longer working with Mr. Combs and the industry, is because you loved that job?

MS. SMYSER:  Objection.

THE COURT:  It's overruled.

A.  My entire world was being ripped away from me immediately and even, in hindsight, that world was awful.  I didn't know it at the time, so that's why it felt like everything was ending.

Q.  You wanted to work and continue to work for Mr. Combs and his industry businesses, right?

A.  I wanted to continue -- I wanted to continue following my dreams.  I was finally making real -- real stuff, and I had a separation from them.

Q.  And that means that you wanted to continue the work at that location with Mr. Combs and his businesses, that's my question, is that true?

A.  Yes.

Q.  And nobody forced you to work at that business, at that time that you were working there, is that true?

A.  Nobody forced --

I'm sorry.  Could you --

Q.  Yes.  You were doing this, you wanted --

Well, it was a voluntary -- your mind was, I want to stay here and work, right?

P62sCOM5                          Mia - Cross

A.   I'm sorry.  I'm sorry.

         Could you ask me that question?

Q.   Sure.  Sure.

         While working with Sean Combs and the related businesses, that was your voluntary decision, you wanted to work for those companies and with Mr. Combs, is that true?

         MS. SMYSER:  Objection.

         THE COURT:  It's overruled.

A.   I wanted to work for those companies?

Q.   I couldn't hear you.

A.   I'm just trying to --

         Did I want to work for those companies?

         Did I want to work the film production we had created, is that what you're asking?

         I'm just a little bit confused by the wording.

         THE COURT:  Mr. Steel, why don't you try to reask the question just a little bit, and maybe you can rephrase it just a little bit to be a little more clear about what you're asking.

BY MR. STEEL:

Q.   You made the decision to continue to work for Sean Combs and his businesses, right, while you were there, right?

         MS. SMYSER:  Objection.

         THE COURT:  It's overruled.

A.   Did I make the decision to continue ...

I didn't think I had a choice, yeah.

Q.   That's why you were devastated, because you liked working there so much when you were let go, right?

A.   Again, I was devastated because it came out of nowhere and it was confusing about the film company being dissolved.  It had -- and I was told it had nothing to do with me.

Then I was called to come back -- again, it was all confusing.  And, yeah, again, my world that I knew, the only world that I knew was being taken away.  And so, yeah, that felt devastating.

Q.   And when you were called to come back, you came back, right?

A.   No, not in that capacity.  Not in the capacity that I believe you're trying to frame it.  I worked from afar.

Q.   But you were allowed --

You continued to work even after December 6, 2016 into March 2017, right?

A.   I did continue to work.

Q.   Now, we talked a lot about Ms. Ventura's career and the promotion of her career.

Do you know whether Mr. Combs and the companies put in more money to promote Ms. Ventura's career than any other artist that they had on their label?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

Q.  Do you have access and were you on e-mails, if you remember, talking about the amount of money being put forth for the various artists on the label?

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

A.  I'm not sure.  I don't remember.  I mean, I was forwarded things from all over and, just, for him to review.  So I didn't have time to absorb every piece of information.

Q.  Did you ever absorb information that Ms. Ventura was being promoted more moneywise than any other artist with Mr. Combs' companies?

A.  Not that I remember.  Nope.

Q.  Let me show you what's been marked just for your eyes and the parties, Defense Exhibit No. 1769, if that's OK.

Just do me a favor and just orient yourself with this.  Don't say what it is.  Just look at it and tell me, it's multiple pages, by the way, just tell us when to turn the page, if you need it.

A.  This one says that --

MS. SMYSER:  Objection.

THE COURT:  Mia, just read over the document, and Mr. Steel is going to follow up with a question.

THE WITNESS:  OK.  I've read it.

THE COURT:  OK.  Mr. Steel.

P62sCOM5                        Mia - Cross

BY MR. STEEL:

Q.  Did you review the document, did you say yes?

A.  Yes.

Q.  Is that document accurate for what it purports to be in the e-mail?

A.  I'm not sure.  I don't remember it.

Q.  Do you remember receiving and being part of this e-mail chain?

A.  No.  Again, I received hundreds of e-mails a day, so I don't remember this in particular.

Q.  Who is Jason Wiley, W-i-l-e-y?

A.  He worked for the record label.

Q.  Do you know what position?

A.  I don't remember his exact position, but...

        I don't remember his exact position.

Q.  Do you remember he was in budgeting?

A.  I don't know what everybody does all the time, so I don't remember exactly.  But he could have been.

Q.  Did that exhibit that you just reviewed, 1769, refresh your memory as to how much money was being expended on Ms. Ventura's career compared to other artists?

A.  It doesn't refresh my memory.

Q.  You're not saying that Ms. Ventura was not promoted the most by Sean Combs, are you?

        MS. SMYSER:  Objection.

Q.  Compared to other artists.

Sorry.

THE COURT:  It's overruled.

A.  I'm sorry.  You said two nots.  It sounded --

Could you ask that again?

Q.  You're not telling the jury that Mr. Combs did not promote
Ms. Ventura more than any other artist assigned to the label,
are you?

A.  I'm not telling --

THE COURT:  All right.  I'm going --

A.  Sorry.  I'm just confused.

THE COURT:  Mr. Steel, there is, like, a triple
negative in there.  Maybe you've got to rephrase it.

Q.  Is it true that Mr. Combs promoted Ms. Ventura more than
any other artist in the label?

When I say Mr. Combs, I'm also talking about the other
persons who work for the businesses.

A.  I mean, I don't know.

Q.  OK.  Now, do you know an artist and actor and artist model
Michael B. Jordan?

A.  Do I know him?

I know of him, yeah.

Q.  Did you ever -- do you know him personally?

A.  No.

Q.  Were you ever with him when he was with Ms. Ventura?

P62sCOM5                        Mia - Cross

A.   No.

Q.   OK.   I would like to ask you about, you mentioned Kim Porter?

A.   Have I mentioned Kim Porter?

Q.   Yes.

     Do you know who I'm talking about, right; you mentioned her name?

A.   Of course.

Q.   And she is the mother and significant other to Mr. Combs, is that your understanding?

A.   She's the mother of some of his children, correct.

Q.   And Mr. Combs and Ms. Porter are very close or were very close, true?

A.   Correct.

Q.   And that's the funeral you went to in November of 2018 you talked about, right?

A.   Yes.

Q.   And you liked Ms. Porter, true?

A.   Absolutely.

Q.   And you knew from your observations Mr. Combs' love for her, true?

A.   Yes.

Q.   And do you remember speaking with Ms. Ventura -- don't say what was said -- about jealousy, that she was jealous at times of Ms. Kim Porter spending time with Mr. Combs?

Do you remember that?

A.  I don't remember her saying those words.

Q.  Well, did she indicate to you, from your observations, that it bothered her when Mr. Combs would be, at times, with Ms. Kim Porter?

A.  Um, I just -- I don't remember.

Q.  Ms. Ventura wanted to be with Mr. Combs as his significant other, from your observations, is that true?

A.  Yes.

Q.  And Ms. Ventura was disappointed -- I'm not saying anyone lied to her, but she was disappointed that Mr. Combs was with other women, true?

           MS. SMYSER:  Objection.

           THE COURT:  That's sustained.

Q.  That Mr. Combs spent time with other women, including Kim Porter, is that true?

           MS. SMYSER:  Objection.

           THE COURT:  That's sustained.

Q.  Do you know personally from your observations whether it bothered Ms. Ventura when she would see, on social media or otherwise, that Mr. Combs was not spending time with her, but was spending time with Ms. Porter and other women?

A.  From my memory and my experience, she only saw him on social media the one time in South Africa, and then there might have been -- there might have been with Kim, as well, but I

don't remember.  I'm sure she wasn't stoked.

Q.  You don't remember, but you --

Say it again.

A.  I don't remember, but I'm sure she wasn't thrilled.

Q.  You're saying "she" a lot.

You're talking about Ms. Ventura was not thrilled, true?

A.  Yes.

Q.  And that's because Ms. Ventura wanted to be Mr. Combs' exclusive girlfriend-boyfriend, is that true?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

Q.  Do you know from your own observations whether Ms. Ventura wanted to be exclusive with Mr. Combs?

A.  That's what he presented to her, that they were exclusive.

Q.  But that was clearly not true, right?

A.  It was not clear to her.

Q.  Now, upon speaking with Ms. Ventura and being so close to her, did she ever tell you that she was being forced to have sexual contact she did not want before you read the November 16, 2023 lawsuit?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

Q.  Do you have -- did you have any reason to believe, from your observations, that Ms. Ventura was not freely spending all

of her time with Mr. Combs?

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

A.  I'm sorry.

Could ask you the question one more time?

Q.  Let me go to an example.

Do you remember telling the jury last week, I believe, on direct examination that there was a time in a hotel that you were asked by Ms. Ventura to bring some items, and Ms. Ventura -- you knocked on the door -- you went up to the room, knocked on the door, and Ms. Ventura opened the door.

Do you remember something like that?

A.  Puff asked me to bring items to the hotel and Cass answered the door, yes.

Q.  Do you remember how you said that Ms. Ventura peeked out of the door and took the items, or something to that effect?

A.  Yes.

Q.  Remember that?

OK.  Now, after that, did you ever have a conversation with Ms. Ventura that somehow she was held against her will in that hotel room?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

Q.  All right.  Let me ask you, do you recall being given the opportunity to have your therapist's notes permitted to be seen

P62sCOM5                          Mia - Cross

by the parties?

          MS. SMYSER:  Objection.

          THE COURT:  That's sustained.

          Sidebar.

          (Continued on next page)

P62sCOM5                           Mia - Cross

(At the sidebar)

THE COURT:  Mr. Steel, how much time do you have left in cross-examination?

MR. STEEL:  Not much.

THE COURT:  Not much?

MR. STEEL:  I don't believe.

THE COURT:  All right.  Now, since this is the third or fourth time we're getting into this therapist issue, which wasn't previously raised to the court, what is the issue?

Let's figure it out.

MR. STEEL:  The government met with and asked the lawyers for Mia, whether Mia would sign a release and waive confidentiality for the therapist's notes, and the 3500 says that they would not do so.

THE COURT:  OK.  But how can you possibly ask this witness about those discussions?

MR. STEEL:  It's her agent.  It's her lawyer.  And I believe that constant statements and testimony of this witness saying you have to ask my therapist, and my therapist told me, and this is all explained in therapy and my therapist explained to me --

(Counsel confer).

MR. STEEL:  -- I think opens the door.  And Mr. Agnifilo just said that Mia also testified that she told her therapist when, in the 3500 she said that she did not tell

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

her therapist, did not tell him, did not tell her lawyer, or anyone before the June 18, 2024 meeting with the government.

THE COURT:  All right.  Ms. Smyser.

MS. SMYSER:  Let me clear up the record, your Honor.

First of all, the government never asked for Mia's therapist's notes.  There was one text message exchange when we searched Mia's phone.  We didn't realize it was with her therapist.  We were going to use that in trial, and then her lawyers and Mia asserted privilege over that.  That was the end of that conversation, so I just wanted to make that clear.

And I don't think there has been any opening the door to her privileged therapist's conversations.  And my memory of the transcript is not that she testified to if or when she told the therapist about disclosures.  I think all she said was that her therapist's conversations were privileged.

So I don't think we should -- this should be an opening of the door into those many privileged conversations.

THE COURT:  All right.  Well, we're going to proceed with cross-examination.

This is the type of issue that should have been brought up either before or after the lunch break, because it had been raised, questions had been asked, there were objections leveled, and then the court made a ruling on those objections.

If there was going to be another attempt to elicit

that testimony, that's the kind of thing that we would have brought up on the lunch break, not at a sidebar after the lunch break, when you're almost done with cross-examination.

So, that's a procedural default from the defense in terms of raising this issue.

If, to the extent, that there is any issue based on any testimony that Mia brought up concerning conversations with the therapist at this juncture, we'll address that. And if there is a need for a limiting instruction or a curative instruction, we can give that instruction.

But it's going to have -- that's the kind of thing we're going to have to look at the transcript, see exactly what she said, and evaluate the objection, which is not something we can do right now.

For present purposes, the objection is sustained. Let's move forward.

MR. STEEL: Can I ask the court a question? Would you consider taking a break?

I'm almost done. I just wanted to organize the topics, I believe I'm done, and then see on this topic if I can find something in the transcript real fast.

THE COURT: How much time do you have left?

MR. STEEL: Ten minutes.

THE COURT: Ten minutes?

MR. STEEL: Something like that.

P62sCOM5                        Mia - Cross

THE COURT:  Why don't --

MR. STEEL:  I'm not sure.  I want to go over all my notes and streamline.

THE COURT:  Do you have additional questions at this time for this witness?

MR. STEEL:  Yes.

THE COURT:  Why don't you finish up with those questions, we'll take a short break, and if there is anything further to ask me at that time, then we can address that.

MR. STEEL:  OK.  I think I can just...

THE COURT:  The same thing we're talking about, re-sequencing it.  We came back from a lunch break.  I want to make sure, to the extent you have questions, you asked those questions and get that out of the way.  Any loose ends or if there is anything on this issue to address at that juncture, we can take a break.

All right.  Let's do it that way.

MR. STEEL:  That's fine.  I think I could --

That's fine.  I think I can be even shorter, though, is what I'm trying to tell you, because I think that I'm being told that Mr. Agnifilo found something in the transcript that Mia -- I'm not making this representation -- told her therapist about this supposed sexual assault.

MS. SMYSER:  Your Honor, I want to say on this point, this came up on cross-examination.

THE COURT:  Yes.

MS. SMYSER:  The defense doesn't get to open their own door to Mia's privileged conversations with her therapist.

MR. STEEL:  I think it depends on how it came out.  I didn't open the door.  I didn't bring up this conversation.

THE COURT:  If the door has been --

Hold on.  Finish up with whatever other questions you have, then we're going to take a break.

MR. STEEL:  OK.

(Continued on next page)

P62sCOM5                        Mia - Cross

(In open court)

THE COURT:  All right.  Mr. Steel, you may proceed.

BY MR. STEEL:

Q.  During the time that you were confused working with Mr. Combs, you testified that you never called law enforcement.

Do you remember that?

MS. SMYSER:  Objection.

THE COURT:  It's overruled.

Q.  And you said that, well --

THE COURT:  You didn't get an answer.

Q.  I'm sorry.

Do you remember saying that?

A.  Yes.

Q.  And you gave examples of why you didn't call the police. And if I'm wrong, just please correct me.

But one example was, do you remember you were speeding to get to a meeting with Mr. Combs, or for Mr. Combs or for a business reason, and you were stopped by law enforcement, and Mr. Combs spoke with the officer and the officer let you go?

Do you remember something like that?

A.  Yes.

Q.  The other reason you gave, the example you gave, was you were in a car with Mr. Combs stopped by law enforcement, and when law enforcement realized Mr. Combs was in the car, no ticket was issued.

P62sCOM5                       Mia - Cross

Do you remember that?

A.  Yes.

Q.  They were both, I think you said, in Los Angeles, right?

A.  Yes.

Q.  Did you ever anonymously think about calling law enforcement?

A.  No.

Q.  Did you ever think about getting a third party to call law enforcement?

A.  No.

Q.  Did you ever hear about a battered women's shelter while working for Mr. Combs and just reporting it there?

A.  No.

Q.  From 2009 up until November 24 of 2023, so that's approximately 14 years, 15 years -- 14 years, is that true?

A.  Um, sure.

Q.  And in all of that time, all of those days that passed, the only thing that you wrote to or about Mr. Combs were admiration statements, right, statements of admiration?

A.  The only text messages I sent to him?

Q.  Yes.

Or social media postings, you know, the jurors have seen?

A.  Oh, my social media and my text messages?

Of course.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P62sCOM5                          Mia - Cross

Q.   And kindness towards Mr. Combs, right?

A.   Oh, yeah.

Q.   And laughter towards Mr. COmbs, right?

A.   Of course.

Q.   And love for Mr. Combs, right?

A.   Yep.

Q.   Do you remember telling this honorable court and the honorable jurors that Mr. Combs slammed a door on your arm, you thought it was an accident at first?

A.   Yes.

Q.   But then it continued, the pressure on the door -- I believe you said it was a big door -- continued where you believed, you know, in your mind, that Mr. Combs was actually trying to break your arm?

        Do you remember that?

        MS. SMYSER:  Objection.

        THE COURT:  It's overruled.

A.   He slammed my arm multiple times, yes.

Q.   And did you have to go seek any type of medical treatment?

A.   No.  I wouldn't have been allowed.

Q.   Did you have any bruising?

A.   Yes.

Q.   Did you take a photograph of the bruising?

A.   No.

Q.   Was anyone there to watch this supposedly happen that you

can identify?

MS. SMYSER:  Objection.

THE COURT:  It's overruled.

A.  The office was -- had people in it.  I don't know who was there, who was watching, but people were around all the time.

Q.  Weren't you screaming?

A.  I was not screaming.

Q.  Wasn't it painful?

A.  Yes.

Q.  How did you not scream, if you don't mind, if you know?

A.  I don't know.  I don't have the answer of why I didn't scream.  I was in shock, but...

Q.  Are you done?

A.  Yes.

Q.  You talked about your very first day on the job, you went to an office in New Jersey or a home in New Jersey, and came back to a studio, and you were wiped out because it was a 24-hour day.

Do you remember something like that?

A.  I reported to the office, then I went to his house in Alpine, New Jersey, I reported back to the office, I went home.  Before I got there, I was called to the studio, and then back to his place, yes.

Q.  And shortly thereafter, you talked about being sleepless, sleep deprived, rather, for five days in a row.

P62sCOM5                        Mia - Cross

Do you remember that?

A.   There was a time five days in a row, correct.

Q.   And you were starting to -- these are my words -- but you were getting physically sick?

MS. SMYSER:  Objection.

Q.   That's what you testified?

THE COURT:  That's overruled.

Q.   Correct?

A.   I didn't say sick.  I said I had physical reactions.  I just remember, like, seeing stars a bit and my equillibrum was off.  And I remember, like, it felt like my hearing was under water.

Q.   How did you stay awake?

Have You stayed awake for five days before?

A.   Nope.

Q.   Four days before?

A.   No.

Q.   Three days before?

A.   No.

Q.   Two days before?

A.   Not really.  Maybe.

Q.   At some point, didn't you just stop and say, I have to go to sleep?

A.   Absolutely not.

Q.   And your testimony in front of the jurors is you were still

functioning, though, day one, day two, day three, day four, and day five, that's what you're saying?

A.  Was I functioning, or was --

Q.  You were doing your work, is what you're saying, that's why you're not sleeping, is that true?

MS. SMYSER:  Objection.

THE COURT:  It's overruled.

A.  I'm sorry.  I'm a little confused by the question.

Q.  You're working for those five days, is what you're telling the jurors, correct, that's why you couldn't sleep?

A.  That's why I wasn't allowed to sleep.

Q.  You're productive, is what you're saying, I believe?

If not, just say.

A.  Was I productive?

I don't remember really what was happening, but I'm assuming I made it through.  Definitely not my best work.

Q.  But you didn't quit?

A.  No.

Q.  You didn't complain?

A.  Well, I guess I burst into tears because I couldn't hold it anymore.  I don't know if that's complaining.

Q.  There is no text message or note or self-reflection that this happened, right?

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

A.   There -- I did e-mail multiple times to the office saying, I haven't slept in this many days.  Please, please, please, please, please, like, let me off work, if that's what you're asking.  Yeah, there was -- there was e-mails like that.

Q.   And your testimony is that HR -- you know what HR stands for?

A.   Yes.

Q.   What is it?

A.   Human resources.

Q.   And it's your testimony human resources was really just a front for Mr. Combs, that's what I think you're saying?

     If not, just correct me.

A.   The only interactions I had with human resources were for them to enforce whatever punishment he wanted.

Q.   And it's your testimony that you didn't deserve any of that punishment or suspensions of work, is that what you're telling the jury?

A.   Correct.

Q.   And who in HR were the people you're talking about did not get it right?

A.   Who in HR --

     Wait.  Who?

Q.   Who suspended you without cause?

     Who were those people who were working there?

A.   Vashta Wilson.

P62sCOM5                         Mia - Cross

Q.   Say that again?

A.   Vashta Wilson.

Q.   Now, you talked about blood dripping down your leg or flowing down your leg.

     Do you remember that?

A.   Yes.

Q.   Any witness to that, that you know about?

A.   Yes.

Q.   Who would that be?

A.   The house was full of probably like 30, 40 people.

Q.   40 people.  OK.

A.   Something -- I mean, something along those lines.

Q.   And during this whole time working with Mr. Combs, you testified and told the government in your prior statements that you were terrified at all times.

     Do you remember that?

     MS. SMYSER:  Objection.

     THE COURT:  That's sustained.

Q.   You were afraid of being killed.

     Do you remember that?

     MS. SMYSER:  Objection.

     Timeframe, your Honor.

     THE COURT:  Mr. Steel.

     MR. STEEL:  Yes, sir.

     THE COURT:  Can we get some clarification on what

P62sCOM5                        Mia - Cross

you're talking about?

BY MR. STEEL:

Q.  While working with Mr. Combs, you testified that there were times that you felt that you could die at the hands of Mr. Combs.

Do you remember that?

MS. SMYSER:  Objection.

THE COURT:  It's overruled.

A.  He threatened my life before and physically assaulted me before, if that's what you're asking.

Q.  But then your answer is the highs are highs and the lows are lows, right?

A.  Yes.

(Continued on next page)

P62KCOM6                          Mia - Cross

BY MR. STEEL:

Q.   You testified that you would give up all of the money if there was no sexual abuse.

     Do you remember that conversation you had with the prosecutor?

A.   Yes.

Q.   Have you had any discussions — I'm not asking for any type of attorney-client matters — did you have any discussions with anybody that you believe that you will make money by testifying against Mr. Combs in the manner you testified today?

A.   No.   That's not even a thing.

     MR. STEEL:   Your Honor, can I organize those other matters?

     THE COURT:   Yes.   We're going to take a short break and come back in ten minutes.

     Thank you, members of the jury.

     All rise.

     (Continued on next page)

P62KCOM6                        Mia - Cross

(Jury not present)

THE COURT:  Thank you, Mia.  We'll see you back here in about ten minutes.  Thank you.

(Witness not present)

THE COURT:  Mr. Steel?

MR. STEEL:  Your Honor, can I just have one minute to get some notes together on the therapist issue?

THE COURT:  Yes.

MR. STEEL:  Thank you, sir.

MS. SMYSER:  Your Honor, while he's doing that, can we be heard on the therapist issue?

THE COURT:  You may.

MS. SMYSER:  So, your Honor, I was carefully objecting throughout Mia's testimony when conversations with her therapist came up.  I don't think she disclosed anything that would waive that privilege.  And I'll remind the Court that this witness is a lay witness, she is not a lawyer.  I think she was trying very hard not to disclose conversations with her attorneys or conversations with her therapist.  And as we pointed out at sidebar, to the extent any conversation with her therapist came up, it was on cross-examination and in response to cross-examination, and defendant shouldn't be able to open their own door here.

I will also note, just before I sit down, if there's any possibility that you're considering any waiver, I

understand that Mia's counsel would like to be heard, also.

THE COURT:  Understood.

I take it the government has no objection to an instruction to the jury that to the extent there was any testimony concerning discussions with Mia's therapist, they should disregard that testimony and not consider it as part of their deliberations?

MS. SMYSER:  That's fine, your Honor.

THE COURT:  All right.

MS. COMEY:  Your Honor, while we are waiting, we have some logistical issues to flag.  We have the custodian from a hotel, who has an 8:00 p.m. flight.  We thought she'd be on the stand hours ago.  We're hoping that, if necessary, we could stay a little late so that she doesn't have to stay until tomorrow.

THE COURT:  That's fine.

MS. COMEY:  Thank you, your Honor.

And, also, we're going to have to reorder some of our witnesses, given how long Mia's cross was today.  We have other logistical issues with other witness travel that we're going to have to take into account, given how long the cross was today.

THE COURT:  Understood.  And I appreciate that.

MR. STEEL:  Your Honor, I believe we're going to be done based upon the Court's colloquy just now with an instruction.  I just have to make sure with the rest of the

people here.

MR. AGNIFILO:  Only because I was looking for the testimony when your Honor was speaking, so I might not have gotten what your Honor said.

Your Honor was talking about instructing the jury in regard to something in connection with any reference to the testimony about the therapist?

THE COURT:  Yes.

MR. AGNIFILO:  And what's the Court's proposal?

THE COURT:  Before the break, there were some questions about the witness' discussions with her therapist. You should not consider that testimony in this case or as part of your deliberations.

MR. AGNIFILO:  All right.  Thank you.

THE COURT:  With that, that resolves the issue?

MR. AGNIFILO:  I think that resolves the issue.  Thank you, Judge.

THE COURT:  With that, if anyone needs a very short break, you can take it, but, otherwise, we will proceed in a couple of minutes.

Why don't we take five minutes and come back.

(Recess)

THE COURT:  Please be seated.

Let's have Mia come back to the stand.

MR. STEEL:  Your Honor, thank you for that break.

No other questions.

THE COURT:  All right.  Thank you.

(Witness present)

(Continued on next page)

P62KCOM6                        Mia - Redirect

(Jury present)

THE COURT:  Please be seated.

Anything further, Mr. Steel?

MR. STEEL:  No, sir.

THE COURT:  Members of the jury, before the break there was some testimony concerning the witness' discussions with her therapist.  You should not consider that testimony in this case or as part of your deliberations.

With that, Ms. Smyser.

MS. SMYSER:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MS. SMYSER:

Q.  Mia, do you remember being asked on cross-examination about Instagram posts that you made?

A.  Yes.

Q.  Did you post on social media as part of your job?

A.  Yes.

Q.  Do you remember looking at posts promoting Ciroc?

A.  Yes.

Q.  Was that part of your job?

A.  Yes.

Q.  Do you remember looking at a post promoting the Diddy door?

A.  Yes.

Q.  Was that part of your job?

A.  Yes.

Q.  Do you remember looking at posts promoting the Bad Boy reunion tour?

A.  Yes.

Q.  Was that part of your job?

A.  Yes.

Q.  And do you remember looking at posts promoting Mr. Combs himself?

A.  Yes.

Q.  Was that also part of your job?

A.  Yes.

        MS. SMYSER:  Ms. Gavin, could you please pull up Government Exhibit 3T106R.

        Could you just zoom in on the second full paragraph there.

Q.  That starts with:  All of PD's social media presence.

        Do you see that, Mia?

A.  Yes.

Q.  Was it, in fact, part of your job, to manage all of PD's social media presence?

        THE COURT:  Hold on, Ms. Smyser.  Is this already in evidence?

        MS. SMYSER:  Yes, your Honor.

        THE COURT:  I think it's not being shown to the jury.

        MS. SMYSER:  Oh.  Can we please publish to the jury?

BY MS. SMYSER:

Q. So, Mia, was it, in fact, part of your job to manage all of PD's social media presence?

A. Yeah.

Q. And as part of that, did you post on your personal Instagram account?

A. Yes.

Q. And did other employees post on their personal Instagram accounts?

A. Yes.

Q. What kinds of things did Mr. Combs do when he thought that you were not doing your job?

A. I would be punished.

Q. And in what way would you be punished?

A. I would be screamed at, humiliated, made fun of, and my job would be threatened.

        MS. SMYSER:  You can take that down, Ms. Gavin.

Q. Mia, do you remember being asked about social media posts that you posted for Mr. Combs' birthday?

A. Yes.

Q. Was that also part of your job?

A. Yes.

Q. Did other employees also make posts for Mr. Combs' birthday?

A. Yes.

Q.   What did you expect would happen if you did not post for Mr. Combs' birthday?

A.   It would be really weird, and I would have gotten some sort of -- I would have been in trouble.

Q.   Do you remember being shown a video of you wishing Mr. Combs a happy birthday in 2013?

A.   Yes.

Q.   And was that for a club Diddy post?

A.   That was a club Diddy post, yes.

Q.   And were you drinking a bottle of AQUAhydrate water in that post?

A.   Yes.

Q.   What is Mr. Combs' relationship with AQUAhydrate water?

A.   I believe he was part owner.

Q.   And do you remember saying, at the end of that post, Revolt?

A.   Yes.

Q.   Is that the business that you worked for?

A.   Yes.

Q.   The business that Mr. Combs owned?

A.   Yes.

Q.   And when you were posting on Instagram, did you post about the good times or the bad times?

A.   The good times.

Q.   Why didn't you post about the bad times?

P62KCOM6                    Mia - Redirect

A.   That's not what social media was for, for a myriad of reasons.  Yeah, that was like the highlight reel was Instagram.

Q.   Is that why you didn't post about Mr. Combs slamming Cassie's head into the corner of a bed frame?

MR. STEEL:  Objection.

THE COURT:  That's overruled.

THE WITNESS:  Yes.

BY MS. SMYSER:

Q.   And is that why you didn't post about Mr. Combs throwing a computer at your head?

MR. STEEL:  Objection.

THE COURT:  That's overruled.

THE WITNESS:  Yes.

BY MS. SMYSER:

Q.   Is that why you didn't post about Mr. Combs sexually assaulting you?

A.   Yes.

MR. STEEL:  Objection.

THE COURT:  Overruled.

BY MS. SMYSER:

Q.   Mia, do you remember being asked about a scrapbook that you gave Mr. Combs for one of his birthdays?

A.   Yes.

Q.   And do you remember testifying that you thought the scrapbook would make him happy?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   Yes.

Q.   Why did you try to keep the person who abused you happy?

A.   Because when he was happy, I was safe.

Q.   And do you remember Mr. Steel referring to Mr. Combs as the man who terrorized you?

A.   Yes.

Q.   Did Mr. Combs always terrorize you?

A.   No.

Q.   Were there also times that you had fun with him?

A.   Yes.

Q.   Could you just explain to the jury how it can be both terrifying at times and fun at times?

A.   Yes.  The dynamic would shift quite often, where, when he would refer to me or treat me like his best friend or his family, then we would have -- it would be great, I would be safe, it would be so much fun.  And then it could dramatically shift, based on his moods, to the abusive, scary versions.

Q.   Mia, do you remember Mr. Steel referring to Mr. Combs' birthday as the anniversary of the initial sexual abuse?

A.   Yes.

Q.   Why do you not remember it that way?

A.   Because I never wanted to think about that ever again.

Q.   Because you wanted to keep it moving; is that right?

A.   Yes.

Q.   What do you mean by "keep it moving"?

P62KCOM6                    Mia - Redirect

A.   Keep it moving meant you -- there was no time for any sort of emotional reacting or assessment of what happened, you just have to keep working and keep going, otherwise, you were labeled as dramatic, crazy, too much to deal with.

Q.   And who at Combs Enterprises taught you to, quote, keep it moving?

A.   Puff.

Q.   In fact, what did Mr. Combs tell you to do the first time you ever apologized to him after he was angry with you?

A.   He told me to keep it moving.

Q.   And did you follow his instructions on that?

A.   Absolutely.

Q.   What would happen if you didn't follow Mr. Combs' instructions?

A.   I would be punished.

Q.   Mia, do you remember being asked on cross-examination questions about why you didn't disclose Mr. Combs' sexual assaults of you earlier?

A.   Yes.

Q.   Why did you not tell human resources about the sexual assaults?

A.   For a million reasons.  Human resources only punished unjustly.  They also fired Kayla for even discussing Cassie -- Cassie's abuse.  They wouldn't have believed me, and I would have been fired immediately.

P62KCOM6                        Mia - Redirect

Q.  Mia, you mentioned Kayla.

What did Mr. Combs tell you to do -- or tell you you would have to do after Kayla was fired?

A.  That I would have to get on the stand and testify against her.

Q.  And what did Mr. Combs tell you you would have to do after Capricorn left?

A.  The same thing.

Q.  What did Mr. Combs call it when other people went against him?

A.  It was betrayal.

Q.  What were you worried would happen if you disclosed that Mr. Combs sexually assaulted you?

A.  That I wouldn't be believed, I would be wiped out, I would be abused, fired, and somehow made out to look like it was -- I was a crazy person, making everything up.

Q.  Mia, do you remember being asked on cross-examination whether it was great when Brian Offutt told you that Revolt Films was no more?

A.  Yes.

Q.  And do you remember responding that, in hindsight, it was fantastic, but at the time, it was the worst thing ever?  Is that right?

A.  Yes.

Q.  Why, at the time, was it the worst thing ever?

A.  Because that was what I worked so hard -- so hard for.  It came out of nowhere, and there was no explanation.  And that was, again, my entire world.

Q.  And why, in hindsight, was it fantastic?

A.  Because now I've been surrounded by the support that I need, and I needed, and I've seen other worlds that are not like that.

Q.  To be clear, Mia, at any point in time when you were working for Mr. Combs, did you feel like you could leave your job?

A.  No.

Q.  Was there ever a time that you tried to leave?

A.  Yes.

Q.  When you tried to leave, did a chief of staff tell you to go back?

A.  Yes.

Q.  And what were you worried would happen if you didn't go back?

A.  That I would be in trouble, punished.

Q.  What specifically were you worried would happen if you got in trouble?

A.  That I would have been completely stripped of any credibility, I would have lost -- I wouldn't have been able to get a job in the same or any industry that I wanted, and I would have lost everything I knew.

Q.   Were you bothered about your physical safety at all?

A.   Yes.

Q.   Why?

A.   Because my physical safety was -- had been -- I'd been abused physically before, and had also seen -- I just knew his power and his wrath.

Q.   And who had abused you physically before?

A.   Puff.

Q.   Okay, Mia.  Sometime after meeting with the government, did you engage a pro bono lawyer?

A.   Yes.

Q.   Are you paying for that lawyer?

A.   No.

Q.   Was your lawyer engaged for the purposes of representation in this criminal case?

A.   Yes.

Q.   Mia, do you also remember being asked about how many times you met with the government?

A.   Yes.

Q.   You testified that you met with the government quite a bit, right?

A.   Yes.

Q.   Why did you meet with the government so much?

A.   I met with the government so much in order to -- in order to understand my story and because I was so terrified, and I

P62KCOM6                    Mia - Redirect

was learning, at the same time, how --

MR. STEEL:  Objection, your Honor.

THE COURT:  It's overruled.

A.  -- I was learning how the things that happened to me were wrong, and, from my understanding, everybody --

MR. STEEL:  Objection, your Honor.

THE COURT:  Overruled, but let's finish with the answer.

THE WITNESS:  Sorry.

THE COURT:  Mia, do you have anything further?

THE WITNESS:  No.

THE COURT:  All right.

Ms. Smyser.

BY MS. SMYSER:

Q.  Mia, you said you were terrified.  Why were you terrified?

A.  Terrified of Puff and the repercussions.

Q.  And, Mia, in your many meetings with the government, did anyone ever tell you what to say here today?

MR. STEEL:  Objection.

THE COURT:  That's overruled.

THE WITNESS:  Never.

BY MS. SMYSER:

Q.  In your many meetings with the government, what is the only thing that the government has asked you to do?

MR. STEEL:  Objection.

P62KCOM6                        Mia - Redirect

THE COURT:  Overruled.

THE WITNESS:  Tell the truth.

BY MS. SMYSER:

Q.  Mia, can you explain how you feel about public speaking?

MR. STEEL:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Terrified.

BY MS. SMYSER:

Q.  Could you just explain how you feel that way when, for example, on cross-examination, you testified that you had been in comedy videos before?

MR. STEEL:  Objection.

THE COURT:  Ms. Smyser, could you rephrase that question?

MS. SMYSER:  Yes.

BY MS. SMYSER:

Q.  Do you remember talking about being in a comedy video that was related to an Instagram post, Mia?

A.  Yes.

Q.  And you also just testified that you're terrified of public speaking?

A.  Yes.

Q.  Could you just explain how you can be terrified of public speaking and also be in comedy like that?

MR. STEEL:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT:  Overruled.

THE WITNESS:  Oh, I didn't speak in that video.  And I had Puff's permission.

BY MS. SMYSER:

Q.  And how does the experience of, for example, being in that video compare to talking about Mr. Combs sexually assaulting you on this stand in front of all these people?

MR. STEEL:  Objection.

THE COURT:  It's overruled.

THE WITNESS:  There's no comparison between the two.

BY MS. SMYSER:

Q.  Have you ever been able to talk about Mr. Combs sexually assaulting you without looking down?

A.  No.

Q.  Why is that?

MR. STEEL:  Objection.

THE COURT:  That's overruled.

THE WITNESS:  Because it -- because it's the worst thing I've ever had to talk about in my life.

BY MS. SMYSER:

Q.  Are you getting any money for being here today?

A.  No.

Q.  Are you getting any fame for being here today?

A.  No.

Q.  Do you want to be here talking about this today?

MR. STEEL:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Absolutely not.  This is --

THE COURT:  All right, Ms. Smyser.

BY MS. SMYSER:

Q.   Just one final question for you, Mia.  Why are you testifying here today?

MR. STEEL:  Objection.

THE COURT:  That's overruled.

THE WITNESS:  Because I can't look my niece or my --

MR. STEEL:  Objection.

THE COURT:  Hold on.

That's overruled.

THE WITNESS:  I can't look my niece and my Goddaughter in the eyes and ever advise them in the future if they happen to be in this situation.

MR. STEEL:  Objection, your Honor; move to strike.

THE COURT:  That's overruled.

Ms. Smyser, anything further?

MS. SMYSER:  No, your Honor, no further questions.

THE COURT:  All right.

Mr. Steel, anything further?

MR. STEEL:  No, sir.

THE COURT:  All right.

Mia, you're done.  Thank you very much.

THE WITNESS:  Thank you.

THE COURT:  Unless you want to stay.

(Witness excused)

THE COURT:  The government may call its next witness.

MS. JOHNSON:  Your Honor, we have one administrative matter before we call our next witness.  We just need to admit a few exhibits that were initially offered during Ms. Ventura's testimony.

THE COURT:  All right.  Do you need that for the next witness?

MS. JOHNSON:  It will be very brief.  I'm just going to offer one document.

THE COURT:  Okay.  Go for it.

MS. JOHNSON:  If Ms. Gavin could pull up Government Exhibit 1502, which is a demonstrative.

The government offers every exhibit listed on this demonstrative, Government Exhibit 1502, at this time.

THE COURT:  Any objection?

MS. GERAGOS:  No, your Honor.

THE COURT:  All right.

So the exhibits identified in Government Exhibit 1502 will be admitted.

(Government's Exhibits B-219, B-223, B-224, B-238, received in evidence)

(Government's Exhibits B-249, B-260, B-261, B-329,

P62KCOM6

B-338 received in evidence)

(Government's Exhibits B-356, B-405, B-409, B-423, B-424, B-426 received in evidence)

(Government's Exhibits B-430, B-511, B-619, B-620, B-627-B received in evidence)

(Government's Exhibits B-627-C, B-629, B-630, B-635, B-638 received in evidence)

(Government's Exhibits B-640, B-642, B-645, B-650 received in evidence)

MS. JOHNSON:  We will provide a copy of this to the court reporter so that it will be reflected in the transcript.

THE COURT:  Thank you very much.

With that, Ms. Geragos, anything further?

MS. GERAGOS:  We just have four exhibits to admit after this, which is Defense Exhibit 1376R, 1373R, 1410, and 1411R.

MS. JOHNSON:  No objection.

THE COURT:  Those exhibits will be admitted.

(Defendant's Exhibits 1376R, 1373R, 1410, and 1411R received in evidence)

THE COURT:  The government may now call its next witness.

MS. FOSTER:  The government calls Sylvia Oken.

SYLVIA OKEN,

    called as a witness by the Government,

having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Can I please ask you to give the Court your first and last flame and spell your first and last name.

THE WITNESS:  Yes.  It's Sylvia Oken, and it's spelt S-y-l-v-i-a; last name is O-k-e-n.

DIRECT EXAMINATION

BY MS. FOSTER:

Q.  Good afternoon, Ms. Oken.

A.  Hello.

Q.  Where do you work?

A.  I work at the Beverly Hills Hotel.

Q.  What is the Beverly Hills Hotel?

A.  A luxury hotel based in Beverly Hills, California.

Q.  How long have you worked at that hotel?

A.  Approximately 17 years.

Q.  What is your current role there?

A.  I'm the area director of sales and marketing.

Q.  What are some of your responsibilities in that role?

A.  So, essentially, the sales, catering, marketing, PR teams all report into myself.

Q.  Prior to being area director of sales and marketing, what other positions have you had at the hotel?

A.  I was the entertainment sales director, and then after that, I was the sales -- the area director of sales.

Q.  Can you briefly explain some of your responsibilities in those roles?

A.  Sure.

So, as the entertainment sales director, I primarily focused on entertainment clients, any entertainment companies, any entertainment guests who stayed with the hotel or any groups, and then, as area director of sales, all the sales team managers reported to myself.

Q.  Through your positions at the Beverly Hills Hotel, are you familiar with the hotel's reservation system?

A.  Yes.

Q.  Could you explain what happens when a hotel guest makes a reservation at the hotel?

A.  Yes.

So, regardless of how a reservation is made — whether it is made through our online website or through American Express or travel agent or anyone like that — that reservation comes through to a system called OPERA.

Q.  Does that, the hotel's reservation system, have profiles for individual guests?

A.  Yes.

Q.  And when are those guests' profiles generated?

A.  As soon as the reservation is made.

Q.  What system are those profiles generated in?

A.  In a system called OPERA.

Q.  Could you explain what type of information is contained on that guest profile?

A.  Yes.

It's essentially the guest's name, first and last name, address, phone number, email, sometimes birthdays if we have it, marketing opportunities, and any kind of profile notes that -- preferences, such as newspapers or allergies, et cetera.

Q.  Does the profile also contain information about all prior stays of the guest?

A.  Yes.  So, it includes any stay, and then anything that they have spent at the hotel.

Q.  Can that profile be updated at all over time?

A.  Yes.  It gets updated every single time a guest stays because there is obviously a charge to every time they come. So, the invoices or the folios get updated, as well as if the guest changes their last name because they get married or they change a name or, you know, any kind of allergy updates, anything gets updated.

Q.  I believe you mentioned this before, but does each guest profile have a name associated with it?

A.  Yes.

Q.  Is the name on the guest profile always the name of the actual hotel guest?

A.  No.  At times, particularly for entertainment clients, as

well as other guests, they have what we call an alias or an

incognito.

Q.  When a guest uses an alias, does the hotel have a way of

knowing who the actual guest is?

A.  Yes.

       So, our system, called OPERA, that I just stated, has

both names recorded into the system.

       MS. FOSTER:  Ms. Gavin, could you please pull up what

has been marked as Government Exhibit 7B-149 just for the

parties, the witness, and the Court.

Q.  Ms. Oken, are you familiar with this document on the

screen?

A.  Yes.  That is a profile of a guest in OPERA.

Q.  Are you familiar with the way records are maintained in

OPERA?

A.  Yes.

Q.  Is the information contained in Government Exhibit 7B-149

kept and maintained in the regular course of business

activities of the hotel?

A.  Yes.

Q.  Is this information recorded at or near the time of the

events set forth therein by people with knowledge of those

matters?

A.  Yes.

       MS. FOSTER:  The government would now move to admit

P62KCOM6                         Oken - Direct

Government Exhibit 7B-149.

MS. GERAGOS:  No objection.

THE COURT:  Government Exhibit 7B-149 will be admitted.

(Government's Exhibit 7B-149 received in evidence)

MS. FOSTER:  Ms. Gavin, can you please display that for the jury.

Q.  You mentioned this is a guest profile.

What is the name on this guest profile?

A.  So, the name is Phillip Pines.

Q.  And at the Beverly Hills Hotel, how many guest profiles are there using the name Phillip Pines?

A.  Just one.

Q.  Based on your review of this guest profile, can you tell whether Phillip Pines is the real name of the guest staying under the profile?

A.  So, it's an alias.

Q.  How can you tell that?

A.  Because on that name -- on that line, where it has surname and Pines, there's a little globe, and then there's a little "I," and if you click on the "I," it will say the real name.

Q.  What is the real name of the guest staying under the name Phillip Pines?

A.  Sean Combs.

Q.  Is that displayed in the box titled "Incognito Name" on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

this sheet?

A.  Yes.

MS. FOSTER:  Ms. Gavin, you can take this down.  Thank you.

Q.  Can a guest change the alias or name on his or her guest profile?

A.  Yes.

Q.  How do they do that?

A.  They would most likely tell the front desk or myself or a sales representative.

Q.  What happens in the hotel's reservation system once they ask for a new name?

A.  So, in that scenario, if Mr. -- if they wanted to switch from Phillip Pines, then we would just change that name to whatever they requested.

Q.  In the Oracle system --

A.  Yes --

Q.  -- or the OPERA system?

A.  Yes.

Q.  Now, I'd like to look at some records of the Beverly Hills Hotel.

MS. FOSTER:  Ms. Gavin, could you please first pull up Government Exhibit 1304, which is a stipulation between the parties, and please turn to page 7 and zoom in on paragraph 39.

This states that Government Exhibit 7B-101 through

7B-148, including the subdivisions thereof are true and accurate records from the Beverly Hills Hotel 9641 West Sunset Boulevard Beverly Hills California 90210.  Pursuant to this stipulation, the government now offers 7B-101 under seal and Government Exhibit 7B-101-R.

THE COURT:  Those exhibits will be admitted under the terms you stated.

(Government's Exhibit 7B-101 (Sealed) received in evidence)

(Government's Exhibit 7B-101-R received in evidence)

MS. FOSTER:  Ms. Gavin, can you please pull up Government Exhibit 7B-101-R.

Q.  Ms. Oken, have you seen this record before?

A.  Yes.

Q.  What, generally, does it show?

A.  It shows each row is essentially a stay, and it essentially says the guest's name, check-in dates, checkout time, check-in date checkout time, accompanying guests, checkout day, checkout time, and the last room that he has stayed in.

Q.  You mentioned that each row shows an individual reservation; is that right?

A.  Yes.

Q.  Does this entire document show a series of different reservations at the hotel?

A.  Exactly, yes.

Q.  You explained some of the initial rows.

        MS. FOSTER:  Ms. Gavin, can you highlight starting with reservation notes through email.

Q.  Can you explain just what these rows show or these columns show, very briefly?

A.  Yes.  So the reservation notes is any kind of request that pertained to that particular reservation.  So, in that first line, it's mostly about newspapers.  And then it's any -- the requests during stay would be like an early check-in or a late checkout, as an example.  And then the folio, which every stay has a folio.  And then the address of the guest, the phone number of the guest, and the email of the guest.

Q.  Pausing you on the one titled "Reservation Notes and Preferences," who inputs that information?

A.  It's usually -- it could be the front office or it could be the reservations department.

        MS. FOSTER:  Ms. Gavin, could you now highlight the last three columns.

Q.  Can you just generally speak about what these columns show?

A.  Yes.  The form of payment was essentially how the particular reservation was paid for, and then any vehicles associated with that particular stay.

        MS. FOSTER:  Ms. Gavin, can you highlight "Other Accompanying Guests," that column, again.  Yes, thank you.

Q.  Ms. Oken, what does this column specifically show?

A.  So, it's just any guests that -- a name that they want access to that particular reservation.  So, this person, any accompanying guest has full access to the reservation to order room service or charge to the room, anything like that.  So, they essentially had full access to the room.

Q.  Can a guest have more people in their rooms than is reflected under this column?

A.  Yes.

Q.  And how is that?

A.  Because once a guest arrives, we don't technically know who's inside the room, we just know that the room is checked in.  And the accompanying guests can -- they're not necessarily always guests who stay at the hotel; they could be somebody that checks in on the guest's behalf.  So, we never really know who's inside the room, for obviously reasons, privacy reasons.

        MS. FOSTER:  Ms. Gavin, could you please focus on the reservations in white that are at the end of page 1 through the top of page 4 in the name Phillip Pines.

Q.  Ms. Oken, what do these show?

A.  So, this essentially shows various stays.  So, you can tell by the check-in date that there are various different stays that happened.

Q.  Under what guest profile?

A.  Under Mr. Phillip Pines.

Q.  Again, is Phillip Pines the actual name of the actual guest

P62KCOM6                      Oken - Direct

for these reservations?

A.   It was not.

Q.   Who was the guest?

A.   Mr. Sean Combs.

Q.   How do you know that?

A.   Per the OPERA screen that we just showed you previously, again, it says Phillip Pines and then the incognito name as Sean Combs.

Q.   Is that also evidence from some of the notes on this spreadsheet, as well?

A.   Yes, because if you look at the fourth line down, it -- the number 4 states:  "Also known by his stage name as Diddy, P. Diddy, as an American rapper, singer, entrepreneur, record producer, actor."

Q.   Now, we talked about how someone can change their alias or guest profile name over time.

     Do you know if, at the time each of these reservations were made, they were made using the alias Phillip Pines?

A.   They were not, because his alias had changed over time.

Q.   And who is "he"?

A.   Oh.  Mr. Combs.

Q.   And how do you know that?

A.   Actually, I had made a couple of reservations in the past under a different alias, called Frank Black.

Q.   Reservations for Mr. Combs?

P62KCOM6                        Oken - Direct

A.   Yes.

Q.   Why do each of these reservations then show up under the name Phillip Pines?

A.   Because Phillip Pines was the last alias he had used prior to the last checkout.

Q.   So, then, does that alias then become the name associated with all prior reservations for that profile?

A.   Yes, it does.

Q.   Understood.

     Now, I want to briefly walk through some examples.

     Directing your attention to page 3, row 17, just very briefly, what does this show?

A.   It shows that Mr. Pines stayed on June 12th -- checked in on June 12th, arrived at 5:55 p.m., departed on June 14th at 1:05 p.m., in room 259.  And the request that he had for that particular stay was for newspapers, and then that he had extended — he was initially only supposed to stay for one night but he ended up staying for two nights — and moved from bungalow 10A to room 259.

     MS. FOSTER:  Ms. Gavin, now highlight the payment information for this room.

Q.   What does it show as the credit card or the method of payment for this room?

A.   It shows an American Express ending in 3004 under Mr. Sean Combs.

MS. FOSTER:  Ms. Gavin, can you now focus on page 3, row 31.

Q.  Ms. Oken, what does this show?

A.  So, again, it shows that the reservation was under Mr. Pines.  He arrived on May 30th at 11:59, departed on May 31st at 3:51 p.m., and he stayed in bungalow 23B.  And the requests for that stay was, again, particular newspapers.

MS. FOSTER:  Ms. Gavin, can you highlight the payment column for row 31.

Q.  What is the email address before the payment information here?

A.  TFletcher@badboyworldwide.com.

Q.  And what was the payment method for this reservation?

A.  It's an American Express ending in 9004, under Mr. Sean Combs.

Q.  Thank you.

MS. FOSTER:  Ms. Gavin, can you now please pull up Government Exhibit 7B-121.

Ms. Gavin, is this not in evidence yet?  Oh, thank you.

The government would move Government Exhibit 7B-121 and 7B-139 into evidence pursuant to that stipulation that I read previously.

THE COURT:  All right those exhibits will be admitted.

(Government's Exhibits 7B-121 and 7B-139 received in

P62KCOM6                        Oken - Direct

evidence)

MS. FOSTER:  Can you now publish to the jury.

Q.  Ms. Oken, what does this show?

A.  So this is what we call a folio, so it's essentially somebody's bill upon departure.  And this particular bill was Mr. Pines' for the June 12th stay where he stayed for two nights, checking out on the 14th, in room 259.

Q.  Was this one of the stays we saw on the prior spreadsheet?

A.  Yes, it was.

Q.  At a high level, can you walk through some of the charges on this bill?

A.  Yes.  So, it obviously has the room charges for the day, and then it has the paid out doorman for five candles.  So, essentially, we were sent to go out pick up five candles.  So, that's what the first couple of charges are.

And then the Logo Shop is, essentially, our giftshop, and that's the next charge.

And then you have the room charges.  There's some internet; some local telephone charges; parking charges, which is described for the car there; private bar; then a miscellaneous charge for cleaning drapes, the cleaning of drapes.

Q.  And how much was that miscellaneous charge?

A.  $300.

Q.  What does "deep cleaning" mean?

A.   So, deep cleaning is, essentially, when the scope of cleaning is beyond what is normal.  So, sometimes when something is very dirty or stained or whatnot, we have to send it out.  So, that's when we would do a deep cleaning.

Q.   Turning to page 2 of this document, what is the total bill for this room?

A.   $6,774.80.

        MS. FOSTER:  Ms. Gavin, could you please pull up Government Exhibit 7B-139.

Q.   Ms. Oken, what does this show?

A.   This is another bill from his stay where he stayed one night on May 30, 2015, in room 23B.

Q.   Is this a stay that we also saw in that prior spreadsheet?

A.   Yes.

Q.   At a high level, can you walk through some of the charges on this bill?

A.   Sure.  The first line is a SONIFI pay-per-view movie, and then the guestroom charge, parking, standard room service, giftshop, telephone and internet, and then private bar again, and then a miscellaneous charge for $500 for oil damage.

Q.   What is a miscellaneous charge for oil damage?

A.   So, essentially, it was, again, beyond the scope of what we would normally clean.  So, we probably had to either send it out or we had to bring somebody in to deep-clean the room.

        MS. FOSTER:  Thank you, Ms. Gavin.  You can take this

document down.  Thank you.

Q.  The name Philip Pines appears on both of these bills?

A.  Yes.

Q.  When those reservations were made, do you know if they were made in that name?

A.  Not necessarily.  It could have been any of the previous aliases that he used.

Q.  Why is it, then, that Philip Pines shows up on both of these bills?

A.  So, it's when you print the bill.  So, let's say he stayed five years ago, and if we had printed out the bill five years ago, the name would have been whatever that alias was at that time.  But because we printed this after his last stay, in 2021, the name left was Philip Pines, so all folios, or all history, goes under the Phillip Pines.

MS. FOSTER:  Thank you, Ms. Oken.  No further questions.

THE WITNESS:  Thank you.

MS. GERAGOS:  Very briefly, your Honor.

CROSS-EXAMINATION

BY MS. GERAGOS:

Q.  Thank you, Ms. Oken.  I just have a few questions for you, and then we can be out of here.

You testified you worked at the Beverly Hills Hotel for 17 years, right?

A.   Somewhere around there, yes.

Q.   And then I think you said that, particularly with entertainment clients, they book under an alias; is that right?

A.   Most of them, yes.

Q.   So, for you, if you've booked a celebrity or an entertainment client under an alias, that's not uncommon for you, because that happens often in your job, right?

A.   Yes, of course.

Q.   Okay, great.

I will just put up, if we could, 7B-101R, page 2, please, which is in evidence.  Can we just go to line 14.

This is a stay where it lists Mr. Phillips Pines again, correct?

A.   Yes.

Q.   And in that third column, I think you said, would have been accompanying guests; is that right?

A.   Yes.

Q.   And then the stay for this is what date?

A.   January 22nd, 2012.

Q.   And then the checkout date would be January 24th, 2012?

A.   Yes.

Q.   And the accompanying guest lists Dominique, Neil, and then Cassie Ventura, correct?

A.   Yes.

MS. GERAGOS:  Thank you.  No further questions.  Thank

P62KCOM6

you so much.

THE COURT:  Any redirect?

MS. FOSTER:  No, your Honor.

THE COURT:  All right.  Thank you very much, Ms. Oken.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  All right.

I take it from the government that's a good breaking point for today?

MS. COMEY:  I think so, your Honor, yes.

THE COURT:  Thank you, members of the jury.  We'll be back here at 8:45 to get started at 9:00 a.m. tomorrow.

Do not speak with each other about the case.  Don't talk to anyone else about the case.  And do not look up anything about the case.  And we'll see you back here tomorrow.  All rise.

(Continued on next page)

P62KCOM6

(Jury not present)

THE COURT:  Please be seated.

Who is the government's next witness?

MS. STEINER:  Your Honor, the next witness is Eddy Garcia.

THE COURT:  And after Mr. Garcia?

MS. COMEY:  We're going to have to do some juggling, your Honor.

THE COURT:  Okay.  Do we have a ballpark estimate on Mr. Garcia's direct examination?

MS. STEINER:  An hour and a half.

THE COURT:  Hour and a half?  Okay.

Anything further from the government?

MS. COMEY:  No, your Honor.  We have been in discussions with defense counsel about the rest of the week, and we will update the Court and the defense once we come to a landing on our remaining witness order.

(Pause)

MS. COMEY:  Oh, there's one other issue we did want to put on the record.

We understand that Defense Exhibit 1750 was published to the overflow rooms and the public screen, without redactions, showing Mia's full face.  We just wanted to note for the record that that had happened, and we would ask that the defense make sure that any publicly released version be --

P62KCOM6

that they confer with the government about redactions before anything containing Mia's likeness is released to the public.

THE COURT:  Well, there was a 750R, I believe, and that's why the Court had inquired of the parties, precisely because of that, and so I guess there are a couple of questions.

One, was the wrong exhibit used?  Or is 1750R not redacted?

MS. COMEY:  I don't know the answer, your Honor.

THE COURT:  Do we need to do anything in terms of sealing so that the 1750R, to the extent it's not redacted, is not publicly released?  Did we figure that out in the time between when I sent the Post-it out to now?

MS. COMEY:  So, your Honor, the defense — and, in particular, Ms. Geragos — have been very sensitive to making sure that they check with us before they release to the public -- any members of the public who request copies of defense exhibits, they've been checking with us and conferring about redactions.  So, we just ask that we continue to do that.

THE COURT:  All right.

Anything from the defense before we adjourn?

MR. AGNIFILO:  Only it would obviously be very helpful, given our 7:00 o'clock deadline for exhibits the next day, to know all of tomorrow's witnesses.  And I understand the government's going to make some shifting, and if they don't

P62KCOM6

know now, I can't make them give me something that they don't know, but we're --

THE COURT:  Subject to the shifting, do we have a general assortment of people who it may be?

MS. COMEY:  If I can look at my calendar, your Honor.

My best guess, your Honor — and this really could change — is that it would be Eddy Garcia, followed by Frank Piazza, followed by either Derek Ferguson or Bryana Bangolan. Those are the witnesses who I think we may call in some version of that order tomorrow.

THE COURT:  And then just to account for any further shuffling, who is the next person after that?

MS. COMEY:  So, the thing that's up in the air — that the defense does know and I alerted them to this last night — is that the witness testifying under the pseudonym Jane has some travel constraints at the end of next week.  So, our plan is to get her on the stand no later than first thing Thursday morning, and possibly as soon as Wednesday afternoon, to make sure that we have plenty of time to complete her direct and plenty of time to complete her cross-examination before she has a flight to catch for an international trip on next Thursday night, after court.

THE COURT:  All right, very good.

Anything further from either side?

No?

P62KCOM6

MR. AGNIFILO:  Nothing from us, Judge.  Thank you.

THE COURT:  Very good.  We'll see everybody here at 8:30 a.m. tomorrow.

(Adjourned to June 3, 2025, at 8:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                          Page

 EDDY GARCIA

Direct By Ms. Steiner . . . . . . . . . . . .3641

 MIA

Cross By Mr. Steel . . . . . . . . . . . . . .3646

Redirect By Ms. Smyser . . . . . . . . . . . .3823

SYLVIA OKEN

Direct By Ms. Foster . . . . . . . . . . . . .3839

Cross By Ms. Geragos . . . . . . . . . . . . .3853

                    GOVERNMENT EXHIBITS

Exhibit No.                                       Received

 B-219, B-223, B-224, B-238,   . . . . . . . .3837

 B-249, B-260, B-261, B-329, B-338   . . . . .3837

 B-356, B-405, B-409, B-423, B-424, B-426   .3838

 B-430, B-511, B-619, B-620, B-627-B   . . . .3838

 B-627-C, B-629, B-630, B-635, B-638   . . . .3838

 B-640, B-642, B-645, B-650   . . . . . . . .3838

 7B-149   . . . . . . . . . . . . . . . . . .3843

 7B-101 (Sealed)   . . . . . . . . . . . . . .3845

 7B-101-R   . . . . . . . . . . . . . . . . .3845

 7B-121 and 7B-139   . . . . . . . . . . . . .3850

                    DEFENDANT EXHIBITS

Exhibit No.                                       Received

 DX 1750   . . . . . . . . . . . . . . . . . .3618

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

DX 1748 and DX 1794    . . . . . . . . . . . . .3620

DX 1753R    . . . . . . . . . . . . . . . . . .3649

DX 1753 (Sealed)    . . . . . . . . . . . . .3649

DX 1730, 1731, 1732, 1733 (Sealed)    . . . . .3658

DX 1730R, 1731R, 1732R, 1733R    . . . . . . .3658

1750 (Sealed)    . . . . . . . . . . . . . . .3701

1750R    . . . . . . . . . . . . . . . . . . .3701

DX 1737 (Sealed)    . . . . . . . . . . . . .3733

DX 1737R    . . . . . . . . . . . . . . . . .3733

1376R, 1373R, 1410, and 1411R    . . . . . . .3838