P9PKCOMO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                        24 Cr. 542 (AS)

SEAN COMBS,

   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

          Defendant.
                            Oral Argument
------------------------------x

                            New York, N.Y.
                            September 25, 2025
                            11:00 a.m.

Before:

                 HON. ARUN SUBRAMANIAN,

                            U.S. District Judge

                      APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
BY:  MARY CHRISTINE SLAVIK
     MEREDITH FOSTER
     EMILY JOHNSON
     MADISON SMYSER
     MITZI STEINER
     Assistant United States Attorneys

P9PKCOMO

APPEARANCES
(Continued)

AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:  MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        JONATHAN P. BACH
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND

P9PKCOMO

(Case called)

MS. SLAVIK:  Good morning, your Honor. Christy Slavik, Meredith Foster, Madison Smyser, Emily Johnson, and Mitzi Steiner, for the United States.  We're joined at counsel table by Paralegal Specialist Shannon Becker.

THE COURT:  Good morning.

MS. SHAPIRO:  Good morning, your Honor. Alexandra Shapiro, for Mr. Combs, along with Jason Driscoll, Brian Steel, Nicole Westmoreland, Marc Agnifilo, Teny Geragos, Xavier Donaldson, and our colleagues, Christopher Johnson and Jonah Altman, are also sitting at the front counsel table, for Mr. Combs.

THE COURT:  Good morning to you.

And good morning, Mr. Combs.

THE DEFENDANT:  Good morning, Judge.

THE COURT:  We're here for argument on the Rule 29 and Rule 33 motions filed by the defense.

Ms. Slavik, you saw the order with a few of the questions that we had?

MS. SLAVIK:  Yes, your Honor.

THE COURT:  I thought we'd just jump into those. After we address these questions, I'm happy for each side to take some time to address anything that they wanted to.

Ms. Shapiro, same for you, assuming that you're going to be arguing this for the defense?

P9PKCOMO

MS. SHAPIRO:  Yes, your Honor.

THE COURT:  All right.

The only thing I'll say is that you don't have to take the full 15 minutes if you've said everything that you needed to in your papers.  The briefs were excellent, they were comprehensive, they were very long, and so there's no need to rehash what's in the papers.  But if there's anything that you left out or any new material that you wanted to bring to the Court's attention, you should certainly do so.

With that, Ms. Slavik, are you going to be handling the argument?

MS. SLAVIK:  Your Honor, I think we're going to do a bit of tag teaming from the government's side.  So, if you want to go in the order of the questions, we're happy to do that. Ms. Foster will be handling the first two questions; I'll be handling the second two questions.  So however your Honor wants to proceed.

THE COURT:  All right.

Ms. Foster, let's start with the question of waiver/forfeiture.  So, the defense says, looking at the three cases we cited in our order, that, sure, there might be a forfeiture of a Rule 33 argument challenging the jury instructions, but under these three cases, at least, you still can make a Rule 29 sufficiency argument based on a different construction than what you presented at the jury instruction

P9PKCOMO

phase.

Do you have a case that says otherwise, given this very recent Second Circuit precedent?

MS. FOSTER:  Yes, your Honor.  I would actually point the Court to a case from earlier this year, which is *United States v. Kelly.*  That's 128 F.4th 387, and that's (2d Cir. 2025).  In that case, the defendant argued on appeal that one of the state statutes that underlay his RICO and Mann Act convictions was unconstitutionally vague, both as applied and on its face.  In that case, the Court upheld the lower court's holding that that vagueness challenge was untimely and forfeited because it should have been raised in a Rule 12 motion.

So, while this case didn't arise in the Rule 29 context, it clearly stands for the proposition, which the government is making here, that arguments of statutory construction that can be made pretrial, like those here, should be raised pretrial in a Rule 12 motion or deemed forfeited.

That case also cites the Second Circuit's decision in *United States v. Crowley*, which is 236 F.3d 104, the Second Circuit from 2000.  I would also just generally point the Court to a different decision of the Second Circuit's in a different *United States v. Crowley*, which is 318 F.3d 401, and that's from 2003, as well as the Supreme Court's decision in *Davis v. U.S.*, 411 U.S. 233, from 1973.  Those discuss these

broader fairness concerns that really underlie the government's position on waiver and forfeiture, and why it's so important that motions such as this be brought pretrial.

As these cases explain, if claims that reasonably could be adjudicated and brought pretrial could be delayed until after conviction, then there would be no incentive for defendants to raise those claims pretrial because a defendant could just hold them in their back pocket in the event of hoping for an acquittal, and then, in the event of a conviction, what's happened here, raise those statutory arguments as sort of a second bite at the apple.

So, in addition to encouraging gamesmanship, this just raises a host of fairness, efficiency, and justice concerns. First, as the Court has explained, it encourages defendants to raise these claims after the witnesses, the parties, the Court, the jury has all gone through the length and burden of a lengthy trial, which occurred here.  And I think this concern is particularly real here because, essentially, what the defendant is arguing is that he can raise, for the first time after a multimonth trial and after he actually suggested a definition of prostitution, which the Court adopted, that, actually, that was the incorrect interpretation, and that, basically, essentially, they're making the argument that that trial, they sort of knew that this and they had every basis for knowing that this definition and making the arguments they make

P9PKCOMO

today based on the indictment, but they chose not to raise it until after the trial and after they had suggested a contrary definition to the Court.

THE COURT:  Well, let's separate out the jury instructions from the indictment, so kind of looking back in time and then looking forward in time.

So, I think the defense's argument is, look, there are these three cases that say that the Rule 29 argument is not affected by any failure to object to jury instructions.  Let's put that to the side for the moment.  You're saying that based on *Kelly* and these other cases, the type of constitutional challenge that the defense has raised, those are the types of arguments that you would have had to make at the Rule 12 stage, and having not made those arguments, those are, I suppose, forfeited, right?

MS. FOSTER:  That's correct, your Honor.

THE COURT:  All right.

In the defense's response, yes, perhaps a facial challenge based on a defect in the indictment would, in fact, be forfeited based on failure to raise that at the initial stage, but I understand the defense to be making an as-applied argument as to their constitutional issues, and so that is based on the evidence that was presented at trial, so the appropriate place to make that argument was the Rule 29 stage.

MS. FOSTER:  Well, so, your Honor, in *Kelly,* that was

P9PKCOMO

also an as-applied challenge.  The decisions in this circuit are clear that if an as-applied challenge can be made on the face of the indictment — and people regularly bring as-applied challenges where they can be brought pretrial — then they should be brought in a Rule 12.  And I don't believe that the defendant, while they say a line in their brief that they couldn't have brought this earlier, it's entirely unclear to me why they couldn't have, because in the lengthy speaking indictment in this case and in the government's own representations of its evidence, and everyone's understanding of the evidence in this case, there was never an allegation that the defendant, for example, financially profited from the prostitution here.

And, so, this is the type of argument that could be brought pretrial and on the face of the indictment, and could have been raised and resolved at that stage.

I also do, though, want to push back on the idea that those three cases can be read as broadly as the defense would ask the Court to read them.

So, in that first case, *Dennis*, while the defendant sort of framed that argument as an as-applied challenge to the constitutionality of that statute, the Court found that he was essentially just raising a sufficiency argument.  And that made sense because, in that case, the defendant was arguing that he couldn't be tried under that statute without infringing on the

P9PKCOMO

First Amendment unless there was a finding that he had made a true threat. And the government agreed. So, both parties were in agreement on what the relevant legal principles were and what the court had to find in order to not infringe on the First Amendment.

So, the Court in that case found that this was really just a sufficiency argument that the defendant was making as to whether or not the evidence at trial even met the true threat standard.

THE COURT: Well, the court did construe the statute in the context of the Rule 29 challenge. That's the first thing it did. And then it addressed the Rule 29 challenge without addressing any kind of waiver or forfeiture argument. Then it goes to the Rule 33 challenge to the instructions, and it very clearly says that the defendant has forfeited his challenge to the instructions because he didn't object to a broader construction of the statute at the jury instruction phase.

So, how do you reconcile that?

MS. FOSTER: I would agree with you that the court does go on to hold that there does need to be a true threat in order for there to not be a First Amendment issue, but the court does that after it clearly states this is actually a sufficiency argument, that while the government is claiming waiver, no one is disagreeing about a true threat has to be

P9PKCOMO

found.  And so, essentially, the only disagreement between the parties is whether or not the evidence was sufficient.  The court then, I agree, does go on to separately find -- and I think at that point it's one of the last circuits to sort of address that question, and so it does go on and address that issue.  But it doesn't cause either -- it's not going against either party's interpretation of the statute at that point.

THE COURT:  Understood.

Going back to the initial point, it was *Kelly, Crowley*, and was there another case that you had mentioned?

MS. FOSTER:  *Crowley* and *Dennis*, which is a Supreme Court case.  Those, I think, speak to the sort of equitable concerns that the government is raising with respect to why -- the prejudice that the government has, the efficiency concerns that arise when these type of arguments are made so late in the game.

THE COURT:  All right, understood.

Ms. Shapiro, why don't we do this ping-pong style. You want to address the cases and the arguments that Ms. Foster made?

MS. SHAPIRO:  Sure, your Honor.

First, I just want to start by noting that, as the Court's questions indicated, the *Dennis* case is squarely on point, in that there, there was a statutory argument based on a constitutional provision.  The defendant had waived the -- or

P9PKCOMO

failed to preserve the jury instructions issue, but the court made very clear it was appropriate to raise that statutory construction, which was, again, based on a constitutional argument, as our arguments here are.  And the court said that that's perfectly fine, and you can raise it at Rule 29.

I also want to call the Court's attention to the fact that in addition to *Musacchio* and *Blaszczak*, which I think are very clear on their face and stand for the proposition that on Rule 29, the evidence is assessed in light of the elements under the correct law, that also recently in the *Lopez* case in the Second Circuit, which we only briefly discussed in our motion, but which is cited there, that case was decided, I believe, during this trial or at the end — I think it's a date in July — and the government made the exact same argument in the *Lopez* case, repeatedly, both at the district court level and in the Second Circuit.

This issue was discussed at oral argument and the subject of the 28(j) letter.  So, at oral argument, I made the point to the Second Circuit that sufficiency is not assessed based on the jury instructions, it's assessed based on the correct law.  And the government filed a 28(j) letter, in which it said the same thing it says here about the *Musacchio* case. It said that case only applies when there's an unnecessary element added to the jury charge.  Our response -- and that's at Docket 113 of the *Lopez* case, which is cited in our briefs.

P9PKCOMO

Our response, which is Docket 114, made the exact same point we're making now, which is, that's wrong, on Rule 29, the factual sufficiency is assessed against the correct law, regardless of what was in the jury instructions.

I would also note that in *Lopez*, there was a dispute about whether a constitutional vagueness argument that had been raised in the pretrial motions was sufficient. But, again, all of that is irrelevant because you have pretrial motions, you have Rule 30 jury instructions proceedings, and you have Rule 29. If you raise something on Rule 12, and the judge doesn't dismiss the indictment, the remedy on appeal, if you win the appeal, you make an argument it should have been dismissed. The indictment is dismissed; that doesn't lead to an acquittal. The same thing with the jury instructions — the remedy is a new trial.

And, moreover, the law on Rule 12, as the government well knows, is extremely restrictive. And there's tons and tons of case law, some of which we cited in our brief — we only addressed this briefly in the reply brief, I believe — establishing that all the government has to do — and they say this in their briefs in every case — is parrot the language of the statute. And they clearly had done that here.

I would also add that, particularly with respect to our First Amendment argument, there is no way we could have made that argument at an earlier point, because the government

P9PKCOMO

had charged sex trafficking and RICO, and we're not arguing, nor could we, that anyone has a First Amendment right to film a live performance of a crime.

So, it's only as a result of the acquittal that we're even able to make that argument based on the record at trial.

THE COURT:  So, your point is that -- look, let me just make sure I understand — the constitutional arguments that you're making — vagueness, federalism, substantive due process, and the First Amendment argument — those are as-applied challenges, right?

MS. SHAPIRO:  Correct.

THE COURT:  So your point is we're not challenging the indictment, we're saying that based on the evidence presented during this trial, that's what gives rise to the constitutional challenges that we're making, and so the appropriate place for us to have raised those challenges is in the context of Rule 29.  And your argument is, at all times, against challenging the sufficiency of the evidence.  It's just challenging the sufficiency of the evidence in light of the relevant statutory construction that you say applies and the relevant constitutional principles.

So your point is, this is where we would make that, because we think that, based on those two sources of law, we are entitled to an acquittal?

MS. SHAPIRO:  Exactly, your Honor.

P9PKCOMO

THE COURT:  Okay.

MS. SHAPIRO:  The last thing I'll say is I haven't had a chance to fully read those cases, but, as the government conceded in its explanation, the *Kelly* case is not in the Rule 29 context at all, so it's irrelevant to this issue and certainly doesn't control when we have other Second Circuit cases on point.

I also wanted to mention that the *Solar* case, which we cited in our reply brief, which is just an example of the many times that appellate courts review statutory arguments in the context of Rule 29 -- or sufficiency claims also was a case where the defendant didn't object to the charge.  That's not mentioned in the opinion, but in the Eastern District Docket No. 10 CR 708, Docket No. 136, at 4, you can see that the government pointed out that the defendant had raised this statutory argument for the first time in Rule 29.

The *Davis* case, which I haven't had a chance to reread, but it's a 2255 case, so I expect it's entirely irrelevant because there are various procedural bars that apply to collateral relief claims.  But we're happy if the Court would like us to study those cases and respond, but I think, clearly, none of them -- and *Davis* was a claim of grand jury discrimination, I'm told by Mr. Driscoll.

THE COURT:  We'll take a look at those cases.

Why don't we move to the second question, and maybe,

P9PKCOMO

Ms. Shapiro, I'll start with you.

So, you have two statutory construction arguments that you've made.  The first is that the defendant in a Mann Act prosecution has to have at least a financial motive, and, second, that there has to be a bilateral exchange of money and sex, that that's part and parcel with the definition of prostitution.

So, I take it that given those two -- well, let me first ask you:  Are those alternative requirements, or do they have to exist in all cases together?

MS. SHAPIRO:  No, those are alternative arguments.  So, our argument is that the statute should be construed narrowly, essentially, to only apply to pimping, commercial purveyors of prostitution, or, in the alternative, at the very least, it should be -- it can't be applied to this particular situation, not only because Mr. Combs was merely an alleged consumer, but because this is a wire type of case.

THE COURT:  All right.

So, if there are alternative requirements, then let's put the financial motive part of it to the side, because that involves Mr. Combs specifically, but as to the other part of it, why wouldn't Mr. Combs be liable under, at the very least, a willfully causing theory because, at least in some of these instances, either Ms. Ventura or Jane furnished the payment for the sex that occurred with the escorts.  So, wouldn't the facts

P9PKCOMO

here support a conviction on a willfully-causing theory if Mr. Combs had the relevant intent and the required intent, as we instructed the jury, and then the actions were performed by Ms. Ventura, Jane, and the escorts that would correspond to the bilateral exchange of money and sex?

MS. SHAPIRO:  No, your Honor.  And there are several reasons for that.

First of all, and sort of most fundamentally, the point in these cases that we cited, where a number of states have held that prostitution only involves an exchange between A and B, where A is paying B to have sex with A, the purpose of that would be entirely defeated if the government could get around that with any theory of secondary liability.  For instance, some of those cases involved things like a person at a booth who's watching one or more people engaging in sexual activity, but not touching the person who's watching, and those cases are very clear that in those states, those courts are saying that is not prostitution.

The Mann Act -- the *actus reus* of the Mann Act is the transportation.  And, certainly, the government's theory, presumably, about transportation is that somebody else was doing the transport, but it was at Mr. Combs' direction.  But the other part of the crime is the *mens rea*, the intent that the transportation will result in people engaging in prostitution.  If we're right that prostitution doesn't include

P9PKCOMO

commercial voyeurism, I'll call it — and that's the term that some of the cases use — then you can't say that he's willfully causing that, because then there's no point to the rule at all. The idea is that what's in the defendant's head about his understanding of engaging in prostitution, and if his understanding of engaging in prostitution is that, it has to be narrowed to avoid a situation where we're not including conduct that a number of states have said is not prostitution, then you can't get around that by just saying that here, it was two other people, and he was paying, because that's exactly the situation in these other cases — you know, like, for example, the *Wooten* case in California — and just the way the issue is articulated in a number of these cases.

THE COURT:  Okay.

So, while we're on that subject, on the bilateral exchange of money for sex, you mentioned *Wooten*.  What other case is your --

MS. SHAPIRO:  So, there are a number of cases.  So the *Paulino* case, in New York.

THE COURT:  Okay.

MS. SHAPIRO:  There's also the *Greene* case in New York.  And, in addition, there's a Georgia case, which we cite in our opening brief — I can't remember the name of it — and there's a Pennsylvania case.  Those are a few examples.  But there are many state court cases that have held -- the Georgia

case involved a situation in which the government had alleged that a private residence was being used for prostitution, and the court held that the evidence didn't support that because there was no direct evidence of exactly what was going on in the residence, and that it could as easily have been commercial voyeurism, which would not qualify as prostitution.  That one is called *Smoot v. State*.  It's cited on pages 21 to 22 of our opening brief.

THE COURT:  Yes.

Switching gears, and then we'll come back to Ms. Foster, on financial motive, what's the case there that we should look at?

MS. SHAPIRO:  So, on financial motive -- sorry, are you asking about aiding and abetting -- because I think it's clear that --

THE COURT:  No, I heard you on the underlying reasons why you shouldn't allow the government to approach this from a secondary liability perspective.  But now I'm going back to your actual statutory interpretation arguments.  So, you've mentioned the cases that support the definition that would include a bilateral exchange of money for sex.

What about the defendant having a financial motive? Is that just a pure constitutional avoidance issue?  Or is there --

MS. SHAPIRO:  It's a constitutional avoidance issue.

P9PKCOMO

And just to be clear, I think -- and I'll get to that in a second, if I may, but, in addition, the other points are that the statute originally had this explicit text referring to immoral purposes and debauchery, which was excised in 1986. After *Cleveland* and *Caminetti*, there was a subsequent, very short, summary order by the Supreme Court in which the Court reversed a Seventh Circuit holding affirming -- which had affirmed a conviction there, where the defendants didn't have a commercial motive.

And then, of course, we have this constitutional point. And one of the points I wanted to emphasize there, if I may, is that if you look at the *Cleveland* and *Caminetti* cases, they're very clear that the court is saying the word prostitution, even though those other words were in the statute, includes sex for hire or not for hire when it's for immoral purposes, like traveling interstate for a woman to be a mistress or a concubine, for example, or in the case of the *Cleveland* case, polygamy. And the court is very clear that it doesn't matter if it's for hire. But then --

THE COURT: Just to push back a little bit there, in *Caminetti*, it is true that the court said that prostitution can be for hire or not for hire, but *Cleveland* said the opposite, that at least, as of 1946, the definition was sex for hire. In that case, the court held that polygamy would fall under the immoral purpose clause.

P9PKCOMO

So, for that reason, the court sustained the convictions in that case, but prostitution wasn't an issue in that case because that's not the part of the statute that the court was looking at.  It was, instead, looking at the debauchery and immoral purpose clause.

MS. SHAPIRO:  Your Honor, respectfully, I disagree with that because there's a passage in the opinion in which the court discusses, in quotes, the *Bitty* case, which is that case from the late 19th Century involving the similarly worded immigration statute, and the court quotes the part of *Bitty* that talks about how the word "prostitution" includes sexual relations for hire or not for hire.

So, respectfully, I think *Cleveland* -- and *Cleveland* has been cited by the government here, and by the government and courts in many other cases, for the proposition that the statute is not limited to commercial purpose.

THE COURT:  Right, because at that time, the statute was not limited to commercial purposes because the language was different.  It was changed in the 1986 amendment.  But as of the time of *Cleveland*, the statute had a bunch of other language in there that would cover noncommercial transactions. That was the point that the court was making in *Cleveland*, because it points out, right after that citation that you pointed to, that it had no view on whether the *Caminetti* case came out rightly or wrongly, but the court noted that because

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P9PKCOMO

of the broad language of debauchery and immoral purpose, the statute was not limited to commercial transactions and could include a broader sweep that would include things like, at that time, polygamy.  And that is where *Cleveland* left it.

And you have the 1986 amendment, which, obviously, strips out the other language.  In fact, it strikes the entire statutory text and replaces it with language that has the prostitution and the criminal violation language that's in the present statute.

As of that time, I don't think anyone's questioning that the settled meaning of prostitution was sex for hire, right?  So, at that time, Congress looked at it, they had the language from *Cleveland*, where *Cleveland* itself said that the prostitution means sex for hire, and then in 1986, they reenacted the language with prostitution, stripping out that broader language that the *Cleveland* court had relied on in sustaining the convictions in that case.

MS. SHAPIRO:  Well, I guess --

THE COURT:  I don't know that that really matters here.

MS. SHAPIRO:  I don't know that that's a problem for us, anything your Honor is saying.  It's all consistent with our argument here.

THE COURT:  I don't necessarily disagree with you because I think you're making two further arguments that are

P9PKCOMO

based on the state authorities *Paulino*, *Wooten*, *Freeman*, these other cases that you're citing. So, I think that's an independent issue.

MS. SHAPIRO: Right.

THE COURT: So now, with that background, as to financial motive?

MS. SHAPIRO: The other thing I was going to say was that -- and I --

THE COURT: I just want to make sure that I'm getting your best cases.

So, on the defendant having to have a financial motive, I take it that your answer was, well, after *Cleveland*, there was a summary order that dealt with --

MS. SHAPIRO: By the Supreme Court of the United States.

THE COURT: Right.

-- that dealt with the Seventh Circuit that can only be read to require a defendant in one of these cases to have a financial motive.

MS. SHAPIRO: That's correct, your Honor.

THE COURT: Okay. I'll take a look at that.

MS. SHAPIRO: The only other thing I'll say, and I understand what your Honor said about *Cleveland*, but I do think it's important to understand that when you look at *Caminetti*, which, apart from our debate about *Cleveland*, clearly, it is

P9PKCOMO

saying that the word "prostitution" doesn't require sex for hire.  We know that that holding is not good law because of *Griswold* and its progeny, including *Lawrence*, leading up to *Lawrence v. Texas*, and all of the federal constitutional law that developed afterwards about people's freedom and rights to privacy to engage in essentially -- as long as they're consenting adults, sexual relations in whatever way they see fit.

THE COURT:  Understood.

Ms. Foster, so going back to the question that we started with, which is, given what Ms. Shapiro just said, is the government going to concede that, yeah, we raised the issue about secondary liability, but we don't think you should adopt the defense's construction of the statute; if you were to adopt that construction, then I suppose it would come -- the aiding and abetting and willfully-causing convictions would rise and fall with the main liability, or do you have a way in which those theories would nevertheless be grounds to sustain the convictions?

MS. FOSTER:  Yes, your Honor.

So, I think your question gets at something that really distinguishes this case in a lot of ways from some of the cases that the defendant is raising, such as the one where a person at a booth watches two individuals engage in sexual relations, and which shows that I would say, even under primary

liability, even if the Court were to adopt their definition, the defendant's conviction would still stand. That's because what the defendant really appears to be challenging is the vagueness or the interpretation of the term "prostitution." My understanding of their argument is that that term, based on sort of state case law and definitions, is overbroad and should be interpreted in only these two specific situations — one, where the person who engages in the sexual contact with the escort is the person who's paying the escort, and, two, where a person has a financial motive.

Here, the defendant seems to be arguing, because the defendant wasn't involved in the sexual contact with the escort, that he's not guilty. But the issue in front of this Court — and they made this point with the *actus reus* — the issue before this Court is not whether the defendant himself engaged in prostitution, it's whether there's sufficient evidence from which this Court could find that the defendant knowingly transported an individual with the intent that the person would engage in prostitution. And, here, even in a world where the defendant wasn't engaged and involved in those acts of prostitution himself, there was clearly sufficient evidence, for the reasons you mentioned, from which a jury could convict under the Mann Act even under this definition, this constrained definition, of prostitution that the defendant seems to be arguing for, because there is evidence in the

P9PKCOMO

record, as your Honor noted, that even though the defendant was the one who sort of ultimately funded these acts, the victims, the ones who were actually engaging in the sexual intercourse with the escorts, were the ones who handed over the money, in a large majority of the cases.

So, when the defendant, even under a primary liability standpoint, when he would facilitate transportation, a reasonable juror could conclude, based on that evidence, that he was doing so with the intent that prostitution, even under that narrow definition they are arguing for occurred, which is that the victims, the people who turned over the cash, were the people who had the sexual intercourse.

So, I think even if the Court were to adopt their interpretation of prostitution, which is sort of separate from ours, where the person who engages in the intercourse doesn't have to be the same person who turns over the money, the defendant would still be liable under a primary liability, even under their definition, based on the evidence at trial, and I think there was more than sufficient evidence of that.  But the defendant at times in their argument sort of seems to make a second step, which is like, actually, the person who transports also needs to have had some involvement in that prostitution, which I'm not quite sure how they get there, but, in that case, your Honor is correct that secondary liability would seem to solve that issue, because there's no doubt that the evidence

P9PKCOMO

showed that in many cases, the victims here, the women, facilitated the transportation of these escorts — they would help arrange the tickets, they would pay for the transportation of the individuals, they would set up the flights.  And the defendant --

THE COURT:  Let me just make sure I understand that. I understand your argument about primary liability.  You're saying on a -- I suppose it would be a -- would it be a willfully causing theory?

MS. FOSTER:  Yeah, or aiding and abetting.

THE COURT:  But you're saying that Ms. Ventura and Jane, they did the transporting, so they did that, they may not have had the relevant intent, or maybe you're saying they did?

MS. FOSTER:  Well, I think they would have because, as they both testified, they understood that when they were turning over money, they were doing it for the services of prostitution.

THE COURT:  And a reasonable jury could have determined that.  So you're saying that they had all the intent, they did the acts, and they also paid the money, and they had the sex?

MS. FOSTER:  Yes.

THE COURT:  And that would meet the defense's construction of the statute, right?

MS. FOSTER:  That's correct.  And the defendant,

P9PKCOMO

clearly the evidence would suggest, aided and abetted or willfully caused that by being the person who suggested it, was the ultimate source of the payments, had his own staff oftentimes arrange travel and book travel.

So, I think sort of in sum, none of their Rule 29 arguments actually -- on the statutory construction, may actually matter that much in light of the evidence and the standard that the Court has to apply in adjudicating a Rule 29 motion, which is to see whether there is any evidence from which a reasonable juror could find the defendant guilty.

THE COURT:  All right.  Very good.

So --

MS. SHAPIRO:  Your Honor, may I respond, just very briefly, to that?

THE COURT:  You know what might make most sense, since I am going to give each side a chance to come back at the end, you can pick it up at the closing, just so we can get through these questions at the beginning.

So, Ms. Slavik.

MS. SLAVIK:  Yes, your Honor.  I'll be responding to the second two questions related to the First Amendment arguments.

If your Honor would permit me, may I answer the fourth question first, kind of go out of order?

THE COURT:  Yes, that's fine.

P9PKCOMO

MS. SLAVIK:  So, the fourth question was about whether the record showed that every time an escort traveled across state lines, it was filmed, and I want to just start by answering the question directly.

The answer to that question is no.  The record does not show that every time an escort traveled internationally or domestically and had sex, that that sex act was filmed.  To be clear, I don't understand the defendant to be arguing that.  I think in the reply brief, the defense says that escorts were routinely filmed; it doesn't say that they were always filmed every time they crossed state lines.  And the record surely does not support the inference that every time an escort traveled, the sex act was filmed by the defendant.

We note in our opposition brief that the evidence at trial reflects that the defendant frequently filmed freak-offs or hotel nights, but he didn't do so all the time.  That evidence, of course, includes the testimony of both Cassie, Ms. Ventura, and Jane, as well as the two escorts that testified at trial, but the two summary exhibits at Government Exhibits 1402 and 1406, I think, could be helpful to the Court.  Those exhibits show examples of freak-offs in the case of Ms. Ventura or hotel nights in the case of Jane.  It's not an exhaustive list, as I think was made clear at trial, but it's a list of certain freak-off or hotel nights.  And those exhibits show travel records, when they were available, and

P9PKCOMO

they also indicate instances in which there were explicit videos or explicit photos recovered by the government. Those are any references to the X series. Those are the explicit videos and content.

So, what those charts show is that on many occasions, there was travel for a freak-off or a hotel night — whether it was Ms. Ventura, whether it was Jane, whether it was the male escorts — but that there were no videos or photos recovered from those specific encounters.

I'm happy to go through -- we can pull up those exhibits, if your Honor would find it helpful, but --

THE COURT: But I think your second argument is, even if it was the case that every one of these incidents was filmed, that would not make a difference under the relevant --

MS. SLAVIK: That's exactly right. So let me go to the second part of your question, which is, does this matter.

And I think the answer is no, because there's a threshold question that just makes all of this irrelevant, and that is, whether we should even be talking about the First Amendment here.

Just focusing on the Mann Act, the counts of conviction. The Mann Act criminalizes transportation of individuals for the purpose of prostitution. It does not criminalize filming sex acts of any kind; it criminalizes transportation. As Ms. Shapiro just said, the *actus reus* is

P9PKCOMO

transportation.  Transportation for prostitution is, obviously, not pure speech, so the question is, then, is it symbolic speech.

I think it's laid out in the papers — the test to determine whether something is symbolic speech or not is examining whether there's an intent to convey a message and whether that message is likely to be understood.  That's the *Spence* case from the Supreme Court.

And the conduct here — transporting individuals to engage in prostitution — that just cannot be understood to convey a message, much less a message that could be understood.

So, I think what that means is that there's no symbolic speech, and *O'Brien* doesn't even apply.

Looking at the facts in *O'Brien*, I think, is helpful because in *O'Brien*, the law at issue there was related to the destruction of draft cards.  And the protected speech was burning the draft card.  So, in other words, the protected symbolic speech was the very act that violated the law.  Here, the act that violated the law was the transportation, which is not protected symbolic speech.

I would point your Honor to --

THE COURT:  So, are you telling me that -- let's say you had a movie producer who was making pornography, and he transports actors across state lines for the purposes of making a pornographic film where they will have sex for money.  In

P9PKCOMO

that circumstance, are you saying the First Amendment is not implicated?  Because I think that some of the cases that Ms. Shapiro has pointed to map that scenario.

MS. SLAVIK:  I think, your Honor, it would be a closer call.  I think the *Roeder* case from the Eleventh Circuit touches on those cases.  The facts in this case are nowhere near the facts in *Roeder*.  In *Roeder*, the defendant transported a woman across state lines for the purpose of prostitution, but also for the purpose of filming the movie.  And the record in that case indicates that the defendant told the woman, as he was transporting her across state lines, we'll be filming a movie.  That is absolutely not the case here.  The record certainly does not support that sort of inference.  The record here supports that when the defendant transported the individuals across state lines, which is the moment that we need to look at for the Mann Act, he intended for those individuals to engage in prostitution, nothing more than that.  And I think that's where your Honor's question about was this filmed all the time, that is relevant because it is just not the case that the defendant was an amateur porn producer.  That's not the case here.

THE COURT:  Right.  So, it's an as-applied challenge -- to back up, you're not saying that there might never be a case where a Mann Act prosecution would raise First Amendment concerns; it might, it's just not in this case.

P9PKCOMO

In this case, in contrast to *Freeman*, *Theriault*, those other cases cited by the defense, there was a motive a jury could easily find that the intent of the transportation was prostitution.

MS. SLAVIK:  And, in fact, that's what the jury found by convicting him on the Mann Act counts, yes, that's right, your Honor.

THE COURT:  Okay.

MS. SLAVIK:  So, I'd be happy to continue to explain why *O'Brien* does not apply.  I can also happily go to your third question, which was about whether *O'Brien* applies or not.  However your Honor would like to take it.

THE COURT:  Well, let's go to -- I've heard you on why we never get to *O'Brien*.  So, why don't we move to *O'Brien*.  And why, in this context, is the government's interest important and no more than essential to satisfy that interest?

MS. SLAVIK:  Yes, your Honor.

So, the question of whether there is an important governmental interest — courts that have addressed laws regarding prostitution have uniformly concluded that there is substantial government interest in regulating prostitution.  I have not found any case to the contrary.

One case to point your Honor towards is the *Arcara v. Cloud Books* case.  That's 478 U.S. 697.  It's a 1986 case. There's kind of two points on that case:

P9PKCOMO

The first is:  In that case, in the *Cloud Books* case, the court declined to apply *O'Brien*, because, as I just mentioned, the act that was criminalized had nothing to do with the expressive speech.  So I point your Honor to that case for that proposition, but also for the proposition that regulating prostitution is a governmental interest.  That case addressed a New York statute that was related to prostitution.  It was about closing down buildings where prostitution took place, and it wasn't even a question that regulating prostitution was an important government interest.  Even the dissenting opinion — I think it was Justice Souter's dissent — that would have applied the *O'Brien* test, which is not what the majority decided.  Even Justice Souter agreed that the state interest in regulating prostitution is important or substantial under the *O'Brien* test.

There is also a line of Supreme Court cases that addresses public decency laws and their effect on nude dancing.  In those cases, the courts have repeatedly found that these sorts of general laws prohibiting public nudity promoted the states' important interest in preventing secondary effects of adult entertainment establishments, including prostitution, sexual assaults, and other sorts of criminal activity.

So, I think there's a related question.  So, that's all to answer, is there an important or substantial government interest.  Your Honor's question said why.  And I think the

P9PKCOMO

answer to that is that regulating prostitution is important because it can include discouraging violence against women, discouraging illegal drug use, there are public health reasons like preventing diseases.  These reasons are all laid out in a Ninth Circuit opinion called *Erotic Service Provider Legal Education and Research Project v. Gascon*, 880 F.3d 450.  And that's the Ninth Circuit 2018 case that challenged a law criminalizing prostitution in California.

All of those things that answer why the government might want to regulate prostitution — discouraging violence against women, preventing sexual assault, monitoring illegal drug use — all of those things are present here in this case.

So, I think there is an important and substantial interest.  And this federal interest is very consistent with the approaches of other jurisdictions.  All 50 states have laws regulating prostitution.  Some vary in severity, but all have laws that regulate prostitution.  So, what that means is that all 50 states have determined that there is a substantial state interest in thwarting prostitution, and courts have uniformly agreed with that.  And, here, in federal court, when interstate or international travel is concerned, then that's when the federal government has an interest.

So, the second part of your question is if regulating prostitution is an important government interest, are the Mann Act's prohibitions no more than essential to achieving

P9PKCOMO

that interest.  And I think, here, the answer is yes.  The government interest is thwarting prostitution.  So, the statutory provision is kind of an end in itself — the goal is to thwart prostitution — and so prohibiting the transportation of individuals to engage in prostitution is really the only way that that goal of thwarting prostitution could be accomplished.

You asked for cases that support that proposition.  I would point you to the *O'Brien* case.  That's the case that lays out the four factors.  And there, the court decided that the government interest and the law at issue were limited to the noncommunicative aspects of the defendant's conduct, and, therefore, it satisfied the fourth prong of the *O'Brien* test.

There's another case in the line of this public decency law case line that I just mentioned, *Barnes v. Glen Theatre*, and that effectively held that the government interest was the prevention of nudity in public places, and so the requirement that dancers wear pasties and G-strings, that was really the only way that that could be accomplished.

The only thing I'll note, in addition to the cases that I just raised, is to go back to the *Roeder* case, which, as I mentioned, did apply the *O'Brien* factors in a bit of a perfunctory way, it wasn't like a full analysis, but it found that the Mann Act passed the *O'Brien* test when the defendant transported a woman across state lines, even where, at the time of transportation, he intended to film the sexual encounter.

P9PKCOMO

THE COURT:  What was the name of that case?

MS. SLAVIK:  That's the *Roeder* case.  I believe I said the Eleventh Circuit.  It's actually the Tenth Circuit.

THE COURT:  And the *O'Brien* analysis proceeds on an as-applied basis, right?

MS. SLAVIK:  That's right, your Honor.

THE COURT:  Thank you.

Ms. Shapiro, I'll let you respond on the First Amendment writ large, and specifically the question was about the *O'Brien* factors, but Ms. Slavik started with the threshold question of whether the First Amendment applies here at all.

MS. SHAPIRO:  Yeah, so let me start with that.

First of all, I agree with Ms. Slavik that our argument was not that — and, to be clear — was not that Mr. Combs always filmed, but that it was routinely filmed, and there was evidence that it was probably filmed the vast majority of the time.  For example, Jane testified that Combs filmed hotel nights almost every time.  And even though there are some examples on the government's charts where they didn't introduce videos or photos, that doesn't mean that those particular events were not photographed; it just means that either the data no longer was on the devices or the government chose not to introduce them.  But the bigger point is that, in our view, we also think it doesn't matter whether he always

P9PKCOMO

filmed them or not.  We have two different First Amendment arguments here, and I will point out, the government has entirely ignored the second one.  I'll talk about the first one, which they did brief and discuss with your Honor today, which is that he was a producer of amateur porn, but we have a second theory that he was a consumer of amateur porn, which I'll get to in a minute.

With respect to the producer element, I think it's well settled that this type of amateur porn, whether it's live or recorded, is protected by the First Amendment.  There was a lot of evidence in the case, some of which was greatly emphasized by the government during the trial and before the trial, about how highly choreographed these freak-offs and hotel nights were, the fact that there was mood lighting, there were costumes.  Indeed, as the Court will recall, both Ms. Ventura and, I believe, Jane also testified to the role-playing, and Ms. Ventura talked about, in some of the early freak-offs, wearing wigs and other costumes.

So, it's clear from cases like *Freeman* and *Theriault*, that where you have a person filming this type of thing, that is protected by the First Amendment, but we also have cases, including some cited by my colleague on the other side, like the *Glen* case, and many other cases about nude dancing and so forth, that this is protected, whether it's a live performance or not.

P9PKCOMO

Now, I want to talk a little bit about our point that Mr. Combs had a right as a consumer. And there are many cases on this. The most recent case, which is cited in our papers, is the *Free Speech Coalition v. Paxton* case, which reaffirms that adults have a right to consume pornography, a First Amendment right. And, here, we have not just Mr. Combs, but his girlfriends were also watching the ones that were filmed. Jane even bought a TV so that they would catch movie nights together. And the government doesn't seem to have any response to that.

I would point out --

THE COURT: What does that have to do with the count of conviction? The transportation was for the purpose of Ms. Ventura and Jane and the escorts to engage in prostitution, that is, sex for hire. The mere fact that they videotaped those incidents, and then may have consumed them later, how does that give rise to a First Amendment issue?

MS. SHAPIRO: Well --

THE COURT: Right? Because just to use the example of *Freeman* and *Theriault*, right, in those two cases, there was no evidence, and the courts made that very clear, that the purpose of the actual sexual acts was for the gratification of the person taking the video or the participants; instead, the cases proceeded on the basis that the purpose was the filming. And so, then, a First Amendment issue was brought to bear. But,

P9PKCOMO

here, the government is saying that this was sex for hire, it was not performance for hire, and the jury couldn't easily determine that based on the facts in the record.

MS. SHAPIRO:  Actually, in *Freeman*, there were alternative holdings, and the court was quite clear that even if the evidence supported the notion that the person doing the filming had a motive of sexual gratification, that it would still be protected by the First Amendment.  That's explicitly stated in *Freeman*.  So, I don't think that's right.

In addition, the point that I'm making about consumption doesn't even require it to be a recorded film.  So, for instance, OnlyFans came up in the trial.  My understanding is that with respect to OnlyFans, that it's often simply a Livestream back and forth where two people are -- somebody's watching someone on a camera that is not recorded, it's just happening in realtime.  So, it doesn't really even matter, but I'm just pointing out that I think if the intent included filming and watching later, that's part of the overall point here, that --

THE COURT:  You're saying that any prosecution for prostitution is defeated by the participants recording and then viewing the acts at a later time?

MS. SHAPIRO:  That's not what I'm saying, and that's not what the Court would need to hold to agree with this point. The point is that there are two different rights at issue here,

P9PKCOMO

and one of them is the right to watch porn, and that includes live porn, not just filmed porn.

You might have a different case if we didn't have these highly orchestrated, highly choreographed, performances, involving what the government's witnesses called painting a sexy scene and so forth.

So, I think this argument is very particular with the specific facts of this case and the way in which the sexual activity was described by the government's own witnesses and as evidenced by the videos that are in evidence.

With respect to the Court's third question:  So, obviously, for all those reasons, we think this is clearly expressive conduct protected by First Amendment.  We concede that we're in *O'Brien*, but there is no important government interest.  And, indeed, DOJ policy itself confirms as much, because DOJ policy, for the last 75 years, has been that the government does not prosecute Mann Act cases unless they involve a purveyor -- someone who's running a commercial business of exploiting sex workers, and then, you know, a little bit after that policy was promulgated in 1953, the government then began to add emphasis on cases involving minors and other sex trafficking.  But we don't have any of that here. What we're left with, after the jury's verdict, is simply a case in which we have to accept that what we're talking about is consenting adults, and there is no substantial or important

P9PKCOMO

government interest.

And, indeed, what some of the cases talk about, in connection with why regulating prostitution is a substantial interest, is secondary effects — so, for instance, crime will go up in a neighborhood where there are massage parlors that are being used as houses of prostitution or the like, that sort of thing. And, here, you don't have that concern because what we're talking about is occurring in the privacy of a hotel room or someone's residence.

So, there are two cases that I wanted to emphasize to the Court in this regard. The first one is *Texas v. Johnson*, which is cited in our briefs. And we understand that that case is a strict scrutiny case, and it doesn't apply the *O'Brien* test, but the reason I think it's important is because it makes clear that when a challenge like this is brought, the question is not whether the state has a sufficiently important interest sort of in general in regulating the conduct; the question is whether the state's interest is sufficiently substantial or important as it relates to the particular conduct of the defendant.

So, in *Texas v. Johnson*, one of the arguments Texas made was that it had an interest in preventing breaches of the peace, and that was the flag-burning case, but the court held that Texas had failed to show that Johnson's conduct would likely result -- particular conduct would likely result in a

P9PKCOMO

breach of the peace.  The court wasn't denying that that could be an important interest in some other case, but in the particular case of Johnson, the evidence was not sufficient. And that's what we have here, excepting the jury's verdict. There's really no substantial interest in regulating private consensual sexual activity, which is, as I mentioned earlier, protected by the United States Constitution.

THE COURT:  Well, most prostitution is between consenting at all times in the sense that you're discussing, and I took Ms. Slavik to be saying that even under those circumstances, the courts are uniform that the government has an important interest in regulating that, for the reasons that it could be associated with other criminal activity, other activity that the government would have an interest in policing.  That's perhaps even amplified when you're talking about the actual *actus reus* here, which is the transportation of other people across state lines, which might be connected to all sorts of different illegal conduct.  But it was focused on what's happening here, which is prostitution without talking about nonconsent, coercion, or anything like that.

MS. SHAPIRO:  No, but I think the point of Texas is that the government has to show -- and there are other cases like this, but I mention that because it's a United States Supreme Court case, and it's not that long ago.  The point is that you have to look at the particular conduct of this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P9PKCOMO

defendant and not sort of generally.

Another case --

THE COURT:  And Ms. Slavik referred to the facts of this case, and she pointed, for instance, to illegal drug use as being one of the things that the evidence in this case showed, and that would be one of the things that the government would have an interest in policing, which is associated with prostitution, even if it's between consenting adults.

MS. SHAPIRO:  Well, I think the only drug charge that was brought in this case was in connection with the RICO charge, which Mr. Combs was acquitted of.  And as we discussed at length in the jury charge conference, and as Mr. Agnifilo argued to the jury, it's different when you're talking about personal use.

So, I don't think that that is sufficient here.  And I think that this is the reason that -- DOJ policy doesn't even say what Ms. Slavik said.  DOJ policy specifically says that the statute should only be used against people who are running a business of prostitution or people who are exploiting minors or sex trafficking.

The other case I wanted to cite, which is not in our papers, is a case called *White River Amusement Publishing, Inc. v. Town of Hartford*, 481 F.3d 163, which is a Second Circuit case from 2007.  That case involves an adult entertainment business which offered nude dancing, and it involves a

P9PKCOMO

challenge to a town ordinance forbidding nudity and sex in a public place.  The Second Circuit ruled that the town had failed to present an important or substantial interest for the ordinance.  In that case, the town was claiming that there were secondary effects, as in *Barnes v. Glen Theatre* and *Erie*, the Supreme Court nude dancing case, and made arguments along the lines of some of the things Ms. Slavik was saying about other crimes and decreasing property values in that case.  And the court said that might be a legitimate interest if there's evidence to support it, but, here, there's no evidence to show that that was really the purpose of it.  I think that case is important because it shows that you really have to look at the evidence in the particular case.  And I think the DOJ policy itself is really what speaks volumes to what the government's interest here is and what it's not.

THE COURT:  Thank you very much.

Ms. Slavik, just one additional question:  Are you aware of any case, any Mann Act case, where the transporter, the defendant, did not have, at the very least, a financial motive?  I think the government cited the *Mi Sun Cho* case, and I don't think the Second Circuit in that case referred to any financial motive on the part of the defendant, but I think if you look at the district court record, the defendant actually had been paid for the transportation of the individual from Atlantic City into New York.

P9PKCOMO

Is there another case where there was no financial motive?

MS. SLAVIK:  In other words, john cases, your Honor? Yes, your Honor, the government is aware of other cases.  I don't have them at my fingertips, but we plan to raise them in our sentencing submission, certainly.

THE COURT:  In those cases, the person who did the transporting actually was a participant in the sexual activity?

MS. SLAVIK:  That's right.

THE COURT:  Do you have any case that involved a transporter who was transporting separate people, but did not have a financial motive?  You understand what I'm saying?

MS. SLAVIK:  Not really.

THE COURT:  So, person A transports person B to have sex with person C, all right?  So they're doing the transporting, the other elements are satisfied.  They don't have a financial motive, but they are nevertheless prosecuted and convicted under the Mann Act.

MS. SLAVIK:  I understand, your Honor.

And, yes, we do have examples.  Again, I think that we'll refer to those in our sentencing submission, as well.

THE COURT:  All right.  Very good.

Those are my questions.

Ms. Shapiro, I'm happy to give you a first chance if there's anything that you wanted to address that we didn't

cover today that you wanted to spend some time on.  You don't have to, but the floor is yours.

MS. SHAPIRO:  Your Honor, first, I did want to just respond to one thing Ms. Foster said at the end of the discussion of the second question, with respect to secondary liability.  I just wanted to make a few points in response to that.

So, I think she said that Mr. Combs was paying, and that there were instances in which either Ms. Ventura or Jane would hand money to the male, and I think it's undisputed that the money was Mr. Combs' money.  And if that would be sufficient, then — for instance, let's take the case of *Wooten*, that's one of the cases with the booths — if the person paying to watch the people have sex had given his cash to somebody else who worked in the establishment, who, in turn, gave it to the two performers, then we would say, oh, the result has to be different.  But that doesn't make any sense.  The point here is that the money is coming from Mr. Combs, and the fact that somebody else may have, on some occasions, been the one to hand it to the males doesn't change the analysis.  And, indeed, that's why the government has, throughout this case itself, argued that Mr. Combs was the ringmaster here.  Even on page 1 of their opposition to this motion, they refer to him as the mastermind, they say he transported, he directed.  They never raise the aiding and abetting or secondary liability theories

P9PKCOMO

to the jury in any way.  And I think that just speaks volumes to what we're really talking about here.

The other thing I wanted to mention with respect to that was that, I believe Ms. Foster said that the two women testified that they were paying for prostitution.  And maybe they were at a different trial than I was at, but I don't believe either of them ever said that or ever suggested that they were involved in prostitution or used that word in that way.  So, I want that to be clear.  That is not consistent with the record.

The last thing I just wanted --

THE COURT:  Just so I'm clear — and let me give you an example, this comes out of the *Freeman* case — a businessman and client go to a brothel — this is the example given in the case, okay — and the businessman pays the brothel for a prostitute to have sex with his or her client.  You're saying that's not prostitution?

MS. SHAPIRO:  Correct.  I mean, assuming the -- is the businessman a voyeur?

THE COURT:  No, he's just trying to curry favor with his client through prostitution, an otherwise prostitution transaction.  This is the example given.

MS. SHAPIRO:  I see.

THE COURT:  You understand what I'm saying?

MS. SHAPIRO:  That might be a different case --

P9PKCOMO

THE COURT:  Why would that be a different case?  So a businessman has no financial motive other than --

MS. SHAPIRO:  Because he's not a voyeur.  So we're making two arguments.  One is the financial motive.  I assume you're putting that to one side and saying, assuming you reject that argument, then we're talking --

THE COURT:  I'm taking both of them.  I'm saying the businessman has no financial motive in the prostitution transaction, he's just with his client, but he is doing the paying and not the client, who is engaging in the sex with the prostitute.  And that's a factual scenario that came up in a Wisconsin case that's addressed in *Freeman*.  I'm just asking you, based on -- as I understand it, that would not meet your definition, and so your position would be that that is not prostitution?

MS. SHAPIRO:  Correct.  That's correct.

THE COURT:  All right.

MS. SHAPIRO:  The last thing I'll say is just — I know the Court is aware of this — the statute that Mr. Combs has been convicted of violating is possibly the most infamous law in the history of the United States Code.  Its racist and sexist origins and early enforcement are well documented and beyond dispute.  And even a hundred years ago, in a very different age, the statute was being criticized by multiple Supreme Court justices, who sought to limit it to commercial

P9PKCOMO

purveyors of prostitution.  And even in its early days, and certainly later in the 20th Century, many judges and juries refused to enforce it.

We only talked about that a little bit in our brief, but it's discussed at length in this book, which we cited in case anyone is interested.  The whole history of the statute is really, I would submit, respectfully, an embarrassment to the United States of America.  Nearly 75 years ago, as we've talked about ad nauseam, the DOJ stopped enforcing the law in noncommercial cases, and has followed that policy to this day, other than in cases involving minors or sex trafficking, and under that policy, this case would never have been charged had the government not brought the other charges, but it was unable to prove those charges, and the jury rejected them.

So, what we're left with is a case about adults who traveled interstate and participated in a threesome, an adult couple that chose to have sex by bringing a third consenting adult into their private sex life.  It's unclear why this conduct should be criminal in 2025, even if the third person was a professional who was paid to participate.

So, for those reasons, as well as all the reasons in our briefs, and which we've discussed today, we submit that Mr. Combs should be acquitted of the two Mann Act counts.

THE COURT:  All right.  Thank you.

Ms. Slavik?

P9PKCOMO

MS. SLAVIK:  Yes, your Honor.  Just to respond to a couple of the points that counsel raised.

First, the government is not conceding that the Mann Act implicates any sort of First Amendment right to view porn.  I think, as is made clear in our briefs and argument today, our view is that the Mann Act simply does not apply here.  And I think that's consistent with *Freeman*, which says that the purpose of the Mann Act is quite removed from, and has no direct impact on, First Amendment activities.  That's the first thing.

The arguments that counsel makes about DOJ policy related to the Mann Act and the history related to the Mann Act, those are laid out -- those have been argued before, those are laid out in several previous submissions.  There was a motion to dismiss the Mann Act count where counsel raised the same issues, and the Court denied that.  The arguments related to the DOJ policy, the government response, I think, is in our bail opposition filed in July.

And then, finally, counsel argued that, here, in this case, there should be no concern about the secondary effects of prostitution, including violence, including drugs that I mentioned, because all of this conduct in this case occurred behind closed doors.  And, your Honor, respectfully, I think that's exactly why the secondary effects matter so much in this case — because what was happening behind those closed doors.

P9PKCOMO

Ms. Ventura was getting punched in the face.  Jane was getting hit and kicked.  The defendant was providing drugs to all parties.  I think it's especially important here to consider the secondary effects.

Stepping back more broadly, I just want to point out the reason that we're here, which is a sufficiency of the evidence motion.  In other words, the defendant has the burden to show that no reasonable juror could have found that the evidence presented at trial established the elements of conviction beyond a reasonable doubt.  And that just simply is not a burden that the defendant can meet.

Over seven weeks, the jury heard evidence that overwhelmingly proved that the defendant transported Cassie, Jane, and male escorts, both domestically and internationally, so that they could engage in prostitution.  Cassie and Jane both testified that, although they didn't want to be having sex with strangers, they participated in hours' and days' long freak-offs and hotel nights, sometimes on a weekly basis.  And those freak-offs, they were about one thing only — the defendant's sexual gratification.  He planned them, he choreographed them, all for one purpose, which was to suit his sexual pleasures.

And each freak-off followed the same general pattern, which culminated in the escort being paid to have sex with Ms. Ventura or Jane, except if the escort couldn't perform

P9PKCOMO

sexually, and in those cases, the escort was paid less or not at all.

The defendant, sometimes with help from Cassie, Jane, or his staff, arranged for escorts to travel to the freak-offs. And this is what happened over and over and over again, from 2009 until 2024.  That's 15 years.

The evidence amply satisfies Rule 29.  And that Rule 29 standard is that any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.  And it also requires the Court to view the evidence in the light most favorable to the government, and to draw all inferences in favor of the government.

So, your Honor, the government's view is that the defendant cannot meet his burden here, and his motion should be denied.

THE COURT:  Thank you.

While we're here, Ms. Slavik — I'll start with you — are there any issues that the government needs to raise in relation to next week's sentencing proceeding --

MS. SLAVIK:  No, your Honor.

THE COURT:  -- if the motion is not granted?

MS. SLAVIK:  No, your Honor.

THE COURT:  Thank you.

Ms. Shapiro, anything that the defense would like to raise?

P9PKCOMO

MS. SHAPIRO:  No, your Honor.

THE COURT:  All right.

So, we'll see everyone.  Thank you for the argument, very good argument, on both sides, and for the papers, which were superb.  The Court will consider them and reserve decision on the motions.  We'll get you a decision very shortly.

Otherwise, we'll see everyone back here next Friday. Thank you very much.  We are adjourned.

(Adjourned)