P5CsCOM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

            v.                        24 Cr. 542 (AS)

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

            Defendant.                Trial
------------------------------x

                                      New York, N.Y.
                                      May 12, 2025
                                      9:18 a.m.
Before:

                 HON. ARUN SUBRAMANIAN,

                                      District Judge
                                      -and a Jury-

                        APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY: MADISON R. SMYSER
    EMILY A. JOHNSON
    MAURENE R. COMEY
    MEREDITH FOSTER
    MITZI STEINER
    MARY C. SLAVIK
    Assistant United States Attorneys

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P5CsCOM1

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
       Attorneys for Defendant
BY:   MARC A. AGNIFILO
       TENY R. GERAGOS
       -and-
SHER TREMONTE
BY:   ANNA M. ESTEVAO
       -and-
SHAPIRO ARATO BACH LLP
BY:   ALEXANDRA A.E. SHAPIRO
       JASON A. DRISCOLL
       -and-
XAVIER R. DONALDSON
BRIAN STEEL


ALSO PRESENT:
LINDA MORENO, Defense Jury Consultant

P5CsCOM1

(In the robing room)

MR. AGNIFILO:  One thing on the record, the court's record.  I'm happy to do it on the record.

I'm going to ask that victim number one, when she testifies, be already in the jury box when the jury comes in. Only as to her.  Only because of her physical condition.  I mean, there are certain things we can't control about a juror who is eight and a half months pregnant, but I think there is -- there is a quality to her walking in front of the jury that I think is easily avoidable.

I'm not making an application for any of the other witnesses.

THE COURT:  Wait.  Let me make sure I understand.

MR. AGNIFILO:  Yes.

THE COURT:  Ms. Comey, who is your first witness?

MS. COMEY:  First witness is Israel Florez.

THE COURT:  That's what I thought.

When we get to the third witness, which is Ms. Ventura --

MS. COMEY:  Correct, your Honor.

THE COURT:  -- when we get to our third witness, just for purposes of that witness --

MR. AGNIFILO:  Yes.

THE COURT:  -- you would like her to be already sitting in the witness box --

P5CsCOM1

MR. AGNIFILO:  Yes.

THE COURT:  -- when the jury comes in.

MR. AGNIFILO:  Correct.

THE COURT:  All right.  Let me think about that.

MS. COMEY:  Your Honor, we would object.

If your Honor is considering it, I would like to be heard on that.  I don't think there any basis to treat any witness differently because of a medical condition, most notably pregnancy.  I think that would be deeply inappropriate.

MR. AGNIFILO:  I can make the application.  It doesn't have to be done now.  It can be done before she testifies.  Any time good for the court.

THE COURT:  I'll think about it.  Ms. Comey makes the point, we wouldn't treat people differently based on any other sort of medical condition or physical impairment or any other attribute, right?

Why would we treat this differently?

MR. AGNIFILO:  Because I think there is a prejudicial quality.  Pregnancy is beautiful and wonderful.  It also is a source of potential sympathy.

THE COURT:  They are going to see the witness.

MR. AGNIFILO:  100 percent.

THE COURT:  Aren't they also going to see the witness leaving the witness stand?

What are you trying to achieve?

MR. AGNIFILO:  Well, so, in past trials -- and each trial is different -- I've certainly had situations where the jury was excused before the witness either sat down or left the witness stand.

And I would make that application for all the witnesses, except I think it takes a certain more little bit more time, so I wasn't going to do that in the interest of time.

I've always preferred the procedure where the witness is seated then the jury comes in.  I've probably had most of my trials with that as the process.

THE COURT:  Well, the court does that, too, when it fosters efficiency.  I'm sure that we will actually do that at this trial.

But you're making a different application.  You're saying we will, in fact, have the witness seated whenever the jury comes in, and there's an objection to that, and it's a fair one, that I don't know that there is any support anywhere in the history of American jurisprudence.

You can find that for me.  You've got time.  I've heard the objection.  I tend to agree with it.  However, you've got until the afternoon, because this isn't going to happen, if it happens today at all, I think you've got some time.  If you have any support for that, I'm happy to take a look at it.

THE DEPUTY CLERK:  Your Honor, can we go off the

P5CsCOM1

record?

(Recess)

(In open court)

THE COURT:  Mr. Courtroom deputy, are we prepared to proceed?

THE DEPUTY CLERK:  Yes, your Honor.  I will check on them right now.

MS. SHAPIRO:  Your Honor, I'm sorry.

Can I just put one thing on the record?

THE COURT:  Yes.

MS. SHAPIRO:  We just want to note, to supplement the *Batson* application which we understand your Honor has denied, that in addition to the points Mr. Agnifilo made, that two of the black individuals the government struck, No. 161 and 163, were the only two black men in the first 28.

THE COURT:  All right.

MS. COMEY:  Your Honor, I don't think that's right.

In the first 28?

MS. SHAPIRO:  In the first 28.

THE COURT:  That's what --

MS. COMEY:  I don't think that's right, and if I can correct the record, Juror No. 184, who is on the jury, I believe, is a black man.

THE COURT:  Well, I think we have the government's response.

P5CsCOM1

Ms. Comey, do you have anything further in response to Ms. Shapiro's submission?

MS. COMEY:  Your Honor, I would want the record to also reflect that there were other men who weren't non-white men also seated on the jury.

I think I noted that, but given --

MS. SHAPIRO:  I don't think that's correct, but ...

THE COURT:  All right.  I understand that you've supplemented the record, Ms. Comey has responded, and the *Batson* application continues to be denied.

So, with that, at this point, Mr. Courtroom deputy, are we prepared to bring in the jury?

THE DEPUTY CLERK:  Yes, your Honor.

THE COURT:  All right.  Let's bring in the jury.

(Venire present)

Please be seated.

THE DEPUTY CLERK:  Your Honor, I'll confirm I have the jurors seated in the correct position.

Are you Juror No. 2?

JUROR:  Yes.

THE DEPUTY CLERK:  Are you Juror No. 5?

JUROR:  Yes.

THE DEPUTY CLERK:  Are you Juror No. 25?

JUROR:  Yes.

THE DEPUTY CLERK:  Are you Juror No. 55.

P5CsCOM1

JUROR:  Yes.

THE DEPUTY CLERK:  Are you Juror No. 58?

JUROR:  Yes.

THE DEPUTY CLERK:  Are you Juror No. 75?

JUROR:  Yes.

THE COURT:  Are you Juror No. 116?

THE DEPUTY CLERK:  Thank you.

Are you Juror No. 160?

JUROR:  Yes.

THE COURT:  Are you Juror No. 184?

THE DEPUTY CLERK:  Are you Juror No. 201?

JUROR:  Correct.

THE DEPUTY CLERK:  Are you Juror No. 217?

JUROR:  Yes.

THE DEPUTY CLERK:  Proceeding to the last row, are you Juror No. 230?

JUROR:  Yes.

THE DEPUTY CLERK:  Are you Juror No. 234?

JUROR:  Yes.

THE DEPUTY CLERK:  Are you Juror No. 292?

That's why we do this.

Are you Juror No. 292?

JUROR:  Yes.

THE DEPUTY CLERK:  Great.  Thank you.

Are you Juror No. 321?

JUROR:  Yes.

THE COURT:  Are you Juror No. 330?

JUROR:  Yes.

THE DEPUTY CLERK:  Thank you, your Honor.

THE COURT:  Good morning, ladies and gentlemen, and thank you for bearing with us through the jury selection process.

Welcome back to the United States District Court for the Southern District of New York.  As you were told when you were here for jury selection, I am Arun Subramanian, and I will be presiding over the trial in this case, *United States of America v. Sean Combs*.

Trial will begin shortly with opening statements.  We will sit every weekday until trial is over with the exception of court holidays.  Our anticipated schedule had not changed since I last spoke to you.  The attorneys and I expect this trial to be over before July 4.  Obviously, it is possible that the trial could go longer, but I don't expect that it will. Every day this week we will be here from 9:30 a.m. to 5:00 p.m.

After this week, we will go from 9:00 a.m. to 3:00 p.m. each day, and we will try to make your trial experience as smooth and pleasant and possible.  If any issues come up, please contact the courtroom deputy.  A light breakfast will be available for every trial day in the jury room at 8:30, and I encourage you to arrive early so as to not

delay the other jurors and the participants in this trial.

We will take a shorter than usual break for lunch. I'm anticipating about 30 minutes, but we will have lunch provided for you in the jury room so you don't need to leave the courthouse and take that additional time.

Now, the reason why we will have one shorter break in the middle of the day is so that you can leave earlier, most days. That is the point. So that you can have more time to attend to the things you need to do in life while we're conducting this trial. Of course, if you need a break during the proceedings for any urgent personal reason, you should let the courtroom deputy know. But I will make every effort to move this trial along promptly and make efficient use of your time.

Now, the names and identities of the jurors are known to the court and both parties who will keep your names and identities in confidence. In order to protect your privacy, that personal information about you will not be disclosed to the public. This is in no way unusual. It is a common practice followed in many cases in the federal courts that is being followed here in this case.

The courtroom deputy will now swear in the jury.

Is there anyone in the jury who does not swear an oath but affirm?

Put your hands down for a minute.

P5CsCOM1

Is there anyone who does not take an oath?

You can raise your hands again.

(A jury of 12 jurors and 6 alternates was impaneled and sworn)

THE COURT:  Now, members of the jury, now that you have been sworn, I will give you some preliminary instructions to guide you in your participation in this trial.

To begin with, you are here to administer justice in this case according to the law and evidence.  You are to perform this task with complete fairness and impartiality and without bias, prejudice, or sympathy for or against any of the parties.

It will be your duty to find from the evidence what the facts are.  You and you alone will be the judges of the facts.  You will then have to apply those facts to the law as the court will give it to you.  You must follow the law whether you agree with it or not.  Nothing that I say or do during the trial is intended to indicate or should be taken by you as indicating what your verdict should be.

The evidence from which you will find the facts will consist of the testimony of witnesses, documents, and other things received into the record as exhibits, as well as any facts that the parties agree to or stipulate to that the court may instruct you to find.

Certain things are not evidence and must not be

considered by you.  I will list them for you now.

First, statements, arguments, and questions by lawyers are not evidence, nor are my own statements to you.  Only the answers given by the witnesses and the documents admitted as exhibits are evidence.

Second, objections to questions are not evidence.  The lawyers have an obligation to their clients to make an objection when they believe evidence being offered is improper under the rules of evidence.  You should not be influenced by the court's ruling on an objection.  If the objection is sustained, ignore the question.  If it is overruled, treat the answer like any other.  If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Third, testimony that the court has excluded or told you to disregard is not evidence and may not be considered.

Finally, anything you may have seen or heard outside the courtroom is not evidence and must be disregarded.  You are to decide the case solely on the evidence presented here in this courtroom.

When you are determining the facts, keep in mind that there are two kinds of evidence:  Direct and circumstantial. Direct evidence is direct proof of a fact, such as the testimony of an eyewitness.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts

exist.  The word infer or the expression to draw an inference means to find that a fact exists from proof of another fact. An inference is to be drawn only if it is logical and reasonable to do so and not by speculation or guesswork.

In deciding whether to draw an inference, you must look at and consider all the facts in light of reason, common sense, and experience.  Whether a given inference is or is not to be drawn is entirely a matter for you, the jury, to decide. Circumstantial evidence does not necessarily prove less than direct evidence, nor does it necessarily prove more.

Here is an example to help you think about the difference between direct and circumstantial evidence.  Assume that when you came into the courthouse this morning, the sun was shining as it is outside, and it was a nice day outdoors. Also assume that the courtroom blinds were drawn and you could not look outside.  Assume further that as you were sitting here, someone walked in with an umbrella that was dripping wet, and then a few moments later, someone else walked in with a raincoat that was also dripping wet.

Now, because you could not look outside the courtroom and you couldn't see whether it was raining, and because no witness has testified that it is raining, you would have no direct evidence of the fact that it was raining.  But on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it was, in

fact, raining.  That is all there is to circumstantial evidence.

You infer on the basis of reason, experience, and common sense from one established fact the existence or the nonexistence of some other fact.  I'll give you further instructions on these, as well as other matters, at the end of the case, but keep in mind that you may consider both kinds of evidence.

Now, one of your most important tasks as jurors is to evaluate the credibility of the witnesses who will testify before you.  That is how truthful and believable they are.  Listen carefully as each witness testifies during both direct and cross-examination and consider whether the witness is telling the truth.  It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject.

Now, how do you decide what to believe and what not to believe?  You are to listen to the witnesses, observe their testimony, and then decide as you would decide such questions in your own life.  Did they know what they were talking about?  Were they candid, honest, open, and truthful?  Did they have a reason to falsify, exaggerate, or distort their testimony?

Sometimes it is not what a witness says, but how he or she says it that may give you a clue as to whether or not as to accept that witness's version of an incident or an event as

credible or believable.  In short, the way a witness testifies may play an important part in your reaching a judgment as to whether or not you can accept the witness's testimony as reliable.

You may hear from law enforcement officials in this case.  The fact that a witness may be employed as a law enforcement official does not mean that his or her testimony is deserving of greater or lesser weight than that of an ordinary witness.  You may also hear from two witnesses testifying using pseudonyms, that is, not using their real names.

The government, the defense, the court, and you, the jury, will know their real names, but the names will not be used in open court solely to protect the privacy of these individuals from disclosure to persons who are not parties to this case.  The fact that a witness is testifying using a pseudonym does not mean that his or her testimony is deserving of greater or lesser weight than that of any other witness.

Now, a few words about your conduct as jurors.  I gave each of you the following instructions when you were here for jury selection last week, but I will repeat the instructions now because they are extremely important and I am counting on each and every one of you to follow them.

First, during the trial, you are not to discuss the case with anyone, nor are you to permit anyone to discuss it with you.  This includes posting anything on the internet about

this case, whether it be on Instagram, Facebook, X or any social media platform or website.

Until you retire to the jury room at the end of the case to deliberate, you simply are not to talk about this case with anyone, including your spouse or partner, family, or close friends. Do not even discuss the case with each other until you begin your actual deliberations at the end of the trial.

Second, please do not, while you're serving as jurors in this trial, have any conversations with the parties, the attorneys, or any witnesses in this case, whether in the courtroom, in the hallways, in the elevators, outside, and anywhere else. I mean, not only to avoid talking about the case, do not talk at all, even to say good morning or to acknowledge any of these people.

Someone seeing a juror in conversation with a party, lawyer, or witness might think that something improper was being discussed. To avoid even the appearance of impropriety, avoid any such contact or conversations. I can tell you that when the parties, witnesses, and lawyers pass you in the halls without even acknowledging your presence, they do not mean to be rude. They are simply following my orders because I have ordered them not to talk to you.

(Continued on next page)

THE COURT: Now, third, do not read or listen to anything outside the courtroom that relates to this case in any

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

way.  You are not to allow anyone to speak to you about this case.  If you are approached by anyone to speak about it, politely but firmly tell them that the judge has directed you not to do so.  Because I am ordering you not to do so.  If any person seeks to contact you about this case, you are required to report the incident promptly to me, by sending me a note through my courtroom deputy or through the jury office.

Also, be sure that I am informed if any person that you know comes into the courtroom.  This is a public trial, so it could happen.  But it is important that you do not hear from them what may have happened in the courtroom while the jury was not present.  If you should see a friend or relative come into the courtroom, please send me a note through the deputy at your first opportunity.

Fourth, do not try to do any research or make any independent investigation about the case or the issues brought up by this case.  Do not go on the internet tonight and research any matters relating to this case.  Do not call up lawyer friends and ask about the type of matters at issue here.

Fifth, I know many of you use cell phones, laptops, social media, the internet and other tools of technology.  You all do.  You must not use these tools to communicate electronically with anyone about the case.  This includes your family and friends.  You may not communicate with anyone about the case on any technological device, including through e-mail,

P5CACom2

text messaging, or any social media websites.

Finally, do not form any opinion until all the evidence is in.  A case can only be presented step by step, witness by witness until all the evidence is before you.  Keep an open mind until you start your deliberations at the end of the case.

Now, you are permitted to take notes during this trial.  The courtroom deputy has given each of you a note pad and a pen.  Please write your name on the -- or your juror number, excuse me, on the cover of the pad.  Do not write your name.  Just the number.  If you do take notes, please do so only on these pads.  Remember that any notes you take are for your use only and they are to be used only as an aid to your memory.  Your memory controls.  If you do take notes, be careful not to get so involved in taking notes, that you are not listening to the evidence.

Once you are in your deliberations, if there is a disagreement between one juror's notes and another juror's notes or between one juror's notes and another juror's recollection, you can ask to have the court reporter read back the testimony or to have that portion of the transcript sent to you, for it is the official court transcript that controls, not any particular juror's notes.

During the course of the trial, exhibits will be received into evidence.  They will be marked by an exhibit

P5CACom2

number.  If there is an exhibit that you are interested in seeing during your deliberations or you think you might be interested, just write down that exhibit number.  At the end of the trial, as you begin your deliberations, we will provide each of you with a list of all the witnesses who testified as well as a list of all the exhibits that have been received into evidence.  This will be a lengthy trial with many exhibits and witnesses, but please do not hesitate to request as much material as you need when you are in your deliberations.

We will now begin the trial.  As I told you earlier, the trial is expected to be done in eight weeks.  This week, we'll begin each day at 9:30 a.m.  Please be on time.  To help ensure we start on time, please be in the jury room at 9:15 a.m. at the latest so we can begin without delaying.  Starting next week when we begin at 9:00 a.m. each day I will ask you to be here in the morning by 8:45.  The key thing is that nobody is late.  If any of you are late, we will have to wait and we can't start until you're all here.  And all of us will just have to be kind of cooling our heels until you arrive.  And if we lose 10 to 20 minutes each day, we might not be able to get completed on time.  It might go past July 4th, which nobody wants.

Now, let me tell you how the trial will proceed.  First, we will have opening statements.  An attorney for the government will make an opening statement.  Then an attorney

P5CACom2

for the defense will do so.

The opening statements are neither evidence nor argument.  They are simply outlines of what the attorneys believe the evidence will show and they are given to help you follow the evidence as it is presented.  After opening statements, the government will present its case.  The government will call its witnesses, and after each witness testifies, the defense will have an opportunity to examine the witness.  If that witness is also one of the witnesses the defense will call, the defendant may also examine that witness on matters relevant to its defense so that the witness does not have to testify twice.

Following the government's case, the government will rest.  The defendant will then have an opportunity to present a defense case should he choose to do so.

The defendant here is under no obligation to present a defense.  The burden remains at all times on the government to prove the elements of each offense beyond a reasonable doubt.  Should the defendant present a defense case, any remaining defense witnesses will testify and the government will have an opportunity to cross-examine them.  After the evidence is completed and all sides have rested, the attorneys will give their summations.  This is the opportunity for the lawyers to summarize the evidence and to give their closing arguments.  Following the summations, I will give you instructions on the

law.  And you will then, finally, retire to deliberate on your verdict.

I know this will be a long road, but I want to emphasize that you have a tremendously important task as jurors.  It is to determine the facts.  You, and not the Court, are the sole judges of the facts.  The Constitution itself recognizes your unique role in our system of justice.  So, please, pay careful attention to the witnesses and evidence received at trial, as well as my instructions on the law.

I thank you for your commitment to performing this civic duty and recognize the sacrifices that you have all made to be here today.

We will now begin with opening statements.  Is the government prepared to proceed?

MS. JOHNSON:  Yes, your Honor.

THE COURT:  All right.  You may proceed.

MS. JOHNSON:  This is Sean Combs.  To the public, he was Puff Daddy, or Diddy, a cultural icon, a businessman, larger than life.  But there was another side to him, a side that ran a criminal enterprise.

During this trial, you are going to hear about 20 years of the defendant's crimes.  But he didn't do it alone.  He had an inner circle of bodyguards and high-ranking employees who helped him commit crimes and helped him cover them up.  Kidnapping, arson, drugs, sex crimes, bribery and obstruction;

these are just some of the crimes that the defendant and his inner circle committed again and again.  You are going to hear about all of them during this trial.

Let's start now with just one night.  The defendant was on the hunt for his girlfriend, a woman named Cassie.  For years, the defendant physically abused Cassie.  He also sexually exploited her, forcing her to have sex with male escorts while he watched and recorded it.  But that night, the defendant learned he had lost control of Cassie.  He found out Cassie was seeing another man.  Furious, he set out to find Cassie and that other man.  But he couldn't do it by himself.  So he took his gun and he took his bodyguard, one of his most loyal lieutenants, to wake up one of the defendant's employees in the middle of the night.

The defendant yelled that he was going to kill the man Cassie was with.  He demanded that his employee take him to that man's home.  The defendant forced the employee out of her apartment and into an SUV.  They drove to the house.  The defendant and his bodyguard broke in, but no one was there.

The defendant didn't give up.  He kept looking for Cassie.  When he finally found her, he did what he had done countless times before.  He beat her brutally, kicking her in the back and flinging her around like a rag doll.

All of that violence wasn't enough though.  The defendant had to make sure he had control over Cassie once

again.  So he threatened her.  The defendant told Cassie that if she defied him again, he would publicly release the videos of her having sex with male escorts that he kept as blackmail. Souvenirs of the most humiliating nights of her life.

This was just one night in the defendant's two decades of crime.  In one night, he and his lieutenant kidnapped an employee, broke into a man's house, and the defendant beat and blackmailed his girlfriend.  And as you will learn, this was just the tip of the iceberg.  These are not the only crimes the defendant committed.  That's not the only time he kidnapped someone, and Cassie is not the only woman he beat or sexually exploited.

For 20 years, the defendant, with the help of his trusted inner circle, committed crime after crime.  That's why we are here today.  That's what this case is about.

Twenty years of crime is a lot to cover.  So, first, I'm going to walk you through what the evidence in this case will show.  Then, I will explain a little bit about the charges, and then I will tell you how the government will prove that the defendant is guilty beyond a reasonable doubt.  So what will the evidence show?

You'll learn that the defendant was a musician who created an empire.  He had a record label, Bad Boy Records, and other businesses that he ran or controlled.  Those businesses made the defendant rich, and he used money and resources from

P5CACom2                    Opening - Ms. Johnson

those companies to build his reputation and to feed his every desire.  To do that, he relied on an inner circle of people closest to him, like his bodyguards, chiefs of staff, and other high-ranking employees who ran all aspects of his life. Together, the group worked to promote the defendant's power. They carefully cultivated and guarded his reputation.  And they worked to get the defendant everything he wanted.  He sometimes called himself the king, and he expected to be treated like one.  He expected his inner circle to cater to his every desire, including his sexual desires.

For years, the defendant used his inner circle and his company's resources to sexually exploit multiple women, including women he forced and manipulated into having sex with male escorts, meaning men who the defendant paid to have sex with women while he watched.

No matter what, the defendant and his inner circle made sure he got everything he wanted.  Many times, that involved committing crimes together and then covering up those crimes.

Those crimes included violent acts, like when the defendant bought his bodyguard and his gun to kidnap the employee I mentioned earlier.  But you'll hear about other violence, too, like when the defendant's bodyguards kidnapped the same employee another time, forcing her to sit through days of lie detector tests, or when the defendant had a man's car

set on fire, or when the defendant dangled a woman over a balcony.  You'll see and hear evidence of all of this.

The defendant had impossible demands.  When his employees failed to meet those demands, the defendant threw things at them, threatened them, hit them, or pressured them to take drugs.  He even sexually assaulted one of them.

You'll also hear how the defendant used his employees to get and distribute drugs.  They delivered those drugs whenever the defendant asked, including so he could give those same drugs to the women he was forcing to have sex with male escorts.  He transported those women and those escorts across state lines and even out of the country for those sex acts.  And he used his inner circle and the vast resources of his business empire to help to arrange those trips and make the women available to him.

Let me be very clear on this next point.  This case is not about a celebrity's private sexual preferences.  The evidence will show that the sexual conduct at issue in this case was coercive and criminal, because the defendant made women have sex when they did not want to, because he threatened them, he drugged help, he lied to them, and he even used violence to make them do it.

A lot of this trial will focus on just two of those women.  Cassie, who I talked about earlier, and Jane.  Some of the details of what happened to Cassie and Jane may be hard to

hear, but this is what the evidence will show happened.

The defendant used lies, drugs, threats, and violence to force and coerce, first, Cassie, and later Jane, to have sex with him in front of male escorts.  The defendant insisted that the sex occur in a very specific, highly orchestrated way.  These sexual performances lasted multiple days and they involved multiple escorts.

The defendant called these encounters by different names over the years.  First, freak-offs.  Later, wild king nights or hotel nights.  Week after week, the defendant directed freak-offs in hotels across the country and sometimes out of the country.  At times, the defendant had escorts and the women travel from out of state so the defendant's staff sometimes organized flights, cars, and hotels.  The defendant's businesses paid those expenses.

The defendant had particular demands for freak-offs.  At his direction, the defendant's staff set up the room in advance with supplies, like his preferred lighting, extra linens, and lubricant.  His staff remained on call to refresh anything the defendant needed, like cash to pay the escorts or drugs for the women and the defendant.

The hotel rooms were dark.  The defendant instructed Cassie and Jane how to look, to dress in lingerie, wear tall platform high heels, and have manicured white nails.  The defendant selected drugs for Cassie and Jane to take.  Usually

MDMA, also known as Molly or ecstasy.  Sometimes those drugs made Cassie and Jane sick, but they also made the women more uninhibited and sexually aroused.

The defendant fed Cassie and Jane drugs throughout the freak-offs so they could stay awake and perform for him for hours and days at a time.  Once an escort arrived, the defendant dictated every step of the sexual activity that followed, sexual activity that followed the same pattern.  And he expected the women to enjoy themselves, to appear to, while they did it.  The defendant masturbated throughout the freak-offs and often video recorded part of them.

Now, I want to tell you more about Cassie and about Jane.  Cassie was a 19 year-old model, an aspiring singer with a hit song when she met the defendant in 2006.  The defendant was 17 years older than her and the head of a record label. Soon, Cassie was signed to a ten album deal with that label. The defendant pursued Cassie, and within a year, they were dating.  They stayed together on and off until about 2018.

During that time, Cassie tried to work on her music and in modeling and acting, but the defendant made her turn down many opportunities.  Instead, he paid for Cassie's cars, her apartments, and some of her day-to-day expenses.  Although Cassie recorded music constantly, the defendant, the head of her record label, had the final say on the music that she released.  It was never another album.

The defendant started abusing Cassie early on. Initially, Cassie fought back.  But time and again, the defendant hit Cassie in the head, threw her to the ground and kicked her, and dragged her by the hair.  In 2009, the defendant threw Cassie to the floor of an SUV and stomped repeatedly on her face.

To hide her injuries, the defendant forced Cassie to stay in a hotel for the next week.  He refused to let her leave and he had a staff check on her to make sure she stayed put. The defendant also introduced Cassie to freak-offs early on. Soon, the defendant made it Cassie's job to find and book escorts for freak-offs.  Freak-offs that were happening as often as once a week for days at a time.  Meaning that for almost half of every week, Cassie was in a dark hotel room, high and awake for days, performing sex acts that she did not want to do on male escorts.

Cassie will tell you how she felt like she was choking when the defendant made an escort urinate in her mouth, and how she overdosed at a freak-off when she still had an open wound on her face from the defendant's most recent assault.

The defendant's physical attacks on Cassie happened at freak-offs too.  As you will see on video during this trial, the defendant hit and kicked Cassie in the hallway of an LA hotel, trying to drag her back to the room where they had been with an escort.  We'll talk more about that video later.

P5CACom2                           Opening - Ms. Johnson

Cassie tried the first freak-off because she loved the defendant and wanted to make him happy.  After that, she knew it was not something she wanted to do.  But because of the defendant, it became almost everything she did.  Because if Cassie didn't do what the defendant wanted, the consequences were severe.  Physically, the defendant beat her viciously, exploding over even the tiniest slight and beating her to show who was in charge.

He beat her when she didn't answer the phone when he called.  He beat her when she left a freak-off without his permission.  He beat her when he thought she took too long in the bathroom.  The defendant taught Cassie that defying him could and often would end in violence.  And when she tried to run away, he always found her.  Often with the help of his inner circle.

And Cassie's career and livelihood were also in the defendant's hands, something the defendant made clear to Cassie.  He told her he could destroy her career by releasing the videos that he recorded of her performing sex acts on dozens and dozens of male escorts.  So Cassie knew that failing to please the defendant, refusing his demands, had more than just physical consequences.  It had the power to ruin her life.

The defendant's control, the defendant's violence, and the defendant's threats, that is how the defendant ensured Cassie could not say no to him.  So time and again, when the

defendant suggested to Cassie that they have a freak-off, she knew she had no choice but to agree and went to work setting one up. She texted the escorts, arranged for them to come to hotels, and put on the performance the defendant wanted. Her livelihood and her safety depended on keeping him happy.

Cassie's relationship with the defendant was complicated. You will hear during this trial that both Cassie and the defendant were unfaithful, jealous, and at times angry. But only one of them had power. Only one had control. And that was the defendant. And with that power, and with that control, he made Cassie do his bidding in those dark hotel rooms.

You'll learn, though, that Cassie was not the only woman the defendant did this to. This was part of a pattern.

Now, I want to tell you about Jane. Jane was a single mom who started spending time with the defendant in 2020. The defendant pursued and romanced Jane, who fell in love with him quickly. Jane was not seeing other men, but the defendant was seeing other women at the time, so his relationship with Jane was not at all public.

For the first few months, their sex life was just the two of them and Jane was happy. That was until the defendant introduced Jane to freak-offs. One night, when they had already taken drugs and been having sex for hours, the defendant told Jane about freak-offs. Jane agreed to try one

to make the defendant happy.  To her surprise, the defendant said he would make it happen immediately, that very same night. He took her to a hotel where a room was already set up and an escort was on the way.  Jane was nervous and the defendant directed her step by step.

Jane thought the first freak-off was a one-time, wild night.  Jane was wrong.  The defendant continued asking Jane to have freak-offs and promising that if she did, they would spend quality time together, they would go on dates together, they would go on trips.  That was what Jane wanted more than anything, a real relationship.  So she agreed.  She helped plan freak-offs and reach out to escorts.  But even though the defendant promised her quality time and trips, he never delivered.  Those were just lies he told her to get more nights in dark hotel rooms with escorts.

Jane will tell you about those nights in detail, how she wanted the escorts to wear condoms, but many times the defendant did not let them.  And Jane will tell you how he had her take drugs to stay awake and aroused for days.  Jane tried twice to make it through these nights without drugs.  The first time, she broke down and had took ecstasy to finish performing for the defendant.  The second time, Jane vomited after having sex with one escort.  How did the defendant respond?  He told her to hurry up and get back into the room where another escort was waiting.

Early on, Jane told the defendant that she didn't like freak-offs and she just wanted to be alone with him. She loved him desperately and wanted a real relationship with him. The defendant did not listen. Feeling stuck and sick of the strangers the defendant kept bringing to these hotel rooms, Jane tried to assert herself in small ways. She found two men, men who performed in pornography, and she invited them to join the freak-offs. That way, Jane could at least choose the other man she was forced to be intimate with.

Like he did with Cassie, the defendant eventually took steps to control Jane financially. The defendant wanted Jane available to meet with him at a moment's notice and he discouraged her from working. Jane's income plummeted. The defendant gave Jane money and later started paying the rent for the house that she lived with her child. That way, when Jane resisted the freak-offs and told him over and over that she wanted to stop, he had the power to coerce her back into the hotel rooms. And just as he had with Cassie, the defendant threatened Jane with the videos he recorded of her engaging in sex acts with the escorts.

But the lies, and the drugs, and the threats, were not the end of it. Not even a year ago today, Jane had the worst day of her life. The defendant came to Jane's house for an at-home date night. She and the defendant argued about another woman that the defendant had been seeing. Jane was upset and

jealous.  She had now spent years in hotel rooms for forced sex while the defendant took his other girlfriends for dates and trips.

Jane hit the defendant and threw things at him.  The defendant became enraged.  So Jane tried to get away from him and hide.  She ran to her bedroom and locked the door.  He kicked it open.  She ran to her bathroom and locked the door.  He kicked it open.  She ran to her closet and locked the door.  He kicked it open.  She ran to the guest bedroom and locked the door.  He kicked it open.  She tried to run out the front door, but he grabbed her, in a chokehold, lifted her off the ground by her neck, and kicked her to the ground.

Later that night, they fought again.  And just as he had with Cassie, the defendant viciously attacked Jane.  He punched her in the face, kicked her while she was curled up in a ball on the ground, dragged her by her hair and her arm, and slapped Jane's face so hard she fell over.  When all of this was over, the defendant still did not let Jane be.  Instead, he told Jane you're not going to fuck up my night.  The defendant instructed her to put on an outfit and call up an escort for a freak-off.  He made Jane cover her black eye and bruising, take an extasy pill, and perform for the defendant with that escort.

Jane followed his instructions.  Like with Cassie, the defendant's violence had gotten him what he wanted.

The defendant's sexual violence did not stop at

freak-offs though.  Cassie will tell you about the time when the defendant forced himself on her, having sex with her as she cried and repeatedly told him no.

And Mia, an employee who the defendant worked to the bone for years will tell you about the times that the defendant forced himself on her sexually, putting his hand up her dress, unzipping his pants and forcing her to perform oral sex, and sneaking into her bed to penetrate her against her will.

As I said before, the defendant had the power and the control, endless resources and a loyal inner circle who would stop at nothing to get what he wanted.  Amidst all this violence, the defendant and his inner circle had to make sure that nothing put the defendant's public image and his power at risk.  So as tirelessly as the defendant's inner circle worked to meet the defendant's every need, they also worked to cover up his crimes.

Remember the video at the LA hotel of the defendant attacking Cassie during a freak-off?  You will hear just how far the defendant, his bodyguards, and his chief of staff went to get what they thought was the only copy of that video.

The defendant first tried to pay off a hotel security guard with a wad of cash in exchange for his silence.  Then, the defendant and his chief of staff reached out to a different hotel security guard to broker a deal.  In exchange for the video from the hotel, the defendant gave the security guard a

brown paper bag full of $100,000 in cash, while the defendant's bodyguard and his chief of staff stood by.  This is far from the only time that the defendant's inner circle tried to close ranks and do damage control.

You'll hear how the inner circle covered up the defendant's brutal beatings by keeping Cassie in hiding for days.  You'll hear about the inner circle contacting witnesses of the defendant's abuse to feed them lies, including even after he knew about the investigation in this case.  Again and again the defendant and his inner circle tried to keep the defendant's crimes out of public view, to protect his reputation, and to protect his power.  That is what the evidence in the case will show.

For all of this, the defendant is charged with multiple federal crimes.  You'll hear a lot more on the charges at the end of the trial when the judge instructs you on the law, and his instructions control.  But for now, there are just a few points I want to highlight so you have context for what you'll hear during this case.

First, the defendant is charged with racketeering conspiracy based on his agreement to commit crimes as part of an enterprise.  I expect the judge will tell you that an enterprise is a group of people who work together for a common purpose of engaging in a conduct, a course of conduct, over a time.

Here, you will learn that that enterprise is the inner circle I talked about, the bodyguards and high-ranking employees, like chiefs of staff. Some of these people came and went over 20 years. But I expect the evidence will show that the defendant was a through line. He remained at the top, running that group, and he always had trusted bodyguards and advisors helping him.

Together, they agreed to commit different crimes, including kidnapping and arson, distributing drugs to other people, exploiting employees for labor, and in Mia's case, sex, bribery and obstruction, sex trafficking, and transporting people for prostitution. That's all covered by the racketeering conspiracy charge.

The defendant is also charged separately for sex trafficking Cassie and Jane through force, fraud, or coercion. Again, the judge's instructions control, but I expect you'll learn that fraud includes a lie about a material fact. Coercion includes threats, and force includes violence.

The defendant is charged with using all three tactics to make Cassie and Jane participate in day's long, drug fueled, recorded sexual encounters with male escorts against their will.

Finally, he is charged with transporting Cassie, Jane, and male escorts across state lines for these sexual encounters.

How will the government prove to you beyond a reasonable doubt that the defendant is guilty of these crimes? You'll hear from witnesses, including Cassie and Jane, two of the defendant's victims. They will tell you how the defendant tried to control their lives, from their homes, to their careers, how the defendant used his control over them, his lies, his drugs, his threats, and his violence to force and coerce them into having sex with male escorts.

Cassie and Jane will describe freak-offs for you in painstaking detail. They will tell you some of the most personal and painful experiences of their lives. The days they spent awake in hotel rooms, high on drugs, dressed as characters to perform the defendant's fantasy, just as he directed them to do.

You'll also hear from some of the defendant's employees. You'll hear from Mia, who worked as the defendant's personal assistant for years, the employee he sexually assaulted. Mia is just beginning to grapple with the times the defendant forced himself on her sexually. Mia will tell you how she could not talk about what happened to her until recently, how she wanted to take the secret of what the defendant did to her to her grave.

You will hear from the employee who the defendant forced into that SUV with a gun from one of the defendant's chefs and from other personal assistants. They will tell you

they worked punishing hours and days for the defendant, at times without any sleep.  They will tell you how the defendant ordered them to buy drugs for him, how they used all the resources at their disposal to make sure the defendant always had everything he desired, how they were expected to keep quiet about what they saw and what they heard in the defendant's homes.

You will learn that some of these witnesses and victims, including Cassie, have already received financial settlements from the defendant, or have filed lawsuits against the defendant.  But these witnesses will tell you that they'd trade any money from the defendant for not having been abused.

You will also hear from some of the escorts who participated in freak-offs with Cassie and Jane.  They will tell you how the defendant directed the sexual activity between the escorts and Cassie or Jane, down to the details of how they touched each other, the specific sex acts they performed, all while the defendant filmed it.  You will even hear from an escort who saw the defendant assault Cassie and drag her by her hair during a freak-off.

In addition to these witnesses, you will see documents that prove the defendant's crimes.  You'll see records from hotels, car services, and airlines, showing the dates and locations when the escorts and women traveled to meet the defendant for freak-offs.  You will see records of the physical

damage the defendant in his freak-offs caused the hotel rooms where he stayed.  You will see dozens and dozens of text messages about freak-offs, including messages from the defendant to his staff asking for more cash to pay escorts. Messages where the defendant tells Cassie what drugs to take and when before a freak-off.  And messages from Jane to the defendant telling him over and over again that she did not want to do freak-offs.  And you will see videos of some of the freak-offs, the videos the defendant used to blackmail Cassie and to blackmail Jane.  Those videos capture just small parts of these day's long performances.  In them, you can hear the defendant providing direction to Cassie and Jane, and you will see Cassie and Jane do exactly what the defendant tells them to do.

You will see them put on a performance, high on ecstasy, where they pretend to enjoy themselves because that's what the defendant said he wanted.  You will see for yourselves the defendant's violence in its aftermath.  You will see a video capturing the defendant brutally beating Cassie during a freak-off at an LA hotel.  You will see photos of Cassie and her injuries from the defendant's assaults.  You will hear from witnesses who saw the defendant assault Cassie or saw injuries he inflicted on her.  You will see photos of the damage the defendant did when he kicked in four doors at Jane's home.  And you will see videos of Jane, with bruising still on her face,

days after the defendant attacked her and forced her to do a freak-off, not even a year ago.

You will see for yourself what the defendant had in his homes in March 2024 when they were searched.  Guns, the defendant's so-called med bag full of illegal drugs, and freak-off supplies like lubricant and platform high heels.

Finally, you will see and hear evidence of how the defendant and his inner circle worked to keep his reputation and his power intact for all these years.  You will see the agreement signed by the hotel security guard barring him from speaking about the $100,000 that the defendant paid him for that hotel security video.

You will hear recordings of phone calls when the defendant called Jane after Cassie had filed a lawsuit.  You will hear him -- you will hear him try to manipulate Jane into saying she wanted to have freak-offs.  You will hear him interrupt Jane when she pushes back.  You will hear the defendant's thinly veiled references to continuing to pay for Jane's home in exchange for her silence, and you will see the text messages the defendant sent to his chief of staff right after talking to Jane to make sure that Jane's rent would still be paid on time.  The evidence will come in piece by piece and it won't always come in chronological order.  But by the end of this trial, when you've seen and heard all of the evidence, you will see how it all fits together.  You will see how it proves

that the defendant led and controlled an enterprise that enabled him and others working for him to commit many crimes. How it proves that he forced and coerced Cassie and Jane into sex with male escorts, including by having them travel to other states and countries so those sex acts could happen.  And you will see how all of these crimes and the empire the defendant controlled were designed to fulfill his sexual desires, to protect his representation, and to keep his power.

At the end of this trial, we will have the opportunity to speak with you again.  But between now and then, I would ask that you do three things.

First, please pay close attention to the evidence.

Second, please follow the judge's instructions on the law.

And, third, please use and trust your common sense.

If you do all that, you will reach the only verdict that is consistent with the law and the evidence in this case. That the defendant, Sean Combs, is guilty.

THE COURT:  All right.  Who will be presenting opening statements?

MS. GERAGOS:  I am, your Honor.

THE COURT:  And if you're in the gallery and you have a device, use this opportunity to silence it or it will be taken.

MS. GERAGOS:  Good morning.

Sean Combs is a complicated man, but this is not a complicated case.  This case is about love, jealousy, infidelity, and money.

This case is about voluntary, adult choices made by capable adults and consensual relationships.  This case is about those real-life relationships, and the government is trying to turn those relationships into a racketeering case, a prostitution case, and a sex trafficking case.  It will not work.

Let's start with the basics, the most important things in this courtroom are you and him.  At a time when everything in government can feel so uncertain, one thing has remained the same in our justice system, and that is standing between all of us and a criminal conviction, is a jury of our peers.  That is you.  You will hear the evidence.  You will get to the truth.  You will see the witnesses and evaluate them one by one.

And finally, finally, the story about this case can finally come out.  Why do I say that?  I say that because this case is not about what you've heard on the news, read in the news, or have seen on social media for the past year and a half.  This case is not about what civil attorneys looking for a payday are trying to make my client out to be.  There has been a tremendous amount of noise around this case for the past year and it is time to cancel that noise and hear and see the evidence that will be presented in this courtroom.  And it will

P5CAСom2                          Opening - Ms. Geragos

be crystal clear.

The story of Sean Combs is a fascinating one, but it is a human one. We are going to tell you his story over the next two months in this courtroom. And you will learn that he is a man who grew up here in New York City, in Harlem, who came from little, but built ground breaking, lawful businesses. You will hear that he is a wealthy individual, but know that the evidence will show that nobody gave him this money. He worked for it and no one gave him a dime. It will show that he made every single dollar. Recreated a culture and produced music that I believe you will hear will change the generation. And I believe that the evidence is going to show that this ingenuity is what drew people to Mr. Combs.

Witnesses will share with you that Mr. Combs is a fascinating person, and that people are drawn to him. Yes, he is famous. Yes, he is wealthy. And that's certainly part of it. But he was charismatic and magnetic and a larger than life figure. If you had any interest in climbing the social ladder at the time and being involved in the music industry, the apparel industry, spirits industry, attending his legendary parties, you wanted to be around Sean Combs.

You also wanted to be around him because of the benefits that came along with being with him. As you listen to the evidence in this case, try to remember why that matters. Try to remember why people stayed around him and why it

matters.  I expect it will matter to you as the jury because he gave people opportunities and he gave people chances to work at his companies.  They believed he had a vision that few others had, and, for the most part, I believe the evidence will show you that they loved him.  I don't think that the witnesses will tell you they always liked what he did or how he behaved, but the real time text messages that you will review in this case show that the people really loved him.  And they believed that by being with Sean Combs, they were part of something special.

So, by now, you've heard the government say a lot of things about my client.  It's time for me to introduce you to him.  His name is Sean Combs.  You may have heard him by Puff Daddy, P. Diddy, Puffy, Diddy, but standing in this courtroom, at 55 years old, in the same place he was born and raised, he's going by the same name he was born with, Sean Combs.  My name is Teny Geragos and I am one of the attorneys honored to represent him.

The government started their opening statement by telling you this is about a 20-year racketeering influence corrupt organization act enterprise that he committed with his apparent trusted inner circle.  The only people in this courtroom who will tell you that they participated in, knew about, or came to an agreement to participate in a racketeering enterprise are the prosecutors.  Not one witness will get into this courtroom and will take that witness stand and tell you

that they were part of any racketeering influenced corrupt organization act enterprise.  And the reason is simple:  There was not one.

You heard what the government tried to say the enterprise is, that he used his lawful businesses to feed his every desire, including sexual ones.  This case is about Sean Combs' private, personal sex life, which has nothing to do with his lawful businesses.  The government has no place here in this man's private bedrooms.  The government can say over and over again that this is not about his private sex life, but the evidence will show you that it is.

The people who will come into this courtroom and testify are the people who would know about a racketeering enterprise, and those people will all say they knew nothing about any enterprise.  That is because these hard working individuals were either doing their jobs as personal assistants, or as top executives running his successful businesses.  These are individuals educated at places from Harvard to Howard University.

The prosecution will bring in those same employees and others into this courtroom and have them testify that Sean Combs has a temper.  And when he drank, or when he did the wrong drugs, he would get violent.  My client is not proud of that.  But it is one of the many things we are going to own and fully admit right up front at this trial.

P5CACom2                    Opening - Ms. Geragos

Sean Combs has a bad temper. He sometimes gets so angry or so jealous that he is out of control. You will see evidence and you will hear some testimony that does not portray my client in a good light. You will hear some text messages, some voice notes, and some witness testimony that may make you think I don't think this guy is a great guy. I don't like how he just lied to his girlfriends. I don't like the things he just said in that text message.

I want to tell you now there may be one point, there may be multiple points at this trial where you think I think he is a jerk and I think he is kind of mean. But he is not charged with being mean. He is not charged with being a jerk. He's charged with running a racketeering enterprise.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MS. GERAGOS:  And though there was violence that you are going to hear about, you already have, that violence is not part of any RICO.  That violence is not connected to sex trafficking and that violence is not prostitution.

There was a name in criminal law for the violence that we will hear about and we will see at this trial.  It is called domestic violence.  It is called assault.  Domestic violence is a very serious matter.  I want to say that now.  It is a bad, illegal problem, and it is something that the law addresses. We take full responsibility that there was domestic violence in this case.

Domestic violence is not sex trafficking.  I want to say it again.  Domestic violence is not sex trafficking.  Had he been charged with domestic violence, had he been charged with assault, we would not be here right now.  We would not be sitting through an eight-week trial.  However, he has been charged with different crimes:  Sex trafficking, prostitution, racketeering.  These are federal crimes with their different statutes, they charge different elements, and he is simply not guilty of those crimes.

One of the central themes of my statements to you will be personal accountability and personal responsibility.  As the trial goes on, we will see that with each witness.  We are going to take that on ourselves.  We will not shy away from the things Mr. Combs did.  But we will not, we will not deny his

personal responsibility or own the things he did not do.

We are telling you right now that he is physical, that he is a drug user, and I'm telling you he had a bit of a different sex life.  For example, you have not heard any evidence in this case, but the prosecutors already told you about lubricant, and you may know of his love of baby oil.

Is that a federal crime?  No.  You will hear that he got IVs after ingesting drugs.  Is that a federal crime?  No. He will be responsible.  He will be accountable for the things that he did.  But we will fight for his freedom throughout the next eight weeks for what he did not do.

And he cannot be the only person in this case who accepts personal responsibility and accountability for his actions.  The alleged victims who will testify in this case are capable, strong, adult women.  They were all getting something each of them wanted from him and from being in a romantic relationship with him.  And these adult, capable, strong women will have to take on the same level of personal responsibility for their lives that he is going to take on for his.

When any person in life makes an adult choice, that is a free choice.  A free choice has pros.  It has cons.  You may think there are better choices.  You may think there are worse choices.  But that does not eliminate the personal responsibility behind those choices.  And each of the women you will hear from, they all had the personal responsibility and

the freedom to make the choices that they made.

You will hear from these women.  You will see these women.  You will meet them.  They will sit in that witness chair a few feet away, and you will evaluate them for yourselves.  You will see that they are capable, you will see that they are strong, and you will see that they made free choices every single day for years.

As you are listening to the evidence and you listen to them testify, I want you to ask yourselves:  What are all the ways that this individual had the ability to make that choice?  Ask yourselves:  What are they getting from being with Sean Combs?  They are not with him because they are stuck or because they are without a choice.  The government will try to show you that Sean Combs is the only one getting something from each of the alleged victims who testify in this case.  But with each of these individuals, ask yourselves, what is this person getting?  They are with him or they are working for him because they are getting something they want from being with him.  Now, with each person, that something may be different.  And it usually is.  But with each person, they are all getting something.

So as you listen to the evidence, watch closely to the role that jealousy plays in this case.  We have talked to you, both of us already, about jealousy and how it is pervasive and present in every single relationship.  But I want to also let you know it drives a lot of the choices that the alleged

victims make here.

Combs is one of those men that, I'll submit to you, we all know.  The evidence is going to show that he is somebody who never married, but he needed to always have a woman around him.  He is a many-women man.  He has seven children by four different women.  And he is the kind of guy who is always in relationships.  In fact, he was always in multiple relationships.  But critically, he was not always honest about that fact.  And you'll find that even when he was, even when women knew he was in multiple relationships, this would drive a primal jealousy in people.  It would drive a lot of the choices you are going to see in this case.

You are also going to see that Sean Combs is extremely jealous.  You might think that it's hypocritical. You might not like it.  But you are going to see that he is also extremely jealous.  So as you're listening to the evidence and you're evaluating the testimony, ask yourself, what is causing that fight?  The answer is, without exception, jealousy or drugs. The hitting, the things we are going to take responsibility for, it is typically because of jealousy or drug use.  The role of jealousy here is critical and it's pervasive.

The evidence will show you that, over the course of the 20 years we will examine in this courtroom, we'll see the same women over and over.  They remained in multi-year relationships with him.  And I believe that you'll pretty much

know about every relationship he's had over the past 20 years. Again, that's whether this is an employee or a girlfriend, you will pretty much know about every girlfriend he has had.

You will see that these women are strong, capable, and they were in love with him. You will see that breaches of trust, infidelity, and jealousy are what drove the domestic violence you will hear about. You will see that alcohol and drugs played a major role in his temper. The evidence is going to show you a very flawed individual, but it will not show you a racketeer, a sex trafficker, or somebody transporting for prostitution.

So, as we've said, you're going to hear from two women: Cassie and Jane. This case is, in large part, about his sexual relationships with these two women. And you're going to hear that they went to private hotel rooms to engage in what I expect some witnesses at this case to call the swingers lifestyle, which is essentially just a fancier terminology for threesomes by adults.

Sometimes Combs partook in the sex with his girlfriend and the male escort, and other times he watched while the male escort was having sex with his girlfriend. You heard the government call these freak-offs. I expect you will hear that. I expect you will also hear them called parties and entertainment.

You will hear from both Cassie and Jane about these

nights.  They will testify about their relationships, and you will hear things that should never be heard in a federal courtroom.  I think you've heard that already.  You've heard things that may make you uncomfortable at first, that he liked to watch this.  You might hear about his kinky sex or his preferences for sex that may make you uncomfortable and may not be what you like to do in your bedroom.

But you are not here to judge him for his sexual preferences.  You are not here to judge him for all purposes.  You are here to evaluate whether the government can prove beyond a reasonable doubt what they actually charged him with.  They cannot.  You've also heard that in his relationships with both Cassie and Jane, he bought them things.  Yes, like every relationship, they got things from their boyfriend.  Here, a wealthy rapper, paid for their housing, he paid for Cassie's car, and he gave them money.  These are nice houses that he paid for.  It was a nice car that Cassie drove.  And they were nice vacations on private planes because he is a wealthy individual.  These were vacations that they took together as couples.  And as I've said, like every relationship, there was jealousy and there were flaws.

But as you evaluate the evidence in this case, remember that he is not charged with being a flawed individual or having a flawed relationship.  They did not stay with him over and over again because of force, fraud, or coercion.  The

evidence in this case will show you that over and over again, day after day.  These women fought to be in a relationship. Fought to do what they wanted to do in consensual adult relationships.

This case started with Cassie, so I think it's best for me to start there.  I expect you will hear from her this week.  She will sit in this witness box and she will tell you about her 11-year relationship with Sean Combs.  You heard that they met when she was an up-and-coming artist.  What you didn't hear is that she had a boyfriend at the time, and he was in a very public relationship with the mother of four of his children named Kim Porter.

After the two fell in love and started dating, she broke up with her producer boyfriend.  But Combs, for his part, did not break up with Kim.  He remained in a public relationship with her, and that is something that caused extreme jealousy with Cassie.  He continued that relationship with Kim Porter until her tragic untimely death from pneumonia in 2018.  This is important because, as you look at the evidence and as you evaluate Cassie and Combs' relationship, you will see that their fights, their cheating, their jealousy, it typically surrounded his cheating or it surrounded hers. This is something that plagued their relationship until the very last day.

The evidence will show you that he was extremely

jealous of Cassie's actual or perceived infidelities, and she was uncontrollably jealous of his.  This led to a toxic relationship between two people that I expect the evidence will show deeply, deeply loved each other.  Perhaps they did not always show love to one another the way you would with your partner, but they were in a relationship and she was not being trafficked.

You will see that over and over again in this decade-long relationship.  These two fought about his inability to remain faithful.  I expect Cassie to tell you about the jealousy of Kim Porter and another girlfriend that he started dating in 2014 named Gina.  This jealousy is something that plagued their relationship, even the day of the InterContinental video in the elevator bank, that much of you told us during jury selection that you saw.  That day, unfortunately, jealousy was on full display.  And in combination with the bad drugs that I expect Cassie to testify that Combs took, it led to domestic violence in the elevator bank.

This assault happened almost 10 years ago on March 5 of 2016.  I expect that we are all going to see this video many, many times throughout this trial.  You are going to see it later today, and I expect you to see it many more times throughout this week.  You're going to see it a lot.  But I want to start by saying two things.

First, what Combs did to Cassie on this videotape is indefensible.  It is horrible.  It's dehumanizing.  It's violent.  It's virtually every bad word you can think of.  And while it is dehumanizing and violent and terrible, the second most important thing is that it is not evidence of sex trafficking.  It is evidence of domestic violence.  You will see that it is also evidence of the central theme in this case, which is jealousy.  That's what this videotape shows you.

As you watch it later today and as you watch it throughout the week, I want you to look for two things.  The first part is Cassie walking out of the hotel room, walking down the hallway.  She is carrying two bags, and you see that she makes it to the elevators, and then Combs comes down wearing only a towel.  He pulls Cassie by the hoodie and she falls to the floor.  He kicks her in her back side and he stomps her on the back of her leg and he starts to drag her by her hoodie back to the hotel room.  You will see him walk away momentarily with her bags.  And you will see this.  Then he comes back around and walks towards her, and she is kind of in the left part of the screen.  When he comes towards her, he has nothing in his hand.  And when he walks away from her, you will see an illuminated phone in his hand.  He wanted this phone and he got it.

Please understand that this video is overwhelming evidence of domestic violence, but it's overwhelming evidence

that this domestic violence is over a phone and not because of sex trafficking.  What causes a fight about a phone?  We can all use our life experiences to show us that.  Phones keep the secrets of infidelity.  And you will hear that there was another fight even later that year, again, about a phone.  I'm not justifying the assault, not by a long shot, but I'm putting it in the proper context.  Because you will see that as soon as he gets the phone, he sits down.  He's visibly disgusted.  He broke a vase, and he threw flowers and stayed away.

The video has a second part.  Cassie calls security from the hotel phone.  The security officer comes to the floor, and I expect you will hear from him later today.  Combs is sitting in the chair slumped over.  He's holding his head in his hands and the security officer tells them to leave the public area of the hotel where they are making a commotion. You will see Cassie turn to Combs and gesture to her.  And pay attention to the words that I think you will see her say to him, which is, Get back to the room.

Two parts.  Both of them important and both of them important to show that Combs assaulted Cassie.  But you can't stop there because he is not charged with assault.  Is it because of sex trafficking, as the government is going to argue to you, or is it because of something else?

I expect the evidence, even just this week, will show you that the fight was over a phone.  These two stay together

two more years after this incident.  And to understand how and to understand why is to understand how this relationship ended. You'll hear that, even into 2018, these two were fighting to stay together.  But the evidence will show you that in the summer of that year, of 2018, she woke up to a gossip site that showed a photo of Combs and Gina, the same woman who he had started having an affair with in 2014, or a relationship with, I should say, walking out of The Standard Hotel together.

Cassie could not come back from it.  She could not give him another chance.  And instead, she made the choice, as she often did, when he was caught in public with Gina, to break up with him and date another man.  For Cassie, she made a choice every single day for years.  A choice to stay with him. A choice to fight for him.  Because for 11 years, that was the better choice.  That was her preferred choice.  And so she made the choice to stay with him until one day she decided she was going to break up with him because that was her preferred choice.

So it's important for you to remember as you evaluate the evidence, because she was not coerced to continue or engage in this sex life with Sean Combs.  When she made the decision to leave, there were no repercussions, as the government hinted.  She made the choice to leave.  She communicated it to him and she ran into the arms of another man, a physical trainer who Combs had hired to train her.

So I will ask you, ladies and gentlemen, pay close attention to the messages, the realtime communications between these two individuals, and the messages surrounding their breakup. Does Combs release the videotapes the government was just talking about? No, he doesn't. You will hear that the government raided two of his homes, you have already heard that, over a year ago. They seized countless electronic devices. The only freak-off videos you will see or hear about at this trial came from her devices that she kept for five years.

So when the government talks about power and control, who had the power? Who had the control? The government did not find any freak-off videos with Cassie on those devices. And so going back during the time of Cassie and Combs' breakup, Cassie is already dating her now husband. She is with him for months as she is breaking up with Combs, all while telling Combs she still loves him.

And then in November of 2018, Kim Porter tragically passes away from pneumonia. Knowing that Combs would be distraught and wanting to be there for him, she did everything she could to be there. She came to memorial service at his home. She flew to Kim's home state of Georgia to be at the funeral. Don't lose the sight of the fact that, amidst a breakup, all the way at the end of 2018, she flew to a funeral service to be there for him and support him and his family

during this trying time of their life.

And at the service at their home, Combs, to a group of loved ones, former employees, and others, and to many people on social media who were paying respects, said, and I quote, "Kim was my soulmate." In Cassie's presence for everybody to hear, he said, She was my soulmate.  The end of the relationship between Cassie and Combs is important, and I want you to focus on the evidence of how and why it ended.  When Combs publicly said Kim Porter was his soulmate to all the people around him who were there, for the first time maybe ever, Cassie realized all the things she would not be.

I expect many witnesses at this trial to tell you she wanted to be Combs' wife.  I expect even she may tell you that.  That is what she spent 11 years trying to get.  And in one day, it became clear to Cassie she was never going to be that.  And if she was never going to be Combs' wife, if she was never going to be the love of his life, then she would leave.  And that is what she did, on her terms, her choice, for reasons that, for her, were the right reasons.

This is where bringing personal experience to this jury matters.  This is something we have all been through. That one life event you can point to where you can say that is when I knew it was over.  Because that is what this was for her.  Because this was a relationship, although toxic at times, like every other relationship, it was not based on coercion.

It was not based on force.  At a certain point, you know you're not going to get what you need from that other person and you leave.

After Kim's funeral, they never saw each other again. The very first time that this former couple will see each other after six and a half years of a breakup is in this courtroom later today or tomorrow.  We are all going to witness their closure, and that is because she moved on with her life and he moved on with his.  You will see that she married the trainer. She had two children with him.  And she's pregnant with her third.  And Combs also moved on with his life.

As you listen to her testimony, as you read her messages closely, evaluate what Combs' intent was at the time. Evaluate what he understood about what she wanted during those 11 years that they spent together.  What he understood, I expect the messages to show you, was that she was a willing participant in their sex life.  That was a voluntary adult choice by two capable adults.  What Cassie may testify to this week, six years after a breakup, is not a match for the realtime evidence that you will have.  The realtime text messages I urge you to read.  Evaluate his intent, which is the only thing that matters here.

The government also talked to you a lot about Jane. She is the other woman that the government alleges Combs sex-trafficked.  She was his girlfriend of three years, and she

comes into his life several years after the Cassie breakup.
He, I think you will find in the evidence, is a little bit
different in 2020 and 2021 than he was when he was dating with
Cassie.  And I think the most important reason you will see is
that he was more upfront about his dating life.  Rather than
saying that he was only dating one person, he was very upfront
with Jane.  I expect her to tell you that he was dating
multiple different women.

However, as I started my opening statement, this did
not stop the jealousy.  Jane's relationship with Combs was
plagued by jealousy.  Their relationship was not the 11-year
public romance that Combs and Cassie had.  The problem is that
Jane wished that it was.  The government told you that their
relationship was not public.  You are going to hear from Jane
why that was.  There were many different reasons why that was.

And so, after a period of time, their relationship
becomes primarily sexual.  Jane is also older than Cassie was
when she started dating him, and she was living her own life in
a different state raising her child.  She is a capable, strong
adult woman.  And you are going to hear, as I expect that
you've already heard, that pretty soon after her relationship
with Combs started, he brought up the idea of whether she would
want to have sex with another man.  Again, like a consensual
threesome.  And Combs would watch.  She agreed, and they went
to a private hotel room, away from his employees, away from

family.  And I expect that she will testify that she enjoyed that night.  She laid down on the couch after and said to herself, like, wow, I can't believe I just did that.

And you will see that Combs really began to love these hotel nights with her.  And I expect that she will testify that she began to do everything possible to make these nights incredible for Combs.  That includes finding the best male entertainment to join them, to wear the outfits he would find the sexiest, and saying all the things during these nights that would excite him.

I expect she will testify she did this because she loved him.  She was desperate to spend time with him, to be with him, and ultimately, to give him something none of the other girlfriends that he was dating at the time were giving him.  She will tell you that she tried many times to change the tenor of the relationship from one of a purely sexual nature to something maybe deeper or more meaningful.  I'm not sure exactly how she will put that to you, but she will testify that it always came back to what they would call parties, which were these nights in hotel rooms.

And the evidence will show you that she did it over and over again for three years because she made the choice.  And this became their time together.  This became their sex life.  And I expect that she will testify that she realized that if she didn't have these hotel nights with Combs, they may

P5CsCOM3                              Opening - Ms. Geragos

not get their alone time together, which is time she so deeply craved.

I expect she will tell you that she kept coming back over and over again because she did it for the affection, she did it for the love, for the cuddle, and because she knew it would make him happy.  And she wanted more than anything to make him happy.  She was unable to resist him emotionally, and her desire to be with him outweighed all other considerations of hers.

The government told you about a phone call they had in November of 2023.  I expect the evidence will show you that even after this phone call, she continued.  She flew out to see him many more times, and continued willingly engaging in these nights.  The evidence is going to show you a toxic and dysfunctional relationship between these two individuals.  And you may think to yourself, wow, he is a really bad boyfriend.  But the evidence is going to show you that she is a capable, strong woman who willingly engaged in their sex life so they could spend time together.  That is simply not sex trafficking.

I expect her to testify that she was a willing participant, and being a willing participant in your own sex life is not sex trafficking.  I expect her to also testify that there were nights she engaged in the sex because she hoped she could turn their relationship from one of a more sexual relationship into something more.  And she will testify that

P5CsCOM3                        Opening - Ms. Geragos

if she walked away, she would have lost him.  That is not something she was willing to do.

And as I said, you will see her jealousy on full display at this trial.  And you will see that she was willing to engage in these nights with Combs, and then she would be on social media after, and she would see he was with another one of his girlfriends, either out to dinner or traveling, and she would send messages with regret afterwards.  These are born out of jealousy, which was the root of their troubles.  And regret does not mean that she was coerced.  Her jealousy drove her to make the moves that she made.

As I said, every single witness in this case had free choice to make the choices that they made.  The jealousy of other women in Combs' life was one of hers.  Seeing the other women that he would be on social media posts with or otherwise drove her to try to be in first place and made her more desirous of their time together.  This was the way to get there and the evidence will show you that that is simply not a crime.

The government also told you about a night a year ago where Jane hit Combs.  Once again, as I said, this was a night born out of jealousy.  You will hear, as you've already heard, that he also hit her back.  But what you didn't hear was the start of the fight.  She was overcome by jealousy that night.  She slammed his head down on her kitchen counter.  This is how the fight started.  I do not want to justify this night.  I do

not want to justify the assault. But I simply am here to tell you that the evidence will show you that it starts because she slams his head on her kitchen counter.

And you are also going to hear that less than a month or approximately a month after this assault, an incident of domestic violence at her home, she flew to Combs' home in Miami. She called an escort and had what I expect her to say was one of her best hotel nights that she had with one of their regular escorts.

Now, during the testimony of both Cassie and Jane, I expect the government is going to put in a bunch of videotapes of the so-called freak-offs or hotel nights or wild king nights, however you would like to call them, into evidence. These videotapes depict what we've been telling you about, Sean Combs, one of his girlfriends, and a man. These videos, we believe, are powerful evidence that the sexual conduct in this case was consensual and not based on coercion.

But I want to say one thing to you now. Some of you may find them hard to watch. Not because they are violent, not because they are non-consensual, but because they were never meant to be seen by people outside of that room. They are in one word - intimate. And they were always meant to remain that way. The reason these videos will be seen by you is because the government has chosen to take possession of these videos and to put them into evidence in a federal courtroom. Playing

these videos will feel invasive, but the government has charged him with sex trafficking, and the evidence of the alleged sex trafficking is on these videos.  This is why you will have to see them.

You may hear about other women.  The government told you about someone named Mia, for example.  I urge you to pay attention to these other women's realtime communications with Combs.  Ask yourself, why are they making this allegation now? What is their motive?  You will conclude, like you will with every single other witness in this case, that everybody who testifies has a motive.

With Mia, for example, I ask you to evaluate her motive when you listen to her testimony.  What are the reasons she is saying what she might be saying now, what she never said before, and certainly never said when she first started cooperating with the government?  This is someone you should evaluate her messages carefully, ones of unbelievable love for Combs throughout her employment.

You are also going to hear from several other past employees of his.  They will try to paint a picture for you of a hostile workplace.  As I've said with nearly every single witness in this case, when these people testify, ask yourself: Why did anybody, if they were so scared and if this was so hostile, ever call the police?  Why not?  I expect that the evidence will show you that the testimony against him, their

former boss, for many, not all, is vindictive or they are being subpoenaed to give it.

Like every other witness, ask yourself: What is the something? What is the reason that they stayed. You will find, with every single person, they had a something. So when you hear from the witnesses who testify here who will tell you they were victimized, and you ask yourself, What is their motive? For many of them, the answer is simple: Money.

This criminal case started because of Cassie. Not because she went to law enforcement with her allegations, but because she filed a public lawsuit against Combs in November of 2023, at this time when she was having financial trouble and living in her parents' modest home in Connecticut with her family. Rather than go to law enforcement about what had allegedly happened to her, she went to a civil lawyer who is here today.

I expect that this trial, from nearly every witness that you hear from, they will tell you that instead of going to law enforcement, after either their employment ended for the alleged victims, they went to a civil lawyer for a money grab. They will claim that they were so afraid of this man that they could, of course, not go to the police because he was so powerful. But they were not so afraid that they could not go to civil lawyers to make money demands against him. Demands for unbelievable amounts of money. More than any of us have

ever made.

Cassie, for example, will tell you that she first made a demand on Combs for $30 million.  Another witness will tell you that in a breach of contract case, she made a demand for $22 million.  And as you listen to these witnesses -- and there will be many, as the prosecutor told you -- who made civil demands against him, I want you to ask yourself:  How many millions of reasons does this witness swearing to tell the truth, and nothing but the truth, have to lie?  How many hundreds of thousands of reasons does this witness swearing to tell the truth, and nothing but the truth, have to lie?

Will you really believe that these people who have demanded an unimaginable amount of money from Mr. Combs would have traded all of that to not have been abused?  Because if that is the case, I submit that you will consider, why did they never go to law enforcement?

So, in closing, the evidence will be framed to prove from the government, they will attempt to prove racketeering influence and corrupt organizations act charge, two sex trafficking charges, and two prostitution counts.  The evidence you will hear at this trial will not make out any of them.  The conspiracy charged is that Combs allegedly committed two counts of acts of kidnapping, one act of arson, a bribery, an obstruction of justice, forced labor, and drug trafficking.

I'm going to take these briefly, briefly in turn, and

then I'm going to ask you to evaluate the evidence by the witnesses who will testify about these acts.

First, he did not commit any of these acts.  In terms of the alleged bribery and the obstruction of justice, this relates to the InterContinental Hotel incident that we've talked about this morning.  You will hear, as you already did, that he paid money to a security guard at the InterContinental so the footage would go away.  This was solely, solely related to preventing bad publicity for both Combs and Cassie, and had nothing to do with obstructing a law enforcement investigation.  No law enforcement investigation existed, period.  That is a requirement.  And so the evidence will show you he simply did not commit those acts.

As to the kidnappings and the arson, I submit that you are not going to find there were any kidnappings, and he was simply not involved in the alleged arson.  The government told you that the kidnappings relate to one employee, who I am telling you the evidence will show worked for Combs for almost a decade.  As you listen to her testimony and evaluate:  Was this person actually kidnapped?  I expect the evidence is going to show you that, even after the criminal investigation into Combs started, she asked to work for him again 12 years after her employment ended.  12 years after she claimed she had been kidnapped the last time.  Now, more than a decade after these kidnapping acts.  And so the evidence is going to show you that

he simply did not commit them.

As to the drug trafficking, I submit the evidence is going to show you that the drugs are personal-use drugs for him and, at times, the women he was with. And those drugs have nothing to do with an enterprise.

As to the forced labor, you will see that Combs worked hard, his employees worked hard, but they were there to do something great and novel for his lawful businesses. It was not forced. Being there was an adult, free choice like everything else in this case.

Second, the RICO conspiracy requires a group effort, even if the group is two people. And there will be no evidence of that. So as you are listening to the evidence, ask yourself: Who is Combs actually conspiring with to violate the racketeering influence corrupt organization act? The answer will be no one.

Finally, the last of the charges I will talk to you about are the two counts that charge him with causing interstate travel for the purposes of prostitution. For him to be guilty, I expect the judge will tell you that he had to intentionally engage in what he knows to be prostitution. What the evidence is going to be is that he was paying different men for their time and an experience.

Think about the pornography industry, for example. Actors in pornographic movies are paid for their time, and

generally they have sex.  Otherwise, it wouldn't be pornography.  You also hear about many companies, I expect you'll hear from one later today, called Hunkomania, a company called Cowboys4Angels that advertise online across the country where you can pay money for time and an experience.

These escort companies are common and they do not advertise themselves as money for sex.  They advertise themselves as money for time and money for an experience.  And that is what Sean Combs was doing.  He was paying money for that experience.

So, in closing, I ask you once again to listen carefully to all of the evidence.  You are not here to judge or impose your moral beliefs onto this man.  You are here as a jury of his peers to determine whether the government can meet its burden of proving beyond a reasonable doubt that he committed these crimes.

When you hear the evidence, when you go back into the jury room and evaluate the evidence in light of the crimes that are actually charged here, you will return the only verdict that the evidence demands, that is he not guilty of these crimes.

THE COURT:  All right.  At this time, I think it's appropriate for us to take a break for lunch.

We are going to take a little bit longer of a break today because I think that some of the folks in the jury office

and the marshal service have things to discuss with our jurors.

It's now 12:13.  We will come back at 1:15 and we will make some adjustments to the courtroom.

So, just a reminder, during lunch, do not have any discussions with each other about this case.  Don't look up anything about this case.  Do not have any discussions with anyone about this case.  And no one here in the courtroom or outside of it is to have any discussions with the jurors whatsoever.

With that, all rise for the jury.

(Continued on next page)

(Jury not present)

THE COURT:  Please be seated.  Do either of the parties have anything to raise before we adjourn for lunch?

MS. COMEY:  Not from us, your Honor.

THE COURT:  Mr. Steel.

MR. STEEL:  Good afternoon, your Honor.

I just want to call the court's attention, the prosecutor for the first witness is going to attempt to introduce, I believe, she's very professional, told me two exhibits.  It's Government Exhibit 7R-141, as well as Government Exhibit 7R-148.  I will have an objection to both.  I just want to give you a heads-up, in case you wanted to discuss it at all.  I didn't want to slow down the case.

THE COURT:  Well, in the future, let's try to have these things raised the day before.  Because in this kind of situation, what I would have done is had the parties address these issues at the beginning of the day.  That's just for the next time.

But, for now, what are these exhibits and what is the objection?

MS. SLAVIK:  Your Honor, I can take it from here.  We apologize for not raising this until today.

The government has been conferring with defense about business records stipulations and the government had thought that we reached an agreement over the weekend.  The defense

P5CsCOM3                        Opening - Ms. Geragos

informed us that they would not be stipulating to the admissibility of these particular records.

So at issue here for the first witness that the government intends to call, that's one of the security guards at the InterContinental Hotel in 2016. The two exhibits are two separate incident reports. I have paper copies of those exhibits, if your Honor would like to see them.

Essentially, the first exhibit is an incident report that the security guard drafted and sent, per hotel policy and practice, approximately three hours after the incident. The report included the guard's, you know, a recounting of his personal observations and interactions with the defendant and Victim 1. This particular report included photos that were taken of the hotel lobby that showed the broken vase and the damage caused to the lobby. This first report was drafted and sent by the guard before he had reviewed the video surveillance.

So the second incident report that the government intends to offer is exactly the same as the first, but includes an addendum that describes the video surveillance that he reviewed after the incident. So this guard will testify that drafting and sending incident reports like these were part of his responsibilities as a security officer at the InterContinental Hotel, and that he drafted and sent incident reports like these in the normal course of his duties. As I

mentioned, both incident reports were sent immediately after the incident in question.

So the government obtained these incident reports, along with other documents from the parent corporation of the hotel, along with the business records certification, also produced by the parent corporation.  And under these circumstances, the government's position is that these incident reports are admissible under the business record exception to hearsay.  That's 803(6).

And I'm happy to get further into why the government submits that the conditions laid out in 803(6) are met here.

THE COURT:  Well, I mean, you're going to have the witness prove it up, right?

MS. SLAVIK:  Of course.

The witness will lay the foundation for entry of these documents as business records.

THE COURT:  Right.

You don't have the individual who executed the stipulation, you're not relying on that?

MS. SLAVIK:  That's right.

THE COURT:  You're relying on what you have from the parent corporation, you have the --

MS. SLAVIK:  Who drafted and sent the documents. Exactly.

THE COURT:  So, Mr. Steel, what's the nature of the

objection?

MR. STEEL:  Your Honor, the objection is threefold. First of all, on the Exhibit 7R-148, your Honor, there is an addendum, as the prosecutor just told you, and this is the speculation of the witness.  He's watching -- he's a security guard.  He comes up to the sixth floor of this hotel.  He interacts with Cassie and Mr. Combs, and then he goes back down eventually to his office and he watches the video recording that he had not seen before.  Then he details his opinions about that recording, that he does not have personal knowledge of, including that Mr. Combs attempted to take Cassie's phone away.  I don't believe that he would know whose phone that is from watching that video.  No personal knowledge.

In addition to that, your Honor, he has impressions in the body of both of the Exhibits 141 and 148, such as in the second paragraph, that Mr. Combs began to offer me a bribe. That's a quote, your Honor.  That is his mental impression.

I just don't want the document to go in.  I understand he's a witness.  We'll cross-examine him.  I'm not objecting to that.  I'm objecting to this document going into evidence.

In addition to that, your Honor, he talks about in the third full paragraph that he did not want Mr. Combs to see Cassie.  That is when Cassie is outside on the street level waiting on her car.  And he talks about what he himself did not want, meaning that Mr. Combs was going to come back down off

the sixth floor, which did not happen. And he talks about a coworker, Adey, A-d-e-y, who he went up to Room 602 with Mr. Adey. And that Mr. Combs, he speculates, is about to start yelling.

My point is, your Honor, that I believe that all of that is speculation. It should not go in on either document. He also writes in the third paragraph that if Mr. Combs touches Ms. Adey again, the Los Angeles Police Department would escort Mr. Combs from the hotel property. There is no police there. There is no police called. There is no discussion of the police.

So I don't believe that under 803(6)(e), that this document is trustworthy. It is not all based on personal knowledge. And under 403, there are parts of it that are prejudicial, and I don't believe that it should come in. Either document.

THE COURT: All right. I think you've got to --

You anticipated my question. So your objection comes under 803(6)(e) and 403, right?

MR. STEEL: Fair.

THE COURT: OK. I understand.

So, Ms. Slavik, do you have the paper copies? Could you hand them up?

MS. SLAVIK: I do, your Honor.

THE COURT: So we'll pick this up after the lunch

break.

Anything further, Mr. Steel?

MR. STEEL:  No, sir.

THE COURT:  All right.  We are adjourned.

We will come back at 1:15.

(Luncheon recess)

P5CACom4

AFTERNOON SESSION

1:25 p.m.

(In open court; jury not present)

THE COURT:  In terms of the objection raised before our break to 7R --

MR. AGNIFILO:  Judge, I apologize.  We're just waiting for the defendant.  He isn't quite here yet.

THE COURT:  Oh.  Thank you for giving me the heads up.

MR. AGNIFILO:  No, that's all right.

(Pause)

Thank you, Judge.

THE COURT:  All right.  Before we bring the jury back, there was an objection raised to two of the government's exhibits.  7R-141 and 7R-148.  My understanding is that they're identical except for the added notes on 7R-148.

As to 7R-141, subject to the government laying the proper foundation under 803(6), the exhibit is admissible.  So we'll see whether the foundation can be laid.

As to 7R-148, my understanding is that in addition to the objection on 803 grounds, Mr. Steel, the principal objection is to the added notes under rule 403, and I think that objection is well taken.  We're going to have whatever video evidence is presented to the jury presented, and the jury can draw its own inferences and its own conclusions based on the review of the video.

P5CACom4

The added notes here are the individual's characterization of what he saw, and I think principally, the objection is under rule 403, that his impressions and opinions concerning a video that the jury is going to see is potentially prejudicial and there's very little probative value given that the video will be shown to the jury.  So on that basis, 7R-148 will be excluded.  All right?

Is the government -- well, let's get the jury back and then we can proceed.  But any reason we cannot proceed at this time, Ms. Slavik?

MS. SLAVIK:  No, your Honor.

THE COURT:  Mr. Agnifilo?

MR. AGNIFILO:  No, your Honor.

THE COURT:  All right.  Let's bring back our jury.

(Continued on next page)

(Jury present)

THE COURT:  Is the government prepared to call its first witness?

MS. SLAVIK:  Your Honor, before the government calls its first witness, the government moves to enter four stipulations agreed to between the parties.  That's Government Exhibit 1301, 1302, 1303, and 1304.

THE COURT:  Any objection?

MR. AGNIFILO:  No, your Honor.

THE COURT:  All right.

(Government's Exhibits 1301, 1302, 1303, 1304 received in evidence)

MS. SLAVIK:  And with that, the government calls its first witness, Officer Israel Florez.

THE COURT:  All right.  The witness may approach.

THE DEPUTY CLERK:  Remain standing for a moment. Please raise your right hand.

ISRAEL FLOREZ,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

THE COURT:  Ms. Slavik you may proceed.

DIRECT EXAMINATION

BY MS. SLAVIK:

Q.  Good afternoon, Officer Florez.

A.  Good afternoon.

P5CACom4                          Florez - Direct

Q.  Could you please state and spell your name for the record?

A.  Israel Florez, I-S-R-A-E-L, Florez, F-L-O-R-E-Z.

Q.  Officer Florez, are you currently employed?

A.  Yes, ma'am.

Q.  What do you do?

A.  I'm a police officer for the Los Angeles Police Department.

Q.  Is that commonly referred to as the LAPD?

A.  Yes, ma'am.

Q.  How long have you been an LAPD police officer?

A.  A little over seven years.

Q.  Approximately when did you start?

A.  2018.

Q.  Do you currently have any other jobs?

A.  Yes.

Q.  What are those?

A.  I'm a reservist for the Army.

Q.  How long have you been a reservist in the Army?

A.  A little over 15 years.

Q.  And what did you do for work prior to joining the LAPD?

A.  I was a security guard.

Q.  Did you work for a specific company?

A.  Yes, ma'am.

Q.  What company was that?

A.  Securitas.

Q.  What kind of company is Securitas?

A.  It's a high-rise security company.  So they deal with high-rise buildings and hotels and stuff.

Q.  And is it a contractor?

A.  Yes, ma'am.

Q.  Approximately how long did you work for Securitas?

A.  Ten years.

Q.  And did you work for Securitas in March 2016?

A.  Yes, ma'am.

Q.  What location were you working at in March 2016?

A.  I was working for the InterContinental Hotel in Century City.

Q.  Where is Century City?

A.  It's a neighboring city next to Beverly Hills.

Q.  Is that in the Los Angeles area?

A.  Yes, ma'am.

Q.  Were you working there on March 5th, 2016?

A.  Yes, ma'am.

Q.  Officer Florez, at a high level, can you explain to the jury what happened during your shift on March 5th, 2016?

A.  I received -- I was at the security base.  I received a call from instant services saying there was a woman in distress on the sixth floor.

Q.  And did you respond to that call?

A.  Yes, ma'am.

Q.  And what happened after you responded?

A.   After I responded, I -- when I got out of the elevator, I observed a male and female at the -- in the elevator lobby.

Q.   Did you recognize the male and female?

A.   Yes, ma'am.

Q.   Who did you recognize them to be?

A.   Mr. Combs, Sean Combs.

Q.   And sitting here today in court, do you see Mr. Combs?

A.   Yes, ma'am.

Q.   Can you identify him by describing a piece of clothing that he's wearing?

A.   I think he's wearing a gray sweater.

        MS. SLAVIK:   Let the record reflect that the witness has identified the defendant.

Q.   Now, Officer Florez, we'll come back to this incident that you've described at a high level involving Mr. Combs, but first, what was your title at Securitas in March 2016?

A.   I was the -- the assistant director of security.

Q.   How long did you hold that title?

A.   For about a little over a year.

Q.   And what were your responsibilities as the assistant director of security at the InterContinental Hotel?

A.   Pretty much deal with any incidents that happened in the hotel, any trainings for new employees, assisted the director with a -- what is it?  Like any new employee for the hotel that needed training for security purposes, we work -- I would

P5CACom4                      Florez - Direct

assist with that.

Q.   And so you were the assistant director; is that right?

A.   Yes, ma'am.

Q.   While you were the assistant director, who was the director of security?

A.   The director was Bill Medrano.

Q.   And after you -- what was your next position after being assistant director of security at the InterContinental?

A.   I became the director.

Q.   At the InterContinental as well?

A.   Yes, ma'am.

Q.   And when did you become the director of security at the InterContinental?

A.   I believe at the end or the beginning of 2017 -- the end of 2016, beginning of 2017.

Q.   What were your responsibilities as the director of security?

A.   Pretty much the same thing I just mentioned, but also now I would be facilitating the training for the whole hotel and I attend a lot more meetings with the hotel staff and managers.

Q.   How long were you director of security?

A.   Like a year or a little bit over.

Q.   When did you leave Securitas?

A.   2018.

Q.   And why did you leave?

A.   I got hired on with Los Angeles Police Department.

Q.   Officer Florez, I want to focus now on the InterContinental

Hotel in Century City.

        MS. SLAVIK:  Ms. Gavin, can you please publish for the

witness the Court and the parties Government Exhibits 2B-124

and 2B-125.

Q.   Officer Florez, do you see the photos on the screen in

front of you?

A.   Yes, ma'am.

Q.   Do you recognize these photos?

A.   Yes, ma'am.

Q.   What are they?

A.   Pictures of the InterContinental Hotel.

Q.   And how do you know that?

A.   It's a very unique hotel.  It's like a pyramid shape hotel

in Century City.

Q.   Are these photos fair and accurate depictions of the

InterContinental Hotel in Century City as it existed in

March 2016?

A.   Yes, ma'am.

        MS. SLAVIK:  Your Honor, the government officers

Government Exhibit 2B-124 and 2B-125 into evidence?

        THE COURT:  Any objection?

        MR. STEEL:  No, your Honor.

        THE COURT:  Those exhibits will be admitted.

P5CACom4                          Florez - Direct

          (Government's Exhibits 2B-124, 2B-125 received in

evidence)

          MS. SLAVIK:  Ms. Gavin, can you please publish these

exhibits for the jury.

Q.  Officer Florez, can you please explain to the jury what

they're looking at in Government Exhibits 2B-124 and 2B-125?

A.   They're looking at the InterContinental Hotel.

Q.   And where is that located once again?

A.   In Century City.

Q.   Thank you, Officer Florez.

          MS. SLAVIK:  Ms. Gavin, you can take this down.

Q.  Now, turning back to your role as a security officer at the

InterContinental Hotel, approximately how many other people

worked as security officers at the InterContinental in

March 2016?

A.   About like 12.

Q.   And how, generally, were those 12 or so officers staffed?

A.   It was pretty much three per shift and we had three shifts.

Q.   Can you describe what shifts there were?

A.   Yes.  Morning, which was 6:00 to 2:00 p.m.  Afternoon,

2:00 p.m. to 10:00 p.m.  And nights, which was 10:00 p.m. to

6:00 a.m.

Q.   And you said that three officers staffed each shift; is

that right?

A.   Yes, ma'am.

P5CACom4                        Florez - Direct

Q.   Of those three officers, were any of them supervisors?

A.   Yes, ma'am.

Q.   Now, generally speaking, where were security officers stationed during their shifts?

A.   So if there was all three of them working at -- on the shift, the supervisor would stay in the security base and then the other two would be doing patrols, one inside and one outside.

Q.   Now, you mentioned security base.  Can you explain to the jury what the security base is?

A.   Just our security office.  We used to just call it base for shorter or slang.

Q.   Now, moving onto a slightly different topic, did the InterContinental Hotel have a video surveillance system in March 2016?

A.   Yes, ma'am.

Q.   Can you describe that system?

A.   It had three systems, one covered the roof, the other one, the interior of the hotel, and then the other system covered the parking lot.

Q.   I want to focus on the video surveillance system that was on the interior of the hotel.

          Where, generally, were the cameras within that system?

A.   Obviously, every floor had cameras.  There would be one on the elevator lobby and then two on the hallway.  One facing

P5CACom4                        Florez - Direct

north, the other one facing south.  And depending on the -- on the floor, there would be more cameras if there was more hallways, so more turns.

Q.  But at least three cameras per floor?

A.  Yes, ma'am.

Q.  Did the cameras run continuously?

A.  They were motion.  So, yes.

Q.  So they ran continuously?

A.  Yes, ma'am.

Q.  Did they record continuously?

A.  Only when there was motion on the cameras.

Q.  They were motion activated?

A.  Yes, ma'am.

Q.  What, if any, responsibility did security staff have with respect to video surveillance?

A.  Just review cameras.  That's pretty much it.

Q.  Where could security staff review the video surveillance?

A.  So we had obviously our security base where they can -- where we could review it.  And supervisors and the director, we had -- there was another room, it was like the main room and that was pretty much to troubleshoot the cameras if we had to and you could also review cameras there.

Q.  So you specified two different rooms; is that right?

A.  Yes, ma'am.

Q.  The security base; is that right?

P5CACom4                        Florez - Direct

A.   Yes.

Q.   What had access to the security base?

A.   Every security officer.

Q.   And you mentioned a main room; is that the term you used?

A.   Yes, ma'am.

Q.   Who had access to the main room?

A.   The supervisors and the director of security.

Q.   Did anyone else at the hotel monitor video surveillance?

A.   No, it was just us.  If anybody needed to review footage, they would come to us.

Q.   Now, did security staff have the ability to rewind video surveillance?

A.   Yeah.  We were able to rewind, but it was only for like a good amount.  It wasn't like -- so you couldn't rewind further back than specific days, and if you did want to, then you would need a passcode or a password to do that.

Q.   Did you have a password or a passcode to rewind farther from however many days?

A.   No, ma'am.

Q.   Was it possible to download video surveillance?

A.   If you had that password, I'm sure you were able to.

Q.   Who among the security staff had the ability to download video surveillance with the passcode?

A.   The director of security and the camera guy.

Q.   Who is the camera guy?

P5CACom4                          Florez - Direct

A.   I don't remember his name.

Q.   Was he a member of the security staff?

A.   No.  He was like a third-party company.

Q.   Did you have the passcode to download or rewind video surveillance?

A.   When I became the director, I did.  But not at that time.

Q.   Not in March 2016?

A.   No, ma'am.

Q.   Now, you mentioned a moment ago that one of your responsibilities as a security officer at the InterContinental included responding to incidents; do you remember that?

A.   Yes, ma'am.

Q.   What exactly do you mean by responding to incidents?

A.   Pretty much any incident, like there's an altercation, trespass, any fights, any -- we've had a couple suicides there so any suicides.  Just anything out of the ordinary.

Q.   Did you have to document your response to incidents?

A.   Yes, ma'am.

Q.   How exactly did you document your response to incidents?

A.   So we would do our incident reports where just pretty much an e-mail sent out to all the department heads.

Q.   And did you -- did you have a name for these sorts of e-mails that you would send to department heads?

A.   Yeah.  Just incident reports.

Q.   What information were you required to include in an

incident report?

A.   Who -- the five W's and the how.

Q.   The five W's?

A.   Yes, ma'am.

Q.   Can you explain to the jury what the five W's are?

A.   Who, what, when, where, and why.

Q.   What determined whether you filed an incident report or not?

A.   Anything that had to do with the hotel.  So if there's like destruction of the hotel or anything that specific department heads needed to know, we would send those e-mails out.

Q.   Did you include attachments to incident reports?

A.   Yes, ma'am.

Q.   What sort of attachments?

A.   Just pictures.

Q.   And where would the pictures come from when you attached them to incident reports?

A.   So if we -- so we had a camera at our security office.  So if -- we would use that camera, but if let's say they didn't charge it, we would use our phones and take pictures with our phones and then send it as an attachment.

Q.   And what determined whether you would attach a photo to an incident report or not?

A.   Like I said, anything that's like out of the ordinary, there's anything that was broken, anything that was damaged,

P5CACom4                        Florez - Direct

that's sorts of...

Q.   Did you attach video surveillance to incident reports?

A.   No, ma'am.

Q.   Why not?

A.   We didn't have the password and we didn't know how to do it.

Q.   Did you otherwise reference video surveillance in incident reports?

A.   Yes, ma'am.

Q.   How did you do that?

A.   So we had like a -- so we had the e-mails that we sent out, and then we had a book, which was like our pass down book.  And anybody that was like coming into the shift, we would pretty much let them know what happened, like a brief summary of what happened in that book, and we would just tell them, like see e-mail.  And then they would know to go to the out -- to the sents e-mails, and that's how they would get it.

Q.   And when you referenced video surveillance in these e-mail incident reports, what did you include?

A.   The time stamp of the -- of the video, and the location of the video.

Q.   The location of the video?

A.   Yes, ma'am.

Q.   What do you mean by that?

A.   So if it was like, if it happened on the seventh floor, we

P5CACom4                        Florez - Direct

would put seventh floor camera, north camera, or lobby camera.

Q.  Who did you send incident reports to?

A.  I would send it to my director, I would send it to the committee for the hotel, which was all the department heads, and if it had to do with like specific managers, like for the housekeeping, they didn't have an actual department head, they had a manager, so we would send the e-mail to the manager.

Q.  Was drafting and sending incident reports something you did regularly when you worked at the InterContinental Hotel?

A.  Yes, ma'am.

Q.  Officer Florez, were you required to alert police about incidents?

A.  Yes.

Q.  Under what circumstances?

A.  Depending, like, like I said, if there was like an altercation, and let's say there was a fight and there's like more than -- if it was only three of us and it was more than, more than three, then we would call the police so they can assist us.

If there was someone trespassing that they didn't want to leave, let's say they were naked and we couldn't get them out, then we would call the police.  The suicide, we would call the police.  If there's any -- if there's like a fight and one of them wanted to press charges, then we'll detain them, call the police so they can assist us.

P5CACom4                        Florez - Direct

Q.  Generally speaking, Officer Florez, after you sent an
incident report, what would happen?
A.  So after we sent the incident report, it was pretty much
like completely out of our hands.  We're just observing and
reporting, so anything that happened, we send it to them and
then if they needed a follow-up, they would ask questions or
they would come to the officer and they would review footage
with us, but that's pretty much it.
Q.  I want to go back to March 5th, 2016.
          You said you were working that day?
A.  Yes, ma'am.
Q.  What was your shift?
A.  The morning shift, which is 6:00 to 2:00 p.m.
Q.  6:00 a.m. to 2:00 p.m.?
A.  Yes, ma'am.
Q.  Do you remember who else was working with you that day?
A.  Henry Elias, and I don't remember the other -- there was
two, two guards though.
Q.  Two other officers?
A.  Yes, ma'am.
Q.  Now, you described an incident that took place that day
just a moment ago; do you remember that?
A.  Yes, ma'am.
Q.  Approximately what time did that incident take place?
A.  Around 11:00 a.m.

P5CACom4                           Florez - Direct

Q.  How were you made aware of the incident?

A.  I received a call from instant services, and pretty much letting me know that there was a woman in distress on the sixth floor.

Q.  Where were you when you got this call?

A.  I was in the security base.

Q.  And you said you got this call from instant services?

A.  Yes, ma'am.

Q.  What is instant services?

A.  So the hotel has like -- each floor has a phone.  So if you pick it up, it goes directly to them.  And it's pretty much you don't have to dial anything.  You just pick up the phone it goes to instant services, and she pretty much directs the call.  So if you need, like, housekeeping, if you need security, she'll direct the call.

Q.  And what information was provided to you by instant services?

A.  The only thing she said was there was a woman in distress on the sixth floor.

Q.  Did you respond to the call?

A.  Yes, ma'am.

Q.  What, if anything, did you do before responding to the call?

A.  I closed down the security base.  I checked the cameras to see what was going on because I didn't want to go into a

situation where I was, you know, unprepared.  I looked at the cameras and I seen a male, male, black, just pacing back and forth on the sixth floor.

Q.  Were you looking at the cameras on the sixth floor in real time?

A.  Yes, ma'am.

Q.  And did you recognize the man pacing back and forth at that time?

A.  No, ma'am.

Q.  Did you rewind the video surveillance to see what had happened before?

A.  No, ma'am.

Q.  Why not?

A.  I got the call saying that there was a woman in distress. I looked at the camera.  I see a man walking back and forth. There was no woman in the video, so I'm thinking something happened.  Because I didn't see any -- a female in the footage. So I wanted to get there as fast as possible to make sure that nothing was going on.

Q.  Who, if anyone, did you notify of this call at the time that you responded?

A.  So when I close down the security base, as I was going, running to the elevator, I had my radio so I radioed both my guys to respond back to the security base and just standby for further...

P5CACom4                        Florez - Direct

Q.   What did you do next?

A.   I got on the elevator, went to sixth floor.  I got off and then that's when I -- I seen both the individuals.

Q.   So what happened when you arrived on the sixth floor?

A.   I seen Mr. -- Mr. Combs in a towel and some like colored socks, sitting down to my -- further away from me on my right side.  And I seen Ms. Cassie in the corner kind of like covering her face and bundled up in the corner.

Q.   Did you recognize either of these individuals at this point?

A.   Just Mr. -- Mr. Combs.

Q.   How did you recognize Mr. Combs?

A.   He's a rapper, producer.

        MS. SLAVIK:  Ms. Gavin, can you please publish for the witness, the Court, and the parties only Government Exhibits 2A-101 and 2A-401.

Q.   Officer Florez, do you recognize these photos?

A.   Yes, ma'am.

Q.   What are they?

A.   Picture of Mr. Combs and Ms. Cassie.

Q.   And how do you know these individuals?

A.   They were the ones involved in that incident.

Q.   Are they fair and accurate depictions of the individuals that you encountered in the elevator lobby of the InterContinental Hotel in March 2016?

P5CACom4                        Florez - Direct

A.   Yes, ma'am.

MS. SLAVIK:  The government offers Government Exhibits 2A-101 and 2A-401 into evidence.

THE COURT:  Any objection?

MR. STEEL:  No, your Honor.

THE COURT:  These exhibits will be admitted.

(Government's Exhibits 2A-101, 2A-401 received in evidence)

MS. SLAVIK:  Ms. Gavin, can you please publish these exhibits for the jury.

Q.   Officer Florez, can you please identify the individuals in these photos for the jury?

A.   To my left is Mr. Combs, and to my right is Ms. Cassie.

Q.   And is the individual on the left in Government Exhibit 2A-101, is that the same person as the individual that you identified as Mr. Combs just a moment ago?

A.   Yes, ma'am.

Q.   Thank you.

MS. SLAVIK:  Ms. Gavin, you can take those down.

Q.   Now, Officer Florez, you said that you recognized Mr. Combs immediately; is that right?

A.   Yes, ma'am.

Q.   Did you recognize the female immediately?

A.   No, ma'am.

Q.   Did you come to understand the identity of the female?

A. Yes, ma'am.

Q. How?

A. Later on in the day when I got home, I was -- I went home to tell my wife at the time that -- what had happened, and she's the one that brought it up like, oh, I think she's --

MR. STEEL: Objection. Hearsay.

THE COURT: Get a fresh question.

MS. SLAVIK: I'm sorry?

THE COURT: Can you rephrase your question.

Q. Officer Florez, did you come to understand the identity of the female who was there in the elevator lobby?

A. Yes.

Q. Who did you come to understand her to be?

A. Ms. Cassie.

Q. Can you describe Mr. Combs' demeanor when you got off the elevator?

A. Yeah. It was -- so he was on the chair, slouched down and he was like at a blank stare. And, yeah, as soon as I walked out it was -- the best way I can describe it is like a -- like a devilish stare. He was just like looking at me. So when I got out of the elevator, I kind of was stuck because I'm looking at him, he's looking at me with like no movement and then he starts to move.

Q. What was he wearing?

A. Just the towel and socks.

Q. Now, you said that you didn't recognize the woman at the time. Did you hear Mr. Combs refer to the woman?

A. Yes.

Q. How did he refer to her?

A. Ms. CC, or CC.

Q. And this is the woman that you came to understand was Cassie?

A. Yes, ma'am.

Q. What was the woman's demeanor?

A. Scared.

Q. Can you describe what you mean by that?

A. Well, she was in the corner. She was -- she had her hoodie on. She was pretty much just covered up. I couldn't see her face and she was just, you know, just pretty much in the corner.

Q. What, if anything, did you notice about the state of the elevator lobby?

A. So every floor had a flower vase, and it was destroyed pretty much on the floor.

Q. Did you speak to the two individuals?

A. I did.

Q. Who did you address first?

A. Mr. Combs.

Q. What did you say?

A. I advised them, obviously, like -- first, I was like, hey,

P5CACom4                          Florez - Direct

what's going on.  Obviously, they were arguing, so I told them, like, hey, if you guys are going to argue, you guys have to take it back to your room.  And then I told them the mess that was there, it was going to be charged to the room.

Q.  Did you address the woman?

A.  Eventually.  Just talked to -- if she's going to -- if she's going to be arguing, pretty much to go back to the room.

Q.  What did she say?

A.  She just said that she wanted her phone and her bag and she wanted to leave.

Q.  What did you do next?

A.  After talking to them, I pretty much started escorting back -- escorting both of them back to the room.

Q.  And did Mr. Combs interact with the woman after you started to escort them back to the room?

A.  So I know they were arguing.  I don't remember exactly what they were saying.  But, as I was escorting them, she left the opposite way.  And we were walking towards the room.  And then eventually he started -- he tried to like reengage, and I was just pretty much reminding him, like, hey, there's other guests in the hotel, just out of respect for them, let's go back to the room.

Q.  What did Dr. Combs say to Cassie as he was trying to reengage with her?

A.  I don't remember.

P5CACom4                          Florez - Direct

Q.  Do you remember Cassie saying anything as she was walking back to the room?

A.  Yeah, she was just saying that she wanted to get her phone and her bag and she wanted to leave.

Q.  And what did Mr. Combs say in response to that?

A.  He did tell her at one point that -- he said you're not going to leave.

Q.  And what did you say?

A.  I told him, like, well, if she wants to leave, she's going to leave.  And that was pretty much it.

Q.  Did you follow them to their room?

A.  Yes, ma'am.

Q.  Who entered the room?

A.  Mr. Combs.

Q.  Did anyone else enter the room with Mr. Combs?

A.  Yes.  She finally did, Ms. Cassie.

Q.  Did the door close behind them?

A.  No, ma'am.

Q.  Why did it not close?

A.  I put my foot in between the door.  Again, she wanted to leave.  He said that -- he had mentioned I don't want her to leave.  Well, I don't want you to leave.  So I knew if I let the door close, something can happen.  So I put my body in between the door before he closed it.  And watched her get her stuff.

P5CACom4                    Florez - Direct

Q. Did you actually enter the room?

A. Half of my body was at the door, the other half was outside the door.

Q. Were you able to see inside the room?

A. Yeah. The majority of the room I was able to see.

Q. Now, you said that both Mr. Combs and Cassie entered the room; is that right?

A. Yes, ma'am.

Q. Besides Mr. Combs and Cassie, was anybody else in the room?

A. Yes, ma'am.

Q. Who?

A. It's a male black wearing dark clothing. He was sitting at the corner of the bed.

Q. Did you recognize this man?

A. No, ma'am.

Q. Was he clothed?

A. Yes.

Q. And what was he doing?

A. Nothing.

Q. Can you describe his, his appearance?

A. He was fully clothed, male, black. He wasn't engaging in any conversation with either of them. He was just sitting in the corner of the bed.

Q. Was he present in the room when Mr. Combs and Cassie entered?

P5CACom4                          Florez - Direct

A.   Yes, ma'am.

Q.   Officer Florez, approximately how long were you standing at the door to the room?

A.   A couple minutes.

Q.   Did Mr. Combs say anything else to Cassie?

A.   So they were going back and forth.  First, she was like you can't leave.  Then, he was telling her to leave.  So it was -- it was just back and forth between both of them.

Q.   Did Cassie ultimately leave the room?

A.   Yes, ma'am.

Q.   Which way did she go?

A.   Back the same way to the elevator lobby.

Q.   And where was Mr. Combs when Cassie left the room?

A.   In the room.

Q.   What, if anything, did Mr. Combs do after Cassie left?

A.   So after she left, I told him like, hey, stay in the room. Again, everything is going to be charged to your room.  As I started walking away, he, he called for me.  He said hey.  I turned around.  And with his -- he was pretty much holding like a stack of money.  Pretty much -- I don't know, that's the best way I can do it.  And he was pretty much telling me, like, hey, take of this, don't tell nobody pretty much.

Q.   What did you understand him to mean when he said don't tell anyone?

A.   A bribe.

P5CACom4                         Florez - Direct

Q.   A bribe to do what?

A.   Not to tell anybody.

Q.   How far away from you was Mr. Combs he offered you the money?

A.   About 3 or 4 feet.

Q.   Can you describe approximately how much cash he offered you?

A.   I don't -- it was just 100-dollar bill on the top, and then the rest were just -- it was just a stack of money.

Q.   And just going back to something you said earlier.  You said that initially Mr. Combs said you can't leave, and then he eventually said leave; is that right?

A.   Yeah.

Q.   Okay.  Back to the cash that Mr. Combs offered you, you said that it was a stack?

A.   Yes, ma'am.

Q.   Approximately, can you show the jury what you mean with your hands?

A.   I don't know, if you extend your thumb to your pinky.

Q.   How did you respond to Mr. Combs' offer?

A.   I told him I don't want your money, just go back into your room, everything is going to be charged to the room and stay in your room, and I left.

Q.   Did you take the money?

A.   No, ma'am.

Q.   Were there any video surveillance cameras focused on Mr. Combs' room?

A.   No, ma'am.

Q.   Where did you go, Officer Florez, after Mr. Combs tried to hand you this stack of money?

A.   I tried catching up to Ms. Cassie.

Q.   Did Mr. Combs follow?

A.   No.

Q.   Where did Cassie go?

A.   She went down to the valet area.

Q.   Where is the valet area?

A.   Right in front of the hotel lobby, right outside pretty much.

Q.   Outside the hotel?

A.   Yes, ma'am.

Q.   What did you do when you and Cassie were in the valet area?

A.   So when I -- obviously I noticed her, she was in the valet area.  I still didn't know what had happened.  The only thing I saw was the broken vase.

     So I went up to her.  So where the cars pass there's like a -- it's like a -- it's a sidewalk.  So it's a step down. She was at the corner or at the edge of it.  So I stepped down and I got in front of her, pretty much directly in front of her, and then I was pretty much looking up at her.  And then I just started asking her questions.  What happened?  Are you

P5CACom4                        Florez - Direct

okay?  And then I notice she had like a -- she had a purple

eye.  And then I asked her, like, did he do that?  Do you want

me to call the cops?  And all she kept saying is I just want to

leave.

Q.  Why did you offer to call the cops?

A.  I mean, if anybody is going to -- you know, one, if there's

an altercation, you still -- I'm still going to be like, hey,

you know, are you going to -- do you want to call the cops?

And then as a female getting hit I'm obviously going to ask her

if she wants to call the cops.  I do understand, you know, that

they get scared and they don't want to do anything.  So you

kind of try to like comfort them, and, you know, allow them to

be like -- to feel safe.  So I asked her if she wanted me to

call the cops, and she just kept saying she wanted to leave.

Q.  Now, to be clear, Officer Florez, at this point had you

seen an altercation?

A.  No, ma'am.

Q.  And, at this point, had you reviewed any of the video

surveillance?

A.  No, ma'am.

Q.  Did Cassie eventually leave the hotel?

A.  Yes, ma'am.

Q.  How?

A.  Excuse me.  So after speaking to her, I was trying to get

some information, so I walked inside to go get Adey, who is a

P5CACom4                    Florez - Direct

front desk manager.  As I was coming back, there was a car that had pulled up and she left in that black SUV.

Q.  Did she -- did she drive herself in that black SUV?

A.  No, ma'am.

Q.  Did she have a driver?

A.  Yes.

Q.  Did you interact with the driver?

A.  I did before I went inside.

Q.  Can you describe the driver?

A.  About 7 feet, pretty big guy, male, black.

Q.  Did you -- did you speak with him?

A.  Just briefly because he interrupted my conversation with her.

Q.  And what did you -- can you describe the interaction?

A.  So, again, I was talking to her, trying to get her to see if she wanted me to call the cops.  And he said, hey, she wants to leave.  And I looked at him and I said I'm not talking to you, I'm talking to her.  So I continued talking to her.  And she said, no, I just want to leave.  And I said, hold on, I'll be back and that's when I left.

Q.  And you had said that you were trying to get some information from her; is that right?

A.  Yes, ma'am.

Q.  What sort of information?

A.  Just her name, phone number, just in case the hotel wanted

P5CACom4                          Florez - Direct

to reach out to her for anything in the future.

Q.  At this point, did you know who she was?

A.  No.

Q.  After Cassie left, Officer Florez, what did you do next?

A.  So after she left, obviously I had already gotten Adey, who is a front desk manager.  And he said, all right, well, let's go talk to Mr. Combs so we can advise him of the hotel rules. So we went up to his room.

Q.  And what was the purpose of speaking with Mr. Combs?

A.  So from what Adey had told me, is it had happened --

        MR. STEEL:  Hearsay.

        THE COURT:  Ms. Slavik, maybe re-ask the question and if the witness can just listen to the question and then answer.

Q.  Officer Florez, you said that you went to -- you and Adey went up to Mr. Combs' room?

A.  Yes, ma'am.

Q.  Why did you go up to Mr. Combs' room?

A.  So we can remind him of the hotel rules.

Q.  Did you make it to his room?

A.  Yes, ma'am.

Q.  Did Mr. Combs come to the door?

A.  Yes, ma'am.

Q.  What was his demeanor as he came to the door?

A.  He opens the door, he closed the door behind him and immediately he pretty much grabbed Adey's phone.

P5CACom4                        Florez - Direct

Q.  Can you explain how that came to be, why he grabbed the phone?

A.  So Adey, he talks with his hands and he talks -- he's always holding his phone.  So while he was talking to Mr. Combs, he was doing this.  And, obviously, Mr. Combs thought he was being recorded.  So he grabbed his phone and he was pretty much saying like -- well, he said are you recording me, and he grabbed the phone.  And as he did that, then I pretty much pinned him to the wall and told him to let go of Adey's phone.

Q.  How did Mr. Combs respond to you pinning him to the wall?

A.  I told him to let go, let go of the phone.  He eventually did because Adey was like I'll show you my phone, I'll show you my phone.  So then Adey, you know, was just trying to deescalate the situation.  He pretty much opened his phone and said I'm not recording you, and he showed everything.  So kind of deescalated the situation.

Q.  What happened next?

A.  Just told him the same thing I had told him, like everything that happened in the lobby is going to be charged to your room, and he reminded him that it was checkout so he needed to check out by 3:00 p.m.

Q.  Now, you said that you had seen another man in the hotel room when you first responded to the incident; is that right?

A.  Yes, ma'am.

P5CACom4                          Florez - Direct

Q.   During this interaction involving Mr. Combs and Adey, did you see that man in the room again?

A.   No, ma'am.

Q.   Why not?

A.   The door was closed behind him.

Q.   Did you leave Mr. Combs' room after this interaction?

A.   Yes, ma'am.

Q.   Did you do anything else before leaving the sixth floor?

A.   Yeah.  We went to the elevator lobby, and I don't remember if it was me or Adey, but one of us took pictures of the lobby.

Q.   Why?

A.   It was property damage, and obviously there was broken stuff so we needed to, one, attach it to the e-mail that I was eventually going to send.  And, two, so we can send to the housekeeper so she can tell the house men to clean it up.

Q.   Where did you go next, Officer Florez?

A.   We went down to the lobby.  I just told them that I would send the e-mail as soon as I can.  And I went back to security office.

Q.   You went back to the security office?

A.   Yes, ma'am.

Q.   And what did you do when you returned to the security office?

A.   I started writing the e-mail of what had happened.

Q.   The e-mail incident report?

A.   Yes.

Q.   Can you just remind the jury what an incident report is?

A.   Just anything that happened in the incident so the who, what, when, where, and why.

          MS. SLAVIK:  Ms. Gavin, can you please publish for the witness, the Court, and the parties only the first two pages of Government Exhibit 7R-141.

Q.   Officer Florez, do you recognize the document on the screen in front of you?

A.   Yes, ma'am.

Q.   What is it?

A.   It's the incident report that I sent out.

Q.   How do you know?

A.   My name is on it and hotel security e-mail is on top.

Q.   Did you draft this incident report at or near the time of the actual incident on March 5th, 2016?

A.   Yes, ma'am.

Q.   Did you draft and send incident reports like these in the course of your duties as a security officer at the InterContinental Hotel?

A.   Yes, ma'am.

Q.   Was drafting and sending reports a regular practice when you were a security officer at the InterContinental?

A.   Yes, ma'am.

          MS. SLAVIK:  The government offers Government Exhibit

P5CACom4                         Florez - Direct

7R-141 into evidence.

THE COURT:  All right.  7R-141 will be admitted.

MR. STEEL:  Same objection.

THE COURT:  Noted.

MR. STEEL:  Thank you.

(Government's Exhibit 7R-141 received in evidence)

MS. SLAVIK:  Ms. Gavin, can you publish this exhibit for the jury, please.

Q.  Officer Florez, can you explain to the jury what they're looking at here?

A.  The incident report.

Q.  And did you draft and send this document?

A.  Yes, ma'am.

MS. SLAVIK:  Ms. Gavin, could you zoom in on the top portion of the e-mail?

Q.  Officer Florez, do you see the from line?

A.  Yes, ma'am.

Q.  And what e-mail address is that?

A.  That's the security office e-mail.

Q.  And who was this e-mail sent to?

A.  Adey, who was the front desk assistant manager.  Bill Medrano, who was my -- who was my director.  And the hotel committee, which is all the department heads of the hotel.  And Sandy, who was the housekeeping manager.

Q.  What is the subject of the e-mail?

P5CACom4                        Florez - Direct

A.  It says pics from sixth floor, from the sixth floor.

Q.  And what about the time and -- the date and time that the e-mail was sent?

A.  March 5th, 2016, at 3:00 p.m.

Q.  Now, you testified earlier that you responded to the incident around 11:00 a.m. that day; is that right?

A.  Yes, ma'am.

Q.  Is the date and time of this e-mail consistent with your recollection of when you sent the incident report?

A.  Yes, ma'am.

        MS. SLAVIK:  You can zoom out, Ms. Gavin.  Thank you.

Q.  Now, Officer Florez, without going line by line, can you just give an overview of what's in the body of this incident report?

A.  It's pretty much the incident from start to finish.  The date, time, when I received the call, and just the incident of me interacting with both the individuals.

Q.  Did you include the individual's names in the incident report?

A.  Yes, ma'am.

Q.  Now, you mentioned that you had seen another man in the hotel room.  Did you include that fact in the incident report?

A.  No, ma'am.

Q.  Why not?

A.  He was -- he was irrelevant.  When I got there, he was

in -- wasn't at the incident.  When we got into the room, he didn't talk to nobody.  So he was just someone that was just there.

Q.  And when you say when you got there, he wasn't part of the incident; you mean when you got to the elevator lobby, he wasn't there?

A.  Correct.

MS. SLAVIK:  Ms. Gavin, can you put up pages three and four of this document side by side.

Q.  Officer Florez, what is depicted in these photos here?

A.  The broken or the damage that was in the sixth floor.

Q.  Who took these photos?

A.  Like I said, it was either me or Adey that took them.

Q.  Do these photos fairly and accurately depict the condition of the sixth floor elevator lobby when you responded to the incident?

A.  Yes, ma'am.

Q.  And what was the purpose of attaching these photos to the incident report?

A.  Again, it was kind of to let them know what had happened, the damage, and also so that the housekeeping manager can see what she needed to do to send the house men and what the house men needed to take to clean that -- the damage.

MS. SLAVIK:  Ms. Gavin, can you put up pages five and six of this document side by side.

Q.  Officer Florez, what is depicted in these photos here?

A.  That's dirt splattered on the wall, and then that's the flowers that were in the corner.

Q.  Do these photos accurately depict the wall area of the sixth floor lobby when you responded to the incident?

A.  Yes, ma'am.

        MS. SLAVIK:  Thank you, Ms. Gavin.  You can take this down.

Q.  Now, Officer Florez, after you sent the incident report that we just looked at, who, if anyone, contacted you?

A.  The only one that contacted me was my director.

Q.  And remind the jury who that was?

A.  Bill Medrano.

Q.  What, if anything, did Mr. Medrano tell you to do?

A.  Obviously he had reviewed the e-mail and all he told me was to --

        MR. STEEL:  Objection.  Hearsay.

        THE COURT:  Overruled.

Q.  You can answer.

A.  He told me to review the footage and then add anything else that was -- that I observed on the footage to the e-mail.

Q.  On the video surveillance footage?

A.  Yes, ma'am.

Q.  So did you review the video surveillance footage?

A.  Yes, ma'am.

P5CACom4                        Florez - Direct

Q.   When did you review the video surveillance footage?

A.   Almost simultaneously when he was -- when we were talking

on the phone, I started reviewing.  And then I was pretty much

telling him what I was seeing, and then that's when he said,

okay, add that to the e-mail.

Q.   And why did you review the video surveillance?

A.   Same thing, he had told me to review, make sure that there

was nothing else that we missed on the first e-mail.

        MS. SLAVIK:  Your Honor, may I have permission to

approach the witness.

        THE COURT:  You may.

Q.   Officer Florez, I've put a drive in front of you.  Do you

recognize this thumb drive?

A.   Yes, ma'am.

Q.   How do you recognize it?

A.   It's the drive that has about five videos.

Q.   Did you review the contents of the drive?

A.   Yes, ma'am.

Q.   When?

A.   Yesterday.

Q.   And did you initial the tag attached to the drive after you

reviewed it?

A.   Yes, ma'am.

Q.   Do you see your initials on that tag right there?

A.   Yes, ma'am.

Q.  And, again, what is on this drive?

A.  It's two cell phone -- videos that I took, and three other camera footages.

Q.  Are you in certain of these videos?

A.  Yes, ma'am.

Q.  Do the contents of the drive fairly and accurately depict what you saw on March 5th, 2016?

A.  Yes, ma'am.

Q.  Is that true of each file on the drive?

A.  Yes, ma'am.

        MS. SLAVIK:  Your Honor, the government offers into evidence the contents of this drive.  That's Government Exhibits 3B-101, 3B-102, 10C-103, 10C-104, and 10C-105.

        THE COURT:  All right.  Are there any objections that the Court has not previously addressed?

        MR. STEEL:  Based -- no.

        THE COURT:  All right.  These exhibits will be admitted.

        (Government's Exhibits 3B-101, 3B-102, 10C-103, 10C-104, 10C-105 received in evidence)

        MS. SLAVIK:  Ms. Gavin, can you please publish Government Exhibit 10C-103.

Q.  Now, we're going to play this video, Officer Florez, but before we play it, can you just describe to the jury what we're looking at here on the screen?

P5CACom4                          Florez - Direct

A.   That's the sixth floor elevator lobby.

Q.   And do you see the time stamps at the top of the video?

A.   Yes, ma'am.

Q.   What do they say?

A.   It says March 5th, 2016, 11:10 a.m.

Q.   And is that generally consistent with your recollection of when this incident took place?

A.   Yes, ma'am.

          MS. SLAVIK:  Ms. Gavin, could you please play the video all the way through and then we'll go back and walk through specific segments.

          (Video played)

          (Continued on next page)

BY MS. SLAVIK:

Q. Officer Florez, I want to walk through this video segment by segment.

But first, did the video surveillance at the InterContinental have audio?

A. No, ma'am.

MS. SLAVIK: Ms. Gavin, could you restart and play the video through 29 seconds.

Q. Officer Florez, who is this?

A. Ms. Cassie.

(Video played)

Q. Do you notice the pixelation in this video?

A. Yes, ma'am.

Q. Was that typical of the video surveillance system used at the InterContinental in March 2016?

A. Yes, ma'am.

MS. SLAVIK: Ms. Gavin, please play through 31 seconds.

Q. Who is this individual, Officer Florez?

A. That's Mr. Combs.

(Video played)

MS. SLAVIK: Ms. Gavin, please continue playing through 56 seconds.

(Video played)

Q. Officer Florez, have you seen this video before you

responded to the incident on the sixth floor?

A.  No, ma'am.

MS. SLAVIK:  Ms. Gavin, please listen playing through 1:16.

(Video played)

Q.  What is happening here, Officer Florez?

A.  She picked up the phone so it pretty much went straight to instant services.

Q.  This is the phone that connected to instant services that you described earlier?

A.  Yes, ma'am.

MS. SLAVIK:  Ms. Gavin, could you continue playing through 1:26, please.

(Video played)

Q.  Now, Officer Florez, did you notice how the video kind of jumped right there?

A.  Yes, ma'am.

Q.  Was that typical of the video surveillance system as well?

A.  Yes, ma'am.

MS. SLAVIK:  Ms. Gavin, please continue playing through 2:14.

(Video played)

Q.  Now, first, Officer Florez, can you remind the jury of what Cassie said as she was heading back to the room?

A.  Um, she just wanted to get her phone and her bag and wanted

to leave.

Q.  And can you remind the jury of what you found when you arrived at the elevator lobby?

A.  Um, the broken vase and flowers that were ...

Q.  And these were depicted in the photos that we just looked at?

A.  Yes, ma'am.

MS. SLAVIK:  Ms. Gavin, can you play the video to the end, please.

(Video played)

Q.  Now, Officer Florez, what do you see here at the very end of this video?

A.  It's me coming out of the elevator -- the lobby.

Q.  That's you?

A.  Yes, ma'am.

MS. SLAVIK:  Ms. Gavin, could you please publish what is in evidence as Government Exhibit 10C-104.

Q.  Now, Officer Florez, before we start playing this video, can you explain to the jury what we're looking at here?

A.  We're looking at the north hallway of the sixth floor.

Q.  So where in relation to this, to the video that we see on this screen, is the elevator lobby that we saw in the previous video?

A.  To the right.

Q.  Those doors to the right?

A.  Yes, ma'am.

MS. SLAVIK:  Ms. Gavin, could you please start at 3:19 and play to 3:24.

(Video played)

Q.  Who do you see in that little clip that we just played, Officer Florez?

A.  Ms. Cassie going south on the hallway and me going back to the lobby.

MS. SLAVIK:  Ms. Gavin, I want you to continue playing through 7:07.

Q.  Officer Florez, I'm going to ask you some questions as we play the video.

(Video played)

Q.  Now, who is in this frame?

A.  Myself and Mr. Combs.

Q.  And what was happening here?

A.  Pretty much just escorting him back to his room.

Q.  What, if anything, was Mr. Combs saying at this time?

A.  I don't remember, but I'm sure I was just letting him know, like, we got to go back to your room.

(Video played)

Q.  Now, here, around this 4:48 timestamp, what's happening here?

A.  Um, Ms. Cassie is coming back north on the hallway.

Q.  And what, if anything, was Mr. Combs saying to Cassie?

A.   Pretty much started to argue again.  I'm trying to deescalate telling him to go back to the room.

          (Video played)

Q.   Here, around the 5:22 timestamp, what is happening here?

A.   That's when she is saying she wants to get her cell phone and her bag and she wants to leave.

Q.   And she's heading towards the room?

A.   Yes, ma'am.

Q.   This is around the 5:51 timestamp.

          Who is this?

A.   It's a house man that's in charge of that floor.

Q.   Was he involved in the incident at all?

A.   No, ma'am.

Q.   And that is around the 6:17 timestamp.

          Who is this in the frame?

A.   That's Ms. Cassie going back to the lobby, elevator lobby.

Q.   Here around the 6:38 timestamp, who is this?

A.   That's me.

Q.   Where were you going?

A.   Going to catch up to Ms. Cassie.

Q.   Why did you go down this hall?

A.   So what I was checking was the stairwell that leads to the bottom floor.  And I didn't see her in the lobby, so either she had gotten in or she probably went through the stairs.  So I was checking to see if I can hear her going down the stairs.

Q.   You were just checking for Cassie?

A.   Yes, ma'am.

        MS. SLAVIK:   Thank you, Ms. Gavin.   You can take this down.

Q.   Now, Officer Florez, had you reviewed this video surveillance before you sent the incident report?

A.   No, ma'am.

Q.   And after viewing the video surveillance, did you call the police?

A.   No.

Q.   Why not?

A.   Um, after speaking to her, she didn't -- she didn't respond to any of my questions.   She was just saying I wants to leave. I just want to leave.   And even when I offered her, like, hey, the cops can go to the back of the building, nobody is going see, she just kept saying, I just want to leave.

        So there was no victim there.   Obviously, nobody was pressing charges.   And then by the time I did draft up the e-mail, nobody -- everybody was gone, because Mr. Combs had left already.

Q.   At that point, did you have -- well, did you know who Cassie was at that point?

A.   No.

Q.   Did you have any of her contact information?

A.   No.

MS. SLAVIK:  Now, can we pull up the incident report at 7R-141, please, Ms. Gavin.  Can you highlight the third paragraph.

Q.  Officer Florez, you just said that at the point that you drafted and sent the incident report, Mr. Combs had left the hotel, is that right?

A.  Yes, ma'am.

Q.  Can you remind the jury what the manager told Mr. Combs when you were at the -- Mr. Combs' hotel door?

A.  Um, pretty much the same thing.  Um, that everything that had happened in the elevator lobby was going to be charged to the room, and he reminded him that checkout was -- was coming up, so he needed to check out and leave.

Q.  And focusing on one of the, I guess, third to the last sentence, starting with he saw MOD Adey holding his phone.

MS. SLAVIK:  Ms. Gavin, can you just highlight that sentence.

Q.  Officer Florez, can you read beginning at no one was recording?

A.  No one was recording him, that the safety and the privacy of the guest is important to the hotel, and if he tried to do something like that, he would get kicked out and escorted off the property by LAPD.

Q.  That's the Los Angeles Police Department?

A.  Yes, ma'am.

MS. SLAVIK:  Thank you, Ms. Gavin.  You can take that down.

Q.  And you said that Mr. Combs did eventually leave the hotel?

A.  Yes, ma'am.

Q.  Now, going back to your review of the video surveillance. What, if anything, did you add to the incident report after you reviewed the video surveillance?

A.  Pretty much the whole, like, altercation between him and her.

Q.  You included a description of that altercation?

A.  Yes, ma'am.

Q.  Did you attach the video to the supplemented incident report?

A.  No, ma'am.

Q.  Why not?

A.  I had no way of doing that, no password, and I didn't know how to do that.

Q.  Now, Officer Florez, what else, if anything, did you do with the video surveillance capturing this incident?

A.  Um, can you repeat that?

I'm sorry.

Q.  Did you do anything else with the video surveillance after you reviewed it?

A.  Oh, yeah.  I recorded two, I guess, two videos of the video.

P5CsCOM3                    Florez - Direct

Q.  How did you record those two videos?

A.  With my cell phone.

Q.  What kind of phone did you have?

A.  An iPhone.

Q.  Why did you record it with your iPhone?

A.  Um, again, I was going home.  And if I would have told my wife, Hey, this is what happened, she wouldn't have believed me.  So, here's a video.

Q.  When did you make these cell phone recordings?

A.  Um, right after while I was still at work that same day.

        MS. SLAVIK:  Ms. Gavin, can you please publish what's in evidence as Government Exhibit 3B-102.

Q.  Officer Florez, before we start this video, can you just explain what we're looking at?

A.  Um, the sixth floor elevator lobby.

Q.  And what video is this?

A.  This is mine.

Q.  One of your cell phone videos?

A.  Yes, ma'am.

        MS. SLAVIK:  Ms. Gavin, can you play the video.

Q.  And, Officer Florez, can you just talk us through what's happening?

        (Video played)

        Actually, pause please.

        Officer Florez, is there sound in this video?

A.   Background noise, yes.

Q.   What do you mean by background noise?

A.   I was recording with my phone, so anything that was happening in the office, you'll be able to hear it.

Q.   Thank you.

         MS. SLAVIK:  Keep playing Ms. Gavin, please.

         (Video played)

Q.   What is happening here, Officer Florez?

A.   I'm pretty much explaining everything that I'm seeing and that they had to go to their room.  I'm telling them, like, obviously there is damage to the lobby, so that's going to -- that needs to get fixed and it is going to be charged to the room.

         (Video played)

Q.   Who was that?

A.   That was me.

Q.   Officer Florez, was the portion of the video that we just watched, was that portion captured on the videos that we watched just a moment ago?

A.   No.

Q.   Did you record any other portions of this incident?

A.   Um, just an altercation between them two and this one.

         MS. SLAVIK:  Ms. Gavin, could you please publish Government Exhibit 3B-101, and could you start playing the video.

P5CsCOM3                        Florez - Direct

(Video played)

Q.   Whose voice could you just hear, Officer Florez?

A.   That was Henry.  Henry Elias.

Q.   Another security officer?

A.   Yes, ma'am.

(Video played)

MS. SLAVIK:  Now, going back to 146, please, Ms. Gavin.  And thank you.

Q.   Officer Florez, what do you see towards the back of the video?

A.   Um, what do you mean?

Q.   Like, in the back of the video, what do you see?

A.   I see Mr. Combs sitting down.

Q.   And how is that reflected?

A.   Um, backwards, I guess.  I don't know.

Q.   In other words, can you explain the layout of the sixth floor lobby?

A.   Um, yeah.  So he's, obviously, in the mirror.  You can see that he's on the right side, but he's actually on the left.

Q.   In other words, the image that you see of Mr. Combs sitting in the chair, that's him being reflected in the mirror?

A.   Yes, ma'am.

MS. SLAVIK:  Can you continue to play, Ms. Gavin, through the end.

(Video played)

Thank you.  You can take that down, Ms. Gavin.

Q.  Officer Florez, did you record any other portion of the video surveillance of this incident?

A.  No, ma'am.

Q.  Did you download the videos from the hotel's computers?

A.  No, ma'am.

Q.  Why not?

A.  Like I said, I didn't have no password and I didn't know how to do that.  Only the director knew how to do that.

Q.  Besides these two videos that you recorded with your iPhone, do you have any other copies of the video surveillance?

A.  No, just the ones that I recorded.

Q.  Now, you mentioned that you discussed the incident with your supervisor, Bill Medrano, is that right?

A.  Yes.

Q.  Who else at Securitas, if anyone, did you discuss the incident with?

A.  The incoming security guards.  Again, I had to give them a pass-down.  I explained to them what had happened, showed them the video, just so they know what happened, pretty much.

Q.  And who specifically were those guards that you gave the pass-down to?

A.  Um, the afternoon supervisor and the incoming guards.

Q.  Who were they?

A.  It was Eddie, who was the afternoon supervisor, and then I

P5CsCOM3                          Florez - Direct

can't remember the other guy's name.

Q. What is Eddie's last name?

A. Garcia.

Q. What else, if anything, did you do to document the incident before you left that day?

A. Just the e-mail and the pass-down book that I had stated earlier.

Q. Did you work the following day?

A. No, ma'am.

Q. Why not?

A. My days off were Sunday, Monday.

Q. When was the next day that you returned to work?

A. On Tuesday.

Q. Did you try to view the video surveillance footage when you returned to work?

A. I did.

Q. One of the guards that wasn't there, I'm not sure if he was on vacation or something. He wasn't there. He comes up -- obviously, he get there. He said, Hey, I've been trying to see the video you've been talking about. I can't see it. Oh, I know where it's at, right.

So I go on the camera system and I try to, like, review it, but the camera is blue. So, it was typical for those cameras to go to, like, to go off, so we didn't think anything of it. Like, it's gone, pretty much.

P5CsCOM3                         Florez - Cross

Q.   What did you do when the video wasn't available?

A.   I told him that I had taken a video of with my phone.  I showed him with my phone.

Q.   Did you see the video surveillance footage again after March 2016?

A.   Yes.

Q.   Under what circumstances?

A.   On the news.

Q.   And when was that that you saw the video in the news?

A.   Last year.  Last year, May, something like that.

         MS. SLAVIK:  Just a moment, your Honor.

         Nothing further.

         THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. STEEL:

Q.   By March 5, 2016, you were employed with this company for approximately eight, nine years, is that fair to say?

A.   Yes.

Q.   And you've written incident reports before, is that true?

A.   Yes.

Q.   And in the incident report, you told the ladies and gentlemen of the jury it's the who, why, where, when, what, in the incident report, basically every detail, is that fair to say?

A.   Yes.

Q.  And the reason that you do every detail is because, or significant detail, is because it's important because later other people who did not witness what you witnessed may want to review your notes, that fair to say?

A.  Yeah.  The hotel staff, yes.

Q.  It also helps you memorialize for your memory what was significant during that time, true?

A.  Yeah.

Q.  So we don't have to rely on your memory, it's now 2025, so we're approximately nine years after March 5, 2016, right?

A.  Um-hmm, yes.

Q.  So that incident report that is marked and admitted into evidence that the jury saw, that is a good rendition by you, best of your ability at that time, fair to say?

A.  I remember everything in detail, yes.

Q.  And that is why you make it promptly, you made it during or right after your shift that day, right?

A.  Yes.

Q.  That's why you send it out to all these other people, so you can get feedback if anything is missing, like you did in this case, true?

A.  Yes.

Q.  You get to review it, right, you read it over before you send out the e-mail?

A.  Yes.

Q.  And this is something that is not unique, it's part of your training, your experience, and what you do in that position?

A.  Yes.

Q.  Now I would like to ask you a couple of things about that report, that incident report that you did.  Just you explain, if you don't mind.

You mentioned that when you get off the elevator, the first time you get off the elevator, approximately 11:14, 11:15 a.m. Pacific time that day.  OK.  You describe Mr. Combs as having a devilish, scary look in his face.

Do you remember saying that to the jury?

A.  Yes.

Q.  If you need to review it, where in your report, that incident report, do you ever describe Mr. Combs like that?

A.  It's not -- it's -- that's my opinion, so it had nothing to do with the incident.

Q.  OK.  That has nothing to do with what happened that day, is that what you're saying?

A.  Yeah, with the incident.

Q.  That is just your opinion now?

A.  Correct.  No, it was my opinion then and now.

Q.  But you didn't put that in the report?

A.  Again, it was my opinion.

Q.  Answer my question, if you don't mind.

It's not in the report, true?

P5CsCOM3                          Florez - Cross

A.   No.

Q.   And when you get off the elevator, you have something in your hand.

         Can you tell the ladies and gentlemen of the jury what that is?

A.   My radio.

Q.   And tell us who the radio communicates with, if you don't mind?

A.   The security officers.

Q.   Before you even went up to the sixth floor, the reason that you called your coworkers to come closer, come off the outside perimeter and come off the other interior of the building and come to the base, true?

A.   Yes.

Q.   And you did that because you really don't know what you're getting into and you may need assistance, is that fair to say?

A.   Yes.

Q.   And they may need assistance, whereby you say you even have to call outside assistance like the Los Angeles Police Department or the LAPD, true?

A.   Correct.

Q.   So there in the base, you have your walkie-talkie, excuse me, your radio, and you never call for assistance, right?

A.   No.

Q.   Mr. Combs did not attack you?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5CsCOM3                         Florez - Cross

A.   No.

Q.   True?

A.   Yeah.

Q.   He was cordial to you, that's my word, but you describe it any way you want?

A.   Yeah.

Q.   He was cooperative, right?

A.   Yes.

Q.   And when you see it, and everyone saw it on the video, he's actually, when you first come, he's sitting in a chair, fair to say?

A.   Yeah.

Q.   And we see him reverse, like you said, because it's through a mirror, so everything is transposed, true?

A.   Yeah.

Q.   And he doesn't make any aggressive movements towards you?

A.   True.

Q.   You don't see him make any aggressive movements towards the lady, do you?

A.   No.

Q.   Now, you say that the young lady Cassie has a purple eye.
     Do you remember telling the jurors that?

A.   Yes.

Q.   Tell the ladies and gentlemen of the jury, where in your report -- if you need to see it, it's no problem -- you wrote

that she has any type of discoloration to her eye?

A.  Um, I don't recall on my report.

Q.  Do you need to see it?

A.  Sure.

MR. STEEL:  Your Honor, with the court's permission, it's already in evidence over objection, 7R-141.

Q.  If you can just scan this, take as much time as you need. If you need it blown up, just please tell the gentleman, he will do it.

Point to the jurors and where you say that Cassie has a purple eye.

A.  It doesn't.

Q.  I could not hear.  I apologize.

A.  It doesn't.

Q.  It does not?

A.  No, not on this e-mail.

Q.  Now, that would be significant, wouldn't it?

A.  Yeah.

Q.  Because you have to know if somebody gets injured on your property.  That's important for not only you, but your coworkers to know, true?

A.  Correct.

Q.  There could be civil lawsuits, right?

A.  Yeah.

Q.  Law enforcement could get involved, right?

A.   Yeah.

Q.   Now, in this particular case, just make it clear, just please make it clear, was there any law enforcement involvment in this case from your knowledge?

A.   No, we didn't call them.

Q.   Did anybody --

     And when you say we didn't call them, did anybody, to your knowledge, alert law enforcement to come out and investigate this case at that time?

A.   No, sir.

Q.   You took the time to video to show your wife.

     Do you remember --

A.   Yeah.

Q.   -- you explained that to the ladies and gentlemen of the jury?

A.   Um-hmm.

Q.   Yes?

A.   Yes.

Q.   And you, in fact, kept that video, right?

A.   Correct.

Q.   And people were talking about this even after your day off, come back.  Another officer said, Hey, would you do me a favor and take your time and show me the video.

     Remember looking at it and it self-erased you thought?

A.   Yes.

Q.  You then showed your other coworker your video on your cell phone, right?

A.  Yes.

Q.  And never during any of that time, to your knowledge, was law enforcement called, true?

A.  Correct.

Q.  OK.  Now, when you talk about Mr. Combs, I think you told the ladies and gentlemen of the jury saying that Cassie wanted to leave the hotel, and he said, You're not leaving, or something to that effect.

Do you remember that?

A.  Yes, sir.

MR. STEEL:  OK.  So with the court's permission, it's already in evidence over objection, 7R-141.  If that can be shown to you, if you need to see it.

Q.  Tell the ladies and gentlemen of the jury if you put that in your report.

A.  I'm sorry.  What was the question?

Q.  Where in your report, or if it is in your report, I'll ask first, did you ever say that Mr. Combs -- excuse me -- that Cassie said, I'm leaving the hotel, and Mr. Combs said something to the effect of, You're not leaving?

A.  Um, I don't believe it's in the report.

Q.  In fact, the opposite is in your report, isn't it?

A.  Um, what part?

Q.  Mr. Combs -- it's in the second paragraph, if you need to see it, fifth line.

Mr. Combs.  We walked over -- its in the center of the fifth line -- we walked over to his room, 602.

Meaning Mr. Combs' room, right?

A.  Yes.

Q.  And when we went -- when he -- excuse me -- went inside, it says, and Miss CC was told to leave by Mr. Combs, so she did just that.

Do you see that?

A.  Yes.

Q.  So tell -- you can look at everything -- where in here did you ever write what you told the jurors today, the significant fact that Mr. Combs told Cassie she could not leave that hotel?

A.  At that point, I didn't believe it was a significant fact because, again, they are just going back and forth.  So I'm not going to put something, like, he told her off.  I'm not going to say that.  He said to leave eventually, and she left.

Q.  So you wrote down what you just said, that Mr. Combs told Cassie to leave?

A.  Yeah.

Q.  And she left, but you didn't write down that Mr. Combs told her she could not leave?

A.  Yeah, because it's not -- it's not important.  That's him just telling her don't leave, and me telling him, she is going

to leave.  And then he says, you're going to leave.  So, of course, I don't put he told her that she needs to leave.

Q.  Officer, if it's not important, we're talking about nine years later.

A.  Correct.

Q.  You remember the unimportant detail nine years later, but it's not important enough --

A.  I remember most of the incident, sir.

Q.  Let me just finish the question.

A.  All right.

Q.  It's not important enough to write in the report that you're sworn to do at that time to put in all of the important information, yet you remember to this day, that's what you're telling the jury?

MS. SLAVIK:  Objection.

THE COURT:  It's overruled.

A.  I wasn't sworn to do it.  It's observing reports, sir.  So whatever -- as a security guard, whatever I put in the report, that's pretty much what it is.

Q.  With regards to the bribe, do you remember telling the jurors that Mr. Combs held up a stack of money, you noticed a $100 bill.  And you're fair.  You say you don't know what the other bills were.

A.  Correct.

Q.  They could have been dollar bills, I guess is what you're

saying.

A. Correct.

Q. But you took that as a bribe, right?

A. What do you mean I took that as a bribe? What he was offering?

Q. Well, I was just using your word. Maybe I misheard you.

A. Yeah.

Q. On direct examination with the prosecutor, you used the word it was a bribe?

A. 100 percent.

Q. OK. So that's what I'm talking about.

A. OK.

Q. Now, before going -- that was at the room. Do you remember telling the jurors that?

A. Outside the room, yes.

Q. That you were already leaving, just to set the stage, you were walking back towards the elevator hallway or elevator lobby?

A. Correct.

Q. And you wanted to see if you could catch up to Cassie?

A. Yes.

Q. She had already left?

A. Yes.

Q. Mr. Combs was in his room?

A. Yes.

P5CsCOM3                        Florez - Cross

Q.   No incident, right?

A.   Correct.

Q.   And when Mr. Combs then says to you, I'm not saying shout, but gets your attention, holds up his hand the way you describe, holding the money, whatever amount of money it is, you took that, you said it was a bribe.  I want to ask you a couple of questions.  OK?

A.   Yeah.  Go ahead.

Q.   When you first saw Mr. Combs and he's still sitting in that chair, when you're first off the elevator, you made it known -- I guess it's obvious -- but you made it known that Mr. Combs is going to have to pay for the damage?

A.   Yeah.

Q.   And later you explained to Mr. Combs on the way down to the hallway, correct me if I'm wrong, that he's going to have to pay for that damage, right?

A.   Yes.

Q.   And then when you get to his room, he has a stack of money and he holds it up to you, right?

A.   Correct.

Q.   And you take that as a bribe?

A.   Yeah, that -- definitely.

Q.   OK.  Now, with regards to Mr. Combs having money on him when you first see him in the chair, is it fair to say, to your knowledge, he's really in a towel and socks, is that what it

looked like?

A. Yeah. That was what he was wearing.

Q. He didn't have any access to have any money, to have money on him at that time?

A. Correct.

Q. He couldn't give you any money --

A. We don't take money.

Q. I'm not saying you would take it. He didn't offer you any money, let me put it that way, when he was in the chair.

He didn't have access to money, right?

A. Correct.

Q. OK. Now I want to talk to you about the gentleman who you say you saw in the bedroom or in the hotel room. OK?

A. Um-hmm.

Q. So you describe to the ladies and gentlemen of the jury that there's a gentleman, when you are walking down the hallway with Mr. Combs, Cassie is behind you, she needs her items, you said a bag, right?

A. Yeah.

Q. Cell phone?

A. Cell phone and a bag.

Q. Fair?

A. Yes, sir.

Q. Mr. Combs enters the room. There is no way to have this on video, and that's just the way it's set up. You see the

hallway, but you don't see the entrance to the room, right?

A. Correct.

Q. And you describe it that Cassie is in the room with Mr. Combs and you wanted to observe them. That was just part of your job, fair?

A. Correct.

Q. And that is when you tell the ladies and gentlemen of the jury that there is this other third party, right?

A. Yes.

Q. OK. I would like you to explain why, in your incident report, that is not there, if there is any more explanation than what you said on direct?

A. No, same thing. It was irrelevant. He didn't engage with nobody and he wasn't at the lobby as well.

Q. But, again, you just remember that nine years later?

A. Yeah. Anybody would remember an extra person sitting in the corner of a bed not doing anything.

Q. Why?

A. Because this is an altercation going on, and then there is just someone just sitting there. That's probably something that I would remember.

Q. Did you think it would be important at that time to ask that gentleman for his name?

A. No.

Q. Why?

P5CsCOM3                         Florez - Cross

A.  Because he wasn't involved in their altercation or what they were arguing about.

Q.  How do you know?

A.  Because he wasn't talking to nobody.

Q.  Did you ever follow up on video, because there has to be video of that gentleman leaving the room, right?

A.  Correct.

Q.  Did you ever bother to use your cell phone and record that person leaving the room?

A.  No.

Q.  Did you ever talk to anybody that there was a third party in that room?

A.  Nope.

Q.  But you remember it today?

A.  I remembered it, yes.

Q.  I want to talk with you about the seven foot gentleman.

        Do you remember describing that to the jury?

A.  Yes.

Q.  That's pretty tall, right?

A.  Yeah.

Q.  That's something to remember, right?

A.  100 percent.

Q.  And this is somebody who's in a car, right?

A.  Outside of a car, yes.

Q.  And when you say outside of a car, describe what that

P5CsCOM3                          Florez - Cross

means?

A.  He stepped out of the car, approached myself and Cassie, and then that's when he said that she wanted to leave.

Q.  OK.  Do you know who this person is?

A.  No, sir.

Q.  Do you know if this person was a member of the family of Cassie or she knew him from other places?

A.  She didn't know him.

Q.  How do you know that?

A.  Because the interaction that they had when I was about to leave.

Q.  Just the demeanor with each other?

A.  Yes.

Q.  OK.  NoW, you see the car pull up, right?

A.  Yes.

Q.  And you see Cassie then leave with that gentleman, true?

A.  Yeah.  They were talking, and when they came back, they were gone, yeah.

Q.  I would like you to look at, again, what's been entered into evidence by this Honorable court as 7R-141.  It's in the third paragraph.  It starts with, I took the elevator down.

        Do you see that?

A.  Yes.

Q.  And you saw Miss CC -- just for the ladies and gentlemen of the jury, CC is the same person we're calling Cassie, right?

A.   Yes.

Q.   All right.  You advise her that you did not want him, that means Mr. Combs, to see her, so you walked over to the valet office until her ride got there, right?

A.   Correct.

Q.   And you asked her that we could -- we would need some information from her, to stand by, and then you walked over to MOD Adey's office.

     Do you see that?

A.   Yeah.

Q.   OK.  Do you ever write anything in your report at any time that there was this conversation about the seven foot person saying she's leaving or anything like that?

A.   No.

Q.   Do you write anything in there, you told the ladies and gentlemen of the jury that Cass -- that you told Cassie, Hey, you could come with me and nobody will see, we'll go to another office and no one will see the law enforcement?

A.   Nope.

Q.   That's not in here either, is it?

A.   No, sir.

Q.   But you remember all that today?

A.   100 percent.

Q.   Isn't it you important to tell your coworkers and your -- for you, for your memory, that you offered to call law

enforcement and the guest refused?

A.   Um, I guess it goes either way.  Because if she refused, I mean, there -- that's where it ends.  I don't have to tell anybody.  Obviously, I'm the supervisor.  I'm the assistant director right now.  So if I'm the one that is doing it, then I don't need to tell my guys that that's what I did.  If they did it, then they would have told me.  Hey, sir, this is what we did.  We offered this.  They said no.

Q.   But you're second in command, by that time?

A.   Correct.

Q.   You're not in command?

A.   Nope.

Q.   Second of all, isn't it important to show that you, as a representative of the hotel, offered to have the patron, who you say had a purple eye, you're encouraging the police to come, you're encouraging the person to call the police, you're encouraging the person to wait with you, wouldn't that all be important to put into your incident report?

A.   No, because I -- I already had talked to Adey when I went to go get him.  I told him exactly what had happened, so I was in conversation with all of them.  I didn't need to write it in the email.  Like I said, that e-mail just states what happened, and I don't need -- what you're saying is I need to add extra, extra pieces to this e-mail, that have nothing to do with what happened.  So if I made a left turn, I'm not going to write I

made a left turn, sir.

Q.  You compare somebody with a purple eye who refused police to somebody making a left turn?

A.  No.  What you're saying is that I needed to put that in there, even though I had already spoken to the hotel manager.

Q.  All right.  Did you describe for the jury that when Mr. Combs thought that Adey was recording him, do you remember that --

A.  Yes, sir.

Q.  -- situation?

        Did you say that you put Mr. Combs against the wall?

A.  Yes.

Q.  That's pretty -- that's a pretty aggressive move, wouldn't you say that?

A.  Yeah.

Q.  I mean, you could hurt somebody when you put them up against the wall?

A.  It depends.  Yeah, because I wasn't aggressive.  I just -- I just placed him -- I put my hand on him and told him to let go of the phone.

Q.  Where did you put your hand, on his chest?

A.  On his chest.

Q.  Neck area?

A.  Chest.

Q.  And you shoved him back into the wall?

A.  Yeah.

Q.  And you did it with your forearm, that is what you just did --

A.  Correct.

Q.  -- for the ladies and gentlemen of the jury?

A.  Yes, sir.

Q.  And put your weight behind it, so you --

A.  No, just my forearm.

Q.  Is that the part of the body that you touched to Mr. Combs, you pushed him against the wall?

A.  His chest level.  His chest area.

Q.  In 7R-141, in the third paragraph, the eighth line -- actually, the seventh line to the left of center.

     Do you see where you wrote:  He, meaning Mr. Combs, saw MOD Adey holding his phone and he, meaning Mr. Combs, automatically assumed he, meaning Mr. MOD Adey -- excuse me -- he, meaning Mr. Combs, was being recorded.  So he, meaning Mr. Combs, grabbed MOD Adey's phone.  And then I grabbed his hand and told him to back off, as we took his hand away from MOD Adey?

A.  Correct.

Q.  But today you remember it as you put your forearm into his chest?

A.  Yeah, put my forearm in his chest, and his hand was there because he was pulling on Adey's hand, trying to take it away.

P5CsCOM3                        Florez - Cross

So if you're pulling, right, your hand is here.  I put my hand here, and I'm grabbing his hand, so yes.

Q.  But that's not what you wrote in the report?

A.  But I put that I grabbed his hand, yes.

Q.  But you didn't put that you put him up against the wall?

A.  Again, what you want me to do is add stuff that, like, it's already in the report saying that I grabbed his hand.

Q.  I don't really want you to do anything.

A.  OK.

Q.  I'm just asking if it's in the report --

A.  It's not, sir.

Q.  -- what you told the jury?

A.  No, sir.

Q.  It's not there, right?

A.  No.

Q.  Now, in the video --

        If you need to see it, we're going to show it again.  OK?

A.  Yes, sir.

Q.  There are pictures of a broken vase.  When you first come off the elevator bank.  I'm going backwards, by the way --

A.  Yes, sir.

Q.  I'm not trying to confuse you.

A.  It's fine.

Q.  It's 11:15 a.m.  We're doing the whole thing again.  You're

first coming to the sixth floor.

A. Yes, sir.

Q. You notice, because you're observant?

A. Yes, sir.

Q. You notice that there are flowers on the ground?

A. Yes, sir.

Q. And you notice that there is a broken vase on the floor, true?

A. Yes, sir. Yes, sir.

Q. And that is when Mr. Combs, again, is sitting in the towel and his socks, right?

A. Yes, sir.

Q. And Cassie is over to in the corner, true?

A. Yes, sir.

Q. And the flowers are closer to where Cassie is, true?

A. Yes, sir.

Q. And the vase is closer to where Mr. Combs is, true?

A. Correct.

Q. And, in fact, we see it on the video, and it's juxtaposed because it's in the mirror, but we see that Mr. Combs is grabbing the flowers, tosses the flowers, but the vase goes down by his feet and breaks --

A. Correct.

Q. -- true?

            Just want to be clear. You're not telling the jurors

P5CsCOM3                         Florez - Cross

that Mr. Combs threw the vase, are you?

A.   No, sir.

Q.   OK.

         (Counsel confer)

Q.   I'm asking you to go back nine years.  If you can't
remember, say you can't remember.

A.   Roger.

Q.   Can you describe that room, well, different types of rooms
in the InterContinental Hotel?

A.   It was a corner room.  That's what you're talking about,
his room?

Q.   I'm going back, obviously, to the date at issue, March 5,
2016.

         Do you remember the layout of that room?  If yes, can
you describe it to the jury?  If you can't, just say you can't
remember?

A.   No, I don't remember.  It was just a corner room.

Q.   Do corner rooms have significance, by that, I mean, they
are better views, bigger?

A.   Some of them do, yeah, depending on the floor.

Q.   How about the sixth floor?

A.   Um, no, not really.

Q.   How many, like, rooms -- is it like a typical hotel that I
would stay in, you just walk in and it's all right there as one
room, or are there bedrooms and living rooms, bathrooms, do you

remember?

A.  Yeah.  Some of them have, like, a living room.  Some of them have just the room, you open the door, and the bed is right there.

Q.  Were you aware that this room has the living room and it is not -- when you first walk in, it's a living room.

Have you seen those rooms before?

A.  Yeah.

Q.  And then you go in further and there is a door and it actually leads to a bedroom.

Do you remember what I'm talking about?

A.  Yeah.

Q.  Were you aware that this room was like that?

A.  No, sir.

Q.  Now, you mentioned that when you see this supposed third party?

A.  Um-hmm.

Q.  The gentleman sitting -- sitting in the room?

A.  Yes, sir.

Q.  Do you know what I'm talking about, right?

A.  Yes, sir.

Q.  You have him on a bed, right?

A.  Correct.

Q.  Now, you didn't go in that room further than the living room, did you?

A.   No, sir.

Q.   How did you see into the bedroom?

A.   So, if they have a living room, those couches have pull-out, it becomes a pull-out bed.

Q.   That's what you're saying, this was a pull-out bed?

A.   Yeah.

Q.   Did you realize that this was a presidential suite in that hotel?

A.   Presidential suite on the sixth floor on the corner?  I don't think so.

Q.   You don't think so?

A.   No.

          MR. STEEL:  Your Honor, may I have one moment?

          THE COURT:  You may.

Q.   Now, you being in a hotel, working with the hotel, you're in hospitality -- I know you're in the security business, but it's also the hospitality business, fair to say?

A.   Yes, sir.

Q.   I mean, you have potentially presidents, dignitaries?

A.   They stay there, yes.

Q.   I mean, heads of industry come to the hotel, right?

A.   Yes, sir.

Q.   And there are people who are well-known who come to that hotel?

A.   Yes, sir.

Q.   While you were working there, I'm talking about?

A.   Yes, sir.

Q.   And you sometimes recognize people who come there just from their fame, true?

A.   Yeah.

Q.   And that's what happened here when you got off the elevator, you recognized Mr. Combs, true?

A.   Correct.

Q.   And you knew him from his fame, you wrote that?

A.   Public figure, yes, sir.

Q.   And he's, like, he's a public figure, true?

A.   Yes, sir.

Q.   And it was clear to you that he wanted to pay for the damage, right?

          MS. SLAVIK:  Objection, your Honor.  It calls for speculation and mischaracterizes previous testimony.

          THE COURT:  All right.  Mr. Steel, why don't you rephrase the question.

Q.   OK.  It can be embarrassing, if you know, to a public figure to have that video released, true?

          MS. SLAVIK:  Objection.

          THE COURT:  Sustained.

          MR. STEEL:  Your Honor, may I have one second?

          THE COURT:  You may.

          (Counsel confer)

P5CsCOM3                         Florez - Redirect

MR. STEEL:  Thank you, your Honor.

THE COURT:  All right.  Redirect?

MS. SLAVIK:  Very briefly, your Honor.

REDIRECT EXAMINATION

BY MS. SLAVIK:

Q.  Officer Florez, you were asked on cross-examination about details in incident reports.

Do you remember that?

A.  Yes, ma'am.

Q.  Can you just remind the jury of what an incident report is?

A.  It's just, um, pretty much -- it's explaining what happened, what we saw, what we observed.  Pretty much, like I said, the 5W.

Q.  And were you expected to include every single detail --

A.  No.

Q.  -- in an incident report?

A.  No, ma'am.

Q.  And did you typically include every single detail?

A.  No, ma'am.

Q.  Now, you were asked several questions about Mr. Combs' demeanor when you responded to the incident?

A.  Yes.

Q.  Do you remember that?

A.  Yes, ma'am.

Q.  Did Mr. Combs seem in control of his facilities?

A.   Um, as in -- I'm sorry.

Q.   Did Mr. Combs seem drunk?

A.   Oh, no.  No, ma'am.

Q.   Did he seem high?

A.   No, ma'am.

Q.   Can you remind the jury what Mr. Combs said to you when he tried to hand you a stack of cash?

A.   Um, pretty much saying that he doesn't want anybody to know, telling me to take care of it.  Um, I just don't want people to, to find out, pretty much.

Q.   Now, you were also asked several questions on cross-examination about Mr. Combs telling Ms. Ventura -- excuse me -- Cassie that she couldn't leave.

Do you remember those questions?

A.   Yes, ma'am.

Q.   Now, you remember seeing the video that we played for you on direct examination?

A.   Yes, ma'am.

MS. SLAVIK:  Actually, Ms. Gavin, could you play the video at 10C-103 starting at 31 seconds and going to 56 seconds.

(Video played)

Keep playing to 56 seconds, please.

(Video played)

BY MS. SLAVIK:

Q. Officer Florez, towards the end of that snippet, did you see Mr. Combs dragging Cassie?

A. Yes, ma'am.

Q. What direction was he dragging her in?

A. To the room.

MS. SLAVIK: Nothing further.

THE COURT: All right. Anything further, Mr. Steel?

MR. STEEL: I left something out.

May I just ask a question, your Honor?

THE COURT: Yes.

MR. STEEL: Not on redirect. Thank you.

RECROSS EXAMINATION

BY MR. STEEL:

Q. Sir, on the videos from the surveillance, they are motion-sensored videos, is that true?

A. Yeah.

Q. And that means that they will not record unless there is some sort of movement, that is how it's set up, is that true?

A. For the most part, yes.

Q. So sometimes we see gaps in time?

A. Yes.

Q. And that's because either there is a glitch, there is something wrong with the system, right?

A. Yeah.

Q. Or there is no movement or significant movement to make the

system capture an image, is that true?

A.   Correct.

Q.   All right.  So if there is several minutes of no motion, that would explain the time difference, right?

A.   Yes.

MR. STEEL:  OK.  Thank you.  Thank you for letting me do that, your Honor.

THE COURT:  Ms. Slavik, did you have anything further in response to that?

MS. SLAVIK:  No, your Honor.  Thank you.

THE COURT:  All right.  Thank you very much, Officer Florez.

THE WITNESS:  Sure.

(Witness excused)

THE COURT:  The government may call it's next witness.

MS. COMEY:  The government calls Daniel Phillip.

THE DEPUTY CLERK:  Remain standing and please raise your right hand.

THE WITNESS:  Sure.

DANIEL PHILLIP,

   called as a witness by the Government,

   having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Thank you.  You may be seated.

THE COURT:  All right.  Ms. Comey, you may proceed.

MS. COMEY:  Thank you, your Honor.

P5CsCOM3                        Phillip - Direct

DIRECT EXAMINATION

BY MS. COMEY:

Q. Good afternoon.

A. Good afternoon.

Q. Would you please state and spell your name for the record.

A. Daniel Phillip, D-a-n-i-e-l P-h-i-l-l-i-p.

Q. How old are you?

A. I am 41.

Q. How far did you go in school?

A. I did some college.

Q. I would like to direct your attention to the period around approximately 2012 and 2013.

During that time, what were you doing for work?

A. I was managing a male review show.

Q. What is a male review show?

A. Male strippers for women.

Q. In what city?

A. New York.

Q. From where else did you receive money in approximately 2012?

A. From Cassie Ventura, Casandra Ventura.

MS. COMEY:  Can we please pull up what's in evidence as Government Exhibit 2A-401.

Q. Mr. Phillip, do you recognize the person in that photograph?

P5CsCOM3                       Phillip - Direct

A.   Yes.

Q.   Who is that?

A.   That is Casandra Ventura, or Cassie.

Q.   What did Cassie Ventura give you money for in around 2012?

A.   To have sex with her.

Q.   Who else was present when you had sex with Ms. Ventura in exchange for money?

A.   Sean Combs.

        MS. COMEY:  Can we now please pull up what's in evidence as Government Exhibit 2A-101.

Q.   Do you recognize the person in that photograph?

A.   Yes.

Q.   Who is that?

A.   Sean Combs.

        MS. COMEY:  We can take that down.  Thank you, Ms. Gavin.

Q.   About when did you first meet Ms. Ventura?

A.   I'm estimating, but probably 2012 or '13.

Q.   Through whom did you first meet Ms. Ventura?

A.   Um, through my boss.

Q.   What did your boss tell you?

A.   He contacted me one evening and told me that he couldn't find any of our black dancers, which was what was requested, so he asked me if I would mind going down to fulfill an order to have a dancer go down to the Gramercy Park Hotel for a

bachelorette party.

Q. How did you respond?

A. I told him I would do it.

Q. To what location did your boss send you?

A. To the Gramercy Park Hotel.

Q. Where is that hotel located?

A. In Gramercy Park, downtown Manhattan.

Q. What were you expecting to do at the Gramercy Park Hotel?

A. I was expecting to go do a little strip tease, and that was it, just for a bachelorette party, a group of women, and then leave.

Q. At what time of day did you arrive at the Gramercy Park Hotel?

A. Um, probably sometime after midnight.

Q. So nighttime?

A. Nighttime.

Q. What happened when you arrived at the Gramercy Park Hotel?

A. When I arrived, Cassie opened the door. And she asked me, um, if I was OK if it was just going to be us, because I was expecting to see a group of women there, but there was only her standing the door. And, um, she asked me to come into the room.

Um, we were standing, in, like, a foyer. And she basically said it was her birthday and that her husband wanted to do something special for her, and so she asked me if I would

P5CsCOM3                        Phillip - Direct

mind rubbing baby oil on her and giving her a massage.  And, um, you know, wherever things went from there, if it went, if, you know, based on how comfortable I was.

Q.  Let me ask you some followup questions.

A.  Sure.

Q.  Did you know her name at that moment?

A.  No.

Q.  Did you later learn her name?

A.  Yes.

Q.  And what did you later learn her name was?

A.  Casandra Ventura.

Q.  And what did you call her during your later interactions?

A.  C.

Q.  When she first opened the door and invited you just inside the door, what was Ms. Ventura wearing?

A.  Um, lingerie, like, a red lace outfit with high heels, a red wig, and some sunglasses, dark sunglasses.

Q.  And after Ms. Ventura told you about her husband being there and baby oil, what, if anything, did she give you when you were in that entryway of the hotel room?

A.  Um, she asked me, um, if I --

MR. DONALDSON:  Objection.

THE COURT:  Rephrase the question.

Q.  After telling you what she wanted that evening, what did Ms. Ventura say next?

A.  She told me that, first off, that I didn't have to worry about anything because her husband wasn't gay.  I remember her saying that to me, and he wasn't going to try to touch me or anything.  And I told her, that's good, because I wasn't with that.  And then, um, she told me that, um, she knew that my boss told her that she --

MR. DONALDSON:  Objection.

MS. COMEY:  Your Honor, it's not offered for the truth, just to provide context for the statement coming next.

THE COURT:  That's overruled.

THE WITNESS:  Continue?

THE COURT:  You may continue.

A.  OK.  Um, she -- she told me that she knew that my boss had told her that she had to give me $200 upon arrival.  And, um, at that point, she gave me a few thousand dollars and said that, um, that, you know, at the end, she would tip me when I'm leaving, before I'm leaving.

Q.  After she handed you cash, what part of the hotel room did you go into with Ms. Ventura?

A.  We went into the main living room area.

Q.  What kind of hotel room was this room?

A.  It -- I believe it was a suite.

Q.  What did the living room area look like when you walked into it that night?

A.  It had, like, velvet couches straight ahead, and it opened

P5CsCOM3                          Phillip - Direct

up into a big living room.  And there was a table in front of the couch, and there were candles that were lit all over the table.  Yeah, and -- and then the rest of the room was dark.

Q.  What else, if anything, did you see on the table?

A.  Um, there were bottles of baby oil and Astroglide, which is a lubricant.

Q.  Who else did you see in the living room when you walked into it?

A.  There was a man sitting on the right side of the room, if I was facing him, to the back of the room.

Q.  What was the man wearing?

A.  Um, a white robe with a bandana over his face and, like, a baseball cap on his head.

Q.  What part of this man's face was the bandana covering?

A.  Um, his nose down.

Q.  So were you able to see his face clearly?

A.  No.

Q.  How, if at all, did Ms. Ventura refer to the man in the room?

A.  As babe.

Q.  Did you later learn who that man was?

A.  I did.

Q.  What did you learn about that?

A.  Um, well, if you're asking when did I realize who he was?

Q.  Sure.

P5CsCOM3                         Phillip - Direct

A.   Um, as soon as he spoke to me.

Q.   So when he spoke to you, whose voice did you recognize?

A.   That was Sean Combs.

Q.   Had you heard Sean Combs' voice before?

A.   Yes.

Q.   In what context?

A.   In every form I've ever seen him in entertainment.

Q.   Did you later see his face uncovered at a later date?

A.   I did, yes.

Q.   Now, that first night, what did you and Mr. Combs say to each other?

A.   Um, not much.  I complimented the room, the hotel that we were in, and I asked him what he did for a living.  And he told me that he was in importing and exporting.  That was the first conversation we had.  And then, um, as I was getting ready to leave the hotel, he spoke to me again and told me that, um, I guess he had some trouble with my -- my boss --

        MR. DONALDSON:  Objection.

        (Continued on next page)

P5CACom6                         Phillip - Direct

BY MS. COMEY:

Q.  Mr. Phillips, we'll talk about that conversation later.

A.  Okay.

Q.  Let's focus now on when you first entered the room and when you first started interacting with Mr. Combs.

After you had that brief conversation with him, what did you and Ms. Ventura do?

A.  We ended up having sex.

Q.  Before you and Ms. Ventura had intercourse, what if anything did you rub on each other?

A.  Baby oil.

Q.  For about how long did that last?

A.  Couple minutes.

Q.  And then what happened?

A.  And then I ended up having sex with her.

Q.  What was Mr. Combs doing while you and Ms. Ventura rubbed baby oil on each other?

A.  He was sitting in the corner masturbating watching us.

Q.  What was he doing while you and Ms. Ventura were having sex?

A.  He was sitting in the corner masturbating.

Q.  About how long did the sex with Ms. Ventura last that first time?

A.  Not long at all.

Q.  And how did that sexual encounter end?

P5CACom6                         Phillip - Direct

A.   With me ejaculating.

Q.   What, if any, protection were you wearing?

A.   I wasn't at that time.

Q.   After you finished having sex with Ms. Ventura, but before you left that hotel room, what if anything did she or Mr. Combs give you?

A.   Cassie gave me more money.  I think it was a couple thousand dollars more.

Q.   Before you left the hotel room after that first encounter, what do you remember Mr. Combs saying to you?

A.   He said that he had some issues with my boss at the time. And said that --

          MR. DONALDSON:  Objection.

          MS. COMEY:  Your Honor, it's an opposing party statement.

          THE COURT:  Grounds for the objection?

          MR. DONALDSON:  Hearsay, Judge.

          THE COURT:  I didn't get that.

          MS. COMEY:  It's the statement of the defendant --

          THE COURT:  First of all, I didn't hear you.

          MR. DONALDSON:  I'm sorry, Judge.  Hearsay.

          THE COURT:  Okay.  That's overruled.

BY MS. COMEY:

Q.   Can you repeat for us what Mr. Combs said?

A.   He said he was having some issues with my boss at the time.

P5CACom6                          Phillip - Direct

I guess he was, my boss, was being a bit aggressive. And he asked me if I would like to see them again, continue seeing them and so --

Q. And let me ask you, how did you respond to that?

A. I said sure. And he told Cassie to take my phone number, and she took my phone number and that was that.

Q. After you gave them your phone number, where did you go?

A. I left the hotel. I was getting ready to go home.

Q. And about how long after you left the hotel did you hear from them again?

A. Few minutes after.

Q. What happened?

A. Cassie asked me if I would mind sending her a picture of my penis.

Q. How did she contact you?

A. Via my cell phone.

Q. How did you respond?

A. I gave her a picture of my penis.

Q. What was the next communication you had with her?

A. She asked me if I could come back upstairs and see her again.

Q. How did you respond?

A. I went back upstairs to see her again.

Q. So where did you go back to?

A. The same hotel room that we were in.

Q.  And who was in the hotel room when you returned to it?

A.  The same two people, Cassie Ventura and Sean Combs.

Q.  About how long were you in that hotel room this second time?

A.  A few hours.

Q.  What do you remember happening over those few hours?

A.  The same thing.  It was literally the same exact scene basically.

I -- we rubbed baby oil on each other.  We had sex again for longer this time, and then I was done.  I do not recollect whether or not they gave me anything after that, money wise.

Q.  What was Mr. Combs doing while you were having this sexual encounter with Ms. Ventura?

A.  He was masturbating in the corner.

Q.  And what, if anything, do you remember him saying during this second sexual encounter?

A.  At what point?  While we were --

Q.  Yes.

A.  I don't know if I remember him saying anything.

Q.  At the end of that sexual encounter with Ms. Ventura and Mr. Combs, at that point when you left, did you know who Ms. Ventura was?

A.  Yes.

You're saying when I left the hotel the second time?

P5CACom6                           Phillip - Direct

Q.  Yes.

A.  No.

Q.  When did you learn who she was?

A.  My boss looked her up and told me who she was.

Q.  Approximately how many more times did you have sex with
Ms. Ventura in front of Mr. Combs for money?

A.  Well, I had sex with Cassie a few times after that.

Q.  Did you ever meet Ms. Ventura and Mr. Combs in person for
any reason other than to have sex with Ms. Ventura in front of
Mr. Combs?

            MR. DONALDSON:  Objection.  Form of the question.

            THE COURT:  You can rephrase the question.

Q.  Every time you met with Ms. Ventura and Mr. Combs, what was
the purpose of the meeting?

A.  To have sex with Cassie.

Q.  In front of who?

A.  In front of Mr. Combs.

Q.  Approximately when was the last time you met in person with
Ms. Ventura and Mr. Combs?

A.  I'm estimating, but probably the end of 2013, early 2014.

Q.  In what city did all of these meetings take place?

A.  New York.

Q.  In what borough?

A.  Manhattan.

Q.  At what locations do you remember having these encounters

P5CACom6                        Phillip - Direct

with Ms. Ventura and Mr. Combs?

A.   I'm sorry.  Can you repeat that?

Q.   At what locations do you remember meeting --

A.   Oh.

Q.   -- with Ms. Ventura and Mr. Combs?

A.   The Gramercy Park Hotel, the Jumeirah Essex House, InterContinental, his personal residence on 56th Street, her personal residence on West End Avenue.  And there may be more. I'm not remembering.

Q.   You said his personal residence.  Who were you referring to?

A.   Mr. Combs, Sean Combs.

Q.   And you said her personal residence, who were you referring to?

A.   Cassie's residence.

Q.   And where was that?

A.   Cassie lived on West End Avenue.  I think number 10 West End Avenue, and then Sean Combs, I believe he lived at 210 West 56th Street at the time.

Q.   When you met them at hotels, in what kind of rooms did you generally meet them?

A.   In suites.  Is that what you're asking me?

Q.   Yes.

A.   Okay.

Q.   What if any name did Ms. Ventura tell you to give hotel

management if you were asked who you were there to see?

A.   Black.

Q.   For each of these locations, how did you learn that they wanted to meet you there?

A.   Cassie either called me or texted me.

Q.   How much notice did you generally receive between when Cassie would contact you and when you were supposed to arrive for a meeting?

A.   It could be anywhere between an hour to a couple of days.

Q.   Did you yourself reach out affirmatively to Cassie via text?

A.   Yeah.

Q.   Why was that?

A.   At some point after some things had happened, I always wanted to -- to know that she was good.  I used to try to get her to -- to text me to tell me that, you know, she was good. And then when she wouldn't reply, eventually I started sending her, you know, more vulgar text messages to see if I could get her, you know, more interested to see me again so that I could actually see her in person and know that she was good.

Q.   And when you say you sent her vulgar text messages, what do you mean?

A.   I mean, I can recall sending her at least one message telling her that I wanted to -- you want me to say it?

Q.   If you wouldn't mind giving an example.

A.   I want to fuck you right now.

Q.   And are those the kind of vulgar text messages you would send her?

A.   Not often, but once or twice, yeah.

Q.   To the best of your recollection, did Cassie ever respond to those vulgar text messages?

A.   I don't think so.

Q.   During your sexual encounters with Cassie and Mr. Combs, generally how were the rooms decorated?

A.   Sometimes sheets or like towels on the couch.  The curtains were always shut fully.  There was always a table in front of the couch, and there was always candles on that table.  And also bottles of baby oil or Astroglide and then there were a few occasions where they would ask me to actually go to the pharmacy and pick those things up.  I guess because they didn't have them at their location.

Q.   Across all of these encounters, how often did you use baby oil?

A.   Every time.

Q.   Other than that first time at the Gramercy Park Hotel, who directed you to use baby oil?

A.   Well -- are you asking -- okay.  I think I understand.

          So the first time Cassie did.  And then I guess we kind of knew what to do after that.  But Sean Combs would often tell us, y'all need to rub more baby oil on each other.  Your

P5CACom6                          Phillip - Direct

not like -- you don't have enough on.

Q.  So what types of things do you remember Mr. Combs saying to you and to Ms. Ventura about baby oil during these encounters?

A.  He would just tell us to put more on.

Q.  Across all of these encounters, after the first one, who if anyone gave directions about how to engage in sexual activity?

A.  Sean Combs did.

Q.  What are some of the directions you remember Mr. Combs giving to you and Ms. Ventura?

A.  He would tell us things like slow down, you know, y'all stop now, separate from each other, it's getting too much now, it's getting too hot, y'all -- you know, one time he had us try to role play like we had just met at an airport and, yeah, we were not very good at that at all.  So I think we skipped past that one really quickly.

Yeah.  But mainly, it was more like, you know, don't cum yet, don't cum.  If you feel like you're going to cum, don't cum yet.  Things like that.

Q.  About how often during these encounters would Mr. Combs tell you to wait to ejaculate?

A.  I mean, it was often.  But I think he started really directing us from like the second time on.  So the first encounter he didn't really say much to us.  But after that, he would tell us what to do after that.

Q.  So, again, focusing just on the second time forward.

A.   Okay.

Q.   What directions about when you should ejaculate do you remember Mr. Combs giving you?

A.   I mean, yeah, he would often tell me not to cum, don't cum yet.  And if you feel like you're going to cum, stop.  But it was more so where he wanted me to ejaculate.

Q.   And what do you remember about him -- what do you remember him saying about that?

A.   He occasionally wanted me to cum on her stomach or, you know, inside of her.  And, you know, yeah.

Q.   What, if any, directions did Mr. Combs give to you and Ms. Ventura about what sex acts to engage in?

A.   He really would just tell us to like rub each other and like, you know, touch each other, and then he would tell her to, you know, blow me, give me oral sex.

Q.   Throughout these encounters, what did you observe Mr. Combs doing?

A.   He was always sitting in the corner masturbating.  And then occasionally he would tell me to step off and back up because he was going to get some, and then he would start having sex with her.  And I would be sitting off in the corner watching. Just...

Q.   Other than oral sex and intercourse, what other acts, if any, do you remember Mr. Combs asking you to perform on Ms. Ventura?

A.   I don't -- I don't recall anything else.

Q.   How many times, if any, were you asked to urinate on Ms. Ventura?

          MR. DONALDSON:  Objection.

          THE COURT:  The question needs to be rephrased.

BY MS. COMEY:

Q.   What, if any, bodily fluids other than ejaculate do you remember there being in these rooms?

          MR. DONALDSON:  Objection.

          THE COURT:  Just on leading grounds?

          MR. DONALDSON:  Yes, Judge.

          THE COURT:  That's overruled.

A.   So Cassie was actually the one that asked me to, to urinate on her.  They had just come out of the room and she asked me if I had ever done that before, and I said no.  And she told me to do it.  And, apparently, I was doing it wrong because they both stopped me and told me that I was supposed to let a little out at a time and not go full like -- take a leak on her.  But, yeah, that was just one time that they asked me to do that --

          MR. DONALDSON:  Objection to the characterization of they asking him to do that.

          I believe the testimony was that he --

          THE COURT:  No.  I've got -- I've got it.

          All right.  The jury should disregard the last sentence of the witness's last answer.

Ms. Comey, you can proceed.

Q. What was Mr. Combs doing when you urinated on Ms. Ventura?

A. He was masturbating.

Q. What, if any, conversations do you recall having with Mr. Combs about using protection?

A. I brought up the fact that I would like to start unless she could provide me with her sexual STD history and make sure that she was good. She agreed. I agreed to do the same. And I ended up bringing her mine, but I never received her's.

Q. How often did you use condoms with Ms. Ventura?

A. By the time we had that conversation, not many.

Q. What did Ms. Ventura and Mr. Combs usually do after you ejaculated on her?

A. They would get up and go inside of wherever the bedroom was inside the hotel room.

Q. And, generally, what happened next?

A. I would be sitting in that room for hours, just sitting there.

Q. And then what do you remember happening?

A. Sometimes they would come out and tell me, okay, you can go. And other times, they would come out and ask me if I'm ready to go again.

Q. About how long did each of these encounters with Mr. Combs and Ms. Ventura usually last?

A. Could be anywhere from an hour to ten hours.

P5CACom6                         Phillip - Direct

Q.  And, generally, what happened over those hours?

A.  We would have sex, and then I would be sitting there waiting for hours on the couch just sitting there.

Q.  How many times, if any, did you pretend to ejaculate but actually didn't?

A.  Once.

Q.  Can you tell us about that?

A.  I -- I think this was on our second go round.  And he told me to make sure that I came inside of her this time, and I went to go do it but I just -- I couldn't do it.  I just -- I was in my head or whatever the problem was, but I couldn't ejaculate, and so I just pretended to do it.  And I was -- they got up, they went into the room.  And then Sean Combs came out of the room and he asked me, he said, yo, are you sure you came.  And I said, yeah, I'm positive.  And he was like, you sure.  And I said yes.

        And so they went back into the room.  And, yeah, that was that.  But, yeah, they definitely knew --

        MR. DONALDSON:  Objection.

A.  -- I pretended.

        THE COURT:  The jury should disregard the last sentence in the witness's answer.

        Ms. Comey.

Q.  You mentioned that at some point you saw Mr. Combs face, how did that happen?

P5CACom6                        Phillip - Direct

A.   I was supposed to meet Cassie and Sean Combs down at the --

The Dream Downtown Hotel I believe.  And Cassie called me while

I was on my way down there.  She told me that they were

switching hotels and they were heading uptown to the Jumeirah

Essex House.  And she told me at that hotel I don't need to

stop at the front desk and that I can just go straight

upstairs.  And so she told me to give them maybe 30 minutes or

something like that before I came upstairs, and so I did that.

I went up in about 30 minutes and I knocked on the door.  And

this was the first time that Sean Combs opened the door as

himself.  You know, dressed in a suit and peacoat and no mask,

no hat, no anything on.  Just it was him.

Q.   So what was covering his face when he opened the door?

A.   Nothing.

Q.   How did your interactions with Mr. Combs change after you

saw his face?

A.   He didn't feel obviously --

          MR. DONALDSON:  Objection.

A.   I guess --

Q.   Without commenting on how Mr. Combs felt.

A.   Yeah.

Q.   Or what he thought, based on your own observations, how did

your interactions change?

A.   He never wore a mask or a hat again.

Q.   Who, if anyone, recorded your sexual encounters with

Ms. Ventura?

MR. DONALDSON: Objection. Leading. If any.

MS. COMEY: Your Honor, it's who, if any.

MR. DONALDSON: I'm sorry. I didn't hear that part. My apologies. Withdrawn.

THE COURT: All right.

Q. Who, if anyone, recorded any -- recorded your encounters with Ms. Ventura?

A. Sean Combs.

Q. About how many times do you remember Mr. Combs recording you and Ms. Ventura during these sexual encounters?

A. Again, I would be estimating, but once or twice.

Q. And what do you remember Mr. Combs using to record those encounters?

A. I do believe a cell phone and a camcorder device.

Q. What, if any, form of identification do you remember Mr. Combs asking you for?

A. He asked me for my ID, my driver's license.

Q. What do you remember about that?

A. He took my driver's license and took a picture of it. And then said to me it's just for, you know, insurance, just in case.

Q. What did you understand him to be telling you?

A. That if I spoke about this to anybody, that he'd prob --

MR. DONALDSON: Objection.

P5CACom6                        Phillip - Direct

A.  I don't know.

MR. DONALDSON:  Objection.  Objection.

A.  I felt --

THE COURT:  Hold on.

MR. DONALDSON:  Objection.

THE COURT:  Grounds?

MR. DONALDSON:  He's about to speculate as to what Mr. Combs intended by asking for a --

THE COURT:  All right.

MS. COMEY:  Your Honor, he's explaining the context --

THE COURT:  Hold on.  Ms. Comey, why don't you ask a new question that's perhaps more focused.

Q.  Based on Mr. Combs' demeanor, tone of voice, and behavior during that conversation, what did you understand he was communicating to you?

MR. DONALDSON:  Objection.

THE COURT:  That's overruled.

A.  I understood it to be that he was threatening me.

Q.  How many times, if any, did you notice that Ms. Ventura appeared to be under the influence of drugs?

A.  Just once.

Q.  What do you remember about that?

A.  I came to a hotel room, and Sean Combs opened the door, and I -- when I went inside the hotel room, he closed the door behind me and then said to me that I don't think this is going

P5CACom6                        Phillip - Direct

to happen today.  And I looked at the couch, and Cassie looked like, like, to me, she looked like she was completely passed out on the couch.  Slumped over, and half on the couch, half off of the couch.

Q.  What was she wearing?

A.  I think she was wearing lingerie.

Q.  What, if any, drugs did you use during your sexual encounters with Ms. Ventura and Mr. Combs?

A.  He offered me a Cialis once or twice.  And then Molly once.

Q.  And who offered you the Molly?

A.  Mr. Combs.

Q.  And when you say Molly, what are you referring to?

A.  I don't do drugs, so MDMHA -- I don't know what, what the term is.  But I guess ecstasy.

Q.  I don't want you to guess, Mr. Phillip.  Thank you.

A.  Okay.

Q.  What do you remember about the time that you were offered Molly by Mr. Combs?

A.  I remember they had -- I really can't tell you who gave me the money, but I had gotten a couple thousand dollars I guess after we were -- we had sex, I took that Molly and then I became a totally different person.  I went out into Times Square and I handed out hundred dollar bills to every single person that I saw in front of me.

Q.  When you say you became a totally different person, how did

P5CACom6                          Phillip - Direct

the Molly make you feel?

A.  It made me feel like a jackass that wanted to go out into the middle of Times Square and hand out $100 bills to every person that he saw.

Q.  Can you describe the sensation of taking the Molly for us please?

A.  I felt sick, like physically sick, like nauseous.  But also felt euphoric at the same time.

Q.  That time that you took Molly from Mr. Combs, other than Mr. Combs and Ms. Ventura, who else, if anyone, do you remember being at this encounter?

A.  There was one other time that I can remember, it may have been twice, that they invited another guy to come and --

Q.  Sorry.  Let's back up.

        Can we focus just on the time that he gave you the Molly?

A.  Oh, sure.

Q.  On just the time he gave you the Molly.

A.  Okay.

Q.  Who else was present, if anyone?

A.  There was another guy who told me he was an actual escort.

        MR. DONALDSON:  Objection.

        MS. COMEY:  It's not offered for the truth, your Honor.

        THE COURT:  It's overruled.

P5CACom6                        Phillip - Direct

Q.  And what did you see that other guy doing?

A.  He was having sex with Cassie.

Q.  Now, where did this encounter happen?

A.  At Cassie's house.

Q.  So can you walk us through who all was at Cassie's apartment on this particular occasion?

A.  It was this other guy, myself, Cassie, and Sean Combs.

Q.  And what did you see this other guy doing?

A.  Having sex with Cassie.

Q.  And what did you see Mr. Combs doing while this other guy was having sex with Cassie?

A.  She was actually giving him a blow job most of the time.

Q.  And what do you remember happening during that particular sex act?

A.  The guy kept on looking at Sean in the face, Sean Combs in the face.  And Mr. Combs turned to him and basically told him look, motherfucker, you better stop looking at me in my face, and the guy got like real scared, and he's like I'm not looking at you.  And he's like you better not be fucking looking at me.  And Cassie jumped off of the couch and like ran to the opposite side of the room.  And the guy was just like saying profusely I'm not looking at you, I swear I'm not looking at you.

            MR. DONALDSON:  Objection, Judge.

            THE COURT:  All right.  Let's get a fresh question.

Q.  After Cassie ran away, what do you remember happening next?

P5CACom6                          Phillip - Direct

A.   The guy told Mr. Combs I'm not looking at you.  Mr. Combs said, okay, all right, let's, let's -- we here to have fun, not do anything else.  And then he told Cassie to come back to the couch.  And Cassie asked if they were absolutely positive that they're good now because she was -- she seemed like she was scared to go back to the couch.

Q.   What did this other man look like?

A.   Black guy, kind of skinny.

Q.   And what, if any, contact did you have with him outside of that night?

A.   We, at some point, and I do not recollect how this happened, but we at some point exchanged phone numbers.

Q.   And about how many times did you see each other in person outside of that night?

A.   We never saw each other out, in person out -- you mean like met up with each other?

Q.   Yes.

A.   No, we had never done that.

Q.   Did you speak over the phone occasionally?

          MR. DONALDSON:  Objection.

          THE COURT:  Overruled.

A.   We may have shared a couple of text messages.

Q.   Do you remember his name?

A.   No.

Q.   Have you spoken to him in the last ten years?

P5CACom6                          Phillip - Direct

A.   No.

Q.   After Mr. Combs gave you the Molly, what else did he give you that night?

A.   If it was him, cash, a couple thousand dollars.

Q.   Well, let me ask you this:  Do you remember whether -- do you remember who gave you cash that night?

A.   I don't.

Q.   Okay.  But do you remember getting cash that night?

A.   I do.

Q.   And then what did you do after getting the cash and taking the Molly?

A.   Like I said, I went into the middle of Times Square and I handed out every single dollar they gave me.

Q.   Were there ever times when you arrived for one of these encounters with Ms. Ventura and Mr. Combs and it appeared that you were not the first person who had been there?

A.   Yes.

Q.   Can you tell us about that?

A.   Just times that I would come to the hotel room and there would be like towels on the floor that looked used, and bottles of baby oil that were almost finished, and Astroglide that was halfway used.  And it just looked like, you know, like someone had been there before already.

Q.   After that time that you took the Molly and gave the cash away in Times Square, did you see Ms. Ventura or Mr. Combs in

person again?

A.  Not to my knowledge, no.

Q.  And why not?

A.  Because I, after a certain point, was no longer able to get hard when I was interacting with them.

Q.  What were you paid for your sexual encounters with Ms. Ventura in front of Mr. Combs?

A.  What was I paid?

Q.  Yes.

A.  In totality?

Q.  Each time.

A.  Oh.  It could be anywhere from 700 bucks to six -- five, $6,000.

Q.  And who do you remember handing you the cash?

A.  It was always Cassie.  And I say that saying that I do not remember who handed me the money the last time.

Q.  What, if any, comments do you remember Mr. Combs making to you about money?

A.  I remember he came out of the room once and asked me and the gentleman if we had gotten our bread.

Q.  Now, stepping back, when you first arrived at the Gramercy Park Hotel for that first encounter, did you expect to be paid for sex?

A.  No.

Q.  Had you ever been paid for sex before that night?

P5CAC om6                           Phillip - Direct

A.   No.

Q.   Have you ever been paid for sex since you last saw Ms. Ventura and Mr. Combs?

A.   No.

Q.   When you were able to sexually perform with Ms. Ventura in front of Mr. Combs, what were you paid?

A.   Again, it could have ranged -- oh, you're saying when I couldn't?

Q.   When you could.  When you could.

A.   Okay.  It could range anywhere from $700 to thousands of dollars.

Q.   And when you could not sexually perform with Ms. Ventura in front of Mr. Combs, what were you paid?

A.   Nothing.  Sometimes nothing.

Q.   If there were times when you were not paid, why did you go back to more meetings with Ms. Ventura and Mr. Combs?

A.   Well, I, for one, was not someone that was getting paid for sex.  In my head, I was just excited that I was in this world and, you know, happy to, to be involved with people with such notoriety.  I didn't care if I got paid one way or another.  I never asked them for a single dollar.  They gave that to me every time that I went to see them.

So for me, it was just, you know, this is just something that they do.  They have that kind of money.  They want to share it with me.  I'm fine with that.

P5CACom6                         Phillip - Direct

Q.   What sexual performance issues did you experience when
meeting with Ms. Ventura and Mr. Combs?

A.   I could not get hard.  You want the medical term for that?
Erectile dysfunction.

Q.   When was the first time you experienced that sexual
performance issue?

A.   After the first time that I saw him hit her.

Q.   Where were you when you first saw him hit her?

A.   At Cassie's house.

Q.   And when you say you saw him hit her, who did you see hit
whom?

A.   Sean Combs hit Cassie.

Q.   Right before the violence started, where were you in
Cassie's apartment?

A.   I was sitting on her couch, which was directly behind her.

Q.   And where was Cassie?

A.   She was sitting at her computer, which was facing a wall
directly in front of me.

Q.   Where was Mr. Combs?

A.   He was in her bedroom, Cassie's bedroom.

Q.   And what had happened just before this violence?

A.   I had sex with her, with Cassie.

Q.   What do you remember happening?

A.   From the time that I had sex with her?

Q.   Yes.

P5CAСom6                          Phillip - Direct

A.   Okay.  Well, I had sex with her.  We finished doing what we were doing.  And then they both went into their -- into the bedroom.

She eventually came out and she got on her computer and he was -- Mr. Combs was in her bedroom.  Cassie was on her computer, and I heard him yell out, babe, come here.

Q.   Let me pause you right there.

A.   Sure.

Q.   You said you heard him yell out; who did you hear yell out?

A.   I heard Mr. Combs yell out to Cassie, babe, come here.

Q.   How did Cassie respond when Mr. Combs said, babe, come here?

A.   Cassie was on her computer and she said, hold on one second, I have my personal information out on my computer right now.

Q.   What happened right after Cassie said, hold on one second?

A.   He, Mr. Combs, came out of the room, and I just saw a bottle fly past her and hit the wall.

Q.   What kind of bottle?

A.   It looked like a liquor bottle.  And then he, Mr. Combs, walked over to her, to Cassie.  He grabbed her by her hair, and started dragging her by her hair into her bedroom.  And --

Q.   Let me ask you, as Mr. Combs was dragging Cassie by her hair to her bedroom, what did you hear Mr. Combs saying?

A.   He wasn't saying anything while he was dragging her.  She

was yelling.

Q.   What was she saying?

A.   She was screaming.  And he, Mr. Combs, pulled her into the bedroom, and I could hear him -- what I could hear what sound like him slapping her.

Q.   What else could you hear from the bedroom?

A.   She was screaming.

Q.   What did you hear her saying?

A.   I'm sorry, I'm sorry.  And then he, Mr. Combs, was basically saying, bitch, when I tell you to come here, you come now, not later.

Q.   How did Ms. Ventura compare in physical size to Mr. Combs?

A.   She's tiny compared to him.

Q.   I'm sorry, I didn't hear you.

A.   I said she's tiny compared to him.

Q.   How did you react to this violence?

A.   I was shocked.  I -- came out of nowhere.  I was terrified. I didn't know what the -- what to do.  I didn't know what to do.

Q.   Did you intervene?

A.   No.

Q.   Why not?

A.   Because I knew that the chances that there were four or five big bodyguards in another room --

          MR. DONALDSON:  Objection.

THE COURT:  Sustained.

Q.  Without speculating about what might have been going on outside of what you could see and what you could hear, can you explain to the jury why you didn't intervene when you heard Cassie crying and what sounded like smacks?

A.  I didn't know what to do.  I was shocked.  I, in my mind, it was going through my head that if I tried to do something, I might lose my life.

MR. DONALDSON:  Objection.

MS. COMEY:  Your Honor, I'm happy to explain why I think that's perfectly admissible.

THE COURT:  It's overruled.

Q.  And why didn't you call the police and report what you saw?

A.  Because I --

Q.  Again, without speculating.

A.  I'm not.  I'm not speculating.  I'm just telling you what was in my mind, and my -- what I was feeling at the time.

My thoughts were that this was someone with an unlimited power.

MR. DONALDSON:  Objection.

THE COURT:  That's overruled.

A.  My thoughts was that this was someone with unlimited power, and chances are that even if I did go to the police, that I might still end up losing my life.

MR. DONALDSON:  Objection.  Move to strike.

P5CACom6                           Phillip - Direct

MS. COMEY:  Your Honor, it's the same basis of admissibility as the prior explanation of his state of mind.

THE COURT:  Denied.  Motion is denied.

Q.  What happened after the beating stopped?

A.  They -- Sean Combs and Cassie, came out of the room.  She was -- Cassie was visibly like very upset, did not look like she wanted to continue doing anything.  But Mr. Combs asked, are y'all ready to continue now.  And I was -- I couldn't do anything after that.

Q.  What did you try to do?

A.  I don't know.  I -- I may have tried to act like everything was okay.  I mean, I don't know.  I don't really recall.

Q.  How do you remember that interaction ending?

A.  I remember leaving.  I do not remember them handing me money.  And I probably wouldn't have taken that anyway.

MR. DONALDSON:  Objection.

Q.  Why did you return to meet --

THE COURT:  Hold on.  Hold on.

The jury should disregard the last sentence of the witness's answer.

Ms. Comey, you may continue.

Q.  Why did you return to meet with Ms. Ventura and Mr. Combs again after you witnessed that violence?

A.  I -- I've had conversations in between our interactions with Cassie.  And I felt like I had started developing at least

some kind of a friendship with her.  I may have been speculating.  But, you know, I -- it was my way of being able to check on her and know that she was okay, because she had asked me not to --

MR. DONALDSON:  Objection.

THE COURT:  Well, let's stop right there.  And, Ms. Comey, you can ask your next question.

Q.  Let me ask you this:  How many other times did you hear Mr. Combs yell at Ms. Ventura?

A.  Once after that.

Q.  Where was this?

A.  At the Jumeirah Essex House Hotel.

Q.  Would you please describe the layout of the hotel room you were in?

A.  There's a door, the front door.  When you walk into the front door, there's a bedroom right in front of that door.  If you turn left, there's a hall, a foyer, that goes down into a living room, common area.  Bathroom where the foyer is on the left-hand side.

Q.  What do you remember happening right before you heard Mr. Combs yell?

A.  I think we had sex during this encounter.

MR. DONALDSON:  Objection.  That -- well, nevermind. Withdrawn.

Q.  And then after you had sex, what do you remember?

P5CACom6                         Phillip - Direct

A.   Sean Combs and Cassie were in the bedroom for a while, and --

Q.   And where were you when they were in the bedroom?

A.   I was in the living room.

Q.   And what did you hear coming from the bedroom?

A.   Out of nowhere, I could hear Cassie yelling, I'm sorry, I'm sorry.  And then I could hear again what sounded like she was being slapped or someone was being slapped around and slammed around the room.  And I looked around the corner to the -- where the foyer was, and I saw Mr. Combs walk out of the hotel all together without clothes on.  He might have had a towel on.  And then Cassie came running into the living room and she literally jumped into my lap and she was shaking, like, like literally, like her whole entire body was shaking, like she was terrified.

Q.   Do you remember what she was wearing?

A.   I don't, no.

Q.   Do you remember what she said to you when she jumped into your lap?

A.   I remember what I said to her.

Q.   Well, first, let me ask:  Do you remember what she said to you or no?

A.   At what point?

Q.   When she jumped into your lap.

A.   I don't know if she said anything to me when she jumped

into my lap.  I don't remember.

Q.  What did you say to her?

A.  I asked her why is she doing this, why is she staying with this guy if he's --

MR. DONALDSON:  Objection.

MS. COMEY:  Your Honor, it's not offered for the truth.  It's a question.

THE COURT:  What's the ground of the objection?

MR. DONALDSON:  Hearsay.

THE COURT:  Overruled.

Q.  Can you tell us again what you said to Cassie?

A.  I asked her why she was staying with this guy if he is hitting her and beating her like this, and I tried to explain to her that she was in real danger if she stayed with him, and she basically tried to convince me that it was okay, it's okay. I'm fine, I'll be okay.  And I just kept trying to tell her that you're not okay and you need to get help and --

Q.  What do you remember happening next?

A.  She and I were alone.  This was the first time we were alone.  And Cassie was not somebody that likes to kiss --

MR. DONALDSON:  Objection.

THE COURT:  Overruled.

A.  During our interactions, Cassie was not a kisser.  But in this instance, she just started making out with me.  And we ended up getting into, you know, into it.  But the fact that I

was alone with her this time, I had no problem getting hard. And right when we were actually about to start having sex, I realized that Mr. Combs had reentered the room and he was sort of sneaking around the corner watching us.  And once he realized that we could see him, he came into the room and basically was saying that, yeah, that he liked that, he liked that we were getting along in that way.

Q.  And what do you remember happening next?

A.  I think the second that he came back into the room, I was done again.  I couldn't -- I couldn't continue.

Q.  Why didn't you go to the police after this incident?

A.  I told you, again, I was concerned for my life.  By this point, he had taken my ID and taken a picture of it, and I felt threatened by what he said to me.  And I felt that at the very least, I could try to get her to realize that she needed to leave, and maybe try to help her that way.  But I felt like maybe the police he has -- Sean Combs might have someone within the police department --

        MR. DONALDSON:  Objection.  Objection.  Objection.

        THE COURT:  That's sustained.

        MS. COMEY:  Just as to the last sentence, your Honor?

        MR. DONALDSON:  Move to strike all --

        THE COURT:  Well, the objection wasn't articulated, but I'm sustaining the objection and instructing the jury not to consider the last portion of the witness's answer.

Q.  Why didn't you go into the bedroom to intervene when you heard Cassie crying and saying I'm sorry and what sounded like a beating?

A.  Well, I had no idea if I would have been met with a gun or --

MR. DONALDSON:  Objection.

Q.  Without speculating about what might have happened, can you just generally explain why you didn't go into that bedroom?

A.  Because my life was at risk if --

MR. DONALDSON:  Objection.

A.  -- I did so.

MR. DONALDSON:  Objection.

THE COURT:  That's overruled.

MS. COMEY:  One moment, your Honor.

No further questions.

THE COURT:  All right.

MR. DONALDSON:  Can we take a two-minute break, Judge, please.

THE COURT:  Yes, I was going to suggest that.

Can you give us, before we take our break, can you give us just a general how much time do you anticipate your cross-examination taking?  And I'm not holding you to anything, I'm just trying to get a sense of the clock.

MR. DONALDSON:  We will go until the end of the day.

THE COURT:  Okay.  All right.

P5CACom6                              Phillip - Direct

MR. DONALDSON:  At a minimum.

THE COURT:  Good.  Okay.  So we're going to take a ten-minute recess just so everyone can stretch their legs.  And we will be back at 4:20.

All rise for the jury.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5CACom6                          Phillip - Direct

(Jury not present)

THE COURT:  Please be seated.

Mr. Phillip, you understand that you are still under oath, and so we're going to take a ten-minute break, but you're not to have any discussions whatsoever of any kind with anyone on the government side or anyone who's in the back, no one. You can stare at some of the artwork in the hall --

MS. COMEY:  Your Honor, may I just clarify.  May the agents escort him to the room where he's going to be without having any conversations.

THE COURT:  That's fine.  You had an inquiry?

THE WITNESS:  I was going to ask for a restroom break.

THE COURT:  Yeah.  And there's a restroom you can be directed to.  But other than that, please do not speak with anyone.

All right.  We will be back at 4:20.

MS. COMEY:  Thank you, your Honor.

(Recess)

(Continued on next page)

P5CsCOM7                          Phillip - Cross

THE COURT:  All right.  We're back.

MS. COMEY:  Your Honor, I apologize for the delay. The witness had to go to a different floor to go to the restroom, and so we're waiting, we're waiting for him to come back.

THE COURT:  That's OK.

MS. COMEY:  I did not go to avoid having the appearance of me having any communications with him.

THE COURT:  It's OK.  I assume it will be just a couple of minutes?

MS. COMEY:  I'm sorry, your Honor?

THE COURT:  I assume it will be just a couple of minutes?

MS. COMEY:  Sounds like he's back.

THE COURT:  All right.

MS. COMEY:  So we'll ask him to come back to the stand.

THE COURT:  Mr. Courtroom deputy, let's get our jury back.

THE DEPUTY CLERK:  Yes, your Honor.

(Jury present)

THE COURT:  All right.  Please be seated.

Welcome back, members of the jury.  I hate to do this to you, since you just came back, but can I have the lawyers and the court reporter for a sidebar.

(At the sidebar)

THE COURT: All right. When I thought that the witness had asked for water, he had actually asked if he could have a word with his attorney.

MR. DONALDSON: Oh.

THE COURT: To which I said no. I felt it was prudent to let everyone know that he had made that request and that I had said no to see if there was any reaction from the parties or anything to do at this time.

MS. COMEY: Your Honor, generally when a witness for the defense or government asks to speak with the attorney, I think it's prudent to give them an opportunity to, though I don't want to waste time. The attorney is in the courtroom. Can I go confer with her briefly?

THE COURT: You may.

MS. COMEY: Thank you.

I don't know if the defense has a position.

MR. DONALDSON: I don't, but I agree. Generally, in my experience, when a witness does ask to speak to their attorney, we oblige them to let them do that just in case something is about to come up we don't know about. We don't object to that at all.

THE COURT: That's why I called the sidebar.

Let's consult with the attorney and do it right now.

MS. COMEY: I'm happy to do it right now.

P5CsCOM7                        Phillip - Cross

THE COURT:  We'll wait.

MS. COMEY:  Thank you, your Honor.

(Counsel confer)

Thank you, your Honor.

So the witness's attorney said that she had the opportunity to confer with the witness briefly during break and that nothing came up that concerned her, so she was would not request an opportunity to speak with the witness right now.

So, given the attorney's views, I'm happy to proceed. If the witness expresses concerns again, then perhaps we can take a break.

THE COURT:  All right.  Is that any different view from the defense?

MR. DONALDSON:  No.

THE COURT:  Let's proceed.

MS. COMEY:  Thank you, your Honor.

THE COURT:  Thank you.

(Continued on next page

P5CsCOM7                          Phillip - Cross

(In open court)

THE COURT:  Mr. Phillip, you understand you're still under oath?

THE WITNESS:  Yes.

THE COURT:  Mr. Donaldson, you may proceed.

MR. DONALDSON:  Thank you.

CROSS-EXAMINATION

BY MR. DONALDSON:

Q.  Good afternoon.

A.  Good afternoon.

Q.  I'm going to ask you to speak up into that microphone so that the last person in this jury can hear you, if that's OK.

A.  That's fine.

Q.  Thank you.

I'm going to ask you a few questions.  If you don't understand a question, just let me know, and I'll rephrase the question.

A.  No problem.

Q.  Very good.

MR. DONALDSON:  All right.  Putting up Government Exhibit B3-24 just for the parties.

Q.  Mr. Phillip, I'm showing you what's been marked previously marked as Government Exhibit B-324.  Do you see that?

A.  Yes.

Q.  Is that a text message chain between you and Cassie?

P5CsCOM7                          Phillip - Cross

A.   Yes.

Q.   And does it relate to the time period that you have been testifying about?

A.   Yes.

Q.   That would be fair to say it's pretty accurate about the text messages you had between yourself and Cassie Ventura?

A.   Yes.

          MR. DONALDSON:  I could move this into evidence as Government Exhibit B-324, or we can make it a defense exhibit.

          MS. COMEY:  No objection to making it a government exhibit, your Honor.  We were planning to offer this at a later time.

          THE COURT:  All right.  The exhibit will be admitted.

          MR. DONALDSON:  Thank you.

          (Government's Exhibit B-324 received in evidence)

          MR. DONALDSON:  You can take that down for me.

          Thank you.

BY MR. DONALDSON:

Q.   Mr. Phillip, I want to ask you a few questions.  I want to start off with, you mentioned that you were working for a service back in 2011, 2012, 2013.

          Do you recall that?

A.   I was working for a male review show.  I don't know if I was there 2011.

Q.   When did you get there?

P5CsCOM7                        Phillip - Cross

A.   I would be estimating, but somewhere between 2011 and 2012.

Q.   Right.  Let's estimate 2011.

So you were working for this exotic male service between -- well, around 2011.  When did you stop?

A.   I would be estimating, but probably somewhere between 2014 or 2015.

Q.   And this male service that you were working for, you were a manager or a supervisor, is that correct?

A.   That is correct.

Q.   And this male service was a business for male strippers for women, is that correct?

A.   That is correct.

Q.   And this male service allowed or could hire strippers to go out to locations or to a show to perform for primarily women, is that correct?

A.   That is correct.

Q.   And this male service specifically did not involve prostitution, correct?

A.   That is correct.

Q.   In fact, this male service specifically prohibited prostitution, correct?

A.   That is correct.

Q.   And as a supervisor you were aware of that, correct?

A.   That is correct.

Q.   And also, the supervisor, I believe you helped to make the

P5CsCOM7                        Phillip - Cross

company run smoothly, is that correct?

A.   That is correct.

Q.   And you helped develop this company, is that right?

     You help --

A.   That is correct.

Q.   OK.   Sorry.

     Let me repeat that.   You did help develop the company, correct?

A.   That is correct.

Q.   Around 2011, 2012, the company was really just getting started, correct?

A.   That is not correct.

Q.   But it was your job as supervisor to help develop it and get it more popular?

A.   Yes and no.

Q.   Well, yes.   Now --

          MS. COMEY:   Objection, your Honor.

          THE COURT:   Yes.   We don't need --

          The jury should disregard counsel's last statement and there should be no statements, there should just be questions.

BY MR. DONALDSON:

Q.   Was your job to help secure and build up the male review for the show?

A.   Yes.

Q.   And in doing so, your job was to help the company develop

P5CsCOM7                            Phillip - Cross

its business model, correct?

A.  Yes.

Q.  And advertising helped the company grow as well, correct?

A.  Yes.

Q.  You were aware, or are you aware, this service you worked for back in 2011, 2012, 2013, used fake businesses to help the business grow, correct?

A.  I am not aware of that.

        MR. DONALDSON:  Can I have one second, please, your Honor?

        (Pause)

Q.  Are you aware that the company helped open fake businesses to optimize searches?

A.  I am not aware of that.

        You're asking that question not in the right way.  If you would like me to specify, I will.

Q.  Did the company that you worked for open fake businesses to optimize searches?

A.  I don't know if they were actual fake businesses, but they used fake addresses to optimize the searches.

Q.  And when you say the company used fake addresses to optimize searches, you were aware of that, correct?

A.  Yes.

Q.  And you participated in that?

A.  No.

P5CsCOM7                        Phillip - Cross

Q.   When you became aware that the business that you were helping to develop was optimizing or using fake addresses to make the business grow, you resigned, correct?

A.   No.

Q.   You continued working for the business?

A.   Yes.

Q.   So you worked for a business that you knew was using fake addresses to help it grow?

A.   Yes.

Q.   And you did that knowing that was, I don't know, fraudulent?

A.   I did not know that that was fraudulent.  I just knew that my boss told me how he works with the search engine optimization and that he uses fake addresses to build with that.  I had no idea what that meant.  That wasn't my part of the business.

Q.   And while you were a supervisor, you were aware that this service provided the ultimate ladies night experience, is that correct?

A.   That was their slogan.

Q.   Right.

        That was your business, your service that you worked for, their slogan was to provide an ultimate ladies night experience, correct?

A.   Yes.

Q.  And your business that you worked for also prohibited prostitution, correct?

A.  Yes.

Q.  Then when you met with Cassie Ventura on that first day, you were not going for prostitution, correct?

A.  Correct.

Q.  You were going to optimize the ladies experience, correct?

A.  I have no idea what that means.

Q.  You have no idea what the company slogan that you worked for means?

A.  In regards to me going there to optimize the ladies experience?

I don't know what you're referring to.  Can you be specific with your question?

Q.  Yes.

The company slogan was to provide the ultimate ladies night experience, correct?

A.  That was the company's slogan, yes.

Q.  You worked for the company, correct?

A.  Correct.  Yes, I did.

Q.  The company sent you to a lady that night, correct?

A.  Yes, they did.

Q.  So you were going there to do the ultimate ladies night experience, correct?

A.  I certainly was going there to give a great experience,

yes.

Q. For a ladies night, for a lady, correct?

A. For a bachelorette party, is what I thought it was, correct.

MR. DONALDSON: One second, Judge.

Q. I believe you testified earlier that Cassie told you, when you arrived at the hotel, to ask for -- to say the name Black, is that correct?

A. Yes.

Q. And that's what Cassie told you, correct?

A. Yes.

Q. Now, you testified on direct that I believe you said that, well -- bless you -- for this first time meeting with Cassie, you got a call from your boss, is that correct?

A. I don't know if I got a call from him or if I called him, but we did have a conversation after that, yes.

Q. And you said on direct that the boss told you that somebody wanted to use a black male stripper, correct?

A. That was what my boss told me upon going down to the hotel.

Q. OK. Your boss told you that someone called the service wanting a black male stripper, correct; yes or no?

A. Yes, that is correct.

Q. And the boss told you that, according to you, that there was no other black male strippers available, correct?

A. Correct.

P5CsCOM7                        Phillip - Cross

Q.  And so he called you because you're a black male, correct?

A.  Correct.

Q.  But you're not a stripper, correct?

A.  I'm not.

Q.  You were not a stripper at this time, correct?

A.  No.

Q.  You were not a dancer at that time, were you?

A.  I occasionally would do it when we needed help.

Q.  So, and you said your boss told you to go to Gramercy Hotel?

A.  Correct.

Q.  Sir, isn't it actually a fact that Cassie Ventura called you on that first incident and told you to come to the Gramercy Hotel?

A.  That is incorrect.

Q.  Isn't it a fact that Cassie told you to come to the Gramercy Hotel and ask for a person named Black?

A.  Later on.  But not to the Gramercy Park Hotel, no.

Q.  Isn't it true that Cassie called you on the phone and told you that I'm celebrating something for my birthday and my husband wants to give me something special, isn't that correct?

A.  That is not correct.  Would you like me --

Q.  No, I don't.

A.  OK.

          MR. DONALDSON:  Sir, could you put up 3501, 3570-01,

for the parties only.  Could you go to page two, please.

Q.  Mr. Phillip, isn't it true that you spoke to law

enforcement officers --

MS. COMEY:  Your Honor, this shouldn't be up on the

screen, I believe, while Mr. Donaldson is asking these

questions.

MR. DONALDSON:  Take it off.  Take it off first.

Q.  Is it true that you spoke to a law enforcement officer on

December 18, 2023, about this matter?

A.  I don't know if that was the day, but I did speak with law

enforcement agents about this matter, yes.

Q.  In December 2023, correct?

A.  I don't recall if that was the day.

Q.  And, but not the exact day, but did you speak to them in

December of 2023, how about that?

A.  I believe so, yes.

Q.  And when you spoke to them on December 2023, they asked you

questions about this incident, correct?

A.  Correct.

Q.  They asked you questions about your relationship with

Cassie Ventura, correct?

A.  Correct.

Q.  And they asked you about you meeting with her, correct?

A.  Correct.

Q.  And they asked you about you meeting with her on the first

P5CsCOM7                         Phillip - Cross

occasion, correct?

A.   Correct.

Q.   And you gave them answers to those questions, correct?

A.   Correct.

Q.   They asked you questions about how you met with her, correct?

A.   Correct.

Q.   And the details about how you met with her, correct?

A.   Correct.

Q.   And isn't it true on December 2023, when you met with these officers, you told them that you spoke on the phone with the client, a woman, and was told to report to the Gramercy Park Hotel at three o'clock in the morning, and tell the front desk you're there to see somebody named Mr. Black?

         Did you not tell them back in December 2023?

A.   They may have written the notes that way, but that is not what I told them, because that's not how that happened, no.

Q.   You're saying the agents that you spoke to may have written the notes -- strike that.

         MR. DONALDSON:  Could we put this up the screen now?

         MS. COMEY:  Just for the parties.

         MR. DONALDSON:  Just for the parties.  Just for the parties.

         MS. COMEY:  All right.

BY MR. DONALDSON:

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

Q.  Mr. Phillip, I'm showing you a document from December 18, 2023.  There is a part highlighted at the top.

A.  Um-hmm.

Q.  Now, on this particular day, is it not true that you spoke to the officers, the agents, and told them that you spoke on the phone to the client, a woman, and was told to report to the Gramercy Park Hotel at three o'clock in the morning and tell the front desk he was there to see Mr. Black?

A.  Correct.

Q.  So you did speak to a woman, she told you that, correct?

A.  I did not speak with Cassie, no.  Not that day.  Not before I went to the hotel the first time, so that may have been misunderstood.

Q.  Now, when you got to the hotel room, when you got to the hotel, I believe you said according to you on your direct, you arrived at the front door and I believe you knocked on the door, is that fair to say?

A.  Correct.

Q.  When you knocked on the door, someone answered the door, is that fair to say?

A.  Correct.

Q.  This person that answered the door was a beautiful woman, would that be fair to say?

A.  Correct.

Q.  And you recall that in your mind there was a beautiful

woman opening the door, correct?

A.   Correct.

Q.   And she was wearing a wig at that point, correct?

A.   Correct.

Q.   And at that point, prior to you -- well, strike that.

You hadn't talked to her about money, correct?

You didn't talk to her about how much you would get paid for coming there, correct?

A.   She brought it up to me.

Q.   So when you knocked on her door, Cassie brought up to you something about money, correct?

A.   Correct.

Q.   And that is before you had sex?

A.   Correct.

Q.   So then, at that point, Cassie gave you money, correct?

A.   Yes, correct.  Correct.

Q.   So, as soon as you knocked on the door, she opened the door, you had a conversation about what?

A.   You're asking me?

Q.   Yes.  When you opened --

A.   Sure.

Q.   You knocked on the door, right?

A.   Sure.

Q.   Is that right?

A.   That's correct.

P5CsCOM7                         Phillip - Cross

Q.   She opened the door, correct?

A.   Correct.

Q.   You saw a beautiful woman there, correct?

A.   She, as in Cassie, right?

Q.   Yes.

A.   Yes, correct.

Q.   And then, now, let's get the image right.

     You were in the hallway, correct?

A.   Yes, correct.

Q.   She's in the door, correct?

A.   Correct.

Q.   And at that moment, she hands you money?

A.   She invites me into the hotel room.  I go into the room, she closes the door behind me.  And then she says to me, your boss told me that I have to give you $200 upon your arrival here.  And I said, correct.  And then she handed me about $4,000 or somewhere around that in that ballpark.

Q.   4,000?

A.   Roughly.

Q.   And this is before any oil rubbing, correct?

A.   Yes, correct.

Q.   Before any hugging, is that correct?

A.   That is correct.

Q.   Before any kissing, is that correct?

A.   Correct.

P5CsCOM7                    Phillip - Cross

Q.  This is before an agreement about what you're going to do, correct?

A.  Correct.

Q.  So before you had an agreement about sex and an agreement about rubbing oil, agreement about my husband being pleasured, Cassie Ventura just handed you $4,000 in cash?

A.  First off, we never had an agreement about sex.

Q.  We'll get to that.

Before you have any agreements about anything, Cassie Ventura hands you $4,000?

A.  That is correct.

Q.  Now, she was standing in, I believe you said, lingerie?

A.  Correct.

Q.  She had on heels, correct?

A.  Correct.

Q.  She was just lingerie, heels, and wig, correct?

A.  And a pair of dark glasses.

Q.  And a pair of dark glasses?

A.  Correct.

Q.  Where did the money come from?

A.  Um, are you asking me who gave me the money?

Q.  No.  I'm asking, when she was standing at the door with lingerie on, panties, bra, heels, wig, and shades, was she holding a bag of money?

A.  She had the money in her hand.  It was --

P5CsCOM7                        Phillip - Cross

Q.   She had the money in her hand?

A.   Yes.

Q.   She opened the door with the money in her hand?

A.   Yes.

Q.   And, at that point, I believe you said you looked to the --
well, strike that.

          After you got the money, then you looked to the right
and saw a man sitting in the chair?

A.   That is incorrect.

Q.   You looked to the left and saw the man sitting in the
chair?

A.   After she handed me the money, we walked into the room
fully past the hall, past the little hallway that was there,
toward the couch that was in front of us with the candles and
everything on it.  And I looked to the left, and on the right
side of the room, if I'm facing Mr. Combs, Mr. Combs was
sitting in the chair with a robe on, hat, and a bandana over
his face.

Q.   OK.  And at that point, you're past the hallway, you're
standing -- are you standing near the couch?

A.   I'm sorry?

Q.   Are you standing near a couch?

A.   There's a couch in front of me, yes.

Q.   And you're standing near this couch, and Mr. Combs, you're
saying, is to your left?

Q. To your left or to your right?

A. If I'm facing the couch?

Q. Yes.

A. Mr. Combs would be in the room to the left. The living room is to the left of me. Once I turn left and face forward toward the open room, Mr. Combs would be sitting on the right side of the room in the back of the room.

Q. All right. And I believe you said on direct he wasn't saying anything, correct?

A. At that moment, no.

Q. Now, while you are standing there with Cassie and after you receive the money, you were going to start rubbing baby oil on her, correct?

A. Correct.

Q. She began rubbing baby oil on you, correct?

A. Correct.

Q. And this is while she still had on her lingerie, correct?

A. At that point, at some point, our clothes were off. She wasn't rubbing baby oil on me with my clothes on.

Q. Let's walk through it.

A. Sure.

Q. So, you get in there, you have -- I'm sorry. I forget this part.

You were wearing a New York City Police Department shirt, correct?

P5CsCOM7                        Phillip - Cross

A.   That's correct.

Q.   And you were wearing that shirt because your boss told you that the person in the hotel wanted you to be wearing a New York City police officer uniform, correct?

A.   Yes.  Um, if you don't --

Q.   Yes or no?

A.   If you don't mind, could you please talk into the microphone.  I can hardly hear you when you step away.

Q.   I'm sorry.

     Your boss told you that you, the dancer needed to be wearing a New York City Police Department uniform, correct?

A.   That is correct.

Q.   You couldn't find one, correct?

A.   That is correct.

Q.   So you went out and bought a T-shirt?

A.   Yes.

Q.   And then you went to Gramercy Hotel wearing the New York City Police Department T-shirt?

A.   Correct.

Q.   When you got inside the hotel, after you got the money, you had to take that off to get the oil rubbed on you, correct?

A.   That's correct.

Q.   And you took the oil off in front of Cassie or you went someplace else to do that?

A.   I took the oil off?

P5CsCOM7                         Phillip - Cross

Q.   I'm sorry.  You took the shirt off in front of Cassie?

A.   I took my clothes off in front of Cassie, yes.

Q.   So, at the moment you got the money, you then took off all your clothes, correct?

A.   At the moment I got the money, I did not take off all of my clothes.

Q.   After you got the money, you had a conversation first?

A.   She walked me into the hotel room.  And then after she had already explained me, Hey, listen, it's my birthday.  I want, you know, to do this instead of the dance, the bachelorette party.  I want you to rub baby oil on me, rub me down, give me a massage.  And wherever things go from there, whatever you're comfortable with, we can do.

     And so I told her I was comfortable with giving her that massage and rubbing her down, and I asked her if she wanted me to be the same, like, to remove my clothes as well, and so I stripped down as well to my underwear.

Q.   OK.  So you stripped down to your underwear?

A.   Correct.

Q.   And at that point, she --

     OK.  Now, you have your underwear on.  And at that point, she is rubbing baby oil on you?

A.   I'm rubbing her down and then she starts doing the same to me, and it started getting intimate and we --

Q.   Stop right there.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5CsCOM7                          Phillip - Cross

A.   Sure.

Q.   When you say it started to get intimate --

A.   Um-hmm.

Q.   -- you mean that you're rubbing her down, you're rubbing her breasts, you're rubbing her whole body down, correct?

A.   After she started touching me, yes, I started touching her erotically, as well.

Q.   And at that point, Mr. Combs in the corner, he's not saying anything, correct?

A.   No.  He was in the corner masterbating immediately.

Q.   OK.  And while you are -- while Cassie is rubbing you down --

A.   Um-hmm.

Q.   -- it appears that she is enjoying herself, would that be fair to say?

A.   Yes.

Q.   And you are rubbing her down and you are enjoying yourself, correct?

A.   Yes.

Q.   And then that's why you're saying you became -- it started getting intimate, correct?

A.   Correct.

Q.   Because you started getting sexually aroused, correct?

A.   Absolutely, yes.

Q.   And it appeared to you that she was getting sexually

P5CsCOM7                          Phillip - Cross

aroused, correct?

A.   Yes.

Q.   And it appeared to you that she wanted more than just a rubdown, correct?

A.   Yes.

Q.   And at some point, she took off your underwear, correct?

A.   I took off my underwear.

Q.   You took off your underwear, correct?

A.   Correct.

Q.   And after you took off your underwear, I imagine at that point, she is still rubbing you down, correct?

A.   We're rubbing each other down.

Q.   Well, we'll get to that.

        She was rubbing you down after you took off your underwear, correct?

A.   Correct.

Q.   And she started massaging your penis, correct?

A.   I don't recall, like, the particulars of how that happened. I just know we ended up happening sex.

Q.   OK.  So you didn't have sex standing up, correct?

A.   No.

Q.   So after you're standing up rubbing each other down, you then move to another part of the room, correct?

A.   We basically were where we did our -- where we had sex the whole time.  We were by the couch.  We had sex on the couch.

P5CsCOM7                          Phillip - Cross

Q.   OK.  So, after you were standing up, you then laid her down on the couch, is that fair to say?

A.   Correct.

Q.   And then sexual intercourse occurred for, I believe you said -- well, not believe -- for approximately 30 minutes, correct?

A.   No.  The first time, that was probably the most beautiful woman I had seen.  That was fast.

Q.   So when you say the most beautiful woman you've seen, that caused you to ejaculate fast?

A.   Yeah.

Q.   And then after you did that --

A.   Um-hmm.

Q.   -- you -- well, strike that.

       Were you on top of her or behind her at this point?

A.   I have no idea what timeframe during this you're referring to.  This could be at any point in the interaction --

Q.   On the first --

A.   -- you're talking about.

Q.   -- time you had sexual intercourse with Cassie Ventura --

A.   Sure.

Q.   -- in the Gramercy Hotel, after you received the $2,000, were you on top of her, behind her, what happened?

A.   Are you asking when I ejaculated --

Q.   Yes.

A.   -- what position I had her in?

Q.   I asked that --

A.   It was a missionary position.

Q.   OK.  So after the missionary position, you got up and then you decided to leave, correct?

A.   I was told that we were done and I could get dressed now. I didn't just decide to leave.

Q.   Now, at that point in time, because you were still working for the service, you were not -- you knew you were not engaging in prostitution, correct?

A.   I didn't know what the hell just happened.  I was in complete shock and just was, like, did that just happen.  I -- I -- I wouldn't have thought twice to think that that was prostitution.

Q.   OK.  And then you left the hotel, correct?

A.   Correct.

Q.   And then within five minutes, you got a phone call from Cassie, correct?

A.   That is correct.

Q.   And at that time, Cassie asked you could you come back and have another orgasm, correct?

A.   Correct.

Q.   And you said absolutely, correct?

A.   Correct.

Q.   And she said, Give me 30 minutes to take a shower, correct?

P5CsCOM7                         Phillip - Cross

A.   No, I don't recall that.

Q.   You don't recall what?

A.   I don't recall her saying, Give me 30 minutes to take a shower.

Q.   OK.

A.   It's possible she said that.  I don't recall, though.

Q.   OK.  You then -- she also asked you to send her a picture of your penis, correct?

A.   That is correct.

Q.   And she also informed you that you had the largest penis she had ever seen before, correct?

A.   That is correct.

Q.   And she had said that to you also while you were having sex with her the first time, correct?

A.   That is correct.

Q.   So that's -- go back to the first time.

     So the first time you were having sex with her, you were not only aroused at her beauty, she was aroused at the size of your penis, correct?

     MS. COMEY:  Objection, your Honor.

A.   I can't say that.

     THE COURT:  That's sustained.

Q.   She was commenting to you on the size of your penis, correct?

A.   Yes.

Q.  While you were having sex the first time, correct?

A.  Yes.

Q.  And then after you left the hotel, she texted you asking you for a picture of your penis, correct?

A.  Correct.

Q.  Relating to her conversation before, when she was talking about the size of your penis, correct?

A.  I cannot speculate that.  I have no idea if Sean Combs asked her for that picture or not.

MR. DONALDSON:  Objection.  Move to strike.

THE COURT:  Hold on.  That motion is granted.

The jury should disregard the witness's last answer.

Mr. Donaldson, we're at 5:00 o'clock.  if you one more or two more questions, I'm happy to hear them, but otherwise we can start again in the morning.

MR. DONALDSON:  We can start again in the morning, Judge.

THE COURT:  Thank you, members of the jury, for your time today.  We are ending right at 5:00 p.m., as promised.

So, again, I'm going to tell you this every day.  Do not talk to each other about the case.  Do not look up anything about this case.  Do not try to talk to anyone outside this courtroom about the case.  And definitely do not talk to anyone here about this case.

No one inside the courtroom or outside of the

P5CsCOM7                        Phillip - Cross

courtroom is to have any discussion with members of the jury whatsoever.

With that, have a great evening.  We'll see you here at 9:15.  If you're here at 9:15, we can get started on time and make efficient use of our time together.

All right.  All rise.

(Continued on next page)

(Jury not present)

THE COURT:  Mr. Phillip, you understand that you are still under oath, so be back here tomorrow to resume your testimony.  You are not to have any communications whatsoever with anyone on the government's side.

Now, is there --

MS. COMEY:  May I note a request of exception to that?

Agents are providing for his security, transportation from court and to court again tomorrow.  They have been instructed not to discuss his testimony or the case and only the logistics of transportation.

Is that acceptable, your Honor?

THE COURT:  That is acceptable.

Any objection from the defense?

I'm not hearing any.

MR. DONALDSON:  No, your Honor.

THE COURT:  OK.  So, except for that, no other discussions of any kind.  Are they here to escort him?

MS. COMEY:  They are here to escort him.  The case agent can escort him out.

MR. AGNIFILO:  Your Honor, before you let the witness go...

MS. SHAPIRO:  Can we raise an issue at the sidebar?

THE COURT:  Yes.

(At the sidebar)

MS. SHAPIRO:  I apologize, your Honor.  I was not at the sidebar, so we weren't able to communicate with one another about the issue of whether the witness could speak to his lawyer during cross-examination.  And we would request that your Honor direct him not to do so under Perry v. Leek, 488 U.S. 272.  It's clear that this is a case involving, actually, the defendant as a witness, in which the Supreme Court held that even a defendant, who obviously has the right to counsel, may be instructed not to meet with his lawyer to discuss the substance of his testimony during his testimony.  And that's true for all the reasons everyone understands that having to do with the truth-seeking function of the trial.

So we would request that this witness and other government witnesses be directed not to speak to anyone about the substance of their testimony, including their counsel, during the trial.

MS. COMEY:  Your Honor, I think that case is distinguishable because a defendant in a criminal case, their counsel would be party for an opposing -- would be counsel for an opposing party, so that would be the justification for that restriction.

I'm not aware of any case law justifying telling a third party, who is represented by counsel but does not represent a party in the litigation, that they cannot communicate with their counsel.

I have not had the opportunity to research this issue.

MS. SHAPIRO:  I would be happy to read quotes from the case.  The court explains that when -- it talks about the rights of the defendant and why it says neither he nor his lawyer have a right to have the testimony interrupted in order to give him the benefit of counsel's advice.

The reason for the rule -- this is at page 281 -- is that one that applies to all witnesses, not just defendants. It is a common practice for a judge to instruct the witness not to discuss his or her testimony with third parties until the trial is completed.  Such non-disclosures orders are corollary of the broader rule that witnesses may be sequestered to lessen the danger that their testimony would be influenced by hearing what other witnesses have to say and to increase the likelihood they will confine themselves to truthful statements based on their own recollection.

And then the court goes on to talk about the defendant and when he assumes the role of a witness, the rule is that generally apply to other witnesses, rules that serve the truth-seeking function --

Do you want me to just show it to you, Judge?

THE COURT:  Yes.

MS. SHAPIRO:  Sorry.

THE COURT:  Sorry.  This is old school.

MS. COMEY:  Your Honor, I'll just note that the

distinction, I think, here is that this counsel does not represent a third party. The counsel represents him. So, again, I have not read the case.

THE COURT:  Is his attorney here?

MS. COMEY:  May I go get her and invite her to join us?

THE COURT:  Yes.

MS. SHAPIRO:  I will say, also, that I have had other cases in which this has come up and other trial judges have issued this type of direction. If anything, the defendant's rights, one would think, to consult with his counsel would be that of a greater witness who is not a party to the case.

THE COURT:  Good afternoon.

MS. PARLOVECCHIO:  Good afternoon, your Honor.

THE COURT:  Could you identify yourself for the record.

MS. PARLOVECCHIO:  My name is Gina Parlovecchio, P-a-r-l-o-v-e-c-c-h-i-o.

THE COURT:  Were you planning to have any discussions with your client between this evening and tomorrow when his testimony resumes.

MS. PARLOVECCHIO:  No, your Honor.

THE COURT:  Is there any issue with him not having any communications with you?

MS. PARLOVECCHIO:  Not that I'm aware of.

P5CsCOM7                          Phillip - Cross

THE COURT:  Problem solved for now.  We can actually address this issue in a more deliberate fashion.

MS. SHAPIRO:  Thank you, your Honor.

THE COURT:  So I'll give him an instruction here that he's not to have any discussions with you, and we'll pick the issue up tomorrow.

MS. PARLOVECCHIO:  Sounds good.

THE COURT:  Thank you very much.

(In open court)

THE COURT:  Mr. Phillip.

THE WITNESS:  Yes.

THE COURT:  When I said you're not to have any discussions with anyone else, that also includes your lawyer.  So you're not to have any discussions with your lawyer or with any counsel for the government, anyone from the government side, with the only exception being that you are obviously going to be escorted by the folks at the agency.

So do you understand that?

THE WITNESS:  Yes.

THE COURT:  All right.

MS. COMEY:  Your Honor, would it be permissible for his lawyer to explain to him why, or for your Honor to explain to him why he can't speak with his lawyer?

I think this might be new information to the witness, and I want him to understand why.

THE COURT:  Well, I'm giving him the instruction.

MS. COMEY:  Thank you.

THE COURT:  The reason is that, while you're testifying, it's like you're here in the courtroom and your testimony is continuing.  And the reason why we tell witnesses that they are not allowed to speak to other people is you might just be able to figure this out.  It's so that you don't have discussions that might influence your testimony and that might change your testimony in a way that would be -- kind of change the facts up, which would be prejudicial once you've started testifying.

THE WITNESS:  Um-hmm.

THE COURT:  In the usual course, we always tell people, don't have discussions with anyone about your testimony while it's ongoing.  That's the reason why I'm giving you that instruction.

Do you understand or do you have any questions?

THE WITNESS:  I understand.  No, but I -- I had asked you prior.

THE COURT:  You started it.  You asked me.  It was a good question.  I'm glad you asked that question.  If other questions like that come up, you can definitely raise them with me.

THE WITNESS:  Sure.

THE COURT:  We had an inquiry and a discussion, and

that's what led to this instruction.

THE WITNESS:  No problem.

THE COURT:  I appreciate you doing that.

THE WITNESS:  No problem.

THE COURT:  See you here at 9:30 and you can leave the stand at this time.

(Witness temporarily excused)

Please be seated.

Mr. Donaldson, again, just a ballpark, what are you envisioning for time duration of your cross-examination?

MR. DONALDSON:  Probably an hour.

THE COURT:  Sorry?

MR. DONALDSON:  An hour.

THE COURT:  An hour?

MR. DONALDSON:  Yes.

THE COURT:  We'll have an hour of cross-examination.

MR. DONALDSON:  Don't hold me to that.  Hopefully an hour.

THE COURT:  I'm going to loosely hold you to that.

MR. DONALDSON:  Very good.

THE COURT:  One of the benefits of having ended in the middle of your cross-examination is it gives you the evening to tighten things up so that you can do it in a more efficient and effective manner.

Ms. Comey, I assume, will have some redirect, so we'll

be in a position to move forward with Ms. Ventura in the morning.

MS. COMEY:  Yes, your Honor.

THE COURT:  All right.  Anything further that the government would like to raise at this time?

MS. COMEY:  I think we wanted to ask if we can come back tomorrow morning at 9:00 a.m. to address potential evidentiary issues that might come up during Ms. Ventura's testimony.  I think the parties are still meeting and conferring about some exhibits and hoping to resolve them, and then -- but there may be some that we can't resolve.

And so we are hoping to come back tomorrow morning to raise those with your Honor so that we don't have to cover them while she's on the stand.

THE COURT:  Absolutely.

When are we going to hear about what the issues are tonight?

MS. COMEY:  May I defer to Ms. Johnson, your Honor?

THE COURT:  Is 8:00 o'clock doable, or 10:00 o'clock?  I'll give you those two.  I'm negotiating against myself, which is bad.  But 10:00 o'clock?

MS. JOHNSON:  I think 10:00 o'clock should be acceptable, your Honor.  We're talking about some rule of completeness issues, and hopefully we'll be able to resolve those with the court without the court's intervention.

P5CsCOM7                          Phillip - Cross

THE COURT:  All right.

MS. JOHNSON:  We'll advise the court by 10:00 p.m.

THE COURT:  That's fine.  So we'll be here at 9:00 to deal with any outstanding issues that may come up during Ms. Ventura's testimony.

Anything further from the government?

MS. COMEY:  No, your Honor.  We're going to research the issue that Ms. Shapiro raised, and if we have any contrary law, we'll raise it to your Honor.

THE COURT:  Have the parties discussed Rule 615 and the exclusion of witnesses, has that come up?

MS. COMEY:  I believe that we e-mailed your Honor. There was some e-mail traffic with your Honor's chambers about that.  I believe the parties agreed witnesses would be removed from the courtroom until their testimony is complete.

THE COURT:  And is it just the courtroom, or does that include access to transcripts?

MS. COMEY:  I think it includes access to transcripts, your Honor.

THE COURT:  All right.  So is there any an agreement there, Mr. Agnifilo?

MS. GERAGOS:  Yes, there is an agreement, your Honor.

THE COURT:  I'll count on the parties to police that and if there are any issues, let me know.

MS. COMEY:  Yes, your Honor.

P5CsCOM7                        Phillip - Cross

THE COURT:  The only other thing to raise, and then I'll turn to Mr. Agnifilo, is that I think the overflow feed is an overhead view of the counsel tables.  I don't believe it's close enough to see what you're doing.  Just be mindful of that when you're working.  If you're writing really big, there is a chance at least someone might see it.  I'm just doing that for your benefit, but I think it should be OK.

The other thing for everyone else is that there should be no attempt, especially within this courthouse, in any way, shape, or form to depict or otherwise make attempts to identify any of the jurors.  If that happens, there will be serious consequences, so don't do it.

All right.  Mr. Agnifilo.

MR. AGNIFILO:  The one issue that I raised earlier, I think it's beneficial for all witnesses, that we continue the way we have handled the last witness today.  In other words, the witness comes, gets in the witness chair, is ready to go, and then we bring the jury in.

So I would just like to continue the way we've gone with this witness.  That's my request.

THE COURT:  Well, we'll be doing that, but just as we did with both of these witnesses, when they came into the courtroom, they walked in.  So that is what we will be doing with the remaining witnesses, unless you have some authority that suggests different treatment is appropriate in this

P5CsCOM7                         Phillip - Cross

context.

Now, when we break for lunch and we come back from lunch, the witness will be seated, just as we did with Mr. Phillip and with Mr. Florez.

MR. AGNIFILO:  If I do find -- I haven't had the chance.  If I find authority before 10:00 o'clock tonight, that will be the witching hour for all purposes.

THE COURT:  I'm trying to make sure everyone gets rest.  If I don't put a deadline in, it will be 2:00 o'clock in the morning.

All right.  Anything further?

MR. AGNIFILO:  Nothing from us.

MS. SHAPIRO:  Sorry.  Just, this is sort of obvious, but just with regard to the Rule 615, experts are excluded, so we've been assuming we can share transcripts with experts.

THE COURT:  Yes.

All right.  We are adjourned.  See you tomorrow.

MS. COMEY:  Thank you, your Honor.

(Adjourned to May 13, 2025, at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                        Page

ISRAEL FLOREZ

Direct By Ms. Slavik . . . . . . . . . . . . . 162

Cross By Mr. Steel . . . . . . . . . . . . . . 215

Redirect By Ms. Slavik . . . . . . . . . . . . 241

Recross By Mr. Steel . . . . . . . . . . . . . 243

 DANIEL PHILLIP

Direct By Ms. Comey  . . . . . . . . . . . . . 245

Cross By Mr. Donaldson . . . . . . . . . . . . 290

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 1301, 1302, 1303, 1304  . . . . . . . . . . . 162

 2B-124, 2B-125  . . . . . . . . . . . . . . . 168

 2A-101, 2A-401  . . . . . . . . . . . . . . . 180

 7R-141    . . . . . . . . . . . . . . . . . . 195

 3B-101, 3B-102, 10C-103, 10C-104, . . . . . . 200

          10C-105

 B-324   . . . . . . . . . . . . . . . . . . . 291