P5DCcom1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

               v.                        24 Cr. 542 (AS)

SEAN COMBS,
     a/k/a "Puff Daddy,"
     a/k/a "P. Diddy,"
     a/k/a "Diddy,"
     a/k/a "PD,"
     a/k/a "Love,"

               Defendant.                Trial
------------------------------x
                                         New York, N.Y.
                                         May 13, 2025
                                         9:00 a.m.
Before:

                    HON. ARUN SUBRAMANIAN,

                                         District Judge
                                         -and a Jury-

                         APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
BY:  MADISON R. SMYSER
     EMILY A. JOHNSON
     MAURENE R. COMEY
     MEREDITH FOSTER
     MITZI STEINER
     MARY C. SLAVIK
     Assistant United States Attorneys

P5DCcom1

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
     Attorneys for Defendant
BY:  MARC A. AGNIFILO
     TENY R. GERAGOS
     -and-
SHER TREMONTE
BY:  ANNA M. ESTEVAO
     -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
     JASON A. DRISCOLL
     -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


ALSO PRESENT:
LUCY GAVIN, AUSA Paralegal Specialist
SHANNON BECKER, AUSA Paralegal Specialist
RAYMOND MCLEOD, Defense Paralegal Specialist

(In the robing room)

THE COURT:  Two juror issues.  One is from juror 160, and if you recall, I believe this is the juror who indicated that her son was graduating from high school, I believe, in June.  I take it that she wants to make sure that she can attend her son's graduation, which I think is on June 20th.  We can figure that out.  We could keep people late other days.  We'll make up the time.  She's going to write a letter to me, which I'll share with you so you can understand what the issue is and we can understand what the issue is, but we haven't received that yet.

This morning we received a letter from juror 75.  I'll share this with you and we'll make this Court Exhibit 1.  He says, I live in Westchester County with my wife, who is 75-plus.  She is a cancer survivor.  We have been married for 40 years.  My wife's caretaking needs are very specific and precise and therefore are present.  I am the only one who could take care of her in addition to cooking and cleaning the house on a daily basis.  I hope you will take into account my unique situation in which I am responsible for the welfare of my wife who will be greatly appreciated if my request for an excuse from jury duty can be granted.

So this is the letter.  Share this with the parties.

Now I will go get juror 75 so he can come in and explain his situation.  But based on this, I would not be

inclined to excuse this juror. And I don't think that he's asking necessarily to be excused. I think he doesn't know the situation and whether it's kind of optional. And so he's suggesting that if it is possible to not have him serve on the jury, then he would take that route. However, I don't think this provides grounds to excuse this juror at this time. That's what I'm thinking, but we'll hear from him. I'm just putting that on your radar.

Let's get juror 75.

(Juror present)

We received your letter and I read it. First of all, I understand the situation with your wife and that you would like to take care of her. We went through this long process of jury selection to identify issues like this, and this is not something that came out in jury selection. Right now, you are on the jury.

JUROR: All right.

THE COURT: So you have to stay on the jury, okay?

JUROR: Okay. No problem.

THE COURT: If something serious happens, then you can let me know. Right now, what I'm understanding from your letter is that you're letting me know what you're responsible for.

JUROR: Yes.

THE COURT: Now, unfortunately, once we have the jury,

then it's your service, it's what you're required to do.  I have no doubt that you're going to do it with the utmost care and concern.

Is there anything I should be concerned about?  If you're on this jury, do you think you could do it and live up to your responsibilities as a juror?

JUROR:  Yes.  Yes, I can, sir, yeah.

THE COURT:  If something happens, it's serious, you will let me know just like you let me know with this letter?

JUROR:  Sure, I will.

THE COURT:  Do the parties have any questions for this juror?

MS. SMYSER:  No, your Honor.

MR. AGNIFILO:  No, Judge.

THE COURT:  More communication is always better than less communication.  Thank you.

(Juror not present)

I think it was consistent with what I thought, which is he wanted to let me know and, look, he's coming from Westchester.  That's just a long trip for him.  I think it was consistent with what the letter said, that he's prepared to serve, he's going to be careful and conscientious.  He'll let us know if anything more serious happens.  I took this more of a heads up than anything else.

Any applications from either side?

P5DCcom1

MS. SLAVIK:  Not from the government.

MR. AGNIFILO:  Not from us.

THE COURT:  We'll continue.  I'll let you know if we hear anything from 160 and we can head out and address the issues you've identified for today.

(In open court)

THE COURT:  Mr. Agnifilo, should we wait for Mr. Combs or are you prepared to address the evidentiary and other issues without his presence?

MR. AGNIFILO:  If he's up, I'd rather bring him out, if possible.

THE COURT:  Okay.  We have a letter from a juror that we addressed with the parties that will be made Court Exhibit 1.

Next, on the issue of access to these sealed exhibits, the videos, when do we anticipate these being offered into evidence?

MS. JOHNSON:  Your Honor, anticipate potentially offering images from those videos as early as this afternoon. I do think the government would oppose the application that was filed last night.  If the Court would prefer for the government to try to rework its direct examination so that we can reach those issues tomorrow to allow the government an opportunity to put in a submission this evening, I can do that.

THE COURT:  Why don't we do that.  I have to say that

I'm inclined to grant the application that was made for reasons that I previously addressed, which is we've made certain adjustments for certain of the witnesses but in a very limited way, as the government indicated. This issue is different. This is about evidence that's coming into this case and treating that evidence in a different way than the other evidence here because of an understandable and palpable and real issue of privacy and the personal interests of a witness. However, that has to be balanced against the usual First Amendment protections and the rights of the public to know about what is happening at trial. While we've handled a lot of things under seal before trial has started, we are now in trial and there's a heightened First Amendment concern in this context. I'm not seeing how we would navigate that concern in this instance.

I'm also a little bit concerned, and maybe the parties are not, that there is a potential impact on the jury when certain evidence, especially given the content and the nature of the evidence, is signaled to them to be of such a nature that the courtroom has to be cleared and they're the only people that can see it, and what message that sends to the jury.

So those are my concerns, which I'm happy to give you a chance to address in your response.

MS. JOHNSON: Thank you, your Honor. If I may, may I

respond briefly to those and we'll respond more fulsomely later?

THE COURT:  Of course.

MS. JOHNSON:  I want to be clear at the outset that the government, nor the defense, I believe, anticipates clearing the courtroom.  What would happen is that the materials — that are a very small subset of materials — that are entirely sexually explicit or involve nudity of victims and others would not be shown to the public gallery.  It would not require any logistics of people leaving the courtroom.  To the extent any of those exhibits have any sound that is also sexually explicit, we have arranged for headphones to be available for everyone in the well of the courtroom so that that sound could be played without impacting people needing to leave the courtroom.  So there would be sort of no shuffling in and out to the extent the logistics are factoring into the Court's consideration.

But just on the nature of what these materials are, they are all sexually explicit or involve nudity, and the parties and I believe the attorneys for the victims, one has already submitted a letter, I believe that another victim will also want to be heard on this issue.  We think we're on good standing in the Second Circuit to keep this type of material out of the public record, and we'll certainly put in a submission on that.

P5DCcom1

So I just wanted to flag those two items for the Court.

THE COURT:  Mr. Agnifilo.

MR. AGNIFILO:  Yes, Judge.  I think the timing makes sense.  My read of the cases, my close reading of the application for unsealing, really, the focus is on how good we are at narrowly tailoring the materials.  I agree.  And so it's just a few observations as we think about this through the day and I think it makes sense if the government can get to this tomorrow, we can all have a little more time to figure out how we tailor this.

There is no aspect to any of the videos that I think the government is looking to put into evidence that is not in the nature of adult pornography.  That's really what it is. It's people who are nude who are having sex or about to have sex.  It's all sexually explicit.  So it's not the case that anything would be looked to be sealed that's not sexually explicit.  So we couldn't really tailor it any more narrowly than that.

Our application, to the extent that we have one and want to see how this all shakes out, is only that the visual images and the audio is within the purview of the sealing order.  The parties would be free to tactfully, of course, ask questions about the evidence.  So we wouldn't be looking to do anything in regard to testimony.  The onus would be on the

parties to do this in a tasteful way, obviously.  So we're not looking to affect testimony.  We're not looking to do anything other than really address the -- it's a privacy issue, but it's also -- I think it's not insignificant that this is all in the nature of pornography.

And so my question is:  What would the press do with this even if it had it?  And I don't know what they -- it's not that they might provide an answer, but I think that's a useful question.  What would the Wall Street Journal and the New York Times do with this information if it had it, if it's in the nature of adult pornography?  I think that's a useful way of approaching the issue because it's not as though there's some body of information that can be reported as is, as is the case sometimes, other legal matters are unsealed and the papers can write about the information in there.  We're really only looking to address the visual images and what is said.  And I agree with my colleague, it's all sexual in nature, completely.

So, as we're thinking through the day and the government starts to put together their response and we do the same, I think the focus should be on how we tailor this in a constitutionally exceptional way.  There is no doubt that the First Amendment is very much in play in this analysis.  So the onus is really on everyone trying to do something that's contrary to some degree to the First Amendment to do this in the most narrowly tailored way possible.

P5DCcom1

THE COURT:  How many exhibits are we talking about and what's the running time of those exhibits?

MS. JOHNSON:  With respect to the next witness, there will be no videos that will be at least on direct examination, it would be in the nature of six still images.  And, your Honor, I can flag those for the Court if your Honor would like.  We've provided chambers with the exhibits.  So if you would like to review them, I can direct you to the exhibit numbers.

THE COURT:  Do you have the numbers now?

MS. JOHNSON:  I can.

THE COURT:  You can have them emailed to chambers.  That's fine.

Briefly, does anyone on behalf of the news organizations wish to be heard on this issue, given what Mr. Agnifilo has said and what Ms. Johnson has offered?  Please approach.  You can approach the lecturn.

THE DEPUTY CLERK:  Good morning, sir.  State your name.

MR. BALIN:  Robert Balin, B-A-L-I-N, of Davis Wright Tremaine for the news organizations.

THE COURT:  You heard Mr. Agnifilo.  He says that the approach that the parties were intending on taking is a narrow one.  The testimony would be in open court.  The only thing that would be under seal would be visual images and video and associated audio that is purely reflecting sexual conduct.  So

under those circumstances, is there still an objection or, under those circumstances, is it narrowly tailored enough to satisfy the First Amendment interests at stake?

MR. BALIN:  I think that prohibiting any public or press viewing of these videos would not be narrowly tailored. Your Honor is correct, the First Amendment is at a zenith in this type of case, in a criminal case.  There are serious charges.  The question is how we accommodate what are unquestionable privacy interests.

I would say that the testimony is not a substitute for these videos.  If it were, the government would not be putting in stills, would not be putting in videos.  They obviously think they have some persuasive value.  It is important that the press, the people through the press be able to see justice being done.

One of the issues in this case, your Honor, of course, is:  Were these acts consensual or coerced?  The best evidence of that of course is the videos themselves.  If the Court is not inclined to show the videos in open court, and that is our preference, your Honor, there are other ways, and the Court does have to consider, constitutionally, other ways besides a total sealing to accommodate First Amendment access rights.

Another option, of course, would be pool reporters. We could talk about the number of them.  But at least some representatives of the press who can see these videos in real

time as they're being shown to the jury and be able to report. And the New York Times and the Washington Post and the Wall Street Journal are not interested in reporting anything salacious.  They want to be able, however, to report that this was shown to the jury and here, in a very discrete and appropriate and mature way, is what they show.  That's no different than any other trial, your Honor.

So we do strongly, strongly object to the total sealing of the exhibits.  We think they should be shown to the press and the public.

And in the courtroom, I'd add, your Honor, we're not asking for copies of these exhibits.  Typically, that would be part of press access.  We're not asking for copies.  We do understand the serious privacy concerns.  We ask the Court to try to craft something that not only has the privacy concerns considered, but the very strong First Amendment access right considered, as well.

That's our submission, your Honor.

THE COURT:  Ms. Johnson, as you're crafting your response, you'll take account of that proposal from the news organizations.

MS. JOHNSON:  Yes, of course, your Honor.

And I just wanted to make sure, when I answered the Court's question, I talked about just the next witness.  There are videos the government intends to introduce later.

THE COURT:  Thank you very much.  Appreciate it.

Let's move on to the exhibits and other issues pertaining to Ms. Ventura.

So first on the two incidents, Mr. Agnifilo, we discussed the Rule 404 issue.  And just to make sure we're all on the same page, when we discussed this last week, the government agreed that to the extent that they opened the door to the introduction of unrelated acts of violence by asking, for instance, Ms. Ventura if she's a peaceful person — I think that was the example given — then you'd approach, we'd discuss whether the door was in fact opened, and you would potentially be able to address those incidents.

Separately, you raised the issue of Rule 404, and we discussed that briefly yesterday.  I didn't get a response.  So what is your position on the Rule 404 issue?

MS. ESTEVAO:  Your Honor, good morning.  I'll be cross-examining Ms. Ventura.

We are no longer seeking to admit those instances for purposes of showing her character in any way or even for door-opening purposes.  As I informed government counsel, we're no longer planning on introducing evidence of her assault of the security guards.

However, with respect to her assault -- her brother's birthday party in Connecticut, there is a relevance to that assault because it comes up in the context of messages between

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ms. Ventura and Mr. Combs, and it relates to their relationship and their argument stemming from infidelity and drug use in particular. And I can add more specifics, but --

THE COURT: Let's see if there's any issue with that.

Ms. Johnson.

MS. JOHNSON: Yes, your Honor. We still strongly oppose that and we reiterate that we are moving to preclude any cross-examination on this incident in its entirety. It is a prior bad act that has very limited admissibility on cross-examination. It does not go to her credibility, and it is simply irrelevant that there are communications about this particular act. Our application is that it should be excluded in its entirety.

THE COURT: Ms. Estevao, how are you getting that in?

MS. ESTEVAO: In the context of a text communication between Ms. Ventura and Mr. Combs, she is in Connecticut at her brother's birthday party at a bar and he is in a separate state. He is upset that she is not answering her phone, and this relates to their arguments about his suspicions that she is cheating on him. In response, she is not answering her phone and eventually says that she did not answer because she got in a bar fight and tried to kill someone. So this relates to their arguments about his suspicions that she's cheating on him and her responses to that. It relates to her -- in addition to her substance use and abuse outside the context of

their sexual relationship, and in fact in another state with her family nearby and her support network, and his knowledge of her continued substance abuse. So it all relates to the context of this conversation and their continued arguments. The government's argument is that the violence stem from their sexual relationship, and a large part of the cross-examination is going to establish that that is not true, it's related to infidelity and drug use.

THE COURT: So how is that not trying to introduce evidence about Ms. Ventura's character or character trait?

MS. ESTEVAO: Well, in the context of this conversation, it's irrelevant whether or not she in fact got into a bar fight, but the fact she told Mr. Combs that and he believed that and understood that is relevant.

THE COURT: And connect the dots. You're saying that because he thought this, this would make him jealous or be related to the theme of maybe there's domestic violence, but there isn't coercion? Can you help me understand the relevance.

MS. ESTEVAO: Sure. So, so much of their relationship and their arguments stem from — first I'll take infidelity — her not answering the phone and being unavailable when they're not together. And so this response, it relates to the entire conversation about her not being present. In fact, I believe there are messages -- or there's evidence to suggest that she

P5DCcom1

got into a fight because she believed someone was taking a photograph of her, presumably with someone and that she was -- she did not want Mr. Combs to find out about this.

THE COURT:  All right.  Understood.

Ms. Johnson, you can respond.

MS. JOHNSON:  Your Honor, I just want to respond.  So I'm trying to be a little circumspect because we are talking about evidence that the government believes is clearly inadmissible, but it is --

THE COURT:  Well, the jury's not here, so you don't need to be circumspect.

MS. JOHNSON:  The photo, it is pure speculation that a photograph would have shown that she was with someone else. The defendant can cross examine her on infidelity, it can cross examine her on all of these themes.  It is entirely irrelevant and it does not overcome 403 to bring up this particular act.

THE COURT:  That's what I'm trying to understand, and now I think you're helping me.  Your objection is grounded in, now, Rule 403 based on this particular version of the issue, meaning previously we had talked about 608 and 404.  I assume Ms. Estevao is saying we're not trying to bring in this evidence on either of those two grounds, it goes to I guess Mr. Combs's intent; is that right, Ms. Estevao?

MS. ESTEVAO:  That's right.

THE COURT:  And then you're saying, Ms. Johnson, that

it's not really relevant to his intent in any meaningful way?

MS. JOHNSON:  Correct.  It's certainly more prejudicial than probative.  The government does still strongly object under 608, but this should not come in.  They can cross examine on all these topics, but this particular prior bad act is completely irrelevant for his intent, and there are many other ways of establishing that that are far less prejudicial.

MS. ESTEVAO:  May I respond briefly.

I believe the government is trying to argue that Mr. Combs was forcing Ms. Ventura to take substances and that was the way that she was induced into participating in their sexual activity, and a large part of the cross-examination of the defense will be that Ms. Ventura independently took many substances on her own, and this shows that she was taking substances in such a way and to such a degree that she was acting erratically and nowhere near Mr. Combs and, in fact, another state and surrounded by her family members, and Mr. Combs knew all of this because it's in the context of the conversation and her telling him this.

THE COURT:  All right.  Understood.  I will overrule the government's objection to the introduction of just that evidence.

I understand that as to the other incidents, those are out, correct?

MS. ESTEVAO:  That's right.  And it is just in the

P5DCcom1

context of this text message exchange.

THE COURT:  Now, as to the introduction of prior consistent statements, Ms. Johnson, there's three pieces of evidence.  I'm not understanding how the defense addressed these in their opening in a way that would not be just a generalized attack on credibility.  So maybe someone can help me with that, because I understand they're the bulleted statements from the opening that you say are more than just a generalized attack on credibility, but none of those statements address even indirectly any of the particular pieces of evidence.

Now, all we're really talking about is a sequencing issue.  This is just a question of whether these three pieces of evidence can be refused on direct examination or should be reserved for rebuttal.  But I'm happy to be convinced that I'm wrong.

MS. FOSTER:  Yes, your Honor.  So I'll address this point.  As your Honor noted, there was clearly a generalized attack on Ms. Ventura's credibility.

THE COURT:  Absolutely.

MS. FOSTER:  They implied she had a financial motive for testifying.  They implied that you would see messages that would contradict her testimony.  And so I agree with you on that.

As our letter to the Court had made clear, you don't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5DCcom1

need to attack a specific statement in an opening, you just have to make an attack that is sort of logically related to the prior consistent statement and that would rebut that attack. And you don't need to make the attack explicitly, you can sort of imply it. Here, the opening, the sort of central theme of their opening was that victim 1 — or Ms. Ventura — had agency. This was not coercion. She was the person who made her own choices. She decided what she was doing. In fact, there's a line in their opening that was like, who really had control in this relationship. And that was in the context of discussing Mr. Combs and Ms. Ventura's relationship clearly implying the answer of it was Ms. Ventura.

And so in each of these ways -- and I would say this is the central theme. And so when they attacked Ms. Ventura's credibility, generalized, and then made this claim that you're not going to see coercion, you're going to see a grown woman making her own choices, each of these statements -- well, two of them sort of specifically rebut that claim because they show that Mr. Combs, he controlled her career, she had to ask him for permission to take certain actions, he had control over her phone, her laptop, her car, and had the ability to take that away from her when he was angry at her.

And so another sort of central thesis of that opening was she was doing various things because they were in her best interests. And so when you have these statements that show,

P5DCcom1

well, actually, if she does something to upset him, he's taking things away from her and he has the power to do that. That does rebut that sort of central thesis that they made in the opening.

I would also say one of these statements was much more specifically attacked during the opening, and that was what is exhibit B-315 where she talks about the threats to release the sex tapes. They said in their opening basically, I'll quote, does Combs release the videotapes that the government was talking about? No, he doesn't. You will hear that the government raided the home, they seized the electronics and the only videos you see or hear came from the devices that she kept. And so clearly that is an attack on any claim that he had the power to release those videos and made those threats to Ms. Ventura.

THE COURT: I'll hear from the defense briefly.

MS. SHAPIRO: Good morning, your Honor. So the statements made in opening were of a very general nature as to the overall defense, and all of these exhibits are very specific statements regarding very specific alleged incidents.

THE COURT: What about with respect to D-315?

MS. SHAPIRO: So a couple of things about that.

First of all, to the extent those two exhibits are admitted on direct for non-hearsay purposes, for instance the fact that she said that, and that she sent the email to those

people, we do not object.  We simply would submit that they're not admissible as hearsay under the prior consistent statements exception until redirect if she's attacked on this particular point.

THE COURT:  Well, help me with that.  If they come in, then they're coming in.  So you're saying you don't object to those?

MS. SHAPIRO:  No, we're not saying that.

So, to be clear, what we said in the opening was very different and was not specific to the particular alleged incident discussed in this email, which occurred in 2011.  All that we said in opening was that Mr. Combs --

THE COURT:  You don't disagree with the account of the opening, which I think was quoting from the opening; is that right, Ms. Foster?

MS. FOSTER:  That's correct, your Honor.

THE COURT:  This is how I see it:  There was a suggestion, meaning an implied suggestion to the jury that there was no threat to use the videos in any way because when there ultimately was an investigation and the search warrants were executed, he didn't have those videos.  The only people who had them were people like Ms. Ventura.  I think that's a fair implication that you're saying that she's lying about there being videos that were used as any kind of leverage against her.  And so the government is saying, well, we have

this text message exchange that addresses this issue.  And so why doesn't that fairly fit within the rule?

MS. SHAPIRO:  Well, your Honor, I don't think that's a fair characterization of what we said in the opening because what we said in the opening was very specific to what the government found in 2024, 13 years later, and that the only videos that existed at that point were the ones on her devices, and that shows that he wasn't keeping the videos.  We didn't specifically discuss any threats or respond directly to the idea that there was an allegation of a threat in 2011 that's referred to in these emails.

So what we would say is that, for that reason, they're not admissible as non-hearsay on direct as prior consistent statements.  We would not object to them being admitted for the non-hearsay purposes with a limiting instruction that, at least for purposes of direct, are not coming in for the truth, and then if cross-examination occurs on those topics, then they can be admitted on redirect.  Since that hasn't happened yet, the predicate for prior consistent statements hasn't been met by the opening.

THE COURT:  So I believe that the predicate for application of the rule on prior consistent statements has been satisfied as to B-315 given the statements made in the opening. And it's not just the statement that Ms. Foster referred to, it's that statement in conjunction with the other statements

P5DCcom1

that are identified in the government's letter.  The ending thought of the opening was for the jury to ask themselves about the millions of reasons that people would have had to testify in the way they're about to testify.  So that's the general attack on credibility, that's also expressed elsewhere in the opening.  That's coupled with a specific reference to the issue of videos and the fact that the defendant didn't have the videos, but that the victims did.  And so that is the charge that, well, they had the videos, he didn't, and you have to ask yourself why are we hearing about videos being held over people's heads, because there's a reason for that.  It's the fact that things have changed and money has been paid or money has been requested and that's the sort of attack that was raised, and I think that fairly fits within the rule as to B-315.

Now, is B-316 the same text thread or what?

MS. FOSTER:  Yes, it is.  It just, I think, captures just a little bit more of the entirety of it.

THE COURT:  So that applies to B-315 and 316.  The standard has not been satisfied as to B-332 or B-329, so we have to wait until rebuttal to see what happens on cross-examination.

Anything further, Ms. Foster or Ms. Johnson?

MS. JOHNSON:  No, your Honor.  Thank you.

THE COURT:  Why don't we bring Mr. Phillip back so he

P5DCcom1

can be sitting in the witness stand and at the same time we'll have our jury ready in the anteroom.

(Continued on next page)

(Jury present)

THE COURT:  Welcome back, members of the jury.

Mr. Phillip, you understand that you are still under oath?

THE WITNESS:  Yes.

THE COURT:  Mr. Donaldson.

MR. DONALDSON:  Yes, Judge.  Thank you.

DANIEL PHILLIP, resumed.

CROSS-EXAMINATION CONTINUED

BY MR. DONALDSON:

Q.  Good morning, sir.

A.  Good morning.

Q.  If we can briefly, I just want to go back to what we talked about yesterday, finish what we talked about yesterday.

A.  Sure.

Q.  Regarding that first meeting at the Gramercy Park Hotel. Do you recall that?

A.  Yes.

Q.  I believe you said yesterday on direct, I believe you said on direct that you left and then returned back to the hotel, correct?

A.  Yes.

Q.  And you returned back because Cassie called you to come back, right?

A.  Yes.

P5DCcom1                           Phillip - Cross

Q.  And at that time when you came back, you stayed for
approximately one or two hours; is that right?

A.  For a few hours, yes.

Q.  And I believe you said on direct that during the time of
this Gramercy Park Hotel visit, Mr. Combs was not saying
anything, correct?

A.  During which time?

Q.  During the first time or the second time.

A.  During what time are you referring -- I didn't say he
didn't say anything, he did speak to me.

Q.  While you and Ms. Ventura Cassie were having sex for a few
hours, Mr. Combs was quiet in the corner, correct?

A.  Correct.

Q.  And so for those two hours of you having sex with
Ms. Cassie Ventura at the Gramercy Park Hotel, it would be fair
to say that Ms. Ventura took the lead in the sexual
intercourse, correct?

A.  No.

Q.  You took the lead?

A.  We were equally just doing our thing.  I don't -- I
wouldn't say there was a leader.

Q.  Ms. Ventura and you decided on what positions you would do
in this sexual intercourse of those few hours, correct?

A.  Correct.

Q.  You and Ms. Ventura decided together what types of sex you

P5DCcom1                        Phillip - Cross

would have with those few hours, correct?

A. Correct.

Q. And on that time period when you were with Ms. Ventura at the Gramercy Park Hotel, she wasn't drunk, correct?

A. Correct.

Q. She did not appear high, correct?

A. I'm sorry.  Can you repeat that.

Q. She did not appear to be under the influence of any narcotics, correct?

A. Correct.

Q. And you did not see her consume any alcohol, correct?

A. Correct.

Q. You did not see her take any drugs that day, correct?

A. Correct.

Q. So from your perspective, for those two hours that you were having sexual intercourse with Ms. Ventura, it's fair to say she was in complete control of everything she was doing, correct?

A. I cannot say that.

Q. Now, you also said on this first time with Ms. Ventura at the Gramercy Park Hotel you did not wear a condom, correct?

A. Correct.

Q. And she did not ask you to wear a condom, correct?

A. Correct.

Q. And it's fair to say you did ejaculate that day, correct?

A.   Correct.

Q.   Now, after you left the Gramercy Park Hotel, I believe you said on direct that you spoke to your boss; is that correct?

A.   Correct.

Q.   And when you spoke to your boss, you learned that Ms. Cassie Ventura paid for the hotel visit with a credit card, correct?

A.   Correct.

Q.   So at this point at the Gramercy Hotel, you knew that -- strike that.  Cassie Ventura paid for this, gave you cash, correct?

A.   I'm sorry.  Can you repeat that.

Q.   At the Gramercy Park Hotel experience, Cassie Ventura gave you cash, correct?

A.   Correct.

Q.   She also paid for this hotel visit with her credit card, correct?

A.   I don't know what she paid for with the hotel.  I have nothing to do with that.

Q.   Well, you did learn from your boss that Ms. Ventura paid for this hotel stay with her credit card, correct?

A.   That's not correct.  She paid for the dancer to come to her with the credit card.  I have no idea who paid for the hotel.

Q.   Strike that.

         She paid for the dancer from the service with her

P5DCcom1                    Phillip - Cross

credit card, correct?

A.   Correct.

Q.   Now, yesterday, you also mentioned an assault that you observed inside Cassie's apartment; is that right?

A.   Correct.

Q.   You indicated this assault occurred on Eleventh Avenue at her apartment, I believe it was 10 West Eleventh Avenue; is that correct?

A.   I believe it was West End Avenue, but it may have been Eleventh Avenue.

Q.   And this assault at her apartment happened after the Gramercy Park experience, correct?

A.   Correct.

Q.   And that was your first time going to her apartment when this assault occurred, correct?

A.   I believe so, correct.

Q.   And in order to get to her apartment, she had to provide you the address for that, correct?

A.   Correct.

Q.   And in fact, I believe she texted you her address to where you were supposed to come, correct?

A.   Correct.

Q.   Now, when you got to the apartment, I believe you said on direct that you had sex with Ms. Ventura prior to this assault occurring, correct?

A.  Correct.

Q.  And this sex occurred, again, you didn't see Ms. Ventura in an inebriated state before you had sex, correct?

A.  Correct.

Q.  She didn't appear to you to be under the influence of any drugs before you had sex, correct?

A.  Correct.

Q.  Now, after you all had sex, I believe you said that Ms. Ventura was sitting at a desk on her computer, correct?

A.  Correct.

Q.  And you were sitting in the room next to her, correct?

A.  Incorrect.

Q.  You were sitting somewhere near her?

A.  I was sitting behind her.

Q.  You were sitting behind her in a room while she was on her computer, correct?

A.  Correct.

Q.  And this was after you had already had the sex that you all had?

A.  Correct.

Q.  And so at this point, she was just doing something on the computer and you were just having a conversation with her?

A.  Incorrect.  I was just sitting there.

Q.  So you were just sitting there and she was doing something on the computer?

P5DCcom1                        Phillip - Cross

A.   Correct.

Q.   At some point you heard her yell for Mr. Combs, saying, hay, babe, come over here, correct?

A.   Correct.

Q.   And Ms. Ventura responded, hey, I have all of my personal information on the computer, I'll be there in a second, correct?

A.   Correct.

Q.   And then you're saying that at that moment a bottle flew past her head and crashed against the wall; is that correct?

A.   Correct.

Q.   And then Mr. Combs came outside and grabbed her by her hair and neck and took her back to the room; is that right?

A.   Grabbed her by her hair and dragged her by her hair into her bedroom, yes.

Q.   And then at some point, you're still sitting where you were sitting, correct?

A.   Correct.

Q.   And then after you hear this commotion in the bedroom between Mr. Combs and Cassie, I believe you said on direct, he comes outside to where you were, looks at you and says, are you ready; is that right?

A.   He said are you guys ready to continue, somewhere along those lines.

Q.   And that is what he said to you after you're saying the

P5DCcom1                         Phillip - Cross

assault occurred, correct?

A.   Yes, correct.

Q.   Isn't it true, Mr. Phillip, that after this assault occurred, Mr. Combs walked outside to and you said, you got to get out of here, you got to go?

A.   I don't recall that.

Q.   Isn't it true that when he walked outside after this assault, Mr. Combs looked you right in your face and said, yo, man, going to have to deal with this, you need to get the fuck out?

A.   No.

Q.   Do you recall yesterday I asked you whether or not you had a conversation with law enforcement officers in December of 2023, you indicated that you did, correct?

A.   Correct.

Q.   And you indicated yesterday that you had this conversations with law enforcement officers and they asked you about these events, correct?

A.   Correct.

Q.   And they asked you about this assault, as well, correct?

A.   Correct.

Q.   And you told them what happened with this assault, correct?

A.   Correct.

Q.   And you told them what you said in response to this assault, correct?

P5DCcom1                    Phillip - Cross

A.   Correct.

Q.   Isn't it true that on December 18th, 2023, Combs exited the room and threw a bottle of liquor towards Ventura.  Combs then slapped Ventura in the face, grabbed her by her hair, and dragged her into the bedroom.  Phillip could hear Combs continue slapping and hitting Ventura.  Combs eventually came back out and told Phillip, yo, man, going to have to deal with this, you need to get the fuck out.  Phillip left and blocked Ventura --

         MS. COMEY:  Objection, your Honor, to reading a document not in evidence.

         THE COURT:  That's sustained.

Q.   Isn't a fact that on December 18th, 2023, you told law enforcement agents, after Mr. Combs assaulted Ms. Ventura, that Mr. Combs told you, yo, man, you need to get the fuck out?

A.   I do not recall that.

         MR. DONALDSON:  Can you please put up 3574, the parties and the witness only.  End of page 3, beginning of page 4.  Could you highlight where it ends Ventura stated at the top.  End of page 3.  Right there.

         (Continued on next page)

P5DsCOM2                        Phillip - Cross

THE COURT:  Mr. Donaldson, are you attempting to refresh the witness' recollection?

MR. DONALDSON:  Yes, I am.

THE COURT:  You should just ask him to read what you presented and ask him a fresh question, not referring to the document.

MR. DONALDSON:  I am.

BY MR. DONALDSON:

Q.  Mr. Phillip.

A.  Yes.

Q.  I'm showing you a single page document with the highlighted portion.

A.  I see it.

Q.  I would like you to read that portion to yourself.

A.  I've read it.

Q.  Does that refresh your recollection as to what you told the agents on December 18, 2023, after you indicated that you observed an assault and what Mr. Combs told you after that?

A.  I do not remember saying that, no.

Q.  You do not remember telling the agents, you do not remember saying what?

A.  What I am reading here, that --

MS. COMEY:  Objection, your Honor.

A.  -- that Mr. Combs told me to get the fuck out.

THE COURT:  Hold on.

We are going to strike that last answer.  The jury should disregard it.

Mr. Donaldson, please ask your next question.

MR. DONALDSON:  May we approach, your Honor, please?

One second.

MS. COMEY:  May I confer with counsel, your Honor?

THE COURT:  You may.

(Counsel confer)

BY MR. DONALDSON:

Q.  Mr. Phillip.

A.  Yes.

Q.  You recall -- not recall, but -- well, do you recall dating a model by the name of Malia?

A.  I never said I dated her.  She was a friend of mine.

Q.  Do you recall having a friend named Malia?

A.  Malia.

Q.  Malia.

And while you were with this friend Malia, would it be fair to say that you were walking by Dream Hotel here in downtown New York and happened to see Ms. Cassie Ventura outside of that hotel?

A.  Yes.

Q.  And when you saw her outside the hotel, outside the Dream Hotel, she was not with Mr. Combs, correct?

A.  Correct.

Q.   She was with some other friends, correct?

A.   Correct.

Q.   And you were walking with your friend Malia, correct?

A.   Correct.

Q.   And you and Ms. Cassie Ventura made contact with each
other, correct?

          MS. COMEY:  Objection to the form.

Q.   Well, did you at that time, when you saw Cassie Ventura
outside the Dream Hotel, say anything to her?

A.   No.

Q.   Did she say anything to you?

A.   No.

Q.   Did you say anything to Malia about Cassie Ventura?

A.   Yes.

Q.   And you told Malia that -- you told Malia about the
relationship that you had with Cassie Ventura, correct?

A.   Malia already knew about the relationship I had with her.

Q.   She knew because you told her, correct?

A.   Correct.

Q.   And you told Malia that you were and Cassie Ventura had
been seeing each other socially, is that fair to say?

          MS. COMEY:  Objection to hearsay, your Honor.

          MR. DONALDSON:  I'm asking what he told her.

          THE COURT:  It's overruled.

A.   Correct.

P5DsCOM2                         Phillip - Cross

Q.   And then after you saw Cassie in front of the hotel, the Dream Hotel, Cassie then called you later on, correct?

A.   Correct.

Q.   And Cassie called you later on and said she wanted to get together with you to have another experience, would that be fair to say?

A.   She asked me to meet her.  She asked me if I was available.

Q.   She asked you were you available to meet her to have another experience, correct?

A.   Incorrect.

Q.   OK.  And you thought, when Cassie called you, you thought she was calling you to come see her for a one-on-one, is that correct?

A.   Correct.

Q.   And when you say you thought she was calling you for you to come see her on a one-on-one, you meant one-on-one regarding a sexual encounter, correct?

A.   Correct.

Q.   So, and this had nothing to do with Mr. Combs, correct?

A.   I don't understand that.

Q.   Well, you saw Cassie Ventura in front of the Dream Hotel, correct?

A.   Correct.

Q.   She wasn't with Sean Combs, correct?

A.   Correct.

P5DsCOM2                        Phillip - Cross

Q.  And then Cassie called you, correct?

A.  Correct.

Q.  And then you presumed that Cassie was calling you for a
one-on-one between you and her, correct?

A.  Incorrect.

Q.  Now, yesterday you also mentioned something about a hearing
argument, a yelling at the Essex Hotel between Cassie and
Combs.

      Do you recall testifying about that?

A.  Yes.

Q.  Now, in that particular situation, again, Cassie called you
and asked you to meet her at the Dream Hotel, is that right?

A.  Correct.

Q.  And then she canceled and said meet her at the Essex House,
correct?

A.  Correct.

Q.  So then you went to the Essex House, correct?

A.  Correct.

Q.  And you and Cassie had sex at the Essex House, correct?

A.  Correct.

Q.  And, once again, Cassie, you did not observe Cassie to have
to be under the influence of any narcotics, correct?

A.  Correct.

Q.  You didn't observe her to be drunk, correct?

A.  Correct.

Q.  And you didn't see her drinking or taking any drugs before you all had sex that day, correct?

A.  Correct.

Q.  And then after you all you and Cassie had sex, you then said you --

Well, Cassie and Mr. Combs went to a bedroom together, correct?

A.  Correct.

Q.  And then you heard some yelling and screaming in the bedroom, is that right?

A.  Correct.

Q.  And then yesterday you said you saw Mr. Combs run out the hotel, completely out the hotel naked, correct?

A.  I think he had a towel on, correct.

Q.  He ran completely out the hotel with just a towel on?

A.  He ran out of the room.

Q.  And then after that, Cassie then ran to you and jumped in your lap, is that correct?

A.  Correct.

Q.  And then you said you all started kissing, is that right?

A.  She was shaking uncontrollably, obviously afraid, and we started talking for a while before we ended up kissing each other, yes.

Q.  OK.  So let's go to that.

So, Cassie ran and jumped into your lap and then you

P5DsCOM2                        Phillip - Cross

all started talking for a while, is that right?

A.  Correct.

Q.  And then while you were all were talking, she started kissing you, correct?

A.  Correct.

Q.  And this is something different than has ever been done before, correct?

A.  Correct.

Q.  And then you started kissing her back, correct?

A.  Correct.

Q.  And then you all started, I believe you said, starting getting into it, correct?

A.  Correct.

Q.  And when you say getting into it, you all started having sex, correct?

A.  Moving in that direction.

Q.  You got an erection, correct, you said?

A.  Correct.

Q.  And this was a different moment than before, correct?

A.  Correct.

Q.  You felt like there was some kind of bond between you two, correct?

A.  I always felt that, but correct.

Q.  And then at that point you said Mr. Combs walked in, correct?

A.   Correct.

Q.   And then at that point, you lost your erection?

A.   Correct.

Q.   So you lost your erection because Mr. Combs was present, correct?

A.   Correct.

Q.   And because his presence made you lose your erection?

A.   Correct.

Q.   And his presence caused you to have this erectile dysfunction?

A.   Correct.

Q.   Now, you also said that you had been with Cassie and Combs for at least six or seven times, right?

A.   Correct.

Q.   And only one of those times you indicated that you saw Cassie under the influence of any drugs, correct?

         That's what you said yesterday.  Yesterday you said only one of those times you saw case under the influence of drugs?

A.   My hesitation is in your reference to me being with them. I literally was invited to come that day.  He opened the door, Sean Combs opened the door.  I saw her visibly on the couch passed out, slumped over on the couch.  She looked completely inebriated.

         MR. DONALDSON:  Your Honor, I move to strike.  There

was no question on the --

                MS. COMEY:  Your Honor, it was responsive.

                THE COURT:  Overruled.

A.  And as I saw her on the couch, Mr. Combs said to me, I
don't think this is going to happen today.  I looked at her,
and I said, yeah, obviously.  And I left.

Q.  Let's go through that.

        As I said, so you were with them several times,
correct?

        Well, in the presence of Cassie and Mr. Combs several
times with these experiences, correct?

A.  Correct.

Q.  And that one time you said you saw Cassie under the
influence or inebriated in some sort, correct?

A.  Correct.

Q.  And that one time you saw her in this condition, Mr. Combs
told you nothing is happening today, correct?

A.  Correct.

Q.  So the one time that you did see her under any kind of
influence or under any kind of drugs, Mr. Combs said no to any
sexual intercourse, correct?

A.  Correct.

Q.  You said something about a last encounter you had with
Cassie and Combs and there was another man in the room.

        Do you recall saying that?

A.   Yes.

Q.   In that situation, Cassie again called you to the apartment, correct?

A.   Correct.

Q.   This was at her apartment, correct?

A.   Correct.

Q.   And, of course, you arrived at her apartment, is that fair to say?

A.   I arrived at her apartment, is that what you asked me?

Q.   You went to her apartment, right?

A.   Yes, correct.

Q.   And when you got to the apartment, there was another male there already, correct?

A.   Incorrect.

Q.   You were there first, correct?

A.   Correct.

Q.   And you and Cassie Ventura had already had sex before the male got there, correct?

A.   Incorrect.

Q.   OK.   Would it be fair to say that --

     OK.   When the male got there, you and Cassie had sex, correct?

A.   Incorrect.

Q.   Would it be fair to say that you and the male that was there rotated having sex with Cassie Ventura?

P5DsCOM2                    Phillip - Cross

A.  Incorrect.

Q.  Would it be fair to say that you watched the male have sex with Cassie Ventura while Cassie Ventura was having sex with Sean Combs?

A.  Correct.

Q.  Would it be fair to say that during this time period, Cassie Ventura was not under any influence of narcotics?

A.  Didn't appear to be so.

Q.  And would it also be is that fair to say that she was not intoxicated, correct?

A.  I couldn't say that, but it didn't appear that she was.

Q.  Well, let's do it this way.

From your appearance, from your observation of Cassie Ventura on the day she had sex with Mr. Combs and another person, she did not appear to be under the influence of narcotics, correct?

A.  Correct.

Q.  On the day that you saw Cassie Ventura having sex with Mr. Combs and another individual male, she did not appear to be inebriated, correct?

A.  Correct.

Q.  You mentioned something about directing, Mr. Combs directing things.

Do you recall saying that yesterday?

A.  Yes.

Q.  Now, it will be true that Mr. Combs never gave directions about what positions to use during sex with Cassie Ventura, correct?

A.  Incorrect.

Q.  You recall meeting with the federal government, the prosecutors, on March 28, 2025, correct?

A.  Correct.

Q.  And when you met with these federal prosecutors on March 28, that was this year, correct, March 28, 2025, you met with federal prosecutors, correct?

A.  Correct.

Q.  And when you met the federal prosecutors on March 28, 2025, you spoke to them about your relationship or your contacts with Cassie, correct?

A.  Correct.

Q.  And you told them about the sexual intercourse and the sexual interactions you had with Cassie Ventura, correct?

A.  Correct.

Q.  And isn't it true that on March 28, 2025, you told the AUSAs here that you do not recall Sean Combs giving directions about what position to use during sex?

A.  Correct.

Q.  So, in fact, on March 28, 2025, and today, it is true that you don't recall Sean Combs giving any directions about sexual positions during yourself with Cassie Ventura, correct?

A.   Incorrect.

Q.   OK.  Mr. Phillip, it's fair to say that you believe Cassie Ventura liked you in a -- liked you in a unique way, correct?

A.   We were becoming friends, yes.

Q.   You thought that you all were establishing some, I believe you said earlier, establishing some kind of bond together, correct?

A.   Correct.

Q.   In fact, prior to your last visit with Mr. Combs and Cassie, you thought that you were in a relationship with Cassie, correct?

A.   No, incorrect.

Q.   There were times you were actually trying to get Cassie alone because you were attracted to her and you wanted to be with her, isn't that correct?

A.   I always wanted to make sure she was OK.  I definitely was attracted to her.  And had she ever given me the chance to date her, I absolutely would have.

Q.   In fact, on those occasions when you were, they were alone in the bedroom and you were -- well, strike that.

     There were occasions where Mr. Combs and Ms. Ventura were would go into another room and they would be having sex, correct?

A.   I don't know what they were doing in the other room.

Q.   It is true that you would actually get jealous when you saw

P5DsCOM2                          Phillip - Cross

Mr. Combs having sex with Cassie, correct?

A.   Incorrect.

MR. DONALDSON:  Can I have one second, please, your Honor?

THE COURT:  You may.

(Pause)

Q.   You met with the government on October 7, 2024, as well, correct?

A.   Correct.

Q.   When you met with the federal government on October 7, 2024, you met with these federal prosecutors here, correct?

A.   Correct.

Q.   And when you met with them, you told them about your interactions with Ms. Ventura and your sexual intercourse with her, correct?

A.   Correct.

Q.   And you told them about how you felt about her, correct?

A.   Correct.

Q.   Isn't it true that on October 7, 2024, you told the federal prosecutors in your meeting with them that Sean Combs would occasionally tell you to go sit on the couch, it's my turn, and then --

MS. COMEY:  Objection, your Honor.

THE COURT:  Sustained.

Q.   Did you not tell the prosecutors on October 7, 2024, that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5DsCOM2                         Phillip - Cross

you would feel jealous --

            MS. COMEY:  I'm sorry, your Honor --

            THE COURT:  Can we have a sidebar.

            MS. COMEY:  Thank you.

            (Continued on next page)

P5DsCOM2                        Phillip - Cross

(At the sidebar)

THE COURT:  All right.  Do you have the document, like, right in front of the jury that you're reading from?

MR. DONALDSON:  I have it to the side so I can read it.  I'm trying to make sure I --

THE COURT:  You can't do that.

MR. DONALDSON:  They can't see the document, Judge.

THE COURT:  It's right in front of the juror.

MR. DONALDSON:  OK.

MS. COMEY:  Your Honor, I just realized that Mr. Donaldson had his papers on the bar right in front of the jury throughout the cross-examination.

THE COURT:  I'm sorry.  There is space limitations. We can adjust that during the break.

MR. AGNIFILO:  Your Honor.

MR. DONALDSON:  I'll put it on the ledge.

MR. AGNIFILO:  Your Honor --

THE COURT:  Put it on the lectern.

MR. AGNIFILO:  -- there's a side thing.

No, it has a side so they can't see it from the side.

MS. COMEY:  I'll also note Mr. Agnifilo could share space at counsel table directly to the left.

MR. DONALDSON:  I'll do whatever I can do to make sure that the juror can't see.  It wasn't my intention do that, just so it's clear about that.

P5DsCOM2                    Phillip - Cross

THE COURT:  Anything further, Ms. Comey?

MS. COMEY:  No.  Thank you, your Honor.

MR. DONALDSON:  Sorry about that.

(Continued on next page)

P5DsCOM2                         Phillip - Cross

(In open court)

THE COURT:  All right.  Mr. Donaldson, you may continue when ready.

MR. DONALDSON:  Thank you, Judge.

BY MR. DONALDSON:

Q.  Mr. Phillip, isn't it correct that on October 7, 2024, the meeting with the federal government, you told them that you would feel -- that when Sean Combs and Ms. Ventura were having sex, you would feel jealous because you liked Ms. Ventura romantically?

Is that not what you told the federal government and the prosecutors on October 2024, when you were telling them information about your relationship with Ms. Ventura?

A.  I do not recall that.

MR. DONALDSON:  All right.  Ray, could you please put up 3570, page five.

Go down to where it says other recollections.

MS. COMEY:  I want to confirm it's just for the parties and the witness.

MR. DONALDSON:  Just for the parties, of course.

Third bullet point down.  Highlight that section, please.

BY MR. DONALDSON:

Q.  Mr. Phillip, I'm showing you a document on the screen.

Would you please read that document to yourself and

P5DsCOM2                        Phillip - Redirect

see if that refreshes your recollection, that on October of 2024, you told the federal prosecutors that when Mr. Combs and Ms. Ventura were having sex, you would feel jealous because you liked Ms. Ventura romantically?

A.   That does not refresh my memory.

Q.   What does not refresh your memory?

A.   I do not recall saying that to them.

Q.   But you're not saying you didn't say that, correct?

A.   I do not recall saying that to them.

        MR. DONALDSON:  I have no further questions for this witness.

        THE COURT:  Redirect.

        MS. COMEY:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MS. COMEY:

Q.   Good morning.

A.   Good morning.

Q.   Mr. Phillip, do you recall yesterday and today on cross-examination being shown reports and notes?

A.   Yes.

Q.   Before defense counsel showed you those reports and those notes, had you seen them at all?

A.   No.

Q.   Had anyone ever asked you to review those reports or those notes?

A.   No.

Q.   Had anyone ever asked you to check whether they were accurate?

A.   No.

Q.   Do you recall being asked about whether you told prosecutors in March of this year that you could not recall Mr. Combs directing you and Ms. Ventura about what positions to use during sexual intercourse?

A.   Yes.

Q.   Can you explain why you didn't remember that in March of this year, but you do remember that today?

A.   Because he -- Sean Combs definitely did direct us, direct Cassie to give me blow jobs, and also to rub each other down in certain ways with baby oil and stuff.  And so I -- my hesitation is in what would be considered directing you sexually, the positions.

         I don't know if he's referring to actual intercourse or the actual experience altogether.  But, either way, he was directing us for what to do in terms of touching each other in sexual ways.

Q.   So let's break that down.

         Who would direct you and Cassie to rub baby oil on each other?

A.   Sean Combs.

Q.   And who would direct Cassie to perform oral sex on you?

A.   Sean Combs.

Q.   Who would direct you and Cassie to have sexual intercourse with each other?

A.   Sean Combs.

Q.   Do you recall being asked yesterday on cross-examination about the timing of when Cassie handed you cash during your first meeting at the Gramercy Park Hotel?

A.   Yes.

Q.   How did the amount of money that Cassie handed you that first night compare to the fee you were owed for your stripping services?

A.   Can you repeat that?

Q.   How did the amount of money that Cassie handed you that first night at the Gramercy Park Hotel compare to the amount of money you were owed as a fee for your stripping services?

A.   It was roughly $3,800 more.

Q.   And over all of your meetings with Cassie and with Mr. Combs, when you could perform sexually, what were you paid?

A.   Anywhere between $700 and five or $6,000.  I'm estimating. I couldn't say definitively.

Q.   When you could not perform sexually, how much were you paid?

A.   Most of the time, nothing.  I don't recall if there was a time that they gave me money for times that I couldn't have sex with her.

Q.   But as you sit here today, to the best of your recollection, did they pay you when you could not maintain an erection and have sexual intercourse with Ms. Ventura?

A.   No.

Q.   Do you recall being asked about your perception of Ms. Ventura's level of intoxication on cross-examination?

A.   Yes.

Q.   Other than seeing her briefly on the street outside the Dream Hotel, did you ever see Ms. Ventura outside of the context of meeting with her to have sex in front of Mr. Combs?

A.   No.

Q.   And did you ever speak with her in person outside of the context of having sex with her in front of Mr. Combs?

A.   No.

Q.   Do you recall being asked about on cross-examination Ms. Ventura calling you after seeing you in person outside the Dream Hotel?

A.   Yes.

Q.   Do you know who she was with when she made that phone call?

A.   No.

Q.   Do you know who she was with every time she sent you a text message?

A.   No.

Q.   Do you know who she was with every time she called you?

A.   No.

P5DsCOM2                           Phillip - Redirect

Q.   Were there times when you texted her and she did not respond?

A.   She never responded to my text messages, usually.

Q.   So when you initiated the conversation, did she respond?

A.   No.

Q.   Do you recall being asked about what Mr. Combs said when he came out of the room after you heard him beating Cassie?

A.   Yes.

Q.   As you sit here today, what do you remember Mr. Combs saying when he came out of the room after beating Cassie?

A.   I recall him coming out of the room and trying to get us to have sex again, but I could not after that.  After that, that was the first time that I started experiencing erectile dysfunction.

Q.   When you say he was trying to get us to have sex again, who were you referring to when you say us?

A.   Sean Combs.

Q.   And what, as you sit here today, do you remember Mr. Combs saying to try to get you and Cassie to have sex after he had beaten Cassie?

A.   I just recall him asking us if we are ready to go.

Q.   And after that, did you try to get an erection?

A.   I was completely in my head.  I -- I -- I tried to -- to engage.  Um, I wanted to really hug her, but I -- there was nothing I could do.  I was completely shocked and just

completely messed up in my head.  So, no, there was nothing I could do.

Q.  You said you wanted to really hug her.

Why was that?

A.  Because she was afraid.  I could see that she was afraid. She was really upset.  I could see in her face that she was crying a lot.

Q.  So you said you tried to engage.

What did you do to try to engage?

A.  We got as close to, like, sitting on the couch next to each other, and I think that she put her -- her hand on me.

Q.  I'm sorry to ask this specifically.

What part of your body did she put your hand on?

A.  Like, she went in to, like, grab my shoulder -- she went in to grab my shoulders.  That's how we always started, with an actual hug, and started to hug each other and rub baby oil on each other and stuff.  But I -- I was just -- I was completely messed up.  I could not engage in this act.

Q.  So I want to make sure we have this clear.

After Mr. Combs told you and Cassie essentially to have sex again --

A.  Um-hmm.

MR. DONALDSON:  Objection.

THE COURT:  Let's rephrase the question.

Q.  What did Mr. Combs say to you and Cassie when he came out

of room after beating her?

A.  He asked us if we were ready to go.

Q.  And what did you understand that to mean based on your experiences with him in the past?

A.  If we are ready to have sex again.

Q.  And after that, did you and Cassie have clothes on?

A.  I don't recall if I had put my clothes on already or not.

Q.  When you were sitting on the couch --

A.  I should say my underwear.

    My apologies.  I didn't mean to interrupt.

Q.  Oh, no.  That's fine.

    So when you heard this beating, were you in your underwear?

A.  Um, I most likely put my underwear on when they were in the bedroom, um, because I was afraid and I was imagining that it was time for me to -- I was about to get kicked out or something.

Q.  And so, after Mr. Combs said something that you understood to be telling you and Cassie to have sex again, when you were sitting on the couch, what were you and Cassie wearing?

A.  I'm pretty sure I was wearing underwear and she was -- I honestly don't recall what she had on.

Q.  Was she wearing clothes?

A.  It wouldn't have been much.  Probably a robe or something like that, but ...

Q.   And what did you two do to try to engage in sexual activity?

A.   She put her hands on me for a couple of seconds, and I recall, I feel like he told me it's time to go now, because he could see that I was not -- that messed me up.

Q.   So were you able to get an erection when Cassie tried to rub baby oil on you?

A.   She didn't try to rub baby oil on me after that.

Q.   I'm sorry.  I misunderstood.

     When she tried to touch you?

A.   Um, no.

Q.   Do you recall being asked about your first interaction with Cassie at the Gramercy Park Hotel during cross-examination?

A.   Yes.

Q.   And do you recall being asked whether Mr. Combs gave instruction during that first interaction?

A.   Yes.

Q.   Throughout all of the sexual activity during that first interaction at the Gramercy Park Hotel, who was in the room?

A.   Myself, Sean Combs, and Cassie.

Q.   And do you recall on cross-examination being asked about whether there were times when Cassie appeared to enjoy the sexual activity with you?

A.   Yes.

Q.   Throughout all of your sexual activity with Cassie, who was

in the room?

A.  Sean Combs, myself, and Cassie.

Q.  And is Sean Combs the same man that threw a liquor bottle across the room when she asked him to wait a minute?

MR. DONALDSON:  Objection.

MS. COMEY:  It's directly responsive to the line of cross, your Honor.

THE COURT:  It's overruled.

Q.  Is Sean Combs the same man who threw a liquor bottle across the room when Cassie asked him to wait a minute?

A.  Yes.

Q.  Is that the same man that grabbed her by her hair and dragged her to the bedroom?

A.  Yes.

Q.  And is that the same man who beat her and called her bitch?

A.  I didn't see him beating her beyond him dragging her into the room.  However, I could hear it, and it is my presumption --

MR. DONALDSON:  Objection.

THE COURT:  That's sustained.

The jury should disregard the last sentence of the witness's answer.

Ms. Comey.

BY MS. COMEY:

Q.  Is that the same man who called her bitch while you heard

her say I'm sorry and heard smacking sounds?

A.  Yes.

Q.  Is that the same man who then came out of that same room and asked you -- and told you and Cassie, in essence, to have sex again?

A.  In essence, yes.

        MR. DONALDSON:  Objection.

        THE COURT:  It's overruled.

        MS. COMEY:  No further questions.

        THE COURT:  Mr. Donaldson, anything further?

        MR. DONALDSON:  Yes, briefly.

RECROSS EXAMINATION

BY MR. DONALDSON:

Q.  Mr. Phillip, you just indicated that when you texted her, you did not receive a response.

        Do you recall saying that just now?

A.  Yes.

        MR. DONALDSON:  Can we put up Government Exhibit B-324, please, that's in evidence.

Q.  Now, these are text messages between you and Ms. -- and Cassie, correct?

A.  Correct.

Q.  And you texted her, correct?

A.  Correct.

Q.  And she responded, correct?

P5DsCOM2                       Phillip - Recross

A.  Correct.

Q.  And, in fact, on --

I need my glasses.  If we can go to page --

one second.  Go to page three of that document where it says, I'm in New York.

Q.  Do you see that?

A.  Yes, yes.

Q.  And do you see the date it says July 30, 2012?

A.  Yes.

Q.  If we can flip two pages and go to the next.

You see where it says, How long until you're here?  Do you see that?

A.  Yes.

Q.  That's Cassie talking to you?

A.  Yes.

Q.  And then you see where it says was that meant for me, that's you, correct?

A.  Yes.

Q.  All right.  The next line says what's the address, do you see that?

A.  Yes.

Q.  And then go to the next page, please.  The next line says I'm on the Upper West Side, so I can meet you within 10 or 15 minutes.

That's you, correct?

P5DsCOM2                       Phillip - Recross

A.   Yes.

Q.   And then further down in the blue it says 10 West End Avenue, hit me when you're there.

          That's Cassie, correct?

A.   Yes.

Q.   And that's her giving you the address to her apartment, correct?

A.   Yes.

Q.   So that you can get there, correct?

A.   Yes.

Q.   And so -- one second.

          And that's the date that this assault happened, correct, that is the first day you went there when you got the address.

          Do you remember saying that on cross?

A.   Yes.

Q.   All right.  We can scroll down please to go two pages over to ...

          Now, down to the bottom of that page it says Daniel NY LA.  The date is October 12, 2012.  Do you see that?

A.   Yes.

Q.   And flip one more page over.

          Do you see where it says, Don't give a fuck that I am a little tipsy, I love y'all niggas?

          Do you see that?

A.   Yes.

Q.   So, on October 12, 2012, three months after this assault, you sent her a text saying, I love y'all niggas, correct?

A.   Yes.

Q.   And you were telling both of them that you loved them, correct?

A.   Yes.

Q.   This is after the assault, correct?

A.   Yes.

          MR. DONALDSON:  I have no further questions.  Thank you.

          MS. COMEY:  Brief re-redirect, if I may, your Honor.

          THE COURT:  Very brief.

          MS. COMEY:  Yes.

REDIRECT EXAMINATION

BY MS. COMEY:

Q.   Why did you send that text message?

A.   Because I was trying to get her to respond to my messages. She would not respond to my messages, and the only way that I could see if she was OK was to try to bait her into making her and Mr. Combs believe that I had no problem with what he had done so that they would invite me back so that I could see for myself that she was OK.

          MS. COMEY:  No further questions.

          MR. DONALDSON:  Move to strike.

THE COURT:  On what basis?

MR. DONALDSON:  Nonresponsive.

MS. COMEY:  It's totally responsive to why did he send that text, your Honor.

THE COURT:  That's overruled.

All right.  Thank you very much, Mr. Phillip.

(Witness excused)

MS. ESTEVAO:  Your Honor, may we have a brief sidebar before the next witness?

THE COURT:  You may.

(Continued on next page)

(At the sidebar)

MS. ESTEVAO:  Your Honor, this is a Rule 615 issue. We understand that Ms. Ventura's husband, Alex Fine, may be present in the courtroom.  And we expect him to be a potential defense witness, so we would ask that he being excluded.  We can elaborate a little bit more on the reasons.

THE COURT:  I don't think you need to, unless there is an issue with that.

MS. JOHNSON:  There is, your Honor.  We were advised of this approximately 10 minutes ago.  He's not included on the defense witness list.  Ms. Ventura's husband is here with his family to support his wife and testify publicly.  We had, under the CVRA, she has the right to be treated with dignity and privacy.  And she would like support in this courtroom as she testifies.

MS. ESTEVAO:  Your Honor, her husband, Ms. Ventura began her relationship with her husband while she was still in a relationship with Mr. Combs, and there is an overlap between the two of those relationships.  It also relates to our cross-examination related to her accusations about rape during the course of both of those relationships.

THE COURT:  It doesn't matter why you're seeking to call him as a witness.

MS. ESTEVAO:  OK.

THE COURT:  You're telling me that, at this time, you

are calling him as a witness, is that right?

MS. GERAGOS:  If I could just elaborate.

What we have given the government is a witness list for our case in chief.  We do not know who the witnesses we would need to call on our direct case would be for possible impeachment areas for witnesses that the government would call on their -- that they called on their case in chief.

The reasons are important because, at this time, we can't really tell your Honor who we know we would call.  But there are several allegations that the government could bring up during their direct examination that we would explore during cross that may lead to witnesses we would call on our case in chief.  That would just be for impeachment reasons.

At this time, we can't say who definitely would call and we certainly --

THE COURT:  Why wasn't it raised before this morning when he's here with the entire family?

MS. GERAGOS:  Your Honor, I apologize.  I brought this to up to Ms. Comey, but not Ms. Johnson, yesterday.  This is my fault.  And then I didn't follow up on it last night.

I apologize.  We're not looking to not have to have her have support people.  Her brother is here, who was around all the while in their relationship, and we have --

THE COURT:  Her brother is here?

MS. GERAGOS:  We have no problem with her brother.

P5DsCOM2                       Phillip - Redirect

THE COURT:  How old is her brother?

MS. GERAGOS:  Her brother is a couple years...

MS. JOHNSON:  Mid 30s.

THE COURT:  OK.  And her children are here?

MS. JOHNSON:  Her children are not here.

THE COURT:  They.

Are not here.

MS. JOHNSON:  No.

THE COURT:  So who's here?

MS. JOHNSON:  Her brother is here, her cousin, and husband.

Now, with respect to the husband and his very small factual overlap with this case, the government is open to discussing what stipulations could be reached to obviate any means --

THE COURT:  Let's do this, because we have the jury and everyone sitting here.  There's been a request for the break.  I'll let the jury go back to the jury room just for a second.  That way, whoever needs to take a break, take a break, and then discuss this in open court.

MS. JOHNSON:  All right.

THE COURT:  Thank you.

(Continued on next page)

P5DsCOM2                         Phillip - Redirect

(In open court)

THE COURT:  All right.  Members of the jury, we're going to take a brief break so that people can stretch their legs, and there is some things we need to take care of here.

Let's take a ten-minute break and we'll be back at --

It's 10:52.  Let's try to get back by 10:55.

All rise for the jury.

(Continued on next page)

(Jury not present)

THE COURT:  All right.  Please be seated.

If anyone needs a break or needs to use the restroom or anything like that, you should do it now.  So, please, go.

Now, in terms of the issue that was raised at sidebar, maybe Ms. Estevao, you can, or Ms. Geragos, you can explain what is going on here.  Under the hush tones at the sidebar, I may have missed things.  You can tell me exactly what is happening.

MS. GERAGOS:  Our application, your Honor, is that Ms. Ventura's husband not be in the courtroom under Rule 615. The reason for this -- and of course we do not know what her direct testimony will be at this time -- but if the government elicits any allegation about any alleged rape by Mr. Combs in the summer or fall of 2018, I could see that there could be a possibility, based on how cross-examination goes, that we may need to call him on our case for impeachment purposes.

Additionally, there are several other, I mean, Ms. Johnson said at the sidebar this is just a very small period of overlap, but there has been three instances I want to point your Honor to that could be relevant with respect to his potential testimony.

So the first would be the alleged rape in the summer or fall of 2018, if they go into that on direct examination. The second thing would be whether or not Ms. Ventura is going

to testify on direct that Mr. Combs ever threatened Mr. Fine when they had -- when their breakup was -- when they had broken up, when they weren't together anymore and she was with him. And then the third is that after Ms. Ventura made the demand of 30 million, began to make the demand of $30 million to Mr. Combs and prior to Ms. Ventura's lawsuit against Mr. Combs, Mr. Fine sent several very threatening text messages to our client saying that he would like to beat the F word out of his old -- just several words that I will not repeat on the record.

There are several threatening messages that my client received that we got in discovery from the government. And, again, we don't know what the direct will be, so I think this argument would be a little bit better if we did.

These three areas of possible testimony that we may -- that we could have to call him on our direct case. And the reason we didn't put him on our witness list, of course, was because that witness list is for the defense's case in chief. But there are several potential witnesses that, depending on how the government's case comes in, we would have to put on in our case in chief.

That's our application. We are certainly not looking to not have her have support people in the courtroom. That is not what we're looking to do.

I expect, my understanding is that her brother will be in the courtroom. Her brother is someone that was around their

entire relationship, but I don't expect that his testimony would be relevant at all in this case, based on our review of the 3500 and the messages.  And so we are not making an application that he be excluded in any way or that any of her other family members, except for her mother, who I expect to testify, not be in this courtroom.

It's really with respect to her husband because of these three discrete issues.

THE COURT:  OK.  Ms. Johnson.

MS. JOHNSON:  Your Honor, a few responses.

First, with respect to both this witness and future witnesses, the government would respectfully request that the defense provide more notice of any potential impeachment witnesses it intends to call, to the extent they are not -- may call, to the extent they are not on the 34-witness list. Because this is nothing that was foreseeable to the government until a few minutes ago when it was raised.

I do not expect that any of these topics will be covered in today's direct examination.  We may cover one of those topics likely tomorrow.  That would be the first one, the rape.  As I said at sidebar, the government is open to speaking to the defense about what, if any, stipulations could be entered -- a fact could be entered that could obviate the need to call Mr. Fine as a witness.

I really am not sure how, if at all, he would be able

to testify about an alleged rape that occurred between Mr. Combs and Ms. Ventura.  But we're open to having that dialogue, and we would ask that Ms. Ventura be allowed to have her support -- her people, including her husband -- here in this courtroom.

She has various rights under the Crimes Victim Rights Act and we would ask that he be allowed to be present.

THE COURT:  All right.  And, look, Rule 615 is mandatory on the court once it's invoked.  The rule has been invoked.  The exception is, I suppose, in Federal Rule of Criminal Procedure 60, and that would pertain to victims, so that doesn't not apply here.

So I don't understand how there would be an exception to the rule, unless the defense said -- and maybe they are willing to do this -- that given what you've said about the nature of the examination, it's probably not going to come up this morning and that might be, for you, one of the critical times for her husband to be in the courtroom.

So if that is not going to come up this morning, it may be something we can deal with in the afternoon session.  That depends on the defense.  Unless I'm missing something, that depends on the defense indicating that they are comfortable with that and waiving any right they may have under Rule 615.  If they invoke the right, maybe you can help me.

I'm not seeing what the exception is you're trying to

invoke, given Rule 60 addresses this issue and it only pertains to victims.

MS. JOHNSON:  Understood, your Honor.

Then I would, again, reiterate my request for much more significant notice.

THE COURT:  It is no longer a request.  It is now an order from the court.

So, and you don't need to explain what is happening, Ms. Geragos.  All you need to say is that, for this witness, we are seeking exclusion of X person because of our understanding of what the testimony may be.  That way, the government will have advanced notice, so there is not a surprise in the immediate, you know, right before or right during anyone's testimony.

MS. GERAGOS:  Understood.

THE COURT:  All right.  So, Ms. Geragos, what is your position?

MS. GERAGOS:  Can you give me 15 seconds to confer, your Honor?

THE COURT:  Yes.

(Counsel confer)

MS. GERAGOS:  Your Honor, we've conferred.

We understand she would like her support people.  If he wants to come into the courtroom today, before 2018, the 2018 time period starts, we are fine with him remaining in the

courtroom until then.  We would ask that he be excluded once we get into that time period.

THE COURT:  All right.  So, Ms. Johnson, I think all you need to do is to request a sidebar at the appropriate juncture, and we'll take that sidebar and then we'll make the adjustments as necessary.

MS. JOHNSON:  Understood, your Honor.

I want to flag one idea.  I will be asking one series of questions early in the examination about a post-2018 time period, but I don't believe it would implicate any concerns.

It's related to the authentication of evidence and electronic devices provided by the witness.

THE COURT:  That's up to Ms. Geragos.

MS. GERAGOS:  That's fine.

THE COURT:  OK.  All right.  So we'll take it there. We'll be back in a couple minutes.

(Recess)

THE COURT:  Anything to raise before the government calls their next witness?

MS. JOHNSON:  No, your Honor.

MR. AGNIFILO:  No, your Honor.

THE COURT:  All right.  Let's have our jury.

(Continued on next page)

(Jury present)

THE COURT:  Please be seated.

Is the government ready to call their next witness?

MS. JOHNSON:  Yes, your Honor.

The government calls Casandra Ventura.

THE COURT:  All right.

THE DEPUTY CLERK:  Remain standing and please raise your right hand.

CASANDRA VENTURA,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE COURT:  Ms. Johnson.

MS. JOHNSON:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. JOHNSON:

Q.  Good morning, Ms. Ventura.

A.  Good morning.

Q.  Just so you know, you can drink that water that's on the stand.

A.  Oh, thank you.

Q.  How old are you?

A.  I am 38 years old.

Q.  What is your occupation?

A.  I'm a musician, an entertainer.

MS. JOHNSON:  Ms. Gavin, could you please publish

P5DsCOM2                         Ventura - Direct

Government Exhibit 2A-101 in evidence for all the parties in the courtroom.

Q.   Ms. Ventura, who is depicted in Government Exhibit 2A-101?

A.   Sean Combs.

Q.   How do you know Sean Combs?

A.   We were in a relationship for a little over 11 -- 10 years, 11 years.

Q.   If I refer to Sean Combs as Sean today, will you know what I'm talking about?

A.   Yes.

Q.   You said you were in a relationship with Sean for a little over a decade.

During that period, were you together consistently or were there breaks during the relationship?

A.   There were breaks.

Q.   During that same time, were there times where you got along well with Sean?

A.   Yes.

Q.   Were there times where you did not?

A.   Yes.

Q.   Were there times when you had arguments with Sean?

A.   Yes.

Q.   Without getting into the subject matter of those arguments, can you describe what arguments with Sean were like?

A.   If they were violent arguments, um, it would usually result

in some sort of physical abuse, um, and dragging, just different things of that nature.

Q.   When you say physical abuse, can you tell me what types of things that Sean did that hurt you physically?

A.   I mean, he would mash me in my head, knock me over, um, drag me, kick me, um, stomp me in the head, if I was down.

Q.   How frequently was Sean physical with you during your relationship?

A.   Too frequently.

Q.   Were you ever injured as a result of these incidents?

A.   Yes.

Q.   What kind of injuries did you have as a result of Sean being physical with you?

A.   Usually pretty similar.  Um, I would get knots in my forehead, busted lips, swollen lips, black eyes, the whites of my eyes would be red, um, bruises all over my body, um, just depending.

MS. JOHNSON:  OK.  Ms. Gavin, could you please pull up and publish for the courtroom, Government Exhibit 10C-103 at 33 seconds.

Q.   Ms. Ventura, directing your attention to the screen in front of you, do you recognize who's depicted in that still image?

A.   Yes, that's me and Sean.

Q.   Do you recognize the location recorded in this still image?

A.   Yes, that's the InterContinental Century City.

Q.   What were you and Sean doing at the InterContinental Century City at the time of this image was captured?

A.   We were having an encounter that we call a freak-off and I was leaving there.

Q.   We're going to get back to that specific incident later on.

You just mentioned the word freak-off.  Do you recall that?

A.   Yes.

Q.   Who introduced you to the term freak-off?

A.   Sean did.

Q.   And how did you learn what a freak-off was?

A.   Um, within the first year of our relationship, um, Sean proposed to me this idea, this sexual encounter that he called voyeurism, where he would watch me be -- have intercourse and sexual activity with a third party, specifically another man.

Q.   And how did it come -- how did the term freak-off come about?

A.   I honestly don't remember exactly how it came about.

Q.   Can you describe for the jury, when you say the term freak-off, what that entails?

A.   Um, it basically entails the hiring of an escort and setting up this experience so that I could perform for Sean.

Q.   And what did the performance involve, at a high level?

A.   The performance involved -- I'm sorry.

Um, it just involved watching, Sean being able to watch me with the other person and, um, actually direct, like, direct us on what we were doing sexually.

Q. And when you say the other person, who are you referring to?

A. Um, the third party, the escort or dancer that would be hired.

Q. Who was in charge of all the aspects of the freak-offs you mentioned, the hiring, the setup, etc.?

A. Eventually, it became a job for me, pretty much, um, to where I knew if that is something that he wanted to do, I had the contacts to set it up and get a hotel room and all of that.

Um, but in the beginning, Sean set it up. He was in charge.

Q. And after it became your job, how did you know what to do?

A. He would tell me.

Q. When Sean first proposed freak-offs, what was your reaction?

A. Oh, I just remember, like, my stomach falling to my butt, like, just the nervousness and the confusion in that moment.

I think I was 22 at the time. I had just turned 22. I don't ...

I didn't have a concept of how that would be a turn-on, but I also felt a sense of responsibility with him sharing something, um, like that with me. So, yeah, I was

P5DsCOM2                        Ventura - Direct

confused, nervous, but also loved him very much and wanted to make him happy, so ...

Yeah.

Q. Did you agree to try a freak-off when Sean first proposed one?

A. I did.

Q. After that, were there more freak-offs?

A. Yes, there were.

Q. How, if at all, did your willingness to engage in freak-offs with Sean change over time?

A. I mean, pretty quickly over time. I knew that it wasn't something that I wanted to be doing, especially as regularly as it became. Um, but, again, I was just in love and wanted to make him happy.

Q. Well, despite not wanting to do freak-offs, did you continue to engage in freak-offs with Sean?

A. I did.

Q. And why did you continue to engage in freak-offs with Sean?

A. He would ask me, he would bring it up at random times, and I think, to a point, I just didn't feel like I had much of a choice. Um, I didn't really know what no would be or what no could turn into.

Q. When you say you didn't know what no could turn into, what do you mean by that?

A. Um, making him angry. Very honestly, also making him

uncomfortable, that I knew this thing and that I no longer wanted to do it.

Can you repeat the question?

Q. Sure.

You said that you didn't know what no could turn into and I wanted to -- I asked you if you could explain what you meant by that phrase?

A. Ultimately, at that point, Sean controlled a lot of my life, whether it was career, the way I dressed, like, everything. Everything. And I just didn't feel like I had much say in it at that time being, like, really super young, naive, total people-pleaser.

Yeah. I didn't know if he would be upset enough to be violent or if he would write me off and just not want to be with me at all.

Q. What, if anything, were you afraid would happen if you said no to a freak-off?

A. Well, over time, it turned into the fact that there were actually blackmail materials to -- to basically make me feel like, if I didn't do it, that it would be hung over my head in that way, or that these things would become public.

I experienced violence with him before that. The abuse had started before that, so, obviously, in the back of my mind.

Q. And, Ms. Ventura, when you said that the blackmail

materials would be hung over your head, what, if anything, were you afraid Mr. Combs -- Sean would do with the blackmail materials?

A.   Um, release them.  Put them out on the internet.  He had many resources to do that, so ...

Q.   And you mentioned that at this point, violence had started.

What, if anything, were you afraid would happen physically if you refused to do a freak-off?

A.   I mean, it was always in the back of my mind that I would somehow be hurt by him, but, it's -- Sean is a really polarizing person, also very charming.  So it's hard to be able to decide in that moment, like, what you need when he's telling you what he wants.  I just didn't know.  I just didn't know what would happen.

Q.   Ms. Ventura, just to clarify one thing you said, you said you called something blackmail materials.

What were you referring to?

A.   Referring to actual videos and photos of the sexual encounters, the escort.

Q.   To be clear, that's the freak-offs you mentioned earlier?

A.   Yes.

Q.   OK.  And who was depicted in those videos and photos with the escort?

A.   Me, Sean is in some of the videos.  Yeah.

Q.   OK.  We're going to get back to this, but first I would

like to direct your attention to approximately December 2023.

What, if any, items did you provide to the government?

A.  I gave them broken laptops, iPads, phones, things that no longer worked but I kept because I didn't know what was on them.

Q.  And what was the approximate time period that these broken electronic devices were from?

A.  It was around the time period of being in a relationship with Sean.

MS. JOHNSON:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q.  Ms. Ventura, I've handed you what's been marked for identification as GX B.

Do you recognize that I've handed you?

A.  Yes.

Q.  Have you reviewed the contents of that drive?

A.  I have.

Q.  At a high level, what's on that drive?

A.  Um, different communications and documents pertaining to this trial.

Q.  Are those communications and documents from the electronic devices we just discussed?

A.  Yes.

Q.  And did you also review photographs that are contained on that drive?

A.   Yes.

Q.   Are those photographs also from the electronic devices we just discussed?

A.   Yes.

Q.   And how do you know that the drive I just handed you is the drive that you reviewed before this trial?

A.   Because my initials are on here.

Q.   Did you initial the drive after you reviewed it?

A.   I did.

         MS. JOHNSON:  Your Honor, at this time, the government is going to offer some of the materials on that drive.  We would offer the Exhibits B-101 through B-112, B-201 through B-209, B-301 through B-313, B-315 and 316 -- I'm sorry -- B-315 through 320, B-400-A through B-402, B-500-A through B-503, and B-600-A through B-608, and all subdivisions thereof.

         THE COURT:  Any objection?

         MS. ESTEVAO:  Subject to connection, no objection.

         THE COURT:  All right.  They will be admitted.

         (Government's Exhibits B-101 through B-112, B-201 through B-209, B-301 through B-313, B-315 through 320, B-400-A through B-402, B-500-A through B-503, and B-600-A through B-608 received in evidence)

         MS. JOHNSON:  Ms. Gavin, can you pull He's please pull up what is in evidence as Government Exhibit B-105.

BY MS. JOHNSON:

Q.   Ms. Ventura, who is depicted in Government Exhibit B-105?

A.   That's me and Kerry Morgan.

Q.   With respect to when you first met Sean, is this photograph taken before or after you first met Sean?

A.   Um, it might have been taken after, but really close to.

Q.   OK.  Approximately what year is this photograph, if you recall?

A.   I feel like this photo is probably around 2004.

Q.   Who is Kerry Morgan?

A.   She was my best friend at the time.

Q.   At the time this photograph was taken, where were you living?

A.   I was living in New York City.

Q.   And at the time this photograph was taken, what were you doing for working?

A.   I was modeling.

          MS. JOHNSON:  Ms. Gavin, you can take that photograph down.

Q.   Ms. Ventura, besides modeling, what, if anything, were you doing in the music industry around this same time?

A.   Around this same time, I really wasn't doing too much with the music industry.  Um, I had recorded a few songs with a producer I was working with and in a relationship with.  And, um, yeah, it was really new for me at that point.

Q.   Did there come a time when you released songs that you

recorded?

A.   Yes.

Q.   Did there also come a time when you signed a contract what Bad Boy Records?

A.   Yes.

Q.   Approximately what month and year did you sign that contract?

A.   I believe it was in January or February of 2006.

Q.   What affiliation, if any, did Sean have with Bad Boy Records?

A.   He ran the company.

Q.   Before you met Sean, what did you know about him?

A.   Um, I just knew that he was this larger-than-life entrepreneur, musician.  I was a fan of the music.  I didn't know too much about him personally.

Q.   And you mentioned that you signed that contract in around the beginning of 2006.

     How old were you at that time?

A.   At that time, I believe I was 19.

Q.   And at a high level, what were the terms of that record contract you signed about Bad Boy?

A.   It was a ten-album deal, so, yeah.

Q.   Did you release an album?

A.   I did an album, yeah.

Q.   Approximately when did you release an album?

A.   Later that year in 2006, August.

Q.   After August 2006, did you release any other albums?

A.   No.

Q.   After you were signed to Bad Boy, can you please describe your professional relationship with Sean?

A.   After I signed to Bad Boy, it was still a plutonic relationship.  He looked out for me.  I had some rough performances, so he had my back through that.  Yeah.

          MS. JOHNSON:  Ms. Gavin, can you please pull up and publish what's in evidence as Government Exhibit B-102 and B-103, side by side, if possible.

Q.   Ms. Ventura, directing your attention first to B-102 on the left side, who is depicted in that photograph?

A.   That's me and Sean.

Q.   And what's the occasion for that photograph, if you remember?

A.   Um, I remember it being the CFDA Awards in New York.

Q.   And relative to your signing of the record contract, when is this photograph taken?

A.   Sometime later that year, I would say.

Q.   Around 2006?

A.   Yes.

Q.   OK.  Directing your attention now to the photograph on the right, Government Exhibit B-103, who is depicted in that photograph?

A.   From the left is Kim Porter, Sean, me, and Cheri Dennis.

Q.   What's the occasion where this photograph is taken?

A.   It's the 2006 BET Awards.

Q.   OK.   Who is Kim Porter?

A.   Kim Porter was Sean's ex from before me and the mother of his children.   Sorry.

          MS. JOHNSON:   Ms. Gavin, you can take those down.

Q.   Besides the photographs I just displayed, Government Exhibits B-102 and B-103, when, if ever, did you see Sean in other social settings around 2006?

A.   Um, we used to kind of hang out with the same group of people in New York, so we would see each other out here and there at clubs.   Um, but that was pretty much it.

Q.   How frequently would you see Sean out at clubs in New York?

A.   Maybe, like, once a month, once every couple months.

Q.   OK.   Directing your attention to your 21st birthday, did you turn 21 in August of 2007?

A.   Yes.

Q.   Where did you celebrate your 21st birthday?

A.   In Las Vegas.

          MS. JOHNSON:   Ms. Gavin, could you please pull up and publish what's in evidence as B-104.

Q.   Ms. Ventura, what's depicted in Government Exhibit B-104?

A.   That is Kerry Morgan, Alizay Roshi, Sean, and myself.   And we're on the outside patio in his room in Las Vegas on that

trip.

Q. When you say that trip, which trip to Las Vegas are you referring to?

A. 21st birthday, at the VMAs.

Q. When you say at the VMAs, can you explain what you meant of the VMAs?

A. That was the event that was going on that weekend. The MTV Video Music Awards.

Q. And what, if anything, happened between you and Sean while you were in Las Vegas for your 21st birthday?

A. A lot of different things happened, but he kissed me in the bathroom of his -- or in the bathroom of this actual suite, pretty early in the morning. We had been up, all of us, pretty late.

Q. What was your reaction to Sean kissing you in the bathroom?

A. I think I was just really confused at the time. Again, young, new artist, like, just didn't really know the lay of the land when it came to things like that. So, in my confusion, just, kind of cried and ran out.

Q. When you say you were a new artist who did not know the lay of the land, what did you mean by that?

A. Um, I just wasn't familiar with -- with having an executive or anybody pay attention to me in that way and be that forward at that point. I just didn't really understand it. I was pretty naive, I would say.

P5DCcom3                      Ventura - Direct

Q.  When you say that way, can you clarify what you mean by that way?

A.  In a more-than-friends way, in a sexual way, romantic way.

Q.  And at this time at your 21st birthday, what was your professional relationship with Sean again?

A.  I was signed to his label.

Q.  And what happened after Sean kissed you in the bathroom?

A.  I just remember running out and headed back to my hotel.  I think I told Kerry about it at the time, but I didn't really share it with anyone.

Q.  Did you want to kiss Sean at your 21st birthday?

A.  No, not at my 21st birthday.

Q.  After your 21st birthday in Las Vegas, how, if at all, was your relationship with Sean different?

A.  Um, when we got back to New York, I would just visit with him.  He would invite me over to his hotel.  I think his apartment at the time was getting renovated.  So, I went to see him a handful of times.

Q.  Which hotel did you go to see Sean at?

A.  The Trump Hotel in Columbus Circle is the one that I remember specifically.

        (Continued on next page)

BY MS. JOHNSON:

Q.  At the same time after your 21st birthday, what, if anything, were you doing with your music career?

A.   I was trying just to continue to go to the next album, continue recording, come up with a concept.

Q.   Were you recording another album at the time?

A.   Yes.

Q.   What influence, if any, did Sean have on your music career at this time?

A.   At this time, I mean, he called most of the shots -- well, all of the shots.  If I had a new record, I would have to come play it for him.  He chose what was next for me, basically.

Q.   Before we talk about the hotel, what is the age difference, if any, between you and Sean?

A.   17 years.

Q.   And when Sean invited you to the hotel after your 21st birthday, what was your reaction to that invitation?

A.   I'm sorry.  Can you ask that question again.

Q.   Of course.  You testified earlier that after your 21st birthday, Sean invited you to hang out with him at hotels in New York; is that right?

A.   Yes.

Q.   How did you feel when Sean invited you to those hotels?

A.   I mean, initially, a bit of nervousness.  And then just being a young artist, like, excitement, of course, like, okay, we're going to go talk about music or we're going to talk about what's next.  Yeah, I think I just -- it's a lot in that time period that's kind of hazy because it was a while ago, but just

P5DCcom3                    Ventura - Direct

nervous, excitement.

Q.   At the meetings in the hotel rooms, what, if anything, did you two talk about about music?

A.   Talked about upcoming projects or the actual next album and other things.  We started to develop a more comfortable relationship with each other.

Q.   And what else, if anything, happened at those meetings at the hotels?

A.   I remember being introduced to the idea of oral sex.  It wasn't something that I really understood or did at that point. And he basically taught me how.

Q.   When you say he basically taught you how, who is the "he" in that sentence?

A.   Sean.

Q.   When you say you were introduced to oral sex, who introduced you?

A.   Sean.

Q.   How did he introduce you to oral sex?

A.   He gave me oral sex.

Q.   Did you reciprocate the oral sex?

A.   I did not.  I went home and I heard about it from him.

Q.   When you say you heard about it from him, can you tell me more about that.

A.   He just kind of made me feel crazy for not reciprocating. At that time, just didn't understand that kind of a sexual

relationship.  I also was still in a relationship with someone else.

Q.  When you say you didn't understand that kind of a sexual relationship, can you tell me more about what you mean by that.

A.  I was just so young.  I didn't -- I didn't have even the vocabulary for some of the things that we talked about.  Like, I was just trying to understand it.  Just completely sexually inexperienced at that point.

Q.  And around the same time, in addition to performing oral sex on you, were there ever any occasions where you performed oral sex on Sean?

A.  Later on, yeah.

Q.  What was your reaction to the hotel room visits with Sean?

A.  I think it was the nervous excitement that I say.  It also just made me feel sneaky.  I didn't know -- I was curious, but of course ended up there and wanted to be, like, around him. So that was just kind of -- it was like, okay, I'm here. Leaving, it was just always confusing because I really didn't know what I felt.  I felt like I -- I don't know that I knew that I was making decisions for myself or not.  I feel like it was just, like, here I am.  I don't know how to explain that.

Q.  You said you wanted to be around him.  Why did you want to be around Sean?

A.  I wanted to be around Sean for the same reasons as like everyone else at the time.  It's just this exciting,

entertaining, fun guy.  I had also happened to have my career in his hands.  But, yeah, just wanted to spend time.  It felt special because not a lot of people got that kind of time with him.

Q.  Around the same time, did you also take a trip to meet Sean in Miami?

A.  I did.

Q.  What were the circumstances of meeting Sean in Miami?

A.  The circumstances were that we essentially -- I didn't have a party to host in Miami, but wanted to spend that weekend together.  And so came up with a flyer that said I was hosting a party at a club in the beach area, Miami Beach area.

Q.  When you talk about hosting a party, can you explain to the jury what you mean by that.

A.  Yeah.  As an artist, to make extra money, sometimes you're asked to host events at different clubs, sometimes to perform, and that would have fallen in line with me going to a club and making money for just showing up.

Q.  And you mentioned a flyer, who made that flyer?

A.  I don't know exactly who made the flyer, but somebody that we knew that could create it.

Q.  Did you make the flyer?

A.  I did not make the flyer, no.

Q.  Was the flyer advertising an actual club hosting for you?

A.  No.

P5DCcom3                    Ventura - Direct

Q.  Besides yourself and Sean, who else was in Miami with you?

A.  I was there with Kerry Morgan and Dallas Austin later, met us down there.

Q.  Who is Dallas Austin?

A.  He is a producer, musician, and friend.

Q.  Kerry Morgan is the individual in the photograph we saw earlier?

A.  Yes.

Q.  What, if anything, did you and Sean do together on this trip?

A.  Together -- this trip was the first time we had sexual intercourse with each other.  He rented a boat.  I was the first to get there.  We just spent some time together and, yeah.

Q.  And you had testified earlier that at some point after the hotel visits, you had given Sean oral sex.  Do you remember that?

A.  Uh-huh.

Q.  Was that prior to Miami?

A.  I don't think so.  I think it happened there, I'm pretty sure.  Everything kind of happened that weekend.

Q.  Prior to having sex on the boat, what were you doing on the boat?

A.  Just riding on the boat.

Q.  What, if any, alcohol were you drinking?

P5DCcom3                    Ventura - Direct

A.   Drinking wine during the day and then later that night started to take drugs.

Q.   What drugs did you take?

A.   On that trip, it was ecstasy, it was a blue dolphin ecstasy pill.

Q.   Can you explain what you mean by a blue dolphin ecstasy pill?

A.   Ecstasy used to -- I don't know how it is now, but came as a pressed pill with a little symbol on it.  So these had dolphins.

Q.   Who gave you the ecstasy that you took on the boat in Miami?

A.   Sean did.

Q.   Prior to this Miami trip, had you taken ecstasy before?

A.   No.

Q.   Had you ever taken ecstasy unintentionally before?

A.   Yes.

Q.   What happened at that time?

A.   I just was out of it, with friends, laughing.  Didn't know what it was until a little bit later.

Q.   And when you say you had unintentionally taken ecstasy, how did you unintentionally take it?

A.   I took it out of someone else's Gatorade bottle.  Just drinking Gatorade, but it had drugs in it, but didn't know.

Q.   This was before Miami?

P5DCcom3                          Ventura - Direct

A.   This was before Miami, yeah.

Q.   Prior to hanging out with Sean more, what, if any, drugs did you use?

A.   I smoked marijuana, and I'd drink wine and, yeah.

Q.   On this Miami trip when you took ecstasy intentionally for the first time, how did it make you feel?

A.   It's totally euphoric.  It's an experience of something called rolling where you're just really in the high.  So you're super high.  You're sensitive to touch.  You're just sensitive to all your different senses.

         MS. JOHNSON:  Ms. Gavin, could you please pull up and publish what's in evidence as Government Exhibit B-107 and B-108 side-by-side.

Q.   Ms. Ventura, starting with the photograph on the left, B-107, do you recognize who is depicted in that photo?

A.   Yes.  That's me and Sean on the boat in Miami.

Q.   And is this the boat you just described being on?

A.   Yes.

Q.   And turning to the next photograph, B-108, do you recognize who's depicted in that exhibit?

A.   Yes.  That's Sean and me sitting down, same boat.

         MS. JOHNSON:  Ms. Gavin, you can take those exhibits down now.

Q.   After the Miami trip, what was the status of your relationship with Sean?

P5DCcom3                         Ventura - Direct

A.   I would say we were just together.  We spent a lot of time with each other after that.  Now I know in hindsight, but I had become, like, one of his girlfriends after that trip.

Q.   When you say you know in hindsight, what do you know in hindsight?

A.   That Sean Combs had many girlfriends.

Q.   At the time, what did you know?

A.   At the time, I don't know.  I was -- can't say naïve enough.  I knew that we were spending a lot of time together one-on-one and really felt, yeah, like we were in a -- a monogamous relationship for a period.

Q.   After the Miami trip, was it public that you were dating Sean?

A.   No, not for many years after that.

Q.   Why was it not public for many years?

A.   It was always just a discussion of me being his artist and just not wanting it to look bad.  But I also know it was because of his family and his children and other things, personal things for him.

Q.   What are those other personal things, if you know?

A.   His family, yeah.  Just, it was always something I understood.

Q.   Around the same time, who, if anyone, was publicly linked to Sean romantically?

A.   Around this time, I believe it was Kim, but I think she had

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5DCcom3                         Ventura - Direct

also just moved away around that time.

Q.   When you say Kim, are you referring to Kim Porter?

A.   Yes.

Q.   After you started dating Sean, what changes, if any, did you eventually make in your career management?

A.   Well, my management at that time was also managing the other producer/boyfriend that I was with, and just looked at that as a major conflict of interest at that point.  And yeah, I basically just trusted that we were going to find new people.

Q.   And when you say you trusted that we were going to find new people, who was the "we" in that sentence?

A.   Sean and I.

Q.   To be clear, did you break ties with your old management after you started dating Sean?

A.   I did, yeah.

Q.   After Miami, how did your relationship with Sean evolve?

A.   After Miami, we really just -- I mean at least from my own side of things, I really fell in love with him.  I traveled with him everywhere.  I was in studio.  I was just like a little shadow for a little while.

Q.   You were a shadow to whom?

A.   To Sean.

Q.   How did Sean treat you at this time?

A.   We had fun.  It was just kind of like a -- it's my first adult -- real adult relationship, at least what I thought it

P5DCcom3                           Ventura - Direct

was.  And it was different, so different than anything, as you can imagine.  His lifestyle was much different than mine.

Q.  How long did you feel this way about your relationship that you describe being this -- strike that.

You said that Sean's lifestyle was different.  Can you explain what you mean by that?

A.  I mean he had assistants at his beckoned call.  He could get anything done quickly.  He had respect from everyone.  He traveled quite a bit.  So he was, yeah, moving around a lot.

MS. JOHNSON:  Ms. Gavin, could you please pull up and publish Government Exhibit B-112.

Q.  Ms. Ventura, do you recognize who's depicted in Government Exhibit B-112?

A.  Yeah, that's me and Sean.

Q.  What's the occasion when this photograph was taken, if you remember?

A.  This was at a strip club in New York, I'm not sure which one, but it was on Halloween.

Q.  And what year?

A.  I would say this was probably 2007 or 8, 7.

Q.  And Halloween 2007, is that shortly after the Miami trip?

A.  Yeah.  Yes.

MS. JOHNSON:  If you can pull that down, Ms. Gavin, and pull up Government Exhibit B-106 and B-109, both in evidence, side-by-side, please.

P5DCcom3                         Ventura - Direct

Q. Ms. Ventura, starting with the photograph on the left, B-106, who's depicted in B-106?

A. That's Sean and myself.

Q. And where are you?

A. We're in the back of his car, probably driving to the Hamptons or something.

Q. Approximately what time period is this photograph from?

A. This is in the first year of us dating, like within that first few months.

Q. And turning to the photograph on the right, B-109, again, who is depicted in that photograph?

A. Sean and myself in the back of the car.

Q. Is that the same car?

A. Yes.

Q. And what's the approximate time period that this photograph was taken?

A. It was around the same time.

Q. In the beginning of your relationship?

A. Yeah.

Q. Ms. Ventura, how did you feel about Sean around this time in the beginning of your relationship?

A. I think I was just enamored by him. We were just having a good time. It was really fun at this point.

Q. How long did you feel that way about Sean?

A. I don't know exactly how long. It was off and on for many

P5DCcom3                        Ventura - Direct

years, yeah.

Q.  How, if at all, did your relationship change over time?

A.  I mean, over time you get more comfortable with somebody, obviously, but I began to just experience a different side of him, which was his abusive side and his side that just was very controlling over my life and the things that I wanted to do, but there was still love there.

          MS. JOHNSON:  Ms. Gavin, you can take these exhibits down.

Q.  Ms. Ventura, you mentioned a side of Sean that wanted control over your life.  Can you explain to me what you mean by that.

A.  Being an artist at that time, everything moved really quickly for me and I didn't -- I don't know.  There was just no way of keeping up with what was happening and -- I'm sorry. Can you repeat the question.

Q.  Sure.  You had mentioned that one thing that changed about your relationship over time was Sean wanting to have control over your life.  I just wanted to ask you what that meant when you said control over your life.

A.  Control was everything from the way that I looked to what I was working on that day, who I was speaking to.  Control was kind of like an all-around thing to a certain point.

Q.  How often did you talk to Sean in a typical day while you were dating?

P5DCcom3                    Ventura - Direct

A.   All day throughout the day.

Q.   How did you two communicate?

A.   Texts mostly, calls.

Q.   What about phone calls?

A.   Phone calls for sure.

Q.   And when it became a thing, did you FaceTime?

A.   Yes.

Q.   Were there times when you did not answer Sean's messages or phone calls right away?

A.   Yeah.

Q.   What happened when you didn't answer his messages or phone calls right away?

A.   He's a bit of an incessant caller, or would have staff, his assistants, security, somebody continue to call until you answered or until he found you.

Q.   When you say incessant caller, what do you mean by that?

A.   If there's no answer, you just keep going.

Q.   Would he do the same thing with text messages?

A.   Yes.  That's just his nature.

Q.   You mentioned that assistants and security would reach out until they found you?

A.   Correct.

Q.   What did you mean by until they found you?

A.   Until they heard from you and knew where you were and could tell him.

Q.   Were there times when Sean's staff located you in person?

A.   Yes.

Q.   How, if at all, did Sean's mood vary from day to day?

A.   It varied depending on what was going on.

Q.   How did his mood vary?

A.   I mean, it could change at the drop of a conversation, a bad conversation that I had nothing to do with.  It just swung different ways.

Q.   I didn't catch that last part that you said.  Could you repeat it?

A.   I said it swung different ways quite a bit.

Q.   When it swung, could you describe the different moods that you experienced?

A.   Yeah.  I mean, agitation, kind of zoning out if he was passionate about a subject, he would just be really focused. Yeah, anger.

Q.   How, if at all, did Sean's moods impact you?

A.   I felt like they impacted me pretty greatly.  It got to a point where you -- this is me speaking for myself, but -- like, you know how to handle certain people, you know when to speak to them, you know when to approach them, like that it's timing or what you say, how you present something just in order to make sure the person doesn't become upset with you or, yeah, change their demeanor with you.

Q.   Do you have an example of how Sean's moods impacted you?

A.   I mean the greatest -- the most complicated and greatest examples are the abuse because, like, I also felt at certain times when I knew that it wasn't even about me and, yeah, like make the wrong face and the next thing I knew, I was getting hit in the face.  It was, you know --

Q.   When you say the abuse, what abuse are you talking about?

A.   Physical abuse in a relationship, but there is also psychological.  There's a lot of things going on.

Q.   You said something about making the wrong face.  Can you explain what you meant by that?

A.   If I wasn't smiling at him the way he wanted.  If I just looked a certain way that he didn't like, maybe I was a brat or something, like, he would let me know I need to fix my face or watch my mouth.  That was like a -- those were things that were said in the relationship quite often, fix your face, watch your mouth, or you have a slick mouth.

Q.   You also mentioned psychological abuse.  Can you describe what you meant by psychological abuse?

A.   That's pretty deep.  I mean, psychological is just every day, not knowing who he was going to be when we woke up that day.  The entire relationship, I didn't live with him.  So we had time apart and usually it was just, like, I always had to be doing something.  I don't know if that makes sense.  I had what you would call, like, busy work.  I needed to make sure I knew what songs I was recording, what things were coming up and

P5DCcom3                          Ventura - Direct

then have to, like, list them out or I wasn't amounting to anything in my life.  So that was -- it was a lot.  I mean, psychological is an everyday thing, somebody constantly telling you who to be.

Q.  When you say someone constantly telling you who to be, are you referring to anyone in particular?

A.  I'm referring to Sean.

Q.  You mentioned you always had to be doing something?

A.  Yeah.

Q.  Who, if anyone, would check in on you about what you were doing?

A.  He would.  He would check in.  But I also worked with his engineers and all of his people.  So everybody was pretty much in tune with everything I was doing.

Q.  When you say his engineers and his people, are you talking about people you worked with in the studio?

A.  Studio staff, yup.

Q.  You also mentioned making lists of songs.  Do you recall that?

A.  Yes.

Q.  Who, if anyone, would you give those lists to?

A.  I would give it to him, like an engineer or the writer, but he would have a list.  He knew what I was doing at studio, Sean.

Q.  What was the purpose of giving those lists to Sean?

A.   That I was completing what I was supposed to be doing, that songs were getting done, and yeah.  It's my busy work.

Q.   When you say busy work, can you describe what you mean by busy work?

A.   Work that just kept me busy mainly because a lot of the things I did didn't actually come out, be it music or whatever. I think busy work was just the way I interpreted it.  It was just control.  It was just control over what I was doing every minute of the day.

Q.   You said some things didn't come out, whether it was music or whatever.  Can you tell me what whatever might be?

A.   Music wouldn't come out, but I also would get a lot of opportunities that would come through that I wouldn't -- I was told not to participate in, be it a modeling campaign, which was something that I actually did before music, or a runway show.  There are things that I just had to say no to.

Q.   And who told you not to participate in those opportunities?

A.   Sean advised.

Q.   We'll get back to that in a few minutes.

     Were there times in your relationship when you ignored Sean?

A.   Yes.

Q.   What happened in your relationship when you ignored Sean?

A.   I mean, if I ignored him, he would call constantly, which I said.  I usually didn't live too far, so it was easy to send

P5DCcom3                        Ventura - Direct

someone to just come see if I was home.  But it was definitely a not stop until you find me thing.

Q.  And you mentioned sending someone to see if you were home.  Who typically would be sent on that task?

A.  Usually security would be sent on that task, but maybe like a trusted assistant or something.

Q.  And can you describe for the jury whose Sean security would be?

A.  Like specifically?

Q.  Just what were their roles?

A.  I mean, security protected him, kept an eye on me.

Q.  How often would security -- I'm sorry.  I didn't mean to cut you off.

A.  It's okay.  I was trying to understand your question more, I think.

Q.  Understood.

        How often was security around Sean?

A.  Oh, all the time, 24/7 security.

Q.  When you say trusted assistant, whose assistant are you referring to?

A.  Sean's assistant.

Q.  What are some of the names of the security who worked for Sean during the time that you two were dating?

A.  There was D Rock, Bonds, Uncle Pauley, Faheem, Malik.  Just a lot of people, but those are the main ones I can remember.

P5DCcom3                        Ventura - Direct

Q.  When you mentioned trusted assistant, who were some of the
trusted assistants?
A.  I mean, in the very beginning, it was David James.  It just
kind of changed over time.  Kristina Khorram eventually.  Neil
Dominic.  He had a lot of different assistants.
Q.  And we'll get back to some of those folks.
        When you said security kept an eye on you, what did
you mean by that?
A.  I mean, they could easily just come over and see if I was
home or not.  It wasn't really a secret.  Yeah.  Does that make
sense?
Q.  Was your relationship with Sean always exclusive?
A.  No.
Q.  Were there times where you saw other men?
A.  Yes.
Q.  Were there times where he saw other women?
A.  Yes.
Q.  How did you feel about Sean seeing other women?
A.  I was insanely jealous, but also super young, didn't get it
at all, but I was definitely, yeah, young and jealous.
Q.  When you say you didn't get it, what didn't you get?
A.  I didn't get that he was him.  As he would say, I'm Puff
Daddy, and Puff Daddy has many women where, you know, he likes
the company of women.  And yeah, I had to just really learn
that over time, despite what he would tell me, just between us.

P5DCcom3                      Ventura - Direct

Q.  When you say despite what he would tell you, what do you mean?

A.  He made me feel like we were in a monogamous relationship, more often than not.  It was more figuring out that I wasn't in a monogamous relationship.

Q.  How did he make you feel like you were in a monogamous relationship?

A.  I mean, he expected that of me, so I assumed that it was the same, but he definitely would say, like, I'm not dealing with anyone else or it's just us.

Q.  And when he would say, I'm not dealing with anyone else, was that true?

A.  It could have been sometimes and then other times no.

Q.  In what city did you live when you first started dating Sean?

A.  I lived in New York.

Q.  And after you started dating Sean, in what part of the city did you eventually move to?

A.  I eventually lived on West End around 60th, around 60th and West End.

Q.  What were the circumstances of you moving to 60th and West End?

A.  It was a gift, actually, for my birthday.  And I remember on my birthday Sean taking me and my parents up there to show them.  It really -- it wasn't far from his house like all of

P5DCcom3                          Ventura - Direct

the other houses.

Q. Where did Sean live in relation to the West End apartment?

A. He was around, he was like 56th is Broadway at the time, so not far.

Q. Who paid the rent for the apartment on West End?

A. Sean did.

Q. Besides New York, where else and what other cities did you live while you were dating Sean?

A. Los Angeles. I occasionally were in Miami, but I really didn't live there. Los Angeles and New York.

Q. Did you eventually move full-time from New York to Los Angeles?

A. Yeah.

Q. And what led to your move to LA?

A. After spending quite a bit of one-on-one time, I knew he really wanted to be closer to his kids, so that was ultimately the move he wanted to make, was to be closer to them in LA. Although I wasn't ready to move out of New York, I followed him, I went.

Q. So why did you move?

A. I moved because I was in love and I wanted to be near him.

Q. And when you said Sean wanted to be closer to his kids, where did his kids live at that time?

A. His kids lived in California, or some of them, yeah.

         MS. JOHNSON: Ms. Gavin, can you please pull up for

P5DCcom3                    Ventura - Direct

identification, for the Court and the parties only, Government Exhibits 2B-101 and 2B-102 side-by-side.

Q.  Ms. Ventura, do you recognize what's depicted in 2B-101 and 2B-102?

A.  Yes.  This is one of the houses that Sean rented while in LA.

Q.  How do you recognize this house?

A.  I spent a lot of time there.  I had my 26th birthday there.

Q.  Are these fair and accurate photos of one of the houses Sean rented in LA?

A.  Yes.

MS. JOHNSON:  The government offers Government Exhibit 2B-101 and 2B-102.

MS. ESTEVAO:  No objection.

THE COURT:  They'll be admitted.

(Government's Exhibits 2B-101, 2B-102 received in evidence)

MS. JOHNSON:  Ms. Gavin, can you please publish for the jury those two exhibits.

Q.  Ms. Ventura, directing your attention to the photograph on the left, 2B-101, which side of the house is depicted, the front or the back?

A.  This is the backside of the house.

Q.  With respect to the three floors that you can see, on which floor is the front entrance of this house?

P5DCcom3                              Ventura - Direct

A.   The front entrance is at the very top where there's like a clear glass, it's not lit up from the inside.

Q.   And what floor is Sean's bedroom on in this particular house?

A.   It's on that same floor.  So the rounder part in the middle is the bathroom and then all the way to the left is the bedroom.

Q.   And that's that top floor you're referencing?

A.   Yes.

MS. JOHNSON:  You can take that down now, Ms. Gavin.

Q.   Ms. Ventura, between when you moved to LA and when you ended your relationship with Sean, approximately how many residences in LA did you live in?

A.   Let me see.  One -- about four, I believe.

Q.   Where did you live when you first moved to LA?

A.   When I first moved to LA, I moved to a building on Doheny 818 Doheny.

Q.   Where did you live after 818 Doheny?

A.   After that, I wanted to get my own house, so I got a house in Studio City.  From there, moved back over the hill and I was on -- what is that -- Willshire Corridor, and then from there moved to West Hollywood.

Q.   In the Willshire Corridor, what address did you live at?

A.   It was 875 Comstock Avenue.

MS. JOHNSON:  Ms. Gavin, can you please pull up for

P5DCcom3                         Ventura - Direct

identification for the Court and the parties only Government Exhibits 2B-111 and 2B-112 side-by-side.

Q.   Ms. Ventura, do you recognize what's depicted in Government Exhibits 2B --

          MS. JOHNSON:  Sorry.

Q.   2B-107 and 2B -- I can't see the exhibit number on the second one.  Focusing on 2B-107, what's depicted in that exhibit?

A.   That's the back of -- was my entrance side and where my apartment was of 875 Comstock, was the entryway.

Q.   And the other exhibit, 2B-109, what's depicted in that exhibit?

A.   That's the Willshire Corridor side, the opposite side.

Q.   How do you recognize this building?

A.   I lived there.

Q.   Is this a fair and accurate photograph of 875 Comstock?

A.   Yeah.

          MS. JOHNSON:  The government offers Government Exhibits 2B-107 and 2B-109.

          MS. ESTEVAO:  No objection.

          THE COURT:  They'll be admitted.

          (Government's Exhibits 2B-107, 2B-109 received in evidence)

          MS. JOHNSON:  Can you please publish them for the jury, Ms. Gavin.

Q.   Ms. Ventura, focusing on 2B-107, which side of the building does this depict again?

A.   That's the back, but the front entrance.

Q.   The front entrance is on the side of the building --

A.   Yeah.  It's like a little roundabout.

Q.   Which side of the building did you live on?

A.   I lived on this side.

Q.   The front side that you can see in 2B-107?

A.   Yes.

Q.   What floor did you live on?

A.   I was on 17.

Q.   And approximately how many floors was in 875 Comstock?

A.   I don't think it was much more than 17.

Q.   Where did Sean live in relation to 875 Comstock?

A.   Right down the block on South Mapleton.  It's probably a few-minute drive or walk away.

Q.   What was his address on South Mapleton?

A.   I believes it was 200 South Mapleton Drive.

        MS. JOHNSON:  Ms. Gavin, can you please take down these two exhibits and put up for the Court and the parties for identification only Government Exhibit 2C-103.

Q.   Ms. Ventura, do you recognize what's depicted in Government Exhibit 2C-103?

A.   Yes.

Q.   What is this?

P5DCcom3                        Ventura - Direct

A.    It's the distance between my apartment and Sean's house.

Q.    And your apartment at 875 Comstock?

A.    Yup.

Q.    Is this a true and accurate map of the distance between 875 Comstock and 200 South Mapleton?

A.    It is.

        MS. JOHNSON:    The government offers Government Exhibit 2C-103.

        MS. ESTEVAO:    No objection.

        THE COURT:    It will be admitted.

        (Government's Exhibit 2C-103 received in evidence)

        MS. JOHNSON:    Ms. Gavin, can you please publish to the jury at this time.

Q.    Ms. Ventura, how did you get between your apartment at 875 Comstock and Sean's house at 200 South Mapleton?

A.    I would drive, sometimes walk.    He also had -- Sean also had a golf cart that he would take.

Q.    Approximately how long of a drive was it?

A.    A few minutes.    Three minutes is what it says here.

Q.    Is the three minutes on the map accurate?

A.    Yes.

        MS. JOHNSON:    You can take that down now, Ms. Gavin.

Q.    You mentioned that you lift in West Hollywood after 875 Comstock?

A.    Yes.

P5DCcom3                    Ventura - Direct

Q.   What was the street you lived on in West Hollywood?

A.   That street was called Harold Way.

Q.   Was this the residence you were living at when you ended your relationship with Sean?

A.   Yes.

Q.   Who generally paid the rent for your LA apartments and house?

A.   Generally Sean did, except for the one house.

Q.   When you say except for the one house, who paid the rent for the house?

A.   The house in Studio City I paid for.

Q.   And why did you pay for the rent in Studio City?

A.   This is at a time where I could afford it and I had just wanted that freedom for myself and to be able to have my own place.

Q.   Why did you want that freedom at that time?

A.   Because I wasn't getting it a lot of other ways and there was no fight, so I did.

Q.   When you say there was no fight, what do you mean by that?

A.   There was no argument for me getting my own place, not that I remember.  Yeah, it was accepted.

Q.   When you say it was accepted, who accepted it?

A.   Sean.

Q.   And what, if anything, happened around the time you moved from that residence to 875 Comstock?

P5DCcom3                        Ventura - Direct

A.   I believe -- I'm sorry.  When I moved?

Q.   I'm sorry, Ms. Ventura.  Let me ask a different question.

For the residences where Sean paid the rent, what access, if any, did Sean have to those apartments?

A.   He had access.  He had his own keys.

Q.   When, if ever, did he use those keys?

A.   Whenever he wanted.

Q.   Did he ever come by unannounced?

A.   Yeah.

Q.   How frequently?

A.   I mean, frequently enough, but not too much.  A lot.

Q.   I think you answered a number of different ways there.

A.   Yes.

Q.   I'll give you a chance to --

A.   Yeah.  875 Comstock was the closest, and I would say there were a lot of unannounced visits there.

Q.   So did it vary by location how frequently there were unannounced visits?

A.   I think so, yeah.

Q.   How did you feel when Sean stopped by your apartment unannounced?

A.   I mean, depending on his mood and if he was yelling or banging on the door or if he was just coming in smooth and being nice, it just varied.  Usually, if it was to check in and see what was going on without us knowing -- and by us, I mean

me and my friends.  It was just a little bit of a stomach-in-knots moment.

Q.  When you say stomach-in-knots moment, what do you mean by that?

A.  Didn't know what was going to come of the visit or why Sean might have been angry to start.  So, yeah.

Q.  What were you concerned could happen?

MS. ESTEVAO:  Objection.

THE COURT:  Ms. Johnson, can you rephrase.

MS. JOHNSON:  I'll move on.

Q.  Ms. Ventura, you were asked some questions -- you talked about your music earlier you had been recording.

A.  Yes.

Q.  Approximately how many songs did you record during your relationship with Sean?

A.  Hundreds of songs.

Q.  What happened to the songs that you recorded?

A.  Some of them got released, some of them got leaked on the internet prior to, like, a proper release, and some just didn't see light of day.

Q.  Besides the songs that were released, did you release any additional albums when you dated Sean?

A.  No.  I put out a mixed tape.

Q.  What's a mixed tape?

A.  It was a free album, like, for fans that had been waiting

for so long for music.

Q. Approximately what year did you put out that mixed tape?

A. I believe it was 2011 or '12.  I'm not 100 percent sure.

Q. How many albums on your record deal were not released?

A. Nine.

Q. And what, if any, compensation do you receive if albums are not released?

A. You don't.  You barely receive it when they are released.

Q. What, if any, impact did not releasing albums have on you financially?

A. I mean, it was not released -- can you repeat that again. I'm sorry.

Q. Sure.  What, if any, impact did not releasing albums have on you financially?

A. I mean, financially, I didn't make anything off of them, but I think it was just more of a, you're not releasing music, you're not doing your job.  So the career was kind of stifled.

Q. Why did you not release another album during this time?

A. You're asking me?

Q. Well, put another way, what were you doing instead of -- when you working on your music, what were you doing?

A. When I wasn't working on my music, I was recovering from partying.  That was a big -- that took a big chunk out of my life.  I just, plainly, the freak-offs became a job where there was no space to do anything else but to recover and just try to

feel normal again.

Q. When you say partying, what do you mean by partying?

A. Staying up for days on end, taking drugs and other different substances, drinking, having sex with a stranger over days.

Q. Does partying include what you described earlier as freak-offs?

A. Yeah.

Q. Before we move on, who ultimately decided whether you could release another album?

A. Sean did.

Q. How much time out of your week did freak-offs take?

A. It would depend on how long they were. They ranged anywhere from 36, 48, to 72 hours. I feel like the longest one ever was four days, maybe even more, like, on and off with breaks. So it was a significant part of the week.

Q. And you also testified just a moment ago about recovering. What, if anything, were you recovering from after a freak-off?

A. Recovering from the drugs, dehydration, the just staying awake all that time.

THE COURT: Ms. Johnson, when you come to a good landing place, we can take our midafternoon break.

MS. JOHNSON: Your Honor, I think this is a good landing place, if the Court is amenable.

THE COURT: Thank you, members of the jury. It's

P5DCcom3                        Ventura - Direct

12:20 right now.  I have been informed that your lunch is here.
So let's come back at 1:00 p.m.

            All rise for the jury.

            (Continued on next page)

(Jury not present)

THE COURT:  Ms. Ventura, we're going to take a break. We'll come back at 1:00 p.m.  During our break, you're not to have any discussions with any of the government lawyers.

MS. COMEY:  Your Honor, the witness is still on direct examination.  I think the rule applies only on cross examination.

THE COURT:  Any objection from the defense?

MS. ESTEVAO:  No objection.

THE COURT:  Thank you for that.

So you may have discussions with whomever you like. And be back here at 1:00 p.m.  You can leave the stand now.

(Witness not present)

Ms. Johnson, anything to address before we adjourn?

MS. JOHNSON:  I don't believe so.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  Nothing, Judge.  Thank you.

THE COURT:  See everyone back at 1:00 p.m.

(Luncheon recess)

(Continued on next page)

AFTERNOON SESSION

1:05 p.m.

(Jury not present)

THE COURT:  All right.  Ms. Johnson, are we prepared to proceed?

MS. JOHNSON:  We are, your Honor.  I anticipate using a binder with the witness.

May I put it on the witness stand?

THE COURT:  You may.

Do we have our witness?

MS. JOHNSON:  We do.  We'll bring her in.

THE COURT:  She can go ahead and take the stand.

MS. JOHNSON:  Would the court like a copy as well?

THE COURT:  Are you going to be also putting it on the screen?

MS. JOHNSON:  Yes.

THE COURT:  Then let's save the trees.

Welcome back.

THE WITNESS:  Thank you.

THE COURT:  Is it a little too cold for you?

THE WITNESS:  I'm actually OK.  It doesn't matter to me.

THE COURT:  Is it too cold for anyone else?

ALL PRESENT:  Yes.

THE COURT:  OK.  We'll see what we can do.  We have so

many people in here, it kind of get hots very quickly.  We will make some adjustments.

THE COURT:  Mr. Courtroom deputy, do we have our jury ready?

THE DEPUTY CLERK:  Yes, your Honor.  I believe they are ready.

THE COURT:  OK.  All rise.

(Continued on next page)

P5DsCOM4                    Ventura - Direct

(Jury present)

THE COURT:  Welcome back.  Ms. Ventura, you understand you're still under oath?

THE WITNESS:  Yes.

THE COURT:  Ms. Johnson, you may proceed.

BY MS. JOHNSON:

Q.  Ms. Ventura, earlier this morning you testified about eventually changing your career management after you started dating Sean?

A.  Yes.

Q.  Do you recall that testimony?

A.  Yes.

Q.  Eventually who, if anyone, managed your career?

A.  Eventually, it was kind of a group effort with Sean, and in the background, but I worked with a man named James Cruz who also, like, helped manage Sean.

Q.  OK.

A.  Helped him manage himself.

Q.  Where, if you know, did James Cruz work?

A.  James Cruz worked for Bad Boy, the company.

Q.  OK.  What relationship, if any, did James Cruz have with Sean?

A.  They had a business relationship together, did a lot of work together.

Q.  What, if anything, did James Cruz tell you about his role

as your manager?

MS. ESTEVAO:  Objection.

MS. JOHNSON:  Your Honor, we discussed this yesterday.

THE COURT:  Is this the issue from yesterday?

MS. JOHNSON:  This is the issue from yesterday.

THE COURT:  That's overruled.

BY MS. JOHNSON:

Q.  Ms. Ventura, let me repeat the question.

While Mr. Cruz was managing you, what, if anything, did you tell you about his role in managing your career?

A.  His role in managing my career was that he was managing me with one hand tied behind his back.

Q.  Is that what Mr. Cruz told you?

A.  Yes.

Q.  And what did you understand Mr. Cruz to mean when he told you he had one hand tied behind his back?

A.  That he couldn't work as a normal manager, music manager, that, um, he had to have decisions go through other parties. And, yeah, just a different, different way of doing things.

Q.  Who are the other parties who decisions would go through?

A.  Sean.

Q.  How did you primarily earn money while you were dating Sean?

A.  Um, I would do club hostings, as I talked about earlier, occasionally a campaign, or some sort of modeling job.  Yeah,

along those lines.

Q.  For those club hostings, approximately how much were you paid?

A.  Anywhere between 7,500 to 20,000, just depended on whether or not I would perform or what I had to do.

Q.  What reaction, if any, did Sean have to your hosting jobs?

A.  Um, he was supportive of them, for the most part.  Um, if he didn't want me to do one, he would let us know.

Q.  And how common was it for him to say no to a job?

A.  It was pretty common.

Q.  Turning to a different topic now.

When you first started dating Sean, what, if any, comments would he make about your physical appearance?

A.  Oh, well, anything from I look too Mexican with my hair like that, to I needed to have my nails done a certain way.  I mean, he would clown my chipped nail polish and dirty sneakers.  That was, like, a thing.  Um, but appearance was very important to him.  My appearance.

Q.  How soon after you started dating Sean did he start making comments like you just described?

A.  It was pretty immediate.

Q.  What, if anything, did Sean say about how he wanted you to dress?

A.  It varied depending on what was going on.  Some days he would want me to be really sexy and be his woman, and then

other days, you know, I could be on my tomboy looks and stuff like that.  But he was just very involved in it, yeah.

Q.  You mentioned your nails earlier?

A.  Um-hmm.

Q.  How did Sean say he wanted your nails to look?

A.  He preferred them to be white, from the beginning of our relationship.  They just always had to be done, for sure, but specifically, during the freak-offs, like, white or, um, French tip.

Q.  And you also mentioned how your hair was parted.

How did Sean want your hair to look?

A.  Hair.  Specifically when?  It varied.

Q.  What were some of the things he said to you about your hair?

A.  Um, well, I mean, the biggest change was that I shaved my head around 2009, after talking about it for quite some time.  But, everything.  The way it was styled that day, to the color, everything.

Q.  What else, if anything, did Sean say he wanted you to do with your physical appearance?

A.  Um, I mean, we had discussions about breast implants, I also -- we had tons of conversations about my body.  And at that time, like -- I mean, now I'm 38 years old and a woman.  I didn't have much body to really talk about, um, and I was still developing, so ...

There may be comments about working out or just, like, keeping my shape a certain way, when there wasn't much there to begin with.

Q.  Approximately how much time did you spend on your appearance weekly while you dated Sean?

A.  All the time.  I, um, if I wasn't doing my nails, I was getting a tan.  If I wasn't getting a tan, I was doing some else.  And more often than not, like, the prep, the physical prep was for the freak-offs.  Also to be, you know, next to him and be his girlfriend.  But, yeah, I had to look a certain way during the freak-offs.

Q.  OK.  We'll get back to that.

How frequently did Sean comment on your appearance?

A.  Daily.

Q.  And how common was it for Sean to make specific demands about how you looked?

A.  It was very common.

Q.  How would you feel about the comments that Sean made about your appearance?

A.  That also varied.  I mean, he kind of critiqued a lot of people around me, other artists as well.  So, like, it wasn't a shocker.  But, after a while, that wears down on you.  When your confidence and your self-worth, definitely, my self-worth took a hit for the entirety of the relationship.  Just trying to establish who I was and who I wanted to be and who I was

P5DsCOM4                        Ventura - Direct

allowed to be.

Q.   Turning to a slightly different topic.

You testified earlier that Sean paid rent for you at several residences.  What else, if anything, did he pay for?

A.   He paid for cars, um, clothing, things like that, trips we'd take together.

Q.   Did he ever give you money to spend?

A.   He did, yeah.

Q.   When, if ever, did he take possessions away from you?

A.   Oh, all the time.  But that was kind of, like, a, if you're not doing what I'm asking of you or if you're out of line in any way, I'll get my car taken away.  Like, I got kicked out of the house, my apartment.  I would have jewelry taken away.  It was very random, depending on how he felt.

Q.   Besides you mentioned your car, you mentioned jewelry, you mentioned your house --

A.   Um-hmm.

Q.   -- is there anything else he would take away?

A.   My self-confidence.  Just -- just physical things.  But at that point, to me, the physical things didn't really matter.  I really just wanted his approval.

Q.   Who would typically take these items?

A.   I mean, staff, I would assume.

Q.   I don't want you to assume.  Just --

A.   I'm sorry.

Q.  No worries.

A.  I shouldn't ...

If I wasn't there, it would have had to be a staff member or security, somebody that had access.

MS. ESTEVAO:  Object to the speculation.

THE COURT:  Sustained.

The jury should disregard the witness's last answer.

Q.  Ms. Ventura, let me ask some more specific questions.

You mentioned that laptops were taken?

A.  Um-hmm.

Q.  What else, what, if any, other electronics were taken, from you?

A.  My phone.

Q.  Who took laptops or your phone from you?

A.  They would be taken, um, by Sean's direction.  Somebody would come take them.  I don't ...

MS. ESTEVAO:  Objection.

THE COURT:  Same objection?

MS. ESTEVAO:  Yes.

THE COURT:  Ms. Johnson, can you lay some foundation?

MS. JOHNSON:  Sure.

BY MS. JOHNSON:

Q.  Ms. Ventura, did Sean ever take any electronics from you personally?

A.  Yes.

Q.  Did anyone else ever take electronics from you personally, besides Sean?

A.  Yes.

Q.  Who were those people?

A.  Security.

Q.  Who from security?

A.  Specifically?

Q.  Yes.

A.  I know that D Rock was a person that used to take things by direction.

MS. ESTEVAO:  Objection.

THE COURT:  It's overruled.

Q.  How long -- strike that.

Would you get these items back when they were taken?

A.  Yeah.

Q.  How long would they typically be gone for?

A.  Um, it depended on how long I was -- that I was being punished for, I guess.

Q.  How were they returned to you?

A.  Sean would give them back to me.  If I would go to his house, and he would give them back to me.

Q.  We've talked about a few employees so far.

How frequently -- how frequently were you in contact with Sean's employees during your relationship?

A.  Um, regularly, daily.

MS. JOHNSON: Ms. Gavin, can you please pull up Government Exhibit 2A-301 and 2A-305 for identification for the parties and the court only.

Q. Ms. Ventura, starting with the photograph on the left, do you recognize that individual?

A. Yes.

Q. Who is that?

A. Kristina Khorram.

Q. And turning to the photograph be the right, do you recognize that individual?

A. Yes.

Q. Who is that?

A. Tony Fletcher.

Q. How do you recognize these individuals?

A. I was around them for several years while I dated Sean.

Q. Who did they work for?

A. They worked for Sean.

Q. Are these true and accurate photos of Kristina Khorram and Tony Fletcher?

A. Yes.

MS. JOHNSON: The government offers Government Exhibit 2A-301 and 2A-305.

MS. ESTEVAO: No objection.

THE COURT: They are admitted.

(Government's Exhibit 2A-301 and 2A-305 received in

evidence)

MS. JOHNSON:  Can you please publish them to the jury, Ms. Gavin.

Q.  Ms. Ventura, directing your attention to 2A-305. Ms. Fletcher.

How frequently did you interact with Ms. Fletcher while you were dating Sean?

A.  Um, when she worked for the company, when she was around, I talked to her regularly.  Every day.

Q.  For what reasons would you speak to Ms. Fletcher?

A.  Um, usually financial, when I just had some -- a lot of transitioning of my -- my accounts and things like that.  And she helped me with those things, pay bills and, um...

MS. ESTEVAO:  Your Honor, I apologize.  We have a lot of vague narratives without any time period.

If Ms. Johnson could be more specific with respect to the year, at least that would be helpful.

THE COURT:  I don't understand the objection.

What's the basis for the objection?

In any event, it's overruled.  Now, you've said that and, Ms. Johnson, I think, will help guide our discussion this afternoon.

Are we getting a fresh question?

MS. JOHNSON:  Yes.

THE COURT:  Yes.  OK.  Good.

P5DsCOM4                        Ventura - Direct

BY MS. JOHNSON:

Q.  Ms. Ventura, relative to when you started dating Sean, how soon thereafter did you start speaking to Ms. Fletcher?

A.  I started speaking to Ms. Fletcher, I would say, it's -- within the first three years of the relationship.

Q.  OK.  And turning to Kristina Khorram on the left-hand side, Government 2A-301.

At what point in your relationship did you start communicating with Ms. Khorram?

A.  As soon as she started.  I'm not positive of the year.

Q.  Was that in the beginning, the middle, or the end of your relationship with Sean?

A.  It was, like, the middle of the relationship.

Q.  What did you call Ms. Khorram?

A.  I called her K.K.

Q.  And how frequently did you interact with K.K.?

A.  Every day.

Q.  And was that starting from approximately the middle of your relationship with Sean when Ms. Khorram started working for him?

A.  Yes.

Q.  And what subject matters who you communicate with K.K. about?

A.  Everything from scheduling to, um, what kind of mood he was in.  I talked to K.K. about a lot.  She knew a lot of my

P5DsCOM4                    Ventura - Direct

personal things, doctor's appointments, everything.

Q.  You testified earlier about security coming to find you.

Do you remember that testimony?

A.  Yes.

MS. JOHNSON:  Ms. Gavin, you can take down these two exhibits.  Can you please pull up for identification for the court and the parties Government Exhibit 2A-202 and 2A-204.

Q.  Ms. Ventura, do you recognize who is depicted in Government Exhibit 2A-202?

A.  Yes.

Q.  Who's that?

A.  That's D Rock.

Q.  What about Government Exhibit 2A-204?

A.  Yes, that's Uncle Paulie.

Q.  How do you recognize these individuals?

A.  I spent many years around them.

Q.  Did they work for Sean?

A.  Yes.

Q.  And what was their role again?

A.  They were both security.

Q.  And are these true and accurate photos of D Rock and Uncle Paulie?

A.  Yeah.

MS. JOHNSON:  The government offers Government Exhibit 2A-202 and 2A-204.

MS. ESTEVAO:  No objection.

THE COURT:  They will be admitted.

(Government's Exhibits 2A-202 and 2A-204 received in evidence)

MS. JOHNSON:  If you can please publish them to the jury, Ms. Gavin.

BY MS. JOHNSON:

Q.  Ms. Ventura, I believe you testified earlier that it was D Rock had taken a phone from you before, is that right?

A.  Yes.

Q.  Is that the individual depicted in Government Exhibit 2A-202?

A.  Yes.

MS. JOHNSON:  You can take those down, Ms. Gavin.

Can you please pull up for identification Government Exhibit 2A-201 and 2A-205 for the court and the parties only.

Q.  Ms. Ventura, starting with Government Exhibit 2A-201, do you recognize this individual?

A.  Yes.

Q.  Who is that?

A.  Roger Bonds.

Q.  And on the right-hand side, Government Exhibit 2A-205, do you recognize that individual?

A.  Yes.

Q.  Who is that?

A.   Ruben Sandy.

Q.   How do you recognize these individuals?

A.   I spent many years around them as well.

Q.   And what roles did they have?

A.   Security.

Q.   Did they work for Mr. -- did they work for Sean?

A.   Yes.

        MS. JOHNSON:   The government offers Government Exhibit 2A-201 and 2A-205.

        MS. ESTEVAO:   No objection.

        THE COURT:   They will be admitted.

        (Government's Exhibits 2A-201 and 2A-205 received in evidence)

        MS. JOHNSON:   Can you please publish those to the jury, Ms. Gavin.

Q.   Ms. Ventura, you testified that 2A-201 depicts Roger Bonds, right?

A.   Yes.

Q.   And the other Exhibit 2A-205 is Ruben Sandy?

A.   Correct.

Q.   Did Ruben Sandy go by any nicknames?

A.   Rube, yep.

        MS. JOHNSON:   You can take those down, Ms. Gavin.

        Finally, can you pull up Government Exhibit 2A-203 for identification for the court and the parties only.

P5DsCOM4                        Ventura - Direct

BY MS. JOHNSON:

Q.  Ms. Ventura, do you recognize whose depicted in Government Exhibit 2A-203?

A.  Yes.

Q.  Who is this?

A.  That's Faheem.  He was the security driver for Sean.

Q.  When you say security/driver, what's that position?

A.  He's the main driver, but he also provides security.

Q.  OK.  How do you recognize Faheem?

A.  I was around him quite a bit.

        MS. JOHNSON:  The government offers Government Exhibit 2A-203.

        THE COURT:  It will be admitted.

        MS. ESTEVAO:  No objection.

        (Government's Exhibit 2A-203 received in evidence)

        MS. JOHNSON:  Can you please publish the exhibit to the jury, Ms. Gavin.

        You can take that down now, Ms. Gavin.

BY MS. JOHNSON:

Q.  Ms. Ventura, which of the people in those photos we just looked at came to look for you when you did not answer Sean's calls?

A.  D Rock.

Q.  How frequently were you in Sean's residences when you dated him?

A.  All the time.

Q.  Which, if any, of Sean's Combs had safes?

A.  They all did.

Q.  How do you know that?

A.  Because I saw them.

Q.  And who else to your knowledge had access to the safes besides you?

A.  Security.  Sometimes, again, a trusted assistant.

Q.  When you say security, would that cover all the individuals whose photos we just looked at?

A.  Yes.

Q.  How frequently did you access safes in Sean's residences?

A.  Um, not super frequently, but I had access to them. Occasionally.

Q.  For what reason would you have access to the safes?

A.  If Sean needed me to get money out or somebody asked me to get something out of it.

Q.  On those occasions, what, if anything, did you observe inside the safes?

A.  I mean, there was always cash, um, jewelry, um, sometimes, like, tapes and SD cards from cameras, um, guns, um, yeah.  It depended on which safe.

Q.  OK.  You mentioned tapes from cameras.

        Are you referring to videotapes?

A.  Yes, videotapes.

P5DsCOM4                        Ventura - Direct

Q.   And you mentioned guns.

        Which residences did you see guns inside the safes?

A.   I saw in, um, New York, Los Angeles, and Miami, and also Alpine, New Jersey.

Q.   Can you describe the size of the guns you saw inside the saves in those four residences?

A.   I only ever saw handguns.

Q.   When, if ever, have you seen guns outside of Sean's safes?

A.   A few times.

Q.   Who had the guns when you saw them outside of Sean's safes?

A.   They were just laid out, um, by security.  They were just on the table.

Q.   Do you recall an incident involving Sean and Suge Knight?

A.   Yes.

Q.   Were Sean and Suge Knight friends or rivals?

A.   Rivals.

Q.   Can you describe what happened?

A.   Sean and I were having a freak-off at one of his homes in LA.  And, um, I just remember we were kind of, like, just chilling at this point.  And D Rock came in and he said that Suge was down at Mel's Diner, which was just right down the hill.  And they quickly packed up and drove down there.

Q.   What was your reaction?

A.   I -- I was crying.  I was screaming, like, please don't do anything stupid.  Um, I just was really nervous for them.  I

didn't know what it meant, what they were going to do.

Q. Did they return?

A. They did.

Q. Have you ever handled Sean's guns?

A. Um, handled? I've been handed, yeah. But scared.

Q. Who handed a gun to you?

A. I don't know specifically who, but it was some security in the car.

Q. Approximately when did this happen?

A. This happened later on in our relationship. We were going to a club hosting in downtown LA.

Q. And what do you recall about that night?

A. I just remember -- I remember we took mushrooms and I was really, like, high and I was handed the gun to just hold in my bag. But I was just freaking out the whole time that it was going to go off. I didn't -- I hadn't used or learned to operate a gun at that point, so...

Q. What did you do after the gun was in your bag?

A. At what point?

Q. You mentioned that the gun, that you were handed a gun in your bag?

A. Um-hmm.

Q. How long was it in your bag?

A. It was in my bag for the duration of the club visit. So, like, about an hour, an hour and a half.

Q.  And how did you feel while the gun was in your bag?

A.  Just terrified.  I didn't want anybody to touch me, come near me.  I just stayed, like, sitting in the back.

Q.  You testified that, who else was present when the gun was put in your bag?

A.  There was a driver and security.  I just don't know exactly who.

Q.  Was Sean present?

A.  He was.

Q.  What, if anything -- strike that.

After you left the club, what did you do with the gun?

A.  As soon as we got in the car, I gave it to whoever the security was.  Just didn't want it.

Q.  Why did you do that?

A.  I had no idea why I had it in the first place, and I just wanted to not be holding a loaded gun, if I was.

Q.  And aside from the time you just described, when the gun was in your bag at the club, do you recall handling Sean's guns at any other time?

A.  I recall handling --

MS. ESTEVAO:  Objection to Sean's guns.

MS. JOHNSON:  I'll rephrase, your Honor.

THE COURT:  All right.

Q.  Aside from the time a gun was in your purse at the club, do you recall handling guns at any other time?

A.   Yes.

Q.   Can you tell me about that?

A.   It's a vague memory.  Just, they came out here and there, the guns were taken out here and there, so just, like, a -- I always felt, like, it was just a little bit of a scare tactic. I didn't really know for what purpose.

Q.   Where were the guns taken out from?

A.   From the safe.

Q.   Where were the safes?

A.   In the closet in his homes.

Q.   And whose homes were those?

A.   Sean's.

Q.   And circling back to the Suge Knight incident, you described Sean and D Rock packing up?

A.   Um-hmm.

Q.   What do you mean by packing up?

A.   I mean, it was, like, I wasn't even there.  They just put on a bunch of black clothes, covered up their heads, went in the safe, grabbed guns, and next thing I knew, they were in the SUV just --

        MS. ESTEVAO:  Objection to foundation and knowledge.

        THE COURT:  Ms. Johnson, can you lay some foundation on knowledge?

        MS. JOHNSON:  Sure.

Q.   After you saw them pack up, what did you see them do?

A.   I saw them get dressed and leave the house.

Q.   And you mentioned they returned, is that correct?

A.   Yes.

Q.   Approximately how long between when they left did they return?

A.   It really wasn't that long.  I couldn't imagine it was probably, like, definitely less than an hour.  30 minutes. 30, 45 minutes, tops.

Q.   I want to turn to a different topic now.

A.   OK.

Q.   You testified early on that Sean mentioned voyeurism to you.

Do you recall that testimony?

A.   Yes.

Q.   How did Sean describe voyeurism to you?

A.   He described voyeurism as a fantasy that he had where he would want to see me with another male and having sexual interaction, talking.  Yeah.

Q.   OK.

A.   He would watch.

Q.   What, if anything, did Sean tell -- say to you about swinging?

A.   Um, swinging was brought up separately, and it was a lifestyle that he taught me about, about couples that switch partners.  And, um, yeah, I didn't really have too much

knowledge of it.

Q.  And you testified earlier that you eventually started having freak-offs with Sean.

Do you recall that testimony?

A.  Yes.

Q.  How did the freak-offs that you did compare to how Sean described voyeurism to you?

A.  Um, can you rephrase that?

Q.  Sure.  Of course.  Let's talk about the freak-offs first. I think that will be easier.

How soon into the relationship did Sean mention voyeurism to you?

A.  It was within the first, like, six months to a year.  It was very early.

Q.  And what, if anything, did Sean say about the identity of the other person who would be involved in the sex acts?

A.  He said we wouldn't know them, um, that it would, more than likely, be a stranger, an escort or a dancer.

Q.  Earlier you also testified that Sean physically hurt you in your relationship.

Do you recall that testimony?

A.  Yeah.

Q.  Relative to when Sean first started physically hurting you, did the conversation about voyeurism happen?

A.  Relatively close together, I would say.

Q.   Which one happened first?

A.   There was abuse first and then the conversation after.

Q.   To be clear, the conversation about voyeurism?

A.   Conversation about voyeurism.

Q.   What was your reaction when Sean told you about voyeurism?

A.   Um, I was shocked.  I didn't -- I wasn't expecting that.
Um, I just felt really, like, at a loss.  I didn't know how to
react.  I didn't want to upset him if I said that it scared me
or I said anything outside of, OK, let's try it, because I was
always just down for the things that he wanted to do.  I was
really nervous.  Really, really nervous.

Q.   Approximately how old were you when Sean first proposed
freak-offs to you?

A.   I think I just turned 22.

Q.   And how long after Sean mentioned his interest in seeing
you have sex with another man was the first freak-off?

A.   Within the first, like, two to three months of him telling
me about it.

Q.   Why did you agree to try a freak-off?

A.   That's a great question.

        I wanted to make him happy.  I was in a really
significantly mature relationship that I don't think I was
prepared for, now when I look at it.  But, yeah, I loved him.
I didn't want him to think that I thought anything bad of him
for it.  I -- I just wanted to make him happy.

Q.   Where was the first freak-off?

A.   It was at one of his homes that he was renting in Los Angeles.

Q.   And where was it inside the home?

A.   In his bedroom.

        MS. JOHNSON:   Ms. Gavin, can you pull up for identification only Government Exhibit 2A-627 for the court and the parties.

Q.   Ms. Ventura, do you recognize who is depicted in Government Exhibit 2A-627?

A.   Yes.

Q.   Who is that?

A.   That is the first escort that we ever had an encounter with.

Q.   OK.   When you say encounter, do you mean a freak-off?

A.   A freak-off, yeah.

Q.   OK.   Is this a fair and accurate photograph of the escort?

A.   Yes.

        MS. JOHNSON:   The government offers Government Exhibit 2A-627.

        MS. ESTEVAO:   No objection.

        THE COURT:   It will be admitted.

        (Government's Exhibit 2A-627 received in evidence)

        MS. JOHNSON:   Can you please publish that for the jury, Ms. Gavin.

BY MS. JOHNSON:

Q.  Ms. Ventura, do you know the name of the individual depicted in Government Exhibit 2A-627?

A.  I don't remember.

Q.  If I refer to him as the first escort, will you know who I'm talking about?

A.  Yes.

Q.  What did you understand his occupation to be?

A.  I understood him to be a dancer, a stripper.  In Vegas, I think.

Q.  At this first freak-off, are you aware if the first escort was paid?

A.  I'm -- yeah, he was paid.

Q.  What was he paid to do?

A.  He was paid to entertain, to dance, and to have intercourse with me.

Q.  Who arranged for the first escort to be present at the first freak-off?

A.  Sean did.

Q.  What, if any, drugs did you take at the first freak-off?

A.  We took ectasy and drank alcohol.

Q.  And earlier you testified that ectasy is a pressed pill, is that right?

A.  Yes.

Q.  Was there any particular kind of ectasy you took at the

P5DsCOM4                      Ventura - Direct

first freak-off?

A.   Those were the blue dolphins that I spoke about earlier.

Q.   The same pills from Miami?

A.   Um-hmm, yeah.

Q.   At what point in the freak-off did you first take the ectasy?

A.   Before anything started.

Q.   Who provided the ectasy to you?

A.   Sean.

Q.   What did you wear at the first freak-off?

A.   Specifically, I don't know exactly, but it was definitely an outfit from a sex store, Hustler or something with some really high platform shoes, dancing shoes.

Q.   What, if anything, did you do to disguise your appearance?

A.   On that first meeting, Sean told me that we would wear masks, so I wore a masquerade mask and...

Q.   You described the really tall platform heels.

        Who, if anyone, told you to wear those heels?

A.   Sean did.

Q.   Can you please describe what happened at the initial, at the first freak-off?

A.   Um, after we took the drugs, um, he had a conversation -- Sean had a conversation with the dancer.  And then shortly after, he came down to the room and, um, performed and stood in the doorway and danced for a little while, while I just

watched, and while Sean watched us.

Q.   What happened next?

A.   Um, it was just a gradual -- I should say, every freak-off was, like, directed by Sean.  Like, he knew specifically where he wanted everyone to be, the lighting and such.  So, over that, that first session, we just kind of, like, ended up get closer and closer and talking to each other, and then eventually had to put oil on each other.  Yeah.

Q.   You used the word session.

What do you mean by session?

A.   A session in a freak-off would be, like, one full-time, um, with the escort until basically they finished, they ejaculated.

Q.   Would a session include all of the sex acts that led up to ejaculation?

A.   Yeah, it would be pretty standard, yeah.

Q.   Do you recall how many sessions you had with the first escort at the first freak-off?

A.   I believe we at least had two.

Q.   And you testified earlier that the first escort was paid.

How were you aware that he was paid?

A.   I -- I knew because Sean told me.

Q.   What, if anything, did Sean say to you about paying the escort?

A.   That he had to go pay him and he went and paid him.

Q.   Approximately how much, if you know, was the escort paid?

A.   I don't know specifically.  I just know that escorts were paid in the thousands.

Q.   After this first freak-off, how did you feel?

A.   Well, I was high, so there wasn't too much feeling.  I think it was a mixture of dirty and confusion with, like, OK, he's really happy with me and I did something right.  So, just really confusing.

     I didn't -- I didn't know -- I didn't know what was going to happen after that.  I didn't know if we were going to be doing it more frequently because I was willing to.  I didn't know, so ...

Q.   What, if anything, did you tell Sean about how you felt about the first freak-off?

A.   I honestly don't remember.

Q.   Did there come a time when Sean proposed another freak-off?

A.   Yes.

Q.   How soon after?

A.   It was pretty soon after.  Within weeks.

Q.   How would you respond?

A.   It was the same nervousness feeling, like, like, what am I going to.  Do, I can't say no.  Like, I've already done it.  And I ultimately said yes.

Q.   Why did you feel you couldn't say no?

A.   Just didn't want to make him upset.  Um, yeah.  I didn't want to make him upset.  I didn't want to make him angry and

regret having told me about this experience that was so personal. I, like, his trust meant a lot to me at that point.

Q. What concerns, if any, did you have about Sean becoming upset with you?

A. Um, there were concerns.

MS. ESTEVAO: Objection, leading.

THE COURT: Grounds?

Did you say leading?

MS. ESTEVAO: Yes.

THE COURT: That's overruled.

Q. Ms. Ventura, do you want me to reask the question?

A. Please.

Q. You testified that you were concerned that Sean might be upset with you?

A. Yeah.

Q. What concerns, if any, did you have if Sean was upset with you?

A. His anger, really. His mood changed, like, what -- that was going to do to the rest of the day and, um, just how he felt about me and our relationship. Um, so, it could be different things.

Q. How frequently did you have freak-offs with Sean after they started?

A. After they started, they became almost weekly, I would say.

Q. And how, if at all, did that frequency change over time?

P5DsCOM4                        Ventura - Direct

A.   Um, it -- it became more, um -- depending on if we were spending time with each other.  It would become less.  But it was weekly for a consistent amount of years.

Q.   And approximately what year was the last freak-off?

A.   The last, the final freak-off?

     Um, 2017, 2018.

Q.   And you testified earlier that the approximate duration of a freak-off was, I think, like two to three days.

     Do you recall that testimony?

A.   Yes.

Q.   Is that accurate?

A.   Yes.

Q.   How long were you awake during the freak-off?

A.   The whole time.

Q.   Did you get any sleep?

A.   No.

Q.   Did you want to sleep?

A.   Yes.

Q.   How did you stay awake that whole time?

A.   The drugs, honestly, helped.

Q.   What kind of drugs kept you awake?

A.   Um, well, ectasy and molly, for sure.  We started to do other drugs, like, cocaine, later on.

Q.   Who gave the ectasy?

A.   Sean.

Q.   Who gave you the molly?

A.   Sean.

Q.   Who gave you the cocaine?

A.   Sean.

Q.   You testified earlier that the longest freak-off was four days.

        Do you remember that testimony?

A.   Yes.

Q.   Who decided when a freak-off was over?

A.   I mean, ultimately, it would be Sean.  Discuss it and say this is the last one, and then hopefully that would be the last one.

Q.   And when you say the last one, are you referring to a session?

A.   To a session, yes.

Q.   Between when the freak-offs started and when they ended in approximately 2017 or 2018, do you recall every freak-off you participated in?

A.   No.  That would be impossible.

Q.   What are some of the reasons that would be impossible?

A.   The frequency, the drug use, um, just, it was crazy times.

Q.   In that same time period, did you want to engage in every freak-off that you participated in?

A.   No.

Q.   Why is that?

A.  I just felt, like, it was all I was good for to him.  I --
I just felt pretty horrible about myself.  I felt disgusting.
I was humiliated.  I didn't have those words to, like, put
together at the time, like, how horrible I really felt.  And I
didn't -- I couldn't talk to anybody about it, so ...

Q.  You testified a few moments ago that you did freak-offs
because you did not want to make Sean angry?

A.  Yeah.

Q.  During your relationship, what did Sean do when he was
angry?

A.  He would be violent with me.  Um, his look would just
change over.  He would just become a different person and,
just, didn't know what was going to happen.

Q.  When you say his look would change over, what do you mean
by that?

A.  The best way for me to describe it is, like, his eyes go
black.  Um, just, it's -- the version of him that I was in love
with was no longer there.

Q.  Were there any parts of freak-offs that you enjoyed?

A.  The time spent with him.

Q.  And what about the time spent with him did you enjoy?

A.  Just, um, at that time, just --

        I'm sorry.  Just the one-on-one time I would get.
Because there was always so many people around, and I did feel
very close to him.  So, as sad as it was, I thought that, like,

it was the only time I could get.

Q.  And when you said the only time you could get, are you referring to the freak-offs?

A.  Yeah, yes.

Q.  And specifically are you referring to the one-on-one time with Sean?

A.  Yes.

Q.  OK.  What, if any, discussions did you have with Sean about not wanting to participate in freak-offs?

A.  I definitely brought it up, but gently, because I didn't want to upset him or make him angry with me for even sharing it.  But I just treaded lightly when I would bring it up.

Sometimes I would e-mail him about it, like, I didn't want to -- I just didn't want anything bad to happen.

Q.  When you say you didn't want anything bad to happen, what do you mean by anything bad?

A.  Um, I mean, anything bad could be him being violent, but also him just saying, OK, well, I'll find somebody else to do it with.  Like, you know, when you really care about somebody and you're in love with them, you don't want to disappoint them, so ...

Q.  When you would talk to Sean about how you were feeling, how much of your concerns were you able to express to him?

MS. ESTEVAO:  Objection, leading.

THE COURT:  Maybe you can rephrase.

MS. JOHNSON:  Sure.

Q.  Ms. Ventura, you said earlier that you would talk to Sean gently about how you were feeling.

Do you recall that?

A.  Yes.

Q.  Why would you talk to him gently?

A.  I just never wanted him to feel like I judged him for it, but I wanted him to know that, like, this made me feel -- doing this made me feel horrible.  It made me feel worthless, that, like, I didn't have anything else to offer him.

Q.  How would he respond when you would say things to him like this?

A.  Um, he was pretty dismissive.  Um, I find that I express myself quite a bit and it just kind of went, like, he didn't really care, like, it was unheard.

MS. ESTEVAO:  Objection.

THE COURT:  Grounds?

MS. ESTEVAO:  Speculating about whether or not he really cared.

THE COURT:  That's overruled.

Q.  Ms. Ventura, you said Sean was dismissive --

A.  Yes.

Q.  -- when you expressed these concerns.

What did you do?

A.  I'm sorry?

P5DsCOM4                        Ventura - Direct

Q.  It's OK.  You testified that Sean was dismissive.

Do you remember that?

A.  Yes.

Q.  What would he say to you when you expressed concerns?

A.  He would say -- he would call me predictable.  He would be, like, I know you don't want to do the freak-offs anymore.  I already know what you're thinking.  At that point, I would try to backpedal and say no, no, no, you know.  You know, I was predictable.

Q.  How frequently would this happen?

A.  Frequently enough.  Yeah.  I said it more than once, more than a handful of times.

Q.  Ms. Ventura, I'm going to --

MS. JOHNSON:  Ms. Gavin, can you please pull up for identification for the parties and the court only Government Exhibit 3A-107.

Q.  Ms. Ventura, do you recognize what this document is?

A.  Yes.

Q.  What is it?

A.  It's an e-mail between me and Sean.

Q.  How do you recognize it?

A.  Um, our names.

Q.  And is this a true and accurate communication between you and Sean?

A.  Yes.

MS. JOHNSON:  The government would offer Government Exhibit 3A-117, at this time, pursuant to the stipulation in Government Exhibit 1302, paragraph one.

MS. ESTEVAO:  No objection.

THE COURT:  All right.  It will be admitted.

(Government's Exhibit 3A-117 received in evidence)

MS. JOHNSON:  Ms. Gavin, could you please publish to the jury, if it's possible, to put page one and page two side by side.

BY MS. JOHNSON:

Q.  Ms. Ventura, I'm going to direct you to the very bottom communication on page two.

Do you see where that is?

A.  Yes.

Q.  OK.  Who is that communication from?

A.  At the very bottom is from me.

Q.  OK.  The name says BG New New Pin?

A.  Yeah.  Baby Girl was my name I was called.

Q.  Is Baby Girl a name Sean called you?

A.  Yes.

Q.  Who was this communication to?

A.  This is to Pop Pop.

Q.  Who is Pop Pop?

A.  Sean.

Q.  Why did you call Sean Pop Pop?

P5DsCOM4                      Ventura - Direct

A.  Um, there was a period early on in our relationship where he wanted me to have a nickname for him, and I didn't want to call him anything that anyone else had called him.  So he asked me what I called my grandfather, and I said Pop Pop.

Q.  How did you feel about calling Sean the same name you called your grandfather?

A.  I thought it was weird at the time.  And now I just feel, like, it's -- it was disrespectful.

Q.  What's the date of this first message?

A.  April 19, 2010.

Q.  OK.  One more question about nicknames for you.

        Besides Baby Girl, are there any other nicknames that Sean had for you?

A.  He called me CC.

Q.  What does CC stand for?

A.  Cassie Combs.

Q.  In this first message, what is the subject line?

A.  It says, I really need to fuck.

Q.  Who sent that e-mail?

A.  I did.

Q.  How does Sean respond to your message in the next communication?

A.  He says, So who you going to fuck?  Wanna call someone?

Q.  What is your understanding of what wanna call someone is referencing?

P5DsCOM4                         Ventura - Direct

A.   Wanna call someone is, like, want to call an escort for a freak-off.

Q.   And when you sent the communication, I really need to fuck, why did you send that?

A.   Because I wanted to be with him and that was my way of saying it.

Q.   And when you said you want to be with him, are you referring to Sean?

A.   Sean specifically, yes.

Q.   During your relationship with Sean, who did you want to have sex with?

A.   I wanted to have sex with him.

Q.   Did you want to have sex with the escorts?

A.   No.

Q.   So, turning now --

          MS. JOHNSON:  Ms. Gavin, we can take that down.  If you could blow up the bottom communications on page one.

Q.   So, directing your attention to the first communication, your response, what do you respond to Sean saying, Want to call someone?

A.   I say, I want to fuck you.  Are you crazy?

Q.   Why do you respond that way?

A.   Because that's exactly how I felt, and I didn't want to call anyone.

          MS. JOHNSON:  So, Ms. Gavin, if you can take that

down.

Q.  So, starting from that point, I'm going to read Sean's messages and you'll read your messages through to the end.

A.  OK.

Q.  So, Just joking.

A.  I want to talk to you about something tomorrow.  Going to sleep.  Love you.

Q.  Is it going to stress me out?  What is it about?

A.  Freak-off.  It can wait.  It's not a big deal.

Q.  Now you don't want to do it anymore.  Oh, I already know. You so predictable.

A.  Really?  OK.  Since that's definitely what it was, we'll leave it at that then, since I'm so predictable.  Have a good night.

Q.  Whatever, Baby.  I'm not going to play no games with you and you ain't gonna keep shutting me down.

A.  I'm not shutting you down.  I never do.  If anything, it's always the other way around.  I wasn't going to say I didn't want to do it anymore.

Q.  What were you gonna say?

So, directing your attention to Sean's message in about the middle of the page saying, Now you don't want to do anymore, what did you understand him to be referring to in that message?

A.  That I -- that he knew that I didn't want to do the

P5DsCOM4                        Ventura - Direct

freak-offs anymore.

Q.  And how did you react after Sean sent this message where he said, Now you don't wanna do anymore, I already know, you so predictable?

A.  I mean, I tried to backpedal.  I said, um, yeah, OK.  Since that definitely what it was, just kind of playing it off or trying to.

Q.  Why would you backpedal in situations like this?

A.  Because I didn't want to make him angry, like ...

Q.  Directing your attention to --

        MS. JOHNSON:  I'm sorry, Ms. Gavin, can you take that down.  The top, if you can blow up the top, please, the first two.

Q.  Directing your attention to the end of your message here where you said, I wasn't going to say I didn't want to do it anymore.

        Do you see that?

A.  Yes.

Q.  Is that accurate?

A.  Accurately how I felt?

Q.  Yes.

A.  No.

Q.  Why did you say that if that wasn't how you felt?

A.  Just didn't -- I really didn't want to to make him think I didn't want to do it anymore.  I didn't want him to be upset or

not trust me.

Q. During -- you said you didn't want him to be upset.

During your relationship, what did Sean do when he was upset?

A. He would be a scary person. He could be violent. Or also, just, somehow figure out how to make it happen anyway, no matter how uncomfortable it made me.

Q. When you say make it happen anyway, what does it refer to?

A. The freak-off.

MS. JOHNSON: OK. Ms. Gavin, you can take down this exhibit.

Q. Ms. Ventura, turning back to the freak-offs.

In the beginning, was Sean open at the freak-offs about his true identity?

A. He was not.

Q. How, if at all, did he disguise his identity?

A. Um, well, he started with the masquerade masks. Sometimes he would wear a hat or something covering his face.

Q. Were you open about your true identity?

A. I was not either.

Q. And what, if anything, did you do to hide your identity?

A. The same thing, as far as the mask. I would wear wigs.

Q. Who asked you to wear a wig?

A. Sean.

Q. Who asked you to wear a mask?

P5DsCOM4                      Ventura - Direct

A.   Sean.

Q.   Over the period of time that you did freak-offs with Sean, did you always wear wigs and masks?

A.   No, not always.

Q.   How did that change?

A.   Eventually, um, I mean, I don't think it was too difficult to figure out who he was because he would talk, um, but, eventually, just be comfortable enough with the escort or person that was there to just remove the coverings.

Q.   Besides a wig and a mask, what other clothes would you wear for freak-offs?

A.   Always super, like, see-through, netting outfit.  It varied.  Just sexy outfit from a sex store.

Q.   What are some of the stores you would buy outfits at?

A.   Um, in LA there is a store called Pleasure Chest.  Um, Hustler on Sunset.  Here in the city, there's just, like, little shops everywhere.

Q.   In addition to the outfit you described, did you wear shoes?

A.   I did.  Every -- every time, yeah.

Q.   What kind of shoes?

A.   The lucite Stripper dancer shoes, yeah.

Q.   What kind of heels do those shoes have?

A.   Extremely high heels.

Q.   Who decided what you would wear to freak-offs?

A.   I would purchase outfits and show Sean and see what he liked the best.

Q.   Would you wear the outfit that Sean selected?

A.   Yep.

Q.   And with respect to the high heels you talked about, for how long would you wear those high heels during the freak-off?

A.   I would wear them throughout.  Um, if there was a break, I might take them off.  But, yeah, throughout.

Q.   What conversations, if any, did you have with Sean about preparing your physical appearance for a freak-off?

A.   I mean, he would just ask me, like, did you get a wax?  Are your nails done?  Do you have a tan?  Just, like, basic list.

Q.   How long did it take to prepare your physical appearance for a freak-off?

A.   It could take, like, all of that daytime.

Q.   Would that be taken up by the things you mentioned, like, getting your nails done, getting a wax, getting a tan?

A.   Getting supplies, everything, yep.

Q.   What, if any, body piercings did you have while you were dating Sean?

A.   I had my nipples pierced, and prior to, way back, I had my belly button pierced and, um, a hood piercing.

Q.   OK.  So starting with the nipple piercing, when did you get the nipple piercing?

A.   I initially got one with a friend and took it out.  This

P5DsCOM4                        Ventura - Direct

was, like, early on in LA.  I just took it out.  And then he made a suggestion that I do both, so the next week I went and did both.  Yeah.

Q.  When you say he made a suggestion that you do both, who is he?

A.  Sean.

Q.  And what does both refer to?

A.  Both nipples.

Q.  Did you want to pierce both nipples?

A.  At the time, I think I did.  I took it -- I took the initial one out because of the pain, um, but I thought it looked cool.

Q.  And you mentioned a hood piercing?

A.  Um-hmm.

Q.  What's that?

A.  Um, it's a piercing that, like, basically sits on your clitoris.

Q.  And when did you get that piercing?

A.  I got that shortly after the nipple piercings.

Q.  Why did you get that piercing?

A.  Sean's suggestion.  He actually came with me.  Yeah.

Q.  Earlier you testified that the first freak-off was at Sean's house.

       Do you remember that testimony?

A.  Yes.

Q.  Were there any other freak-offs at his house?

A.  Yeah, there were others.

Q.  Which of his homes did you have freak-offs in?

A.  Um, I would say mostly all of them, except for Mapleton.

Q.  Does that include his home in Miami?

A.  Yes.

Q.  Does that include his apartment in New York City?

A.  Yep.

Q.  And besides his home, what, if any, other homes did you have freak-offs at?

A.  In my apartments, my homes.

Q.  Which of your homes did you have freak-offs at?

A.  I think all of them, except for the Studio City house.

Q.  So does that include the West End address in New York?

A.  Yes.

Q.  Does that include 818 Doheny?

A.  Yes.

Q.  And does that include 875 Comstock?

A.  Yep.

Q.  And besides homes and apartments, at what other locations did freak-offs occur?

A.  Hotels, mostly.

Q.  And in what cities did you have freak-offs with Sean and a male escort?

A.  New York, Miami, Los Angeles, Atlanta, um, Ibiza, Spain,

Turks and Caicos.  Random places.

Q.  What about Las Vegas?

A.  Vegas, as well.

Q.  So, going through, you mentioned New York City.

What are some of the hotels that you had freak-offs at in New York?

A.  New York would be the London, Trump Hotel, Gramercy. Honestly, you name it, we probably did it there.

Q.  What about the InterContinental Hotel?

A.  44th Street, yep.

Q.  In LA, what are some of the hotels where you had freak-offs?

A.  Um, L'Ermitage was frequent, Beverly Hills Hotel.  The London there, as well.  Um, Shutters on the Beach, you know, there's --

Where else?  Other places.

Q.  What about the InterContinental in LA?

A.  Century City.

Thank you.  Yeah.

Q.  And in Miami, what are some of the hotels where you had freak-offs?

A.  Um, Mandarin Oriental, Satei, Fountainbleu, the 1 Hotel. Yeah.

Q.  What types of rooms were freak-offs usually held in?

A.  They were usually held in, like, a room that had, like, a

P5DsCOM4                        Ventura - Direct

living room that you could close the door or, like, an extra room with an additional bathroom so, like, a small suite, junior suite.

Q.   Who, if you know, booked the hotel rooms?

A.   It varied.  Sometimes it was someone like Tony Fletcher on staff.  Occasionally, I would book hotel rooms.  Yeah.

Q.   Who, if you know, paid for the hotel rooms?

A.   I believe Sean paid for the hotel rooms.

Q.   What are some of the names that were used on hotel reservations?

A.   Um, Jackie Star was the name that I used.  Um, Frank Black, Frank White.  There was all types of names.

Q.   Turning to Jackie Star, why did you use the name Jackie Star?

A.   Um, that was a name that -- um, I don't know who came up with it, if it was him or me, um, that I used to actually book dancers.  So I would use that name instead of my own name and then just started using it as a hotel room name.

Q.   And you also mentioned Frank White and Frank Black?

A.   Um-hmm.

Q.   Whose aliases were Frank White or Frank Black?

A.   They were Sean's.

Q.   What, if any, supplies were needed for freak-offs?

A.   Main supplies were baby oil, Astroglide, as lubricants, and condoms.

Q.   Who typically brought the supplies to the freak-offs?

A.   More often than not it was staff.  The room was usually stocked by the time we got there.  If not, if it were a last-minute situation and I set it up, I would get things or sometimes Sean would bring them.

Q.   When you say staff, whose staff are you referring to?

A.   Sean's staff.

Q.   Which positions on Sean's staff would be tasked with stocking the hotel rooms?

A.   Assistants, security.

Q.   You mentioned baby oil.

     What brand of baby oil was used?

A.   Johnson's baby oil.

Q.   How was the baby oil used during the freak-off?

A.   It was -- it was just as important as everything else, as being there.  We used it quite a bit.

Q.   Where was it -- where was the baby oil placed?

A.   We poured it all over our bodies.  Had to be glistening. Yeah.

Q.   Which participants in the freak-off, if any, used the baby oil?

A.   Everyone.

Q.   Would that include you?

A.   Yes.

Q.   Does that include the escort?

P5DsCOM4                      Ventura - Direct

A.  Yes.

Q.  Did that include Sean?

A.  Yes.

Q.  What temperature was the baby oil when it was poured on your body?

A.  It was always heated.  Um, like, keep the cap on, put it in the sink with hot water, and let it warm up.

Q.  Who wanted the baby oil to be heated?

A.  Sean.

Q.  You mentioned that the baby oil was used because you had to be glistening?

A.  Um-hmm.

Q.  Who told you that you needed to be glistening?

A.  Sean.  It was his preference.

Q.  How frequently would baby oil be applied to be glistening?

A.  Like, every five minutes.  It was a lot.

Q.  What, if any, comments would Sean make about needing to apply baby oil?

A.  He would -- if he felt, like, you were too dry, he would let you know.

Q.  What would he say?

A.  He would say, You're too dry, you need to put more oil, on or you need to be glistening, you need to be, um -- yeah, you need to be shining.  Yeah.

Q.  Who directed the application of baby oil during the

freak-offs?

A. I would say that was heavily on Sean. Occasionally I would say that we needed more, too, because I just knew what to do.

Q. Why did you know what to do?

A. It was a very choreographed experience.

Q. Who choreographed the experience?

A. Sean.

Q. During the freak-offs, who applied baby oil to you?

A. I applied it to myself, sometimes Sean, sometimes the escort.

Q. Would you apply baby oil to anyone?

A. Sometimes with the escort, sometimes to Sean.

Q. How did you usually apply baby oil?

A. You just squirt it on out of the bottle.

Q. Were there other ways of applying oil at a freak-off?

A. There was one time, um, where I got to -- I think it was at L'Ermitage in Beverly Hills and there was a pool, like, a blowup pool, and it was filled with lube and oil. So that was a different way.

Q. When there was the blowup pool that was filled with lube and oil, what did you do with the pool?

A. I don't know what happened to the pool, honestly.

Q. I'm sorry. Strike that.

When there was that pool and oil, did you get into the pool?

A.  I did, with my outfit, my shoes.  It was quite dangerous.

Q.  Who, if anyone, asked you to get into the pool?

A.  Sean.  It was his idea.

Q.  Did you want to get into a pool of baby oil?

A.  No, especially not in a hotel room like that.  It was such a mess.  It was, like, what are we doing?  Yeah.

Q.  Why did you get into the pool with baby oil?

A.  At that point, I couldn't say no.  It would have been all bad.  Um, yeah, where, I don't ...

Q.  When you say all bad, what do you mean?

        MS. ESTEVAO:  Objection, calls for speculation.

        MS. JOHNSON:  Your Honor, the witness just used --

        THE COURT:  I think just the verbiage is a little vague.  I think you can ask a more focused question and you'll get a response.

        MS. JOHNSON:  Sure.

Q.  You testified that if you did not get into the pool with baby oil, that it would be bad?

A.  Yeah.

Q.  What concerns did you have about not getting into the pool with baby oil?

A.  That, amongst other things, just his temper.  If that is something that he wanted, Sean wanted to happen, that's what was going to happen.  There wasn't another way around it.

        (Continued on next page)

BY MS. JOHNSON:

Q. Approximately how many bottles of baby oil would be used in a typical freak-off?

A. A lot. I would say definitely somewhere close to ten.

Q. What size were those bottles?

A. The larger-size bottles.

Q. Were there freak-offs where you ran out of baby oil --

MS. ESTEVAO: Objection. Your Honor, at this point, it's getting a little cumulative.

THE COURT: Let's see if we can wrap this up and move on.

Q. You also mentioned Astroglide. How was that used at the freak-offs?

MS. ESTEVAO: Same objection. Irrelevant.

MS. JOHNSON: Your Honor, it's a supply.

THE COURT: Sidebar.

(Continued on next page)

P5DCcom3                          Ventura - Direct

(At the sidebar)

THE COURT:  Ms. Johnson, maybe you can help us with where we're going right now.  I think the objection is grounded in lack of relevance and also the cumulative nature of the questioning.  Am I right about that?

MS. ESTEVAO:  That's right.

THE COURT:  Maybe if you can give us some guidance as to where we're going next, that will be helpful.

MS. JOHNSON:  Yes, your Honor.  We are going to go through the various supplies that were used because those are supplies that were demanded by the defendant, that were at every freak-off, that were consistent, which showed a pattern, which showed how he controlled the events that happened at these freak-offs.  I will not ask anymore oil questions.  I have one question on lubricant, but I'm going to march through the different supplies that were present.

THE COURT:  That's fine.  I understood the objection to mainly be on the cumulative nature on this.  I think we had about 20 questions on baby oil issues and I think we can condense that a little bit and you'll avoid the objection; is that fair?

MS. ESTEVAO:  That's fair.

THE COURT:  Mr. Agnifilo.

MR. AGNIFILO:  I was going to say slippery slope, but I'm not going to say it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5DCcom3                        Ventura - Direct

            (In open court)

            THE COURT:  Ms. Johnson, you may proceed.

            MS. JOHNSON:  Thank you, your Honor.

Q.  When we were just talking about Astroglide, how was the
Astroglide used at freak-offs?

A.  As a lubricant.

Q.  With respect to these two supplies, baby oil or Astroglide,
were there times when you ran out of them?

A.  Yes.

Q.  What would happen when you ran out?

A.  When we would run out, would have to either call somebody,
staff to bring it or ask the bell desk and give them a tip.

Q.  When you say staff, whose staff are you talking about?

A.  Sean's staff.

Q.  Which members of Sean's staff would resupply the hotel
rooms?

A.  Assistants usually.

Q.  Who would call those staff members?

A.  Sean would advise me to or he would call himself.

Q.  And you also mentioned calling the bell desk.  Who would
call the bell desk?

A.  Again, either me or him.

Q.  If you called, at whose direction would you be calling?

A.  Sean's.

Q.  Initially, what kind of lighting was used for freak-offs?

P5DCcom3                    Ventura - Direct

A.   Initially it was candle-lit.  So various candles.

Q.   Who decided what kind of lighting would be used?

A.   Sean.

Q.   What type of candles were used?

A.   At a time, really strong smelling candles, like Glade or Diptyque.  Any just really strong smelling --

Q.   Who would typically bring the candles to the freak-offs?

A.   It was all part of the setup.  So whether it was an assistant or me or him.

Q.   Approximately how many candles were used?

A.   Approximately six to ten.

Q.   How were the candles placed in the room?

A.   They were placed so that Sean could see me and the escort in the candlelight.

Q.   Who requested the candle setup?

A.   Sean.

Q.   Besides lighting, were there any other uses of candle wax at freak-offs?

A.   A couple of times where it was poured on the body, but it wasn't common.

Q.   When you say poured on the body, whose body was it poured on?

A.   My own or Sean's.

Q.   And whose decision was it to pour wax on either your body or Sean's body?

A.  Sean's.

Q.  Did the lighting that was used in freak-offs change over time?

A.  Yes.  There were lights after a certain point, like the lights that we would use in studio.

Q.  Can you describe what the light you would use in the studio is.

A.  There are multicolored lights that change with the music, kind of like a club light.

Q.  What colors are those lights?

A.  Red, green, blue, purple.

Q.  Who made the decision to change the lighting?

A.  Sean would have assistants bring the lights, so I guess him.

        MS. JOHNSON:  Ms. Gavin, can you pull up for identification Government Exhibit 3Q-118 for the parties and the Court only.

Q.  Ms. Ventura, do you recognize who's in this photograph?

A.  Yes.

Q.  At what type of location is this photograph taken?

A.  To me it looks like a hotel.  It looks like The London hotel in New York.

Q.  Who took this photograph?

A.  I believe I did.

Q.  Is this a true and accurate photograph of Sean?

P5DCcom3                          Ventura - Direct

A.   Yes.

        MS. JOHNSON:  The government offers Government Exhibit
3Q-118.

        MS. ESTEVAO:  No objection.

        THE COURT:  It will be admitted.

        (Government's Exhibit 3Q-118 received in evidence)

        MS. JOHNSON:  Ms. Gavin, can you please publish
Government Exhibit 3Q-118 to the jury.

Q.   Ms. Ventura, directing your attention to Sean's hand, what
is he holding?

A.   He's holding cash.

Q.   How do you describe the color of the room?

A.   It's red from the studio light.

Q.   Is the studio lighting you described earlier responsible
for that red color?

A.   Yeah.

        MS. JOHNSON:  You can take that down, Ms. Gavin.

Q.   What temperature were the rooms where the freak-offs were
held?

A.   They were usually pretty warm.

Q.   Who set the temperature?

A.   Sean.

Q.   And you described that the candles were strong.  How did
the room smell during the freak-offs?

A.   I mean, if it were a Glade candle and a bunch of them,

P5DCcom3                          Ventura - Direct

angel whispers, if anybody knows what that smells like, just on 10, it was super pungent and strong mixed with oil and just all of the other scents.

Q.   What other scents were there?

A.   I mean, it was warm, so body odor, you know.

Q.   After a freak-off, can you describe the condition of the room where the freak-off was held?

A.   The room was usually pretty bad off.  There was oil all over the walls, the door handles, the bed, the sheets.  We often would get to the room, I would need to call and ask for extra linens and towels and stuff like that to try to mitigate those problems, but oil, candle wax all over the place.

Q.   You mentioned you would call for extra linens.  When would you do that?

A.   Prior to starting.

Q.   Why would you call for extra linens?

A.   To cover up the furniture that was there to try to protect it.

Q.   You described wax and oil damage.  What else, if anything, was soiling the linens?

A.   Sometimes blood, urine.

Q.   So starting with blood, how would blood get on the linens at freak-offs?

A.   I was expected to have freak-offs on my period.

Q.   Who expected you to do freak-offs on your period?

A. Sean.

Q. Did you want to do freak-offs on your period?

A. No.  I don't think anybody really wants to do that.

Q. And you also mentioned urine.

A. Yes.

Q. How would urine get on the linens at freak-offs?

A. Sometimes Sean would have -- he, himself, he would have the escort urinate on me.  Sometimes there was so much going on I don't know how they got soiled the way they did, to be completely honest.

Q. So focusing on the urine, did you want an escort or Sean to urinate on you?

A. No.

          MS. ESTEVAO:  Asked and answered.

          MS. JOHNSON:  Your Honor, I did not ask that question before.

          THE COURT:  Hold on.  What is the objection?

          MS. ESTEVAO:  Asked and answered.

          THE COURT:  It's overruled.

Q. Ms. Ventura, did you want Sean or an escort to urinate on you?

A. No.

Q. And before that happened, what, if anything, did you discuss about being urinated on?

A. There was no conversation.  It just was a turn-on for him,

so it happened.

Q. Who directed an escort to urinate on you?

A. Sean.

Q. Can you please describe how it felt when this happened.

A. I mean, just as humiliating if anybody were there to see it. It was disgusting. It was too much. It was overwhelming. I choked. There couldn't have been anything on my face that was reading that I wanted to be doing that. I was kind of just laid on the floor in a position that I couldn't easily get out of, so --

Q. Were you able to tell the escort to stop?

A. I just kind of put my hands up and eventually Sean saw and he told them to stop.

Q. Why did you put your hands up?

A. Nothing I could really do laying on the floor.

Q. You mentioned choking. Why were you choking?

A. Too much urine in my mouth.

Q. And besides the escort urinating on you, who else, if anyone, did that?

A. Sean.

Q. Did you want Sean to urinate on you?

A. I don't want anybody to urinate on me, no.

Q. And when in relation to the escort urinating on you did Sean urinate on you?

A. The same time.

Q.   Approximately how many times did this happen?

A.   Throughout the relationship?

Q.   Yes.

A.   Not super often, but often enough.

Q.   Before leaving the hotel, what, if anything, did you do to clean up the linens you described?

A.   I mean, there wasn't really too much you could do but give a good tip and hope that they would help out.  I would just try to clean up what I could.  Usually like an assistant or staff or somebody would come, I believe, after.

Q.   Are you aware if hotels charged for damage to the rooms?

A.   I am.

Q.   How do you know that?

A.   Through conversations with the staff that got the call from the hotel.  I remember specifically hearing like a number that was crazy.  It was having to redecorate the room.  It was a really high number to fix it.

Q.   Are you aware which hotel charged that really high number?

A.   That was the Intercontinental in New York.

Q.   One more question for you about the urination.  Why didn't you say no when this happened?

         MS. ESTEVAO:  Objection.  Mischaracterizes.

         THE COURT:  Ms. Johnson, there's probably a couple more questions to ask.

Q.   Ms. Ventura, I believe you testified earlier about the

P5DCcom3                    Ventura - Direct

urination, that it just happened and there wasn't any

discussion.  Is that an accurate summary of your testimony?

A.  Yes.

Q.  When it happened without any discussion, what did you do?

A.  I mean, I was squeamish immediately, and high, and in the

moment with this man.  So that's what happened.

Q.  When you say you were high and in the moment, what do you

mean by that?

A.  There's not a whole lot of control you have at that point

of taking that many drugs and being laid on the floor with two

men standing over you peeing on you.  Could have gotten up and

screamed, I guess.

Q.  Why didn't you say no when that happened?

A.  I thought that it was obvious that I didn't want to do it,

I guess.

Q.  Do you remember the person that I referred to as the first

escort?

A.  Yeah.

Q.  Were there other escorts that you used beside the first

escort?

A.  Yes.

Q.  And after the first escort, who typically found escorts for

freak-offs?

A.  I was put on that task to find escorts.

Q.  And who, if anyone, put you on that task?

P5DCcom3                        Ventura - Direct

A.   Sean did.

Q.   What, if any, requirements, physical or otherwise, did Sean have for escorts?

A.   At first it was very specific that he wanted a black male with a large penis, but eventually it just kind of became whatever's available.

Q.   Where did you find escorts to hire?

A.   When it became really consistent, we had found an escort service called Cowboys 4 Angels, and they have escorts in, like, all the major cities in the U.S.

Q.   Before using Cowboys 4 Angels, how did you find escorts?

A.   Initially craigslist or Backpage or whatever.

Q.   What is craigslist?

A.   Craigslist is a website where you can put up ads and sell your bed and other things.  It's just where you can place ads.

Q.   Besides placing ads, can you also respond to ads?

A.   You can also respond to ads.

Q.   Did you post any ads to craigslist?

A.   No.

Q.   Did you respond to ads?

A.   I did.

Q.   At whose direction did you respond to ads?

A.   At Sean's direction.  He'd tell me what to look for.

        MS. JOHNSON:  Your Honor, I'm not sure when the Court was planning on taking a break this afternoon.

P5DCcom3                          Ventura - Direct

THE COURT:  I was planning on doing it at 3:00, but if this is a good place, we can take it now.

MS. JOHNSON:  I think it would be a good place.

THE COURT:  Thank you, members of the jury.  As always, do not talk to each other about the case and we'll have some further instructions at the end of the day.  We'll be back at 3:00 p.m.  All rise.

(Continued on next page)

P5DCcom3                    Ventura - Direct

(Jury not present)

THE COURT:  Anything to raise before we take our break?  Ms. Johnson.

MS. JOHNSON:  Nothing, your Honor.  Thank you.

THE COURT:  Anything from the defense?

MS. ESTEVAO:  No, your Honor.

THE COURT:  We'll be back at 3:00 p.m.

(Recess)

Ms. Johnson, do we have our witness?  Are we just waiting for her?  It's fine if she just needs a minute or two.

(Witness present)

Welcome back.

(Continued on next page)

P5DCcom3                           Ventura - Direct

(Jury present)

THE COURT:  Ms. Johnson, you may proceed.

MS. JOHNSON:  Thank you, your Honor.

BY MS. JOHNSON:

Q.  Ms. Ventura, before the break, you were talking about craigslist.  Do you remember that testimony?

A.  Yes.

Q.  In what cities did you respond to ads on craigslist?

A.  In New York, I think was the main.

Q.  At whose direction did you respond to ads on craigslist?

A.  At Sean's direction.

Q.  When you responded to ads on craigslist, whose contact information did you use?

A.  I used my own.

Q.  Did you use your own name?

A.  No.

Q.  What name would you use?

A.  Jackie Star.

Q.  Would you use your own phone number?

A.  I would have to use my own phone number, yup.

Q.  You also mentioned Backpage.  What is Backpage?

A.  Backpage is a similar thing to craigslist, ads.

Q.  Did you respond to ads on Backpage, as well?

A.  I did.

Q.  At whose direction?

P5DCcom3                         Ventura - Direct

A.   Sean's.

Q.   Also before we broke you testified about a company called Cowboys 4 Angels.  Do you remember that testimony?

A.   Yeah.

Q.   Who typically communicated with Cowboys 4 Angels?

A.   I did.  I communicated with a gentleman named Garren.

Q.   Who, if anyone, directed you to communicate with Garren?

A.   Sean.

Q.   And how did you typically communicate with Garren?

A.   Usually through texts, occasionally a call.

Q.   When you would reach out to Garren, how much notice would you give him that you needed an escort?

A.   It usually wasn't that much notice.  It would be, like, somebody today.

Q.   What else, if anything, would you tell Garren during those communications?

A.   I'd tell him what city we're in because he would basically send escorts based off of the city we were in, time, location, all of that.

          MS. JOHNSON:  Ms. Gavin, can you pull up for identification for the Court and parties only Government Exhibit B-236.  You can put page 1 and 2 on the same screen. That would be helpful.  I'm sorry, Ms. Gavin.  I meant B-326 I'm sorry that I misspoke.

Q.   Ms. Ventura, do you recognize the communication in

Government Exhibit B-326?

A.   Yes.

Q.   What is it?

A.   It's a text thread with me and Garren.

Q.   How do you recognize it?

A.   I have his name in there as Garren CB4A, which is Cowboys 4 Angels.

Q.   Is this text thread from one of the devices you gave to the government?

A.   Yes.

Q.   Is this a true and accurate text thread between you and Garren?

A.   Yes.

         MS. JOHNSON:   The government offers Government Exhibit B-326.

         MS. ESTEVAO:   No objection.

         THE COURT:   It will be admitted.

         (Government's Exhibit B-326 received in evidence)

         MS. JOHNSON:   Ms. Gavin, could you please publish to the jury.  Ms. Gavin, could you please blow up the chat participants in the top of the first page.

Q.   Ms. Ventura, you mentioned this already, but since the jury can now see it.  The contact says Garren CB4A.  What does CB4A stand for?

A.   The company Cowboys 4 Angels.

MS. JOHNSON:  You can go back to the message, Ms. Gavin.  Thank you.

Q.  Who are the participants in this chat?

A.  Garren and I.

Q.  Directing your attention to the first gray bubble on the first page, what is the date of the first message?

A.  June 29th, 2012.

Q.  What does Garren say to you in that message?

A.  Okay.  This is the guy.  He's new and really an amazing guy.  I had him come to Miami for his final interview to meet with me and he is ready to go.

Q.  And then what are the next two messages that you receive?

A.  Photos.

Q.  And then at the bottom, what does Garren tell you at the bottom of page 2?

A.  His name is Trent.  Have him for 7:00 p.m.

Q.  When you received communications like this with photographs, what did you do with the photographs?

A.  I would usually show them to Sean and see if that person was of interest for a freak-off.

Q.  If that person was not of interest, what happened?

A.  I would just tell Garren no, see if he had anybody else.

Q.  Did Sean have to approve the escorts?

A.  I definitely had to show him, yeah.

MS. JOHNSON:  Ms. Gavin, can you turn to pages 3 and 4

P5DCcom3                        Ventura - Direct

of this exhibit, please.

Q.  Ms. Ventura, directing your attention to the left page,
starting at the top, I'll read the gray bubbles and you read
the blue.

So the first gray bubble has a photograph with a
message of William, who you saw before, but we'd need to
confirm William soon so he can rearrange his plans.

A.  Okay for Trent.  Let's do 8:00.

Q.  Okay.  Sounds good.  Send over that addy when you can.

A.  10 West End.  Not close to home yet, stuck in traffic.  Can
we push to 9:00 p.m.?

Q.  Pausing you there.  10 West End in the previous message,
who lived at 10 West End?

A.  That was my apartment in New York, on 60th and West End.

Q.  Is this sort of short excerpt we read from the
communication from you and Garren consistent with how you
typically communicated with Garren about hiring an escort?

A.  Yes.  It was very transactional.

Q.  You also testified earlier about dancers or strippers were
sometimes hired.  Do you remember that testimony?

A.  Yes.

Q.  Who would reach out to hire a dancer or a stripper?

A.  I would be tasked to do that based off of seeing a website
or something.

Q.  Who tasked you with hiring a dancer or a stripper?

A.   Sean.

Q.   In what cities did you hire dancers or strippers?

A.   New York, Miami, Los Angeles.

Q.   Do you recall any of the names of the dancing or stripping services that you used?

A.   I remember one was called, like, Latin Men, but I don't remember the exact names.

Q.   And aside from craigslist, Backpage, the stripping and dancing services and Garren, were there times you spoke directly with escorts?

A.   Yes.

Q.   Who had typically communicated with escorts?

A.   I did.

Q.   Who directed you to communicate with escorts?

        MS. ESTEVAO:  Objection.  These types of questions are leading.  I know there have been a number of them.

        MS. JOHNSON:  Your Honor, I'll rephrase.

        THE COURT:  Okay.

Q.   Who, if anyone, directed you to communicate with escorts?

        MS. ESTEVAO:  Same objection.  It doesn't solve the problem.

        MS. JOHNSON:  It's who, if anyone.

        MS. ESTEVAO:  And it assumes a fact not in evidence that there was direction.

        THE COURT:  I think that's the objection here.

P5DCcom3                      Ventura - Direct

Ms. Johnson, I think you need to ask a few questions before you get to that one.

Q. What, if any, conversations would you have prior to communicating with an escort directly?

A. Can you repeat the question.

Q. Sure. I'm sorry. You testified you would typically communicate directly with an escort. Do you remember that?

A. Yes.

Q. Prior to communicating directly with an escort, what, if any, conversations would you have with Sean?

A. It would usually just be like are we going to have a freak-off this afternoon, like, very simple. Even though I had contacts, he had contacts, as well, Sean.

Q. When you say contacts, what do you mean by that?

A. He had Garren's contact, he had some of the escorts' personal contact information, as well. So he reached out, as well.

Q. How do you know that?

A. Because he would tell me.

Q. Did you ever reach out to escorts independently?

A. No.

Q. How would you typically communicate with escorts?

A. Through text.

Q. When would you, for example, go through someone like Garren versus communicating directly with an escort?

A.  Occasionally Garren would actually just offer, like, maybe you should grab his number so you can call him directly.  There was that much communication going on.

Q.  And when would that communication happen?

A.  Just before.  Are you talking -- I'm sorry.  I don't think I understood.

Q.  You testified that Sean would tell you to grab an escort's contact information; is that right?

A.  Yeah.

Q.  When would Sean tell you that?

A.  Before they would leave after a session usually.

Q.  How would you save an escort's contact information in your phone?

A.  I used to just use the abbreviated word "strip" after their name, like Garren's was CB4A.  If they came from that company, that's how I would put them in my phone.

Q.  Were there ever abbreviations you'd use besides CB4A?

A.  Strip is the only one I can think of.

Q.  You testified earlier that Sean also had Garren and other escorts' contacts; is that right?

A.  Yes.

Q.  Why did you contact escorts and Garren?

A.  Sean was a very busy person, but he would just ask me straight up if he was busy doing something, if I could do it.

Q.  Whose idea was it for you to contact escorts, yours or

someone else's?

A.   It was someone else's.

Q.   When you were reaching out to an escort, what, if anything, would you say to the escort about what you were hiring that escort to do?

A.   It depended on, like, the situation, how they came in.  But I would usually say that my husband is into something called voyeurism and he likes to watch me with another man.  It was like a basic conversation that I had with most of the escorts. From there I would get a feel if they were willing to do it or not.

Q.   When did that conversation typically occur in the process?

A.   Before, when they would first get there.

Q.   First arrive at a location?

A.   First arrive at the hotel or wherever we were.

Q.   And circling back to one of your answers where you said that it was someone else's idea to contact escorts, who was that someone else?

A.   Sean.

Q.   So when you would speak to the escort when they arrived at the hotel and have the conversation you just described, who was typically present for that conversation?

A.   It would usually be just me and the escort.  If Sean wanted to hear or overhear, he could listen from the room over.

Q.   How would you know he could listen from the room over?

P5DCcom3                    Ventura - Direct

A.   Just the actual distance.  It wasn't super far.

Q.   Did you ever speak to Sean about him listening to the conversation?

A.   Yeah.  He would tell me if he heard everything or not.

Q.   What conversations, if any, did you have with Sean about what to say to the escorts at this initial meeting?

A.   I'm sorry.  Could you rephrase that.

Q.   Sure.  You described sort of an initial meeting with the escort.  Do you remember that?

A.   Uh-huh.

Q.   What, if anything, did you discuss with Sean about what you would say at that initial meeting?

A.   Just Sean gave me direction.  It was usually, you know, this is my husband's fantasy.  We created this scenario that we were married, this is his fantasy, this is what I like to do for him to please him.  So these were things that he would tell me to be able to say to the escorts or make them more comfortable in it, I guess.  I don't --

Q.   Are those the things that you would then say to the escort?

A.   Yup.

Q.   After you had this initial conversation with the escort, what would you do next?

A.   After that conversation, I would usually go back into the room with Sean and just finish getting ready to go out and start the session.

P5DCcom3                          Ventura - Direct

Q.   Would you tell Sean what the conversation with the escort was about?

A.   Yes.  If it was somebody that we hadn't used before or somebody that still didn't know us, like who we were, he would have questions about it and, you know, just inquire if it was a safe person.  I felt comfortable with them if they were willing to do all the things that we had discussed.

Q.   Were there occasions where you did not use an escort who came to meet you and with whom you had this initial conversation?

A.   Yes, with one particular in mind.  The person tried, but eventually just said they could not keep an erection, so they were sent on.

Q.   Who sent them on?

A.   Sean.

Q.   And you mentioned something in your description of your conversation with Sean if the escort was safe, what did you mean by safe?

A.   Safe that they -- there was sometimes a conversation.  This wasn't all the time, where Sean wanted me to clarify if the person was a cop.  At first I didn't understand, and I learned later, why.  Also that the person wasn't going to, you know, just run and tell everybody about their experience with us.

Q.   What did you learn about why, what you just said?

A.   I'm sorry.

Q.  You just said that sometimes Sean asked you to ask if a person was a cop, right?

A.  Yeah.

Q.  And you said, later, I learned about why?

A.  Yeah.

Q.  What did you learn?

A.  I learned that this whole situation was not legal.

MS. ESTEVAO:  Objection.

THE COURT:  Sustained.  The jury should disregard the witness's last answer.

Q.  How were escorts typically paid?

A.  With cash, money.

Q.  At what point during the session were they typically paid?

A.  At the end.

Q.  Approximately how much were escorts typically paid?

A.  Anywhere from $1,500 to I would say $5,000, $6,000.

Q.  What role, if any, did you have in determining how much escorts were paid?

A.  I didn't have a role.  It wasn't my money.

Q.  Who typically handed cash to escorts?

A.  I often did, sometimes Sean.

Q.  If you handed cash to escorts, where did you get the cash?

A.  It was handed to me by Sean.

Q.  How did cash get to the location for the freak-offs, if you know?

P5DCcom3                          Ventura - Direct

A.   It was brought by, like, security or somebody, or he brought it himself.

Q.   When you say he brought it himself, who is he?

A.   Sean.

Q.   When you were hiring, for example, a stripper or a dancer, were there ever times when you were required to pay a deposit in advance?

A.   Yes, specifically with a dancer at a company.

Q.   How did you pay that deposit?

A.   I would put that on my personal card.

Q.   Approximately how much did those deposits cost when you hired a dancer?

A.   Anywhere between $165, $200.

Q.   For the escorts who you interacted with, what were they paid thousands of dollars to do?

A.   To ejaculate, to finish.

Q.   Is that after they finished having sex with you?

A.   After having sex, after a long session.

Q.   And for all the dancers you interacted with at freak-offs, were those individuals paid, as well?

A.   Yes.

Q.   How much were those dancers paid when they came to freak-offs?

A.   Anywhere between that range that I said before, $1,500 to $6,000, $7,000.

P5DCcom3                      Ventura - Direct

Q.  For all the dancers you interacted with, what were they paid, those $1,500 to $6,000 to do?

A.  To entertain and to also ultimately have intercourse with me.

Q.  Generally, what gender were the escorts who were hired for freak-offs?

A.  Male.

Q.  Were there any exceptions?

A.  No.  We did have a female one time, one or two times.

Q.  Ms. Ventura, there's a binder sitting next to you.  Do you see that binder sitting next to you.  Could you look through that binder at the photographs inside and let me know who you recognize those individuals to be.

A.  Would you like me to look at all of them?

Q.  Yes, please.

         Have you looked at all of them?

A.  Yes.

Q.  Who, generally, do you recognize the individuals depicted in those exhibits to be?

A.  Generally, they're escorts that we hired, but not everybody.

Q.  Not everybody.  Are some of them dancers?

A.  Some of them I don't recognize.

Q.  We can go through them one by one.

A.  Do you want me to --

Q.  You can leave that there.  That's fine.

MS. JOHNSON:  Ms. Gavin, can you please pull up Government Exhibit 2A-627.  It's in evidence.

Q.  Ms. Ventura, we talked about this individual previously, right?

A.  Yes.

Q.  We referred to him as the first escort; is that right?

A.  Correct.

Q.  Do you know his name?

A.  I don't.  I can't remember it.

Q.  You earlier testified about a freak-off with him in LA; is that right?

A.  Yes.

Q.  Are there any other cities in which you had freak-offs with this escort?

A.  Besides Los Angeles, definitely Vegas, maybe New York, but not 100 percent sure.

MS. JOHNSON:  You can take that down, Ms. Gavin.  Can you please pull up Government Exhibit 2A-612 for identification for the Court and the parties only.

Q.  Ms. Ventura, do you recognize the individual depicted in 2A-612?

A.  Yes.

Q.  How do you know that individual?

A.  He was an escort that we called Dave.

P5DCcom3                        Ventura - Direct

Q.   Is this a fair and accurate picture of Dave?

A.   Yes.

          MS. JOHNSON:  Government offers Government
Exhibit 2A-612.

          MS. ESTEVAO:  No objection.

          THE COURT:  It will be admitted.

          (Government's Exhibit 2A-612 received in evidence)

          MS. JOHNSON:  Can you please publish that to the jury,
Ms. Gavin.

Q.   How did you hire Dave?

A.   Dave was actually through craigslist or Backpage.  One of
the two.  I don't remember specifically which one.

Q.   And in what cities did you use Dave?

A.   We used Dave in New York.  He would fly to Miami and
Los Angeles.

Q.   When Dave would travel, who would arrange Dave's travel?

A.   Occasionally I did.  He would, Dave would himself.  I think
a couple of times a travel agent from Sean's company.

Q.   When you say he would, which he are you referring to?

A.   To Dave.

Q.   Do you know Dave by any other names?

A.   His real name is Clayton.

Q.   Do you know his real last name?

A.   Howard.

          MS. JOHNSON:  Can you take that down, Ms. Gavin.

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

Can you pull up Government Exhibit 2A-625 for the Court and the parties only.

Q.   Ms. Ventura, do you recognize who's depicted in Government Exhibit 2A-625?

A.   Yes.

Q.   Who is that?

A.   That is Daniel.

Q.   How do you know Daniel?

A.   Daniel was an escort that we hired in New York City at one point.

Q.   Is this a fair and accurate picture of Daniel?

A.   Yes.

MS. JOHNSON:   The government offers Government Exhibit 2A-625.

MS. ESTEVAO:   No objection.

THE COURT:   It will be admitted.

(Government's Exhibit 2A-625 received in evidence)

MS. JOHNSON:   Can you please publish that to the jury.

Q.   You mentioned you hired Daniel in New York; is that right?

A.   Yes.

Q.   And what service did you contact to hire Daniel?

A.   I believe it was a dancer service, but it's, like, vague.

MS. JOHNSON:   You can take that down, Ms. Gavin.

Can you pull up for identification Government Exhibit 2A-630.

Q.  Do you recognize who's depicted in Government Exhibit 2A-630?

A.  Yes.

Q.  Who's that?

A.  That's Jewels.

Q.  How do you recognize Jewels?

A.  I was going to say worked with him for many years.  But yeah, we had encounters for a few years.

Q.  When you say encounters, what do you mean by that?

A.  Freak-offs, for several, really.

Q.  Is that a fair and accurate photograph of Jewels?

A.  Yes.

        MS. JOHNSON:  The government offers Government Exhibit 2A-630.

        MS. ESTEVAO:  No objection.

        THE COURT:  It will be admitted.  For this series of exhibits, if there's no objection, we'll deem it admitted.

        (Government's Exhibit 2A-630 received in evidence)

        MS. JOHNSON:  Can you publish that to the jury, Ms. Gavin.

Q.  Ms. Ventura, do you know Jewels's last name?

A.  I don't.

Q.  You mentioned you had freak-offs with him for many years. In what cities did you have freak-offs with Jewels?

A.  Los Angeles, New York, Miami, Vegas.  All of them.

P5DCcom3                         Ventura - Direct

Q. How, if you know, did you hire Jewels?

A. I don't remember, actually. No.

        MS. JOHNSON: We can take that down.

        Ms. Gavin, can you please pull up for identification Government Exhibit 2A-609.

Q. Ms. Ventura, do you recognize the individual depicted in Government Exhibit 2A-609?

A. Yes.

Q. Who is that?

A. I knew him as The Punisher.

Q. How did you know The Punisher?

A. We used him a few times for freak-offs.

Q. Is this a fair and accurate photograph of The Punisher?

A. Yes.

        MS. JOHNSON: Government offers Government Exhibit 2A-609.

        MS. ESTEVAO: No objection.

        (Government's Exhibit 2A-609 received in evidence)

        MS. JOHNSON: Can you display that to the jury, Ms. Gavin.

Q. Ms. Ventura, did you know The Punisher's real name?

A. No.

Q. In what city was he used?

A. I believe we originally hired him in New York. I don't know that he traveled. I don't think he did.

P5DCcom3                        Ventura - Direct

Q.  Do you recall how he was hired?

A.  I believe he was hired through a dancing service in New York.

        MS. JOHNSON:  You can take that down, Ms. Gavin.

        Can you pull up for identification Government Exhibit 2A-613.

Q.  Ms. Ventura, do you recognize who is depicted in Government Exhibit 2A-613?

A.  Yes.

Q.  Who is that?

A.  I knew him or know him as Johnny.  I don't know his last name.

Q.  How do you know Johnny?

A.  He was an escort that we hired.

Q.  Is this a fair and accurate photo of Johnny?

A.  Yes.

        MS. JOHNSON:  The government offers Government Exhibit 2A-613.

        MS. ESTEVAO:  No objection.

        (Government's Exhibit 2A-613 received in evidence)

        MS. JOHNSON:  Can you please publish it to the jury, Ms. Gavin.

Q.  In what city or cities did you hire Johnny?

A.  He was hired in Los Angeles.  Might have done some traveling to New York and Miami, but not 100 percent.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

Q.  How did you hire Johnny, if you remember?

A.  Johnny was through a service called Latin Men.

MS. JOHNSON:  Ms. Gavin, you can take that down.

Q.  Who were some of the most frequently used escorts?

A.  Most frequently used would be Jewels, Dave, Johnny.  I think those were the main ones.

Q.  And we just looked at six photos of escorts.  Are those all the escorts hired for freak-offs or just some of them?

A.  Just some of them.

Q.  And we talked about travel a little bit with Dave.  How, if you know, would travel be arranged for other escorts?

A.  For other escorts, I mean, we didn't have a whole lot of them travel, but there was one particular trip that we took to Ibiza, and one of Garren's guys flew out there, so I think the travel was probably arranged by them.

Q.  When, if ever, did you book escort travel?

A.  Occasionally, like if we absolutely needed to.  It wasn't all the time.

Q.  Before booking any escort travel, what, if any, conversations would you have with Sean about booking travel?

A.  I mean, he would ask me, like, what we were doing, if we were flying somebody in, who's available, and from there talk about how to get them there if they weren't in the town or they weren't in the city.

Q.  What would he say about when you say he talked about how to

get them there, what would he say?

A.   Do they need to fly in, do they need travel or are they

here.   Just basic questions.

Q.   You also mentioned, with respect to Dave, that Sean's

travel agent was sometimes involved.   Do you remember that?

A.   Yeah.

Q.   What, if any, role did you have in communicating with

Sean's travel agent?

A.   I definitely reached out to his travel agent.   I believe we

just acted as if it was a new employee or somebody that was

being interviewed or something.

Q.   When you say we acted, who are you referring to?

A.   Sean and I.

Q.   And when you say acted as a new employee, who would you say

was the new employee?

A.   Dave, for instance.   If we were going to have the travel

agent book his travel or, you know, oh, I have a new staff

member, we have somebody new coming to visit for a meeting so

that it wouldn't be speculated.

Q.   Why was it necessary to tell the travel agent that Dave,

for example, was a new employee?

A.   It was important to Sean not to have his identity known --

MS. ESTEVAO:   Speculation.

THE COURT:   That's sustained.

Q.   What, if any, discussions did you have with Sean about

communicating with the travel agent?

A.  Can you repeat that.  Sorry.

Q.  It's okay.  You were talking about reaching out to the travel agent.  Did you discuss that reach-out with Sean?

A.  Yes.

Q.  What did you talk about?

A.  I mean, it was by his direction, so we would discuss when they would arrive and when we would start.

Q.  You testified earlier about using some drugs at freak-offs. Do you remember that testimony?

A.  Yup.

Q.  And specifically we talked about using ecstasy at the first freak-off; is that right?

A.  Yes.

Q.  Did you use drugs at other freak-offs?

A.  Yes.

Q.  How many?

A.  All kinds.

Q.  Let me rephrase that question, Ms. Ventura.  How many freak-offs did you use drugs at?

A.  Oh, all of them.

Q.  Why did you use drugs at every freak-off?

A.  For me, it was dissociative and numbing.  I couldn't imagine myself doing any of that without having some sort of buffer or just way to not feel it for what it really was, which

was emotionless and sex with a stranger that I didn't want to be having sex with.

Q. Who else, besides you, used drugs at freak-offs?

A. Sean did and occasionally the escort, but I wasn't always clear on that.

Q. Were there any freak-offs where you did not use drugs?

A. No, not that I remember, no.

Q. You talked earlier about using ecstasy at the first freak-off. What other drugs, if any, did you use at freak-offs?

A. At freak-offs, marijuana, ketamine, GHB, sometimes mushrooms. Just whatever was the drug of choice at that point.

Q. Who provided the drugs for freak-offs?

A. Sean.

Q. When, in relation to the session starting, would Sean provide you with drugs?

A. Before, sometimes an hour before, sometimes before we even got there somebody would drop drugs off to me where I was.

Q. When you say somebody would drop off drugs to you, who dropped off drugs to you?

A. A staff member, security, assistant. Whoever was available.

Q. When you say staff, whose staff dropped off drugs to you?

A. Sean's staff.

Q. And whose security dropped off drugs for you?

P5DCcom3                      Ventura - Direct

A.   Sean's security.

Q.   How did you know how far in advance to take drugs?

A.   I would ask.

Q.   Who would you ask?

A.   Sean.

MS. JOHNSON:  Ms. Gavin, can you please pull up Government Exhibit B-244 for identification, for the Court and the parties only.  If you could pull up page 1 and page 2 side-by-side.

Q.   Ms. Ventura, do you recognize the document that's marked Government Exhibit B-244?

A.   Yes.

Q.   What, generally, is this document?

A.   It's a text message between me and Sean.

Q.   Is this a fair and accurate text message between you and Sean?

A.   Yes.

MS. JOHNSON:  The government offers Government Exhibit B-244.

MS. ESTEVAO:  May I have one moment?

THE COURT:  You may.

MS. ESTEVAO:  No objection.

THE COURT:  The exhibit will be admitted.

(Government's Exhibit B-244 received in evidence)

MS. JOHNSON:  Ms. Gavin, can you please publish the

P5DCcom3                        Ventura - Direct

exhibit for the jury.

Q.  Ms. Ventura, focusing first on the left-hand side of the page, who are the participants in this conversation?

A.  Sean and I.

Q.  And focusing on the right-hand side of the screen, at the very top, what is the date of the first blue bubble?

A.  April 6th, 2013.

Q.  For a few pages, I'm going to read the gray bubbles and you read the blue bubbles.  Can you start with that first blue bubble.

A.  About to touch down.

Q.  Call me as soon as you hit.  I'm happy.  Call APT.  RM in London 5301, Sally Richards.

So pausing there before we go on, what is your understanding of what Sean's text, RM in London Sally 5301 Sally Richards means?

A.  That the room number is 5301 and Sally Richards is the name under the room.

Q.  At what hotel is the room at?

A.  It says The London.

Q.  So continuing on, if you can, with the blue bottom at the page.

A.  It says K, bags came out that quick.

MS. JOHNSON:  Ms. Gavin, can we please turn to page 3 and 4.

P5DCcom3                    Ventura - Direct

A.   All set.  What Tim do I tell him?

Q.   What do you think Tim is supposed to say?

A.   Time.

Q.   3:00 a.m.  Who?

A.   Punisher.  His dad dies, Punisher will come at 6.  Died.

Q.   Pausing you there, is this the same Punisher whose photograph we looked at a few moments ago?

A.   Yes.

Q.   So continuing on down.

A.   Yeah.

Q.   We forgot about Daniel.

A.   He's, like, having a baby or something.  He hit me a little while back.

Q.   So pausing you there.  The reference to the name Daniel, is that the same Daniel we just looked at a photograph of?

A.   Yes.

Q.   Continuing on.  What you think Garren just hit me back.

A.   We've had him before.  White boy named William.

Q.   So him or Daniel, I'm good with whatever.

A.   Checking on Daniel availability.

         MS. JOHNSON:  Ms. Gavin, can you turn to the next two pages, please.

A.   Can't buy Astro.  It's too much.  I'm buying crazy stuff.

Q.   Okay.  Lol.  I got.  Lol.

A.   Lol.  Cool.  When should I take the thing?  Daniel isn't

P5DCcom3                    Ventura - Direct

hitting back.

Q.  Just pausing you there to talk about two text messages. When you say can't buy Astro, what does Astro refer to?

A.  The lubricant Astroglide.

Q.  And the next blue bubble, when it says, lol, cool, when should I take the thing?  What does the thing refer to?

A.  The thing refers to the drugs, ecstasy or MDMA.

Q.  Continuing on.  Okay, so book other through Garren.  Want me to hit Garren?

A.  All set.  When shall I take it?  Where is it?  When will you be there?

Q.  Pausing you there.  What are you talking about taking in that text message?

A.  The drugs, like, when do I take it.

Q.  In the next message from Sean says, it's in med bag. What's the med bag?

A.  The med bag is where Sean kept his medicine.  It's a Louis Vuitton bag and occasionally kept other drugs in there.

Q.  When you say other drugs, what other drugs are you referring to?

A.  To ecstasy, MDMA, party -- more party drugs.

Q.  So can you continue reading the blue, please?

A.  Yes.

Q.  Did you book with Garren?

A.  Yes.  3:00 a.m.  The white guy.

P5DCcom3                          Ventura - Direct

Q. Di you want to take now and push up to 2:45. In that message, what is your understanding of what Sean is asking you of what you want to take now?

A. The drugs and to push up the time of the escort.

Q. To push up the time for earlier?

A. Yeah, to push it up earlier.

MS. JOHNSON: Ms. Gavin, can we turn to the next two pages, please.

Q. So continuing on. Push up to 2:45 or I can.

A. No, that's 45 minutes, you said you'll be here in 20, I haven't even seen you, damn.

Q. When you say, no, that's in 45 minutes, you said you'll be here in 20, I haven't even seen you, damn, why did you say that?

A. Because I wanted to see Sean before we started doing anything.

Q. Did you want to see Sean before you started taking drugs?

A. Yeah, I wanted to just see him before all of this.

Q. So continuing to read. Lol, I'm ready. Did you get orange pill?

A. No. You told me not to take.

Q. Can you take now? It's the orange in the 5HTP bottle.

A. Okay.

Q. I took mine.

A. Okay. Getting now.

Q.  I'm flying.  Meet me.

A.  Orange or yellow?

Q.  Pausing you there.  When Sean says I'm flying, meet me, what is your understanding of what I'm flying means?

A.  He's high.

Q.  And when you say orange or yellow, what does Sean respond?

A.  Orange.

Q.  At the bottom of the message, what does Sean say?

A.  Have a drink, too.

        MS. JOHNSON:  Ms. Gavin, we can take that down.

Q.  Ms. Ventura, if you didn't take drugs before reaching the location of the freak-off, at what point would you take drugs when you reached the location?

A.  Immediately after or when I actually got with Sean.

Q.  And relative to when an escort would arrive, when did you typically take drugs?

A.  Before.

Q.  In addition to taking drugs at the beginning of the freak-off, how often did you take drugs during the freak-off?

A.  All the time.

Q.  How did you get more drugs?

A.  If we ran out, we would call people, friends or drug dealers or whoever at the time.

Q.  Backing up a little.  When you said you took drugs all the time throughout the freak-off, approximately how frequently

would that be?

A.  During a freak-off or just -- sorry.

Q.  No problem.  How long would the high lap typically last if you took, for example, ecstasy?

A.  Like three to four hours and then would take more because the sessions were quite long.

Q.  So if you took ecstasy, would you typically need to take more ecstasy every few hours when the high would run out?

A.  Yeah.

Q.  And when that would happen, how would you get more ecstasy to take?

A.  We either had it or would have it brought to the room.

Q.  And who had the ecstasy in the room?

A.  Sean.

Q.  And if more drugs needed to be brought to the room, how would you get more drugs?

A.  Either he would contact or I would make contact with his contact to bring more.

Q.  Who would you contact for additional drugs, if anyone?

A.  Drug dealers, friends, assistants.  Whoever had at that point.

Q.  And when you say assistants, whose assistants would be contacted?

A.  Sean's.

Q.  When you decided to take more drugs during the freak-off

P5DCcom3                         Ventura - Direct

when the high was wearing off, why did you take more drugs?

A.  For me to just remain high and not, like, be present with the experience.

Q.  Why did you not want to be present with the experience?

A.  Because it was something I hated doing.

Q.  Circling back on bringing additional drugs, if you contacted the individuals you discussed, were you present when anyone dropped off additional drugs?

A.  Sometimes, but it was a really brief thing.

Q.  Who brought additional drugs to freak-offs?

A.  Again, friends.  Whoever had the hookup of the drug of the moment.  So that could be a drug dealer, it could be a friend, it could be an assistant, anyone of Sean's, because I didn't have any of those things.

Q.  You testified earlier that ecstasy is typically a pressed pill.  Do you remember that?

A.  Yeah.

Q.  How does ecstasy make you feel?

A.  It's a euphoric feeling.  I don't really know what's in it, the pressed pill.  You're more sensitive, you're more aroused, you even just feel more sexual, I would say.

Q.  You also mentioned taking MDMA.  What does MDMA look like?

A.  It's like a crystalized drug and you can crush it up and turn it into powder and ingest it.

Q.  How would you take MDMA?

P5DCcom3                      Ventura - Direct

A.   Put it in a drink usually.

Q.   How does MDMA make you feel?

A.   Very similar to ecstasy, just kind of euphoric.  Everything feels light and nice and -- yeah.

Q.   When, if ever, did taking drugs make you feel sick?

A.   Often.  I used to get sick a lot.  My stomach used to not agree well with ecstasy especially, but MDMA, as well.

Q.   How often would you get sick from taking MDMA or ecstasy?

A.   Almost every time, like before the actual high hit, I would feel like vomiting.  It was usually like a normal thing.

Q.   Would you vomit or would you just feel nauseous?

A.   I would actually vomit, yeah.

Q.   Did Sean know about the effects that ecstasy and MDMA had on you?

A.   Yeah.

Q.   How?

A.   Because he would see me in the bathroom or I would tell him, so he would just know.

Q.   What, if anything, would Sean say when you got sick from MDMA or ecstasy?

A.   He didn't say much, but if we were in the freak-off, he would be encouraging me to get up and continue on with it in that condition.

Q.   When you say continue on with it, what are you referring to?

P5DCcom3                    Ventura - Direct

A.  Continue the freak-off, continue the intercourse, even though I felt like vomiting, or that I was.

Q.  Did you want to continue intercourse when you felt like vomiting?

A.  No.

Q.  Besides ecstasy and MDMA, what, if any, other drugs were used at freak-offs?

A.  I said cocaine, GHP, ketamine, marijuana, mushrooms.

Q.  How does ketamine make you feel?

A.  Ketamine, for me, is dissociative, like you can be there, but not mentally be there at all.

(Continued on next page)

BY MS. JOHNSON:

Q.   And how does GHB make you feel?

A.   I would say that GHB makes you feel kind of drunk, a little bit, tipsy.

Q.   How about cocaine, how does cocaine make you feel?

A.   Cocaine makes my heart race.  I was never a huge fan.

Q.   You also mentioned mushrooms.

How do mushrooms make you feel?

A.   They are psychedelic, so you can see things.  I feel like the walls come alive.

Q.   What does that mean, the walls come alive?

A.   Everything has life to it when you're taking those kinds of drugs, like, psychedelics.

Q.   Have you ever used the phrase the turn-up?

A.   Yes.

Q.   What have you used that to refer to?

A.   To drugs, to party.

Q.   And of the drugs we've discussed, what are drugs that you would take to party?

A.   Ectasy and MDMA would be the main ones.

Q.   And how, if at all, did taking the drugs we just discussed assist in sexual arousal?

A.   They always did.

Would it be OK to take a quick break?

MS. JOHNSON:  Your Honor, is that OK?

P5DsCOM6                    Ventura - Direct

THE COURT:  Of course.  It's 4:00 o'clock.

Let's come back at 4:10.

THE WITNESS:  Thank you.

THE COURT:  All rise for the jury.

(Continued on next page)

(Jury not present)

THE COURT:  All right.  We'll back in ten minutes.

THE WITNESS:  Thank you.

(Recess)

THE COURT:  Let's come back.  Please be seated.

We're just waiting for Ms. Ventura.

MS. JOHNSON:  Yes.

THE COURT:  Welcome back.  Let's get our jury.

(Jury present)

Please be seated.

Ms. Johnson, you may continue when ready.

MS. JOHNSON:  Thank you, your Honor.

BY MS. JOHNSON:

Q.  Ms. Ventura, before we broke we were talking about using drugs at freak-offs.

Do you remember that testimony?

A.  Yes.

Q.  And you had testified about sometimes contacting people if you ran out of drugs at freak-offs.

Do you remember that?

A.  Yes.

Q.  When you reached out to a contact for more drugs, how did you know who to reach out to?

A.  Sean would tell me who to reach out to exactly.

Q.  OK.  Earlier you described the term session referring to

all of the sex acts with the escort.

Do you remember that?

A.  Yes.

Q.  Did the sessions follow a similar pattern at most freak-offs?

A.  Yes.

Q.  And how did you know what the pattern was?

A.  It was established pretty early on in doing the freak-offs, that Sean enjoyed a lot of conversation or describing -- usually started with oil and touching and went to oral sex, and then eventually turned into intercourse.  It was, like, a gradual process.

Q.  And is that the same pattern that was typically followed in the session?

A.  Yeah.

Q.  Who decided what that pattern was?

A.  Sean did.  I -- I often would try to speed it up, um, if anyone wasn't really paying attention.

MS. ESTEVAO:  Objection, nonresponsive.

THE COURT:  Sustained.

A.  Can you bring me back?

Q.  Of course.  You were talking about what the pattern was, so let's focus on that for a moment.

A.  OK.

Q.  What was the first sex act of the session?

P5DsCOM6                    Ventura - Direct

A.   First sex act of the session would just be, um, masturbating, looking at each other.

Q.   When you say looking at each other, who would you be looking at?

A.   I would be looking at the escort and they would be looking at me.  Um, I would describe what I saw in detail and, um, yeah, that's kind of how the beginning went.

Q.   Why would you describe what you saw in detail?

A.   That is what turned Sean on.  That was his fantasy.  Um, so, yeah.

Q.   Who, if anyone, asked you to describe in detail what you saw?

A.   Sean.

Q.   How did you feel about describing what you were doing in the masturbation step of the session?

A.   I mean, it was just always awkward.  Um, I'm a pretty laid-back person, so, like, sitting there and describing somebody's penis to another male was just awkward, um, and pretty humiliating.  But eventually, it just became normal.

Q.   Did you want to be describing what you were doing sexually?

A.   No, I did not.

Q.   After masturbation, what was the next step in the session?

A.   Masturbation was, just, continued, to put oil on, eventually get to each other, the escort and I, and actually start touching each other.  Um, that would eventually lead to

P5DsCOM6                    Ventura - Direct

oral sex.

Q.  I'm going to pause you there.

A.  Um-hmm.

Q.  When you moved to touching the escort, how would you know when to move from masturbation to touching the escort?

A.  More often than not, I would ask if it's OK for me to.

Q.  Who would you ask?

A.  Sean.

Q.  And you moved from touching to oral sex.

How would you know when to make that move?

A.  I would just do it and hope that it would be accepted timing-wise, or he told.

Q.  Who would tell you?

A.  Sean would tell me.

Q.  When you would ask Sean if you could move from masturbation to touching, why would you ask him?

A.  It was his fantasy.  He was controlling the whole situation.  He was directing it.  He was doing the lighting. He was telling us where to be, what to say, how to act in the room.

Q.  And you testified that you would sometimes move straight to oral sex.

Why would you want to move to the next sex act?

A.  I would just try to speed the process along.  It was, personally, if I get it done, then it's over and then we move

P5DsCOM6                         Ventura - Direct

on to the next thing.  I just wanted it to be over.

Q.  When you say you wanted it to be over, what's it?

A.  The freak-off session.  I, more often than not, would just want to be able to get to the other room where we could just spend time with each other alone.

Q.  When you say get to the room where you could spend time alone, who was in the room when you were spending time alone?

A.  Just me and Sean.

Q.  And after oral sex, what was typically the next sex act?

A.  Oral sex would lead to intercourse.  Um, and depending on the familiarity with the escort, um, sometimes Sean and the escort would both, um, have intercourse with me or be doing something at the same time.  Sometimes he would just watch.

Q.  When you say he would be doing something with you at the same time, what was that something?

A.  If I was having intercourse with an escort, um, Sean could walk up and have me give him oral sex.  It was just, like, a lot happening at once.

Q.  During intercourse, would escorts ejaculate?

A.  Yes.

Q.  And at what point would escorts ejaculate?

A.  Usually when it was OK for them to, per Sean.  But if they did, they would usually do it on me and then --

        Sorry.

        Um, and then we would -- Sean and I would go into the

next room, and he would want me to put the semen on his body.

Q. OK. When escorts would ejaculate on you, who, if anyone, would tell them where to ejaculate?

A. Sean was usually right there directing it, where it could be.

Q. Were there occasions when escorts ejaculated without having been told to do so?

A. Yes.

Q. What happened on those occasions?

A. They got paid less.

Q. What, if anything, would Sean say about when escorts ejaculated without having been told to do so?

A. He was pretty open with the fact that he wasn't pleased by their performance. So, yeah. He would take less money.

Q. And when you would go into the other room and you said Sean asked you to put semen on him?

A. Um-hmm.

Q. Did you do that?

A. I did.

Q. Where did you put it?

A. Usually on his chest, on his nipples.

Q. Did you want to do that?

A. No.

Q. And, in total, how long approximately did each of these sessions last?

A.   Um, each session?  Not, like, a full freak-off?

Q.   Yeah, each session.

A.   Um, anywhere between, like, an hour to three hours.  Just depended.

Q.   And the individual stages that you described, how long typically did each of those stages last?

A.   Felt like forever.  One thing could be hours, honestly, depending on how high we were.  Yeah.

Q.   And you testified about wanting to speed the process along?

A.   Um-hmm.

Q.   How would Sean react when you tried to speed up the process?

A.   Um, he would tell me to slow it down or tell both me and the escort to slow it down.  Um, I could often, like, if I left the room to use the bathroom, I could hear -- I could hear Sean telling the escort to slow it all down, because I usually wanted to just finish.

Q.   Besides asking you to slow down, were there occasions where you had to start a stage over if you moved too quickly?

A.   Yeah.  We would go back to square one.

Q.   Approximately how many sessions would you have with one escort during a freak-off?

A.   I would say at least two to three.  Um, but a freak-off could be three to four different men.

Q.   And how is it determined how many sessions would be had

with any one escort?

A.   It was based off the high and just how things were moving.

Q.   Did you ever want to have additional sessions with an escort?

A.   No.

Q.   Who, if anyone, would ask you to have -- would tell you to have additional sessions with an escort?

MS. ESTEVAO:  Objection, form.

MS. JOHNSON:  I can rephrase, your Honor.

THE COURT:  You may.

MS. JOHNSON:  I'm sorry.

THE COURT:  You may.

MS. JOHNSON:  Thank you, Judge.

BY MS. JOHNSON:

Q.   Ms. Ventura, you just testified you did not want to have additional sessions with an escort?

A.   I hated it.

Q.   Did you have additional sessions with escorts during freak-offs?

A.   Sometimes, yes.

Q.   Why?

A.   Because Sean would want to do more, go longer, finish up strong, as he would say.

Q.   You also testified that there were sometimes three to four escorts at a freak-off.

P5DsCOM6                    Ventura - Direct

Do you recall that?

A. Yes.

Q. Were there any occasions where there was more than one escort present for one session?

A. Yes.

Q. Approximately how many times was that?

A. That, I don't know an exact number, but definitely more than once.

Q. Did you want more than one escort to be present at a session?

A. No. It was already enough managing one additional person.

Q. And when more than one escort was present, how did the sex acts proceed?

A. Just, it was very, like, like porn.

Q. What do you mean by that?

A. Um, it was just I was an object, um, being heavily objectified by men in that scenario.

Q. You talked about managing an additional escort.

What did you mean by managing?

A. Um, just having to be the only female in the room, like, with the sexual stuff. It, just, having to entertain one more person, make sure one more person is satisfied. Um, yeah.

Q. During these sessions, where was Sean physically relative to you and the escort?

A. If he wasn't involved, he would be, like, just outside the

P5DsCOM6                          Ventura - Direct

room, kind of covered up, not seeing, you could just hear his voice or in the corner.  Um, it -- yeah, if he was involved, though, he would be right next to us.

Q.  And when you say involved, is that what -- are you referencing he would be a part of the sex as you discussed earlier?

A.  Yeah, with me.

Q.  If Sean was in the corner of the room, what was he generally doing there?

A.  He was generally masturbating and just talking.

Q.  What kinds of things did he say?

A.  Um, he would just ask me, like, how -- how the dick felt, like, what it looked like, how it made me feel.

        Um, this is so awkward.

Q.  You also mentioned sometimes Sean would be outside the room?

A.  Um-hmm.

Q.  Is that right?

A.  Yeah.

Q.  How frequently did that happen?

A.  Um, I mean, it varied.  No real number.

Q.  When Sean was outside of the room during a freak-off, what, if any, conversations did you have with Sean before it started about where he would be?

A.  Um, we didn't really.  Um, I guess, on occasion, he --

there was, like, a couple of occasions where he said he wanted to watch from a different room or he would set up, like, my phone and his phone on a FaceTime so that he could watch while he wasn't, like, present in the actual room. So I was still expected to do the same thing, even though he wasn't there.

Q. So on the occasions when Sean was out of the room, what did you and the escort typically do?

A. Um, if he could see me, if Sean could see me on the FaceTime, I was still doing the same thing. So talking and having, this, sexual encounter with the escort.

But if he was just out of the room and not paying attention, I would stop.

Q. How would you know if Sean was out of the room and not paying attention?

A. I would just know that you can't hear him or he didn't call. He's not paying attention.

Q. During freak-offs, what difficulty, if any, did escorts have in getting or maintaining erections?

A. It was actually pretty frequent with people that we didn't know well. Um, yeah, and they would express it, like, it's -- every time Sean would talk, it would throw them off, or if he moved a candle or, you know, just was distracting, I guess.

Q. And what did Sean do when escorts were having trouble with erections?

A. Um, he would give them a pep talk. I don't -- at the end,

P5DsCOM6                          Ventura - Direct

they definitely didn't get paid the normal amount.  I know that.

Q.  How do you know that?

A.  Because he would tell me and he would tell them as well. It wasn't really a secret.

Q.  When you say he, who is he?

A.  Sean.

Q.  Were there any occasions where Sean offered the escorts drugs like Viagra?

A.  Yeah.

Q.  And who else besides escorts did Sean offer Viagra to?

A.  He offered it to me before.

Q.  And what did he say about you taking Viagra?

A.  That it has the same effect on women, just sensitivity.

Q.  Did you take the Viagra that he offered you?

A.  I did.

Q.  And how did you feel?

A.  Sensitive and engorged.

Q.  Did you want to take the Viagra?

A.  No.  I thought -- no, I didn't.

Q.  When escorts were having trouble getting erect, what, if anything, did you observe affected their inability to get erect?

A.  Like I said before, just the distraction of seeing Sean move around, maybe just hearing his voice.  It's quite

recognizable.  Any distractions, though, really, some of the men would actually just say that, like, having someone else in the room just was disturbing for them.  It made them uncomfortable.

Q.  Were there any distractions that you observed other than Sean's voice?

A.  Um...

MS. ESTEVAO:  Your Honor, I'm going to object at this point.  Cumulative and it's straining.  Relevance.

THE COURT:  I'm sorry.  The last part of it, I missed.

MS. ESTEVAO:  Relevance.

THE COURT:  OK.  I'll sustain the objection, and you can maybe rephrase the question.

MS. JOHNSON:  Sure.

BY MS. JOHNSON:

Q.  After the end of a session, what would you and Sean do next?

A.  The end of an entire session or?

Q.  Just one session within a freak-off.

A.  We would hang out and take more drugs with each other.

Q.  After a session, would you ever have sex with Sean?

A.  Yeah.

Q.  And where would you have sex with Sean after the session?

A.  In the room outside of where the session was, separate room.

Q.   You mentioned earlier today that freak-offs were video recorded.

          Do you recall that testimony?

A.   Yep.

Q.   How were they recorded?

A.   Um, in the beginning, they were on video cameras, like, the ones with the small tapes, then eventually phones, iPads, computers.

Q.   Whose devices were used to record freak-offs?

A.   Um, his devices and my own.  Sean's and my own.

Q.   Approximately when did freak-offs start being recorded?

A.   Pretty early on.  Within the first year.

Q.   Who, if anyone, proposed recording freak-offs?

A.   I wouldn't say there was a proposal.  It just started happening.

Q.   How did it start happening?

A.   Sean brought out a camera and set it up, and that's what was happening.

Q.   Did you want to be recorded?

A.   No.  I remember feeling insane at first and then, um, he explained to me that it's for him for afterwards, so, yeah.

Q.   Did you ever watch the videos again?

A.   Yes.

Q.   When would you watch the videos again?

A.   Um, I would watch them with Sean afterwards when we --

usually when we were having intercourse.  But I also, if I saw them and I was on my own, I was deleting them.

Q.  You mentioned that some of these videos were recorded on some of your devices?

A.  Um-hmm.

Q.  Do you remember that?

A.  Yep.

Q.  Why were your devices used?

A.  Because they were there.  No real reason.

Q.  Did you want these videos to be on your devices?

A.  No.

Q.  If you saw videos on your devices, what did you do?

A.  Delete them.

Q.  Who set up the recording equipment during freak-offs?

A.  Sean.  If he wanted me to move it, I would move it.

Q.  How would you know when he wanted you to move it?

A.  He would tell me.

Q.  Whose idea was it to use your devices?

A.  It was Sean's idea.

Q.  Were you always successful -- why did you delete the videos that you found on your devices?

A.  Humiliating.  Disgusting.  I never wanted anyone to ever see me like that.  It just was not OK for me, and I felt, like, it was just tossed around, like, the idea of it was tossed around like it was nothing, like ...

Yeah.

Q.  The idea of what was tossed around like it was nothing?

A.  Objectifying me and putting me in these really compromising gross positions with strangers that I just...

Yeah.

Q.  You also testified that Sean's devices were sometimes used to record freak-offs.

Do you remember that?

A.  Yes.

Q.  And what, if anything, did you ask Sean to do with the videos?

A.  I would frequently ask him to delete videos, because he had his assistants and staff members would have access to his computers and phones.

Q.  To your knowledge, did Sean delete the videos that were on his devices?

A.  I don't know.

Q.  Were there times when you saw videos even after Sean said he deleted them?

A.  Yes, and I would delete them.

Q.  How often did that happen?

A.  On occasion.  It wasn't all the time, but enough.

Q.  Ms. Ventura, when, if ever, did you leave a freak-off before it was over?

A.  Um, when I was literally just trying to go home.

P5DsCOM6                    Ventura - Direct

Q.   What do you mean by that?

A.   Um, there was an instance in Los Angeles where it got violent, and I chose to leave.

Q.   Where were you in Los Angeles?

A.   I was at the Century City or, sorry, InterContinental Century City.

Q.   And what happened when you chose to leave?

A.   When I chose to leave, I grabbed what I could and I got out.  And Sean followed me into the hallway before the elevators and grabbed me up, threw me on the ground, kicked me, tried to drag me back to the room.  He took my stuff.  Yeah.

Q.   Ms. Ventura, I'm going to start at the beginning of that incident.

A.   OK.

Q.   Prior -- strike that.

        MS. JOHNSON:  Ms. Gavin, can you please pull up for identification for the court and the parties Government Exhibit B-625.

        Can you please also put up page two, side by side.

Q.   Ms. Ventura, do you recognize the document at B-625?

A.   Yes.

Q.   What do you recognize it to be?

A.   A text message between me and Sean.

Q.   Is this a true and accurate text message between you and Sean?

A.  Yes.

MS. JOHNSON:  The government offers Government Exhibit B-625.

MS. ESTEVAO:  Can I have one moment, please?

THE COURT:  You may.

(Counsel confer)

MS. ESTEVAO:  No objection.

THE COURT:  B-625 will be admitted.

(Government's Exhibit B-625 received in evidence)

BY MS. JOHNSON:

Q.  Ms. Ventura, focusing you on the top of page one, if --

MS. JOHNSON:  Ms. Gavin, if you could blow up that top section.

Q.  Who are the participants in this chat?

A.  That's me and Sean.

MS. JOHNSON:  Ms. Gavin, can you take that down.

Can you blow up the bubble on page two, please.

Q.  What's the date of this message?

A.  March 5, 2016.

Q.  And what event, if anything, did you have at or around March of 2016?

A.  I had my first big movie premier.

Q.  And in relation to March 5, when was that premier?

A.  That premier was on the following Monday or Tuesday.  So this was on a Friday, I believe.

MS. JOHNSON:  And, sorry, Ms. Gavin.  Can you take that down and put pages two and three side by side.

Q.  Ms. Ventura, directing your attention to the first message on page two.

Who is this message from?

A.  From me.

Q.  I'm sorry.

A.  Oh, to?

Q.  On the page on the left.  I'm so sorry.

A.  Yeah.  That's from Sean.

Q.  OK.  And what does that message say?

A.  Thanks.  So what you gonna do so I can plan the rest of my night.

Q.  And when Sean asked you, so what you gonna do so I can plan the rest of my night, what was your understanding of what Sean was asking you?

A.  I mean, my understanding after that time passed was that he wanted to have a freak-off or do something along those lines.

MS. JOHNSON:  Turning to the next page.  And, Ms. Gavin, can you blow up the green message at the top, please.

Q.  How do you respond, Ms. Ventura?

A.  I say, Baby, I want to FO so bad but I don't want to fuck myself up.  What am I to do?

Q.  What does FO stand for?

A.   Freak-off.

Q.   When you say, Baby I want to FO so bad, but I don't want to fuck myself up, what did you mean by that?

A.   I -- there's a lot in that little line.  But I definitely didn't want to mess myself, my body, up for my premier by partying.  But I was telling him that I wanted to have an FO with him.

Q.   And why did you tell him you wanted to have an FO, even if you didn't want to mess up your body by partying?

A.   Honestly, it was, like, a bit of damage control ahead. I -- I personally felt like if I, um, sort of initiate or go along with creating this night, that my premier wouldn't be ruined.  I don't know.

Q.   What were you worried would happen at your premier if you didn't have a freak-off with Sean before the premier?

A.   He would have just made it miserable for me.  Um, I never really had, like, the chance to -- or the opportunity to enjoy the things that I had worked really hard on.  So it just felt, like, I was just trying to play a balancing act a bit.

Q.   I think you mentioned damage control.

     What did you mean by damage control?

A.   If I pleased him with a freak-off, then my premier would run smoothly.  That's how I looked at it.

     MS. JOHNSON:  And, Ms. Gavin, can you pull that down.

Q.   Ms. Ventura, directing your attention to the text message

on the bottom in green.

A.  Um-hmm.

MS. JOHNSON:  Can you blow it up, Ms. Gavin.

Q.  Ms. Ventura, what does this message say?

A.  It says, I'm going to boa quickly to see Erin because I didn't get to see her and ... we can have fun ... I don't want you thinking I don't want to.

Q.  When you say, I don't want you thinking I don't want to, what are you referring to?

A.  To the freak-off.

Q.  And why did you say that?

A.  Because I didn't want him thinking I didn't want to.  That would be a problem.

Q.  Why would that be a problem?

A.  Because I knew what he wanted and, you know, I just ...  I knew the nuanced conversation.  I understood it differently.

Q.  So, turning to the hotel, I believe you testified earlier this was at the InterContinental in Century City?

A.  Yes.

Q.  OK.  Inside the hotel room, at a high level, can you describe to the jury what happened?

A.  Um, inside the hotel room, we were having a freak-off.

And is it OK to say who was there?

Q.  Yes.

A.  Jewels was one of the escorts.  And in the middle of it --

there was a lot of drinking, there was a lot of partying, but in the middle of it, I'm not sure what happened, but I got hit by Sean and I had a black eye.  And at that point, all I could think about was getting out of there safely.  I had my premier and I didn't want to mess it up, so I left.

Q.  At what point in the freak-off did Sean hit you?

A.  It was, like, in between sessions, so when we weren't in the room with the escort.

Q.  Was Jewels still present in the overall hotel suite --

A.  Yes, he was.

Q.  -- when Sean hit you?

A.  Yes.

Q.  After that happened, after Sean hit you, what happened next?

A.  After he hit me, um, and I saw the result of it, I just -- I knew I had to get out.  So when he was distracted, I don't know exactly what he was doing, he was either in the shower or on the phone, I just grabbed my stuff and ran out as fast as I could.

Q.  And where -- and where were you headed when you ran out of the room?

A.  I was headed home to my apartment.

Q.  What happened next?

A.  Um, I made it to the elevators, I got my sneakers on, and then the next thing I knew, I was just thrown to the ground.

P5DsCOM6                          Ventura - Direct

Yeah, it -- it was really fast, thrown to the ground.

Q. You said you got your sneakers on when you got to the elevator.

Where were your sneakers before?

A. My sneakers, I think, were in my bag. I just ran out without any shoes.

Q. Why did you run out without any shoes?

A. Faster.

Q. You said you were thrown down in the elevator lobby.

Who threw you down?

A. Sean. He grabbed me by the back of my neck and my hoodie and just threw me to the ground.

Q. And in the interaction in the elevator lobby, what kind of things was Sean saying to you?

A. It's a little bit fuzzy to remember. Um...

Q. Well, I don't want you to speculate, so let's pull up some exhibits.

MS. JOHNSON: Ms. Gavin, can you please pull up Government Exhibit 10C-104 in evidence. If you could just pause it at that first second.

Q. Ms. Ventura, do you recognize this hallway?

A. Yes. That's the Century City InterContinental hallway.

MS. JOHNSON: OK. Ms. Gavin, can you please play until 14 seconds.

(Video played)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5DsCOM6                    Ventura - Direct

Q. Ms. Ventura, in which direction are you walking in this video?

A. I'm walking towards the elevator.

Q. Sorry. I skipped a step.

        Who is in this video?

A. That's me.

        MS. JOHNSON: OK. Ms. Gavin, can you play until 33 seconds.

        (Video played)

        Pausing there.

Q. Who is depicted on the screen at 33 seconds?

A. That's Sean.

Q. And in which direction is Sean heading?

A. Same as me, towards the elevator.

Q. What is Sean wearing in this video?

A. Towel and socks.

        MS. JOHNSON: Ms. Gavin, can you please take this exhibit down and pull up 10C-103.

        Can you please play until 29 seconds, please.

        Actually, pausing there first.

        (Video played)

Q. Ms. Ventura, do you recognize what's depicted here in 10C-103?

A. Yes. That's the elevator area, um...

Q. Is that at the InterContinental?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.  That is at the InterContinental, yeah.

MS. JOHNSON:  Ms. Gavin, can you play until 29 seconds.

(Video played)

Q.  Who is depicted in this frame?

A.  It's me.

MS. JOHNSON:  And can you play a few more seconds, Ms. Gavin.

(Video played)

Pause there.

Q.  Who is behind you now?

A.  Sean.

MS. JOHNSON:  Can you play until 56 seconds.

(Video played)

Pausing there.

Q.  Ms. Ventura, in which direction is Sean pulling you at the end of that clip?

A.  He's pulling me towards the room.

Q.  And earlier in that clip, do we see what you described earlier of being thrown to the ground?

A.  Yes.

Q.  How many times had Sean thrown you to the ground like that before?

A.  Too many to count.  I don't know.

Q.  And when you were thrown to the ground at the

InterContinental, what did you do?

A.  I, at that moment, covered my face and just stayed there.

Q.  Why did you cover your face?

A.  Because I didn't want him to do any more damage than he had already done.

Q.  Why did you just stay on the ground?

A.  Because it felt like the safest place to be.

MS. JOHNSON:  Ms. Gavin, can you take this down, please, and pull up 10C-105.

If you can play from 23 seconds to 30 seconds.

(Video played)

Just pausing, I'm sorry, before we start.

Q.  Ms. Ventura, do you recognize what's depicted on the screen in 10C-105?

A.  Yes.  That's the opposite side of the hallway at the InterContinental.

MS. JOHNSON:  OK.  Ms. Gavin, can we play to 30 seconds, please.

(Video played)

Q.  And was Sean visible in that clip?

A.  Yes.

Q.  Where was he?

A.  He was dragging me around the corner.

MS. JOHNSON:  Ms. Gavin, if you can take that down and pull up 10C-103, again, please, and where we are at 56 seconds.

Q. Ms. Ventura, taking it back to your testimony about staying on the ground, were there occasions when you tried to fight back when Sean hit you?

A. No.

MS. JOHNSON: Ms. Gavin, can we please play from 143 to 146.

(Video played)

MS. JOHNSON: OK. Sorry. Just one moment. I gave you the wrong timestamp. Can you play from 56 seconds to 1:32.

(Video played)

Starting from where you're at the corner. Pausing you there.

BY MS. JOHNSON:

Q. Ms. Ventura, what are you doing in the corner?

A. I picked up the hotel phone that was on that floor.

Q. OK. And where is Sean?

A. He's standing facing me.

Q. And what does he have in his hands?

A. My purse and my overnight bag.

MS. JOHNSON: OK. If we can take -- Ms. Gavin, if we can take that down. Pull up 10C-104. If you can play from 1:40 to 1:50.

(Video played)

Q. Which direction is Sean walking?

A. He's walking back towards the room we're staying in.

Q.   What does he have in his hands?

A.   All of my bags.

        MS. JOHNSON:  And if you can play to 2:08.

        (Video played)

Q.   Which direction is Sean walking?

A.   Back towards the elevator bank.

Q.   And where are you at this point?

A.   Um, I think I'm off -- I don't know.  I'm off camera, or I'm either on the phone, or I don't know.  So I went down the other hallway as well.

Q.   Are you still in the elevator bank?

A.   I think I'm still in the elevator bank.  I'm probably about to get on the phone.

Q.   What does Sean have in his hands?

A.   I don't see anything in his hands.

Q.   Your bags are no longer in his hands, is that right?

A.   No.  It looks like he dropped them off.

        MS. JOHNSON:  Your Honor, it's 5:00 o'clock.

        Should we?

        THE COURT:  Are you at a good stopping place?

        MS. JOHNSON:  I'm at a good stopping place.

        THE COURT:  All right.

        Thank you, members of the jury.  I'll give you the same instructions that I gave you yesterday.

        Do not talk to each other about the case.  Do not look

up anything about this case.  One just specific point about that.  If you have notifications on any of your devices, please turn those off, especially if they are from any news organization of any kind.  Do not talk to anybody about the case.

And no one here should be talking to any of the jurors directly or indirectly.

With that, have a great evening.  We'll see you here tomorrow morning at 9:15.

All rise.

(Continued on next page)

(Jury not present)

THE COURT:  Please be seated.

Ms. Ventura, we'll see you hear tomorrow at 9:30.

THE WITNESS:  Thank you.

THE COURT:  Does Ms. Ventura have any escort or anyone we need to coordinate with?

MS. COMEY:  Yes, your Honor.  I believe the agents are going to coordinate escorting her out of the building.

THE COURT:  All right.

(Witness temporarily excused)

Ms. Johnson, what are we looking at for tomorrow?

MS. JOHNSON:  Your Honor, I expect that we'll finish direct tomorrow.  I'm hesitant to give you an exact time.  I probably need at least half the day.

THE COURT:  Half the day?

MS. JOHNSON:  At least.

THE COURT:  Anything further from the government right now?

MS. JOHNSON:  Nothing right now, although I know the parties intend to submit some letters later this evening.

MS. COMEY:  Yes, your Honor.

We wanted to flag for your Honor, we do plan to put in a letter on the sealed, the sealed exhibits, the videos.  We're planning to put that in --

Can you hear me?

THE COURT:  I can hear you.

MS. COMEY:  We're planning to put that in tonight. Also, we've been doing research on the issue Ms. Shapiro raised about witness contact with counts.  We found some law and we found some examples of judges in this district denying those kinds of applications from the defense, so we're planning to put in a letter on that for your Honor as well.

THE COURT:  OK.  Do you have -- I mean, if you're going to submit letters on this, is there an objection to the proposal made by the news organizations that three pool reporters have access to the terms?

MS. COMEY:  Yes, your Honor.  I've been in touch with victim with Jane's counsel, who strongly objects and wants to be heard on this and wants to put in a letter, and I believe Victim 1's counsel also objects.

The core of the objection is that this was blackmail material that was used to victimize these women, used to convince them to do more or coerce them to do more of these acts, and showing them to anyone more than absolutely necessary would feed into that victimization, would re-victimize them, and would unnecessarily humiliate them.

We have now heard vivid testimony about how humiliating one victim found all of these incidents to be. And, in our view and in victims' counsel view, it is absolutely unnecessary and unwarranted to show them to anyone outside of

the jury and the parties.

THE COURT:  And I know that I'll take a look at these exhibits.  I know they will be identified for the court.  But, in general, I understand there are images and then separately there are videos.

The videos pertain to whom?

MS. COMEY:  To Ms. Ventura and to Jane.  They are only of those two victims.

THE COURT:  They are depictions of sexual encounters the ones that are being discussed in this case?

MS. COMEY:  Exactly, your Honor.

THE COURT:  The images are of?

MS. COMEY:  They are screenshots.

THE COURT:  Of those same videos?

MS. COMEY:  Of those same videos.  And the reason there are screenshots is our plan was, to avoid unduly humiliating these women in public, to have them identify themselves and the escorts in screenshots, and then minimize the amount that we play while they are on the stand.  And, instead, play whatever excerpts we think the jury needs to see when the witnesses are not, the victims are not themselves on the stand.

THE COURT:  I take it that the argument on narrow tailoring is that is exactly what the parties are doing, because the testimony will be heard in open court and the

image, the only thing not being shown in open court will be the images and the videos themselves.  Those materials, from the parties' position, or at least the government's position, constitutes the revictimization of these individuals.  And so whether it stems from the Crime Victims' Rights Act or from basic notions of avoiding that kind of trauma to alleged victims at this point, those are compelling interests that would override any interests in the public of having access to these materials.

So if we, even spotting the news organizations, that there is a compelling interest on the side of the public having access to trial materials, those are overridden by the interests in these victims.  I'm not seeing, since I've had a chance to look through all the cases, I'm not seeing any case that would suggest in any way, shape, or form that images or videos of these types of acts that are alleged to be sexual abuse would be required to be shown in open court when they pose the obvious risk of revictimization of the people who are providing this testimony, especially when the individuals are subjecting themselves to testimony about the incidents in open court, and the public will have access to that testimony.

MS. COMEY:  Precisely, your Honor.  And we are not collectively aware of any case.  We collectively have extensive experience trying cases that involve sexual abuse of adults and minors.  We are not aware of a single case in which a video of

alleged sexual abuse has been shown outside of the jury and the parties.

THE COURT:  The news organizations cite to *Brown v. Maxwell*, but that case is different.  That involved a situation where the entire summary judgment record was sealed and the Court of Appeals determined that the district court had aired by not doing a document-by-document review of what needed to be sealed, so the Court of Appeals did it.

However, there is a footnote opinion that says that material was redacted, especially when it related to intimate encounters that the parties expected to remain confidential, and that would seem to apply, among other reasons, to the materials that we're talking about here.

MS. COMEY:  That's exactly right, your Honor.  I'm actually familiar with the materials from *Brown v. Maxwell* because many of them were subject of the criminal case against *Maxwell*, and my understanding is not a single nude image was released in that.  And the process that followed, I believe Judge Preska conducted after the Circuit reversed Judge Sweet's universal sealing of the summary judgment record, not a single image of nudity was released for very good reason.

So I don't think there is any basis in the case law whatsoever for the showing of any nude images, particularly of alleged abuse, to anyone outside of the jury and the parties.

THE COURT:  All right.  So, to complete the record,

P5DsCOM6                        Ventura - Direct

you're going to put in the letters that you indicated, and also please identify those exhibits so I can review them --

MS. COMEY:  Yes, your Honor.

THE COURT:  -- consistent with the rules here.

I'm provisionally denying the application raised by the news organizations and including the suggestion that three pool reporters be allowed to view and report on the video exhibits.  But, obviously, if something comes in overnight, I'll take a look at it.  If it changes anything, I'll let everybody know.

MS. COMEY:  Thank you, your Honor.

THE COURT:  Was that the only issues the parties expected letters to come in?

MS. COMEY:  We also plan to put in a letter, I think I mentioned, on the defense's application that witnesses not be permitted to communicate with their counsel while on cross-examination.

THE COURT:  Thank you.

MS. COMEY:  We plan to put it in a letter on that issue.

THE COURT:  Very good.  And just looking ahead, Ms. Estevao, I take it that, given what Ms. Johnson has said, your cross-examination will go into Thursday, is that basically right?

MS. ESTEVAO:  Easily, yes.

THE COURT:  All right.  So, Ms. Comey or Ms. Johnson, who is your next witness after Ms. Ventura?

MS. COMEY:  We are still trying to figure that out, your Honor.  We have assured defense counsel, we will inform them of that tonight.  And part of that is we want to look at the calendar about who would be available to be in New York, if we need to put witnesses on, on Friday.

THE COURT:  OK.  Anything from the defense?

MS. SHAPIRO:  Your Honor, just with regard to the letter Ms. Comey mentioned about the witness' communications with her attorney on cross or other witnesses' communications with their attorneys on cross.  It would be -- we would like to respond to that letter.

And I realize that cross is going to start tomorrow, so we would appreciate if the court would set a very tight deadline so we have time to respond in writing before the court rules on that.

THE COURT:  I think that was directed at you, Ms. Comey.

MS. COMEY:  I'll take as much time as Ms. Shapiro is willing to give me.

MS. SHAPIRO:  We can meet and confer.

THE COURT:  It's 5:00 o'clock right now.  You say you've identified some cases?

MS. COMEY:  We have your Honor.  I would like to put

them in a format legible and coherent, though.

THE COURT:  8:00 o'clocl.

MS. COMEY:  All right, your Honor.  Thank you.

THE COURT:  8:00 p.m., Ms. Shapiro, respond.  If it comes in the morning, I'll read it before we convene.

MS. SHAPIRO:  We'll do this as quickly as possible.

THE COURT:  Let's plan to be here at 9:00 a.m.

Anything else from the defense?

MR. AGNIFILO:  No, Judge.

THE COURT:  All right.  We are adjourned.

See everybody at 9:00 a.m.

(Adjourned to May 14, 2025, at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

DANIEL PHILLIP

Cross By Mr. Donaldson . . . . . . . . . . . . 353

Redirect By Ms. Comey  . . . . . . . . . . . . 380

Recross By Mr. Donaldson . . . . . . . . . . . 389

Redirect By Ms. Comey  . . . . . . . . . . . . 392

 CASANDRA VENTURA

Direct By Ms. Johnson  . . . . . . . . . . . . 404

GOVERNMENT EXHIBITS

Exhibit No.                                                    Received

 B-101 through B-112, B-201 through  . . . . . 413

         B-209, B-301 through B-313,

         B-315 through 320, B-400-A

         through B-402, B-500-A through

         B-503, and B-600-A through

         B-608

 2B-101, 2B-102  . . . . . . . . . . . . . . . 441

 2B-107, 2B-109  . . . . . . . . . . . . . . . 443

 2C-103  . . . . . . . . . . . . . . . . . . . 445

 2A-301 and 2A-305  . . . . . . . . . . . . . 463

 2A-202 and 2A-204  . . . . . . . . . . . . . 467

 2A-201 and 2A-205  . . . . . . . . . . . . . 468

 2A-203  . . . . . . . . . . . . . . . . . . . 469

 2A-627  . . . . . . . . . . . . . . . . . . . 478

 3A-117  . . . . . . . . . . . . . . . . . . . 490

 3Q-118  . . . . . . . . . . . . . . . . . . . 511

 B-326  . . . . . . . . . . . . . . . . . . . . 522

 2A-612  . . . . . . . . . . . . . . . . . . . 535

 2A-625  . . . . . . . . . . . . . . . . . . . 536

 2A-630  . . . . . . . . . . . . . . . . . . . 537

 2A-609  . . . . . . . . . . . . . . . . . . . 538

 2A-613  . . . . . . . . . . . . . . . . . . . 539

 B-244  . . . . . . . . . . . . . . . . . . . . 544
 B-625  . . . . . . . . . . . . . . . . . . . . 573