P5EsCOM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
UNITED STATES OF AMERICA,

          v.                          24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

           Defendant.              Trial
-------------------------------x
                          New York, N.Y.
                          May 14, 2025
                          9:17 a.m.
Before:

                HON. ARUN SUBRAMANIAN,

                          District Judge
                          -and a Jury-

                    APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
    EMILY A. JOHNSON
    MAURENE R. COMEY
    MEREDITH FOSTER
    MITZI STEINER
    MARY C. SLAVIK
    Assistant United States Attorneys

P5EsCOM1

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:   MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
SHER TREMONTE
BY:   ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:   ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND

ALSO PRESENT:
LUCY GAVIN, AUSA Paralegal Specialist
SHANNON BECKER, AUSA Paralegal Specialist
RAYMOND MCLEOD, Defense Paralegal Specialist

P5EsCOM1

(Trial resumed; jury not present)

THE COURT:  Are we ready to proceed?

Please be seated.

First matter is that we have a note from a juror about a scheduling accommodation on Friday, June 20, which won't be an issue.  I'll enter this as Court Exhibit 2.  The parties can review the letter and they can advise the court if there are any issues based on that.

Second question --

Do we need to wait for Ms. Johnson?

MS. COMEY:  No, your Honor.  I have their authorization to go ahead without Ms. Smyser and Ms. Johnson.

THE COURT:  In terms of the Rule 615 issue raised yesterday, is that going to be an issue for this morning's proceeding, or have the parties discussed what to do?

MS. COMEY:  Meaning with respect to consulting counsel?

THE COURT:  No.  The 615 issue concerning Ms. Ventura's husband.

MS. COMEY:  That may be an issue this morning, but the parties are aware of the agreement to have him removed from the courtroom before a particular subject matter comes up, and we'll be sure to pause at that point and make sure that he is removed from the courtroom.

THE COURT:  Thank you.

P5EsCOM1

Third issue, did we get the privacy screens installed?

MS. SLAVIK:  Your Honor, I can take that.

Yes.  With the thanks to the courthouse tech staff, my understanding is that the privacy screens are currently affixed to the relevant juror screens.

THE COURT:  Good.  Thank you.

On the consultation with counsel issue.  The defense, in their late-breaking letter, I think that's the last one in the chain, indicates that they have no objection to communications about a witness's health or correspondence concerning trial logistics.  I take it, Ms. Shapiro, that would also include no objection to questions about potential liability arising from any testimony as well, right?

Meaning that if a witness were concerned about the implications of their testimony -- not the substance, but the implications of their testimony -- that is also something they can consult with the lawyers about.

MS. SHAPIRO:  For instance, if something came up and the witness wanted to consult with the attorney about whether they should assert the Fifth or something like that?

THE COURT:  Something along those lines.  There is other versions of that.

MS. SHAPIRO:  I think we're OK with that, your Honor.

THE COURT:  So the sole instruction would be no communications concerning the substance of the testimony.  And

as you point out, you would say that substance would include things like the substance of any testimony about, for instance, Ms. Ventura's civil lawsuit?

MS. SHAPIRO:  Correct, your Honor.

THE COURT:  Given those narrow contours, Ms. Comey, and the cases cited in defense's letter, is there an issue here?

I think what Ms. Shapiro is saying is they have no issue with emotional support.  They have no issue with inquiries concerning any kind of liability.  They have no issue with any inquiries concerning witness health or any of those trial logistical issues.

Given that, it would seem that the defense's submission is well taken, understanding there is no dispute, this is a matter of discretion.

MS. COMEY:  Your Honor, I think there would still be an issue, at least with respect to consulting, allowing witnesses to consult with their attorneys about matters of potential privilege.  I think this may be the main issue of dispute is that I think that witnesses are likely to be asked about topics that touch upon areas of past representation by attorneys in connection with civil matters.  And I think that victim counsel and witness counsel are rightly concerned about being able to confer with their clients about any assertion of privilege.

P5EsCOM1

I will also note that, before agreeing to that kind of compromise, counsel for Jane, counsel for Mia, and counsel for Ms. Ventura are in the courtroom, have noted they joined the government's letter and have asked to be heard by your Honor before your Honor makes a decision on this point.

THE COURT:  Well, let's turn back, Ms. Shapiro.

I take it the government is saying if the witness wants to consult with their attorney about the assertion of privilege, that also is something that you have no issue with.

Again, we're talking about the substance of testimony. If you're talking to a witness about what happened, what they did, historical events, you just don't want that to be the subject of discussion.  Tell me what I'm supposed to say about this.  Is it OK that I said that?  Should I change my testimony?  Things of that nature, that we typically see in any kind of civil or criminal trial.

But if the witness wants to consult with their attorney about whether to assert a privilege or whether they are -- whether or not they are permitted to talk on a certain subject, that is something that it would seem within bounds for a witness to discuss.  And if an issue comes up, then we would address it here in court.

Again, the thing you're primarily concerned about is just the substance of testimony.

MS. SHAPIRO:  Yes, your Honor, but --

P5EsCOM1

THE DEPUTY CLERK:  Can you pull that mic a little closer.

MS. SHAPIRO:  I'm sorry.

I think it kind of depends on the way it comes up, because if the -- first of all, we're obviously not intending to elicit any privileged communications.  And, as typical, we will make sure that questions are framed in a way that avoids that.

If an issue comes up, presumably at least in my experience what will happen is the government will object if there is a problem, and then the court can police it.  And if necessary, at that point, then the witness wants to talk to their lawyer, then that's fine.

But I'm a little concerned with the idea that, during the break, there just could be generalized discussions about those kinds of issues.  Because, necessarily, it's hard to see how that would be divorced from the substance of the testimony, if it's just during a break, a general conversation about the testimony and what might come up.  If that occurs during the cross.

It's another thing if, for some reason -- again, we don't anticipate doing this.  We will try to avoid eliciting any response that would call for privileged communications.  You know, then obviously we wouldn't object if something came up during the testimony and there needed to be a break for the

P5EsCOM1

witness to consult with the counsel.

THE COURT:  Is the government consulting with counsel for any of these witnesses as, you know, where this issue is coming up?

Meaning, is the government back there, when we have a break, having any discussions with these individuals' lawyers, or no, you're not having those kinds of discussions?

I mean, you know, because what Ms. Shapiro is, I think, concerned with and what comes up sometimes is there are no discussions between one side's lawyer and an actual witness, but there may be discussions between the attorneys and the other, the witness's attorney.  Then the witness's attorney speaks then with the witness, and there is a concern that, through that daisy chain, you would have some impact on the witness's testimony.

That would never -- I have no reason to believe that would ever happen here, but that, I think, is part of the concern that's being articulated by the defense.

MS. COMEY:  If what your Honor is asking is whether the government attorneys would be trying to influence a witness's testimony --

THE COURT:  That's not what I'm asking you.  I'm just asking you whether you --

When I go back there --

MS. COMEY:  Yes.

P5EsCOM1

THE COURT:  -- and you all go into the hallway, are there discussions happening between the government and the witness's attorneys during testimony?

That's what I'm trying to understand.

MS. COMEY:  Your Honor --

THE COURT:  I'm not saying --

MS. COMEY:  -- during direct testimony, yes.  I'm sure that is happening during direct testimony.

During cross-examination, it certainly has not happened, other than during Mr. Phillip's cross-examination, when in the courtroom I went to go talk to his attorney with the permission of your Honor.  And I think that we would be in touch with victim counsel to discuss security and logistics and those types of matters.

But in terms of discussing the substance of testimony, no.  I mean, we would not do that.

THE COURT:  All right.  Understood.

I was asking a more general question.  Just were you having any discussions --

MS. COMEY:  The answer is yes.  We would need to speak with these witness's attorneys.

THE COURT:  During cross?

MS. COMEY:  During cross, we think these witnesses will be on the stand during multiple days during cross, and we are arranging for their transportation, for their security.

P5EsCOM1

And for those reasons, we do need to speak with them and their attorneys. But we only talk about security and logistics.

THE COURT: Understood.

That, I think, falls outside of what Ms. Shapiro is concerned about.

So, Ms. Shapiro --

This is only going to come up, Ms. Comey, after the lunch break, is that right?

MS. COMEY: That's right, your Honor. I will note, again, that counsel for three of the victims are here. And as we noted in our letter, we do think victims are differently situated than other witnesses. And in the exercise of your Honor's discretion, we do think that it would make sense to draw a line between non-victim witnesses and victim witnesses, given the Crime Victims' Rights Act.

THE COURT: I will hear them. However, this is coming up at the very last minute, and so let's see if we can --

No, I'm not saying it's anyone's fault. You all have tons of stuff to do. It's absolutely understandable this is coming up in this way. Rather than talking about this in the abstract, Ms. Shapiro, can you draft -- do it on a piece of paper -- the instruction you would propose, given what we've discussed here and the clarifications that we made, and give that, if you can, to Ms. Comey so that she can take a look at it. Maybe you think there are modifications that you can make

P5EsCOM1

that would narrow it enough so that it would accommodate your concerns and the concerns of any witnesses or victims, so that we can see if everyone can have their interests reflected in the instruction I would give.

I think everyone's on the same page. No one wants someone being told about or having discussions about the substance of their testimony. It seems like everyone should be on the same page. Rather than making this a big issue that is going to gobble up trial time, let's see if we can figure this out. And if we can't figure it out, then we'll have the lunch break to discuss it, and I'm happy and I will hear from anyone who wants to be heard on this issue.

MS. COMEY: Thank you, your Honor.

THE COURT: Then I think the next issue are the rule of completeness objections.

MS. SLAVIK: Your Honor, defense counsel sent a zip file containing proposed government exhibits, and then the proposed defense exhibits that include additional text messages.

Let me just flag for your Honor that the government is currently reviewing, side by side, those exhibits, and I think we may be able to reach agreement on several of those. So maybe we can take this up at the lunch break, if that is acceptable to your Honor.

THE COURT: That is absolutely -- that is appreciated

and acceptable.  The only reason I was going to jump into this now, I thought it might come up in the morning.

MS. SLAVIK:  With respect to these particular messages, I don't believe they will come up before the lunch break.

THE COURT:  Perfect.  Thank you.

Anything else, Ms. Comey?

MS. COMEY:  Yes, your Honor.

We were discussing with defense counsel last night, and unable to reach agreement, on a matter that I think we need to raise before your Honor.  It relates to marked exhibits from the defense.

As of today's date we have received only four total marked exhibits from the defense.  They produced those to us on April 27.  Their deadline for producing exhibits.  We understand from conferring with them that they have continued to mark new exhibits and they have not produced them to us, and they intend to possibly offer some of them during cross-examination of witnesses, including Ms. Ventura.

We have made clear to the defense that we have no need to and no right to see anything that they plan to show just the witness for refreshing recollection or impeachment.  We understand that.  But to the extent the defense intends to offer any marked exhibits for the jury to see, we believe that the court contemplated those marked exhibits would be shared

P5EsCOM1

with the government back in April.

We understand that trial happens, especially for the defense, they may need time to mark exhibits.  We're willing to negotiate that in good faith.  But we are worried that this is going to keep coming up throughout the trial, if the defense is of the view that they do not have to given us marked exhibits that they plan to seek to offer for the jury to see during cross-examination.

So we wanted to raise this because we are worried that if we are just handed exhibits that are going to go to the jury in the middle of, or right before, cross-examination, we will not have the time and will need to take a break to check the authenticity and admissibility of those documents.

I understand that some of those documents may come from the government's discovery productions.  Your Honor knows those productions were terabytes of data, and we need to check and make sure we actually know the providence of these exhibits.

We also might have objections under 401, 403, hearsay, rule of completeness.  And we just shouldn't be in a position to have to assess all of that while a witness is being cross-examined.  So we would ask that the defense be directed to provide us with marked exhibits on a rolling basis as they mark them or no later than the morning that they plan to offer them.

P5EsCOM1

We think that is entirely reasonable, and it's more than consistent with what the government has done. We produced hundreds of marked exhibits on our exhibit deadline. And as we have marked additional exhibits, we have in realtime been producing them to the defense throughout the trial.

Our goal is not to have this be trial by ambush and our goal is not to waste the jury's time in the middle of a witness's cross-examination.

THE COURT: Response.

MS. GERAGOS: Yes, your Honor. I think both Mr. Agnifilo and I will handle this.

First, we have been conferring with the government on this point. We, with respect to any -- I just want to break it up and give you the background.

With respect to any Rule 16 we have that the government did not have in their possession, we turned it over at our exhibit deadline. They have all of that Rule 16. They had it on whatever Sunday that was. I think it was the 27th.

Anything that we may offer --

THE COURT: This is the four exhibits?

MS. GERAGOS: The four exhibits. Exactly.

Anything that we may offer and -- I want to be very clear on this point. we don't know what that is. And so, yes, we are marking a tremendous amount because we don't know -- it doesn't even seem that have of her direct is done, so we --

THE COURT:  Give me the categories of what you're -- what you might put in.  Not the substance.  I'm saying the categories.

Because Ms. Comey is saying that, to the extent that you are using any marked exhibit for purposes of refreshing the witness's recollection or for impeachment, then they don't need to see that in advance.  However, if you're trying to put something in front of the jury, then there are a host of issues that it would be unfair for them to have to deal with as they are brought up in court.

MS. GERAGOS:  Well --

THE COURT:  Are there.

MS. GERAGOS:  -- I will start with categories. Categories, broadly, are more text messages between Mr. Combs and Ms. Ventura.  So, in an abundance of caution, we do not know what we will offer.  We are marking several chains of text messages.

Do we think that, even when we are in the process of marking, I should say we're not complete, that full chains would come in?  No, we don't.  I think we're trying to mark things in an abundance of caution, and maybe a couple text messages will come in here and there.

But in terms of fairness, your Honor, if I could just talk about that point.  This is cross-examination.  And as we've been discussing during direct examination, the government

has an absolute right to continue preparing their witness.  And so, to give over everything that we have marked or things that we think could be important, things -- it's kind of hard at this stage to determine what would be a cross-examination exhibit, what would be something that we would try to put in.  So, to give that all over while she's on direct examination so that the government can then prepare her on potential exhibits, that is unfair for the defendant.

It's not trial by ambush.  These are all documents they've seen.  They have them in their possession for eight months before we got them.  So in terms of a fairness argument, it's a fairness for the defendant.  In terms of the government, we gave them anything that they didn't have by our deadline, so...

THE COURT:  Well, we are here, and there are exhibits that you may have marked and you're saying we may use some of them, we may not.  At a certain point, we were told yesterday maybe half a day remaining on direct.

So let's assume for the moment that we ended the direct around the lunch hour.  Would you be in a position, once cross-examination has commenced at least for this witness, and we can figure out what to do moving forward, to furnish to the government any exhibits that you have marked that you may use given, at that point, you'll be in cross-examination, the government wouldn't have an ability to even speak to the

P5EsCOM1

witness?  And so if you're just giving them at least the set of things that you might use that don't fall into the categories that Ms. Comey identified, then at least they can start looking at those, and we can try to eliminate some of the potential evidentiary issues, the government can ask you any questions it wants, you can -- if you don't answer, then we'll bring it up to the court.

But at least we're getting a little bit ahead of it while meeting the concern that you raised about direct examination.

MS. GERAGOS:  Yes.  I have spoken to my paralegal.  We are doing everything we can.  She is printing everything we marked last night.  So we'll bring it over and it will be here in the government's hands at that point.

MS. COMEY:  Your Honor, may I be heard on the impeachment issue?

THE COURT:  Yes.

MS. COMEY:  So, that is, Ms. Geragos' concern is precisely why we acknowledged we are not entitled to documents used to impeach the witness and will be shown to the witness to refresh her recollection.

We agree, we should not see those, because we should not be able to prepare.  It's fair for the defense not to want us to prepare the witness for how she might be impeached or what documents she might be shown to challenge her credibility.

P5EsCOM1

What we are talking about is documents they might want to admit as affirmative evidence, affirmative defense evidence to the jury. That is distinct.

THE COURT: Right.

We are talking about prior inconsistent statements.

MS. COMEY: Exactly, your Honor. These are substantive exhibits that should have been turned over on April 27. That is what should have been. That is what the court's order contemplated, was not that the government has to show what exhibits we're going to show to the jury this April, but the defense doesn't have it until cross-examination starts.

We're not talking about impeachment or cross-examination. We are talking about a affirmative evidence that the defense wants to use in front of the jury as part of its defense case.

THE COURT: So, Ms. Geragos, Ms. Comey is saying that, to the extent that you have documents, the purpose of which is to impeach the witness or even in the form of prior inconsistent statements, that you're going to first have to do the inquiry and try to get into evidence, that's not what she's talking about. If there is other stuff, then the concerns you raised would not seem to be at the forefront. And we did have a schedule where you were supposed to turn over documents.

Understanding that you're marking exhibits in realtime, as you mark those exhibits, if there are any, why

shouldn't you be required to turn those over, given the carve-outs Ms. Comey has identified?

MS. GERAGOS:  Your Honor, Mr. Agnifilo would like to take it.

MR. AGNIFILO:  So, this is all under the rubric of Rule 16.  This is all matters of Rule 16, and Rule 16 doesn't recognize these carve-outs.

Rule 16 talks about exhibits that are going to be used as part of the defense case in chief.  The defense case in chief is when we call witnesses.  That is the defense case in chief.  The defense case in chief is not the cross-examination of a government witness.

That being said, there are sound, practical reasons for doing exactly what your Honor is suggesting, and we're doing that.  But the reason I add that is because we are not behind the eight ball on this.  We have absolutely complied with Rule 16.

As a practical matter, because we don't know -- I would be surprised if the government only has another three hours left.  But whatever it is, we are marking exhibits in response to what has happened in the direct.  I agree with your Honor, we will give them -- we will give everything that we have marked to the government before the cross-examination starts.  We can do that.

I'm looking over.  I want to make logistically we can

P5EsCOM1

do that.

MS. GERAGOS:  Yes.  Yes.  It's over-inclusive.

MR. AGNIFILO:  So, logistically, we can do that.  We are endeavoring to do that.  We have started to do that.

That all being said, I don't think Rule 16 requires that.  But we don't have to have a Rule 16 argument, because we're willing to do it.  We're willing to do it as, just a matter of practicality, to make things easier for the court, to make things easier for the government, quite frankly, and so that all the examinations go smoothly.

That all being said, there is nothing in Rule 16 that requires that.  Now, I am aware of certain cases from outside the Second Circuit, district court cases, I believe, that have said that when the defense offers exhibits, offers documents, puts them into evidence, to put up forward an alternative factual theory, aside from undermining the credibility of the witness or something like that, that there are some courts that have defined that, I think, errantly at the defense case in chief.

So if that is what we're talking about, we disagree with that, with that legal assessment.  But on a much more practical level, we are doing it anyway, and so we're going to continue to do it.  The government has done things to make the trial easier that the rules don't require that they do.  We recognize that.  And we are going to do the same thing.

P5EsCOM1

So we are doing this feverishly.  Luckily, we have a sizeable defense team.  We think we can do it effectively, and we're in the process of doing that to make this trial run as smoothly as possible.

THE COURT:  Ms. Comey, you've heard that.  What do you want?

MS. COMEY:  I want their exhibits, your Honor.  I think they've already marked them, and I would like them now.

THE COURT:  Meaning you're saying you want the exhibits, all of the exhibits?

MS. COMEY:  All of the exhibits that they think they might show to the jury.  I'll note that we marked --

THE COURT:  For this witness?

MS. COMEY:  For all of witnesses.  I think that the court's order contemplated not having a trial by ambush. Mr. Agnifilo cited to the law that I was thinking of in my head when he said that Rule 16 doesn't require this.  I want to look back at the cases and see if there are any within this circuit.

But my understanding of the law is if the defense is seeking to affirmatively offer evidence on cross-examination, even during the government's case, if they want to start putting forward their defense during the government's case, they have to produce those exhibits in advance, the same way the government does.

I'll also note that the government has over-marked

P5EsCOM1

exhibits.  We have produced far more marked exhibits than we expect actually to offer, because if we think we might possibly offer something, we put a sticker on it and send it over to the defense so they are on notice and can raise any objection in advance.

So, I want their exhibits now, please.

MR. AGNIFILO:  Your Honor, can I do this?

I'm sorry.

THE COURT:  Well, no.  Here is what I'm going to propose.  We have a jury that's cooling its heels in the back.

MR. AGNIFILO:  Yes.

THE COURT:  For today's purposes, you have indicated that before cross-examination, you're going to give over all the exhibits.

MR. AGNIFILO:  Right.

THE COURT:  And Ms. Ventura's cross-examination, if we even get there today, is going to take more than today.

MR. AGNIFILO:  Yes.

THE COURT:  We're going to be back.

So, what I'm going to do is take a look at Rule 16, which is one issue.  Second, I'm going to look at the actual order which reflected the parties' agreement, by and large, on most of the issues concerning what there needed to be deadlines for and what those deadlines meant.  So I'm going to take a look at those submissions.

The only outstanding issue, Ms. Comey, would be these cases that you maybe haven't seen, but Mr. Agnifilo has done you a solid and identified them.

MS. COMEY:  I remember reading cases on this, your Honor.  I will try to find them.

THE COURT:  If there are those cases, you don't need to put in a letter.  Literally, someone can just e-mail the citation to me so I can take a look at them.

MS. COMEY:  OK, your Honor.

THE COURT:  I'll see what I can do to get clarity and give the parties clarity on this before the end of the day.

MS. COMEY:  Thank you, your Honor.

MR. AGNIFILO:  Thank you.

MS. GERAGOS:  The last thing, if we are going to turn them over at lunchtime, they do not go over the exhibits with Ms. Ventura.  That's just -- that's a practical.  We are giving these over to them.  We're asking that they don't go over them with her.

MR. AGNIFILO:  Can I add one thing to do that, Judge?

The government and the defense are not similarly situated.  They have the burden of proof.  We don't.  We don't have to go first and give the government the things that we are going to use as part of our cross-examination so that they could then prepare their witness.

There is nothing and I think it would be

P5EsCOM1

unconstitutional, for one, and I don't know of any cases that say that, which is why Rule 16 is written the way it is.

Rule 16 --

THE COURT:  Why are we still --

I thought we had an agreement, I thought I had gotten us to an agreement at least for --

MR. AGNIFILO:  I'm --

THE COURT:  Cease fire.

MR. AGNIFILO:  I'm snatching the feet from the jaws of victory, at least that's what I want to do.  If we are good for now, we're good for now.

I saw Ms. Comey was going to talk about how the defense and the government are the same, but we are not.

MS. COMEY:  I don't think we are.

I don't think we are, and that's why I don't think they have to give me anything they are going to show for impeachment or to refresh recollection.  Just exhibits --

THE COURT:  OK.

MS. COMEY:  -- that they want to use to prove their case.

I think we should be allowed to show those to any witnesses, the same way they can show our exhibits to any of their witnesses.

THE COURT:  For present purposes, Mr. Agnifilo, you graciously agreed that, to the extent you've marked exhibits

P5EsCOM1

that don't fall into those categories, you can provide those over at the lunch break.  Yes?

MR. AGNIFILO:  Yes, Judge.

THE COURT:  OK.  And that's not with any provisos of what the government would do with those exhibits, because I can't tell the government what to do or not to do with exhibits that you've agreed to turn over to the government at that stage.

So what they will do with those is what they will do with those, correct?

Because if you're not agreeing to that, then you're not really agreeing to turning over those exhibits.  You're saying we're not going to actually turn over those exhibits. Wait until cross-examination begins.

If that is your position, you should tell me now.

MR. AGNIFILO:  I think that has to be our position, Judge.

THE COURT:  And --

MR. AGNIFILO:  If cross-examination is to start after lunch, that's when they would get it.  I do not think that we should be in a position of giving the government ideas about our defense while the witness is on direct examination.

THE COURT:  OK.  So, for today's purposes, since this issue wasn't previously raised and it wasn't previously litigated or addressed in connection with any scheduling order

in this case, you should go ahead and turn over those exhibits whenever you see fit, but no later than before cross-examination begins.

There are no limitations on what the government would be able to do with those exhibits once you turn those over, and we'll address this issue further at the end of the trial day so that we don't run into it as to any other witnesses, and we'll get final resolution.

MS. COMEY:  Your Honor.

THE COURT:  Now, look, what we're talking about is a few hours.

MS. COMEY:  I agree, your Honor, but this is gamesmanship, your Honor.  And I would ask that exhibits that they do not turn over to us before the end of direct, not be admitted to the jury for any purpose other than impeachment.

If there is anything that they want to admit for anything other than impeachment, they should have turned it over.

THE COURT:  Let me ask you.

If you only received four exhibits on April 27, why is this the first time we're hearing about this on May 14, in the morning, while we have a witness who is waiting in the back to continue her testimony?

MS. COMEY:  Because we had been conferring and asking for marked exhibits.

P5EsCOM1

THE COURT:  That's not -- that seems --

Look, you can confer, but we're here to field these issues, and this is an issue that, if it was addressed and brought up to the court prior to trial, then we could have addressed all of this in a deliberate fashion and we would have had a clear rule that everyone would have applied.

Now, this is being raised literally while the jury is sitting in the box, and so I need a current solution for today. And then I'll hear you and we'll figure out an actual solution that will apply for the rest of this trial, which is going to last for weeks.

MS. COMEY:  Our solution for today, your Honor, is they produce them by the lunch break.

THE COURT:  All right.  Well, that's denied.

We'll have those produced, at the latest, Mr. Agnifilo, before the commencement of cross-examination.

MR. AGNIFILO:  Understood.

THE COURT:  With no restrictions on their use by the government, and then we'll address this later in the day.  If there are any cases that either side wants to submit that are relevant to this issue, you need to e-mail those to chambers during the trial day so that we don't have another day where this goes over and we don't know what the resolution is or what needs to be turned over.  Because I know that you are all doing that work overnight.

P5EsCOM1

So, let's get moving on whatever work needs to be done.

MR. AGNIFILO:  Yes, Judge.  Thank you.

THE COURT:  Anything further, Ms. Comey?

MS. COMEY:  I don't believe so, your Honor.

THE COURT:  Mr. Agnifilo, anything on your end?

MR. AGNIFILO:  Nothing from us.

Thank you, Judge.

THE COURT:  Can we get Ms. Ventura back?

MS. COMEY:  Your Honor, there is an issue we need to raise at the lunch break.  We don't need to raise it now, but before Ms. Ventura's cross begins.

I'm sorry.  There is another issue I was asked to raise.

THE COURT:  That's OK.

MS. COMEY:  Thank you.

MS. ESTEVAO:  Your Honor, may we confer with the court reporter about the live feed?

THE COURT:  Yes.

Good morning, welcome back.

THE WITNESS:  Thank you.

THE COURT:  We'll wait for a couple minutes.

MS. JOHNSON:  I'm ready, Judge.

MR. STEEL:  Your Honor, may I quietly step out for just a moment?

P5EsCOM1

THE COURT:  Yes.

MR. STEEL:  Thank you, sir.

(Pause)

(Continued on next page)

P5EsCOM1                      Ventura - Direct

(Jury present)

THE COURT:  Please be seated.

Welcome back, members of the jury.  Thank you for being here on time.  It helps thing runs smoothly here, and everyone here really appreciates it and knows how much of a hardship it is to get to the courthouse in the morning and dodging traffic and the subway and everything else that's out there, especially on a rainy day.  We all really appreciate it.

Ms. Ventura, you understand you're still under oath?

THE WITNESS:  Yes.

CASANDRA VENTURA, resumed.

THE COURT:  Ms. Johnson, are you prepared to proceed?

MS. JOHNSON:  I am, your Honor.

Thank you.

Your Honor, may I approach the witness?

THE COURT:  You may.

DIRECT EXAMINATION

BY MS. JOHNSON:

Q.  Ms. Ventura, I just handed you two drives.

Do you recognize those drives?

A.  Yes.

Q.  OK.  The first one is marked Government Exhibit B.

Do you recall discussing Government Exhibit B yesterday?

A.  Yes.

Q.  And how do you -- strike that.

What is on the drive at Government Exhibit B?

A.  Um, it has messages and photos from my devices that I gave to the government.

Q.  OK.  And you testified yesterday that you've reviewed the contents of Government Exhibit B, correct?

A.  Yes.

Q.  OK.  And how do you know that you've reviewed the contents of Government Exhibit B?

A.  I initialed it.

MS. JOHNSON:  Your Honor, at this time the government is going to offer a number of exhibits, so I'll read the numbers into the record.  It may take me just a moment.

THE COURT:  Do you understand there to be any objections to the admission of these exhibits?

MS. JOHNSON:  I do not believe so.  That's why I just conferred with counsel on.

THE COURT:  OK.

MS. JOHNSON:  But counsel will double-check me.

(Counsel confer)

Yes, your Honor.  The list is:

B-210, B-211, B-212, B- 213, B- 217, B-218, B-221, B-225, B-226, B-227, B-229, B-231, B-232, B-233, B-235, B-236, B-243, B-245, B-247, B-248, B-251, B-253, B-254, B-255, B-256, B-257, B-258, (B-259, B-262, B-263, B-264, B-266, B-322, B-323,

B-324, B-325, B-327, B-328, B-333, B-336, B-339, B-340, B-341, B-344, B-347, B-349, B-351, B-352, B-354, B-355, B-357, B-358, B-359, B-361, B-362, B-403, B-404, B-406, B-407.  Sorry.  And also B-405-A, B-410, B-412, and all subdivisions thereof.

We would offer all those at this time.

THE COURT:  Any objection?

MS. ESTEVAO:  Can we just have one more moment, your Honor?

THE COURT:  Yes.

MS. GERAGOS:  324 was already admitted, your Honor. The rest, we have no objection.

THE COURT:  So those exhibits will be admitted.

MS. JOHNSON:  Thank you, your Honor.

(Government's Exhibits B-210, B-211, B-212, B- 213, B- 217, B-218, B-221, B-225, B-226, B-227, B-229, B-231, B-232, B-233, B-235, B-236, B-243, B-245, B-247, B-248, B-251, B-253, B-254, B-255, B-256, B-257, B-258, B-259, B-262, B-263, B-264, B-266, B-322, B-323, B-325, B-327, B-328, B-333, B-336, B-339, B-340, B-341, B-344, B-347, B-349, B-351, B-352, B-354, B-355, B-357, B-358, B-359, B-361, B-362, B-403, B-404, B-406, B-407, B-405-A, B-410, B-412 and received in evidence)

BY MS. JOHNSON:

Q.  Ms. Ventura, I'm directing your attention now to the second drive that's in front of you that's marked Government Exhibit BX?

P5EsCOM1                         Ventura - Direct

A.   Yes.

Q.   Do you recognize that drive?

A.   Yes.

Q.   What is on that drive?

A.   Similar content from my devices.

Q.   Have you reviewed the materials on that drive?

A.   Yes.

Q.   Does that drive also contain enhanced video images from the videos that were found on your devices?

A.   Yes.

Q.   OK.  How do you know that what you reviewed is what's on that drive?

A.   I've signed that I saw it.

Q.   Do you see your initial on the drive in front of you that's marked for identification as Government Exhibit BX?

A.   Yes.

          MS. JOHNSON:  At this time, your Honor, the government is going to offer the Government Exhibit BX 201 through 210, including all subdivisions, and that includes offering, subject to connection, certain materials that will be authenticated by a later witness.  Government Exhibit BX-601 to BX-602, including all subdivisions thereof.

          THE COURT:  Any objection?

          MS. ESTEVAO:  Subject to connection, no objection.

          THE COURT:  Those exhibits will be admitted.

(Government's Exhibits BX 201 through 210 and BX-601 and BX-602 received in evidence)

MS. JOHNSON:  Thank you, your Honor.

BY MS. JOHNSON:

Q.  Ms. Ventura, you can put the drives aside now.

Before we move on to before we left off yesterday, have you -- you testified yesterday that you used alias Jackie Star sometimes.

Do you remember that testimony?

A.  Yes.

Q.  Are there any other aliases that you have used?

A.  Personally?  Veronica Bang was one I used for many years and Anita Crawford.

Q.  Just a few points I want to clarify from yesterday.

Yesterday you testified about an incident that involved Suge Knight.  Do you recall that testimony?

A.  Yes.

Q.  And after D Rock came to the house that night, you testified that you saw him and Sean pack up?

A.  Um-hmm.

Q.  What did they pack up?

A.  Um, well, they got dressed and quickly packed up guns that were in the safe, but they put them on their bodies.

Q.  Also yesterday, you testified that Sean wanted you to clarify if the escort was safe and not a cop.

Do you recall that testimony?

A.   Yes.

Q.   Did Sean ask you once or more than once to confirm that an escort was not a cop?

A.   More than once.

Q.   Approximately how many times did he ask you to confirm the escort was not a cop?

A.   Over the whole relationship, roughly maybe, like, six to eight times.  Not a lot.

Q.   Did he ever tell you to say anything in particular to the escort to make sure they were not a cop?

A.   Um, I would lead with the fact that I wasn't a cop.

Q.   Is that something that Sean told you to say?

A.   Yeah.

Q.   Ms. Ventura, when we broke yesterday, we were talking about the incident at the InterContinental.

Do you remember that testimony?

A.   Yep.

Q.   During that testimony, you said that you did not fight back when Sean hit you.

Were you speaking about the incident at the InterContinental that we were talking about, or were you speaking generally about incidents in your relationship?

A.   I was speaking specifically about the InterContinental.

Q.   And generally, in your relationship, were there times when

you tried to fight back when Sean was violent with you?

A.   Yeah.   Yep.

Q.   What happened when you fought back?

A.   I did that more on the earlier side of the relationship. So I, um, I learned that it could escalate the fight more, make it worse for myself.   Um, sometimes it would slow him down and he would stop.   But, yeah, not usually.

Q.   When you say make it worse for yourself, what do you mean by that?

A.   Um, just make him more violent, make him stronger, want to push me harder in that situation.

          MS. ESTEVAO:   Objection to the specification as to the state of mind.

          THE COURT:   That's overruled.

Q.   How did you observe Sean react when you fought back?

A.   Um, it varied.   It usually could be anywhere from him just being surprised that I was actually fighting back, so shock, um, and more anger, more frustration is what I saw.

          MS. JOHNSON:   Ms. Gavin, could you please pull up and publish what's in evidence as Government Exhibit 10C-103.   The timestamp one minute and 43 seconds.

Q.   Ms. Ventura, picking up where we left off yesterday, do you recognize what's depicted in Government Exhibit 10C-103 at timestamp one minute and 43 seconds?

A.   Yes.   That's the InterContinental Century City in LA.

P5EsCOM1                        Ventura - Direct

Q.   OK.   And who, if anyone, is depicted at this timestamp?

A.   I am, in the corner.

Q.   In the bottom left-hand corner of the screen?

A.   Yep, and in the mirror.

Q.   And where is the mirror in this image?

A.   Across from me, down the hall.

        MS. JOHNSON:   Ms. Gavin, can you play from 1:43 to 1:46, please.

        (Video played)

Q.   Who entered the elevator lobby during that clip, Ms. Ventura?

A.   That's Sean.

Q.   What, if anything, is in his hands?

A.   It doesn't appear to have anything in his hands.

        MS. JOHNSON:   Ms. Gavin, can you please play to 1:59.

        (Video played)

Q.   Ms. Ventura, are you able to tell from this pause if Sean has anything in his hands at one minute 59?

A.   Yeah.   It looks like a phone that's lit up, I think.

Q.   Whose phone is in his hands?

A.   I think that's my phone.   Yeah.

Q.   How did Sean get your phone?

A.   Well, he took all my stuff, so ...

        MS. JOHNSON:   Ms. Gavin, can we please play to a minute stamp two minutes, ten seconds.

P5EsCOM1                      Ventura - Direct

(Video played)

Q. Where does Sean initially head in that clip, in what direction?

A. It likes like he heads towards the room.

Q. And where does he end up at the end of the clip?

A. Sitting in a chair across from the mirrors by the window.

Q. And are you visible in this particular timestamp?

A. No, not in the timestamp.

Q. OK. Where are you relative to Sean right now?

A. I am, if you're looking at the screen, on the left, just behind the wall.

Q. Directing your attention to the area of the video where Sean is sitting that's visible in the mirror --

        MS. JOHNSON:  Ms. Gavin, can you please play until 2:14.

        (Video played)

Q. Ms. Ventura, what, if anything, is Sean recorded throwing in that clip?

A. There was a vase with flowers in it.

Q. And what do you recall about what happened with Sean throwing the vase with flowers in it?

A. Um, I just remember it coming towards me.  Um, I didn't get hit.  I remember it hitting the wall.  Um, but he was just yelling at me and threw it at me.

Q. When you say he was yelling at you, what, if anything, was

he saying to you during the events depicted on this video?

A.  I mean, I -- I don't remember exactly, like, his words, word for word, but I'm sure he was calling me out of my name.

MS. ESTEVAO:  Objection to speculation.

THE COURT:  That's sustained.

Jury should disregard the witness's last answer.

MS. JOHNSON:  Let's play until the end of the video.

(Video played)

You can pause there, Ms. Gavin.

BY MS. JOHNSON:

Q.  Ms. Ventura, what are you doing with your arm in that clip?

A.  At the end, I'm putting it up, and I'm backing away from him when he's walking towards me.

MS. JOHNSON:  And you can play the last few seconds, Ms. Gavin.

(Video played)

OK.  You can take that down.  If you can pull up Government Exhibit 10C-104, which is in evidence.  Go to timestamp three minutes and 20 seconds.

Q.  Ms. Ventura, again, which direction are we looking at in this view of the hallway?

A.  That's the hallway that goes to the room we were staying in and the elevator is on the right.

MS. JOHNSON:  OK.  Ms. Gavin, can you, please, can you play a few frames.  And pause again.

P5EsCOM1                    Ventura - Direct

(Video played)

Pause there.

Q.  Ms. Ventura, who do you recognize in this image at three minutes and 21 seconds?

A.  Me and security from the hotel.

Q.  In which direction are you walking?

A.  Opposite of the room.

MS. JOHNSON:  Ms. Gavin, can you jump forward to five minutes, 20 seconds.

(Video played)

Can you play from five minutes 20 seconds to five minutes, 31 seconds.

BY MS. JOHNSON:

Q.  In which direction are you headed now?

A.  Towards the room.

Q.  What, if anything, do you have in your hands?

A.  I don't see anything yet.

Did I have my phone yet?

MS. JOHNSON:  Let's jump ahead to six minutes --
minute six and 15 seconds.

Ms. Gavin, can you play 6:15 to 6:25.

(Video played)

Q.  In which direction are you walking in that clip?

A.  To the elevator.

Q.  Where are you walking from?

P5EsCOM1                          Ventura - Direct

A.   From the room.

Q.   What, if anything, are you holding in your hands?

A.   My bag and my purse.

Q.   Without guessing as to what Sean might have said, during this incident with Sean and the elevator lobby, was Sean speaking to you?

A.   Yes.

Q.   What, if anything, do you remember about the substance of what he was saying to you?

A.   That I wasn't going to leave him there.  Yeah, that I couldn't.

        MS. JOHNSON:  Ms. Gavin, you can take that down.

Q.   Ms. Ventura, were you eventually able to leave the InterContinental Hotel?

A.   Yes.

Q.   Where did you go once you left?

A.   I went to my apartment that was close by.

Q.   Which apartment were you living at, at this time?

A.   That was 875 Comstock.

Q.   How did you get from the hotel to your apartment?

A.   I took an Uber.

        MS. JOHNSON:  Ms. Gavin --

        Your Honor, may I have one moment to confer with defense counsel?

        THE COURT:  You may.

(Counsel confer)

MS. JOHNSON:  Ms. Gavin, could you pull up, for identification only, for the parties and the court, Government Exhibit B-626.  If you could put the first page, page one and page two, side by side, please.

BY MS. JOHNSON:

Q.  Ms. Ventura, do you recognize what this document is?

A.  Yes.

Q.  What is it?

A.  It's a text message between me and Sean.

Q.  And how do you recognize it?

A.  Um, our names and phone numbers on it.

Q.  Is this a true and accurate text message between you and Sean?

A.  Yes.

MS. JOHNSON:  The government offers Government Exhibit B-626?

MS. ESTEVAO:  One moment, please, your Honor.

No objection.

THE COURT:  All right.  This exhibit will be admitted.

(Government's Exhibit B-626 received in evidence)

MS. JOHNSON:  Ms. Gavin, can you please publish the exhibit to the jury.

BY MS. JOHNSON:

Q.  Ms. Ventura, directing your attention to the first page on

the left, who are the participants in this chat?

A.   That's me and Sean.

          MS. JOHNSON:  OK.  Ms. Gavin, can you please put pages two and three, side by side.  If you could blow up the first message on page two.

Q.   Ms. Ventura, what's the day and time that this message is sent?

A.   March 5, 2016.

Q.   And who sent this message?

A.   This is from Sean to me.

Q.   Can you please read this message?

A.   Call me.

          MS. JOHNSON:  Can you take that down, Ms. Gavin.

Q.   And, Ms. Ventura, can you read all the messages on page three?

A.   Yo.  PLS call me.  I got six kids.  PLS call me.

          MS. JOHNSON:  Ms. Gavin, can you turn to pages four and five.

Q.   Ms. Ventura, can you please read all the messages on page four.

A.   Yo, PLS call.  I'm surrounded.  I'm sorry.  Call me.  For my kids, help.

Q.   On page five on the right, directing your attention to the top green message, who sends that message?

A.   Me.

P5EsCOM1                        Ventura - Direct

Q.   What is your response?

A.   Put the robe on.

Q.   Why did you tell Sean to put the robe on?

A.   Because he was running around in a towel and I was just looking out.

Q.   Can you continue reading the messages in blue?

A.   It says, Call me.  And then, Call now.

Q.   Who sent those messages to you?

A.   From Sean.

        MS. JOHNSON:  Ms. Gavin, can you turn to page six, please.

Q.   Ms. Ventura, page six, which is on right-hand side of your screen.

        MS. JOHNSON:  Ms. Gavin, can you blow up the green messages, please.

Q.   Who sent these green messages?

A.   I did.

Q.   Can you read your response?

A.   I went and checked everything and spoke to security.  Jules left so you're good and as long as you don't disturb the other guests, they'll leave you be.  Peace.

        MS. JOHNSON:  You can take that down, Ms. Gavin.

Q.   Ms. Ventura, can you remind the jury who Jules is?

A.   Jules was one of the regular escorts that we used for freak-offs.

Q.   Was Jules present at the InterContinental Hotel on March 5, 2016?

A.   Yes.

Q.   And where, if you know, was Jules during the incident that was depicted on the videos that we watched?

A.   Jules was inside of the hotel room.

        MS. JOHNSON:   Can you take this down, Ms. Gavin, and please put up Government Exhibit 2A-630 in evidence.

Q.   Ms. Ventura, yesterday you identified this individual as Jules.

        Is this the same Jules you were just talking about?

A.   Yes.

Q.   OK.  What, if any, communications did you have with Jules after you left the InterContinental that day in an Uber?

A.   I actually don't remember having any conversation with him after, um, until there was, like, another freak-off, honestly.

        MS. JOHNSON:   Ms. Gavin, can you please pull up Government Exhibit B-606 and B-607, side by side, which are both in evidence.

Q.   Ms. Ventura, what's depicted in Government Exhibit B-606 and B-607?

A.   That's me just a selfie of my fat lip, wearing sunglasses.

Q.   When was this image taken?

A.   It was taken in the Uber on the way to my apartment.

Q.   OK.  After you left the InterContinental Hotel?

A.   Yes.

Q.   With what device did you take this photograph?

A.   I took it with one of my phones.

Q.   And why are you wearing sunglasses in this photograph?

A.   Because I had a black eye underneath.  I was trying to cover it.

Q.   And what injury, other injuries, if any, can you see in these images?

A.   Just my fat lip.

MS. JOHNSON:  You can take that down now, Ms. Gavin.

Can you please pull up Government Exhibit 626 in evidence, pages six and seven, side by side.

Q.   Ms. Ventura, directing your attention, we previously looked at the two green bubbles at the top of the screen.

Directing your attention to the blue bubble underneath it on the left-hand side.  Who sent this message?

A.   Sean to me.

Q.   What does it say?

A.   Call me now.

MS. JOHNSON:  And, Ms. Gavin, can you enlarge the messages on page seven, please.

Q.   Ms. Ventura, can you read these messages?

A.   Call me.  The cops are here.  You're going to abandon me all alone.  Call me PLS.

Q.   When Sean said to you, on the top message, call me, the

P5EsCOM1                          Ventura - Direct

cops are here, what was your reaction?

A.  I didn't know.  I don't think I really cared in that moment.  Um, I just wanted to be home.  Get away.

Q.  Are you aware either way if police showed up to the InterContinental Hotel?

A.  No, I'm not.

MS. JOHNSON:  Ms. Gavin, can you please turn to pages eight and nine.  If you could blow up the top two green bubbles.

Q.  So, after the messages we just read where Sean says, Call me, the cops are here, how do you respond?

A.  I say, I have a premiere Monday for the biggest thing I've ever done in my life.  I have a black eye and a fat lip.  It was time for me to go.  You are sick for thinking it's OK to do what you've done.  Please stay far away from me.

MS. JOHNSON:  Can you take that down.

Q.  Ms. Ventura, can you read the rest of the blue bubbles?

A.  Yep.

Call me.  Help.  I'm about to be arrested.  Thanks.

Q.  Who sent you those messages?

A.  Sean.

MS. JOHNSON:  Ms. Gavin, can you please turn to the next two pages.

Q.  Ms. Ventura, can you pick up reading Sean's messages on these -- the blue bubbles on these pages?

A.   If you don't pick up, you'll never hear my voice again.
Damn.  I would never ignore your calls.  Call now.  PLS.  PLS.

Q.   Then the top message on this page?

A.   I'm getting arrested.

Q.   Ms. Ventura, are you aware if Sean was arrested for this incident?

A.   No, I -- I don't know.  I don't think so.

Q.   OK.  And how do you respond to his message I'm getting arrested?

A.   Plugging my phone in and going to bed.  You should do the same.

        MS. JOHNSON:  You can take that down now, Ms. Gavin.

Q.   Ms. Ventura, you testified earlier that you left the InterContinental in an Uber to go to your apartment, is that right?

A.   Yes.

Q.   Who, if anyone, was at your apartment when you arrived home?

A.   My friend, Kerry Morgan, was there.

Q.   How did Kerry react when she saw you?

A.   She was super upset.  She had seen me with black eyes and busted lips before, so she was pretty upset and she wanted to call the cops.

Q.   Are you aware if Ms. Morgan did call the police?

A.   I am.  She did.

Q.  How are you aware of that?

A.  Because she called them in front of me and they came.

Q.  You mentioned the police came to your apartment, is that right?

A.  Um-hmm.

Q.  What interaction, if any, did you have with the police at your apartment?

A.  I answered a couple of questions.  Um, but when they wanted me to say who I was talking about, I would not.  So they left.

Q.  Why would you not say who you were talking about?

A.  Just, in that moment, didn't want to hurt him that way. Um, just too much going on.  It was a lot for me in that moment and I didn't want to -- I wasn't ready.

Q.  And who were you talking about whose name you would not disclose?

A.  Sean.

Q.  Did you want to protect Sean?

A.  Yeah, of course.

Q.  After you returned to your apartment on March 5, 2016, who else, if anyone, tried to come over to your apartment?

A.  Sean did.

Q.  What, if anything, do you recall about that?

A.  I don't know how he got there, but this was the apartment where I lived on the 17th floor, so he was just trying to get in and get to me and --

MS. ESTEVAO:  Objection.

MS. JOHNSON:  Your Honor, can I ask a clarifying question?

THE COURT:  Yes.

Q.  Ms. Ventura, how do you know Sean was trying to get into the apartment?

A.  Because I was notified by his assistant.

Q.  Who told you Sean was trying to get into your apartment?

A.  Well, Kerry because she was there and Kristina Khorram.

Q.  What, if anything, could you hear while this was happening?

A.  Just chaos outside of the door, banging, kicking, yelling.

Q.  Could you hear Sean's voice?

A.  Yeah.

Q.  And where was his voice relevant to your apartment, where was his voice coming from relative to your apartment?

A.  Outside of the apartment door.

Q.  Was Sean able to get inside your apartment on March 5, 2016, after the incident at the InterContinental?

A.  He was not.

Q.  And can you describe how the noises outside your door sounded?

A.  Him trying to -- well, yelling, um, again, banging.  It was pretty normal.  Um, just commotion in a very private building.

Q.  When you say banging, what, if anything --

A.  On the door, yeah.

P5EsCOM1                     Ventura - Direct

Q.   OK.  So you heard banging on your front door?

A.   Yes.

Q.   You also mentioned you heard from Sean's assistant that day?

A.   Yeah.

Q.   Was that Ms. Khorram?

A.   Yes.

Q.   Besides Ms. Khorram, what, if any, contact did you have with any other employees of Sean's that day?

A.   I spoke to D Rock.  We ended up going to his house later on that day.

Q.   Can you remind me what role D Rock has?

A.   D Rock was a security and a close friend.

Q.   You mentioned you went to D Rock's house later that day.

Can you explain to the jury why you went to D Rock's house?

A.   Um, well, living in LA, I really didn't have a whole lot of people, especially family.  And D Rock and his wife were just always there for me, so I ended up going over there to feel safe.  Tried to.

Q.   How long did Ms. Morgan stay with you?

A.   She got on a flight back to New York that evening.  Um, and by the time I got to the apartment, it was, like, afternoon, maybe like 2:00 o'clock, so...

Q.   When did you see Sean next?

A.   I saw him next when he came to D Rock's house at the end of that night.  We had been texting.

Q.   And where did you go over D Rock's house?

A.   After D Rock's house, I went to Sean's house, and I did a fitting for the movie.

          MS. JOHNSON:  Ms. Gavin, can you pull up for identification only for the parties and counsel Government Exhibit B-627-A.

BY MS. JOHNSON:

Q.   Ms. Ventura, do you recognize who is depicted in Government Exhibit B-627-A?

A.   Yeah.  That's me in Sean's bedroom in LA.

Q.   How do you recognize this?

A.   It's what I wore to the premiere.

Q.   Is this a true and accurate photograph of you in Sean's bedroom?

A.   Yes.

          MS. JOHNSON:  Government offers Government Exhibit B-627-A.

          MS. ESTEVAO:  No objection.

          THE COURT:  The government will be admitted.

          (Government's Exhibit B-627-A received in evidence)

          MS. JOHNSON:  Ms. Gavin, please publish that exhibit to the jury.

Q.   Ms. Ventura, what are you wearing in this photo?

P5EsCOM1                        Ventura - Direct

A.   I'm wearing a gown and sunglasses.

Q.   Why are you wearing sunglasses?

A.   To cover up my eye.

Q.   What had happened to your eye?

A.   I got hit in the face, so I had a black eye.

Q.   And where was this photograph taken?

A.   Inside of Sean's bedroom on Mapleton Drive.

         MS. JOHNSON:  You can take that down now, Ms. Gavin.

Q.   Ms. Ventura, when you were talking about Sean trying to get into your apartment after the incident at the InterContinental, you described banging and yelling as normal.

         What did you mean by normal?

A.   He showed up unannounced quite a bit when my friends were there.  And when he did, it was a similar thing.  If he doesn't have a key, he would just be trying to get inside.

Q.   What do you mean by similar thing?

A.   An incident where he was angry, coming from somewhere being angry.

         MS. JOHNSON:  Ms. Gavin, can you please pull up and publish what's in evidence as Government Exhibit B-604.

Q.   Ms. Ventura, what, if any, visible injuries did you have on the day of your premiere?

A.   Visible, I had bruises on my body that weren't completely covered by the makeup.  Um, I had quite a bit of makeup on, on my face.

Q.  Where is this particular image, Government Exhibit B-604, taken?

A.  That's at the beginning of the premiere of the movie that I was doing.

Q.  And you mentioned you had quite a bit of makeup on?

A.  Um-hmm.

Q.  What was the makeup covering?

A.  The makeup was covering a bruising on my face.

Q.  You mentioned other bruising.

MS. JOHNSON:  Ms. Gavin, can you zoom in on Ms. Ventura's shoulder.

Q.  What, if any, other bruising was visible?

A.  You're referencing this.  I had several bruises on my legs, but I changed into a different outfit.

MS. JOHNSON:  You can take that down, Ms. Gavin.

Can you pull up Government Exhibit 9Q-101 for identification for the court and parties only.

Q.  Ms. Ventura, do you recognize who is depicted in this exhibit?

A.  Yep.  That's me and Sean at the after-party for the premiere.

Q.  How do you recognize this picture?

A.  Because we were together for a minute.  I remember it.

Q.  And is this a fair and accurate photograph of you and Sean at the after-party for the premiere?

P5EsCOM1                      Ventura - Direct

A.   Yeah.

          MS. JOHNSON:  The government offers Government Exhibit 9Q-101.

          MS. ESTEVAO:  No objection.

          THE COURT:  It will be admitted.

          (Government's Exhibit 9Q-101 received in evidence)

          MS. JOHNSON:  Ms. Gavin, can you please publish this exhibit to the jury.

Q.   Ms. Ventura, you had mentioned a moment ago that you had changed dresses during the evening, is that right?

A.   Yes?

Q.   What dress is this that you're wearing?

A.   That's the after-party dress that I changed into in, like, a popcorn closet at the movie theater.  Yeah, my second dress.

Q.   And you mentioned earlier that what, if any, bruises were visible on your legs in this dress?

A.   You can see one of them there, but I had a larger one on my thigh, my upper thigh, and I had another one somewhere around my shin, calf muscle.

Q.   Which bruise can you see in this photo?  Can you --

A.   I can see it on my right shin.

          MS. JOHNSON:  You can take that down, Ms. Gavin.

Q.   Ms. Ventura, next to you on the witness stand is a binder.

          Can you please look through the photos in that binder, all of them, and let me know who you recognize the photographs

to be?

A. OK. OK.

Q. Have you finished looking at the binder?

A. Yes.

Q. Who do you recognize those photographs to be depicting?

A. These are escorts that we used for freak-offs.

Q. And are those true and accurate photos of escorts that you used for freak-offs?

A. Yeah.

MS. JOHNSON: Your Honor, the government offers Government Exhibit 2A-617, 2A-602, 2A-619, 2A-616, 2A-634, 2A-607, 2A-618, 2A-601, 2A-620, 2A-624, 2A-632, 2A-633, 2A-628.

THE COURT: Any objections?

MS. ESTEVAO: No objection.

THE COURT: Those exhibits will be admitted.

(Government's Exhibits 2A-617, 2A-602, 2A-619, 2A-616, 2A-634, 2A-607, 2A-618, 2A-601, 2A-620, 2A-624, 2A-632, 2A-633, 2A-628 received in evidence)

MS. JOHNSON: Ms. Gavin, can you please pull up what is in evidence as Government Exhibit 2A-617.

BY MS. JOHNSON:

Q. Ms. Ventura, what do you know the individual depicted in Government Exhibit 2A-617 as?

A. Ash.

Q. How did you hire Ash?

P5EsCOM1                          Ventura - Direct

A.   Ash was hired through Garren at Cowboys4Angels.

Q.   And in what cities did you and Sean use Ash?

A.   We saw him in LA, maybe Vegas, and Ibiza.

          MS. JOHNSON:  Ms. Gavin, you can take this down.

          Can you please pull up Government Exhibit 2A-602
that's in evidence.

Q.   Ms. Ventura, how do you know the individual depicted in
Government Exhibit 2A-602?

A.   He was an escort that we hired through Garren, I believe.

Q.   Do you know his name?

A.   No.

Q.   And in what cities did you see this escort?

A.   New York.

          MS. JOHNSON:  Take that down, Ms. Gavin.

          Can you please pull up Government Exhibit 2A-619 in
evidence.

Q.   Ms. Ventura, what do you know the individual depicted in
2A-619 as?

A.   Islander.

Q.   And how do you know Islander?

A.   He was hired for freak-offs, and I think he was on the site
Latin men.

Q.   And in what cities was Islander hired, city or cities was
Islander hired for freak-offs?

A.   Mostly LA.

P5EsCOM1                        Ventura - Direct

Q.   Were there any other cities, if you remember?

A.   Maybe Vegas.  I'm not sure.

MS. JOHNSON:  You can take that down now, Ms. Gavin.

Can you please pull up what's in evidence as Government Exhibit 2A-616.

Q.   Ms. Ventura, what do you know the individual depicted in this exhibit as?

A.   I know him as Tommy, and he was hired by Garren.  In Miami, I believe.

MS. JOHNSON:  You can take that down now.

Ms. Gavin, can you please pull up Government Exhibit 2A-634 in evidence.

Q.   Ms. Ventura, what do you know the individual depicted in Government Exhibit 2A-634 as?

A.   I can't remember his name, but I know that he came through Garren, as well.

Q.   In what cities was this escort used?

A.   Mainly, Los Angeles, I think.  Yeah.

Q.   When you say mainly Los Angeles, do you recall any other cities?

A.   Possibly we flew him out to another place.  I'm not 100 percent sure.

MS. JOHNSON:  You can take that down now.

Ms. Gavin, you can pull up Government Exhibit 2A-607 in evidence.

Q.   What do you know the individual depicted in this exhibit
as?

A.   I know him as Skyler.

Q.   And how do you know Skyler?

A.   Through at Cowboys4Angels.

Q.   In what cities did you use Skyler?

A.   La.

          MS. JOHNSON:  Can you take that down now?

          Can you please pull up Government Exhibit 2A-618.

Q.   What do you know the individual depicted in Government
Exhibit 2A-618 as?

A.   Jake.

Q.   How do you know Jake?

A.   From Garren at Cowboys4Angels.

Q.   In what cities did you see Jake?

A.   Los Angeles.

          MS. JOHNSON:  You can take that down now.

          Ms. Gavin, can you please pull up Government Exhibit
2A-601.

Q.   Ms. Ventura, what do you know the individual depicted in
Government Exhibit 2A-601 as?

A.   I don't know his name.

Q.   Do you recognize him despite not knowing his name?

A.   Yes, vaguely.

Q.   What do you recognize him to be?

P5EsCOM1                         Ventura - Direct

A.   Somebody that Garren sent.

Q.   In what city did Garren send this individual?

A.   LA.

          MS. JOHNSON:  Can you take that down now Ms. Gavin.

          Can you pull up Government Exhibit 2A-620.

Q.   Ms. Ventura, who do you know the individual depicted in Government Exhibit 2A-620 as?

A.   I know him as Greg.

Q.   OK.  And how did you know Greg?

A.   He was hired as an escort in Miami for freak-offs.

          MS. JOHNSON:  You can take that down now.

Q.   Are you aware, with respect to Greg, do you recall how Greg was hired?

A.   I honestly don't remember.

Q.   Ms. Ventura --

          MS. JOHNSON:  I'm sorry.  Ms. Gavin, can you please pull up Government Exhibit 2A-624.

Q.   Ms. Ventura, who do you know the individual depicted in Government Exhibit 2A-624 to be?

A.   Jonathan.

Q.   How do you know Jonathan?

A.   We saw him, um, several times.

Q.   Who is we?

A.   Sean and I.

Q.   In what cities did you -- city or cities did you see

Jonathan?

A.   In Miami, mostly.  I don't know if he flew anywhere.

MS. JOHNSON:  Ms. Gavin, can you please take that down and pull up Government Exhibit 2A-632.

Q.   Ms. Ventura, what do you know the individual depicted in Government Exhibit 2A-632 as?

A.   I don't remember his name.

Q.   Do you recognize him?

A.   Yes.

Q.   How do you recognize him?

A.   He looks familiar from the freak-offs.

Q.   How, if you remember, was he hired for freak-offs?

A.   I don't remember, but it was in New York, I think.

MS. JOHNSON:  Ms. Gavin, can you please take that down and pull up Government Exhibit 2A-633.

Q.   Ms. Ventura, what do you know the individual depicted in Government Exhibit 2A-633 as?

A.   Brian.

Q.   And how did you know Brian?

A.   He was hired as an escort, I believe, through Craigslist or something.

Q.   In what city?

A.   In New York.

MS. JOHNSON:  You can take that down now.

Ms. Gavin, can you please pull up Government Exhibit

2A-628.

Q. Do you recognize -- how do you know the individual depicted in Government Exhibit 2A-628?

A. He was also hired as an escort, and his name is Vin. And it was through Garren. In Vegas and LA.

MS. JOHNSON: You can take that down now, Ms. Gavin.

Q. Ms. Ventura, in looking through those photos, you often said we hired him as an escort.

Who's the "we" in that situation?

A. Me and Sean.

Q. Who primarily reached out to the escorts?

A. I did.

Q. Why did you primarily reach out to the escorts?

A. Um, just based on who Sean is, I didn't want to put him in that position. And that was just my job, really.

Q. When you say that was your job, what do you mean by that?

A. It was expected of me.

Q. Who expected it of you?

A. Sean.

Q. Who, if anyone, told you to reach out to these escorts?

A. Sean did.

Q. And for all the individuals whose photos I've just shown you, in addition to the photos we saw yesterday, what event did you see all those individuals for?

A. For freak-offs.

P5EsCOM1                    Ventura - Direct

Q.  Was Sean involved in all of the freak-offs with those individuals?

A.  Yes.

Q.  Did you have sex or perform sex acts with all of the individuals that we saw during those freak-offs?

A.  Yes.

Q.  Were all those individuals paid?

A.  I'm not sure.

Q.  OK.  If they were paid --

MS. ESTEVAO:  Objection.

THE COURT:  Sustained.

Q.  Ms. Ventura, were at least some of those individuals paid?

A.  Yes.

Q.  For the individuals who were paid, whose money was used to pay them?

A.  Sean's money.

MS. JOHNSON:  Ms. Gavin, can we pull up for identification Government Exhibit B-622 for the court and parties only.

Can you please pull up the second page, too, Ms. Gavin.

(Counsel confer)

Q.  Ms. Ventura, do you recognize the document depicted in Government Exhibit B-622?

A.  Yes.  It's a text between me and Sean.

P5EsCOM1                    Ventura - Direct

Q.   And how do you recognize it?

A.   Our phone numbers and our names.

Q.   Is this a fair and accurate text between you and Sean?

A.   Yes.

          MS. JOHNSON:   The government offers Government Exhibit
B-622.

          MS. ESTEVAO:   No objection.

          THE COURT:   All right.   This exhibit will be admitted.

          (Government's Exhibit B-622 received in evidence)

BY MS. JOHNSON:

Q.   Directing your attention, Ms. Ventura, to the page on the
left, on the top page.   Who are the --

          MS. JOHNSON:   Can you publish to the jury.   Thank you,
Ms. Gavin.

Q.   Who are the participants in this communication?

A.   Me and Sean.

          MS. JOHNSON:   And turning to the communication on the
second page on the bottom.   Can you blow that up, please,
Ms. Gavin.

Q.   Who sent this text message?

A.   It's from Sean to me.

Q.   What's the date of this message?

A.   January 26, 2016.

Q.   Can you please read this message?

A.   You know we have to have a proper FO without no K.   I need

to get it out of my head.  I hate K.  So you let me know when. Please don't be mad and think that's all I wanna do.  It's just the ksa bathed us.  I don't know.  A successful FO is when we remember and we don't be friending to do it the right way.  I won't bring up again until you are in that mood.  And I'll fly Dave in.

Sorry.

Q.  What is your understanding of what K is in this message?

A.  It's ketamine, the drug.

Q.  Is ketamine a drug that was used at some freak-offs?

A.  Yes.

Q.  Who gave you ketamine at some freak-offs?

A.  Sean had it.

Q.  What was your understanding of what Sean was saying about K in this message?

A.  That it took time out of the freak-off.  Um, it was my preferred drug, because it was very dissociative and you can go into something called a K hole, where you're not present in the moment.  So I think that's what was happening here.

Q.  When you say took time out of the freak-off, what do you -- what do you mean by that?

A.  Just high and not doing any actions.

Q.  When you say not doing any actions, are you referring to sex acts?

A.  Sex acts, intercourse, yeah.

MS. JOHNSON:  And, Ms. Gavin, can you take this down and turn to page six of this document, please.

Q.  Ms. Ventura, directing your attention to these messages, who sent these messages?

A.  I did.

Q.  And can you read the top message?

A.  That is all we do and I'm just getting back on track.  I'm sure you can call Kim or something.

Q.  When you said this is all we do, what were you referring to?

A.  Freak-offs.

Q.  When you said I'm just getting back on track, what were you referring to?

A.  Just back in, like, recovery mode and feeling like I could get back to work, get back to what I really wanted to be doing.

MS. JOHNSON:  You can take that down now, Ms. Gavin.

Q.  When you say what you really wanted to be doing, did you want to be doing freak-offs?

A.  No.

Q.  During freak-offs, was there anything you tried to avoid doing physically with the escorts?

A.  Um, I was really against kissing.  I just felt, like, it was too intimate.  But, um, it still happened anyway.

Q.  Why did it still happen?

A.  Sean would request to see it, so then I would do it.

Q.  Did you tell Sean that you didn't want to kiss the escorts?

A.  I did, at a point, yeah.  Definitely didn't -- it made me like squeamish.  I don't know.

Q.  After you told Sean you didn't want to kiss the escorts, did Sean still request that you kiss the else?

A.  Yeah, on different occasions.

MS. JOHNSON:  Ms. Gavin, if you can please pull up again Government Exhibit B-222 in evidence, page two.

I'm sorry.  I gave you the wrong number.  Government Exhibit B-622 in evidence, page two.

If you can zoom in on this bubble.

BY MS. JOHNSON:

Q.  Ms. Ventura, directing your attention to that last sentence, and I'll fly Dave in.

A.  Yeah.

Q.  Who is Dave?

A.  Dave is one of the escorts that was used.

Q.  What was your understanding of what Sean was offering to fly Dave in for?

A.  He was offering to fly him in for a freak-off.

Q.  Where does Dave live, if you know?

A.  I believe he lives in New York.

Q.  And in what cities did you have freak-offs with Dave and Sean?

A.  New York City, Miami, Los Angeles, Vegas.  I'm not sure.

MS. JOHNSON:  You can take that down now, Ms. Gavin.

Q.  Ms. Ventura, directing your attention to your 29th birthday, how did you spend your 29th birthday?

A.  There was a surprise dinner thrown for me at a restaurant in LA.  And, yeah, my friends were there.

Q.  Who threw that dinner for you?

A.  Sean.

Q.  Was Sean present at the dinner?

A.  Yeah.

Q.  Were you expecting Sean to be present at the dinner?

A.  I wasn't.  I thought he wasn't coming.

Q.  Why did you think he wasn't coming?

A.  Because he told me that he wasn't going to be able to make it.

Q.  After dinner, what did you want to do to celebrate your birthday?

A.  I wanted to go to this club called Blind Dragon and do karaoke with my friends.

Q.  What happened after dinner?

A.  After dinner, um, we were starting to -- like, all of my friends and I were starting to head towards that way.  Um, but Sean already let me know that he had wanted to have a freak-off.  And I was, like, OK, not right now.  Like, I really wanted to celebrate my birthday.

We ended up getting to Blind Dragon, but he kept

pulling me away from my friends.  And I eventually just left.

Q.  What, if anything, did you tell Sean about what you wanted to do on the night of your 29th birthday?

A.  I told him that I wanted to stay out and celebrate with my friends.  And, in my mind, I didn't want the burden of having to do that at the end of the night.  I ... I just wanted to have my birthday.

Q.  Did you want to have a freak-off that night?

A.  No.

Q.  What ended up happening that night?

A.  We went to Blind Dragon for a bit, but he pulled me out so many times, I just, like I said, I gave up and, again, had a freak-off.

Q.  Who, if anyone, was with Sean when he was pulling you out of the Blind Dragon to have conversations?

A.  I don't know specifically what security, but there was security there.

Q.  Ms. Ventura, yesterday you mentioned blackmail materials.

What were you referring to when you said blackmail materials?

A.  Blackmail materials would be actual, like, sex videos, freak-off videos.  Even just other embarrassing videos.  Me drunk, like, anything that would make me look not great.

Q.  When, if ever, would Sean mention these types of videos to you?

A.   Usually when he was angry about something or just really wanted me to fear --

          MS. ESTEVAO:  Objection.

          THE COURT:  It's overruled.

Q.   Ms. Ventura, you can continue.

A.   Um, can you repeat the question?

Q.   Of course.

          When, if ever, would Sean mention the freak-off videos to you?

A.   He would mention them when he was upset about something. It was just a pretty common thing.  One time I dated someone else and, like, that was the, like, that is what it was all about.  I'm going to put out two embarrassing videos of you. He just wanted to hurt me.

Q.   We'll get back to that.

          You said this was common.  How frequently did Sean bring up the freak-off videos to you?

A.   I mean, once is too much, but several times.

Q.   When he brought up the videos, what, if anything, do you remember him saying about the videos?

A.   That he was going to release them and embarrass me and, yeah, put my career in jeopardy.

Q.   Were you afraid that the videos would be released?

A.   Absolutely, yeah.

Q.   What were your concerns?

A.   That he would be mad enough to put them out, and then I would have to answer to my mother, like ...

Q.   Besides your mother, what, if any, other concerns did you have about the freak-off videos being released publicly?

A.   I just feared for my career.  I feared for, um, my family.  Just embarrassing.  All of it.  It's horrible and disgusting.  Like, no one should do that to anyone.

Q.   What, if anything, did Sean say to you about the impact of releasing the freak-off videos?

A.   That it could ruin everything that I worked for.  Just make me look like a slut.  I would be shamed, like, and I wasn't supposed to be on those videos, so ...

Q.   What do you mean by, I wasn't supposed to be on those videos?

A.   I didn't want to be in them.

        MS. JOHNSON:  Ms. Gavin, can you please pull up what's in evidence as Government Exhibit B-253.

Q.   Ms. Ventura, directing your attention to the top, who are the participants in this chat?

A.   That's me and Sean.

Q.   Ms. Ventura, can you please turn to page two?

A.   Do you want me to read?

Q.   What's the date of this communication?

A.   July 22, 2013.

Q.   And what -- can you please read your top message in blue?

A.   Please delete any video out of your phone if you have.  Too many people have access to your stuff.

Q.   And when you said video in that message, what video are you referring to?

A.   Freak-off videos.

Q.   And how did Sean respond?

A.   I did yesterday and no iCloud.  On, all good.  Ambien kicking in.  Good night.

Q.   Were there occasions when you saw videos that you thought had been deleted?

A.   Yeah.

Q.   How frequently did that happen?

A.   It happened often enough.  More than a handful of times.

          MS. JOHNSON:  Your Honor, would it be possible to have a brief sidebar before we introduce the next series of exhibits?

          THE COURT:  Of course.

          MS. JOHNSON:  Thank you.

          (Continued on next page)

(At the sidebar)

THE COURT:  Ms. Johnson.

MS. JOHNSON:  Thank you, Judge.  I'm about to introduce the sealed exhibits.  I just want to make sure we're all lined up in the procedure for how we will do this.  I would ask that the TV that's shown in the gallery be turned off and we'll display them only for the well and the Court and the jury, and they're already admitted.  I also wanted to make sure there's nothing being played in the overflow rooms before I do this.

MR. AGNIFILO:  What exactly are you -- because our screens have protectors, but I wouldn't want anyone to see them.  So even for the parties and the Court, what will actually be shown?

MS. JOHNSON:  It's six still images, no sound, we won't have to do any of the headphones.

But before we did this, I just wanted to make sure that nothing was accidentally being transmitted to the other overflow room.  If we --

THE COURT:  I would propose we take a short recess to make sure that everything's in place.  And also I believe LiveNote is not functioning, so kill two birds with one stone.

(Continued on next page)

(In open court)

THE COURT:  Members of the jury, we're going to take a brief 10-minute recess and we'll be back while we arrange some things in the courtroom.

All rise for the jury.

(Continued on next page)

(Jury not present)

THE COURT:  We're going to take a 10-minute break.  Be back in 10 minutes.

THE WITNESS:  Thank you.

(Witness not present)

THE COURT:  Please be seated.  We're going to make sure we make the adjustments as to the overflow room and also the TV back there.  It may take a couple minutes.  I assume there's nothing else to address at this time?

MR. AGNIFILO:  We're trying to work out a possibility of maybe we can see it beforehand so that we don't have to play any part of it, even on the monitors for the parties.

THE COURT:  Sounds good.

MR. DONALDSON:  We're also working on the live feed.

(Recess)

THE COURT:  Have we resolved all of our issues?

MS. JOHNSON:  Your Honor, we have a solution and we're going to employ that solution after lunch because there's still some issues with the screens, but we'll be able to proceed with that section after lunch and we'll do something else now until lunch.

THE COURT:  Could we have Ms. Ventura back.

MS. JOHNSON:  Yes.

(Witness present)

(Continued on next page)

(Jury present)

THE COURT:  Ms. Ventura, you understand you're still under oath?

THE WITNESS:  Yes.

THE COURT:  Ms. Johnson, you may proceed.

MS. JOHNSON:  Before I get back to questioning Ms. Ventura, I'm going to offer a few additional exhibits into evidence that were on Government Exhibit B that Ms. Ventura -- the drive that Ms. Ventura reviewed.  So at this point, at this time, the government offers B-413, B-414, B-415, B-416, B-418, B-420 B-421, B-422, B-425, B-427, B-431, B-432, B-504, B-506, B-507, B-510, B-512, B-513, B-514, B-610, B-611, B-613, B-614, B-615, B-616, B-617, B-623, B-624 and all subdivisions thereof at this time.

MS. ESTEVAO:  No objection.

THE COURT:  Those exhibits will be admitted.

(Government's Exhibits B-413, B-414, B-415, B-416, B-418, B-420 B-421, B-422, B-425, B-427, B-431, B-432, B-504, B-506, B-507, B-510, B-512, B-513, B-514, B-610, B-611, B-613, B-614, B-615, B-616, B-617, B-623, B-624 received in evidence)

BY MS. JOHNSON:

Q.  Ms. Ventura, before we broke, we were discussing the freak-off videos.  Do you remember that testimony?

A.  Yes.

MS. JOHNSON:  Ms. Gavin, could you please pull up

what's in evidence as Government Exhibit 263.

Q.  Ms. Ventura, who are the participants in this chat?

A.  Me and Sean.

MS. JOHNSON:  Ms. Gavin, could you put up pages 2 and 3 side-by-side.

Q.  Ms. Ventura, directing your attention to the blue bubbles at the top of the screen, the second full one down that says, I need you to call me ASAP.  Do you see that bubble?

A.  Yes.

Q.  What is the date of that text message?

A.  March 9th, 2014.

Q.  Who sent that text message?

A.  I did, to Sean.

Q.  Directing your attention to the gray bubbles underneath that message, can you read those, please.

A.  I called.  Pick up.  When did he say he saw it.  How long ago.  Ask him what did the room look like et cetera.  Girl you need to act like you need to get this info.

Q.  Ms. Ventura, do you recall what this conversation with Sean was about?

A.  Yes.

Q.  What was it about?

A.  I was in Atlantic City hosting a party with new, like, management company.  While they're out, somebody that I was working with mentioned that they had seen sexually explicit

P5ECcom2                     Ventura - Direct

video of me and, immediately, my thoughts went to a freak-off video, so I reached out to Sean.

Q.   Who was the individual who had seen the sexually explicit video of you?

A.   The person who was talking about it, his name was Sugin.

Q.   And to be clear for the record, was this individual saying he had seen the video or just speaking of a video?

A.   He was speaking of a video.

Q.   Looking at the next page, page 3, at the gray bubbles in the bottom, who sends those messages?

A.   That's Sean.

Q.   And can you read the messages.

A.   You gotta tell him this is your life and this is serious. Ask him how did Whoo Kid bring it up.  Did he say, hey, look, I got this video with Cassie.  The natural question Sugin would have asked is how did he get the footage and what is he planning on doing with it.  You got to tell him this is your life and this is serious.

Q.   Who is Whoo Kid?

A.   He's a DJ.

Q.   How, if at all, is Whoo Kid involved in this incident?

A.   I think that he was the one that told Sugin about this video, or that's at least what I gathered from the beginning of the conversations.

            MS. JOHNSON:  Taking that down, can you move to

page 4, please.  Ms. Gavin, can you blow up the bubbles in the middle of the page starting with, are you talking to him yet.

Q.  Ms. Ventura, when Sean said are you talking to him yet, what's your understanding of who Sean was referencing?

A.  He was referencing Sugin.

Q.  And the bottom gray bubble, could you read that bubble.

A.  This is crazy.  Do not let him out of your site.  Wtf.

Q.  In that message, do you have an understanding of who Sean is referencing when he says do not let him out of your sight?

A.  Yes.  He's talking about Sugin.

MS. JOHNSON:  You can take that down now, Ms. Gavin.

Q.  After this conversation with Sean, what did you do, Ms. Ventura?

A.  After that conversation, we were headed back in a car from Atlantic City where the party was to New York the following day.  We were headed there to basically have a conversation with Sugin and Whoo Kid, and I was accompanied by security.

Q.  Who was in the car with you from Atlantic City to New York?

A.  It was me, Sugin, and Kerry Morgan.

Q.  Why was Sugin in the car with you and Kerry back to New York?

A.  We were coming from a party and he wasn't in a great condition, but we -- I was told not to let him out of my sight.  So he stayed with me.

Q.  Who told you not to let him out of your sight?

P5ECcom2                      Ventura - Direct

A.   Sean.

Q.   And you also referenced having a discussion with Sugin and Whoo Kid.  Did that discussion happen?

A.   There was a discussion that happened later that night.

Q.   Where did it happen?

A.   It was at restaurant somewhere in New York.  I don't remember exactly where.

Q.   What was the topic of discussion at that restaurant?

A.   The topic of discussion was where is this video, does this video exist, who saw it, what's in it, like every detail that they could come up with.

Q.   When you say they in that sentence, who is they?

A.   Sugin and -- yeah, party.

Q.   Was it Sugin and Whoo Kid?

A.   Yeah.  I really didn't speak to Whoo Kid too much about it.

Q.   And you mentioned security.  What was security's role in this discussion that you had with Sugin?

A.   I felt like security's role was just to intimidate them in getting the truth and getting real information.

Q.   Where was security during this discussion?

A.   We were sitting in the middle of the restaurant floor.  I think it was like a lower level and then the security was lined around the outside of the room.

Q.   Did you invite security to join you at this dinner?

A.   Yeah, I was told to bring as much security as I could.

Q.   Who told you to bring as much security as you could?

A.   Sean.  But it was set up by whoever was in New York, which I don't know.

Q.   Who do you recall from security being present at this dinner?

A.   I recall Uncle Paulie.

Q.   Who did Uncle Paulie work for?

A.   Sean.

Q.   And how did others react at the dinner to the presence of security?

A.   I think everyone was just scared and really confused.  I don't know if everybody knew why we were there.  Yeah, I'm not really sure.

Q.   And besides security, who else, if anyone, who worked for Sean was present at the dinner?

A.   James Cruz, who worked for Sean.

Q.   And can you remind the jury of James Cruz's role.

A.   James acted as my manager for some years and worked with Sean.

Q.   Turning to a different topic now.  After a freak-off, how did you and Sean typically recover?

A.   If we were going to stay together, like, that night or after, we'd usually go back to his place, whichever city, and get IV fluids, massages, we eat, the chef would cook us some food.  Just trying to take care of ourselves.

Q.   What, if any, drugs did you take after freak-offs?

A.   I personally -- I had an ongoing, off-and-on addiction with opiates.  So I would take the opiates to come down from the ecstasy and MDMA from, like, turned up party.

Q.   How did the opiates make you feel?

A.   Opiates make me feel numb, which is why I rely on them so heavily.  Yeah, that's the best way to describe it.

Q.   Why did you want to feel numb?

A.   I didn't want to feel what was actually going on in my mind, in my real life, in real time.  It was just an escape for me.

Q.   How often did you take opiates after freak-offs?

A.   Pretty often.  Not every time.  There were times when I wasn't on them, but when I was, I was.

Q.   And how did you get the opiates that you took after freak-offs?

A.   From a drug dealer or friends, like, however at the time.

Q.   Were there any occasions when Sean gave you opiates?

A.   Yes.  More so in the beginning of our relationship.

Q.   And approximately what years -- when you say the beginning of your relationship, Sean gave you opiates sometimes, what years, approximately, would those be?

A.   It would be like 2007, 2008, from there.

Q.   As a result of freak-offs, what, if any, medical issues did you experience?

A.   I had a lot of stomach issues and like gastrointestinal issues from taking drugs.  I also would get frequent UTIs, which are, if you've had one, you know how painful that is.

Q.   Just stopping you there, Ms. Ventura, what does UTI stand for?

A.   Urinary tract infection.

Q.   Focusing on that infection, how frequently did you get UTIs?

A.   When we were having frequent freak-offs, it was -- sometimes they were back-to-back.  Sometimes I couldn't get rid of it and I was actually doing the freak-off with an infection.

Q.   When you say sometimes they were back-to-back, what's the they in that sentence?

A.   The they is the UTI infection.

Q.   You described your UTIs as painful.  How painful were they?

A.   Very painful.  It varied.  I would try to flush out, just drink tons of water, cranberry juice, cranberry pills.  I got to the point where Cipro didn't even work anymore, which is a -- it was an antibacterial medicine.  Yeah, just was a mess, like, really painful for a long time.  I actually can't believe that I actually dealt with that.

Q.   Did you talk to Sean about your UTIs?

A.   Yeah, he knew that I would get them.

Q.   You mentioned you had freak-offs with UTIs; is that correct?

A.   Sometimes, yeah.

Q.   How did it feel to have sex while you had a UTI?

A.   I mean, horrible.  It's the most uncomfortable burning.  I would not advise it.

          MS. JOHNSON:  Ms. Gavin, can we please bring up Government Exhibit 340 in evidence.

Q.   Ms. Ventura, who are the participants in this conversation?

A.   This is me and Sean.

          MS. JOHNSON:  Can you please turn to page 2 and 3, Ms. Gavin.

Q.   Ms. Ventura, we're going to read this message out loud.  If you could read the blue messages and I'll read the gray messages.

A.   Okay.

Q.   You can start.

A.   I feel okay.  Just a little achy and tired.  How are you feeling.

Q.   I feel good.  Miss you though.  Shake it off and smile all day.  I had a great time with you this weekend.  Thank you.

A.   Me, too.  I love you.  I miss you.

Q.   What's your day like?  What's the plan, Stan?

A.   Studio, cutting vocals, workout after, get my shit together.

Q.   Let's go.

A.   Have a great day.  I love you.

Q.  Please email me my pics.  What you doing?  Hello.

Before we move on to the next page, what's your understanding of what Sean was referencing when he says, please email me my pics?

A.  I actually don't know.

MS. JOHNSON:  We can go on to pages 4 and 5, please.

Q.  Ms. Ventura, starting at the top in blue.

A.  Hello.  I sent them yesterday.

Q.  Not all of them.  What you doin?

A.  Okay.  Vocals.

Q.  How are vocals going?

A.  They're good.  I have all these sores on my tongue, so it's kind of uncomfortable, and I think I have another UTI.  How's your day?

Q.  Pausing there.  In these messages, you reference having sores on your tongue.  What were you talking about there?

A.  Occasionally I would get sores on my tongue from the freak-offs, the taking drugs, substances, and just friction in my mouth.  So pretty sure that's what I'm talking about.

Q.  What was the friction in your mouth from?

A.  From oral sex.  Also from having my mouth on things where there was oil and Astroglide and lubricants.

Q.  How did the mouth sores you would get feel?

A.  Just stinging and uncomfortable.

Q.  And below that you tell Sean, I think I have another UTI

and have a sad face after that, right?

A.   Yeah.

Q.   How often did you tell Sean about your UTIs?

A.   I was pretty open with him about it, and they were regular, so --

Q.   I'll continue reading on page 5 with the gray bubble from Sean.

        I'm good.  Shit.  Need you to go to doc.

A.   Yeah, we did a lot.

Q.   What you mean?

A.   A lot of dicks, a lot of partying.

Q.   So pausing you there, what are you referencing when you say a lot of dicks, a lot of partying?

A.   The freak-off.

Q.   And relative to a photograph, when is this communication with Sean?

A.   The next day it was, yeah.

Q.   So after a freak-off?

A.   After a freak-off, yeah.

Q.   I'll continue on reading with the Sean bubble.

        So you feel sick?  I'm sorry.

A.   Why you sorry?

Q.   Why did you ask Sean why he was sorry?

A.   I really took the blame for things.  I don't know.  I guess I just didn't understand why he was saying sorry about

something that had happened many times.

MS. JOHNSON:  You can take that down, Ms. Gavin.

Can you please pull up what's in evidence as Government Exhibit 341.

Q.  Ms. Ventura, who are the participants in this communication?

A.  Me and Sean.

Q.  Turning to the next page, what's the date of this communication?

A.  July 18th, 2012.

Q.  And relative to the last exhibit we looked at, do you recall how soon after the last exhibit this was sent?

A.  No.  I missed it.

Q.  We'll come back to that.

A.  Okay.

Q.  Can you read the first sentence of your message here.

A.  I didn't mean that the weekend was hell, but it was on my body.

Q.  And what are you referring to when you say I didn't mean the weekend was hell, but it was on my body?

A.  Talking about the freak-off and staying up and partying.

Q.  Physically, how did you feel after freak-offs?

A.  I just felt so tired and achy and really dehydrated because you're up for so long, not really eating too much.  I used to try to drink as much waters as I could, but staying up that

P5ECcom2                        Ventura - Direct

long and taking that many drugs for that long is kind of -- it is what it is.

Q. How did you feel emotionally after freak-offs?

A. Ooh, emotionally, after freak-offs were just like empty, especially if we didn't continue our schedules, Sean and I together. If I didn't stay with him or whatever, it just felt like, okay, I did my job and now I'm going about the rest of my life. Yeah, they're really empty. I definitely felt just gross, same feelings over and over.

MS. JOHNSON: You can take this exhibit down, Ms. Gavin.

Q. Ms. Ventura, other than freak-offs, did Sean ever ask you to participate in sexual activity involving other people?

A. Sex clubs, but it wasn't -- I wasn't really asked for participation, I wouldn't say.

Q. What is a sex club, first of all?

A. A sex club is a club where they have special rooms where you can have sex with people.

Q. When, if ever, have you visited a sex club?

A. I visited a few with Sean over the years. New York, I don't know what it was called. Las Vegas has a club called The Green Door. There were some in Los Angeles that we would drive to.

Q. Whose idea was it to visit sex clubs?

A. It was Sean's.

Q.   Did you want to go to sex clubs?

A.   I didn't.  I was always terrified and would drink quite a bit.

Q.   Why were you terrified?

A.   It wasn't an experience that I was into.  It just wasn't my thing.

Q.   Yesterday, do you recall telling the jury about Sean discussing the swingers lifestyle with you?

A.   Yeah.

Q.   What did Sean tell you that swinging was?

A.   I mean, based off of what I kind of knew already and what he told me, it was you could swap partners and everybody's okay with it.  It's a certain type of lifestyle and that was a turn-on for him.

Q.   How, if at all, did your understanding of the swingers lifestyle relate to freak-offs?

A.   I related them pretty closely just because of the sexual nature and me actually having intercourse with somebody else besides him.

Q.   Did you want to do freak-offs?

A.   No.

Q.   When you went to sex clubs with Sean, who else, if anyone, went with you?

A.   Sometimes an escort would go with us.  One time we went with an escort and their spouse, their girlfriend.

Q.   Whose idea was it to have an escort come with you?

A.   It was Sean's and the escort, I guess.

Q.   Which escort came to sex clubs with you and Sean?

A.   Jules.

Q.   Is that the same Jules from the Intercontinental Hotel incident?

A.   Yeah.

Q.   You mentioned you would drink before going to sex clubs; is that right?

A.   Yeah.

Q.   What else, if anything, would you ingest before going to sex clubs?

A.   I mean, alcohol, if that's what was there, MDMA, ecstasy, GHP was a big one.

Q.   Who provided you with the MDMA, ecstasy, or GHP?

A.   Sean.

Q.   At sex clubs, who, if anyone, did you have sex with?

A.   I had sex with Sean and Jules at a point.

Q.   Did you want to have sex with Jules?

A.   No, not at the sex club, no.  No.

Q.   Did you want to have sex with Jules ever?

A.   No.  No.  Jules was like, within all of it, was like a safe place.  I saw him a lot.  We actually had our own friendship. So being able to have sex with Jules instead of somebody at the club was much better than having to have sex with somebody else

that I didn't know at the club, if that makes sense.

Q.   Why did you have sex with Jules at the club?

A.   Because I was -- just, that's what was happening.  Sean would request it or we would just do it.  It's what we did.

Q.   Did you want to be having sex with Jules at the sex club?

A.   No.

Q.   And what was your reaction to visiting these sex clubs?

A.   It was just confusing.  By that point, I was pretty messed up.  I remember there being a time where I got just way too drunk to do anything and we had to leave.  It's just uncomfortable when it's not something you're into.  I'm not into seeing the person I'm in love with be with somebody else. That's not my thing.

Q.   What, if anything, did you tell Sean about whether you wanted to go to sex clubs?

A.   I was vocal about it.  I told him it made me uncomfortable. He knew.  He knew how I behaved --

         MS. ESTEVAO:  Objection.

         THE COURT:  That's sustained.

         Ms. Johnson, you can move on to another question.

Q.   Ms. Ventura, how long were you with Sean in total, how many years?

A.   Almost 11 years.

Q.   And during those 11 years, did you become familiar with Sean's moods and actions?

A.   Yes.

Q.   Did he become familiar with yours?

A.   Yes.

Q.   And when you would tell Sean that you didn't want to go to sex clubs, how would he respond?

A.   I feel like -- I feel like some of the time he would just try to turn the energy around and just keep it positive --

          MS. ESTEVAO:  Objection.

          THE COURT:  That's overruled.

Q.   What do you mean by turn the energy around?  Can you give me an example.

A.   I mean just be playful and fun instead of scary.  Like, it wasn't always, like, a scary thing with him.

          Can you repeat it.

Q.   Sure.  When you would tell Sean that you didn't want to go to sex clubs, how would he respond?

A.   Yeah, it varied on the situation.  But he'd really just like push, keep pushing or just try to convince that would be a fun thing to do, or we wouldn't go for long, or --

Q.   Did you end up going?

A.   Yeah.

Q.   Why did you drink so much when you went to sex clubs?

A.   Because I didn't know how to be there sober.

Q.   So moving on to a different topic.  We talked about the Intercontinental yesterday and this morning.  Aside from that

incident, when, if ever, did you leave a freak-off before it was finished?

A.   There were other times where I tried to leave, but I would always end up back at the room.

Q.   Why would you try to leave?

A.   If we were having just a bad time, if I was scared of him, if I felt like uncomfortable, unsafe, would just leave and go -- sometimes end up in the kitchen at the hotel, like, hiding.  It depended on what it was.

Q.   When you left the hotel room, where did you go?

A.   Typically out the back of the hotel, like, I would try to find my way out the back and into, like, alley spaces.  I remember doing that at the L'Ermitage a lot.

Q.   Is the L'Ermitage in Los Angeles?

A.   Uh-huh.

Q.   You said you would always end up back in the room; is that right?

A.   For the most part, yeah.

Q.   Were there occasions where you didn't end up back in the room?

A.   Not that I recall, except for the Intercontinental time.

Q.   How did you end up back in the room?

A.   Sean would find me.  He would come looking for me and find me, call me.  Yeah, I would be found.

Q.   And after Sean found you, where would you go?

A.   Back to the room.

Q.   Would the freak-off continue back at the room?

A.   Usually, yeah.

Q.   Were there times that you were injured at a freak-off?

A.   Yes.

Q.   How were you injured?

A.   Put his hands on me or -- yeah.

Q.   Who put his hands on you?

A.   Sean.

Q.   When you say put his hands on you, can you describe what actions he took?

A.   He would grab me up, push me down, hit me in the side of the head, kick me, like, you name it.

Q.   Who else, if anyone, was present when Sean put his hands on you at freak-offs?

A.   Sometimes it was just us and then other times there was an escort close by.

Q.   Were there occasions when the escort was in the same room with you and Sean?

A.   Yeah, we were in the same hotel room.

Q.   Same hotel room or same room within the suite?

A.   Hotel room.  I don't remember specifically somebody watching me get beat up.

Q.   So just so clarify, do you recall if an escort was present in the same room while Sean was putting his hands on you at a

freak-off?

A.   Yes.

Q.   Who do you recall being present for that?

A.   Jules.

Q.   And were there other times where the escort was present in the hotel room, but not in the room inside the suite where Sean was putting his hands on you?

A.   Yes.

Q.   If you know, were escorts aware of what was happening between you and Sean on those occasions?

          MS. ESTEVAO:  Objection.

          THE COURT:  It's overruled.

Q.   Do you want me to ask it again, Ms. Ventura?

          On the occasions when you were inside of a hotel room and you and Sean were in one room and an escort was in a different room in a suite, if you know, were escorts aware of what was happening in the room where you and Sean were?

A.   Yes, because they could hear it and would ask me afterwards if I was okay.  So yeah.

Q.   Would you know that the escorts heard it because they asked you if you were okay?

A.   Yes.

Q.   How soon after freak-offs started was Sean physical with you during freak-offs?

A.   I mean, within that first year, we were definitely partying

quite a bit.

Q.  And in what cities do you recall Sean putting his hands on you during freak-offs?

A.  You said city?

Q.  Which cities.

A.  New York and Los Angeles for sure, Miami.

Q.  How frequently did Sean put his hands on you at freak-offs?

A.  Too frequently, a lot.

MS. JOHNSON:  I'm going to move to a different topic now.  Ms. Gavin, can you please pull up what's in evidence as Government Exhibit B-255.

Q.  Ms. Ventura, who are the participants in the communication at Government Exhibit B-255?

A.  Me and Sean.

MS. JOHNSON:  Ms. Gavin, can you please turn to page 2.

Q.  Ms. Ventura, directing your attention to the top message, what's the date of that message?

A.  It's August 5th, 2013.

Q.  Can you read the first message.

A.  We went across to the Abbey.  The gays live on a Sunday lol.

Q.  Who sent that message?

A.  Me to Sean.

Q.  When you say the Abbey, what's the Abbey?

P5ECcom2                          Ventura - Direct

A.   It's a club in Los Angeles.  On Sunday, it's a gay club.

Q.   When you say we, who is with you at the Abbey on August 5, 2013?

A.   I was there with Diontae and a group of friends.

          MS. JOHNSON:  We can take that down and, Ms. Gavin, can you pull up for identification, for the Court and the parties, Government Exhibit 2A-504.

Q.   Ms. Ventura, do you recognize who is depicted in Government Exhibit 2A-504?

A.   Yes.  That's Diontae Nash.

Q.   How do you recognize Diontae Nash?

A.   He's my friend of many years.

Q.   Is this a fair and accurate photo of Diontae Nash?

A.   Yup.

          MS. JOHNSON:  The government offers Government Exhibit 2A-504.

          MS. ESTEVAO:  No objection.

          THE COURT:  It will be admitted.

          (Government's Exhibit 2A-504 received in evidence)

          MS. JOHNSON:  Ms. Gavin, can you please publish this exhibit to the jury.

Q.   Ms. Ventura, is this the Diontae who was at the Abbey with you on August 5th, 2013?

A.   Yes.

Q.   After the Abbey, where did you go?

A.  After the Abbey, I went back home to my apartment on Doheny and I was supposed to be packing for a festival, a music festival.

MS. JOHNSON:  Ms. Gavin, you can take down this photo.

Q.  What music festival were you packing for?

A.  OVO Fest.

Q.  What's OVO Fest?

A.  It is a music festival in Canada that the artist, Drake, throws.

Q.  Who else, if anyone, was at your apartment while you were packing?

A.  Another friend, Mia, was with me and Diontae.

Q.  And what happened at your apartment while you were packing?

A.  When Sean came in, I was actually asleep, and it just was commotion, him yelling at us about me being passed out on the couch, about me being asleep and not packing.  Diontae and Mia had jumped on his back, on Sean's back because he was trying to attack me.  Eventually, we ended up in from the living room into the master bedroom and I think they were still jumping on his back.  When he threw me down, I cut my eyebrow on the corner of my bed.

Q.  A couple followup questions, Ms. Ventura.

When you say they were jumping on his back, who was jumping on whose back?

A.  My friends Mia and Diontae were jumping on Sean's back.

P5ECcom2                      Ventura - Direct

Q.   And you said you got thrown down onto the bed frame; is that right?

A.   Yup.

Q.   Who threw you onto the bed frame?

A.   Sean threw me onto the bed frame.

Q.   What, if any, injuries did you have?

A.   I had a pretty significant gash on the side of my eyebrow.

         MS. JOHNSON:   Ms. Gavin, can you please publish what's in evidence as Government Exhibit B-247-A.

Q.   Ms. Ventura, do you recognize what's depicted in this exhibit?

A.   Yup.

Q.   What is it?

A.   That's my eyebrow after I was thrown.

Q.   After you were thrown into the bed frame as you just described?

A.   Yes.

Q.   Who threw you?

A.   Sean.

Q.   What, if any, medical treatment did you receive for the injury depicted in Government Exhibit B-247-A?

A.   I didn't go to the ER or anything.  I ended up -- it was a Sunday, and so nothing was open.  Sean had security bring me to a plastic surgeon's office that opened up in Beverly Hills that Sunday to suture it.

P5ECcom2                        Ventura - Direct

Q.  When you say security, who from security brought you to the doctor's office?

A.  D Rock.

Q.  Who's choice was it for security to accompany you?

A.  Sean.

MS. JOHNSON:  You can take that down, Ms. Gavin, and can you please pull up what's in evidence as Government Exhibit B-247.  You can publish that.  If you can go to -- before you go to page 2, I'm sorry.

Q.  On page 1, who are the participants in this communication?

A.  Me and Sean.

MS. JOHNSON:  And can you please go to page 2, Ms. Gavin.

Q.  What date did you send this photograph, Ms. Ventura?

A.  August 5th, 2013.

Q.  And who did you send it to?

A.  To Sean.

Q.  And what does the text accompanying the photograph say?

A.  So you can remember.

Q.  Why did you write to Sean, so you can remember, with the image of your injury?

A.  I didn't want him to forget what he did.

Q.  Why didn't you want him to forget what he did?

A.  Because it's awful.  The very least, I just wanted him to be sorry about it.

P5ECcom2                         Ventura - Direct

Q.  Ms. Ventura, what is the timestamp of the message when you sent this photograph?

A.  It says 11:48 a.m.

Q.  And that's on August 5th, 2013?

A.  Yeah.

MS. JOHNSON:  Ms. Gavin, can we please return to Government Exhibit B-255, which is in evidence, and can you publish page 7 of that exhibit, please.  If you can zoom in on the bottom of the screen, please, starting with the third message from the bottom.

Q.  Ms. Ventura, directing your attention to that top message, what's the date and time of this message?

A.  August 5th, 2013, 11:51 a.m.

Q.  And is that approximately three minutes after the photograph you just sent to Sean?

A.  Yes.

Q.  Can you read the message in gray, please.

A.  You.  Don't know.  When to.  Stop.  You have pushed it too far.  And continue to push.  Sad.

Q.  Who sent that message to you?

A.  Sean.

Q.  And can you remind the jury what you were doing when Sean came into your apartment?

A.  I was sleeping.

Q.  And how do you respond to Sean?

P5ECcom2                            Ventura - Direct

A.  Just say sorry.  Have some sympathy.  I came in saying sorry and I didn't even know why I deserved that.  You could care less if I was okay.

Q.  So you mentioned that you were at home packing when Sean came over.  Did you go to the music festival you were packing for after this incident?

A.  Yeah.

     MS. JOHNSON:  Ms. Gavin, can you please take that down and pull up what's in evidence as Government Exhibit B-207.

Q.  Ms. Ventura, who is depicted in Government Exhibit B-207?

A.  That's me and French Montana, who is another artist.

Q.  Where are you in the photograph at B-207?

A.  We are in a greenroom in Canada, in Toronto, at the OVO Fest.

Q.  And was the cut on your eyebrow visible in this photograph?

A.  No.

Q.  Why is it not visible?

A.  Because I styled my hair over it.

Q.  Is that your hair on the right-hand side of your face when you're looking at the photograph?

A.  Yeah.

Q.  After OVO Fest, where did you go?

A.  We went to the Hamptons from there.

     MS. JOHNSON:  You can take that down, Ms. Gavin.

Q.  When you were in the Hamptons, what, if anything, happened

P5ECcom2                        Ventura - Direct

in the Hamptons?

A.   Sean wanted to have a freak-off.  So after we hung out with our friends for a little bit, we ended up booking a motel and drove there.

Q.   Which escort attended the freak-off in the Hamptons motel?

A.   It was Dave.

        MS. JOHNSON:  Ms. Gavin, can you please pull up Government Exhibit 2A-612 in evidence.

Q.   Ms. Ventura, is this the Dave you were just referencing?

A.   Yes.

        MS. JOHNSON:  You can take that down, Ms. Ventura.

Q.   What, if anything, happened at that motel in the Hamptons after you arrived?

A.   At that time we were taking GHB, and I spoke before about going into a k-hole, and on G, you can go into a g-hole, and I blacked out and that's what happened to me.  And I woke up nude in the shower, and Dave and Sean were just freaking out, like, outside of the bathroom.

Q.   What was your understanding of why Dave and Sean were freaking out when you woke up nude in the shower?

A.   Because I blacked out and I'm not sure, I didn't see myself, but it wasn't pretty.

Q.   And after you woke up in the shower, what happened next?

A.   I spoke to one of Sean's friends over the phone and then we had a freak-off.

Q.   With Dave?

A.   With Dave.

MS. JOHNSON:  Ms. Gavin, can you please pull up the communication at Government Exhibit B-247 in evidence.  Can you go to page 3, please.

Q.   Ms. Ventura, what is the date of the -- before I get to the date, what does the photograph depict in this exhibit?

A.   It's my eyebrow healed up a little bit.

Q.   And what's the date on this image?

A.   August 13th, 2013.

Q.   So is August 13th, 2013 a little over a week later from August 5th, the date you were injured?

A.   Yes.

Q.   And how soon after OVO Fest did you go to the Hamptons?

A.   Right after.

Q.   And how soon after your injury on August 5th did you go to OVO Fest?

A.   Right after.

Q.   What, if any, scars do you have from this injury?

A.   I have a permanent scar on my eyebrow now.  I cover it with makeup.

MS. JOHNSON:  You can take that down now, Ms. Gavin.

Ms. Gavin, can you pull up for identification only for the Court and the parties Government Exhibit 9D-102.

Q.   Ms. Ventura, do you recognize who's depicted in Government

Exhibit 9D-102?

A.  Yup, that's me and at the Con Film Festival.  I'm not sure what year.

Q.  How do you recognize yourself at the Con Film Festival?

A.  I do.  That's me there.

Q.  Is that a fair and accurate photograph of you at Con?

A.  Yes.

          MS. JOHNSON:  The government offers Government Exhibit 9D-102.

          MS. ESTEVAO:  No objection.

          THE COURT:  It will be admitted.

          (Government's Exhibit 9D-102 received in evidence)

Q.  Ms. Ventura, when you were at Con the year that this photograph was taken, where were you staying?

A.  I was staying on a boat with Sean.  It was one of his friend's yachts.

Q.  Was Sean also at Con with you?

A.  Yes.

Q.  Prior to the red carpet photograph depicted in Government Exhibit 9D-102, what, if anything, happened at Con with Sean?

A.  We got into an argument.  He actually was accusing me of taking drugs from him and kicked me off the boat with no shoes early one morning.  I walked over to his staff's hotel and I stayed in somebody's room over there.

Q.  When he kicked you off the boat with no shoes, what else,

P5ECcom2                      Ventura - Direct

if anything, of yours was still on the boat?

A.  All the stuff I flew there with, my passport, everything.

Q.  And relative to the red carpet depicted in 9D-102, when were you kicked off the boat?

A.  Earlier that morning.

Q.  And the red carpet that's depicted in Government Exhibit 9D-102, what was the occasion for that red carpet event?

A.  It was just a movie premiere.

Q.  Did you attend the movie after the red carpet?

A.  I did.

         MS. JOHNSON:  You can take that down, Ms. Gavin.

Q.  Who else was at the movie, if anyone?

A.  Sean and security.

Q.  Who do you recall from security being present?

A.  I don't remember.

Q.  But when you say security, was it Sean's security?

A.  It was Sean's security, yeah.

Q.  What, if anything, happened during the movie at Con?

A.  During the movie, we hadn't spoken.  Sean and I hadn't spoken at all since the incident where he kicked me off the boat.  So it was just getting evil glares.  While we were sitting together during the movie, he would grab my leg and like squeeze my thigh as tightly as he could, and I was wearing a beaded dress, so it was really painful, but nobody knew, just squeezing my leg.

P5ECcom2                    Ventura - Direct

Q.  After the movie, how soon did you return to the U.S.?

A.  Within the next 24 hours I would say.

Q.  How did you get back to the United States?

A.  We flew on a commercial flight on the same flight.

Q.  What city did you fly into?

A.  To New York.

Q.  Where did you sit on that commercial flight?

A.  I had a seat that I traded with someone else because I didn't want to sit next to Sean at that point, and then he switched seats with the person next to me at that point.  So we still ended up riding together.

Q.  What, if anything, did Sean show you on the flight back to New York from France?

A.  He pulled up videos that I thought I had deleted, some freak-off videos out of his computer, like I thought I really deleted them out.  He had them pulled up and was playing them for me on the flight back to New York.

Q.  On what device was he playing them for you?

A.  On his laptop, one of his devices.

Q.  Were there other people around you when he was playing the freak-off videos?

A.  Yeah.

Q.  What did he say about the videos while he was playing them for you on the plane?

A.  That he was going to embarrass me and release them.  Just

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

threats to release the videos.

Q. When Sean was playing freak-off videos for you on the plane, how did you feel?

A. Couldn't have felt worse. Also scared. I just had my -- sort of got my passport back. I just felt trapped, like, how do you get out of this situation when somebody's -- I don't know. Felt trapped.

Q. When you landed in New York, what did you do?

A. We landed in New York, ended up going to a dinner, and he wanted to have a freak-off, so we had a freak-off.

Q. How soon after dinner did you have a freak-off?

A. Right after.

Q. How soon after landing in New York was dinner?

A. Within a couple of hours, an hour or two.

Q. Why did you do the freak-off?

A. Honestly, at that point, whatever was going to make him not be angry at me and threatening me I was willing to do. Yeah, I just didn't want to feel scared anymore and one thing he made me feel like I was good at.

Q. What concerns did you have if Sean was threatening you?

A. That he could put these videos out and ruin everything for me, embarrass me. Just make me out to be somebody that I'm not in a very unfair way.

Q. Why did you think it was unfair?

A. Which part?

P5ECcom2                        Ventura - Direct

Q.   You just said it was a very unfair way.  Can you explain what you mean by that.

A.   I mean, the leverage of having an incriminating or a derogatory, humiliating video of somebody, telling them they're going to release it if you don't behave the way they want you to or whatever the case may be.  It was just always like that.  Like, that's -- that was a big part of our relationship.

Q.   And who told you that the videos would be released?

A.   Sean.

MS. JOHNSON:  Ms. Gavin, can you please pull up what is in evidence as Government Exhibit B-248.

Q.   Ms. Ventura, who are the participants in this chat?

A.   Me and Sean.

MS. JOHNSON:  Ms. Gavin, can you pull up pages 2 and 3 side-by-side.

Q.   Ms. Ventura, directing your attention to the top bubble on page 2, what's the date of that communication?

A.   June 15th, 2013.

Q.   So I'll read the gray bubbles and you read the blue bubbles.

I'm here.

A.   Comin.

Q.   Yo, I'm outside.

A.   Your sex makes me high.  No, like literally.  I feel like I just took a PK lol.

Q.  Pausing you there, when you say I feel like I just took a PK, what does PK refer to?

A.  A painkiller.

Q.  Is a painkiller the same as the opiates you were describing earlier?

A.  Yes.

Q.  When you say your sex makes me high, whose sex are you referring to?

A.  Sean's.

Q.  During your relationship, who did you want to have sex with?

A.  Wanted to have sex with Sean.

Q.  Continuing on.

        Dope.  I was thinking about a freak-off, but I need to be focused.  Hello.

A.  You do or I do?  Hello.

Q.  We both do.  I was just telling you my thoughts.

A.  Lol.  I've been thinking about one, too.  We were pretty focused last time.  Just has to be the right people or person.

Q.  So pausing there, when you say lol, I've been thinking about one, too, what are you talking about?

A.  I'm talking about the freak-off.

Q.  Why did you respond to Sean that way?

A.  This was just kind of like a normal way to respond if he was throwing the idea out there, that that's something he

wanted to do.  Didn't want him to think I didn't want to, so that's what I said.

Q.  Why didn't you want Sean thinking you didn't want to do freak-offs?

A.  Because then it would be a problem, just end up fighting.

Q.  And what, if anything, would happen when there was a fight?

A.  When there was a fight --

MS. ESTEVAO:  Objection.

THE COURT:  Grounds.

MS. ESTEVAO:  Speculation.

THE COURT:  It's overruled.

Q.  Ms. Ventura, you were saying that you responded like this because you were worried about a fight.  What, if anything, sometimes happened during fights?

A.  Fights were just never good for any couple.  If it was something he really wanted to do, like, it was going to happen. When someone's violent with you at any point, like, you know that that's --

MS. ESTEVAO:  Objection.

THE COURT:  That's sustained.

Ms. Johnson.

Q.  Ms. Ventura, prior to this communication on June 15th, 2013, had Sean been violent with you before?

A.  Yes.

Q.  How many times, approximately?

A.   Who knows.

Q.   And what concerns, if any, did you have about Sean being violent with you?

A.   It was always a concern if we weren't agreeing on something or if I didn't want to get high or if I didn't want to do exactly what was being presented as something to do.  It's the same thing every week.

Q.   And prior to this message on June 15th, 2013, had you told Sean in the past that you did not want to do freak-offs?

A.   Yes.

Q.   Once or more than once?

A.   More than once.

Q.   So let's continue reading.  I'll finish with the gray bubble on the bottom of page 3.

        The only way I could do is is if it was all right.  I got some more G.

        Pausing you there before we turn the page, what is G referring to there?

A.   The drug, GHP.

Q.   Is that a drug that was used at freak-offs?

A.   Sometimes.

Q.   Who provided GHP?

A.   Sean.

        MS. JOHNSON:  Can you turn the page, please, Ms. Gavin, to 4 and 5.

P5ECcom2                    Ventura - Direct

Q.  Can you pick up reading there.

A.  Exactly.  Good G.

Q.  That's what they told me.  Haha.

A.  Question mark.

Q.  Call HS.  Where is my pizza?

        Pausing there, what does HS refer to?

A.  House.  It's an abbreviation.

Q.  You can pick up at the blue bubble.

A.  Picking it up now.  What were you talking about before?
Who told you what?

Q.  Call HS.

A.  What was the MSG from before about?  Ash isn't answering.
Vin isn't here.

Q.  Pausing you there, who are Ash and Vin?

A.  They're both escorts that were working with Garren.

Q.  Did we see pictures of Ash this morning?

A.  Yes.

Q.  Picking up.  Did you call Garren?

A.  Yes, he told me.

Q.  Does he h*ve anyone?

A.  Probably just the guys that we said no to before.  Jules
hit you back.

Q.  Pausing you there, is this the same Jules we previously
discussed?

A.  Yes.

P5ECcom2                         Ventura - Direct

Q.   And Jules is an escort?

A.   Yes.

          MS. JOHNSON:   Turning the page.

Q.   From Sean, Jules can do 12:00.   We need someone from
9:00 p.m.

A.   Okay.

Q.   Yeah, he said 12:00.   See what he has for 9:00.

A.   Checking.

Q.   Do you need to go shopping?

A.   Yes, I'm going to go as soon as we're good.

Q.   Go.   Time is ticking.   I'm getting RM now.   Go.   Time is
ticking.   I'm getting RM now.

A.   Only one available.   He said good reviews.   Jake --

          Do you want me to keep going?

Q.   I'm sorry, Ms. Ventura.   In the message you just read, is
there a photograph accompanying that message?

A.   Yes.

Q.   And how would you have received that photograph that you
transmitted?

A.   From Garren.

Q.   You can continue.

A.   Jake the white guy is also, but Jake can't do until 11:00.

Q.   And who is Jake?

A.   It's another escort.

Q.   Were you shown a photograph of Jake earlier this morning?

A.   Yes.

MS. JOHNSON:  You can turn the page, Ms. Gavin.

Q.   You can continue at the top.

A.   The other guy can do earlier.

Q.   What you think?

A.   He said maybe he can get Jake for 10:00.  Up to you.  It's just one more person knowing our secret.  Jake can def do 10:00.

Q.   When you said it's just one more person knowing our secret, what did you mean by that?

A.   I'm referring to the freak-off and just the shame of the secret.

Q.   Why were you concerned if people knew about the freak-offs?

A.   It's not what I wanted people to know about.

Q.   Is that because you didn't want to do them?

A.   Yeah, it's because I didn't want to do them and I just didn't want to be part of that.

Q.   Picking up in gray.  Call HS.  Jules said he could do 9:00.  Want to just have him after Jake?

A.   Up to you.  If you want to start sooner, we should do that.

Q.   Call HS.  Let's do Jake 10:00.  MK sure he's on time.  Ima do Jules at 1:00 a.m.  SLS.

Before you start picking up reading, what does SLS refer to, if you know?

A.   It's a hotel in Hollywood.

Q. Is that a hotel where you and Sean had freak-offs?

A. Yes.

Q. You can continue reading, Ms. Ventura.

A. Okay.  I'm about to be home.  Want me to come get you?

MS. JOHNSON:  You can turn the page, Ms. Gavin.

Q. I'm horny.  OM playing trouble wit girls.  I'm about to leave.

A. To go where?  Hello?

Q. CM down.  I'm pulling up to you now.  You okay?

A. Yes.  On way hm.  You at the airport?  You get vallies? I'm so tense.

Q. When you say valleys, what are you referring to there?

A. I'm referring to Valium.

Q. What is Valium?

A. It's -- I think it's a benzo.  It's like a Xanax.

Q. When, if ever, would you take a Valium in relation to a freak-off?

A. If I had anxiety.  If I just felt like my heart was racing too much, I'm not a fan.

Q. Picking up with the gray bubble.  Yeah, driver bringing -- I c*lled you.  Pausing there, when Sean says driver bringing, what do you understand him to be referring to?

A. The Valium.

Q. And whose driver would bring you the Valium?

A. Sean's driver.

Q. Who was Sean's driver, if you know?

A. At this time, Faheem, I think, but I'm not -- the year I don't really know.

Q. Was Faheem one of Sean's drivers during the time that you were in a relationship with Sean?

A. Yes.

Q. That last blue bubble, can you read that blue bubble.

A. You are truly the most extraordinary man. I love you so much. You make me a better woman, daughter, sister, person. I hope you always know how much I love and appreciate you. Thank you for always showing me love and happiness the way it's supposed to be. Can't wait until we have a baby of our own to celebrate Father's Day. I love you with all my heart. Happy Father's Day again. Smiley face.

Q. Why did you send that message to Sean?

A. Because I loved him and it was Father's Day.

Q. What relation, if any, did the messages before about freak-offs have to this message about Father's Day?

A. They're completely separate.

        MS. JOHNSON: We can take that down.

        Ms. Gavin, can you please pull up Government Exhibit 512 that's in evidence. If you can turn to page 2, please. Could you blow up this bubble. Thank you.

Q. Ms. Ventura, what's the date of this communication?

A. January 7th, 2017.

Q.  If you can tell from this page, who sent this communication?

A.  I did.

Q.  Who did you send it to?

A.  To Sean.

Q.  What does it say?

A.  Nothing good comes out of FOs anymore.  You treat me like you're Ike Turner.

Q.  What does FOs refer to?

A.  Freak-offs.

Q.  When you told Sean that he treated you like Ike Turner, what were you referring to?

A.  Abusive, controlling.

Q.  What specifically did he do to be abusive and controlling?

A.  On this date or just in general?

Q.  In general.

A.  Just he was actually physically abusive.  That's been said. He put me down a lot as much as I was built up, I was put down quite a bit.  And that's also just like the sheer embarrassment, like how he treated me in front of other people.

        MS. JOHNSON:  Your Honor, it's 12:30.  I just wanted to check in on when the Court wanted to do a lunch break.

        THE COURT:  If you come to a good landing place, we can do the break.

        MS. JOHNSON:  This is a good landing place because I'm

P5ECcom2                          Ventura - Direct

changing topics next.

THE COURT:  Thank you.

Members of the jury, as a reminder, do not talk to each other about this case, and do not look up or talk to anybody about the case.  We'll be back at 1:15.

All rise for the Jury.

(Continued on next page)

(Jury not present)

Ms. Ventura, we'll be back at 1:15.

THE WITNESS:  Thank you.

(Witness not present)

THE COURT:  Please be seated.

Ms. Slavik, have we resolved the issue with the Rule 106 issues or do we need to pick that up now or do you prefer we pick it up at the end of the lunch break?

MS. SLAVIK:  Your Honor, I believe we've resolved many of them.  There continue to be three exhibits where there is disagreement.  I'm happy to provide those exhibit numbers for your Honor.  It's B-409, B-511, and B-619.

THE COURT:  Are the disagreements still the same, meaning that I have here highlighted the differences in terms of what I received yesterday, are they the same?

MS. SLAVIK:  That's exactly right.  I'm happy to run through at a high level what those differences are with respect to each exhibit.

THE COURT:  Let's start with the 409.

MS. SLAVIK:  B-409, the defense proposes adding over 10 additional pages regarding a conversation between the defendant and Ms. Ventura about masturbation.  The government submits that this additional conversation is neither explanatory nor relevant to the section that the government proposes admitting.

P5ECcom2                           Ventura - Direct

THE COURT:  Response.

MS. GERAGOS:  I think the reason that we added the additional pages is it started off on -- the government's exhibit started off on, man, I just looked at my iPad, I had to stop.  We wanted to put the full context of the conversation because Ms. Ventura begins this conversation by saying, I'm horny.  So if you were to look at the government's exhibit, you would think that Mr. Combs started this conversation by saying, I just looked at my iPad, I had to stop, out of nowhere.  In reality, if you go to our proposed exhibit from just earlier that day, it starts with Ms. Ventura saying to him, I'm horny. It is about masturbation, I suppose, but that's why he then looks at the iPad.  And so it provides context to the conversation.  Given that we just heard this morning about iPads and videos on his devices, the jury should know that, given the context of the conversation, she brought this up.

THE COURT:  As I understand what you're saying, the issue is that the government's proposed excerpts here start out midstream in the conversation.  And so to understand the context of why this is coming up in the first place, you would need to have some of the background; is that right?

MS. GERAGOS:  That's right, yes.

THE COURT:  So Ms. Slavik, the difficulty here is that I take it the government doesn't really want so much the first message, it's the following messages that the government --

MS. SLAVIK:  That's exactly right, your Honor.  The government's position is that first message regarding the iPad, that is what provides the context to the subsequent messages.  The government's position is that the additional 10 pages of this back and forth regarding masturbation is not required under Rule 106 because those additional statements don't correct a distorted meaning to the text messages that the government intends to admit.

THE COURT:  I agree with you that the 10 pages need not come in.  However, there's probably a compromise that can be reached.  I think what the defense is saying is that if you just started with that message, it might suggest that this came out of the blue and that the discussion of a sexual nature was one-sided, and then there's this followup discussion about deleting material.  There's an easy workaround I can already see by looking at the messages.  There's some excerpt that can be used to provide proper context so no one is misled into thinking this was a one-directional conversation from Mr. Combs' side.

MS. SLAVIK:  Your Honor, that's reasonable.  We'll confer with the defense and propose somewhere short of the 10 pages, something to address that issue.

Moving on to 511, again, the defense proposes about 10 additional pages of fighting about infidelity, including naming names of specific individuals.  I think critically in this

chain, the proposed additional pages come two hours after the portion that the government proposes to admit.  So that's an important distinction here.  Additionally, this fight that comes in the 10 additional pages is not necessary to understand the two messages that the government is seeking to admit.

THE COURT:  Here, there are two messages from Ms. Ventura, then there's a two-hour gap, followed by another message from Ms. Ventura, and then an ensuing conversation.  I take it the government is saying the ensuing conversation is related to that last communication from Ms. Ventura and has nothing to do with what Ms. Ventura said in the first two messages.

MS. SLAVIK:  That's right, your Honor.

THE COURT:  So it's not a proper completing statement under Rule 106.

MS. SLAVIK:  Correct.

THE COURT:  Ms. Geragos.

MS. GERAGOS:  Your Honor, I think when you read the full context of the conversation, you see the fight, even though it starts again two hours later, we are talking about the full context of the fight.  This happens all the time with these two individuals.  They will break for an hour, two hours, come back, and resume the fight.  And so the jury, to understand these two messages, would have to understand the full context of the fight, which is about infidelity.

THE COURT:  That may be true, but the statements that the government is seeking to introduce are not about the fight in general, they're about a very specific thing that Ms. Ventura has said.  I'm looking through the entire communication and I don't see that coming up again after the break before Ms. Ventura's text at 11:00 a.m.  Can you direct me to any message that picks up on that discussion, meaning in the first two messages, because if there is one, then I'll take a look at that.

MS. GERAGOS:  No, it doesn't pick up on the specific message.  I think they're just trying to contextualize it.

THE COURT:  So the application to include those remaining materials under Rule 106 is denied as to B-511.

MS. SLAVIK:  Finally, your Honor, B-619 is kind of similar.  The government seeks to admit one specific message that's in the middle of the chain that the defendant proposes. The message that the government seeks to admit is kind of isolated both in substance and time from the other surrounding messages.  So the government submits that the requirements for Rule 106 to apply are not applicable here.

MS. GERAGOS:  Your Honor, I don't understand how it would be -- it's fully part of this same fight.  Their second message -- first of all, going to page 706 of the document, it's not Bates stamped, but 706 of our proposed exhibit, she writes that -- he writes, I'm sorry for real, I'm really sorry.

I really didn't know you felt that way about me.  I feel you.  Sorry.  How could that not come in to understand the full context of the message?  I love you forever.  That's just 10 minutes after -- 9 minutes after her initial message.  And then she responds to it and says you have selective memory.  This entire chat should come in because it's all related to the fight that they're in the middle of.

MS. SLAVIK:  Your Honor, respectfully, the burden under Rule 106 is on the defendant to demonstrate that the portions of the statements that he wants to admit are necessary to clarify or explain the portion that the government wants to admit.  That's not applicable here.

THE COURT:  What's the basis for admissibility of the text that the government is putting in?

MS. SLAVIK:  It's a prior consistent statement, your Honor.

THE COURT:  Can you explain that a little bit more.

MS. SLAVIK:  Yes, your Honor.  Very similar to the messages that we spoke about yesterday relating to two screenshots of an email in which Ms. Ventura --

THE COURT:  Specific to the leaking of materials?

MS. SLAVIK:  Correct.  That's right, your Honor.

THE COURT:  Ms. Geragos, I think what the government is saying is that the statement actually only relates to the leaking of material and the potential response.  The followup

messages that say I'm sorry, for instance, are part of the conversation.  But in what way do they go towards giving proper context to what Ms. Ventura said in that one text communication?  That's the real question.

MS. GERAGOS:  The government is making the argument repeatedly, they've done it today all morning, that she felt like he was going to leak the videos.  And so then to not have the rest of the text communication come in, that he says I'm really sorry, I really didn't know you felt that way, how could we then not put this in to complete the context of the message?

THE COURT:  Well, he doesn't say, I didn't say that or I of course am not going to do that, things of that nature.  That would be proper under Rule 106.  But simply saying I'm sorry for having said that, that's what I'm not understanding, how that provides proper context.

MS. GERAGOS:  It relates to a -- this is in 2015 and it relates to a 2011 text message.  And so he's explaining he's really sorry.  For real, I'm sorry, sorry for having said that.  We would have to be able to put this in to complete it, otherwise it leaves the jury with a misimpression that she, again, four years later, still feels threatened and he's not addressing this point at all.

I'm not sure if this could even be hearsay, his statement.  He's saying he's sorry.  I think it's absolutely necessary.  I guess I'll withdraw from page 705 to prior, but I

really think it's necessary for the jury to understand, given the testimony that we've heard this morning, the rest of the conversation.

THE COURT:  You're withdrawing --

MS. GERAGOS:  I'll withdraw --

THE COURT:  Which part?

MS. GERAGOS:  705 before.  I hear your Honor, I'm trying to be reasonable, but I'm trying to come up with a reasonable compromise that doesn't leave the jury with a misimpression as to their conversation about a conversation four years earlier.

THE COURT:  That's fair.  I hear your point, that it may not be directly related to the statement, but the rule says it's the remainder of or related statements, and it includes the introduction of any other statement that, in fairness, ought to be considered at the same time.  And so your point is unlike the prior exhibit we just discussed, here there's a charge made by Ms. Ventura, and then there's the response to that charge that follows in the ensuing pages.  There's no timing issue, none of the other issues that were presented as to the other documents.  So even if that particular charge was not specifically addressed to provide fair context to that one communication, there should at least be some of the followup; is that fair?

MS. GERAGOS:  That's right.  Again, I'm trying to be

reasonable so we could then cut it at 708.

THE COURT:  I think that that's fair.

MS. SLAVIK:  Your Honor, can I just note that the rule does not require admission of self-serving exculpatory statements.  What it requires is correction of something that's misleading.  You don't see here -- he's saying I'm sorry.  He's not saying I didn't say that in 2011, I didn't do that.  These statements are not necessary to correct any sort of misimpression that's left by the text that the government seeks to admit.

THE COURT:  What about, I really didn't know y'all felt that way about me?

MS. SLAVIK:  I believe that's in reference to, my mom remembers that.  I believe that's in reference to Ms. Ventura's reference to her family feeling upset that he would make those threats.  Him knowing whether her family feels that way has nothing to do with whether he actually made that threat or not.

THE COURT:  I'm going to think about this over the lunch break, but for now, Ms. Geragos, just so I understand, really, it's just from 706 to I take it the first message on 708, or are you saying the message on --

MS. GERAGOS:  It's 706 to the first message on 708.

THE COURT:  Those are the only three?

MS. GERAGOS:  That's it.  But we are --

MS. SLAVIK:  Your Honor -- I'm sorry to interrupt.  If

your Honor is inclined to grant that request to the first message on 708, the government would request that your Honor continue through 708, the additional two messages on that page. The government's first request is just the text message that the government identified, but if your Honor is inclined to add additional context, the government would request at least through the end of 708.

MS. GERAGOS:  We are absolutely okay with that, your Honor.

THE COURT:  I'll take a look at that one.

Now, as to the witness instruction, Ms. Shapiro, you may not have had a chance to provide --

MS. SHAPIRO:  We're conferring about it.  We've gone back and forth once and we're trying to reach resolution on it, but we're not yet there.  So if it's okay, we'll bring it back to you after lunch.

THE COURT:  Perfect.

MS. COMEY:  Your Honor, may I note that counsel for the victim testifying under the pseudonym Mia came back today because he in particular wants to be heard.  I think he has concerns even about the limitations that your Honor was considering.  He's in the courtroom, if you wouldn't mind hearing from him.

THE COURT:  Of course.

MR. FERRARA:  Michael Ferrara, Hecker Fink for the

witness testifying under the pseudonym Mia.

Your Honor, two points that I wanted to make.  First, I think it's unfortunate to be using cases that talk about, in large part, cooperating witnesses or sort of confidential sources in the same -- when we're applying it to victim witnesses.  Your Honor knows, there's a jury instruction that your Honor -- I don't know if your Honor will give it in this case, but certainly others, where the jury is told to scrutinize a cooperator's testimony carefully.  That's in sharp contrast to the way we're supposed to treat victims.  It is in fact re-victimizing, at least my client, and I suspect the others, as well, to not allow them to talk about what's happening while they're going through it.  Mia would have taken these things to her grave, I suspect she'll testify to that.  These are the worst things that ever happened to her.

And this is my second point, the idea, which I heard your Honor saying earlier of, well, what if they can give emotional support, but not talk about the testimony.  And I just wanted your Honor to understand as you rule on this how intertwined those things are.  She will want emotional support about the very things.  I don't know how to support her if we can't discuss the pain that she's going to experience from having to tell the world her worst secrets, the worst things that happened to her.

So I just wanted to impress that upon the Court.  We

are not going to put words in her mouth. We will not tell her other things that happened in this courtroom, of course not, but I don't know how to respond if she wants to say something like it was gut-wrenching to say this, that, and the other thing, or am I doing okay, like, is this even coming out. Because, your Honor, candidly, her nerves are through the roof and I don't want to run afoul of your Honor's orders. So I just wanted, as your Honor thinks about these issues, I just wanted to make sure you're sort of understanding how complicated it is to un, you know, tie these ideas.

THE COURT: That's helpful. And I was just looking on the live feed of the transcript to get the quote of what you said, because I think that you -- the instruction perhaps saying substance of the testimony is too vague because you maybe have questions as to what you're permitted or not permitted to do. But what you said I think is consistent with what we're trying to prevent, which is witnesses being counseled as to how to testify or what to say or not say, and it might really be just those two things, and that otherwise the witnesses would be permitted to speak to counsel at least when we're talking about victim witnesses.

Would that be sufficient guidance? So everything you said about the things you would want to talk to your client about during cross-examination, I don't think anyone here would have an issue with that. I trust any officer of the court and

any counsel who comes here to follow the rules that are in place just like we've always done.  And so does that provide some further guidance?  Because I hear everything you're saying, and nothing that you're saying seems unreasonable.

MR. FERRARA:  I think it does.  I think it's more the concern that we don't want to run afoul of the letter of the instruction.  And I am sure Mia is going to want to say things like, how am I doing?  Are you understanding this?  Is it clear?  Am I being clear?  Things along those lines.  I want to be able to answer her honestly and counsel her honestly.

THE COURT:  Again, this is helpful.

MR. FERRARA:  If she were to say -- I mean, candidly, I worry that she might have a sort of almost, like, moment up there when she gets on the stand of, like, almost losing completely thinking, you know.  And if she has, for example, if she has completely, like, left something out and she says to me, was that okay?  Did it come through clearly?  I would like to be able to candidly say you're doing great, I'll mention you didn't -- I think you might have forgotten or -- and maybe that's running a foul, maybe that's too far, but that would be candid counsel -- I just -- I want -- I'm so -- I can't even myself, your Honor, I have spent countless hours with her now and I worry about her emotional state up there and how that's going to work.

So, again, it would not be a situation where we're

saying make sure to -- make sure to say it this way, make sure to -- but if she says, how am I doing, and I know she's had a moment where she completely didn't hear a question or something along those lines, it might be something where my candid counsel, I think you misheard what the prosecutor asked you or et cetera or something like that.

THE COURT:  Anything further?

MS. SHAPIRO:  Your Honor, I think we'll consider that. But I just do want to point out that last example strikes me, with all due respect, understanding the sensitivities here, as going too far in the direction of coaching, to tell the witness that she, quote-unquote, left something out.  I think that's exactly the purpose of this type of instruction is designed to prevent.  So we'll just say that.  But we'll consider what counsel has said and the instruction proposed.

THE COURT:  Thank you for coming forward.  Appreciate what you said and I will definitely take it into account.

MS. COMEY:  Your Honor, I've just been informed counsel for the victim testifying under the pseudonym Jane would also like to be heard and is here today, if that's alright with your Honor?

THE COURT:  Of course.

MS. LEWIS:  Good morning.  I'm counsel for Jane Doe.

THE COURT:  Could you please identify yourself.

MS. LEWIS:  Lindsay Lewis of Dratel & Lewis, counsel

for Jane Doe.

So I've reviewed the proposed instruction and I think it covers everything that I think is critical --

MS. COMEY:  Sorry, your Honor.  One moment.  I don't believe an instruction has been provided to your Honor.  I wanted to clarify that for the record.  The parties are conferring about a proposed instruction which has been shared with counsel and --

THE COURT:  Well, it's not a secret.  If I asked you for it, you would give it to me now.

MS. COMEY:  Yes, your Honor.  I wanted to clarify for counsel.

THE COURT:  Okay.

MS. LEWIS:  I'll reframe, your Honor.  I understand there are discussions between the parties as to what a resolution might look like, all of which are issues that have already been addressed this morning in the courtroom, including critical issues as to discussions of privilege, discussions of witnesses emotional state.  Particularly, I'm concerned about my own client's emotional state during her testimony.  She has had very serious emotional breakdown moments in preparation for this trial.  And so it is critical to me that I be able to have candid, honest, and open conversations with her throughout that process.

So in that regard, while I -- I am hopeful that based

on what I heard today, the nature of things that we will be able to discuss will encompass anything I'm concerned about, not just logistics and not just the emotional, but other issues such as privilege issues that might arise.

What I'm concerned about is anything that would prevent her or chill her from talking to me out of a fear that she might say something to me that would violate an understanding between the parties. And what I mean by that is if she's instructed, hey, you're allowed to talk to your counsel if you think that this -- something that you might say or that might come up might relate to a privileged issue. If she goes further than that and it runs afoul and she's afraid of that, I think it's important that her counsel, as an officer of the court, be entrusted to tell her that's not something that you can address with me, here's the scope of what we can talk about. And I think it has to be very clear and, again, not chill a victim from feeling fully open to speaking with their counsel, which they have a right to do and which, again, this idea that there's not a right to this kind of consultation is really -- there's no judicial rule or rule of, you know, it's an *ad hoc* thing and there's only a handful of cases even in this context that has been presented that's been granted. So I think it's very important that right of counsel be preserved.

THE COURT: So what I hear you saying, and this is

consistent with what Mr. Ferrara said, is that if it needs to be clarified, it can be, but an instruction to counsel not to engage in, for instance, witness coaching or telling a witness what to say or not to say or how to say it should be sufficient because we can trust officers of this court, as we always do, to follow those rules, and if there's a violation or a perceived violation, then you would not have an issue with the witness being subject to inquiry about discussions, non-privileged discussions that they may have had during a break in cross-examination, right?  That happens all the time. Is that fair?

MS. LEWIS:  I think that is fair.  I think counsel is fully competent in this case to be able to discern the difference between content and implications, and be able to parse out what's appropriate and not, and to advise a client where the line may be, you know, we may be coming up to a line where we should stop and reframe our conversation.

THE COURT:  Because what I hear you saying is that the chill comes from the Court's instruction to the witness that they are not to have discussions with their attorneys in ways that they may not fully understand and which may, from their point of view, inhibit them and cause them some of the harms that we've been talking about.  But the same instruction can be made to attorneys who will understand all of those things.  And I'm not hearing from you, just like I didn't hear from

Mr. Ferrara, any attempt to engage in any kind of witness coaching, passing on of messages from the government to your client, any of that kind of thing, right?

MS. LEWIS:  That's all completely correct.  Again, in particular with my client, and though I know with many people here, they never had significant interactions with the Court, and to make sure that they are comfortable to access their counsel, which is their right, is critical.

THE COURT:  Ms. Comey, do we have Mr. Wigdor here, as well?

MS. COMEY:  I believe we do, your Honor.

THE COURT:  Mr. Wigdor, I'll hear you out, but it's going to be a simple --

MR. WIGDOR:  I have nothing to add, your Honor.  I have no intention of speaking to my client about anything other than logistics, healthcare, or potentially attorney-client privilege inquiries that may be made on cross-examination.

THE COURT:  Ms. Comey, are there any other individuals who fall into this category?

MS. COMEY:  Not that I'm aware of, your Honor.

THE COURT:  Ms. Shapiro, my suggestion would be, we've now spoken to each of the attorneys who have indicated that they understand the instruction not to engage in any witness coaching, not to tell any of the witnesses what to say or what not to say, and not to talk to them about how they should or

should not testify, which I think covers the category we're talking about, and I expect those three attorneys to follow that instruction.  We'll add to that that they should not convey messages from the government bearing on the substance of their testimony.

MS. SHAPIRO:  That was the last -- I was just going to say, your Honor, I would ask you to direct them not to confer with the government about the substance of the testimony and only, if necessary, as to logistics.

MS. COMEY:  Your Honor, I can represent as an officer of the court that I have never done something like that and our team would never do anything like that.  You can be assured of that.

THE COURT:  Now we have four attorneys who have made the appropriate representation.  I think we've now covered the waterfront.  If there's a violation, we will address it. Similar to what happened in the *Avenatti* case, if there's any perception that there have been discussions or may have been discussions, the classic example is when someone comes back from a break and says they want to clarify something and it seems a little peculiar, there of course can be inquiry into those subjects with the witness, subject to any privilege issues of course.  But we've all taken depositions, we all know how to deal with this.  This happens from time to time.  We can do these things and make that inquiry and handle it that way.

So that's how we will handle it.

So that takes care of that issue.

Now, as to defense discovery, I had some --

MS. GERAGOS:  We're putting together our response, your Honor.

THE COURT:  Here's the issue.  There are certainly cases going in both directions.  I'd say the vast majority of cases have adopted what I take to be the government's view, that case in chief is not just a timing issue, it's the purpose for which you're conducting discovery.  And so to the extent that you are introducing affirmative evidence during a cross-examination that is not to refresh a witness's recollection and not for impeachment purposes and that counts as being within the case in chief.  However, the way the rule is structured is that the defendant's obligations only are triggered if they have requested discovery from the government, meaning that there's a trade that's made, and then the defendant has to be eyes wide open as to what the trade is.  No discussion, as I take it, was had in this case as to what that meant in terms of the defendant's discovery; is that fair?

MS. GERAGOS:  That's fair.

THE COURT:  So that discussion wasn't had in the context of Rule 16 and also wasn't had in the context of --

MS. COMEY:  I'm not sure I understand what discussion your Honor is talking about.

THE COURT:  I'm saying the government has already turned over its Rule 16 discovery.

MS. COMEY:  100 percent and our marked exhibits.

THE COURT:  So some of the cases that have taken what is the minority position have indicated even if the majority position is correct, the issue is timing of a different kind. If, in advance of the Rule 16 exchange of discovery, there was an acknowledgement or an understanding that the defense discovery that would be triggered would include affirmative evidence that was put in on cross-examination, then I think I would agree with the government that that would be fairly encompassed because that's part of the deal, that's what was discussed, that's what's understood.  But there's no binding authority as to this issue because it's all district court cases.  And I'll grant you that, as far as I can tell, it is in the Southern District, in the Eastern District and around the nation, it is the majority position, but it is still not the confirmed rule and it has some tension with the language of the rule.

So given that none of these discussions happened, why is it -- it seems to me, in fairness, to not really be a Rule 16 issue, meaning not an issue where, by operation of the rule, the defendant is in violation and has to immediately turn over the documents or is subject to preclusion or any of the other remedies, right?

P5ECcom2                          Ventura - Direct

MS. COMEY:  Your Honor, every single discovery letter we have sent to defense counsel in this case has started with in light of your request for discovery, and has ended with, in light of your request for discovery, we request reciprocal discovery, and that is a long string cite.  So I think this has been --

THE COURT:  Do those letters make clear that that would include any evidence that would be put in during cross-examination as opposed to just a general reference to the defendant's case in chief?

MS. COMEY:  I would need to check those letters, your Honor, but I believe the clear intention of those letters, which are standard for our office in every case, is to trigger precisely this reciprocal obligation.  And I think that the spirit of that was also carried through in the parties' negotiation of a period to turn over exhibits in advance of trial.  It is meaningless to receive four exhibits in advance of trial.  It is only meaningful that that deadline that the parties agreed on is only meaningful if it includes all of the exhibits that would be used affirmatively to prove a defense, including on cross-examination.

THE COURT:  I agree with that.  That's why I would have hoped this was raised in advance of trial.

Ms. Geragos, you are standing.

MS. GERAGOS:  I have to respond to this point because

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5ECcom2                         Ventura - Direct

they've been using terms.  They asked for reciprocal Rule 16 discovery.  We have provided that to the government on the date that it was ordered, things that they did not have, that they did not provide to us, that they theoretically could have gotten, but they didn't.  We provided that on the date that we were ordered to do so.  Everything that we have marked otherwise has been stuff that the government gave us in discovery productions in November and December of this year. To now have to be ordered to give those over prior to our cross-examination, it shows our strategy.  It's nothing that they haven't seen before because they have it, but for us to have to --

THE COURT:  This is not a Rule 16 issue.

MS. GERAGOS:  It's a strategy issue.

THE COURT:  You would agree that, as a matter of normal case management, many judges, not even talking about Rule 16, have requirements on turning over documents that are going to be used, like exhibits that are going to be used of some nature, right?

MS. GERAGOS:  We have been ordered in every trial, in every federal trial we've ever done, we have an exhibit deadline, of course, yes.  When it comes to cross-examination, to have to give those over prior to the direct finishing, that's something we have fought consistently in every case since I've been admitted to this district and Eastern District,

because it's also just not practical because we just don't know what's going -- we don't know what we are going to use affirmatively because we don't know how the direct is going to go.  This direct in particular has gone much differently than I expected.  So we are kind of changing our strategy.  So to now give over things before it completes, before lunch hours and times when they can go over this with the witness, it defeats the purpose of cross-examination.

But yes, I understand, as a matter of judicial economy, the Court would like to have these.

THE COURT:  It's not a like.  You acknowledge that it is done, like it is --

MS. GERAGOS:  We've complied with what we knew we would use.  We just don't know what we are using in every cross.

THE COURT:  No, I understand that.  We may be arguing about a very small category of documents is my suspicion.  But regardless of that, is there some issue, as you're getting into cross-examination with the witness, let's say that you had evidence that you may use the following day, would there be any issue in turning that over to the government by 6:00 p.m. the day before so they could see what you're planning to use?

MS. GERAGOS:  Of course we will do that.

THE COURT:  That's just a practical matter.

MS. GERAGOS:  If we have it marked and know we're

going to use it by 6:00 p.m., I mean, we get things late.

THE COURT:  No, you'll just have to do it by 6:00 p.m. if you're planning on introducing something the next day.  The reason for that, putting aside Rule 16, the reason for that is that if it's not going to be used to refresh a witness's recollection or for impeachment purposes, something of that kind, then we need some notice so if there is an evidentiary objection, it does not need to be addressed when the jury is in, the take a sidebar to comb through evidence and redact certain things and do all the things that the parties have been doing with respect to the remainder of the evidence.

The issue, it's not a strategy issue at that point, it's just an issue of let's have a seamless presentation of the evidence, and it's not giving the government that much time to do anything with these documents.  They're going to be trying to go through whatever exhibits you happen to give them to determine whether there's any evidentiary issue that they need to resolve.

MS. GERAGOS:  I think for this week, your Honor, 6:00 p.m. would be very difficult given we go until 5:00 and have not made it back to our office until 6:00 p.m., and then there's discussion of what we would try to introduce the next day.  Or the remainder of the trial, we could absolutely make 6:00 p.m. happen so long as the government -- if the direct is done.

THE COURT:  Okay.  All right.  I'm going to think about this, as well.

Ms. Johnson, can you give us a ballpark estimate on how much we have left on direct?

MS. JOHNSON:  I suspect that I need at least sort of the next 90 minutes until the first break and perhaps a little bit after that, but I imagine being complete with the direct examination at some point after lunch, but before the end of the day.

(Continued on next page)

THE COURT:  All right.  Ms. Comey, I think you were going to get up.  I'm happy to hear any useful suggestion you have.

MS. COMEY:  Just, I anticipate this being an issue later in the trial, that there will be witnesses whose direct finishes and then there is no break and we go right into cross.

And so, if the defense is going to insist on not giving us those exhibits, exhibits they may seek to introduce for those witnesses, before their direct is done, I'm concerned we are going to have delays.

THE COURT:  Do you have an issue with the proposal, which is that if you're going to use it the next day, it has to be turned over.  If there is a chance, we should know that, at the end of every day.  We always talk about what is going to happen the next day.

MS. COMEY:  Yes, your Honor.  I didn't mean to interrupt.

THE COURT:  No, you're fine.

MS. COMEY:  I think that this is reasonable and I think the government has been making similar efforts on our end to preview for the defense what of our many marked exhibits we intend to introduce the next day.  I think that be fair.

THE COURT:  Again, you're not talking about impeachment, you're not talking about things might be used along those lines.

P5EsCOM3

MS. COMEY:  100 percent, your Honor.

THE COURT:  So the strategy concern is diminished.  If you're try to attack a witness' credibility, we are not talking about that.

MS. COMEY:  That's exactly right, your Honor.  In theory, the defense could wait to put in any of the exhibits until we rest.  If they decide strategically that they want to try to start proving up their defense during our cross-examinations, then they have to produce the exhibits in advance.  If they want to hold them back and only introduce them on their defense case, that is a strategic decision they could make.

THE COURT:  Understood.

Again, if this issue came up prior to the Rule 16 disclosures and everything, then we would have addressed this. I would be facing cases from around the nation that say that it's not just a timing issue, it actually applies during cross-examination.

But we are here.

MS. COMEY:  I understand, your Honor.  I want to apologize for not flagging the issue earlier.

THE COURT:  No.  Everything is happening all at once, all the time.  I understand.

Ms. Geragos, any last words, and then I'll think about this and I'll give some guidance when we come back.

MR. AGNIFILO:  The one thing I want to make clear, this is the fourth time we've had this exact same discussion and it's resolved itself a few different ways.

With the trial in front of Judge Garaufis, we gave everything that we had over as soon as the direct ended.  That was fine.  We had another trial in that case.  The prosecutors in that trial said, if you give it to us early, we will assure you, and there is no -- the court can't get involved in this.  We assure you, party to party, we won't prep the witness on it.

So what we did there is we gave it to them early because we trusted them.  So, there is different --

THE COURT:  Do you trust them here?

MR. AGNIFILO:  I do.  If they say they won't prep the witness, I believe them 100 percent.  But to their credit, they are not saying that because they are honest.

So, we can work this out.  I want to take this off the court's plate, and I will.  We will work this out.  Because I don't think -- it's a fascinating issue.  I think there is constitutional issues of burdens of proof that we can avoid.  Like, we're supposed to avoid tricky constitutional issues.

We will work this out, and I will be the one to make sure we work it out.

THE COURT:  All right.  Well, so, resolved.

But if it's not resolved, let's address this sooner than later.  I mean, today.  If you're going to come to an

P5EsCOM3

agreement on this, let's do it before the end of the day so that we can make sure that we are in a good place by close of business.

Otherwise, I think we have already discussed, as to Ms. Ventura, what is going to happen, which is, Mr. Agnifilo, before cross-examination, those, all the exhibits will be turned over.

MR. AGNIFILO:  Yes.

I have one quick question for the government.  Just for a second.

(Counsel confer)

I understand.  I had a logistical question, which I have now answered.

THE COURT:  All right.  We will come back at the time that I indicated, which was what?  I said 1:15.  It is 1:15.

How much time do you all need to get something to eat?

MR. AGNIFILO:  15 minutes, Judge.

(Counsel confer)

THE COURT:  It's all right.

MS. JOHNSON:  We also have to print the binders.

THE COURT:  All right.

MS. ESTEVAO:  The live feed is not operating.  We would request time for that.

THE COURT:  1:45?  Let's come back at 1:45.

(Luncheon recess)

P5EsCOM3

P5EsCOM3

AFTERNOON SESSION

1:45 p.m.

(Jury not present)

THE COURT:  Please be seated.

As to Exhibit 619, the version, the objection to the defendant's proposal under Rule 106 is overruled, subject to the discussion that we had in terms of which pages would come in.

So, just for the sake of the record, my understanding is that it is 706 through 708, is that correct, Ms. Geragos?

MS. GERAGOS:  Yes, it is, your Honor.

THE COURT:  So then we'll handle that exhibit in that fashion.

Other than that, is there anything else we need to address before we bring in the witness and the jury?

MS. JOHNSON:  Your Honor, I just wanted to flag how we will proceed with the sealed exhibits.  We have hard copy material for the defendant and for the court, and we are able to show it on the screens just for the jury and the witness, in order to keep that material within the well of the courtroom and not visible.

THE COURT:  That's fine.  These are not videos, these are the images?

MS. JOHNSON:  These are the images.

P5EsCOM3

THE COURT:  Are there videos that are going to be used in the witness?

MS. JOHNSON:  The government does not intend to use any videos with the witness.  I understand the defense may, and we have requested to confer after the trial day about how that might happen.

THE COURT:  That would require headphones.

MS. JOHNSON:  Headphones, and we will have to address how the video will be shown to counsel.

THE COURT:  Anything else from the government?

MS. JOHNSON:  No, your Honor.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  No, your Honor.

THE COURT:  Let's have Ms. Ventura back, and then we'll bring in our jury.

Welcome back.

THE WITNESS:  Thank you.

(Continued on next page)

P5EsCOM3

(Jury present)

THE COURT:  All rise.

Please be seated.

Welcome back, members of the jury.  I know it was an extended lunch break, but I assure you, while you were hopefully relaxing, we were working hard to make things more efficient so we can save your time.

With that, Ms. Ventura, you understand you're still under oath?

THE WITNESS:  Yes.

THE COURT:  Ms. Johnson, you may proceed.

MS. JOHNSON:  Thank you, your Honor.

May I approach the bench with a binder for the court?

THE COURT:  You may.

MS. JOHNSON:  Just to confirm, before I proceed, my understanding is that the feed, the exhibit feed to the overflow room has been turned off and that the public, the monitor that faces the gallery, has also been turned off.

THE COURT:  All right.  That is confirmed.

If anyone views anything on any of those screens or if anyone is aware of that not being the case or any material going to the overflow room, they should alert me immediately.

THE DEPUTY CLERK:  Your Honor, that is largely correct.  They cannot see the evidence in any capacity.  They will just see the camera feeds.  Nothing else.

THE COURT:  That's the overhead view?

THE DEPUTY CLERK:  That is correct, and the witness stand.

THE COURT:  All right.  So, given that we're using binders, everyone should just be mindful there is an overhead camera on the witness, on the counsel tables.

Ms. Johnson, you may proceed.

MS. JOHNSON:  Thank you, your Honor.

BY MS. JOHNSON:

Q.  Ms. Ventura, I would like to show you a few images now.

A.  OK.

MS. JOHNSON:  OK.  First, Ms. Gavin, can you please pull up for Ms. Ventura only Government Exhibit 2A-404, and for the court and defense counsel, that should be the first document in the binder.

Q.  Do you see that exhibit, Ms. Ventura?

A.  Yes.

Q.  Without saying the name of the individual depicted in Government Exhibit 2A-404, do you recognize that individual?

A.  Yes.

Q.  How do you know that individual?

A.  She's been a friend of mine for a long time and also worked for Sean for some years.

Q.  Is that a fair and accurate photo of the individual depicted in Government Exhibit 2A-404?

P5EsCOM3

A.   Yeah.

MS. JOHNSON:  OK.  At this time, the government offers 2A-404 under seal.

THE COURT:  Any objection?

MS. ESTEVAO:  No objection.

THE COURT:  It will be admitted.

(Government Exhibit 2A-404 received in evidence)

BY MS. JOHNSON:

Q.   Ms. Ventura, you've already been referring to the individual depicted in Government Exhibit 2A-404 as Mia.  But going forward, I would ask that you continue to refer to her as Mia.

A.   OK.

Q.   Thank you.

MS. JOHNSON:  Just one moment.  Ms. Gavin, can you please publish that exhibit to the jury?

Ms. Gavin, can you take that down and pull up what's in evidence as Government Exhibit BX-202-B for the jury and Ms. Ventura only?  For the court and counsel, that's the second document in the binder.

Q.   Ms. Ventura, do you see that exhibit?

A.   Yes.

Q.   Do you recognize who's depicted in that exhibit?

A.   Yes.

Q.   Who is that?

P5EsCOM3

A.   That's Jules.

Q.   And at what -- at what type of event is this still image taken from?

A.   This is during a freak-off.

Q.   Have you seen this image as part of a larger video?

A.   Yes.

Q.   And where was that video found, if you know?

A.   Um, off of one of the devices that I gave to the government.

Q.   When you gave those devices to the government, were all of those devices working at the time?

A.   No, they were actually all broken.

Q.   And when had they been broken?  How long had they been broken for?

A.   Some for years, yeah.

          MS. JOHNSON:  OK.  Ms. Gavin, can you take that document down, please.  And put up Government Exhibit 205 -- BX-205-B for Ms. Ventura and for the jury.  For counsel, that is the third, and the court, that's the third document.

Q.   Ms. Ventura, do you recognize who's depicted in this image?

A.   Yes, that is me and Jules.  I think.

Q.   Is this a frame from a longer video that you've watched?

A.   Yeah.

Q.   OK.  And what was the occasion where you were with Jules in this video?

P5EsCOM3

A.   Also a freak-off.

Q.   And on whose device was that recovered?

A.   From one of my devices that I gave the government.

Q.   One of the broken ones?

A.   Yes.

         MS. JOHNSON:  OK.  Ms. Gavin, can you take that down, please.  And put up Government Exhibit BX-206-B for Ms. Ventura and the jury only.  For counsel, that would be the fourth document in the binder and for the court.

Q.   Ms. Ventura, do you recognize who is in -- who is depicted in Government Exhibit BX-206-B?

A.   Yeah, that's me and Dave.

Q.   OK.  What are you and Dave doing?

A.   We are in a freak-off.

Q.   And is this exhibit a still image from a video?

A.   Yes.

Q.   And the video is from the same source as the previous exhibits?

A.   Same source, broken something.

         MS. JOHNSON:  Can you take that down, Ms. Gavin, and please put up Government Exhibit BX-208-B for Ms. Ventura and for the jury only.

         For counsel, that is the fifth document in the binder.

Q.   Ms. Ventura, do you recognize who is depicted in Government Exhibit BX-208-B?

P5EsCOM3

A.  Yes, it's me and Greg.

Q.  Did we see a photograph of Greg earlier today?

A.  We did.

Q.  And is this another still image taken from one of the videos recovered on one of your broken devices?

A.  Yes.

MS. JOHNSON:  OK.  Ms. Gavin, can you please take that down, and pull up what's in evidence as Government Exhibit BX-601-C for Ms. Ventura and for the jury only.

For counsel, that's the -- and the Court that's the sixth document in the binder.

Q.  Ms. Ventura, do you recognize who's depicted in Government Exhibit BX-601-C?

A.  Yep.  That's me.

Q.  And at what event -- what are you doing in this photograph?

A.  I'm sitting on the couch at a freak-off by myself.

Q.  And what is between you and the couch?

A.  Um, a big cover, like bed cover, sheet.

Q.  Some kind of linen?

A.  Linen, yeah.

Q.  And what's on the floor?

A.  The same thing.

Q.  What are you wearing on your feet?

A.  Very high shoes.

Q.  And what's next to you, if you can see it, on the side

P5EsCOM3

table?

A.  Looks like water.  Bottle of water.

Q.  You mentioned drinking water a lot at the freak-offs earlier.  Why did you need to drink water?

A.  To stay hydrated from all of the partying.

Q.  When you say partying, what do you mean by partying?

A.  Using drugs, drinking alcohol.

MS. JOHNSON:  And finally, Ms. Gavin, can you take that document, exhibit down, and put up Government Exhibit BX-602-A, which is in evidence, for Ms. Ventura and for the jury only.

And that's the last document in the binder for the court and for the defendant.

Q.  Ms. Ventura, do you recognize who's depicted in this exhibit?

A.  Yep, that's me.

Q.  Okay.  And what's on your skin in this exhibit?

A.  Oil.

Q.  And what are you doing in this exhibit?

A.  Just standing there and next to the bed.

Q.  Was this taken at a freak-off, if you know?

A.  Yes.

Q.  And what's behind you on the nightstand?

A.  Candle, looks like some tops for the different lubricants.

MS. JOHNSON:  And if you can take that down,

Ms. Gavin.  And just for the clarity of the record, Judge, I wanted to -- I'm not sure if I mentioned when I offered the BX series that the government would offer all of those series under seal.

MS. ESTEVAO:  No objection.

THE COURT:  All right.  They will be admitted under seal.

BY MS. JOHNSON:

Q.  Ms. Ventura, I'm going to turn to a different topic now.

You've testified both yesterday and today about Sean physically hurt you during your relationship.  Do you recall that testimony?

A.  Yes.

Q.  Approximately when in your relationship was Sean first physical with you?

A.  Pretty early on within, like, the first year of us dating.

Q.  And after that time, how frequent was he physical -- how frequently was he physical with you?

A.  It was frequently enough.  It was a thing that became pretty common, eventually.

Q.  Who, if any of Sean's employees, do you recall being present for Sean being physical with you?

MS. ESTEVAO:  Objection to physical being vague.

THE COURT:  Ms. Johnson, can you rephrase or ask a clarifying question?

P5EsCOM3

MS. JOHNSON: Sure.

Q. Ms. Ventura, you have testified that Sean was physical with you before, right?

A. Yes.

Q. And you testified that that includes -- what actions does being physical include?

A. Being punched, kicked, dragged, mushed.

Q. If I refer to those actions collectively as physical abuse, will you know what I'm talking about?

A. Yes.

Q. Who, if any of Sean's employees, do you recall being present for Sean's physical abuse of you?

A. Um, there were --

THE COURT: Hold on for a second. I think the objection was for lack of a timeframe. I think we need more specificity on the question.

MS. JOHNSON: OK.

Q. Starting at the beginning of your relationship, Ms. Ventura, which was approximately 2007, is that right?

A. Yes.

Q. Who, if any of Sean's employees, do you recall being present or witnessing Sean's physical abuse of you?

A. Security.

Q. Who from security, if you remember?

A. Um, at that point, definitely his driver, Malik. That was

in New York.  It was a long time ago.  I don't know exactly who was there.

Q.  OK.  What about later in your relationship, sort of in the middle of your relationship.  Same question to you.  Who, if any of Sean's employees, do you recall being present or witnessing physical abuse of you?

A.  Um, at that point, it would have been some of his assistants and his security as well.

Q.  Who specifically, if you recall, from Sean's assistants witnessed physical abuse?

A.  Mia.

Q.  Anyone else?

A.  There were other assistants that I know definitely quit, because they told me that they didn't want --

MS. ESTEVAO:  Objection.

THE COURT:  Grounds?

MS. ESTEVAO:  Hearsay.

MS. JOHNSON:  We're not offering it for its truth, your Honor.  We are offering to understand Ms. Ventura's state of mind.

THE COURT:  I'll sustain the objection.  The answer was nonresponsive.  Maybe ask a fresh question, and we can get an answer.

BY MS. JOHNSON:

Q.  Ms. Ventura, are you aware if any of Sean's employees quit

after witnessing physical abuse --

A. Yes.

Q. -- of you?

A. Yes.

Q. Which employee quit?

A. There was an employee that quit named George Kaplan.

Q. You also mentioned that around the middle of your relationship, security witnessed physical abuse, Sean's physical abuse of you?

A. Um-hmm.

Q. Who from security was aware of or was present for or witnessed physical abuse?

A. Um, Bonds, Uncle Paulie, D Rock.

Q. Ms. Ventura, did you see pictures of those individuals yesterday?

A. I did.

Q. OK. At the end of your relationship --

MS. ESTEVAO: Your Honor, objection to just the beginning and end of the relationship. Could we have some more specificity than this?

THE COURT: I think that's fair. Isolate it in terms of an actual timeframe.

MS. JOHNSON: Yes, your Honor.

Q. Starting in approximately 2015 through 2018, would you call that about the end of your relationship, Ms. Ventura?

P5EsCOM3

A.   Yeah.

Q.   So during that time period, who of Sean's employees do you recall being present for or witnessing his physical abuse of you?

A.   Security, staff, um, and management.

Q.   OK.  Let's take those one by one.

Who from security do you recall witnessing or being present for the abuse?

A.   At that point, D Rock.

Q.   What about staff?

A.   At that point, um, well, just before that, Mia was no longer there, but she had seen.  Um, I'm trying to think of who else.  I just lost it...

Q.   OK.  You mentioned management?

A.   Yeah.

Q.   What management, from where?

A.   The management that worked with us, James Cruz, witnessed some of the violence.

Q.   Did you ever initiate a physical fight with Sean?

A.   I did.

Q.   If you did, in those cases, what, if any, injuries did you see on Sean after you initiated a fight?

A.   I didn't see anything after the fight.

Q.   Were you ever injured after Sean was physically abusive with you?

P5EsCOM3

A.   Yes.

Q.   How often?

A.   Any time he was physical there would at least be some trace, a bruise or something.

Q.   What, if anything, did you do to recover from these times?

A.   Recovery was days worth.  I would just kind of hide out for that period.

Q.   Where would you hide?

A.   Hotel rooms.

          MS. ESTEVAO:  Your Honor, objection to the general nature of all these questions.  If we can have some more specificity, it would be very helpful.

          THE COURT:  Let's have a brief sidebar.

          (Continued on next page)

(At the sidebar)

THE COURT:  What's the objection?

MS. ESTEVAO:  Your Honor, this questioning has been going on for some time now.  The questions are related to general instances of physical abuse.  And we're talking about an 11-year relationship, and it's not clear to us what instances of abuse that we're talking about here.  So it's difficult for us to follow the general nature of the questioning and be able to respond to this.

If there are instances of physical abuse that the government wants to question her about, then they should do that.  But this general questioning over and over again is cumulative.  It's -- it's speculative, and we ask that they try to pin down the year -- at least the year that they are talking about here.

THE COURT:  All right.  Ms. Johnson, when you clarified using the years, that didn't draw any objection.  It might be easy for you to do that.  So is that something that we can do?  I think that the objection really is that we're talking about different events that are -- may have similar hallmarks but are not the same events.  It makes it very difficult to understand which events the witness is speaking about, but there is probably some clarification that you can provide to help the witness isolate which events she's addressing.

MS. JOHNSON:  Of course.  And I'm about to get to very specific events.

THE COURT:  OK.

MS. JOHNSON:  I just want to caution that the witness is not always going to know the year, and so that's why --

THE COURT:  That's understandable.

MS. JOHNSON:  You know, it's a long time ago.  She has some memory issues as a result of some injuries, and so for that to be --

THE COURT:  That's fine.  When you use the general timeframe, I think you gave a three-year period as signifying the end of the relationship.  I think that was helpful to make sure that we understood exactly what we were talking about.

MS. JOHNSON:  Yes.

THE COURT:  If you do that, that is helpful.

MS. ESTEVAO:  Also just to add, your Honor, based on our understanding of her interviews with the government, there are a select number of instances of physical abuse in the range of seven to ten, and those are the ones we have been focusing on and we're prepared to address.  These questions just about the general nature of physical abuse in the abstract without getting into those specifics is -- it gives the impression that once Ms. Johnson gets to the point of the specific incidents that there are more than those specific incidents that exist.

THE COURT:  Now you're previewing your

cross-examination for Ms. Johnson. That's helpful. But that's exactly the kind of thing that you would be able to explore on cross-examination. I think for present purposes, the nature of your objection is that it's just vague and that's the main objection.

MS. ESTEVAO: And it gives a misimpression to the jury at this point.

MS. JOHNSON: I want to be clear though, this witness will testify, and that's been reflected in the government's 3500 materials, that there are certain specific events of violence that we're about to get to, but these are by no means the only incidents of violence and that she doesn't remember every incidence of violence because it was pervasive over an 11-year period.

THE COURT: Understood. You've asked questions along those lines, and she has given answers about what she did and did not remember. I understand that. But I think we're all on the same page. Let's take it from here. If you have further objections, you can raise them.

MS. ESTEVAO: Thank you.

MS. JOHNSON: Thank you.

(Continued on next page)

(In open court)

THE COURT:  Ms. Johnson, you may proceed.

BY MS. JOHNSON:

Q.  Ms. Ventura, I would like to direct your attention to the first few years of your relationship with Mr. Combs, approximately 2007 to 2008.  Is that right?

A.  Yep.

Q.  During that time, in what city was the first instance of physical violence?

A.  New York City.

Q.  Where were you earlier that evening before the instance we're about to talk about of physical violence?

A.  We were eating at a restaurant called Phillipe.

Q.  And can you please describe what happened at that restaurant?

A.  Um, there was a downstairs, like, private eating area, and Sean and friends and just a lot of different people came to the dinner.  There was a brief moment where I saw -- caught Sean, like, flirting with somebody, I think, and there was another person and looked at me and saw that I saw it.  I shrugged my shoulders, like whatever, and then when we got in the car, he knocked me around and was just really mean.

Q.  When you said he knocked you around in the car, who is he?

A.  Sean.

Q.  And who else, if anyone, was present in the vehicle when

P5EsCOM3

you got in?

A.   Security.  Security driver.

Q.   And when you say knocked you around, can you be more specific about what Sean did?

A.   He hit me in the side of my head, and I fell to the floor of the car.  We were in his Escalade.  Just shook me up and scared me quite a bit to the point where I just was trying to get out of the car, and I finally got out of the car.

Q.   And how did you feel after that first -- after that instance of violence?

A.   I was just shocked.  I didn't, um, I didn't necessarily understand what happened and why he was so angry, except for the little bit that he said as he was, like, hitting me in the car.  Um, yeah, and I just went home kind of hid out after that.

Q.   Directing your attention now to January of 2009, do you recall attending an event at the Ace of Diamonds in Los Angeles in January of 2009?

A.   Yes.

Q.   Why were you at the Ace of Diamonds?

A.   I was there with Sean.  He was hosting a party, I believe.

Q.   Were you drinking at this party?

A.   Yeah.

Q.   What happened, if anything, as you left the party?

A.   Um, as we left the party, I had been speaking to a producer

about music, and Sean called me a slut or a bitch or something, and when we got in the car, I punched him in the face.

Q.  Did you make contact with Sean's face?

A.  I believe so.

Q.  How hard did you hit him?

A.  As hard as you can hit somebody when you're drunk like that.  I don't know.

Q.  Had you hit Sean before that time?

A.  Not that I recall, no.

Q.  Did you see any injuries on Sean's face after you hit him?

A.  No.

Q.  What was Sean's response after you hit him?

A.  His whole demeanor just switched over.  I remember his eyes went black.  It was just like we were in the -- we were in an Escalade, but the two sitting in the middle, the two seats that are separate from each other with the windows down, and we had a friend kind of like following us back to the house.

So all that went down with the windows down.  And then after I punched him and he attacked me, and I was basically, like, underneath the backseat in the Escalade, just trying to cover my face.

Q.  Why were you trying to cover your face?

A.  Because Sean was stomping on it with his foot.

Q.  How long did Sean stomp on your face with his foot?

A.  Um, the ride back to the house was short, but I mean, the

P5EsCOM3

whole ride was a fight until we got there.  Probably, like, a -- ten-minutes up the hill from the party.

Q.  When you say the whole ride was a fight, what part of the fight happened for most of the ride?

A.  It just was me trying to defend myself and cover myself up. I was just being -- um, I just never experienced anything like that before that where I just was getting really, really badly beaten.  Yeah.

Q.  Where was the destination of the -- where was the car going while you were getting beaten in the car?

A.  The car was going back to Sean's house that he was renting at the time.

Q.  When you got to Sean's home, what did you do?

A.  I took off running.  I got out of the car and started running down the street.

Q.  What happened after you took off and ran?

A.  Pretty sure security caught up with me, and I was brought back to the house.

Q.  Who from security do you remember catching up with you?

A.  Roger Bonds.

Q.  When you were brought back to the house, what happened at the house?

A.  Um, at the house, I went down into his -- Sean's bedroom downstairs, and I finally, like, I saw my face.  Just -- I just didn't look like myself at all.  Um, just knots and bleeding.

Swollen everything.  I just -- I looked horrible, and then shortly after Sean came in and he saw me.  I think I was vomiting when he came in, and he kind of came to and, like, the person that he switched over to was now gone and, like, freaking out at the sight.

Q.  After Sean saw your face inside the home, what happened next?

A.  Um, basically he said that I had to go sneak out of the house, out of the back with security, and go to a hotel and just stay there.  So I went to the London Hotel on Sunset.

Q.  OK.  In Los Angeles?

A.  Yes.

Q.  And just to back up to when you were in the car, who else, if anyone, was in the car with you and Sean during the drive where he was stomping on your face?

A.  During the drive, I remember an assistant and the security driver, Bonds, the driver, security.

Q.  And Bonds is the same person who ran after you when you ran away?

A.  Um-hmm.  Yeah.

Q.  Did you say yes?

A.  Yes, sorry.

Q.  And you testified that you went to -- Sean told you to go to the London Hotel after he saw you, is that right?

A.  Yeah, he had security bring me there and, like, sneak into

P5EsCOM3

the hotel.

Q. When you say sneak in, what do you mean by that?

A. I was just covered up because nobody could see me like that.

Q. When you say you were covered up, what part of your body was covered up?

A. Mostly my face. My head.

Q. Approximately how long were you at the London Hotel?

A. I stayed that week, for about a week, maybe a little more.

Q. Did you want to stay at the London Hotel?

A. No. Um, the next day and I actually -- actually, I was trying to go home to my mom.

Q. OK. Did you tell anyone you wanted to go home to your mom?

A. I did.

Q. Who did you tell?

A. I told security. I told the assistant that came and brought me ice cream.

Q. Who from security, if you remember, did you tell?

A. Bonds.

Q. OK. And the assistant who brought you ice cream, do you recall the name of that individual?

A. Genevieve.

Q. Besides security and Genevieve, who else, if anyone who worked for Sean, came to check on you while you were in the hotel?

P5EsCOM3

A.   I don't really remember.  I think the only other person would be Derek Roche, stylist.

MS. ESTEVAO:  Objection.

THE COURT:  That's overruled.

Q.   OK.  While you were at the hotel, what contact, if any, did you have with Sean?

A.   He would just check-in and was the one who definitely said I couldn't go home.

Q.   Did you tell Sean you wanted to leave?

A.   I don't remember.  I -- I'm sure -- I know I said that I wanted to go home, so I guess, yeah, I did.

Q.   And what did Sean say when you said you wanted to go home?

A.   Just absolutely not.

Q.   Did you feel that you could leave the London Hotel?

A.   No.

Q.   And why not?

A.   Well, I don't think I would have gotten out of there smoothly.  It was not safe.  I didn't have just the resources I need to get out and move and not have anybody stop me.

Q.   When you say not safe, can you explain what you mean by that?

A.   That I felt not safe?

Q.   Right.  Like, you said leaving wouldn't be safe.  Can you explain what you mean by not safe?

A.   It wouldn't be safe.  I mean, I understood at that point it

P5EsCOM3

was still early, but I understood Sean's capabilities, his access to guns, like, and the threats that he made prior to that. Yeah. I was privy.

Q. And when you were taken to the hotel after the assault, did you want to go to the hotel?

A. No. In fact, I remember wanting to stay at the house, but I was not allowed to.

Q. And you mentioned that you had to cover your face when you entered the hotel that first time?

A. Um-hmm.

Q. Who, if anyone, told you to cover your face?

A. Sean. He wanted me to get in there without people seeing me and security.

Q. When you say security, are you still referring to Bonds?

A. Yes.

Q. You mentioned that you said you wanted to stay at the house?

A. Um-hmm.

Q. Who didn't allow you to stay at the house?

A. Sean didn't.

Q. Are you aware if Sean's assault after the club was publicly reported?

A. Um, I don't -- I know that there was a blind item.

Did she object?

MS. ESTEVAO: Objection. Sorry.

P5EsCOM3

MS. JOHNSON:  Yes.

THE COURT:  On what grounds?  It's overruled.

Q.  Ms. Ventura, I'll reask the question.

Are you aware if this incident was publicly reported?

A.  I am only aware that there was a blind item on the internet without our names that described exactly what happened from someone's point of view.

Q.  And who, if anyone, raised that blind item to you?

A.  My mother.

Q.  OK.  Can you describe the conversation with your mother?

MS. ESTEVAO:  Objection.

MS. JOHNSON:  We're not offering this for its truth.

THE COURT:  It's overruled.

A.  The conversation that I had with my mother?

Q.  Yes.

A.  She was pretty straightforward, and so she just asked me, um, and I said no.  It was before FaceTime was really popular. So I could still hide.

Q.  When you say your mom asked you, what did she ask you?

A.  She said that she had read an item on the internet, and she wanted to know if it was me.  And she sent it to me.

Q.  And what did you tell her when she asked you that question?

A.  I said nope.  It's not me.

Q.  Was that truthful?

A.  No.

Q. Can you explain to the jury why you did not tell your mom the truth?

A. I didn't tell my mom the truth because I was ashamed, um, but also felt like, at that point, I didn't know what was going to happen and I didn't -- I also didn't want to put my mother in danger for knowing anything of that magnitude.

Q. When were you allowed to leave the hotel?

A. When Sean wanted me to go with him to the studio.

Q. How did you find out that Sean wanted you to go with him to the studio?

A. Staff, somebody reached out and told me to get ready.

Q. Approximately how long were you at the London Hotel?

A. I would say seven to -- somewhere between seven and ten days.

Q. And when the staff reached out to you and said Sean wanted you in the studio, where did you go?

A. Went to Chalice, the studio.

Q. Is that a recording studio?

A. Yes.

Q. And when you left the London Hotel to go to Chalice, what, if any, injuries were still visible on your face?

A. You could still see my eyes were, like, bloodshot on both sides. Um, I still had some bruising around my mouth and my eye, but I wore sunglasses and just put makeup on.

        MS. JOHNSON:  Ms. Gavin, can you please pull up for

P5EsCOM3

identification Government Exhibit 2A-502 for the court and parties only.

Q.  Ms. Ventura, do you recognize the individual depicted in 2A-502?

A.  Yes.

Q.  Who is that?

A.  That's a makeup artist named Mylah Morales.

Q.  How do you know Mylah?

A.  I worked with Mylah when I was maybe 15 or 16.  We did *Vibe* magazine together, and she just kind of became a bit of a big sister in the industry to me.

Q.  Is this a fair and accurate photograph of Mylah Morales?

A.  Yes.

MS. JOHNSON:  The government offers Government Exhibit 2A-502.

MS. ESTEVAO:  No objection.

THE COURT:  It will be admitted.

(Government Exhibit 2A-502 received in evidence)

MS. JOHNSON:  Ms. Comey reminds me I need to publish this to the jury.

Ms. Gavin, could you please publish Government Exhibit 2A-502 to the jury.

BY MS. JOHNSON:

Q.  Ms. Ventura, did there come a time when you stayed with Mylah after a physical fight with Sean?

P5EsCOM3

A.   Yes.

Q.   Do you know the year that this happened?

A.   I don't remember the exact year, no.

Q.   Can you approximate where in your relationship it occurred?

A.   In the first half.

Q.   In what city did this occur?

A.   In Los Angeles.

Q.   Before you stayed with Mylah, how did the night begin?

A.   I was staying at the Beverly Hills Hotel and was with some girlfriends.  We had dinner, and I went back to my room.  And one of my girlfriends that had left called us back and said that there was a party at Prince's house, and he was going to perform, and so she invited us and we went.

Q.   Was there any discussion about going to Prince's house?

A.   With Sean or?

Q.   Sorry.  Among your girlfriends, was there any discussion of going to Prince's house?

A.   Yes.

Q.   What was the discussion?  What was the nature of the discussion?

A.   Just that it would be fun.  He's performing, probably, in his basement.  And, yeah, just like a once-in-a-lifetime experience.

Q.   Did you talk to Sean about it?

A.   Nope.

P5EsCOM3

Q.   Why not?

A.   Because he definitely would not have let me go.

MS. ESTEVAO:  Objection.

THE COURT:  That's sustained.

Q.   When you were at the Beverly Hills Hotel that night, who, if anyone, else were you staying with?

A.   I was staying on my own, but Mylah had laid down on the couch to take a nap.  So she didn't join us to the party.

Q.   Was Sean in L.A. at this time?

A.   He was.

Q.   Did you and your girlfriends end up going to the party?

A.   Yes, we did.

Q.   You testified that you didn't discuss going to the party with Sean.

A.   Um-hmm.

Q.   Is that right?

A.   Yep.

Q.   Based on your years of dating Sean at that point -- this is in the first half of your relationship, is that correct?

A.   Um-hmm, um-hmm, yes.

Q.   What would you think Sean would have said --

MS. ESTEVAO:  Objection.

Q.   -- if you had asked?

MS. ESTEVAO:  Objection.

THE COURT:  I think there is a clarifying question to

P5EsCOM3

ask, but I'm not sure that that is the one.

BY MS. JOHNSON:

Q. Ms. Ventura, at this point, have you been dating Sean for a few years?

A. Yes.

Q. What did you think Sean would do if you asked to go to the party?

A. I thought he would say no.

Q. OK. When you were at the party, what happened?

A. Um, we arrived and went downstairs. There weren't that many people there, and Prince wasn't performing yet. So we were just there, and I saw some executives, from like, BET. I saw different people that I knew through Sean, and then suddenly I heard that he was there.

Q. And when you say he, who were you talking about?

A. Sean.

Q. You mentioned you went to the party with your girlfriends?

A. Um-hmm.

Q. Have we spoken about any of the girlfriends that were present at this trial?

A. One of them.

Q. Who was that?

A. Natalie.

Q. Anyone else, if you remember?

A. And Mia.

Q.   OK.   When Sean arrived at the party, what did you do?

A.   I left.   I heard he was there and then I caught a glimpse of him, so I ran out as fast as I could, um, to the front yard.

Q.   Why did you run out as fast as you could?

A.   Because I could tell he was angry.   I knew he was angry at me.

Q.   How could you tell he was angry?

A.   His facial expressions.   And he came after me, so, yeah.

Q.   When you ran out of the party, who else, if anyone, ran out with you?

A.   Um, Mia, I believe, ran out with me.

Q.   And what, if anything, do you remember about what happened after you ran out of the party?

A.   It's a little fuzzy, but the most distinct memory I have is like running and falling into the bushes in the front yard. And, like, I don't know if at that point he was over me.   I have no idea.   I just remember falling in the bushes, and then getting up quickly and getting in the car to get back to the hotel.

Q.   And did you see Sean again after Prince's house?

A.   Yes, he came to the Beverly Hills Hotel where I was staying.

Q.   And you mentioned earlier that Mylah was in your hotel room, is that right?

A.   Yeah.   She was asleep on the couch in the living room.

Q.   And when Sean came to the hotel what happened?

A.   When he came to the hotel, he just burst in the room, and I didn't want Mylah to see or hear anything.  So we went in the bedroom.  Um, and we were in a bad fight, and he beat me up in that room.  He was throwing luggage at me.  Just calling me all kinds of names.

Q.   After the hotel, where did you go?

A.   After the hotel, Mylah helped pack me up, and we went and stayed at her house in L.A.

Q.   How long were you there?

A.   I would say for about three to four days, maybe.

Q.   What, if any, visible injuries did you have from the fight with Sean?

A.   Um, bruising on my face, knots on my head, just -- it was always, like, a little bit similar whenever I would get hurt.

          MS. JOHNSON:  Ms. Gavin, can you please pull up for identification for the court and the parties only Government Exhibit 2A-501.

Q.   Ms. Ventura, do you recognize who is depicted in Government Exhibit 2A-501?

A.   Yes.

Q.   Who is that?

A.   That's Scott Mescudi or Kid Cudi, as people know him.

Q.   And how do you know Mr. Mescudi?

A.   We dated in 2011.  We worked together for a brief period.

P5EsCOM3

Q.   Is this a fair and accurate photograph of Mr. Mescudi?

A.   Yes.

          MS. JOHNSON:   The government offers Government Exhibit 2A-501?

          MS. ESTEVAO:   No objection.

          THE COURT:   It will be admitted.

          (Government Exhibit 2A-501 received in evidence)

          MS. JOHNSON:   Ms. Gavin, please publish it to the jury.

BY MS. JOHNSON:

Q.   Ms. Ventura, you mentioned that Mr. Mescudi is known by other names.  If I call him Scott during this testimony, will you know who I'm talking about?

A.   Yes.

Q.   And directing your attention to December of 2011, what was your relationship with Scott at this time?

A.   At that time, we had just, like, formally met around then, just before then.  And we were working together and friends, and then we started dating.

Q.   When you started dating Scott, did you tell Sean about Scott?

A.   No.

Q.   What was the status of your relationship with Sean at that time?

A.   We were always, like, up and down at different times, and

it was definitely a time where we were not in the greatest place.

Q.  Did there come a time when Sean found out about Scott?

A.  Yes.

Q.  How did he find out?  How did Sean find out?

A.  He actually found out during a freak-off in L.A.  He went through my phone, and I believe he saw e-mails between me and one of his staff members.

Q.  And who was the staff member whose e-mails Sean saw?

A.  Capricorn Clark.

Q.  And what about those e-mails would have alerted Sean to your relationship with Scott?

A.  It was about bringing my toiletry bag to his house, or something like that, the next day.

MS. JOHNSON:  Ms. Gavin, you can take down the exhibit.

Q.  After Sean went through your phone and saw those e-mails, what was his reaction?

A.  I just remember him putting like a wine bottle opener between his fingers and, like, lunging at me, just a whole -- his eyes blacked out, super angry.  And I just had to get out of there.  It was actually another time I was able to get out of a freak-off.

Q.  When you were able to get out of there, where did you go?

A.  I went back to -- I had another hotel that I was staying

P5EsCOM3

at.  And I went and I had a burner phone, and I went to get the phone.  And I called Scott, and he came and picked me up.

Q.  What's a burner phone?

A.  It's not my -- it's not your real number.  It's just a phone you use.

Q.  Why did you have a burner phone at the time?

A.  Because I was dating Scott, and I didn't want, um, Sean to find out.

Q.  And before you left the hotel room where you were with Sean, when he lunged at you with the wine opener, did he make any contact with you?

A.  No.

Q.  How much do you remember of what happened after Sean found out about Scott?

A.  I remember, like, the order of the day.  It was a very long, um, drawn out day.  But some of the pieces are a little bit, um, fuzzy.

Q.  So starting with Scott, you just testified that when you got back to your hotel room, you used your burner phone to call Scott, is that right?

A.  Correct.

Q.  When did you next see Scott?

A.  Um, when he came and picked me up on -- I think it was Wilshire Boulevard, just in the middle of the street.

Q.  Where did you go after Scott picked you up?

P5EsCOM3

A.   After he picked me up, we went to his house in the hills.

MS. JOHNSON:  Pulling up for identification for the court and the parties only Government Exhibit 2A-406.

Q.   Ms. Ventura, do you recognize who is depicted in Government Exhibit 2A-406?

A.   Yes, that's Capricorn Clark.

Q.   Is that the Capricorn Clark whose e-mails you referenced earlier?

A.   Yes.

Q.   And how do you know Capricorn?

A.   We worked together.  She worked with Sean, and that's how I met her.  She went through, I think, a Sean John campaign, and then she started to help me with my artistry and stuff.

Q.   Did Capricorn work with Sean or for Sean?

A.   For Sean.

Q.   And is this a fair and accurate photograph of Capricorn Clark?

A.   Yes.

MS. JOHNSON:  I'll offer it as Government Exhibit 2A-406.

MS. ESTEVAO:  No objection.

THE COURT:  It will be admitted.

(Government Exhibit 2A-406 received in evidence)

MS. JOHNSON:  Ms. Gavin, can you please publish Government Exhibit 2A-406.

P5EsCOM3

Q.  Ms. Ventura, what, if anything, do you recall about interacting with Capricorn that day after you had met up with Scott?

A.  Well, we reached out to her because she obviously knew about my relationship with Scott, and just explained to her everything that had happened.  She came over to Scott's house.

Q.  And after you met up with Capricorn, where did you go next?

A.  After I met up with Capricorn, I ended up going to Sean's house.

Q.  Why did you go to Sean's house?

A.  Cap said he just wanted to talk and, you know, the better -- I just felt like the better to resolve it in that moment was to go there and just speak to him.  So I went.

Q.  When you say you went to Sean's house, which of his homes did you go or to?

A.  Um, one of the homes he was renting.  It was actually the one that you showed yesterday.

Q.  The photograph I showed you yesterday?

A.  Um-hmm.

Q.  Which is, for the record, Government Exhibit 2B-101 and 102.

        What happened when you arrived at Sean's house?

A.  When I arrived at his house, that was the house where his bedroom was on the top floor, the same as the entryway.  So I went in his room, and he was irate.  He was just so angry, and

P5EsCOM3

when I was in the room, he told me about videos that he had that he was going to release, and how he was going to hurt Scott and I. Um, so that was all said there, and then I just -- I ultimately just left.

Q. When Sean mentioned videos that he had that he was going to release, what videos is he referring to?

A. To freak-off videos of me.

Q. What happened when you were leaving?

A. When I was leaving, I was more than ready to go. He, Sean, kicked me in my back on the way out. So I had just a big bruise on my back. I fell to the floor and, yeah, yeah. And then left.

Q. What, if any, injuries did you have from being kicked in the back?

A. I had a large bruise on my back. I had -- it's fuzzy. The day is fuzzy, but I had bruises in other places on my body. I just remember that one significantly because he literally kicked me with the bottom of his foot in my back.

Q. And after leaving Sean's house, where did you eventually go?

A. I eventually went to -- I went to my hotel first to get my stuff, the hotel that had the burner phone.

Q. What was the condition of your hotel room?

A. It was just torn up. There was -- somebody peed all over the floor in the bathroom. My clothes were everywhere. All

P5EsCOM3

the furniture was turned upside down.  Somebody pooped in the toilet and didn't flush it.  It was just gross.

Q.  After that hotel room, where did you go next?

A.  I went to another hotel.  This was just before Christmas, so it was, like, literally the night before I left to go home to Connecticut for Christmas.  And I stayed at a -- the Sunset Marquis with Scott.

MS. JOHNSON:  Ms. Gavin, can you please pull up what's in evidence as Government Exhibit B-315 and publish it.

BY MS. JOHNSON:

Q.  Ms. Ventura, start from the from line.

Who sent this e-mail?

A.  Me, Veronica Bang, an alias that I used.

Q.  Who did you send this e-mail to?

A.  To my mom and Capricorn.

Q.  And when is the date this e-mail was sent?

A.  December 23, 2011.

Q.  Where were you when you sent this e-mail?

A.  I was actually on my flight to Boston, Connecticut, for Christmas.

Q.  Can you read the contents of the e-mail?

A.  Threats.  The threats that have been made towards me by Sean Puffy Combs are that he is going to release two explicit sex tapes of me.  One on Christmas Day, maybe before or right after, and another one some time soon after that.  He has also

said that he will be having someone hurt me and Scott Mescudi physically (he made a point that it wouldn't be by his hands, he actually said he'd be out of the country when it happened).

MS. JOHNSON:  Ms. Gavin, if you can you pull up for identification Government Exhibit 3Q-109 and 3Q-112, side by side.

Q.  Ms. Ventura, do you recognize who's depicted in these photos?

A.  Yep, that's me.

Q.  Where are these photos taken?

A.  They are taken at my mom's house.

Q.  And approximately when were these photos taken?

A.  When I got to Connecticut for --

Q.  I'm sorry for interrupting you.

A.  It's OK.

Q.  Are these true and accurate photos taken by your mom from when you got home to Connecticut in December 2011?

A.  Yes.

MS. JOHNSON:  The government offer Government Exhibit 3Q-109 and 3Q-112.

MS. ESTEVAO:  No objection.

THE COURT:  These exhibits will be admitted.

(Government's Exhibits 3Q-109 and 3Q-112 received in evidence)

MS. JOHNSON:  Ms. Gavin, can you please publish them

P5EsCOM3

to the jury.

Q.  Ms. Ventura, how long after you arrived in Connecticut were these photos taken, approximately?

A.  Within the first, like, 12, like, six to 12 hours of being there.  Right away because my mom knew.

Q.  And you testified that your mom took these photographs.

What led to your mom taking photographs?

A.  She asked me if I had been hurt and I told her the truth. Yeah.

Q.  And what, if any, injuries are visible on the photographs?

A.  There is bruising, there is a dark bruise on my left lower back, butt area where I was kicked, and then another one in my thigh.

Q.  When you say where you were kicked, is that the kick in the back you described?

A.  Yeah.  That was the kick in the back where I fell to the ground before I left the house.

Q.  And that's before you left Sean's house?

A.  Before I left Sean's house in Los Angeles.

Q.  Were you entirely honest with your mom about the physical abuse that you were experiencing when you spoke to her in December 2011?

A.  No.  I believe I told her this was the first time.

Q.  Did you tell her about the freak-offs?

A.  No.

P5EsCOM3

Q.   Why didn't you tell your mom about everything?

A.   I couldn't hurt her like that.  Um, I just wasn't there with it.  I wasn't ready.  And I was also just terrified. Like, it's not normal.

Q.   What's not normal?

A.   Just constantly be bruised up by the person that you love, or that says they love you.  Like, you can't justify it to anyone, just, especially not your mom.

THE WITNESS:  Is it possible for me to take a break, a quick break?

MS. JOHNSON:  Do you need to take a break?

THE COURT:  Of course.

We will take a ten-minute break.

THE WITNESS:  Yes.  I appreciate it.

THE COURT:  We'll take a break.  Come back at 3:05.

All rise.

(Continued on next page)

P5EsCOM3

(Jury not present).

THE COURT:  Come back in ten minutes.

THE WITNESS:  Thank you.

THE COURT:  Please be seated.

We'll come back in ten minutes.

(Recess)

Ms. Comey, as we wait for Ms. Johnson and the witness, do you have a sense of how much time we have left on direct examination?

MS. COMEY:  My guess is we have about another hour, but I would not want to be held to that, your Honor, because I'm not putting the witness on.

THE COURT:  I won't hold you to it.

MS. COMEY:  Thank you, your Honor.

THE COURT:  I will loosely hold you to it.

MS. COMEY:  The goal is to finish the direct with time to start cross-examination before the end of the day today.

THE COURT:  OK.  Thank you.

MS. GERAGOS:  Your Honor, I was just conferring with Ms. Johnson, I'll put it on the record, speaking about a few remaining exhibits they intend to introduce on 106 issues.

For efficiency purposes, if we don't figure that out by today, we will allow them to put them in on redirect.  I Just wanted to let you know.

THE COURT:  Very good.

P5EsCOM3

Let's get Ms. Ventura and then we'll bring in our jury.

Welcome back.

THE WITNESS:  Thank you.

(Continued on next page)

P5EsCOM3

(Jury present)

THE COURT:  Please be seated.

Ms. Johnson, you may proceed when ready.

BY MS. JOHNSON:

Q.  Ms. Ventura, before the break, we were talking about you being in Connecticut for the holidays in 2011.

Do you remember that?

A.  Yes.

Q.  OK.  Who else, if anyone, came to Connecticut with you for the holidays?

A.  I flew there alone, but Scott came and met me there for a little bit.

Q.  How long did Scott stay in Connecticut?

A.  He stayed, I think, like, three or four days.

Q.  Approximately when did he leave?

A.  Right before New Year's Eve.

Q.  When Scott left Connecticut, what was the status of your relationship with Scott?

A.  Um, I had broken it off with him.  It was just too much.

Q.  When you say too much, can you explain what you mean by that?

A.  Um, too much danger, too much uncertainty of, like, what could happen if we continued to see each other.  Um, I just --

MS. ESTEVAO:  Objection.

THE COURT:  Overruled.

P5EsCOM3

Q.  When you say danger, what specific danger were you worried about?

A.  I mean, Sean said to me, before I left L.A. that he was going to hurt the both of us.  And I, at least, took that in my mind, like, if I stay in this situation, we both will be hurt.  If I don't, then no one will be.

Q.  How long did you stay in Connecticut?

A.  Um, I stayed there just, I think, until New Year's or just before it, right after it.

Q.  Where did you go after Connecticut?

A.  After Connecticut, I ended up going to see Sean in Arizona.  He was visiting a college with his son.

Q.  Did you tell your family where you were going when you left?

A.  No.  I said I was going back to L.A. to get to work.

Q.  Why weren't you truthful with your family?

A.  I did not want to disappoint them.

Q.  And, in your mind, what would have disappointed them?

A.  In my mind, disappointing them would to be to go back -- would be to go back to the abuse and everything that had happened just days before that.

Q.  And when you refer to the things that happened just days before that, is that the kicking in the back and the other things we discussed?

A.  Kicking in the back, yeah.  Yeah, just all of that.  Yeah.

P5EsCOM3

Q.  Did there come a time after this when Sean mentioned Scott's car?

A.  Yes.  Um, he mentioned that when we were out of the country, that Scott's car would be blown up.  He wanted his friends to be there to see it.

Q.  When you say he wanted his friends to be there to see it, who is he?

A.  Sean wanted Scott's friends to be there to see the car get blown up in the driveway.

Q.  Did there come a time when you saw Scott again?

A.  Yes.

Q.  Where did you see Scott next?

A.  I saw him at the Soho House in Los Angeles.  The three of us had a meeting.

Q.  Who is the three of us?

A.  Me, Sean, and Scott.

Q.  What was the purpose of the meeting?

A.  The purpose of the meeting was to discuss the relationship that we were no longer in.  Yeah, and the only thing I remember from the end was Scott asking Sean --

        MS. ESTEVAO:  Objection, nonresponsive.

        MS. JOHNSON:  I'll ask another question.

        THE COURT:  OK.

Q.  Ms. Ventura, what do you recall happening at the end of the meeting?

A.   Scott said, What about my vehicle?  And Sean said, What vehicle?  And that was the end of the meeting.

MS. JOHNSON:  Ms. Gavin, can you please pull up for identification Government Exhibit 9N-101 and 9N-102.

Q.   Ms. Ventura, do you recognize what's depicted in Government Exhibit 9N-101?

A.   Yes.

Q.   What's that?

A.   That's me and Sean with our friends in Kingston, Jamaica, at Sound Clash.

Q.   And approximately what year were you in Jamaica with Sean for Sound Clash?

A.   I'm not positive, but I want to say around '13, '14.  I'm not 100 percent, though.

Q.   Directing your attention to the image on the right, what is the image on the right?

A.   The image on the right is a zoomed-in photo of my eyebrow and forehead bruise and swollen.

Q.   Are these fair and accurate images from you being in Jamaica at or around 2013 or 2014?

A.   Yes.

MS. JOHNSON:  The government offers Government Exhibit Exhibits 9N-101 and 9N-102.

MS. ESTEVAO:  No objection.

THE COURT:  They will be admitted.

(Government's Exhibits 9N-101 and 9N-102 received in evidence)

MS. JOHNSON:  Ms. Gavin, can you please publish these exhibits for the jury.

BY MS. JOHNSON:

Q.  Directing your attention to the photograph on the right, Government Exhibit 9N-102, can you describe what injury this photograph depicts?

A.  Um, it looks, to me, like a black eye.

Q.  What, if anything, do you recall about getting a black eye in Jamaica?

A.  I recall getting a black eye.  I don't remember exactly the whole story leading up.  I know that Kerry Morgan and I hid underneath a tractor for several hours just trying to hide.  I don't remember the exact, how I got the injury.  I know I was hit, but I don't know.

MS. ESTEVAO:  Objection.

THE COURT:  Overruled.

Q.  Who were you and Kerry Morgan hiding from?

A.  Sean.

Q.  And who gave you the black eye?

A.  Sean.

MS. JOHNSON:  You can take those down now, Ms. Gavin.

Q.  Ms. Ventura, I'm pulling up for identification Government Exhibit 3Q-104.

Do you recognize who's depicted in this photo?

A.   Yes.  That's me in Sean's bathroom on Mapleton.

Q.   And what is the date of the photo?

A.   September 18, 2015.

Q.   Is that a true and accurate photograph of you on September 18, 2015?

A.   Yep.

MS. JOHNSON:  The government offers Government Exhibit 3Q-104.

THE COURT:  Any objections?

MS. ESTEVAO:  No objection.

THE COURT:  It will be admitted.

(Government's Exhibit 3Q-104 received in evidence)

BY MS. JOHNSON:

Q.   Ms. Ventura, can you explain to the jury why you were in Sean's house on September 18, 2015?

A.   I was staying there to recover from a weekend in Las Vegas where I got a black eye and some bruising.

Q.   What happened in Las Vegas?

A.   In Vegas, Sean was hosting a party.  And after the party, there was an after-party in our suite.  And the bedroom was adjoining with the living room.  I was talking to a manager, and Sean tapped me and told me to come in the next room.  And he beat me up in that room, in the adjoining room.

Q.   What specifically did Sean do to beat you up in the

adjoining room?

A.  Um, I mean, he punched me, kicked me.  I was trying to run away and I made it into the bathroom.  I just remember going into, like, where the actual toilet was in the stall and trying to close and lock the door.

Um, and then I ended up just underneath the toilet, just trying to cover myself while he was kicking me.  I ran out to the bath -- like, it was a big bathroom -- just trying to get away from him screaming.

Q.  How did this incident end?

A.  It ended when security and management came in the room finally.

Q.  Who from security came in the room?

A.  D Rock.

Q.  And who from management came from the room?

A.  James Cruz.

Q.  How did D Rock react when he saw you?

A.  When D Rock saw me, he started to cry.  They both kind of teared up.

Q.  What, if any, visible injuries did you have?

A.  I had black eyes, golf ball-sized knot on my forehead, busted-up lip.

Q.  Ms. Ventura --

MS. JOHNSON:  I'm sorry, Ms. Gavin, can you take down this exhibit and please pull up for identification Government

P5EsCOM3

Exhibit B-609.

Q.  Ms. Ventura, do you recognize this chat?

A.  Yes.

Q.  OK.  Who are the participants?

A.  That's me and D Rock, I believe.

Q.  Is this a fair and accurate message thread between you and D Rock?

A.  Yes.

          MS. JOHNSON:  The government offers Government Exhibit B-609.

          MS. ESTEVAO:  No objection.

          THE COURT:  It will be admitted.

          (Government's Exhibit B-609 received in evidence)

Q.  And, Ms. Ventura, looking at the first blue message at the bottom of the page --

          MS. JOHNSON:  Ms. Gavin, would you mind blowing that up.  Thank you.

Q.  Ms. Ventura, what's the date of this message?

A.  September 14, 2015.

Q.  And what is it from?

A.  D Rock.

Q.  Who is it sent to?

A.  Me.

Q.  What does it say?

A.  Where you at?  It's time to ice your face.

Q.   Why would you have needed to ice your face on September 14, 2015?

A.   Because I had just gotten beat up in Las Vegas.

Q.   And besides ice, was there anything else that you used to apply to injuries that you had after physical assaults?

A.   I would use eyes.  I always had, like, Arnica gel for bruising with me, things like that.

         MS. JOHNSON:  You can take that down now Ms. Gavin.

Q.   You testified earlier that after Las Vegas, you were staying in Sean's home in Los Angeles, right?

A.   Correct.

Q.   Why was that?

A.   He offered his house.  And he said, Stay here for a few days to, essentially, recover.  And I had, um, some friends over for a few days.

Q.   Besides your friends, who else, if anyone, was in the home?

A.   One of his sons.

Q.   What communications, if any, did you have with Sean while you were staying in his house in September 2015?

A.   We exchanged messages and FaceTimes.

Q.   What comments, if any, did Sean make about your injuries?

A.   He would just tell me, like, his son couldn't see me like that, and that I should go put more makeup on.  So that's what I did.

Q.   When he said, My son can't see you like that, what did you

P5EsCOM3

understand him to be referring to?

A.  He can't see the bruises on your face.

Q.  How long were you staying in Sean's home in September 2015?

A.  It was a little less than a week, I think.

Q.  Before we move on to another topic, Ms. Ventura, are the occasions we just spoke about all the times that Sean was physical with you?

A.  No.

Q.  Just to be clear, all the times he was physical with you during your approximately 11-year relationship?

A.  Those weren't all the times, no.

Q.  We just spoke about some of the times?

A.  Some of the times, yeah.

Q.  And were there any other injuries that you had as a result of physical abuse that we haven't discussed?

A.  I don't think so.

Q.  Besides yourself, have you seen Sean be physical with other people?

A.  Yes.

Q.  Which other people?

A.  Um, I saw him be violent with assistants, I saw him punch somebody in the head, drag an assistant out of her bed.  Um, yeah.

Q.  Who did you see Sean punch in the head?

A.  Eli.

P5EsCOM3

Q.   And what did you observe on that occasion?

A.   We were in Miami going to -- or from a club, and we were in the back seat and he punched Eli in the back of the head.

Q.   When you say he, who is he?

A.   Sean.

Q.   You also mentioned that you saw Sean dragging an assistant. Who did you see Sean drag?

A.   Mia.

Q.   Where were you?

A.   We were on a trip to Turks and Caicos.

Q.   What happened in Turks and Caicos?

A.   From what I remember, we were hanging out all day, smoking, partying on the beach.  And there came a time where Sean went to Mia's room.  I think she was, maybe, like, falling asleep or something.  I'm not sure.  And he tried to grab her phone, and she tried to hold onto it, and he dragged her out of her bed and out of the room on to, like, the deck outside of her room.

Q.   Did anything else happen on that trip to Turks and Caicos?

A.   I believe there was a freak-off on that trip.

Q.   Who else, if anyone, did you see Sean assault?

A.   I can't think of anybody right now.

Q.   Well, I'm going to show you a photograph.

         MS. JOHNSON:  Ms. Gavin, can you please pull up Government Exhibit 2A-407 for identification.

Q.   Ms. Ventura, do you recognize the individual depicted?

P5EsCOM3

MS. ESTEVAO:  Objection to the leading nature of the order of the questioning.

THE COURT:  It's overruled.

Q.  Ms. Ventura, do you recognize the individual depicted in Government Exhibit 2A-407?

A.  Yeah, it's my friend Bona.

Q.  How do you recognize Bona?

A.  A friend.  I've known her for some years.

Q.  Is this a fair and accurate photo of Bona?

A.  Yes.

MS. JOHNSON:  The government offers Government Exhibit 2A-407.

MS. ESTEVAO:  No objection.

THE COURT:  It will be admitted.

(Government's Exhibit 2A-407 received in evidence)

MS. JOHNSON:  Ms. Gavin, can you please publish to the jury.

Q.  Ms. Ventura, what, if anything, did you see Sean do to Bona?

MS. ESTEVAO:  Objection, leading.

THE COURT:  I think that needs to be rephrased.

Q.  Ms. Ventura, what floor did you live on at 875 Comstock?

A.  17.

Q.  What kind of -- how was the apartment set up?

A.  It was one level.  I had a one bedroom, kitchen, balcony

P5EsCOM3

overlooking a golf course.

Q. Were there any occasions where your friends stayed over?

A. Yeah, all the time.

Q. Which of your friends would stay over at your place at 875 Comstock?

A. Bona, Kerry, Dao.

Q. OK. What, if anything, do you recall about Bona staying over at your apartment?

A. There was an incident where I was asleep in my room. And when I came out, Sean was holding her and threw her onto the patio furniture.

Q. Where was Sean when he was holding her, when he was holding Bona?

A. They were out on the balcony.

Q. And approximately what time of day was this?

A. This was, like, early morning hours.

Q. And what did you see Sean do to Bona?

        MS. ESTEVAO:  Objection, asked and answered.

        THE COURT:  It's overruled.

A. What did I see?

Q. Yes.

        What did you see?

A. I saw him bring her back over the railing of the balcony and then throw her onto the patio furniture.

Q. Ms. Ventura, prior to this trial, what conversations, if

P5EsCOM3

any, have you had with Bona this incident?

MS. ESTEVAO:  Objection.

THE COURT:  Let's have a very brief sidebar.

(Continued on next page)

P5EsCOM3

(At the sidebar)

THE COURT:  Ms. Johnson, just briefly, where are we going?

MS. JOHNSON:  Your Honor, it's not being -- I'm not eliciting this for its truth.  I am offering this to explain, on impeachment that I expect that the defense will do on cross-examination, because the witness, Ms. Ventura, spoke to Bona after her complaint, after Ms. Ventura's civil complaint was filed, about this allegation that was in the complaint. And during that conversation, Ms. Ventura realized she had recalled the incident in the balcony occurring at the wrong date after this conversation.

So I wanted to draw this on direct so that it is not before the jury at the first time on cross-examination.

THE COURT:  That objection is sustained.

I mean, you can pick it up on rebuttal if you need to.

(Continued on next page)

P5EsCOM3

(In open court)

BY MS. JOHNSON:

Q.  Ms. Ventura, you mentioned you were friends with Bona is that right?

A.  Yes.

Q.  Are you still friends with Bona?

A.  I am.

Q.  Do you still speak to her?

A.  Yes.

MS. JOHNSON:  OK.  You can take this exhibit down now Ms. Gavin.

Can you please put up for identification only Government Exhibit 2A-503.

Q.  Ms. Ventura, do you recognize who's depicted in Government Exhibit 2A- 503?

A.  Yes.  That's Kerry Morgan.

Q.  Who is Kerry Morgan?

A.  Kerry Morgan was my best friend of about 17 years.

Q.  Is this a fair and accurate photo of Kerry Morgan?

MS. JOHNSON:  The government offers Government Exhibit 2A-503.

MS. ESTEVAO:  No objection.

THE COURT:  It will be admitted.

(Government's Exhibit 2A-503 received in evidence)

BY MS. JOHNSON:

P5EsCOM3

Q.   Ms. Ventura, you said that Kerry Morgan was your best friend of about 17 years.

Are you still friends with Kerry?

A.   No.

Q.   Why not?

A.   Um, we -- in 2018, she got into an altercation with Sean, and it just ended our friendship.

Q.   What, if anything, did you see about Kerry's altercation with Sean?

A.   Um, he came out of the bathroom after Sean just came in the house.  I was living on Harold Way at the time, which was in Hollywood.  And he came in, saw that we were gonna do drugs, and he hit Kerry in the head with a hanger.

Q.   Are you aware if Kerry had injuries?

A.   I'm not.  She told me she did, but...

MS. ESTEVAO:  Objection.

THE COURT:  Sustained.

The jury should disregard the witness's last answer.

BY MS. JOHNSON:

Q.   When is the last time you spoke to Kerry?

A.   Um, the summer of 2018.

Q.   Moving on to a different topic.

Before we get there, did you see the hanger that Sean used to hit Kerry?

A.   I did.

P5EsCOM3

Q.   What kind of hanger was it?

A.   It was wooden and in my living room.  Just a wooden hanger.

Q.   Moving on --

        MS. JOHNSON:  I'm sorry.  Ms. Gavin, you can take down 2A-503.  Thank you.

Q.   Ms. Ventura, you have testified about occasions when Sean provided drugs to you while you dated him, is that right?

A.   Yes.

Q.   Were there times when you used drugs on your own without Sean?

A.   Yes.

Q.   Did you also see Sean use drugs during your relationship?

A.   Yes.

Q.   What drugs did you see him use?

A.   Um, all of the drugs I spoke about today.  MDMA, ectasy, cocaine, marijuana, ketamine, GHB.

Q.   For these drugs, how did Sean obtain these drugs, if you know?

A.   Through friends and drug dealers.

Q.   How do you know that Sean obtained drugs through drug dealers?

A.   Because it was, just, we just knew.  I just knew.  He talked about it.

Q.   Do you recall the names of any of the drug dealers?

A.   Um, one, yeah.

Q.   What's his name?

A.   One Stop.

Q.   Where did you see Sean store drugs?

A.   Um, in his med bag, his medicine bag, safe, nightstand.

Q.   Can you describe the medicine bag?

A.   It was a smaller, like, Louis Vuitton toiletry bag, brown, with a zipper.

Q.   You testified that you sometimes got drugs on your own?

A.   Um-hmm.

Q.   How did you do that?

A.   I also got them through friends and occasionally drug dealers.

Q.   Which drugs did you buy on your own?

A.   On my own, um, definitely opiates and benzos.

Q.   What do you mean by benzos?

A.   Like, Xanax or Valium.

Q.   And what kind of drugs are Xanax or Valium, how do they make you feel?

A.   Anxiety.  They are to calm you down.

Q.   How often did you buy opiates or anxiety drugs from drug dealers?

A.   Um, I was taking them every day for a period, so, often.

Q.   When did you first take opiates?

A.   I first took opiates, very first took opiates when I got my wisdom teeth removed when I was 19, and then Sean had them and

P5EsCOM3

I took them with him.

Q. What kind of opiates did you take?

A. I took mostly a pill called narco.

Q. Any others?

A. Percocet, oxycodone, Vicodin.

Q. What do Percocet pills look like?

A. I believe they are white or yellow, like, oblong-shaped pills.

Q. You just said that Sean had them referring to opiates, so you took them with him.

Do you remember that?

A. Yeah, in the very early stages of our relationship.

Q. So would that be approximately 2007, 2008?

A. Yeah.

Q. And during that time, where, if you know, did Sean store the opiates when you first started taking them?

A. He had them in his med bag. And eventually, I was taking them pretty often, so he put them inside of a Vitamin C bottle and kept them on the sink in the bathroom in the New York apartment.

Q. And what, if anything, did he say about your access to that Vitamin C bottle?

A. At that point, he said if I wanted any, that that's where they were.

Q. And how frequently did you use opiates after you started

taking them around 2007 or 2008 when you were using them with Sean?

A. Daily.

Q. How did you feel if you stopped taking opiates?

A. Very sick. Like, flu sick.

Q. Were there times during your relationship with Sean where you sought professional help for taking opiates?

A. Yes.

Q. Approximately how many times?

A. Um, like, five or six.

Q. You mentioned that you took these opiates together with Sean, is that right?

A. Yep.

Q. So what, if any, opiates did you see Sean take?

A. I saw him take narco and Percocets and things. We would sometimes take them to come down from the freak-off high.

Q. And what, if any -- strike that.

How, if you know, did Sean obtain opiates in the early part of your relationship?

A. In the early part, he had a contact with a couple of doctors that would write scripts.

Q. Can you explain, at a high level, how Sean would get scripts from doctors?

A. He would ask. If he had a good relationship with the doctor, he would just ask and they would provide.

Q.   When you say scripts, are you referring to prescriptions?

A.   Yes.

Q.   Whose name, if you know, would those prescriptions be in?

A.   Anybody's name.  An assistant, my own name.  Um, yeah. Whoever's name hadn't been used a lot.

Q.   When you say hadn't been used a lot, can you explain what you mean by that?

A.   Um, when you're getting a controlled substance and you're doing it frequently, you can only get a certain amount after a certain point.  Um, so, yeah.

Q.   When you say assistants, whose assistants names would be used?

A.   Sean's.

Q.   During your relationship with Sean, the entirety of the relationship, all approximately ten years I'm talking about, how would you describe your dependency on opiates?

A.   I heavily depended on opiates.

Q.   Do you use any illegal drugs today?

A.   I do not.

Q.   When did you last use any illegal drugs?

A.   Illegal drugs, in 2022.

Q.   How did you stop using drugs?

A.   I went to rehab.  I sought professional help.

Q.   Turning to a slightly different topic.

          I would like to direct your attention to your

brother's birthday party in Connecticut in, I think, around 2013.

A.   Um-hmm.

Q.   Do you remember that party?

A.   Yes, I think it was his 30th.  Yeah.

Q.   What happened at that party?

A.   That party, at the end of the party, everybody was kind of leaving and scattering and going to other places, other bars. And the party was at a family friend's bar.

And my mother told me that somebody was taking a picture of me, and I was intoxicated and, um, I got into a fight with the girl outside of the bar.

Q.   What did you do?

A.   I pulled her out of the car, asked her if she was taking pictures, and I was punching her in the head.

Q.   You testified earlier that your relationship with Sean ended around 2018.

Do you recall that testimony?

A.   Yes.

Q.   Can you describe your physical health in the approximate year leading up to your end of your relationship with Sean?

A.   My physical health?

I was definitely going through a period of, like, these episodes that I later figured out were, like, PTSD episodes.  I would black out.

P5EsCOM3

MS. ESTEVAO:  Objection.

THE COURT:  Overruled.

Q.  You can continue, Ms. Ventura.

You were saying you had PTSD episodes?

A.  I had PTSD episodes.  I know Sean was concerned that I was having seizures.  Um, sleep walking quite a bit.  My body was -- in my mind, my body was telling me that I needed to just chill out.

Q.  You said Sean was concerned you were having seizures.

Did you have a seizure?

A.  I did not.

MS. JOHNSON:  Ms. Gavin, can you please pull up for identification Government Exhibit 3Q-107.

Q.  Ms. Ventura, do you recognize this photo?

A.  Yes.

Q.  What's depicted in it?

A.  That's the inside of my doorway at Harold Way, the last place I lived before breaking up with Sean.

Q.  In approximately what year was this photo taken?

A.  2018.

Q.  Did you take this photo?

A.  Yeah.

Q.  Is this a fair and accurate photo of your front door at Harold Way around 2018?

A.  Yes.

P5EsCOM3

MS. JOHNSON:  Government offers Government Exhibit 3Q-107.

MS. ESTEVAO:  Subject to our earlier objection.

MS. JOHNSON:  I don't believe there's an objection you've made on this photograph.

(Counsel confer)

MS. ESTEVAO:  Withdrawn.

No objection.

THE COURT:  It will be admitted.

(Government's Exhibit 3Q-107 received in evidence)

MS. JOHNSON:  Ms. Gavin, can you please publish to the jury.

Q.  Ms. Ventura, who placed the knife in the door in this photograph?

A.  I believe I did.

Q.  Why did you put a knife in your door handle?

A.  I was getting a lot of unannounced visits from Sean where he was angry, and trying to kill two birds with one stone, to lock it and have a weapon.

Q.  Prior to 2018 --

MS. JOHNSON:  You can take that down now, Ms. Gavin.

Q.  Prior to 2018, were there times when you and Sean took breaks from your relationship?

A.  Yep.

Q.  Can you describe how your relationship ultimately ended in

around 2018?

A.  Um, around 2018, I had spent several years, like, learning about a girl that he was dating for, basically, the whole, like, last half of our relationship.  And I, as an excuse for myself, I don't even know.  I said, if I catch you with her again, then I'm done.

And that's what happened.  They were seen out, and I was in Connecticut, so I was out.

Q.  Directing your attention to approximately August of 2018, did there come a time when you saw Sean?

A.  Yes.

Q.  What was the occasion?

A.  Um, we were having kind of a closure conversation, at least in my mind we were.  We went out to dinner at a restaurant, like, on the way to Malibu.  I think, at that time, he was trying to convince me to come to Burning Man with him.  That's something we did together over the years.

Q.  And from your perspective, what was the status of your relationship at the time you had dinner with Sean in Malibu?

A.  We were not together.

Q.  Were you seeing anyone else at the time?

A.  I was.

Q.  Who were you seeing?

A.  My now husband, Alex.

Q.  Can you describe how Sean was acting at the dinner?

P5EsCOM3

A.   Um, he was just being really nice.  Um, playful, laughing. Um, kind of romantic vibes, sort of.  But we just were normal, laughing.

Q.   How did the dinner end?

A.   Um, it ended with him bringing me home and, yeah, that was it.

Q.   And can you remind the jury which residence you lived in around this time?

A.   Harold Way, where you saw the door with the knife.

Q.   When you arrived at your home at Harold Way, what happened?

A.   Um, I went inside, went in the living room.  He came in, pretty usual, nothing weird, um, and then -- and then he raped me in my living room.

Q.   Where in your living room did the rape happen?

A.   On the floor.

Q.   How did you physically react when Sean raped you?

A.   I just remember crying and saying no.  But it was very fast, so ...

Q.   What, if anything, did you observe about Sean's physical appearance?

A.   Just, like, eyes black, I kind of said that before.  Just wasn't himself.  The laughing and, like, all the things that were happening before that were not there.  And it was just, like, somebody taking something from you, just, like, without ...

P5EsCOM3

Q. You said that you cried?

A. I did.

Q. What did Sean do when you cried?

A. He continued. I don't even know if he noticed, honestly.

Q. You also said that you said no.

What did Sean do when you said no?

A. He continued and finished.

Q. When you say finished, what do you mean?

A. He ejaculated.

Q. Where did he ejaculate?

A. Inside of me.

Q. What happened after you ejaculated?

A. He got up and he left.

Q. After the rape in your living room, were you intimate with Sean again?

A. I was, one more time, but by choice.

Q. What happened on that occasion?

A. Um, it was a friend of ours' birthday dinner that we went to and had a really nice night, like, that we've never really had before. Everything went smooth and happy. Um, so I ended up at his house.

Q. And when you say his house, are you referring to Sean's house?

A. Yep.

Q. Can you explain to the jury why you agreed to see Sean

P5EsCOM3

again after the rape?

A.  We've been together for over ten years.  Like, you don't just turn feelings off that way.  We were very connected at that point still.  I still had good vision of who he was as a person.  Like, I didn't hate him.

Q.  After your breakup, who, if anyone, did you stay in touch with from the individuals who were Sean's friends?

A.  Um, I kind of scattered, like, stayed in touch with everybody, like, just not every day.  It wasn't the same thing. I backed away quite a bit from everyone, but I still talked to assistants and security and would check in on birthdays and things like that.

Q.  Who is Brittany Hall?

A.  Brittany Hall is -- was a friend.  Her dad is one of -- was one of Sean's stylists.

Q.  Are you still in touch with Brittany Hall?

A.  I am not.

Q.  Why not?

A.  Brittany and I were actually working together for a short time before I went to rehab in 2023, and she was, like, the only person I really stayed in touch with out of the group, stayed in touch with after having kids and everything.  We stayed pretty close.  And then she started helping manage me and working with me.

        So when I went to rehab, she started a job as a host

on Revolt TV, which is Sean's television company.  And at that point, I just felt like it was a conflict of interest for us to be working together.  Yeah.

Q.  OK.  Since your breakup with Sean, what sorts of communications have you had with him since approximately 2018?

A.  A few check-ins.  Um, I know he was trying to get in touch with me through other people.  Um...

MS. ESTEVAO:  Objection.

THE COURT:  Sustained.

The jury should disregard the last sentence of the witness's answer.

Ms. Johnson.

BY MS. JOHNSON:

Q.  Focusing on your communications with Sean directly, how frequently did you speak to Sean after you broke up as compared to when you were dating?

A.  I mean, night and day.  There was a few messages over a few years.

Q.  OK.  And what were the topic areas primarily of those messages?

A.  Just checking in.  Sending love.  Nothing crazy.

MS. JOHNSON:  Ms. Gavin, can you pull up for identification Government Exhibit A-401-G.

Q.  Ms. Ventura --

MS. JOHNSON:  Actually, can you also pull up page two

P5EsCOM3

if possible.

Q. Ms. Ventura, do you recognize this document?

A. Yes, it's a text.

Q. Who is the text between?

A. Me and Sean.

Q. And approximately when is this message, this message thread from?

A. It says March 1, 2019.

Q. Is it a true and accurate message thread between you and Sean?

A. Yes.

MS. JOHNSON: The government offers Government Exhibit A-401-G.

MS. ESTEVAO: No objection.

THE COURT: It will be admitted.

(Government's Exhibit A-401-G received in evidence)

Q. Ms. Ventura --

MS. JOHNSON: Sorry, Ms. Gavin. Can you blow up that green message on the bottom of the screen.

BY MS. JOHNSON:

Q. Who sent this message?

A. From Sean to me.

Q. Who is it sent to?

A. To me.

Q. Can you please read it?

A.  I'll pull up and handle it face to face.  No threat.
Facts.  And you will not be threatening me.  You have too many
iPads full of skeletons.  If I was you, I would get me my
money.  Cause we both have better things to do with our lives.
I really don't won't no problems.  I got it from here.  I
tried.

Q.  When the message says, iPads full of skeletons, what is
your understanding of what Sean was referring to?

A.  The videos on the broken devices that I had.

Q.  And when he says, If I was you, I would get me my money.

Do you have an understanding of what he was referring
to?

A.  Yes.

Q.  What is that understanding?

A.  He wanted to be reimbursed.  My husband was my personal
trainer and he was paid, so he wanted money, his money back.

Q.  Who wanted his money back?

A.  Sean.

Q.  From paying whom?

A.  My husband.

MS. JOHNSON:  Ms. Gavin, can you take that down and
please move to page three.

Can you please blow up the blue messages in the middle
of page three.

Q.  Can you read those messages, Ms. Ventura?

P5EsCOM3

A.   It says, Do you want me to tell the truth?  It's way deeper than iPads.

Q.   What did you mean when you said, Do you want me to tell the truth, it's way deeper than iPads?

A.   There is much more than just freak-offs.  There was abuse. There was many things that happened over our relationship.

Q.   What were some of those things that happened over your relationship that you're referring to?

          MS. ESTEVAO:  Objection.  Cumulative at this point.

          THE COURT:  It's overruled.

A.   Can you repeat?

Q.   Sure.

          You just told me you're referring to abuse and more than freak-offs.  I asked what sort of things you were referring to beyond abuse?

A.   The whole dynamic of the relationship.

          MS. JOHNSON:  You can take that down now.

          Ms. Gavin, can you please pull up what's in evidence as Government Exhibit B-513.  Can you please turn to page two and three.

          Ms. Gavin, can you please blow up the message on page two.

BY MS. JOHNSON:

Q.   Ms. Ventura, who sent this message?

A.   It's from me to Sean.

Q.   What's the date?

A.   January 7, 2017.

Q.   What did you tell him?

A.   I told you I feel like this is all I'm used for and that's that.

Q.   What were you referring to when you said, I feel like this is all I'm used for?

A.   Freak-off.

MS. JOHNSON:  And, Ms. Gavin, can you please go to the other page and blow up the first two messages.

A.   Continue?

Q.   Yes.  Can you continue reading, please?

A.   I didn't leave you.  I saved you from beating me up.  And losing another week of my life to recover.

Q.   What are you referring to when you say losing another week of my life to recover?

A.   Exactly that.  Not being able to do anything that I wanted to do.  Work, normal.  Because I had to recover from abuse.

MS. JOHNSON:  You can take that down now, Ms. Gavin.

Q.   Ms. Ventura, I would like to direct your attention to the time period of February and March 2023.

Where were you at that time?

A.   February, as of February 11, I went to rehab and trauma therapy.

Q.   What led to you going to rehab and trauma therapy in

P5EsCOM3

February of 2023?

A.  I was spinning out and I didn't -- I didn't want to be alive anymore at that point.

Q.  Was there any particular event that led to you going to rehab?

A.  Um, I was actually shooting a music video with another artist and I just kept having, like, these horrible flashbacks. Um, and after the video shoot, I went home and it was, like, late, super, super late and my kids were asleep.  My husband was there.  And I just remember telling him, like, you can do this without me.  Like, you don't need me here anymore.

Um, I'm sorry.

Q.  It's OK.  There is a tissue if you need it.

A.  Yeah.  I couldn't take the pain that I was in anymore and so I just tried to walk out the front door into traffic, and my husband would not let me.

Q.  During rehab and after rehab, what, if any, writing did you do?

A.  Just, kind of, letting everything out, putting everything on paper for the first time so that I could really understand what I had been through over many years.  Um, luckily I found out, when I got to what was rehab, at that point I was coming off of Valium because my anxiety was so bad, that it was more trauma therapy than anything.

Q.  And with respect to your writing, what kind of form did it

P5EsCOM3

take?

A.  Um, it took the form of a book with chapters that I started.

Q.  Who, if anyone, helped you with that book?

A.  Um, my mom helped me just get it in, like, a Word document.

Q.  What did you want to do with the book?

A.  I really wanted Sean to read the information.  I wanted him to understand what I had to learn to understand over that period, um...

Q.  Why did you want Sean to read the book?

A.  Because I didn't think he understood.  I don't think, after all those years of begging for, like, sorries, and just for him to actually recognize the pain, the pain that he put me through.  Like, I just wanted him to understand.

Q.  What kind of pain did Sean put you through?

A.  I think bigger, more than anything, it was his own personal shame in having to carry the things that were shameful to him.

Q.  What were those things?

A.  The sexual part, the freak-offs, like, I took on a lot of responsibility with that, that I never should have.

Q.  What do you mean you took on responsibility that you never should have?

A.  He brought the concept to me when I was 22, and I would do absolutely anything for him and I did.  And it never stopped our whole relationship.  And it was expected of me and it made

me feel horrible about myself, and I couldn't -- I couldn't get it out.  I couldn't face him with it.  I was always so numb because that is what I chose to do to get through it.

Q.  How did you go about getting Sean book chapters?

A.  Um, I reached out to lawyers.  I had a lawyer.  I reached out to his lawyers.

Q.  How did you know the attorney that you used?

A.  I met him in 2021, and he was working on other stuff with me, like, modeling contracts and things like that.

Q.  Aside from conversations you had with your attorney, which I don't want to ask you about, was there any other way you went about trying to contact Sean regarding the book chapters?

A.  Yeah.  I reached directly out to Kristina, to K.K.

Q.  What did -- what did you ask K.K.?

A.  I asked if he had read it and/or just knew about it at all.  And, um, she said that, basically, it hadn't been taken seriously.  Like, I don't think anybody believed that that was actually me, so ...

Q.  What do you mean you don't think anyone believed that was you?

A.  She said it wasn't taken seriously.  Like, they didn't think that I would do something like that.

Q.  So other than wanting Sean to read your book, what else, if anything, did you want from Sean?

A.  I wanted to be compensated for the time, the pain, and like

the many, many years of trying to have to fix my life.

Q.  And without telling me about anything you talked about with your lawyer, what, if any, price did you have for the rights to your book?

A.  30 million.

Q.  Can you explain to the jury how you came up with that figure?

A.  I really didn't do any research.  I just picked a number that I felt like would alert him.

Q.  Alert who?

A.  Sean.

Q.  Are you aware if Sean read any of your book chapters in 2023?

A.  I'm not.

Q.  Did you receive any money for your book writes?

A.  No.

Q.  Did there come a time when you filed a civil lawsuit against Sean?

A.  Yes.

Q.  Approximately when did you do that?

A.  That was in November of 2023.

Q.  And who did you file the lawsuit against?

A.  Sean.

Q.  Were his companies also named in that lawsuit?

A.  Yes.

Q.  Is your lawsuit against Sean still pending?

A.  No.

Q.  What is the status of your lawsuit with Sean?

A.  I agreed to settle 24 hours after.

Q.  And how much did your lawsuit settle for?

A.  20 million.

Q.  Do you have any other pending lawsuits against Sean?

A.  I do not.

Q.  Do you have any other pending lawsuits against anyone else relating to your relationship with Sean?

A.  I do not.

Q.  Without telling me about any discussions with your lawyers, why are you testifying at this trial?

A.  I can't carry this anymore.  I can't carry the shame, the guilt.  Um, the way we -- well, I was guided to treat people like they were disposable.  It's -- what's right is right and what's wrong is wrong.  And I'm here to do the right thing.

Q.  When you say you treated people like they were disposable, who are those people?

A.  Escorts, everybody.  Anybody.

Q.  Just circling back on the things you said about your settlement, you said it was 24 hours later.  24 hours after what was your lawsuit settled?

A.  Um, after I turned down what he said.

Q.  Was your lawsuit settled 24 hours after you filed the

P5EsCOM3

complaint?

A.   Yes.

Q.   OK.  And who paid you $20 million?

A.   Sean and his companies.

Q.   Ms. Ventura, over the past two days you've testified about multiple freak-offs that you've had with Sean.

Do you recall that testimony?

A.   Yeah.

Q.   Approximately how many freak-offs in total did you have with Sean?

A.   It's impossible to know.  Hundreds.

Q.   After you broke up with Sean in approximately 2018, did you ever participate in a freak-off again?

A.   No.

MS. JOHNSON:  Your Honor, may I have one moment?

THE COURT:  You may.

(Counsel confer)

MS. JOHNSON:  No further questions at this time, but before we start cross-examination, your Honor, could we have a brief sidebar?

THE COURT:  You may.

(Continued on next page)

(At the sidebar)

MS. COMEY:  Your Honor, we wanted to just flag that we think there may be Rule 412 issues coming up with cross.  I don't know if counsel is going to avoid those issues until we have the break.

MS. ESTEVAO:  I don't know what those issues are.

MS. COMEY:  The issues are there were text messages that I believe that defense counsel was thinking about introducing over cross-examination that we learned through conferral that relate to allegations that Ms. Ventura had sex with other people, people other than the defendant, and that would obviously implicate the Rule 412.

So, as long as defense counsel does not go into those before the end of the day, I think we don't need to have this discussion.

MS. ESTEVAO:  As the government is aware, a large part of the defense is the infidelity on both sides and the fact that Mr. Combs understood that Ms. Ventura was having other relationships with other men.  Under my understanding of our conferrals was that, that was not a 412 issue.

MS. COMEY:  Yeah.  So as long as it's that there were other romantic relationships, without talking about other sex acts, not saying anything about having sex or any sexual contact with other people, that's fine.

If the question is going to be were you in romantic

relationships with other people and did Mr. Combs know about that?  Fine.  We would not object.  That does not implicate Rule 412.

But if there is going to be questions about sex acts that this witness engaged in with people other than the defendant and other than escorts in front of the defendant, we have a 412 objection.

THE COURT:  Well, a more basic question.

Is your preference to proceed at this time, or to come back in the morning and begin your cross-examination?

MR. AGNIFILO:  In the morning.

MS. ESTEVAO:  We can come back and start tomorrow morning.

MS. JOHNSON:  Your Honor, we would really stronger prefer to start today, make sure this witness off the stand, given the timing issues we have.

THE COURT:  All right.

MS. COMEY:  I imagine we have plenty of issues, your Honor, the defense could question this witness about.

THE COURT:  We'll take it up as we go.  I don't think we have an agreement here.  I haven't seen the documents, so I can't rule on it right now.  You can offer it and we can deal with it.

MR. AGNIFILO:  One of the reasons that it would be better to start tomorrow, we only have access to our client

until six o'clock and we need to talk to him.  We need to talk to him.  This is a very important cross.

I think losing 45 minutes of in-court testimony, I mean, it's 45 minutes.  It's not nothing, but 45 minutes with him, our time is very limited because he's incarcerated.  So we would cherish having an additional 45 minutes to speak to him an get prepared for a very long cross.

MS. COMEY:  Your Honor, I'm happy to ask the marshals to keep him here later.  This witness is very, very pregnant. We are afraid she could have the baby over the weekend.  We want her off the stand before the weekend and we believe 45 minutes could make a difference.

THE COURT:  Aren't we -- isn't that going to happen either way?

Let's proceed.  We'll make allowances for you to have access to Mr. Combs later than usual.  We'll handle it that way.

MR. AGNIFILO:  OK.

THE COURT:  We'll take it as it goes.

(Continued on next page)

P5EsCOM3

(In open court)

THE WITNESS:  Would it be possible to have a break?

THE COURT:  Yes.

THE WITNESS:  OK.  No worries.

THE COURT:  All right.  We're going to take a very brief ten-minute break and we'll be back.

Thank you, members of the jury.  We'll be back at 4:25.

All rise.

(Continued on next page)

P5EsCOM3

(Jury not present)

THE COURT:  See you back here in a few.

THE WITNESS:  Thank you.  I appreciate it.

(Witness temporarily excused)

THE COURT:  Please be seated.

Well, I think Ms. Ventura may have solved the issue, she needed a break, which I was happy to give her.

By the time we get back and have the jury back, it's going to be 4:30.  There is going to be 30 minutes left.  Given there are unresolved issues that need to be addressed concerning cross-examination, doesn't it make the best sense to start in the morning?

MS. JOHNSON:  Your Honor, we reiterate our concerns about not starting the cross today, given the timing issues we have with this witness.  The government tried to be as efficient as possible in our direct, which was approximately, definitely, under two days, I would say a day and a half total, and we really need to get this witness's cross done.

THE COURT:  I understand that.

Ms. Estevao, in the same non-binding way I have inquired as to other people about the length of things, do you have a general ballpark sense of the length of your cross examination?

MS. ESTEVAO:  We expect that she will be done at the end of the week, on the end of the day on Friday.

THE COURT:  With cross-examination?

MS. ESTEVAO:  No.  We'll be done with cross-examination before then.  We expect to take the full day tomorrow and likely into Friday.

THE COURT:  Here's what we're going to do.  I think it makes sense for us to adjourn until tomorrow, but I will make up the time.  I think we can -- we have lunch provided for the jurors.  We don't need to take 45 minutes.  I'm hoping we can avoid some kind of lunch discussion that it causes us to extend that.

I'm also happy to ask the jurors to be here a little bit earlier so that we can start, instead of starting at 10:00 o'clock, which is when we've been starting, we can start at 9:30 on the dot.

So what we'll do is, we'll have the attorneys come in tomorrow at 8:30, and then we will start at 9:30.  We'll take a 30-minute lunch break.  We should be able to make up the half hour so that we can really make sure that we're doing things in an efficient way.  We'll proceed on that basis.

So, given that, let's have the jury back.  We can have them in the box, and then we'll let them know what's happening and that they can be retired until tomorrow.  And I don't think Ms. Ventura needs to come back.

Let's get our jury.

MS. COMEY:  Your Honor said the witness can be

P5EsCOM3

excused?

THE COURT:  The witness can be excused.

MS. COMEY:  Thank you.

(Witness excused)

(Continued on next page)

P5EsCOM3

(Jury present)

THE COURT:  Members of the jury, thank you for your patience and all your hard work today.  I hate to bring you all the way out here to tell you we're going to adjourn a little earlier today and come back tomorrow.

And I will just ask you to do what you've been doing, which is to get here on time.  Tomorrow we're going to try our very best to start exactly at 9:30 so that we can make efficient use of your time.

As I've told you on every other day, do not talk to each ear about the case, please do not look up anything about the case.  Don't talk to anybody about anything having to do with this case.  And if there are any issues in the meantime, you can certainly let our courtroom deputy know.

With that, have a great evening, and we'll see you back here tomorrow.

All rise.

(Continued on next page)

P5EsCOM3

(Jury not present)

THE COURT:  Please be seated.

Ms. Comey or Ms. Johnson.

MS. COMEY:  I'll be handing this one, your Honor.  If I may start, just to frame the discussion because it relates to Rule 412, I would like to hand up -- I have a copy for defense counsel -- the letter that the defense sent to the government memorializing the agreement we reached when we conferred about whether or not we would need to brief any 412 issues for your Honor.

So I have that letter, and I also have the letter that the defense sent to your Honor after those conferrals.  I don't believe your Honor has seen the letter to us before.  The relevant part starts at the bottom of page one and goes into the top of page two.

I'm happy to explain the dispute, once your Honor has had a chance to review that.

THE COURT:  Just give me one second.

You may proceed.

MS. COMEY:  Thank you, your Honor.

So the agreement that we understood we had reached was that both parties could elicit testimony about this victim's sexual contact with the defendant and with escorts for obvious reasons.

We also agreed that both parties could elicit

testimony and evidence about this witness's involvement in romantic relationships with people other than the defendant, because we understand that infidelity is a theme of the defense.  And we understand that they want to argue that many of the disputes and the arguments that came up in Ms. Ventura's testimony related to infidelity.

However, it was the government's position in our conferrals that any evidence or questioning about specific sex acts that the victim had with people other than the defendant or other than escorts in the defendant's presence would implicate Federal Rule of Evidence 412, which limits the circumstances under which evidence of other sex acts can be introduced with respect to a victim like Ms. Ventura.

We understand that the defense is going to cross-examine Ms. Ventura about relationships that she had with other people, romantic relationships that she had with other people, and the defendant's awareness of those relationships and the timing of those relationships.  We have, as of now, no subject matter objection to that.

What we object to is that we understand that there are some text messages that reference Ms. Ventura "fucking someone else." That clearly implicates -- that clearly seems to be evidence of another sexual act with a person other than the defendant and other than an escort in the defendant's presence.

We believe that that implicates Rule 412.  We also

don't understand why it would be necessary to prove up any sex acts that Ms. Ventura had with anyone else.  The defense can ask her whether she was in other relationships.  We don't contest they were in other relationships.  We are concerned that efforts to put in text messages referencing her having sex with other people is an attempt to backdoor in evidence that would be prohibited by Rule 412 and to get in front of the jury suggestions that would -- suggestions that she was having sex with other people.  And that would raise the specter of sex-based stereotypes and stereotypes based on promiscuity and would be improper and prejudicial to this victim and violative of her rights under Rule 412 and under the Crimes Victims' Rights Act.

Because this implicates Rule 412, I will also note that Victim 1's counsel wants to be heard on this issue, which he has a right to, under Rule 412.  He would want to submit something in writing if the court is not inclined to sustain our objection.

I've just been handed the proposed exhibits.  I would rather not read these out loud into the record.  If your Honor would like to see them, I can hand up the highlighted versions, and I'll show them to defense counsel first.

THE COURT:  Well, let me just understand your position.

You're saying that this evidence is not admissible

P5EsCOM3

under Rule 412.  The only way it could possibly be admissible is based on an agreement struck with the government, and based on the letter that you provided to me, it is not.  So then there is just no basis for the admission of this evidence.

MS. COMEY:  That is our position, your Honor.

THE COURT:  What is the response?

I suppose, whoever is, as the proponent of the evidence, if you are able to put it on the screen so we can see what we're talking about, that would be helpful.

MR. AGNIFILO:  I don't know what exhibits exactly the government's referring to, but from the way that they referred to them, there is going to be discussion, there is going to be verbal discussion, discussion over text messages between Mr. Combs and Ms. Ventura about jealousy.

When that is being expressed, it's expressed in the terms -- in the vocabulary of are you, you know, F'ing that person?  Are you doing something like that?

I don't see how that is -- that's exactly what we agree is fair game.  I mean, that is -- that is part and parcel of the infidelity and the jealousy, and this is the real-world way that people express hurt over the realization that there is cheating going on.

So if that's what the government's referring to, then --

THE COURT:  I don't think they are saying that's what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5EsCOM3

they are referring to. They are pointing to the letter that defense sent on March 28 in which this issue was addressed. And there, the defense says that there will be evidence as to relationships. However, the defense does not intend to introduce evidence of any specific sexual acts between the alleged victims and these other people.

MR. AGNIFILO: That's right.

We are not going to ask any details about sex acts. That has nothing to do with our defense whatsoever, but --

THE COURT: You're saying you're not going to introduce evidence of any specific sexual acts?

MR. AGNIFILO: So...

THE COURT: I'm just reading from your letter.

MR. AGNIFILO: I understand.

Let me make it more clear.

MS. COMEY: I'm so sorry. If we're going to be talking about specific messages, I've just been reminded by co-counsel that Rule 412 contemplates a sealed in-camera proceeding without the public and press.

So if we are going to talk more specifically, I apologize, the rule expressly requires that it be sealed.

THE COURT: All right. Without referencing any specific evidence at this point, continue.

MR. AGNIFILO: So the way that this is expressed is with certain terms that themselves, I don't -- they do not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5EsCOM3

refer to sex acts.  It's in the colloquial.

I'm sorry to say, but --

THE COURT:  In terms of exhibits --

MR. AGNIFILO:  Yes.

THE COURT:  -- how many exhibits are we talking about?

MR. AGNIFILO:  One second, Judge.

(Counsel confer)

I don't know what exhibits they are talking about, Judge.  I'm doing this with one hand tied behind my back.  I don't know what they are talking about.

MS. COMEY:  One moment, your Honor.

(Counsel confer)

MR. AGNIFILO:  What Ms. Comey showed me is written communications of -- along the lines of, I hear you're F'ing with so-and-so.  Don't F with so-and-so.

That is not a reference to a specific sex act.  That is the way that people express or ask a question, Are you cheating on me?  You know, and if you would have used the words, Are you cheating on me, I don't think they would be making this objection.

But those aren't the words that were used.  The words that were used were a little more, I don't know, vulgar, things you're not allowed to say in a courtroom, mostly, and that is how the questions were expressed.

This is the text messages and the written

communications I expect we're going to see.  That is not a specific sex act.  That is a way of asking, Are you cheating on me?  You know, and we're not -- and this isn't -- this is not even within the spirit of 412.  This isn't about people of ill repute or people who are sexual or things like that.  This is baked into the facts of the case.

Both sides opened on infidelities.  Infidelities get expressed in the real word certain ways.  All we are looking to do is express the infidelities that are part and parcel of both the defense and the prosecution and the exact manner in which they were made and the words that were used.

This is not 412.  And part of the agreement that we have is that this is not 412.  This is part of the case.  This is part of the defense.  We have worn our defense on our sleeve since, I think, the first bail hearing, that all these things are about jealousy and infidelity and the anger and the hurt.  This comes with jealousy and infidelity.  And one would expect that the verbiage reflects the anger and hurt of infidelity, and it does.

That is absolutely all fair game, Judge.  I'm surprised that the government even views this as a 412 issue, or views it as something inconsistent with our agreement, because we discussed this at great length.  Everybody knows that we are going to bring up infidelities, that we're going to want to bring up text messages of infidelities, and these text

messages are often in colorful language.

That doesn't transform this into a 412 issue.

MS. COMEY:  Your Honor, if I may.  We knew that this was going to be the defense, which is why we raised precisely this issue in the context of our conferrals about Rule 412 and why we wanted to make sure that the defense would agree not to introduce evidence of any specific sexual acts between the alleged victims and these other people.

We wanted that specific agreement and that precise language because we would need 412 litigation and 412 notice and a right to be heard, if any evidence of a specific sex act with another person was going to come in at this trial.

We flagged this issue months ago.

MR. AGNIFILO:  Judge, I would like to know what specific sex act they are talking about.

MS. COMEY:  Your Honor, we would need to be under seal.

THE COURT:  Hold on.

So here is the issue.  Now that we're in cross-examination, you're going to be providing all the exhibits over to the government?

MR. AGNIFILO:  Yes.

THE COURT:  So there is no issue sending the court the --

Well, Ms. Comey, once you get these exhibits, then you

should be in a position, if you are not already, to send those exhibits that you believe are subject to 412 to the court.

Maybe you have the numbers already?

MS. COMEY:  So, your Honor, the way this issue came up is that they were making rule of completeness objections to our exhibits, asking to add in text messages that we believe run afoul of Rule 412.  This is how this issue came onto our radar.

So we have a handful that the defense has asked that they come in as part of our exhibits.  I don't know if there are more that the defense is planning to offer, but I can tell you Government Exhibit B-629 and B-640.

I'm sorry.  Those wouldn't have the language because we cut it out.

I apologize, your Honor, we're going to have to get you these text messages separately, but...

THE COURT:  That's fine.

Second, Mr. Agnifilo, is there any issue -- I need to know what you're planning on doing so we can address this issue in advance.

If there is a Rule 412 issue, as Ms. Comey indicates, those are various procedures that have to be followed.  I have to think about whether there is even a procedure that would be permissible, given the lack of any notice under the rule.

So what is your proposal as to how I can get that information?

MR. AGNIFILO:  So we are giving the government all of the possible exhibits that we would use tomorrow so they will have all of that.  And if there are specific things that they object to, we can have that issue raised.

But this issue in terms of, you know, reference communications between Mr. Combs and Ms. Ventura is certainly not 412 and not elicited for a 412 reason.

But that being said, we'll give the exhibits to the government, and we'll see what they raise.

THE COURT:  Well, there's the issue of the exhibits and then there is the issue of the testimony that you're trying to elicit, right.  Because those are the two forms of evidence that we would be concerned about.

MR. AGNIFILO:  Here is what the nature of the problem is.  The government seems to be saying that if there is a text message that says, Are you F'ing so-and-so, that that is 412 because F'ing is a sex act.  That is not what that is.

That is a way of expressing -- that is a way of expressing if someone is cheating on someone, and that's what that is.

THE COURT:  You're saying under the rule, under 412(a)(1) or (2), it's not evidence offered to prove that a victim engaged in other sexual behavior.

MS. COMEY:  Your Honor, I think it is offered to prove that the victim was having sex with another person, as opposed

to being in a romantic relationship with another person.

THE COURT:  You would agree there are certain -- there could be a text where it was phrased as fucking, but it was just the verbiage used.

MS. COMEY:  It's hard for me to imagine, your Honor, such a text not requiring notice under Rule 412.  This is hard for me to imagine.  This is why 412 exists, so that there can be notice, an opportunity to be heard in a sealed proceeding, in order to sus out whether exhibits fall under the rule or not.

This is why we tried to confer with defense counsel months ago and were assured we didn't need such a process.

THE COURT:  All right.  What I need to see are the exhibits.  And I think the onus is on the government to identify the exhibits, once they've been turned over.

As to the nature of the inquiry on cross-examination, I'm happy to do this -- there's an issue here, because I take it that defense does not want to reveal to the government exactly what it's going to ask on cross-examination.

So I need to know, at least in general terms, what it is you are seeking to elicit.

MR. AGNIFILO:  They are certainly going to know when we give all the exhibits.  That's fine.  This is time we have no issue with it.

MS. COMEY:  Your Honor, we're not allowed to speak to

the witness.  I don't understand the defense question.  So there is no conceivable prejudice.  We can't talk to her.

MR. AGNIFILO:  One second.

(Counsel confer)

THE COURT:  Let's just be very clear about it.  Let's say there is a hypothetical question that is --

Give me, like, the hypothetical question that you're alluding to that doesn't have anything to do with 412.

MR. AGNIFILO:  Are you fucking this guy?

THE COURT:  How does that not fall within 412?

MR. AGNIFILO:  Because it's not a specific sex act.  It's a way of asking her, Are you cheating on me?

We're not looking to offer it for its truth.  We don't care what the answer is.  We don't care.  What is relevant --

THE COURT:  Well, I hope you only ask questions that you care about.

MR. AGNIFILO:  It's not being offered for the truth.

THE COURT:  OK.

MR. AGNIFILO:  The relevance is what is in Mr. Combs' mind in asking the question.  We have no interest in determining whether or not that's, in fact, true.  They are in a relationship.  There's a relationship.  If we were talking about relationships instead of the F word, none of this would be a problem.  But this is all about relationships.  It's just the way that these things are being expressed.

MS. COMEY:  Your Honor, I think that the defense can make these points and they largely won't be disputed by asking, for example, I can imagine a line of cross that says something like, The defendant accused you of cheating all be time, didn't he?  The defendant accused you of cheating with this person, he accused you of cheating with this person, accused you of being in a relationship with this person.  The defendant told you he thought you were in a relationship with other people all the time.  And I suspect she would say, yes, yes, yes, yes, yes, yes.  They would get the record they need, they don't run afoul of 412, and they don't backdoor in accusations that she is having other sorts of sex acts that run afoul of Rule 412.

This is not only a 412 issue at this point, but also a 403 issue.  Those kinds of text messages, it's distracting the jury, embarrassing, humiliating this witness unnecessarily on an issue that is largely undisputed.

THE COURT:  We'll get the exhibits no later than when, 7:00 p.m.?

MR. AGNIFILO:  We have them here.  We have them right now.

THE COURT:  You have them and you can hand them up right now?

MS. GERAGOS:  I think, in the first instance, the exhibits we should start with are the ones we have been conferring on with the 106 issues.

Those are the perfect ones to give to the court right now, that you believe are problematic, and I think that gets to the heart of it.

MS. COMEY:  I think that's right, your Honor.  But if we're going to have a discussion about it, it needs to be under seal.

MR. AGNIFILO:  One thing.

THE COURT:  Hold on.

MR. AGNIFILO:  Sure.

THE COURT:  Haven't we been talking about some of these exhibits already?

We haven't been talking about them in the way of a sealed hearing.  I just need to see it.  We are not talking about it.  It doesn't need to be shown to anybody else.

But I'm sure you have the technological capability to put it on my screen.  Is that possible?

MS. COMEY:  Not on our end, your Honor.  I defer to the defense.  It's their exhibit.

MS. GERAGOS:  OK.

THE COURT:  Here's what we're going to do.  We are going to gather all the exhibits that are potentially at issue. We're going to do that by 7:00 p.m.

By 8:00 p.m., if either side wants to put in a letter on their position on these issues to the court, they can do so. If the defense feels that the court's understanding of this

issue requires a deeper understanding of the nature of their cross-examination that they don't want to reveal to the government, then they can separately.  They can give one letter that they want to share with the government.  If there is some portion of that they believe should not be shared with the government, they can submit that to the court in camera ex parte.  I can review it.  We can come back at 8:30.

If there any need for a sealed proceeding before we start, we will have the ability to do that with whomever is at issue that needs to be there.  We can do in our robing room so it won't be in open court.  There are ways in which we can handle that in a fashion that will be acceptable to everyone.

So if someone thinks they might need to be heard on this issue, they should be here at 8:30.

Any issues with that, Ms. Comey?

MS. COMEY:  No, your Honor.  I would note, if we do have a sealing proceed, either the defendant will need to be present, which the marshals would require be in the courtroom.

THE COURT:  We will clear the courtroom.  We will take care it of that way.

Mr. Agnifilo.

MR. AGNIFILO:  No.  Just what I stood up to say a minute ago is, I think your Honor asked me a question and I didn't answer the question.  Your Honor asked me, which is, how are we going to handle the cross-examination?

I think the cross-examination can be more general. You know, talk in terms of relationships, things like that. I'm less worried about the cross-examination than I am about the exhibits that were written already.

THE COURT:  We're solving problems already.

MR. AGNIFILO:  Yes.

THE COURT:  All right.  So that's part of it.

So it's really about these exhibits, is what you're telling me?

MR. AGNIFILO:  I think that's right.  We can phrase the questions in the cross-examination around it, but the exhibits are already written.  And so I think it's an exhibit problem more than a questioning problem.

MS. COMEY:  Your Honor, I understand that counsel for Victim 1 may want to be heard before we break for the day.

THE COURT:  He raised his hand and I saw him.

MS. COMEY:  I understand he would also like to see the exhibits, which he is also entitled to see under the rule.

THE COURT:  OK.  Mr. Wigdor, do you have anything further to add.

MR. WIGDOR:  No, your Honor.  That is my point.

We are entitled to notice to the exhibits as well so we raise an objection by letter tonight or to appear in the hearing in camera tomorrow morning.

Thank you, your Honor.

P5EsCOM3

THE COURT:  Of course.

Anything further on this issue, Ms. Comey?

MS. COMEY:  No, your Honor.

MS. GERAGOS:  I just want to add one point, your Honor, which is why we backed off on the 106 issues on these exact exhibits, which is because if the government puts them in, they are offered for their truth, which is a point Ms. Johnson made to me last night, which we understood.  And we are not going to offer any of Mr. Combs' statements, we have been talking about, that relate to this for their truth.

It's only for a state of mind.  I just want to put that on the record because that's been part of the conferrals about this process.  I just wanted to let you know.

THE COURT:  Understood.

Any issues, other than the 412 issue that was just raised?

There were some exhibits I know were e-mailed.  There is some things to hammer out.

MS. COMEY:  I don't know about that.  I'm just confirming.  I want to make sure we get it right.

We are getting the defense exhibits at 7:00 p.m. tonight

THE COURT:  No.  I think they are ready to be provided to you.

MS. COMEY:  Wonderful.

P5EsCOM3

THE COURT:  We need to get them in advance.  I assumed I could get them by 7:00 p.m.

MS. COMEY:  We'll get the exhibits now, we'll preview them, and get you the ones that raise 412 issues by 7:00.

THE COURT:  If you need more time, let me know.  That's what I said.

MS. COMEY:  OK.  Thank you, your Honor.

THE COURT:  Is the government, in fact, in receipt of the exhibits, or are they --

MS. COMEY:  I am not, your Honor.

THE COURT:  I'm talking to the defense.

MS. GERAGOS:  My paralegal brought binders and they are sitting right there.  We will get them over.

MR. AGNIFILO:  They are in the courtroom.

THE COURT:  OK.

MR. AGNIFILO:  We'll give them.

MS. COMEY:  We will also ask for an electronic copy.

THE COURT:  We're in the 21st century.  Let's try to make that happen.

MS. GERAGOS:  We are.  I do work with Mr. Agnifilo, but we are in the 21st century.

MR. AGNIFILO:  I'm a little behind.

THE COURT:  Anything further from the defense?

MR. AGNIFILO:  No.  Thank you, Judge.

THE COURT:  Be here at 8:30.

P5EsCOM3

Right now, this is the only issue that is relevant to tomorrow's testimony at this time.  I'll be watching my e-mail.

Right now.  Nothing else?

MS. COMEY:  For now, your Honor.

MR. AGNIFILO:  Thank you, Judge.

THE COURT:  We're adjourned.

(Adjourned to May 15, 2025, at 8:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                          Page

 CASANDRA VENTURA

Direct By Ms. Johnson  . . . . . . . . . . . . 624

GOVERNMENT EXHIBITS

Exhibit No.                                       Received

 B-210, B-211, B-212, B- 213, B- 217,  . . . . 626

          B-218, B-221, B-225, B-226,

          B-227, B-229, B-231, B-232,

          B-233, B-235, B-236, B-243,

          B-245, B-247, B-248, B-251,

          B-253, B-254, B-255, B-256,

          B-257, B-258, B-259, B-262,

          B-263, B-264, B-266, B-322,

          B-323, B-325, B-327, B-328,

          B-333, B-336, B-339, B-340,

          B-341, B-344, B-347, B-349,

          B-351, B-352, B-354, B-355,

          B-357, B-358, B-359, B-361,

          B-362, B-403, B-404, B-406,

          B-407, B-405-A, B-410, B-412

          and

 BX 201 through 210 and BX-601 and . . . . . . 628

          BX-602

 B-626   . . . . . . . . . . . . . . . . . . . 636

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

B-627-A . . . . . . . . . . . . . . . . . . 646

9Q-101 . . . . . . . . . . . . . . . . . . 649

2A-617, 2A-602, 2A-619, 2A-616, 2A-634, . . . 650

      2A-607, 2A-618, 2A-601,

      2A-620, 2A-624, 2A-632,

      2A-633, 2A-628

B-622 . . . . . . . . . . . . . . . . . . . 658

B-413, B-414, B-415, B-416, B-418, . . . . . 670

      B-420 B-421, B-422, B-425,

      B-427, B-431, B-432, B-504,

      B-506, B-507, B-510, B-512,

      B-513, B-514, B-610, B-611,

      B-613, B-614, B-615, B-616,

      B-617, B-623, B-624

2A-504 . . . . . . . . . . . . . . . . . . . 691

9D-102 . . . . . . . . . . . . . . . . . . . 699

2A-404 . . . . . . . . . . . . . . . . . . . 748

2A-502 . . . . . . . . . . . . . . . . . . . 772

2A-501 . . . . . . . . . . . . . . . . . . . 778

2A-406 . . . . . . . . . . . . . . . . . . . 781

3Q-109 and 3Q-112 . . . . . . . . . . . . . 785

9N-101 and 9N-102 . . . . . . . . . . . . . 794

3Q-104 . . . . . . . . . . . . . . . . . . . 795

B-609 . . . . . . . . . . . . . . . . . . . 797

2A-407 . . . . . . . . . . . . . . . . . . . 801

2A-503    . . . . . . . . . . . . . . . . . . 805

3Q-107    . . . . . . . . . . . . . . . . . 814

A-401-G    . . . . . . . . . . . . . . . . 820