P5FCcom1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

        v.                      24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

            Defendant.           Trial
------------------------------x

                        New York, N.Y.
                        May 15, 2025
                        8:30 a.m.
Before:

              HON. ARUN SUBRAMANIAN,

                        District Judge
                        -and a Jury-

                  APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
    EMILY A. JOHNSON
    MAURENE R. COMEY
    MEREDITH FOSTER
    MITZI STEINER
    MARY C. SLAVIK
    Assistant United States Attorneys

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5FCcom1

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
     Attorneys for Defendant
BY:  MARC A. AGNIFILO
     TENY R. GERAGOS
     -and-
SHER TREMONTE
BY:  ANNA M. ESTEVAO
     -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
     JASON A. DRISCOLL
     -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND

ALSO PRESENT:
LUCY GAVIN, AUSA Paralegal Specialist
SHANNON BECKER, AUSA Paralegal Specialist
RAYMOND MCLEOD, Defense Paralegal Specialist

P5FCcom1

(Trial resumed; jury not present)

THE COURT:  Who's going to be addressing the 412 issue from the defense's side?

MR. AGNIFILO:  It's going to be me, Judge.

THE COURT:  Mr. Agnifilo, can you put Rule 412 to the side for a moment.

MR. AGNIFILO:  Of course.

THE COURT:  How are you getting these exhibits into evidence?  Just walk me through that.

MR. AGNIFILO:  So for text messages, we are going to ask the witness just like the government did, you see this text message, is this a fair and accurate text exchange between you and the defendant.

THE COURT:  Well, there are no objections raised.  So let's assume there has been an objection raised.  How are you going to get these in?  Are these prior inconsistent statements?  What are you doing?

MR. AGNIFILO:  Most are not offered for the truth of any assertion.  So in the first instance, I believe most of the proffered text messages are not hearsay to begin with because there's no assertion being offered for its truth.  I think your Honor made reference, I think it was a few days ago, that part of what may be relevant, we're saying that it's very relevant in this case, is the nature of the relationship.  This is a relationship that took place largely over text message.  They

P5FCcom1

communicated about everything.

THE COURT:  I understand.  I had that question. You're saying they're not being brought in for the truth of the matter asserted.  They're being brought in either for context or I suppose the defendant's state of mind.

MR. AGNIFILO:  That's right.  Or Ms. Ventura's state of mind because she would need to -- for the sex trafficking count, there would need to be coercion.  But I think it's probably most relevant for Mr. Combs' state of mind.  I don't even know that we necessarily get that far because if they're not being offered for the truth, if they're just being offered to show context and how the relationship progressed, I think it ends there because there's no hearsay statement, there's no statement that's defined as hearsay.

THE COURT:  I understand.  All right.

The defense argues that the messages at issue are not being offered to show either that a victim engaged in other sexual behavior or to prove a victim's sexual predisposition. However, the defense has cited no case indicating that where evidence of a victim's sexual behavior or a sexual predisposition, which this is, is brought in for a different purpose — here, context, or the accused's state of mind, that Rule 412 would not apply.  In fact, this would impose by judicial fiat an exception that is not encompassed by 412(b). The Fourth Circuit has gestured at such an exception the *Doe*

case, but it appears to be the only court that has adopted any exception along those lines, and the exception was itself questioned by the Fourth Circuit in the *Saunders* case, which is cited by the government.  The advisory committee notes moreover that the amendment to the rule to address sexual predisposition was intended to exclude evidence that does not directly refer to sexual activities or thoughts, but that the proponent believes may have a sexual connotation for the fact finder. These messages fit the bill.  Rule 412 applies.

MR. AGNIFILO:  Your Honor, can I be heard?

THE COURT:  Let me finish and I'll do the same thing which we've always done, which is you can react to what I'm saying.

The evidence does not fall within any of the exceptions listed in 412(b).  The only exception that defense points to is (b)(1)(C), which refers to evidence whose exclusion would violate the defendant's constitutional rights.

Here, as the defense acknowledged yesterday and as the government acknowledges in their letter, witnesses can be cross examined on relationships with other people, even questioning on whether those relationships were intimate in nature, and communications between Mr. Combs and witnesses such as Ms. Ventura concerning all of that are fair game, say for the very small category of messages at issue, which the government offers, can be redacted and then admitted, which goes to show

how much of a tempest in a teapot this issue really is.

Even if there were potentially any constitutional dimension to this issue, and there is not, the procedures required in Rule 412(c) were all flouted. While the defense may claim there is good cause to excuse their failure to bring this issue to the Court's attention sooner, the Court disagrees. When the defense struck its deal with the government, as memorialized in the March 28th, 2025 letter, it was aware that there was an issue relating to Rule 412, and the language employed in the letter was conspicuously vague. The defense apparently did not advise the government that they would be introducing evidence about, for instance, Mr. Combs advising Ms. Ventura that he believed she was having sexual encounters with other people. I won't get into the language employed in the messages. Instead saying that while it would introduce evidence of romantic relationships, it would not introduce evidence of any specific sexual acts between the alleged victims and these other people. So the evidence would be excluded in any event for failing to follow Rule 412(c). The evidence would also be excluded on Rule 403 grounds for the reasons stated above. The probative nature of the specific messages that are referenced is minimal given that the witnesses can be cross examined on their relationships with other people, including whether those relationships were intimate in nature and communications relating to all of that

P5FCcom1

are fair game, including any questions to any witness about Mr. Combs communicating that he was jealous or suspected that there was infidelity on the part of the witness being examined.

On the other side of the ledger, there is a high degree of unfair prejudice and potential victimization of the people who are testifying, which is precisely the point of Rule 412 and why it was adopted in the first place, to prevent this kind of thing from happening.  However, the exhibits unredacted can be used to refresh a witness's recollection as Rule 412 solely applies to the admission of exhibits.  The government further argues that the exhibits could be redacted because it is only the evidence of the actual sexual behavior itself that Rule 412 covers, at least as the government acknowledges in its letter.

Finally, there should be no issue with testimony, again, because the issues of Mr. Combs's thoughts on infidelity, jealousy, et cetera, that go to the defense's argument are fair game and the government does not suggest otherwise.  The truth is, this will not affect the defense's case in any way, shape, or form, other than to exclude plainly inadmissible messages that have questionable relevance to this case.

Mr. Agnifilo.

MR. AGNIFILO:  Thank you, Judge.

We alluded to this yesterday, and I see that your

P5FCcom1

Honor's trying to strike a balance, but I want to put everything in a slightly different relief.

THE COURT:  I'm not trying to strike a balance. What's the case?  What's your case or authority?

MR. AGNIFILO:  The crux is the agreement that your Honor referenced, but there's a background to the agreement as almost all agreements have.  This is a subject that we discussed with the government extensively, throughout March of this year, and I want to read the relevant paragraph of the agreement into the record, if I could, just to make sure --

THE COURT:  From the March 28th letter?

MR. AGNIFILO:  Yes, Judge, because there's one particular paragraph, there's a few sentences that really is the whole heart of the argument here, and it reads as follows: In addition, we expect there will be evidence from both prosecution and the defense as to relationships alleged victims had with people other than Mr. Combs.  The defense may cross examine witnesses and/or introduce evidence as to interactions between Mr. Combs and the alleged victims regarding the existence of such relationships.  However, the defense does not intend to introduce evidence of specific sexual acts between the alleged victims and these other people.  We understand, based on our discussions with you, that the government agrees that such evidence does not implicate 412 as long as it does not involve specific sexual activities between the alleged

victims and these third parties.

Now, here's the import of that --

THE COURT:  Let me just pause right there.

MR. AGNIFILO:  Of course.

THE COURT:  In the letter that you submitted last night, you quote from the text messages the specific parts of the messages.  That's really what we're talking about.  We're talking about specific words in specific messages.  How would those not be specific sexual activities, the line that you just quoted from the letter?  Because, again, the government isn't complaining about anything else, meaning they're not complaining as to this particular objection, to anything other than about eight words in specific messages.

So let me ask you this question before we get to the import of all of this.  You're preparing your cross-examination, when you're going through these exhibits, did you go back to the government and confirm that these specific messages would be consistent with the agreement?  And when did you do that?

MR. AGNIFILO:  In terms of the specific exhibits, we didn't do that until yesterday after.

THE COURT:  So how would you ever be in a position to establish good cause?  Because if you had done it even two weeks ago, a week ago, then the government would have told you that they believe this fell under Rule 412 and did not fall

P5FCcom1

within the parties' agreement, at which point you would have filed a motion with the Court, and you would have brought that to the Court's attention in any one of the 15 or so hearings that we had in this court, and I would have addressed that then, right?

MR. AGNIFILO:  I understand.  But a few things that I think we have to all keep in mind.  Every single piece of evidence that we're talking about we got from the government. It's the text messages between Mr. Combs and Ms. Ventura that the government gave us.  They had this material before we did. And this is important I think for the record.  At the moment, I hear your Honor.  I know your Honor has given this a lot of thought, as you always do.  I'm just trying to sort of give your Honor a different way of looking at the letter and the understandings.

When we wrote this letter, we wrote this letter as the government conceding in the letter to our interpretation of the rule and how the rule applied to the facts of this case.  412 is contextual, and I think the Court sees that in what the Court said this morning.  412 will be different in every case, and the reason it will be different in every case is because of the requirement that 412 not violate the Constitution.  That means in this case, there's a defense, there's a defense that we have stated from the get-go, and I think we even told the government in our meet and confers what our defense was going

P5FCcom1

to be as relevant to these issues, which was this:  There's going to be testimony on cross-examination, probably on direct, and there was, there's going to be exhibits, which is why specifically we put in the letter examined witnesses and/or introduced evidence.  That is going to reflect anger, jealousy, betrayal over relationships or perceived relationships.

Now the thought going in was that all of that was fair game, regardless of how colorful, regardless the language that's used, and it's not human nature to express those types of strong emotions in flat language.  They're going to be expressed colorfully, they're going to be expressed the way that they're expressed here.  Our understanding going in was that if we got evidence from the government in discovery that they had, that they would have seen -- and we've always been focused on the specific text messages.  We're not talking about this tremendous universe of evidence, we're talking about the text messages between Mr. Combs and Ms. Ventura.  First and foremost, that's always been sort of the heart of these discussions, that that would be outside the purview of 412.  That animated all of our decisions in this case, that last sentence of that paragraph of the letter where the parties said if this is the case, it doesn't implicate 412.  There's a little bit of a change in the agreement.  The government is, I feel, backing away from the agreement that we struck with them.  The agreement was the entire issue.

THE COURT:  In the context of making this agreement, there always has to be a meeting of the minds.  And so did you tell the government we are going to put in messages that refer to sexual conduct or discussions of a sexualized nature, and just want to let you know, we're going to be doing that, and are you okay with it, and the government responded and said that's no problem, that's okay.  Yes or no?

MR. AGNIFILO:  Yes.  The answer is yes.  The answer is yes.  We had discussions there's going to be text messages, and what they said, as long as it impacts on jealousy, on things like that within the purview of the case.  There's certain things we can't do.  We can't go outside the communications between Combs and Ms. Ventura.  If there's something else that an alleged victim in this case did that Mr. Combs doesn't know about and that doesn't animate the conduct, we can't go into that, and we've always known that.

THE COURT:  And you've had these discussions over email?

MR. AGNIFILO:  I'd have to go back and check.  We had the discussions, we had the discussions specifically about evidence and not just testimony, but the evidence.  The written communications were always the heart of this.

THE COURT:  Let me ask you this:  Let's say I agree with you on everything — in what way is your defense in any way impaired given what I said, which is that the government is

P5FCcom1

really complaining about a few words.  In fact, they are the ones that offered that you could redact these messages.  So let me just give you an example.  I take it that there may be cross-examination of some witnesses in which they're going to be asked, isn't it true that, repeatedly through your relationship, Mr. Combs raised questions about your relationships with other people, and you get whatever answer you get.  You might be in a position to have to use certain messages to refresh the witness's recollection, et cetera.  Government is saying you can do all of that, you can ask the questions, you can get the answers that you need.  They're even saying if you need it, if you can satisfy all the requirements and get this admitted and put in front of the jury, that you can do that if you just redact these a little bit.

There are ways to deal with this.  The witness can see the unredacted emails and text messages and it's just the jury that wouldn't receive the unredacted messages, but you could have the witness confirm what is underlying those redactions in a generalized way that wouldn't implicate the issues raised by 412.  I'm not understanding why there's any issue really here, and this gets to not only Rule 412, but also Rule 403, and it also strongly indicates that there's not even an iota of any constitutional dimension to any of this because your ability to cross examine and confront these witnesses is not in any way impaired.  I think that's the point the government is trying to

P5FCcom1

make.

MR. AGNIFILO:  Here, on a purely practical level, here's what I propose -- I'm going to look at my team as I say this and make sure I don't get dirty looks.  I don't believe we need to get into any of the challenged messages this morning.  We do not need to get into any of the challenged messages this morning.  Now that it's not 3 o'clock in the morning for the next few hours, while Ms. Estevao conducts the examination, Ms. Geragos and I will talk to the government and we will try to bring about an agreed upon resolution to the outstanding issues.

So just to be clear, we're not waiving -- we hear the Court.  We're not waiving any of our objections, we're not waiving a constitutional -- we're not waiving any of those things, but we are going to move forward and try to be practical and reach a resolution that makes the trial run smoothly.

We obviously, and the Court, as well, I'm not saying it's just us, we have to be mindful first and foremost of the constitutional implications of all of these issues, and we are acutely aware of that and we must be.  While I certainly understand your Honor's view that with the solution your Honor's proposing, the constitutional issues are not as paramount.  I don't know that they're eliminated.  I guess the devil's in the details.  So we will do what we can to reach

resolution.

And I just want to take one more step back, and this is one of those times it didn't happen.  This letter was supposed to take this issue off the Court's plate.  That was the idea, that we wouldn't have all of these tricky 412 litigation issues before the trial.  And I thought we had accomplished that.  And I hear your Honor, looking back at it, a week ago, we would have tried to give them the exhibits.  I know.  I'm with you.  We'll move forward, we won't address any of these things in the morning session certainly, and in the meantime when we have breaks or at lunch, we'll confer with the government and try to reach some resolutions.

MS. COMEY:  Your Honor, I need to correct the record on a couple points for the record's sake, if that's all right with your Honor.

THE COURT:  Of course.

MS. COMEY:  Thank you.

The meet and confers that led to the March 2025 letter were over the phone.  There were two of them in March of 2025.  On the first, the parties discussed the potential issues, we agreed to go our separate ways, do some research, come back.  The second was on March 28th of 2025.  There's no emails about it.  We have internal notes, and our internal notes say that the governments reads the rule to say to the extent the parties want to admit evidence between victim and defendant, then 412

P5FCcom1

doesn't apply.  If other sexual contact with other people outside of contact within scope of charges, then need to notice under 412.  Defense counsel acknowledged that this makes sense. And defense counsel will make clear in letter to Court what everyone's understanding is of the rule.  And there were other discussions about potential notice.

At no point in the notes, or in any of our memories, did defense counsel send us any text messages or alert us to any text messages, certainly not the text messages that are at issue here as the kind of evidence that they might want to introduce to prove up these other relationships.

So I forgive Mr. Agnifilo for probably thinking about a different conversation, we have talked about a lot of messages over the course of the last few weeks, but in the context of this particular meet and confer, there was no discussion of these text messages.  And although Mr. Agnifilo is correct that all of these messages came from the government's own discovery as I noted, the messages between Ms. Ventura and Mr. Combs total in the thousands of pages and there are terabytes of data and we were not on notice.  We simply were not on notice that these text messages were going to be at issue.  So I wanted to correct the record on that.

I'm also told victim 1's counsel still wants to be heard, if that's all right with your Honor.

THE COURT:  Why?  For what reason?

P5FCcom1

MS. COMEY:  I think if your Honor is going to maintain your Honor's ruling that these messages will not come in and the meet and confer that Mr. Agnifilo is proposing is just about redactions, I don't know that there's a right to be heard.  If, however, your Honor is holding that ruling in abeyance after Mr. Agnifilo's request that we confer, I think he would have a right to be heard.

THE COURT:  I made my ruling.  It seems like maybe people don't understand.  Not only is there no basis to admit these specific messages, but the whole point, the real practical point that I want to make — maybe we're not on the same page — is that there's no issue here as far as I can tell because the actual examination of witnesses is not being impaired.  The admission of 99.9 percent of the evidence here is not being impaired.  Even as to these specific messages whose probative value is minimal, if any, the government has agreed that these could probably be redacted in a way that even those messages could be put in.  So there's simply no issue here, as far as I can tell, in addition to the other legal infirmities that I've addressed.  Am I wrong about any of that?

MS. COMEY:  I don't believe so, your Honor.

THE COURT:  Just to address it right now.  Because of the nature of Rule 412 and what it actually covers, even if you were to just redact particular words in these messages, that would be sufficient, because at that point the evidence would

P5FCcom1

just go to the communication that was going back and forth and the fact that those communications happened.  So these are simple redactions that technical staff could probably do in about 20 minutes, 30 minutes this morning, and then there would be no issue, right?

MS. COMEY:  I think that's right, your Honor.  We need to look at each message.  I think if we could remove any references to sexual activity, there would be no 412 issue.

THE COURT:  Because as pointed out in cases like *Olden* and cited by the defense, et cetera, there can be inquiry to establish there was a relationship, and that's covered by the parties' agreement.  You can't even specify that the relationship was intimate in nature, right.  None of that falls within Rule 412.

MS. COMEY:  I think that's absolutely permissible, your Honor.  It's beyond anything we object to.

THE COURT:  Mr. Agnifilo, you heard that.  There should be an easy way to resolve this on a practical level.  But I understand what you said before, which is you're not waiving your objection, you're preserving your objection.  I hear that.

MR. AGNIFILO:  Thank you, your Honor.  We will endeavor at breaks to reach resolution.

THE COURT:  With that, Mr. Wigdor, is there something that you wanted to raise?

P5FCcom1

MR. WIGDOR:  Yes, your Honor, briefly.  I know there's a jury that needs to come out.  Your Honor, Doug Wigdor for Cassie Ventura.

Your Honor, I think the only issue that I have is I'm the only person who actually represents the victim who has standing under Rule 412, and I appreciate your Honor's order. But in terms of the meet and confer, I should be part of that. I've already gone through the vast number of documents that have been provided to me.  It was not in conformity with Rule 412, which had required the defendant to provide the victim with actually the exhibits and what they were going to be offered for.  But I went through them and I isolated many instances that I believed would be in violation of Rule 412. And so the government doesn't represent Ms. Ventura, I do.  And so I want to make sure that whatever is decided, that I'm part of that to make sure that Ms. Ventura's interests are met.

THE COURT:  Ms. Comey, the letters that were circulated overnight, has Mr. Wigdor been furnished a copy of those?

MS. COMEY:  Yes, your Honor.

THE COURT:  Mr. Wigdor, you now have the universe of the exhibits that have been identified that implicate this issue?

MR. WIGDOR:  I do, and I went through them into the early morning hours, and I've identified in a chart, frankly,

P5FCcom1

all of the sections in those exhibits that I believe would be in violation of Rule 412. I'm happy to share that with the defense and see what their position is. The burden is on them to share it with me, not vise-versa.

THE COURT: Hold on. Putting that to the side, you heard my ruling.

MR. WIGDOR: I did.

THE COURT: Do you have any issues with that ruling? Because we have to move these proceedings along. You have the exhibits, you've heard what we said, you've heard this entire 30-minute discussion. Is there some part of it you believe does not address the Rule 412 issue? Because I think I covered everything. Let me know.

MR. WIGDOR: The only thing that I would say is your use of the phrase intimate in nature. I'm not exactly sure what defense counsel believes that means and what questions could be asked of Ms. Ventura under that scope.

THE COURT: I think that's the question. It was a romantic relationship. In fact, it was intimate in nature; isn't that right?

MR. WIGDOR: And that's it.

THE COURT: I'm not going to constrain Ms. Estevao, for instance, in terms of the particular verbiage, but I don't think it's going to get -- I don't believe she's going to be getting into the ground of 412 talking about specific sexual

conduct or sexual predisposition. If it's about the general topic of intimacy, it will be fine. Look, I will be policing it, so don't worry. And the government is going to be policing it, too.

MR. WIGDOR: I don't think the rule requires it to be specific in nature. I think innuendo is covered by the rule. And so I want to be very careful that Ms. Ventura's interests are protected.

THE COURT: If an issue comes up, you'll can raise it and we'll address it. Okay?

MR. WIGDOR: Thank you, your Honor.

MS. COMEY: Your Honor, I need to correct the record. I apologize. There were some exhibits that the government flagged I think around 2:00 in the morning for your Honor that we have not had the chance to send to Mr. Wigdor where we identified 412 issues. So we will get them to him. That's what I wanted to note.

THE COURT: Understood.

Separately, the other evidentiary issue that was raised, Ms. Slavik, are you addressing that?

MS. SLAVIK: I will be, your Honor.

THE COURT: Have you had discussions with the defense concerning that issue?

MS. SLAVIK: Not at this point, your Honor. As we noted in the email to the Court early this morning, given the

timing, the government did not have the opportunity to meet and confer with defense about certain of the government's objections.

THE COURT:  So we'll just take that up as it comes?

MS. SLAVIK:  I suppose so, your Honor.

THE COURT:  You've seen the exhibits?

MS. SLAVIK:  That's right.

THE COURT:  I have your email, I can access all the exhibits.  Are there particular ones that it would be productive to address right now?  You might get the high sign from Ms. Estevao that, don't worry about these because, at the very least, they're not coming in today or this morning.

MS. SLAVIK:  That's right.  And to be clear, defense did identify a couple dozen that they do expect could come in this morning.  With respect to those particular items, besides defense exhibit 1380, the government believes defense needs to identify a non-hearsay basis for each of those exhibits.

THE COURT:  These are in the chart in your email?

MS. SLAVIK:  That's right.

THE COURT:  All right.

MS. SLAVIK:  Excuse me.  For each message that the defense intends to enter.

Your Honor, I'm happy to --

THE COURT:  So you've raised the objection.  So who's going to be addressing this from the defense's side?

MS. ESTEVAO:  Your Honor, as Mr. Agnifilo flagged, these messages will all be admissible for their effect on the listener and state of mind.  I think it will be burdensome to go message by message.

THE COURT:  Generally speaking, that's what we're talking about?

MS. ESTEVAO:  Exactly.

THE COURT:  Meaning you're saying that, and to be very specific about, effect on the listener to demonstrate what?  I understand effect on the listener, not coming in for the truth of the matter asserted, it overcomes any kind of hearsay issue, but what's the relevance?

MS. ESTEVAO:  With respect to Mr. Combs's state of mind, it's his understanding of Ms. Ventura's willingness to participate in the sexual activity.  And with respect to Ms. Ventura, the effect of his statements on her are relevant to the sex trafficking charge and that it goes to force, fraud, or coercion.  There will be many, many messages that reflect the state of mind of the person sending that message because these are text messages sent in real time.

THE COURT:  Ms. Slavik, there you have it.

MS. SLAVIK:  Your Honor --

THE COURT:  And with that, I will say these are going to come up and you may have particular objections that that rationale that was just expressed does not apply to a

P5FCcom1

particular text message or text message chain that is introduced.  That may happen.  Can we make some headway right now?  Are there particular messages that you think would not be consistent with that rationale offered by Ms. Estevao?

MS. SLAVIK:  Your Honor, my colleagues are looking through these exhibits now.

Let me bring up two points.

First, in response to Ms. Estevao's observation that going message by message is burdensome — it is.  However, that is the defense's obligation to get in this sort of evidence. The obligation is to go message by message.  This is why the government needs exhibits like this well in advance, so that the government can pour through the messages and identify any objections that it has prior to the morning of cross-examination.

This relates to my second point, which is a broader point about how this trial is to proceed.  The government understands that we should have raised with the Court when defense only produced four exhibits by their exhibit deadline. I think it's fair to say that the government regrets not bringing that to the Court.  However, what happened last night is that the defense dumped 400 exhibits on the government. Some of these exhibits were incredibly long.  There were documents, proposed exhibits of 100, 200 pages.  Many of these documents were internally duplicative.  In other words, there

were several portions of the same email exchange or text message exchange. Many of these documents that were marked by defense either substantially or entirely overlap with government exhibits, which were debated between the parties, and all objections or Rule 106 objections should have been raised at that point. This sort of dump of 400 enormous duplicative documents, this is high inefficiency. The government submits there really needs to be a solution so this doesn't continue happening throughout the course of the trial.

THE COURT: Ms. Estevao.

MS. ESTEVAO: Your Honor, as evidenced by the fact that there are duplicative messages in the defense exhibits just shows that we have been working tirelessly to mark exhibits in the past few days and in response to Ms. Ventura's testimony, and we do not anticipate introducing all 400 of them. Many of them, in fact, are marked simply for identification purposes so that we can refresh her recollection, something to that effect. And we also marked based on anticipated testimony from Ms. Ventura before we knew what her testimony would be, and so they're overinclusive in that respect, and we gave the entirety to the government.

I'm happy to flag the first 20, 50 or so that I intend on using, if that will make things easier.

THE COURT: Let me take a step back. Mr. Agnifilo, I thought you were going to take this off. You said you were

P5FCcom1

going to take this off my plate.  I take it the parties have not come to an agreement as to how disclosures will be made.

MR. AGNIFILO:  I think taking it off your plate, your Honor, is going to be a day-by-day process, and I'm going to continue to try to take it off your plate as the morning goes. I am.

First of all, this is far and away the biggest witness in the case in terms of the volume of materials.  There's no second.  I mean, this witness stands by herself.  It's sometimes typical, but a little unfortunate before the trial kind of gets into the rhythms and patterns that trials sometimes do.  We had this witness early in the proceedings.

That all being said, we have all been, we've been literally doing this all night until 3:00 in the morning, so we're trying to make it as easy as possible, which is why we flagged for them that these are the ones we really think are actually going to come up.  Forget about the 400.  That's so we don't mark something, put something in to refresh her recollection that we didn't give you and then that's the problem.  So we're doing the best we can.  We're working with the government actually fairly closely.

So what we will do and what I will do to try to take this off your Honor's plate on an ongoing aspirational basis, hopefully one I will meet, is we will give the government an idea of what's going to be coming up this morning, we'll work

P5FCcom1

over the breaks to do the same on a going-forward basis so the government will know what's to come.

And part of the problem, and this is a conversation I had with, I think it was particularly with AUSA Comey, I said, in other cases, what we've done is we've given the defense materials even before the direct was over if the prosecution team agreed to not prepare the witness on it.

I think the concern of this prosecution team, and I respect the concern quite frankly, is it's hard to un-know something. And so maybe they wouldn't show it to the witness, but they would know it and that would have some effect.

So I am trying to solve this --

THE COURT: At the very least, if you intend to put in exhibits the next day, you're going to disclose them. We talked about that yesterday and that's not going to be a problem?

MR. AGNIFILO: So, it worked out -- I think it won't be a problem. What I don't want to do, because I've spoken to the government about it, I said if we give you guys stuff during direct, can you assure me you're not going to prep the witness on it. They said they won't show it to the witness, but we can't un-know it. I respect the answer and it's an honest answer. What I can't allow us to be in the position of doing is to flag our defense theory in terms of the exhibits --

THE COURT: So what are you going to do? For today's

P5FCcom1

purposes, the scheduling accommodated disclosing these exhibits last night.

MR. AGNIFILO:  Yes.

THE COURT:  Three binders worth of information, which I've gone through hundreds of binders of information, so three binders is doable, but I understand the concerns here.  But as to other witnesses, there may be a direct in the morning and then a cross-examination in the afternoon.  So you should just be thinking about how you plan to make disclosures in that context so we can address any issues ahead of time.

MR. AGNIFILO:  And I will.  And I will.  And I think the information falls into different buckets.  I think there's certain things that the courts that talk about the Rule 16 obligation, the defense case in chief being part of the cross, I think that stuff is usually a much smaller universe.

THE COURT:  You're saying that if I were to say that the disclosures should be made the previous day, but that those exhibits that you'd be turning over, which would solely be the affirmative evidence on the part of the defense, could not be used to prepare government witnesses, then you'd be fine with that, you'd do it?  Is that what you're telling me?

MR. AGNIFILO:  Your Honor, anything your Honor orders me to do --

THE COURT:  I'm saying, that would be something you're saying happened in a prior case?

MR. AGNIFILO:  Yes.

THE COURT:  By agreement, though?

MR. AGNIFILO:  Yes.

THE COURT:  And anything the parties can do by agreement, I can do by order, right?

MR. AGNIFILO:  No question.  Let's do this, let's get past this witness, which I think presents a universe of issues that we're not going to have with any other witness, and we will work this out.  I will continue to do my best to try to take this off the Court's plate.

THE COURT:  That is good.

MS. SLAVIK:  Your Honor, just a couple of reactions. First, a practical point as to today's cross-examination. There are still several dozen, at least two dozen exhibits that the government does have objections to.  They're noted in the chart.  But as these exhibits are presented and potentially as the defense seeks admission of these exhibits, there will be many sidebars to resolve these issues that could have been resolved earlier.

So, your Honor, the government asks --

THE COURT:  Just the ones in the chart?

MS. SLAVIK:  Those are the ones that the government understands may be used before the lunch break.

THE COURT:  Just help me with the nomenclature here. So you say, for instance, hearsay overlaps with GX B-336, and

P5FCcom1

then theres a paren, waived 106 objection?

MS. SLAVIK:  Right.

THE COURT:  What does that mean?

MS. SLAVIK:  The hearsay objection, you understand that.

With respect to the language overlaps with Government Exhibit B-336, the point there is that defense exhibit 1001 has overlap with an exhibit already in evidence.  The government's point with respect to that is the government identified that Government Exhibit, 336 in this case, and the parties dialogued about whether the defense had any objections, and the defense in fact provided 106 objections and sought to expand those text message exchanges if they had a rule of completeness objection. The government's position is that in remarking a different portion of that very same text, they've waived any sort of 106 objection and the --

THE COURT:  On what basis?

MS. SLAVIK:  They should be precluded from offering that exhibit, your Honor.

THE COURT:  If they have a basis for getting that exhibit in, what does that have to do with the 106 issue? Because 106 says, help me if I'm wrong about this, when you're putting in an exhibit or statement and they are putting in a completing statement, that comes in at the same time.  And so that's why they're doing it in that way, because the statement

can go in without the completing statement going in.  But is there some authority that says that that then waives any effort to independently put in a portion of that document that is not being offered as a completing statement, but is independently admissible for some other reason?

MS. SLAVIK:  Your Honor, the government's concern is efficiency.  In conferring with defense about the government exhibits, that was resource and time intensive, and to have to do that process again is simply a waste of resources.  It's incredibly inefficient.

THE COURT:  Understood.  So if it's efficiency, then that ship has sailed by the fact that none of these things were addressed in advance.  That's what I'm trying to figure out, if it's an efficiency issue or a substantive issue.  If it's a substantive issue, I think the substantive issue that's identified of all of these exhibits is the hearsay issue, which Ms. Estevao identified the basis for the admission of these documents, so I know that now.  So when she tries to admit these exhibits, you will raise an objection if you have one, I will look at the exhibit.  If I need a sidebar, we'll take one, otherwise some of these are just two, three pages and I should be able to look at them and figure out whether the objection is sound or not.

MS. SLAVIK:  Some are quite short, others are not short.

P5FCcom1

I also want to note for the Court that when defense presents a different portion of a Government Exhibit that was presented yesterday, that's potentially confusing to the jury because the government offered those exchanges, that exhibit for the truth as opposed to the purposes of defense offering the text messages.

Your Honor, getting back to the efficiency concern, the government requests that the Court order defense to turn over exhibits that they intend to admit as they mark them.  I think what happened last night really shows that there's no strategic advantage.  Turning over 400 documents is not giving the government a strategic advantage into the defense strategy.  This is purely efficiency and this is for the smooth running of the trial.

Just to be clear, the reason that the government doesn't feel that it can commit to not showing defense exhibits to witnesses because, as defense has repeatedly said, these exhibits come from the government's discovery.  So it's entirely possible that the government is showing what's marked as a defense exhibit to the witness in the normal course of witness preparation.  So I don't think that the government can comfortably make a representation that it will not show defense exhibits that it might already be showing those witnesses.

THE COURT:  I don't think Mr. Agnifilo is concerned with that.

In the course of witness prep, if they have a stack of documents that they're using on a witness and it happens to be some of those exhibits are also in the pile that you provide to the government, you're not saying that they can't prep witnesses on those exhibits, right?

MR. AGNIFILO:  I'm not saying that.

THE COURT:  You're saying that you have other things that you are identifying, that's one category, you can't prep the witnesses on those other things.  Separately, if there are exhibits that the government didn't know of and they see it in your stack and they go run and find them and haul them out and give it to the witness, that would also be improper.  But I don't hear Ms. Slavik saying that's what they're doing.

MR. AGNIFILO:  I don't hear her saying that's what they're doing either.  What I heard the government say, and like I said, I appreciate the candor, is that if we were to give the government a certain number of exhibits, they would know what's important to us and might conduct some type of witness prep accordingly.  These are not the issues -- we will figure this out.

THE COURT:  You told me that yesterday and I'm pretty sure I said it needs to be figured out yesterday.

MR. AGNIFILO:  I know.

THE COURT:  It was not figured out.  So I'll give you a grace period that if it's not figured out before the lunch

P5FCcom1

break, so while you're there, try to figure out a workable solution, talk to the government, because we're going to just end this one way or the other.  I've heard Ms. Slavik, I've heard you, it's now 9:31, I promised the jury we would bring them out at 9:30.  We have a timing issue that we need to be very cognizant of.

So last word, Ms. Slavik.

MS. SLAVIK:  Just the very last word.  It sounds like a lot of the evidence that the defense will offer, they'll seek to admit for the effect on the listener.

THE COURT:  Yes.

MS. SLAVIK:  The government just requests each time a limiting instruction that those statements are not being admitted for their truth, but for the effect on the listener.

(Continued on next page)

MR. AGNIFILO:  I guess it depends on the actual basis of admissibility.  If it's admitted under 803(3), it would be offered for the truth.  If it is being offered solely for its effect on the listener, then that's a different story.  I would object to the Court giving --

THE COURT:  I am not going to be giving any limiting instruction on that basis.  If there is a particular reason for a limiting instruction in a particular circumstance, we can -- a sidebar can be requested, and we can address it.

MR. AGNIFILO:  Very good.

MS. SLAVIK:  Your Honor, I think that's going to confuse the jury.

THE COURT:  How is it not the situation, as with any document or exhibit that the government seeks to admit that is hearsay but not -- that could be hearsay but is not offered for the truth of the matter, the Court does not give the jury a limiting instruction in each instance.  Rather, the way in which the evidence is used is indicative of the purpose for which it was put into evidence, and the jury will understand that.

If Ms. Estevao were to suggest that certain things in the text messages actually happened, which would be inconsistent with the reason why they got them in in the first place, then you will be heard to give a limiting instruction or to strike certain testimony, etc.  We can do that.  If any time

P59MCOM2

we put in a potentially hearsay statement that was not offered for the truth, and the Court would have to give the limiting instruction each time, that would seem to be not the usual practice in any court.

MS. COMEY:  If I may, your Honor, that is what Judge Stein did in the Senator Menendez trial.  And what he did was, the first time such a limiting instruction was requested, he instructed the jury on what it means for something to be admitted not for its truth, and then every time it happened afterwards he would just turn to the jury and say, not for its truth, just like my last instruction, and it was very quick and very efficient.

It's because, otherwise, when a text message comes in, a document comes in, any juror would naturally think, I can read this and interpret it for its truth.  I can assume it's offered for its truth.  It's not intuitive to a juror to understand that a document being put in front of them is not being offered for its truth but for some other purpose.

That's what we were asking for, and we wouldn't have objected if the defense had asked for that when we were offering things for their truth as well.

MR. AGNIFILO:  My position, Judge, is your Honor's initial leaning on this, that if something comes up and the Court feels that it's important to tell the jury for this instance that this is being offered for the truth, that the

Court will do that.

I think it's going to be very apparent from the nature of the cross what this is being offered for. And we haven't -- that's been apparent even in the opening statements. We are not going to transform this evidence into something that it's not. It's about the nature of a relationship. It's about jealousies and it's about the things that people do and the way people react when they are jealous. It's heartland effect on the listener and not being offered for the truth. The jury is going to hear that in real time because of the nature of the evidence.

THE COURT: I have heard both sides. We will take it up at the lunch break. If at that point I need to make some limiting instruction, I'll be able to do so, and the number of exhibits that would be at issue would be small in volume, given that there is just about two hours worth of time that we have before the lunch break, in any event.

With that, Ms. Johnson, let's bring in Ms. Ventura so we can save a little bit of time.

I ask the courtroom deputy to make sure the jury is ready.

MS. ESTEVAO: Your Honor, may I approach to give your deputy a drive of the defense exhibits?

THE COURT: Of course.

(Jury present)

P59MCOM2                          Ventura - Cross

THE COURT:  Members of the jury, welcome back.  I promised you that we would start right at 9:30.  I'm only eight minutes late.  I apologize for that, but we are making some progress here.

Ms. Ventura, you understand you are still under oath?

THE WITNESS:  Yes.

THE COURT:  Ms. Estevao, when you are ready, you may proceed.

MS. SLAVIK:  Thank you.

CASANDRA VENTURA, resumed.

CROSS-EXAMINATION

BY MS. ESTEVAO:

Q.  Good morning, Ms. Ventura.

A.  Good morning.

Q.  You and Sean Combs were in love for 11 years, right?

A.  Yeah.

Q.  During that time you loved him?

A.  I did, yes.

Q.  And you believed that he loved you as well?

A.  Yes.

Q.  And during those 11 years you took care of him?

A.  In the ways I could, yes.

Q.  And you believed that he needed someone to take care of him?

A.  I don't know.

P59MCOM2                    Ventura - Cross

Q.  In some ways?

A.  In some ways I guess, yeah.

Q.  On direct examination you used the term larger than life. Do you remember using that term?

A.  I do.

Q.  From what you could see to many people he was larger than life?

A.  Yes.

Q.  Not just to you.

A.  Yup.

Q.  But to you he was Sean, right?

A.  Um-hum, yes.

Q.  And that's the name that you used the past two days in the courtroom, right?

A.  Yes.

Q.  That's the name his mother gave him?

        MS. JOHNSON:  Objection.

        MS. ESTEVAO:  Withdrawn.

Q.  He might have used other names for other people, Puff Daddy, P. Diddy, Diddy, but you called him Sean, right?

A.  Yesterday, yeah.

Q.  And that's a part of what made your relationship with him special, is that you knew the real Sean, right?

A.  I believe I knew a real version, yeah.

Q.  Well, you knew the Sean that other people didn't see.

P59MCOM2                          Ventura - Cross

A.  Correct.

Q.  You knew a version of him that he wouldn't let the rest of the world see?

MS. JOHNSON:  Objection.

THE COURT:  It's overruled.

Q.  You knew the Sean that he didn't want anybody else to see but you?

MS. JOHNSON:  Objection.

THE COURT:  Overruled.

A.  Can you repeat.

Q.  You knew the version of Sean that he didn't want anyone else to see but you, save the other people that were invited into this relationship?

A.  Can you rephrase that.  I'm sorry.

Q.  You knew of a version of him that the public didn't know, right?

A.  Correct, yes.

Q.  And that many people in his circle, in his world didn't know?

A.  Yes.  That's fair to say.

Q.  Even his family didn't know?

A.  Yeah.

Q.  And you knew and you always knew how special you were to him, right?

A.  No.  I don't think I always knew.

Q.   You sometimes knew.

A.   Sometimes is fair.

Q.   You frequently knew.

A.   Sometimes.

Q.   And that's why it hurt so badly when he lied to you.

A.   Yeah.

Q.   And when he cheated on you.

A.   Yes.

Q.   And that's why it hurt so badly when he promised to tell the truth and be faithful to you and then let you down time and again, right?

A.   Yeah.

Q.   You said on direct that you were very jealous.  I think insanely jealous is the phrase you used?

A.   I did.

Q.   And he gave you a lot to be jealous of, right?

A.   I mean, it's all relative.  Yeah.

Q.   But for 11 years you put up with that jealousy, right?

A.   Not the whole time, no.

Q.   You were on and off during the relationship?

A.   Yeah.

Q.   But you kept coming back to him for 11 years.

A.   I wouldn't use the word coming back.

Q.   You would continue to get back together with him for 11 years.

A.  Yes.

Q.  Despite his -- imperfections his maybe not strong enough?

A.  Yes.

Q.  His flaws, right?

A.  Yes.

Q.  We are going to talk about all of those.  That's because you loved him, right?

A.  I did.

Q.  And for those same 11 years you put up with all that because you believed that he truly loved you too?

A.  I did believe he loved me too.

Q.  And because you were so in love with him, when he cheated on you it really hurt.

A.  I would say not every time.

Q.  I see.

       But you did spend a lot of time feeling very hurt during the relationship.

A.  I would say in the early stages, yeah.

Q.  And I want to go back many years to the beginning of your relationship.  You fell in love very quickly, right, after your 21st birthday?

A.  Yes.  It was very quickly.

Q.  And the early part of your relationship was filled with love and passion, right?

A.  Yes.

MS. ESTEVAO:  Could we bring up for the parties and the Court Defense Exhibit 1353, please, and the witness.

Q.  Do you recognize this communication, Ms. Ventura?

A.  I don't.  I am just going to read it.

Q.  Do you recognize that email address at the top?

A.  Yes.

Q.  That's your -- an old email address, I assume?

A.  Yup.

Q.  This appears to be an email from you to Mr. Combs, correct?

A.  Yes.  Can I read through it?

Q.  We are going to read through it.

MS. ESTEVAO:  I am going to move for its admission at this point.

THE COURT:  Any objection?

MS. JOHNSON:  Yes, your Honor.  We object to the top two messages for hearsay.  They appear to be offered for their truth.

THE COURT:  Response.

MS. ESTEVAO:  This is offered for state of mind and effect on the listener, your Honor.

MS. JOHNSON:  Your Honor, based on the examination so far, on its face it appears to be offered for the truth.

THE COURT:  Ms. Estevao, why don't you ask some further questions, and then we can determine whether there is a basis for admission on the grounds that you've indicated.

P59MCOM2                        Ventura - Cross

Q.  Ms. Ventura, can you read the first two messages.

          MS. JOHNSON:  Objection.  Not in evidence.

          THE COURT:  That's true.  Not in evidence.

Q.  Read to yourself.  Would you please read them just to yourself, Ms. Ventura.

A.  From the top or the bottom?

Q.  From the bottom.

          Why did you send this message, Ms. Ventura?

A.  I was just communicating with him, it looks like, letting him know I was going to dinner.

          MS. ESTEVAO:  One moment, your Honor.

Q.  Ms. Ventura, what was going on at this time when these messages were sent?

A.  I'm not sure, honestly.

Q.  What was going on in your relationship with Mr. Combs at the time these messages were sent?

A.  This was like early in the relationship, but I'm not like specifically sure of like that date.

Q.  And what sort of messages would you and Mr. Combs exchange during this time period?

A.  Loving, yeah.

Q.  Would you exchange messages on a regular basis?

A.  Yes.

Q.  And would you update each other on what you were feeling and thinking at the time you sent the messages?

P59MCOM2                    Ventura - Cross

A.   Yeah.

Q.   And would the messages that you then received from each other be read and reacted to?

A.   Yes.

MS. ESTEVAO:   I would offer it at this time.

MS. JOHNSON:   Your Honor, same objection.   It's clearly being offered for the truth.

THE COURT:   Overruled.

(Defendant's Exhibit 1353 received in evidence)

MS. ESTEVAO:   Can you please publish to the jury.

Q.   Can you read the second message from the top out loud, Ms. Ventura.   This is from Mr. Combs to you.

A.   You want me to read it out loud?

Q.   Yes.   Just the text of the message itself.

A.   It makes me so happy that you would fly to ALT just to see me.   I'm truly a lucky man.   I love you, missing you.   Can't wait to hold you.

Q.   Now, could you read your response at the top, please.

A.   I'm a very lucky woman.   Smiley face.   I'm a very lucky woman.   I miss you so much.   I'd fly wherever you needed me whenever.   I love you.   Cas.

Q.   Thank you.

MS. ESTEVAO:   Can we please take this down to bring up just for the parties, the witness, and the Court Defense Exhibit 1354.

P59MCOM2                        Ventura - Cross

Q.   Can you take a look at this and just read it to yourself, Ms. Ventura.

A.   Sure.

Q.   Do you recognize this to be an email between yourself and Mr. Combs in 2009?

A.   That's what it appears to be.  I'm almost done reading it.

Q.   We are going to read it out loud.  During that time period, would you consistently, again, send messages back and forth with Mr. Combs?

A.   In August of 2009, yeah.

Q.   To update each other on what was going on and what you were thinking?

A.   Yup.

Q.   And you read and reacted to these emails as you received them?

A.   Yeah.  At this point.

        MS. ESTEVAO:  Move for admission.

        MS. JOHNSON:  Objection, your Honor, on a few bases. I don't believe Ms. Ventura has authenticated this document. The bottom -- starting from the bottom that first message has hearsay within hearsay, and then going up to the third message from the bottom and the fourth message from the bottom, and we object on hearsay grounds.  That appears to be being offered for the truth.

        THE COURT:  Ms. Estevao, there are probably a few more

questions to ask.  You can try to address those objections.

MS. ESTEVAO:  I'm happy to only offer the first four messages.

MS. JOHNSON:  We object to the fourth, and we would need to do a redaction prior to publishing or just zoom in on the top, but we still object to the fourth message, and Ms. Ventura needs to authenticate this document.

THE COURT:  Ms. Estevao.

Q.  Ms. Ventura, does this accurately reflect an email between you and Mr. Combs on August 12, 2009?

A.  From what it looks like, yes, but I haven't seen this message in a while, so I don't --

Q.  Would BG new pin reflect your BlackBerry pin number? Withdrawn.

Would BG -- what does BG mean to you?

A.  To me it meant baby girl.

Q.  Is that what Mr. Combs referred to you as sometimes?

A.  Yes.

Q.  And did you correspond with Mr. Combs via BlackBerry during this time?

A.  Yes.

Q.  And did you correspond with him on a regular basis via BlackBerry?

A.  Yeah.

Q.  Would you use your BlackBerry to say update each other on

P59MCOM2                    Ventura - Cross

what you were thinking and what was going on at the time?

A.  Yes.

Q.  Would you read those messages and then react to them?

A.  Yes.

        MS. ESTEVAO:  Move for admission.

        THE COURT:  This portion of the exhibit will be
admitted.

        MS. JOHNSON:  Your Honor, we maintain our objection to
the bottom email.

        THE COURT:  I understand.

        (Defendant's Exhibit 1354 received in evidence)

        MS. ESTEVAO:  Can please publish to the jury.

Q.  I will read from the bottom from Mr. Combs' messages, and I
would ask that you read yours.

        I love you so much it makes me cry and so has five Os
attached to it.

A.  You hungry pop pop?

Q.  Nope.  Thank you.

A.  No prob.  Let me know.

        MS. ESTEVAO:  You can take this down, Mr. McLeod.
Please just show the parties, the Court, and the witness
Defense Exhibit 1359.

Q.  Ms. Ventura, this document, does it also say BG new new pin
in the from column at the top?

A.  I see that, yes.

P59MCOM2                    Ventura - Cross

Q.  And, again, BG would refer to baby girl and that would be you?

A.  Yes.

Q.  And, again, would you frequently correspond on BlackBerry with Mr. Combs?

A.  When we had BlackBerries, yes.

        MS. ESTEVAO:  Move for admission.

        MS. JOHNSON:  No objection.

        THE COURT:  This will be admitted.

        (Defendant's Exhibit 1359 received in evidence)

        MS. ESTEVAO:  Can we go to the third page of this document.  Second page.  I'm sorry.

        MS. JOHNSON:  Our copy has two.

Q.  I am going to read the third message from the top from pop pop.  You understand that to refer to Mr. Combs, correct?

A.  Yes.

Q.  Did it make you miss me?

A.  You want me to read the next part?

Q.  Yes, please.

A.  A lot.  You didn't even respond to my message.

        MS. ESTEVAO:  Can you please take this down and put up Defense Exhibit 1360.

Q.  Again, this says BG new new pin.  Does this accurately reflect a communication between you and Mr. Combs via BlackBerry in 2010?

P59MCOM2                     Ventura - Cross

A.   Yeah.

          MS. ESTEVAO:  Move for admission.

          MS. JOHNSON:  Your Honor, we need a moment to review the document.

          THE COURT:  All right.

          MS. JOHNSON:  Your Honor, we object to hearsay grounds to all the messages except the top two messages on page 1 and the last message on page 2.

          THE COURT:  That objection is overruled.  1360 will be admitted.

          (Defendant's Exhibit 1360 received in evidence)

Q.   Ms. Ventura, we are going to read from the bottom up.  Do you mind reading the BG new new pin messages.

A.   Going to sleep now so it can be tomorrow faster and you can be home.  I love you.

Q.   Love my baby.

A.   Smiley face.

Q.   I love you so much it consumes my life.  How did that happen.

A.   I don't know.  I wonder the same thing for myself all of the time.  Like who was I before we decided to be together.

Q.   I never knew it could be like this.  How do you have me this way.

A.   LOL.  What do you mean.  I'm so happy that we fell in love.

Q.   We are so in love we don't do anything else.

P59MCOM2                       Ventura - Cross

A.   That's not true.

Q.   But you are gonna have to work so hard, four times as hard as me, which takes a lot of time.

Ms. Ventura, this exhibit is from April 4, 2010.  At this point how long had you been seeing Mr. Combs?

A.   At this point I would say like two and a half years.

MS. ESTEVAO:  Mr. McLeod, can you please put up Defense Exhibit 1355 just for the parties, the Court, and the witness.

Q.   Does this accurately reflect a communication between you and Mr. Combs via BlackBerry on August 15, 2009?

A.   May I read it?

Q.   Yes, of course.

MS. JOHNSON:  Your Honor, this has at least three pages.  Could we make sure that the witness sees all three.

MS. ESTEVAO:  Mr. McLeod.

THE COURT:  Ms. Ventura, if you need to see the next page, you can just let Ms. Estevao know.

A.   Is there another page, or is that it?  Was this all of the pages?  Because I was supposed to read it this way.

MS. ESTEVAO:  I believe there should be a third page, Mr. McLeod.  Thank you.

A.   Sorry.  I was confused.  That's all.

Q.   Yes.

MS. ESTEVAO:  Is the government still reviewing?

THE COURT:  I think the witness is still reviewing.

Ms. Ventura, when you are finished looking at it --

THE WITNESS:  I think I'm good.

THE COURT:  Ms. Estevao.

Q.  Does this reflect a communication between you and Mr. Combs on August 15, 2009?

A.  It looks that way, yeah.

MS. ESTEVAO:  Move for admission.

MS. JOHNSON:  No objection.

THE COURT:  This exhibit will be admitted.

(Defendant's Exhibit 1355 received in evidence)

Q.  Turning to page 3, the second from the top beginning with amazing, can you read that one.

A.  Amazing.  I love you so much.  It made me feel like I can't wait until we don't care anymore.  LOL.

Q.  What did you mean by, until we don't care anymore?

A.  Honestly, I don't know.  I haven't seen this message in a while, but we definitely were not open about our relationship for the beginning part, yeah.

Q.  Can we go down to the second from the bottom, beginning with the subject line and then the second from the bottom:

That says:  Read my last tweet.  You say.  OMG.  Pop pop.  Can I respond or write something about my man?

Does that help you -- does it give context for what you meant by, I can't wait until we don't care anymore?

A. Yeah. It's still kind of the same meaning to me.

Q. Go ahead.

A. It was about a post, right, so I'm looking.

Q. Does it suggest that you're looking forward to being public with your relationship?

A. That I can agree with, yeah.

Q. Because at that time it was still relatively secret, is that right?

A. In 2009, yeah.

Q. How long had you been together with Mr. Combs at that point?

A. I think, like I said, it was about two, two and a half years by now, by August.

MS. ESTEVAO: Can we go to the first page, please, the top three lines, top three messages.

Q. What do you say the third message from the top?

A. Pop pop, I really miss you.

Q. Mr. Combs says: Me too baby. Damn. I can't wait till I see you.

What do you say?

A. Me too.

Q. While you were seeing Mr. Combs for the duration of your relationship, did he frequently travel?

A. Yes.

Q. How frequently was he traveling, generally?

A.   Weekly, I would say.

Q.   And were you traveling pretty frequently as well?

A.   Frequently.  Not as much as him.

Q.   Even though you were in a relationship with each other you weren't together all the time, right?

A.   No.

Q.   In fact, you often had long breaks from each other when you didn't get to see each other, right?

A.   Yeah.

Q.   And he sometimes would have to travel for long periods of time when he was doing something for work.

A.   Yup.

Q.   And the same for you.  If you were going to film elsewhere or you had some event, you would not be together, right?

A.   Yup.

          MS. ESTEVAO:  Can we please bring up Defense Exhibit 1364 just for the parties, the Court, and the witness.

Q.   Ms. Ventura, does this reflect a communication between you and Mr. Combs via BlackBerry on April 22, 2010?

A.   May I read it?

Q.   Yes.

A.   I read it.

Q.   Does it reflect a communication between you and Mr. Combs?

A.   Yes.

          MS. ESTEVAO:  Move for admission.

P59MCOM2                          Ventura - Cross

MS. JOHNSON:  No objection.

THE COURT:  1364 will be admitted.

(Defendant's Exhibit 1364 received in evidence)

MS. ESTEVAO:  Please publish to the jury.

Q.  Can you please read your message to Mr. Combs at the bottom.

A.  So you hung up.  It's like I need to have something written out to say to you with no breathing room or you'll get mad at me and hang up.  I haven't talked to you at all.  I know you can take three minutes out of your day to talk to me, and you don't even try.  You're in too much of a rush to get me off the phone.  That's not being in a relationship with somebody that you love and are in love with.  I'm really hurt by the way you deal with me.  I don't need your money.  I need some attention.  I am thankful, but I can pay for these things myself.

Q.  I believe you testified on direct examination that you frequently wanted more time with Mr. Combs, right?

A.  Yes.

Q.  And it was important to you to get your special time with him.

A.  Yeah.

Q.  And it was common for lots of people to want to spend time with him, right?

A.  Right.

Q.  He was in high demand, right?

A.  Yes.

Q.  Why is that?  Why did people want to spend so much time with him?

MS. JOHNSON:  Objection.  Speculation.

THE COURT:  You can rephrase.

Q.  Why did you want to spend so much time with him?

A.  I wanted to spend so much time with him, I mean at this point in 2010, because I had fallen in love with him and cared about him very much.

Q.  When you said in your direct testimony that he was a larger-than-life figure or personality, what did you mean by that?

A.  Larger than life.  I mean, he's a charismatic, like big personality that everyone really loved, so larger than life would be that.

Q.  Thank you.

And you testified that you were in love with him and wanted to make him happy, right?

A.  Yup.

Q.  What about him made you fall in love with him?

A.  I haven't thought about it in a while.  The beginning of the relationship was really -- I kind of spoke about it already.  It was really fast and fast paced, scary, but the more time I spent with him and got to know him it was just -- his really personality, at least what I thought was his really

personality came out, and I liked who that was.

Q.  What about it did you like?

A.  Just very sweet, attentive, yeah.

Q.  You have repeatedly testified on direct that you loved him and therefore wanted to make him happy, right?

A.  Yeah.

Q.  And you didn't want him to think that you thought -- withdrawn.

You testified that you were afraid that he would find someone else if you did not agree to have sex with him in the way that he wanted, right?

MS. JOHNSON:  Objection, your Honor.  That misstates her testimony.

Q.  You testified that you were afraid -- withdrawn.

You testified -- you stated when you really care about somebody and you're in love with them you don't want to disappoint them, right?

A.  Yes.

Q.  And that reflected how you felt at the time with Mr. Combs, right?

A.  Yes.

Q.  And you testified, I wanted to make him happy, right?

A.  Yes.

Q.  And you testified, I didn't want him to think that I thought anything bad of him for it, right?

A.   Right.

Q.   What did you mean by that?

MS. JOHNSON:  Objection, your Honor.  Can we just clarify what it is in that message, and a time period.

MS. ESTEVAO:  It's referring to freakoffs.  I can repeat it.

Q.   You were asked:  Why did you agree to try a freakoff?  You answered:  I wanted to make him happy.  I was in a really significantly mature relationship that I don't think I was prepared for, now that I look at it, but, yeah, I loved him.  I didn't him to think that I thought anything bad of him for it. I just wanted to make him happy.  Right?

A.   Yup.

Q.   That's how you felt at the time, right?

A.   At the time I wanted to make him happy, yup.

Q.   And you also testified about a communication that you had with him where you said:  I love you so much.  You make me a better woman, daughter, sister, person.  I hope you always know how much I love you and appreciate you.  Right?

MS. JOHNSON:  Objection, your Honor.  Can we get a time period for that quote?

THE COURT:  No.  Overruled.

A.   Sorry.

Q.   Isn't it true that you testified that you had previously told him:  I love you so much.  You make me a better woman,

daughter, sister, person.  I hope you always know how much I love and appreciate you.  Right?

A.  I definitely wrote these messages, yeah.

Q.  And that's how you felt at the time?

A.  Yeah.  Whatever time that was, yup.

Q.  We will get there, I'm sure.

A.  OK.

Q.  And you also wrote:  You can't wait until we have a baby of our own to celebrate Father's Day.  I love you with all my heart.  Right?

A.  Um-hum, yes.

Q.  And you were asked why you sent that message and you said, because I loved him and it was Father's Day.

A.  Yes.

Q.  And you knew he would appreciate that as a father.

A.  I thought so.

Q.  You knew that he had his six children at the time, right?

A.  Yup.

Q.  You also testified that you wanted to be around him, and you wanted to be around him for the same reasons as everyone else at the time, right?  That's what you said yesterday.

A.  OK.

Q.  And you said, it's just this exciting -- he's just this exciting, entertaining, fun guy, right?

A.  Yup.  I'm sure I said that.

P59MCOM2                      Ventura - Cross

Q.  And that's how you felt?

A.  Um-hum.

Q.  You said, it felt special because not a lot of people got that kind of time with him, right?

A.  Yup.

Q.  And that you really fell in love with him, and you were just like a little shadow for a little while.

A.  Yes.

Q.  You also testified that it was a very different relationship from any other relationship you had had before, right?

A.  Well, it was, yes.

Q.  It was exciting?

A.  It was much different.

Q.  And it was passionate?

A.  There was passion, yes.

Q.  And it opened up your world tremendously, right?

A.  Hmm.  There is not really a yes-or-no answer to that one for me.

Q.  Did it open up your world?

A.  In a different way, yeah, I'll say that.

Q.  Is it fair to say that he trusted you with his secrets?

A.  I think that's fair to say.

Q.  And that that meant that you held a special place in his heart?

P59MCOM2                          Ventura - Cross

A.   Yeah.

Q.   And that you wanted to keep that trust.

A.   Yup.

Q.   And earn that trust.

A.   I don't know that I wanted to earn it.

Q.   You did earn it.

A.   I did earn it, yeah.

Q.   So to make him happy you told him that you wanted to do freakoffs, right?

A.   No.  There is a lot more to that.

Q.   I'm sure we will get there.

        MS. ESTEVAO:  Can we please put up defense Exhibit 1159 just for the parties, the Court, and the witness.

Q.   Ms. Ventura, after you have taken a look, can you tell me if that reflects a conversation between you and Mr. Combs on August 5, 2009.

A.   OK.

        MS. ESTEVAO:  Move for admission.

        Excuse me.

Q.   Does this reflect a conversation between you and Mr. Combs via BlackBerry on August 5, 2009?

A.   It looks like a real conversation, yes.

        MS. ESTEVAO:  Move for admission.

        MS. JOHNSON:  No objection.

        THE COURT:  1159 will be admitted.

P59MCOM2                        Ventura - Cross

(Defendant's Exhibit 1159 received in evidence)

Q.   Can we begin reading, and I will be Mr. Combs, the fourth message from the bottom and go backwards.

A.   Would that be at the me too?

Q.   I'll begin.  I miss you already.

A.   Me too.

Q.   When do you wanna freak off, LOL?

A.   LOL.  I am just going up to change and put my ring in.  I just picked it up.  I'm always ready to freak off.  LOLOL.

Q.   Let's just pause there.

When you say, I'm always ready to freak off, this was sent on August 5, 2009, correct?

A.   Yes.

Q.   And how long had you been dating Mr. Combs at this point?

A.   Almost two years.

Q.   And you have already had freakoffs before this, correct?

A.   Yes.

Q.   I'll continue reading.  You tell me the day.  You choose.

A.   It can be whenever.

Q.   Name the night.

A.   I feel like the weekend, like a Friday night would be best because we want -- we'd want time to recover for work or the work week, right.  This upcoming weekend the 8th is the only one I have until the 28th.

Q.   OK.  I'm on it.

A.   LOL.  OK.  But if you can't, we can always do it during the week.  You know that doesn't matter to me.

MS. ESTEVAO:  Can we pause.

Q.   When you say we know that doesn't matter to me, you're saying that you understand that Mr. Combs knows that you don't mind whether or not it's on a weekend or during the week, right?

A.   That's what it says, yeah.

Q.   OK.  Then Mr. Combs says:  Friday it is.  I wish we could get Julz here.

A.   LOL.  Maybe we could.  We don't know him that well, though.

Q.   You want to call him and feel him out?

A.   Yeah.  I can do that.

Q.   Call him now, please.

A.   You want me to make you a bowl?

Q.   What do you understand make you bowl to mean?

A.   Some food.

Q.   Was this entire text message exchange kind of typical of your communications with Mr. Combs?

A.   Somewhat typical, one of the conversations.

MS. ESTEVAO:  Can we please put up for the parties, the Court, and the witness Defense Exhibit 1162.

Q.   Does this reflect a communication between you and Mr. Combs on August 7, 2009?

A.   It looks as such.

MS. ESTEVAO:  Move for admission.

MS. JOHNSON:  We object to hearsay.

THE COURT:  It's overruled.

(Defendant's Exhibit 1162 received in evidence)

Q.  Ms. Ventura, I am not going to ask you to read this one out loud, but is it fair to say that you are sending Mr. Combs an explicit text message?

A.  Yup.

Q.  And that this was sent on August 7, 2009, correct?

A.  Yup.

Q.  Which is two days after the last message that we read about how you always were ready to freak off, correct?

A.  Yes.

Q.  Mr. Combs says -- after the explicit message, he says:  I can't wait to watch you.  I want you to get real hot.  Right?

A.  Um-hum, yeah.

Q.  And you say:  Me too.  I just want it to be uncontrollable. Right?

A.  Yeah.

MS. ESTEVAO:  Can we please put up Defense Exhibit 1164.

Q.  Does this reflect a communication between you and Mr. Combs on August 7, 2009?

A.  It appears to be.

MS. ESTEVAO:  Move for admission.

MS. JOHNSON:  Same objection.

THE COURT:  Same objection?

MS. JOHNSON:  Yes.  Based on the questioning on the last exhibit, we think that is a valid objection.

MS. ESTEVAO:  Certainly not for its truth, your Honor.

THE COURT:  It's overruled.

(Defendant's Exhibit 1164 received in evidence)

MS. ESTEVAO:  Please publish for the jury.

Q.  I am not going to read this explicit message, Ms. Ventura, but fair to say that it's an extremely explicit message sent by you to Mr. Combs on August 7, 2009?

A.  Yeah.

Q.  And, again, August 7, 2009 is two days after you and Mr. Combs were discussing planning a freakoff, right?

A.  Yes.  That's what it says.

Q.  So it's a fair interpretation to assume that this was an explicit message related to the anticipated freakoff, correct?

MS. JOHNSON:  Objection.

THE COURT:  That's sustained.

MS. ESTEVAO:  Can we please put up Defense Exhibit 1165 for the parties, Court, and the witness.

THE COURT:  Ms. Estevao, could we take a brief 10-minute recess?

MS. ESTEVAO:  Yes.

THE COURT:  Members of the jury, we will be back in 10

P59MCOM2                    Ventura - Cross

minutes.  All rise.

(Jury not present)

THE COURT:  We will come back in 10 minutes.

Ms. Ventura, during the break you are not allowed to have any communications with anyone on the government side.

THE WITNESS:  Thank you.

(Recess)

THE COURT:  Ms. Ventura just needed a short break, which is fine.  If anyone else needs a break, that's fine as well.

Since this is going to be a recurring issue as to these text message exchanges, my understanding is, Ms. Estevao, that these are admissible and not being presented for an improper purpose because they go either to effect on the listener or to the declarant's state of mind.  Is that correct?

MS. ESTEVAO:  That's correct.

THE COURT:  That's what I had understood.

Ms. Johnson, do you have a response?  Because I anticipate that we will see a lot more text messages that go to that, meaning that any time the statements are being introduced -- for instance, just to give an example, willingness or eagerness to engage in a freakoff or statements of love, all of which, Ms. Estevao at least is saying, fall within the exception for state of mind or effect on the person receiving that message.

MS. JOHNSON:  Your Honor, I don't believe that the questioning is that precise.  I believe that the questioning that's been asked so far is being used to prove that the truthful statement is being used to suggest that Ms. Ventura wanted to do this, and all of these messages are being offered for their truth and not for the limited purpose of her state of mind or the effect on who was hearing them.

And to the extent that these messages are being admitted for that limited purpose, we again request a limiting instruction for all of these messages so that the jury is not confused and is able to understand the limited purpose --

THE COURT:  What is the other purpose?  Meaning that when there is a message that says, for instance, I love you, what is the other purpose?  Meaning, doesn't that just go to the declarant's state of mind and what is being communicated to the person receiving that message?

Just to give that example, just so I'm understanding the objection, what is the other improper purpose that the jury could misunderstand the evidence being used for?

MS. JOHNSON:  In that example it's being -- the improper purpose is that he in fact loves her.  It's being used to prove that fact, not that it's being used to prove that at the time Ms. Ventura thought that he loved her or understood, based on what he said, that he loved her.  The questioning is suggesting that he in fact loved her and that is the

distinction.

THE COURT:  What's the distinction between the fact that he loved her or the love as a state of mind?

MS. JOHNSON:  The fact that he loved her is the improper use of this material.  That's being offered for its truth.  If it's being offered just to show that Ms. Ventura at the time thought that he loved her, that is coming in for its state of mind, and in that case we would request that the jury be instructed accordingly.  But the questioning --

THE COURT:  I get it.

Ms. Estevao, you have heard the objection.  I think there is probably some perhaps fine tuning of some of the questions that would make sure that it's understood why you're trying to introduce these exhibits with the questioning.

MS. ESTEVAO:  I can ask further questions about these exhibits.  I was trying to keep it relatively brief.

THE COURT:  I don't think Ms. Johnson is requesting a higher volume of questions.  I think she is asking for the questions to be perhaps phrased a little bit differently so it isolates the reason why you believe these exhibits would be admissible in the first place, meaning if you are going to either state of mind or effect on the listener, this is what you told him, or this is what he received from the message you were sending, things of that nature.  I'm not trying to curate your questions.  I'm the go-between between the parties.

MS. ESTEVAO:  I'll do my best.  You will make sure I'm staying within the rules.

MS. JOHNSON:  Your Honor, may I add one additional.

I think really incurring it into the time period is important because the state-of-mind exception is about the contemporaneous state of mind when this message was sent.  It is not about the state of mind writ large over a period of years, which is what this questioning is suggesting at times.

(Continued on next page)

P5FCcom3                    Ventura - Cross

MS. ESTEVAO:  Your Honor, 803.3 is an exception to hearsay so that it does come in for its truth.

MS. JOHNSON:  As to in that moment.

THE COURT:  As to the timing issue, there were perhaps, as to the last round of questions, I believe that the time was highlighted.  The time is apparent in the exhibits being shown to the jury.  You objected a couple times for that reason.  If you have further issues that come up in the questioning, you can raise the objection and I'll, as I often do, ask Ms. Estevao to rephrase her question where appropriate.

So we'll come back in five minutes.

(Recess)

Let's have Ms. Ventura back.

(Witness present)

Let's get our jury.

(Continued on next page)

P5FCcom3                         Ventura - Cross

(Jury present)

THE COURT:  Ms. Estevao, when you're ready, you may proceed.

MS. ESTEVAO:  I believe we were on defense exhibit 1165, and I move it for admission.

MS. JOHNSON:  No objection.

THE COURT:  Exhibit 1165 will be admitted.

(Defendant's Exhibit 1165 received in evidence)

MS. ESTEVAO:  Please publish for the jury.

BY MS. ESTEVAO:

Q.  Ms. Ventura, this exchange begins with the subject, what you thinking about, from Mr. Combs to you, correct?

A.  Correct.

Q.  And then you respond with an extremely explicit message in response?

A.  Yes.

Q.  And you responded on August 7th, 2009, right?

A.  Yes.

Q.  And August 7, 2009, again, is two days after the discussion with Mr. Combs about planning a freak-off, correct?

A.  Yup.

Q.  And Mr. Combs responds and sends a message to you, saying, I can't wait, that's why I wanna see, right?

A.  Yes.

Q.  And when you received that message, that's why I wanna see,

did you interpret that as him talking about in the context of a freak-off?

A.  Yes, I would have thought we were talking about a freak-off.

Q.  And how did you reply at the top?

A.  I can't wait either.

Q.  That was on August 7, 2009, this was all on the same day, right?

A.  Yup.

Q.  In anticipation of the freak-off that you were going to do with him, right?

A.  Right.

        MS. ESTEVAO:  Can we please put up for the witness, parties, and the Court defense exhibit 1166.

Q.  Ms. Ventura, does this reflect a BlackBerry communication between you and Mr. Combs on August 7, 2009?

A.  I'm just reading through it.

        Yup.

        MS. ESTEVAO:  Move for admission.

        MS. JOHNSON:  No objection.

        THE COURT:  What's the exhibit number?

        MS. ESTEVAO:  1166.

        THE COURT:  1166 will be admitted.

        (Defendant's Exhibit 1166 received in evidence)

Q.  Beginning at the bottom, Mr. Combs sends you a message with

the subject line, I'm so horny, on August 7, 2009, correct?

A.   Yup.

Q.   And you received that message, and in response, what did you say?

A.   Omg.  I was about to text you the same thing.

Q.   And he replied saying, how you feeling, talk to me, you're supposed to be seducing me all day, right?

A.   Yeah.  I'm just looking at the timestamps.  The bottom one says 7:49.  We were just in different places.

Q.   You're reading it the same way I am?

A.   I believe so.  From the bottom up, right?

Q.   Yes.

A.   I just wanted to make sure I wasn't --

THE COURT:  Let's get a question.

Q.   You say, lol, sorry, I'm nervous.  I feel like I wanna fuck, right?

A.   Yes, that's what it says.

MS. ESTEVAO:  Can we please put up for the witness, the Court, and the parties defense exhibit 1167.

Q.   Ms. Ventura, does this reflect a communication via BlackBerry between you and Mr. Combs on August 7, 2009?

A.   It looks like one, yup.

Q.   Mr. Combs says, I'm so horny, I can't concentrate, right?

MS. JOHNSON:  Objection.  It's not in evidence.

MS. ESTEVAO:  I apologize.  Move for admission.

MS. JOHNSON:  No objection.

THE COURT:  1167 will be admitted.

(Defendant's Exhibit 1167 received in evidence)

MS. ESTEVAO:  Please publish for the jury.

Q.  Mr. Combs says, in the subject line, I'm so horny, I can't concentrate, right?

A.  Yes.

Q.  And what do you say in response after receiving that message?

A.  It says, so what do we want to do?  I'm going to Duane Reade to grab candles and I'm going home to pack us a bag.  Do you want any reg clothes btw or just sweats.  Then I can go check in and set up the room.  I'll eat, take my vitamins lol and get ready before I leave the house.  Just want to know what you're thinking.

Q.  So this reflects your response to him indicating that you are going to set up a room for a freak-off, right?

A.  Yes.

MS. ESTEVAO:  Can we please put up defense exhibit 1177 just for the parties, Court, and witness.

Q.  Ms. Ventura, does this reflect a BlackBerry communication between you and Mr. Combs on August 18, 2009?

A.  It looks like it, yeah.

MS. ESTEVAO:  Move for admission.

MS. JOHNSON:  No objection.

THE COURT:  1177 will be admitted.

(Defendant's Exhibit 1177 received in evidence)

Q.  Ms. Ventura, can you read the bottom message from you from BG new pin.

A.  I just deleted our little vid to this off of my camera.  It was so dope.

Q.  And does that refer to a video of a freak-off with you and Mr. Combs?

A.  I'm not sure.

Q.  Would you have taken any other videos with Mr. Combs?

A.  Yeah.

Q.  In response to that message, Mr. Combs says, Imma do it again, right?

A.  Yes.

Q.  Does that suggest you to that he was referring to taking another video with you?

A.  I would think so.  I just don't know what we're talking about exactly.

MS. JOHNSON:  Objection.  Speculation.

THE COURT:  Ms. Estevao, you can move on.

Q.  Ms. Ventura, when you took videos with Mr. Combs on your devices, you testified on direct that you typically deleted them, correct?

A.  The sexual videos, yeah.

Q.  Yes.  And this message suggests your deletion of a video

off of your camera, correct?

A.  Yes.

Q.  In response to his message, you asked, do you have anymore pills on you, right?

A.  Uh-huh.

Q.  What was that referring to?

A.  Again, I'm not sure which kind of pills, but -- yeah.

Q.  What kind of pills were you taking around this time in 2009?

A.  Around this time, I was taking opiates.

Q.  What kind of opiates?

A.  I don't know specifically on this date which ones, but Norco was one that I mentioned.

Q.  And Mr. Combs was also taking opiates at this time, right?

A.  Yeah.  I don't know how much, like, I don't know what his intake was then, but yeah.

Q.  But the message suggests that you're asking if he has any pills on him that you could have, right?

A.  Yeah.

Q.  And going back to the videos, you testified on direct about deleting videos that were in your possession, right?

A.  Yes.

Q.  And by recording them on your devices, it gave you the capability of deleting them, right?

A.  If I saw them, yes.

Q.   At a certain point in your relationship, you insisted on recording them on your device so that you could delete them, right?

A.   No.

Q.   Would you want to record them on your device so you could delete them?

A.   I didn't want them to be recorded at all.

Q.   If they were going to be recorded, you'd prefer that they would be on your device?

A.   I don't know.

Q.   In some of the videos, did Mr. Combs appear in them, as well?

A.   Yes.

Q.   Before we leave this exhibit, turning to the bottom, you wrote, it was so dope, right?

A.   Yes.

Q.   And that's referring to a little vid on your camera, right?

A.   Yeah.

          MS. ESTEVAO:   Could we please put up defense exhibit 1179.

Q.   Ms. Ventura, does this reflect a BlackBerry communication between you and Mr. Combs on December 8th, 2009?

A.   I'm going to read through it first.

          I've read it.

Q.   Does this reflect a communication between you and Mr. Combs

on December 8th, 2009?

A.   I don't remember it, but it appears to be, yeah.

MS. ESTEVAO:  Move for admission.

MS. JOHNSON:  No objection.

MS. ESTEVAO:  Please publish for the jury.

THE COURT:  1179 will be admitted.

(Defendant's Exhibit 1179 received in evidence)

MS. ESTEVAO:  I'm sorry, your Honor.

Q.   Ms. Ventura, I'll read Mr. Combs's initial message to you, subject line.  The things I want to do for you and to you, I want to be nasty for you, I want to do what you want me to do, I want to make you cum more than you've ever came.  And in the text he says, I want you to feel safe to let go.

Can you begin reading your response.  We'll take it one line at a time.

A.   I like that.  I want it and I want to give you the same.  I just think that I have to trust you beyond it just being sexual.  Do you know what I mean?  In order to be more open with the things we do in bed, I need to feel safe like home, like this is my husband and this is the only man that will ever have this aggressive sexual side of me.

Q.   Can we pause there.  In this message, you're showing that you feel two ways about the freak-offs with Mr. Combs, right?

A.   Yeah.

Q.   And the hesitancy that it reflects relates to the fact that

P5FCcom3                              Ventura - Cross

you want him to be the only one that he's doing these things with?  Withdrawn.

It reflects that your acceptance of doing freak-offs with him is that it's like home, like this is my husband, and this is the only man that will ever have this aggressive sexual side of me, right?  Am I reading that correctly?

MS. JOHNSON:  Objection.

THE COURT:  Sustained.  I think you need to rephrase.

Q.  Do you understand this message to reflect feeling two ways about freak-offs?  Would it help to read the rest of the message first?

A.  Yeah.

Q.  The last time was a mistake, but since has made me feel a little dirty and grimy as opposed to sensual and spontaneous. That's the only reason why I go back and forth in my mind with wanting and not wanting to do it.  When we used to freak-off when we were so in love, there were no questions asked, it felt right, like it literally made sense for the next step in our sex life together.  I get nervous that I'm just becoming the girlfriend that you get your fantasies off with and that's it. I don't get the other part... anymore at least.

When you sent that message, were you afraid that Mr. Combs was only seeing you for sex in this way and that you were only fulfilling that part of his sex life?

A.  Again, I don't, like, remember this message specifically,

but the end of it sounds like that, yeah, like I was worried about that.

Q. And that your hesitancy was that you were afraid that you would just become the girlfriend to get his fantasies off with, right, that you wouldn't be his true full girlfriend?

A. That's a way to look at it, I guess, yeah.

Q. You say that you go back and forth in your mind with wanting and not wanting to do it, right?

A. Yup.

Q. And you say that's the only reason why I go back and forth in my mind, right?

A. That's what it says in the message, yes.

Q. Because at the time you were afraid that you were being treated as someone who could just get his fantasies off with, right?

A. That was a concern.

Q. And this was in December 2009 after you had been seeing him for two years?

A. Yup.

Q. And you still were not public in your relationship with him, right?

A. Correct.

Q. And so it was a fear that you would never be his public girlfriend, right?

A. I guess that was something that was thought about.  It

wasn't a huge fear.  It was kind of an understanding that we had more so.

Q.  By doing these freak-offs with him in the first couple of years of your relationship, was that a defining feature of your relationship with him, doing these freak-offs?

A.  By defining, what do you mean?

Q.  Was it an important part of your relationship?

A.  It became a very -- I don't know if important would be the word, but integral part of our relationship early on.

Q.  And you wanted your relationship to develop more, right?

A.  Right.

Q.  And this message was sent to him by you, correct, via BlackBerry?

A.  The longer part of the message was, yeah, was me.

Q.  And this is also in response to Mr. Combs saying, I want to do what you want me to do, right?

A.  Yes.

Q.  And this reflects your open communication with him about how you felt, right?

A.  I would say.

Q.  It appears to reflect some deep thought about your relationship and your perspective on freak-offs, right?

A.  Yeah.

Q.  And you felt safe sending him this message knowing that --

withdrawn.

You felt comfortable sending him this message, right?

A.  Yes, at this time, I did.

Q.  I'd like to go back to the very beginning of your relationship.  I know we're already two years in.  You testified that it began, your romantic intimate relationship with him began at your 21st birthday party when he kissed you, right?

A.  Sort of, yeah, in a way.

Q.  You testified he kissed you at your 21st birthday party, right?

A.  Yes.

Q.  And that was the first time you kissed each other?

A.  Yes.

Q.  At that time you were a very successful 21-year-old, right?

A.  I was trying, yeah.

Q.  Your 21st birthday party was at a club in Las Vegas?

A.  Yup.

Q.  I believe there were other celebrities there in attendance?

A.  There were.

Q.  Like who?

A.  The actual party?

Q.  Yeah.

A.  Sean was there, and he brought Dallas Austin, he brought Britney Spears.  I think those were the two people that stand out to me.

P5FCcom3                        Ventura - Cross

Q.  How was a 21-year-old able to attract such celebrities to her birthday party in Las Vegas?

A.  That was all him, yeah.  I didn't know them.

Q.  What accomplishments had you already achieved by the time you were 21?

A.  Wow.  I successfully put out my first album by then.  That was a big deal for me.

Q.  How successful was that album?

A.  It did well, I think.  We have a plaque.

Q.  Fair to say that you were a celebrity in your own right?

A.  That's fair to say, yeah.

Q.  And you had very popular songs?

A.  I had some, yeah.

Q.  That were well known at the time?

A.  Yup.

Q.  And people wanted to know you and get to know you?

A.  Yup.

Q.  And you'd been modeling for some time?

A.  Yes.

Q.  And you're very beautiful and charming?

A.  Thank you.

        MS. ESTEVAO:  Can I show the witness and the parties and the Court defense exhibit 1380.

Q.  So by the time you were 21 years old, you'd been a musician for about how long?

A.   Like three years.

Q.   Three years?

A.   Yeah.

Q.   And did you have a manager?

A.   I did.

Q.   Who was your manager?

A.   At that time, it was a man named Ed Woods.

Q.   Did you have other people that worked for you on your team?

A.   I had people from his management office.  It was Casablanca Records, it was Tommy Mottola's company and the people that worked at that office.

Q.   Who's Tommy Mottola?

A.   He's a really popular old school music exec.

Q.   He's well known?

A.   I think he's pretty well known, yeah.

Q.   What was your financial situation as a 21-year-old having a successful album out?

A.   At that time, it wasn't so much the album.  I had been modeling for a while, so I saved up money from that.  Did a lot of commercial catalog-type stuff.  But I was doing well.

Q.   Were you able to have an apartment in Manhattan?

A.   Yup, my own place.

Q.   And pay for your own clothes and goods?

A.   Yeah.

Q.   Was it Tommy Mottola who introduced you to Mr. Combs?

P5FCcom3                    Ventura - Cross

A.   No.  I met Sean through a producer that I was signed to.

Q.   Who was that producer?

A.   His name was Ryan Leslie.

Q.   Who was Ryan Leslie?

A.   He's a producer, musician, writer.  I met him when I moved to New York and we dated for about three years.

Q.   And Ryan Leslie is a well known producer, right?

A.   I'd say in the industry he's well known, yeah.

Q.   At the time, he was well known?

A.   Yeah, for sure.

Q.   People knew who he and Tommy Mottola were and they were important people in the industry?

A.   I guess you could say that.

Q.   And you were an up and coming star, right?

A.   I guess you could say that.

Q.   You were young and had a successful album and people were excited about your prospects, right?

A.   Yeah.

Q.   Do you remember, you testified yesterday that after you were signed to Bad Boy Records -- so when you were signed to Bad Boy Records, you were still in a plutonic relationship with Mr. Combs, right?

A.   Correct, yup.

Q.   And you testified that he looked out for me, I had some rough performances, so he had my back through that, right?

P5FCcom3                         Ventura - Cross

A.   Yup.

Q.   What performances are you talking about?

A.   I had one specific television performance for BET, a show called 106 & Park that used to do a countdown of all, like, the top records at that point.  Yeah, it did not go well for me.

Q.   Was it live or prerecorded?

A.   It was prerecorded.  Still somehow ended up like that, yeah.

Q.   And how did Mr. Combs have your back in that?

A.   After it happened, I spoke to him about it and we did like a YouTube video where he kind of said everybody makes mistakes and, you know, we're moving on from it, Cassie's moving on from it.

Q.   What happened during the performance?

A.   Oh, it was just bad.  Couldn't hear myself.  Just didn't sound good.

Q.   And what was the general public's reaction to that performance?

A.   Everybody recognizes --

          MS. JOHNSON:  Objection.

          THE COURT:  That's sustained.

Q.   What feedback did you receive about that performance?

A.   That it wasn't great, yeah.

Q.   So it must have meant a lot that Mr. Combs supported you through all of that, right?

P5FCcom3                     Ventura - Cross

A.   It did.

Q.   So you just said that prior to your relationship with Mr. Combs, you were in a relationship with Mr. Leslie, right?

A.   Uh-huh.

Q.   And how much older than you was Mr. Leslie?

A.   I believe 10 years older.

Q.   And when did you start dating him?

A.   When I was 19.  18, 19.

Q.   How old were you when you started dating him.  Oh, I'm sorry.  When you were 18 or 19.

     And you testified that you took a trip with Mr. Combs in Miami after your 21st birthday, right?

A.   Yup.

Q.   And you wanted to spend the weekend together, so you came up with a flyer, I believe you said?

A.   I didn't come up with the flyer, but the flyer did happen, yeah.

Q.   In anticipation of your trip to Miami, there was a flyer that was made, right?

A.   Yup.

Q.   And that flyer suggested that there was a club appearance for you in Miami, right?

A.   Yes.

Q.   And the purpose of that flyer was to give the impression that you had a professional reason to go to Miami, right?

P5FCcom3                      Ventura - Cross

A.   Correct.

Q.   And the reason for that was because you were still dating Mr. Leslie, right?

A.   Yup.

Q.   So that he wouldn't be suspicious of you going to Miami?

A.   Yup.

Q.   When, in fact, you were spending the time with Mr. Combs, right?

A.   It was.

Q.   And your friends also went on this trip to Miami with you, right?

A.   One of my girlfriends, yeah.

Q.   Who was that?

A.   Kerry Morgan.

Q.   And how long have you known and been friends with Ms. Morgan?

A.   Well, we are no longer close, but we remained friends.  We met I want to say early teens, 14, 15.  Yeah, we were good friends for like 17 years.

Q.   So Mr. Leslie doesn't know that you're on this trip to Miami, and you go to Miami with Mr. Combs and Ms. Morgan, right?

A.   Not that the detail matters, but I think he knew I was going to Miami, he knew I was going away.

Q.   So you dated Mr. Leslie for three years, right?

P5FCcom3                    Ventura - Cross

A.  About.

Q.  And it was relatively serious?

A.  Yeah.

Q.  In fact, I think you had a tattoo of his initials on your body, right?

A.  Uh-huh.

Q.  And that wasn't your only tattoo at the time, right?

A.  No.

Q.  How many tattoos did you have?

        MS. JOHNSON:  Objection.  Relevance.

        THE COURT:  Overruled.  But let's try to keep it moving along.

Q.  How many tattoos did you have?

A.  At what point?

Q.  By the time you met Mr. Combs.

A.  By the time I met him, I probably had three, two or three.

Q.  Did you have one on your forearm?

A.  On the inside of my foreman, yes.

Q.  What did that one say or does it say?

A.  It says no regrets.

Q.  No regrets?

A.  Yeah.

Q.  So because you'd spent three years with Mr. Leslie, when you started dating Mr. Combs, it wasn't the first time you had been dating an older man, right?

A.   Second, but yeah.

Q.   And you testified that this weekend in Miami was the first time that you and Mr. Combs had intercourse, right?

A.   Yes.

Q.   You testified that after this trip to Miami, that Mr. Combs was the person who introduced you to the idea of oral sex, right?

A.   That actually happened before that trip.

Q.   Oh, before the trip?

A.   Yeah.

Q.   When you were seeing him at hotels in New York, right?

A.   Yeah.

Q.   And presumably you were seeing him in hotels in New York because you were still dating Mr. Leslie?

A.   That was part of it.

Q.   When Mr. Combs invited you to the hotel after he'd kissed you at your 21st birthday party, you understood that the invitation implied that he wanted to have a sexual relationship, right?

A.   I'm sorry.  I just got a little lost.  If you could repeat it.

Q.   Sure.  When he invited you to his hotel room, it implied to you that he wanted to have a sexual relationship?

A.   Which point is this?  Sorry.

Q.   Between your 21st birthday party and the Miami trip.

A.   I don't know that that makes sense timing-wise,
chronologically.

Q.   When did he invite you to hotel rooms in New York?

A.   This was prior to the Miami trip.

Q.   At that point when he invited you to his hotel room, did
you understand that he was inviting a sexual relationship?

A.   I don't remember, honestly.  I was definitely getting to
know him, though.

Q.   But you remember that that's when you were introduced to
the idea of oral sex, right?

A.   Yes.

Q.   And that that wasn't something, as you testified, you
understood or did at that point, right?

A.   Correct.

Q.   And that he was the one who taught you how, right?

A.   Yup.

        MS. ESTEVAO:  Can we pull up for the parties, the
Court, and the witness Defendant's Exhibit 1351.

Q.   Ms. Ventura, could you please take a look at this and tell
me when you're ready.

A.   Okay.

Q.   Ms. Ventura, does this reflect an email between you and
Mr. Combs on October 14, 2007?

A.   Yeah.

        MS. ESTEVAO:  Move for admission.

MS. JOHNSON:  No objection.

THE COURT:  1351 will be admitted.

(Defendant's Exhibit 1351 received in evidence)

MS. ESTEVAO:  Please publish for the jury.

Q.  Can you read from this or would you prefer if I read it?

A.  You can read it, I can also read it.  It's just -- it's making me giggle because it's from 2007.

Q.  I know.  We're taking you back.

A.  You can do it, though.

Q.  We've only really had one week of each other just together and I can say that it's been the best and worst.

I've never felt so loved, safe, and empowered since we've come together.  When I'm with you, I feel like I'm your woman and no one else's.  I feel protected when I'm in your arms and so comfortable that I can sleep and not worry about anything.  You are one of the sweetest, most sincere people I've met in a long time and I cannot express enough how grateful I am that you've chosen to be a part of my life.

I don't want to rush things, but I can't help but sit with you and dream up a beautiful future together.  Who knew I'd fall so fast?  You meek me feel like I can do anything... and that's real.

On the other hand, you're constantly weary of me... I'm sneaky.  I never seem to make the right decisions to you, I'm a spoiled brat, I'm dramatic, disrespectful, and for some

reason, you just don't trust me.  It always goes back to well maybe Kerry would have been the better one to go after since I've witnessed more than once you realizing that she is way better fitting for you than I am.  It's hard for me to handle that as I feel like I have given so much of myself in the short time, but whatever, I can take it.  I'm guessing there will always being something negative.  I don't know.  I really don't.

I'm hurt that you think that I'm a malicious person. The dinner I went to last night was definitely at bad timing, but it had been planned before all of the drama and things had to be handled just like you have to handle your business.  I never step on your toes when it comes to handling yours.

I'm about to get on this plane and I'm sad, mad, frustrated and hurt that you just don't feel like I'm the right one.  I really do love you, and I hope to just be able to learn what it is you want in a woman and give it to you.  You're very important to me, I hope you know that.x Ca$.

Q.  There's a lot in this message, right, Ms. Ventura?

A.  There sure is, yeah.

Q.  I know there's a lot in here and we can take it one at a time or you can tell me what you think you were trying to convey at this point.

A.  At this point, it was very, very early.  I don't know.  I'm just reading it like it's a journal entry.

P5FCcom3                         Ventura - Cross

Q.   It does appear to be journal-like, doesn't it?

A.   Letting it all out.  Do you have any questions for me
first?

Q.   Let me put it this way: your relationship with Mr. Combs
was complicated from the very beginning, right?

A.   Yeah, pretty much the beginning.

Q.   It was complicated by your relationship with Mr. Leslie,
right?

A.   Yes.  That ended kind of quickly, though.

Q.   What do you think you meant by saying, I'm sneaky?

A.   Hmm.  Probably that.

Q.   You think it probably related to your sneakiness with your
cheating on Mr. Leslie?

A.   Could have been.  I don't know.

Q.   When you refer to the dinner you went to the night before
being bad timing, do you know what that was about?

A.   No.

Q.   This message reflects pretty open and honest communication
from you to Mr. Combs, right?

A.   Yeah, it was usually like a one-way street when it came to
messages like this.

Q.   You were honest with him and he wasn't necessarily always
honest back?

A.   I don't know he wasn't honest, just, I put a lot in there.

Q.   So maybe not honest so much as you were open with your

P5FCcom3                          Ventura - Cross

feelings and you sent him messages that reflected those

messages more than he did, right?

A.   Yeah.

Q.   And this message also suggests that his relationship with

you was complicated by his relationship with Kim Porter, right?

A.   No.

Q.   Based on the time --

A.   On this message?

Q.   Based on the date of October 14, 2007, was he still seeing

Kim Porter at the time?

A.   I actually don't know.  I don't know what the status of

their relationship was then.

Q.   This message suggests that you are hoping to have more of a

relationship with Mr. Combs, right?

A.   Yeah.

Q.   You're dreaming up a beautiful future together, right?

A.   Uh-huh.

Q.   And you also discuss your friend Kerry Morgan in this,

right?

A.   Uh-huh.

Q.   Did you think that Mr. Combs had an attraction to Kerry

Morgan, Ms. Morgan?

A.   There was a point in the very beginning.  But, again, I

don't remember, like, ever talking about it like this, so --

Q.   Did that complication carry on in your relationship?

A.   Not really.  Kerry just was always with us for a while.

Q.   She was in your friend group, right?

A.   Yeah, she was my closest friend.

Q.   And this also suggests that you very quickly fell in love with Mr. Combs, right?  This is just a few weeks after your 21st birthday party.

A.   Yeah.

Q.   I'd like to start talking about freak-offs a little bit.

A.   Okay.

Q.   On your direct examination you told us that at least in the beginning, you disguised your appearance, right?

A.   Yeah.

Q.   And when you were meeting someone new, you also disguised your appearance, right?

A.   Yup.

Q.   Sometimes you wore a wig?

A.   Yeah.  Yes.

Q.   In the beginning, you had masquerade masks?

A.   Yes.

Q.   This is because Mr. Combs and you were well known and recognizable, right?

A.   That was a main reason, yeah.

Q.   And you wanted to be discrete, right?

A.   Yes.

Q.   Why did you want to be discrete?

A.  The encounter itself was pretty crazy.  I mean, I really followed his lead on that because I never had done it before.

Q.  Is it fair to say that you didn't want anyone to know?

A.  Yeah, definitely did not want anyone to know.

Q.  Was it your understanding that Mr. Combs didn't want anyone to know either, right?

A.  That's my understanding, yup.

Q.  You also testified on direct that you feared for your career if tapes were released, right?

A.  Yes.

Q.  Because that would have been embarrassing, right?

A.  Totally.

Q.  Mr. Combs is also in those videos, right?

A.  Some of them I'm sure, yeah.

Q.  And your lawsuit in November 2023 that you testified about on direct, that was the first time that the term freak-off ever became public, right, so far as you know?

A.  So far as I know, right.

Q.  The general public did not know about your --

MS. JOHNSON:  Objection.

THE COURT:  I think there's a rephrasing that can be done there.

Q.  Based on your understanding until November 2023, you were not aware of other people knowing about the freak-offs, right?

A.  Besides the participants I guess, yeah.

Q.  You mentioned on direct examination that you feared that the release of any explicit tapes would ruin your career, right?

A.  Yup.

Q.  From your perspective, what happened to Mr. Combs's career after your lawsuit?

A.  From my perspective?

            MS. JOHNSON:  Objection.

            THE COURT:  Overruled.

A.  Sorry.  Can you repeat.

Q.  From your perspective, what happened to Mr. Combs's career after you filed that lawsuit?

A.  That's a lot.

Q.  Fair to say that his career was ruined?

            MS. JOHNSON:  Objection.

Q.  Based on your understanding?

            MS. JOHNSON:  It calls for hearsay and speculation.

            THE COURT:  Objection is overruled.

            Ms. Estevao, you can re-ask the question.

Q.  When your lawsuit was publicized in November 2023, you understood that his career was ruined at that point, right?

A.  I could understand that, yeah.

Q.  Based on everything that you heard after your lawsuit?

            MS. JOHNSON:  Objection.

            THE COURT:  That's sustained.

MS. ESTEVAO:  Can we put up Defense Exhibit 1007 for the parties, Court, and witness.

MS. JOHNSON:  Your Honor, this exhibit is 14 pages long.  If the witness would like to read it, could we pass up a paper copy?

THE COURT:  You may.

Q.  Does this reflect a text communication between you and Mr. Combs on June -- we will see the time stamps between July 29, 2012 and July 31, 2012.

A.  Yes, it looks like a communication.

MS. ESTEVAO:  And I believe this encompasses a large part of Government Exhibit 346.  Move for admission.

MS. JOHNSON:  No objection.

THE COURT:  Exhibit 1007 will be admitted.

(Defendant's Exhibit 1007 received in evidence)

Q.  I believe that some of this was read during your direct testimony, but not all of it.

Can we begin, I'll be Mr. Combs halfway down the page.

What you want to do tonight.  Can you read the blue bubbles.

A.  Yup.  I don't know.  What are the options.  Am I meeting you in the Hamptons or will we be in the city?

Q.  In city.  Whatever your heart desires.

A.  Well, I get in kind of late.  Hmm.

Q.  We can just go to bed.  You'll probably be tired.

Case 1:24-cr-00542-AS   Document 562   Filed 12/18/25   Page 100 of 283   959

P5FMCOM4                         Ventura - Cross

A.   I doubt that.  I am going to sleep on the plane.  LOL.

Q.   So what you want to do, woman.  And, no, I'm not asking you to FO.  I want to know what you want to do.

A.   Get something to eat, smoke, take a walk.

Q.   Debbie Cotta has a party tonight.  I'm horny as fuck also. By the way and please sleep on the plane.  Smiley face.  And it looks like I have off tomorrow and I need some Valium, which is there is a pack in my top drawer.  Hello?

A.   Shit, I'm already down the hill.  I'll go back up.  I'm at the beauty store.  OK.  Let's go out and have some carefree fun.  Don't tell her I'm coming.  I want to surprise you if we go.  I'll go get the Valium when Greg comes to get me.  I really need to go pack.  He comes in one hour and haven't even started packing yet.

Q.   We will play it by ear.  Don't worry about Valium if it's an extra move.  I'm at apartment now.  When are you on your period?  And what's care free fun?

A.   I'm skipping it.  Just taking it as it comes.

Q.   Are you on it now?

A.   No.

Q.   Good.  Are you horny?

A.   Yes.

Q.   How horny?  What you be thinking about when you're horny?

A.   I think about you on top of me and inside of me.  The way you look at me and talk to me like that.  I love looking up at

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5FMCOM4                      Ventura - Cross

you and hearing you moan.

Q.  If you don't ever want to read the message, I can read it for you.

A.  Thank you.

Q.  You like it when I moan.  LOL.  Imma moan more just for you.

A.  I love it.  LOL.  That's really what I think about.  I love the way you talk to me when you're on top.  I'm sorry I wasn't able to get your things.

Q.  One of my favorite times is when we FO'd, and then we made love after that.  I also liked it when we make love before and then just was in next room.  Then he came in and I blindfolded you.

A.  Yeah.  I liked those times.  I love when we make love after.  The last time was so good.  We are at my place.  I came so hard for so long.

Q.  We can stop there.

        The so has lots of Os following it, right?

A.  Yeah.

Q.  You're talking about a freakoff that you had?

A.  We are talking about a freakoff.  I'm talking about us making love after.

Q.  And often during a session of a freakoff you would make love with Mr. Combs, right?

A.  Afterwards, yeah.

P5FMCOM4                          Ventura - Cross

Q.  And in this message you're telling him that you love it when you make love with him during that freakoff, right?

A.  With him, yup.

Q.  And he's also talking about one of his favorite times when you had a freakoff, right?

A.  Yes, I think.

Q.  And he also loved it when you made love after, right?

          MS. JOHNSON:  Objection.

          THE COURT:  Sustained.

Q.  He also told you that he loved it when he made love with you after, right?

A.  That's what it says, yeah.

Q.  Before that, when you're discussing your period, Mr. Combs is asking you when you're on your period, right?

A.  Yeah.

Q.  And he's asking you that in the context of planning to meet up to have sex, right?

A.  Yeah, it looks like that.

Q.  And presumably he's -- withdrawn.

          And you tell him that you're skipping your period, right?

A.  Yup.

Q.  And you're telling him that so that you can plan a freakoff, right?

A.  I don't know exactly what I was thinking then, but

probably, yeah.

Q. In the context of a conversation about planning a freakoff you're telling him when your period is, right?

A. Yup.

MS. ESTEVAO: Can we skip to page 11, please. I'm sorry. Page 10.

Q. Mr. Combs says: I want you to tell me a new fantasy of how you want it next time. Would Dave turn you on? And you say: I don't know. I haven't even had time to think about it. I've been trying to think about you with a girl to get into it, and I think I'm starting to fantasize about that.

That's what you say, right?

A. Um-hum, yeah.

Q. That's what you told Mr. Combs on July 29, 2012, right?

A. Yes.

Q. And prior to this -- withdrawn.

Do you recall having conversations with Mr. Combs about you watching him with a female?

A. It happened, but not often.

Q. The discussions or the instances?

A. Both.

Q. About how many times would you say it happened, actually watching him have sex with a woman?

A. Two or three times, maybe four.

Q. And about how many times had he proposed it?

P5FMCOM4                        Ventura - Cross

A.  Had he proposed it?

Q.  Yes.

A.  He brought it up I don't know -- I don't have like a number.  He brought it up frequently enough.

Q.  And this was in the context of something that he referred to as a swinger's lifestyle?

A.  Yeah.

Q.  I believe you testified about this on your direct examination, right?

A.  Um-hum.

Q.  That he understood that the freakoffs were --

          MS. JOHNSON:  Objection.

          MS. ESTEVAO:  Withdrawn.

          THE COURT:  Sustained.

Q.  Do you recall having conversations with Mr. Combs about the swinger's lifestyle?

A.  Yes.

Q.  And based on those conversations -- withdrawn.

          What do you recall from those conversations?

A.  From those conversations, the earlier ones, it was just about what the swinger's lifestyle is, what you see, how people act, how nobody talks about it.  That is what I knew of it.  And then actually seeing it in person at sex clubs, you see exactly what it is.

Q.  Did you understand that freakoffs were consistent with

P5FMCOM4                    Ventura - Cross

Mr. Combs' description of the swinger's lifestyle?

A.  Can you reword that or ask it again?  Sorry.

Q.  Did you understand the freakoffs to be related to the swingers' lifestyle?

A.  Related in a sexual way, yeah.  They are very different.

Q.  When you said that nobody talks about it, that means it's a secret, right?

A.  Yeah.

Q.  When you kept it a secret, did that mean that you were also keeping it a secret from your friends?

        MS. JOHNSON:  Objection.  Vague.

Q.  Were you keeping it a secret from your friends?

        MS. JOHNSON:  Can we define it.

Q.  Were you keeping freakoffs a secret from your friends?

A.  Yes.

Q.  You testified on direct that there were employees of Mr. Combs, right?

A.  He has employees, yes.

Q.  He has personal assistants?

A.  Yup.

Q.  And his personal assistants do all sorts of things for him, right?

A.  Yup.

Q.  They help him wake up in the morning?

A.  Yes.

P5FMCOM4                      Ventura - Cross

Q.   They arrange for his breakfast?

A.   Yup.

Q.   They cater to his every need, right?

A.   Whatever he need, yup.

Q.   And you testified on direct that they would sometimes assist in setting up hotel rooms for these freakoffs, right?

A.   Correct.

Q.   But the personal assistants didn't know what was going on --

        MS. JOHNSON:  Objection.

        THE COURT:  Sustained.

Q.   Did a personal assistant ever come into a hotel room and see what was going on, based on your knowledge?

A.   Based on my knowledge, no, but they had come in the room during that period, yeah.  I don't know if they saw anything, is probably the better way to say it.

Q.   You would remember if an employee came in the room while you were in the middle of a session with an escort, right?

A.   Would I remember?  Probably.  Maybe.  I don't know.  I was high as well, so --

Q.   Much of it you don't remember, actually, because of the drugs?

A.   No.  I remember.  I just -- I had my privacy invaded quite a bit while I was in that relationship, so I can imagine.

Q.   You don't have any specific recollection of an employee

walking in while you were in the middle of a freakoff, correct?

A. No, I don't have any specific recollection, no.

Q. Did you ever tell any member of his staff about the freakoffs?

A. No.

Q. And Mr. Combs had other staff other than personal assistants, right?

A. Yes.

Q. He had bodyguards?

A. Um-hum.

Q. Drivers?

A. Yes.

Q. He had chiefs of staff?

A. Yup.

Q. He had other high-level executives?

A. Yup.

Q. And you never told any of them about what was going on during the freakoffs, right?

A. No, I did not.

Q. And you wouldn't want any member of his staff to find out what was going on in the freakoffs, right?

A. I definitely didn't, no.

MS. ESTEVAO: Can we pull up Defense Exhibit 1003, please.

MS. JOHNSON: Your Honor, this one is 25 pages. If

the witness wants to read it, we have a paper copy.  May I hand it up.

THE COURT:  OK.

MS. ESTEVAO:  We are not going to read this whole thing.

A.  I'm almost done.  I just don't want to miss anything.

THE COURT:  Ms. Estevao.

Q.  Ms. Ventura, does this reflect a text communication between you and Mr. Combs in July 2012?

A.  Yes.

MS. ESTEVAO:  And the earlier part of this conversation was a government exhibit, but we are going to pick off a day after that exhibit leaves off on page 18, please.

MS. JOHNSON:  Objection.  It's not in evidence.

MS. ESTEVAO:  Move for admission.  I apologize.

MS. JOHNSON:  No objection.

THE COURT:  1003 will be admitted.

(Defendant's Exhibit 1003 received in evidence)

MS. ESTEVAO:  Can we go to page 18.

Q.  In this text chain, on July 14, 2012, you say to Mr. Combs: How is the party?  I'm horny and bored.  I tipped the cleaning ladies.  Hope you don't mind.  Hello.  I need your dick. Dying.  I feel like I'm trapped.

A.  I'm sorry.  I'm not on that page.

Q.  I apologize.  Page 17.  I can read it again.

P5FMCOM4                      Ventura - Cross

A.  I see it.

Q.  You say:  I'm horny and board.  I tipped the cleaning ladies.  I hope you don't mind.  Hello.  I need your dick. Dying.  I feel like I'm trapped.

A.  Yeah.

Q.  This was after a freakoff, correct?

A.  There is a lot of texts here.  I don't know.

Q.  You are discussing tipping cleaning ladies in this message, right?

A.  Yeah.

Q.  And when we go to the next page, at the bottom, you say:  I love you.  Had so much fun with you.  I'm so happy.  Thank you. And then the next message has four exclamation points, right?

A.  Yup.

Q.  This is on July 16, 2012, right?

A.  Yes.

        MS. ESTEVAO:  Can we go to the following page.

Q.  Mr. Combs says:  I love you.

        And then you text a series of photos of you and, Mr. Combs, looks like outside a private plane, right?

A.  Yup.

        MS. ESTEVAO:  Can we pull up Defense Exhibit 1004, please.  Just for the witness and parties and the Court.

Q.  Without reading this entire exchange, does it appear to be another text communication between you and Mr. Combs?

P5FMCOM4                        Ventura - Cross

A.   It appears to be.

MS. JOHNSON:  Your Honor, I would ask that the witness be allowed to read the entire exchange.

THE COURT:  Ms. Estevao, are you only going to be asking about particular parts of this exchange?

MS. ESTEVAO:  Yes.

MS. JOHNSON:  If the whole thing is being offered into evidence --

THE COURT:  We will get to that.  It hasn't been offered yet.

MS. ESTEVAO:  I move for admission.

THE COURT:  Then the witness is going to have a chance to read the entire -- how many pages is this?

MS. ESTEVAO:  Eight.

THE COURT:  OK.

Do you have a copy for the witness, or would you like here to read it off the screen.

MS. JOHNSON:  Unfortunately, we don't have a copy of this exhibit for the witness, your Honor.

THE COURT:  Ms. Ventura, if you can look at the screen.  Let the staff know if you need to move through the pages.

A.   OK.

THE COURT:  Ms. Estevao.

Q.   Ms. Ventura, does --

P5FMCOM4                        Ventura - Cross

THE COURT:  Next page.

A.  There is nine pages.

Next page.  OK.  OK.

THE COURT:  Ms. Estevao.

Q.  Ms. Ventura, does this reflect a text communication between you and Mr. Combs?

A.  Yes.

MS. ESTEVAO:  Move for admission.

MS. JOHNSON:  No objection.

THE COURT:  1004 will be admitted.

(Defendant's Exhibit 1004 received in evidence)

Q.  Much of this conversation you went over during your direct testimony, right, Ms. Ventura?

A.  I don't know about most of it.  I remember it in my direct.

Q.  Do you remember the portion on page 4, a lot of dicks, a lot of partying?

A.  Yes, I do.

Q.  And Mr. Combs said:  So you feel sick.  I'm sorry.

A.  Yup.

Q.  And you asked why are you sorry?

A.  Um-hum, yes.

Q.  And during your direct testimony you were asked why you asked that question, right?

A.  Um-hum.

Q.  And you responded something to the effect of, well, he

never asked that -- he never said he was sorry before, right?

A.   About what was going on, yeah.

MS. ESTEVAO:   Can we go to the next page, please.

Q.   Mr. Combs says:  Can you make it.  I think it will be good to go in with Will tonight.  Rube can take you.  You say:  How are you?  I love you.  Mr. Combs says:  I'm missing you, misspelled.  And you have a frowny face and say:  Staring at our pictures from the plane.  I miss you.  Mr. Combs says:  I love you.  Good morning to my queen.  Have the greatest day of your life and get a lot of work done.  You say:  Good good good morning to my king, you mean everything to me, with lots of extra Os and Es.

MS. JOHNSON:   Your Honor, is there a question coming?

Q.   Am I reading this accurately, Ms. Ventura?

A.   I'm just waiting to find out what you want me to answer.

Q.   Am I reading this accurately?

A.   I believe so.  You are just reading it.

Q.   And then do you respond:  I will never have the greatest day of my life until you're back home, right?

A.   Yes, I see that.

Q.   After Mr. Combs says, I'm sorry, and you respond, why you sorry, you exchange messages of love and affection, right?

A.   Yes.

Q.   Fair to say that when you say why you sorry, you mean why would you even ask; if you're sorry, you have nothing to do

P5FMCOM4                        Ventura - Cross

with that?

A.   I don't know.

Q.   During your direct testimony you testified that Mr. Combs often put you down, right?

A.   Um-hum.

Q.   But he also often built you up?

A.   Absolutely, yeah.

Q.   And often sent you very encouraging text messages.

A.   Yup.

Q.   And often told you that you were a queen, right?

A.   Yeah.

Q.   And often encouraged you to be the best artist and woman you could be, right?

A.   Yes.

Q.   There are many, many examples of that, right?

A.   There are.

Q.   And we don't need to go through all of those text messages.

A.   Yeah.

Q.   Suffice to say that there are many, many text messages that reflect that?

A.   There were uplifting text messages.

Q.   And one -- in what other ways did he build you up?

A.   Other ways did Sean build me up.  I mean, words were helpful.  He has got this energy, just that inspiring energy, so, words.

MS. ESTEVAO:  Can we please show the witness, the Court, and the parties Defense Exhibit 1005.

MS. JOHNSON:  Your Honor, we do have a paper copy of? This.  It's 26 pages long.

THE COURT:  Let's have a brief sidebar.

(Continued on next page)

(At sidebar)

THE COURT:  I take it that a lot of these text messages, the government does not have an objection to their admission.  However, it is fair for the witness to be able to review them before you seek admission.  Because of the length of these exhibits, that takes a little bit of time and it's eating up time in front of the jury that probably does not need to be eaten up because there is probably -- I can think of, at least, two ways to avoid this issue.

One is that you gave the text messages to the witness to review by herself over the lunch break, and then you can just seek admission, and we wouldn't have to go through this.

The other way is to break up the exhibits, little bit more time consuming to focus on those portions that you seek to admit.  That would also save time.

For present purposes, are there questions that you could ask to get us through to the lunch hour so that we can make good use of the jury's time?

MR. AGNIFILO:  What time does the Court want to take lunch?

THE COURT:  I think the jurors will have their lunch by 12:15.  We can take it later, though -- we can go as long as we want.  I'm mindful of the concern that was raised concerning the witness' availability.  As I said yesterday, I'm planning to tell the jury to take 30 minutes and come back.  Just be

mindful of that.  I'd like to go longer, if we can.  However, if this is a good breaking point, I can also stop earlier.

MS. ESTEVAO:  We are way ahead of you, Judge.  We want to make these exhibits smaller and more to the point, and we plan on doing that, because this was a rushed process, but we will endeavor to do that.  I suggest that we get through that exhibit and then take our break.

MS. COMEY:  May I hand this to the witness?

THE COURT:  You may.

MS. JOHNSON:  Thank you.

(Continued on next page)

(In open court)

THE COURT:  Ms. Ventura, you can take a moment to review the document and let us know when you're ready.

THE WITNESS:  OK.

MS. COMEY:  Your Honor, there is a 412 issue with this exhibit that we just found.

THE COURT:  Give me the page.

MS. JOHNSON:  Page 15.  And I believe there is an additional --

MS. ESTEVAO:  Your Honor, I agree with the government on this one.

THE COURT:  Why don't we put this to the side for the moment.

Ms. Estevao, you can ask your next question.

Q.  During your direct testimony, Ms. Ventura, you discussed the instant -- withdrawn.

During your direct testimony, you said that Mr. Combs would periodically call you incessantly, right?

A.  Yes.

Q.  And this was a frequent feature of your communications with him?

A.  Yes.

Q.  If you didn't pick up the phone when he wanted you to pick up the phone, then he would continue to call you, right?

A.  Correct.

P5FMCOM4                      Ventura - Cross

Q.  And this was especially the case if he suspected that you --

MS. JOHNSON:  Objection.  It's speculation.

THE COURT:  I don't know what you were going to ask, but you can rephrase the fragment, and we can see where we are.

Q.  When do you recall -- withdrawn.

What would trigger this incessant calling, from your perspective?

A.  From my perspective, what would it trigger.  It could be anything from not telling him where I was, many things, just angry with me about anything.

Q.  Why did you think he was concerned when he didn't know where you were?

A.  I think because he would assume I was cheating, but I don't know.

Q.  If he gave you reason to think -- withdrawn.

When he suspected that you were cheating, he would call you --

MS. JOHNSON:  Objection.  Same objection.

THE COURT:  That's overruled.

Q.  When he suspected you of cheating he would call you incessantly, right?

A.  It's one of the reasons.

Q.  If you didn't answer the phone when he called, he would jump to the conclusion that you were cheating on him?

THE COURT:  That's sustained.

MS. ESTEVAO:  Your Honor, my next series of questions are about exhibits, so if it makes sense to take a break, we can do so.

THE COURT:  Just give us one second.

Are you prepared to move forward for a few more minutes, just so we can make efficient time?

MS. ESTEVAO:  Sure.

THE COURT:  Let's keep going, and then we will take a break shortly.

Q.  During your direct testimony you talked about the ways in which Mr. Combs was consulted on your appearance, right?

A.  Yeah.

Q.  And you would periodically text him photos of your clothes, right?

A.  Yes.

MS. JOHNSON:  Objection.  Mischaracterizes testimony.

THE COURT:  It's overruled.

Q.  Would you send him photos of your clothes?

A.  What I was wearing, things like that, yeah.

Q.  And send him photos of your hair?

A.  Yup.

Q.  And ask him what he thought?

A.  Sometimes, yeah.

Q.  And is Mr. Combs generally known as someone who has good

taste?

MS. JOHNSON:  Objection.

THE COURT:  Can you rephrase that question.

Q.  Do you believe that Mr. Combs has good taste?

A.  I think he does, yeah.

Q.  And do you believe that Mr. Combs is known publicly for being --

MS. JOHNSON:  Objection.

THE COURT:  That's sustained.

Q.  Mr. Combs is a celebrity known for many things, right?

A.  Yup.

Q.  What are some of the things that he's known for?

A.  He is known for his music and production and artistry, style.

Q.  Is he known for his impact on the culture?

A.  Yup, absolutely.

Q.  Is he known for his impact on fashion?

A.  Yup.

Q.  How, to your knowledge, has he had an impact on fashion?

A.  I would say he has had a big impact on fashion over many decades.

Q.  In what respect?

A.  People like his style.

Q.  Did he also found a clothing line?

A.  Yes.

Q.   Was that clothing line very successful?

A.   It was.

Q.   What's the name of that clothing line?

A.   Sean John.

Q.   And did that clothing line -- did his involvement, creation of that clothing line earn him any awards, to your knowledge?

MS. JOHNSON:  Objection.  Foundation.  Hearsay.

THE COURT:  It's overruled.

A.   I don't know.  I believe he did, but I don't --

Q.   And you consulted with him periodically on your own look, right?

A.   Yes, sometimes I got information without asking for it as well, yeah.

Q.   But in many ways you trusted his perspective, right?

A.   Yeah, I did.

Q.   And to your understanding, many people respected his perspective in this regard.

A.   From my perspective, yes.

Q.   To your knowledge, did other people consult with him on their look?

A.   If he had the time for them, yes, um-hum.

Q.   Did other artists on his label consult with him on their looks?

A.   Yeah.

Q.   Was he consulted on various aspects of marketing and

P5FMCOM4                      Ventura - Cross

production for the label?

A.   I'd say so, yes.

Q.   What other professional roles did Mr. Combs play?

A.   An actor, company owner.

Q.   Would you say he was a very busy man during the course of your relationship?

A.   Yup.  He's very busy.

Q.   He had lots of meetings?

A.   Meetings?

Q.   Yes.

A.   Yes.

Q.   And he met with lots of advisers?

A.   Yup.

Q.   He met with managers and accountants and lawyers?

A.   Yes.

Q.   He was very busy?

A.   Very busy.

Q.   He ran multiple companies.

A.   Yup.

Q.   Successfully.

A.   Yup.

Q.   He was very wealthy?

A.   I believe he was wealthy, yes.

Q.   And he continued to be very wealthy and very successful and very busy during the course of your relationship when you were

P5FMCOM4                          Ventura - Cross

having freakoffs, right?

A.   Yeah.

Q.   And when you were having freakoffs, he was also consuming
lots of substances, right?

A.   Yes.  We both were.

Q.   At least as much as you were.

A.   Yeah.

Q.   And likely more.

A.   I don't know.

Q.   And he would also have to take time to recover from those
freakoffs, right?

A.   Yes.

Q.   Sometimes the recovery would take some time, right?

A.   Yup.

Q.   And sometimes you got IV drips to help recover?

A.   Yup.

Q.   And during this time he was still running all of his
companies, right?

A.   Yes.

Q.   And still attending board meetings, right?

A.   To my knowledge, yes.

Q.   And still traveling all over the country and the world,
right?

A.   Yup.

Q.   And would you say that he was a high-functioning addict --

P5FMCOM4                          Ventura - Cross

withdrawn.

You would say he was an addict, right?

A.  I would say he was an addict.

Q.  What was he addicted to?

A.  Success.

Q.  What substances was he addicted to?

A.  I think it varied over the years.  It depended on what he was taking.  I don't know exactly.

Q.  Was he addicted to opiates?

A.  At a point, yes.

Q.  How do you know that he was addicted to opiates?

A.  Because he told me.

Q.  Did you also see him taking opiates?

A.  I had seen him, yup.

Q.  You would see him on a regular basis taking opiates, right?

A.  Often enough.  I don't know about regular basis.  Depends on when you're talking about in the relationship as well.

Q.  There were points of your relationship when he was heavily dependent on opiates, right?

MS. JOHNSON:  Objection.

THE COURT:  It's overruled.

Q.  There were points in your relationship when he was heavily dependent on opiates, right?

A.  We both were.  There were points.

Q.  And what is it like to withdraw from opiates, from your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

experience?

A. From my experience, it's just really painful. I mean, withdrawal of any kind, you just are super sick. You can't really do normal things, like function normally.

Q. When you say sick, what do you mean?

A. For me, specifically with opiates, when I stopped taking them, I would be nauseous, and I would have like stomach issues. There is various things that can happen.

Q. Does it affect your mood or mental state?

A. Absolutely, yeah.

Q. In what way?

A. I think you're more agitated, just really uncomfortable.

Q. Did you ever witness Mr. Combs go through opiate withdrawal?

A. I did.

Q. You witnessed this frequently, right?

A. It depends on what's frequently. Definitely more than once.

Q. Over the course of your relationship you would witness Mr. Combs attempt to lessen his dependence on opiates, right?

A. Yes.

Q. Is it fair to say that his opiate use would go up and down?

A. You could say that. I don't know specifically what he was taking like day to day, so I don't know.

Q. Is it fair to say that there were times during your

P5FMCOM4                    Ventura - Cross

relationship when his drug use was worse than other times?

MS. JOHNSON:  Objection.  Foundation.  We have not established --

THE COURT:  Hold on.

That question needs to be rephrased.

Q.  Did Mr. Combs' mood, from your perspective, depend on whether or not he was withdrawing from opiates?

A.  I'm sorry.  Could you reword that.

Q.  When Mr. Combs was withdrawing from opiates, he was more irritable, right?

A.  Yes, I would say.

Q.  And more angry.

A.  Yeah.

Q.  And more volatile.

A.  I don't know about all those things, but you're definitely irritated when you're coming off of opiates, yes.

Q.  There were times in your relationship when he was more irritated than other times, right?

A.  Yes.

Q.  He would go through periods of time when he was in a bad mood nearly every day, right?

A.  It went up and down.

Q.  Were there certain years in your relationship that were worse than others?

A.  I think so, yeah.

Q.  And, from your understanding, were the worst years associated in any way with his drug use?

A.  Yeah, I would say.

Q.  In what way?

A.  I mean, from my perspective, and in my mind, like drugs don't help you do anything, so he was taking them and not doing well.  That's what happens when you take drugs.

Q.  You said that when he's taking drugs he is not doing well. Is that what you said?

A.  I was saying, from my perspective, like my mind, if I'm taking drugs, I'm not doing well, like -- I'm sorry.  I am just trying to follow you.

Q.  My question is confusing.

A.  It's OK.

Q.  When Mr. Combs was using more drugs, was his mood worse?

A.  I can't specify.  There was a lot of drug use.

Q.  There was a lot of drug use.  You witnessed a lot of drug use by Mr. Combs, right?

A.  Both participated, yes.

Q.  So to the extent you can remember, you know that he took a lot of drugs at certain points?

A.  At certain points.

Q.  And you were doing drugs as well?

A.  I was.

Q.  You were also addicted to opiates?

A.   I was for a period, yup.

Q.   What other drugs was Mr. Combs addicted to during your relationship with him?

          MS. JOHNSON:  Objection.  We don't know that she knows.

          THE COURT:  It's objection.

          MS. JOHNSON:  Yes.  Foundation.

          THE COURT:  No.  It's objection, and then I'll inquire as to the grounds.  OK.

          Ms. Estevao, the objection is sustained.  The question needs to be rephrased.

Q.   Are you aware of Mr. Combs being addicted to any other drugs?

A.   No.

Q.   What other drugs did Mr. Combs do in your presence?

A.   Ecstasy, MDMA, cocaine, K, GHP.

Q.   Is MDMA something that you get addicted to?

A.   It's a good question.  I don't know.

Q.   Did you ever get addicted to MDMA?

A.   I didn't feel that I was ever addicted to MDMA, no.

Q.   Did you ever feel like you were addicted to molly?

A.   No.

Q.   Did you ever feel like you were addicted to cocaine?

A.   No.

Q.   Based on your experience with Mr. Combs, did you ever

P5FMCOM4                        Ventura - Cross

understand that he was addicted to cocaine?

A.   No.

Q.   Were you ever addicted to GHP?

A.   No.

Q.   From your experience with Mr. Combs, did you ever understand that he was addicted to GHP?

A.   Not to my understanding, no.

Q.   Based on your experience with him and all the drugs that you did, what was his primary drug of choice?

A.   His primary drug of choice, from my perspective, was Ecstasy or MDMA.

Q.   That's in the context of freakoffs, right?

A.   Partying in general.

Q.   That was a party drug, right?

A.   Yup.

Q.   And opiates were a daily regular drug, right?

A.   For me at least, yeah.

Q.   And based on your experience with him, for him as well, right?

A.   When he was doing them, yeah, daily, I would say.

Q.   And you said before that you have witnessed him withdraw from opiates, right?

A.   Yes.

Q.   And based on those experiences, how did his mood change during the withdrawal?

P5FMCOM4                    Ventura - Cross

A.   I haven't thought about it in a while, and I'm not a
doctor.  Your serotonin levels are definitely messed up after
you party and take certain pills.  So coming off of them, yeah,
you'd be pretty irritated.

Q.   If Mr. Combs was withdrawing, would that affect how you
interacted with him in any way?

A.   I'm sure it did to a point, but I don't -- there was no
telling when somebody is actually going through that unless
they tell you.

Q.   Well, sometimes he told you, right?

A.   Sometimes he told me, right.

Q.   In fact, you exchanged lots of text messages about
withdrawing, right?

A.   Yeah.

Q.   And the side effects of withdrawal, right?

A.   Um-hum.

Q.   And that includes feeling sick, right?

A.   Right.

Q.   And like flu-like symptoms?

A.   Right.

Q.   So in your text messages, if you're talking about flu-like
symptoms, it might be that you're discussing withdrawal, right?

          MS. JOHNSON:  Objection.

          THE COURT:  That's sustained.

Q.   Is throwing up or vomiting another symptom of withdrawal?

A.  It could be, yeah.

Q.  And during your direct testimony you were talking about you used a phrase rolling, right?

A.  Yes.

Q.  What does that mean?

A.  It's when the high is really at its peak during taking like MDMA or Ecstasy.

Q.  Is vomiting a side effect of taking MDMA or Ecstasy?

A.  It was for me.

Q.  What do you feel when you take Ecstasy or MDMA?

A.  It's a feeling of euphoria, you're sensitive to touch, sensitive to sensations.

Q.  But notwithstanding the side effect of throwing up, you would still take MDMA or Ecstasy to feel that euphoria, right?

A.  Say it again.

Q.  You would take Ecstasy to feel that euphoria, notwithstanding the side effect of vomiting, right?

A.  I would take Ecstasy and MDMA to be high during freakoffs.

Q.  You have taken Ecstasy and MDMA outside of freakoffs, right?

A.  We had.  It just wasn't my favorite -- it wasn't my drug of choice.

Q.  Do you understand Ecstasy or MDMA to be a drug of choice during sex?

A.  Yes.

P5FMCOM4                        Ventura - Cross

Q.   Outside of the context of freakoffs, you've heard about this concept, right?

A.   Yes.

Q.   It's a popular activity while taking Ecstasy, right?

MS. JOHNSON:  Objection.

THE COURT:  It's overruled.

Let's go ahead and take our lunch break now.

Members of the jury, we are going to come back at 1 p.m., so see you then.  Have a nice lunch.

(Jury not present)

THE COURT:  See you back here at 1.  Again, you are not going to have any discussions with the government.

THE WITNESS:  Gotcha.  Thank you.

(Continued on next page)

THE COURT:  Ms. Estevao, can you give us a rough sense of where we are in your cross in terms of timing.

MS. ESTEVAO:  I have many exhibits to go through.  I think I underestimated the estimate yesterday.  I think I'm going to confer with the team over the lunch break to try to narrow the exhibits and try to come up with a better estimate.

THE COURT:  But just nonresponsive.

MS. ESTEVAO:  Guilty.

THE COURT:  Mr. Donaldson noted when this came up the last time, I'm not holding you to this, but I need to know what we're looking at so we can have a discussion on scheduling.

Let me make it easier for you.  Are we talking about you think you're going to be done today, or no, you think you're going to be done in the morning tomorrow?

MR. AGNIFILO:  I was told that I would be the one to fall on the sword, which is my role at this trial.  I think we're definitely going to finish the week.  I think it's going to be all day today, it's going to be all day tomorrow.  We're going to do everything we can to finish as soon as possible, but I --

THE COURT:  You recognize that that is the exact opposite of what I was told yesterday in this courtroom?

MR. AGNIFILO:  Yes.  That's why there is a sword that I must fall on.

So we're up until late into the night and we knew the

Court was going to ask this question.  There is a lot of material to go through.  It's the most important witness in the case.  We're trying to do it quickly and we're going to try to do it by the end of the day, we're working two long days, by the end of the day Friday.  I definitely want to put the Court on notice and the government on notice, we might not be able to do that, we're going to try to do that.

THE COURT:  This was the subject of discussion for I don't even think it's weeks, I think months that this witness needed to be off the stand by the end of the week.  So what happened?

MR. AGNIFILO:  I never understood that.  I understood --

THE COURT:  Am I wrong about that?

MS. JOHNSON:  No, your Honor.  We've been very clear for months about the timing concerns, and we were assured yesterday that this cross would be finished by tomorrow at some point.  Our direct took less than two days, probably a day and a half, and we would ask that the Court exercise its discretion under Rule 611 to limit the cross-examination to the length of the direct examination.

THE COURT:  For present purposes, we don't need to get into this because we have limited time, we're coming back at 1:00, and everyone needs to do what they need to do.

A few things right now.  The exhibits you plan to go

through, is there a way to provide them to Ms. Ventura so she can look at them?

MR. AGNIFILO:  Yes.

THE COURT:  For those that aren't going to be objected to, I want to avoid having that time being wasted in front of the jury.  If there's a way to do that, let's do that.  That's one thing we could do.

The second thing is an observation that if there's no objection to the exhibits coming in, if they're authentic and there's no substantive issue to raise and those go into evidence, the questioning, there may be the ability to question the witness and get all the answers that you're looking for without going message by message through these exhibits. That's another way to streamline things because you have a witness that is here and answering questions.

And so I'm just making a suggestion.  You can do the cross how you plan to do it.  I'm not trying to tell you how to do it.  I'm just offering that as an observation given the timing concern that we have, that way you have the exhibits in that you need to get in and can ask the questions that you want to ask and maybe there's a way to streamline things.  So as I always say, if there's a way to streamline things over the lunch break and over the evening, I would invite you to do that.

MR. AGNIFILO:  Yes, Judge, we will do that.

One thing I want to point out is the government chose to call two witnesses before this witness, which took up a great deal of time.  So I don't know that this artificial deadline of the end of the day Friday should be held against us when it's the third witness in the case.  We all knew she was going to be early, but they chose not to call her first.  That wasn't our choice.  So we are going to do everything we can, but it's a critically important witness.

THE COURT:  I appreciate that.  And so my suggestion is that it's always good to streamline things.  It helps you, it helps the trial move forward swiftly.  So that's just the suggestion that I had.  If there's a way to do it, if you have some ideas on how to streamline things, great.

As to the scheduling issue, I'm going to think about it over the lunch break and we'll figure out what's going to happen.

Ms. Comey.

MS. COMEY:  Yes, your Honor, if I may respond to what Mr. Agnifilo said.  As he knows and as we told defense counsel, the first two witnesses had scheduling issues and were not going to be available to testify otherwise.  That is why we tried to streamline their directs and why Ms. Johnson was incredibly efficient in getting the direct done in less than two days.

THE COURT:  I understand all of that.  So we'll come

P5FCcom5                        Ventura - Cross

back at 1:00.

(Luncheon recess)

(Continued on next page)

AFTERNOON SESSION

1:10 p.m.

(In open court; jury not present)

THE COURT:  Ms. Estevao, has the witness had a chance to review the exhibits?

MS. ESTEVAO:  I believe government counsel gave them an iPad.

MR. AGNIFILO:  We believe she's somewhere reviewing the exhibits right now.  Everything that we are going to be asking we told the government about, and I believe the government told the witness and provided the information.

MS. JOHNSON:  We did, your Honor, we provided her with an iPad.  I know there's a fair number of exhibits, many of which are lengthy, and the government tried to review them at the same time and got through about a third.

THE COURT:  We'll do the best we can with our limited time.

In terms of the timing of the cross-examination, when we were here yesterday, there was a discussion of whether the cross-examination would begin yesterday or instead would begin in the morning today.  In the context of that ask, from the defense, I was told that, absolutely, this witness would be off the stand by the end of the week.  On that understanding, we let the jury go home early yesterday and started the cross-examination this morning.

(Witness present)

Further, it is the understanding of everyone --

I did not ask to bring the witness back.

MS. COMEY:  I'm sorry, your Honor.  I misunderstood.

(Witness not present)

THE COURT:  To continue.  It was the understanding of everyone that this witness would be off the stand by the end of the week.  As the prosecution has noted, the direct took a day and a half, so the defense will have a day and a half.  So you have today, you have the morning tomorrow.  If there's something that really needs to be done after the lunch break, then you can have some additional time at my discretion in the early afternoon so that we can have redirect done tomorrow and the witness off the stand tomorrow.

In terms of how to do that, I gave some suggestions before we recessed for lunch, and the only additional thing that I'll say is you have a witness who, Ms. Estevao, is being responsive to your questions, the questions you're asking.  So I would just consider that in terms of deciding what questions to ask because this is not the kind of witness that is fighting you on every single question that you're asking.  And so in that regard, it may be possible for you to streamline your examination while at the same time addressing all of the issues that you need to address.  I absolutely understand that there's a lot of material to cover and a lot of exhibits for you to put

in.  And so I appreciate that.  It's just something for to you think about as you're going through your examination.

With that, Ms. Comey or Ms. Johnson, anything to add?

MS. JOHNSON:  No, your Honor.

THE COURT:  Ms. Agnifilo, anything on your side?

MR. AGNIFILO:  Yes, your Honor.  We are going to do everything we can to be efficient.  It is not uncommon for cross-examinations to be three or four hours longer or three or four hours shorter than one estimates.  So we saved 30 minutes yesterday when we sent the jury out at 4:30 instead of 5 o'clock, and I think that that time was well spent.  There's nothing other than our trying to do this as quickly as possible that imposes a Friday 5:00 p.m. deadline.  To my knowledge, nothing happens if the witness has to come back Monday morning, and that is common.  If this was such a hard deadline, this should have been the first witness.  Again, that was the government's decision.

Now, it's starting to feel a little strategic on their part to kind of pen us in to only having a day and a half or two days on cross.  And so if this was that important, if this was a drop-dead deadline, it should have been the first witness.

THE COURT:  In what universe did you not understand that this was important given that it was in numerous filings and discussed among the parties several times, that this was

what was going to happen, that this witness was going to be done this week.  You're not telling me that it wasn't everyone's understanding and expectation that this witness would be done this week, right?  You're not saying that to me?

MR. AGNIFILO:  We are trying to accomplish, we are trying to do that.

THE COURT:  I understand.  You never mentioned to anyone before today, when we addressed it before the lunch break, that there was a possibility that this witness would go into next week, right?

MR. AGNIFILO:  But that is the cross-examination that might be required for this critical witness in a case that involves a life sentence.  And so what's really important, yes, the schedule is important, Mr. Combs's right to cross examine this witness fully and fairly is quite important and I don't know that the two have to be in such great tension.

THE COURT:  I've told you what my expectation is, and I did say if we are getting into tomorrow and there's a real need for additional time, then I understand that you'll make an application at that time to do it.

You have no objection to the government making inquiries on a logistical basis with the witness to determine whether she's even available next week?

MR. AGNIFILO:  That's perfectly appropriate.

THE COURT:  Let's figure that out.

For the time being, my expectation, and there will need to be good cause for me to not follow what I'm saying now, is that you have a day and a half, we should be done by the lunch break or soon thereafter, and then we'll go into redirect. So there has to be a compelling reason not to do that. And I agree with the government that under Rule 611, I have the authority to do that. And so if I see that you are making efficient use of time in your cross-examination, that we're doing things in a streamlined way, and that there is just reasons outside of your control, material that is relevant to the defense and that is grounds for additional time, then hopefully we'll hear back that, logistically, it should not pose an issue and we'll continue on that basis.

MR. AGNIFILO: Thank you, Judge.

THE COURT: Now, if we can please get Ms. Ventura back.

(Witness present)

(Continued on next page)

(Jury present)

THE COURT:  Ms. Ventura, you understand you're still under oath?

THE WITNESS:  Yes.

THE COURT:  Ms. Estevao.

MS. ESTEVAO:  Good afternoon, Ms. Ventura.  I would like to turn to some government exhibits that are already in evidence.  Mr. McLeod, could you pull up Government Exhibit 411, please.  Excuse me, B-411.

MS. JOHNSON:  Your Honor, I don't believe that's in evidence yet.  According to our records, it's not in evidence.

THE COURT:  What was put up was A-411.  So I think now we're getting up B-411.

MS. ESTEVAO:  Can you please pull up B-442.

BY MS. ESTEVAO:

Q.  Ms. Ventura, these are your messages to Mr. Combs on March 18th, 2017, correct?

A.  Yes.

Q.  And you say, please don't play victim, if you can, go to our last messages.  And then you say, that's all you wanted and that's why I was upset, right?

A.  Yes.

Q.  After that, you say I love our FOs, right?

A.  Yes.

Q.  And then you say, when we both want it, right?

P5FCcom5                        Ventura - Cross

A.   Yup.

Q.   And that's how you felt at the time, that you loved freak-offs when you both were into it, correct?

A.   I would say that loving FOs were just words at that point.

Q.   Well, those were words that you said to Mr. Combs, correct?

A.   Those are texts, yes.

Q.   Those are texts Mr. Combs received from you, correct?

A.   Uh-huh.

          MS. ESTEVAO:  Could you please pull up B-415, Mr. McLeod, and scroll down.

Q.   In this text message, Mr. Combs says to you, I want a freak-off right now lol.  And how do you respond?

A.   Lol me too.  Well, I want to have fun with you.

Q.   That's you telling Mr. Combs that you also want to freak-off right now, correct?

A.   That is me agreeing to it in the first message, and the second one is me establishing that I want to have fun with him.

Q.   The text message that you sent to Mr. Combs was, lol, me too, well, I want to have fun with you, right?

A.   Correct.

Q.   And that's the message that he received from you, right?

A.   Yes.

          MS. ESTEVAO:  Can you please pull up B-418 in evidence.

Q.   In this text message, Mr. Combs says to you, let me know if

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

P5FCcom5                          Ventura - Cross

you want to have a light night, Jules is avail FYI.  If you not
into that, NP.  And that means no problem, right?

A.  Yeah.

Q.  We can just do our thing, me and you.  Just want to know
for hotel purposes.  And then he says, love you.  And in
response, you say, love you, right?

A.  Right.

Q.  So that's him asking you if would you like to have a
freak-off, right?

A.  He says let me know if you want to have a light night,
which, yeah.

Q.  By saying Jules is available, that suggests to you that he
wants to have a freak-off, correct?

A.  Correct.

Q.  He says, if you're not into that, no problem?

A.  That's what it says, yeah.

Q.  And that was an invitation for you to respond yes or no,
right?

A.  I suppose so.

Q.  And the response that you gave was, love you, right?

A.  Right.  There was no yes or no.

        MS. ESTEVAO:  Could we please go to the next page.

Q.  He says, you didn't give me an answer.  In response, you
say, I love you Pop Pop.  And he said, love you, Mama.

A.  Yes.  Is this connected to the last page, too --

P5FCcom5                          Ventura - Cross

Q.  -- the following page.

A.  Okay.

MS. ESTEVAO:  Can we go to the next page, please, the next message.

You can take it down, please.

Can you please bring up B-420 on page 2.

Q.  In this message, Mr. Combs writes to you, I want us to have one of our night.  I found this new store.  Dope.  We'll drink a lot of water.  Don't overdo, but have us some freaky fun.  Do I have your permission to set up.  You say, yeah, but I'm ovulation.

That's you responding yes to his request to have freaky fun, right?

A.  Yup.

Q.  But you say that you're on ovulation, which, does that mean you were ovulating, right?

A.  Uh-huh.

MS. ESTEVAO:  Can we go to the next message, please.

Q.  You're correcting your statement saying, ugh, ovulating.  That's good, we'd be extra careful with anything else, right?

A.  Yup.

Q.  And so in that message he's saying to you that he's planning to be careful.  What do you interpret that to mean?

A.  From getting me pregnant, I'm assuming.

MS. ESTEVAO:  Can we go to the next message, please.

P5FCcom5                        Ventura - Cross

Q.  Mr. Combs is asking, if you're not super horny, wtf.  What do you say in response to that?

A.  Horny, of course I am.

        MS. ESTEVAO:  Thank you.  You can take this down.

        Could we pull up B-427, please.

Q.  In this text membership exchange, Mr. Combs says, how you, and you say, okay, how are you.  And he says, baby call me.

        MS. ESTEVAO:  Can we go to the next message, please.

Q.  What do you ask?

A.  I say, which hotel, what was their time.  I must have called him, yeah, ahead of that.

Q.  The text messages don't indicate calls, but would you assume from this message that there would be a call in between these messages?

A.  I don't want to assume anything at this point, but I would think so.

Q.  Is that an inference that you're drawing from this message?

A.  Yes.

Q.  And he says Montage.  And you ask, Hustler is a little unblessed, no?

A.  Yes.

        MS. ESTEVAO:  Can we go to the next message, please.

Q.  And you say, I don't mind, about to get in my car now, just asking what you think.  I can also go to Pleasure Chest.

        This is you discussing an anticipated freak-off and

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

P5FCcom5                         Ventura - Cross

planning to go to Pleasure Chest, right?

A.  Yup.

Q.  What would you get at Pleasure Chest?

A.  I would get different sexual supplies, lubricants, outfits.

          MS. ESTEVAO:  Can we go to the next message, please.

Q.  Mr. Combs says, that's so far.  And you say, okay.  And he says, I'll go if you don't want, right?

A.  Uh-huh.

Q.  So he's suggesting he go to pick up supplies, right?

A.  Yup.

Q.  And, in fact, there were many occasions in which he was picking up supplies for the freak-offs, right?

A.  He picked up supplies, yeah.

Q.  You weren't the only one picking up supplies?

A.  No.

Q.  And there were also occasions in which he was the one contacting escorts, right?

A.  Correct.

Q.  You weren't the only one contacting escorts?

A.  Yup.

          MS. ESTEVAO:  Can we go to the next page, please.

Q.  In response, you say, no problem, no, it's cool, unless you're done.  And he says, not done.  This is you two just negotiating who's going to pick up supplies for the freak-off, right?

          SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

P5FCcom5                          Ventura - Cross

A.  It looks like it.

          MS. ESTEVAO:  Can we go to the next page, please.

Q.  You say, okay, got it.  Anything else you want?  You're asking him in this message if there's anything else he wants for the freak-off, right?

A.  Yup.

          (Continued on next page)

P5FMCOM6                        Ventura - Cross

Q.  He says:  Have fun.  Impress me.  Right?

A.  Yes.

        MS. ESTEVAO:  Can we go to the next message.

Q.  You say:  OK.  Right?

A.  Yes.

Q.  And he says:  Can we kiss tonight a lot.

A.  Yes.

        MS. ESTEVAO:  Next page.

Q.  What do you say?

A.  Yes.

Q.  That's in response to him asking if you can kiss that
evening, presumably at the freakoff, right?

A.  Yup.

Q.  And he says, what are you doing?  Where are you at?

        MS. ESTEVAO:  Can we go to the next page.

Q.  What do you say?

A.  At Hustler, about to check out.  Trying to find something
to impress you, LOL U.

        MS. ESTEVAO:  Can we go to the next page.

Q.  And he says:  Great.  Go to hotel, right?

A.  Um-hum.

Q.  What do you say in response to that?

A.  OK.  How long you gonna be, you think.

Q.  And in this exchange so far you have not said no, right?

A.  Correct.

P5FMCOM6                            Ventura - Cross

Q.   And he says 20, as in 20 minutes, right?

A.   Yup.

          MS. ESTEVAO:  Can we go to the next page, please.

Q.   He says:  You can go set up.  And you respond:  OK.  You
still tired.  Right?

A.   Yes.

Q.   He says:  No.  Right?

A.   Yes.

          MS. ESTEVAO:  Can we go to the next page, please.

Q.   You say:  Shit, I left the iPad.  Should I go get.  Right?

A.   Yes.

Q.   What IPad are you referring to there?

A.   I'm not sure which iPad specifically, but probably an iPad
that we were going to use that night.

Q.   When you say, I left the iPad, you meant that you had
previously had possession of the iPad and had left it wherever
you left it?

A.   Yeah.  I just don't know whose iPad it was.

Q.   Putting aside whose it was, you had left it somewhere,
right?

A.   Yes.

Q.   So it had been in your possession, right?

A.   Yes.

Q.   And you told him that you left the iPad because you knew
that he would want it for the freakoff, right?

A.  Yes.

Q.  It was anticipated that the iPad would be used for some sort of reporting for the freakoff, right?

A.  In 2017, yes.

Q.  And you asked him if you should go get it, right?

A.  I did.

Q.  And he says, yeah, fuck, right?

A.  Um-hum, yes.

MS. ESTEVAO:  Can we go to the next page, please.

Q.  You say:  OK.  I'll run there.  Sorry.  I had it hidden, so I forgot to grab it.  Right?

A.  Yup.

Q.  And you're referring to the iPad being hidden here, right?

A.  I am.

Q.  And this message exchange is from May 26, 2017.  Do you see that?

A.  Yes.

Q.  And at this point you've been together with Mr. Combs for many years, right?

A.  Yes.

Q.  And he says in response to that:  OK.  Meet you at the hotel.  Right?

A.  Yes.

Q.  And you say:  They took forever to check me out because I got a lot of stuff.  I'm leaving the store now.  Right?

P5FMCOM6                          Ventura - Cross

A.  Correct.

MS. ESTEVAO:  Can we go to the next page.

Q.  He says:  On way to hotel.  And you say:  Pulling up to my house.  He says:  I'll be at hotel waiting.  Right?

A.  Yes.

MS. ESTEVAO:  Can we go to the next page.

Q.  And then he is asking about a pizza.  You say:  Almost there.  I'm good, I think.  Maybe a slice.  Right?

A.  Yes.

Q.  Then you say:  I'm too excited.

A.  Yup.

Q.  That's referring to the freakoff that you were about to attend, correct?

A.  In my mind, I probably would have been excited to see him and have fun with him.

Q.  But the words that you texted him were:  I'm so excited. Right?

A.  I'm too excited.

Q.  I'm too excited.  Excuse me.  And this was after a discussion about negotiating supplies and logistics for a freakoff, correct?

A.  Yes.

Q.  Thank you.

MS. ESTEVAO:  Could you please pull up Government Exhibit B428, Mr. McLeod, and go to the last page.

MS. JOHNSON:  This is not in evidence yet.

MS. ESTEVAO:  Can I just ask that the witness and the parties and the Court look at this exhibit.

Q.  Ms. Ventura, could you review this exhibit, please.

MS. ESTEVAO:  If Mr. McLeod can go through.  Thank you.

Q.  Are you ready?

A.  Was it just like the three pages?

Q.  Yes.

A.  OK.

Q.  Is this a conversation between -- a text conversation between you and Mr. Combs, Ms. Ventura?

A.  It looks as though it is, yes.

MS. ESTEVAO:  Move to admit.

MS. JOHNSON:  No objection.

THE COURT:  This is Exhibit -- can you give the number.

MS. ESTEVAO:  It's government Exhibit 428.

THE COURT:  Exhibit B428 will be admitted.

(Government Exhibit B428 received in evidence)

MS. ESTEVAO:  Could we please go to page 5, Mr. McLeod.

Q.  On this page, Ms. Ventura, you said:  I was away all week, partied with you, recovered, and now I'm back.  It is what it is.  Right?

A.   That's what it says, yeah.

Q.   And he says:  What you want to do?  You want to see me tonight?  What's the road to peace?  There's no problem.  I'm doing this fasting.  I can't deal with no problems.  I'm here. What's wrong?  I'll be there right after premier before my session.  Right?

A.   Yes.

Q.   This is in June 2017.  You recall the arguments that you were having with Mr. Combs around this time period?

A.   Around this time period, no, not specifically.

         MS. ESTEVAO:  Can please pull up Government Exhibit B431, which I believe is in evidence.

         Can we blow up the larger bubble.  Thank you.

Q.   In this text exchange you say to Mr. Combs:  The game starts at 10 p.m.  No texting after this.  Create a character that you will be that is nothing like who you really are and so will I.  Different name.  Different occupation.  Different style of dress.  Different background story.  We cannot break character until 8 a.m.  When you see me, I am no one you have ever met before.  I'm not Cassie and you are not Sean, Puff, Diddy, Mr. C, etc., LOL.  Example.  Pilot, doctor, author, professor, or whatever you decide.  We do not know each other. Then it goes on with this game.

         What was the purpose of sending this text message, Ms. Ventura?

A.   The purpose of this, from what I remember, is this was a game that a friend of mine told me about and said it's like -- it was a good way to like rekindle your romance.

Q.   And were you trying to rekindle your romance?

A.   I guess I was at this time, yeah.

Q.   By doing something a little bit different in the bedroom, right?

A.   Yeah.  It pertained more to what was happening prior to getting into the bedroom.  It's like a whole character setup.

         MS. ESTEVAO:  Can we pull up Government Exhibit B432 already in evidence.

Q.   In this exhibit Mr. Combs says to you:  Same fucking page. Let's get some outfits, shoes, and I am not sure what the next word is.  Go to sex club maybe.  Is that how you would interpret it?

A.   That's how I would interpret it.

Q.   Then he says:  Maybe a sex club with your wig.  Right?

A.   Yes.

         MS. ESTEVAO:  If we go to the next page, please.

Q.   What do you say?

A.   I say OK.

Q.   He says:  We sure about tonight because I'm making plans, so I need to know.  No stress.  Right?

A.   Yes.

Q.   Then he says:  Babe.

MS. ESTEVAO:  Can we go to the next page, please.

Q.  He says:  Didn't hear from you.  So I just put some plans in motion.  If you are not sure, please let me stop.  Surprise package coming from outta state.  Right?

A.  Yes.

Q.  And in that message he is asking you to tell him stop if you are not sure, right?

A.  That's what it says.

Q.  He says:  Just let me know if I'm headed in wrong direction so I can cancel.  Right?

A.  That's what it says, yup.

Q.  Then he asks:  Why can't I reach you.  Right?

A.  Yup.

MS. ESTEVAO:  Can we go to the next page, please.

Q.  You say:  I told you I was getting my lashes and brows done at 8.  I just finished.  He's like:  Cool.  Read and answer my text.

MS. ESTEVAO:  Can we go to the next page, please.

You can take that down.  Thank you.

Q.  Ms. Ventura, we mentioned earlier Ms. Porter, right.  And did there come a time when you learned that Mr. Combs was leaving a freakoff with you to see Ms. Porter at another hotel room?

A.  I'm not sure.  I mean, maybe there is something could remind me.

Q.  Were you jealous of Ms. Porter?

A.  I had some jealousy of Ms. Porter, yeah.

Q.  You understood that Mr. Combs spent his holidays with his family, his children, and Ms. Porter, right?

A.  Yes.

Q.  Even though you were under the impression that he was no longer romantically with Ms. Porter, right?

A.  Right.

Q.  So when you learned that he was spending time with Ms. Porter, you were upset by that, right?

A.  At what point?

Q.  For example, were there periods during the holidays when you learned that Mr. Combs was spending time with Ms. Porter?

A.  I always knew that, every holiday.

Q.  And did that upset you?

A.  It did, yeah.

Q.  Did there come a time when you learned about Mr. Combs having relationships with other women?

A.  Yes.

Q.  And do you recall a time in April 2014 when you learned of someone named Gina?

A.  Yes.

Q.  How did you learn about Gina?

A.  I honestly don't remember exactly how I found out.  It might have been like associate media, or something like that.

P5FMCOM6                    Ventura - Cross

Q.   What was your reaction to that?

A.   I was really upset.

Q.   What did you learn?

A.   That time, 2014, I think I just learned that they were spending time together.  I didn't really know.

Q.   And what do you recall Mr. Combs' response was when you approached him about this?

A.   I honestly don't remember, but I feel like he denied it to some extent.  Yeah.

Q.   Did there come a time when you learned that Mr. Combs was still with Gina?

A.   Yes.

Q.   And in fact he did not break it off with Gina, as you were led to believe?

A.   Yeah.

Q.   And did that upset you?

A.   At the time, yeah.

Q.   It did.

        Were there multiple times when you found out that he was getting back together with Gina?

A.   Yeah.  I would say there were multiple, yeah.

Q.   And that prompted arguments between the two of you, right?

A.   Yeah.

Q.   When you learned about him spending time with other women, those also prompted arguments with him, right?

P5FMCOM6                      Ventura - Cross

A.   Yeah.

Q.   And Mr. Combs also developed suspicions that you were not faithful to him, correct?

A.   Correct.

Q.   And what was his reaction like when he developed those suspicions?

A.   About me?

Q.   Yes.

A.   It was a little scary, yeah.

Q.   The arguments that you had with Mr. Combs about the suspicions that you were cheating, do you remember those clearly?

A.   Not super clearly, but I remember them.

Q.   Are there some fuzzy spots?

A.   There is fuzzy spots.

Q.   This was a long time ago?

A.   Yeah.

Q.   It was a long time ago and it sounds like you were doing a lot of drugs at the time, right?

A.   Yup.

Q.   At the risk of having you read more exhibits, I am going to do it.

          MS. ESTEVAO:   Can we please show the witness Defense Exhibit 1019.

Q.   Did you already look at this exhibit, Ms. Ventura?

A.   I saw -- I think I saw part of this one.  I'm not positive if I saw the whole thing or not.

Q.   Do you want to check first?

A.   Yeah.  How many pages is this one?

Q.   Unfortunately, 17 pages.

MS. JOHNSON:  We have a paper copy, if it's easier to check that way.

THE COURT:  All right.

A.   I think I read this one.  I just want to make sure.

Q.   Is that a text exchange between you and Mr. Combs?

A.   Yes.

MS. ESTEVAO:  Move to admit.

MS. JOHNSON:  No objection.

THE COURT:  1019 will be admitted.

(Defendant's Exhibit 1019 received in evidence)

MS. ESTEVAO:  Can we go to the first page.

Q.   Mr. Combs asked:  What can we do in NYC this weekend?  What do you say?

A.   Let's do something different.

Q.   He says:  I have one idea.  Let's see a Broadway play.

MS. ESTEVAO:  I think we are going to skip ahead to page 3, please.

Q.   He says:  FYI, fucking Dave hit me.  And you respond:  LOL. Me too.  So did Daniel.  Right?

A.   Yes.

MS. ESTEVAO:  Can we skip to page 5, please.

Q.  What does hit mean in this context?

A.  Like reached out --

Q.  Thank you.

A.  -- over the phone.

Q.  Mr. Combs asked:  Is coming to NYC this weekend the right move?  Right?

A.  Yup.

MS. ESTEVAO:  Can we go to the next page, please.

Q.  He again asks:  Is coming to NYC this weekend the right move?  Right?

A.  Yes.

Q.  And you say:  It's totally up to you and how you feel. It's really nice being here, actually, if you want a change of scenery and weather.  If not, I can come home tomorrow.  I would just need to know so I can book a new flight.  Right?

A.  Yup.

Q.  And this is after your discussing Dave hitting -- contacting Mr. Combs, right?

A.  Yes.

Q.  And Daniel contacted you, right?

A.  Yes.

Q.  And you understood that Daniel was New York based, right?

A.  Yes.

Q.  So when Mr. Combs is asking about coming to New York City

this weekend, after hearing about Dave and Daniel, did you understand that to mean that you might have a freakoff that weekend?

A.  That we might.  There was lot like a lot of things going on in this one conversation.

Q.  He asks:  Is coming to NYC this weekend the right move? You say:  It's totally up to you and how you feel.  Right?

A.  Yes.

Q.  Then he says:  You make the decision, please.  Right?

A.  Yup.

        MS. ESTEVAO:  Can we go to the next page.

Q.  You say:  What decision?  He says:  I've been hitting you, meaning contacting you.  WTF are you doing that is taking so long for you to hit me back?  WTF.  Right?

A.  Yes.

Q.  You said:  I'm at the studio.  Wyclef is an A.  I played in some stuff, and he wanted me to play a couple of songs.  Right?

A.  Yes.

Q.  You're busy at the studio, right?

A.  Yup.

Q.  You tell him that.  He's telling you:  You better put me on VIP, vibrate, harm, ring, something.  Right?

A.  Yeah.

Q.  He is acting impatient because you're not responding to him, right?

A.  Correct.

Q.  Then he says again halfway down the page:  You make NYC decision.  Right?

A.  Yes.

Q.  And you say -- you're responding to his other questions.

        MS. ESTEVAO:  Can we go to the next page.

Q.  And you say:  OK.  I think it would be a nice switch up for you to come here.  Can you come tomorrow, early, though?  Because I have to leave on Monday afternoon.  Right?

A.  Yup.

Q.  You're telling him to come, understanding that there would be a freakoff, right?

A.  I don't know that that's what I understood, but --

        MS. ESTEVAO:  Can we go to the next page, please.

Q.  He says:  I miss you, baby.  And you say:  I miss you so much.  Right?

A.  Yes.

Q.  Then you're talking about seeing the Book of Mormon, right?

A.  Yes.

        MS. ESTEVAO:  Can we go to page 12, please.

Q.  He says:  I'm horny for that.

A.  Yeah.

Q.  You respond with another explicit text message back, correct?

A.  Yes.

Q.  He says:  Nice and slow for 30 minutes straight.  Right?

A.  Yes.

Q.  And you send another explicit message in response, correct?

A.  Correct.

        MS. ESTEVAO:  Can we go to page 14, please.

Q.  You sent him a screenshot.  What is this?

A.  It looks like an email that I received from -- I don't know where it's from.  Lifestyle Lounge account.

Q.  Then you sent it to him, right?

A.  Yup.

Q.  It's something called Masspleasures?

A.  Yup.

Q.  Does that appear to be a sex club to you?

A.  I would guess that.

        MS. ESTEVAO:  Can we go to the next page, please.

Q.  On this page he says he's on his way.  You asked:  Are you here yet?  He said:  Daddy's home.  Right?

A.  Yes.

        MS. ESTEVAO:  Can we go to the last page, please.

Q.  He sends an explicit message and then says:  You ready for tonight?  What do you say in response to that?

A.  I say yes.  I just gotta get stuff.

        MS. ESTEVAO:  Can we show just the witness, the Court, and the parties Defense Exhibit 1021.

A.  This isn't about how -- like what I feel is relevant at all

right now, right?  Because there is a lot that we skipped over.

Q.  Can you please read the exhibit in front of you and tell me when you're ready.

A.  Which part?

Q.  It's 19 pages.

Have you already looked at this, Ms. Ventura?

A.  I haven't seen this one yet, no.

MS. JOHNSON:  Your Honor, may I briefly confer with counsel?

THE COURT:  You may.

MS. ESTEVAO:  Mr. McLeod, can you pull up 1021, please.

MS. JOHNSON:  I have a hard copy for Ms. Ventura, if it's helpful.

A.  You want me to just read through the whole thing?

Q.  Just to tell me if it's a conversation between you and Mr. Combs.

A.  Yes.

MS. ESTEVAO:  We offer it.

MS. JOHNSON:  No objection.

THE COURT:  1021 will be admitted.

(Defendant's Exhibit 1021 received in evidence)

MS. ESTEVAO:  Can we go to the first page, please.

Q.  That bottom message is from you to Mr. Combs, right?

A.  Yes.

Q.  This is from October 19, 2012, right?

A.  Yes.

Q.  I miss you.  An explicit message.  And I miss our love sessions in the afternoon.  Right?

A.  Yes.

Q.  And when you're referring to love sessions in the afternoon, you're referring to freakoffs, right?

A.  I don't know in this message.

Q.  You often had freakoffs in the afternoon, right?

A.  We did, but that doesn't mean that this is -- that means that for this message.

         MS. ESTEVAO:  Can we go to page 10, please.

Q.  At the bottom Mr. Combs says:  You up?  Want to have some freak fun in the afternoon, Smiley face.

A.  Yes.

         MS. ESTEVAO:  Can we go to the next page.

Q.  Mr. Combs says:  Are you horny or sleepy?  We can sleep or make love today.  Right?

A.  Um-hum, yes.

Q.  What do you say in response to that?

A.  I'm both.  LOL.  I thought we were going to lay up and spend time, but you wanna just come here so we can talk about in person.  I was thinking I wasn't going to see you until tomorrow.  I had stuff planned for the day, but I'm good to cancel.  Either way.

Q.   What does he say?

A.   No.  Cool.  Will do tomorrow.  I just called kids, so imma get them at 2 p.m.  All good.  Coming to see you now.

MS. ESTEVAO:  Can we pull up for the witness, the parties, and the Court Defense Exhibit 1035.

THE COURT:  Ms. Estevao, are you asking --

Q.   Is that a conversation between you and Mr. Combs?

A.   It looks like it, but I don't remember this at all.

Q.   Does this resemble the other conversations we have looked at?

A.   Yes.

Q.   So it appears to be a fair and accurate depiction of your conversation with Mr. Combs?

A.   Yeah.

MS. ESTEVAO:  Move to admit.

MS. JOHNSON:  No objection.

THE COURT:  1035 will be admitted.

(Defendant's Exhibit 1035 received in evidence)

MS. ESTEVAO:  Can we go to the second page, please.

Q.   Can you read your bubbles to Mr. Combs, please.

A.   OK.  I am just going to go lay by the pool for some sun if it's cool.  Wish we could have FOd before you left.  My period is over.  Sad face.

MS. ESTEVAO:  Can we back up to the previous page.

Q.   On that page Mr. Combs is not initiating the freakoff

conversation, right?

A.   No, not in that one.

          MS. ESTEVAO:   Can we go to page 4, please.

Q.   Can you read your message at the bottom.

A.   The large message?

Q.   Yes.

A.   As much as you think you're Bruce Willis, you aren't.  He's married and before he was married.  The family as a whole went on trips together, or just with him and his woman.  Eddie Murphy and Paige took his kids away on their own.  He didn't go with his ex because that's not who he's in love with.  I've been at the edge of tears this whole week.  I don't think that you sympathize with my feelings.  I understand you feeling like you need to protect your children, but after a while, for what?  It's like for what?  They've never known you and Kim to be together, unless there's something that I just don't know about.  They were babies when we started dating.  If Chance can go away with her dad and not her mom, I think the other kids can too.  The more time that goes by, the harder it is to understand.  I'm here ready to be that woman, and I'm in a constant fight because you won't ever allow it.  This isn't what I want.  I can't become that woman this way.  I'm bracing myself for pictures that are going to break my heart.  That's where my head is at.

Q.   Ms. Ventura, you were upset that you weren't integrated

P5FMCOM6                        Ventura - Cross

into Mr. Combs' family life, right?

A.   Yup.

Q.   That you didn't get a chance to form a relationship with his children, right?

A.   Correct.

Q.   You had been together with him for years at this point, right?

A.   Almost seven years here.

Q.   And you still hadn't been on family trips with him and his children, right?

A.   Nope.

Q.   When you would see photos of him and Kim, that was extremely hurtful, right?

A.   Not always.

Q.   If you saw them on social media when he was on vacation with Kim and his kids together, that was a little heartbreaking, right?

A.   It could be.

Q.   Because it seemed as if he was in a family unit with Kim and his children and without you, right?

A.   Yeah.

Q.   And you wanted to be a part of his family, right?

A.   Seven years of my life at this point, yeah.

Q.   You didn't just want to be part of his sexual fantasy, right?

A.   Correct.

            MS. ESTEVAO:  Can we go to Defense Exhibit 1184 just for the parties and the witness.

            MS. JOHNSON:  Your Honor, may I confer briefly with counsel on this exhibit?

            THE COURT:  You may.

            MS. ESTEVAO:  I'm sorry.  1184.

            I understand Ms. Johnson may have an objection.

            MS. JOHNSON:  Your Honor, the basis of the objection is 106.

            THE COURT:  Hold on.  This exhibit has not been offered into evidence, so what are we doing with this?

Q.   Ms. Ventura, is this a conversation between you and someone named Ruth in July 2012?

A.   It could be.

Q.   This communication came from your LI0005 MacBook Pro that you turned over to the government, right?

A.   OK.  I don't know.  I haven't seen this recently.

Q.   Ms. Ventura, do you remember reaching out to someone named Ruth in July 2012?

A.   I could have.  I reached out to people before, yeah.  I don't know about Ruth specifically.

Q.   You do not remember?

A.   I do not remember.

Q.   Can you read this conversation and see if it refreshes your

P5FMCOM6                        Ventura - Cross

recollection, please.

A.  Sure.

Q.  Does it refresh your recollection?

A.  Yes and no.  Yeah.  I kind of remember it.  I don't really -- I don't even remember what this was about.

Q.  You saw something on social media related to someone named Ruth and Mr. Combs, right?

A.  I don't know.

Q.  Were there many women that you saw on social media who claimed to have relationships with Mr. Combs?

A.  Not many.  Like a lot, but not crazy.

Q.  So if there were women who had relationships with Mr. Combs on social media, would you remember it?

A.  I feel like it happened often enough that I don't know that I would remember every single one.

Q.  But you reacted when you saw on social media that Mr. Combs was with some other female, right?

A.  Yeah.  Mainly Gina.

Q.  Mainly Gina.

A.  Yeah.

Q.  Was Gina the main problem in your relationship?

A.  I would say.

Q.  Was Mr. Combs consistently denying his relationship with Gina to you?

A.  For the most part.

P5FMCOM6                    Ventura - Cross

Q.  And how did that make you feel?

A.  Not great.

MS. ESTEVAO:  Can we go to Defense Exhibit 1028, please.

Q.  Ms. Ventura, can you look at this exhibit and tell me if it reflects a conversation between you and Mr. Combs?

A.  Yup.

MS. ESTEVAO:  Move to admit.

MS. JOHNSON:  No objection.

THE COURT:  1028 will be admitted.

(Defendant's Exhibit 1028 received in evidence).

Q.  In this text exchange he asks:  What am I doing disrespectful in picture, presumably?  Right?

A.  From Sean, yeah.

Q.  And what do you say?

A.  You're making me look like a side piece and that is not what I thought I was.

You want me to continue?

Q.  Yes, please.

A.  And you won't come to bullshit.  We'll have a great time because for 2013 I'm not on any okie-doke bull.  It is what it is.  I am who I am to you and I'm clear.  We'll have a good time, no matter what.  I'm having a ball.  It is what it is. I'll be happy with you, no matter what.  I'll treat you as a king, no matter what.

P5FMCOM6                          Ventura - Cross

Q.   This is in response to you seeing a picture on social media, right?

A.   I don't know.

Q.   You're concerned that you are looking like a side piece. What did you mean by that?

A.   Not a main girlfriend.

Q.   And that upset you, right?

A.   Apparently so.

Q.   Because you wanted to be the main girlfriend, right?

A.   I thought I was.

Q.   You thought you were, right?

A.   In 2013, yeah.

Q.   And it was disappointing and hurtful to find out you were not the main girlfriend, right?

A.   Yes.  I just don't know what we are even talking about, though, the text message.  He's talking about a picture, but I don't know what picture it is.

Q.   You testified on direct that you were insanely jealous, right?

A.   I did say that, yeah.

Q.   And you reacted when you saw social media posts of Mr. Combs with other women, right?

A.   Yeah.

Q.   And you were upset and angry when you saw that, right?

A.   Yes.

Q. But you were insanely jealous, right?

A. Sure. But I wasn't -- I expressed that -- can I speak?

Q. Of course.

A. I expressed insanely jealous is who I was then and it didn't pertain to every situation, but I definitely was jealous of certain situations that he was in.

Q. And you were particularly upset because Mr. Combs made it seem as if you were in a monogamous relationship sometimes, right?

A. Yes.

Q. At least that's what he expected of you, right?

A. Yes.

Q. So it seemed hypocritical to you that he would date other women but simultaneously expect you to only be in a sexual relationship with him, right?

A. Yeah.

Q. And if he learned or suspected, rather, that you were in other relationships with other men, he became insanely jealous, right?

A. Yeah.

Q. Far more jealous than you in fact?

A. I would say.

Q. And he had a bad temper, right?

A. He did.

Q. And he reacted poorly, right, to information that he didn't

P5FMCOM6                        Ventura - Cross

like, right?

A.  Yeah, I guess you could say that.

Q.  And he did not like it when he suspected that you were seeing other men, right?

A.  Correct.

Q.  When he suspected you were seeing other men, that is when he lost his temper, right?

A.  One of the times when.

Q.  And there were a couple of relationships in particular that he suspected you of that he was particularly upset about, right?

A.  Yes.

          MS. JOHNSON:  Objection.  Foundation.

          THE COURT:  That's overruled.

Q.  He suspected that you were in a relationship with someone who is also in the industry, right?

          MS. JOHNSON:  Objection.

          THE COURT:  It's overruled.  Let's lay some foundation.

Q.  Did there come a point when Mr. Combs suspected that you were in a relationship with someone in the music industry?

          MS. JOHNSON:  Same objection.

          THE COURT:  Overruled.

Q.  Did there come a time when he learned of this or suspected this relationship?

A.   Can you say the whole question one more time?  Sorry.

Q.   I'll be more direct.

A.   OK.

Q.   Mr. Combs made the connection between you and Mr. Mescudi, right?

A.   Yes.

Q.   Excuse me.  Kid Cudi.  I believe this came out on direct.

A.   I knew what you were talking about.

Q.   Mr. Combs thought that if you could collaborate with Mr. Mescudi, also known as Kid Cudi, that this would be good for your career, right?

A.   I think that was part of it, yeah.

Q.   He helped put together studio time for you and Mr. Mescudi together, right?

A.   He introduced us, yeah.

Q.   How many times did you and Mr. Mescudi go to the studio together?

A.   It was a handful of times.  Not many.

Q.   When was the first time the two of you were in the studio together?

A.   I don't remember exactly.  Sometime in 2011.

Q.   Did Mr. Combs ever accompany you to the studio with Mr. Mescudi there?

A.   I don't remember.  I don't think so.  But I don't remember.

Q.   Where were you living in the fall of 2011?

P5FMCOM6                        Ventura - Cross

A.   I was in New York City.

Q.   You were in New York City in the fall of 2011?

A.   Yeah.

Q.   At what point did you come -- did you return to Los Angeles in 2011?

A.   There was a lot of back and forth at that point.  I am trying to remember like what year exactly I moved to LA, but there was like -- I was like bicoastal quite a bit back then.

Q.   You don't recall when you began your relationship with Mr. Mescudi, right?

A.   It was 2011, the end of 2011.

Q.   But you also testified that you had a burner phone to communicate with him, right?

A.   Yes.

Q.   And Mr. Combs learned -- you testified that Mr. Combs learned of this relationship in December 2017, right?

A.   Yes.

Q.   And you had a burner phone during the course of your relationship with Mr. Mescudi, right?

A.   Yes.  It was a short period.

Q.   Did you get the burner phone for the purpose of your relationship, or did you already have it?

A.   I got it for the purpose of the relationship.

Q.   Whose idea was the burner phone?

A.   I don't know.  It was mine, I guess.  I don't know.

P5FMCOM6                        Ventura - Cross

Q.   Is that the only time you used burner phones?

A.   That was the only time, yeah.

Q.   For the purpose of this relationship?

A.   Yeah.

Q.   You had been seeing Mr. Mescudi for less than a month, but you got a burner phone for the relationship?

A.   Yeah, I did.

Q.   And would you text and call Mr. Mescudi from this phone?

A.   Yup.

Q.   You had a better chance of keeping the relationship with Mr. Combs if Mr. Combs didn't find out about your relationship with Mr. Mescudi, right?

A.   Yes.  We were like not in the best place, even when he found out and we were together at a freakoff.

Q.   Why did you begin your relationship with Mr. Mescudi?

A.   Enjoyed each other's company.

Q.   Did this relationship begin when Mr. Combs was out of the country?

A.   I don't think so.  I don't know.

Q.   Did it begin while you were still with Mr. Combs?

A.   No.  We had broken up.

Q.   You were on a break?

A.   We were on a break.

Q.   And Mr. Combs found out about the relationship during your freakoff, right?

P5FMCOM6                      Ventura - Cross

A.  He did.

Q.  While you were on a break, you were still having a freakoff.  Is that the idea?

A.  Yes.  That was a job.

Q.  Even though you were on a break from Mr. Combs, you still wanted to use a burner phone, right?

A.  Yeah.

Q.  Because you didn't want him to find out about Mr. Mescudi, right?

A.  I did not want him to find out, no.

Q.  And you did not want to tell him about this, right?

A.  No.  I thought it would be way too dangerous to tell him about that.

Q.  Because you anticipated his response, right?

A.  Correct.

Q.  Because he was insanely jealous, right?

A.  Had a temper.

Q.  And by using a burner phone and not informing him of Mr. Mescudi you were lying to him, right?

A.  I wasn't telling him everything.

Q.  You weren't telling him everything.

A.  Right.

Q.  Was he under the impression that you were on a break, or -- I'll rephrase.

        Did Mr. Combs, to your knowledge, believe that you

P5FMCOM6                          Ventura - Cross

were on a break or still together?

A.   I don't know.

Q.   You were continuing to have freakoffs with him, right?

A.   Yup.

Q.   Did you have any plan to tell Mr. Combs about this relationship with Mr. Mescudi?

A.   I don't remember.

Q.   Did you feel justified in cheating on him with Mr. Mescudi because of Mr. Combs' infidelities?

A.   I could have, possibly.  I don't know.

Q.   You were also communicating with Ms. Clark on the burner phone, right?

A.   I don't know if I talked to her on the burner phone.  I might have.  I am not sure.

Q.   OK.  And at this point, this is the end of 2011, so you and Mr. Combs have been together for a number of years, right?

A.   Correct.  On and off.

Q.   When Mr. Combs discovers the burner phone during the freakoff --

A.   He didn't.

Q.   How did he learn of the relationship with Mr. Mescudi?

A.   He went through my phone.

Q.   He went through your phone?

A.   My actual phone.

Q.   You were also communicating with Mr. Mescudi on your phone?

A.  I was communicating with Capricorn Clark on my actual phone.

Q.  And that's when you say that Mr. Combs reacted very poorly. He attacked you, right?

A.  He lunged, but no contact.

Q.  No contact.

And then you say you called Capricorn and Capricorn came to Mr. Mescudi's house, right?

A.  That happened, yeah.

Q.  And then you say -- you testified on direct that you returned to Mr. Combs' house, right?

A.  Yup.

Q.  And you said that you did that to speak with him, right?

A.  Yeah.

Q.  Despite knowing how upset he was, right?

A.  Yeah.

Q.  In fact, you knew that this was so upsetting to him that he previously attacked you, right?

A.  I did.  I think I thought I would be safer with other people around because there were people there.

Q.  Who was at Mr. Combs' house?

A.  His normal staff, security, and Capricorn brought me there.

Q.  You go with Mr. Mescudi to your parents' house in Connecticut, right?

A.  I went on my own, and he met me there a few days later,

yup.

Q.  And then you say that during the course of that trip you broke up with Mr. Mescudi, right?

A.  I did.

Q.  And you got back together with Mr. Combs?

A.  Pretty immediately, yes.

Q.  While you were still in Connecticut or after that?

A.  After that, after that.

Q.  When you returned to LA.

A.  We met up in Arizona.

Q.  When did you meet up in Arizona?

A.  Right before or after New Year's, the day before, day after.

MS. ESTEVAO:  Can we go to Defense Exhibit 1013, please, just for the witness and the parties.

THE COURT:  Let's take a short 10-minute recess.  Will be back in 10 minutes.

All rise for the jury.

(Jury not present)

THE COURT:  We will be back in 10 minutes.  Same instruction.  No discussions with the government.  We will be back in 10.

(Recess)

(Jury present)

THE COURT:  Ms. Estevao.

MS. ESTEVAO:  Thank you.

BY MS. ESTEVAO:

Q.  Ms. Ventura, we've been talking about Mr. Combs -- your actual favor with Mr. Mescudi in December 2011, right?

A.  Yes.

Q.  And you testified that it was less than a month long, right?

A.  It was short, yeah.

Q.  And despite it being less than a month long that you had a burner phone for the purpose of the relationship, right?

A.  Yup.

Q.  And that Mr. Combs did not know about the relationship and you were keeping it a secret from him, correct?

A.  Correct.

Q.  And that you broke up with Mr. Mescudi in Connecticut when you were there for the holidays visiting your family?

A.  Yes, right before new year's.

Q.  And then you met up with Mr. Combs and got back together with him in Arizona?

A.  I did.

Q.  And prior to this, after Mr. Combs discovered the relationship with Mr. Mescudi, you went to his house to talk to him about it and that's when he kicked you in the back,

according to your direct testimony, right?

A.  Yup.

Q.  And after he kicked you in the back, that's when you left his house, right?

A.  Yes.

Q.  Where did you go directly after that?

A.  Directly after that, from what I remember, I went back to my hotel that had my actual clothes.  It was a whole other hotel.

Q.  From there you flew to Connecticut with Mr. Mescudi?

A.  No, I flew on my own.  He went home to his family for the holiday and I went to Connecticut, and then he met me there a few days later.

Q.  And it was from the flight to Connecticut that you sent that email that the government made an exhibit, right?

A.  Correct.

Q.  When did you return from Arizona, if you recall?

A.  From Arizona back to LA?

Q.  Yes.

A.  I think we were only there for a few days.

Q.  Would you have returned to LA by the beginning of January?

A.  Yeah.

Q.  And this relationship was particularly offensive to Mr. Combs because of Kid Cudi's stature in the --

        MS. JOHNSON:  Objection.

THE COURT:  It's overruled.

Q.  To your knowledge, this was particularly offensive to Mr. Combs because of Kid Cudi's stature in the industry, right?

A.  To my knowledge, yeah.

Q.  And Mr. Combs was irate over this, right?

A.  Yeah.

Q.  Because from his perspective, he was cheating on you with people who weren't celebrities, right?

MS. JOHNSON:  Objection.

THE COURT:  Sustained.

Q.  Mr. Combs was not cheating on you with other celebrities, right?

A.  I don't know.

Q.  You did not believe that Mr. Combs was cheating on you with other celebrities, right?

A.  In 2011?  I don't think so.

Q.  To your knowledge, right?

A.  To my knowledge.

Q.  Since your relationship, you've learned that Mr. Combs had many relationships with many women, right?

A.  Yeah.

Q.  Which is very hurtful for you, obviously?

A.  Yeah.

Q.  Yes.  And you understood that your relationship with Kid Cudi was very hurtful to Mr. Combs, right?

P5FCcom7                          Ventura - Cross

A.  I found out, yeah.

Q.  Yes.  In part because of Kid Cudi's stature in the industry, right?

A.  A big part, yeah.

Q.  And because you understood that Mr. Combs put you in the studio with Kid Cudi?

A.  Yes.

Q.  Putting aside the logic of it, this drove Mr. Combs crazy, right?

          MS. JOHNSON:  Objection.

          THE COURT:  It's overruled.

Q.  This drove him crazy?

A.  To my knowledge, it definitely did not, it wasn't good, yeah.

Q.  In fact, it wasn't just his response in December 2011, this issue came up periodically throughout your relationship, right?

A.  What issue?

Q.  That you cheated on him with Kid Cudi?

A.  Oh, yeah, it came up a lot.

Q.  In fact, you would frequently have text arguments about cheating, and he would bring up Kid Cudi all the time, right?

A.  Yeah.

Q.  He would always throw it back in your face, right?

A.  He brought it up quite a bit.

Q.  You would accuse him of cheating on you with other women,

P5FCcom7                          Ventura - Cross

right?

A. Yup.

Q. And he would always come back with, well, you had an affair with Kid Cudi, right?

A. Not always, but yeah, that would be one of them.

Q. It would frequently come up and it would get him angry all over again, right?

A. Sure.

Q. In fact, every holiday season, he became upset just remembering the Kid Cudi incident, the anniversary of the Kid Cudi incident?

        MS. JOHNSON: Objection.

        THE COURT: It's overruled.

Q. Would Mr. Combs become angry over the holidays recalling the Kid Cudi incident?

A. I don't really remember that because we didn't spend the holidays together.

Q. And that was a source of frustration for you, too, right?

A. Yeah.

Q. You were very upset that you didn't get to spend the holidays with him?

A. In the beginning, yeah. I was used to it after a while.

Q. After a while, you understood that you were never going to spend the holidays with him, right?

A. Yeah, I guess.

P5FCcom7                        Ventura - Cross

Q.  You had to slowly come to this realization?

A.  We spent new year's together, 2018.

Q.  But you've never spent Christmas together?

A.  No.

Q.  And Mr. Combs also accused you of having other relationships with other men, right?

A.  Yeah.

Q.  He suspected that you were in a relationship with another celebrity, right?

A.  Yup.

Q.  And in the fall of 2015, you traveled to South Africa to film a movie, right?

A.  Yes, for two months.

Q.  What movie was that?

A.  Honey 3.

Q.  And you spent two months there, during which point you were physically separated from Mr. Combs, right?

A.  Yes.

Q.  And there you had colleagues and friends with you, right?

A.  I had -- yes, I did.

Q.  And you weren't in physical contact with Mr. Combs in any way, right?

A.  No.  In fact, I broke it off with him while I was there.

Q.  But before you got there, you were still in a relationship with him, right?

P5FCcom7                        Ventura - Cross

A.   Yes.

Q.   And in fact, while you were in South Africa, you learned something that made you break up with him, right?

A.   Yup.

Q.   What was that?

A.   He was dating Gina still, so I used it as an opportunity to just focus on the movie I was doing.

Q.   And how did you learn about Gina?

A.   I believe somebody reached out to me and said, hey, I just saw you at the Revolt music conference with Puff, and I wasn't there.

Q.   And you began to suspect he was there with someone else, right?

A.   Someone sent me a picture.

Q.   And then at some point you found a video, right?

A.   Yes.

Q.   And in the video, you see Gina there with Mr. Combs, right?

A.   Yup.

Q.   In fact, it appears as though Mr. Combs is trying to sort of hide her to the side, right?

A.   If I remember correctly, yeah.

Q.   And you saw that video and you were irate, right?

A.   I definitely was angry, yeah.

Q.   Because at that point Mr. Combs had spent years now telling you that he was done with Gina, right?

P5FCcom7                        Ventura - Cross

A.   Yeah.

Q.   And he was telling you that you were, if not the No. 1 girlfriend because of Kim Porter, the No. 2, right?

A.   Uh-huh.

Q.   So you were under the impression that Gina was out of the picture, right?

A.   So I thought.

Q.   And Mr. Combs had given you the impression that she was no longer in the picture, right?

A.   Yes.

Q.   And so when you learned of this when you're in South Africa, you were very upset?

A.   I was upset that day, yeah.

Q.   And you cut off contact with him, right?

A.   Yes.

Q.   You broke up with him?

A.   Yup.

Q.   You blocked him?

A.   Yup.

Q.   And you focused on the movie, right?

A.   Tried my best, yeah.

Q.   Mr. Combs learned at a certain point or suspected at a certain point that you were in a relationship -- you were beginning a relationship with someone else, right?

A.   Yes.

P5FCcom7                        Ventura - Cross

Q.   And who was that?

A.   Michael B. Jordan.

Q.   Is Michael B. Jordan a celebrity?

A.   I would say so.

Q.   What was Mr. Combs's reaction when he heard about that?

A.   I don't know.  I wasn't there.

Q.   I'm sorry?

A.   I wasn't there to see his reaction.

Q.   Did he text you about it?

A.   I don't remember.  I don't know if he was blocked by then. Like, it's kind of fuzzy.  I don't remember.  But he did try to make contact.

Q.   How did you learn about him knowing about it?

A.   I was with one of his staff members.  So people were getting in contact with her.

Q.   And the way that you broke up with him involved you sending the video to him and members of his staff, right?

A.   Yup.

Q.   You sent it to D-Roc, right?

A.   Uh-huh.

Q.   Who else did you send it to, if you recall?

A.   I don't know.  Just the group that was probably around at that point.  I'm trying to think 2015 --

Q.   You sent it to Eli, right?

A.   Eli, yeah.  Whoever was around at that particular time.

P5FCcom7                         Ventura - Cross

Q.  Did you send it to April?

A.  I don't know.

Q.  And you sent it to them because you were angry with all of them, right?

A.  I was really hurt.

Q.  You were upset.

A.  I was hurt.

Q.  Because you felt that they were part of your family, right?

A.  Yeah.

Q.  That they were on your side, on your team, right?

A.  I spent all my time with them when I was home, yup.

Q.  And in fact, I know you talked on direct about Mr. Combs's security guards and how they were employed by Mr. Combs, right?

A.  Yup.

Q.  In fact, you were very close with his security guards and, in particular, D-Roc, right?

A.  Yes.

Q.  You were very close with D-Roc's wife, April, right?

A.  Yes.

Q.  And you felt safe with them, right?

A.  I did.

Q.  And you confided in them, right?

A.  I did.

Q.  And if you were in trouble, you sought help from them, right?

P5FCcom7                         Ventura - Cross

A.   I would go to their house for sure, yeah.

Q.   So you sent the message with the video from the Revolt
conference to D-Roc, Eli, KK, Derek, and Rube.  Does that sound
right?

A.   Sounds about right.

Q.   Those were the people around back then?

A.   Uh-huh.

Q.   You were upset with all of them because you were under the
impression that they were all in on this with Mr. Combs, right?

A.   Everybody was lying, yeah.

Q.   They must have known, right?

A.   Yeah, in my mind.

Q.   In your mind.  What gave you that impression?

A.   That everyone was always around when I wasn't there, so
they would see what's going on.  I don't know.

Q.   And you were so upset with them because you felt like they
were part of your family, right?

A.   Yeah.

Q.   So even though you weren't part of Mr. Combs's family with
his kids, you felt like with the staff that you interacted
with, with Mr. Combs, that was your family, that was your core
group, right.

A.   Yup.

Q.   And you trusted you?

A.   Yeah.

P5FCcom7                      Ventura - Cross

Q. And they broke that confidence, right?

A. I don't know that they broke it in that one period, but yeah.

Q. And when you were in South Africa after you had broken it off with all of them and you were on your own in another country in another time zone, you were working on your movie, right?

A. Yes.

Q. And you stayed in close contact with your other friends, right?

A. From home, yes.

Q. You have several friends that are just yours from home that are separate from Mr. Combs, right?

A. Yup, for the most part.

Q. And you rely on them and they support you, right?

A. I guess it depends who you're talking about, yeah.

Q. For example, Ms. Morgan you knew for years and years, right?

A. Yes.

Q. And your friend Diontae Nash you knew for a long time?

A. Yeah.

Q. And you trusted them and they support you, right?

A. Yeah.

Q. And you also have the support from your family, right?

A. Yeah.

P5FCcom7                          Ventura - Cross

Q.  In general?

A.  In general, of course.

Q.  And during this time period?

A.  Yeah.

Q.  You were close with your mother, right?

A.  Yeah.

Q.  And your father, correct?

A.  Correct.

Q.  And your brother?

A.  Uh-huh.

Q.  And they all knew about the physical problems with your relationship with Mr. Combs, right?

          MS. JOHNSON:  Objection.

          MS. ESTEVAO:  Withdrawn.

Q.  You told each of them in various ways during various points during your relationship that you and Mr. Combs had physical problems, right?

          MS. JOHNSON:  Objection.

          THE COURT:  It's overruled.

Q.  You told each of them, right?

A.  At different points, yes, but I don't know if it was all necessarily before this point we're talking about.

Q.  Well, you told your mother back in December 2011 about the physical abuse, right?

A.  Yeah.

P5FCcom7                          Ventura - Cross

Q.   So she knew about it?

A.   She did.

Q.   Did she know about it before then, too?

A.   No, I didn't tell her.

Q.   And your brother knew about it, right?

A.   I don't know exactly when we spoke about it, honestly.

Q.   And your brother's very protective of you, right?

A.   I think so.

Q.   And did your father know about this?

A.   About the abuse?

Q.   Yes.

A.   He found out with my mother in 2011, yeah.

Q.   And did there come a point at which Mr. Combs flew to Connecticut and talked to your parents about this physical abuse?

A.   About physical abuse?  I don't know that that's what they talked about, but he did come to Connecticut, yeah.

Q.   He talked about problems in your relationship, right?

A.   I would guess so.  I don't really know what the purpose of the trip was.

Q.   Were you present for a conversation between Mr. Combs and your parents?

A.   I had been present for conversations, I just don't know specifically what you're talking about.

Q.   And your friends also knew about the physical abuse in your

P5FCcom7                          Ventura - Cross

relationship, right?

A.  Unfortunately, yes.

Q.  Ms. Morgan knew about it, right?

A.  Yeah.

Q.  At least as of 2016, right?

A.  Before that, but yeah.

Q.  When did she learn about it?

A.  Kerry was with me from day one, so she had been around me for quite a while.

Q.  So she may have known about it from the very beginning, right?

A.  Yeah, possibly.

Q.  Because she was back with you in New York, New York days, right?

A.  Right.

Q.  What about Mr. Nash, did he know about it?

A.  He did know about it.  He also experienced it himself.

Q.  Did he know about it before that point?

A.  Before he was involved?  I think so.  I would think so.  I don't know, but --

Q.  And when you say that he experienced it himself, you're referring to the August 2013 incident where Mr. Combs woke you up in your apartment and Mr. Nash and Mia were there, right?

A.  Not necessarily just that time.  He was around for other things that happened with just me and Sean.

P5FCcom7                          Ventura - Cross

Q.  He was at least there during this August 2013 --

A.  Yes.

Q.  And I'm referring to the time when you --

A.  I'm sorry.

Q.  -- hit your eyebrow.  I know, I'm all over the place.

A.  No, that's okay.  There's a lot.

Q.  We have 11 years to cover.

A.  Yeah.

Q.  He was there during the August 2013 eyebrow gash incident, right?

A.  Uh-huh.

Q.  And that was an incident that was related to -- I believe you testified on direct that Mr. Combs was upset that you weren't doing something?

A.  Didn't answer the phone and went to sleep, was supposed to be packing for a trip.

Q.  You were supposed to be packing for a trip and he was upset that he came home and found you asleep, right?

A.  I was unreachable and he came in and found me, yeah.

Q.  And Mr. Combs was particularly inebriated at that point, right?

A.  I don't know.  I don't remember that.

Q.  During that incident, the eyebrow one, for lack of a better term, were you and your friends doing drugs that evening?

A.  We weren't doing drugs that night, but I went to the Abbey

P5FCcom7                          Ventura - Cross

and I had a drink, and I think it had something in it, which is why I fell asleep when I got home.  We weren't particularly partying a lot that day.  It wasn't like -- yeah.

Q.  Was Mr. Combs intoxicated when he came into the room that evening?

A.  I don't remember.  I don't know.

Q.  That evening you were with your friends at the Abbey, right?

A.  Yeah.  Like, afternoon.  It was daytime.

Q.  You were with your friends and Mr. Combs was upset you weren't packing, right?

A.  Yeah.  He couldn't get in touch I think was the issue initially, but -- it's in the text.

Q.  And he became so upset, right?

A.  Yeah.

        MS. ESTEVAO:  Can we please pull up Government Exhibit B-247, and scroll down.

Q.  At the bottom, you say, so you can remember, right?

A.  Yup.

Q.  Mr. Combs frequently reacted to your accusations of physical abuse by saying he did not remember the incidents, right?

A.  That would be something, yeah.

        MS. ESTEVAO:  You can take this down.

Q.  And you said, so you can remember, so that he couldn't make

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

P5FCcom7                        Ventura - Cross

that excuse, right?

A.  I don't know.  I've seen this message a couple times and I'm not really sure why I said so you could remember, even still.

Q.  Well, during the time Mr. Combs frequently said he could not remember, right, what had happened the previous evening?

A.  Yeah, I guess if he was partying.  I don't know.

Q.  Frequently, when he was inebriated, that's when he did things that were less pleasant, he would not treat people right?

         MS. JOHNSON:  Objection to form.

         THE COURT:  That's sustained.

Q.  Have you ever witnessed Mr. Combs inebriated and being abusive towards other people?

A.  Yes.

Q.  Have you ever witnessed him be inebriated and abusive to you?

A.  Yes.

Q.  And you said before that he has said to you, after these occasions, he did not remember, did not recall?

A.  Yeah.

Q.  And that was frustrating to you, right?

A.  Yeah.

Q.  Because he would have these episodes that were awful, right?

P5FCcom7                        Ventura - Cross

A.   Uh-huh.

Q.   And you wanted him to take personal responsibility for that, right?

A.   I definitely always wanted him to take responsibility, yeah.

Q.   And by saying he didn't remember, you believed he wasn't taking responsibility for it, right?

A.   Yeah, that's fair to say.

Q.   Were there times in your relationship where you and Mr. Combs would discuss getting off of drugs and stop using?

A.   Yes.

Q.   Was this a frequent topic of conversation?

A.   I feel like it was pretty frequent, yeah.

Q.   And in fact there were times when you both did go to rehab, right?

A.   We got off of different things.  Rehab wasn't really a thing during our relationship.

Q.   Well, there were times when you would just try to withdraw from opiates, for example, on your own, right?

A.   Yeah, correct.

Q.   And sometimes you would try to do it without any assistance, right?

A.   Yes.

Q.   And then you would relapse, correct?

A.   Yes.

Q.  And he would, too?

A.  Yup.

Q.  And it was a cycle, right?

A.  Yup.

Q.  You were both addicts, right?

A.  During that time, yes.

Q.  And part of the appeal of freak-offs was going to do drugs, right?

A.  Part of it at a time.  There are different reasons for me.

Q.  The freak-offs were also a time to do drugs in a safe, confined space, in a hotel room, right?

A.  Yup.

Q.  So for someone like Mr. Combs who is a celebrity and well known, it's an opportunity for him to take drugs and experiment and not be seen by anyone, right?

A.  Yeah.

Q.  And you and Mr. Combs used that time as a special time to do drugs together, right?

A.  We did.

Q.  And it was a special time to also experiment with different drugs, right?

A.  We definitely experimented with different drugs, yeah.

Q.  And some took and some didn't, right?

A.  Yeah.

Q.  You tried psychedelics, right?

P5FCcom7                        Ventura - Cross

A.   Uh-huh.

Q.   And GHB?

A.   Yes.

Q.   And ketamine?

A.   Yes.

Q.   And you also took these drugs while partying in other places, right?

A.   Yup.

Q.   You typically went to Burning Man, right?

A.   We did.

Q.   And you did a lot of ketamine at Burning Man?

A.   Yes.

Q.   You both did?

A.   Yup.

Q.   And you had many friends in your friend group that also did a lot of drugs, right?

A.   Yup.

Q.   It was a little bit of a drug party culture that you were both in, right?

A.   Yup.

Q.   And that was kind of what drew you to each other, too, right?

A.   I think the drugs became a thing over time in our relationship.  It was, like, always part of our relationship, but became a main event for us.

P5FCcom7                     Ventura - Cross

Q.   You were able to keep up with him in a way more than other people?

A.   Surprisingly so, yeah.

Q.   Because he operates at a very intense level, right?

A.   I think so.

Q.   Did some of his assistants and employees also go to Burning Man?

A.   Yes.

Q.   And so you would take drugs at these freak-offs, right?

A.   Yeah.

Q.   And one reason why the freak-offs lasted for so long, for many days, was because of all of the drugs you were ingesting and the recovery time, right?

A.   Yup.

Q.   And it wasn't only sex that you were doing in the hotel, right, having in the hotel?

A.   Right.

Q.   You were also listening to music, hanging out?

A.   True.

Q.   In fact, I believe part of the reason you wanted to participate in the freak-offs was to have your time with him, right?

A.   Yup.

Q.   And it was a special time that you cherished, right?

A.   Yeah.

P5FCcom7                      Ventura - Cross

Q.   You wanted to be close with him?

A.   Yes.

Q.   And connect with him?

A.   Yes.

Q.   Did you ever call each other "get high partners"?

A.   We did.

Q.   You did.  What did that mean?

A.   Exactly what it says.  We got high together as partners.

Q.   Did there come a time when Mr. Combs did not want you to be ingesting so many drugs?

A.   There were different periods where, yeah.

Q.   I'm pointing you generally to the 2016 time period, the summer of 2016 when you were hanging out with your friend Bana, Ms. Bongolan.

A.   Yeah.

Q.   Did Mr. Combs like Ms. Bongolan, like you hanging out with Ms. Bongolan?

A.   I don't think he loved it, but they also had their own relationship, so I'm not really -- I'm not sure.

Q.   Well, part of the reason he didn't want you hanging out with Ms. Bongolan was all the drugs you were doing with Ms. Bongolan, right?

        MS. JOHNSON:  Objection.

        THE COURT:  That's sustained.

Q.   Would you do drugs with Ms. Bongolan?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P5FCcom7                        Ventura - Cross

A.   Yes.

Q.   And other friends in that friend group?

A.   Yup.

Q.   What drugs were you doing with them?

A.   I was taking opiates and she was doing something different, but I was taking opiates.

Q.   Mr. Combs didn't hang out with Ms. Bongolan in this friend group, right?

A.   Not really.

Q.   So this was completely separate?

A.   Yeah.

Q.   And Ms. Bongolan also provided you drugs, right?

A.   She did.

Q.   And she provided you with ketamine, right?

A.   I don't remember her providing me with ketamine, no.

Q.   Did she provide you with opiates?

A.   Yes.

Q.   And at this point you were highly addicted to opiates, correct?

A.   Yup.

Q.   And Mr. Combs was not happy with your opiate addiction around this time, right?

A.   No.

Q.   Which you felt was pretty hypocritical given his own addiction, correct?

P5FCcom7                       Ventura - Cross

A.  Yeah.

Q.  It felt unfair when he was so hard on you when he, himself, was a full blown drug addict, right?

A.  Yes, you could say.

Q.  So in this friend group, did you take a variety of drugs all together?

A.  Occasionally, but for me it was really just about opiates.

Q.  What drug did Ms. Bongolan do?

A.  She did cocaine.

Q.  Did you do cocaine, as well?

A.  I have done cocaine, yeah.  I did it, tried everything.

Q.  So Mr. Combs, in a hypocritical fashion in your mind, was telling you to stop doing drugs with your friends, right?

A.  Yeah.  He was -- I took it as, in my mind, if we weren't getting high, that it was a problem, like if him and I weren't getting high together or if I wasn't doing it with him, yeah.

Q.  So from your perspective, you thought that he only wanted you to get high with him and not with your friends; is that the idea?

A.  Yeah.

Q.  And he expressed to you multiple times that he wanted you to stop doing drugs with your friends, right?

A.  I don't know that he expressed it multiple times.  He definitely was angry about it if he found out about it.

Q.  He was angry when he found out about you doing drugs?

P5FCcom7                        Ventura - Cross

A.   Yeah.

Q.   How would he react when he found out about you doing drugs?

A.   Pretty explosive.

Q.   Yeah?

A.   Yeah.

Q.   Were there ever times when you took drugs from him without him knowing about it?

A.   Yeah.

Q.   Were there times when he found out that you had done that?

A.   Yeah.

Q.   And what was his reaction?

A.   Explosive.

Q.   Explosive?

A.   Uh-huh.

Q.   Did there come a time during this summer 2016 time period when he made efforts to stop your consumption of drugs?

A.   No .

Q.   To your knowledge, did he tell drug dealers in the Los Angeles area -- or have it communicated to drug dealers in the Los Angeles area that they were not to deal drugs to you?

A.   Yes.

Q.   Yes?

A.   Uh-huh.  Didn't stop anybody from bringing drugs, that's for sure.

Q.   But you learned he was making that effort, correct?

P5FCcom7                          Ventura - Cross

A.   Yeah.  I don't know it was then, but it happened at some point.  I don't know if it was in 2016.

Q.   Yesterday you testified about an incident where Mr. Combs came to your apartment when Ms. Bongolan and your other friends were there, right?

A.   Yeah, it was Bana and one other person and me.

Q.   Who was the per person?

A.   A friend of hers, I think.  I don't know.

Q.   Was it her girlfriend?

A.   I believe so, at the time.  I was asleep in my room when he got there.

Q.   So when he got there, you were asleep?

A.   I was in my room with the door closed, yup.

Q.   And you testified that when you woke up, you went out to the patio, right?

A.   When I heard commotion, I came out of my room and, yeah, he was holding Bana.

Q.   So you came out and you saw him holding Bana?

A.   Yeah.

Q.   And you testified that you saw him throw her onto the patio furniture, right?

A.   Yup.  He brought her back over the balcony and he threw her down.

Q.   After this incident with Ms. Bongolan, you texted Mr. Combs's chief of staff, Ms. Khorram, correct?

P5FCcom7                          Ventura - Cross

A.   I don't remember, but possibly, yeah.

          MS. ESTEVAO:  Could we show the witness defense exhibit 1340, please.

Q.   Does this your recollection about whether or not you sent Ms. Khorram a text message about the incident?

A.   This is her text thread with me, I'm guessing?  Yeah.

Q.   Just read it to yourself, please.

A.   Yup.

Q.   Didn't you tell Ms. Khorram that you just learned about Mr. Combs's activities on the balcony?

          THE COURT:  You want to take this document down or are you leaving it up?

          MS. ESTEVAO:  We can take it down.

Q.   You told Ms. Khorram that you learned after the fact that Mr. Combs supposedly dangled Ms. Bongolan's feet off the balcony, right?

A.   No.

Q.   You didn't tell Ms. Khorram that?

A.   I'm not sure what you're asking me.  It's kind of confusing.

Q.   Did you tell Ms. Khorram that you had just learned something crazy?

A.   Well, now it's taken down, but I saw that I did text that. I don't know if that's what I'm referring to, because a lot of crazy things happened.

Q.   Well, you were on drugs at the time, right?

A.   Not that night, I was asleep.

Q.   Earlier that night, you were not taking drugs?

A.   I don't know.

Q.   Do you recall this text message?

A.   Sort of, but it's now taken down and I can't remember it, so I don't know.

Q.   Would looking at it help refresh your recollection?

A.   Sure.

        MS. ESTEVAO:   Could we put it back up, please.

Q.   Does this refresh your recollection?

A.   I'm still reading it.

        Okay.   Thank you.

Q.   Isn't it true that you learned about this incident on the balcony after the fact?

A.   I saw what I saw.  So I don't know.

Q.   Has the government, in your preparation for your testimony in this case, gone over this message with you?

A.   Not this one, no.

Q.   Did you continue to hide your drug use from Mr. Combs throughout 2016 and early 2017?

A.   Yeah, I'm sure.

Q.   Did there come a point at which Mr. Combs learned about the extent of your drug use in early 2017?

A.   I don't know.  I don't remember.

Q.   Do you recall Mr. Combs encouraging you strongly to go to rehab in early 2017?

A.   I don't remember.

Q.   Do you recall getting a life coach to help you with your addiction?

A.   I do recall.  There were a few different people that came in over the years, so I'm trying to, like, place who the life coach would have been.  There were a couple different people.

Q.   The place were you in early 2017 before you go to Sedona, I believe.

A.   Okay.

        MS. ESTEVAO:  Can we pull up just for the witness defense exhibit 1369.

Q.   Does this refresh your recollection as to this particular life coach in February 2017?

A.   Can you go back.  And then next page.

        Okay.  I don't know who that other person is.

Q.   Well, you don't remember much from this whole time period, right, Ms. Ventura?

A.   It was a rough time.

Q.   You were doing a lot of drugs, right?

A.   Yeah.

Q.   And you were trying to find your way into a rehab facility called the Goldendoor, right?

A.   It's not a rehab facility, but yeah.  It's like a spa.

Q. A spa?

A. Yeah, I come to find out, yeah.

Q. Mr. Combs found out that you were doing more drugs than you had disclosed to him, right?

MS. JOHNSON: Objection.

THE COURT: It's overruled.

A. As I'm remembering this time period, there was a big issue over new year's where I got very sick and I lost all sense of smell and taste when I woke up and had an IV in my room. After that was when I started to, like, look for help. So that just came to me. Just wanted to share it.

Q. And you periodically, during the periods of intense drug use, had physical symptoms, right?

A. Of?

Q. There were side effects to your drug use, right?

A. Yeah, over the amount of time that they were used and everything, yeah.

Q. In fact, there were side effects to your drug use that Mr. Combs noticed, right?

A. Yes.

MS. JOHNSON: Objection.

THE COURT: It's overruled.

Q. Mr. Combs recommended that you see doctors for certain of these side effects, right?

A. At that time, yeah.

P5FCcom7                        Ventura - Cross

Q.  He was noticing that you were acting funny and he didn't know that you were using so many drugs because you didn't tell him, right?

MS. JOHNSON:  Objection.

THE COURT:  Ms. Estevao, just, some of these questions, I think they just need to be rephrased.

Q.  You weren't telling Mr. Combs about the extent of your drug use, right?

A.  Throughout the relationship, I didn't share with him everything about my drug use, but we were also using a lot of drugs together.

Q.  During this particular time period, you were using a lot of drugs without Mr. Combs, right?

A.  I was definitely using drugs, as I said yesterday, yeah.

Q.  And you were using drugs without Mr. Combs?

A.  Correct.

Q.  And because Mr. Combs did not know about this extra drug use, he, to your knowledge, did not understand the side effects that you were experiencing, right?

A.  No.

Q.  And what was his reaction to those side effects, given his lack of knowledge?

A.  I'm confused by the question.

Q.  How did he react to the side effects?  He was concerned, right?

A.  He had concern throughout the relationship, but these things don't all go together.  I'm sorry.  I can't, like, it's not like a yes or no.

Q.  That's okay.  Were there times when Mr. Combs was concerned for your health?

A.  Yes.

Q.  And I'm not talking about UTIs and that sort of thing, I mean concerned about really, like your mental health, your brain health, those kind of things?

A.  I can imagine, yeah.

Q.  And that's because he observed you acting strangely, right?

        MS. JOHNSON:  Objection.

Q.  You were acting strangely in front of Mr. Combs, in light of your side effects, right?

        MS. JOHNSON:  Objection.  Can we clarify side effects.

Q.  Ms. Ventura, what's it like to take too much ketamine, for example?

A.  Just disassociate from the present completely, like, you're somewhere else.

Q.  And have you ever been around someone who is dissociating on ketamine?

A.  Yeah.

Q.  When you're not on ketamine so you're able to observe this?

A.  Yeah.

Q.  And what do they act like?

P5FCcom7                        Ventura - Cross

A.   Exactly like I said, like they're not there.  They're in a whole other space.

Q.   So did you experience some of those side effects from ketamine?

A.   I did at a point, yeah.

Q.   And Mr. Combs would have observed those side effects, right?

A.   He could have, yup.

Q.   And you didn't ultimately go to Goldendoor?

A.   No.

Q.   Did you continue using drugs throughout that year?

A.   I went to Sedona, because it's in the message.  So I was trying to recover somehow, but I know that immediately coming back from that trip, we partied together and had a freak-off and carried on.

Q.   Do you recall your testimony yesterday about your trip to Con?

A.   Yeah.

Q.   And you testified that Mr. Combs was upset with you and squeezed your thigh, right?

A.   Yup.

Q.   And that was because Mr. Combs suspected you had taken drugs from him without asking, right?

A.   Correct, yup.

Q.   And he was irate over this?

P5FCcom7                         Ventura - Cross

A.  He was very angry about it, yup.

Q.  In fact, it was one of those times he went into a rage, right?

A.  What I would consider, yeah.

Q.  As was typical for him when drugs were taken from him, right?

A.  And other times.

Q.  Well, he was particularly upset with you when he learned that you stole drugs from him, right?

A.  When he thought I stole drugs from him.

Q.  When he thought you stole drugs.  That wasn't the only time, right?

A.  No.

Q.  Do you remember other times when you took drugs from him and he was upset about it?

A.  I don't.

Q.  But you believe it did happen on other occasions?

A.  Yeah.

Q.  And this would be his opiates, correct?

A.  Opiates or anything, yeah.  I don't know.

Q.  But in particular, he was extremely dependent on his opiates, right?

A.  For a time.

Q.  And he was very upset if his opiates were taken away from him?

P5FCcom7                        Ventura - Cross

A.  I guess so.

Q.  Do you remember when Mr. Combs overdosed in February 2012?

A.  Was that around the time Whitney Houston died?

Q.  Yes.

A.  Yeah.

Q.  I believe so.

What was going on that evening before he overdosed?

A.  That evening, we had a freak-off, we went to a sex club in San Bernardino, and then he had a party at the Play Boy Mansion that night and I went home.

Q.  Did you eventually learn what happened at the Play Boy Mansion?

A.  Well, from what he told me, he took a very strong opiate that night, but we didn't know what was happening, so took him to the hospital.

Q.  You assisted in taking him to the hospital?

A.  Yeah.

Q.  And you learned at the hospital that he had overdosed, right?

A.  Yeah, I think so.  I don't remember exactly when we found out, but --

Q.  And he overdosed from painkillers, right?

A.  I believe so.

Q.  And in your text messages, when you and Mr. Combs are referring to PKs, does that refer to painkillers?

A.   Yes.

Q.   And you're frequently talking about painkillers, right?

A.   Yeah.

Q.   Because you were both heavily relying on painkillers?

A.   Uh-huh.

Q.   Did there ever come a time in your relationship where you and he were not dependent on painkillers?

A.   Right after we did ibogaine.

Q.   When was that?

A.   I don't know what year.

Q.   What does ibogaine do?

A.   It is plant medicine that helps you detox off of different drugs and alcohol.  It's not legal in the U.S.

Q.   Like a natural remedy?

A.   Yeah, plant medicine.

Q.   Where did you get it?

A.   We flew separately to Mexico, to Cancun, and did it.  He did it first, I did it after him.

Q.   How long did that last before you both relapsed?

A.   I wouldn't say very long, but it worked.

Q.   It worked temporarily?

A.   Temporarily, yeah.

Q.   Did someone named Sathari help you with that?

A.   Yes, she was there.  Yup.

Q.   And this was in Mexico because it's not legal here, that's

the idea?

A.   Yeah.

Q.   And you don't remember how long this lasted before you both relapsed, correct?

A.   Could have been a couple months.  I don't really know.  Not long.

Q.   So almost the entire duration of your relationship, you were both addicted to painkillers?

A.   Very close to it, yeah.

Q.   But periodically withdrawing and being affected by the withdrawal symptoms in your relationship, right?

A.   Yup.

Q.   And that was a big part of Mr. Combs's mood swings, right?

A.   I don't know if it was a big part, but I think it was a part.

Q.   You understood that if he did not get his painkillers that was reliant on, that it would affect his mood, right?

A.   Yeah, anybody that's addicted to painkillers is like that.

Q.   And Mr. Combs in particular was affected by it?

A.   Right.

Q.   To your knowledge and in your experience with him?

A.   Yeah.

Q.   And you were particularly attuned to his mood for good reason, right?

A.   Yeah, we were together.

P5FMCOM8                      Ventura - Cross

Q.   In fact, I think during your direct testimony you said that you knew how to handle him, right?

A.   I don't remember, but it's possible I said that.

Q.   You understood him?

A.   Yeah.

Q.   You were very close with him?

A.   Very.

Q.   So you could understand his moods better than other people, right?

A.   Yeah, I guess so.

Q.   And you could anticipate his changes in moods better than other people, right?

A.   Not always, no.

          MS. ESTEVAO:  Can we pull up for the witness 1183. I'm sorry.  We can take this down.

Q.   Ms. Ventura --

A.   Yes.

Q.   Referring you back to the Con incident in May of 2012 --

A.   Yup.

Q.   -- you acknowledged your own drug addiction at that point, right?

A.   Yes.

Q.   In fact, that was why you took drugs from him, right?

A.   When specifically are you talking about?

Q.   During the Con trip in 2012.

A. But I didn't take drugs from him.

Q. But he suspected?

A. He suspected that I did, yeah.

Q. But you used it as a time to reflect on your relationship, right?

A. Sorry. Used what? I'm sorry.

Q. The events at Con, when he was accusing you of taking his drugs, even though you didn't?

A. Right.

Q. It caused a big argument, right?

A. Right.

Q. And he was very upset by it?

A. Yes.

Q. And he squeezed your leg in the theater.

A. Amongst other things, yes.

Q. And despite this incident, you still wanted to be together with Mr. Combs, right?

A. I did. I still wanted to be with him, yeah.

Q. It was not a major breaking point in your relationship?

A. It could have been, but -- yeah. On the way home it was really intense, and I just wanted him to be happy, so I couldn't tell you.

Q. You wanted him to be happy?

A. Um-hum. Because he was so angry.

Q. Turning to the other instances of violence that you talked

P5FMCOM8                    Ventura - Cross

about yesterday, Ms. Ventura.

A.   Sure.

Q.   You referred to a couple of times when you were beaten in
the back of a car, right?

A.   Yeah.

Q.   One of those was after a dinner where you shrugged at
another person in the industry, right?

A.   Yes.

Q.   When I say the industry, you understand what I mean, right?

A.   I do.

Q.   What do you take that to mean?

A.   Entertainment.

Q.   In the entertainment industry.

A.   Um-hum.

Q.   Mr. Combs was upset by that, very upset, angry.

A.   To my knowledge, yeah.

Q.   And took it out on you, right?

A.   Yeah.

Q.   Because of that slight, right?

A.   Yeah.

Q.   And you also talked about another instance in the back of a
car in Los Angeles after the Ace of Diamonds, right?

A.   Yes.

Q.   That's because he suspected you of dancing with another
man, right?

P5FMCOM8                         Ventura - Cross

A.  I was speaking to a producer, a music producer.

Q.  Excuse me.  Speaking to a music producer.

A.  Um-hum.

Q.  Also someone in the industry.

A.  Yeah.

Q.  And he perceived both of these as enormous slights, right?

A.  Yeah.

Q.  And very offensive to him?

A.  I would say yeah.

Q.  And he took that out on you?

A.  Oh, yeah.

Q.  You told the jury -- switching topics -- about D-Roc and Mr. Combs going to confront Suge Knight at Mel's Diner.

        Do you remember that?

A.  I do.

Q.  You told the jury that you did not go along with them, right?

A.  Correct.

Q.  Do you remember telling some of the prosecutors and agents here that you did go along with them?

A.  No.

        MS. ESTEVAO:  Can we pull up 3501-016.

        MS. JOHNSON:  Just for the parties.

        MS. ESTEVAO:  Yes.

        At page 4, please.  I'm sorry, can we go up to the

P5FMCOM8                        Ventura - Cross

first page --

Q.  This reflects?

MS. JOHNSON:  Your Honor.

MS. ESTEVAO:  I know.  Withdrawn.

Now we can go back down to page 4.

Q.  Do you recall a June 6, 2024 meeting where you told prosecutors and agents that you remembered being brought along in a car and crying during this incident?

A.  No.  That's totally incorrect.

Q.  You did not tell them this?

A.  I didn't go in the car with them.

Q.  So you would not have told them that?

A.  I don't think so, no.  Can I read it?

Q.  Yes.

A.  It could be a misunderstanding.  That's not what happened.

Q.  You never told them that, because you never went with them?

A.  I did not go with them, no, but I'm pretty sure I always said that.

MS. ESTEVAO:  Thank you.  You can take this down.

Q.  Yesterday you testified about your relationship with Ms. Morgan.

Do you remember that?

A.  Yes.

Q.  You said that in 2018 she got into an altercation with Mr. Combs that ended your friendship?

A.   Um-hum.

Q.   This was in August 2018, right?

A.   This was like earlier in the summer, maybe May, June.  I don't know.  It wasn't August, though.

Q.   About May or June you think?

A.   Like earlier, a couple of months earlier, yeah.

Q.   And had you broken up with Mr. Combs at this point?

A.   It was around the same time.  I'm not sure if it had already happened or not yet.

Q.   Were you already in a relationship with your husband at this point?

A.   I was dating him, yeah.

Q.   And you also did drugs with Ms. Morgan, correct?

A.   Correct.

Q.   And you testified that Mr. Combs came to your apartment and he was upset because he found you doing drugs with Ms. Morgan, right?

A.   Yes.  He saw the drugs on the table.

Q.   And you said that he came in, saw that we were doing drugs, and hit Kerry in the head with a hanger.  Is that right?

A.   Um-hum.

Q.   Do you remember meeting with the government on April 8, 2025 and telling them you did not see what Mr. Combs had done to Kerry?

A.   No.

Q.   You don't recall?

A.   I don't recall.  I know that I talked about it more specifically, and I was in the bathroom when he arrived, and he saw Ms. Morgan.  When I came out, he had hit her in the head with the wooden hanger.

Q.   So is your testimony today that you did see him hit her with a wooden hanger?

A.   I don't think I ever said I saw it.

Q.   So you did not see it?

A.   No.  I heard it.  I heard it, came out, and she was hurt.

Q.   So you were in the bathroom when this happened?

A.   There was a bathroom at the front door.  He came through the front door.  I heard the yelling, and I came out of the bathroom.

Q.   And after you came out of the bathroom, it had already --

A.   The situation, altercation happened.

Q.   It was over by that point?

A.   Yeah.

Q.   But you found Mr. Combs there and you saw that he was angry, right?

A.   Angry, saw the hanger, saw her upset, yup.

Q.   And what did you think that Mr. Combs would be angry at Ms. Morgan for?

A.   I thought he was angry that we had drugs.

Q.   And at the time he wanted you to stop doing drugs, right?

A.  He wanted me to stop doing drugs with other people.

Q.  He didn't want you to be doing drugs with Ms. Morgan on that occasion, right?

A.  Correct.  I don't think so.  I don't know.

Q.  And despite the fact that you had broken up with Mr. Combs and were dating someone else, this fight broke up your friendship with Ms. Morgan, right?

A.  Um-hum.

Q.  And this is your friendship of many, many years, right?

A.  Yes, 17 years.

Q.  Predates your relationship with Mr. Combs?

A.  Yup.

Q.  And at the time of this incident you were already seeing your now husband, right?

A.  Like I said, we were dating, yes.

Q.  And Mr. Combs didn't know about this relationship with your now husband, right?

MS. JOHNSON:  Objection.

THE COURT:  You need to rephrase.

Q.  Did you tell Mr. Combs about your relationship with your husband, now husband?

A.  No.

Q.  So to your knowledge, he did not know?

A.  To my knowledge, he did not know.

Q.  And were you giving Mr. Combs the impression that you were

P5FMCOM8                          Ventura - Cross

still in a relationship with him, or had you broken up?

A.  At that point I feel like we had broken up by then.  It's all like on top of each other, like datewise, the thing with Kerry, me finding out about whatever he was doing that made me break up with him, kind of around the same time.  So I don't know exactly.

Q.  You had been friends with Ms. Morgan for 17 years, right?

A.  Correct.

Q.  And this assault ended your friendship with her, even though you were no longer with Mr. Combs?

A.  Yeah.  She was very mad.

Q.  She was mad at you in particular, right?

A.  I think so.

Q.  And in fact she ended up suing Mr. Combs and you, right?

A.  Not formally.

Q.  Or made a demand against you?

A.  Made a demand, yeah.

Q.  You paid part of that demand personally, right?

A.  I did.

Q.  Because you felt responsible in some way?

A.  Yeah, um-hum.

Q.  And you've had no communication with Ms. Morgan since this lawsuit, right?

A.  No.

Q.  And in fact you've had no communication with her since this

hanger incident, right?

A.  We might have had a text like here and there that year, but I really have not talked to her.  I haven't seen her in years.

Q.  That was the friendship ending event, after you had been with each other for so long?

A.  Um-hum.

MS. ESTEVAO:  Now might be a good time for a break, if the Court is inclined.

THE COURT:  The Court is not inclined, so let's keep going.

MS. ESTEVAO:  That is fine.

THE COURT:  We will take a break in 15 minutes.

Q.  You testified yesterday that you would get Johnson & Johnson baby oil from the drug store, right?

A.  Yes.

Q.  And just to clarify information not in the record, there were no drugs in baby oil, correct?

A.  Not the ones -- no.

Q.  No, never in your experience, right?

A.  No.

Q.  If you took drugs, you always took them orally, right?

A.  Yeah.

Q.  You testified yesterday that you would heat up the baby oil, right?

A.  Correct.

P5FMCOM8                          Ventura - Cross

Q.  And that's the only thing you did to it, right?

A.  Yes.

Q.  And you even testified about this baby pool filled with oil, right?

A.  Yes.

Q.  And that would require a lot of it, correct?

A.  Correct.

Q.  It would explain Mr. Combs having lots of baby oil, right?

            MS. JOHNSON:  Objection.

            MS. ESTEVAO:  Withdrawn.

            Can we pull up Government Exhibit B625, please.

            MS. JOHNSON:  Did you want 625?  Because this is 265.

            MS. ESTEVAO:  One moment.

            MS. JOHNSON:  265.

            MS. ESTEVAO:  625.  B625.  Can we go to the first page.

Q.  This is from March 5, 2016, right?

A.  Yup.

Q.  And this is shortly before the Intercontinental incident, right?

A.  Yes.

Q.  And he says:  So what you gonna do so I can plan the rest of my night.  Right?

A.  Yup.

Q.  And this is the beginning of the government's exhibit,

P5FMCOM8                         Ventura - Cross

right?

A.   I think so.

Q.   It's where you started during your direct testimony talking about this, correct?

A.   Sure.

        MS. ESTEVAO:  Can we go to the next message.  The one before it.

Q.   You say:  Baby, I want to FO so bad, but don't want to fuck myself up.  What am I to do.  Right?

A.   Yup.

Q.   When asked why you sent this message, you testified:  I definitely didn't want to mess myself up -- mess up my body for my premier by partying, but I was telling him that I wanted to have an FO with him.  That's what you testified, right?

A.   Right.

Q.   You said it was a bit of a damage control ahead.  I personally felt like if I sort of initiated, go along with creating this, then my premier wouldn't be ruined.  Right?

A.   Yup.

Q.   So you testified you were trying to get ahead of it in some way, right?

A.   Yes.

Q.   You said:  He would have just made it miserable for me.  I never really had like the chance to or opportunity to enjoy the things that I'd worked really hard on, so it just felt like I

was just trying to play a balancing act a bit.  Right?  That's what you testified about this message?

A.  Yes.

MS. ESTEVAO:  Can we show just the witness and the parties Defense Exhibit 1088, please.  Can we scroll through for her.

Q.  Ms. Ventura, we can scroll through.

Can you, when you're ready, tell us if that reflects your conversation with Mr. Combs the day prior, on March 4, 2016.

A.  Yup.

Q.  So starting at the beginning --

MS. ESTEVAO:  Move to admit Defense Exhibit 1088.

MS. JOHNSON:  I just need a minute more.

Your Honor, this is a 49-page exhibit, so I need a moment to read it.

THE COURT:  Ms. Estevao, you had asked for a break, so it's a good time for a break.

MS. ESTEVAO:  OK.  Thank you.

THE COURT:  The jury will be back in 10 minutes.

(Jury not present)

THE COURT:  We will be back in 10 minutes.

Please be seated, and we will be back in 10 minutes. Let's try to start exactly at 4:05.

(Recess)

P5FMCOM8                          Ventura - Cross

THE COURT:  Let's have Ms. Ventura back.

Welcome back.  Home stretch for today.

We will get our jury back.

(Jury present)

THE COURT:  Please proceed.

MS. ESTEVAO:  Can we pull up for the witness and the parties Defense Exhibit 1088 again.

Q.  Ms. Ventura, can you review the first 15 pages of this exhibit, please, if you haven't already.

A.  Sure.  Yup.

Q.  Does this reflect the conversation between you and Mr. Combs in March -- it's reflected as UTC time March 4, 2016?

A.  I didn't go through all the pages.

Q.  It appears to be?

A.  It appears to be.

MS. ESTEVAO:  Move to admit.

MS. JOHNSON:  No objection, your Honor, but I do want to clarify that with the UTC time the date on the first message is actually March 3.

THE COURT:  1088 will be admitted.

(Defendant's Exhibit 1088 received in evidence)

MS. ESTEVAO:  Please publish to the jury.

Q.  As Ms. Johnson said, the time is in UTC time.  While it says March 4, these text messages are actually on March 3.

A.  Yeah.

P5FMCOM8                          Ventura - Cross

Q.  This begins with Mr. Combs referring to dope accessories.
Do you know what he's referring to?

A.  I would guess for the Met ball.  He's talking about
accessories.

Q.  This is before the Intercontinental incident.

A.  Well, maybe it's just about that premier.

Q.  With respect to your accessories for your premier?

A.  Yeah.  I was looking at the date as if it was May.  I don't
know why.

Q.  And you respond to him:  Which one?  And I hope you're OK.
I love you.  Right?

A.  Yes.

        MS. ESTEVAO:  Can we go to the next message, please.

Q.  When you say, please let me know if it gets bad and if you
need me, I was going to go to bed soon, but I'll leave my phone
on loud, do you know what you're referring to here when you
say, let me know if it gets bad?

A.  When I read ahead, it says, I know you're sick, so I'm
assuming he's sick.

Q.  We can read ahead.  He says:  Get some rest.  And can you
read your next message.

A.  I know you're sick, but I have to tell you this and maybe
you can read this later and enjoy it.

        You want me to read this out loud?

Q.  You don't have to read the explicit portion of the message.

P5FMCOM8                          Ventura - Cross

Suffice to say that this is an explicit message from you to him, correct?

A.   Yup.

Q.   That's sexual in nature, right?

A.   Yes.

Q.   And this was sent UTC time March 4, which is actually March 3, right, so two days before the Intercontinental incident, correct?

A.   Correct.

        MS. ESTEVAO:   Can we go to the next message, please.

Q.   You say:  It happened just now, referring back to the explicit message from the page before.

A.   OK.

Q.   Is that right?

        MS. ESTEVAO:   Can we go back to the earlier message for reference.

A.   Yup.

Q.   So it's just another explicit message, fair to say?

A.   Sure.

        MS. ESTEVAO:   Can we go down to the next message, please.  I think you skipped one, Mr. McLeod.

Q.   He says:  Too bad you have to work, LOL.  Right?

A.   Yes.

Q.   And that was referring to the work that you had to do in connection with your premier, right?

A.   Right.

Q.   And there were events in connection with your premier the day before, correct?

A.   The day -- I'm sorry.  Are you finished?

Q.   I'm sorry.  Excuse me.  I was not clear.

        The day -- I'll rephrase.  The day after this message there were additional premier events that you were expected to attend.

A.   Yes.

Q.   What were those events?

A.   It was more than likely promo, so just the promo that you do before the film comes out.

Q.   And then on the day of the premier you also had promotional events that you were expected to participate in, right?

A.   Probably so.  I don't really remember the day of.

Q.   So there were a number of promotional events associated with the premier that you had to participate in.  You might not remember them specifically, right?

A.   Yup.

Q.   And he's referencing the work that you have to do for the premier of the promotional events, right?

A.   Yup.

Q.   And you would need to be pretty focused for those events; you couldn't be recovering from taking a lot of drugs.  Is that right?

A.   Yup.

Q.   That's the context for this conversation?

A.   Yeah.

Q.   So he says:  Too bad you have to work, LOL, in response to you sending those sexually explicit messages, right?

A.   Yup.

         MS. ESTEVAO:  Can we go to the next page, please.

Q.   Can you read your message in green.

A.   I know.  Gunnar was like, whatever you do, no partying this weekend.  Only get this look once.  It's frustrating.

Q.   Then you send another explicit text message, right?

A.   Um-hum.

Q.   And he received these three text messages, right?

A.   Yup.

Q.   And this is followed by another explicit text message that we don't have to read.

A.   Thank you.

Q.   And so there are a number of explicit text messages sent from you that we don't need to read that he received, right, from you?

A.   Yes.

Q.   And his response is mm, right, with a number of Ms, right?

A.   Right.

         MS. ESTEVAO:  Can we go to the next message, please.

Q.   He says:  Tomorrow.  And you say:  OK.  Is that right?

A.   Yup.

Q.   Then he says:  What's wrong?

MS. ESTEVAO:  Can we go to the next page.

Q.   What did you say?

A.   I just love you.

Q.   And he says:  I love you too.  Right?

A.   Um-hum, yup.

Q.   And then you ask him:  Are you feeling better?  Right?

A.   Yup.

MS. ESTEVAO:  Can we go to the next message.

Q.   Then he is discussing bodily functions, right?

A.   Um-hum.

Q.   And earlier we were talking about the side effects of withdrawal, right?

A.   Yes.

Q.   And would the side effects of withdrawal involve bodily functions such as this?

A.   Yeah.

Q.   And would it involve feeling sick?

A.   Sure, yeah.

Q.   And it's fair to say that you thought that he was going through withdrawal during this particular time period?

A.   I don't know, actually, if that's what was going on.  He is sick.  He is clearly sick, but I just don't know why or if there is a reason.

P5FMCOM8                    Ventura - Cross

Q.   We can see in the messages that he's experiencing sickness and bodily functions, right?

A.   Yes, I can see that.

Q.   And those are side effects that you understand to be -- those are physical symptoms that are side effects of withdrawal, to your knowledge, right?

A.   To my knowledge.

Q.   Without knowing exactly what was going on with him on this day it could have been, right?

A.   Um-hum.

Q.   He says:  Yup.

          MS. ESTEVAO:  Can we go to the next page, please.

Q.   What do you say at the top?

A.   I say:  I love you.  Drink water and Gatorade and get rest. I'm sure you'll feel better in the morning.

Q.   And that message also suggests that it could be that he is going through withdrawal, right?

          MS. JOHNSON:  Objection.

          THE COURT:  Sustained.

Q.   He says in response to that:  Thanks, babe.  Right?

A.   Um-hum, yup.

Q.   And what does he say under that?

A.   I love you.  You look beautiful.

          MS. ESTEVAO:  Can we go to the next page, please.

Q.   Then he says:  Proud of you.  Have a great day.  Right?

A.   Um-hum, yes.

Q.   And then there is a time difference between the next message.  There is some period of time between, proud of you, have a great day and your next message of, thank you and thank you for coming.  It meant a lot.  Right?

A.   Yeah.  Could I get clarity on what the time actually was in between?

         MS. JOHNSON:  Your Honor, there is a stip that's been admitted that I think could help clarify the time.

         THE COURT:  Well, Ms. Estevao, there is a request that's been made about clarity as to the time period.  So maybe you can ask some questions.

         MS. ESTEVAO:  That's fair.  I will need one moment.

         Can we pull up stipulation 1303, please, which is in evidence.

Q.   Ms. Ventura, UTC is during daylight savings time between early March and early November of four hours ahead of Eastern.  And while this does not say when daylight savings time began, I am going to confer with the government --

         THE COURT:  Hold on.

         Ms. Ventura, to the extent that the timing is relevant and prevents you from answering the question, then you should let Ms. Estevao know.  Otherwise, we will proceed.

         Ms. Estevao, let's have your next question.

         MS. ESTEVAO:  Thank you.

Can we return to these a bit.

Q. You say: Thank you and thank you for coming. It meant a lot. Right?

A. Yes.

Q. And that's referring to a lunch that you had for your premier that Mr. Combs attended at the London Hotel, right?

A. I guess so. I do remember something like that happening, yeah.

Q. There was a lunch in connection with the premier?

A. With the movie, yeah.

Q. And Mr. Combs attended that lunch?

A. OK.

Q. And do you recall that lunch?

A. I remember him coming. Yeah. I remember him coming to promo.

Q. And he was supportive at that lunch.

A. Um-hum.

Q. And he says -- and that's what you're referring to in this text message. You're thanking him for coming to the promotional lunch, right?

A. That sounds right.

Q. And in response he says: No problem. What are you doing? I just got out of a spiritual therapy session. Right?

A. Yes.

MS. ESTEVAO: Can we go to the next page, please.

Q.   What do you say in response to that?

A.   That's great.  How do you feel?

Q.   He says:  Pretty good.  It's a process.  What are you doing now?  What's your plans.  Right?

A.   Yup.

Q.   And what do you say?

A.   Trying to decompress.  I gave a lot of people my energy today.  I just finished the brunch.  Kerry just got here trying to figure it out.

Q.   And Kerry refers to Ms. Morgan, right?

A.   Correct.

Q.   When you say she just got here, you mean she arrived in Los Angeles from New York, right?

A.   Maybe, yeah.  Or where I was at that time.

Q.   Was she staying with you in your apartment during that time?

A.   I don't really remember.  Probably.  She stayed with me often.

Q.   In any event, she had just gotten to wherever you were?

A.   Yeah.

Q.   And you were trying to figure it out, right?

A.   Yup.

Q.   And she is still your best friend at this point.

A.   She is.

Q.   And she was supportive of you in all things at this point,

right?

A.   Yup.

          MS. ESTEVAO:   Can we go to the next message.

Q.   You say:   What about you?   Right?

A.   Yes.

Q.   He says:   Trying to figure it out now.   Correct?

A.   Yes.

Q.   And then he says:   Are you getting rest tonight, or are you all going out?

A.   Yes.

Q.   And he is referring to you and potentially Ms. Morgan or your other friends, right?

A.   Yup.

Q.   Maybe celebrating you and your premier?

A.   Yup.

Q.   He is going to ask you if you are going to rest, go out, what you're going to do, right?

A.   Yes.

          MS. ESTEVAO:   Can we go to the next page.

Q.   You say, people are talking Hooray's but you know me, right?

A.   Why.

Q.   What's Hooray's?

A.   I believe it's a place called Hooray Henry's.   I don't know exactly what it is.   Like a nighttime spot in LA.

P5FMCOM8                    Ventura - Cross

Q.   What do you think you meant by, but you know me?

A.   I actually don't know.

Q.   And he says:  OK.  Have fun.  Right?

A.   Yes.

Q.   In response to you saying either we are going out or you know me, whatever that means, he says, regardless, you have fun.  You do you, right?

A.   Yeah.  I don't think I have ever been a huge going-out person.  That could be what it means, you know me.  Yeah.

Q.   You have never been a huge going-out person?

A.   No, no.  Personally liked it?  Like no.

Q.   But you did a lot of it?

A.   I did a lot of it.

Q.   In fact you were paid handsomely for it, I think I recall, right?

A.   Yes.

Q.   You spent a lot of time in clubs?

A.   Yes.  Too much.

Q.   And the club scene in New York and the club scene in LA?

A.   Yes.

Q.   So you're familiar with --

A.   I'm familiar.

Q.   -- culture.

         Thank you.

         So going back to the messages, you say:  I want to

spend time with my baby.  Right?

A.  Yup.

Q.  And that's referring to Mr. Combs?

A.  Yes.

Q.  So you're again asking him to spend time with you, right?

A.  Yup.

        MS. ESTEVAO:  Can we go to the next message, please.

Q.  He says:  OK.  Well, let me know either way so I can plan my night.  Right?

A.  Yes.

Q.  Then he says:  Love you so much.  Right?

A.  Yes.

        MS. ESTEVAO:  Can we go to the next page.

Q.  Then he said:  You looked so sexy today.  And after what appears to be a nonresponse he says:  Hello.  Well, hit me when you have time.  Is that right?

A.  Yup.

Q.  And this is all in the period of days leading up to the Intercontinental incident that we have all been talking about, right?

A.  Um-hum.

Q.  And he is saying:  Well, connect with me if you have time.

A.  Yup.

        MS. ESTEVAO:  Can we go to the next page, please.

Q.  What do you say in response?

P5FMCOM8                        Ventura - Cross

A.   Thank you, baby.  I love you so much and you looked so sexy today.

Q.   Again, that's so with many Os, right?

A.   Yes.

Q.   And he says:  So what you gonna do so I can plan the rest of my night, right?  Is that right?

A.   Yes.

Q.   So he's asking you -- you've decided, right --

A.   Yes.

Q.   -- the question that he put to you before, right?

A.   Right.

         MS. ESTEVAO:  Can you go to the next page, please, Mr. McLeod.

Q.   This is where the government's exhibit picks up, right?

         MS. JOHNSON:  Objection.

         THE COURT:  Let's move forward with the question.

Q.   The next message is -- can you read the next message for me.

A.   My message?

Q.   Yes.

A.   Baby, I want to FO so bad, but I don't want to fuck myself up.  What am I to do.

Q.   So at this point this is the fifth text message to him suggesting that you guys get together, right?

A.   Sure, yeah.

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

P5FMCOM8                          Ventura - Cross

Q.   And after he was asking you multiple times what you wanted to do, it was up to you, right?

A.   Yeah.

Q.   And he again says:  What would you want to do?  Right?

A.   Um-hum.

Q.   And this is where you say:  I am going to BOA quickly to see Erin because I didn't get to see her and we can have fun. Referring to you and Mr. Combs, right?

A.   Yes.

Q.   Then you say:  I don't want you thinking I don't want to. Right?

A.   Yup.

Q.   As in you don't want him to think that you don't want to have a freakoff.

A.   Correct.  Because he's asking me over and over again.

Q.   After you have asked him over and over again.

A.   Yeah, I guess.  It's just like, you know, when you're with somebody and you know how they speak, and you know what they mean when they text certain things.  It's like that.

          MS. ESTEVAO:  Can we go back to the text messages earlier --

A.   We can.

          MS. ESTEVAO:  -- Mr. McLeod.  Can we start at the top.

          We can skip:  With some dope accessories.  Can we go to the next one.

P5FMCOM8                        Ventura - Cross

Q.  He says get some rest.  Right?

A.  Yup.

          MS. ESTEVAO:  Can we go to his next message.

Q.  He says:  Too bad you have to work.  LOL.  Right?

A.  Yup.

          MS. ESTEVAO:  Can we go to his next message.

Q.  He says hmm in response to your three explicit text messages, right?

A.  Yup.

          MS. ESTEVAO:  Can we go to his next message.

Q.  Then he says:  Tomorrow.  What's wrong.  Right?

A.  Yes.

          MS. ESTEVAO:  Can we go to his next messages.

Q.  I love you too.  Right?

A.  Correct.

          MS. ESTEVAO:  Can we go to his next messages.

          We can skip that one.

          Can we go to the next page.

          (Continued on next page)

P5FCcom9                        Ventura - Cross

Q.  He says thanks, babe, I love you, you look beautiful, right?

A.  Yup.

        MS. ESTEVAO:  Can we go to the next message.

Q.  Proud of you, have a great day, right?

A.  Yup.

Q.  And then, no problem, what you doing?  I just got out of a spiritual therapy session, right?

A.  Yup.

        MS. ESTEVAO:  Can we go to the next message.

Q.  Pretty good.  It's a process — referring to spiritual therapy presumably — what are you doing now, what's your plans, right?

A.  Yes.

        MS. JOHNSON:  Objection.

        THE COURT:  Overruled.

        MS. ESTEVAO:  Can we go to his next message.

Q.  He says he's trying to figure out his plans and asking, are you getting rest tonight or are you going out, right?

A.  Right.

        MS. ESTEVAO:  Can we go to his next message.

Q.  Okay.  Have fun, right?

A.  Yup.

        MS. ESTEVAO:  Let's go to his next message.

Q.  Okay.  Well, let me know either way so I can plan my night,

P5FCcom9                          Ventura - Cross

right?  And I love you so much.

A.  Right.  And keywords are, so I can plan my night.

THE COURT:  Ms. Ventura, just answer the question and then --

MS. ESTEVAO:  Can we go to the next page.

Q.  You look so sexy today.  Hello.  Well, hit me when you have time, right?

A.  Yes.

MS. ESTEVAO:  Next.

Q.  And then he asks you, again, so what you gonna do so I can plan the rest of my night, right?

A.  Right.

Q.  He wants to know what you want to do, right?

A.  Yup.

MS. ESTEVAO:  Can we go to the next message.

Q.  He again asks what you want to do, right?

A.  Yup.

Q.  Because at this point you have proposed a number of things, right, you've proposed a freak-off, you've proposed going out with your girlfriends, and you proposed just being you, assuming that means staying in, right?

MS. JOHNSON:  Objection to form.

THE COURT:  It's overruled.

A.  Yup.

MS. ESTEVAO:  Can we go to the next page.  I'm sorry.

P5FCcom9                        Ventura - Cross

Can we back up a page.

Q.  This is the message at the top where you say, baby, I want to FO so bad, but I don't want to fuck myself up.  What am I to do, right?

A.  Yup.

Q.  And this is the one that you were asked about in your direct testimony, right?

A.  Yes.

Q.  And this is the one that you were asked why you sent this message, right?

A.  Yup.

Q.  And you said you were doing damage control, right?

A.  Correct.

Q.  Because you didn't want him to ruin your premiere, right?

A.  Right.

Q.  And at this point Mr. Combs has sent you a number of loving messages, right?

A.  Right.

Q.  And he's participated in a promotional event for your movie, right, a luncheon?

A.  I think he just came, but yeah, he came.

Q.  That went smoothly, right?

A.  Sure.

Q.  And was supportive of whatever decision you wanted to make in terms of how you wanted to spend your time, right?

MS. JOHNSON:  Objection.

THE COURT:  It's overruled.

A.  Yeah.

Q.  He appeared to be supportive of whatever decision you wanted to make, right?

A.  Yeah.

Q.  That's the interpretation that you received from these messages, right?

A.  That's what it reads.

Q.  So he says, what would you want to do, and that's when you say, we can have fun... I don't want you thinking I don't want to, right?

A.  Yup.

MS. ESTEVAO:  Can we go to the next page, please.

Q.  And then what do you say?

A.  So let's do it.  Can you set it up, though, so I can just run home and grab stuff.

Q.  And then he says, I think if we start at 7:00 or 8:00 and end at 4:00 at the latest, take a Xanax and/or Ambien and go to sleep, we'll be okay, and you rest tomorrow and all day Sunday you'll be good and drink a lot of water, we'll be good, but we won't have hours to be caught in a matrix.  If we do it, I want you to call Garren and see what he has so it can really be a turnon, but if we're going to do something, the sooner the better.  Did I read that right?

P5FCcom9                          Ventura - Cross

A.  Yes.

Q.  What did you interpret the term matrix to mean?

A.  The high, being caught in the high.

Q.  What did you take this message to mean in terms of planning drugs for this particular freak-off?

A.  He's saying that it will be like a brief time and he'll have time to recover.

Q.  So it would be a shorter than usual freak-off?

A.  That's how I would understand it, yeah.

Q.  Do you understand this text message to suggest that you would take drugs, other than Xanax and Ambien at this freak-off?

A.  I'm sorry.  Can you reword that.

Q.  Typically, would you take Xanax and Ambien at the end of a freak-off?

A.  I didn't always, but --

Q.  But the idea was it was to come down?

A.  Something to -- yeah.

Q.  Was it assumed in your communications with Mr. Combs that you would be taking more of a party drug for the actual freak-off before the freak-off started?

A.  I would assume that.

Q.  And so you would assume that from this message, even though it's not explicitly said, right?

A.  The way we spoke, yup.

Q.  Because that's sort of part and parcel of a freak-off, right?

A.  Correct.

Q.  And a party drug could include MDMA or ecstasy, right?

A.  Yes.

Q.  Or something even more intense, right?

A.  Possibly, yes.

Q.  And you don't recall what you both took on this particular freak-off?

A.  I don't.

Q.  But he's expressing his desire to not be caught in a matrix, right?

A.  Correct.

Q.  Can you tell me again what a matrix would involve in the context of your experience with Mr. Combs in a freak-off.

MS. JOHNSON:  Objection.

Q.  What do you understand the term matrix to mean?

MS. JOHNSON:  It's asked and answered.

THE COURT:  True.  Overruled.  One question and let's move forward.

Q.  Can you elaborate on the term matrix?

A.  It says, but we won't have hours to get caught in the matrix.  So matrix I said is like the high and being too high where there wouldn't be any sexual -- anything happening because we'd be too high.  There would be no performance.

Q.  In what circumstances would you get too high?  How would that happen, to get too high?

A.  Take too much.

Q.  Take too much of ecstasy or MDMA, for example?

A.  Any drug.

Q.  G, potentially, right?

A.  Uh-huh.

Q.  Or ketamine?

A.  Yup.

Q.  Once someone starts using a drug like MDMA, ecstasy, G, or ketamine, your judgment is impaired, right?

A.  Definitely, yeah.

Q.  And when your judgment is impaired from drug use, it's more likely that you're going to take more drugs, typically, right, in your experience?

          MS. JOHNSON:  Objection.

          THE COURT:  It's sustained.  You can rephrase.

Q.  Are you familiar with being under the influence of those drugs?

A.  Yes.

Q.  And so you know what it's like to have your mind be impaired by those drugs?

A.  Yup.

Q.  And so in your experience, do you understand the effects to include being more inclined to consume more drugs?

MS. ESTEVAO:  I can rephrase.

Q.  When you're high on those drugs, would you be more likely to be taking more drugs?

A.  It would just depend on the situation.  I don't -- is there another way we could ask it?  I don't --

Q.  As someone who has experienced these drugs and been under the influence of these drugs, would you say that it affects your inhibition.

A.  Sure, yeah.

MS. ESTEVAO:  I can move on from this.  I'm sorry.  I want to keep the exhibit up.  Thank you.  Can we go to the next one.

Q.  And he's referring to your friend Erin being in front of him.  You say, where.  He says, but I'm asking you what would you want to do, right?

A.  Yup.

Q.  So again, he's asking you for your preference, right?

A.  Yes.

Q.  And this is in part because he knows that your premiere is a big night, right?

A.  Yeah.

Q.  So it's a big deal for you to get very high before such an important night in your life, right?

A.  Yeah.

Q.  Your premiere was a big night, right?

A.   It was.

Q.   And if you were to enter a matrix or take too many drugs, it might impact your ability to participate in the promotion for the movie, right?

A.   Correct.

Q.   And you understood that he knew that and recognized that, right?

A.   Yeah.

        MS. ESTEVAO:   Can we go to the next page, please.

Q.   He says, at my office, and you say, she's coming down.

        MS. ESTEVAO:   We can go to the next page, please.

Q.   Mr. Combs says, how would you want it to be since you've been thinking about it, right?

A.   Yup.

Q.   And by it, he's referring to the freak-off, right?

A.   Yup.

Q.   And so he's asking you how you want it to be, right?

A.   Uh-huh.   Yes.

Q.   And you said, I have hair and makeup starting at 10:45, right?

A.   Yeah.

Q.   And that's referring to your promotional activities?

A.   Yes.

        MS. ESTEVAO:   Can we go to the next page, please.

Q.   He says, I know, that's why I was saying start ASAP so you

can get rest, right?

A.  Yes.

Q.  So he's saying if we're going to do a freak-off, we have to do it soon, right?

A.  It's what he's saying, yeah.

Q.  Because you need your rest, right?

A.  Yup.

Q.  And you say, do you actually need her, I'm just trying to get with her for a bit and go home.

MS. ESTEVAO:  Can we go to the next page, please.

Q.  He says, yes, we're in a meeting, babe, lol.  Answer my other questions, referring to his questions about scheduling a freak-off, right?

A.  Yes.

Q.  And he says, hello, talk to me so I can finish my meeting, right?

A.  Yeah.

Q.  He says, chill with your friends, I'm check you later, I tried, right?

A.  Right.

Q.  So he's saying you're not responding to me, and so he was sort of checking out of the conversation, so to speak, right?

A.  Yup.

MS. ESTEVAO:  Can we go to the next page, please.

Q.  What do you say?

P5FCcom9                          Ventura - Cross

A.  What questions?  I said let's have fun.  You're tripping and reaching and that's not cool, this is a big moment for me and it feels like its spoiled now.

Q.  You're saying, I said let's have fun, right?

A.  Yup.

Q.  And then you're saying that Mr. Combs is tripping and reaching and that's not cool.  What did you mean by that?

A.  He was tripping out about me not pinning back, and just that was a -- this was the way that we spoke to each other in our relationship.

Q.  You were nonresponsive for some period of time and he was overreacting; is that a fair characterization?

A.  Yup.

        MS. ESTEVAO:  Can we go to the next page, please.

Q.  He says, what, call Garren, can you do that and go get your stuff, right?

A.  Yup.

        MS. ESTEVAO:  Can we go to the next page.

Q.  And then he asks where you want to stay, can you see who Garren has, hello, right?

A.  Yes.

        MS. ESTEVAO:  Can we go to the next page.

Q.  He says, yo, I hate when we're in the middle of texting and you just stop, right?

A.  Yup.

P5FCcom9                          Ventura - Cross

Q.  So he's saying I've been texting you about this and trying to follow up and you're not being responsive, right?

A.  Yup.

Q.  Which he typically did all the time, right, throughout your relationship?

A.  It happened frequently.

Q.  If you didn't respond to him, he kept contacting you over and over again until you responded, right?

A.  Yeah.

Q.  For big things and small things, right, it was just typical of his communication style, right?

A.  Yup.

Q.  And to your knowledge, he did this with other people, too, right?

A.  Yup.

Q.  This was his style of communication, right?

A.  Yeah.

Q.  And you say, I'm waiting for him to hit me back, he didn't answer, right?

A.  Right.

Q.  And that's referring to Garren from Cowboys 4 Angels, correct?

A.  Yes.

        MS. ESTEVAO:  Can we go to the next page.

Q.  Then what does he ask you?

P5FCcom9                          Ventura - Cross

A.   Are you headed home, where are you at, can we do at your house.

Q.   So he's asking multiple questions about this freak-off that you'd proposed, right?

A.   Yeah.

Q.   After you sent multiple explicit messages to him, right? Okay.

        MS. ESTEVAO:  Can we go to the next page.

Q.   He again says, hello, talk to you later, going to go into this meeting, right?

A.   Yes.

Q.   So he's saying, I tried texting you and now we'll have to talk later because I'm going to be unavailable, right?

A.   Yup.

Q.   And then what do you say?

A.   Kerry is here, we can't do at my house.

Q.   As in you can't do the freak-off at your house, correct?

A.   Correct.

Q.   And now it's clear that Ms. Morgan is staying at your house, right?

A.   Yes.

Q.   And she typically lived in LA, right?  Excuse me. Withdrawn.

        She typically lived in New York, correct?

A.   Correct.

P5FCcom9                          Ventura - Cross

Q. And she was staying with you in LA?

A. Yup.

Q. Did she come out for the premiere in particular?

A. She left before the premiere, so I think she was just visiting. I don't remember exactly.

Q. You are suggesting doing the freak-off at a hotel, right?

A. It doesn't say it here, but yeah. I didn't say we could do it at my house.

Q. It's implied in this message that the alternative to your house is the hotel, right?

A. Sure.

Q. Because you never did freak-offs at Mr. Combs's home, right?

A. Not -- what year is this? We did it at his homes before, but I don't think at this point, no.

        MS. ESTEVAO: Can we go to the next page.

Q. You say, about to head home now, right?

A. Yup.

Q. Says okay, I got Intercontinental, did you call Garren, right?

A. Right.

Q. Which suggests that he booked the hotel room, right?

A. Yes.

Q. And set it up, right? Okay.

        And then he says fuchsia, do you know what that refers

to?

A.   No.

        MS. ESTEVAO:   Next page.

Q.   He again says, did you call Garren, and I am headed to your house now, right?

A.   Yup.

Q.   And he says hit me back, right?

A.   Yes.

Q.   And you say, on way with Kerry, right?

A.   Yup.

        MS. ESTEVAO:   Can we go to the next page.

Q.   You say, he sent a pic of another discrete white guy, but Skylar is avail, right?

A.   Yup.

Q.   And what do you take that message to mean?

A.   That Garren sent another picture of a person that was discrete from his site.

Q.   And by putting it in quotation marks, are you suggesting that it was Garren who said that it's a discrete white guy?

A.   Yeah, that's a word he used.

Q.   And then you ask, hello with question marks, right?

A.   Uh-huh.

Q.   So now you're reaching out to him when he's being unresponsive, right?

A.   Looks like it, uh-huh.

MS. ESTEVAO:  Can we go to the next page.

Q.  You say, you hate when I stop responding, but now that's what you're doing, right?

A.  Yup.

Q.  And he says, can we get the other guy, right?

A.  Yup.

Q.  You say, you really just want to bring another random into our situation, right?

A.  Right.

Q.  And that's because you didn't want new escorts that you were unfamiliar with to be invited into a freak-off, right?

A.  Correct.

Q.  Because you preferred to use familiar people, right?

A.  Yeah.

Q.  Because the whole point was to keep this very secret, right?

A.  Yeah, it was to keep it secret, yeah.

Q.  And, in fact, you had had experiences in the past where escorts were not so discrete, right?

A.  I don't know what you're referring to.

Q.  We can return to this tomorrow.

A.  Okay.

MS. ESTEVAO:  Can we go to the next page, please.

Q.  You say, Skylar has a family dinner at 9:00, but could come after that, right?

A.   Yes.

Q.   And Yuengling canceled my thing tomorrow, and then Mr. Combs says where are you, question mark, right?

A.   Yup.

          MS. ESTEVAO:  Can we go to the next page.

Q.   He says, I wanted something new, but whatever you want, right?

A.   Yup.

Q.   So that's, again, him asking you what you want, correct?

A.   Yes.

Q.   He's asking your preference for which escort to invite, right?

A.   That's what it reads.

Q.   You say, my house, and he says, okay, you ready, right?

A.   Yup.

          MS. ESTEVAO:  Can we go to the next page.

Q.   And then you send an attachment of presumably the discrete white guy, right?

A.   Yup.

Q.   And you say, like for real, no.  What did you mean by that?

A.   I was answering for us, that no, didn't want to use that person.

          MS. ESTEVAO:  Can we go to the next page.

Q.   He says, let's see at 8:30, if you don't like, all good, right?

P5FCcom9                    Ventura - Cross

A.  Uh-huh.

Q.  And you say, asking where are you?

A.  Yes.

Q.  So you're arranging with Garren, right?

A.  Yes.

        MS. ESTEVAO:  Can we go to the next page?

Q.  You say, that guy is sick, right?

A.  Yeah.

Q.  I'm not going to ask you what you meant by that.

        He says, want to get Johnny, right?

A.  Yup.

Q.  You say, not really, but if that's what you want, right?

A.  Yup.

Q.  So you're being open to different guys, right?

A.  Yup.

Q.  Within reason, right?

A.  Yes.

Q.  So not the discrete white guy, right?

A.  Nope.

        MS. ESTEVAO:  Can we go to the next page.

Q.  He says, never mind, is there anyone else, and you say Skylar at 9:00 or Jules, right?

A.  Yup.

        MS. ESTEVAO:  Next page, please.

Q.  You say, you said you were on your way here, I rushed back,

wtf.  He says okay Skylar, come down, right?

A.  Right.

Q.  So this is all arranging for this freak-off that's about to happen at the Intercontinental and we've all seen the effects of it, right?

A.  Yup.

        MS. ESTEVAO:  Next page, please.

Q.  I thought he said has a dinner at 9:00, and you say, I'll be right over, let's start the energy fresh, right?  What did you mean by, let's start the energy fresh?

A.  I think we were going back and forth about reaching out to each other and probably disagreeing, so I just said let's start the energy fresh.

Q.  And Mr. Combs typically talked about energy, right?

A.  Yeah.

Q.  It was something he talked about a lot?

A.  True.

Q.  And he wanted to often change the energy?

A.  Uh-huh.

Q.  And you say, I've had such a great day and I intend on keeping that way?

A.  Yeah.

Q.  When you say you were intending on keeping it that way, that included participation in this freak-off that you're planning, right?

A.   No.

            MS. JOHNSON:  Objection.

            THE COURT:  The objection is overruled, but the witness answered the question, so you can move to the next question.

            MS. ESTEVAO:  Can we go to the next page.

Q.   You say, if you don't want to, just say no, right?

A.   Yup.

Q.   And that's referring to what?  Do you want to go back up?

A.   Yeah, can you go back.  Sorry.

            Okay.

Q.   How do you interpret that message?

A.   My own message you're talking about?

Q.   Yes.

A.   Had such a great day and I intend keeping it that way.

Q.   What did you mean when you asked him, he could just say no?

A.   I guess to the freak-off.  I don't know.  I'm not really sure.

            MS. ESTEVAO:  Can we go to the next page.

Q.   You say, I'm not in a combative place, I've just been people pleasing all day and just need relaxed fun, right?

A.   Yeah.

Q.   And by saying you just need relaxed fun, you're referring to the anticipated freak-off, right?

A.   Not necessarily.  I felt like for me it was more about the

high and hanging out with him.

Q.   And the hanging out with him that you're referring to is the freak-off that you're planning, right?

A.   Yeah.

Q.   And you were planning on getting high at this freak-off, right?

A.   I got high at every one.

Q.   And you say, no crazy shit, right?

A.   Yes.

Q.   Because you didn't want it to go wrong, right?

A.   Yeah.

          MS. ESTEVAO:  Can we go to the next page.

Q.   Mr. Combs says, all good, you just don't hear how you be talking, right?

A.   Uh-huh.

Q.   And he says, I'm at home, correct?

A.   Correct.

Q.   And this was also a typical message that he would send, right?

A.   The first one?

Q.   The top one.

A.   Yeah.  Yeah.

Q.   And you say, okay babe, correct?

A.   Correct.

          MS. ESTEVAO:  Next page, please.

Q.   He says how long, hello, after you don't respond, right?

A.   Right.

Q.   And you say, calling the car.

        MS. ESTEVAO:  We can go to the next page.

Q.   You say, 10:00, he says outside.

        MS. ESTEVAO:  We can go to the next page.

Q.   You say you'll be down in five.  He suggests calling Johnny.  And then he says, we can just watch and be with each other, right?

A.   That's what he says, yeah.

Q.   What do you interpret that to mean?

A.   I don't really know, honestly.  I would assume just watch Johnny, but that wasn't something that ever happened.

Q.   Is Johnny a dancer or an escort, to your knowledge?

A.   He was hired through a dancing company, but did what an escort does.

Q.   Mr. Combs says, we can just watch, right?

A.   That's what he says, yeah.

Q.   And he says, and be with each other, right?

A.   Right.

Q.   Suggesting he and you could just be with each other, right?

A.   That's what it says, yeah.

Q.   And then he says, where you at, right?

A.   Yeah.

        MS. ESTEVAO:  Next page, please.

P5FCcom9                          Ventura - Cross

Q.  He says, it's 10 minutes, yo, I'm out, right?

A.  Yup.

        MS. ESTEVAO:  Next page, please.

Q.  He says, I'm going to studio, will holler later, he waited for 2P min, 20 min.  And you say, okay, I'll have him bring me back home, right?

A.  Right.

        MS. ESTEVAO:  Next page.

Q.  You say, I'm outside, but I'm not doing this, have a great night.  He says, no problem, I'll drop you off, right?

A.  Yup.

Q.  And you're just bickering about transportation and timing, right?

A.  That's what it looks like, yeah.

        MS. ESTEVAO:  Next page, please.

Q.  He says, I can't wait no more.  And you said, nah, I'll get out and take an Uber, all good, right?

A.  Yup.

Q.  He says, call me, right?

A.  Right.

        MS. ESTEVAO:  Next page, please.  That's the last page?

Q.  Do you recall earlier in the conversation when you were asking Mr. Combs how he was doing because he was sick, right?

A.  Right.

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

Q.  And he had flu-like symptoms?  Well, he was sick and had bodily symptoms, right?

A.  Yup.

MS. JOHNSON:  Objection.

THE COURT:  Overruled.

Ms. Estevao, last couple of questions.  We have two minutes left.

MS. ESTEVAO:  Yes, thank you.  I'll finish up.

Q.  Do you recall the beginning of the freak-off session?

A.  Of that particular one?

Q.  Yes.

A.  I don't really recall.

Q.  So before you start taking drugs, you don't recall?

A.  Not really, no.

Q.  You don't recall what kind of drugs you took?

A.  I mean, it was usually always the same kind of thing.  So I would guess that's what we took, like ecstasy or MDMA.

Q.  It was most likely ecstasy or MDMA based on your experience?

A.  Yeah.

Q.  Have you ever had bad ecstasy or MDMA?

A.  Yeah.

Q.  What are the effects of bad ecstasy or MDMA?

A.  Just makes you really sick.

Q.  Can you elaborate on that?

P5FCcom9                        Ventura - Cross

A.   I mean, I don't know -- I've -- I used to get sick all the time taking those things, so I don't really know if it was because it was bad or not or because it was good.  I have no idea.

Q.   The drugs that you and Mr. Combs took that day were a bad batch of MDMA, right?

          MS. JOHNSON:  Objection.

          THE COURT:  Overruled.

Q.   They were a bad batch, right?

A.   I have no idea.  I don't know.

          MS. ESTEVAO:  No further questions.

          THE COURT:  Thank you, members of the jury.  Again, thank you for all your close attention and hard work.  We'll be back here tomorrow.  Please try to be here at 9:15.  I again promise you we will start at 9:30 and I will try to be less late tomorrow.

          As always, do not speak to each other about the case, do not look up anything about the case, and don't talk to anybody about the case.  We'll see you back here before 9:30, but be here at 9:15.

          All rise.

          (Continued on next page)

                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

(Jury not present)

THE COURT:  Thank you, Ms. Ventura.  We'll see you here tomorrow.  Again, no discussions with the government, and have a great evening.

Everyone else may be seated.

(Witness not present)

Ms. Estevao, can I get a time check.

MS. ESTEVAO:  One moment, your Honor.

THE COURT:  While she's doing that, Ms. Johnson, obviously the cross is not complete, but can you give me a general time check on what you anticipate for redirect.

MS. JOHNSON:  I think half an hour or less.

MR. AGNIFILO:  Judge, we're going to go back and try to, now that we have one day down, see what we don't need as much.  I've heard the Court loud and clear, I have.  It's a critical, critical witness.  And so we'll come back in the morning and I'll give the best estimate.  I know all of the moving parts, but it's probably the most important witness in a very important case.  So I will be mindful of all of the different factors that I'm aware of.

THE COURT:  We'll address this in the morning, but the reason I ask those questions is because if we work efficiently tomorrow, and given what Ms. Johnson has said, you should have upwards of five hours on the record tomorrow, and that would give you a total of closing in on 12 hours for the

cross-examination.  That's why I raised it, because I wanted to make sure that if we needed to finish tomorrow, you were going to be afforded enough time.  And so I just wanted to put that on your radar because given the time estimates and the math that I've done, it would seem you would have that much time. So that's perhaps a good way to think about it.

MR. AGNIFILO:  I appreciate asking the government the question and then coming back to us with that added information.  I will do everything I can to get as accurate a figure to the Court first thing in the morning.

THE COURT:  We'll see where we are in the morning.

Ms. Johnson.

MS. JOHNSON:  Your Honor, two things.  First, anticipating tomorrow, we would ask that defense counsel identify for us as early as possible this evening anticipated exhibits for tomorrow so that the government can review them in advance and flag any objections, and ideally so the government can send them to Ms. Ventura's counsel in the hopes she might be able to review some tonight to make this more efficient tomorrow with the instruction that there's no coaching, but to see if she would be available to at least review some tonight.

THE COURT:  Ms. Estevao, that seems like a good idea that would aid your cross-examination because you wouldn't have to have those breaks where Ms. Ventura is reading the text chains, assuming there are long text chains included in the

materials.

MS. ESTEVAO:  It's also in our interest to make sure this is done as efficiently as possible tomorrow and we will endeavor to both shorten certain exhibits and clarify with the government what those exhibits are and make sure we have appropriate conferrals, without making any promises as to timing, but we understand it will make everything more efficient.

THE COURT:  This is the time.  It's 5 o'clock.  So when you say that you're going to furnish them to the government, let's just focus on that, you need a time.  So 8:00 p.m.?

MS. ESTEVAO:  We can make 8:00 p.m. work.

THE COURT:  All right.  8:00 p.m.

Ms. Johnson, you had a second point.

MS. JOHNSON:  I did.  I just had a few items to clean up with the transcripts with respect to evidence that was admitted that I think inadvertently isn't reflected in the transcript.  I just want to make clear that the government admitted on direct examination with Ms. Ventura Government Exhibit B-326 A through O.  It wasn't clear that the subdivisions of Government Exhibit B-326 were admitted.

THE COURT:  Okay.

MS. JOHNSON:  I also want to make clear the subdivision B-625 A was admitted from the exhibit we were just

looking at, B-625.  Yesterday, I believe I read B-346 as an exhibit that was admitted and it's not reflected in the record.

THE COURT:  Okay.

MS. JOHNSON:  One more evidentiary item.  On I think Tuesday of this week we admitted Government Exhibit B-2305 and B-209.  The government would move to admit those exhibits under seal as they depict the likeness of a witness who is testifying under a pseudonym.

THE COURT:  Any objection?

MS. ESTEVAO:  No objection.

THE COURT:  That exhibit that you identified, give me the number again.

MS. JOHNSON:  B-203 through B-205 and B-209.

THE COURT:  Those exhibits will be placed under seal.

Anything further, Ms. Johnson or Ms. Comey or Ms. Slavik?

MS. SLAVIK:  Your Honor, just to flag for the Court that the government does intend to submit a very short letter on the Rule 611 issue later this evening.

MS. COMEY:  Relatedly, I wanted to note we made arrangements for two witnesses be available to go on tomorrow after Ms. Ventura.  It would be helpful to know whether we should actually have them here in the courthouse.

THE COURT:  They should be ready.  Who is it?

MS. COMEY:  Depending on when we end, it will either

P5FCcom9                          Ventura - Cross

be Dawn Richard or Yasin Binda, and I'm not sure which will go first. It depends on what time we finish with Ms. Ventura.

THE COURT: All right. From the defense.

MS. GERAGOS: The only thing, your Honor, is we've been conferring with Ms. Ventura's counsel about the exhibits and your Honor's order from this morning. Procedurally, would you like us to submit the redacted versions to chambers? I just want to understand what your Honor would like us to do next. I think we're --

THE COURT: Is there agreement on the redactions?

MS. GERAGOS: There's general agreement. There's one exhibit left that we need to confer about, but, generally, Ms. Ventura's counsel and I have agreed on redactions, and then I have to submit them to the government.

THE COURT: So in terms of those exhibits, whenever they're ready, they should be submitted to the Court. And just procedurally, when they are used, you'll have a copy for the witness that is unredacted and then the version that is redacted will be put into evidence or were you just going to use the redacted copy?

MS. GERAGOS: We were just going to use the redacted copy.

THE COURT: Okay. So then you'll handle that end of it and we'll have the copy submitted to chambers so that we'll have them, but then we'll see them on the screen since that's

P5FCcom9                         Ventura - Cross

the only version that's going to be used.

MS. GERAGOS:  Yes.

THE COURT:  Anything further.

MS. GERAGOS:  Not from us.

THE COURT:  In terms of being here, there are no issues right now.  So if there are going to be issues to address this the morning, then someone needs to send an email, but let's all plan on being here at 9:00 a.m. to address anything.

(Adjourned to May 16, 2025 at 9:00 a.m.)

* * *

INDEX OF EXAMINATION

Examination of:                                  Page

CASANDRA VENTURA

Cross By Ms. Estevao . . . . . . . . . . . . . 897

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 B428     . . . . . . . . . . . . . . . . . . .1013

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 1353    . . . . . . . . . . . . . . . . . . . 904

 1354    . . . . . . . . . . . . . . . . . . . 907

 1359    . . . . . . . . . . . . . . . . . . . 908

 1360    . . . . . . . . . . . . . . . . . . . 909

 1355    . . . . . . . . . . . . . . . . . . . 911

 1364    . . . . . . . . . . . . . . . . . . . 914

 1159    . . . . . . . . . . . . . . . . . . . 921

 1162    . . . . . . . . . . . . . . . . . . . 923

 1164    . . . . . . . . . . . . . . . . . . . 924

 1165    . . . . . . . . . . . . . . . . . . . 930

 1166    . . . . . . . . . . . . . . . . . . . 931

 1167    . . . . . . . . . . . . . . . . . . . 933

 1177    . . . . . . . . . . . . . . . . . . . 934

 1179    . . . . . . . . . . . . . . . . . . . 937

 1351    . . . . . . . . . . . . . . . . . . . 951

 1007    . . . . . . . . . . . . . . . . . . . 958

1003 . . . . . . . . . . . . . . . . . . . . 967

1004 . . . . . . . . . . . . . . . . . . . 970

1019 . . . . . . . . . . . . . . . . . . .1020

1021 . . . . . . . . . . . . . . . . . . .1025

1035 . . . . . . . . . . . . . . . . . . .1027

1028 . . . . . . . . . . . . . . . . . . .1032

1088 . . . . . . . . . . . . . . . . . . .1094