P5GMCOM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
UNITED STATES OF AMERICA,

                    v.                        24 Cr. 542 (AS)

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

                    Defendant.                Trial
-------------------------------x

                                              New York, N.Y.
                                              May 16, 2025
                                              9:05 a.m.

Before:

                    HON. ARUN SUBRAMANIAN,

                                              District Judge
                                              -and a Jury-

                              APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
BY:  MADISON R. SMYSER
     EMILY A. JOHNSON
     MAURENE R. COMEY
     MEREDITH FOSTER
     MITZI STEINER
     MARY C. SLAVIK
     Assistant United States Attorneys

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5GMCOM1

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:   MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
SHER TREMONTE
BY:   ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:   ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND

ALSO PRESENT:
LUCY GAVIN, AUSA Paralegal Specialist
SHANNON BECKER, AUSA Paralegal Specialist
RAYMOND MCLEOD, Defense Paralegal Specialist

(Trial resumed; jury not present)

THE COURT:  Ms. Estevao.

MS. ESTEVAO:  Yes, your Honor.

THE COURT:  The government has done you a solid and has constrained their redirect and says that you can have until 4:30, and they will take the balance of time and then know that we are going to stop at 5.  It doesn't leave them much time for redirect.

But given that, do you foresee any issues in meeting that time expectation?

MS. ESTEVAO:  Well, first of all, I think the parties have a very different understanding as to the admissibility of certain exhibits which impacts my answer, so it might make sense --

THE COURT:  I did not receive anything in advance of this hearing on any evidentiary issues, but OK.

Putting that to the side, do you foresee any issues with the 4:30, I said deadline, but they are saying you will have until 4:30, and they will limit themselves on redirect to facilitate the issues concerning the one that we previously discussed.  Putting aside the issues for the moment on admissibility, do you foresee any issues in terms of timing, or can we move on to those evidentiary issues?

MS. ESTEVAO:  Unfortunately, they are intertwined because if the government continues to object to the

P5GMCOM1

admissibility of certain evidence and insists on Ms. Ventura reading text chains from the stand, that will significantly delay things.

However, we have no -- we don't understand why the government is continuing to object to authenticity on this basis when they have had the documents now. We complied with the 8 p.m. deadline, and presumably the government has had time to review and determine whether or not they are authentic and that they could be admissible. And some of them --

THE COURT: Ms. Estevao, I hear you. What is the evidentiary issue? What are we talking about? Which exhibits? What is the issue?

MS. JOHNSON: Your Honor, since they are our objections, do you want me to raise them?

MS. ESTEVAO: There are a number of exhibits that we proposed.

THE COURT: Let's hold on for a second.

First of all, I thought I was pretty clear that if issues are to be raised before the jury comes in, they need to be raised with the Court in advance, and I've been very lenient with that. There have been letters that have come in at 3 a.m., and I've come in early so I can make sure that I have a handle on the issues before we get here, because the jury has been so prompt. They are here. They are ready to go at 9:30.

This is a problem because we are running out of time

P5GMCOM1

to address issues that you are saying impacts a very serious concern that the government has but that the government did not raise.  They did not raise the issue of any kind of admissibility concern of any evidence whatsoever, despite the fact that they put in a letter at 12:30 a.m. complaining about the timing of the cross-examination.  That would be a good opportunity to say there are urgent issues that we need to address concerning the admissibility of certain exhibits that are being put in on the cross-examination.  Perhaps, your Honor, we should come in at 8:30 a.m., at 8 a.m.  Here are the exhibits.  Take a look at them.  We can decide this in advance.

MS. ESTEVAO:  Understood, your Honor.

THE COURT:  I'm asking you, Ms. Estevao, and then I'll turn to Ms. Johnson, what are the issues, as you understand them?

MS. ESTEVAO:  As we understand them, and we understand that it would have been prudent to inform the Court.  However, these issues have been developing as early as this morning, that there are a number of exhibits that we told the government about by 8 p.m. last night, and we significantly winnowed the number of exhibits and shortened the number of exhibits and provided to the government those exhibits so that they could review them and tell us about any objections in advance of Ms. Ventura's continued cross-examination this morning.

THE COURT:  You don't know exactly what the objections

P5GMCOM1

are.

MS. ESTEVAO:  With respect to --

MS. GERAGOS:  If I could just speak on this, since I've been handling most of the objections, I think there are a couple.

First are a few 412 issues, which I think we can put to the side because we may not just even use those exhibits anymore.  I think it's really only about two to three. Ms. Johnson or Ms. Slavik will correct me.  Two are recordings, video recordings, and I believe that the objection from the government is a 403 objection.  I really think it's just those two or three.

I think we have significantly narrowed any -- I'm just looking at my email to double check.  I think we have significantly narrowed any dispute over exhibits.  We have withdrawn about five that we were going to use that they were going to object to.  I think it's two videos and it's one text chain between Ms. Ventura and Mr. Combs' chief of staff, which they do not think there is a basis to get in because it's not with Mr. Combs.  We think that it's an 803(3) state of mind to Ms. Ventura's state of mind.

THE COURT:  Understood.

Ms. Johnson.

MS. JOHNSON:  Yes, your Honor.  Again, I apologize to the Court for not teeing this us more promptly.

P5GMCOM1

THE COURT:  That's fine.  Don't worry about it.

MS. JOHNSON:  I agree with Ms. Geragos.  We have an objection to the proposed -- to the marked exhibit, Defense Exhibit 1278.  That is approximately a 30-second video clip of Mr. Combs wandering through nature and talking about -- hold on one moment, please.

THE COURT:  Do we have the video and can you throw it up on the screen.  Can somebody do that.

MS. JOHNSON:  One moment.

While she does that, I will explain the nature of our objection.

This is, first of all, hearsay, and there is absolutely no indication that Ms. Ventura has seen this video, that she is familiar with this video or be able to testify about it.  It's simply a video of the defendant speaking.  And the content of the defendant speaking, the government submits, should be excluded under 403.  He is speaking about religion and God.  To the extent that -- that is improper argument seeking sympathy from the jury, and it goes to nullification.

THE COURT:  I understand.  Do we have the video.

While we are waiting, what's the next issue?

I think we have the video.

(Video played)

THE COURT:  Ms. Estevao.

MS. ESTEVAO:  Your Honor, this is a video of Mr. Combs

P5GMCOM1

when he was attending rehab approximately a month after the

Intercontinental incident in April of 2016 and it was sent from

him to Ms. Ventura.  That being said, we anticipate only using

it to refresh her recollection if she says that she does not

remember him going to rehab following this incident.

THE COURT:  You're not intending to admit this into

evidence.

MS. ESTEVAO:  We are not.

THE COURT:  Then there is no issue, right?

MS. JOHNSON:  I agree.  Although I would note that

this cannot be used to refresh her recollection without dealing

with sound issues because she cannot listen to it in the

courtroom in front of the jury without headphones.

MS. ESTEVAO:  I believe we have headphones.

MS. JOHNSON:  We do, but that requires some setup.

I'm just flagging that for the Court.  We could do it over

lunch, if it becomes an issue.

THE COURT:  Given that we have, by request of the

witness, have taken breaks at a steady interval, there should

be a way for the witness to view the video outside of the

presence of the jury and then answer any follow-up questions,

so I don't think that's an issue.  I think that one is

resolved.

Next.

MS. JOHNSON:  There are four 412 objections which we

P5GMCOM1

will continue to confer with Ms. Geragos on appropriate redactions.

And then we have an objection to 1193, which is a photograph -- it's a photograph that is sent by Ms. Ventura in a text exchange with another individual that was originally marked. She is talking about how she went --

THE COURT: Let's see it, 1193.

MS. JOHNSON: This photograph is sent in a text chain that we otherwise objected to because it's between Ms. Ventura and another individual speaking about going to a dance class and becoming bruised, and this is contained therein. Admission of simply this photograph without any context, and we submit that the context is admissible, is confusing to the jury.

I can also proffer that Ms. Ventura has seen this photograph before and does not recall what it is, so I don't think she has any personal knowledge that she can testify about.

If defense wants to cross-examine Ms. Ventura about whether she was bruised on any other occasions from any other incidents, they certainly can do so, but this exhibit, without anything else, is very confusing and should be excluded under 403.

MS. ESTEVAO: Your Honor, may I?

THE COURT: You may.

MS. ESTEVAO: Ms. Ventura was shown this photograph

P5GMCOM1

during an interview with government counsel and asked about these bruises, and she said that it was likely caused by Mr. Combs, which shows that she was speculating as to these bruises on her leg, which is very relevant.

THE COURT:  That may be true, but how are you getting this into evidence?

MS. ESTEVAO:  I am going to show this to her.  I'm not planning to admit this.

THE COURT:  Then there is not an issue.

Ms. Johnson, how can there possibly be an issue?

MS. JOHNSON:  That's fine.  To be clear, that wasn't clear to us that it wasn't being admitted.

THE COURT:  Two down.  We are making progress.

MS. JOHNSON:  I believe that is all of our issues, absent the 412 issues that we need to continue to discuss.

THE COURT:  That took us five minutes.

MS. JOHNSON:  I would like to address the authenticity issue that Ms. Estevao raised.

THE COURT:  Yes.  Because there is one text chain -- let me take a step back.  Ms. Geragos mentioned one text chain, but then I didn't hear about that, so I just want to make sure there are no issues.

MS. GERAGOS:  That was 1373.  It is a message between Ms. Ventura and Mr. Combs' chief of staff at the time.  That is the only other one I have on my list right now that we are --

P5GMCOM1

that is in dispute.

THE COURT:  That's Defense Exhibit 1373.

MS. GERAGOS:  Defense Exhibit 1373.

THE COURT:  If either side could put that on the screen, great.  Thank you.

MS. GERAGOS:  I think we would specifically be going to the second page of what is important for the defense.

THE COURT:  It's this message here?

MS. GERAGOS:  Yes, that's right.

THE COURT:  Could you zoom in on that message.

What are the grounds for admission?

MS. GERAGOS:  We are offering it under 803(3) your Honor, which is the declarant's state of mind.  But we will not be doing that this morning, so in the interest of --

THE COURT:  It's not going to come in this morning?

MS. GERAGOS:  We will not be dealing with this topic before the morning break.

THE COURT:  Unlike some of the other text chains that we have addressed, where it was very clear that they fell within the 803(3), this has a lot of other factual content, so that doesn't even come close to fitting that rule.  For instance, there is references to dealing with ketamine.  There is references to other factual developments.  So there are definitely things in this message that would not relate to a then existing mental, emotional, or physical condition.

P5GMCOM1

That's one thing.  What's the response on that?

MS. GERAGOS:  Perhaps understanding your Honor's concern during this morning, before the break, I could try to redact portions of the exhibit.  I think where we are most -- where we think that 803(3) would certainly apply is when she is talking about her feelings, which certainly would come into her state of mind.  If you don't want us to talk about the ketamine --

THE COURT:  There may not be an objection, but let's hear, Ms. Johnson, do you have an objection to this?

MS. JOHNSON:  We do, your Honor, because we don't understand the relevance of her state of mind at this point in time, given that we don't allege that any freak-offs occurred after the date of this email.  This email is dated in August of 2018, which is after Ms. Ventura and Mr. Combs broke up.  She testified on direct that the last freak-off was sometime in late 2017, early 2018.

MS. GERAGOS:  However, your Honor, we believe it's relevant, given the allegations of rape we heard on direct examination, which is unclear to us as to when this happened, and I think we will spend a significant amount of time on that today going through messages from August and September, because the time period of this alleged rape has changed over the past year and a half.  So we think it is extremely important to bring out her state of mind, her feelings from August and

P5GMCOM1

September in order to try to confront Ms. Ventura on those allegations.

MS. JOHNSON:  I don't think this needs to be in evidence for that purpose.  It sounds like there will be a lot of testimony that the defense is attempting to elicit on this point, and this exhibit seems like it's potentially cumulative.

THE COURT:  I have heard an objection on relevance and on this evidence being cumulative.  I have not heard that there is an objection ground in the hearsay issue that Ms. Geragos addressed.  Is there?

MS. JOHNSON:  Yes, your Honor.  There is a state-of-mind objection.

THE COURT:  Ms. Geragos says, if you really read this, there may be factual content here, but that's not what this is really about.  It's about at the time this message was written Ms. Ventura's state of mind and her feelings.

So what's the response to that, just so I understand the government's position?

MS. JOHNSON:  The defense has said that this is probative of her state of mind related to her rape by Mr. Combs.

THE COURT:  The hearsay issue is independent of the relevance issue, the 403 issue, so just on the hearsay issue. If there is not a dispute on that, then I want to get to your relevance objection.

P5GMCOM1

MS. JOHNSON:  I think we would need to spend some time parsing this to figure out that this is a very long message.  I think on the hearsay issue -- that includes a lot of factual assertions, and we would need to see any proposed redactions before we could speak --

THE COURT:  Let's please take care of that before the lunch break so we can come back and address this.  I have been told that this is not going to be used in the morning session, so it should not pose an issue.

As to relevance, can you address, just so I can think about it, why Ms. Ventura's state of mind in 2018, even if it's after the last freak-off, would not be relevant to the defenses that have been raised, meaning that if after a freak-off, for instance, Ms. Ventura had indicated that she felt really thrilled and happy that her and Mr. Combs had been together, wouldn't that be relevant to the issues of coercion and intent that the government raised, and, if not, why not?

MS. JOHNSON:  Yes, your Honor.  Her state of mind -- the defenses to the charged offenses relate to Ms. Ventura's consent or lack of consent.  Her state of mind in August 2018 related to a different incident does not go to any of the charged offenses.  That incident is a singular date and time and it's not even clear to me that this message is at or around that date and time.  She can't quite pinpoint it.  It's in August.  We don't know the relationship of this message to that

P5GMCOM1

rape.

THE COURT:  I understand.  You can pick it up again at the lunch break, but I've been told that our jury is ready.

Are there any other issues that we should address before the jury comes out?

MS. GERAGOS:  No.

May I respond to Ms. Johnson's point?

THE COURT:  Of course.

MS. GERAGOS:  Very briefly.

THE COURT:  While you're at it, does someone have a paper copy of that, or can you email it?  Even if you have the file.  You have it.  If you don't need it, please.  Thank you.  Appreciate it.

MS. GERAGOS:  My response, your Honor, and I will be very brief.

First, if it's not relevant, because it's after the charged conduct, then the rape shouldn't have come in.  That's a huge point for us.

THE COURT:  That was not a huge point for you because it wasn't raised.

MS. GERAGOS:  We thought we would be able to explore it on cross-examination, and she testified on direct examination that the date of the alleged rape, they were talking about whether or not she was going to go to Burning Man, which is what this message addresses.

P5GMCOM1

Those are just our two points.  I agree, but we thought we would be able to properly explore such an important allegation on cross-examination.  That's all.

I understand our jury is ready, so we are ready.

THE COURT:  Let's just think about it.  This is because this came up right before this session.  I think the parties just need to think a little bit about both the hearsay issue and the relevance issue.  You might need a little time to do that.  So we have the morning.  You can think about that. We will address it right when the jury retires for lunch.

MS. GERAGOS:  Just the last thing.  I apologize.

The government, myself, and Ms. Ventura's counsel have conferred on the 412 issues that we brought to the Court, and we all agree on those redactions, and we will submit those to the Court this morning.

THE COURT:  Great.

Ms. Johnson.

Then I'm going to come back to Ms. Estevao because we started here with there being a number of objections.  We have resolved them all in record time.

Ms. Johnson.

MS. JOHNSON:  Your Honor, I just wanted to flag that we did provide, after confirming with defense counsel, the exhibits with sound in them to Ms. Ventura to review outside of the courtroom.  But given that there was a lot of movement on

P5GMCOM1

the other documents, she has not seen them, and she will need some time, particularly if they are lengthy, to review them. We can facilitate that outside of the room on breaks, if defense counsel is OK with that. We brought paper copies to make that much, much quicker, but the exhibits that were going to be offered today were in flux until this morning.

THE COURT: Understood.

MS. ESTEVAO: Your Honor, I understand that there is a dispute as to whether or not Ms. Ventura needs to continue to read the exhibit in full before she is asked about it. That was the issue that I expected would take the most amount of time and with slow things down. And we anticipated that by sending the exhibits to the government last night that they could agree to authenticity and that they could be admitted to wholesale, the way that the government did in their case when they read a long list of exhibits, which we had reviewed in advance and agreed to their admission. And there is some that we could do with Ms. Ventura and just admit and not even ask her about.

The government appears to take the position that she needs to continue to read them, and we don't understand the basis for that.

THE COURT: I don't believe the government is saying that if you are trying to make sure that these text message chains are in evidence that you can't do what you're saying.

P5GMCOM1

I think that the government's position is, to the extent that you are going to be asking questions based on the exhibit, then the witness, in fairness, should have a chance to review the exhibit, which I think you probably agree on.

Ms. Johnson, did I say anything else wrong?

MS. JOHNSON:  No.  That is exactly our position, Judge.

For clarity, when the government authenticated its exhibits in this way, Ms. Ventura reviewed every single one of those exhibits outside of the courtroom before she came in to testify.

THE COURT:  And, further, can we all agree that if Ms. Estevao is, for instance, only going to ask questions about a single page, but the first page of a long text chain, then we can admit portions of the exhibit to speed things along?

MS. JOHNSON:  We can admit portions.

THE COURT:  Those are two strategies, Ms. Estevao, that should help avoid the lengthy reading of exhibits that you could employ and that should work.  If there are long exhibits and you really need to ask questions about the entire exhibit, then that's fine.

MS. ESTEVAO:  Understood.  Thank you.

THE COURT:  Understanding all of that, are we going to run into any issues here?

MS. ESTEVAO:  I do not believe so.

P5GMCOM1

THE COURT:  Can we get Ms. Ventura.

MS. ESTEVAO:  I'm sorry, your Honor.  One more issue.

I believe the government has an objection to a recording that may come up earlier in light of the representation that there is not going to be a lot of reading by Ms. Ventura on the stand.

THE COURT:  Which one is that?

MS. ESTEVAO:  1217.

MS. JOHNSON:  To be clear, it's a 25-minute recording that we wanted Ms. Ventura to listen to to make sure she knew what it was.  I'm not sure if she has listened to it yet.  We sent it over this morning after confirming that that was OK with defense counsel.

We had asked defense counsel to mark metadata, which they have done, because a recording absent any indicia of date or time is very difficult to pinpoint.  So I think if she recognizes it and we have the date and time, I don't think we have -- she has listened to it.  I have confirmed.  I don't think we have an objection, so long as we admit it with the metadata.

THE COURT:  Can we admit it with the metadata?

MS. GERAGOS:  We could admit it with the metadata.  We sent the provided metadata exhibit this morning.  We will mark it as 1217-A, and we will admit it with the metadata.

THE COURT:  Seems like we have no issue then.

P5GMCOM1                    Ventura - Cross

Let's get Ms. Ventura, and we will get our jury two minutes late.

(Jury present)

THE COURT:  Welcome back, members of the jury.  I'm only five minutes late today.  You were here early, as usual, so I apologize for our lateness, but we are making a couple of minutes progress.  We will keep working on it on our end.

Ms. Ventura, you understand you are still under oath?

THE WITNESS:  Yes.

THE COURT:  Ms. Estevao.

MS. ESTEVAO:  Thank you.

CASANDRA VENTURA, resumed.

CROSS-EXAMINATION (cont'd)

BY MS. ESTEVAO:

Q.  Good morning, Ms. Ventura.

A.  Good morning.

Q.  We finished our conversation yesterday talking about the Intercontinental and the drug use that was going on that evening, right?

A.  Yup.

Q.  And you previously told the government that you believed that Mr. Combs was blackout for the Intercontinental event, isn't that right?

A.  I believe that he was intoxicated, yeah.

Q.  Thank you.

P5GMCOM1                         Ventura - Cross

You believed he was blackout, right?

A.   Everybody's definition of blackout is different.

Q.   You used the word blackout.

A.   Sure.

Q.   Thank you.

        MS. ESTEVAO:  Can we pull up Government Exhibit B-631, page 6, in evidence.

Q.   Can you read the bottom message that you sent to Mr. Combs, please.

A.   When you get fucked up the wrong way --

        MS. JOHNSON:  Objection, your Honor.  This is not yet in evidence.

        MS. ESTEVAO:  I apologize.  Please take it down.

        Can you just show the witness that exhibit.

Q.   Ms. Ventura, do you recognize this as a text message that you sent to Mr. Combs?

A.   I do.

        MS. ESTEVAO:  Move to admit.

        THE COURT:  Any objection?

        MS. JOHNSON:  No objection.

        THE COURT:  This exhibit will be admitted.

        (Government Exhibit B-631 received in evidence)

        MS. ESTEVAO:  Please publish for the jury as Government Exhibit about 631.

Q.   Please read it.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P5GMCOM1                     Ventura - Cross

A.   When you get fucked up the wrong way, you always want to

show me that you have the power and you knock me around.  I'm

not a rag doll.  I'm someone's child.

Q.   When you say, when you get fucked up the wrong way, you

meant that he took too many drugs, right?

A.   I meant that he was out of control.

Q.   Because of the amount of drugs that he had taken, right?

A.   And alcohol.

Q.   And alcohol.  He often combined drugs with alcohol, right?

A.   Yes.  We both did.

Q.   Thank you.

          MS. ESTEVAO:  Can we show just the witness Defense

Exhibit 1080, please.  I apologize.  1090.  We are beginning on

page 1090.17 at the bottom.  Thank you.

Q.   Ms. Ventura, do you recognize this exchange as a

conversation between you and Mr. Combs on March 9, 2016?

A.   Yup.

Q.   We are just three days after the Intercontinental incident,

right?

A.   Yes.

Q.   Mr. Combs says to you, I'm so horny for you, right?

          MS. JOHNSON:  Objection.  This is not yet in evidence.

          MS. ESTEVAO:  I'm sorry.  Move to admit.

          MS. JOHNSON:  Your Honor, we don't have an objection,

but we discussed with Ms. Geragos that this -- as I understand

P5GMCOM1                        Ventura - Cross

it, the application is to admit the pages marked 1090.17,

1090.18, 1090.19, and 1090.20, not this entire PDF.

MS. ESTEVAO:  We propose a revised version referred to

as Defense Exhibit 1090-A.

THE COURT:  That includes solely those pages?

MS. ESTEVAO:  Yes, correct.

THE COURT:  1090-A will be admitted.

(Defendant's Exhibit 1090-A received in evidence)

Q.  Ms. Ventura, could you first just take a look at this

yourself.

MS. ESTEVAO:  Mr. Cepregi, can you please go to the

next page so she can see the whole thing.

A.  Is there another page after?

MS. JOHNSON:  I have a hard copy, if that's easier.

May I approach?

THE COURT:  You may approach.

A.  OK.

Q.  Do you recognize this as an exchange between you and

Mr. Combs?

A.  Yes.

MS. ESTEVAO:  Move to admit.

MS. JOHNSON:  I thought this was admitted.

THE COURT:  Already admitted.

MS. ESTEVAO:  Can we start at the beginning.

Q.  Mr. Combs says:  I'm so horny for you with three

P5GMCOM1                       Ventura - Cross

exclamation points, right?

A.  Yes.

Q.  This is only a couple of days after the Intercontinental, right?

A.  Yes, I think so.

Q.  You say:  You are?  And then:  Why?  What made you feel that way?  Right?

A.  Um-hum.

Q.  Are you reacting that way because it's a little unusual that he would say he was horny for you after what had happened, right?

A.  Yeah.

Q.  It's a little strange, given the events of the past few days, right?

A.  A little strange, yeah.

          MS. ESTEVAO:  Can we go to the next message.

Q.  And he said:  I felt that way from Friday.  What are you doing?  Right?

A.  Yup.

Q.  You say:  Not a good vibe.  Right?

A.  Right.

Q.  This is him sending you a suggestion to have sex shortly after the Intercontinental, right?

          MS. JOHNSON:  Objection.

          THE COURT:  Overruled.

P5GMCOM1                      Ventura - Cross

Q.   He is proposing having sex or some sexual activity with you after the Intercontinental, right?

A.   He is saying how he feels.  I don't know if that's sex.

Q.   You took it as a suggestion to have sex shortly after the incident, right?

A.   I mean, I don't know exactly at this point.

Q.   You say in response:  Not a good vibe.  Right?

A.   Which makes sense.

Q.   Because it's a little odd that he would be suggesting something like that after the Intercontinental?

A.   Yeah.

          MS. ESTEVAO:  Can we go to the next message, please.

Q.   What do you say at the top?

A.   We need a different vibe than Friday.

Q.   By that you mean we need to do something different from what happened on Friday, right?

A.   A departure, yeah.

Q.   A departure from what had happened at Intercontinental, right?

A.   For sure.

Q.   Because what had happened at Intercontinental was terrible, right?

A.   Yes.

Q.   You acknowledged that?

A.   Yes.

P5GMCOM1                      Ventura - Cross

Q.  He says in response:  Fuck Friday.  Right?

A.  Yup.

Q.  And LOL.  Right?

A.  Yes.

        MS. ESTEVAO:  Can we go to the next message, please.

Q.  What does he say at the top.

A.  I don't even wanna do that again.

Q.  By that, you took it to mean that he does not want to do whatever happened at Intercontinental again, right?

A.  That is what I would guess, but I don't know specifically.

Q.  And that would include the violence that ensued in the hallway, right?

A.  I would think so.

Q.  And potentially the amount of drugs that he was taking on Friday, right?

        MS. JOHNSON:  Objection.

Q.  What do you say in response?

A.  LOL, true.

Q.  And he says:  What are you doing again.  Right?

A.  Yup.

        MS. ESTEVAO:  Can we go to the next message.

Q.  You say:  At Conde Nast for my Vogue interview.  He says: You're a star.  Know that.  You're the shit.  Right?

A.  Right.

        MS. ESTEVAO:  Can we go to the next.

P5GMCOM1                         Ventura - Cross

Q.  Mr. Combs says:  This is the sweetest card I ever got.  I love you.  Right?

A.  Is this a continuation?  Yes.  I guess so.  Yup.

        MS. ESTEVAO:  Can we go to the next page, please.

Q.  You say love you in response, right?

A.  Yes.

Q.  And you meant that when you sent it, right?

A.  Yeah.

        MS. JOHNSON:  Your Honor, I have an objection.  I'm sorry.  We only admitted through page 1090.20 and now we are on -- we are past that, so this is not in evidence.

        MS. ESTEVAO:  We can take it down.

        MS. JOHNSON:  I move to strike everything after the message that ended WYD on 1090.20.

        THE COURT:  The motion to strike is granted, and the jury should disregard the last testimony just on that last page.

        Let's proceed.

        MS. ESTEVAO:  Can we pull up Government Exhibit B-606 and B-607.  I believe these are already in evidence, but Ms. Johnson will correct me.

        MS. JOHNSON:  They are.

Q.  Ms. Ventura, you remember testifying about these photos, right?

A.  Yes.

P5GMCOM1                          Ventura - Cross

Q.  Why did you take these photos of your face?

A.  I honestly don't know now.  When they came up it was a surprise to me because I didn't remember it.

Q.  Is it fair to say that you didn't remember much from that day?

A.  No.  I just didn't remember taking these photos.

MS. ESTEVAO:  Please take them down.

Q.  Mr. Combs went to a rehab facility about a month following the Intercontinental event, didn't he?

A.  I don't know.

Q.  Would it help to refresh your recollection?

A.  Sure.

MS. ESTEVAO:  Can you we please show just on the screen, we don't need any audio, just for the witness 1278, please.

Q.  In the meantime, while that is getting pulled up, Ms. Ventura, do you recall an incident when Mr. Combs suspected you of cheating on him with someone in August of 2018?

A.  Our relationship was over by then.

Q.  Excuse me.  August of 2016.

A.  I do recall.

Q.  And you know who I'm referring to?

A.  Yes.

Q.  And Mr. Combs was at your apartment at a certain point in August 2016 when he learned that this relationship or suspected

P5GMCOM1                         Ventura - Cross

that this relationship was going on, right?

A.  Yeah.  No.  It wasn't at my house, though.

Q.  Were you in a car?

A.  We were in a car.

Q.  You were in a car?

A.  Yeah.

Q.  You received a call on your phone, right?

A.  No.

Q.  How did Mr. Combs learn about information that suggested that you were having an affair with someone else?

A.  I actually am not sure, you know.

Q.  Do you want to tell us what happened when he suspected you of cheating and ultimately took your phone?  That's what I'm getting at.

A.  At this point we was also not in a great place.  This was right before my 30th birthday, I think.  Yeah.  I was dating someone else.  And I am not sure how he found out, but I took a drive with him to a doctor's appointment, and he told me to hit my mom and tell her I was OK.  When I unlocked my phone, he grabbed my phone and ran out of the car.

Q.  And that's because he saw something on your phone that suggested that you were cheating?

        MS. JOHNSON:  Objection.

        THE COURT:  You need to rephrase.

Q.  What made him grab your phone, from your perspective?

P5GMCOM1                        Ventura - Cross

A.   From my perspective?  Would be because he was trying to get in it and read what was in my phone.

Q.   Then he took it and left, right?

A.   Down Wilshire, yeah.

Q.   You were upset by that.

A.   Yeah.

Q.   And it was a big fight between the two of you, right?

A.   It really wasn't a fight because he was gone.

Q.   Excuse me.  I don't mean fight as in a physical altercation.  There was no physical altercation, right?

A.   No.  He was just gone.

Q.   It was just an argument and he took your phone.

A.   He took my phone, yup.

Q.   How long did he take your phone for?

A.   It was a couple of hours before the police were called.

Q.   Who called the police?

A.   My mother.

Q.   And she called the police because she was concerned about you, right?

A.   I returned home with no phone, and she asked me where it was, and I told her, and she said, I am going to call the police.

Q.   And her reaction was out of concern for you, right?

A.   Of course, yes.

Q.   Because your phone hadn't returned yet, right?

P5GMCOM1                    Ventura - Cross

A.  It was gone, yeah.

Q.  And at some point later in the day you did get your phone back, correct?

A.  I did.

Q.  Did you ever learn whether or not Mr. Combs had looked through your phone?

A.  I believe he looked through my phone.  I believe he also spoke to somebody on my phone.

Q.  He spoke to the person that you were having an affair with, right?

A.  I believe so.  I wasn't there.

Q.  And that was -- and that person is a professional NFL player, right?

A.  I don't know if he is now.

Q.  He was at the time.

A.  Yup.

Q.  And Mr. Combs was insanely jealous over this event, right?

A.  I guess you could call it that.

Q.  He was always upset with you when he suspected you of cheating, right?

        MS. JOHNSON:  Objection.

        THE COURT:  That's overruled.

Q.  He was upset with you when he suspected you of cheating?

A.  If I was with anyone else besides him, yeah.  I don't know that I would call it cheating at that point.  Sorry.

P5GMCOM1                        Ventura - Cross

Q.   If he thought that it was cheating -- you understood that he thought it was cheating, right?

A.   No.  When you're not with somebody, it's not cheating, but I feel like that's a technicality in a boyfriend/girlfriend relationship.  We weren't married.

Q.   Even when you were on breaks he would get upset and jealous from your perspective when he learned that you were with someone else, right?

A.   Yeah.

Q.   Even when you weren't with him?

A.   Agreed.

Q.   And that bothered you because it meant that you couldn't go and date other people without him getting upset with you, right?

A.   Bothered.  I don't know if that's the word.

Q.   Fair to say that he would get upset whenever he found out about -- or whenever he suspected you were with another man, right?

          MS. JOHNSON:  Objection to foundation.  Speculation.

          THE COURT:  Sustained.  The question needs to be rephrased.

          MS. ESTEVAO:  I can move on.

Q.   That was not the first time that he took your phone, right?

A.   No.

Q.   He has taken your phone on other occasions too, right?

P5GMCOM1                         Ventura - Cross

A.   Yes.

Q.   That's typically so he could look through your phone, right?

MS. JOHNSON:  Objection.

Q.   After he has taken your phone, tell us about other times that he has taken your phone.

A.   Other times he has taken my phone.  When he was angry at me about something, he would take a lot of things.

Q.   On one occasion he found out that you were dancing with another entertainer in the industry and took your phone, right?

MS. JOHNSON:  Objection.

THE COURT:  It's overruled.

A.   Can you reask.

Q.   He found out that you were dancing with another person in the entertainment industry and was upset and took your phone, right?

A.   I honestly don't know.

Q.   Do you remember the occasion when he suspected you of dancing with Chris Brown?

A.   I do.  But I was not.

Q.   He thought that you were, right?

MS. JOHNSON:  Objection.

A.   I don't know.

THE COURT:  Sustained.  That's sustained.  These questions need to be rephrased.

Q.  You remember him taking your phone on that occasion?

A.  Absolutely don't remember what happened on that occasion

besides the fact that I wasn't dancing with Chris Brown.

Q.  Would it help to refresh your recollection?

A.  Sure.

        MS. ESTEVAO:  Can we show just the witness Defense

Exhibit 1191, please.  Can we go to the next page and the third

from the bottom.

Q.  Have you read it?

A.  Yes.

Q.  Does that refresh your recollection?

A.  This is what I thought you were talking about, yeah.

Q.  I understand this is from many years ago, from 2013?

A.  Yeah.

Q.  So that might be why you didn't remember?

A.  Yeah.

Q.  Do you now remember that he took your phone after

suspecting that you danced with Chris Brown?

A.  It says that in the message, but I don't really remember

it.

        MS. ESTEVAO:  You can take that down, please.

Q.  Were there any other occasions when he took your phone?

A.  Yes.

Q.  Can you tell us about those.

A.  The only other general times where he would take my phone,

P5GMCOM1                      Ventura - Cross

my car, my watch, my passport, was when he was angry about

something.

Q.   Thank you.

            MS. ESTEVAO:   Is Defense Exhibit 1278 ready for the

witness?

Q.   Does this refresh your recollection as to whether or not

Mr. Combs was in rehab following the Intercontinental incident?

A.   I vaguely remember it, but I don't know that it was rehab.

I don't really know where he was exactly.

Q.   OK.   Thank you.

            What do you remember from the period following the

Intercontinental incident?

A.   What do I remember.   Not a whole lot.   I went back to or

ended up in New York to do promo for the movie.   After that, I

don't really remember too much.

Q.   Do you remember Mr. Combs going anywhere following the

Intercontinental incident?

A.   He went to a lot of places.   I don't know.

Q.   Did he go to Sedona?

A.   He could have, yeah.   That looks like Sedona.

Q.   You're familiar with Sedona?

A.   Yes.

Q.   You've also gone to rehab in Sedona.

A.   It wasn't rehab, but I went to Sedona, yeah.

Q.   What is Sedona?

A.   That's a place in Arizona that has a lot of vortexes.

Q.   Why did you go to Sedona?

A.   My purpose of going to Sedona was to take a break from the drugs and partying.  I was there for about a week.

Q.   I believe you referred to it as a spa yesterday.

A.   That was the Golden Door, which is a whole other place.

Q.   I see.  Thank you.

A.   You're welcome.

          MS. ESTEVAO:  I am going to go a new topic, please.

          Can we pull up Government Exhibit 263.  I believe this is in evidence.  Excuse me.  B-263.

Q.   In your direct testimony you were asked about an occasion in March 2014 relating to someone named Sugin, right?

A.   Yes.

Q.   You remember that testimony?

A.   Yup.

Q.   You said on your direct that you had learned from Sugin that there was potentially a recording of you out there, right?

A.   Yup.

Q.   And you were concerned about that because you thought it may have been one of the freak-off videos?

A.   Correct.

Q.   And you at some point were with Sugin and were asking him about this video, right?

A.   Yes.

P5GMCOM1                           Ventura - Cross

Q.   And I believe you testified that a security guard from Mr. Combs' staff was also there during this conversation or in relation to this conversation.

A.   That day they were there, yeah, or that night.

Q.   And I think you went through part of this government exhibit in discussing this, right?

A.   Yes, I believe so.

Q.   And you suggested on your direct testimony that Mr. Combs was encouraging you to get to the bottom of it with Sugin, right?

A.   Yes.

        MS. ESTEVAO:  Can we go to the next page, please, and the following page.

        (Continued on next page)

P5GCcom2                      Ventura - Cross

Q.  Mr. Combs is asking you in these messages about this video?

A.  Yes.

Q.  And he's asking, are you talking to him yet, right?

A.  Yes, I see that.

Q.  And he says, this is crazy, don't let him out of your sight, wtf, right?

A.  Right.

        MS. ESTEVAO:  Can we go to the next page, please.

Q.  And he's asking what's going on.  And you say, I don't think you understand how crazy this is, right?

A.  Yup.

Q.  He says, the way you've been talking to me is crazier, man, you don't even know, right?

A.  Right.

        MS. ESTEVAO:  Can we go to the next page.

Q.  And you say, what's up in car, hello, you think I should just hit Jess and say I want to talk to him on my own before, right?

A.  Yes.

        MS. ESTEVAO:  Next page, please.  Can you please keep going.  I see.  Okay.

        Can you please bring up just for the witness defense exhibit 1057.  Can you let the witness review this document first.

        I believe this wasn't on the list we provided to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5GCcom2                         Ventura - Cross

government, I'm just realizing.  So if the government could review it, as well.

Q.  Have you reviewed the exhibit, Ms. Ventura?  Is this a conversation you had with Mr. Combs on March 11, 2014?

A.  It looks like it.

How many pages was that, though?  Just curious because we went a little bit past.

MS. ESTEVAO:  I'm sorry.  We haven't finished it.

Q.  It was seven pages.

MS. ESTEVAO:  Did we go through it?  Great.

A.  I don't know if I caught everything, but yes, it looks like a conversation between us.

MS. ESTEVAO:  Move to admit.

MS. JOHNSON:  No objection.  Except I would note the conversation starts on March 10th, not March 11th.

MS. ESTEVAO:  Thank you.

THE COURT:  1057 will be admitted.

(Defendant's Exhibit 1057 received in evidence)

Q.  Can you read from the top -- or I'll read Mr. Combs and can you read your bubbles.

It says, remember you said it done.  What did I do to you, you disappearing, where were you, and watch what you ask for, right?

A.  Yup.  I'm at the apartment.  Are you serious.  Obviously you're high.  I'm not at all.  Just trying to relax from the

night it.

Q.  It's 7:30 a.m.  You're just up, and you didn't get into my apartment until 4:45 a.m., which is crazy, and was hitting you to get an update, no answer.  So where were you all that time and why were you busy to respond?

A.  I was checking my phone constantly and was hitting you back.  I went to the party and came home.  Because of everything going on, we didn't go in until 2:30.  I'm up because it took this long to turn down.  In the bed now.  Why are you up.

MS. ESTEVAO:  Next page, please.

THE WITNESS:  Was that part of the other message?

MS. ESTEVAO:  I believe this is the next page, if you'd like to keep reading.

A.  You're whack for lying to me about bitches coming to the house, I tried to just leave it, but you fucking with me now. You aren't here and all you've done is stress my nerves. You're really bringing up Sugin?  You crazy.  He's a grown man. I was trying to keep it cool.  He hit me when I got home that he fell asleep.  I don't know what you want to do anymore.  I want to do whatever I can, but you just keep putting me down. I'm over here dealing with this on my own, I really hope you didn't get drunk and embarrass me, but I'm sure you did. Always great to hear bitches telling me shit I don't want to hear or know.

Q.  And this is following the events with Sugin, right?

A.  Yeah.  How many days after was this?  Is that like a day after?

MS. ESTEVAO:  I see Ms. Johnson is ready.

MS. JOHNSON:  Can I clarify with defense counsel one moment?

THE COURT:  Yes.

Ms. Ventura, just answer the questions to the best of your ability and if you can't because you need some clarification, then Ms. Estevao will give you that clarification.

Ms. Estevao.

MS. ESTEVAO:  Thank you.

Q.  This is shortly after an occasion where you went to your brother's birthday party, right?

A.  I'm not sure if this is the same year or not.

Q.  Well, this was a trip to New York and New Jersey that you went on in 2014, right?

A.  Okay.

Q.  And Mr. Combs was back in California, right?

A.  Yeah.

Q.  You went to your brother's birthday party and got into a physical altercation there, correct?

A.  Yes.

MS. ESTEVAO:  Can we pull up, just for the witness,

P5GCcom2                          Ventura - Cross

defense exhibit 1198.

Q.  If you could just review this page and then skip to the page that bears the number 1198.8 at the bottom.

A.  Okay.

Q.  And review this page, as well.

A.  Yup.

Q.  On March 10th, 2013, you went to your brother's birthday party, right?

A.  Yup.

Q.  At that birthday party, you got in a bar fight, right?

A.  Right.

Q.  And you told Mr. Combs that you got in a bar fight and that you tried to kill a bitch, right?

A.  Yes.

        MS. JOHNSON:  Objection.

A.  It's what it says.

        MS. JOHNSON:  This is not in evidence.

        MS. ESTEVAO:  I'm just asking if she told --

        THE COURT:  It's overruled.  Let's continue.

        MS. JOHNSON:  Can we take it off the screen.

        THE COURT:  You want to move to admit this exhibit?

        MS. ESTEVAO:  I don't need to.  She told me that she told Mr. Combs that.

        THE COURT:  Let's have a very brief sidebar.

        (Continued on next page)

(At the sidebar)

I want to make sure that the mechanics are down on some of this just to avoid some of the objections. When you're putting up an exhibit and then you need to authenticate it or just make sure the witness is aware of it, you're putting it up with the assumption that after doing that, you're going to move to admit it, but if you're then going to essentially use it as a refreshing document, then it needs to be taken down once the witness has had a chance to read it. I think if we just do that, it will be helpful because then the witness will probably have fewer questions about what she's seeing, and then also you might avoid some of the objections.

MS. ESTEVAO: Thank you, your Honor.

THE COURT: So that's all I have to say.

Ms. Johnson, anything further?

MS. JOHNSON: I just want to flag that this document, I understand this was to refresh, the one before also wasn't on the list. I want to know if there were any other documents that weren't given to us.

THE COURT: At this point, I understand the concern, and hopefully we will not run into anything like that. If we do, we'll deal with it. Thank you.

(Continued on next page)

P5GCcom2                          Ventura - Cross

                    (In open court)

BY MS. ESTEVAO:

Q.  In March 2014, you did have that conversation with Sugin

and I believe it was Atlantic City, right?

A.  Yes.

Q.  And you recorded that conversation, right?

A.  Yes.

          MS. ESTEVAO:  Move to admit defense exhibit 1217-A and

defense exhibit -- withdrawn.  The metadata is defense exhibit

1217-A and the video is defense exhibit 1217.

          MS. JOHNSON:  No objection.

          THE COURT:  Defense exhibits 1217 and 1217-A will be

admitted.

          (Defendant's Exhibits 1217, 1217-A received in

evidence)

          MS. ESTEVAO:  Can we begin playing at the 16:30 mark,

please.

          (Audio played)

Q.  Whose voice is that that we're hearing?

A.  That's Sugin's voice.

Q.  I am abbreviating this audio recording so we don't have to

listen to a half hour.  Can you help set the scene for us in

terms of what's going on in this audio recording.  Where are

you?

A.  At the point of this audio recording, I believe we're in

P5GCcom2                        Ventura - Cross

Atlantic City.  I had just hosted a set of parties the night before.

Q.  And you reviewed this audio recording this morning before taking the stand?

A.  I did, yes.

        MS. ESTEVAO:  Can you please keep playing.

        (Audio played)

Q.  That's your voice talking to Sugin, right?

A.  Yes.

        MS. ESTEVAO:  Please keep playing.

        (Audio played)

        Can we start playing at minute 17, please.

        (Audio played)

Q.  That's you on that audio recording, right?

A.  Yup.

Q.  And at this time, Mr. Combs was in California, correct?

A.  I believe so.

Q.  And there were other occasions when you were afraid that video recordings were going to be released of freak-off activities, right?

A.  There might have been some other instances.  I don't remember specifically.

Q.  This wasn't the only time that that happened?

A.  Uh-huh.

Q.  And Mr. Combs was also concerned about the prospect of

videos being released, right?

MS. JOHNSON:  Objection.

THE COURT:  That's sustained.

Q.  Did you know whether or not Mr. Combs expressed concern about these videos also being released?

A.  When?

Q.  Have you ever witnessed Mr. Combs express concern about these videos being released?

A.  Yes.

Q.  And Mr. Combs always supported you in not wanting these videos to come out and prevented these videos from coming out?

A.  I would say for the most part.

Q.  There was an escort that you met named Mr. Jonathan Oddi a few times, right?

A.  Yeah.

Q.  Do you know who I'm referring to?

A.  Yup.

Q.  At some point, you understood that he'd taken a video, a secret video of you and Mr. Combs and he at a freak-off, right?

A.  I thought he did, yeah.

Q.  When you found out about that, you spent some amount of time, several months, trying to make sure that it went away, right?

A.  I did not.

Q.  Mr. Combs did?

P5GCcom2                         Ventura - Cross

A.   Yeah.

Q.   You understood that Mr. Combs spent a great deal of time
and money to make sure that that video went away, right?

A.   I didn't know any of the details.

Q.   Were you aware that he spent a significant amount of money
to make sure that the video did not get released?

A.   No.

        MS. JOHNSON:  Objection.

        THE COURT:  It's overruled.

Q.   Mr. Combs would make sure that a video did not get
released, right?

        MS. JOHNSON:  Objection.  Asked and answered.

Q.   When you found out that Mr. Oddi --

        THE COURT:  Hold on.  Do you want me to rule on the
objection or would you like to move on?

        MS. ESTEVAO:  I'm fine moving on.  We did get the
answer.

Q.   When you learned that Mr. Oddi had taken a secret recording
of you, that ended your relationship with him, right?

A.   I believe so.

Q.   You never would have had a freak-off with him ever again,
right?

A.   No.  Uh-huh.

Q.   I'm not going to play anything, but you also had a
conversation with Mr. Oddi that was transcribed, right?

P5GCcom2                         Ventura - Cross

A.   Um --

Q.   Or recorded.

A.   Recorded.  I don't remember, but it sounds familiar.

Q.   And you were very concerned about the situation with Mr. Oddi, right?

A.   Yeah.

Q.   He seemed like a volatile personality, right?

A.   I don't know about volatile.  I just didn't trust it.

Q.   He was threatening to release a sex video of you, right?

A.   I don't know that he actually did that.  I don't -- I'm sorry.

Q.   You don't know if he threatened to release the video?

A.   I don't remember.

Q.   You just remember learning that he did have a video?

A.   I was in the room with him and I saw the phone up, and so I told Sean about it right after.

Q.   But you were concerned that he was recording at the time, right?

A.   Yes.

Q.   And when you raised that concern with Mr. Combs, he did all that he could to get rid of Mr. Oddi, right?

          MS. JOHNSON:  Objection.

          THE COURT:  That's sustained.

Q.   What happened when you told Mr. Combs about your suspicion that Oddi was recording you?

A.   He said I'll take care of it.  That's the most I remember.

Q.   To your knowledge, Mr. Combs was also concerned about recordings of him getting out, right?

A.   Yup.

Q.   Mr. Combs is a celebrity, as we've already established, right?

A.   Yes.

Q.   And these would have been embarrassing to him had they been released, right?

A.   Yes.

Q.   Just as they would have been embarrassing to you had they been released?

A.   I guess it depends on what content.  Yeah.

Q.   Had a sex video of you been released, it would have been embarrassing, right?

A.   For sure.

Q.   That's why you were so upset in that audio recording we just heard, right?

A.   Yeah.

Q.   What is Cowboys 4 Angels?

A.   It's an escort service that's online.

Q.   There's an individual named Garren who's the head of the agency, right?

A.   Yes.

Q.   This escort service was also featured on a reality

television show, right?

A.   From what I hear, yup.

Q.   A show called Gigolos on Showtime?

MS. JOHNSON:  Objection.  Hearsay.

THE COURT:  That's overruled.

Q.   Cowboys 4 Angels was on a Showtime television show called Gigolos, right?

A.   Yes, I think so.

Q.   And that television show also featured an escort that you had invited to a freak-off, right?

MS. JOHNSON:  Objection.  Hearsay.

THE COURT:  It's overruled.

A.   I've never seen the show, so I don't know.

Q.   You were concerned that individuals from Cowboys 4 Angels that you were hiring were also participating in a reality television show, right?

A.   Yes.

Q.   Because you did not want the fact of your freak-offs to be on a reality TV show, right?

A.   Right.

Q.   You understood that the reality TV show followed these escorts around, right?

A.   I don't know because I didn't see it, but I would guess so.

Q.   There was a time when one of the escorts from Cowboys 4 Angels was leaving comments on Mr. Combs's pictures on social

P5GCcom2                         Ventura - Cross

media, right?

          MS. JOHNSON:  Objection.  Foundation.

Q.  Are you aware of an escort from Cowboys 4 Angels leaving comments on Mr. Combs's Instagram page?

A.  I am not.

          MS. ESTEVAO:  Can we show just the witness defense exhibit 1395.  Could we go to page 7, please.  I'm sorry.  The end of page 6 into page 7.

          Can you please take this down.

Q.  Do you recall a Cowboys 4 Angels escort leaving comments on Mr. Combs's picture?

A.  I see it, but I don't remember this instant.

Q.  You and Mr. Combs obviously wanted to keep this private, right?

A.  Yup, we did.

Q.  That's why you wanted to make sure the escorts you hired were discrete, right?

A.  Yes.

          MS. ESTEVAO:  Can we pull up defense exhibit 1083. Withdrawn.  We can take this one down.

          Can we put up Government Exhibit A-441-G, which I believe is in evidence.  And scroll down.  Oh, it's in evidence.  Can we pull it up on the screen, please.

Q.  Mr. Combs says, do you want me to tell the truth, it's way deeper than iPads, right?

MS. JOHNSON:  Just to clarify, that message is not from Mr. Combs.

MS. ESTEVAO:  I'm sorry.

Q.  Ms. Ventura, you say, do you want me to tell the truth, it's way deeper than iPads, right?

A.  Right.

MS. ESTEVAO:  Can we go back up.  I guess skip one.

Q.  Mr. Combs says, I'll pull up and handle it face-to-face. No threat.  Facts.  And you will not be threatening me.  You have too many iPads full of skeletons.  If I was you, I would get me my money because we both have better things to do with our lives.  I really don't want no problems.  I got it from here.  I tried.  Right?

A.  Right.

Q.  And he was accusing you of having iPads, right?

A.  That's what it says, yeah.

MS. ESTEVAO:  And if we scroll back down.

Q.  You say, it's way deeper than iPads, right?

A.  Right.

Q.  And you testified that when you said it's way deeper than iPads, you were referring to physical assaults, right?

A.  The relationship as a whole, yeah.

Q.  Just as a reminder, this text exchange was after your breakup, right?

A.  Oh, yeah.

MS. ESTEVAO:  Can I confer with government counsel for a moment, please.

THE COURT:  You may.

MS. ESTEVAO:  Your Honor, at long last I'm going to offer a number of exhibits.

THE COURT:  Please proceed.

MS. ESTEVAO:  Defense exhibit 1000, 1022, 1080, 1081, 1082, 1083, 1084, 1087, 1096, 1115, 1117, 1118, 1122, 1134, 1134, 1145, 1152, 1299, 1304, 1306, 1309, 1311, 1312, 1313, 1316, 1320, 1325, 1334, 1405, 1406, and 1409.

THE COURT:  Any objection?

MS. JOHNSON:  No objection.  The government just notes with respect to authenticity, all of these exhibits, save defense exhibit 1405, are from Ms. Ventura's devices, and Government Exhibit 1405 is an exhibit that Ms. Ventura has received, so the government has agreed to its authenticity, and has paper copies should Ms. Ventura want to review them.

THE COURT:  Those exhibits identified by Ms. Estevao will be admitted.

(Defendant's Exhibits 1000, 1022, 1080, 1081, 1082, 1083, 1084, 1087, 1096, 1115, 1117, 1118, 1122, 1134, 1134, 1145, 1152, 1299, 1304, 1306, 1309, 1311, 1312, 1313, 1316, 1320, 1325, 1334, 1405, 1406, and 1409 received in evidence)

MS. ESTEVAO:  Can we begin with exhibit 1000.  Can we go to the next page, please.  Next page.

P5GCcom2                      Ventura - Cross

Q.  You say to Mr. Combs -- can you read your message to Mr. Combs, please.

A.  From the top?

Q.  Yes.

MS. JOHNSON:  Your Honor, I need a moment to confer with counsel.

MS. ESTEVAO:  We can take this down.  Can we please — new subject — pull up exhibits 3Q-109 and 3Q-112.

Q.  Ms. Ventura, who took these photos?

A.  My mother.

Q.  How did you provide them to the government, without disclosing any communications with counsel.

A.  I don't know what you mean.  I'm sorry.  How did I give --

Q.  Do you have possession of these photos?

A.  I do.

Q.  In what form do you have possession of these photos?

A.  They're just photos in my iPhone.

Q.  They're photos in your iPhone?

A.  Yeah.

MS. ESTEVAO:  You can take these down.

Q.  You testified that after the Kid Cudi instance, you got back together with Mr. Combs, right?

A.  Yes.

Q.  In fact, by January 1st, you were already back together with Mr. Combs, right?

A.   Yeah.

Q.   And that was just shortly after the events in question, right?

          MS. JOHNSON:  Objection.  Vague.

          THE COURT:  Overruled.

Q.   Was January 1st shortly after the Kid Cudi events you discussed on direct?

A.   Yes.  Yup.

          MS. ESTEVAO:  Can we fast forward to September 2012 and pull up defense -- just for the witness, defense exhibit 1007.  I'm not going to offer this.  Scroll down.

          THE COURT:  Ms. Estevao, did you say you're not going to offer this exhibit?

          MS. ESTEVAO:  Yes, but Ms. Geragos reminds me it's already in.  We can put it up for the jury.

Q.   Mr. Combs says to you --

          MS. JOHNSON:  Can we check before it's published to the jury that this is in evidence.

          MS. ESTEVAO:  I'm sorry?

          MS. JOHNSON:  I want to check that this is in evidence before it's published.

          We're good.

          THE COURT:  Please proceed.

Q.   Mr. Combs says, so what you want to do, woman, and no, I'm not asking to FO, I want to know what you want to do, right?

A.   Yup.

Q.   And you say, get something to eat, smoke, take a walk, right?

A.   Right.

MS. ESTEVAO:  Can we scroll down and go to the next page, and the next page.  We can take this exhibit down.  I apologize.

Q.   Ms. Ventura, you talked on -- you spoke about the treatment facility that you went to in early 2023, right?

A.   Right.

Q.   And that treatment facility is called the Willow House, right?

A.   Yup.

Q.   And that was a 45-day inpatient treatment center, right?

A.   Correct.

Q.   Because of the mental health problems you described on direct, right?

A.   Yeah.

Q.   And during that period of time, you had no family communication whatsoever, right?

A.   It was really sparse, yeah.  There was no phone.

Q.   It was part of the rules of the facility, right?

A.   Correct.

Q.   Did you review the website of Willow House prior to going?

A.   Actually, I don't remember.  I might -- I've seen it.

Q.   Presumably, you would have if you were leaving your children for 45 days to go to this place, you wouldn't do this --

MS. JOHNSON:  Objection.

MS. ESTEVAO:  Withdrawn.

Q.   You said on direct that you've been clean since 2022, right?

A.   Yes.

Q.   But do you still take Suboxone?

A.   I do.  Well, actually, no, that's not what I'm taking right now.

Q.   What are you taking right now?

A.   I'm taking buprenorphine.

Q.   What is that?

A.   It's Suboxone without naloxone.  I'm not a doctor.  I don't know exactly.

Q.   What do you understand it to treat?

A.   Opiate addiction.

Q.   And how long have you been on this medication?

A.   Since 2022.

Q.   You were put on this medication following your treatment at the Willow House, right?

MS. JOHNSON:  Objection.  403.

THE COURT:  It's overruled.

A.   No.

P5GCcom2                    Ventura - Cross

Q.   When were you put on the treatment?

A.   In 2022.  I went to treatment in 2023.

Q.   So you were put on the treatment in 2022 and went to Willow House in 2023?

A.   Correct, yeah.

Q.   And you testified on direct about the document that you wrote that you called a book, right?

A.   The form of a book, yup.

Q.   Titled the Dark Times, right?

A.   Yup.

Q.   And you wrote that book following or during your stay at Willow House, right?

A.   I -- yeah.

Q.   Was it during or following?

A.   It was following, really.  I started to write while I was there, but it wasn't really an idea while I was there.

Q.   You began writing while at Willow House, your feelings?

A.   Yeah, healing.

Q.   And that ultimately ended up in the book, right?

A.   Correct.

Q.   And Willow House includes treatment for a number of different conditions, right?

A.   Yeah.

Q.   Things like sex addiction, right?

A.   Yup.

P5GCcom2                        Ventura - Cross

Q.  Sexual compulsion, right?

         MS. JOHNSON:  Objection.  403.

         THE COURT:  It's overruled.

Q.  To your knowledge, does it treat sexual compulsion?

A.  To my knowledge, I don't know specifically, but it sounds about right.

Q.  It also treats something called love addiction?

A.  Yup.

Q.  Were you treated for any of these during your stay at Willow House?

A.  Nope.

         MS. JOHNSON:  Objection.  401, 403.

         MS. ESTEVAO:  I will get there.

         THE COURT:  Let's have a very, very brief sidebar.

         (Continued on next page)

(At the sidebar)

THE COURT:  Can I get a proffer of relevance.

MS. ESTEVAO:  Your Honor, the book that Ms. Ventura wrote where she says that she learned that she was sex trafficked for the first time, she says she learned it in connection with entering the Willow House facility, and she took their standard psychological entrance exam, something like that, and that's how she learned that she was --

THE COURT:  You're leading up to that?

MS. ESTEVAO:  Yes.

THE COURT:  Okay.  Understood.

MS. JOHNSON:  While we're here, I think that we need to discuss what, if anything, comes in about that.  It's hearsay, and any discussion of sex trafficking is a legal conclusion that this witness cannot testify to.

THE COURT:  Wait.  Hold on.  Who are you talking to? Are you raising an objection to a question that has not been asked?

MS. JOHNSON:  Yes.

THE COURT:  Thank you for giving me the heads up, that's helpful.  If those questions come up, Ms. Estevao, when counsel says objection, because nothing further should be said, I will understand what you're directing that to.  So there are issues of sex trafficking, there are potential issues of hearsay, you'll be mindful of that because I --

MS. ESTEVAO:  Your Honor, I anticipate asking her if she wrote down in her book that she learned that she was --

THE COURT:  I don't think that's what Ms. Johnson is referring to.

MR. AGNIFILO:  Can we have a second, Judge.

MS. ESTEVAO:  Withdrawn.

MR. AGNIFILO:  I don't think we're going to go that far.  I don't think we're going to ask that question.

THE COURT:  Do what you need to do and the objections will be raised, if they are raised, and we will deal with them.

MS. JOHNSON:  Your Honor, just one more thing before we go.  The line of questioning about what Ms. Ventura was not at rehab for is what the government has been objecting to.

MS. ESTEVAO:  Is --

MS. JOHNSON:  Is not at rehab for.  She testified on direct what she did go to rehab for, which is trauma therapy and drug addiction, and a line of questioning about what she wasn't there for is prejudicial, it has no probative value, and it's harassing a witness.

THE COURT:  Well, we don't know because we haven't gotten there yet, but I understand --

MS. ESTEVAO:  I'm not going further, I was asking.

MS. JOHNSON:  She testified what she wasn't there for.  Can we ask her what she was in fact there for.

THE COURT:  I understand the objection, let's proceed.

(In open court)

THE COURT:  Ms. Estevao, when you're ready.

MS. ESTEVAO:  Thank you.

Q.  Ms. Ventura, while you were at Willow House, did you receive any treatment there -- withdrawn.

Ms. Ventura, do you know whether or not Willow House includes treatment such as something called neurofeedback?

A.  Yes.

Q.  And were you treated with this neurofeedback therapy?

A.  I did neurofeedback, yup.

Q.  Can you explain what that is.

A.  I mean, I couldn't explain it to you like a professional, but --

Q.  Based on your understanding.

A.  They hook your brain up to a machine and you watch something, and just kind of regulates your brainwaves.  The best way to describe it.  It was a while ago.

Q.  This was while were you were at Willow House?

A.  Yeah.

Q.  And it included putting some device to your head, right?

A.  Yeah, uh-huh.

Q.  How many times did you do that at Willow House?

A.  Probably, roughly five or six times, like once a week while I was there.

Q.  And Willow House advertises this technique as something

P5GCcom2                       Ventura - Cross

that can change brain --

MS. JOHNSON:  Objection.  Hearsay, 403.

THE COURT:  So counsel can just say objection and let me take a look at the question and then we can proceed from there.

Ms. Estevao, you need to rephrase that question or ask some additional questions before getting to it.

Q.  Ms. Ventura, when you read the website for the Willow House facility, did you look at its description of neurofeedback?

A.  I don't believe that's something that I was paying attention to at that point.  It was kind of like a dire situation to just get there.

Q.  When you were at Willow House, were you told the effects of this neurofeedback --

MS. JOHNSON:  Objection.

Q.  What did you understand the effects of the neurofeedback to be?

A.  Help me with my trauma.

Q.  In what way was it supposed to affect your brain activity?

MS. JOHNSON:  Objection.

MS. ESTEVAO:  Withdrawn.

Q.  Willow House also has a treatment called psychodrama.  Did you participate in that?

MS. JOHNSON:  Objection.

THE COURT:  It's overruled.

P5GCcom2                          Ventura - Cross

A.  I don't remember that, no.

Q.  Willow House also has a treatment called EMDR.  Are you familiar with that?

A.  Yup.

Q.  Did you participate in EMDR?

A.  I did.

Q.  And what do you understand EMDR to do?

A.  It helps you recount memories.  It's kind of random, but it's part of the trauma therapy.  I'm not a doctor, so I'm not trying to give a --

Q.  I understand.  Your understanding.

A.  My understanding is that it helped me recount memories and process them.

Q.  And it involves prompts to have you think about prior traumatic memories again, right?

A.  There are no prompts.  It's kind of open.

Q.  But the idea is you recall prior traumatic memories, right?

A.  That's what comes up for you, yeah.

Q.  And it's a typical treatment for PTSD, from what you understand, right?

        MS. JOHNSON:  Objection.

        THE COURT:  Sustained.

Q.  You understand you were being treated for PTSD, right?

A.  Yes.

Q.  Willow House also includes something called somatic

P5GCcom2                          Ventura - Cross

experiencing, right?

A.   Yup.

Q.   What do you understand that to be?

A.   I actually did not do a whole lot of somatic experiencing, but from what I remember, it kind of let's you complete a trauma that got cut off.  I don't know how to explain this, really.  Yeah.  For instance, you're getting -- I don't want to talk too much.  If you were getting beat up and you couldn't walk out of a room, you get to walk out of the room in that healing.

Q.   Reimagining a traumatic experience, correct?

A.   Yup.

Q.   And you participated in that treatment, reimagining traumatic experiences, right?

A.   A couple of times there.

Q.   As part of your PTSD therapy, right?

A.   Yup.

Q.   On direct you said something to the effect of when you met Mr. Combs, you were still physically developing.  Do you remember that?

A.   I do.

Q.   And when you said that, you weren't referring to your physical body, other than your brain.  What were you referring to when you said that?

A.   Everything, my brain, my body, all of it.

Q.   Well, you were 22 years old, right?

A.   Yeah.  So --

Q.   So in what way were you physically developing still?

A.   I think every woman continues to develop after 22.  You don't think so?

Q.   So you are suggesting that -- you are not suggesting that your body was not fully physically developed at 22, right?

A.   No.

Q.   Okay.  At Willow House, you took a standard psychological entrance testing, right?

A.   Yup.

Q.   And that consisted of hundreds of questions, right?

A.   Yes.

        MS. ESTEVAO:  Can we pull up defense exhibit 1022, please.  This has been admitted.  Withdrawn.

        Can we put up 1080, please.

Q.   Can you read your message to Mr. Combs, please.

A.   I'm just finishing reading it.

        MS. JOHNSON:  I have a hard copy, if that would be helpful.

        THE WITNESS:  It would.

        MS. JOHNSON:  May I approach?

        THE COURT:  You may.

A.   Are you ready for me to read it?

Q.   Yes, please.

P5GCcom2                         Ventura - Cross

A.   I liked the me that I was better when I was in the Bahamas, but yeah, I guess the physical part has been fucked up a little.  I'm sorry that I've been upset.  I think I just wish it could be overnight sometimes, and I'm overthinking a lot, stressing myself out.  I'm back to caring too much and being frustrated with myself.  I just need to stay busy and keep in motion, sitting still has me depressed.  Love you.  Have a good night.  Please don't feel like you can't go have fun.

Q.   Do you remember what this was referring to?

A.   No.

Q.   And he says, I love you, it's okay, right?

A.   Yup.

        MS. ESTEVAO:  Can we go down.

        THE WITNESS:  Do you want me to continue?  Sorry.

        MS. ESTEVAO:  Can we keep going down.

Q.   And what do you say?  He said physical sex, right?  Physical means sex?

A.   Yeah.  Yeah, because I love you and sex means a lot to me with you.

Q.   And he says, so you want to have sex for a while, right?

A.   Yup.

        MS. ESTEVAO:  Can you scroll down, please.

Q.   I love you, too.

        MS. ESTEVAO:  Can you keep going.

        Can we pull up 1081, please.

MS. JOHNSON:  I have a hard copy for Ms. Ventura, if that's helpful.  May I approach?

THE COURT:  Of course.

MS. ESTEVAO:  And you can skip to 1081.6 at the bottom.

MS. JOHNSON:  Your Honor, may I confer with counsel.

Q.  Can you look at the bottom of the page and --

MS. ESTEVAO:  The very bottom.  Oh, yes.  We're in the right place.

Q.  Ms. Ventura, can you read the bottom message on the screen, please.

A.  You know we have to have a proper FO without no K.  I need to get it out of my head.  I hate K.  So you let me know when. Please don't be mad and think that's all I want to do.  It's just the K -- I don't know what that says.  A successful FO is when we remember and don't be friending to do it the right way. I won't bring it up again until you're in that mood and I'll fly Dave in.

Q.  When he says friending, he means fiending, you think, right?

A.  Yeah.

Q.  This is him indicating to you he wants to have a freak-off without ketamine, right?

A.  Correct.

Q.  Which suggests that you previously had a freak-off with

ketamine, right?

A.   Yeah.

MS. JOHNSON:  Your Honor, may I confer with counsel.

THE COURT:  No.  Ms. Estevao.

MS. ESTEVAO:  Can we go to defense exhibit 1082, please.

Q.   Can you read your message at the top.

A.   Is it okay to read it?

Q.   Yes, please.

A.   I'm fine.  Just trying to get my life back organized.

Q.   Can you read his message, as well.

A.   Yeah, I know, right.  I'm sorry.  I feel like it's my fault that we rushed back into shit.  I'm praying on us.  Love is so hard sometimes.  We both got to get back on track or we'll never get shit done.  I want you to know that I realize what's going on.  We're at a great place.  Let's give things time to breathe in a positive light.  I need to get the songs for Epic.  Send me all the songs on a flash drive.  When you're ready, I'll send Dave to get so I can get that done and I'm coming up with a management solution.  Anything else you want me to work on, please send.  And I'm going to my therapist today.  Love you so much and always will.

Q.   And this message is from February 2016, right?

A.   Yup.

Q.   This is after you went to South Africa and broke up --

MS. JOHNSON:  Your Honor, I'm really sorry.  I not sure this piece of the exhibit is in evidence.

(Continued on next page)

THE COURT:  It's 11.  I think we have been going a hour and a half.  Let's take a 10-minute recess at this point.

All rise for the jury.

(Jury not present)

THE COURT:  Ms. Ventura, we will see you back in 10 minutes.

We are not going to proceed in this fashion.

A few ground rules that should have been clear if the parties had reviewed this Court's individual practices.  I will just remind people about this.

First, on objection, you say objection.  If I need the grounds, I will ask for those grounds.  If you need to specify further and ask for a sidebar, you may ask for a sidebar. That's how we are going to handle objections from here on out.

In terms of admitted exhibits, why is there confusion between the parties on what is admitted and what is not admitted?  We should not have any of that confusion.

MS. ESTEVAO:  I apologize.  I am going to use the break to clarify some of the issues.

THE COURT:  There is not going to be a break for the people here.  That was a break for the jury and a break for the witness, but we are going to come back in, I said, 10 minutes. We are going to come back in 10 minutes.

A list of all admitted exhibits will be shared between the parties in advance of Sunday at 5 p.m. and will be

P5GMCOM3                        Ventura - Cross

furnished to the Court at that time.  That list will be updated each day and submitted to chambers by 7 p.m.  That way, we will have no confusion whatsoever about which exhibits are admitted, and any disputes or lack of agreement on that can be worked out between the parties.

I don't believe the Court has the government's witness list, so I want a witness list.  I want an anticipated order of witnesses.  We will have that by Sunday at 5 p.m. as well.

As for the defense, exhibits to be used on the next trial day that are part of the defense's case in chief -- what I mean by that is affirmative evidence that is not going to be used for impeachment purposes -- will be provided to the government, at the latest, at 7 p.m. before the next trial day for any witnesses to be testifying that day and 5 p.m. on Sunday.  Whichever government witnesses are testifying on Monday, if the defense plans to put in affirmative evidence that isn't going to be used for impeachment purposes, that needs to be furnished to the government by 5 p.m. on Sunday so that we can address any objections well in advance.  If there is no proper disclosure, then the exhibits will be precluded.

As for these long text messages, if the defense or the government is planning to use long text messages with any witness, I am telling you to use binders with the witnesses. They can have a binder of those exhibits in front of them so we can avoid some of the time that we have been losing with having

to look at the exhibits on the screen.  It's just hard with the infrastructure that we have, and this is a court problem.  It's hard to just have multiple things on the screen, and our screens are not big enough to see the whole exhibit.  I think it will be helpful to have binders for the witnesses.

Ms. Johnson, maybe you can fill me in.  There have been these instances where we have had some meet-and-confer sessions during cross-examination.  What have those been about?

MS. JOHNSON:  Your Honor, the primary thing they have been about is that the defense last night cut down some of the length of their exhibits, which the government greatly appreciates.

But I think what's been happening and the reason the government has been objecting that this isn't in evidence is it appears that the longer versions are sometimes what's been pulled up.

For that last exhibit, for example, the exhibit we understood was being admitted was the revised version we received of six pages last night.  I'm looking at that version on the iPad.  That text that was shown is not in the version that I see.  That's what we are conferring about.

We just want to make sure that the revised exhibits that we received last night, which were the ones that we thought were being admitted today, are the only exhibits being published to the jury and shown to the witness.

P5GMCOM3                        Ventura - Cross

THE COURT:  Understood.  Thank you.

You have four minutes.

MR. AGNIFILO:  Your Honor, I'm sorry.  If we can have six extra minutes, I think we can probably save 20 minutes.

THE COURT:  OK.  On that representation, I am going to hold you to that.

(Recess)

THE COURT:  Let's have Ms. Ventura back.

Welcome back.

Ms. Geragos, do we have your colleagues?

MS. GERAGOS:  Your Honor, I thought they were coming behind me.

THE COURT:  Let's get our jury.

(Jury present)

THE COURT:  Ms. Estevao, when you're ready.

BY MS. ESTEVAO:

Q.  Ms. Ventura, on direct examination you were shown and asked about Government Exhibit 3A-117.

MS. ESTEVAO:  Can we please pull that up.

Q.  Do you recall this message, dated April 19, 2020, the portion starting from:  I want to talk to you?

A.  2010.

Q.  I want to talk to you about something tomorrow.

A.  Yup.

Q.  Going to sleep.  Love you.

P5GMCOM3                        Ventura - Cross

A.   Right.

Q.   Then Mr. Combs says:  Is it going to stress me out?  What is it about?  Right?

A.   Yup.

Q.   And what do you say?

A.   Freak-off, it can wait.  It's not a big deal.

Q.   And he says:  Now you don't want to do anymore.  LO.  I already know.  You so predictable.  Right?

A.   Yup.

Q.   What do you say?

A.   Really.  OK.  Since that's definitely what it was, we'll leave it at that then since I'm so predictable.  Have a good night.

Q.   And he says:  Whatever baby.  I'm not going to play no games with you.  And you ain't going to keep shutting me down.  Right?

A.   Right.

Q.   You testified on direct that you were going to tell him that you didn't want to do freak-offs anymore, right?

A.   I was going to tell him that, yeah, I didn't love it, yeah.

Q.   But you didn't tell him that because you didn't want him to be upset, right?

A.   I saw his reaction and, yeah.

Q.   You expected that he might react poorly because he would somehow figure out a way to make it happen anyway.  I think

that's what you testified to?

A.  Yup.

MS. ESTEVAO:  For the parties and the witness can we put up Defense Exhibit 1406, please.  We can publish to the jury.

Q.  And this is a message between you and Mr. Combs?  I'll let you take a look at it.

MS. JOHNSON:  Your Honor, I have a hard copy for the witness.

THE COURT:  You may approach.

MS. ESTEVAO:  Can we start, and, baby, we really need.  Yes.  It's near the top of the second page.

Q.  Mr. Combs says to you:  And, baby, we really need to do some soul searching this time.  We gotta figure out a plan to get us back on point.  Think about it.  Right?

A.  I haven't seen this.  Can I just read through it?

Q.  Sure.  Let me know when you are done reading.

Just as a reminder, this is one day before the last exhibit we just looked at, right?  This is April 19.

A.  OK.

Q.  We can go back to 3A-117, if that would be helpful.

A.  No.  It's OK.  I'm just making sure that I understand.

OK.

Q.  Have you reviewed this document before today?

A.  No.

Q.   The government didn't review it with you in preparation for your testimony?

A.   No.  I don't recognize it.

Q.   Going back to some of the documents we reviewed yesterday, did those include some that you had never reviewed with the government before?

A.   I don't really know at this point.

         MS. ESTEVAO:  Let's go to the bottom where -- sorry. Can you scroll down, please.  The and, baby.

Q.   Mr. Combs says:  And, baby, we really need to do some soul searching this time.  We gotta figure out a plan to get us back on point.  Think about it.  Right?

A.   Um-hum.

Q.   And you say:  Definitely.

A.   Yup.

Q.   Keep reading.

         I'll read Mr. Combs.  Mr. Combs says:  What do you feel about where we are at?  Right?

A.   Um-hum.

         You want me to read my part?

Q.   Yes, please.

A.   What do you feel about us.

Q.   He says:  I think it's more than the missing you trick. I'm talking about us.  What do you say?

A.   I know that I'm the happiest when I can feel your love, and

I haven't felt it lately because I know that you don't really want to be around me.  I know that I need to work on being nicer, less moody and more like your woman.  I just think that things haven't been able to turn around because we have haven't given it any time to breathe.  We just keep getting pushed backwards.  I believe that our love has no bounds.  I'm 150 percent sure that you're the man I want to be with, and I want to be that for you too.

Q.  Then he says:  Yeah.  That's prob.  You Donatto.  How much is to be Ruth you.  I think he means with you.  You're insecure and you don't know what it is to take care of me.  I over you so much but.  Right?

A.  Yes.

Q.  You said:  Just know that I love you and that I'm trying. Right?

A.  Yup.

        MS. ESTEVAO:  Can we introduce Defense Exhibit 1405, please.

Q.  This reflects a message between you and Mr. Combs on April 20, 2010, right?

A.  Yup.

Q.  Which is a day later, correct?

A.  Yes.

Q.  And he says:  Call house.  Right?

A.  Yup.

Q.   And you say:  Freak-off with a girl.  Right?

A.   Right.

Q.   And you were suggesting freaking off with a girl on this date, right?

A.   Right.

Q.   He says:  What makes you want to do that.  Right?

A.   Yup.

Q.   And this is after the conversation about getting to a good place.  Right?

A.   Yes.

Q.   That you discussed in your direct testimony, right?

A.   Getting to a place, good place was -- OK.  It wasn't in the last message.

        MS. ESTEVAO:  We can pull up 3A-117, please.

Q.   This is the exhibit that the government showed you on direct, right?

A.   Right.

Q.   And this is the exhibit that you were referencing when you said that you wanted to have that discussion with him, right?

A.   Yup.

Q.   And the date is 4/20/2010, right, and April 19, 2010, correct?

A.   Yup.

        MS. ESTEVAO:  Can we turn back to Defense Exhibit 1405.

P5GMCOM3                    Ventura - Cross

Q. This is the document that you did not review before today, right?

A. Yeah.

Q. You didn't review this with the government, right?

A. I don't remember it, no.

Q. And this is the document where you say -- you're proposing freaking off with a girl, right?

A. Yeah. That's what it says.

Q. When bringing up a freak-off discussion and you tell him that you want to freak off with a girl, that's what you were feeling at the time, right? That's what you were suggesting at the time?

A. That's what I was suggesting, yup.

Q. You testified on your direct examination that around 2018 you found a photo of Mr. Combs with a woman that he had been dating for the last approximate half of your relationship, right?

A. Yup.

Q. And that was Gina, right?

A. Correct.

Q. And you were staying at home with your parents at the time, right?

A. I went back to Connecticut around then, yeah.

Q. And you made the decision when you saw that photo to break up with Mr. Combs, right?

P5GMCOM3                      Ventura - Cross

A.   Yup.

Q.   For the nth time, right?

A.   End for me, yes.

Q.   He didn't make any threats against you at that point, right?

A.   Not to my memory, no.

Q.   In fact, he was suggesting going to marriage counseling -- not marriage counseling; couples counseling, correct?

A.   Maybe.  I don't remember.

Q.   Shortly after that you started dating your now husband, right?

A.   Yeah.

Q.   And you said you couldn't recall exactly when you started seeing him, I believe, right?

A.   It was in 2018.  Yeah.

Q.   And you were breaking up with Mr. Combs over the course of several months, right?

A.   I was breaking up with him -- can you repeat that or reword it.

Q.   When you broke up with him in 2018, it didn't happen on one occasion and then you ceased all contact after that, right?

A.   There is no ceasing of all contact, but it was over when I said it was over, yeah.

Q.   You said to Mr. Combs that the relationship was over many, many, many times in your relationship, right?

A.  Because we were on and off, yeah.

Q.  So there was communication after you said this is over, right?

A.  Yeah, um-hum.

Q.  And you can't pinpoint exactly when that was, the final this is over, right?

A.  I know when mine was.

Q.  You continued to communicate with Mr. Combs regularly after telling him that it was over, right?

A.  Yeah.

        MS. ESTEVAO:  Can we pull up Defense Exhibit 1303. Not for the jury.  Just for the witness and counsel.

Q.  You said yesterday that you saw Mr. Combs in August of 2018 and you were having a closure conversation, right?

A.  Yeah.  We had a dinner.

Q.  And at that time he was trying to convince you to go to Burning Man with him, right?

A.  What I remember, yes.

Q.  Burning Man was something that you went to with him every year typically, right?

A.  Yup.

Q.  And your other friends were planning on going too, right?

A.  I don't know.

Q.  But they typically went?

A.  Yes.

P5GMCOM3                      Ventura - Cross

Q.  You testified that from your perspective at this point you were no longer together, right?

A.  Yes.

Q.  You were seeing your now husband, right?

A.  Yeah.

MS. ESTEVAO:  It looks like you found 1303.  Can we pull that up, please.  Can we jump ahead to the third --

Q.  I'll allow you to review the whole thing first.

A.  Can we go back.

Q.  Are you ready?

A.  Is there another page?

MS. ESTEVAO:  We can go to the next page, just for her to look at.

A.  OK.  The next page.

MS. ESTEVAO:  And the next page.

Can we go halfway down the page here to where it says:  Can I not get a chance.

MS. JOHNSON:  Objection.

MS. ESTEVAO:  I'll move to admit.

THE COURT:  Any objection?

MS. JOHNSON:  Your Honor, in terms of what's being admitted, I want to clarify the length of the exhibit that's being admitted.

THE COURT:  What I'm seeing is a three-page exhibit.  Is that correct, Ms. Estevao?

MS. ESTEVAO:  I'm just moving to admit the first three pages.

THE COURT:  Is there an identifier that we can use?

MS. ESTEVAO:  1303-A, please.

MS. JOHNSON:  No objection.

MS. ESTEVAO:  Excuse me.  The first four pages I would like admitted.

THE COURT:  Any objection?

MS. JOHNSON:  No objection to the first four pages of 1303.

THE COURT:  The first four pages of 1303 will be admitted and the defense will provide an exhibit that we will mark as 1303-A that will reflect those four pages only.  Please proceed.

(Defendant's Exhibit 1303-A received in evidence)

Q.  I'll read Mr. Combs.  Can I not get a chance to make things right.  It seems like you're blaming everything on me.  It's like you have anger to me.  I haven't taken care of you.

Can you read your messages.

A.  I'm not running around telling our business, but my family knows because I need their support right now.  You took care of me materialistically, not where I needed it.

MS. ESTEVAO:  Can we go to the next page.

Q.  Can you keep reading, please.

A.  I have lived in this bubble by myself for too long.  I'm

too dope.  You may not be happy, but maybe it's because you surround yourself with people that always take from you.  I don't need you taking care of Kim, Sarah, and Gina.  I needed to love you and put me first.

MS. ESTEVAO:  Can we go up to page 3, please.  Excuse me.  Page 4.

Q.  Can you read these messages, please.

A.  I just don't trust anymore.  That last shot put the nail in the coffin.  I promised myself I wouldn't be with you anymore if you did that to me again.  You lied to me.  When I think to Burning Man a year ago and all the things I found out that you paid for and continued happening.  I just love myself more. I'm not blaming you.  Maybe I didn't try, but you wanted me to be a machine and forgive you every time.  She never went away.

Q.  When you're talking about the last shot put the nail in the coffin and that she never went away, you're talking about Gina, right?

A.  I would think so.

Q.  And in fact there was a photo of Mr. Combs and Gina that was posted that summer that you saw, right?

A.  Yup.

Q.  That made you believe that they were still together, right?

A.  Um-hum.

Q.  When you say, I promised myself I wouldn't be with you anymore if you did that to me again, you promised yourself that

P5GMCOM3                      Ventura - Cross

you wouldn't allow him to cheat on you anymore and put up with it, right?

A.   Yup.

Q.   And because of this you broke up with him, right?

A.   Yup.

Q.   And again when you say she never went away, you're talking about Gina, right?

A.   Yup.

Q.   They were in a relationship that lasted for years during the course of your relationship with him, right?

A.   To my knowledge, yup.

Q.   You said yesterday that you saw him in August of 2018 and you were having what you called a closure conversation, correct?

A.   Yup.

Q.   And that at the time he was trying to convince you to go to Burning Man with him?

A.   From what I remember, yeah.

Q.   And you said that from your perspective at that time you were not together anymore, right?

A.   Correct.

Q.   And instead you were seeing your now husband, right?

A.   Yup.

Q.   And you said that the dinner that evening -- you had dinner with him that evening, right?

P5GMCOM3                      Ventura - Cross

A.  I did.

Q.  And he was bringing you home afterwards?

A.  There was an evening, yeah.  Sorry.  I wasn't sure -- go ahead.

Q.  And that you went inside your apartment with him?

A.  My house, yeah.

Q.  I'm referring to the instance when you testified on your direct testimony that he followed you into your apartment and that's when he raped you?

A.  He came in, yes.  But it was my house.  It wasn't an apartment.

Q.  Excuse me.  Your house.

    You wrote about this alleged rape in the lawsuit that you filed against him, right?

A.  Yup.

Q.  And in that lawsuit you alleged that the rape took place in September 2018, right?

A.  OK.

Q.  And you said in your lawsuit that you filed that you and Mr. Combs went to a dinner at an Italian restaurant in Malibu, right?

A.  From what I remember, yeah.

Q.  That's what the civil lawsuit says, right?  And you said in that civil lawsuit that he forced himself into your apartment and tried to kiss you, right?

P5GMCOM3                    Ventura - Cross

A.   I don't remember the exact wording, but I could tell you what happened.

Q.   Something to that effect was filed in your federal complaint, right?

A.   Right.

Q.   Is that right?

A.   I don't remember the word forced, but maybe.  I don't know.

Q.   But the general idea that he raped you in September 2018 after an Italian restaurant date in Malibu, right?

A.   Yup.

Q.   And you said in that lawsuit that -- withdrawn.

Do you recall meeting with agents and prosecutors on November 30, 2023?

A.   I could have.  I don't remember the exact date.

Q.   This would be the meeting shortly after the lawsuit that you filed.

A.   OK.

Q.   And do you recall that meeting?

A.   Yes.  But I just don't remember exactly when it was.

Q.   I'm referring to the first meeting that you had with government agents.

A.   OK.

Q.   And it was in New York, right?

A.   Yup.

Q.   And this was approximately two weeks after you filed your

P5GMCOM3                      Ventura - Cross

lawsuit, right?

A.   OK.

Q.   And on that date you told the government that this incident occurred when Mr. Combs returned from Burning Man in September 2018, right?

A.   Yup.

Q.   So you told the government essentially the same thing that was in your civil lawsuit, that it was in September 2018, right?

A.   OK.

Q.   And this time after Burning Man, right, and you said to the government that Mr. Combs was acting very strangely at that dinner, right?

A.   Nice, but strangely, yeah.

Q.   Your testimony is that he was acting strangely?

A.   He was acting strangely, yeah.

Q.   Is your testimony that you told the government that he was acting strangely?

A.   I don't really remember that word.  I don't remember that word.

Q.   That's OK.

     In fact, do you remember that you told them that he seemed anxious?

A.   I don't remember saying that.

     MS. ESTEVAO:  Can we say pull up just for the witness

P5GMCOM3                        Ventura - Cross

3501-007 at page 12.

Q.  I'd like to direct your attention to the paragraph in the middle, the large paragraph in the middle.

A.  Yup.

Q.  Let me know when you are done.

A.  Yup.

Q.  Does this refresh your recollection as to whether or not you told the government agents that Mr. Combs was acting anxious and strangely that evening?

A.  It does sort of.

Q.  Did you tell them that he was acting anxious and strangely?

A.  I believe so, some sort of version of that.

Q.  Thank you.

And you told the prosecutors that you thought his behavior might be attributed to his bipolar disorder, right?

A.  Yeah.

Q.  You also told the prosecutors that you did not think that Mr. Combs was in his right mind because he did not respond when you told him to stop, is that correct?

A.  Yup.

Q.  Do you remember meeting with prosecutors again on April 8, 2025?

A.  Not specifically, but I'm sure I did.

Q.  Going back to your first meeting with them, you told the federal prosecutors, consistent with your lawsuit, that the

rape occurred in September of 2018, right?

A.  Yeah.

Q.  Now, April 8, 2025 you met with the government again, right, so approximately a month ago?

A.  OK.

Q.  There were many meetings in between these two, so we are skipping way ahead.

A.  OK.

Q.  So about a month ago you met with the government again, right?

A.  Sure.

Q.  You spent a lot of time with them preparing your testimony, right?

A.  Preparing, yeah.

Q.  And the prosecutors showed you a text message from August of 2018 for the first time at this meeting, right?

A.  I don't know.  I have seen it on different things, yeah.

        MS. ESTEVAO:  Can we pull up Defense Exhibit 1306, please.

        I believe this is already admitted and can be published.

Q.  Have you seen this message before, Ms. Ventura?

A.  No.  I don't recognize it.

Q.  Can you read it through, please.

A.  OK.

P5GMCOM3                        Ventura - Cross

Q.  So you write to him at the top:  Hit me when you can with a little heart emoji.  Right?

A.  I don't know who the other person is.

MS. ESTEVAO:  Can we back up.

Q.  Do you recognize the number at the top to be Mr. Combs' phone number at the time?

A.  Where it says FB?

Q.  Yes.

A.  I don't know that I knew it by heart.

Q.  What do you understand FB to stand for?

A.  Frank Black.

Q.  Which is a nickname or alias of Mr. Combs?

A.  Yup.

Q.  What about CC?

A.  That would be me.

Q.  Is that a number that you had in August of 2018?

A.  Yup.

Q.  And this message is from August 21, 2018, right?

A.  Yup.

Q.  And you say to him:  Hit me when you can with a heart. Right?

A.  Yup.

Q.  And he respond saying:  OK.  I'm in a investors conference. You good?

A.  Yeah.

P5GMCOM3                        Ventura - Cross

Q.   And he says:  I'm calling.  It's going straight to voice mail.  Proud of you.  Right?

A.   Right.

Q.   Just to scroll up to the top to your message, hit me when you can, and that's a little heart right next to it.  Right?

A.   Right.

MS. ESTEVAO:  Can we go to the next page, please.

Q.   And you say:  Thank you.  What does he say?

A.   I know I look bad to you.  I could tell I didn't turn you on yesterday.  I fell off.  But I'm about to get my shit together.

Q.   After the prosecutors showed you this text message in April of 2025, just a month ago, you then said --

MS. JOHNSON:  Objection.

THE COURT:  Hold on.

Let's have a brief sidebar.

(Continued on next page)

P5GMCOM3                          Ventura - Cross

(At sidebar)

THE COURT:  What are the grounds for the objection?

MS. JOHNSON:  It mischaracterizes her earlier testimony that she did not recall being shown this message by prosecutors.

THE COURT:  I think, Ms. Estevao, you can deal with that objection.  Ask a different question.

MS. ESTEVAO:  Thank you.

THE COURT:  Thank you.

(Continued on next page)

(In open court)

THE COURT:  Ms. Estevao, you may proceed.

MS. ESTEVAO:  Thank you.  Can we pull this back up, the little heart emoji one.

Q.  This message from you to Mr. Combs, dated August 21, 2018, is just the day after the messages we were discussing a moment ago, right?

MS. JOHNSON:  Objection.

THE COURT:  Sustained.  Can you rephrase.

Q.  It was after this meeting that you told the government that you were -- that the date of the alleged rape was in August 2018, right?

MS. JOHNSON:  Objection.

THE COURT:  I think we need some clarity on what you mean by the meeting.  Why don't you take us back a few steps and then proceed.

Q.  At the April 2025 meeting, you told the government that the alleged rape was in August of 2018, right?

A.  Yeah.

MS. ESTEVAO:  Can we pull back up this heart emoji message.

Q.  You saw Mr. Combs the day before this message, right?

A.  I think so.

Q.  And this is the heart emoji that you sent him the day after, right?

A.   Yup.  I think so.  I'm not sure.  What date did we look at before this, the 20th?  I'm sorry.

MS. ESTEVAO:  Can we pull back up.

Q.   You testified on direct that you saw him the following month by choice, right?

A.   Correct.

Q.   And you said you agreed to see him because you had been together for over 10 years, right?

A.   Yeah.  It was a friend's birthday.

Q.   And you testified that you saw him because you couldn't just turn your feelings off just like that, right?

A.   Right.

Q.   And you can't actually just turn your feelings off just like that, right?

A.   Right.

Q.   And you still had feelings for him at that point, right?

A.   There were still feelings there, yeah.

Q.   Whose birthday was this, the event that you saw him?

A.   If I remember correctly, it was Andre Harrell.

Q.   Who you know and Mr. Combs both know, right?

A.   Yeah.

Q.   And at that point, when you saw him and you still had feelings for him, you didn't hate him then, right?

A.   No.

Q.   And this is a month after August 2018, right?

A.   Yup.

Q.   And you don't still hate him now, right?

A.   I don't hate him.

Q.   You don't know, you said?

A.   I said I don't hate him.

Q.   Thank you.

        In fact, you still have love for him?

A.   I have love for the past and what it was.

        MS. ESTEVAO:  Can we pull up Defense Exhibit 1307.
This is not evidence.

Q.   If you could review it, please.

        Do you recognize this to be a communication between
you and Mr. Combs?

A.   It looks like it.  I don't remember it, but yeah.

        THE COURT:  Ms. Estevao, can you make sure you speak
into the microphone.

        MS. ESTEVAO:  Sure.  Sorry.

        Move to admit.

        THE COURT:  Any objection?

        MS. JOHNSON:  I'm sorry, your Honor.  I just want to
see.  Is this just one page?

        THE COURT:  Ms. Estevao, two pages.

        MS. JOHNSON:  I'll need a moment to review the entire
exhibit.

        MS. ESTEVAO:  There is no need to read the fourth

page.  We can submit a --

THE COURT:  Ms. Estevao, was this previously furnished to the government?

MS. ESTEVAO:  I believe so.

MS. JOHNSON:  It was not on the list furnished to us last night.

THE COURT:  Ms. Johnson, let us know when you have finished reviewing.

MS. JOHNSON:  Your Honor, we do object to this, and we may need to be heard at sidebar.

THE COURT:  Briefly, what are the grounds?

MS. JOHNSON:  412.

THE COURT:  Ms. Estevao, can you scroll through these slowly, just for me.

MS. JOHNSON:  It's page 7.

THE COURT:  Let's go to page 7.

MS. ESTEVAO:  We would just move to admit the first four pages to avoid this issue.

THE COURT:  Just the first four pages.

Ms. Johnson, any objection?

MS. JOHNSON:  Your Honor, can you allow me one moment to confer with my team?

THE COURT:  You may.

MS. JOHNSON:  Your Honor, I think we need a sidebar to resolve this issue.

P5GMCOM3                         Ventura - Cross

THE COURT:  Right.  Let's go to sidebar.

(Continued on next page)

(In open court)

THE COURT:  What is the objection of the first four pages?

MS. JOHNSON:  The objection to the first four pages is that if the exhibit is to be admitted, we think the entire exhibit should be admitted instead of just the partial part of the exhibit, and we flagged the 412 issue last night on page 7, and the defense said that they were not going to use it and withdrew the exhibit.

THE COURT:  What is the basis for including the additional pages?

MS. JOHNSON:  I think it's misleading if you don't include the entire exhibit.

THE COURT:  Let me see the 412 message.

Is it very easy to redact that one set?

MS. JOHNSON:  Yes.

THE COURT:  It's going to be admitted, but the jury will not be shown that message.  To the extent the jury wants to review it, it will be only shown to them in redacted form and only used in redacted form.

Is there any issue with that approach at this point to move forward?

MS. JOHNSON:  To move forward that's fine.  We just want to redacted version in evidence at some point today because of cross inquiries about exhibits.

P5GMCOM3                        Ventura - Cross

THE COURT:  Absolutely.  Thank you.

(Continued on next page)

THE COURT:  This is exhibit 1307; is that right?

MS. ESTEVAO:  Yes.

THE COURT:  1307 will be admitted.  Only the first four pages will be shown at this time.

(Defendant's Exhibit 1307 received in evidence)

Q.  If you take a look at the date, this is August 5th, 2018, right?

A.  Yup.

Q.  And so four days after the last text message that we were looking at, right?

A.  Yeah.

Q.  The one with the little heart emoji?

A.  Yes.

Q.  And he writes, Mr. Combs writes, can you call me, please, right?

A.  Yup.

Q.  And you say, I'm sorry, I just wanted to be with you, we're friends, no randoms, that's not my thing, right?

A.  Yup.

Q.  You say, didn't mean to be a bitch, I just feel like we never get the time you ask for, right?

A.  Right.

Q.  He says, cool.

MS. ESTEVAO:  Can we keep going, please.

P5GCcom4                    Ventura - Cross

Q.  And then halfway down the next page, he says, can't wait to see you, I miss you, right?

A.  Yup.

Q.  And he says, just need you to be positive and happy to see me, correct?

A.  Correct.

Q.  You say, I'm on the way, all positive, can't wait to see you, too, right?

A.  Right.

Q.  Going to the next page, he writes, okay -- midway down, he says, okay, five minutes away, right?

A.  Right.

Q.  And we're talking about, he writes that at 5:29 a.m. UTC time, correct?  Or that's what this message reflects?

A.  Right.

Q.  And at 6:53 a.m., you write, I'm so heartbroken, right?

A.  Yup.

        MS. ESTEVAO:  And with respect to all of these timestamps, it's subject to the stipulation about the UTC time.

Q.  And he writes, me, too, have a good night, right?

A.  Right.

Q.  Fair to say this was a big breakup conversation between the two of you, right?

A.  Can you reword that.

Q.  You said you're so heartbroken, right?

A.   Yeah.

Q.   And he says, me, too, right?

A.   Yup.

Q.   And this was four days after the text message that says, I know I look bad to you, I could tell I didn't turn you on yesterday, I fell off, right?

A.   Yup.

Q.   Four days after that, you're so heartbroken?

A.   Yup.

        MS. ESTEVAO:  Can we go to defense exhibit 1309, please, which is in evidence.  Please publish.

Q.   If you could take a look at that, if you haven't already. Tell me when you're ready.

        MS. JOHNSON:  I have a hard copy for the witness, your Honor.

        THE COURT:  You may approach.

Q.   We're going to go through together if you're ready.

A.   Yeah.

Q.   At the top you say -- and this is September 12th, 2018, right?

A.   Yeah.

Q.   You texted him, landed safe, how's yoga treating you.  I'm assuming now it's safe to date.  Let me know.  Right?

A.   Yeah.

Q.   He says, good morning.  I'm confused.  Safe to date, what

P5GCcom4                        Ventura - Cross

are you talking about, right?

A.   Right.

Q.   And just going back, when you say, how is yoga treating you, what are you referring to there?

A.   I don't know.  Yoga, it was yoga.

Q.   You're aware that around that time --

A.   I didn't finish reading the message.  Could I finish reading it?

Q.   Sure.

A.   Okay.

        MS. ESTEVAO:  In fact, if we go to page 4, that might help.

Q.   Does that provide a little extra context?

A.   It does.  Thank you.

        MS. ESTEVAO:  Can we go back to the first page.

Q.   When you're referring to yoga here, what do you think you were referring to at the time?

A.   Well, if we go forward, he had a yoga instructor that I heard about.

Q.   That he was having some sort of romantic relationship with, right?

A.   Yup.

        MS. ESTEVAO:  Can we go up to the top again, please. I'm sorry.  Go down.

Q.   So he says --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

MS. ESTEVAO:  Are we on page 2?

Q.  Mr. Combs says -- and this is still September 12th -- what does yoga have to do with me?  Hit me back, please, babe, right?

A.  Yup.

Q.  And you say, nothing, I hear you're dating.  I didn't know. Right?

A.  Yup.

Q.  And you say, I'm on the beach walking with my dad right now, right?

A.  Right?

Q.  Or maybe you just have been along, right?

A.  Yeah.

Q.  He says, I'm not dating, dating who, I'm not dating, right?

A.  Yup.

MS. ESTEVAO:  Can we scroll down, please.

Q.  And you say, maybe you've been going on dates all along, right?

A.  Yup.

Q.  He says, baby, I'm not dating, lol, and no dates, no dinners, nothing, nobody, right?

A.  Right.

Q.  You say, K.  He says, who do you think I'm dating, right?

A.  Right.

Q.  You say, I don't think I should even be bringing this up to

P5GCcom4                        Ventura - Cross

you, let's just leave it alone, right?

A.   Right.

Q.   You're still talking about dating, right?

          MS. ESTEVAO:   We can go to page 5, please.

Q.   And you say -- what do you say in this first blue bubble?

A.   I actually need to stop even caring.

Q.   And you write that because in September 2018, you still did care about him, correct?

A.   Yeah.

          MS. ESTEVAO:   Can we go to the middle of the next page, please.

Q.   Mr. Combs says, do you want to start dating?  If you are, let's just talk about it, right?

A.   Yeah.

Q.   And in this message, he's asking you to talk about it, and if you were to start dating someone else, right?

A.   I guess so.  I don't --

Q.   You're having a conversation about dating other people, correct?

A.   Yeah.

Q.   And when he says, do you want to start dating, he means, to you, date other people, correct?

A.   I think so.

Q.   Because he's saying, if you are, let's just talk about it, correct?

A.   Yup.

Q.   As in let's have the conversation about whether or not we should just move on and see other people, right?

A.   Right.

Q.   And at the end of the last page, you write, if you're in LA next week, maybe we can talk.  I'm just trying to take care of myself right now, right?

A.   Right.

Q.   And at this point you're in New York for Fashion Week; does that sound right?

A.   I don't -- I don't remember at this point.

Q.   You were out of town during this period of time?

A.   Yeah.  I'm not sure exactly what it was.

        MS. ESTEVAO:  Can we pull up defense exhibit 1313, please.  It's in evidence and you can publish, please.  Thank you.

        MS. JOHNSON:  Your Honor, I have a hard copy for Ms. Ventura.

        THE COURT:  Please approach.

        MS. ESTEVAO:  We're going to start at the end of the third page.  If you want to go to the bottom of the third page, that's where we're going to begin.

Q.   You're ready?

A.   Uh-huh.

        MS. ESTEVAO:  At the end of this page, if we highlight

P5GCcom4                          Ventura - Cross

the bottom.

Q.  Mr. Combs says, I don't want to have a conversation where you break up with me again.  I want you to love me.  I need you to love me, right?

A.  Yup.

Q.  Or I need to love you, rather?

A.  Yes.

        MS. ESTEVAO:  Can we go down to the next page.

Q.  Can you read your response.

A.  I do love you.  I would just prefer not being one of your girlfriends anymore.

Q.  And then halfway down the page, he writes, I need to hold you --

        MS. ESTEVAO:  Of the next page.  Thank you.

A.  I need to hold you, yup.

Q.  And what do you say?

A.  Let's get up tomorrow night.  I'll do studio from like 6:30 until 9:00, 9:30.

Q.  Just to place us in time, this is September 26th, 2018, right?

A.  Yup.

Q.  And he asks, can I hold you or are you just going to break up with me some more, right?

A.  Yup.

        MS. ESTEVAO:  The next page, please.

P5GCcom4                         Ventura - Cross

Q.  You say, we already did that, you're saying tomorrow, right?

A.  Yup.

Q.  He says, is that a yes, that I can hold you, right?

A.  Right.

Q.  And you say, we can embrace lol, right?

A.  Yup.

Q.  He says, lol good to know you still have a sense of humor. I can't wait to see you Cassie, right?

A.  Yup.

Q.  You say, I can't wait to see you, too, correct?

A.  Correct.

Q.  And he says, yay.  And you say, tried to call you back, right?

A.  Right.

          MS. ESTEVAO:  Can we go to the next page, please.

Q.  Here you say, wasn't trying to upset you and I promise I'm not being mean, I'm embracing my sanity.  People have access and just showing up to the house really has me fucked up -- had me fucked up.  We don't even have to talk about it.  That's just what I need right now, right?

A.  Right.

Q.  And he says, if I can't know where you live, that's too far for me.  If you want to be away from me like that, we don't have to deal with each other on any level.  That's too far for

me.  Live your life.  Whatever you need will be done as

promised that's too far, right?

A.  Right.

Q.  And you say, I don't know what to say.  I choose my sanity

over everything.  Today would be the first time we're seeing

each other in person in a long time.  I'm so peaceful right

now, I want to keep it.  I'm finally sleeping well and I gained

weight.  I don't think you understand how those two small

things have made the hugest difference, right?

A.  Mhm.

Q.  And you don't say anything to the effect of, the last time

we saw each other, you raped me, right?

A.  Right.

Q.  And, in fact, you're saying that you want to keep peace,

right?

A.  Yup.

Q.  And he responds, I respect your sanity.  It's best we just

keep it moving.  I'm not a stalker, no beef.  I'm clearer than

ever.  I don't want a link.  Focus on you and your sanity.  I'm

good.  Love.  Right?

A.  Right.

Q.  And you said, was really looking forward to that hug, but

okay, right?

A.  Right.

Q.  And you wanted to hug him at that point, right?

A.   That's what I said.

Q.   And in the next message, you say, I'd just rather talk in person, right?

A.   Uh-huh.

          MS. ESTEVAO:   The next page, please.

Q.   What do you say at the top?

A.   And I know you're not a stalker.  I wish you could just hear me out and be supportive of my growth.  I'm about to call you.  Really need you to answer.  It's important.

Q.   So when you say you'd rather talk in person, you're referring to a closure conversation, right?

A.   Some form of closure, yeah.

Q.   It suggests that it's a closure conversation and you haven't seen each other in some time, right?

A.   Right.

Q.   And then looking at the next page halfway down, you write, I had --

          MS. ESTEVAO:   Can we go to the next page, please, and scroll up.

          Can we pull up defense exhibit 1376.  I don't believe this is in evidence.

          MS. JOHNSON:   It's not, your Honor.  There's a pending objection.

          MS. ESTEVAO:   Yes, understood. Okay.  One moment.

          THE COURT:   Ms. Johnson, what is the objection, just

P5GCcom4                    Ventura - Cross

remind me.

MS. JOHNSON:  412.

THE COURT:  Which page?

MS. JOHNSON:  One moment, please.

Q.  Did you see Mr. Combs again --

MS. ESTEVAO:  You can take it down.  Thank you.

Q.  Did you see Mr. Combs again on September 27th, 2018?

A.  I'm not sure.

Q.  Would it help to see a document that might refresh your recollection?

A.  Sure.

MS. ESTEVAO:  Can you pull up defense exhibit 1376, please.

THE COURT:  Ms. Johnson, do you have a paper copy for the witness?

MS. JOHNSON:  Yes.  May I approach?

THE COURT:  You may.

Q.  And I'll refer you to the second page, halfway down, and just read it to yourself.

A.  Yup.

Q.  Does that refresh your recollection as to whether or not you saw Mr. Combs on September 27th, 2018?

A.  Yup.

MS. ESTEVAO:  You can put the document down.

THE COURT:  And let's take it down from the screen.

P5GCcom4                        Ventura - Cross

Thank you.

Q. And when you saw him that night, did you have sexual intercourse with him?

A. I did.

Q. And that night when you were having intercourse with him, did you receive a FaceTime call?

A. I did.

Q. And did you answer that call?

A. No.

Q. Did you recognize the caller ID to be your now husband?

A. I did.

Q. And Mr. Combs noticed this call, right?

A. Yup.

Q. And he noticed the name that was -- or the alias that was popping up on your phone, right?

A. Yup.

Q. And this was in the middle of your evening with Mr. Combs?

A. Correct.

Q. During which you were having sexual intercourse, right?

A. Yeah.

Q. Was it actually in the middle of sexual intercourse that you received this call?

A. We were together.  I don't know if it was actually in the middle.

Q. After that evening with Mr. Combs, you told him that you

P5GCcom4                          Ventura - Cross

had a great night with him, right?

A.   Right.

Q.   Yes, you did?

A.   Uh-huh.

Q.   Yes.

     And your now husband didn't know that you were with Mr. Combs at the time, correct?

A.   I don't know what he knew.  At that point, I don't know.

Q.   You were seeing him at the time, right?

A.   Yes.

Q.   At the time that you had this evening with Mr. Combs?

A.   Yes.

Q.   After this incident, your now husband discovered -- at a certain point, your now husband discovered you had spent the evening with Mr. Combs, correct?

          MS. JOHNSON:  Objection.

          THE COURT:  It's overruled.

Q.   At a certain point after this incident, your husband learned about your evening with Mr. Combs, right?

A.   At a point, but I don't -- I don't know.

Q.   You didn't answer his FaceTime call that evening, right?

A.   I did not.

Q.   Did he find out after that evening that you didn't answer his FaceTime call because you were with Mr. Combs?

          MS. JOHNSON:  Objection.

P5GCcom4                      Ventura - Cross

THE COURT:  Ms. Estevao, you need to rephrase these questions.

Q.  You told your now husband that Mr. Combs raped you, didn't you?

A.  I did.

Q.  That evening, right?

A.  That evening?

Q.  In September.

A.  No, that wasn't the evening when I was raped.

Q.  Your husband punched a wall at a certain point, right?

A.  He did.

Q.  When he learned that you were still having intercourse with Mr. Combs, right?

MS. JOHNSON:  Objection.

MS. ESTEVAO:  Withdrawn.

Q.  When you informed him that Mr. Combs raped you, correct?

A.  Yes.  I think.  I don't remember exactly when that was.

Q.  Your husband learned of your sexual intercourse with Mr. Combs, right?

A.  Right.

Q.  And you told him that Mr. Combs raped you, right?

A.  Right.

Q.  And when your now husband learned about in, he punched a wall, right?

A.  I believe so.

Q.  And you testified on your direct examination that this was at a friend's -- withdrawn.

You kept corresponding with Mr. Combs after you saw him that evening in September, right?

A.  After that evening in September, I believe so.

Q.  Yes.

A.  Yeah.

MS. ESTEVAO:  Can we bring up defense exhibit 1320, please.

Q.  At the top, this is October 5th, 2018, right?

A.  Yup.

Q.  Which is shortly after the late September messages we were just looking at, right?  Excuse me.  We were just referring to a late September night that you were having sexual intercourse with Mr. Combs, correct?

A.  Yeah, okay.

Q.  And Mr. Combs writes, Imma just fall back, you call me when you need me, right?

A.  Yup.

Q.  And you responded, to be honest, I'm not sure how to even handle things to get my life to a comfortable place, right?

A.  Right.

Q.  I know that you don't want to hurt me anymore, I miss you, I feel lost without you, I'm heartbroken, I don't trust anymore, I'm sad, right?

P5GCcom4                          Ventura - Cross

A.   Right.

Q.   And after your breakup, you're telling him that you feel lost without him, right?

A.   Yup.

Q.   And after your dinner in September, you don't see him for a number of weeks, correct?

A.   Correct.

Q.   And that's because you had broken up with him, right?

A.   Yeah.

Q.   A month after this on November 15th, 2018, Kim Porter passed away unexpectedly; isn't that right?

A.   Yup, it is.

Q.   And you went to the memorial service for Ms. Porter, correct?

A.   Yup, I went.

Q.   The one that Mr. Combs held at his home, right?

A.   I wasn't at his home, no.

Q.   Oh, in Georgia, you flew to Georgia for Ms. Porter's memorial service, correct?

A.   Correct.

        MS. ESTEVAO:  Can we pull up defense exhibit 1334, please.

Q.   Do you need a minute to review this?

A.   Yes, please.

Q.   Sure.

MS. ESTEVAO:  It's in evidence and can be published. Thank you.

MS. JOHNSON:  And I can bring over a hard copy.

THE COURT:  Thank you.

Q.  So, in this message, Mr. Combs says, you just left me, you not picking up, right?

A.  Right.

Q.  And this is on November 19th, 2018, correct?

A.  Correct.

Q.  Just following Ms. Porter's memorial service, right?

A.  Right.

Q.  Can you read your messages back, please.

A.  I didn't just leave you, I said goodbye a few times.  I want to be there for you, but needed to get to grandma.  My flight was delayed, so I'm taking off now.  I need to be real with you.  I know how crazy and painful this all is.  And you want my support, but you've compared me to Gina the other day and the babysitter was there last night and you posted that Kim was your soulmate.  What was the 11 years all about?  11 consistent years.  I know you're going through a lot, but that hurt my feelings.  I love you, but I'm going to my family right now.  I'll probably make it Saturday with my dad.  I'll hit KK. Hit me if you need me.  Love you.

Q.  Gina in that sentence is the Gina we were talking about before?

P5GCcom4                          Ventura - Cross

A.   Yeah.

Q.   The same woman Mr. Combs had been seeing for a number of years during the course of your relationship?

A.   Yes.

Q.   And the babysitter here is referring to someone named Nikki, right?

A.   I think so.  I'm not really sure.

Q.   The babysitter that you're referring to is someone that you suspected Mr. Combs was also seeing, right?

A.   I think so, yeah.

Q.   Or having some sexual affair?

A.   It's a vague memory, yeah.

Q.   And fair to say that you had suspicion that he was seeing this babysitter based on this message, right?

A.   I don't even remember talking about the babysitter to be honest, but yeah, okay.

Q.   And so your feelings are hurt following this memorial service, correct?

A.   Yeah.  Yup.

Q.   You write, you posted that Kim was your soulmate.  What was the 11 years all about.  That refers to him saying after Kim's death that Kim was his soulmate, right?

A.   Yup.

Q.   And that was extraordinarily hurtful, right?

A.   Yeah, at that time, yeah.

P5GCcom4                          Ventura - Cross

Q.   Because you'd been with him for 11 years, right?

A.   Mhm.

Q.   And he was saying that Kim was his soulmate, not you, right?

A.   Yes.

Q.   And so after this message, you went to Ms. Porter's funeral, right?

A.   After this message?

Q.   After the memorial service, was there a funeral service?

A.   I'm sorry.  I was just confused was this message before or after the service.

Q.   Do you recall if it's before or after the memorial service?

A.   I don't remember the day of the service.

Q.   At the top, he says, you just left me.  Did you leave the memorial service?

A.   I did leave the memorial service, but there were other places I left him.

Q.   I'm not trying to put words in your mouth.

A.   I know.  I'm just trying to clarify, even for myself.

Q.   And after that memorial service, you never saw him again after that, right?

A.   I didn't see him again after that, no.

Q.   And you testified that he tried to get in touch with you in various ways after that point, right?

A.   Right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5GCcom4                    Ventura - Cross

Q.   In fact, through some other people, correct?

A.   Yup.

Q.   Including Lauren London?

A.   Yup.

Q.   And your friend, Diontae Nash?

A.   Correct.

Q.   But you rebuffed those attempts to contact you, right?

A.   Yeah.  These were later on, yeah.

Q.   And you never saw him again, right?

A.   I did not.

Q.   And he let you go, right?  You never saw him again, right?

A.   I didn't see him again.  I don't know about letting me go. That's different.

Q.   You never saw him again?

A.   Yup.

Q.   And you got married, right?

A.   I did.

Q.   To the love of your life, right?

A.   Correct.

Q.   And over the years, has Mr. Combs reached out to you?

A.   Yup.

Q.   I'm sorry.  What was that?

A.   Yeah, yes.

          MS. ESTEVAO:  Can we pull up defense exhibit 1409.

          THE COURT:  Ms. Estevao, if this is a good place, why

P5GCcom4                        Ventura - Cross

don't we take our lunch break.

MS. ESTEVAO:  This is my last exhibit and -- okay. Ms. Geragos is telling me that we can take a break at this point and return to it.

THE COURT:  Thank you, members of the jury, for your attention this morning.  We'll come back at 1:10.

All rise.

(Continued on next page)

(Jury not present)

THE COURT:  All right.  1:00 and no discussions with the government.

THE WITNESS:  Thank you.

(Witness not present)

THE COURT:  Ms. Estevao, are you still planning to use exhibit 1373?

MS. ESTEVAO:  I'm sorry.  I missed that, your Honor.

THE COURT:  Exhibit 1373, the one with the very long message that there was a dispute about, but there were going to be redactions to see if it would address the government's objection.

MS. ESTEVAO:  Yes, we would still --

THE COURT:  Do we have the redaction ready?

MS. GERAGOS:  You're talking about 1373, right, your Honor?

THE COURT:  Yes, 1373.

MS. GERAGOS:  We are still planning on using that.  If we can discuss appropriate redactions, we have several to discuss with the government over the break.  I also sent the proposed 412 redactions to chambers, copying the government. If those are acceptable to the Court, we would admit those after the break.

THE COURT:  If there's no objection, they will be acceptable.  If there is an objection, then we'll address the

objection.

MS. JOHNSON:  Just with respect to the materials that were just submitted, we need to consult with Ms. Ventura's counsel, as well.

THE COURT:  Understood.

MS. GERAGOS:  I think those are the ones that we conferred about with them.  They responded multiple times.

THE COURT:  You will work it out.  I will be here at 1:00.  I could be here for the entirety of the lunch break, but I will be back at 1:00.  I really thought that we could have a couple minutes here because I know that everyone needs to take a little break and then come back.  What other issues are there?  We have 1373, we have the 412 issue, which maybe is not an issue.  Any other issues?

MS. JOHNSON:  I think we just need to confer with defense on those issues.  I just wanted to note two other administrative issues that we anticipate this afternoon.

As Ms. Geragos flagged during the government's direct examination, we have additional documents to admit on redirect because we were still conferring on 106 issues, so we plan to do that when redirect occurs.  Based on the cross-examination that occurred today, we anticipate marking one additional exhibit, which we'll share with defense as soon as possible.

THE COURT:  Ms. Estevao, how are we looking on time?  It looks like we resolved most of the evidentiary issues.

P5GCcom4                           Ventura - Cross

MS. ESTEVAO:  Yes.  Given the exhibits that were admitted on mass, which are consistent with a number of themes that I already covered yesterday and I don't believe we need to go through each of them, I think we are going to end sooner than expected.

THE COURT:  Very good.  I'll be here at 1:00, so if we need to address anything, we can do it and get the jury back.

(Luncheon recess)

(Continued on next page)

P5GMCOM5

                         AFTERNOON SESSION

                            1:00 p.m.

          THE COURT:  Ms. Geragos, can you round up everybody,
or Mr. Steel.  Anyone.

          MS. GERAGOS:  I will do my best.

          THE COURT:  Ms. Slavik, have we actually worked out
anything?

          MS. SLAVIK:  Yes, your Honor, we actually have.

          THE COURT:  Ms. Geragos, maybe we can start with 1373.

          MS. GERAGOS:  In reading it more and more this
morning, I think one of Ms. Johnson's concerns with it this
morning was that she thought that it was talking about
ketamine.  And after reading it again, that is not what I
understand this text message to mean.  I think she is talking
about --

          THE COURT:  I understand.  Yes.

          MS. GERAGOS:  I think that lends more credence to my
argument, which is a state of mind.  This should come in under
state of mind.  It's about Kerry, not about ketamine.  We still
think it's appropriate for this entire message to come in.

          MS. JOHNSON:  Your Honor, I think we will still have
that same issue with the intermixed factual assertions with
phrases like, if it's OK, I'd like to reconnect.  But the
paragraph above seems --

          THE COURT:  Above what?

P5GMCOM5

MS. JOHNSON:  The second full paragraph seems to have a fair amount of like, I've been trying to deal with this case shit.  Even if this is Kerry, I don't think that goes to her state of mind.

This is also at least six full paragraphs.  I am not sure what state of mind this is being offered for.

MS. GERAGOS:  Ms. Ventura's.

THE COURT:  There are portions of this message that are properly admissible under 803(3).  But as the government points out, there are portions of this message that do not go to any of the permissible purposes in that rule.  This needs to be redacted if it's going to be admitted into evidence, which -- let me put it this way.  If redactions are done, if the only remaining objection was on relevance or any 403 issue, I would overrule that objection.

So that being said, if you can redact this message to remove the content that does not come in under 803(3), then it would be admissible.  But the entire paragraph-long, multi-paragraph message has material that would not be admissible under that rule, and I'm not hearing any other basis for admission.  To give just some example --

MS. GERAGOS:  That's what I was just going to ask.  If you can just tell me what your Honor is ruling as not state of mind, I will redact it right now and make this very easy.

THE COURT:  It's not the Court's job to go through

P5GMCOM5

this sentence by sentence, but I'll give you some examples. For instance, in the fifth paragraph, I've been getting my life together, that's an example of something -- that's not going to the declarant's state of mind. It's talking about what she is in fact doing.

MS. GERAGOS: That's fine with us. There are several of the exhibits, frankly, that say that. I think what we would -- understanding what your Honor is saying --

THE COURT: They might be light redactions and can -- you might be able to do it right now.

MS. GERAGOS: I will do it right now, your Honor.

THE COURT: Look through it. You have got to think, is this content that is going to historical events that happened, what the declarant is doing, things of that nature, which would be hearsay and would not fall into an exception, or are they the kinds of messages that there have been no objection to that go to state of mind and feeling and the things that are covered by 803(3).

I hear you that most of this is probably admissible under 803(3) and it may take light redactions. As it's stated, it is mixed in with a lot of other material. If it was going to come in in this form, then I would give the jury a limiting instruction as to the purposes for which they should consider this message.

You have two routes. You can either redact this maybe

P5GMCOM5

lightly to remove the material that is factual in nature and not talking about emotional state of mind, or I can give the jury a limiting instruction before this is introduced.

MS. GERAGOS:  Could we do the limiting instruction, your Honor.

THE COURT:  We can do a limiting instruction.  So there should not be questions, for instance, about when you said, I've been getting my life together, what did you mean by that.  Right.  Because that would be probing into the actual substance of the statements.  If you're actually trying to admit this, you understand --

MS. GERAGOS:  I understand.  Can I take it the other way and ask your Honor, can there be questions about paragraph -- the paragraph number 2 and paragraph number 3, which I believe -- for example, I want nothing more than for us to be good.  It just felt like I can't do things I've ever done before because of my weakness for you.

THE COURT:  That's fine.

MS. GERAGOS:  In the past you haven't respected me and things haven't changed.  Real talk.  That's my heart.  But at the same time, you are my heart.

THE COURT:  That's fine.

MS. GERAGOS:  I've been trying to deal with this case shit, which is being really uncool.  I think that goes to her testimony about Kerry and this situation that happened with

P5GMCOM5

Kerry, who I expect to take the stand very soon.  And I'm feeling betrayed in a lot of directions, been trying to handle how I feel about you and all of the hopes I did have for us.

Is that fine under --

THE COURT:  Let me ask a different question.  What is it that you're planning to do with this exhibit?  Because as a redacted exhibit I've already told you what my ruling would be so you could get it into evidence.  But what are you planning to actually do with this message?  It's unclear to me.

MS. GERAGOS:  Your Honor, we will just -- to make this much easier and quicker, because we are under a time crunch, we will just submit a redacted version.  We don't have to ask about it today.  Then we can admit it and it's in evidence.

THE COURT:  I'm not telling you what to do.  I'm trying to understand.

MS. GERAGOS:  I'm just asking if that's a pathway forward so that we can get this witness on and off the stand.

THE COURT:  If you choose to do that, this is an acceptable way to proceed.

I think the government would agree, yes, Ms. Johnson?

MS. JOHNSON:  Yes.  Except I do note that it's the government's position that I've been trying to deal with this case shit should be redacted.  That's not a state of mind but rather something factual.

THE COURT:  Ms. Geragos, it's your case to try, so if

P5GMCOM5

you want to ask questions about this message, you're free to do so with a limiting instruction, and you may draw objections from the government as to questions that go to material that is outside of scope bounds.

What I'm hearing you say is you're comfortable putting in a redacted version of this message, and Ms. Johnson has indicated that at least one of the things that she believes would not fall into the exception, and I tend to agree with her, is the statement about dealing with this case shit. So you understand that.

Those are the two things you can do. You can also use this to refresh the witness' recollection and then just ask her questions, which is another thing that you can do. I'll leave it up to you to decide. Really, I won't leave it up to you. I'll leave it up to Ms. Estevao.

MS. ESTEVAO: I've already indicated I did not need to cross-examine on this.

MS. GERAGOS: Has the Court had an opportunity to look at the 412 redactions?

THE COURT: They are agreed upon, right?

MS. GERAGOS: They are agreed upon with the government, yes.

MS. SLAVIK: Your Honor, just to add to the 412 pile, the government, defense, and counsel for Ms. Ventura have conferred and defense proposed a redaction to 1307. I believe

P5GMCOM5

the witness was shown the first four pages of that.  The redactions are acceptable to all parties.  I think that has been admitted and we will just make sure --

MS. GERAGOS:  It has not been.  We will offer the redacted versions when the witness takes the stand.

THE COURT:  Understood.

MS. GERAGOS:  I'm sorry.

THE COURT:  1307 was admitted in full.  The first four pages were shown to the jury.

MS. GERAGOS:  Yes.

THE COURT:  So there is nothing to be done there.  The version of 1307 that is in evidence will have the redaction that the parties have agreed on.  That's out of the way.  Then we have the other exhibits.  I'm hearing no objection from anyone.  So since there is no objection, then those can come in in the redacted form that the parties have agreed on.

MS. GERAGOS:  OK.

THE COURT:  Anything further?

MS. GERAGOS:  We just have one more.

MS. SLAVIK:  One more.  That's Defense Exhibit 1016. The version that was sent to the government is 12 pages. Defense just handed over a one-page version.  The government would insist on the entire 12 pages coming in, if any of it is to come in.

MS. GERAGOS:  That's fine with us, your Honor.  We

P5GMCOM5

were just trying to shorten things.  We will do the full exhibit.

MS. SLAVIK:  There will be no objection.

THE COURT:  We are clearing out objections.

MS. GERAGOS:  We have the other one.

THE COURT:  Ms. Estevao, I'm sorry.  You weren't here when we started.  I should have been directing the questions to you.

MS. ESTEVAO:  That's fine.  Ms. Geragos is the master of evidence around here.

THE COURT:  Again, your choice how you use 1373.  I laid out some options.  But it is up to you how to do it.  My understanding is, based on what we have discussed, you're electing to do some redactions and, assuming there is no objection on hearsay grounds, that can be put into evidence.

MS. ESTEVAO:  Wonderful.  Thank you.

Just as an update, I'm expecting to finish much sooner than I earlier indicated, just so the government knows that they should plan to redirect probably before the next break.

THE COURT:  Good.  Then we will have our next witness.

MS. GERAGOS:  The only thing we wanted to flag for your Honor is, I don't expect that we will go through, given the time constraints, and we heard your Honor loud and clear yesterday, the videos with Ms. Ventura, the BX series.  But we would ask that we be allowed instead to do that through the

P5GMCOM5

government's video expert that they are going to call, just so that we could speed things up to make sure she is off the stand today.  We would just propose that we be able to do that through the expert who enhanced them.

THE COURT:  Is there an objection to that?

MS. JOHNSON:  No, I don't think so.  We can certainly play them through him because he modified the videos to enhance their quality of audio and visual quality.  But he certainly just can't comment on anything that's occurring in the videos because he's not a participant.

THE COURT:  I am not hearing any objection or disagreement.  So, again --

MS. GERAGOS:  I'm just putting it on the record.

THE COURT:  Each side is fully allowed to try the case the way they are going to try the case.

MS. GERAGOS:  Absolutely.

The only reason I put it on the record is because Mr. Agnifilo had said that the cross of him would be 10 minutes. It will be a little bit longer now.

THE COURT:  Understood.

MR. AGNIFILO:  I appreciate that.

THE COURT:  That is fine.

MS. GERAGOS:  We have one last exhibit, and then I think --

MS. SLAVIK:  I think everything else is resolved.

MR. AGNIFILO:  Can I speak with the government for two minutes?  One minute.

MS. SLAVIK:  Your Honor, I think we can address issues.

THE COURT:  Hold on, everybody.  What's the remaining objection?

MS. SLAVIK:  There is disagreement about Government Exhibit B-426.  We can pull that up on the screen, if that's helpful.

Can you go to page 2.  Maybe put 2 and 3 up together.

Your Honor, this is a May 2017 exchange between Ms. Ventura and the defendant.  It's clearly a very short exchange. I think the nature of the defense objection is with respect to the first message.

MS. GERAGOS:  That's correct, under 403.  We have a 403 objection to this message, to the first part of the message.

THE COURT:  This is the message, I want to be with you, etc.?

MS. GERAGOS:  Correct.

THE COURT:  Which part of the message is there an objection to?

MS. GERAGOS:  The problem that we have with it is, I can't get pregnant is the problem we have with that portion of the message.  It implies -- I would feel comfortable if we did

P5GMCOM5

this at a sealed sidebar, your Honor, I think to protect --

THE COURT:  This is going to come up in redirect, if ever?

MS. GERAGOS:  This was an exhibit that we had agreed we would keep conferring about.  So to come up -- we agreed they could put it up in redirect even though it wouldn't be -- it would be beyond the scope, probably, but that they could --

THE COURT:  First of all, there is a side conversation that's happening while we are trying to resolve this.

Second, because this is happening in real time and hasn't been discussed in advance, there is a conversation happening while we are trying to resolve this.

Please, we have to have one person speaking at a given time.

Now, Ms. Geragos, is this coming in in your cross-examination?

MS. GERAGOS:  No.

MS. SLAVIK:  Your Honor, the exhibit is -- we intend to move for its admission in redirect.  To be clear, we do not intend to show this message to the witness.  We are simply seeking its admission.

THE COURT:  Is there an objection to that message going into evidence so that it can be reviewed by the jury when they are deliberating?

MS. GERAGOS:  Yes.

P5GMCOM5

THE COURT:  What is the basis for admission of the message from Ms. Ventura?

MS. SLAVIK:  Prior consistent statement, your Honor.

THE COURT:  In what way has that issue been -- has Ms. Ventura's credibility as to the portion of the message at issue been attacked, directly or indirectly?

MS. SLAVIK:  Your Honor, the cross-examination, particularly yesterday, focused extensively on Ms. Ventura's interest and desire to be more a part of the defendant's life, her consternation and regret at not spending time with him and his family at Christmas, her interest in being more serious in their relationship, her interest in being monogamous with the defendant, things of this nature.  And I think this message shows that she is thinking about the future but has this very specific concern about the physical abuse and the violence and how that would affect her future with the defendant.

MS. GERAGOS:  I really want to respond to that point, but I ask that I be able to do it the way we have been handling these specific types of issues thus far, under a protective order at a sealed sidebar, to explain to your Honor why I think that this is a 403 objection and should have been briefed when we were briefing that medical issue.

THE COURT:  Just to be clear, the objection is to the entire message, everything after, I want to be with you.  Right?

P5GMCOM5

MS. GERAGOS:  Yes.  We understand that drag down the hall would be admissible.

THE COURT:  I'm not understanding the prior consistent statement issue.  I am not understanding how this comes into evidence.

One last word on this, Ms. Slavik, and then we can pick it up.  It's not going to come in during cross-examination.

You only have an objection to five words of this.  As to that issue, I have not heard anything relating to that topic in this cross-examination or in opening statements.

MS. SLAVIK:  Your Honor, for the reasons I just mentioned, our position is that it is a prior consistent statement.

But, in addition, I think that this is a state of mind.  This statement gets directly at what she is thinking and how she is feeling.  And for the reasons that several messages throughout the course of direct and cross-examination have come in for state of mind, I think that this can come in under those grounds as well.

THE COURT:  That is not state of mind.  The objection is sustained as to this message, but I don't know how -- the objection is sustained as to that portion of the message.  So if you want to introduce it, you're going to have to redact this message.

P5GMCOM5

MS. GERAGOS:  I think we can solve the problem, your Honor, by redacting pregnant and just redacting that.  It still gets what the government needs.

MS. SLAVIK:  We are fine with that, your Honor.

THE COURT:  That is resolved.

Let's have Ms. Ventura back.

(Continued on next page)

P5GMCOM5                         Ventura - Cross

THE COURT:  Welcome back.

THE WITNESS:  Thank you.

(Jury present)

THE COURT:  Ms. Ventura, you understand you're still under oath?

THE WITNESS:  Yes.

THE COURT:  Ms. Estevao.

BY MS. ESTEVAO:

Q.  Good afternoon, Ms. Ventura.  We are almost finished here.

A.  Thank you.

MS. ESTEVAO:  Could we please pull up Defense Exhibit 1409, which is in evidence.

Q.  We are going to go through this one in full, but feel free to read through the whole thing first.

A.  OK.

There isn't a hard copy?

Q.  I can give you my hard copy.

A.  Sorry.

Q.  Ready?

A.  Yes.

MS. ESTEVAO:  Could we please go to the next page, Andy, and start at the top.

Q.  If you wouldn't mind, if you could read yours, and I will be Mr. Combs.

A.  This is a different one from this.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5GMCOM5                    Ventura - Cross

THE COURT:  Ms. Estevao, how many pages is this exhibit?

MS. GERAGOS:  I believe it's my nine pages.

A.  This isn't like --

MS. ESTEVAO:  May I approach?

THE COURT:  You may approach.

Q.  You can use the screen.  It's six pages.

THE COURT:  Let's use the screen.

We have Exhibit 1409.  So Ms. Ventura, take a look at the messages.

THE WITNESS:  Yup.

A.  You can go to the next page.  Next page.

MS. JOHNSON:  I'm sorry to object, your Honor, but --

MS. GERAGOS:  Could we take this down off the screen.

MS. JOHNSON:  I am not sure it was on the screen.

MS. ESTEVAO:  It was an incorrect exhibit that was being brought up on the screen.

We can return to this.

I'll turn to a different subject.

Thank you so much.  Perfect.  Thank you.

Do you mind pulling up the first four messages.

Q.  If you can read this, Ms. Ventura.  Do you mind --

A.  This is the same as what you handed me, so I saw this.

Q.  This is the one that I intended.  I apologize about that. This is my fault.

A.   No worries.

Q.   These green messages are from Mr. Combs, and I will read the ones from Mr. Combs.

A.   OK.

Q.   Checking on you, seeing how you're doing.  Hope you're well.  Just sending you love.  Have a great weekend.

     This was sent on March 22, 2019?

A.   Yeah.

Q.   And then on May 14, 2019 he said:  Sending you love and light.  Hope you're well.

A.   Yes.

     MS. ESTEVAO:  Can we keep going.  There is a message at the bottom.

Q.   Congratulations, Cas.  I truly am happy for you.  You are gonna make a beautiful mother.  God bless.

     MS. ESTEVAO:  Can we go to the next page.  Thank you.

Q.   Did I read that earlier page correctly, Ms. Ventura?

A.   Yes.

Q.   Thank you.

     Can you continue.

A.   I said:  Thank you.  God bless.

Q.   Mr. Combs said:  Sending you love and light.  Hope all is well.  Had a dream about you last night.  Shaking my head.  What a difference a year makes.  Really happy for you.  Have a blessed day.  Just sending love.  That's it.  Right?

A.   Right.

Q.   And at this point had you had your first baby?

A.   No, not yet.  I was pregnant.

Q.   I'm skipping ahead.

A.   That's OK.  Just a few months.  I had her in December.

Q.   I see.

         Then he says:  Congratulations.  I know you're so
happy.  I'm happy for you.  God bless.  You deserve it.  Love.

         This was on December 6, 2019.

         Then, on March 7, 2020, he said:  Miss my best friend.
Hope you are well.  Frankie is so beautiful.  Love.  Did I read
that right?

A.   Yes.

         MS. ESTEVAO:  Can we go to the next page, please.

Q.   Can you read that?

A.   Miss you too and thank you.  Hope you're taking care of
yourself and that the family is well too.

Q.   That was on March 7, 2020?

A.   Yup.

Q.   Mr. Combs said:  Thank you so much for responding.  It
really means a lot.  More than you know.  I'm so happy for you.
The kids are good.  Mom is good.  I hope your family is well
also.  I miss all you guys.  Sending you nothing but love and
light always.  Please know I'm always here if you need me.

A.   Same.  Been reflecting a lot, like a lot.  The turns of

P5GMCOM5                          Ventura - Cross

life are so crazy, but I'm happy everyone is good.  Please send my love to them.  And if I can express anything, take care of you.

Q.  Mr. Combs says:  I'm trying.  Just had another operation.  This is gonna be my last one.  LOL.  Shit has definitely been rough without your friendship.  I pray for a day that I can sit down with you and let you know all the things that I've reflected on.  You were there for me throughout everything.  You were my ride or die, and I've got nothing but love for you always.  My heart is filled with joy to know that you don't hate me.  And I hope you're taking care of you also.  I thank God for the time that we had together.  And you're one of the greatest women in the world and don't ever forget that.  Love.

Ms. Ventura, you were also friends with Mr. Combs throughout your relationship, right?

A.  Right.

Q.  You didn't only consider yourselves romantic partners, correct?

A.  Correct.

MS. ESTEVAO:  Can we go to the next page.

Q.  Can you read from the top as soon as it's blown up.

A.  Sorry.  I needed a second to gather my thoughts.  The things you said blew my mind a bit.  First, I don't hate you. I never have.  I wouldn't be at this beautiful point in my life without having been with you.  I definitely think of the same

P5GMCOM5                        Ventura - Cross

day to sit down and just talk because I know that we need closure and understanding.

Q.   Mr. Combs sends a tear-faced emoji in response to that.

Can we go back up to the message that you sent.  When you said, I needed a second to gather my thoughts, right, because you took some amount of time to respond to him, right?

A.   Yeah.

Q.   And what did you mean when you said the things you said blew my mind a bit?

A.   Can we go back to his message?

Q.   Sure.

A.   I think those were honestly, probably, all the things I wanted to hear for a long time that I never did.

Q.   Him telling you that you were his ride or die always?

A.   Just being -- yeah, it being recognized.

Q.   As the greatest woman in the world, right?

A.   Not that part.  Just the message in general.  It was nice.

Q.   That it was filled with love and affection?

A.   Yes.

Q.   In other messages that he sent you throughout your relationship he would say that he loved you, but how is this message different in that respect?

A.   I think when you reflect on things, you just get a clearer picture, and I understood that that's how he really felt.

Q.   You appreciated that this was a heartfelt message to you?

A.   Sure.

Q.   And it was what you had been craving for a long time to hear from him, right?

A.   Before this.  I don't think I was craving it then.

Q.   You had wanted it previously.

A.   In the relationship.

Q.   Yes.

A.   Yup.

          MS. ESTEVAO:  Can we go back to your response to this.

Q.   When you said, the things you said blew my mind a bit, that's you reacting to his message?

A.   Um-hum.

Q.   Are you expressing surprise?

A.   Unexpected, yeah.

Q.   And then you say:  First, I don't hate you.  I never have.  Right?

A.   Right.

Q.   Were you afraid that he thought that you hated him?

A.   I don't know.  I said that.  I don't know.

Q.   You said:  I wouldn't be at this beautiful point in my life without having been with you.  Right?

A.   Yup.

Q.   Because he shaped you in many ways after 11 years, right?  You shaped each other.

A.   Yeah.  That's fair.

Q.   You said:  I definitely think of the same day to sit down and just talk because I know that we need closure and understanding, right?

A.   Um-hum.

Q.   And after you sent this message you didn't get that chance to sit down and talk and get closure, right?

A.   No.

     MS. ESTEVAO:  Can we go to the bottom message, please.

Q.   Mr. Combs says:  Tears of joy.  I don't even know what to say.  But I'll always love you.  And one day I hope you can forgive me.  I pray for the day we can have closure, but most importantly talk.  We're honestly lucky to be alive.  We went hard.  God was really watching over us.  You deserve the world.  And I'm happy you found someone that loves you the way you deserve to be loved and respected.  Please let me know when is a good time to get together, and I'll make myself available.  Tell moms and pops I said hi.  Please know I send this message with all respect for your marriage.  Be well and never forget who you are.  Love.  Right?

A.   Right.

Q.   You said:  We are honestly lucky to be alive.  Right?  What did you take that to mean?

A.   We partied quite a bit.

Q.   Too much and many times, right?

A.   Yeah.

P5GMCOM5                        Ventura - Cross

Q.   Thank you.

          MS. ESTEVAO:   We can take that down.

Q.   You never had an opportunity to have that sitdown and have closure, right?

A.   Correct.

Q.   And you moved on with your life and continued with your marriage and you had another child, right?

A.   Yup.

Q.   And you were still struggling with addiction issues, as you described on your direct testimony, right?

A.   Yes.

Q.   But then were ultimately able to receive a lot of trauma treatment at the Willow House?

A.   Yeah, amongst other things, yeah.

Q.   And were successfully able to kick your opiate addiction, right?

A.   Yeah.

Q.   And have been maintaining sobriety since then.

A.   Yeah.

Q.   Turning to after you left Willow House the summer and fall of 2023 before your lawsuit in November --

A.   Yeah.

Q.   -- in or around October of 2023, you and your husband moved into your parents' house in Connecticut, right?

A.   I think it was October.  We left LA.

P5GMCOM5                      Ventura - Cross

Q.   You moved into your parents' house in Connecticut because of financial issues, is that right?

A.   No.  We were just moving to the east coast and transitioning at my parents'.

Q.   You transitioned to the east coast and you are living with your parents, your children, and your husband in Connecticut, right?

A.   We stay there quite a bit.

Q.   And your husband is a physical trainer, is that right, or he was at the time?

A.   He was.

Q.   Thank you.

     And your financial situation in October of 2023 was limited to the income of your husband as a physical trainer and whatever income you were able to make at that time, right?

A.   Correct.

Q.   And the house that you grew up in in Connecticut was relatively modest, right, compared to the mansions that we have seen in the government's exhibits?

A.   Sure.

Q.   And at the time, in October 2023, were you performing professionally?

A.   I don't know if I was performing professionally, but I was preparing for a tour later that year.

Q.   The Juicy Fest 2024?

A.   I don't remember what it was called, but possibly.

Q.   Was it scheduled to begin the following January?

A.   Yes.

Q.   And were you -- you were scheduled to go on tour.  Was this Australia and New Zealand?

A.   Yes.

Q.   So you are preparing for that tour?

A.   Yes.

Q.   You were working with a Matt Testa, among other people, in connection with this tour, right?

A.   Yes.  He's an engineer.

Q.   You were doing a lot of work in connection with preparing for this performance?

A.   Yeah.

Q.   Was the work that you were doing in connection with the performance all throughout that fall and summer?  Could you describe the extent of the work.

A.   I mean, I don't remember it super clearly, but, yeah, we were preparing over months for January.  I don't remember if it started January or we were supposed to start December, but something like that.

Q.   But fair to say that there was extensive planning going on in connection --

A.   There was, yeah.

Q.   -- with this tour?

A.   Yup.

Q.   As soon as you agreed to settle your lawsuit against Mr. Combs in November 2023, you canceled this tour, right?

A.   I did.

Q.   And you didn't go to Australia?

A.   I didn't.

Q.   And as soon as you saw that you were going to get the $20 million, you canceled the tour because you didn't need it anymore, right?

A.   That wasn't the reason why.

Q.   You could have -- withdrawn.

     You recall posting on Instagram after the video of the Intercontinental Hotel was aired in May of 2024?

A.   What did I post?

Q.   You wrote on Instagram, among other things, domestic violence is the issue.  Right?

A.   Yes, um-hum.

Q.   It's an important issue.

A.   Yup.

Q.   And that is what you focused on in your Instagram post following the Intercontinental Hotel release?

A.   I wrote something.

Q.   You wrote:  Domestic violence is the issue.

A.   There was more to it than that, but, yeah.

Q.   You wrote:  Thank you for all the love and support from my

family, friends, strangers and those I have yet to meet. The outpouring of love has created a place for my younger self to settle and feel safe now, and this is only the beginning. The domestic violence is the issue. Right?

A.  Yes.

Q.  You felt that way, right?

A.  I did.

Q.  And still feel that way?

A.  Yup.

MS. ESTEVAO:  Can we pull up Defense Exhibit 1016-A, which is a single page -- I'm told it's 1016 without the A -- just for the parties and the witness.

Q.  Ms. Ventura, can you take a look at this and tell me when you're ready.

MS. ESTEVAO:  I move for admission.

MS. JOHNSON:  No objection.

THE COURT:  1016 will be admitted.

(Defendant's Exhibit 1016 received in evidence)

A.  It's just the one page?

Q.  Yes.  The exhibit is longer, but we are only going to be focused on this one page.

A.  OK.  Yes, I read it.

Q.  Mr. Combs says:  Wanna have our last freak-off tonight? This is him sending this in September 2012.  He asks:  Wanna freak off one last time tonight?  Right?

A.   Right.

Q.   What do you say?

A.   What?

Q.   He says:  You can't read?

A.   I don't want to freak off for a last time.  I want it to be the first time for the rest of our lives.

Q.   Thank you.

MS. ESTEVAO:  I have no further questions.

THE COURT:  Thank you.  Ms. Johnson.

REDIRECT EXAMINATION

BY MS. JOHNSON:

Q.   Good afternoon, Ms. Ventura.

A.   Good afternoon.

MS. JOHNSON:  Ms. Gavin, could you please pull up the exhibit that was just on the screen, Defense Exhibit 1016. Could you please publish that for the jury.

THE COURT:  We have it now.

MS. JOHNSON:  Thank you, Ms. Gavin.

Q.   Ms. Ventura, do you recall just a moment ago that you were directed to read the message on this page that you sent that says:  I don't want to freak off for a last time.  I want it to be the first time for the rest of our lives?

A.   Yes.

MS. JOHNSON:  Ms. Gavin, can you please move forward through the rest of this exhibit.  I think it's on page 3 of 4.

P5GMCOM5                        Ventura - Redirect

Can you go one more page.  One more page.  Actually, go back one.

Q.  Ms. Ventura, directing your attention to the blue bubbles in the middle of this page, is that messages that you sent?

A.  Yes.

Q.  Directing your attention to one that says, yes, I'm horny, just got over a UTI, is that a message that you sent to Sean?

A.  Yes.

Q.  What did you say below that?

A.  I did it without meds this time.

Q.  What does Sean respond to you?

A.  So what do you wanna do?

        MS. JOHNSON:  Can you go to the next page now, Ms. Gavin.  Ms. Gavin, can you please blow up the top two blue bubbles.

Q.  Ms. Ventura, can you please read those two blue bubbles.

A.  I want to see you, but I'm emotional right now.  I can't do one last time.  I'd rather not at all.

Q.  What are you referring to in those messages?

A.  Freak-offs.

        MS. JOHNSON:  Thank you, Ms. Gavin.  You can take those down.

Q.  Ms. Ventura, before I ask you a few more questions, I am going to admit some exhibits.

A.  OK.

P5GMCOM5                    Ventura - Redirect

Q.  Do you recall on our direct examination the drives that you looked at and signed with your initials?

A.  Yes.

Q.  And you reviewed the contents on those drives, is that correct?

A.  I did.

Q.  And what, generally speaking, was on those drives?

A.  There were messages, photos, videos from devices that I turned into the government, broken devices.

        MS. JOHNSON:  Your Honor, just one moment.  I need to grab my computer.

        At this time the government would offer Government Exhibits B-219, B-223, B-224, B-238, B-249, B-260, B-261, B-329, B-332, B-338, B-346, B-356, B-405, B-409, B-423, B-424. B-426, B-430, B-511, B-615, B-619, B-620, B-622, B-627-B, B-627-C, B-629, B-630, B-631, B-633, B-634, B-635, B-638, B-640, B-642, B-643, and B-645.

        THE COURT:  Any objection?

        MS. ESTEVAO:  May we have a moment, your Honor?

        MS. JOHNSON:  Your Honor, Ms. Geragos is going to review those, and I'll conduct the examination, and we will circle back to this, if that's all right with your Honor.

        THE COURT:  OK.

Q.  Ms. Ventura, do you recall defense counsel showing you some law enforcement reports documenting interviews with the

P5GMCOM5                          Ventura - Redirect

government on cross-examination?

A.   Yes.

Q.   Before defense counsel showed you those reports, had you ever seen them before?

A.   No.

Q.   Were you ever asked to review those reports?

A.   No.

Q.   Were you ever asked to check those reports for accuracy?

A.   No.

Q.   Do you also recall being asked on cross-examination about what messages the government did or did not show you in meetings you had with the government?

A.   Yup.

Q.   Are you aware of how many thousands of messages were found on your devices, Ms. Ventura?

A.   Exactly, no.

Q.   Are you aware of how many thousands of messages there are on other devices in this case?

A.   No.

             (Continued on next page)

P5GCcom6                        Ventura - Redirect

BY MS. JOHNSON:

Q.  Are you aware of how many thousands of messages and emails that have been received from some of Sean's companies?

A.  No.

Q.  Do you recall yesterday that defense counsel showed you a number of messages between you and Sean where you showed love and affection of each other?

A.  Yes.

Q.  And you were showed more of those messages today; is that correct?

A.  Yes.

Q.  Throughout your relationship with Sean, were there periods where Sean was kind and loving?

A.  Yeah.

Q.  Did those periods ever last?

A.  No.

Q.  What always ended up happening?

        MS. ESTEVAO:  Objection.

        THE COURT:  Grounds.

        MS. ESTEVAO:  Not specific.

        THE COURT:  Ms. Johnson, could you rephrase.

        MS. JOHNSON:  Sure.

Q.  Ms. Ventura, you just testified that the periods where Sean was kind and loving didn't last.  Do you remember that testimony?

P5GCcom6                         Ventura - Redirect

A.  Yes.

Q.  What happened when those periods didn't last?

            MS. ESTEVAO:  Objection.

            THE COURT:  It's overruled.

A.  When those periods wouldn't last, it would just be a downswing.  Yeah, I don't know how to put that.

Q.  Can you tell me a little more by what you mean by a downswing?

A.  When Sean wasn't happy anymore, it affected everybody around him.

            MS. ESTEVAO:  Objection.

            THE COURT:  It's sustained.  The jury should disregard the witness's last answer.

            Ms. Johnson, next question.

Q.  Ms. Ventura, how, if at all, were you affected by Sean's moods?

A.  I was pretty affected.

Q.  How were you affected?

            MS. ESTEVAO:  Objection.

            THE COURT:  Overruled.

A.  I was affected in various ways.  Can you repeat it.

Q.  Sure.  You testified that Sean's moods affected you.  What were some of the ways that they affected you?

A.  I mean, they affected my whole life, my career, how I felt about myself, my self-worth, yeah.

P5GCcom6                        Ventura - Redirect

Q.   How did Sean's moods affect your career?

A.   It depended on if he was in the mood to have a freak-off, my work would take the back seat, so that would be my career not being paid attention to because I had to do other things.

Q.   What other things did you have to do?

A.   I had to do freak-offs.

Q.   And what kind of preparation did freak-offs entail?

A.   A lot.  Me getting myself ready, head to toe, getting a room ready, setting up entertainment, yeah.

Q.   When you say setting up entertainment, what are you referring to?

A.   To escorts.

Q.   You also said that Sean's moods affected how you felt about yourself?

A.   Yeah.

Q.   Can you tell me how they affected how you felt about yourself?

A.   Well, throughout the relationship, I really -- I really just, like, hung on a lot of his words and everything he said, trusted his style and everything that he was doing.  So when he would put me down or make me feel lesser than, I was extra hard on myself.  I was already hard on myself as it was, so -- yeah.  There was good, but there was a lot of negative, too.

Q.   Do you recall defense counsel asking you yesterday if Sean opened up your world?

A.   Yes.

Q.   Do you recall responding that it wasn't a "yes" or "no" answer?

A.   Yup.

Q.   Can you explain what you meant by that?

A.   To the yes or no world?

Q.   Yes.

A.   Sorry.  Can you repeat what was yesterday.

Q.   Yesterday, do you recall that defense counsel asked you if Sean opened up your world?

A.   Yeah.

Q.   And you responded, that's not a yes or no question.

A.   Yeah.  I think I also might have said, like, it opened up a world.  I didn't really describe it.

Q.   What world did it open up to you, Ms. Ventura?

A.   To me -- I mean, I was led into his world, but I was opened up to a world of just chaos and with his lifestyle, his choosing.  And wanting approval, being a part of it, it was a whole other world I didn't know, I didn't understand at the time.  It was a lot.

Q.   Do you remember when defense counsel showed you a number of explicit texts yesterday that you sent to Sean?

A.   Yeah.

Q.   Throughout your entire 11-year relationship with Sean, who did you want to have sex with?

A.  I wanted to sex with just him.

Q.  Was there anyone else you wanted to have sex with?

A.  Not at that time.

          MS. JOHNSON:  Ms. Gavin, and I apologize for not letting you know about this, could you pull up, if you are able, defense exhibit 1166, which is in evidence.  Ms. Gavin, would you mind zooming in on those messages.

Q.  Ms. Ventura, do you recall being shown this message yesterday?

A.  Yeah, vaguely.

Q.  I'd like to direct you to the message that's the second message from the top.  Do you see that message?

A.  Yup.

Q.  It's sent from Sean on August 7th, 2009, at 7:52 p.m.

A.  Yup.

Q.  Do you see where Sean says, you supposed to be seducing me all day?

A.  Yup.

Q.  What is your understanding of what Sean is telling you to do?

A.  To send him sexy messages and just make him feel excited sexually.

Q.  How often did Sean give you instructions like seduce me all day?

A.  All the time.

Q.   What did you do in response to those instructions?

A.   Sometimes I did it and sometimes I didn't know what to say.

Q.   When you did it, what kind of messages would you send to Sean?

A.   I would talk mainly about freak-offs and the things that I knew would actually turn him on.

           MS. JOHNSON:   Thank you.   You can take that down, Ms. Gavin.

Q.   Ms. Ventura, do you recall yesterday that defense counsel asked you questions about your music career?

A.   Yes.

Q.   About your celebrity status?

A.   Yes.

Q.   About your financial status?

A.   Yes, I think so.

Q.   Do you also remember that defense counsel asked you questions about how Sean supported you when you had a bad life performance at the beginning of your career?

A.   Yup.

Q.   What happened to your music career after you started dating Sean Combs?

A.   I put out music, but it wasn't the same as when I first started.

Q.   How was it different?

A.   It was different because I had to give him all of my

attention and made the choice to listen to him because he was the person that was running everything.

Q. When you say you gave him all of your attention, who is him?

A. Sean.

Q. While you were in a relationship with Sean, who, if anyone, controlled your music career?

A. Sean.

Q. How often would Sean direct you to turn down other opportunities in your career?

A. Regularly.

MS. JOHNSON:  Ms. Geragos, I know you're still looking at the exhibits, but I did want to offer Government Exhibit B-332.

The government offers Government Exhibit B-332.

THE COURT:  B-332 will be admitted.

(Government's Exhibit B-332 received in evidence)

MS. JOHNSON:  Ms. Gavin, you can publish that to the jury, please.

Q. Ms. Ventura, who are the participants in this communication?

A. That's me and a person that I worked with named Martin Bowier.

Q. What was Martin's role?

A. At that time, he was trying to help with management.  I had

P5GCcom6                          Ventura - Redirect

tried a bunch of different people over many years.

Q. Management of what?

A. My career, music career.

Q. Directing your attention to the first message, I'll read the gray messages and you read the blue messages.

A. Okay.

Q. From Martin. Is Puff okay with you doing a common video?

A. I don't know. I'll find out. He'll prob say no lol.

Q. Lol okay.

MS. JOHNSON: Can you turn to the next page, Ms. Gavin. Thank you.

Q. Just let me know so I can me them know either way.

A. I'm forwarding the email. He just wants to hear the song.

Q. Yup. I put the song in the email. Hit me back as soon as you can, please.

A. Waiting for Puff to call me back.

Q. Oh, okay. Cool. Underdogs might want you to come by and listen at 3:00?

A. Puff said no to vid.

MS. JOHNSON: Ms. Gavin, if you can go back to page 2, please.

Q. Ms. Ventura, in your last message where you said Puff said no to vid, what is your understanding of what vid Puff said no to?

A. The video that Martin asked me if I wanted to do or if I

could do.

MS. JOHNSON:  You can take this down, Ms. Gavin.

Q.  Ms. Ventura, you mentioned this a few moments ago, but when you were not working on your career while you were dating Sean, what else were you doing?

A.  When I wasn't working on my career, I was being his girlfriend.  Yeah.

Q.  And did that involve preparing for and participating in freak-offs?

A.  Yup.

Q.  During freak-offs, what, if any, work calls did you observe Sean taking?

A.  He took quite a bit of work calls during freak-offs.

Q.  How frequently would he take work calls during freak-offs?

A.  Every time.

Q.  During freak-offs, how often was your career discussed?

A.  A lot.

Q.  And are you aware if Sean ever canceled meetings or other work obligations for freak-offs?

A.  Yeah.

Q.  Are you aware if Sean ever canceled meetings or other work obligations to recover from a freak-off?

A.  Yes.

Q.  What was your understanding of why Sean could do that?

MS. ESTEVAO:  Objection.

THE COURT:  Sustained.

Q.  Ms. Ventura, were you able to cancel meetings or work obligations for freak-offs?

A.  If I was told to.

Q.  What effect, if any, did that have on your career?

A.  A lot.  I didn't get to do many of the things I wanted to.

Q.  And why didn't you get to do many of the things you wanted to?

A.  Because I had a whole other job.

Q.  What was that whole other job?

A.  It's basically a sex worker.

MS. ESTEVAO:  Objection.  Move to strike.

THE COURT:  Motion is granted.  The jury should disregard the witness's last answer.

Q.  Ms. Ventura, when you say you had a whole other job, did that whole other job involve participating in and performing at freak-offs?

A.  Yup.

Q.  Ms. Ventura, do you recall on cross being asked questions about Sean using drugs during your relationship?

A.  Yes.

Q.  Do you also recall on cross-examination being asked many questions about how successful Sean was?

A.  Yes.

Q.  Do you recall being asked many questions about how

successful Sean's businesses were?

A. Yes.

Q. Do you recall being asked many questions about Sean's impact?

A. Yes.

Q. During that same period where you testified that Sean was using drugs, was Sean also running all of his businesses?

A. Yes.

Q. Was Sean taking meetings during that same period?

A. Yup.

Q. Meetings for work?

A. Yes.

Q. Was Sean taking calls for work during that same period?

A. Yes.

Q. Was Sean traveling for work during that same period?

A. Yes.

Q. Was Sean making music during that same period?

A. Yes.

Q. Was Sean appearing on television during that same period?

A. Yes.

Q. And despite doing all those things, to your knowledge, was Sean also still using drugs?

A. Yes, to my knowledge.

Q. Ms. Ventura, do you recall being asked about breaking up with Sean while you were shooting a movie in South Africa in

the fall of 2015 yes?

A.  Yes.

Q.  Do you remember also being asked about how you blocked contact with him during that time?

A.  Yeah.

Q.  Would you have been able to block contact with Sean if you were not on the other side of the world from him?

MS. ESTEVAO:  Objection.

THE COURT:  Sustained.

Q.  Ms. Ventura, would you have been able to block contact with Sean if you were not in South Africa?

MS. ESTEVAO:  Objection.

THE COURT:  The question needs to be phrased or additional questions need to be asked.

Q.  Despite being far away from Los Angeles, did Sean still contact you during that time?

A.  Yes.

Q.  How did he contact you?

A.  I blocked him, but through other people.

Q.  Who were the other people who were the intermediaries?

A.  I had one of his assistants was with me, and she was one person, but other people that were around him would try to contact me, as well.

Q.  Who were some of the other people that were around him that would try to contact you, if you remember?

A.   I mean, it would be management, security, same people, assistants.  Whoever was there at that time.

Q.   When you say management, security, and assistants, are you referring to individuals who worked for Sean's businesses?

A.   Yes.

Q.   And I apologize, Ms. Ventura, if I missed it, but what was the name of the individual who was with you in South Africa who worked for Sean?

A.   Mia.

Q.   Do you also recall yesterday that you were asked about Sean claiming that he could not remember some of the times when he hurt you?

A.   Yup.

Q.   When Sean claims that he couldn't remember hurting you, did you believe him?

          MS. ESTEVAO:  Objection.

          THE COURT:  Grounds.

          MS. ESTEVAO:  It's vague and object to the form.

          THE COURT:  It's overruled.

Q.   Do you want me to re-ask the question, Ms. Ventura?

A.   Please.

Q.   Yesterday you were asked some questions about Sean claiming he could not remember some of the times when he hurt you?

A.   Yeah.

Q.   When that happened, did you believe him?

A.  No, not every time.

Q.  Why not?

A.  Because I'd tell him.

Q.  Can you tell me what you mean by that answer?

A.  I mean, you know the difference -- he blacked out and I could tell he really blacked out, then I would know that, but I feel like there were times where he was pretty aware of what he was doing.

Q.  Why did you think he was pretty aware of what he was doing?

A.  Because it's just who he was.

Q.  What do you mean by that.

A.  I had seen him be -- I had seen him be violent with other people, so I knew the difference because I had been around it. I don't know if that makes sense.

Q.  Let me try this another way.  When Sean claimed he couldn't remember, did you think he was manipulating you?

        MS. ESTEVAO:  Objection.

        THE COURT:  That's sustained.

Q.  Ms. Ventura, do you recall earlier today that you listened to a recording between you and a man named Sugin?

A.  Yup.

Q.  What were you talking about during that recording?

A.  We were talking about potentially a video, a sexual video of me that Sugin had seen.

Q.  And during that conversation with Sugin, how were you

P5GCcom6                        Ventura - Redirect

feeling during that conversation about the video that was the topic?

A.  I was just sick about it and was feeling pressure from Sean, so I was going in on Sugin.  It was just -- it was weird.  It was a weird day.

Q.  What do you mean, you were feeling pressure from Sean?

A.  He was sending me messages to -- because I shared it with him, obviously, right away because we didn't know whether or not it was a freak-off video.  And yeah, he just texted me quite a bit and called me quite a bit about it, so I felt like I had to handle the situation.

Q.  When you say he texted and called you quite a bit, are you referring to Sean?

A.  Yup.

Q.  Who, if anyone, was directing you to speak to Sugin?

A.  Sean.

Q.  And who, if anyone, was directing you not to let Sugin out of your sight?

A.  Sean.

Q.  Do you also recall being asked if Sean supported you in not wanting freak-off videos to come out?

A.  Yes.

Q.  Do you also recall defense counsel asking you about Sean accusing you of stealing his drugs while you were in Cannes?

A.  Yes.

Q.  On the flight home from Cannes, can you remind the jury what Sean did?

A.  He pulled up a video --

        MS. ESTEVAO:  Objection.  Beyond the scope.

        THE COURT:  It's overruled.

A.  He pulled up a video that I thought I had deleted out of his computer of me having sex with an escort, and he played it the whole flight home.

Q.  And where did that flight depart from?

A.  From the South of France and landed in New York.

Q.  While Sean was playing that video for you the whole flight home, what, if anything, did he say?

A.  He said he was going to release it to embarrass me.

Q.  When you landed in New York, what did Sean insist you do later that night?

A.  A freak-off.

Q.  What were you afraid would happen if you refused that freak-off?

A.  That the video would come out or that he would just be really angry.

Q.  What happened when Sean was angry?

A.  He could be violent, he could just make you feel horrible.

Q.  Do you recall being asked some questions yesterday about a weekend in New York with Sean?

A.  Specifically --

P5GCcom6                         Ventura - Redirect

MS. JOHNSON:  Let me see if I can pull that up for you.

Ms. Gavin, would you be able to pull up defense exhibit 1019.

THE WITNESS:  Yes, I remember.

Q.  Do you remember looking at this exhibit yesterday?

A.  Yes.

MS. JOHNSON:  Ms. Gavin, can you please go forward to page 9 of this exhibit.

Q.  Ms. Ventura, directing your attention to the bottom set of blue messages, can you read those, please.

A.  Like the last two or --

Q.  Sorry.  The last five, starting with okay.

A.  Okay.  I think it would be a nice switch-up for you to come here.  Can you come tomorrow early, though, because I have to leave on Monday afternoon.  I can book a show for us to go see tomorrow night.  We can be like old times and take our Central Park walks, smoke, drink some wine, and just veg out.  I'm sorry if I seem a little out of it.  They put our oldest dog to sleep today.

Q.  Were these the types of suggestions that you made to Sean about how to spend the weekend in New York?

A.  Yes.

Q.  What ended up happening that weekend in New York?

A.  Freak-off I would guess, I don't know.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MS. ESTEVAO:  Objection.

THE COURT:  That's sustained.  The jury should disregard the witness's last answer.

MS. JOHNSON:  Let's go to page 17, please, Ms. Gavin.

Q.  Ms. Ventura, directing your attention to the top message in the gray bubble on the page from Sean Combs that says, you ready for tonight?

A.  Yup.

Q.  When Sean said, you ready for tonight, what did you understand Sean to be communicating to you?

A.  Ready for a freak-off, he was asking me.

Q.  When you respond, yes, I just gta get stuff, what stuff are you referring to?

A.  Stuff, supplies for the freak-off and outfits and whatever else.

Q.  So what did Sean insist you do instead of doing things like going to the park --

MS. ESTEVAO:  Objection.

THE COURT:  I don't know what the question is.  Let's hear the question first.

Q.  Ms. Ventura, what did Sean insist you do instead of your suggestions like going to the park?

MS. ESTEVAO:  Object to the characterization.

THE COURT:  The question needs to be rephrased.

Q.  Ms. Ventura, you made suggestions of how you wanted to

P5GCcom6                          Ventura - Redirect

spend this weekend.  Do you recall those?

A.  I do.

Q.  What, if anything, did you do instead?

A.  We had a freak-off.

Q.  Whose idea was that?

A.  Sean's.

Q.  What were you afraid would happen if you did not do that freak-off?

MS. ESTEVAO:  Objection.

THE COURT:  Grounds.

MS. ESTEVAO:  It assumes a fact not in evidence. Leading.

THE COURT:  It's overruled.

Q.  Ms. Ventura, do you want me to re-ask the question?

I asked you if you didn't do the freak-off on this weekend in New York on October 13th, 2012, what were you afraid would happen?

A.  I don't know specifically what I would have been afraid of that weekend.

THE COURT:  Then that's done.  Next question.

Q.  Yesterday do you recall being asked a number of questions about the side effects of drug use?

A.  Yup.

Q.  Do you also recall being asked questions about a bad batch of drugs yesterday?

A.   I do.

Q.   Did using drugs ever make you get violent?

A.   Did using drugs -- I feel like drinking more so than drugs, yeah.

Q.   Did using drugs ever make you get violent?

A.   No.

Q.   Yesterday do you recall being shown a number of messages about the time period leading up to the incident at the Intercontinental Hotel?

A.   Yeah.

        MS. JOHNSON:  Ms. Gavin, can you please pull up Government Exhibit B-625, which is in evidence.  Can you please go to page 2.

Q.   Ms. Ventura, directing your attention to the message on this page, that's from Sean, right?

A.   Yes.

Q.   And it's from March 5th, 2016; is that right?

A.   Yes.

Q.   And it says, so what you gonna do so I can plan the rest of my night?

A.   Right.

Q.   Do you recall seeing this message yesterday?

A.   Yup.

Q.   And yesterday when you were asked multiple times about this question, you responded that so I can plan my night was the key

P5GCcom6                        Ventura - Redirect

phrase of this message.  Do you recall your testimony?

A.  Yes.

Q.  What did you mean by that?

A.  The so I can plan the rest of my night being the key?

Q.  Yes.

A.  This point in 2016, that was just part of our -- the way I understood him.  It was a weekly ask, a weekly what are you going to do, what are we going to do.  It was just kind of common.

Q.  And so through this text exchange, what did you understand Sean was communicating to you?

A.  He was asking me if we were going to do a freak-off that night, what's the plan.

        MS. JOHNSON:  Can you take that down, Ms. Gavin, and go to the next page, please.  Can you blow up Sean's message on that page, the blue bubble.

Q.  Ms. Ventura, this is another message from Sean on March 5th, 2016; is that right?

A.  Yes.

Q.  And it says, what would you want to do?

A.  Yup.

Q.  In your experience, when Sean said what do you want to do --

        MS. ESTEVAO:  Objection.

        THE COURT:  I don't know what the question is.  So

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

let's hear the question.

Q.  Ms. Ventura, when Sean said what do you want to do, in your experience, what did that mean?

MS. ESTEVAO:  Objection.

THE COURT:  That's sustained.

Q.  When Sean said what do you want to do, Ms. Ventura, what was your understanding of what Sean was communicating to you?

A.  After the --

MS. ESTEVAO:  Objection.  Same objection.

THE COURT:  Ms. Johnson, you're referring to the message we're looking at here?

MS. JOHNSON:  Yes.

THE COURT:  Why don't you re-ask the question and maybe clarify.

MS. JOHNSON:  Sure.

Q.  Ms. Ventura, with respect to this message, what would you want to do, sent on March 5th, 2016, what was your understanding of what Sean was communicating to you?

A.  He wanted to know if I wanted to do a freak-off.

Q.  And if you did not respond to Sean messages like this by setting up a freak-off --

MS. ESTEVAO:  Objection.  Sorry.

THE COURT:  That's sustained.

Q.  Did you end up having a freak-off at the Intercontinental Hotel with Sean on March 5th, 2016?

P5GCcom6                    Ventura - Redirect

A.   Yes.

Q.   What did Sean do to you during that freak-off?

         MS. ESTEVAO:  Objection.

         THE COURT:  It's overruled.

A.   During that freak-off in the room, before I left, he hit me, and that's what prompted me to leave.

Q.   Where did he hit you?

A.   In my eye.

Q.   And you said that's what prompted you to leave.  Did you leave the freak-off before it was over?

A.   Before he said it was over, yeah.

Q.   What happened after you left?

A.   He followed me into the hallway and tried to bring me back.

Q.   How did he try to bring you back?

A.   He tried to drag me back.

Q.   And what was he wearing when he was trying to drag you back?

A.   A towel and socks.

Q.   Did you eventually leave the hotel?

A.   I did.

Q.   After Sean tried to drag you back to the freak-off and you left the hotel, did you keep hearing from Sean that day?

A.   Yes.

Q.   Did he keep reaching out to you by phone?

A.   Yes.

P5GCcom6                        Ventura - Redirect

Q.   By text?

A.   Yup.

Q.   Did he have other staff members reach out to you, as well?

A.   Yes.

Q.   And when I say staff members, individuals who worked for Sean reached out to you, as well?

A.   Yes.

          MS. JOHNSON:  Ms. Gavin, can you please take this down and pull up Government Exhibit B-631, which I believe the defense admitted this morning.  Can you go to the bottom of page 6, please.  Can you blow up the final message, please.

Q.   Can you please read that message, Ms. Ventura.

A.   When you get fucked up the wrong way, you always want to show me that you have the power and you knock me around.  I'm not a rag doll, I'm someone's child.

          MS. JOHNSON:  You can take that down, Ms. Gavin.

          Ms. Gavin, can you pull up for identification for the witness and the parties only the government exhibit marked A-441-I.

          MS. ESTEVAO:  No objection.

          MS. JOHNSON:  I was going to authenticate it first, but if there's no objection, I'll offer the Government Exhibit.

          THE COURT:  A-441-I will be admitted.

          (Government's Exhibit A-441-I received in evidence)

Q.   Ms. Ventura, who are the participants in this chat?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

A.   It's me and Sean.

Q.   Before we get to the specific messages --

          MS. JOHNSON:  I'm sorry.  Can you please publish this to the jury, Ms. Gavin.  Can you please go to page 7.

Q.   Focusing your attention on the top two bubbles, Ms. Ventura, do you recall being asked a number of questions on cross-examination about you sending Sean a message saying, hit me when you can, on August 20th, 2018?

A.   Yes.

Q.   What's the exact timestamp of that message?

A.   4:08 p.m.

          MS. JOHNSON:  You can take that down.

          MS. ESTEVAO:  Let it be reflected that I believe Ms. Ventura misspoke.  It says 4:18.

          MS. JOHNSON:  I think it says 4:08.

          MS. ESTEVAO:  Oh, I was looking --

Q.   There's two messages.  It looks like the first message is 4:08; is that right?

          THE COURT:  Hold on.  Ms. Johnson, do you have a question?

          MS. JOHNSON:  Yes.

Q.   Ms. Ventura, the first message, is that sent on August 20th, 2018, at 4:08 p.m.?

A.   Yes.

Q.   And then there's an identical message below it; is that

right?

A.   Yup.

Q.   And that's sent on August 20th, 2018, at 4:13 p.m.; is that right?

A.   Yes.

          MS. JOHNSON:   Ms. Gavin, I want to go back to the page before this, page 6.   Ms. Gavin, can you please blow up those four green bubbles.

Q.   Who are these messages from?

A.   They're from Sean.

Q.   Are these messages sent to you from Sean before the two messages we just looked at?

A.   It looks like that, yup.

Q.   And was days are these messages sent on?

A.   August 19th, 2018, and August 20th.

Q.   What does the first message say?

A.   Are you okay.

Q.   Ms. Ventura, were you asked a number of questions this morning about the time Sean raped you in August of 2018?

A.   Yeah.

Q.   What was going on in your life in August 2018 around that time?

A.   Around that time, in August 2018, I was trying to remove myself from this relationship completely.   I had moved around quite a bit in LA, and yeah.

P5GCcom6                    Ventura - Redirect

Q.  Do you have a clear memory of August 2018?

A.  Not super clear, but clear enough.

Q.  Is it fair to say a lot was going on in your life?

A.  A lot, yeah.

Q.  Do you have any doubt that Sean raped you?

A.  No.

        MS. ESTEVAO:  Objection.

        THE COURT:  It's overruled.

Q.  You can answer, Ms. Ventura.  Do you have any doubt that
Sean raped you?

A.  No.

        MS. JOHNSON:  Ms. Gavin, can you please go to the next
page.  Can you go to the page after that.  Can you please zoom
in on the bottom of page 51.

Q.  Ms. Ventura, can you please read the message in the green
bubble on the bottom from Sean.

A.  I know I look bad to you, I could tell I didn't turn you on
yesterday, I fell off, I'm about to get my shit together.

        MS. JOHNSON:  You can take that down now, Ms. Gavin.

Q.  Ms. Ventura, a few weeks after Sean raped you in August
2018, did you have consensual sex with Sean?

A.  Yes.

Q.  And is that when your now husband FaceTimed you during that
consensual sex act?

A.  Yup.

MS. JOHNSON:  I don't have that many questions.  I just wanted to check with Ms. Geragos on the status of admitting the exhibits.

THE COURT:  You may.  But is there another way to do this?  If it's going to take time to review the list, then you can put it in by agreement at a later time.

MS. JOHNSON:  Okay.  If the defense is fine with that, I'm happy to proceed that way.

THE COURT:  Ms. Geragos.

MS. GERAGOS:  We're fine with that, your Honor.

THE COURT:  All right.

Q.  Ms. Ventura, do you recall being asked about your settlement with Sean?

A.  Yup.

Q.  Do you recall defense counsel also asked you just a moment ago about your financial situation in October of 2023?

A.  Yes.

Q.  And you mentioned that you had a tour scheduled?

A.  I did.

Q.  And you said that the settlement was not the reason you canceled the tour?

A.  Correct.

Q.  Why did you cancel the tour?

A.  After filing my civil suit, I just was overwhelmed and I didn't -- I didn't -- couldn't continue doing that at that

point.

Q. What do you mean, you were overwhelmed?

A. I mean I didn't -- I think just addressing the past the way that I chose to, it was just quite overwhelming and I didn't want to be away from my kids at that time, you know, I just didn't want to go.

Q. Do you plan to file anymore lawsuits?

A. No.

Q. Do you expect to get any money out of testifying at this trial?

A. No.

Q. How much money did Sean pay to settle your lawsuit?

A. $20 million.

Q. Would you give that money back if it meant you never had to have freak-offs?

        MS. ESTEVAO: Objection.

        THE COURT: It's overruled.

A. I'd give that money back if it meant I never had to have freak-offs. If never had to have freak-offs, I would have agency and autonomy and I would --

        MS. ESTEVAO: Objection.

        THE COURT: It's overruled.

Q. You can continue, Ms. Ventura.

A. I wouldn't have to work so hard to get it back.

Q. And when you say get it back, are you talking about the

agency and autonomy that you mentioned?

A.  Yeah.

Q.  Do you remember when defense counsel asked you yesterday if freak-offs were a special time that you cherished?

A.  Yeah.

Q.  How would you describe the experience of an escort urinating in your mouth while you were on the floor?

        MS. ESTEVAO:  Objection.

        THE COURT:  Sustained.

Q.  How many times did Sean insist you have a freak-off when you still had a UTI?

A.  All the time, frequently.

Q.  And did Sean beat you during freak-offs?

A.  Yes.

Q.  Once or more than once?

A.  More than once.

Q.  How did you --

A.  Sorry.  You could continue.  I'm sorry.  You can go on.

Q.  How did you feel during the freak-offs when Sean beat you?

A.  Worthless, just like dirt, like I didn't matter to him, but that I was nothing, like absolutely nothing.

Q.  At the beginning of your relationship, were you open to freak-offs?

A.  I was open in the very beginning to trying it.

Q.  Did defense counsel show you a number of messages that

reflected some of that openness over the past two days?

A.  Yeah.

Q.  Did that openness change?

A.  Over time, yeah.

Q.  And after it changed, did you want to have freak-offs?

A.  I didn't.

Q.  Did you feel that you could say no?

A.  No.

Q.  Did you try to tell Sean that you did not want to do freak-offs?

        MS. ESTEVAO:  Objection.

        THE COURT:  It's overruled.

A.  I tried.

Q.  Once or more than once?

A.  More than once.

Q.  What were you afraid would happen if you refused a freak-off?

        MS. ESTEVAO:  Objection.

        THE COURT:  Could you rephrase the question.

Q.  Ms. Ventura, you testified that you told Sean more than once that you did not want to do freak-offs?

A.  Yeah.

Q.  What concerns did you have, if any, about saying no to freak-offs?

        MS. ESTEVAO:  Same objection.

P5GCcom6                    Ventura - Recross

THE COURT:  It's overruled.

A.  I worried for my safety, I worried for my career, but I also was in love with him, so I worried that he wouldn't want to be with me anymore, like, that was part of it, too.

MS. JOHNSON:  No further questions at this time.

THE COURT:  Thank you, Ms. Johnson.

Ms. Estevao.

RECROSS EXAMINATION

BY MS. ESTEVAO:

Q.  Ms. Ventura, picking up on that, you said that you were afraid that if you said no to a freak-off, that Mr. Combs wouldn't want to be with you anymore, right?

A.  That was part of it.

MS. JOHNSON:  Objection.

THE COURT:  It's overruled.

Q.  That was part of it, you said?

A.  It was part of it.  We were in a relationship.

Q.  You knew that Mr. Combs's sexual preference were these freak-offs, right?

A.  I learned, yeah.

Q.  And part of being his girlfriend meant participating in these freak-offs, right?

A.  I don't know that it was a rule, but it was --

Q.  Not a rule, but it was his sexual preference, and so you knew that part of being his girlfriend meant doing this sort of

thing with him, right?

A.  I would say I learned over time.

Q.  That's what was animating the fear that he would leave you if you didn't do it, right?  The part of it we were just talking about.

A.  Yeah.  Sorry.  My mind is a little bit all over the place right now.

Q.  Do you want to take a moment?

A.  You can continue.

MS. ESTEVAO:  The government brought up exhibit 1016, can we bring that up, please, defense exhibit 1016.

Q.  Mr. Combs asked you, want a freak-off one last time tonight.  And you said, I don't want a freak-off for one last time, I want it to be the first time for the rest of our lives, right?

A.  Yeah, that's what it says.

MS. ESTEVAO:  Can we go to the next page.  And the next page.

Q.  You say, yes, I'm horny, just got over UTI, I did it without meds this time.  And he asked you, what you want to do, right?

A.  Yup.

MS. ESTEVAO:  Can we go on.

Q.  And this is what the government went over with you just now.  You said, I'm emotional right now, I can't do one last

P5GCcom6                      Ventura - Recross

time, right, that's what government counsel pointed out, you can't do one last time?

A.   That's what it says, yeah.

Q.   And that's in reference to your earlier text message where you said you can't do one last time, right?

A.   The text messages, the page before this, you're talking about?

Q.   When you said, I can't do one last time, I want it to be the first time for the rest of our lives, right?

A.   Yeah.

Q.   So when you're saying you can't do one last time, you're saying you don't want it to be the last freak-off you ever do with him, right?

A.   I honestly don't know what I was thinking in 2012.

Q.   But you did say on the earlier page, I don't want it to be the last time, I want it to be the first time for the rest of our lives, right?

A.   That's what it says, yeah.

Q.   And then the government asked you about certain devices that you turned over to the government in connection with this investigation, and you said that they were broken devices. What did you mean by that?

A.   They were no longer working.  I couldn't turn them on.

Q.   And you kept these broken devices for many, many years, right?

P5GCcom6                      Ventura - Recross

A.   Yeah.

Q.   And those are the broken devices -- those are the devices that the government was able to access, right?

A.   Correct.

Q.   And those are the devices that ultimately had the only freak-off videos in this case, right?

A.   I don't know if it was the only ones.  I don't know.

Q.   Those devices are the source of the government exhibits that are the freak-off videos in this case.  You're familiar with those videos, right?

A.   I'm familiar with videos.

Q.   That came from your devices?

A.   That came from my devices, yeah.

Q.   Those are the devices that you kept for many years, right?

A.   Yes.

Q.   And those freak-off videos were from 2012 and 2014, right?

A.   I don't know what year.

Q.   Suffice it to say that you kept them for over a decade, those devices for over a decade, right?

A.   I guess so.

Q.   Despite being broken?

A.   Yeah.

Q.   Government counsel asked you about how this impacted your career and asked about Mr. Combs's ability to continue running his businesses while participating in all these freak-offs,

P5GCcom6                    Ventura - Recross

right?

A.  Yeah.

Q.  What did you do on your time when you were not doing freak-offs?

A.  I was recovering from freak-offs or I was working in studio.

Q.  You were working in the studio on your music?

A.  Yeah.

Q.  And you also were seeing your friends and family?

A.  Occasionally, yeah.

Q.  And you were communicating regularly with people in your circles, right?

A.  Yeah.

Q.  And you were communicating with many employees at Bad Boy Records, right?

A.  Yeah.

Q.  The government asked you about Mr. Combs's ability to continue running his businesses, right?

A.  Yes.

Q.  To your knowledge, many employees for Mr. Combs and Bad Boy understood that he had a major drug problem, right?

          MS. JOHNSON:  Objection.

          THE COURT:  Could you rephrase that just a little bit.

Q.  Are you aware of any employees expressing knowledge or concern about Mr. Combs's drug problems or drinking problems?

A.   Yeah.

Q.   Was it in fact something that was discussed among you and other employees?

A.   At certain times, yeah.

Q.   In fact, many of his employees and staff members had to manage his moods in light of his addiction, right?

A.   We all did.

Q.   Which employees can you recall who discussed this with you who understood that -- withdrawn.

        Which employees did you discuss this with?

A.   D-Roc for sure, Mia, Tony Fletcher.  There's probably more, I just don't really remember.

Q.   In fact, it was pretty common knowledge that Mr. Combs had a major drug problem, right?

        MS. JOHNSON:  Objection.

        THE COURT:  It's sustained.

Q.   Government counsel also asked you questions about Mr. Combs being hard on you, right?

A.   Yeah.

Q.   But he was of course also quite uplifting, right?

A.   Yup.

Q.   And he sent you many uplifting messages over the many years, right?

A.   Yeah.

Q.   And his messages were also conveyed orally, right?

P5GCcom6                         Ventura - Recross

A.   Yeah.

Q.   And when you met with him, sometimes you met him when he was in a great mood and he lifted you up, right?

A.   Yeah.

Q.   In fact, most of the time that you were with him, you loved being with him, right?

A.   Good amount of the time, yeah.

Q.   Government counsel asked you about being let into his world.  Do you remember those questions?

A.   Yes.

Q.   And you said it was a world of chaos, right?

A.   Uh-huh.

Q.   And it was a world of chaos, you stand by that, right?

A.   Pretty crazy.

Q.   It sounds like it was filled with freak-offs and drugs and alcohol and partying, right?

A.   Yeah, but I was referring more to other things, but --

Q.   What were you referring to?

A.   It's fast paced.

Q.   He was a major part of the entertainment industry?

A.   Yup.

Q.   And by being with him, you were able to meet all sorts of other people in the entertainment industry, right?

A.   I did meet a lot of people, yeah.

Q.   And you were able to go to fascinating places and famous

events, right?

A.   Yup.

Q.   And you were able to stand by his side at the Met Gala and other premieres and other things like that, right?

A.   Yup.

Q.   And in many ways, being his girlfriend meant that opportunities were available to you in many different ways, right?

A.   Couldn't take them all, though.

Q.   Of course.  But you had access to producers and people in the entertainment industry that many other people trying to come up in this business never had, right?

         MS. JOHNSON:  Objection.

         THE COURT:  Overruled.

A.   Within reason.

Q.   You were given opportunities in terms of your ability to access contacts in the entertainment industry?

A.   Sometimes given, but earned, as well.

Q.   Certainly.  And you also had plenty of studio time, right?

A.   A lot of studio time.

Q.   With access to sound engineers, right?

A.   Yup.

Q.   And you were given access to all kinds of musical artists, right?

A.   Yeah.

P5GCcom6                    Ventura - Recross

Q.  We talked about how you were put in the studio with Kid Cudi, right?

A.  Yup.

Q.  What other artists were you put in the studio with?

A.  What other artists?  Nicki Minaj and I did a song together.

Q.  Wow.

A.  I worked with a lot of people, didn't really transpire, but I worked with a lot of people.

Q.  What about Lil Wayne?

A.  Yes.

Q.  And you put out a mixed tape called RockaByeBaby, right?

A.  I did.

Q.  And you were proud of that?

A.  Very.

Q.  You put a lot of work into that?

A.  Uh-huh.

Q.  And that was released, right?

A.  It was released, yeah.

Q.  And when your relationship with Mr. Combs ended, you were let out of your contract, right?

A.  I was let out -- I had to, yeah, fight my way out of the contract, yeah.

Q.  You weren't able to break ties with Bad Boy Records successfully, right?

A.  Eventually, yeah.

P5GCcom6                        Ventura - Recross

Q.   You also had singles with Rick Ross, right?

A.   Yes.

Q.   And Pusha T, right?

A.   Yup.

Q.   Am I missing anyone?

A.   You got a lot of people.

Q.   I'm sure I'll be reminded if I missed someone.

You were saying on redirect that you only wanted to have sex with Sean really, right?

A.   When we were together, yeah.

Q.   And you participated in the freak-offs because you wanted to make him happy, right?

A.   Part of the reason, yeah.

Q.   And you knew that, as I asked you before, you knew that this was the kind of sex that he wanted to have, right?

A.   I found out through experience.

Q.   And you believed that you were special in his life because you were able to give him that, right?

A.   Sort of, yeah.

Q.   Well, you didn't think he was having this kind of sex with anyone else, right?

A.   I was hoping not, but I didn't know.

Q.   You in fact did hold a special place in his heart, right?

A.   I think I did.

Q.   You believe that today, right?

P5GCcom6                        Ventura - Recross

A.   Yeah.

MS. ESTEVAO:  Can we pull up defense exhibit 1166, the seducing me all day part.

Q.   You were asked about this message, Mr. Combs saying, you supposed to be seducing me all day, right?

A.   Yes.

Q.   And you sometimes did that?

A.   Yeah, whatever he wanted, yeah.

Q.   When he asked you to do certain things like this, like send him dirty text messages, you did that, right?

A.   Yup.

Q.   In this message, this begins with Mr. Combs saying in the subject line, I'm so horny, and what is your response to that?

A.   Omg I was just about to text you the same thing lolol.

Q.   That's before he says you supposed to be seducing me all day, right?

A.   Correct.

Q.   And then your response to that is, lol, sorry, I'm nervous, I feel like I wanna fuck, right?

A.   Yup.

Q.   And when you said you're nervous, you were being open about your feelings, right?

A.   I think so.  I'm not really sure what I'm nervous about in this text.

Q.   Ms. Johnson was asking you about how your music career was

P5GCcom6                       Ventura - Recross

affected by participating in these freak-offs, right?

A.   Right.

Q.   And it's fair to say that you've always been a little self-conscious about your musical talents, right?

A.   Yeah.  It's kind of like an abbreviated version of -- yeah.

Q.   I'll rephrase.  Your ability to perform under pressure. I'm referring in particular to your performance on 106&park.

A.   It was one performance in the beginning of my career, I did others.

Q.   Of course.  Did you ever suffer from feelings of self-doubt?

A.   I did.

Q.   Like anyone would?

A.   Yeah.

Q.   You were in an industry that required, really, a high level of performance?

A.   Of course.

Q.   Like very demanding and very competitive, right?

        MS. JOHNSON:  Objection.

        THE COURT:  Overruled.

A.   Yup.

Q.   You were meeting musical artists in the studio that were famous and the top of the entertainment industry, right?

        MS. JOHNSON:  Objection.  Asked and answered.

        THE COURT:  Overruled.

P5GCcom6                         Ventura - Recross

A.   Can you repeat.

Q.   You were in the studio with musical artists who were famous and talented, right?

A.   Yeah.

Q.   Some of the most famous and talented in the country, right?

A.   Uh-huh.

Q.   And you were asked to perform at that level, right?

A.   Yes.

          (Continued on next page)

P5GMCOM7                        Ventura - Recross

Q.   So it would be natural to assume that feelings of self doubt would keep in when you are singing and performing with those kind of artists, right?

MS. JOHNSON:   Objection.

THE COURT:   Sustained.

Q.   Ms. Johnson asked you about how Mr. Combs was controlling over you, right?

A.   Um-hum, yes.

Q.   And from your understanding, was he also controlling over other people?

A.   Yes.

Q.   In fact, he was controlling over lots of other people, right?

MS. JOHNSON:   Objection.

Q.   Based on your understanding.

THE COURT:   Let's get a new question.

Q.   You understood that he was controlling over his other musical artists under the label, right?

MS. JOHNSON:   Objection.  Beyond the scope.

THE COURT:   It's overruled.

A.   Can you ask it again.

Q.   Were you aware of him being controlling over other artists on his label?

A.   I was aware.

MS. ESTEVAO:   Can we bring up Government Exhibit

B-332.

Q. This is the government exhibit about the common video. You remember those?

A. Yes.

Q. You recall the specifics of this particular common video?

A. Specifics meaning --

Q. Meaning more details about the -- your potential involvement in the common video.

A. No.

Q. So you don't know one way or another whether or not Mr. Combs' objection to your involvement in the common video was based on some legitimate concern or not, right?

A. I don't know. Yeah.

Q. It could have been one of many concerns?

MS. JOHNSON: Objection.

Q. You have no idea?

THE COURT: Sustained.

Q. You don't know why Mr. Combs said no to the common video, right?

MS. JOHNSON: Objection.

THE COURT: That's overruled.

A. I don't know.

Q. You don't know why?

A. No.

Q. You also released several music videos while you were with

P5GMCOM7                        Ventura - Recross

Bad Boy Records, right?

A.   Yes.

Q.   How many?

A.   I don't know.  You'd have to count.  I don't know.

Q.   Several?

A.   Several.

Q.   Those were successful?

            THE COURT:  Let's have a brief sidebar.

            (Continued on next page)

P5GMCOM7                        Ventura - Recross

(At sidebar)

THE COURT:  How much time do we have left?

MS. ESTEVAO:  I just have -- maybe quite a few minutes.

THE COURT:  I'm sorry.  I didn't hear that.

MS. ESTEVAO:  Fifteen minutes.

THE COURT:  OK.  One thing that I'd like to avoid, and I know you're almost done, sometimes a question is asked but then you are kind of going and looking at the rest of the members of the defense team.  And I think it's disruptive in terms of you have asked a question, so you should listen to the answer.  And the jury is seeing it.  I don't want that to be an element of this case.

MS. ESTEVAO:  I apologize.

MR. AGNIFILO:  It's probably our fault.  I'll try and keep --

THE COURT:  Ms. Estevao is in charge.

MS. ESTEVAO:  I'm sorry, Judge.

THE COURT:  That's fine.

(Continued on next page)

P5GMCOM7                        Ventura - Recross

(In open court)

THE COURT:  Please proceed.

MS. ESTEVAO:  Thank you.

Q.  You were also asked by government counsel about Mr. Combs' ability to continue successfully running his company as well as being a drug addict.  Do you recall those questions?

A.  Yes.

Q.  And were you aware of other members of his staff knowing about his drug use?

MS. JOHNSON:  Objection.

THE COURT:  It needs to be rephrased.

Q.  Did you have discussions with other members of staff about his drug use?

A.  Yeah.

Q.  And which members of his staff knew about his drug use?

A.  I think a lot of people, but I don't know specifically who.

Q.  And Ms. Johnson was asking you about when you were in South Africa, and you blocked Mr. Combs, right?

A.  Um-hum.

Q.  And she was asking you about other employees of Mr. Combs that were reaching out to you, right?

A.  Right.

Q.  And many of those people you also had independent relationships with, right?

A.  Right.

P5GMCOM7                    Ventura - Recross

Q.  For example, D-Roc was like a member of your family, right?

A.  Like a big brother.

Q.  You were very close with D-Roc?

A.  Yeah.

Q.  In fact, you have had conversations with D-Roc that are completely independent of Mr. Combs, right?

A.  Yeah.

Q.  And you knew his wife April very well too, right?

A.  Yes.

Q.  And the individual Mia, who was an assistant, you also had a friendship with, right?

A.  Right.

Q.  An independent friendship with that that has remained to this day, right?

A.  It was on and off, but yeah.

Q.  And it outlasted your relationship with Mr. Combs, right?

A.  Like I still speak to her, yes.

Q.  And many other members of Mr. Combs' staff were like family to you as well, right?

A.  Some people, yeah.

Q.  And that's why when you broke up with Mr. Combs in the summer of 2015, you sent the video of Mr. Combs and Gina to many members of the staff, right?

A.  Right.

Q.  Because they all betrayed you, right?

A.   I was hurt.

Q.   That's what you felt?

A.   Yup.

Q.   Ms. Johnson asked you about whether or not you believed Mr. Combs when he said that he didn't remember what he did when he blacked out.

A.   Um-hum.

Q.   But you only didn't believe him some of the time, right?

A.   Yeah.  They are not like specific memories of when I believed him and when I didn't.

Q.   Sometimes you did believe him that he blacked out, right?

A.   Yeah, sometimes.

Q.   There were certain times that you assumed that he must have blacked out given how many --

          MS. JOHNSON:  Objection.

          THE COURT:  Sustained.

Q.   There were some times when you believed Mr. Combs when he said he blacked out, right?

A.   Yes.

Q.   Ms. Johnson asked you about Mr. Combs ever being violent with people other than you, right?

A.   Right.

Q.   And those were instances of Mr. Combs being violent with people who were not his girlfriends, right?

          MS. JOHNSON:  Objection, your Honor.  Beyond the

P5GMCOM7                          Ventura - Recross

scope.

THE COURT:  The objection is sustained.  I think you can ask it separate from what you actually asked.

MS. ESTEVAO:  I can move on.

Q.  Ms. Johnson asked you about the instance when you had a conversation with Sugin, the audio we listened to this morning?

A.  Yes.

Q.  Mr. Combs wasn't there when you recorded that audio, right?

A.  I don't believe so, no.

Q.  He was on the other side of the country, right?

A.  California.

Q.  And he wasn't telling you what to say, right?

A.  Not in that specific moment, but before it.

Q.  He wasn't giving you any specific words to say, right?

A.  Not right at that moment, but we spoke before, yeah.

Q.  And you texted Mr. Combs before that saying -- asking if he should take Sugin hostage, right?

MS. JOHNSON:  Objection.

THE COURT:  It's overruled.

A.  I don't remember that.

Q.  And you had that conversation with Sugin in the context of your fear that a video would be released, right?

A.  Right.

Q.  And to your knowledge, Mr. Combs also did not want the video released, right?

P5GMCOM7                    Ventura - Recross

A.   Right.

Q.   And in fact Mr. Combs' involvement in these videos is highly embarrassing to him, right?

MS. JOHNSON:  Objection.

THE COURT:  Sustained.  Rephrase the question.

Q.   You understood that Mr. Combs would be embarrassed if this video was released, right?

A.   We didn't know it was going to be on the video, but yeah.

Q.   Based on your understanding of what was typically on these videos, right?

A.   Yeah.

Q.   Because Mr. Combs sometimes appeared himself in these videos, right?

A.   Occasionally, yeah.

Q.   And his involvement could be inferred even if he --

MS. JOHNSON:  Objection.

Q.   If he's not in the video, right?

THE COURT:  Sustained.

MS. ESTEVAO:  Can we pull up Defense Exhibit 1019, which you went over with Ms. Johnson.

Can we go down to, I believe the 17th page is where she was.

Q.   Mr. Combs asked you:  Are you ready for tonight? Ms. Johnson asked you about this message and you said, I knew that he was asking for a freak-off, right?

P5GMCOM7                        Ventura - Recross

A.   At this point, yeah.

Q.   Based on the messages before this and your general understanding about what he wanted, right?

A.   Um-hum.

Q.   And in response to that you said yes, right?

A.   Yup.

Q.   And nowhere here did you say no, right?

A.   Right.  In here, yeah.

          MS. ESTEVAO:  Can we go to page 12, please.

Q.   Mr. Combs sends you an explicit message at the top, and you respond with another explicit message, right?  I'm sorry.  You begin the top of this page with an explicit message, right?

A.   Yes.

Q.   And he responds with another explicit message?

A.   It's an explicit page, yeah.

Q.   We don't need to go through all of these.  Suffice to say that you were actively participating in this sexting back and forth, right?

A.   Um-hum.

          MS. ESTEVAO:  Can we pull up Government Exhibit B-625, please.  Can we scroll down to -- there we go.

Q.   Mr. Combs asked:  So what you gonna do so I can plan the rest of my night.  Right?

A.   Right.

Q.   Ms. Johnson asked you about this, and you responded that

you understood that to mean that he wanted a freak-off, right?

A.  Right.

Q.  Can you read again your response at the top of the page.

A.  Baby, I want to FO so bad, but I don't want to fuck myself up.  What am I to do.

Q.  Thank you.

When he was asking you, what are you going to do so I can plan my night, that was a question posed to you, right?

A.  Yup.

Q.  And you responded:  I want to FO so bad, but I don't want to fuck myself up.  Right?

A.  Right.

Q.  You did not say no in response to his message, right?

A.  No.

MS. ESTEVAO:  Can we pull up Defense Exhibit 1088, please, page 17.

Q.  And government counsel was asking you about the Intercontinental incident and about whether or not you left the freak-off early.  Do you remember that?

A.  Yes.

Q.  And this message at the bottom suggests that the plan was to have a short freak-off, right?

MS. JOHNSON:  Objection.

Q.  Can you read this message, please.

A.  I think if we start at 7 or 8 and end at 4 at the latest,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5GMCOM7                         Ventura - Recross

take a Xanax and/or Ambien and go to sleep, we'll be OK.  And you rest tomorrow and all day Sunday.  You'll be good.  And drink a lot of water.  We'll be good.  But we won't have hours to be caught in a matrix.  If we do it, I want you to call Garren and see what he has so it can really be a turn on.  But if we're gonna do something, the sooner the better.

Q.  You stated that you were feeling overwhelmed after your civil lawsuit, right?

A.  Yup.

Q.  And that's because this has been hard on you, right?

A.  Right.

Q.  You publicized a lot of very private information, right?

A.  Right.

Q.  And have been subjected to a lot of scrutiny, right?

A.  Right.

Q.  And your name has been in the press, right?  And it has been hard on Mr. Combs too?

        MS. JOHNSON:  Objection.

        THE COURT:  That's sustained.

Q.  You stated on redirect that you did not have any additional lawsuits other than your suit against Mr. Combs, right?

A.  Right.

Q.  You have recently received a settlement from the Intercontinental Hotel, didn't you?

A.  No.

Q.  You did not?

A.  I haven't received a settlement from the Intercontinental.

Q.  Did you make a demand on the Intercontinental?

A.  I did.

Q.  Did you receive anything in response to that demand?

A.  No, I haven't.

Q.  Do you anticipate receiving some settlement in that case or matter?

A.  I do.

Q.  How much do you expect to receive?

A.  I don't know the exact number.

Q.  Can you provide an estimate?

A.  I think it would -- 10 million, maybe.

Q.  And have you reached the end of settlement discussions with the Intercontinental?

A.  I have.

Q.  So you expect to receive 10 million?

A.  From the Intercontinental, yeah.

Q.  Thank you.

         THE COURT:  Anything further?

         MS. JOHNSON:  Yes, your Honor.  I have one question on redirect.

         THE COURT:  I'm asking Ms. Estevao.

         MS. ESTEVAO:  I have a couple more questions.  Thank you.

THE COURT:  It's past 15 minutes, so can you get it done in a couple of minutes?

MS. ESTEVAO:  Yes.  I will be brief.

Can we pull up Defense Exhibit 1159, please.  Can we go to the next page.

Q.  In response to Mr. Combs' message of August 5, 2009, when he asked, when do you want to freak off, LOL, what do you say?

A.  LOL.  I'm just going up to change and put my ring in.  I just picked it up.  I'm always ready to freak off.  LOLOL.

MS. ESTEVAO:  Can we pull up Defense Exhibit 1409, please.  Can we scroll down, please.  The next page.  Next page.  Can you highlight the first bubble.

Q.  Ms. Ventura, this is the last thing I am going to ask you to read.

A.  Thank you.

Are you ready?

Q.  I'm ready.

A.  Sorry.  I needed a second to gather my thoughts.  The things you said blew my mind a bit.  First, I don't hate you. I never have.  I wouldn't be at this beautiful point of my life without having been with you.  I definitely think of the same day to sit down and just talk because I know that we need closure and understanding.

MS. ESTEVAO:  Thank you so much.

THE COURT:  Ms. Johnson.

MS. JOHNSON:  Yes, your Honor.  I apologize.  I have three questions, but I'll be very brief.

REDIRECT EXAMINATION

BY MS. JOHNSON:

Q.  Ms. Ventura, to be clear, do you have any pending lawsuits?

A.  Pending lawsuits, no.

Q.  Do you have any financial stake in the outcome of this trial?

A.  Absolutely not.

Q.  And defense counsel asked you a number of questions about the broken electronic devices that you kept after your relationship with Sean was over.

A.  Yup.

Q.  Why did you keep those devices?

A.  Because I didn't know what was on them, and I feared bringing them to the Apple store and somebody else seeing what was on them.  They were broken.

Q.  When you say you feared what was on them, what specifically were you worried about being on those devices?

A.  Explicit videos.

MS. JOHNSON:  No further questions.

MS. ESTEVAO:  Can I ask just one question?

THE COURT:  It's just going to be one question.

RECROSS EXAMINATION

BY MS. ESTEVAO:

P5GMCOM7

Q.   You just reached the settlement with the Intercontinental last week, right?

         MS. JOHNSON:  Objection.  Beyond the scope.

         THE COURT:  That's overruled.

A.   I don't know if it was last week.  In the past month.

Q.   Before your testimony today, right?

A.   Yeah.

         MS. ESTEVAO:  Thank you.

         THE COURT:  Thank you very much, Ms. Ventura.  Have a great weekend.

         THE WITNESS:  Thank you.  You too.

         (Witness excused)

         THE COURT:  We are going to take a break.

         Ms. Ventura, why don't you go ahead.  You've been here a long time.

         We will let Ms. Ventura leave the courtroom, and we will take a recess.

         Members of the jury, we will take a recess, and then we will be back with the next witness.

         All rise.

         (Jury not present)

         THE COURT:  Ms. Comey, who do we have next?

         MS. COMEY:  Next will be Yasin Binda, your Honor.

         THE COURT:  Who will be presenting the next witness?

         MS. SMYSER:  I will, your Honor.

P5GMCOM7

THE COURT:  Ms. Smyser.

How much time do you need to prepare, to get everything ready?  Is it Mr. Binda?

MS. SMYSER:  No.  It's Special Agent Binda.

THE COURT:  Are they ready?

MS. SMYSER:  Yes.  Just need a few minutes.

THE COURT:  Let's take 10 minutes, and then we will come back at 3:30.

Ms. Johnson, you were getting up.  Did you have something?

MS. JOHNSON:  I'm sorry, Judge.  I thought you were done.

THE COURT:  Mr. Agnifilo.

MR. AGNIFILO:  Your Honor.  It might not end up being a problem because we have a witness before this, but the witness after this one is someone named Dawn Richard, and the parties have a strong difference of opinion on the scope of your Honor's order precluding large amounts of this particular witness' testimony.  It might not be a problem, because I don't know that we are going to get to Dawn Richard today or not, but I don't want start the break without putting this on the Court's radar screen.

If the Court remembers, I believe this witness was cited in the government's last enterprise letter, and we objected that the letter was too late in time, and we asked the

P5GMCOM7

Court to preclude this witness' testimony concerning what essentially --

THE COURT:  Forced labor issue.

MR. AGNIFILO:  Forced labor.

But the important part is the way it was phrased in your Honor's order.  Your Honor was referring to the government's enterprise letter of April 20, 2025.

And what your Honor stated in the order, and maybe over the break we can find the transcript, is, your Honor said that everything under what was sort of paragraph 5, the letter -- if the Court remembers it.  It may or may not -- was broken into different sections, and there is one section 5 and the Court said everything in section 5 is off limits.  And we have a difference of opinion as to essentially what your Honor intended by your order and, as a result, what is going to be part of this witness' testimony and what is not.

THE COURT:  What's the difference of opinion?

MR. AGNIFILO:  I'm taking your Honor's order at face value, and number 5 has four subdivisions in it.  And I believe the order on its face says that all of the four subdivisions of number 5 are off limits.

THE COURT:  It's consistent with my recollection.

MR. AGNIFILO:  Yes.

THE COURT:  Let's hear the response.

MS. COMEY:  Thank you, your Honor.

If I may, this is referring to the April 25, 2025 transcript. Your Honor's ruling was at page 45, lines 19 through 24.

You said: The Court will exclude the evidence in item 5. The other remaining evidence is not excluded.

Then later, on page 51, lines 1 through 8, Ms. Johnson said: I just want to make sure I understand that the Court's ruling is that the government can't argue forced labor as to employee number 4, that's Ms. Richard, but employee number 4 is an individual who has been on the government's witness list for other testimony, and we still intend to call her, and I understand that the Court's ruling on this would not preclude our calling her, and your Honor said: That's correct.

THE COURT: That's also consistent with my recollection.

MS. COMEY: I think the dispute is that, your Honor, some of the testimony that we had already been planning to introduce from Ms. Richard to prove up the enterprise acts in our February 1 letter and to prove up the sex trafficking charged in Count Two with respect to Ms. Ventura overlapped with some of the proof that we would have used had your Honor allowed us to argue that Ms. Richard was a victim of forced labor; and in particular it's that she observed violence, she observed Mr. Combs being violent with Ms. Ventura.

We would have argued, had we been permitted, that some

P5GMCOM7

of her observations of him being violent was coercive as to her. We will not be making that argument because we understand your Honor's ruling, but we believe her witnessing Mr. Combs be violent to Ms. Ventura is still admissible under our February 1 enterprise letter which notified the defense that we would be proving sex trafficking in part through violence to Ms. Ventura and to prove up Count Two.

And, similarly, we expect Ms. Richard would testify that she observed Mr. Combs and his security in possession of guns, that she observed Mr. Combs in possession of and distributing drugs, and that Mr. Combs and other -- at least one other employee of one of his companies threatened Ms. Richard to keep her silent about the violence and the other crimes that she observed.

All of that we think falls comfortably within our February 1 enterprise letter, which previewed those types of acts as the way the enterprise operated.

Had your Honor permitted us to, we would have also argued that that is evidence of forced labor. We will not be making those arguments, and we will also not be introducing any evidence on direct examination of Ms. Richard's own experience of violence or coercion at the hands of Mr. Combs because we understand that would only be relevant as to forced labor of Ms. Richard. We will not be eliciting testimony about that topic from her on direct.

THE COURT:  With that explanation, Mr. Agnifilo --

MR. AGNIFILO:  That's all well and good, but that's totally inconsistent with your Honor's order.

THE COURT:  When did this issue come up, by the way, between the parties?  Because you now have a present understanding that there is an issue.

MR. AGNIFILO:  Yes.

THE COURT:  But the issue is coming up at 3:30 p.m.

MR. AGNIFILO:  I thought we were going to the end of the day.  I emailed the government over lunch when I saw that we were going to end early.  And what I suggested to the government -- I'm not the government.  It's only a suggestion.

THE COURT:  This is reflective really of the issue that the Court addressed earlier, the list of ground rules for the remainder of this proceeding where the parties will be addressing these issues in good faith before we get to the courtroom so that we can address these issues at the beginning of the trial day, which you tried cases in this district.  All the folks in the front table have done it, and that's the standard practice.

If something could come up during the day, it is brought up early, and the parties tell the Court, we need to get here -- you can tell me to get here at 5 a.m.  I will be here to address these issues.  But when it comes up at 3:30 p.m., and I don't know how long Special Agent Binda is going to

P5GMCOM7

be testifying, but we have the jury here, and they are working really hard. If we have to send them home early because there is a real detailed issue, that's a problem. I'm not saying that to you. I am saying that everybody here.

MR. AGNIFILO: You can say it to me. It's fine. I am happy that we are -- I did not think that we would finish this witness as early as we did. We moved heaven and earth to do that. I didn't think we would be in this position. So as soon as I saw, frankly, that we were going to be in this position, it really wasn't until the lunch break, I emailed the government and I said, we have this great difference of opinion as to this one witness. Why don't you call the other witness first, and then hopefully it will break so that we can maybe resolve this issue at the end of the day.

THE COURT: What I understand Ms. Comey is saying is that taking the Wayback Machine to the hearing that we are talking about, I was told that there were portions of the new enterprise letter that related to existing parts of the case that were reflected in an earlier enterprise letter or that were part of the indicted and the charged acts. As to those pieces of the final enterprise letter, the Court said that's fair game because it was in either the prior enterprise letter or it was in the indictment, so there is no concern with a late disclosure. As you identified, there was the one paragraph that we -- that the Court ruled was out. What I understand Ms.

P5GMCOM7

Comey is saying, they are operating consistent with that understanding, that what they are going to put in is either going to relate to material that was in the prior enterprise letter or that was reflected in the charged acts in the indictment.

Is that right, Ms. Comey?

MS. COMEY:  That's exactly right, your Honor.

THE COURT:  What I need some help with, and you can do it after the break, is that if there is a portion of the transcript or if there is something that I'm missing, let me know.  If you can do it now, great.

MR. AGNIFILO:  What I am going to give your Honor is, I am going to give your Honor the government's last enterprise letter.  I'll give your Honor the portion of the transcript where you discuss it, and we will take it from there.

THE COURT:  It may be more nuanced than that.  I understand that.

MS. COMEY:  Your Honor, if I may just expand the record a bit.

We informed defense counsel on May 13 that Ms. Richard would be either the next or the second witness after Ms. Ventura.  They have had 3500 for Ms. Richard for weeks and it has been clear, through the 3500, what her direct testimony would be.

And I would also note that Ms. Richard has flown from

P5GMCOM7

across the country to be here to be available to testify today. We would ask that she be permitted to testify, and frankly we take some issue with the defense raising this issue so late in the game when they have been on notice of this for a while.

THE COURT:  How long is Agent Binda expected to testify, Ms. Smyser?

MS. SMYSER:  Her direct is no more than 45 minutes, your Honor.

THE COURT:  How long do you expect Ms. Richard to take?

MS. STEINER:  Approximately 30 minutes, your Honor.

THE COURT:  Mr. Agnifilo, when we come back from the break, are you going to have these materials that you are going to show me?

MR. AGNIFILO:  Yes, I am.  I am going to have them, as long as our printer works.  We have a printer on our 24th floor, and my credibility is now dependent on a printer, but I will make it work.

MS. COMEY:  Your Honor, we can print copies of the enterprise letters for your Honor and for Mr. Agnifilo.

THE COURT:  We'll just deal with it.

Let's take 10 minutes and we will come back.

MS. COMEY:  We will go do that.

(Recess)

MS. COMEY:  Your Honor, may I be heard, now that we

have gotten a chance to look at the enterprise letter?

THE COURT:  Yes.

MS. COMEY:  On the April 20, 2025 letter, paragraph 5 was the subject of your Honor's order.  And I think crucially paragraph 5 begins by saying:  On multiple occasions between certain dates, the defendant and others obtained the labor and services of employee 4 by force and threats of force in addition to serious harm and threats of serious harm, including through some of the methods described in paragraph 2 of the earlier letter, in addition to the following.

The reason I highlight that is, it makes clear that the subparagraphs are tied to the forced labor allegations.  It is not saying these are all of the purposes for which we will be offering this evidence at trial.  It is tied to the forced labor allegation.

So that is why the government I think very reasonably understood your Honor's ruling to be that we could not prove up forced labor using this evidence.  However, as we clarified at the end of the conference, we can use her testimony to prove other aspects of our case, so that is what we would ask that we be permitted to do.

THE COURT:  Just so I understand, Ms. Comey, the subparts of paragraph 5.

MS. COMEY:  Yes, your Honor.

THE COURT:  Those subparts in any prior enterprise

P5GMCOM7

letter.

MS. COMEY:  A and B are not.  C and D would be covered by the broad categories in the February 1 letter for which we did not disclose which witnesses or which pieces of evidence but generally said that we would be proving up different racketeering acts, and those are contained in paragraphs B1, B2, B4, and B5 of our February 1 enterprise letter.

(Continued on next page)

THE COURT:  But 5C and D are independently relevant to the sex trafficking charge; is that correct?

MS. COMEY:  Precisely, your Honor.

THE COURT:  So 5C and D are in, 5A and B are out.

MR. AGNIFILO:  Can I be heard, your Honor?

THE COURT:  Yes.

MR. AGNIFILO:  That's not your Honor's ruling that we've been sort of laboring under is, most respectfully, not that.  It's that 5 is out, and 5 has four subcategories.

THE COURT:  5 is out as to the RICO charge.  That's why I asked that question, because 5C and D would be evidence the government could bring on the independent sex trafficking charge, which had nothing to do with the RICO charge, except the fact it's also one of the predicates, right?

MR. AGNIFILO:  If it were explicitly in one of their enterprise letters --

THE COURT:  What does the independent 1591 charge have to do with the separate RICO charge, for which an enterprise letter was provided?

MR. AGNIFILO:  The government --

THE COURT:  I'm asking you the question, what does one have to do with the other, meaning you have an independent 1591 charge, meaning the government dropped their RICO charge today. They would still have that 1591 charge, they would still call Ms. Richard to testify concerning violence perpetrated against

P5GCcom8

Ms. Ventura, correct, Ms. Comey?

MS. COMEY:  Correct, your Honor.

THE COURT:  Right.  So I'm saying there's no enterprise letter, there was no other bill of particulars sought as to that particular issue.  So there was no relief sought in the way of a disclosure.  The disclosure was directed towards the RICO charge.  So that's why I asked the question, because 5C and D, first of all, it's not coming in for the forced labor acts that are in paragraph 5, Ms. Comey has confirmed that.  Ms. Comey is just saying that 5C and D, that kind of testimony may be elicited in direct examination of Ms. Richard because it goes to, among other things, the 1591 charge.

MR. AGNIFILO:  That might be along --

THE COURT:  That's not something we addressed by the order, it's not what was intended by the order, and 5C and D are in, 5A and B are out consistent with my prior ruling.

MR. AGNIFILO:  My exception is noted.  Thank you, Judge.

THE COURT:  It is.

With that, let's have our jury back.

(Continued on next page)

(Jury present)

Ms. Smyser, you may call your next witness.

MS. SMYSER:  Your Honor, the government calls Special Agent Yasin Binda.

YASIN BINDA,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. SMYSER:

Q.  Good afternoon, Special Agent Binda.

A.  Good afternoon.

Q.  Could you please state and spell your name for the record.

A.  Yasin Binda, Y-a-s-i-n B-i-n-d-a.

Q.  Where do you work?

A.  I work at Homeland Security Investigations.

Q.  Is Homeland Security Investigations also known as HSI?

A.  Yes.

Q.  What is your title with HSI?

A.  I am a special agent.

Q.  How long have you worked with HSI?

A.  For a little over five years.

Q.  Do you work in a particular group there?

A.  Yes.

Q.  What group is that?

A.  The human trafficking group.

Q.  How long have you worked with the human trafficking group?

A.  A little over four years.

Q.  What are some of your responsibilities as a special agent with the human trafficking group?

A.  I conduct criminal investigations, both domestic and internationally.

Q.  Do you have any other roles at HSI?

A.  Yes, I do.

Q.  What are those?

A.  I'm a crisis negotiator.

Q.  What does that mean?

A.  We help our special response team when they go out on warrants to deescalate situations.

Q.  Special Agent Binda, I want to focus on the particular things you did in this case.  Did you serve any subpoenas in connection with this case?

A.  Yes, I did.

        MS. SMYSER:  Ms. Gavin, could you please pull up what is in evidence as Government Exhibit 2A-602.

Q.  Do you recognize this person?

A.  Yes, I do.

Q.  Who is it?

A.  Mr. Paul Arthur.

Q.  How do you recognize him?

A.  I served him with a subpoena.

P5GCcom8                          Binda - Direct

Q.   When did you serve him with a subpoena?

A.   March 27th of 2024.

          MS. SMYSER:  You can take that down.

Q.   Stepping back just a moment.  As a special agent with HSI, do you participate in the searches of premises?

A.   Yes, I do.

Q.   What kind of trainings, if any, have you received regarding the execution of search warrants?

A.   I received training at my academy, and I also had experience throughout my years with Homeland Security conducting search warrants.

Q.   Approximately how many times have you participated in premises search warrants?

A.   Around five to ten.

Q.   What kinds of premises have you searched?

A.   Houses, apartments, and brothels.

Q.   Now I want to direct your attention to September 16th of 2024.  Did you participate in a search that day?

A.   Yes, I did.

Q.   Where was that search?

A.   That search was at the Park Hyatt in Manhattan.

Q.   What kind of building is the Park Hyatt?

A.   It's a hotel.

Q.   What were you doing immediately prior to that search?

A.   I was at our office at 26 Federal Plaza handling logistics.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Q.   What were you handling logistics for?

A.   The arrest of Mr. Sean Combs.

Q.   Did you find out whether Mr. Sean Combs was arrested on September 16th, 2024?

A.   Yes.

Q.   And how did you know that?

A.   I knew that because I saw him at our office.

Q.   What did you do after you finished with the arrest logistics?

A.   I headed to the Park Hyatt.

Q.   Did you end up searching a particular room at the Park Hyatt?

A.   Yes.

Q.   What room did you search?

A.   2115.

Q.   Who was staying in that room?

A.   Mr. Sean Combs.

       MS. SMYSER:   Ms. Gavin, could you please pull up for the witness, Court, and parties what has been marked for identification as Government Exhibit 2B-133.

Q.   Special Agent Binda, do you recognize what is depicted here?

A.   Yes, I do.

Q.   What is it?

A.   It's the entrance of the Park Hyatt.

Q.   How do you recognize it?

A.   Because that's where I went for the search warrant.

Q.   Is this a fair and accurate depiction of the Park Hyatt hotel?

A.   Yes.

Q.   And just remind us where that hotel is located?

A.   In Manhattan.

MS. SMYSER:  Your Honor, the government offers Government Exhibit 2B-133.

MS. GERAGOS:  No objection.

THE COURT:  2B-133 will be admitted.

(Government's Exhibit 2B-133 received in evidence)

MS. SMYSER:  Ms. Gavin, could you please publish that for the jury.

Q.   Special Agent Binda, just remind the jury what they're looking at here.

A.   This is the front entrance of the Park Hyatt.

Q.   Special Agent Binda, was the search you did at the Park Hyatt hotel authorized by a search warrant?

A.   Yes, it was.

Q.   Approximately what time of day did you execute that warrant?

A.   Around 11:30 p.m.

Q.   Was anyone besides law enforcement present for the search?

A.   No.

MS. SMYSER:  You can take that down, Ms. Gavin.

Q.  Special Agent Binda, could you please walk us through the process by which the hotel room was searched.

A.  Yes.  So at first we cleared the hotel room to make sure that no one else was there, afterwards we took a video of the hotel room, then we proceeded with the search, which started marking each room with a piece of paper that contained a letter designating each room, and then we commenced the search.

Q.  Generally, what happens if an agent who is searching a room finds something of interest?

A.  They will call the photographer so that piece of evidence could be photographed.  The photographer will photograph it, there will be an inventory log of it, and whoever found the item will place it in an evidence bag and mark the evidence bag appropriately.

Q.  What was your role during this particular search?

A.  I was the photographer.

Q.  And what did you do as the photographer?

A.  Whenever a piece of evidence was found, I took a picture of that evidence or anything of interest.

Q.  Where did you typically photograph the items?

A.  Where the items were found.

Q.  Were the items always photographed exactly where they had been located when law enforcement came into the room?

A.  No.

Q.  And why not?

A.  Sometimes items are found in bags or in suitcases, and those items were in a closet, so we had to move them.

Q.  What happened to the particular items seized from the Park Hyatt hotel room after you photographed them?

A.  They were then brought to the office for further processing.

Q.  Did you see all the items in the hotel room before they were brought to the office?

A.  Yes, I did.

Q.  What, if anything, did you do related to the items after the search?

A.  I then signed for all of the items.

Q.  When you say you signed for the items, what do you mean?

A.  I mean that I took responsibility for them and signed on our 6051 forms that I had been in possession of the items.

Q.  What's a 6051 form?

A.  A 6051 form talks about what was seized from which room, and then it also shows the chain of custody of that particular item.

Q.  And what's the purpose of completing 6051 forms?

A.  So that we know that the evidence maintain a clear chain of custody.

Q.  Special Agent Binda, now I want to direct your attention to the binder that's in front of you, which contains what's been

marked for identification as Government Exhibits 1D-104, 1D-108

through 111, 1D-113 through 114, 1D-118 through 120, 1D-123,

1D-125, 1D-129, 1D-131, 1D-133, 1D-135 through 136, 1D-138

through 139 and 1D-141.  Could you just take a moment and flip

through that binder and tell me if you recognize what is in it.

A.   Yes, I recognize these.

Q.   What are they?

A.   These are photographs that I took at the Park Hyatt.

Q.   How do you know that?

A.   Because I recognize the photos.

Q.   Are they fair and accurate depictions of the Park Hyatt

hotel on September 16th, 2024?

A.   Yes.

        MS. SMYSER:  Your Honor, the government offers the

exhibits that I just listed for identification purposes.

        THE COURT:  Any objection?

        MS. GERAGOS:  No objection.

        THE COURT:  Those exhibits will be admitted.

        (Government's Exhibits 1D-104, 1D-108 through 111,

1D-113 through 114, 1D-118 through 120, 1D-123, 1D-125, 1D-129,

1D-131, 1D-133, 1D-135 through 136, 1D-138 through 139 and

1D-141 received in evidence)

Q.   Special Agent Binda, next I want to walk through the layout

of the hotel room.  Let's start with the entrance of the hotel

room.

P5GCcom8                          Binda - Direct

MS. SMYSER:  Ms. Gavin, could you please display Government Exhibit 1D-104, which is in evidence.

Q.  Special Agent Binda, could you explain what the jury is looking at here.

A.  Yes.  So you see room 2115 in the corner.  You see the front entrance of the hotel room.  The door is being opened by my colleague, and there is a wall right behind that door.  You see my reflection in the mirror that's opposite the front entrance door.

Q.  And just focusing on that document that's labeled A, do you see that on the screen?

A.  Yes, I do.

Q.  What is that?

A.  That is the room designation marker that I talked about earlier.

Q.  And did every room that was searched have one of these designation markers?

A.  Yes.

Q.  What is to the right of this mirror?

A.  To the right of the mirror is a wall.

Q.  And what about to the left?

A.  To the left is a hallway that leads further into the room.

MS. SMYSER:  Ms. Gavin, could you now please pull up side-by-side Government Exhibit 1D-125 with Government Exhibit 1D-109.

P5GCcom8                         Binda - Direct

Q.  Special Agent Binda, first I want to focus on the photograph on the left-hand side of this screen.  Could you first explain where this is in relation to the entryway we were just looking at.

A.  Yes.  So the entryway that we were just looking at would be to the left of that marker B.  This is taken from the back portion of what I consider the living room.

Q.  Do you see a document labeled B in that photograph?

A.  I do.

Q.  What does that represent?

A.  That's representing the hallway closet as a room.

Q.  I want to focus now on the right-hand side of the screen, Government Exhibit 1D-109.  What does that show?

A.  So that would be right in front of that hallway closet, room B, and you're looking at the open space, which has a seating area, to the right a table, and then a couch and TV.

Q.  Is there also a bedroom in this hotel room?

A.  Yes, there is.

Q.  Where is that in relation to this living room area?

A.  So between the table and the sofa, there's a doorway, and you would go through that doorway to get into the bedroom.

Q.  Is there a full bathroom?

A.  Yes, there is.

Q.  Where is that?

A.  Once you go into the bedroom, on your right-hand side,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

you'll go through another hallway and closet, and then it would lead you into the full bath.

MS. SMYSER:  Ms. Gavin, could you now please pull up side by side again Government Exhibit 1D-114 and Government Exhibit 1D-120.

Q.  Special Agent Binda, what is depicted in Government Exhibit 1D-114?

A.  That's the bedroom.

Q.  And what about 1D-120?

A.  That's the left-hand side of the bathroom.

MS. SMYSER:  You can take those down, Ms. Gavin.

Q.  Now I want to walk through certain items that you found during the search.  You testified earlier that there was a closet near the entryway that was labeled B.  Do you remember that?

A.  Yes.

MS. SMYSER:  Ms. Gavin, could you please pull up Government Exhibit 1D-108.

Q.  What are we looking at here?

A.  This is the hallway closet that's marked as room B.

Q.  And what is depicted at the bottom of this closet?

A.  There are several bags at the bottom of the closet.

MS. SMYSER:  Let's next pull up Government Exhibit 1D-131.

Q.  Special Agent Binda, what is this?

A.   This is one Ziploc bag filled with Johnson's baby oil, and you see another Ziploc bag filled with Astroglide that was found in one of the hallway bags in the closet.

MS. SMYSER:  Ms. Gavin, could you now please display Government Exhibit 1D-129.

Q.   What is this?

A.   This is a hard drive that was also found in one of the bags in the hallway closet.

Q.   Where was it found?  Oh, sorry.

A.   It was in one of the bags in the hallway closet.

Q.   I just want to direct your attention to the cart beside you to what has been marked for identification as Government Exhibit A-1500.  Do you see that?

A.   Yes, I do.

Q.   What is that?

A.   That is the hard drive that is shown in this picture.

MS. SMYSER:  Ms. Gavin, could you please display Government Exhibit 1301, and turn to page 3.  Could you just zoom in on paragraph 16.

I'm going to read 16C here.  On or about September 16, 2024, in the vicinity of the Park Hyatt hotel, in New York, New York, HSI seized the following electronic devices following Combs's arrest:  Government Exhibit A-1500, a hard drive from Park Hyatt, room 2115.

You can take that down, Ms. Gavin.

Q.  Special Agent Binda, I next want to focus on the living room of that hotel room.

        MS. SMYSER:  Ms. Gavin, could you please display Government Exhibit 1D-110.

Q.  What is this?

A.  This looks to be a lighting device.

Q.  Where was this lighting device located?

A.  This was in the living room.

Q.  And how would you describe the lighting device?

A.  I would describe it as potentially mood lighting.

        MS. SMYSER:  You can take that down, Ms. Gavin.

Q.  Let's move on next to the bathroom.  What, if anything, was found in the bathroom?

A.  In the bathroom we found several bottles of baby oil.

        MS. SMYSER:  Ms. Gavin, could you please display Government Exhibit 1D-123.

Q.  What does this show?

A.  This shows five bottles of baby oil that were found in the bathtub in the bathroom.

Q.  And were they in this position when they were found?

A.  Yes, they were.

Q.  I just want to clarify here, are the bottles with the green caps, are those baby oil?

A.  Yes.

Q.  And are the others lubricant?

A.   Yes.

MS. SMYSER:  You can take that down, Ms. Gavin.

Q.   Special Agent Binda, next I want to turn to the bedroom.

MS. SMYSER:  Ms. Gavin, could you please display Government Exhibit 1D-118.

Q.   What generally is depicted here?

A.   A nightstand.

Q.   Where is this nightstand in relation to the bed?

A.   This was on the right side of the bed.

MS. SMYSER:  Ms. Gavin, could you please zoom in on the brown bag on the right-hand side of the photo.

Q.   What brand is that bag?

A.   A Louis Vuitton bag.

Q.   What, if anything, was found inside of the bag?

A.   There was a bottle of medication found.

MS. SMYSER:  Ms. Gavin, could you please pull up Government Exhibit 1D-139.

Q.   What is this?

A.   That was the bottle of medication that was found in the bag.

Q.   What is the name on this pill bottle?

A.   Frank Black.

MS. SMYSER:  You can take that down, Ms. Gavin.

Q.   Was anything found inside of this nightstand?

A.   Yes.

P5GCcom8                    Binda - Direct

MS. SMYSER:  Ms. Gavin, could you please display Government Exhibit 1D-133.

Q.   What are we looking at here?

A.   Those are two bottles of lubricant.

Q.   And where were they found?

A.   They were found in the drawer of the nightstand.

Q.   Special Agent Binda, we've now looked at several pictures of baby oil and lubricant.  Was that all of the baby oil and lubricant found in the hotel room?

A.   No.

MS. SMYSER:  You can take that down, Ms. Gavin.

Q.   Were there any other nightstands in the hotel room?

A.   Yes.

MS. SMYSER:  Ms. Gavin, could you please display Government Exhibit 1D-111.

Q.   What generally are we looking at here?

A.   This is the nightstand that was on the left side of the bed.

Q.   Do you see a red item in that picture?

A.   Yes, I do.

Q.   What is that?

A.   That's a red iPhone.

Q.   Special Agent Binda, I want to direct your attention to what's been marked for identification as Government Exhibit A-1300 beside you.  What is that?

A.   This is the iPhone that is depicted in the picture.

          MS. SMYSER:  Ms. Gavin, could you please display

Government Exhibit 1301 and return to page 3, and zoom in on

paragraph 16.

          This paragraph states that on or about September 16,

2024, HSI seized the following electronic devices following

Combs's arrest, including, B, Government Exhibit A-1300, a

cellphone from the Park Hyatt, room 2115.

          Ms. Gavin, you can take that down.

Q.   Special Agent Binda, was anything else found inside of this

nightstand?

A.   Yes.

          MS. SMYSER:  Ms. Gavin, could you please display

Government Exhibit 1D-135.

Q.   What does this show?

A.   This shows a bottle of medication.

          MS. SMYSER:  Ms. Gavin, could you please display

Government Exhibit 1D-138.

Q.   What is this?

A.   These two bags were found inside the bottle of medication.

Q.   Where was this bottle of medication found?

A.   In the drawer of the nightstand.

Q.   Was there a name on this bottle?

A.   No, there wasn't.

Q.   Special Agent Binda, now I want to direct your attention to

what's been marked for identification as Government Exhibit 1D-150 beside you. Do you recognize this?

A. Yes, I do.

Q. What is it?

A. This is the pink powder and the medication bottle that was depicted in the picture.

MS. SMYSER: At this point, your Honor, I'd like to offer Government Exhibit 1305, which is a stipulation between the parties.

THE COURT: All right. The stipulation will be admitted.

(Government's Exhibit 1305 received in evidence)

MS. SMYSER: Ms. Gavin, could you please display Government Exhibit 1305, and let's zoom in first on the bottom two paragraphs. I will read these.

The parties stipulate and agree that Government Exhibit 1D-150, described below, was seized during a search of room 2115 at the Park Hyatt hotel, on or about September 16, 2024, and was analyzed for the presence of controlled substances by a U.S. Department of Homeland Security and U.S. Customs and Border Protection laboratory. The results of this analysis are described below.

Government Exhibit 1D-150 contains the following items, which were found in the hotel room's bedroom.

Ms. Gavin, could you go to the next page, please.

Could you zoom in on the top half of the page.

A clear plastic Ziploc bag containing pink solid material, which was found in an orange plastic prescription bottle and is pictured in Government Exhibit 10A-105-A1.  The pink solid material tested positive for ketamine.

A clear plastic Ziploc bag containing pink solid material, which was found in the same orange prescription bottle described in paragraph 2A.  The pink solid material tested positive for MDMA and ketamine.

Your Honor, the government would offer Government Exhibits 1D-150 and Government Exhibit 10A-105-A1.

MS. GERAGOS:  No objection.

THE COURT:  Those exhibits will be admitted.

(Government's Exhibits 1D-150 and 10A-105-A1 received in evidence)

MS. SMYSER:  Ms. Gavin, could you please display Government Exhibit 10A-105-A1.

And while she's doing that, your Honor, could we please have permission to pass the physical exhibit around for the jury so they can inspect it?

THE COURT:  Any objection to that?

MS. GERAGOS:  No, your Honor.

THE COURT:  You may proceed.

Q.  Special Agent Binda, I'd like to focus on another item now.

MS. SMYSER:  Ms. Gavin, could you please display

Government Exhibit 1D-113.

Q.   Special Agent Binda, away does this show?

A.   This shows a black fanny pack that's hanging off of the bed.

Q.   Was anything found in that bag?

A.   Yes.

Q.   What?

A.   $9,000.

         MS. SMYSER:  Ms. Gavin, could you please display Government Exhibit 1D-141.

Q.   What does this show?

A.   This is a picture of the $9,000 that were in the black fanny pack.

Q.   Special Agent Binda, I want to direct your attention to what's been marked for identification as Government Exhibit 1D-151 in the cart beside you.  Do you recognize this?

A.   Yes, I do.

Q.   What is it?

A.   This is the black fanny pack that's depicted in the picture.

Q.   How do you know?

A.   By the description on the evidence bag and by the 6051 that's also with the evidence bag.

Q.   And did you sign that 6051?

A.   I did.

MS. SMYSER:  Your Honor, the government offers Government Exhibit 1D-151.

MS. GERAGOS:  No objection.

THE COURT:  That exhibit will be admitted.

(Government's Exhibit 1D-151 received in evidence)

Q.  Special Agent Binda, there's some scissors next to you. Could you please cut open that evidence bag.  Could you please take the cash out of the bag to display it for the jury.  You can put it back in the bag.

Special Agent Binda, I want to ask you a few final questions about the Park Hyatt.  Were any additional electronics seized at the Park Hyatt hotel on September 16th?

A.  Yes.

Q.  I want to direct your attention to two items marked for identification in the cart beside you, it's Government Exhibit A-1200 and C-400.

MS. SMYSER:  While she's looking for those, Ms. Gavin, could you please pull up Government Exhibit 1301, and zoom in on paragraph 16.

This paragraph reads that on or about September 16th of 2024, at the Park Hyatt hotel, HSI seized the following electronic devices following Combs's arrest:  Government Exhibit A-1200, a cellphone from Combs's person, and Government Exhibit C-400, a cellphone from Kristina Khorram's person.

Your Honor, may I have just a moment?

P5GCcom8                        Binda - Cross

THE COURT:  You may.

MS. SMYSER:  No further questions.

THE COURT:  Cross-examination.

MS. GERAGOS:  Your Honor, just a few.

CROSS-EXAMINATION

BY MS. GERAGOS:

Q.  Good afternoon, special agent.  My name is Teny Geragos.
I'll only be asking you a few questions.

A.  Good afternoon.

Q.  So we just looked through -- we'll start with the beginning
of your testimony.  You stated that you served a subpoena on an
individual.  Do you know what his name was?

A.  Mr. Paul Arthur.

Q.  Where did you serve the subpoena?

A.  This was at his residence.

Q.  In what state, what county?

A.  It was in Los Angeles, California.

Q.  And you said you served it on March 27th, 2024?

A.  Yes.

Q.  Had warrants been executed at Mr. Combs's homes two days
prior to that?

A.  Yes.

MS. GERAGOS:  Can we pull up what's already in
evidence as 1D-108.

Q.  This was what you testified was the hallway closet of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

hotel, right?

A.   Yes.

Q.   And you can see in the bottom portion there, there's several bags and suitcases, right?

A.   Yes.

Q.   And several shoeboxes in the top portion?

A.   Yes.

Q.   And several clothes on those hangers?

A.   Yes.

Q.   Were you part of the team that was monitoring Mr. Combs's movement at the Park Hyatt hotel?

A.   No, I was not.

Q.   Did it seem like he had a lot of items at the hotel when you went in, many clothes, many suitcases, many shoes?

A.   There are a good amount of items.

Q.   Were you part of the team that arrested him or were you just part of the team that processed him after he was arrested?

A.   I was just part of the team of the search warrant.

Q.   When you were in the room, did you see any bags or other items that indicated that a woman was staying with him there?

A.   Yes.

Q.   And you recovered -- I know we looked at the pink powder that you passed around to the jury, but you also recovered a marijuana cigarette, right?

A.   I don't recall.

P5GCcom8                         Binda - Cross

MS. GERAGOS:  Can we bring up just for the witness and the parties 3722-005 at page 5.

Q.  If I show you something, will it help refresh your recollection?

A.  Yes.

MS. GERAGOS:  3722-005.  It's no problem if we don't have it, but if we do -- okay, we don't have it.  No problem.

Can we go to 1D-118 already in evidence for the Court, the parties, and the jury.

Q.  You testified that the Louis Vuitton bag on the top right had a pill bottle in it, right?

A.  Yes.

MS. GERAGOS:  Can we put 1D-139 on the right half of the screen.  We seem to be having technical difficulties today.

Q.  So you testified that that is under Frank Black at the top, right?

A.  Yes.

Q.  And you didn't testify as to what the actual pill bottle is, what does that word say, what is the medication?

A.  Clonazepam.

Q.  It indicates this was from a Walgreen's at the bottom.

A.  Yes.

Q.  You also testified about a black fanny pack that had $9,000, right?

A.  Yes.

P5GCcom8                         Binda - Cross

Q.   And you seized the cash and you took it to the HSI office?

A.   Yes.

Q.   Was that supposed to be evidence of some crime?

A.   It could be possible that it was evidence of a crime.

          MS. GERAGOS:  One moment, your Honor.

Q.   Is that the standard for agents to take money from somebody?

A.   The warrant had --

          MS. SMYSER:  Objection.

          THE COURT:  It's overruled.

A.   The warrant had bulk cash in it, and $9,000 is considered bulk cash, so we seized it.

Q.   Who taught you that $9,000 is considered bulk cash?

          MS. SMYSER:  Objection.

          THE COURT:  Overruled.

A.   It's a significant amount of money.

Q.   Who taught you that $9,000 is considered bulk cash?

          MS. SMYSER:  Objection, your Honor.

          THE COURT:  Rephrase the question, please.

          MS. GERAGOS:  We need a sidebar on this, your Honor.

          (Continued on next page)

(At the sidebar)

THE COURT:  What's the relevance of any of this?

MS. GERAGOS:  They brought the cash, they asked many questions on it, it's $9,000, that's less than the $10,000 amount that you would have to declare at an airport.  I'm trying to understand why that's evidence of a crime.  The government knows he wasn't going to hire an escort while he was here in September.  They know that because of many reasons which I can proffer.  So I'm just asking why the $9,000 is considered bulk cash.

THE COURT:  Your objection.

MS. SMYSER:  I think Ms. Geragos' questions are directed to whether the search and the seizure here are lawful, and those are plainly not at issue here, and I anticipate your Honor would give an instruction as to the searches in this case being lawful searches.  These questions are really improper.

MS. GERAGOS:  I'm not arguing that they were unlawful searches, we did not say --

THE COURT:  That's why I asked, what's the relevance to this case?

MR. AGNIFILO:  They fanned out $9,000 in cash to the jury and I want to know --

THE COURT:  You think that has a criminal implication?

MR. AGNIFILO:  I do.

THE COURT:  And so then --

P5GCcom8                    Binda - Cross

MR. AGNIFILO:  We're asking what it is.

THE COURT:  If that's the basis for the objection, I'll allow limited questioning on this issue.

MS. GERAGOS:  I have one more question and we're done with this witness.

(Continued on next page)

P5GCcom8                        Binda - Cross

(In open court)

Q.  You took the $9,000 because it could be evidence of a crime?

A.  Possibly, yes.

Q.  And you determined that $9,000 was considered bulk cash?

A.  Yes.

        MS. SMYSER:  Objection.

        THE COURT:  Overruled.

Q.  But you had no idea whether it actually was, right?

A.  I wouldn't say that.

Q.  The warrant called for cash, you stated, right?

A.  Yes.

Q.  Or bulk cash you stated, right?

A.  Yes.

Q.  And so you took the $9,000 making the determination that that was bulk cash, correct?

A.  No.

Q.  Who made the determination that was bulk cash?

        MS. SMYSER:  Objection.

        THE COURT:  Can you rephrase.

Q.  Do you know who made the determination that that was bulk cash?

A.  Yes.

Q.  Who?

A.  It was a group decision.

Q.   Of the agents who were at the hotel room?

A.   Yes.  And we also checked with the prosecutors.

          MS. GERAGOS:  Thank you.  No further questions.

          THE COURT:  Any redirect?

          MS. SMYSER:  Your Honor, just one question.

REDIRECT EXAMINATION

Q.   Special Agent Binda, you were asked about a subpoena that you served on Paul Arthur in March 2024 on cross-examination. Do you remember that?

A.   Yes.

Q.   Was that a grand jury subpoena?

A.   Yes.

          MS. SMYSER:  No further questions, your Honor.

          THE COURT:  Thank you.

          Thank you, agent Binda.

          THE WITNESS:  Thank you.

          (Witness excused)

          THE COURT:  Government may call its next witness.

          MS. STEINER:  Your Honor, the government calls Dawn Richard.

 DAWN RICHARD,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. STEINER:

Q.  Good afternoon, Ms. Richard.

A.  Hello.

Q.  How old are you?

A.  42.

Q.  Where are you from?

A.  I'm from New Orleans, Louisiana.

Q.  What, if any, musical background did you have growing up in New Orleans, Louisiana?

A.  I was a singer and dancer, and my father was a singer, as well.

Q.  How far did you go in school?

A.  I have a bachelor's degree.

Q.  Directing your attention to the time period from 2004 to 2011, were you working in the music industry at that time?

A.  Yes.

Q.  Who were you working for?

A.  Puff, Sean Combs.

Q.  When you say Puff, were you signed to a particular label?

A.  I was signed to Bad Boy Records.

Q.  Is that a company that was owned by Sean Combs?

A.  Yes.

Q.  Ms. Richard, do you see Mr. Combs in the courtroom today?

A.  Yes.

Q.  And I'll ask that you identify him, please, by an article of clothing.

A.   The white or the cream.

THE COURT:   Indicating the defendant.

Q.   Do you know Mr. Combs by any other names?

A.   I called him Puff.

Q.   I will refer to him as Puff, as well, for purposes of clarity.

Without getting into any of the details, can you describe, at a high level, your employment for Puff during that period of time.

A.   I was a part of a girl group called Danity Kane --

THE COURT:   Ms. Steiner, let's refer to him as Mr. Combs, please.

MS. STEINER:   Of course, your Honor.

A.   I was a part of a girl group, one of five, I was one of five, and I was a part of another group called Diddy Dirty Money.

Q.   During your employment for Mr. Combs, did you meet any of his girlfriends?

A.   Yes, I did.

Q.   Who did you meet?

A.   Cassie.

MS. STEINER:   Ms. Gavin, can we please put up for the parties, the jury, and the Court, Government Exhibit 2A-401.

Q.   Ms. Richard, who is depicted in this image?

A.   That's Cassie.

P5GCcom8                        Richard - Direct

Q.   Approximately when did you first meet Cassie?

A.   In 2005.

Q.   Did you continue to see Cassie after meeting her?

A.   Yes.

Q.   And would you see her with Mr. Combs?

A.   Yes, I would.

Q.   Approximately how often?

A.   Frequently, all the time.

Q.   Directing your attention now to 2009, did you observe an incident between Mr. Combs and Cassie?

A.   Yes, I did.

Q.   Can you please describe that, what you observed generally.

A.   I observed Cassie being attacked.

Q.   And when you say that Cassie was attacked, who was she attacked by?

A.   She was attacked by Sean Combs.

Q.   Again, at a high level, what did you observe of that attack?

A.   He came down the stairs, screaming, belligerent, asking where his food was, and proceeded to hit her over the head and then kick and beat her on the ground in front of us.

Q.   After that incident, were there any other occasions when you observed Mr. Combs being physically violent with Cassie?

A.   Yes.

Q.   How frequently?

A.   Often.

Q.   We will return to the abuse you observed in a moment.

MR. AGNIFILO:  I'm going to object to the characterization by the prosecutor.

THE COURT:  That's sustained.

MS. STEINER:  I can rephrase.

Q.   We'll return to that topic in a moment, Ms. Richard. Before we do, I want to ask you a few questions about your employment for Mr. Combs.  You testified earlier that you were a member of a group called Diddy Dirty Money.  Can you please describe for the jury what Diddy Dirty Money is.

A.   It was an electrosoul trio, and it consisted of myself, Kaleena Harper, and Sean Combs.

MS. STEINER:  Ms. Gavin, can you please put up for the Court, the parties, and the witness what has been marked as Government Exhibit 9M-105.

Q.   Ms. Richard, do you recognize this image?

A.   Yes, I do.

Q.   Generally, what does it depict?

A.   It's Diddy Dirty Money.

Q.   Is it a fair and accurate depiction of the members of Diddy Dirty Money?

A.   Yes.

MS. STEINER:  The government offers Government Exhibit 9M-105.

MR. AGNIFILO:  No objection.

THE COURT:  9M-105 will be admitted.

(Government's Exhibit 9M-105 received in evidence)

MS. STEINER:  Ms. Gavin, can you please publish that for the jury?

Q.  Ms. Richard, can you please describe who is depicted in the image.

A.  On the right is Kaleena Harper, on the left is myself, and on the left is Sean Combs.

Q.  Are those who were the members of Diddy Dirty Money?

A.  Yes.

Q.  Approximately when were you a member of this group?

A.  Through 2009 to 2011.

MS. STEINER:  Ms. Gavin, please take that down.

Q.  When you were a member of the group Diddy Dirty Money, was Mr. Combs your boss?

A.  Yes, he was.

Q.  How frequently did you interact with Mr. Combs?

A.  Frequently.

Q.  And generally, where did you work when you were a member of Diddy Dirty Money?

A.  It varied.  It could be the studio, it could be his home, and it could be in hotels, as well.

Q.  Where did Mr. Combs have homes or residences at that time?

A.  Los Angeles, New York, and Miami.

P5GCcom8                        Richard - Direct

Q.  You testified earlier about an incident that occurred in 2009 between Mr. Combs and Cassie.  Do you recall that, Ms. Richard?

A.  I do.

Q.  Where did that incident take place?

A.  In his Los Angeles home.

Q.  And when you say he, are you referring to Mr. Combs?

A.  Sean Combs.

        MS. STEINER:  Ms. Gavin, can you please bring up what's already in evidence as Government Exhibit 2B-101.  Thank you.

Q.  Ms. Richard, do you recognize this image?

A.  I do.

Q.  What is this image of?

A.  This is Sean Combs's LA home.

Q.  At the time of this incident in 2009, why were you in Mr. Combs's residence?

A.  We were recording.

Q.  And when you say we, who are you referring to?

A.  Kaleena Harper and myself.

Q.  Where in the home, generally, were you recording?

A.  At the bottom, lower level, he has a studio.  Sean Combs has a studio at the bottom.

Q.  Approximately what time of day were you in the residence?

A.  It was nighttime.

P5GCcom8                    Richard - Direct

Q.  And at the time that you were there for purposes of recording, was Cassie in the house?

A.  She was.

Q.  Where was she located?

A.  In the kitchen on the second level.

Q.  Where were you located when Cassie was in the kitchen?

A.  We were -- Kaleena and I were in the kitchen with her.

        MS. STEINER:  We can take this down.  Thank you.

Q.  Ms. Richard, what, if anything, was Cassie doing in the kitchen?

A.  She was cooking breakfast.  She was cooling eggs.

Q.  And you said she was cooking breakfast.  Was she doing that at night?

A.  At night, yeah.

Q.  Just to be clear.

        And where was Mr. Combs at that time?

A.  He was at the top level, the floor above us.

Q.  What did you observe Mr. Combs do?

A.  He came  downstairs angry and was saying where the fuck was his eggs.  Excuse my language.  And he was telling Cassie that she never gets anything right, where the fuck is his food, and he proceeded to come over to her and took the skillet with the eggs in it and tried to hit her over the head with it and she fell to the ground.

Q.  Let me ask you a couple questions about that.  You

testified that Mr. Combs grabbed a skillet of eggs, correct?

A.   Correct.

Q.   Can you describe the skillet?

A.   It was a black skillet, just something you would cook eggs, in, flat pan.

Q.   Can you describe the material?

A.   Like -- I don't -- a regular pan, a skillet that you would see at any store.  I don't --

Q.   And you said that he attempted to hit her; is that correct?

A.   Correct.

Q.   Where did he attempt to hit her with the skillet?

A.   Over the head.

Q.   And you testified also that Cassie dropped to the ground; is that correct?

A.   She fell to the ground.

Q.   So did the skillet hit her?

A.   It didn't seem that he hit her fully.  It seemed like she was anticipating it by going down.

Q.   When you just said that Cassie dropped to the ground, can you describe specifically what she did.

A.   She went into fetal position.  You could see she was literally trying to hide her face or her head.

Q.   Did you see Cassie respond with any physical force?

A.   No.

Q.   Based on your observations of Cassie's reaction, so falling

to the ground and going into the fetal position, what, if any, understanding did you have?

MR. AGNIFILO: I'm going to object to the form of the question.

THE COURT: Can you rephrase the question.

MS. STEINER: Of course, your Honor.

Q. Ms. Richard, you testified a moment ago that Cassie dropped to the ground; is that correct?

A. Correct.

Q. And assumed the fetal position?

A. She did.

Q. Is that correct?

A. That's correct.

Q. Did you have any understanding about why she did that?

MR. AGNIFILO: Objection, Judge.

MS. STEINER: This is just the witness's understanding, your Honor.

THE COURT: I think it's the why she did that portion of it. So perhaps you could use a different phrasing.

MS. STEINER: Of course.

Q. How did Cassie react?

A. She fell to the ground into fetal position, and it seemed like she was doing it --

MR. AGNIFILO: I'm going to object to the answer as not responsive.

THE COURT:  That's overruled.

MS. STEINER:  You can answer, Ms. Richard.

A.  It seemed as if she was doing it as if it was something she did often.

MR. AGNIFILO:  I'm going to object to that as nonresponsive and move to strike it.

THE COURT:  That's granted.  The jury should disregard the witness's last answer.

Q.  Ms. Richard, what happened after Cassie dropped to the ground in the fetal position?

A.  He started to punch her and kick her.

Q.  And again, when you say he, who are you referring to?

A.  Sean Combs.

Q.  Where was Mr. Combs kicking and punching Cassie?

A.  Her body and her head.

Q.  After you observed Mr. Combs kicking and punching Cassie on the ground, what did you observe next?

A.  He proceeded to take his arm around her neck and put his hand in her hair and dragged her upstairs to the first floor.

Q.  What, if anything, did you hear from upstairs?

A.  Glass breaking and yelling.

Q.  Ms. Richard, how did you react to seeing and hearing this?

A.  I was scared for her and scared to do anything in fear of what that might mean for me, too.

Q.  Ms. Richard, when you say you were scared of doing

P5GCcom8                           Richard - Direct

anything, did you intervene between Mr. Combs and Cassie?

A.   No.

Q.   Did you call for law enforcement assistance?

A.   No.

Q.   Why not?

A.   I had never seen anything like that before and I didn't know what that would mean.  I was scared of what that might mean for myself.

Q.   Can you explain what you mean by that?

A.   He was punching his girlfriend, he was beating her up in front of us, and I was scared if I intervened or did anything, that it might get worse.

Q.   What, if anything, were you directed to do the next day?

A.   Sean Combs called us to come in and record.

Q.   When you say we, who are you referring to?

A.   Kaleena and myself.

Q.   Did you follow Mr. Combs's instructions?

A.   I did.

Q.   What did Mr. Combs do once you and Kaleena Harper arrived at his residence?

A.   He brought us into the recording studio and locked the door.

Q.   What, if anything, did Mr. Combs tell you and Kaleena in the locked recording studio?

A.   He said that what we saw was a passion and what lovers in

P5GCcom8                          Richard - Direct

relationships do.  He said that she was okay and that it would be in our best interests if we didn't say anything.  He was trying to take us to the top, and that, where he comes from, people go missing if they say things like that, like, if people talk.  And then he gave us flowers.

Q.  When Mr. Combs told you that people can end up missing, what did you understand him to be meaning?

A.  That people could die, death.  I don't know, it just seemed Cassie --

       MR. AGNIFILO:  I'm going to object to this entire line, your Honor, and move to strike it.

       MS. STEINER:  Your Honor, this is the defendant's statements that she is explaining her understanding of.

       THE COURT:  First of all, I think there needs to be an objection.  If you'd like a sidebar to address the issue, you can request a sidebar.

       MR. AGNIFILO:  Yes, Judge.

       THE COURT:  All right.  Let's have a sidebar.

       (Continued on next page)

(At the sidebar)

THE COURT:  What is the objection?

MR. AGNIFILO:  First of all, I think this is getting into forbidden territory.  This is part of the forced labor your Honor ruled they could not get into.  There's no other relevance to what's going on in the recording studio other than that.  So I think, first of all, it runs afoul on the Court's ruling and it's unduly prejudicial, it's not relevant to any of the charges.

THE COURT:  Ms. Steiner.

MS. STEINER:  Your Honor, this is describing the witness's mental state in response to a threat made to her directly by the defendant.  It's an act of attempted obstruction, and as she's going to continue to testify, threats such as this were always in the back of her mind when she was observing this by the defendant and was a primary reason why she did not take other actions in response to what she observed.  It's also directly relevant to what's been alleged in the government's indictment about the way the defendant would make use of threats in response to individuals attempting to intervene with his conduct, and this was squarely within what the government described as being part of its case.

MR. AGNIFILO:  If I could.  This is not charged as obstructive conduct.  If the government is saying that this is part of the obstruction count, that's news to us.  This is --

P5GCcom8                          Richard - Direct

THE COURT:  Let me raise this question.  It is now 4:55.  So at this point, given that this issue has arisen, although, not to be a broken record, but this seems like the kind of thing that would have been raised on a motion in limine, understanding that Ms. Richard was going to testify. That was clarified as late as the April 25th conference where Ms. Johnson specifically said Ms. Richard is going to testify. At that time, the defense would have had questions about what the scope of that testimony would be, which they could have raised at that time.  So let's take our recess for the weekend, we can address briefly the issue, we'll see what we can do about it.

(Continued on next page)

P5GCcom8                          Richard - Direct

(In open court)

THE COURT:  Members of the jury, we are going to stay and keep working here, but you are off for the weekend.  I want to say on behalf of everyone here, thank you, thank you, thank you so much for your hard work this week.  You are always on time, you are always paying attention, and we know how hard this is on you, your families, your loved ones, everyone.  But as I said at the beginning of this proceeding, your work here is the bedrock of not only this case, but of our democracy, and I really mean that.  And so I want you to remember that this is really important and we all know that.

So we will keep working over the weekend, but you take that time off.  You can watch the Mets-Yankees, the Nicks, if you're not into sports, there's all sorts of other stuff to do.  Have a great and relaxing weekend and we'll see you here on Monday.

Just a reminder, on Monday, we are changing our schedule.  I'll ask you to be back here at 8:30, I know that's early, and I apologize for that.  In exchange of that, you're going to get out of here earlier, so you can go home much earlier than we've been going home this week.  And so that's the exchange.

Again, do not talk to each other about the case, do not talk to anyone else about the case, even your loved ones, your family, do not look up anything about the case, and you

should have no discussions whatsoever about the case.  Other

things, that's fine.  Have a great weekend.  All rise.

          (Continued on next page)

(Jury not present)

THE COURT:  Ms. Richard, can you leave the stand at this time and we'll see you back here on Monday.  Thank you very much.

(Witness not present)

Mr. Agnifilo, can you just start from the beginning and explain the concern.

I'm just going back to the testimony so I can make sure I know where this begins.

Ms. Steiner, remind me, can I get a proffer of relevance as to this line of testimony.

MS. COMEY:  If I may, your Honor.  This is relevant on multiple grounds.  First, it is relevant to show the defendant's consciousness of guilt as to Count Two.  We allege that this particular act of violence, like the many others that this Court has now heard about, were all evidence of a course of coercion and force that compelled Ms. Ventura to participate in the commercial sex acts that are alleged in Count Two.  We allege this and many other acts that we expect to introduce in evidence at this trial, threatening those who witnessed that violence reflects his consciousness of guilt as to Count Two.

In addition, this is evidence of Count One, the racketeering --

THE COURT:  Stop there.  Can you put a finer point on that.  I'm looking at the testimony.  So connect the dots for

me.

MS. COMEY:  So at the point where he calls in a meeting where the two women who witnessed his extreme violence that included dragging Ms. Ventura into a bedroom and beating her, his threats to those two witnesses telling them not to say anything and essentially threatening to harm them if they said anything reflects his consciousness that if they said anything, it could lead to him being prosecuted, charged, or otherwise investigated for his conduct against Ms. Ventura.  So our argument is that his threats to witnesses of his conduct, that was part of the course of conduct charged in Count Two reflects his consciousness of guilt.

THE COURT:  That's the specific episode in the recording studio the next day after the incident with the skillet?

MS. COMEY:  Precisely, your Honor.  The fact that he felt compelled to call this meeting, lock the door, and then give these explicit threats and then these flowers in an effort to both threaten and also bring these witnesses closer to him reflects his consciousness that what he did was wrong and what he did could lead to him being prosecuted, could lead to him being arrested, could lead to all sorts of negative consequences if these women spoke about what they saw.  So we should be allowed to argue that he knew what he was doing was wrong, and one of the reasons the jury knows that --

THE COURT:  Why does that go to Count Two given that the prior day's incident was not -- that was not a sex trafficking incident, right?  It's a few steps removed.

MS. COMEY:  It is a few steps removed, your Honor, but we allege that the entire course of conduct, the way that Count Two is charged is that all of the abuse created a culture of coercion and a culture of fear, and I think Ms. Ventura testified to that, that the violence was always in the back of her mind when she was told to do a freak-off, when she was told to follow the defendant's directions.  I think that was Ms. Ventura's testimony, that the entire course of conduct, all of the violence was in the back of her mind and caused her to participate in the freak-offs.

THE COURT:  I mean, I think what you're saying is that anything concerning Mr. Combs and violence is in the case?

MS. COMEY:  No, your Honor.

THE COURT:  Why not?

MS. COMEY:  Anything concerning Mr. Combs and Ms. Ventura, abusing Ms. Ventura specifically, who is the victim alleged in Count Two.

THE COURT:  All right.

MS. COMEY:  So that's with respect to Count Two, your Honor.

THE COURT:  Let's stop there.

Mr. Agnifilo, I'm not trying to translate, I'm trying

to make sure I understand the position.  As to that specific incident that happened the day after what we heard about, given the witness's recollection of Mr. Combs's statements, the submission is it's relevant to Count Two because it's the day after, it relates to an incident involving Ms. Ventura and Mr. Combs.  You heard the reasons from the government in terms of consciousness of guilt, threats, if there's disclosure, et cetera.  So why wouldn't that bear on Count Two?  Just focusing on this, because I know there's other things you want to address.

MR. AGNIFILO:  It doesn't bear on Count Two because, as your Honor pointed out, Count Two is not an incident of sex trafficking.  Count Two is an incident of what we opened on, which is domestic violence.  It's not sex trafficking, it's not one of the charged offenses.  It's too far -- it's not just that it's too far removed, I mean, there are these tremendous gaps in the evidence.  What the government is trying to say is anytime Mr. Combs does something somewhat violent to Cassie Ventura, that anyone who sees it, you know, remote in time, the next day in a different place without Ms. Ventura there can therefore add evidence to this trial about how afraid they were.

THE COURT:  Why didn't you bring a motion in limine on that issue?

MR. AGNIFILO:  Because it just came up.  I didn't know

she was going to say that. I had no idea she was going to say that.

MS. COMEY: It's in the 3500, your Honor.

MR. AGNIFILO: Can I get a turn, Judge?

It's unduly prejudicial. Rule 403 is meant for exactly this situation where this is a deeply problematically prejudicial piece of testimony, which is why I objected to it and why I moved to strike it because it has no role at this trial and it doesn't get to be tangentially connected with a series of intervening steps to something that, under some theory, is charged. This is wholly irrelevant. It's the irrelevant under 401, I don't think we even get to 403.

THE COURT: I think the government's argument is that they're saying that the freak-offs were as a result of force, fraud, or coercion. So if they can show that Mr. Combs, as to Ms. Ventura, imposed physical violence on her on a routine basis, then a jury can rationally infer that when these sex acts occurred, they also were a result of the same physical violence. So why isn't that an inference that the jury could draw, could permissibly draw? Not to say that they would or should, meaning I understand your argument you're going to prove otherwise or disprove the government's case, but why isn't that an inference that the jury could draw? And if it is, then why wouldn't this evidence be relevant to that?

MR. AGNIFILO: First of all, Ms. Ventura is on and off

the stand, and she didn't mention this incident. So let's start with that. She didn't mention this incident. There's no testimony from her about being almost hit with a frying pan, being dragged upstairs and being beaten on the floor. She didn't say a word about it. So we know she's not afraid of that because she didn't mention it. So that's the first thing.

The second thing is our position is this is just a drop-dead lie, this didn't happen, and the way we know it didn't happen is because Ms. Ventura didn't talk about it. And I understand your Honor's ruling.

THE COURT: As you are, I'm sure, going to forcefully present to the jury in your closing argument. But I understand your position.

MR. AGNIFILO: So just a few more things just so my whole position is on the record.

THE COURT: Yes.

MR. AGNIFILO: Ms. Ventura, we cannot sit here and say Ms. Ventura did anything because of this event because she didn't speak about it. She talked about some other events, we heard about some things that she remembered, and what role, if any, that played in other conduct. She didn't talk about this one. So this is now in the area of just rank speculation as to what this might mean, because in terms of evidence in the record --

THE COURT: How is it rank speculation if this witness

was there?  If you had an objection based on personal knowledge, then I would hear that, but, I mean, she's just testifying as to what she saw.

MR. AGNIFILO:  It's speculation as to what effect violence, this event had on Cassie Ventura because she didn't testify about it.

THE COURT:  If this witness is going to testify about that, then you can raise an objection.

MR. AGNIFILO:  But my point is if the government's theory is when Cassie Ventura is subject to violence, that is something that's in her head that compels her to do some other thing that the government is saying illegal.  My point is we can't make that connection with this event because Cassie Ventura does not have this event in her head because she's testified this entire week and didn't talk about it.  So it's already on dubious ground to start with.

THE COURT:  Well, no, because the government has to first establish there was force, fraud, coercion, they have to first to that and then they have to connect the dots to a commercial sex act, et cetera.  But they have the burden to prove beyond a reasonable doubt that there was force, fraud, or coercion, so this goes to that.

MR. AGNIFILO:  This doesn't go to that.  That has to come from Cassie.  Cassie has to be the one to say I felt force, fraud, or coercion from these things that happened to

P5GCcom8                          Richard - Direct

me, but she didn't talk about this thing.

Let me get to the next several points.

The second thing is I objected based on your Honor's ruling that this witness should not be permitted to talk about what she saw happened to Cassie and I lost and we moved on.  So I didn't object to what she said happened to Cassie with the skillet and the eggs because your Honor made a ruling on that. But then we get to the next day and now Cassie is not there, so Cassie is not seeing any of this, Cassie is not aware of any of this from anything that we're hearing from the evidence, and we have this witness who's going on about I make people disappear and that means that that's a death threat and I'm very scared and all this stuff.  And it's incredibly prejudicial and objectionable, which was why I objected and I moved to strike it because it has no place at the trial as being either relevant or certainly if your Honor deems that it has some relevance.  And that's all I hear the government saying, that there's some relevance.  It's certainly to be precluded under 403 as being unduly prejudicial given that the circumstances, as we understand it -- it would be a different story, I suppose, if Cassie had testified that this thing happened to me in the kitchen, it was traumatic, and that was some big issue in the case, that that was something that was abuzz among Mr. Combs and Cassie and others, but there is no testimony along those lines because Cassie's done testifying.

P5GCcom8                           Richard - Direct

THE COURT:  Understood.

Ms. Comey, you had other points?

MS. COMEY:  I did, your Honor.  First, I'd like to note that I believe, and I've asked my colleagues to look for the specific cite that Ms. Ventura testified that she could not remember every specific act of violence that the defendant inflicted on her over 11 years with him.  So I think based on that testimony, the government will ask the jury, I understand Mr. Agnifilo will ask for a different inference, but the government will ask the jury to draw the inference that this happened, she just couldn't remember it because there were too many assaults for her to remember this far along in the future.

Second, in addition to being admissible under Count Two, it was also admissible under Count One.  And I would direct your Honor to the indictment, and specifically to paragraph 12(j) and (k), which is on page 9 of the indictment.  That alleges that when employees, witnesses to his abuse, or others threaten Combs's authority or reputation, Combs and members and associates of the enterprise engage in acts of violence, threats of violence, threats of financial and reputational harm and verbal abuse, that's on paragraph (j).

And paragraph (k) says when Combs's authority or reputation was threatened by the possibility of negative publicity or legal or law enforcement action against him, and then there's an including, it says Combs and members and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

associates of the enterprise pressured witnesses and victims to stay silent and not to report what they experienced or knew to law enforcement.

THE COURT:  Was this incident that we just heard about in any of the enterprise letters?

MS. COMEY:  Since that it was not specifically mentioned in the enterprise letter, your Honor, but it was, I believe, encapsulated by paragraph 2 of the February 1st letter, which says that on multiple occasions between in or around 2004 and in or around 2024, the defendant assaulted, and threatened to assault, among others, his employees, acquaintances, and other individuals who witnessed his abuse of women or other illegal activity, and then provided a non-exhaustive list of examples.  This was not included on that non-exhaustive list, but I believe that this paragraph, which was intentionally crafted broadly to capture the fact that there were many, many threats is captured by that paragraph and by the specific language of the indictment.  The means and methods of the enterprise as we alleged was to threaten anyone who witnessed crimes.  That's what we opened on to the jury, that has been our theory of this enterprise from the beginning of the case.

THE COURT:  And remind me what year did these incidents that we just heard about happen?

MS. COMEY:  2009, your Honor.

MR. AGNIFILO:  Your Honor, if I may.

MS. COMEY:  And I have the transcript cite for your Honor.  It's at page 799.

"Q.  Before we move on to another topic, Ms. Ventura, are the occasions we just spoke about all the times that Sean was physical with you?

"A.  No.

"Q.  Just to be clear, all the times he was physical with you during your approximately 11-year relationship.

"A.  Those weren't all the times, no.

"Q.  We just spoke about some of the times?

"A.  Some of the times, yeah.

"Q.  And were there any other injuries that you had as a result of physical abuse that we haven't discussed?

"A.  I don't think so."

MR. AGNIFILO:  Your Honor, the point of the enterprise letter is to put us on notice.  They didn't put it in the enterprise letter.  Being encapsulated by some general statement is not what an enterprise letter is supposed to do.  It's supposed to put us on notice of specific things that the government looks to prove as part of the enterprise.  They didn't tell us about this.

THE COURT:  Ms. Comey, in terms of understanding what Ms. Richard was going to testify about, did the defense have any notice of that?

MS. COMEY:  Absolutely, your Honor.  They've had detailed 3500 material.  I would defer to Ms. Steiner on the specific language, but it includes this incident and other incidents where the defendant and at least one other member of the enterprise threatened her to prevent her from talking about abuse that she witnessed.

THE COURT:  When was that 3500 material turned over?

MS. COMEY:  Throughout the last few months.  I'll work with Ms. Steiner to get specific dates for your Honor so that we can complete the record.

MR. AGNIFILO:  Your Honor, that gets back to my initial objection.  This is forced labor.  If it's anything, it's forced labor.  We just saw the picture of Mr. Combs and this witness being in the same band because the government's theory was that she was a victim of forced labor.  Your Honor kept that out of the case.  So there's no reason for us to think this would be coming in, in light of your Honor's ruling, and in light of there was nothing else in the enterprise letter.  I would understand if the government said in the enterprise letter, this is relevant to the RICO.  I would understand that and then I'd be on notice, but they didn't have it in the enterprise letter.

And in terms of this is being a forced labor event --

THE COURT:  I agree with you as to the second point that was raised.  I think it turns on whether it's relevant to

the sex trafficking charge, and you've addressed that and I need to think about that.  If you have something else to raise on that point, I'm happy to hear it.

MR. AGNIFILO:  Nothing that I haven't said.

THE COURT:  And I agree with you that it's also related to the first issue, the initial issue that we addressed concerning the scope of Ms. Richard's testimony.  In that regard, just to put a finer point on it, the defense had raised a late-breaking concern about the scope of Ms. Richard's testimony, and the question is whether certain testimony of Ms. Richard would be admissible given the Court's ruling at the April 25th conference.

Now, the Court's ruling at the April 25th conference was very clear, and I've now reviewed the transcript from that hearing.  First, in excluding the evidence in paragraph 5 of the government's April 20th letter, it was clear that the only thing being discussed at that hearing when we were discussing the enterprise letter and in the briefing relating to that issue was the RICO charge.  That was the sole focus of the enterprise letter, was to inform the defense as to what evidence would be put in as to the RICO charge.  There was no application made concerning the admissibility of evidence, even the same evidence in the letter, if relevant to one of the substantive counts in the indictment.

Second, if that wasn't enough, the Court clarified,

after Ms. Johnson raised the issue, that its ruling was that the government could not argue forced labor as to Ms. Richard, but that she could be called as a witness and testify as to other matters.  That's where we left things on April 25th.

With that, the evidence cited in 5C and 5D of the April 25th enterprise letter, prior to the instant objection that Mr. Agnifilo raised, relates to the substantive 1591 charge.

Now, before, Mr. Agnifilo, you raised the objection and made the motion to strike, I asked you that question whether it related to the substantive 1591 charge, and you didn't disagree with that at that time, and that was the basis for my ruling that 5C and D would be in as to the 1591 charge, but that A and B would be out because they did not relate to that charge.

MR. AGNIFILO:  Can I clarify --

THE COURT:  I'm going to finish and then I'll let you clarify.

Nothing in the Court's order suggested that Ms. Richard would be precluded from testifying as to those matters as to that charge, meaning the substantive 1591 charge, since it was not at issue on the enterprise letter and was not addressed at the April 25th conference.  To the extent it was addressed, the Court made clear that to the extent evidence would have been admissible and relevant as to the substantive

counts.  Those were fair game because they were relevant to other charges, they would be in the case in any event, and so there was no notice issue presented.

To the extent there was any doubt about that, again, the Court clarified that the scope of the Court's ruling was that the government could not argue forced labor as to Ms. Richard, which was the new material in the enterprise letter.  In any event, the concern about Ms. Richard's testimony and the Court's April 25th order was brought to the Court's attention at 3:30 p.m. before Ms. Richard was set to testify, and the defense was on notice that Ms. Richard might testify today because the Court made that clear yesterday when Ms. Comey raised the issue of scheduling.

In addition, the defense would have known that Ms. Richard was likely to testify since they were in control of the cross-examination of Ms. Ventura, and so they would know the timing of that.  So any request for clarification should have been raised well in advance, not minutes before the witness was set to testify.  As Ms. Comey points out, the 3500 material relating to Ms. Richard had been turned over, we don't know the exact timing, but --

MS. COMEY:  I do now, your Honor.  I'm sorry.  It was on the first production of 3500 in March of 2025.  So the very first production contained 3500 material disclosing this incident.

THE COURT:  So it was turned over months before this trial.  It could have been raised in advance, if not in the motions in limine, which the Court set a deadline for precisely so that these types of issues could be raised, at least in any number, any one of the pretrial motions that the parties had filed and the Court ruled on.  And this is emblematic, as I said, a few times today.  I have a number of issues that have arisen over the last couple of days where issues could have, but were not raised in advance, and it is an independent ground to reject the defense's late-breaking request for exclusion of evidence relevant to the 1591 charge based on the Court's prior order.

However, Mr. Agnifilo, you raised a separate issue, which is you don't think it's relevant to the 1591 charge.

MR. AGNIFILO:  Or if it's marginally relevant, it's unduly prejudicial.

THE COURT:  That's a fair objection for you to raise and it's not one that implicates the prior order.  So that's an issue that I'll have to address, and I will do so before we reconvene on Monday.

Ms. Comey.

MS. COMEY:  May I be heard further, your Honor.

First, with respect to the enterprise letter, I just want to be clear that I'm not aware of an enterprise letter being treated like a bill of particulars.  And so the way this

enterprise letter was crafted, the same way that I understand many enterprise letters are crafted in this district, was to give notice of the general types of other acts that would be introduced. For example, paragraph 1 of the enterprise letter says on multiple occasions between in or around 2004 and in or around 2024, the defendant and other members and associates of the enterprise possessed and distributed controlled substances and conspired to do so. It does not then purport to set forth every single time that happened.

The same is true of the next paragraph, which covers the same 20-year period to describe threats of violence and violence. That letter was not purporting to set forth every single specific instance. It was meant to highlight a number of them, and we did our best to highlight a number of them, but particularly, given that the indictment said that the way that the enterprise operated was by threatening people who witnessed the violence, it is unreasonable to preclude evidence of the way that this enterprise was conducted and its means and methods for failure to include every single threat that any witness at this trial might testify about. So that's my point with respect to the enterprise letter.

Second, I've been reminded of a third basis for admission, and that is it goes to witness credibility, and it's to respond directly to a line in Ms. Geragos's opening that I'd like to read for your Honor. It starts at page 147 of the

P5GCcom8                        Richard - Direct

transcript and goes into page 148, and it says the following: As I've said with nearly every single witness in this case, when these people testify, ask yourself, why didn't anybody, if they were so scared, and if this was so hostile, ever call the police? Why not? I expect that the evidence will show you that the testimony against him, their former boss for many, not all, is vindictive or they are being subpoenaed to give it. That's a direct attack on witnesses who claim they saw violence like the violence Ms. Richard just testified about and didn't call the police, were entitled to respond to that by eliciting this testimony.

THE COURT: Understood. I will say as to the enterprise letters, this is where, on the other hand, having had the discussion concerning paragraph 5, that might have raised in the government's mind, well, let me make very clear that this particular allegation in 5D is relevant to other aspects of the RICO charge, and we can bring that in for that purpose unrelated to one of the substantive counts. Now you say, look, it's not like a bill of particulars, and that's a fair point. However, the way that these enterprise letters were crafted is that they are extremely specific in certain respects. And as to other respects, as you pointed out, sometimes they include non-exhaustive lists, and I can understand why the defense might have not been on proper notice and might have been misled by the specificity of some things in

the enterprise letter when other things are, in your words, a non-exhaustive list.

So this is where the same issue that I just addressed with respect to evidence that would be related to the 1591 charge, I think is, you know, what's good for the goose is good for the gander that comes back on the government's side on the RICO charge.  Again, I think this comes back to the 1591 issue. You've given me two separate bases for why you think it's relevant to that charge, and I understand that and I'll think about it.

MS. COMEY:  Your Honor, if I may, just as a policy matter, to incentivize the government to be less detailed in these enterprise letters I think would -- it is the outcome of a ruling like this.  If what we're being told, as the government, is you need to be more general about the categories and not give specific examples, that creates perverse incentives.  We were trying to be helpful to the defense, we were not trying to create a bill of particulars.  If we had known that we would be held to this the way that prosecutors are held to bills of particulars, we would have pushed back, we would have presented more law, and we also would have crafted this differently.  And so I am concerned about being held to this the way somebody would be held to a bill of particulars, your Honor.

THE COURT:  I didn't say you were held to that, I said

there is a combination of two things, which is the specificity coupled with the lack of specificity in other respects, and the fact that we addressed this issue specifically on April 25th, and there were clarifications sought by the government that did not raise this issue, and the same thing, the defense did not seek clarifications that they are now saying had misled them. Neither side raised this. I think the reason why neither side raised this is because they were trying to use these perceived ambiguities in a tactical way --

MS. COMEY: Absolutely not.

THE COURT: -- and they've done that. I'm saying both sides. I'm not pointing any fingers at any side in particular, but I'm saying this is, again, as I said, when I was talking about the April 25th issue, there have been a number of issues that have come up this week as opposed to before trial, despite the fact that we had several pretrial hearings, we had numerous pretrial motions, all of which we dealt with well in advance of jury selection. These issues are coming up now because I think both sides are doing what they are supposed to do, which is represent their clients in a zealous fashion within the bounds of the law. So I understand that, but I'm saying this is what happens, there are some ambiguities and I have to figure out how to navigate those and that's what we're doing here. I understand what you're saying about the enterprise letters in general, but I think it's this particular set of circumstances

and there shouldn't be any larger inference drawn from it.

Anything further, Ms. Comey, on this particular issue?

MS. COMEY:  No.  Thank you, your Honor.

MR. AGNIFILO:  Nothing, your Honor, on this issue.

THE COURT:  Ms. Comey, is there any separate issue?

MS. COMEY:  I was hoping to get clarification from your Honor about the order that you issued earlier today.  With respect to our witness list, we will obviously furnish that to you at the end of the day today.

With respect to our witness order, I wanted to understand, usually, in my experience, we provide the order for the next few trial days and then, as trial progresses, inform the order for the rest of the trial because it can change.  Was your Honor expecting that or --

THE COURT:  That's fine.  Are you able to, even on an *ex parte* basis, provide the Court with what you foresee for the government's case in chief?  Would that be possible?

MS. COMEY:  On an *ex parte* basis, yes, your Honor.

THE COURT:  I think it would be helpful because there's a little bit of a veil here where I'm not seeing -- and I need to figure out just because of how long the trial is, I just want to make sure that everything is happening according to a proper schedule.

MS. COMEY:  Yes, your Honor.  And I'll tell you, in our view, we are right on schedule in terms of our perspective

in terms of how this week went.  So we think we're on track to keep our case to six weeks, we think.

THE COURT:  Okay.  Any other issues?

MR. AGNIFILO:  Yes, Judge, two.  One thing I want the Court to think about maybe over the weekend is while your Honor obviously precluded all of the forced labor stuff from this witness's testimony, this witness does have a lawsuit, pending lawsuit against Mr. Combs.  I want to handle that -- I want to be able to ask about it.  I won't ask the nature of it, but I think it's important that the jury knows that this witness may have a financial incentive to testify a certain way.

So here's the question, and I will not bring up that it's a false labor lawsuit or it's a labor-related lawsuit or anything like that.  I can keep my question very general, and I'm not asking for a ruling right now.  It's just something that I want the Court to think about before we get to cross-examination on Monday.

THE COURT:  I might not have to think about it.

MS. COMEY:  If Mr. Agnifilo keeps that door closed, we will not walk through, and what he just described I think will keep the door closed.

MR. AGNIFILO:  So if I just mentioned you have a lawsuit against Mr. Combs and keep it at that, that's fine, I can do that.

The other issue, and this is a very important issue to

us, as we sit here today, we only know of one witness that the government is calling in the future. That's just not good enough.

THE COURT: You're about to hear about some more witnesses.

MR. AGNIFILO: We know that the Court is. I'm not hearing that we are.

MS. COMEY: I'm happy to proffer the witnesses we think we'll call on Monday and Tuesday, your Honor.

MR. AGNIFILO: That's terrific news.

MS. COMEY: So next we expect we will call Kerry Morgan, David James, Sharay Hayes, Regina Ventura, Jourdan Atkinson, and Gerard Gannon. That should easily take us through the end of the day Tuesday and possibly into Wednesday. And they may not be in that order, I'm told, due to travel issues, but, generally, approximately that order, your Honor.

THE COURT: Can you tell us who the next witness is going to be? Is it going to be Kerry Morgan?

MS. COMEY: The next witness is Kerry Morgan, and that's the one we told them about last night. The order in which I just stated, it is the order in which I am hoping they will appear.

THE COURT: Understood.

Mr. Agnifilo, just in case it was unclear, I will ask, if I don't ask, you have to remind me, I will ask the

government at the end of every trial day, I'll do it in the morning if it's helpful and ask them who they are calling over the next couple of days.  You are going to get that information so just in case that was unclear.  As to the total roster, I need to know that just for scheduling purposes, given the length of the trial, to make sure there's not going to be any train wreck that I can't see coming in the future.  That's why I asked for that submission.

MR. AGNIFILO:  I understand, Judge.

THE COURT:  Anything else?

MS. COMEY:  Yes, your Honor, I understand from your Honor's ruling that the defense will now produce to us by 5:00 p.m. on Sunday any exhibits they expect to introduce on cross-examination for the witnesses that we expect to call on Monday.

THE COURT:  Yes.

MR. AGNIFILO:  Is there some reason why we can't know the witness roster that the Court knows?  If the government -- we're not going to hold them to anything, nothing's going to change in the universe by the fact we know it, but it would help us, too.

MS. COMEY:  I'm happy to exchange that for all of the rest of the defense exhibits, your Honor.

THE COURT:  No.  I'll think about that.  I understand the request.  Let me think about that.

MR. AGNIFILO:  Thank you, Judge.

MS. GERAGOS:  Ms. Comey sent us an email last night and I'm asking your Honor for clarification also as to your order.  They agreed that if we agreed to provide all of the marked exhibits that we would plan to offer into evidence on cross-examination, that they would not show the marked exhibits to their witnesses unless they were already planning to review that material that was within our marked exhibits to the witnesses.  We would ask that your Honor's order be modified to include that provision.

MS. COMEY:  Your Honor, I had offered that to address a concern that defense counsel had raised.  They never responded to that and it was an effort to negotiate between the parties.  I don't think that we are required to agree to that and I don't think the Court needs to order that.

THE COURT:  Well, have you agreed to that?

MS. COMEY:  No, we had not.  I sent an email saying, would you be open to this, and they never responded, your Honor.  And I'm surprised Ms. Geragos raising without talking with us first.

THE COURT:  If you work out an agreement, then I will make that part of my order.  But right now, you don't have an agreement on that point.  So to be very, very clear about this, the reason why I am doing this is because some of the exhibit issues that came up during Ms. Ventura's testimony were

P5GCcom8                          Richard - Direct

unacceptable, and I understand that it was the first week, there were issues concerning misunderstanding about Rule 16 and what it required and the timing and all those things could have been brought up earlier and it happened and we got through it and we're on schedule, which is great, but it can't happen again, and that's why we're doing that.

Now, the government has made an offer, so I think there's an email perhaps, Ms. Geragos, that if you respond to it and say accepted, then you you've got your deal.

But you made an offer --

MS. COMEY:  I did, your Honor.  I might want to withdraw that offer.  And the reason is not because your Honor came out and made this order, it's because the way that the cross-examination of Ms. Ventura proceeded.  Part of what was so inefficient was that the witness had not had the opportunity to review any of the lengthy exhibits and documents, and I think it would be prudent, not so that we can get some tactical edge, but I think it would be prudent for witnesses to be able to see the documents that they're going to be shown before they take the witness stand so we don't have to sit for minutes at a time in silence while they read these exhibits.  So I don't think it makes sense, having now seen how the cross-examination proceeded, to agree not to show any defense exhibits to witnesses, especially when we're not going to be getting them days in advance, we're going to be getting them the night

P5GCcom8                          Richard - Direct

before.  So I don't think it makes sense to have that restriction placed on us.

MS. GERAGOS:  Your Honor, we have never been in a trial where we give our cross-examination exhibits to a government witness before they take cross-examination so they can sit there, speak to their lawyer about how to prep on it, speak to the government about how to prep on it in advance.  We understand --

THE COURT:  I'm going to accept the offer on your behalf.

MS. GERAGOS:  Thank you, your Honor.

THE COURT:  So the clarification that you made, that will be that.  However, Ms. Geragos, it is on the defense to make sure that, during cross-examination of any witness, it is done in an efficient manner.  There should be a binder provided to the witness.  If there are going to be lengthy exhibits, then you should provide the witness and the government with those exhibits in advance.  It can be during the direct, it can be, I'd like you to review this during a break.  Whether or not they talk about it with the government, at that point, it's going to help the defense, especially if we're talking about text exchanges that were produced by the government to the defense.  At that point, I'm not understanding what the strategic advantage is.  You get the strategic advantage when you have seamless cross-examination because you don't have to

wait for a witness to review text messages for 30 minutes. That helps you. So I'm not understanding the strategy issue, but it's on the defense.

MS. COMEY: Your Honor, if my offer has been accepted, I think I should get the terms that I proposed, which was 24 hours before the witness. So instead of the night before, I asked for it 24 hours, so it would be the morning before was my request so we would have 24 hours to deal with any exhibits. So if Ms. Geragos gets what I offered, I would ask for what asked for in exchange.

THE COURT: The bidding was closed. So we have the order from before, subject to Ms. Geragos's modification. The only thing that I'll ask, Ms. Geragos, is that you just work with the team to make sure that when we do cross-examination, the use of these text message chains, which are long, is done in an efficient manner. Can you do that?

MS. GERAGOS: I understand. I do think that with Ms. Ventura, the chains are long because it was an 11-year relationship. I don't foresee these as being as long text messages coming up really with many other witnesses. So I just want to explain that to the Court.

THE COURT: Of course. Anything else --

MS. SHAPIRO: Yes, your Honor. I just want to add that all of this would be a lot easier on the defense if we could get more than just two days of witnesses. If the

government knows who the witnesses are next week, we can start over the weekend planning these crosses, getting the exhibits together so that everything can go more seamlessly.  It creates additional problems if they're only giving it in tiny dribs and drabs if they already know who the next group of witnesses at least for the whole week.  Why are we only getting two days?

MS. COMEY:  Your Honor, respectfully, that point is not well taken, given the defense knew that Ms. Ventura would be one of the first witnesses for at least a month and clearly had not prepared the exhibits.

MS. SHAPIRO:  My point is, going forward --

THE COURT:  Let's not get into that.

MS. SHAPIRO:  -- in making the trial more efficient --

THE COURT:  Ms. Comey, can you help me, what is the reason why, in this district, disclosures are only made of the next day's witnesses or two days' worth much witnesses?  What's the reason for that?

MS. COMEY:  Your Honor, I think there are a few reasons.  One is travel.  We often have to reschedule and shuffle witnesses around, and so we don't want to be held to anything we have said.  In this case, we have been held to things that we've said thinking that we were not, for example, setting out a bill of particulars.  In addition, your Honor, we have some concerns in this case about witness tampering that we have flagged for your Honor.  We have concerns about

obstruction, we have concerns about publicly stating too many names on the record, we have concerns about witnesses being intimidated.  So that's another reason why we are concerned about announcing witnesses on the record earlier than absolutely necessary.

In addition, as your Honor pointed out, we have an obligation just like the defense to advocate zealously for our clients.  And so part of it, yes, I will admit is a strategy and is a strategic advantage the same way the defense is like when the defense doesn't give us their exhibits.

THE COURT:  I understand that, and I don't think those are compelling reasons not to disclose to the defense the next week's witnesses.  I think that's fair.  I don't think any of the concerns you raised would be implicated by that kind of disclosure.  So the government should disclose to the defense the next week's witnesses.  You don't need to do that right now, you can do that over the weekend so the defense has that before Monday.

MS. SHAPIRO:  Thank you, your Honor.

THE COURT:  Anything else from the defense?

MR. AGNIFILO:  No, Judge.  Thank you.

THE COURT:  Anything else from the government?

MS. COMEY:  No.  Thank you, your Honor.

THE COURT:  Everyone take a reset over the weekend, take a deep breath, made it through the first week.  As

Ms. Comey noted, we're right on schedule, so that's great.

I do want to have just a brief word in the robing room with Mr. Agnifilo and Ms. Comey. We don't need the court reporter, so everyone can be at ease. Thank you very much. We'll see everyone next week.

(Adjourned to May 19, 2025 at 9:00 a.m.)

* * *

INDEX OF EXAMINATION

Examination of:                                          Page

CASANDRA VENTURA

Cross By Ms. Estevao . . . . . . . . . . . . . .1162

Redirect By Ms. Johnson . . . . . . . . . . . .1296

Recross By Ms. Estevao . . . . . . . . . . . . .1331

Redirect By Ms. Johnson . . . . . . . . . . . .1358

Recross By Ms. Estevao . . . . . . . . . . . . .1358

 YASIN BINDA

Direct By Ms. Smyser . . . . . . . . . . . . . .1372

Cross By Ms. Geragos . . . . . . . . . . . . . .1392

Redirect Q. . . . . . . . . . . . . . . . . . .1399

 DAWN RICHARD

Direct By Ms. Steiner . . . . . . . . . . . . .1399

GOVERNMENT EXHIBITS

Exhibit No.                                          Received

 B-631   . . . . . . . . . . . . . . . . . . . .1163

 B-332   . . . . . . . . . . . . . . . . . . . .1306

 A-441-I  . . . . . . . . . . . . . . . . . . .1323

 2B-133  . . . . . . . . . . . . . . . . . . . .1376

 1D-104, 1D-108 through 111, 1D-113  . . . . .1379
          through 114, 1D-118 through
          120, 1D-123, 1D-125, 1D-129,
          1D-131, 1D-133, 1D-135 through
          136, 1D-138 through 139 and

          1D-141

1305  . . . . . . . . . . . . . . . . . . . . . . .1388

1D-150 and 10A-105-A1  . . . . . . . . . . . . . .1389

1D-151  . . . . . . . . . . . . . . . . . . . . .1391

9M-105  . . . . . . . . . . . . . . . . . . . . .1404

                        DEFENDANT EXHIBITS

Exhibit No.                                    Received

1090-A   . . . . . . . . . . . . . . . . . . . .1165

1057    . . . . . . . . . . . . . . . . . . . . .1181

1217, 1217-A . . . . . . . . . . . . . . . . . . .1186

1000, 1022, 1080, 1081, 1082, 1083, . . . . .1195
         1084, 1087, 1096, 1115, 1117,
         1118, 1122, 1134, 1134, 1145,
         1152, 1299, 1304, 1306, 1309,
         1311, 1312, 1313, 1316, 1320,
         1325, 1334, 1405, 1406, and
         1409
1303-A   . . . . . . . . . . . . . . . . . . . .1226

1307    . . . . . . . . . . . . . . . . . . . . .1244

1016    . . . . . . . . . . . . . . . . . . . . .1295