P5JsCOM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                          24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

           Defendant.            Trial
------------------------------x

                      New York, N.Y.
                      May 19, 2025
                      8:35 a.m.

Before:

              HON. ARUN SUBRAMANIAN,

                      District Judge
                      -and a Jury-

                 APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
    EMILY A. JOHNSON
    MAURENE R. COMEY
    MEREDITH FOSTER
    MITZI STEINER
    MARY C. SLAVIK
    Assistant United States Attorneys

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5JsCOM1

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:  MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
SHER TREMONTE
BY:  ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND

ALSO PRESENT:
LUCY GAVIN, AUSA Paralegal Specialist
SHANNON BECKER, AUSA Paralegal Specialist
RAYMOND MCLEOD, Defense Paralegal Specialist

P5JsCOM1

(Trial resumed; jury not present)

THE COURT:  I've reviewed the letters submitted overnight.

Please be seated, everyone.

I'll do the same thing that I've done previously, which is I'll give you my tentative rulings and then I'll hear the parties to see if there is anything that I've missed, and we can take it from there.

First, as to Dawn Richard, concerning the objection to testimony concerning threats made by the defendant to Ms. Richard the day after the witness testifies she observed the defendant assault Ms. Ventura with the skillet is overruled.  Whether or not the evidence would independently pass Rule 403 muster as to the charge in Count Two relating to Victim 1, the defense plainly opened the door to this testimony in opening statements.  The court refers to the excerpt that is included in the government's letter from yesterday recounting Ms. Geragos' statements in the transcript, page 147.

The government's May 18 letter identifies several other issues concerning Ms. Richard's testimony.  First, the government's letter addresses other instances where Ms. Richard witnessed acts of abuse against Ms. Ventura.  As to those incidents that Ms. Richard witnessed, I take it there is no objection to the introduction of that testimony and none has been identified by the defense.  However, the defense does

P5JsCOM1

object to subsequent discussions that Ms. Richard had with the defendant and Harve Pierre.  The sum and substance which is recounted in the government's letter is that they told Ms. Richard to mind her own business concerning conversations that Ms. Richard had with Ms. Ventura.

The court does not see the relevance and probative value of this kind of testimony, whether or not it would be admissible as not hearsay under Rule 801, and so it excludes on Rule 403 grounds, those discussions between the defendant and Harve Pierre and Ms. Richard.

For the same reason, the court excludes evidence and testimony that when Ms. Richard wanted to leave the Bad Boy label in 2011, the defendant and Mr. Pierre told her she can leave only if she agreed to keep things quiet, which according to the government's letter Ms. Richard understood was a reference to the abuse.  That testimony is excluded on Rule 403 grounds as well.

Just taking a step back, some portion of the testimony of all three of the witnesses addressed in the government's letters strikes me as a case built on gossip, as opposed to what witnesses actually saw or did or communications that would otherwise be admissible.  And I think the defense makes a fair point that we have to police those lines, because under Rule 403, even if these statements would technically not be hearsay or would fit within an exception, Rule 403 is always

P5JsCOM1

applicable to judge the admissibility of that kind of testimony.

And for the reasons stated in the defense's letter from early this morning, absent a further proffer of relevance in admissibility, the evidence as to these two additional parts of Ms. Richard's testimony would be excluded.

The government objects to the attention of defense Exhibits 1500 through 1519 on relevance grounds.  That objection is overruled.  The government does not challenge the admission of these materials on hearsay grounds, but rather raises what appears to be a Rule 403 objection.  To the extent that Ms. Richard testifies about acts of violence and threats from the time period of 2009 through 2011, the defense is entitled to attempt to undermine her credibility by referencing later communications that show love and friendship, as opposed to fear and intimidation.  Of course, the government will establish or try to establish that those friendly texts were the result of intimidation that Ms. Richard felt based on things like the earlier incident in the recording studio the day after the skillet assault.  However, the defense is entitled to suggest that those later communications are violative of the lack of credibility in Ms. Richard's testimony concerning the violence that took place.

As to Ms. Morgan, the first issue concerns statements by Ms. Ventura to Ms. Morgan that the defendant controlled

P5JsCOM1

Ms. Ventura's career and that she could not break up with the defendant because he controlled her career. Those go directly to the defense's attacks on Ms. Ventura's credibility as to those issues in cross-examination and in opening statements, as the government points out in its May 18 letter. These statements are admissible as a prior consistent statement under 801(d)(1)(B).

Ms. Ventura's statements that she was scared of the defendant would be admissible under Rule 803(3) as a statement of the declarant's then existing state of mind and emotional condition, and they would be independently be admissible under 801(d)(1)(B).

Ms. Ventura's statements that Ms. Morgan -- to Ms. Morgan that Mr. Combs physically assaulted her after she found out she was seeing Mr. Mescudi is offered not for the truth of the matter, but as context for testimony that, during this time, the defendant called Ms. Morgan incessantly. The court will exclude those statements on hearsay and Rule 403 grounds. The main import of that kind of testimony goes to the underlying statements that Ms. Ventura was actually physically assaulted. And so even technically it would be admissible and overcome a hearsay objection. The court would exclude that kind of testimony under Rule 403 grounds.

As for Ms. Ventura's statements concerning what happened to her at the InterContinental Hotel in 2016, same

P5JsCOM1

thing. The government offers that testimony for context for what subsequently happened at Ms. Morgan's apartment. These statements are unnecessary for Ms. Morgan's subsequent testimony, are plainly going to the truth of the matter and, in any event, would be excludable on Rule 403 grounds. For that reason, that testimony is excluded.

Ms. Ventura's statements to Ms. Morgan that Ms. Ventura believed that the defendant had a tracker on her car are excluded on the same grounds, hearsay and Rule 403.

Other issues in the defense's e-mails that is not addressed in the government's letter, but for the sake of completeness, any testimony from Ms. Morgan that Ms. Ventura's contract was a hostage contract and that the defendant was notorious for driving unfair bargains with artists is excluded under 403 grounds.

Ms. Ventura's statements to Ms. Morgan that the defendant had Ms. Ventura hold a gun for her at a club are excluded on the same basis.

Ms. Morgan's opinions that the defendant controlled Ms. Ventura's career are excluded.

So, just to clarify, to the extent that Ms. Ventura told Ms. Morgan that the defendant controlled her career, those statements related from Ms. Ventura to Ms. Morgan would be admissible for the reasons I specified. However, Ms. Morgan's opinions or views that the defendant controlled Ms. Ventura's

P5JsCOM1

career don't fit in the same bucket, and they are excluded.

As to Mr. James, Ms. Ventura's statements that Mr. James -- to Mr. James that this life is crazy and that the defendant had too much control over her and that Ms. Ventura could not leave her relationship because of those things is admissible under 801(d)(1)(B) and 803(3) for the same reasons as the similar testimony would be admissible as offered by Ms. Morgan.

Now, Mr. James' testimony concerning statements made by Genevieve Robles as to the defendant's assault of Ms. Ventura in a car on the way home from a club in January 2009 is, absent a further foundation, inadmissible on hearsay and Rule 403 grounds. The court disagrees that this can be brought in just in terms of context.

The government also offers that the statements would be admissible under 801(d)(2)(D), which covers statements against an opposing party made by the parties' agent or employee on a matter within the scope of the relationship. It's not clear how a statement by Ms. Robles to Mr. James concerning the defendant hitting Ms. Ventura on the way home from a club would be within the scope of Ms. Robles' employment or agency with the defendant.

I'm happy to hear the government further on that issue, but I'm not seeing it based on the submission that's been made to date.

Mr. James' testimony concerning statements made by Mr. Bonds, who works in security, and Atkinson, who is a chef, to him concerning the defendant assaulting Atkinson would not seem to be statements made by these individuals within the scope of their employment or agency with the defendant.  But, again, the government is permitted to try to lay a foundation for admission of that testimony.  I'm happy to hear if there is further context that I'm missing as to that specific issue.

Now, the testimony concerning Mr. Bonds telling James about Capricorn Clark having to take a lie detector test after the defendant's jewelry went missing, made after Mr. James found what he thought was a loose diamond, would seem to be within the bounds of Rule 801(d)(2)(D), given that Bonds is a security officer discussing a security matter that was plainly relevant to both his and Mr. James' employment, given that Mr. James had just found a diamond.  I'm sure that the government will lay appropriate foundation to show that the exception applies and that this testimony would be coming in for a non-hearsay purpose.

So I'll stop there because I think I've covered everything.

Ms. Steiner.

MS. STEINER:  Yes, your Honor.  Thank you.

With respect to your Honor's ruling about the two threat statements made by Ms. Richard, I did want to make a

clarification, which I think I inartfully worded in my letter, which is where things got garbled.

THE COURT:  That's OK.  The letter came in very late, so...

MS. STEINER:  Understood.  Apologies for that.

In the letter, we wrote that with respect to the earlier-in-time threat about Ms. Richard's attempts to intervene with Ms. Ventura after either incidents of abuse or to encourage her to get an independent career when the defendant was stating things to the contrary, we intended to write that Ms. -- the defendant would both be threatened by Mr. Combs and informed to mind her own business, so to speak. And, in fact, the mind your own business comment, I expect, if I were to ask her about it, would come primarily from Mr. Harve Pierre, if on direct the court permitted me to ask regarding the threats that were made by Mr. Combs.

I expect she would state the exact same types of statements that were elicited with respect to the egg skillet incident, such as, I'm going to make you go missing. Similarly, she perceived kind of a threat to her life.  To the extent that the court has ruled that the defense has opened the door because they stated in their opening that witnesses were not going to police, Ms. Richard will testify that it's because of the threats that she would go missing that the defendant made at that time that she did not continue to intervene with

P5JsCOM1

that abuse.

So I fully take your Honor's point with respect to the later-in-time threat in 2011. I think they are -- Mr. Combs did not make a more specific threat, and it really is Ms. Richard's inference that would get us there. But with respect to the earlier-in-time threats about her intervention, they are much more specific.

THE COURT: Understood.

So, just in a nutshell, the same brand of testimony that was objected to on Friday, is that what you're talking about?

MS. STEINER: Correct.

THE COURT: There is going to be testimony along those same lines, meaning Ms. Richard observed violence against Ms. Ventura after that. The defendant, referencing what she heard, what she saw, made threats against Ms. Richard --

MS. STEINER: Correct, your Honor.

THE COURT: -- to keep her quiet.

MS. STEINER: Correct, your Honor.

THE COURT: So that would be -- that would not fall within my ruling, so that would be permissible for the same reason as the incident in the recording studio.

MS. STEINER: Thank you, your Honor.

Just to clarify, to really parse this with respect to Mr. Harve Pierre, I do expect she would say, as to his

P5JsCOM1

statements, that he would say, among other things, mind your own business, where are you going to go. And she inferred that to be maybe a less severe threat, but similarly a threat.

Would that also fall within your Honor's ruling?

THE COURT: How do you overcome the hearsay objection as to Mr. Pierre?

If he's working for Bad Boy Records and he's talking about Ms. Richard being quiet about things that she has seen, how does that fit within the scope of the agency relationship?

MS. STEINER: It's in furtherance of the conspiracy, your Honor. And also, he is acting, I expect she would testify, that she's acting in tandem with the defendant. So the defendant would come in and make threats, and then Mr. Pierre would essentially back up the defendant by making, perhaps, less extreme threats, but threats nonetheless.

THE COURT: Same thing. Even putting aside the fact that it's a coconspirator statement, it comes in for the same reason that the defense has put in issue, the fact that allegations of violence or hostile workplace are unfounded because nobody complained to the police. So they've opened the door to those statements coming in.

MS. STEINER: Thank you, your Honor.

THE COURT: I'm just characterizing.

MS. STEINER: I thought that was a ruling.

THE COURT: Try to get the wins when you can get them.

P5JsCOM1

I'm just characterizing that.  That's the submission?

MS. STEINER:  Yes, your Honor.

THE COURT:  All right.  I think that is well taken.  I think that if there were specific threats made relating to instances of violence by Mr. Combs against Ms. Ventura, which, I take it, you're saying that's what is going to come out in the testimony.

MS. STEINER:  Correct.

THE COURT:  Those would be admissible on the same basis.

MS. STEINER:  Thank you, your Honor.

THE COURT:  Ms. Slavik, we will turn to the defense.

MS. SLAVIK:  Yes, your Honor.

I wanted to address some of the issues that you raised with respect to David James, specifically the statements that the government seeks to admit through the employee exception.

And those two statements, the statement of Ms. Robles with respect to the January 2009 assault and then the statements of Bonds and the chef with respect to the defendant's assault of the chef, those statements, the government submits, are admissible under the employee exception.

And I just want to start by noting the liberal admissibility standard with respect to this particular exception.

P5JsCOM1

I'm quoting from the *Pappas* case, a Second Circuit case that's cited in the government's MILs, but the Second Circuit encouraged liberal admissibility of statements under this exception because "an employee is usually the person best informed about certain acts committed in the course of his employment, and because while still employed an employee is unlikely to make damaging statements about his employer unless those statements are true."

So, with that standard in mind, courts in this district have admitted things that have been described as private musings of employees.  That's from a Judge Gardephe case, I believe.  The *In Re Reserve Fund Securities & Derivatives* litigation.

I think what's important here is understanding the scope of the employment relationship between the defendant and these individuals making statements.  I expect that Mr. James will testify that being a personal assistant to the defendant was merely a 24/7 job.  Personal assistants were with the defendant from the time that he woke up to the time that he went to sleep.  Often, that was 20 hours a day, sometimes more.  Personal assistants were expected to be at his side at all times.  At business meetings, at dinners, at club appearances, in the studio.  At all times personal assistants were expected to be there with the defendant.

The same is true for security.  Security staff was

P5JsCOM1

with the defendant nearly at all times.  And so the scope of that employment relationship is really quite broad, and these actions that we're discussing certainly fall within the scope of those individuals' employment.  For instance, Ms. Robles was at the club with the defendant.  She was working.  This was part of her duty as a personal assistant to be with the defendant at the club, to be riding in the car with the defendant, security, and Ms. Ventura.  So her witnessing this assault was certainly within the scope of her employment.  And the statements that she made to Mr. James were within the scope of that employment and during the duration of that employment.

The other point on this is Ms. Robles' statements, and the whole event is kind of -- it's difficult to separate what Mr. James can testify about due to his direct personal knowledge.  He can testify that that night, Mr. Combs burst into the home, made a beeline to Mr. James, and reviewed his browsing history because, according to the defendant, there was a blogger who was "lying about him," lying about the assault of Ms. Ventura.

Immediately after that, Mr. James was asked by the defendant to deliver something to Ms. Ventura, who was staying at the London Hotel at the defendant's behest.  So this incident and Ms. Robles' recording of this incident is really intermixed with the directives that the defendant provided to Mr. James personally.

So I think that between the scope of Ms. Robles' employment and the directives that the defendant gave Mr. James in the context of his employment, I think these statements come in under the employee exception.

THE COURT:  Don't we run into an issue here that, given what you've said about the scope of these individuals' employment, essentially anything that they said to each other would be admissible in your view under this exception, so we have a situation that, for an extended period of time, any witness can come on the stand and say, This person told me that this thing happened, this person told me that that thing happened?  Even if it wouldn't be within the scope of a conventional employment relationship, in this case, it all comes in.

My concern with that is that there are other ways to get this evidence in.  For instance, Ms. Ventura testified as to the underlying incident here, right?

MS. SLAVIK:  That's right.

THE COURT:  So what Mr. James is adding is just the post script, meaning that after this happened, he was dispatched to the London Hotel to bring food to Ms. Ventura. He then saw someone from the security detail which answered the door, which he thought was unusual.

The government is going to put those pieces together in closing argument to show that there was this incident of

P5JsCOM1

violence, and then she was in the London Hotel for an extended period of time. There was food brought to her, but the food was brought to someone from the security detail. And I take it the government will suggest that she was essentially held captive there after an incident of violence perpetrated by the defendant.

So, now, I've explained how the pieces would be put together in a way where Mr. James would not have to testify about these statements coming in from other employees. What I'm suggesting is that it's a Rule 403 issue more than it might be an issue under Rule 801, if you get my drift.

MS. SLAVIK: I understand what you're saying, your Honor. And certainly the focus of his testimony is not going to be on Ms. Robles' statements. The government does not intend to spend a lot of time getting the description of Ms. Robles' recounting of this event.

But I do think that it's important to establish that Mr. James was aware of this assault, not only because of what happened before, where the defendant bursts in and reviews Mr. James' search history, but also what happens after, which is that the defendant dispatches Mr. James to go to the hotel and to provide the food to Ms. Ventura. I think that that context of Ms. Robles' reporting that, what had happened at the club, I think that that's important to give context to what happened before with respect to Mr. James and what happened

after with respect to Mr. James.

I also think it's important to note that, you know, your Honor remarked that this is different from a traditional employment relationship. Maybe, you know, this sort of exception could apply to an employee making representations about a contract or something like that.

That is very true. This is not, you know, necessarily a typical application. But I think that's reflective of this job not being a typical job, and I think that's what we have to focus on. I think that's what the Second Circuit directs us to focus on. The scope of that employment relationship and here, because the scope is so broad and involves so much of the defendant's personal life, I think these statements come in under that.

THE COURT: Understood.

Let's hear from the defense.

MS. SLAVIK: I'm happy --

THE COURT: Did you have other issues?

MS. SLAVIK: Well, I think essentially for the same reasons, the statements by Bonds and the chef with respect to the defendant's assault of the chef, I think those statements are similarly situated in that both Bonds and the chef were employed by the defendant. The scope of that employment was broad, particularly for security. Security was with the defendant nearly 24/7. I expect the chef will testify that she

P5JsCOM1

worked extensively for the defendant as well.

This particular incident took place while the chef was working in her capacity as a chef. I believe Mr. James will testify that the dispute was a result of the defendant's dissatisfaction with the chef's preparation of his eggs. And the timing is also, I think, important with respect to these statements.

Mr. James shows up, you know, sort of midway through this altercation. He doesn't see the physical altercation himself, but immediately after, the defendant instructs him to go to the police station to file a police report. Mr. James obviously does not do that, and I think it's important for the context of Mr. James' actions and the directive to Mr. James that he hears from Mr. Bonds and from the chef what actually happened.

THE COURT: What's the relevance of this testimony?

MS. SLAVIK: Sorry?

THE COURT: What's the relevance of the testimony concerning the defendant telling Mr. James to file a police report and his refusal to do so?

Can you connect the dots?

MS. SLAVIK: Yes.

The relevance is the defendant seeking to obstruct his assault of the chef by asking Mr. James to file a false police report.

P5JsCOM1

THE COURT: So, again, this would be relevant to what the defense opened the case on, which is that there is -- there was violence here, but people were -- people did not --

Well, this is a little bit different. He was actually told to go to the police, but just in a way that would be inconsistent with what he understood had actually happened.

MS. SLAVIK: That's right.

THE COURT: Again, tell me what the relevance is.

MS. SLAVIK: The relevance is the defendant's --

First of all, his consciousness of guilt. Secondly, it's the defendant's efforts to obstruct his -- the defendant's own criminal acts.

THE COURT: Understood.

Anything else, Ms. Slavik?

MS. SLAVIK: No, your Honor.

THE COURT: Let me hear there the defense.

MR. AGNIFILO: Yes, your Honor.

If I may, let me take a step back for a second. I'll deal --

THE COURT: Before you proceed, just so you know we're not burning the jury's time, I think one of the jurors might be just a few minutes late. So we've got a couple minutes.

MR. AGNIFILO: Great. Thank you, Judge.

One thing, I know that when the witness on the stand was beginning her testimony, I lodged a few objections. I

checked with the government on Saturday to see if the government would be OK with the fact that Ms. Westmoreland would be doing the cross of the current witness rather than myself, and they said they were fine with that.

Although I raised some legal challenges, I think what sort of happened, it segued from your Honor's ruling into the examination. So, the government is OK with it. So, I know your Honor's individual rules would prefer we sort of stay one lawyer on one examination, and we think we're going to do that going forward, with the court's --

THE COURT: That's OK.

MR. AGNIFILO: OK.

All right. Let me start with the David James issue for a second.

I think your Honor touched on the important issue that what I hear the government saying is that there are really no bounds to the employment description of this person. And I think that sort of defeats with the whole purpose of this hearsay exception is. I mean, I think this hearsay exception is supposed to be, for instance, this is a company, you know, if it deals with fashion, that there is going to be statements that have to do with the mission of the company.

And so those sorts of statements get to be an exception to the hearsay rule because there is some independent indicia of reliability. So that we're not as concerned about

P5JsCOM1

sworn statements and cross-examined statements.

I think all of those underline, underlying rationales, disappear from what I see the government arguing here, which is that it's almost that any piece of hearsay would be admissible because the job description is so vague and so open. And that's not really what these things were about.

There is nothing about the -- anyone's job description to deal with fights or to deal with, you know, arguments or to deal with things like that. I mean, it's our contention, these are all personal matters, and I think that by taking another side of that, I just don't believe that the government's view of the facts is justified on the record so far, so that anything would be a matter of hearsay if a personal assistant hears someone else say it.

So I think that the government's position is inconsistent with the core of this particular exception. I think now, to be clear, obviously any witness can talk about anything that they see, anything that they hear, and anything that they do. What they can't do is they can't --

THE COURT: Not everything that they hear. That's what we're talking about.

MR. AGNIFILO: From a hearsay standpoint.

I do think it's -- I think it is still hearsay, and I hear where your Honor is thinking, at least even if it could be within the exception, given the nature of the exception that

the government is asking your Honor to sort of accept, that we run into 403 issues because it becomes a dwindling relevance. I think both exceptions very much apply.  I do think it's hearsay without a valid exception, and I do think it is unduly prejudicial under 403.

These are things, I mean, I think some of these witnesses are going to testify at the trial about things that they personally observed, things that personally happened to them, and we should be permitted to cross-examine those people.

THE COURT:  Well, let me focus you in on the last thing that we addressed with Ms. Slavik, which is the assault on the chef.

OK.  So, in that context, there is an instruction from the defendant to Mr. James to file a police report.  Mr. James learns from a security, a member of the security detail, that actually what happened is that the defendant assaulted the chef, right.  That's the allegation.

And wouldn't it be within the security officer's -- not officer -- but someone who is in security, who is running security 24/7 for the defendant, telling Mr. James, who's been asked to file a police report, that here is what actually happened, which is certainly within the purview of someone who is responsible for security, to be monitoring issues of violence or assaults or things of that nature that occur involving their protectee, the defendant.  He says, Well, it

wasn't a situation where he was attacked.  Actually, he did the attacking.  You show know that because you've been asked to file a police report which, by the way, is also within the security officer's purview.

So why, given all that, wouldn't it overcome the hearsay objection, then we move to the relevance issue?

MR. AGNIFILO:  So, if I could, if I could deal with the second issue first.  There is a reason for me doing so.

I cannot -- I do not know what relevance some interaction between Mr. Combs and the chef has to this racketeering conspiracy.  I mean, I think we're just getting very far afield, and I think this is becoming sort of a bad act free-for-all.  I don't know where this is in the indictment.  I don't know where this is in the pattern of racketeering activity that's been alleged.  I don't know where this is in terms of the enterprise that's been alleged.

Now, I've done this long enough to know that almost any fact done in a racketeering conspiracy case can arguably be part of the enterprise.  But that is where 403 comes in, because we have to put in some sort of limits to the actions that are not directly related to the pattern of racketeering activity.  And there is no pattern of racketeering activity, there is no racketeering act that concerns the chef.  There is no racketeering activity that concerns any assault.  We have to keep in mind, assault is just not one of the racketeering acts

P5JsCOM1

because RICO does not have assault as a racketeering act. Congress made that decision in 1970.

So we're running the risk, I think, of creating a very prejudicial environment where the government is trying to get in all of this bad act evidence that has character components to it that, sort of, fits an assault.  It's coming into evidence and that has never been a theory that I've understood is a valid theory that the government is trying to propound here.

The assaults are relevant at this trial to the extent that they had some effect on a purported victim to this sex trafficking.  That is it.  The assaults are not relevant, the assaults aren't racketeering activity, and the assaults are unduly prejudicial.  I think your Honor's questions, as I understood it when you asked my colleague, why is any of this evidence relevant?  I think that's right.  I think we're just getting too far afield.

I see my colleague wants to say something.

THE COURT:  Ms. Slavik, is it your submission that this would be relevant as relating to a tampering with a witness victim or an informant, or what is the other basis for --

MS. SLAVIK:  Your Honor, this is relevant to the means and methods of the enterprise.

I also want to note that the chef is identified as a

P5JsCOM1

victim of forced labor.  That's in the government's enterprise letter dated March 10, 2025.  And so these actions related to the chef are undoubtedly within the scope of the enterprise and the racketeering activity alleged.

THE COURT:  Even though it's not perhaps directly relevant to one of the predicates, it is relevant to the means and methods of the conspiracy alleged in the indictment.

MS. SLAVIK:  Your Honor, to put a finer point on that, I think the evidence is related to the racketeering activity, specifically to the forced labor.

THE COURT:  Understood.

MS. SLAVIK:  Excuse me.  The forced labor predicate.

THE COURT:  Related to the chef.

MS. SLAVIK:  Correct.

THE COURT:  Understood.

Anything else, Mr. Agnifilo, relating to the myriad of issues that were raised?

MR. AGNIFILO:  Yes.  I'm trying to make sure I kept them all lined up.  I think that's it for Mr. James.

I'm going to defer to Ms. Westmoreland on the other witness.

MS. WESTMORELAND:  Good morning.

THE COURT:  Good morning.

MS. WESTMORELAND:  In regards to Ms. Richard, I'm going to discuss the alleged threats by Mr. Combs that the

P5JsCOM1

government is asking you to admit.  The alleged threat that the government wants admissible now is not similarly situated to the alleged threat that you've already allowed in evidence.

The alleged threat that you allowed into evidence is an incident, the egg incident, where Ms. Richard claims Mr. Combs assaulted Ms. Ventura right in front of her.  The very next day, close in time, she says Mr. Combs brings her into the room and threatens her about what she saw.  So, Don't tell what you saw or this is going to happen.

These other alleged threats are nowhere near close proximity to any assault.  They are not similarly situated.  As a matter of fact, the other alleged threats, you'll go missing, I'll make you go missing, people go dark.  Those allegedly, in discovery, the only ones that I've seen was in reference to the Danity Kane era.

And just to put this in a timeframe for your Honor, Ms. Richard has a relationship with Mr. Combs from 2004 to 2011.  Danity Kane is from 2004 to 2009.  Ms. Richard testified that she never saw violence until 2009, once she goes over to Diddy Dirty Money.  These alleged threats, You'll go missing, I make people go dark, things of that nature, she expressly says that these comments were made, or these attempted threats were made to her, during the DK era, which would be pre seeing Ms. Ventura allegedly assaulted.  They are not close to an assault period and they predate it.

As a matter of fact, in the most recent interview with the government, the government asked Ms. Richard, Tell me about the other threats.  They are in your civil complaint, paragraph 64, 65.  And she said that was about the DK era.

THE COURT:  Ms. Steiner, do you agree with that characterization?

MS. STEINER:  I do not, your Honor.  I'm trying to bring up the 3500 now.

THE COURT:  You don't need to convince me now.  I want to make sure you disagree with it.

MS. STEINER:  I do disagree, your Honor.

THE COURT:  I was advised they are similar to, I'll call it, the skillet incident.

MS. STEINER:  That is correct, your Honor.

THE COURT:  And in the recording studio.

You have to lay the foundation that that is the case. And I understand from Ms. Westmoreland that if you fail to do that, she is going to stand up and object, and I'll address it at that time.  If it's related to something totally separate, it would fall within the ruling and be excluded.  I understand from you that it falls into the same exact category as to the recording studio incident.

You'll have to make that case.  Ms. Westmoreland, you're free to object when, if Ms. Steiner is not able to establish that foundation.  And, in any event, you'll be able

P5JsCOM1

to cross-examine Ms. Richard based on the materials that you've identified.

MS. WESTMORELAND:  Thank you, your Honor.

If I can briefly address the alleged threats by Mr. Pierre.  So, this is in regards to a meeting where Ms. Richard is asking to be relieved from her contract.  And allegedly Mr. Pierre says, Where are you going to go?  That, number one, I don't understand how that is even perceived as a threat.

Number two, for Ms. Richard to say that she perceived that as some kind of threat is complete speculation.

THE COURT:  Now, that was within the scope of my ruling.  I understand that, from Ms. Steiner, there is separate statements that have been made by Mr. Pierre that she is going to elicit.  She understands that the kind of statement you just referred to is within the scope of my ruling is out.

MS. WESTMORELAND:  All right.  Thank you, your Honor.

THE COURT:  I'm seeing a nod from the front.  I think we're on the same page.

MR. AGNIFILO:  Your Honor, one last thing.  I apologize.  I believe that the situation between Mr. Combs and the chef was after the chef had terminated her employment, so I don't know what relevance it would have to the forced labor. That is my understanding of it factually.  So I think that could be relevant.

P5JsCOM1

MS. SLAVIK:  Your Honor, the chef was literally cooking eggs for him.  She was a chef.  This is within the scope of her employment.

THE COURT:  Understood.

Let me think about the issue, Ms. Slavik, that you raised, and I'll let you know if I'm going to change my ruling on that particular incident before Mr. James testifies.

MS. SLAVIK:  Thank you, your Honor.

MS. FOSTER:  Your Honor, can I just flag two very quick things about Ms. Morgan's testimony?

THE COURT:  Yes.

MS. FOSTER:  The first is that, at one point, I conferred with defense counsel on this.  She is going to be testifying about Mr. Combs' alleged assault of her or assault of her.

THE COURT:  The "her" being Ms. Morgan?

MS. FOSTER:  Yeah, Ms. Morgan.

At that point, there is -- Mr. Combs makes a statement to her about Ms. Ventura that raises a 412 issue based on the specific words that were used.  I flagged to defense counsel that, in that place, I'm going to just say, without going into the specific words, what did he express anger about.  Just to flag that.

THE COURT:  Understood.

MS. FOSTER:  The second thing is that defense provided

P5JsCOM1

us a list of the exhibits they plan to admit for Ms. Morgan yesterday.  We reviewed them and responded to defense counsel with, sort of, very specific objections, and then also noting how, what basis they are admissible as they appear to be hearsay.

Based on our communications, my understanding had been that they were only going to admit them to refresh the witness's recollection or as potential impeachment material.  I now understand that may not be true based on talking to defense counsel, that, actually, they may show Ms. Morgan certain of the exhibits.  If she doesn't remember them, then they may seek to admit them.

At that point, we would firmly take the position that that is hearsay.

THE COURT:  Understood.

Let's try to get these things aired in advance so that we can run through them before we have the jury in.

MS. FOSTER:  Yes.

THE COURT:  However, in this instance, I'll deal with the objections as they come up.

MS. FOSTER:  OK.  Thank you.

THE COURT:  Understood.

The only other housekeeping issue, I understand, Ms. Slavik, as to the Local Rule 23.1 issue, there is nothing needed from the court at this time, correct?

P5JsCOM1

MS. SLAVIK:  Not at this time, your Honor.

THE COURT:  OK.  And then the only other thing, general housekeeping, is that there is a lot of e-mail correspondence concerning applications that have been made via e-mail.

We have an application from the press that that correspondence be posted to the docket.  I think that is well taken.  What I'll ask you to do is have your staff organize the correspondence and then file what exists to date by next Tuesday.  So, not something you have to deal with urgently.

Let's get it on the docket by next Tuesday, and try to handle that on a weekly basis.  Just so people know who is supposed to do this.  Let's say then, it's your application, you are responsible for getting the e-mail correspondence together.  And you can just file a very short letter that says that this attached e-mail correspondence was submitted to the court, and then attach the correspondence, file it on the docket.  The defense can do the same thing for any application that it was responsible for.

With that, I take it, Mr. Courtroom deputy, that we have our jury.

THE DEPUTY CLERK:  Yes, I believe so, your Honor.

THE COURT:  Let's have Ms. Richard back.

MS. GERAGOS:  We are just going to bring up the binder, your Honor.

P5JsCOM1

THE COURT:  Thank you.

Binders.  Great.

Welcome back.

THE WITNESS:  Thank you.

(Continued on next page)

P5JsCOM1                    Richard - Direct

(Jury present)

THE COURT:  Please be seated.

Welcome back, members of the jury.  I hope you had a great weekend.

Ms. Richard, you understand you're still under oath?

THE WITNESS:  Yes, sir.

DAWN RICHARD, resumed.

THE COURT:  Ms. Steiner, you can proceed when ready.

MS. STEINER:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. STEINER:

Q.  Good morning, Ms. Richard.

A.  Good morning.

Q.  Before the weekend, you testified regarding an incident involving an egg skillet in 2009 at Mr. Combs' residence.

Do you recall that?

A.  Yes.

MS. STEINER:  If you can just...

THE COURT:  Yes.  Please speak up.

THE WITNESS:  Sorry.

Q.  You also testified that, the following day, Mr. Combs called you back to his residence and made certain statements to you.

Do you recall that?

A.  Yes.

P5JsCOM1                         Richard - Direct

Q.   Can you please remind the jury the statements that Mr. Combs made to you at that time?

A.   That he -- the relationship that he had, that the incident was of passion and that Cassie was OK.  And that if we say anything, that we could go missing.

Q.   When Mr. Combs told you, and I believe it was Ms. Harper --

A.   Kaleena Harper.

Q.   -- that you could go missing, what did you understand him to mean?

          MS. WESTMORELAND:  Objection, your Honor.

          THE COURT:  It's overruled.

A.   That we could die.

Q.   Ms. Richard, how did you react when Mr. Combs threatened you in this manner?

A.   I didn't react at all.  Was shocked, but also scared because it was our first time really getting started to record, and that was my first time really being in a group with everybody.  And I couldn't believe that this would be the beginning of the journey for us.

Q.   The group you're referring to, Ms. Richard, is Diddy Dirty Money?

A.   Dirty Money.

Q.   Following the incident in Mr. Combs' residence in 2009, did you continue to see Ms. Ventura while you were a member of Diddy Dirty Money?

A.   I did.

Q.   Generally, where would you see her?

A.   In the studio, in hotels, events that we would have, performances we would have, and in the house as well.

Q.   Generally, how frequently would you see Ms. Ventura?

A.   Frequently.

Q.   After the incident in Mr. Combs' Los Angeles residence, were there other occasions when you observed acts of violence between Mr. Combs and Ms. Ventura?

A.   Yes.

Q.   How frequently did you observe Mr. Combs being violent with Ms. Ventura?

A.   Frequently.

Q.   Can you please describe for the jury what you observed generally?

A.   Um, he would punch her, choke her, drag her, slap her in the mouth.  Um, I saw him kick her.  Um, punch her in the stomach.

Q.   Prior to witnessing those incidents, were you able to observe the interactions between Mr. Combs and Ms. Ventura?

A.   Yes.

Q.   And, generally, based on your observations, what would prompt these acts of violence?

            MS. WESTMORELAND:  Objection.

            THE COURT:  It's overruled.

A.   It varied.  It could be Cass speaking up for herself.  It could be, um, random -- like, we wouldn't even know where it came from.  It could be if she wanted to perform or she had an opinion about something.  It just varied.

Q.   And when you state that it happens sometimes when Ms. Ventura would speak up for herself, can you describe what you mean by that?

A.   Cass is, like, quiet.  She would be quiet.  She had a quiet demeanor.  She was soft.  And when she would have these moments of, like, trying to be stick up for herself, trying to be more for herself and he wasn't having that, he would hurt her for it.

Q.   And when you refer to him, are you referring to Mr. Combs?

A.   Yes.

Q.   Who, if anyone, from Mr. Combs' staff was present for these incidents of violence?

A.   That varied, too.  It could be anyone from Harve Pierre to Capricorn Clark to Mia, to D-Roc, to Bonds.  It depends.

Q.   Generally, at a high level, can you describe the roles that Capricorn Clark and Mia served for the defendant?

A.   They were, um, assistants and also a head of marketing, like, brand work.

Q.   You also testified that members from his security staff would observe these incidents, is that correct?

A.   Yes.

Q.  And?

MS. WESTMORELAND:  Objection.  Your Honor, may we have a time context to any of this testimony?

THE COURT:  Hold on.

MS. WESTMORELAND:  Objection.

THE COURT:  Thank you.

Is that an objection?

MS. WESTMORELAND:  Yes.

THE COURT:  Ms. Steiner, can you rephrase the question?

MS. STEINER:  Yes, your Honor.

BY MS. STEINER:

Q.  Ms. Richard, you testified that the first incident of violence that you observed between Mr. Combs and Ms. Ventura was in 2009, is that correct?

A.  Right.

Q.  And approximately when was the last incident?

A.  You said the last incident?

Q.  Of violence?

A.  Which one?

Q.  Let me rephrase my question.

You said you also observed violence frequently thereafter, is that right?

A.  Yes, yes.

Q.  And that continued throughout the period of time in which

you were a member of Diddy Dirty Money?

A.   Yes.

Q.   And were you a member of Diddy Dirty Money from 2009 through 2011?

A.   Correct.

Q.   And did that those incidents of violence continue throughout that period of time?

A.   Yes.

Q.   Can you specify, Ms. Richard, who from Mr. Combs' security staff witnessed incidents of violence?

A.   Um, D-Roc and Bonds.

        MS. STEINER:  Ms. Becker, can we please bring up what has been marked for identification and may be in evidence, I apologize, as Government Exhibit 2A-2-202.

        Thank you.  I believe this is in evidence.

Q.   Ms. Richard, do you recognize this image?

A.   I do.

Q.   Who is this?

A.   It's D-Roc.

Q.   And can you please describe what D-Roc's role was for Mr. Combs?

A.   He was a bodyguard.  He was also really close to Puff. Like, they were close, like brothers.

        MS. STEINER:  Ms. Becker, can you please bring up what is in evidence as Government Exhibit 2A-201.

P5JsCOM1                      Richard - Direct

Q.   Ms. Richard, do you recognize this image?

A.   Yes.

Q.   Who is depicted in it?

A.   That's Bonds.

Q.   What was Bonds' role for Mr. Combs?

A.   Security.

          MS. STEINER:  You can take that down.

Q.   The D-Roc and Bonds work for Mr. Combs the entire time you were a member of Diddy Dirty Money?

A.   Yes.

Q.   How would D-Roc and Bonds react to incidents of violence that they observed?

A.   They wouldn't react.  They wouldn't do anything.

Q.   Did you ever observe Ms. Ventura with injuries after these instances of abuse?

A.   Yes.

Q.   Where on her body?

A.   Her face.  When I say face, her eyes, her lip, her arms, her knees.

Q.   How, if at all, would Ms. Ventura attempt to cover up or hide these injuries?

A.   Um, with makeup, clothing, and sometimes sunglasses.

Q.   Did there come a time later in 2009 when you were in New York for a festival performance?

A.   Um, yeah.  We were in Central Park.

Q.   Which festival was this?

A.   I don't know the name of it, but we were announcing our group.  It was in Central Park.

Q.   Again, the group is Diddy Dirty Money?

A.   Diddy Dirty Money.

Q.   And in connection with that festival, was there a time that you and Ms. Ventura and Mr. Combs were in Mr. Combs' New York residence?

A.   Correct.

Q.   Where is that residence located?

A.   In New York City.

Q.   Who else, if anyone, was present?

A.   Kaleena Harper, Cassie, and myself.

Q.   What happened while you were in the residence?

A.   Kaleena and I were in the bathroom getting ready, doing our makeup, and Puffy and Cassie were in the hallway arguing.

Q.   What did you observe happen next?

A.   He punched her in the face.

Q.   When you say he, are you referring to Mr. Combs?

A.   Sean Combs punched her in the face.

Q.   Did he punch her with an open or closed fist?

A.   It was a closed fist.

Q.   After Mr. Combs punched Ms. Ventura in the face with a closed fist, how did she respond?

A.   She came into the bathroom crying.  He walked off angry and

she came in the bathroom.  And we were with her and it was really quiet.  You could see her -- you could see her upset. Like, she just -- she was hurt.  She was embarrassed.

MS. WESTMORELAND:  Objection.

THE COURT:  That's sustained.

The jury should disregard the last sentence of the witness's answer.

Q.  What, if any, injuries did you observe on Ms. Ventura at that time?

A.  Her eye was swelling.

Q.  What, if anything, did you observe Ms. Ventura do to try and cover up that injury?

A.  She started doing her makeup to try to hide it.

Q.  Did she do anything else to cover up the injury?

A.  She wore sunglasses that day.

Q.  Why did she wear sunglasses?

A.  She wanted to hide the swelling --

MS. WESTMORELAND:  Objection.

THE COURT:  Sustained.

Q.  Ms. Richard, did you remain with Ms. Ventura after this incident?

A.  Yes.

Q.  Why did you remain with her?

A.  I wanted her to feel supported.  She wanted to be with us. We wanted to have her back.

P5JsCOM1                          Richard - Direct

MS. STEINER:  Ms. Becker, can you please bring up for the parties, witness, and court what has been marked for identification as Government Exhibit 9R-101.

Actually, can we please do 9P-102.

Thank you.

Q.  Ms. Richard, do you recognize this image?

A.  I do.

Q.  Generally, what does it depict?

A.  It's us at the Central Park festival together in New York.

Q.  Is it a fair and accurate depiction of that?

A.  Yes.

MS. STEINER:  Government offers Government Exhibit 9P-102.

THE COURT:  Any objection?

MS. WESTMORELAND:  No.

THE COURT:  9P-102 will be admitted.

(Government's Exhibit 9P-102 received in evidence)

BY MS. STEINER:

Q.  Ms. Richard, was this image taken later in the day following that incident?

A.  Yes.

Q.  Can you please describe --

MS. STEINER:  Or can you please publish that for the jury.

Q.  Can you please describe who is depicted in this photograph?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5JsCOM1                       Richard - Direct

A.  On the left is Kaleena Harper, and in the middle is myself, and to the right is Cassie.

Q.  And it appears in this photo that the three of you are wearing sunglasses.

        Why are you all wearing sunglasses?

        MS. WESTMORELAND:  Objection.

        MS. STEINER:  I can rephrase, your Honor.

        THE COURT:  OK.

Q.  Ms. Richard, what are you wearing in this photograph?

A.  I'm wearing sunglasses.

Q.  And what is Ms. Harper wearing?

A.  She's wearing sunglass.

Q.  What is Ms. Ventura wearing?

A.  She is wearing sunglasses.

Q.  Are those the sunglasses you observed her put on in the bathroom?

A.  Yes.

Q.  Why are the three of you, why did you --

        MS. WESTMORELAND:  Objection.

Q.  Why did you decide to wear sunglasses that day?

A.  To have solidarity, to be a friend, to be a support system for someone who needed it.

        MS. STEINER:  You can take this down.

Q.  Ms. Richard, directing your attention now to the following year in 2010, did there come a time that you were in a

restaurant in West Hollywood, California, with Mr. Combs and Ms. Ventura?

A.   Yes.

Q.   What happened at that restaurant?

A.   Mr. Combs punched Cassie in the stomach.

Q.   Can you please describe what you observed leading up to that incident?

A.   We were having a private conversation and we were all sitting, eating at the tables together.  When I say we, I mean some Bad Boy -- some of our other label, and even some celebrities were in the room.  And they were secretly arguing, and he punched her in the stomach.  Sean Combs punched her in the stomach.

Q.   How, if at all, did Ms. Ventura respond when she was punched in the stomach?

A.   She immediately bent over and then was -- he was -- he told her to leave because I could see him point out, and she went out and left the room.

Q.   Who, if any, of Mr. Combs' employees were present?

A.   Harve Pierre, Capricorn Clark, Mia, D-Roc, Bonds, myself, and Kaleena Harper.

         MS. STEINER:  Ms. Becker, can you please bring up for the parties and the court and the witness what has been marked as Government Exhibit 2A-319.

Q.   Ms. Richard, do you recognize this image?

A.   I do.

Q.   What is it?

A.   This is Harve Pierre.

Q.   Is it that a fair and accurate depiction of Mr. Pierre?

A.   Yes.

          MS. STEINER:  Government offers Government Exhibit 2A-319.

          MS. WESTMORELAND:  No objection.

          THE COURT:  All right.  2A-319 will be admitted.

          (Government's Exhibit 2A-319 received in evidence)

          MS. STEINER:  Ms. Becker, can we please publish that for the jury.

BY MS. STEINER:

Q.   Ms. Richard, generally, who was Mr. Pierre?

A.   He was the president of Bad Boy Records.

Q.   Who, if anyone, did he report to at Bad Boy?

          MS. WESTMORELAND:  Objection.

          THE COURT:  Can you rephrase the question?

          MS. STEINER:  Of course.

Q.   Ms. Richard, you said that Mr. Pierre was the president of Bad Boy, is that correct?

A.   Correct.

Q.   Does that mean he was your boss?

A.   He wasn't my boss.  He just was the boss of Bad Boy.  My boss was Puff, Sean Combs.

P5JsCOM1                    Richard - Direct

Q.  Mr. Combs?

A.  Yeah.

Q.  And did you observe Mr. Combs and Mr. Pierre while at Bad Boy together?

A.  Yes.

Q.  Did you have an understanding of what Mr. Pierre's role was at Bad Boy?

A.  Yes.  He answered to Puff or Sean Combs.

Q.  What, if anything, did Mr. Pierre or the other employees present do to intervene after that incident?

A.  They didn't.  No one intervened.  We didn't.

Q.  When did you next see Ms. Ventura?

A.  We got in the car together to head back to the LA house.

Q.  Who was present in the car?

A.  Kaleena, myself, Cassie, Puff, and D-Roc.

Q.  Can you please describe where everyone was positioned in the car?

A.  Yes.  Kaleena and I was -- it was, like, a Sprinter, so, like, a BMW Sprinter, so we were sitting facing them, if that makes sense.

So it was Kaleena and I and then Puff and Cass and then D-Roc was in the front.

Q.  Was D-Roc driving?

A.  He was driving, yeah.

Q.  Was anyone speaking in the car?

A.   Cass and Puff were arguing.

Q.   And what generally were they discussing?

A.   Cass was embarrassed and she was telling him, like, he shouldn't have done that in public and she felt embarrassed.

        MS. WESTMORELAND:  Objection.

        THE COURT:  Sustained.

Q.   How did Mr. Combs respond?

A.   He grabbed her by the neck and popped her in -- he slapped her in the mouth, told her to shut the fuck up.

Q.   You say that he popped her in the mouth.

        What do you mean by that?

A.   Like, an open-hand slap to the mouth.

Q.   How did Ms. Ventura respond after she was hit in the mouth?

A.   She looked outside the, um, the window and everyone was quiet for the rest of the ride.

Q.   How, if at all, did D-Roc respond?

A.   He didn't.

Q.   Ms. Richard, what, if anything, would you discuss with Ms. Ventura about her music career?

A.   Cass had big dreams.  She really loved --

        MS. WESTMORELAND:  Objection.

        THE COURT:  The basis?

        MS. STEINER:  It's for the effect on the listener, your Honor, not for its truth.

        THE COURT:  All right.  It's overruled.

A.   She wanted to put out her album, and I told her I would write for her.  She wanted to do more modeling.  She wanted to do well with her career.  And I, myself and Kaleena, we encouraged her to do that.  We wanted to support her in any way that we could.

Q.   Did you observe any discussions between Ms. Ventura and Mr. Combs about those career goals?

A.   Yes.

Q.   And how, if at all, would Mr. Combs respond in those discussions?

MS. WESTMORELAND:  Objection.

THE COURT:  It's overruled.

A.   Um, Mr. Combs didn't like that we knew or we talked to Cassie, and oftentimes, we would pay for it.

Q.   I just want to stop you for a moment.

Ms. Richard, can you describe what, if anything, you recall Mr. Combs saying to Ms. Ventura in those discussions?

A.   Oh, that it would be, um, on his time.  Like, it was coming.  But when he say it would come, he would also tell her, like, he owned her.  Like, this was -- I do -- I do this.  It was a very much, like, when I'm ready for you, you'll do it.  And it was always wait, wait, wait for her.  Like, she had to wait her time.

Q.   Would Mr. Combs ever be upset in these discussions?

MS. WESTMORELAND:  Objection.

P5JsCOM1                    Richard - Direct

THE COURT:  You can rephrase.

MS. STEINER:  Thank you, your Honor.

Q.  What was Mr. Combs' demeanor in these discussions?

A.  That varied.  Sometimes it was just a moment of, like, wait your turn and it was regular.  And then other times, it was violent, violent and volatile, and we would have to see that.

Q.  What, if anything, would Mr. Combs say when he became violent or volatile?

A.  It varied to, I mean, whether that was him hitting her or calling her out her name or telling her, like, you know, it was -- he owned her in that moment, or her decisions, that would be what it would be.

Q.  Ms. Richard, what, if anything, would you tell Ms. Ventura after witnessing acts of physical abuse?

A.  We told her she should leave.

MS. WESTMORELAND:  Objection.

THE COURT:  Grounds?

MS. WESTMORELAND:  Hearsay.  We.

THE COURT:  I think, Ms. Steiner, you can probably rephrase the question to avoid the objection.

MS. STEINER:  Thank you, your Honor.

BY MS. STEINER:

Q.  Ms. Richard, can you please answer just limit it to you specifically?

A.  Yeah.

P5JsCOM1                       Richard - Direct

Q.   Thank you.

A.   I told her she should leave.

Q.   How would Ms. Ventura react when you told her to leave?

A.   Cass looked torn.  Like, she -- she would listen, but you could see -- I could see the fear --

          MS. WESTMORELAND:  Objection.

          THE COURT:  Sustained.

Q.   If you know, Ms. Richard, was Mr. Combs later made aware of these discussions?

A.   Yes.

Q.   And what, if anything, did Mr. Combs tell you after those discussions?

A.   He didn't like it when Kaleena and I would talk to Cass because she would -- she would tell him, and then he would come and we would pay for it.

Q.   And, I guess --

A.   I paid for it.

Q.   Specifically, what, if anything, do you recall Mr. Combs telling you?

A.   Oh, man.  Stay the fuck out of my relationship.  You bitches are here to work, not be a part of my relationship. Um, you motherfuckers don't know real work.  Man...

Q.   What, if any, threats would Mr. Combs make to you?

A.   That we would -- it would be, or else, we would pay for it. That was always -- y'all are going to pay for it or keep doing

P5JsCOM1                        Richard - Direct

it, a-ight, that kind of thing.  It's always you do this or else something bad will happen to you.  It was always that, like, a threat, that if you didn't stay in line, there was consequences.

Q.  What was Mr. Combs' demeanor when he made these threats?

A.  That varied.

Again, sometimes it was a -- a stern, like, moment to say it, and other times it was loud, angry, violent and, like, it's mean.  It was mean.  It was mean.

Q.  Did anyone else speak to you specifically about your discussions with Ms. Ventura?

A.  Yes.

Q.  Who was that?

A.  Harve, Harve Pierre.

Q.  And what, if anything, would Mr. Pierre tell you?

A.  Harve said it gets dark and lonely.  And Mr. Combs used to say this, too.  It gets dark and lonely if you don't listen. It was very much, like, y'all need to listen to him.  Y'all don't want to deal with what happens if you don't.  And that was stated by Harve and Mr. Combs.

Q.  What did you understand that when Mr. Pierre and Mr. Combs said it gets dark and lonely?

MS. WESTMORELAND:  Objection.

THE COURT:  It's overruled.

A.  I had seen and witnessed brutality in a way that I had to

believe that if the person that was supposedly in love with, did what he did to her, what would he do to an employee?

I imagine it would be worse than that.

Q.  How did you respond to these threats?

A.  My thought was to be as kind and possible.  Like, I tried to please -- I saw what if you spoke out looked like.  So I would oftentimes approach Mr. Combs, like, with softness and, like, Hey, how are you.  It was always very much, like, if I do it this way, I maybe will have a better chance than what the other way looked like.

Q.  Did you continue to try to intervene in Mr. Combs' relationship?

A.  No.  I made a decision that it would be best for the safety of myself to not -- not interfere -- interfere, because I don't think she was ready to really do anything.

MS. WESTMORELAND:  Objection.

MS. STEINER:  I'm prepared to turn to a new topic, your Honor.

THE COURT:  I didn't even hear the objection, so must be a problem with the microphone.

What was the objection?  What were the grounds?

MS. WESTMORELAND:  Speculation.

THE COURT:  That's overruled.

Ms. Steiner, you may proceed.

MS. STEINER:  Thank you, your Honor.

P5JsCOM1                        Richard - Direct

BY MS. STEINER:

Q.  While you were employed by Mr. Combs, did you ever observe him using drugs?

A.  Yes.

Q.  What kinds of drugs?

A.  Um, weed, ketamine, cocaine, um, molly, E.

Q.  Approximately how often did you observe him taking those drugs?

A.  Often.

Q.  Generally, where would he take these substances?

A.  The studio or the house.

Q.  How often, if at all, did you observe him taking opiates?

A.  I never really saw him take opiates.

Q.  Who, if anyone, would deliver the drugs to the studio?

A.  There was this guy named One Stop that used to come in the studio.

         MS. STEINER:  Ms. Becker, can you please put up for the witness the parties and the court what has been marked as Government Exhibit 2A-507.

BY MS. STEINER:

Q.  Ms. Richard, do you recognize this image?

A.  Yes.

Q.  What does it depict?

A.  That's One Stop.

Q.  Is that a fair and accurate depiction of One Stop?

P5JsCOM1                     Richard - Direct

A.  It is.

MS. STEINER:  Government offers Government Exhibit 2A-507.

MS. WESTMORELAND:  No objection.

THE COURT:  2A-507 will be admitted.

(Government's Exhibit 2A-507 received in evidence)

MS. STEINER:  Ms. Becker, can we please publish that.

Q.  What types of drugs did One Stop sell?

A.  That varied, too.  The reason why they called him that --

MS. WESTMORELAND:  Objection.

THE WITNESS:  OK.

THE COURT:  That's sustained.

Hold on.

THE WITNESS:  I'm sorry.

BY MS. STEINER:

Q.  What types of drugs did you observe One Stop selling?

A.  Cocaine, plan B, birth control, weed, E, molly, like, everything.

(Continued on next page)

BY MS. STEINER:

Q. Did he deliver drugs to Mr. Combs?

A. He did.

Q. Where would he deliver the drugs?

A. In the studio.

MS. STEINER: We can take that down.

Q. Where did Mr. Combs generally store the drugs he received?

A. He had --

MS. WESTMORELAND: Objection.

THE COURT: Ms. Steiner, you can rephrase.

MS. STEINER: Thank you, your Honor.

Q. Ms. Richard, did you observe Mr. Combs take possession of the drugs that were delivered?

A. Yes.

Q. Did you observe where he stored the drugs?

A. Yeah, he had this Louis Vuitton pouch, travel toiletry bag that he would put the drugs in.

Q. When, if at all, would you observe Mr. Combs traveling with that Louis Vuitton pouch?

A. That Louis Vuitton pouch went everywhere from domestic to overseas.

Q. Who would you observe carrying the Louis Vuitton pouch?

A. It could be his assistants or himself.

Q. Did Mr. Combs ever offer you drugs?

A. Yes.

Q.   Did you take them?

A.   I only smoked weed.

Q.   Did you observe Mr. Combs offer anyone else drugs?

A.   Yes.

Q.   Who did you observe him offer drugs to?

A.   Kaleena Harper and Cassie.

Q.   You've been testifying about observing Mr. Combs receiving drugs in the studio.  Did you observe him consume those drugs in the studio?

A.   Yes.

Q.   While he was taking drugs in the studio, was he also working?

A.   Yes.

Q.   What type of work was he doing?

A.   It could be anything from our album stuff to his business corporations and things he had going on.

Q.   While you were working for Mr. Combs, when, if ever, did you see him with a weapon on his person?

A.   A few times.

Q.   What kind of weapon did you observe on his person?

A.   It looked like a handgun.

Q.   Approximately when did you first see Mr. Combs with a handgun?

A.   In the studio.

Q.   When you say in the studio, was that when you working for

Diddy Dirty Money?

A.  Correct.

Q.  Where in time during your employment for Diddy Dirty Money did you first observe the handgun?

A.  In 2009 going into 2010.

Q.  Generally, where would you observe Mr. Combs carrying the handgun?

A.  In the lower waist, in the back.

Q.  You said that you observed Mr. Combs with a handgun in the studio; is that correct?

A.  Correct.

Q.  Did you observe him carrying the handgun in any other locations?

A.  If we went to a club after studio.

Q.  Who, if anyone else, working for Mr. Combs carried handguns or guns?

A.  His body guards.

Q.  And specifically, which body guards?

A.  D-Roc and Bonds.

Q.  And generally, where would D-Roc and Bonds carry those firearms?

A.  In the same place, the lower back.

Q.  How, if at all, did your observations of Mr. Combs and his security with handguns affect you?

MS. WESTMORELAND:  Objection.

P5JCcom2                         Richard - Direct

THE COURT:  That's overruled.

A.  I mean, fear.  You have to know your environment, and it was fearful every day to be in to understand, like, what that meant.  I mean, it was just -- that was the kind of environment I was in.

Q.  Ms. Richard, did there come a time when you left your employment for Mr. Combs?

A.  Yes.

Q.  Approximately when was that?

A.  2011.

Q.  Generally, what did you do after leaving Bad Boy?

A.  What do you mean?

Q.  Did you work after leaving Bad Boy?

A.  Yeah.

Q.  Generally, what kind of work did you do?

A.  It was the same.

Q.  Did Mr. Combs remain in contact after you left Bad Boy?

A.  Yes.

Q.  Can you describe generally when he would be in touch?

A.  Every time I was kind of, like, getting a little momentum in my career, there would be a FaceTime call, and if you didn't answer that, then someone else would call, and if you didn't answer that, someone else would call, and finally you would get on the call and make contact.  And so it would be every so often.  Another time he contacted me for the possibility of

using an old song --

Q.  I'm going to stop you right there, Ms. Richard.

When you said someone else would contact you when you didn't pick up immediately, who would those individuals be?

A.  His assistant or management.

Q.  And when you had these discussions with Mr. Combs, how would you interact with him?

A.  Again, the smartest way to talk, because it was the way I felt was the safest, was to always be pleasant, very pleasant, very kind, almost calling him bro all the time.  Hi bro, very much like that.

Q.  When you initially left your employment for Mr. Combs, did you disclose the abuse that you had observed?

A.  No.

Q.  Why not?

A.  Before I left, I was told to come in, and that the only way I could --

Q.  I'm going to stop you right there, Ms. Richard.  Without getting into that conversation, can you just describe, more generally, why you did not disclose what you had?

A.  I was told not to.

Q.  Who told you not to?

A.  Mr. Combs and Harve Pierre.

Q.  Did there later come a time when you did decide to speak publicly about what you had witnessed?

P5JCcom2                         Richard - Direct

A.   Yes.

Q.   Approximately, when was that?

A.   2024.

Q.   What, if anything, changed your willingness to be public with what you had experienced?

A.   I saw Cassie finally take the stand and tell the truth.

          MS. WESTMORELAND:  Objection.  Move to strike.

          THE COURT:  The objection is sustained.  The jury should disregard the witness's answer.

          Ms. Steiner, you can ask a question phrased differently to avoid the objection.

Q.   Ms. Richard, did you observe Ms. Ventura file a civil lawsuit around that time?

A.   I did.

Q.   Did you, yourself, file a civil lawsuit against Mr. Combs around that time?

A.   I did.

Q.   Is that civil lawsuit that you filed primarily related to Mr. Combs's treatment of you?

A.   Yes.

Q.   Are there claims in your civil lawsuit based on Mr. Combs's conduct towards you --

          MS. WESTMORELAND:  Objection, your Honor.

          THE COURT:  That's sustained.  You can rephrase the question.

P5JCcom2                        Richard - Direct

Q.  You testified just now, Ms. Richard, that your civil lawsuit is based on Mr. Combs's treatment of you specifically; is that correct?

A.  Correct.

Q.  And in your testimony here today and on Friday before the weekend, have you talked about Mr. Combs's treatment of you during your testimony or have you focused on his treatment of others?

A.  His treatment of others.

        MS. WESTMORELAND:  Objection.

        THE COURT:  That's overruled.

Q.  Ms. Richard, is your lawsuit against Mr. Combs still pending?

A.  It is.

Q.  And are you aware of the details of any settlement negotiations with Mr. Combs?

A.  No, I'm not.

Q.  Are you aware of how much money, if at all, has been requested to settle the suit?

A.  No, I'm not.

Q.  As a result of your testimony here today, Ms. Richard, are you expecting any compensation?

A.  I'm expecting justice.

Q.  Are you expecting any compensation, Ms. Richard?

A.  From this?

Q.   From your testimony.

A.   No.

          MS. STEINER:   No further questions, your Honor.

CROSS-EXAMINATION

BY MS. WESTMORELAND:

Q.   Good morning, Ms. Richard.   My name is Nicole Westmoreland.
I represent Mr. Combs.   Okay?

A.   Good morning.

Q.   I need to ask you a few questions.

          Now, your lawsuit that's pending right now as we
speak, correct, you have a lawsuit?

A.   Correct.

Q.   And there's a motion to dismiss pending for that lawsuit?

A.   I'm not sure.

          MS. STEINER:   Objection.

          THE COURT:   Overruled.

Q.   You're aware that there's currently a motion to dismiss
pending in your lawsuit, correct?

A.   Not aware.

Q.   Okay.   Now, before filing a lawsuit against Mr. Combs,
you're aware that your attorneys sent a demand letter on your
behalf, correct?

A.   I'm not aware of what my attorneys sent.   I'm sorry.

Q.   Without telling me any conversations between you and your
lawyers, you hired civil lawyers, correct?

P5JCcom2                         Richard - Cross

A.  I have civil lawyers.

Q.  And you understand that the civil lawyers that you hired are litigating on your behalf, correct?

A.  Can you give that in a term I can understand.

Q.  You hired lawyers to do a job on your behalf?

A.  Yes.

Q.  Thank you.

Ms. Richard, you formally filed suit January 11, 2024; does that sound accurate?

A.  I'm not sure.  I'd have to see.  I thought it was September 2024.

Q.  So you formally filed suit September 2024; does that sound accurate?

A.  It sounds -- yeah.

Q.  Now, after filing a formal lawsuit against Mr. Combs, you had an interview with the government; do you remember that?

A.  What are you referring -- like, just a conversation with -- can you give me more?  I'm sorry.

Q.  Yes.  You've had the opportunity to sit down and speak with the federal prosecutors, the government, correct?

A.  Correct.

Q.  And you sat down and you spoke with them numerous times, right?

A.  A few times.

Q.  You sat down with them eight times; does that sound right?

P5JCcom2                        Richard - Cross

A.   I don't recall the number.  I'm sorry.

Q.   Would several be fair?

A.   A few times.

Q.   Would you agree with me that over the few times that you sat down and spoke with the government that your allegations, the ones that you've testified to today have changed over time?

A.   No, I think they've been as best as I can recall.

Q.   You think they've been consistent?

A.   As best as I can recall.

Q.   First, I want to speak with you about your testimony on Friday, about the egg in the kitchen incident.  Do you remember explaining a situation like that to the jury?

A.   Yes, ma'am.

Q.   And you, on Friday, you stated that Ms. Ventura was in the kitchen and she was cooking eggs, right?

A.   She was cooling eggs.

Q.   The eggs were done and she was cooling eggs, correct?

     And then you said Mr. Combs came downstairs, he was yelling, right?

A.   He was.

Q.   And then he attempted to hit Ms. Ventura with the frying pan, with the -- okay.

     I couldn't hear you.  I need you to say yes or no with the court reporter.

A.   He went to swing at her, it didn't --

P5JCcom2                        Richard - Cross

Q.   So he attempted to hit her in the head, and then you testified Ms. Ventura dropped down into a fetal position?

A.   She covered herself, yeah.

Q.   And that's your testimony?

A.   Yeah.

Q.   This isn't the first time, testifying on Friday and today, it's not the first time you spoke about this egg alleged incident, right?

A.   Spoke in my civil case and right now.

Q.   I'm sorry.  I couldn't hear the last part.

A.   I'm not sure.  Yes, I've spoken in my case and here now.

Q.   You've spoken about it in your civil case and you've spoken about it here?

A.   Mhm.

Q.   And you've also spoken about it to the prosecutors, right?

A.   We've spoken, yes.

Q.   Let's start with the civil part.  You're aware that in the letters sent on your behalf to Mr. Combs, that you described this egg incident; are you aware of that?

A.   Repeat the question.  I'm sorry.

Q.   Are you aware in the letters sent on your behalf to Mr. Combs that the egg incident that you allegedly saw, that it's described, are you aware of that?

A.   No, I'm not aware.

Q.   I'd like to show it to you to see if it would refresh your

memory. Okay?

A. Okay.

MS. WESTMORELAND: Could you please pull up pre-marked defense exhibit 1500 just for the parties. Can you go to page 7, paragraph 2.

Q. Ms. Richard, could you please read that to yourself and, once you're finished, please look up at me.

A. Okay.

Q. Are you done?

A. Yes, ma'am.

Q. Were you aware that your allegation here was described as you --

MS. STEINER: Objection.

THE COURT: Sustained.

Q. Did you ever make the statement that you heard a pan hit the wall, you didn't see it?

A. I don't recall.

Q. Does looking at that document refresh your memory?

A. I don't recall that, though, writing that.

Q. Are you aware that that was said on your behalf?

MS. STEINER: Objection.

THE COURT: That's sustained.

Q. Let's go back. You hired civil lawyers, correct?

A. Correct.

Q. And you hired civil lawyers to enter into a litigation on

P5JCcom2                          Richard - Cross

your behalf, correct?

A.  Right.

Q.  And you are aware that civil lawyers reached out to lawyers in reference to Mr. Combs, you're aware of that, right?

A.  I'm not aware of that.  I'm sorry.

Q.  You're aware that they filed a lawsuit on your behalf?

A.  Correct.

Q.  And you are aware that, in the civil proceedings, they litigated on your behalf, correct?

A.  Can you, again, give it to me where I understand it.  I'm sorry.

Q.  Sure.  You hire lawyers to represent you, right?

A.  Correct.

Q.  And you understand what a civil suit is, correct?

A.  Correct.

Q.  That's when you're suing someone?

A.  Correct.

Q.  And you're asking for money?

A.  Correct.

Q.  You understand that?

A.  I'm asking for compensation for the work that I had.

Q.  Compensation, money, whatever term you'd like to use, that's what you're asking for, right?

A.  Correct.

Q.  And you hire a lawyer to do that for you, that's what you

did?

A.  Correct.

Q.  And so you understand that lawyers make claims on your behalf?

A.  Correct.

Q.  And you understand that when you hire civil lawyers, they make claims on your behalf?

A.  Correct.

Q.  To seek for your compensation?

A.  Okay.

Q.  And are you aware that, on your behalf, the incident you described was that you heard --

        MS. STEINER:  Objection.

        THE COURT:  That's sustained.

Q.  Ms. Richard, let me ask you this: you sat down with the federal government on October 31st, 2024, didn't you?

A.  I don't remember the date.  I'm sorry.

Q.  May I show you something to help refresh your memory?

A.  Please, yes.  Thank you.

        MS. WESTMORELAND:  Could you please, for the parties only, pull doc 3574.006.

Q.  Do you see the highlighted date?

A.  I see the highlighted date.

        MS. WESTMORELAND:  You can pull that down for now.

Q.  You understand that when you went in to interview with the

P5JCcom2                        Richard - Cross

government that there was someone there taking notes?

A.  Yes.

Q.  And the government, during these interviews, the government would ask you questions, right?

A.  Correct.

Q.  You would answer them?

A.  Yes.

Q.  Now that you had the chance to look at that document, does that help refresh your memory that you met with the government on October 31st, 2024?

A.  It doesn't help me because I don't know what that document -- like, I've never seen that document before.

Q.  Do you have any reason to disagree with me that you met with the government?

A.  I was saying I didn't see that.

Q.  No worries.  No worries.  I want to get to the substance of it.

        When you met with the government, didn't you tell them that Mr. Combs actually hit Ms. Ventura with a frying pan?

A.  I said he attempted to hit her with a frying pan.

Q.  I didn't ask you that.  Did you actually tell the government not that he attempted to hit her, that he did hit her?

A.  Yes.

Q.  You told the government that?

P5JCcom2                          Richard - Cross

A.   That he hit her, yes.

Q.   And you agree with me that there's a major difference
between attempting to hit someone with a frying pan and
actually hitting them, you agree with that?

A.   Yes.

Q.   And you understood that when you were sitting down with the
federal prosecutors, that it was very important for you to tell
the truth?

A.   Yes.

Q.   And you understood that it was important for you to be as
accurate as possible?

A.   To the best of my ability, yes.

Q.   And you understand, testifying today, that you're under
oath?

A.   Yes.

Q.   And you know that you need to tell the ladies and gentlemen
of this jury the truth?

A.   Absolutely.

Q.   And you would agree with me that there is a difference
between hitting someone with a frying pan and throwing a frying
pan, correct?

A.   Correct.

Q.   But you gave two different stories, didn't you?

A.   I did the best that I could to recall.

Q.   How about, you gave another interview.  Would you have

P5JCcom2                          Richard - Cross

reason to disagree with me that your next interview was on March 18, 2025?

A.  I wouldn't disagree with you.  That sounds right.

Q.  And in that interview, isn't it true that you told the federal prosecutors that Mr. Combs actually threw eggs at Ms. Ventura?

A.  No, I don't recall that.

Q.  You don't recall that?

And that after throwing eggs at Ms. Ventura, that he actually set the pan back down.  Do you remember saying that?

A.  I don't recall that.

Q.  Let me show you something to help refresh your memory. Okay?

A.  Thank you.

MS. WESTMORELAND:  Can you please publish only for the parties 3574.007.  Can you please go down to page 4, first open bullet point.  Can you highlight that section right there. Thank you very much.

Q.  Please read that to yourself and then look up at me when you're done.  Are you done?

A.  I am.

Q.  Does it refresh your memory that you actually told the prosecutors that Mr. Combs didn't hit her with the pan at all?

A.  I don't recall saying that.  I'm sorry.

Q.  And isn't it true that you told the prosecutors, now with

P5JCcom2                          Richard - Cross

reading that, that he actually threw eggs at her?

A.   I don't recall saying it.

Q.   You don't recall saying that?

A.   Uh-uh.

Q.   And we discussed that when you had these interviews, that there was a note taker, right?

A.   Yes.

Q.   You agree that throwing eggs and then setting the pan down is different than hitting someone with a pan, right?

A.   I do.

Q.   And you agree that hitting someone with a pan is very different than attempting to hit someone with a pan, right?

A.   Correct.

Q.   And you agree that hearing a pan thrown against the wall is different than all three of the other ways, right?

A.   Correct.

Q.   Ms. Richard, let me just ask you, would you agree with me that it's been hard for you to keep your story the same in reference to this egg incident?

          MS. STEINER:   Objection.

          THE COURT:   It's overruled.

A.   No, I wouldn't agree with that.

Q.   You would agree that you told multiple different stories, though?

A.   No, I would agree that I told it to the best of my

P5JCcom2                        Richard - Cross

recollection and it was as close as I could give it.

Q. To the best of your recollection, you have about four different recollections on what may have happened that day?

A. No, I don't.

Q. Let's talk about the day after.

A. Okay.

Q. Now, you testified on Friday and you furthered that testimony today, and you explained to us that Mr. Combs called you to the studio the next day, right?

A. He did.

Q. And that you went to the studio, Mr. Combs locked the door, and he told you this was a love and passion thing, right?

A. Correct.

Q. And then he told you, you better not say anything, and -- excuse me. He told you and Ms. Harper, right? Ms. Harper was there?

A. Yes.

Q. And he told both of you, you better not say anything because where I'm from, people go missing?

A. Correct.

Q. And that's what you told the ladies and gentlemen of the jury in this court, that's what you said?

A. Correct.

Q. And that's the truth?

A. That's the truth.

P5JCcom2                         Richard - Cross

Q.   Now, testifying Friday and today, that's not the first time that you've had the opportunity to explain that alleged incident, right?

A.   Correct.

Q.   Because you sat down with the prosecutors on numerous occasions, right?

A.   Correct.

Q.   And you remember them asking you about this?

A.   Correct.

Q.   October 31st, 2024, we're going back to what you don't argue with me is the first interview, okay?

A.   Okay.

          MS. STEINER:  Objection.

          THE COURT:  It's overruled.

Q.   Now, isn't it true that at that interview, during that interview, you explained to the prosecutors that Mr. Combs told you that this was nothing but a love argument, right, no one was hurt?

A.   Correct.

Q.   And you did not tell the prosecutors that Mr. Combs told you, where I'm from, people go missing?

A.   Can I see what you're saying, because --

Q.   Absolutely.

A.   Thank you.

          MS. WESTMORELAND:  Could you please pull 3574.006,

page 6, first paragraph.  Can you highlight the first paragraph, please.

Q.  Please read to yourself and look up at me when you're done. That whole line, please.  Thank you.  You're done?

A.  Mhm.

Q.  Does that refresh your memory that you did not tell the federal prosecutors that Mr. Combs told you, people go missing?

A.  I always state what I've stated.  So if not, it's not my recollection that wasn't stated, but that was what happened.

Q.  So you agree with that if you stated that, the prosecutors didn't write that down?

MS. STEINER:  Objection.

A.  No.

THE COURT:  That's sustained.

Q.  You didn't see it there?

MS. STEINER:  Objection.

THE COURT:  That's sustained.

Q.  Let's go to your interview on 3/18/2025, that's your next interview.

A.  Okay.

Q.  Okay?

A.  Okay.

Q.  And isn't it true in that interview, you stated that Mr. Combs said this was a love thing, no one was hurt, right, and that you did not say anything about Mr. Combs told you,

P5JCcom2                          Richard - Cross

people go missing?

A.   Is there -- what was the question?

Q.   You didn't tell prosecutors that on 3/18/2025; isn't that true?

A.   No, that's not true.  I don't recall not saying that.

Q.   I'm going to show you a document to refresh your memory.

A.   Thank you.

          MS. WESTMORELAND:  Can you please pull 3574.007.  This is for the parties.  Page 5, second bullet point.

Q.   You done?

A.   I'm done.

Q.   Isn't it true, Ms. Richard, that you told the prosecutors that you were in the studio --

          MS. STEINER:  Objection.

          THE COURT:  Ms. Westmoreland, can you start again and maybe rephrase the question.

          MS. WESTMORELAND:  Sure.  No worries.  Thank you.

Q.   I'll ask you one question: you didn't tell the prosecutors on 3/18/2025, your second interview, that Mr. Combs told you, people go missing?

A.   I tell my story as I remember it.

Q.   So on that day, you just didn't remember that Mr. Combs told you that people go missing, a comment that you said meant that you could die?

          MS. STEINER:  Objection.

P5JCcom2                         Richard - Cross

THE COURT:  That's overruled.

A.  I spoke as best as I could as I remember it.  It was a long time ago.  I'm doing my best to understand these questions as best I can.

Q.  Let me ask you this: when you were in that room with the federal prosecutors, Mr. Combs was not there, right?

A.  No.

Q.  And none of his lawyers were there?

A.  No.

Q.  And you felt safe in the room with federal prosecutors?

A.  Yes, ma'am.

Q.  And you know it was important to tell the truth?

A.  Yes.

Q.  You know it was important to try to be accurate?

A.  Yes.

Q.  The prosecutors were asking you questions?

A.  Yes.

Q.  You were answering them?

A.  Yes, ma'am.

Q.  You spoke about this particular incident in detail, right?

A.  Yes, ma'am.

Q.  I mean, they asked you questions and you answered them?

A.  To the best of my ability.

Q.  Right.  And you would agree that you alleging Mr. Combs threatened you was something that you would want to tell the

United States federal government, right?

A.  Yes, ma'am.

Q.  And although that's what you're saying here in trial, you would agree with me that even in your second interview, you didn't mention that?

MS. STEINER:  Objection.

THE COURT:  It's overruled.

Q.  Could you please answer the question.

A.  What was the question?

Q.  You would agree with me you didn't mention that?

A.  I, again, I mentioned it.  Whether or not -- I don't know what the notes were taken.  I don't know -- I can't know what the notes are going to be taken.  Sorry.

Q.  You did another interview on April 17, 2025?

A.  Okay.

Q.  Do you have a reason to disagree with that date?

A.  No.

Q.  During that interview, you and the United States Government, you guys spoke about this incident that you're alleging, you spoke about it again, okay?  Do you agree with that?

A.  I would have to see the document.

Q.  No worries.

A.  Thank you.

MS. WESTMORELAND:  Could you please pull 3574.012,

page 2, first paragraph.

Q.   Please look up at me when you're done.

A.   I'm done.

Q.   You would agree with me that you discussed this alleged incident with prosecutors on 4/17/2025?

A.   Yes, ma'am.

Q.   We're on our third interview?

A.   Uh-huh.

Q.   Mr. Combs wasn't there?

A.   No, he was not.

Q.   I wasn't there?

A.   No.

Q.   None of his lawyers were there?

A.   No, ma'am.

Q.   You felt safe in this interview?

A.   Yes, ma'am.

Q.   You didn't tell the federal government that Mr. Combs told you, people go missing?

A.   I told them exactly what my recollection of that event was.

Q.   So your recollection that day was that Mr. Combs didn't threaten you by telling you that people go missing?

A.   He threatened me and said, people go missing.

Q.   I understand that's what you're testifying here.  I'm asking you, you didn't tell the government that, on 4/17/2025, your third interview, correct?

A.  I'm telling you I told them what I remembered.

Q.  So you just didn't remember the threat?

         MS. STEINER:  Objection.

Q.  Is that fair?

A.  No, I remembered everything I'm telling you now.

Q.  Ms. Richard, you don't have a reason to disagree with me that you met the government on 10/31/2024, we talked about that, right?

A.  Yes, ma'am.

Q.  You met the government on 3/18/2025, no disagreement there?

A.  No, ma'am.

Q.  You met the government on 4/8/2025, no disagreement there?

A.  Yes, ma'am.

Q.  You met the government on 4/17/2025, no disagreement there?

A.  No, ma'am.

Q.  You met with the government on 4/9/2025, no disagreement there?

A.  No disagreement there.

Q.  You met with the government on 5/10/2025, no disagreement there?

A.  Yes, ma'am.

Q.  Ms. Richard, isn't it true that the first time that you mention and allege that Mr. Combs told you, people go missing, was a week ago on May 10th, 2025?

A.  No, ma'am.

P5JCcom2                          Richard - Cross

Q.  Would you like me to show you the rest of your interviews to refresh your recollection?

A.  I know what I said, ma'am.

Q.  Now, you said that when Mr. Combs told you, people go missing, you took that to be a death threat?

A.  Yes, ma'am.

Q.  That's what you're telling us, right?

A.  Yes, ma'am.

Q.  A death threat that you didn't recall on seven different occasions?

        MS. STEINER:  Objection.

        THE COURT:  That's sustained.

Q.  Let's move on.  Ms. Richard, you testified to some other incidents that you allegedly witnessed, right?

A.  Yes, ma'am.

Q.  Now, you told us about a restaurant, right?

A.  Yes, ma'am.

Q.  And that Ms. Ventura and Mr. Combs were arguing and that he hit her?

A.  Yes, ma'am.

Q.  Please tell me who all was at this restaurant.

A.  Harve Pierre, Capricorn Clark, Mia and myself, Kaleena, our body guards, which was Bonds and D-Roc, Cassie.

Q.  Now, you've spoken about that incident before, right?

A.  I have.

P5JCcom2                         Richard - Cross

Q.   And you remember being asked who was all there, right?

A.   Mhm.

Q.   Do you recall alleging several celebrities was actually there?

A.   Yes.

Q.   So when the government asked you who was all there and I asked you who was all there right now, you didn't mention any of the celebrities, right?

A.   Right.

Q.   Please recall those celebrities now.

A.   Usher was there, Jimmy Iovine was there, Ne-Yo came through.  There were a few others, too.  I don't recall those people, but those are the ones I remember talking to.

Q.   Those are the ones you remember talking to.  Any reason why you left those individuals out when I asked you the question?

A.   I just -- I thought you were recalling what I mentioned here, asked me to give you the names of the people I mentioned here.

Q.   Any reason you left those individuals out when the government asked you the question?

         MS. STEINER:  Objection.

         THE COURT:  It's overruled.

A.   She just asked me who was there.

Q.   And if those individuals were there, why didn't you say their name?

P5JCcom2                          Richard - Cross

A.   I'm not sure.

Q.   Okay.  You told us about an incident in a car leaving the festival.  Do you remember that?

A.   Yeah.  Wait, no, not -- in the car leaving the festival, no.

Q.   Today is not your first day discussing these other alleged situations that you saw, right?

A.   Correct.

Q.   Spoke about that, too, with the prosecutors, correct?

A.   Correct.

Q.   Was there a time that you stated that you saw Mr. Combs pull Ms. Ventura out of the car, drag her in the grass, and everybody around saw it?

A.   I never stated that.

Q.   You never stated that?

A.   Uh-uh.

Q.   I'm going to show you something to help refresh your memory, okay?

A.   Mhm.

        MS. WESTMORELAND:  Can you pull 3574.002.  Actually, I want you to take that down for a second.  I want to pull something else first.  Can you pull 3574.016.  Can you go to the next page.  Go to page 1, first paragraph, yes, first bullet point right there.  Thank you very much.

Q.   Can you please read that to yourself and then look up at me

P5JCcom2                         Richard - Cross

when you're done.  You done?

A.  Uh-huh.

Q.  During that interview, you remember having an interview with the government, right?

A.  Yes.

Q.  In May?

A.  Yes.

Q.  Just a week or two ago.

And the government asked you about an allegation that was made on your behalf in your civil complaint, right?

A.  Correct.

Q.  And the government asked you about an allegation made on your behalf that Mr. Combs dragged Ms. Ventura out of the car, onto the grass in front of everyone, correct?

A.  Correct.

Q.  Because that was in your complaint, right?

A.  That was a misquote from a lawyer in my complaint.

Q.  And so you explained to the government that that didn't happen?

A.  Correct.

Q.  Now, you told us about an incident that you allege occurred at a festival, right?

A.  Correct.

Q.  And you agree with me that, at that festival, Ms. Harper was there, right?

A.  Correct.

Q.  Isn't it true that at the festival, you were being filmed, you, Ms. Ventura, and Ms. Harper were being filmed the whole time?

A.  Correct.

Q.  And so there's video, to your knowledge, of this whole vent, right?

A.  Yes.

Q.  You have video?

A.  No.

Q.  But you're aware that there is video?

A.  Yes.

Q.  Are you aware of whether that video has been turned over to the prosecution's office?

A.  No.

        MS. STEINER:  Objection.

        THE COURT:  It's overruled.

Q.  I couldn't hear you.  Yes or no?

A.  No.

Q.  Because you're aware that there was video, and you made an allegation that Mr. Combs punched Ms. Ventura, right?

A.  Yes, in the bathroom.

Q.  So that was surely beyond the video, right?

A.  No.

Q.  Well, camera crew was filming.

P5JCcom2                        Richard - Cross

A.   Okay.

Q.   You're aware there's video?

A.   Okay.

Q.   And if something like what you described occurred -- you're not following me?

A.   No, because we were filmed in the bathroom.

Q.   Right.  You had to go out of the bathroom, right?

A.   Yeah.

Q.   So at some point you had to go out of the bathroom, you spent all day at this festival, right?

A.   Correct.

Q.   With a camera crew filming all day?

A.   Correct.

Q.   Now, for these alleged times that you said you saw different situations, you'd agree with me that you were never with Mr. Combs alone, right?  There was someone else with you?

A.   What do you mean by -- just the incidents I've named, yes.

Q.   Let's just stick to those.  The incidents that you named, there was someone always with you, right?

A.   Yes.

Q.   You've provided those individuals' names to the prosecution?

A.   Yes.

Q.   And we can both agree that during all of the allegations of what you said that you saw happen with Cassie, that Ms. Harper,

P5JCcom2                        Richard - Cross

that she was with you, right?

A.   Yes.

Q.   She was with you at the festival?

A.   Yes.

Q.   You told the ladies and gentlemen of this jury she was with you in this car?

A.   Yes.

Q.   She was with you at the restaurant?

A.   Yes.

Q.   Ms. Richard, let's talk about guns.  You testified about guns, right?

A.   Yes.

Q.   Now, you would agree with me that Mr. Combs was a celebrity, right?

A.   Yes.

Q.   And during the whole time that you had the opportunity to be around Mr. Combs and Bad Boys, he was a celebrity, right?

A.   Yes.

Q.   And you once yourself had fame, right?

A.   Yes.

Q.   And you would agree with me that it's common for celebrities to have body guards?

A.   Yes.

Q.   And you would agree with me that part of the reason for celebrities to have body guards is to help protect them from

danger?

A.   Yes.

Q.   Now, you testified that you saw Mr. Combs with a gun?

A.   Yes.

Q.   And I don't want to misquote you, you said a few times?

A.   Yes.

Q.   You were around Mr. Combs from 2004 to 2011, pretty close proximity, you would say?

A.   Yes.

Q.   So over several years, you saw a gun a few times?

A.   Yes.

Q.   You told us once, studio, that's what you said?

A.   The studio and sometimes the club.

Q.   Can you give us a little bit of detail, first time you saw a gun, tell us when, where, tell us about it.

A.   Studio, New York, Daddy's house.

Q.   Second time.

A.   Studio, New York, Daddy's house.

Q.   Third time.

A.   In his house, New York.

Q.   Did you give those details to the government?

A.   No.

Q.   No?

A.   No.

Q.   Eight interviews, right?

P5JCcom2                         Richard - Cross

A.   Mhm.

Q.   And during these interviews, the prosecutors asked you questions, right?

A.   Mhm.

Q.   And you answered them?

A.   Mhm.

Q.   And you spoke about guns?

A.   Yes.

Q.   This question-answer session?

A.   Yes.

Q.   And out of eight interviews, you didn't tell the prosecution, hey, I saw a gun, it was at the studio at daddy's house, you didn't tell them that?

A.   I answered what was asked of me.

Q.   They didn't ask you any detail?

A.   That wasn't asked at the time.

Q.   Well, when you say at the time, I'm talking about eight times.

A.   It wasn't asked.  I'm sorry.

Q.   Okay.  Thank you for that.

        Let me ask a few questions.

A.   Okay.

Q.   You never saw Mr. Combs pull a gun out and like wave it around, right?

A.   No.

P5JCcom2                          Richard - Cross

Q.  You never saw Mr. Combs like pull a gun out and like cock it back or anything?

A.  No.

Q.  You never saw Mr. Combs like load bullets in a gun or anything like that?

A.  No.

Q.  Matter of fact, you've never seen Mr. Combs pull a gun out, period?

A.  Just had it on him.

Q.  Just had it on him?

A.  Mhm.

Q.  In the back?

A.  Mhm.

Q.  I want to ask you about your testimony regarding drugs. Okay?

A.  Okay.

Q.  You saw Mr. Combs do drugs?

A.  Yes.

Q.  You did drugs, too, right?

A.  Weed, yes.

Q.  You ever pretend to do some other drugs?

A.  Yes.

Q.  But you didn't actually do them?

A.  No.

Q.  You were putting on a facade?

A.  Yes.

Q.  Now, I want to make sure that this is your testimony.  You stated today that you've never seen Mr. Combs do cocaine, right?

MS. STEINER:  Objection.

THE COURT:  Sustained.

MS. STEINER:  Misstates the testimony.

Q.  You've never saw Mr. Combs do cocaine, right?

THE COURT:  That's sustained.

Q.  I'm asking, have you ever seen Mr. Combs do cocaine?

A.  Yes.

Q.  You have.  Okay.

Was there a time that you told the government in interviews that you've never seen Mr. Combs do cocaine?

A.  I don't recall that.

Q.  Let me help refresh your memory.

A.  Thank you.

MS. WESTMORELAND:  Can you please pull doc 3574.006, please.  Can you take us to page 7.  This is just for the parties.  First bullet point, can you highlight that.

Q.  Ms. Richard, can you please read that to yourself and when you're finished, please look up at me.  You done?

A.  Mhm.

Q.  Did that refresh your memory?

A.  It did.

P5JCcom2                          Richard - Cross

Q.  So, I'll ask you again, isn't it true that you told the government that you've never seen Mr. Combs do cocaine?

A.  At the time I hadn't recalled that, no.

Q.  I'm sorry.  At the time that you did the interview on 10/31, you hadn't recalled that?

A.  No, I hadn't.

Q.  But the government asked you about Mr. Combs's drug usage, right?

A.  They did.

Q.  And you didn't say to the government, hey, I don't know?

A.  No, I didn't say that.

Q.  You actually said, Mr. Combs did not do --

MS. STEINER:  Objection.

THE COURT:  I think there was a withdrawn objection. Can you re-ask the question.

Q.  You didn't say, I don't know if Mr. Combs does cocaine, right?

A.  I didn't say.

Q.  You told the government, Mr. Combs, I've never, never seen him do cocaine, that's what you said?

A.  Yes.

Q.  And you would agree with me that your testimony has changed on that?

A.  It has.

Q.  I mean, you would agree with me at this point that your

P5JCcom2                          Richard - Cross

testimony's changed on quite a few things?

A.   I think I'm, as time progresses, I get better with knowing it because it was so long ago.

Q.   So you would agree with me that as time progresses, your story changes?

A.   Yes.

Q.   Now, you testified to the ladies and gentlemen of the jury that you would see an individual by the name of One Stop?

A.   Yes.

Q.   And that he would come to the studio?

A.   Yes.

Q.   And that you witnessed him sell drugs?

A.   Yes.

Q.   That's what you said?

A.   Yes.

Q.   This is not the first time you had an opportunity to discuss this subject, right?

A.   Mhm.

Q.   And isn't it true that you've never seen One Stop actually sell drugs?

A.   No, I've seen One Stop sell drugs.

Q.   Who did you see give One Stop money?

A.   That varied.  It could be an assistant or it could be Puff giving the assistant money to pay for it.

Q.   You said could be, I'm not asking you to speculate, that's

not allowed here.  I'm asking you to answer the question, if you know.

A.  Yeah, I've seen him give money, an assistant give money to One Stop and he would give drugs.

MS. WESTMORELAND:  Can you please pull doc 3574.015, page 2.  This is just for the parties.  Take us down to the third bullet point.  And please highlight the last open bullet point, just the last open bullet point, please.  Thank you.

Q.  Ms. Richard, please read that to yourself and look up at me when you're done.

Isn't it true that you had an interview with the government, right?

A.  Mhm.

Q.  And you discussed One Stop?

A.  Mhm.

Q.  They asked you questions?  They, meaning the government.

A.  Yes.

Q.  You answered questions?

A.  Yes.

Q.  You knew to tell the truth?

A.  Yes.

Q.  And whether you had witnessed One Stop selling drugs?

A.  Mhm.

Q.  That subject was discussed?

A.  It was.

P5JCcom2                        Richard - Cross

Q.  And isn't it true that you told the government you never saw --

MS. STEINER:  Objection.

THE COURT:  Overruled.

Q.  Isn't it true that you told the government that you never saw anyone give payment to One Stop?

A.  Yes.

Q.  You didn't know who paid for the drugs?

A.  Correct.

Q.  Right.  So when you testified today in front of the ladies and gentlemen of the jury that you saw One Stop sell drugs, that you saw Mr. Combs pay him for drugs, that was a lie?

A.  No.

Q.  So you agree with me that what you're testifying to today is different than what you told the government in that interview?

A.  Correct.

Q.  Another story change?

A.  Not a story change, but yes, different.

Q.  Ms. Richard, I don't know the exact count, but at this point, you would agree with me we have several story changes?

MS. STEINER:  Objection.

THE COURT:  That's sustained.

Q.  Let's talk about your testimony in reference to how threatened you felt by Mr. Combs.  You were scared?

P5JCcom2                        Richard - Cross

A.   Yes.

Q.   Very?

A.   Yes.

Q.   So, Ms. Richard, you separated in 2011, meaning you went on as a solo artist, right?

A.   Correct.

Q.   And so you were no longer with or around Mr. Combs like that, right?

A.   Correct.

Q.   And I mean, you being pretty scared and so fearful, in fear of your life, after 2011, you were away from him, right?

A.   Correct.

Q.   And I'm sure you being pretty fearful and scared of him, that once you were able to get away from him, you definitely wouldn't want to come back, right?

A.   Correct.

Q.   But you would agree with me that you actually asked Mr. Combs to come back, didn't you?

A.   Not to come back, no.

          MS. WESTMORELAND:  Can you please pull up for the parties defense exhibit 1501.

Q.   Ms. Richard, I'm going to ask you to look at the top of this document.  Do you know what this is?

A.   Yes, I do.

Q.   Looks familiar to you?

P5JCcom2                      Richard - Cross

A.   Yes.

Q.   And you would agree that this is a text message exchange?

A.   Yes, it is.

Q.   Accurate?

A.   Yes.

          MS. WESTMORELAND:  At this time I move to admit defense exhibit 1501.

          MS. STEINER:  Objection.  Hearsay.

          MS. WESTMORELAND:  Your Honor, this was ruled on.

          THE COURT:  Well, there was an issue that was ruled on, but let's have a very brief sidebar.

          (Continued on next page)

P5JCcom2                        Richard - Cross

(At the sidebar)

THE COURT:  The issue that was previously raised had to go to the 803.3 issue of then state of mind.  However, the way you've presented this is as an impeaching document.  So that's a separate issue and I don't believe that the prerequisites have been satisfied yet that would permit you to put in the statement on those grounds.

MS. WESTMORELAND:  Okay.

THE COURT:  Ms. Steiner, do you have anything further?

MS. STEINER:  No.

THE COURT:  I understand that there was a different issue that was presented with this document and that's why I called the sidebar.  So you can lay the foundation, go through the steps and try to introduce it as a prior inconsistent statement, but you have to ask the questions first.

(Continued on next page)

P5JCcom2                          Richard - Cross

(In open court)

Q.  Ms. Richard, now, you gave testimony that after you left and you were separate from Mr. Combs, that he would reach out to you when you were -- he would reach out to you at certain moments is what you described.  You testified that you would respond kindly, right?

A.  Mhm.

Q.  And that you would only respond kindly because you figured out that was the best way to do so, right?  Okay.

But you also just testified that because were you in fear, right, I asked you about your fear?

A.  Mhm.

Q.  And because you were finally able to -- or you were gone from Mr. Combs, that being in fear, that you wouldn't want to come back and work with him or be around him, right?

A.  Correct.

Q.  That's what you said, right?

A.  Correct.

Q.  Isn't it true that Mr. Combs didn't just reach out to you, you reached out to him?

A.  Correct.

Q.  So you weren't just responding in kind, you were initiating conversation?

A.  Once before, yeah.

Q.  Once?

P5JCcom2                    Richard - Cross

A.   When I say once before, I mean there was a time when I was asked by someone --

Q.   I'm going to stop you right there.

A.   -- to contact Puffy --

Q.   I'm going to stop you right there.  The government will get up and ask you questions and I'm asking you this question.

A.   Yes, ma'am.

Q.   The question I'm asking you is: isn't it true that you initiated contact with Mr. Combs?

A.   Correct.

Q.   And I just want to make sure we are clear, because you said something about one time a second ago, so I want to make sure we're clear.  You reached out to Mr. Combs on several different occasions, correct?

A.   Yes.

Q.   And so you would agree with me that there is a difference between Mr. Combs reaching out to you and you responding to him, as opposed to you reaching out to him?

A.   Correct.

Q.   And you were so scared of him, right?

A.   Yes.

Q.   So you would agree with me that you reached out to Mr. Combs and one of the reasons that you reached out to Mr. Combs was to work with him again?

A.   Yes.

P5JCcom2                         Richard - Cross

Q.   Ms. Richard, I want you to help us understand.  Mr. Combs had threatened you?

A.   Mhm.

Q.   You perceived the threats as death threats?

A.   Yes.

Q.   Feared for your life?

A.   Yes.

Q.   Scared?

A.   Yes, ma'am.

Q.   You're away from him 2011, but then you ask him to come work with him again?

A.   Mhm.

Q.   Now, Ms. Richard, you explained to us that your relationship with Mr. Combs started about 2004, right?  And you testified Friday that you were in a group, Danity Kane, correct?

A.   Yes, correct.

Q.   And you would agree with me that when you were a member of Danity Kane that you experienced fame by way of that, right?

A.   Yes.

Q.   I mean, you would describe it as you couldn't walk the streets, you know, like a regular person?

A.   I wouldn't describe it as that.  I mean, we were young, so it was younger kids.

Q.   You've had this conversation with the government about

P5JCcom2                        Richard - Cross

Danity Kane, right?

A.  Yup.

Q.  And in fame?  You don't remember?

A.  In fame, meaning like just us being famous?

Q.  Yes.

A.  Yeah, I mean, we were big.

Q.  You were big?

A.  Yeah.

Q.  Right.  And Danity Kane was dismantled in 2008, 2009?

A.  Yes, in 2009, yeah.

Q.  And then after Danity Kane, Danity Kane was like a five-member group?

A.  Yes.

Q.  And you named Danity Kane, right?

A.  Yes.

Q.  And then Danity Kane was dismantled and then you were a member of the group Dirty Money, right?

A.  Correct.

Q.  When you were a member of the group Dirty Money, that was you, Mr. Combs, and Ms. Harper?

A.  Yeah.

Q.  So now Mr. Combs is actually a member in the group that you're in, right?

A.  Yes.

Q.  And you would agree with me that Dirty Money did pretty

P5JCcom2                          Richard - Cross

good in the industry, right?

A.   They did okay, yeah.

Q.   I mean, you would agree that Danity Kane and Dirty Money both went platinum?

A.   Yeah, they went --

Q.   In case the ladies and gentlemen of the jury, explain platinum?

A.   We sell a lot of records.

Q.   I mean, you would agree with me that Danity Kane sold 100,000 records in one day?

A.   Yes.

Q.   600,000 in a week?

A.   Mhm.

Q.   Did pretty good.

A.   Did pretty well.

Q.   Now, you testified Danity Kane stopped 2009, Dirty Money stopped in 2011?

A.   Mhm.

Q.   And so that was the end of the music with Mr. Combs, correct?

A.   Correct.

Q.   And then I think the prosecutor asked you about what you had been doing since, right?

A.   Correct.

Q.   And you've released over 100 songs?

P5JCcom2                          Richard - Cross

A.   Correct.

Q.   And you would agree with me that the songs that you've released haven't reached the levels of success as Dirty Money and Danity Kane, to mean no offense, but you agree with that, right?

A.   Correct.

Q.   And you agree with me that you actually asked Mr. Combs to sign you as a solo artist?

A.   Before I left.

Q.   Before you left, right, about 2011?

A.   Mhm.

Q.   And he told you no?

A.   Yeah.

Q.   And you agree with me that you've reached out to Mr. Combs after you were gone and asked him to come back and do work with him, right?

A.   Correct.

Q.   I mean as recently as the years 2020, 2021, right?

A.   To work together as Dirty Money?

Q.   Just work together, period.

A.   Yeah.  Yes.

Q.   You have?

A.   Yes.

Q.   And the endeavors that you were trying to do with Mr. Combs more recently, those didn't work out, you didn't end up working

P5JCcom2                          Richard - Cross

with him, right?

So you would agree with me that you felt like Mr. Combs had no legitimate reason to dismantle the previous groups that you were in, you would agree with that, right?

A.   Correct.

Q.   And you would agree with me -- I mean, you've given plenty of interviews in reference to your feelings on Dirty Money and Danity Kane being dismantled, right?

A.   Correct.

Q.   So you felt Mr. Combs had no legitimate reason to do that?

A.   Correct.

Q.   And you would agree with me or admit that you were angry about it?

A.   Saddened by it.

Q.   Saddened by it.  Because you would agree that you felt like Mr. Combs ruined your career, not once, but twice?

A.   Yes.

Q.   And then Mr. Combs had the audacity to not sign you as a solo artist, you felt like that?

A.   Yeah, I didn't care about that.

Q.   You didn't care?

A.   Yeah, whether he signed me.

Q.   Music is your dream?

A.   Yes.

Q.   And you've been trying to succeed at it for a long time?

A.   I did succeed at it.

Q.   In the past?

A.   Now.

Q.   Ms. Richard, November 2023, you saw Ms. Ventura had filed suit against Mr. Combs?

A.   Correct.

Q.   You read her complaint?

A.   Correct.

Q.   And shortly after Ms. Ventura filed suit, you filed suit yourself, right?

A.   Correct.

Q.   And it is your want to get a lot of money from Mr. Combs, correct?

A.   No.

Q.   So you're not filing a lawsuit to get money?

A.   I'm filing a lawsuit to get compensated for the work that I've put forth.

Q.   And you would agree with me that your definition of compensation is money?

A.   Yes, correct.

        MS. WESTMORELAND:  I have no further questions.

        MS. STEINER:  Your Honor, may we please have a sidebar?

        THE COURT:  You may.

        (Continued on next page)

(At the sidebar)

MS. STEINER:  Your Honor, the government believes that Ms. Westmoreland, through her repeated line of questioning regarding Ms. Richard's employment, why she was dissatisfied, why she left has opened the door in several respects to testimony that we did not elicit about forced labor, specifically asked her why things didn't work out, why she was dissatisfied, that she had no reason to leave, that she not once, but twice had asked the defendant to return to working for him.  Ms. Richard, if asked, would testify that the defendant had on numerous occasions overworked her, underpaid her, groped her, had not permitted her to take any respite, leading to her hospitalization, and that he would make continuous threats if she failed to perform, work the hours that he required.  All of that is going to be omitted from what's proven to the jury currently and leave the jury with a false impression that Ms. Richard simply was asking the defendant about work or was dissatisfied with work without giving the appropriate context.

MS. WESTMORELAND:  Your Honor, not true.  First, just want to make sure that we had a discussion yesterday about what I would go into.

MS. STEINER:  Just to clarify, we never discussed this issue.

MS. WESTMORELAND:  Can I finish real quick?

That's number one.  Number two is the government asked Ms. Richard Friday, you started your career what 2004, it ended 2011, it was with Mr. Combs, she introduced Danity Kane, she introduced Dirty Money.  If I could go one by one, if I could see your pad or if you want to say it again.

MS. STEINER:  You can look at the notes.

THE COURT:  Just ask you a basic question.  My understanding, and I'll go back and look at the transcript, is that on direct examination, the witness indicated that after her employment had ended, she just responded to Mr. Combs's outreach in a way that would keep her safe, and to undermine that, you asked questions concerning Ms. Richard's career to show that she was still interested in talking to Mr. Combs because of gripes about her career essentially.  So this issue of undermining the witness's credibility, given what had been elicited on direct, that's what I understood it to be.

But Ms. Steiner, I think you're suggesting that it was broader than that, that there were questions that went to the reasons why Ms. Richard left Bad Boy Records in the first place.

MS. STEINER:  Correct.

THE COURT:  I don't remember that.  But --

(Indiscernible crosstalk)

MS. WESTMORELAND:  No, I did not ask that and I did respond to that.  I said that he closed the group down.  I

P5JCcom2                        Richard - Cross

didn't say why did you leave, Ms. Richard, or you were unhappy or --

THE COURT:  I think you said it was dismantled.

MS. WESTMORELAND:  The group was dismantled.  I didn't say why did she leave.  I said Mr. Combs dismantled the group. I didn't say why did you leave the group.  She didn't leave the group anyway, the group was dismantled.

THE COURT:  Ms. Steiner.

MS. STEINER:  A couple of points, your Honor.

Sorry to interrupt.

With respect to dismantling of the group, again, I do think that does speak to the circumstances surrounding that. Ms. Richard would testify that it was dismantled on live TV after she had received a series of threats by the defendant, that she had sustained these very difficult work conditions. Ms. Westmoreland, through her line of questioning, also attempted to paint a picture that Ms. Richard made more money, had greater success in Danity Kane and Dirty Money than she's ever had since, and that calls into question what her experience actually was in those groups, which was not as has been elicited that she made a ton of money.  In fact, Ms. Richard would testify she was underpaid, at times not paid, is actually the subject matter of her current suit.

THE COURT:  I think there's a narrower issue here.  I don't think Ms. Westmoreland has opened the door to all the

forced labor allegations.  However, there was an attack on her credibility, fair?

MS. WESTMORELAND:  Fair.

THE COURT:  And Ms. Steiner, on redirect, you can rehabilitate the witness in any way that you believe is appropriate given what Ms. Westmoreland asked about.  I take it, Ms. Westmoreland, you are anticipating and happy to have Ms. Steiner do that?

MS. WESTMORELAND:  Absolutely.

THE COURT:  I don't know if there's a real issue here because, to the extent that Ms. Westmoreland, for instance, suggested reasons why Ms. Richard did certain things after she left Bad Boy Records that were related to her efforts to try to get money from Mr. Combs, and your response is, actually, there are legitimate reasons why she acted the way she did; that's fair game, correct?

MS. WESTMORELAND:  I agree.

MS. COMEY:  I want to make sure the record is clear about what's allowed here.  I want to make sure we're following your Honor's order and responding appropriately.  So it would be about the fact that she felt she was underpaid, did not receive fair compensation to respond to that line of cross, but not the allegations of being overworked, not the allegations of being hospitalized?

THE COURT:  I don't believe -- maybe I need to

P5JCcom2                        Richard - Cross

understand what's going on.  So I don't believe there was any questioning on cross-examination concerning what happened in the employment to the witness.  I don't remember that.

MS. WESTMORELAND:  I didn't.

THE COURT:  That's what's missing.  I think there was questioning about what happened after the employment ended and the communications to suggest that, essentially, the witness had come up with these things after the lawsuit was filed and after she proceeded to get money; is that a fair characterization?

MS. WESTMORELAND:  Yes.

MS. COMEY:  I thought there was questioning about how many songs they put out, how many records they sold, how they went platinum with Danity Kane and Dirty Money, and the implication was she made money from that and being successful like that, the redirect would be, well, how much were you paid for that.

THE COURT:  I don't think that was in bounds.

MS. COMEY:  That's what I wanted to check.

THE COURT:  Thank you for asking that.  I do think if you want to rehabilitate the witness by saying, why did you file your lawsuit, what was involved in the lawsuit, to show that it was not an effort simply to just get money from Mr. Combs in the wake of Ms. Ventura's lawsuit, but that she believed that these things happened or if there's something in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5JCcom2                        Richard - Cross

the communications, you could say that, well, the reason why she was having these communications was X or Y reason, I think that that's within bounds; correct, Ms. Westmoreland?

MS. COMEY:  If she's asked why did you file a lawsuit, she will say, because I was underpaid, because he didn't pay me for the work I did, and because he worked me to the bone to the point I was hospitalized.

THE COURT:  I think defense opened the door to that by asking about the lawsuit.  But keep the questioning brief to respond to what was a brief questioning on cross-examination.

MS. COMEY:  Understood.  Thank you, your Honor.

(Continued on next page)

P5JCcom2                         Richard - Redirect

(In open court)

REDIRECT EXAMINATION

BY MS. STEINER:

Q.  Good morning again, Ms. Richard.

A.  Good morning.

Q.  You were asked a series of questions on cross-examination about your employment for Mr. Combs.  Do you recall that?

A.  Yes.

Q.  And specifically you were asked about your employment when you were working as a member of Danity Kane, which is a women's group; is that correct?

A.  Correct.

Q.  And of Diddy Dirty Money; is that right?

A.  Correct.

Q.  And you were also asked questions about your civil lawsuit. Do you recall that?

A.  Correct.

Q.  Can you explain why you filed your civil lawsuit?

A.  I felt I was in an environment that wasn't conducive for an employee.  And I am, for my time and experience working with Sean Combs, that's what I was suing for.

Q.  When you say not conducive for an employee, can you describe what you mean by that?

A.  No sleep, days --

        MS. WESTMORELAND:  Objection.

THE COURT:  That's sustained.

Q.  What, if anything, related to your financial compensation was addressed in your civil lawsuit?

A.  I don't recall.  I don't -- I don't know.

Q.  Did your civil lawsuit discuss how much you were paid for those jobs?

A.  No.

Q.  You were asked on cross-examination a series of questions about what you had told the government in various meetings.  Do you recall that?

A.  I do.

Q.  And what you had included in your complaint and demand letters related to your case.  Do you recall that?

A.  Yes.

Q.  And you also were asked questions about how your memory of those events have in certain ways changed.  Do you remember that?

A.  Yes.

Q.  When did the events that you have testified about here today occur?

A.  Between 2004 and 2011.

Q.  And when did you first meet with the government?

A.  Late 2024, early 2025.

Q.  So over a decade later; is that right?

A.  Correct.

Q.   And during the course of that decade, had you thought a lot about your employment?

A.   I try not to.

Q.   Why did you try not to think about it?

A.   Because it was a hard time.  It was a bad time for me and a bad environment for me.

Q.   And so you filed the lawsuit in 2024, is that right, and you started meeting with the government around then, too; is that right?

A.   Correct.

Q.   Can you describe the process for the jury of trying to recall these events that you've tried to forget for so long?

A.   They don't all come back immediately, I have to go back to memories that I don't want to, and it takes time to remember things that have happened during the time that you try to forget.

Q.   When you're referring to memories that you didn't want to come back to, what types of memories are those?

A.   Work until you sick.

        MS. WESTMORELAND:  Objection, your Honor.

        THE COURT:  Sustained.

        MS. WESTMORELAND:  Move to strike.

        THE COURT:  Granted.  The jury should disregard the witness's last answer.

Q.   And Ms. Richard, without speaking about your personal

P5JCcom2                              Richard - Redirect

condition, what, if any, memories had you been trying to suppress?

A.  The environment was volatile and it was very hard to work in.  And so I tried to erase those things from my mind.

Q.  And over time, has your memory become clearer?

A.  Every day it gets easier to remember certain things.  I try my best to do it to the best of my ability.

Q.  And how is that?

A.  By speaking with you guys, speaking with others about the incidents, trying to remember and piece those things together as best and accurate as I can.

Q.  You were asked a series of questions on cross-examination about notes that the government had taken during meetings with you and your attorney.  Do you recall that?

A.  Yes.

Q.  Did you review those notes for accuracy?

A.  No, I did not.

Q.  Do you know if, in fact, they are accurate?

A.  No, I don't.

Q.  Had you ever seen those notes prior to being shown them by defense counsel today?

A.  Did not.

Q.  And similarly, you were shown a letter written by your attorney on cross-examination.  Do you recall that?

A.  Yes.

Q.  Had you ever seen that letter before today?

A.  I had not.

Q.  Had you reviewed it for accuracy?

A.  No.

Q.  So again, you were asked on cross-examination a series of questions about your memory, and you testified that as part of this process of recalling, your memory has on certain issues changed over time.  Do you recall that?

A.  Yes.

Q.  And you met with the government on several occasions; is that right?

A.  I'd say a few, but yeah.

Q.  A few?

A.  Yes.

Q.  Okay.  I want to be accurate.

In every meeting with the government, did you inform the government that Mr. Combs hit Ms. Ventura?

A.  Correct.

Q.  And in every meeting with the government, did you inform the government that Mr. Combs beat Ms. Ventura?

MS. WESTMORELAND:  Objection.

THE COURT:  Sustained.  You can rephrase the question.

Q.  On every meeting with the government, did you inform the government that Mr. Combs had been violent with Ms. Ventura?

MS. WESTMORELAND:  Objection.

P5JCcom2                          Richard - Redirect

THE COURT:  Sustained.  The question needs to be rephrased.

Q.  In every meeting with the government, did you discuss physical encounters --

MS. WESTMORELAND:  Objection.

THE COURT:  What's the grounds for the objection?

MS. WESTMORELAND:  Leading.

THE COURT:  Yes, that's sustained.

Q.  In every meeting with the government, did you describe the encounters that you had observed between Ms. Ventura and Mr. Combs?

MS. WESTMORELAND:  Objection.

THE COURT:  That's overruled.

A.  Yes.

Q.  With respect to those interactions, what did you observe?

A.  That Cassie was attacked and beaten.

Q.  In every meeting with the government, did you tell the government that Mr. Combs had been either been yelling at Ms. Ventura, degrading Ms. Ventura, or hitting or kicking Ms. Ventura?

MS. WESTMORELAND:  Objection.

THE COURT:  Sustained.

Q.  In all of your meetings with the government, Ms. Richard, did you discuss that Mr. Combs had threatened you?

A.  Yes.

P5JCcom2                          Richard - Redirect

Q.  And that he told you to keep quiet?

A.  Yes.

Q.  And when would he tell you to do that?

A.  Anytime I spoke up or anytime I would talk to Cassie about her journey or we did something we weren't supposed to do.

Q.  And I want to talk about a specific incident that you were asked about with respect to the frying pan in 2009.  Do you recall being asked about that on cross-examination?

A.  Yes.

Q.  And that incident took place in 2009, so approximately how long ago was that?

A.  I'm not good at math.  I'm sorry.  A long time.

Q.  In the course of speaking with the government, is it fair to say that you have been thinking a lot about that incident?

A.  Yes.

Q.  Sitting here today, do you have any doubt, any doubt in your mind that Mr. Combs attempted to strike Ms. Ventura?

A.  I have no doubt that he did.

Q.  And do you have any doubt, any doubt at all that Ms. Ventura, when he did that, dropped to the ground and formed the fetal position?

A.  Correct.

Q.  Do you have any doubt?

A.  No, I don't have any doubt.

Q.  And do you have any doubt that he then dragged Ms. Ventura

P5JCcom2                       Richard - Redirect

up the stairs by the hair?

A.   Yes.

Q.   Do you have any doubt?

A.   No doubt.

Q.   And do you have any doubt that, once upstairs, you heard
the breaking of glass as though it was being thrown?

A.   No doubt.

Q.   And do you have any doubt that the following day, Mr. Combs
brought you in and threatened you to keep quiet?

A.   No doubt.

Q.   You were asked a couple of questions on cross-examination
about the incident that had occurred at the restaurant in West
Hollywood, California.  Do you remember that?

A.   I do.

Q.   During that incident, what occurred?

A.   Cassie was punched in the stomach.

Q.   By who?

A.   By Sean Combs.

Q.   And was she punched with full force or less than full
force?

A.   He punched her -- I wasn't -- hard, he punched her hard.

Q.   And when he punched her hard, you had been asked by me on
direct examination which of his employees was present; is that
correct?

A.   Correct.

Q.  Did I ask you whether anyone, aside from his employees, was present?

A.  No, you did not.

Q.  And were there in fact other individuals, aside from his employees, present?

A.  Yes.

Q.  And why didn't you raise them on direct examination?

A.  Because you didn't ask.

Q.  Were you trying to hide that fact?

A.  No.

Q.  You were also asked about an incident in which you had at one point stated that Ms. Ventura had been pulled out of a vehicle by Mr. Combs and dragged onto the grass.  Do you recall that?

A.  I do.

Q.  And you testified that you believed that was an error that had been made by your attorneys; is that right?

A.  Correct.

Q.  Do you ever recall an incident of violence that you had been referring to?

A.  Yes.

Q.  Can you please describe for the jury what occurred during that incident of violence?

A.  Cassie was grabbed the neck and head slammed against the window.

Q.  By who?

A.  By Sean Combs.

Q.  When you say the window, which --

A.  The glass in the car.

Q.  And where were you relative to Ms. Ventura and Mr. Combs when Mr. Combs slammed Ms. Ventura's head into the window?

A.  Sitting right there in front of them.

Q.  You were asked a few questions on cross-examination by Ms. Westmoreland about instances where you had initiated contact with Mr. Combs since leaving Diddy Dirty Money.  Do you recall that?

A.  I do.

Q.  And you were specifically asked about an instance where you had reached out to Mr. Combs about making demand, is that correct, and I believe Ms. Westmoreland interrupted you at that point.  Can you please explain to the jury why you reached out to Mr. Combs at that time.

A.  LaurieAnn Gibson was a part of the judges for making the band, and I had not had contact with her and I really wanted a relationship with her.  She was the first person to help me be a part of the band.  She had talked to me and said --

MS. WESTMORELAND:  Objection.

THE COURT:  That's sustained.

Q.  Can you explain, without specifying what Ms. LaurieAnn said to you, why you reached out and at whose direction you

reached out to Mr. Combs?

A. I was told to contact --

MS. WESTMORELAND: Objection.

A. I contacted Puff to be a part of making the band to develop a relationship with LaurieAnn again, and it was a way to do it without Mr. Sean Combs being a part of it. He was not a judge, he was not in that, a part of that filming, he wasn't there.

Q. Why did you think you needed to reach out to Mr. Combs at that time to participate in that opportunity?

A. It was informed that I should do so by LaurieAnn.

Q. It was what --

A. Informed that I should do so by LaurieAnn.

Q. And did you ever subsequently reach out to Mr. Combs about working for him?

A. For making the band?

Q. For any reason.

A. Yes.

Q. Why is that?

A. Kaleena was having issues and she wanted to get back in the band --

MS. WESTMORELAND: Objection.

A. For Dirty Money.

MS. WESTMORELAND: Objection.

THE COURT: Hold on. Hold on.

MS. STEINER: I can rephrase, your Honor.

P5JCcom2                          Richard - Redirect

THE COURT:  I'll sustain the objection.  You can ask another question.

Q.  Ms. Richard, you were asked on cross-examination about reaching out to Mr. Combs after you've ended your employment for Diddy Dirty Money in the years that followed; is that right?

A.  Correct.

Q.  And generally, how frequently would you maintain contact or would you hear from him?

A.  It would be sporadic.

Q.  In those discussions, what would you tell Mr. Combs?

A.  That we want to get the band back together, to hope that Dirty Money could get back together.

Q.  Why would you tell him that?

A.  Helping out a friend at the time.

Q.  Is the friend Ms. Harper?

A.  Yeah.

Q.  Is there any reason that, aside from helping a friend, that you personally wanted to work for Mr. Combs?

A.  I didn't want to go back.

Q.  Why didn't you want to go back to working for Mr. Combs?

A.  Because it wasn't good and I didn't want it, but I was trying to help a friend.

Q.  When you say it wasn't good, what did you observe between Mr. Combs and Ms. Ventura during your prior employment?

P5JCcom2                         Richard - Redirect

A.   Violence.

          MS. WESTMORELAND:  Objection.

          THE COURT:  That's sustained.

          MS. STEINER:  No further questions, your Honor.

          THE COURT:  Ms. Westmoreland.

          MS. WESTMORELAND:  Yes, your Honor.  May we have a

brief conference at the bench, like 30 seconds.

          (Continued on next page)

(At the sidebar)

MS. WESTMORELAND:  I'm asking this out of an abundance of caution, you might not have an objection, we talked about it yesterday, but you asked her about the financial contention of the lawsuit, I'm going to ask her if she's aware of the $22 million that was demanded.

MS. COMEY:  She's already testified she doesn't know.

MS. STEINER:  She already testified.  To clarify and provide context, in the demand letter that was issued on Ms. Richard's behalf, which Ms. Richard testified on several occasions on cross-examination she has not reviewed, there is a $22 million amount that is included, but I don't think you've laid the foundation that she would have any reason to have knowledge of the amount, even though she said she never looked at the document.

MS. WESTMORELAND:  I don't think she needs to look at the document to have knowledge.  I think she authorized them to file suit on her behalf.  I want to ask if she's aware.  If she's not, she could say no.

THE COURT:  No.  You can ask some initial questions to see if she has any knowledge whatsoever about what the amount is or what discussions have had, I'll allow you to do that.  If she has no knowledge about anything, you can't start talking about a number that I haven't seen and no one's seen in this courtroom.

P5JCcom2                        Richard - Redirect

MR. AGNIFILO:  Your Honor, can I add one thing.  I think the number is so large it's just -- it goes to her credibility when she says -- she doesn't know that a lawyer asked for $22 million on her behalf is different than she doesn't know that a lawyer asked for $100,000 on her behalf.  One strains credibility, I think.

MS. STEINER:  I think we have to take this --

THE COURT:  Do you have some evidence that you want to put in to try to establish that she has knowledge and she is not telling the truth?

MR. AGNIFILO:  It's just the number itself --

THE COURT:  That's not true.  I mean if she doesn't know what demands have been made, she doesn't know.  You can ask questions.  If you think that someone in her position would know what the number is, then there are a number of questions you can ask to try to establish that she does or doesn't know.  So you can do that and let's take it from there and see if you get to a point where if the witness says that she has been following and receives the updates from her lawyers and all of this other stuff, then we can take it from there and you can raise your objection there.

MS. WESTMORELAND:  Me and you spoke, you do not object to me saying "a lot of money" as long as I don't say a number.

MS. STEINER:  Sorry.  Can you provide context.  I don't --

MS. WESTMORELAND:  Making sure that you're still in agreement that I can say a lot of money, because that's the we made yesterday, I can't say the amount.

MS. STEINER:  I never said a lot of money.  I think it's fair to say that she has requested money during her -- as part of her civil suit, which she acknowledged on cross-examination.

MS. WESTMORELAND:  Okay.

(Continued on next page)

P5JsCOM3                          Richard - Cross

THE COURT:  All right.  Ms. Westmoreland, when you're ready.

MS. WESTMORELAND:  Thank you.

RECROSS EXAMINATION

BY MS. WESTMORELAND:

Q.  Ms. Richard.

A.  Yes.

Q.  So you admit that you reached out to Mr. Combs to reengage in Making the Band, right?

A.  Yes.

Q.  And you explained that you while, you only did that because you wanted a relationship with LaurieAnn Gibson, right?

A.  I did.

Q.  OK.  And you explained that while Mr. Combs, he wasn't going to be a judge on that one?

A.  I was only asked to go to one place.

Q.  So you were only going to go to one place?

A.  Um-hmm.

Q.  But you would agree with me that if you reformed Dirty Money as a music group with Mr. Combs, that if that actually happened, you would be around him pretty often?

A.  Yes.

Q.  I mean, as a group, you guys would go to the studio together?

A.  Yes.

P5JsCOM3                          Richard - Cross

Q.  Write together?

A.  Yes.

Q.  Brainstorm together?

A.  Yes.

Q.  Perform together?

A.  Yes.

Q.  Radio appearances together?

A.  Yes.

Q.  TV appearances together?

A.  Yes.

Q.  Tours together?

A.  Yes.

Q.  Travel together?

A.  Yes.

Q.  Hotels together?

A.  Yes.

Q.  Travel from state to state, together?

A.  Yes.

Q.  I'm sorry.  I can't hear you.

A.  Yes.

Q.  Travel out of the country together?

A.  Yes.

Q.  Possibly, if successful enough, go on tours with tens and tens of different or 50, 70 different destinations?

A.  Yes.

P5JsCOM3                          Richard - Cross

Q.  Fair to say that, as a group, you would spend a lot of time together?

A.  Yes.

Q.  And you're telling us that you initiated contact with Mr. Combs, right?

A.  Um-hmm.

Q.  To restart a group?

A.  Um-hmm.

Q.  Right.

That you are fully aware that you would spend a lot of time with Mr. Combs, right?

A.  Yes.

Q.  OK.  Even though you're telling us that he made death threats?

A.  Yes.

Q.  OK.  Ms. Richard, before your first meeting with the government, you had seen that Cassie Ventura filed a lawsuit, right?

A.  Yes.

Q.  You read the lawsuit?

A.  Yes.

Q.  And then you went out and you hired your own lawyers, right?

A.  Yes.

Q.  And you filed your lawsuit?

P5JsCOM3                        Richard - Cross

A.   Yes.

Q.   And you were hoping to be nicely compensated for that, correct?

A.   For justice.

Q.   And justice for you would be money?

A.   It would be to be made whole, and also be paid for the time that I was with Puff, with Sean Combs.

Q.   Which means money?

A.   Yes.

          MS. WESTMORELAND:  No further questions.

          THE COURT:  Thank you.

          Any further questions, Ms. Steiner?

          MS. STEINER:  No, your Honor.  Thank you.

          THE COURT:  Thank you very much, Ms. Richard.

          (Witness excused)

          The government may call its next witness.

          MR. DONALDSON:  Your Honor, would this be a good time to take a two-minute break, three-minute break?

          THE COURT:  Well, I was planning on going until noon and then taking our afternoon break.

          Can folks hang out for that much time?

          Would you like a very short break right now?

          MR. DONALDSON:  I would like a very short two-minute break.  I don't know about anybody else.

          THE COURT:  We'll take five and come back at 11:40.

(Recess)

(Jury not present)

THE COURT:  Let's come back.  Please be seated.

Let's get our jury.

(Jury present)

Please be seated.

The government may call its next witness.

MS. FOSTER:  Your Honor, the government calls Kerry Morgan as its next witness.

While Ms. Morgan is coming to the stand, the government would move to offer as Government Exhibit C-364-4 and Government Exhibit C-364-4A.

THE COURT:  Any objections to those?

MR. AGNIFILO:  No objection.

THE COURT:  All right.  Those exhibits will be admitted.

THE DEPUTY CLERK:  I would ask you to rise for one moment and raise your right hand.

KERRY MORGAN,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

Thank you.  You may be seated.

DIRECT EXAMINATION

BY MS. FOSTER:

Q.  Good morning.

P5JsCOM3                    Morgan - Direct

A.  Good morning.

THE COURT:  Ms. Morgan, please make sure to speak into the microphone.

THE WITNESS:  Yes.

THE COURT:  Thank you.

Q.  Can you please state your full name.

A.  Kerry Morgan.

Q.  How old are you?

A.  39.

Q.  Where are you from?

A.  Buffalo, New York.

Q.  Where do you currently live?

A.  Los Angeles.

Q.  What do you do for work?

A.  I'm a personal assistant.

MS. WESTMORELAND:  Ms. Foster, could you please pull up what is in evidence as Government Exhibit 2A-401.

Q.  Ms. Morgan, do you recognize this person?

A.  Yes.

Q.  Who do you recognize this person as?

A.  Casandra Ventura.

Q.  What other names do you know her by?

A.  Cassie.

MS. WESTMORELAND:  Ms. Foster, you can take down that photo.

P5JsCOM3                        Morgan - Direct

Q.  Ms. Morgan, approximately when did you meet Cassie?

A.  Approximately 2001.

Q.  I want to focus your attention on the time period from 2001 until 2018.

         What was your relationship with Cassie during that period?

A.  We were best friends.

Q.  What is the current status of your friendship with Cassie?

A.  We don't speak.

Q.  And what year did your friendship with Cassie end?

A.  2018.

Q.  What, if anything, happened to you in 2018?

A.  Her boyfriend assaulted me.

Q.  Who was her boyfriend at that time?

A.  Sean Combs.

Q.  Sitting here today, do you see Sean Combs in this courtroom?

A.  Yes.

Q.  Could you please identify him by describing an article of clothing that he's wearing?

A.  Yellow sweater.

         MS. WESTMORELAND:  Let the record reflect that the witness has identified the defendant.

Q.  Ms. Morgan, why are you testifying here today?

A.  I was sent a subpoena.

P5JsCOM3                        Morgan - Direct

Q.   What does that subpoena require you to do?

A.   To testify.

Q.   Do you want to testify at this trial?

A.   No.

Q.   Why do you not want to testify?

A.   I have moved on with my life and away from all these people and their problems.

Q.   Taking a step back, you mentioned that you met Cassie in 2001.

          How did you meet her?

A.   We met on modeling on a photo shoot.

Q.   How old were you at that time?

A.   I was 16.  She was 15.

Q.   Did there ever come a time when you and Cassie started living together?

A.   Yes, in 2004.

Q.   And where did you live together?

A.   Manhattan.

Q.   During your first few years in Manhattan, how often would you and Cassie see each other?

A.   All the time.

Q.   And how would you describe Cassie at this time?

A.   Young, fun, she worked really hard.  She was very successful as a model.

Q.   And based on the time you spent with her, what were your

observations about her confidence?

A.  She was very confident.

Q.  What types of things would you and Cassie do together during those first few years in Manhattan?

A.  We always worked together.  We would go out together.  We did everything, basically.

Q.  When you would hang out, how much alcohol would you see Cassie drink?

A.  Not much.

Q.  What, if anything, did you observe happen if she had a drink?

A.  Um, she usually -- I had to put my finger down her throat most of the time so she could throw up.

Q.  She got sick, is that what you're saying?

A.  Yeah.

Q.  OK.  Got it.

    What drugs did you see Cassie use during these first few years in New York?

A.  None.

Q.  I believe you mentioned this, but what was Cassie doing for work during these first few years in Manhattan?

A.  She was a model.

Q.  Did there come a time she also started to make music?

A.  Um, yeah.  Eventually, in 2006, she recorded a song that exploded.

P5JsCOM3                        Morgan - Direct

Q.   And what was that song?

A.   Me&U.

Q.   You mentioned that Mr. Combs was Cassie's boyfriend in 2018, is that right?

A.   Yes.

Q.   When did you first learn that Mr. Combs and Cassie were dating?

A.   Um, I believe it was 2007.

Q.   From that period, from 2007 until 2018, what was the sort of status of their relationship?

A.   They were -- they were together.

Q.   When they were together, how often would you see Cassie?

A.   Often.

Q.   How often would you spend time with Mr. Combs and Cassie together?

A.   Often.

Q.   When you would spend time with them, what types of things would you do together?

A.   Just hang out.  Sometimes we would travel, go to eat dinner.

Q.   Where is some of the places you traveled?

A.   Um, Ibiza, we went to Italy, LA, um, Vegas, Miami.

Q.   When you spent time with Mr. Combs and Ms. Ventura, were drugs ever involved?

A.   Yes.

Q.  And who used these drugs?

A.  All of us.

Q.  Who generally provided the drugs?

A.  Um, Sean.

Q.  Sean Combs?

A.  Um-hmm.

Q.  And how frequently would he provide drugs?

A.  It wasn't -- I wouldn't say too -- too frequently, but when we would party or something.

Q.  What do you mean by party?

A.  Like, go out.  Go to a club.

Q.  What drugs did he provide?

A.  Um, molly, marijuana, ectasy.

Q.  And did you take some of those drugs?

A.  Yes.

Q.  Did you take ectasy?

A.  Yes.

Q.  How did it feel to take ectasy?

A.  How did it feel?  Um, euphoric.

Q.  Did you -- which of these drugs did you observe Mr. Combs take?

A.  Um, all of them.

Q.  Did you also do drugs with Ms. Ventura alone?

A.  Yes.

Q.  And what type of drugs would you do with her alone?

A.   Um, sometimes opiates, marijuana.  Um, alone, that's probably it.

Q.   How well did you get to know Mr. Combs during this period?

A.   Very well.

Q.   And when you first got to know him, what did you think of him?

A.   Um, I thought he was very nice.  Um, extremely generous, also sort of intimidating and a strong presence.

Q.   And as you got to know him more, how did those views change?

A.   Um, you see that he had mood swings.  Sometimes he would get aggressive or he would be upset instead of just always having fun.

Q.   What would he do when he was aggressive or upset?

A.   What would he do?

     Sometimes he would just yell at Cassie or you could feel, like, he was mad.

Q.   You mentioned earlier that Cassie was very confident when you first met her, is that right?

A.   Yes.

Q.   Based on the time you spent with Cassie during her relationship with Combs, what changes did you notice in her confidence?

A.   Um, she lost her confidence big time.  She lost her spark. She was not who -- like, the same Cassie.

Q. And did you notice any changes in how she carried herself during this period?

A. Yeah. She was always very slumped and kind of just bad posture. She became, like, this ...

Q. Were there ever times you heard Mr. Combs talk down to Cassie?

A. Yes.

Q. What about criticize her?

A. Yes.

Q. How often did you hear him do these things?

A. I wouldn't say often, but it depended on what was going on, if they had an event or something.

Q. What types of things did he criticize her about?

A. Her looks. Um, how she behaved, who she talked to.

Q. During your friendship with Cassie, were there ever times that Mr. Combs would try to contact you looking for her?

A. Yes.

Q. And how would he contact you?

A. On the cell phone. He would call my phone.

Q. How many times did that happen over the course of your friendship with Cassie?

A. A lot.

Q. And when you did that, would he contact you once or more than once?

A. More than once.

Q. How much?

A. It depends. It depended. Sometimes he would call 50 times in a row. Sometimes it would just be a couple times.

Q. Were there ever times that Combs' employees would try to contact you to reach Cassie?

A. Yes.

MS. WESTMORELAND: Ms. Foster, could you pull up what is in evidence as Government Exhibit 2A-301.

Q. Ms. Morgan, do you recognize the person in this image?

A. Yes.

Q. And what is that?

A. Kristina Khorram.

Q. What other names do you know her by?

A. K.K.

Q. And who was Kristina Khorram?

A. She was -- I believe she was his chief of staff or personal assistant.

Q. And whose personal assistant?

A. Sean Combs.

Q. And was she one of the employees who would try to contact you looking for Cassie?

A. Yes.

MS. WESTMORELAND: Ms. Foster, you can take down that photo.

Q. Why would Ms. Khorram tell you she was trying to call you?

A.   If he couldn't get in touch with Cassie, usually.

Q.   Did she ever tell you who had told her to call?

A.   Well, I'm assuming it would be Sean.

Q.   Without assuming, did she ever say that he had told her to call?

A.   Yes.

Q.   During your friendship with Cassie, did you ever have conversations with her about her music career?

A.   Yes.

Q.   And what about Mr. Combs' involvement in that career?

A.   Yes.

Q.   How many conversations did you have with her about that?

A.   Over the years?

Q.   Yes.

A.   A lot.

Q.   What, if anything, did she express to you during those conversations?

A.   Um, she would -- sometimes she was frustrated because she would be working on music and then it would never get put out. Um, sometimes --

         Can you repeat the question, please?

Q.   Yes.

         What did she say to you about Mr. Combs' involvement in her career?

A.   He was in charge of her career, so ...

Q.  You said that she would record music and it wouldn't be put out, is that right?

A.  Yes.

Q.  What did she say about why it wouldn't be put out?

A.  She never really told me why.

Q.  Did she say who wouldn't let it be put out?

A.  Yeah.  It was Sean Combs.

Q.  Over the course of your friendship, did you ever see Mr. Combs physically assault Cassie?

A.  Yes.

Q.  How many times?

A.  Twice.

Q.  And what types of things did you see him do to her?

A.  Um, hit her, pull her hair.  I've seen him kick her.  Push her.

Q.  Did Mr. Combs appear to be intoxicated or high on all of those occasions?

A.  No.

Q.  OK.  And where were these two assaults that you described?

A.  One was in Los Angeles at a home in Hollywood Hills and one was in Jamaica.

Q.  Starting with the assault that happened in the Hollywood Hills, where would this occur?

A.  Where in the house?

Q.  Or was it at --

P5JsCOM3                        Morgan - Direct

Whose house was it at?

A.   It was -- Sean Combs' was renting the house, I believe.

Q.   And approximately when was this?

A.   I don't remember the date.

Q.   Who was at the house?

A.   Um, me, Cassie, Sean, and Ruben.

Q.   And who is Ruben?

A.   Ruben was one of his security guards.

MS. WESTMORELAND:  Ms. Foster, can you please pull up what is in evidence as Government Exhibit 2A-205.

Q.   Sorry.  Just to confirm, whose security guards?

A.   Sean Combs.

Q.   Ms. Morgan, do you recognize the person in this photo?

A.   Yes.

Q.   And who do you recognize it as?

A.   Ruben.

Q.   And do you know Ruben by any other names?

A.   Rube.

MS. WESTMORELAND:  Ms. Foster, you can take down that photo.

Q.   OK.  So you mentioned you saw him, Mr. Combs, assault Cassie at this house.

Where were you when you saw this?

A.   I was in the front foyer.

Q.   And where were Mr. Combs and Cassie?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   In the master bedroom that was directly off of the front.

Q.   So did you have a direct view into the bedroom?

A.   Yes.

Q.   And where was Ruben?

A.   I think he was just to the left of me.

Q.   And when did you see happen?

A.   Um, I saw him push her.  Um, I'm pretty sure he hit her. They were on the other side of a bed, so I'm not sure what was -- if he kicked her or something, but it was ...

He pushed her.

Q.   And this was Mr. Combs to Cassie?

A.   Yes, um-hmm.

Q.   What did you see Cassie do in response?

A.   Nothing.

Q.   What did you say when you saw this?

A.   I don't remember exactly what I said, but I was upset.

Q.   Did you say anything to Ruben?

A.   Yes.

Q.   And what did you say?

A.   Do something.

Q.   And how did Ruben respond?

A.   Like -- like, that he wasn't going to do anything.

Q.   What happened after you saw this?

A.   Um, we left the house, and it's a narrow road and they were coming out to follow us.  So we were, like, hiding in the -- in

people's, like, front steps.

Q.   And who is we?

A.   Me and Cassie.

Q.   And so, just to make sure I understand the sequence of events, after this happened, you left -- you and Cassie left the house, is that right?

A.   Yes.

Q.   And whose steps did you hide?

A.   I don't -- some neighbor's house.

Q.   So you went from his house to the neighbor's house?

A.   Yes.

Q.   And where exactly did you hide at that house?

A.   There were, like, concrete steps like this, but the stairs were like that.  So it went across like this, and we were laying flat down on the stairs.

Q.   There was an incline next to the steps?

A.   Yes.  Um-hmm.

Q.   Approximately --

        How were you positioned when you were on that incline?

A.   Face down.

Q.   Laying flat?

A.   Yeah.

Q.   Was that both you and Cassie?

A.   Yes.

Q.   And just to confirm, you were laying on the concrete?

P5JsCOM3                      Morgan - Direct

A.   Yes, on the stairs.

Q.   How long were you in that position for hiding?

A.   I'm not sure.

Q.   Approximately?

A.   20, 30 minutes.

Q.   What tone of voice --

     Were you speaking at all when you were hiding?

A.   Um, yeah.  We were whispering.

Q.   You and Cassie were?

A.   Yeah.

Q.   Why were you whispering?

A.   We could hear Sean and Ruben driving back, like, looking for us.

Q.   And --

A.   I didn't -- I didn't know what to do, so, um, I didn't -- I just wanted to stay there until everyone calmed down.

Q.   And what did you hear when you heard them looking for you?

A.   I don't remember exact words, but...

Q.   But you could hear their voices?

A.   Yes.

Q.   How do you remember this ending?

A.   Um, I remember her going back to the house.  And I went to my hotel, I believe.  I'm not sure.

Q.   Now, you mentioned that you saw Mr. Combs assault Cassie in Jamaica as well, is that right?

A.   Yes.

Q.   And approximately when was that?

A.   Um, I believe that was January of 2013.

Q.   Why were you in Jamaica?

A.   For vacation.

Q.   Who was on that vacation?

A.   Originally it was me, Casandra, our friend Nellie and his daughter, my friend Lucas, his son, and another friend little cash and then halfway through, Sean came and joined us.

Q.   Where were you when you saw the assault?

A.   Um, I had -- I was -- when I saw it?  I was originally in the bar area and then I heard Cassie screaming so I ran into the hallway where she was.

Q.   And who was around in that location where you were in the bar area?

A.   At that time, no one.

Q.   What about right before you heard the screams?

A.   Cassie, Sean and I were all in the bar.

Q.   OK.  And then what, if anything, happened before the screams happened?

     Can you talk through that chain of events?

A.   Cassie, um, had gone to the bathroom.  And then after a few minutes, Sean said she's taking too long.  So he left me -- I was just in the bar by myself, and then a few minutes later, I heard her screaming.

Q.   And how would you describe her scream?

A.   Like, guttural.  Like, terrifying.

Q.   What did you do?

          What did you see next after you heard her screaming?

A.   So, I heard her screaming and I went to the hallway.  The hallway was extremely long.  And they were coming out of the master bedroom and he was dragging her by her hair on the floor.

Q.   And how far did you see him drag her by her hair?

A.   I saw -- I only saw -- I probably saw, like, ten feet, and then I ran back to get my purse so that we had credit cards and a phone and stuff.  And when I came back, um, they were outside, so I didn't actually see him drag her all the way down the hall.

Q.   Just to confirm, the person who was screaming, it was Cassie, is that right?

A.   Yes.

Q.   And the person who was being dragged was Cassie?

A.   Yes.

Q.   And the person who was dragging her by the hair was Mr. Combs?

A.   Yes.

Q.   Why did you go and get your, like, purse?

A.   We were in Jamaica.  I didn't know where we were going to go.  Like, if we had to run away or if -- I didn't know what to

do.  If we had to get a cab, I don't have any money.

Q.  What did you see next?

A.  Um, when I came -- excuse me.

When I came back to the front, they had been -- they were outside in the front, like, outside the front doors in the driveway.  So where I was coming from to get my bag, it was, like, a long thing until the front door, but the doors were open.  And I saw him push her on the ground and she hit her head on the brick.

Q.  And also, Ms. Morgan, there is water in front of you if you need to have a drink.

A.  Thank you.

Q.  How did you see Ms. Ventura react after she hit her head on the brick?

A.  She didn't move.

Q.  And how was her body positioned?

A.  She fell -- she fell on her side, so she was, like, this and her hands were kind of out.  She was, like, a loose fetal position, I would say.

Q.  Were her eyes opened or closed?

A.  Closed.

Q.  And what, if anything, was she saying when she was in that position?

A.  Nothing.

Q.  What went through your head when you saw that?

A.  I thought she was knocked out.

Q.  How long did she not move for?

A.  I would say like 20, 30 seconds.

Q.  What happened next?

A.  Um, Sean and I were yelling at each other.  And while we were arguing, she got up and ran into, like, a wooded area barefoot.

Q.  And what did you do?

A.  Um, I jumped in a golf cart that was -- there was two golf carts in the driveway, in a circle driveway.  I got in one car, Sean went in the other one.  We went different ways looking for her.

Q.  And did you ever find her?

A.  Yes.

Q.  What happened then?

A.  Um, I was, like, Cassie, Cassie.  Like, she came running outs of the woods.  She got in the car.  I turned the lights off.

        We drove, I think -- I don't remember where we parked the golf cart, but we ended up hiding in a ditch.

Q.  How were you positioned when you were hiding in the ditch?

A.  Crouched down.

Q.  What about Cassie?

A.  Same.

Q.  What tone of voice were you speaking in?

A.   Whispers.

Q.   And why were you whispering?

A.   We could hear, um, Sean, and our friend Lucas had joined him to look for us, going back and forth around the community.

Q.   How long were you crouched in the ditch for?

A.   I'm not sure exactly, but it felt like hours.

Q.   How do you recall this incident ending?

A.   We went back to the house, eventually.

Q.   And do you remember exactly why you went back to the house?

A.   No.

Q.   Stepping back, what did you notice about Cassie's appearance after she fell and hit her head?

A.   She had a really big bump on her -- on her forehead.

Q.   Do you know if she ever received any medical attention?

A.   I don't believe she did.

Q.   OK.  Before we move on, are these two occasions the only times that you ever saw Mr. Combs assault Cassie?

A.   No.

Q.   You saw additional times?

A.   Yeah.

Q.   Are these times the ones that you remember best?

A.   Yes.

Q.   And why is it -- and how --

     What would you describe your memory of the other times as?

P5JsCOM3                        Morgan - Direct

A.  Um, just the other times wouldn't -- were just not as big of a deal, just, like, a little push or a slap or something.

Q.  During those times you saw violence, did you ever see Cassie fight back?

A.  Um, eventually, yeah.

Q.  Can you describe what you saw from her?

A.  I don't -- I don't remember, but I know she started fighting back.

Q.  Who initiated the violence in each of those instances?

A.  I believe Sean.

Q.  Did you ever see injuries on Mr. Combs from what Cassie did?

A.  No.  No.

Q.  OK.  Directing your attention to March 6, 2016, where were you staying on that date?

A.  Um, Cassie's house.

Q.  Why were you staying there?

A.  I was visiting.  I don't remember.

Q.  Where was that house?

A.  Um, on Comstock in Los Angeles.

Q.  Do you remember what, if any, event Cassie had around that time?

A.  She had her first movie premiere for *The Perfect Match*.

Q.  Did there come a time that day when you were alone in the apartment and Cassie came back?

A.   Yes.

Q.   What did you observe about Cassie's appearance when she arrived?

A.   Um, she had her hoodie completely covering her face and she was kind of, like, slumped down.  And she dropped her bags and didn't say anything.  She was just standing there.

Q.   I'm sorry.  Can you -- did you.

     I'm sorry.  Can you repeat that?

A.   She had her hoodie, like, over her head and she was kind of, like, slumped and she just dropped her bags.  When she pulled her hoodie back, she had a black eye.

Q.   Thank you.

     After Cassie arrived at the apartment, who, if anyone, else came to the apartment?

A.   Sean Combs came.

Q.   And how much later did he come?

A.   It was probably, like, 30 minutes, I guess.

Q.   Can you describe what happened when he arrived?

A.   Um, yes.  He was hitting the door with a hammer to try to open it.

Q.   And how did you know it was Mr. Combs?

A.   He was yelling.  I could hear him.  There was a peephole. We could see through.

Q.   How did you know it was a hammer?

A.   We could see it.

Q.   How loud was the hammer?

A.   It was pretty loud.

Q.   What type of door was it?

A.   I believe it was a wooden door.

Q.   How loud was he speaking through the door?

A.   I don't remember.

Q.   How did you feel when you saw -- when you heard this?

A.   I was terrified.

Q.   And how did Cassie appear?

A.   Numb.

Q.   Why did you say numb?

A.   She was just sitting on the couch.  She wasn't doing anything.  She wasn't -- I was freaking out and she was just, like, she didn't care if he came in and killed her.  She was just, like...

Q.   What did you do after this happened?

A.   What did I do?

Q.   Yes.

A.   Um...

Q.   Did you call anyone?

A.   I called Kristina and I called D-Roc.

Q.   And is that Kristina Khorram?

A.   Yes.

Q.   And who is D-Roc?

A.   D-Roc is the -- I think he was the head of his security

team.

Q.  Whose security team?

A.  Sean Combs.

MS. WESTMORELAND:  Ms. Foster, can you please pull up what is already in evidence as Government Exhibit 2A-202.

Q.  Ms. Morgan, do you recognize this individual?

A.  Yeah, that's D-Roc.

MS. WESTMORELAND:  Ms. Foster, you can take the photo down.

Q.  Why did you call Ms. Khorram and D-Roc?

A.  Um, I believe I called D-Roc first, because he's the security.  I thought he could come and get him out of there.

And then he couldn't, so I called Kristina to come and get him to go home.

Q.  Approximately how long was Mr. Combs banging at the door?

A.  I'm not sure.

Q.  Did he eventually leave?

A.  Yes.

Q.  And do you know what happened?

A.  I don't know.  I -- I think maybe Kristina came, but I'm not sure.

Q.  Did he ever get into the apartment?

A.  No.

Q.  What happened after he left?

A.  The police came.

P5JsCOM3                        Morgan - Direct

Q.  Who called the police?

A.  I'm not sure.

Q.  What happened when they got there?

A.  Um, I opened the door.  They pushed me against the wall, took my ID.  Um, they asked Cassie for her ID.  She wouldn't give it to them.  She wouldn't tell them her name.  Eventually, they left.

Q.  Who, if anyone, did you tell about the police officers arriving at the apartment?

A.  Kristina Khorram.

            MS. WESTMORELAND:  Ms. Foster, would you please pull up what is already in evidence as Government Exhibit C-364-4.

            Can we just focus on the participants at the top.

Q.  Ms. Morgan, do you recognize the participants in this chat?

A.  Yes.

Q.  Who are they?

A.  Me and Kristina.

            MS. WESTMORELAND:  OK.  You can take that down.  Then could we go to the next page.

Q.  What date are these messages from?

A.  March 6, 2016.

Q.  And is that the same date of the incident you just discussed?

A.  Yes.

Q.  Could you please read your first two messages?

P5JsCOM3                          Morgan - Direct

A.   I'm so sorry I missed your calls.  I'm just so not used to
this shit.  Are you OK?

Q.   And then the first two messages on the next page?

A.   It's so dramatic.  I haven't been looking at my phone.
We're OK, but it's just so nuts.

Q.   What were you --

          Oh, before we go to the next one, what were you
referring to in these messages?

A.   The violence.

Q.   Him coming to the door?

A.   Yeah.

Q.   OK.  Turning to this next message, can you read it, please?

A.   I don't think anyone should call her.

Q.   Who is the "her" you're referring to?

A.   Cassie.

Q.   Did you send an attachment with this message?

A.   Yes.

Q.   What was that attachment?

A.   It's the card that the detective left.

Q.   The law enforcement officer who came to the apartment?

A.   Yeah, um-hmm.

          MS. WESTMORELAND:  Ms. Foster, can you now please pull
up what's in evidence as Government Exhibit 364-4A.

Q.   Is that the card we just talked about?

A.   Yes.  Yes.

MS. WESTMORELAND:  Thank you, Ms. Foster.

Can you go back to the prior exhibit, 364-4.

Can we go to the fourth page.

BY MS. WESTMORELAND:

Q.  I'll read Ms. Khorram's messages, if you read your own, please.

Can I call you in a bit?  When I'm alone?

A.  She was looking for anyone to say the wrong thing so she can call domestic abuse.

Q.  Who is the "she" that you're referring to in this statement?

A.  The police officer that came.

Q.  OK.  Turning to the next messages.

Could you please read?

A.  Of course.  Cass just asked me to send you that.

Q.  And what were you referring to when you said Cass just asked me to send you that?

A.  The business card of the detective.

MS. WESTMORELAND:  OK.  Thank you Ms. Foster.  You can take down these exhibits.

Q.  In these messages, Ms. Khorram mentions she is going to call you.

Did you talk with Ms. Khorram on the phone after this?

A.  I'm not sure.

Q.  Did you encourage Ms. Ventura to speak to the police that

day?

A.   Yes.

Q.   On the other occasions you witnessed Mr. Combs be violent towards Ms. Ventura, did you ever call law enforcement?

A.   No.

Q.   Why not?

A.   She didn't want me to.

Q.   You mentioned that when Cassie -- or what was your understanding of where Cassie had been prior to her coming back to the apartment on that day?

A.   A hotel.

Q.   And who was she with?

A.   Sean Combs.

Q.   What, if anything, did Cassie tell you about why she was at that hotel?

A.   She didn't tell me why.

        MR. AGNIFILO:  Objection.  Hearsay, your Honor.

        THE COURT:  That's sustained.

A.   She didn't -- I don't remember her telling me why.

        MS. FOSTER:  Your Honor, she's not going to testify about a statement that Ms. Ventura made to her.

        Is that permissible?

        THE COURT:  I sustained the objection, and then the witness answered that she didn't have knowledge.

        But you can ask a different question.

MS. FOSTER:  OK.

BY MS. WESTMORELAND:

Q.  Did she ever tell you anything about why she was at the hotel with Mr. Combs; yes or no?

A.  No.

Q.  Do you remember any other occasion that you and Cassie discussed her going to a hotel with Mr. Combs?

A.  Yeah.

Q.  What do you remember about that?

MR. AGNIFILO:  Objection, your Honor.

MS. FOSTER:  Your Honor, could we have a sidebar briefly about this?

THE COURT:  We can.  Yes.

(Continued on next page)

(At the sidebar)

MS. FOSTER:  Your Honor.

THE COURT:  Well, first, I take it that, at least part of the objection, was a form objection given the nature of the question?

Is that at least part of objection?

MR. AGNIFILO:  Yes.

THE COURT:  I think it was a little vague.  The question was a little broad and vague.

MS. FOSTER:  OK.

THE COURT:  That's just something you can rephrase the question to address.  But now?

MS. FOSTER:  I just wanted to clarify that we are going to seek to admit a prior consistent statement in which Ms. Ventura states -- tells Ms. Morgan that she does not -- did not want to good to a hotel, but had to because Mr. Combs wanted her to.

I brought this up with Mr. Agnifilo prior, so I just wanted to make sure that that wasn't going to be an issue.

THE COURT:  If you're more specific about, like, the question, then it probably would not have drawn the objection given that discussion.

Mr. Agnifilo.

MR. AGNIFILO:  So, no.  I am objecting to the hearsay.  Really, this is something that if they were going to do this,

they should have done it with the declarant.  It's not fair, in my opinion.  It's not fair to have a declarant on the stand, have the declarant get off the stand, and have speculation about what the declarant said.

This should have been asked of Cassie.  Did you have a conversation with Ms. Ventura with Kerry Morgan after you got out of the hotel?  What did you say?  Why did you say it?

Now I can't question this witness on why Cassie said what she said.  Cassie is off the stand and not someone we can recall because of circumstances.

So, given the particular circumstances here, I think it's inadmissible hearsay.  And if they wanted to get this out, they should have done it through Cassie, the declarant.

THE COURT:  Why would it be inadmissible just because Ms. Ventura is off the stand?

MR. AGNIFILO:  Because it's offered for the truth.  It's a statement that -- of Cassie, you know, saying something that is true, I don't want to go to the hotel.

And to the extent that they are doing this after the person was off the stand, well, you know, why not?

And there's a whole series of questions one would ask someone who is expressing that view.  We can no longer ask because she's off the stand.

I think to bring this in is a statement --

THE COURT:  Ms. Foster, wouldn't this statement, in

P5JsCOM3                          Morgan - Direct

this context, be the statement that Ms. Ventura made to
Ms. Morgan?

          And so if there is a prior -- if there was an attack
on credibility, then you would be able to elicit this
testimony.  But I think Mr. Agnifilo's point is that there was
no testimony about that discussion, and so for that reason,
they did not address in any way, shape, or form anything that
Ms. Ventura would have said to Ms. Morgan.

          Given that they didn't do that, you can't get this
statement in as a prior consistent statement.

          MS. FOSTER:  Well, there was numerous testimony not
about any specific statement, but a large part of Ms. Ventura's
testimony was about her feeling that she did not want to attend
these sex or freak-offs at hotels.

          They cross-examined her extensively on that by showing
her messages, showing that she messages that they purported
showing that she did want to go to that.  I think that this
issue was put directly at issue in her testimony.

          THE COURT:  I think you're right that the general
issue of Ms. Ventura's consent or lack of consent was put in
issue.  But I think that the rule says that when you are
putting in a statement, there has to be an attack on the
statement, and at least directly or indirectly.  I'm just
saying that I think Mr. Agnifilo's point is the statement was
never addressed.

MR. AGNIFILO:  Correct.

THE COURT:  There was never any testimony about that during Ms. Ventura's examination, and for that reason, it falls outside of the rule.

MR. AGNIFILO:  That is the reason.  You're right.

But there is a more practical result, which is there was discussion about her premiere the next day.  So if she -- if Ms. Ventura says to this witness, I didn't want to be in the hotel, I don't -- it's not fair to bring out the larger issue of freak-offs.  There was a discussion, this has to be fast, because we have a premiere the next day.

THE COURT:  I'm going to sustain the objection.

MS. COMEY:  Perhaps we could revisit some of this at the lunch break, your Honor?

THE COURT:  All right.

MS. COMEY:  If that's OK with you.

THE COURT:  OK.

(Continued on next page)

P5JsCOM3                          Morgan - Direct

(In open court)

THE COURT:  Ms. Foster, when you're ready.

BY MS. FOSTER:

Q.  Ms. Morgan, did you ever speak with Cassie about her relationship with Mr. Combs?

A.  Yes.

Q.  And did you ever talk with her about whether she should stay in that relationship?

A.  Yes.

Q.  Approximately how many times?

A.  Often.

Q.  What would you say to her?

A.  I wanted her to do what she wanted to do, but sometimes I would tell her she should leave him.

Q.  What would she say in response?

A.  That she couldn't.

Q.  Why did she say she couldn't?

A.  Because of her job, her car, her apartment.  He controlled everything.  She would have lost all of her livelihood.

Q.  And that's Mr. Combs?

A.  Yes.

Q.  Other than yourself, how many other friends did Ms. Ventura have around this time?

A.  Not many.

Q.  And how many of them were employed by Mr. Combs?

A.   Almost everyone, but me.

Q.   How much time would Cassie spend with those employees of Mr. Combs?

A.   A lot.

Q.   Would you see her after she would spend time with them?

A.   Yeah.

Q.   What did you notice about Cassie after she spent time with people close to him?

            MR. AGNIFILO:  I'm going to object to the form of the question, Judge.

            THE COURT:  Ms. Foster, can you rephrase the question.

BY MS. FOSTER:

Q.   Did you observe Cassie's demeanor after she would hang out with employees of Mr. Combs?

A.   Yes.

Q.   And did you speak with her about her relationship after you would hang out, after she would hang out with employees of Mr. Combs?

A.   Yes.

Q.   And what, if anything, did you notice about Cassie after she spent time with people associated with him based on your observations of her demeanor and those conversations?

            MR. AGNIFILO:  I'm going to object, without a time period.

            THE COURT:  Overrule the objection.

P5JsCOM3                          Morgan - Direct

Q.  You can answer the question.

A.  Can you repeat it, please?

Q.  Yes.

    Based on your conversations with her and your observations of Ms. Ventura's demeanor, what did you notice about Cassie after she would spend time with people associated with Mr. Combs?

A.  She didn't want to leave him after.  She would see some -- some people that -- you could tell they were convincing her to, it's OK.

Q.  And who were those people?

A.  One was April, D-Roc's wife.

Q.  Anyone else?

A.  Um, not off the top of my head.  But yeah, I'm sure.

Q.  Directing your attention to 2018, you mentioned that Combs assaulted you, is that right?

A.  Yes.

Q.  Where were you when that happened?

A.  At Cassie's house.

Q.  And who were you with?

A.  Cassie.

Q.  Where was that house?

A.  The Hollywood Hills.

Q.  What happened on that day?

A.  Um, Cassie and I were listening to her music.  Um, she got

P5JsCOM3                        Morgan - Direct

up to go to the bathroom, which was by the front door, and he had -- Sean had come in.  I guess he had a key and she didn't know.

So, she was in the bathroom.  So she saw him come in and she locked herself in the bathroom.  And I was in the living room, and he came up behind me and choked me.  And then when I got away, he boomeranged a wooden hanger on my head.

Q.  And how did he choke you?

A.  I'm not sure, but I had finger marks on my neck, so ...

Q.  What type of hanger did he hit you with?

A.  A wooden coat hanger.

Q.  And when he did these things, where was Cassie?

A.  In the bathroom.

Q.  And what part of your body did the hanger hit you?

A.  Behind my right ear.

Q.  Without telling me Mr. Combs' specific words, what did he express concern about when he hit you?

A.  Who Cassie was cheating on him with.

Q.  At that time, did you know what he was talking about?

A.  I had no idea.

Q.  What did you do in response?

A.  Um, I got my stuff and left the house.

Q.  Who, if anyone, did you see when you left the house?

A.  Um, Ryan.  I'm not sure his last name.

Q.  Who is Ryan?

P5JsCOM3                        Morgan - Direct

A.   Um, Sean's old assistant.

Q.   Sean Combs?

A.   Yes.

Q.   And what did you say to Ryan?

A.   I said, He's going crazy.  Like, he's lost it.

Q.   And how did Ryan react?

A.   Kind of, like, I don't think he knew what he could do about
it.  He didn't do anything.

Q.   Did you shrug?

A.   Yeah.

Q.   Is that what you just did?

A.   Yeah.

        MS. FOSTER:  Let the record reflect that the witness
shrugged.

        Ms. Foster, could you pull up, just for the parties
and the witness, what has been marked as Government Exhibit
2A-311.

Q.   Ms. Morgan, do you recognize this person?

A.   Yes.  That's Ryan.

Q.   That's the person we were just talking about?

A.   Yes.

Q.   How do you recognize him?

A.   Because of the picture.

Q.   Had you known him?

A.   Yeah.  I met him before.

P5JsCOM3                    Morgan - Direct

Q.  Is this a fair and accurate photograph of Ryan?

A.  Yes.

        MS. FOSTER:  The government offers Government Exhibit
2A-311.

        MR. AGNIFILO:  No objection.

        THE COURT:  2A-311 will be admitted.

        (Government's Exhibit 2A-311 received in evidence)

        MS. FOSTER:  Ms. Foster, would you please publish
Government Exhibit 2A-311 for the jury.

        Could you please take that down.

Q.  What injuries did you have after this happened?

A.  I had a concussion.

Q.  What physical symptoms did you experience in the hours
after?

A.  I was dizzy.  I vomited a few times.

Q.  What did you do as a result of these symptoms?

A.  I went to an urgent care facility.

Q.  And what happened when you got there?

A.  They saw me.

Q.  After you were assault, did you ever have anyone reach out
to Mr. Combs on your behalf?

A.  Yes.

Q.  Who?

A.  A lawyer.

Q.  And about what?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

A.   The assault.

Q.   Why did you have them reach out?

A.   To, um -- I was planning on filing a lawsuit.

Q.   Did you ever file a lawsuit?

A.   I did not.

Q.   Did you eventually receive money?

A.   Yes.

Q.   Approximately how much did you receive?

A.   30,000.

Q.   Who paid you that money?

A.   Sean Combs.

Q.   Who told you about it?

A.   Cassie.

Q.   Where did Cassie tell you about this money?

A.   Where?

     We met at a pizza place in West Hollywood.

Q.   And how long after the assault was this?

A.   I would say about a month.

Q.   And was your lawyer involved in that meeting?

A.   No.

Q.   What did Cassie say when she told you about the money?

A.   She told me she thought I was milking it, that I was over-exaggerating, and da, da, da, da, da.

Q.   What, if anything, did she give you to sign when she told you about the money?

A.   An NDA.

Q.   Do you still have a copy of that NDA?

A.   No.

Q.   How closely did you read it prior to signing?

A.   I barely read it.

Q.   What happened to your relationship with Cassie after this?

A.   We haven't spoken since.

Q.   And when about Mr. Combs?

A.   Same.

Q.   When was the last time you spoke to either of them?

A.   The last time I spoke to Sean Combs was probably that night, um, of the assault.

     And the last time I spoke to Cassie was that pizza place, when I signed the NDA.

Q.   And do you have any pending lawsuit against Mr. Combs or anyone else relating to what happened?

A.   No.

     MS. FOSTER:  Your Honor, would we be able to take the lunch break so we can just speak about that issue over the break before I get off direct.

     THE COURT:  You may.

     All right.  Thank you, members of the jury.  We'll take a break and we'll be back at 1:05 p.m.

     Please do not speak to each other about the case. Don't look up anything about the case.  Don't let anyone speak

P5JsCOM3                          Morgan - Direct

to you about the case.

            Have a nice lunch.  All rise.

            (Continued on next page)

P5JsCOM3                         Morgan - Direct

(Jury not present)

THE COURT:  All right.  Ms. Morgan, I'll see you back here then.  Thank you.

(Witness temporarily excused)

Please be seated.

All right.  Ms. Foster, can you explain to me what the question is going to be and what you anticipate the answer is going to be, just so I have an understanding of what is going to happen.

MS. SLAVIK:  Your Honor, if you don't mind, I'll address this.  Ms. Foster can certainly jump in and correct me if I'm wrong.

Essentially, Ms. Foster will elicit from Ms. Morgan the incident that is very clear in Ms. Morgan's mind because Ms. Morgan's fiancé had just broken up with her.  She and Ms. Ventura were together.  Ms. Morgan was very upset about the breakup of her relationship, and Ms. Ventura told Ms. Morgan that she had to go to a hotel with the defendant.

Ms. Morgan was upset about this.  She wanted Ms. Ventura to spend time with her.  And Ms. Ventura said, in sum and substance, I don't want to go to this hotel, but I have to.  That's essentially what will be elicited from Ms. Morgan.

And to be clear, this incident is separate from the InterContinental incident.

THE COURT:  Is she --

MS. SLAVIK:  Let me --

THE COURT:  Hold on.

Is she going to say that Ms. Ventura was going to have this sexual encounter at a hotel and that's why she didn't want to go and stuff about that?

MS. SLAVIK:  Ms. Morgan will testify that she was -- she understood that Ms. Ventura was going to the hotel for sexual purposes.

THE COURT:  She told that?

MS. SLAVIK:  She saw Ms. Ventura pack a bag with sex supplies, effectively.

And can I just note for the court, just for the record, that defense earlier this morning, I believe, indicated that they would not object to this question and this line. They were fully aware of the question and what would be elicited, and so this objection is a bit of a surprise to the government.

THE COURT:  I may have missed this.

Are you saying this morning when we were discussing this prior to Ms. Morgan's testimony, or are you saying this happened in a discussion between the parties?

MS. FOSTER:  This happened between me and Mr. Agnifilo directly before your Honor took the bench.  I alerted him that this would be a statement that we would elicit on direct examination and so we could tee it up for your Honor if there

was a dispute.  And he said that he did not plan to object to it.

That's why I called a sidebar, to just sort of clarify that.

MR. AGNIFILO:  I have no doubt that that is the way my colleague remembers it.  That's just not true.  We discussed --

THE COURT:  It doesn't matter.  I'm not going to deem an objection waived based on a discussion between the parties.

MR. AGNIFILO:  Yes.  I mean, we object.

It's hearsay and it's prejudicial, and it's being -- if this was a statement that they wanted to get out for some reason, they should have asked the declarant.

And, Judge, I think we should go one at a time.  It's hearsay without an exception.  We have never challenged --

THE COURT:  Well, the exception that's been raised is the exception for prior consistent statements.

MR. AGNIFILO:  I understand.

But I don't believe it meets the criteria for prior consistent statement.  We didn't challenge this.  I mean, also it's been shifting sands.  The way I understood it ten minutes ago was that this was connected to the InterContinental.  Now it's not connected to the InterContinental, and it's just some hotel visit at some point in time.

I think it's unduly prejudicial.  The government wants to get it in so that they can say, look, she's admitting to her

friend that she didn't doesn't want to do the freak-offs.  That is what they want to do with this.

THE COURT:  That's exactly what they want to do with this, yes.

MR. AGNIFILO:  And they can't do it.  They can't do it with a hearsay -- there is a danger -- there is a lot of hearsay flying around, Judge.  They are using different ways to get a lot of hearsay in.

And if this is something that Cassie Ventura said, she was on the stand, and she's gone, so I cannot ask her why she would have said that.  So it's not fair the way they are doing it.  It's hearsay, the exception doesn't apply, it's unduly prejudicial, and we highly object to it.

THE COURT:  All right.  Understood.

MS. SLAVIK:  May I respond, your Honor?

THE COURT:  You may.

MS. SLAVIK:  I think this reading of the law is entirely too narrow.  There is nothing in the rule itself that restricts statements in the way that the defense suggests.

Specifically, the defense has directly attached Ms. Ventura's credibility with respect to whether or not she consented to these freak-offs in hotels.

And let me just note that --

THE COURT:  Here is my question.  If you just read the text of the rule, it says what's covered is a statement, and

the declarant testifies and is subject to cross-examination about a prior statement, meaning the same statement.  And the statement is consistent with the declarant's testimony and is offered etc., etc., so...

MS. SLAVIK:  The prior statement in this case --

THE COURT:  Hold on.

Doesn't the rule focus attention on the statement, and that is true, why wouldn't the fact that Ms. Ventura was not subject to examination about the statement does not have relevance here?

MS. SLAVIK:  Your Honor, the statement at issue here is Ms. Ventura's statement that she did not consent to freak-offs, that she did not want to participate in freak-offs. There was plenty of cross-examination on that topic.

And let me just point your Honor to the case law interpreting this very rule.  This case law is cited in the government's motions in limine, as well as in its May 11 letter on this very topic.  But Second Circuit case, *United States v. Caracappa* -- I can provide the cite if your Honor needs it -- states, "the prior consistent statement need not be proffered through the testimony of the declarant, but may be proffered through any witness who has firsthand knowledge of this statement."

That is exactly this situation.  And pursuant to that case, this should be admitted as a prior consistent statement.

THE COURT:  Well, that may overcome the hearsay objection, but think Mr. Agnifilo is saying, consistent with your explanation of what it is Ms. Morgan would testify about, that it would not meet the Rule 403 threshold, given that it goes directly to the heart of this case.

But the testimony itself is vague in terms of what was actually conveyed to Ms. Morgan.  And given the hearsay nature of this, meaning even if you overcame the objection in a technical fashion, the way the situation here, where Ms. Ventura who was not asked about these statements is not available for the defense to question about them, and so all we have is Ms. Morgan's vague recollection of a particular conversation where Ms. Ventura apparently, generally, says, I don't want to go to this hotel, without giving further explanation as to why, without giving further explanation even as to what she was doing.

When I asked you how Ms. Morgan discerned that, she was going there for a sexual reason, you didn't indicate that it was based on a statement by Ms. Ventura, but rather because of the bag and the type of bag that she was preparing.

Is she even going to testify that Ms. Ventura was going to a hotel to be with Mr. Combs for a particular reason?

MS. SLAVIK:  Yes.  Yes, she will testify to that very fact.

Let me just push back on your Honor's suggestion that

this is a vague memory of Ms. Morgan.  It's actually very specific and, in part, specific because it's tied to this key event in Ms. Morgan's life.  So this is actually, like, a fairly specific memory.

Now, I would just, again, point your Honor to the violence argument that any such prior consistent statement needs to be presented to the actual declarant, in this case, Ms. Ventura.  That is not what the case law requires.

THE COURT:  What's the citation to your best case?

MS. SLAVIK:  Let me give you the citation to the *Caracappa* case, which is 614 F.3d 30, 39.

THE COURT:  All right.  I'll check that out.

MS. SLAVIK:  The other case that I'll point you to is the *Flores* case, which states that Rule 801(d)(1) applies to a witness --

THE COURT:  Just give me the citation.

MS. SLAVIK:  945 F.3d at 706.

THE COURT:  I'll take a look at those cases and we'll come back.

MS. SLAVIK:  Your Honor, I'm sorry to belabor this.  Can I just make a practical point?

Ms. Ventura testified that she was in an 11-year relationship with Mr. Combs.  It is not surprising or, you know, suggestive of dishonesty that she wouldn't remember a statement like this.  It's important to Ms. Morgan because,

P5JsCOM3                          Morgan - Direct

like I said, this is key to an important event in Ms. Morgan's life.  Ms. Ventura, it's not quite the same for her.

THE COURT:  Ms. Ventura wasn't asked about this statement.

MS. SLAVIK:  I'm sorry.

THE COURT:  Ms. Ventura wasn't asked about this statement.

MS. SLAVIK:  Exactly.

THE COURT:  I don't know that she knows or doesn't know about this statement.

MS. SLAVIK:  She was asked multiple times whether she wanted to go to hotel rooms, whether she consented to go to hotel rooms.  She was cross-examined extensively on that point.

THE COURT:  I understand that.

MS. SLAVIK:  And, therefore, the prior consistent statement she made to Ms. Morgan should come in under the rule and under the cases I just cited to your Honor.

MR. AGNIFILO:  One last thing.

THE COURT:  All right.

MR. AGNIFILO:  I think this just came up in the 3500 today.  I don't know that I've ever seen any of this evidence before the report we were given this morning, and that's not here nor there.  But this is really coming up at the last minute.

And one of the things that I think -- your Honor is certainly alluding to it -- this prior consistent statement is not a matter of sort of general positions of issue. It's about specific statements, and there's just been nothing.

This specific statement has come for the first time, and this isn't even a typical situation where we would be able to call this witness back. I think this witness is gone from us forever. And I have a hard time not thinking that that was strategic on the part of the government.

MS. SLAVIK: Your Honor, I strongly object.

THE COURT: Hold on. Hold on. Hold on.

I think we're repeating ourselves. Plus, you all need to get something to eat, because otherwise you're not going to get anything to eat.

I understand the issue. I'll take a look at those two cases, and I'll let you know what is going to happen after we come back.

Thanks a lot.

MR. AGNIFILO: Thank you, Judge.

THE COURT: Thanks a lot.

(Luncheon recess)

AFTERNOON SESSION

1:12 p.m.

(In open court; jury not present)

THE COURT:  Ms. Slavik, you directed me to that *Caracappa* case, and I think it, if I'm reading it correctly in the five minutes or so that I just had, it stands for two propositions.  One, to your point, the prior attack on credibility need not be directed to the particular statement that is being elicited.  So that was your first point, that the attack on credibility need not be to the particular statement, it may be directed towards the issue that the statement is relevant to; is that right?  Am I tracking your argument at least?

MS. SLAVIK:  Yes, your Honor.

THE COURT:  Then the court in *Caracappa* says there is, however, an additional requirement that the declarant be subject to cross-examination.  And so in *Caracappa*, there were two reasons why the court held that that was satisfied, even though the individual who was relaying the statement, *Burshteyn*, discussed this statement after the declarant, Kaplan, had left the stand.  Those two reasons were that Kaplan was going to be subject to cross-examination because he could be recalled by the defense.  Secondly, the records show that 3500 material produced to defendants prior to the declarant's cross-examination had revealed the statements and had provided

a basis for the defendant to know about the statements.

As to the first of those requirements, is Ms. Ventura able to be re-called by the defense in this case?  If I were to allow the statement in, I would have to, under *Caracappa*, permit Ms. Ventura to be re-called to the stand.

MS. SLAVIK:  Your Honor, I'm not necessarily sure I agree with the Court's conclusion.  But to answer your question, it would be unlikely that we would call Ms. Ventura again.

THE COURT:  You don't have to call --

MS. SLAVIK:  Given Ms. Ventura's health issues, it would be unlikely that she would be available to be re-called.

THE COURT:  Is Mr. Agnifilo correct that this particular statement was first revealed in the 3500 material that was produced today?

MS. SLAVIK:  Yes, your Honor, the 3500 related to this particular statement was produced yesterday.  We met and conferred, as I mentioned to your Honor, on this particular statement.

THE COURT:  So that testimony will be excluded on this basis.

Mr. Agnifilo, let me make sure, because I expect that this issue will recur in this case, so I want to make sure I understand the defendant's position so that I can do these things more quickly.  Do you agree with my recitation of what I

understand the court in *Caracappa* said, which is the attack on credibility can be on a general issue to which the statement pertains?  So let's give an example.  Ms. Ventura's on the stand and her credibility is attacked as to her willingness to participate in freak-offs, just to give an example.  Then the government puts in a prior consistent statement from Ms. Ventura in which she's telling someone that she does not want to participate in freak-offs, right.  You would agree that at least the prerequisite is satisfied for the prior consistent statement rule based on what I just talked about in *Caracappa* and because it's Ms. Ventura and she's on the stand, she is subject to cross-examination concerning that statement which satisfies the second part of that.  That's obviously not this situation, but I want to make sure we're on the same page so I don't need to read a bunch of other cases about this.

MR. AGNIFILO:  I really want to answer your Honor's question, but let me frame it a little differently.  Certainly if we said that she didn't want to agree to that freak-off, I would agree with you.

THE COURT:  It depends.  But context aside.

MR. AGNIFILO:  Yes.  Putting context aside, which is hard to do because -- and I'm sorry to bog us down with facts.

THE COURT:  Let me be more specific about it.  You're not taking the position that the rule is only triggered if the declarant testifies about a particular conversation and you

attack the credibility of that witness as to that statement, you understand that under cases like *Caracappa*, it's looked at in a broader way, fair?

MR. AGNIFILO:  I agree that it's not that statement specific.

THE COURT:  Okay.

MR. AGNIFILO:  Where I think the rub is, though, is not exactly that.  It's what does the statement connect to beyond the statement.  In other words, the government is saying the statement connects to all the freak-offs.  I don't think we would ever agree with that.

THE COURT:  That's the context that I can deal with in addressing any of the objections, I understand that.

MR. AGNIFILO:  Yes.

THE COURT:  Separately, as to Mr. James, because I anticipate he will be testifying next, the issue was raised concerning the incident where the chef was assaulted and there was a request for Mr. James to file a police report.  I'm still not understanding the relevance of this.  So, Ms. Slavik, if you want to maybe give it to me one more time in terms of why that's relevant.  There was an incident concerning the defendant and the chef, and then Mr. James is requested to file a police report.  The way it's laid out in the letter, he decides not to because he doesn't want to file a false police report, and then after that he is told by the chef and another

individual that, actually, Mr. Combs was the one who assaulted the chef. Now am I correct in terms of the sequence of that?

MS. SLAVIK: Yes, your Honor, that's correct.

Just to clarify what I think Mr. James meant is he'd be filing a false police report because he didn't witness the actual incident. He then learned that, in fact, Mr. Combs was asking him to file it.

THE COURT: What is this relevant to?

MS. SLAVIK: This is relevant to two things, it's relevant to the means and methods of the enterprise --

THE COURT: How?

MS. SLAVIK: Because per the indictment and the enterprise letter, Mr. Combs is accused of participating in an enterprise that assaulted, threatened to assault employees, acquaintances, and other individuals, and then to conceal or --

THE COURT: Which paragraph?

MS. SLAVIK: In the February 1st letter.

THE COURT: Where is it in the indictment?

MS. SLAVIK: I'm sorry, your Honor. I don't have the indictment right in front of me. I believe paragraph 12 is the means and methods paragraph.

THE COURT: It is. I apologize for that. Can you explain again. I've now read that portion of the indictment.

I understand what you're saying and I understand that issue, but here what happened is the defendant allegedly told

Mr. James to file a police report, Mr. James, not having witnessed the event in question said that he didn't want to file a false police report. Let's stop right there. What's the relevance of that? That's what I'm trying to understand.

MS. SLAVIK: Well first, your Honor, it's the defendant's consciousness of guilt.

THE COURT: Guilt of what?

MS. SLAVIK: His assault of the chef. I think I made clear before the break, the chef is a victim of forced labor. That's set out in the government's March 10th enterprise letter.

THE COURT: So that's forced labor. That's within one of the earlier enterprise letters, so it doesn't run into the issues of last Friday.

MS. SLAVIK: Correct.

THE COURT: There's this issue of forced labor, and the request of Mr. James to file a police report when Mr. James had not seen the events in question is consciousness of guilt I guess because he's trying to cover his tracks?

MS. SLAVIK: As to the defendant's use of force against the chef, which is an element of the forced labor offense.

THE COURT: And then you have the subsequent conversations where Mr. James is then told that it was actually the defendant who perpetrated the attack and not the other way

around?

MS. SLAVIK:  Correct.

THE COURT:  And that comes in on a hearsay basis because it's within the scope of their relationship given their jobs.

MS. SLAVIK:  Exactly.

THE COURT:  Which were 24/7 jobs attending to the defendant, and they're all attending to the defendant, and so that's why they're having these conversations in the first place, so it gets in through that exception.

The relevance is the same thing, because this is evidence of Mr. Combs assaulting the chef, who is one of the identified victims of forced labor and that's why it's relevant.

MS. SLAVIK:  Exactly, your Honor.

THE COURT:  I think I understand.  If anyone has a response, but I think that was helpful clarification on the relevance of this specific incident.

MR. AGNIFILO:  I understand.  The problem I have is this assertion that it's consciousness of guilt of an assault. He's not charged with assault.  I understand what they're saying is the assault is part and parcel of a forced labor --

THE COURT:  It's the force.

MR. AGNIFILO:  No, I understand that argument.  I still think it's -- there's going to be a witness who's going

to come here and testify to these events.  And so my worry is that they're getting two bites at the apple.  They're getting a hearsay statement about an alleged assault and then they're going to have perfectly admissible appropriate testimony about alleged assault.  We have no problem of course with the second.

THE COURT:  I don't think there's a two bites at the apple exception to the rules of evidence.

MR. AGNIFILO:  But there is a two bites -- to 403, there might be.  My argument is this is far afield, it's prejudicial, and I think that we are getting onto thin ice with this agency admission concept given these facts.  Everything would be an agency admission.  It would just be -- everything would be admissible as an exception to the hearsay rule --

THE COURT:  Who is going to be presenting Mr. James?

MS. SLAVIK:  I will, your Honor.

THE COURT:  And you'll lay the appropriate foundation before we're eliciting the testimony?

MS. SLAVIK:  Of course.

THE COURT:  On that basis I will permit that testimony.

Obviously, Mr. Agnifilo, if you're seeing the questions come in and you don't believe the proper foundation has been laid, then you can raise an objection at that time.

MS. SLAVIK:  Sorry, your Honor.  There was another pending statement related to Mr. James' testimony --

P5JCcom4                          Morgan - Direct

THE COURT:  That's still out.

MS. SLAVIK:  Understood.  However, I think there are matters around that statement that Mr. James will testify about.  I will proceed carefully.  I just wanted to advise your Honor that I do plan to ask him questions about his personal recollection of certain of those events.

THE COURT:  Let's have Ms. Morgan back on the stand.

And let's bring in the jury.

(Witness present)

(Continued on next page)

(Jury present)

THE COURT:  Ms. Foster, any further questions?

MS. FOSTER:  No further questions.  Thank you.

THE COURT:  Ms. Morgan, you understand you're still under oath?

THE WITNESS:  I do.

THE COURT:  Mr. Agnifilo.

CROSS-EXAMINATION

BY MR. AGNIFILO:

Q.  Good afternoon, Ms. Morgan.  I'm one of Sean Combs's lawyers.  I have a few questions for you, not a ton, you'll be out into the nice afternoon in a little while and you'll have satisfied your subpoena and you'll be on your way.

A.  Thank you.

Q.  So if I ask you a question that you don't understand or you want me to rephrase it, all you need to do is ask and I will do that.  Okay?

A.  Sure.  Okay.

Q.  So you identified a few people today.

MR. AGNIFILO:  I'm going to ask to put up something that was just admitted into evidence today.  It's 9P-102.  It's a photograph.  It's already in evidence.

Q.  Do you recognize the people in that photograph?

A.  Cassie on the right, I recognize.

Q.  Do you recognize anybody else?

A.   No.

Q.   Do you know who Dawn Richard is?

A.   Not personally, but I believe she was in making the band.

Q.   So just to recap some of the things you said this morning. For a period of time, a long period of time, you were Cassie's best friend?

A.   Yes.

        MR. AGNIFILO:  We can take this picture down.  I'm sorry.  Let's put it back up for one second.  I'm sorry.

Q.   Which one is Cassie?

A.   She is on the right in the colorful --

Q.   Okay.  And you don't recognize the other two people with her?

A.   I don't.

        MR. AGNIFILO:  Okay.  We can take it down.

Q.   You were Cassie's best friend for -- starting in what, 2004 until --

A.   2001.

Q.   2001 you guys met.  2001 to 2018, right?

A.   Yes.

Q.   And you tended to know the other people who were close to Cassie, right?

A.   Yes.

Q.   And you don't recognize the two people in that photo?

A.   I don't.

Q.  So I have a few questions for you.

So you met Cassie in 2001.  Where exactly did you guys meet?

A.  What city or what --

Q.  Yeah, what city --

A.  We were doing a photo shoot in New York City.

Q.  Was she already modeling?

A.  Yes.

Q.  And you were modeling, too?

A.  Yes.  It might have been my first job, actually, one of my first jobs.

Q.  You grew up in Buffalo, you said?

A.  Yes.

Q.  Came to New York for the vastly improved weather, and now you're in New York and you meet Cassie?

A.  Yes.

Q.  I don't need all the details to the extent -- how did you meet her, how did you come to meet Cassie?

A.  Well, at the time we had Polaroid, not digital, this is how long ago, so we used to have to wait a long time between shots to wait for the Polaroids.  So then we started talking, we became really close.

Q.  So modeling was done with Polaroids?

A.  That's how ancient -- that's how old I am, yeah.

Q.  So you and Cassie met because you had to wait for the

Polaroids to develop?

A.  Yes.

Q.  And describe your friendship from that point.

A.  Well, she was living in Connecticut, I was living in Buffalo, so we would see each other on photo shoots.  We would talk and stuff, but we never -- once she was done with high school, we moved in together in New York.

Q.  So when you met Cassie, she was still in high school?

A.  Yes.  So was I.

Q.  So then you shared an apartment for a time in New York City?

A.  Yes.

Q.  And you guys lived downtown?

A.  Yes.

Q.  How long a period of time did you guys live together?

A.  One year.

Q.  Do you remember, is that 2004?

A.  Yes.

Q.  And then you move uptown and she stays downtown?

A.  Opposite.  She moved to Harlem, I stayed downtown.

Q.  And she was, from what you could tell from living with her and being her friend, she was doing pretty well financially with her modeling career, correct?

A.  Yes, she was.

Q.  I think you said she was making about a quarter million

dollars?

A.   Yes.  Some years she was doing really well.

Q.   This is modeling in what context --

A.   Catalogs, catalog modeling, Target ads, we used to do the back to school circuit, J. C. Penny.  They had the same bunch of people working together doing back to school ads.

Q.   At some point in time, Cassie started dating someone named Ryan Leslie, am I right?

A.   Yes.

Q.   And when did she start dating Mr. Leslie?

A.   They started dating when we were living together in 2004.

Q.   Did you come to know Mr. Leslie pretty well?

A.   Yes.

Q.   Who was he at the time?

A.   He was a music producer.

Q.   At that point when she started dating Mr. Leslie, she had not put out any music?

A.   No.

Q.   How long a period of time, based on living with Cassie, being Cassie's friend, did she date Mr. Leslie, from what you could tell?

A.   I think it was a couple years, two or three years.

Q.   And only what you know, not what you don't know.  Did they seem pretty serious?

A.   Yes.

P5JCcom4                        Morgan - Cross

Q.   At one point you met Mr. Combs for the first time?

A.   Yes.

Q.   That's you said that's about 2007ish?

A.   I believe so.

Q.   Do you remember how you met him?

A.   I don't.

Q.   After Cassie started dating Mr. Combs, what kind of time would you spend with the two of them?

A.   I'd see them often.

Q.   And what sort of -- give us an idea, the best you can, give us an idea --

A.   If we were in the same town, we'd probably be hanging out.

Q.   So 2008, just to pick a time period, how often would you say you're seeing Mr. Combs and Cassie in a month?

A.   2008, let me think about what I was up to.  I had a boyfriend that year, so probably less than --

Q.   And in part because you had your own social life?

A.   Yes.

Q.   And so once a month, twice a month, less?

A.   Couple times a month probably.

Q.   And where would these meetings tend to be?  I'm just trying to give the jury a sense of what things were like.

A.   Usually, maybe one of Sean Combs's apartments or house, it depends where we were.  We'd always go to the studio.  There was always a bunch of people there, it wasn't just the three of

P5JCcom4                    Morgan - Cross

us, but --

Q.  You said that through the years, you guys all traveled together?

A.  Uh-huh.

Q.  You said you went to Italy?

A.  Yes.

Q.  Once or more than once?

A.  I'm pretty sure once, I went once.

Q.  Do you remember where?

A.  We were on a boat.  We started in Rome and then I think ended in Naples.

Q.  And then I think you had said Ibiza?

A.  Yeah, that was the same trip, actually.  We left the boat, went to Ibiza for a day and got back on the boat.

Q.  Where else outside of the country?

A.  Jamaica.

Q.  And anything else, any other trips outside the country?

A.  Not that I recall.

Q.  And you guys would go to Burning Man here obviously in the country?

A.  Yes.

Q.  Tell the jury, what's Burning Man?

A.  Burning Man is a music festival -- music and arts festival outside of Reno, Nevada.

Q.  Is it the same time every year, roughly?

A.   Yes, it's around Labor Day.

Q.   How many times would you say that you and Mr. Combs and Cassie went to Burning Man?

A.   I've been much more than they have.  I'm not sure how many times they went.  Maybe three.

Q.   Did you go with them those three times?

A.   Yes.

Q.   And who, other than Mr. Combs and Ms. Ventura, who else would go with you, typically?

A.   Like, in the --

Q.   In the --

A.   In the group.  His stylist would come, he had assistants that came, other friends, obviously.  We stayed in a camp together.

Q.   You stayed in a camp together.  Tell us what that was like.

A.   What the camp was like?

Q.   Yeah.

A.   In Burning Man, nothing is there, so you have to bring everything in with you.  You create your own tent or you have a camper, you bring all the food you need for a week, all the water, everything you could possibly need, and it's kind of a communal event.  So you set up -- we camped with our friends and some people would cook and some people would this, some --

Q.   You're friendly with other people kind of in the general group.  Is there someone named Dallas Austin?

A.  Yes.

Q.  Who's Dallas?

A.  He's a music producer.

Q.  And you know him?

A.  I do.

Q.  And when would you say you first met Dallas?

A.  I don't remember.

Q.  But would it have been before 2010, after 2010?

A.  No, before 2010.

Q.  And then Lucas White, do you know who that is?

A.  Yes, I do.

Q.  What are the connection of Dallas — we'll start with Dallas — Dallas and Mr. Combs, from what you could see?

A.  What is the connection between the two?

Q.  Yeah, how do they know each other?

A.  Through Kim, I believe, Kim Porter.

Q.  Tell the jury, who's Kim Porter?

A.  Kim Porter is the mother of a few of Sean Combs's kids.

Q.  Have you ever met her?

A.  Yeah.

Q.  Do you know how many times, ballpark?

A.  No.

Q.  Do you know where you would have met her?

A.  Probably at one of his houses.

Q.  And I'm not going to ask to delve into this.  From your

connection with Ms. Ventura and your friendship with Ms. Ventura, could you tell if Kim Porter was a source, from time to time, of jealousy on her part?

A.   Who?

Q.   Cassie.  Was Cassie ever jealous of Kim?

A.   I'm sure, yes.

Q.   I'm trying to see if there's more than I'm sure.  Is there anything that you saw, because of your friendship with Cassie, that would lead you to that conclusion?

A.   I -- yes, she was jealous because she could never go to the New Year's Eve parties.

Q.   Fair to say, this was sort of an ongoing situation?

A.   Yes.

Q.   And Lucas White, what was Mr. Combs's connection to Lucas White from what you could see?

A.   I'm not sure how they met or anything, but he was very good friends with Nelly Cooper, who I believe was in the music business, also.  I don't know if there's a connection with that, but they're friends.

Q.   You said that you guys would go to the studio from time to time, and that would be Ms. Ventura, as well?

A.   Yeah.

Q.   And was Ms. Ventura, from time to time, going to the studio to work on her own music, from what you could see?

A.   Of course, yes.

Q.  How often would you say she went to the studio to work on music?  I'm sorry about asking all these general questions. I'm really trying to get an idea of how things were like?

A.  It would depend if she was working on a project or something, because you have to pay all the people that are there, as well.  It's not like she would just pop in there and waste everyone's time.  So there was a point.  So if she was working on something, she would be there every day.

Q.  Only if you know, do you know who was paying for the studio time?

A.  No.

Q.  Did she ever tell you whether or not she was paying for the studio time?

A.  I'm assuming it's part of the label deal.

Q.  And the label being Bad Boy?

A.  Yes.

Q.  Do you know from time to time if Mr. Combs would put Ms. Ventura together with other artists in the studio?

A.  Yes.

Q.  Was your understanding that, many times, these were artists that were further along in their musical career than Ms. Ventura was along in her musical career to kind of help her whatever she was working on?

A.  Yes.

Q.  And one of them was someone named Kid Cudi?

P5JCcom4                          Morgan - Cross

A.   I didn't know that they were working together.

Q.   I think you said Lil Wayne?

A.   I didn't say that.

Q.   You didn't?

A.   No.

Q.   Sorry.  Do you know if that's true?

A.   That she worked with Lil Wayne?

Q.   Yeah.

A.   Not that I can --

Q.   That's fine.  Do you remember any other artists that
Ms. Ventura did work with?

A.   Yeah.  French Montana, Fabolous, Too Short.  I'm sure I'm
missing a bunch, but -- she did a mixed tape that had features
on every song.

Q.   Do you remember the name of the mixed tape?

A.   RockaByeBaby.

Q.   That came out, ballpark, do you remember when about?  Okay.
          But while she and Mr. Combs were together,
romantically together?

A.   Yes.

Q.   Do you remember, Mr. Combs was quite jealous in your
experience, correct?

A.   Yes.

Q.   And fair to say this was a source of great stress to you?
Let's start with you.  Fair to say?

A.  Him being jealous?

Q.  Yes.

A.  Yes.

Q.  Because he would be jealous and he would act up.  Is that a fair way to put it?

A.  The only way it would stress me is because they would involve me.

Q.  But you saw this, you saw the jealousy playing out, correct?

A.  Yes.

Q.  Because you were Cassie's best friend?

A.  Yes.

Q.  And he was jealous, for instance, one day that he thought that Cassie had danced with Chris Brown, correct?  Do you remember that?

A.  I don't remember that one.

Q.  Let me see if I can show you something.  That's a very specific thing.

MR. AGNIFILO:  It's B-329.

Q.  Oh, I think you might have it in your folder.  See that book next to you?  We are not nearly going to go through everything in that book, so don't worry about that.  But if there's something there that's a tab for B-329, here's what I'm going to ask you to do:  I'm going to ask you to take a look at it.

P5JCcom4                    Morgan - Cross

A.  I got it.

Q.  Do me a favor, there's a couple of text sections there, just read them to yourself.  When you've read them, just look back up at me if you could.

Did you read it?  Okay.

Do you remember something about dancing with Chris Brown?

A.  I don't.  I don't know who this is, either.

Q.  That's fine.  Fair enough.

Do you remember Cassie complaining to you in a text that Combs is angry because Combs believes that she was dancing with Chris Brown?

A.  I don't remember that.

Q.  And at one point, Combs was jealous, was he not, of the actor Michael B. Jordan.  Do you remember that?

A.  Yes.

Q.  And what do you remember about that?  Let me ask you what you remember and then I'll ask you some specific questions.

A.  I remember she had started talking to Michael B. Jordan right before she went to South Africa to shoot a movie, and I remember them not being together while she was in South Africa.

Q.  Mr. Combs wasn't with her?

A.  Uh-huh.

Q.  Let's take a step back and thank you for that.

So Ms. Ventura goes to South Africa to film a movie.

Remind us again what movie that was, if you remember?

A.   I don't remember, but it was a dancing movie.

Q.   And how long was she in South Africa, ballpark, about?

A.   I want to say two months, maybe.

Q.   And during this period of time, it was your belief that Combs and Ms. Ventura were not together?

A.   Yeah.   I was with her in South Africa for a few weeks and she was not speaking to him.

Q.   And in fact, didn't she say something along the lines of, she was -- I'm going to use the wrong word because I'm of a generation where I'm using wrong words, like blocking everybody, right, she was blocking everyone?

A.   Like on social media?

Q.   Yeah, all of Mr. Combs's people.

         MS. FOSTER:  Objection.

Q.   Let me ask a better question and one that's probably more educated.

         THE COURT:  Well, sustained.

         MR. AGNIFILO:  That's fine.

Q.   Do you remember being with Ms. Ventura and Ms. Ventura saying, I'm blocking Combs --

         MS. FOSTER:  Objection.

         MR. AGNIFILO:  I'm not asking for the truth, I'm just trying to figure out --

         THE COURT:  Then let's ask in a different way.

P5JCcom4                       Morgan - Cross

Q.  So how long were you with Ms. Ventura in South Africa?

A.  Two weeks.

Q.  And for another period --

          MR. AGNIFILO:  Give me one second, Judge.

          Your Honor, may I approach the witness?

          THE COURT:  You may.

Q.  I'm showing you a photograph, and the person in the middle we're going to call Mia.

A.  I've --

Q.  Okay.  I'll take that from you.

          So for a period of time, Mia was in South Africa, as well, correct?

A.  She was, yes.

Q.  And were you and Mia there at the same time or at different times?

A.  The same time.

Q.  For the whole time?

A.  I was there for two weeks, they were there for much longer.

Q.  Were you there on the front end or the back end or in the middle?

A.  I believe I was kind of in the middle.  I'm not sure.

Q.  And the way we got to this subject, as you said, during this period of time, there was some relationship of some nature between Ms. Ventura and Michael B. Jordan?

A.  Correct.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

Q.   Very, very succinctly, what was the nature of that?

A.   I actually don't know.  I never met him, I never seen them together.  I know they were speaking when she was in South Africa, but I don't know anything about when they met up or --

Q.   Understood.  And at some point you were aware, were you not, that Mr. Combs expressed, in your presence, jealousy over this situation?

A.   I'm not sure that it was in my presence, but --

Q.   Was it only things that Ms. Ventura would tell you?

A.   I don't remember.  I'm not sure.

Q.   But do you remember this being an issue at some point?

A.   Yes.

Q.   Tell the jury what you remember.

A.   The only thing that I do remember would be that she was speaking to Michael B. Jordan, they were not together, and he was jealous about it.  I think she was trying to leave him, because especially when she was in Africa, she was away, so --

Q.   Ms. Ventura was trying to leave Mr. Combs?

A.   Yes.

Q.   Now while you and Ms. Ventura were in South Africa -- and I'm not going to belabor this point -- you guys were using some controlled substances, some drugs, right?

A.   No.

Q.   Not at all?

A.   No.

P5JCcom4                        Morgan - Cross

Q.  Was Ms. Ventura using anything, from what you could see?

A.  No.  We were in South Africa.  I'm not sure.

Q.  I understand.

Did you come to learn that there was a woman in Mr. Combs's life named Gina?

A.  Yes.

Q.  And fair to say that Gina was a source of jealousy and worry to Ms. Ventura?

A.  She was a big problem, yes.

Q.  Thank you.  That's a great way to put it.

Tell the jury why Gina was a big problem.

A.  He wouldn't -- she wouldn't go away, basically.  He was having like a full-on relationship with this little girl and Cassie found out about it, and she wouldn't go away, he wouldn't leave her.  So it just went on for a really long time.

Q.  I need to clarify one thing.  You called her a little girl.  She was a grown adult woman, right?

A.  Yes.  We looked at her like a little girl.

Q.  Why do you say that?

A.  Because she acted like one and she was like a little girl.  She's much younger than us, I believe.

Q.  Do you know how old she was at the time?

A.  No.

Q.  She was --

A.  She was an adult, yeah.  Sorry.

Q.  So I'm trying to understand, she was acting like a little girl, I want to understand very briefly what you mean.

A.  I believe that Cassie was having conversations with her or they spoke or something.  I'm not sure.  Honestly, I'm not sure.  I don't want to say something that I don't --

Q.  That's fine.  Only what you know.  But what you do know is that Gina was a problem?

A.  She was a problem, yes.

Q.  And she was a problem because this was all hurtful to Ms. Ventura?

A.  Yes.

Q.  Ms. Ventura was hurt by this?

A.  Yes.  I'm pretty sure she got pregnant, that Gina girl.

Q.  Let's just --

A.  Sorry.

Q.  That's okay.

And it was a persistent problem, it lasted for years, and years, and years, and years?

A.  Yes, from what I remember.

Q.  When you said she wouldn't go away, what you're saying, tell me if this is right, is that Mr. Combs was with Gina romantically for many, many years?

A.  Yes.

Q.  And during the same time, he was also with Cassie?

A.  Correct.

P5JCcom4                         Morgan - Cross

Q.   And that Mr. Combs was cheating on Cassie was a source of a great deal of conversation between you and Cassie while you're in South Africa and at other times?

A.   In South Africa, she did not want to speak about him.

Q.   About Mr. Combs?

A.   Yes.

Q.   And then she comes back from South Africa when, in the late fall of 2015; does that sound right?

A.   Yes.

Q.   And your friendship continued?

A.   Yeah.

Q.   In the latter part of 2015, do you remember where you were living?  Not the exact address.

A.   New York.

Q.   Do you remember where Ms. Ventura was living?

A.   In 2015?

Q.   Only if you remember.

A.   Either New York or LA.  I'm not sure.

Q.   At some point she moved from New York to LA; am I right?

A.   Yes.

Q.   Do you remember, ballpark, when that was?

A.   No, I don't.

Q.   Now, in connection, were there times when Ms. Ventura would ask you to sort of be cover in terms of, like, don't tell Mr. Combs where I am type of thing?

A.   Not really.

Q.   Do me a favor, I think 1607 and 1608 are in your binder. Look at 1607 first, just read it to yourself, and if you can't find it, let me know.

(Pause).

Now read 1608, also.

(Pause).

Do you remember a time when you and Ms. Ventura were talking and you were essentially being asked to provide like a back story if Mr. Combs were to call looking for her?

A.   I don't recall it, but it sounds like what this message is about.

Q.   That's fine.  Do you recall that happening ever?

A.   No.

Q.   I mean --

A.   I'm sure it probably did, I just don't remember.

Q.   That's alright.

When Ms. Ventura came back from South Africa, to your knowledge — I'm going to keep it very general purpose — was there any romantic type of relationship to your knowledge that she had with Michael B. Jordan?

A.   I'm not sure of the timeline of their -- I don't know if she came back and was still speaking with him.  I'm not sure.

Q.   That's fine.

I want to talk for a second about this situation where

P5JCcom4                        Morgan - Cross

Mr. Combs had a hammer on the wooden door, Ms. Ventura's wooden apartment door. So just a few questions about that.

So you and Ms. Ventura were at her apartment on Willshire Boulevard in Comstock?

A. Yes.

Q. And you hear banging on the apartment door?

A. Yes.

Q. And other than you and Ms. Ventura, are anyone else in the apartment?

A. No.

Q. It's just the two of you?

A. Mhm.

Q. And you said the banging was very, very loud?

A. Yes.

Q. Mr. Combs, you're saying you saw him through the peephole?

A. Yes.

Q. And he was banging the door with a hammer?

A. Yes.

Q. Wooden door I think you said on direct?

A. I believe it was a wooden door. It wasn't my apartment.

Q. Fair enough. Did anyone, and only if they did, did anyone take any pictures of the door, do you know?

A. I didn't.

Q. And no one did, from what you can see?

A. Unless the police did. I'm not sure.

P5JCcom4                          Morgan - Cross

Q.  I'm going to ask about them in a second.

And you did not call the police, right?

A.  I don't believe I did.

Q.  And you didn't see Ms. Ventura call the police?

A.  She definitely did not call.

Q.  And so the police show up, right, Los Angeles police department?

A.  Yeah, three hours later.

Q.  Three hours later, right on time.

Do you remember, is it one officer or more than one officer?

A.  Two.

Q.  Two.  Men or women?

A.  One man and one woman.

Q.  And the police officers don't say anything to indicate what prompted them to come there, correct?

A.  There was the noise.

Q.  Let me ask a better question.

They didn't say a particular someone had called them, someone specific had called them?

A.  No.

Q.  What they did indicate to you is they were there because of the banging on the door?

A.  Yes.

Q.  And at the time, were there any injuries to Ms. Ventura

P5JCcom4                         Morgan - Cross

that were visible that you could see?

A.  Yes.

Q.  Where?

A.  She had a black eye.

Q.  And was it noticeable, could one see it?

A.  Yeah.

Q.  Now, tell me, when the police get there, what do the police do, what happens?

A.  I open the door, they pushed me against the wall until I gave them my ID, and Cassie was sitting on the couch, she didn't move.

Q.  What did the officers say to you, other than asking for your ID?

A.  They asked me what happened, what was happening.  She was visibly injured.  I wasn't at the prior hotel where she was injured, so I didn't have anything to say about how it happened to her.  And she didn't say anything.  She didn't say.

Q.  And did the police, from what you could see, did the police approach Ms. Ventura and speak to her?

A.  Yes.

Q.  And from what you could see, how far away from Ms. Ventura were the police when they were speaking to her?

A.  Well, they looked all around the apartment and then they came -- like, they would talk to her while she was sitting on the couch.

P5JCcom4                         Morgan - Cross

Q.   So Ms. Ventura is sitting on the couch, the two police
officers are right in front of her?

A.   Yes.

Q.   Is this daylight or nighttime?

A.   Daytime.

Q.   Light in the apartment is normal lighting like this?

A.   It's -- yeah.

Q.   So we have lighting like this, the police are what, five
feet from Ms. Ventura?

A.   Yes.

Q.   Is she doing anything to obstruct her face?

A.   No.  She had a hoodie on.

Q.   She had a hoodie on, but the hoodie wasn't covering her
eye?

A.   Yes.

Q.   So the two police officers, in lighting just like this
lighting, are five or so feet away from Ms. Ventura, how long a
period of time would you say they were speaking to Ms. Ventura
from that distance away?

A.   I'm not sure.

Q.   But I mean a couple of minutes, right?

A.   Yeah.

Q.   And Ms. Ventura is sitting on the couch, they're five feet
away, speaking to her, does either police officer say anything
or do anything that lead you to conclude that they see she has

P5JCcom4                    Morgan - Cross

an injury to her eye?

A.  Yes, they asked what happened.

Q.  What did she say?

A.  Nothing, she didn't respond.

Q.  And you say that they asked her for her license?

A.  Yes.

Q.  And what did she say?

A.  She said she didn't have it.

Q.  Did the police officers in your presence ask whose apartment it was?

A.  Yes.

Q.  And it was whose apartment?

A.  Cassie's.

Q.  Did the police do anything to learn Cassie's identification, other than asking for her license?

A.  Not that I'm aware of.

Q.  Ultimately, Ms. Ventura did not give them a driver's license?

A.  No.

Q.  Or any type of ID that you could see?

A.  No.

Q.  And from what you could also see, the police didn't do anything else to determine her identity?

A.  Yes.

Q.  So you never saw anything that would lead you to conclude

that the police learned her identity, either because Cassie told her or gave them some sort of documentation?

A.  No.

Q.  How long would you say the police were in the apartment altogether?

A.  I don't remember.  Maybe 15 minutes.

Q.  Really, it took them three hours to come?

A.  It took a really long time.

MR. AGNIFILO:  I think we can pull it up, it was just admitted into evidence as Government Exhibit C-3644-A.  I think it's the card of one of the officers.  It's already in evidence.

Q.  Can you see that okay?

A.  I can.

Q.  So this person, do you remember there being a sergeant -- I know it's a long time ago.  I apologize.  Do you remember one of them being a sergeant named Hall?

A.  I don't know the difference between a sergeant and lieutenant, it's --

Q.  Got it.  And this is one of the two officers, left their card?

A.  Yes.

Q.  When the officer left the card, did the officer say anything that you could hear, here's why I'm leaving the card?

A.  I don't remember what was said.

Q.   And you didn't say anything to the police about -- well,
let me back up.

     Did you tell the police what happened with the hammer?

A.   I don't remember.  I'm not sure.

Q.   You didn't hear Ms. Ventura tell the police what happened
with the hammer?

A.   I don't think she said anything.

Q.   Did the police do or say anything to indicate that they saw
any damage to the wooden door?

A.   I don't remember.

Q.   How long would you say the police were in the apartment in
total?  If you answered that, I've already forgot it.

A.   I already said I don't recall.

Q.   They leave and this incident comes to an end?

A.   Yeah.

Q.   We can pull it up if we need to, but I think we just looked
at it this morning.  There was text communication between and
you Kristina Khorram, right?

A.   Yes.

Q.   The person we call KK.

A.   Uh-huh.

Q.   Tell the jury a little bit about KK.  Who's KK?

A.   KK was Sean Combs's chief of staff or personal assistant.
She was with him all the time.  She took care of most of -- she
was like his right hand, basically.  She's a good, really nice

P5JCcom4                         Morgan - Cross

girl.

Q.   Did you have your own relationship with KK?

A.   I did.

Q.   And tell us about that.

A.   About our relationship?

Q.   Yeah.

A.   It wasn't -- we would only see each other when she was working or when I was hanging out with them, but we would hang out at Burning Man and stuff, she was there, we would hang out. We weren't that close, but --

Q.   Understood.  You said a minute ago that she's a nice girl. Just tell us more.

A.   She's a nice girl.  She always seemed very innocent and she's always trying to help everybody.  She was always nice.

Q.   You also talked about someone, a D-Roc?

A.   Yeah.

Q.   How well do you know D-Roc?

A.   I haven't seen him in a long time.

Q.   You haven't seen a lot of these people.

A.   Yeah, none of them.  I'm sorry, can you repeat the question.

Q.   Tell me about D-Roc, what's your relationship with D-Roc?

A.   He was always around because he was the head of security. There were certain people that were always around, and if I was around, then we -- we all became friends.

P5JCcom4                          Morgan - Cross

Q.   And so you would consider him a friend?

A.   Yes.

Q.   And you considered KK a friend or no?

A.   Yes.

Q.   Who else in the group would you consider your friends?

A.   Derek.

Q.   Derek?

A.   Roche.  He was a stylist.  Who else?  I'm drawing a blank of who was around.  XXXX.

Q.   The person who was in South Africa who was a friend?

A.   Yeah.

Q.   We're calling her Mia.

A.   Yeah.

Q.   Tell me about Mia.

A.   Mia was an assistant for a while.  She was pretty close with Cassie, close enough that she came with her to South Africa to help her out.  She was always like tons of energy, she could, you know, she could hang -- it was a lot of work for the assistants to work for Sean Combs, they had to work long hours and she had the stamina for it.

Q.   She could do it?

A.   Yeah.

Q.   Were there issues, from your experience, with her drinking from time to time?

A.   I don't recall.

MS. FOSTER:  Objection.

MR. AGNIFILO:  I'll go on.

Q.  How well did you know her?  How would you characterize your relationship with Mia?

A.  I knew her fairly well, but we didn't really hang out outside of Cassie.

Q.  And she was close with Cassie just like you were close with Cassie?

A.  I wouldn't say as close.

Q.  You were Cassie's best friend, that's how you see this, right?

A.  Yes.

Q.  And I'm not saying anyone sees it differently, I'm just asking how you see it.

A.  Yeah.

Q.  Let me ask, I really want to understand this -- and we're going to get to this in a minute.  In 2018, Mr. Combs comes to Cassie's apartment, you're there, you say he grabs you by the neck and he throws a wooden hanger at you?

A.  Cassie's house.

Q.  Cassie's house.  And he does these things, right?

A.  Yes.

Q.  And that spelled the end of your relationship with Cassie?

A.  Yes.

Q.  And I want to understand this better, because by this

point, you guys are best friends for 17 years?

A.  Yes.

Q.  Right, 2001 to 2018, right?  Okay.  Do me a favor, if you don't say yes, he'll hit me.

A.  Yes.  Sorry.

Q.  For 17 years, and you haven't spoken to her since?

A.  No.

Q.  But she's married to another man about to have her third baby, she's not with Mr. Combs and --

MS. FOSTER:  Objection.

THE COURT:  It's overruled.

Q.  Let me do it again.  I'm trying to understand this.  At the sake of being Captain Obvious, it's May 2025?

A.  Yeah.

Q.  You have not spoken to Cassie in what, almost seven years?

A.  Yes.

Q.  In that period of time, she left Sean Combs six and a half years ago?

A.  I'm aware.

Q.  She's moved on with her life completely, right?

MS. FOSTER:  Objection.

THE COURT:  That's sustained.

Q.  Do you know, do you know if she's moved on with her life?

MS. FOSTER:  Objection.

Q.  Let me ask another question.  How come you haven't

rekindled?

A.   The reason I stopped speaking to her was because she was not supportive of me after that incident.

Q.   It all comes back to what you said on direct, tell me if I'm right, where she said to you that you're overreacting about the wooden hanger incident?

A.   Yes.

Q.   And that, that ended a 17-year best friendship, just so I understand?

A.   I draw my line at physical abuse, so --

Q.   But she didn't do it, right?

        MS. FOSTER:  Objection.

        THE COURT:  It's overruled.

A.   She also has not reached out to me.

Q.   Now, you reached a settlement agreement with her, right?

A.   Yes.

Q.   Not with Mr. Combs?

A.   She told me it was through him, the money was coming from him.

Q.   But we're not talking for the moment where the money is coming from.  You reached a settlement agreement with Ms. Ventura?

A.   Correct.

Q.   And I just want to understand, what do you think that she did?

P5JCcom4                        Morgan - Cross

A.   What do I think she did?

Q.   Yeah.

A.   The money wasn't coming from her.  She was the in-between.

Q.   You had a lawyer?

A.   Uh-huh.  And then I didn't use the lawyer.

Q.   I'm really just trying to understand it better.  So you had a lawyer who you didn't use, right?

A.   Yes.

Q.   And you made a demand of money to Cassie, correct?

A.   No, I didn't demand money.

Q.   To who?

A.   I didn't demand money from anyone.  She offered it.

Q.   Let me do it this way: tell the jury how it happened.

A.   She offered me money to sign an NDA, and that was essentially, like, to close the case on this, like, you don't get to sue anybody or say anything in public about it.

Q.   And where were you and Cassie when you had this conversation?

A.   In West Hollywood.

Q.   Where, what sort of place?

A.   At like a pizza, a random pizza place.

Q.   So you and Cassie are in a pizza place?

A.   Yes.

Q.   And you and Cassie are talking.  Did you agree on a figure?

A.   I don't remember the conversation exactly.  She gave me the

figure.

Q. She gave you a figure and you accepted it?

A. Yes.

Q. Was it $50,000 or $30,000?

A. $30,000.

Q. You're sure?

A. That's all I got was $30,000.

Q. And it was just the two of you there?

A. Yes.

Q. Mr. Combs wasn't there?

A. No.

Q. No lawyers were there?

A. No.

Q. Which is why it probably got done.  Withdrawn.

So you guys are having a conversation over pizza and she agrees that she's going to give you this money?

A. Yes.

Q. And you accepted it?

A. Yes.

Q. And you still never became friends again?

A. I don't know why she doesn't reach out to me, so --

Q. I understand.

A. I'm sure she doesn't have the same phone number anymore, also.

Q. Was that the last time you spoke with her?

A.   Yes.

Q.   So in the pizza place talking about money is the last time you spoke to her?

A.   Correct.

Q.   I want to show you a couple of photographs.

MR. AGNIFILO:  First I want to look at defense exhibit for identification only 1620.  It's going to be shown to the witness and the parties, but not yet the jury.

Q.   You can see that's a photograph, right?

A.   Yes.

Q.   Do you recognize all the three people in it?

A.   Yes.

Q.   One of them is yourself?

A.   Yes.

MR. AGNIFILO:  We offer 1620, your Honor.

THE COURT:  Any objection?

MS. FOSTER:  No objection.

THE COURT:  Defendant's Exhibit 1620 will be admitted.

(Defendant's Exhibit 1620 received in evidence)

MR. AGNIFILO:  So now the jury can see it.

Q.   There's you repping the Snow City.  Who's in the middle?

A.   Casandra.

Q.   Who's the third person?

A.   Bana.

Q.   Tell us, who's Bana?

A.  Bana was a friend of Cassie's.  They used to design -- she was making T-shirts or something.  She helped her design them.

Q.  Let me take a step back.

Mr. Combs and Cassie and yourself all did drugs together and then separately, correct?

A.  Yes.

Q.  Do you remember a time when Mr. Combs was trying to get -- from what you could see, was trying to get Cassie to do less drugs?

A.  Yes.

Q.  Do you remember about when that was?

A.  No, I don't.

Q.  But was it for a period of time, more than a couple of days, a couple of weeks?

A.  I remember him, because I'm pretty sure he sent her to Mexico to get cleaned up.

Q.  Tell us what you remember about that.

A.  She went with Mia to Mexico for treatment called ibolcane.

Q.  What is it?

A.  I don't really know.  But I know it's like in a hospital. It's kind of like a new AG way of getting rid of addiction.

Q.  In addition to sending her to Mexico with Mia, do you remember being present for conversations -- from Mr. Combs. Withdrawn.  Mr. Combs saying things in your presence along the lines of, Cassie, you need to do less drugs?

P5JCcom4                     Morgan - Cross

A.  Not that I can recall.

Q.  Do you remember, the third person in this photo, Bana, from time to time, is it fair to say Bana would bring different drugs to you and Ms. Ventura?

A.  I believe, yes.

Q.  And do you recall that being a source of displeasure on the part of Sean Combs that he would say, I don't want Bana bringing drugs anymore?

A.  I don't recall.  I'm not sure.

MR. AGNIFILO:  We're going to look at another photograph for identification only.  1621, Defendant's Exhibit 1621.

Q.  Can you see that photo?

A.  Yes.

Q.  And can you see that you're in it yourself?

A.  Yes.

MR. AGNIFILO:  We offer it, your Honor.

THE COURT:  Any objection?

MS. FOSTER:  No objection.

THE COURT:  Defendant's Exhibit 1621 will be admitted.

(Defendant's Exhibit 1621 received in evidence)

Q.  Do you recognize some of the people in the photo?

A.  I do.

Q.  Can we start with the person in the LA Dodgers hat there on the left side?

A.   Elie Maroun.

Q.   Who's Elie?

A.   I think he was a manager.  I think he used to work with the management team.

Q.   What does that involve, in your experience, what does it mean to be a manager?

A.   I don't know.  They handle all their business, get them jobs.

Q.   Who's above Elie with another baseball hat?

A.   Rob Holiday.

Q.   Who is Rob Holiday?

A.   He is a music producer.  He worked with Cassie on RockaByeBaby.

Q.   Can you see, you only see half of his face to Rob Holiday's -- over his left shoulder?

A.   I don't know who that is.

Q.   And woman to the left of Rob?

A.   On the top or the --

Q.   The top.

A.   The top, I don't know.

Q.   Below that.

A.   The left is Keke Palmer.

Q.   Who is Keke Palmer?

A.   She is an actress.

Q.   That is fine.  Keep going over.  Woman in the back there to

P5JCcom4                          Morgan - Cross

the left?

A.   I don't know who that is.  Or the one next to her I don't know.

Q.   A man with the short beard there on the right?

A.   Diontae Nash.

Q.   And who's right next to Diontae?

A.   Luba -- I'm not sure her last name.

Q.   And below Diontae, who's that woman?

A.   I'm not sure who that is with the red lipstick.  And then there's Bana.  I don't know the other person.

Q.   Fair to say, there was a lot of chaos with being in Combs's circle, correct?

A.   Yes.

Q.   But from time to time you guys had a lot of fun?

A.   We had a lot of fun, yeah.

Q.   And you had a lot of fun a lot of the time, right?

A.   Yeah.

Q.   It was exciting, was it?

A.   Yeah.

Q.   And sometimes it was exciting for all the wrong reasons, right?

A.   That's fair, yes.

Q.   But sometimes it was exciting for all the best reasons, right?

A.   Yes.

Q.   And you all loved each other?

A.   We did.

Q.   And fair to say the people in this photo love each other?

A.   We look like a loving bunch.

Q.   But you're the only one --

A.   I didn't love all these people.  Yeah.

Q.   But you loved some of them?

A.   Yes.

Q.   Is that the right word for it, love?

A.   Yeah.

          MR. AGNIFILO:  Can we also, for identification, look at 1602.

Q.   I'm showing you photograph 1602, you're smiling.  Do you recognize yourself in it?

A.   Yeah.

Q.   Other people are in it, too?

A.   It's Sean Combs --

Q.   I'm sorry.  I have to ask to admit it into evidence.

          MR. AGNIFILO:  We offer 1602, your Honor.

          THE COURT:  Any objection?

          MS. FOSTER:  None.

          THE COURT:  Defendant's Exhibit 1602 will be admitted.

          (Defendant's Exhibit 1602 received in evidence)

          MR. AGNIFILO:  We're going to show it to the jury.

Q.   Tell us who everybody is.

A.   I'm on the right, then there's Lucas White, Dallas Austin is on the bottom, and Sean Combs is on the left.

Q.   Holding that umbrella?

A.   Oh, yeah.

Q.   Where are you, can you tell?

A.   At Burning Man.

Q.   This is one of the three times you went to Burning Man with some of these folks?

A.   Yes.  This might have been the first time that Sean came.

Q.   And that was fun?

A.   Yes, it was.

Q.   It was fun every time you went to Burning Man?

A.   Yeah.

Q.   And a lot of the places you guys went was fun?

A.   Yes.

Q.   I'm going to ask you to look --

     MR. AGNIFILO:  We're going to take the pictures down for the moment.

Q.   We're going to look in your binder at 1612.

     MR. AGNIFILO:  For the parties and the Court, we can pull up 1612, not for the jury yet.

Q.   You can look on the screen or in the book, whatever is easier for you.

     In 2016, do you recall sending -- I don't know if you'd call it a poem or a passage to Sean Combs?

A.  Can you repeat the question.

Q.  Sure.  Do you remember sending -- let me back up for a second.

There were times when you thought that Ms. Ventura should leave Mr. Combs, right?

A.  Yes.

Q.  And there were times when you thought that they were deeply in love and maybe should try to work it out?

A.  Yes.

Q.  And you thought both things maybe in the same day, right?

A.  Not usually, but --

Q.  In the same week, in the same month?

A.  Yeah, possible.

Q.  From your perspective, they were very much in love, correct?

A.  Yes.

Q.  From your perspective, Ms. Ventura very much loved Mr. Combs, correct?

A.  Yes.

Q.  And from your perspective, he very much loved her also, right?

A.  Yes.

Q.  We'll talk about him first.

From your perspective, he was a flawed person, correct?

A.  Yes.

Q.  And did you come to think that he was doing things to not take good care of himself?

A.  I'm not -- I don't understand the question.

Q.  Let me ask a better question.

        Did you try to help him be a better person from time to time?

A.  Yeah.

Q.  And did you send him this message with that in mind, trying to help him be a better person?

        MS. FOSTER:  Objection.  I don't believe this is in evidence yet.

        MR. AGNIFILO:  It's not.  Let me back up.

Q.  Do you recognize your cellphone number on the top-left?

A.  Yes.

Q.  Do you recognize FB an abbreviation for Frank Black, which is Mr. Combs?

A.  Yes.

        MR. AGNIFILO:  Your Honor, we offer it.

        THE COURT:  Any objection?

        MS. FOSTER:  Yes, your Honor.  We object for hearsay, 401, 403.

        THE COURT:  What's the response on hearsay?

        MR. AGNIFILO:  I've never known a poem offered for its truth and I think it's in line with what we're talking about.

THE COURT:  Brief sidebar.

(At the sidebar)

THE COURT:  You may be correct that putting in a poem is not for the truth of the matter.  What's the point of it?

MR. AGNIFILO:  It's 2016.  She has seen Sean Combs do some terrible things.  He was violent with Cassie, he's been jealous, he's been difficult, and here she is in 2016 sending him something as a pure gesture of love to make him be a better person, which she already said she tries to do, and it's important for that, that this is -- we get to tell the story of a relationship of friends rooting for them at times and telling them at times that they should break it up, and we embrace it all, and this is part of that narrative.

MS. GERAGOS:  For relevance, your Honor.  Tomorrow, Ms. Ventura's mom is going to testify about a time she called the police on Mr. Combs, this is three days after that event.  And so it's also relevant.

THE COURT:  So walking through the objections, on hearsay, Mr. Agnifilo's point is there's nothing being conveyed in the poem, so it can't be in for the truth.  Do you have any issue with that?

MS. FOSTER:  To some extent, he's sort of saying the poem is a demonstration of love or affection for him.  So, to some extent, he is trying to admit --

THE COURT:  If it was a demonstration of love, in that

sense, wouldn't it be admissible under 803.3 as the state of the declarant's emotional condition?

MS. FOSTER:  I don't think he's laid any of the foundational questions, to be honest.  I understand his interpretation of what he thinks the message may have said, but it's just as likely that they were walking somewhere and she was reading a poem and he was like, hey, can you send that to me.  They haven't established anything.

THE COURT:  Right.

MS. FOSTER:  He needs to ask questions to actually make it admissible under the basis that he's --

MR. AGNIFILO:  I don't think we need 803.3.  It's not offered for the truth.  I don't need a hearsay exception.  It's not hearsay.

THE COURT:  I'm going to overrule the objection and we'll see if, based on the questioning, you have a further objection, could you raise it.

(Continued on next page)

(In open court)

MR. AGNIFILO:  Your Honor, we offer 1612.

THE COURT:  Defendant's Exhibit 1612 will be admitted.

(Defendant's Exhibit 1612 received in evidence)

Q.  On the left side, we see FB, that's Frank Black, that's Sean Combs, correct?  Feel free to read it.

A.  I have read it.

Q.  So we have FB on the left side saying, hey, I never really asked you to call me, but I need you to call me to ask you about Cass birthday.  I won't put you in an effed up position.  Do you see that?

A.  Yes.

Q.  When is Ms. Ventura's birthday, do you know?

A.  August 26th.

Q.  So this is a week before her birthday?

A.  Yes.

Q.  Then he goes on to say, even if you can't just say that, it's a five-minute convo about her birthday.  This is I think what you said on direct examination, is sometimes he reaches out, and then he reaches out, and then he reaches out, and he's kind of doing that here?

A.  Yes.

Q.  Then you write back, K, 2 min, two minutes, right, and he says thanks.  And then a few minutes later -- a few seconds later, actually, you send what's on the other side.

A.  It's not seconds.  The last thing he wrote was at 6:36, it says.  That last message is blank.

Q.  Right.  I'm sorry.  So somehow he sends you a message without any content?

A.  Yes.

Q.  And then you send this back, right?

A.  I guess so, yeah.

Q.  Do you recognize this?

A.  I do recognize this.  It's like an affirmation, I guess.

Q.  Do you know who Louise Hay is?

A.  Maybe she's the author.  I'm not sure.

Q.  Does that sound right?

A.  Yeah.

Q.  Tell me if this is right:  Louise Hay has written books about affirmation and --

MR. AGNIFILO:  It's a question.

Q.  So the question is: do you know if Louise Hay is an author of self-affirmation and self-love books?

MS. FOSTER:  Objection.

THE COURT:  It's overruled.

A.  I believe that's who it is.  I would have to see the book again.

Q.  And you decide to send this to Mr. Combs, correct?

A.  It appears that way, yes.

Q.  And do you know why you're sending this?

A.  I don't.

Q.  If we look at it, it's all about loving one self, correct?

A.  Uh-huh.

Q.  Did you believe Mr. Combs did not love himself?

A.  He had -- sometimes he did not -- it seemed like he did not, yeah.

Q.  Is this, is it fair to say — and I'm guided by you — that you're sending him this here, A, to help him?

A.  Yes.

Q.  To give him words of encouragement?

A.  Yes.

        MS. FOSTER:  Objection.  She said she didn't know why she sent it.

        THE COURT:  It's overruled.

Q.  To give him words of encouragement, right?

A.  I don't remember sending it, so I don't really have --

        (Continued on next page)

P5JsCOM5                         Morgan - Cross

BY MR. AGNIFILO:

Q.  OK.  Do you remember giving him words of encouragement at other times?

A.  Not that I can -- I can't recall a specific instance.

Q.  OK.  But you said a few minutes ago, there were times when you thought that he and Cassie should try to stay together and work things out, correct?

A.  Yeah, sometimes.

Q.  OK.  Sometimes yes and then sometimes no?

A.  Most of the time no, yeah.

Q.  All right.  I'm going to show you a few more photos and then we really are almost done.

    Before we do that, I want to talk for a second about the incident where he came into Cassie's apartment and put his hands on your neck and threw the --

A.  OK.

Q.  -- the wooden hanger.

    I'm going to do this very quickly.  I apologize for asking about it.

A.  OK.

Q.  I'm sorry to ask this question.

    Were you and Ms. Ventura, were you using any drugs at the time?

A.  Not that I recall.

Q.  OK.  Do you remember there being any drugs on the table?

P5JsCOM5                         Morgan - Cross

A.   No, I don't remember.

Q.   You don't remember?

A.   No.

Q.   OK.  And you said -- I know, just to summarize it, not the exact words -- when he came in, he said something.

Tell us generally what he said.

A.   Who is she cheating with?

Q.   And at the time, did you know the answer to that question?

A.   No.  I had no idea who she was cheating with at that time.

Q.   OK.  But it turns out she was cheating on him with somebody?

A.   Yes.

Q.   Right?

A.   Yes.

Q.   OK.  And at the time, at the moment, you didn't know who it was?

A.   I had no idea she was cheating on him.

Q.   OK.  Now, you said that you got a concussion?

A.   Um-hmm.

Q.   OK.  You have to answer yes or no.

A.   Yes.

Q.   OK.  Now, I just have a couple of questions around a few details.  I apologize.

So you said you went to an urgent care, correct?

A.   Yes.

Q.  You didn't go to the hospital?

A.  No.

Q.  OK.  Do you remember when you first told the government about this, back on December 7, 2023, you said you went to the hospital?

Do you remember that?

Only if you remember.

A.  I don't remember that.

Q.  OK.  Do you remember saying, when you first spoke to the government on December 7, 2023, that it was bleed -- it was bleeding?

A.  I don't believe I even said that.

Q.  No?

MR. AGNIFILO:  All right.  Let's just pull up for the witness, if we could, 3513-001 at page five.

Q.  So this is just for you to look at.  Just take a look at it, and I'm going to ask you a couple questions.  I think it's on page five.

I think it's the second, the last full -- no, the second to last full paragraph.

A.  OK.

Q.  No, the one below that.

A.  The next one?

Q.  Two, just down.  Read that to yourself and look at me when you're done.

(Pause)

OK.  So, the only question is, do you remember telling the government that you went to a friend's house and then to the hospital to treat your wounds?

Do you remember saying that?

A.   Yes.

Q.   You remember saying that?

A.   I don't remember saying hospital, but I -- hospital and urgent care are not that different.

Q.   No, I'm not saying they are.  I'm just trying to understand kind of what happened.

So you remember telling them hospital?

A.   I don't remember saying hospital.

MR. AGNIFILO:  OK.  Fine.  Let's pull it back up again and I want to ask about the next thing, too.

Q.   OK.  Do you remember telling the government that the hospital staff told you they would call the Los Angeles Police Department?

A.   Yes.

Q.   OK.  And now did someone from the urgent care say that?

A.   Yes.

Q.   But not someone from the hospital because you didn't go to the hospital?

A.   No.

MR. AGNIFILO:  OK.  All right.  We can take it down.

And thank you.

Q.   There was no LAPD response, correct?

A.   No.

Q.   Were any photographs taken of the injury?

A.   I took photographs, yes.

Q.   OK.  Do you have them?

A.   I don't know where they -- I haven't looked for them.

Q.   It's a long time?

A.   Yeah.

Q.   Did they take photographs at the urgent care?

A.   I don't remember if they did or not.

Q.   OK.  And do you remember what your course of treatment was?

A.   No.  I don't remember.

Q.   All right.  Any records from the urgent care?

A.   That I have?  No.

     I'm sure they have it at the urgent care, though.

Q.   Fair enough.

     Now, did the government ever give you a subpoena for your phone or any devices?

A.   No.

Q.   OK.  And how did you -- did you give the government anything from your phone, your devices, from 2018?

A.   No.

Q.   And they didn't ask?

A.   No.

P5JsCOM5                          Morgan - Cross

Q.  And they didn't give you a subpoena for that stuff?

A.  I don't believe so, no.

Q.  We're going -- we're going to do a few photos and then we're going to be finished.

A.  OK.

MR. AGNIFILO:  We're going to up for identification 1616.  It's sideways.

A.  I can see it.

Q.  OK.  Who's in the photo?

A.  Casandra and Sean.

MR. AGNIFILO:  OK.  We offer it, your Honor.  1616.

THE COURT:  Any objection?

MS. FOSTER:  None.

THE COURT:  Defense Exhibit 1616 will be admitted.

(Defendant's Exhibit 1616.1 received in evidence)

MS. FOSTER:  Just to clarify, is it just one page?

MR. AGNIFILO:  It's only one page.

MS. FOSTER:  That's fine.

(Counsel confer)

MR. AGNIFILO:  I think it's part of a text message chain.  We're trying to establish the date.

BY MR. AGNIFILO:

Q.  Can you see it on top there?

A.  The date?

Q.  Yes.

P5JsCOM5                          Morgan - Cross

A.   Yes.

Q.   OK.  May 2, 2017?

A.   Um-hmm.

Q.   OK.  That's perfect.  Great.  Thank you.

THE COURT:  Mr. Agnifilo, are you seeking to admit the entire text chain?

MR. AGNIFILO:  No, no, no.

Wait a minute.  I'm being overruled.

THE COURT:  All right.

MR. AGNIFILO:  One second.

THE COURT:  1616.1 is admitted, but the remainder of the exhibit has not been admitted yet.

(Counsel confer)

MR. AGNIFILO:  Actually, we're going to seek to admit the whole thing.  It's five different photographs as part of the same exhibit.

THE COURT:  OK.  Why don't you go through with the witness the five photos, and then we can see if there's an objection.

BY MR. AGNIFILO:

Q.   All right.  Let's pull up, there's another two.  Do you see them there?

A.   Yeah.

Q.   All right.  I believe --

A.   That's me, yep.

P5JsCOM5                         Morgan - Cross

Q.  OK.

A.  Yes.

Q.  I think that's the last page.

         Do you recognize everyone in those series of photos?

A.  Yes.

         MR. AGNIFILO:  OK.  We offer them.  We offer all the
photos in the exhibit.

         THE COURT:  Any objection?

         MS. FOSTER:  No objection.

         THE COURT:  All right.  1616 will be admitted.

         (Defendant's Exhibit 1616 received in evidence)

BY MR. AGNIFILO:

Q.  All right.  We looked at the first photo.

         That's Ms. Ventura and Mr. Combs, correct?

A.  Yes.

Q.  Let's go to the second page.

         Same two folks, right?

A.  Yes.

         MR. AGNIFILO:  Let's go to the third page.  All right.
Can we blow that up.

Q.  You're there, too, now?

A.  I am.

         MR. AGNIFILO:  OK.  And go to the last page.

Q.  Can you recognize where you are there?

A.  This is after the Met Ball.

P5JsCOM5                      Morgan - Cross

Q.   After the Met Ball.

     OK.  Met Ball 2017?

A.   Yes.

Q.   All right.  When you stopped speaking with Ms. Ventura and you stopped speaking with Mr. Combs, you really stopped speaking with all of those people, right?

A.   Yes.

Q.   OK.  And many of them were your friends, as you said, correct?

A.   Yeah.

Q.   I think, like, D-Roc you said you considered a friend?

A.   A lot of them were my friends.  It was a big loss.

Q.   It's a big loss because when you were all together, you were all close?

A.   Yes.

Q.   And you had a lot of good times together?

A.   Yes.

     MR. AGNIFILO:  All right.  Your Honor, I really have nothing else.

     Thank you very much for your time.  I really appreciate it.

     THE WITNESS:  Thank you.

     THE COURT:  Thank you.

     Ms. Foster.

     MS. FOSTER:  Yes, just a few questions.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

REDIRECT EXAMINATION

BY MS. FOSTER:

Q.  Ms. Morgan.

A.  Hi.

Q.  Do you remember being asked on cross-examination about whether the government had served you a subpoena for certain records and communications?

A.  Yes.

Q.  And you said they had not?

A.  I don't -- I don't believe they have.  I'm not sure.

Q.  Do you know whether the defense ever served you such a subpoena?

A.  I -- no, I have not been served a subpoena from them.

Q.  Do you remember being asked on cross-examination about how jealousy was an issue in Cassie and Mr. Combs' relationship?

A.  Yes.

Q.  And do you remember talking earlier about two specific in incidents you saw Mr. Combs assault Cassie?

A.  Yes.

Q.  One was in LA?

A.  Yes.

        MR. AGNIFILO:  Beyond the scope.  I didn't ask anything about either of them.

        MS. FOSTER:  Your Honor, this responds to the cross-examination questions about jealousy.

P5JsCOM5                     Morgan - Redirect

THE COURT:  OK.  That's overruled.

BY MS. FOSTER:

Q.  And then the other one was in Jamaica?

A.  Yes.

Q.  And can you just remind me what you saw generally in LA?

MR. AGNIFILO:  I'm going to object, your Honor.  I didn't get into any of this.

THE COURT:  That's overruled.

A.  Um, what I saw?

Q.  Yes.

A.  When I was in LA?

He, like, hit her and pushed her on the bottom or something.

Q.  And directly prior to that argument or seeing that physical assault, what, if anything, do you remember about an argument about jealousy?

A.  Um, I'm not sure.

Q.  You don't remember anything?

A.  No.

Q.  And, again, can you remind everyone what you saw in Jamaica happen?

A.  Um, he dragged her down probably, like, a 50-yard hallway by her hair, and then took her out in the front driveway and pushed her down, where she hit her head on the brick.

Q.  And prior to that happening, what, if anything -- what, if

P5JsCOM5                    Morgan - Redirect

any, argument did you hear about jealousy happening?

A.  None.

Q.  And what did you hear Mr. Combs complain about before he dragged her by the hair?

A.  That she was taking too long in the bathroom.

MS. FOSTER:  Thank you.  No further questions.

THE COURT:  Mr. Agnifilo, any further questions?

MR. AGNIFILO:  No.  Thank you very much.

THE COURT:  All right.  Thank you, Ms. Morgan.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  The government may call its next witness.

MS. SLAVIK:  Your Honor, the government calls David James.

THE COURT:  All right.

Come on up here.

THE WITNESS:  Thank you.

How are you doing, your Honor?

THE COURT:  Good.

THE DEPUTY CLERK:  Remain standing for a moment and please raise your right hand.

DAVID JAMES,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

Thank you.  You may be seated.

P5JsCOM5                    James - Direct

THE COURT:  You may proceed.

DIRECT EXAMINATION

BY MS. SLAVIK:

Q.  Good afternoon, Mr. James.

A.  Good afternoon.

Q.  Could you please state and spell your name for the record.

A.  My name is David James.  That is D-a-v-i-d J-a-m-e-s.

Q.  Mr. James, why are you testifying here today?

A.  I've been subpoenaed twice.

Q.  Does that -- do the subpoenas you received obligate you to testify here today?

A.  They do, yes.

Q.  What specifically does the subpoena obligate you to do?

A.  To tell the truth.

Q.  Mr. James --

MS. SLAVIK:  Excuse me.  Ms. Foster, could you please publish what's in evidence as Government Exhibit 2A-101.

Q.  Mr. James, do you recognize the individual in this photo?

A.  I do.

Q.  How do you --

Who is it?

A.  That's Mr. Combs.

Q.  What's his first name?

A.  Sean.

Q.  How do you know Mr. Combs?

A.   I was his personal assistant for two years.

Q.   Approximately when did you work as Mr. Combs' personal assistant?

A.   From May 2007 to May 2009.

          MS. SLAVIK:  Ms. Foster, can you take this down and publish for the parties only what's marked for identification as Government Exhibit 2A-307.

Q.   Mr. James, do you recognize the individual in this photo?

A.   Yes, I do.

Q.   Who is this?

A.   That is myself.

Q.   And is this a fair and accurate depiction of yourself?

A.   It is, yes.

          MS. SLAVIK:  The government moves to enter Government Exhibit 2A-307 into evidence.

          THE COURT:  All right.  2A-307 will be admitted.

          (Government's Exhibit 2A-307 received in evidence)

          MS. SLAVIK:  Can you publish this for the jury, Ms. Foster.

Q.   Mr. James, can you just tell the jury who this is pictured in the photo?

A.   That is David James.

Q.   In other words, yourself?

A.   That's right.

          MS. SLAVIK:  Thanks, Ms. Foster.  You can take that

down.

Q.  Mr. James, I want to talk with you about how you came to work for Mr. Combs.

Did you go to college?

A.  I did.  I went to Michigan State University.

Q.  When did you graduate?

A.  2005.

Q.  What did you do after you graduated?

A.  I moved to New York City.  I became an executive assistant in the PR communication world to the chairman of the company.

Q.  How long were you in that executive assistant role?

A.  I was with that company for about a year and a half.

Q.  And why did you leave that job?

A.  I wanted to pursue a career in fashion.

Q.  And so what was your next role after the executive assistant position?

A.  Being the personal assistant to Mr. Combs.

Q.  How did you find out about that role?

A.  Um, I saw an article posted in *New York Times*.

Q.  What did the article describe?

A.  It was probably, like, a half-page article and it said the chairman of Bad Boy Entertainment is looking for a personal assistant.

Q.  Did you apply for the job?

A.  I did.  Multiple times.

P5JsCOM5                    James - Direct

Q.  Can you explain what you mean by multiple times?

A.  So, I faxed my resume, I dropped it off at Bad Boy, I e-mailed it in.  I applied multiple times because no one was calling me back.

Q.  So you wanted this job?

A.  That's correct, yes.

Q.  And what year was this?

A.  This was 2007.

Q.  Did you go to an interview for this position, Mr. James?

A.  Yes, I did.

Q.  Where was the interview?

A.  That was at 1710 Broadway.

Q.  And what was at 1710 Broadway?

A.  That was the headquarters to Bad Boy Entertainment.

Q.  How many other people were there for the interview?

A.  There was probably about 15 people in the lobby waiting for the interview.

Q.  And who did you meet with during this interview?

A.  I met with several people in the interview.  His current personal assistant, Tommy, I met with the senior vice president of human resources, Vashta, I met with his current chief of staff, Dia, I met with his sister, Keisha, and I met with another lady in human resources, Marilyn.

Q.  Focusing on Vashta, you said what was her position?

A.  VP, senior VP of human resources.

Q.   At what company?

A.   Bad Boy Entertainment.

Q.   Who was the chairman of Bad Boy?

A.   Mr. Combs.

Q.   Mr. James, what, if anything, did Vashta say about working for Mr. Combs during that first interview?

A.   I remember sitting at her desk, and we were sitting at her desk and there was a picture of Mr. Combs on the wall.

     Sorry.

Q.   You can take your time, Mr. James.  There's a box of Kleenex next to you if you need it.

A.   She pointed at the wall and she said, This is Mr. Combs' kingdom.  We're all here to serve in it.

Q.   What happened after you met with the folks that you just mentioned?

A.   At the conclusion of my interview process, there was a final interview, round of interviews, and I was given a packet of questions on a Thursday to be filled out.  And I had a week to compile those questions and answers.

Q.   Do you remember what the questions were?

A.   I remember a few of them, yes.

Q.   What were they?

A.   Oh, one was, do a swat analysis on the men's beauty industry, because Sean -- Sean John, one of Mr. Combs' industry, wanted to get into the beauty industry.  Do a swat

analysis.

Second was they gave me 40 different appointments just on a piece of paper and asked me to put together a calendar in chronological order of where things would fit.  You had to really know, for example, Hot 97, what time that show was during the day.  You had to really show good knowledge of his schedule.

Another question was that Mr. Combs likes to go to Saint-Tropez.  He wants to rent out a yacht, provide different options for him to select a yacht that he can rent out for the weekend in Saint-Tropez.

Q.  Did you complete this assignment?

A.  I did, yeah.

So, excuse me.  I received the questions on a Thursday and I remember just being so excited.  I went home and worked throughout the weekend, and I turned them in on Monday.

Q.  What happened after that?

A.  Well, Dia was a little surprised how quickly I answered all the questions.  And she said, you know, you have a week to compile the information.  I told her I didn't need a whole week to compile the information.

Q.  Who, if anyone, did you meet with next?

A.  The way they did it, whoever turned in the answers first, that was who got to meet with Mr. Combs first.

So I met with Mr. Combs and Dia in the office.

P5JsCOM5                    James - Direct

Q.  Can you exhibit that interaction between you, Dia, and Mr. Combs?

A.  Yeah.  It was a very professional interaction.  Dia was leading the charge of the interview and Mr. Combs asked me two questions.

Q.  What were those questions?

A.  He asked me -- first of all, he likes to go out in Miami. And he said, How do you compile a spreadsheet with my preferences in Miami?

So I took that, for example, with where he likes to eat.  And so I said, well, I compile a spreadsheet that talked about what your food preferences were, what table you liked to sit at, what's the name of the maître d' so we can organize information around your preferences so we would know that, basically, wherever you were.

Excuse me.  The second question was how would you make good personal assistant?  And I told him that I would make a good personal assistant for two reasons.  Number one was I'm not so concerned about what accomplishments we did yesterday. Only thing I'm concerned about is what have we got to do today to make sure we get accomplishments tomorrow.  And the second thing is I said, I can't stop, I won't stop.  And he kind of nodded his head and said, Yeah, I like that.

Q.  So were you ultimately hired as Mr. Combs' personal assistant?

A.   I was, yes.

Q.   When did you start working as his personal assistant?

A.   Pretty immediately afterwards.  I was hired in a temporary position.  I wasn't a full employee at that time.  It was, like, a 90-day probationary period.

Q.   When was that approximately, a month, year?

A.   May 2007.

Q.   When you joined, did Mr. Combs have other personal assistants?

A.   He did.  He had one senior personal assistant named Tommy.

Q.   That was Tommy?

A.   That's correct.

Q.   What about through your tenure, did Mr. Combs have other personal assistants?

A.   Yeah.  We went through a lot of personal assistants in those two years.

Q.   Can you name a few?

A.   Genevieve Robles was one, a gentleman named Hector, Mike Barber was another one.

Q.   Did you interact with any of Mr. Combs' former assistants during your tenure?

A.   I did.

          MS. SLAVIK:  Ms. Foster, could you please publish for the parties only what's marked for identification as Government Exhibit 2A-406.

P5JsCOM5                        James - Direct

Q.  Mr. James, do you recognize the person on the screen in front of you?

A.  I do.

Q.  Who is that?

A.  That is Capricorn Clark.  She was, I believe, the director of marketing when I was his assistant.

        MS. SLAVIK:  The government moves Government Exhibit 2A-406 into evidence.

        THE COURT:  2A-406 will be admitted.

        (Government's Exhibit 2A-406 received in evidence)

        MS. SLAVIK:  Ms. Foster, could you please publish that for the jury.

Q.  Mr. James, can you just explain to the jury who this is and what her role was when you were a personal assistant?

A.  Yeah.  I believe her name was Capricorn Clark and she was the director of marketing for Sean John when I was there.

        MS. SLAVIK:  Thank you, Ms. Foster.  You can take this down.

Q.  Mr. James, who was your supervisor?

A.  Dia.

Q.  What was Dia's last name?

A.  I think it was Simms or Banks.  I can't remember.

Q.  What was Dia's role at that time?

A.  She was the chief of staff for Mr. Combs.

Q.  Generally speaking, Mr. James, what were your

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

responsibilities as a personal assistant for Mr. Combs?

A.   That's a --

How long do we have?

Honestly, it was to make sure that he was able to operate as a chairman of a company and to make every environment for him comfortable so he could perform his duties. There was a lot of organization of his personal items, um, traveling around the world with him, basically be at his right-hand side wherever he was.

Q.   So how often were you with Mr. Combs day to day?

A.   Every day I was working, I would be by his side.

Q.   Can you just walk the jury through the day to day as a personal assistant for Mr. Combs?

A.   Yeah.

So what you want to do is, you have to arrive at his house before he wakes up in the morning.  It's important that you set the environment up as soon as he wakes up so he's able to have a successful day.  So that would be to compile different documents.

One of those documents, we have a folder on the table, and that would be everything he needs to approve from a business perspective.  If there is certain artwork for an album he's doing, certain advertisements he has to approve.  there would be a file of business documents.

Next to that would be his business schedule for the

day that we would have laid out. We would also have a folder of all the press clippings for any news mention of Mr. Combs in the last 24 hours.

I would turn on the TV for him to his preferred channel, and I would work with the chef to make sure breakfast was getting started. And I would knock on the door to get the day going and get his feedback as to if he was ready to wake up, if we need to make adjustments to his schedule.

From there, he would wake up, and we would wait for him to be done with his breakfast. We would call down to security, let them know that Mr. Combs is getting ready to move out for the day. And we would travel around the city, especially New York City. For example, we would walk across the street to Bad Boy for him to do meetings or we would travel around the city for him while he was doing meetings that would take us to about five or six p.m. He would typically go out to dinner, either personal dinner or business dinner.

From there, we would go to his studio where he would be working on his album or another album for one that he was producing. That would take us to three or four o'clock in the morning. And then from there, we would either go back to his personal residence or to a destination that he requested.

And we would get a call time at the end of the night. It was important that I didn't leave his side until I got the call time to know what time to be back tomorrow. I would text

the executive team, his security staff, let them know what time I would be back for tomorrow.

Q.  So, generally speaking, what were your hours?

A.  I would say 30 minutes before he woke up until he gave me that call time at night, and that could be anywhere from eight in the morning to four in the morning.

Q.  And how many days per week were you on duty?

A.  Depending upon the personal staff at the time, some days it would be six days a week, seven days a week.  There were times I worked three weeks straight.  When we had more executive staff, I worked sometimes five days a week.

Q.  What was your salary, Mr. James?

A.  I believe my starting salary was $70,000.

Q.  Were you paid any overtime?

A.  I was.

Q.  How did you receive your salary?

A.  Through a check from Bad Boy Entertainment.

Q.  Bad Boy signed the checks?

A.  That's correct.

Q.  Focusing back on your responsibilities as Mr. Combs' personal assistant, were you responsible for advancing locations?

A.  I was often responsible for advancing locations, yes.

Q.  Can you explain to the jury what you mean by advancing locations?

A.   Yeah.

So, to advance a location, you want to set up an environment so Mr. Combs feels comfortable.  We would often have different riders depending upon the location.  If it was, like, a green room at Oprah, for example, or if it was at a hotel, or if it was at a concert venue.  We knew exactly what he wanted to have in the room.  That was based off a rider I was provided

Q.   Can you explain what a rider is?

A.   A rider is a list of items that he would like to have in the hotel room.

Q.   You mentioned that one of the locations that you were responsible for advancing was hotel rooms, is that right?

A.   That's correct.

Q.   Did hotel rooms have a specific rider for Mr. Combs?

A.   They had a relatively unique rider, as opposed to a dressing room at Ellen DeGeneres, sure.

Q.   Mr. James, when you worked as a personal assistant for Mr. Combs, where were you based?

A.   Wherever he was.  So, in New York City, I had an apartment or I rented out a room in a townhouse in the Upper West Side.  When I was in Miami, I would stay inside of his house in Star Island.  When we were in Los Angeles, I would also either stay in his home in Los Angeles or in a hotel room down the road.

Q.   You just mentioned New York City, Miami, Los Angeles.

P5JsCOM5                        James - Direct

Did Mr. Combs have homes in all of those locations?

A.  Yes, he did.

Q.  Did you travel with Mr. Combs as well?

A.  I did.

Q.  How frequently?

A.  Very frequently.  We traveled quite a bit.

Q.  You mentioned other staff members for Mr. Combs.

Do you remember that?

A.  Yes.

Q.  You mentioned security staff?

A.  That's correct, yes.

Q.  Who were the members of Mr. Combs' security staff when you were employed as a personal assistant?

A.  His head of security was a gentleman named Uncle Paulie. We also had a gentleman named Roger Bonds.  A gentleman named D-Roc.  Big Tim.  And Malik was his driver in New York City.

Q.  Did all of these individuals work for Mr. Combs?

A.  That was my understanding.  Um, Uncle Paulie oversaw them. I understood they were being paid by Bad Boy.

Q.  And you mentioned the hours that you worked, sometimes up to 20 hours a day, is that right?

A.  That's correct.

Q.  Was it your understanding that security staff worked those similar hours?

A.  Absolutely.  They would have to be there just as long.

P5JsCOM5                        James - Direct

They may not be -- yes, that's correct.

Q.   What was the role of Mr. Combs' security staff?

A.   To protect Mr. Combs, Mr. Combs' family, and Mr. Combs' property.

Q.   Did any of these securities staff carry weapons?

A.   Illegal weapons or legal weapons?

Q.   Starting with legal weapons, were you aware of security staff carrying legal weapons?

A.   I was, yes.

Q.   What -- well, who carried legal weapons?

A.   I saw the head of security carried a knife.

Q.   The head of security being?

A.   Uncle Paulie.

Q.   You saw this knife?

A.   I did.

Q.   Can you describe it?

A.   It was just, like, a switchblade knife that could fit in your pocket.

Q.   What about illegal weapons, did you see any security staff carry illegal weapons?

A.   No, I did not.

Q.   What, if any, guidance did security staff provide you with respect to your role as a personal assistant?

A.   They often told me to stay in my lane.

Q.   When did security staff say this to you in your tenure as a

personal assistant?

A.  Typically, if I was asking too many questions, it was honestly all the time, to be honest with you.

Q.  How was the message delivered?

A.  Verbally.

Q.  What was your reaction to this message, stay in your lane?

A.  I understood it to, basically, do the job I was hired to do and do that job and only that job.

Q.  And do you remember who specifically said this to you?

A.  I can remember Uncle Paulie saying it to me, Bonds saying it to me, Big Tim saying it to me, Malik saying it to me.

Q.  When, relative to when you started as Mr. Combs' personal assistant, when was the first time that one of the security staff told you to stay in your lane?

A.  I would say very early on.  When I first started, obviously, I was training.  I didn't really know the ropes or what was expected of me.  I was trained very early on.

        As I became more tenured, they had to say it less because I you know, I knew what I was supposed to do.

Q.  When you first heard this message, stay in your lane, delivered by the security staff, what was your reaction?

A.  Um, I knew not to mess with them, to listen to them.

Q.  Now, you mentioned household staff as well, is that right?

A.  That's correct.

Q.  Who did Mr. Combs have as household staff while you worked

as a personal assistant?

A.  It was a woman who managed his house in Miami.  I believe her name was Amanda.  He also had a personal chef and he had different housekeepers in Alpine, for example.

Q.  Can you explain to the jury what Alpine is?

A.  Alpine, New Jersey.  It's a city in New Jersey.

Q.  And did Mr. Combs have a residence in Alpine, New Jersey?

A.  He did, yes.

Q.  Focusing on Mr. Combs' personal chef.

        MS. SLAVIK:  Ms. Foster, can you publish for the parties only what's been marked as identification as Government Exhibit 2A-405.

Q.  Mr. James do you recognize the individual in this photo?

A.  I do, yes.

Q.  Who is it?

A.  Chef Jordan.

Q.  How do you know?

A.  Because she was Mr. Combs' personal chef for probably a year and a half or so since I was there.

Q.  Is this a fair and accurate depiction of Chef Jordan?

A.  It is, yes.

        MS. SLAVIK:  The government moves Government Exhibit 2A-405 into evidence.

        MR. AGNIFILO:  No objection.

        THE COURT:  2A-405 will be admitted.

(Government's Exhibit 2A-405 received in evidence)

MS. SLAVIK:  Ms. Foster, can you please publish this photo.

BY MS. SLAVIK:

Q.  Mr. James, can you explain to the jury who is in this photo?

A.  That is Chef Jordan.  It was Mr. Combs' personal chef.

Q.  So Chef Jordan worked for Mr. Combs?

A.  That's correct, under Bad Boy Entertainment.

MS. SLAVIK:  Thank you, Ms. Foster.  You can take this down.

Q.  Mr. James, what about girlfriends.

Did Mr. Combs have girlfriends during your tenure?

A.  Yes, he did.

Q.  Who were the girlfriends that you were familiar with during your tenure?

A.  Ms. Porter was his main girlfriend, I would say.  He had other girlfriends, such as a woman named XXXX, a woman named Tara, a woman named Yanna, a woman named Cassie.

Q.  Focusing on Cassie.

MS. SLAVIK:  Ms. Foster, could you please publish what is in evidence as Government Exhibit 2A-401.

Q.  Mr. James, do you recognize the individual in this photo?

A.  I do.

Q.  Who is it?

P5JsCOM5                      James - Direct

A.   That's Ms. Ventura.

Q.   Is that Cassie?

A.   That's correct.

         MS. SLAVIK:  Thank you, Ms. Foster.  You can take this down.

Q.   When did you first meet Cassie, Mr. James?

A.   The first time I ever met Cassie was in Mr. Combs' house in Miami.

Q.   And what were the circumstances under which you met Cassie?

A.   Cassie was coming down for a weekend to be with Mr. Combs.

Q.   And what happened during that weekend?

A.   Um, Mr. Combs, he rented out a yacht to take her out on the boat.  We went out to the club, we went out to dinner.  They partied all weekend.

Q.   What, if anything, did Mr. Combs say about Cassie visiting that weekend?

A.   He was really trying to impress her.

Q.   Did Cassie eventually become Mr. Combs' girlfriend?

A.   She did, yes.

Q.   Was there a professional component to their relationship as well?

A.   There was, yes.

Q.   What was that?

A.   Um, Mr. Combs was the chairman of Bad Boy Records and Cassie was an artist on Bad Boy.

P5JsCOM5                     James - Direct

Q.   What, if any, conversations did you have with Cassie?

A.   I can remember having two conversations with Cassie over the course of my career.  They weren't very frequent, but those two, I do remember.

Q.   Starting with the first conversation you remember, can you describe to the jury that conversation?

A.   Yeah.

          We were in Star Island.  This was probably within the first year of my tenure with Mr. Combs.  And it was me, her friend, I think her name was Kerry Morgan, and Cassie.  We were standing out on a dock on Star Island and we were smoking cigarettes.  And Cassie said to me, she said, Man, this lifestyle is crazy.  I was, like, Yeah, this lifestyle is crazy.  You know, I was thinking about how many hours we work, how much we travel.  Um, I told her, I said, Cassie, if it's so crazy, why don't you just leave and get out.  She was, like, I can't, I can't get out, you know.  Mr. Combs oversees so much of my life.  He's -- he controls my music career, he pays for my apartment, he gives me an allowance, essentially a salary. I just didn't think that she could easily leave.

Q.   You mentioned Star Island.

          Can you explain to the jury what Star Island is?

A.   Star Island is a location in Miami.  It's a neighborhood that is its own private island that's very famous.

Q.   And that is where Mr. Combs' residence in Miami was

P5JsCOM5                    James - Direct

located?

A.   That's correct.

Q.   You mentioned a second conversation you had with Cassie.

Can you explain to the jury that conversation?

A.   Yeah.  This was further along with my tenure.

We were at the Sundance Film Festival, which is in Utah.  Cassie and I shared a cab from the airport, and she was really -- she was really happy this trip.  And --

Sorry.  She was going over her songs that she was working on for a long time.  And she put together a track list, which was essentially what the album she was going to put out.  And she remembered, like, telling me about the songs and the track list.  And she was super happy about it.

Q.   Do you remember that album coming out?

A.   I do not remember that album coming out, no.

Q.   Did you ever speak with Mr. Combs about his relationship with Cassie?

A.   I did not, no.

Q.   Did you ever hear Mr. Combs speak about his relationship with Cassie with other people?

A.   I did.  There was a conversation that I overheard, yes.

Q.   Can you describe that conversation that you overheard?

A.   So we were in Manhattan and we were driving to a meeting, business meeting, in the back.  We were in the Escalade, and I was sitting in the third row.  And Mr. Combs was with one of

P5JsCOM5                         James - Direct

his business associates/friends.

          And his friend asked him, you know, How is Kim?  How is Cassie?  And Mr. Combs said, you know, Kim is doing good. She's out in LA.  She's taking care of the family.  That's my queen.  And then he said, you know, Cassie is good.  I got her right where I want her.  She's young.  And, you know, that's what he said.

Q.  And what did you understand Mr. Combs to mean by that?

          MR. AGNIFILO:  I'll object.

          THE COURT:  Sustained.

Q.  Did Mr. Combs say anything else about Cassie in that conversation?

A.  Yeah.  He said that she was very moldable.

Q.  Mr. James, did you ever see disagreements between Mr. Combs and Cassie?

A.  I did.

Q.  Can you describe the disagreements that you observed?

A.  The disagreements I observed were about Cassie's professional career.  She really wanted to get into modeling and acting and Mr. Combs --

          Those are the arguments, yeah.

          MS. SLAVIK:  Your Honor, I'm not sure how much longer you want to go.  This is actually a good stopping point.

          THE COURT:  All right.  Thank you, members of the jury.  We'll see you back here.  You were all so prompt today.

P5JsCOM5                    James - Direct

Thank you again for your all efforts.

Remember, don't talk to each other about the case.  Do not look up anything about the case.  Do not talk to anyone in here or anyone in your lives about this case.  And we'll see you here.

So, if you can be here 8:45, we can get started at 9:00.  That would be perfect.  Thank you very much.  Have a great evening.

All rise.

(Continued on next page)

P5JsCOM5                          James - Direct

(Jury not present)

THE COURT:  Mr. James, we'll see you here tomorrow.

THE WITNESS:  Thank you, your Honor.

THE COURT:  Thank you very much.

Please be seated.

(Witness excused)

Ms. Slavik, do you have an estimate on the length of remaining time in your direct examination?

MS. SLAVIK:  Your Honor, I would estimate probably, at most, another hour.

THE COURT:  Another hour?  OK.

Who do you have next after Mr. James?

(Counsel confer)

MS. SLAVIK:  Sorry?

THE COURT:  Who do you have next?

MS. SLAVIK:  Next witness will be Sharay Hayes.

THE COURT:  After Ms. Hayes?

MS. SLAVIK:  Mr. Hayes.

THE COURT:  Mr. Hayes.  Sorry.

MS. SLAVIK:  One moment, please, your Honor.

The next witness after Mr. Hayes will be Regina Ventura.

THE COURT:  Do you anticipate those two witnesses being the morning witnesses, in all likelihood, tomorrow?

MS. SLAVIK:  Your Honor, I think we could probably get

to the next witness after that, we expect to be, Gerard Gannon, law enforcement officer.

THE COURT:  Given that, after Mr. Gannon.

MS. SLAVIK:  I'm sorry.  I need to go back.

After Ms. Ventura, we'll actually be calling Jordan Atkinson, and then Gerard Gannon.  So I think it's likely that we will get to Ms. Atkinson tomorrow.

THE COURT:  And then, perhaps, Mr. Gannon?

MS. SLAVIK:  He'll be here.

Frankly, it would be surprising if we got to him tomorrow.  He'll be here.  He'll be prepared.  We will certainly get to him on Wednesday.

THE COURT:  All right.  Just so the parties know, I mean, I like the fact that we're starting -- that we're ending earlier.  And I know that makes it a lot easier on the parties. But depending on the pace that we're going at, I may tell the jury that there may be certain days where, instead of 3:00, it's something like 3:30 or closer to 4:00, just so we can get in more testimony.

I am just putting that on the parties' radar.  And if there are any concerns about that, let me know.  If anyone thinks it's a bad idea, just let me know.  I just want to put that on the radar and make sure we're moving at a swift pace.

Ms. Slavik, anything else to address?

MS. SLAVIK:  Your Honor, just to note, that we do

P5JsCOM5                      James - Direct

think we're moving exactly on pace.  We are doing great for time.

To the extent your Honor does want to extend the court day, totally fine.  If you're able to provide a little bit of notice, I think it would be very helpful.  Certainly, for the government, and I imagine for the defense as well.

THE COURT:  All right.  Mr. Agnifilo.

MR. AGNIFILO:  Yes, Judge.

I don't know if this is something you can help us with, but we've run it down as far as we can on our end.  There is a mechanism at the MDC for video calls.  It's called VTC.  And given --

THE COURT:  I think I've seen it.

MR. AGNIFILO:  Yes.

We have to get off the VTC sometimes 5:30, sometimes as late as 6:00.  The MDC has been very accommodating to us in many, many ways.  This, unfortunately, has not been something they've been able to do.  Meaning, that we just can't have Mr. Combs on the video past 5:30 or 6:00 o'clock, and it's just not enough time.  I mean, it's a little bit easier with the 3:00 o'clock stop, quite frankly, because we do get some time with him when we're not all sitting in court listening to the evidence.

But if we can get -- I mean, 9:00 o'clock would be a walk-off home run, and I might as well swing as hard as I can.

So that would be wonderful.  Your Honor has been very good at saying, if you have an issue, bring it to me.  I'm bringing it to you.

I wish had a more of a path to success to present you with, as well.  We'll start with me bringing it to you and see where that goes.

THE COURT:  Would it be possible for you to put a very short letter on the docket requesting additional time?

That just makes it easier on my end to forward it to the appropriate people to see if I can get you some help.

MR. AGNIFILO:  Of course, Judge.  Thank you very much.

THE COURT:  Anything further on your side?

MR. AGNIFILO:  I see nothing.  Nothing, Judge.

THE COURT:  I take it, from your perspective as well, you're comfortable with the current end time and think that we're making good pace.  Seems like you have -- there is some additional reasons on your side why the earlier stop time is helpful.

MR. AGNIFILO:  There are.  The 3:00 o'clock really does help us.  It might be a -- if the VTC time extends, it's a little easier on our end.

What I was going to propose is to see where we are on Thursday, because I get the sense we're moving pretty efficiently.

THE COURT:  That's fair.

P5JsCOM5                     James - Direct

And that addresses Ms. Slavik's concern about the notice.  So we will see how we're doing next week, and if we need to make any adjustments, we'll do it next week.

MR. AGNIFILO:  Very good.

THE COURT:  Thank you very much.

I'll see you at 8:30, if any issues are raised this evening.

(Adjourned to May 20, 2025, at 8:30 a.m.)

* * *

INDEX OF EXAMINATION

Examination of:                                      Page

 DAWN RICHARD

Direct By Ms. Steiner . . . . . . . . . . . .1482

Cross By Ms. Westmoreland . . . . . . . . . .1511

Redirect By Ms. Steiner . . . . . . . . . . .1562

Recross By Ms. Westmoreland . . . . . . . . .1578

 KERRY MORGAN

Direct By Ms. Foster . . . . . . . . . . . . .1582

Cross By Mr. Agnifilo . . . . . . . . . . . .1643

Redirect By Ms. Foster . . . . . . . . . . . .1701

 DAVID JAMES

Direct By Ms. Slavik . . . . . . . . . . . . .1704

GOVERNMENT EXHIBITS

Exhibit No.                                      Received

 9P-102    . . . . . . . . . . . . . . . . . .1491

 2A-319    . . . . . . . . . . . . . . . . . .1494

 2A-507    . . . . . . . . . . . . . . . . . .1503

 2A-311    . . . . . . . . . . . . . . . . . .1621

 2A-307    . . . . . . . . . . . . . . . . . .1705

 2A-406    . . . . . . . . . . . . . . . . . .1712

 2A-405    . . . . . . . . . . . . . . . . . .1721

DEFENDANT EXHIBITS

Exhibit No.                                      Received

 1620    . . . . . . . . . . . . . . . . . . .1678

1621      . . . . . . . . . . . . . . . . . . . .1680

1602      . . . . . . . . . . . . . . . . . . .1683

1612      . . . . . . . . . . . . . . . . . .1689

1616.1      . . . . . . . . . . . . . . . . . .1697

1616      . . . . . . . . . . . . . . . . . . .1699