P5KsCOM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

        v.                          24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

         Defendant.                 Trial
------------------------------x
                          New York, N.Y.
                          May 20, 2025
                          8:38 a.m.
Before:

               HON. ARUN SUBRAMANIAN,

                          District Judge
                          -and a Jury-

                  APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
    EMILY A. JOHNSON
    MAURENE R. COMEY
    MEREDITH FOSTER
    MITZI STEINER
    MARY C. SLAVIK
    Assistant United States Attorneys

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5KsCOM1

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:   MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
SHER TREMONTE
BY:   ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:   ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND

ALSO PRESENT:
LUCY GAVIN, AUSA Paralegal Specialist
SHANNON BECKER, AUSA Paralegal Specialist
RAYMOND MCLEOD, Defense Paralegal Specialist

P5KsCOM1

(Trial resumed; jury not present)

THE COURT:  Good morning, everyone.  Please be seated.

Just to inform everyone and just as a reminder of how conscientious our jurors are, Juror No. 5 informed the court that they will be ten minutes early instead of 15 minutes early.  I want to let everyone know that.

I don't think we have a lot to get through before the jury comes in.  There was one issue that was flagged by the government, and we can see if we can resolve that.

MS. JOHNSON:  Yes, your Honor.

We have conferred further this morning.  I understand Mr. Agnifilo does have an objection to testimony that the government intends to offer with Ms. Regina Ventura, Ms. Ventura's mother.  The testimony is relating to the events of December 2011 that Ms. Ventura testified to on direct examination already.

To remind the court, that is when Mr. Combs learned that Ms. Ventura had been romantically involved with Scott Mescudi.  Ms. Ventura testified that Mr. Combs attacked, lunged at Ms. Ventura during -- when he found out.  She ran away, was picked up by Mr. Mescudi, and there was an e-mail -- piece of e-mail that we admitted that showed a message sent from Ms. Ventura to her mom and Capricorn Clark that next day describing threats that Mr. Combs made about videos and against the lives of Mr. Mescudi and Ms. Ventura.

P5KsCOM1

And in the interim, between when Mr. Combs finds out and the e-mail, Ms. Ventura testified that she went to his home and he assaulted her.  Ms. Ventura's mother would testify that prior to the e-mail that she received, she received a demand from Mr. Combs for $20,000 and that she was told by Mr. Combs that the $20,000 was money that he had spent on Ms. Ventura, that Ms. Ventura had been with another individual, and that Ms. Ventura's mother had to pay him the $20,000.

Ms. Ventura's mother then went to the bank, took out a loan, and paid him the $20,000.  The wiring information that she received was over e-mail from some individual who worked for Mr. Combs and she transferred the money to Mr. Combs' -- one of Mr. Combs' accounts in the name of 207 Anderson, for which we have bank records that we would also intend to offer after the completion of this testimony.

Your Honor, I'm not sure of the precise nature of Mr. Agnifilo's objection to this testimony.  I think it's grounded potentially in 403.  The government submits this is highly probative evidence of Count Two.  It goes to the coercion of Ms. Ventura.  Ms. Ventura previously testified extensively about the various forms of coercion, including control over her career, her appearance, her finances.

This is just additional evidence of financial coercion, because as soon as Ms. Ventura was slipping from the defendant's control, he reaches -- this evidence proves that he

P5KsCOM1

reaches out to her mother to exercise -- to demand money and to keep -- I mean, I think it's strong proof of that coercion. It's continuing to keep Ms. Ventura in his sphere even as she's attempting to leave.

I do not think it's particularly prejudicial given the nature of the case. It's a very short vignette, about $20,000. I will also -- Ms. Ventura's mother will also testify that the $20,000 was returned to her bank account with no explanation a few days later after it was wired out.

THE COURT: Understood.

Mr. Agnifilo.

MR. AGNIFILO: Yes, Judge.

My colleague is right. It's a 403 objection. The money was returned. The money was paid back, so no money ever left Ms. Ventura's possession on an ongoing basis. It was transferred and it was transferred back. And I just don't know what the relevance is, given that.

You know, if Mr. Combs was of the belief that there was some money owed because of some debt, you know, that Ms. Ventura's daughter might have owed and then decided that there wasn't a debt, that just seems to introduce a lot of confusion into the case without a great deal of purpose.

And I think, you know, the government saying, well, it was returned without explanation. The whole thing is without explanation. You know, it's money that leaves Ms. Ventura, the

P5KsCOM1

mom's, you know, account that she has control over, goes to Mr. Combs, and then is returned.

So I don't really know what this proves, and I think it raises a lot more questions than it answers. I think it's purely prejudicial. It doesn't actually advance any of the issues in the case, and so my basis for asking that it be excluded is under 403.

THE COURT: What's the prejudice?

MR. AGNIFILO: The prejudice is --

THE COURT: Given what you just said, which is that it's returned shortly afterward.

MR. AGNIFILO: I mean, the prejudice is, I think the prejudice is that the Ventura family is a hard-working middle-class family who probably could use -- that needs $20,000. And the prejudice that I think is that Mr. Combs probably does not.

So I think it shines an unfair light on the economic disparity between those two people, those two -- those two families, in essence, and I think that's prejudicial. I think the nature of the testimony is going to be, when he asked for this money, we had to really scrounge and work to get it, maybe even take out loans. And gave him the money and then he gave it back.

And so I think it shines a prejudicial spotlight on the relative finances of the people involved, which have no

P5KsCOM1

issue, which is not an issue in this case whatsoever.  So that's the nature of the prejudice.

MS. JOHNSON:  Your Honor, if I may just respond to that briefly?

THE COURT:  Well, let me ask you a question.

You had mentioned that this evidence would be relevant to coercion.

MS. JOHNSON:  Yes.

THE COURT:  But coercion is not a freestanding element in this case.  Count Two states that means of force, threats of force, fraud, and coercion would be used to cause the person to engage in a commercial sex act.  So if that's the standard, then how do you connect the dots between the $20,000, which might have been extortion.  Who knows what it was.

But I'm not hearing from you that there was some connection to participation in a commercial sex act or that Ms. Ventura, when she testifies, is going to explain that Mr. Combs, for instance, said Cassie Ventura is under my control, we're in this relationship, you know, something to connect the dots.

Maybe you can help me do that.

MS. JOHNSON:  Sure, your Honor.

Just stepping back for one moment.  You know, the coercion is a course of conduct here.  It is consisting of a number of different elements and ways in which the defendant

P5KsCOM1

coerced Ms. Ventura on an ongoing basis to participate in commercial sex acts. That includes control over her career, control over a number of elements of her life, and control over her finances.

In this particular time period, recall that at this exact same time, Ms. Ventura has sent her mother a message saying that Mr. Combs is threatening to blackmail her about the particular sex acts and release the videos. That is happening, and Ms. Ventura's mother's mind, this is all part of that same incident. She will testify -- this is all happening to her at the same time. The money is transferred on the same day that she receives that e-mail.

I think that this is all tied up in Mr. Combs' efforts to keep Ms. Ventura in his circle and under his influence, which is the coercion that the government is trying to prove.

THE COURT: I take it that you -- that will be elicited on Ms. Ventura's testimony, that she -- at least it was her understanding that there was this issue of blackmail and potentially videos relating to the commercial sex acts that are at issue in this case. And for that reason, Ms. Ventura believed that it was necessary to do what she could do, make this $20,000 payment to avoid the potential ramifications on her daughter. Is that fair?

MS. JOHNSON: That is fair.

Ms. Ventura's mother does not -- she receives the

P5KsCOM1

e-mail that says videos, she doesn't understand at that time what the videos are of, but she does perceive it as a threat and acts accordingly.

THE COURT:  All right.  Mr. Agnifilo, so that's a little bit of a more particularized showing of why the evidence would be relevant.  Meaning, I'm with you that if it was just $20,000 that came out of nowhere or was just related to something having to do with Mr. Mescudi, then that's one thing.

But the government is going to establish before this testimony comes in that there was some understanding that there were videos, there was potential blackmail, and as we know from Ms. Ventura, Cassie Ventura's testimony, the videos at issue were videos concerning the commercial sex acts involved.

So, under those circumstances, it would seem to be relevant and probative.  And as we addressed, the prejudice here is fairly minimal because the $20,000 is immediately given back, and I'm sure that will be elicited in testimony if not on direct, then on cross.

So under those circumstances, how do --

MR. AGNIFILO:  I have two arguments.

THE COURT:  Why is the unfair prejudice substantially -- why does it substantially outweigh the probative value?

MR. AGNIFILO:  I have two arguments.

One, the first is, to the extent that the government

P5KsCOM1

is saying that this is part of some type of extortion or blackmail, they should have given 404(b) notice of that. That's not the way that we ever understood this evidence. We understood this evidence to be that Mr. Combs is essentially saying I spent a certain amount of money, you know, to try --

THE COURT:  This isn't 404(b).  They are saying it's actually directly about the Count Two.

MR. AGNIFILO:  I think that's far afield.  That certainly was not an enterprise letter.

THE COURT:  What year was this, Ms. Johnson, 2011?

MS. JOHNSON:  Yes, December of 2011.

THE COURT:  That's within the timeframe at issue in Count Two.

MS. JOHNSON:  It is.

THE COURT:  So that's why they are saying it's not 404(b).  It's not other acts.  It's part of this coercion scheme.

MR. AGNIFILO:  This connection between the e-mail and the $20,000 is, you know, sort of a new connection.  And it was always understood that this was because Mr. Combs had amassed a certain amount of expenses for Ms. Ventura, wanted the money back, and then thought better of it and sent the money back to the family.

So, the other thing is, Ms. Ventura certainly didn't connect these things as an extortion.  There was no testimony

P5KsCOM1

from her that the $20,000 that her family gave to Mr. Combs was given over as part of an extortion.  So I think we have a problem that we keep coming to is that the government called a witness with personal knowledge of all these things, the person most -- the best person in a position to talk about, yes, I felt coerced.  I didn't feel coerced.  Whatever it is I felt about these things.  They don't bring it out through her.

And now that are trying to bring it out through a witness who's more tangentially involved, I think, in large part, because they didn't bring this connection out through her.  And who better than -- and, I mean, Cassie Ventura -- to make this connection.  They shouldn't be allowed to do it sort of through this backdoor way.

THE COURT:  All right.  And, Ms. Johnson, are you going to be presenting Ms. Regina Ventura?

MS. JOHNSON:  Yes, your Honor.

THE COURT:  I take it that you will establish, you will lay a foundation for the circumstances under which Ms. Ventura felt compelled to make this $20,000 payment before you address the $20,000 payment?

MS. JOHNSON:  Yes, your Honor.

THE COURT:  OK.  So, Mr. Agnifilo, you can raise an objection at the appropriate time.  Let's see what -- I think we need to see how the testimony comes in, and then I'll make a determination.

P5KsCOM1

MR. AGNIFILO:  Understood.

Since we have a few minutes before the jury comes in.

THE COURT:  Yes.

MR. AGNIFILO:  Can I raise another issue?

THE COURT:  Yes.

MR. AGNIFILO:  I wish I would have raised this last night.  I just thought it of this morning.

So, I believe Mr. James -- I spoke to the prosecutors just before we started.  I haven't gotten into it in great length.  There is this incident that Mr. James is going to talk about involving Mel's Diner and that there -- that Suge Knight had some sort of confrontation with Mr. James and another person, and then they went back to the house and they got guns and Mr. Combs came back.  And there was this -- they looked for Suge Knight and couldn't find him.

There was 3500 material from Cassie Ventura, and I crossed Ms. Ventura on it, she said she didn't remember saying it, that she went along, that she went along on this ride.  And had that happened and had that been the testimony, I could see the relevance to that.  Because she would say that was scary, it was part of this atmosphere of fear, because I went along.

But she didn't say that on the stand.  She didn't say what she had said in some prior statements.  Just to be fair, in a prior statement, she said both ways.  Once she said she went.  Once she said she didn't go.  In light of the fact that

P5KsCOM1

the testimony now on the record is that she didn't go, this is a contested event. It's a prejudicial event. And if Ms. Ventura didn't go along, I don't see the relevance to overcome a 403 objection to Mr. James talking about what he did as part of this.

Again, I was under the belief that Ms. Ventura was going to say that she went, but she didn't say that. And in the best of worlds, your Honor, let me start with that, is I would have raised this to you at 10:00 o'clock last night, but I really thought about it at about 5:00 o'clock this morning.

THE COURT: Ms. Slavik, do you want to address this?

MS. SLAVIK: Your Honor, I would be happy to.

First, let me just note that Mr. Agnifilo has just complained about not having the opportunity to cross Ms. Ventura on this issue with the $20,000 extortion. Now he's complaining that he did cross Cassie on this very issue. This is the defense trying to have its cake and eat it too.

THE COURT: But you would agree that Ms. Ventura's testimony, at least here, was that she was not -- she did not accompany.

MS. SLAVIK: Right.

I would agree that that was -- that that was Ms. Ventura's testimony. And what Mr. James will testify about is something that he personally observed and experienced. This is exactly the type of testimony that should come in. It goes

P5KsCOM1

to multiple elements of Count One.  This does not entirely relate to Count Two.  This relates to Count One, specifically the existence of the enterprise, the membership and the association of the enterprise, the purposes of the enterprise, and the means and methods of the enterprise.

THE COURT:  In what way?

Meaning, this does not go to any of the predicates, right?

MS. SLAVIK:  No.

THE COURT:  OK.  So you're saying it goes to --

MS. SLAVIK:  Excuse me.  Except for sex trafficking of Victim 1, in that the culture of fear and violence, but the incident itself is not charged as a predicate.  But it was notified in our enterprise letter.

Let me direct your Honor's attention to the indictment.  Specifically paragraph 11, subparagraph B and subparagraph D, which relate to the purposes of the enterprise.

THE COURT:  I'm sorry.  You said B and which other subparagraph?

MS. SLAVIK:  B and D.

Which relate to preserving, protecting, promoting, and enhancing the power, reputation, and brand of Sean Combs as a musician, entrepreneur, and figure in the entertainment industry.  That's paragraph B.

THE COURT:  That's what this was all about.

P5KsCOM1

MS. SLAVIK:  Correct.

THE COURT:  So, Mr. Agnifilo, you make a fair point on Count Two, and I agree with you on that, given the testimony that came in.

Ms. Slavik says it's really Count One, and in particular, there are actually -- it was indicted that purposes of the enterprise, included preserving and enhancing the power of the enterprise through violence, use of firearms, threats of violence, coercion, and verbal, emotional, physical, or sexual abuse.  The last part doesn't apply.  But the first part would seem to -- and I take it that Mr. James is going to say, it wasn't just Mr. Combs, it was Mr. Combs and members of the enterprise, and I was there and I witnessed these things.

So why wouldn't that pass scrutiny here?

MR. AGNIFILO:  So what I think he's going to say is that Mr. James and someone, who I think he's going to identify as D-Roc, were in a car outside the diner.  A red car of some -- I don't know if he'll say it's red.  A car pulls up.  The two doors open.  D-Roc gets out of his car.  Suge Knight gets out of his car.

D-Roc says to Suge Knight, It's me, D-Roc.  I was Biggie Smalls -- I was Biggie's best friend.  This is not about anything that we are doing in this courtroom.  This goes back decades.  And there is a conversation, and I think he's -- Mr. James is going to say all this.  And Mr. James and D-Roc

P5KsCOM1

stayed at the diner for a while and then his prior statements sort of vary.

In his first statement, he doesn't talk about going back to the house to get guns and coming back with Mr. Combs. He doesn't say anything about it. That's his first statement.

Then he does say that. And then he says what I think, you know, the government is going to say here today. The problem is, this is -- this is a very contentious issue. And I don't know that the first version that Mr. James gave the government is consistent with our -- if we have to prove this up, some other way, how we would prove it up. His second version to the government is not consistent with how we would prove this up, if we had to.

And so, I feel like --

THE COURT: Isn't this a situation where you're going to be cross-examining Mr. James and you can --

MR. AGNIFILO: 100 percent.

THE COURT: -- reveal all this?

If you want to preview your cross here again.

MR. AGNIFILO: Yeah, I just previewed it.

And at the end of the day, I don't know what he's going to say. We are all going to sit at the edge of our seats together and see how he's going to handle this Mel's Diner incident.

THE COURT: I think what Ms. Slavik is saying is she

P5KsCOM1

is going to establish by eliciting testimony from Mr. James that this was Mr. Combs and his associates, who are members of this enterprise, and they were engaged in this effort to intimidate and threaten Suge Knight for the reasons that have been addressed here, and that was part of what this enterprise was doing. Then you'll try to undermine that that is what happened. But that's fair game, as far as I can tell.

MR. AGNIFILO: Understood.

THE COURT: The objection is overruled.

MR. AGNIFILO: Thank you, Judge.

THE COURT: Anything further, Ms. Slavik, or Mr. Agnifilo?

MS. SLAVIK: Not for the government.

MR. AGNIFILO: Nothing from us.

MS. SMYSER: Your Honor, can I put one thing on the record before we move on?

So we had conferrals with the defense last night related to Special Agent Gannon's testimony, and we understand that the defense does not intend to cross him with questions directed at the legality of the search and of the seizure of evidence, as they did with Special Agent Binda's testimony. That should limit the objections during their cross-examination.

We just wanted to put that on the record.

THE COURT: Is there going to be a disagreement as to

P5KsCOM1

what kind of questioning would be directed to the legality of the search, as opposed to other aspects of this case, as there was with the prior witness?

MS. SMYSER:  I hope not, your Honor.

THE COURT:  All right.  We will see.

Let's have Mr. James back and then we will get our jury.

MS. SLAVIK:  Your Honor, may I take the position at the podium?

THE COURT:  Thank you.

Good morning, welcome back.

THE WITNESS:  Good morning, your Honor.

How are you doing?

THE COURT:  Good.  How are you doing?

THE WITNESS:  Good.

THE COURT:  All right.

(Continued on next page)

P5KCcom2

THE DEPUTY CLERK:  Your Honor, we are missing four jurors.  It may be train problems leading to this.

THE COURT:  We'll keep tabs on things.

Mr. James, if you want to hang out here, you can, but you can also head back, it might take 15 minutes, whichever you're more comfortable with, and we'll be back.

Courtroom deputy, just keep us apprized of the status.

THE DEPUTY CLERK:  Yes, your Honor.

(Recess)

THE COURT:  We have our jurors.  Let's get Mr. James back on the stand.

(Witness present)

(Continued on next page)

P5KCcom2                    James - Direct

(Jury present)

THE COURT:  Welcome back, members of the jury.

Mr. James, do you understand you're still under oath?

THE WITNESS:  I do, yes.

THE COURT:  Ms. Slavik, when you are ready.

DAVID JAMES, resumed.

DIRECT EXAMINATION CONTINUED

BY MS. SLAVIK:

Q.  Good morning, Mr. James.  Welcome back.

A.  Good morning.

Q.  Before we broke yesterday, Mr. James, you were describing disagreements that you observed between Mr. Combs and Cassie. Do you remember that?

A.  Yes, I do.

Q.  Can you remind the jury what these disagreements were about?

A.  They were regarding Cassie's professional career.  She wanted to get more involved in modeling as well as acting.

Q.  What was Mr. Combs's reaction?

A.  He would remind her that she needed to focus on her music career, and that was the priority.

Q.  Did you observe these sorts of disagreements once or more than once?

A.  There was more than one occasion.

Q.  What about physical violence between Mr. Combs and Cassie,

did you personally observe physical violence?

A.  I did not, no.

Q.  Mr. James, I want to direct your attention to January 2009. Do you recall an incident involving a blog post around that time?

A.  Yes, I do.

Q.  What time of day do you remember this incident taking place?

A.  This was late into the evening, early morning.

Q.  Where were you at the time?

A.  I had a day off, so I was at Mr. Combs's estate in Los Angeles, and I was sitting at the computer in the office.

Q.  What were you doing?

A.  I was working on a research project for Mr. Combs.  He wanted to get new tattoos, so I was looking up different options for him.

Q.  Was Mr. Combs with you at that time?

A.  He entered the house at that time.

Q.  Where was he before he entered the house?

A.  He was out at the club.

Q.  Who was he with at the club?

A.  Ms. Ventura, another assistant, and security.

Q.  Do you remember who from security?

A.  I believe it was Bonds.

Q.  You said that Mr. Combs returned to the Los Angeles house?

P5KCcom2                          James - Direct

A.   He did, yes.

Q.   What did he do when he returned to the house?

A.   As soon as he entered the door, he beelined straight towards me, and he was -- he came right over to me and looked over my shoulder, asked me what I was doing.  And I said I'm doing a research project for you, sir.  He told me that someone was lying on him, that someone did a blog post that someone hit Cassie.  And he looked at my browser history to see what websites I had been visiting that night.

Q.   What was Mr. Combs's demeanor when he was doing this?

A.   He was pretty upset.

Q.   Did he explain what he was doing?

A.   He mentioned that -- I think he was -- he did say that, you know, that someone was lying on me about this blog post and that he was trying to see if I had wrote this blog post.

Q.   What did he indicate the lie was?

A.   That he had hit Cassie at the club.

Q.   What was your reaction to Mr. Combs searching your browsing history?

A.   It was jarring.  He's never done that before.

Q.   Was Cassie at the house while Mr. Combs was doing this?

A.   I did not see Cassie that night, no.

Q.   Where was Cassie?

A.   I'm not sure.  I think she was outside.

Q.   Did you see Cassie after this incident?

P5KCcom2                          James - Direct

A.  I did not, not for some time.

Q.  Did Mr. Combs provide you with any instructions with respect to Cassie after this incident?

A.  He did, yes.  A few days later, he instructed me to bring her food to the hotel.

Q.  Which hotel?

A.  I believe it was The London in Los Angeles.

Q.  And Cassie was staying at The London hotel?

A.  That was my understanding, yes.

Q.  Prior to Cassie staying at The London hotel before this incident, where had she been staying?

A.  At the house with us.

Q.  At Mr. Combs's Los Angeles house?

A.  That's correct, yes.

Q.  How long was Cassie at The London hotel after this incident?

A.  About a week.

Q.  What specifically did Mr. Combs instruct you to do?

A.  To bring Cassie some Roscoe's.

Q.  What's Roscoe's?

A.  It's a restaurant in Los Angeles.  They make delicious fried chicken.

Q.  Did you bring Roscoe's to Cassie at the hotel?

A.  I did.  I approached the hotel with Roscoe's and I knocked on the door.  She did not answer the door.  There was a

personal staff who answered the door.

Q.   Do you remember who answered the door?

A.   I believe it was Bonds or Genevieve, but I'm not 100 percent sure.

Q.   And when you say personal staff, what do you mean by that?

A.   It was someone on the executive team.

Q.   Mr. Combs's executive team?

A.   That's right.

Q.   Did you see Cassie in the hotel room?

A.   I did not, no.

Q.   What was your reaction to this event?

          MR. AGNIFILO:  I'm going to object to the reaction.

          THE COURT:  It's overruled.

A.   I was surprised.  I was expecting to see Cassie answer the door.

Q.   Had you delivered items to Cassie at hotels before this?

A.   I have, yes, and she'd always answer the door.

Q.   Mr. James, did you ever look for this blog post that Mr. Combs referred to?

A.   I did, yes.

Q.   Why?

A.   Because I was confused as to what was going on and I wanted to figure out what he was talking about.

Q.   Did you find it?

A.   I did, yes.

P5KCcom2                        James - Direct

Q.   Where did you find it?

A.   So I just Googled Diddy Cassie Los Angeles club, and it came up on a blog called -- I think it was Lipstick something. I forget the name of the blog.

Q.   Turning to a different topic, Mr. James, you testified yesterday that one of your responsibilities as Mr. Combs's personal assistant was advancing and setting up locations.  Do you remember that?

A.   I do, yes.

Q.   And that included advancing hotel rooms?

A.   That's right.

Q.   Who directed you to set up hotel rooms or advance hotel rooms?

A.   Mr. Combs would direct me.  He would let me know he wanted to get a hotel room for the evening.

Q.   Did Mr. Combs stay in hotel rooms frequently?

A.   He did, yes.

Q.   Did you book hotel rooms for Mr. Combs?

A.   I did not, no.

Q.   Do you know who did?

A.   I'm not sure, no.

Q.   Were hotel rooms booked under Mr. Combs's name?

A.   They were not, no.

Q.   What name were they booked under?

A.   Under Frank Black.

P5KCcom2                          James - Direct

Q.   Where were these hotels that Mr. Combs stayed in located?

A.   New York City.  The Trump International in new York City was his favorite hotel he stayed at.  There was also some in Los Angeles and Miami.

Q.   Can you remind the jury what advancing hotel rooms entailed.

A.   Yeah.  Advancing a hotel room, it entailed bringing his personal items in to go against a rider that he provided -- that the office provided so when he arrived at the hotel room, it was a very comfortable environment for him.

Q.   Now you mentioned personal items.  What sort of personal items did you bring to the hotel rooms for Mr. Combs?

A.   So like in New York City, for example, if he asked for me to go advance a hotel room, I'd go back to his apartment and I'd get like a Jordan sweatsuit, I'd get a fresh pair of underwear, fresh pair of socks, some slides for him.  I'd also bring a toiletry bag, and I would bring the iPod speaker base. And then next to the Trump, there's a Duane Reade there, so I'd go there and get different food items, applesauce, jello, Fiji water, and then we'd always have Ciroc vodka and Simply Lemonade, as well.

Q.   You mentioned a toiletry bag.  What was in the toiletry bag?

A.   The toiletry bag basically had a lot of different cosmetic products for his skin.  So we'd set them up on his bathroom

counter.  There was probably 40 different products, everything from ointments to a razor, he had Just For Men in there, as well.  Basically, everything that he may need.  He didn't always use these items, but I was always taught to provide everything just in case he needed something, that way he wouldn't need to call you later on.

Q.  And you set these items up before Mr. Combs got to the hotel?

A.  I did, yes.

Q.  How did you do that?

A.  I'm sorry?

Q.  How did you enter the hotel room before Mr. Combs arrived?

A.  Yeah, so I'd get a key from the front desk.  For example, at the Trump International, they knew me very well, so they'd hand me a key.  Other times, like in Beverly Hills, I'd go to the front desk and say I was here for Mr. Black, and they would provide me a key, as well.

Q.  You mentioned the toiletry bag and several other items that you used to set up the hotel room.  Were there any other bags or items that Mr. Combs required at hotel rooms?

A.  He did, yeah.  There was always a medicine bag that would be required at the hotel rooms and other personal items, as well.

Q.  Were there any other bags, besides the medicine bag?

A.  The medicine bag, his toiletry bag, and we called it the

P5KCcom2                    James - Direct

personal LV bag.

Q.   What did the personal LV bag look like?

A.   It was like a Louis Vuitton briefcase, like a bag you keep a computer in.

Q.   What was in the personal LV bag?

A.   So most of the time there was money in there, his wallet, items that he would need on a daily basis to move around the city.

Q.   You said money was in the personal LV bag?

A.   That's correct.

Q.   How much money?

A.   Depended on the day, around $10,000, sometimes much more than that.

Q.   And that was in cash?

A.   That's correct.

Q.   Generally, who carried the personal LV bag?

A.   The security always carried the personal LV bag most of the time because it always stayed with Mr. Combs whenever he was around.

Q.   You also mentioned a medicine bag; is that right?

A.   That's correct.

Q.   What was in the medicine bag?

A.   There were probably 25 to 30 different pillboxes or pill bottles.  Some of them were unmarked, so I was not familiar with what they were.  Some were like Advil, Tylenol.  He had

P5KCcom2                        James - Direct

water pills to help him lose weight.  He had a Viagra in there. He had some pills that helped increase his sperm count, for example.

Q.  Any other sorts of pills?

A.  He did have ecstasy and Percocets in there, as well.

Q.  Who was responsible for ensuring -- excuse me.  Where was the medicine bag kept?

A.  It was kept mostly in the personal LV bag.

Q.  The personal LV bag that security carried generally?

A.  That's right.

Q.  Who was responsible for ensuring that the LV bag was transported to the hotel?

A.  Most of the time it would be security.  From my understanding, they would walk up to the hotel room with Mr. Combs and they would drop off the bag there.

Q.  Do you remember who specifically from security would do that?

A.  That would be something that Bonds would do.

Q.  You mentioned several items that you used to advance hotel rooms.  Generally speaking, who was responsible for replenishing these supplies?

A.  I was.

Q.  How did you go about replenishing these supplies?

A.  So I would go to Duane Reade and I would use my own personal credit cards for the items.  Some items I used cash

for, as well.

Q. Were you reimbursed for these items?

A. I was, yes.

Q. Generally speaking, how did the reimbursement process work?

A. We would have to submit all our receipts through Bad Boy Entertainment where we would put them on a white piece of paper and write notes on them. So, for example, PD medicine, PD hotel, snacks, things like that.

Q. And how did you get reimbursed for those items that you'd get receipts for?

A. I'd get a check from Bad Boy Entertainment.

Q. Do you know who was responsible for overseeing the reimbursement process?

A. I don't remember their name. It was a midlevel manager at Bad Boy.

Q. In what department?

A. Finance.

Q. Do you remember who the head of the finance department was while you were a personal assistant?

A. I do.

Q. Who was that?

A. Derek Ferguson.

Q. Was Mr. Ferguson personally responsible for handling reimbursement for hotel supplies?

A. No, I believe it was below him.

Q.   You described this reimbursement process of submitting receipts and being paid through a check.  Were you reimbursed in this manner for all hotel supplies that you replenished?

A.   No, not all.

Q.   For what supplies were you reimbursed differently?

A.   So they'd be more of his personal items, so things like baby oil, Astroglide, condoms, prophylactics.

Q.   How were you reimbursed for those supplies?

A.   I would go to security and ask for cash out of the medicine bag.

Q.   Who instructed you to pay for these sorts of things, baby oil, lubricant, prophylactics in cash?

A.   Bonds told me to do that.

Q.   What was your understanding as to why?

A.   Because Mr. Combs would review the receipts and expenses, and he did not want that stuff ran through the company.

Q.   How did you get the cash used to pay for these sorts of supplies?

A.   Through security directly.

Q.   Who specifically do you remember getting cash from for these supplies?

A.   Bonds.

          MS. SLAVIK:  Ms. Foster, could you please pull up Government Exhibit 2A-201 that's in evidence.

Q.   Who is this, Mr. James?

P5KCcom2                     James - Direct

A.   That is Roger Bonds.

Q.   And he provided you cash to pay for personal supplies for
Mr. Combs?

A.   He did, yes.

          MS. SLAVIK:   Thank you, Ms. Foster.   You can take this
down.

Q.   Mr. James, did you interact with Mr. Combs at any point
while you were setting up hotel rooms?

A.   Not while setting them up, no.

Q.   When you set up the hotel rooms, did Mr. Combs -- excuse
me.   After you set up the hotel rooms, did you interact with
Mr. Combs?

A.   I did, yes.   I always would send him a text and ask him if
I could go home for the evening.   On a few occasions, he asked
me to stick around in the hotel for him to come because he
perhaps needed something pulled up on his computer or he needed
some other business affair handled for him.

Q.   When you set up these hotel rooms, did Mr. Combs stay in
these hotel rooms alone or with others?

A.   I don't think Mr. Combs ever stays alone.

Q.   Who did he stay with?

A.   His girlfriend at the time, mostly Cassie, but other women,
as well.

Q.   Now, you said that, generally speaking, you were
responsible for replenishing supplies that Mr. Combs required

for hotel stays; is that right?

A.   That is correct.

Q.   What about supplies that Mr. Combs wanted during his hotel stays?

A.   There were, on a few occasions, that he would call me to the room to replenish some supplies or ask for a specific thing like an iPod.

Q.   How did Mr. Combs tell you that he wanted something during a hotel stay?

A.   He would send me a text message.

Q.   And generally speaking, what did he text you to bring?

A.   Either an iPod or food.

Q.   Did anything unusual ever happen when you were dropping off items to Mr. Combs in a hotel?

A.   Yes.

Q.   Where was that?

A.   There was one time in Miami.

Q.   Approximately when was this incident?

A.   I believe it was 2008.

Q.   What had Mr. Combs asked for during his hotel stay?

A.   He asked for me to bring an iPod for him to the hotel room.

Q.   What did you do?

A.   So this was a day we had multiple days off, we knew we had multiple days off, so I was running around Miami probably getting a haircut doing personal chores, and he texted me he

needed his iPod.  So I drove back to the house on Star Island to get his iPod, and it was probably like a 45-minute to an hour time period before I got to the hotel.  I knocked on the door to give him his iPad and there was no answer.  And so I had a key for the room, I opened up the door --

Q.  Why did you have a key for the hotel room?

A.  Because I set that room up for him a few days prior.

Q.  What did you see when you entered the room?

A.  I saw Cassie on the bed.  She had a white comforter up to her neck, she was laying on her back with her head to the side, and she did not move when I entered the room.  And there was a gentleman who I had not recognized, he was on the right side of the room, and he walked across the room and kind of scurried away.  And I heard a shower on the right side of the room that I thought Mr. Combs was in the shower.

Q.  Starting with Cassie, had you seen Cassie asleep on prior occasions?

A.  I have yes.

Q.  How did those occasions compare to this incident where you saw her in the bed in the hotel room in Miami?

        MR. AGNIFILO:  I'm going to object to this, Judge.

        THE COURT:  Can you rephrase the question.

        MS. SLAVIK:  Of course.

Q.  Mr. James, have you seen Cassie sleeping on prior occasions?

A.   I did, yes.  I'd wake them up in the morning.

Q.   How, generally, did Cassie sleep?

A.   She normally slept on her side.

Q.   How was she sleeping when you entered the hotel room in Miami?

A.   On her back.

Q.   What was your reaction to her sleeping on her back?

          MR. AGNIFILO:  I'm going to object to this, Judge.

          THE COURT:  That's sustained.

Q.   Mr. James, you said that you saw another individual in the room.

A.   That's correct.

Q.   Can you describe this other person?

A.   He was completely naked, about five-feet eight, long hair, and he had a very large endowment, and he had a condom on.

Q.   What did he do when you entered the room?

A.   He scurried out as if he didn't want to be seen.

Q.   Did Cassie react when you entered the room?

A.   She didn't move at all, no.

Q.   Did you see Mr. Combs in the room?

A.   I did not, no.

Q.   You said you heard the shower going?

A.   That's correct.

Q.   To be clear, who had asked you to come to the hotel room in Miami?

A.   Mr. Combs did.

Q.   Did you speak with Mr. Combs about this incident?

A.   I did not, no.

Q.   Did you speak with Cassie about this incident?

A.   I did not, no.

Q.   Why not?

A.   I just didn't really think it was my business.  I mean, I thought they were doing some personal things and just was part of the day, you know, part of the job.

Q.   What do you mean, part of the job?

A.   I mean, I don't really have conversations with Cassie or Mr. Combs about their personal affairs.

Q.   Why not?

A.   That wasn't what I was hired for.

Q.   Mr. James, you mentioned that Mr. Combs had a number of pills in the medicine bag.  Can you remind the jury of what sort of drugs were in the medicine bag?

A.   I was familiar with Percocets as well as ecstasy.

Q.   Did you understand that Mr. Combs took Percocets and ecstasy?

A.   I was, yeah.

Q.   How did you know that Mr. Combs took those sorts of drugs?

A.   I witnessed him taking those drugs.

Q.   Were you ever asked to pick up drugs for him?

A.   I was, yes.

P5KCcom2                     James - Direct

Q.   Can you describe the occasions on which you were asked to pick up drugs for him?

A.   We would be in Miami and he told me that I had a prescription at a pharmacy for his Percocets.

Q.   In whose name were the Percocet prescriptions that you picked up?

A.   Sometimes they were in his name, sometimes they were in my name.

Q.   Prior to being asked to pick up these prescriptions, were you aware that Mr. Combs had Percocet prescriptions filled in your name?

A.   I don't remember that.

Q.   Did you give him or anyone else permission to fill prescriptions in your name?

A.   I don't recall that.

Q.   Do you know how else Mr. Combs got drugs?

A.   Through a drug dealer.

Q.   Do you remember the drug dealer's name?

A.   A gentleman named One Stop.

Q.   How frequently did Mr. Combs do drugs, in your observation?

A.   I would say every day.

Q.   Did he do drugs during the day?

A.   He would take Percocets throughout the day.

Q.   You testified previously that one of your responsibilities as a personal assistant was to attend business meetings with

Mr. Combs throughout the day.  Do you remember that?

A.  I do.

Q.  Did Mr. Combs attend these meetings after taking Percocets?

A.  I would assume so, yes.

Q.  Did Mr. Combs make decisions about business after taking Percocets?

A.  I would assume so, yes.

Q.  Did he conduct the affairs of his business after taking Percocets?

A.  Sure, yes.

Q.  Did Mr. Combs take drugs at night, too?

A.  He did.

Q.  What sort of drugs did he take at night?

A.  At nighttime he would go to more ecstasy.

Q.  And did you observe him taking ecstasy?

A.  I did.

Q.  Can you describe the ecstasy that you saw him taking?

A.  It was a pill.

Q.  What did the pill look like?

A.  There were various pills, but there was one that was in the shape of a former president's face.

Q.  Which former president?

A.  President Obama.

Q.  You testified yesterday that Mr. Combs would often go to the studio at night; is that right?

A.   That's right, yeah.

Q.   Did Mr. Combs take these drugs while he was at the studio?

A.   Yes, of course.

Q.   Mr. James, during your employment with Mr. Combs, were there any occasions on which you secured drugs for Mr. Combs or Mr. Combs's friends?

A.   Yes, there were two occasions that I remember.

Q.   Starting with the first occasion that you remember, can you describe the circumstances of that occasion?

A.   We were in Saint Tropez, I believe, and we were on his yacht.  One of his friends texted me that they wanted some cocaine.

Q.   What happened after that?

A.   So I called one of Mr. Combs's handlers who was basically coordinated everything for us in Saint Tropez and asked him for an 8 ball.

Q.   Did this individual provide you with that 8 ball of cocaine?

A.   He did, yes.

Q.   What did you do with it?

A.   I took a tender, which is a small boat, to the other yacht and delivered the cocaine.

Q.   Did Mr. Combs instruct you to do this?

A.   He did not, no.

Q.   Why did you do it?

A.   Because as a personal assistant, your job is to take care of Mr. Combs and his personal friends.

Q.   What was your understanding of what would have happened if you hadn't done it?

        MR. AGNIFILO:  I'm going to object, Judge.

        THE COURT:  That's sustained.

Q.   You mentioned another occasion on which you provided drugs to Mr. Combs or his friends?

A.   That's correct.

Q.   What were the circumstances of that occasion?

A.   We were in Los Angeles at a house party, and one of Mr. Combs's associates in the music industry asked Mr. Combs for ecstasy.  Mr. Combs did not have any ecstasy on him at the time.  And so I -- Mr. Combs told me to go back to the house to get some ecstasy and to bring this gentleman a pill.

Q.   Did you do it?

A.   I did.

Q.   Can you explain how you did it?

A.   I drove back to the house, I got a pill out of the medicine bag, drove back to the house and handed the gentleman a pill.

Q.   And Mr. Combs instructed you to do this?

A.   He did instruct me to do that, yes.

Q.   Mr. James, were there any occasions during your employment with Mr. Combs where you consumed drugs?

A.   There were, yes.

P5KCcom2                      James - Direct

Q.  Can you explain the circumstances of that incident.

A.  There was one time, it was a New Year's Eve party and Mr. Combs gave me the night off, but he invited me to the house to party and to celebrate New Year's Eve.  And so I went to Mr. Combs's bag and I took a pill of ecstasy that night.

Q.  Just to stop you right there.  Were you staying at Mr. Combs's home during that trip?

A.  I was not, no.

Q.  Where were you staying?

A.  I was staying at a hotel.

Q.  And you said that you took an ecstasy pill from Mr. Combs's bag that night?

A.  That's right.

Q.  Did Mr. Combs offer you the ecstasy?

A.  He did not, no.

Q.  So how did you get it?

A.  I just took it out of his bag and consumed it.

Q.  What happened after you took the ecstasy?

A.  I was feeling pretty good.

Q.  Can you describe the feeling of taking ecstasy?

A.  I would say it's ecstatic.

Q.  Did your behavior change after you took the ecstasy?

A.  It did, yes.  So I was also drinking Ciroc that night.  So I was drinking and on ecstasy.  Normally, I'm very straightedge, don't normally have too much emotion, but this

night I was, like, dancing, said I was Diddy bopping all around the party.

Q.   What happened after you started Diddy bopping, as you describe it?

A.   I was just vibing.

Q.   What do you mean by vibing?

A.   I was enjoying myself.

Q.   What happened throughout the course of the night?

A.   There was a certain point after it became midnight, I realized I was very intoxicated, and I knew if I stayed at the house, Mr. Combs would likely forget I had the night off and he would ask me to do certain chores for him or run errands and I was not in the mental state to do that, so I left the house and went back to my hotel.

Q.   What, if any, conversations did you have with Mr. Combs after this incident?

A.   A few days later, we made it back to New York City, we were in the executive office and he called me into his office.  He was reviewing footage from the party.

Q.   Can you explain what you mean by footage from the party?

A.   Yeah, so we'd have a videographer who basically recorded everything for his parties, and Mr. Combs was reviewing the footage to see what people were doing at the party, things like that.

Q.   What, if anything, did Mr. Combs say to you about this

video?

A.  He was kind of like, I heard about it at first.  And he says, yo, playboy, is that you dancing around the party, and I said, yeah, that was me dancing around the party.  And he said, were you on ecstasy that night, and I said, yes, sir, I was.  And he kind of nodded his head and he said, okay, I want to keep this footage in case I ever need.

Q.  What did you understand Mr. Combs to mean by that?

A.  That, again, because it was so out of character for me that he thought it would be embarrassing if he released that footage of me to the public.

Q.  Mr. James, I want to turn your attention back to Mr. Combs's security detail.  You testified yesterday that security staff was responsible for protecting Mr. Combs and his property.  Do you remember that?

A.  I do, yes.

Q.  Focusing on their protection of Mr. Combs's property, did there ever come a time during your employment that valuables belonging to Mr. Combs or others went missing?

A.  Yes.

Q.  Do you remember a specific incident involving a Cartier bracelet?

A.  Yes.  It was like the love bracelet that Ms. Ventura would wear.  One day it came up missing and everybody was really upset, Cassie was really, really emotional and upset about it.

P5KCcom2                        James - Direct

Mr. Combs was very upset about it, as well.

Q.   Where were you when this Cartier bracelet went missing?

A.   This was the week I was staying at the hotel, so I was out of the house for this week.

Q.   Do you remember what year it was?

A.   I do not remember.  Sometime between 2007 and 2009.

Q.   What happened after the bracelet went missing?

A.   So I was sitting at my hotel with my girlfriend at the time and we get a knock on the door.

Q.   Who was at the door?

A.   Uncle Paulie.

Q.   Can you remind the jury of who Uncle Paulie is?

A.   Uncle Paulie is Mr. Combs's head of security.

Q.   What did Uncle Paulie do after he knocked on your door?

A.   He let me know that he was here for a security check, and he had to look through all of my personal belongings and my girlfriend's personal belongs to make sure we didn't have anything of Mr. Combs's or Cassie's.

Q.   What happened next?

A.   They went through all my clothes, went into all my socks, went into all the drawers in the hotel room, and they didn't find anything.

Q.   Did you feel like you could say no to Uncle Paulie coming into your hotel room to search through your belongings?

A.   No, I did not want to tell Mr. Uncle Paulie no.

Q.  Why not?

A.  Because, I mean, it was a security issue and I don't think you'd want to go against security.

Q.  Why?

A.  They're professionals at their job.

Q.  Any other reasons?

        MR. AGNIFILO:  Objection, Judge.  He gave a reason.

        THE COURT:  Let's move on.

Q.  Were there any other incidents during your tenure in which valuables went missing?

A.  There were.  I had plenty of items stolen from me over my tenure.  There were other items that were stolen, as well, from Mr. Combs.

Q.  Focusing on the instances when items were stolen from Mr. Combs, what happened after those incidents?

A.  I was instructed I had to take a lie detector test.

Q.  How many times during your employment did you have to take a lie detector test?

A.  I took two lie detector tests.

Q.  Focusing on the first time you had to take a lie detector test, do you remember what the circumstances were of that first time?

A.  I believe there was cash that came up missing.

Q.  And when in your tenure did this happen, if you remember?

A.  It was within the first year.

Q.  Can you describe to the jury what happened when you were instructed to take a lie detector test?

A.  Yeah.  So I was invited to this -- almost looked like a government building, it was kind of a tall skyscraper, and I met with a gentleman who said he was a former FBI lie detector detector, I guess you could call it, and he was the most, you know, specialist lie detector agent in America.

Q.  Who told you that?

A.  The gentleman did.

Q.  The lie detector detector?

A.  Yeah.

Q.  And who told you to go to this office?

A.  That was either Dia -- I think it was Dia.

Q.  Who was Dia again?

A.  Mr. Combs's chief of staff.

Q.  Who was present when the lie detector test was administered?

A.  Just me and this gentleman.

Q.  How would you describe this experience?

A.  It was very intimidating.  I don't know if you've ever taken a lie detector test before, but you basically sit in a chair where they monitor your movements, they put a heartbeat monitor on your chest, I believe they put something on my head, and something on my hand.

Q.  And you said that you were invited to take this lie

P5KCcom2                        James - Direct

detector test a moment ago.  Did you feel like you could refuse to take this test?

A.   Not if I wanted to maintain my employment with the company.

Q.   What was the result of this first lie detector test?

A.   There were no discrepancies in my results and I passed the test.

Q.   You mentioned that there was a second time?

A.   There was, yes.

Q.   What were the circumstances of the second time?

A.   So the second time Mr. Combs had a watch that was stolen from him, it was like a Jacob & Co. watch.  And I was actually off that day when the item got stolen, but I got a call from security that someone had stolen the watch or the watch was missing.  They asked me if I knew where the watch was, and I said I don't know, I'm at my house on the Upper West Side, I have no idea.  And we also had to take a lie detector test about that circumstance, as well.

Q.   Where did you take this lie detector test?

A.   The same location as the first time.

Q.   Was it administered by the same individual?

A.   It was, yes.

Q.   How soon after the first lie detector test was this second lie detector test?

A.   I would estimate like six to eight months.  It was a previous amount of time.

Q.  How would you describe this second experience?

A.  I was more nervous the second time, but again, it was extremely intimidating and, you know, I didn't like it.

Q.  Did you feel like you could refuse it?

A.  Not if I wanted to maintain my employment with the company.

Q.  What was the result of this second lie detector test?

A.  In regards to the watch, I cleared that question, there was no discrepancies.  The gentleman did say to me, you seem really nervous today.  What are you nervous about?  Did you take anything from Mr. Combs ever?

Q.  How did you respond?

A.  I told him that I did.  I took some Ciroc vodka, for example, from the studio.  Or, on occasion, I would take Mr. Combs's jeans that were -- we'd get a box of Sean John clothing, and sometimes I would go and take the jeans that I really liked before Mr. Combs could see them.

Q.  What, if anything, did Mr. Combs say about lie detector tests being administered?

A.  You know, Mr. Combs does not like people who steal, that's like one of his big things, and he basically told me we had to get the rat out of the team.

Q.  Were you aware of other employees having to take lie detector tests?

A.  I was aware a previous employee had to take one at a prior time.

P5KCcom2                    James - Direct

Q.   Who was that?

A.   Capricorn Clark.

Q.   Who told you Ms. Clark had to take a lie detector test?

A.   Roger Bonds.

         MS. SLAVIK:  Ms. Foster, can you please pull up what's in evidence side-by-side as Government Exhibits 2A-201 and 2A-406.

Q.   Mr. James, can you remind the jury who these individuals are?

A.   The gentleman on the left is Roger Bonds.  He was on security.  And the woman on the right is Capricorn Clark.  At the time, I believe she was the director of marketing for Sean John and she was a former personal assistant to Mr. Combs.

Q.   And Ms. Clark on the right is the one who had to take the lie detector test?

A.   That's right.

Q.   And Mr. Bonds on the left is the one who told you about this incident; is that right?

A.   That's right.

         MS. SLAVIK:  Thank you, Ms. Foster.  You can take that down.

Q.   How did this topic of Ms. Clark taking the lie detector test come up?

A.   So Mr. Combs used to wear a lot of jewelry, obviously, and there was one in particular, it was a diamond chain, a diamond

cross on it, and I found a loose diamond around the house.  So I took that diamond, I gave it to Mr. Bonds, and I said, hey, Mr. Combs lost a diamond out of his chain, and Roger -- Mr. Bonds told me, he's like, oh, don't worry about it, just cubic zirconia.  And I said, really?  I was really shocked by that.  He told me the story previously --

MR. AGNIFILO:  I'm going to object, your Honor, to the hearsay.

MS. SLAVIK:  Your Honor, we discussed this issue yesterday.

THE COURT:  It's overruled.

Q.  You can continue, Mr. James.

A.  Trying to think where I was.  Roger -- Mr. Bonds told me that Capricorn, while she was his assistant, used to carry his jewelry bag -- his jewelry suitcase or briefcase, if you will. At one point, she got jumped and all the jewelry was stolen from him.  So at that point they replaced some of the jewelry with fake jewelry.

Q.  And what was your understanding of what Ms. Clark had to do after the jewelry was taken?

A.  She had to take a lie detector test to prove that she wasn't part of the heist, if you will.

Q.  Mr. James, moving on to a different topic.

MS. SLAVIK:  Ms. Foster, can you please publish what's in evidence as Government Exhibit 2A-202.

Q.   Do you recognize this individual, Mr. James?

A.   I do.

Q.   Who is this?

A.   That is D-Roc, one of Mr. Combs's security guards.

          MS. SLAVIK:   You can take this down.   Thank you,
Ms. Foster.

Q.   Mr. James, I want to focus your attention on an incident
involving D-Roc at Mel's Diner.   Do you recall a time that you
were at Mel's Diner with D-Roc?

A.   I do, yes.

Q.   When was that?

A.   This was I believe November of 2008.

Q.   And can you explain to the jury what Mel's Diner is?

A.   Mel's Diner -- there's a few of them in Los Angeles, it's a
famous diner, a 24-hour diner where they serve diner food.

Q.   What happened leading up to you going to Mel's Diner with
D-Roc in the fall of 2008?

A.   That night we were at the studio and we were working until
late hours in the morning.   It was probably 3 or 4 o'clock in
the morning by the time we got home.   Mr. Combs notified me
that he was hungry, he wanted some cheeseburgers.   And so D-Roc
was also hungry, so D-Roc came with me to get food for other
security staff, and we drove down to Mel's Diner together.

Q.   How did you get to Mel's Diner?

A.   I drove the staff truck, which was a silver Lincoln

Navigator.

Q.  You drove?

A.  I did, yes.

Q.  And D-Roc was with you in the car?

A.  Yeah, he was sitting shotgun.

Q.  What happened when you got to Mel's Diner?

A.  So we pulled into the parking lot and D-Roc looks over and he said, that's mother fuckin' Suge Knight.

Q.  Can you explain to the jury who Suge Knight is?

A.  Mr. Knight was the chairman of Death Row Records.

Q.  With respect to Mr. Combs, how would you describe that relationship?

A.  They were competitors.

Q.  What did D-Roc do after he saw Suge Knight in the parking lot?

A.  He got out of the car very calmly and he went over to Mr. Knight and said what's up.  Suge kind of looked at him, didn't really recognize him.  D-Roc said, it's me, D-Roc, Biggie's boy.  Then I could kind of see on Suge Knight, he kind of recognized him then.  And he said, oh, what are you doing in my city, and D-Roc said, shit, man, I'm just out here gettin' money, you know what it is.  And Mr. Knight said, yeah, that's what's up.  And they gave each other a dab and he walked away.

Q.  You said that D-Roc described himself as Biggie's boy?

A.  Yes.

P5KCcom2                        James - Direct

Q.   Can you describe to the jury who Biggie is?

A.   He's a musician.

Q.   How did biggy relate to Mr. Combs?

A.   He was on his record label.

Q.   What happened after D-Roc and Mr. Knight greeted each other?

A.   So D-Roc walked back to the car, told me let's go inside, so we went inside to order food.

Q.   What happened next?

A.   While we were waiting for the food -- again, Mel's Diner, if you're familiar with it, everything is glass windows, so you can kind of see outside, and we noticed four black SUVs pull into the parking lot, they all went to different corners of the parking lot.  Mr. Knight was standing there in the middle of the parking lot under a light, and so we saw one gentleman get out of the car and he passed a gun to Mr. Knight.

Q.   What was D-Roc's reaction after he saw Suge Knight handling a gun?

A.   He said we got to fucking go.

Q.   Did you go?

A.   I did, yes.

Q.   Where did you go?

A.   We drove back to Mr. Combs's house in Hollywood Hills.

Q.   Who was there when you got back to Mr. Combs's house?

A.   Mr. Combs and Cassie were outside.

Q.   What were they doing?

A.   I could tell they were arguing.  Cassie looked very distressed, she was crying, she was telling him not to go.  She was very upset.

Q.   What happened next?

A.   So I get out of the car and I walk towards the house, and Mr. Combs instructed me to get in the car.  At this time, there was a black Escalade that was outside the house, he instructed me to drive the car.

Q.   Who got into this black Escalade?

A.   Me, D-Roc was sitting shotgun, and Mr. Combs was in the back seat, middle back seat.

Q.   What, if anything, did Mr. Combs have with him in the back seat?

A.   So when I get in the car, I looked back, Mr. Combs had three handguns on his lap.

Q.   What, if anything, did Mr. Combs say to you?

A.   He said mother fucking go.

Q.   What did you do next?

A.   I drove to Mel's Diner.

Q.   What, if anything, did you, D-Roc, and Mr. Combs talk about while you drove?

A.   I don't remember anything.  I just remember complete silence.

Q.   What were you thinking?

A.   A few things.  First, that I had this weird sense of calm because I drove down previously in a silver Navigator, but this time we had a black Escalade, so I was thinking if anything were to happen they, wouldn't expect us.  Two, I remember thinking there's three guns and three people in this car.

Q.   How long did it take you to get to Mel's Diner?

A.   About 10 minutes.

Q.   What happened when you arrived at Mel's Diner?

A.   We didn't see any of the black Escalades in the parking lot.

Q.   So what did you do next?

A.   Mr. Combs instructed me to drive around the block.

Q.   Did you do that?

A.   I did.

Q.   What happened?

A.   We didn't see any black Escalades or black SUVs, and then we eventually drove to the house in Hollywood Hills.

Q.   Mr. James, what was your reaction to this event?

A.   I was really shook up by it, you know, this was the first time being Mr. Combs's assistant that I realized that my life was in danger.

Q.   What decisions, if any, did you make as a result of this incident?

A.   When we got back to New York City, I had a conversation with Vashta in her office, and I let her know that I wanted to

leave the company.  However, I gave them a six-month notice.  I told them that I would train the next personal assistant.  So after my tenure if Mr. Combs would have missed me, or need me, I should say.  And she offered me any position in the company.  She asked me if I wanted to work for Blue Flame Marketing or at Sean John and I told her no, I just wanted to get out.

Q.   When did you leave the company?

A.   May 2009.

           MS. SLAVIK:  Nothing further, your Honor.

           THE COURT:  Thank you, Ms. Slavik.

           Mr. Agnifilo.

CROSS-EXAMINATION

BY MR. AGNIFILO:

Q.   Good morning, Mr. James.

A.   Good morning, sir.

Q.   My name is Marc Agnifilo.  I'm one of Mr. Combs's lawyers.  I'm going to ask you a bunch of questions.  If I ask you a question that's not clear to you, all you have to do is ask and I'll do that.

A.   Sounds good.  Thank you.

Q.   The testimony you just gave the jury today about the Mel's Diner incident.  When you spoke to the government the first time, you didn't tell them all of these things, did you?

A.   The story stopped the first time when we were driving back up to the house.

Q.   And when you say the story stopped, you're saying what you told the government stopped then?

A.   That's right.

Q.   Did they tell you they didn't want you to say anymore?

A.   They instructed me not to say anything that would incriminate myself.

Q.   At the time, you didn't say anything about going back to the house and getting guns or anything like that, right?

A.   That's correct.

Q.   The first time, I want to understand the first time.  The first time you said you and D-Roc were at the diner, in the diner, right?

A.   Yes.

Q.   And you said the first time that you and D-Roc were in the diner and Suge Knight walked into the diner?

A.   I don't recall saying that.

Q.   Let me help you out.  I'm going to show you, just for you, the parties, and the witness 3548-001, page 3, I think it's the second full paragraph.  Here's what I'm going to ask you to do: I'm going to ask you to read that paragraph to yourself.  When you're done reading the paragraph, just look up at me.

         (Pause)

A.   Okay.

Q.   Just a couple questions for you.

         So the first time you spoke to the government, January

10th, 2024, you said that you and D-Roc were inside the diner, right?

A.   I don't remember saying that.

MR. AGNIFILO:  Can we pull that up.  I want to be able to see it again.  Just pull it up for the witness.

A.   I don't recall that we were inside eating dinner because we never were inside eating dinner, so I think those are inaccurate notes.

Q.   Do you remember telling the agent that Suge Knight walked into the diner?

A.   I don't recall saying that, no.

Q.   And you said that D-Roc --

THE COURT:  We can take this down?

MR. AGNIFILO:  Yeah, we can take it down.

Q.   That D-Roc went to speak to Suge Knight, correct?

A.   And that was outside the diner, yes.

Q.   So the second time you spoke to the government --

MR. AGNIFILO:  And we can look at 3548-007, pages 9 and 10, and I think it's on the bottom of 9 going into 10.

Q.   So the second time you spoke to them, you were clear that this happened outside the diner; am I right?

A.   That what happened outside the diner?

Q.   The conversation between D-Roc and Suge Knight.

A.   It did happen outside the diner, yes.

Q.   And what you're saying that you heard, what you told the

P5KCcom2                      James - Cross

jury that you heard is that D-Roc says to you something like, oh, that's Suge Knight, right?

A. He said, yeah, that's mother fucking Suge Knight.

Q. Do you know who Suge Knight was when he said that?

A. Of course.

Q. Why do you say of course, just so we all understand?

A. I grew up listening to hiphop.

Q. You say Suge Knight was associated with a company called Death Row Records?

A. That's right, yeah.

Q. And Death Row Records was a record label that was in competition, as you said, with Bad Boy?

A. That's right.

Q. And so D-Roc approaches Suge Knight, correct?

A. He did, yeah.

Q. Outside the diner?

A. That's right.

Q. And where are you when D-Roc is approaching Suge Knight?

A. I'm in the driver seat of the car.

Q. You're sitting in the car?

A. Yes, the silver Navigator.

Q. Do you remember what kind of vehicle Suge Knight had?

A. It was a black SUV.

Q. It wasn't red?

A. Not that I remember.

P5KCcom2                        James - Cross

Q.   It wasn't a pickup truck?

A.   Not that I recall.

Q.   Let me ask you, do you recall, are you clear on these events?

A.   The majority of the event has not changed.  These details of 20 years ago --

Q.   No, I'm not asking that.  What time of the morning is it?

A.   It was 4 o'clock in the morning after a long day of working.

Q.   Let me ask you a few questions around that.  It's 4 o'clock in the morning, you've been working all day, right?

A.   Sure.

Q.   Where were you before you came to the diner?

A.   With Mr. Combs in the studio.

Q.   And with D-Roc, as well?

A.   Yeah, he was security detail that night, yes.

Q.   Were you drinking anything, smoking any pot, doing any drugs at all, anything at all?

A.   No, sir.

Q.   You're sure?

A.   100 percent sure.

Q.   So your mind is clear, it's early in the morning, it's been a long day, but you're saying your mind is clear for these events, right?

A.   As clear as it could be after working 20 hours a week at

P5KCcom2                        James - Cross

4 o'clock in the morning.  I'm sure you could relate to that.

Q.  So you see and you hear D-Roc speaking to Suge Knight,
right?

A.  Yes.

Q.  And you heard what he said clearly?

A.  Yeah, they were probably three parking spaces away from
each other.  It wasn't a very big space.

Q.  Let me just see if I have this right.  D-Roc is getting out
of the car you were all in, right, he opens his passenger door
because you said he was riding shotgun, right?

A.  That's correct.

Q.  So he gets out, and tell me if this is right, Suge Knight
is in a car a few parking spots over, he's in the driver side,
so he gets out of his driver side door, right?

A.  Mr. Knight did not exit the vehicle at that time.  He was
sitting in the car with the window open.  D-Roc approaches him
and he looks over and he looks up at him.

Q.  So Suge Knight is still in the car, in his car?

A.  That's right.

Q.  His window's open?

A.  That's right.

Q.  D-Roc approaches the open window, right?

A.  Yeah.

Q.  Addresses Suge Knight, you can hear this and see this?

A.  Yeah.

P5KCcom2                        James - Cross

Q.  And says -- tell the jury exactly what he says.

A.  Who?

Q.  D-Roc.

A.  He said what's up — D-Roc.  First he said, what's up, and Suge Knight is kind of looking at him, didn't recognize who he was.  Next, he said, it's me, D-Roc, Biggie's boy.  At that point, I could see kind of Suge Knight recognizing him.  He said, oh, what's up, what you doing in my city.  And D-Roc said, shit, man, we're just out here getting money, you now what it is.  Mr. Knight said, you know, he gave him a dab and he said, yeah, I know what it is, he gave him a dab.  And then D-Roc left or walked -- turned around and walked back to the car.

Q.  And what's a dab?

A.  A dab is a handshake.

Q.  So they shake hands?

A.  Yeah, it was a handshake, yeah.

Q.  And you're in the silver SUV for this whole thing?

A.  It was a Lincoln Navigator, yes.

Q.  So you're in a silver Navigator?

A.  That's right.

Q.  You're hearing this, what, because the door is open, the window?

A.  The window was open, yes.

Q.  Was the passenger door closed?

P5KCcom2                      James - Cross

A.   I don't recall that detail.

Q.   But you heard it and you heard it clearly?

A.   Very clearly, yes.

Q.   So then D-Roc comes back to you, right?

A.   Uh-huh.

Q.   You have to answer yes or no so he can write it down.

A.   Yes.

Q.   And what happens then?

A.   We walked into Mel's Diner to order the food, the takeout food.

Q.   Were you worried?

A.   I was not worried that time.  I saw Mr. Knight before at events, didn't think it was an issue, seemed to be a very friendly back and forth between the two, so I was not concerned.

Q.   You were not worried.  Then you and D-Roc went into the diner, correct?

A.   That's right.

Q.   Did you leave D-Roc at the diner?

A.   No, I did not leave D-Roc at the diner.

Q.   You're smiling and laughing, why?

A.   I mean, that's a crazy statement.

Q.   Yeah?

A.   Yeah.

Q.   Why is it crazy?

A.   Why would you leave D-Roc at a diner when you saw a gun being passed?  I don't understand that.

Q.   I'm asking you that exact question.

A.   No, me and D-Roc got back in the car and drove back to the Hollywood Hills.

Q.   Are you sure about that?

A.   100 percent.

Q.   You didn't leave D-Roc alone at the diner?

A.   No, sir.

Q.   So D-Roc is -- when is the last time you spoke to D-Roc?

A.   Probably around my employment time.

Q.   You haven't spoken to him since, what, 2010?

A.   Some point maybe after I left, him and his wife were doing like a fashion label, I think it was called Invisible Bully, and I probably talked to D-Roc after that, yeah.

Q.   So you didn't leave D-Roc and go back to the house by yourself?

A.   No, that doesn't make any sense, sir.

Q.   I'm not asking if it makes sense, I'm asking if you did it.

A.   No, sir.

Q.   And you went back to the house when Sean Combs and D-Roc had conversation and Sean Combs had to go pick D-Roc up at that same location?

         MS. SLAVIK:  Objection.

         THE COURT:  It's overruled.

A.   I was driving the car, sir, and it was me, D-Roc was to my right, Mr. Combs was in the middle seat.  It was the three of us driving back.

Q.   I heard you.

A.   I'm just clarifying.

Q.   So let me ask you a you few more questions.  So what you're saying is that you and D-Roc go back to Mr. Combs's house, right?

A.   That's right.

Q.   And you're driving?

A.   That's right, the silver Lincoln Navigator.

Q.   So tell me everything, because you weren't drinking that night, you weren't doing any drugs that night?

A.   That's right.

Q.   They'll me everything that happened when you got back to the house?

A.   What I could remember is when we got back to the house, I saw Mr. Combs and Cassie outside arguing --

Q.   Let's stop right there for a second.  Where outside?

A.   It was in the street.  If you're familiar with Mr. Combs's residence, he had like a wall and there was like a street, they were in the road.

Q.   So you saw Cassie in the road?

A.   That's correct.

Q.   How far from the house was Cassie in the road?

P5KCcom2                          James - Cross

A.   40 feet, 50 feet.  It was pretty close.

Q.   I'm sorry.  I didn't hear you.  4 feet?

A.   50 feet.  It was close.

Q.   Close to the house, but in the road?

A.   That's right.

Q.   Which house is this?

A.   The one in Hollywood Hills.

Q.   You said you saw Cassie in the street with Mr. Combs?

A.   Yup.

Q.   And you see them in the street arguing, right?

A.   That's correct.

Q.   And what happens next?

A.   There was a black Escalade.  So at that house, there's a driveway that's right there also by the road, and there was a black Escalade basically parked right there.  It looked like it was ready to go.  It was pointed out towards the road.  I get out of the car to walk into the house and Mr. Combs instructed me to get into the car and drive.

Q.   And where were you and Mr. Combs when he instructed you to get into the car and drive?

A.   In the road.

Q.   Now, you had gone back to the house in a silver Lincoln Navigator right?

A.   That's right.

Q.   But when you left the house, you were not in a silver

Case 1:24-cr-00542-AS   Document 568   Filed 12/18/25   Page 67 of 257   1800

P5KCcom2                          James - Cross

Lincoln Navigator, right?

A.   A black Escalade, that's right.

Q.   And who made the decision to change cars?

A.   Mr. Combs.

Q.   You didn't tell us about that conversation.  Tell us about that.

A.   There was no conversation.  It was what it was.  It was A black Escalade, he told me to get in the car, and I get in the car.

Q.   Did you come in the house?

A.   I did not, no.

Q.   So you didn't come in the house and you didn't see what, if anything, he did in the house?

A.   No.

        MR. AGNIFILO:  Give me a second.

Q.   So you never went into the house?

A.   I'm sorry.  I don't understand.

Q.   Let me ask a more specific question.  You're saying when you and D-Roc came back from Mel's Diner and came back to the area where Mr. Combs lived, Mr. Combs and Cassie were outside, right?

A.   That is what I remember, yes.

Q.   And so you did not go into the house?

A.   That is correct.

Q.   You stayed outside the whole time?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5KCcom2                        James - Cross

A.  Well, they were outside and I was walking towards the house to go back to my room, which was in the house, I was staying at the house.  Before I got to the house, Mr. Combs told me to get in the car to drive away, to go back to Mel's Diner essentially.

Q.  So let's talk about that part.  So you get to the house, you see Mr. Combs and Ms. Ventura arguing outside, right?

A.  Yes.

Q.  And then you go where?

A.  I'm sorry?

Q.  You said you were headed back out to the house to go to your room?  Did I not understand that right?

A.  I don't understand what you're asking me.

Q.  After you saw Mr. Combs and Ms. Ventura arguing, what did you do?

A.  I got out of the car, and then as I got out of the car, Mr. Combs turned to me, he said, get in the car, pointing towards the black Escalade, and so I got in the car.

Q.  So you never walked toward the house?

A.  Of course I walked towards the house.  I got out of the car to walk towards the house, sir.

Q.  I'm trying to understand your movements.  So you get out of this silver car?

A.  Yup.

Q.  You walk towards the house, right?

P5KCcom2                          James - Cross

A.   That's right.

Q.   Where did you park the silver car?

A.   Out front of the house.

Q.   And how far from Mr. Combs and Ms. Ventura did you park the silver car?

A.   Relatively close, probably the distance between me and you.

Q.   And you got out of the silver car and did you walk toward Mr. Combs and Ms. Ventura?

A.   I was going back into the house.  I thought the night was over and I was going back to my room.

Q.   Did you tell Mr. Combs what had just happened?

A.   I don't recall telling him that, no.

Q.   Did you tell Ms. Ventura what just happened?

A.   I never talked to Cassie that night, no.

Q.   And so you're on your way back to the house, but Mr. Combs says, get back in the car, we're going back, right?

A.   That's right.

Q.   And then he gets in the car, right?

A.   That's right.

Q.   And you're saying that you, D-Roc, and Mr. Combs are in the car?

A.   That's correct.

Q.   And you looked back and you see three guns?

A.   Yes.

Q.   On Mr. Combs's lap?

P5KCcom2                          James - Cross

A.   That's correct.

Q.   And so between the time that you arrived at the house and the time that Mr. Combs and you got into the black car, you didn't see Mr. Combs go back into the house, right?

A.   I did not, no.

Q.   So that would mean he had three guns on his person when you got to the house, right?

A.   I guess that's the assumption, that's correct, yes.

Q.   But you didn't see where he got these three guns?

A.   I was unaware we had guns in the camp until that exact moment.  I never saw guns.

Q.   So now you're in a black -- what kind of black car was it?

A.   It was an Escalade.

Q.   You were in a black Escalade driving?

A.   Yes.

Q.   With D-Roc in the front passenger seat?

A.   Yes.

Q.   And Sean Combs in the back seat with three guns on his lap, right?

A.   That's right.

Q.   Have you ever remotely been in a situation like this before in your life?

A.   No.

Q.   Are you saying, I don't want to go with three guns to approach Suge Knight and four Escalades of people at Mel's

P5KCcom2                          James - Cross

Diner, do you say anything like that?

A. We didn't really have a conversation about it. We were executing.

Q. You were executing?

A. Yeah.

Q. And what you're saying, what you're telling this jury you're executing is you are executing a potential shooting, right?

MS. SLAVIK: Objection.

THE COURT: That's overruled.

Q. What are you going there to do, sir?

A. I was there to drive the car.

Q. You were there to drive the car. You told this jury, I think you said three people in the car, three guns, right?

A. That's right.

Q. I want to back up for a second. Before you worked with Mr. Combs, what did you do for a living?

A. I was an executive assistant.

Q. What kind of work did you do as an executive assistant?

A. As an executive assistant, you answer the phone, you make appointments, you roll calls, you attend meetings and take notes.

Q. And we're going to get to it in a lot more detail. You described the kind of work you did with Mr. Combs's companies, right, which was, you know, organization, things like that,

P5KCcom2                          James - Cross

executive support, right?

A.   Correct.

Q.   Before you had this other job where you were answering phones and making appointments, what kind of work did you do?

A.   My first job out of school I was a door-to-door salesman at a company called SID Corp..

Q.   And you are now in a black Escalade with two other men and three guns going to confront somebody, that's what you're telling us, right?

A.   Yes.  It was not ideal.

Q.   It was not ideal.  And you didn't say a thing?

A.   I didn't, honestly.  Respectfully, sir, you have someone with three guns that in close proximity, I didn't think I had the option to say something.

Q.   And so you're driving this car, what you're saying is you're driving this car with D-Roc and Sean Combs in it looking for Suge Knight and you go down, you're driving to the diner, right?

A.   That's correct.

Q.   You don't need directions on how to get to the diner, you know how to get there, right?

A.   I frequent Mel's all the time.

Q.   And you are going there, you said nothing was said in the car, right?

A.   I don't remember anything.  It was complete silence.

P5KCcom2                        James - Cross

Q.   And so what you told the jury you were doing is you were executing the mission, right?

A.   I was doing what I was told.

Q.   I think what you said was something about executing a plan or a mission.  Do you remember that?

A.   I think those are the same things.  But yes, I was executing my command I was given.

Q.   You were executing your command?

A.   That's right, that Mr. Combs commanded me to do.

Q.   I understand.

     And so what Mr. Combs commanded you to do was to get into this car with D-Roc with three guns.  You've never seen guns before, right?

A.   Not with Mr. Combs.

Q.   This isn't the kind of thing where you see guns from time to time, right?

A.   That's correct.

Q.   And this is, fair to say, a radical departure in your job responsibilities; is that an understatement?

A.   That is the understatement of the day so far.

Q.   So far, we might have others, but that's the one of the day?

A.   Yeah.

Q.   And I want to get back to the first time you spoke to the government.

A.   Okay.

Q.   You didn't tell them any of this other part, right?

A.   That's correct.

Q.   And you told them this other part only the second time that you spoke to them, right?

A.   After I had legal counsel, yes, sir.

Q.   Have they given you some type of immunity?

A.   I'd have to ask my lawyer that question.  I don't -- there was like a pre-offer agreement or something like that.

Q.   A proffer agreement.

A.   Thank you.

Q.   Did they ever say you're not going to get in trouble for this?

        MS. SLAVIK:  Objection.

        THE COURT:  Overruled.

A.   My lawyer said I have no legal visibility --

        MS. SLAVIK:  Objection, your Honor.

Q.   Let me specify one thing.  I don't want to know anything about what you and your lawyer talked about.  I'm only really talking about your understanding, and the reason I'm doing that is because when I was asking you questions to begin with, you said that something was said and then you went back and you added to the story.  I'm trying to understand what your understanding is about what, if any, protections you have from the story that you're telling.

P5KCcom2                        James - Cross

A.  I'm not sure.

Q.  You don't know.  All right.

Now, you left Combs's employment about how long after this?  About a year or so?

A.  Six months.

Q.  Did you ever tell anybody about this?

A.  I did not, no.

Q.  You never told anyone about it?

A.  I think I've told my wife over the years, yes, at the time.  And, I mean, security was aware of it, but I didn't tell the office or any of the media or anything like that.

Q.  Other than your wife, you didn't tell anybody?

A.  It's not something I'd discuss.

Q.  And the first time you ever told anyone about it is you told the government about it, what, earlier this year, right?

A.  I was asked the question and I responded to the question.

Q.  Did you meet with the government at all this morning?

A.  What do you mean?

Q.  I don't know how to ask any more clearer.  Did you speak to the prosecutors at all this morning?

A.  Very briefly, yes.

Q.  What did you guys talk about?

A.  Potentially what could come up in cross.

Q.  Did you talk about the Mel's Diner incident?

A.  We did not, no.

P5KCcom2                        James - Cross

Q.   Not at all?

A.   Not that I recall.

Q.   When you say not that you recall, I'm asking you to recall things from today.

A.   I understand that.

Q.   So I asked you if you talked to the prosecutors about the Mel's Diner incident and your answer is not that I recall?

A.   To be honest, I was more focused on my own, trying to jog my own memory.  I don't exactly remember what our conversation was this morning.

Q.   Where and when was this conversation?

A.   About 8:45 in the room there across the hall.  It was a very brief conversation.

Q.   Who was there?

A.   Ms. Christy, my lawyer.

Q.   So your lawyer's here?

A.   That's correct.

Q.   And what did you guys talk about?  Let me be very clear.  I don't want to know anything about you and your lawyer without anyone else in the room.  That I am not asking about.

        Do you understand that?

A.   Yes.

Q.   I'm only asking you conversations where the prosecutor or someone other than your lawyers in the room, what you guys talked about.

P5KCcom2                        James - Cross

A.   Your style.

Q.   Fair enough.  How did I do?

A.   It's consistent.

Q.   Good.  I'm dying to ask you what they said, but I'm not going to.

     Anything come up about Mel's Diner, anything at all?

A.   I honestly don't remember.  It's such a flash.  This whole thing is, you know, I just don't remember, sir.  I'm sorry.

Q.   Did they say to you, did the prosecutors say to you or your lawyer in the prosecutors' presence say to you, you're going to get questioned on the events around Mel's Diner?

A.   I think they were talking about there could be some -- you would call up some inconsistencies, the things that changed over time.  She didn't say it's specifically about Mel's Diner or another issue, but yes, she was aware you were going to call out my inconsistencies.

Q.   They spoke to you at 8:45 today about the fact that there might be inconsistencies in your testimony brought out on cross?

A.   Sure.

Q.   Who brought that up?

A.   I believe that was Christy.

Q.   The prosecutor, one of the prosecutors, right?

A.   That's correct.

Q.   What did she say?

P5KCcom2                          James - Cross

A.   I don't know the exact quote, but recapping what I just said, it was consistent to that.

Q.   And you're saying you don't remember if these questions, these issues with inconsistency related to Mel's Diner, that's what you're telling me, right?

A.   That is correct, I don't remember exactly.

Q.   You don't remember?

A.   There were other inconsistencies in my testimony, I don't remember exactly what we were talking about, but, you know, it was very natural to have inconsistencies.

Q.   Thank you.

A.   You're welcome.

Q.   My question, though, I'm really trying to focus you on the Mel's Diner thing, and I understand you're saying you don't remember, but now you remember there were questions about inconsistencies?

A.   That I do remember, yes.

Q.   Did anyone say to you there's going to be -- you're going to be confronted with inconsistencies about Mel's Diner?

        MS. SLAVIK:  Your Honor, this has been asked and answered.

        THE COURT:  Let's move it along.  I'll overrule the objection, but let's try to speed things up.

Q.   Do you remember?

A.   I don't have a clear memory of that, no.  I'm sorry.

P5KCcom2                     James - Cross

Q.  Just so we're clear, this meeting was not even two hours ago, right?

A.  Yeah.

MS. SLAVIK:  Objection.

THE COURT:  It's overruled.  But Mr. Agnifilo --

MR. AGNIFILO:  I'm getting there.

Q.  You are telling this jury about things that happened in 2009, right?

A.  To the best of my ability, yes.

Q.  Which is why I asked you when we started, do you have a clear recollection of the events around Mel's Diner.  Do you remember that question?

A.  I don't remember you asking me that, no.

Q.  And you are saying, and I'm going to ask this again, I apologize, you did not leave D-Roc there?

A.  I absolutely did not leave D-Roc there, no.

Q.  You're sure?

A.  100 percent sure.  We drove back together to the house.

Q.  And you have a clear memory of that?

A.  I do.

Q.  And when you drove back with D-Roc to the house, which is what you're telling the jury you did, you got out of the car, right, and where was D-Roc?

A.  I don't recall.  I believe he was out the car, as well, but I don't remember that detail.

P5KCcom2                          James - Cross

Q.   And you are certain, I just want to make sure, you are certain that when you saw Cassie and Mr. Combs, they were both outside of the house?

A.   That is what I remember, yes.  I am certain about what I remember.

Q.   You're certain about what you remember?

A.   In regards to that, it's a pretty core memory, yes.

Q.   I have a few much more mundane questions for you.

A.   I love mundane questions.

Q.   So when you were testifying yesterday, you're saying that your responsibilities, and I hope I have this right, were to ensure that Mr. Combs could operate as a chairman to perform his duties most efficiently, correct?

A.   That was correct.

Q.   And that is really, that is your core responsibility, is that right, when you were working with Mr. Combs?

A.   The word core responsibility is a tough one.

Q.   That was a large aspect of what you were supposed to be doing?

A.   That's right.

Q.   And at the time, if you remember, Mr. Combs was operating Sean John, the fashion line?

A.   Yup.

Q.   And Bad Boy, the record label, right?

A.   That's right.

Q.   And Ciroc, was he doing Ciroc at the time?

A.   He started that relationship while I was with him, but yes.

Q.   And he was a brand ambassador.  Does that sound right for Ciroc?

A.   I understood it as he had a big influence in their marketing, and he had an ownership stake in the company, I believe.

Q.   Was there a fragrance line at the time?

A.   Sean John Forgivable, I believe.

Q.   So there's a fashion part and then a fragrance part?

A.   That's right.

Q.   And let me ask you, let's back up a second, why did you want to work for Sean Combs?

A.   Growing up I was -- well, I mean, how long do we have? That could be a good answer.  But I was a fan of Sean John specifically.  I wore Sean John very early on, and I remember one day I was studying abroad in London and I was wearing a Sean John sweater.  This was early, really early on, probably 2004, and there were people coming up to me, like, oh, where did you get that Sean John from, you know, because at that point there was not a lot of international distribution.  And I understood the global reach of urban fashion, I was very interested in that.  And so Mr. Combs, Sean John, I was a fan of the brand and that's why I wanted to work for him.

Q.   And you believed in the product, right?

A.   100 percent.

Q.   And did you know anything about Mr. Combs individually?

A.   Yes.

Q.   And things that made you want to work there I'm really asking.

A.   Yeah, that he was very successful, he was self-made, that he's a brilliant marketer.  And yeah, I thought it would be a great opportunity to have someone like that to work for.

Q.   And you mentioned that he's self-made.  How is that an attractive quality for you?

        MS. SLAVIK:  Objection.

        THE COURT:  It's overruled.

A.   I just respect Mr. Combs from a business perspective.

Q.   And before interviewing, did you do sort of like your homework, your research into Mr. Combs and his companies?

A.   Sure.

Q.   And you knew going in this was going to be a really tough job, right?

A.   Yes.

Q.   And tell me if this is right:  You would have known, had you done your research and your homework, that Mr. Combs was a very, very hard worker, you would have known that, right?

A.   Absolutely.

Q.   And you would have known going in that to perform the function that you wanted to perform, basically to keep this

CEO, this chairman working as efficiently as possible, you yourself would have to work very, very hard as well, right?

A.   Yeah.   I'm not afraid to work hard.

Q.   I have no doubt because you wanted to work there at a very, very busy time in Mr. Combs's lives and the lives of his businesses, correct?

A.   That's correct.

Q.   So you knew this was going to be very long hours, right?

A.   I assumed, sure.  I don't have an issue with the hours.

Q.   So we're going to come back to some of this.

So I want to understand a little bit more, because you talked quite a bit about this yesterday and I have just a couple of followup things for you.

You traveled with Mr. Combs pretty regularly I think you said yesterday, right?

A.   Absolutely.

Q.   International travel, domestic travel?

A.   That's correct.

Q.   Do you remember where you went internationally, just a few places?

A.   Ibiza, Saint Tropez, Morocco, London.

Q.   Are these business trips or personal vacations?

A.   That's a fine line to determine that, but I'd say these are more business-oriented trips.

Q.   What made them business oriented?

A.  Well, I guess in Saint Tropez he was there going on vacations, so I guess that isn't a business trip necessarily. I mean, everything -- but -- so, for example, you could call it a personal trip.  We're in Saint Tropez on a yacht, and he flew in Estée Lauder on a helicopter to determine different fragrance notes for his fragrances.  So Mr. Combs's lives blended daily through business and personal.  It was kind of one consistent theme.  Even if he's on vacation, he's always working.

Q.  So tell me if this is right:  The idea is he's in this beautiful place and he's bringing in his business contacts to this business place with him?

A.  That's right.

Q.  And that's part of how he did business, right?

A.  Absolutely.

Q.  And you and Mr. Combs and others went to many beautiful places?

A.  Sure.

Q.  I'm not trying to trick you.

A.  Beautiful is I guess, you know --

Q.  In the eye of the beholder, as they say?

A.  That's right.

Q.  And so domestically, where did you travel domestically?  I imagine quite a bit.

A.  So our major places we'd go to was Atlanta, Miami,

P5KCcom2                          James - Cross

Los Angeles, New York City, Sundance Film Festival multiple times.

Q.  I think you said yesterday that you would be at his house before he woke up every day?

A.  That's correct.

Q.  And the idea is — and tell me if this is right — you would have a folder of relevant business documents for him to review?

A.  That's correct.

Q.  And that's really how he started his day, from what you could see and what did yourself, right?

A.  Especially in New York.  It was more business oriented in New York.  If we were in Miami, it was a little more laid back and casual, but I necessarily have a folder every day in Miami.  But if there's an issue we had to have approval on, then yes, it would certainly be that morning's folder.

Q.  So let's talk about New York, sort of typical.  You worked for two years for Mr. Combs, correct?

A.  Yes.

Q.  And that's what, part of 2007, 2008 into 2009, does that sound right?

A.  Yeah, May 2007 to May 2009.

Q.  You said that there'd be a folder with all of the contracts, proposals, agreements for him to review and approve.  Does that sound right?

A.  I don't necessarily remember contracts necessarily, but it

P5KCcom2                         James - Cross

was more like:  Lizzo is coming out with an album, the artwork needs to be approved; Mr. Combs just had a fashion shoot with Sean John, this is where the logo is going to go on the paper. So there was no decision made with his businesses without him giving the final word.  It was a very vast and a lot of businesses happening at once.  So yes, he was very involved with his businesses.

Q.  Marketing, advertising, all that stuff?

A.  That's right.

Q.  He reviewed all that stuff?

A.  Absolutely.

Q.  So even though he had people working probably in more specialized roles to deal with that, he dealt with it all himself from what you could see?

A.  He always had the final word, yes.

Q.  And part of your protocol -- what was your title?

A.  I was hired actually as a personal liaison, but that never really traveled or didn't really stick, and I was considered a personal assistant.  But I was actually hired as a personal liaison.

Q.  But your title was personal assistant, just so I know what to call you.

A.  Call me David.

Q.  Okay, David.  So what you did is you had all of these documents at the ready for when he woke up and had his

P5KCcom2                          James - Cross

breakfast, right?

A.  That's correct.

Q.  That's how your day started certainly when you were in New York, right?

A.  That's right.

Q.  In Florida, in Miami, it was a little less business-focused, right?

A.  That's correct.  It wasn't a set start time, for example, but absolutely we'd have business documents for him there, as well, to approve.

Q.  And now the documents that you put in his folder for him to consider, did you gather those documents or were they given to you by someone else?

A.  They would be sent to me.  We had an email account, which was I think like BadBoyAssistant@Gmail.  I don't remember the exact email, but they would be emailed to us from the office to download and to present to Mr. Combs.

Q.  So who, what positions would be sending you these documents that you would compile into the folder?

A.  His executive assistant.

Q.  Do you know who that was at the time?

A.  Karleen Roy.

Q.  Through your joint email, you would get these documents, you would put them into a physical folder and have them at the ready when he got up?

A.   That's correct.  And Dia would send us documents, as well, his chief of staff.

Q.   I think you also said that in addition to this folder of the documents for him to review, he had a business schedule?

A.   That's correct, yes.

Q.   Tell us about the business schedule, what is that?

A.   So it's almost like a printout of the Google calendar, it had all dates and times and locations of his business meetings for the day, and that was sent by Karleen.

Q.   By Karleen Roy?

A.   Yeah.

Q.   So he had business meetings throughout the day, correct?

A.   Yes.  It was very common.

Q.   Of course.  And these were with other executives, performers, music producers and the like, correct?

A.   Yes.

Q.   A pretty high level roster of people that he's talking to on a day-to-day basis, correct?

A.   Probably the second understatement of the day.

Q.   And thank you for that.

     And so why is that an understatement?  Tell the jury why that would be an understatement.

A.   Because Mr. Combs had very high level personal friends and associates.  I mean, so they were basically the who's who in any business.

P5KCcom2                          James - Cross

Q.  And he is going to meet with the who's who of any business, right?

A.  Yup, mostly chairmans and CEOs.

Q.  And it's critical, critical that he be absolutely well informed about whatever they're going to discuss, correct?

A.  That's right.

Q.  It's absolutely critical that he's on time, right?

A.  That's not true.

Q.  So let's scratch that one.

A.  We would adjust his schedule around his needs and we would rearrange meetings all the time because he didn't want to show up at a certain time and everybody would accommodate what he wanted.

Q.  But when he got that, he was informed?

A.  Sure, yeah, was very informed.

Q.  And so there's a great, from what you could see, there was a great deal of preparation involved in going to these meetings?

A.  Yes, Mr. Combs is very involved with his businesses.

Q.  From what you could see, what does that mean, when you say he's involved, give us a feeling, because you were there, we weren't, give us a feeling of what you saw, what was that like?

A.  It was fascinating.  I think the example I mentioned in Saint Tropez was something never seen before.  So Mr. Combs was developing a fragrance, for example, for Sean John, and he

P5KCcom2                      James - Cross

literally flew out the testers of Estée Lauder to show like exact notes like fragrance notes on a yacht because he was really that in tune and detailed about what notes he wanted. So I mean that's just a really good example of how involved he was with everything.

Q. And that was across all of his businesses?

A. That's right.

Q. And you would be involved in the logistics of getting him from place to place for these meetings, correct?

A. I was not his personal driver. I would be part of the -- we had a staff car, for example, we would probably follow the security detail. There were times where I would be in his car, but I wasn't necessarily responsible for that, no.

Q. So at some point, you're with him at his house wherever he's starting his day, whether it be New York or Miami or Florida, and you see that he's going to be ready to leave the house soon, correct?

A. Yeah, he would let us know.

Q. Who would you communicate with to say we're about to take it on the road?

A. His security detail.

Q. And the security detail, if you were in New York, he would often walk to work, right?

A. That's right. His security, I would text his security that Mr. Combs would be ready in 10 minutes, Bonds would come up to

P5KCcom2                         James - Cross

the door, meet him and escort him.  Security would always escort him everywhere.

Q.  And if were you in Miami or Los Angeles, he'd be leaving the house usually by car?

A.  That's right, yeah.

Q.  And you would basically tell security when you were in Miami or Los Angeles, we're ready to go, get the car ready, whatever it is that you said?

A.  That's right, yeah.

Q.  Were you typically in a second car or were you in the car with him?

A.  Typically in a second car.

Q.  Tell us how that works, who is in the second car, why is there a second car, just tell us about all that.

A.  Yeah, so, I always understood it from like a security perspective that if Mr. Combs had a Maybach, he would want to have a second car to his right, that way someone couldn't pull up on him, for example, and try to assassinate him or shoot him.  So we'd always follow him around from like a security detail.  We also had a lot of people.  So there was other executive assistants, sometimes a stylist, sometimes other people that would travel around with us.  So that was my understanding of why there was second cars.  Plus, we would have a staff car in New York City, an Escalade, that we would drive around, do errands that we needed to do, as well, or

drive out to his house in Alpine, New Jersey for example.

Q.  Talking about a security detail, I think what you said yesterday is that the security detail had three primary responsibilities:  To protect Mr. Combs, to protect his family, and to protect his property; do I have that right?

A.  That's right.

Q.  And at the time that you worked for him, do you remember how many kids he had?  I'm not trying to put you on the spot.

A.  I think he only has one new child since I left Mr. Combs, so --

Q.  Six.

A.  Thank you.

Q.  So he had six kids for the entire time you were working for him?

A.  Yeah.

Q.  And his security detail in addition to protecting him was there to protect his children?

A.  Absolutely.

Q.  And protect his property?

A.  Absolutely.

Q.  And I think you said he was almost never without his security detail?

A.  That's right.

Q.  So from the minute you left the house in the morning, you said, Bonds, if you're in New York and he was walking to the

office, Bonds would meet him at the door, right?

A. Yup.

Q. And walk him -- how long was it to get to the office, short walk, right?

A. It was a short walk, 1710 Broadway, and his apartment was right there, so five minute or less walk.

Q. And you've been in public with Mr. Combs many, many times, correct?

A. That's correct.

Q. For over the two years, you're probably with him in public hundreds of times, right?

A. Sure, yeah.

Q. Not uncommon for people to want to talk to him, to approach him, to run up to him, to walk up to him, correct?

A. That's correct.

Q. These are the kinds of things that you saw yourself, right?

A. Absolutely, yeah.

Q. And invariably, 99.9 percent of these people mean well, correct?

A. I can't tell you what other people's intention is.

Q. Of course. But everyone has to be alert for that one in a million that wants to approach him not for the right reason, right?

A. I think security was suspicious of anybody trying to approach him.

P5KCcom2                          James - Cross

Q.  And that happened all the time, right?

A.  Absolutely.

Q.  If he was out in New York, people would want to approach him, correct?

A.  That's correct.  He couldn't go anywhere without almost making a mob around him.

Q.  Tell us about that.

A.  So they would just be people that always, like, for the airport, for example, he'd walk through an airport and he would have like 10, 12 people that just wanted to come up to him. They wanted to touch him, shake his hand, get his autograph, things like that.

Q.  Kids, adults, right?

A.  Not so many kids necessarily, but adults, yeah.

Q.  And they wanted his autograph?

A.  There were people that wanted his autograph.

Q.  And you said that happened in airports.  That happened everywhere, right?

A.  It happened.  He couldn't even go into McDonald's without being identified and people want to have access to him.

Q.  And from what you could see, in your opinion, did he intend to be gracious around these sorts of things?

A.  I don't think gracious is a word I would use to describe Mr. Combs.

Q.  Was he -- I mean, he had to get from place to place, right?

P5KCcom2                          James - Cross

A.   Yes.

Q.   Did he ever sign autographs?

A.   He did not.  Actually, sometimes I would sign autographs or his executive staff would sign autographs.  We would send those out if we got fan mail, for example.  He did not sign many autographs.

Q.   And he had to get from place to place, that was part of your job to get him from place to place efficiently, correct?

A.   That was security's job.

Q.   Right.  But you would be involved in the scheduling, right?

A.   The scheduling was executive office.  I was there to execute.  And so making sure he was prepared for where he had to go.

Q.   And if he had a meeting, if he had to go -- he was in New York and say he had to go to a meeting in a building, where would you wait for him?

A.   Most likely in the car with security detail.  Sometimes I'd go up to the lobby and wait in the lobby with him.  There were a few occasions where I'd be in meetings with him himself, but for the most part, I would be waiting for him in a lobby wherever security was or in the car.

Q.   From time to time, you went into the meeting with him, but that was not the norm?

A.   That's right.

Q.   For the most part, you waited outside the meeting in some

P5KCcom2                         James - Cross

way?

A.   That's right.  He would text me if he needed me to run an errand or get him some food or -- I would always would stay busy -- well, not always, but often stay busy while he's doing something, I would go advance somewhere or do something else that he needed.

Q.   And he typically had business meetings the entire day?

A.   He had a lot of business meetings.

Q.   And I think you said yesterday he had dinner around 6 o'clock or so?

A.   Yeah, around 6:00 or 7:00, it would be frequent that he would go to a dinner.

Q.   And you said sometimes these were personal dinners, sometimes these were business dinners?

A.   That's right.  Those lines blurred quite a bit, but yes.

Q.   I'm sorry.  I missed the last part.

A.   So, yes, they could be a business dinner with friends, but, you know --

Q.   Got it.  Got it.  And would you sometimes come to the dinner or just wait outside wherever it was where he was eating?

A.   Oftentimes, the security detail and I, we would wait in the car and they would send food out to us.  Sometimes I would be in the restaurant, like at a fleet chow, for example, I would be there because there's more of a waiting area and a bar area.

P5KCcom2                         James - Cross

Typically, I'd be outside with security.

Q.  And now after dinner when some other CEOs might be going home, he doesn't go home, he goes to the studio, right?

A.  That's correct.  Most of the time he'd go to the studio, yes.

Q.  And so he'd be getting to the studio like what, 9 o'clock, 10 o'clock?

A.  Yeah, dinner would be three hours.  Pretty standard to have a three-hour dinner.

Q.  And after dinner, he would go to the studio?

A.  That's correct.

Q.  So if we're in New York, where is the studio?

A.  Daddy's house.  I believe it was somewhere in the 40s.  I don't remember exactly the location.

Q.  If we're in Miami, where is the studio?

A.  He would use other people's studios.  He didn't have a -- well, he had a studio in his house on Star Island, for example, but we would go to like where Pharrell was working or other producers.  I feel like will Smith, for example, would have a studio we'd go to, but, you know.

Q.  And if it was in LA, where was the studio?

A.  I don't remember the location.  Somewhere in Melrose.  I don't remember the location.

Q.  So LA, that's not his studio, he would have to essentially rent studio time?

P5KCcom2                        James - Cross

A.   That's right.  He did build a house.  I'm sorry.  He did build a studio in his house, as well, in Los Angeles.

Q.   While you were working there, he did that?

A.   Yeah, while we were doing the Last Train to Paris, I think it was called.

Q.   And I think you said yesterday he'd stay in the studio until 3:00 or 4:00 a.m.?

A.   Very common, yes.

Q.   And you would be with him the whole time?

A.   That's right, yeah.  I'd be in the studio with him for sure.

Q.   And so at some point, he would leave the studio in whatever city he was in and he would go home or to a hotel and go to sleep, right?

A.   That's right.  I'd leave before him.  I'd take one of those staff cars in advance so when we got home, it was set up for him.

Q.   And I think what you said yesterday was the way your day ended very often at 4:00 a.m. or so is you would try to figure out when the next day was going to start?

A.   Yeah, I couldn't leave until I had -- until -- I always asked him if it was okay for me to leave, and then he instructed me what time he'd want me back tomorrow.

Q.   And the day would end and you would start assembling the documents and the materials and the business schedule for the

P5KCcom2                    James - Cross

next day?

A.   That's right, yeah.   That's why I arrived before he was typically up, because you had to prepare for the day.

Q.   And you said that there were times when you worked seven days a week for weeks on end?

A.   Sure.   There was definitely times I worked 21 days straight, yeah.

Q.   And it was hard demanding work, right?   And if it wasn't to you, please feel free to say it.

A.   I was prepared for the moment.   I mean, I guess for the average person, it would be very hard and demanding.   One personal assistant actually went to the hospital after working with him for 24 hours because of dehydration.   I'm just a different type of person.

(Continued on next page)

P5KsCOM3                        James - Cross

BY MR. AGNIFILO:

Q.  OK.  And here is your chance to say good things about yourself.

Tell us how.

A.  I just have -- I'm from Flint, Michigan.  I'm a grinder. I'm a hard worker.

Q.  You're a hard worker and you can handle it?

A.  Yeah.

Q.  OK.  And you enjoyed it, right?

A.  I did, at times.

Q.  Yeah.

And the long days didn't adversely affect you?

A.  Well, there was a saying that the security detail would always tell us, and that is, Do you know what rhymes with tired?  And the answer is fired.

Q.  And that wasn't a problem for you because you never got tired?

A.  That's not true.  One day I was actually driving home from the studio in Los Angeles, and I was actually driving the car this night.  And I blew through a red light and Mr. Combs got very upset with me.  He was like, What are you doing, man?  We can't be blowing red lights, we will be pulled over by the cops.  I just literally turned around and said, I'm fucking tired, man.  Like, I'm just exhausted.

Q.  And you didn't get fired?

A.   That's right.

Q.   You talked about advancing locations?

         All right.  Do me a favor.  You just have to answer so they can write it.

         Yes?

A.   I'm sorry?

Q.   You talked on direct about advancing locations?

A.   Yes.

Q.   OK.  And one of those places where you advanced locations were hotel rooms, correct?

A.   That was one location, yeah.

Q.   OK.  And you mentioned a term called riders?

A.   Yes.

Q.   Riders, you've worked in the entertainment field a lot of your life, is that right?

A.   That's not accurate.

Q.   Where else did you work in the entertainment field?

A.   I don't think --

Q.   That's a bad question.

A.   I agree.

Q.   Yeah.  Thank you.  We agree on that.

         Mr. Combs, did you consider that the entertainment field?

A.   Yes.

Q.   OK.  Did you have other jobs where you worked with people

who were involved in music production or things like that?

A.  No.  Before I was with Mr. Combs, I was not in entertainment.  After Mr. Combs, I was in social media.  I guess, essentially, Beats by Dre was a client of mine.  That's not necessarily entertainment, that's music.  But I was a social media person for a long time and now I'm a realtor, so...

Q.  So you're out of entertainment completely?

A.  Yeah.  Fashion was always my passion.

Q.  I see.

A.  Wasn't really in entertainment.

Q.  Got it, got it, got it.  OK.

Now, riders are common?

A.  OK.

Q.  Do you know that?

A.  I would assume so, yes, at a high-level person.  Yeah, sure.

Q.  And the idea is that, when you're talking about high-level people, certain people want, when they are away from home, they want things to be as close to home as they can get, right?

MS. SLAVIK:  Objection, vague.

THE COURT:  Sustained.

Q.  Well, that means you don't answer.

A.  Thank you.

Q.  All right.  What was your understanding of why there were

P5KsCOM3                         James - Cross

riders?

A.   To have a consistent environment for wherever he was.  And so, for example, one of his rider items, when we were traveling in London, is ketchup, Heinz 57 ketchup.  And I don't know if you guys have ever been to London before, but the checkup in the U.K. is not similar to the ketchup in America.  He would not be happy.  I mean, ketchup was a big item that he always needed for his food.  And so, it was just the consistency, to create a consistent environment for wherever he was, which I think helped make him feel comfortable in that moment.

Q.   Were you aware that he put applesauce on cheeseburgers?

A.   I was not aware of that.  I did know he liked applesauce.

Q.   And the rider would be all these things he would want wherever he was to be most comfortable?

A.   That's correct.  There was different riders for different situations.

Q.   OK.  And now, you said --

     I have a couple of specific questions for you.

     You were talking about the distinction, when you were talking to the government, you were talking about the distinction in different types of items.  And you made the point that there were certain items that were personal items.

     And what you said, among the personal items, was Astroglide, condoms, and baby oil?

A.   That's correct.

P5KsCOM3                        James - Cross

Q. And you did not expense those through the business?

A. I did on occasion and -- but, no, I was told not to do that.

Q. OK.

A. But there was a time or two, I certainly did because, again, I -- you know, I didn't -- yes.  But most of the times, no, I did not.

Q. When you did expense it through the business, you were -- you knew you weren't supposed to do that?

A. Not the first time, no.  I just thought they were everyday items, you know.

Q. All right.  So there were certain items and these are the three you identified that you did not submit receipts for?

A. That's correct.

Q. OK.  Other than when -- this is my word, you tell me if this is right.

        Other than when you made a mistake?

A. I guess you could see it that way, sure.

Q. When you weren't making a mistake, you did not submit these through the business and you did not submit the receipts for these things, right?

A. That's correct.  I would just give cash and give the security detail the change.

Q. Because you -- and I think what you said is that these were personal expenses, right?

P5KsCOM3                        James - Cross

A. They were items that I was told that he didn't want to run through the company.

Q. OK. And your understanding was that -- I think what you said on direct, tell me, maybe you don't remember it this way, they were not run through the company because they were personal expenses?

A. No. I just think because they were items that he didn't -- he didn't want to have a record for.

Q. But the company didn't pay for them, he didn't run them through the company?

A. I mean, it's all his money.

Q. No. But, my question is what's run through the company and what's not run through the company, not what's his money.

He didn't run these through the company, that's my question?

A. That was what I was instructed, yes.

Q. Very good.

Other things were run through the company, so if you bought toilet paper, through the company or not through the company?

A. I never bought toilet paper.

Q. I'm sorry. That's a bad question.

A. Like candles, for example, run through the company.

Q. Run through the company?

A. Yes.

P5KsCOM3                       James - Cross

Q.   All right.  If he, you know, you said that he liked Heinz

ketchup.  Run through the company?

A.   Run through the company.

Q.   Things like food items would run through the company?

A.   Absolutely.

Q.   OK.  Things that, you know, when he was away that, you

know, snacks, drinks you said Vitamin -- you said Fiji water?

A.   He did like Vitamin Water.  Triple X.

Q.   OK.  Run through the company?

A.   Run through the company.

Q.   OK.  All these things were run through the company, but the

Astroglide, baby oil, condoms, not run through the company?

A.   That's correct.

          MR. AGNIFILO:  All right.  Just so I can plan

accordingly, when does the court want to take a break?

          I can do it anytime.

          THE COURT:  We're going to keep going.

          MR. AGNIFILO:  That's fine.  Like 12:15, just so I can

get to a spot.

          THE COURT:  All right.

          MR. AGNIFILO:  Thank you, Judge.

BY MR. AGNIFILO:

Q.   I want to talk to you about something that happened in

Saint-Tropez.

A.   Yes.

P5KsCOM3                      James - Cross

Q.  You said you bought drugs there?

A.  That's correct.

Q.  And you said he you bought an eight ball of cocaine?

A.  That's right.

Q.  What's an eight ball of cocaine?

A.  I believe it's eight grams of cocaine.

Q.  Eight grams?

A.  I think so.  I could be wrong on that.  I'm not an expert.

Q.  Do you know what you spent for that?

A.  I don't recall.

Q.  And you said that was not for Mr. Combs, correct?

A.  It was not.  It was one for one of his friends who was with us on the trip.

Q.  This person was a friend of yours, too, right?

A.  No.

Q.  No?

A.  No.

Q.  Who's Nellee Hooper?

A.  Nellee Hooper is a music producer for a company like YouTube.

Q.  And did Nellee Hooper ask you to do this?

A.  There was a time when I did mention that to the government. But after further consideration, I was not convinced that that was actually Nellee Hooper.  It was him or someone else named Vikram, but I don't know exactly who it was.

P5KsCOM3                          James - Cross

Q.  So I want to follow up on the answer you just gave.

You told the government that you had gotten the eight ball for Nellee Hooper, right?

A.  That's correct.

Q.  And you told them that in one of these proffer meetings you had with the government, right?

A.  Sure.

Q.  Why did you say that?

A.  It was the honest answer at time.  I was being as honest as I could.

Q.  That's how you remembered it --

A.  Yeah.

Q.  -- right?

I mean, you wouldn't tell the government that  Nellee Hooper had you buy the eight ball and be lying about it, right?

A.  I was told never to lie to the government.

Q.  So that was your honest answer?

A.  Yes.

Q.  And after you gave it, what happened?

A.  Just, like, similar, the way my mind works, after I say something, I kind of think about it again.  This is a very long time ago.  There's details that kind of come up and get refreshed.  And then I, you know, I adjust my answer accordingly.  I think that's very natural.

Q.  OK.  So you adjusted your answer after you told the

P5KsCOM3                          James - Cross

government that Nellee Hooper had you buy the eight ball, right, you adjusted it?

A.   I was not confident afterwards it actually was Nellee.

Q.   Who it was?

A.   What's that?

Q.   Who was it?

A.   Like I said, I don't remember.  Either Vikram or Nellee.  I don't remember who it was.

Q.   It might have been Nellee?

A.   Could have been.  I just don't remember.

Q.   When you adjusted your answer, you hadn't excluded Nellee as a possibility?

A.   That's correct.

Q.   How was your memory refreshed, just so I can understand?

A.   I just think about, kind of, thinking through my thoughts.

Q.   So you refreshed your own mind?

A.   That's correct.

Q.   All right.  So, getting back to this eight ball.

        Very clear, Mr. Combs didn't ask you to do it, right?

A.   No.

Q.   You never told Mr. Combs that you did it?

A.   No.

Q.   OK.  As far as you know -- well, let me ask a question regarding you.

        You never told him you were doing it, right?

P5KsCOM3                        James - Cross

A.  Correct.

Q.  You never went to him and said, Hey, so-and-so asked me to buy an eight ball of coke.  Is that something you think I should do since I'm on your payroll?

You didn't say that to him, right?

A.  No.  There were other times --

Q.  I'm asking about this time.

A.  No.

Q.  All right.

A.  I think he was sleeping at the moment.  At the time, he was in his room.

Q.  All right.  So you didn't tell him and say, I'm going to go buy an eight ball of coke, is that OK; you didn't say that?

A.  I didn't ask Mr. Combs a lot of questions.

Q.  And you didn't ask him that question is my question?

A.  That's correct.

Q.  Right?

OK.  After you did it, you didn't tell him, you know, you should know I bought an eight ball of coke while we're here in Saint-Tropez?

MS. SLAVIK:  Your Honor, this has been asked and answered.

THE COURT:  Overruled.

Let's speed this up.

MR. AGNIFILO:  We're almost done.

P5KsCOM3                          James - Cross

BY MR. AGNIFILO:

Q.  You didn't tell him afterwards?

A.  No.

Q.  And you didn't say it in front of him until you said it in this courtroom, right?

A.  I'm sorry?

Q.  You never said that in front of him until we all sat in this courtroom together, yesterday?

A.  That's correct.  Yeah, yeah.

Q.  All right.  Now, how did you know where to go to get this eight ball of coke?

A.  Mr. Combs had a gentleman, I forget his name, that coordinated everything for us when we were there.  He coordinated cars.  He coordinated events.  He basically was his main contact locally, and I knew to call him if I needed anything.

Q.  Say that again?

A.  I knew I could call him and he could give me anything I needed for Mr. Combs or his associates.

Q.  I just want -- you keep mentioning Mr. Combs.

I have to ask you, Mr. Combs had nothing to do with this, right?

A.  With me buying cocaine?  That's correct.

Q.  Right.

A.  There's other things Mr. Combs needed, I would go to this

P5KsCOM3                         James - Cross

gentleman for.

Q.   I got it.

A.   That's right.

Q.   In this instance, you decided that you would go to this other gentleman to get the eight ball of cocaine that you wanted to buy, right?

A.   I don't think I wanted to.  I was executing.

Q.   You were executing what?

A.   A request by one of his personal friends.

Q.   You were executing --

Now, executing leads me to believe that you're doing something in connection with your job.  Is that what you mean executing?

MS. SLAVIK:  Objection.

THE COURT:  It's overruled.

Q.   You used the word executing, right?

Was this in connection with your job?

A.   Yes.

Q.   Yeah.  And in connection with your job, you didn't think you should tell your boss what you were doing?

Tell me how that was in connection with your job.

A.   There were a lot of things that we did that Mr. Combs was not aware of, sure.

Q.   And how many times did you buy eight balls of cocaine?

A.   This was only one time.

P5KsCOM3                         James - Cross

Q.  Let's talk about this one time.

So you said you were executing this thing and you
didn't tell your boss about it.  And then we're done with this
topic, right?

A.  Thank you.

Q.  Is that the answer?

A.  Yes.

Q.  Tell me about your relationship with Roger Bonds.

A.  Um, what do you mean?

Q.  Tell me about your relationship with Roger Bonds.

A.  Roger Bonds was a security guard for Mr. Combs and I was a
personal assistant to Mr. Combs.

Q.  Did you have an independent relationship, just you and him?

A.  What do you mean?

I don't understand what you mean, what relationship
means.

Q.  Characterize your relationship in whatever words you choose
between yourself and Roger Bonds.

MS. SLAVIK:  Objection, asked and answered.

THE COURT:  Overruled.

Q.  Did you consider him a business associate, did you consider
him a friend, did you socialize with him?

Anything.

A.  We were former -- we were definitely employees.  But, yeah,
there was a good bond there.  There was, you know, we were --

P5KsCOM3                        James - Cross

we would talk about Bad Boys being a family, right.  I think we all looked at each other, in a sense, as being family, yes.

Q.  OK.  So let me ask you about that.

You said that Bad Boy is a family?

A.  Yeah.

Q.  Tell me what you mean by that.

A.  Nana Combs called me her son at one point.

Q.  Mr. Combs' mother?

A.  That's correct.

Q.  And when did that happen?

A.  Multiple times.

Q.  OK.  And tell me why else it was a family?

A.  Because we were all there to support Mr. Combs.  We all had a joint mission to support him in what he needed.

Q.  OK.  Did you have a sense of mission?

A.  Sure.

Q.  What was the mission?

A.  To make sure that he was happy and, you know, prepared for the day.

Q.  OK.  Make sure he was happy.

He is running several very sophisticated business entities, right?

A.  Yes.

Q.  Right.

And the mission was to make sure that, one of the

first things you said when you got on the stand, was to help him be effective as a chairman, right?

A.  I believe that's where the personal comes in with personal assistant.

Q.  OK.  But the mission was to make sure that the businesses ran well, and your role in the mission was to make sure that he was an effective chairman, is that fair to say?

A.  That's fair.

Q.  And I know you worked really, really hard and you worked very long hours.

And whatever you say is going to be the answer.  Was it fun?

MS. SLAVIK:  Objection to the commentary.

MR. AGNIFILO:  That's fine.

THE COURT:  No commentary.

MR. AGNIFILO:  Yes, Judge.  Absolutely.

Q.  Did you have fun from time to time?

Was it fun?

A.  Sure.  I enjoyed it from time to time.  There's times I didn't enjoy it as well, but yeah.

Q.  And you enjoyed the camaraderie, right?

A.  Yeah.  Sure.

Q.  You just described it as a family?

A.  Yeah.

Q.  Right?

P5KsCOM3                          James - Cross

A.  I did.

Q.  And you felt camaraderie not just with Roger Bonds, but with other people, too, right?

A.  Yeah.

Q.  Who were you closest to, kind of, during your time working with Mr. Combs, you know, among the other people in your orbit?

A.  Like, other personal staff that was always around us, like, his other assistants, his chef.  Basically, I mean, you know, his executive staff, I would say, I was closest to.

Q.  Chef Jordan?

A.  Yep.

Q.  Is that right?

A.  Yep.

Q.  What was your relationship with Chef Jordan?

A.  Um, a business relationship.

Q.  OK.  Was there any kind of issue between you and Chef Jordan?

          MS. SLAVIK:  Objection.

          THE COURT:  Can you rephrase the question?

Q.  Did you choke her?

          MS. SLAVIK:  Objection.

A.  No.

          THE COURT:  Hold on.

          That's overruled.  Let's go.

Q.  You didn't choke Chef Jordan?

P5KsCOM3                         James - Cross

A.   No, I never choked Chef Jordan.

Q.   Tell us what you did do.

          MS. SLAVIK:  Objection.  This is beyond the scope.

          THE COURT:  Let's have a very brief sidebar.

          (Continued on next page)

P5KsCOM3                    James - Cross

(At the sidebar)

THE COURT:  All right.  Where are we going?

MR. AGNIFILO:  This is part of the reason that he left Bad Boy.  He didn't leave Bad Boy because of the incident he discussed.  He left Bad Boy because he got in trouble for having a physical confrontation with another government witness.

THE COURT:  OK.  How much time do you have left in your cross?

MR. AGNIFILO:  Probably 15 minutes.

THE COURT:  15 minutes?

MR. AGNIFILO:  10, 15 minutes.  Probably not more than that.

THE COURT:  All right.  The objection is overruled.

Let's go.

(Continued on next page)

P5KsCOM3                        James - Cross

(In open court)

THE COURT:  Mr. Agnifilo, you may proceed.

MR. AGNIFILO:  Yes.  Thank you.

BY MR. AGNIFILO:

Q.  Tell the jury what happened between you and Chef Jordan.

A.  There was an incident once in Miami.  We were in Star Island -- excuse me -- and we were in his kitchen.  And me and chef were going back and forth, and she kept telling me, basically, that Mr. Combs had beef of the day.  And she was basically kind of telling me how to do my job.

So I got very upset by it, and I grabbed her two wrists and I squeezed her wrists and I told her to stay in her fucking lane.

Q.  You grabbed her wrists?

A.  Both wrists, yeah.

Q.  Yeah.

You didn't grab her anywhere else?

A.  No.

Q.  No?

A.  No.

Q.  Was there any fallout from you grabbing her wrists?

A.  What do you mean fallout?

Q.  Was there any consequence?  Did you have to speak to anybody?  Did you get in trouble?  Did someone lodge a complaint?

Anything that you would consider a fallout?

A.  I understand.

Yes.  It was reported to the corporate -- the headquarters, and either Dia or to Vashta.  And then Mr. Combs heard about it and he called me to his room.

Q.  And then what happened?

A.  He asked me what had happened and I told him what happened. And, um, and he said, You can't be putting your hands on women. And I said, I know, sir.  I fucked up.  And he said, If you do it again, I'm going to have to let you go.  And he told me to write her a note and to buy her a gift.

Q.  And did he -- and he said if you ever did anything like this again, you would be fired?

A.  That's correct.

Q.  OK.  And fair to say, when did you end up leaving the company in relation to that?

A.  I don't have that marker in my head.  I'm not sure.

Q.  We're talking weeks, months?

A.  Months.

Q.  Months?

A.  Months.

Q.  Few months, right?

A.  Yeah.

Q.  Not long at all?

A.  No.  It was a pretty good time.  This was not towards the

P5KsCOM3                        James - Cross

end of my tenure.  I think this handled about the middle of my tenure.

Q.  What was the relationship between you and Chef Jordan after that?

A.  It was fine.  She forgave me and we were fine.

Q.  Did you buy her a gift?

A.  I rolled you a blunt and gave her a blunt.

Q.  That was your gift?

A.  That's right.

Q.  All right.  Did she seem to appreciate it, from what you could see?

A.  She did.

Q.  Few other questions for you.

You said that yesterday, that you overheard a conversation when you were in a car with Mr. Combs and a business associate concerning Cassie.

Do you remember what I'm talking about?

A.  I do, yes.

Q.  Who was the business associate?

A.  Chris Lighty.

Q.  Chris Light?

A.  Lighty.

Q.  Chris Lighty?

All right.  And who was in the car, other than Mr. Combs, yourself, Mr. Lighty?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5KsCOM3                          James - Cross

Who else?

A.  A driver and a security detail, most likely Bonds and Malik.

Q.  OK.  And where were you in the car?

A.  I was in the third row, they were in the second row, I was behind them.

Q.  OK.  Could you hear the entire conversation?

A.  I was as close to me as this lady in front of me.  So yes, I could hear the conversation.

Q.  Who was Mr. Combs talking to?

A.  To Chris.

Q.  Chris Lighty?

A.  That's right.

Q.  OK.  And at about -- at what point in your employment was this conversation, do you remember?

A.  This was early on.  This was after Kim had moved out to Los Angeles with the family.  This was just when they started dating, Cassie and Mr. Combs.  So it was very early on.

Q.  OK.  And do you remember when Kim moved out to L.A. with some of the kids, right?

A.  Yeah.

Q.  OK.  That Mr. Combs ended up spending -- starting to spend more time in Los Angeles after that?

A.  Of course.

Q.  No, no.  I meant yes, right?

A.   Yeah.  He wanted to be by his kids.  For sure.

Q.   Right.

          I'm going to ask you a few questions.  I don't mean to
embarrass you.  I'm just going to ask them.

          You've taken ectasy, correct?

A.   That's correct.

Q.   How often?

A.   Not very often.

Q.   All right.  And you were taking ectasy from time to time
while you were working with Mr. Combs, correct?

A.   Um, not when I was actually working with Mr. Combs.  But if
I had a night off, I would party, sure.

Q.   I mean, during that time, during that two-year time period?

A.   Yeah.

Q.   All right.  And you smoked marijuana from time to time,
correct?

A.   That's correct.

Q.   OK.  How often would you do that?

A.   I don't recall.

Q.   OK.  Would it be several times a week?

          Just give us an idea, rough idea, that period of your
life.

A.   Honestly, I was working so much, there was not real time to
smoke, so not that often.

Q.   OK.  I want to ask you a few questions about what things

P5KsCOM3                          James - Cross

were like in the studio.

This was typically at nighttime, correct?

A.   Yes.

Q.   All right.  And were there people, were people sometimes smoking marijuana or using other drugs in the studio?

A.   All the time.

Q.   OK.  All the time.

You're talking about musicians hanging out all night in a recording studio making music, right?

A.   That's right.

Q.   So there is drugs, that's just kind of part of what was going on?

A.   It was a creative environment, yeah.

Q.   A creative environment.

And from time to time you would do some drugs then, too, correct?

A.   No.  I was never -- I never did drugs with Mr. Combs, in his presence, while other people were smoking, no.

Q.   So you never did that?

A.   No.

Q.   OK.  Except a couple times when you were talking about when you got in trouble about having a joint once, right?

You put the joint behind your back and you got in trouble for that, do you remember that?

A.   So that was an evening once.  We were in his house in Miami

P5KsCOM3                          James - Cross

and he had a recording studio in Miami.  And I thought he was in for the night, and so I think I was there with one of his producers, Rio.  I was smoking a joint outside, relaxing my mind a little bit, and he comes out of the house.  And he looks at me.  He said, What are you doing?  I said, Nothing, sir.  And he said to me, you know, If you're man enough to smoke, you're man enough to tell me that you smoked.  I said, OK.  I'm smoking a joint.  He says, Do that again and I'm going to fire you.  So that was the last time he saw me smoking weed.

Q.  Do you remember a time that you and Bonds picked up two women who were prostitutes?

MS. SLAVIK:  Objection.

THE COURT:  Overruled.

Q.  Yes?

A.  Answer?

Q.  Answer.

A.  I was not familiar at the time that they were prostitutes, no.

Q.  Tell us what happened.

A.  Roger Bonds and I went out to eat.  We went out to have drinks one night.  We were off.  We went to the hotel lobby and we met two women and we brought those women back to Mr. Combs' residence.

Q.  So you brought these women back.

Which residence?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5KsCOM3                          James - Cross

A.   The one in Hollywood Hills.

Q.   Was Mr. Combs there at the time?

A.   No.

Q.   OK.  So --

A.   He was at a hotel, probably.

Q.   Say that again?

A.   He was most likely at a hotel.

Q.   Did you ask anyone if you could bring these women back to the house?

        MS. SLAVIK:  Objection, your Honor.  This is beyond the scope.

        THE COURT:  Overruled.

Q.   Did you?

A.   Um, I mean, Roger Bonds, it was his idea to do it.

Q.   OK.  Roger Bonds made you do it?

A.   I don't understand.

Q.   Did you speak to Mr. Combs and say, I'm bringing Bonds and I picked up two women, can we bring them back to your house?

        Did you have that conversation?

A.   It was often that security detail would actually invite women over to the house without Mr. Combs' knowledge.

Q.   I'm going to ask you the question one more time.

        Did you tell Mr. Combs that, Bonds and I picked up two women and we are bringing them back to the house, did you tell him that?

A.  I don't have that relationship with Mr. Combs.  I didn't talk to him about personal items like that.

Q.  So you didn't tell him?

A.  That's right.

Q.  But you thought you could bring two women that you and Bonds picked up back to that man's house, correct?

A.  It was not uncommon.

Q.  How many times did you do it?

A.  Well, I had a girlfriend at the time, and she would come over quite frequently.

Q.  OK.  That was your girlfriend?

A.  That's right.

Q.  How many times did you pick women up from another place and bring them back to the house?

        MS. SLAVIK:  Objection, your Honor.  403.

Q.  You said it was common?

A.  Me?

        MS. SLAVIK:  Objection, 403.

        THE COURT:  No, I understand the objection.

        It's overruled.

A.  Me?  This was the only time that I randomly met a women.  But I was saying that security did it all the time.

Q.  And it turns out that these weren't just women, they were what?

A.  Um, well, after we had intercourse, they asked me for $200.

I was very surprised.  I was, like, What do you mean?  And I called Bonds and I said, Why is this  woman asking me for money?  I had no idea she was a, you know, a person to ask for money after that.

And I was against paying her.  So I told Bonds, I don't want to pay her for this.  I don't understand why.  He said, You better pay her because we don't want any problems here at the house, so pay her.

Q.  And you paid her?

A.  I did.  And then she wanted to take a shower, so I asked her to pay me $200 to take a shower.

Q.  How did that turn out?

A.  I got my money back.

Q.  You got your money back?  Congratulations.

MR. AGNIFILO:  Hold on a second.  Hold on a minute.  Hold on.

(Counsel confer)

On that note, I have no other questions for you, sir.  Thanks so much.

THE COURT:  Ms. Slavik.

REDIRECT EXAMINATION

BY MS. SLAVIK:

Q.  Mr. James, a few minutes ago Mr. Agnifilo was asking you questions about an incident involving you and Chef Jordan, is that right?

P5KsCOM3                      James - Redirect

A.   That's right.

Q.   And this incident involved some sort of report with HR?

A.   That's right.

Q.   And after this incident, Mr. Combs told you that if you put your hands on a woman again, you would be fired?

A.   That's right.

Q.   Mr. James, were there any instances of violence between Mr. Combs and Chef Jordan?

A.   There was one time that I was familiar with, an incident that occurred, yes.

Q.   Where did that incident take place?

A.   This was in Alpine, New Jersey.

Q.   What were the circumstances of that incident?

A.   So when I get to Alpine that day, I arrive probably at nine or ten o'clock, and Chef Jordan was not there at the house.  We were in the process of trying to find a new chef for the day.

Q.   And you said this was in Alpine, New Jersey?

A.   That's right.

Q.   What was in Alpine, New Jersey?

A.   Mr. Combs, that's where he had a house.

Q.   And who was there when you arrived?

A.   It was me, Roger Bonds, Mr. Combs, probably Malik, as well.

Q.   And who is Malik?

A.   Mr. Combs' driver in New York.

Q.   What, if anything, did Mr. Combs say to you when you

P5KsCOM3                      James - Redirect

arrived?

A.  He told me to go out to the police station and make a report that Chef Jordan hit him.

Q.  What was your understanding of why he asked you to do that?

A.  It was my understanding that if this were ever to come up in the media or future date, he would have --

MR. AGNIFILO:  Object to understanding.

THE COURT:  That's sustained.

Jury should disregard the witness's last answer.

Q.  Mr. James, you said that Mr. Combs instructed you to go down to file a police report?

A.  That's right.

Q.  What did he instruct you to say in the police report?

A.  That Chef Jordan was the aggressor and that she hit him first.

Q.  Did he tell you why he wanted you to file the police report?

A.  No, but I understood.

Q.  Did you file the police report, Mr. James?

A.  I did not, no.

Q.  Why not?

A.  I didn't want to make a false police report and lie to the police.

Q.  What did you do instead?

A.  I took the staff car and drove around for an hour around

New Jersey and came back home and I told him I made the report.

Q.  Mr. James, you were asked several questions by Mr. Agnifilo about your meetings with prosecutors.

Do you remember that?

A.  Yes.

Q.  What is the only thing that prosecutors have asked you to do with respect to this case?

A.  To tell the truth.

MS. SLAVIK:  Nothing further, your Honor.

THE COURT:  Thank you very much.

MR. AGNIFILO:  Very quick, Judge.

THE COURT:  All right.

RECROSS EXAMINATION

BY MR. AGNIFILO:

Q.  So you lied to Mr. Combs about the making the police report?

A.  That's correct.

Q.  Did you ever tell him that you made a police report?

A.  I did.

Q.  When?

A.  That --

Q.  No.  I mean, did you ever -- My bad.

Did you ever tell him that you actually never did file the police report?

A.  No.

Q.  Did he ever ask you about it again?

A.  No.

Q.  To your knowledge, was there some sort of relationship between Chef Jordan and Roger Bonds?

            MS. SLAVIK:  Objection.

            THE COURT:  Sustained.  It's sustained.

            MS. SLAVIK:  It's beyond --

            THE COURT:  Sustained.

            MS. SLAVIK:  Thank you.

            MR. AGNIFILO:  Fine.  Thank you.

            THE WITNESS:  Thank you.  Thank you.

            MS. SLAVIK:  Nothing further, your Honor.

            Thank you.

            THE COURT:  All right.  Thank you very much, Mr. James.

            THE WITNESS:  Thank you.  Can I go home now?

            THE COURT:  Yes, you can.

            THE WITNESS:  Thank you.

            (Witness excused)

            THE COURT:  The government may call its next witness.

            MR. AGNIFILO:  Your Honor, can I ask for a three-minute break?

            THE COURT:  You can ask for --

            Let's take ten minutes and we'll come back.

            MR. AGNIFILO:  Thank you, Judge.  I apologize.

THE COURT:  Hold on.  All rise.

We'll take ten minutes.  See you back in ten minutes.

(Jury not present)

We'll be back in ten.

MR. AGNIFILO:  Thank you, Judge.

(Recess)

THE COURT:  Please be seated and let's get our jury.

(Jury present)

THE COURT:  Welcome back.

We're going to try to get the temperature turned up just a few degrees.  I've been told it's very complicated to change the temperature in this courtroom, but I am freezing here right with you.

With that, the government may call its next witness.

MS. JOHNSON:  Thank you, your Honor.

The government calls Regina Ventura.

THE COURT:  Welcome.  You can come right up here.

THE DEPUTY CLERK:  Just remain standing for a moment and please raise your right hand.

 REGINA VENTURA,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

Thank you.  You may be seated.

DIRECT EXAMINATION

BY MS. JOHNSON:

P5KsCOM3                          R. Ventura - Direct

Q.   Good morning, Ms. Ventura.

A.   Good morning.

Q.   Can you pull a little yourself a little closer to the
microphone.

A.   Kind of.  OK.

Q.   OK.  What is your occupation?

A.   I'm retired.

Q.   In what city and state do you live?

A.   New London, Connecticut.

Q.   Approximately how long have you lived in New London,
Connecticut?

A.   57 years.

Q.   Do you have any children?

A.   I do.

Q.   How many children do you have?

A.   I have two.

Q.   What are their names?

A.   Rodrick and Casandra.

          MS. JOHNSON:  Ms. Foster, can you please pull up
what's in evidence and publish to the courtroom Government
Exhibit 2A-101.

BY MS. JOHNSON:

Q.   Ms. Ventura, do you see Government Exhibit 2A-101 on the
screen in front of you?

A.   I do.

P5KsCOM3                          R. Ventura - Direct

Q.  Do you recognize who's depicted in that exhibit?

A.  I do.

Q.  Who is that?

A.  Sean Combs.

Q.  At a high level, how do you know Sean Combs?

A.  He dated my daughter.

Q.  Is that your daughter Casandra?

A.  Casandra.

Q.  And what do you -- how do you refer to Sean Combs?

A.  Sean Combs.

Q.  Do you call him Sean?

A.  Yes.

Q.  OK.  I'm going to call him Sean during this examination.

        Will you know who I'm talking about?

A.  I absolutely will.

Q.  Thank you.

        MS. JOHNSON:  You can take that photograph down now,
Ms. Foster.

Q.  Ms. Ventura, approximately what year did you first meet
Sean?

A.  Approximately 2006.

Q.  OK.  What was the occasion on which you first met Sean?

A.  Casandra was signing to Bad Boy.

Q.  And what was your understanding of Bad Boy?

A.  It was a record label.

P5KsCOM3                        R. Ventura - Direct

Q.   And what, if any, understanding did you have of Sean's affiliation with Bad Boy?

A.   He ran Bad Boy.

Q.   When Casandra signed with Bad Boy, what was your understanding of her -- the status of her relationship with Sean at that time?

A.   He was her boss.

Q.   Did that ever change?

A.   Yes.

Q.   How did it change?

A.   They started dating.

Q.   When Casandra and Sean started dating, in what city did they live?

A.   New York.

Q.   Did that change?

A.   Yes.

Q.   How did that change?

A.   They moved to the West Coast.

Q.   And where on the West Coast did they move?

A.   Los Angeles.

Q.   Once Casandra and Sean started dating, and I want to focus it first on the time period when they were in New York City.

        How frequently did you see your daughter?

A.   Probably three to four times a year.

Q.   OK.  Did the amount of times you saw your daughter change

once Casandra moved to Los Angeles?

A.   Yes.  It was harder to get to her, yes.

Q.   Does that mean you saw her less frequently?

A.   Yes.  Probably twice a year.

Q.   Were there occasions every year where you would see Casandra?

A.   I always saw her at the holidays.

Q.   And by the holidays, do you mean the Christmas holiday in December?

A.   Yes.

Q.   And with respect to Sean, when Casandra was dating Sean and they lived together in -- and they both lived in New York, how frequently did you see Sean during that time period?

A.   Not very often.

Q.   And did that change when Casandra moved to Los Angeles with Sean?

A.   No.

Q.   Ms. Ventura, I would like to direct your attention to the time period December 2011.

        Did Casandra come home to Connecticut for the holidays in December of 2011?

A.   She did.

        MS. JOHNSON:  Ms. Foster, could you please pull up for the courtroom what's in evidence as Government Exhibit B-315.

Q.   Ms. Ventura, directing your attention to Government Exhibit

P5KsCOM3                         R. Ventura - Direct

B-315, what is the date of this communication?

A.   December 23, 2011.

Q.   And who sends this communication?

A.   Casandra.

Q.   Through what e-mail address?

A.   *Vbang2011@yahoo.com*.

Q.   Is the Veronica Bang e-mail address an address that you knew to be associated with Casandra?

A.   Yes.

Q.   OK.  And who receives this e-mail?

A.   I did, and Capricorn Clark.

Q.   And is the e-mail address associated with mom new e-mail your e-mail address?

A.   Yes.

Q.   Could you please read the communication that Casandra sent to you?

A.   The threats that have been made towards me by Sean Puffy Combs are that he is going to release two explicit sex tapes of me.  One on Christmas Day, maybe before or right after and another one some time soon after.  He has also said that he will be having someone hurt me and Scott Mescudi physically (he made a point that it wouldn't be by his hands, he actually said he'd be out of the country when it happened).

Q.   A couple followup questions for you, Ms. Ventura.

Without telling me anything else that was happening

P5KsCOM3                        R. Ventura - Direct

around this same time in December of 2011, how did you react

when you received this e-mail?

A.   I was physically sick.  I did not understand a lot of it.

The sex tapes threw me.  I did not know the other person in it,

but I knew that he was going to try to hurt my daughter.

Q.   And when you say you knew he was trying to hurt your

daughter, who is the "he" that you're talking about?

A.   Sean Combs.

Q.   And what else, if anything, happened related to Sean Combs

and Casandra's relationship at or around the same time you

received this e-mail?

A.   It was understood that he was going to need $20,000 to

recoup money that he had spent on her because he was angry that

she had a relationship with Scott Mescudi.

Q.   And who was to provide the $20,000?

A.   Again, I'm sorry?

Q.   Who was providing the $20,000 that Sean was requesting?

A.   We were.  My husband and myself.

Q.   So let me ask you a few questions about that.

         How did you obtain $20,000 at the end of

December 2011?

A.   We had taken a home equity loan and decided to -- that's

the only way we could get the money.  So we took it out of

there and transferred it to our checking.

Q.   OK.  And at what bank was your home equity loan?

P5KsCOM3                          R. Ventura - Direct

A.  Charter Oak Federal Credit Union.

Q.  And, again, what was your understanding of why you had to send $20,000 to Sean?

A.  He was angry.  He had spent money on her and she had been with another person.

Q.  And how did you know where to send the $20,000?

A.  His bookkeeper e-mailed me the wiring information.

Q.  When you say he, who are you referring to, his bookkeeper?

A.  Oh, his bookkeeper.  I don't know if it was a he or a she.

Q.  I'm sorry.  It was a bad question.

When I said -- when you said his bookkeeper, whose bookkeeper are you referring to?

A.  Sean Combs' bookkeeper.

Q.  When you received wiring instructions, what did you do with them?

A.  I went to Charter Oak Federal Credit Union and we wired the money to the account indicated in the e-mail.

Q.  And whose account sent the money to the account indicated in the e-mail?

A.  Our checking account sent the money to the Bad Boy account that was indicated in the e-mail.

Q.  And when you say "our," who does our checking account refer to?

A.  My husband and myself.

Q.  What else, if anything, happened a few days after you sent

the $20,000 to the account, to the account that was indicated in the e-mail?

A.   Well, the money came back.

Q.   Approximately how many days later did the money come back?

A.   About four, four to five days.

Q.   What, if any, communications did you have with Sean about the money returning?

A.   None.

Q.   And you mentioned that the wiring instructions came to you over e-mail.

Do you remember that?

A.   Yes, I do.

Q.   Do you have a copy of that e-mail?

A.   I do not.

Q.   Ms. Ventura, just to be clear, why did you go to the bank and take out a $20,000 loan?

A.   I was scared for my daughter's safety.

Q.   What did you need the $20,000 for?

A.   To pay Sean Combs.

Q.   Why did you need to pay Sean Combs $20,000?

A.   Because he demanded it.

Q.   OK.  Ms. Ventura, I'm going to --

Do you see that there is a binder on ledge next to you, the black binder?

A.   Yes.

MS. JOHNSON:  I have one for you.

Q.  Can you please look through that binder and let me know in you recognize what's inside?

A.  The first folder or the whole binder?

Q.  The whole binder.  We will get to the folder in a moment.

A.  OK.

Q.  Do you recognize the photographs that are marked Government Exhibit 3Q-106 through 3Q-115?

A.  Yes, I do.

Q.  What is depicted in those photographs?

A.  Casandra is depicted in all the photographs.

Q.  And when were those photographs taken?

A.  Christmas Eve Day 2011.

Q.  Who took the photos?

A.  I did.

Q.  And what device did you use to take these photographs?

A.  I had a Kodak digital camera.

Q.  Are the photographs that are stamped Government Exhibit 3Q-106 through 3Q-115 true and accurate photographs of Casandra in December of 2011?

A.  Yes, they are.

MS. JOHNSON:  The government offers at this time Government Exhibit 3Q-106, 3Q-107, 3Q-108, 3Q-110, 3Q-113, 3Q-114, and 3Q-115.

MR. AGNIFILO:  No objection, Judge.

THE COURT:  Those exhibits will be admitted.

(Government's Exhibits 3Q-106, 3Q-107, 3Q-108, 3Q-110, 3Q-113, 3Q-114, and 3Q-115 received in evidence)

MS. JOHNSON:  Ms. Foster, can you please pull up side by side Government Exhibit 3Q-106 and 3Q-109, which is already in evidence.

BY MS. JOHNSON:

Q.  Ms. Ventura, why did you take these photos of Casandra in December 2011?

A.  Because she was bruised and I wanted to make sure that we memorialized it.

Q.  OK.  What, if anything, did Casandra tell you about the source of the bruising?

A.  That she was beaten by Sean Combs.

Q.  And directing your attention to Casandra's hairstyle in this photograph, approximately what years did she wear her hair in this particular style?

A.  Oh, she -- she shaved her head in, I believe, 2009.

Q.  And how long did she keep her head shaved after 2009?

A.  I would say four or five years.  I can't really recall.

MS. JOHNSON:  OK.  Ms. Foster, can you take those two down and put up side by side Government Exhibit 3Q-113 and 3Q-115.

Q.  Where is Casandra in these photographs, Ms. Ventura?

A.  In her bedroom.

P5KsCOM3                         R. Ventura - Direct

Q.   And is that her bedroom in your home in Connecticut?

A.   Yes, it is.

          MS. JOHNSON:  OK.  You can take those down,

Ms. Foster.

Q.   Was December 2011 the first time Casandra told you about

Sean being physical with her?

A.   Yes.

Q.   Prior to that time, when, if ever, had you discussed this

topic with your daughter?

A.   I read what I remember to be a blind item or an item that

mentioned her name about being beat up in a car.  And I called

her and she told me it was not her or him.

Q.   And was that prior to December 2011?

A.   Yes.

Q.   Can you explain what a blind item is?

A.   I think they are on -- I have -- I think they are on blogs

or whatever, and they just talk about celebrities without

telling their name.

Q.   And after Christmas 2011, who else, if anyone, came to your

home for the holidays that year?

A.   After Christmas, Scott Mescudi came to my home.

Q.   And how long did he stay?

A.   Three or four days.  I cannot recall.

Q.   So directing your attention after the holidays in 2011,

when was the next time you saw Casandra?

A.  I believe it was in February, I just don't know the exact date.  But they came to the Foxwoods Casino for some opening.

Q.  When you say "they," who is they?

A.  I'm sorry.  Sean Combs and Casandra.

Q.  Did you see Casandra again in 2012?

A.  I did.  In April we flew out to Los Angeles, Rod and myself.

Q.  Who is Rod?

A.  My husband.

Q.  Ms. Ventura, I'm going to ask you to look at the folder, the manila folder that was inside of the black binder now.

A.  Um-hmm.

        MS. JOHNSON:  I'm going to give a copy to counsel.

Q.  Ms. Ventura, without telling me the name of the individual depicted, do you recognize who is in that photograph that's marked Government Exhibit 2A-404?

A.  Yes.  Oh, yes.

Q.  OK.  I'm going to call that individual Mia and I'm going to ask that you do the same.

A.  OK.

Q.  Do you know Mia?

A.  I do.

Q.  How do you know Mia?

A.  She was an employee of Sean Combs and a friend to Cassie.

Q.  OK.  In April 2012, were you present for an interaction

between Sean and Mia?

A.  Yes.

Q.  Where were you?

A.  In his kitchen.

Q.  And can you describe what happened?

A.  We were just standing around talking very casually, laughing, and she was laughing.  And then all of a sudden, he didn't want her to, I guess.  And he asked her what she was laughing at, and she shrugged and she went pale and she looked very shaken and afraid and disappeared.

Q.  And when you say "she," are you referring to Mia?

A.  I am.

Q.  So I would like to direct your attention now to August of 2016.

We're done with the binder and the folder.

A.  I have to move this chair.  Hold on.  It's a very heavy chair.

THE COURT:  We can provide some assistance here. We'll try to move the mic, also.

THE WITNESS:  OK.  Thank you.

THE DEPUTY CLERK:  You're welcome.

THE WITNESS:  Thank you.

THE COURT:  No problem.

THE WITNESS:  I'm ready.

BY MS. JOHNSON:

Q.  OK.  Just for one moment, turning back to the incident in April 2012 that you described.

When you said he in that incident, are you referring to Sean Combs?

A.  I am.

Q.  Now directing your attention to August of 2016.

Did you travel to Los Angeles in that month and year?

A.  Yes, we did.

Q.  What was the occasion?

A.  Casandra's 30th birthday.

Q.  While you were in L.A., did there come a time when you called the police?

A.  Yes, I did.

Q.  So I want to start earlier in that day before you called the police.

What happened earlier that day?

A.  Cassie, Casandra, was out with Sean and he stole her phone.

Q.  How do you know that?

A.  Because she came and told me.

Q.  What did you do?

A.  I called the police.

Q.  What, if any, interactions did you have with Sean that same day that Casandra's phone was stolen?

A.  We had a bitter argument outside her apartment building.

MS. JOHNSON:  Ms. Foster, can you please pull up

Government Exhibit 2B-107 in evidence.

Q. Ms. Ventura, do you recognize the building depicted in Government Exhibit 2B-107?

A. I do.

Q. What is that?

A. That's where Casandra lived on the 17th floor.

Q. Is that the building you referred to having an argument with Sean in front of?

A. Yes.

Q. Which side of the building did Casandra live on?

A. The side that you can see.

Q. OK. Where did you have the argument with Sean?

A. Like, down in the roundabout.

Q. Is that visible on this exhibit?

A. Well, the driveway -- the driveway is.

Q. OK. Besides Sean and yourself, was anyone else present for this argument?

A. Yes.

Q. Who?

A. D-Roc. Damion Butler.

        MS. JOHNSON: Can you please take this down, Ms. Foster, and pull up Government Exhibit 2A-202.

Q. Ms. Ventura, do you recognize this individual?

A. I do.

Q. Who is that?

A.   That's D-Roc.

Q.   And I believe you also called him Damion Butler?

A.   Damion Butler.

Q.   Is that his government name?

A.   I think it's his government name.  I didn't get everybody's government name.

Q.   Understood.

            MS. JOHNSON:  You can take that down now, Ms. Foster

Q.   Ms. Ventura, can you describe the argument that you had with Sean outside of Casandra's apartment building in August of 2016?

A.   We were arguing about the phone.  I wanted the phone back and he was holding it.

Q.   And where -- how were you and Sean positioned?

A.   Damion was between us.

Q.   OK.  What, if anything, did you do during this argument?

A.   I was yelling, screaming, and trying to hit him.

Q.   Trying to what?

A.   Hit him.

Q.   Were you successful in hitting him?

A.   No.

Q.   And when you say him --

A.   Sean Combs.

Q.   OK.  Let me just finish my question.

            Were you trying to hit Sean Combs?

A. Yes.

Q. OK. Where was Casandra during this argument?

A. Up in her apartment.

Q. What, if anything, did Sean say about Casandra's phone during the argument?

A. I almost cannot recall, but he did give it back.

Q. When you say it, are you talking about the phone?

A. Yes, I am.

Q. And who did Sean give the phone back to you?

A. Me.

Q. And after the phone was returned, what happened next?

A. He took her car.

Q. When you say he, who?

A. Sean Combs took her car.

Q. And when you say her, who is her?

A. Casandra.

Q. How do you know that the car was taken?

A. Because I watched it leave.

Q. What kind of car was it?

A. A Jaguar.

Q. Before you left Los Angeles on that trip, did you celebrate Casandra's 30th birthday?

A. Yes.

Q. Was Sean present for that celebration?

A. He was not.

MS. JOHNSON:  One moment, your Honor.

No further questions at this time.

THE COURT:  Cross-examination.

MR. AGNIFILO:  Good afternoon, Ms. Ventura.

THE WITNESS:  Good afternoon.

MR. AGNIFILO:  I don't have any questions for you. Thank you.

THE COURT:  All right.  Thank you very much.

THE WITNESS:  Thank you very much.

(Witness excused)

THE COURT:  Who is the government's next witness, and should we start with that witness or do that after the lunch break?

MS. FOSTER:  The government's next witness is Sharay Hayes.  We can do either.

THE COURT:  All right.  Let's government can call its next witness.

MS. FOSTER:  The government calls Sharay Hayes.

He's going to be here in just one moment, I was just informed.

THE COURT:  OK.  Ms. Comey, maybe someone from your team can check to see the status of the witness.

MS. COMEY:  I'd be happy to go check, your Honor.

MS. JOHNSON:  Your Honor, I also just realized we can put in some evidence at this time, if that works for the court.

THE COURT:  Sure.  Let's make use of the time.

I hear one side say that, we're going to have the witness emerge from the doors.

But let's see what we can do.

MS. JOHNSON:  The government would offer Government Exhibit 4G-151 pursuant to the stipulation at Government Exhibit 1304, paragraph eight.

THE COURT:  Any objection?

MR. AGNIFILO:  No, your Honor.  Thank you.

THE COURT:  All right.  That exhibit will be admitted.

(Government's Exhibit 4G-151 received in evidence)

MS. JOHNSON:  Ms. Foster, could you please pull that up and display page 264.  It's Government Exhibit 4G-151.

THE COURT:  141?

MS. JOHNSON:  151.

THE COURT:  So 4G-151.

MS. JOHNSON:  Yes, 4G-151.

We can publish that later, your Honor.

THE COURT:  OK.

MR. AGNIFILO:  Just checking on ...

Never mind.

THE COURT:  Mr. Agnifilo, check on it and let me know if there is any issues.

MR. AGNIFILO:  Will do.

THE DEPUTY CLERK:  Please remain standing and raise

your right hand.

SHARAY DASHAWN HAYES,

called as a witness by the Government,

having been duly sworn, testified as follows:

You may be seated.  Thank you.

DIRECT EXAMINATION

BY MS. FOSTER:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Can you state your full name?

A.  My name is Sharay Dashawn Hayes.

Q.  How old are you, Mr. Hayes?

A.  I'm 51.

Q.  Where are you from?

A.  I'm from Harlem, New York City.

Q.  What state do you currently live in?

A.  New Jersey.

Q.  Directing your attention to the period between approximately 2012 to 2016, what were you doing for work during that period?

A.  I was working as a male exotic dancer, stage name Punisher, in New York City, in the New York City area.

Q.  What is a male exotic dancer, just generally?

A.  We usually do, um, house parties, bachelorette parties, strip tease performance for groups to kind of make a memorable,

P5KsCOM3                        Hayes -Direct

fun moment for a celebration.

MS. FOSTER:  Ms. Foster, would you please pull up side by side what is already in evidence as Government Exhibits 2A-101 and 2A-401.

Q.  Mr. Hayes, do you recognize these individuals?

A.  I do.

Q.  And starting with the individual on the left, 2A-101, who do you recognize that to be?

A.  Mr. Sean Combs.

Q.  And turning to the individual on the right, 2A-401, who do you recognize that as?

A.  Ms. Cassie Ventura.

Q.  How do you know these two individuals?

A.  I was hired sometime in late 2012 to create, like, a sexy scene, sexy erotic scene for them on occasion.

Q.  You mentioned you were paid for that?

A.  Yes.

MS. FOSTER:  Ms. Foster, you can take down these exhibits.

Q.  You said you were hired around them by fall of 2012, is that right?

A.  That is correct.

Q.  Is that when you first met the both of them?

A.  Yes.

Q.  And can you just walk through how you first met them?

A.   I was working at a club event, it was either Friday or Saturday night, and I got a call for with a woman stating that it was her birthday and her husband said that she can have a hired dancer.  So she told me there was some -- she had a get-together with some friends and she wanted to hire me to do a show.

Q.   And how did she tell you that?  Was it by phone, text, call?

A.   It was initially, I believe, a telephone call, and then it moved to text message.

Q.   What name did she provide to you?

A.   Janet.

Q.   Where were you living at this time?

A.   I was living in New York City.

Q.   Was your phone number publicly accessible at that time?

A.   Yes.  I used to market through a website, *getpunished.com*. If you Google search male strippers, bachelorette parties, it would come up on the search engine.  And my phone number was connected to the website.

Q.   You mentioned that your nickname at this period was the Punisher, is that right?

A.   Yes.

Q.   And can you tell us how you got that nickname?

A.   That was a nickname that I got in my teens.  I played basketball on West 4th Street in the cage, and usually the guys

played on a regular basis, you would get a nickname, an association with the park and how you played.  So I earned the Punisher.

Q.  You mentioned you had a website.

What services did you offer on that website?

A.  Um, aside from booking a male stripper for a bachelorette or birthday party, I also do ladies night events or I'll do a party, party where women can come and celebrate, bachelorette parties at a venue.

Q.  Turning back to the call that you received, when did the caller ask you to meet her for this party?

A.  Initially we scheduled sometime around midnight, but the time kept changing, basically being pushed back to later and later.  And I think we settled on somewhere around 2:30, 2:45 in the morning.

Q.  That was that, sort of, following day, basically, within the day that the call came, is that right?

A.  Yeah.  So I would have got the call somewhere between, let's say, 9:00 p.m. and 11:00 p.m. and it followed over into the following day.

Q.  At what location did she ask you to meet her for this party?

A.  Trump Tower, Central Park West.

Q.  In New York City?

A.  Yes.

Q.   What services did you believe you were going to be providing?

A.   Strip tease for a small group of friends.

Q.   And what directions did she give you about what to do when you arrived?

A.   Oddly, I was told to -- well, attempt to come in and come straight upstairs.  Basically bypass security and just come straight to the room.

Q.   Prior to arriving there, what, if any, discussion did you have with her about the cost of these services?

A.   Typically -- typically, at that time, to hire a male dancer would be $200.  That's about a 30- to 45-minute show, so that's what I called it.

Q.   What happened when you arrived at the hotel?

A.   When I arrived at the hotel, I was greeted at the door by Ms. Ventura.  She had on a bathrobe with -- that appeared that she had nothing on underneath, and I think she had on a wig.

Q.   You stated that the woman who greeted you was Ms. Ventura, is that right?

A.   Yes.

Q.   At that time, did you recognize who it was?

A.   I did not.

Q.   But here today you recognize that person as Casandra Ventura, is that right?

A.   Yes, I do.

P5KsCOM3                          Hayes -Direct

Q.   What happened when she opened the door?

A.   When she opened the door, she greeted me typically like any party, and she invited me into the hotel suite.

Q.   And what, if anything, did she say to you when you got inside the suite?

A.   Um, we walked into the hotel suite area.  I was expecting a crowd, but the room was -- there was no guests there.  I just stopped in front of a bathroom and just kind of asked, Would you like me to change here?  And she explained to me that she didn't want me to actually dance.  She explained to me that her and her husband liked to create a sexy scene that consisted of me and her mutually applying baby oil, applying it to ourselves and to possibly each other, and try to create a sexy environment that her husband would eventually come out to watch.

Q.   You mentioned that when you were booked for this, you anticipated, like, a small party, is that right, of people?

A.   Yes, that is correct.

Q.   When you arrived, did you see anyone other than her?

A.   I did not.

Q.   What did she hand to you when she said this to you?

A.   So when she explained in front of the bathroom that -- once she explained that she wanted us to create the scene, she handed me a stack of money for me to take into the bathroom and instructed to change into either underwear or a towel.  It was

P5KsCOM3                          Hayes -Direct

my preference.  When I got into the bathroom, I counted it and it was $800.

Q.  You mentioned she wanted you to create the scene for herself, for her and her husband, is that right?

A.  That is correct.

Q.  What, if anything, did she say about how you should react when her husband came into the room?

A.  I was specifically told to not -- not acknowledge her husband, try not to look at him, no communication or anything between me and him.

Q.  Can you describe the room?

A.  The room was very dimly lit.  There were candles.  I don't think there were actual candles, but maybe electronic candles that looked like regular candles, but they were electronic. All of the furniture was covered in sheets and there was an area pretty much set up for me to sit and her to sit across from me, and there were little bowls in the area with baby oil in them.

Q.  There were what bowls?

A.  Yeah, there were bowls of water, and then in the bowls of water there were bottles of baby oil.

Q.  Got it.

    You mentioned you went into the bathroom, is that right, after she told you what was going to happen?

A.  Yes.

P5KsCOM3                        Hayes -Direct

Q.   And you counted the money, is that right?

A.   Yes.

Q.   Sorry.  Can you remind me, what was the amount of money that she had handed you?

A.   It was $800.

Q.   What happened when you got out of the bathroom?

A.   I chose to wear a towel, and I was instructed to sit in a single chair that was kind of adjacent to a sofa.

Q.   And then what happened?

A.   Ms. Ventura got on the sofa opposite me and we -- I kind of just followed -- I just mimicked what she did.  She grabbed a bottle of baby oil and poured on herself, and I did similar.

Q.   After a few minutes of applying baby oil, what happened?

A.   A few minutes of applying the baby oil, I can kind of see from my peripherals her husband entered the room.

Q.   A man came into the room?

A.   Yes, a man came into the room.

Q.   How was that man dressed?

A.   What I recall is the man was nude, but I could not see his face.  There was, like -- I don't know it was called, it was, like, what the Muslim women wear, where the face is covered completely in the veil and you can only see the eyes.  It was a nude male with one of those veils on.  And I could see he had what I -- what I saw as a bottle of Astroglide he was carrying.

Q.   Why did you believe he was carrying Astroglide?

A.  I use Astroglide myself.  I noticed it by the purple top, so that is what had I associated it with.

Q.  What is Astroglide?

A.  It's a lubricant, sexual lubricant.

Q.  What did the man say when he entered the room?

A.  I had no communications with him.  He didn't say anything upon entering, that I remember.

Q.  After he entered the room, what could you see the man doing?

A.  At points, he was -- there was a table and a chair on the opposite side of the room.  So he sat behind a table and chair, and he kind of paced back and forth.  And I noticed that at times he was masturbating.

Q.  What, if anything, was he saying during the interaction?

A.  He was speaking to Ms. Ventura directly, but it was mostly subtle directions, things like, um, move the light to the side, maybe positioning her body a certain way.  Similar suggestions in terms of the angles we sat, I guess, for -- to get a better view.

Q.  And about how long did this encounter last in total?

A.  I feel like maybe 25, 35 minutes.  Possibly 25 to 45.  I didn't keep real good track of time, but it wasn't a long encounter.

Q.  And how did it end?

A.  At some point the man stood up and left the room.

P5KsCOM3                              Hayes -Direct

Ms. Ventura followed him out.  I kind of sat there waiting on the couch, and then she returned and she asked me if I wanted to finish.  So finished, I interpreted it as having an orgasm, which I declined at that point.  I was trying to be as professional as possible.  I know I was there to create what I called a sexy scene, so I declined.  I said I was good.  As long as they were happy, I was happy.  And she said thank you, and that's -- that's, you know, you were -- you know, that's what we wanted, and I was handed additional monies.

Q.  And did you count the money you were handed?

A.  Yes.  I didn't count it until after I got dressed.  When I got to the elevator, I counted it.  It was an additional $1,200.

Q.  At the time that this man entered the room at the time of this encounter, did you know who he was?

A.  I did not.

Q.  Did that change at some point?

A.  Yes.

Q.  And who do you now know the man to be?

A.  Mr. Sean Combs.

Q.  And how did you learn who he was?

A.  Um, I was -- I was actually contacted in the future to create a similar scenario.  And one specific time at a hotel called the Essex House, there was a waiting period until before we started.  I was put into a room, and to kill time I cut on

P5KsCOM3                         Hayes -Direct

the TV.  And the hotel TV had a welcome message, and it said Essex House would like to welcome Mr. Sean Combs.

Q.  You mentioned you were contacted in the future, is that right?

A.  Yes.

Q.  Approximately how many more encounters with Ms. Ventura in front of Mr. Combs did you have?

A.  I don't have an exact number, but I estimate between eight and 12 times.

Q.  And during those encounters, did you ever see his face?

A.  Um, yeah.  Further along down the line, I believe a similar time when I found out what the hotel scene, the hotel Essex House, where I saw it on the TV, eventually it switched from wearing one of those veils to just a baseball cap.  So I was able to notice his face.

Q.  And how did you find out who the woman was?

A.  So, ironically, I'm a fan of Mr. Combs.  I followed him on Instagram.  So I would see his posts and things, but I just didn't put it together.  So once I recognized the name on the TV, I went to his page, and I saw Ms. Ventura and some of the posts with him.

        MS. FOSTER:  Your Honor, this would be a fine place to take a stop.

        THE COURT:  OK.  Thank you, members of the jury.  We will take our break for lunch.

P5KsCOM3                          Hayes -Direct

Please don't speak about the case among the group. Don't talk about the case with anybody else.  And have a great lunch.  We'll be back at 1:00 p.m.

All rise for the jury.

(Continued on next page)

(Jury not present)

THE COURT:  All right.  Mr. Hayes, we'll have you back here at 1:00 p.m.

THE WITNESS:  Thank you.

THE COURT:  Thank you very much.

(Witness temporarily excused).

Please be seated.  Anything to raise from the government?

MR. AGNIFILO:  Nothing from us, Judge.

MS. SLAVIK:  No, your Honor.

THE COURT:  OK.  See everyone back here at 1:00.

MR. AGNIFILO:  Thank you, Judge.

(Luncheon recess)

P5KCcom4                        Hayes - Direct

AFTERNOON SESSION

1:07 p.m.

THE COURT:  Can we get Mr. Hayes back, unless there's anything else for us to address?

MS. FOSTER:  Yes, your Honor.  May I also approach the lecturn?

THE COURT:  Of course.

And let's get our jury.

(Witness present)

Welcome back.

(Continued on next page)

(Jury present)

THE COURT:  Welcome back, everyone.

Mr. Hayes, do you understand you're still under oath?

THE WITNESS:  Yes, I do.

THE COURT:  Ms. Foster, when you're ready.

Q.  Mr. Hayes, before the break, we talked about one time you had an encounter with Mr. Combs and Ms. Ventura; is that right?

A.  Yes.

Q.  And you said you had additional encounters; is that right?

A.  That is correct.

Q.  Could you just remind everyone how many more encounters you had with Mr. Combs and Ms. Ventura.

A.  Again, I don't have an exact number, but I estimate between eight and twelve times.

Q.  How often did these encounters occur?

A.  They would be every few months spaced in between, but sometimes it can be multiple days, so like a Friday night and a Saturday night within a weekend time span.

Q.  So you would have encounters on consecutive days, but then they'd be spaced by months; is that right?

A.  Yes.

Q.  In what city did each of these encounters happen?

A.  In New York City.

Q.  And at what locations?

A.  I recall the Trump Central Park West, the Essex House, The

London hotel, the Gramercy Hotel, and there was another hotel on the same street as the Essex House, but I don't remember the name.

Q. Was it always a hotel?

A. Yes.

Q. And at what times of day did these occur?

A. It was usually very early in the morning, sometime between 2:30 a.m. to maybe as late as 11:00 a.m. with me leaving.

Q. How would you be contacted before these encounters?

A. Typically the same way, a phone call that would then turn into text message communications to kind ever figure out a place and a time that worked.

Q. Who would reach out?

A. The majority of the time I assume it was Cassie Ventura. The communication was pretty standard. I only had one occasion where I got kind of confused text message and I didn't understand -- I didn't know who I was talking to because it was a different phone number, and I asked for a photo to be texted to me. The conversation kind of stopped. Then, later that day, I got a text from Ms. Ventura stating that it was her husband. At that time, I thought it was still Janet. So I got a text saying it was her husband and she'll take over from there. So that's the only time I think I was contacted by someone else other than Ms. Ventura.

Q. About how much notice would you receive before one of these

encounters?

A.  It was typically the same day.  So it would be sometime in the evening, let's say from anywhere from 5:00 p.m. to about 9:00 p.m., hey, are you available, and if I was, obviously we would schedule -- or kind of just -- I was just kind of kept posted to a location and time.

Q.  After the first few encounters, what did you understand you were being hired to do?

A.  It always started the same.  It was to create a sexy scene, like I said before, but I understood it could escalate to more sexual activity, whether it be oral sex or penetrative sex.

Q.  During these encounters, at a high level, could you describe what would happen?

A.  It was pretty much a similar pattern.  It would always start in some sort of seated couch scenario where we would put on baby oil to kind of create a look.  Me and Ms. Ventura would kind of put oil on ourselves, put it on each other, and kind of create a sexy atmosphere.

Q.  And was Mr. Combs always involved?

A.  Yes.

Q.  What would he be doing?

A.  Similar, like the first occasion, he would at some point come into the room, sit in the distance, gave subtle directions to Ms. Ventura based on, like I said, angles, lighting, positionings, and sometimes the sexual activity.

P5KCcom4                         Hayes - Direct

Q.   And what type of sexual activity did you engage in with Ms. Ventura?

A.   Oral sex, either me performing or her performing, and penetrative sex.

Q.   And how did the rooms look?

A.   Excuse me?

Q.   How would the rooms look?

A.   Similar, like the first, it was very consistent with dimly lit, candles, sometimes music in the background, and always the furniture covered in sheets.

Q.   You mentioned that during these encounters, Mr. Combs would give directions or instructions; is that right?

         MR. DONALDSON:  Objection.  Mischaracterizes the evidence.

         THE COURT:  That's overruled.

Q.   You may answer.

A.   Yes.  Yes, the way I described.

Q.   Could you describe what type of directions he would give?

A.   You know, like I said, it would be very subtle between him and Ms. Ventura.  Usually, generally, move the candle to the right, move it to the left, you know, position your body, sit forward.  At times, it could be directly to what's happening sexually in terms of, you know, perform -- one time specifically, because I don't have a full recollection of all the words, I know there was a time during sex where he would

P5KCcom4                          Hayes - Direct

say -- one time we were actually having sex and he dropped like a stack of money on the bed, and he said, you know, he popped up, said, are you okay, and he was just like, no, I like this shit.  So he would give feedback in terms of his being happy with the scenario.

Q.  And who would he give the directions to?

A.  Ms. Ventura.

Q.  Did you ever observe Ms. Ventura give any directions to him?

A.  I did not.

Q.  Across all these encounters, you mentioned you would use baby oil; is that right?

A.  Yes.

Q.  And how much?

A.  A considerable amount.  It was preferred to keep our bodies I guess covered, for I guess the look of it to shine or whatever was the preference.

Q.  And who gave directions about applying baby oil?

A.  Initially, I was told to do it by Ms. Ventura upon starting the session.  That was my original -- but during the acts, it would kind of be suggested or I would follow her lead in terms of grabbing more, putting more on.  It was kind of implied and known by me to keep the bodies as covered in baby oil as possible.

Q.  From start to finish, from you arriving there to leaving,

P5KCcom4                      Hayes - Direct

how long would these encounters last?

A. Consistently, about four hours. About four hours. A lot of time was waiting time, and probably about 25 to 45 minutes of sexual activity.

Q. How would these encounters generally end?

A. At some point I would be instructed to finish. Finishing is me having an orgasm. There was kind of a specific pattern with that, too, where I would orgasm around the outside area of Ms. Ventura's vagina. That was kind of the cue that we were done and the session would conclude that way.

Q. So you would have to finish in a specific spot on her body; is that right?

A. Yeah. It was always the same way. It was on the outside of her vagina, clitoris area where I was instructed to orgasm.

Q. What happened after you did that?

A. Usually, after that happened, Mr. Combs would stand up and leave the room, and shortly after Ms. Ventura would follow on.

Q. And then what would happen?

A. I would just be sitting there, waiting, sometimes 10 minutes, sometimes 15 minutes. Eventually she would return, usually tell me that was fine, and I was able to leave, and she would pay me.

Q. And how would Ms. Ventura pay you when she would come back from the room she had left to with Mr. Combs?

A. Usually, by that time -- when she would leave, she would

leave probably nude in a sexual scenario, she would usually come back in a bathrobe where it gave me a clear indication that we were done.

Q.  How much money were you paid for these encounters?

A.  It was the same amount every time.  It was either two amounts.  It was either $1200 dollars or $2,000.

Q.  Why would you get paid sometimes $2,000 and sometimes $1200?

A.  I don't have any understanding to why there was a difference in pay.

Q.  And how were you paid?

A.  It was cash.

Q.  And who would pay you?

A.  Ms. Ventura.

Q.  Were there ever times when you saw Mr. Combs handle the money that was used to pay you?

A.  Only the time that I mentioned earlier.  Like I said, we were in the midst of having sex, and Mr. Combs threw money on the bed.  That money at some point was removed from the bed and put on a nightstand, but then once we were finished, it was handed to me as my pay.

Q.  How did Ms. Ventura react when he threw the money on the bed, Mr. Combs?

A.  It was somewhat of a startled response where she immediately turned to him to check his wellbeing to see if he

P5KCcom4                      Hayes - Direct

was okay and everything was all right.

Q.  What did he respond?

A.  He said something to the degree that I'm fine, I'm enjoying this shit.

Q.  Going back to the directions that Mr. Combs would give, you mentioned that sometimes he would give directions about what sex acts you could perform; is that right?

A.  Yeah.  Everything was very subtle, but yes, certain things were suggested.

Q.  Like what?

A.  Like oral sex, like time for oral sex.  There was a specific time where we were interacting and -- probably one of the only times because he only in close proximity two times, the time with the money, and one other time he came over and he threw some condoms on the couch where we were interacting and said, I'm ready to see you fuck her, you know.  So that was kind of an instruction at that point, too.

Q.  Were there ever times that Mr. Combs would leave the room during these encounters?

A.  Yeah.  Briefly, sometimes we would be in the middle of an encounter, a sexual play scene like I described, and at times Mr. Combs would just stand up and leave the room.  Usually Ms. Ventura would then follow behind him.  They would be gone for a few minutes and then she would return.

Q.  So he would leave the room and then what would happen?

P5KCcom4                         Hayes - Direct

A.  He would leave -- he would stand up and leave the room at some point in the middle, Ms. Ventura would notice it, and then give me a cue to just call time out and she would follow him out the room.

Q.  Was there any communications between them before she would do that?

A.  Not anything specific that I recall.

Q.  What would happen when they would return from the room?

A.  We would either resume what we were doing previously. Sometimes I would get instructions to, like I said, finish.  So it could vary depending on the time.

Q.  Based on your observations of Ms. Ventura and your interactions with her during these encounters, what was your understanding of whether she was enjoying herself?

A.  I don't have a full -- I can't rely on -- I don't have a thought process to her enjoyment level.  I just -- my understanding was we were creating a scene, like a sexy scene that was enjoyable for her partner.

Q.  Can you explain what you mean by that?

A.  It appeared to me at some point that this was -- appeared like a fetish type of thing --

        MR. DONALDSON:  Objection.

        THE COURT:  What are the grounds?

        MR. DONALDSON:  I believe he's about to speculate related to what --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

P5KCcom4                    Hayes - Direct

THE COURT:  Let me get a new question, Ms. Foster, and we'll take it from there.

MS. FOSTER:  Yes.

Q.  You mentioned that Mr. Combs would give Ms. Ventura directions during these encounters; is that right?

A.  That is correct.

Q.  What, if any, noises did you observe her make in response to some of these directions?

A.  Some of the directions at times were very specific in terms of, you know, move the candle, move the candle again, position your body, position your body again.  So I did observe sometimes a sigh, a wince that appeared to be frustration with the frequency of the directions.

Q.  And who would wince and sigh?

A.  Ms. Ventura.

Q.  How many times throughout the encounters would you observe her do one of these things, wince and sigh, in response to directions?

A.  It was random.  I can't say it was multiple times in any specific encounter.  I just notice that it did happen on occasion.

Q.  What conclusions did you draw from that?

MR. DONALDSON:  Objection.

THE COURT:  That's sustained.

Q.  Based on the noises that she would make and based on her

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5KCcom4                         Hayes - Direct

size and her winces, what, if anything, was your understanding of whether Ms. Ventura was enjoying herself during these encounters?

MR. DONALDSON:  Objection.

THE COURT:  That's sustained.

Q.  Can you just describe, generally, how she would appear during these encounters, like what you observed about her and her demeanor?

A.  Yeah.  Prior to any of the physical encounters, we had just personable conversation.  She would ask me about, you know, my business, how is things going.  It was pretty typical interaction that seemed normal.

Q.  And you mentioned that she would sometimes sigh and wince in response to directions.  Who was giving those directions?

MR. DONALDSON:  Objection.  Asked and answered.

THE COURT:  That's overruled.

A.  The directions would be coming from Mr. Combs.

Q.  And what did you notice about where Ms. Ventura would look during these encounters?

A.  She was definitely seeking cues.

MR. DONALDSON:  Objection to that.

THE COURT:  That's overruled.

A.  She was seeking cues.  My understanding, from the time I started in this, was we were trying to create a sexy scene.  So there was some awareness to the preferences --

P5KCcom4                         Hayes - Direct

MR. DONALDSON:  Objection.

THE COURT:  It's overruled.

Q.  Can you just describe where she would look during these encounters?

A.  In and about the direction of -- well, not the full-time, but in and about the direction of where Mr. Combs would be situated.

Q.  What would she do when he would give her direction?  Would she respond accordingly?

A.  Yes, usually the directions were followed.

Q.  Did you ever hear her say no to one of these directions?

A.  I did not.

Q.  What, if any, drugs would you use during these encounters?

A.  I personally don't use drugs myself, no.

Q.  Did anyone ever provide you with any drugs during these encounters?

A.  I was always offered either alcohol or would I be interested in anything.  At times there were marijuana.  I'm not a marijuana smoker.  I call it a Bill Clinton.  I do recall being handed marijuana, I act like I take a puff, I don't inhale.  I'm not a drug user to that degree.  So I was never under the influence at all in any of the encounters.

Q.  Did you ever see Mr. Combs do any drugs in your presence?

A.  I did not.

Q.  Did Mr. Combs seem intoxicated during any of these

encounters?

A.   He did not appear to be.

Q.   Did you ever have any difficulty creating the scene for Mr. Combs?

A.   Yes, at times, I experienced anxiety and some sexual pressure within myself.  So there were moments I could struggle with getting and maintaining an erection.  So there were times I experienced those issues.

Q.   Why did you have these performance issues?

A.   Just, you know, me personally, a sexual scenario with a woman's partner present, actively giving directions and stuff like that was not the norm for me.  So it created some discomfort that could affect me and my performance.

Q.   What would you take to address these performance issues during these encounters?

A.   Oh, I tried Cialis, Viagra, the corner store pill, anything that I thought could possibly help me perform.  It was a lot of pressure.

Q.   You mentioned that you would get paid different amounts depending on the day.  How, if at all, did your performance issues affect your pay?

         MR. DONALDSON:  Objection.

         THE COURT:  That's overruled.

A.   I have no direct understanding if my performance issues was the -- associated with the difference in my pay.

P5KCcom4                          Hayes - Direct

Q.  Approximately when was the last time you had a sexual
encounter with Ventura and Combs?

A.  March of 2015, somewhere around that time.

Q.  Can you describe what happened during that encounter?

A.  Similar scenario where we started out interacting on the
couch.  This is specifically, I believe I mentioned earlier
that there was a time that Mr. Combs came, intervened, he
put -- threw condoms on the couch, and he expressed he was
ready for us to begin penetration.  His interaction and him
being in close proximity was not the norm, so it kind of threw
me off and startled me, so I struggled with getting an erection
and I couldn't perform.

Q.  What did he say?

A.  He said I'm ready -- as he presented the condoms, he said
I'm ready to see you fuck her.

Q.  And what did he do with the condoms?

A.  He threw them on the couch where we were interacting.

Q.  What was his tone when he said I'm ready to see you fuck
her?

A.  Assertive, aggressive.

Q.  How did she react?

A.  She reacted kind of startled, similar to myself.

Q.  And did you and Ms. Ventura engage in penetrative
intercourse after this?

A.  We attempted to, but like I said, I struggled to achieve an

P5KCcom4                          Hayes - Direct

erection and maintain it, so it was a failure.

Q.   And what happened at the end of this encounter?

A.   Eventually, another similar scenario, Mr. Combs left the room, Ms. Ventura followed him, she might have returned a few minutes later and I was still instructed to finish.  So I believe I masturbated to a point of orgasm.  Shortly after they both left the room and she returned with money to pay me.  We had a conversation where she was thanking me for my -- for being private and, you know, respecting their privacy in terms of our interactions.

Q.   At the end of this encounter, what was your understanding of whether you'd ever see them again?

A.   Well, my own assessment, because I felt like I didn't perform and I didn't achieve the scene or the circumstance that was wanted, I was insecure about being called again.  I thought I didn't do the job I was there for, so I was worried that I would not be called back.

Q.   Is that because he had said he wanted you to have sex with her and you didn't?

        MR. DONALDSON:  Objection.

        THE COURT:  Hold on.  "Is that," you got to let me hear the rest of the question or else I won't understand what the objection is.

        Can we get the question again.

        MS. FOSTER:  I'll rephrase.

Q.  He said, I want to see you fuck her; is that right?

A.  Yes.

Q.  And you did not do that?

A.  Yes, I couldn't perform.

Q.  Did you ever see them again after this?

A.  No, that was the last encounter.

Q.  Were you paid for that?

A.  Yes.

Q.  And you were paid for every single one of these; is that right?

A.  Yes.

Q.  So I want to turn to a slightly different topic.  Around September 2022, did you start to write a book?

A.  Yes, I did.

Q.  And what is that book about?

A.  The book is called In Search of Freezer Meat.  And it chronicles my -- it's a men's self-help book that chronicles me developing and ultimately curing my erectile dysfunction by way of a penis implant.

Q.  Can you describe how that book is written?

A.  What it is, is it's real genuine medical advice, but it's framed in me telling personal stories about my journey developing and trying to cure my own erectile dysfunction. When I was going through the issue, it was really hard for me to find a relatable source to help me with the problem and get

me information, so I decided to write a book to try to give other men information that I was seeking myself.

Q. I'm sorry. How is it written, how do you tell this story?

A. Oh, I use personal stories where I try to make light of the issues and comical references that could possibly be relatable to then address what the serious problem is.

Q. In this book, do you mention anything about your encounters with Ms. Ventura and Mr. Combs?

A. I do.

Q. How many pages in the book does the description of these encounters take up?

A. Approximately six and a half.

Q. Pages?

A. Yes.

Q. And how long is the book in total?

A. 182 pages.

Q. How do you refer to Ms. Ventura and Mr. Combs in the book?

A. I don't mention any names and I'd say they're a married, wealthy couple.

Q. How do you describe their relationship?

A. Similar to --

Q. I'm sorry. Their status, do you say husband and wife?

A. Yes, husband and wife.

Q. Are you aware when you wrote the book of whether Ms. Ventura and Mr. Combs were husband and wife when you wrote

P5KCcom4                        Hayes - Direct

it?

A.   Yes, I was clear that they were not a married couple.

Q.   And so why did you write it that way?

A.   I did base it on my original interaction with them.  I was told I was with a married couple.  My point of writing the story was really to speak to my anxiety in the moment, not necessarily to detail what happened.  I still maintain to respect their privacy.  So I was just trying to tell the story to frame it around my anxiety and not necessarily the details of the encounter.

Q.   And so are certain details not entirely accurate; is that right?

A.   Yeah.  I kind of wrote it from a framework of my anxiety in the moment and how I envisioned it.  And honestly, I told the story to a few friends, the encounter, and I tell it to my friends for an entertainment scenario like guy talk.  So I framed the story similar to the way I would explain it to a friend, you know, male banter.

Q.   Do you describe Ms. Ventura's enjoyment of these encounters in the book?

A.   Yeah.  I sensationalize it based on trying to put together an entertaining story for the book.

Q.   Why do you sensationalize it?

A.   I wanted the book to be relatable and enjoyable.  It centers around highs and lows with your erectile dysfunction,

P5KCcom4                        Hayes - Cross

so I'm going to tell a high sensationalized version because it works perfectly with the low that I'm trying to associate it with.

MS. FOSTER:  No further questions.

THE COURT:  Thank you.

Mr. Donaldson.

MR. DONALDSON:  Yes.

CROSS-EXAMINATION

BY MR. DONALDSON:

Q.  Good afternoon, sir.

A.  Good afternoon.

Q.  How are you?

A.  I'm pretty good, surprisingly.

Q.  I'll try to make this as harmless as possible.

A.  Appreciate it.

Q.  You got it.

First, congratulations on your book.

A.  Thank you.

Q.  Good job.  Good job.  That's hard to do.  What's the title again?

A.  In Search of Freezer Meat.

Q.  Freezer M-E-A-T?

A.  Yeah, like you put meat in the freezer, freezer meat.

Q.  In search of freezer, as in hard meat?

A.  What's harder than freezer meat?

P5KCcom4                         Hayes - Cross

Q.   Just want to understand.  I got it.  I got it.  Good title.

So you said that book, you did speak about a married couple that was wealthy, right?

A.   Yes.  I don't remember verbatim, but I play them out as a powerful rich couple, I believe was the wording.

Q.   I believe you said it was about six pages of the book and the book was totaled about 200 or so pages?

A.   182.

Q.   And the book is about erectile dysfunction?

A.   Yes.

Q.   And so you had had issues -- a possible issue with erectile dysfunction prior meeting with Cassie and Mr. Combs, correct?

A.   Yes.  It was a longstanding, kind of slowly developing situation that I was struggling with by that time.

Q.   Now, you said you were with Cassie and Mr. Combs in 2012, 2013, somewhere around there?

A.   Yeah.  I believe it started somewhere in fall of 2012 and it lasted to maybe March of 2015.

Q.   And at that time, you were working with a place called Hunk-O-Mania?

A.   Yes.

Q.   And Hunk-O-Mania is a destination for exotic dancers for bachelorette parties and things like that?

A.   Yeah, it's a weekly event where ladies come out and they can celebrate bachelorettes' birthdays, kind of like a ladies

P5KCcom4                         Hayes - Cross

night centered around male entertainers.

Q.  Do you still work for them?

A.  Yes.  I'm actually one of the partners.

Q.  You're co-owner now, correct?

A.  Yes.

Q.  Fair to say Hunk-O-Mania also has a website, right?

A.  Yes.

Q.  And part of the services is they rent out exotic dancers or strippers, correct?

A.  Yes.

Q.  When you say rent out, that means Hunk-O-Mania, the company you co-own sends out or gets called by customers, correct?

A.  Yes.

Q.  Those customers actually rent out the exotic dancer services, correct?

A.  Yes.

Q.  When these exotic dancers go to homes or locations and do their entertaining, correct?

A.  That is correct.

Q.  And they get paid for that?

A.  Yes.

Q.  In 2012 and 2013 and 2014, you were an employee or a part of Hunk-O-Mania, correct?

A.  Yeah, at that time I was not an owner.  All of the male dancers are independent contractors, so we get booked to either

P5KCcom4                        Hayes - Cross

perform at the show or the company can refer out for a show.
And that specific show, I was not contacted through
Hunk-O-Mania, I had ran my own website at that time.

Q.  Your website is called getpunished.com, correct?

A.  That is correct.

Q.  And getpunished.com has the same type of webpage where you
can rent out strippers, correct?

A.  Same exact model as Hunk-O-Mania.

Q.  So with getpunished.com, it's exotic dancers that get
called to go to locations and dance for ladies, correct?

A.  Yes.

Q.  And I believe you said stripteases for ladies, correct?

A.  Yes.

Q.  You would be almost naked in a -- what do you call that?

A.  Seminude to either underwear or a G-string.

Q.  And you have been doing this for 25 years, correct?

A.  I started in 1995, Labor Day of 1995.

Q.  Congratulations.  30 years.

A.  Yeah, coming up on a big anniversary.

Q.  So by the time 2012, 2013, it's fair to say you were very
experienced in exotic dancing?

A.  Yes.

Q.  You had danced with hundreds of thousands of ladies,
correct?

A.  That is correct.

Case 1:24-cr-00542-AS   Document 568   Filed 12/18/25   Page 189 of 257   1922

P5KCcom4                          Hayes - Cross

Q.  You had danced with hundreds of thousands of ladies
seminude or almost nude in G-strings, correct?

A.  Yes.

Q.  And when you say dances, that includes lap dances, upclose
dances, rubbing, all that's included, correct?

A.  Yeah.  I call them professional dry humps.

Q.  So a professional dry hump is where you would be almost
naked in a G-string and you would be dry humping a lady,
correct?

A.  Yes.

Q.  And fair to say you had been doing that 25 years before
2012, correct?

A.  Yeah, very close to that.

Q.  When we say 25 years, we mean throughout the whole year, so
we're talking thousands of ladies you've done that with,
correct?

A.  Yes.

Q.  Now, as part of your professionalism in being an exotic
dancer for 25 years, you try not to develop romantic feelings
for the person you're doing these dry humps for, correct?

A.  Yeah, you kind of get actually desensitized to the
situation and it's just another show.

Q.  So it's a job for you, correct?

A.  Yes.

Q.  So when you're dry humping all these ladies, it's a job,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

it's not personal, correct?

A.   That is correct.

Q.   And I think you said earlier that you and Cassie, though, on these eight or ten times you all met, you all had personal conversations, correct?

A.   Yeah, like cordial.  I wouldn't say I was a personal friend to her or anything like that.  But it would be a typical check-in, she would always ask how's business, how's work, that type of banter before any interactions.

Q.   So to set the stages, she would call you, correct?

A.   Yes.

Q.   You would go to a hotel, correct?

A.   That is correct.

Q.   She would let you in, correct?

A.   That is correct.

Q.   And you and her would sit down and talk and have light conversation about your work, how you're doing and things like that?

A.   That is correct.

Q.   At some point in time, you would start baby oiling her or she would start baby oiling you; is that right?

A.   Yes.

Q.   On a few occasions when you were with Cassie, she actually asked you if she could ever call you to speak to you, correct?

A.   That is all my -- all her inquiring about calling me was

P5KCcom4                         Hayes - Cross

pertaining to hiring me again.  We never had any personal scenario where we was instructed to speak, if that's what you're referring to.

Q.  That's not.  So over these eight or twelve meetings with Cassie, fair to say that you believe that she was comfortable with you, correct?

A.  Yes.  That was one of the -- after the very first encounter, before she paid me, she expressed to me that she was comfortable with me and that she would like to call me again in the future and if I was okay with it.

Q.  And after these eight to twelve occasions, it's fair to say you began to have feelings for Cassie, correct?

A.  That is incorrect.

Q.  At some point after these eight to twelve meetings, you grew to believe that you were the only person that Cassie was doing this with, correct?

A.  That is correct.

Q.  Fair to say that you felt special that you thought you were Cassie's only person, correct?

A.  That is correct.

Q.  And you felt special because you had met with her eight or twelve times, correct?

A.  Yes.  My original arrival, it was a birthday and this was something special she was doing with her husband.  I actually aligned with that understanding.  So I did feel special that

P5KCcom4                         Hayes - Cross

out of all of the options, I was the person being chosen for this interaction.

Q.  I want to go back to -- I asked you earlier, you said -- well, not you said, but you did, after several interactions with Cassie, began to have some feelings for her; that's not correct?

A.  That's not correct.

         MR. DONALDSON:  Pull up 3542.1, please, page 3, paragraph 4.

Q.  Now, you met with the government on several occasions, correct?

A.  I did.

Q.  When you met with them, they asked you questions about your relationship with Cassie and Combs, right?

A.  That is correct.

Q.  They told you it was important for you to tell the truth, correct?

A.  Yes.

Q.  And they told you the consequences of not telling the truth, correct?

A.  Yes.  It was emphasized.

Q.  And when you met with them, you were in fact telling the truth, correct?

A.  Yes.

Q.  And you told them about the meetings you had with Cassie,

P5KCcom4                         Hayes - Cross

correct?

A.   That is correct.

Q.   You told them about the times that Combs was with you and Cassie during those meetings, correct?

A.   Yes.

Q.   And isn't it true that on --

THE COURT:  Take the document down.

MR. DONALDSON:  Take the document down.

Q.   In 2023, you informed the government that you began to develop feelings for Ms. Ventura?

A.   I believe that may have been taken out of context because that is not the case.

Q.   When you say taken out of context -- well, let's go through it.

On the first meeting you met with Ms. Ventura, this was for about 25, 30 minutes, correct?

A.   Yes.

Q.   And when you came to the door, she -- once you got inside the room, she provided you some cash, some money, correct?

A.   Yes.

Q.   And it was $800?

A.   Yes.

Q.   And after that time, you -- well, not after that time.  You then changed clothes and came back out and you and Cassie began oiling each other down, correct?

A.  That is correct.

Q.  While you were oiling her down, you were using your 25 years of experience to make the scene exotic, correct?

A.  I wouldn't -- this scene is completely different than anything I did as a male dancer.  So whatever I acquired skills in terms of putting on a show didn't really apply in this scenario.  This was nuance that was different than what I had done for my typical work.

Q.  It was nuanced and different because you both were completely naked at this time, correct?

A.  Yeah.  And also, as a male dancer, my focus specifically is more fun.  Most of the things that I do, you're going to laugh more than try to create an erotic sexual connection.  I'm at bachelorette parties, ladies are about to get married.  I'm not trying to turn anybody on, I'm trying to get a funny move with a mom or a grandma or aunt, something memorable in that way. So this was very sexually natured, so it was different than my exotic dancing performance.

Q.  So that's what I'm saying, this was very sexually natured?

A.  Yes.

Q.  And it was different than what you normally do?

A.  Yes.

Q.  And let's go back for a second.  You said you do a lot of bachelorette parties, correct?

A.  Yes.

P5KCcom4                        Hayes - Cross

Q.  When you do these parties, there are lots of women inside the room?

A.  Exactly.

Q.  And they are yelling and screaming to tell you to do certain things, correct?

A.  Yeah.  Yeah.  Well, no, not necessarily.  I don't get instructions.  I kind of create the show myself.

Q.  Create the show yourself and you go up to a young lady and you start dancing in front of her, correct?

A.  Yes.

Q.  And you start doing what you call a dry hump, correct?

A.  Yup.

Q.  And you know if that person doesn't want to do that, you're not going to do that, correct?

A.  That is correct.

Q.  You're not going to dry hump someone you don't believe wants to be dry humped, correct?

A.  Yeah.  That's very important to read the room to know what to do and what not to do.

Q.  So when you would have any sexual interactions with Ms. Cassie, based on your 25 years of experience, you were reading that room, correct?

A.  That is correct.

Q.  You were making sure you weren't doing something with someone who did not -- you were making sure you were doing

something with Cassie that she wanted to do, correct?

A. Well, I did not get any cues that there was a discomfort with what was going on.

Q. Let's start there. You didn't get any cues that there was a discomfort with the sexual interactions between you and Cassie, correct?

A. I did not.

Q. Because if you had got some cues or some kind of discomfort, you would not have done that, correct?

A. That is correct.

Q. So when you were having these sexual encounters with Cassie eight to twelve times, no cues about any discomfort, correct?

A. That's correct.

Q. That's based on your 25 years of experience and dry humping hundreds of thousands of women, correct?

MS. FOSTER: Objection.

THE COURT: That's sustained.

Q. Hunk-O-Mania does not allow prostitution, correct?

A. That is correct.

Q. Neither does getpunished.com?

A. It does not.

Q. And you are still part of Hunk-O-Mania?

A. I am.

Q. You are still part of getpunished.com?

A. I am.

P5KCcom4                         Hayes - Cross

Q.  So you don't do prostitution, correct?

A.  I do not.

Q.  Now you mentioned these directions, you said subtle directions he was giving, correct?

A.  Yes.

Q.  And when you say subtle, you mean like quiet directions, correct?

A.  Yes.

Q.  Like these directions were given while you and Cassie were already involved in sexual intercourse, correct?

A.  Not necessarily.  Sometimes just massage.  Every time was not during intercourse, it was throughout the entire, let's call it scene or interaction.

Q.  So while you're creating a scene, Mr. Combs would say, put a candle here, put a candle there; is that correct?

A.  That's correct.

Q.  And then once you guys started intercourse, Mr. Combs would say, subtly, do this and do that, correct?

A.  Yes.

Q.  And again, you're not doing anything with Cassie unless you think she wants to do it, correct?

A.  Yes, that is correct.

Q.  So while he's providing subtle directions, you are still involved in sexual intercourse with Cassie, correct?

A.  That is correct.

Q.  And Cassie is showing you that she's engaged in the sexual intercourse, correct?

A.  Yes.  It seemed like it was consented as far as I was concerned.

Q.  Seemed like it was mutual and she was having a good time and you were having a good time, correct?

A.  Well, I can only speak for myself, but it seemed like the scenario, I was there to create the scene or whatever, that it was going well.  That was my goal.  I really looked at it as a job, and in those moments, I would feel I was doing what I was there to.

Q.  So you say on the scene.  So you're saying scene and you're saying Mr. Combs was providing directions, you said that?

A.  Yes.

Q.  So it was kind of like a movie, correct?

A.  Yes.

Q.  And Mr. Combs was saying was the director?

A.  Yes, that's correct.

Q.  You and Cassie were actors?

A.  That is correct.

Q.  Sometimes coproducers?

A.  I don't know what -- the title of what producers actually do, I thought they finance most of it.

Q.  Sorry.  Definitely wasn't doing that, were you?

A.  No, not doing that.

P5KCcom4                         Hayes - Cross

Q.  You mentioned something about throwing condoms.  Do you recall that?

A.  Yes, I do.

Q.  Mr. Combs came in and threw condoms on the couch you said?

A.  Yeah, the couch sofa, similar.

Q.  This is while you and Ms. Cassie were already having sex, correct?

A.  No, we were not having -- well, we were in -- I actually believe I was performing oral sex on her.

Q.  At that time, you were performing oral sex on Cassie, correct?

A.  Yes.

Q.  And based upon your performing oral sex on Cassie, it appeared to you that she was enjoying herself, correct?

A.  Not this specific time.  I didn't take any cues from it, so I can't call that one.

Q.  Not this specific time.  Another time you performed oral sex on Cassie, it appeared she was enjoying it?

A.  Yes, that was the time with the stack of money.

Q.  So when you were performing oral sex on Cassie, it appeared that she was enjoying it before the money came, correct?

A.  Yes.

Q.  And the money came and it shocked you, correct?

A.  Yes.

Q.  Because you and Cassie were having an enjoyable moment at

P5KCcom4                         Hayes - Cross

that time, correct?

A.   Well, I was -- I assumed so.

Q.   You assumed that because it appeared that Cassie was enjoying you performing oral sex on her, correct?

A.   Yes, that specific time, yes.

Q.   I'll get back to the throwing condoms.

So when you were performing oral sex on Cassie on the couch, Mr. Combs threw condoms on the couch, correct?

A.   Yes.

Q.   This was not threatening, correct?

A.   No, it was not threatening, more just assertive.

Q.   And this kind of threw you off because you and Cassie had not previously used condoms, correct?

A.   Yes.

Q.   So that's why it threw you off, correct?

A.   Yeah, also, and then I was experiencing my own anxiety, too, with -- I had not achieved an erection.  In my thought process, the condoms I knew was going to be an obstacle for me in terms of getting an erection and maintaining one, too.

Q.   Just so we're clear, when you were performing oral sex on Cassie and the condoms got thrown on the couch, the throwing you off part was because you and Cassie had always had sex without condoms, correct?

A.   Well, not always.

Q.   Most of the time?

P5KCcom4                          Hayes - Cross

A.  Yeah, most of the time.

Q.  And then you said he said, I want to see you fuck her, correct?

A.  Yes.

Q.  And when he said that, that was because in the heat of the moment, you and Cassie were really getting into it, correct?

A.  Yeah, it was the beginning of a sexual encounter.  It seemed like -- I was definitely stalling.  Oral sex kind of was like a beginning start to me being able to do penetration.  So part of the startle was I wasn't ready, so I felt the sexual pressure of the demand to start penetration.

Q.  And you said demand.  It wasn't a demand, it was a suggestion, correct?

A.  It was an aggressive suggestion, that's how I interpreted it.

Q.  It was not threatening, though, correct?

A.  It was not threatening.

Q.  It was not threatening and it was Mr. Combs appearing to be impatient, correct?

A.  Yes, possibly, yes.

Q.  Now, you also mentioned that you ejaculated oftentimes on Cassie's stomach or near her vagina area?

A.  Particularly just her vagina area, not her stomach.

Q.  To be clear, Ms. Cassie will be the one to instruct you where to ejaculate on her, correct?

P5KCcom4                         Hayes - Cross

A.   That is correct.

Q.   Mr. Combs never told you to or directed you to ejaculate anywhere on Cassie, correct?

A.   He did not.

Q.   Anytime that you were performing intercourse on Cassie, when you were about to orgasm, Cassie would tell you, get up and ejaculate on my stomach, correct?

A.   Her vagina area, that is correct.

Q.   There was an occasion where Cassie called you and you arrived at the hotel and nothing happened, correct?

A.   Yes.

Q.   And when you arrived at the hotel, Cassie opened the door and provided you money, correct?

A.   Yes.

Q.   She provided you approximately $500?

A.   It was $500.

Q.   So, on that occasion, you actually got paid for doing nothing, correct?

A.   That is correct.

Q.   So it would be fair for some time, you're getting paid for your time, correct?

A.   Yeah, it was a quick day.  For some reason she had to cancel the last minute, so she gave me the $500 for coming out.

Q.   And all these occasions that you had sexual intercourse with Ms. Ventura was in New York City, correct?

P5KCcom4                         Hayes - Cross

A.   That is correct.

Q.   You mentioned drugs, or the prosecutor asked you about drugs.  You never saw any drugs in any hotel room, correct?

A.   The only thing that I saw would be I assume was marijuana.

Q.   You assume was marijuana?

A.   Yeah.

Q.   And you said that when you observed Mr. Combs, he never appeared to be intoxicated, correct?

A.   That is correct.

Q.   They didn't ask you, when you observed Ms. Ventura, she never appeared to be intoxicated, correct?

A.   She did not.

Q.   And when you observed Ms. Ventura, she never appeared to be under the influence of any drugs, correct?

A.   Not that I would recognize, no.

Q.   You wouldn't have sexual intercourse with a woman who you believed to be under the influence of drugs, would you?

A.   I would not.

Q.   Because that would be bad, right?

        MS. FOSTER:  Objection.

        THE COURT:  That's overruled.

Q.   That would be bad, right?

A.   Absolutely.

Q.   Right.  So the ten or twelve times you visited Cassie Ventura and had sexual intercourse with her, it's fair to say

she never appeared to you to be under the influence of drugs, correct?

A.   She did not.

Q.   And you never saw any filming either, correct?

A.   I did not.

Q.   And you never saw any violence, correct?

A.   I did not.

MR. DONALDSON:  Mr. Hayes, I wish you good luck on the success of your book.  Thank you very much.

THE WITNESS:  I appreciate that.

THE COURT:  Ms. Foster.

MS. FOSTER:  Yes, just a few questions.

REDIRECT EXAMINATION

BY MS. FOSTER:

Q.   Hello, Mr. Hayes.  You mentioned on cross-examination that there was one time when you thought Ms. Ventura was enjoying herself; is that right?

A.   Yes.

Q.   And what made you, on that occasion, think that Ms. Ventura was enjoying herself?

A.   Well, it was actually the first time we had unprotected sex.

Q.   Without the details, just, what did she do that made you think she was enjoying herself?

MR. DONALDSON:  Objection, Judge.

THE COURT: Overruled. Overruled.

A. Well, she -- the scenario was I just finished performing oral sex and it was a moment in between where you have penetrative sex, and she had -- Mr. Combs was in the room in close proximity, so I saw her look to Mr. Combs for I guess consent. That's how I interpreted it.

MR. DONALDSON: Objection.

THE COURT: It's overruled.

A. So I interpreted it and Mr. Combs said something to her, like, go ahead, enjoy yourself or whatever, and that was the first time we had unprotected sex. So I read the desire or the getting consent as an approval. So that's why -- and that's why I interpreted to somewhat that it was enjoyable for her.

(Continued on next page)

P5KsCOM5                    Hayes - Redirect

BY MS. FOSTER:

Q.  So it was the fact that she looked at Mr. Combs --

A.  Not just --

Q.  -- that made you think that?

A.  Not just looked at Mr. COmbs, but it was a heated sexual moment.  And I thought she was turning to her partner to get consent for unprotected sex.

Q.  Did she make any noises that indicated she was enjoying herself?

MR. DONALDSON:  Objection, your Honor.

THE COURT:  Overruled.

MR. DONALDSON:  Withdrawn.

A.  No noises as a cue.  The cue that I lean to was after performing -- I was performing oral sex, I'm between her legs.  So when I rose up, she moved her body towards me, like, her -- she scooted forward to put herself in line with penetration.  So that was the physical interaction that I -- I witnessed that I interpreted it as her enjoying it.

Q.  And were there any other times that you interpreted her as enjoying herself during any of these sexual interactions?

A.  Um, not anything that stands out.  That one was specific to me because, again, it was our first time having unprotected sex.  So I -- in my mind, that was a -- a big gesture, so I assumed that it was an enjoyable moment.  That was my assumption.

Q.  Mr. Hayes, do you remember meeting with the government a few days ago?

A.  Yes.

Q.  And when you met with us a few days ago, do you remember testifying about whether there were any other -- or speaking to the government about whether there were any other interactions you remember that you believe Ms. Ventura was enjoying herself on?

MR. DONALDSON:  Objection.

A.  Um --

MR. DONALDSON:  Objection.

THE COURT:  Hold on.

Ms. Foster, why don't we take a step back.  Why don't you ask a few more questions, and we can see if there is still an objection.

MS. FOSTER:  We can continue on.

BY MS. FOSTER:

Q.  You mentioned that Ms. Ventura did not appear to be under the influence of any drugs on prior interactions with her?

A.  Yes.

Q.  How much experience in your own life do you have with being around people who are under the influence of drugs?

A.  Not much.

Q.  Did you ever see Ms. Ventura outside the context of meeting with her for one of these sexual encounters?

P5KsCOM5                           Hayes - Redirect

A.   I did not.

Q.   And did you ever speak with her in person outside of the

context of one of these sexual encounters?

A.   I did not.

Q.   You mentioned on cross-examination that there was a time

you went to meet Ms. Ventura and Mr. Combs and you were turned

away at the door, is that right?

A.   Yes.

Q.   And you said you were paid $500 for that encounter?

A.   That is correct.

Q.   How did that amount of money compare to the times when you

had sexual contact with Ms. Ventura in front of Mr. Combs?

A.   Well, it was -- it was a lesser amount, but it was -- it

was kind of, like, I guess, a cancellation fee.  I don't know

how else to sum it up.

         MS. FOSTER:  One second, your Honor.

         (Counsel confer)

Q.   Do you remember testifying about Ms. Ventura seeming to

enjoy herself on that one encounter that we just talked about?

A.   Yes.

         MR. DONALDSON:  Objection, Judge.

         THE COURT:  It's overruled.

A.   Yes.

Q.   And you mentioned that there were other times when you

would have sexual encounters with Ms. Ventura where she would

wince, is that right?

A.  Yes, to some of the directions.

Q.  And she would sigh?

A.  Yes.

Q.  And you mentioned that during these encounters, her focus was on Mr. Combs for a large part of them, is that right?

A.  Um --

        MR. DONALDSON:  Objection, Judge.  Mischaracterizes the evidence.

        THE COURT:  Hold on.

        Do you mean objection?

        MR. DONALDSON:  Yes.

        THE COURT:  Stop.

        MR. DONALDSON:  My fault.  My fault.

        THE COURT:  That's overruled.

BY MS. FOSTER:

Q.  You may answer.

A.  Yes.  Like I said earlier, there was a consistent awareness to Mr. Combs' direction and I guess his perception of either the desires during the moments.

        MS. FOSTER:  No further questions.

        THE COURT:  Anything further, Mr. Donaldson?

        MR. DONALDSON:  Just two.

RECROSS EXAMINATION

BY MR. DONALDSON:

Q.  When you mentioned heated, just now you said there was a heated -- it was a heated sex scene.

Do you recall saying that?

A.  Yeah, it was -- it was -- it was steamy.  It was intense.  It was probably our best sexual interaction.

Q.  Steamy, intense, what does that mean?

Describe that in detail.  What do you mean?

A.  Um, it -- you know, as far as me being there with sexual pressure and stuff like that, it was probably the day that I felt like I did a great job.  I thought it was enjoyable for both Ms. Ventura and Mr. Combs in that circumstance.

Q.  So when you say both for Ms. Ventura, what do you mean by for Ms. Ventura?

What was steamy about the sex scene that you thought was --

A.  Just, I'm still basing it off of the same details that I said.  There was a period of time where I finished oral sex, it appeared she moved towards me for penetration --

Q.  Stop right there.

So when you say you finished oral sex, you said she then scooted towards you, correct?

A.  Yes.

Q.  She scooted towards you without direction from anyone?

A.  Yeah.  The scooting towards me, there was no direction associated.

Q.   That was all her wanting to do that, correct?

A.   Um, the way it was interpreted, yes.

Q.   And then prior to that, the steamy interaction between you and Cassie was all her and you enjoying a sexual moment, correct?

MS. FOSTER:  Objection.

THE COURT:  If you can rephrase that question.

Q.   This sexual moment that you were having with Cassie that you say was steamy, there was nothing about that moment that would lead you to believe that Ms. Cassie wasn't engaged with you in that sexual activity, correct?

MS. FOSTER:  Objection.

A.   There --

THE COURT:  It's overruled.

A.   Yeah, in that moment, I had no reason to believe that she wasn't engaged.

Q.   She appeared to you that she was completely 100 percent desirous of having that sexual moment with you, correct?

A.   That -- that wouldn't be my words, but I did feel like I was doing a good job, or based on my sexual pressure of the moments and stuff, that was my best day, encounter.

Q.   Do you have any idea whether or not Cassie -- I'm just going to ask.

You said that you had orgasms?

A.   Correct.  Yes.

Q.   And 10 or 12 time situations, do you recall at all whether Cassie had any orgasms?

A.   Not that I can confirm, only -- only that I can assume.

Q.   Assume?

A.   The only time.

MS. FOSTER:  Objection.

THE COURT:  That's sustained.

The jury should disregard the witness's last answer.

MR. DONALDSON:  No further questions.

MS. FOSTER:  Nothing from the government.

THE COURT:  All right.  Thank you, Mr. Hayes.

(Witness excused)

THE COURT:  Government may call the next witness.

MS. SMYSER:  Your Honor, the government calls Special Agent Gerard Gannon.  This witness will involve physical evidence.  We just need a couple of minutes to set up.

THE COURT:  All right.  A couple minutes?  Should we wait here?

MS. SMYSER:  Either way.  I think you can wait here.

THE COURT:  All right.  We'll wait on you.

Anyone on the jury wants to stand up for a second, please do.  If you want to stretch your legs, that's perfectly OK.

I'll do it first.

MR. AGNIFILO:  Your Honor, while we're standing, could

we come to the side for two minutes while we're all standing up?

THE COURT:  Yes.

(Continued on next page)

P5KsCOM5                          Hayes - Recross

(At the sidebar)

MR. AGNIFILO:  So after we had the time -- I would ask it this way.  Are you guys going to be wanting to put physical evidence in front of the jury like we did before?

MS. COMEY:  We need to get Ms. Smyser to ask her.

MR. AGNIFILO:  OK.

THE COURT:  I think the answer is yes.

MR. AGNIFILO:  I'm sensing that.

THE COURT:  I don't think we need to check with anybody.

MR. AGNIFILO:  I think so, Judge.

THE COURT:  All right.  What's the issue?

MR. AGNIFILO:  I would object, unless there is something in particular that the jury has to see because of the qualities of that object.  I think the idea of them handling whatever physical evidence that is going to be admitted through this witness, A, it takes time, which is precious and, B, I don't know what the relevance is, unless there is independent relevance.

THE COURT:  Well, if you have any objection to any of the pieces of evidence as having relevance for the case --

If you have any objection to the evidence or any of the pieces of evidence, hopefully you discussed that with the government.

MR. AGNIFILO:  I don't think --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT:  And there isn't any --

MR. AGNIFILO:  The problem isn't going to be there.

THE COURT:  There is no issue on relevance.

What objection could you possibly have to the actual evidence being presented to the jury?

MR. AGNIFILO:  I think the objection is, unless it's particularly relevant for the jury to handle the evidence, which very often it is not, there is a prejudicial quality to the jury being permitted to handle evidence.

And if there is something relevant, like, you would need to see how heavy this is or you need to see some aspect of the physical characteristics of this evidence, I understand that.  But just to give the jury drugs, or whatever is going to be admitted through this witness, I don't know what the independent -- we'll use the word relevance, I don't mean relevance -- I don't know what the independent fact-finding objective is of that.

MS. GERAGOS:  To add, I think because we've stipulated a lot to drugs, that all the drugs that will be shown to the jury right now are the drugs that the agent will say that they are.  I think Mr. Agnifilo's point is why do we have to then hand them to each juror to look at?  We're stipulating as to what they are, right?

MR. AGNIFILO:  That's part of it.

I just don't know what other fact-finding value there

P5KsCOM5                         Hayes - Recross

is in giving the jury the evidence.

THE COURT:  Is there any response?

MS. COMEY:  Your Honor, I'm not sure that this is going to matter for this witness.  We are going to make an efficient presentation of the evidence.  Some of this evidence may be difficult to see, and so we might need to bring it closer to the jury so they can take a look.

Passing it around is often a way for the jury to actually understand what the evidence is.

THE COURT:  What is the evidence?

MS. COMEY:  There's a variety of evidence seized from one of Mr. Combs' residences.  I don't think we're going to pass much, if any, of it around for the witness.  I don't think this is going to end up being an issue.  Actually, here is Ms. Smyser.

MR. AGNIFILO:  We started without you.

MS. SMYSER:  I see.

THE COURT:  What is the evidence?

What are we talking about here?

MS. SMYSER:  We're not passing out any evidence.

THE COURT:  OK.

MS. SMYSER:  I'm going to have him walk one piece of evidence in front of the jury and stand up and hold pieces of evidence.

MR. AGNIFILO:  There you go.

P5KsCOM5                      Hayes - Recross

THE COURT:  We had this long discussion we really needed, Ms. Smyser.  Good.

MR. AGNIFILO:  All right.

(Continued on next page)

(In open court)

THE COURT:  Welcome.  Please come up.

THE DEPUTY CLERK:  Remain standing for a moment and raise your right hand.

GERARD GANNON,

called as a witness by the Government,

having been duly sworn, testified as follows:

Thank you.  You may be seated.

Before the direct begins, if you could just please give your first and last name and spell your first and last name for the court.

THE WITNESS:  Yes.  My name is Gerard Gannon. G-e-r-a-r-d.  Last name G-a-n-n-o-n.

DIRECT EXAMINATION

BY MS. SMYSER:

Q.  Good afternoon, Special Agent Gannon.

A.  Good afternoon.

Q.  Where do you work?

A.  I work at Homeland Security Investigations in Miami, Florida.

Q.  What is your title with Homeland Security?

A.  I'm a Special Agent.

Q.  How long you have worked for Homeland Security?

A.  A little over five years.

Q.  Did you work in law enforcement before that?

P5KsCOM5                        Gannon - Direct

A.   I did.

Q.   What did you do?

A.   I worked as a Deputy U.S. Marshal in DC and as a police officer in Round Lake Police Department in Illinois.

Q.   Prior to joining law enforcement, what were you doing?

A.   I was in the U.S. Army Reserves as an officer.

Q.   How long were you in the Army Reserves?

A.   Approximately six years.

Q.   What was your title when you left the Army?

A.   I had the rank of captain.

Q.   Do you work in a particular group at HSI now?

A.   I do.

Q.   What group is that?

A.   I'm a part of the national security group.

Q.   When did you begin working for the national security group?

A.   It was approximately the week of January 20 of this year.

Q.   I want to take you back to March of 2024.

         What group were you working with then?

A.   I was part of the Miami human trafficking group.

Q.   How long had you been a part of the human trafficking group?

A.   Total time, almost four years.

Q.   What were some of your responsibilities as a Special Agent with the human trafficking group?

A.   I was responsible for investigating sex trafficking and

labor trafficking within Miami-Dade County.

Q.  As a Special Agent with HSI, have you participated in the searches of homes?

A.  Yes, I have.

Q.  You have received training on how to execute search warrants at homes?

A.  Yes, I have.

Q.  Could you please describe some of that training for the jury?

A.  I participated in the criminal investigative training program in Glynco, Georgia, before we received training on executing search warrants, as well as the Homeland Security Investigations Special Agent training program, also in Glynco, where we learned how to the HSI process of executing search warrants and backing evidence and chain of custody.

Q.  Approximately how many searches of homes have you done or assisted with?

A.  With HSI, approximately five.

Q.  Special Agent Gannon, now I want to direct your attention to March 25 of 2024.

         Did you participate in a search of a property that day?

A.  Yes, I did.

Q.  What was the address of that property?

A.  It was 2 Star Island Drive in Miami Beach, Florida.

P5KsCOM5                        Gannon - Direct

Q.   Who owns 2 Star Island?

A.   It belongs to Sean Combs.

Q.   Was the search of 2 Star Island authorized by a search warrant?

A.   Yes, it was.

Q.   Who got that search warrant?

A.   It was the HSI New York agent, Sean Quinn.

Q.   How did you become involved with the search?

A.   Due to it being a human trafficking investigation, it was assigned to the human trafficking group in Miami, Florida, due to the residence being in the area of responsibility of Miami, Florida.  Me being a part of that group, I was chosen to be the Special Agent on the ground in charge of that operation.

Q.   So what was your specific role in regard to this search in Miami?

A.   So I was responsible for the overall planning, the tasking of agents, gathering the necessary resources for the search. The day of the operation, actually being on the ground, managing the search, all the way to the conclusion of every agent leaving the property.

Q.   Approximately how many other law enforcement officers were involved in the execution of this search?

A.   It was 80 to 90, approximately, overall that helped out with the execution of search warrant that day.

Q.   Is it typical for a search to involve that many agents?

P5KsCOM5                          Gannon - Direct

A.   It does not, no.

Q.   Why were there so many?

A.   Due to the size of the property, as well as the security measures on the property.  It required our special response team to be involved.  They have special equipment to be able to get through, to deal with those security measures on property like that, as well as the possibility of having armed security.

        So they were involved, which increased the number of agents.  And due to the size of the property being approximately 20,000 square feet, it required a lot of agents to search.

Q.   Approximately how many special response team members were involved?

A.   Approximately 25.

Q.   What did they do at this particular search?

A.   They helped clear -- they gained entrance to the property, helped clear the property, and make it safe for the rest of us to go in and begin actually searching the property.

Q.   Could you just explain what you mean when you say they were clearing the property?

A.   So the SRT, they get specialized training in actual breaking through security measures on property, as well as they have more experience clearing rooms and large structures.

        Since the manpower that would be required to do that would take a lot of agents that don't have as much experience,

they were utilized so because of their efficiency in actually clearing rooms, checking for individuals on the property, removing them from the property, and then turning it over to us, the rest of the agents, to actually begin the search.

Q.   Just to make sure I understand, when they are clearing the property, are they ensuring there are no people on the property?

A.   They are ensuring there is no people, as well as no -- nothing that could hurt any agents that are on the property afterwards.

Q.   What time of day did you execute the search warrant?

A.   It was approximately 3:40 p.m.

Q.   Is that the time of day that search warrants are typically executed?

A.   No.  Typically they are executed at 6:00 a.m.

Q.   Why did this search begin in the afternoon?

A.   It was decided -- we had information that the defendant and his family were going to be taking a trip out of the country via plane.  So we thought it was best to wait until him and his family had left the property to actually execute the search warrant.

Q.   I want to talk a little bit about Star Island.

Could you explain where Star Island is?

A.   Star Island is a small island where people with -- usually celebrities or rich people live.  There is a two-lane road to

get onto the property, onto the island.  They have a security gate, as well, you have to go through, to get on the actual island.

And you also can reach it via boat, each -- most of the properties have a pier behind them to reach the island.

Q.  Was there direct access via water to 2 Star Island in particular?

A.  Yes.  There was a small pier that you could -- that was behind the actual property.

Q.  What, if any, security concerns did that pier create during the search?

A.  Initially, when SRT moved onto the property, they had a team that was on the -- that had -- that were on boats behind the property to maintain security, so that people leaving, they could intercept anybody trying to leave the property, and also make sure nobody could get onto the property.

Q.  Special Agent Gannon, now I want to show you what's been marked for identification as Government Exhibit 1B-101.

Do you recognize this?

A.  Yes.  It's a Google view of Star Island and the surrounding area.

Q.  And how do you recognize it?

A.  I recognize it because I used Google maps to -- during the briefing to show where Star Island actually was.

Q.  Is this a fair and accurate representation of Star Island

on a map?

A.  Yes, it is.

MS. SMYSER:  Your Honor, the government offers Government Exhibit 1B-101.

THE COURT:  All right.  1B-101 will be admitted.

(Government's Exhibit 1B-101 received in evidence)

MS. SMYSER:  Ms. Foster, could you please publish that for the jury.

BY MS. SMYSER:

Q.  Special Agent Gannon, could you please describe where Star Island is on this map?

A.  Star Island is north of MacArthur Crossway.  It's to the west to the main Miami Beach, South Beach, and next to Hibiscus Island.

Q.  And so it's kind of in the middle of this map?

A.  Close to the middle of the map, yes.

Q.  Where is the two-lane road that you were talking about that goes on and off of Star Island?

A.  It's the gray line connecting MacArthur Crossway to Star Island.

Q.  And what is MacArthur Crossway?

A.  It's a main -- it's one of the main roads that connects Miami Beach to the rest of Miami.

Q.  What does the red marker on Star Island indicate?

A.  That's a pin for where roughly 2 Star Island is located.

Q.  Could you just explain what kind of property 2 Star Island is?

A.  Yes.  It's approximately 20,000 square feet.  It's surrounded by walls, has a gate in the front, and there is two main structures on the property, the main residence and then a smaller guest house-type residence.

Q.  Special Agent Gannon, now I want to direct your attention to the binder to your left.

MS. SMYSER:  And, Ms. Foster, you can take this down.

Q.  Particularly, to the first tab of that binder, which contains what has been marked for identification as Government Exhibit 2B-105, 2B-106, and 1B-102 through 105.

Could you please look through that and look up when you're finished.

Do you recognize what is contained in the first tab of the binder?

A.  I do.

Q.  What is it?

A.  There are pictures of the 2 Star Island property.

Q.  How do you know that's what they are?

A.  I've seen what the island -- what the property looks like on the island.

Q.  Are these photographs fair and accurate representations of the 2 Star Island property on the day of the search?

A.  Yes, they are.

MS. SMYSER:  The government offers Government Exhibits 2B-105, 2B-106, and 1B-102 through 105.

THE COURT:  Any objection?

MS. GERAGOS:  No objection.

THE COURT:  Those exhibits will be admitted.

(Government's Exhibits 2B-105, 2B-106, and 1B-102 through 1B-105 received in evidence)

MS. SMYSER:  Ms. Foster, could you please pull up Government Exhibit 1B-102.

Q.  Special Agent Gannon, could you please explain what we're looking at here and, in particular, what the yellow lines represent?

A.  This is a top down view of the 2 Star Island property, and the yellow lines indicate the property lines for that.

Q.  Looking at this paragraph, what is the property to the south of 2 Star Island?

A.  That is 1 Star Island.

Q.  Who owns 1 Star Island?

A.  It belongs to Sean Combs.

Q.  Did you search 1 Star Island?

A.  We did not.

Q.  I want to focus back on 2 Star Island.

Special Agent Gannon, could you please point out or describe where you entered the property?

A.  So we entered the property where you can see in the top

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

right-hand corner of the photo, where it says Island Drive.
That is the street and it -- there's a gate that's connected to
the property from there.

Q.   What is the first structure you see when you enter through
that gate?

A.   That is the guest house that I mentioned previously.

Q.   And what is contained in that building?

A.   Inside that building, there is a gym on the first floor, as
well as what would be, like, a security shack for guards to
encounter whoever comes through the gate immediately, and then
on top of that is where there is bedrooms and bathrooms for
people who can stay on the property, as well as a small studio.

Q.   And what is the large building in the center of the
property?

A.   That's the main -- the main residence.

Q.   At a high level, what's contained in the main residence?

A.   The master bedroom, kitchen, dining room, other bedrooms.

Q.   There appears to be three roofs to the north of the main
building.

         What are those?

A.   Those are just for design.  That's the actual entrance to
the main residence.

Q.   OK.  We'll come back to the main building shortly.

         But first, what is located behind the main building?

A.   Behind the main residence, there is a pool, as well as a

couple of huts that are covered space back there.

MS. SMYSER:  Ms. Foster, could you please pull up Government Exhibit 1B-103.

Q.  Special Agent Gannon, when was this photo taken?

A.  That was taken the day of the operation, after we had made entrance onto the property.

Q.  What does it show?

A.  It shows the gate broken through, the guest house on the left-hand side, and the main residence directly in front.

Q.  Was this how the gate appeared when HSI arrived on the property?

A.  No.

Q.  What happened to it?

A.  The SRT used their armored vehicle to break through the gate to gain entrance onto the property.

Q.  And why did they use an armored vehicle?

A.  That's the standard vehicle that SRT travels in whenever they are conducting operations.  Due to the size of the gate, it's -- they deemed that was the quickest and safest option to be able to get onto the property, using the actual vehicle to push the gate open and break the gate.

Q.  Why did they need to break open the gate?

A.  That's standard practice when conducting a search warrant for us to gain access to the property as quickly as possible. It's for officer safety reasons to not allow any bad actors to

be able to try to set up positions to be able to do harm to law enforcement.

Q. All right. Could you please describe what structures are pictured in this photograph?

A. The structure to the left, where a bunch of agents are standing, there is a pillar there, that is the guest residence. You can see in the top left of the picture where the lights are, that's the second story of where the bedrooms are located. Then behind them you see the van. The van is parked right in front of the doorway to the main residence.

Q. Earlier you mentioned three roofs next to the main building.

Can you see any of those here?

A. Yes. You can see the first one closest to the street with the four windows, and then the roof right above it.

MS. SMYSER: Ms. Foster, could you please pull up Government Exhibit 1B-104.

Q. Special Agent Gannon, what is this?

A. That's another picture of the front entrance to the main residence.

Q. What do you see right when you enter the main building?

A. Right when you enter, there's a staircase that leads to the second floor.

Q. Where on the second floor does that staircase lead?

A. It leads to the entrance to the master bedroom and one of

the master closets.

MS. SMYSER:  Ms. Foster, could you please pull up Government Exhibit 2B-105.

Q.  What are we looking at here?

A.  This is the rear of the property where the pier is at, and you can see the pool behind the main residence.

Q.  Are there any storage areas located behind the residence?

A.  Yes.  There is, where you see the door, that is an underground storage area where it goes down to underneath, roughly, where the pool is at.  That's used for storage.

MS. SMYSER:  Ms. Foster, could you please display Government Exhibit 1B-105.

Q.  What is shown here?

A.  This is the back of the residence from underneath the hut that was furthest back.

Q.  Is the master bedroom visible in this photograph?

A.  Yes.  You can see the windows to the left of the balcony. Those are the windows for the master bedroom.

Q.  Special Agent Gannon, next I would like to talk about how the search was conducted.

MS. SMYSER:  And, Ms. Foster, you can take that down.

Q.  What was the general process by which this property was searched?

A.  So, once we got onto the property, SRT cleared the property, turned it over to myself.  I took control of the

P5KsCOM5                          Gannon - Direct

property.  I walked around the property to assess how it looked and to figure out -- making sure our plan of attack for actually searching it, if it was viable.

We recorded what the property looked like when we took it over.  And then from there, we labeled each room, and then I assigned teams of two to search each room.  Sometimes two teams of two, depending on the size of the room to search.  And then from there, if they found anything, the process was to contact the photographer.  The photographer would take photos of the items that they found before they actually bagged it.

We had somebody logging the photographs to make it easier to ID what photos were with what -- what rooms they found evidence in.  And then once that was done, they would bag the evidence, document it on a piece of paper, or general description of what the item was, who found it, and the room it was found in.

From there, they would bring it down to our property specialist.  He was the one, that was his van you saw in the photo that was parked out front.  He would take the evidence from them, document the item, and then put it inside the van for transport.

Q.  You mentioned that photographs were taken of items of interest, is that right?

A.  Yes, there were.

Q.  Where were those photographs taken?

A.   They were taken, if possible, if the item was in a spot where they hadn't been moved yet, say someone opened a drawer and found an item that was to be collected, they would try to leave it that place and then the photo would be taken as close to where they found it as possible.  Sometimes that wasn't always the case, because items were on shelves.  They didn't know what they had until they took it off the shelf.  There, they put it down in the general area where they found it to be photographed.

Q.   Special Agent Gannon, where were you typically located during the search?

A.   I was typically located near the evidence van so that I could see the evidence that was coming in to the property specialist.  And if I wasn't there, it was because I was around the property, if somebody had questions about anything that they found, to determine whether if it was something that we were going to seize.

Q.   So were there times where you actually walked around to the different rooms of 2 Star Island?

A.   Yes.

Q.   When you were on the property, did you have any role in ensuring the items seized were properly documented?

A.   Yes.  Ultimately, it falls on me at the end.  After we collect all items that we collected, it was my responsibility to ensure we had all those specific items, document what those

items were, because we were required to leave a receipt for the owner to document what items we took from them, you know, as a chain of custody, got copies left with them, along with a copy of the search warrant.

Q.  So what was the process you went through as you were filling out that form?

A.  So as each item that was coming into the property specialist, I actually saw quite a few of the items.  Either they were found when I was around them or I saw them come to the actual van.  I was responsible for looking through the items that he had documented and making sure that we had every single item before we actually left the property.  So putting eyes on the actual property before we left.

Q.  Where was the evidence taken after the search?

A.  After that, it was transported to our office and locked in the vault, property vault that we have.

Q.  What, if anything, did you do related to the evidence when it got back to the office?

A.  So after it -- after that night, we locked it up.  The next day we came back and I went through every single piece of evidence and broke down the evidence that we had into different categories.  Per our policy, such as firearms or narcotics, they have to be separated, any ammunition has to be removed from, say, magazines from firearms, or different narcotics have to be separated out.

And those all became separate, what are referred to as, line items. And those were all broken out by me, documented in our online system, and then all those bags were sealed up with chain of custody forms, which are referred to as 6051s. And I signed every single one of those 6051s.

Q. OK. Special Agent Gannon, next I want to talk about some of the particular items that you seized.

So before we look at the items individually, could you please turn to the second tab of the binder in front of you. This tab contains what's been marked for identification as Government Exhibits 1B-200 through 202, 1B-204 through 208, 1B-210, 1B-212, 1B-215, 1B-217 through 219, 1B-221, 1B-222, 1B-225 through 228, 1B-230 through 242, 1B-244, 1B-247, 1B-249 through 252, 1B-254 through 258, 1B-261, 1B-263, and 1B-265.

Could you please look through those photographs and then look up when you're done.

Do you recognize those?

A. I do.

Q. What are they?

A. They are pictures of evidence that was seized or items that were located during the search warrant at 2 Star Island.

Q. How do you know that?

A. I recognize the photos from seeing them and reviewing them prior and actually seeing the items there on the property.

Q. Are these photographs a fair and accurate representation of

the items you seized and things that you saw at 2 Star Island?

A.   Yes, they are.

MS. SMYSER:  Your Honor, the government offers the exhibits that I just listed for identification purposes.

THE COURT:  Any objection?

MS. GERAGOS:  No.

THE COURT:  Those exhibits will be admitted.

(Government's Exhibits 1B-200 through 202, 1B-204 through 208, 1B-210, 1B-212, 1B-215, 1B-217 through 219, 1B-221, 1B-222, 1B-225 through 228, 1B-230 through 242, 1B-244, 1B-247, 1B-249 through 252, 1B-254 through 258, 1B-261, 1B-263, and 1B-265. received in evidence)

MS. SMYSER:  We're going to go through those items, but first, I just want to orient everyone.  So let's turn to the main building.

Q.   Special Agent Gannon, I'm going to show you what's been marked for identification as Government Exhibit 1B-106.

MS. SMYSER:  So, Ms. Foster, could you please pull that up for the witness and the parties only.

Q.   Special Agent Gannon, do you recognize what this is?

A.   Yes.  This is a sketch of part of the first floor of the main residence.

MS. SMYSER:  And, Ms. Foster, could you please scroll through the pages of this document.

Q.   Special Agent Gannon, what do the remainder of the pages of

this document contain?

A.   That's a sketch of the property.

Q.   How do you know that?

A.   I recognize it from seeing the sketch that was actually sketched by the agent.

Q.   Are any structures missing from this sketch?

A.   Yes.

Q.   What?

A.   The basement or what was termed the basement was not annotated on the outside.  At the time, the basement was not labeled.  The agent didn't realize that there was that room there behind one of the huts outside.

Q.   Other than the basement, is this a fair and accurate representation of the layout of the 2 Star Island properties?

A.   Yes, it is.

         MS. SMYSER:  Your Honor, the government offers Government Exhibit 1B-106.

         MS. GERAGOS:  No objection.

         THE COURT:  All right.  1B-106 will be admitted.

         (Government's Exhibit 1B-106 received in evidence)

         MS. SMYSER:  Ms. Foster, could you please publish for the jury.

Q.   We're looking at the first page of this document here. And, Special Agent Gannon, could you please describe at a high level what this shows?

A.   This is part of the first floor, the front entrance, the stairs, the couple closets to the left, once you enter in the front entrance and, like, the living space with chairs and couches.

Q.   And where is the front door?

A.   The front door would be in the bottom right of the sketch.

MS. SMYSER:   Ms. Foster, could you please turn to page four.

Q.   What does this show?

A.   This shows the layout of the second floor.

Q.   Where did the stairs that you just referenced lead?

A.   The stairs lead up, where it's labeled P and it's the middle of the sketch where it says stairs, that's where the stairs lead up to.

MS. SMYSER:   Mr. Foster, could you zoom in on the bottom half of this sketch below room Y.

Q.   Special Agent Gannon, could you point out where the master bedroom is?

A.   The master bedroom was labeled Q.

Q.   Is there a master bathroom?

A.   Yes.   One of the master bathrooms is labeled S.

Q.   And are there closets for the master bedroom?

A.   Yes.   One of them is labeled R.

Q.   So I want to zoom out just for a second.

Are there other closets for the master bedroom?

A.   Yes.

Q.   Where are those located on the sketch?

A.   It's labeled U.

Q.   Were you personally in all of these rooms at some point during the search?

A.   I was personally at all of them, except for what was labeled the basement outside.

Q.   Let's start with room R, which is one of the closets that you just mentioned.

        Is that in the bottom left of this sketch?

A.   Yes, it is.

Q.   How big is room R?

A.   I would say approximately maybe the size of two rooms in a single family home, like two bedrooms.

        MS. SMYSER:  Ms. Foster, could you please display Government Exhibit 1B-217.

Q.   What is this?

A.   This is a picture of one of the shelves just to the left as you enter into room R.

Q.   Is this all of room R or just part of it?

A.   This is just part of it.

Q.   What are some of the things found on these shelves?

A.   Um, there were upper and lower receivers, AR 15s, found on the top shelf, along with some platform high heels.  There was also some sex toys, baby oil, Astroglide lubricant, and

P5KsCOM5                          Gannon - Direct

condoms, as well as some lingerie.

MS. SMYSER:  Ms. Foster, could you just zoom in on the second shelf on the bottom.

Q.  What is in the crate to the left?

A.  To the left are bottles of baby oil and Astroglide lubricant.

MS. SMYSER:  Ms. Foster, could you please pull up Government Exhibit 1B-222.

Q.  What is generally shown in this picture?

A.  These are pictures of some platform high heels, lingerie, as well as the lower receivers, AR-15 lower receivers, and the upper receiver, which is in a towel.

Q.  We'll walk through those in a moment.

But lower receivers and upper receivers, are those parts of a gun?

A.  Yes, they are parts of an AR-15 rifle.

Q.  And are you familiar with AR-15s?

A.  Yes, I am.

Q.  How are you familiar with AR-15s?

A.  From my experience in the U.S. Army Reserves, as well as my time in law enforcement.

MS. SMYSER:  Ms. Foster, could you please zoom in on the white towel and the cardboard box toward the bottom of the screen.

Q.  Special Agent Gannon, what is contained in the towel?

P5KsCOM5                         Gannon - Direct

A.   Inside the towel are two upper receivers for an AR-15.

Q.   We'll look at those in just a moment.

     First, what are upper receivers?

A.   The upper receiver for an AR-15, it contains the barrel, the ejection port, usually sights, if they are on top, as well as the bulk carrier group for the AR-15 rifle.

Q.   What is contained in the box?

A.   Inside the box are two lower receivers, AR-15 lower receivers, and magazines.

Q.   What are lower receivers?

A.   The lower receiver of the AR-15 is where the fire control group or the trigger is located, as well as pistol grips, the mag well, when you insert the magazine, the buffer tube, and the stock.

Q.   You mentioned magazines.

     What are those?

A.   Magazines are the feeding device for the bullets for the AR-15.

Q.   So does it hold the bullets?

A.   Yes, it holds the bullets.

Q.   OK.  Let's talk first about the upper receivers.

     MS. SMYSER:  Ms. Foster you could you please display Government Exhibit 1B-219.

Q.   What is this?

A.   Those are two AR-15 upper receivers.

P5KsCOM5                         Gannon - Direct

Q.  And as you indicated, these were found inside of the towel?

A.  Yes.  They were wrapped up in the towel and taped.

           MS. SMYSER:  OK.  Ms. Foster, could you please display Government Exhibit 1B-218.

Q.  Is this a zoomed-in version of that picture?

A.  Yes, it is.

Q.  What is the make of the top upper receiver here?

A.  The top upper receiver is made by BCM, which is Bravo Company Manufacturing.

Q.  What is located on the top of the BCM upper receiver?

A.  That is a Holosun red dot optic.

Q.  What is a red dot optic?

A.  A red dot optic is a projected red dot that allows you to be more accurate when firing a firearm.

Q.  Are red dot optics commonly sold as part of an AR-15?

A.  Usually not.

Q.  Were you able to determine the make of the other upper receiver in this photograph?

A.  We were not.

Q.  Does that upper receiver also have a red dot optic?

A.  It does not have a red dot optic.  It has iron sights.

Q.  And what is an iron site?

A.  An iron site is a mechanical -- usually, it's a steel post that also has on one end, which is in the front, then the back has a post that has a circle.  And you line up the thin post

within the middle of the circle to aim the rifle.

Q.  Is it easier or harder to hit a target using the iron sight as compared to that red dot optic you were describing before?

A.  It's more difficult with an iron site compared to a red dot.

Q.  Special Agent Gannon, I want to now direct your attention to a few items in that cart beside you, specifically what's been marked for identification as Government Exhibit 1B-120 and 1B-121, which should be on the top.

MS. SMYSER:  You can leave that up, Ms. Foster.

Q.  Special Agent Gannon, what are those?

A.  These are the items that are in the photo.

Q.  Are they the same upper receivers that are in the photograph?

A.  Correct.

Q.  How do you know that?

A.  I recognize them, as well as the chain of custody form has my signature on them.

MS. SMYSER:  Your Honor, the government offers Government Exhibits 1B-120 and 1B-121.

MS. GERAGOS:  No objection.

THE COURT:  All right.  Those will be admitted.

(Government's Exhibits 1B-120 and 1B-121 received in evidence)

BY MS. SMYSER:

Q.  Special Agent Gannon, is there anything on these upper receivers that was not there when they were found?

A.  Yes, there are.

Q.  What has been added to them?

A.  They are zip ties that are tied around the ejection port, as well as the bolt carrier group.

Q.  What is the purpose of those zip ties?

A.  It is to make sure that if a round is ever inserted, that it would not be able to be fired.

Q.  So the guns cannot be fired right now, is that correct?

A.  Correct.

Q.  So, please cut open Government Exhibit 1B-120.  There should be scissors there to your left.

Could you please remove the upper receiver and display it for the jury.  You can stop there.

Thank you.  You can set those two to the side.

Next we're going to focus on the lower receivers.

MS. SMYSER:  And while he is putting those away, Ms. Foster, could you please display Government Exhibit 1B-225.

Q.  What does this show?

A.  This was a picture pressure of the two lower receivers found in the box along with two magazines.

Q.  Were these wrapped in anything like the upper receivers?

A.  They were not.

Q.  How, if at all, could these lower receivers be made into a

functional gun?

A.   So both of the lower receivers have pins, one in the front and one to the back, that those are the circular holes above the safety selector switch that's above the pistol grip.  Those pop out and those -- they line up with -- when you put the upper receiver right on top, they have holes where those pins pop right in.  You pop those in and that completes the firearm.

Q.   So could these lower receivers be connected to the upper receivers that we were just looking at?

A.   Yes, they could.

Q.   There are some black items to the left and the right of this photograph.

         What are those?

A.   Those are two magazines.

Q.   And where were the magazines found?

A.   They were found inside the box with the two lower receivers.

Q.   OK.  Was anything found inside of the magazines?

A.   Yes.  They were loaded with bullets.

Q.   Are these magazines compatible with a lower receivers in the photo?

A.   Yes, they are.

         MS. SMYSER:  OK.  Ms. Foster, could you please display Government Exhibit 1B-226 side by side with 227.

Q.   What do these show?

A.   These show the magazine well of the two upper receivers with the serial numbers cut out.

Q.   As part of your time in law enforcement, are you familiar with firearms serial numbers?

A.   Yes, I am.

Q.   What is the purpose of serial numbers?

A.   The purpose of the serial number is to identify the originating manufacturer all the way up to who actually owned the firearm, if it's ever found during a crime.

Q.   Are firearms supposed to have serial numbers?

A.   Yes, they are.

Q.   I think you mentioned the serial numbers here were cut out, is that correct?

A.   Yes, they were.

Q.   So do these firearms have serial numbers?

A.   They do not.

Q.   Where were they cut out?

        Can you describe that for the jury on the photograph?

A.   Yes.  They are -- the serial numbers are right below the logos, usually where the -- see at the bottom or at the top. In the case, one of them has it at the bottom, one has it at the top.

Q.   And what is the law enforcement purpose of a serial number?

A.   The law enforcement purpose would be to help identify who the owner of the actual firearm is, if it's ever recovered.

Q.   And if there is not a serial number, is it more difficult

to do that identification?

A.   It's either -- it's a lot more difficult or impossible.

Q.   Special Agent Gannon, I want to direct your attention back

to the cart, to what's been marked for identification as

Government Exhibit 1B-122 and 1B-123.

          What are those?

A.   These are the two lower receivers that are pictured here.

Q.   How do you know that they are the same lower receivers that

are in this paragraph?

A.   I recognize them, as well as the 6051 has my signature on

it.

          MS. SMYSER:   The government offers Government Exhibit

1B-122 and 1B-123.

          MS. GERAGOS:   No objection.

          THE COURT:   All right.   They will be admitted.

          (Government's Exhibits 1B-122 and 1B-123 received in

evidence)

BY MS. SMYSER:

Q.   Special Agent Gannon, are you familiar with semi-automatic

AR-15s and fully automatic AR-15s?

A.   Yes, I am.

Q.   What does it mean if an AR-15 is semi-automatic?

A.   If it's semi-automatic, it means that with each trigger

pull, one trigger pull, one bullet gets fired.   You have to

release the trigger and pull it again for another bullet to be fired.

Q.  What about if an AR-15 is fully automatic?

A.  If it's fully automatic, you pull the trigger once, and it will fire either all the rounds or it will -- it will only stop when it runs out, or unless you release the trigger.

Q.  Do these guns appear to be semi-automatic or fully automatic?

A.  They appear to be semi-automatic.

Q.  Can you tell if that was always the case?

A.  They both have indicators on the -- where the safety selector lever is.  They both say or have some type of indication that it could have been full auto at some point, but the safety selector lever only goes to the semi.

Q.  From your experience, are guns that are manufactured as semi-automatic AR-15s, do those typically have a fully automatic setting?

A.  They usually do not.

        MS. GERAGOS:  Objection, your Honor.  Move to strike.

        THE COURT:  Sustained.

        The jury should disregard the witness's last answer.

        MS. SMYSER:  All right.  Ms. Foster, could you please display Government Exhibit 1B-228.

Q.  What is this?

A.  This is a picture of one of the magazines with the

ammunition inside.

Q.   All right.  Special Agent Gannon, I want to direct your attention to what's been marked for identification next to you as Government Exhibit 1B-126 and 1B-127, next to you in the cart.

What are those?

A.   These are the 10 and 30-round magazines.

Q.   Are those the same ones that you found at 2 Star?

A.   Yes, they are.

Q.   How do you know?

A.   I recognize them, as well as the 6051 has my signature on them.

MS. SMYSER:  Your Honor, the government offers Government Exhibits 1B-126 and 1B-127.

MS. GERAGOS:  No objection.

THE COURT:  All right.  They will be admitted.

(Government's Exhibits 1B-126 and 1B-127 received in evidence)

BY MS. SMYSER:

Q.   OK.  Special Agent Gannon, let's now turn to two more items in your cart, specifically Government Exhibit 1B-124 and 1B-125.

What are those?

A.   These are the ammunition that was in each of those 10-round and 30-round magazines.

Q.  OK.  And how do you know that?

A.  They have the 6051 with my signature on them.  Both of them do.

        MS. SMYSER:  Your Honor, the government offers Government Exhibit 1B-124 and 1B-125.

        MS. GERAGOS:  No objection.

        THE COURT:  All right.  1B-124 and 1B-125 will be admitted.

        (Government's Exhibits 1B-124 and 1B-125 received in evidence)

BY MS. SMYSER:

Q.  Special Agent Gannon, how many bullets were inside the 30-round magazine?

A.  There was 19 rounds in the 30-round magazine.

Q.  And when about the 10-round magazine?

A.  It had 10 rounds.

        MS. SMYSER:  Ms. Foster, could you please display Government Exhibit 1B-221.

Q.  Special Agent Gannon, could you remind us where these items were found?

A.  These were found on the top shelf of the -- in room R, just to the left to the photo we saw earlier on the top shelf.

Q.  What kinds of items do you see here aside from guns?

A.  There were platform high heels and some lingerie.

Q.  OK.  Approximately how tall were the heels?

P5KsCOM5                    Gannon - Direct

A.   Seven inches.

Q.   All right.  I want to direct your attention to a few items in your cart, specifically Government Exhibit 1B-145 and 1B-146.

            What are these items?

A.   These are the high heels that were in the photo.

            (Continued on next page)

P5KCcom6                    Gannon - Direct

Q.  How do you know they're the same high heels that were in the photo?

A.  I recognize them, as well as the 6051 has my signature on both of them.

MS. SMYSER:  Your Honor, the government offers Government Exhibits 1B-145 and 1B-146.

MS. GERAGOS:  No objection.

THE COURT:  They will be admitted.

(Government's Exhibits 1B-145, 1B-146 received in evidence)

MS. SMYSER:  Your Honor, this may be a good place to break for the day, unless you'd like to keep going.

THE COURT:  Thank you, members of the jury.  We'll be back here at 8:45 to start at 9:00 a.m.  Thank you, again, for all your hard work and close attention today.  Don't talk to each other about the case, don't talk to anybody else, don't look up anything about this case, don't let anyone talk to you about anything having to do with this case.  With that, have a great evening and we'll see you all here tomorrow.

All rise.

(Jury not present)

(Continued on next page)

THE COURT:  Special Agent Gannon, we'll see you here tomorrow.

(Witness not present)

Ms. Comey, who are we looking at as our next witnesses after special gentleman Gannon?

MS. COMEY:  Your Honor, as we informed defense counsel earlier today, we expect to call Dawn Hughes after Agent Gannon finishes, after that I expect we'll call George Kaplan, and after that we're planning to call Scott Mescudi, and we think that will take us through the end of the day tomorrow. Mr. Mescudi may not get to the stand until even Thursday morning.

THE COURT:  So you think it may be just Dawn Hughes, George Kaplan tomorrow, and Mr. Mescudi Thursday?

MS. COMEY:  Yes, your Honor.

THE COURT:  And maybe start with Mr. Mescudi tomorrow.

MS. COMEY:  Yes, your Honor, that's right.

I'll note that, I'm not certain, but it is possible that we may need to deal with implication of the Fifth Amendment as to Mr. Kaplan.  I'm still speaking to his counsel as to whether that will happen.  So we may have an application for your Honor, I don't know whether he'll be invoking or not, and so I wanted to put on your Honor's radar that we may, during our lunch break, need to have the witness invoked.

THE COURT:  Understood.  Thank you.

Any issues from the government before we adjourn?

MS. COMEY:  I don't believe so, your Honor.

THE COURT:  Any applications or issues from the defense?

MR. AGNIFILO:  One second, Judge.  Nothing from us.

THE COURT:  Now, Ms. Smyser, when we started today, had raised an issue that she was trying to head off at the pass concerning Special Agent Gannon's testimony.  Is there going to be an issue, because if so, it might take a couple minutes now to resolve and we won't have to deal with it in the morning.

Do you remember what the issue that Ms. Smyser, based on the prior special agent's testimony, was concerned that there might be questioning about the legality of the search?  There's nothing that we should be concerned with along those lines?

MR. AGNIFILO:  We had agreed that we would not get into -- they didn't have a search warrant for one star, but I want to go back and see if there was mention of one star in the agent's testimony.  I frankly don't know that it opens the door or not.  I want to go back and read the transcript.  That's the only conceivable issue.

THE COURT:  And no other issues?

MR. AGNIFILO:  I feel like your Honor thinks that I should have an issue.

THE COURT:  No.  I'm just making sure.

MR. AGNIFILO:  No, I don't think so, Judge.  If something comes to me --

THE COURT:  If something comes to me, then the parties will inform the Court by 10:00 p.m., and if so, we'll be here at 8:30, otherwise we'll see everyone at 9:00 a.m.

MR. AGNIFILO:  Your Honor can expect another letter from us in regard to extended phone time.  So we're going to give that in both letters to your Honor.

THE COURT:  That reminds me, we did reach out to the MDC and they are working on it.  We'll probably hear back from them because they're usually pretty prompt, but put in your letter so I know exactly when you want access until every day, but we're on it.  We're working on it on our end, as well.

MR. AGNIFILO:  I appreciate that very much.

THE COURT:  We are adjourned.  See everyone tomorrow.

(Adjourned to May 21, 2025 at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 DAVID JAMES

Direct By Ms. Slavik . . . . . . . . . . . . .1753

Cross By Mr. Agnifilo . . . . . . . . . . . .1789

Redirect By Ms. Slavik . . . . . . . . . . . .1861

Recross By Mr. Agnifilo . . . . . . . . . . .1864

 REGINA VENTURA

Direct By Ms. Johnson . . . . . . . . . . . .1866

 SHARAY DASHAWN HAYES

Direct By Ms. Foster . . . . . . . . . . . . .1886

Cross By Mr. Donaldson . . . . . . . . . . .1918

Redirect By Ms. Foster . . . . . . . . . . . .1937

Recross By Mr. Donaldson . . . . . . . . . .1942

 GERARD GANNON

Direct By Ms. Smyser . . . . . . . . . . . .1951

GOVERNMENT EXHIBITS

Exhibit No.                                              Received

 3Q-106, 3Q-107, 3Q-108, 3Q-110, 3Q-113, . . .1876
          3Q-114, and 3Q-115

 4G-151    . . . . . . . . . . . . . . . . . . .1885

 1B-101    . . . . . . . . . . . . . . . . . . .1958

 2B-105, 2B-106, and 1B-102 through  . . . . .1960
          1B-105

 1B-200 through 202, 1B-204 through 208, . . .1969
          1B-210, 1B-212, 1B-215, 1B-217
          through 219, 1B-221, 1B-222,
          1B-225 through 228, 1B-230
          through 242, 1B-244, 1B-247,
          1B-249 through 252, 1B-254
          through 258, 1B-261, 1B-263,
          and 1B-265.

 1B-106    . . . . . . . . . . . . . . . . . .1970

 1B-120 and 1B-121   . . . . . . . . . . . . .1976

 1B-122 and 1B-123   . . . . . . . . . . . . .1980

 1B-126 and 1B-127   . . . . . . . . . . . . .1982

 1B-124 and 1B-125   . . . . . . . . . . . . .1983

 1B-145, 1B-146 . . . . . . . . . . . . . . . .1985