P5LCcom1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
UNITED STATES OF AMERICA,

            v.                       24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

            Defendant.          Trial
-------------------------------x
                            New York, N.Y.
                            May 21, 2025
                            8:45 a.m.
Before:

                HON. ARUN SUBRAMANIAN,

                            District Judge
                            -and a Jury-

                  APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
    EMILY A. JOHNSON
    MAURENE R. COMEY
    MEREDITH FOSTER
    MITZI STEINER
    MARY C. SLAVIK
    Assistant United States Attorneys

P5LCcom1

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:   MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
SHER TREMONTE
BY:   ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:   ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        JONATHAN P. BACH
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND

ALSO PRESENT:
LUCY GAVIN, AUSA Paralegal Specialist
SHANNON BECKER, AUSA Paralegal Specialist
RAYMOND MCLEOD, Defense Paralegal Specialist

P5LCcom1

(Pages 1991 through 1994 sealed)

(Trial resumed; jury not present)

THE COURT:  First, on Dr. Hughes, who will be presenting Dr. Hughes?

MS. STEINER:  I will, your Honor.

THE COURT:  Let me make sure I understand.  I take it you're going to elicit on direct that Dr. Hughes did not review any of the evidence in this case; is that fair?

MS. STEINER:  Correct, your Honor.

THE COURT:  And that she's not talking about any specific witness in this case?

MS. STEINER:  Absolutely.

THE COURT:  Was she here during Ms. Ventura's testimony?

MS. STEINER:  No, your Honor.

THE COURT:  She's not going to be commenting on Ms. Ventura specifically?

MS. STEINER:  In no way at all.

THE COURT:  In your letter, I think you addressed most of what defense had identified in their letter.  The only portion of your letter that I had a question about is on the second page.  You indicate that as part of her testimony, the government will elicit brief testimony regarding how specific types of abuse cause a victim to remain in a relationship.  I think that's consistent with the Court's ruling.  But you go on

P5LCcom1

to say that Dr. Hughes will provide concise definitions of the relevant forms of abuse.  And I haven't heard from the defense, but I would imagine what they would say is, well, isn't that a backdoor way of introducing what is in the coercive control section in Dr. Hughes's report and that should be out.  But maybe you can shed a little more light on what Dr. Hughes would be saying.

MS. STEINER:  Of course, your Honor.  First of all, I think, as the Court can see, we're very much trying to hue to the April 25th order of the Court, and what's specifically in Dr. Hughes' notice, we expect that during the course of Dr. Hughes' testimony, she's going to need to differentiate between different types of abuse because they have different effects on the victim, and as your Honor order contemplated and I think understood, it's important that Dr. Hughes be able to explain and not be hindered from explaining the reasons that a victim is engaging in the behavior that they are.  In order to explain those reasons, she has to explain kind of the effect of these different types of abuse.  This is going to be very limited, your Honor, but I do think it's necessary and I think for two reasons.

THE COURT:  Well, when you say limited, are you saying like five minutes?

MS. STEINER:  I don't even think, your Honor, I'm going to ask her, I don't expect to ask her, can you please

P5LCcom1

define this term.  She's an expert, and the first time she uses a term, she'll want the jury to understand what she's referring to.  So, for example, if she talks about financial manipulation, she'll want the jury to understand what that term is.  It's going to be something that is relevant to coping, it's going to be something that's relevant, of course --

THE COURT:  Why does she have to explain what it is?  Doesn't that go to what's in the coercive control section, meaning Dr. Hughes will explain that these tactics may include, among other things, the following, actual or threatened physical violence, aggression, sexual assault and abuse, sexual degradation, micro regulation, financial and physical and emotional isolation from preexisting support networks and external influence, use of collateral or damaging or compromising information, exploitation of preexisting psychological traumatic and financial vulnerability, et cetera.  So is that what she's essentially going to be testifying about?

MS. STEINER:  No, your Honor, she's not going to use all those terms.  I expect she'll refer to kind of buckets of types of abuse.  So for example --

THE COURT:  Physical abuse --

MS. STEINER:  Sexual abuse.  And when she says sexual abuse, to lay a proper foundation for her opinion about what she's talking about, she'll want to define the parameters of what that means to her --

P5LCcom1

THE COURT:  In concise --

MS. STEINER:  In concise terms, exactly.

THE COURT:  Okay.

MS. STEINER:  Exactly.

THE COURT:  Because otherwise, what she says, it would be hard for her to provide her opinion --

MS. STEINER:  Exactly.

THE COURT:  On the things that the Court has permitted her opinion without saying something about what is triggering those things.

MS. STEINER:  Exactly.  Like I said, your Honor, we're not going to belabor the point.  We've kind of instructed her not to repeat the definition.  She's going to lay out kind of the contours and then move on just to provide that foundation for the jury.

THE COURT:  Look, I think whats the defense says is, Dr. Hughes is a skilled and trained witness, and so she doesn't need to be asked the questions to try to do as much as she can.  That's what they're concerned about.  Understanding from what you're saying is that you have told Dr. Hughes about the limitations on her testimony, and then you will keep her within those bounds.

MS. STEINER:  Yes, we have, your Honor.  Yes, and we've worked with her.  I would ask even, your Honor, to the extent I feel in any way that the expert is veering, that I be

P5LCcom1

able to lead the witness back to the appropriate scope.  She knows this and is going to do her very best --

THE COURT:  I think that's acceptable and I think we will also be hearing from Mr. Bach outside of those bounds.

MS. STEINER:  Yes.

THE COURT:  Anything further from the defense?  I think most of the issues you raised in your letter, which were well taken, given the 3500 material were addressed in Ms. Steiner's response, there was that one part of the response I think was a little bit ambiguous, and so we've had some changes.

Any further issues from your side?

MR. BACH:  Judge, first, I just want to introduce myself and say hello.

THE COURT:  Good morning.

MR. BACH:  Jonathan Bach.  Nice to meet you.

Secondly, I can tell from the Court's comments and from the government's remarks that the issues are well known to the Court and they seem to be addressed, the devil will be in the details.  We are of course concerned about coercive control coming back into play.  We're just also concerned about parading kind of a parade of horribles of abuse in front of the jury to suggest that there's a large societal problem here that might not relate to this case.  I think your Honor, when you ruled, said that Ms. Hughes was not to expound at length about

P5LCcom1

different types of abusive conduct as a precursor.  That's in the transcript.

THE COURT:  It's in the paragraph after what was quoted.

MR. BACH:  If she's not expounding at length, we can obviously live with it and we'll address it, but if she does --

THE COURT:  I expect you to stand up and I will not hesitate to police those lines, which I think is what I said in the transcript you're citing.

MR. BACH:  Perfect.  Thank you very much.

MS. SHAPIRO:  Your Honor, I wanted to note for the record, as your Honor is aware, we're preserving our objection to her entire testimony.  So during the examination, the objections will be about policing the Court's ruling, but we don't intend -- by not objecting to every question

THE COURT:  You filed your motion and I denied it in part and that preserves the issue.

MS. SHAPIRO:  Thank you.

THE COURT:  That addresses Dr. Hughes.

As to Mr. Steel's letter concerning certain exhibits, exhibit 406, which is the photograph, I think that's within bounds subject to connection with the testimony that would be admitted.

As to exhibit 402, I'm not understanding what that has to do with anything.  So I don't know if anyone wants to

P5LCcom1

address that.

MR. AGNIFILO:  I can address it, your Honor.  So it really, it just shows the relationship between Ms. Ventura and this other particular witness.  The relevant part of it is there's been this suggestion in the case that somehow Mr. Combs made, compelled Ms. Ventura to do drugs.  Here, what we have in the conversation is only that Ms. Ventura is somewhere else, she says she's in Boston.  That's irrelevant one way or another where she is, and that she's contacting this witness to see if there's places where she can get drugs in Boston.

THE COURT:  But if that's the case, doesn't it go to the truth of the matter asserted?

MR. AGNIFILO:  No, because it's irrelevant she's in Boston.

THE COURT:  That's not the only matter asserted.  The matter asserted is she's fiending for drugs and she wants to get them in Boston just like she does in New York City, which is the correspondence.

MR. AGNIFILO:  But there's no assertion.  It's a dialogue.  She's having a conversation through text with this witness — do you know a place in Boston?  That's really a question.  And he says no, the stuff in Boston, other than marijuana, is not very good.  And that's really the crux of it.

THE COURT:  What is the relevance again?

MR. AGNIFILO:  The relevance is that she's a free

P5LCcom1

agent.  She goes to other places, she makes decisions on her own about what she wants to do there.

THE COURT:  See, as you discuss the relevance, it seems more like you're putting this exchange in for the truth of the matter asserted.

MR. AGNIFILO:  But the truth isn't that -- we don't even know whether she got any drugs.  And that's not the point.  The point is, she has -- excuse me.  I'm calling her she.  Ms. Ventura has friendships in the group.  That's established by the text chain.  She can go to these friends she has made in the group to ask for things that she wants.  She is responded to and she can make decisions of her own free will about how she wants to live her life.  None of this would be horribly relevant if it weren't for the overlay that the government is putting forward that she didn't have this type of free agency and that drugs were imposed on her by Mr. Combs, and this shows that that's just simply not the case.

THE COURT:  Any response from the government?

MS. COMEY:  Yes, your Honor.

So first, I think there are two instances that are clearly being offered for the truth of the matter asserted to prove the point that Mr. Agnifilo just set out, and that is, I'm in Boston tomorrow hosting a party tomorrow night.  The reason the defense wants that in is to prove that she was in fact going to be in Boston that next night.

P5LCcom1

And then the other is on the next page, it's just me anyway, and they want to offer that to prove that it was just her without Mr. Combs. That is the truth of the matter asserted, and that is the only way that they have the relevance hook that Mr. Agnifilo just proffered to your Honor.

I'd also note that I don't know how probative this is because I don't believe Ms. Ventura's testimony was that she only ever got drugs from Mr. Combs. To the contrary, I think that she testified that she got drugs from other sources, in particular she started getting drugs from other sources later in the relationship by the time she was addicted, which would have certainly fallen into 2016, which is when these text messages are.

THE COURT: You would agree though, the certification -- well, the question from Ms. Ventura about obtaining drugs, that itself would be properly admissible because it's not being put in for the truth of the matter asserted.

MS. COMEY: I would agree it's not hearsay, your Honor, because there is no truth being asserted.

THE COURT: It's a question.

MS. COMEY: I totally agree, not hearsay, a question is not hearsay.

On that, I think the relevance is tenuous at best. I think it's an attempt to impeach Ms. Ventura improperly through

P5LCcom1

this extrinsic evidence that has very, very minimal probative value.  But I agree with your Honor that the question alone, if you redacted the assertions, would not be hearsay.

THE COURT:  Meaning that she was in Boston and on her own?

MS. COMEY:  And that she's on her own, exactly.  And I think that those two points are the reason that Mr. Agnifilo wants this exchange in, is to prove not only that she's asking for drugs, but she's asking for drugs when she's in another city and on her own.  I think that is the purpose for which the defense is going to want to use this exhibit.

THE COURT:  I'll think about that.  Before Mr. Kaplan testifies, I'll give you a definitive ruling after I consider the parties' arguments.

MS. COMEY:  Thank you, your Honor.  And may I just briefly be heard on 406?  I understand your Honor's ruling.  I just wanted to flag the reason I had objected.

THE COURT:  Yes.

MS. COMEY:  Which is that I don't think that the picture in isolation is objectionable, it's the picture together with the message of condolences to Mr. Combs and his children upon the death of Ms. Porter.  I think this witness, it is totally fair for the defense to cross examine this witness about the fact that he remained in contact with Mr. Combs, that he remained friendly and supportive of

P5LCcom1

Mr. Combs, even that he sent condolences, I think that's all fair cross-examination of Mr. Kaplan and I won't object to that.

My concern about this, my 403 concern about this particular exhibit is that it starts to veer into seeking juror sympathy for the fact that the mother of Mr. Combs's children tragically died and would, I worry, be an attempt to plant a seed in the jurors' minds that if Mr. Combs is convicted, they may be taking away the only remaining parent from these children.

And so while I understand Ms. Porter's death is going to come in at this trial and is somewhat relevant, that relevance is extremely limited, and the probative value of this message is extremely low.  I don't think it goes to any disputed issues at this trial and I think we start to veer into unfair prejudice and tugging at the jurors' heartstrings and sympathies when we start putting in a picture of her together with condolences.

So that was my objection, your Honor.

THE COURT:  Understood.  I'll take a closer look at exhibit 406 while we're dealing with the other witnesses.

And as to Mr. Mescudi, let me ask you this:  Whoever is going to be presenting Mr. Mescudi, are any of these concerns well founded, I guess is the way it put it, because I think, in general terms, the defense's concern is that either

you are going to try to elicit inadmissible hearsay or speculation concerning Ms. Ventura's state of mind, both of which would be improper, but you may not be trying to do any of that.

MS. JOHNSON:  Your Honor, I don't believe the vast majority of the items laid out in the letter are anything we need to tee up for the Court.  Mr. Mescudi will not be testifying today, and so the government would appreciate an opportunity to confer further with the defense, and there may be one issue where we need your Honor's input, but I don't anticipate that most of the items in that list will be at issue.

THE COURT:  All right.  So then if he's not going to testify today, is that based on the anticipated length of the testimony of the other witnesses or is there a change in the order and I missed it?

MS. JOHNSON:  Your Honor, I apologize.  We emailed the Court last night and the parties, maybe around 10:30, 10:45, I think there's a chance we wouldn't get to him anyway based on the anticipated length of testimony.  If we do, we would need to call the next witness out of order just because of availability issues.

THE COURT:  I see that in the paragraph.  I saw the list, which had Ms. Morales after Mr. Mescudi.  That's my mistake.  Okay.  Understood.

P5LCcom1

And as to Mr. Kaplan and the issue that was raised over email, Ms. Comey, what, if anything, does the Court need to do, other than potentially signing that order?

MS. COMEY:  So my experience with immunized witnesses during trial is that usually during a break outside the presence of the jury, the witness is called to the stand to officially assert his Fifth Amendment privilege, and I think either the Court can --

THE COURT:  I'll ask you to do that --

MS. COMEY:  -- inquiry.

THE COURT:  I think some courts have done that in front of the jury on direct, and there have been some judges who have done the interim instruction that I sent to you, because that's where I got it from.  We don't have to do it that way.  If the parties are in agreement, I'm happy to have Mr. Kaplan called outside the presence of the jury, we'll swear him in, and then you can ask any questions that you feel are appropriate.

MS. COMEY:  That would be our request, your Honor.

THE COURT:  Okay.  Anything further from the government?

MS. COMEY:  No.  Thank you, your Honor.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  No.  Thank you, your Honor.

THE COURT:  Let's have Special Agent Gannon back on

the stand.  Let me ask the deputy to check on our jury.

(Jury present)

(Witness present)

THE COURT:  Agent Gannon, you understand you are still under oath?

THE WITNESS:  Yes, sir.

THE COURT:  Ms. Smyser, when you're ready.

GERARD GANNON, resumed.

DIRECT EXAMINATION CONTINUED

BY MS. SMYSER:

Q.  Good morning, Special Agent Gannon.

A.  Good morning.

Q.  Yesterday, when we left off, I was asking you about some items that were seized from one of the master closets.  Do you remember that?

A.  Yes, I do.

Q.  I want to keep going with certain of the items you seized.

MS. SMYSER:  Ms. Foster, could you please display Government Exhibit 1B-215.

Q.  What does this generally show?

A.  It shows red heels and some sex items in a dresser within room R.

Q.  And so this is in that master closet we were talking about?

A.  Yes, it is.

Q.  Earlier we had looked at some shelving from this closet.

P5LCcom1                          Gannon - Direct

Where is that in relation to this dresser?

A.  It would be behind where the photographer would be.

            MS. SMYSER:  Ms. Foster, could you please display

Government Exhibit 1B-244.

Q.  Is this a closeup of the red heels you mentioned?

A.  Yes, it is.

Q.  I want to direct your attention to the bottom of the cart

beside you for what has been marked for identification as

Government Exhibit 1B-142.  What is this?

A.  These are the red heels from the photo.

Q.  How do you know they're the heels from 2 Star?

A.  They look very similar, and the chain of custody has my

signature on them.

            MS. SMYSER:  Your Honor, the government offers

Government Exhibit 1B-142.

            MS. GERAGOS:  No objection.

            THE COURT:  1B-142 will be admitted.

            (Government's Exhibit 1B-142 received in evidence)

Q.  Special Agent Gannon, could you please open that and

display the heels for the jury.

A.  Yes.

Q.  Thank you, Special Agent Gannon.  We looked at six pairs of

heels so far from this master closet.  Are those all the pairs

of platform heels that were seized from 2 Star?

A.  No, it's not.

Q.  Approximately, how many others were there?

A.  There were 12 other pairs of platform high heels.

MS. SMYSER:  Ms. Foster, you can take that down.

Q.  Special Agent Gannon, I want to talk about a few other things that were seized from room R, that master closet.

MS. SMYSER:  Ms. Foster, can you please display Government Exhibit 1B-239.

Q.  What does this show?

A.  This is a picture of two -- of a pair of boots on the floor.

Q.  This is in that same closet?

A.  Yes, it is.

MS. SMYSER:  Ms. Foster, could you zoom in on those boots, please.

Q.  What kind of boots are these, Special Agent Gannon?

A.  They were Balenciaga boots.

MS. SMYSER:  Ms. Foster, could you please display side-by-side Government Exhibit 1B-241 with 1B-242.

Q.  What are we looking at here, Special Agent Gannon?

A.  We are looking at three cellphones that were found inside of one of the boots.

Q.  I want to direct your attention to the top of the cart next to you.  In one of the red wells, you should find what's been marked for identification as Government Exhibit A-600, A-700, and A-1400.  What are those?

P5LCcom1                          Gannon - Direct

A.   These are the three cellphones that are in the photograph.

        MS. SMYSER:  Ms. Foster, could you please pull up Government Exhibit 1301, which is a stipulation between the parties.  Could you turn to page 3 and zoom in on paragraph 11. I'm going to read a portion of this paragraph.

        On or about March 25th, 2024, as part of a search of the residence located at 2 Star Island, Miami Beach, Florida, HSI seized the following electronic devices:  Government Exhibit A-600, a cellphone stored inside of a black Balenciaga boot in room R, one of the master bedroom closets; Government Exhibit A-700, a cellphone stored inside of a black Balenciaga boot in room R; and Government Exhibit A-1400, a cellphone stored inside of a black Balenciaga boot in room R.

        You can take that down, Ms. Foster.

        Moving on to another item, Ms. Foster, could you please display Government Exhibit 1B-236.

Q.   What is this, Special Agent Gannon?

A.   It's a black Gucci bag.

Q.   Where was that found?

A.   It was found on top of the dresser, the same dresser where the red heels were inside.

Q.   Was there anything inside of the Gucci bag?

A.   Yes.  There were an assortment of presumed to be narcotics pills and crystal rock-like substance.

Q.   Was there any powder?

A.   There was also powder.

MS. SMYSER:  Ms. Foster, could you please display Government Exhibit 1B-238.

Q.   What are we looking at here?

A.   We are looking at most of the drugs that were located in the bag.  There were also two bottles of eyedrops.

MS. SMYSER:  Ms. Foster, could you please zoom in on the items that are from the bag.

Q.   Could you just walk us through what we're looking at here?

A.   At the top, there is a bag of a different assortment of pills — blue, pink, white, and yellow.  There is a smaller bag of pink pills, another bag of white and yellow pills, a bag of black pills, a bag of orange pills, a bag containing a crystal rock-like substance, a bag containing white powder, a $100 bill, a black plastic straw, and a container containing a white substance.

MS. SMYSER:  I want to go through each of these items, but at this point, your Honor, the government would offer Government Exhibit 1306, which is a stipulation between the parties.

THE COURT:  All right.  1306 will be admitted.

(Government's Exhibit 1306 received in evidence)

MS. SMYSER:  The government offers the following exhibits which the parties agreed may be admitted as government exhibits at trial in 1306.  Those exhibits are Government

P5LCcom1                          Gannon - Direct

Exhibit 1B-130 through 1B-135, 1B-137, 1B-138, 1B-147, 1B-148, 10A-103-A1, 10A-103-C1 through 10A-103-C3, 10A-103-D1, 10A-103-E1, 10A-103-F1, 10A-103-G1, 10A-103-H1, 10A-103-I1 through 10A-103-I4, 10A-103-J1 through 10A-103-J3, 10A-103-K1, 10A-103-L1, and 10A-103-M1.

MS. GERAGOS:  No objection.

THE COURT:  Those exhibits will be admitted.

(Government's Exhibits 1B-130 through 1B-135, 1B-137, 1B-138, 1B-147, 1B-148, 10A-103-A1, 10A-103-C1 through 10A-103-C3, 10A-103-D1, 10A-103-E1, 10A-103-F1, 10A-103-G1, 10A-103-H1, 10A-103-I1 through 10A-103-I4, 10A-103-J1 through 10A-103-J3, 10A-103-K1, 10A-103-L1, and 10A-103-M1 received in evidence)

MS. SMYSER:  Ms. Foster, could you please pull up Government Exhibit 1306 and zoom in on paragraph 1.

The parties agree that Government Exhibits 1B-130 through 1B-136, 1B-137, 1B-138, 1B-147 and 1B-148 described below were seized during a search of 2 Star Island, in Miami, Florida, on or about March 25th, 2024, and were analyzed for the presence of controlled substance by a U.S. Department of Homeland Security and U.S. Customs and Border Patrol laboratory.  Details of this search and the results of this laboratory analysis are described below.  Where capsules or tablets were tested as part of the laboratory analysis, those particular capsules or tablets were destroyed in the course of

testing.

Ms. Foster, you can zoom out, and next to the stipulation, could you please display Government Exhibit 10A-103-M1.  Could you please turn to paragraph 4 of this stipulation.  As I'm doing that, I'm going to read this paragraph.

Special Agent Gannon, could you please find Government Exhibit 1B-138.

Government Exhibit 1B-138 contains the following items: a black, red, and green Gucci bag (the Gucci bag) which was found in room R (one of the master closets) and is pictured in Government Exhibit 10A-103-M1.  Prior to testing, the Gucci bag contained white solid material residue.  The white solid material residue tested positive for cocaine and ketamine.  A black plastic straw, which was found inside the Gucci bag and is pictured inside Government Exhibit 10A-103-M1, residue from the black plastic straw tested positive for cocaine and ketamine.

Special Agent Gannon, looking at 1B-138, could you please cut that open and display the Gucci bag for the jury.  Thank you.

Ms. Foster, could you now pull up 10A-103-D1 next to the stipulation.  Could you please zoom in on paragraph 5 here.

As I read this, Special Agent Gannon, could you please find Government Exhibit 1B-130.

P5LCcom1                          Gannon - Direct

Government Exhibit 1B-130 contains a white plastic bottle with a gray Lumify eyedrops label, which was found inside the Gucci bag and pictured in Government Exhibit 10A-103-D1. Prior to testing, the bottle contained liquid residue. The liquid residue tested positive for MDMA and ketamine.

Special Agent Gannon, can you please hold that up for the jury.

Ms. Foster, could you please now display Government Exhibit 10A-103-E1 next to the stipulation, and turn to page 3 of the stipulation.

Special Agent Gannon, could you please locate Government Exhibit 1B-131 while I read a portion of paragraph 6 here.

Government Exhibit 1B-131 contains the following items, which were found in the Gucci bag: a clear plastic container with a white cap labeled DBL wash, which is pictured in Government Exhibit 10A-103-E1, and contained white powdery solid material prior to testing. The white powdery solid material tested positive for cocaine. The entire sample of white powdery solid material was destroyed during the course of testing. A clear plastic Ziploc bag, which is pictured in Government Exhibit 10A-103-E1 and contained white powder-like solid material prior to testing. The white powder-like material tested positive for cocaine and ketamine. The entire

P5LCcom1                        Gannon - Direct

sample of white powder-like material was destroyed.

Special Agent Gannon, could you please hold that up for the jury.

Ms. Foster, could you now pull up Government Exhibit 10A-103-F1 next to the stipulation.  I'm going to read paragraph 7 here.

Government Exhibit 1B-132 contains a clear plastic Ziploc bag which was found inside the Gucci bag.  Prior to testing, the clear plastic Ziploc bag contained nine pink rectangular tablets with a Supreme imprint on one side and a CP imprint on the other, and pink solid material residue as pictured in Government Exhibit 10A-103-F1.  Two of these pink tablets were randomly selected and tested positive --

Could you pull that up just a little bit, Ms. Foster.

-- tested positive for MDMA.

Special Agent Gannon, could you please display Government Exhibit 1B-133 for the jury.

Ms. Foster, next, could you please pull up Government Exhibit 10A-103-H1 next to the stipulation.  I'm going to read paragraph 9 here.

Government Exhibit 1B-134 contains a clear plastic Ziploc bag, which was found inside the Gucci bag.  Prior to testing, the clear plastic Ziploc bag contained three orange triangular-shaped tablets with a Tesla symbol on one side and a CP imprint on the other as pictured in Government Exhibit

10A-103-H1.  One of these orange tablets was randomly selected and tested positive for MDMA.

Special Agent Gannon, could you please display Government Exhibit 1B-134 for the jury.

Ms. Foster, could you please pull up Government Exhibit 10A-103-I1 first next to the stipulation.  I'm going to start paragraph 10, which is at the bottom of this page.

Prior to testing, Government Exhibit 1B-135 contained the following items which were found in the Gucci bag: six whole rectangular white tablets and 10 partial tablets with a GG249 imprint, which are pictured in Government Exhibit 10A-103-I1.  Two of these white tablets and partial tablets were randomly selected and tested positive for alprazolam.  Alprazolam is the active ingredient in Xanax.

Ms. Foster could you please now display Government Exhibit 10A-103-I2 next to the stipulation.  I'm going to read B.  No need to zoom in, Ms. Foster.

Five whole rectangular yellow tablets and two partial tablets with a R039 imprint on one side and score marks on the other, which are pictured in Government Exhibit 10A-103I2.  Two of these yellow tablets and partial tablets were randomly selected and tested positive for alprazolam.

Ms. Foster, could you now please pull up Government Exhibit 10A-103-I3.  Looking at subparagraph C here, five whole rectangular white tablets and two partial tablets with a G3722

imprint on one side and score marks on the other, which are pictured in Government Exhibit 10A-103-I3.  Two of these white tablets and partial tablets were randomly selected and tested positive for alprazolam.

Ms. Foster, could you please display Government Exhibit 10A-103-I4.  And subparagraph D says: one whole rectangular white table and two partial tablets with a 2I/< imprint, as well as tablet fragments, which are pictured in Government Exhibit 10A-103-I4.  Two of these white tablets and partial tablets were randomly selected and tested positive for alprazolam.

Special Agent Gannon, could you please hold up Government Exhibit 1B-135 for the jury.

Ms. Foster, next, Government Exhibit 10A-103-L1 next to the stipulation.  I'm going to read paragraph 11 here.

Government Exhibit 1B-137 contains a $100 bill with serial number PB21705835E, which was found inside the Gucci and as pictured in Government Exhibit 10A-103-L1.  Residue from the $100 bill tested positive for cocaine and ketamine.

Could you please hold that up for the jury, Special Agent Gannon.

And returning to Government Exhibit 1306, I just want to walk through a few more items that were found in the Gucci bag as described in paragraph 12.

Ms. Foster, could you please first display Government

Exhibit 10A-103-C1.

In addition to the items described above, the following items were also found inside the Gucci bag: first, a bright blue round partial tablet, which is pictured in Government Exhibit 10A-103-C1.  The bright blue round tablet tested positive for methamphetamine and MDMA.

Ms. Foster could you please display 10A-103-C2.  This was a blue-green partial tablet, which is pictured in Government Exhibit 10A-103-C2.  The blue-green partial tablet tested positive for MDMA.

Ms. Foster, could you please pull up Government Exhibit 10A-103-C3 and turn to the next page of the stipulation.

The blue-green tablet fragments, which are pictured in Government Exhibit 10A-103-C3.  These blue-green tablet fragments tested positive for methamphetamine and MDMA.

Ms. Foster, could you please pull up Government Exhibit 10A-103-J1.

This is one yellow rectangular tablet with a G3722 imprint on one side and score marks on the other, which is pictured in Government Exhibit 10A-103-J1.  The yellow tablet tested positive for ketamine and alprazolam.

Ms. Foster, could you please pull up Government Exhibit 10A-103-J2.

This says one yellow rectangular tablet with an R039

imprint on one side and score marks on the other, which is pictured in Government Exhibit 10A-103-J2.  The yellow tablet tested positive for ketamine and alprazolam.

Finally, Ms. Foster, could you please display Government Exhibit 10A-103-J3.

One white rectangular tablet with a GG249 imprint, which is pictured in Government Exhibit 10A-103-J3.  The white tablet tested positive for alprazolam.

You can take those down, Ms. Foster.

Special Agent Gannon I want to move on from that master closet into the master bathroom.

Ms. Foster, could you please display Government Exhibit 1B-252.

Q.  What are we looking at here?

A.  This is a picture of the one of the master bathrooms.

MS. SMYSER:  Ms. Foster, could you please zoom in to the right side of the sink.

Q.  Do you see that wooden box on the right side?

A.  Yes.

Q.  What is that?

A.  It's a dark woodbox with the word Puffy on the top.

MS. SMYSER:  Ms. Foster, could you please display Government Exhibit 1B-254.

Q.  And what is this?

A.  That's the description of where it says Puffy on the top of

P5LCcom1                        Gannon - Direct

the box.

MS. SMYSER:  Next, could we look at Government Exhibit 1B-255.

Q.  What does this show?

A.  This shows clear pills and a crystal rock-like substance in a bag that was located inside that, inside the Puffy box.

MS. SMYSER:  Let's look at these two individually.

Ms. Foster, could you please again pull up Government Exhibit 1306 and side-by-side with Government Exhibit 10A-103-A1.  Could you turn to the next page, and specifically look at paragraph 2.

And this says:  Government Exhibit 1B-147 contains a brown paper and plastic pouch labeled Golden Teachers, 250 milligrams that was located in a wooden box labeled Puffy, which was seized from the countertop in room S, the master bathroom.  Prior to testing, the pouch contained 10 clear capsules containing brown solid material, which are pictured in Government Exhibit 10A-103-A1.  The 10 clear capsules were tested and tested for psilocybin.  Psilocybin, the naturally occurring active ingredient --

Could you just please pull that up a little bit, Ms. Foster.

-- in mushrooms converts to psilocybin when exposed to high temperatures.

Special Agent Gannon, could you please hold up

Government Exhibit 1B-147 for the jury.

Ms. Foster, could you now please pull up Government Exhibit 10A-103-K1 next to the stipulation.

We're going to look at paragraph 3 here, which says: Government Exhibit 1B-148 contains a clear plastic Ziploc bag, which located in the wooden box labeled Puffy described in paragraph 2. The clear plastic Ziploc bag contains purple rock-like solid material as pictured in GX 10A-103-K1. The purple rock-like solid material tested positive for 3,4 methylenedioxymethamphetamine, which is otherwise known as MDMA. Ecstasy and Molly are other terms for MDMA.

Special Agent Gannon, could you please hold up Government Exhibit 1B-148.

You can take those down now, Ms. Foster.

I want to go to Government Exhibit 1B-106 and turn to page 4, please. I want to look at a different part of the second floor. Ms. Foster, could you please zoom in on the areas of T, V, and U in this sketch.

Q. Can you remind us what these are, Special Agent Gannon?

A. T is the opening from the master bedroom to the master closet. It's like a hallway that takes you to -- if you go to the left, it takes you to a bathroom, and then go right, takes you more into the closet.

Q. This is a different closet than R, which we looked at earlier?

P5LCcom1                         Gannon - Direct

A.   It is.

          MS. SMYSER:  Ms. Foster, could you please pull up

Government Exhibit 1B-258.

Q.   What are we looking at here?

A.   This is one of the closets in that hallway, just the left

as you come out of the master bedroom right before the

bathroom.

Q.   And what's located on the bottom-left of the picture?

A.   That is some baby oil and Astroglide lubricant.

          MS. SMYSER:  Ms. Foster, could you please display

Government Exhibit 1B-261.

Q.   This is a zoomed-in picture of what was located at the

bottom of that closet?

A.   Yes, it is.

Q.   Special Agent Gannon, I just want to direct your attention

to that blue box over there and what's been marked for

identification as Government Exhibit 1B-151 and 1B-152.  What

are those?

A.   These are the baby oil and the Astroglide lubricants.

Q.   And how do you know that those are the baby oil and the

Astroglide that were seized from this closet in 2 Star?

A.   Based on the chain of custody on the back with my signature

on them both.

Q.   Could you please speak into the microphone.

          For Government Exhibit 1B-151, the baby oil, how many

bottles were there?

A.   25.

Q.   And for 1B-152, the Astroglide, how many bottles were there?

A.   31.

Q.   You can put those up.  Before you do, is this all the baby oil and Astroglide that was found in 2 Star?

A.   It is not.

          MS. SMYSER:  You can put those away.

          As he's doing that, Ms. Foster, could you please display Government Exhibit 1B-263.

Q.   What is U that we're looking at here?

A.   U is one of the master closets, and this is a -- like a medicine-cabinet-type area within the closet.

          MS. SMYSER:  Ms. Foster, could you please zoom in on the top shelf.

Q.   What is the black box here?

A.   It is Vital Honey.

          MS. SMYSER:  Ms. Foster, could you please display Government Exhibit 1B-265.

Q.   Is this the same Vital Honey that you were just referencing?

A.   Yes, it is.

          MS. SMYSER:  You can take that down, Ms. Foster.

Q.   Were cellphones found in any other rooms on the second

P5LCcom1                        Gannon - Direct

floor?

A.   Yes, there was.

Q.   I want to direct your attention to what's been marked for identification as Government Exhibit 900, which should be in your cart.

MS. SMYSER:  As he's looking for that, Ms. Foster, could you please pull up Government Exhibit 1301 and return to page 3, paragraph 11.

Q.   Special Agent Gannon, what is Government Exhibit A-900?

A.   It's a dark gray iPhone in a black case.

MS. SMYSER:  And this stipulation explains that on or about March 25th, 2024, as part of the search of the residence located at 2 Star Island, Miami Beach, Florida, HSI seized Government Exhibit A-900, a cellphone from a bedroom on the second floor of 2 Star Island.

You can take that down, Ms. Foster.

Special Agent Gannon, I want to move on to a different part of the property altogether.

Ms. Foster, could you please display Government Exhibit 1B-106 again, and this time turn to page 6.

Q.   What does this show?

A.   This shows a layout of the first floor of the guest house.

Q.   And could you remind us what rooms are on the first floor of the guest house.

A.   There's a guard shack area, a gym, and like a living

P5LCcom1                      Gannon - Direct

room-type room.

Q.  Are there multiple floors to this structure?

A.  Yes.  There's two.

Q.  What's on the second floor?

A.  That's where the bedrooms and the bathrooms are located as well as a music studio.

Q.  I want to focus on room GG, which you said was a security room.

        MS. SMYSER:  Ms. Foster, could you please display Government Exhibit 1B-206.

Q.  What does this show?

A.  This shows the entrance to that guard area with the red suitcase right there in the front.

Q.  What was found in this room, Special Agent Gannon?

A.  There was a handgun found inside the red suitcase.

        MS. SMYSER:  Ms. Foster, could you please display Government Exhibit 1B-207.

Q.  What is this?

A.  That's the handgun that was found inside the suitcase.

Q.  What caliber is this gun?

A.  It's a .45 caliber.

Q.  And does this gun have a serial number?

A.  It does.

Q.  Special Agent Gannon, I want to direct your attention to the cart beside you for what's been marked for identification

as Government Exhibit 1B-115.  What is this?

A.   From the outside, it says it's the .45 caliber firearm.

Q.   And how do you know?

A.   It's sealed up and has the chain of custody form with my signature on it.

          MS. SMYSER:  Your Honor, the government offers Government Exhibit 1B-115.

          MS. GERAGOS:  No objection.

          THE COURT:  1B-115 will be admitted.

          (Government's Exhibit 1B-115 received in evidence)

          MS. SMYSER:  Ms. Foster, could you now display Government Exhibit 1B-210.

Q.   What does this show?

A.   This is a picture of the magazine with the ammunition out of it inside of a bag.

Q.   Where was this magazine and the ammunition found?

A.   The ammunition was in the magazine, and the magazine was inserted into the handgun when it was found.

Q.   I want to direct your attention to the cart beside you to what's been marked for identification as Government Exhibit 1B-118.  You can also grab 1B-116.  Looking first at Government Exhibit 1B-118, what is that?

A.   This is the magazine that belongs to the handgun.

Q.   How do you know it's the same?

A.   The 6051 with my signature on it.

P5LCcom1                    Gannon - Direct

MS. SMYSER:  Your Honor, the government offers Government Exhibit 1B-118.

MS. GERAGOS:  No objection.

THE COURT:  1B-118 will be admitted.

(Government's Exhibit 1B-118 received in evidence)

Q.  Approximately how many bullets does this magazine hold?

A.  Since it had nine in there, there's no markings to indicate how many it can have, so at least nine.

Q.  Could you please just hold it up for the jury.

Now I want to direct your attention to what's been marked for identification as Government Exhibit 1B-116.  What is that?

A.  These are the nine rounds of .45 caliber ammo that was found inside the magazine.

Q.  How do you know?

A.  The 6051 that's attached to it with my signature on it.

Q.  Were the magazine and these rounds found inside of the gun?

A.  Correct.  The ammunition was inside the magazine, the magazine was inserted into the firearm.

MS. SMYSER:  Your Honor, the government offers Government Exhibit 1B-116.

MS. GERAGOS:  No objection.

THE COURT:  1B-116 will be admitted.

(Government's Exhibit 1B-116 received in evidence)

Q.  Could you just hold those bullets up for the jury.

          What caliber are the bullets?

A.   They're .45.

Q.   Remind us what caliber the gun is.

A.   It's a .45.

Q.   Was any more ammunition found in this room?

A.   Yes.   There was a box of .45 ammo found.

          MS. SMYSER:   Ms. Foster, could you please display
Government Exhibit 1B-212.

Q.   What is this?

A.   That's a picture of the box of ammunition inside of an
evidence bag.

Q.   How many bullets were inside the box?

A.   There were 41 bullets inside the box.

Q.   How many bullets would a new box contain?

A.   They typically have 50.

Q.   Could these bullets be used in Government Exhibit 1B-115,
the firearm?

A.   Yes, they're the same caliber as the firearm.

Q.   I want to direct your attention to what's been marked for
identification as Government Exhibit 1B-117.   What is that?

A.   This is the box of ammunition that was found containing
41 rounds of .45 ammunition.

Q.   And how do you know?

A.   The 6051 that's attached to it has my signature on it.

          MS. SMYSER:   Your Honor, the government offers

Government Exhibit 1B-117.

MS. GERAGOS:  No objection.

THE COURT:  1B-117 will be admitted.

(Government's Exhibit 1B-117 received in evidence)

MS. SMYSER:  Could you just hold that up for the jury.

Now, Ms. Foster, could you please return to Government Exhibit 1B-207.

Q.  Special Agent Gannon, is Government Exhibit 1B-115 still in front of you?

A.  Yes, it is.

Q.  Could you please open it.

MS. SMYSER:  Your Honor, for the record, I want to ensure that I've offered Government Exhibit 1B-115, and Government Exhibits 1B-151 and 1B-152.

THE COURT:  All right.  We'll admit those exhibits.

(Government's Exhibits 1B-151, 1B-152 received in evidence)

Q.  Is there a zip tie on this gun, Special Agent Gannon?

A.  There is.

Q.  Was that on the gun when it was found?

A.  It was not.

Q.  Where is the zip tie on the gun?

A.  It is through the ejection port, through the magazine well to prevent it from inserting a magazine or being able to close

P5LCcom1                              Gannon - Cross

all the way.

Q.  So this gun can't be fired right now?

A.  Correct.

           MS. SMYSER:  Your Honor, I'd ask permission for the witness to slowly walk Government Exhibit 1B-115 in front of the jury.

           THE COURT:  Granted.

           MS. SMYSER:  No further questions, your Honor.

           THE COURT:  Thank you, Ms. Smyser.

           Cross-examination.

           MS. GERAGOS:  Yes, your Honor.

CROSS-EXAMINATION

BY MS. GERAGOS:

Q.  Good morning, Agent Gannon.  My name is Teny Geragos and then you can be on your way.

A.  Good morning, ma'am.

Q.  The execution of these search warrants happened on March 25th, 2024, correct?

A.  Yes, ma'am.

Q.  And you were the agent put in charge of the 2 Star Island search warrant, right?

A.  Yes, ma'am.

Q.  Were there other search warrants that were also being conducted that day?

A.  Yes, there were, ma'am.

Q.   There were search warrants that were being conducted on Mr. Combs's person, right?

A.   Yes, ma'am.

Q.   And then also at his residence in Los Angeles?

A.   Yes, ma'am.

Q.   As part of HSI, you knew that the Southern District of New York and HSI had been conducting an investigation into Mr. Combs since November 17th, 2024, correct?

        MS. SMYSER:   Objection.

        THE COURT:   It's overruled.

A.   I learned of --

Q.   Of 2023.  I'm sorry.  You learned that HSI and the Southern District of New York had been conducting an investigation to Mr. Combs since November 17th, 2023, right?

A.   I learned that they had been conducting investigation.  The timeframe of how long I was not made aware of.  And I was informed of that approximately 11 days prior to the execution of the search warrant.

Q.   So you didn't become involved in the investigation until 11 days prior?

A.   I was notified that they were going to be conducting a warrant at the defendant's address, but I was not given any more information on that until the Monday before.  So approximately eight days where I learned generally what it was.

Q.   Understood.  And you testified yesterday that you received

training while employed at HSI on how to execute search warrants, right?

A.   Yes, ma'am.

Q.   And you had said yesterday, and I just want to understand, that you had executed five search warrants at residences before; is that right?

A.   Me personally, I have not, but I assisted with other agents that were doing search warrants at residences, yes, ma'am.

Q.   So at the time of the 2 Star Island search warrant, how many search warrants at residences had you been involved in?

A.   About five, ma'am.

Q.   So 2 Star was your sixth?

A.   It was either fifth or sixth.

Q.   Understood.  And so when you're on a team executing a search warrant at a residence, you do some preplanning, and for this one you had done it for about a week before, right?

A.   Yes, ma'am.

Q.   And for many reasons, your team at HSI would need to know where the target of the investigation would be at the time of executing the search warrant, right?

A.   Yes, ma'am.

Q.   And can you explain to the jury what a target of an investigation is.

A.   Generally, that's defined as somebody who -- a person of interest that's actually being investigated for a specific

P5LCcom1                    Gannon - Cross

crime.

Q.   And can you explain to the jury what a subject of an investigation is.

          MS. SMYSER:   Objection.

          THE COURT:   It's overruled.

A.   It's just another term for a target.   It's the same definition.

          (Continued on next page)

Q.   Essentially, somebody that could be relevant, had relevant information to your investigation, right?

A.   Yes, ma'am.

Q.   So at the time that you were executing the search warrants on Mr. Combs' home, you knew he would not be home at 2 Star Island, right?

A.   Yes, ma'am.

Q.   And because part of being an HSI agent is you know when someone books a flight to leave the country, right, or files a flight plan to leave the country?

A.   We can get information to determine that, yes, ma'am.

Q.   So you were aware that Mr. Combs was leaving with his family on a flight that day, right?

A.   Yes, ma'am.

Q.   He was leaving with his twin daughters?

         MS. SMYSER:   Objection.

         THE COURT:   Can we have a brief sidebar.

         (Continued on next page)

(At sidebar)

THE COURT:  What's the relevance of any of this?

MS. GERAGOS:  It's relevant to show where the target and the subject were when they executed the warrants and why they executed it in the manner that they did, knowing that no subjects or targets of the investigation were home.

THE COURT:  What does that have to do with anything that's at issue in this case?

MS. GERAGOS:  The government talked about how they broke down the gate to get in, and I think I should be able to ask on cross-examination that the family and Mr. Combs were not home.

THE COURT:  Meaning that there was no need for the 80 to 90 agents on the scene, etc.

MS. GERAGOS:  That's where I am about to go.

MS. SMYSER:  Your Honor, before we go on, I think we have a 403 objection to Ms. Geragos eliciting the twin daughters and the specifics about his children and his family that were traveling, which could lead to prejudicing the jury.

THE COURT:  That's fair.  Let's move through this part of this.

Just to be very clear, I would sustain the objection if it wasn't that on direct examination you did elicit testimony concerning a number of agents and how the search warrant was executed, so I think it's fair for Ms. Geragos to

inquire briefly on this issue.

          MS. GERAGOS:  I also think they will put on an agent who executed the warrant at the Opa-Locka Airport.  I assume that agent will say he was with his family, but I will move on. He answered the question.  Thank you.

          (Continued on next page)

P5LMCOM2                      Gannon - Cross

(In open court)

THE COURT:  Ms. Geragos, you may proceed.

MS. GERAGOS:  Thank you.

BY MS. GERAGOS:

Q.  You knew that Mr. Combs was not home, correct?

A.  Yes, ma'am.

Q.  You knew that he was with his family at the airport, right?

A.  Yes, ma'am.

Q.  You knew that he was going to fly on his private plane that day, correct?

A.  Yes, ma'am.

Q.  That's why you executed the warrant in the afternoon and not at 6 a.m., you testified, right?

A.  Yes, ma'am.

Q.  It's your job, when being in charge of the execution of a warrant, to know who would be at the property at 2 Star Island, right?

A.  For the most part, we tried our best to be able to ID how many people are going to be there and who is going to be there to be better prepared, yes.

Q.  When you were in the preplanning stages of the warrant, you knew that none of the targets or subjects of the investigation would be there when you executed the warrant, right?

MS. SMYSER:  Objection.

THE COURT:  Overruled.

A.   The plan was to do it when the subject had left the residence with his family, but there is always the possibility that he wasn't going to do -- wasn't going to leave, so he would have had to execute it, so we had contingencies.

Q.   Understood.  You waited until he left the property to execute it, right?

A.   Yes, ma'am.

Q.   Then that's when the special response team moved in on the property?

A.   Yes, ma'am.

Q.   Can you explain what type of vehicle the special response team used to move in on the property?

A.   It's an armored vehicle, typical like swat-type vehicle. It's an armored vehicle.

Q.   Was there multiple armored vehicles or just one?

A.   It was just -- I don't remember.

Q.   No problem.

A.   I think it was one or two.

Q.   Then there was also a boat that came in on the dock from behind to the residence?

A.   Yes, ma'am.  There were also boats.

Q.   HSI determined you would come in by land and by sea to secure the property?

A.   Yes, ma'am.  Which is normal practice.  They like to come in and cover all the areas to be able to get onto the property

as quickly as possible.

Q.  And you had 80 to 90 agents to do so after you secured the property?

A.  So it was approximately 80, 90 agents that participated total in the execution of the search warrant.  Not all of them at the same time.  There was a small group of us that went with SRT when they executed the search warrant to deal with anybody that they encountered.  So anybody they encountered they handed over to myself and a group of agents that would ID who they were and handle them while they cleared the residence.  And then once they cleared the residence, then they turned it over to myself.  Then we brought over the rest of the agents, the SRT left, and the rest of the agents searched the property.

Q.  OK.  So let's talk about who you encountered.  You encountered six individuals on the property, right?

A.  It sounds about right.

Q.  Was one of them a property manager?

A.  Yes, ma'am.

Q.  One of them was a music producer?

A.  Yes, ma'am.

Q.  And the rest were facilities people?

A.  Yes, ma'am.

Q.  And then you put them in handcuffs?

A.  Yes, ma'am.  We detained them until we ID'd who they actually were and had a chance to be able to search them.

Q.   And you kept them in handcuffs for an hour, is that
correct?

A.   No, ma'am.

Q.   How long did you have them in handcuffs?

A.   I don't remember the exact time, but once we had ID'd who
they were, we took them out of handcuffs.  There was one
individual that wasn't too happy with us initially and wasn't
really cooperating with us, so we left him in handcuffs a
little bit longer.

Q.   Because he wasn't happy that you put him in handcuffs?

A.   No.  He was trying to -- we were trying to search him, and
he wasn't making it easy to search him.

Q.   Once you searched all six individuals, none of them had any
weapons on them, right?

A.   That's correct.

Q.   No one had any paraphernalia on them, right?

A.   Correct.

Q.   You testified about photos that you took on the day of the
search.  Can you tell the jury briefly why it's important to
take photographs when you're executing a search warrant?

A.   It's -- are you talking about the initial photographs or
just in general, ma'am?

Q.   We looked through several photographs, I would say, aside
from like the Google Maps photos that we looked at, the
photographs that you took of the residence and items within the

residence.  I believe you testified that you took those photographs, correct?

A.  I personally didn't, but, yes.  HSI agents took those photographs.

Q.  That's a policy when you are executing search warrants, right?

A.  Yes, ma'am.

Q.  Can you just briefly tell the jury why that's important.

A.  So part of the process, we want to document what the property looked like when we took it over to actually conduct -- before we started conducting the search, so we take photographs and video.  And then we also sketch the property.  And then each item that we find we try to get as close of where it was located with a photograph to better remind individuals for testifying purposes and actually show where the item is to have a better idea of where it is.

Q.  So it's important essentially to document all important aspects of the search, right?

A.  Yes, ma'am.

        MR. AGNIFILO:  Can you we pull up Government Exhibit 1B-103 already in evidence.

Q.  You testified on direct evidence that this was a photo taken of the entry of 2 Star Island after the SRT team took over the property essentially, right?

A.  Yes, ma'am.

Q.   And this was a fair and accurate depiction of the gate after you entered the property?

A.   Yes, ma'am.

Q.   You see the gate on the right-hand side?

A.   Yes, ma'am.

Q.   Did the SRT team destroy that section of the gate?

A.   It appears that when they pushed through the gate that it broke.

Q.   It's important, you just said, to document aspects of the search, correct?

A.   Yes, ma'am.

Q.   Did you take video or photographs of how that happened?

A.   You mean the action of it or prior to?

Q.   Correct.  The action of it.

A.   No.

Q.   You just took a photo afterwards of the broken gate?

A.   Yes, ma'am.

Q.   I want to show you what's been marked for identification as Defense Exhibit 313, so just for the parties, the Court and the witness.

         What is this?

A.   It appears to be the gate from behind, from inside the property.

         MS. GERAGOS:  Your Honor, can I move this into evidence?

THE COURT:  Any objection?

MS. SMYSER:  No objection.

THE COURT:  Defense Exhibit 313 will be admitted.

(Defendant's Exhibit 313 received in evidence)

Q.  You didn't take this photograph, right?

A.  No, I don't think so.  Doesn't look like one of ours, ma'am.

Q.  So you didn't document the gate from the inside after the SRT, the special response team, destroyed the gate, correct?

A.  No.  We didn't take it from the site.

Q.  Showing you what's been marked only for identification as DX-310, if you know, Agent Gannon, what is this?

A.  I'm not sure, ma'am.

Q.  No problem.

MS. GERAGOS:  We will take that down.

Q.  You testified then that 80 to 90 agents, after you -- after the special response team got to 2 Star Island were on the ground there, is that right?

A.  The 80 to 90 includes everybody on the ground to include SRT.  So there were not 80 to 90 on there to do the search at the exact same time.

Q.  Understood.

When you opened the gate --

MS. GERAGOS:  If we could put back up 1B-103, government exhibit already in evidence.

P5LMCOM2                        Gannon - Cross

Q.   We just talked about the security hut, I'll describe it, in the guest house.  Can you describe, looking at this photo, where the security area is.

A.   It would be right in front of the post there where the agents are standing next to.  It's closer to the gate.

Q.   To that left part of the gate, right?

A.   Yes, ma'am, approximately.

        MS. GERAGOS:  So if you could bring up Government Exhibit 1B-106 at page 6.

Q.   Is it fair to say that where it says GG is where the security area is in the guest house?

A.   Yes, ma'am.

Q.   And then the door and where it says stairs is the entrance to the security area?

A.   Yes.  The door.

        MS. GERAGOS:  On the left-hand bottom side.  Thank you.

A.   The door would be to the left of the stairs, yes, ma'am.

Q.   Got it.

        MS. GERAGOS:  If we could pull up 1B-206 already in evidence.  I believe we just looked at that.

Q.   That would be the entry to the security area, right?

A.   Yes, ma'am.

Q.   And you testified that that red suitcase is where you found the handgun that you just displayed to the jury, right?

P5LMCOM2                          Gannon - Cross

A.  Yes, ma'am.

Q.  So the red suitcase, it's actually in the security area on the property, right?

A.  Yes, ma'am.

MS. GERAGOS:  And then can we pull up the next one -- we could do side by side -- 1B-207.

Q.  So this is the handgun that you just displayed, right?

A.  Yes, ma'am.

Q.  So it was located within several items of clothing within the suitcase, right?

A.  It looks to be.  I just know that it was in the suitcase.

Q.  You just testified that you tried to take the photographs as close as possible to where the items were seized, right?

A.  Yes, ma'am.

Q.  So there seems to be clothes underneath this handgun, right?

A.  Yes, ma'am.

Q.  And it was located in the suitcase, right?

A.  Yes, ma'am.

Q.  Did you personal take this photo or no?

A.  I did not, ma'am.

Q.  Understood.

MS. GERAGOS:  Can we please pull up 1B-212 already in evidence.

Q.  You also just testified about this ammunition that was also

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

found as well, right?

A.  Yes, ma'am.

Q.  And this was also located in the security area of the property, right?

A.  Yes, ma'am.

Q.  In the little guard house that we just looked at, right?

A.  Yes, ma'am.

         MS. GERAGOS:  You can take that down.

Q.  We also looked at several photos of the guest house on the property, right?

A.  Yes, ma'am.

Q.  There was also a music studio in the guest house.  Does that sound right?

A.  Yes, ma'am.

         MS. GERAGOS:  I am going to pull up for just the parties and the witness Defense Exhibit 305.

Q.  Do you recognize this photo?

A.  Yes, ma'am.

Q.  What is this?

A.  This is a picture of the music studio on the second floor.

         MS. GERAGOS:  Your Honor, we move to admit Defense Exhibit 305.

         THE COURT:  Any objection?

         MS. SMYSER:  No objection.

         THE COURT:  Defense Exhibit 305 will be admitted.

P5LMCOM2                         Gannon - Cross

(Defendant's Exhibit 305 received in evidence)

Q.  When you walk into the guest house from the other area, not from the studio -- I mean, not from the security area, this would be the music studio in the guest house, right?

A.  Yes, ma'am.

Q.  And there is kind of a couch on the right and then several keyboards and mixing areas, is that right?

A.  Yes, ma'am.

Q.  Great.

We looked at several photos today and yesterday of the closet in the main house.  Do you remember that?

A.  Yes, ma'am.

Q.  You testified that you found the seven-inch heels there and you found some taken-apart firearms there as well?

A.  Yes, ma'am.

Q.  I think you described this as room R.  That's what you had labeled it as, correct?

A.  Yes, ma'am.

Q.  Do you remember that Ms. Smyser asked you about how big the closet was.  You were trying to describe it for the jury, room R.

A.  Yes, ma'am.

MS. GERAGOS:  Can we bring up Defense Exhibit 314 just for the parties and the witness.

Q.  What is this, Agent Gannon?

A.   This is -- this looks to be the closet labeled U.

Q.   That's U.

          MS. GERAGOS:  We will take this down.

          Can we bring up Defense Exhibit 312 just for the
parties and the witness.

Q.   What is this?

A.   This is a picture of the shelves just -- if you were coming
into the room to the left.

Q.   In room R, right?

A.   In room R it looks to be, yes.

          MS. GERAGOS:  We move to admit 312.

          MS. SMYSER:  No objection.

          THE COURT:  Defense Exhibit 312 will be admitted.

          (Defendant's Exhibit 312 received in evidence)

Q.   Did you take this photo, Agent Gannon?

A.   No.

Q.   So in this photo there are shoeboxes and other items at the
top area of the utility closet, is that right?

A.   It looks to be, yes.

Q.   So when you took the seven-inch heels out of the closet
after the search warrant, did you leave the boxes?

A.   I think some of the boxes were left, yes, ma'am.

Q.   OK.  Got it.

          MS. GERAGOS:  Now, if we can put it side by side,
1B-217 already in evidence, Government Exhibit.

Q.   The photo that you took or somebody on your team took is the one on the right-hand side, is that correct?

A.   Yes, ma'am.

Q.   And up above the utility closet there is nothing on those shelves, is that right?

A.   Correct.

Q.   So nobody on your team took a photo of the utility closet before it was searched, is that right?

A.   That's correct.

Q.   But you took a photo of it after it was searched.

A.   Yes, ma'am.

Q.   And after you had taken the heels down, right?

A.   Yes, ma'am.

Q.   And after you had taken the towel and the box off of the shelves, right?

A.   Yes, ma'am.

Q.   Do you know from which of these three cubbies on top the wrapped-up towel came from?

A.   Specifically, no.  I know it was from one of the top two that are empty.

Q.   But you can't say which one?

A.   Exactly, no, ma'am.

Q.   Do you know from which of the top two cubbies the heels came from?

A.   I think they came from both, but I can't say for sure

P5LMCOM2                        Gannon - Cross

exactly which boxes were where, ma'am.

Q. Let's just go back quickly, and then we will come back to the closet, to the bedroom.

MS. GERAGOS: If you could pull up what's in evidence as Government Exhibit 1B-213.

Q. This is a photo of Mr. Combs' bedroom, correct?

A. Yes, ma'am.

MS. GERAGOS: Can we put it side by side with 1B-206 in evidence.

We can take that down. Sorry.

Can we pull up just for the witness Defense Exhibit 303, and the parties.

MS. SMYSER: Your Honor, I don't believe 1B-213 is in evidence.

THE COURT: It's just being shown to the witness, I think.

MS. GERAGOS: Yes.

So Defense Exhibit 303 just for the witness.

Q. Do you recognize this?

A. It looks to be from the master bedroom.

Q. Was this part of the photos that you or your agents took?

A. I'm not sure.

MS. GERAGOS: We move to admit Defense Exhibit 303.

THE COURT: Any objection?

MS. SMYSER: No objection.

P5LMCOM2                         Gannon - Cross

THE COURT:  Defense Exhibit 303 will be admitted.

(Defendant's Exhibit 303 received in evidence)

Q.  When you walk into Mr. Combs' bedroom there are these couches on the right-hand side, is that right?

A.  Sounds right, ma'am.

Q.  And then does this look how it looked after the agents went in to search the bedroom?

A.  I don't remember specifically if this is how it looked afterwards.

Q.  When you went in there the pillows weren't strewn about, correct?

A.  From what I remember, yes, that's correct.

MS. GERAGOS:  We will go back now, thank you, to the closet.

If we could pull up 1B-219 already in evidence.

Q.  You testified yesterday that these were the upper receivers that you or someone from your team recovered from one of the two cubbies in that closet, correct?

A.  Correct, ma'am.

Q.  And they were wrapped up in those -- in the towel that we are looking at in this photo, right?

A.  Yes, ma'am.

Q.  And there was tape wrapped around them also, is that correct?

A.  Yes, ma'am.

Q.   And you can see in this photo on the right-hand side the
tape was removed to take this photograph, right?

A.   Yes, ma'am.

Q.   Did you remove the tape or did someone on your team remove
the tape?

A.   Someone on my team removed it.

Q.   And these upper receivers were disassembled from the lower
receivers, right?

A.   Yes, ma'am.

Q.   So when you unwrapped it in the form that we are looking at
right now, these are inoperable, right?

A.   Yes, ma'am.

Q.   And the upper and the lower receivers were in two
separate -- there were two separate areas, correct?

A.   What do you mean by that?

Q.   This towel was not in the box where you found the lower
receivers, right?

A.   No, it was not.

Q.   It was separate, right?

A.   Yes.

Q.   And the magazines were also not loaded into the lower
receivers, correct?

A.   That's correct.

Q.   And so when you seized them they did not look like they did
yesterday when you were displaying them to the jury, correct,

because they were in the wrapped-up towel?

A.   Yes, ma'am.

          MS. GERAGOS:   Can we bring up 1B-222 already in evidence.

Q.   Here we have a photo that you or somebody on your team took, correct?

A.   Correct.

Q.   And you testified that you take photos as close to where something was located for the importance of the investigation, right?

A.   Yes, ma'am.

Q.   In this photo you took five boxes and displayed them on the ground in the closet, right?

A.   Yes, ma'am.

Q.   And then you took the upper receivers, which are in the towel on the left-hand side, right?

A.   Yes, ma'am.

Q.   And the box on the lower side of this photo.  And you arranged it in this photograph and took it that way, right?

A.   Yes, ma'am.

Q.   And so there is no way of knowing where any of these items were actually placed in the utility closet before you took this photo, right?

A.   Yes.  There is no way to know exactly the order that they were in, correct.

Q.   Nobody had documented that on the day of the search?

A.   No, ma'am.

          MS. GERAGOS:   Do you see if we could zoom in on the
cardboard box on the bottom.

Q.   This is a cardboard box that you testified that the lower
receivers were in, correct?

A.   Correct, ma'am.

Q.   So can you see here that there is a perforated edge on the
box on the bottom section?

A.   Yes, ma'am.

Q.   And then there is also three pieces of tape that wrap
around that?

A.   Yes, ma'am.

Q.   Then you also testified that the lower receivers were not
connected to the ammunition either, is that right?

A.   Yes, ma'am.   You can see one of the magazines behind --

Q.   It's that kind of bottom area, if I have it right, that the
magazine --

A.   Yes, in the bottom left.   That's one of the magazines.

Q.   Great.

          So you testified yesterday, we talked about the --
what you said were the scratched-off serial numbers, right.
And you said that it's important to have serial numbers for law
enforcement because it helps law enforcement identify who the
owner is of a gun, is that right?

P5LMCOM2                          Gannon - Cross

A.   Yes, ma'am.

Q.   I'd like to talk about all the ways that law enforcement can help identify someone who has possessed or owned a firearm without a serial number.

So you've been at HSI now for five years, correct?

A.   Yes, ma'am.

Q.   You know that you can dust for prints, right?

A.   Yes, ma'am.

Q.   You can swab a firearm for DNA, is that right?

A.   That's right.

Q.   You have labs that are able to do that?

A.   Yes, ma'am.

Q.   You can pull for hair and fiber, right?

A.   Yes, ma'am.

Q.   Can you explain to the jury what pulling for hair and fiber associated with any scene, what you do?

A.    It would be to remove any fibers that could be associated with an individual, and then you can test for DNA through those hair and fibers and stuff like that.

Q.   When you were executing the warrant, did you look for any photos of Mr. Combs anywhere in the home with these firearms?

A.   We did not locate any, no.

Q.   That's something, though, that you would look for in executing the warrant, right?

A.   Yeah.

Q.  If you found any, then you would have seized it, right?

A.  Yes, ma'am.

Q.  And would you agree with me that metal in these firearms is very conducive for fingerprints?

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

A.  You can get fingerprints off of them, yes.

Q.  Is it easier to get fingerprints off of metal when something is inside and outside of the elements?

A.  Yes.

MS. SMYSER:  Objection, your Honor.

THE COURT:  You needed to rephrase that.

MS. SMYSER:  We move to strike that.

THE COURT:  Strike the witness' last answer.

I think you can rephrase the question.

Q.  Do you have any training in recovering fingerprints from devices?

A.  Generally, yes.

Q.  Are you aware as to whether metal is easier to get fingerprints off of an item than maybe another type of -- maybe another type of device?

A.  I can't say whether it's easier compared to another one.  I just know that you may be able to get fingerprints off of the items.

Q.  As a trained agent in getting fingerprints off of

something, are you able to do that more easily when something is outside of the elements, essentially when it's inside?

A.   I would think you would be -- they would be able to remove fingerprints if it's not affected by the weather outside or other.

          MS. SMYSER:  Objection.

          THE COURT:  Overruled.

Q.   At HSI you have Mr. Combs' DNA, right?

          MS. SMYSER:  Objection.

          THE COURT:  Overruled.

A.   I'm not sure.

Q.   Mr. Combs was arrested, right?

A.   Yes, he was.

Q.   Was he swabbed for DNA?

A.   I can't say.  I wasn't present for his actual arrest.

Q.   You have Mr. Combs' prints at HSI, right?

          MS. SMYSER:  Objection.  Foundation, your Honor.

          THE COURT:  That's sustained.

Q.   Did you ever conduct any fingerprint analysis of these firearms?

A.   I can't answer that.  I didn't make that decision, so I don't know if they have or not.

Q.   Did you personally ever conduct any fingerprint analysis of these firearms?

A.   No.

Q.   We will move on to the Gucci bag.

Can you please hold up the Gucci bag again for the jury.

Thank you so much.

Most of the drugs aside, I'll say, from marijuana at 2 Star Island and the wooden box that we just looked at in Mr. Combs' bathroom were contained within the Gucci bag, is that right?

A.   Yes, ma'am.

Q.   So we saw the Gucci bag and then we saw the wooden box that was labeled Puffy on top, right?

A.   Yes, ma'am.

Q.   And that was in his bathroom, right?

A.   Yes.  It was in one of the master bathrooms.

Q.   And the Gucci bag was on -- you said on top of the closet on top of the armoire?

A.   Yes.  The dresser inside the closet.

Q.   So there were an assortment of substances in this bag, right?

A.   Yes, ma'am.

Q.   And I think you even said a few times that, in the course of testing, the samples were completely destroyed, right?

MS. GERAGOS:  I can bring it up, Government Exhibit 1306, page 3.  If we zoom in on paragraph 6A and B.

Q.   We saw the clear plastic container with a white cap labeled

P5LMCOM2                         Gannon - Cross

DBL wash.  Do you remember that on direct this morning?

A.  Yes, ma'am.

Q.  Then the stipulation states that the white powdery solid material tested positive for cocaine, right?

A.  Yes, ma'am.

Q.  But that the entire sample of the material was destroyed in the course of testing, right?

A.  Yes, ma'am.

Q.  And that happens when something is so small in the course of testing that it's destroyed, right?

        MS. SMYSER:  Objection.

        THE COURT:  Overruled.

A.  I don't know.  I don't test substances, ma'am.

Q.  You don't do the testing.  You just do the collecting?

A.  Correct.

Q.  Let's look at 6B, which says a clear plastic Ziploc bag, which was pictured in GX-10A-1003-E1.  I can pull it up, but we just looked at it this morning.  Do you remember it?

A.  Yes, ma'am.

Q.  That said it tested positive for cocaine and ketamine, right?

A.  Yes, ma'am.

Q.  That entire sample of power-like material was destroyed in the course of testing.  Do you remember that?

A.  Yes, ma'am.

Q.   We then looked at the Puffy box which had two separate types of drugs in it as well, right?

A.   Yes, ma'am.

MS. GERAGOS:  Your Honor, I am going to admit right now a sealed exhibit, so I would ask that we have IT cut the feed.

THE COURT:  Do we have someone from IT who can accomplish that.

MS. GERAGOS:  May I have permission to approach the witness, your Honor?

THE COURT:  You may.

THE DEPUTY CLERK:  Your Honor, we may proceed with the exhibit.

MS. GERAGOS:  I just handed up, and I would ask that we display for the jury and court only Defense Exhibit 304.

THE COURT:  Have you provided this to the government?

MS. GERAGOS:  I provided this to the government two days ago, your Honor.

We just ask that it not be shown to the gallery and the overflow.  The TV for the gallery here is off, and I believe we have worked this out with IT over the past 24 hours to ensure that it's not publicly shown.

But I see Ms. Smyser standing.

THE COURT:  Ms. Smyser.

MS. SMYSER:  We have no objection to this being

admitted under seal, as long as the witness can authenticate it, and we just want to confirm that the overflow room has been cut off.

THE COURT:  Give us one second.

MS. GERAGOS:  I will use this one second to confer with Mr. Agnifilo, if that's all right.

THE COURT:  I got a nod, so we are ready to go.

MS. GERAGOS:  We are ready to proceed.

Q.  Agent Gannon, do you recognize this photo?

Please don't say the name of the individuals besides my client in the photo.

A.  I do not.

Q.  You do not.

Did you look at all of the photos that were taken as part of the search warrant photos at 2 Star Island?

A.  At some point I did.

Q.  But you do not recognize this one?

A.  No.

MS. GERAGOS:  I would ask that we admit it anyway. Even though he cannot authenticate it, it's part of the same batch of photos that we have been looking at.  They were contained in the same document.

I don't think Ms. Smyser has an objection to it being under seal.  I will just not ask that he talk about it, I suppose.

MS. SMYSER:  Can I just confer with counsel for one moment, your Honor?

THE COURT:  You may.

MS. GERAGOS:  Your Honor, we will address this at a later time.  We don't have to do it through this witness if he cannot authenticate it right now.

THE COURT:  You should ask whatever questions you might need to address the authentication issue.  So this is your chance.  Otherwise, we can, of course, move on.

Q.  Agent Gannon, did you or someone on your team take approximately 500 photos at the execution of 2 Star Island that day?

A.  Sounds about right.

Q.  Then at some point either that day or afterwards you reviewed all of those photos for accuracy, correct?

A.  Yes, ma'am.

Q.  And can you explain why it's important that you review those photos for accuracy.

A.  We just try to make sure that we documented everything that we had and just to be able to ID what photos actually were taken, because that gets turned over to the defense and prosecutors.

Q.  And when you or somebody from your team goes into a house to execute a search warrant, you have to review kind of what is called for in the warrant, correct?

A.   Correct.

Q.   Then you would take photos of something that would be called for in the warrant and then seize those items as well, right?

A.   Correct, ma'am.

          MS. GERAGOS:  I have asked all the questions I need to, your Honor, on that point.  I just have a few more.

          THE DEPUTY CLERK:  Your Honor, requesting clarification from counsel, if I may.  We are not going to show that document anymore, so I may put the feedback on.

          MS. GERAGOS:  That's right.  You can put the feedback on.  I only have a few more questions.

          MS. SMYSER:  For the record, your Honor, can we clarify which defense exhibit for identification that was?

          MS. GERAGOS:  304.

Q.   Special Agent Gannon, you live in Florida, correct?

A.   Yes, ma'am.

Q.   You're familiar that many people in Florida have guns in their home, right?

A.   Yes, ma'am.

Q.   Do you?

          MS. SMYSER:  Objection.

          THE COURT:  Overruled.  But let's keep it going.

Q.   Do you?

A.   I'm issued firearms for work, yes, ma'am.

P5LMCOM2                         Gannon - Cross

Q.   Do you have a gun -- I'm asking if you have guns.

A.   I have guns at home, yes, ma'am.

Q.   OK.   Thank you.

          MS. GERAGOS:  No further questions, your Honor.

          THE COURT:  Any redirect?

          MS. SMYSER:  No, your Honor.

          THE COURT:  Thank you, Agent Gannon.

          (Witness excused)

          THE COURT:  Government may call its next witness.

          MS. SLAVIK:  One moment, your Honor.

          THE COURT:  While we are doing that, do we have an issue with the screens?

          MR. AGNIFILO:  I broke the monitor.

          MS. GERAGOS:  Because he moved over to my seat.

          THE COURT:  Here we have our amazing staff that hopefully can address the issue.

          MS. STEINER:  Your Honor, the government calls Dr. Dawn Hughes.

          THE COURT:  The witness may approach.

DAWN HUGHES,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

          THE COURT:  You may proceed.

          MS. STEINER:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. STEINER:

Q.   Good morning, Dr. Hughes.

A.   Good morning.

Q.   Dr. Hughes, what is your profession?

A.   I'm a clinical and forensic psychologist.

Q.   What is clinical psychology?

A.   So clinical psychology is basically the study of human behavior of both normal and abnormal human behavior.  Clinical psychologists assess and treat and evaluate individuals who are having difficulties in their life, from problems of living to major psychiatric and mental disorders.  Psychologists can also teach and conduct research as well.

Q.   What is forensic psychology?

A.   Forensic psychology is just the application of the science and principles of clinical psychology to a particular legal question.

Q.   Can you please describe your general educational background.

A.   Yes.  I received my bachelor's of arts degree in psychology at Hamilton College, which is upstate New York.  I received my Master's of science and my doctorate degree in clinical psychology at Nova Southeastern University, which is in Florida.  I had to do my full-year intensive internship to obtain the Ph.D. and that was at Yale University in their

school of medicine in the department of psychiatry, and there I had two full-year rotations.  Instead of breaking it up, I had a one full-year rotation at a substance abuse treatment unit run by Yale, and then the other one was at the West Haven Mental Health Clinic, where we treated individuals with more severe and persistent mental illness.

After that, I came back to New York and had to complete my postdoctoral fellowship in order to amass a number of hours to get licensed in the State of New York, and that was at Weill Cornell Medical College on the east side, and there I worked in the department of psychiatry as well in the anxiety and traumatic stress program.

Q.  Dr. Hughes, can you please describe generally your training and experience in psychology and trauma.

A.  Yes.  My training in traumas is fairly unique because I've almost always had training in trauma.  I started working in a domestic violence survivors program that was housed within a community mental health center during graduate school, and there we saw individuals who were coming in for treatment.  We treated females, women who were victims of domestic violence. But we also had to assess and treat men who were court ordered for treatment for having battered or beaten their partners.  So I was treating both for that full year.

I also worked somewhat overlapped at the child sex abuse survivors program.  I was the research coordinator for

P5LMCOM2                        Hughes - Direct

that program.  And that was where individuals who had had childhood abuse were coming to the clinic to get help for the abuse to help heal from the traumatic effects of that victimization.  And there I conducted a lot of research and data on those individuals so we could learn better about their experiences and how we could better help them.

After that, I worked at the Veterans Administration in the outpatient unit, again continuing that vain of trying to understand how trauma affects different people in different walks of life.  And I'm dating myself, but back at that time I was able to treat individuals who were in World War II, which was such an honor, and also treat Vietnam era veterans and then veterans from the first Gulf War at that time.

After that I was -- as I stated, I was at Yale University on an internship, and there I was in the substance abuse treatment unit.  And because we know that there is a high degree of cooccurrence between substance-use disorders and trauma-based disorders, myself and my cointern, who also had had trauma training, we developed a group for female individuals who were heroin addicts.  They were in recovery from heroin use, and they had some kind of abuse or trauma in childhood or adulthood, and we ran a group for them as well.

And then also at Weill Cornell, at the anxiety and traumatic stress program, that's where I was seeing adolescents and ultimate adults who had experienced either a rape or sexual

assault or physical assault or childhood neglect or abuse in that program.

Q.   Dr. Hughes, what do you do professionally?

A.   So I'm currently in independent practice in New York City.

Q.   What does your independent practice entail?

A.   So I look at it as three main areas.

One area is the clinical area, where I treat individuals in therapy.  I have an active clinical practice, two, two and a half days a week, where individuals are coming to me to deal with their problems that they have, struggling with the traumatic effects of the victimization or abuse or violence that they experienced.

The other part I do is the forensic psychology part, so something that I'm doing here today.

I also assess individuals who are involved in criminal or civil matters and write reports for the court and confer with attorneys on cases, and then sometimes I testify in court.

And then the third part of what I do is, I'm on the faculty at Weill Cornell.  I'm a clinical assistant professor in the department of psychiatry there and that means I'm supervising an extern, I'm participating in the teaching program, and I'm doing other type of academic things.  This is called a voluntary position, which is what academic medical institutions do, which means you don't get paid for that, but you give your time back.  So that's one of the things I do.

And then the other part of that third bucket is, I'm engaged in our professional organizations, in the American Psychological Association and the trauma division specifically, and spend time because I'm on the board doing things with that organization as well, which also is not a paid position.

Q.  You have said a lot, Dr. Hughes.  I am going to ask you to slow down a little bit.  I want to make sure that the jury is able to take in everything you're saying.

Asking a few follow-up questions, with respect to your clinical practice specifically, can you describe for the jury what that entails.

A.  That entails people coming to my office for individual psychotherapy.  Most of them, but not all, but a good majority of them have had some kind of violence or abuse in their lives, either having been sexually assaulted, having been a victim --

MR. BACH:  Objection.

THE COURT:  That's overruled.

But, Dr. Hughes, just make sure that you are listening to the questions asked and that you stay within those questions.

THE WITNESS:  Yes, your Honor.

THE COURT:  Ms. Steiner.

MS. STEINER:  Thank you, your Honor.

Q.  I believe you were saying that you primarily treat victims of trauma, is that correct, in your clinical practice?

P5LMCOM2                        Hughes - Direct

A.   That's correct.

Q.   In your forensic practice, just briefly, what does that entail?

A.   That entails conducting sometimes comprehensive psychological assessments of individuals who are involved in criminal or civil matters.

Q.   And with respect to your teaching position at Weill Cornell, again, just briefly, what does that include?

A.   So the teaching part is, I teach an ethics seminar for the incoming interns.  I teach ad hoc seminars for the interns.  I do supervision of an extern who is in the military families program who is treating some of our military members.  I supervise him.  And I field the ethics calls and trauma or violence calls from our faculty when they need consultation.

Q.   Earlier you mentioned a few professional organizations that you're a member of.  Can you describe the organizations that you're a member of professionally and any leadership roles that you have in those organizations.

A.   Yes.  So, as I mentioned, I'm a member of the American Psychological Association, and that's the largest body of psychologists, and, because it's so big, it's broken down into different divisions.  And one of the divisions is the division of trauma psychology, and that division was founded in 2007.  I was one of the founding members advocating for APA to have this division.  I served in many leadership roles, and I'm just

P5LMCOM2                          Hughes - Direct

rotating off as the past president of that organization.

I also am part of trauma organizations, the International Society for Traumatic Stress Studies, the International Society for Trauma and Dissociation.  I'm a member of a New York State Psychological Association, the Anxiety Disorders of America Association, and a local women's mental health consortium which is based here in New York City.

Q.  Dr. Hughes, what, if any, areas do you specialize in?

A.  I specialize in interpersonal violence and traumatic stress.

Q.  What is interpersonal violence?

A.  So interpersonal violence --

MR. BACH:  Objection.

THE COURT:  Sustained.

MS. STEINER:  May I have a moment, your Honor?

THE COURT:  You may.

Instead of that, let's have a very brief sidebar.

(Continued on next page)

P5LMCOM2                        Hughes - Direct

(At sidebar)

THE COURT:  Mr. Bach, you have no objections to this witness' qualifications?

MR. BACH:  I do not.

THE COURT:  I think you can qualify the witness as an expert, and then let's get into the actual opinions.

MS. STEINER:  Thank you.

(Continued on next page)

P5LMCOM2                        Hughes - Direct

(In open court)

MS. STEINER:  Your Honor, just a couple more questions for the jury.

THE COURT:  Of course.

MS. STEINER:  Thank you.

Q.  Dr. Hughes, are you familiar with traumatic stress?

A.  Yes, I am.

Q.  What generally does that include?

A.  Traumatic stress is the psychological outcome, one psychological outcome that someone can have from sustaining a traumatic event, such as domestic violence, rape, sexual assault --

MR. BACH:  Judge, objection.

THE COURT:  That's overruled.  Let keep it moving.

Q.  Do you have experience in that area, Dr. Hughes?

A.  Yes, I do.

Q.  And in total approximately how many years have you practiced as a psychologist dealing with trauma and traumatic stress?

A.  I think it's close to 30 years now.

Q.  During that time approximately how many trauma victims or victims of sexual abuse have you treated?

A.  Probably thousands at this point.

Q.  And are you a board certified forensic psychologist?

A.  Yes, I am.

Q.   At a very high level what does that mean?

A.   That means that I have amassed the highest degree of board certification that psychologists can have, meaning that you have demonstrated a certain competency and excellence in the field of forensic psychology.

Q.   And are you licensed in various jurisdictions to practice psychology?

A.   Yes, I am.

Q.   Can you just outline what those jurisdictions are.

A.   Sure.  I'm licensed in New York, in New Jersey, in Connecticut and in North Carolina.

Q.   Have you previously been qualified in the field of forensic psychology to give testimony as an expert witness?

A.   Yes, I have.

Q.   Approximately how many times?

A.   I think it's approximately 60, 65 times in court.

Q.   Again, what jurisdictions, if you could list them.

A.   Sure.  In New York, in New Jersey, in Pennsylvania, in Connecticut, in Virginia, and I think in the federal court in the Southern District here and the Eastern District and then the Northern District of New York.

Q.   Have you ever not been qualified as an expert?

A.   No.

          MS. STEINER:  Your Honor, at this time we offer Dr. Hughes as an expert in clinical and forensic psychology

with specializations in trauma and traumatic stress.

MR. BACH:  No objection.

THE COURT:  The witness will be accepted on that basis.

You may proceed.

MS. STEINER:  Thank you, your Honor.

Q.  Dr. Hughes, are you aware of press and news reporting relating to the allegations in this case?

A.  On a very brief level, yes.

Q.  Can you describe what you're aware of.

MR. BACH:  Objection.

THE COURT:  Sustained.

Q.  Do you have any personal knowledge of the facts of this case?

A.  I do not.

Q.  Have you reviewed any evidence in this case?

A.  I have not.

Q.  Have you interviewed the defendant?

A.  I have not.

Q.  Have you interviewed any government victims or witnesses in this case?

A.  I have not.

Q.  Dr. Hughes, why have you not assessed any victims or witnesses in this case?

A.  Because it's my understanding that under the law I'm not

P5LMCOM2                          Hughes - Direct

permitted to do so.

MR. BACH:  Objection.

THE COURT:  Sustained.

MS. STEINER:  Your Honor, can I have a brief sidebar on this issue?

THE COURT:  Yes.

MS. STEINER:  Thank you.

(Continued on next page)

P5LMCOM2                      Hughes - Direct

(At sidebar)

MS. STEINER:  Your Honor, the reason I elicited that question is because it is my understanding that we had discussed this in court previously, and given the expected testimony of someone like Dr. Bardey --

THE COURT:  What was the question?

MS. STEINER:  What's her understanding about why she can't interview any of the witnesses or victims in the case.

THE COURT:  She cannot testify about that.  I thought I was pretty clear when this issue came up that she can't testify about it, nor can Dr. Bardey address that issue.

MS. STEINER:  I misunderstood, your Honor.

(Continued on next page)

P5LMCOM2                       Hughes - Direct

(In open court)

Q.  Dr. Hughes, a moment ago you said that you have seen press at a very high level in this case, is that right?

A.  Yes.

Q.  Without telling me any of the substance of what you reviewed, have you seen any details about what's been happening in court?

A.  No, I haven't.

Q.  You testified a moment ago, Dr. Hughes, that you have not interviewed any witnesses or victims in the case, is that right?

A.  That's correct.

Q.  And how, if at all, will that affect your ability to testify regarding any particular witness or victim?

MR. BACH:  Objection.

THE COURT:  Sustained.

Q.  What is your understanding of what your role is here today for the jury?

A.  So my role here today is to provide expert witness testimony as a blind expert.  That means I don't know anything about the case or the players or the witnesses, and to provide the ladies and gentlemen of the jury of some things that we know in the field about domestic violence, rape, sexual assault, and traumatic stress.

Q.  On what topics is your testimony expected to be about

today?

A.   I'm really going to address four main topics.

One of them is how do individuals, how do we understand why individuals stay in relationships mired with domestic violence.

The second is how do individuals cope when they are in those relationships.

The third is what are the -- the patterns of disclosure, how do victims finally tell about the abuse.

And then the fourth category is what do we know about memory for traumatic events.

Q.   Dr. Hughes, you referenced earlier a term domestic violence.  Can you very briefly define what you're referring to?

A.   Sure.  Domestic violence is commonly defined as a pattern of behavior that functions to instill fear and to control.  It is using multiple abusive behaviors, such as --

MR. BACH:  Objection to the subject.

THE COURT:  Sustained.  I think we can move on.

MS. STEINER:  Thank you, your Honor.

Q.   Dr. Hughes, today when you testify using particular terms, will those terms be defined based on the psychological literature?

A.   Yes, that's correct.

Q.   Just to be clear, will those terms be based in any way on

P5LMCOM2                         Hughes - Direct

legal definitions of those concepts?

A.   No, not at all.

Q.   Dr. Hughes, have you been retained by the government to testify here today?

A.   Yes, I have.

Q.   And have you been retained in other cases by the government?

A.   I have.

Q.   Have you been retained in some other cases by defense attorneys?

A.   Yes, I have.

Q.   Are you being compensated for your work in this case?

A.   Yes, I am.

Q.   And what is your hourly rate?

A.   $600 an hour.

Q.   What is your rate for a court testimony?

A.   I think it's $6,000 for the day.

Q.   Does that amount that you get paid depend in any way on the outcome of the trial?

A.   No, not at all.

Q.   Dr. Hughes, turning to our first topic of why victims stay in relationships, based on your clinical experience and review of the academic literature, do victims at times remain in abusive relationships?

A.   Yes, they do.  And it's important to understand that they

don't remain in the relationships because they are unconcerned about the violence. They don't remain because they want to be abused. No victim wants to be abused, and anyone can be abused: Strong people, people who have vulnerabilities, smart people, people who have other difficulties and deficiencies, and we know that domestic violence crosses race, ethnicity, sex, gender.

MR. BACH: Objection.

THE COURT: Just objection. Then I'll ask you if there are grounds for the objection.

What are the grounds, briefly?

MR. BACH: Stay within the four corners of the question.

THE COURT: That's fair.

Dr. Hughes, if you have a direct question, just give a direct answer and Ms. Steiner will follow up if she needs to. OK?

THE WITNESS: Yes, your Honor.

Q. Based on, again, your clinical experience and your review of the literature, how common is it for a victim to remain in an abusive relationship?

A. So it's very common.

Q. Can you please describe what the academic literature states about why victims do stay in abusive relationships.

A. Yes. So there is three main categories that the research

has looked at.  This is a question that has been explored extensively over the last 40, 50 years.  And the three main kind of areas are:

One, they stay in the relationship because it's not just about hitting.  It's about using a lot of different abusive behaviors that make a victim feel entrapped in the relationship and those abusive behaviors, it can be physical violence, but it's also psychological abuse, emotional abuse, economic abuse, surveillance behaviors, and all of those behaviors conspire together to keep the victim trapped in the relationship and make it feel like they can't leave.

Secondly, we know that in these types of relationships there is almost always love and attention and attraction and companionship, and it's those positive feelings that when they get paired with the violence and the abuse make it very difficult for the victim to see their way out.  It creates an intense psychological bond, an attachment with their abuser that makes it difficult for them to leave.

And the third bucket, the third reason we know why individuals have a hard time leaving the relationship is because of the psychological consequences from the abuse itself.  We know in the psychiatric and psychological literature that exposure to repeated acts of violence and sexual assaults results in significant psychological disorders and symptoms, and that makes it difficult for individuals to

P5LMCOM2                        Hughes - Direct

have higher order planning to leave.

(Continued on next page)

Q.   And again, briefly, Dr. Hughes, when you say higher order of planning to leave, can you define what you mean by that?

A.   Sure.  In order to leave a very complex, difficult situation, it's hard for us to break up with someone under the best of circumstances, and then when you have all this violence and abuse, you're just trying to kind of live day-to-day in this micro way of trying to avoid being hit, avoid being yelled at, avoid being hurt, and that interferes with all these other resources.  We need to think about how am I going to get out of this relationship.

Q.   And the first area of study, Dr. Hughes, that you just mentioned is you said there's a combination of types of abuse and it's not just about hitting.  Can you briefly explain what you mean when you say it's not just about hitting.

A.   Right.  Because it's about the power and control that the abuser has over the victim, and the hitting is just one tool that the abuser used.  The abuser uses other tools such as the psychological abuse --

MR. BACH:  Objection.

THE COURT:  Let's move on.  Ms. Steiner, next question.

MS. STEINER:  Yes, your Honor.

Q.   Turning first to the physical abuse, the hitting, what effect does that have on a victim's ability to leave a relationship?

A.   So when we are hit, harmed, beat up, the normal human emotion that gets arisen is fear, we feel scared, and it's very hard to take that fear away once you've been hit.  So what happens is the victim, the brain organizes around that fear, and that fear is now organized around the relationship.  So they're always sort of walking on eggshells trying not to do something to get hit.  Once again, the resources are now being devoted to, how do I stay safe in this relationship and not over here, how do I do all these things I need to do to get out.

Q.   And specifically, what is it about this fear reaction that you're describing that makes it difficult for a victim to leave a relationship?

A.   So fear is also a very debilitating emotion.  When you feel anxiety, sort of butterflies in your stomach, that's the low-level fear.  When you feel like oh, my gosh, I'm going to die on this roller coaster, that's the high-level fear.  So if you're in high-level arousal and high-level fear, you're not really able to start thinking about these other big-deal things on your plate that you have to do, like leaving an abusive relationship.

Q.   How often does physical abuse need to happen in order to make it difficult for a victim to leave a relationship?

A.   It doesn't have to happen all the time.  We know that once someone has shown us not only the ability, but the willingness

to use violence against us, that link has been set, like our brains don't forget, we know that it can be forthcoming.  And then with the other types of behaviors, the threats, the control, and the putdowns, that can solidify and reinforce that threat even without using more physical violence.

Q.   Dr. Hughes, you also mentioned earlier that psychological abuse can be a factor.  How does psychological abuse cause a victim to remain in a relationship?

A.   So psychological abuse is about threatening future violence and about controlling your victim.  So when you are doing things that the abuser doesn't want you to do, there are negative consequences for that.  That could be a physically violent act or that can be other acts.  So the physical, psychological violence looks like intimidation, like threats, like throwing things, like telling you where you can go and what you can do.

MR. BACH:  Objection.

THE COURT:  Hold on for just one moment, Dr. Hughes.

Is it the same objection?

MR. BACH:  Same objection and the Court's ruling.

THE COURT:  I'm going to strike the witness's last answer.

Ms. Steiner, can you re-ask the question that you did ask.

MS. STEINER:  I will, your Honor.

THE COURT:  Okay.

Q.  Dr. Hughes, very briefly and at a high level, can you describe how psychological abuse can cause a victim to remain in a relationship.

A.  So because psychological abuse is so controlling, it makes the victim feel entrapped in that relationship.  It makes her feel frayed because of the threats she can't get out, it makes her feel intimidated to make choices to get out because of that fear.

Q.  What effect does that have on the victim?

A.  It has a tremendous amount of psychological distress when you're always trying to figure out what abusive behavior is coming at me and at which time, this proverbial feeling of walking on eggshells and not know what's coming next.

Q.  When you describe psychological distress, what does that look like?

A.  So psychological distress is symptoms of depression, symptoms of anxiety, symptoms of PTSD where you're constantly being reminded of the acts that came before and you're really sort of on an equilibrium trying to keep yourself physically and psychologically safe, and not able to be thinking about how am I going to get out of this relationship.

Q.  Dr. Hughes, I want to make sure we all understand what you mean when you refer to psychological abuse.  So very briefly and concisely, can you explain what that includes?

P5LCcom3                        Hughes - Direct

MR. BACH:  Objection.

THE COURT:  Sustained.  Let's move on.

MS. STEINER:  Okay.

Q.  You testified that sexual abuse can also cause a victim to remain in a relationship.  How does that work?

A.  Yes, because sexual abuse is so inherently damaging, it's a very private harm, and it very much debilitates a person's psychological functioning.  Sexual abuse is one of the highest types of traumatic stressors that we know can result in PTSD and is often met with a high degree of psychological distress. So if you're in significant psychological distress in the relationship, you're walking around injured and harmed.  It's important to understand that sexual abuse doesn't only mean --

MR. BACH:  Objection.

THE COURT:  I think the witness answered the question that was asked.

Ms. Steiner, do you have another question?

MS. STEINER:  Yes.

Q.  Why does that effect prevent a victim who's experienced sexual abuse from leaving the relationship?

A.  Because they experience a tremendous amount of shame, humiliation, degradation, they don't want to talk about it, they don't even want to think about it in their own brain, they don't want to hear it come out of their own mouth, and they need significant help and resources in order to get out of that

P5LCcom3                        Hughes - Direct

relationship.  And if it's something you can't even talk about, these unspeakable acts, it prevents them from getting that help to get out of the relationship.

Q.  How, if at all, does emotional abuse cause a victim to remain in a relationship?

A.  So, simply, emotional abuse is when we belittle, demean, and put down our partner.  What that does, the result is that our partner begins to feel like a low sense of self, a low sense of esteem, not feeling like they're worthy, feeling like a piece of crap.  When you feel so low about yourself, you're moving into depressive symptoms.  When we have depressive symptoms, we really don't have the motivation to do other things that maybe could be helpful for us and we're still back to trying to prevent further physical violence or further psychological harm.

Q.  And again, can you bring us back to how that causes a victim to remain in a relationship.

A.  Because if you can't talk about what's happening in the relationship, you can't get help, and who's going to talk about these very humiliating degrading sexual things your partner does to you when that's not supposed to happen in an intimate relationship.

Q.  How does a victim's financial dependence on an abuser affect their ability to leave?

A.  So that's very important.  We look, we say we need

P5LCcom3                    Hughes - Direct

psychological resources to leave --

MR. BACH:  Objection.

THE COURT:  Grounds.

MR. BACH:  Court's ruling.

THE COURT:  It's overruled.

A.   So you need the psychological resources to leave, but you also need the tangible resources to leave.  What we see in a lot of these situations of domestic violence, there's a lot of financial control.  So if your abuser controls the money for, you know, housing, transportation, healthcare, childcare and just general sort of expenses of living, how are you to leave if you don't have access to those tangible resources?  And sometimes that financial control is about sabotaging the victim's ability to have independence, taking away her laptop, taking away --

MR. BACH:  Objection.

THE COURT:  Sustained.  The jury should disregard the last sentence of the witness's answer.

Ms. Steiner.

Q.   Same question, Dr. Hughes.  How does this financial dependence, how can that prevent a victim from leaving a relationship?

A.   So if you don't have access to tangible resources, money or an apartment, you are left with a feeling of where am I going to go, am I stuck here, and that makes it very difficult to

leave.

Q.  Dr. Hughes, you've now testified about a few different types of abuse.  How do these types of abuse interact to prevent a victim from leaving a relationship?

A.  So they're all interacting, they're not all happening at once, they're not all happening simultaneously, sometimes they do, sometimes they don't, and that keeps the victim on a very unstable footing because they never know what's coming at them. So if you are unstable and you don't know how and when this person is going to abuse you, you're feeling more psychological consequences, you're feeling more trapped, and you're unable to extricate yourself from that dynamic.

Q.  Do all of these types of abuse have to be present to prevent a victim from leaving a relationship?

A.  No, they don't.

Q.  Why not?

A.  Because some -- we look at the magnitude of what the behaviors are.  Some of the behaviors are quite severe.  So if you have severe physical violence and severe sexual assault, that can be enough, even if we don't have emotional abuse or psychological abuse.  But the more abusive behaviors we have, the greater the degree of likelihood that it's difficult for that individual to leave that relationship.

Q.  Dr. Hughes, how does the duration of these types of abuse affect a victim's ability to leave the relationship?

P5LCcom3                        Hughes - Direct

A.   So it's very important.  We know that more trauma is never a good thing.  So the more you're exposed to traumatic events and acts of violence and sexual violence, that deteriorates, again, the psychological functioning of the individual.  So we look at those measures, we look at the severity of the acts, how severe is what's happening — in our field we say what's the magnitude of that stressor — we look at the frequency, how often is it happening, and then we look at the duration, over what period of time.  When those things are high, we're seeing that, you know, a victim who was, you know, functioning to low capacity because they're so distressed and are feeling more and more entrapped and hopeless and helpless in this relationship.

Q.   Dr. Hughes, I want to turn to the second area of study that you mentioned.  You testified that there can be periods of positivity and neutrality in a relationship in addition to the abuse.  How can that affect a victim's ability to leave a relationship?

A.   Sure.  So because of -- as I said before, these relationships start with love and companionship and kindness, and the victim wants that, they want that back.  So when that is shown to the victim, that becomes very reinforcing.  And we see this often, it's called the honeymoon phase, that after that particular assaultive episode that the abuser becomes contrite, becomes apologetic, gives promises to change, maybe gives -- so now they're sort of showering their victim with all

this love and care.  That's what she or he only wanted.  So now you have this very difficult situation where you're trying to live with the person who's abusing you, but I want that good person back, and that creates not only psychological confusion, but also a psychological attachment to the individual, which sometimes we call as a trauma bond.

Q.   What is a trauma bond, Dr. Hughes?

A.   So A trauma bond is when somebody leads the partner or somebody is attached to the partner, and somebody loves the partner in spite of the violence and the abuse.  We know when we pair violence and abuse with times of good, it creates that very strong bond.  We know that from just general psychological principles of intermittent reinforcement.  Things that are intermittently reinforced have greater stability and behavior, they have a better ability to change behavior.  So when you're getting unpredictable abuse and unpredictable love, that creates this intermittent cycle.  It's like a slot machine, you press the button, you press the button, you're going to lose most of the time, but when you hit it, that's the feeling that you want and you keep going back because you want that good feeling, they want that good partner that they got, fell in love with, and that becomes an immense trauma bond.

        The other important part of the trauma bond is, you know, usually because these acts are so private and they're so humiliating, the only person -- not the only, but the person

P5LCcom3                          Hughes - Direct

who the victim often turns to is the abuser because that's the person who knows what's happened and who they can talk to about it.  So if that's the person that you go to for that support, that's that need, that's that attachment, and that creates a very powerful bond, and it's very difficult with all the other abusive behaviors to extricate and leave an abusive relationship.

Q.  Dr. Hughes, what is the psychological effect of a trauma bond on a victim?

A.  Well, first, it makes her unable to leave or makes them unable to leave, it makes them more attached to their partner, more willing to sort of go back and give it a try again, but it also has a sense of hopelessness and a sense of meaninglessness because you're feeling that sort of you, as your individual person, you know, does not have the same agency as your partner.

Q.  Dr. Hughes, are you familiar with a term referred to as love bombing?

A.  Yes.

Q.  What is that?

A.  So love bombing is a term that's used now in the popular media.  How we understand it in the literature is that honeymoon phase that I talked about, that when a victim is trying to extricate herself, extricate themselves from the relationship or leave the relationship, the perpetrator, the

P5LCcom3                          Hughes - Direct

abuser, you know, showers them with love and affection and attention and, you know, presents and gifts, and this is really a tactic to bring that trust and dependence back and get that victim back in the relationship.

Q.  Dr. Hughes, when a victim does attempt to leave an abusive relationship, does that tend to happen immediately or over time?

A.  No, it happens over time.  We know from the research that it takes multiple attempts to leave an abusive relationship. There's reconciliation and then there's leaving again, and it can take multiple attempts.

Q.  And what obstacles are present for a victim at the time that they're attempting to leave the relationship?

A.  So at the time that they're attempting to leave, that is usually met with intense fear on the victim.  They are afraid of retaliation, they have been with a partner who has abused them, who has hurt them, who has shown them that they're willing to use serious forms of violence against them, and they're afraid of more retaliation and more danger.  And that is not unwarranted.  We know from our very robust --

            MR. BACH:  Objection.  Objection.

            THE COURT:  Let's move on.

Q.  Do victims ever return to abusive relationships after leaving?

A.  Yes, they do.  There's this pattern of returning and

P5LCcom3                        Hughes - Direct

reconciliation and trying to leave again.

Q.   And why do they return?

A.   So they return for the love, they return for the companionship, they return for the good version of their partner that they still do love, and sometimes they return because the abuse is continuing, and if the abuse is continuing when they left and they're still being harassed and followed and surveilled and controlled, I might as well be back in the relationship because it's not working here, I'm not free.

Q.   Dr. Hughes, I want to move on to a new topic now.  You testified for a while now about why victims remain in a relationship.  I want to discuss with you how victims cope when they do stay in those relationships.

So first of all, can you describe generally what coping mechanisms are?

A.   Sure.  Coping mechanisms, that's just a psychological term of how we deal with stressors in our lives, and coping strategies that we have examined are specific to what do individuals do when they are in an abusive relationship.  We know they do a lot of things, but we want to see what they do. When we look at that, we look at sort of formal coping mechanisms, informal, and then personal strategies that they use.

Q.   I want to take those one at a time.  So you mentioned that there are formal coping strategies.  What do you mean by that?

A.  So formal strategies are using outside help.  It may be going to the police, filing a protection order, getting medical help, going to a shelter, you know, it's going to somebody who has the kind of authority to take a report, it can be, you know, going to a Title IX officer in a university setting or going to an HR professional in a workplace setting.  It's somebody who has the authority to take that report.  The problem is it's the least likely used strategy --

MR. BACH:  Objection.

THE COURT:  Let's move on.  Next question.

Q.  You referred to informal types of coping.  Can you describe what that means?

A.  So the informal strategies are the ones where we're trying to get the abuser to stop the abusive behavior by talking to family or friends, or talking to trying to get their friends to talk to him or their family to talk to him or trying to get them to go to church or go to counseling, and it's also talking to family and friends to try to get much needed support for the victim of how am I going to continue to deal with this mess.

Q.  Finally, what are types of personal coping mechanisms?

A.  So the personal strategies are what the victim uses within the relationship.  So it's not trying to get out of the relationship, but what do I do that I'm in it.  These are trying to talk to your partner to try to stop the violence, talk about what's going on, trying to get counseling or help,

trying to plead and negotiate for different kind of behaviors, trying to placate and give compliance to make your partner okay, sometimes it's physically fighting back.  It's all of these different strategies that a victim is doing but within the relationship, within the confines of the relationship.

Q.  You've described now these different types of coping mechanisms, formal, informal, personal.  Which of these is most common?

A.  The personal strategies are the most common that they're trying to use within the relationship, trying to work it out with your partner.

Q.  Why is that the most common?

A.  Because of the trauma bond, because of the feeling entrapped that you can't leave, because of the psychological consequences that you're being burdened with, and you still, you don't want to lose your partner, you still want to try to preserve the love of that partner and you have this hope for change, which comes from the honeymoon phase and that cycle. So you're trying to do everything you can with that partner within that relationship to make this violence stop.

Q.  Within the personal coping mechanisms you mentioned, you mentioned quite a few, does a victim use all of those personal coping mechanisms at the same time?

A.  No, they don't.  They have to be very attuned to their partner's moods and how they're feeling and what particular,

you know, anger, eruption or abusive behavior they may use at a certain time. So they use a lot of different strategies depending on the demands of what their partner brings into the room. I mean, it's important to know that as the abuse gets more severe, so do the coping strategies. So they don't use less, they use more. So they're doing a lot of things, it's just not stopping the violence.

Q. I want to discuss a few of the personal coping mechanism strategies that you mentioned. Looking specifically at appeasing or placating an abuser, how does that work?

A. When we placate and appease our abuser, what we're trying to do is soothe the abuser, we're trying to make an abusive episode not happen. We may be apologizing unnecessarily, we might be going along with things that we don't want to do, and that's back to what I talked to you about before, the contingency. Once someone has demonstrated that they can use serious forms of violence against you, you know, that contingency has set, that link is set. So the victim is really trying to do all of those things to not get hurt, to not get hit, and sometimes placating and complying strategies are a good strategy to use.

Q. What is the purpose for the victim of that coping strategy?

        MR. BACH: Objection.

        THE COURT: Sustained.

Q. Does this placating cannot appear in a sexual relationship?

P5LCcom3                          Hughes - Direct

A.   It usually appears in all facets of the relationship, and it's, you know, if you can't say no to little things --

          MR. BACH:   Objection.

          THE COURT:   It's overruled.

A.   So if you can't say no to little things, it's hard to imagine when you're talking about something so sensitive and so personal that someone and a victim would actually have the agency to say no to something like that.

Q.   How, if at all, might that coping mechanism of placating and appeasing an abuser confuse a victim -- actually, taking a step back, how might it confuse others that are observing the relationship?

          MR. BACH:   Objection.

          THE COURT:   Sustained.

          MS. STEINER:   If I could have a moment, your Honor.

Q.   Are you familiar with the terms passive and active self-defense?

A.   Yes, I am.

Q.   Are those coping mechanisms?

A.   Yes.

Q.   Can you describe what passive self-defense is?

A.   So passive self-defense ways that a victim might try to protect themselves when they are being assaulted, it may be blocking punches, it may be throwing a pillow or throwing at someone to get them to stop, it may be curling up in a ball on

P5LCcom3                         Hughes - Direct

the floor, and it may be trying to do something as the least

provoking as possible to get the violent episode to stop.

Q.  By contrast, what is active self-defense?

A.  So active self-defense are when victims are actively

fighting back.  They may hit back, they may punch back, they

may push back, they may throw objects, they may yell back in a

way to, you know, have some way of standing up for themselves,

even though, in many cases, that usually results in more severe

injury to themselves.

Q.  And you just said that it can result in more severe injury.

What do you mean by that?

A.  Because if we're talking about a generally -- a

heterosexual relationship of a man and a woman, just the size

and strength disparity between a man and a woman, a man can do

more damage --

        MR. BACH:  Objection.

        THE COURT:  Sustained.

Q.  Can a victim use both of these strategies, Dr. Hughes,

meaning both passive and active self-defense?

A.  Yes.  And like we said before, they're really trying to

mirror the strategies to what their abuser is bringing into the

room.  Victims get very hypervigilant to their abuser's moods,

they're really trying to scan and track how they are presenting

and how they are a certain day, and that's how they decide what

strategies to use.  Remember, I said they're using a lot of

strategies, they just don't work.

Q.  Are there other coping strategies that victims use personally to cope with the consequences of the abuse?

A.  Yes.

Q.  Can you describe what those might include.

A.  Sure.  So, in addition to the strategies to working within the relationship and toward the abuser, they have to do things to deal with all that psychological and traumatic stress that I talked about.  When you're in the relationship, one of the things that they use is avoidance strategy.  They try to not think about it, not feel it, not talk about it, they try to push it down and direct at forgetting, I'm going to push this in the back of my mind, I'm going to compartmentalize it somewhere.  Sometimes there's the disassociation that happens in all these episodes.  So it's all the way of sort of protecting themselves from the onslaught of the psychological consequences of the abuse while still being able to maintain the status quo and stay in the relationship.

Q.  I want to talk about a few of those strategies with you now, Dr. Hughes.  You mentioned avoidance.  What is avoidance?

A.  Avoidance is not dealing with something, right, not trying to think, not trying to feel, not trying to talk about something.  So it's about pushing under the rug and I'll deal with it later.

Q.  And what is minimization?

A.   Minimization is a way of distancing yourself from the reality of what's going on.  Sometimes victims do that to themselves by saying, you know, maybe they didn't mean it or maybe they were drunk or maybe they were angry, had a stressful day at work, it's a way of kind of lessening the responsibility of what happened to them.  And again, that's a way that they can try to find some kind of semblance of normalcy and stay in the relationship.  And sometimes when they minimize the problem, as we know, that that also increases the risk for more danger.

Q.   How does avoidance and minimization help a victim cope?

A.   Well, it has short-term effectiveness, it's not a long-term strategy, but it helps them get through the day.  It helps them get from one assaultive episode to the next.

Q.   And you also mentioned disassociation, Dr. Hughes, what is that?

A.   So, unlike those other strategies, disassociation is more of an involuntary coping mechanism.  Our brain does that for us automatically.  What it is, it's a change in our conscious awareness, it's about zoning out, spacing out, looking at a spot on the ceiling, feeling that you're leaving your body, and it's a way really that your brain protects yourself from very serious psychological injury and physical injury.  And with disassociation, because you're not attending and you're not focusing, that often leads to impairments in memory.

Q.   And why is that?

A.   Because memory is dependent on our focusing and attention and applying significance to things, and when we're disassociating, we're having -- technically it's called an alteration in consciousness, we're having a change in our conscious awareness, we're not attending, so we're not encoding that information.

Q.   And we'll get back to memory in a few minutes, Dr. Hughes.

Can substance abuse function as a coping mechanism?

A.   Yes, it's a very common coping mechanism.  Like I said before, we see a high degree of co-occurrence between trauma-based disorders and substance use disorders.  And substances allow us to numb our pain.  Most people know that. The problem with trauma survivors is they do it to -- for a very trauma-specific function, to get rid of the memories and the thoughts about what has happened to them in the past and the fear of what's happening to them in the future, to get rid of all those anxiety and fear-based feelings that they're having because they're living in a state of fear.  And then survivors and victims also use it as a preventive measure.  We see a lot of survivors, if they've had a fight with their partner the day before, before they get home, I'm going to take drugs, I'm going to drink because I know what's going to happen when I get home.  As I told you, they're very attuned to their partner's moods.  They may take it sort of preventively to ward

P5LCcom3                          Hughes - Direct

off other physical and psychological pain that's going to come.

And sometimes they do it to not feel and to not remember.

Sometimes they know that that may interfere with their memory

and they don't want to remember these things.  The problem is

that substance use, the cycle --

MR. BACH:  Objection.

THE COURT:  Let's go, next question.

Q.  Dr. Hughes, can victims applying these various coping

strategies that you've been testifying about still express love

and loyalty to their abuser?

A.  Yes, and often they do.  That's back to the trauma bond.

Often, they still have positive and loving feelings toward

their abuser, even after they've left for years, there's still

a part of them that loves that initial person that they fell in

love with.

Q.  Do these coping strategies, are they effective to stopping

the abuse?

MR. BACH:  Objection.

THE COURT:  That's sustained.

Q.  How does the use of these coping mechanisms consistently in

a relationship impact the victim?

MR. BACH:  Objection.

THE COURT:  It's sustained.

Q.  I want to turn to a new topic with you, Dr. Hughes, that of

disclosure.  How common is it for victims of abuse to disclose

abuse at or near the time that it occurs?

A.  So it's not common that victims do that.  Many victims will wait months, even years before telling about what happened to them.  And the term that we use in the literature is called delayed disclosure because of that.

Q.  What are some of the reasons for disclosing or not disclosing abuse?

A.  Some of the top reasons are fear of not being believed, fear of the negative consequences that are going to come from the disclosure, fear that other people are going to look negatively on you, they're going to shame you, they're going to blame you, say those questions like, oh, well, why didn't you just leave.  They fear -- they have sort of internal still that shame and that embarrassment, so they have to overcome that internalized shame and self-blame in order to tell.  Sometimes they've had previous traumatic experiences, and if those, you know, didn't go well in a disclosure, they might not disclose again or they may feel that somehow, why does this keep happening to me, I can't tell anyone about it.  They fear the change in probably their economic situation, if they have those financial controls, they fear being publicly identified, and they fear that the change in the network, the change in the relationship.  But usually, even when we leave the relationship, we have friends and family, and all of those people then, you know, are going to go away, and they fear

P5LCcom3                         Hughes - Direct

losing that, as well.

Q.   How does the relationship between the victim and the abuser affect the disclosure process?

A.   So one of the robust findings is that the closer the relationship to the perpetrator, the less likely you're going to disclose.  So that means if you've had a stranger rape or assault, you're more likely to disclose that as opposed to somebody who's an acquaintance or somebody who's a partner.

Q.   How, if at all, does an abuser's perceived authority or stature affect a victim's disclosure?

MR. BACH:  Objection.

THE COURT:  That's overruled.

A.   So what it does is just amplify, amplify the power and control differential between the abuser and the victim.  It's very difficult for a victim to disclose in the best of circumstances.  And somebody can have celebria power because they're the principal of a school, and it can change many different things.  So if you're going against someone who has wealth and access and privilege, you're beginning to think who is going to protect me, who is going to believe me, how am I going to come out of this.  They don't feel very safe in that disclosure in those situations.

Q.   What factors contribute to when a victim does decide to disclose what they've experienced?

A.   Usually it's when they're in a safe environment.  Clearly,

they're not being bombarded with abuse anymore, that can be a factor; they could have left the relationship, that could be a factor; they could have had some psychological help.  Having a way to put words to what they went through and to understand their experience of, you know, how did I get here, how was I not able to say no, how was I abused for so long.  And sometimes there are societal reasons, the way, you know, things change in the public or in society where you feel like you're not so alone and it's okay, it's okay for me to talk about this now.

Q.  When a victim does come forward to report abuse, who are they initially most likely to disclose to?

A.   They're most likely going to talk to a trusted friend or confidant, it's usually a mother, a sister, a best friend, someone who they think really can support them through this process.

Q.  And when a victim does come forward initially with a report of abuse, what does that initial disclosure typically look like?

A.   It's typically piecemeal, it's not a binary, I disclosed, I didn't disclose.  Usually, it unfolds over time, especially if we have a long duration of a type of a domestic violence situation.  And different bits come out with different people in different contexts.  So we know that and even I know that of evaluating hundreds of thousands of individuals, I'm not going

to get all the information in one sitting, that wouldn't be realistic and we may not need that.  Also, what inhibits the disclosures is that when they're talking about it, all of those trauma feelings are being evoked, all of that is coming up.  So they're sitting there really trying to manage that internal traumatic stress and psychological distress each time they're talking about it.  So they may sort of approach, talk a little, and then have to back up because it's just too painful.

Q.  How can past threats affect disclosure?

A.  I mean, it can affect disclosure in a very serious way.  If you've been threatened, if you tell, something bad will happen to you, and this person has already demonstrated that they can use serious forms of physical violence or sexual assault against you, you believe them.  So you may have to sort of wait to disclose to you have other safety measures in place you have for yourself, whatever those may be.

Q.  Can you describe the type of language that victims typically use when they initially disclose?

A.  So we talk about they use minimizing language, they don't want to talk about the details of what happened, they talk around it.  They don't want to label themselves as a victim, they don't want to label their abuser as abuser, and they don't want to talk about graphic details.  So that's sort of the piecemeal process that happens for individuals where it's a little bit of a distancing of all of the psychological harm

that they're feeling when they have to talk very detailed and specific about the abuse.

Q.  And Dr. Hughes, you just testified that victims, they don't want to label themselves as a victim, they don't want to label an abuser as an abuser, why is that?

A.  Really, because it's just too painful, it's really too painful to admit that back to somebody who loved me did this to me, and they are still in self-blame.  Self-blame takes a long time to go away and shame takes a long time to go away.  Like, why did it take me so long to get out of here.  They don't understand it, like the higher order of conceptualization I'm providing here today, that takes years of therapy for them to really understand the elements of control on entrapment that they were in.

Q.  Dr. Hughes, you said that victims can be reluctant to use more graphic descriptive language.  What type of language do they tend to use instead?

A.  They use hedging language.  Sometimes they won't say the name of the perpetrator, sometimes they'll say -- even patients in my practice, they'll say, you know when that thing happened or the incident.  They won't say the rape, the sexual assault.  They'll use anything they can to sort of distance themselves from the reality of the horrors that they went through.

Q.  Dr. Hughes, I want to turn to our final topic now, that of memory and the impact of trauma on memory.

What does the literature and your clinical experience say about how victims remember these traumatic events?

A.   Sure.   So we know that trauma impacts memory, we know that on one hand we can have a vivid bright memory sort of burned into our brain, but at the same time have lack of details and fragments for that same trauma.   We know that trauma memories can be forgotten or not recalled and recalled at a later time. And we know that this cuts across trauma groups.   This is not just domestic violence survivors, it's not just sexual assault survivors, we again see this in combat veterans, in child sex abuse victims, in our law enforcement.   So whenever we have different trauma groups, we can see this type of interrupted memory.

Q.   And what is the impact of trauma on memory?

A.   So, in general, it's because of the neurobiology of stress, right, that narrows attention and that narrows attention in trauma.   What we know is what victims remember is the core gist of what happened — I was sexually assaulted, I was in a car accident, I was in the battle field.   People don't forget that. Then we go to those central details.   Those are also pretty robust, people don't usually forget them.   The problem is it's whatever the person assigns significance to at the moment.   So that's not up to us, that's up to their brain.   It may be if they're being assaulted, the smell of alcohol on their perpetrator's breath, it may be focusing on the chipping paint

P5LCcom3                        Hughes - Direct

on the ceiling, right, that's what they decided to assign

significance for the real reason of keeping themselves safe.

And those details also tend to be robust and tend to be

remembered.  It's the peripheral details which we say is

everything else was not assigned significance, that doesn't get

encoded because it doesn't have any value for the victim.  It

may have value, we might want to know those details, but it

didn't get encoded because it didn't have significance for the

victim.

Q.  I want to make sure we all understand these concepts.  Can

you describe what central details of a memory include?

A.  So central details are usually sensory things, a sight, a

smell, a feeling, an emotion, and those are the type of details

that get remembered.

Q.  And the peripheral details that you said are less likely to

be remembered, what do those include?

A.  Those are things that are just surrounding the other things

that don't get established significance.  We sort of say

they're in the bucket of everything else that's not

significant.

Q.  And what determines whether something is significant,

meaning whether something is a central detail or a peripheral

detail?

A.  That is absolutely unique to each individual and their

unique brains.  Your brain is trying to function to keep you

safe.  We say your brain's working, it's doing what it's supposed to do.  So we can't, out here, determine what's significant for you or what's significant for the next person.  That's a very unique thing for each person in each situation that they're in.

Q.  When you say it's a unique thing, is that a conscious or an unconscious process for people?

A.  It's mostly unconscious.  Certainly the central detail of a person can say, make a deliberate attempt, I'm going to look at those drapes, and sometimes they just find that's what they're doing.  So there can be some voluntariness in the central details.

Q.  Is that always the case?

A.  No, it's not always the case, and sometimes victims don't know why I was focusing on the drapes.

Q.  And you referred earlier to memories being fragmented.  What does that mean?

A.  So fragmented just means because the narrowing of the attention that not all memories are getting in about the event that happened to you.  So that's why it's not complete.  And there's no evidence to suggest that because it's not complete, what we do know isn't reliable.  So the fragmented memories can be just as reliable, they're just not as expansive and they're just not as complete, they're missing details.

Q.  Dr. Hughes, earlier you testified about the various types

P5LCcom3                        Hughes - Direct

of coping mechanisms, including avoidance, disassociation.  How can those types of coping mechanisms affect the memory of the victim?

A.   So these are the things that the victim is doing after these assaultive episodes, right, they're trying to push it down, not think about it, not talk about it, and pushing it further in the recesses of their brain.  This is a common thing that we see with trauma survivors.  It's recognized as part of the PTSD diagnosis.  What they do is they're deliberately trying not to remember, and that can interfere with your recall of the information, not the storage which we did before, but that can interfere with the recall of the information.

Q.   And why are individuals who are employing or using disassociation or other coping mechanisms trying not to remember?

A.   Right, they're trying not to remember because it's too painful to remember.  The only difference -- you said disassociation, that's involuntary.  So these other things I just talked to you about, the directed forgetting, the compartmentalization, that's voluntary, the disassociation is not voluntary.  That's when your brain is sort of taking you someplace else to not feel and to not remember.  So that's the difference between those.

Q.   And specifically then, for disassociation, how can that coping strategy affect memory?

A.  Because if you're not attending and you're not focusing, it's not getting encoded.

Q.  You say encoded, are you referring to being remembered?

A.  Yes, a memory has to be encoded for us to remember it, yes.

Q.  How does the frequency of abuse affect a victim's ability to recall particular events of abuse?

A.  So we know that when we have chronic situations, again, like domestic violence, like our combat veterans, not everything is going to get in, events are going to blend together.  And that's because of, again, that high stress neurobiology of repeated traumatic events and also just the general principles of memory of repeated events.  We know that, could you remember each time you had a slice of pizza at your favorite pizza place, I can't.  You know, you can't remember every single time you've walked in this courtroom and the precise details of what happened at every time.  The repeated events that we do commonly are not all going to get recalled.  Unfortunately, in situations of domestic violence, there are these repeated events, there is this routine of all of this abuse happened.  So these abusive episodes are blending together.

Q.  When you say that memories are blending together, what does that look like?

A.  It looks like someone can say, I know I got punched a bunch of times, but I can't tell you when that was.  I know I was

kicked and I was in a ball in a closet, I know that happened a couple times, but I can't tell you when, I can't place it in a timeline. And sometimes it's those external markers where individuals are able to place it in a timeline of this happened on my birthday or this happened on the beach vacation where they have a marker and they can go, yeah, I remember that happened there. But all of the other similar type of behaviors that have been happening to them, they are not usually able to bring out each and every one.

Q. And are memories of an abusive event that's connected to a marker, are they more likely to be remembered?

A. Yes, they are.

Q. And can you just describe what a marker might be.

A. That's, like I said, like a birthday or anniversary or it was a snowstorm, right, there's something that sort of connects the memory to something else, which makes it much more likely to be recalled.

Q. You testified a moment ago, Dr. Hughes, that when abuse is very frequent, a victim tends not to recall each instance of abuse; is that correct?

A. That's correct.

Q. Does that prevent a victim from knowing that they were abused or recalling that they were abused?

A. No, because like we just said, they don't lose the core gist of what happened to them, that they were being abused or

P5LCcom3                          Hughes - Direct

they were being sexually assaulted.  That is pretty solid, that does not go away.

Q.  Can trauma memories be recalled over time?

A.  Yes, they do.  All memories can be recalled.  That's sort of the hallmark of trauma memories in post traumatic stress disorder that the trauma doesn't stay in the background forever, eventually it comes up into the forefront and the person is left in having to deal with it.  That's usually met with a tremendous amount of psychological distress and being sort of bombarded with images and thoughts of the traumatic experience and having a tremendous amount of anxiety and hypervigilance and sadness and all types of disequilibrium when that memory comes back.

Q.  You used a couple of words that I may not understand.  So hypervigilance and disequilibrium can you just briefly explain what those terms mean?

A.  Sometimes, when the memory comes back, we feel as though it's happening now.  So that hypervigilance, which means you're scanning for danger, you're being on alert, even though you're out of the relationship, the brain is not so sure you are, so it's bringing those same characteristics back, and you're usually hypervigilant and afraid and watching things, even though you're not in that situation anymore.

Q.  When victims do recall these difficult events, how do they tend to describe them?

P5LCcom3                        Hughes - Direct

A.   I mean, a lot of times they describe them, frankly, like I think I'm going crazy.  That's a lot of times how people enter into ERs or enter into the VA or enter into my office.  They don't really understand how they can't put these memories back in the box like they were, you know, a couple of days ago.  Once you sort of open that crack, they're out there and individuals have to deal with them and use them.  But it's very distressing for people and it's very upsetting and they have a lot of psychological difficulty with that process.

Q.   How can trauma memories be cued or triggered?

A.   So that's our recall, our retrieval of memories and they're cued by context and cues.  Sometimes the context elements are a place or a feeling, and sometimes the triggering cues are back to our senses, a smell, a sight, a sound, and sometimes it's a combination of those that bring a memory back up into the forefront.  And that's also, you know, happens to trauma memories.  But also general principles of memory, again, you go home for Thanksgiving and you're at your family table with your siblings and the same dynamics, someone laughs in a certain way or someone yells in a certain way, that likely is going to trigger a memory from before.  That's just how memory retrieval and recall works.  That's something that happens with trauma victims, as well.  They may smell the smell of alcohol, they may see someone dressed in a certain way, someone walk in a certain way, and the brain will register that as something of

danger and open up those memories.

Q.   And when in time after the instance of abuse can memories be triggered or cued in the way you're describing?

A.   I mean, they can be triggered at any time.  Sometimes they're triggered all the time since the episodes have happened and ended and sometimes we have what we call later recall.  We know that that can happen, as well, that because of all of those defenses where someone's trying to put them in the back of their head, that they can later recall these memories.  We know this, again, in the PTSD diagnostic criteria, we have it, it's called delayed expression of PTSD, and that is the manual that we've used in the psychological and psychiatric communities for decades now.  There's no evidence either, especially we know this with our war veterans our combat veterans as well as our assault victims, that later retrieve memory is any less accurate than if someone had it -- they might not have all the details because it's a later retrieved, but there's no evidence that it's less accurate.

          MS. STEINER:  No further questions at this time, your Honor.

          THE COURT:  Thank you, Ms. Steiner.

          Cross-examination.

          MR. BACH:  Very quick sidebar.

          THE COURT:  Okay.

          (Continued on next page)

P5LCcom3                        Hughes - Direct

(At the sidebar)

THE COURT:  Yes.

MS. SHAPIRO:  Your Honor, the defense moves to strike the direct testimony as violative of both Rule 702 and 403 for many of the reasons in our motion in limine.  In particular, the testimony on coping strategies and why people don't leave relationships essentially was a backdoor way of getting in much of the information in the coercive control discussion that your Honor included.  We tried to object as best we could, but she used the word "control" multiple times.  She referred to many of the supposed control strategies in the disclosure in the guise of the testimony about the coping strategies.  In addition, even the testimony about delayed memory I think illustrates some of the points we made previously about how it's junk science.  It was virtually any memory can be explained.  Her testimony essentially was an effort to mirror some of and bolster the credibility of Ms. Ventura in an inappropriate way.  So I just wanted to renew that motion before we moved to cross-examination.

THE COURT:  Ms. Steiner.

MS. STEINER:  Your Honor, I think the defense very robustly objected, your Honor was policing the issues very carefully.  I think we're well within the scope of your Honor's order and the notice.  Specifically, with respect to coping strategies, the notice was specifically very broad.  It says

that Dr. Hughes will speak about a broad range of defense

mechanisms and coping strategies, and as she did, she explained

there are a multitude of coping strategies that are necessary

that can be utilized at different points in time depending on

what the victim is encountering.

Similarly with memory, I'm not quite sure what the

objection is here.  I think she hued very closely to the notice

and talking about the effects of PTSD, how trauma affects

memory, and how memory can subsequently be recalled through

cues and triggers.

MS. SHAPIRO:  With respect to memory, if I could just

respond to that.  My point is she strayed from the disclosure.

It's that the substance of the testimony was so all over the

map, as we had argued earlier that this sort of amounts to junk

science because she's basically almost -- whatever the

particular circumstances of an alleged victim's recall would be

explained by the testimony.  That was my point, just to be

clear.

THE COURT:  Understood.  As to the first basis for the

application involving the attempt to get in the backdoor on

coercive control, I think that based on Mr. Bach's objections

and the constant sustaining of objections and requesting

Ms. Steiner to move forward, that we avoided all those issues

to the extent that any issue arose.

As to the issue concerning the basis under Rule 702

P5LCcom3                         Hughes - Direct

for testimony that was offered, I think I need to see the cross-examination because, as it was presented, there was an initial specification, witness's qualifications, and the indication that she was basing her opinions on both literature and then her clinical practice.  When she was testifying, she offered testimony, sometimes she did indicate that she was basing her testimony on literature or her clinical practice.  I agree that sometimes she just offered testimony without stating the basis.  I think that, under the preponderance standard under Rule 702, you can infer that's based on her clinical experience or literature, but I think some of these issues are going to be teased out in the cross-examination.  So I'll reserve on the application for now.

                MS. SHAPIRO:  Thank you, your Honor.

                MS. STEINER:  Thank you, your Honor.

                (Continued on next page)

(In open court)

MR. BACH:  May I proceed, your Honor?

THE COURT:  You may proceed.  And just so we have a sense of the schedule, let's go for about 15 minutes and then we'll take our break for lunch.

MR. BACH:  Sure.

CROSS-EXAMINATION

BY THE COURT:

Q.  Dr. Hughes, you've been a psychologist for nearly 30 years, correct.

A.  I believe so.  I think I was licensed in 1997.

Q.  And you have a private independent practice?

A.  Correct.

Q.  So people come to you for counseling and therapy?

A.  Correct.

Q.  And you see them at an office?

A.  Yes, I do.

Q.  You sit down with them face-to-face?

A.  Yes, I do.

Q.  And you talk with them, right?

A.  Yes, I do.

Q.  And you talk with them at length, right?

A.  Yes.

Q.  And when the people that come to you meet with you, you listen very carefully to what they have to say, right?

P5LCcom3                          Hughes - Cross

A.   Yes.

Q.   And you pay attention to detail?

A.   Yes.

Q.   And not just to what they're telling you about their lives, but you observe the manner in which they express themselves, correct?

A.   Yes.

Q.   In other words, you're trained as a psychologist to look at someone's cognitive style?

A.   Among other things, yes.

Q.   The way their emotional affect registers, correct?

A.   Yes.

Q.   They can be red sent and shy, right?

A.   Yes.

Q.   They can be verbose and talk active, correct?

A.   Yes.

Q.   And when you do your work, you pay attention to those types of details, correct?

A.   Yes.

Q.   And you pay attention to the different things they tell you about their lives, correct?

A.   Yes.

Q.   And you are trained to do that because any detail they convey to you can be important, correct?

A.   I don't know if I would say any detail can be important.

P5LCcom3                          Hughes - Cross

You're trying to ascertain which facts are and which aren't.

Q.  Well, not every detail is important, but you're listening carefully because a detail could be important, correct?

A.  Sure.

Q.  And people are complicated?

A.  Yes, we are.

Q.  You laugh, but people don't fit into boxes; is that fair?

A.  Well, we have general categories of how we understand people, general categories of psychiatric disorders that we do know, you know, present in a certain way.

Q.  Understood.  But even with those categories, when someone comes to you for analysis or diagnosis, you have those categories in mind, but you listen to that particular individual and to what that particular individual has to say, correct?

A.  Yeah, I'm certainly not divorced from my education, training, and experience about certain other areas of study when I'm doing that, of course.

(Continued on next page)

Q.   Your education and experience taught you how to listen carefully to individuals, correct?

A.   Correct.

Q.   And you can't diagnose somebody without hearing what they have to say, correct?

A.   Correct.

Q.   In your practice you typically wouldn't treat somebody without sitting down with them, spending time with them, and listening very, very carefully to what they are telling you and the manner in which they are conveying it, correct?

A.   Correct.

Q.   When someone comes to you, you have your education, you have your background, you have your categories.  But when someone comes to you, you do, I think you said on direct, a comprehensive evaluation to understand what you're being presented with, correct?

A.   I do.

Q.   Comprehensive evaluation means it's comprehensive, you look at a lot of things, correct?

A.   Correct.

Q.   And each person presents in his or her own way when they come to you, right?

A.   Correct.

Q.   And you have to hear what each person has to say, correct?

A.   Sure.

P5LMCOM4                    Hughes - Cross

Q.   And right now we are just talking about your private practice, right?

A.   Correct.

Q.   And I think you used the words before, you used the words clinical practice, right?

A.   Yes.

Q.   In other words, your office is kind of like a clinic in which you see and treat people, correct?

A.   It's not a clinic.  It's a private office where I treat people in psychotherapy.

Q.   You said.  But you referred to that as your clinical practice, right?

A.   Because I'm conducting clinical work.

Q.   I got it.

     And that's one kind of work that you conduct.

A.   Yes.

Q.   We just talked about that.

     There is another kind of work that you said you conducted and that's called forensic work, correct?

A.   Correct.

Q.   And that's something that you do as well, correct?

A.   That's correct.

Q.   And that's different from your clinical practice?

A.   That's correct.

Q.   Forensic work is when you're evaluating somebody in the

context of a legal proceeding, correct?

A.   Correct.

Q.   That's where you're evaluating someone and you're listening to them carefully, not just because you want to treat them, you're listening to them carefully because courts and judges and lawyers might be reviewing what you have to say about that person, correct?

A.   That's not why I'm listening intently.  I'm listening intently to really understand the person in front of me and what ails them and what the difficulties are.

Q.   But you know that whatever conclusions you may or may not draw, whatever analysis you may conclude, that may be reviewed by courts and lawyers?

A.   Of course.

Q.   In the forensic context, correct?

A.   Yes.

Q.   So there you pay attention to detail, correct?

A.   I pay attention to detail because I want to do a comprehensive evaluation, and I know that that work is going to be looked at other people.

Q.   When you do forensic work, as opposed to seeing a patient say once or twice a week in your clinical practice, you take your investigation of the facts to the next level, correct?

A.   You have to explain what you mean.

Q.   Sure.  When you do forensic work, you don't just talk to

someone who comes to see you for therapy, correct?

A.   Correct.

Q.   You go to other sources for information, correct?

A.   Correct.

Q.   You want as many sources of information, as many data points as you can reasonably get a hold of, right?

A.   Depending on the relevance of that data, sure.

Q.   Of course.  If something is irrelevant, you don't care about it, right?

A.   Correct.

Q.   But if something is relevant, you care about it, right?

A.   Correct.

Q.   And even if it contradicts what the person is telling you, you really want to know about that, right?

A.   Yes.

Q.   And so what you do in a forensic setting -- and a bunch of your work is forensic, correct?

A.   Correct.

Q.   What you do in forensic work, you listen to what the person has to say, and then you go look at other things to see how that pans out, correct?

A.   I think you're making it a little more simplistic.  I just don't listen.  I'm conducting a clinical interview, a semistructured clinical interview and administrating psychological tests, so it's not like I'm listening like I

would be listening with a psychotherapy patient.  It's a different methodology.

Q.  I don't disagree with what you said.  I want to explore that a little more so everyone understands where we are.

You understand that when you're in a forensic setting, the person that you're evaluating may have certain motivations because of the legal proceeding that you wouldn't necessarily find in your ordinary clinical practice?

A.  Correct.

Q.  And you approach forensic evaluation with that possibility that someone might have certain motivations in mind, correct?

A.  Correct.

Q.  And so when someone tells you something and offers it for a fact, in forensic work you approach that with some degree of healthy skepticism, correct?

A.  Correct.

Q.  And you do some cross checking, correct?

A.  Correct.

Q.  You do a deeper dive than you do in your ordinary clinical practice, correct?

A.  Correct.

Q.  And you look at all kinds of sources of information when you do forensic work for courts and lawyers, correct?

A.  Correct.  As we said, determined on their relevance.

Q.  The ones that are irrelevant you ignore, OK, and the ones

that are relevant you try to look at, correct?

A.   Yes.

Q.   Sometimes you don't know if they are relevant until you look at them, right?

A.   Correct.

Q.   Among the things that you tend to look at when you do legal related work, you look at witness reports, correct?

A.   Correct.

Q.   Police reports, correct?

A.   Correct.

Q.   If someone has medical records or prior psychiatric or therapy records, you hope you could see those as well, right?

A.   Yes.

Q.   You would look at their educational background, correct?

A.   Yes.

Q.   You mentioned veterans.  If you were treating someone in the military you would look at their military background?

A.   Yes.

Q.   So you would do what you called your structured interview of the person, but then you would also look at documents and records and all this other information, correct?

A.   That's correct.

Q.   Again, that's because you've been trained to pay attention to detail, correct?

A.   Trained to do a comprehensive forensic assessment, yes.

P5LMCOM4                        Hughes - Cross

Q.   And that means looking at a lot of pieces of information, correct?

A.   Correct.

Q.   It means looking at a lot of pieces of evidence, correct?

A.   Correct.

Q.   And you mentioned a moment ago, and I want to come back to this, something that you referred to as psychological testing, correct?

A.   Yes.

Q.   When we are talking about psychological testing, let's be clear.  There are certain standardized tests that the discipline of psychology has developed over time, correct?

A.   Correct.

Q.   And these tests are developed by experts in the field, correct?

A.   Correct.

Q.   And they go through a validation process to make sure that they have decent diagnostic value, correct?

A.   To make sure they have reliability and validity, yes.

Q.   Perfect.

      And those tests give you an opportunity to look at something that's reliable, kind of an objective measure, instead of just relying on what you're hearing from the person that you're sitting across from when you do your semistructured interview, correct?

A.   Correct.

Q.   Those tests can be a very important data point in your

comprehensive evaluation, correct?

A.   Correct.

Q.   And, again, you've had years of training to enable you to

do the kind of complex analytical work that this kind of

psychological investigation typically requires, right?

A.   Correct.

Q.   You've administered tests such as the -- you've

administered something called a personality assessment

inventory, correct?

A.   Correct.

Q.   You've administered a TSI test.  What does that stand for?

A.   The trauma symptom inventory.

Q.   And these are -- in your forensic practice these are tests

that you're quite familiar with, right?

A.   Correct.

Q.   And these are tests that you rely on, correct?

A.   Correct.

Q.   And you rely on them because you're not relying just solely

on your own interaction with the individual, correct?

A.   Correct.  But it's a way of analyzing and looking at a

whole host of symptoms that individuals may have.

Q.   Even with all of your training, and it's impressive

training and background, even with all that training, you rely

P5LMCOM4                         Hughes - Cross

on these tests developed by other people to help guide your

analysis, correct?

A.   I rely on multiple methods.  What we say, a forensic

evaluation is a multi-method, multi-hypothesis driven model.

So I'm relying on all of these methods to arrive at my

conclusion.

Q.   Because these things are complicated, right?

A.   I agree.

Q.   You can't find a sentence in the literature that says this

is how somebody is.  You have to do all these multi data point

evaluations to get a sense of that, correct?

A.   To get a sense of that individual, yes.

Q.   And when you do the testing and when you talk to the

individual, you're familiar with a concept, I don't think this

was mentioned by the prosecutor, but you're familiar with a

concept called malingering, right?

A.   I am.

Q.   And malingering is a fancy way of saying that someone might

be exaggerating or distorting the facts because of the

circumstances of which they find themselves, right?

A.   That's not a correct definition.

Q.   Why don't you give us a correct definition.

A.   Malingering is just the fabricating of emotional or

psychological symptoms.  It's not related to the facts of their

case.

Q.   You talked about different emotional responses that people have to trauma or you talked about a trauma bond.  You talked about a number of things.  But people can fabricate emotional responses, correct?

A.   They can.

Q.   And notwithstanding the patterns that you talked about in the literature, these tests help you determine what's going on with a particular individual that you are looking at at any given time, correct?

A.   You wouldn't take the test alone.  You're looking for the confluence of the data points, the clinical interview, the testing, the external data, and you're looking how it all holds together to render an opinion.

Q.   And you have to look at everything, right?  You have to look at all those different sources, the ones that are relevant, you have to look at them, and you have to see how they all hold together, correct?

A.   Correct.

Q.   And that's part of doing a detailed fact-intensive analysis, correct?

A.   Correct.

Q.   You're familiar with something called -- let me withdraw that and say, a number of the tests that you use have something called a built-in validity index, correct?

A.   Validity scales, yes.

Q.  Validity scales.

And the validity scale is because there is some people, even on a forensic setting, even when someone like you is administrating the test, there are some people who try to fool the tests, right?

A.  Yes.

Q.  And the validity, what did you say it was?

A.  Validity scale.

Q.  Validity scale is there to help you, Dr. Hughes, decide whether the person you're evaluating is trying to fool the test or not, correct?

A.  The validity scales are really to look at the response style of the individual.  The two tests that you mentioned also are used clinically, and we use them in a clinical practice as well.  So it does look at things like exaggeration, but it also looks at things, minimization and defensiveness and not wanting to report symptoms.  So we see that as well.

Q.  Minimization is sometimes understated, something that you may have done or that you're ashamed of, correct?

A.  Not that necessarily you're ashamed of but that you don't want to address, like I talked about before.  So sometimes we see individuals who are minimizing their distress.

THE COURT:  Dr. Hughes, if you're asked a yes-or-no question, give a yes-or-no answer, and then we will have redirect after cross.

P5LMCOM4

THE WITNESS:  OK.

THE COURT:  A couple more questions, and then we are going to take our lunch break.

MR. BACH:  Sure.

THE COURT:  Or you can stop now.

MR. BACH:  Why don't we stop now because I don't have a good cliffhanger, and we will take it up after lunch.

THE COURT:  Fair enough.

Thank you, members of the jury.  Enjoy your lunch. Please do not speak with each other about the case during lunch.  We will be back at 12:45.

All rise.

(Jury not present)

THE COURT:  Dr. Hughes, we will see you back here at 12:45.  You are not to have any discussions with the government during the break.

THE WITNESS:  Thank you.

THE COURT:  Thank you very much.

Everyone else, please be seated.

Anything from the government before we take our lunch break?

MS. COMEY:  Just to inquire when your Honor would like to have Mr. Kaplan come in to invoke.

THE COURT:  Let's do that right now.

MS. COMEY:  I will ask the agent to bring Mr. Kaplan

in then.

Your Honor, do you need a hard copy of the order, or do you have it?

THE COURT:  Do you have an extra hard copy?

MS. COMEY:  I do, your Honor.  I'll bring it up.

THE COURT:  I'll ask the courtroom deputy to swear the witness in.

GEORGE KAPLAN,

        called as a witness by the Government,

        having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. COMEY:

Q.  Good afternoon, Mr. Kaplan.  Did you receive a subpoena requiring you to testify at this trial?

A.  Yes.

Q.  Do you have an attorney who represents you in connection with this matter?

A.  Yes.

Q.  And based on your discussions with your attorney, do you intend to invoke your constitutional right not to testify and not to answer any and all questions put to you at this trial on the grounds of potential self-incrimination?

A.  I do.

Q.  Do you understand that if the Court enters an order granting you immunity that you will be required to answer any

and all questions truthfully here today?

A.   Yes.

Q.   Do you understand that that order will not protect you from prosecution for perjury if you make a false statement here today?

A.   Yes.

          MS. COMEY:   Your Honor, I would ask, on the basis of the witness' answer to my questions, that you enter the proposed order that we have submitted.

          THE COURT:   Let me ask the witness, have you seen a copy of this order?

          THE WITNESS:   I have not.

          THE COURT:   Ms. Comey, is there any reason that the witness needs to review the order or the application materials?

          MS. COMEY:   I don't believe so, your Honor, but I have a copy available if he or his attorney would like to review them.

          THE COURT:   Has his attorney reviewed it?

          MS. COMEY:   He has not, but I can hand him a copy right now.

          THE COURT:   Why don't do we give it over to the witness' attorney, give him a second to review it, and I'll ask the attorney if there are any further issues to address before the Court signs the order.   Just give it one moment.

          MS. COMEY:   The attorney has informed me, your Honor,

that he has reviewed the order and that he is satisfied that there are no issues with it.

THE COURT:  What is the attorney's name?

MS. COMEY:  Michael Becker, your Honor.

THE COURT:  Based on the questions asked and the answers given, the Court will execute the order regarding immunity and make it part of the record.

Is there anything further, Ms. Comey?

MS. COMEY:  No, your Honor.  Thank you.

THE COURT:  Thank you very much, Mr. Kaplan.  We will see you back here this afternoon.

We are adjourned until 12:45.

MS. SLAVIK:  Your Honor, can I raise one issue before the lunch break?

THE COURT:  Yes.

MS. SLAVIK:  I apologize, especially to Ms. Westmoreland.

I just wanted to flag for the Court that the government will seek to admit a certain exhibit, it's Government Exhibit 629-A, after Mr. Kaplan's testimony.  The government has not yet conferred with the defense, but we will do so over the lunch break.  I expect that there could be argument on this particular exhibit before its admission.

THE COURT:  Let's see if it's something that we can address briefly when we come back from the lunch break, just so

we don't have to have a break while the jury is out here.

MS. SLAVIK:  Of course, your Honor.

THE COURT:  Very good.  We are adjourned.

(Luncheon recess)

P5LMCOM4                    Kaplan - Direct

AFTERNOON SESSION

12:50 p.m.

THE COURT:  Ms. Slavik, do we have any issues to address as to that exhibit?

MS. SLAVIK:  Your Honor, I haven't had the opportunity to confer with the defense.  I'm looking at Ms. Geragos.

Your Honor, I understand that the defense will object to the exhibit's admission.

THE COURT:  They will.  Shall we take a look at them, or do I need some see the context through Mr. Kaplan's testimony?

MS. SLAVIK:  No.  I think we can take a look now. Like I said, the government will plan to admit this after Mr. Kaplan's testimony.  So we can take it up now.

THE COURT:  Let's take it up right now.

MS. SLAVIK:  Great.

THE COURT:  Sorry, do I have the exhibit?

MS. SLAVIK:  I sent the exhibit to your Honor's chambers.  It can be brought up on the screen as well.

THE COURT:  No.  I have it.

MS. SLAVIK:  You've got it.

THE COURT:  I apologize for that.  I didn't see the email.

I'm looking at this.  I see it's redacted.

MS. SLAVIK:  Yes.  It's redacted for 412 issues, your

Honor.

THE COURT:  What is the nature of the objection?

MR. AGNIFILO:  The objection is that it is hearsay, clearly being offered for its truth from someone who is not going to be testifying at this trial.  It's prior out-of-court statements.  It's detailed.  It's -- the government believes that it's damaging.  There is no endorsement of the statement by Mr. Combs.  And so I have two bases for objection.

First, it's inadmissible hearsay.

THE COURT:  Explain how it's hearsay over a statement of a party opponent or statement of a party opponent as to Mr. Combs and then under 801(d)(2)(D) as to Uncle Paulie.

MR. AGNIFILO:  First, the statement -- thanks.  I feel you -- from Mr. Combs, I think is ambiguous.  It's not -- he is not saying, I agree.  He could be saying, thanks for the advice, thanks -- the statement is, thanks.  I feel you.  I don't think -- without anything more, there is nothing about that statement that's an endorsement.  He is not verifying --

THE COURT:  Maybe I'm missing something.  Is that a 403 objection?

MR. AGNIFILO:  That's a hearsay objection.

The order I would like to go is why it's hearsay without an exception, and then I'll go to 403.

The two reasons why it's hearsay is because it's a statement by another person, it's a prior out-of-court

statement being offered for the truth of the assertions in the statement.

THE COURT:  Let's start.  To the extent that Mr. Combs made any statements, why would it not fit under 801(d)(2)(A), which covers statements made by the party.

MR. AGNIFILO:  The only statement Mr. Combs makes is: Thanks.  I feel you.

THE COURT:  Right.  And you would not have a hearsay objection to that statement.

MR. AGNIFILO:  Thanks.  I feel you is absolutely admissible as a statement of a party.

THE COURT:  Great.

MR. AGNIFILO:  It's the blue statements that I object to.

THE COURT:  As to the blue statements, why would those not be admissible under 801(d)(2)(D)?

MR. AGNIFILO:  Because these are not statements that are -- can we do this.  We just got this.

THE COURT:  Would you rather take this up after Dr. Hughes is off the stand?

MR. AGNIFILO:  Let me take a look at this, compare it to the cases we have been talking about, and I can be more helpful to the Court.

THE COURT:  That's fine.

Thank you, Ms. Slavik, for sending the exhibit.  Now I

have seen it.  We will pick it up after Dr. Hughes.

MS. SLAVIK:  Thank you, your Honor.

THE COURT:  Ms. Steiner, can we get Dr. Hughes back.

MS. STEINER:  Yes.

THE COURT:  Welcome back, Dr. Hughes.

THE WITNESS:  Thank you, your Honor.

(Jury present)

THE COURT:  Dr. Hughes, you understand you're still under oath.

THE WITNESS:  Correct.  Thank you.

THE COURT:  Mr. Bach, you may proceed.

MR. BACH:  Thank you, your Honor.

BY MR. BACH:

Q.  Dr. Hughes, before the break we were discussing your clinical practice, correct?

A.  Yes.

Q.  Then we got to your forensic practice, correct?

A.  Yes.

Q.  We talked about how in both of those practices you listen carefully to the individual pieces of information that you are gathering over time, correct?

A.  Yes.

Q.  And we were talking about tests just before the break, correct?

A.  Yes.

Q.   And you rely on those tests because when you're doing forensic work you want to get as much information, as many data points as you can, correct?

A.   Yes.

Q.   In fact, when you do forensic work in a case-specific way, the last thing that you want to do is be blind to the facts, correct?

A.   When I'm conducting the evaluations, sure.

Q.   You want to live in those facts, correct?

A.   I don't know if I want to live in them, but I certainly review everything copiously as I can.

Q.   You agree that a psychologist cannot give an opinion on the psychological characteristics of an individual when that psychologist has not assessed that person, correct?

A.   I mean, there is some controversy in the field about that. In our ethical codes some people we say can't diagnose, but sometimes, as a forensic psychologist, if that individual is made unavailable, we can make some conclusions based on a record review.

Q.   Dr. Hughes, do you remember testifying in June 2019 across the Brooklyn Bridge in the Eastern District of New York in another matter?

A.   Not particularly, but, yes, I know I testified.

Q.   Let me ask you if you were asked this question and gave this answer.

A.   Sure.

Q.   "QUESTION:  You agree that a psychologist such as yourself cannot give an opinion on the psychological characteristics of an individual when he or she has not assessed that person? "A.   That's generally a fair statement."

         Were you asked that question and did you give that answer?

A.   I don't have the transcript.  I'm assuming that you have it and I did say that.

Q.   I'm happy to share it with you.

A.   I think the answer is the same as what I'm telling you.

Q.   I think you testified on direct examination that you participate in an organization known as the American Psychological Association, is that correct?

A.   That's correct.

Q.   And you would agree that the American Psychological Association states, as a matter of policy, that a psychologist should only render an opinion of an individual after an examination of the individual adequate to support the statement or conclusion, correct?

A.   And what are you reading from?

         MR. BACH:  Let's let Dr. Hughes see this.  Can you put up 3752-3, page 10.

         MS. STEINER:  Your Honor, can we confirm that is only for the parties and the witness?

MR. BACH:  Only for the parties and the witness.

Q.  Dr. Hughes, any time I mention something that draws on your memory, and you don't remember it, let me know, and I'll show it to you as best as I can.

MR. BACH:  Do we have 3752-3 at page 10 in front of the witness.  Can I get it on my screen.

Q.  Would you like me to repeat the question?

A.  Yeah.  I don't know what your question was.

THE COURT:  Let's take the document down, and you can ask a question.

Q.  You would agree that the American Psychological Association --

THE COURT:  Let's take the document down, and then you can ask your question.

MR. BACH:  Sure.

THE COURT:  Now proceed.

MR. BACH:  Thank you.

Q.  Dr. Hughes, you would agree that the American Psychological Association, which you are a part of, states that a psychologist should only render an opinion of an individual after an examination of the individual adequate to support the statement or conclusion?

A.  I agree with that.  There are other guidelines, but that is part of one that I agree with.

Q.  In this case, let's -- we talked about your clinical

P5LMCOM4                          Hughes - Cross

practice, we talked about your forensic practice.  Now let's talk about your work in this case.

In this case you did not do a comprehensive forensic evaluation, correct?

A.  I was not asked to do that.  I was asked to give general testimony to the ladies and gentlemen of the jury.

Q.  Understood.

When you say general testimony, that means you did not meet a single witness, correct?

A.  That's correct.

Q.  You did not review a single witness statement?

A.  That's correct.

Q.  This is different from your forensic practice, it's different from your clinical practice, where you listen carefully to details, correct?

A.  It's a different role that I do as a forensic psychologist, yes.

Q.  You know there is a court reporter here who takes down what people say during the trial every day, correct?

A.  Yes.

Q.  You didn't review any transcripts from any prior days of this trial, correct?

A.  I did not.

Q.  You didn't review any police reports?

A.  I did not.

P5LMCOM4                         Hughes - Cross

Q.   You didn't review any medical or psychological records?

A.   I did not.

Q.   You didn't crosscheck or do anything like that with family members or friends?

A.   I did not.

Q.   To cut to the chase, you have not gathered detailed information about the specific facts of this case, correct?

A.   Because I'm not rendering any opinions about a specific individual.

Q.   Let's be clear about that.

        Point 1, is, you have not done any work to gather detailed information about the specific facts of this case, correct?

A.   Correct.  That is not my role.

Q.   And you have not gathered detailed information about any of the women who testified in this case, correct?

A.   Correct.

Q.   Have you heard there is someone named Cassie?

A.   I have seen a headline.  I don't know who that is other than that.

Q.   But you don't know what she said on the witness stand?

A.   I do not.

Q.   You don't know what her demeanor was, how she presented?

A.   I do not.

Q.   You don't know what she said in her texts to Mr. Combs?

P5LMCOM4                          Hughes - Cross

A.   I do not.

Q.   You don't know anything about her psychological history or background, correct?

A.   That's correct.

Q.   You don't know anything about her drug use, right?

A.   That's correct.

Q.   And that's because you're just here -- let's just be clear about this.  You're just here providing general background information, correct?

A.   Right.  It's called subject matter testimony on my area of expertise.  That's correct.

Q.   You can call it that or you can call it general background information, correct?

        MS. STEINER:  Objection.  Argumentative.

        THE COURT:  Sustained.

Q.   You're not providing any opinion on any particular fact in this case, correct?

A.   That's correct.

Q.   And you understand that while you're here giving subject matter or general background evidence, that while you're doing that you understand from all of your experience that the jury's job is to consider the specific facts and the evidence in this case?

        MS. STEINER:  Objection.

        THE COURT:  Sustained.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.   Now, I want to make sure you and I agree on terms.  I
called it general background testimony.  But what was your
preferred term?

A.   General subject matter testimony.

Q.   You have given more or less the same general subject matter
testimony that you gave in this court, you have given it in
open courts in other cases, correct?

A.   Because this is my area of expertise.

Q.   So the answer is yes, correct?

A.   Yes, that's correct.

Q.   So in other courtrooms you have come in, you have taken the
witness stand, you have talked about memory, right?

A.   Yes.

Q.   Talked about coping, correct?

A.   Yes.

Q.   Talked about reporting, correct?

A.   Correct.

Q.   You have said many of the same things you have told us
about here today, correct?

A.   Probably.

Q.   And you have been hired by a number of different
prosecutors' offices to do that, correct?

A.   Correct.

Q.   You have done it for this prosecutor's office before,
correct?

A.   Correct.

Q.   We just discussed how you have done it across the river in Brooklyn, is that correct?

A.   That's correct.

Q.   You have done it in state cases brought by state ADAs in a number of domestic violence cases, correct?

A.   That's correct.

Q.   You have given this same subject matter or general background testimony even though in all of those cases none of them involved the same people, correct?

A.   Correct.

Q.   None of them involve the same evidence, right?

A.   Correct.

Q.   In other words, it's not keyed to the particular facts at issue in the case, correct?

A.   I think it's key to the jury understanding the issues that they are trying to understand.

Q.   But the jury is here to understand the evidence in the case, correct?

A.   Yes.

Q.   Because you have given this general testimony a number of times now -- over how many years have you been giving this same general testimony?

A.   I don't know if I'm giving the same general testimony, but I was first qualified in 1999 in Kings County.

Q. You're talking about your understanding of the literature, right?

A. Correct.

Q. And you're talking about lessons that you have learned from your own experience, correct?

A. Correct.

Q. By the way, that experience, the experience that you have in your own private practice, that's confidential, correct?

A. About the individual patients, of course.

Q. And you haven't published any data relating to your patients?

A. No, I have not.

Q. So you haven't shared information about the dates of your experience with the prosecutors, right?

A. Of my patients?

Q. Right.

A. No.

Q. You haven't shared them with the judge?

A. Of course not.

Q. You certainly haven't shared them with me, right?

A. No.

Q. When you say that something -- you know something from your experience, there is no way that I can do any kind of forensic crosscheck or any kind of data point to see whether what you're saying -- someone might interpret what your patients have said

P5LMCOM4                        Hughes - Cross

to you in slightly different ways, correct?

A.   Possibly.

Q.   And given this summary of the literature a number of times, there is no fact, there is no individual piece of data from this case that I could present to you that would lead you to say, oh, you know what, all the literature is different than I thought, right?

A.   Correct.

Q.   I mean, I could sit here and throw facts at you all day, but you are just here to say what your understanding of the literature is, correct?

A.   And the totality of my knowledge, education, training, and experience as well.

Q.   Right.

        I could tell you about Cassie, I could tell you about the evidence in this case and you'd say, well, I know my experience, correct?

A.   I don't understand that question.

Q.   What I'm trying -- I may be already there, but you're here to talk about what you say is your experience and what you say the literature can be distilled as saying, but you are not here to say what any particular witness' state of mind is, correct?

A.   That's correct.

Q.   By the way, you talked about coping and you said there was informal coping and formal coping, correct?

A.   Strategies, yes.

Q.   Coping strategies, right?  Because coping, that's a common term, right?

A.   Yes.

Q.   People cope with all kinds of things.  Coping is kind of dealing with things, right?

A.   Yes.

Q.   And you talked about -- I think in response to the prosecutor's questions you distinguished between formal coping mechanisms and informal coping mechanisms, right?

A.   Yes.

Q.   And when you talked about formal mechanisms, you talked about going to the police or the authorities, correct?

A.   As one, yes.

Q.   And when you talked about informal coping mechanisms, you talked about going to family and friends, right?

A.   Yes.

Q.   But you didn't mention anyone going to a civil plaintiff's lawyer, correct?

A.   Correct.

Q.   And many people talk to civil plaintiffs' lawyers for different reasons, right?

         MS. STEINER:  Objection.

         THE COURT:  It's overruled.

A.   Can you read back the question?

P5LMCOM4                        Hughes - Cross

Q.   Sure.  People might go to a civil plaintiff's lawyer for different reasons, right?

A.   Correct.

Q.   And one of them might be to make some money, correct?

A.   I would say they go to civil lawyers to right a wrong.

Q.   But some people go to civil lawyers because they want to make a little money based on a claim?

        MS. STEINER:  Objection.

        THE COURT:  Let's move on.

Q.   When you do your forensic work, the work that you do in the -- when you do a comprehensive forensic evaluation, that's often in the context of a civil case brought by a civil plaintiff's lawyer, correct?

A.   I do both civil and criminal work.

Q.   In the civil context you do forensic work where there are money damages at stake, right?

A.   Correct.

Q.   And that's where you engage in testing to look for the possibility of malingering, right?

A.   Yes.

Q.   That's where you approach the person you're interviewing with a healthy skepticism, correct?

A.   Yes.

Q.   That's where you have your concerns about motivation, correct?

P5LMCOM4                      Hughes - Cross

A.   Yes.

Q.   You were talking about memory, right?

A.   Yes.

Q.   And you were explaining why people may have hazy memories, why they might recall things in fragments over a period of time, right?

A.   I don't know if I said they recall things in fragments over the time, but their memory can be fragmented.

Q.   Let me ask you this hypothetical.  Let's say that there is time one.  Time one, someone has a hazy memory.  They recall a few things.  They do the best they can at that time, but they recall a few things.  Then time two, after they have hired a civil plaintiff's lawyer, and they have made a claim for money damages, they now recall details that they didn't recall before.

             MS. STEINER:  Objection.

             THE COURT:  Hold on for one second.

             I am going to sustain the objection.  You can try to rephrase and ask the question a different way.

             MR. BACH:  Sure.

Q.   You talked about issues with memory, correct?

A.   Yes.

Q.   There might be all kinds of reasons why people happen to have new memories after consulting a lawyer, correct?

             MS. STEINER:  Objection.

P5LMCOM4                        Hughes - Cross

THE COURT:  That's sustained.

MR. BACH:  Let me rephrase.

Q.  You talked about the neurobiology of stress, correct?

A.  Yes.

Q.  And you said the neurobiology of stress can explain why people's memories might change over time, correct?

A.  I don't think I said they may change over time.  They certainly can be recalled over time based on context and cues. So you can have different time periods where those contexts and cues evoke a memory.

Q.  And memories do change over time, correct?

A.  They do.

Q.  And a memory issue, a lapse of memory, a forgotten detail, that can be the result of prevarication, correct?

A.  Prevarication did you say?

Q.  Yes.

A.  As a result of lying?

Q.  Yes.

A.  I guess anything is possible.

Q.  One moment.

MR. BACH:  One moment, please.

THE COURT:  We are seeing it up here.  Let's take it down.

Q.  You understand that there are times when people's memory issues can be related to prevarication, correct?

A.  Yes.

Q.  That's a fancy way of saying there are circumstances in which people may shade the truth, correct?

A.  Correct.

Q.  And that's not because of the neurobiology of the brain, correct?

A.  Correct.

Q.  That's for other motives and reasons, correct?

A.  Yes.

Q.  Now, you testified on direct that you have been retained many times as an expert, correct?

A.  Yes.

Q.  And you testified in court multiple times as an expert as well, right?

A.  Correct.

Q.  So much so that you've become comfortable training other experts to testify in court, correct?

A.  I don't know if I train experts to testify in court, but we certainly train mental health professionals and lawyers and judges about the intersection between trauma and the courtroom.

Q.  Don't you train them on how to testify in court?

A.  I think I did one training years ago on battered women for the clearing house on how to do that, but most of the time the trainings are how to conduct comprehensive forensic assessments.

Q.  But you have given people tips on how to prepare and present -- prepare for and present themselves in a courtroom setting, right?

A.  Yes.  Those were tips for battered women advocates who don't have that level of training and sometimes have to come into court.

Q.  And you gave tips on how to answer questions both on direct examination and on cross-examination, correct?

A.  I don't remember the presentation, but probably.

Q.  I think what you're referring to, just to be clear, is a webinar you gave in May 2015 entitled expert witness testimony in cases involving domestic violence, correct?

A.  And who was that by?

Q.  That was presented by you and Mary Ann Dutton, correct?

A.  For the National Clearing House for the Defense of Battered Women.

Q.  That was 10 years ago, correct?

A.  Yeah.

Q.  Ten years ago you were training other experts how to give testimony in domestic violence cases, correct?

A.  Correct.

Q.  Let me show you Defense Exhibit --

          MS. STEINER:  Your Honor, I haven't seen this exhibit.

          MR. BACH:  Just for the parties.

          THE COURT:  Do you have a copy for the government?

MR. BACH:  Yes.  Just for the parties and the Court for now.  Parties, lawyers, and the Court.

THE COURT:  Let's have a brief sidebar.

(Continued on next page)

P5LMCOM4                        Hughes - Cross

(At sidebar)

THE COURT:  How are you using this document?

MR. BACH:  She just mentioned it.  I'm using it to show her bias to the orientation.  I'm not going to spend that much time with it, but I am going to go through some things to show that she has a certain approach and agenda in these types of cases and that she is essentially not just a clinical psychologist, a forensic psychologist that she testified, but she has become a professional expert.

THE COURT:  I understand the relevance, but you can't put it in front of her and try to get it into evidence unless there is a basis for doing so.  That's what I am asking.  What is the basis --

MR. BACH:  The basis is bias, and it goes to the orientation and bias of a witness.  It's her background.

There are other pieces that I want to bring out.  For instance, it talks about coping in here, which is something that she has testified to substantively, so I want to talk to her about coping.

I am not going to go over every page or spend a lot of time on it, but I think it's relevant for the jury to see.  She is not coming here just as a professional psychologist who is learned in the discipline, but she is coming here as someone who has honed herself to be an expert and that --

THE COURT:  I understand the relevance, believe me.  I

P5LMCOM4                        Hughes - Cross

understand why you're doing this.  But if you're going to

attempt to impeach the witness with statements from this

document, then you would go through the steps for doing that.

If there is a basis, then you could seek admission as a prior

inconsistent statement.  However, you have got to go through

those steps.

MR. BACH:  I am not offering it as a prior

inconsistent statement, at least not yet.  I'm offering it as

impeachment in a different sense, that it shows bias.  It's not

that she has made a statement that's false that I'm impeaching.

It's a bias to show her orientation.

So, respectfully, I don't think that kind of

evidentiary foundation is necessary for the admissibility of

this.

THE COURT:  Ms. Steiner.

MS. STEINER:  Your Honor, I think the Court has a

deadline for exhibits that we are seeking to have admitted for

both parties for a reason.  We have never reviewed this before.

I have no idea what's in it or whether it is relevant.

I would ask that the Court and the government have the

ability to review the document.  The government doesn't object,

like your Honor is suggesting, to having him question the

witness and pursue a line of impeachment potentially about

bias.  But introducing the document without us even having

reviewed it, I have no doubt, just the things that you are

describing --

MR. BACH:  If you want a couple of minutes, it's on her resumé that you provided to us.  It's a presentation in her resumé that's right on point in this case.  There is nothing -- it won't take you very long to review this.  I don't mind.

THE COURT:  I'm happy to take a recess.

I guess you would agree that there isn't an issue in terms of the Court's order from the weekend because this is a document that's being used for impeachment purposes.  Is that fair?

MS. STEINER:  If it is only used for impeachment purposes.

THE COURT:  Mr. Bach has said that.

You are not using it for any kind of affirmative purpose.  It's purely for impeachment.

MR. BACH:  This has nothing to do with our case in chief.

MS. COMEY:  If I may, your Honor, I have had a chance to look through this.  My concern is, I think if your Honor actually reviews it, you will see that the face of the document, as far as I can tell, shows no indications of bias along the lines that counsel just articulated.  I think it would be helpful for your Honor to take a look because, in reading through this quickly, I don't see any indications of bias.

MR. BACH:  I'll lay a foundation, but the bias IS that you presented her as someone who has come into the courtroom as a professor at Cornell Weill, as someone who has clinical practice, as someone who has a forensic practice.  I don't think that's a complete portrayal of the kind of background and energy and motivation that she has here.

I think this puts the way that you characterize her in a different light that is bias and motive, and everything bias is always relevant.

MS. COMEY:  If I may respond.

I think that Ms. Steiner also elicited how many times she has testified, what kinds of cases she has testified in, and how many times she has been qualified as an expert.  I'll note that Ms. Steiner, I think, rushed through that part of her direct examination because we had a sidebar during which we were told to move on past the qualifications aspect.  Part of this is that her direct was short-circuited.  We did not mean to suggest that there was any sort of bias here or to create a setup.

THE COURT:  I am going to ask the jury to take a brief recess, and then we can address this.

MS. STEINER:  Thank you, your Honor.

(Continued on next page)

P5LCcom5                          Hughes - Cross

(In open court)

THE COURT:  Members of the jury, we have a matter that we need to address, and it may take a few minutes.  Rather than you sitting here with that white noise going, which I'm sure is really annoying, I'm going to allow you to retire to the jury room for a few minutes and then we'll bring you back.

All rise.

(Continued on next page)

P5LCcom5                         Hughes - Cross

(Jury not present)

THE COURT:  Dr. Hughes, I'm going to ask you to step out and we'll call you back in a few minutes.

(Witness not present)

Give me one moment.

(Pause)

So first issue, Ms. Shapiro, is this the document that was emailed to the Court yesterday?

MS. SHAPIRO:  Yes.

THE COURT:  Yesterday, Ms. Shapiro sent an email on an *ex parte* basis to the Court requesting advice about whether to disclose certain information, and this was the document.  The Court promptly responded that the Court is not permitted to give either side advice about the rules, and the Court referred the defense to its order from this weekend and the discussions last week.  So that was just to make sure that everyone's on the same page here.

Now, I'm reviewing this document.  What should I look at here?

MS. COMEY:  Your Honor, from the government's perspective, this just shows neutral bullet points about what any witness, especially any expert witness might think about when preparing to testify.  We don't see that it shows this witness has an agenda, a bias, has a favor, favors one side or the other, one party or the other.  So we don't see any basis

to believe that this document would be admissible to prove
bias.

THE COURT:  So the government doesn't object to the
form of this document.  It's just on a Rule 403 basis, the
government doesn't believe that -- well, you've made the
objection.  Mr. Bach, can you just walk me through how you're
getting this in.

MR. BACH:  They view this as a neutral document and
not presented as a 403 argument in terms of any prejudice.  If
they view it as a neutral document, great.  What this is is a
document in which she's received -- an organization that's
received funding from the Department of Justice Office on
Violence Against Women.  She testified a moment ago that this
was a presentation for battered women advocates.  She had
testified previously that what she does is provides training
for legal professionals and experts.  She's now described it as
for battered women advocates.  Those are people who advocate
for a perspective.  And she also answered my questions by
saying initially that she doesn't do this kind of work, that
she doesn't prepare people to appear in court.

So without going into the details of my cross, I think
I'm going to spend less than five minutes on this to let people
know that she's in the business, contrary to her testimony on
direct, not simply of providing clinical services, not simply
providing forensic evaluations, but that she's really someone

who participates in a different professional world and in a different professional category, which she has over the last number of years become someone who makes most of her money as a professional witness.  And she's got kind of a cottage industry in this kind of general testimony.  And I think this is very relevant to our defense, it puts in perspective who she is.  With experts, it's very dangerous because they come in with an aura of authority about them based on the discipline.  She testified at length about her training in New Haven, her Ph.D.s, and suggesting that her knowledge comes from the world of academia, the world of psychological textbooks, from her own experience, but there's a perspective that forms her testimony that the defense is entitled -- the defense is obviously entitled to present a defense, but --

THE COURT:  Ms. Comey, if I'm understanding you correctly, you have no issue with Mr. Bach asking questions about this document.

MS. COMEY:  100 percent, your Honor.  Everything that Mr. Bach just said is, depending how the questions are formed, totally appropriate cross-examination.  The issue is presenting this document to the jury has very minimal probative value because, among other reasons, it's a neutral document on its face, it doesn't show bias, and it has an extreme risk of confusing the issues.  This would be a very confusing document to put in front of the jury and it would lead us down a

sideshow where, on redirect, we would feel obligated to go through it and have her explain essentially this training that she gave so the jury's not confused about what's in this document.  It's a sideshow that's not necessary for Mr. Bach to make the points that he wants to.  And if Dr. Hughes doesn't remember any of the details of the presentation that Mr. Bach wants to ask about, he can certainly pull a page up to refresh her recollection so that she knows what he's talking about. The point is this should not be shown to the jury.

MR. BACH:  Judge, the rules for admissibility are broad, and the ability of a defendant to present a defense should not be curtailed.

THE COURT:  Right.  But you think Ms. Comey's point is anything you need to get, you could get through testimony about the fact that a training was given.  The document itself, now that I'm reviewing it, doesn't say really anything about anything.  I mean, it provides information about how to go to court, meaning minding your personal appearance, conduct in the courthouse, time management, personal safety.  In general terms, it talks about demeanor, listening to questions, nature of expert testimony, not a conversation, know your audience, et cetera.  It doesn't have anything in here about being biased or not giving truthful testimony, anything of that kind.  I'm reviewing the whole document.

But I think that you've asked Dr. Hughes if she had

P5LCcom5                          Hughes - Cross

provided any trainings of this nature, and she indicated she had given a training to advocates.  And so I think it's fair and I think Ms. Comey agrees that she can be shown the document to refresh her recollection, that she in fact gave a training to expert witnesses, and you can ask questions along those lines.  I'm not seeing a basis under Rule 403, as I now understand the objection, for this to go into evidence, which is a separate issue.

So I'm going to sustain the objection to the admission of the document.  However, you can ask questions about it, you can refresh the witness's recollection using the document, and if the witness denies any of the statements that are in this document, can you potentially introduce the document at that point or at least the portion of the document that contains the inconsistent statement.

Now, Ms. Comey, you had mentioned something about the qualification process and that, in your view, that it had been short-circuited, which certainly was not the Court's intent. Just to make sure we're on the same page, the objection and the reason why the Court had asked the defense whether there was an objection to qualification is that in the process of providing her credentials, Dr. Hughes began to provide her substantive opinions in the case, and that is perhaps inadvertent, perhaps Dr. Hughes did not heed her own advice not to have a conversation on the stand, which came up from time to time.

That was the reason for the objection, because instead of just outlining her qualifications, she began to provide her substantive opinions, some of which the defense viewed was outside of the bounds of the Court's prior ruling.  That was the issue.

MS. COMEY:  Thank you, your Honor.

THE COURT:  I will permit, however, on redirect examination if there is a missing component that would go to the Rule 702 objection that was raised after the direct examination and you feel like there's a gap that you need to fill, then can you do that and Mr. Bach can address it on recross so we have a full record when the Court considers that application.

MS. COMEY:  Thank you so much, your Honor.  And I apologize for misunderstanding the sidebar earlier.

THE COURT:  That's what happens when things come up in the heat of the moment.

MS. COMEY:  Thank you, Judge.

THE COURT:  Let's have Dr. Hughes back and then we'll have our jury back.

(Witness present)

(Continued on next page)

(Jury present)

THE COURT:  Mr. Bach, you may proceed.

MR. BACH:  Thank you, Judge.

Q.  Dr. Hughes, before the break, we were talking about a presentation you gave in 2015 to advocates for battered women, correct?

A.  Correct.

Q.  And you made that training session available in the form of a webinar, correct?

A.  I didn't make it available.  I believe the organization made it available.

Q.  And that was an organization that was funded by the U.S. Department of Justice, correct?

A.  I believe they received a grant from the Violence Against Women Act.

Q.  And you gave this presentation, and it was called Expert Witness Testimony in Cases Involving Domestic Violence, correct?

A.  Yes.

Q.  So you were giving an audience some pointers on expert appearances and expert witness testimony in cases involving domestic violence, correct?

A.  Correct.

Q.  And you were essentially training advocates for battered women to do what you do, correct?

A.   Not to do what I do, but they don't have the resources available that I do across the country, but to have certain skills and strategies that when they have to go into court, how that might be helpful to them.

Q.   And you weren't teaching them how to do clinical work with battered women, right?

A.   Not on this particular presentation, no.

Q.   You weren't telling them how to analyze whether a person had been battered or not or had a trauma bond or not, right?

A.   Correct.

Q.   You were talking to them about what to do when they get to a courtroom, correct?

A.   I don't know if that was the only thing that the presentation talked about.  I haven't seen it in a long time. But certainly how you present in court and how you can convey certain information to a judge or jury.

Q.   Well, there were four parts to the presentation, correct?

A.   I haven't seen it in a long time, so I don't recall.

Q.   Let me see if I can summarize them for you and see if this refreshes your recollection.

            MS. STEINER:  Objection.

            THE COURT:  Grounds.

            MS. STEINER:  Improper refreshing, your Honor.  He can put up the document if he wants to refresh the witness.

            THE COURT:  That's overruled.  You may proceed,

P5LCcom5                          Hughes - Cross

Mr. Bach.

Q.   There were four parts.  Part one, advance preparation for testimony.  Part two, preparing for court.  Part 3, conduct on the stand, the process.

THE COURT:  Let's stop there and you can ask the witness if her memory is at all refreshed.

Q.   Does that refresh your recollection that there were four parts?

A.   I mean, not really.  I'd like to see it.  I trust you, but I did a lot of presentations, so I can't say I recall those four parts.

MR. BACH:  Let's have Dr. Hughes view this exhibit.

MS. STEINER:  Your Honor, can I approach the witness and provide the hard copy?

THE COURT:  You may.

MR. BACH:  Thank you.

MS. STEINER:  Thank you.

Q.   Let me know when you're ready, Dr. Hughes.

A.   Yes, I'm ready.  Thank you.

Q.   Does that refresh your recollection that there were four parts?

A.   Yes.

Q.   And the fourth part was navigating direct and cross-examination, the content, correct?

A.   Yes.

P5LCcom5                         Hughes - Cross

Q.   And that's answering questions that a prosecutor might ask
on direct, right?

A.   Correct.

Q.   And advice on how to answer questions that a defense
attorney might ask on cross, correct?

A.   Defense attorney or the prosecutor?

Q.   Well, it says navigating direct and cross-examination?

A.   Yes.

Q.   So you were teaching people how to navigate both sides,
right?

A.   Correct.

Q.   On page -- I don't know what page number this is.  I think
it's 500.6, there's a slide about preparing for court, correct?

A.   I don't have numbers on mine, so --

Q.   There's a slide, preparing for court.  We can put it up on
your screen if you'd like.

A.   Yup, I have it.

Q.   There you use the word coping, right?

A.   Yes.

Q.   You're helping the experts develop coping strategies for
dealing with their nerves and their personal needs before they
go to court, right?

A.   Yes.

Q.   And that reminds us that coping is just a broad term again
for things that people do, correct?

A.  It's a psychological term for how people can deal with, you know, different types of situations, some more extreme than others.

Q.  Sometimes even experts have to cope, right?

A.  Yes.

Q.  Even defense lawyers have to cope, correct?

A.  Yes.

Q.  And so you're talking to these experts, these battered women advocates about that?

A.  Yes.

Q.  And you're telling them -- there's a page called conduct on the stand, about dealing with objections when they come up in court, right?

A.  Yes.

Q.  And dealing with questions about, would this change your mind or would that change your mind, correct?

A.  Yes.

Q.  And you and Ms. Dutton are talking to an audience of battered women advocates to tell them how they can advocate in a courtroom based on your tips and advice, correct?

A.  Yes.  And it would be Dr. Dutton, but yes.

Q.  Dr. Dutton.  I'm sorry.

And one piece of advice you have, this is on the page entitled Conduct on the Stand — The Process is know your audience, correct?

P5LCcom5                          Hughes - Cross

A.   Yes.

Q.   And the audience is the jury, right?

A.   And sometimes it's a judge.  Sometimes it's a bench trial.

Q.   You prepared a Power Point, you and Dr. Dutton prepared a Power Point for this presentation, correct?

A.   Yes.

Q.   And the presentation itself consisted of advice and recommendations that you and she gave to the battered women advocates over a period of about 90 minutes, correct?

A.   I don't recall how long it was, but if you tell me, I agree with that.

Q.   You told us you have a clinical practice, you do forensic work, but today most of your income comes from working on court-related matters as an expert, correct?

A.   Today meaning Wednesday?

Q.   Today meaning Wednesday or the last few years.

A.   No, that's not correct.

Q.   Most of your income comes from court-related work, right?

A.   That's not correct.

Q.   What is not correct about that?

A.   Maybe about 60 percent comes from the courtroom work and 40 percent from the other work.

Q.   Well, my question was, doesn't most of your income come from court-related work.

A.   I don't know how you qualified most.  More or less.

Q.   60 percent is more than 50 percent, correct?

A.   That's correct.

Q.   Let's move on.  You've now raised your rate to $600 an hour, correct?

A.   It's been that rate for a couple years, I believe.

Q.   And you've done that work for the federal prosecutors here and in Brooklyn for lower rates, correct?

A.   I don't remember.

Q.   In other words, your services aren't in enough demand that you can raise your rate, right?

A.   I raise my rate commensurate with what other experts at my level of expertise are getting.

Q.   At this time in your career, when approximately 60 percent of your income comes from court-related expert work, you're no longer riding and publishing scholarly articles in the field of psychology, correct?

A.   And I wasn't doing that for most of my career.  I'm a clinician, I'm a practitioner, that wasn't my role.

Q.   But early in your career, I like to call it the 20th century, but back in the 19s, you actually wrote some articles about combat veterans and how children experience trauma, you wrote some articles in academic books and peer-reviewed articles, correct?

A.   Right.  And that was during graduate school when that's what you're supposed to do and that's what you do.

Q.   The last 25 years, you really haven't done that kind of academic work, correct?

A.   Correct.  I'm a clinician and practitioner, that's correct.

Q.   And you've talked about the literature and the data, but in the last 25 years, you haven't really been a contributor to that literature and that data, correct?

A.   I've been contributor to the professional organizations and the training, but not in published papers, that's correct.

Q.   And you said you teach at -- is it Weill?  Right.  That's not a full-time faculty position, right?

A.   No.  Like I said, that's a voluntary faculty position.

Q.   That's a tenured position?

A.   That's correct.

Q.   And you're not expected or required to do any writing or research as part of that job, correct?

A.   That's correct.

Q.   And the Cornell website describes you not as ordinary faculty, but as a volunteer faculty member, correct?

A.   It's called a voluntary faculty member.

Q.   There's a different category in that university's employment handbook, correct?

A.   I haven't seen the handbook, but I assume that's true.

Q.   And you don't get any income from that, right?

A.   I do not.

Q.   Now, you've been doing this for nearly 30 years, I think?

A.   The this being?

Q.   Good point.  Let me rephrase the question.

You've been a psychologist since about 1998, correct?

A.   Correct.

Q.   And you've been doing court-related work to a different degree, but you've been doing court-related work since 1998, correct?

A.   Correct.

Q.   And you've been retained hundreds of times as an expert in relation to court-related work, correct?

A.   Correct.

Q.   Now, over all of those years and all of those retentions as an expert, isn't it a fact that you have never come into court, taken the witness stand, and testified in the defense of a man accused of a sex crime?

A.   That's correct.  I don't evaluate offenders.

MR. BACH:  Can I have just a moment, your Honor?

THE COURT:  You may.

(Pause)

Q.   Ms. Hughes, before testifying in this case, you had a number of meetings with the prosecutors, correct?

A.   That's correct.

Q.   And a number of those meetings were devoted to preparing your testimony in this case, correct?

A.   That's correct.

Q.  You went over questions and answers with them in advance, correct?

A.  Correct.

Q.  And you met with them about six times; is that correct?

A.  I don't have my log, I don't know, but that sounds about right.

Q.  And most of those meetings were in-person, correct?

A.  Correct.

Q.  One was a video call, correct?

A.  Correct.

Q.  Some of those meetings were well over an hour, correct?

A.  Correct.

Q.  You also had phone calls and email correspondence with them apart from the meetings?

A.  That's correct.

Q.  And you had all of these meetings, even though you didn't learn the specific facts of this case, correct?

A.  Correct.

Q.  And even though you're providing general testimony that you provided in a number of other cases before, correct?

A.  Correct.

Q.  So during these six meetings, did the prosecutors tell you -- they wouldn't tell you particular facts; is that what you're saying?

A.  I don't understand your question.

P5LCcom5                         Hughes - Cross

Q.  Let me ask you this, some of the meetings you had with the
prosecutors in this case were after the defense delivered its
opening statement, correct?

A.  I believe so.  The trial had already begun.

Q.  So some of the meetings you had were after the defense had
disclosed its theory of the case in its opening statement,
correct?

A.  Correct.

Q.  And some of the meetings you had were after certain key
witnesses had been put on the stand and asked questions by both
sides, correct?

A.  I believe so.

Q.  And the prosecutors met with you after that had occurred,
correct?

A.  Correct.

Q.  During the meetings, is it your testimony that they didn't
tell you the themes of the defense opening statement?

A.  They did not talk to me about the specifics of this case.

Q.  They didn't talk to you about specifics, but let me try and
understand what that means.  Did they tell you there are
particular issues they think you should cover?

A.  No.

Q.  You came up with that entirely on your own?

            MS. STEINER:  Your Honor, may we have a sidebar.

            THE COURT:  You may.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

(At the sidebar)

THE COURT:  Now, there hasn't been an objection, Mr. Bach, but as you know, anytime an expert witness testifies, they of course have had many, many, many discussions with that party to know what they're supposed to testify about.  Usually, people don't ask questions about meetings with the party as to whether they were given any direction as to their testimony, and I'd have to look up whether this applies in the criminal context, but isn't it the case that usually questioning about witness preparation is being a fault and a reason to suspect the credibility of a witness is usually out of bounds?

MR. BACH:  It's different in the criminal context.  I think you'll see that certain bounds were crossed here.

THE COURT:  By who?

MR. BACH:  By the other side.  I hope I didn't cross any bounds.  I will confess if I did.  But people are very careful about these things.  As you no doubt know, there are things such as consulting experts, testifying experts.  People are very careful about how they draw the lines, in criminal cases especially.  Preparation is fair game when someone's not in the privilege.  She's not in the privilege.

THE COURT:  It's not a privilege issue.

MR. BACH:  I'm not going to get into details, but I do think it's fair for me, based on the foundation that I've laid, to say, my goodness, you say you're just providing general

testimony.  Why not?  What's going on here?  That's fair.

THE COURT:  You certainly addressed that, but let me hear from Ms. Steiner.

MS. STEINER:  Your Honor, the government believes that, based on this line of questioning, defense has opened the door as to why the government needed to meet with this witness on so many occasions.  In large part, it was because the government was very concerned about cueing her testimony towards the Court's limited order, which, as your Honor knows, very cut down on substance of her expert testimony and was different from how she's testified previously, and the government was working to ensure to the best of its ability that this witness was going to be able to answer questions in that manner.

THE COURT:  And that's fair, Mr. Bach.  You don't have an issue with that, handled in the right way?

MR. BACH:  No.  I will say, I don't doubt what we're hearing, but the 3500 materials seems to suggest that those meetings were about a number of topics.  They did share the Court's rulings, but you could, have on the phone, handled.

THE COURT:  So Mr. Bach can continue with his line.  I take you don't have an objection to his questioning, you just wanted to make sure that once it's turned over to you, that you can explain the context without running afoul of any rules, and Mr. Bach has said that you can in fact do that.

MS. COMEY:  I just want to make clear we didn't want to start this line of questioning without flagging it for everyone that we think this opens the door to the fact that she is not being permitted to testify about many topics she's testified in the past, and that she was instructed to not use certain terms in the literature and that she was instructed to to not discuss certain topics because that is why --

THE COURT:  I think that's going to open the door in a different way, but I think you can say that based on rulings by the Court and legal issues in this case, there needed to be significant discussion to make sure that the testimony fell within those bounds.

MS. COMEY:  Thank you, your Honor.  That is the way we want to respond this line of cross, so thank you.

MS. SHAPIRO:  Your Honor, there's sometimes a standard, very short instruction that can be given that basically says the fact that a witness met with lawyers to prepare for the testimony is neither here nor there, and it's standard instruction.

THE COURT:  Neither side requested it.  If someone does --

MS. SHAPIRO:  I'm just saying -- all right.  That's fine.

MS. COMEY:  I think we would but --

MS. STEINER:  Thank you, your Honor.

P5LCcom5                        Hughes - Cross

(In open court)

THE COURT:  Mr. Bach, you may proceed.

Q.  Did they suggest, without getting into specific facts, topics that they wanted to cover with you?

A.  I mean, as you know, Mr. Bach, our disclosure was submitted way before the trial even started.  So the general topic areas were already outlined and discussed.  It was really, with utmost respect to the government lawyers, me educating them on what would be appropriate for me to say to educate this jury.

Q.  So you knowing nothing about the facts of this case, having spent no time working on it, needed six to eight meetings to educate these lawyers about what they should hear from you?

A.  Well, to educate how you're going to present that information in a way that it makes it digestible and meaningful.

Q.  Were you giving them a training seminar on how to present expert testimony in domestic violence cases?

MS. STEINER:  Objection.  Argumentative.

MR. BACH:  I'll withdraw it.

Q.  Now, one of the things that you did with these prosecutors was you helped them write briefs.

A.  I don't think I helped them write briefs.

Q.  Didn't they share draft --

MS. STEINER:  Your Honor, can we have a sidebar, please?

THE COURT:  Very brief.

(Continued on next page)

(At the sidebar) I'll make it shorter than the last one.

(Continued on next page)

(At the sidebar)

MS. COMEY:  Your Honor, I'm so sorry to ask for another sidebar, but I want to stop before we go down this path of introducing in front of the jury pretrial motion practice and pretrial litigation and legal issues.

THE COURT:  Where are we going?

MR. BACH:  I don't have to show the exhibits --

THE COURT:  Just tell me where you're going.  I don't understand.

MR. BACH:  She sent language, proposed language for briefs.  They shared drafts of briefs with her before submitting them to your Honor.  There are red lines that she provided when she makes legal argument.  She's working with them as part of their team to advocate in this court.  I think it shows her clear bias.  I think it shows the level of where she's coming from in this case.  I think they crossed the line by having the expert engage in that kind of process.  That's not typically happens with an expert.  You don't show them a brief on a legal issue and ask them to help you write it.  And I think it shows her bias.  It's evidence of bias.  They might not like it because it's a little unusual for an expert to be helping prosecutors write a brief.

THE COURT:  I don't have this brief.  I don't know what you're talking about.

MR. BACH:  I'll show it to you.

P5LCcom5                         Hughes - Cross

MS. STEINER:  If I can clarify, first of all, with the notice, we obviously showed it to Dr. Hughes so that she can confirm it for accuracy.

THE COURT:  You mean the disclosure?

MS. STEINER:  The disclosure.

MR. BACH:  This is not that.

MS. STEINER:  With respect to briefing in the motion in limine practice, we would submit like the legal analysis -- actually not the legal analysis.  You mean the --

THE COURT:  You mean on Dr. Hughes' report?

MS. STEINER:  The psychological, when we were describing the psychological arguments.

MS. SHAPIRO:  To exclude Bardey, as well.

MS. STEINER:  And the psychological arguments that had been made potentially by Bardey, we provided it just to understand what the statement was, and for her to confirm accuracy of any psychological arguments that we may be making. But we were not providing any factual argument or anything of that nature that was specific to the case.

THE COURT:  Assuming that that's true, Dr. Bardey is the rebuttal expert for Dr. Hughes.  So it would seem natural that Dr. Hughes would take a look at what the government was saying with respect to Dr. Bardey that's not coming in.

MR. BACH:  That's not the issue.  Let us show you document sow you see exactly what happened.

MS. STEINER:  I also would note any red line was not created by Dr. Hughes.  Again, it was in consultation, her giving input, the government would make its own red line.  It wasn't providing --

(Crosstalk)

MR. BACH:  -- documents, including emails where they say thank you for your edits.  Let us show you the documents. I'm not making this up.  And it's defense evidence.  I'll show you the documents.

(Pause)

The government provided this to us, as they should, and consistent with their obligations, with 3500 material because of statements of Dr. Hughes.  These are drafts of their brief to keep out Dr. Bardey, to keep out his rebuttal testimony.  I'm showing you a number of documents.  You can see there are red lines here.  And there are red lines throughout the brief that they're sharing with her.  And then --

THE COURT:  Let's me see.

MR. BACH:  Then there's more.  They give her a subsequent draft with further -- comes back with further red lines.  I'll give this to you in a second, your Honor.  But then there's email correspondence from the government thanking her for her edits and asking if she has any more.  I'll find that for your Honor.  But then Dr. Hughes is emailing -- this is from Dr. Hughes, an email to them about how to argue a legal

P5LCcom5                          Hughes - Cross

point about what's after cross-examination, you know, making legal arguments for them.

THE COURT:  And why, when we had the jury leave the room so that we could address the other issue, did you not raise this issue, which you must have known was going to come up.  You knew this was going to come up.  It was part of your cross-examination, so why didn't you raise it at that time so we don't have the jury sitting here?

MR. BACH:  Forgive me.  Honestly, what I'm doing was I'm trying to concentrate.  I'm doing my best.  But they produced this to us in 3500 because they knew this wasn't just government work product, these were her statements that she worked with them on this.  They knew this was an issue.

THE COURT:  All right.

MS. STEINER:  As I stated earlier, your Honor, Dr. Hughes did not input these edits and send it back to us. We would have a conversation with her over the phone and she would provide inputs and to confirm accuracy.  We wanted to make sure we went through that process.  Then the government would input red line edits.  In fact, we would produce to the defense, because we believe that, at least a portion of that, we erred on the side of caution, if any portion of that could have been part of her statement, we produced the red line.

MS. SHAPIRO:  Your Honor, regardless --

THE COURT:  Hold on.  We've got to have one person.

MS. SHAPIRO:  Sorry.

MR. BACH:  Look at this.  This is summary of a meeting with Dr. Hughes.  View draft of MIL, motion in limine, and made edits in the attached.  That's what she did in the meeting and the call with Dr. Hughes.  You can share documents on the screen, you can talk through the text.  Everyone knows how to do that.  She's reporting she reviewed the draft brief with Dr. Hughes and made edits.

MS. STEINER:  Your Honor, I want to clarify, we would send over the redacted version of any brief so, again, it would not have any of the facts of the case --

THE COURT:  What's the nature of the objection to Mr. Bach asking questions about this?  His point is this was produced as 3500 material because these were statements of Dr. Hughes.

MS. STEINER:  Right.

THE COURT:  And so why isn't Mr. Bach permitted to ask questions along those lines?

MS. COMEY:  So --

MS. SHAPIRO:  I think the judge said only one of us can talk, so I think the same rule should apply to the prosecutors, with all due respect.

THE COURT:  Fair.  Ms. Steiner.

MS. STEINER:  I mean, I think they can ask some amount of questions to do review, did the government provide documents

that you confirmed for accuracy, however they want to pose it. They can't get into any of the government's legal briefing in the case.

THE COURT:  That's true.  They can't put up as 3500 material, they wouldn't be permitted to put that up.  How are you going to get that into evidence?

MR. BACH:  I think I'm going to get in that she was consulted about briefs --

THE COURT:  Ms. Steiner said you could do that.

MR. BACH:  I want to say one of the briefs was to exclude an expert who might disagree with her.

THE COURT:  He's not going to put anything up on the screen, he's not going to show anything to the jury.

MS. STEINER:  We understand any substantive legal dispute is not something that can come in.  That, the government would object to being asked about in front of the jury.

MR. BACH:  I'm not asking about who's right and --

THE COURT:  Hold on.  Hold on.  You have no objection. As a general matter, the question that is, Dr. Hughes, did you consult with the government on certain filings that they made in this case, no objection to that?

MS. STEINER:  No objection.

THE COURT:  Then you can ask that question, and that gets you where you need to go.  I'm not permitting testimony

P5LCcom5                         Hughes - Cross

and review of various briefs in this case, especially when the briefing that we're talking about, and correct me if I'm wrong, has to do with the issue that came up about the admissibility of both Dr. Hughes' testimony and, in response, Dr. Bardey's testimony.  It would be natural in reviewing Dr. Bardey's testimony to have your own expert, who is the person being responded to, review what was being filed to make sure that nothing was being missed concerning Dr. Bardey's testimony.  I don't think that goes to bias in any way, shape, or form, but you don't have an objection to the general point about there having been some consultation with Dr. Hughes.  So that's what we're going to do and let's proceed.

          Anything further?

          MR. BACH:  I do think I have to orient this is after her disclosure was made, so there's no confusion.

          THE COURT:  Of course.  There's no objection to that. They just don't want you putting this stuff up and making a sideshow out of it, and I agree with that.

          (Continued on next page)

(In open court)

THE COURT:  Members of the jury, I was wrong about this one being shorter than the last one.  I apologize.  We're going to get some music actually put in as opposed to the white noise next time.

Mr. Bach you may proceed.

Q.  Dr. Hughes, I want to focus your attention on the time period before trial after your name was disclosed as the government's expert, and after the substance of your testimony was disclosed.  Okay?

A.  Okay.

Q.  I want to focus on the time period after that.

After that and before the trial began, the government shared with you certain draft submissions that it wanted to make to the Court for your input, correct?

A.  That directly related to me and my testimony.

Q.  Related to the subject matter of your testimony, correct?

A.  Correct.

Q.  Not just to you, correct?

A.  I was only focusing on the aspects that related to me and the substance of my testimony.

THE COURT:  If you'd like to refresh the witness's recollection, then you can put documents in front of the witness.

MR. BACH:  Sure.  Can we show the witness 3547.16 at

page 4.

Q.  Dr. Hughes, is that on your screen yet?

A.  Yes, it is.

Q.  Refer your attention --

THE COURT:  You're not referring her attention to anything.  You want her to take a second and read this?

MR. BACH:  That's fine.

THE COURT:  Dr. Hughes, take a second, read what's on the page, and let us know when you're done.

(Pause)

THE WITNESS:  Yes, I see.

THE COURT:  Let's take it down.

Mr. Bach.

Q.  Does that refresh your recollection that the advice and help you were giving to the government in connection with this submission was not just about your testimony?

A.  Well, there was about Dr. Bardey who was going to rebut my testimony, so I was giving the information about my testimony for that purpose.

Q.  And from time to time you would email the prosecutors to suggest language for their briefs?

A.  Probably.

Q.  And you were doing that to help advocate for their side, correct?

A.  I don't think I was advocating for their side.  I was

advocating for the science that was being, I believe, misconstrued.

Q. You were getting paid by the Department of Justice to do this work, correct?

A. Correct.

Q. When you gave advice on a submission to the Court, you weren't getting paid by the National Foundation of Science, right?

A. I'm not, did you say?

Q. You were not getting paid.

A. Correct.

Q. You were getting paid by the Department of Justice, right?

A. Correct.

Q. You were getting paid by the same Department of Justice that pays these prosecutors, correct?

A. Correct.

Q. And you were working alongside with them on their submissions to the Court, correct?

A. That were relevant to this testimony, correct.

Q. And that was before this case began, the trial began, correct?

A. Correct.

Q. And then you met with them again after the trial began, correct?

        And you're doing all this work on these submissions

that they're submitting to the Court knowing that you would be a witness in this case, correct?

A.  Correct.

Q.  Dr. Hughes, you're here as, I think this is in your own words, a blind expert, correct?

A.  Correct.

Q.  And that means you don't know the particular facts in this case?

A.  Correct.

MR. BACH:  I have nothing further.

THE COURT:  Ms. Steiner.

MS. STEINER:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MS. STEINER:

Q.  Good afternoon again, Dr. Hughes.

A.  Good afternoon.

Q.  I'm going to start where we left off about your review of some filings to the Court in this case; is that correct?

A.  Yes.

Q.  And is everything that you reviewed, does that all relate to the subject matter of your expert testimony?

A.  Yes.

Q.  And did you review anything that was not about the topics of your testimony?

A.  No, I did not.

P5LCcom5                        Hughes - Redirect

Q.   Did you review any factual information about this case?

A.   No, I did not.

Q.   And in fact, when you reviewed those briefs, weren't they at times redacted such that you could not look at any factual information about this case?

A.   Yes, they were.

Q.   And you were also asked on cross-examination about having several meetings with the government.  Do you recall that?

A.   Yes.

Q.   And part of what you were doing, in your own words during those meetings, was educating the government, right?

A.   Yes.

Q.   And part of what you were doing was also making sure your testimony fit within what the Court permitted of your testimony; is that right?

A.   That is correct, too.

Q.   You informed the government that you could only testify about certain subjects; is that right?

A.   That's correct.

Q.   And that was in line with the Court's ruling; is that correct?

A.   That's correct.

Q.   Was that a substantial portion of the discussions you had with government during your meetings?

A.   Yes.

Q.   I want to talk with you about some of your qualifications, Dr. Hughes.  You were asked a lot of questions on cross-examination about your various positions.  Do you recall that?

A.   Yes.

Q.   And you were asked a lot of questions about a particular presentation that you gave about 10 years ago; is that right?

A.   Correct.

Q.   And you testified that you gave that presentation once; is that right?

A.   Correct.

Q.   So one time 10 years ago?

A.   Correct.

Q.   Have you given it since?

A.   Not this particular one, no.

Q.   Since then, what have you focused on in any presentations you've given?

A.   I mean, the majority of the presentations are for psychologists or mental health professionals, but also for lawyers and judges.  I focus on training individuals to do comprehensive forensic assessments and also how to understand trauma and traumatic stress and domestic violence and rape and sexual assault.

Q.   And approximately how many trainings and presentations in the area of trauma and sexual assault have you given?

A.   I don't know.  A lot.  30 maybe on my CV.  I haven't counted.

Q.   Are they all generally about the subject matters you've just described?

A.   Generally, yes.

Q.   Do you also attend professional conferences, Dr. Hughes?

A.   Yes, I do.

Q.   Can you describe those generally.

A.   Sure.  I go to the American Psychological Association conference every year, which is in August.  I go to the American Board of Forensic Psychology once a year.  I usually try to go to the trauma conferences, the International Society for Traumatic Stress Studies conference.

Q.   And from your testimony on cross-examination, it sounds like you have published in the past, but that's not the primary focus of your current professional career; is that fair?

A.   That's correct.

Q.   When you have published in the past, what would have been the areas of your publications, generally?

A.   In the area of childhood sex abuse, which was coming out of the research when I was in that clinic.  I also published a book chapter on rape and sexual assault on adult women.  I also published a book chapter on assessment of risk.

Q.   Even though you're not currently publishing, how do you remain up to date on the current state of the academic

literature?

A.   Well, I go to conferences all the time, I attend continuing education courses.  Even when I teach a course, I have to be abreast of the literature.  I'm subscribed to too many journals that I can't read all the time and try to also coordinate with my peers and my colleagues who are also experts in this field.

Q.   Dr. Hughes, are you a board certified forensic psychologist?

A.   Yes, I am.

Q.   What does that mean?

A.   That is the highest level a psychologist can get.  It requires going through sort of rigorous testing and examination in order to meet the qualifications in order to be a board certified forensic psychologist.

Q.   Approximately how many board certified forensic psychologists are there in New York State?

A.   I think there's about 40 in New York State.

Q.   And you also testified earlier about your professional affiliations.  Can you again just describe briefly, and if you've left any out, please include them, any leadership roles you have in those organizations.

A.   As I stated in the trauma psychology division of APA, of the American Psychological Association, I've been on various roles of that board -- or that organization since its inception, and culminating in being the president last year,

P5LCcom5                            Hughes - Redirect

just rotated off the presidential term.  I also was the
president of the Women's Mental Health Consortium, which is a
New York City-based, multidisciplinary organization to help
women with their mental health across the lifespan.

Q.  And you also testified that you have a clinical practice;
is that correct?

A.  That's correct.

Q.  How long have you had a clinical practice?

A.  Since I began, signs 1998.

Q.  Approximately, how many trauma victims have you treated?

         MR. BACH:  Judge, this is all asked and answered.

         THE COURT:  It's overruled.

A.  Thousands at this point.

Q.  I want to ask you specifically as to memory.  Is that an
issue that comes up in your clinical practice?

A.  Yes, it does.

Q.  How so?

A.  Because sometimes, as I testified to, my clients especially
who have had repetitive multiple traumas can have some memories
that are just in their head and in their face and causing a
tremendous amount of distress, and then they can have these
other memories where they only have bits and pieces of it and
it's not a full coherent narrative.

Q.  Does the issue of memory and how its impacted by trauma
also come up in your forensic work?

A.   Yes, of course.

Q.   How does it come up in your forensic work?

A.   Because when you're assessing or evaluating an individual, you do want to understand how, if the trauma did impact the memory or are there other things, like Mr. Bach said, is there malingering, is someone telling me something that I know is not true.  I want to be able to buttress my understanding of a person in the literature of what we know about memory and trauma memories.

Q.   And speaking of malingering, that's a term you were asked about on cross-examination.  Do you recall that?

A.   Yes.

Q.   I believe you testified that it's defined as fabricating an emotional response; is that right?

A.   The technical definition is the false production of psychological symptoms.  So saying that you have psychological symptoms that you don't really have.  We have tests that can determine how people might try to do that.

Q.   But to be clear, it's not about fabricating any facts about what happened; is that right?

A.   That's correct.

Q.   And how common is the phenomenon of malingering in your clinical practice?

         MR. BACH:  Objection.

         THE COURT:  That's overruled.

P5LCcom5                        Hughes - Redirect

A.   Usually people don't malinger in the clinical practice because they're going there to get help.  So there's no motivation to malinger.

Q.   Is it fair to say it's uncommon?

A.   Correct.

Q.   And how about in your forensic practice?

A.   In the forensic practice, it probably is about under 10 percent, which is consistent with some of the statistics on what we see in malingering.  Again, malingering is just one. There are many types of response styles that we're trying to assess.

Q.   You were also asked about, I believe the term is prevarication; is that correct?

A.   Correct.

Q.   How would you define that?

A.   Lying.

Q.   Is that something that you're also attempting to tease out in your clinical and forensic work?

A.   I'm trying to see if the individual is giving me information that is consistent with the other data.  If someone says I was in a car accident on the FDR Drive and there was no car accident on that day at that time, then that wouldn't be an accurate memory for them to be telling me about.

Q.   Would you say that that phenomenon is common or uncommon?

A.   Lying?

P5LCcom5                         Hughes - Redirect

Q.   Yes.

A.   I think it can happen, I don't think it's particularly common, but it can happen for sure.

Q.   You were asked on cross-examination several questions about how you evaluate patients in your private practice.  Do you recall that?

A.   Yes.

          (Continued on next page)

Q.  So you were asked questions about setting the affect of an individual and the cognitive style and the personal details. Do you recall all of that?

A.  Yes.

Q.  You also testified that you're testifying as a blind expert, is that correct?

A.  That's correct.

Q.  Approximately how many criminal trials have you testified in, Dr. Hughes?

A.  Probably about half of the trials that I have testified in, if not more.

Q.  Can you give us a ballpark number?

A.  So if I testified in about 60 trials, maybe 30.  I haven't really gone through and done criminal and civil, but maybe 30 or 40 are criminal.

Q.  In all of the criminal trials that you can recall, have you ever been permitted to analyze an individual witness or victim?

A.  When I'm called as a blind expert?

Q.  When you're called as a blind expert.

A.  No.

Q.  Again, when you're called as a blind expert are you permitted to evaluate an individual witness in a case?

A.  My understanding is, no, I'm not.

Q.  And how does the fact that you can't assess an individual witness or victim in a criminal case affect your ability to

testify regarding any particular witnesses or victims in the case?

MR. BACH:  Objection.

THE COURT:  Ms. Steiner, could you rephrase, just to hopefully clarify the question.

MS. STEINER:  Of course.

Q.  Dr. Hughes, what is your role here today?

A.  Again, as I stated, my role is to impart information in my area of expertise about domestic violence and sexual assault and why individuals stay and how they cope and how they remember things.  And that's just blind testimony, giving you the knowledge and the experience that I have, having done this work for 30 years.

Q.  You have testified that in part your testimony here today is based on not only your clinical practice but also the academic literature and research, is that correct?

A.  That's correct.

Q.  What is academic literature and research based on?

A.  On scientific studies.

Q.  And what is a scientific study?

A.  A scientific study has a significant amount of what we say methodological rigor.  There are very clear rules about how we analyze data and how we see if things are significant where there are measure patterns that can emerge.

Q.  Is it often a study, a group study?

A.   Right.  We are looking at groups of individuals to render some kind of understanding, groups of individuals who have experienced domestic violence, for example, and how many of those individuals would meet criteria for PTSD.  That would be an example.

Q.   What is the value of conducting a group study, as opposed to doing an individual assessment?

A.   Well, we have to use the group studies to understand the individuals that we are going to treat.  The studies give us sort of evidence-based knowledge and evidence-based practice that then we take to our practices with individuals or in our forensic practice to make an accurate assessment.

Q.   Finally, Dr. Hughes, you were asked on cross-examination about your prior testimony for the government.  Do you recall that?

A.   Yes.

Q.   And you testified that you have been retained for the government on other occasions, is that correct?

A.   That is correct.

Q.   Across the river, for example?

A.   Yes.

Q.   Have you also been retained by defense attorneys?

A.   Yes, of course.

Q.   In fact, have you previously been retained by any of the defendant's attorneys here in this case?

P5LMCOM6                          Hughes - Recross

A.   Yes, I have.

          MS. STEINER:  No further questions.

          THE COURT:  Anything further, Mr. Bach?

          MR. BACH:  One moment, your Honor.

RECROSS EXAMINATION

BY MR. BACH:

Q.   Dr. Hughes, you testified a moment ago that you have testified for defendants in criminal cases.

A.   That's correct.

Q.   Those defendants are victims of alleged abuse, correct?

A.   Some of them are.  Some have not been.

Q.   In other words, they are people who, because of domestic violence, reached out and responded in some way, correct?

A.   In some cases, yes.

Q.   So when you say defendants, you're talking about people that you regard as victims of domestic violence, correct?

A.   Not always.  That's not correct.

Q.   But the vast majority of your defense work has been with victims of domestic violence, correct?

A.   I'm not sure that's correct.

Q.   You said that there was an attorney in this case that you worked with?

A.   That's correct.

Q.   And that was Mr. Steel?

A.   That's correct.

Q.   That was in connection with a woman who was claimed to be a victim of domestic violence, correct?

A.   That's correct.

Q.   And she was charged with shooting her husband with a gun five times?

MS. STEINER:  Objection.

THE COURT:  Overruled.

Q.   He was a victim of domestic violence, and she responded by shooting her husband in the head with a gun five times, correct?

A.   So I was not a testifying expert in that case, so I'm not comfortable answering some of these questions.  That may be confidential.

Q.   In fact, Mr. Steel decided not to call you as an expert in the case, correct?

A.   I did not testify in that case.

Q.   That's because he decided, after meeting with you, not to call you as a witness?

THE COURT:  Move on.

Q.   You were asked some questions a moment ago about scientific studies?

A.   Yes.

Q.   You've testified today not just about scientific studies but about what you call your own personal experience in your own private practice, correct?

A.   And my forensic practice, correct.

Q.   And those are not written about in journals, correct?

A.   That's correct.

Q.   Those are not group studies that other practitioners in your field can look at to learn categories and patterns, correct?

A.   That's correct.

Q.   And often when you testified you would say, I know from the literature and my own personal experience certain things, correct?

A.   Sometimes, sure.

Q.   And you didn't distinguish whether you learned about it from a scientific study in a journal or whether it's something that you inferred from talking to some of your patients in your practice, correct?

A.   Correct.  And there is remarkable consistency between what I see in the literature and what I see in my patients and what I see in my forensic practice.  They do blend together.

Q.   And we have to take your word for that because there is no public data relating to that, right?

A.   That's correct.

Q.   There is no scientific study about Dawn Hughes' patients in private practice, correct?

A.   Correct.

Q.   You were asked some questions about your understanding

P5LMCOM6                          Hughes - Recross

about whether you could speak to individual witnesses in this
case, correct?

A.   Yes.

Q.   Nothing stopped you from taking a look at witness
statements, correct?

          MS. STEINER:  Objection.

          THE COURT:  Sustained.

Q.   Nothing stopped you from reading trial transcripts in this
case, correct?

          MS. STEINER:  Objection.

          THE COURT:  Sustained.  Let's move on.

Q.   You talked about malingering in your clinical practice.  In
your clinical practice, when people come to you, they come to
you for treatment, correct?

A.   That's correct.

Q.   You're not asked to do a comprehensive evaluation for a
court, correct?

A.   That's correct.

Q.   So you're not involved in a search for the rock-bottom
truth, correct?

A.   That's correct.

Q.   I mean, what you're interested in is the person's feelings
and their emotional condition, correct?

A.   Well, I'm interested in the connection between the
experiences that they had and their feelings and their emotions

P5LMCOM6                          Hughes - Recross

for sure.

Q.  If you can get them to a state of emotional stability or emotional comfort, that's a win for your therapy, regardless of what the truth or falsity is, correct?

A.  It's a win for my patients, for sure.

Q.  Absolutely.

And in your forensic work, that's different from your clinical work, right?

A.  Correct.

Q.  And that's where malingering is important because that's where courts and lawyers and judges review the work, correct?

A.  That's correct.

Q.  And that's where you always approach things with a healthy degree of skepticism, correct?

A.  Yes.

Q.  You look at as many facts as you possibly can, right?

A.  Yes.

Q.  You consider as many data points as you can, right?

A.  Yes.

Q.  And whatever the technical definition of malingering is, you're trying to figure out if you're learning the facts and learning the truth, correct?

A.  I'm trying to figure out if everything goes together and makes sense and there is consistency across data points.

Q.  And you didn't look at any evidence or data points in this

P5LMCOM6                          Kaplan - Direct

case, correct?

A.   That's correct.

          MR. BACH:   No further questions.

          THE COURT:   Ms. Steiner, anything further?

          MS. STEINER:   No, your Honor.

          THE COURT:   Thank you very much, Dr. Hughes.

          THE WITNESS:   Thank you, your Honor.

          (Witness excused)

          THE COURT:   Government may call its next witness.

          MS. COMEY:   The government calls George Kaplan.

          May I approach to remove the items?

          THE COURT:   You may.

          MS. COMEY:   Thank you, your Honor.

GEORGE KAPLAN,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

          MS. COMEY:   May I inquire, your Honor?

          THE COURT:   You may.

          MS. COMEY:   Thank you.

DIRECT EXAMINATION

BY MS. COMEY:

Q.   Good afternoon.

A.   Hi.

Q.   How old are you?

A.   Thirty-four.

Q.   How far did you go in school?

A.   I got a bachelor's degree from the College of Charleston.

Q.   What was your first job after college?

A.   I worked at Nickelodeon for seven months.

Q.   What did you do at Nickelodeon for seven months?

A.   I was the executive assistant to the SVP of creative operations.

Q.   What was your next job after that?

A.   I was the executive assistant to the chief operating officer of Combs Enterprises.

Q.   How did you end up moving from Nickelodeon to Combs Enterprises?

A.   My boss moved from Nickelodeon to Combs Enterprises to become the chief operating officer, and I joined him.

Q.   Who was your boss?

A.   His name was Brian Offutt.

Q.   When did you move with him to Combs Enterprises?

A.   December 2013.

Q.   When did you stop working for Combs Enterprises?

A.   December 2015.

Q.   What is Combs Enterprises?

A.   Combs Enterprises is a holding company that controls the business interests of Sean Combs' companies.

Q.   Could you explain to the jury what is a holding company, please.

A.   It's a company that oversees a bunch of other companies. Often, in the case of Mr. Combs, someone who owns or operates numerous companies will have a company that is responsible and accountable for the success of the other companies known as a holding company.

Q.   In the case of Combs Enterprises could you just give us a general sense of what types of businesses fell under the umbrella of that holding company?

A.   Lifestyle businesses, liquor, television, music, clothing.

Q.   Who ran all of those businesses?

A.   Mr. Combs.

Q.   What was your first job title at Combs Enterprises?

A.   The executive assistant to the chief operating officer.

Q.   What were your duties and responsibilities in that role?

A.   They were very administrative, scheduling meetings, scheduling phone calls, scheduling executive leadership off-sites and travel, things of that nature.

Q.   Where did you physically work when you had that job title?

A.   At 1710 Broadway in Manhattan.

Q.   For about how long did you have that job title?

A.   About 10 months.

Q.   And then what was your next job title at Combs Enterprises?

A.   Executive assistant to the chairman.

Q.   Who was the chairman?

A.   Sean Combs.

P5LMCOM6                         Kaplan - Direct

Q.   How did you get that job?

A.   I was promoted.

Q.   Do you know why?

A.   I think that Mr. Combs noticed my work ethic and attention to detail and thought that I could be of value to him professionally.

Q.   So about when did you get this promotion?

A.   September 2014.

Q.   Remind us when you left the company.

A.   December 2015.

          MS. COMEY:  Can we please pull up what's in evidence as Government Exhibit 2A-101, Ms. Foster.

Q.   Do you recognize the person in that photograph?

A.   Yes.

Q.   Who is that?

A.   Sean Combs.

Q.   The same Sean Combs we have been talking about?

A.   Yes.

Q.   Do you know him by any other names?

A.   Mr. Combs, Puff Daddy, P Diddy, PD.

Q.   During your time working at Combs Enterprises, what was Mr. Combs' role at Combs Enterprises?

A.   He was the chairman.

          MS. COMEY:  We can take that down.  Thank you, Ms. Foster.

Q.  Who did you personally report to when you were Mr. Combs' assistant?

A.  I reported to Kristina Khorram, who was the director of his office.

MS. COMEY:  Ms. Foster, would you please pull up what's in evidence as Government Exhibit 2A-301.

Q.  Do you recognize the person in that photograph?

A.  Yes.

Q.  Who is that?

A.  Kristina Khorram.

Q.  The same Kristina Khorram you were just talking about?

A.  Yes.

Q.  Do you know her by any other names?

A.  KK.

Q.  What was her role within Combs Enterprises?

A.  She was the director of Mr. Combs' executive office.

Q.  So what were her job responsibilities?

A.  She essentially ran Mr. Combs' life.

MS. COMEY:  We can take that down.  Thank you.

Q.  During your time working as Mr. Combs' assistant, who paid your salary?

A.  Combs Enterprises.

Q.  Where did you physically report when you worked as Mr. Combs' assistant?

A.  To his home in Los Angeles.

Q.   Where was that during your time working for him?

A.   200 Mapleton.

Q.   Generally, what were your duties and responsibilities as Mr. Combs' assistant?

A.   I carried his bags.  I made sure that they had everything that they might need in them for wherever we were going, and also made sure that his homes were organized and had his belongings where he needed them.

Q.   You mentioned carrying bags.  What were in these bags that you carried?

A.   Clothes, medicine, computers and iPads, sometimes food.

Q.   Where did you bring these bags?

A.   Wherever we were going.

Q.   When you say we, who do you mean?

A.   Mr. Combs.

Q.   How, if at all, did your duties and responsibilities change as you continued to work for Mr. Combs?

A.   I think that as he grew to trust me a bit more, he had me around a bit more.  I don't know that day-to-day duties changed tremendously, but I think that his confidence in my ability to do the things that he wanted continued to improve.

Q.   So how did that impact the work that Mr. Combs asked you to do?

A.   It broadened the purview a little bit.  I would say I started being around more at the studio and at night and ending

P5LMCOM6                            Kaplan - Direct

nights, as opposed to only starting mornings.

Q.   What did those responsibilities broaden to include, for example?

A.   Late nights at the studio, setting up hotel rooms, late nights at the house, making sure that everything was shut down after the day was over.

Q.   On average about how many hours per week did you work as Mr. Combs' assistant?

A.   Between 80 and a hundred, I would say.

Q.   What were you paid for all of that work?

A.   I got -- I was there for 15 months.  For the first 12 I got paid $125,000, and I was also paid for the last three, but I don't know what the total was.  It was the same amount over another three months.

Q.   What time would you typically start work each morning?

A.   9:30.

Q.   How would your day start typically as Mr. Combs' assistant?

A.   Arrive at the house, make sure that the chef was ready to make breakfast, that the housekeeping staff was doing what they needed to do, make sure that the office room was organized, and then go into his bathroom and make sure that all of his toiletries and toothpastes and medications and, you name it, were available, facing forward, and ready for use.

Q.   About how long did that process take?

A.   About a half hour.

P5LMCOM6                              Kaplan - Direct

Q.   What time did you generally finish work each day as
Mr. Combs' assistant?
A.   It varied significantly.  I wouldn't say that any two days
were really the same.
Q.   What's the earliest that you can remember finishing a day?
A.   Maybe 6 p.m., 5 or 6 p.m.
Q.   What's the latest that you can remember finishing a day?
A.   6 or 7 a.m.
Q.   Why did the time vary so much, in your experience?
A.   Mr. Combs was recording a mix tape at the time, so he was
spending a lot of time in the recording studio, which
necessitated often late nights.
Q.   How did your nights typically end when you were working as
Mr. Combs' assistant?
A.   I would unpack the bags from the car, I would make sure
that the office was ready to go for the next day, I would make
sure that Mr. Combs was taken care of, that his bedroom was set
up, that his phone chargers were ready to go, and that he had
what he needed.  I would get him food if he was hungry.  And
then I would go home.
Q.   During your time working for him, what other assistants, if
any, did Mr. Combs have?
A.   He had four other assistants while I was there that I
recall.  Their names were Ezequiel Leal, Alex Plaisance, Eric
Purvis, and Dave Shirley.

P5LMCOM6                              Kaplan - Direct

MS. COMEY:  Ms. Foster, would you please pull up just for the witness the Court and the parties what's been marked for identification as Government Exhibit 2A-310.

Q.  Do you recognize the person in that exhibit?

A.  Yes.

Q.  Who is that?

A.  Ezequiel Leal.

Q.  Is that the same Ezequiel Leal that you were just talking about?

A.  Yes.

MS. COMEY:  Your Honor, the government offers this in evidence.

MR. AGNIFILO:  No objection.

THE COURT:  2A-310 will be admitted.

(Government Exhibit 2A-310 received in evidence)

MS. COMEY:  May we please publish?

THE COURT:  You may.

Q.  Just remind the jury what this person's role was.

A.  An executive assistant to Mr. Combs.

MS. COMEY:  We can take that down.  Thank you, Ms. Foster.

Would you please, Ms. Foster, pull up just for the witness, the Court, and the parties what's been marked for identification as Government Exhibit 2A-308.

Q.  Do you recognize the person in that photograph?

A.   Yes.

Q.   Who is that?

A.   That's me.

          MS. COMEY:  Your Honor, the government offers this in evidence.

          MR. AGNIFILO:  No objection.

          THE COURT:  It will be admitted.

          (Government Exhibit 2A-308 received in evidence)

          MS. COMEY:  May we please publish briefly.

          We can take that down.  Thank you, Ms. Foster.

Q.   During your time working for Mr. Combs, what, if any, security personnel also worked for him?

A.   There were a few members of his security.  There were two different teams during my time there.  When I started, it was D-Roc, Paul, and Rube.  And when I left, there were licensed security guards whose names I don't remember.

Q.   Let me break that down a bit.  Starting with D-Roc, did you know him by any other names?

A.   His first name was Damion.

Q.   And Rube, did you know him by any other names?

A.   Rubin.

Q.   And Paul, did you know him by any other names?

A.   Uncle Paulie.

Q.   Then you said that at some point there was licensed security, is that right?

P5LMCOM6                          Kaplan - Direct

A.   Correct.

Q.   About when do you remember Mr. Combs hiring what you refer to as licensed security?

A.   Some time in the second half of 2015.

Q.   Based on your experience working with and observing these security personnel, how did the new security in 2015 compare to the prior security team?

A.   They were -- I would say they were more professional, they were more polished.  They seemed to have a lot of real-time training.

Q.   When you say they in that sentence, who are you referring to?

A.   The new security group.

Q.   What other employees for Mr. Combs did you regularly interact with during your time as his assistant?

A.   The other assistants, Kristina, management, his stylist team, the chefs, and the heads of his business units.

Q.   Who within the management team in particular did you work with?

A.   James Cruz and Elie Maroun.

        MS. COMEY:  Ms. Foster, would you please pull up what's been marked for identification as Government Exhibit 2A-312, just for the parties and the witness and the Court, please.

Q.   Do you recognize the person in that photograph?

Case 1:24-cr-00542-AS   Document 570   Filed 12/19/25   Page 238 of 256   2232


A.   Yes.

Q.   Who is that?

A.   Elie Maroun.

          MS. COMEY:  Your Honor, the government offers this in evidence.

          MR. AGNIFILO:  No objection, Judge.

          THE COURT:  It will be admitted.

          (Government Exhibit 2A-312 received in evidence)

          MS. COMEY:  May we please publish that, Ms. Foster, to the jury.

Q.   Mr. Kaplan, can you please tell the jury what this individual's role was for Mr. Combs.

A.   He was on his management team.

          MS. COMEY:  We can take that down.  Thank you.

Q.   What properties did Mr. Combs own during your time working as his assistant?

A.   He had a home in Miami, he had an apartment in New York, he had a home in Los Angeles.  And then I believe he had homes in New Jersey and the Hamptons as well, though I never went to either of them.

Q.   During your time working as his assistant, who typically traveled with Mr. Combs?

A.   Assistants, security, sometimes guests or friends or stylists or other people.

Q.   During your time as Mr. Combs' assistant, how frequently

did you communicate with him each day?

A.   Multiple times a day.

Q.   And if you were apart, how would you communicate with him?

A.   Phone, text, email.

Q.   And generally what topics would you and Mr. Combs discuss when communicating multiple times per day?

A.   Things that he needed.

Q.   What kinds of things?

A.   Generally, something that might be found in the bags, whether it was clothing or potentially food from somewhere or drugs or liquor or an iPad or a speaker or anything.

Q.   During your time working for Mr. Combs, what, if any, threats do you remember him making to you?

A.   He threatened my job on occasion.

Q.   About how often do you remember Mr. Combs threatening your job?

A.   Maybe monthly.

Q.   What types of things do you remember Mr. Combs saying when he would threaten your job approximately monthly?

A.   That he was only to be surrounded by the best and that those were around him at the time were not performing to that level.

Q.   What was his tone when he said these things?

A.   Sometimes angry, sometimes motivational.

Q.   What do you remember about the first time Mr. Combs

P5LMCOM6                        Kaplan - Direct

threatened your job?

A.   It was my first week on the job, and he asked me to go to Whole Foods to get a BPA-free gallon water bottle, and they didn't have it, and I didn't want to be late coming back, so I got two half-gallon water bottles to make up the whole gallon, and that was insufficient.

Q.   How did Mr. Combs respond when you brought him two half-gallon water bottles instead of a one-gallon water bottle?

A.   He told me that I did not bring him what he asked for.

Q.   And what was his tone?

A.   He was angry.

Q.   How far away from your face was he when he said this to you angrily?

A.   He was very close to my face.

Q.   What, if any, trips do you remember taking with Mr. Combs when you worked as his assistant?

A.   Went to New York, to Miami, to Atlanta, to Washington, D.C., to Orlando, to Cabo.

Q.   How did you get to all of those places?

A.   I either flew on Mr. Combs' jet with Mr. Combs or I flew in advance on a commercial flight.

Q.   Let's break that down.  When you say you flew on Mr. Combs' jet, what do you mean?

A.   That I traveled with Mr. Combs on his jet for the trip.

Q.   Is that a private jet that he owned?

A.   Yes.

Q.   When you said you would otherwise do advance, what does advance mean?

A.   It means arriving in the city in question before Mr. Combs arrives in order to make sure that his hotel or domicile or whatever is set up properly and so he can just walk in and have it feel like home and not like no one has been there for a while.

Q.   You mentioned earlier that at some point your job responsibilities expanded to include setting up hotel rooms for Mr. Combs, is that right?

A.   Yes.

Q.   How did you set up those hotel rooms?

A.   There was a hotel bag that had seemingly what was needed for hotel stays.  So the first time I went I was just told to take the bag and essentially unpack it, so that's what I did.

Q.   Do you remember who told you to set up your first ever hotel room for Mr. Combs?

A.   No.

Q.   What was in the bag that you unpacked that first time?

A.   Clothes, a speaker, candles, liquor, baby oil, Astroglide.

Q.   After that first time, what supplies did you bring when you were directed to set up hotel rooms for Mr. Combs?

A.   I just tried to re-create the bag.

Q.   Who bought the supplies that you just described for these

P5LMCOM6                          Kaplan - Direct

hotel room setups that you did?

A.    Often I did.

Q.    How did you pay for those supplies?

A.    With my corporate credit card.

Q.    When you say your corporate credit card, what do you mean?

A.    By credit card issued to me by Combs Enterprises.

Q.    About how much notice did you usually get before you needed to set up a hotel room for Mr. Combs?

A.    About a matter of hours, probably.

Q.    Who usually instructed you to set up a hotel room for Mr. Combs?

A.    Either Mr. Combs himself or Kristina.

Q.    When you say Kristina, do you mean Kristina Khorram?

A.    Yes.

Q.    In what cities do you remember setting up hotel rooms for Mr. Combs using the supplies that you have listed for us?

A.    LA, New York, and Miami.

Q.    In what hotels in LA do you remember setting up hotel rooms using the supplies you have described for us?

A.    The Intercontinental, Mr. C, and the Bel-Air Hotel and there is another one, the name of which I can't recall.

Q.    And in what hotels do you remember setting up hotel rooms using these supplies in New York?

A.    Trump.

Q.    Where is that Trump hotel located?

A.   Near Columbus Circle.

Q.   In Manhattan?

A.   Yes.

Q.   In what hotel or hotels do you remember doing setups like this in Miami?

A.   At the SLS.

Q.   Under what name were these hotel rooms you set up for Mr. Combs usually booked?

A.   Frank Black.

Q.   Do you know where that name came from?

A.   I think it was a reference to Biggie.

Q.   How so?

A.   I think that his nickname was Frank White.

Q.   Who else, if anyone, do you remember going to those hotel rooms you set up for Mr. Combs?

A.   Nobody.

Q.   Other than Mr. Combs.

A.   Correct.

Q.   Do you remember knowing whether anyone other than Mr. Combs would go into those hotel rooms after you set them up?

A.   Yes.  My understanding was that he would have guests or a partner there.

Q.   When you say a partner, do you mean a male or a female partner, or do you know?

A.   Female partner.

Q.   About how long would Mr. Combs stay in a hotel room after you set it up for him in this way?

A.   Twelve hours to a couple of days maybe.

Q.   What would you do when Mr. Combs left a hotel room after that time?

A.   I would return to it to collect his belongings and make sure that it was in somewhat polished shape from the night before as far as any pillows or garbage or baby oil being around the room.

Q.   What do you remember seeing when you went into these hotel rooms after Mr. Combs finished his stay in them?

A.   Lots of empty bottles, empty Gatorade bottles, empty liquor bottles, and often baby oil.

Q.   Where did you see baby oil?

A.   On the table, on the floor, on the bed, around the room.

Q.   And what, if any, powder do you remember seeing in any of these hotel rooms?

A.   There was a single occasion where I came across some sort of brown crystallized powder that I didn't know what it was, and I got rid of it.

Q.   Where was it?

A.   It was on the counter of the bathroom sink.

Q.   And what cleanup, if any, did you do in these hotel rooms after Mr. Combs left them?

A.   I tidied them.  I made it as close as I could to look like

it was the way that it was found when he came in.

Q.   Why did you do that instead of having say the hotel staff do that?

A.   I think that it was implied in the role, as you continue to work closely with Mr. Combs, that protecting him and protecting his public knowledge were really important, and that was certainly nothing that I was very keen on doing.

Q.   How was cleaning up these hotel rooms connected to protecting Mr. Combs?

        MR. AGNIFILO:  I am going to object to this line, Judge.

        THE COURT:  That's overruled.

Q.   You can answer.

A.   Can you repeat the question, please.

Q.   Sure.  How was cleaning up these hotel rooms related to your job responsibility of protecting Mr. Combs?

A.   I would see often at some point during that time that people -- hotels would sell videos and images to newspapers to try to embarrass celebrities or other public figures, and that was something that I always wanted to avoid.

Q.   Did you ever personally see Mr. Combs' guests after they left these hotels?

A.   No.

Q.   During these hotel stays, what would you do?

A.   I would go home.

Q.   Why would you go home?

A.   I would take a rest.

Q.   About how often would Mr. Combs contact you during one of these hotel stays?

A.   Infrequently.

Q.   When he did contact you from these hotel stays, how did he contact you?

A.   Usually, text or phone.

Q.   What do you remember Mr. Combs asking you to do on the few occasions he reached out to you during one of these hotel stays?

A.   Bring him something that he did not have.

Q.   What kind of things do you remember him asking you to bring?

A.   Food, clothes, and, on a couple of occasions, drugs.

Q.   What did you do in response?

A.   I acquiesced.

Q.   Meaning?

A.   I did what he asked me to do.

Q.   Picking up on drugs, what, if any, drugs did you personally see Mr. Combs possess during your time working as his assistant?

A.   He had a medicine bag, a Dopp kit that had tons of different pills, prescriptions, other things in there.

Q.   What drugs do you remember seeing inside of that med kit?

P5LMCOM6                    Kaplan - Direct

A.  Advil, Tylenol, ketamine, Wellbutrin.

Q.  Any others?

A.  None specifically.

Q.  What, if any, other illegal drugs do you remember seeing
Mr. Combs possess?

        MR. AGNIFILO:  I am going to object to the term
illegal, Judge.

        MS. COMEY:  Fair enough.  I'll rephrase.  I apologize.

Q.  Other than over-the-counter drugs like Advil and Tylenol,
what, if any, other types of drugs do you remember seeing
Mr. Combs possess during your time as his assistant?

A.  Nothing beyond that bag -- nothing beyond what was in the
med bag.

Q.  So you mentioned ketamine, Advil?

A.  Tylenol, Wellbutrin.  I'm sure that there were other things
in the bag specifically, but I wasn't necessarily going through
the prescriptions.

Q.  You mentioned there were times that Mr. Combs asked you to
get drugs for him.  What drugs did he ask you to get for him?

A.  He never asked me specifically to get a certain kind of
drug.  There were two occasions where I picked up drugs on his
behalf.

Q.  Do you remember on either occasion what kind of drug you
picked up?

A.  Yeah.  One time were MDMA.

Q.   Was that the only time that you were ever aware of him possessing MDMA, or were there other times you were aware of him possessing MDMA?

A.   That was the only time that I was aware.

Q.   You said there were two times that you personally picked up drugs for Mr. Combs?

A.   Correct.

Q.   Who asked you to pick up those drugs?

A.   Mr. Combs.

Q.   Where did that happen?  In what cities do you remember these things happening?

A.   LA and Miami.

Q.   Let's start with Miami.  Where were you when Mr. Combs instructed you to pick up drugs for him?

A.   Somewhere at his house.

Q.   Where was Mr. Combs?

A.   At his house.

Q.   What did Mr. Combs say to you?

A.   He gave me a number to call and some cash to pick up what he wanted.

Q.   What did you do with the phone number?

A.   I called it.

Q.   And then what happened?

A.   The guy came, and I paid him for the drugs.

Q.   You say the guy came?

A.   To the house.

Q.   What do you mean by that?

A.   To the outside of the house.

Q.   The person you had called came to whose house?

A.   Mr. Combs' house.

Q.   Did you meet him?

A.   Yes.

Q.   What did you give this person?

A.   Cash.

Q.   Where did the cash come from?

A.   Mr. Combs.

Q.   And what did this person give you in exchange?

A.   A bag of pills.

Q.   What kind of pills did you understand them to be?

A.   MDMA.

Q.   What did you do with that MDMA?

A.   I gave it to Mr. Combs.

Q.   Now let's talk about the time in LA.  Where were you when Mr. Combs made this request of you?

A.   At the Bel-Air Hotel.

Q.   What did Mr. Combs say to you?

A.   It was a very similar exchange as far as call this number, go meet this person, pick this up, and bring it back to me.

Q.   So what did you do?

A.   That.

P5LMCOM6

Q.   When you called the number, what did you arrange to do?

A.   I arranged to meet the person in Hollywood.

Q.   After that phone call, where did you go?

A.   Hollywood.

Q.   And what happened in Hollywood?

A.   I gave him money.  He gave me a bag.  I don't know what the bag was.

Q.   By him, do you mean the person you had called on the phone?

A.   Yes.

Q.   Was this the same person who had dropped off the MDMA in Miami or a different person?

A.   A different person.

Q.   What did you give this person when you met him in Hollywood?

A.   Cash.

Q.   Where did the cash come from?

A.   Mr. Combs.

Q.   What did you get in exchange?

A.   A bag.

Q.   What did you do with that bag?

A.   I gave it to Mr. Combs.

        MS. COMEY:  Your Honor, I see we are after 3:00.  I'm happy to stop or keep going.

        THE COURT:  How much time do you have left?

        MS. COMEY:  I have well beyond five minutes, your

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P5LMCOM6

Honor.  I think I have at least half an hour.

THE COURT:  Let's stop for today.  We will come back tomorrow.

Thank you very much.

Members of the jury, I'll give you the same instructions I give you every day.  Don't talk to each other about the case.  Do not talk to anyone in this courtroom, including the lawyers, the attorneys, anyone else.  That means in-person conversations, electronically, anything.  And please have a great evening.

We will see you here tomorrow morning at 8:45 for the last day of the week.  We will see you then.

All rise for the jury.

(Jury not present)

THE COURT:  Mr. Kaplan, we will see you here tomorrow at 9.

THE WITNESS:  Thank you.

THE COURT:  Please be seated.

Ms. Comey, any issues to address from the government side?

MS. COMEY:  I don't believe so, your Honor.  No. Thank you.

THE COURT:  There is the one issue concerning the exhibit that Ms. Slavik had raised.  Is there anything further along those lines or have there been any further discussions?

P5LMCOM6

MS. SLAVIK:  My understanding is that the defense continues to object to its admission.

MR. AGNIFILO:  Yes, Judge.

THE COURT:  You took some time.

MR. AGNIFILO:  I really didn't.  We have had testimony since the second I got the exhibit.

THE COURT:  We will address that tomorrow at 8:30.

MR. AGNIFILO:  That's right.  I'm planning on submitting maybe a short letter by the 10:00 deadline.

THE COURT:  Ms. Slavik, just so I understand, what is the relevance of the email chain, now that I have read it?

MS. SLAVIK:  Yes, your Honor.  The email chain is relevant to multiple allegations in the indictment, specifically related to Count One, the defendant's assault of women and efforts to cover up those assaults.

MR. AGNIFILO:  Your Honor, can I put something on the Court's radar screen, a bigger issue.  This all relates to Gina, who is out of the case.  Gina is not coming.  So I think the relevance of this has plummeted dramatically since we are not going to be having Gina as a witness.

MS. SLAVIK:  Your Honor, Gina is very much a part of this case.  We have heard plenty of testimony on Gina.  She is certainly relevant.  The jury has heard plenty about Gina.  In fact the defense has made her a central issue in the relationship between the defendant and Ms. Ventura.

P5LMCOM6

Furthermore, Gina is identified in the indictment, and the government is entitled to present proof related to her.

MR. AGNIFILO:  My point is not an indictment issue. The government can call Gina if it wants to.  It might be difficult.  It might be hard to do.  They are the United States of America.  They can get Gina into this courtroom if that is what they want to do.  They are choosing not to.

THE COURT:  I am not sure why that means the exhibit is inadmissible.

MR. AGNIFILO:  Because they are putting in evidence -- this is all going to be part of the letter that I am going to submit to the Court.  We are now in more 403 land than we are in hearsay land on this.

THE COURT:  Understood.

Anything further from the government?

MS. SLAVIK:  Just one thing to flag, your Honor.

Obviously, we will continue with Mr. Kaplan's testimony tomorrow.  The government plans to call, I believe, five additional witnesses tomorrow.  They should all be relatively short.

If the government finishes all five witnesses tomorrow, our next batch of witnesses we expect to have to travel across the country.  If we manage to get through all five witnesses tomorrow before the end of the 3:00 break, I think the government would, instead of calling its next

P5LMCOM6

witness, just ask to end a little bit early on Thursday to plan for the travel.  If that's the case, we will be well ahead of schedule.  I think ending early one day should not set us off schedule at all.

THE COURT:  Starting everyone's holiday early.

MS. SLAVIK:  I'm hoping.

THE COURT:  What is the order of witnesses for tomorrow after Mr. Kaplan?

MS. SLAVIK:  After Mr. Kaplan finishes it will be Scott Mescudi, then Mylah Morales, then a hotel witness.  I can provide your Honor with his name.

THE COURT:  That's fine.

MS. SLAVIK:  Then Josh Croft and then Tony Abrahams.

THE COURT:  Thank you.

Mr. Agnifilo, anything from the defense?

MR. AGNIFILO:  No, nothing from us, Judge.

I spoke too soon.

MS. SHAPIRO:  I just wanted to alert the Court, we are going to put together a letter in support of that motion to strike.  I just wanted to let you know.  We have to get the transcript first.  We will probably submit it tomorrow rather than tonight.

THE COURT:  Thanks for putting that on my radar.

We will see everyone here at 8:30 tomorrow.

(Adjourned to May 22, 2025 at 8:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                         Page

 GERARD GANNON

Direct By Ms. Smyser . . . . . . . . . . . . . .2010

Cross By Ms. Geragos . . . . . . . . . . . . . .2033

DAWN HUGHES

Direct By Ms. Steiner  . . . . . . . . . . . . .2068

Cross By The Court . . . . . . . . . . . . . . .2126

GEORGE KAPLAN

Direct By Ms. Comey  . . . . . . . . . . . . . .2141

Redirect By Ms. Steiner  . . . . . . . . . . . .2204

Recross By Mr. Bach  . . . . . . . . . . . . . .2216

GEORGE KAPLAN

Direct By Ms. Comey  . . . . . . . . . . . . . .2221

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 1B-142  . . . . . . . . . . . . . . . . . . . . .2011

 1306  . . . . . . . . . . . . . . . . . . . . . .2014

 1B-130 through 1B-135, 1B-137, 1B-138,  . . .2015

          1B-147, 1B-148, 10A-103-A1,

          10A-103-C1 through 10A-103-C3,

          10A-103-D1, 10A-103-E1,

          10A-103-F1, 10A-103-G1,

          10A-103-H1, 10A-103-I1 through

          10A-103-I4, 10A-103-J1 through

                    10A-103-J3, 10A-103-K1,

                    10A-103-L1, and 10A-103-M1

  1B-115  . . . . . . . . . . . . . . . . . . .2029

  1B-118  . . . . . . . . . . . . . . . . . . .2030

  1B-116  . . . . . . . . . . . . . . . . . . .2030

  1B-117  . . . . . . . . . . . . . . . . . . .2032

  1B-151, 1B-152  . . . . . . . . . . . . . . .2032

  2A-310   . . . . . . . . . . . . . . . . . . .2229

  2A-308   . . . . . . . . . . . . . . . . . . .2230

  2A-312   . . . . . . . . . . . . . . . . . . .2232

                    DEFENDANT EXHIBITS

  Exhibit No.                          Received

  313   . . . . . . . . . . . . . . . . . . . .2046

  305   . . . . . . . . . . . . . . . . . . . .2050

  312   . . . . . . . . . . . . . . . . . . . .2051

  303   . . . . . . . . . . . . . . . . . . . .2054