P5MWCOM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

v.                              24 Cr. 542 (AS)

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

                Defendant.              Trial

------------------------------x

                                        New York, N.Y.
                                        May 22, 2025
                                        8:45 a.m.

Before:

                    HON. ARUN SUBRAMANIAN,

                                        District Judge
                                        -and a Jury-

                        APPEARANCES

JAY CLAYTON
        United States Attorney for the
        Southern District of New York
BY:    MADISON R. SMYSER
        EMILY A. JOHNSON
        MAURENE R. COMEY
        MEREDITH FOSTER
        MITZI STEINER
        MARY C. SLAVIK
        Assistant United States Attorneys

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:  MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
SHER TREMONTE
BY:  ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND

ALSO PRESENT:
LUCY GAVIN, AUSA Paralegal Specialist
SHANNON BECKER, AUSA Paralegal Specialist
RAYMOND MCLEOD, Defense Paralegal Specialist

(Jury not present)

THE COURT:  Mr. Driscoll, hopefully you got the Court's email about the summary charts.

MR. DRISCOLL:  Yes, Judge.

THE COURT:  I may have missed the email.  I don't think I have them.

MR. DRISCOLL:  Right.  I thought the government had provided them when they provided all exhibits.  I will work to get them to you this morning.

THE COURT:  That's not a problem.  Is that an issue for today?

MS. COMEY:  It is not an issue for today.  If it is all right with your Honor, we would like to put in a response over the long weekend.  We do not expect to offer any of these summary charts for at least a week, so I think we have time.

THE COURT:  Perfect.  Resolved.  We are making progress.

On 629(a), is there going to be some foundation laid for what occurred on October 9, 2015?  Because I agree with the government that the defendant's argument as to the hearsay nature of the statements is weak.  However, there is a basic 401, 402, 403 issue, given that if you just read the text exchange, it is hard to understand what these two individuals are talking about, and neither Uncle Paulie nor Mr. Combs, unless he elects to do so, is going to be testifying to explain

what is occurring in this text message.

So unless there is some other witness or some other evidence that is going to provide context for what occurred and what these two individuals are talking about, then the defense would seem to have a viable argument that there is just a failure to establish by a preponderance of the evidence the relevance and probative nature of the discussion.  And, given that, their point is that given the context of the discussion and the language used, there is a serious risk of unfair prejudice.

I guess it's a long-winded way of saying, what's the evidence going to show leading up to the offer of this into evidence?

MS. SLAVIK:  Yes, your Honor.

First of all, Gina, the subject of the discussion between Uncle Paulie and the defendant, has been brought up numerous times, as your Honor is well aware.

THE COURT:  That's true, but not exactly in this way.

MS. SLAVIK:  What I'd like to point out for your Honor is that the witness will testify first today.  That's George Kaplan.  He will testify that he witnessed an incident of violence between the defendant and Gina in 2015.  And for that reason, your Honor, I think the government can establish by a preponderance the relevance --

THE COURT:  Is it going to be in the fall of 2015 or

something that would match up with the text exchange that we are talking about?

MS. COMEY:  I'm happy to proffer, your Honor.

He doesn't remember exactly when.  But what he will say is it was the final straw for him and the reason he put in his notice to leave, and then he left a couple months later. So he doesn't remember the exact time when it happened, but I think the inference is that it happened around the time of these messages.

MR. AGNIFILO:  Can I add to that.

Unless his testimony is different than what was in his 3500 material, what he is going to say is that he saw Mr. Combs throwing apples at Gina, and he wasn't sure that any of the apples struck her.  That's going to be his testimony.  I don't know that that is -- that without a date is a far cry from this text exchange.

THE COURT:  Let's see what happens because all I will say is, it is helpful to understand that Mr. Kaplan's testimony is going to lay some of the foundation for the introduction of this text exchange.

My understanding, Ms. Slavik, you are not going to offer this exhibit through a witness.  You are going to do it after Mr. Kaplan's testimony.

MS. SLAVIK:  That's right, your Honor.

THE COURT:  Then we would be able to take a beat, and

we can have a discussion as to whether it would be admissible or not.  In fact, it doesn't need to come in immediately after Mr. Kaplan's testimony, is that right?

MS. SLAVIK:  Not necessarily, your Honor, but the government would prefer to present it after Mr. Kaplan's testimony.

THE COURT:  All I'll say is, whatever you are going to do to try to get this exhibit in, you should do it through Mr. Kaplan, and we will see where we are.

Mr. Agnifilo, I understand you will be cross-examining the witness and making some of the points that you're talking about.

MR. AGNIFILO:  Correct.

My worry is that the government associating this text exchange, which has nothing to do with Mr. Kaplan, with the apple-throwing event without a date is an artificial suggestion.  The fact that they want to put it in in connection with Kaplan's testimony, even if only soon thereafter, is itself just an artificial construct because Mr. Kaplan knows nothing about this telling Uncle Paulie or this event here.

But I agree with your Honor.  Let's see how the evidence comes out, and at the end of that we can revisit it.

THE COURT:  That takes care of that for the moment.

Now, as to Mr. Mescudi.

Mr. Steel, with the exception of Mr. Mescudi's

speculation as to the reason for the 2015 apology, which I think the explanation of why Mr. Combs was apologizing would be out and would call for speculation, as to the other testimony, the government has responded and indicates, first, as to the conversation between Ms. Ventura and Mr. Mescudi that that would be admissible under the exception for state of mind and effect on the listener, and they say that, given the context of the discussion and the other evidence in the case, the probative value would outweigh the unfair prejudice.

As to Mr. Mescudi's discussion with Ms. Clark, it would seem to plainly fall within 803(1) through (3).

And as to the understanding from Mr. Mescudi that the defendant was involved in the arson, if he is testifying as to his reason for attending the meeting at the Soho House and he is just explaining why he did that, and that is his understanding, and not speculating as to anyone else's understanding, then it would seem to be admissible and not run afoul of Rule 403. I'll lay that out for you, and then I'll hear your response.

MR. STEEL: Good morning, your Honor. Good morning, everyone.

THE COURT: Good morning. Sorry.

MR. STEEL: Your Honor, I was listening intently, and it sounds like you said that the witness cannot speculate and say that Mr. Combs committed either the burglary or the arson.

That's what I heard the Court say.

THE COURT:  If I'm understanding right, he is going to say that the reason why he initiated the meeting at the Soho House was because he believed that Mr. Combs was responsible for the events that took place, the arson.  So that's why he wanted to attend the meeting, because he wanted to squash it. If he's explaining why he did the meeting, then he is just giving -- that's why I did it.  But he is not saying he did it or he told me that he did it or I thought he said that he did, something of that nature.

Ms. Johnson, am I correct about that?  It's like, why did you go to this meeting?  Here is why I went.

MS. JOHNSON:  Right.  I expect Mr. Mescudi will testify that he, after the arson, felt compelled to set up the meeting to have a discussion about this, and that's -- that is the reason he reached out to Mr. Combs and set up this meeting.

THE COURT:  Because he was scared.

MS. JOHNSON:  Yes.

THE COURT:  Wanted to end it.

MS. JOHNSON:  Exactly.  Because there was a Molotov cocktail in his car.  I don't think we will belabor the point.

THE COURT:  That's not speculation.  That's like what he thought.

MS. JOHNSON:  That's what he thought when he set up the meeting.

THE COURT:  That would be in, but only to that extent. As to the 2015 apology, to the extent that Mr. Mescudi was going to testify that, well, I thought the reason he was apologizing to me is because he knew he did that thing back in 2012, that's out.  He can just say that there was an apology, and the jury can draw whatever inference it wants from that apology.

MR. STEEL:  Understood.  Thank you.  I'm sticking with my objection, but I heard the honorable Court's ruling.

Can I go on to another topic?

THE COURT:  Yes.

MR. STEEL:  I think that if the government is going to do this -- they say that the witness' dog was put behind a closed door on or around December 22 of 2011 -- I just want to make sure that they are not going to elicit testimony from him that the dog acted differently thereafter, somehow traumatized. I don't know if they are objecting to it.  I thought they weren't, but it's in their notes from yesterday I just got.

MS. JOHNSON:  Your Honor, Mr. Mescudi will certainly testify about the location of the dog when he came home because that's relevant to his understanding of whether someone had been in his home or not because his dog had not been locked up when he left his home.  I do think his observations about his dog after are relevant to the effects of this break-in on him. That is the primary thing.

THE COURT:  He is not going to testify about what the dog thought.

MS. JOHNSON:  He is not going to testify what the dog thought, certainly not.  He is not a dog psychic.

THE COURT:  He is going to say that the visible demeanor of the dog was different than it was usually and, given that it's his dog, he would know what the dog usually acts like.

MS. JOHNSON:  Correct.  He will say after the break-in the dog was jumpier and scared, more scared.

MR. STEEL:  I will object.  I don't see why we are getting into what a dog --

THE COURT:  Let the record reflect the smirk on Mr. Steel's face.

MR. STEEL:  I can't imagine that this is something that should come into this trial.

THE COURT:  It's a 403 objection?

MR. STEEL:  Yes.

THE COURT:  You understand why the event in general is relevant, right, just the general event that we are talking about.

MR. STEEL:  Unfortunately.  I got that.

THE COURT:  Why wouldn't it be part and parcel to that?  When he comes in and he sees that the dog is behind the door, and he has let the dog out, and then the dog is jumpy and

acting strange, why wouldn't that just be part of the event?

MR. STEEL:  I don't think I would have a problem with that.  That's not my understanding.  It's afterwards, day two after the event.  The next year the dog was never the same. The dog urinated on the floor.  Why do we need that?  Now we traumatized the dog.  That's really what the government is doing.  There are some dog lovers, potentially, on the jury.

THE COURT:  I agree.  It's a serious issue.

Ms. Johnson, I think there is a fair point.  What are we talking about here?  Is he going to say that when he got home and he opened the door, he noticed that the dog was acting differently, or is it going to like, now, even now, my dog acts like differently?  At a certain point it becomes kind of far afield.

MS. JOHNSON:  I agree, your Honor.  Unfortunately, the dog is no longer with us.

THE COURT:  Sorry to hear that.

MS. JOHNSON:  He will testify that I'm happy to cabinet it to the immediate aftermath.  I think he will say: When I came home, the dog was behind this locked door.  I had not put the dog there.  The dog has free rein of my home and the dog acted differently thereafter.

THE COURT:  In the immediate aftermath.

MS. JOHNSON:  Um-hum.

THE COURT:  In the immediate aftermath I think is part

of the event and that would be fair game.

But, Mr. Steel, I hear you. There should be no questioning, and I'll stop any answers that are about the long-term consequences to the dog. I hear your point on that.

MR. STEEL: Thank you.

I believe, your Honor, with regards to after the Porsche, it's a vehicle that has the fire device in it, I believe that it's out. But please make sure that I'm tracking this honorable Court that the witness, you're allowing to say after that, I wanted to meet with Mr. Combs. But you are not -- you are including that but you are not including that Mr. Combs must have hired someone to commit that. I understand that's out. That's in the note from yesterday as well, but I think you made it clear. Nobody should speculate that Mr. Combs was behind this.

THE COURT: I think the questioning needs to be precise. What was in your head when you made that meeting? If he is saying the reason why I made the meeting was X, Y, or Z, then that's fair game.

I think that Ms. Johnson is going to frame the questions and make sure that there isn't speculation about things like, well, he must have hired some squad to go do this, etc. Right?

MS. JOHNSON: Correct. I only intend to ask the witness why he set up the meeting.

THE COURT:  This is one of those situations where, depending on the framing of the question and your control of the witness, it should be fine.  But if the questions are too open-ended and the witness starts engaging in speculation, then I'll have to step in and stop it.

And, Mr. Steel, I'll understand you to object at that time.

MR. STEEL:  I'm objecting now.  I know I preserved it.  But I don't think that his state of mind -- I understand this happened, and therefore I was moved to meet with Mr. Combs.  I think it should be ended there.  The addition -- and the reason I was moved to meet with Mr. Combs is because I speculate that he was behind this attack on my car.

THE COURT:  How would you explain why he was doing the meeting in the first place?  How do you connect the dots without explaining what the reason was to have a meeting?

MR. STEEL:  I think that it's self-explanatory.  This event happened at my house with the car, and I thought it would be prudent to meet with Mr. Combs.

THE COURT:  Even though he had nothing to do with it.

MR. STEEL:  Just leave it like that.

THE COURT:  Is he just like a person who could figure it out, like sleuth it out?

MR. STEEL:  Because introducing it is so prejudicial.  It's his state of mind on total speculation.  It's character

evidence and it's 403.  I don't see --

THE COURT:  The question is whether it's unfairly prejudicial.

Ms. Johnson, what is the probative value of the meeting and the reasons why Mr. Mescudi arranged the meeting?

MS. JOHNSON:  The meeting is probative because in the aftermath of the meeting the targeting of Mr. Mescudi stops.  He meets with Mr. Combs.  They talk it out.  There is no more break-ins, there is no more Molotov cocktails in his driveway, and he sets up that meeting because of these things that have happened over the last few weeks.

THE COURT:  Meaning there is an act of intimidation by the defendant, this is the government's narrative, and then there is this meeting and so it's a submissive act.  Mr. Mescudi goes and has this meeting, and we will hear what happened at the meeting, and the reason he did that was to squash this because he could not have that continue in the future.

MS. JOHNSON:  Exactly.

THE COURT:  So the question is unfair prejudice.

Ms. Johnson has explained why this is probative.  It may be prejudicial in the sense that all probative evidence is prejudicial if it goes to the government's theory of the case, but I don't see the unfair prejudice if we keep the limitations if the way that we have discussed here.

I'll certainly police those lines, and, Mr. Steel I'll hear you to object at the appropriate juncture.

But you have made the objection, so I have overruled it in the way that we have discussed here, so we will see how it comes in.

MR. STEEL:  I understand the rules, and I respect what the Court said.  If you can just ponder this, I don't mean to belabor it.  If I could just have one moment.

THE COURT:  Sure.  Give me something to think on.

MR. STEEL:  To say, oh, and then everything stopped thereafter, I didn't get any more harassment or vandalism to my home or my property, he can say that.  I don't have a problem.

My problem is him saying, and my strong belief, my belief is that Mr. Combs was behind this.

That is a problem.  The government can absolutely close on that and draw inferences.  The jurors may do that themselves.  But to have a witness without any type of foundation to say that Mr. Combs in his mind definitively did this, I don't see the prejudice -- I do see the prejudice as being highly, highly prejudicial to my client and that's my basis.

I'm not trying to belabor the point.  I heard what the honorable Court said.  But, your Honor, having a witness say, I'm a victim, my dog is a victim, this has disrupted my life and Mr. Combs had to be behind it, without any evidence, I

don't think is proper.

THE COURT:  I thought one of the things that was raised by the government was the discussion with Ms. Clark.

What are we talking about here, Ms. Johnson? Mr. Steel says there is no basis for Mr. Mescudi to speculate that the defendant was involved in any of this, so he shouldn't be able to speculate on that with reference to the Soho House meeting.

MS. JOHNSON:  With respect to the break-in I, think there is absolutely no speculation involved.  Mr. Mescudi has a phone call with Ms. Clark who says, I'm in the defendant's car in front of the house and he is in your home.  He then has a call two times in the immediate aftermath with Mr. Combs, one of which where Mr. Combs says he is in his home.  So I don't think there is any speculation with respect to the break-in.

With respect to the Molotov cocktail incident, Mr. Mescudi will say that he was rebuffing the defendant's attempts to talk to him after the break-in, and then there was this escalation.  And the escalation, in terms of his car being lit on fire in his driveway, caused him to want to end this because he was concerned about where this could go.

I don't intend to elicit anything -- I do not think that it will come through the way maybe my notes from the meeting reflect last night.  But there is no other context for why he had this meeting at the Soho House unless he is allowed

to explain that I had this meeting because I was concerned with this pattern of activity.  He will also say that there was no one else.

THE COURT:  I understand that.

And, Mr. Steel, you heard what Ms. Johnson just said. I think what you're principally worried about is something further, which is that maybe what Ms. Johnson says now is fine, but when he gets on the stand he is going to go further and say, here, let me tell you what happened.  He and his hired security staff, they went to my car, they put this thing in, they wanted to blow it up, etc., right?

MR. STEEL:  Yes.

THE COURT:  Let me just make sure that I'm correct, Ms. Johnson.  It's not going to be that.

MS. JOHNSON:  No.

THE COURT:  It's not going to be that.  If it starts getting into that, then I will stop it.

MR. STEEL:  OK.

THE COURT:  I understand what Mr. Steel is saying. You don't need to really go deep into that to understand the sequence of events.  Mr. Steel doesn't object to the sequence of events, so that should get you most of the way there.

In terms of just understanding why he scheduled a meeting with Mr. Combs, I think he has to explain like why he did that.  And then I think Mr. Steel is just saying, it can't

be from that point to like an indictment of Mr. Combs and an explanation of what he thought, like all the things that he thought Mr. Combs did.  That's fair.

But I'm hearing from you that's not going to happen, so I think we are good to go on that point.

Anything further?

MR. STEEL:  If it's OK with this honorable Court, I gave to the government already, just in case it's easier and make it faster, I made two small booklets of cases, if he needs to be impeached or refresh his recollection.

THE COURT:  Of course.  Thank you for doing that.

MR. STEEL:  Can I just approach now, so I don't have to do it when the next witness comes in --

THE COURT:  Absolutely.

MR. STEEL:  -- and give it to his honorable Court's courtroom deputy.  And then when the witness comes on, it can go in front of him.

THE COURT:  That's perfect.

MR. STEEL:  Thank you, your Honor.

Anything further, Ms. Comey?

MS. COMEY:  As to Mr. Kaplan, your Honor, I don't think we got your Honor's ruling on our hearsay objection to Defense Exhibit 402 and our 403 objection on Defense Exhibit 406.  The 402 was the text exchange between Mr. Kaplan and Ms. Ventura during which she says:  I am going to be in Boston.  I

am going to be on my own. And then she asks if he knows where she can find drugs. And we had had that hearsay objection to the first two statements.

THE COURT: That's fine.

As to Exhibit 406, that is admissible, including the message that precedes the photograph.

As to Exhibit 402, let me ask the defense -- I think the government's point is well taken that as to the statements that Ms. Ventura was in Boston and that she was on her own, those statements would be put in -- they go to the truth of the matter asserted. However, I didn't hear the government have any objection as to Ms. Ventura's request for drugs in Boston and then the response from Mr. Kaplan concerning getting those drugs. So there is no objection to that, so you can get that in. You can make any arguments you want based on the fact that Ms. Ventura was asking for those drugs independently, without Mr. Combs in the conversation.

MR. AGNIFILO: What I think I am going to do, Judge, just to hopefully make it easier, I'll ask him if he remembers the event. He probably won't. It's a very detailed specific thing. Assuming he says he doesn't remember it, I'll show him the chat to refresh his recollection. If he remembers it, I'll ask him about it. If he doesn't remember it, only then would I put in the part -- just so I'm clear, I see that your Honor, I think, is leaning a certain way, and I don't need to fight this

battle.

THE COURT:  I think like the last two pages of the exchange are not objected to.  It's really the statements from Ms. Ventura that she was in Boston and that she was there on her own.  And, by the way, it's not really clear whether Ms. Ventura was saying that she was on her own in Boston or was going to be on her own in New York City when she was going to be there.  There are some issues with that part of the exchange.

MR. AGNIFILO:  Let me see if I can do it the easy way, without putting it into evidence; and if I can, I will.  If I have to put that portion into evidence, I will put that portion into evidence.

MS. COMEY:  Finally, with respect to Mr. Kaplan, I failed to put this on the record the other day, but the parties conferred and agreed that Defense Exhibit 400 and 401 would not be offered because they contain double hearsay.  So my understanding is they may be used to refresh or impeach, but they are not going to be offered.

MR. AGNIFILO:  That's correct.

THE COURT:  Very good.

MS. COMEY:  Thank you, your Honor.

THE COURT:  Let's have Mr. Kaplan back on the stand.

MS. COMEY:  Thank you, your Honor.

THE COURT:  Welcome back.

(Jury present)

THE COURT:  Welcome back, members of the jury.

Mr. Kaplan, you understand you're still under oath.

THE WITNESS:  I do.

THE COURT:  Ms. Comey, you may proceed when ready.

MS. COMEY:  Thank you, your Honor.

GEORGE KAPLAN, resumed.

DIRECT EXAMINATION (cont'd)

BY MS. COMEY:

Q.  Good morning, Mr. Kaplan.

A.  Good morning.

Q.  I would like to pick up where we left off yesterday talking about some of your job responsibilities and tasking that you carried out as Mr. Combs' assistant.

How often, if at all, did you carry cash for Mr. Combs when you were his assistant?

A.  Very infrequently.

Q.  How would that come about on those infrequent occasions?

A.  There was an occasion where security in New York gave me a bag of cash to hold while we were in the air on a jet, on Mr. Combs' jet, and then land and hand it to the security who was on the ground meeting us.  And then --

Q.  Let me pause and just ask you about that one, if that's OK. Do you remember about when that was?

A.  Sometime in 2015.

Q. Do you remember who the security personnel were who handed you the cash or you handed the cash to?

A. No.

Q. But it was Mr. Combs' security?

A. Yes.

Q. And how much cash, if you know, did security have you hold for them on Mr. Combs' jet?

A. I was told it was $50,000.

Q. Were there ever any other times that security had you carry such a large amount of cash for Mr. Combs or was that the only time you can recall?

A. That's the only time I can recall.

Q. And then what other times, if any, were there when Mr. Combs had you carry large amounts of cash for him?

A. I didn't carry them, but I went to the Western Union a couple of times to pick up cash and give it to Mr. Combs, but not --

Q. Understood. I apologize for using the word carry. Pickup.

About how many times do you remember picking up cash for Mr. Combs at Western Union?

A. Two or three times.

Q. And how much cash did you pick up from Western Union for Mr. Combs each time?

A. $10,000.

Q. Do you know where the $10,000 was being Western Union'd

from?

A.   Combs Enterprises.

Q.   Combs Enterprises?

A.   Yes.

Q.   When you picked up that cash each time at Western Union, what did you do with it?

A.   I gave it to Mr. Combs.

Q.   I want to take a step back, Mr. Kaplan, and just talk about your testimony here today.

         Did you receive a subpoena requiring you to testify at this trial?

A.   Yes.

Q.   And is there also an immunity order compelling you to testify even if your testimony might incriminate you?

A.   Yes.

Q.   What is your understanding of what that order requires you to do?

A.   To testify truthfully and allow for this testimony to not be used against me.

Q.   Let's break that down.

         First, are you required to tell the truth here?

A.   Yes.

Q.   If you do that, what is your understanding of the protections that that order gives you?

A.   That my testimony cannot be used against me.

Q. Does this order protect you from prosecution for any crimes you may have committed in the past, as far as you know?

A. No.

Q. Does this order protect you if you lie here today?

A. No.

Q. In other words, can you still be prosecuted for perjury if you lie here today?

A. Yes.

Q. I want to turn now to a different topic.

What, if any, long-term romantic partners were you aware of Mr. Combs having during the time that you worked for him?

A. Cassie, Ms. Porter. There is a woman named Gina.

Q. Let's take each of those in turn.

I would like to start with Kim. Based on your interactions with her and Mr. Combs, what was your understanding of who Kim was?

A. She was the mother of some of Mr. Combs' children and very important figure in his life.

Q. And then you mentioned Cassie. Who was she, as far as you understood?

A. Mr. Combs' girlfriend.

Q. Then you mentioned a woman named Gina. Who was she?

A. She was another one of Mr. Combs' girlfriends.

Q. What, if any, social relationship did you have with those

three women?

A.   Very little, if any at all.

MS. COMEY:   Ms. Foster, could we pull up what's in evidence as Government Exhibit 2A-401.

Q.   Mr. Kaplan, do you recognize the person in that photograph?

A.   Yes.

Q.   Who is that?

A.   Cassie.

Q.   Do you know her by any other names?

A.   Cassie Ventura.

MS. COMEY:   We can take that down.   Thank you, Ms. Foster.

Q.   About how often, Mr. Kaplan, do you remember seeing Cassie in person during your time as Mr. Combs' assistant?

A.   Very regularly.

Q.   About how often did you see Cassie when she was not physically with Mr. Combs?

A.   Irregularly.

Q.   Did it happen that much?

A.   Not really.

Q.   How many times, if at all, did you witness Mr. Combs be physically violent with Cassie?

A.   Once.

Q.   I'd like to talk about that time, please.

Can you remember about when this happened?

A.   It was in the second half of 2015.

Q.   Where were you when this happened?

A.   On Mr. Combs' jet.

Q.   On his private plane?

A.   Yes.

Q.   Who else was on the jet with you?

A.   Other team members, security, management.  I don't remember exactly.

Q.   Let's break that down.  You were on the jet?

A.   Yes.

Q.   And security was on the jet?

A.   Yes.

Q.   And you said other team members were on the jet?

A.   Yes.

Q.   And other than those people, who else was on the jet?

A.   Mr. Combs and Cassie.

Q.   Where was the jet flying to?

A.   Las Vegas.

Q.   Could you describe for the jury what the layout of the jet was, please.

A.   Sure.  You walk up the steps.  At the top of the steps, if you look left, it's the cockpit.  If you look right, there are four captains chairs, two and two facing one another.  As you continue down, if you're facing on the right side, there is a picnic table with more seats.  There is a bench facing that.

And then you run into a partition with two sliding doors, and then there was a bedroom or a bed area in the back.

Q. So behind the partition there was a bed area?

A. Yes.

Q. Before the violence you witnessed started, where were you on the jet?

A. I was sitting at the picnic table with my back to the door.

Q. By the door, do you mean that partition you talked about?

A. Yes.

Q. And who was behind the partition?

A. Mr. Combs and Cassie.

Q. How is the partition positioned?

A. It was ajar. It was more open than it was closed.

Q. So what part of the back of the plane were you able to see from where you were sitting?

A. I had a partial view over my right shoulder into the back.

Q. And who was in front of you on the plane toward the cockpit?

A. Everyone else.

Q. So security, everyone else who was traveling with you was further to the front of the plane?

A. Correct.

Q. How did you first notice that something was happening?

A. I heard a glass break.

Q. From what direction did you hear glass break?

A. Behind me.

Q. Can you describe the sound you heard.

A. It was a glass crash shatter.

Q. What did you do when you heard that glass shatter?

A. I looked over my right shoulder.

Q. And what did you see in the back of the plane when you looked over your right shoulder?

A. I saw Mr. Combs standing over Cassie.

Q. Can you describe for us how Cassie's body was positioned.

A. Yeah. She was on her back and her legs were extended up in a way that would indicate that she was trying to create space between the two of them.

Q. Was she lying on her back on the floor?

A. Yes.

Q. And what was Mr. Combs doing?

A. He was standing above her, over her.

Q. What, if anything, was in his hand?

A. He had another glass in his hand that he was holding up.

Q. He was holding it up above Cassie?

A. Yes.

Q. What did that glass look like?

A. It was a rocks, a whiskey rocks glass.

Q. As this was happening, what, if any, voices could you hear from that back of the plane?

A. I mean, there was tremendous commotion and scuffle, and

then, after the glass crashed, Cassie screamed, isn't anybody seeing this.

Q.  Did Mr. Combs say anything before Cassie said, isn't anybody seeing this?

A.  I don't know.

Q.  Did you hear his voice at all during this interaction?

A.  Yes.

Q.  Do you remember what words he said?

A.  No.

Q.  Do you remember what his tone of voice was?

A.  He was angry.

Q.  After you looked back and saw Mr. Combs standing over Cassie with a glass in his hand, what did you do?

A.  Nothing.

Q.  Did you look away?

A.  Yes.

Q.  After you looked away, what did you hear?

A.  Further glass crashing and chaos.

Q.  At what point in all of this did Cassie say, isn't anybody seeing this?

A.  Maybe a second or two after I turned my head back forward.

Q.  Did anyone respond to her?

A.  No.

Q.  You said you did nothing.  What did security do?

A.  Nothing.

Q. Why didn't you intervene, Mr. Kaplan?

A. I was 23 years old. All I wanted to do was have a great job in the entertainment industry. I could not believe my good fortune would be working for such an icon. And the last way that I thought that I would be successful in that career would be to compromise his well-being in any way.

Q. Did you ever call the police to report what you saw?

A. No.

Q. Why not?

A. Apropos of what I just said, it would not have been keeping with what I was trying to accomplish professionally.

Q. What did Mr. Combs do after you heard the last glass shatter?

A. He came into the front section of the plane and sat in one of the captain's chairs.

Q. Before he came to the front of the plane, what, if anything, did you hear him say?

A. He told Cassie to stay in the back.

Q. When he came to the front of the plane, what was his demeanor?

A. Pretty even keeled.

Q. So he was calm?

A. Yeah.

Q. After he came to the front of the plane, who was in the back of the plane?

A.   Cassie.

Q.   Was anyone with her?

A.   No.

Q.   Did anyone go to check on her?

A.   No.

Q.   How much longer did the flight last?

A.   Less than an hour.

Q.   What do you remember happening in Las Vegas after that flight?

A.   Mr. Combs had a club appearance.  We went to the hotel that we were staying at.  He and Cassie got ready.  I don't remember if it was together or separately.  And then Mr. Combs went to the club.  All the staff went with him.  And then I went back to collect Cassie when she was ready to bring her to where Mr. Combs was.

Q.   Did you bring Cassie to Mr. Combs at the club?

A.   I don't remember specifically dropping her off next to him, but I remember bringing her to the table where we were all anchored.

Q.   Can you just explain what a club appearance is, please.

A.   A club appearance is when a club hires a celebrity to show up for promotional purposes to attract other guests and club goers.

Q.   After this incident, how many times, if any, did you see Cassie with bruising or injuries on her face?

A.    One time.

Q.    About when was this?

A.    Also the second half of 2015.

Q.    Was it before or after the plane incident we have just discussed?

A.    After.

Q.    Where did this happen?

A.    I saw her in Mr. Combs' home.

Q.    In which home?

A.    Los Angeles.

Q.    Can you explain to us how you came to see Ms. Ventura with injuries on her.

A.    Yes.  Mr. Combs called me via intercom to come see him upstairs.  I thought that he was in his bedroom.  He was actually in his bathroom.  I entered his bedroom.  Cassie was crying on the bed with her head in her hands.  I walked past her without saying anything to her and met Mr. Combs in his bathroom.

Q.    Let me ask you some follow-up questions about that.

        You said Mr. Combs called you via intercom.  What do you mean by that?

A.    Like a PA system in the house.

Q.    And then is Mr. Combs' bedroom connected to his bathroom in that house?

A.    Yes.

Q.   When you went into the bedroom, can you explain what you saw in a bit more detail, please.

A.   Cassie was on the bed.  She was clearly upset.  Her head was in her hands.  It was clear that there was bruising near her right eyebrow and on her forehead where her hands were not covering her face, and I was in that room for less than three seconds.

Q.   Where did you go after seeing Cassie on the bed with injuries on her face?

A.   To Mr. Combs.

Q.   And what happened when you went to Mr. Combs?

A.   He asked me to go pick up several over-the-counter lotions that remedy -- lotion remedies of some kind, which I later came to learn were to be mixed together to act as an antiswelling agent.

Q.   What ingredient do you remember Mr. Combs asking you to get specifically?

A.   The only one I remember is witch hazel.

Q.   What did you do after Mr. Combs instructed you to pick up these ingredients?

A.   I picked them up.

Q.   Where?

A.   At CVS.

Q.   How did you pay for them?

A.   With my corporate credit card.

Q. Your Combs Enterprises credit card?

A. Correct.

Q. Where did you bring them?

A. To Mr. Combs.

Q. When did you stop working for Mr. Combs, Mr. Kaplan?

A. December 2015.

Q. Why did you decide to leave your job as Mr. Combs' assistant?

A. The central reason that I left my job as Mr. Combs' assistant was that I was not comfortable or aligned with the physical behavior that had been going on that I had seen pieces of over the course of the months.

Q. When you say the physical behavior, what are you referring to?

A. The plane incident in question, the bedroom incident in question, having to be responsible for fixing those types of things and being -- assisting the fixing. It was extremely challenging because I obviously was extremely grateful to be in the role and had and have a great deal of respect for Mr. Combs and it was extremely vexing, but in my heart of hearts I knew it was the right thing to do.

Q. You referenced having to fix these things. What do you mean by that?

A. Like being asked to go get witch hazel and just being party to any of this type of stuff.

Q. When did you make the final decision to leave as Mr. Combs' assistant?

A. My dad was diagnosed with prostate cancer and that was the straw that broke the camel's back for me. He lives in Boston. Being so far away, it was untenable for me. And given the rest of what's been described, that was the best choice for me.

Q. Was it just the two incidents with Cassie that led you to the decision, or did something else happen?

A. There were other incidents.

Q. What are the other incidents?

A. There was one incident where in the Miami house Mr. Combs threw a number of decorative or real green apples at another girlfriend.

Q. Which other girlfriend was this?

A. Gina.

Q. I want to talk about that, please. You said this was at the Miami home?

A. Yes.

Q. What's the address of that home?

A. 2 Star Island.

Q. And what time of day did you see this happen?

A. Late at night.

Q. Where on the 2 Star property did you see this happen?

A. In the entryway of the main home.

Q. And what did you see in the entryway of the main home?

A.   Mr. Combs was very angry, and he was throwing these green apples that lived in a decorative vessel of some kind in the main entryway.

Q.   Where was Mr. Combs throwing these apples?

A.   At Gina.

Q.   How hard was he throwing these apples?

A.   Hard.

Q.   What was his demeanor as he was throwing these things?

A.   He was very angry.

Q.   And who was he throwing them at?

A.   Gina.

Q.   How was Gina reacting?

A.   She was trying to shield herself with her arms, and she was moving away from him.

Q.   What did you do in response?

A.   I left.

Q.   Why didn't you intervene?

A.   For all the same reasons that I mentioned before.  Just a young kid really trying to make it in the entertainment industry.  This was essentially my first professional endeavor, and I actually thought for a second that it might be normal, this is what I could expect if I wanted to have a career in this industry.  So I was sort of working all of that out in real time as a young man.

Q.   When is the next time you saw Mr. Combs after that

incident?

A.   Later that night.

Q.   What happened later that night?

A.   He intercomm'd me to ask if I would bring him his medicine bag.

Q.   What did you do in response?

A.   I brought him his medicine bag.

Q.   To where?

A.   His bedroom.

Q.   What happened when you went to Mr. Combs' bedroom?

A.   He received the bag from me, and he asked me to leave.

Q.   Can you describe what was going on in the bedroom when you walked in?

A.   Yeah.   There was definitely some tension.   Gina was standing in a corner of the room on the other side, like very far away, and Mr. Combs knew why I was coming to the room.   So he was not upset with me for coming to the room, but he wanted me to leave the room once I gave him the medicine bag.

Q.   What was his demeanor?

A.   He was seemingly on edge.

Q.   When is the next time you heard Gina's voice after that?

A.   A while later, also in the middle of the night, there was a commotion near the front gate of Mr. Combs' home where I heard her voice.

Q.   Where were you when you heard Gina's voice near the front

gate to 2 Star?

A.   I was in my bed in the guest house.

Q.   Where is the guest house relative to the front gate?

A.   It is closer to it than the main house, and if you are entering the front gate it's on the left in the driveway.

Q.   What did you hear Gina saying in the middle of the night near the gate?

A.   I didn't hear any specific words, but, again, it was a lot of the commotion and a lot of screaming and back and forth.

Q.   Who else did you hear outside near the gate with Gina?

A.   I heard other male voices which I deemed to be Mr. Combs' security.

Q.   For about how long did you hear this going on?

A.   Less than a minute.

Q.   Is it possible to get out of 2 Star without someone opening the gate for you?

A.   Or you opening the gate yourself if you know the code.  No. I don't believe so.

Q.   If you don't know the code, is it possible to get out of the property at 2 Star?

A.   I don't remember if there was a button for the gate or not. That would have been the way that someone would have gotten out without the code.

Q.   What did you do after you heard this commotion by the gate?

A.   Nothing.

Q.   Why nothing?

A.   Because I didn't -- because I wished it wasn't happening because I didn't want to be involved with it and because I really, really wanted to have a successful career in the entertainment industry, and standing in the way of that was not my way to succeed.

Q.   Do you remember about when in 2015 this happened?

A.   Second half of 2015.

Q.   Was it before or after the two incidents you described involving Cassie?

A.   After.

Q.   And when did you leave Combs Enterprises?

A.   December 2015.

Q.   How long did you stay at Combs Enterprises after giving notice that you were going to leave Combs Enterprises?

A.   Three months.

Q.   And when did you officially give notice that you were going to leave Combs Enterprises?

A.   September 2015.

Q.   And how soon after this incident with Gina you have just described did you give that notice?

A.   Within a month.

Q.   After the incident with Gina, who did you speak to the next morning?

A.   I spoke to Brian Offutt and Sandy Humphrey.  I spoke to

Kristina Khorram.  I remember those conversations.

Q.  Which of those was in person?

A.  Kristina.

Q.  And is that the person we have talked about called KK?

A.  Yes.

Q.  What did you tell KK?

A.  I gave her a recount of what I had observed the night before.

Q.  Did you tell her everything you have just told us?

A.  Yes.

Q.  What, if anything, did you tell her about what you had observed on the jet involving Cassie?

A.  I had told her each time that I witnessed any sort of violent act.

Q.  So let's break that down.  Did you tell KK about the incident on the jet?

A.  Yes.

Q.  Did you tell KK about the time you saw bruising on Cassie's face?

A.  I don't remember.

Q.  And did you tell KK about the incidents that you saw involving Gina?

A.  Yes.

Q.  How did she respond when you told her these things?

A.  She was sad, she was disappointed.

Q. What did you tell her the morning after this incident involving Gina?

A. That this was going to be the last straw for me and that I was going to see my way out of this role over the next period of time.

Q. How did she respond when she told you that?

A. She was disappointed. We were very friendly, and we worked really closely together, and I think that she was sad about the whole situation.

Q. Then how much longer did you stay with Combs Enterprises after you told Kristina that this was the last straw for you?

A. Four months.

Q. What did you tell Mr. Combs about your decision to quit?

A. I told him that my dad was sick and that I needed to be closer to him.

Q. How did he respond to that?

A. He was extremely gracious.

Q. After you left Combs Enterprises in December of 2015, what did you do?

A. I moved back into my mom's house for three months and kind of collected myself, and then I moved back to New York and got a job at an integrated marketing firm.

Q. What do you mean you collected yourself?

A. I needed to dig pretty deep to sort of compartmentalize the experience for what it was, which I learned an incredible

amount from in -- at that time it was the most incredible thing that had ever happened to me in my life. There was a lot of cognitive dissidence trying to parse apart the different pieces and what they all meant and how I could sort of be OK moving forward in my life.

Q. What's the last time you saw Mr. Combs in person?

A. Before the pandemic.

Q. Did you remain in touch with him after you left?

A. Yes.

Q. Why is that?

A. Because I like Mr. Combs, and I wanted to continue having a relationship with him.

MS. COMEY: May I have a moment, your Honor?

THE COURT: You may.

MS. COMEY: No further questions.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. AGNIFILO:

Q. Good morning, Mr. Kaplan.

A. Good morning.

Q. My name is Marc Agnifilo. I'm one of Mr. Combs' lawyers. I am going to ask you some questions. I don't think it's going to be terribly long. We will get you out into the rain.

If I ask you a question that you don't understand, if you want me to rephrase the question, all you need to do is ask

and I'll do that.

A.   Yes, sir.

Q.   Thank so much.

A.   Thank you.

Q.   I want to ask you about something you just said to my colleague at the U.S. Attorney's Office.  You said working with Mr. Combs was the most incredible thing that happened in your life.

A.   At the time, yes.

Q.   I just want -- tell the jury why you gave that answer.

A.   I think like a lot of people in their early twenties, even those of whom have gone to college, their world is extremely small.  When I moved to New York City after college I was looking up at the buildings.  I couldn't believe how big the world was and how small I was in it.  And working for Mr. Combs made my world so much bigger in such a short period of time in the amount of knowledge that I gained both from a business perspective, but also just in a way of living was so much every day that it was almost like drinking from a fire hose, not in a bad way but in a particularly overwhelming way that in many ways was positive.

Q.   Thank you.

And tell us about the business perspective.  You said part of the answer you just gave related to your perspective on business.  Just tell the jury why you gave that part of the

answer.

A.   Yeah.   The reason that I was excited to take the role in the first place is because Mr. Combs is obviously an enormous business mogul across numerous industries.   I had been a fan of his since I was a child.   And to be frank, I keep lessons from him to this day from a business perspective that I use in my career every day.   He taught me to have the work ethic that I have, understanding that no job was too big or small, and frankly without a bunch of these lessons I don't believe that I would have had the jobs that I've had since then.   I find when I interview young people, none of these people understand that, and I'm very grateful for having learned those lessons from him.

Q.   I think you said yesterday that you were promoted.   When you started working for Mr. Combs at one point you got promoted.   If I remember correctly, I think my colleague said, well, why were you promoted?   You said, I think he recognized how hard that I work.

          Do you remember all that?

A.   Yes, sir.

Q.   You're a hard worker?

A.   Yes.

Q.   And you knew, when you starred working with Mr. Combs, it was going to be hard work, right?

A.   Yes.   The line was, you're going in eyes wide open, which

is ironic because I was not, as it turned out, but I did as far as the business and the hours and that type of stuff was concerned.

Q. When you started working -- I just want to get the segue of things. So you knew Brian Offutt before you knew Mr. Combs?

A. Correct. He hired me out of college to be his assistant at Nickelodeon.

Q. And tell us very briefly, what did you do at Nickelodeon?

A. Purely administrative duties. Scheduling travel, scheduling meetings, scheduling phone calls, sitting at a desk from 9 to 5, and 5:01 coming up and me saying, I'll see you tomorrow.

Q. Mr. Offutt came over to Combs Enterprises and you came with Mr. Offutt?

A. Correct.

Q. When you first got to Combs Enterprises, what was your job description then?

A. Same. Administrative duties. The one difference was that because Brian was now sort of accountable for Mr. Combs -- the success of Mr. Combs' business units and all of the heads of those units reported to him, I got more into broader executive planning and planning group events for all of the executives because Brian was in charge of them, whereas at Nickelodeon he was not, so those types of things were not in my purview.

Q. Because Brian Offutt -- I'll call him Brian. You called

him Brian, so I will call him Brian.  When Brian came to Combs Enterprises, he had -- what was his role?

A.  He was the chief operating officer.

Q.  And from what you could see, what was involved in that job description, from what you could see?

A.  Ensuring the profitability and smooth operation of each of Mr. Combs' holdings.

Q.  And what was your role in helping Mr. Brian Offutt do that?

A.  Making sure that he was in the right place at the right time, making sure that he wasn't running terribly over on phone calls and sticking to his schedule, making sure that if he had meetings outside of the office, his car was ready. he was in and out the door, getting him lunch, scheduling travel.

Q.  That at some point you got promoted from that job to a different job?

A.  To Mr. Combs' assistant.

Q.  And how long were you working with Combs Enterprises when you got promoted to being Mr. Combs' assistant?

A.  Ten months.

Q.  And you said -- I know you just said it.  I just want to sort of start us off again -- part of the reason you thought you got promoted is Mr. Combs recognized your hard work, right?

A.  Correct.

Q.  You were working very hard?

A.   Correct.

Q.   What led you to conclude that Mr. Combs recognized your hard work?

A.   Brian told me.

Q.   How much time did you spend with Mr. Combs before you got promoted, ballpark?

A.   Like certainly less than 10 hours, probably closer to five. He came to New York one time and his assistants kind of tried me out.  Like I went to get him coffee.  I brought him a cup of tea in a Starbucks cup and it wasn't in a tea service, and I remembered that moving forward, those types of things.

Q.   And while you were working with Mr. Offutt, before you became Mr. Combs' assistant, you did work very hard, correct?

A.   Yes.

Q.   And from what you could see from your time at Combs Enterprises, not everybody worked as hard as you did?

A.   Correct.

Q.   And so you said that with a certain emphasis that I don't know that the record picked up, so tell the jury what you mean by that answer.

A.   As I described myself in Nickelodeon, being someone who stood up at 5:00 to leave, I kind of kicked that at Combs Enterprises because it was inspirational and motivational, and I was so happy to be there.  I would actually find myself staying late after Brian, which was kind of the start of this

whole thing, but I can't say that that was true for everybody who worked there, by any means.

I also worked on the executive floor with Brian, which was a seemingly very different experience than people who worked for different brands on other floors.

Q. You mentioned different brands. What were the different brands?

A. Revolt was in there until they got a new office. Blue Flame, the marketing agency was in there. The head of Sean John had an office there. The head of Ciroc I think had an office there. There were certainly different businesses all operating over these floors in this building.

Q. Let's go through some of them, and I want to know what your experience is with the various ones.

Revolt. Tell the jury what Revolt is.

A. It was -- it's a cable news network that focuses on music and hip hop specifically.

Q. What, if any, connection did you have -- not connection. What work did you do in connection with Revolt?

A. The head of Revolt at the time, Keith Clinkscales, reported to Brian. So to the extent that I was scheduling meetings for Keith and Brian, Brian was also on the board, I think, if I remember correctly, of Revolt, so he was going to board meetings and things like that. I was also an employee of the company when Revolt launched, which they had been working on

for a long time.  So that was a very exciting day, obviously, that everyone was -- everyone saw all their really hard work come to fruition, so that was exciting.

Q.   You were there when Revolt launched?

A.   Correct.

Q.   Tell the jury about that.

A.   We were all in a conference room on the sixth floor of the Bad Boy offices at 1710 Broadway.  Anybody who was not producing the launch of television kind of was in that room. People were having cocktails.  Mr. Combs I think opened the station from Biggie's doorstep in Brooklyn, if I remember that correctly, I'm not positive on that one, but it was an extremely momentous occasion.

Q.   In your view, why was it momentous?

A.   It was momentous because we all worked for Mr. Combs and this was his thing and everybody -- most people had contributed in some way, so I think that people felt good about that.  I also think that Revolt came about through an initiative.  I don't have all the details, all the information, but it came about through a cable company initiative where cable companies were trying to give voices to more diverse groups, and Revolt ended up being a fruit of that experience.

Q.   So it was important -- tell me if this is right.  Diversity was an important feature of Revolt, correct?

A.   Yes.  Everything that Mr. Combs did and does, diversity is

a very important part of it, specifically for African-American people.

Q. How specifically did that express itself in Revolt, from what you could see?

A. Could you rephrase it.

Q. Yeah. That was a terrible question. I am going to ask a less terrible one.

From what you could see, what was the -- what about Revolt -- let me try again. I said I would get you out soon.

A. All good.

Q. You said that Revolt had aspects of diversity to it. Just tell the jury what that was.

Let me back you up one second. I am going to ask you to try to put us all back there. None of us worked there. You did. Give us the feel. Give us what it was like. You're in a conference room. You're having cocktails. This thing launches. Give us a feeling of what it was. Were you proud?

A. Yeah. It was a party. In this particular moment, from 5 to 6:30 p.m. on a Thursday night, or whatever it was, in the office, it was a party, like it was an office party. People were not dancing on tables, there was not loud music, but folks were thrilled. It took years to launch the network.

When you work with Mr. Combs, part of the job, no matter if you're close to him or not, he has an extremely infectious vibration. I mean, you are around him, and you feel

his excitement -- you feel what he feels, and he's very adept at projecting that. So I think that those things in confluence made people proud, excited, feel like their hard had paid off and that they were actually seeing what they were working on coming to life in the marketplace and on television.

Q. Did Revolt have a mission? Did you ever use that word or did you ever hear that word used, mission?

A. Vaguely. I don't really --

Q. That's OK.

I want to go through some of the other companies, and we will come back to some of this.

You mentioned Blue Flame?

A. Yes.

Q. What did Blue Flame do?

A. My understanding is Blue Flame provided the marketing services for Ciroc.

Q. And Ciroc was a vodka company?

A. Correct.

Q. Spirits?

A. Yes.

Q. And Sean John was fashion?

A. Correct.

Q. And did you have connections and input from what you experienced into all of these businesses?

A. No. Not from a creative or business perspective. Maybe

from an administrative perspective.

Q. So let's talk about that part of it, the administrative perspective. What administratively did you do for Revolt?

A. I personally did not do very much. Brian did an incredible amount, so I had a calendar of due dates of budgets or creative proposals, recommendations, you name it, pitches that needed to be adhered -- sufficed by a certain date. So I made sure that these things were in front of him. If he wasn't looking at them or neglecting them or prioritizing something else, I would make sure that he got to them in time.

Q. And how about for Blue Flame, administrative or other responsibilities, not too much.

A. Not really.

Q. Most of your efforts were geared at which companies?

A. Ciroc. Like as far as Mr. Combs' trips to Norwalk and like the relationships with the Diageo executives, making sure those meetings were straight, making sure that all of the transportation and all the administrative stuff.

I'm failing to remember the two. There were two men who led the Ciroc relationship on the Diageo end. I can't remember either of their names right now.

Q. Give the jury a little bit. What is Diageo?

A. Diageo is an enormous spirits company. It owns dozens of liquor brands that are household names, like Johnnie Walker and Ciroc and numerous others.

Q.   What was the connection between any of Mr. Combs' companies and Diageo, from what you understood?

A.   Mr. Combs certainly was the face of the Ciroc vodka brand, and I think that he had a lucrative financial interest in it as well.  And so my understanding, and this all obviously came to be before I was there, is he set up an in-house marketing agency to come up with great ideas to market Ciroc.

Q.   So he was sort of the marketing face of Ciroc.

A.   Yeah.  I mean, publicly he was the whole face of it, but yeah.

Q.   Got it.

      Now, when you were working as Mr. Combs' executive assistant, fair to say you were trying to figure out what sort of innovations, what sort of things you could do to make the company work better?

A.   Every day.

Q.   And tell us some of the things that you did to try to bring that about.

A.   I mean, I think that the checklists were a big one, though I certainly didn't invent that.  Someone suggested to me after I didn't have them that I should make them.  That made my days a hell of a lot easier.  It was really repetition.  It was understanding what Mr. Combs' movements were going to look like.

      So, for example, if he said he was ready to leave the

house, that meant to me that we probably had between three and five minutes before we were going to leave the house. It was about picking up those little things and understanding just kind of getting close to him and understanding what he meant by what he was saying and what he wanted, and sometimes he would ask for things where he actually wanted something else, and you kind of needed to decipher to get through. I kind of refer to it as like an out-of-classroom educational experience because it's not like something you would learn in school, but it was tremendously edifying.

Q. You mentioned a checklist. What was the checklist?

A. I had checklists for each of the bags. I had checklists for his toiletries in the bathroom.

It was a very, very bad look on me if he wanted something from the bags and it wasn't in the bags. So once I screwed that up a couple of times, I realized that I could never screw that up again.

Q. Do you remember something called the executive leadership think tank?

A. Not by that name, no.

MR. AGNIFILO: Can I show the witness something that may or may not refresh his recollection. It's Defense Exhibit 411. I think we can put it on the screen. I have a hard copy if that's easier too.

Q. Is there a binder near you?

A.  Yes, there is.

Q.  I can't read that, by a long shot.

A.  It says U.S. District Court, Southern District --

Q.  I am not sure --

THE COURT:  You don't need to read it.

Q.  Can you look at the back of that, sort of toward the back.

MR. AGNIFILO:  Can I just do this.  Can I just hand this to him.

THE COURT:  Yeah.  That's easier.  You may approach.

MR. AGNIFILO:  I think everybody has a copy now except me.  Thank you.

Q.  I am handing you something that purely is something to refresh your recollection, if it refreshes your recollection.

A.  It does.

Q.  Do me a favor.  Take whatever -- you don't have to read the whole thing.  Take a look at it.  See what it is.  If it refreshes your recollection, look at it as long as you want to. When you're done looking at it, please look back at me, and that will let me know that you're done reading.

So is your recollection refreshed?

A.  Yes.  I don't ever remember calling it a think tank.  I remember calling it an offsite.  But the rest of it, yeah, totally.

Q.  You said you remember it as being an offsite?

A.  Yes.

Q. What do you remember? What's an offsite?

A. An offsite usually is when you take members of a business, in this case it was all of the executive leaders, to somewhere that is not the office to do bonding activities or engage in things that you may not have in like a regular business week, and it's meant to build relationships and glean insights into how to make a business run more smoothly or become more profitable.

Q. What, if any, role did you have in that process?

A. I planned the whole thing and put the whole thing together and invited everybody and made all the reservations and created and printed all the materials, and this was a big project for me.

Q. I am going to ask you about a few names, and you are just going to tell me if you remember them or not. If you do remember them, I might ask you a few more questions about each person.

A. Sure thing.

Q. Do you remember somebody named Tony Abrahams.

A. I do.

Q. Who was Tony Abrahams?

A. He was the CFO of Combs Enterprises.

Q. Do you know anything about Tony Abraham's background?

A. I had been made to believe that he had some financial issues coming into that role, but that was the only thing I

knew about him.

Q.  Do you know if he went to Harvard Business School?

A.  No.

Q.  That's fine.

Kenny Burns?

A.  Yes.

Q.  Who was Kenny Burns?

A.  Kenny Burns was a friend of Mr. Combs who came in to work at Revolt.

Q.  Do you know what he did at Revolt?

A.  Not really.  He was like a promoter or talent person.  Not exactly, no.

Q.  Fair enough.

I might say this wrong, but I think you said it before.  Keith Clinkscales?

A.  Correct.

Q.  Who was Keith Clinkscales?

A.  He was the CEO of Revolt.

Q.  CEO of Revolt?

A.  Yes.

Q.  And James Cruz?

A.  James Cruz, Mr. Combs' manager.

Q.  What did Mr. Cruz do?

A.  He was Mr. Combs' manager.

Q.  As the manager, what did you see Mr. Cruz do?

A.   He was responsible for Mr. Combs' musical performances and club appearances and essentially his career as an artist.

Q.   Neil Dominique?

A.   Yes.  Neil worked at Revolt while I was there.  I also knew that he was one of Mr. Combs' assistants before me.

Q.   You talked about Kristina Khorram, KK?

A.   Right.

Q.   Now, you said you and KK had a friendship.  Is that a fair way to put it?

A.   We had a very close professional working relationship, yeah.

Q.   How much interaction -- I could call her KK.  That's how you called her.

A.   I called her Kristina, but whatever you want.

Q.   Then that's what I'll call her.

Tell the jury more about your relationship between you and Kristina.

A.   She was my immediate boss.  Certainly in the first six months that I was there she told me what to do and when to do it.  I learned how do the job very much from her guidance.  I talked to her more than I talked to any other individual on the staff.  We certainly bonded over the amount of time that we spend together, which was many hours in different locations and late nights and things like that.

Q.   I want to focus you on something that you talked about with

the government before you sat down.  You said that at some point you spoke to Kristina about the violence that you saw, correct?

A.  Correct.

Q.  And if I remember your answer right, I think you said that Kristina was disappointed and saddened?

A.  Correct.

Q.  And that's what she expressed to you in the conversation you had with her, right?

A.  Correct.

Q.  OK.

And there was no endorsement or even indifference about the news you had told her.  She was saddened by it, right?

A.  Yes.

(Continued on next page)

Q. And she was disappointed in Mr. Combs; is that right?

A. Yes.

Q. As were you?

A. Yes.

Q. You and Kristina had a conversation when you said this is what I saw. You told her what you saw, and you were disappointed, and even more than disappointed?

A. I was sad.

Q. You were sad. And part of the reason you were sad — and tell me if it's right, I'm sorry for doing this way — because it's sad, right?

A. Yeah, it's horrible.

Q. It's horrible.

Also, you loved working there.

A. I liked working there.

Q. Fair enough. You liked working there and you didn't want to leave?

A. I did not want to leave.

Q. And you left because of what you had told the jury that you saw?

A. Correct.

Q. So, from your perspective, and tell me if this is right, Mr. Combs's temper, what you saw, from what you saw did not help his business?

A. No, it did not.

Q. It hurt his business?

A. Yes, it did.

Q. Among other things, it prompted a really hardworking, dedicated, beloved person — meaning yourself — to leave the company?

A. Correct.

Q. And you leaving the company because of what you saw, you have no reason to think that helps his business, right?

A. No.

Q. You were effective, right?

A. I tried to be.

Q. You worked very, very hard, right?

A. I never worked harder in my life.

Q. You never worked harder in your life. And they always say don't ask a question you don't know the answer to — here I go.

Looking back at it, was that a good thing or a bad thing?

A. I can't answer that question. It's proven to be one of the most complicated pieces of my life.

Q. Okay. I survived.

A. Yup.

Q. But looking back, you're proud of the work you did?

A. Yes.

Q. You're proud of how hard you worked, right?

A. Yes.

Q.   You're proud you were asked to do a great, great deal of work, and you did a great, great deal of work, right?

A.   Very proud of that.

Q.   You're proud of the quality of the work that you did, right?

A.   Yes.

Q.   And Mr. Combs, at times, has been very difficult, right?

A.   Yes.

Q.   When he wanted, what was it, one gallon of water, you brought two gallons of water, he didn't need to yell at you, right?

A.   Well, it was two half gallons.

Q.   I'm sorry.

A.   I figured that I'd keep one full and then he'd go through it, I'd give him the next one full already.  We'd keep the count.

Q.   You had a theory.  Okay.  That must have been startling?

A.   It was very startling.

Q.   You're a young man, right?

A.   I'm a young man and this is, you know, this is a god among men talking to me.

Q.   And you didn't like that he spoke to you that way, right?

A.   Did not.

Q.   It made you feel bad, right?

A.   Yeah.

Q.  You remembered all these years later?

A.  Yes, sir.

Q.  But you said the word, I'm going to ask you about it, there was something about him that was inspirational?

A.  Highly.

Q.  Tell us what that means for you.

A.  He -- he didn't just push me to my deepest depth, he introduced me to depths that I did not know that I had.  It helped me not only professionally, but that piece helped me grow up as a man.

Q.  And so when you realized it wasn't right for your own moral standards to stay, that was deeply, deeply disappointing, to put it mildly?

A.  Yeah, my friends told me this was my Harvard and I was blowing it.

Q.  Yet — I'm about to compliment you — you have a strong moral compass, correct?

A.  I think so.

Q.  And your moral compass told you it was the best thing for you to leave?

A.  Yes.

Q.  And you did?

A.  Yes.

Q.  You still wish Mr. Combs well on his birthday, right?

A.  I do.

Q. You remember his birthday?

A. November 4th.

Q. And that's because working at the company was really special for you?

A. It was a once-in-a-lifetime opportunity.

Q. What happened from the steps of Biggie's house? You said something happened from the steps of Biggie's house.

A. If I remember correctly, Mr. Combs was on air, and the first shot of Revolt launching the network with a microphone in his hand from the front steps of Biggie's house behind, behind him.

Q. Biggie has come up a few times in this trial and I neglected to ask who Biggie was. Who is Biggie, who are we talking about?

A. Notorious B.I.G. He was very famous rapper in the '90s who unfortunately passed away.

Q. When you were working at Combs Enterprises, you had a number of holidays that were paid holidays that you didn't have to come to work, right?

A. Yes.

Q. If you were working at Combs Enterprises yesterday, would you have had to come to work?

A. It only just occurred to me that I would not have had to come to work yesterday because I think it was Biggie's birthday and that was a holiday for Combs Enterprises.

Q. That's correct. So if you worked at Combs Enterprises, with the subpoena aside, you wouldn't have had to go to work because May 21st is Biggie's birthday, and that's a paid holiday?

A. Correct.

Q. I interrupted my own list. Ezequiel Leal, what was Ezequiel's job?

A. He was one of the four counterparts that I had while I was in Mr. Combs's employ as his assistant.

Q. And Elie Maroun, who is Elie?

A. He was on Mr. Combs's management team.

Q. And Nathalie Moar, who's that?

A. That's Mr. Combs's publicist.

Q. Dia Simms?

A. She ran Ciroc, and I think DeLeon, too -- actually, no. She did Ciroc and I think Andrew Mancini did. I don't know if he's even on this list. But yeah, no, she was the head of Ciroc.

Q. And David Tapscott?

A. Yeah, I don't remember what he did.

Q. That's fair enough.

So I'm going to ask you, and you can look at the memo that you wrote just to refresh your recollection, I'm going to ask you about a few things and you'll tell me what you remember about them.

Do you remember wanting to convey to the people in the company that you should have a Fortune 500 spirit?

A.   Yes.

Q.   And what did you mean by the term Fortune 500 spirit?

A.   Best in class.  And in the case of Combs Enterprises, just because it's technically kind of like a startup holding company, it could still operate in a way that a very successful heritage business had for many years with best practices and the greatest people, which is always the most important thing to Mr. Combs, was to have the best people.

Q.   And fair to say from what you saw, there really was a culture of excellence; is that fair to say?

A.   Certainly in his executive office.

Q.   And you were part of that, right?

A.   Yes.

Q.   I want to ask you what you mean by excellence in the executive office.  Is that people worked very, very hard, right?  Everybody, not just you, but the whole executive office, right?

A.   Yes.

Q.   People work very long hours, correct?

A.   Correct.

Q.   You and others tried to make the company more efficient in every way, okay, right?

A.   Correct.

Q.   You tried to save money when you could, right?

A.   Always.

Q.   That's a key part of any business, right?  Okay.  Tried to make as much money as you could within reason, right?

A.   Mhm.

Q.   And even aside from all of that, having worked there, did you have a sense of some sort of innovation, something -- that you were involved in something new and special, even just aside from the business components of it?

     Is that a confusing question?

A.   Yes.

Q.   Thank you.  Let me ask you a different question.

     Aside from the bottom line financial issues, was there anything else that you saw in the company that made it special?

A.   Oh, yeah.  I mean, the company was comprised of all ambitious, young, creative people.  I think Combs Enterprises, and because Mr. Combs being an artist and his success in the music industry, it attracted a lot of people who also wanted to be artists, but maybe wouldn't become a musician, but could become a creative graphic designer or a producer or the types of businesses that Mr. Combs had really availed themselves to, like, having lots of different positions — you could be a finance person or you could be a creative -- or you could be, you know, not necessarily a scientist.  But you could be one of the number of things.  You could be an attorney and there,

like, would be a place for you somewhere in the greater ecosystem.  And I think that that was super inviting to people. I also think that people who applied to work at Combs Enterprises really wanted to work there and really gave a crap about it.

Q.  You guys were like a team, you were like lick a family?

A.  The executive team was a team.

Q.  Did you guys sometimes talk about yourselves as the Combs Enterprises family?  Was the word family ever used or am I -- if it wasn't, it wasn't.

A.  I don't remember that word being used.

Q.  That's fine.

Now, I have a few more specific questions for you and we'll let you go.

A.  Sure.

Q.  You said you had a corporate credit card?

A.  Correct.

Q.  And you used that for virtually all purchases, correct?

A.  I used it any time I was working.

Q.  Now, you don't know how -- were you involved in going through the credit card statement and figuring out this is a business, this is not business, you didn't do that?

A.  No.

Q.  And do you know who did?

A.  No.

Q. So if you had to make a purchase for something while you were working, you used the corporate credit card?

A. Correct.

Q. Now, in your experience with Mr. Combs, Mr. Combs does not — tell me if this is right — pay for things like himself in the moment?

A. That's correct.

Q. So in other words, it's not as though you and Mr. Combs are going to be someplace, you guys get lunch together, Mr. Combs gets a bill and writes a check or --

A. No, definitely not.

Q. Tell us how it worked, from what you could see.

A. Ideally -- so Kristina, one of his assistants, would have his wallet, which was a wallet with a Black Amex and a license and that was it, which was awesome. And ideally, we would have the black credit card and that would just take care of anything for him. I would use my credit card if I was alone or if I didn't have the black card.

Q. And while you were with Mr. Combs, did he do things like lease yachts or lease villas and things like that?

A. Yeah.

Q. And from what you could see, how was that kind of arranged and paid for?

A. There was at least one person, if not multiple people in his office whose job it was to handle his travel.

Q.  So he was making multi tens of thousands thousand-dollar purchases, rentals, leases, things like that?

A.  Yes.

Q.  You have no reason to think that he's keeping track of baby oil purchases, right?

A.  Definitely not, no.

Q.  That's just not -- whether a baby oil gets purchased at Duane Reade or CVS, you have no reason to think Mr. Combs has the vaguest idea about that?

A.  Not at all.  It just needed to be there when it needed to be there.

Q.  And the same is true with -- did he like apples?  Do you remember applesauce being a thing?

A.  I do.

Q.  Tell the jury what you remember about applesauce.

A.  Mr. Combs loves applesauce.  He eats it on the side or on top of a lot of things.

Q.  Cheeseburgers?

A.  Cheeseburgers being one of them.

Q.  And he just didn't keep track of the applesauce, right?

A.  He kept track of what he was focusing on in the given moment in the given day.  I mentioned how, like, my world was really small and it got bigger and bigger — his world was the size of the earth.  Like, he knew people who was doing things with -- for business and whatever literally around the world.

So, frankly, to think that he knew where some of these things were coming from was unrealistic.

Q. I want to talk about the incident on the airplane for a second that you told the jury about. Did you see Cassie with any physical injuries?

A. Not that I remember.

Q. You said that it looks like rocks glasses were being thrown. You heard them breaking?

A. Yeah, and he was holding one.

Q. And that's, Cassie was saying isn't anyone seeing this or something along those lines?

A. Yeah.

Q. And then you heard glass breaking. Okay.

And I think, and tell me if this is right, you would have seen Cassie later that evening, right, because you brought her to the club premiere?

A. Yes.

Q. And so how much time would you have spent with her to bring her to the club from your -- ballpark?

A. Five minutes, seven minutes.

Q. Would you have been in close proximity to her?

A. Yes.

Q. Did you see any injuries to her?

A. Not at the time, no.

Q. Not at the time, I mean -- so I know you're talking another

time, but I'm going to get to that time in a second.

A.   I did not see her injured.  She was not, no.

Q.   That's later that same day, right?

A.   Yes.

Q.   And you agree with me, you're in close contact with her a few feet away from her, correct?

A.   Yes.

Q.   For about a five-minute period of time or so, right?

A.   Correct.

Q.   Bringing her to the club, right?

        No injuries to her face, no injuries that you could see?

A.   Correct.

Q.   Now, you said there was another time where you didn't see what happened, but this is the time Mr. Combs asked you to go out and get things including witch hazel?

A.   Correct.

Q.   You said she had like a bruise to her forehead type thing?

A.   Correct.

Q.   And she was crying?

A.   Yeah, she was -- she wasn't sobbing, she was sort of whimpering.

Q.   Okay.  And I have no reason to dispute that something may have happened, but whatever happened --

        MS. COMEY:  Objection to the commentary, your Honor.

Q.   You didn't see it?

A.   I did not see it.

Q.   Now, the incident with Gina, and tell me if this is right, this is at the Miami house?

     Do me a favor, you have to answer yes or no.

A.   Yes.

Q.   So you walk into the house, right, the front door, you walk in the house, and tell me if you remember, there's a little, like, kind of thin table, like, in front of you.  You come in --

A.   I don't remember.

Q.   You said that there were apples, either real apples or decorative apples, you don't know which?

A.   Correct.

Q.   But green apples, things that look like green apples?

A.   Correct.

Q.   In a, like decorative holder or container or something?

A.   Yeah, I've been referring to it as a four-legged cauldron, that's not really the right way of putting it, but it was this huge bowl on four legs.  It was made out of stone.

Q.   That's the bowl?

A.   Yeah.

Q.   And these decorative apples, real or fake, are in the bowl?

A.   Correct.  Probably 50.

Q.   And Mr. Combs is throwing the apples hard at Gina, correct?

A.   Uh-huh.  Correct, yes.

Q.   And they're all in that same area.  Is this like the entrance area to the Miami house?

A.   Yes.

Q.   So Gina's there, Mr. Combs is there and you're there?

A.   Yes.

Q.   Is anybody else there?

A.   I don't remember.

Q.   You don't have any recollection of anyone else being there with the three of you?

A.   I don't.

Q.   Okay.  Fair enough.

     And he's throwing these apples at Gina?

A.   Correct.

Q.   Can you tell if the apples are hitting her?

A.   No, I don't remember if they were -- I don't know if I could tell at the time, but I don't remember.  I remember her going away and covering herself.

Q.   She's trying to avoid getting hit by the apples.

     But you don't have a recollection, one way or the other, as to whether any of the apples actually struck her?

A.   Correct.

Q.   Now let's go to later that same night, am I right, when you talked about the gate?

A.   Mhm.

Q. So when you leave the Miami house, okay, you walk out, there's some distance, some fairly considerable distance, and then there are these two large gates that separate the road from the house?

A. Yes.

Q. And the gates are typically in a closed position?

A. Yes.

Q. And one of the things you're not sure of, all these years later, is whether the gates could be opened by some kind of button or device on the inside of the gate?

A. Correct.

Q. You just don't remember one way or the other?

A. Correct.

Q. Or, or whether to get the gates to open, you would have to alert someone who has whatever control mechanism is required to open the gate?

A. Yes.

Q. And could you hear what Gina was saying?

A. No.

Q. Okay, you could not?

A. I just heard screaming and commotion.

Q. When you say screaming, and I don't know if you can differentiate, but I'll ask you to if you can, is it screams of terror or screams of, can someone open this gate?

A. I don't know how to differentiate the two.

Q. Okay. Okay. And it's nighttime?

A. Yes, the middle of the night.

Q. And so if no one -- and do you know where -- do you know where security goes in the middle of the night if they're not -- let me ask a different question.

Do you know where security goes in the middle of the night?

A. Some of them slept in the guest house that I was in.

Q. If they were sleeping, someone would have to alert them to open the gate, unless there was a button, which you don't remember?

A. Correct.

Q. And other than the screaming, there was no other event at the gate, there was no physical event at the gate?

A. Correct.

Q. And I think you've talked on direct examination about a few things that Mr. Combs did, you know, he yelled at you, right? Okay.

Do me a favor, you have to say yes or no.

A. Yes.

Q. I think you said he threatened your job from time to time?

A. He did.

Q. He never threatened you physically, did he?

A. No.

Q. Did you ever hear him threaten Cassie physically?

A.   Can you --

Q.   Other than, you know, the event on the plane, which, he was angry and throwing things.  Did he ever physically threaten Cassie in your presence, to your recollection?

A.   I'm sorry.  Physically threatening, meaning like saying that I'm going to hurt you type of a thing?  Physically, is that what that means?

Q.   Among other things.

A.   Yeah, no.  No.  No.

Q.   Now you said you were -- you talked about Kim Porter to a certain extent.  Okay.

Now, and you talked about -- I think you said Kim Porter was a very important person and was the mother of several of Mr. Combs's children?

A.   Correct.

Q.   And then when my colleague with the government asked you about Cassie, you said Cassie was a girlfriend?

A.   Correct.

Q.   And Gina was a girlfriend?

A.   Correct.

Q.   When the government asked about Kim Porter, you didn't say she was a girlfriend, you said something else?

A.   Yeah, she was a special figure to him.  I didn't see her as being a girlfriend of his.S she was kind of -- she was vaunted above it.

Q.   In what sense, from what you could see?

A.   His respect of her.

Q.   And you said they had children together, right?

A.   Correct.

Q.   That was the mother of some of his children?

A.   Correct.  Incredible kids.

Q.   Say it again?

A.   Incredible kids.

Q.   Okay.  Thank you.

        Ms. Ventura and Mr. Combs did not have children, to your knowledge?

A.   Correct.

Q.   Gina and Mr. Combs did not have children, to your knowledge?

A.   Correct.

Q.   Ms. Porter and Mr. Combs did?

A.   Correct.

Q.   And when you say she was vaunted above a girlfriend, from what you could see, what you could observe with your own two eyes, tell the jury what you saw that led you to that conclusion.

A.   Mr. Combs always seemed to have an extra gauge of patience with Ms. Porter.  Ms. Porter seemed to make Mr. Combs really happy, even when he was otherwise not.  And again, just the way -- and it's not that he was going around treating everybody

poorly all the time, but he treated her in a very special manner that just felt different than the way he treated others.

Q. Now, I think you said you set up hotel rooms -- actually, I don't know if you did. Did you ever set up hotel rooms for what you understood to be Mr. Combs and Ms. Porter?

A. Yes.

Q. And when you did that, there was no baby oil, right?

A. No, that's not my recollection.

Q. Let me ask you a different thing. Do you remember lotions, other than baby oil, like lotions?

A. Yes.

Q. Ms. Porter and Mr. Combs, there were lotions, like over-the-counter type lotions? I'm really asking if you remember.

A. Yeah, it's coming to me. I remember one time, yes, lotions.

Q. But you said you think that there was baby oil, too?

A. Yeah, there was always baby oil in the bag and I always unpacked the whole bag.

Q. Got it.

A. I wouldn't have known not to unless somebody said very specifically not to.

Q. Meaning, meaning since there was always baby oil in the bag and you always brought the bag, to not bring baby oil, someone would have to say, don't bring baby oil?

A.   Or don't unpack it.

Q.   Got it.  And you talked on direct examination about cleaning up the hotel rooms afterward?

A.   Yes, sir.

Q.   One thing I want to ask you about, I think you also said and tell me if this is right, that when Mr. Combs went to these hotel rooms, you yourself would go home for a period of time?

A.   Yes.

Q.   Because you weren't working?

A.   Correct.

Q.   So the idea is, tell me if this is right, if Mr. Combs is going out to a business dinner, you're still at work because he's working?

A.   Correct.  There were two types of, like, you were either on or you were on call.  And so if you were on, you were at the house no matter what was going on.  Hotels were generally an on-call situation.

Q.   So I want to know about the difference.  So on means you are at the house or at someplace doing work, correct?

A.   Yeah.  Yes, correct.

Q.   So if Mr. Combs had a business meeting at 3 o'clock in the afternoon, you were on?

A.   Correct.

Q.   If Mr. Combs had a business dinner and was going to do work after it, you are on?

A. Correct.

Q. If Mr. Combs was having a lunch with a recording executive, you were on?

A. Correct.

Q. When Mr. Combs went to these hotels, you weren't on, you were on call?

A. Correct.

Q. And you understood from your job description, this was his personal time?

A. Yes.

Q. Now, am I right that from what you could see in these hotel rooms, when you would sometimes tidy them up afterward, there was baby oil on things and on the floor, correct?

A. Correct.

Q. You never saw physical damage to furniture or to the room itself?

A. Not that I recall.

Q. I should have asked a better question. Physical damage meaning chairs broken, lamps broken, things broken, not things with baby oil on them?

A. Not that I recall.

Q. And I think you said yesterday at one point, I think the prosecutor asked, well, how come you cleaned them up, the rooms, how come you didn't let the hotel do it. And I remember your answer, your answer was sometimes you were worried that

the hotel would release pictures or release something to embarrass Mr. Combs?

A. Correct.

Q. And that was a worry that you had?

A. Absolutely.

Q. Because in your experience -- well, why was that a worry? Tell the jury, why were you worried about that?

A. The most important thing at the end of the day for me about this job was doing it well and being recognized for doing it well, and that's all that I cared about. And obviously, in my testimony, you can see how much tunnel vision I had just trying to do a good job in trying to check the box, and this to me was just a continued, you know, example of that, trying to go above and beyond. It's also the type of thing where if you do nothing and nothing happens, fine, but if you do nothing and something happens, I would have had a problem. And so trying to protect myself and my employment as well and just trying to do what I thought was the right thing.

Q. So you had some measure of distrust for the hotel staff that they might release something?

A. A large measure.

Q. A large measure of distrust for the hotel staff?

A. Mhm.

Q. And why did you have this large measure of distrust for the hotel staff?

A. Because money's involved and people want a payday. If they steal security footage or if there's a security guard who leaks footage or any number of permutations that could be like that would have been severely compromised and it would have been a terrible look on me. And it's also not what I wanted. I didn't want his reputation to be compromised.

Q. You think that would be unfair?

A. I think that's the way the world works.

Q. I mean, you used the word payday?

A. To, like, sell the video or the imagery to a news outlet in exchange for money as a hotel employee.

Q. Couple more questions. I'm going to keep saying that. We're almost done, we really are.

A. It's all right.

Q. You said at one point the security kind of changed over and they went from sort of having a less professional security staff to a more professional security staff?

A. Correct.

Q. And when about was that?

A. It was in 2015, I want to say the spring because we started traveling with the security in the last months that I was working there.

Q. And when the more professional staff came on, you understood this was a security company that Mr. Combs hired?

A. Correct.

Q. So he essentially outsourced his and his family's and his property's security to a company, correct?

A. Yes.

Q. And that company made decisions on how to try and keep him and his family and his property safe, right?

A. Yes.

Q. And you said that they -- you believed they had licenses to carry firearms?

A. That was my understanding.

Q. And you never saw the security staff, the old security staff or the new security staff with firearms one way or the other?

A. The new security staff, I did; the old, I did not.

Q. The old did not?

A. Correct.

Q. So you never saw them with guns?

A. Correct.

Q. You never saw Mr. Combs with a gun?

A. No.

Q. So the old security staff was D-Roc?

A. Yeah, he was a member.

Q. Uncle Paulie?

A. Yes, sir.

Q. Let me just stop on Uncle Paulie for a second.  Let me go through everybody.

There's D-Roc, Uncle Paulie.  Who else do you remember?

A.   Rube.

Q.   Rube.  Okay.  Anybody else?

A.   No.

Q.   When you saw Mr. Combs throwing apples at Gina, did you tell security about it?

A.   I don't remember.

Q.   So you have no recollection of telling anybody in security about the apples?

A.   No.

Q.   I want to show you a couple of photographs.  We're going to start with defense exhibit 406 for identification.

         MR. AGNIFILO:  Just for the witness at the moment.

Q.   This is a message from yourself to Mr. Combs from November 16th, 2018.  Do you see that there?

A.   Yes, sir.

Q.   And you do you recognize who's in that photograph?

A.   Yes, sir.

Q.   Who's that?

A.   Ms. Porter and her friend.

         MR. AGNIFILO:  Your Honor, we offer it.

         THE COURT:  Exhibit 406 will be admitted.

         (Defendant's Exhibit 406 received in evidence)

         MR. AGNIFILO:  And we can put it up for the jury.

Q. Ms. Porter is the woman on the second horse, on the whiter horse?

A. Correct, she's in the back.

Q. And you sent this soon after Ms. Porter passed away, a couple of days in fact. Okay.

And what you write is, P, no possible words -- RN?

A. Right now.

Q. Right now. Sorry. So not going to reach, but I am so, so sorry and sending all of my condolences. My thoughts are with you and the kids. Wishing you immense strength. Please hang in there. Love you.

A. Yes.

Q. You sent him this after Ms. Porter passed away?

A. Yes.

Q. Because of why?

A. I was heartbroken for him.

Q. And I think you said that in addition to this occasion, you stayed in touch with him through the years.

A. Yes.

Q. If things happened in your life, sometimes you'll send him a text and say this happened to me?

A. Yeah, I invited him to my wedding, I did not hear back, and I told him when I had a baby.

Q. I think what you said when Ms. Comey was asking you questions is you have and had great respect for him?

A.   Yes.

Q.   You still do?

A.   Yes.

Q.   What you saw him do offended you, correct?

A.   Yes, it did.

Q.   It offended you so much it made you leave your dream job?

A.   Yeah, it shook me tremendously.

Q.   And yet, you still, as you sit here today on the witness stand of his trial, you have respect for him?

A.   Yeah, I'd say that it's a complicated relationship at this point.  I think I have a lot of complicated relationships in my life, and I think this perhaps falls into that bucket.

Q.   And based on what you know, what you saw, what your experience was with him, that's why you have respect for him, correct?

A.   Yeah, the way the time we spent together, the things that he taught me, and the way that I observed him in most cases, yes.

Q.   I want to show you another photograph.  If I walk back to that table, I'm going to have another question for you every time.

          MR. AGNIFILO:  I'm going to ask that the witness be shown exhibit 404 for identification.

Q.   This is a text exchange between you and Mr. Combs and KK. Do you see that?  It would be on the page on the left.

A.  Yup.

Q.  And there's a photograph there, right?

A.  Yes.

Q.  Who's in that photograph?

A.  Kristina Khorram and Mr. Combs.

Q.  And who else?

A.  Myself.

        MR. AGNIFILO:  We offer it as 404, your Honor.

        MS. COMEY:  No objection, your Honor.

        THE COURT:  Exhibit 404 will be admitted.

        (Defendant's Exhibit 404 received in evidence)

        MR. AGNIFILO:  Show it to the jury.  Can we blow up the photo.

Q.  KK is the woman on the right, Mr. Combs in the middle, you on the left, yeah?

A.  She's on my left, I'm on my right, but yeah.

Q.  Any idea where you are?

A.  We're at Teterboro Airport.  This is the day that Mr. Combs got his private jet.

Q.  That he actually got the private jet?

A.  Correct, that's what the champagne was for.

Q.  Got it.  So tell me if this is right: it was a difficult, difficult job, right?

A.  Right.

Q.  You saw things that offended you?

A.   Right.

Q.   You had a lot of fun, right?

A.   No, that is not right.  No, I wouldn't say that.

Q.   You're having fun there?

A.   Is that what you see on that facial expression?

Q.   I'm not sure.  What do you see on your facial expression?

A.   I see a kid who thank god found the mascara in the back seat of that car.

Q.   Fair enough.  And you learned a lot, right?

A.   I learned an incredible amount.

Q.   You said that he not only showed you kind of like all you can be, he showed you things you didn't even know you could be, right?

A.   Yes, that is correct.

Q.   And you didn't want to come here today, right?

A.   I desperately did not want to come here today.

Q.   Because you have nothing against Sean Combs, right?

A.   Correct.

Q.   And you are here, and you tell me if this is right, do you feel like you were forced to be here?

A.   I was subpoenaed to be here.

Q.   You could not say no?

A.   Correct.

Q.   And so you would rather not be testifying at this trial, right?

A.   100 percent.

Q.   And you are here because the government subpoenaed you, right?

A.   Correct.

Q.   You never reached out to the government to say, I have information about Sean Combs that I am dying to give you folks, right?

A.   Absolutely not.

Q.   They found you?

A.   Correct.

Q.   Once they found you, they were going to put you on that stand, right?

A.   Yeah, I was hosed.  I had to retain counsel immediately.

MR. AGNIFILO:  I have no other questions for you.  I really want to thank you for coming.

THE WITNESS:  Thank you very much.

THE COURT:  Ms. Comey.

MS. COMEY:  Thank you, your Honor.  Very briefly.

REDIRECT EXAMINATION

BY MS. COMEY:

Q.   Mr. Kaplan, do you remember being asked on cross-examination about the incident you observed on the plane involving Mr. Combs being violent toward Cassie?

A.   Yes.

Q.   And you testified on cross-examination just now that what

you saw more generally shook you tremendously. I want to understand which incidents you're referring to that shook you tremendously.

A. The plane incident and the apple incident.

Q. Let's talk about both of those.

The plane incident, you testified on cross-examination that you did not observe Cassie have any injuries as a result. Do you remember that?

A. Correct.

Q. Why did this incident shake you tremendously if you did not see Cassie suffer any injuries?

A. Because in my heart of hearts, I told myself I knew what was happening and I also definitely felt an element of guilt to not be stopping it.

Q. Why did you think you needed to stop it if she wasn't having visible injuries?

A. Because people can be injured all the time without the injuries being visible.

Q. And then the apple incident, I believe you testified on cross-examination that you did not see any of the apples hit Gina. Do you remember that?

A. Correct.

Q. Why did that incident shake you tremendously if none of the apples hit Gina?

A. The tension and anger in the room was scary, and I never

seen or been a part of anything like this.  I was naïve enough to think that these were like hyperbolized moments that happened in bad movies or something.  So I was really taken aback and it took me a while to process.

Q.   What was scary about it?

A.   The tonality, the tension, the fact that it was happening at all.

Q.   And finally, do you remember being asked about the conversation you had that next day with Kristina Khorram?

A.   Yes.

Q.   Did you tell her about both of these incidents during that conversation?

A.   No.

Q.   Which incident did you tell her about?

A.   The green apple incident.

Q.   And earlier, had you told her about the incident on the jet?

A.   Yes.

Q.   And did you tell her that -- well, what did you tell her about why you had decided to quit working for Mr. Combs during that conversation?

A.   I think the words I used were that I was unwilling to stand by the behavior.

Q.   What behavior were you talking about in the context of that conversation with Kristina?

A.   The green apples and the airplane incident.

Q.   Did you tell Kristina you were going to quit because of that?

A.   Yes.

Q.   Did Kristina say she was going to quit, too?

A.   No.

Q.   Did Kristina, as far as you know, quit anytime after you left?

A.   No.

Q.   As far as you know, how long did Kristina stay working for Mr. Combs after you told her about these two incidents that shook you tremendously?

A.   I haven't spoken to her in a while, but my understanding was that she was working for him up until pretty recently.

MS. COMEY:  No further questions, your Honor.

THE COURT:  Thank you.

Any further questions, Mr. Agnifilo?

MR. AGNIFILO:  I don't.

THE COURT:  Okay.  Mr. Kaplan, thank you very much.

THE WITNESS:  Thank you, your Honor.

(Witness excused)

THE COURT:  Government may call its next witness.

MS. SLAVIK:  Your Honor, before the government calls its next witness, the government moves to admit A-629-A.

THE COURT:  Does the defense maintain its objection?

MR. AGNIFILO:  Yes.

THE COURT:  That exhibit will not be admitted at the present time and we can pick it up at the break.

MS. JOHNSON:  The government calls Scott Mescudi.

THE COURT:  Welcome.  Just come right up here.

SCOTT MESCUDI,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Can I ask you to please give the Court your first and last name, and spell your first and last name.

THE WITNESS:  Scott Mescudi, S-C-O-T-T M-E-S-C-U-D-I.

THE COURT:  Ms. Johnson, you may proceed.

MS. JOHNSON:  Thank you, your Honor.

DIRECT EXAMINATION
BY MS. JOHNSON:

Q.  Good morning, Mr. Mescudi.

A.  Hi.

Q.  What do you do for work?

A.  I'm an actor and musician.

Q.  Are you known by any other names?

A.  Kid Cudi.

MS. JOHNSON:  Ms. Foster, could you please pull up what's in evidence as Government Exhibit 2A-401.

Q.  Mr. Mescudi, do you recognize who's depicted in Government

Exhibit 2A-401?

A.   Yes.

Q.   Who is that?

A.   Cassie Ventura.

Q.   Do you know Ms. Ventura?

A.   Yes.

Q.   How do you know Ms. Ventura?

A.   We were friends and we dated briefly.

Q.   How did you first meet Ms. Ventura?

A.   Just at an event in New York years ago, around like 2008.

Q.   Did you ever collaborate professionally with Ms. Ventura?

A.   Yeah, we worked on some music together.

Q.   You also mentioned you dated briefly.  Approximately when did you date Ms. Ventura?

A.   2011.

        MS. JOHNSON:  You can take that down now, Ms. Foster.

Q.   Mr. Mescudi, who else, if you know, was Ms. Ventura involved romantically with around the time that you were dating her in 2011?

A.   Sean Combs.

        MS. JOHNSON:  Ms. Foster, could you please pull up what's in evidence as Government Exhibit 2A-101.

Q.   Mr. Mescudi, do you recognize who's depicted in Government Exhibit 2A-101?

A.   Yes.

Q.   Who's that?

A.   Sean Combs.

Q.   Is that the same Sean Combs who was romantically involved with Ms. Ventura?

A.   Yes.

        MS. JOHNSON:  You can take that down now.

Q.   Mr. Mescudi, when you first were dating Ms. Ventura, what, if anything, did you know about the status of her relationship with Mr. Combs?

A.   When we first started dating, you mean?

Q.   Yes, when you first started dating.

A.   That she and Sean Combs had some problems and they weren't dating anymore.

Q.   Did your understanding of the nature of their relationship ever change?

A.   Did the what now?

Q.   Did your understanding of the status of their relationship ever change?

A.   After she told me?

Q.   Yes.

A.   No, not that I knew of.

        MS. JOHNSON:  Ms. Foster, can you also please pull up what's in evidence as Government Exhibit 2A-406.

Q.   Do you recognize, Mr. Mescudi, who is depicted in this exhibit?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   Yes.

Q.   Who is this?

A.   Capricorn.

Q.   How do you know Capricorn?

A.   She was a friend of Cassie's.

Q.   I want to direct your attention to December of 2011.  Did there come a time when law enforcement responded to your home in December of 2011?

A.   Yes.

Q.   Why did law enforcement respond in December 2011?

A.   Because I had a break-in.

Q.   I'd like to start at the beginning of the day of the break-in.  How did that day start?

A.   Well, I got a call from Cassie around 5:30, 6:00 a.m., and she told me that Sean Combs had found out about us.  I was really confused, but she asked me to pick her up.  She sounded really stressed on the phone, nervous, scared, so I went to go pick her up and, yeah.

Q.   A few followup questions for you.

When Ms. Ventura said that Mr. Combs had found out about us, as you just said, what was your understanding of what Ms. Ventura was saying?

MR. DRISCOLL:  Objection.

THE COURT:  Overruled.

Q.   You can answer.

A.   Repeat the question.

Q.   Sure.  You testified that Ms. Ventura told you Mr. Combs found out about us.  What was your understanding of what Mr. Combs had found out?

A.   That me and her were dating.

Q.   And you also testified that you were confused when you heard that?

A.   Yes.

Q.   Why were you confused?

A.   Because I didn't think she was still dealing with him.

Q.   And you mentioned that you went to pick her up; is that right?

A.   Yes.

Q.   Why did you go pick her up?

A.   She wanted me to come pick her up.  And she was also worried that he would come to my house because he asked for my address and she gave it to him.

Q.   When you picked her up, could you please describe for the jury Ms. Ventura's demeanor.

A.   Very stressed, nervous, just scared, didn't know what Sean Combs would do.

Q.   Prior to the phone call you received that you just testified about, had you and Ms. Ventura previously discussed the nature of her relationship with Mr. Combs?

A.   Yeah, about, like, if they were still hanging out or if she

had seen him or just meaning in general?

Q. Let me be a little more specific. What, if anything, had Ms. Ventura previously told you about Mr. Combs being physical with her?

A. That he was abusive --

MR. STEEL: Same objection, your Honor.

THE COURT: It's sustained.

Q. Mr. Mescudi, after you picked up Ms. Ventura, where did you go?

A. I took her to the Sunset Marquis.

Q. What's the Sunset Marquis?

A. It's a hotel in Los Angeles.

Q. Why did you go to the Sunset Marquis after you picked up Ms. Ventura?

A. I used to frequent the Sunset Marquis and I just thought it was safe and just wanted to put her somewhere where she was off the radar.

Q. When you say safe, what do you mean by that?

A. Just safe, away from him.

Q. When you and Ms. Ventura were at the Sunset Marquis, who else, if anyone, did you speak to while you were at the hotel?

A. Capricorn.

Q. So before we talk about the substance of that communication, I have a couple of questions.

A. Okay.

Q. Had you spoken to Capricorn before this morning?

A. Yes.

Q. How often had you spoken to Capricorn on previous occasions?

A. Quite often. She hung out with me and Cassie a lot.

Q. On the morning when you were at the Sunset Marquis, how did you speak to Capricorn?

A. On speakerphone.

Q. Who else was present, if anyone?

A. Cassie.

Q. And can you describe how Capricorn's voice sounded on the phone call that you and Ms. Ventura had with her at the Sunset Marquis?

A. She was very scared, sounded like she was on the verge of tears.

Q. What, if anything, did Capricorn say to you and Ms. Ventura on that phone call about what was happening at that moment for her?

        MR. STEEL: Objection, your Honor.

        THE COURT: That's overruled.

Q. You can answer.

A. That Sean Combs and an affiliate were in my house, and she was in a car. She was forced to go along with them over there.

Q. And what, if anything, did Ms. Capricorn say about where she was at that moment?

A.   She was in a car outside of my house waiting for them.

Q.   And what, if anything, did Capricorn say about where Mr. Combs was at that moment?

          MR. STEEL:  Asked and answered.  Sorry.  Objection.

          THE COURT:  Overruled.

A.   In my house.

Q.   After you spoke to Capricorn, what did you do next?

A.   I got in my car and went to my house.

Q.   Did anyone go with you when you went to your house after that phone call?

A.   No.

          MS. JOHNSON:  Ms. Foster, can you please pull up for identification for the Court, the witness, and the parties only Government Exhibit 8C-102.

Q.   Mr. Mescudi, do you recognize what's depicted in this exhibit?

A.   Yes.

Q.   What is it?

A.   It's the front door of my old house.

Q.   And is this the house you drove to after receiving the phone call from Ms. Clark?

A.   Yes.

          MS. JOHNSON:  The government offers Government Exhibit 8C-102.

          MR. STEEL:  No opposition.

A.   8C-102 will be admitted.

(Government's Exhibit 8C-102 received in evidence)

MS. JOHNSON:   Will you please publish to the jury, Ms. Foster.

Q.   Mr. Mescudi, what was the address where you were living at the time?

A.   8925 Hollywood Hills Road.

Q.   And you mentioned that this was the -- just so I'm clear, you mentioned that this door we see in the photograph, is this the front gate door or is this the door to the residence?

A.   This is the front gate odor.

Q.   Is there an additional door to the residence?

A.   Yes.

MS. JOHNSON:   You can take that down now, Ms. Foster.

Q.   How would you describe the neighborhood that 8925 Hollywood Hills Road is located in?

A.   Quiet, family oriented.

Q.   And approximately how long was the drive from the Sunset Marquis hotel to your home at 8925 Hollywood Hills Road?

A.   Maybe like 12, 15 minutes.

Q.   And in December 2011, what kind of car did you drive?

A.   A Porsche 911 cabriolet.

Q.   Was that the car you were driving that evening?

A.   Yes.

Q.   While you were on that drive from the hotel to your home,

what, if anything, did you do?

A.   I called Sean Combs.

Q.   How did you have Sean Combs's phone number?

A.   I just had it from years ago.

Q.   Did Mr. Combs pick up your call?

A.   Yes.

Q.   Can you describe the conversation that you had with Mr. Combs on the drive to your home?

A.   Yeah.  I'm going to be very candid.  I said, motherfucker, you in my house?  And he was like, what's up?  I was like, motherfucker, are you in my house?  And he said, I just want to talk to you.  I was like, I'm on my way over right now.  He was like, I'm here.

Q.   I'm sorry.  I didn't hear that last bit.  After you said I want to talk to you, what did Mr. Combs respond with?

A.   No.  He said he wants to talk to me.

Q.   Oh, I'm sorry.

A.   Yeah.  And I said, I'm on my way over to my house right now.  And he's like, I'm over here waiting for you.

Q.   When Mr. Combs said, I'm over here waiting for you, what was your understanding of where Mr. Combs was located?

A.   At my house.

Q.   What was Mr. Combs's tone of voice during that phone call?

A.   Calm.

Q.   When you arrived at your house, focusing first on the

outside of your house, what did the outside look like?

A. Pretty normal.

Q. Were there any security cameras at your residence at that time?

A. Yes.

Q. Were those security cameras working that evening?

A. They weren't. I thought they were working, but they weren't.

Q. You find out later that they weren't working?

A. Yeah.

Q. Where were the security cameras positioned on the exterior of your house?

A. To the side, like somebody moved it out the way.

Q. When you say someone moved it out of the way, can you explain what you mean by that?

A. Like, the camera was angled down at the door originally, and it was moved to an opposite angle.

Q. And when did you discover the camera had been moved to a different angle?

A. Once I got to the house.

Q. And was the camera at a different angle earlier before the break-in?

A. Yes.

Q. Had you moved the security cameras at all?

A. No.

Q.   I want to focus now on the inside of your home.  When you went inside, was anyone inside of your home?

A.   No.

Q.   What did you see inside your home?

A.   Some gifts that I bought for my family were opened, some stuff I got from Chanel, and then my dog was locked up in my bathroom.

Q.   So taking those one at a time.  Where were the gifts that were opened?

A.   On the kitchen counter.

Q.   What type of gifts were those?

A.   I can't remember exactly what specifically, but it was stuff from Chanel.

Q.   And you mentioned that your dog was locked up in the bathroom; is that right?

A.   Yes.

Q.   How did you typically allow your dog to stay in your home when you weren't present?

A.   I just let him roam.

Q.   Had you shut the door to the bathroom before you left?

A.   No.

Q.   Before the break-in, how long had you had your dog?

A.   I think by this time maybe three years.

Q.   And I want to focus on the immediate aftermath of the break-in, right after.  What, if any, changes in behavior did

Q. you notice in your dog after the break-in?

A. Very jittery and kind of on edge all the time.

Q. I want to focus on what you did next. After you got to your home, what did you do after that?

A. I got in the car, and that's when I called Sean Combs.

Q. So you got back in your car after you went to your home?

A. Yeah.

Q. Were you still alone in your car?

A. Yeah.

Q. And you mentioned you called Mr. Combs again?

A. Yeah.

Q. Why did you call Mr. Combs again?

A. Because I was looking for him.

Q. Why were you looking for him?

A. Because I wanted to confront him, I wanted to fight him, you know.

Q. Did you call Mr. Combs?

A. Yeah.

Q. Did he answer?

A. Yes.

Q. Can you describe that conversation for the jury?

A. I can't remember my exact words, but I was kind of like asking him where he was. And he was, I'm on my way, I'm on my way. So at that point I hung up and I thought to myself, I was like, okay, you're angry.

MR. STEEL:  Objection.

THE COURT:  Grounds.

MR. STEEL:  Nonresponsive.

THE COURT:  That's overruled.

A.  Okay.  You're angry, just think about this, you know, like -- and I just thought, like, I don't know who he has with him, I don't know what his intentions are.

MR. STEEL:  Objection.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT:  Why don't we get a fresh question.

MS. JOHNSON:  That's fine.

Q.  Mr. Mescudi, what did you do after that phone call with Sean Combs?

A.  I thought about, you know, the reality of the situation, not knowing what I was walking myself into, so I decided to call the police.

Q.  Can you describe Mr. Combs' tone of voice when you spoke to him on the phone while you were in your car?

A.  Calm.

Q.  Where did you go after you called the police?

A.  I went back to my house.

Q.  When you returned home, was anyone there?

A.  Yes.

Q.  Who was there?

A.  The police.

Q.  Did you speak to the police?

A.  Yes.

Q.  Did you make a report about the break-in?

A.  Yes.

Q.  Did you see Ms. Ventura later that day?

A.  Yes.

Q.  What was her demeanor like when you saw her later?

A.  Stressed.

Q.  You mentioned this was in December 2011, is that right?

A.   Yes.

Q.   Where did you spend the Christmas holiday in December 2011?

A.   With Cassie's family in Connecticut.

Q.   Where did you stay in Connecticut when you were there for the holidays?

A.   At her family's house.

Q.   Can you generally describe Ms. Ventura's demeanor when you were in Connecticut for the holidays with her family?

A.   I think being around her family really did a lot for her at that time.  She really needed it.

Q.   While you were away in Connecticut, did you have any additional communications with Mr. Combs?

A.   Yes.  He had hit me a couple of times.

Q.   When you say he hit you, what do you mean by that?

A.   He text me.

Q.   Did he text you -- you said a couple of times.  How frequently did Mr. Combs text you?

A.   It wasn't every day.  It kind of stopped at some point when I responded to him and told him I didn't want to talk.  His text messages were always along the lines of him wanting to speak, just get to the bottom of it.

Q.   When you say get to the bottom of it, what are you talking about?

A.   Just figure out what's going on, I guess.  He was in the dark about things and wanted to talk.  But at that point, you

know, post break-in, I didn't want to talk to him.

Q. Did you respond to Mr. Combs' texts?

A. Yeah. I told him, you know, specifically told him you broke into my house. You messed with my dog. Like I don't want to talk to you.

Q. When did you leave Connecticut?

A. A little bit before New Year's.

Q. By January of 2012, after New Year's, what was the status of your relationship with Ms. Ventura?

A. We weren't really hanging out.

Q. Why was that?

A. I guess --

MR. STEEL: Objection.

THE COURT: Can you rephrase the question.

MS. JOHNSON: Sure.

Q. You said you weren't really hanging out with Ms. Ventura?

A. No.

Q. Did the relationship end?

A. Yeah.

Q. Directing your attention to January of 2012, did there come a time when you learned that your car had caught fire?

A. Yes.

Q. How did you learn that your car had caught fire?

A. My dog's babysitter called me in the morning.

Q. Approximately what time did you receive that phone call?

A.    6:30, 7 a.m.

Q.    What was your understanding of where your dog's babysitter was located when she called you?

A.    At my house.

Q.    Was it your understanding that your dog's babysitter was telling you what was happening in real time?

A.    Yes.

Q.    And what did your dog's babysitter say to you about what she saw?

A.    She told me my car was on fire.

Q.    Was anyone else present at your house at that time?

A.    No.

Q.    Where were you?

A.    I was at my exgirlfriend's sister's house.

Q.    Approximately how far away from your house were you?

A.    Like 45 minutes, or something like that.

Q.    Where was your car at the time your babysitter called?

A.    In the driveway.

Q.    Was it in the driveway of the same home at 8925 Hollywood Hills Road?

A.    Yes.

Q.    After you received this phone call from your dog's babysitter, what did you do?

A.    I immediately went to my house.

        MS. JOHNSON:    Ms. Foster, can we please pull up for

P5NMCUD3

identification for the Court, the witness, and the parties Government Exhibits 3F-101 and 3F-102.

Q.  I am going to show you six total pictures, Mr. Mescudi.

A.  Um-hum.

Q.  Do you recognize what's depicted in those pictures?

A.  Yeah.

Q.  What is it?

A.  My Porsche.

MS. JOHNSON:  Ms. Foster, can you please pull up Government Exhibits 3F-103 and 3F-104.

Q.  Do you recognize what's depicted in these photos, Mr. Mescudi?

A.  Yes.

Q.  What is it?

A.  The damage from a Molotov cocktail in my Porsche.

Q.  Is this your car?

A.  Huh?

Q.  This is your car?

A.  Yes.

MS. JOHNSON:  Ms. Foster, can you now please pull up for identification Government Exhibits 3F-105 and 3F-108.

Q.  Mr. Mescudi, do you recognize what's depicted in those photographs?

A.  Yes.

Q.  Is that your car?

P5MMCUD3

A.   Yes.

          MS. JOHNSON:   The government offers Government Exhibits 3F-101, 102, 103, 104, 105, 108.

          MR. STEEL:   No opposition, your Honor.

          THE COURT:   Those exhibits will be admitted.

          (Government Exhibits 3F-101, 3F-102, 3F-103, 3F-104, 3F-105, 3F-108 received in evidence)

          MS. JOHNSON:   Can you publish those exhibits to the jury.

Q.   Mr. Mescudi, when did you receive these photos?

A.   While I was on my way to my house.

Q.   Who sent these photos to you?

A.   My friend Chip.

Q.   Who is Chip?

A.   He's a good friend and collaborator.

Q.   Why did Chip send you photographs of your car?

A.   He was closer to my house, and I wanted to see the damage that had been done.

Q.   Did you ask Chip to go take photos for you?

A.   Yes.

Q.   So I want to focus on these two photographs.

          First on the one on the left, can you describe what's depicted in the photograph on the left.

A.   It looks like the top of my Porsche was cut open and that's where they inserted the Molotov cocktail.

Q.   And the photograph on the right, from what angle is that photograph taken?

A.   It looks like that's from the passenger's side looking up at the roof.

Q.   On the right-hand side of that photograph what is the hole -- is that the same hole in the roof you can see on the photograph on the left, 3F-101?

A.   Yes.

          MS. JOHNSON:  Can you take these down, Ms. Foster, and pull up 3F-103 and 3F-105 side by side.

Q.   Mr. Mescudi, starting with the one on the left, can you please describe what we are seeing in Government Exhibit 3F-103.

A.   That's the door to the driver's side, smoke damage.

Q.   Then what is depicted in the photograph on the right?

A.   That's the hole in my roof.

          MS. JOHNSON:  Can you take those down, Ms. Foster, and pull up Government Exhibit 3F-104 and 3F-108.

Q.   What's depicted in these two images?

A.   The damage to the driver's side.

Q.   You mentioned a Molotov cocktail earlier.

A.   Yeah.

Q.   What's a Molotov cocktail, to your understanding?

A.   It's -- would you say explosive, or something like that.  I guess it's a bottle with some type of like inflammatory liquid

inside and a cloth that you light on fire and it ignites.

Q. Did you eventually get to your home on the day of the car fire?

A. Yeah.

Q. What did you see when you arrived home?

A. Just the damage. I saw the Molotov cocktail -- yeah.

Q. Are these photographs that we just looked at similar to what you saw when you arrived home?

A. Yeah.

Q. When you say, I saw the Molotov cocktail, what did you see?

A. The bottle and it was kind of just burnt up.

Q. Was any law enforcement present when you arrived here to your home?

A. Yes.

Q. Did you speak to law enforcement that day?

A. Yes.

Q. Did you make a report?

A. Yes.

Q. With respect to your car, was your car able to be repaired after the fire?

A. No.

Q. And when you said that you saw the bottle for the Molotov cocktail when you returned home, where was that bottle?

A. On the ground.

Q. Was it on the ground inside or outside of your vehicle?

A. Outside of the vehicle.

Q. Was it near the vehicle?

A. Huh?

Q. Where was it in relation to the vehicle?

A. It was near the vehicle.

Q. What was your understanding of where the Molotov cocktail was found by law enforcement?

A. In the driver's seat.

Q. I think you mentioned this, but was your car able to be repaired?

A. No.

Q. What was your reaction to your car being set on fire?

A. What the fuck.

MR. STEEL: Objection.

THE COURT: That's overruled.

Ms. Johnson, we are going to take like a five-minute break whenever you are ready in the next couple of minutes, when you find a good landing place.

MS. JOHNSON: I'm about to move on to a different topic, so I think this may be a good landing place.

THE COURT: Very good.

Members of the jury, we are going to take a short recess, and we will be back in 10 minutes, so around 11:22 or thereabouts.

All rise.

(Jury not present)

THE COURT:  Mr. Mescudi, we will be back in 10 minutes.

Everyone, we will be back in 10.

(Recess)

THE COURT:  Let's come back.

Ms. Comey, are we still on pace, based on what we had discussed yesterday, in terms of the witnesses for today?

MS. COMEY:  We will definitely get through all of the witnesses today.  When is a little up in the air.  Mr. Kaplan's cross was about three times as long as we had expected.  But other than that, we will get through all of the witnesses today, your Honor.

THE COURT:  That's fine.  I am trying to make use of the time.

Let's get Mr. Mescudi back.

Please be seated unless you're choosing to stand.

Welcome back.

THE WITNESS:  Thank you.

(Jury present)

THE COURT:  Ms. Johnson, you may proceed when ready.

MS. JOHNSON:  Thank you, your Honor.

BY MS. JOHNSON:

Q.  Mr. Mescudi, before we took the break we were talking about the day your car was set on fire.  Do you remember that?

A.   Yes.

Q.   Just two additional questions about that day.

MS. JOHNSON:   Ms. Foster, could you please pull up what's in evidence as Government Exhibit 3F-105.

Q.   Mr. Mescudi, was the damage depicted in Government Exhibit 3F-105 present on your vehicle before you got the call from the dog sitter you described earlier?

A.   I'm sorry.   Can you repeat that.

MS. JOHNSON:   I'll strike that question.

Q.   The last time you saw your car prior to the phone call you got from the dog sitter, did your car look like this?

A.   No.

Q.   What was your understanding of whether this was accidental or intentional?

A.   It was intentional.

MS. JOHNSON:   Ms. Foster, can you please pull up Government Exhibit 3F-103.

Q.   Mr. Mescudi, did the door of your car look like this before you got the call from your dog sitter that there was a fire in your car?

A.   No.

Q.   Was it your understanding that this damage was accidental or intentional?

A.   Intentional.

MS. JOHNSON:   You can take that down now, Ms. Foster.

Q.   When was the last time you saw Ms. Ventura?

A.   2012.

Q.   Where did you see her?

A.   At the Soho House.

Q.   When did you see Ms. Ventura at the Soho House relative to the day your car was on fire?

A.   Couple of days later.

Q.   Why were you at the Soho House?

A.   I reached out to Sean Combs after my car had caught fire and, you know, finally told him that we needed to meet up to talk, you know.  He had been wanting to talk to me.  So after the fire I was like, this is getting out of hand.  I need to talk to him.

Q.   Why was it Mr. Combs you reached out to after the fire?

A.   Because I knew he had something to do with it.

MR. STEEL:  Your Honor, can we have a sidebar?

THE COURT:  Is there an objection?

MR. STEEL:  Objection.

THE COURT:  Objection is sustained.  The jury should disregard the witness' last answer.

Ms. Johnson, you may ask your next question.

Q.   Mr. Mescudi, who, if anyone, helped arrange the meeting at the Soho House?

A.   This man named D-Roc and my manager, Dennis Cummings.

Q.   Who is D-Roc, if you know?

A.   I don't know exactly what he does for Mr. Combs, but I guess he was like security or somebody.

Q.   Do you have an understanding that he worked for Mr. Combs?

A.   Yes.

Q.   Where at Soho House was the meeting held?

A.   It was held -- the rooms are not there anymore, but they used to have like meeting rooms on the first floor.

Q.   In which city was the meeting held?

A.   Hollywood.

Q.   In Los Angeles?

A.   Yeah.

Q.   Can you describe what happened when you arrived at the Soho House.

A.   Yeah.  I walked in and I met D-Roc.  He was escorting me into the room.  And then I got to the room.  It was -- one wall was all window and Sean Combs was standing there staring out the window with his hands behind his back like a Marvel super villain.  Yeah.  It was just me and him in the room.  No security, nobody.

Q.   Was Ms. Ventura present when you initially arrived at the meeting?

A.   No.

Q.   What happened when it was just you and Mr. Combs in the room at the Soho House?

A.   We discussed, you know, pretty much the whole story about

how me and Cassie first started to date to what it was to how it ended. And his whole point was, you know, we were homies, you know, that was my girl. I let him know that, you know, she told me they were broken up, and I took her word for it. Yeah.

Q. What was Mr. Combs' demeanor during this meeting?

A. Very calm. He kept offering me water. He offered me water twice.

Q. What was your reaction to his demeanor?

A. It was very off-putting. It was weird that he was so calm.

Q. You mentioned that Ms. Ventura wasn't present when you first arrived?

A. No.

Q. Did that change?

A. Yes. She eventually came.

Q. And how did you react when Ms. Ventura arrived?

A. I was upset to find out that she had kind of went back to him.

Q. What did Ms. Ventura do when she arrived?

A. She pretty much kind of explained that we fell in love and things just happened and you know.

Q. I believe you testified to this earlier, but how soon was the meeting at the Soho House in relation to the day your car was on fire?

A. I think it was like the next day.

Q. At that same time did you have conflicts with anyone else?

A.   No.

Q.   Can you describe how the meeting with Mr. Combs ended at the Soho House.

A.   Yeah.  We stood up, shook hands, and as I was shaking his hand I said, what are we going to do about my car?  I made sure to ask him right when our hands were clasped together, where he couldn't run away and I could look at him square in his eyes, and he looked right back at me, very cold stare, and said:  I don't know what you're talking about.  I said:  OK.  I took my hand from his.  And he said:  Wait.  I thought we were cool.  Is there a problem?  I was like:  You said you didn't burn my car, right?  You said that's your word.  He said:  Yeah.  I was like:  That's it.

Q.   When Mr. Combs looked at you and said, I don't know what you are talking about when you asked about your car, what was his tone of voice?

A.   Very calm.

Q.   After this meeting were there any other break-ins at your home?

A.   No.

Q.   And after this meeting was your car ever set on fire again?

A.   No.

Q.   Have you seen Mr. Combs since that Soho House meeting?

A.   Yes.

Q.   Approximately when did you next see Mr. Combs?

A.   Couple of years later at the Soho House again.

Q.   Can you describe what happened when you saw him at the Soho House a few years later?

A.   Yeah.  He was with his daughter, and he pulled me to the side and basically apologized for everything.  He said, and I quote:  Man, I just want to apologize for everything and all that bullshit.

Q.   Between the break-in and the car fire and Mr. Combs' apology a few years later, did you have any other conflicts with Mr. Combs in that interim time period?

A.   No.  After I got the apology, I kind of found peace with it because I thought, you know, that was the last thing I was expecting to get from him.

MS. JOHNSON:  Your Honor, may I have one moment?

THE COURT:  You may.

MS. JOHNSON:  No further questions at this time.

THE COURT:  Thank you, Ms. Johnson.

Mr. Steel.

CROSS-EXAMINATION

BY MR. STEEL:

Q.   I want to ask you some questions about your Porsche.  OK?

A.   Yes.

Q.   So if you remember, it's January 9 of 2022.  Does that sound right?

A.   2012?

Q. What did I say?

A. You said 2022.

Q. I apologize. 2012.

A. Yeah, yeah.

Q. Sound right?

A. Yes.

Q. And you are with your former girlfriend the night before at her sister's house, fair to say?

A. Yes.

Q. And you get a phone call alerting you that there has been serious damage to your vehicle?

A. Yes.

Q. And are there any surveillance photographs at that time?

A. No.

Q. And law enforcement was called, correct?

A. Yes.

Q. Fire department also came. Do you remember that?

A. Yes. My dog's babysitter did send me some pictures of the damage.

Q. You know that fingerprints were taken, true?

A. Yes.

Q. And you understood what fingerprints were in 2012, right?

A. Yes.

Q. You knew that DNA was collected, true?

A. Yes.

Q. You know that DNA comes back to a female, right?

A. You said what now?

Q. The DNA comes back to a female.

MS. JOHNSON: Objection.

THE COURT: Grounds.

MS. JOHNSON: Hearsay, speculation, foundation.

THE COURT: Mr. Steel, maybe you can ask some more questions.

MR. STEEL: Sure.

Q. Are you aware that DNA was collected from your vehicle?

A. Yes.

Q. And you kept in touch as much as you could about this incident, fair to say?

A. Yes. I reached out to the police department a couple of times.

Q. And were you aware that the results came back from the DNA that it came to a female? That's my question.

MS. JOHNSON: Same objection.

THE COURT: Sustained.

Q. Do you know that there were results from the DNA?

MS. JOHNSON: Objection.

THE COURT: That's overruled.

A. I tried to reach out to the police. I didn't hear any follow-up about any of the fingerprints or anything.

Q. No eyewitness that puts Sean Combs near or around your

property on or about January 9, 2012, fair to say?

A. Yeah.

Q. And no eyewitness or other evidence that anybody affiliated with Mr. Sean Combs was on or around your property on January 9, 2012, is that true?

MS. JOHNSON: Objection.

THE COURT: Hold on for a second.

That's sustained.

Q. You don't have any information, do you, you personally, that anybody affiliated with Mr. Combs was on or around your property at the time of the damage to your vehicle, is that true?

A. No.

Q. So it's January 9 of 2012, but before that date, if you can just lock in, before that date, your relationship with Ms. Ventura has ended, fair to say?

A. Yes.

Q. And you knew it ended because she told you it ended, fair to say?

A. I don't know if she told me it ended. We just stopped talking.

Q. And you and Ms. Ventura had been talking every day for about a year, is that true?

A. For the most part.

Q. And when I say every day, I'm not saying it has to be just

on the phone.  It could be in person, text, but you were in close communication with her, right?

A.  Yes.

Q.  And that's why it was surprising to you, or I think your word today before this honorable Court and the jury, you were very confused to hear that she was dating Sean Combs while dating you, right?

A.  Yes.

Q.  Ms. Ventura was not frank with you, true?

A.  True.

Q.  She played you.  That was your words, right?

A.  Yes.

Q.  When she played you she was convincing about that, right? You had no clue?

A.  No clue.

Q.  You were with her a lot, right?

A.  Um-hum.

Q.  True?

A.  Yes.

Q.  Now, you are a very accomplished artist.  I know you're modest.  But that's an objectively factual statement.  Fair to say?

A.  Yes.

Q.  I'm not trying to embarrass you.

A.  Yeah.

Q. And you have done incredible things with your career, fair to say?

A. Yes.

Q. And you have a following that is so close, to this day, of fans, true?

A. Yes.

Q. And in 2011, so I am going back to the year we are talking about -- I know we are also talking about 2012, but it goes into 2011, 2012. You did a nationwide, actually international, Canada too, tour. Do you remember that?

A. Yeah. I think I did. Yeah.

Q. Called, I believe -- and you tell me. If I'm wrong, you got to tell the jurors -- Cud Life tour. You remember that?

A. Yes.

Q. You were doing approximately, I'm not saying it's a hundred percent, approximately, if you remember, a concert in a different city than Los Angeles every week. You had 65 different places that you visited. Does that sound right?

A. I don't know if it was 65, but yeah.

Q. You were the act. You were the lead. It wasn't like you just hooked on to somebody else, a bigger artist, true?

A. True.

Q. And you were playing at large venues, right?

A. Yes.

Q. And in 2011, you also knew -- you had previously known of

Mr. Sean Combs, right?

A. Yes.

Q. And you describe, in your words, if you don't mind, but he was an icon at that time. Is that fair to say?

A. Yeah.

Q. He transcended different types of businesses and art, is that true?

A. Yeah.

Q. He was in fashion, right?

A. Yes.

Q. Music?

A. Yes.

Q. Not only performed, but he produced, right?

A. Right.

Q. He made other people tremendously popular, or tried, right?

A. Right.

        MS. JOHNSON:  Objection.

        THE COURT:  Overruled.

A. Right.

Q. And he was in other types of business, including liquor and other international ventures. You knew all this, right?

A. Somewhat. I didn't know all his business dealings.

Q. When Sean Combs was with you at one event after one of your concerts in 2011, he actually asked you if you would do him a favor and do a song with Ms. Ventura. Is that true? Do you

remember that?

A. Vaguely, yeah.

Q. You graciously agreed, right?

A. Right.

Q. You were in a studio doing your art with Ms. Ventura. Is that true?

A. Yes.

Q. And that's how you guys really became close, right?

A. We were cool before.

Q. And this didn't hurt your relationship, right? It was nice. You enjoyed the time with her, true?

A. Yeah. It was truly just friends at that time.

Q. Mr. Combs wasn't around you and Ms. Ventura when you were with her, right?

A. No.

Q. And she wasn't getting all these text messages from him, to your knowledge, when you were with her, right?

A. Not to my knowledge.

Q. You two were locked in. You two were focused on each other. You had a great relationship is my point. Is that true?

A. Yes.

Q. And you did things like, you exercised together, right?

A. Exercised together?

Q. Yeah. You went hiking.

A.   No.  I don't remember going hiking.

Q.   Watch movies?

A.   We watched a movie or two.

Q.   Did music?

A.   Yeah.

Q.   Drugs?

MS. JOHNSON:  Your Honor, can we get a time period?

MR. STEEL:  2011.

THE COURT:  Let's get a new question.

MR. STEEL:  Yes.

Q.   Did drugs together?

A.   When you say drugs, what do you mean, like weed?

Q.   Yeah.

A.   We smoked some weed, yeah.

Q.

MS. JOHNSON:  Objection.  Sidebar.

THE COURT:  Sustained.  You can move on.

Q.

MS. JOHNSON:  Objection.  Can we have a sidebar?

THE COURT:  You may.

(Continued on next page)

(At sidebar)

THE COURT:  Let's move on.  We don't need to cover this.  What's going on?

MR. STEEL:  I believe that it was discussed on direct, and I'm exploring their relationship.

THE COURT:  What is there to explore?  What's the relevance of the question?

MR. STEEL:  That they were intimate.

MS. JOHNSON:  Your Honor, this is a direct violation of Rule 412.

THE COURT:  The first question definitely was.  I sustained the objection.

What's the objection on the second question?

MS. JOHNSON:  Same objection.  I think intimate is also violating 412, especially given the sustained objection.

THE COURT:  Let's move on.  I think you can talk -- they were in a relationship, right.  What other relevance to this does any of this line of questioning have?  What does it matter?

MR. STEEL:  All right.  I note my objection.

THE COURT:  I'm asking you a question.  What is the answer?

MR. STEEL:  I think it matters that there has been testimony from Ms. Ventura that she is being suffocated, these are my words, by Mr. Combs, and she is spending all her time

doing unconsensual sex, yet she is having intimate relations with this gentleman and it's all calm and consensual.  That's really where I'm going.

THE COURT:  If that's the proffer of relevance, then the objection is sustained.

Let's move on to the next question.

(Continued on next page)

(In open court)

THE COURT:  Mr. Steel, you may proceed.

A.  Mr. Steel, I just want --

THE COURT:  You can't say anything.  Mr. Steel is going to ask you a question, and you can answer.

THE WITNESS:  I just wanted to clarify something from earlier.

THE COURT:  You are going to have a chance on redirect.

THE WITNESS:  Cool.

Q.  Do you want to clarify something?

A.  Yeah, yeah.  I don't think the date was 2011 when Sean Combs asked me to do the song with Cassie.  I think it was 2010.

Q.  Thank you.

A.  Yeah, yeah.

Q.  Now, you really liked Ms. Ventura, is that fair to say?

A.  Yeah.

Q.  She is smart, right?

A.  Yup.

Q.  She is talented?

A.  Yes.

Q.  And she was fun to be with, true?

A.  Yes.

Q.  Outgoing?

A.   Yeah.

Q.   Strong personality?

A.   Yeah.

Q.   And she is interesting to be with, fair?

A.   Yeah.

Q.   And she told you, did she not, that for the last four years, so I am going back, 2011, four years before that, she really wasn't with Mr. Combs.  It was off again, on again, something to that effect.  Is that true?

A.   I don't know if that was the exact conversation we had. The first time she talked to me about her relationship with him was around Thanksgiving 2010, and that's when she was telling me she was having problems.

Q.   Do you remember meeting with the prosecutor here, as well as other people, including the agents, about this case?

A.   Yes.

Q.   Do you remember telling them that you believe from Ms. Ventura that for the past four years before 2011 she and Mr. Combs were in constant off again on again?  Do you remember that?

A.   No, I don't remember that.

Q.   There may be a book that might help us in front of you.  It is to your left.  If you see, on the bottom of the page --

A.   Which page?

Q.   If you look at the second -- you might have a Post-it note

at the very top of a couple of pages. The second Post-it note?

MR. STEEL: Your Honor, for the parties who don't have a book, it's 3512-004.

Q. If you look at your second Post-it. You see at the very top?

A. The second Post-it note is a police report.

MS. JOHNSON: Objection.

THE COURT: Hold on.

Mr. Steel, first of all, there are Post-it notes in this binder instead of the usual tabbed pages that we usually have. Do you have this so you can just show Mr. Mescudi the document on the screen?

MR. STEEL: Yes.

THE COURT: I myself am having trouble finding it.

MR. STEEL: It's 3512-004.

THE COURT: It should come up on your screen in a second.

Q. Page 6, the middle of the page. It's the second full paragraphs, three lines up. It's going to be highlighted for you.

THE COURT: Just take a second, read it to yourself, and when you are ready, you are going to get another question.

Q. You see where it's highlighted. You can read it all if you need to.

A. OK.

THE COURT:  Take it down, Mr. Steel.

MR. STEEL:  Sure.

Q.  Do you remember telling law enforcement that Ms. Ventura told you that the relationship with Mr. Combs --

MS. JOHNSON:  Objection.

Q.  -- had been off again on again for four years?

A.  Law enforcement?

THE COURT:  Hold on.  What's the grounds?

MS. JOHNSON:  Reading from the document.

THE COURT:  Are you just asking the same question you asked the last time?

MR. STEEL:  Correct.

THE COURT:  Overruled.

Mr. Steel, let's get a new question.

Q.  Do you remember telling that to law enforcement?

A.  Yes.

Q.  In 2011, Ms. Ventura confided in you, true?

A.  Yes.

Q.  And you confided in her?

A.  Yeah.

Q.  You were even so close with her that for Christmas that year you flew across the country to Connecticut her, home state, is that fair to say?

A.  Yes.

Q.  And you spent about three days Christmas with Ms. Ventura,

true?

A.   Yes.

Q.   Her mother and father.

A.   And her brother.

Q.   And her brother.

          And you did things with their family, true?

A.   Yes.

Q.   And you had -- it was a great time?

A.   Yeah.

Q.   And you felt very close with her?

A.   Yes.

Q.   And this is after the trespass into your home, true?

A.   Yes.

Q.   With regards to -- you said that you were hurt when the relationship ended with Ms. Ventura, true?

A.   Yes.

Q.   Because you really cared for her and you knew your feelings for her and you felt that she felt the same about you, true?

A.   Yes.

Q.   By the time of December 22 of 2011, that's when your house -- remember when you talked to the ladies and gentlemen of the jury?

A.   Yes.

Q.   I want to talk to you about some of that, OK?

A.   OK.

Q. You believe that you left your front door open. When I say open, I mean unlocked. Is that fair to say?

A. Yes.

Q. And there was no forced entry into the home, true?

A. No.

Q. Am I correct?

A. Yes.

Q. And in the home there was no damage to the home? By damage I mean there was no chairs turned over, glass broken, holes in the wall, things like that. True?

A. No.

Q. The only thing -- I'm not belittling it, but the only things that were displayed differently is there were some Christmas presents that were unwrapped, right?

A. Yes.

Q. And your dog was behind the door?

A. Right.

Q. Locked in a bathroom, basically.

A. Yeah.

Q. True?

A. True.

Q. And no other disturbance there, right?

A. No.

Q. And you spoke with Mr. Combs or Sean that evening or that morning, right?

A.   I don't know when.  I can't remember.

Q.   Do you remember calling --

A.   You're talking about after the break-in?

Q.   I'm saying when you went back to your house and you called him on his phone, you told the ladies and gentlemen of the jury --

A.   Yeah, yeah, yeah.

Q.   And Mr. Combs, he was calm, right?

A.   Yes.

Q.   He didn't curse at you, did he?

A.   No.

Q.   He didn't threaten you, right?

A.   No.

Q.   He just said, we need to talk, basically.  Right?

A.   Yeah.

Q.   And you were demanding from him, are you at my house?  That's basically what you were saying.

A.   Yeah.

Q.   Later, after you got home, you called Mr. Combs again because he's not at your house, right?

A.   Right.

Q.   And he answers the phone, true?

A.   Yes.

Q.   Again, he's calm, right?

A.   Yes.

Q. And he tells you, I'm coming to your house, something to that effect, right?

A. Yeah.

Q. There is no mention of a firearm, right?

A. No.

Q. No one threatened you with a firearm, right?

A. No.

Q. You came to meet him, you had no belief that he had a firearm, no one -- Ms. Capricorn Clark didn't tell you that, right?

A. At that point I really didn't know. Maybe he would. I couldn't call it.

Q. Let's do it this way. Ms. Capricorn Clark didn't tell you that, right?

A. You know, no, but I took it --

THE COURT: Hold on. Mr. Steel.

Q. I guess what the judge is telling us, the answer to the question, you related a conversation with Ms. Capricorn Clark to the jury, right?

A. Yeah, yeah, yeah.

Q. She didn't tell you he is armed with a firearm, right?

A. No.

Q. You are a strong person. Is that fair to say? That's how you categorize yourself?

A. Yeah.

Q.   You are a principled person, fair to say?

A.   Yes.

Q.   And you went back to your home, you told the ladies and gentlemen of the jury, to fight Mr. Combs if he was there, right?

A.   Yeah.

Q.   Because nobody has the right to wait for you in your home, whether damage was done or not.  That was your position, right?

A.   Yeah.  If you want to talk, you can text me.  We can talk.  But this crossed the line.

Q.   And Ms. Ventura, when she told you and confided in you about her relations with Mr. Combs, she told you that there was physical abuse, right?

A.   Yes.

Q.   And that bothered you because you were -- these are my words.  If it is not true, just say it's not true -- you were in love with her, right?

A.   Yeah.

Q.   And she never told you, as close as you were with her, that there was any type of sexual abuse.  Is that true?

A.   No.

Q.   Am I correct?

A.   Yes.

Q.   And she also told you, with all your dealings with her, texting every day or speaking every day or seeing her every

day, whatever, the relationship is what I'm talking about, you never saw Mr. Combs do anything inappropriate to Ms. Ventura. Is that true?

A.   No.

Q.   Let me just ask it differently.  Am I correct?  Is that a correct statement?

A.   Yes.

Q.   You never were interrupted by Mr. Combs, true?

A.   No.

Q.   You spent time with her freely, right?

A.   Right.

Q.   And Ms. Ventura was free with you.  She was care free, as far as you could tell, true?

A.   Yeah.

Q.   Now, with regards to going back to the meeting at the -- I believe you said it's called the Soho House?

A.   Yes.

Q.   And some of the jurors may not have been there before.

A.   OK.

Q.   So have you been or do you remember being in that room? Can you describe that room that you talked about that you and Mr. Combs were in?  Can you just paint for them what it really looks like?

A.   Yeah.  It's like a nice-sized big room, windows.  One wall was all windows looking into Beverly Hills.  And we were on

like -- I don't know -- Soho House starts at like the seventh

floor, or something like that, so we were high up.

Q.  Do you know -- some people may not know -- what is the Soho

House?  If you were going there, what would you be doing there,

potentially?

A.  It's like a members-only type restaurant slash, you know,

meeting place.  You can have business meetings there or get

lunch, get dinner.

            (Continued on next page)

BY MR. STEEL:

Q. Now, Mr. Combs made it clear to you that he was also confused, true?

A. True.

Q. Just like you, he's similarly situated, he did not, to your knowledge, know that you were dating Ms. Ventura, true?

A. Yes, true.

Q. And he wants to understand how did this happen and you want to understand how did this happen, basically, right?

A. Yes.

Q. And Ms. Ventura was living two different lives; is that true?

A. Yes.

            MS. JOHNSON:  Objection.

            THE COURT:  Overruled.

Q. When you went in that room with Mr. Combs, no weapons, to your knowledge, true?

A. No.

Q. He definitely didn't threaten you, true?

A. No.

Q. In fact, he was gracious, I think your word was really calm?

A. Yeah.

Q. And you were professional, as well, true?

A. Yes.

Q. And it was an understanding, a meeting that this was about a girl, a relationship, and both of you guys were played, that's pretty much how it ended, true?

A. True.

Q. And the person who played you is the same person who played Sean, it's Ms. Ventura, true?

A. True.

Q. To your knowledge, we're approximately, if you don't mind, approximately 13 and a half years after January 9th, 2012 when your car was damaged, is that approximately true?

A. Yes.

Q. To your knowledge, no one has been charged or arrested for the damage to your car; am I right?

A. No.

MS. JOHNSON: Objection.

THE COURT: Sustained. The jury should disregard the witness's last answer.

Mr. Steel.

Q. Have you ever gone back to court at any time or been notified to go to court as a victim about your car?

MS. JOHNSON: Objection.

Q. Damage?

THE COURT: Do you need a sidebar? I'm not understanding the grounds. Do you want a brief sidebar?

MS. JOHNSON: Yes.

(At the sidebar)

MS. JOHNSON:  Your Honor, that question is asking Mr. Mescudi to testify about a legal conclusion regarding any other cases related to his car.  In fact, the arson in this case that relates to his car is charged as a predicate in this very indictment, hence he is here testifying.

THE COURT:  Thank you.  Now I understand.

MR. STEEL:  Now I understand, too.  I'll make it clear in the State of California.

MS. JOHNSON:  I still don't think that's relevant.  It should be excluded under confusion and 403 grounds.

THE COURT:  I think what he's saying is that there was an investigation that you brought up on direct examination, law enforcement was on the scene.  He's just trying to say that as a result of that investigation, there was no followup, he didn't go back, there wasn't any proceeding in California. That's all he's saying.

MS. JOHNSON:  I don't know that Mr. Mescudi knows that and I think we need to limit the time period if that is in fact the question.

MR. STEEL:  I will say, before this case or before 2024, is that --

MS. JOHNSON:  It was 2012.

THE COURT:  You said law enforcement was on the scene, did that law enforcement, did they figure out who had done

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

this, something like that.

MS. JOHNSON:  There's no foundation that he would know that.

MR. STEEL:  He would know it under the victim rights bill.  If somebody was arrested, he has to know that.

THE COURT:  Well, he doesn't know any of that.  Your point is he has not been contacted by law enforcement in California concerning what happened.

MR. STEEL:  Exactly.

THE COURT:  That's fine.  All right.  Do that.

(Continued on next page)

(In open court)

THE COURT:  Mr. Steel.

Q.  In the 13 and a half years that has passed, in California, have you ever been notified that there's been any other action on this case in California?

A.  Action on?

Q.  The car, the damage to the car.

A.  No.

MR. STEEL:  Your Honor, may I have one moment?

THE COURT:  You may.

Q.  Do you remember, back when you were with Ms. Ventura, did she have multiple phones, if you can remember?

A.  I don't think I remembered that.

Q.  Do you remember telling that to law enforcement, that she had multiple phones?

A.  I don't know.  I can't remember.

Q.  Can I ask you to look at something in this honorable court, with this Court's permission, to see if it jogs your memory?

A.  Yeah.  If I said it, I guess I said it.

THE COURT:  Let's go to the next question.

What are we looking at, Mr. Steel?

MR. STEEL:  It's 3512.006, page 6 of 7, fourth paragraph, second line.

Q.  Would you do me a favor, read that to yourself when it's on your screen, it's the line above it, it's going to be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

highlighted for you, and tell me if that refreshes your memory.

A.  Yeah, it does.

THE COURT:  Take it down.  Mr. Steel, next question.

Q.  Fair to say, with your memory refreshed, she had multiple phones?

A.  Yeah.

Q.  Do you know what a burner phone is, do you know what I'm talking about?

A.  Yeah.

Q.  Can you explain that to the jury?

A.  I guess it's an untraceable phone.

Q.  With regards to the night of the trespass in your home, I think you called it a break-in, I guess more narrowed to trespass, but that's what I'm talking about, okay?

A.  Right.

Q.  You received a phone call from Ms. Ventura explaining that she gave your home address to Combs.  Do you remember that?

A.  The morning of, not the evening.

Q.  About 5:00, 5:30 in the morning; fair to say?

A.  Yes.

Q.  I'm just trying to coordinate you.

A.  Yeah.

Q.  And that information about your address, according to what you were told, came from Ms. Ventura to Mr. Combs?

A.  Yes.

MR. STEEL:  Your Honor, I do not believe I have any other questions.  I want to thank the Court.  Thank you so much, sir.

THE WITNESS:  Yeah, no problem.

THE COURT:  Ms. Johnson.

MS. JOHNSON:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MS. JOHNSON:

Q.  Mr. Mescudi, you were asked by Mr. Steel some questions on cross-examination about Ms. Ventura confiding in you.  Do you remember those questions?

A.  Yes.

Q.  And do you recall that Mr. Steel asked you about Ms. Ventura confiding in you about Mr. Combs being physically abusive to her?

A.  Yes.

Q.  What did Ms. Ventura confide in you specifically about that abuse?

A.  That he would hit her, sometimes kick her.

Q.  Do you also recall that Mr. Steel asked you some questions about whether Ms. Ventura was free when she was with you?

A.  Yeah.

Q.  And he described her as carefree.  Do you remember that line of questions?

A.  Yes.

Q. Directing your attention to the day of the break-in, the morning when Ms. Ventura called, would you describe her as carefree when she called you that morning?

A. No.

Q. Would you describe her as carefree throughout that day when you saw her?

A. No.

Q. You were also asked some questions about a conversation you had with Capricorn Clark. Do you remember those questions?

A. Yes.

Q. Now, what exactly did Ms. Clark tell you about how she ended up at your house that morning?

A. She told me that Sean Combs and an affiliate came to her apartment and made her get in the car to come up to my house.

Q. What else, if anything, did she say about how they made her get in the car?

A. They forced her physically.

Q. What were your concerns, if any, about going to your house that day?

A. I didn't really know what I was walking into, but I was so angry at first. Then, once I thought about it, not really knowing if they had weapons or if there was any type of situation like that, that's when I called the police.

Q. And did you know either way whether there were any weapons involved?

A.   No.

Q.   And when Ms. Ventura called you that morning, what was your understanding of what she was scared of?

A.   Him finally knowing that we have been hanging out and that he had my address and he was probably going to come over to my house.

Q.   And who's the him that you were describing?

A.   You said what now?

Q.   When you say him, who are you referring to?

A.   Sean Combs.

Q.   And how would you describe Cassie that day of the break-in?

A.   Just really shook.

Q.   Do you have an understanding of why she was shook?

A.   Yeah, because of just the circumstance of him finding out about us.

Q.   You were also asked questions about your feelings for Ms. Ventura.  Do you remember that?

A.   Yes.

Q.   And you were asked about whether you cared for Ms. Ventura. Do you remember that?

A.   Yes.

Q.   Why did your relationship with Ms. Ventura end, despite having feelings for Ms. Ventura?

A.   The drama, it was just getting out of hand and kind of wanted to give her some space.

Q.   What drama are you talking about?

A.   The break-in and everything.

Q.   Why did you want to give it space?

A.   Just feel like things were just getting out of hand, you know, and for my safety, for her safety, you know, I just thought --

MR. STEEL:  Objection, your Honor.

THE COURT:  Let's get another question.

Q.   When you say your safety, why were you concerned about your safety?

MR. STEEL:  Objection, your Honor.

THE COURT:  Grounds.

MR. STEEL:  Speculation.  Future dangerousness.

THE COURT:  That's overruled.

Q.   You can answer.

A.   Repeat the question.

Q.   Sure.  You just said you were concerned for your safety and Ms. Ventura's safety.  Why were you concerned about your safety?

A.   Because I kind of --

MR. STEEL:  Your Honor, objection.  404(a).

THE COURT:  Give me one second.

MR. STEEL:  Can we approach, if needed?

THE COURT:  The objection is overruled.

Ms. Johnson, could you just ask the question again.

MS. JOHNSON:  Sure.

Q.  We were talking about when you broke off your relationship with Ms. Ventura.  Do you remember that?

A.  Yes.

Q.  And that's around the end of the year 2011; is that right?

A.  Yes.

Q.  And you mentioned you had safety concerns?

A.  Yes.

Q.  Why did you have safety concerns?

A.  Because I knew Sean Combs was violent --

MR. STEEL:  Objection, your Honor.  Can we approach?

THE COURT:  You may approach.

(Continued on next page)

(At the sidebar)

MR. STEEL:  May I?

THE COURT:  Yes.

MR. STEEL:  Your Honor, I'm going to move for a mistrial.  The government knows that the answer is about to be that Mr. Combs has had other people killed.  This is an outrageous question.

THE COURT:  He didn't say that.

MR. STEEL:  But he will say that.

THE COURT:  He hasn't said that.

MR. STEEL:  Well, he's about to say it.  I'm putting the Court on notice.

THE COURT:  No, you don't get to put me on notice.  There's no grounds for any kind of application along those lines because no question that you're talking about has been asked and the answer has not been given.

Now what is your objection to the question that was asked?

MR. STEEL:  Why were you scared of Mr. Combs, and his answer's going to be, because Mr. Combs is violent, he has had other people killed.

THE COURT:  His understanding of the things that had happened and his understanding of that event is not a 404(a) issue, which is what was raised, correct?

MR. STEEL:  It's not going to be a 4 -- it's not like

that.

THE COURT:  That was the objection that was raised. So what is the objection?

MR. STEEL:  He called his friend -- this is what is in the 3500, I know the Court read it.  He calls his friends who told him that Mr. Combs had had other people killed.  I believe that's going to be his answer why he was scared.  I'm preempting it because I know the Court, if he says it --

THE COURT:  That's the way you raise the issue.  Okay?

MR. STEEL:  Yes.  I just wanted to give you a preview.

THE COURT:  Now, what further questions do you have, Ms. Johnson?

MS. JOHNSON:  I don't have further questions on this and I don't believe that's what he would say.  I was specifically directing this to the end of the relationship and his concerns at that time.

THE COURT:  Well, to be fair, you asked the question, you got the answer.

And Mr. Steel, your point is let's just move on, right?

MR. STEEL:  Please.

THE COURT:  So let's move on.

(Continued on next page)

(In open court)

THE COURT:  Ms. Johnson, you may proceed.

MS. JOHNSON:  Thank you, your Honor.

Q.  Mr. Mescudi, do you recall being asked on cross-examination some questions about the meeting you had with Mr. Combs at the SoHo house?

A.  Yes.

Q.  Do you recall that Mr. Steel asked you questions about what Mr. Combs was thinking during that meeting?

A.  Yeah.

MR. STEEL:  Objection.

THE COURT:  Can you rephrase the question.

Q.  Do you recall that Mr. Steel asked you questions about whether Mr. Combs thought the meeting was about a girl?

A.  Yes.

Q.  Do you recall testifying earlier today about a conversation that you had with Mr. Combs at the end of that meeting?

A.  Could you repeat that.

Q.  Do you recall testifying earlier today about a conversation you had with Mr. Combs about that meeting?

A.  Yes.

Q.  Do you recall testifying that Mr. Combs said I don't know what you're talking about?

A.  Yes.

MR. STEEL:  Objection.

THE COURT: Hold on, Mr. Mescudi. If there's an objection, sometimes you can't hear it --

THE WITNESS: Okay. Sorry.

THE COURT: That's overruled. We got the answer. Let's go.

Q. Mr. Combs said, I don't know what you're talking about when you asked about your car; is that correct?

A. Yes.

Q. Did you believe Mr. Combs when he said he didn't know what you were talking about?

MR. STEEL: Objection.

THE COURT: Ms. Johnson, can you just rephrase the question.

Q. What was your understanding when Mr. Combs said he didn't know what you were talking about, at the end of that conversation?

MR. STEEL: Objection.

THE COURT: That's overruled.

Q. You can answer.

A. That he was lying.

MS. JOHNSON: No further questions.

THE COURT: All right. Mr. Steel.

MR. STEEL: Thank you, sir. No.

THE COURT: No further cross. All right.

Mr. Mescudi, thank you very much. You're done.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  This is a good time for our lunch break. Members of the jury, I believe your lunch is here.  So during the lunch break, same instructions as always, don't talk to each other about the case, don't talk to anybody else about the case through any means whatsoever, and have a great lunch. We'll be back at 1:00 p.m.  Thank you very much.

All rise.

(Continued on next page)

(Jury not present)

THE COURT:  Please be seated.

Ms. Comey, who do we have after the lunch break?

MS. COMEY:  We have Mylah Morales, your Honor.

THE COURT:  Who's next?

MS. COMEY:  Then it is the custodian from L'Ermitage, Frédéric Zemmour.  If we have time, Josh Croft, he is local, so if we don't get to him, that's fine.

As to Ms. Morales, Ms. Estevao has informed me that there are a number of exhibits that she may seek to introduce through Ms. Morales, and she has suggested it might be productive for me to show Ms. Morales those photographs before she takes the stand.  Given your Honor's order that I not do that, I wanted to expressly ask for your Honor's permission with defense counsel's consent to show those exhibits to her during the lunch break.

THE COURT:  Of course, that's fine.

MS. COMEY:  Thank you, your Honor.  Hopefully that will avoid any issues, but if we can come back a few minutes early in case there are issues with those exhibits.

THE COURT:  Yes, and it reminds me there was a Rule 16 objection raised as to certain exhibits.  My question is, I guess this is for Ms. Estevao, were the exhibits that are at issue turned over in compliance with the Court's order from over the weekend?

MS. ESTEVAO:  Some of them were included and some of them were not.  However, I would ask the Court to allow us continue conferring with the government on this point and potentially raise it before the lunch hour as it may not be an issue.

THE COURT:  Let's try to come back 10 minutes earlier.

MS. COMEY:  Yes, your Honor.

I had one other issue I wanted to raise before the break, if that's all right, unless there was more your Honor wanted to cover?

THE COURT:  No, you may.

MS. COMEY:  It's regarding Rule 412, your Honor.  All of us at the government table were frankly shocked at counsel asking the question that he asked about sexual activity with another person.  I do not think your Honor's ruling from the bench could have been clearer about the bounds of Rule 412.  Apparently we need to make them even clearer.  The rule itself is crystal clear that any evidence of any victim's sexual activity outside of the charged conduct must be noticed, and the victim must have a right to be heard, and the victim must have a right to be heard in a sealed proceeding.  It is frankly outrageous that that question was asked in open court without notice to us, notice to the Court, or notice to the victim.  And so I would ask that the boundaries be made crystal clear from this point on that that question should not even be asked

without raising the issue in the first instance.

THE COURT:  Well, I agree with you that, one, the line was crystal clear; and two, that the line was crossed.

Mr. Steel, I mean, you knew what you were doing when you did it, and you still did it anyway, and that is unacceptable.  If there's an application for further relief, I'll hear it from the government.

But just to be clear, and this is how I understood the parties were handling this, with the witnesses that we've had to date, to the extent there was even a question about any Rule 412 concern, I've seen the parties meet and confer to discuss that issue to determine whether there's anything to be brought to the Court, and you did not do that here.  So you have to do that even if you think that the line of questioning or the exhibit might technically not fall within Rule 412, meaning something like the reformulation of your question.  You just need to raise that in advance and you need to raise it with the government.  It's not state secrets, it's not revealing any strategy, but you need to at least let people know that you're attempting questioning is or you're trying to put in an exhibit that's along those lines, that way we can police these things so we don't run into any potential issue.  In this instance, we should not have run into the issue and that first question was out of bounds.

So, is it going to happen again?

MR. STEEL:  No.

THE COURT:  If there's anything else to be done, the government will let me know.

MS. COMEY:  Our only request is that the question and answer be struck from the record.  Otherwise, at this time, we are not asking for further relief, but we do want to make very clear that any questions like that are totally out of bounds.

THE COURT:  You've made that clear and the question and answer will be struck from the record.

Now, anything further from the government?

MS. COMEY:  No.  Thank you, your Honor.

THE COURT:  You heard what I said on the 629(a) issue?  So just it's clear why I --

MS. COMEY:  Yes, your Honor.  The testimony was different than I had expected on timing, and I understood.

THE COURT:  Look, you still are in the government's case in chief.  So if there's further evidence that comes in that lays a foundation, then I'll hear it.  That's why I made that clear.  I didn't want to say that it was just out of the case, it could come in, but not right now.

Anything from the defense?

MR. AGNIFILO:  Nothing at this point, Judge.  Just one clarification, just because it will be easier.  Can we have sort of a standing understanding, and I need the Court's approval for this, that if we want the government to show

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

exhibits to their witnesses, that we don't have to come back to the Court and change the ruling?  We can do that with the Court's permission on a going-forward basis?

THE COURT:  If you have an agreement on something, usually it will be okay, and in this instance, it's okay.

MR. AGNIFILO:  Thank you, Judge.

THE COURT:  We'll see everyone back here at 12:50 to address any issues.

AFTERNOON SESSION

1:00 p.m.

THE COURT:  Let's have everyone back.  Are there any issues to address?

MS. COMEY:  There are some, your Honor.  We've managed to work out a number of issues, with thanks to my colleague for the defense, but there are some that I think we're going to need your Honor's ruling on.  I'm happy to tee it up and I'm happy to let Ms. Estevao explain her position.

There are a number of photographs that the defense produced to us for the first time, and they are all photographs of Ms. Cassie Ventura from various -- it looks like events or photo shoots or albums.  None of them were shown to Ms. Ventura during her testimony and none of them were produced to us before the trial, and the vast majority do not come from the government's discovery productions.

We've narrowed down the issues for today to a subset of these 146 photos to about a dozen that the next witness, Ms. Morales, recognizes as photos for which she did makeup.  I think the authenticity will be fine, she can testify that she recognizes the photos as photos for someone for whom she did makeup.

The remaining issue is a 403 and on a couple of 412 ones.  In some of these photographs, Ms. Ventura is constantly clad or topless or wearing only underwear on the bottom or

wearing a very low-cut dress and a very high-cut dress.  My concern with all of that ha is even if defense counsel is not planning to make an argument based in sexual stereotypes, putting in images of Ms. Ventura partially dressed or scantily dressed risks a stereotype in the minds of the jurors that if she dressed like this in photo shoots, if she dressed like this in public, then it makes it more likely that she consented to the sexual activity that's at issue here.

Now, I do not object to the defense cropping the photos to show Ms. Ventura's face or the parts of her body that are clothed and then introducing those to the jury.  My objection is to the portions where she is topless or only wearing underwear or is very scantily clad.  I don't think that is probative.  I don't think what she is wearing is probative and I think it is unfairly prejudicial and raises concerns of sexual stereotypes that are inappropriate in this trial.

THE COURT:  Now I have three exhibits in front of me.

MS. ESTEVAO:  Your Honor, just to back up a little bit.  We provided the government with a number of photos yesterday, and the relevance of these are to rebut the government's claim that was suggested in Ms. Ventura's testimony, that she spent all her time either participating in sexual activity or recovering from it, and that her career was stifled as a result, and also Ms. Morgan's testimony about Ms. Ventura over the years and losing confidence.  These are a

series of photos of many that exist because Ms. Ventura was in the public sphere and a public figure of her participating in red carpet events and other events and photo shoots. It also goes to a lot of the government's arguments about her keeping up her appearance specifically for sexual activity --

THE COURT: I've heard from Ms. Comey that there are about a dozen of these exhibits that are under dispute, right? Am I right?

MS. ESTEVAO: There are approximately a dozen that we will elicit, we will potentially elicit with Ms. Morales because she was the one who did the makeup for those particular events, and of that dozen, we've narrowed I believe the government's objections to five, and your Honor has three photos right now, and we're working on the other two, which we may reach a resolution on.

MS. COMEY: Your Honor, I can put on the record the ones we object to. They are defense exhibit 641, defense exhibit 652, defense exhibit 739, defense exhibit 744, defense exhibit 745, and defense exhibit 746. And with respect to all of those, the objection is the sex-based stereotypes that I articulated, with the exception of 641. My objection is not based on that concern about stereotypes for that one, it's just a picture of her head, but it is a picture in which she's holding what appears to be a gun up to her mouth, and that just feels entirely prejudicial. It seems to imply in some way that

she would possess guns, was the kind of person who would hold guns --

THE COURT:  I don't think you have to show a lot of unfair prejudice because the probative value is nil.  So 641 is out.  I mean, you can ask questions about this album or anything about it, but I don't see why the image of the cover has anything to do with this case.  So 641 is out.  I only have 652 and 739.  652 appears to be an album cover.

MS. COMEY:  I believe so, your Honor.

MS. ESTEVAO:  We can also bring these up on the screen, 652, please.

Your Honor, this is also another album cover.  And also, just to back up, in terms of the past 24 hours in conferrals with Ms. Comey, she raised issues with respect to many exhibits that we agreed to withdraw based on Ms. Ventura's clothing in those photographs, and we agree with Ms. Comey that those suggestions are not the ones that we're trying to convey with these photos, it's about her career opportunities and of the like.

And so, just to let your Honor know, we agreed to withdraw many, many photos, even though we would have a great argument that this was the way that Ms. Ventura dressed at the time, and it was the style at the time, and it's not meant to convey anything other than her full --

THE COURT:  What are the relevance of these exhibits?

That's what I'm trying to understand.  If you're trying to elicit from the witness that she did makeup for Ms. Ventura for various events, and in your view there are a lot of them, which goes to show that during the time period in question, she had a vibrant and event-filled life, great.  What's the purpose of these exhibits?  I'm not understanding what the pictures have to do with anything.  So it's just a 402 issue really.  It's like what's the relevance of this, and then we can get to 403.  Is there some kind of relevance that I'm missing?

MS. ESTEVAO:  The fact Ms. Morales was providing makeup for these photographs and photo shoots that were then used for the purposes of Ms. Ventura's album all supports the argument that she had a full and blossoming career.

That being said, we were using this opportunity and the extra time because of the absence of witnesses this afternoon to introduce a number of these photographs.  If it makes more sense, we can do it through a separate witness who knows more about Ms. Ventura's musical career.

THE COURT:  You have an objection to putting these into evidence.  Is there an objection, to the extent it's necessary, to using these images as demonstratives?  Meaning, to the extent it just helps the examination to say, you did makeup on the Love a Loser album cover, right, and let's show the jury what you did, great work.

MS. COMEY:  Your Honor, I would object to showing a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

topless photograph of one of our victims to the jury, strongly.

THE COURT: Well, it's not topless.

MS. COMEY: Your Honor, in this photograph, she's not wearing a shirt.

THE COURT: This is the one with the folded hands? Okay. So -- .

MS. COMEY: It's 652. She's not wearing a shirt, your Honor.

THE COURT: All right. Look --

MS. COMEY: I don't see the relevance --

THE COURT: Relevance is not established, Ms. Estevao, by the fact that you're filling time. So the fact that we have time here is not a reason for these exhibits to be admitted. And I'm still not understanding what the probative value of any of this is.

MS. COMEY: I'll note, your, we would be willing to enter a stipulation that Ms. Ventura in fact recorded a song called Love a Loser if that's what the defense wants to prove.

THE COURT: She can ask about it, and I assume the witness is going to say, I did the makeup and style for that album cover.

MS. COMEY: I would assume so, yes, your Honor.

THE COURT: Let me hear from Ms. Estevao.

MS. ESTEVAO: Your Honor, Ms. Ventura testified about her career being impacted, and her having an album Love a Loser

that was released and there's a photo associated with it to help corroborate that is certainly relevant.

MS. COMEY:  Your Honor, they don't need corroboration for a fact I'll stipulate to.

MS. ESTEVAO:  Your Honor, we're entitled to put in evidence to support the case.

THE COURT:  But the image is not probative of anything.  The image just is a depiction of something that you can elicit through testimony.  An objection has been raised on 403 grounds that I have to evaluate.

Now, I don't know that there's that much, if any, prejudice from putting any of these in.  I certainly don't see any prejudice from exhibit 739, which appears to be an image from a public event.  So I don't know what the prejudice would be.

MS. COMEY:  Your Honor, it's the same concern I raised, it is a low-cut dress --

THE COURT:  That's overruled as to 739.  Which, the only other one I have in front of me is 652.

MS. ESTEVAO:  Can we please pull up exhibit 744, 745, and 746, if you put them next to each other.

THE COURT:  I'll sustain the objection as to 652.

So now we have 744.  The objection is overruled as to 744.

Next, the objection is overruled as to 745.

Anything else?

MS. ESTEVAO:  746.

THE COURT:  Objection is sustained as to 746.

Anything further?

MS. COMEY:  I just wanted to correct one thing that I said, your Honor, right before the lunch break.  When I was referencing that the testimony didn't come in the way I expected, I had been meaning to correct what I said, not to concede that we don't think that the text message is admissible.  My colleagues tell me I may have been unclear, that I wanted to make clear that the witness's testimony was that this incident involving Gina and the apples happened earlier than I thought he was going to say.

THE COURT:  Yes.

MS. COMEY:  I think we will want to be heard, not now, at a later time about the admissibility of that exhibit.  But I just wanted to be clear that we were not conceding that we don't think that that exhibit is admissible -- or is not -- I'm sorry.  I'm tired, your Honor.

THE COURT:  That's okay.  That's okay.  That is in fact what I thought, but you have now clarified the record.

As I said, I think I said this after you made that remark, I'll hear the government if they want to get the document in.  I just have some questions as to what it relates to.

MS. COMEY:  Completely understood, your Honor, and I appreciate the opportunity to clarify, but I don't think we need to take it up now.

THE COURT:  So I believe we are ready.  So let me ask the courtroom deputy to get our jury.

THE DEPUTY CLERK:  Yes, your Honor.

(Continued on next page)

(Jury present)

THE COURT:  Welcome back, members of the jury.  The home stretch for today and for this week.

Government may call its next witness.

MS. COMEY:  The government calls Mylah Morales.

MYLAH MORALES,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Can I ask you to please give the Court your first and last name, and spell your first and last name.

THE WITNESS:  Mylah Morales, M-Y-L-A-H M-O-R-A-L-E-S.

MS. COMEY:  May I inquire, your Honor?

THE COURT:  You may.

MS. COMEY:  Thank you.

DIRECT EXAMINATION

BY MS. COMEY:

Q.  Good afternoon.

A.  Hello.

Q.  What do you do for work?

A.  I'm a celebrity makeup artist.

Q.  Could you, speaking in a slow voice so the court report can pick up what you're saying, please explain to the jury what a celebrity makeup artist is.

A.  We work with A-list celebrities for their photo shoots,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

videos, red carpet appearances, editorial, and just about everything.

Q. Would you please take a look around the courtroom today and tell us if you see anyone for whom you have worked as a celebrity makeup artist.

A. Yes.

Q. Who do you see?

A. Sean Combs.

Q. Would you please identify him by an article of clothing that he's wearing?

A. The gray sweater with a white collar.

MS. COMEY: Would the record please reflect that the witness has identified the defendant.

Q. Do you know Mr. Combs by any other names?

A. Puff Daddy, Puffy, P. Diddy, Love.

Q. By what name did you usually call him?

A. Puff.

Q. Approximately when did you work for Mr. Combs?

A. 2000 to 2005.

Q. And what kind of work did you do for Mr. Combs during that time?

A. Mens grooming, light makeup.

Q. What's mens grooming?

A. It's very light makeup for the camera.

Q. Why did you stop working for Mr. Combs?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   I went on to other clients.

Q.   After you stopped working for Mr. Combs, who is the next artist that you worked with?

A.   Rihanna and many others.

Q.   For how long did you work with Rihanna?

A.   13 years.

Q.   During the time you were working with Rihanna, what other artists, if any, did you provide makeup to?

A.   Cassie Ventura, Jennifer Lopez.

Q.   Are there others that you're not remembering right now?

A.   Yeah, there's so many.  It's like a long list of names.

          MS. COMEY:  Ms. Foster, can we please pull up what's in evidence as Government Exhibit 2A-401.

Q.   Do you see the picture on the screen in front of you?

A.   Yes.

Q.   Do you recognize the person in that photograph?

A.   Yes.

Q.   Who is that?

A.   Cassie Ventura.

Q.   About when did you first meet Cassie?

A.   I met Cassie when she was 16 years old.

Q.   And how did you meet her when she was 16 years old?

A.   On a photo shoot in Brooklyn for an editorial.

Q.   About when did you start more regularly doing makeup for Cassie?

A.   2007, I believe.

Q.   And how did you end up doing makeup for Cassie starting around 2007?

A.   She was signed to Bad Boy and that's when I started working with her.

Q.   And what is Bad Boy?

A.   It's a record label.

Q.   Whose record label?

A.   Sean Combs's.

Q.   About when was the last time that you did makeup for Cassie?

A.   2021 during COVID.

MS. COMEY:  We can take that down.  Thank you, Ms. Foster.

Q.   Over the years that you worked with Cassie, what was your relationship like with her?

A.   Well, we were close, she was like a little sister to me.

Q.   About how much older than Cassie are you?

A.   A few years, a few years older.

Q.   Over the years between 2007 and 2018, how often did you see Cassie in person?

A.   A few times a year.

Q.   At some point did you learn that Cassie was dating Mr. Combs?

A.   Yes, I did.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.  And do you remember about when you learned that?

A.  2007 or 8.  I'm not sure of the exact dates.

Q.  Focusing on the period between approximately 2007 and 2018, for what types of events did you do makeup for Cassie during that time period?

A.  I did makeup for Cassie for photo shoots, music videos, editorial.

Q.  What's an editorial?

A.  An editorial is a fashion magazine.

Q.  So a fashion magazine photo shoot?

A.  Yes.

Q.  Where did you usually do Cassie's makeup for those types of events?

A.  Those types of events I did Cassie's makeup at the studio, in a trailer, at her home.  On location, really.

Q.  What does on location, mean?

A.  It's where we're shooting the photo shoot or music video. So that's where the trailer is.

Q.  When you did Cassie's makeup during that same period, 2007 to 2018, what, if any, role did Mr. Combs have in deciding how Cassie should look?

A.  Well, Sean always made sure that, you know, the look was perfect.  So we had to, like, report back to him, you know, with pictures and --

Q.  Pictures of what?

A.  Pictures, you know, on a phone.

Q.  Pictures of who?

A.  Of Cassie.  Sorry.

Q.  Other than when you were doing Cassie's makeup, how often did you see or interact with Mr. Combs between 2007 and 2018?

A.  Very few.

Q.  How many times, if ever, have you seen Cassie with injuries on her face?

A.  Just once.

Q.  I want to talk about that one time, please.

A.  Okay.

Q.  What year was this?

A.  That was 2010.

Q.  What, if any, awards events were going on around this time?

A.  Grammy Weekend.

Q.  What, if any, parties were going on that Grammy Weekend in 2010?

A.  The Prince party.

Q.  What is a Prince party?

A.  The artist named Prince, it was a party at his home, I believe.

Q.  Now, what time of day do you remember seeing injury on Cassie's face over Grammy Weekend in 2010?

A.  Late at night, early in the morning.

Q.  What do you remember doing earlier that same day?

A.   Well, earlier that day, we did a photo shoot and then went out to dinner, and after that we went back to Cassie's hotel.

Q.   When you say we, who are you talking about?

A.   Cassie and I.

Q.   Just the two of you?

A.   Yes.

Q.   You said you went back to the hotel, did I hear that right?

A.   Yes.

Q.   What hotel, if you remember?

A.   The Beverly Hills hotel.

Q.   What type of room did you and Cassie go back to at the Beverly Hills hotel?

A.   A one-bedroom suite.

Q.   What did you end up doing in that suite?

A.   I fell asleep.

Q.   Where did you fall asleep?

A.   I fell asleep on the couch.

Q.   In the living room area?

A.   In the living room area, yes.

Q.   How did you come to wake up after falling asleep on the couch?

A.   Well, I'm a light sleeper, so I woke up to a little bit of a commotion.

Q.   So what's the first thing you noticed when you woke up?

A.   Cassie walked in.

Q.   Walked into the hotel room?

A.   Yes.

Q.   And then where did you see her go?

A.   Into the bedroom.

Q.   What happened after Cassie came into the room?

A.   Sean came in immediately after and asked where she was.

Q.   What was his tone of voice?

A.   Angry.

Q.   Do you remember what he said?

A.   Where the fuck is she.

Q.   How did you respond?

A.   I don't know.

Q.   And then what did you see Mr. Combs do next?

A.   Walk into the room.

Q.   And by the room, what do you mean?

A.   The bedroom.

Q.   So at that point, who was in the bedroom?

A.   Cassie and Sean.

Q.   And what did Mr. Combs do after he went into the bedroom after Cassie?

A.   Well, the door was shut.

        MS. ESTEVAO:  Objection.  Withdrawn based on the answer.

Q.   Say that again.  I didn't hear the answer.

A.   The door was shut.

THE COURT: Hold on. There was an objection, the witness answered. Let's get a new question.

Q. After Mr. Combs asked where Cassie was, where did you see him go?

A. In the bedroom.

Q. And then what happened to the door of the bedroom?

A. The door was shut.

Q. Once the door was shut, what do you remember hearing behind the bedroom door?

A. Yelling and screaming.

Q. What did you do at that point?

A. I was just frantic and I didn't know what to do.

Q. Do you remember how long there was yelling and screaming going on in the bedroom?

A. I don't recall.

Q. What do you remember happening next?

A. He opens the door and he storms out of the hotel room.

Q. Who's the he?

A. Sean Combs.

Q. And you said you heard yelling and screaming going on in the bedroom. Whose voices did you hear?

A. The both of them.

Q. Could you describe Mr. Combs's tone of voice?

A. I don't remember.

Q. Do you remember Cassie's tone of voice?

A.  No, I don't.

Q.  When Mr. Combs came out of the bedroom, did you see any visible injuries on him?

A.  No.

Q.  Do you remember, as you sit here today, one way or the other, whether he said anything to you when he came out of the bedroom?

A.  I don't remember.

Q.  After he came out of the bedroom, where did he go?

A.  Out the door.

Q.  So he left the hotel room?

A.  Left the hotel room.

Q.  What do you remember seeing next?

A.  Cassie.

Q.  And when you saw Cassie, what did you observe about her appearance?

A.  She had a swollen eye and a busted lip and knots on her head.

Q.  What was her demeanor?

A.  Distraught, upset.

Q.  What did you do after seeing these injuries on Cassie?

A.  Well, in a hurry, I just, you know, packed her things up immediately.  We wanted to get out of there as soon as possible.

Q.  And then where did you and Cassie go?

A.   I took her to my house.

Q.   How far away was your house, approximately?

A.   About a mile away.

Q.   How long did Cassie stay with you at your house?

A.   A few days.

Q.   What, if any, medical attention did you get for Cassie?

A.   My friend, who's a doctor, a medical doctor, I asked her to come the next day to just, you know, make sure that she doesn't have a concussion or anything.

Q.   And did that friend who's a medical doctor come to your house?

A.   She did.

Q.   Were you present when your doctor friend came over?

A.   Yes, I was.

Q.   And did you see her examine Cassie?

A.   Yes, I did.

Q.   What injuries did you see on Cassie during that examination?

A.   A black eye, the same -- the same with the lip, and knots on her head.

Q.   What other parts of Cassie's body did your doctor friend check, if you remember?

A.   She checked her stomach area and her ribs.

Q.   What did your doctor friend suggest that you and Cassie should do after she examined Cassie?

A.   She suggested that we go to the ER.

Q.   Did you take Cassie to the ER?

A.   It was her wishes not to go to the ER.

Q.   Why didn't you insist on taking Cassie to the ER?

A.   We were also very afraid.

Q.   I want to focus on you.

A.   Okay.

Q.   What were you afraid of?

A.   Afraid of Sean.

Q.   What were you afraid of Sean doing?

        MS. ESTEVAO:  Objection.

        THE COURT:  Overruled.

Q.   You can answer.

A.   Well, of course, I feared for my life because if he could do that to her --

        MS. ESTEVAO:  Objection.

        THE COURT:  Next question.

Q.   Did you call the police after seeing this?

A.   No, we did not call the police.

Q.   You specifically.

A.   I didn't call the police.

Q.   Why didn't you call the police?

A.   Like I said, I feared for my life.

        MS. ESTEVAO:  Objection, move to strike.

        MS. COMEY:  Your Honor, I think we discussed this.

THE COURT:  It's overruled.

Q.  About how long did Cassie stay at your house?

A.  A few days.

Q.  And when she left, did she say anything to you?

A.  No, she didn't.

Q.  After she left your house, about how often did you see or speak with Cassie?

A.  I spoke to Cassie a few times a year.

Q.  And when you spoke with Cassie a few times a year, did you or Cassie ever acknowledging what had happened over Grammy Weekend?

A.  No, we didn't.

Q.  After that Grammy Weekend in 2010, about how often did you see Mr. Combs?

A.  Whenever I would see Cassie.

Q.  Did you or Mr. Combs ever acknowledge what had happened over Grammy Weekend?

A.  Not at all.

Q.  Now, Ms. Morales, taking a step back, have you spoken with journalists about what you witnessed during Grammy Weekend 2010?

A.  Yes, I have.

Q.  About how many interviews have you given to journalists about what you witnessed?

A.  A couple.

Q.   Were you paid for participating in any of those interviews?

A.   No, I wasn't.

Q.   Did you provide any of those journalists with any documents or other materials?

A.   I did.

Q.   What did you provide?

A.   Just photos of myself and Kim Porter from earlier.

Q.   And who's Kim Porter?

A.   Kim Porter is Sean's -- the mother of Sean's children.

Q.   And from when were those photographs taken?

A.   Very early, in the early 2000s.

Q.   And how many journalists or media companies did you provide those photographs to?

A.   Just one.

Q.   And were you paid for the rights to those photographs?

A.   Yes.

Q.   How much?

A.   About $1,000.

Q.   Since learning that you were going to be called as a witness at this trial, have you participated in any other interviews with journalists or media companies?

A.   No, I haven't.

          MS. COMEY:  No further questions.

          THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MS. ESTEVAO:

Q. Good afternoon, Ms. Morales. My name is Anna Estevao. I represent Sean Combs.

A. Good afternoon.

Q. So you testified that you met Ms. Ventura many years ago back in -- she was 16 years old, you said, right?

A. 2004, 2005, yes.

Q. And you started doing her makeup more frequently around 2007?

A. Just around the time, yeah.

Q. You knew Ms. Ventura before she even met Mr. Combs, right?

A. Yes, I met her -- yes.

Q. And back when she was seeing someone else, right?

A. Yes.

Q. And, in of the, you introduced her to someone else, right?

A. Yes, I did.

Q. Who is that that you introduced her to?

A. Ryan Leslie.

Q. Who is Mr. Leslie?

A. Ryan Leslie is a producer and a musical artist.

Q. Was he prominent in the music entertainment industry around that time?

A. Yes, he was.

Q. Ms. Ventura was also a popular recording artist, right?

A. Yes, she was.

Q. And she had an album out at the time, right?

A. Yes.

Q. And that album was pretty popular, right?

A. Yes, it was.

Q. Do you know what else she was doing professionally around that time?

A. Modeling.

Q. And what kind of modeling was she doing?

A. Editorials.

Q. Meaning what you said before about magazine shoots?

A. Magazine shoots, yes.

Q. And sort of high fashion?

A. Yes.

Q. And you did Ms. Ventura's makeup for a number of years, right?

A. Yes, I have.

Q. So during that time, can you tell us about some of the times when you assisted her with her makeup in connection with -- let's start with -- you gave a list.  Photos shoots, for example, can you talk about those photo shoots?

A. Yes.

Q. Do any in particular come to mind?

A. Yes.  I worked with her with, like, Blank Magazine, Vibe Magazine.  And that's all I can remember for now.  I don't remember the others.

Q. And she was photographed in connection with -- the magazine had her photographed so that she could be featured in the magazine.

A. Exactly.

Q. And you also said red carpet events. Did you assist Ms. Ventura for any red carpet events?

A. Possibly.

Q. Do you recall any in particular?

A. No, I can't.

Q. What about videos. Can you talk about videos?

A. Yes.

Q. Which videos did you assist Ms. Ventura with?

A. I don't remember the names of the videos, but there is one particular video that I do remember. It was black and yellow with Wiz Khalifa, and I don't remember the other videos.

Q. I think we have a few photos to help remind you.

A. OK.

MS. ESTEVAO: Can we start with Defense Exhibit 647, please, just for the witness and the parties.

Q. Do you recognize this photo?

A. This is the video.

MS. ESTEVAO: Move to admit.

MS. COMEY: No objection.

THE COURT: 647 will be admitted.

(Defendant's Exhibit 647 received in evidence)

MS. ESTEVAO:  Please publish for the jury.

Q.  So this is a photo from that music video, right?

A.  Yes.

Q.  Who is that next to Ms. Ventura?

A.  This is Wiz Khalifa.

MS. ESTEVAO:  Can we show the witness Defense Exhibit 648.

Q.  Do you recognize this photo?

A.  That is from the same photo shoot.  I mean, same video shoot.  Sorry.

MS. ESTEVAO:  Move to admit.

MS. COMEY:  No objection.

THE COURT:  648 will be admitted.

(Defendant's Exhibit 648 received in evidence)

MS. ESTEVAO:  Please publish.

Q.  You did Ms. Ventura's makeup for this photo shoot, right?

A.  This is the video.

Q.  Excuse me?

A.  For the video, yes.

Q.  And also for these photo shoots and videos, would Ms. Ventura also get her hair done?

A.  Yes.

Q.  And her entire look would be --

THE COURT:  Just to help you out, just wait until the question is over.  Take a second and then answer.  It will help

out for the record.

MS. ESTEVAO:  It was my fault too.

Q.  And she would also have her nails and her hair done, right?

A.  Yes.

MS. ESTEVAO:  Can we go to 655, please, just for the witness.

Q.  Do you recognize this photo?

A.  That was from the same video shoot.

MS. ESTEVAO:  Move to admit.

THE COURT:  655 will be admitted.

(Defendant's Exhibit 655 received in evidence)

MS. ESTEVAO:  Please publish.

Q.  Who is with Ms. Ventura in this photo, if you know?

A.  It's Wiz Khalifa, and I don't know who the one in the middle is.

MS. ESTEVAO:  Can we show the witness Defense Exhibit 656, please, and 657, to be more efficient.

Q.  Do you recognize these photos?

A.  Yes.  It's from the same video shoot.

MS. ESTEVAO:  Move to admit.

MS. COMEY:  No objection.

THE COURT:  These exhibits will be admitted.

(Defendant's Exhibits 656 and 657 received in evidence)

Q.  You assisted Ms. Ventura in connection with this whole

video shoot?

A.   Yes.

          MS. ESTEVAO:  And let's turn to a different event.

          Can we pull up Defense Exhibit 623 for the witness, please.

Q.   Do you recognize this photo?

A.   Yes.  But I don't remember what this is from.

Q.   But you believe that you did the makeup?

A.   I think so, yes.

          MS. ESTEVAO:  Move to admit.

          MS. COMEY:  No objection.

          THE COURT:  623 will be admitted.

          (Defendant's Exhibit 623 received in evidence)

          Ms. Estevao, how many of these do you have, do you think?

          MS. ESTEVAO:  Not many.

          THE COURT:  Good.

Q.   Is this an example of an editorial shoot?

A.   Yes, it is.

Q.   In connection with all of these events, it was important for Ms. Ventura's -- it was important that Ms. Ventura appear put together, right?

A.   Yes.

Q.   Her look was important to her, right?

A.   Yes.

MS. ESTEVAO:  I'm almost done.

Can we pull up Defense Exhibit 743, please.

Q.  Do you recognize this photo?

A.  Yes.  It's from a blank magazine photo shoot.

MS. ESTEVAO:  Move to admit.

MS. COMEY:  No objection.

THE COURT:  743 will be admitted.

(Defendant's Exhibit 743 received in evidence)

MS. ESTEVAO:  Please publish.

Q.  Is this another example of an editorial shoot?

A.  Yes, it is.  Sorry.

Q.  Thank you.

MS. ESTEVAO:  Can we pull up for the witness Defense Exhibit 739, please.

Q.  Do you recognize this photo?

A.  Yes.

Q.  Who appears in this photo?

A.  Rihanna, Ryan Leslie, and Cassie.

MS. ESTEVAO:  Move to admit.

THE COURT:  739 will be admitted.

(Defendant's Exhibit 739 received in evidence)

Q.  For this photo whose makeup did you do?

A.  Rihanna.

Q.  You didn't do Ms. Ventura's for this one?

A.  No.

Q. And this is the same Ryan Leslie that we were speaking about before.

A. Yes, it is.

MS. ESTEVAO: Can we pull up, I believe these are the last ones, Defense Exhibits 744 and 745.

Q. Do you recognize --

A. This is from the same photo shoot.

Q. You recognize these photos from this photo shoot?

A. Yes, it is.

MS. ESTEVAO: Move to admit.

MS. COMEY: No objection.

THE COURT: 744 and 745 will be admitted.

(Defendant's Exhibits 744 and 745 received in evidence)

Q. These photos reflect your artistry, right?

A. Yes.

Q. In fact, you recently reposted these on Instagram, right?

A. Yes.

Q. And in connection with text about her bold look, right?

A. Yes.

Q. Thank you.

We don't need to rehash your testimony about the hotel room.

MS. COMEY: Objection to the commentary, your Honor.

Q. You testified about the incident at the hotel suite over

Grammys weekend. Do you recall that?

A. Yes, I do.

Q. You were in the suite outside of the bedroom, right?

A. Yes.

Q. And you testified you didn't actually see what happened inside the bedroom?

A. No, I did not.

Q. And you were staying in her hotel room that evening even though you lived only a mile away, right?

A. Yes.

Q. Because you were quite close with her, right?

A. Yes.

Q. I think you said that she was like a little sister to you?

A. Yes, she is.

Q. Correct?

A. Yes.

Q. You had known her for a number of years?

A. Over two decades.

Q. And it made sense to you to sleep over in her hotel room because you had spent the evening together, right?

A. Yes.

Q. And you were friends, correct?

A. Yes.

Q. In fact, you had met her family at that point, right?

A. I met her father when I first met her.

Q. You met her father?

A. Um-hum.

Q. You were familiar with her family?

A. Yes.

Q. You and she discussed her family on prior occasions?

A. I would ask her how her parents are or her brother.

Q. Following the incident, you allowed her to stay at your house for a few days?

A. Yes.

Q. And you called a couple of friends to come over, right?

A. Yes.

Q. Including a doctor friend, is that correct?

A. Yes, it is correct.

Q. It's true that the doctor friend of yours talked to her at length, correct?

A. She examined her to make sure she didn't have a concussion.

Q. And you had another friend, a hair stylist, who also arrived, right?

A. Yes.

Q. Over the course of a few days, right?

A. The next day or that evening, rather.

Q. Did you also call a lawyer friend of yours?

A. Yes.

Q. And did that lawyer friend come over?

A. No, no, no. He lives in San Francisco, but we just called

him.

Q.   I see.  So you called and spoke with him?

A.   Yes.

Q.   And did Ms. Ventura speak with him?

A.   She did.

Q.   About what had occurred, right?

A.   Yes.

Q.   Thank you.

And you provided emotional support for her during this time, right?

A.   Of course.

Q.   If she needed that emotional support you were there for her?

A.   Of course.

Q.   And if she needed additional emotional support you would have given that, right?

A.   Absolutely.

Q.   If she needed a ride somewhere you would have given her a ride?

A.   Yes, of course.

Q.   And if she wanted to go to the hospital you would have driven her there?

A.   Of course.

Q.   And if she wanted to call her family you would have helped call her family?

A. Yes.

Q. And if she wanted to call the police you would have helped her call the police?

A. Exactly.

Q. You were there for her in whatever way she needed?

A. Yes, I was.

Q. Like you said, you were like a big sister to her?

A. Um-hum.

Q. And you were concerned, right?

A. Very concerned, of course.

Q. And you would have done whatever she needed in that moment?

A. Yes, I would.

Q. And you became aware at a certain point that Ms. Ventura and Mr. Combs had broken up, right?

A. Later on.

Q. But you continued your friendship with her after the breakup, correct?

A. Yes, I did.

Q. Regardless of when exactly it happened?

A. Yes.

Q. In fact, it sounds like you had met with her in 2021?

A. Yes, I did.

Q. And in the past year you've done a number of interviews with the press, right?

A. Yes.

Q.   I think you said a couple, but it was more than a couple, right?

A.   Um-hum.

Q.   Was that a yes?

A.   Yes.

Q.   Do you know how many you did?

A.   No, I don't.

Q.   You started with a couple with CNN immediately after the -- in May of 2024, right?

A.   I believe so.

Q.   And there was also an extended interview with Don Lemon, right?

A.   Think so.

Q.   And you did a couple of interviews with Extra TV, right?

A.   Yes.

Q.   And what else?  You appeared on Piers Morgan, right?

A.   Yes.

Q.   And then you appeared in a documentary about Mr. Combs, right?

A.   Yes.

Q.   And then you appeared in another documentary about Mr. Combs, right?

A.   Yes.

Q.   So eight appearances?

A.   Yes.

Q.   In the past year.  OK.

And other than the thousand dollars or so for the photographs, were you paid for these appearances?

A.   Not at all.

Q.   No?

A.   No.

Q.   Did Ms. Ventura ask you to do these interviews?

A.   No, she didn't.

Q.   Do you recall getting outreach from Dateline to be interviewed more recently?

A.   Probably.  But I'm not exactly sure because I don't look at those anymore.

Q.   Do you recall asking the government permission to do additional interviews?

A.   No, I didn't.

MS. ESTEVAO:  Can we show --

Q.   Would something refresh your recollection if I showed it to you?

A.   Sure.

MS. ESTEVAO:  Can we show just the witness 3563-008, please.

Q.   Only read this to yourself and then look up, please.

A.   Yes.

Q.   Dateline counts as the press, right?

A.   Um-hum.

Q.   Does this refresh your recollection as to whether or not you were asked by Dateline to do an additional interview?

A.   I mean, I just refuse all the interviews, so I don't really pay attention to any of this.

Q.   Does this document refresh your recollection as to whether or not you asked permission from the prosecutors to do additional interviews?

A.   Of course I would ask.  I just asked the question and that was it.

Q.   Does it refresh your recollection that you did ask for permission?

A.   I did ask, yes.

Q.   Thank you.

A.   Of course.  OK.  I see what you're saying.

Q.   That's all I'm getting at.  Thank you.

Until these public interviews you never spoke about this event with anyone?

A.   I have never spoken about them.

Q.   And you never talked to Ms. Ventura about it again?

A.   Not ever again.

Q.   You never talked to Mr. Combs about it again?

A.   Not at all.

Q.   And no one approached you after the incident to talk to you about this?

A.   No one has approached me, no.

Q.   Mr. Combs never approached you?

A.   No.

Q.   No employees from his company ever approached you?

A.   No.

        MS. ESTEVAO:  Can I have one moment, please.

        THE COURT:  You may.

Q.   In connection with one of these documentaries, were you reimbursed for any services in connection with your participation?

A.   Therapy?

Q.   You were reimbursed for therapy services?

A.   Yes.

Q.   How much did the documentary reimburse you for therapy services?

A.   I believe it was $250, yeah.

Q.   And you sold the photos of Ms. Porter for about a thousand dollars?

A.   Yes.

        MS. ESTEVAO:  One moment.

        Thank you.  No further questions.

        THE WITNESS:  Thank you.

        MS. COMEY:  No redirect, your Honor.  Thank you.

        THE COURT:  Ms. Morales, thank you very much.

        THE WITNESS:  Thank you so much.

        (Witness excused)

THE COURT:  Government may call its next witness.

MS. SMYSER:  Your Honor, government calls Frederic Zemmour.

THE COURT:  Come on up here.  Welcome.

FREDERIC ZEMMOUR,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. SMYSER:

Q.  Good afternoon, Mr. Zemmour.

A.  Good afternoon.

Q.  Where do you work?

A.  I work at L'Ermitage Beverly Hills.

Q.  If you can just make sure to speak into the mic.  Thank you.

What is the L'Ermitage Beverly Hills?

A.  It's a luxury hotel in Beverly Hills, California.

Q.  How long have you worked at the L'Ermitage Hotel?

A.  Since April of 2019.

Q.  What is your role there?

A.  I'm the general manager of the hotel.

Q.  How long have you been the general manager?

A.  For and a year and a half now.

Q.  What are some of your responsibilities as the general manager of the L'Ermitage?

A.   I handle day-to-day operation of the hotel, financial strategy of the hotel, and certain marketing strategy of the hotel.

Q.   And why are testifying here today, Mr. Zemmour?

A.   I'm testifying because I received a subpoena.

MS. SMYSER:   I want to talk about some records from the L'Ermitage Hotel.

Ms. Foster, could you please pull up Government Exhibit 1304, which is a stipulation between the parties. Could you please turn to page 7 and zoom in on paragraph 45. Sorry.   Page 8.   Thank you.   Paragraph 45.

Government Exhibits 7H-101 through 7H-188, including the subdivisions thereof, are true and accurate records from LBVH Hotel LLC, doing business as L'Ermitage Beverly Hills, 9291 Burton Way, Beverly Hills, California 90210.

Your Honor, at this point the government offers Government Exhibits 7H-101, 7H-102, and 7H-153.

MS. GERAGOS:   No objection.

THE COURT:   These exhibits will be admitted.

(Government Exhibits 7H-101, 7H-102, and 7H-153 received in evidence)

MS. SMYSER:   You can take that down, Ms. Foster.

Q.   Mr. Zemmour, as general manager of the L'Ermitage, are you familiar with the hotel's reservation system?

A.   Yes.

Q. Could you please explain what happens on your end when a guest makes a reservation?

A. We have a system called OPERA. We have a reservation agent at the hotel, and they would enter the guest information in the system, creating a profile.

Q. Are those profiles for individual guests?

A. Yes.

Q. When are those profiles generated?

A. At the time of reservation, when the guest calls to make a reservation.

Q. Could you please explain what kinds of information are contained on those guest profiles.

A. Sure. Guest personal information such as name, first name, last name, email address, phone numbers, credit card information, and then guest preferences, personal preferences for room types, dietary restrictions, and things like that.

Q. Who inputs those personal preferences into the system?

A. The reservation agent taking the reservation.

Q. How long do those notes regarding personal preferences remain in the system?

A. They stay forever.

MS. SMYSER: I want to look at some specific examples.

Ms. Foster, could you please pull up what's in evidence as Government Exhibit 7H-101.

Q. Mr. Zemmour, I want to focus on the first five pages of

this document. Could you please just explain what we are looking at here.

A. We are looking at all the reservations starting 2008 for the guest name Ryan Lopez.

Q. Is there an additional name associated with this guest profile?

A. Yes.

Q. Who is that?

A. Sean Combs.

Q. What does each row in these boxes represent?

A. The first one is the name of the reservation. The second one is the alternative name of the reservation. Second one is arrival date. Third one, departure date. The fourth one is the status of the room, then room number, the room type, and how many people are in the room.

Q. Does each row in the box represent one reservation?

A. Yes. Each row is an individual reservation.

Q. The first name listed here is Ryan Lopez. Is Ryan Lopez the name of the person who is actually staying in these rooms?

A. No.

Q. What is the name of the person for whom these reservations were made?

A. It would be Sean Combs.

Q. How do you know that?

A. Because the alternative name says Sean Combs and that would

be the name of the person in the room.

Q.   In this document is Ryan Lopez the name used for all of the reservations?

A.   No.

Q.   Is the name used for all of the reservations associated with the Ryan Lopez profile in this particular document?

A.   Yes.

Q.   Based on your review of additional records for the Ryan Lopez profile, do you know if all of the records were reservations that were actually made under the name Ryan Lopez?

A.   There were different names.

Q.   How do you know that?

A.   Through the daily log on the back end of the system we can see the changes made to the profile.

Q.   We are going to look through that log in just a moment. But just generally, how does it happen that the profile reflects that the Ryan Lopez name made this reservation, even if he was not the one to have actually made it?

A.   Well, the profile will reflect the name of the person who made the reservation.  If there is a name that needs to be changed, or on our side we realized that the other person stays in the room, we can also combine profiles.

Q.   Please explain why you would merge profiles in the way that you're talking about.

A.   It's an operation.  It's to make sure that the guest traces

that we talked about earlier, personal preferences, follows the profile. It's to make sure that we can customize surveys and create a better experience for our guests.

Q. When you merge profiles together, do those notes about preferences also merge together?

A. Yes.

Q. And when you merge profiles together, do they then have one name for that profile?

A. Yes. They come under the last name associated with the profile.

MS. SMYSER: I want to look next at Government Exhibit 7H-102.

Q. Is this the activity log that you were referencing earlier?

A. Yes. That's the back-end log of OPERA.

Q. Is this for the Ryan Lopez profile?

A. Yes.

Q. What kinds of information does this document contain?

A. It shows the name change on the profile.

MS. SMYSER: I want to turn to the last page in this document, Ms. Foster. Could you zoom in on the bottom line.

Q. Mr. Zemmour, what is the name under which this profile was originally created?

A. Under Sean Combs.

Q. When was it created?

A. December 6, 2006.

Q.   Was there a website that was associated with this creation?

A.   It says www.badboy.ent.com.

Q.   Now I want to direct your attention to the third row from the bottom here.

MS. SMYSER:  Ms. Foster, can you zoom in on that. It's dated June 1, 2007.  Ms. Foster, can you zoom in on that. I'm sorry.  The one dated September 30, 2009.

Q.   Was the name changed on this date for the profile?

A.   Yes.

Q.   What was it changed from and what was it changed to?

A.   It was changed from Sean Combs to Jackie Starr.

MS. SMYSER:  I want to now look at the second page of this document.

Ms. Foster, we are going to be looking at the middle of the page, specifically between the dates of September 1, 2011 and January 13, 2012, if you could just zoom in.

Q.   Mr. Zemmour, could you walk us through the name changes on this profile during this period of time?

A.   Sure.  The name would change September 1, 2011 from Jackie Starr to Sean Combs; then November 4 from Sean Combs back to Jackie Starr; and then November 5, from Jackie Starr to Frank White; then Frank White to Sean Combs; then January 4, 2012, from Sean Combs to Jackie Starr; and then on January 13, 2012, from Jackie Starr to Frank Black; and then January 14 from Frank Black to Frank White.

MS. SMYSER:  Ms. Foster, can you zoom out and let's turn to page 1 and focus on the top three lines.

Q.  Mr. Zemmour, could you walk us through the name changes during this period of time.

A.  Sure.  January 12, 2016, the name was changed from Sean Combs to Mr. Black.  Same day it was changed to Mr. Black, to Frank Black.  And then January 19, 2019, it was changed from Frank Black to Ryan Lopez.

MS. SMYSER:  Ms. Foster can we now return back to Government Exhibit 7H-101.

Q.  I want to walk through an example of a reservation.

MS. SMYSER:  Let's turn to page 2 and go to April 7, 2015.  There is a reservation in the bottom box, third row from the top.

Q.  Do you see this, Mr. Zemmour?

A.  Yes.

Q.  So earlier we talked about the names here:  Ryan Lopez and Sean Combs.  Could you explain to us what the remainder of the columns mean for this particular reservation.

A.  Sure.  April 7, 2015 is the check-in date, when the guest arrived at the hotel.  April 8, 2015 is the check-out date, when guest departed the hotel.  Checked out is an indication for us in the system that the room is vacant and ready to be cleaned and prepared for another guest.  517 was the room number.  GDLX means grand deluxe is a type of room.  And one

would be the number of people in the room.

MS. SMYSER:  Ms. Foster, could you please pull up Government Exhibit 7H-153.

Q.   What is this document, generally?

A.   This is what we call a guest folio.  It's the invoice that the guest receives once they checked out of the hotel.

Q.   How does this guest folio relate to the reservation that we were just talking about?

A.   It's attached to the guest profile.

Q.   I want to focus on the top left here.  What is the name listed?

A.   Mr. Ryan Lopez.

Q.   Based on your review of the activity log, was this reservation actually made under the name Ryan Lopez?

A.   No.  It's the last name that appeared on the profile due to the change of profile name on January 19.

Q.   What is the address under Mr. Lopez's name?

A.   1440 Broadway, third floor, New York, 10018, United States.

Q.   Focusing on the top right, what's the room number?

A.   517.

Q.   And what's the arrival and departure dates?

A.   April 7, 2015 for departure of April 8, 2015.

Q.   Is this document essentially the bill for that reservation?

A.   Yes.

Q.   Turning to page 2, what is the total bill for this

reservation?

A.   Total was $2,381.69.

MS. SMYSER:  Ms. Foster, could we please return to Government Exhibit 7H-101 and turn to page 3.

Q.   Mr. Zemmour, earlier you mentioned that profiles have notes associated with them, is that right?

A.   Correct.

Q.   I want to direct your attention to the portion of this document that says profile note.  Is that what you were referring to?

A.   Yes.

Q.   First, I want to focus on the section labeled FD.  What does FD stand for?

A.   Front desk.

Q.   Where did these notes come from?

A.   These notes from either a travel agent or people making the reservation, or it can also be from our team members adding notes for special requests from guests.

Q.   Is this document organized by different parts of the hotel where the information comes from?

A.   Yes.

Q.   Mr. Zemmour, could you please focus on that first bullet under FD.  Could you read it for us, please.

A.   It says:  Per JR, guest can only stay and reserve VSJ, VBS, SKY.  Suites can't be sold for occupancy.  Please see JR with

any questions.

Q.   What does that mean to you?

A.   It means that the notes is for the front desk that we can only reserve a certain type of rooms for that guest.

Q.   What are the types of rooms that can be reserved?

A.   Those are entry-level rooms of the hotel.

Q.   I want to direct your attention to the third bullet here that starts aka.  Could you please read that.

A.   Sure.  Aka Sean Combs/P. Diddy.

Q.   Why is this a note here?

A.   If the guest stays under a different name, so we know who is in the room.

Q.   Looking at the fourth bullet starting CPRG, could you please read that.

A.   Sure.  CPRG, SPRG on approval only.  Use American Express 9004 only if Eli Maroun, Dave Shirley, or Kristina Khorram approve.  MH December 1, 2016.

Q.   What does CPRG or SPRG mean?

A.   It's a code for nonregistered guests.

Q.   What do you understand this bullet to be saying?

A.   That means we can only put the reservation preregistered guests.  Preregistered guests would be a guest that doesn't follow the proper check-in process because they are not presenting credit cards or an ID during the check-in process. This is given prior to arrival to the hotel.

P5NMCUM4    Four

Q. Is this saying you could only be a preregistered guess if Eli Maroun, Dave Shirley, or Kristina Khorram approve?

A. Yes.

Q. Let's focus now on the bottom two bullets here. Could you please read those.

A. Always spill candle wax on everything and uses excessive amounts of oil, place the room out of order upon departure for deep cleaning. Please authorize an extra $1,000 when guest stays with us to cover any room damages.

MS. SMYSER: Could you please zoom out, Ms. Foster. Could you focus on the F and B section.

Q. What is F and B?

A. Food and beverage.

Q. Could you please read just the first line.

A. Sure. Amenity, fruit and water plus VHG chocolate, June 3, 2015.

Q. What does that mean?

A. That is the food and beverage we place in the room prior to the guest arriving, so in that case it would mean a bowl of fruit, a bottle of water, and a box of chocolate.

MS. SMYSER: Can we please zoom out and go to page 4 and zoom in on HSKP, that section.

Q. What is HSKP?

A. It stands for housekeeping.

Q. I want to focus you on the second, third, and fourth

bullets here. Could you please read those.

A. Please monitor outside his room. Down the hall to spray air freshener. Likes the room hot. Set thermostat to 75. Place a portable heater in the room prior to arrival.

MS. SMYSER: You can zoom out.

Q. I want to direct your attention to the bottom where it says history. What is this section about?

A. This is general note about prior stays.

Q. Do these sometimes reflect employee complaints about the stays?

A. Those are comments made by employees.

Q. Do they reflect all the concerns that hotel staff has about guests, or just some of them?

A. Just some of them.

MS. SMYSER: Let's turn to the next page, and we will read an example.

Could you zoom in on the January 10 date.

Q. Could you please read this entry, Mr. Zemmour.

A. Sure. January 10, 2010. Room number 804 under the name Starr. Housekeeping contacted MOD at approximately 14:45, stating room attendant noticed wax from candles while executing daily service. MOD inspected room and found large deposits of candle wax on carpets in living room area and on the nightstands in bedroom area. Pictures taken. Security to complete incident report. Miscellaneous charge of $500 posted

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

to resident's account for damage/cleaning.  SKR.

Q.  What is MOD here?

A.  Manager on duty.

Q.  Mr. Zemmour, are these notes documenting damage to a room on a particular occasion?

A.  Yes.

MS. SMYSER:  No further questions, your Honor.

THE COURT:  Cross-examination.

MR. DONALDSON:  One second, your Honor.

No.  Thank you very much for your time.

THE COURT:  Thank you very much.  You are done.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  Government may call its next witness.

MS. JOHNSON:  Your Honor, the government calls Special Agent Josh Croft.

JOSHUA CROFT,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

MS. JOHNSON:  Your Honor, before I begin, may I approach the witness?

THE COURT:  You may.

DIRECT EXAMINATION

BY MS. JOHNSON:

Q.  Good afternoon, Special Agent Croft.

A.   Good afternoon.

Q.   Where do you work?

A.   Homeland Security Investigations.

Q.   Is Homeland Security Investigations sometimes called HSI?

A.   Yes, it is.

Q.   What is your title at Homeland Security Investigations?

A.   I'm a special agent and computer forensic agent.

Q.   What difference, if any, is there between a special agent and a computer forensic agent?

A.   So the special agent does investigative duties investigating cases, arresting criminals.  Computer forensic agent, I received extra training in how to extract data from computers.

Q.   How long have you worked as a special agent or computer forensics agent with HSI?

A.   So I've been a special agent since December of 2016 and a computer forensics agent since June of 2023.

Q.   When you were a special agent, were there any particular areas of investigation that you focused on?

A.   Yes.  I was assigned to the child exploitation investigations unit.

Q.   As a computer forensics agent do you have any areas of focus or is your scope more broad?

A.   It's more broad.  We support any investigation that our entire agency investigates.

Q.   Have you received training in the analysis of electronic evidence?

A.   Yes, I have.

Q.   Have you received training in forensic examinations of electronic devices?

A.   Yes, I have.

Q.   And does that include training in the analysis and extraction of laptop computers?

A.   Yes, that's correct.

Q.   Can you at a very high level describe some of that training.

A.   Sure, yes.

So my earliest certification was a CompTIA A plus certification, which is an entry information technology certification process.  I've also attended the basic computer evidence recovery training that my agency, HSI, puts on, as well as the basic mobile evidence recovery training, which handles phones and tablets and those types of devices, and I've also received a certification from the SANS Institute.

Q.   What does that stand for?

A.   Actually, I don't know.  They are very opaque in that fashion, but it's an information technology and digital forensics organization that provides professional certification, and I have received a certified forensic examiner certification from them.

Q. As a computer forensic agent at HSI, have you performed extractions on electronic devices?

A. Yes, I have.

Q. And approximately how many laptops or computers have you extracted during your tenure?

A. Approximately 80.

Q. I want to talk about a few definitions so we are all on the same page.

At a high level what does it mean to forensically examine an electronic device?

A. So that's for me to extract data without altering it and then reproduce it in reports in a fashion that a layman could understand or examine.

Q. Can you define the term forensic image.

A. Yes. So when I extract data from a device, we save it in a file generically called a forensic image, which is a package of all the data that's self-verifying so that we know the data is all there and hasn't been altered.

Q. How do you know that the forensic image of the data that you have extracted correctly copied from the electronic device that you took it from?

A. We do that by checking the hash value of the file when it's copied out.

Q. Can you explain what a hash value is.

A. Yes. So a hash value is a unique identifier that a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

mathematical algorithm assigns to a set of data, and that number or the hash value will change if anything in that data is altered. So, for instance, if you had the hash value of a photograph and somebody took that photo and altered even one pixel in it, when it runs back through that computation you'll have an entirely different hash value and know that it's not the same file.

Q. After you take the forensic image by extracting data from a particular electronic device, what steps, if any, do you take to ensure that the data isn't altered?

A. So the biggest thing we do is, once we have made that original extraction, we call that the gold copy, and that gets saved separately from all the other evidence and stays on its own, and we never use it. What we will do is, we will copy, we will make a working copy of that gold copy so that at any point if that hash value changes through whatever process we examine the file with, we know we have to go back to the original one.

Q. After you extract data from the electronic device and create the forensic image, do you ever go back to the actual electronic device?

A. Rarely, but there can be instances where you would have to re-examine a device. But we try to limit that -- limit any interaction with the device so we are not altering anything.

Q. Why do you try to limit interaction with the device?

A. So any time a user interacts with the device, it's leaving

some kind of artifact or breadcrumb trail of your presence there, like powering it on, what folders did you open, did you create files on there, and things of that nature. So we want to do everything possible to not alter the data we have.

Q. I want to focus just on laptops today. What kind of tools do you use to extract the data that is stored in laptops and create the forensic image?

A. In this particular case there is two tools I used. The TX1, which is a hardware device that has a write-blocking capability. And what that means is that when we plug a device into it, we can't write any data to it. It cuts off our interaction to it, so we know that we are only copying out data and not altering what's on there. And another function that device has is, it creates the hash of the extraction we make so we can verify it in the future.

Q. Is there another tool you used in this case?

A. Yes. There is another tool I used called the digital collector, which is a hardware device that plugs in through a USB into a computer, and it has software on it that helps us extract the data, similar to the TX1, and it also has that same function of creating a hash value for the data you retrieve from a device.

Q. When you use tools like TX1 and digital collector, how do you know that these tools were successful in extracting the data that's stored on the electronic device?

A.   While the device is doing its thing, it creates a log file that shows you the work that's done.  That includes the hash verification at the end.

Q.   If there are any errors in the extraction, would that be reflected in the log file?

A.   Yes, it would show there.

Q.   And once you have the forensic image created from the electronic device, what do you do with that data to make it user friendly?

A.   So like I said earlier, we create that gold copy that stays unaltered, and then we take the working copies that you spawn off of that one, and we feed it into various software programs. In this case I used a program by a company called Magnet.  It's called axiom examiner.  And you take your extracted data, your forensic image, and you feed it into that, and it will create a report where it shows the data in a more user-friendly manner.

Q.   If I refer to that report that shows data in a more user-friendly manner as the axiom report, will you know what I'm talking about?

A.   Yes.

Q.   In the axiom report, how is that data displayed in a more user-friendly manner for an individual to review?

A.   So it has a graphic user interface, kind of like any other software program you'd be familiar with where there is different info panes that have categories of data, and then you

can take a look at those categories in different windows that show you what content, what data was captured by the program.

Q.  Are the categories of data things like chat messages, documents, images, things like that?

A.  Yes.  Also operating system artifacts, file system.  It uses various different categories and breaks it down so it's much more user friendly.

Q.  And typically is the axiom report searchable?

A.  Yes, it is.

Q.  I want to talk about your process now for examining laptops.  At a high level can you walk us through the general steps you take when you extract data from a laptop.

A.  Sure.

The very first thing I do is, I'll take the chain-of-custody form and sign it to prove that I have accepted it from another person so we can maintain the integrity of the property that way to know who it switched hands from, where and when.

Then the next thing I will do is, I photograph all the devices that come into the lab so I can show what condition it was in, so that say someone can't accuse us of damaging their property later when we return it.

At that point I'll test the function of the devices.  In the case of laptops, see if they are charge, the battery charges, does it power on.  Typically, we will want to see if

there is any user partitions with a password or encrypted hard drives that might make recovering the data difficult. So that's why we power it on, to see if those kind of things are present. Then after assessing the device and its function that way, I'll determine what tool works best to actually create the forensic extraction of that data.

Q. During this process how, if at all, do you confirm that the data extracted and processed correctly?

A. Like I mentioned earlier, the tools have log functions that tell you what data has been extracted, and they provide you with the hash value of that package of data at the end of that extraction.

Q. So Special Agent Croft, I want to speak now about your role in this case. Were you asked to extract certain electronic devices in this case?

A. Yes.

Q. I am going to talk about just three of the electronic devices you extracted today.

Do you have an understanding of whose laptops you extracted that are sitting next to you?

A. Yes. They belong to Cassie Ventura.

Q. For each of those laptops was a similar process of extraction of the data followed by you?

A. Roughly similar, but each had their own unique kind of challenges to extract the data.

Q.   I want to direct your attention to what's been marked for identification only as Government Exhibit B-100.  Do you see that in front of you?

A.   Yes, I do.

Q.   Did you perform an extraction on this electronic device?

A.   I did.

Q.   How do you know that?

A.   So I spoke earlier about the chain-of-custody forms which I have here.  Here it shows that I accepted the property from Special Agent Quinn on December 28 in our lab.

Q.   What kind of laptop is the item marked for identification as Government Exhibit B-100?

A.   This is a MacBook Pro.

Q.   What's the relative age, give or take, of that MacBook Pro?

A.   It's relatively old.  It's probably 2010, 2011, roughly.

Q.   What color is the case?

A.   It's a white case.

Q.   Can you explain at a high level the process of extracting the data from this particular laptop?

A.   Yes.  When this one came into the lab, I did the procedure I talked about earlier, took photographs, then plugged it in, indicated it was charging, and I was able to power it up.  And it did finish booting up to the MacBook user setup screen.

Q.   What are some reasons why you would see the MacBook user setup screen?

A.   So either it would be because it's a brand-new computer out of the box, or a user at some point had wanted to maybe sell it or exchange it, turn it in, and remove their personal data from it.  So there is a function inside the MacBook settings where you can reset it to factory defaults.

Q.   Despite being confronted by the factory default screen, what, if any, data were you able to extract from this device?

A.   I was able to remove the hard drive and use the TX1 device to extract the data from that, and it did indeed contain data that had not been wiped or overwritten by that factory reset setting.

Q.   Once you extracted the data from using TX1, did you process it into an axiom report?

A.   Yes, I did.

Q.   Moving on to the next laptop, which is marked for identification as Government Exhibit B-200, do you see that device in front of you?

A.   Yes, I do.

Q.   Did you perform an extraction of data on this electronic device?

A.   Yes, I did.

Q.   How do you know that?

A.   Again, I have the property custody receipt with me signing for it on December 28.

Q.   What kind of electronic device is Government Exhibit B-200?

A.   That is a MacBook Air laptop.

Q.   Can you explain at a high level the process of extracting the data from Government Exhibit B-200?

A.   Yes.  This one did function, battery charged, and it was able to power on, and it came to a login screen for a user Frank Black, and there was a second login screen for a guest user.

Q.   Focusing on the guest user account, were you able to determine if there was any data stored in the guest user account?

A.   There wasn't, but that would be fairly typical because with this version of the Mac operating system a guest-user account, by default, is set to remove any user data that's left there when the computer is powered down.

Q.   Were you able to extract data from this electronic device?

A.   Yes.  This one I was able to boot up into target disk mode, which is a setting MacBooks have which turn a laptop into a hard drive, in essence, that's recognized by another laptop or another MacBook that you plug it into.

Q.   Since the guest-user profile didn't have any data, is the data that's extracted from the other profile the Frank Black profile?

A.   Yes, correct.

Q.   And did you process the extracted data into an axiom report?

A.   I did.

Q.   Turning to the last electronic device, which is marked for identification as Government Exhibit B-300, did you perform an extraction on this laptop?

A.   Yes, I did.

Q.   How do you know that?

A.   Again, I have my signature here on the chain of custody.

Q.   Can you explain at a high level the process of extracting the data from the laptop marked Government Exhibit P-300.

A.   Sure.  So this particular laptop, when I was assessing it, it was able to power on, but there was a clicking noise that I believe was coming from the hard drive, and it didn't finish the boot process, only a blank screen on the laptop display, so I powered it down and removed the hard drive and the laptop and used the TX1 again to image that.

Q.   I'm sorry.  I forgot to ask you.  What kind of laptop is Government Exhibit B-300?

A.   Sorry.  This is a -- looks like the chain of custody got switched here.  This -- this is a MacBook Pro.

Q.   And you mentioned that you had to remove the hard drive to extract the data from Government Exhibit B-300.  Were you able to recover all the data on that hard drive?

A.   No.  So there were some bad sectors on that hard drive where there was some damage that wasn't allowing us to recover the data that was on there, but it did recover a majority of

the contents of the drive.

Q.   What, if any, signs of physical damage were there to the actual laptop?

A.   So you could see some dents and kind of bending around the CD drive on this one, which indicated it had been bumped or dropped possibly at some point.

Q.   Were you able to determine that not all of the data was extracted because of the log files from the TX1 program?

A.   Yes, correct.  As I spoke about earlier, that TX1 has a function where it will detect bad sectors and then attempt to keep scanning until it finds good sectors, and it will tell you in the log that there were in fact bad sectors where no data was retrieved, but then it shows you where the rest of the data continued.

Q.   After you had extracted the data you were able to extract from the hard drive, did you process that date into an axiom report?

A.   Yes, I did.

Q.   I have just a few questions for you about what data looks like once it's processed into an axiom report.

        Can you explain for the jury the concept of unallocated space?

A.   Yes.  Unallocated space is space on the -- on a file system or on a hard drive where something that's not viewable to the user exists, i.e., something that was deleted at some point.

Q. And can forensic extraction of a device recover data from unallocated space?

A. Yes, it can.

Q. Can you explain sort of how computers store data and what gets overwritten?

A. Sure. If you imagine a hard drive in the file system as a book, you have the table of contents, which is -- say you're looking at the files on your computer, and you see the list of what files exist there. That's your table of contents. And the files themselves would be the chapters in your book.

And what a computer does for efficiency sake is, when an item is deleted it will remove the entry from the table of contents, but it doesn't waste the time in wiping all of the bits and bytes off the hard drive itself, so the file itself still exists in unallocated space on the hard drive.

Q. So is that why a forensic extraction can recover some files that a user might not necessarily be able to see on a laptop?

A. Correct. So it would be as if you're looking at the table of contents, but you don't see an entry for chapter 5. But then you skip past the contents of the book and scan through, and you see chapter 5 is there and it will always be there until the file system assigns another file to reside on the spot where chapter 5 was.

Q. With respect to the three laptops that we are discussing in your testimony today, are you generally familiar with the

source of chat messages that were extracted from those laptops?

A.   Yes.

Q.   What is the source of the messages?

A.   On these devices we found numerous iTunes phone backups. So in the era before the iCloud was popular you could use the iTunes software to plug your phone into your laptop or desktop and create a backup of your phone's contents that would reside on that computer.

(Continued on next page)

BY MS. JOHNSON:

Q.  Were you asked to review some messages from these laptops and assess the way the messages appeared?

A.  Yes, I did.

Q.  At a high level, how does the way Axiom is programmed affect the way some chat messages appear once the data is processed into the Axiom report?

A.  So sometimes you'll see -- if you think about all the different chat apps that exist from WhatsApp, Signal, Snapchat, or iMessage, each of them uses a different database to store their data, and Axiom itself, as a forensic program, has a limited number of ways to display those different formats of databases back to the user.  So sometimes you'll see data that looks kind of funky on what Axiom is showing you, but as a forensic agent, I take a look at the raw data behind what Axiom is showing you to confirm or to verify that data is proper and correct.

Q.  When you see data that, as you said, looks kind of funky, is the way to check the source of that data to go to the actual raw data as you just described?

A.  Yes, so one of the features Axiom has, not only does it have an interface that allows the lay person to view the reports, it also will show you the behind the scenes.  It has the software in it that allows you to view all these different types of databases or the raw bits and bytes straight off the

forensic image.

Q.   I want to talk about some of the ways in which data can appear funky in Axiom due to the programming that you just described.  Is one of those ways the way usernames appear in chat threads?

A.   Yes, that can happen.

Q.   What about duplicate messages in one thread?

A.   That's another potential issue we encounter.

Q.   Is there any other technical explanation for having duplicate messages in some chat threads?

A.   Yes, especially some of the ones I reviewed on this one, in these laptops is that there were several phone backups from the same device that existed on there.  So you can imagine, you know, over the years you backed up your phone one, two, or three times, all three of those three different phone backups are on there.  In those instances, there were overlap and the same exact message appearing three times.

Q.   What about blank messages appearing in chat threads, is that another one of the issues you described?

A.   Yes.  That can happen commonly when you're dealing with the carved data, which we recovered from unallocated space.  So you can never guarantee that all of that chapter 5 in the example wasn't at least partially overwritten by another file, you may be able to recover the majority of it, but there might be little bits that the program can't find and can't recover.

Q.   What about message threads that appear to be either missing participants or missing other indicia like timestamps?

A.   So those can be manifested by sometimes different versions of an app having different naming conventions in the tables in their databases.  So if you imagine a version 1 of a messaging app having a column in its data saying, message send date, and then eight years down the road — this is just a hypothetical example — they change the format of it, they shift the column over one and call it date message sent, Axiom is going to have a problem in some instances representing that data, but that's why we check and verify that the data is there.

          MS. JOHNSON:  Thank you, Special Agent Croft.  I have no further questions at () this time.

          THE COURT:  Cross-examination.

          MS. GERAGOS:  Thank you.

CROSS-EXAMINATION

BY MS. GERAGOS:

Q.   Good afternoon, Special Agent Croft.  My name is Teny Geragos.  I want to personally thank you for explaining this all to us.

A.   You're welcome.

Q.   I just have a few questions for you and then we can be on with our day.

          So you testified that Ms. Ventura gave Homeland Security these three devices that we just looked at, right?

A.   Yes.

Q.   And she gave Homeland Security essentially what's called a consent to search those devices, right?

A.   That's correct.

Q.   And can you explain to the jury what a consent to search means versus a warrant?

A.   Sure.  So in the course of an investigation, we can ask a witness, or even a suspect for that matter, if they would consent to have us search a device, and if they agree to it, that's one way we would examine a device without having obtained a warrant.

Q.   And we just went through B-100, B-200, and B-300.  So for B-100, that device was operable when you turned it on, right?

A.   Correct.

Q.   And it was not damaged?

A.   No.

Q.   And it was not broken?

A.   Correct.

Q.   And then for B-200, I think you said that was the MacBook Air, right?

A.   Let me doublecheck for you.

Q.   Thank you.

A.   That's correct, MacBook Air.

Q.   And that was operable when you opened it and had it charged?

A.   Correct.

Q.   It was not broken or damaged?

A.   Correct.

Q.   And B-200 was the device that, when you opened it, there were two user profiles?

A.   Correct.

Q.   There was the Frank Black user profile and the guest user profile?

A.   That's correct.

Q.   And you determined that there was no material in the guest setting, right?

A.   Yes.

Q.   But Ms. Ventura had given you consent to search this device, right?

A.   That's correct.

Q.   Were you able to collect or process every single file from this device, from what you could tell, you had no issues extracting the data from this device?

A.   From what I could tell, the log indicated we collected the data successfully without errors like in the instance of the third laptop I talked about.

Q.   We'll get to the third one so I can understand that a little bit more.

        For this, what we'll call the Frank Black and guest user laptop, B-200, you did not encounter any problems when you

opened it, powered it on, and then extracted the data, right?

A. Correct.

Q. And we get to the third one, which is B-300, and I didn't catch what type of MacBook model that was.

A. Let me get that for you. So this was a MacBook Pro.

Q. Were you able to determine the approximate year from that model?

A. The model number is A1278 -- I don't know the exact year that would have been released.

Q. Was this a laptop that had a CD slot in it?

A. Yes.

Q. And so what would that indicate to you as to the age of the laptop?

A. It would be a fairly old model if it still had a CD drive in it.

Q. Do you know an approximate year, give or take one or two years, or no?

A. Best guess would be before 2012.

Q. And so you charged that, you powered it on, but that one just did not finish booting. Can you just explain how that one worked when you turned it on?

A. Correct. So there was -- when I turned it on, the screen was black and it never showed a login screen, and you could hear a faint clicking, which sometimes indicates there's some type of damage on a hard drive.

Q. And I think you said it had appeared slightly damaged, like it was bumped or it was dropped, right?

A. Correct.

Q. And you had attributed that to perhaps the reason why it was clicking when you turned it on?

A. Yes.

Q. And you were still able to extract a lot of data from that laptop; is that right?

A. That's correct.

Q. And then going back to, well, I guess all of them. You described the reason for duplicate messages, and I think you described the reason, as you go back before we had iCloud backups, we could back up our phones to our iTunes, right, you could just plug in your phone to a cord to a laptop, right?

A. That's correct.

Q. And you could select on iTunes and say, back up your phone, right?

A. That's correct.

Q. And so, for example, B-200 had several phone backups onto that computer, right?

A. That's correct, yes.

Q. And that's why there are sometimes duplicate messages for many of the chats on that device, right?

A. Yes. I can't speak to every single time there was a duplication, but from the checking and verification I did, that

did appear to be the cause.

Q. Understood. Thank you.

Did you review, I know that you processed B-100, B-200, B-300, meaning that you extracted, and I know you reviewed some of the chats because we asked you to, which is very helpful, so thank you, but did you review any of the data on either of the devices after you extracted it, did you then go through the review step once you had extracted the data?

A. No. So I didn't do the full review. What I'll do is I'll do spot-checking to see, you know, you're expecting to see certain types of files, do those show up in the report, and at that point it was passed on to other agents to do the full review.

Q. So other agents in HSI are then assigned to review the extraction and see basically what's relevant from the laptop; is that right?

A. That's correct.

MS. GERAGOS: Thank you, agent Croft. We really appreciate it. Have a wonderful weekend.

THE COURT: Redirect?

MS. JOHNSON: Just one redirect question, Special Agent Croft.

REDIRECT EXAMINATION

BY MS. JOHNSON:

Q. On Government Exhibit B-200, when you came across the user

profile Frank Black, did you continue to process the data under the consent that Ms. Ventura had given?

A. No. So what I did was, to preserve the data, I did a forensic image, then I contacted the agent and let him know that there was a user partition on there that indicated that it possibly belonged to somebody else, so we didn't actually process any data or search it until later.

Q. And was a warrant obtained before it was processed or searched?

A. Yes, it was.

MS. JOHNSON: No further questions.

THE COURT: Thank you very much, agent Croft.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: The government have any further witnesses for today?

MS. COMEY: Not for today, your Honor. If it's all right with your Honor and defense counsel, we propose to end the week early.

THE COURT: Any objections from the jury?

I'm going to give you some instructions for our long weekend, you've earned it, four days off, but this is when it is very important for you to follow those instructions. Do not talk to anyone about the case. If anyone tries to talk to you about the case, walk away or tell them that you cannot talk

about it because I am ordering you not to talk about the case. You can tell them that. Do not watch, look up, browse, read, or use your phone or computer to access anything about the case. So if you see something come up on the TV screen, change the channel, turn the TV off, go for a walk. These are some things you can do. If something appears on your phone, you can swipe away, turn off your phone, go on a bike ride, watch the Nicks avenge their game one loss. Don't try to research anything. Do not look up the attorneys, the places, the people, or things in this case. And do not try to talk to the lawyers or reach out to them or anyone involved in this case. Don't reach out to them in any way, shape, or form, electronically or otherwise. Don't try to talk to anyone in the courthouse about the case. And no one in the courthouse is to talk to you. If anyone breaks these rules, let me know. If you see or hear another juror violate these rules, it is your job to let me know. It's not tattling -- it is tattling, but the law requires you to tattle under these circumstances.

So look, including jury selection, you all have been here for basically four weeks, and this is an immense public service, we are making great progress, we are right on schedule. So thank you very much for your hard work. Enjoy the long weekend. You all really deserve it. And if there's anything that would make your jury service more pleasant, please let our courtroom deputy know and we will get on it. I

think it's a little warmer here today.  So we'll keep working
on everything to make your service as pleasant as possible.
Thank you very much.

          All rise.

          (Continued on next page)

(Jury not present)

THE COURT:  Anything further to address before you all go to sleep?

MS. COMEY:  Not from the government, your Honor.

THE COURT:  Anything from the defense?

I guess I would ask who the next witnesses are if you have that information here.  I know you're going to furnish a list to the defense, but if you have it.

MS. COMEY:  Let me just confer and make sure I don't misspeak, your Honor.

Your Honor, on Tuesday, our first witness will be Capricorn Clark.  After that we will have a witness from the LAPD and a witness from the LAFD, and I think that will take us through the end of the day Tuesday.  And if it's all right with your Honor, we're working through travel through the rest of the week, so we will email the Court and defense after we get out of court today, so later today with the rest.

THE COURT:  That's fine.  Are you still thinking six weeks for the case in chief?

MS. COMEY:  Yes, your Honor.  I think we're right on time.  I say that hesitating not knowing how long cross examinations for certain witnesses will be, but I do think our case will end up being just about six weeks.

THE COURT:  Are we still looking, I did tell the jurors we were going to try to get this done on July 4th, and

it's too early to really be able to predict with any certainty going through trial, but is there any reason not to think that we're going to able to meet that deadline, from the government's perspective?

MS. COMEY:  Not from the government's perspective, your Honor, assuming that the defense case is no more than about a week and then we do summations and charge the jury.  I would think that we should be able to wrap this up before the 4th of July.

THE COURT:  So I'll just ask everybody, when you get that first inkling that there's an issue or there's going to be an extension, let me know so I can let the jurors know there might be a delay.  I think if you do things in advance, it comes off much better.  Thank you.

Mr. Agnifilo.

MR. AGNIFILO:  We'll do that, Judge.  I'm sorry to ask the Court.  The VTC, anything from the -- and I'm not expecting, I know that your Honor was involved, we'll keep pushing things on our end, too, but we just haven't had a great deal of success.

THE COURT:  Yeah, me neither.

MR. AGNIFILO:  I know.

THE COURT:  So we did reach out to the BOP to see if they'll be able to accommodate nighttime access to the VTC, which they said they could absolutely not do, but never say

never.  If there's something that you can think of.

And let me ask, Ms. Comey, are you aware of anything that can be done along these lines?  I mean, in terms of the hours, I think there are some limitations, there are some issues just with general staffing that prevent them from being able to do this, but in your experience, is there any alternative or anything you can think of that we could do?

MS. COMEY:  In terms of the timing of the VTC, your Honor?

THE COURT:  I think it's more about the amount of access, if there's a way to work --

MS. COMEY:  I've had a case before where accommodations were made, and I'm thinking, I can remember a couple where accommodations were made where defendants were given additional VTC time on weekends and holidays when we were able to say the Judge would really like this to happen.  We can try to call and convey that the judge in this case would really like this to happen.

THE COURT:  I would appreciate that, if you could do that.  And we have a four-day weekend.  At least for this next four-day period, it may be possible for you to get that additional time since we won't be here in the courtroom during the day.

MR. AGNIFILO:  The other request, and I'm sorry to keep coming back to this, is if we don't get more VTC time,

maybe get more phone time?  I think we're out of minutes.  And so if we can't speak on --

THE COURT:  I saw that in your letter.  Let me work on that.

MR. AGNIFILO:  Thank you, Judge.  I know this is a little unorthodox, we really appreciate it.

THE COURT:  That's fine.  Let's try to get you more time.

Anything else?

MS. SHAPIRO:  Your Honor, with respect to the Court's deadlines for Sunday nights, can we move those to Monday night just for this week because Monday is a holiday?

THE COURT:  Sure.  Hopefully I don't have to put in something in writing.

Anything else?

MR. AGNIFILO:  I think that's all we have for you this week, Judge.

THE COURT:  Everyone has done a fantastic job.  Thank you.  If there's anything else we can do on a procedural level to help things move along more smoothly, let us know.  Otherwise, a well deserved break for everyone.  So have a great holiday and we'll see you back here on Tuesday.

(Adjourned to May 27, 2025 at 8:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                          Page

GEORGE KAPLAN

Direct By Ms. Comey . . . . . . . . . . . . .2271
Cross By Mr. Agnifilo . . . . . . . . . . . .2292
Redirect By Ms. Comey . . . . . . . . . . . .2340

 SCOTT MESCUDI

Direct By Ms. Johnson . . . . . . . . . . . .2344
Cross By Mr. Steel . . . . . . . . . . . . . .2373
Redirect By Ms. Johnson . . . . . . . . . . .2401

 MYLAH MORALES

Direct By Ms. Comey . . . . . . . . . . . . .2425
Cross By Ms. Estevao . . . . . . . . . . . . .2439
FREDERIC ZEMMOUR

Direct By Ms. Smyser . . . . . . . . . . . . .2455

JOSHUA CROFT

Direct By Ms. Johnson . . . . . . . . . . . .2468
Cross By Ms. Geragos . . . . . . . . . . . . .2486
Redirect By Ms. Johnson . . . . . . . . . . .2491

GOVERNMENT EXHIBITS

Exhibit No.                                          Received

 8C-102 . . . . . . . . . . . . . . . . . . . .2352
 3F-101, 3F-102, 3F-103, 3F-104, 3F-105, . . .2363
          3F-108
 7H-101, 7H-102, and 7H-153 . . . . . . . . .2456
                    DEFENDANT EXHIBITS

Exhibit No.                                          Received

 406 . . . . . . . . . . . . . . . . . . . . .2335

 404 . . . . . . . . . . . . . . . . . . . . .2338

 647 . . . . . . . . . . . . . . . . . . . . .2441

 648 . . . . . . . . . . . . . . . . . . . . .2442

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

655 . . . . . . . . . . . . . . . . . .2443

656 and 657 . . . . . . . . . . . . . . . .2443

623 . . . . . . . . . . . . . . . . . . . .2444

743 . . . . . . . . . . . . . . . . . . . .2445

739 . . . . . . . . . . . . . . . . . . . .2445

744 and 745 . . . . . . . . . . . . . . . .2446

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300