P5RACom1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                    24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

          Defendant.          Trial
------------------------------x

                    New York, N.Y.
                    May 27, 2025
                    8:46 a.m.

Before:

           HON. ARUN SUBRAMANIAN,

                    District Judge
                    -and a Jury-

                APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
    EMILY A. JOHNSON
    MAURENE R. COMEY
    MEREDITH FOSTER
    MITZI STEINER
    MARY C. SLAVIK
    Assistant United States Attorneys

P5RACom1

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:   MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
SHER TREMONTE
BY:   ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:   ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        JONATHAN P. BACH
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND

ALSO PRESENT:
LUCY GAVIN, AUSA Paralegal Specialist
SHANNON BECKER, AUSA Paralegal Specialist
RAYMOND MCLEOD, Defense Paralegal Specialist

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5RACom1

(Trial continued; jury not present)

THE COURT:  Welcome back.  I hope everyone had a great weekend.

MR. AGNIFILO:  You too, your Honor.

THE COURT:  All right.  I see everyone was burning the midnight oil, so why don't we start with the issues concerning Ms. Clark.

First, there are some defense issues on certain exhibits the defense may use.  The defense has indicated they want to address those as they come up.  Unless there's something else that needs to be discussed along those lines or the government wants to address those now, we'll just address them as they come up.

As to the objections to statements made, I suppose, although the letter is a little bit unclear by male number one, regarding the 2004 incident of alleged kidnapping, the government responds that these statements would be admissible as non-hearsay because they go to effect on the listener or are threats.  They cite to the *Bellomo* case.  That is 176 F3.d 580 at page 586 (2d Cir. 1999), which states that statements offered as evidence of commands or threats or rules directed to the witness rather than for the truth of the matter asserted are not hearsay.  And on that basis, the statements would be admissible.  And the statements would further overcome a rule 403 objection as they are probative and relevant to the

P5RACom1

kidnapping predicate which is in the indictment at paragraph 13A. For that reason, the probative value would outweigh any unfair prejudice.

As to the statements from Ms. Ventura to Ms. Clark, concerning abuse, the defense objects on hearsay and rule 403 grounds. Those statements to Ms. Clark will be excluded. They go primarily to the truth of the matter asserted. They would also be excluded on rule 403 grounds.

As I understand the government's submission, there were certain statements made by Ms. Ventura to Ms. Clark to go to Ms. Clark's I suppose hesitancy in taking Ms. Ventura to meet Mr. Combs. However, that's followed up, according to the government's letter, by an incident in which Ms. Clark actually witnesses abuse by Mr. Combs against Ms. Ventura. That would be admissible and is not challenged by the defense. And so the statement that Ms. Ventura made to Ms. Clark regarding the prior abuse going to the hesitancy of Ms. Clark, would seem to have minimal probative value and the potential for unfair prejudice is high. It would also seem to go primarily not to the effect on the listener given the description of the general sequence of events, but rather to the truth of the matter asserted. So that takes care of the issues regarding Ms. Clark.

I'm going to pause on the summary charts issue and go to the issue concerning the DNA testing questions to Officer

P5RACom1

Jiminez. And as I understand it -- and I'm happy, Ms. Slavik, for you to address this -- the mentioning of DNA testing is in Mr. Jiminez's report, right?

MS. SLAVIK: That's right, your Honor. Investigator Jiminez.

THE COURT: Investigator Jiminez, okay. So if that's true, then help me understand it. I may be misunderstanding this. But wouldn't the defense be able to prove up the report as a business record so the report would come in, and then they could ask Investigator Jiminez about what's in his report similar to what we handled on the first day of trial with the officer who was at the InterContinental Hotel. We had his report of the incident, that was put into evidence, and then he was asked questions about it. He might not have any idea what happened with respect to the DNA testing and may say that. At which point, that's the end of it.

But help me understand why you can't get it in under the hearsay exception for business records, and then why he wouldn't be able to be asked about his own report.

MS. SLAVIK: Your Honor, I think the key things are Investigator Jiminez, his participation in the collection of DNA, the testing for DNA, the analysis of DNA, as well as the very significant limitations of the DNA analysis report. Starting first with investigator --

THE COURT: Let me stop you right there. Are you

P5RACom1

making a 403 objection?

MS. SLAVIK:  A 403 and a 702 objection, your Honor.

THE COURT:  What's the 702 objection?  He either knows something about it or he doesn't.

MS. SLAVIK:  Your Honor, this is --

THE COURT:  Just to make sure I understand.  And sorry to interrupt.

MS. SLAVIK:  Sure.  No.

THE COURT:  So if he comes up and testifies that actually as a side business he's an expert in DNA testing and etc., and he has expertise he satisfies all the 702 predicates and then he testifies about the DNA testing, that's one thing.  But most likely what he's going to say is this is just -- this is in my report, I see it there, and it reflects something I was told by a member of the team.  Other than that, I have no idea about anything concerning this DNA testing.  So what's the 702 issue?

MS. SLAVIK:  So the 702 issue, your Honor, is that the conclusion in Investigator Jiminez's report comes from someone who is an expert in DNA testing and analysis, that is not Investigator Jiminez.  He did not swab any of the evidentiary items for DNA.  He did not do the actual testing.  He did not do any of the analysis.

So his personal knowledge of any of this is extremely limited.  His knowledge is -- rests on the report that the

actual DNA expert conducted, submitted, prepared that was not Investigator Jiminez.

THE COURT:  Right.  But if he's asked:  Well, in the normal course of an investigation, would you ask the serologist whether any DNA samples were taken?  Yes, I would.

MS. SLAVIK:  I think that's fair game.  I think it's fair game to ask Investigator Jiminez whether he submitted any evidentiary items for DNA analysis.  The problem that I have is questioning about the results of that analysis.  The DNA report included in the case materials that were submitted to your Honor, you can see that's two pages.  That is woefully incomplete, and I think that has the real risk of misleading the jury.

DNA analysis at this point is something that, you know, is very much is in the common sphere.  It's given a lot of weight.  The case law suggests that the district court needs to set up guardrails for the admission of DNA evidence like this because it has a real potential to mislead and confuse the jury.  And in this case, that is absolutely true.

While it is true that there was a partial profile that was obtained from the glass bottle, first of all, Investigator Jiminez does not know what a partial profile means.  He cannot explain the significance of a partial profile.  He doesn't know what it means.  But, secondly, just based on, you know, previous experience with DNA experts, there has to be a

sufficient concentration of DNA and a sufficient amount of alleles they're called to --

THE COURT:  Let me stop you right there.  So you don't have an objection to the report coming in assuming that -- Mr. Steel, are you doing this cross-examination or who is? Mr. Agnifilo.  So I assume you're going to ask the predicate questions and establish this as a business record.

MR. AGNIFILO:  Yes.

THE COURT:  So.

MS. SLAVIK:  Your Honor, we would have an objection to the full report coming in.  There's a one pager that establishes Investigator Jiminez's opinion that this was an intentionally set fire.  The report, the full report, is much longer, and includes details of Investigator Jiminez's conversations and interviews with witnesses, and other matters that we don't think are appropriately entered here.

And that's in part because the one line about the DNA analysis is just unsupported by anything that is contained in Investigator Jiminez's report.  Like I said, the DNA report is two pages.  There is undoubtedly a more fulsome report with respect to the DNA.

And Investigator Jiminez simply is not qualified to interpret the results.  He's not qualified to testify as to the limitations of that report, which the government submits are significant.

P5RACom1

And so, for that reason, I think that the full report, with the DNA analysis, I think that's only going to confuse the jury. The defense wants to get this in because they're undoubtedly going to suggest that there was only one DNA profile obtained from the glass bottle and that was a female. I don't think that the DNA report can sustain such an argument and I think to make that argument, to advance that argument, will only confuse the jury.

THE COURT: All right. Mr. Agnifilo.

MR. AGNIFILO: Yes, Judge.

THE COURT: First of all, are you going to ask Investigator Jiminez to interpret the DNA results or anything along those lines?

MR. AGNIFILO: Not to interpret it, no. I'm going to ask him simply -- in addition to being an expert, he's also the lead investigator in this particular investigation. And in that capacity, he sent the glass bottle and some other objects for DNA test. He got the results back, and that's significant to him in terms of how he continues forward with his investigation. Because, I dare say, if the DNA came back with Sean Combs' DNA, this investigation would have gone in a different direction than it did.

So it's significant to him as the lead investigator on this fire investigation that it came back. And I'm not going to make more of this than it is. As my colleague pointed out,

P5RACom1

the DNA doesn't come back identifying another person.  It comes back simply that it's consistent with a female contributor.  Now --

THE COURT:  Because, as I understand, let me just make sure I'm getting this.  It's not the substance of the DNA testing, whether it was accurate, inaccurate; he's not going to know anything about that.  It's the fact that he was the lead investigator and he got this information, and what impact, if any, did that have on his investigation.

MR. AGNIFILO:  That's right.  That's right.  And I'm not -- I think what the government is afraid of is somehow we're going to do something with this and go off into left field and we're just not.  It's a piece of evidence in the case.  It's going to the case investigator, the lead investigator.  He knows about it.  I'm not going to ask him questions about how DNA works or anything like that.  And that's how I'm going to handle it.  And, frankly, I wasn't even going to -- I don't know that we have to put in the report.  I think I can just ask him, give him the report, does this refresh your recollection.  Did this happen, yes, and, you know, you conducted your investigation.  Going forward with this investigation -- I'm sorry, with this information in mind, which you got from, you know, in this case Bode Technology.

MS. SLAVIK:  Your Honor, can I just respond?  I think one of the significant issues here is that Investigator Jiminez

P5RACom1

simply is not equipped to testify as to the results.  The results are -- the results that the defense wants to get in, that is not necessarily the results.  Like I was saying, the partial female profile is one thing that was apparently taken from the glass bottle.  But that is absolutely not the extent of the DNA that was taken.  In many cases, there are multiple contributors to items such as these.

THE COURT:  And, in this case, did further DNA testing show that there were multiple --

MS. SLAVIK:  We don't know.  That's exactly the issue.

THE COURT:  How do we not know?  How do we not know right now?

MS. SLAVIK:  Because oftentimes you need -- like I said, you need a sufficient concentration of DNA to do a comparison, like to develop a profile and then to compare it to DNA that's in a database.  If you don't have a sufficient concentration, you can't do that.  And so, oftentimes, the reports that I've seen, historically, you know, you see the profiles that does have -- that do have a sufficient concentration and DNA experts compare that to what's in a database already.  But oftentimes there are multiple contributors that, you know, is just not enough DNA to throw into a database and see what comes back.

THE COURT:  How long is Investigator Jiminez's direct examination?

P5RACom1

MS. SLAVIK:  It's about half an hour to 40 minutes.

THE COURT:  Half an hour, all right.  I'm going to overrule the objection.  However, I want to hear what he's going to be testifying about on direct and then I'll hear you after the direct examination is over.  We can have a short side bar and I'll make sure that I'm sticking with that ruling.

And, Mr. Agnifilo, you understand that if you start to go into left field that you're going to field an objection from Ms. Slavik?

MR. AGNIFILO:  I understand.

MS. SLAVIK:  Your Honor, I just want your Honor to be on guard that DNA evidence of this sort has the strong potential to mislead the jury.  The defense has had this report since I think November of last year.  They've known that Investigator Jiminez was testing as a cause and origin expert since March 7th.  They have not noticed a DNA expert.  And for those reasons, I want the Court to be just very attuned to these issues of misleading and confusing the jury.

THE COURT:  All right.

MR. AGNIFILO:  Your Honor, one thing.  They put this exact evidence in the grand jury.  I mean, they put it in -- and I understand that the standards are different and all that, but we would have no -- I'm surprised at the objection.  I mean, so they're saying we've been on notice of different things.  When I saw they put this evidence in the grand jury,

P5RACom1

exactly the way it's going to come out here, I was on notice of quite the opposite. And for the government to say somehow that we couldn't call -- that if your Honor does preclude it, we could not prove this up through the government's witnesses that they're not calling, in other words, the serologist and people from the laboratory did the testing, I think is deeply problematic. I mean, this is absolutely fair game for this witness.

THE COURT: All right. I heard it.

MR. AGNIFILO: Thank you, Judge. Yes, Judge.

THE COURT: We'll pick it up again. But for now, people should operate under the assumption that the objection is overruled. As to the DNB record to be issued with Officer Ignacio.

MS. SLAVIK: Your Honor, my understanding is that the defense no longer has an objection to the entry of that exhibit.

THE COURT: Great. Making progress.

So then we go as to the summary charts, when are those going to be put in, Ms. Comey?

MS. COMEY: Some of them will be put in as early as Monday of next week. The longest one won't be put in until I think our second to last witness at the end of our case.

THE COURT: All right. So I'll just, just so we can address this in more fulsome detail later, as for GX 1401,

1404, 1405, 1408, and 1409, those seem to be proper summary charts admissible under rule 1006.  As to Exhibit 1403, I think that's properly a demonstrative that would be covered by rule 107.  It doesn't prove the content of voluminous materials or materials that cannot be conveniently examined in court.

The close calls, in my view, are 1402, 1406, 1407, 1410 and 1411.  And I think my issue with this -- and you may be able to convince me those are 1006 exhibits that can go back to the jury room.  I think my real concern is with the text messages.  Because so basically these exhibits are going in to show particular events and to show that those events were freak-offs that are the subject of this case.  They bring in bank records, phone records, things of that nature.  And that would seem to be fair under rule 1006.  I take it that the principle objection is there are certain text messages that are being put in from other text message chains that are already in evidence and is that proper.  And you might be able to avoid the objections by not having the text messages there if you just have the events and then the text messages which are already in evidence and which the juror can review if they need to are separately in evidence and don't need to be on there.

Now, you might say that doesn't work because in order to show that these were these types of events, we need to have some evidence of that and the evidence that we have is from the text messages.  So I hear that.  It's just that's why I'm

P5RACom1

thinking through it. I think it's a closer call than some of the other ones.

MS. COMEY: Yes, your Honor. So if I can break those two apart as you're thinking about it. 1402 and 1406 I think are different in kind from 1407, 1410, and 1411. So I think 1402 and 1406 are really just about putting in hotel and travel records. And the reason for references to text messages or references to communications of any kind are just to establish who the people were who were going to that hotel room. So it's not about proving up the activity. It's really about like including in each row the relevance of that hotel record or that travel record. And I think that some of the defense's points about the characterization of some of those text messages are well taken and I think question address those for 1402 and 1406, and those two I think will save an enormous amount of time. Because if those don't go back to the jury, then we have to show the jury where in the hotel records to find each of the relevant stays and that's going to take us a long, long time.

So I think 1402 and 1406, the concern your Honor just raised I think we can address by conferring with the defense and making sure that there isn't improper argument about what happened at those hotels outside of just explaining why each hotel record is relevant.

THE COURT: All right.

P5RACom1

MS. COMEY:  So there's 1402 and 1406.  1407, 1410, and 1411, are really just very much like the exhibits that Judge Stein admitted in *Menendez*, which I think we talked about a great deal in our letter, and they are setting up a timeline of different communications that come from different devices and records that come from different sources.  And the reason that this chart will save an enormous amount of time, and we think is 1006 exhibit, is because it will line up those messages from many, many different devices and from many, many different text threads that span hundreds if not thousands of pages in chronological order.

They are not argumentative and I don't think that there's any commentary in those charts that says what inferences should be drawn.  And we take the defense's points about taking things out of context with a bit of a grain of salt because of the cases that I cited to your Honor about how we are allowed to pick what supports our case.  But we have tried particularly in the revised draft that was sent out last night to be more inclusive so that they are more a timeline within a specific range of events rather than picking out specific communications between two people if that makes sense.

THE COURT:  Understood.  And so these are not going to -- they do not need to come into evidence this week?

MS. COMEY:  They do not need to come into evidence this week, your Honor.  But I think those five charts that your

P5RACom1

Honor said are on the bubble for your Honor will save the jury an enormous amount of time if we can put them in.  If we can't put them in substantively, if the jury can't review them in the jury room, then we have to show the jury where to find these exhibits and that's going to take extra days of testimony.

THE COURT:  That's fair.  I'll think about that.

MS. COMEY:  Thank you, your Honor.

THE COURT:  And I've heard the defense's arguments and I've heard your response, so I'll consider what you just said and let you know this week what the ruling is going to be on those.

MS. COMEY:  Would your Honor like us to try to meet and confer in the meantime or should we wait on your ruling?

THE COURT:  If you can eliminate some of the objections, then great.

MS. COMEY:  I will do that.  Thank you.

THE COURT:  I think that leaves us with the motion to strike on Dr. Hughes and the objection raised as to Mr. Mescudi's testimony.

So a question for the government as to the motion to strike Dr. Hughes' testimony, were you planning to put anything in?  It was submitted on Saturday, so I will give the government a chance to respond if you were going to respond.

MS. STEINER:  Yeah, we would ask to respond by the end of the week, your Honor.

P5RACom1

THE COURT:  I think we need to do it sooner.

MS. STEINER:  Sooner, okay.

THE COURT:  If the defense is moving to strike her testimony, and I think it needs to be close in time to when that testimony happened.  So let's get a response in by tomorrow, and then I'll let everyone know what's going to happen on Thursday, if anything.

MS. STEINER:  Thank you, your Honor.

THE COURT:  So we'll do that.

And then as to Mr. Mescudi's testimony, so the defense says, look, so here's what happened.  There was an objection to the question, which the Court sustained in the form of asking for the question to be rephrased.  The question was then asked in a form that was appropriate.  And so the Court overruled an objection to that question.  And I think what the defense is saying is the government knows what their witnesses are going to say, so they can reframe these questions to be proper in terms of their form, but what they are in fact soliciting is an improper opinion that is not permitted under rule 701.  The answer given by Mr. Mescudi, I think fairly, is an opinion that would be covered by rule 701.

Now, there wasn't any objection or motion to strike the answer, because it came out as an opinion.  But there was no subsequent motion by the defense.  But putting that to the side, why isn't it an opinion?  And if it is an opinion, how is

it rationally based on Mr. Mescudi's perception as opposed to an opinion that would be impermissible given the requirements of rule 701?

MS. JOHNSON:  Your Honor, the government would appreciate a chance to look more closely at the cases cited by the defendant and put in a letter to the Court.

I do think that it is properly based on his rational perception.  He had a meeting with this individual.  He had many communications with Mr. Combs.  It's, like, to distinguish the case cited, *Kaplan* case cited by the defense, in that case, the opinion was about the knowledge and participation of the defendant in a fraud scheme.  I do not think that's what Mr. Mescudi was saying.  He was saying when I looked him eye to eye and he said I don't know what you're talking about, I don't think he was telling the truth.  That's it.

I don't think that goes any further than that.  It doesn't mean he participated or not participated.  He's talking about a single statement.  And I do think that's rationally based on his perception of attending this meeting --

THE COURT:  Meaning everything he said about the SoHo House meeting, he looks at Mr. Combs, he sees him acting in a particular way.  And there was questioning on that and you're saying based than foundation, the answer that he gave was rationally based on his perception?

MS. JOHNSON:  Precisely.

P5RACom1

THE COURT:  I understand that.  Can you get a letter in on that today just so we can eliminate that?

MS. JOHNSON:  Sure.

THE COURT:  So let's do that and I'll let you know tomorrow what, if any, relief is warranted there.

Ms. Shapiro, in the meantime, you're asking to strike that portion of Mr. Mescudi's testimony?

MS. SHAPIRO:  Correct, your Honor.

THE COURT:  So can you submit to the Court a proposed instruction what you want to do along those lines?

MS. SHAPIRO:  Certainly.

THE COURT:  Not saying I'm agreeing with the defense, but let's move this forward.  Again, with Dr. Hughes, if anything needs to be done, it needs to be done close in time I think to when the testimony was offered.

MS. SHAPIRO:  Absolutely.  We can do that tonight.

THE COURT:  That takes care of Mr. Mescudi's testimony.  And I'll say generally as to the phrasing of some of these questions I think the defense's larger point is that in certain instances, questions are phrased as what was your understanding of what someone else was doing.  And the defense is saying that given the government has had numerous conversations with these witnesses, they are in fact soliciting improper opinions.

Is that fair, Ms. Shapiro?

MS. SHAPIRO:  Yes, your Honor.

THE COURT:  So the defense should object when these things come up and the government should just be careful that if they are soliciting an opinion that would be covered by 701, that they've laid a proper foundation that any opinion offered would be based on perception and not based on just thoughts or speculation on what the other person was doing or thinking or had done.

With that, anything further from the government before we check on our jury?

MS. STEINER:  Briefly, your Honor.  The government did confer with the defense yesterday afternoon and evening about the exhibits that had been marked as Defense Exhibits.  I understand as the defense has indicated they're largely going to be used for impeachment purposes, which is why we're not kind of going through them individually.

There were two that the government flagged as having rule 412 issues and our understanding is the defense does not intend to show them to the witness or offer them.  Those are Defense Exhibits 930 and 938.

And, similarly, the government has raised a rule 412 issue that involves Ms. Ventura and has conferred with the defense on that, that has come up in Ms. Clark's statements and is in her 3500.  The government understands that the defense does not intend to elicit that absent some door opening,

P5RACom1

although as the government has flagged, given that it doesn't involve a rule 412 issue, there would have had to be noticed, and the victim and her counsel would have the right to be heard on that issue.

But, in any event, the defense has confirmed that they would wait to flag such an issue in a side bar rather than addressing in open court.

MR. AGNIFILO:  That's all accurate.

THE COURT:  Okay.

Ms. Caliendo, can we check in with the jury?

THE DEPUTY CLERK:  Yes.

THE COURT:  And is there anyone from the IT department that can help get the system up and running.  Ah, Cavalry has arrived.

(Continued on next page)

P5RACom1                        Clark - Direct

(In open court; jury present)

THE COURT:  Welcome back, everybody.  Hope you had a restful and enjoyable weekend.

And, with that, is the government prepared to call its next witness?

MS. STEINER:  Yes, your Honor.  The government calls Capricorn Clark.

THE DEPUTY CLERK:  Raise your right hand.

CAPRICORN CLARK,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE WITNESS:  Capricorn Clark, C-A-P-R-I-C-O-R-N, C-L-A-R-K.

THE COURT:  Ms. Steiner, you may proceed.

MS. STEINER:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. STEINER:

Q.  Good morning, Ms. Clark?

A.  Good morning.

Q.  Where are you from?

A.  Born in San Francisco, raised in Los Angeles.

Q.  Ms. Clark, when, if at all, did you become involved in the music industry?

A.  When I graduated high school in 1996.

Q.  And what role did you play in the music industry at that

P5RACom1                        Clark - Direct

time?

A.   I got an internship at Def Jam Records.

Q.   What is Def Jam?

A.   Def Jam is heritage brand in the hip hop community that served my generation as sort of the true lineage.

Q.   Is it a record label?

A.   It is.

Q.   Immediately prior to that, how if at all did your family circumstances change?

A.   My mother died and then shortly thereafter my father died.

Q.   And how if at all did that effect your need for employment?

A.   It made me have to start life a lot earlier.

Q.   Did you attend some college?

A.   I did.

Q.   And what if any record label did you sign with after college?

A.   I signed with Death Row Records.

Q.   What is Death Row Records?

A.   Death Row Records is a 90s, a late 90s, street rap, gangster rap label on the West Coast.

Q.   Who is managing Death Row Records at that time?

A.   Suge Knight.

Q.   And what if any relationship did you have personally with Suge Knight?

A.   Suge Knight is the father of my best friend's children.

P5RACom1                          Clark - Direct

Q.   Following your work at Def Jam and Death Row, what was your next job in the music industry?

A.   My next job was for Sean Combs at Bad Boy Entertainment.

Q.   And approximately when did you start that role?

A.   2004.

Q.   Who did you report to at Bad Boy?

A.   Sean Combs.

Q.   Ms. Clark, I'm going to ask that you look around the courtroom and see if you identify Mr. Combs.  And if you do, please identify him by an article of clothing.

A.   Blue sweater.

        MS. STEINER:  Your Honor, if the record could reflect that the witness has identified the defendant.

Q.   Do you know Mr. Combs by any other names?

A.   I do.

Q.   What are those?

A.   Puff, Puffy, Diddy.

Q.   And how did you refer to him during your employment for him?

A.   Puff.

Q.   During what time periods did you work for Mr. Combs?

A.   From 2004 through 2012.

Q.   And, Ms. Clark, I want to direct your attention to December of 2011.  Were you working for Mr. Combs at that time?

A.   Yes.

P5RACom1                        Clark - Direct

Q.  What occurred at that time?

A.  I was kidnapped.

Q.  And after you were kidnapped, did you continue to work for Mr. Combs?

A.  I did.

Q.  Did there come a time after that you left your employment?

A.  I did.

Q.  And did you leave or were you terminated?

A.  I was terminated.

Q.  We're going to return to that incident in a few minutes.

        I want to start by asking you a few questions about your relationship with Mr. Combs.  When did you first meet Mr. Combs?

A.  I met him shortly after I moved to New York City in 2002.

Q.  And what if any social relationship did you have with Mr. Combs at that time?

A.  We were super platonic friends.  We had a mutual friend that I met him through.  Her name was Jeanette, and we were just regular friends.

Q.  And how were you initially hired to work for Mr. Combs?

A.  I got a call from a head hunter agency called The Jennifer Group.  They had saw my résumé online and thought that it aligned well with what they were looking for for him.

Q.  What role did you first serve in for Mr. Combs?

A.  Personal assistant.

P5RACom1                          Clark - Direct

Q.   Approximately what was that?

A.   2004.

Q.   And how long did you serve as personal assistant to him?

A.   Until 2006.

Q.   Generally, what were your duties as a personal assistant?

A.   To shadow him from before he wakes up until he releases me at night.

Q.   And did you briefly leave your employment for Mr. Combs in 2006?

A.   I did.

Q.   Did you later return to work for him?

A.   I did.

Q.   When was that?

A.   In 2007.

Q.   And when you returned in 2007, what was your role at that time?

A.   Director of marketing for Sean John womens.

Q.   What is Sean John womens?

A.   Sean John womens was a new tentacle from the master brand of Sean John, which was a mens sportswear line.

Q.   Was that a sportswear line owned by Mr. Combs?

A.   Yes.

Q.   Was this a higher ranking position than your prior role for him?

A.   It was.

P5RACom1                        Clark - Direct

Q.  Did you have any increase in pay?

A.  I did.

Q.  And approximately how long did you work in that role?

A.  A year.

Q.  What role did you hold next?

A.  Global brand director for Sean Combs.

Q.  Was that also a promotion?

A.  It was.

Q.  What were your duties in that role?

A.  Name and likeness.  Anything his name was on was my neck of the woods.  If we're launching a television program, if he's ideating on something, my job is to do the due diligence, to do the research to figure it out, to try to continue to grow the brand in different ways once we had reached new levels and ideas.

Q.  Approximately when did you serve in that role?

A.  That was 2008 through 2012.

Q.  And how did that position end?

A.  I was terminated.

Q.  And after your termination, did there come a time when you were reemployed by Mr. Combs?

A.  Yes.

Q.  When was that?

A.  2016.

Q.  What was your position at that time?

A.   Creative director for Casandra Ventura.

Q.   And how long did you hold that role?

A.   Until 2018.

Q.   I want to turn back, Ms. Clark, to your first position for Mr. Combs as his personal assistant.

     You testified that you began that role in 2004; is that correct?

A.   Yes.

Q.   Where were you physically working for him at that time?

A.   1440 Broadway.

     MS. STEINER:  Ms. Foster, can you put up for the witness, the parties, and the Court what has been marked for identification Government Exhibit 2B-111.

Q.   Do you recognize this image, Ms. Clark?

A.   I do.

Q.   Generally, what is it?

A.   Bad Boy Worldwide and Sean John offices.

Q.   Is this a fair and accurate depiction of it?

A.   It is.

     MS. STEINER:  Government offers Government Exhibit 2B-111.

     MR. AGNIFILO:  No objection, your Honor.

     THE COURT:  2B-111 will be admitted.

     (Government's Exhibit 2B-111 received in evidence)

     MS. STEINER:  If you can publish that, Ms. Foster.

Q.   You testified that was Bad Boy offices.  During what time period was this where Bad Boy was located?

A.   In 2004.

Q.   Until when, if you know?

A.   I don't know when the move was made, maybe 2005.

          MS. STEINER:  We can take that down.

Q.   I want to direct your attention, Ms. Clark, to your very first day on the job.

          Where, if at all, did Mr. Combs take you on your first day?

A.   Central Park.

Q.   At approximately what time of day?

A.   It was dark.  After 9:00.

Q.   Who was present, if anyone, when Mr. Combs took you to Central Park?

A.   Myself, Puff, and Paul Offert.

Q.   Who is Paul Offert?

A.   Head of security for Sean Combs, owner of Green Gate Security.

Q.   And can you please describe his general appearance?

A.   Quiet, stoic, a bit menacing.  Physically he looks like a line backer.

          MS. STEINER:  Ms. Foster, can you please put up what's in evidence as Government Exhibit 2A-204.

Q.   Ms. Clark, do you recognize this image?

P5RACom1                          Clark - Direct

A.  I do.

Q.  Who is this?

A.  Paul Offert.

Q.  And do you know Mr. Offert by any other names?

A.  I do.

Q.  What names?

A.  Uncle Paul, Paulie.

Q.  And how did you refer to him during your employment?

A.  Uncle Paul.

Q.  And is this picture how Mr. Offert typically looked?

A.  No.

Q.  What's different?

A.  He doesn't have his glasses on.

Q.  What glasses are you referring to?

A.  His blacked out sunglasses that he wears 100 percent of the time.

        MS. STEINER:  We can take that down.

Q.  Were there any other individuals around you aside from Mr. Combs and Mr. Offert in Central Park that night?

A.  No.

Q.  What if anything did Mr. Combs tell you at that time?

A.  He told me he didn't know that I had anything to do with Suge Knight and if anything happened he would have to kill me.

Q.  What concern did you understand Mr. Combs to have?

        MR. AGNIFILO:  Objection, Judge.

P5RACom1                         Clark - Direct

THE COURT:  Sustained.

Q.  What was Mr. Combs --

MR. AGNIFILO:  I'm sorry, Judge.  I'm going to ask to strike the last answer.

MS. STEINER:  I don't believe she answered.

MR. AGNIFILO:  No, I mean the question and answer before.

THE COURT:  Grounds?

MR. AGNIFILO:  403.

THE COURT:  That's overruled.

BY MS. STEINER:

Q.  Ms. Clark, what was Mr. Combs' demeanor when he threatened that if anything happened, he would have to kill you?

A.  Calm.

Q.  Did you have the opportunity to observe him in this conversation?

A.  Yes.

Q.  How did you perceive this threat?

A.  Very serious.

Q.  Why is that?

A.  I felt like there was some gravitas to the fact that he might have had issues with Shug.

Q.  I'm going to stop you right there, Ms. Clark.

What if anything did Mr. Offert state when Mr. Combs made that threat to you?

P5RACom1                          Clark - Direct

A.   Nothing.

Q.   Was he near by?

A.   He was.

Q.   What was his demeanor?

A.   Calm.  Stoic.

Q.   How did you react when Mr. Combs threatened you?

A.   I said we'll just have to see.

Q.   What did you mean by that?

A.   I meant there was nothing I could do in Central Park to convince him that I was a trustworthy person.  I knew my character.  I knew that I didn't have anything to do with any of that stuff that he would possibly have any --

          MR. AGNIFILO:  Objection, Judge.

          THE COURT:  That's sustained.  The jury should disregard the witness' answer.

          Ms. Steiner.

Q.   Did you continue to work for Mr. Combs after this incident?

A.   I did.

Q.   Why did you continue to work for him?

A.   I felt maybe I could have been more transparent.

Q.   Transparent about your background?

A.   Yes.

Q.   Was this the only time that Mr. Combs threatened you?

A.   No.

Q.   You testified that Mr. Offert was with you at Central Park

P5RACom1                        Clark - Direct

that night when Mr. Combs threatened you.  Can you explain to the jury what Mr. Offert's role entailed?

A.  Mr. Offert was in charge of security, the security and protection of the principal, the movements, who's on staff as it relates to security, and the movements that we would make and the logistical components of keeping Mr. Combs safe.

Q.  And he was the principal, Mr. Combs?

A.  Yes.

Q.  And what is your understanding of how long Mr. Offert had been working for Mr. Combs?

A.  I knew he was there long before me.  I didn't have a sense of the timing.

Q.  Did he continue working for Mr. Combs throughout your employment?

A.  He did.

Q.  What if any other security did Mr. Combs have?

A.  He had Roger Bonds, D-Roc and Ruben.

        MS. STEINER:  Ms. Foster, can you please put up what's in evidence as Government Exhibit 2A-202.

Q.  Ms. Clark, who is this an image of?

A.  D-Roc.

Q.  And who generally is D-Roc?

A.  D-Roc is a security guard and a friend -- a very good friend of Biggie Smalls.

Q.  Can you describe his general appearance?  We just have a

P5RACom1                         Clark - Direct

face here.

A.   He's about six, three; six, four.  More slender, very solid.  I would say quarterback, running back type body.

Q.   Did D-Roc start working for Mr. Combs before or after you?

A.   After me.

Q.   And, if you know, where was D-Roc working before that?

A.   I don't believe he was working before that.

         MS. STEINER:  Ms. Foster, can we please put up Government Exhibit 2A-205.

Q.   Who is this an image of?

A.   Ruben.

Q.   And who is Ruben?

A.   D-Roc's little brother.

Q.   Did he also work as security for Mr. Combs?

A.   He did.

Q.   And when did he start working for Mr. Combs?

A.   He came later.  I don't know exactly when, but it wasn't the same time as D-Roc.

         MS. STEINER:  Ms. Foster, if we can take that down and put up Government Exhibit 2A-201.

Q.   Ms. Clark, who is this an image of?

A.   Roger Bonds.

Q.   Who is Roger Bonds?

A.   Another security guard.  He started at the same time as I did.

P5RACom1                           Clark - Direct

MS. STEINER:  We can take that down.

Q.  Ms. Clark, were the security guards we just referred to, so D-Roc and Roger Bonds and Rube and Mr. Offert, around Mr. Combs while you were working for him?

A.  Yes.  Yes.

Q.  Generally, when would they be around Mr. Combs?

A.  The entire day.

Q.  And how did the fact that Mr. Combs was surrounded by security affect you during your employment?

MR. AGNIFILO:  Objection, Judge.

THE COURT:  Ms. Steiner, can you rephrase the question.

MS. STEINER:  Of course.

Q.  Ms. Clark, you just testified a moment ago that Mr. Combs was surrounded by security through most of the day when you were employed by him; is that correct?

A.  Yes.

Q.  Did that have any effect on you?

A.  It just let me know that there was always a serious nature around, yes.

Q.  What do you mean by a serious nature?

MR. AGNIFILO:  I'm going to object, Judge.

THE COURT:  Sustained.

Q.  Did you ever observe Mr. Combs with a gun?

A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.   When was that?

A.   At my home.

Q.   Was that the kidnapping referred to earlier?

A.   Yes.

Q.   We'll get back to that in a moment.

     When you were working as a personal assistant for Mr. Combs, did you ever hear Mr. Combs discuss guns?

A.   Yes.

Q.   Once or more than once?

A.   Once.

Q.   Can you describe that incident?

A.   We were at MTV.  He was doing MTV press with 50 Cent and we -- after the interview rapped up, myself, Puff, and Chris Lighty got in the elevator.

Q.   Just to stop you for a moment.  Who is Chris Lighty?

A.   Chris Lighty was an amazing entertainment manager in the music industry.  And he was, on paper, managing Puff at the time, and he was actually 50 Cent's manager at the time.

Q.   And what happened in that elevator?

A.   Puff told Chris, because they were having some sort of issue, like I really don't like all the back and forth, I don't do that, I like guns.

Q.   And what's the issue, with an individual?

A.   He had an issue with 50 Cent.

Q.   What was Mr. Combs' demeanor when he said that he liked

P5RACom1                          Clark - Direct

guns?

A.   Very serious.

Q.   Directing your attention to 2004.  Did there come a time when you were accused of theft?

A.   Yes.

Q.   Approximately how long was this after you started working for Mr. Combs?

A.   Couple months.

Q.   Can you please describe generally what you were accused of stealing?

A.    I was accused of stealing three pieces of very high-end jewelry that was out on loan from Jacob the Jeweler.  There was a diamond necklace with a cross, a diamond bracelet, and a diamond watch.

Q.   Ms. Clark, had you stolen the jewelry?

A.   I did not.

Q.   Was there a time when the jewelry came into your possession?

A.   Yes.

Q.   Why did it come into your possession?

A.   Puff gave it to me.

Q.   Did he give it to you for safekeeping?

A.   He gave it to me to take on the plane trip that we had that afternoon to Miami.

Q.   And who is this jewelry on loan to?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   Mr. Combs.

Q.   Did you -- did there come a time on the way to your trip to Miami that you realized the jewelry had gone missing?

A.   Yes.

Q.   Where were you when you realized that?

A.   A couple yards away from Signature at Teterboro.

Q.   What did you do when you realized that the jewelry was missing?

A.   I told the driver to stop the car and I called security at 1440 and told them to lock everybody in and search them.

Q.   What if anything did you convey to Mr. Combs at that time?

A.   I told him that his jewelry was missing.

Q.   And what did Mr. Combs do?

A.   He said okay, I'm going to go ahead to Miami, you go back with Paul.

Q.   And when he directed you to go back with Paul, where was he directing you to go?

A.   1440 Broadway.

Q.   Where did you go after that?

A.   Went to my home in Queens.

Q.   And we'll get to that in a moment.  But did you go back to 1440 Broadway?

A.   Yes.

Q.   And you said you went with Paul; is that Mr. Offert?

A.   Yes.

Q.   What if anything did Mr. Offert do once you were back in the Bad Boy office?

A.   He questioned me about the events leading up to the bag being missing.

Q.   The bag with the jewelry?

A.   Yes.

Q.   How long was he questioning you for?

A.   Couple of hours.  Two and a half, three, finished out the day.

Q.   And you mentioned that you also went to your home; is that correct?

A.   Yes.

Q.   Did you go there from the Bad Boy office?

A.   Yes.

Q.   Did you go by yourself or with someone else?

A.   With someone else.

Q.   Who was that individual?

A.   Paul Offert.

Q.   What happened once you arrived at your residence?

A.   Paul searched my house.

Q.   Can you describe what he did?

A.   He went through my belongings.  He went through my common areas.  I had a roommate.  And just searched.  He didn't find anything.

Q.   What if anything did Mr. Offert tell you after he was

unable to locate the jewelry?

A.  He says, okay, I'll be back tomorrow.  We need to figure this out.  We'll try to figure out what's happening, what's going on.

Q.  Did Mr. Offert pick you up the next day?

A.  He did.

Q.  And where did Mr. Offert take you at that time?

A.  1710 Broadway.

MS. STEINER:  Ms. Foster, if you could please bring up for the witness, the parties, and the Court what has been marked for identification as Government Exhibit 2B-112.

Q.  Ms. Clark, do you recognize this image?

A.  I do.

Q.  What is it?

A.  Bad Boy Worldwide.

Q.  Is that a fair and accurate depiction of that building?

A.  It is.

MS. STEINER:  Government offers Government Exhibit 2B-112.

MR. AGNIFILO:  No objection.

THE COURT:  2B-112 will be admitted.

(Government's Exhibit 2B-112 received in evidence)

MS. STEINER:  Ms. Clark, you mentioned -- if we can publish that for the jury please.

Q.  You testified, Ms. Clark, that you had been working at 1440

P5RACom1                          Clark - Direct

Broadway; is that right?

A.   Yes.

Q.   And that was also a Bad Boy building; is that right?

A.   Yes.

Q.   What was this building?

A.   I didn't know.

Q.   At the time you did not know?

A.   I did not know.

Q.   Did you later find out what it was?

A.   I did.

Q.   What is that?

A.   It became our new corporate offices.

Q.   So Bad Boy eventually moved into this building?

A.   Yes.  And Sean John.

Q.   Directing your attention just to the front door of the building.  Can you see that on the bottom left-hand side?

A.   I can.

Q.   Can you describe the doors?

A.   A glass door, gold frame.

Q.   How did you enter this building with Mr. Offert?

A.   Through the front door.

Q.   And after you entered, was the front door kept open or locked behind you?

A.   It was locked behind us.

Q.   How do you know that?

P5RACom1                        Clark - Direct

A.   I could see the gentleman locking us in.

Q.   How could you see it?

A.   Through the glass door.

          MS. STEINER:  We can take that down.

Q.   Ms. Clark, once you entered this building, 1710 Broadway, can you describe what the interior looked like at that time?

A.   Dilapidated, post move out, post -- pre move in.  The floors weren't really done on the level we were on, the floor wasn't done.  There was like old pieces of like, you know, permanent fixtures around that were sort of half taken out. But pretty much just a gutted building.

Q.   And again, at this time, did you know what this building was?

A.   I had no idea.

Q.   Where were you brought inside the building?

A.   I was brought to the sixth floor.

Q.   Who brought you there?

A.   Paul Offert.

Q.   Can you describe what the sixth floor of the building looked like?

A.   Similar.  Dilapidated, floor wasn't done, nothing built in yet, some old build-ins kind of not completely removed.  And there was a 6-foot folding table with some chairs in the middle of the room.

Q.   Was anyone present on the sixth floor when you arrived

P5RACom1                      Clark - Direct

there with Mr. Offert?

A.   Yes.

Q.   Who was there?

A.   There was a gentleman, a heavy set gentleman, who was chain smoking cigarettes and drinking black coffee.

Q.   Can you describe this individual's appearance?

A.   Very wide.  Very heavy.  Looked like the size of two linebackers.  He wasn't tall.  He didn't stand very much either.

Q.   When you say size, in width he was very large?

A.   Yes.

Q.   Can you describe this man's size relative to your own?

A.   Five of me, across.  He was very wide.

Q.   Did you learn this man's name?

A.   I did not.

Q.   Was anyone else with you on the sixth floor?

A.   No.

Q.   And you said that Mr. Offert had brought you to the sixth floor; is that correct?

A.   Yes.

Q.   Did he remain there?

A.   No.

Q.   Do you have an understanding of where he went?

A.   I do not.

Q.   Did he ever return to the sixth floor?

P5RACom1                              Clark - Direct

A.  He did.

Q.  And when would he return to the sixth floor?

A.  Intermittently during the day.

Q.  So he was in and out?

A.  Mm-hmm.

Q.  Did you speak with this heavy set man?

A.  I did.

Q.  And what did he tell you was the reason you had been brought to the building?

A.  He says I had been brought to the building to take a lie detector test to figure out what happened with this jewelry.

Q.  What if anything did he say would happen if you did not pass the test?

A.  He said if you fail these tests, they're going to throw you in the East River.

Q.  What was the man's demeanor when he said that they would throw you in the East River?

        MR. AGNIFILO:  Your Honor, I'm going to object.  Move to strike the last answer.

        Can we approach for a second.

        THE COURT:  You may.

        (Continued on next page)

P5RACom1                          Clark - Direct

(At sidebar)

MR. AGNIFILO:  There's no indication any of this is coming from the defendant.  I mean, we don't know who this man is.  He's since been given her a lie detector test, and this is just incendiary testimony about her being threatened about thrown in the East River.  Which even if it's believed, and I'm not here to quarrel with that at this point, there's nothing that say that Mr. Combs wanted any of this to happen.  So it's unduly prejudicial.

So I think for that reason, we object to it and move to strike it.

THE COURT:  I'll let Ms. Steiner respond.  But when we addressed this before the jury came in, why didn't you mention any of this?  Because I specifically addressed this testimony and I explained that there was a Second Circuit case that indicated that if there are threats, that that's not hearsay, so it doesn't fit into a hearsay exception based on the *Bellomo* case from 1999, and there was silence from the defense.

MR. AGNIFILO:  I thought they were going to tie this back to Mr. Combs.  And I'm not hearing that.  That's the missing link.

THE COURT:  Okay.  So there's an allegation of a missing link.  Ms. Steiner?

MS. STEINER:  And I've conferred with Mr. Agnifilo on this previously.  As we established already in her testimony,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

this witness has laid the foundation that she was directed to go back to the Bad Boy office, the first Bad Boy office by Mr. Combs when the jewelry went missing. She was then personally escorted there by Mr. Offert, who was his head of security and reported directly to Mr. Combs. That's also in her testimony.

Mr. Offert was essentially the person escorting her, as she will continue to testify, for the remainder of that week, to her apartment, back to her apartment, to this new building, the deserted building, back to her home, was checking in intermittently.

She'll testify that she would have otherwise been by Mr. Combs' side from essentially 9:00 a.m. to 4:00 a.m. every single day. So I think the logical inference would be that Mr. Combs surely understood that she was not present and was elsewhere, and that Mr. Offert, again, is acting as Mr. Combs' head of security at his direction in terms of any security operation.

THE COURT: All right.

MR. AGNIFILO: But now we're far afield even from Mr. Offert, and that's the reason I'm objecting now, is that he's gone and she's with this unknown man, who is giving her a lie detector test, and the connection between that man and Mr. Combs is just not existent at this point.

THE COURT: I don't think that's a fair

P5RACom1                      Clark - Direct

characterization of the testimony, but I understand your argument.

          The objection is overruled.

          (Continued on next page)

THE COURT:  Ms. Steiner, you may proceed.

MS. STEINER:  Thank you, your Honor.

BY MS. STEINER:

Q.  Ms. Clark, I'll ask you the question again,

What was the man's demeanor when he made the threat that they would throw you in the East River?

A.  Very serious, very direct, no frills.  This was a very serious conversation.

Q.  How did you react?

A.  I was petrified.

Q.  Did this man proceed to administer the lie detector test?

A.  He did.

Q.  At that time, did you want to be taking the test?

A.  I did not.

Q.  Why did you permit him to do that?

A.  I was afraid of what would happen if I didn't pass this test, and I felt the test was the only way to get through this thing.

Q.  Can you describe how the test is administered?

A.  They strap some stuff to your chest and they strap some stuff to your arms, and they ask you a series of questions over and over again.

Q.  What types of questions were you asked?

A.  Did I steal the jewelry, did I come up with an idea to steal the jewelry, did I plan with somebody to steal the

jewelry, had I ever stolen from him.  Just a lot of stealing centric questions.

Q.  From him, was that Mr. Combs?

A.  Yes.

Q.  Did this man tell you the results of the test?

A.  They said they were inconclusive.

Q.  What, if anything, did the man tell you about them -- the results being inconclusively?

A.  It's, like, I'm not getting a good reading.  You need to calm down.  You're going to be in the East River if I can't get a reading on this.

Q.  When he told you to calm down, how had you been reacting in that moment?

A.  I couldn't calm down.  I wasn't doing a good job at calming down.

Q.  Approximately how long were you in this deserted building on that day?

A.  Full workday.

Q.  Of this full workday, approximately how long was the man administering the lie detector test on you?

A.  Intermittently all day.

Q.  And, if you know, was anyone else inside the building at the time?

A.  Not to my knowledge.

Q.  During the hours that you were in 1710 Broadway, were you

P5RsCOM2                        Clark - Direct

able to leave?

A.  No.

Q.  Why not?

A.  We weren't allowed to leave.

Q.  Who told you, you weren't allowed to leave?

A.  Paul.

Q.  Paul Offord?

A.  Yes.

Q.  And was the door also locked at that time to the building?

A.  It was locked.

Q.  Was it locked from the inside or the outside?

A.  Locked from the outside.

Q.  Did you attempt to leave the building?

A.  I did not.

Q.  Why did you not attempt to leave the building?

A.  That was opposite of what I was there to do.  I was there to prove my innocence.

Q.  How did you eventually leave the building?

A.  Paul took me home.

Q.  And what, if anything, did Paul, Mr. Offord, tell you when he brought you home?

A.  He told me, I'll be back tomorrow to get you.  We still got to figure this out.

Q.  What happened the next day?

A.  He came back and got me.

Q.  Who is that?

A.  Paul Offord.

Q.  What happened the next day?

A.  We started again.

Q.  And when you say you started again, were you administered a lie detector test again?

A.  Yes.

Q.  Is that at the same location?

A.  Same location.

Q.  For approximately how many hours?

A.  All day.

Q.  Who escorted you to that location?

A.  Paul Offord.

Q.  Are you free to leave on that second day?

A.  I was not.

Q.  Why not?

A.  I was told I was not able to leave until we got to the bottom of this.

Q.  Who told you that?

A.  Paul Offord.

Q.  Approximately how many days were you required to go to 1710 Broadway to take this lie detector test?

A.  Five.

Q.  And who, if anyone, picked you up from your residence, brought you there, and returned you each day?

A.   Paul Offord.

Q.   Why did you continue to go with Mr. Offord to that building, 1710 Broadway?

A.   I wanted to prove my innocence.  I didn't like the threats.

Q.   And can you say that again?

A.   I didn't like the threats.  I just wanted to get through it.

Q.   And the threats that you're referring to, is that the threat to be thrown in the East River?

A.   Yes.

Q.   Did you want to be taking the lie detector test over these five days?

A.   I did not.

Q.   Why did you continue to take the test?

A.   I felt like it was the only way to prove that I had nothing to do with it.

Q.   Ms. Clark, during this five-day period, did you tell anyone where you were?

A.   I did not.

Q.   Why not?

A.   I just did not.  I was in a different head space.  I was just trying to survive it.

Q.   Did you report the incident to law enforcement?

A.   I did not.

Q.   Why not?

A.   I worked under an NDA.  I didn't --

MR. AGNIFILO:  Object to that, Judge.

THE COURT:  That's sustained.

The jury should disregard the witness's last answer.

Ms. Steiner.

BY MS. STEINER:

Q.   Did Mr. Combs ever reach out to you during this five-day period?

A.   He did not.

Q.   During this five-day period, did he ever ask where you were?

A.   Not to me.

Q.   Typically, what would you have been doing during a five-day period like this?

A.   I would have been shadowing him, I would have woken him up, and I would have been there through the course of the day until about four o'clock in the morning.

Q.   When you say you would be shadowing him and be with him, who are you referring to?

A.   Mr. Combs.

Q.   Where were you instead?

A.   1710 Broadway.

Q.   Doing what?

A.   Taking lie detector tests.

Q.   What, if anything, happened after those five days?

A.  I was told I could return to work Monday.

Q.  Who told you that?

A.  Paul Offord.

Q.  And what, if anything, did Mr. Offord tell you at that time about seeing Mr. Combs?

A.  He said, You'll see him sometime next week in the office.

Q.  Did he give you any directions with respect to how to interact with Mr. Combs?

A.  He did not.

Q.  And who is Mr. Offord's direct boss?

A.  Sean Combs.

Q.  Did Mr. Combs ever discuss the theft or the lie detector test with you after you returned to the office?

A.  He did not.

Q.  Do you know if the jewelry was ever located?

A.  I do not.

Q.  Ms. Clark, did you continue to work for Mr. Combs after this incident?

A.  I did.

Q.  Why did you continue to work for him?

A.  Well, I felt if I would have left, it would have been written off as I stole anyway.

Q.  Ms. Clark, when you returned to the office, when you returned to work, did Mr. Combs ask where you had been?

A.  He did not.

Q.  Generally, what hours were you required to work as Mr. Combs' personal assistant?

A.  Probably start of the day at his townhouse on 74th and Park at 9:00 o'clock in the morning and finish at Daddy's houses or wherever we were sometime around 4:00 a.m.

Q.  What's Daddy's house?

A.  Recording studio.

Q.  Who determined how long the day would be for you?

A.  Puff.

Q.  What types of tasks would you be given from 9:00 a.m. to 4:00 a.m.?

A.  Um, give him a carnation for his suit, print out documents, something he wants to show someone, research something that he's had on his mind, roll calls, get his food.

Q.  A variety of tasks?

A.  Anything that he needed to do as our job, yes.

Q.  What, if anything, would Mr. Combs tell you if you failed to accomplish a task?

A.  You would lose your job.

Q.  Is that what he would say?

A.  Yes.

Q.  Generally, what, if any, breaks would you get during the day for basic needs, like, eating?

A.  None.

Q.  How much sleep were you getting each night?

A.  On a good night, four.  On a bad night, two.

Q.  What, if any, medical conditions did you develop as a result of this?

            MR. AGNIFILO:  Object to the form of the question.

            MS. STEINER:  I can rephrase, your Honor,

Q.  What, if any, medical conditions did you develop when you were a personal assistant for Mr. Combs?

A.  Alopecia.

Q.  What is alopecia?

A.  It's a stress-induced condition where you get bald patches on your head.

Q.  Did you seek medical attention?

A.  I did.

Q.  And what medical recommendation did you receive to treat the condition?

A.  Told me to calm down and try to destress somehow.

Q.  How much were you compensated for your work as a personal assistant to Mr. Combs?

A.  $65,000.

Q.  Were you working over time?

A.  Yes.

Q.  Sounds like you must have been, because you worked til 4:00 a.m., is that fair to say?

A.  Yes.

Q.  What, if any, discussions did you have with HR about being

paid for over time?

A.  I went to them and I told them, I'm working basically 24/7 and I'm not making enough money.  And she sat with me to calculate my overtime.

Q.  And who is she?

A.  Vashta Dunlap.

Q.  And what was her role?

A.  Head of HR.

Q.  Did she calculate your overtime?

A.  She did.

Q.  What did she calculate?

A.  She calculated --

          MR. AGNIFILO:  Object to the form of the question, Judge.

          THE COURT:  Ms. Steiner, can you rephrase the question.

          MS. STEINER:  Of course.

BY MS. STEINER:

Q.  What, if any, discussions did Vashta have with Mr. Combs in your presence?

A.  She sat down to review the overtime, due diligence that she had worked out to present to him for my overtime.

Q.  What did she present to him?

A.  She said that I was owed $80,000 per three-month period in my assistant era.

Q.   How did Mr. Combs respond?

A.   He ripped up the paper.

Q.   Were you paid that $80,000 that Vashta referred to at the time?

A.   I was not.

Q.   I want to discuss some of your job responsibilities when you were working as Mr. Combs' personal assistant.

While you were working in that role, were there times that Mr. Combs would stay at hotels?

A.   Yes.

Q.   And, if you know, who would he stay there with?

A.   Kim Porter.

Q.   How frequently would he stay at a hotel with Ms. Porter?

A.   Once a week.

Q.   And what, if anything, was your role with respect to hotels when Mr. Combs would travel?

A.   To pack and bring and unpack his personal effects.

Q.   Generally, what names would Mr. Combs' hotel rooms be booked under?

A.   Frank Black.  Frank White.

Q.   And, generally, what name would any of his girlfriends' rooms be booked under?

A.   Jackie Star.

Q.   Which hotels did Mr. Combs frequent most when he traveled outside of New York?

A.   In Atlanta, it was the InterContinental Buckhead.  In Los Angeles, it was the Beverly Hills Hotel.

Q.   And when Mr. Combs would travel to outside of New York and have these hotel stays, how would you set up the room?

A.   I would unpack all of his clothes and shoes and personal belongings and put them in their place, and it would be set.

Q.   And what did those belongings include?

A.   Clothes, toiletry bag, and camera bag.

Q.   Let's take those one at a time.

     So what's the camera bag?

A.   Camera box, actually,

Q.   Camera box?

A.   It was a silver -- at that time, it was a silver, like, 45-record carrier, repurposed, and it had three click-in -- three point-and-shoot cameras and one small mini DV camera.

Q.   Was there anything else in the camera box?

A.   A small bottle of baby oil and a small bottle of lube.

Q.   What, if any, lighting was in the hotel?

A.   No lighting.  We brought his Diptyque candles.  That was it.

Q.   You also mentioned a toiletry bag?

A.   Yes.

Q.   Would that be brought to the hotel room?

A.   Yes.

Q.   What was inside of that bag?

A.   Toiletries, medications, drugs.

Q.   What type of drugs would be in the toiletry bag?

A.   Ectasy.

Q.   Can you describe what the toiletry bag looked like?

A.   Black, top zip, Louis Vuitton.

Q.   How frequently would Mr. Combs bring the toiletry bag with him to a hotel stay?

A.   100 percent of the time.

Q.   How frequently would he bring the camera box to the hotel stay?

A.   100 percent of the time.

Q.   About how long would Mr. Combs stay in a hotel room after you set it up for him?

A.   Three to four days.

Q.   During these hotel stays, what would you be doing?

A.   Watching TV, catching up on sleep, and ordering room service.

Q.   And would Mr. Combs reach out to you at all during this time?

A.   A couple of times.

Q.   Infrequently?

A.   Infrequently.

Q.   What, if any, responsibilities did you have after one of Mr. Combs' hotel stays?

A.   To pack up his belongings and sweep the room for anything

that might be left behind.

Q.  What, if any, damage did you observe in the hotel rooms after his stays?

A.  Just baby oil.  At the InterContinental, I would see, like, handprints left in oil on the, like, ultra-suede wall.

Q.  How frequently did you observe damage from baby oils in the rooms?

A.  Frequently.  But it was a lot -- it was just a lot of baby oil.  It was just everywhere.  It wasn't necessarily always on the wall.

Q.  Earlier you testified that, by 2008, you were Mr. Combs' global brand director, is that correct?

A.  Yes.

Q.  And at that time, was Mr. Combs still going to hotels with women?

A.  Yes.

Q.  Did you still have a role in setting up those hotels?

A.  I did not.

Q.  And, if you know, which women would he bring to hotels most frequently at that time?

A.  Kim Porter.  Casandra Ventura.

        MS. STEINER:  Ms. Foster, can you please bring up what's in evidence as Government Exhibit 2A-401.

Q.  Ms. Clark, who is this?

A.  Casandra Ventura.

MS. STEINER:  You can take that down,

Q.  How frequently would Mr. Combs stay at a hotel with Casandra Ventura when you returned in 2008 as his global brand director?

A.  I would say once a week.

Q.  Approximately how long would these hotel stays last?

A.  Three to four days.

Q.  What hotels would Mr. Combs and Ms. Ventura typically go to?

A.  Beverly Hills Hotel, L'Ermitage, London.

Q.  And what, if anything, would Mr. Combs and Ms. Ventura do after a hotel stay?

A.  They started getting IV drips.

Q.  What, if anything, did Mr. Combs tell you about why they were getting these IV drips?

A.  I asked.  He was -- he related it's similar to serotonin supplements, because ectasy depletes your serotonin.  It's just replenishing us from partying over the weekend.

Q.  From the drugs?

A.  Yes.

Q.  Did Mr. Combs ever speak with you about his relationship with Ms. Ventura?

A.  He did.

Q.  And did one of those discussions occur in 2010?

A.  Yes.

Q.   Where were you at that time?

A.   We were in his first rental house in Los Angeles.

Q.   And do you know the address for those location?

A.   I think 9933 Beverly Grove.

Q.   Who was present during this discussion?

A.   Myself, Puff, Laura London, Chef Jordan was in the kitchen, but she...

Q.   Who's Chef Jordan?

A.   It was his personal chef at the time.

Q.   Who is Lauren London?

A.   Lauren London is a friend, and she also was an associate of us, all of ours, because she had once modeled for Sean John.

Q.   Where were you located in the house during this discussion?

A.   We were in the kitchen.

Q.   What did Mr. Combs discuss with you at that time?

A.   He was discussing with us why we didn't have a man like him.

Q.   What did he do?

A.   He said, Let me show you something.

Q.   What did he do next?

A.   He called Cassie over and he asked her to sit down, stand up, turn around, turn the other way, walk over there, grab that, hand me that, walk back, turn around, go back in the other room.

Q.   How did Cassie respond or Ms. Ventura?

A.  She did it.

Q.  She followed each of his instructions?

A.  Yes.

Q.  After Ms. Ventura left the room, what, if anything, did Mr. Combs say?

A.  He said, Did you see that?  He said, You bitches won't do that.  That's why you don't have a man.  To which we said, You motherfucking right.

Q.  During your employment, did you ever observe Mr. Combs using drugs?

A.  I did.

Q.  What types of drugs?

A.  Ectasy, molly.

Q.  And how often did you observe Mr. Combs taking these drugs?

A.  Once a week.

Q.  Did the frequency of his drug use change overtime?

A.  Yes.

Q.  How so?

A.  It increased.

Q.  To more than once a week?

A.  Yes.

Q.  During what period?

A.  After I was an assistant, I think it increased.  I think it was the most contained when I was his assistant.

Q.  Other than molly, ectasy, did he take any other drugs you

were aware of?

A.   He did.

Q.   What drugs?

A.   Um, like, prescription medications.

Q.   Who, if any, drug dealers would Mr. Combs obtain drugs from?

          MR. AGNIFILO:  Object to the form of the question.

          MS. STEINER:  I can rephrase.

Q.   Did Mr. Combs obtain drugs?

A.   Yes.

Q.   Did you observe that?

A.   Yes.

Q.   And who would he obtain drugs from?

A.   He had a girlfriend in New York that he could get drugs from.

Q.   Did he obtain drugs from anyone else?

A.   Not really in New York, no.

Q.   How about in Los Angeles?

A.   Yes.

Q.   Who would he obtain drugs from in Los Angeles?

A.   One Stop.

          MS. STEINER:  Ms. Foster, if you could please bring up what's in evidence as Government Exhibit 2A-507.

Q.   Ms. Clark, do you recognize this individual?

A.   I do.

Q.  Who is this?

A.  One Stop.

Q.  And what types of drugs did you observe Mr. Combs obtain from One Stop?

A.  Ectasy, molly.

Q.  Where were the drugs delivered?

A.  Either to me or to Puff directly.

Q.  Where?

A.  Either to myself or Puff directly.

Q.  But where would it be delivered to?

A.  Either a hotel or a house.  Wherever we were staying at the time.

        MS. STEINER:  You can take this down.  Thank you.

Q.  Did Mr. Combs ever ask you to obtain drugs for him?

A.  Yes.

Q.  What drug would he ask you to obtain most frequently?

A.  Ectasy.

Q.  Approximately how many times did he ask you to personally get him ectasy?

A.  Not more than ten times in my career with him.  He could get it on his own.

        MR. AGNIFILO:  Object to the last part, Judge.  Move to strike.

        THE COURT:  Granted.

        The jury should disregard the last sentence in the

P5RsCOM2                         Clark - Direct

witness's answer.

Ms. Steiner.

BY MS. STEINER:

Q.  Who, if anyone, did you observe Mr. Combs provide drugs to?

A.  Girlfriends, friends.

Q.  Did Mr. Combs ever ask you to obtain drugs for others?

A.  Yes.

Q.  On how many occasions?

A.  Once.

Q.  Approximately when was that?

A.  It was the summer of 2006, I believe.

Q.  Where were you at the time?

A.  In the south of France.

Q.  What did Mr. Combs ask you to obtain in the south of France?

A.  Cocaine.

Q.  How did you respond when he asked you to get cocaine?

A.  I said, For who?

Q.  Why did you react that way?

A.  Because it wasn't going to be something that I was going to add to my list of things to do, given that's how my mother died.

MR. AGNIFILO:  Objection, Judge.

Can we approach again, Judge?

THE COURT:  You may.

P5RsCOM2                          Clark - Direct

(At the sidebar)

MR. AGNIFILO:  This is becoming just a wholesale character assassin.  I'm not sure what many of these things have to do with the charges.

The drugs, I understand, because there's a drug predicate as part of the racketeering count.  But to have the witness add that this is how her mother died, it's just -- it's just too much.  It's not targeted at allegations, and so I object.

THE COURT:  All right.  I understand.

Ms. Steiner.

MS. STEINER:  She had said that before.  I think her primary thing was that she was willing to get some drugs and not others for him.  I think she -- she does not always say that.  Sometimes she did.

I thought it was important to distinguish why, on this one occasion, she was unwilling to comply with the directive, given her job was to follow all of his directives.

But I can move on from the question.

THE COURT:  Let's move on.

(Continued on next page)

(In open court)

BY MS. STEINER:

Q.  Ms. Clark, you testified that you refused to get cocaine for Mr. Combs, is that correct?

A.  Yes, Yes.

Q.  Or initially, at least, is that correct?

A.  Yes.

Q.  How did Mr. Combs respond when you said, I believe you said, Who is this for?

A.  Yes.

Q.  How did he respond to that?

A.  Not me, nigga.

Q.  Was the cocaine obtained?

A.  It was.

Q.  Was the cocaine for someone else?

A.  It was for someone else.

Q.  How is the cocaine obtained?

A.  I had the Spanish security guards get it.

Q.  Did Mr. Combs ever ask you to obtain prescription drugs for him?

A.  He did.

Q.  Generally, what time of day?

A.  Anytime of day, but mostly at night.

Q.  Were these sedatives?

A.  I believe so.

Q.   Were these prescription drugs always in Mr. Combs' name?

A.   No.

Q.   Whose name were they sometimes in?

A.   My name.

Q.   Why were they in your name at times?

A.   Because I had exceeded the amount of controlled substances I could get on Miami Beach.

Q.   Under Mr. Combs' name?

A.   Yes.

Q.   When the prescription drugs were in your name, who were they for?

A.   Mr. Combs.

Q.   Did Mr. Combs ever travel with any of these drugs?

A.   Yes.

Q.   How frequently?

A.   All the time.

Q.   And when he traveled with the drugs, where would the drugs be contained in?

A.   In the toiletry bag.

Q.   Who would carry the toiletry bag?

A.   Myself or security.

Q.   Did Mr. Combs ever carry the bag?

A.   He did.

Q.   This is the toiletry bag, correct?

A.   Yes, the toiletry bag.

Q.  Did you ever see Mr. Combs with bulk cash?

A.  I did.

Q.  Would you see him with bulk cash --

MR. AGNIFILO:  I'm going to object to this.  I don't know what bulk cash is.  I don't know if the witness does either.  I'm sorry.

THE COURT:  Ms. Steiner, can you play some foundation or rephrase.

MS. STEINER:  Of course, your Honor.

If I could just ask a couple of questions to lay out a foundation, your Honor?

THE COURT:  You may.

MS. STEINER:  Thank you.

BY MS. STEINER:

Q.  Ms. Clark, did you see Mr. Combs with large amounts of cash during your employment?

A.  I did.

Q.  When we say large amounts of cash, approximately how much money are we talking about?

A.  In my case?  100,000 euro.

Q.  And where would you see Mr. Combs with 100,000 euro?

A.  Primarily coming back from Europe.

Q.  Where would he receive the cash from?

A.  We would get it from club bookings in Europe.

Q.  What did Mr. Combs do once he received this cash?

A.  Keep it.

Q.  Who would he provide it to?

A.  Oh, he would turn it over to security, after I gave it to him.

Q.  When you had the money, what were you doing with the money?

A.  I was counting the money.

Q.  Who would you give the money to after you counted it?

A.  Directly to Puff.

Q.  If you know, where was the cash stored once it was back in the United States?

A.  It appeared to me that it was always kept in his bedroom's personal safe.

Q.  During your employment with Mr. Combs, what, if any, violence did you observe?

A.  I observed fighting.

Q.  What kind of fighting?

A.  Him fighting men.

Q.  Can you describe who?

A.  Paul Offord.

Q.  Anyone else?

A.  His barber, Curtis Smith.

Q.  What, if any, objects would Mr. Combs throw at people?

A.  Phones.

Q.  When would he do that?

A.  When he was upset.

Q.  Did he do that once or more than once?

A.  Often.

Q.  Was Mr. Combs ever violent with you during your employment?

A.  Yes.

Q.  Approximately when was that?

A.  Summer of 2006.

Q.  Where were you at the time?

A.  In his home in 2 Star Island, Miami.

Q.  And what, if anything, did Mr. Combs tell you when you had arrived at 2 Star Island in Miami?

A.  He told me, I don't care what goes on this weekend, you are not to leave this house.

Q.  Did Mr. Combs later send you on an errand?

A.  He did.

Q.  Where to?

A.  Pharrel Williams, who was a music producer, his manager came over and was dropped off by boat on the back dock for a quick meeting.  He had me return Rob Walker to Palm Island, where they were shooting a video.

Q.  Did Mr. Combs direct you to do that?

A.  He did.

Q.  Approximately how long did you remain on the other island?

A.  An hour.

Q.  What were you doing during that time?

A.  Hanging out.

Q. When did you next hear from Mr. Combs?

A. About an hour in on the phone, I got a call.

Q. What did he say?

A. Where the fuck are you?

Q. What did you do after you got that call?

A. I went back to Star Island.

Q. What, if anything, did Mr. Combs tell you when you returned to Star Island?

A. He said, See, your problem is you want a life and you can't have that here.

Q. What, if anything, did he direct you with respect to the rest of the weekend?

A. He said, Like I said, don't go anywhere. You are not to leave this house.

Q. What happened the next morning?

A. I woke up and I went to the kitchen to get some breakfast.

Q. What happened then?

A. I was making my plate. The chef was there. She was tired. I asked her where the turkey bacon was. She said, There is no more fucking turkey bacon. She was very upset from a long night. And I said, I hate it here.

Q. And what, if anything, did the chef then tell Mr. Combs in your presence?

A. She then walked outside to where Puff was standing on the back deck and told him what I said. It exasperated her. He

P5RsCOM2                        Clark - Direct

immediately looked at me and said, You hate it here?  And he charged me.

Q.  When you say he charged you, can you describe what he did physically to you?

A.  He ran towards me with his hands open and pushed me, my shoulders, and he started pushing me back.

Q.  In what direction?

A.  Out towards, out towards the front entrance of the kitchen, through the butler's pantry.

Q.  Approximately how far did he push you?

A.  About 25, 30 yards.

Q.  And how was he pushing you?

        Just to make sure the record is reflecting, the witness, with open hands --

A.  Open hands.  Right here on my shoulder, like, you know.

Q.  The top of your shoulders.

        What, if anything, was Mr. Combs telling you while he was pushing you in this way?

A.  He said, You hate it here?  Get the fuck out of my house. You hate it here?  Get the fuck out of my house.  And he repeated it until we were outside.

Q.  Can you describe the amount of force that Mr. Combs was using when he was pushing you?

A.  I would say 75 percent.  I never fell.  I kept catching myself.

Q.  Did anyone intervene?

A.  Yes.

Q.  Who?

A.  Paul Offord.

Q.  What did Paul Offord do?

A.  He told Puff to stop and he told me to go pack my things.

Q.  Did you follow his instructions?

A.  I did.

Q.  And after this incident, when Mr. Combs pushed you through his house, did you leave your employment?

A.  I did.

Q.  Why did you leave?

A.  That was crossing my boundary.

Q.  I want to direct your attention now to a few years later in 2011.

         Had you returned to work for Mr. Combs by that point in time?

A.  Yes.

Q.  What was your role at that time?

A.  I was global brand director.

Q.  Why had you returned to work for Mr. Combs after that incident at 2 Star?

A.  Um, my first role back was director of marketing for Sean John.  He was impressed with what I was doing in my job that I had left for.  I got a couple number one album.

Q.  Who is he?

Sorry to interrupt you.

A.  Puff was very impressed with my work at my new place and was, like, I'm starting a women's line.  You wouldn't have to work directly with me, but you can work for me, and it will be something right up your alley.  And it was paying more than Samba Records was.

Q.  Is that where you were employed?

A.  Yes.

Q.  Why was it important for you not to work directly with Mr. Combs?

A.  I didn't want that close proximity of his personal orbit like that anymore.  I didn't want to be in his house.  I didn't want to be trapped in a house.  I was growing.  I was 28 by then.

Q.  What, if any, work were you also doing for Ms. Ventura in 2011?

A.  I was her creative director and manager.

Q.  What did that role involve?

A.  Coming up with a direction for her, coming up with creative for videos, positioning, what are we talking about, what's the look, answering the interview questions, managing the modeling portfolio.  Trying to generally maximize her opportunity and the optics for her.

Q.  And who did you report to generally on Ms. Ventura's

projects?

A.   Sean Combs.

Q.   And who had approval over Ms. Ventura's work?

A.   Sean Combs.

Q.   What was approval required for by Mr. Combs?

A.   Schedule, hair, makeup, look, what we -- what we said yes to, what we said no to.  Everything he had final approval on.

Q.   In 2011, were you spending time in both New York and Los Angeles?

A.   I was.

Q.   Why was that?

A.   We all lived in New York.  However, we --

Q.   We -- sorry to interrupt you again.

        When you say we, who are you referring to?

A.   Staff, Mr. Combs, myself, just the general Bad Boy team, as it related to him.  We were going back and forth because we had followed Kim Porter to LA

Q.   Where in LA were you living in 2011?

A.   1420 Ambassador in a gated community.

Q.   Who was paying your rent?

A.   Sean Combs.  Bad Boy.

Q.   Was Mr. Combs also living in LA in 2011?

A.   He was.

Q.   And are you familiar with the address 9374 Beverly Crest Drive?

A.   I am.

Q.   What is that address?

A.   That was his second rental property in Los Angeles.

Q.   After the property you referred to earlier?

A.   Yes.

Q.   Do you know approximately during what time period he lived at that property?

A.   I couldn't be specific, but I know that it was before he actually found a house to buy.

Q.   And he was there in 2011?

A.   Yes.

Q.   Generally, where was Ms. Ventura living at this time?

A.   She still lived in New York on the West End.

Q.   Would Ms. Ventura visit Los Angeles?

A.   She would.

Q.   And generally where would she stay in Los Angeles when she visited?

A.   With him, Mr. Combs.

Q.   Did she stay anywhere else?

A.   Yes.

Q.   Where?

A.   With me or in a hotel.

Q.   How frequently was Ms. Ventura staying with you in 2011?

A.   About 30 percent of the time.  We had a lot of work.

Q.   She would stay in your -- was it an apartment?

A.   Yes.

Q.   What was your relationship with Ms. Ventura at that time?

A.   Creative director and manager and friend.

Q.   In December 2011, who, if anyone, was Ms. Ventura seeing aside from Mr. Combs?

A.   Scott Mescudi, Kid Cudi.

          MS. STEINER:  Ms. Foster, if you can please put up in evidence Government Exhibit 2A-501.

Q.   Ms. Clark, do you recognize this individual?

A.   Yes.

Q.   Who is this?

A.   Scott Mescudi.

Q.   How did you refer to him?

A.   Cudi.

Q.   Cudi.

          MS. STEINER:  We can take that down,

Q.   How did you learn that Mr. -- or that Ms. Ventura was seeing Mr. Mescudi?

A.   She brought him to my apartment for a little hangout and we cooked.

Q.   Had you also been to his residence?

A.   After, yes.

Q.   Did Ms. Ventura ever communicate directly with you about Mr. Mescudi?

A.   Yes.

Q.  How did she communicate with you?

A.  She had sent me a text.  I was picking her up one day.  We were going to Runyon Canyon, which is a Los Angeles place where you hike.  And she asked if he could join us.

Q.  How did you react when you received that text message?

A.  Not well.  It was a bad idea.  I responded, I don't think we should go to Runyon.  There is too many people there.  If he comes, we need to go to Fryman canyon.  Delete this text.

Q.  Why did you direct Ms. Ventura to delete the text?

A.  Because that's the second everything got so tricky when she texted me.

Q.  I just want to stop you for a moment, Ms. Clark.

        What, if any, concern did you have about Mr. Combs learning about Mr. Mescudi?

A.  Very concerned.

Q.  Why did you believe --

        Well, who paid for your phone?

A.  Mr. Combs paid for my phone.  She's texting me on the phone he pays for on a phone he pays for.  It's not a good idea.

Q.  After that happened, did Ms. Ventura change the way that she communicated with Mr. Mescudi?

A.  Yes.

Q.  How so?

A.  I took her to Best Buy to buy a burner phone.

Q.  Why did you take her to Best Buy to buy a burner phone?

P5RsCOM2                         Clark - Direct

A.   The way she was moving, she was going to get us all killed.

Q.   Was Mr. Combs --

          MR. AGNIFILO:   I'm sorry.

          THE COURT:   Sustained.

          The jury should disregard the witness's last answer.

          MR. AGNIFILO:   I had to check.

Q.   Was Mr. Combs in town at this time?

A.   No.

Q.   Approximately how long after this did Mr. Combs return to town?

A.   Not long after.

Q.   And do you know if he and Ms. Ventura went anywhere after he returned?

A.   Yes.

Q.   Where did they go?

A.   Mr. C's.   The Cipriani Hotel.

Q.   Where was the Cipriani Hotel located relative to your residence?

A.   One city light away.

Q.   When did you next see Mr. Combs after he went to the Cipriani Hotel with Ms. Ventura?

A.   I saw him the morning of December 22, 2011.

Q.   At approximately what time of day?

A.   It was sometime between 5:30 and 6:00 o'clock in the morning.

Q.   What, if anything, did you hear at that time?

A.   I heard a loud banging at my door.

Q.   What did the banging sound like?

A.   Like metal on metal.

Q.   What material was your door made of?

A.   Metal.

Q.   Did Mr. Combs have keys to your apartment, that you knew of?

A.   He did not.

Q.   Were you able to observe who was outside of your door?

A.   Yes.

Q.   How so?

A.   Through the peephole.

Q.   What did you observe through the peephole of your door?

A.   Mr. Combs.

Q.   Can you describe what you were able to observe through the peephole?

A.   A very upset Puff.  He was pacing.  He was moving around a little bit.  He was just anxious, I could tell.  But he was furious, that was evident.

         MR. AGNIFILO:  I'm going to object to the question as what she saw.

         THE COURT:  Ms. Clark, when Ms. Steiner is asking you a question, just answer that question, and Ms. Steiner will ask you follow up as she needs it.  OK?

P5RsCOM2                         Clark - Direct

THE WITNESS:  OK.

THE COURT:  Ms. Steiner.

MS. STEINER:  Thank you, your Honor.

BY MS. STEINER:

Q.  Can you describe the movement of his body outside of your door?

A.  He was pacing and the body language looked like he had something in his hand.

Q.  Why do you say that?

Can you describe what you observed?

A.  Just, like, the body language, I could see, like, his shoulders.  It was something, like, he was moving in his hand. I couldn't really see through the peephole all the way down, but the body language was giving me, like, he's holding something.

Q.  Did you open the door for Mr. Combs?

A.  I did.

Q.  Why?

A.  He was upset.  Part of my job is to make sure that the name and likeness is OK.  And he's outside my door, I -- just get to it, what is this.

Q.  What did you observe when you opened your door?

A.  I saw Mr. Combs.

Q.  Can you describe Mr. Combs at that time?

A.  He had a white button-down shirt with a button-down

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

sweater, business slacks, gray slacks, and nice shoes.

Q.   And can you describe what the slacks looked like?

A.   His pants were gray and they were split, open from knee to knee through the crotch, so I could see his underwear.

Q.   Can you describe his face?

A.   Furious, no glasses on.

Q.   Did you notice anything in his hand?

A.   A gun.

Q.   Did Mr. Combs enter your apartment holding a gun?

A.   Yes.

Q.   And when did Mr. Combs tell you once he was inside of your apartment?

A.   He said, Why didn't you tell me?

Q.   How did you respond?

A.   I said, I don't know what you're talking about.

Q.   What did he say next?

A.   He said, who is Scott?  I said, I don't know any Scott.

Q.   What did he say?  What did Mr. Combs say after that?

A.   He said, Kid Cudi.  I said, Oh, Cassie's friend.

Q.   What, if anything, did Mr. Combs state about Kid Cudi, Mr. Mescudi?

A.   He just said, Get dressed.  We're going to go kill this nigga.

Q.   Who did you understand him to be referring to?

A.   Cudi.

Q.  And when Mr. Combs said -- or directed you to get dressed to go and kill Cudi, Mr. Mescudi, where was the gun?

A.  In his hand.

Q.  When Mr. Combs directed you to go get dressed, how did you respond?

A.  I don't want to go.

Q.  How did Mr. Combs respond when you said you did not want to go?

A.  He says, I don't give a fuck what you want to do.  Go get dressed.

Q.  Was the gun still visible to you at this point?

A.  He had put it in his waist when I moved to get dressed.

Q.  The waist of his pants?

A.  Yes.

Q.  Can you please describe Mr. Combs' demeanor during this conversation where he directs you to get dressed?

A.  Livid, furious, mad at me.

Q.  What, if any, concerns did you have for your safety?

A.  I had never seen anything like this before.  I had never -- he had never come to my house in the entire time I'd known him. I've never seen him with a weapon.  I've never seen him making me do something like this.

Q.  Did you make any attempts to escape your apartment?

A.  I did not.

Q.  Why not?

A.   The way he was acting, I just felt like anything could happen.

MR. AGNIFILO:  I'm going object to, Judge.

THE COURT:  Let's move on, Ms. Steiner.

Q.   Ms. Clark, did you follow Mr. Combs' instructions and get dressed?

A.   I did.

Q.   Did you leave your apartment building with Mr. Combs?

A.   I did.

Q.   When you left your apartment building, did he still have the gun at that time?

A.   He did.

Q.   Where was it?

A.   When we got in the car, it was in his lap.

Q.   Before you got on the car, was it visible to you?

A.   I was in front of him when we were walking to the car, so...

Q.   You don't know?

A.   But he brought it with us, yes.

Q.   When you exited the building with Mr. Combs, who was there?

A.   Ruben.

Q.   Can you remind the jury who Ruben is?

A.   Ruben is D-Roc's little brother, security guard who was added last to the team.

Q.   Where was Ruben?

A.   Ruben was in the driver's seat of the Cadillac Escalade.

Q.   What color was the Escalade?

A.   Black.

Q.   Can you describe that car?

A.   Black, Executive Class Cadillac Escalade with the captain chairs, so that you don't have to climb over the back seat. You can just walk through.

Q.   Is an Escalade an SUV?

A.   Yes.

Q.   What seat was Ruben?

A.   Driver's seat.

Q.   Did you get into the vehicle?

A.   I did.

Q.   Where did you get into the vehicle?

A.   The first row of the back seat on the right-hand side in the captain chair.

Q.   Did Mr. Combs enter the vehicle?

A.   He did.

Q.   And where did he enter the vehicle?

A.   In the back seat in the left captain chair behind Rube.

Q.   Was that next to where you were sitting?

A.   Yes.

Q.   Is that where Mr. Combs would usually sit in his vehicle?

A.   Not typically.

Q.   Where would he usually sit?

A.   In the front passenger seat.

Q.   Where was the gun when Mr. Combs was sitting next to you?

A.   In his lap.

Q.   Were you able to leave the Escalade?

A.   No.

Q.   Why not?

A.   We were moving.  But no, I was not allowed.

Q.   Before you got moving?

A.   I was not allowed.  It was very fast.  We got in the car very quickly.  It was immediately at the bottom of the stairwell.

Q.   When you say you were not allowed, did anyone tell you, you couldn't leave the Escalade?

A.   It wasn't a conversation, it was where we were going.  There was no conversation about being allowed to leave or anything.

Q.   There was no conversation, it happened very quickly?

A.   Yes.

Q.   Where did you go with Mr. Combs and Rube?

A.   We went to Cudi's house in the Hollywood Hills.

Q.   Approximately how long is the drive from your residence at the time to Mr. Mescudi's house?

A.   If you're pushing it, you can do it 15, 20 minutes.

          MS. STEINER:  Ms. Foster, can you please put up just for the witness, the parties, and the court what has been

marked for identification as Government Exhibit 2C-101.

Q.  Do you recognize this, Ms. Clark?

A.  I do.

Q.  What is it?

A.  Um, a map of my house to Cudi's house.

Q.  Is it a fair and accurate depiction of a map of your house to Cudi's house?

A.  It is.  It's not the route I would take, but it is.

MS. STEINER:  Government offers Government Exhibit 2C-101.

MR. AGNIFILO:  No objection.

THE COURT:  2C-101 will be admitted.

(Government's Exhibit 2C-101 received in evidence)

BY MS. STEINER:

Q.  Can you identify on this map where your residence was located at the time?

A.  It's next to the Museum of Tolerance in Century City, 1420 Ambassador.

Q.  Can you identify where Mr. Mescudi's residence was at the time?

A.  Cudi's house was at 8925 Hollywood Hills Road, up Laurel Canyon, a part of Laurel Canyon called Wonderland.

Q.  At the top of the map?

A.  Yes.

MS. STEINER:  Ms. Foster, please take that down and

P5RsCOM2                         Clark - Direct

put up what is in evidence as Government Exhibit 8C-102.

Q.   Do you recognize this image?

A.   I do.

Q.   What generally is depicted in this photograph?

A.   Cudi's front door.

Q.   At the time you went to Mr. Mescudi's house, did you know whether or not he was home?

A.   I did not.

Q.   What, if anything, did Mr. Combs and Rube do after you arrived at the home?

A.   They entered the house.

Q.   Were you still in the car?

A.   I stayed in the car.

Q.   Were you able to leave the car?

A.   No.

Q.   Why were you not able to leave?

A.   I probably could have left, but I didn't.

Q.   What were you afraid of, if you left?

        MR. AGNIFILO:  Objection to the leading.

        THE COURT:  Sustained.

Q.   When you were in the car, were you able to see into the residence?

A.   Yes.

Q.   How were you able to do that?

A.   That door right there was open into the courtyard.

Q.  What did you observe Mr. Combs and Rube do on the property?

A.  Fidget around, trying to gain access, and they gained access.

Q.  And what if -- when you say gained access, do you mean to the residence?

A.  Yeah.  Beyond this door is another outdoor courtyard area and there is another house door set back further past this door.  So, yes.

Q.  Which did they gain -- what did you observe them gain access to?

A.  After they gained access here, they gained access to the main door to the actual property that's beyond this wall.

Q.  What, if anything, did you do while Mr. Combs and Rube were on the property out of the car?

A.  I called Cassie.

Q.  What phone number did you call her on?

A.  On the burner phone.

Q.  And when did you tell Cassie when you called her?

A.  Cassie, what the fuck?  And I asked her where she was at.

Q.  What, if anything, else did you tell her?

A.  I told her that Puff came, got me with a gun, and brought me to Cudi's house to kill him.

Q.  And what, if anything, did you do to the contact number for Cassie's burner phone on your phone after you made that call?

A.  I changed it to my best friend's name.  I changed it to

Stormy.

Q.  Why is that?

A.  I wasn't thinking very smart, but I just didn't want it to stay as Cassie's backup phone.  I didn't want him to know it was Cassie's phone.

Q.  Who did you not want to know?

A.  Puff.

Q.  And when you were speaking with Ms. Ventura on the phone, did you hear anyone else on the phone?

A.  Yes.

Q.  Who did you hear?

A.  I could hear yelling in the background.

Q.  What did you hear?

A.  I heard someone say, He's in my house?  And I said, Who is that?  She said, Scott.  And I could hear him running out.  And I said, Cassie, stop him.  He's going to come get himself killed.  And she was like, I can't.

Q.  Did Mr. Combs return from the house to the vehicle after that call?

A.  He did.

Q.  And what, if anything, did he do when he returned to the car?

A.  He said, Who were you talking to?

Q.  What did he do next?

A.  He asked to see my phone.

P5RsCOM2                          Clark - Direct

Q.  Did you give him your phone?

A.  I did.

Q.  What happened next?

A.  He called back the last number I was speaking to.

Q.  Was that Ms. Ventura's burner number?

A.  It was.

Q.  And what did he say when he called back that number?

A.  Bitch, what the fuck is this number?

Q.  And how, if at all, did Mr. Combs react to Cassie having or Ms. Ventura having a new number?

A.  He livid, more so than already.

Q.  What, if anything, happened after Mr. Combs spoke with Ms. Ventura on your phone?

A.  We heard a very fast-moving engine coming up the hill.

Q.  What happened next?

A.  Out of the corner of my eye, I could see that it was Cudi. Puff looked at my face.  I guess I gave him a visual cue that it was him.  And he goes, There's that nigga right there.

Q.  What happened next?

A.  Cudi pulled up next to the Cadillac Escalade, came to a complete stop, looked, and then took off and sped up the hill. Puff and Rube jumped in the car and we started chasing him.

Q.  How long was this chase?

A.  It felt like forever, but couldn't have been longer than a minute.

P5RsCOM2                          Clark - Direct

Q.   What, if any, other cars did you observe while you were driving at this time?

A.   Cudi lost us.  We turned south, down Laurel Canyon.  We heard sirens and we passed the police.

Q.   In what direction were the police headed?

A.   They were headed north on Laurel Canyon.  We were headed south on Laurel Canyon.

Q.   Were they headed in the direction of Mr. Mescudi's residence?

A.   They were.

Q.   How, if at all, did Mr. Combs react to the police cars passing you?

A.   It calmed him down.

Q.   Can you describe what you mean by that?

A.   He just started to, maybe for the first time that morning, pull himself together.

Q.   Where did Rube and you and Mr. Combs go next?

A.   We went -- we stopped at the Key Club.

Q.   And what, if anything, did Mr. Combs instruct you when you stopped at the Key Club?

A.   Told me to call Cassie.

Q.   And just for context, how far is the Key Club from Mr. Mescudi's residence?

A.   The Key Club is on  Sunset.  Maybe, depending on how you're driving, two and a half minutes down Sunset.  West, west of

Cudi's home.

Q.   And what is the Key Club?

A.   Key Club was a nightclub that's been on Sunset forever. It's had a million names.  It was the Key Club and then it was One Oak, and it's the Key Club again.

Q.   Did you follow Mr. Combs' instructions to get Ms. Ventura on the phone?

A.   I did.

Q.   And what, if anything, did Mr. Combs instruct you to tell Ms. Ventura?

A.   He told me to tell Cassie that he has me and he's not going to let me go until I come get her.

Q.   Did you convey that message to Ms. Ventura?

A.   I did.

Q.   And when you conveyed that message to Ms. Ventura, where was Mr. Combs in the vehicle relative to yourself?

A.   He was standing outside of the vehicle by my window.

Q.   And you said he was standing outside the vehicle by your window.

     Was he able to hear the discussion?

A.   Yes.

Q.   Did you remain in the vehicle or did you exit the vehicle at any point?

A.   I sat in the vehicle.

Q.   Why did you stay in the vehicle?

A.   Because we were just stopping to make the call and then continuing on.  He was the only person that got out.  Rube didn't get out either.

Q.   How did Ms. Ventura respond when you told her Mr. Combs' message that I believe you said he has you and that --

Well, I don't want -- maybe you can say it.  I don't want to mischaracterizes your...

A.   He has me.  He won't let me go until I come get you.  To which Cassie said --

THE COURT:  Hold on.  Let's get the question.

Q.   What did Ms. Ventura respond?

A.   She said, OK.  Come get me.

Q.   Did you -- when Cassie, Ms. Ventura, said that, what was her tone?

A.   Calm.

Q.   Did you return to Mr. Combs' residence after that call?

A.   I did.

Q.   Who drove you there?

A.   Ruben.

Q.   What, if any, instructions did Mr. Combs give you at that time?

A.   Told me, once you get Cassie, you guys need to go talk with Cudi and convince him to not tell the police that it was me.

Q.   Did he tell you anything else?

A.   He says, If you guys don't convince him of that, I'll kill

all you motherfuckers.

Q.  What did you do after you arrived at Mr. Combs' residence?

A.  I got in his staff vehicle, which is an older nondescript car, and I went and picked up Cassie.

Q.  Where did you pick her up from?

A.  Sunset Marquis.

Q.  At a hotel?

A.  Yes.

Q.  And where did you go with Ms. Ventura from the Sunset Marquis?

A.  Back to Cudi's house.

Q.  Why did you return to Mr. Mescudi's residence?

A.  Because we needed to talk to him.  We needed to make sure that he wasn't going to make a police report about Puff.

Q.  What, if anything, did you convey to Mr. Mescudi and Ms. Ventura about what had happened earlier that day?

A.  I had just, kind of, recounted the morning and let them know what had happened until I got with them.  And they did the same.  We all kind of told each other what had happened that morning while we were sitting there, smoking weed, trying to get our spines together to go.

Q.  What did you tell them had happened to you that morning?

A.  I told them they came to my house with a gun and told me that I had to go with him to kill Cudi.

Q.  And who is the "him" in that sentence?

P5RsCOM2                        Clark - Direct

A.   Puff.

Q.   What, if anything, did you inform Mr. Mescudi and Ms. Ventura about what Mr. Combs had told you?

A.   I let them know what he said.  And I said, If you tell on him, he's going to hurt us all.

Q.   What was Ms. Ventura's reaction when you said that?

A.   Do you really think he will?

Q.   What was Mr. Mescudi's reaction, if you recall?

          MR. AGNIFILO:  I'm going to object to this.

          THE COURT:  What grounds?

          MR. AGNIFILO:  It's hearsay.

          THE COURT:  Sustained.

          MS. STEINER:  Your Honor, for a reaction, I'm looking not for a verbal reaction.  I can phrase it that way.

          THE COURT:  And the question can be rephrased and we'll see if there is an objection.

          MS. STEINER:  Thank you, your Honor.

BY MS. STEINER:

Q.   What was Mr. Mescudi's appearance after you informed him of that?

A.   Mind blown.

          MR. AGNIFILO:  I'll object to the answer as that being an appearance.

          THE COURT:  Objection is sustained.

          The jury should disregard the witness's last answer.

P5RsCOM2                          Clark - Direct

Ms. Steiner, let's move on.

(Continued on next page)

P5RACom3                          Clark - Direct

BY MS. STEINER:

Q.  What did you do next with Ms. Ventura?

A.  She and I went back to Puff's house.

Q.  And approximately what time of day is it now?

A.  Maybe 11:00, maybe 11:30, somewhere around there.  It started early.

        MS. STEINER:  Ms. Foster, can you please put up what's in evidence as Government Exhibit 2B-101.

Q.  What does this photograph depict?

A.  This is Puff's second rental house in Los Angeles.

Q.  Is this the 9374 Beverly Crest address?

A.  It is.

Q.  Is this where he was living in 2011?

A.  It is.

Q.  Who is present in the house when and you Ms. Ventura arrived?

A.  Puff and Rube.

Q.  Can you just indicate for the jury where you entered the house?

A.  This visual is of the back of the house.  We entered on the front side on the top level of the house into the vestibule.

Q.  So did you enter through the vestibule at the top of the house?

A.  Yes.

        MS. STEINER:  We can take that down.

Q.   What happened after you and Ms. Ventura entered the
vestibule of the house?

A.   Puff was standing there in a robe and his underwear and he
immediately began kicking Cassie.

Q.   Can you describe how Mr. Combs was kicking Ms. Ventura?

A.   100 percent full force, in her legs to begin with.  She was
facing him to start, and he kicked her in her -- in like the
thigh and her leg.  He kept kicking her.  He never used his
hands.

Q.   And you said he kept kicking her.  Was he kicking her more
than once?

A.   Yes.  He repeatedly kicked her and she just kept -- each
kick, she would crouch into more and more of a fetal position.

Q.   And as Ms. Ventura was crouching more and more into a fetal
position, can you describe where she was physically located?

A.   Outside.  By now, we were in the courtyard of the home,
just outside of the vestibule.  Every time she kicked, she
moved back -- every time she got kicked, she moved back.

Q.   And approximately how far back did Ms. Ventura get moved
back from the kicks?

A.   Couple steps each time.

Q.   And in total?

A.   All the way to the street.

Q.   Approximately how far is that?

A.   Maybe 20 feet.

P5RACom3                    Clark - Direct

Q.  And you said that Ms. Ventura kept crouching further into the fetal position; is that correct?

A.  Yes.

Q.  And by the time she reached the street, can you describe what her body looked like?

A.  She was all the way on the ground in full fetal position.

Q.  What was Mr. Combs doing to Ms. Ventura in the street when she was on the ground and in full fetal?

A.  She wasn't doing anything.  She was crying silently.

Q.  What if anything was Mr. Combs doing to her?

A.  Kicking her.

Q.  Where was he kicking her when she was on the ground?

A.  He back.

Q.  Anywhere else?

A.  It was her back, her backside.  She was here, so whatever was revealed, what was ever off the ground side, he was kicking her.

Q.  How far were you from Ms. Ventura while this was happening?

A.  No more than 5 feet.

Q.  Was Rube present?

A.  He was.

Q.  And how far was he from Ms. Ventura?

A.  No more than 5 feet.

Q.  What if anything did Mr. Combs tell you while he was kicking Ms. Ventura?

A.   He said if I jump in, he was going to fuck me up too.

Q.   Did you intervene?

A.   I did not.

Q.   Why not?

A.   I had never seen him do that, and I was in shock.  And I was -- my heart -- I was -- my heart was breaking for seeing her get hit like that.

          MR. AGNIFILO:  I'm going to object, your Honor.

          THE COURT:  Objection is sustained.  The jury should disregard the last sentence of the witness's answer.

          Ms. Steiner, let's move on.

BY MS. STEINER:

Q.   You testified, Ms. Clark, that Rube was also present and close to Ms. Ventura when this was happening; is that right?

A.   Yeah.

Q.   What if anything did Rube do to intervene?

A.   Absolutely nothing.

Q.   Who, if anyone, did you contact after you observed that Rube was not intervening?

A.   I called D-Roc.

Q.   What did you tell D-Roc?

A.   I said tell your brother to stop him.

Q.   And when you say him, who are you referring to?

A.   Puff.

Q.   What did you explain to D-Roc was happening?

P5RACom3                          Clark - Direct

A.  That he was kicking the shit out of Cassie.

Q.  And when you say him, who are you referring to?

A.  Puff.

Q.  Did you contact anyone else aside from D-Roc?

A.  I did.

Q.  Who did you contact?

A.  Paul Offert.

Q.  Why did you contact Paul?

A.  I didn't see Rube's phone ringing.

Q.  Was Mr. Offert D-Roc and Rube's supervisor?

A.  He was.

Q.  What did you inform Mr. Offert?

A.  Same thing.  I said, Paul, he's kicking the shit out of
her.  Help her.

Q.  How did Mr. Offert respond?

A.  I'll handle it.

Q.  And while you were there, did you ever observe Rube
intervening?

A.  Never.

Q.  What if anything did Mr. Combs tell you after you made
these calls?

A.  He said matter of fact, you get the fuck out of my house.

Q.  Did you leave his house?

A.  On foot, I walked, yes.  I walked.

Q.  Why did you leave on foot?

A.   They had taken me from my home.  I had no vehicle.

Q.   After you left, do you know if the beating -- or do you know if Ms. -- Mr. Combs continued to kick Ms. Ventura?

THE COURT:  Let's move on.  Or you can rephrase the question.

MS. STEINER:  Yeah, I'll rephrase, your Honor.

Q.   After you left the property, were you still able to hear what was going on?

A.   I could.

Q.   And what did you hear?

THE COURT:  Wait.  You got to lay some more foundation for this.

Q.   How far were you from the home?

A.   I started getting feet away.

Q.   Feet away?

A.   Feet away.

Q.   Okay.  Were you still able to see Ms. Ventura at that point?

A.   Yes.  I could see her until I hit the bend.  It's a mountain ring, so once you get out of view, when you turn the corner, she's out of view.

Q.   And were you also able to hear her?

A.   No.

Q.   You were not able to hear her.  Were you able to see her?

A.   No.

Q. Let me clarify. I think I've asked some confusing questions now.

When you were leaving the property, were you able to see Ms. Ventura until you turned the bend on the street?

A. I was able to see her. She was still on the ground, yes.

Q. And while she was still on the ground while you're walking away, what was happening?

A. He was still kicking her.

Q. Who is he?

A. Puff was still kicking her.

Q. Who if anyone did you call when you left the property?

A. Regina Ventura.

Q. Who is Ms. Ventura?

A. Cassie's mom.

Q. And what if anything did you inform Ms. Ventura?

A. I told her mom, I say he's beating the shit out of your daughter, I'm in over my head. Please help her. I can't call the police, but you can. Please help her.

She said I'll handle it. And we hung up.

Q. After that call, Ms. Clark, did you call the police?

A. I did not.

Q. Why didn't you call the police?

A. The mission of the day was to get Cudi not to involve the police, so that was certainly counterintuitive.

Q. And later that day, did you see Ms. Ventura again?

A.  I did.

Q.  Where did you see her at that time?

A.  I went to the Cipriani Hotel to check on her.

Q.  Is that the room where she had been staying with Mr. Combs the night before?

A.  Yes.

Q.  That's near your own apartment at the time?

A.  Yes.

Q.  Did you enter the room where she had been staying with Mr. Combs?

A.  Yes.

Q.  And can you describe what the room looked like?

A.  Things were thrown around everywhere.  All her belongings were scattered, her purses were toppled over.  There was no broken furniture, but the room was in complete disarray.

        MS. STEINER:  Ms. Foster, can you please bring up what's in evidence as Government Exhibit B-315.

Q.  Ms. Clark, is this an e-mail that was sent to your work e-mail?

A.  Looks like it.

Q.  Is Capricorn1@tmo@blackberry.net your work e-mail at the time?

A.  Yes.

Q.  It's sent from Veronica Bang; who is that?

A.  Cassie.

P5RACom3                          Clark - Direct

Q.   And it's sent on December 23rd, 2011.  Was that the day after this incident?

A.   Yes.

Q.   Can you please read the message?

A.   Threats -- the threats that have been made towards me by Sean Puffy Combs are that he is going to release two explicit sex tapes of me.  One on Christmas day, maybe before or right after, and another one some time soon after that.  He has also said that he will be having someone hurt me and Scott Mescudi physically.  He made a point that it wouldn't be by his hands, he actually said he'd be out of the country when it happened.

Q.   Ms. Clark, do you recall if you responded to this e-mail?

A.   I don't.

          MS. STEINER:  You can take this down.

Q.   Following the incident in December 2011 that you just described, did law enforcement ever contact you about Mr. Mescudi?

A.   They did.

Q.   Who contacted you?

A.   The arson investigators.

Q.   And approximately when did they contact you?

A.   Summer of 2012.

Q.   And what if anything did the arson investigator request of you at that time?

A.   He wanted me to make a statement.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5RACom3                          Clark - Direct

Q.   A statement about what?

A.   About what had happened.  Cudi had provided my name to them.

Q.   And when you say what had happened, are you referring to what had happened in December 2011?

A.   Yes.

Q.   Did you provide a statement to the arson investigator?

A.   I did not.

Q.   Why not?

A.   Just like the police, I hung up the phone.

Q.   Can you explain why you hung up the phone?

A.   Just -- I wanted this whole thing to be over and that was just going to make it worse.

Q.   Prior to receiving the phone call from the arson investigator, did you know any details about what had happened to Mr. Mescudi involving arson?

A.   No.

Q.   Did you ever discuss an arson related to Mr. Mescudi with Mr. Combs?

A.   Never.

Q.   Following the incident in December of 2011, what if any questions did Mr. Combs ask you about Ms. Ventura's relationship with Mr. Mescudi?

A.   He just asked the same thing, when did I know about it, why didn't I tell him.

P5RACom3                        Clark - Direct

Q.  And what was his demeanor when he was asking you this?

A.  Very angry.

Q.  Did he tell you anything else?

A.  He was very upset and he said I should kill you bitches and I should cut her face.

Q.  How frequently after this incident in December of 2011 was Mr. Combs making threats to you?

A.  Often.

Q.  Approximately how many times?

A.  I'd say once we got to December 2011 and to that summer, I would say 50.

Q.  Who was present when Mr. Combs was asking these questions and making these threats?

A.  D-Roc and Cassie.

Q.  And what was D-Roc doing during these discussions?

A.  Questioning us.

Q.  And what if anything did he do when Mr. Combs made these threats?

A.  He just doubled down on whatever Puff was saying in the moment.

Q.  What if anything did Mr. Combs instruct you with respect to Ms. Ventura after December 2011?

A.  That we weren't to really be friends anymore.  I could just see her for work.

Q.  Did your relationship with Ms. Ventura change after that

P5RACom3                          Clark - Direct

time?

A.  It did.  It did.

Q.  Following what occurred in December of 2011, who if anyone at Bad Boy did you report the incident to?

A.  Love Whelchel, the head of HR, and Harve Pierre.

        MS. STEINER:  Ms. Foster, can you please put up what's in evidence as Government Exhibit 2A-319.

Q.  Do you recognize image?

A.  Yes.

Q.  And who is depicted in it?

A.  Harve Pierre.

Q.  Who is Harve Pierre?

A.  He was the president of Bad Boy Records.

        MS. STEINER:  Take that down.

Q.  Ms. Clark, approximately when did you speak to Mr. Pierre about what happened in December 2011?

A.  In March, in Miami.

Q.  March of --

A.  2012.

Q.  2012.  And what specifically did you inform Mr. Pierre at that time?

A.  I told him that Puff kidnapped me with a gun and came to take me to kill Kid Cudi, and he beat up Cassie all in one day.

Q.  How did Mr. Pierre respond when you told him that?

A.  He was like that's crazy.  He was like but it's going to be

P5RACom3                        Clark - Direct

okay.

Q. Did Mr. Pierre ever mention calling the police?

A. No.

Q. Following this incident, what if any disciplinary action was taken against you at work?

A. I was put on a 30-day notice.

Q. Approximately when, if you recall?

A. I don't.

Q. Did there come a time in August of 2012 that you were terminated from your position?

A. I was.

Q. Was that a few months after your conversation with Mr. Pierre?

A. Yes.

Q. And what if any misconduct were you accused of at that time?

A. I was accused of not properly putting in for the vacation that I was on.

Q. Had you sought authorization for your vacation?

A. I did.

Q. From who?

A. Harve Pierre.

Q. During your years of employment for Mr. Combs, had you previously taken a vacation?

A. Never.

P5RACom3                        Clark - Direct

Q.  Why not?

A.  Didn't have enough money, or -- it really wasn't feasible. But as a global brand director, I had more bandwidth to be free.

Q.  Were you still in contact with employees from HR while you were on vacation?

A.  Yes.

Q.  And what if anything did you -- and who specifically?

A.  Love Whelchel.

Q.  And what did you tell Mr. Whelchel when you were on vacation?

A.  They started sending me work to do when I was on vacation for Cassie.  And I said to Love, I said they're harassing me. And I explained he's mad at me because I didn't tell him his girlfriend was cheating on him.

Q.  What happened next?

A.  I was called to the office and I was terminated.

Q.  Who called you to the office?

A.  Love Whelchel.

Q.  What if any benefits did you lose when you were terminated?

A.  All of them.

Q.  What does that include?

A.  Health, 401k, you know, whatever benefits I had at the time.

Q.  Was your house paid for by the company?

A. Yes.

Q. Did you lose that funding?

A. Yes.

Q. How about your car?

A. Lost the car.

Q. Following your termination, did you have any additional discussions with Mr. Combs?

A. I did.

Q. And what do you recall him saying in those discussions?

A. That I would never work again, that he would show me that all these people weren't my friends, that he would make me kill myself.

Q. Following your termination, did you seek other employment?

A. I did.

Q. Did you receive job offers?

A. I got a job, yes.

Q. Did that job fall through?

A. It did.

Q. Were you ultimately able to obtain and keep employment?

A. No.

Q. Following your termination, did you reach out to Mr. Combs' attorneys?

A. Yes.

Q. And did you reach a settlement with Mr. Combs?

A. I did.

P5RACom3                     Clark - Direct

Q.   If you recall, approximately when was that?

A.   That was in like October of 2012.

Q.   And was that based on allegations of wrongful termination?

A.   It was based on -- yes, wrongful termination.

Q.   Under the terms of the agreement, approximately how much were you paid for --

        MR. AGNIFILO:  I'm going to object, Judge.

        THE COURT:  I think you can rephrase the question if you want to ask.

        MS. STEINER:  Okay.

        THE COURT:  I mean, was it a form objection or is there a different basis?

        MR. AGNIFILO:  Can we approach for a second.

        THE COURT:  You may.

        (Continued on next page)

(At sidebar)

THE COURT:  Ms. Steiner, I take it that you're almost done with your examination.

MS. STEINER:  I am, yes.

THE COURT:  And then we'll take a short break and come back.

Mr. Agnifilo.

MR. AGNIFILO:  So the objection, I don't know that the amount of the objection is relevant.  And, I mean, I would say it's unduly prejudicial.  I mean, I don't intend to get into it.  I don't know how it advances the relevant issues in this case what the settlement was for.

THE COURT:  Are you going to address the settlement?

MR. AGNIFILO:  Not if they don't.  I mean, that there was a settlement, but not -- I'm not getting into the details.

THE COURT:  Let's move on for the time being.  And depending on what Mr. Agnifilo does, you may be able to address the issue in redirect examination.

MS. STEINER:  That's fine.  I do want to flag for the Court I intend to address a couple of the terms, not financial terms, but the other terms of the agreement.

THE COURT:  What are those terms?

MS. STEINER:  The terms would include that they not disclose anything that had occurred and Ms. Ventura was also --

THE COURT:  Again, I think I want to see what the

P5RACom3                    Clark - Direct

cross-examination is.

MS. STEINER:  Okay.

THE COURT:  We can get into it on redirect.

MS. STEINER:  Sure.

(Continued on next page)

(In open court; jury present)

THE COURT:  Ms. Steiner.

MS. STEINER:  Thank you, your Honor.

Q.  Ms. Clark, aside from this settlement agreement, have you received any compensation from Mr. Combs in connection with your termination?

A.  No.

Q.  Do you have any pending civil litigation against him?

A.  I do not.

Q.  Did you briefly return to work for Mr. Combs after this?

A.  I did.

Q.  When was that?

A.  2016.

Q.  And why did you return to work for him at that time?

A.  I wanted to try to get my life back.

Q.  Were you able to obtain other work?

A.  No.

Q.  What was your role in 2016?

A.  Creative director for Casandra Ventura.

Q.  What were your job responsibilities as Ms. Ventura's creative director?

A.  She had a new record deal with Epic.  It was once again to try to figure out how to maximize her, figure out a new look, a new direction to accompany the music she was working on.

Q.  Who did you report to?

P5RACom3                          Clark - Direct

A.   Sean Combs.

Q.   And who if anyone provided approval to Ms. Ventura's

projects?

A.   Sean Combs.

Q.   And what projects of Ms. Ventura's required approval by

Mr. Combs?

A.   All of them.

Q.   Can you describe what they might include?

A.   Oh, mini-movie, video shoot, photo shoot, red carpet look,

schedule, what day we're -- you know, soup to nuts.  We needed

to get approval for our movement as it related to Cassie.

Q.   Based on your observations of Ms. Ventura during this

period, what if any changes did you notice in her drug use?

A.   She was much worse off.

Q.   Was there an increase in her drug use?

A.   Absolutely.

Q.   Was she still dating Mr. Combs during this period?

A.   She was.

Q.   And when did you leave this position?

A.   2018.

Q.   And is that the last time you worked with Ms. Ventura?

A.   Yes.

Q.   I want to direct your attention finally to December of

2023.

A.   Yes.

P5RACom3                          Clark - Direct

Q.   Did there come a time when you retained an attorney in

connection with your prior employment for Mr. Combs?

A.   Yes.

Q.   Why did you retain an attorney at that time?

A.   I was upset about Cassie's civil complaint.

Q.   Did her complaint reference you?

A.   Not at all.  It traumatized me.

Q.   Because it did not reference you; is that what you're

referring to?

A.   She did not mention me at all.

Q.   Did there later come a time when you met with Mr. Combs'

attorneys in April of 2024?

A.   I did.

Q.   And during that meeting, did you inform Mr. -- well, what

did you inform Mr. Combs' attorneys?

A.   That I wanted my life back.

Q.   And did you discuss what had occurred during December of

2011?

A.   I did.

Q.   What did you inform his attorneys?

A.   I told them that he kidnapped me and I went through the

events of the day.

          MR. AGNIFILO:  Your Honor, I'm going to object as this

is hearsay.

          THE COURT:  In terms of what this witness said?

P5RACom3                        Clark - Direct

MR. AGNIFILO:  Just, yeah, in terms of -- right.

THE COURT:  Or are you anticipating the follow-up questions?

MR. AGNIFILO:  No, no.  That the question and the answer.

MS. STEINER:  I'm not going to elicit the response, your Honor.

THE COURT:  Overrule the objection.

Ms. Steiner, you can continue.  Next question.

Q.  Ms. Clark were there any discussions about you working in some capacity again for Mr. Combs' companies?

A.  There was.

Q.  And just generally what was discussed?

A.  Like what it would look like if I came in as chief of staff, got him up out of there, put him in rehab, so that somebody that was around in the inception of a lot of his business deals would be back in place.

Q.  Did you hear from Mr. Combs' attorneys again?

A.  No.

Q.  When is the last time, Ms. Clark, that you communicated with Ms. Ventura?

A.  2018.

Q.  And when's the last time you communicated with Mr. Mescudi?

A.  2012.

MS. STEINER:  No further questions at this time, your

P5RACom3                          Clark - Direct

Honor.

THE COURT:  All right.  This is a good time for us to --

MR. AGNIFILO:  Can I start and then have a break?  Unless we all want to stop now, whatever you want to do.

THE COURT:  Well, we're taking a break which is what I was doing and then we'll come back.

MR. AGNIFILO:  Okay.  I will take a break too.

THE COURT:  Thank you.

Members of the jury, we will take a short break.  It's 11:14.  We'll come back at 11:40.  All rise for the jury.

(Continued on next page)

(In open court; jury not present)

THE COURT:  Ms. Clark, we'll see you back here at 11:30.  Thank you very much.

THE WITNESS:  Thank you, Judge.

THE COURT:  Please be seated.

Mr. Agnifilo, just briefly, I know people want to take a break.  But can you just give me more on the objection as to the discussion with the attorneys.

MR. AGNIFILO:  No, it's fine.  I just thought it was -- essentially hearsay.  You know, what she had told us.  But I mean, we talked about this beforehand.  I knew she was going to --

THE COURT:  If you're saying it's okay, then I will stop asking about this.

MR. AGNIFILO:  Hold on.  Wait.  Hold on.

It's fine.  We had discussed it beforehand.

THE COURT:  I'm hearing it's fine, so objection withdrawn.

MR. AGNIFILO:  Yeah, I'll withdraw the objection.

THE COURT:  Okay.  Any further issues to address before we take our break?

MR. AGNIFILO:  Nothing, Judge.  Thank you.

THE COURT:  Very good.  We'll be back at 11:30.

(Recess)

THE COURT:  Anything to address before Ms. Clark comes

back?

MS. STEINER:  Not from the government, your Honor.

MR. AGNIFILO:  Not from us, Judge.

THE COURT:  All right.  So let's have her back and we'll bring in our jury.

(Continued on next page)

P5RACom3                        Clark - Cross

(In open court; jury present)

THE COURT:  Please be seated.  Welcome back.

Ms. Clark, you understand you're still under oath?

THE WITNESS:  Yes, sir.

THE COURT:  Mr. Agnifilo, when you're ready.

CROSS-EXAMINATION

BY MR. AGNIFILO:

Q.  Good morning, Ms. Clark.

A.  Good morning.

Q.  Nice to see you again.

A.  Nice to see you.

Q.  My name is Marc Agnifilo.  I know you know that.

I'm going to ask you some questions.  If I ask you a question that you don't understand, or a question that you would like me to rephrase, all you need to do is say can you rephrase that or I don't understand that and that's what I'm going to do.  Okay?

A.  Yes, sir.

Q.  All right.  So this is actually the second time we're meeting, right?

A.  Yes.

Q.  Okay.  And the first time we met, I don't know if you remember, it was April 10th, 2024?

A.  Yes.

Q.  And at the time you had a lawyer in Los Angeles, Bryan

P5RACom3                         Clark - Cross

Freedman; do you remember him?

A.   I do.

Q.   Well-known, highly regarded lawyer, from your perspective?

A.   Yes.

Q.   And I met with you, Ms. Geragos met with you, and a third lawyer named Jonathan Davis met with you, right?

A.   Yes.

Q.   And you and Mr. Freedman.  And you had a friend there, do you remember who that was?

A.   Yes. John McLaughlin.

Q.   John McLaughlin.  So if I remember right, it was Mr. Freedman, yourself, Mr. McLaughlin on one side of the table, I think it was me, Ms. Geragos, and Jonathan Davis on the other side of the table?

A.   Correct.

Q.   And one of the things -- we talked about a lot of things that day, right?

        You just --

A.   Oh, yes.  Yes.

Q.   Great.  One of the things we talked about, and you just told the government this, you wanted to come back and work with Mr. Combs as his chief of staff?

A.   We discussed it, yes.

Q.   Okay.  And you mentioned that; you brought that up?

A.   Yes.

Q.   Okay.  And tell me if this is right, what you said was you've always been able to take care of him?

A.   I don't recall saying that.

Q.   Okay.  Do you remember saying he wouldn't be in this mess had he kept me around?

A.   I probably said something like that, yes.

Q.   And just so we're clear, do you remember, only if you remember, do you remember Ms. Geragos was taking notes?

A.   Yes.

Q.   You saw her, you saw her taking notes?

A.   Yes.

Q.   Handwritten notes?

A.   Yes.

Q.   And you said -- tell me if this is right, you said you didn't think that Ms. Ventura was good for Mr. Combs?

A.   Correct.

Q.   You said that at the meeting, right?

A.   Correct.

Q.   And you believe that?

A.   Correct.

Q.   Okay.  Do me a favor, tell the jury in your words why you think that's true?

        MS. STEINER:  Objection.

        THE COURT:  Overruled.

A.   I just felt they were toxic as a couple.

P5RACom3                           Clark - Cross

Q.  Okay.  And tell me if this is right, when you first met --
and you called him Puff, right?

A.  I did.

Q.  Okay.  And you never called him Sean?

A.  Never.

Q.  And you never called him Mr. Combs?

A.  Never.

Q.  You called him Puff?

A.  Puff.

Q.  Okay.  So if it's okay with you, just since that's what you
called him, can we call him Puff?  Is that all right?

A.  Yeah, I just kind of go with whatever is being asked, but
absolutely, yeah.

Q.  Okay.  All right.

        THE COURT:  Let's call him Mr. Combs.

        MR. AGNIFILO:  Okay, Judge.  That ends that.

Q.  We're going to call him Mr. Combs.

A.  Mr. Combs.

Q.  So when did you first meet Mr. Combs?

A.  In 2002 when I moved to New York.

Q.  Okay.  And before you worked with him, before anything
else, you and he were friends?

A.  Correct.

Q.  You guys hung out a lot?

A.  Yes.

P5RACom3                    Clark - Cross

Q.  And you had a mutual friend?

A.  Yes.

Q.  And remind the jury of that person's name?

A.  Jeanette DeLoan.

Q.  Jeanette DeLoan.  And to your knowledge from what you could see, did Ms. DeLoan and Mr. Combs have any kind of romantic relationship from what you could tell?

A.  I knew that they had a past --

Q.  Okay.

A.  -- relationship.  They were older than me.  They were -- used to, years before had.

Q.  Right.

A.  Yes.

Q.  But you guys would all hang out?

A.  Platonic, yes.

Q.  Yeah.  Platonic.  And just to be clear, you and Mr. Combs have always been platonic?

A.  1,000 percent.

Q.  Okay.  And you started as friends?

A.  Yes.

Q.  So tell the jury about your friendship.  Tell us how it started.  Bring us back to 2002 and tell us what it was like.

A.  I had moved to New York.  I was working in advertising.  I was living in the Bronx.  Hated the Bronx.  My friend Jeanette, I met her through a mutual -- my roommate had a girlfriend and

P5RACom3                          Clark - Cross

they were friends and we kind of got closer than the

girlfriend, because they were vegans and whatever.  Whatever.

        So me and Jeanette, we formed a friendship, and she

would -- she went out a lot.  She was like a popular, New York

City, Lower East Side girl, New Yorker.  And she would hang out

with different people, but she would often hang out with

Mr. Combs and would invite me.  And then we just sort of start

hanging out, us three as like a little friendship group.

Q.  And you and Mr. Combs and Jeanette had fun?

A.  We did.

Q.  Right.  And you would hang out quite a bit?

A.  Yeah.

Q.  Back in the day?

A.  Definitely.

Q.  Okay.  Do you remember could it have even been earlier than

2002 that you met Mr. Combs?  And I know we're going back two

decades.  I'm just -- could it have been 2000 or 2001?

A.  Well, I moved to New York in September of 2000.

Q.  Right.

A.  And then in -- and then 2001 was the World Trade Center

thing.  I don't remember exactly when, but I know that it

wasn't necessarily my first year.  I met him a little bit after

I moved there.

Q.  Got it.  Got it.  And when you first met Mr. Combs, he

wasn't doing any drugs, right?

A.   I mean, ecstasy.

Q.   Was he doing ecstasy when you met him?

A.   Not when I met him.

Q.   No, I don't mean at that time.  I mean in that time period.

A.   Yeah.  In that time period.

Q.   You saw him doing it?

A.   Like socially.  One night at Daddy's House I think I saw him do it, in the lounge.

Q.   Okay.  But I'll ask you about Mr. Combs the same question that my colleague asked you about Ms. Ventura.

     As time went on, you saw that Mr. Combs was doing a lot more drugs?

A.   Absolutely.

Q.   Okay.  And you, with the exception of a few years where you kind of were away from him, you were his friend from 2002 to 2004, right?

     You have to answer yes so she can --

A.   Oh.  Yes.  Sorry.

Q.   Okay.  And then you worked for him from 2004 until 2012 but with a little break in the middle?

A.   Couple of breaks, yes.

Q.   Okay.  And then you came back in 2016 and 2017?

A.   Yes.

Q.   Okay.  So from what you could see, from your vantage point, is it fair to say that you saw that he started doing a lot more

drugs over time?

A.  Yes.

Q.  Okay.  And is it also fair to say that he started doing more drugs after he started being with Cassie?

A.  Fair.

Q.  Okay.  And Cassie was doing more drugs too as time went on?

A.  Yes.

Q.  And from what you could see, they were doing drugs together?

A.  Yes.

Q.  Okay.  Now, getting back very briefly to our meeting in April 2024.  You thought that if you could go back and be the chief of staff, you could be helpful to him and his business, right?

A.  That was a discussion.

Q.  Okay.  And when you say it was a discussion, do you remember you actually saying that to Teny and myself in front of your lawyer Mr. Freedman?

A.  I remember discussing it with you guys, yes, in front of Bryan.

Q.  And Bryan is Bryan Freedman?

A.  Yes, sir.

Q.  Okay.  Thanks.  And did you authorize Mr. Freedman to have further discussions with Mr. Combs' lawyers about the possibility of you coming back as chief of staff?

A.   I don't know if I authorized them.  And I don't know that there was anything discussed outside of that room to my knowledge, but he was my lawyer.  I don't know what he might have discussed with you all.

Q.   Okay.

A.   Because it was very nonprocedural.  It was lawyer to lawyer versus a letter or something.

Q.   Right.  And do you recall at the meeting it was said to you that there was a criminal investigation going on of Mr. Combs, correct?

A.   Yes.

Q.   Okay.  By the time we had the meeting in April, there had been search warrants executed on two of his homes; you knew that, right?

A.   Yes.

Q.   And do you remember being told that it would be impossible for you to be given a job in the middle of the investigation; do you remember something along those lines?

A.   I do not.

Q.   And I don't want to get into anything that Mr. Freedman said to you.  So I can't ask the next question.  Okay.

So getting strictly to the meeting, to the meeting when we were all together.  Do you remember that being discussed?  And let me ask you specifically.  Do you remember saying that would be very difficult to do, to bring you on

because of a pending investigation?

MS. STEINER:  Objection.

THE COURT:  Overruled.

A.  I do not remember.

Q.  Okay.  And I'm not trying to -- do you remember telling Mr. Combs that you had a crush on him even going back to your -- when the time when you guys were friends?

A.  No.

MR. AGNIFILO:  All right.  I am going to ask just to show to the witness Defense Exhibit 946.  This is just for the witness and the parties.  And if we can blow up.

Q.  Can you read that?  Is that big enough for you?

THE COURT:  Ms. Clark, can you read that?

THE WITNESS:  Yes, I can see it.

THE COURT:  Are you able to read it?  Okay.  Take a second.  Read it and let us know when you're done.

MR. AGNIFILO:  Yeah.  Read the top blurb and let me know when you're done.

Q.  And, Ms. Clark, I'm also told if you have any trouble reading anything on the screen, there's a binder next to you.

A.  No.  I can see it.

Q.  Okay.  So when you finish reading it, just look up at me and that will tell me that you're done.

Okay.  All right.  So do you remember telling him that you had the biggest crush on him before you started working for

P5RACom3                        Clark - Cross

him?

A.   I don't remember this text.

          MR. AGNIFILO:  Okay.  Can we put it back up for a
second.

Q.   Is this a text between you and him?

A.   It looks like it, but I don't remember this text.

Q.   Okay.  Do you recognize the phone number attributed to you?

A.   Yes.

Q.   All right.  Do you recognize the phone number attributed to
him?

A.   No, but it could be his number.  I don't know this number.

Q.   All right.

          MR. AGNIFILO:  We ask that it be admitted?

          THE COURT:  Any objection?

          MS. STEINER:  Your Honor, hearsay and 403.  And I
don't believe they've authenticated it.  She couldn't identify
the number.

          THE COURT:  And what's the response on hearsay?

          MR. AGNIFILO:  None of it is offered for the truth.
It's state of mind.  And the witness's recollection wasn't
refreshed.  So I've offered it, but nothing here is offered for
the truth.

          MS. STEINER:  Your Honor, I think it's clearly being
offered for the truth.  There's no response other than the
witness's text message.

THE COURT:  Mr. Agnifilo, there was an issue raised with respect to authentication, so why don't you try --

MR. AGNIFILO:  We had a stipulation.

Okay.  Hold on one second.

We have a stipulation on authenticity.

THE COURT:  Ms. Steiner?

MS. STEINER:  Can we have a side bar, your Honor.

THE COURT:  Very brief.

(Continued on next page)

(At sidebar)

MR. AGNIFILO:  I know you have a two lawyer rule at side bar, and I know we have been breaking it.  So I'm guilty.

THE COURT:  Well, it's like Who Wants to be a Millionaire.  You get a few lifelines, but you're running out.

MR. AGNIFILO:  Great.

MS. SHAPIRO:  Judge, I have to do something on this trial.

THE COURT:  Ms. Steiner.

MS. STEINER:  Yes, your Honor.  The issue here, the reason the government is objecting is because this witness is not sure what these numbers are.  So it's a relevance issue to this witness.  She herself can't be at -- you know, can't know who this conversation is between in any definitive way.

THE COURT:  Well, if there's not -- you're not objecting on authentication grounds, right?

MS. STEINER:  Just one moment.

MS. COMEY:  I take defense counsel's representation that this is covered by one of the stipulations that this came from Mr. Combs' devices or iCloud accounts?

MS. GERAGOS:  That's right.

MS. COMEY:  If it's covered by that stipulation, we're not arguing it's not from his phone.  The issue for 401 and 403 purposes, this witness doesn't recognize it to be a conversation she had.

THE COURT:  Well, she doesn't recall the conversation, but if there's no authentication objection, then it is what it appears to be, and the parties have stipulated that it is in fact authentic communication from Mr. Combs' phone.

So the question is, is it inadmissible hearsay.  And Mr. Agnifilo says it goes to her state of mind.  And I've reviewed the message and it does appear to go purely to her state of mind.  So that overcomes the hearsay objection.

So at that point, there would be a 403 issue.  So on 403 grounds, what's the argument?

MS. STEINER:  I think that there's the probative value of this is so low, that the risk of confusing the jury with a document that she is not quite sure who the communication is between is high.  It would be one thing if she could even know who the parties are in the conversation, but she's not sure.

THE COURT:  Understood.  I think you can ask a couple questions to resolve that particular issue.

MR. AGNIFILO:  Okay.

THE COURT:  Of who the people are on this communication.

MR. AGNIFILO:  Okay.

THE COURT:  To address the, I suppose it's the 401, 402 issue.  As to 403, why is this probative?  What's it probative of?

MR. AGNIFILO:  It's probative.  I think it undermines

her entire direct testimony that she was the subject of all these horrific threats.

THE COURT:  So ask those questions and you can seek to offer it again.

MR. AGNIFILO:  Okay.

(Continued on next page)

P5RACom3                          Clark - Cross

(In open court; jury present)

BY MR. AGNIFILO:

Q.  So on top you see a phone number where it says cap new new; do you see that?

A.  I do.

Q.  That's your phone number?

A.  That is my number.

THE COURT:  Ms. Clark, could you pull that microphone over.  It might have gotten pushed to the side.  Thank you.

A.  I do.  That is my number.

Q.  And then the green, the green blurb, it says PD iPhone; do you see that?

A.  I see it, but I don't recognize that number.

Q.  Were you communicating with Mr. Combs by text around this time?

A.  I was -- I did text him in 2021.

Q.  Okay.  And you don't recognize the numbers, but you see it says PD iPhone, right?

A.  I see it says PD iPhone, but I don't know that number.  I don't recognize the number.

Q.  The numbers?

A.  Yes.

MR. AGNIFILO:  Your Honor, we offer it.

THE COURT:  What's the number?

MR. AGNIFILO:  Oh, it is 946.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5RACom3                          Clark - Cross

THE COURT:  926.

MR. AGNIFILO:  No, 946, Judge.

THE COURT:  All right.  Defense Exhibit 946 will be admitted.

(Defendant's Exhibit 946 received in evidence)

MR. AGNIFILO:  So now we can play it for the jury.

Q.  So the first blurb there, it says:  Totally unrelated to our current conversation, but did you ever know that I had the biggest crush on you before I started working for you.

Do you see that there?

A.  I see it.

Q.  Then you go on to say:  We hung out all the time, I played it super cool.  Jeanette might be the only one who knew.

Do you see that?

A.  Yes.

Q.  And who is the Jeanette that is being discussed there?

A.  It's reading as my friend Jeanette DeLoan.

Q.  And that's the Jeanette DeLoan that you were talking about to the jury a couple minutes ago, right?

A.  Yes.

Q.  I don't think you knew.  I couldn't tell if it was mutual, I just knew for sure that you liked to have me around.

That's what you write, correct?

A.  That's what it says I wrote, yes.

Q.  Do you have any memory of this at all?

P5RACom3                    Clark - Cross

A.  I really don't.

Q.  No?

A.  No.

Q.  Did you reach out to Mr. Combs a lot in June of 2021?

A.  I don't know what month it was, but I knew I was reaching out to him to try to talk to him.

Q.  Okay.  But you see there's a reference to Jeanette, Jeanette DeLoan, right?

A.  I do, yes.

Q.  And that's the person you talked about, that's your friend, right?

A.  Mm-hmm.

Q.  And the friend that introduced you to Mr. Combs, right?

A.  True.

Q.  So you go on to say:  Sometimes I wonder did we misuse all that dope chemistry; do you see that?

A.  I see that.

Q.  It was super fun back then.  The SJC days.

What's SJC days.

A.  Sean, Jeanette, Capricorn.

Q.  So is that a term that you used a lot, the SJC days?

A.  Yeah.

Q.  Okay.

A.  All of us did.

Q.  All right.  Sean, Jeanette, Capricorn.

P5RACom3                          Clark - Cross

And what were the Sean, Jeanette, Capricorn days exactly?

A.  Before I worked for him.

Q.  So when you guys were just friends?

A.  Yes.

Q.  We called you Choc, short for chocolate.

Right?

A.  Mm-hmm.

Q.  Is that true?

A.  Yes.

Q.  And who called him Choc?

A.  Jeanette.

Q.  Okay.  I was just thinking about them nights before everything.  So nice.  Great memories.  Twenty years ago.  Time is wild.

You see that there?

A.  I see it.

MR. AGNIFILO:  Okay.  So we can take it down.

Q.  So before you ever worked for him, am I right that you liked him?  Forget about crushes for the time being; you liked him?

A.  I liked him as a friend.

Q.  Okay.  You liked him as a friend, right?

Right?

A.  Yes, as a friend.

P5RACom3                         Clark - Cross

Q.  Yeah, I'm sorry.  I'm going to keep doing that to you.

A.  I'm sorry.  Yes, I liked him as a friend.

Q.  You also respected him, didn't you?

A.  Yeah.

Q.  He was, even in 2001, 2002, 2003, he was starting to be a pretty accomplished businessman; is that fair to say?

A.  Yes.

Q.  And he was doing things in the worlds of music and fashion that you respected; am I right?

A.  True.

Q.  Now, tell us your background up to that point.

        You said where did you work, you worked at Def Jam back in the day?

A.  My first job was an internship at Def Jam.

Q.  Okay.  And you said that's kind of like -- that's like the start of hip hop, that's like the birthplace of everything that became hip hop?

A.  Yes.

Q.  Like back like Run-DMC type thing, like all back that far or not that far?

A.  Not that far.  I'm not that old, sir.

Q.  Well, I am.

A.  I'm more Foxy Brown, Redman, Method Man, Jay-Z days.

Q.  Got it.  Got it.

        And how did your friendship with Sean Combs proceed in

P5RACom3                         Clark - Cross

2002, 3, going to 2004?

A.   Just super platonic.  He had his girlfriends around.  We'd go all hang out, whoever, you know, me and Jeanette would come.  Jeanette would go sometimes by herself and we would go to clubs or go to dinners.  Or he was getting an award, he would invite us to when he was getting an award or something.  You know, very casual.

Q.   Okay.  Fair to say because you've been close with him for many, many years, he had more free time back then; does that sound right or no?

A.   I don't know about free time because he still seemed busy.

Q.   Okay.  He was still working hard?

A.   Yes.

Q.   Now, how did you come to start working for him in 2004 exactly?

A.   I get the call from a head hunter.

Q.   Okay.  And was this -- and tell me if this is right.  Was this the time when the head hunter is like, there's a job for an entertainment tycoon in music and you knew who it was?

A.   Yes.

Q.   Tell the jury that story.

A.   So I was -- I was working in advertising and then September 11th happened, and then I went to a film company called Crossroads.  Awesome people.  They paid off my student loans.  They were great.  And I had put my résumé on Monster.

It was like a new website at the time where you could upload your résumé, similar to I guess whatever the one is now.

And I was at the new job and I got a random call from this company called The Jennifer Group, and they were like, hey, we found your résumé on Monster and you have the criteria -- you had all the job experience that is needed for this fashion, entertainment tycoon.

Q.   Okay.  And when they said those words to you, fashion, entertainment tycoon, what went off in your head?

A.   I asked them, I said do you mean Sean Combs.

Q.   Okay.

A.   And they were like how did you guess that.  And I was like, well, you described somebody very specific.

Q.   And because at that point in time, when they used those words, Sean Combs is who you thought of?

A.   That is who I thought of and I was right, the way they described him, yeah.

Q.   Right.  And then you called Mr. Combs directly; am I right?

A.   I did.

Q.   And what did you say to him?

A.   I said, hey, I just got a call from a head hunter.  They want me to work for you.  And I was like are you hiring for an assistant.  And he was like yeah, would you work for me.  And I was like I don't know.  What's the job, like what is it.  And then we talked about, you know, the job.

Q. He hired you?

A. Huh?

Q. And he hired you?

A. Well, I met with some people and they liked me and I guess he called around a couple people and he hired me.

Q. So tell us a little bit about the process. You said you met with a few people. Tell us what you remember. And this is back in 2004, right?

A. Yes.

Q. Tell us what you remember about the hiring process?

A. I remember meeting a couple people. I don't know who all they were, but I know for sure Vashta was one of them.

Q. Vashta, last name?

A. Vashta Dunlap.

Q. Okay.

A. Met with a couple people. I guess he asked them what they thought of me, and then me and him had a conversation.

Q. And what was Vashta Dunlap's position, if you recall?

A. I guess it was like vice president of human resource.

Q. All right. So then you started working with him in 2004; am I right?

A. Yes.

Q. And do you recall if that was the year that he started to play Raisin in the Sun?

A. It is exactly. He was on Broadway when I started.

P5RACom3                        Clark - Cross

Q.   Okay.  And tell me if this is right -- let me back up.

Were you impressed that he was acting in a Broadway play?

A.   I guess.  I wouldn't say I was impressed, but I thought it was pretty cool.

Q.   Okay.  Why was it cool?

A.   Because he's thriving.  He's accomplishing dreams.  He's music producing.  He got a business.  He wanted to act.  He's on Broadway.  Broadway was very strenuous.  I was, you know -- show every day, two shows on Saturday.

(Continued on next page)

BY MR. AGNIFILO:

Q.  And he had a prominent role, right?

A.  He was the star.

Q.  He was the star of the show?

A.  Um-hmm.

Q.  OK.  He was also involved in something called the "Vote or Die!" campaign?

A.  Yes.

Q.  Tell us about that.

A.  Um, one day we were leaving the show on a Saturday, in between shows, and he was, like, I have an idea.  What do you think of, like, citizen change or something.  And I was like, Oh.  He was like, Voter, and he went through a couple of revolutions.  And he said, "Vote or Die!" I was like, Oh.  And he came up with "Vote or Die!" in the car in between shows one day.

Q.  This is something that you kind of, like, kind of workshopped the name or the concept together?

A.  I wouldn't say that.  I was just a sounding board for what he was coming up with.

Q.  OK.  And 2004 was the year of a presidential election, do you remember?

        MS. STEINER:  Objection.

        THE COURT:  Overruled.

        Let's keep moving.

P5RsCOM4                        Clark - Cross

MR. AGNIFILO:  OK.

BY MR. AGNIFILO:

Q.  So I want to talk about the "Vote or Die!" campaign.

You said you were a sounding board?

A.  Yes.

Q.  And this came to pass, right; this thing actually happened?

A.  It did.

Q.  What was it?

A.  It was a voter initiative, voter drive.

Q.  And what, if any, role did you have in it?

A.  Just shadowing him as it related to the movements for the

initiative.

Q.  OK.  Did you offer your opinions of ways of making the

"Vote or Die!" campaign better or more effective?

A.  I don't remember.  I know that my primary job then was to

get the celebrities and those T-shirts and do the photo shoot.

Q.  So it was somewhat celebrity focused, am I right?

A.  Yes.

Q.  That was your part of it?

A.  Yes.

Q.  What did you do in terms of getting celebrities for

campaign?

A.  I would call them and explain that Puff wanted them to come

do a photo shoot to support this voter initiative he was

working on.

P5RsCOM4                           Clark - Cross

Q.  All sorts of folks came out?

A.  Yeah.

Q.  And tell me if this is right.  I don't want to put words in your mouth.

        These sorts of things made you believe that the job you had was special?

A.  Um, I don't know that it made me think the job that I had was special.  It made me think that I was with a, um, person who knew how to execute their ideas.  And I like people who know how to follow through.

Q.  So he knows how to follow through, right?

        But following it through alone doesn't get you to star on a Broadway show, right?

A.  No, no.

Q.  OK.  And so how long had you been working for Mr. Combs before this whole thing of the jewelry going missing takes place?

A.  If I started in, I think it was April -- April, May, June, July -- it had to be between July -- it will be, like, like, four, four months.  It had to be after the 4th of July.  That's where he wore it, when we had the Declaration of Independence at his house and the white party in the Hamptons.

Q.  Tell us about that.

        The Declaration of Independence at his house in Hamptons?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

A.   Yes.

Q.   What was that?

A.   The white party.  It was held at his home in the Hamptons that year.  It was a little bit more elaborate due to the "Vote or Die!" initiative.

Q.   OK.  So there was a sort of a political kind of angle to it?

To be fair, one more yes or no.

A.   Yeah.  Sorry.

Q.   OK.  And so when -- I might have lost you.

When did the jewelry going missing coincide timewise with the 4th of July party in the Hamptons?

A.   It was shortly thereafter because it was still out on loan from Jacob the Jeweler.

Q.   OK.  Got it.

I want to make sure I get this right.  You said that the jewelry was with you, right?

A.   Yes.

Q.   And then, all of a sudden, the jewelry wasn't with you anymore?

A.   Right.

Q.   And you didn't know where it was?

A.   I did not.

Q.   OK.  So, if I understood your answers correctly, you made a phone call to the folks back at 1440, right?

A.   Yes.

Q.   Which is the main office at the time?

A.   Yes.

Q.   And I think what you said, you said on direct is, make sure you search everyone?

A.   Yes.

Q.   OK.  Those were your words?

A.   Yes.

Q.   Make sure you search everyone?

A.   Yes.

Q.   OK.  And why did you think everyone should be searched?

A.   Because the bag was missing from the office.

Q.   OK.  And you were taking this seriously, right?

A.   Yeah.

Q.   OK.  And to your knowledge, did many people, many staff members, get lie detector tests?

A.   To my knowledge, only one other person.

Q.   Mike B?

A.   Yes.

Q.   Who is Mike B?

A.   Mike B was his stylist.

Q.   Did you and Mike B discuss this lie detector test business?

A.   Um, I only remember him being there, like, the first day. We discussed it.

Q.   Mike B?

P5RsCOM4                          Clark - Cross

A.   Yes, Michael B.

        The reason he was there is because me and him went down to the basement level -- I mean, not the basement -- the street level of 1440 before the day got too deep in it, and we got a manicure.

Q.   You and Mike B did?

A.   At the nail shop.  We didn't go together.  We just happened to both go.

Q.   When does this relate to the lie detector test?

A.   The lie detector test was the next day.

Q.   The next day?

A.   Yeah.

Q.   OK.  So, at the time that you and Mike B go and do this, had either of you had the lie -- let me -- withdrawn.

        You had not had your lie detector test?

A.   By when?

Q.   When you went and got your nails done?

A.   The jewelry was still in my purse at the nail shop.

Q.   OK.  All right.  My question, though, is:  Did you and Mike B ever talk, you and Mike B with each other, about these lie detector tests?

A.   I think we talked on the first day.  I don't remember how or where, but I think I do remember talking to him because I remember seeing him.

Q.   Do you remember Mike B telling you that it takes a half an

hour?

A.  I don't remember that.

Q.  So you're saying that you, you got lie detector tests five days in a row all day?

A.  Yes.

Q.  OK.  So, five days week, every day for five days, all day, you were taking a lie detector test?

A.  Yes.

Q.  With this guy who was five times as wide as you are?

A.  Yes.

Q.  I have that right?

A.  Yes.

Q.  And you said that the building locked from the outside?

A.  The person locked it with a key from the outside, yes.

Q.  So this building --

A.  Yes.

Q.  -- the building had a lock where you could lock people into the building from the outside?

A.  Yes.

Q.  OK.  And you were on the sixth floor, right, you said?

A.  Yes.

Q.  And you were locked in the building because this New York City building locked from the outside?

A.  We were locked in.  When we came in, someone locked it as we waited for the elevator.

Q.  Who was that?

A.  Whoever was with Paul, whatever security guard was sitting out in the car.

Q.  All right.  And so you said that Paul brought you to the five times as wide as you man, right?

A.  Yes.

Q.  OK.  And then Paul did not stay for the lie detector test portion of the day?

A.  He did not.

Q.  OK.  And that is true for each of the five days?

A.  Yes.

Q.  And you were all hooked up to the lie detector test equipment all day for five days?

A.  Not all day.  He would unhook me to review the test.

Q.  OK.  And this man, you had no idea who this man was other than the description you gave us; you have no idea who he is?

A.  I do not.

Q.  Never saw him before the first day?

A.  No, I did not.

Q.  Never saw him after the fifth day?

A.  I did not.

Q.  You don't know what relation he has to Mr. Combs in any way, shape, or form, correct?

A.  I do not.

Q.  You said you yourself didn't speak to Mr. Combs during the

P5RsCOM4                          Clark - Cross

five days that you're getting these lie detector tests, am I
right?

A.   That's true.

Q.   And after the five days, the man giving the lie detector
test says that it's inconclusive?

A.   Well, he doesn't -- he did it after every test.

Q.   OK.  It's inconclusive?

A.   Yes, sir.

Q.   How many hours a day would you say that you were hooked up
to the lie detector machine?

A.   Like, until, like, a regular getting off time, five, six
o'clock.

Q.   OK.  What time did you get hooked up and what time did you
get unhooked up?

A.   Like, ten.

Q.   You got hooked up?

A.   Ten to, like, five, six.  Yeah.

Q.   And you were hooked up the whole time?

A.   I wasn't hooked up the whole time.  I would take the test,
he would unhook me, we would review it, we would do it again.

Q.   OK.  So how many individual lie detector tests did you get?

A.   I didn't count, but I know I kept doing it every day.

Q.   All right.  And who -- did you complain to anybody about
the lie detector test?

A.   Paul, but no one else.

P5RsCOM4                        Clark - Cross

Q.  When you got hired, did you speak to someone from human
resources?

A.  Yes.

Q.  Who was that?

A.  Vashta.

Q.  Did you call Vashta and say, I've been locked in a New York
City building that locks from the outside for five days, I
don't -- I get this is some kind of violation?

Did you do that?

A.  I did not.

Q.  OK.  You spoke to Vashta from time to time, right?

A.  I did.

Q.  Vashta was approachable, right?

A.  Futile conversations, but yeah, she was approachable.

Q.  OK.  You knew where her office was, right?

A.  I did.

Q.  You knew that she had a working telephone, right?

A.  I did.

Q.  OK.  And you never called Vashta to say, You should know an
employee of this company is being kidnapped, locked in a
building of New York City that locks from the outside on the
sixth floor, being given lie detector test after lie detector
test every day for five straight days; you never had that
conversation?

A.  I did not.

Q.  Then how long did you continue to work for the company after the five days of lie detector tests?

A.  I worked for him for maybe another couple months.  Not very long.

Q.  The lie detector tests were 2004, right?

A.  Yeah.

Q.  OK.  You didn't you work all of 2005 and all of 2006 with the company?

A.  I did, but I got fired in 2004.

Q.  You got fired in 2004?

A.  Um-hmm.

Q.  When was that?

A.  Before -- between the lie detector test and his birthday.

Q.  All right.  So you got fired in 2004?

A.  Yes.

Q.  You're sure?

A.  Yes.

Q.  OK.  And what were you fired for?

A.  Over his girlfriend at the time, Erica *Hugh.

Q.  So you got fired over another girlfriend?

A.  Yes.

Q.  And then how long were you not working for the company?

A.  Like, three or four weeks.

Q.  Three or four weeks?

A.  Yeah.

Q.   OK.  So tell us how that worked.

So you get fired?

A.   Um-hmm.

Q.   For three or four weeks?

A.   Yes.

Q.   OK.  And then after three or four weeks, how did you get unfired?

A.   Um, I was happy to be fired.  I was getting rest.  I rested for the three weeks.

Um, I got a call from Norma Augenblick.  It was time to do the 35th birthday party at Cipriani.  Norma's stipulation was if he was going to work on the party was, I'm not doing this party unless Capricorn is doing the celebrity guest list.

She and he called and said, Look, will you come back to do the celebrity list for Puff's birthday at Cipriani?  We will pay you.

OK.  I'll come do the celebrity list.  And that's how I came back.

Q.   All right.  So, after the three or four-week hiatus, you come back?

A.   Um-hmm.

Q.   And then you continue to work the rest of 2004?

A.   Um-hmm.

Q.   All of 2005?

A.   Um-hmm.

Q. And all of 2006?

A. Not all of 2006.

Q. We'll get there in a second.

Were you his personal assistant during this period of time?

A. For a couple of months, and then my title was changed.

Q. You became a personal liaison?

A. Yes.

Q. All right. What are the differences in the job descriptions?

A. Nothing.

Q. OK. And then you stayed until 2006 and you left in 2006?

A. Yes.

Q. All right. And you left to make more money, isn't that right?

A. I left because he pushed me out of his house.

Q. Do you remember telling the government that you left to make more money?

A. In 2006, I left because he pushed me out of his home.

Q. All right. When you left, where did you go?

A. Jive Samba.

Q. And did you have that job already lined up when you left?

A. No, I got it after.

Q. And were you making more money?

A. Yes.

Q.   OK.   How much more money were you making?

A.   I believe I was making 90,000 at Jive.

Q.   And when you left Combs' company, how much money were you making?

A.   For Combs, I was making 65,000.  When I went to Jive, I was making 90,000.

Q.   OK.   So, in 2006, you're making 65,000 at Combs, right?

You leave, and then you go to Jive and you're making 90,000?

A.   Yes, sir.

Q.   All right.  And you stayed at Jive for how long?

A.   About a year.

Q.   OK.  And why did you leave Jive and come back to Combs, which is what you did, right?

A.   Yes.

Q.   OK.  So, what happened at Jive, why did you leave Jive?

A.   I had gotten two number one albums, one for R Kelly and one for  Ciara.  And I had beat him on the Hot 100 chart, and he was impressed, if I could use that word.  And he said, You did really good.  I'm starting a clothing line.  I would love for you to come and work for me.  You don't have to work with me, you can just work at one of my companies.

Q.   All right.  And so then, in 2007, you came back?

A.   I did.

Q.   All right.  And when you say you didn't have to work for

him, you were working for his clothing line, correct?

A.  Yes, sir.

Q.  What kind of contact did you have with him in 2007, 2008?

A.  While I was at Sean John?

Q.  Yes.

A.  Same level of contact.

Q.  Quite a bit, right?

A.  Yes.

Q.  He relied on you a lot?

A.  He did.

Q.  Right?

A.  Yes.

Q.  What you're telling me, and I'll use your word, he was impressed with your abilities, right?

A.  You asked about the job.  He was impressed with what I had done at Jive Samba.

Q.  OK.  Aside from that, didn't he tell you very often that he was impressed with your ability to see things and be a brand -- have good concepts about brand marketing and things like that?

A.  I think, generally, my resume reflects how awesome he thought I was.  I worked for him in very many roles over a long period of time.  I think I was a really good employee for him.

Q.  And he would tell you that?

A.  He would.

Q.  He would tell you how awesome you were, right?

P5RsCOM4                          Clark - Cross

A.  Sometimes.

Q.  Maybe he wouldn't use the word awesome?

A.  He would not use the word awesome.

Q.  But, suffice to say, he let you know that he thought you were talented and hard-working and dedicated and effective?

A.  True.

Q.  OK.  And so, you knew, you always knew that that's what he thought, right?

A.  That's what I --

Q.  And you worked hard for him?

A.  I did.

Q.  And from what you could see, a lot of the people in this orbit worked hard for him, right?

You saw that.  Not all of them, but a lot of them?

A.  I don't think they worked as hard as me, but yes, people were working hard.

Q.  OK.  Let's talk about you for a second.

You worked hard for him because you believed in what you were doing, right?

A.  I believed, coming from my background, without finishing college, that it was another form of business school if I could make it through.

Q.  OK.  Can you explain what that means?

Tell us what you mean as a form of business school.

A.  Separate of all of this stuff, I did learn a lot of stuff

from Puff -- I mean, Mr. Combs.  He -- he has ideas.  He knows how to execute.  He is tenacious.  He wanted to break the glass ceiling as it related to what we were allowed to do as black people in the business world, and that was -- it helped, when you're working so hard, to be working with somebody who would, um, match wits with you on the fervor to be successful.

Q.  All right.  Let me unpack a little bit of what you said.

Do you need a minute?

A.  No, I'm fine, sir.  Sorry.  I mean, this is a very complicated ...

Q.  I got it.

THE COURT:  Mr. Agnifilo, we're going to take a break in a few minutes, so when you get to a good landing place?

MR. AGNIFILO:  We can do it now, Judge.

THE COURT:  All right.  We're going to take our lunch break.  We'll be back at 1:00 p.m.  Thank you, members of the jury.

Once again, don't talk about the case with each other. Don't look up anything about the case.  And we'll see you back here at 1:00.

All rise.

(Continued on next page)

P5RsCOM4                          Clark - Cross

(Jury not present)

THE COURT:  All right.  Ms. Clark, we'll be back at 1:00 p.m.  You.

Are not to have any conversations or discussions of any kind with the government.  All right?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  We'll see you back here at 1:00.

THE WITNESS:  Thank you.

(Witness temporarily excused)

THE COURT:  Please be seated.

Anything to raise from the government, Ms. Steiner, or Ms. Comey, or Ms. Slavik?

MS. STEINER:  Ms. Slavik.

MS. SLAVIK:  Your Honor, just with respect to Investigator Jiminez's testimony, the government just would request a ruling from the court.  If the court overrules the government's objection, I think there are certain things that we would want to bring out on direct.

THE COURT:  All right.

MS. SLAVIK:  So, for the reasons that we have just discussed earlier this morning, the government submits that this sort of DNA testimony that the defense plans to elicit is not proper under 403, 702, and all the relevant hearsay rules. And, for those reasons, the government requests the court to

preclude such line of questioning.

THE COURT:  All right.  The government's objection is overruled.  This is not DNA evidence or DNA testimony in the conventional sense.  And as the morning has been progressing, we have looked at authorities addressing this DNA evidence and it's of a different brand.

In this case, there is a report that, I don't think the government contests, would be itself admissible as a business record that's coming in and which outlines the government's, or the fire department's investigation of this incident from -- we have the lead investigator, Investigator Jiminez, who put the reference to the DNA results into his report.

Now, I think from, as I understand what the defense is going to do with that, they are going to say you put this in the report, where did that lead you in terms of your investigation, which is an investigation that Investigator Jiminez was in charge of.

The defense is not going to be asking -- I'll ask Mr. Agnifilo if it's true or not -- about the substance of the DNA testing, the nature of the testing, what it entailed, things of that nature.  It's purely brought in because it is referenced in the investigatory report and goes to what happened in the investigation, which is, by the way, the reason why the government is calling Investigator Jiminez in the first

place.

So, for that reason, the government's objection is overruled.

But, Mr. Agnifilo, am I correct in terms of the characterization of how this is going to be utilized by the defense?

MR. AGNIFILO:  Yes, very much so.

THE COURT:  You're not going to be asking about probing into the DNA testing and asking about --

MR. AGNIFILO:  He wouldn't know the answer to any of those questions.

THE COURT:  The government's objection is overruled. Ms. Slavik.

MS. SLAVIK:  Can I clarify the report your Honor is referring to?

THE COURT:  What I'm looking at, I'm looking at Exhibit B to the -- that's where I got the reference.

MS. SLAVIK:  Yes, your Honor.

THE COURT:  Is that the correct report?

MS. SLAVIK:  That was just confirming that we're talking about the investigator's report, as opposed to the case materials that were referenced.

THE COURT:  That's what I understood.  Mr. Agnifilo, is there something --

MR. AGNIFILO:  Let me --

P5RsCOM4                          Clark - Cross

THE COURT:  Now let's talk about the document.

There is multiple documents that contain this reference.  Mr. Agnifilo.

MR. AGNIFILO:  I don't know that we need the document in.  I mean, because the significance isn't the document, the significance, as your Honor seized upon, is he gets this information.  What, if anything, does he do next.

So I don't know that the document needs to be admissible for him to --

THE COURT:  I think the government has an objection potentially in terms of which document is being used.  If you're telling the government that you're not actually putting in a document, then there is no objection.

MR. AGNIFILO:  I was going to elicit from him without it.  If he needed his recollection refreshed, I was going to do that.  I don't know that the document is important for the reason that I think your Honor is allowing this in, which is because he is the lead investigator, this is an investigative step that informed the rest of the investigation.

THE COURT:  Stop right there.  Let's see if there's an issue.

Ms. Slavik, I took it from what you were saying that, based on which document was at issue, you might have a different kind of objection.  Maybe I'm misunderstanding this.

Is there an issue if the defense isn't --

MS. SLAVIK:  What I hear is the defense isn't planning to introduce any exhibits, therefore, I don't think there is an issue.  I will flag for the court that, in addition to the DNA testing, there were -- there was fingerprint testing and there was testing of fluid that was found in the Molotov cocktail.

The government had not planned to elicit facts about that testing, but given that DNA testing and testimony on that subject will come in, I think it's appropriate to include limited testimony on those subjects, as well.

THE COURT:  What is that limited testimony?

MS. SLAVIK:  The fact that fingerprints were collected at the scene, were submitted for testing, additional fingerprint cards were received, those were submitted for testing, the results of those tests.  The outcome --

THE COURT:  What are the results of those tests?

MS. SLAVIK:  Inconclusive.

Nothing came back, your Honor.  For the gasoline, the liquid found inside the Molotov cocktail which smelled of gasoline, that was submitted for testing and that returned a positive result for gasoline.

THE COURT:  For gasoline.

Mr. Agnifilo, any issues with that?

MR. AGNIFILO:  That's all completely permissible, I believe.

THE COURT:  OK.  Anything further from the government?

MS. SLAVIK:  The only request that the government has, I believe this is shared by the defense, is that we have a little bit longer for lunch.  Maybe ten after 1:00, if that's permissible to the court.

THE COURT:  All right.  That's fine.  My only --

MS. SLAVIK:  Just to assure the court, we believe that we are actually running ahead of schedule.  So, to the extent the court is concerned about our schedule, I think we're doing just fine.

THE COURT:  All right.  Fair enough.

Since I asked the parties to let me know if there are ways to make this run more smoothly, I appreciate raising that.  That's fine.

Just as a general matter, you would like more than 30 minutes for lunch, is what you're telling me?

MS. SLAVIK:  That is what we're telling you, your Honor.

THE COURT:  That's a fair point.

I had some questions as to how anyone was eating anything during lunch.

MS. SLAVIK:  We're not, your Honor.

THE COURT:  OK.  So we'll take that extra time.

I mean, I'm happy to give you close to an hour.  I'm happy to give you an hour.  My only concern was, because we have this shorter day, are we going to get through everything?

P5RsCOM4                        Clark - Cross

(Counsel confer)

MS. COMEY:  Your Honor, I think more time during lunch would be very helpful.  We also think that we're running so far ahead of schedule, that our case may end up being closer to five weeks than six, at this point.  I do think that we could spare the extra time.

THE COURT:  All right.  Why don't we come back 1:15.

MS. SLAVIK:  Thank you, your Honor.

MR. AGNIFILO:  Thank you, Judge.

THE COURT:  Thank you very much.

(Luncheon recess)

AFTERNOON SESSION

1:15 p.m.

(Jury not present)

THE COURT:  Ms. Steiner.

MS. STEINER:  Yes.  Thank you, your Honor.

So, over the lunch break, the defense informed the government that they intend to seek to introduce, I think it's approximately 25 defense exhibits through this witness.

The government received most of these yesterday evening, had been informed by the defense then and this morning they were only used for impeachment, which is why we did not raise these objections earlier.

If I can outline the general categories I see these communications falling into.  One bucket is communications I think similar in kind to what we saw being used for impeachment purposes before the break, just a communication between Ms. Clark and Mr. Combs, typically fairly brief.  And I don't think the government would object to those at this time.

There are, however, two other buckets of communications that, as far as I can tell, have no non-hearsay basis.  They are just out-of-court statements.  Most of them with Ms. Ventura, some of them with Ms. Ventura's team.  But I don't think it goes to state of mind, really just trying to establish the truth of the matter.

For example, there is a group of e-mail communications

where Ms. Clark is just coordinating scheduling for shoots, for various career opportunities for Ms. Ventura. I think it's pretty clear it's not being offered for Ms. Clark's state of mind, rather to establish that those opportunities did, in fact, exist and were offered to Ms. Ventura.

So that's the objection to those types of communications, and there are several.

Additionally, there are communications that are directly between Ms. Clark and Ms. Ventura, which if the defense can proffer some state of -- why is this relevant to Ms. Clark's state of mind, then potentially we can have that discussion.

But just on their face, I don't see any non-hearsay purpose.

THE COURT: Mr. Agnifilo.

MR. AGNIFILO: Yes, your Honor.

There is nothing that we're seeking to admit that is an assertion being offered for the truth. There are times when there are logistics being discussed. There are photo shoots being discussed. These are the things that are done by way of organization to bring about these things, and this is some of what the witness testified to on direct, that she was working with Cassie.

And what we told the government was, depending on how the direct went, we would use these, you know, possibly refresh

recollection, possibly to put them in.  So we always sort of knew that.  And the direct, in my opinion, went further and more negative than I had imagined it would.  And so I think a lot of these logistics show that this is a hard-working woman, the witness, she's doing the things she needs to do, she is doing her job well.  And rather than having her describe it -- I'm certainly within my rights, hearsay, you know, obviously being in consideration -- to show that the way that she conducts her business along with other people from Bad Boy and Epic Records and Sony Records and all the different people she's dealing with is through this way.  You know, whether it be an e-mail or text message.

There is no statement I'm offering for the truth of the facts in the statement.  I don't think that's the case.  It's all background about how she does her job.

THE COURT:  Well, at this point, we're going to have to deal with it on an exhibit-by-exhibit basis.

But as to the third bucket, I suppose it is -- so there's the exhibits where it's just saying, you were coordinating these events and these things were happening.  OK.

I'm told there is another category of exhibits that don't fall into that bucket and, instead, are communications, I believe, with Ms. Ventura or Ms. Ventura's team that don't go to that issue.  And you just don't know why they are even relevant, is that fair?

MS. STEINER:  Correct, your Honor.

MR. AGNIFILO:  So...

MS. STEINER:  I understand, perhaps, their argument of relevance.  I don't understand the non-hearsay basis for admission.

MR. AGNIFILO:  So, I think the relevance is -- I don't know if there is a difference between the second and third bucket.

THE COURT:  What are we talking about and what's the non-hearsay basis?

MR. AGNIFILO:  I'm not sure.  I don't know -- I'm trying to think back to my exhibits.  When I think about their three buckets, it's not all that clear to me.

What I think we're going to put in, for instance, there are times when Ms. Ventura and this witness are talking about Ms. Ventura's photo shoot and Ms. Ventura is, you know, picking out artwork and they are discussing the artwork.

These aren't statements being offered for the truth.  It's to show that Ms. Ventura and this witness are having, you know, a natural synergy in the creative process.  And the reason that is relevant in the case is because I think it's the government's theory of the case somehow Ms. Ventura was not permitted to be creative and productive as an artist.

THE COURT:  I don't think you're going to get pushback on questioning along those lines.  I think the objection is

focused on the exhibits.  We'll deal with them as the testimony comes in.

After today, when you've identified exhibits and there is a government objection, then those have to be put into the letters that are coming in overnight.  That way, as you can see, we get through a lot in that 30 minutes before the jury comes in.  And if the parties want extra time for lunch and we still want to let the jury out early, we can't have a situation where we're going down to less than four hours of trial time with a jury here.  We're bringing them in every day.

That's just looking forward.  For today, I'm going to deal with these as they come up.  We'll hopefully not need side bars to deal with them.  I understand the issues and, you know, my understanding is, to the extent you're able to get this testimony out from the witness without having to introduce the exhibits, you will do so.  There may be a few times where you want to offer the exhibits, and we'll deal with the objections then.

MR. AGNIFILO:  OK.

MS. STEINER:  Your Honor, one more issue that was just brought to my attention.

When I walked in, I was actually handed a physical copy of an additional defense exhibit we had not received previously, and included in this exhibit -- it's a text message chain -- is an image depicting Ms. Ventura from *Love or Lose*

*Her* that your Honor has previously ruled should be kept out under Rule 412 and 403.

I only have this hard copy.  I'm happy to pass it up to your Honor.  I just wanted to note that, and we will object to any attempts to introduce this as an exhibit on that basis.

THE COURT:  That was addressed in the letter that addressed the Mescudi issue, right, that particular artwork?

MS. STEINER:  That was actually a separate issue, your Honor.  This is something that was just brought to my attention for the first time when I was handed this a moment ago.  The fact that there is an image that your Honor has previously -- the defense previously sought to introduce, your Honor reviewed, determined that under 412 and 403 it should be kept out.

THE COURT:  When I excluded it, though, there was minimal, if any, probative value to that evidence.  What I'm saying is that in the defense submission over the weekend.

MS. STEINER:  I see, your Honor.  I understand.

THE COURT:  They articulated a different reason why that particular album cover would be relevant and probative, because it was actually something that Ms. Ventura worked on, and she developed the artwork during that time period and it was her artistic vision, I take it.

Ms. Shapiro, is that fair?

MS. SHAPIRO:  That's correct, your Honor.  Also, I may

be misremembering, when I looked at the transcript again, your Honor didn't -- I don't believe your Honor excluded it on 412 grounds.

THE COURT:  It wasn't a 412, it was a 403.

MS. STEINER:  Your Honor, on whatever basis, certainly if we want to limit it to 403.  Again, this is a photo where Ms. Ventura is topless and just covering her chest with her arms, and it's part of a broader conversation about ten different individuals, one of them is Ms. Clark, many, many others.

Similarly, I don't understand the relevance, so I think any probative value is nil and the prejudice is significant.

THE COURT:  We'll have to deal with this, and here is what's going to happen.  Now, if I'm remembering the sequence of events, there was an e-mail from Ms. Geragos indicating that there were exhibits the defense was planning to put in, but that we could deal with it in realtime.

That's my understanding, my recollection of what the e-mail said.  But there was a pending objection that had been raised by the government at that time.  And so, knowing that, if you really want these in, you should have raised it prior to the trial day and we would have gone through this at 8:30 and potentially gone all the way to 9:30.

Now we're going to make the decision and make the

calls as they come up.  Mr. Agnifilo, to the extent you want to seek to admit these, I'll take a look, see if it complies with the rules, and make a ruling and we will proceed from there.

So I think it makes best sense, moving forward, to raise these in advance so that I can fully hear everybody on all their arguments.

MR. AGNIFILO:  Understood, Judge.

THE COURT:  OK.  Let's have Ms. Clark come back.

(Witness resumed)

Welcome back, Ms. Clark.

(Continued on next page)

P5RsCOM4                        Clark - Cross

(Jury present)

THE COURT:  Ms. Clark, do you understand you're still under oath?

THE WITNESS:  Yes, sir.

THE COURT:  Mr. Agnifilo, you may proceed.

BY MR. AGNIFILO:

Q.  Good afternoon, Ms. Clark.

A.  Good afternoon, sir.

Q.  So, I want to get back very briefly to when you left Combs' employment in 2006 and went to, was it, Samba Records?

A.  Jive Samba, yes.

Q.  And do you remember that Mr. Combs was supportive of you leaving and going there?

A.  I don't really remember, but I don't remember that it was a problem based on what had happened.

Q.  Do you remember that he had good connections with the leadership of Samba?

A.  He did, but I did, too.

Q.  OK.  And do you know if he made phone calls that made it easier for you to get that job?

A.  I do not.

Q.  OK.  But you discussed it with him, did you not?

A.  I don't remember.

Q.  OK.  And do you remember -- do you remember him saying that he had good connections there?

P5RsCOM4                         Clark - Cross

A.  I don't remember that.

Q.  OK.  I'm going to ask you to look at something to refresh your recollection, which is -- this is just for the witness and the parties -- 3509-011 at page three.  We'll pull it up.  It is sort of the top.

        Do me a favor.  If we can just do the top, like, quarter.  Even higher.  There we go.  Now blow that up.

        All right.  Do me a favor.  I want you to read to yourself the first few lines there.  And when you get to Samba, look back up at me.

        Never mind.  That was terrible.  It's a few times. Read the first five lines and then look up at me.

        OK.  All right.  So you remember that he had strong relationships there, right?

A.  Yes.

Q.  OK.  And do you remember he told you that?

A.  I don't remember.

Q.  OK.  You remember he was supportive of the move, correct?

A.  I don't remember him being unsupportive of the move.

Q.  OK.  But it was a big deal, I mean, to you, that you were leaving and going there, correct?

A.  No, not after what happened.  It wasn't necessarily good at that moment.  But we both knew Mark Pitts.  Obviously, he knew Mark Pitts better.

Q.  Say that name again?

A.  Mark Pitts.

Q.  Who is Mark Pitts?

A.  He was the president of Jive at that time.  I didn't work for Mark, but he was working there.

Q.  And do you remember that you went there because you were making more money there?

A.  I was making -- that's not why I went there.

Q.  OK.  Can we go back and take a look at what we just looked at.

A.  Um-hmm.

Q.  If we can look at the top line.

        Read it to yourself.

A.  I read it, sir.  That's not why --

        THE COURT:  Ms. Clark, just read it to yourself and we'll take it down, and Mr. Agnifilo will ask you a followup.

        THE WITNESS:  OK.

Q.  All right.  Do you remember telling anybody that you had an opportunity to go there and make more money?

A.  No.

Q.  You don't remember saying that to anyone?

A.  I do not.

Q.  No?

A.  No.

Q.  All right.  But you did make more money, quite a bit more money?

P5RsCOM4                          Clark - Cross

A. I did.

Q. OK. All right. I want to also talk about you, you talked about this walk in Central Park?

A. Yes, sir.

Q. You guys were going to Tavern On the Green, right?

A. No, we parked at Tavern On the Green. We had been in the park earlier that day.

Q. Did you go to Tavern On the Green that night?

A. No.

Q. So, that's just -- you just parked there?

A. We just parked. There's a roundabout there --

Q. OK.

A. -- on the east side of the park -- the west side of the park.

Q. And then you and Mr. Combs and who walked?

A. Paul Offord.

Q. How long were you walking through the park?

A. We walked -- not long. Just a little bit away of Tavern On the Green under a tree.

Q. Have you known Mr. Combs to walk in Central Park as a matter of course from time to time?

A. We were in the park earlier that day on a walk, yes.

Q. But I'm talking not that day, just that Central Park is a place that Mr. Combs went to from time to time?

A. I mean, yeah.

Q.   Your office was pretty close to Central Park, right?

A.   No.

Q.   Where was it?

A.   1440 Broadway.

Q.   And what was a cross street?

A.   From 1440 Broadway?

Q.   Yes.

     Broadway and what, do you know?

A.   40th?

Q.   OK.  It's less than 20 blocks away?

     It is.

A.   It is, but it's not close.

Q.   OK.  All right.  Did you ever walk in Central Park other than that one time with Mr. Combs?

A.   Earlier that day.

Q.   OK.  And where were you earlier that day?

A.   We -- he was giving me the run of the, you know, run of show, what the job would be like.  And we walked from the east side of the park to the west side of the park, and we ran into Nas and Kelis in the middle of the park.

Q.   OK.  And who are they?

A.   Nas is a rapper and Kelis is a singer.

Q.   So, when that happened, just you and Mr. Combs were walking in the park?

A.   Yes.

P5RsCOM4                        Clark - Cross

Q. And that was during the day?

A. That was in the daytime.

Q. OK. All right. How long were you and he in the park at that time?

A. Just a walk, like, 20 minutes, walking across.

Q. You said that this was earlier in your career there, so he was kind of giving you the lay of the land?

A. We were talking. Yeah, he was giving me the lay of the land. And then we ran into them in the middle of the park.

Q. OK. And I want to talk -- you told the jury about this incident where he had Cassie come in a room and spin around and all that stuff.

OK. Who was there?

A. Lauren London and Chef Jordan.

Q. But not LaurieAnn Gibson?

A. I don't recall LaurieAnn Gibson being there.

Q. Do you remember ever saying that LaurieAnn Gibson was there?

A. I never said LaurieAnn Gibson was there.

MR. AGNIFILO: Can we look at 3509-055, page three, just for the witness and the parties.

Blow up the top maybe third.

Q. All right. I'm going to focus your attention to the bottom paragraph there, and just read it to yourself.

A. Someone misunderstood then. Oh, no.

P5RsCOM4                          Clark - Cross

Q. We're not there yet.  We're not there yet.

A. All righty.

Q. OK.  Just read it to yourself, and when you're done reading, just look up at me.

        Who is LaurieAnn Gibson?

A. LaurieAnn Gibson is a choreographer.

Q. You know her, right?

A. I do.

Q. You've known her more many years?

A. Yeah.

Q. She goes back to the old -- withdrawn on old.

        To the days of hip-hop from, like, back in the '90s, like you do?

A. No, I don't go back to the '90s like she does.  She's older than I am.

Q. So she goes back even further than you?

A. Yes, sir.

Q. OK.  Do you remember telling the government that this thing with Cassie spinning around was with LaurieAnn and Chef Jordan in 2010?

A. No.  It looks like I was misunderstood.  They heard LaurieAnn instead of Lauren.

Q. OK.  So you didn't take these notes, correct?

A. No, I didn't take these notes.

Q. How many times would you say you met with the government

P5RsCOM4                        Clark - Cross

before you testified here today?

A.  I don't know.  A couple of times.  I don't know the exact count.

Q.  Couple meaning, like, more than, like, a dozen?

A.  Maybe a dozen.  It's a good number.

Q.  All right.  And so, you understand when you sit down with them, they have an agent taking notes or one of the prosecutors takes notes, right?

        You have to answer yes or no.

A.  I'm sorry.  Yes, sir.  Sorry.

Q.  What you're saying, so you didn't say LaurieAnn Gibson?

A.  Absolutely not.

Q.  All right.  OK.  I want to talk about Cassie Ventura for a little bit.

A.  OK.

Q.  When did you first meet Cassie Ventura?

A.  I met Cassie briefly when she was signed, when Niles brought her to be signed.  I met her and Ryan Leslie.

Q.  And so, when you first met her, do you know if she was still with Ryan Leslie?

A.  Yes, she was.

Q.  And just tell the jury, the jury has heard a little bit.

        Tell the jury who Ryan Leslie is.

A.  Ryan Leslie was a producer.  He came in with her as her, sort of, like, the producer that she was working with.  Um, and

P5RsCOM4                          Clark - Cross

they -- they were being managed by Glenn Niles, who was the head of publishing at Bad Boy.  And she was married to Cassie's lawyer and Ryan Leslie's lawyer, so it kind of came like that.  And I met them through Glenn.

Q.  OK.  And to your knowledge, when you met Ms. Ventura, was she in a relationship with Ryan Leslie?

A.  Yes, she was.

Q.  OK.  And how do you know that?

A.  Just off of how they presented themselves.  This is -- this is Cassie, this is Ryan.  You know, they are boyfriend-girlfriend.  But it wasn't a big thing, no.

Q.  Got it.

They seemed together that way?

A.  But they weren't around us a lot.

Q.  OK.  And Ryan Leslie is how much older than Cassie, if you know?

A.  I don't know Ryan personally, so I don't know.  But I know he's older than she.

Q.  OK.  And you didn't always get along with Cassie, am I right?

A.  No.

Q.  All right.  And why did you not get along with Cassie sometimes?

A.  Um, what time period would you be referring to?

Q.  Let's go in the beginning.  Let's say the early years, 2007

to 2010.

A.  I don't think we really had issues in 2007 to 2010.

2007, she was my model for Sean John.  We hadn't really developed the other side.  She was just in the Sean John campaigns.

Q.  So when did you -- you said you hadn't had issues yet.

When did you and she develop issues?

A.  I would say our issues developed after she started dating him.

Q.  OK.  So that's about what, 2007, 2008?

A.  I would say she got a little bit more -- 2008, I would say, perhaps.

Q.  And so, just so the record reflects, you said she got a little bit more, and then you moved your shoulders.

A.  Oh, sorry.  Yeah.

Q.  It's all right.  What are conveying?

What are you telling the jury?

A.  She got a little bit more bravado as being his girlfriend, the longer it lasted.

Q.  And what did you see in that regard?

When you say she got more bravado, how did that manifest itself to what you could see?

A.  Sometimes she thought I was being paid to help her.

MS. STEINER:  Objection.

THE COURT:  Objection is sustained.

P5RsCOM4                          Clark - Cross

The jury should disregard the witness's answer.

Mr. Agnifilo, you can reask the question in a way ...

MR. AGNIFILO:  Sure, sure, sure.

BY MR. AGNIFILO:

Q.  Without getting into what she might have been thinking.

A.  Apologies.

Q.  No, no, no.  That's all right.  I'm asking really what you were able to see.

So what were you able to see and hear, you know, sense from being around her?

A.  Um, just that her expectation level was increasing.

Q.  How did that manifest itself?

What could you see?  What could you hear?

A.  She went from more being a sweet model to, um, a feisty girlfriend.

Q.  OK.  And did you think she was very talented?

A.  I think she had talent and I think she was a very beautiful girl.

Q.  So in your -- is having talent different than being very talented?

A.  Yes.

Q.  OK.  So I asked you if she was very talented and she was not very talented, as far as you were concerned, correct?

A.  True.

Q.  You said she had talent?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5RsCOM4                            Clark - Cross

A.   Yes.

Q.   And tell the jury, you've been in this field your whole career, correct?

A.   Yes, sir.

Q.   And do you feel like you're a pretty good judge of talent, from what you could see?

A.   I mean, it's subjective, but I think I have good taste.

Q.   OK.  All right.  And why did you think --

        Why do you think she just had talent as opposed to being very talented?

A.   Um, talented to me is Whitney Houston, Mariah Carey.  Very talented is that level of performer, entertainer.

        Cassie was more of a studio artist.

Q.   OK.  What does that mean?

        Tell us what a studio artist is.

A.   Um, a little bit more comfortable in the vocal booth to have a little bit of things equalized for you and, you know, engineered properly.  Less of a live performer.

Q.   OK.  So you said equalized, vocal -- her voice would have to be manipulated by other means to live up to -- withdrawn.

        I obviously don't know this terrain very well.  So, Mariah Carey, Whitney Houston, get up in front of a microphone, belt it out, and the world says wow, that was amazing, right?

A.   True.

Q.   That's not Cassie?

P5RsCOM4                           Clark - Cross

A.   No.

Q.   OK.   What did Cassie need to put a record out?

A.   She needed number one great records, she needed a well-oiled plan, and she needed to go out there and work it.

Q.   Are there -- could she perform --

        Did she perform live while you were with her?

A.   A couple of times.

Q.   OK.   And how did it go?

A.   It wasn't the greatest.

Q.   Why is that?

A.   Um, she was a little bit nervous.   She didn't really have a lot of opportunities.   She wasn't getting booked a lot for live performances, so there wasn't necessarily a chance for her to gain that experience.

        When she did have it, she would rehearse and do her very best, but she still had nerves.

Q.   And, on occasion, was it worse than having nerves?

        Were there occasions where, either from what you could see because of drug use or something else, she was unable to perform?

A.   I mean, later, when I came back for that consultancy that I did in 2016, I could see that her drug use was preventing her from the opportunities that were before us.

Q.   OK.   From what you could see, was she a very hard worker?

A.   At times.

P5RsCOM4                        Clark - Cross

Q.  OK.  And, at times, not?

A.  At times, not.

Q.  OK.  Now let's talk about the times she was a hard worker.

What did you -- in what areas was she a hard worker?

A.  Um, if we were in the studio, she would show up on time.
She would do the vocals.  She would do them over again.  If we
were listening to tracks, if we were trying to meet with
producers, she would show up.  If I'm sitting there trying to
come up where a creative direction, she's looking, she's
enthusiastic, she's giving input.  Um, working out, dance
rehearsals, choreography, just trying to do the things an
artist does to create betterment for the execution of the show.

Q.  And in what ways was she not a hard worker?

A.  Oh, well, I would say most of the time she preferred to be
with her boyfriend.

MS. STEINER:  Your Honor, can we get a time period?

MR. AGNIFILO:  Fair enough.

Q.  Let me break it down.  We'll call the early years 2007 to
2010.

Would you say she was not a hard worker or a hard
worker in 2007 to 2010?

A.  2007, I would say she was a hard worker then.

Q.  OK.  Did there come a time when, from your perception, she
stopped being as hard a worker?

A.  I would say that it -- I saw her downgrade in her level of

execution when we made the move to LA.

Q.  OK.  And do you know when that was approximately?

A.  After Kim had the twins, so 2009-ish.

Q.  OK.

A.  I'm not exactly sure.  I would say 2009.

Q.  After that, you saw that she wasn't working as hard?

A.  Not as hard.

Q.  What did you see along those lines?

A.  I saw her not working.  I saw her developing more of her relationship with Puff, Mr. Combs.

Q.  OK.  And did you think she deserved -- did she get a tension?

        Did she get support, from what you could see, from Combs and the business?

A.  Yes.

Q.  OK.  And --

        MS. STEINER:  Again, can we get a time period.

        THE COURT:  Mr. Agnifilo.

Q.  Is there --

        Did it change as time went on?

A.  The support?

Q.  Yes.

        Or was it about the same throughout, from what you could see?

A.  I would say it was about the same.  He always was

supportive, but there would be times when the support would fall away.

Q. OK. So you said he -- there were times it would fall away. He would always be supportive.

In what form did this support come from, what you could see?

A. Budgets, producers, artists, other artists, choreographers, stylists, hair artists. You know, just general top tier of the industry that creates stars. He made sure to give her access.

Q. OK. So she, in all of those areas, she got top-tier talent to support her to become a star, fair to say?

A. Fair.

Q. Did you think that she always deserved all of this attention and support?

MS. STEINER: Objection.

MR. AGNIFILO: Let me ask a different question.

THE COURT: Go ahead.

BY MR. AGNIFILO:

Q. Let me ask a different question.

Did you think all of this attention and support -- I'm going to ask you a different question.

Were there other artists in Bad Boy who were getting less attention and support than she was?

A. Yes.

(Continued on next page)

BY MR. AGNIFILO:

Q.  Okay.  So describe that for us in terms of the amount of attention and support that she got as opposed to other artists in Bad Boy at the time.

A.  May I ask for a time period?

Q.  Sure.  Let's talk first 2007 to 2010 and then we'll go from there.

A.  2007 to 2010, she got a considerable amount of support. That was the early days.  In relation to the other artists, we really didn't have -- I think maybe Yung Joc was there.  We had maybe -- I forget.  We had another group from Atlanta I think around that time.  They got a video.  And who else was there?

The -- I would say, as I could see it, from my POV.

Q.  Mm-hmm.

A.  The lion's share of Bad Boy was on Cassie in that first block of time.

Q.  Okay.  Now, let's talk about 2010 to 2012 because you leave in August of 2012, so let's talk about that period of time. Same or different?

A.  Different.

Q.  Okay.  In what way?

A.  We had new artists at the time.  My portfolio, in terms of who I was working with, as in relation to Bad Boy, opened up. That's when French -- like I developed French Montana, had Red Cafe and MGK.  And MGK was getting a lot of attention, as was

P5RACom5                        Clark - Cross

French Montana.

So I kind of see -- I was, from where I was, kind of seeing support now coming for the other artists as well.

Q. Okay. About the same level of support and attention as Cassie was getting roughly?

A. Yes.

Q. Okay. And you came back in what year after you left in 2012?

A. 2016.

Q. Okay. 2016, 2017. Same question. What kind of attention and support was Cassie getting during those years?

A. I would say same support. However, he had fell back in terms of being on our sets, being there when we were working. So he took a step back.

Q. You mean Mr. Combs?

A. Yes.

Q. Got it.

A. So I would say he kind of put it more in her hands in that 2016 window to actually show up and do it. Like he wasn't going to ride her now. He wasn't over our shoulder on set. He was doing whatever he was. And he was just supporting from the phone.

Q. Okay. But in 2016, 2017, it was your job to work closely with Cassie, right?

A. Yes.

P5RACom5                         Clark - Cross

Q.   And tell the jury exactly what you did for Cassie in 2016 and '17?

A.   So she had a deal -- she got a new record deal on Epic. And she and I hadn't spoken since 2012.  We ran into each other somewhere and she was like, hey, I got a new record deal, maybe I'll talk to Puff, maybe we get back together and work and stuff.

And, you know, I haven't been doing anything since.  I had a baby.  And I love being creative.  I love my work.  And so it was the first thing was the MTV Awards that year to come up with a look for her.  And I -- we turned her hair highlighter green and dressed her like David Bowie, and it was amazing.  And then we did a photo shoot at my house on Puff's birthday to support the project.  We wrote a movie.  We shot a mini-movie.  We shot videos.  And that was pretty much the time.  Every time I saw her, it was for work.

Q.   All right.  Let's back to 2008 time period.

Was there a song called Official Girl; does that sound right?

A.   Yes.

Q.   Tell the jury about that.

A.   Official Girl was a song where -- in a super cute video, she looked great.  It had a good uptempo, and it was about wanting to be someone's official girl.

Q.   Okay.  And then Must Be Love?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5RACom5                        Clark - Cross

A.  Must Be Love was another song that came out, I don't know if it was before or after, I'm sorry.  A long -- time has passed.  But it was a really cute song and Puff was featured on that song with her.  And it was about like, you know, falling in love.

Q.  All right.  So I'm going to ask you some things, sound right, Official Girl released August 5th, 2008, ballpark?

A.  Could be, could be, yeah.

Q.  Lil Wayne was on it?

A.  Yes.

Q.  At the time, Lil Wayne was a pretty popular artist?

A.  He was popular.  But it's good to note, I was still at Sean John technically for Official Girl.

Q.  Got it.  Okay.

Now, for Must Be Love, April 14th, 2009 release?

A.  Yes.  I was back by then, yes.

Q.  Produced by Mario Winans?

A.  Yes.

Q.  And just tell us, who is Mario Winans?

A.  Mario Winans is from the Winans family.  The Winans are a gospel family in the industry.  Great -- if you've been to a Christian church, you've probably heard him.  And he is one -- he was one of the hitmen.  The hitmen were Puff's producing squad back when Biggie was alive and they did some good stuff.  And Mario was a really talented producer.

P5RACom5                              Clark - Cross

Q.   And then a little bit later, King of Hearts released February of 2012, sound right?

A.   Yes.

Q.   Tell us about that?

A.   King of Hearts was a song that I found from my friend and this producer and it was -- it was different.  It was outside of the audio scope she had been in, and it was something new and fresh and it sounded pretty cool.  And Puff liked it when he heard it, and she liked it.  So we got it up as a single and did a really cool video for it.

Q.   You mentioned that at one point Cassie had like a colorful neon wig?

A.   Yeah.  Well, no, we died her hair.

Q.   Dyed her hair, I'm sorry, I'm sorry.

         MR. AGNIFILO:  I just want to just for the witness and the parties Defense Exhibit 628.  We're going to pull it up.

Q.   Is that it?

A.   Yes, sir.

         MR. AGNIFILO:  Your Honor, we would ask just to offer it.

         MS. STEINER:  No objection.

         THE COURT:  Defense Exhibit 628 will be admitted.

         (Defendant's Exhibit 628 received in evidence)

BY MR. AGNIFILO:

Q.   And so, now, you had input into this or no?

A.   Yes, sir.

Q.   And tell us what the concept is?

A.   The concept was I hadn't been around them in years.  And she had a new record deal.  And she had -- you know, we had the shaved head before with the cascading long hair, and it was really pretty, and I wanted to depart from that.  I wanted something edgier, bolder.  The music that she was making with Kaytranada, producer, was slicker and more contemporary, and I wanted to put her in the future a little bit and I wanted to -- everybody want to be her.  And I thought it was a good look.

Q.   And was she opposed to this?

A.   No.

Q.   She liked the idea?

A.   She did.

Q.   Right.  So this was collaboration between the two of you and this was the look that was the result of this collaboration?

A.   Yes, sir.

Q.   Right.  She very much had her own voice in this look, correct?

A.   Yes.

Q.   You wouldn't do this against her will, right?

A.   No.

Q.   Okay.  You did this working with her.  And this is something, this is the look that she and you wanted for her at

P5RACom5                          Clark - Cross

that time?

A.  I presented to her.  I presented it to her before we presented it to Mr. Combs.  She liked it.  She loved the hair. She was like yeah, let's do it.  I said we could do a cheat it with a weave, but it would be cooler if you dye your hair, and she was like I love that.  So it was cool.

Q.  Now, in January 2012, you were working with Cassie at that time period, right?

A.  Yes.

MR. AGNIFILO:  I'm going to ask to show you an exhibit for the parties and the witness, 968.  I'm sorry it's small. If we can blow up the top so the witness can see where it is.

Does that help you?  Is that still too small?  Let's do this.  Can we just do the top, the top -- yeah, there you go.  See if we can get it bigger.

A.  Whoa, there's a lot of people in here.

Q.  No, that's all right.  That's all right.  Take a look at it for a second.  Let me ask you a couple questions and help you.

A.  Yes, sir.

Q.  This is an e-mail from you?

A.  This is an e-mail from me.

Q.  Okay.  And it's that Capricorn1@tmo.blackberry.net.  I think we saw that during direct examination that same e-mail?

A.  That was my blackberry, yes.

Q.  That was your blackberry.  And without getting to

everybody, you have a lot of folks here from Bad Boy and other places, right?

A.  Yes, sir.

Q.  All right.

MR. AGNIFILO:  I ask that it be admitted as 968.

MS. STEINER:  Your Honor, we have the same hearsay objection we flagged earlier.  There's also a sealing objection related to pseudonym issue.

MR. AGNIFILO:  Related to?

THE COURT:  Well, there's apparently some sealed information here that should be sealed, although I have no idea what it is.  But for present purposes, Mr. Agnifilo, why don't you ask some questions.

MR. AGNIFILO:  Sure.

THE COURT:  Because I'm not understanding the relevance of this document to begin with.

MR. AGNIFILO:  Sure.

Q.  So, at this point, you are like Cassie's representative; am I right?

A.  Yes, sir.  Yes, sir.

Q.  And this is setting up a conference call; do you see that it says Bad Boy conference call?

A.  It looks like Jason Wiley was setting up a conference call.

THE COURT:  Ask her questions about what happened.

MR. AGNIFILO:  Okay.

P5RACom5                        Clark - Cross

THE COURT:  Don't ask her questions about the document, which you haven't put into evidence.

MR. AGNIFILO:  That's fine.  Very good.

Q.  So you don't have any recollection of this e-mail, or do you?

A.  No, sir.

Q.  Okay.  And as part of the way you conducted business at this point in time is by e-mails with other people from Bad Boy, right?

A.  Yes.

Q.  Okay.  It was common for you to send e-mails and receive e-mails, right?

A.  Yes.

Q.  And the e-mails would be sent or received in regard to different things that had to happen, such as conference calls and other things, correct?

A.  Yes.

Q.  And this appears to be an e-mail that you sent in connection with a conference call at Bad Boy, related conference call, right?

A.  It looks to be a response.

MR. AGNIFILO:  Okay.  So can I speak to the government for a second, Judge?

THE COURT:  Yes, you can.

MR. AGNIFILO:  So here's is what I ask, just a few

P5RACom5                          Clark - Cross

more questions for the witness about this exhibit, and then we won't put it into evidence.

THE COURT:  All right.

MR. AGNIFILO:  All right.

Q.  So the date of this e-mail is January 13th, 2012; can you see that?

A.  I can.

Q.  Okay.  Great.  So January 12th, so you're conducting business as usual in this e-mail, correct?

A.  Yes.

MR. AGNIFILO:  And we can take it down.

Q.  And January 12th -- I'm sorry.  What did I say it was? January 13th.  Sorry.

January 13th, 2012, was three weeks after this kidnapping you told this jury about?

A.  Yes.

Q.  Okay.  So you were conducting business that whole time, right?  I mean, you told the jury about this kidnapping and Mr. Combs has a gun and people are going to get murdered.  And here you are on January 13th, 2012, arranging for a Bad Boy conference call on behalf of Cassie with a lot of other folks from Bad Boy.  That's what we see in this e-mail, right?

A.  I don't think that's what you see.  I think you see Jason Wiley requesting that the chairman wants to speak to everybody, and I responded that Cassie and I are confirmed.

P5RACom5                          Clark - Cross

Q.   Right.  Okay.  So the chairman being Mr. Combs, right?

A.   Yes.

Q.   So this was a meeting -- a conference call, right, for Bad Boy?

A.   I can't tell what it is, but it's something, yes.

Q.   All right.  My point is you're back conducting business, being a productive member of the company, immediately after this kidnapping you told the jury about, right?

A.   Yes.

Q.   Okay.  Now, I want to talk about the summer and fall of 2011.

     You were living -- you said it's paid by the company, by Bad Boy, right?

A.   Yes.  It was staff housing.

Q.   And what was the name of the apartment complex; do you remember?

A.   The HillCreste.

Q.   The HillCreste, okay.  And it is right near the Museum of Tolerance in Los Angeles; is that right?

A.   Yes, sir.

Q.   And how long had you been living there?

A.   Maybe a couple of months.

Q.   Okay.

A.   Because we had been living in hotels prior.

Q.   All right.  And so were there lots of different people from

P5RACom5                           Clark - Cross

Bad Boy living in the HillCreste?

A.   Just me.

Q.   Just you; no one else?

A.   The rest of the staff lived around the corner.

Q.   And how far from HillCreste were they?

A.   They were two and a half minutes.

Q.   Okay.  Walking or driving?  I mean like right around the corner around the corner, or some distance away?

A.   Right around the corner around the corner.

Q.   Okay.  And you said that Cassie was staying with you about 30 percent of the time?

A.   Mm-hmm.

Q.   Okay.  Just --

A.   Yes.

Q.   There you go.

A.   Yes.  Sorry.

Q.   Starting when?  When did Cassie start staying with you?

A.   When we started going back and forth to LA, once I had the place, because I was tired of staying in hotels because I couldn't eat properly, you know, at room service.  She would come to my house when he was busy.

Q.   When Combs was busy?

A.   And if she wasn't -- if she didn't feel like staying in a hotel and she wanted to be with somebody.

Q.   Okay.  Now, at what point did you first realize or learn

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5RACom5                         Clark - Cross

that Cassie Ventura and Scott Mescudi, Kid Cudi were in a
relationship?

A.   I didn't -- I was never made aware that they were in a
relationship.  I knew that they were getting to know each
other.  I believe I found out maybe after Thanksgiving in 2011.

Q.   Okay.  After Thanksgiving that they were in a relationship?

A.   No.  That they were getting to know each other.

Q.   Got it.  From time to time, were you aware that Ms. Ventura
was spending the night at Kid Cudi's house?

A.   One time I was aware when I picked her up.

Q.   And when was that?

A.   That was about a week before everything, a couple days
before everything.

Q.   Okay.  So everything, you're talking about the
kidnapping --

A.   Yes, sir.

Q.   -- and everything?

A.   Yes, sir.

Q.   So a week before that?

A.   About.

Q.   And to your knowledge, she only stayed at Kid Cudi's house
that one night?

A.   To my knowledge.

Q.   Okay.  Other than that, she would stay with you about 30
percent of the time, right?

A.  Yes.

Q.  And when she wasn't staying with you, where was she staying?

A.  She would either be in a hotel.

Q.  Mm-hmm.

A.  Or with Mr. Combs in his residence.

Q.  Okay.  And so you believed, in terms of what you believed, that Ms. Ventura and Mr. Combs were still together?

A.  Yes.

Q.  Okay.  And you believed that after Thanksgiving, Ms. Ventura and Kid Cudi were what?  How would you characterize it?

A.  Getting to know each other, hanging out.

Q.  Hanging out?

A.  Yeah.

Q.  And that at one point in December, she spent the night at his house; you knew that?

A.  I knew that because I was picking her up, yes.

Q.  Okay.  Now, at what point do you and she go to Best Buy and get her a burner phone?

A.  After we went hiking with Cudi that day.

Q.  And about when was that?

A.  Like a week before December 22nd, not very long before that day.

Q.  Okay.  And tell me how the conversation goes.  You and

P5RACom5                          Clark - Cross

Cassie are speaking, correct?

A. Which conversation, sir?

Q. That led to you and she going to Best Buy and buying a burner phone, that one.

A. I said, oh, well, you need a burner phone. And she was like huh. And I was like you cannot do this on your phone, my phone, you cannot -- this is very -- you're making this very dangerous.

Q. So you came up with the idea of a burner phone?

A. Yes, sir.

Q. And where did you get that idea from? I know it sounds naive, but where did you get the idea from?

A. My parents died when I was 17. I'm from Los Angeles. I don't know how to answer that question. I'm smart.

Q. Okay. Have you ever used a burner phone?

A. No.

Q. Okay. So you never used one yourself?

A. But I know of them.

Q. Okay. You know of them and you suggested that Cassie get one?

A. Yes, sir.

Q. And then you and she went to Best Buy. Who paid for it?

A. She did.

Q. And so now she had two phones, right?

A. Yes, sir.

P5RACom5                         Clark - Cross

Q.  She had her Bad Boy phone, her work phone, and she had her burner phone?

A.  Yes, sir.

Q.  You never got a burner phone?

A.  I did not have a burner phone.

Q.  You kept using your Bad Boy phone?

A.  Yes, sir.

Q.  Now, did you spend Thanksgiving 2011 with Kid Cudi and Cassie?

A.  No.

Q.  Did Kid Cudi ever come to your house to hang out, your apartment to hang out?

A.  Yes, sir.

Q.  About how many times?

A.  Once.

Q.  And when was that?

A.  It was after Thanksgiving.  I don't know the date, but it was after Thanksgiving.

Q.  Now, do you remember -- was he drinking Jameson at your apartment?  Do you remember anything about this?

A.  He was drinking Jameson at my apartment.

Q.  And the Jameson bottle was out?

A.  Yes.  He left the Jameson bottle.

Q.  It was out where people could see it?

A.  It was out on the counter, yeah.

P5RACom5                         Clark - Cross

Q.  Now, you said that -- how many times have you been to Cudi's house?

A.  I had been there to pick her up and we went hiking, and then again with Mr. Combs.

Q.  Okay.  So when you went to pick her up to go hiking?

A.  Yes, sir.

Q.  There's a door that separates the property from the road, right?

A.  Mm-hmm.

Q.  How did you get through it?

A.  Cudi opened it.  They came -- they came out.  We stopped and chat before we went to the canyon.

Q.  Okay.  So that door locks, right?

A.  I wasn't paying attention.

Q.  Okay.  You didn't turn the knob and walk through it though is my point?

A.  I -- I think they opened it for me.  One of them.  I wasn't -- like I was let in or anything like that.  It was more like, hey, you're here, boom, boom, boom.

        So I don't know the mechanics of the door.

Q.  Okay.  Now, do you know how many times, only if you know, how many times Cassie Ventura has been to Kid Cudi's house?

A.  I did not know.  I do not know.

Q.  Okay.  Did you know that she was there -- other than the night that she slept over, did you know that she was there from

time to time?

A.   I didn't know that.

Q.   Now, in December 2011, Mr. Combs was not in the United States, right?

A.   Correct.

Q.   He -- do you recall if he was, on December 19th, 2011, at an orphanage in Almaty, Khuzestan?

A.   I just remember he was in Russia.  I don't remember exactly what -- but I just remember he was in Russia or something like that.

Q.   Okay.  Do you remember seeing photographs of him on the internet of him at an orphanage in Almaty, Khuzestan in December?

A.   No, sir.

         MS. STEINER:  Objection.

         THE COURT:  Overruled.  Keep it going.

Q.   You knew he was in Russia; you don't know he was in Khuzestan?

A.   No, sir.  I wasn't his assistant.

Q.   I'm just asking --

A.   No, I'm just saying, I didn't know his schedule at that point.

         THE COURT:  Let's move on.

         Mr. Agnifilo, let's get the next question.

         MR. AGNIFILO:  Yes.

P5RACom5                          Clark - Cross

Q.  So you said today that at some point between 5:30 a.m. and 6:00 a.m. on December the 22nd, there's a banging on your door.

Okay.  Could it have been as early as 5:00 a.m.?

A.  I don't think it could have been as early as 5:00.

Q.  Do you remember telling the government that it was 5:00 a.m.?

A.  I told them it was always between 5:00 and 6:00.

MR. AGNIFILO:  Okay.  Can we look at, for the witness only, 3509-001, page four.  Give me a second.

Q.  So it's that middle paragraph there.

A.  Okay.

Q.  So here's what I'm going to ask you to do.  Just read the last five lines to yourself.

A.  Okay.

Q.  So my question for now is did you tell the government that it was 5:00 a.m.?

A.  I never said 5:00 a.m.  I said between 5:00 and 6:00.

Q.  So you never said 5:00 a.m.?

A.  No, sir.

Q.  Okay.  And did -- and so there was no building security guard out there with Mr. Combs, right?

A.  There was building security at the gate and he let him in with the fob and then left.

Q.  Okay.  My question though, is when you looked through the peephole --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   No.

Q.   Let me finish the question.

          Did you see Mr. Combs with a building security guard?

A.   No, sir.

Q.   Did you tell the government that when you looked through the peephole you saw Mr. Combs with a building security guard?

A.   Absolutely not.

          MR. AGNIFILO:  Okay.  Can we pull this back up.

Q.   We're going to look at the last four lines.

A.   I read it, yeah.

Q.   So my question to you is -- well, let me back up.

          Do you remember speaking with the government on June 21st, 2024?

A.   I do remember speaking to them.  I don't remember it being June, but sure.

Q.   Okay.

A.   Yeah.

Q.   And when you -- can we go back to page four.  And I just want you to look at it one last time.

A.   Mm-hmm.

Q.   Okay.  And did you tell the government that you looked through the door peephole and saw Combs with one of her building security guards; did you say that?

A.   I did not say that.

Q.   You did not say that?

A.   I did not say that.

Q.   You understand -- we can take it down.

Now, this was a meeting that you had with the Department of Homeland Security special agent, correct?

A.   Yes, sir.

Q.   Sean Quinn, right?

A.   Yes, sir.

Q.   And he was asking you questions about this event, correct?

A.   Yes, sir.

Q.   And notes were being taken of this meeting; are you aware of that?

A.   Yes.

Q.   You're aware that when you speak, the government, as part of an investigation, they tend to take notes, right?

A.   Yes.

Q.   And they were taking notes on this occasion, right?

A.   Yes.

Q.   And do you have an understanding that these notes are then made into a report?

A.   I see, yes.

Q.   Okay.  So what you're telling us is you didn't tell the government that you saw a building security guard outside with Mr. Combs through the peephole; you did not say that?

A.   I did not say that.

Q.   Because there was no building security guard, right?

A. He was in the guard box.

Q. No, no, that's not my question. I know there's a building security guard somewhere.

My question is whether the building security guard is on the other side of your front door and that you see this building security guard through your peephole when you see Mr. Combs; and you're saying you never said that, right?

A. I never said that.

MS. STEINER: Objection to form.

THE COURT: Overruled.

Q. Now -- so you let Mr. Combs in, right?

A. Yes.

Q. Do you know how he got up to -- because you can't get into your building without security letting you in, correct?

A. Correct.

Q. Okay. You didn't let him in, did you?

A. No.

Q. You sure?

A. Yes.

Q. So how did he get in?

A. You want me to answer?

Q. If you --

A. I'm assume --

Q. No, I don't want an assumption. I want if you know.

A. When --

Q.   If you know, how did he get in?

A.   When I inquired, when we inquired with the security guard that was normally there.

Q.   Yeah.

A.   She said that that security guard was fired.  He said that Mr. Combs came to the gate.  He was livid as hell, very upset, had a gun, and was like you're going to let me in that building.

Q.   And who is this person?

A.   Some random security guard at HillCreste.

Q.   Did you get a name?

A.   I don't have his name.

Q.   No?

A.   I'm sure you can call HillCreste.

Q.   Go ahead.  All right. What does he look like?

A.   Black guy, younger.

Q.   Yeah.

A.   Younger than 35.

Q.   Have you seen him before?

A.   He hadn't worked there very long.  He was like a new guard.

Q.   New guard?

         THE COURT:  Mr. Agnifilo, let's have a question and then an answer.

         MR. AGNIFILO:  I'm sorry.  Yeah.  Yeah.  I got you.

Q.   So nothing can you do to help us out with a name or

anything like that.  Ever speak to him again?

A.  No, sir.  He was fired.

Q.  He was fired.  So there's nothing you can do to help us with a name or anything like that, right?

A.  No, sir.

Q.  Okay.  All right.

So now Mr. Combs is outside of your door alone, right?

A.  Yes, sir.

Q.  No one is with him, right?

A.  No one is with him.

Q.  And you let him in, right?

A.  Yes.

Q.  And what's his -- what do you notice about him?  What's his physical condition?

A.  Furious.

Q.  Furious.  Does he appear to be on drugs?

A.  I wouldn't say so.  But the furious, he was at another level of fury, so I wasn't quite sure what was going on with him.

Q.  Okay.  And you're saying that he had a gun in his hand?

A.  Yes.

Q.  All right.  And you said you've never seen him with a gun in his hand, correct?

A.  Prior to that day, no, sir.

Q.  And what was he doing with the gun in his hand?

P5RACom5                        Clark - Cross

A.   Holding it.

Q.   Was he pointing at you?

A.   No.

Q.   Do you remember telling the government that he was pointing it at you?

A.   I never told the government he was pointing it at me.

Q.   No.

MR. AGNIFILO:  Can we go back to 3509-001, page four.

Q.   So here's what I would like you to do, read from -- read the third and fourth lines and then look at me when you're done.

Do you remember telling the government that Mr. Combs was pointing the gun at you?

A.   It says or waved around in that text you let me read.

Q.   So here's my question:  Does it -- did you tell the government -- we can pull it back up so you can see it again.

A.   The latter half of that is more correct.

THE COURT:  Hold on.

Q.   Hold on.

THE COURT:  You got to just wait for the question, Ms. Clark, just so we can...

Q.   Did you tell the government that Combs was pointing a gun at her or waving it around; is that what you told the government?

A.   I said he was waving it around.

Q.  So you didn't say that Combs was pointing a gun at you; you didn't say that to the government?

A.  I clarified multiple meetings that he did not point the gun at me.

Q.  So other than clarification, my question is only one thing.

A.  I did not say that, sir.

Q.  Did not say that?

A.  I did not say that.

Q.  Okay.  And you went and then you -- you were not in street clothes when he arrived, correct?

A.  I was in pajamas.

Q.  And then you went and you changed into street clothes, right?

A.  Sweats and a button down shirt.

Q.  Okay.  Where did you go to do that?

A.  My closet.

Q.  And where was Mr. Combs when that happened?

A.  My kitchen.

Q.  And how far is your kitchen from your closet?

A.  Behind my closet.  Like, you know, shared wall.  Shared wall.

Q.  So you went and you put on street clothes, correct?

A.  Yes.

Q.  And you put on shoes?

A.  Yes.

Q. And you left, right?

A. Yes.

Q. And isn't it true that you went so that Mr. Combs wouldn't do something stupid?

A. No.

Q. Do you remember telling me and Ms. Geragos that when we were all together in April?

A. I do not.

Q. That: I went so that he wouldn't do something stupid?

A. I do not.

Q. Right?

A. I do not.

Q. You don't remember saying that?

A. I do not.

Q. I am quite sure that you did not want to be woken up at 5:30 in the morning; am I fair in that assessment?

        MS. STEINER: Objection.

        THE COURT: Sustained.

        Let's get a question.

Q. But you went because you were afraid he was going to do something stupid?

        MS. STEINER: Objection.

        THE COURT: That's overruled.

A. I went because he told me he didn't care that I didn't want to go.

Q. So you are saying that you didn't want to go, told him you didn't want to go, and you went anyway?

A. Yes, sir.

Q. And you're telling me that it's not the case that you'd rather not go, but you did not want him to go and do something stupid?

A. The case was I didn't want to go. He told me it wasn't up to me, sir.

Q. Now, you were concerned he could do something stupid, right?

A. Yeah.

Q. Right. Because he's a jealous guy; you knew that, right?

A. I wouldn't use the word jealous. I would use he has a very bad temper.

Q. Okay. He has a very bad temper. You know he has a very bad temper, and you did not want him to do something stupid?

A. I did not want to go and it was not my choice, sir.

Q. Because if he did something stupid, you would be out of a job?

A. Myriad of things were happening, but I did not want to go, sir.

Q. So you walked down and you get in the Escalade, correct?

A. Yes, sir.

Q. And where is the Escalade in regard to the front of your building?

P5RACom5                              Clark - Cross

A.   It is at the like a fire exit stairwell, closer to my door because I wasn't near the elevator shaft, if you will.

Q.   And where is -- did you have to pass the security guard?

A.   Yes.

Q.   Yeah.  Did you see him?

A.   I did.

Q.   And how far were you from him at your closest point?

A.   The windows were up.  I was in the passenger, back passenger seat, and he was in the little hut.

Q.   So before you got into the Escalade, where were you in relation to the security guard?

A.   Out of vantage point.  My building sat on Pico, the security guard sits sort of in the outside of the complex.  And where I came down, that guard house is still outside of the bearing of the complex, if you will.

Q.   But how far away in feet?

A.   Oh, feet, 50, 60, 70 feet, something like that.

Q.   Okay.  So when you -- you said that you went back and you had a conversation with somebody about getting someone fired; am I right?

A.   I didn't get them fired.  When I asked, she said he had been fired.

Q.   And who did you speak?

A.   The security guard.  I forget the lady's name.  Maybe it was Ms. Berta.  I don't remember.  She was an older black lady.

P5RACom5                        Clark - Cross

She was super sweet and she was sort of the boss of the security.

Q.  And do we know a full name for her?

A.  I do not.

Q.  But you knew -- you said something Berta?

A.  I think it was Ms. Roberta.  But I could -- don't quote me on Ms. Roberta, but it was Ms. something.

Q.  You don't know her name?

A.  No.

Q.  Now, and you drove over to Cudi's house, correct?

A.  Yes, sir.

Q.  Where you have been before, right?

A.  One time, yes.

Q.  And Mr. Combs is in the back of the Escalade behind the driver, right?

A.  Yes, sir.

Q.  And you were next to him in the passenger seat, right?

A.  Yes, sir -- no, I was in the back.  Yeah.  Yeah.

Q.  In the second row passenger seat?

A.  Yes, sir.

Q.  And you said that there was a gun on his lap?

A.  Yes, sir.

Q.  So now -- and you made a phone call on the way, didn't you?

A.  Not on the way.

Q.  No?

P5RACom5                          Clark - Cross

A.  No, sir.

Q.  You get there?

A.  Yes, sir.

Q.  And what happens when you get there?

A.  I don't do anything until he is out of my vantage point.
He's in that house.

        MR. AGNIFILO:  So before we get to the house, can we
pull up Government's Exhibit -- one second.  The front of
Cudi's house.  Give us one second.

        There it is.  BC-102.  It's already in evidence.

Q.  This is where the car pulled up, right?

A.  Yes, sir.

Q.  And where was the Escalade in relation to this door?

A.  My door, my back passenger door is literally truncated to
this door.  So I'm sitting sort of in that walkway.  We're
parallel to the curb.  We're facing up the hill, not down the
hill.

Q.  Okay.  So this street is a hill going up from right to
left, right, the way the photo looks?

A.  Yeah.  The way the photo looks.

Q.  It goes up a hill?

A.  Yes, sir.

Q.  And this door when you got there was closed, or was it
open?

A.  It was closed when we got there.

P5RACom5                        Clark - Cross

Q.  Okay.  How did he get through it?  Not you.  How did anyone get through it?

A.  I wasn't paying attention to how they did anything.  I was so busy waiting for my chance to use the phone.

Q.  All right.  So they -- you saw -- it was Rube you're saying and Mr. Combs, right?

A.  Yes, sir.

Q.  You saw them go through this door?

A.  Yes, sir.

Q.  Okay.  Did it seem like anyone had a key?

A.  No.

Q.  Did it seem like they pulled the door hard and it opened?  Like what did you see that allowed them to get through the door?

A.  They were -- whatever they were doing, their backs were to me.  I don't know, but I was really not engaged in how they were getting in.  I was very -- waiting for them to get away from me so I could use the phone.

Q.  But wouldn't you be watching them to see if they're actually going to be getting away from you?  I mean, the key thing here is if they don't get through this door this ends right here.

         MS. STEINER:  Objection.

         MR. AGNIFILO:  Let me ask a different question.

         THE COURT:  All right.

Q.  Why wouldn't you be staring right at the door to see if
they can get through in the door?

MS. STEINER:  Objection.  Argumentative.

THE COURT:  Rephrase.

Q.  Were you looking at the door to see if they could get
through the door?

A.  I was looking at their backs.

Q.  Okay.  As you're looking at their backs, what -- on the
other side of them is this door, right?

MS. STEINER:  Objection.

THE COURT:  Overruled.

A.  Yes.  But I would say at that point I was sort of kind of
not really paying attention.  I was so in my head trying to
think the next step.  And I was praying that Cudi wasn't inside
there.

Q.  Okay.  So what you're telling us is you haven't the vaguest
idea how they got through this door; is that about right?

MS. STEINER:  Objection.  Argumentative.

THE COURT:  Overruled.

Q.  Right?

A.  I don't.

Q.  You don't know?

A.  I don't.

Q.  At some point they're through the door you're telling us,
right?

A. Yes, sir.

Q. And you're saying that they left this door open?

A. Yes, sir.

Q. Okay. And you're saying that through this door -- tell us exactly what part of the house you could see into through this door?

A. I could see the front door. And maybe like the immediate vestibule of his house. I think it was glass behind the main house door. So I could sort of see whatever was behind that glass and sort of into his entryway. But no further.

Q. And so you're now looking through this door, which you're saying is open. Looking into the house in through the front door of the house which you're saying is open, right?

A. Well, once I -- once they were in and I looked up, yeah.

Q. Okay. And then you said you made a phone call, right?

A. Yes.

Q. Okay. And you're saying that you called Cassie's burner phone?

A. Yes.

Q. Now, do you know, only if you know, if Cassie had two different hotel rooms that night?

A. I do not know. She had the room at The Cipriani, and then Scott had taken her to Sunset Marquis, so I guess that would make two.

Q. Do you know if her burner phone was at the other hotel

P5RACom5                          Clark - Cross

room?

A.   I do not know where the burner phone was, sir.

Q.   Okay.  But you're telling us you called that burner phone;
that's what you're telling us?

A.   Yes, sir.

Q.   And you're clear as a bell that you called the burner
phone, not the other phone, right?

A.   Yes.

Q.   And you are telling us -- so let me ask you a question.
Could you tell from your side of the call if Cassie was on a --
on the phone with speaker with Scott Mescudi present with her
when you called?

A.   Yes.

Q.   So it was a speakerphone?

A.   Yes.  Because I could hear like closings and -- more so
than I should be able to.

Q.   And you're telling this jury that you 100 percent said the
word gun --

A.   Yes.

Q.   Hold on.

        To Mr. Mescudi and Ms. Ventura on that phone call,
right?

A.   Yes.  Yes.

Q.   No doubt in your mind?

A.   No doubt in my mind.

Q.  You said gun.  You said Combs has a gun, right?

A.  Yes.

Q.  100 percent?

        MS. STEINER:  Objection.

        THE COURT:  Let's keep it going.

Q.  100 percent?

        MS. STEINER:  Objection.

        THE COURT:  Understood.  Are we going to ask that again or can we move on?

        MR. AGNIFILO:  I think 100 percent is all there is.

        THE COURT:  All right.

Q.  What exactly did you say about the gun?

A.  I said -- I said it very quickly.  I said Puff came to my house with a gun, we came to Cudi's house to kill him, he's in there right now.  And then I heard:  They're in my house?

Q.  Okay.  So you said it quickly?

A.  I said it very quickly.  I didn't want him to see me on the phone.

Q.  So, so but wait a minute.  You would absolutely want it to be crystal clear to Cassie and Cudi that Combs had a gun?

        MS. STEINER:  Objection.

        MR. AGNIFILO:  I'm asking about the quickly part.

        THE COURT:  There's an objection.  Just hang on for a second.

        MR. AGNIFILO:  Yep.

THE COURT:  And then I'll rule on the objection.

Overruled.  Proceed.

Q.  So when I asked you quite a few times about the gun, you said you said it quickly?

A.  Yes.

Q.  My question now --

A.  I had to talk fast.

Q.  My question now is:  You would want to make absolutely clear that Combs had a gun, right?

A.  It wasn't about being clear.  I was furious at her now, and I was like what the hell.  And I'm letting her know as fast as I can without him knowing I'm on the phone what the hell is going on with me.

Q.  I'm asking about the gun part.

A.  I said yes.  I said he came to my house with a gun and took me to Cudi's house and we're here to kill him, sir.

Q.  Okay.  Now, when you said gun.

A.  Yes.

Q.  To them, did anyone say anything back?  A gun, he has a gun, was there any acknowledgment on their part of the fact that you said gun?

A.  No.  I heard:  He's in my house?

Q.  Okay.  But you clearly -- you said gun clearly, right?

A.  Yes.

Q.  Because that's very important it's very important that you

P5RACom5                          Clark - Cross

convey that fact, right?

MS. STEINER:  Objection.

THE COURT:  Overruled.

Q.  Right?

A.  Yes.

Q.  Now, when you were on -- when you called Cudi and Cassie, were you on a three-way call with Lauren London?

A.  No.

Q.  Do you remember telling the government that you were?

A.  I was on a call with her earlier before that call.

Q.  All right.  So let's stop right there for a second.  That's not my question.

Do you remember telling the government that when you called Cudi and Cassie, you were on a three-way call with Lauren London?

A.  That's incorrect.

Q.  That's incorrect.  Okay.

MR. AGNIFILO:  Let's do this.  Let's go to 3509-44, page four just for the witness and the parties.  It's maybe halfway, between halfway and a third from the bottom.

Q.  Here's my question.  Do you remember telling anybody, Lauren London, who had Cassie and Cudi on three way the whole time, that Cap was being forced to --

MS. STEINER:  Objection.

THE COURT:  That's sustained.

P5RACom5                          Clark - Cross

Q.  Do you remember telling anyone that?

THE COURT:  Hold on.  Do you want the witness to read what's on the page?

MR. AGNIFILO:  I'm sorry, Judge, yes.  Read it to yourself first.

THE COURT:  Ms. Clark, read it to yourself first and when you're ready, just let us know and we'll take it down.

Q.  Okay.  So my question is:  Did you say to anyone that Lauren London was on a three-way call the whole time that you were being taken to this place?

A.  She was on the phone, but not the whole time.

Q.  Was she on the phone at the same time?

A.  No.

Q.  Let me just ask the question.

A.  Okay.  Sorry.

Q.  The same time as Cudi and Cassie?

A.  No.

Q.  Did you tell anyone that she was?

A.  No.

Q.  Okay.  When did you call Lauren London?

A.  Right before I called Cassie.

Q.  Okay.  So let's break this down for a second.  I want to understand this.

You're in front of the house.  Combs has a gun, right?  Combs and his gun and Rube somehow get through that door and

P5RACom5                          Clark - Cross

are now in Cudi's house, right?

A.  Yes.

Q.  You don't know at that moment whether Cudi is there or not, right?

A.  I don't.

Q.  So you call Lauren London?

A.  Yep.

Q.  Tell us why you did that?

A.  She was the only one that was sort of in our orbit as it related to me and Cassie.  And she was like my sister at the time.  And I just wanted somebody to know where I was if -- if he was in that house and that he did get killed.  I didn't know -- I just needed somebody to know where I was in case that all went really bad.  So I called her for my protection.  I just needed somebody to be aware.

Q.  So tell us exactly what you said to Lauren London?

A.  Just like, Lauren, I'm at Cudi's house.  Puff brought me up here, and I want to run but I'm scared of the mountain lions.

Q.  Scared of the mountain lions?

A.  Yeah.  It was early.  If you're familiar with the Hollywood Hills, there's mountain lions and coyotes.

Q.  Okay.

A.  I was just scared.

Q.  Okay.

A.  And I just needed to talk to somebody to get my head on

P5RACom5                         Clark - Cross

straight.  It was so early in the morning.

Q.  Yeah.  How early was it?

A.  By now it's got to be like 6:15 maybe.

Q.  Did you wake Lauren London up?

A.  I don't remember her status.

Q.  Okay.  And how long did you talk to Lauren London?

A.  Seconds, maybe 30 seconds.  It was fast.  I had to get off the phone because Puff kept popping out to the walkway and in the courtyard.

Q.  So you didn't think Lauren London could do anything to save Cudi, right?

A.  It wasn't about saving Cudi.

Q.  So after you called Lauren London, then how much time passed between calling Lauren London and calling Cassie and Cudi?

A.  Hung up, Puff came back out.  That's when he asked me who I was speaking to.  So it was just before that if that makes sense, you know.  So he came out a couple times.  I called Lauren.  He went back in.  And then maybe, maybe, maybe Lauren was on the phone then.  Maybe Lauren was on the phone --

Q.  Okay.

A.  -- to hear that.

Q.  Tell us.  Go ahead.

A.  No, I don't -- I'm just like, it's such a long time ago.

Q.  Yeah.

P5RACom5                          Clark - Cross

A.   And maybe she was on the phone hearing that.  I really don't remember.  But I do remember making a phone call to Lauren and I do remember making a phone call to Cassie.

Q.   So when you say maybe she was on the phone, you're saying maybe Lauren London was on the phone with you and Cassie and Cudi?

A.   Not Cudi.

Q.   All right.  So I asked you Cassie was on a speakerphone; you said yes, right?

A.   Yes.

Q.   So when you say maybe Lauren was on the phone, you mean that Lauren maybe was on the phone with you and Cassie, right?

A.   With me and Cassie, yes.

Q.   That's possible, right?

A.   It's possible.

Q.   Are you aware that Lauren London and Combs were friends for years after this?

A.   I am.

Q.   You are, right?  They're still friends.  I mean, not at the moment, but they were friends until a couple years ago, right?

          MS. STEINER:  Objection.

          THE COURT:  Is there a question there?

Q.   Yeah.  You're aware that Sean Combs and Lauren London were friends for years after this; and you said yes, right?

A.   Yes.

Q.   So do you have -- now that we've been through this, do you have a clear recollection or not as to whether Lauren London was on the phone call with you?

A.   I'm thinking now she might have been on the phone before, before Puff came out and made me call Cassie back.  Now that you say it, I'm like -- because then she couldn't have been on the phone when we called back directly.

Q.   Why couldn't she have been on the phone?

A.   Who, Lauren?  Because we called Cassie directly.  You can't do a three way if you're calling a number directly.

Q.   Now, the government asked you these exact question two days ago, right?  Do you remember that?

A.   Possibly, yes.

Q.   Okay.

A.   So many days --

Q.   The government asked you exactly this question.  Was Lauren London on the three-way call with Cassie and -- right?  Do you remember being asked that?

A.   Mm-hmm.

Q.   Okay.  Did you ever mention calling Lauren London before two days ago?

A.   Yes.

Q.   When was that?

A.   Multiple times.

Q.   You said that the first call you made when you were outside

P5RACom5                          Clark - Cross

that house was to Lauren London?

A.  I believe so.  Yeah.

Q.  Yeah?

A.  Yeah.

Q.  Okay.  And you have a clear recollection of calling Lauren London from outside the house?

A.  From outside the house, yes, I do.

Q.  And then you have a clear recollection of making a second call, that second call being to Cassie, right?

A.  Yes.

Q.  So you said that -- how long are they inside the house?

A.  Which time?

Q.  So you said that Combs kept coming back outside, correct?

A.  Yes, sir.

Q.  All right.  Did -- where was Rube while this was happening?

A.  Inside the house.

Q.  And you said that Combs kept coming back outside and checking your phone?

A.  He checked my phone once.

Q.  And then at one point he called Cassie?

A.  Yes.

Q.  Tell us everything about that phone call when he calls Cassie?

A.  He said, bitch, what the fuck is this number.  And we got cut off -- he got -- not we.  But then he stopped because

P5RACom5                           Clark - Cross

that's when we heard the car coming up the hill.  And I don't even know if he hung up or what happened because that conversation ended once Cudi was coming up the hill.

Q.  Okay.  But you're saying from your phone, he called Cassie?

A.  Yes.

Q.  And said what you just said to the jury to Cassie, right?

A.  Yes.

Q.  And then at that point you see the Porsche coming up the hill?

A.  Yes, sir.

Q.  And is it light out at this point?

A.  It was now -- it was glooming before, now it's burning off. So it's about to be sunny.

Q.  Okay.  What time is it?

A.  It's got to be like 6:30, six -- somewhere in there.

Q.  Okay.  6:30?

A.  Give or take, I don't know exacts.

Q.  And you're saying -- and the car that comes up the hill is what?  What car is it?

A.  It's a black Porsche.

Q.  And who's in the Porsche?

A.  Cudi.

Q.  And Cassie or no?

A.  No Cassie.

Q.  Just Cudi?

P5RACom5                            Clark - Cross

A.  Just Cudi.

Q.  And what happens then?

A.  He stops next to us.  Well, next to the Escalade.  Puff and Rube look at him, see if he's going to get out or what's going happen, and he speeds off and they jump in the car and we chase him.

Q.  Up the hill?

A.  Up the hill.

Q.  And are you aware of the fact that when you go up the hill, the only way to kind of get back down to the main roads is to come exactly the way you came?

A.  That's not true.

        MR. AGNIFILO:  Can we mark this for the witness as Defense Exhibit 957.

Q.  Is this a map of area around 8925 Hollywood Hills Road?

A.  Yes.

        THE COURT:  Your Honor, we offer it.

        MS. STEINER:  No objection.

        THE COURT:  Exhibit 957 will be admitted.

        (Defendant's Exhibit 957 received in evidence)

Q.  So let me make sure that I have this right.  So here the red little thing there, that's 8925 Hollywood Hills Road.  That's Cudi's house, right?

A.  Yes, sir.

Q.  Now, up the hill is -- and going to the bottom left as we

P5RACom5                        Clark - Cross

look at this map, correct?

A.  Up the hill is going to the bottom left...

Q.  So when you pulled up -- let me ask you this.  When you pulled up in front of the house, you said the driver side door was up against the curb, right?  Front of where the door is, right?

A.  Yes, sir.

Q.  So the car was facing in the direction of going kind of like to the bottom left, correct, in this map?

A.  Yes.

Q.  Okay.  So when the Porsche came up, the Porsche came up and passed the Escalade on the left?

A.  Can you -- can you show me where Mulholland is?  I don't have my bearings on this map.

Q.  So you see Wonderland Park Avenue; does that help you?

A.  Skyline helps me.  Because what I believe is he turned onto Skyline, and then we went the other way.  Skyline is the way out.

Q.  All right.  All right.  So let me just -- this part, in terms of the map, as you see, if you go up the hill, there are all these different ways you can go, but they all seem to be dead ends; do you see that?

A.  But they're not.

Q.  Do you know something we don't?

A.  I mean, you can ask somebody that is a technical person,

P5RACom5                        Clark - Cross

but Skyline, if you go from Hollywood Hills Road to Skyline, you can get yourself back to Mulholland, and then you can get yourself back to Laurel Canyon, and you can go towards Beverly Hills on Mulholland or go back down Laurel Canyon.

MR. AGNIFILO:  All right.  Let's get rid of the map.

Q.  So tell us about the chase.  You said it seemed like an entire lifetime, but it was about a minute?

A.  Or less.  It wasn't very long.

Q.  Porsche goes up the hill, right?  Escalade goes up the hill chasing the Porsche, right?

A.  Yes, sir.

Q.  And then what happens?

A.  He loses us.  We turn away.

Q.  And when you come back down the hill, you see a police officer?

A.  We hear the sirens and then we see the police officers.

Q.  Where do you see the car?

A.  Which car?

Q.  The police car?

A.  They pass -- they're passing us on Laurel Canyon.  We made our way back to Laurel Canyon.

Q.  Now -- and where do you then go in the Escalade?

A.  We go down Sunset.

Q.  Yeah.

A.  West to the Key Club.

P5RACom5                         Clark - Cross

Q.   And what's the Key Club?

A.   Key Club is like our old school nightclub that is -- it's been there since the 70s, 80s, and it's always just reinvented as something else.

Q.   And you guys all get out of the car?

A.   No.

Q.   What happens at the Key Club?

A.   He gets out and has me call Cassie.

Q.   So you call Cassie from the Key Club, and do you speak to Cassie?

A.   Yes.

Q.   All right.  Where is Cassie at this point?

A.   The Sunset Marquis.

Q.   And is she with Cudi?  Can you tell from the call?

A.   I can't tell because I asked -- I just say what he says and she says come get me, so there was not that much discussion.

Q.   And how long was Mr. Combs inside the Key Club?

A.   He didn't go inside the Key Club.  We just stopped there to park.

Q.   Okay.

A.   And just to stop.  Because service is tricky.  Once you are in the Hollywood Hills, Sunset is where you get it back.  And if we were to approach his house, we would have lost service again going up towards Benedict Canyon.

Q.   So you speak to Cassie, and what do you do then?

P5RACom5                          Clark - Cross

A.   Then after she says come get me, we hang up and then we go back to Mr. Combs' house.

Q.   And then you get a different vehicle, right?

A.   Yes, sir.

Q.   All right.  Which vehicle do you get?

A.   It's like Puff's staff vehicle.  It's like an old, janky SUV.  Nothing special.  It's something that he might have driven what he wanted to just go get some burgers by himself.

Q.   And where did you go to get Cassie?

A.   I went to the Sunset Marquis.

Q.   And was she there alone?

A.   She came out to the car.  I don't know who she was with, what she was -- you know.

Q.   She comes out to the car.  Where do you go then?

A.   We go to Cudi's house.

Q.   And is Cudi there?

A.   Yes.

Q.   And do you go inside?

A.   Yes.

Q.   Okay.  How long are you inside Cudi's house?

A.   Two, two and a half hours, something like that.

Q.   Are there any police there?

A.   There were ADT.  There was a security guard.  I might have seen a police car leaving when I got there.  But the ADT and the Kanye West security guard was in the house, yes.

P5RACom5                        Clark - Cross

Q.  You said you might have seen a police car?

A.  Leaving, like, you know, wrapping up based on the times.
He wasn't there in the house when I got there, no.

Q.  Where was the police car when you got back to Cudi's house?

A.  It wasn't at the vehicle.  I might have seen a car on the
Canyon.  A police car on the Canyon, but it was not lit up or
anything.

Q.  Okay.  You didn't try to stop the police car and just say
I've just been kidnapped, right?

A.  No, sir.

Q.  You get back to Cudi's house, and by this point the police
have already been to Cudi's house; do you understand that?

A.  I don't know what -- I don't know what's going on as I've
been at Puff's house, and then I went to get Cassie.  So I
don't really know the reality of what's going on at Cudi's
house, sir.

            (Continued on next page)

P5RsCOM6                        Clark - Cross

BY MR. AGNIFILO:

Q.  All right.  You're in Cudi's house and then you leave Cudi's house and go where?

A.  We go back to Puff's house.

Q.  You and Cassie?

A.  Yes, sir.

Q.  And you go inside the house, right?

A.  We go into the entryway.

Q.  OK.  So it's you and Cassie are inside Puff's house, Mr. Combs' house, at this point?

A.  Yes, sir.

Q.  OK.  And you're saying that you then witness Mr. Combs kicking Cassie many, many times, not just inside the house, but outside the house, and even by the street where she's in fetal position?

A.  Yes, sir.

Q.  And you're sure about this, right?

A.  Yes.

Q.  And so you're absolutely positive that you saw Mr. Combs kicking Cassie and Cassie was in fetal position in the street?

A.  Yes, sir.

Q.  No doubt in your mind?

A.  No doubt.

Q.  Now, at one point you get a call from a fire investigator, right?

P5RsCOM6                           Clark - Cross

A.   Yes, sir.

Q.   When was that?

A.   That was after I was fired.

Q.   OK.  So it's in the summer?

A.   Yes, sir.

Q.   Summer of 2012?

A.   Yes, sir.

Q.   OK.  And the fire investigator wanted to talk to you?

A.   Yes.

Q.   About what happened at Kid Cudi's car, right?

A.   Yes.

Q.   And you didn't want to speak to the fire investigator?

A.   I did not want to be involved with any of this any longer.

Q.   So did you tell that to the fire investigator?

A.   I hung up the phone, sir.

Q.   So when a fire investigator is trying to get in touch with you to solve a crime, that's what you understood he was doing?

A.   Yes, sir.

Q.   He's trying to solve an arson?

A.   Yes, sir.

Q.   And you don't speak to the fire investigator?

A.   I do not.

Q.   You don't give the fire investigator the courtesy of saying I would rather not speak to you?

A.   Yes, sir.

Q.  You just hang up the phone on him?

A.  Yes, sir.

Q.  And you never call him back?

A.  No, sir.

Q.  And you're never interviewed by the fire investigate?

A.  No, sir.

Q.  And you're never interviewed by police?

A.  No, sir.

Q.  Now, you said that you got terminated in the summer of 2012, correct?

A.  Yes, sir.

Q.  OK.  Where were you?

A.  I was on vacation.

Q.  OK.  Where were you?

A.  South of France, Italy.

Q.  Who did you tell you were going?

A.  Harve Pierre.

Q.  You told him?

A.  Yes, sir.

Q.  And you got fired anyway?

A.  Yes, sir.

Q.  Even though you told him?

A.  Yes, sir.

Q.  Who were you with?

A.  On my vacation?

Q.   Yes.

A.   Rihanna.

Q.   You were upset about being fired, correct?

A.   Yes.

Q.   And you wanted to continue to work with Mr. Combs and the company, correct?

     You didn't want to be fired?

A.   I wanted to continue my career, yes.

Q.   Now, can we show the witness Exhibit 952.

     This is e-mail correspondence between you and another person at Bad Boy.  Do you see that?

A.   Yes, sir.

Q.   I think you mentioned this person on direct examination, Love -- how do you say the last name?

A.   I think it's Whelchel.

Q.   Love Whelchel.

     And this is an e-mail correspondence with that person?

A.   Yes, sir.

     MR. AGNIFILO:  All right.  Your Honor, we offer it?

     MS. STEINER:  No objection.

     THE COURT:  Exhibit 952 will be admitted.

     (Defendant's Exhibit 952 received in evidence)

BY MR. AGNIFILO:

Q.   OK.  All right.  Let's take a look at this.  We'll pull it up.

P5RsCOM6                          Clark - Cross

On the bottom, we see an e-mail from that *BlackBerry.net* address of yours, correct?

A.   Um-hmm, yes.

Q.   All right.  And it writes, record, my boss is Sean Combs and by default, Harve Pierre, are upset I went on vacation and are being petty as usual whenever I have happiness in my life. I have landed here by force.  They made me fly straight from my vacation to New York to tell me how they are stripping me of my work setup/living situation that has been standing for the past two years.

I will tape-record the meeting for any possible legal purposes needed in future.

I will also document this entire process.  I am done being treated this way.  It is beyond reasonable.  Dear lord, make them stop.

That's what you write, correct?

A.   Yes.

Q.   And then Love Whelchel writes you back, Hi, Capricorn. Glad you made it in safely.  Let's plan on meeting at 12 p.m. on Monday.  Best regards, right?

A.   Yes.

Q.   And soon after that, you were terminated, correct?

A.   Yes.

Q.   All right.  And what did you do after being terminated?

Did you get another job?

A.  Yes.

Q.  OK.  Where did you work?

A.  I was hired by Chris Lighty to be 50-cent's day-to-day manager at Primary Wave.

Q.  Even years later you asked Mr. Combs to forgive you, am I right?

A.  Perhaps.  I wanted my life back.

Q.  That's fine.

Let's look at Exhibit 965.  All right.

This is an e-mail from you to Mr. Combs, correct?

A.  Yes.

Q.  It's dated September 30, 2014, right?

A.  Yes.

MR. AGNIFILO:  I ask that it be admitted, Judge.

MS. STEINER:  No objection.

THE COURT:  All right.  This will be admitted.

(Defendant's Exhibit 965 received in evidence)

MR. AGNIFILO:  OK.  Could we just blow up.  There we go.

Q.  All right.  So there's an e-mail on the bottom here, September 29, 2014.

You see that?

A.  Yes, sir.

Q.  It's from you to Mr. Combs, right?

A.  Yes, sir.

P5RsCOM6                          Clark - Cross

Q.  And it's from 2014, so this is now over two years since you had not been working with him, correct?

A.  Yes, sir.

Q.  Are you OK?  Is your mom OK?  Hope all is well.  XX. Right?

A.  Yes, sir.

Q.  And then he writes you back, Yes, we're great.  How are you?  Right?

A.  Yes.

Q.  Then you write him back, Hopefully you'll forgive me soon. It's been long enough.  I feel like you forgave everyone but me.  Anyways, be well.  XX.  Right?

A.  Yes, sir.

Q.  Can we look at 963.

It's an e-mail from yourself to Sean Combs, right?

A.  Yes.

Q.  January 5, 2015.  So it's now 2015, right?

A.  Yes, sir.

MR. AGNIFILO:  We offer it, your Honor.

MS. STEINER:  No objection.

THE COURT:  963 will be admitted.

(Defendant's Exhibit 963 received in evidence)

Q.  Sending you blessings and love for a new year.  Hope I finally see you this year.  XX.  Right?

A.  Yes, sir.

Q.   Let's look at 962.

Next month, it's now February 28.  It's an e-mail from yourself to Mr. Combs, right?

A.   Yes, sir.

MR. AGNIFILO:  And we're just --

We offer it, your Honor.

MS. STEINER:  Your Honor, can I confer with defense briefly?

THE COURT:  Yes, you may.

MS. STEINER:  Thank you.

(Counsel confer)

MR. AGNIFILO:  Your Honor, rather than offering it, I'm just going to read a part to the witness, if that's OK.

THE COURT:  Any objection?

MS. STEINER:  No, your Honor.

THE COURT:  Proceed.

MR. AGNIFILO:  Thank you.

BY MR. AGNIFILO:

Q.   You write to Mr. Combs on February 28, 2015, Hope you are well.  Your grace period to be mad at me is long -- has long exceeded the agreed upon time, man.  LOL.

You write that, right?

A.   Yes, sir.

Q.   OK.  We can take that down.

961.  OK.  This is from you to Mr. Combs, correct?

P5RsCOM6                         Clark - Cross

A.   Looks like it, yes.

          MR. AGNIFILO:  Just give me one second.

          We offer it, your Honor.

          MS. STEINER:  One moment, your Honor.

          No objection.

          THE COURT:  What number is this?

          MR. AGNIFILO:  It is 961.

          THE COURT:  All right.  961 will be admitted.

          (Defendant's Exhibit 961 received in evidence)

BY MR. AGNIFILO:

Q.   Can you do me a favor and just read the second paragraph

there.

          Out loud, if you could.

A.   I'm sorry.

Q.   That's OK.

A.   No, no.  I'm -- I haven't seen these e-mails in such a long

time.

Q.   That's OK.

A.   My hope for this year is you make good on your promise to

get other things and actually be my friend again.  Hopefully

retrospect has taught you that I just minded my own business

and grown people did what they wanted to ... she was clearly

never my real friend cause she didn't clarify that to you.  So

many of your other so-called friends knew things too and you

still fuck with them.  She just musta wanted me, in particular,

gone.  I realized that later.

Q.  Thank you.  I'm sorry.  We can take this down.

Did you think that Cassie wanted you gone?

A.  Pardon me.

Q.  Take your time.  Take your time.  Just take a second.  Take as much time as you need.

A.  Sorry.

Q.  There's nothing to be sorry about.

A.  I felt -- again, I told you, this is so complicated for me. I felt that I was somewhat of a protector for Puff.  And if you could get me away from him, he wouldn't have someone looking after his back that actually was really looking out for him, so -- and that e-mail is me pleading, like, dude, let it go.

Sorry.

Q.  That's all right.  That's OK.  Take all the time you need. There's no rush.

A.  I don't know.  I felt a little bit, um, in retrospect, looking at how everything happened, I was the only one that was gone.  She was still there and things were getting worse.  A lot of the things that I kind of worked really hard to keep on track, to keep professionalism and business as the goal.  So that was how I felt in retrospect.

Q.  So you thought you could protect him?

A.  Not protect him.  My job was to keep it professional and to keep -- move the ball toward the goal, just to be successful

and to inspire people so they know, if they can do this, they can attempt to be great.

(Pause)

THE COURT:  Ms. Clark, is it OK if we go on?

THE WITNESS:  I'm sorry.

THE COURT:  Don't be sorry, please.

Mr. Agnifilo.

MR. AGNIFILO:  You're OK.

THE WITNESS:  I apologize for my language today.

THE COURT:  Do not apologize.

Mr. Agnifilo, when you're ready.

MR. AGNIFILO:  Yes, yes.

BY MR. AGNIFILO:

Q.  You ended up coming back and working with him again, right?

A.  Yes.

Q.  OK.  So tell me if this is right.

From your perspective, he heard you?

A.  Um, I don't think that that was the case.  I think that he did what Cassie wanted and Cassie wanted me back.

Q.  All right.  And can I ask you a question?

A.  Yes, sir.

Q.  Did that hurt, that he would only take you back because that's what Cassie wanted?

A.  Yes, absolutely.  This is my whole life and their shenanigans.  I have no parents.  My son has autism.  He's

P5RsCOM6                          Clark - Cross

nonverbal.  My stakes are higher, sir.

Q.  I understand, and I'm sorry to keep asking questions.

Do you need a minute?

A.  No.  I want to try to make it through.

Q.  OK.

THE COURT:  How much time, Mr. Agnifilo, do you have left?

MR. AGNIFILO:  Can I talk to the government for a second?  I mean...

THE COURT:  We can have a brief sidebar?

MR. AGNIFILO:  Let's have a sidebar.

THE COURT:  All right.

(Continued on next page)

P5RsCOM6                          Clark - Cross

(At the sidebar)

MR. AGNIFILO:  I mean, I do have more.  I don't want -- I would love to get her off the stand.  I don't --

THE COURT:  I don't think it's in anyone's best interest to have the witness have to come back tomorrow.

MR. AGNIFILO:  I know.

THE COURT:  I think the jury will understand if we go a little bit longer.

MR. AGNIFILO:  OK.

THE COURT:  I was just asking so I understand, to do that analysis.

MR. AGNIFILO:  Let me cut some stuff that I can cut.

THE COURT:  Do what you need to do.

I don't think it's a good idea for the witness to go home and come back.  We will stick around and try to get this done.

MR. AGNIFILO:  OK, Judge.  Thank you, Judge.

(Continued on next page)

P5RsCOM6                          Clark - Cross

(In open court)

BY MR. AGNIFILO:

Q.  I'm going to only ask you a few more minutes of questions. OK?

A.  Thank you.

Q.  And then we're going to get you out today.

A.  Thank you, sir.

Q.  No, it's OK.

(Counsel confer)

We'll do this very, very fast.

You did a lot of great work with Cassie in 2016 and 2017, right?

A.  Yes, I think so.

Q.  OK.  You worked really hard, you had good results, right?

A.  I believe so.

Q.  Cassie was -- you thought that she had challenges with addiction, is that fair to say?

A.  Yes, sir.

Q.  OK.  And that really affected her performance, right?

A.  Yes, sir.

Q.  Made it very difficult, at times, for her to see things through in terms of shoots and music, am I right?

A.  Yes, sir.

Q.  But through it all, you worked very hard despite all this, correct?

A.   Yes, sir.

Q.   OK.  I think you said you guys made a movie?

A.   Yes, sir.

Q.   A short film?

A.   Yes, sir.

Q.   Real quick, just tell the jury about that.

A.   It was called *Love or Lose Her*.

Q.   *Love or Lose Her*?

A.   Cassie video, movie, little mini movie.

Q.   All right.  Real quickly, I'll have you look at Defense Exhibit 938, just for you to see.

All right.  Can we make it just a little bit bigger.  I'm going to ask you just a couple questions.

A.   OK, sir.  I mean -- OK, sir.

Q.   Read it over, and then I'll just ask you the questions.

A.   Yes, sir.

Q.   OK.  So you're no longer working for Mr. Combs in November of 2018, right?

A.   No, sir.

Q.   OK.  But, in November of 2018, you're still communicating with him and you're still asking him to forgive you, in essence, is that fair to say?

A.   In essence.

Q.   All right.  Great.  Let's take this down.

Do you remember asking him for a reference letter in

P5RsCOM6                        Clark - Cross

June of 2021?

A.  I do.

Q.  OK.  And he gave it to you, right?

A.  No.

Q.  He didn't?

A.  No, sir.

Q.  Are you sure?  Are you sure?

        Let's look at 950.  Just look at it real quickly.

A.  Yeah, I wrote this.

Q.  You wrote it, but, I mean, the name on the bottom is Sean Diddy Combs, right?

A.  Yes, sir.

Q.  Right?

A.  Yes, sir.

        MR. AGNIFILO:  We offer it, your Honor.

A.  This is from 2012 --

        MR. AGNIFILO:  Hold on.

        Then we have to look at Exhibit 947.  Take this down and look at 947.

Q.  This is from 2021, right?

A.  This is from 2021, this text, right.

Q.  June 21, 2021.

        Am I right that you write, the bottom part here, you're asking for a recommendation letter from Mr. Combs for yourself, correct?

P5RsCOM6                          Clark - Cross

A.  Yes, sir.

Q.  You're saying that's not the letter that I just showed you?

A.  This is not the letter that you just showed me.  That was the recommendation -- what you just showed me was the recommendation that I had to write with the settlement.

Q.  OK.

A.  This is what I was -- I needed his help in June of 2021, so I could take care of my son.

Q.  OK.  And so you reached out to him consistently, right, and -- I'm sorry -- through the year 2018, '19, '20, '21, '22, you wanted him to forgive you, am I right?

A.  I wanted my life back, sir.

Q.  I understand.

     And your life, when you say, I want my life back, you wanted to work with him again?

A.  I wanted to work with the music industry and my core competency.

Q.  I understand.

     And that's why when we all met in April of 2024, just a little over a year ago, you wanted to come back and be his chief of staff, am I right?

A.  Not necessarily.

Q.  Well, not necessarily.

     Isn't that what you asked me?

A.  That's what we talked about.  I didn't ask you, but we did

discuss it.  Yes, we definitely did discuss it.

Q.  Who brought it up, me or you?

A.  I did.

        MR. AGNIFILO:  OK.  Give me one second.

        (Counsel confer)

        I have nothing else.

        Thank you, Judge.

        THE COURT:  All right.  Ms. Steiner.

        MS. STEINER:  Yes, your Honor.

REDIRECT EXAMINATION

BY MS. STEINER:

Q.  Good afternoon, Ms. Clark.

A.  Hi, Ms. Steiner.

Q.  You were just asked a moment ago by Mr. Agnifilo about a
recommendation that you wrote and provided to Mr. Combs.

        Do you recall that?

A.  Yes, sir.

Q.  And why did you provide that to Mr. Combs?

A.  Because it was a stipulation in the settlement agreement in
2012.

Q.  And what was the stipulation in the agreement?

A.  That he would, um, give me a positive recommendation to get
a job.

Q.  And as part of that agreement, what were he and you also
required to do?

A.   Non-disparagement, mutual non-disparagement.

Q.   And as part of that agreement -- and I believe the door was opened on this, your Honor --

THE COURT:  You can ask the question and then we'll see if there is an objection.

MS. STEINER:  Yes, your Honor.

Q.   As part of that agreement, how much was Mr. Combs -- how much, if anything, was Mr. Combs required to pay you?

MR. AGNIFILO:  Objection.

THE COURT:  How is the door opened, just briefly?

MR. AGNIFILO:  Your Honor, can we do it at the sidebar, Judge?

THE COURT:  All right.  Sidebar.

(Continued on next page)

(At the sidebar)

THE COURT:  How was the door opened?

MS. STEINER:  Your Honor, on cross-examination, Mr. Agnifilo asked about one of the key provisions of the termination agreement, which was that Mr. Combs had to provide a recommendation for Ms. Clark.  The recommendation letter that he put up is one that was provided by Ms. Clark to Mr. Combs in connection with that termination agreement and in connection with those settlement negotiations.

THE COURT:  Help me.

MS. STEINER:  Yes.

THE COURT:  Maybe I misheard you.  Mr. Agnifilo put up the recommendation letter --

MS. STEINER:  Correct.

THE COURT:  -- thinking it was from 2021.

Did he mention the settlement agreement, open the line of inquiry into that?

MS. STEINER:  The witness talked about the fact that this was part of the settlement agreement.

THE COURT:  I don't think that Mr. Agnifilo is opening the door.  She was shutting the door on the suggestion that that letter was from 2021.  So if that's the only hook to opening the door on the 2012 settlement agreement terms, then no.

You did, I do believe that it was opened, to the

extent of confirming that the letter of recommendation was, in fact, from 2012 in connection with the settlement agreement, and there was to objection to that line of questioning.

But further than that, unless I'm missing something, I don't see --

MS. STEINER:  I think I didn't fully make our record previously about the significance of this document.  This document, the terms of the settlement agreement were negotiated just a few months after the kidnapping.  And so I think there is a very significant probative value to the fact that Mr. Combs paid half a million dollars to her so close in time to that incident, and given also what the witness has stated.

THE COURT:  No, we're not opening that.

The objection is sustained.

MS. STEINER:  OK.

(Continued on next page)

P5RsCOM6                          Clark - Redirect

(In open court)

THE COURT:  Ms. Steiner, you may proceed.

MS. STEINER:  Thank you, your Honor.

BY MS. STEINER:

Q.  Ms. Clark, you testified a minute ago that you were supposed to receive a recommendation letter, is that correct?

A.  Yes.

Q.  Did Mr. Combs provide you with a recommendation letter?

A.  No.

Q.  And after you left his employment in 2012, you testified on cross-examination that you were offered a job with Chris Lighty, is that correct?

A.  Yes.

Q.  What happened to that job?

A.  He died a day before I was signing my contract.

Q.  Did you start that position?

A.  No.

Q.  Did you continue to seek employment?

A.  I did.

Q.  And tell us about that process?

A.  I made a couple calls.  I got a couple calls.  Jimmy Iovine called me.

Q.  Who is that?

A.  Chairman of Interscope Records.

And he told me to come by and talk about job

opportunities.  When I got there, himself and Larry Jackson, who was senior vice president of Interscope at the time, it wasn't about job opportunities.  They were there to tell me to leave Puff alone and that this wasn't going to end well for me.

MR. AGNIFILO:  I object to all this, Judge.

MS. STEINER:  This is for the state of mind of the witness, your Honor.

THE COURT:  The question was:  Who is that?

The objection is sustained.  The jury should disregard everything except the first sentence of the witness's answer, which was that Mr. Iovine was the chairman of Interscope Records.

Ms. Steiner, you can ask your next question.

MS. STEINER:  Thank you.

BY MS. STEINER:

Q.  Did you have a meeting with Mr. Iovine?

A.  I did.

Q.  What was the outcome of that meeting?

A.  The outcome of that meeting was that -- well, no job, but it was a warning.

Q.  What was the warning?

MR. AGNIFILO:  Objection, Judge.

A.  He told me --

MR. AGNIFILO:  Objection, Judge.

THE COURT:  Hold on.

That's sustained.

Q.  Ms. Clark, did you continue to seek employment through CAA?

A.  I did.

Q.  What's CAA?

A.  CAA is a talent agency.

Q.  And what happened when you went to seek employment at CAA?

A.  Mr. Combs and Andre Harrell followed me around CAA.

Q.  Who is Andre Harrell?

A.  Andre Harrell was a music industry executive and, like, everybody's godfather, pretty groovy guy, ran Uptown Records back in the day and was a confidante, like a father to Puff, Mr. Combs.

Q.  Is your testimony that he and Mr. Combs showed up when you were looking for employment?

A.  Yes.

Q.  And what effect did that have on you?

        MR. AGNIFILO:  Objection, Judge.

        THE COURT:  Hold on.

        That question needs to be rephrased.

        MS. STEINER:  Of course, your Honor.

Q.  Did you have an understanding about why they were there?

A.  To talk me out of pursuing my legal efforts.

Q.  After this process of continuing to seek employment --

        And this is 2012, is that right?

A.  Yes.

Q.   How long were you looking for work?

A.   I was looking for work until I, pretty much, got pregnant.

Q.   In what year was that?

A.   2015.

Q.   Were you able to obtain work?

A.   No.

Q.   Why not?

A.   I was blacklisted.

          MR. AGNIFILO:  Object to the form of the question.
I'm sorry.

          THE COURT:  Sustained.

          The jury should disregard the witness's last answer.

Q.   Ms. Clark, on direct examination and cross-examination, you
testified that in 2012, Mr. Combs kidnapped you, is that
correct?

A.   Yes.

Q.   And that he showed up to your house with a gun, is that
correct?

A.   Yes.

Q.   And that --

          MR. AGNIFILO:  Objection.

          It's all leading, Judge.

Q.   And yet --

          THE COURT:  Hold on.  Hold on.  There's an objection.

          Ms. Steiner, are you just repeating questions from

direct?

Let's get a question.

MS. STEINER:  I can rephrase, your Honor, or turn to a new question.

Q.  And after all this happened, you left your work; you were fired, right?

A.  Yes.

Q.  And were you able to get steady employment in the entertainment industry after you left?

A.  No.

Q.  So where did you turn to find work?

A.  I started consulting.

Q.  Did you return to work for Mr. Combs?

A.  I did.

Q.  Why did you do that?

A.  I wanted to take the opportunity so that other people could see that I was a valuable person and that I wasn't disposable.

Q.  Why did you need Mr. Combs' approval for that?

A.  At this level of business, he hold all the power as it related to me.

Q.  You were also asked many questions on cross-examination about a meeting with defense counsel fairly recently in April 2024.

Do you recall that?

A.  Yes.

P5RsCOM6                          Clark - Redirect

Q.  What do you understand the purpose of that meeting to be?

A.  For me, it was for me to get my life back.

Q.  What do you mean when you say to get your life back?

A.  I've been fighting since 2012 to just be able to not have to deal with drama.  I just want to work and provide for my son.

Q.  And you testified that you discussed employment in that meeting, is that right?

A.  Yes.

Q.  Employment with Mr. Combs?

A.  Yes.

Q.  And that you offered to assist with his business, is that right?

A.  Yes.  It was discussed.  I didn't offer.  It was a topic.

Q.  It was discussed?

A.  Yes.

Q.  Why were you willing to engage in that discussion after everything that had happened to you?

A.  Initially, when I reached out, we initially reached out in December of 2023.  I was upset and I wanted to talk to him because I was very disturbed by Cassie's document.  And I was going to be aggressive with him, because I was maxed out on dealing with this.  She --

Q.  Just to stop you for a minute.  It sounds like you were upset from the document.

What about it made you --

MR. AGNIFILO:  I'm going to object to this, Judge.

THE COURT:  Let's take a few steps back, Ms. Steiner.

MS. STEINER:  OK.

THE COURT:  I think you asked a question.  I don't know that you got an answer that was responsive.

So, Ms. Clark, you're almost done.  That's the good news.

THE WITNESS:  Thank you.

THE COURT:  Just listen to the questions from Ms. Steiner, and then answer them to the best of your ability, and then we'll keep going Ms. Steiner can ask further followup.

Ms. Steiner, let's get a fresh question.

MS. STEINER:  Yes.  I'm going to move on shortly.

BY MS. STEINER:

Q.  Just in this meeting itself, Ms. Clark, when you actually got to the meeting with the attorneys, why were you willing to have a discussion about potential employment with Mr. Combs.

A.  It was a better strategy, given that he had his house just raided and he was under criminal investigation, for him to see me as not a threat.

Q.  Did you think that you would not be a threat if you asked for employment?

A.  I felt like, given what I was -- what I had said directly to him and what I had said publicly, it was obviously not

anything pleasant.  Um, did --

Q.  Let me stop you there.

MR. AGNIFILO:  Your Honor, this is all entirely irrelevant and is going to require a great deal of time to put back together.

THE COURT:  Is that an objection?

MR. AGNIFILO:  It's an objection.

THE COURT:  All right.  Overruled.

BY MS. STEINER:

Q.  I just have a couple more questions for you, Ms. Clark.

You were asked on cross-examination many questions about the December 2011 kidnapping.

Do you recall that?

A.  Yes.

Q.  OK.  And you were asked why you went with Mr. Combs.

Do you remember that?

A.  Yes.

Q.  At each of the steps from getting to your apartment to getting to Mr. Cudi's apartment, was Mr. Combs carrying a gun?

A.  Yes.

Q.  And was that gun visible to you?

A.  Yes.

Q.  And what was -- what, if any, concern did you have if you did not go with him?

A.  That I would be hurt.

Q. You were also asked why you didn't report this incident to the police, including when they were driving right past you.

Why did you not report it to the police?

A. Because he told me that if the police found out it was him, we would all be hurt.

Q. And, finally, Ms. Clark, I just want to ask you a couple questions about your employment for Mr. Combs working with Ms. Ventura in 2016.

You were asked about Mr. Combs' involvement in her career at that time.

Do you recall that?

A. Yes.

Q. And you were asked several questions about his support for her.

Do you recall that?

A. Yes.

Q. You said, at a certain point, it fell away.

What did you mean by that?

A. When he would be upset and they would fight, it would be, like, you know, show is over, all bets are over, but it would go back to support. So their fighting led to fluctual -- no, you're not doing that video. OK, you're doing that video. No, you're not doing that photo shoot. OK, you're doing the photo shoot.

Q. Just to clarify --

A.   That's what I mean.

Q.   -- would he withdraw support when they were fighting?

A.   When they were fighting.

Q.   OK.  And you also had testified on direct a bit and asked about it on cross, Mr. Combs' level of involvement in Ms. Ventura's career and the types of things that would have required his approval.

     Do you recall that?

A.   I do.

Q.   And you were shown, for example, on cross-examination a few images of Ms. Ventura, I believe, one in particular.

     Do you recall that?

A.   I do.

Q.   Who was required to approve any of Ms. Ventura's looks for appearances?

A.   Mr. Combs.

Q.   And who was required to approve each of Ms. Ventura's songs?

A.   Mr. Combs.

Q.   And who was required to approve any event that Ms. Ventura went to?

A.   Mr. Combs.

          MS. STEINER:  No further questions, your Honor.

          THE COURT:  All right.  Mr. Agnifilo.

          MR. AGNIFILO:  Very, very fast.

I think I can do this more quickly if I show the witness Defense Exhibit 941.

THE COURT:  Approach.

RECROSS EXAMINATION

BY MR. AGNIFILO:

Q.  Hi.  I'm just going to ask the witness to read to yourself. Read to yourself, the highlighted area.

I'm sorry.  It's 941.

THE COURT:  All right.

MR. AGNIFILO:  You can put it up for the parties.

A.  Yes.

Q.  My question is, that's from 2021, am I right?

A.  Yes, sir.

Q.  OK.  You were working at the time, right?

A.  Yes.

Q.  OK.  But you were asking Mr. Combs to come back and work with him, right?

A.  Does it say that?

Hold on.  I only read the highlighted.

Q.  OK.

A.  I only read the highlighted or --

Q.  It's all right.

THE COURT:  Ms. Clark, take your time.

THE WITNESS:  Read the whole thing?

THE COURT:  Read through.  Read through the text

exchange.

THE WITNESS:  OK.

A.  OK.

Q.  My only question is:  Were you working at that time, in May of 2021?

Were you working?  That's my only question.

A.  Yes.

Q.  OK.  You were.

What were you doing for a living?

A.  I was working as a -- I was a strategy consultant.

Q.  All right.  The prosecutor asked you a bunch of questions about this meeting of April of last year?

A.  Yes, sir.

Q.  Do you remember saying at the meeting that, that Cassie said to you, that if she -- you told Cassie, you have to -- you should move away from him and date other people, right?

A.  Yes.  Yes.

Q.  And she said to you that Jay-Z was taken, who would she date?

A.  True.

Q.  She said that?

A.  She did.

MR. AGNIFILO:  One second.

Nothing else.  Thanks, Judge.

THE COURT:  All right.  Thank you very much.

THE WITNESS:  Thank you, Judge.  I appreciate you. I'm sorry.

THE COURT:  Thank you.

THE WITNESS:  Thank you so much.

I can go?

THE COURT:  You can go.

(Witness excused)

THE COURT:  All right.  Members of the jury, thank you so much.  I know that we're ending later than usual, and I do appreciate your patience.  We'll be back here to start at 9:00, so please try to be here at 8:45.

Again, don't speak to each other about the case.  Do not do any research.  Don't look up anything about the case. Do not reach out to anyone, including the attorneys, either directly or through the internet, about the case.

We'll see you tomorrow.

All rise.

(Continued on next page)

P5RsCOM6                        Clark - Recross

(Jury not present)

THE COURT:  Please be seated.

Ms. Comey, what is the order for tomorrow?

MS. COMEY:  Ms. Slavik.

MS. SLAVIK:  Your Honor, we'll begin with LAPD officer Christopher Ignacio.  Then we'll move to LAFD Arson Investigator, Lance Jiminez.  The next witness we expect to call is Deonte Nash.  Followed by Mia.

THE COURT:  OK.  Do we expect, based on the anticipated length of direct examination, to get to those four witnesses tomorrow?

MS. SLAVIK:  I think we should, your Honor.

THE COURT:  You can only speak for that piece.

MS. SLAVIK:  Of course.  Without being able to anticipate the length of cross, I do think we should be able to get to all four witnesses.

THE COURT:  Any further issues that the government wishes to raise at this time?

MS. SLAVIK:  Not at this moment.

THE COURT:  Mr. Agnifilo.

MR. AGNIFILO:  Nothing from us.

Thank you, Judge.

THE COURT:  All right.  We'll see everyone here likely, well, we'll see everyone here at 8:30.  I'm sure there will be issues.

MR. AGNIFILO:  Your Honor, I'm sorry.  I apologize. I'm so sorry.

Did we ever hear anything about the VTC?  I only ask --

THE COURT:  Thank you for reminding me.

MR. AGNIFILO:  OK.

THE COURT:  The question is, have you heard anything from the Bureau of Prisons.  I'll ask the government the same question.  The letter was submitted.  I inquired and sent your letter to BOP counsel and the people who administer things on that end.  There are some logistical difficulties in terms of timing, especially in the evenings, for VTC access.

The question is, what is the issue and how can we help resolve it?  Because I think there may be a communication disconnect between the defense and the Bureau of Prisons.  I think, from their perspective, there are allowances being made in terms of both time for calls and then the VTC, and so they, perhaps, do not understand the particular issues and the challenges that you're facing.

And I think if they had a better understanding of that, they may be able to address some of those.  To give you an example, in terms of call minutes, I think it was their understanding that calls, legal calls were not held to the minute total.  So I think there's a lack of understanding as to what exactly is being requested.  And then if the request were

clearer, there may be something that they can do.

So that is what I've heard so far, and I'm happy to -- look, I want to make sure that the defense has adequate time to prepare and that Mr. Combs has the ability to speak with his team and participate fully in his defense. I need to bridge that communication divide, and I think you're the person that can help me do that.

That's what I've heard as for now. So what can you tell me now, or is there anything that you can help me with?

MR. AGNIFILO: I'll turn it over to Ms. Geragos, who is better versed in these matters.

MS. GERAGOS: Thank you, your Honor.

I think, first, with respect to VTC, we have been communicating with the Bureau of Prisons' legal office at MDC in order to try to get longer VTC time, because even with the shortened day, ending at around 3:00 to 330, Mr. Combs does not get processed and into the facility until around 5:00, and the VTC time for us for Mr. Combs has cuts off around 5:00, 5:30. So we're not able to meet with him after court through VTC.

So we've been trying to figure out creative ways with MDC legal to make that happen. But neither of us -- we had proposed something. MDC legal said it's not possible. What our letter addressed last week was, perhaps, giving Mr. Combs more phone minutes. Those wouldn't be legal call phone minutes, because legal call phone minutes have to happen with

MDC legal is there, so that would also cut off around 5:30.

So phone minutes, they are segregated -- the filter team segregates those calls that Mr. Combs has with his attorneys on his recorded line, but because he maxes out during these months at 300 minutes a month, that doesn't allow for many phone minutes for him to call us.

So that was our backup option. So we ask --

THE COURT: You asked -- just so I'm understanding it, so I can speak to BOP about this, because of the filtering, you're not concerned about having the calls on this other line, you just need more minutes?

And I think what they did not understand is that connection, that you were trying to make up for the lack of VTC time by, perhaps, increasing the number of minutes on the nonlegal line.

MS. GERAGOS: I think VTC is obviously preferable. We want that for a legal call. However, while we're trying to figure out a creative solution for this, we would ask for more phone minutes on his monitored line, understanding the government is not listening because they are filtering it out.

THE COURT: Let me work on that piece of it.

As to the VTC, I think it's more complicated because of the staffing that is just unavailable and some of the arrangements behind the screens in terms of union issues and other things that make it hard for them to accommodate VTC time

in the evenings.

MS. GERAGOS:  That's what I understand as well.  So what we may be asking the court to do is allow him more SCIF time, perhaps here, until later in the day, and order that the marshals not take him until later.

We are really trying to figure that out.  We understand that the issue there is staffing.  That's why it gets cut off at 5:30 because that's when the MDC legal staff leaves.

THE COURT:  For the time being, let me see if I can work on the minutes issue.  If there is anything further you can figure out on the VTC access and, perhaps, any accommodations we can make in the courthouse, let me know.

MS. GERAGOS:  OK.  Thank you.

THE COURT:  From the government's side, I don't know if you have heard anything about this or have any guidance based on your experience that might be helpful here.

MS. JOHNSON:  Your Honor, at the court's request, we did speak to the Bureau of Prisons.  And I think we heard the same thing that the court and Ms. Geragos has heard about the difficulties with the VTC and the staffing -- pardon me -- the staffing issues.

We didn't speak directly about the minutes because I think I didn't quite understand Ms. Geragos' request.  But if there is anything you would like us to follow up on there,

P5RsCOM6                         Clark - Recross

we're happy to do so.

THE COURT:  I think that's probably -- I'm not saying it's going to happen, but it's probably the easier of the various options.  So we'll work on that.

If there is anything further that I can use help with, I'll let you know.  If there is anything that you find out, please let me know.

MS. JOHNSON:  Of course.

THE COURT:  With that, we'll see everybody tomorrow at 8:30.

(Adjourned to May 28, 2025, at 8:30 a.m.)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

INDEX OF EXAMINATION

Examination of:                              Page

CAPRICORN CLARK

Direct By Ms. Steiner  . . . . . . . . . . . .2523

Cross By Mr. Agnifilo  . . . . . . . . . . . .2627

Redirect By Ms. Steiner  . . . . . . . . . . .2767

Recross By Mr. Agnifilo  . . . . . . . . . . .2781

                GOVERNMENT EXHIBITS

Exhibit No.                              Received

 2B-111     . . . . . . . . . . . . . . . . . . .2529

 2B-112     . . . . . . . . . . . . . . . . . . .2541

 2C-101     . . . . . . . . . . . . . . . . . . .2591

                DEFENDANT EXHIBITS

Exhibit No.                              Received

 946     . . . . . . . . . . . . . . . . . . . .2643

 628     . . . . . . . . . . . . . . . . . . . .2703

 957     . . . . . . . . . . . . . . . . . . . .2744

 952     . . . . . . . . . . . . . . . . . . . .2753

 965     . . . . . . . . . . . . . . . . . . . .2755

 963     . . . . . . . . . . . . . . . . . . . .2756

 961     . . . . . . . . . . . . . . . . . . . .2758