P5SsCOM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

            v.                         24 Cr. 542 (AS)

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

                Defendant.             Trial
------------------------------x
                                       New York, N.Y.
                                       May 28, 2025
                                       8:38 a.m.
Before:

                HON. ARUN SUBRAMANIAN,

                                       District Judge
                                       -and a Jury-

                    APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
     EMILY A. JOHNSON
     MAURENE R. COMEY
     MEREDITH FOSTER
     MITZI STEINER
     MARY C. SLAVIK
     Assistant United States Attorneys

P5SsCOM1

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
     Attorneys for Defendant
BY:  MARC A. AGNIFILO
     TENY R. GERAGOS
     -and-
SHER TREMONTE
BY:  ANNA M. ESTEVAO
     -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
     JASON A. DRISCOLL
     -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND

ALSO PRESENT:
LUCY GAVIN, AUSA Paralegal Specialist
SHANNON BECKER, AUSA Paralegal Specialist
RAYMOND MCLEOD, Defense Paralegal Specialist

P5SsCOM1

(Trial resumed; jury not present)

THE COURT:  First, on the motion to strike Mr. Mescudi's testimony, that motion is denied for the reasons stated in the government's May 28 letter.

Primarily, the two arguments that the court found persuasive were that, first, on cross-examination, the door was opened to the type of testimony that was elicited on redirect examination, and second, to the extent, as the court pointed out yesterday, the question was proper.

So the objection was overruled.  To the extent that the defense believed that the answer elicited was an improper lay opinion, the time to raise that objection would have been contemporaneous with the answer being given.  For the reason that, at that time, if the court could have stricken the testimony and permitted the government to reask the question or rephrase the question to elicit testimony that was not even arguably a lay opinion on the question of whether what was elicited was an improper lay opinion, the court finds persuasive the government's arguments concerning the context in which the testimony was offered and the circumstances surrounding the meeting at the Soho House and the meetings between Mr. Mescudi and Mr. Combs in the immediate timeframe preceding that meeting.

This was an instance in which the testimony, to the extent it could be construed as an opinion, was plainly based

P5SsCOM1

on the circumstances of the meeting and the interactions between Mr. Mescudi and Mr. Combs preceding the view being solicited, including the handshake and the testimony concerning that, that Mr. Mescudi offered without objection concerning the end of that meeting.

So the motion to strike is denied.

As to the prior consistent statement issue, just generally, because there is a lot of primary consistent statements that are being offered here.  What is the response from the government on the fact that the *Caracappa* case, which is the principal authority cited, states in its discussion of the parameters of 801(d)(1)(B) that it is required that the opposing party be permitted an opportunity to cross-examine the declarant on the statements being offered.  That's literally in the statement in *Caracappa* about what the rule requires.

What's the response to that argument which is not addressed in the government's letter?

MS. COMEY:  So, your Honor, with respect to Mr. Nash, I think the answer is that the defense was on notice that Mr. Nash had received statements from Ms. Ventura about the fact that she was having sex with other men, and that she did not want to do so, in 3500 that was produced well before trial. And I think that includes 3500 from March of 2025, and the most recent before Ms. Ventura's testimony was on May 10 of 2025.

I think that those, that 3500 does not purport to

provide a specific transcript.  It does not purport to provide every single word that the witness said, but it certainly put the defense on notice that this witness was likely to testify about conversations that he had with Ms. Ventura about the fact that she was having sex with other men in front of the defendant, that he was recording it, and that she did not want to be doing that.

In particular, they were also on notice that Mr. Nash may testify about similar conversations during Ms. Ventura's 29th birthday.  So they were on notice of all of that and could have cross-examined her about all of those particular statements --

THE COURT:  Let me get this straight.

Having not elicited testimony on direct examination concerning particular statements, meaning, for instance, the statement from Ms. Ventura to Mr. Nash, you're saying on cross-examination the defense should elicit testimony concerning those statements that the government did not get into?

Doesn't that create a strange situation where the cross-examination is forced to address issues that they don't know whether the government is going to get into them or not, which are outside of the scope of direct examination?

MS. COMEY:  So, I don't think so, your Honor.  I think it would have been well within the scope of cross-examination.

P5SsCOM1

During the direct, taking the 29th birthday first, Ms. Ventura on direct examination talked at some length about her 29th birthday, talked about Mr. Combs showing up, talked about how she didn't want to go, told him she did not want to do that on her birthday, talked about, I believe, who was at her birthday.  And I don't understand there to be any requirement in *Caracappa* that we ask specifically, well, did you tell Deonte, did you tell your friends that, other than just asking her what she remembers from her 29th birthday and what she remembers happening.

I don't know if she would have remembered that statement.  I think that with respect to the 29th birthday, the very least is sufficient, combined with the 3500 from Mr. Nash, to put the defense on notice that there is a witness a prior consistent statement.

So, for the 29th birthday, I think that that would be totally appropriate.

THE COURT:  Did Ms. Ventura reference the statements to Mr. Nash?

MS. COMEY:  No, your Honor.

In direct examination, she did not.  I do not think she remembers them.  I Think if she had been asked, do you remember having a conversation with Mr. Nash, I think she would have said no, I don't remember that.

THE COURT:  All right.  So I'm just reading from

P5SsCOM1

*Caracappa.*  So within Rule 801(d)(1)(B), the prior consistent statement need not be proffered through the testimony of the declarant.  This is the line that the government relies on.

MS. COMEY:  Precisely, your Honor.

THE COURT:  Further, where the declarant has already testified and the prior consistent statement is proffered through the testimony of another witness, the rules subject the cross-examination requirement is satisfied if the opposing party is not denied the opportunity to recall the declarant to the stand for cross-examination concerning the statement.

That's the completion of the Second Circuit's articulation of the standard.  You would agree that's not satisfied, right?

MS. COMEY:  I would agree that this witness cannot be recalled to the stand.  I do believe that, again, as I thought we had discussed before with respect to prior consistent statements that we had offered in the past, if the defense was on notice that there was a prior consistent statement that might be offered from another witness, that the opportunity to cross-examine them would be available if they had received that 3500 material before Ms. Ventura's testimony.  I thought we had that discussion.

THE COURT:  We had a discussion with respect to a prior witness that, in that circumstance, neither --

I mean, Ms. Ventura is not subject to recall.

P5SsCOM1

MS. COMEY:  No, she's not.

THE COURT:  In that instance, the 3500 material relating to the statement in question had been produced, like, that day.

MS. COMEY:  Yes, your Honor.

THE COURT:  It was very close in time.

MS. COMEY:  Yes, your Honor.

THE COURT:  With respect to Mr. Nash, the defense says the statements, at least as they are articulated in the government's letter, are not even in the 3500 material.  That's a separate issue.  But I'm not sure, reading *Caracappa*, that it's an independent basis to permit these statements coming in.  And you've read the case.  So they were both those issues that were addressed and they were addressed together, the witness was subject to recall and the statements were revealed in the 3500 material.

So it's hard to tell from *Caracappa* whether it would -- the court would have found it satisfied if Kaplan was not subject to recall.

MS. COMEY:  I understand, your Honor.  I think that this could be short-circuited, though, by the fact that all of statements we have proffered are also admissible to prove Ms. Ventura's state of mind.  If we can focus on that, we don't need to spend more time --

THE COURT:  You're not going to spend more time.

P5SsCOM1

I'm not going to allow these statements to come in under the prior consistent statement rule for the reason that Ms. Ventura can't be recalled.

Let's focus on state of mind.

MS. COMEY:  Thank you, your Honor.

THE COURT:  So, as for state of mind, let me ask the defense, because I don't think this is addressed in the response.  Why wouldn't, at the very least, statements concerning Ms. Ventura's lack of desire to participate in freak-offs not fall within 803(3)?

Put aside whether Mr. Combs was making her do it and that coercion aspect, because I don't know if that falls within state of mind.  But just the statement that Ms. Ventura, did she want to do these?  No, she didn't want to do these.

That would seem to fall right within the rule, which says, a statement of the declarant's then existing state of mind, such as motive, intent, or plan, or emotional sensory or physical condition, such as mental feeling, pain, or bodily health.

So if we cut it off right there, and if the questions were just about whether Ms. Ventura told Mr. Nash that she did not want to participate in a freak-off that was happening right then, then wouldn't that fall within the rule?

Again, put to the side the stuff about Mr. Combs making her do it.  OK.

P5SsCOM1

MR. DONALDSON:  Judge, I still think that it would have to be for its truth because that would be the only reason why it would be relevant for what they are trying to use it for.

THE COURT:  It comes in for the truth if it falls within the exceptions.

MR. DONALDSON:  I don't think it goes to --

I'm sorry.  I don't think it goes directly to her state of mind as much as it goes to what someone else said.  I don't know how Ms. Nash, saying what Cassie told her -- told him about that specific statement, goes towards what Cassie is thinking.  I don't think it goes to that.

THE COURT:  The government is going to ask it that way.  I'm saying, on this view, if we cut it off right there, the questions from the government are going to be very focused on, you know, did Ms. -- I'm just giving an example -- did she say anything about the place she was going, the hotel she was going?  Yes, she did.  All right.  Did she say she wanted to go to that hotel?  No, she said she didn't want to go to the hotel.

Look at that, standing alone.

MR. DONALDSON:  OK.

THE COURT:  Why wouldn't that be state of mind testimony?

MR. DONALDSON:  Did she say that she wanted to go to

P5SsCOM1

the hotel; yes or no?

I guess if it's looking backwards, maybe not.  If she's answering a question about what she is about to do, I don't think that goes towards what she is thinking as much as what her actions are going to be.  I would argue it's not towards her state of mind specifically, but more towards what she is trying to do at that time, not actually what she's thinking about doing.

So I don't think it goes to her state of mind.

THE COURT:  I don't think that that argument is well taken in this context, but now let me turn back to the government.

MS. ESTEVAO:  Can I add one point, your Honor?

THE COURT:  Yes.

MS. ESTEVAO:  I believe this also raises the same issue about our inability to recall Ms. Ventura to ask her questions about her state of mind at the time beyond she may have made this statement to Mr. Nash, if she made it at all, and about the foundational requirements for her state of mind at the time.

And this wasn't raised in the government's direct -- sorry, I'm not sure if I'm making that noise --

THE COURT:  There's some problem with our microphones.  We'll get it fixed.

Please.

P5SsCOM1

MS. ESTEVAO: -- because this wasn't raised in the government's direct. I didn't have an opportunity to question Ms. Ventura about her state of mind at the time and why she may have made certain statements to Mr. Nash. And it may have to do with their relationship and what was going on at the time. There are a whole host of issues that only Ms. Ventura would be able to answer with respect to her state of mind at the time.

THE COURT: True. That is absolutely true.

However, it doesn't matter for purposes of Rule 803(3). It matters for the other rule, which I keep getting the number wrong, 801(d)(1)(B)

MS. ESTEVAO: But at a certain point, there are due process concerns that are raised as a result of this.

THE COURT: Understood.

All right. Now, the government heard my curtailing of the question.

MS. COMEY: I did, your Honor. So I think at this point throughout this trial, your Honor has allowed the defense to put in a wide variety of text messages and e-mails from a wide variety of declarants, including a poem at one point, all for the state of mind of the declarant. Not --

THE COURT: You can put in poems as well, if you would like to.

MS. COMEY: My point is, your Honor, that the court has had a very, very wide --

P5SsCOM1

THE COURT:  That's not convincing to me.

Explain to me -- this is the statement, OK.  The statement, as I understand it from the letter, has two components.  One is that Ms. Ventura did not want to do these things.

MS. COMEY:  The second is that she felt that --

Well, she did not say she felt that.  What she said is he's making me.  I think the statement "he is making me" goes to her state of mind that she feels she has no choice.  It goes to her state of mind that she feels she has to go, that she feels coerced.  It goes directly to the core of the state of mind that we have to prove for Count Two.  It goes to whether or not, in her mind, she felt like she had a choice and whether or not, in her mind, she felt like she could say no and whether or not, in her mind, she felt like she had to go even though she did not want to.  It goes directly to her mind.  Indeed, that's why we would be offering it.  We would not be offering it --

THE COURT:  What's the "it"?

MS. COMEY:  The statement that he's making me go.  He's making -- he's making me freak-off on my birthday.  He's making me go to these hotels.  We are offering it to prove that, in her mind, she felt coerced.  That is the purpose of offering those statements, your Honor.

MR. DONALDSON:  Judge, can I?  Sorry.

P5SsCOM1

THE COURT:  All right.  Fair enough.

Mr. Donaldson.

MR. DONALDSON:  Just one last point, and I understood the court's distinction between Ms. Ventura not being available.  I understand that, which is why we didn't talk about that.

But I think the government is -- the government is going to say what was her state of mind, and that is not what the rule is supposed to be for.  So they are telling the court that they are going to hear what she said and then decide that what her state of mind was, was that she was coerced.  That's not how it works.

As my colleague said earlier, I mean, if Ms. Ventura was able to say what her state of mind was based upon this statement, then fine.  But the government should be able to say, well, he said, I want to make you go, so therefore that must mean she is thinking coercion.

They can't tell the jury what her state of mind is, which is what they are saying they are offering this evidence to do.  They shouldn't be allowed to do that.

THE COURT:  Well, hold on.

What the government is -- all they are doing is just eliciting the statements, so that is all they are doing.  They are just saying that the statements only go to Ms. Ventura's state of mind.  Like, no matter how you slice it, I tried to

P5SsCOM1

slice it, the government says, no matter how you slice it, Ms. Ventura is just saying what she was thinking at the time.

She is saying that she didn't want to do these things and she felt that she was made to. OK. So why wouldn't that go to state of mind, as opposed to some other impermissible purpose?

MR. DONALDSON: I don't think that, unless I'm --

THE COURT: I mean, I suppose -- I suppose the comeback is, well, her state of mind is just that she didn't want to do it and that she felt like she had to. The non-state of mind part of the statement is that it was the defendant who, through various means, if that is what she is going to testify about, made her, compelled her to do it. Because that's not her state of mind, that's actions by the defendant.

MR. DONALDSON: Right.

THE COURT: I don't know if those would come in under those statements.

MS. COMEY: No, your Honor.

All Mr. Nash will say is, He's making me freak-off on my birthday. That's the statement. It's not, He's beating me, he's blackmailing me, he's using these other methods. It's, He's making me freak-off on my birthday. He's making me go to this hotel. And that is reflective of her state of mind that she feels she has no choice. She feels she has to go. And this is the argument that we will make in summation to the jury

P5SsCOM1

from that statement.

THE COURT:  And I guess the point is, like, other than the fact that it's him, as opposed to somebody else, but, of course, it is him because that's, like, that's who she is going to the hotel with.

MS. COMEY:  Yes, your Honor.

THE COURT:  The only actual substance to the statement is the making me.

MS. COMEY:  Exactly, your Honor.

THE COURT:  That goes to her state of mind.

MS. COMEY:  Exactly, your Honor.

THE COURT:  All right.

MS. SHAPIRO:  Your Honor, I'm sorry.  If I can just interject.

I think there is an additional problem here, which is that he's making me go.  That could mean any number of things.  A spouse may say, He's making me to go the Rangers game tonight.  I don't want to go.  I'm doing it to make him happy.

Without Ms. Ventura and the ability to cross-examine her about what she meant when she was doing it, whether she said that because she didn't want to do freak-offs at all and felt coerced or whether, on the other hand, as the defense has tried to argue and elicit testimony about, she loved Mr. Combs, she wanted to make him happy, and that was the main reason that -- or one of the reasons, at least, that she sometimes

P5SsCOM1

went to freak-offs, even if she made statements like that.

I think the problem here as a point of due process, among other things, is that there is no ability to cross-examine her on what she meant by that.  And it could mean any number of things far short of coercion.

THE COURT:  Well, if you're going back behind the rule to these due process principles, at that point, why wouldn't the government's response be you could have cross-examined Ms. Ventura about all of these things.

I'm looking at the 3500 material that is cited in your letter, and you give an example as to the 29th birthday.  This statement is in there, that Ms. Ventura said that Mr. Combs was trying to ruin her birthday and was mad because she didn't want to freak off on my birthday, which is what I take it the government is going to elicit, that statement.  And so there can't be any issue about not being able to confront Ms. Ventura with these statements because the defense had it and so they had this beforehand.

Now, the different situation with the prior consistent statement rule, the rule imposes certain requirements.  But here, there is no rule-based requirement that the declarant be subject to cross-examination about the statement, and that's the distinction here.

MS. ESTEVAO:  Your Honor, may I?

THE COURT:  We have three people arguing, which is --

P5SsCOM1

MR. DONALDSON:  No, we don't.

THE COURT:  -- which is fine for the moment, but we've got to, kind of, try to streamline these things.

MS. ESTEVAO:  I apologize.

In preparing for Ms. Ventura's cross-examination, the amount of 3500 that was produced was so voluminous, there was no way that we could have fronted every single thing that was produced, that was mentioned in 3500, which was extreme.

So we relied on the government's direct in crafting our cross-examination because that's what the government chose to elicit.  And I don't believe that this statement in particular was on the list of prior consistent statements that the government was seeking to elicit with Ms. Ventura.

THE COURT:  To the extent that that was a real concern that the defense had, that the material was too voluminous and so they did not understand exactly which statements would be raised with particular witnesses, the time to have raised those types of arguments was in advance of trial.

Every day I'm getting these letters about broad-based issues, many of which should have been raised in the motion in limine phase and the court would have addressed it there. Every time an issue was raised prior to trial, we had a conference and we dealt with it and I imposed requirements on the government that I'm sure they were not really happy with in terms of disclosures and everything else.  And we did that to

P5SsCOM1

try to make sure that, when we got to this phase, things were streamlined and there was proper notice, etc.

So if there was any sort of issue along those lines, the proper time to raise it is not after Ms. Ventura has left the stand. Now we have the other witnesses where the 3500 material shows these various issues. It would have been prior to trial, if the defendant had -- if the defense had any issue with going through these materials.

MS. ESTEVAO: Your Honor.

THE COURT: In any event, I'm going to think on the arguments that have been raised relevant to 803(3), and I'll let you know before Mr. Nash testifies on direct, which should happen after the break, right, given where we are?

MS. COMEY: I think, your Honor, he's likely to take the stand around 10:30 or 11:00.

If I may just respond to the due process point?

THE COURT: OK.

MS. COMEY: The points Ms. Shapiro made, I think, are all excellent points of cross-examination of Mr. Nash and for closing argument to the jury. They are not a basis to keep out where a proper foundation is laid, a statement that is offered for state of mind, which is what this is clearly offered for.

Again, it is narrowly directed at Ms. Ventura's state of mind with respect to coercion, which is an essential element of Count Two.

P5SsCOM1

THE COURT:  All right.  We'll have a brief sidebar before Mr. Nash takes the stand so that the government understands what's going to happen here.

For present purposes, I'm going to make a tentative ruling, but I want to just think about it just for a little bit longer, to overrule the objection to those statements.

Now, Ms. Comey, they are all of this nature, right?

MS. COMEY:  Exactly, your Honor.

THE COURT:  There is nothing that falls outside of that?

MS. COMEY:  They will all either be Ms. Ventura -- I think there is three separate vignettes -- and they are all either Ms. Ventura saying, I don't want to go to a hotel or, I don't want to be having sex with other men, and some version of, He's making me.  Like, very, very tight, he's making me.

THE COURT:  Are you putting on Mr. Nash?

MS. COMEY:  I am, your Honor, yes.

THE COURT:  All right.  You're going to have to do that because one of the issues -- it hasn't been that pronounced, but there are sometimes, and it's unavoidable, where witnesses, because they may not appreciate the scope of the question, get outside of that.

MS. COMEY:  I understand, your Honor.

THE COURT:  So I'll trust that you will be monitoring and will try to constrain that.

P5SsCOM1

MS. COMEY:  I will, your Honor.

The way I have asked this question with him in prep has been:  What do you remember her saying?  And every time it has been no more, with respect to what Mr. Combs did, it's just, He's making me.  Nothing more than that.  And with respect to her own state of mind, it's some version of, I don't want to do this.

If I hear him start going astray beyond what he has said to me in the past, I will interrupt him and cut him off, your Honor.

THE COURT:  All right.  What else do we need to address?

Because there's a lot in these letters, and the defense says that because the government's letter came in so late, they didn't address a lot of it.

So what are the other issues that need to be addressed for Mr. Nash?

I think we have Ignacio, Jiminez, and then we will have Mr. Nash.

MS. COMEY:  So, for Mr. Nash, it's Defense Exhibits 1818 and 1820.  There were two texts in each that the government objected to as hearsay.  And there are similar objections to the objections that I raised with respect to a text exchange that the defense sought to put in with respect to Mr. Kaplan, where much of the text exchange is fine and not

P5SsCOM1

hearsay.  There are statements buried within that appear offered to prove the truth.

And I don't know if we have those to pull up or if somebody has a paper copy.

MS. SHAPIRO:  Your Honor, those were addressed in our letter this morning.

THE COURT:  All right.  So this is DX 1818.

MS. COMEY:  Yes, your Honor.  If I can pull up my copy.

Your Honor, if you're on 1818, my concern was the text from Ms. Ventura at the bottom of page one:  About to go out of town for a couple of days.  Getting my stuff together.  And then her next text, Secret trip, LOL.

My reading of those is that the defense is offering them to prove that she was, in fact, going out of town for a couple of days and she was keeping that she was keeping that trip a secret.  That, to me, seems like a statement that's offered for the truth of the matter asserted.

So that would be my objection, your Honor, similar to what I raised with Mr. Kaplan.

THE COURT:  All right.  Putting aside the fact that the expansive view of 803(3) taken by the defense to this exhibit sort of undermines their narrow construction of the rule with respect to the statements being elicited by the government.

P5SsCOM1

What is the government's response on motive, intent, or plan, given that the nature of the conversation seems to indicate that this was a plan of Ms. Ventura's?

And so the defense cites to the text in the rule, as well as certain cases that indicate that statements of future intent and plan may be introduced to prove that the declarant thereafter acted in accordance with the stated intent.

MS. COMEY:  I think that probably gets over the line for about to go out of town, your Honor.  I don't know that it does for secret trip.

THE COURT:  I'm going to overrule the objection to DX 1818.

What about 1820?

MS. COMEY:  1820, the two text messages from Ms. Ventura at the bottom of page two appear to be stating that Mr. Combs is wasted, we both did the same of everything, but he's tripping.  I think that means -- I believe they are offering that to prove that, in fact, Mr. Combs and Ms. Ventura did the same type of drugs and that Mr. Combs had a bad trip. So that appears to be offered for its truth.

Similarly, the two text messages from Ms. Ventura on the next page, I tried to stop him from embarrassing himself, but I can't, appeared to be offered to prove that she, in fact, tried to stop him from embarrassing himself and couldn't.

That would be my objection, your Honor.

P5SsCOM1

THE COURT:  All right.  Why doesn't that, at least with respect to the observations of Mr. Combs being wasted, why doesn't that fall within 803(1) as a statement describing or explaining a condition made while or immediately after the declarant perceived?

MS. COMEY:  The fact that he's wasted might, your Honor.  But the fact that they both did the same of everything, I think, would be offered for its truth and would not fall within that exception.

THE COURT:  If, for instance, we both did the same of everything were redacted so it said, He's wasted, but he's tripping.

MS. COMEY:  Yes, your Honor, I think that would be fine.

THE COURT:  All right.  Is there any issue from the defense with that redaction, or if not, what's the grounds to get in, We both did the same of everything?

MS. SHAPIRO:  I mean, I think it's in the context of the same sentence.  It's fairly incoherent without the context and, in fairness, it ought to be included.  I mean, it's still, you know --

THE COURT:  It's at 4:00 a.m., and the events in question happened in the preceding hours, is that correct?

MS. SHAPIRO:  Well, this is during a freak-off that the government has put in evidence.

P5SsCOM1

THE COURT:  So it's during the freak-off.

MS. SHAPIRO:  Yes, your Honor.

THE COURT:  I'm going to overrule the objection to 1820, even with regard to the statement that we both did the same of everything.  It would seem to fall within the 803(1) exception for a statement describing or explaining an event made immediately after the declarant perceived it.  And, obviously, Ms. Ventura, under those circumstances, had perceived the drug use immediately during the events in question.  For that reason, the objection is overruled.

What else?

MS. SHAPIRO:  Your Honor, just quickly, I'm not going to reargue the Mescudi ruling.  I appreciate the court has made its decision.  I do want to point out, going forward, with respect to the question that was asked, the reason the objection was valid wasn't the form of the question.

I think the problem here -- and that may recur, that's why I'm raising it now -- when the prosecutor asked, What was your understanding?  It was clear that she knew his response was going to be Mr. Combs was lying, which the answer is improper for all the reasons that we explained under the case law.

I think it's inappropriate for the government to frame questions, you know, what was your understanding, in an attempt to make it seem like the form of the question is fine, when

they know that the answer is going to elicit an improper lay opinion.

I would ask the court to at least direct the government to be more careful about that and make sure that they are not just disguising improper -- eliciting improper testimony under the guise of some question that sounds appropriate on its face.

THE COURT:  Well, in this instance, as I noted, even if this were construed to be an opinion, the government's response is that it was rationally based on the witness's perception, given what had just been discussed concerning the meeting.  Not only on direct examination, but also on cross-examination.  It was all about what Mr. Mescudi had seen and the way he perceived Mr. Combs and all of that.

So that was the precursor to the testimony being offered.  That's just on that issue.

MS. SHAPIRO:  Well, your Honor, I mean --

THE COURT:  The larger -- I don't know want to get sidetracked.  I just wanted to address that.

On your larger question, the reason you address this, I agree with you that, you know, in some instances here, the questions that are coming out are, in terms of form, proper. But the defense is aware, because they have the 3500 material, as to what the response is going to be.  And so it puts the defense in a tough spot, where the question may be proper, but

P5SsCOM1

they know that the answer that is going to be elicited may pose various issues.

This has come up from time to time, I agree, but I think the government needs to watch out, going forward, and make sure if they are running into one of these issues, they cabin the questions so we can avoid these issues or head them off at the pass before the answer is given, and then there is a motion to strike or an objection and I have to instruct the jury not to consider the witness's answer.

So I think it's a fair point.

MS. SHAPIRO:  I appreciate that, your Honor.  I do want to flag for the court, because I think the court may have a view of the 3500, that is what we would have hoped it would be.  But, in reality, as a practical matter, it's not, which is that we don't always know what the witness is going to say. And, in fact, often the witnesses say things that are slightly different from the 3500.  So we're not totally present just because we have a lot of 3500 material, so I just want to flag that.

THE COURT:  Make your objections, but I'm watching.

So, to give a good example:  Were you concerned that this was happening?  Yes.  Why were you concerned?  That's, like, a chief example where it is known that the why question is going to open the floodgates to all sorts of potentially improper testimony.

P5SsCOM1

To the extent that that is known, let's try to avoid it.  There are other questions that can be asked that are more focused and that will navigate around any issue where there is an objection and we have to tell the jury to disregard testimony, so...

MS. SHAPIRO:  Thank you, your Honor.

THE COURT:  Let's try to do that moving forward.

Anything further with respect to Mr. Nash?

And, Ms. Johnson, you've been trying to get something...

MS. JOHNSON:  Sorry.  I'm doing that pop-up thing.

I do want to respond to Ms. Shapiro's accusations that the government is purposefully asking questions to elicit improper testimony.

That is certainly not the case.  I don't think that we -- you know, as Ms. Shapiro has noted, witnesses say different things in our preparations with them than they sometimes say.  There is some delta between the 3500 material and what they may say in a courtroom.  We are not -- I did not know exactly how Mr. Mescudi would respond to that question.

So I just want to say that we are absolutely not intentionally eliciting impropr testimony.

THE COURT:  Understood.  Thank you.

Anything further from the government?

MS. COMEY:  Not with respect to Mr. Nash, your Honor,

P5SsCOM1

no.

THE COURT:  All right.  Then the only outstanding issues are with respect to Mia, is that right?  There's various evidentiary issues.

MS. SMYSER:  That's right, your Honor.

THE COURT:  OK.  Is that something we can handle before or after the elongated lunch break?

MS. SMYSER:  Yes.  I don't expect her to take the stand until sometime after lunch.

THE COURT:  Is there any further meeting and conferring necessary?

I'm trying to figure out in my mind whether it's something to handle at the beginning of the lunch break or whether the parties can use the additional time to narrow some of the objections.

MS. SMYSER:  We may be able to speak some.  I don't expect them to be narrowed much.

THE COURT:  OK.  All right.  Very good.

So let's get our jury, and then we'll bring in our next witness.

MS. SLAVIK:  Your Honor, may I take a place at the podium?

THE COURT:  You may.

(Continued on next page)

P5SsCOM1                          Ignacio - Direct

(Jury present)

THE COURT:  Please be seated.  Welcome back, members of the jury.

The government may call its next witness.

MS. SLAVIK:  The government calls Los Angeles Police Officer Christopher Ignacio.

THE DEPUTY CLERK:  Just remain standing for a moment and raise your right hand.

CHRIS IGNACIO,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

You may be seated.  Can I ask you to just please give the court your first and last name and spell your first and last name into that microphone.

THE WITNESS:  It's Chris Ignacio.  C-h-r-i-s. I-g-n-a-c-i-o.

MS. SLAVIK:  May I inquire, your Honor?

THE COURT:  You may.

DIRECT EXAMINATION

BY MS. SLAVIK:

Q.  Good morning, Officer Ignacio.

A.  Good morning.

Q.  Are you employed?

A.  Yes, I am.

Q.  What do you do?

P5SsCOM1                    Ignacio - Direct

A.  I am a police officer for the Los Angeles Police Department.

Q.  Is that also known as the LAPD?

A.  Yes.

Q.  How long have you been an LAPD police officer?

A.  For approximately a little over 16 years.

Q.  What is your current title?

A.  Police officer two.

Q.  How long have you held that title?

A.  For approximately 15 years.

Q.  What was your title before you became a police officer two?

A.  It's a police officer one, which is a probationary officer.

Q.  And how long did you hold that title?

A.  About a year.

Q.  Focusing on your role as a police officer two, what are your responsibilities?

A.  My responsibilities are to protect lives and property, respond to various radio calls, including non-emergency and emergency calls, make arrests, complete reports, interview witnesses and victims, and gather evidence, book evidence, and also sometimes testify in court.

Q.  You mentioned that one of your responsibilities is responding to radio calls.

        Can you just explain to the jury what a radio call is?

A.  So a radio call is when someone calls 911, it goes into --

P5SsCOM1                          Ignacio - Direct

comes into a dispatch center, like, communications.  The

dispatcher takes the information and decides what type of radio

call, what type of call would be, like, a robbery, a burglary,

or a traffic collision.  And then from there, it's sent to the

next available or near the unit available or near.

Q.  In other words, dispatch receives radio calls and then

assigns out jobs to police officers who are on duty?

A.  Yes, that's correct.

Q.  Officer Ignacio, are you currently assigned to a particular

division?

A.  Yeah.  At the moment I'm assigned to officer operations,

CSOC, which stands for Community Safety Operations Center.

Q.  Focusing on the December 2011 time period, did you have a

particular assignment at that time?

A.  Yes.  I was working Hollywood division patrol.

Q.  And can you explain to the jury what the Hollywood division

is?

A.  So, Hollywood division is just a geographical area in the

city of Los Angeles.  It's -- I don't know exactly how many

square miles it is.  It's from Western Avenue all the way to

West Hollywood to Mulholland Drive, down to Santa Mon- --

Melrose Avenue.

Q.  You said that your assignment was patrol, is that right?

A.  That's correct.

Q.  What does patrol mean?

P5SsCOM1                          Ignacio - Direct

A.  Patrol is the uniformed personnel that is assigned to that particular geographical area, and they are assigned to for visible presence and to respond to calls for service.

Q.  Generally speaking, what did your day-to-day look like as a patrol officer in the Hollywood division?

A.  So day to day would be, we would show up to work, get dressed in our police uniform and gear, respond to radio -- respond to roll call, which is a short briefing, we would get our assignments, go downstairs to the room, retrieve our keys to our police vehicles, and then immediately respond and patrol the areas.

Q.  I want to focus your attention on December 22, 2011.

Were you working that day?

A.  Yes, I was.

Q.  What was your shift that day?

A.  It was day watch, which is the hours of six a.m. to six p.m.

Q.  Were you working with a partner that day?

A.  Yes, I was.

Q.  Were you uniformed?

A.  Yes.

Q.  And were you patrolling in a vehicle or on foot?

A.  In a marked police vehicle.

Q.  Did you receive any calls from dispatch during that shift?

A.  Yes, I did.

P5SsCOM1                    Ignacio - Direct

Q.  What do you remember about the calls from dispatch that day?

A.  That day, I did receive a call at approximately 820 hours of a possible burglary, suspects there now, at 8925 Hollywood Hills Road.

Q.  You received this call at approximately 8:20 in the morning, is that right?

A.  That's correct.

Q.  What, if any, details were provided by dispatch when you received this call?

A.  At the time, what I remember is it just came out as a possible suspect is there now.

Q.  What was the location of the scene?

A.  8925 Hollywood Hills Road.

Q.  Did you respond to this call?

A.  Yes, I did.

Q.  Why?

A.  It was assigned to us and it was a private...

Q.  By us, you mean you and your partner, is that right?

A.  That's correct.

Q.  How did you and your partner respond?

A.  We responded code three, which is immediately with lights and sirens.

Q.  Where did you go with the lights and sirens?

A.  To 8925 Hollywood Hills Road.

P5SsCOM1                          Ignacio - Direct

Q.  Is that address business or residential?

A.  It's a residential.

MS. SLAVIK:  Ms. Foster, could you please pull up what's -- excuse me.

Ms. Foster, could you pull up for the witness and the parties what's been marked for identification as Government Exhibit 8C-101.

Q.  Officer Ignacio, do you recognize what's depicted in this photo?

A.  Yes, I do.

Q.  What is it?

A.  It's the front gate and wall of the residence at 8925 Hollywood Hills Road.

Q.  Is there a fair and accurate depiction of the residence at 809025 Hollywood Hills Road?

A.  Yes, it is.

MS. SLAVIK:  The government moves to enter Government Exhibit 8C-101 into evidence.

MR. DONALDSON:  No opposition, your Honor.

THE COURT:  8C-101 is admitted.

(Government's Exhibit 8C-101 received in evidence)

MS. SLAVIK:  Ms. Foster, could you please publish 8C-101 side by side with 8C-102 that is already in evidence. Could you publish this for the jury.

BY MS. SLAVIK:

P5SsCOM1                        Ignacio - Direct

Q.  Officer Ignacio, can you explain to the jury what they are looking at here?

A.  So, this is the front wall to the 8925 Hollywood Hills Road, the residence.  So it's the front wall and gate, and behind it is a courtyard, and then there is a house.

Q.  More generally, can you describe the neighborhood where this residence is located?

A.  So this neighborhood is actually situated above the Hollywood Hills -- Hollywood Boulevard and Sunset Boulevard. Typically, to get to this location, you would have to drive through narrow and windy roads.  And it's known for, sometimes, its panoramic views overlooking the metropolitan area.

MS. SLAVIK:  Thank you, Ms. Foster.  You can take this down.

Q.  Officer Ignacio, what, if anything, did you notice as you arrived to the residence?

A.  As we were driving to the residence, I did notice a dark black Cadillac Escalade.

Q.  Where was the Cadillac Escalade going?

A.  It was directly in front of the house and it drove northwest into the hills.

Q.  As you approached the residence?

A.  That's correct.

Q.  Did you observe any passengers in the black Escalade?

A.  No, I did not, but I did observe a license plate.

P5SsCOM1                          Ignacio - Direct

Q.   What prevented you from observing passengers in the black Escalade?

A.   It was had -- it was heavily tinted, like, limo tinted.

Q.   The windows were?

A.   The window, yes.

Q.   And where were you when you observed this black Escalade?

A.   I was in our police vehicle.

Q.   And this was a marked police vehicle you said?

A.   That's correct.

Q.   What did you do after you noticed this black Escalade?

A.   I memorized the plate, the license plate.

Q.   Why did you memorize the plate number?

A.   Um, just in case it may be involved in a crime.

Q.   What made you think it could have been involved in the crime?

A.   It was parked directly in front of the residence and as soon as we arrived, it took off up the hill.

Q.   Did you pull the black Escalade over?

A.   No, I did not.

Q.   Why not?

A.   We didn't have a crime at the time.

Q.   Do you remember the license plate that you noted in your mind?

A.   Yes, I do.

Q.   Can you tell the jury what that license plate was?

P5SsCOM1                          Ignacio - Direct

A.   It's 6LKN013.

Q.   And that was a California plate?

A.   That's correct.

Q.   After you noticed the black Escalade and took note of the license plate number, what did you do next?

A.   We went to the front gate and my partner jumped over the fence and let me in.

Q.   At this point, was anyone else at the residence with you?

A.   Just my partner and I.

Q.   What did you do next after you got into the courtyard?

A.   So we went to the front door and knocked on the door, and then that's when we noticed the door was unlocked.

Q.   How did you discover that the door was unlocked?

A.   We checked the door handle.

Q.   What did you do next?

A.   So we went inside and searched the residence for any suspects or any victims.

Q.   Did you find any individuals, any people in the residence at that time?

A.   No, I did not.

Q.   What, if anything, do you remember seeing inside the residence?

A.   I remember seeing on the table, like, high-end, high-value watches and purses.

Q.   Were these items wrapped?

P5SsCOM1                      Ignacio - Direct

A.   Some of them were and some of them were not.

Q.   Did anything look disturbed from your observations?

A.   No.

Q.   Was the owner of the property present at this time?

A.   Not at the time.

Q.   Did any other law enforcement officers arrive at the residence?

A.   Yes, two detective units showed up.

Q.   Two detective -- excuse me.

     Two detectives you said?

A.   Yes.

Q.   What did you do when those detectives arrived?

A.   We searched the property again to make sure nothing was taken.

Q.   And what happened when you went through the residence again with the detectives?

A.   We just searched the area and just -- just to make sure that there was nobody inside and then make sure nothing was disturbed as well.

Q.   What happened next?

A.   We exited the residence.

Q.   And what, if anything, did you see when you exited the residence?

A.   I saw the same black Cadillac Escalade coming down the hill.

P5SsCOM1                        Ignacio - Direct

Q.   How quickly was the black Escalade driving as it came down the hill?

A.   Down the hill?  I can't be too sure.  Maybe 10, 15 miles.

Q.   Miles per hour?

A.   Per hour.  Sorry.

Q.   How does that compare to when you saw it driving the opposite direction when you first arrived at the residence?

A.   It was probably about the same, but it took off immediately.

Q.   As you arrived at the residence?

A.   That's correct.

Q.   Now, you said that this was the same black Escalade that you saw when you arrived at the residence?

A.   Yes.

Q.   How do you know that it was the same?

A.   I looked at the rear plate, license plate.  It was the same license plate.

Q.   Approximately how much time passed between the first time you saw the black Escalade and the second time that you saw the black Escalade?

A.   I would say about 15 to 20 minutes.

Q.   Did you observe passengers in the black Escalade the second time that you saw it?

A.   I tried to, but it was heavily tinted and I wasn't able to see anybody inside of it.

P5SsCOM1                              Ignacio - Direct

Q.  Did you pull the black Escalade over the second time you
saw it?

A.  No, I did not.

Q.  Why not?

A.  We didn't have a crime at that time.

Q.  Did anyone else arrive at the residence?

A.  Yes, the tenant, Scott Mescudi.

Q.  And how did Mr. Mescudi arrive at the residence?

A.  He arrived in a -- I believe it was a black Porsche.

Q.  A black Porsche you said?

A.  Yes.

Q.  Did you speak with Mr. Mescudi?

A.  I did.

Q.  Did you go through the residence with Mr. Mescudi?

A.  Yes, I do.

Q.  What, if anything, did you conclude with respect to whether
a burglary had taken place?

        MR. STEEL:  Objection, your Honor.

        THE COURT:  Hold on.  That's sustained.

BY MS. SLAVIK:

Q.  Officer Ignacio, what, if any, reports did you complete
with respect to the incident that you responded to?

A.  We completed a trespass report.

Q.  What is a trespass report?

A.  It's basically someone entering someone's land or property

P5SsCOM1                    Ignacio - Direct

without the owner's consent.

Q.  And you took that report immediately after the incident?

A.  That's correct.

Q.  I want to turn back to the black Escalade.

You testified that you saw this Escalade pass the residence twice, is that right?

A.  That's correct.

Q.  What, if anything, did you do after the second time you saw the black Escalade pass the residence?

A.  As soon as it passed, I went into our police vehicle and entered the license plate into our mobile digital computer.

Q.  What information did the mobile computer provide after you ran the plates?

A.  It provided the registered owner.

MS. SLAVIK:  Your Honor, at this time, the government moves to admit Government Exhibit 8B-101.

MR. STEEL:  No objection, sir.

THE COURT:  8B-101 will be admitted.

(Government's Exhibit 8B-101 received in evidence)

MS. SLAVIK:  Ms. Foster, could you please publish 8B-101 for the parties and the jury.

Ms. Foster, can you zoom in on the very stop of this document.

BY MS. SLAVIK:

Q.  Officer Ignacio, can you read the title of this document?

P5SsCOM1                        Ignacio - Direct

A.   DMV vehicle registrations information.

Q.   Thank you.

     MS. SLAVIK:  Ms. Foster, can you zoom in on the line that says LIC.

Q.   Officer Ignacio, do you see the license plate number that you saw on the black Escalade here?

A.   I do.

Q.   What is that license plate number?

A.   It's 6LKN013.

Q.   And that's the same license plate that you saw in the black Escalade that passed the residence twice?

A.   Yes.

     MS. SLAVIK:  Thank you, Ms. Foster.  Could you go down to the line that says prior R/O.

Q.   Officer Ignacio, do you have an understanding as to what R/O means?

A.   It means registered owner.

Q.   And can you read the name of the registered owner?

A.   Bad Boy Productions, Incorporation.

Q.   Can you read the address?

A.   The address is 9374 Beverly Crest Drive in the city of Beverly Hills.

     MS. SLAVIK:  Nothing further, your Honor.

     THE COURT:  All right.  Cross-examination.

P5SsCOM1                      Ignacio - Cross

CROSS-EXAMINATION

BY MR. STEEL:

Q.  Good morning.

A.  Good morning, sir.

Q.  This is 13 and a half years ago, approximately, is that fair to say?

A.  Yes.

Q.  And in order to come to the great City of New York, you prepared yourself for this testimony, is that true?

A.  Yes.

Q.  And the way you prepared yourself was you needed your memory refreshed, is that fair to say?

A.  Yes.

Q.  And the reason why is because you've been a police officer now for a decade and a half or more, right?

A.  Correct.

Q.  And you have done a lot of cases, trying to help people, right?

A.  Yes.

Q.  And some cases stick in your mind, for whatever reason, some cases don't stick in your mind, for whatever reason, is that true?

A.  Yes.

Q.  And this case had no particular value to you until, of course, you were notified you're having to appear in court, is

that fair to say?

A.  Yes.

Q.  And, in fact, in this particular case, the way you worked, you worked with a teammate or a co-officer that morning, is that true?

A.  Yes.

Q.  And that morning, that officer is Officer Snyder.

Do you remember him?

A.  I do.

Q.  And Officer Snyder, just like you're taught and he's taught, actually wrote a report about this incident, is that true?

A.  That's correct.

Q.  And you used that report to, my word would be, refresh your memory, but whatever.

Just to kind of bring this up, whether you remembered it or not, you rely on that report, is that true?

A.  That's correct.

Q.  And that report is something that not only do you do regularly in your course of business, or, in this case, Officer Snyder, but you go to training for that report, right?

A.  Yes.

Q.  And you have to put in that report everything that is to your knowledge at that time important in the case, true?

A.  Yes.

Q.   And it's important because, 13 and a half years later, you may be testifying about it, right?

A.   That's correct.

Q.   And you try to make it clear, true?

A.   Yes.

Q.   And you try to make it understandable, if somebody else has to read it as well, true?

A.   Yes.

Q.   And police reports are an important part of what you do.

I know you listed a lot of things you do to the ladies and gentlemen of the jury.  But the police report is something also important, true?

A.   Yes, it is.

Q.   And people rely on it, even when you're not there, you understand what I'm talking about?

A.   Yes.

Q.   Like defense lawyers, judges, prosecutors, citizens, true?

A.   Yes.

Q.   All right.  Now, this is -- you respond, and it's right before Christmas.

It's December 22, 2011, is that fair to say?

A.   Yes.

Q.   And you arrive at an address, which you announced three times for the jury, but it's 8925 Hollywood Hills Road, true?

A.   That's correct.

P5SsCOM1                    Ignacio - Cross

Q.  And that was your area of where you would travel and report to and assist in that time, is that true?

A.  Yes.

Q.  How long did you patrol, is my word, that area?

A.  For approximately 12 years.

Q.  So I'm assuming that you're pretty familiar with that area?

A.  I am, yes.

Q.  And are you familiar with the roads that lead to and from the 8925 Hollywood Hills Road?

A.  Yes.

        MR. STEEL:  If I showed you --

        Your Honor, I believe this is already in evidence. It's Defendant's Exhibit No. 957.  Could you take a look at --

        I believe it's in evidence, your Honor.  It could be shown to everybody.

BY MR. STEEL:

Q.  If you could look at this and try to tell me and the ladies and gentlemen of the jury whether this accurately depicts the roadway around, you see the 8925 Hollywood Hill Road?

A.  Yes.

Q.  Just take a minute to orient yourself and just tell me whether you feel comfortable that, yes, this depicts the roads in that area of those subdivisions?

A.  Yes, it does.

Q.  All right.  Can you explain to the jury -- they have it on

their screens if you don't see where they sit, so they can see what is marked and admitted as 957, Mr. Combs exhibit.

Is it fair to say from that house, the 8925 Hollywood Hills house, a lot or all of the roads to the bottom or to the south of that area, they are dead-ends, is that true?

MS. SLAVIK:  Your Honor, I would just ask Mr. Steel to refrain from the compound questions.

THE COURT:  Is that an objection?

MS. SLAVIK:  Yes, your Honor.

THE COURT:  All right.  Mr. Steel, could you rephrase the question.

MR. STEEL:  Sure.

BY MR. STEEL:

Q.  Using Exhibit No. 957, is it fair to say that from 8925 Hollywood Hills Road, the home, if you go south or downward on the exhibit, you hit to the left, you hit dead-ends, is that your memory?

A.  According to the photo, it does look like some of them are dead-ends.

Q.  Let's talk about you, because you've driven this area or parts of that area for 12 years, right?

A.  Correct.

Q.  And it's a true statement, it's a beautiful neighborhood, right?

A.  Yes, it is.

P5SsCOM1                    Ignacio - Cross

Q.  A lot of cul-de-sacs, dead-ends, true?

A.  Yes.

Q.  Now I want to go back and just talk about --

        MR. STEEL:  You can take that down if you don't mind, when you get a chance.

Q.  I want to go back, sir.

        Did you need to see that longer?

A.  No, sir.

Q.  If you do, tell us or the court.

A.  Thank you.

Q.  No problem.

        It's 8:20 in the morning.  You get a call for a potential person in someone's house, that's what you told the jury, fair to say?

A.  Yes.

Q.  And that's true, right?

A.  Yes.

Q.  It's recorded in your report or Officer Snyder's report, right?

A.  That's correct.

Q.  So, you really don't know, god forbid, what you're coming into, right?

A.  Yes.

Q.  It could be a home innovation, right, true?

A.  Yes.

P5SsCOM1                    Ignacio - Cross

Q.  It could be a simple trespass, right?

A.  That's correct.

Q.  It could be nothing, it could be, you know, a report that's just not vindictive, but just wrong, right?

A.  Yes.

Q.  So you and your partner are on alert to report, and you put on -- I'm not saying you, you or your partner -- put on what I would call blue lights, true?

A.  Yes.

Q.  And the sirens, right?

A.  That's correct.

Q.  And even though it's 8:20 in the morning, it doesn't matter because this could be a dangerous situation, it may not be a dangerous situation, but you're taking no --

You're going to play it safe, true?

A.  Yes.

Q.  You also want to get there as fast as possible, so you are warning people, we are coming through, the police, right?

A.  Yes.

Q.  And you're in the black-and-white patrol vehicle, so it's clearly marked to a casual observer, true?

A.  Yes, it is, true.

Q.  And when you arrive, you actually see if the government -- or excuse me.

MR. STEEL:  If we could put up, and they are both in

P5SsCOM1                        Ignacio - Cross

evidence now, it's Government Exhibit 8C, as in Colette, 101

and 8C-102.  You can put them next to each other, if that's OK.

Q.  Do you see this on your screen, sir?

A.  Yes, I do.

Q.  Let's wait for the other exhibit.

Now, this is the same exact photograph, but just from a different angle, is that true?

A.  This appears to be.

Q.  I'll just use both.  But if you're focusing on one, just announce it.

When you arrive with your partner, Officer Snyder, there's actually a large car there, right, a black Cadillac Escalade, true?

A.  Yes.

Q.  And you're so observant, and that's what you're trained to do, right?

A.  Yes.

Q.  And you didn't remember the license plate for 13 and a half years, but you refreshed your memory and you were able to tell it off the top of your head today, true?

A.  Yes.

Q.  And when you arrive, you know that you're going to a possible crime at that home, and the car was there.

So you're observant and you focus in and get the license plate, right?

P5SsCOM1                         Ignacio - Cross

A.  Yes.

Q.  But you don't follow the car as it pulls off because you really get a call from a house, and there's only one of you and Officer Snyder, true?

A.  Yes.

Q.  But you record that license plate that the jurors just heard, right?

A.  Yes.

Q.  And the car pulls off.  If doesn't peel wheels or anything, it just drives away as you're pulling up, true?

A.  It drives up the hill, yes.

Q.  OK.  Now, I want you to tell the ladies and gentlemen of the jury, at the time, that you're observant, you're following all this, you're focused, did you see a black Porsche next to or around that black Cadillac Escalade?

A.  I don't remember.

Q.  Well, you would have put it in your report, right?

A.  Possibly.

Q.  OK.  And, I mean, if you saw the black Cadillac and the Porsche interacting in any way, you would have included both vehicles, true?

A.  Yes.

Q.  And you didn't see a car chase at all, did you?

A.  No.

Q.  Because a car chase would have been important to you, as

P5SsCOM1                    Ignacio - Cross

well, right?

A.  Yes.

Q.  If two cars were driving side by side or one car in front of the other or fast, that's something that law enforcement officers like you, an observant gentleman, would have noted, right?

A.  Yes.

Q.  That didn't happen here, right?

A.  No.

Q.  When you get the call to respond to the scene, it's important that you have all the information that you can have, right?

A.  Yes.

Q.  You had no information that there was a gun involved, am I correct?

A.  I don't believe so, no.

Q.  You would have put that in the report, right?

It would have been on the radio, right?

A.  Yes.

Q.  Because you have to know whether you are going into a potential -- anything could be dangerous.  I'm not belittling that.

You have to know as much information so you can properly have your mind set on how you're going to respond, true?

A.  Yes.

Q.  And a firearm is always serious to everybody, true?

A.  Yes.

Q.  OK.  And that's not in your report, right?

A.  No.

Q.  In fact, no one, to your knowledge, told you or Officer Snyder anything about a firearm, true?

A.  True.

Q.  OK.  And you also spoke with, as well as the detectives and Officer Snyder, spoke with the tenant or the homeowner, is that true, later that day?

A.  Yes.

Q.  And the homeowner never mentioned anything about a gun, right?

A.  I don't remember.

Q.  Well, is it in your report; how about that?

A.  It's not.

Q.  OK.  And that's something that is so important that you would have put in the report, true?

A.  Possibly.

Q.  Well, why possibly?

A.  Well, if he would have told us, we probably, most likely, would have put it in the report.

Q.  Of course.  I mean, if a perpetrator is in someone's home with a firearm, you're writing it down in the report, right?

P5SsCOM1                     Ignacio - Cross

A.  Yes.

Q.  Now, did you hear anything about a kidnapping?

A.  No.

Q.  Because a kidnapping is something violent, as well, true?

A.  Yes.

Q.  You know the definition of a kidnapping?

        MS. SLAVIK:  Objection.

        THE COURT:  That's sustained.

Q.  You didn't hear anything about a kidnapping in this matter, did you?

A.  No.

Q.  OK.  Because that would have been important to put in the report, right?

A.  Yes.

Q.  OK.  And I want to ask you, if you don't mind, whether you were ever told that the homeowner was in the house shortly before you and your partner got there?

        MS. SLAVIK:  Objection.

        THE COURT:  It's overruled.

A.  Can you repeat the question?

Q.  Of course.

        Did you have any information from the homeowner --

        You spoke with the homeowner eventually, right?

A.  Yes.

Q.  And let's just put it in sequence.

P5SsCOM1                          Ignacio - Cross

You and your partner get there, the black Cadillac drives off, fair?

A.  Yes.

Q.  OK.  You're observant, you see the black Cadillac's license plate.

You already told that, right?

A.  That's correct.

Q.  You don't see anything about a Porsche, correct?

A.  No.

Q.  You don't see anything about any other car, true?

A.  No.

Q.  And am I right?

A.  Yes.

Q.  And you don't see a car chase at all, right?

A.  No.

Q.  Even when the black Cadillac, later, 10, 15 minutes later drives by, you don't see a car chase or another car, true?

Am I correct?

A.  Yes.

(Continued on next page)

BY MR. STEEL:

Q. Am I correct?

A. Yes.

Q. Now, you and your partner get to the house, your blue lights are on, your siren is on, and you need to enter the home to clear it, true?

A. Yes.

Q. And by clearing it, that means you just have to see -- not only you but the partner and the other officers who arrive -- you have to make sure that it's safe, true?

A. Yes.

Q. Okay. And at that point in time you don't see anybody leaving the house, right?

A. No.

Q. And your partner actually climbs over what we have on the Court's screen. It's either HC, as in Collette, 101 or 102, either one. Your partner climbs that small wall, or it may not be that small, but the wall, true?

A. Yes.

Q. And your partner goes around and that gate that's in there that the jurors can see on the screen, opens the gate, so other officers, including yourself at first, can enter, right?

A. Yes.

Q. And do you remember the courtyard when you walk in through that gate?

P5SACom2                    Ignacio - Cross

A.   Yeah.  It was a short courtyard.

Q.   It had trees; fair to say?

A.   Yes.

Q.   And it had -- it was nicely manicured if you remember at that time?

A.   Yes.

Q.   And it's something where it blocks the house, the trees block the house, true?  I mean, from the yard -- I mean from the street.  Sorry.

A.   I believe so, yes.

Q.   And this way if you're sitting at that gate, that your partner, Officer Snyder opened up, you can't see the house, but you can see into the courtyard, true?

A.   Yes.

Q.   And behind the courtyard, though, is the house, right?

A.   Yes.

Q.   And you eventually make your way, but you're searching the grounds.  That's how you remember the courtyard.  You're making sure nobody is in the courtyard, because people can hide behind trees or in trees, bushes, things like that, right?

A.   Yes.

Q.   And you're clearing that; clearing that means you're making it safe, true?

A.   Yes.

Q.   And you and your partner have your guns on ready.  I'm not

saying you're pointing at anybody, but you're ready for anything that may happen, true?

A.   Yes.

Q.   You're again observing, right?

A.   Yes.

Q.   After you clear that courtyard and finally see the house, then you make entry to the home, true?

A.   Yes.

Q.   Now, the home door is actually not ajar.  I'm not saying it's like, you know, a cat could run in, but it's -- you don't need a key, you can just turn the knob and get in; is that true?

A.   Yes.

Q.   When I say turn a knob, I shouldn't have said that.  You actually push down on the door, right?

A.   Yes.

Q.   And then in the interior of the house, right?

A.   That's correct.

Q.   And at that point, again, you and your partner have to go together, you have to be aware, you have to clear the different areas, including cabinets, etc., make sure no one is hiding, true?

A.   Some cabinets.

Q.   I mean cabinets large enough to fit a human being, right?

A.   Yes.

P5SACom2                        Ignacio - Cross

Q.  And you do that for the entirety of the house, right?

A.  Yes.

Q.  You do it for the backyard as well, right?

A.  I believe, yes.

Q.  And you made sure, based upon your best senses, as well as relying on your partner and the other officers to come, there was no danger there; there was no one there, true?

A.  Yes.

Q.  Am I correct?

A.  Yes, sir.

Q.  Okay.  Now, officer, there was no property disturbed in the house from what you could tell, true?

A.  From what it seemed like, yes.

Q.  And there was no furniture upended, right?

A.  No.

Q.  No closets thrown about, right?

A.  No.

Q.  It looked organized, true?

A.  Yes.

Q.  And you didn't see any bullet holes in the wall or notes of threats or anything like that, did you?

A.  No.

Q.  Because you would have made note of all that, right?

A.  Yes.

Q.  Now, you called it, I believe, not a burglary, but a

P5SACom2                    Ignacio - Cross

trespass; do you remember telling the ladies and gentlemen of the jury that?

A.  Yes.

Q.  And that's because if a person is in another person's property or residence --

MS. SLAVIK:  Objection.

THE COURT:  I think sustained, but I didn't hear the rest of the question so maybe re -- try to rephrase it.

MR. STEEL:  If the Court says you think sustained, I will rephrase it.

Q.  You didn't see evidence of anything stolen, right?

A.  No.

Q.  Okay.  And the homeowner didn't report anything stolen, true?

A.  He did not.

Q.  Now, with regards to that Escalade, if you had any evidence that Escalade was carrying somebody with a gun, you could have done -- put out what's called a BOLO.  Do you know what I mean by a BOLO?

MS. SLAVIK:  Objection.

THE COURT:  That's overruled.

A.  We could have.  Yes.

Q.  Can you tell -- some people may not know what that acronym means.  Can you just explain that to the ladies and gentlemen of the jury what a BOLO is?

P5SACom2                        Ignacio - Cross

A.   I believe it means be on the look out.

Q.   And that's where you can use your radio on your shoulder, right?  True?

A.   Yes.

Q.   And you can say, hey, just saw this Cadillac Escalade, been told that somehow it's involved in a major crime, right?

A.   Yes.

Q.   You did not do that, did you?

A.   We did not.

Q.   There was no mention of any threat to kill because you would have thought that was important, right?

A.   Yes.

Q.   So and was there any mention that there was security cameras; do you remember that?

A.   No mention, but I did see some cameras on the exterior of the residence.

Q.   And the homeowner or tenant was charged, if you know, with getting those images if they exist, if they were working, to law enforcement; is that true?

A.   Yes.  We asked Mr. Scott Mescudi if he can provide us with --

Q.   And he was -- sorry.  Go ahead.

A.   Surveillance footage.

Q.   And he was cooperative with law enforcement, right?

A.   Yes.

P5SACom2                        Ignacio - Cross

Q. And he wasn't hyperventilating or saying, oh, my God, this is -- this is a threat to me, right? He was professional?

A. Came off I guess kind of I would say like -- how can I explain it?

Like he was flustered, a little flustered.

Q. Okay. And did you ever search his Porsche?

A. I did not.

Q. Was he driving a Porsche?

A. Yes, he was.

Q. Do you remember what color?

A. I believe it was a black Porsche.

MR. STEEL: Your Honor, may I just have a minute if you don't mind.

THE COURT: You may.

MR. STEEL: Thank you, sir. I'll be right back.

Officer, just give me one second, okay?

THE WITNESS: Yes.

BY MR. STEEL:

Q. Can I just ask you one other question, sir?

A. Yes.

MR. STEEL: Your Honor, is that okay?

THE COURT: It's okay.

Q. You arrive, I believe you told the jury, approximately -- or you got the call to arrive approximately 8:20 that morning, true?

P5SACom2                    Ignacio - Cross

A.  Yes.

Q.  It wasn't 6:30 in the morning; the first call was 8:20, true?

A.  Approximately 8:20, yeah.

Q.  Approximately, okay, all right.  And obviously I believe it's daylight, true?

A.  Yes, it is.

MR. STEEL:  Okay.  Thank you, sir.

THE COURT:  All right.  Any further examination?

MS. SLAVIK:  No redirect, your Honor.

THE COURT:  All right.  Thank you very much, Officer Ignacio.

THE WITNESS:  Thank you very much.

(Witness excused)

THE COURT:  The government may call its next witness.

MS. SLAVIK:  Your Honor, the government's next witness is arson investigator Lance Jimenez.

And with the Court's permission, I will place a binder at the witness stand.

THE COURT:  Very well.

LANCE JIMENEZ,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

THE WITNESS:  Good morning, your Honor.

THE COURT:  Good morning.

P5SACom2                         Jimenez - Direct

THE DEPUTY CLERK:  Can you provide the Court your first and last name and spell your first and last name.

THE WITNESS:  Lance Jimenez, L-A-N-C-E, J-I-M-E-N-E-Z.

THE COURT:  Ms. Slavik, you may proceed.

DIRECT EXAMINATION

BY MS. SLAVIK:

Q.  Good morning, Investigator Jimenez.

A.  Good morning.

Q.  Are you employed?

A.  Yes.

Q.  Who is your employer?

A.  The City of Los Angeles Fire Department.

Q.  Is that sometimes referred to as LAFD?

A.  Yes.  Correct.

Q.  What is your current title?

A.  Arson investigator, firefighter.

Q.  What year did you start working at the LAFD?

A.  I was hired in February of '03, so a little over 22 years now.

Q.  When did you become an arson investigator?

A.  In 2011, so a little over 14 years now.

Q.  What was your role prior to becoming an arson investigator?

A.  Firefighter.  I was -- also went and did a time as a peer instructor at the academy, and then I later on became a paramedic.

Q.   Have you held any other titles?

A.   With the fire department?

Q.   With the fire department or otherwise?

A.   Yes.  I actually joined LAPD a while back, and I was a reserve officer, went through three levels of reserve training, three, two, one.  And I did that for a few years.

Q.   How long were you a reserves officer?

A.   For 17 years.  16, 17 years.

Q.   Can you describe your educational background?

A.   I have a Bachelor's Degree and a Master's Degree in kinesiology.

Q.   And can you explain to the jury what kin -- I'm going to say it wrong.

A.   It's study of human movement, biomechanics, or exercise, things like that, health and fitness.

Q.   Going back to your role as an arson investigator, what are your duties and responsibilities?

A.   We're basically detectives for the fire department.  We work hand in hand with LAPD to work on the crime of arson, which is intentionally set felony crimes.  And I do everything from crime scene investigation, origin and cause determination, evidence collection.  We look into going into law enforcement as far as the follow-up cases, the detectives, so filing a case, report writing, testifying in court, things of that nature.  Like a detective role for the fire department.

P5SACom2                          Jimenez - Direct

Q.   Now, you mentioned that one of your duties is origin and cause investigations.  Can you explain to the jury what that is?

A.   Yeah.  So whenever a fire occurs, the duty for me is to go in and try to determine where that fire originated and how the fire started.  And there's a systematic approach that we use to determine that.

Q.   So I want to talk about that systematic approach.  But first, is it fair to say that the origin is where the fire started?

A.   Yes.

Q.   And the cause is how the fire started?

A.   Yes.

Q.   So how do you go about conducting such an investigation?

A.   So I use a systematic approach that I've been trained over the years to go in.  And I usually go from starting from the dispatch of the call.  And I get a call out, what we may have, what type of fire it possibly could be.

     So I might do a little research on the way, maybe follow up with the 9-1-1 caller to see what it is.  We might pull up the address, look to see what we're looking at, a building, a trash can, a street corner, apartment, commercial, whatever it may be.  We try get an idea.

     When we get there, then I will make sure the scene is secure, hopefully we still have resources on scene, maybe a

P5SACom2                              Jimenez - Direct

LAPD officer holding the scene or a fire company or battalion chief or somebody of that nature that called us out.

And I'll start with identifying pertinent people that might be involved or witnesses or -- kind of set that aside so we maintain those people or victims that might still be there. We'll look at do they get transported to the hospital, anybody gone that route. Was there maybe a suspect on scene.

So we kind of identify some things first, safety wise, to kind of get organized. And then I'll do my actual scene investigation. And starting from the outside in, let's say it's like a single-family dwelling, I'll go through and I'll go around the perimeter of the building, look at the exterior of the building, what kind of burn patterns do I see, did the windows break, were doors opened or broken open or kicked open or burned through, was the roof burned through. I'll kind of do a lap around. Work my way in from the unburned area to the most burned to try to pinpoint where the burn patterns lead me to where the most severe area of the fire may be.

From that, we will dig through the area and kind of get an idea of what possible causes may be there. We'll go into an extensive collection of possible data, which was, like I said, witnesses. I might go back and talk to witnesses. I'll look at maybe surveillance footage. We'll look at any items in the area that may have been potential causes. I'll kind of create like a general hypothesis of what possibly could

P5SACom2                          Jimenez - Direct

have been the cause.

I'll work with another partner usually who will also do the same thing on their own.  I'll collaborate with that partner.  We'll take photos.  We'll look for any evidence we might want to collect.  Then we kind of break it down.  Is there an actual cause that might be crime related?  Is this an accidental fire?  Is this an intentional fire?  Is this a fire that's caused by the natural effects?  Or is this something we just don't -- we don't know and we can't figure it out.  We may label that undetermined and kind of go from there.

Q.  Pausing you there, Investigator Jimenez.

A.  Sure.

Q.  You mentioned that you typically work with a partner; is that right?

A.  Correct.

Q.  How is work divided between partners?

A.  Usually we work in pairs.  They'll be a lead investigator and then like a partnered up to be a colleague as assistant, so to speak.  They'll usually do the photos, the scene collection for evidence.  And then maybe do some witness interviews.  But we always meet up with whoever called us out, like instant commander in the beginning, and then we'll split up and do our duties.  And then we meet back up and kind of collaborate and corroborate our findings and what we both think, and come up with like a cause and origin together usually if we can.

P5SACom2                          Jimenez - Direct

Q.  As an arson investigator, what determines whether you and your partner respond to the scene of a fire?

A.  We have different ways of being called out.  Usually three different ways.  We might get a dispatch from our central command center, which is basically like our -- we call it our metro dispatch, like if someone calls 9-1-1 and says, hey, there's a fire.  So usually the fire company on scene will call our dispatch to respond to call us out.  So that's one way.

And the other way may be just maybe a fire company didn't respond, and we'll go out and follow up with maybe LAPD who is out there already.  LAPD being Los Angeles Police Department.  Sorry.  LAPD will be out there saying we have a fire, no fire companies, can you come take a look at it.  Fire might be out.

And the last way, we might be doing follow-up from the day before, something might have happened maybe an owner of a vehicle or owner of a home or somebody that they notice a fire after the fact, and they called and we're going to go out and do a follow-up on it without anybody there.

Q.  Investigator Jimenez, approximately how many fires have you investigated in your career as an arson investigator?

A.  I've been with -- before I was on as an arson -- I partook in a lot of different investigations while I was prepping to get into the arson section.  And then we average about 100 a year as an investigator.  That's assisting in investigations or

P5SACom2                        Jimenez - Direct

being the lead investigator.  So over the last 14 years, I would say well over 1,000 plus.  1,200 possibly.  Maybe more.

Q.  And what sort of fires have you investigated?

A.  Los Angeles is pretty crazy.  I'm not going to lie.  So I've seen everything from trash on the ground to commercial buildings with fatalities and everything in between.  Auto fires, dumpsters, single-family dwellings, apartments.  You name it, I think I've seen it over the last decade and a half.

Q.  Did you receive training to become an arson investigator?

A.  Absolutely.

Q.  What sort of training?

A.  I went through basic training through private fire academy where I went through and put myself through a fire academy before I got on with LA City.  I went through extensive fire academy while on the job with LA City, learning about fire behavior, building construction, basic fire fighting tactics, little bit of origin and cause determination.

        As a firefighter, I experienced fire firsthand, fighting fires on the end of a nozzle, inside a building, fire burning around me, feeling and seeing fire travel and behavior.

        To get certified, I went through state training, few hundred hours of -- a couple hundred hours of state training to be certified through the California State fire marshal as a fire investigator one and two.  Also did a lot of other training throughout the state and throughout the fire

P5SACom2                          Jimenez - Direct

department.

Q.   Have you received training specific to auto fires?

A.   Yes.

Q.   What sort of training is that?

A.   Went through advanced forensic fire training for auto fires in the --

          (Court reporter clarification)

          Advanced forensic fire investigation for auto fires in the City of San Obispo, a course for that.

Q.   What if any certifications do you hold?

A.   I was training as a terrorism liaison officer.  I've had advanced training in weapons of mass destruction, hazmat training.  Also certified as a state fire marshal, like I said, through the California state fire marshals fire investigator or -- yeah, fire investigator.  I have the forensic auto fire class.  I've had certifications as an EMT.  I'm also a paramedic, like I said.  And through LAPD as a reserve officer, those certifications as well.

Q.   As an arson investigator, have you testified as an expert witness on prior occasions?

A.   Yes.  Several times over the years.

Q.   Can you ballpark how many?

A.   It's tough to say.  Throughout the LA County court system we have, I think, five different courts.  I've testified at all of them throughout the years.  It would be tough.  I'd say

P5SACom2                          Jimenez - Direct

within the last four or five years, probably at least a dozen or so.

Q.  Have you ever not been qualified as an expert?

A.  Never.

MS. SLAVIK:  Your Honor, at this time, the government moves to qualify Investigator Jiminez as an expert in fire cause and origin determinations.

MR. AGNIFILO:  No objection.

THE COURT:  He'll be accepted on that basis.

BY MS. SLAVIK:

Q.  Before we move on, Investigator Jimenez, I just want to make sure that we understand the limits of your expertise.

As part of your duties as an arson investigator, do you perform DNA testing or analysis?

A.  No.

Q.  Have you had any training with respect to DNA and analysis?

A.  Not in testing or analysis, no.

Q.  Do you have any expertise related to DNA testing and analysis?

A.  No.

Q.  Same questions regarding fingerprint analysis.

As part of your duties as an arson investigator, do you collect fingerprints?

A.  I've been trained on latent prints, but I don't personally do that, no.

P5SACom2                          Jimenez - Direct

Q.  Do you perform fingerprint analysis?

A.  No.

Q.  And do you have any expertise with respect to fingerprint analysis?

A.  No.

Q.  I want to know focus your attention on January 9th, 2012.

    Were you working that day?

A.  Yes.

Q.  What was your shift?

A.  I was on a 24-hour platoon shift with another partner, working a 24-hour car.

Q.  What is a 24-hour platoon shift mean?

A.  We're just working a 24-hour shift, available for the whole city to be dispatched throughout the City of Los Angeles.

Q.  Were you working with a partner that day?

A.  Yes. I was.

Q.  Who was that?

A.  Mike Camillo.

Q.  Did you respond to an auto fire in the Hollywood Hills that day?

A.  Yes.

Q.  I want to direct your attention to an auto fire at 8925 Hollywood Hills Road on January 9th, 2012.

    Do you remember responding to that fire?

A.  Yes.

P5SACom2                        Jimenez - Direct

Q.   How were you alerted to that auto fire?

A.   I believe that was through a dispatch, if I'm not mistaken.

Q.   And can you just explain what dispatch is?

A.   Like I said before, our metro communications will let us know that we've been requested at a fire scene.

Q.   Approximately what time of day were you alerted?

A.   I want to say around 11:00, and we were located at our station.  It wasn't too far away, so we were probably there within 30 minutes.

Q.   What information were you provided by dispatch?

A.   The auto fire and parked in a driveway.

Q.   And this auto fire was reported at 8925 Hollywood Hills Road; is that right?

A.   Yes.

Q.   What did you do after you were alerted to this auto fire by dispatch?

A.   We went to proceed to investigate, like any other normal investigation we would conduct.  We arrive.  We talk to the company that's there.  This particular engine company was there with a fire captain and an engineer and two other firefighters.

Q.   I want to walk through that step by step.  But, first, can you describe the residence?

A.   Very -- Hollywood Hills is a very affluent area in Los Angeles, kind of up in the hills by Mulholland.  It's nicer homes up on the hillsides, more up and away from the city, so

P5SACom2                          Jimenez - Direct

to speak.  So we consider that kind of more of an affluent
area, very nice home, offset from the street.

Q.  And what about the home itself, can you describe that?

A.  This was a home kind of offset from the long driveway, kind
of a large fence in front of the yard, so you couldn't really
see into the home.

Q.  Now, you started to get into this, but who was on the scene
when you and your partner arrived?

A.  There was a fire company there.

Q.  What's the first thing you do -- you did when you arrived
at the scene?

A.  We catch up with the captain to find out what they saw,
what they did, and why they called us out.

Q.  What did you do next?

A.  We were identified that there was a witness there so we
made sure that person stayed by.  We were told that the victim
was there, so asked that that person standby.  And then we were
shown the vehicle that was -- had the fire involved, and then
we started our investigation.

Q.  And just generally speaking, what did you observe with
respect to the scene?

A.  So for this vehicle was parked fairly close to the garage.
It was a long driveway.  There were two other cars parked
behind it going out to the street.  The street was kind of
offset so it's hard to see from the -- I'm sorry.  The driveway

P5SACom2                          Jimenez - Direct

and where the car was is a little offset from the street, hard to see.

So when you walk into the driveway, it's more visible. I observed a black Porsche that had had a fire. It was involved in a fire.

Q. Did you inspect the black Porsche?

A. I did.

Q. What was the condition of it?

A. Well, first, I inspected the surrounding area if I could backtrack.

So there was a lot of vegetation and foliage around the vehicle, kind of blocking the view. So I checked to make sure none of that is burned. I didn't see any of that burned. I look around the car to see if there was any fire damage to the exterior of the car. I'm looking for things that may have got into the car from the outside. I didn't observe any of that.

I observed -- it was a black Porsche 911 with a canvas top. There was a cut on the top of the vehicle or the top of the roof, about a foot long. And inside I observed that a fire occurred inside the passenger space compartment.

Q. What if anything did you observe inside the Porsche?

A. Inside the Porsche, when we opened it up, there was burn patterns throughout the seats, the center console, little bit of carpet. Some burn patterns on the interior roofing.

P5SACom2                              Jimenez - Direct

Q.  Did you observe any items within the Porsche?

A.  Yes.  There was a bottle on the front seat.  And there was a -- like a cloth handkerchief on the center console that was burned.

Q.  What if anything did you observe around the Porsche, outside of it?

A.  Outside the Porsche there was a couple extinguishers that the fire company brought up.  There was also a disposable lighter within close proximity, couple of feet from the Porsche on the ground by the drivers side.

Q.  And what if any initial hypothesis did you draw after making these observations?

A.  Well, I look at -- I look at different things that may potentially cause the fire.  I look -- first, we always look at the engine, see if there's any electrical issues.  The engine in the back of the Porsche was not damaged.  The backseats weren't damaged, really nothing burnt through the rear.  Look at the battery area, the battery in the front.  There's nothing indicating in the front console any kind of fire occurred.

So I try to rule out any kind of accidental type thing.  Nothing natural.  Weather is good.

Inside, I did observe the bottle.  I smelled what I know to be gasoline inside the vehicle when we opened it up. And inside the bottle we observed a liquid.  That odor gave to me what I know to be gasoline.  And the handkerchief there.  So

P5SACom2                        Jimenez - Direct

I made a general observation this may have been a Molotov cocktail.

Q.   Can you explain to the jury what a Molotov cocktail is?

A.   A Molotov cocktail is a makeshift fire bomb.  The idea it's a breakable container with an ignitable liquid poured inside, some kind of a cloth wick or something stuck inside the nozzle of the bottle.  They light that on fire.  The object is -- it breaks open.  The gas and the vapors disperse with the flames and it creates a fire bomb.  And a very -- cause a lot of damage for a fire.

Q.   Now, focusing on the damage to the Porsche.  You said that you saw smoke and fire damage to the Porsche; is that right?

A.   There was a lot of heat damage to the center console, the door, and the windows.  I didn't observe any broken windows.  So the windows were still intact.  And there was a lot of burn patterns on the seat and the floor carpeting.

Q.   And what in your view caused this damage?

A.   The bottle itself, I formed the opinion that it was a Molotov.  And that the handkerchief had burned but fell out of the bottle.  The bottle had dropped in, in my opinion, and it didn't break.  So the gas kind of splashed around causing the burn patterns I observed.

Q.   Have you seen other auto fires called by Molotov cocktails?

A.   Many, yes.

Q.   And how did the damage to the Porsche in this case compare

P5SACom2                          Jimenez - Direct

to the other auto fires that you've seen caused by Molotov
cocktails?

Q.   Although there was fire damage to the vehicle, it wasn't as
extensive as what I usually see when the Molotovs do break and
extensive fire damage.  I've seen cars burn all the way down to
the frame from these type of fire bombs.

Q.   And why was the damage to the Porsche in this case less
significant?

A.   I formed the opinion that the cloth was more of a silky
type material.  I think it just fell out of the bottle.  The
bottle didn't break so the liquid wasn't able to disperse with
I think the objective intent of it.  And it just did -- and the
fire just smoldered out inside.  It stayed small and relatively
didn't have enough oxygen to cause the damage I think it was
intended for.

Q.   How close to the residence was the Porsche parked when this
incident occurred?

A.   A few feet away, maybe ten.  I would be approximating.

Q.   If the Molotov cocktail had broken, if the glass bottle had
broken, what if any damage could it have caused to the
residence?

A.   In that particular incident, I think the foliage around
directly would have been more exposed by the heat, and that
would have definitely caught fire, spreading through the
vegetation of the hillside.  And then if the radiant heat gets

P5SACom2                        Jimenez - Direct

big enough and the fire gets big enough, it definitely would have affected the home and the roofing material on the garage, causing the home to burn and the vehicle behind it as well.

Q.   Now, you said that you observed the Porsche; is that right?

A.   Yes.

Q.   Did you form an opinion as to how the Molotov cocktail got into the interior of the car?

A.   Yeah.  At the end of my investigation, I formed the opinion that somebody had lit it and dropped it -- cut the roof and dropped it inside of the front seat.

Q.   So after making these observations as to the scene, what did you do next?

A.   We proceeded to look for any surveillance cameras.  There were cameras there.  I was informed that they weren't recording.  We also looked for witnesses, canvassed the area. We only had one witness that was there, but they just came after the fire had already been set.  So they weren't -- they didn't see the actual fire occur.  And then we -- I was able to speak with the victim of the -- of the Porsche in the home.

Q.   What did your partner do?

A.   He took photos and proceeded to collect the evidence.  We did collect evidence on scene.

Q.   Did you look at the photos that your partner took at or around the time that they were taken?

A.   Yes.

P5SACom2                        Jimenez - Direct

Q.  Have you looked at them since?

A.  Yes.

Q.  When?

A.  As recently as yesterday I believe, or the day before yesterday.

Q.  Investigator Jimenez, you should have a binder next to you that contains two photos in evidence which are Government Exhibits 8C-101 and 102, as well as what's been marked for identification as Government Exhibits 8C-103 through 141.

Have you reviewed the contents of that binder, Investigator Jimenez?

A.  Yes.

Q.  How do you know?

A.  I was given this binder to look at and I initialed the front of the binder.

Q.  And do you recognize the photos that are contained in that binder?

A.  Yes.  These are what I know to be the photos that my partner took on scene.

Q.  Do these photos fairly and accurately depict what you observed on January 9th, 2012?

A.  Yes.  They were taken the day of while we were there.

MS. SLAVIK:  The government offers Government Exhibits 8C-103 through 141 into evidence.

MR. AGNIFILO:  No objection.

P5SACom2                        Jimenez - Direct

THE COURT:  All right.  8C-103 through 141 will be admitted.

(Government's Exhibits 8C-103 through 141 received in evidence)

Q.  I want to walk through some of these photos with you, Investigator Jiminez.

MS. SLAVIK:  Ms. Foster, can you please publish Government Exhibits 8C-101 and 103 side by side.

Q.  Investigator Jimenez, can you explain to the jury what we're looking at in these photos?

A.  Yes.  The photo 101 is the front of the residence, the fence I had spoke about with the vegetation.  And then the one adjacent to that, is that 103?

Q.  The one on the right is 103, yes.

A.  It's the vehicle in front is the Porsche, and then the other two cars that were parked.  You see myself there with some of the fire companies that were there.

Q.  And how would you describe this driveway that's depicted in 8C-103?

A.  Like I said, it was a long driveway that kind of fed to the street, and the front part of that driveway was kind of hidden by the vegetation.

Q.  And where is the black Porsche in this photo?

A.  Up in front towards the garage.

MS. SLAVIK:  Thank you, Ms. Foster.  You can take this

P5SACom2                          Jimenez - Direct

down.

And could you please publish Government Exhibits 8C-104 and 107 side by side.

Q. What are these photos, Investigator Jimenez?

A. That is myself there off to the left of the vehicle and then that's the vehicle that we were referring to that was burned.

Q. This is the black Porsche that was burned?

A. Correct.

MS. SLAVIK: Thank you. You can take these down, Ms. Foster.

Q. Now, Investigator Jimenez, you said that the canvas roof of the Porsche had been cut; is that right?

A. It was my opinion, yes.

MS. SLAVIK: Ms. Foster, could you please publish Government Exhibits 8C-108 and 111 side by side.

Q. Investigator Jimenez, can you explain to the jury what they're looking at here?

A. Yeah. That's the canvas roof that I was referring to, and you'll see that a line straight to the right of that cut, looks like it was intentionally cut.

Q. I want to focus now on the damage to the Porsche.

MS. SLAVIK: Ms. Foster, could you please publish Government Exhibits 8C-113 and 116 side by side.

Q. Investigator Jimenez, what are we looking at here?

P5SACom2                          Jimenez - Direct

A.   So 113 would be looking from the passenger space, passenger door looking towards the driver's seat.  And you'll see the cloth I was referring to on the center console there with the bottle in the drivers seat.

116 would be the opposite side looking from the driver's end, you'll see a closer view of that bottle that we had observed and the burn patterns there.  You can see the burn patterns there right along where the nozzle of that bottle where the liquid was kind of leaking out causing that burn pattern.

Q.   And do you see any items that you later collected as evidence in these photos?

A.   Yes.  We go back to 113, you see the bottle there and then you'd see the cloth material there.

Q.   And is that approximately where the cloth was when you arrived at the scene?

A.   Yes.

MS. SLAVIK:  Ms. Foster, could you take these down and publish Government Exhibit 8C-114.

Q.   What is on the -- what is depicted in the photo here, Investigator Jimenez?

A.   So you'll see the driver's door, which shows you kind of the smoke and soot damage to the window that I referred to earlier where the window did not break.  You'll see more of a burn pattern towards that lower bottom corner of the door,

P5SACom2                         Jimenez - Direct

which coincides with where that bottle was at.

Q.  And, again, how does the damage to this Porsche compare to other auto fires set by Molotov cocktails that you've observed?

A.  Yeah.  There's severe damage, but not nearly what I would normally see with a Molotov where the distribution of gasoline would have been more effective and causing more of a catastrophic damage of the vehicle.  I've seen some vehicles that really just burn as if you wouldn't even recognize the vehicle.

        MS. SLAVIK:  Ms. Foster, can you take this down. Could you please publish Government Exhibits 8C-119 and 120 side by side.

Q.  What are we looking at here in these photos, Investigator Jimenez?

A.  You're looking more up towards the rear-view mirror and the roof again and the canvas roof, and you'll see some of the heat damage to the top of that roof.

Q.  Did you reach any conclusions as to what caused this damage?

A.  Well, like I said, I believe it was originally cut, but then once the fire burned, you get a little more heat damage towards the top as the heat rises.  Radiant.  Radiant heat damage.

Q.  Caused by the Molotov?

A.  Correct.

P5SACom2                    Jimenez - Direct

MS. SLAVIK:  Ms. Foster, could you please publish 8C-122 and 124 side by side.

Q.  And what are we looking at here, Investigator Jimenez?

A.  You'll see some minor burn patterns here.  And you'll see some of the roofing material that kind of melted down and dropped down, and you'll see some what looks to be like a splash pattern from when the bottle hit inside the car.

Q.  And looking at --

A.  I'm sorry.  And you'll see the cloth in 122.

Q.  Thank you.

MS. SLAVIK:  You can take these down, Ms. Foster.

Q.  Now, Investigator Jimenez, you testified that you collected several items as evidence; is that right?

A.  Correct.

Q.  I want to just run through some of the photos of those items.

MS. SLAVIK:  Ms. Foster, could you please publish Government Exhibit 8C-128.

Q.  What is this item?

A.  That's the bottle that we collected.

Q.  And what kind of bottle was it?

A.  I believe we have a better photo if you want a close up. But it's a 40-ounce malt liquor bottle, Old English it looks like.

Q.  Made of glass?

P5SACom2                    Jimenez - Direct

A.   It's a glass bottle, yes, correct.

Q.   What if anything was contained inside the bottle?

A.   Gasoline.

     MS. SLAVIK:  Ms. Foster, could you please publish 8C-129.

Q.   Is this the photo you were referring to, Investigator Jimenez?

A.   Yes.  We always do like a close up once we collect it.

Q.   And what brand of malt liquor is this?

A.   Old English 800.

Q.   Does this photo more clearly show the liquid inside the glass bottle?

A.   Yes.

Q.   Did you smell the liquid?

A.   Yes.

Q.   What did it smell like?

A.   What I knew to be gasoline.

Q.   And what conclusion did you reach about the purpose of this glass bottle?

A.   That it was a -- used for a Molotov cocktail.

     MS. SLAVIK:  You can take this down, Ms. Foster.  And could you please publish Government Exhibit 8C-131.

Q.   What is this?

A.   That's where we take some of the fluid out of the bottle and we have it tested for analysis and collected as evidence.

P5SACom2                          Jimenez - Direct

Q.   Was this particular container recovered at the scene?

A.   We provide that container, but we put the fluid inside it.

Q.   And what is the purpose of that, of putting the fluid in that container?

A.   To preserve it and we tag it.  We seal it, and we mark it for evidence.

         MS. SLAVIK:  Ms. Foster, could you please publish Government Exhibit 8C-132 and 135 side by side.

Q.   What is depicted here, Investigator Jiminez?

A.   You'll see the fire extinguishers I was referring to and then the disposable item that we observed on the -- adjacent to the Porsche.

Q.   And does the photo on the left, Government Exhibit 8C-132, does that depict the location of the lighter where it was actually found on the scene?

A.   Yes.

         MS. SLAVIK:  You can take this down, Ms. Foster. Could you please publish Government Exhibit 8C-138.

Q.   What is this photo, Investigator Jiminez?

A.   That's the cloth material that I believe was attempted to be stuffed inside the bottle.

Q.   Can you describe the cloth material for the jury?

A.   Yes.  It's what appeared to be some kind of designer-type handkerchief.

Q.   What led you to believe it was designer?

P5SACom2                          Jimenez - Direct

A.  If you'll see in the corner of that material that didn't burn, it had some kind of like fancy lines, like a -- and it just had like a silky type material to it.

MS. SLAVIK:  You can take this down, Ms. Foster. Thank you.

Q.  Investigator Jimenez, after reviewing the evidence that we've just looked at, what if any conclusion did you reach as to the cause and origin of this auto fire?

A.  I made the determination that somebody had taken that bottle, put gasoline inside it, stuffed that cloth inside it, lit the cloth, cut the roof of the vehicle, dropped it down inside.  I believe that the cloth had fell out, burned, smoldered, and then the liquid splashed.  And the bottle never broke obviously, and then the fire just kind of self-contained inside the vehicle causing damage, burn damage.  And the origin was there on the seat, the driver's seat that caused the most damage where the bottle had eventually landed.

Q.  What if anything did you conclude about whether this was a random act?

A.  In my opinion, it was targeted for where the car was located.  This car was not easily visible from the street.  The car was not -- there was several car -- another car in the driveway that didn't get targeted.  So I believe the Porsche was targeted closer to the home.

It's also an area that you don't see too much activity

P5SACom2                          Jimenez - Direct

or crime and activity or homeless activity.  And my experience
is something in that neighborhood, something like that where
the vehicle was located, I personally felt it was targeted.

Q.  So you just described the investigation that you conducted
at the scene.  I want to talk about the additional
investigative steps that you took starting with testing the
evidence that we just talked about.

So, first, did you request that any of the items that
we just saw were tested for DNA?

A.  Yes.

Q.  Which items?

A.  That would be one, three, and four, which would be the
bottle, the cloth material, and the lighter.

Q.  Did you personally collect or swab these items for DNA?

A.  I did not.

Q.  Did you personally perform the DNA testing or analysis?

A.  I did not.

Q.  Did you receive any results with respect to the DNA testing
or analysis?

A.  Nothing came back on item three and four, and I believe
there was DNA hit on the bottle.

Q.  Which --

A.  Item number one.

Q.  Items three and four, that was the cloth?

A.  Lighter and the cloth.

Q.   And just to be clear, have you received any training with respect to interpretation of DNA testing?

A.   I have not.

Q.   You said that DNA was recovered from the glass bottle; is that right?

A.   Yes.  I was informed that there was a partial DNA.

Q.   Do you know where on the glass bottle the DNA was found?

A.   I do not.

Q.   Do you know what areas of the bottle were swabbed for DNA?

A.   I do not.

Q.   And you said that you are aware that there was a partial DNA profile recovered from the bottle?

A.   That's what the report informed me, yes.

Q.   And are you aware that the partial DNA profile was consistent with a female contributor?

A.   That's what it was -- I was told, yes.

Q.   So, first of all, do you know what that means that a partial profile was consistent with a female contributor?

A.   Unfortunately, I do not know what that means.

Q.   Do you know if any additional DNA was found on the bottle?

A.   I don't believe so.

Q.   Do you know whether the presence of one DNA profile means that only one person touched the bottle?

A.   No.  I don't know that.

Q.   Do you know whether it's possible to touch an object but

P5SACom2                    Jimenez - Direct

not leave detectable DNA?

MR. AGNIFILO:  Objection.

THE COURT:  Sustained.

Q.  Investigator Jimenez, in your experience, is DNA found commonly at arson scenes?

A.  Unfortunately, throughout my career, I've requested DNA a lot, and I have had very few hits with DNA.

Q.  Focusing now on the fluid in the glass bottle.  Can you remind the jury what that fluid smelled like?

A.  It smelled like gasoline.

Q.  Did you submit the fluid in the bottle for testing?

A.  We did, and that was the item number two that you saw with the can.

Q.  What sort of testing did you request?

A.  Trace analysis to identify what the liquid was.

Q.  Did you personally perform this trace analysis?

A.  No.

Q.  Do you have any training in trace testing or analysis?

A.  No.

Q.  What was -- what were the results of that trace testing?

A.  The report came back that it was in fact gasoline.

Q.  Turning now to fingerprints, did you request that fingerprints be taken in this case?

A.  I requested -- yes.  I believe one and four, maybe three, I don't recall if three was requested.  But we did request

P5SACom2                          Jimenez - Direct

fingerprints on the bottle and the lighter.

Q.  The bottle and the lighter you said.

Did you request fingerprinting of any other items at the crime scene?

A.  I did make a call to LAPD latent prints lab to have them come and fingerprint the vehicle itself.

Q.  That was the Porsche?

A.  The Porsche, yes.

Q.  Did you personally take the fingerprints?

A.  I did not.

Q.  Who did?

A.  I don't know.  I wasn't present for that collection.

Q.  Was it someone from your unit?

A.  No.

Q.  Arson investigator?

A.  No.  It was somebody from LAPD.

Q.  Is that standard protocol?

A.  Yes.

Q.  Have you received any training with respect to fingerprint analysis?

A.  Not analysis, no.

Q.  Were fingerprints recovered from the glass bottle or the BIC lighter?

A.  I was -- I have no idea to be honest.  I never received any report.

P5SACom2                    Jimenez - Direct

Q.   Were fingerprints recovered from the Porsche?

A.   I believe there was two prints recovered.  I don't know the results of that.

Q.   You don't know the results?

A.   No.

Q.   Did you collect any other fingerprints in this case?

A.   There was -- the victim had informed me that they had -- he had somebody come and print his house from a previous trespass, and that person recovered two fingerprints on his glass front door, and that person put those on print cards and turned them over to me.

Q.   What did you do after obtaining these print cards?

A.   The print cards were sealed in an envelope with the person's signature, and then I put them in another envelope I sealed for evidence and turned them into LAPD for a print analysis.

Q.   What do you mean by putting them into evidence?

A.   We take all of our evidence we collect and we turn it over -- we book everything with LAPD's evidence unit and they -- they store and collect all the evidence, and it's properly maintained through LAPD.

Q.   Did you receive results related to these fingerprint cards?

A.   I did not.

Q.   Now, you said that you entered these fingerprint cards into evidence.  Did there come a time when you learned what happened

to the print cards?

A. Yes. Recently.

Q. What happened to the print cards?

A. The two print cards I had turned in were destroyed.

Q. When were they destroyed?

A. They were destroyed in August of 2012.

Q. Were you aware that they had been destroyed in August of 2012?

A. I was not.

Q. Did you authorize the print cards being destroyed?

A. I did not.

Q. Who ordered their destruction?

A. Somebody within LAPD.

Q. Is that typically the way that logged evidence is destroyed?

A. Not for evidence that I turn in. I'm the lead investigator. So everything goes through me before it's destroyed. Unless it goes through our arson section, it will come through in a request if they want it destroyed or not or returned back to the owner.

Q. And the LAPD employee who authorized the destruction wasn't you, you said, right?

A. No.

Q. Was that person a member of your team?

A. No.

P5SACom2                        Jimenez - Direct

Q.  Did this strike you as unusual?

          MR. AGNIFILO:  I'm going to object to all of this,
Judge.

          THE COURT:  There was a question pending.  I take it
there's an objection to that question?

          MR. AGNIFILO:  Yes.

          THE COURT:  That's sustained.

          MS. SLAVIK:  I'll ask a different question, your
Honor.

Q.  Investigator Jiminez, in your 15 years, approximately, as
an arson investigator, has evidence been ordered destroyed by
someone who was not a member of your team?

          MR. AGNIFILO:  Your Honor, I object.  And can we have
a side bar on this?

          THE COURT:  You may.

          (Continued on next page)

(At sidebar)

THE COURT:  Do you have any more questions along these lines?

MS. SLAVIK:  No, that's my last question.

THE COURT:  Well, the objection to that question, which I take it there is an objection, is sustained.

MR. AGNIFILO:  Well --

MS. SLAVIK:  Your Honor, this is an item of evidence that he collected with respect to his investigation.  I think he's entitled to explain to the jury what happened with respect to those evidentiary items.

THE COURT:  Well, if it were going to be asked, it would need to be rephrased.  The way the question was posed was whether in his 15 years of experience there's been evidence that has been destroyed by someone who is not within his chain of authority, something along those lines.

MS. SLAVIK:  That's right.

THE COURT:  Well, in what instances are you talking about?  How would he know if evidence was destroyed, if there was never any follow up to determine whether any evidence was destroyed.  And you're talking about the destruction of evidence when it's not within his chain of authority, so how would he know about that one way or another?

MS. SLAVIK:  I can ask in a way that frames it within his knowledge.  Understood.

P5SACom2                        Jimenez - Direct

THE COURT:  But let me hear.

MR. AGNIFILO:  There's a larger issue.  There's an inference of wrongdoing here, which we are hearing for the first time.  And which is utterly unfounded.  They're clearly saying that something happened to cause these fingerprint cards to be destroyed suspiciously under circumstances that this witness has never seen before.

And I am asking that that this entire line be struck as being prejudicial.  They're clearly suggesting that Mr. Combs, with his authority, did something to cause the destruction of these print cards.  There's no other reason for these questions other than that.

THE COURT:  I, for one, hearing the testimony, did not think that's where the government was going.

MR. AGNIFILO:  I don't know where else --

THE COURT:  Let me hear from Ms. Slavik.

MS. SLAVIK:  This is with respect to his investigation.  And this material was in the 3500.  Investigator Jimenez only recently learned of the destruction of these fingerprint cards in this matter.  He learned of the destruction as of Friday.

THE COURT:  But what's the inference?  What are you drying to address?

MS. SLAVIK:  It goes to the completion of the investigation.  I think the defense is going to get up on

P5SACom2                        Jimenez - Direct

cross-examination and suggest that the -- there was -- it was a dead end investigation. There were no charges and there are reasons why. And this destruction of the print cards is one such reason.

MR. AGNIFILO: They could have left it at that. That's clearly not what they're doing. What they're clearly doing is saying in addition. They could have just said where are the print cards, they're destroyed. They didn't have to go further and say have you ever heard of this before, did you authorize it. That is clearly improper. And that's what they're doing.

They are putting in front of this jury that there was wrongdoing in the LAPD. And the only reason that would be relevant, since this is not an LAPD internal investigation, is that someone in this courtroom had something to do with it, and that someone is Mr. Combs.

MS. SLAVIK: Your Honor.

THE COURT: Hold on. Again, that's not how I would have taken it. I understood the questions as they were coming in as drawing the sting from potential cross-examination that would show that the destruction of the fingerprint cards is reason to question the entirety of the investigation to the arson incident, and I assume that that's what Ms. Slavik was doing, was trying to -- anticipating that you are going to get up and say what are you talking about, you lost evidence that

P5SACom2                         Jimenez - Direct

would show -- possibly point to someone else as having done this and just mysteriously vanished before trial.

MR. AGNIFILO:  Then she should have waited for me to do that.  And the last question is improper along those same lines.

THE COURT:  The last question is going to be rephrased.

MS. SHAPIRO:  That was the only reason they asked the last question.  There's no other legitimate reason consistent with their explanation.

MR. AGNIFILO:  It shows the motive all along.  The motive -- first of all, I wasn't going to bring up the print cards.

THE COURT:  You can.  I don't think you're going to hear anything in response because there's nothing to elicit.

MR. AGNIFILO:  But then they should have done this on redirect.  They did this not for that reason.  They did this to suggest something improper happened.

And it's not just an LAPD matter because they wouldn't have asked all the other questions.  In 15 years have you ever heard of -- it's suspicious.  They're making it suspicious.

MS. SLAVIK:  Your Honor, we discussed this yesterday. With the defense raising the DNA testing issue with the testing results coming into play and defense going to call into question the investigation and the lack of charges in this

P5SACom2                    Jimenez - Direct

crime.  I think, as I flagged for the Court we plan to --

THE COURT:  It was not flagged for the Court, so.

MS. SLAVIK:  I remember flagging for the Court that the government will ask questions relating to the DNA testing, the gas testing, and the fingerprint testing.

THE COURT:  Yes.  Those questions were asked and there were no objections that were raised.  This is a separate issue as I'm understanding.

MR. AGNIFILO:  This is a separate issue.

MS. SLAVIK:  I think we're entitled to draw this --

THE COURT:  Well, do you have any further questions other than this line?

MS. SLAVIK:  No -- well, yes, I have further questions, but not related to this line of inquiry.

MR. AGNIFILO:  My request is that all of the questions and answers in regard to this witness being asked, in 15 years you've never heard such a thing, you didn't authorize this to be done --

THE COURT:  Fifteen years thing hasn't been answered.

MR. AGNIFILO:  Okay.  That you didn't authorize this to be done.

MS. SLAVIK:  I think he's absolutely entitled --

MR. AGNIFILO:  My request is that it be stricken.

THE COURT:  I need a second to look at the transcript.

(Continued on next page)

P5SACom2                         Jimenez - Direct

(In open court; jury present)

THE COURT:  For the jury, give us one second to sync up our technology here.

Since we've been going for a while, why don't we take a restroom recess.  I'm sure everyone will appreciate it so people aren't just pulling their heels here.  We will be back in ten minutes.  Thank you.  All rise.

(Continued on next page)

P5SACom2                        Jimenez - Direct

(In open court; jury not present)

THE COURT:  Investigator Jiminez, we will be back in ten minutes.  I think you have a room.

THE WITNESS:  Thank you, Judge.

THE COURT:  Please be seated.

(Pause)

Now that we are not in side bar.

MR. AGNIFILO:  Can we --

THE COURT:  Oh, okay.

MR. AGNIFILO:  Bring him back out, Judge.

THE COURT:  If you would like this issue to be addressed --

MR. AGNIFILO:  Yes.  Yes.

THE COURT:  Or I suppose if it's appropriate to proceed in his absence, we can do it that way too.

MR. AGNIFILO:  Let me get him, Judge.

He's present, Judge.  Thank you.

THE COURT:  All right.  Ms. Slavik, what was the purpose of eliciting testimony concerning these fingerprint cards?

MS. SLAVIK:  Your Honor, the defense clearly intends to attack the credibility of this investigation.  They've already elicited certain details in the testimony of Mr. Mescudi that, you know, certain aspects of the investigation, the fact that no charges were brought, the fact

P5SACom2                          Jimenez - Direct

that this investigation kind of went nowhere.

So I think we're entitled to establish what steps were taken and what steps were not taken and why those steps were or were not taken through Investigator Jiminez.  So I think that this testimony regarding the fingerprint analysis falls squarely within that testimony of the investigative steps that were and were not taken and why.

THE COURT:  What does the destruction of the fingerprint cards have to do with what you just said?

MS. SLAVIK:  Because the outcome of the destruction of the fingerprint cards is that no fingerprints were obtained.  There was nothing connecting anyone to the scene of this crime.  And I think there's an important reason as to why, which is that these fingerprint cards were destroyed.

THE COURT:  And what is the defense's proposal as to the instruction to be given to the jury?

MR. AGNIFILO:  I would like the Court to -- we're not having live feed.

THE COURT:  Let me take a step back.

MR. AGNIFILO:  Yes.

THE COURT:  When I heard the questions, I assume that there was a different reason why that line of inquiry was coming up.  My assumption -- and there was no objection for I think some of the initial questioning -- was that there was going to be a line of cross-examination directed to the

fingerprint cards, much in the same way that we anticipate there was a line of cross-examination going to the DNA evidence.  That does not appear to be the case from the defense's perspective.  That also is not the case from the government's perspective, because I've raised that issue and that isn't the reason why that testimony was brought up.

It appears to have been brought up precisely for the reason that the defense suggests.  However, at the present time, there's no inference one way or the other based on this particular testimony.  That being said, I'm not -- the defense's point about at the very least at this juncture a lack of any relevance to the issues that are in this case is -- I think we'll take it.  I don't think that there's any prejudice from the line of questioning that we've had so far.

So my proposal would be to tell the jury to disregard the testimony concerning the fingerprint cards that they just heard and move on from there.

MR. AGNIFILO:  So, if I may, I think there's actually quite -- there is prejudice.  And I think -- and I have to just say it the way I think I see it.  I think what the government has done is outrageous.  And I haven't used that had word all trial, but I'm using it now.  And they know what they were doing.  They knew exactly what they were doing.  They were suggesting to this jury that someone in this courtroom had something to do with the improper and suspicious destruction of

P5SACom2                          Jimenez - Direct

these fingerprint cards and that's outrageous.  And, quite frankly, we are having discussions and I need a few more minutes before we hit ground on what, if any, other remedies we are going to ask for in light of that line of questioning.

So before I do that, let me speak with my colleagues for a second.  And I will, if it's okay with the Court, I know we're trying to get back to the jury back in the box, if I could have a few minutes, two minutes, three minutes just to discuss with my colleagues.

THE COURT:  Well, let me hear from the government before we take a break, and then we'll come back at 11:00.

MS. SLAVIK:  Your Honor, I think that inference is absolutely unwarranted here.  I think it is very clear that the defense intended to attack the integrity of this investigation.  And, specifically, to attack the credibility of Investigator Jimenez.

I think that the reason for eliciting the fact that this was unusual, an unusual way to destroy evidence is related to the fact that Investigator Jimenez did not personally authorize the destruction of this evidence.  He did not have anything to do with it.  Which otherwise could be, could be the inference that the jury draws, that Investigator Jimenez did not do an adequate investigation, which I think is exactly what the defense intended to elicit.

The relevance of the fingerprint cards being destroyed

shortly after the incident itself is absolutely relevant because it relates to the reason that there was no -- there was no ability to conduct a fingerprint comparison. If the fingerprint cards from the trespass were destroyed, there's no way to compare those fingerprints against any other fingerprints that were obtained from the arson, such as those retrieved from the Porsche.

This is I think an important fact for the jury to consider as it assesses whether the trespass and the arson are connected, which I expect the defense to argue strongly against.

I think this is relevant, I don't think there's prejudice. I'm happy to move on from this line of questioning, but I do think that it's absolutely relevant that the fingerprint cards that Investigator Jimenez obtained were destroyed shortly after the investigation.

THE COURT: All right. Thank you. We'll take a recess. We'll come back at 11:00, and then that will give you time, Mr. Agnifilo to discuss.

MR. AGNIFILO: Thank you.

(Recess)

(Continued on next page)

P5SsCOM3

THE COURT:  All right.  So my having reviewed the transcript, my intent is to strike from the record any testimony regarding the fingerprint cards and the destruction of them, and to instruct the jury not to consider that testimony in this case.

I will note that after the only questions that were asked as to which answers were given concerned the actual facts of what the witness knew about the destruction.

Mr. Agnifilo, you objected solely to the question:  Did this strike you as unusual?  And I sustained that objection.  No answer was given.  Then there was a followup question about the 15 years of experience, at which point you objected, and we had the sidebar and there was no further testimony.

As I'm reviewing the record, the appropriate remedy for the testimony that was given would be to strike the testimony concerning the fingerprint evidence, since there was no suggestion from the witness of any kind as to whether it was usual or unusual or what happened in his 15 years of experience since the objections were raised and either were sustained or not ruled upon because of a sidebar.  There was no further questioning after that.

So with that, Mr. Agnifilo.

MR. AGNIFILO:  I'll turn it over.

MS. SHAPIRO:  Your Honor, respectfully we are going to

P5SsCOM3

move for a mistrial at this time based on the prosecutorial misconduct that went into this.

I think it's clear that, first of all, just to take a step back, as the court will recall during jury selection, there were issues raised by some prospective jurors about, you know, the idea that Mr. Combs could buy his way out of this, this type of conspiracy theory is out there, and the type of implication that we believe these questions were designed to create plays right into that.

I think the first few set of questions seem perfectly fine, but --

I apologize, I need to use the technology here.  Can you go -- yes, so go back up a little bit.

So we start with a few questions about what happened to the fingerprints, when were they destroyed.  They were destroyed in August.  You know, that all seems fine, right.  And it should have ended there, if the only purpose of it was the one described by the government in the sidebar.

But instead, you know, they start going on and they start asking more questions.  Did he authorize the prints being destroyed?  And then he goes on, they go on to ask, in particular --

This is going the wrong way.  I'm sorry.  I apologize.  The technology is not working.

THE COURT:  I have the questions in front of me.

P5SsCOM3

MS. SHAPIRO:  So then they get to the question, you know, was this unusual.

THE COURT:  Right.

MS. SHAPIRO:  And then the last question was --

THE COURT:  Wait.  You got to that question and then that's the first time there was an objection --

MS. SHAPIRO:  Well --

THE COURT:  -- which I sustained.

MS. SHAPIRO:  -- your Honor, I understand that.

But my point is that it was becoming clearer and clearer that this inference is what the government was doing this for, and the jury is going to be left with the impression, even if your Honor strikes the testimony, including not only those two questions, where the objections have been sustained, but strikes the previous questions and answers and gives an instruction, there is no way to unring this bell, particularly those last two questions.

You know, first of all, it's clear from the last two questions that, respectfully, what the government was doing here, there's just no reasonable way to interpret their motivation, other than they were trying to plant an idea in these jurors that Mr. Combs was responsible for the destruction of these fingerprints.  And there is no other reason.

Otherwise, they would have just stopped at the point to elicit the testimony that the fingerprints are gone, you

P5SsCOM3

know, that they don't exist anymore, and that that would have been the end of it.  So we, respectfully, submit that the only proper remedy to cure the outrageous prejudice caused by this is a mistrial.

THE COURT:  All right.  Let's hear from the government.

MS. SLAVIK:  Your Honor, respectfully, a mistrial is absolutely unwarranted here.  There was a good-faith basis for the questions asked by the government.  I've been over those good faith reasons, and I simply think that there is no prejudice here, much less incurable prejudice that would require a mistrial.

I think, going back to our discussion yesterday about the DNA evidence, Mr. Agnifilo made very clear that the reason that the DNA results were relevant here was because Investigator Jimenez was the lead investigator and, therefore, it was appropriate to explore why certain steps were taken in the investigation and why certain steps weren't taken in the investigation.

As I flagged for the court yesterday, given the court's ruling that Mr. Agnifilo could pursue such questions on cross-examination, that the government would elicit certain information about the testing in this case from Investigator Jimenez.  That includes the DNA testing, the gas testing, and the fingerprint testing.

P5SsCOM3

I think here, with respect to the fingerprints, I think that a curative instruction that the jury should not draw any inference from the destruction of the fingerprints, I think that sufficiently cures any possible prejudice in this case.

And that is the government's view of how this should be resolved.

THE COURT:  The application for a mistrial is denied for the reasons stated by the government.

In addition, I'll just offer the following, which is, as I said, there were no objections to the questions that were asked up to the last two.  As to those questions, the objections were sustained, so there was no testimony from the witness pertaining to those questions.

The jury has been instructed and will be instructed that they are not to consider questions from attorneys or statements from attorneys as evidence, and they are presumed to follow those instructions, which we will give again.  So there is no absolutely no testimony from the witness that was prejudicial in any way, shape, or form, as the court sustained the objections that were raised.

As to the inference to be drawn here, as I noted at sidebar, the inference that is the most available and plausible inference is that the government raised the issue concerning destruction of the fingerprint cards because the defense on cross-examination was intending to address that and to

P5SsCOM3

undermine the credibility of the investigation concerning the arson incident by showing that critical evidence was destroyed and could not be used by the defense to defend against the suggestion from the government that Mr. Combs was responsible for the arson that occurred.

That is the inference that the court drew -- excuse me -- from the questions that were asked by the government, and it was not until we had the colloquy at sidebar that it became apparent that there may have been a different reason for the line of questioning.

So I don't think that there is a problem of the jury being left with an improper inference or a bell that's been rung and can't be unrung. And as the government points out, to the extent there was any prejudice -- I don't believe that there is any -- that could be cured by striking the testimony and giving an appropriate instruction to the jury.

So, for those reasons, the motion for a mistrial is denied.

As to now, given that, Ms. Shapiro, what do you want me to tell the jury?

MS. SHAPIRO:  Yes, your Honor.

We would request that the court instruct the jury that the questions regarding the destruction of the fingerprint cards were improper and the answers given were irrelevant to this case and this defendant and are not to be considered by

P5SsCOM3

you.

MS. SLAVIK:  Your Honor, the government would consider that prejudicial to the government and an overcorrection of any possible --

THE COURT:  What's the difference between what you said, Ms. Slavik, and what Ms. Shapiro just offered?

I think, phrased differently, I think it's the same thing.

MS. SLAVIK:  Your Honor, I've been calling the government's question improper is absolutely unwarranted.

MS. SHAPIRO:  Your Honor, they were improper, and the court has so found.

MS. SLAVIK:  Your Honor, Ms. Shapiro just said that those questions were not improper and her objection was to questions that, in her mind, suggested the inference that Mr. Combs had anything to do with the inference.

I don't think questions simply related to the destruction of the fingerprint cards were improper.  Frankly, I don't believe that these should be struck from the record.  I think that the best way to correct, to the extent there is a correction required, is to inform the jury that they are not to infer anything from the fact that the fingerprint cards were destroyed.

THE COURT:  I think the issue from the defense's perspective is, just saying the last part, that the answers are

P5SsCOM3

not to be considered, might leave an impression, although I don't think it would, that the questions were appropriate and were getting to something, but that there was some other legal reason why the answers should not be -- the testimony should not be considered.

And so there needs to be that extra step, but I hear the government's argument.  In any event, the motion for a mistrial is denied.

Let's have the witness back.

MS. COMEY:  Your Honor, if I may, it would be deeply prejudicial and unfair to tell the jury that the government did something improper.  Perhaps your Honor could instead instruct the jury that they are to disregard both the questions and the answers and that they are irrelevant to this case, instead of impugning the government counsel by calling our questions improper in front of the jury, your Honor.

THE COURT:  That's fair.

MS. SHAPIRO:  Your Honor, I think the problem that I have with not doing that is that --

Look, we don't want a curative instruction that says, You are not to draw any inference, you know, that Mr. Combs had anything to do with the destruction of the fingerprints, obviously, because that would just make things worse, right.

But we need to find a way to subtly get that issue, if the court is really intending, that the instruction is going to

P5SsCOM3

cure the unfair prejudice from this line of questions and the implication that they were clearly directed at.  I think --

THE COURT:  I don't think there was that implication from the questions, as I explained at length, but I'm still giving a curative instruction.

I think the government's point is, if you're suggesting that there was an improper -- that there was improper conduct, that is too far in the other direction.  Your point is, you have to at least point out that the questions should not be considered because that's really what you're -- what the objection is directed to, since I sustained the objection to the questions that were asked.

MS. SHAPIRO:  So what --

THE COURT:  That's the reason why I think the government is making the point, that there is a different way to do it, that would address your concern, which, again, I think it's highly questionable that there is any inference that the jury would draw along those lines.

So I do agree that you wouldn't want to address it specifically.  I don't think that's the inference the jury would draw.  For present purposes, the point is, the jury shouldn't consider the questions, although we have already instructed them about that.  And we will instruct them about it again and they shouldn't consider the answers.

So that's what we'll do.

P5SsCOM3

MS. SHAPIRO:  Will the court also include that the answers are irrelevant to this case and this defendant and not to be considered by you?

THE COURT:  Yes, I will.

The instruction I'll give is that the jury should disregard --

Sorry.  So, I'll instruct the jury that the questions regarding the destruction of the fingerprint cards and the answers given are irrelevant to this case and this defendant and are not to be considered by them.

MS. SHAPIRO:  Thank you, your Honor.

THE COURT:  All right.  Let's have our witness back. Then we will continue with the examination.

Welcome back.

THE WITNESS:  Yes.

(Continued on next page)

P5SsCOM3

(Jury present)

THE COURT:  All right.  Please be seated.

Members of the jury, before the break, you heard some testimony about fingerprint cards.  And I am now instructing you that the questions regarding the destruction of the fingerprint cards and the answers given are irrelevant to this case and the defendant and are not to be considered by you.

All right?  With that, Ms. Slavik, you may continue.

MS. SLAVIK:  Thank you, your Honor.

BY MS. SLAVIK:

Q.  Investigator Jimenez, before the break we were talking about testing various evidentiary items that you recovered during your investigation.

Do you remember that?

A.  Yes.

Q.  Before we wrap up this morning, I want to talk to you briefly about the interviews that you conducted in connection with your investigation.

Did you interview the owner of the Porsche?

A.  I did.

Q.  Who was that the owner of the Porsche?

A.  He identified himself as Scott Mescudi.

Q.  Based on your interview of Mr. Mescudi, did you reach out to other potential witnesses?

A.  I did.

P5SsCOM3

Q.  Who did you reach out to?

A.  I reached out to one of his drivers named -- first name of Egor.  I don't recall the last name.  And then his personal assistant who was there on scene.  And then the person who provided some -- those print cards, and then there was a --

Q.  Did you reach out to any individuals that did not work for Mr. Mescudi?

A.  OK.  I made attempts to reach out to people unsuccessfully.

Q.  Who specifically did you attempt to reach out to?

A.  There was a suspect named by Mr. Mescudi and there was an assistant that that suspect had.  I reached out to that person unsuccessfully.  And there was a common female involved between the two.  I reached out, made an attempt to reach out to that person.

Q.  Focusing on the person that you identify as the assistant, what was that assistant's name?

A.  It's in my report.  I think it might have been Mary.  I don't recall.  I have to look at my report again.

Q.  You referred to an assistant of a suspect.

Do you remember that?

A.  Oh, her name was Capricorn.

MR. AGNIFILO:  Your Honor, I'll object to the use of suspect.

THE COURT:  All right.  Let's rephrase the question.

Q.  Investigator Jimenez, you mentioned that you reached out to

P5SsCOM3

individuals who were not employed by Mr. Mescudi, is that right?

A. Correct.

Q. Who, by name, did you reach out to who was not employed by Mr. Mescudi?

A. It was a female named Capricorn, there was an individual named Egor, I spoke about before, there was the assistant who did work for Mescudi, who I spoke about, and then there was a -- a common female between somebody who was identified.

Q. Do you remember the common female's name?

A. Yeah. Her name was Cassie Ventura.

Q. So, starting with Capricorn, were you able to make contact with Capricorn?

A. I was not.

Q. Did you attempt to contact Capricorn?

A. Several times, yes.

Q. How many times, if you recall?

A. Multiple phone calls, door knocked the place of residence. Half a dozen maybe, times, attempts.

Q. And when, if you remember, did you attempt to contact Capricorn?

A. Within -- within the immediate timeframe of that investigation. Within a couple of months.

Q. You mentioned that you attempted to reach out to a woman named Cassie, is that right?

P5SsCOM3

A.  Correct.

Q.  Were you able to make contact with Cassie?

A.  I was not.

Q.  How many times did you try?

A.  Maybe a couple.  I don't recall.

Q.  Do you remember how you tried to reach out to Cassie?

A.  I tried to identify maybe where she lived, was unable to, telephone, didn't -- wasn't able to get through, through via telephone, and then I made an attempt through a family member of hers.

Q.  Were you able to reach her?

A.  Never.

Q.  Now, just stepping back, Investigator Jimenez, you said that you concluded that the auto fire was deliberately set and that the Porsche was targeted, is that right?

A.  That was my opinion, yes.

Q.  Were any charges brought related to this auto fire?

A.  Not on my case, no.

Q.  Why not?

        MR. AGNIFILO:  I'll object to the form of the question.

        THE COURT:  Can you rephrase?

Q.  You said that you did not -- no charges were brought with respect to your case?

A.  Correct.

P5SsCOM3                    Jimenez - Cross

Q.  What, if anything --

What, if anything, did you need that you did not have in order to bring charges?

THE COURT:  Sustained.

Q.  Investigator Jimenez, you said that no charges were brought related to this auto fire, right?

A.  Not at that time, no.

Q.  Did you ever close the case?

A.  I did not close the case.

Q.  What is the status of the case presently?

A.  It's listed as inactive pending anything further that may arise.

MS. SLAVIK:  Nothing further at this time, your Honor.

THE COURT:  All right.  Cross-examination.

MR. AGNIFILO:  Thank you.

CROSS-EXAMINATION

BY MR. AGNIFILO:

Q.  Good morning --

A.  Good morning.

Q.  -- investigator Jimenez.  My name is Marc Agnifilo.  I'm going to ask you some questions.  If I ask you a question that you don't understand, just ask me to rephrase it and I'll be happy to do that.

A.  Sure.

Q.  You put a number of photographs into evidence this morning.

P5SsCOM3                    Jimenez - Cross

I'm going to direct your attention to one particular one, which is 8C-116.

MR. AGNIFILO:  So, that's in evidence.  If we can put it on the screen and give it to Investigator Jimenez and the jury.

Q.  This is the inside of the Porsche, right?

A.  Correct.

Q.  You see a glass bottle?

A.  Yes.

Q.  You submitted that glass bottle for DNA testing?

A.  I did.

Q.  And it came back with a hit, as you said, correct?

A.  A partial hit, yes.

Q.  Partial hit.  That this bottle contained female DNA, correct?

A.  That's what the report said, yes.

Q.  When you send out DNA, you send it to an external laboratory, am I right?

A.  Right, within LAPD.

Q.  Bode Laboratories, does that name sound familiar?

A.  I don't know the name of the laboratory.  I'm sorry.

MR. AGNIFILO:  Let me show you something, if it's going to help.  It's Defense Exhibit 850.  We can put it up just for the witness and the parties.

Q.  All right.  You see that in front of you?

P5SsCOM3                    Jimenez - Cross

A.  I do.

Q.  Yeah, I know.

        MR. AGNIFILO:  Do me a favor.  If we could enlarge the top of this for the fire investigator.  All right.

Q.  OK.  So my question is if, in this case, you sent this glass bottle out for DNA testing to Bode Technology?

A.  I did not.

Q.  OK.  Did you --

        THE COURT:  Hold on.  Hold on.  Are you trying to refresh the witness's recollection?

        MR. AGNIFILO:  Yes.

        THE COURT:  All right.  Then allow him to refresh his recollection.

        MR. AGNIFILO:  I'm sorry.  That's fine.

        THE COURT:  Then ask some questions.

Q.  All right.  So do you remember if -- not you personally, but you and the other people who were working --

        THE COURT:  Let's take the document down.

        MR. AGNIFILO:  We can take it down.

        THE COURT:  Ask your questions.

Q.  -- were working on the fire investigation, sent the glass bottle to Bode Technologies for DNA testing?

A.  Incorrect.

Q.  OK.  How did that happen?

A.  I have no idea.

P5SsCOM3                        Jimenez - Cross

Q.  Did you receive a report from Bode Technology?

A.  I don't recall who the report came back from.

Q.  Do you remember seeing a report?

A.  I did a report.

Q.  OK.  Do you remember seeing a report indicating that the glass bottle tested positive for a female's DNA?

A.  I think we've testified to that, yes, there was a partial female.

Q.  OK.  And after that, you reached out for Capricorn Clark, isn't that right?

A.  Not after that.  I think it was all during the same timeframe.

Q.  When was the first time you reached out for Capricorn Clark?

A.  I would imagine -- I recall maybe within a few weeks of the incident.

Q.  Do you remember?

A.  I don't recall.

Q.  Do you have a specific recollection one way or the other?

A.  It was within that immediate timeframe before I turned in my report.

Q.  Are you sure about that?

A.  Yes.

Q.  Did you reach out for her several times you said?

A.  Made couple of phone calls and did a door knock at her

location.

Q. Do you remember reaching out for her in August of 2012?

A. It's possible.

Q. OK. That would have been after you got this report, right?

A. I don't recall.

MR. AGNIFILO: OK. So can we look at the report and see when you would have gotten this report. Pull it back up for the fire investigator.

Q. Do you recall that the report came back on or about March 22, 2012?

A. I don't recall that, to be honest, when it came back.

Q. Do you know about when it came back?

A. Within that first year of the investigation.

Q. OK. And aside from a year, can you tell us anything more specific about when the DNA report came back for the bottle that's in the car?

A. I mean, it's -- the timeframe would be probably within, maybe, six months to a year. I don't recall.

Q. You don't recall?

A. I don't recall when the report came back, no.

Q. All right.

A. I would have to go through, like, my previous e-mails when it was given to me.

Q. All right. So let's talk about Government Exhibit 8C-116.

Do you have that in front of you?

P5SsCOM3                    Jimenez - Cross

A.   Not yet, no.

MR. AGNIFILO:  Put it in front of the fire investigator.

Q.   OK.  So, here, we have the glass bottle that you say was dropped in through the top of the car, right?

A.   Correct.

Q.   OK.  And this glass bottle, when you recovered it, contained a certain amount of gasoline, correct?

A.   Yes.

Q.   All right.  And so, your theory, as you just told us, is that this glass bottle was the source of the fire in the car, right?

A.   It's an opinion, yes.

Q.   OK.  And that was your opinion as a trained fire investigator?

A.   Correct.

Q.   OK.  And so, who made the decision to send this glass bottle off to be DNA tested?

A.   I did.

Q.   OK.  So, you realized it's possible that there is going to be important evidence on this bottle, correct?

A.   Yes.

Q.   And you sent it off to be tested for DNA, right?

A.   Yes.

Q.   And you would be expecting results on that, you would want

P5SsCOM3                         Jimenez - Cross

to see what those results were, correct?

A.  Yes.

          MS. SLAVIK:  Objection.

          THE COURT:  It's overruled.

Q.  Right?

A.  Yes.

Q.  It's important to your investigation to know if this glass bottle comes back with DNA on it, right?

A.  Correct.

Q.  OK.  So this is something that you would be looking forward to seeing, correct?

A.  Yes.

Q.  And you got results back that, in fact, there was female DNA on this glass bottle, am I right?

A.  Partial female, yes.

Q.  OK.  Partial female.  So what does that mean to you?

A.  I have no idea.

Q.  So did you do any followup?  Did you figure this out?

A.  I asked what that meant, and I was told that if I could come up with a -- maybe a sample of somebody or suspect, maybe they might be able to match.  Other than that, I have no idea what that was referring to.

Q.  But it was female DNA, you knew that?

A.  That's what the report said, yes.

Q.  That's the only DNA that came back in this case, am I

P5SsCOM3                      Jimenez - Cross

right?

A.  On that, yes.

            MS. SLAVIK:  Objection.

            THE COURT:  That's sustained.

            The jury should disregard the witness's last answer.

            Mr. Agnifilo.

Q.  To your knowledge, to your knowledge, did any other --

            MS. SLAVIK:  Objection.

Q.  -- DNA comeback?

            THE COURT:  That's sustained.

Q.  So this glass bottle comes back with female DNA.

            Is there any other DNA that's on this glass bottle?

            MS. SLAVIK:  Objection.

            THE COURT:  You've got to rephrase the question.

            MR. AGNIFILO:  All right.

Q.  You sent a number of objects off for DNA testing, right?

A.  Yes.

Q.  You sent the cloth, right?

A.  Correct.

Q.  You sent the bottle, as we discussed, right?

A.  Yes.

Q.  You have to say yes or no.

A.  Yes.  I'm sorry.

Q.  You sent the lighter?

A.  Yes.

P5SsCOM3                        Jimenez - Cross

Q.  Now I want to show you Government Exhibit 8C-122.  Is that up in front of you?  Do you see that there?

A.  Yes.

Q.  All right.  Do you see in the lower left-hand corner of that photograph what seems to be a black object?

     Do you see that?

A.  I don't.

Q.  Do you see a black object on -- yeah, on the passenger seat in the rear, on the rear?

A.  Yes.

Q.  Do you know what that was?

A.  I think it's a glove.

Q.  It's a glove.

     MR. AGNIFILO:  OK.  I'm going to ask that the witness be shown what has been introduced, but not admitted yet, as Defense Exhibit 853.  This is just for the witness and the parties.

Q.  This is another one of the photographs that were taken that day, correct?

A.  Correct.

Q.  OK.  You didn't discuss this one on your direct examination, am I right?

A.  Correct.

Q.  OK.

     MR. AGNIFILO:  And we offer it as 853.

P5SsCOM3                        Jimenez - Cross

THE COURT:  Any objection?

MS. SLAVIK:  No objection.

THE COURT:  853 will be admitted.

(Defendant's Exhibit 853 received in evidence)

MR. AGNIFILO:  OK.  Can we show the jury 853.

BY MR. AGNIFILO:

Q.  That's a glove, right?

A.  Yes, sir.

Q.  Did you find a second glove?

A.  I don't recall.

Q.  So, in the car there is the bottle, right?

You have to answer yes or no so she can write it down.

A.  Yes.

Q.  There is the fabric, right, that was burned?

The piece of cloth, you said it was a fancy napkin or handkerchief?

A.  Yes.

Q.  And there was the liquid gasoline, correct?

A.  Yes.

Q.  And there was this glove, this one single glove in the back seat, am I right?

A.  Yes.

Q.  Without a second glove, am I right?  No second glove you found?

A.  I don't recall the second glove.

P5SsCOM3                        Jimenez - Cross

Q.  OK.  Did you test the glove for DNA?

A.  No, we did not.

Q.  OK.  Did you look at the glove?  Did you examine the glove?

A.  I believe it belonged to the owner.

Q.  Belonged to the owner?

A.  Of the car.

Q.  Did you ask the owner if it was his glove?

A.  I believe so, yes.

Q.  Did you ask him why there was one in the car?

A.  I did not ask him.  It was a driving glove, according to him.

Q.  Driving glove?

A.  Yes.

Q.  So let's talk about this.  So the one driving glove belonging to the owner was in the back seat of this car, is that what you're telling us?

A.  That's where I observed it, yes.

Q.  Yeah.  You observed it, and this photograph was taken of the one driving glove belonging to the owner in the back seat of the car, right?

        MS. SLAVIK:  Objection, your Honor, form.

        THE COURT:  It's overruled, but let's ...

        Let's keep in mind that there may be objections to repeated questioning along these lines.

        MR. AGNIFILO:  I understand.

P5SsCOM3                          Jimenez - Cross

BY MR. AGNIFILO:

Q.   Let me ask you a different question.

     Did you think it was significant that a single glove was in the back seat of this car?

A.   I did not.

Q.   OK.  You thought it was significant enough that you talked to the owner about it, though, right?

A.   Yes.

Q.   And you asked him if he knew about it and he said it was his glove, correct?

A.   That's my recollection, yes.

Q.   Now, so you did not send this glove for any sort of testing of any sort, correct?

A.   I did not collect the glove as evidence.

Q.   You didn't even take the glove as a piece of evidence?

A.   No.

Q.   Now, do you know how the one glove would have gotten into the car?

A.   I have no idea.

Q.   And you agree with me that, how far --

     See, let's look at 853.  You see these markings, these black kind of blotches on the console in the back of the rear seat?  Do you see that?

A.   Which photo are you referring to?

Q.   Looking at 853.  I think it's up on the screen.

P5SsCOM3                    Jimenez - Cross

MR. AGNIFILO:  It's not marked.

MS. SLAVIK:  Your Honor, this is not marked.

A.  OK.  Now, I see it.

Q.  Do you now see it?

A.  I do now.  Thank you.

Q.  All right.  And you see the black sort of splotch in between the two seats in the rear of the car?

A.  Yes.

Q.  What is that?

A.  It's my opinion it's the drop-down material from the canvas roof.

Q.  OK.  So the roof, right above where these black marks are, that's where the roof was cut, right?

A.  And it also had burned through.

Q.  But it was cut there and it was burned there, right?

A.  Yes.

Q.  OK.  And your premise was that the Molotov cocktail was dropped in that part of the roof, right?

A.  That was my opinion, yes.

Q.  OK.  Did you think it was a possibility that the person who was holding the Molotov cocktail would have been wearing a glove?

A.  It's possible.

Q.  OK.  Because the Molotov cocktail would get hot, right?

A.  No.

P5SsCOM3                         Jimenez - Cross

Q.  After you set it on fire?

A.  No, it doesn't get hot.

Q.  At one point it's on fire, right?

A.  The wick is on fire.

Q.  So part of is on fire, right?

A.  The cloth material would be on fire.

Q.  So if I were holding a Molotov cocktail and I lit it --

          MS. SLAVIK:  Objection.

          THE COURT:  It's overruled.

Q.  -- my hand would be close to the fire, correct?

A.  It would be close to the bottle.  It would be on the bottle.  That's how Molotovs operate.  They throw --

Q.  That's not my question.

A.  OK.

Q.  My question is, if I was holding a Molotov cocktail --

A.  Yes.

Q.  -- and I lit it, my hand would be close to the flame that I lit, correct?

A.  Sure.

Q.  OK.  So, let's look.  Let's take a few steps back.

          We're going to go through some of these photographs that you and your partner were good enough to take that morning.  We're going to start with 8C-101 that's already in evidence.

          OK.  All right.  When you entered the property the day

of your investigation, did you go through that door?

A.  I did not.

Q.  You never went through that door?

A.  No.

Q.  Let's go to 8C-103.  Now, I think you said that there were -- it was a long driveway and we see the driveway in this photograph, correct?

A.  Correct.

Q.  And I think we see the black Porsche up front.

     Do you see that?

A.  Yes.

Q.  All right.  Then there is a red Mercedes, and then I think you said there was a black-colored Jeep?

A.  Correct.

Q.  This vehicle we see on the left, a Chevy of some sort, do you know what that is?

     Was that a law enforcement vehicle, or was that vehicle there --

A.  That's the vehicle we arrived in.

Q.  That's my question.  That's your car.

     All right.  OK.  Let's go to 8C-105.

     There is one of the entry doors to the house, am I right?

A.  I believe so.  I think it's adjacent to the garage door.

Q.  OK.  So let's do this.  Let's look at 8C-106 to orient us.

P5SsCOM3                    Jimenez - Cross

That's what you're talking about, right?

A.  That's the one you're referring to, yes.

Q.  That's the garage.  The larger door is the garage door?

A.  Correct.

Q.  All right.  And the other door is entry into the house?

A.  I don't recall if it was actually into the house or into the garage.  I don't know.

Q.  All right.  Let's go to 8C-107.  This is the black Porsche, right?

A.  Yes, sir.

Q.  OK.  And there is no damage on the outside of the car, am I right?

A.  Yeah.  I didn't observe any damage to the outside of the vehicle.

Q.  And here, you can see, we're going to have closer-up views, you can see the damage to the roof of the car, right?

A.  It's a tough picture.  You can barely see some damage.

Q.  All right.  We're going to see it better.

        Let's look at 8C-108.  All right.  8C-108, that's a -- that's the damage to the top of the car, right?

A.  Correct.

Q.  OK.  And does it look to you that it's two cuts?

        You said there were intentional cuts that looked, to you, to be intentional into the roof?

A.  I formed the opinion they made a cut.  I don't know if they

P5SsCOM3                          Jimenez - Cross

made two, but that is some burn damage that occurred from the fire, as well.

Q.   OK.   Just so the jury understands what you're saying, so the material that is sort of on the inside of the opening has -- that's burn damage.

The way that looks, that's from heat, correct?

A.   Can you rephrase your question?

Q.   Yes.

What's the top of the car made out of?

A.   I don't know, to be honest.   I'm -- I don't know Porsche material.

Q.   All right.

A.   Sorry.

Q.   So the burn damage you're talking about, though, is this material that is sort of, like, slightly discolored, correct?

A.   The burn damage that we're referring to in the other photo?

Q.   The one we're looking at right now.

A.   Right now.

What is your question?   I'm sorry.

Q.   Where is the burn damage?

A.   It looks like heat damage to the left side of that cut.

Q.   OK.   So heat damage is different than fire damage, am I right?

A.   I consider it the same.   I mean, it's part of fire damage.

Q.   All right.   So, from what you can tell, was this part ever

P5SsCOM3                              Jimenez - Cross

on fire?

A.  I think it got affected by the radiant heat, yes.

Q.  That is really my question.  So this damage comes from the heat from the fire inside the car.  It's not your conclusion that this was on fire, right?

A.  I don't know how extensive the fire was.  But, in my opinion, heat rose from the seat of the vehicle and it caused the damage to the interior of the roof, which we showed previously pictures of.

Q.  Let's look at 8C-112.  Wait for that to come up.

OK.  So in 8C-112, we see -- what did you say this material was between the center console and the driver's seat?

A.  Are we talking about the handkerchief?

Q.  Yes, the handkerchief.

A.  It looked like a cloth material handkerchief.

Q.  So this is, that white thing that is partially burned, is the handkerchief, correct?

A.  Correct.

Q.  It's not all the way burned.  Do you agree with me?

A.  Yes.

Q.  It has some burn damage and some parts of it were not burned at all, am I right?

A.  Yes.

Q.  Now, does that mean to you that --

Well, let's look at a few more photographs, and then

P5SsCOM3                        Jimenez - Cross

I'll ask you the next question.

Let's go to 8C-115.  All right.  Here, we see the bottle, and the bottle has fallen over to the left side, correct?

A.  Correct.

Q.  All right.  Now, gasoline is a liquid?

A.  It's ignitable liquid, yes.

Q.  It pulls -- it tends to go downward and pulling at the lowest point, correct?

A.  I don't understand the question.

Q.  It's not a gas, right?

A.  You mean fumes?

Q.  I'm asking you, the gasoline that you recovered was a liquid, right?

A.  Inside the bottle.

Q.  OK.  And looking at the damage that you see here in 115, is it consistent with liquid gasoline pouring out of this bottle to the left and then dropping down into the seat of the car?

A.  I think it's visual inside that whole seat, where you would drop the bottle, the wick would fall, get stuck in the side. The bottle would tip over and spill more gasoline.  So you would see more damage there, where the fire was burning.

Q.  So the majority the damage is right near the opening of the glass bottle, am I right?

A.  Where you see that one, yes.

P5SsCOM3                        Jimenez - Cross

Q.   OK.   Let's look at 116.   It's a little closer-up.

So, from here, you can see some of the damage is to the left of the photo, but the majority is sort of down, you know, where the seat bottom meets the back, correct?

A.   You'll have to rephrase that.

What do you mean by left of the photo?

Q.   So some, some of the liquid seems to go towards the steering wheel on that front seat.

Do you see that?

A.   No, I don't see what you're talking about.

Q.   Do you see burn damage in the direction of the front seat from the bottle?

A.   I don't see what you're referring to.   You would have to point it out to me.

Q.   All right.   Let's focus on the bottle.

You see the bottle, right?

A.   Yes.

Q.   There is burn damage on both sides of the opening, correct?

A.   Both sides of the opening of the bottle?

Q.   Correct.

A.   Meaning, like, to either side, like, if the bottle is here, to either side?

Q.   Yes, that's right.

A.   I see what you're saying, yes.

Q.   Good.   That was my question.

P5SsCOM3                           Jimenez - Cross

A.  OK.

Q.  All right.  So the majority of the damage, though, is to the part of the seat where the rear seat meets the back of the seat, am I right, as opposed to it moving in the direction of the steering wheel?

A.  Yes.  I see what you're saying.

Q.  OK.  And my question is, that's because the gasoline is a liquid, and so it tends to go down to the -- it drops, it's affected by gravity, it goes down and pools at a low point, correct?

A.  I don't understand what you're saying, but if you're -- if you can let me elaborate what you're trying to say?

Q.  Sure.  Go ahead.

A.  From my opinion, from what happened, the bottle was dropped.  Where the base is, the wick got caught, which is where you see the unburned part of the wick, which was inside the bottle.  The wick smoldered and the bottle flipped, and then did distribute a little bit of gasoline there.  A lot of gas stayed in the bottle.  You have fumes and still burning when the gas platters.

Q.  Here is my question.

You can see what you call the wick between the driver's seat and the console; you see that white part right there?

A.  Correct.

P5SsCOM3                        Jimenez - Cross

Q.  So if the --

A.  Not in this photo, no.  But yes, I know what you're talking about.

Q.  You don't see the white there?

A.  Not in this photo.

Q.  OK.  So, if the wick falls out of the bottle, my question is, how does the fire move to this part of the seat, if the wick is already out of the bottle?

A.  Well, you have flame disbursement from the fumes, and then you have the gas emitting the fumes, and you have the gas that spills over on this side, which were -- fumes would follow. And then there's not enough oxygen, which is why the fire, in my opinion, smoldered out.  You'll still going to have some generating heat that travels up to the roof, where we saw damage to the interior.

Q.  So your belief is that this bottle was dropped into that opening in the roof, correct?

A.  That is my opinion, yes.

Q.  And it struck some part of the seat, the front seat or the console, correct?

A.  That's my opinion, yes.

Q.  When that happened, the wick came out of the bottle, am I right?

A.  That's my opinion, yes.

Q.  And then this bottle ends up falling to the left and

P5SsCOM3                         Jimenez - Cross

depositing some of the gasoline into this area where you see a burn pattern, am I right?

A. That would -- that's a good -- yes. That's what my opinion is, yes.

Q. All right. And my question is this. Since you are seeing that the bottle fell from the roof onto that center console area, wouldn't you consider the glove significant in the back seat?

A. Not if the glove belonged to the owner. I'm not -- if the glove -- if the owner took off the glove and tossed it in the back seat, he said it belonged to him, so it was irrelevant to my investigation.

Q. Now, did Mr. Cudi have one Porsche or more than one Porsche?

A. If I'm not mistaken, I think he had one in the garage.

Q. OK. So he had a second Porsche, right?

A. In the garage, from what I understand, yes.

Q. Is there any mention of the second Porsche in your report?

A. No. It was unrelated to this fire.

Q. So was the red Mercedes, right, and that was in your report?

A. Because it's in the photo.

Q. So, let's look at --

A. It would be like describing furniture in his house. It would be irrelevant.

P5SsCOM3                         Jimenez - Cross

Q.  I've got a question for you.

Let's look at another photo that you took that day that you didn't talk about on direct examination.  Defense Exhibit 852 for the witness.  Defense 852 for identification.

Do you see that photo?

A.  Yes.

Q.  That's the second Porsche?

A.  Yes, I believe so.

MR. AGNIFILO:  We offer it, your Honor.

MS. SLAVIK:  No objection.

THE COURT:  852 will be admitted.

(Defendant's Exhibit 852 received in evidence)

BY MR. AGNIFILO:

Q.  So, Mr. Cudi had a second -- Kid Cudi, Mr. Mescudi, had a second Porsche, correct?

A.  That's what I was informed, correct.

Q.  You and your partner took a photo of it?

A.  Yes.

Q.  And that's the photo we're looking at?

A.  Yes.

Q.  OK.  So, what you said was that you put in the vehicles in your report that were in the photo, but you didn't put the blue Porsche in the report, did you?

A.  The garage door was closed at the time of our arrival.  It was irrelevant to my investigation.

P5SsCOM3                    Jimenez - Cross

Q.  So why did you take a picture?

A.  I did not take the picture.  My partner did.

Q.  Why, to your knowledge, why did your partner take a picture of it?

A.  I have no idea why he took that picture.

Q.  So, there's a second Porsche, though, right?

That was Mr. Mescudi's Porsche, correct?

A.  That's my understanding.

Q.  Let's look at Government Exhibit 8C-106.  It's already in evidence.

Here, we can see how much liquid is in the Old English bottle.  You see that, right?

A.  Correct.

Q.  So that, obviously, did not burn up in the fire because it's still in the bottle, correct?

A.  Yes.

Q.  All right.  And is that significant with your premise that the wick that was on fire fell out of the bottle when the bottle tipped over to the left?

A.  That's my opinion, yes.

Q.  OK.  Because, tell me if this is right, if there was fire inside the bottle, all of the gasoline would have burned up?

A.  Not necessarily.

Q.  OK.

A.  You need a proper oxygen, mix of fuel and oxygen.

Q.  All right.  And you don't know how much gas -- you don't know how full this bottle was when it was dropped, you have no idea how much gas leaked out of the bottle?

A.  Correct.

Q.  Do you know how much gas was left in the bottle?

A.  Yes.

Q.  Now, you said that you tried several times to contact Capricorn Clark and you were not able to, right?

A.  Correct.

Q.  And you said you tried several times to contact Cassie Ventura, am I right?

A.  Yes.

Q.  And you never made contact with her either?

A.  No.

Q.  OK.  And were these contacts after you got the results from Bode Labs that there was female DNA on the bottle?

A.  I don't recall.  It might have been before that.

Q.  Do you have anything in your report indicating exactly when you reached out for Ms. Ventura?

A.  No.

Q.  You have no indication in your report as to when you did that, correct?

A.  Correct.

          MS. SLAVIK:  Objection, asked and answered.

          THE COURT:  Overruled.

P5SsCOM3                    Jimenez - Cross

Q.  Can you tell us a month?

A.  It would have been within that -- probably that first few weeks maybe

Q.  Are you sure?

A.  Yes.

Q.  You're sure?

A.  That's my recollection.

Q.  So tell me about how you recall.

Where were you when you called?  Tell us everything you recall about making these phone calls.

A.  Sure.

MS. SLAVIK:  Objection, argumentative.

THE COURT:  It's overruled.

Q.  Go ahead.

A.  Sure.

I reached out, left messages, got no response, got no return call.  I believe Capricorn's brother answered the phone. I got in an argument with him for me to leave her alone, she wanted nothing to do with me, she wanted nothing to do with the investigation.  She wanted -- and he and I got in an argument about it.  He was impeding my investigation.  I had questions for her, strictly just as an investigative side.  She wasn't in any trouble.  And I got in a verbal confrontation with him over the phone, on her phone, and that was the last of my attempts.

Q.  All right.  And with Ms. Ventura, did you ever make contact

P5SsCOM3                    Jimenez - Cross

with her in any sort?

A.  I did not.

Q.  How many times did you try?

A.  Maybe a couple.  I did reach out to her -- I was able to contact her father, I believe, if I am not mistaken.

Q.  Who is a fireman, right?

A.  Yes, sir.

Q.  But Ms. Ventura never called you back?

A.  She never returned -- I asked and pleaded with him to reach out to her to see if she would answer some questions.  He said he would let her know I just wanted to talk to her on the investigative side.  And she never reached out to me.

Q.  And nobody called you back?

A.  She did not call me back.

Q.  And in regard to Mr. Mescudi, as soon as he told you that the one glove in the car was his, you didn't do any more investigation as to that glove, right?

A.  Correct.

        MR. AGNIFILO:  I don't think I have any more questions, but let me check.

Q.  Do you remember if you put anything in this report about this single glove you found in the back seat of the car?

A.  I don't think I did.

        MR. AGNIFILO:  One more second, judge.

        Thank you, sir.  Thank you, Judge.

P5SsCOM3                    Jimenez - Redirect

THE COURT:  All right.  Redirect.

MS. SLAVIK:  Just very briefly, your Honor.

REDIRECT EXAMINATION

BY MS. SLAVIK:

Q.  Investigator Jimenez, you were just asked a series of questions about the glove that was found in the back of the car.

Do you remember that?

A.  Yes, of course.

Q.  And you didn't collect that glove as evidence?

A.  Yes.

Q.  Why not?

A.  I did not.

Q.  Can you remind the jury why not?

A.  It was irrelevant to my investigation.  The owner said it belonged to him.

Q.  At any point when you spoke to the owner, that's Mr. Mescudi, did you have the impression that he did not want you to investigate this issue?

MR. AGNIFILO:  Objection.

THE COURT:  That's sustained.

Q.  You spoke with Mr. Mescudi, is that right?

A.  Yes.

Q.  Can you remind the jury when you first spoke with Mr. Mescudi?

P5SsCOM3                    Jimenez - Redirect

A.   The day of the incident.

Q.   And how soon after you spoke with Mr. Mescudi did you reach out to Capricorn?

A.   I made attempts, I think, within a weeks after that.

Q.   To be clear, was the reason that you reached out to Capricorn because you received a DNA report?

A.   No.

          MS. SLAVIK:  Nothing further, your Honor.

          THE COURT:  All right.  Thank you very much.

          Thank you, Investigator Jimenez.

          (Witness excused)

          THE WITNESS:  Thank you, your Honor.

          THE COURT:  The government may call its next witness. Ms.  Comey, we're at 12:00.  We can go on for a little bit or we can take a break.  It's your election.

          Would you want to take the lunch break now, or would you rather get your direct started, and then maybe there's a good stopping place about 20 minutes.

          MS. COMEY:  I think we can get started, your Honor.

          THE COURT:  The government may call its next witness.

          MS. COMEY:  The government calls Deonte Nash.

          Your Honor, may I retrieve the binder?

          THE COURT:  You may.

          MS. COMEY:  Thank you.

   DEONTE NASH,

P5SsCOM3                          Nash - Direct

called as a witness by the Government,

having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Could I please ask you to give the court your first and last name and spell your first and last name into that microphone.

THE WITNESS:  Deonte Nash.  D-e-o-n-t-e N-a-s-h.

MS. COMEY:  May I inquire, your Honor?

THE COURT:  You may.

MS. COMEY:  Thank you.

DIRECT EXAMINATION

BY MS. COMEY:

Q.  Good afternoon, Mr. Nash.

Are you testifying here today because you received a subpoena?

A.  Yes.

Q.  Did that subpoena require you to appear here today?

A.  Yes.

Q.  Do you want to testify at this trial?

A.  Absolutely not.

Q.  What do you do for work?

A.  I am a celebrity stylist.

Q.  Can you explain to the jury what a celebrity stylist, please?

A.  Um, I shop, do a little designing for music videos, all the fun stuff.

P5SsCOM3                          Nash - Direct

Q.  I would like to direct your attention to 2008.

What were you doing for work then?

A.  Working with Sean Combs and Cassie.

Q.  What were you doing with Sean Combs and Cassie?

A.  Styling.

Q.  Who did you style?

A.  Puff and Cassie.

MS. COMEY:  Could we please pull up what is in evidence as Government Exhibit 2A-101.

Q.  Do you recognize the person in that photograph, Mr. Nash?

A.  Yeah.  That's Puff.

Q.  Is that the person that you styled starting in around 2008?

A.  Yes.

Q.  Do you know him by any other names?

A.  Um, yeah.  Sean Combs.

MS. COMEY:  We can take that down.  Thank you.  Can we please pull up Government Exhibit 2A-401.

Q.  Do you recognize the person in that photograph?

A.  Yes.  That's Cass.

Q.  Is that the same person you said you styled starting in 2008?

A.  Yes.

Q.  Do you know her by any other name?

A.  Cassie, Casandra Elizabeth Ventura.

MS. COMEY:  We can take that down.  Thank you.

P5SsCOM3                         Nash - Direct

Q.   How did you get hired to work styling Mr. Combs and
Ms. Ventura?

A.   I moved to New York.  Maybe, like, two weeks later, I
responded to a Craigslist ad and it kind of went on from there.

Q.   So what was your first position?

A.   Intern.

Q.   Where?

A.   Um, the fashion department with Derek Roche.

Q.   The fashion department of what?

A.   Bad Boy Entertainment.

Q.   Who ran Bad Boy Entertainment?

A.   Sean Combs.

Q.   What was your next position after you were an intern?

A.   Just a stylist.

Q.   And you said that you were an intern with Derek Roche.
          Who is Derek Roche?

A.   That was Puff's main stylist.

Q.   About when did you stop working for Mr. Combs?

A.   2018.

          MS. COMEY:  Can we pull up, please, what's in evidence
as Government Exhibit 2A-504.

Q.   Who is that?

A.   That's me.

Q.   Is that a fair and accurate depiction of what you looked
like during part of the time you worked for Mr. Combs for a

stylist?

A.   No.

Q.   Is it a Glamour Shot of you?

A.   Yes.  I look amazing.

          MS. COMEY:  We can take that down.  Thank you.

Q.   During your time working as a stylist for Mr. Combs and Ms. Ventura, how were you paid?

A.   Um, through Sean Combs' companies.

Q.   What was your relationship with Ms. Ventura like during the years you worked as her stylist?

A.   We were very close.

Q.   Based on your interactions with Ms. Ventura between 2009 and 2018, who did you understand she was in a relationship with?

A.   Puff.

Q.   How did you learn that Ms. Ventura and Mr. Combs were in a relationship?

A.   I mean, I was around every day.

Q.   And about when did you learn that they had started being in a relationship?

A.   Very early.

Q.   Do you remember what year approximately?

A.   Very early.  Maybe 2009, 2010.

Q.   I would like to focus on the period between 2009 and 2018.

          During that time, how much time did you spend with

P5SsCOM3                        Nash - Direct

Ms. Ventura?

A.   Almost every day.

Q.   How close were you and Ms. Ventura during that same period?

A.   Very close.

Q.   And about how often did you see Ms. Ventura interact in person with Mr. Combs during that same period?

A.   Pretty often.

Q.   So could you give us a sense of about how often you would see the two of them interact?

A.   At minimum, once a week.

Q.   I would like to focus on those in-person interactions.

What, if any, names did you hear Mr. Combs call Ms. Ventura in front of you?

A.   Um, Baby Girl, CC, Cass, bitch, slut, ho.

Q.   About how many times do you remember hearing Mr. Combs call her a bitch?

A.   Um, quite a bit.  That was his fave.

MR. DONALDSON:  I'm sorry, Judge.  I couldn't hear the last answer.

A.   I said quite a bit.  That was his fave.

Q.   In what context did you hear Mr. Combs call Cassie a bitch?

A.   Bitch, stop playing with me.  Bitch, you better bring your ass to this house.  I mean, I was there for quite some time.

Q.   What was Mr. Combs' tone when you heard him say those things to Cassie?

P5SsCOM3                          Nash - Direct

A.   Sometimes he would be calm, sometimes irate, but he was always.

Q.   And about how often did you hear Mr. Combs refer to Cassie as a ho or a slut?

A.   Quite a few.

Q.   In what context?

A.   Um, he told her that she was just an outright ho.  Um, he told her she was nothing but a slut anyway.

Q.   What was Mr. Combs' tone when he said those things?

A.   Um, he was pretty irate.

Q.   How did Ms. Ventura react when Mr. Combs said those things to her in front of you?

A.   She --

        MR. DONALDSON:  Objection.  Time period, Judge.

        MS. COMEY:  Talking about the statements he just testified to, your Honor.

        THE COURT:  That's overruled.

Q.   So when you heard Mr. Combs say the things you just testified to, Mr. Nash, how did you observe Ms. Ventura react?

A.   She would be sad.

Q.   What would she do?

A.   Sometimes cry.  Sometimes go into a depression.

        MR. DONALDSON:  Objection, your Honor.  Move to strike the last part of the answer.

        THE COURT:  Overruled.

P5SsCOM3                          Nash - Direct

A.  Pardon me.

Q.  During the period between 2009 and 2018, what, if any, threats did you personally hear Mr. Combs make to Ms. Ventura in front of you?

A.  That he would beat her ass.  Um, that he wouldn't put her music out.  Um, that he would get her parents fired from their jobs and he would send her sex tapes to their jobs.  He would start there.

Q.  Let me break each of those down, please.

About how many times do you remember hearing Mr. Combs say, in front of you to Ms. Ventura, that he would beat her ass?

A.  Quite a few.

Q.  What was Mr. Combs' tone when you heard him say that?

A.  Um, he was pretty angry.

Q.  How did Ms. Ventura react each time you heard him say that to her?

A.  It drove her crazy.

Q.  What do you mean?

A.  She would be super emotional.

Q.  Can you explain what you mean?

A.  She would cry.  Sometimes she would just stay in the house for days and go in a cocoon.

Q.  Next you said that you heard Mr. Combs say that he would not put Cassie's music out.

P5SsCOM3                        Nash - Direct

About how many times did you hear Mr. Combs say that to Cassie in front of you?

A.   Quite a few.

Q.   In what context?

A.   When we were working on the mix tape, anytime she did something that he didn't like, he always said that, you know, Y'all little mix tape ain't coming out.

MR. DONALDSON:  Objection, your Honor.  Form of the question.  Strike the answer.

THE COURT:  Hold on.

Mr. Nash, when there is an objection, just hold on for a second, and then I'll let you know if you can answer.

MS. COMEY:  I think I asked for context.

THE COURT:  Hold on.

It's overruled.

MS. COMEY:  Sorry.

THE COURT:  Why don't we get a fresh question.

When there is an objection, all you need to say is objection, we'll pause, and I'll take a look.

MS. COMEY:  Thank you, your Honor.

BY MS. COMEY:

Q.   Mr. Nash, we'll come back to the mix tape in a bit.  I just want to ask about another threat you said you heard Mr. Combs make.

About how many times did you hear Mr. Combs threaten

P5SsCOM3                    Nash - Direct

to do something to Ms. Ventura's parents?

A.  One, off the top of my head.

Q.  And that one time, where were you?

A.  Sitting right next to her in the car.

Q.  And about what year was that?

A.  2012, '13.

Q.  We'll come back to that as well.

A.  OK.

Q.  During that same period, between 2009 and 2018, about how many times do you remember hearing Mr. Combs say that you and Ms. Ventura could not go out without his permission?

A.  Twice.

Q.  When is the first time that you remember?

A.  The first time was when we went to a gay club with Rita Ora and Adrienne Bailon.

Q.  Let me ask you about that.

     About what year was this?

A.  2013.

Q.  Are you estimating?

A.  Yes.

Q.  And you said you went to a gay club.

     Who went to the gay club?

A.  Me, Cassie, Kyle, Rita, and Adrienne.

Q.  And after going to the gay club, where did that group of people go?

P5SsCOM3                           Nash - Direct

A.  To Cassie's apartment.

Q.  Where was Cassie's apartment at the time?

A.  818 Doheny.

Q.  Was that in Los Angeles?

A.  Yes.

Q.  And when that group was back at Cassie's apartment, what, if any, phone calls did you observe Cassie receive?

A.  A call from Puff.

Q.  What happened when she got a call from Mr. Combs?

A.  He told her that --

Q.  Hold on.  Did she answer it?

A.  Yes.

Q.  And were you able to hear the other side of the call?

A.  Yes.

Q.  How?

A.  Because it was on speaker.

Q.  So, over speakerphone, what did you hear Mr. Combs say?

A.  That she better bring her ass to his house.

Q.  What happened next?

A.  She started to panic.  And then Puff called back and he, um, talked to me at that moment and told me, um, that we were wilding and that he thought he told us not to be going out. And since every time I go out, that bitch want to go out, then I need to stay my ass home, too.

Q.  So what did you understand Mr. Combs was telling you?

P5SsCOM3                        Nash - Direct

MR. DONALDSON:  Objection, Judge.

THE COURT:  Overruled.

Q.  What did you understand Mr. Combs was telling you?

A.  To stay home.

Q.  And when he referred to that bitch in this conversation, who did you understand Mr. Combs was referencing?

A.  Cassie.

Q.  What did Cassie do after Mr. Combs made these phone calls to you and to her?

A.  She just packed her stuff and went to his house.

Q.  During your time as Ms. Ventura's stylist, in your experience, how much control, if any, did Mr. Combs demand over Ms. Ventura's appearance?

MR. DONALDSON:  Objection.

THE COURT:  That's sustained.

Q.  In your experience as Ms. Ventura's stylist, what did you have to do to get approval of looks that you prepared for Ms. Ventura?

MR. DONALDSON:  Objection.

THE COURT:  That's overruled.

Q.  You can answer.

A.  We had to sent all the photos of him to approval.

Q.  Photos of what?

A.  Cassie's options from the fittings.

Q.  So outfits that she might wear?

P5SsCOM3                      Nash - Direct

A.  Outfits that she would wear, yes.

Q.  And who would you send pictures of those outfits to?

A.  Puff.

Q.  What, if any, conversations would you then have with Mr. Combs about those outfits?

A.  We would pick which one he liked, and that's usually the one we went with.

Q.  I want to direct your attention to the year 2014.

Did you attend a Vanity Fair party that year?

A.  Yes.

Q.  Could you explain what a Vanity Fair party is, please?

A.  A Vanity Fair party is the Oscars after-party.

Q.  Who did you attend the Vanity Fair party with in 2014?

A.  Puff, Cass, Derek, and a couple other people from the team.

Q.  Who did you arrive at the party with?

A.  Cassie.

Q.  When you and Cassie arrived at the party, who else was already there?

A.  Puff.

Q.  What interactions did you have with Mr. Combs at that Vanity Fair party?

A.  He said, I thought I fucking told y'all that she needed to wear her hair up.

Q.  Let me back up.

How was Ms. Ventura's hair styled when you arrived at

P5SsCOM3                        Nash - Direct

the party?

A. Oh, she looked bomb.  Her hair was down --

MR. DONALDSON:  Objection.

A. -- all the way to her shoulders.

THE COURT:  It's overruled.

A. She -- her hair was, like, down, cut straight.

Q. And when Mr. Combs came and had this conversation with you, what did he say?

A. I thought I told you she need to wear her hair up.

Q. What did Mr. Combs do physically when he said that to you?

A. Grabbed me by my jacket and lifted me up.

Q. What was Mr. Combs' tone as he was grabbing you by your jacket and lifting you up?

A. Angry.

Q. How did you respond?

A. I just started asking people in the party for hair pins. And I told Derek he needed to go deal with her and take them to the bathroom, and they went to go fix her hair in the bathroom.

Q. Who went to the bathroom?

A. Derek Roche, Puff, and Cassie.

Q. What happened after?

A. Oh, when he came out, he said, Y'all was right.  It does look better down.

Q. Who said that?

A. Puff.

P5SsCOM3                         Nash - Direct

Q.  During her relationship with Mr. Combs, did you observe
Ms. Ventura record music?

A.  Yes.

Q.  How often did you accompany Ms. Ventura to the studio while
she recorded music?

A.  Quite often.

Q.  And what, if any, role did you play in helping her record
music during her relationship with Mr. Combs?

A.  I helped her pick songs.  I probably should have been
called an executive --

        MR. DONALDSON:  Objection.  Objection.

        MS. COMEY:  I can ask another question.

        THE COURT:  All right.

Q.  What, if any, role did you play in helping Ms. Ventura
prepare for a mix tape that you mentioned earlier?

A.  Helped come up with the creative and helped pick songs.

Q.  Now, you talked about this mix tape earlier.

        Could you explain what Ms. Ventura's mix tape was?

A.  It's a body of work, like, a promotional body of work she
put out.  Almost like an album, but it's not.

Q.  How is a mix tape put out?

        MR. DONALDSON:  Objection.

        THE COURT:  It's overruled.

A.  Um, you can put it out online for free or you can put it on
streaming platforms.

P5SsCOM3                          Nash - Direct

Q.   What was Ms. Ventura's mix tape called?

A.   RockaByeBaby.

Q.   About when was it put out?

A.   April 2013.

Q.   And was it put out for free, or was it put out to sell online?

A.   For free.

Q.   To your knowledge, was it ever sold online?

A.   No.

Q.   Based on your participation in the preparation of the release of the mix tape, what was your understanding of who decided whether the mix tape would be sold or free?

         MR. DONALDSON:  Objection.

         THE COURT:  Overruled.

A.   Puff.

Q.   What, if any, conversations were you present for with Mr. Combs about whether the mix tape should be sold?

A.   He said that, if it did well, then it can go on streaming platforms.

Q.   Do you have an understanding of how well the mix tape did --

         MR. DONALDSON:  Objection.

Q.   -- with free downloads?

         MR. DONALDSON:  Objection.

         THE COURT:  We've got to wait until the end of the

questions.

MR. DONALDSON:  Apologies.

THE COURT:  I can't understand what the question is. It's overruled.

So, Ms. Comey, why don't you ask the question again.

BY MS. COMEY:

Q.  Do you have an understanding how well the mix tape did with free downloads?

A.  It did really well.  It was the top mix tape of that year.

Q.  Was it ever sold online?

A.  No.

Q.  Who made that decision?

A.  Puff.

MR. DONALDSON:  Objection.

THE COURT:  It's overruled.

Q.  During your time -- withdrawn.

During Ms. Ventura's relationship with Mr. Combs, about how often did you personally observe her recording music in the studio?

A.  Pretty often.

Q.  Would you give us a little more context?

A.  I mean, during -- an example is, I guess, towards the end of, you know, their relationship, she was recording an album. We stayed there so much, she decorated the studio room with photos.  And in the next room, she had a teepee and we

P5SsCOM3                          Nash - Direct

literally slept in there.

Q.  You said she was recording an album towards the end of her relationship with Mr. Combs.

To your knowledge, was that album ever released?

A.  No.

Q.  What percentage of music that Ms. Ventura recorded during her relationship with Mr. Combs was actually released?

MR. DONALDSON:  Objection.

THE COURT:  Maybe we can ask some initial questions to lay a foundation.

MS. COMEY:  Sure.

Q.  Mr. Nash, you said that you were present with Ms. Ventura recording music at multiple points throughout her relationship with Mr. Combs, is that right?

A.  Yes.

Q.  Do you have a sense, based on your relationship with Ms. Ventura and your professional role, of how much music she recorded during her relationship with Mr. Combs?

A.  A lot.  Hundreds of songs.

Q.  Do you have an understanding of approximately what percentage of the songs she recorded were actually released?

MR. DONALDSON:  Objection.

Q.  Just yes or no.

THE COURT:  That's overruled.

You can answer.

P5SsCOM3                        Nash - Direct

Q.  Yes or no, do you have an understanding?

A.  Yes.

Q.  And what is that understanding?

A.  I would say, I'm being generous by saying 10 percent.

MS. COMEY:  Your Honor, this is a good place to break for lunch.

THE COURT:  Good.  Thank you very much.

Members of the jury, we'll have our lunch break now. We'll come back at 1:15.  Have a great lunch.  Don't talk to each other about the case.  Don't talk to anyone else about the case, and we'll see you back at 1:15.

All rise.

(Continued on next page)

P5SsCOM3                          Nash - Direct

(Jury not present)

THE COURT:  Mr. Nash, we'll see you back here at 1:15. You can leave the stand now.

(Witness temporarily excused)

Please be seated everyone.

Ms. Comey, as to the 2013 conversation between Ms. Ventura and Mr. Nash, to the extent that Mr. Nash addresses Ms. Ventura's state of mind, concerning the sex acts, that would be her present state of mind meaning on -- at that time, in 2013, she did not want to engage in those sex acts.  The reason I ask the question, that conversation has to do with the sex tapes.  I want to make sure he's not going to say that those sex acts that are depicted in the tapes were without consent, because that would not be the then existing state of mind of Ms. Ventura.

MS. COMEY:  Yes, your Honor.

That is not how I believe the testimony will come out. If I can refer to my notes, I want to be precise in my proffer.

THE COURT:  Sure.

MS. COMEY:  What I expect he will say is that she said the videos were of her having sex with other men and then that Mr. Combs, the way he would say it, I expect, is I think he will say, "Puff had her doing these things she didn't want to do," which is in the present sense.

So yes, I think the testimony will be of the present.

P5SsCOM3                          Nash - Direct

THE COURT:  All right.  As to the exhibits to be used with Mia, what I'll do is, I'll address the exhibits that were raised in the letters, and then I think it makes sense for us to take our lunch break.  And then there may be just a couple issues that the parties want to revisit, and you can do that at the end of the lunch break.  It may turn out no one has any issues.  We can proceed on that basis.

As for 3T-107, I've reviewed the materials.  That is admissible under 801(d)(2)(D).  It's also not being introduced based on the submission for the truth of the matter, but rather just a fact of the communication.

As to 3T-110, that would be admissible under 803(1), and I don't believe it would be testimonial under the standard in *Ohio v. Clark*.

As to 3T-112, that's also admissible under 801(d)(2)(D) and also 803(3).  That's the government's exhibits.

Again, Ms. Shapiro, to the extent that you want to revisit any of those, you can at the end of the lunch break.  But for present purposes, that's how the court sees it based on the submissions.

MS. SHAPIRO:  That's fine, your Honor.  I just wanted to address the defense exhibits, because we have not had a chance to respond, and I don't believe Mia will be on cross until tomorrow.

P5SsCOM3                              Nash - Direct

So we can get a letter in to the court not very late tonight, but we would like the opportunity to respond in writing. And just to reiterate, we didn't get the government's letter until 1:00 in the morning. We were focused on today's testimony and did not get a chance to write that up yet. We would like to address it in writing.

THE COURT: I was about to say that because I think the gravamen of the government's objection is that there is no relevance or probative value to any of these exhibits, and so I was just going to ask you that question.

Now you'll submit your letter and I'll get the answer.

MS. SHAPIRO: Thank you, your Honor.

THE COURT: All right. Anything further from the government?

MS. COMEY: No. Thank you, your Honor.

THE COURT: Anything from the defense?

MR. DONALDSON: No, Judge.

I think you said we can take it right before we finish. I'll come back and take a look then.

THE COURT: On the three exhibits?

MR. DONALDSON: Just on what Ms. Comey just said related to when the court asked about 2013 sex acts and whether we're talking about at that time.

My concern is the government's response to the court. I believe they still left that rather vague. The answer

P5SsCOM3                         Nash - Direct

doesn't seem to apply to just at that time, it seems to -- it may be interpreted to be something else.

Just didn't seem like --

THE COURT:  I think, at that point, we have to see what the answer is to the question.

MS. COMEY:  Your Honor, if the answer ends up being unclear, if I have permission to lead, I'm happy to lead to make sure that it is narrowly tailored.

THE COURT:  Yes.  You have that permission so that we can avoid any issue that would --

MR. DONALDSON:  Right.

THE COURT:  -- raise a state of mind from a prior time period, which is out of bounds.

MR. DONALDSON:  Very good.  Thank you.

THE COURT:  We'll take our break.

I'll come back at 1:10 just to see if there is any issues before we proceed at 1:15.

(Luncheon recess)

P5SACom4

AFTERNOON SESSION

1:13 P.M.

THE COURT:  Anything to address before we bring the jury back in?

MS. COMEY:  Very briefly, your Honor.  I'm about to pull up a photograph of the witness testifying under pseudonym Mia for the witness, and I would like the jurors to be able to see it too.

May I ask that the overflow screens be cut and the public screen be turned off just until I show that exhibit and then we can turn them back on for the rest of Mr. Nash's testimony?

THE COURT:  I think that can be done.

MS. COMEY:  That would be wonderful.  Before I pull it up, I will check and make sure I have a thumbs up from Mr. Deputy.

THE COURT:  Yes.

MS. COMEY:  And we won't display on counsel table.  It will just be for the witness and the jury and the Court.

And then the other thing I wanted to flag is because I'm about to start eliciting testimony about Mia, I wanted to ask if the Court would order prospectively that if any witness accidentally says the true name of a witness who is testifying under pseudonym, that you authorize the parties to confer, without further consulting from your Honor, with the court

P5SACom4

reporters, to have the true name replaced with the pseudonym.

THE COURT:  That's fine.

MS. COMEY:  Thank you, your Honor.  And that way we don't have to interrupt and ask for striking and revising the transcript.

THE COURT:  Let me ask you a question.  As to the picture.

MS. COMEY:  Yes, your Honor.

THE COURT:  Since Mia is going to be testifying in open court, I just want to make sure I'm understanding the reason.

MS. COMEY:  Yes, your Honor.  So the reasoning is that the exhibit itself would be under seal and not released to the public.  Obviously, as we've discussed, she'll be here in person and anyone who comes to the courthouse and wants to see her in person will be able to see her in person, but we will not be releasing a photograph of her to the press, as that would undermine the Court's pseudonym order.

THE COURT:  All right.  So that's going to happen right when the jury comes back?

MS. COMEY:  I have one more topic on the music topic to cover, and then pretty soon after we'll get into Mia.  But the very next exhibit that I'm going to pull up will be a photograph of Mia.

And then once I ask it to be taken down, the rest of

P5SACom4

my exhibits will be public and the screens can go back on.
Thank you.  I see Mr. Deputy nodding.

THE COURT:  So given the nods from the court
personnel, I'm assuming this can be done.

MS. COMEY:  Thank you, your Honor.

THE COURT:  Anything further from the government?

MS. COMEY:  No, your Honor.

THE COURT:  Mr. Steel, I see you standing up.  You
might be stretching your legs, but if not...

MR. STEEL:  I'm definitely stretching my legs, but can
I ask the Court, I heard your ruling.  I understand your ruling
about Government Exhibit number 3T-107, 110, and 112.

THE COURT:  Okay.

MR. STEEL:  But when it's appropriate, can we make
more of a record if you don't mind for us?

THE COURT:  Now is the time to make your record.
Because as I said, if there's an issue to raise, let's hear it.

MR. STEEL:  So, your Honor, on 107.

THE COURT:  Yes.

MR. STEEL:  3T-107.  Obviously, I'm going to adopt
what the Court already read in writing that we asserted.  But
there's hearsay within hearsay in that e-mail.  And I'm
quoting:  I have been informed that I cannot perform on Monday
due to overage in cost.  We ask that that be looked at by the
Court for redaction.  Or another reason to cut that out.  I

P5SACom4

don't think that that is appropriate to let in on the -- that exhibit.  So I just wanted the Court to be aware of that.

Number two, if I'm going too fast I'm not trying to. 110.

THE COURT:  Let me stop you there.  How is the statement that Ms. Ventura has been informed, how is that a statement of anything?  Because you can be informed of something by virtue of things that are not statements.  Right? I could be informed of an event by seeing the event.  Right? So just the statement, I have been informed, how is that a hearsay within the larger hearsay of Ms. Ventura's statement?

MR. STEEL:  I think I am tracking the Court.  I can be educated besides someone telling me is what I hear the Court saying.  But in context, what I'm reading is:  I have been informed that I cannot perform Monday due to overage in cost. So I don't think that's something that she is just educating herself on or learning herself.  I think somebody tells her that.  And I assume it's been offered for the truth of the matter, because the government's position is Mr. Combs -- this is my belief -- stopped the show because said it's just costing too much.

So I'm asking that to be redacted.  And I hope I've answered your question, your Honor.  I believe it's hearsay within hearsay.

THE COURT:  Is there a response on that point?

P5SACom4

MS. SMYSER:  Your Honor, I think as expressed in our letter, I do think this whole statement can come in for its truth, but that's not what we're seeking to do here.  It's alternatively not admissible for its truth, but to show these things were communicated to the defendant.

THE COURT:  Meaning you're not going to do what Mr. Steel suggests, to suggest that Ms. Ventura had been informed by Mr. Combs that she cannot perform on Monday, etc., right?  Because then the statement is just coming in for the fact of the communication, which I understand it's not coming in for the truth, then none of these issues are really of any moment.

MS. SMYSER:  We're not making that specific argument, your Honor.

THE COURT:  Okay.

Mr. Steel, so you heard that.  That's not coming in for the purpose that you thought.  So I think that avoids the hearsay issue.

What else?

MR. STEEL:  Can I go to 110, your Honor.

THE COURT:  Yes.

MR. STEEL:  I don't believe that it's 801(d)(2)(D) because it's -- the statement is prefaced with, and I believe I'm quoting:  I still don't know what's going on.  I just snuck into D-Roc's room to watch the cameras.  Really -- can't really

P5SACom4

talk about on e-mail --

THE COURT:  Right.  So in this one.  It's 803(1).  So it's present sense in -- present sense impression.  Excuse me.

MR. STEEL:  Well...

THE COURT:  A statement describing or explaining an event or condition made while or immediately after the declarant perceived it.

So the argument is that this is just relating what these things were -- what was happening as Ms. Lee perceived it.

MR. STEEL:  Well, they're watching -- this is how I read it, your Honor.  They're watching cameras.  I'm not conceding that those cameras are instantaneous or realtime cameras.  It could have been previous, a fight or argument.  And without a proper foundation, from the person who's not testifying, I would ask the Court to reconsider the lacks personal knowledge.

There's also 403 objection, your Honor, if you would consider that as well.  Because when I said earlier about I understand it's not testimonial under *Crawford*, but I have nobody to cross-examine to say what did you say, what was it like.  And I understand the hearsay rule that the Court is attaching to it.  But without more to it, that this is instantaneous, I would hold my objection.

THE COURT:  Well, on the 403 issue, what's the unfair

P5SACom4

prejudice given the nature of what's in the message?  Because there's not anything in the message about the actual incident of any kind of kicking or anything of that nature.  There's just a commotion.  And that's it.

And so what's the substantial unfair prejudice as a result of the introduction of the fact that there was like a commotion and that people were on edge?  Which is the most that this particular e-mail would go to.

MR. STEEL:  Your Honor, they're building this entire volcano from what happened earlier that day allegedly to now moving to Mr. Combs' home.  And the jurors already heard Mr. Combs, supposedly, we're denying it, but supposedly beat Ms. Ventura from inside the house to the street.  And this just adds another layer.  So I think it should not come in.  And its probative value is very slight.  And I think it's very prejudicial because we're getting another person, who cannot be discussed, what they actually --

THE COURT:  Okay.  Ms. Smyser, can I ask you what is Mia going to testify about concerning the events of December 22nd?  And the reason I'm asking this is, is this all she's going to be testifying about, the fact of this e-mail exchange?  Or is there more?  Meaning there's other parts to her testimony that don't run into this issue that go to what was happening on that day.

MS. SMYSER:  That don't run into what issue?  I'm

P5SACom4

sorry, your Honor.

THE COURT:  That run into the issue raised with respect to 3T-110.

MS. SMYSER:  So with regard to, like, the events of that day, Mia is going to testify that she was at Mr. Combs' house that morning and everyone was very on edge and the mood was very ominous.  And before she left for the airport that day, she had a conversation with Mr. Combs in which Mr. Combs said, in sum and substance, I found out Cassie has been cheating on me with Kid Cudi.  He looked very upset.  Mia is very worried about what was going on.

She will also say before she leaves, she saw Cassie and Capricorn Clark in an SUV out on the street outside of the home.

And so then she goes to the airport.  And it is during that flight when she's trying to figure out what is happening.  So that's the context of what she'll provide.  She'll also say that Sienna Lee was in the home that day.  So that's one of the reasons she is communicating with her.

THE COURT:  All right.  Understood.  Let me think about that for just a second.

Mr. Steel, what else do you have?

MR. STEEL:  On that, your Honor, just, you know, I think you said something earlier in the trial, if I'm misquoting you, I'm not trying to do that intentionally.  But

P5SACom4

something like this is a trial by rumor I think you said.
Gossip.  Sorry.  And that's how I feel about this.  It's a
person on an airplane, bad energy, what am I learning, tell me
what I missed.

I think that it's very, very, very prejudicial to us.
And it just shows this -- people talking and people giving
their own, their own -- in this context at the trial, making
Mr. Combs things that he doesn't have to be in front of the
jury.  The jurors already heard a substantial amount of
testimony of what was allegedly going on that morning, and
including at his home.

So I don't know if I'm answering your question, but
I'm trying to, when you said anything else, that's why I'm
trying to exclude it.

THE COURT:  All right.  And that's on 110.  And do you
have anything on 112 or?

MR. STEEL:  I do, if you don't mind.

THE COURT:  Okay.

MR. STEEL:  112, your Honor.  I don't believe, we
don't believe, that it is 801(d)(2)(D) because the statement is
prefaced with:  I have no clue what's going on.  I don't
usually care to know the details, and therefore I don't believe
that it satisfies any scope requirement of the ruling, does not
relate to the employment.

I understand that the government constantly said,

P5SACom4

well, they have to know, everyone has to know because it's part of their employment.  The rule can't be that much.

THE COURT:  That's true.  But, Ms. Smyser, before in trying to introduce 112 into evidence, I take it that you'll ask some foundational questions to establish the parameters of the rule.

MS. SMYSER:  Absolutely, your Honor.

THE COURT:  So you can raise, Mr. Steel, you can raise the objection on 112 at that point if you don't believe that proper foundation has been laid for introduction of this exhibit under the agency rule.

MR. STEEL:  And then for everything, your Honor, I think I made it clear, but 403, I don't want to waive anything.

THE COURT:  Yeah.

MR. STEEL:  So also 403 objection.

THE COURT:  So as to 107 and 112, the objections are overruled.  As to 112, it's subject, as I just said, to there being an adequate foundation for introduction of the exhibit under 801(d)(2)(D).

As for 110, I'm going to see how the questioning is coming in, but I am convinced by Mr. Steel that as to 803(1), which I think is the only basis for introduction of this particular e-mail, the problem is that Ms. Lee is not actually viewing the events in question, but rather she's in Roc's room watching the cameras.

P5SACom4

We'll see if the foundation can be laid that can put some more color to this.  But there is that issue on 803(1).  And even if there wasn't an 803(1) issue, I take Mr. Steel's point that given that limitation on what Ms. Lee was perceiving, that introduces a 403 issue that she is then relaying to Mia what she is seeing on the video and then her impressions of people around her.  And I think that there is a prejudicial component to that, that outweighs any probative value, especially when we've had witnesses testifying from firsthand knowledge as to what occurred on December 22nd, and obviously their testimony was firsthand and was offered here in court.

So when we have issues like this of this e-mail where it's going through a camera and then going to one witness and then being relayed to the person testifying in court, I think there is a high level of potential prejudice.

So 110 is provisionally out.  However, Ms. Smyser, you can obviously try to establish a foundation for it.  Now you're going to tell me why I'm wrong about this, so I'm happy to hear.

MS. SMYSER:  Just briefly, your Honor.  So I just want to point out the question is whether -- the first question is whether it comes in as a present sense impression.  And multiple times in the e-mail Ms. Lee, who is an employee who is there that day, is saying I just saw this, this just happened.

P5SACom4

She's describing what she saw in realtime. Whether that's on the camera or outside. I don't think that matters for purposes of 803(1). And Mia is going to explain that there are cameras in D-Roc's room that show what is happening outside of the home. So we'll have that context in addition to the context of Ms. Lee being there at the time. I don't think there's unfair prejudice here, your Honor. Just because other witnesses have testified to this. In fact, I think the probative value of this is even higher in that case because it helps corroborate the witness's accounts of what was happening that day.

THE COURT: But you mention the fact that it doesn't matter whether it's on the camera or in person. And as a technical matter in the operation of the rule, I think that's right. But as you can tell from the statements, here it actually makes a difference, because, because she's watching this through camera, she has a limited vantage point in terms of what she can perceive. So she's not perceiving the actual event. She's only perceiving what comes in through the camera.

The further issue is that -- and, look, I don't have the actual exhibits. I have what's in -- I can pull them up. But I have the statements that are related in the letter. And there's a lot of -- there's "IDK." There's "I can't really talk about it on e-mail." And then "I still don't know what's going on."

And those statements seem to suggest that there's a

P5SACom4

limitation in terms of what Ms. Lee is able to see and perceive concerning the event.  Which, at the same time, reduces the, you know, makes it harder to meet the limitations in 803(1), and then increases the potential for prejudice.

Okay.  Now I see the e-mail.  That's helpful.  So let me see this.

All right.  Thank you.

So, again, 110 is out subject to laying a foundation through questioning that there's something that I'm missing.  But I'm not sure what you can do in that regard.  So 110 is out.  And 107 and 112 are in.

Anything further, Mr. Steel?

MR. STEEL:  No.  Thank you, your Honor.  No, sir.

THE COURT:  All right.  Let's have Mr. Nash back and then we'll get our jury.

(Continued on next page)

P5SACom4                    Nash - Direct

THE COURT:  Welcome back.

(In open court; jury present)

THE COURT:  Please be seated.

Mr. Nash, you understand you're still under oath?

THE WITNESS:  Yes, sir.

THE COURT:  Ms. Comey, you may proceed.

MS. COMEY:  Thank you, your Honor.

BY MS. COMEY:

Q.  Good afternoon, Mr. Nash.  I would like to follow up on a topic we were touching on before the break.

So before the break you testified about Ms. Ventura's recording of music; do you remember that?

A.  Yes, ma'am.

Q.  And I think earlier in your testimony you testified that you had personally heard Mr. Combs threaten not to put out some of Ms. Ventura's music; did I hear that right?

A.  Yes.

Q.  Could you please tell the jury in what context you heard Mr. Combs threaten not to put out Ms. Ventura's music?

A.  He told her that one time if she keep -- if she keeps having a smart ass mouth, her little mix tape won't be coming out.

Q.  Do you remember about when that was?

A.  It had to be 2012, '13.

Q.  And do you remember what Ms. Ventura was doing before

P5SACom4                        Nash - Direct

Mr. Combs made that comment?

A.  I think she just responded to him in a normal fashion.

Q.  In a normal fashion.

Do you remember what Mr. Combs' tone was when he made that threat to her?

A.  Pretty regular.

Q.  Calm?

A.  Calm.

Q.  I want to switch topics now.  Approximately how many times in person have you witnessed Mr. Combs be violent with Ms. Ventura?

A.  Quite a few, but three that really stand out.

Q.  So do some of those stand out more in your mind than others?

A.  Yes.

Q.  I want to talk about some of those.

MS. COMEY:  First, I would like to pull up what's in evidence as a sealed exhibit, please.  And that is sealed Exhibit 2A-404, just for the jury, the witness and the Court, please.

Is that on your screen?

THE COURT:  It's not on the screen yet.

Q.  Let me know when it's on your screen, please, Mr. Nash.

A.  It's there.

Q.  Okay.  Without saying her name, would you please tell us

P5SACom4                    Nash - Direct

just yes or no if you recognize the person in that photograph?

A.  Yes.

Q.  Okay.  I'm going to call that person Mia, and I would ask that you do the same, please.  Okay?

A.  Yes.

Q.  Okay.

          MS. COMEY:  We can take that down.  Thank you so much. And we can turn on the public screens, Mr. Deputy.  Thank you.

Q.  How many times, if any, was Mia present with you when you witnessed Mr. Combs be violent with Cassie?

A.  One.

Q.  About what year was this?

A.  Maybe 2013, '14.

Q.  And where were you before the violence started?

A.  At Cassie's house.

Q.  Which home of Cassie's was this?

A.  818 Doheny.

Q.  And is that in Los Angeles?

A.  Yes.

Q.  Is that an apartment or a house?

A.  Apartment.

Q.  What were you and Mia helping Cassie get ready for before the violence started?

A.  We were packing Cassie for the OVO Fest in Canada.

Q.  What is the OVO fest in Canada?

P5SACom4                    Nash - Direct

A.   Drake's music festival.

Q.   Right before the violence started, where was Cassie in the apartment?

A.   On the couch sleep.

Q.   She was asleep?

A.   Yes.

Q.   Where were you?

A.   Between the living room where she was sleeping and her second bedroom, which was where her closet was, packing.

Q.   And do you remember where Mia was?

A.   No.

Q.   Who came to the door?

A.   I did.

Q.   Did you hear a knock at the door?

A.   Yes.

Q.   What did you do in response?

A.   I opened it.

Q.   Who did you see outside the apartment door?

A.   Puff.

Q.   What did Mr. Combs say when you opened the apartment door for him?

A.   Bitch, didn't I tell you to answer the phone.

Q.   Who did you understand he was speaking to when he said bitch, didn't I tell you to answer the phone?

A.   Cassie.

P5SACom4                        Nash - Direct

Q.  What did you see Mr. Combs do after he said that?

A.  Grab her by the hair and pull her off of the couch and start hitting her.

Q.  When you say grab her by the hair, who did Mr. Combs grab by the hair?

A.  Cassie.

Q.  And after Mr. Combs grabbed Cassie by the hair, what did he do next?

A.  He began to hit her.

Q.  Could you tell whether it was with an open or closed fist?

A.  Not really, no.

Q.  Could you tell how hard he was hitting her?

        MR. DONALDSON:  Objection.

        THE COURT:  Overruled.

Q.  Could you tell how hard he was hitting her?

A.  Pretty hard.

Q.  What was Mr. Combs saying as he pulled Cassie by the hair off the couch and hit her?

A.  I just remember y'all going to stop fucking with me.

Q.  What was Mr. Combs' tone and demeanor?

A.  He was in a rage.

Q.  Where did you, Mia, and Cassie go after Mr. Combs -- immediately after Mr. Combs started hitting Cassie?

A.  We ran to her bedroom.

Q.  To Cassie's bedroom?

P5SACom4                        Nash - Direct

A.  Cassie's bedroom, yes.

Q.  What did you, Mia, and Cassie attempt to do in her bedroom?

A.  Try to close the door.

Q.  What happened when you, Mia, and Cassie tried to close the bedroom door?

A.  Puff pushed it open.

Q.  After Mr. Combs pushed the bedroom door open, what did you see him do next?

A.  He continued to attack Cassie.

Q.  And how was he attacking Cassie?

A.  With his fists and kicking her.

Q.  And what parts of Cassie's body did you see him kick and hit?

A.  I mean, it was so fast.

Q.  But did you see him --

A.  Yes.

Q.  -- make contact with her body?

A.  Yes, he made contact, yes.

Q.  What did you do to try to help Cassie?

A.  I jumped on Puff's back.

Q.  How did Mr. Combs react when you jumped on his back?

A.  He threw me off.

Q.  Where did you land?

A.  On the floor.

Q.  Were you injured?

P5SACom4                        Nash - Direct

A.  I was a little sore.

Q.  What did Mia do to try to help Cassie?

A.  Jump on his back as well.

Q.  When you say his back, whose back?

A.  Puff.

Q.  How did Mr. Combs react when Mia jumped on Mr. Combs' back?

A.  She was thrown off as well.

Q.  What did Mr. Combs do after throwing you and Mia off of his back?

A.  Continued to hit Cassie until her head hit the edge of the bed frame.

Q.  What did you see happen after Cassie's head hit the edge of the bed frame?

A.  He still continued to hit her for, you know, a short time, and when he noticed the blood, he just panicked.

Q.  So what blood did you see after Cassie's head hit the bed frame?

A.  Blood coming from her head.

Q.  How much blood did you see coming from Cassie's head?

A.  A lot.

Q.  And did Mr. Combs stop hitting Cassie immediately after her head hit the bed?

A.  No.

Q.  For about how much longer did he continue to hit her as she was bleeding from the head?

P5SACom4                         Nash - Direct

A.   A couple of seconds.

Q.   After that, at that point, were you still in the room?

A.   Yes.

Q.   And where was Mia?

A.   Getting towels.

Q.   And where -- what were the towels for?

A.   Cassie's head.

Q.   And where was Cassie?

A.   She went into the second bathroom.

Q.   As you all were leaving the bedroom, what if anything did Mr. Combs say to you, Mia, and Cassie?

A.   Look what y'all made me do.

Q.   What if any phone calls did you try to make after seeing all the blood from Cassie's head?

A.   I tried to call 9-1-1.

Q.   What happened when you tried to call 9-1-1?

A.   I was immediately told to hang up.

Q.   Do you remember who told you to hang up?

A.   No.

Q.   As you sit here today, can you remember?

A.   No.

Q.   Did you hang up?

A.   Yes.

Q.   So did the call connect?

A.   No.

P5SACom4                        Nash - Direct

Q.   What if anything did Mr. Combs say about where Cassie was going to go next?

A.   The plastic surgeon.

Q.   Who did Mr. Combs say was going to go to the plastic surgeon with Cassie?

A.   D-Roc.

Q.   Who is D-Roc?

A.   A friend of his, his security.

Q.   Whose security?

A.   Puff.

         MS. COMEY:  Can we please pull up what's in evidence as Government Exhibit 2A-202.

Q.   Do you recognize the person in this photograph?

A.   Yes.

Q.   Who is that?

A.   D-Roc.

Q.   Do you know him by any other names?

A.   D-Roc is fine.

Q.   And do you know what his role was for Mr. Combs at the time that Cassie had this head injury?

A.   Security.

         MS. COMEY:  We can take that down.  Thank you.

Q.   After that incident, when was the next time that you saw Cassie, either over FaceTime or in person?

A.   The next day.

P5SACom4                         Nash - Direct

Q.   And how did you see her the next day?

A.   FaceTime or something like that.

Q.   And when you saw her, what if any injuries did you see?

A.   She had a -- stitches on her forehead.  She had a gash on her forehead.

Q.   And you made a gesture, was it above her eyebrow?

A.   It was like in the eyebrow.

Q.   I want to talk about another time you witnessed violence.

Was there a time when you and Cassie were cooking in her apartment before Mr. Combs became violent?

MR. DONALDSON:  Objection, Judge.  Form of question.  I'm sorry.  Objection.  Sorry.

THE COURT:  Rephrase the question.

MR. DONALDSON:  Sorry, Judge.  Sorry.

BY MS. COMEY:

Q.   I want to direct your attention to a night when you were cooking with Cassie in her apartment.

Does that ring a bell?

A.   Yes.

Q.   About what year are we talking about?

A.   '13, '14.

Q.   2013 or 2014?

A.   Yes.

Q.   What apartment were you and Cassie in?

A.   818 Doheny.

P5SACom4                        Nash - Direct

Q.   The same apartment that you just talked about?

A.   Yes.

Q.   And this incident that we're about to talk about, was it
before or after Cassie cut her head open on the bed frame?

A.   After.

Q.   So who was at the apartment this evening?

A.   Just me and Cassie.

Q.   And who came over?

A.   Puff.

Q.   About what time of day do you remember Mr. Combs coming
over to the apartment?

A.   Nighttime.

Q.   And what do you remember Mr. Combs saying when he first
came over to the apartment?

A.   He just said, hey, and that he wanted to talk to Cassie for
a minute.

Q.   And where did he and Cassie go?

A.   To her bedroom.

Q.   And what happened after they went into the bedroom?

A.   He grabbed her as they were walking out, he grabbed her
like by her hair and the back of her shirt and starting pushing
her out, and he was like, I don't give a fuck, you going to get
the fuck up out of my house, y'all going to get the fuck up out
of my house.

Q.   So a few follow-up questions.

P5SACom4                        Nash - Direct

First, when Mr. Combs referred to "my house," what did you understand he was referring to?

MR. DONALDSON:  Objection.

THE COURT:  Overruled.

A.  Cassie's --

MS. COMEY:  You got to wait for the judge.

THE COURT:  I said overruled.

MS. COMEY:  So sorry, your Honor.

THE COURT:  That's okay.  Far away from the mic.

Q.  What did you understand he meant when he was referring to "my house?"

A.  Cassie's house.

Q.  And had you heard how this argument had started in the bedroom?

A.  No.

Q.  And what did you see Mr. Combs doing to Cassie as he was saying get out of my house?

A.  Grabbing her by the hair and the back of her shirt or jacket and was pushing her out the house.

Q.  And where did Mr. Combs ultimately push Ms. Ventura?

A.  Halfway out of the door.

Q.  And after he pushed her there, what did he do to you?

A.  He began to do the same to me.  And then he told me to go downstairs and she'll be right down.

Q.  You said he did the same to you.  What did Mr. Combs do to

P5SACom4                    Nash - Direct

you?

A.   Well, he was more so popping me in the back of the head, because I don't have hair.  And grabbing me by my shirt and pushing --

Q.   When you said he was popping you in the back of your head, what was he doing to your head?

A.   Like a, you know, slap.  You pop somebody in the head.

Q.   Slapping you with his hand?

A.   Yes.  Yes.

Q.   Where did you go after Mr. Combs pushed you and Cassie out of the apartment?

A.   To get my car from valet.

Q.   So did you go downstairs?

A.   Downstairs, yes.

Q.   And who did you see when you went downstairs?

A.   Security.

Q.   Whose security?

A.   Puff.

Q.   Do you remember who from security?

A.   No.

Q.   What did security say to you when you got downstairs?

        MR. DONALDSON:  Objection.

        MS. COMEY:  I can rephrase, your Honor.

        THE COURT:  Okay.

Q.   What if any instructions did security give you when you got

P5SACom4                      Nash - Direct

downstairs?

MR. DONALDSON:  Same objection.

THE COURT:  That's overruled.

A.  That I needed to wait for her to -- Puff to come down.

Q.  So what did you do?

A.  I was blocked in, so I waited.

Q.  What was blocking you in?

A.  Security.

Q.  Security's cars?

A.  No.  Security.

Q.  Oh, just security --

A.  Yes.

Q.  And then what happened next?

A.  They came down.

Q.  When you say "they," what do you mean?

A.  When Puff and Cassie came down, when they came down, Cassie got in my car.  Puff began to berate us both.  And he finally let us go --

Q.  Let me pause you there.  You said Mr. Combs began to berate you both.  Who was he berating?

A.  Cassie and I.

Q.  And what was Mr. Combs saying as far as you can remember?

A.  We not going to be playing with him.  We can just take our broke ass and ride into the sunset.

Q.  Where did you and Cassie go next?

P5SACom4                    Nash - Direct

A.  We drove off.  And as we drove off, we got a phone call to pull over --

MR. DONALDSON:  Objection.

MS. COMEY:  I can ask another question, your Honor.

THE COURT:  Let's have a new question.

MS. COMEY:  Yep.

Q.  After you drove, what -- drove away from the building, what if any phone calls did you and Cassie receive?

A.  Phone call from Puff.

Q.  What did Puff say?

A.  For us to pull over.

Q.  And what did you do?

A.  Pulled over.

Q.  What happened after you pulled over?

A.  He came to the window and began to talk to Cassie.

Q.  Who came to the window?

A.  Puff.

Q.  What did you hear Mr. Combs say when he came up to the car window?

A.  That she fucked up.  And that he was going to put her sex tapes on the internet.  He was going to release them on schedule.  And that he was going to first start by sending them to her parents' jobs, and he was going to get them fired, and that her brother was a bitch, and that Puff was the only one that -- that protected her.

P5SACom4                    Nash - Direct

Q.   How did Cassie react to Mr. Combs saying all of these things to her?

A.   She was in tears.

Q.   What was Mr. Combs' tone when he said these things to Cassie?

A.   He was pretty in between.

Q.   In between what?

A.   Angry, but he wasn't shouting.

Q.   After Mr. Combs finished saying all of those things, what did you and Ms. Ventura do next?

A.   We drove off.

Q.   And where did you ultimately drive to?

A.   To my house.

Q.   As you were driving away, what was Cassie's demeanor?

A.   She was in tears.

Q.   What did you say to try to comfort her?

          MR. DONALDSON:  Objection.  Objection.

          THE COURT:  Overruled.

A.   I told her, I said, well, girl if he wants to release the -- release the sex tapes, then let him because he's on them too.

Q.   What did you mean when you said he's on them too?

A.   That Puff was on them too.

Q.   On the videos?

A.   Yes.

P5SACom4                         Nash - Direct

Q.  How did Cassie respond when you said that Puff was on the videos too?

A.  She said that she -- that he wasn't on the videos, that it was him taping her with other guys.

Q.  And did she say what she was doing with those other guys?

A.  Yeah, having sex with the other guys.

Q.  What did she say about whether, in that moment, in 2013, 2014, she wanted to have sex with other guys?

MR. DONALDSON:  Objection.

THE COURT:  That's overruled.

A.  That she didn't want to.

Q.  And what did she say about why she was in that moment?

A.  Because Puff wanted her to.

Q.  After you got back to your house, who if anyone called you and Cassie?

A.  Puff and Derek Roche.

Q.  What do you remember about those phone calls?

A.  Derek Roche called me and told me that he had given Puff my address and that Puff was on the way.

MR. DONALDSON:  Objection.

MS. COMEY:  It's not offered for the truth, your Honor, just impact on the listener.

THE COURT:  That's overruled.

Q.  How did you and Cassie react when Derek told you that Puff was on the way?

P5SACom4                      Nash - Direct

A.  We panicked.

Q.  And then what did you do?

A.  I drove her to Sunset Boulevard so she can catch a yellow taxi.

Q.  Why did you drive Ms. Ventura to Sunset Boulevard to get a taxi?

A.  Uber wasn't really a thing then.

Q.  What did Cassie tell you she was going to do when she got into the taxi?

A.  She would call me when she got to where she was.

Q.  Did she tell you where she was going at that point or no?

A.  No.  No.

Q.  What did you do after dropping Cassie off to get a taxi?

A.  I went back home.

Q.  What happened when you went back home?

A.  Puff came to my house with Derek Roche and D-Roc.

Q.  What happened when Mr. Combs, D-Roc, and Derek Roche came to your house?

A.  Puff came in and he was like where the fuck is she.  He started looking all around my house.  In the closets, he went in the oven, I don't know why he looked in the oven.  And he asked me where she was.

Q.  Who did you understand he was referring to when Mr. Combs said where is she?

A.  Cassie.

P5SACom4                     Nash - Direct

Q.  After Mr. Combs looked around your house, what happened next?

A.  He then took my phone and my car keys.

Q.  And as Mr. Combs took your phone, what if any phone calls came into your phone?

A.  Cassie called.

Q.  And what happened when Cassie called your phone?

A.  When he saw the number, he --

MR. DONALDSON:  Objection.

THE COURT:  Can you rephrase the question.

MS. COMEY:  Yes, your Honor.

Q.  Could you tell what phone number or what ID came up on your phone?

A.  The Le Montrose.

Q.  And what's the Le Montrose?

A.  A hotel in the West Hollywood.

Q.  And were you able to see the Le Montrose come up on the screen of your phone?

A.  Yes.

Q.  As Mr. Combs was holding it?

A.  Yes.

Q.  And after that came up on the screen of your phone, what did Mr. Combs say?

A.  He said, oh, she at the Le Montrose, let's go.

Q.  So then what did Mr. Combs tell you to do?

P5SACom4                    Nash - Direct

A.  He told me to get in the car and they will follow me to the Le Montrose so I can get her to come down.

Q.  And who did you understand would be following you?

A.  Puff and security.

MR. DONALDSON:  Objection.

THE COURT:  That's overruled.

Q.  Who from security?

A.  D-Roc.

Q.  So what did you do?

A.  I hopped in a car and drove to the Le Montrose.

Q.  And as you drove, where was your phone?

A.  With Mr. Combs.

Q.  Where did you drive to?

A.  Le Montrose.

Q.  What happened after you got to the Le Montrose?

A.  When I walked up, he kind of like stopped before he went in and he told me that since -- because we got shipments there a lot, I knew the people so --

MR. DONALDSON:  Objection.  Objection.

MS. COMEY:  Let me break it down if that's okay, your Honor.

THE COURT:  It's okay.

MS. COMEY:  Thank you, your Honor.

Q.  So, first, who was talking to you?

A.  Puff.

P5SACom4                         Nash - Direct

Q.  And backing up, before this day, what if any connection did you personally have to the Le Montrose?

A.  We always got packages there, and most of the staff stayed there.

Q.  Most of the staff meaning whose staff?

A.  Bad Boy staff.

Q.  So what did Mr. Combs say to you outside of the Le Montrose?

A.  Since I want to be all chummy chummy with those bitches, go upstairs and get Cassie.

Q.  How did you respond?

A.  I told him that if he gave me my phone back -- I told him that he needed to give me my phone back because she would think it was weird that I didn't have my phone.

Q.  And what did Mr. Combs do in response?

A.  He gave it back.

Q.  And then where did you go?

A.  Upstairs to her room.

Q.  When you went inside the Le Montrose, who came with you?

A.  D-Roc, and Toni Bias Fletcher showed up some kind of way.

Q.  Who is Toni Bias Fletcher?

A.  Puff's old chief of staff.

        MS. COMEY:  Can we please pull up what's in evidence as Government Exhibit 2A-305.

Q.  Do you recognize the person in that photograph?

P5SACom4                    Nash - Direct

A.   Yes.

Q.   Who is that?

A.   Toni Bias Fletcher.

          ms.com:  We can take that down.  Thank you.

Q.   How did you and Toni and D-Roc know which room to go to?

A.   The people at the front desk told me.

Q.   And then where did you go?

A.   To Cassie's room.

Q.   And what happened when you got to Cassie's room?

A.   I opened the door and turned on the light.

Q.   And what happened when you turned on the light to Cassie's room?

A.   She jumped up.

Q.   Who jumped up?

A.   Cassie.

Q.   And how was her demeanor based on her appearance --

withdrawn.

          Based on your observations of her appearance, what did her demeanor appear to be when she jumped up?

A.   She was frightened.

Q.   What did you and D-Roc and Toni say to Cassie?

A.   That Puff was downstairs looking for her.

Q.   How did Cassie react when she heard that?

A.   She said, oh, no.  And then she went towards the balcony. She said she was going to go over the balcony.

P5SACom4                          Nash - Direct

MR. DONALDSON:  Objection.  Objection, your Honor.

THE COURT:  That's sustained.  The jury should disregard the witness's last answer.

Ms. Comey, you can ask a different question or rephrase.

Q.  Did Cassie make any statements about what her intent was to do in the immediate future?

MR. DONALDSON:  Objection.

THE COURT:  That's overruled.

Q.  Did he make any statements about what her intent was to do in the immediate future?

A.  Yes.  She said that she was going to climb over the balcony.

Q.  How high up was the balcony?

A.  It wasn't the first floor.

Q.  Do you remember what floor it was on?

A.  No.

Q.  How did you and D-Roc and Toni react when Cassie said she was going to go over the balcony?

A.  We told her no and that we would sneak her out the side.

Q.  So then where did Cassie go?

A.  I assume out the side.

Q.  Where did you go?

A.  Back through the front.

Q.  Now, when you say out the side, what do you mean by the

P5SACom4                    Nash - Direct

side of the Le Montrose?

A.   The side of the hotel I guess.

Q.   And then where did you go?

A.   I went back to the front of the hotel.

Q.   And who did you see when you went back to the front of the hotel?

A.   Puff and some other security guards.

Q.   Whose security guards did you see?

A.   Puff's.

Q.   About how many of Mr. Combs' security guards did you see outside of the Le Montrose?

A.   Maybe four or five.

Q.   And what if any vehicles did you see with Mr. Combs and his security staff?

A.   An SUV and I don't remember the other one.

Q.   Do you remember what color SUV?

A.   No.  I mean, I'm sure -- no.

Q.   What if any conversation did you and Mr. Combs have when you went outside?

A.   I told him that she -- she had left the room and he told me that I played him.

Q.   What happened next?

A.   As he was talking, I just hopped in the car and drove off.

Q.   Where were you driving to?

A.   I was going to drive home.

P5SACom4                         Nash - Direct

Q.  And what happened?

A.  I noticed that a car was following me.

Q.  Did you recognize the car?

A.  Yes.

Q.  From where?

A.  One of the same cars that was outside of the Le Montrose.

Q.  And who had been in or next to those car -- one of those cars outside of the Le Montrose?

MR. DONALDSON:  Objection.

THE COURT:  Overruled.

A.  Puff and security.

Q.  What did you do when you saw this car that you recognized driving behind you?

A.  I turned off my lights and drove really fast until I -- until I lost them.

Q.  And then where did you go?

A.  To the Universal Sheraton.

Q.  Why did you go to a hotel?

A.  Because I didn't think my home was safe to go to that night.

Q.  When did you go back to your home?

A.  The next morning.

Q.  And what did you find when you went back to your home?

A.  My backpack was stolen.

Q.  What had been in that backpack?

P5SACom4                        Nash - Direct

A.   My identification, thousand dollars cash, and my iPad.

Q.   Why did you have a thousand dollars cash in your backpack?

          MR. DONALDSON:  Objection.

          THE COURT:  It's overruled.

A.   Generally when Puff would --

          MR. DONALDSON:  Object --

A.   -- go be irate, I kept $500 for a deposit for the hotel and $500 for the room so that I didn't have to put my name on a hotel room.

          MR. DONALDSON:  Objection.

Q.   Why didn't you want to put your name --

          THE COURT:  Hold on.  When the question is being asked, if you object, then I have no idea what the objection is or what the question is.

          So let's get the question, and then, Mr. Donaldson, I'll give you a chance for the objection.

          MR. DONALDSON:  Judge, just for the record I was actually objecting to the prior answer that he started with generally.  I didn't want to interrupt his answer.

          THE COURT:  That's overruled.

          Ms. Comey, can we get a new question.

          MS. COMEY:  Yes, your Honor.  Thank you.

Q.   Why, Mr. Nash, did you not want to put your name on a hotel where you were staying?

A.   Because I didn't want Puff to find me.

P5SACom4                    Nash - Direct

Q.  Switching topics a bit.

How many times, if any, do you remember seeing Mr. Combs slap Cassie across the face?

A.  Once.

Q.  Where was this?

A.  Outside in the parking lot at a studio.

Q.  At which studio?

A.  I just remember it was in like North Hollywood.

Q.  And who do you remember being in the studio parking lot?

A.  It was quite a few people.

Q.  About what year was this?

A.  2015.

Q.  And what did you see happen?

A.  I just heard commotion, and I looked over, and by the time I looked over, he slapped her.

Q.  Who slapped who?

A.  Puff slapped Cassie.

Q.  Where?

A.  In her face.

Q.  What did Mr. Combs say as he slapped Cassie in the face?

A.  Get this bitch out of here.

Q.  What did you do in response?

A.  Got her out of there.

Q.  And how did Cassie react to being slapped in the face?

A.  She was in tears.

P5SACom4                              Nash - Direct

Q.   During Cassie's relationship with Mr. Combs, what if any
movies are you aware of that she appeared in?

A.   Step Up 3, The Perfect Match, and Honey 3.

Q.   I want to talk about The Perfect Match.  Do you remember
about when the premiere of that movie was?

A.   2015, '16.

Q.   Are you estimating?

A.   Yes.

Q.   Who helped her get ready for that premiere?

A.   Derek Roche and I think Rokael, the makeup artist.

Q.   And who if anyone did you FaceTime with while Cassie was
getting ready for that premiere?

A.   Derek.

Q.   And when Derek FaceTimed with you, did you talk with
Cassie?

A.   Yes.

Q.   And when you saw Cassie's face over FaceTime, what did you
see?

A.   That she had a black eye.

Q.   When was the next time you saw Cassie in person after
seeing that black eye over FaceTime?

A.   At the premiere.

Q.   When you saw Cassie at the premiere, what if any injuries
could you see on her face?

A.   I could see the black eye under the makeup.

P5SACom4                    Nash - Direct

Q.  But was there makeup covering it?

A.  Yes.

          MR. DONALDSON:  Objection.

          THE COURT:  Overruled.

Q.  How much makeup?

A.  A lot.

Q.  While you were at the premiere, what if any interactions did you observe between Mr. Combs and Cassie?

A.  He just kept pulling her next to him any time she would try to, you know, have a conversation with someone.  And then I notice him grabbing at her side and she would, like, jump.

          MR. DONALDSON:  Objection, your Honor.  Objection. Move to strike.

          THE COURT:  Overruled.

BY MS. COMEY:

Q.  Now, Mr. Nash, other than what we've already talked about, how often do you remember seeing bruises on Cassie during her relationship with Mr. Combs?

A.  Quite often.

Q.  Where do you remember seeing bruises on Cassie's body?

A.  Legs, arms, and neck.

Q.  And other than the premiere and the incident where Cassie hit her head on the bed frame, how many other times do you remember seeing bruising on Cassie's face either in person or over FaceTime?

P5SACom4                          Nash - Direct

A.  Twice.

Q.  When are those times?

A.  One time was just a random time, I think he slapped her.
And the other time was after a Las Vegas trip.

Q.  All right, I want to talk about just your interactions with
Cassie and your observations with her, not anything anyone told
you about that.  Okay?

A.  Mm-hmm.

Q.  So about what year was this?

A.  2015 maybe.

Q.  And are you estimating?

A.  Yeah.

Q.  And how did you come to first see injuries on Cassie's
face?

A.  She FaceTimed me.

Q.  From where?

A.  From --

Q.  From what city?

A.  From Vegas -- no, I don't think they were in Vegas.  But
she FaceTimed me.

Q.  Well, did this have any connection to a Vegas trip or no?

A.  Yes.  This was a Vegas trip.

Q.  And what injuries did you see on Cassie's face when she
FaceTimed you?

A.  I saw bruising on her face.

P5SACom4                         Nash - Direct

Q.  Could you describe it, please?

A.  She had two black eyes that time.

Q.  How did those injuries compare to the other injuries you'd seen her with?

A.  It was pretty bad.

Q.  Now, how many times, Mr. Nash, has Mr. Combs been physically violent with you?

A.  A few.

Q.  Do some stand out more in your mind than others?

A.  Yes.

Q.  Was one of those times that stands out at a music video shoot?

         MR. DONALDSON:  Objection, Judge.

         THE COURT:  It's overruled.

A.  Yes.

Q.  About what year was this?

A.  2013.

Q.  Are you estimating?

A.  About.

Q.  Whose music video was being shot that day?

A.  Cassie's.

Q.  Where were you right before the violence started?

A.  Outside smoking a cigarette.

Q.  Was anyone with you?

A.  No.

P5SACom4                    Nash - Direct

Q.   What were you standing by?

A.   A car.

Q.   Was it parked?

A.   Yes.

Q.   What happened as you were outside smoking a cigarette by a car?

A.   Puff came around and threw me on the car and started choking me out.

Q.   What did Mr. Combs say as he choked you on the car?

A.   I thought I told y'all about going out, y'all wilin.

Q.   Who did you understand Mr. Combs was referring to when he said y'all?

A.   Cassie and I.

Q.   And at that point what had Mr. Combs said to you in the past about whether you and Cassie could go out without his permission?

A.   After the Rita thing, that's basically -- he said that we couldn't.

Q.   That you couldn't what?

A.   That we couldn't go out.  Because every time I wanted to go out, she wanted to go out.

Q.   Now, Mr. Nash, stepping back, did you report any of the violence you've described today to the police?

     Did you file a report?

A.   No.

P5SACom4                          Nash - Direct

Q.  To the police?

A.  No.

Q.  Why not?

A.  Out of fear.

Q.  What were you afraid of?

A.  Of retaliation from Puff.

Q.  What kind of retaliation were you afraid of?

        MR. DONALDSON:  Objection.

        THE COURT:  Sustained.

Q.  Who on Mr. Combs' staff did you talk to about the violence
you observed Mr. Combs inflict on Cassie?

A.  Derek and Kristina.

Q.  Who is Kristina?

A.  Puff's assistant.

        MS. COMEY:  Can we please pull up what's in evidence
as Government Exhibit 2A-301.

Q.  Do you recognize this person?

A.  Yes.

Q.  Who is that?

A.  Kristina.

Q.  Do you know her last name?

A.  Khorram.

Q.  Do you know her by any nicknames?

A.  K.K.

        MS. COMEY:  We can take that down.  Thank you.

P5SACom4                          Nash - Direct

Q.  How did Kristina respond when you told her about violence you observed between Mr. Combs and Cassie?

A.  That she would talk to him.

MR. DONALDSON:  Objection.

THE COURT:  That's overruled.

Q.  And did the violence stop after she said that?

A.  No.

Q.  During your friendship with Cassie, approximately how many times did you help Cassie hide from Mr. Combs?

A.  Too many to count.

Q.  About how often?

A.  Pretty often.

Q.  Do those instances run together in your mind?

MR. DONALDSON:  Objection.

THE COURT:  That's overruled.

A.  Yes.

Q.  Where are some of the places you remember going with Cassie to hide?

A.  Hotels.  Shutters, The London, and a couple of other places.

Q.  What sorts of things do you remember seeing and hearing Mr. Combs say and do before you and Cassie ran away to hide?

MR. DONALDSON:  Objection, your Honor.

THE COURT:  That needs to be rephrased.

Q.  What caused you and Cassie to hide from Mr. Combs?

P5SACom4                      Nash - Direct

MR. DONALDSON:  Objection, your Honor.

THE COURT:  Can we get some specificity on what you're talking about.

MS. COMEY:  Sure.

Q.  So you talked about hiding in hotels; is that right, Mr. Nash?

A.  Yes.

Q.  Can you explain to us why you and Cassie went to hotels to hide?

MR. DONALDSON:  Objection, your Honor.

THE COURT:  Grounds?

MR. DONALDSON:  Form of the question, your Honor.

THE COURT:  Overruled.

A.  Repeat the question, please.

Q.  Can you explain to us why you and Cassie would go to hotels to hide from Mr. Combs?

A.  Because we didn't want him to come back to the house and attack us.

Q.  And before you went to these hotels, what if any conversations do you remember having with Mr. Combs or hearing Cassie have with Mr. Combs?

A.  I can't even remember.

Q.  On the occasions when you helped Cassie hide from Mr. Combs, what ended up happening each time?

A.  He would blow everyone's phone up and threaten everybody

P5SACom4                         Nash - Direct

until --

Q.  Let me pause you there.  You said he would blow everyone's phone up.  Who's the "he?"

A.  Puff.

Q.  And when you say "blow everyone's phone up," what do you mean?

A.  He would call incessantly.

Q.  Who did you see him call incessantly?

A.  Me and Cassie.

Q.  And who else during those same periods called you and Cassie?

A.  Kristina.

Q.  Kristina Khorram?

A.  Yes.

Q.  Did you answer any of those calls?

A.  Yes.

Q.  When you answered Mr. Combs' calls, what did he say?

A.  He would just say we needed to get back to the house.  She needs to get back to the house and --

Q.  And what do you remember his tone being?

A.  Sometimes angry.  Sometimes he would soften up.

Q.  And what do you remember Kristina saying when you answered her calls?

A.  That she was going to help with the situation, that he's calmed down, that we should come back to the house.

P5SACom4                    Nash - Direct

Q.   And after you heard that Mr. Combs had calmed down, what did you and Cassie do each time after going to a hotel?

A.   I would -- she would just go back -- she would go back to her house.

Q.   During Ms. Ventura's relationship with Mr. Combs, about how often did she tell you that she was going to a hotel with Mr. Combs?

A.   Quite often.

Q.   Can you give us an estimate, weekly, monthly, yearly?

A.   Weekly.

Q.   And each time that she told you she was going to a hotel with Mr. Combs, what if anything did you see her packing?

A.   A black duffle bag.

Q.   Did you see what she put in the duffle bag?

A.   Sex toys.

Q.   And what, on each of those occasions, what if anything did Cassie say to you about whether she wanted in those moments to go to those hotels with Mr. Combs?

        MR. DONALDSON:  Objection.

        THE COURT:  Overruled.

A.   She said she didn't want to.

Q.   And in those moments, what did she tell you about why she was going?

        MR. DONALDSON:  Objection.

        THE COURT:  Overruled.

P5SACom4                        Nash - Direct

A.   Because he wanted her to.

Q.   How long would Cassie usually be gone when she went to these hotels with Mr. Combs?

A.   Maybe, maybe a day or more.

Q.   And did you ever see her when she came back from these hotel stays?

A.   Most times, yes.

Q.   And what did you observe about her demeanor when she came back?

A.   That she would be tired.

Q.   During Cassie's relationship with Mr. Combs, what if any drugs did you see her take?

A.   Prescription pills and cocaine, Molly.

Q.   What if any of those drugs did you understand she became addicted to?

A.   The prescription drugs.

Q.   I want to talk now about Cassie's 29th birthday.  Okay?

A.   Mm-hmm.

Q.   What conversations, if any, do you remember having with Mr. Combs ahead of Cassie's 29th birthday?

A.   Should he surprise her for her birthday.

Q.   Is that what he asked you?

A.   Yes.

Q.   How did you respond?

A.   I told him if you want to.

P5SACom4                    Nash - Direct

Q.  Now, why did you tell Mr. Combs to come if he wanted to if you'd seen him do all of this violence to Cassie?

A.  Girl, I was not about to tell him he couldn't come, give that girl a party.

Q.  Where was Cassie's 29th birthday?

A.  At the Cavatina.

Q.  What's the Cavatina?

A.  A restaurant in Los Angeles.

Q.  What do you remember happening at the birthday party there?

A.  As they were leaving, Puff was telling Cassie, fuck you, I do all this -- I'll do everything for you and you just can't do this one thing for me.

Q.  Did you end up speaking with Cassie at the Cavatina about Mr. Combs?

A.  Yes.

Q.  Were you two alone?

A.  It was -- it was a couple people around.

Q.  What do you remember Cassie saying to you at the Cavatina?

A.  I asked her about Puff.  I was like girl, what is she over there doing, what is she talking about.  And Cassie said, girl, she's just mad because I don't want to go to the hotel and freak-off with him.

Q.  Now, before that moment, had you heard the words freak-off come out of Cassie's mouth before to the best of your memory?

A.  Yeah.  But it's not like freak-off.  It was just like

P5SACom4                        Nash - Direct

freak-off.  You know what I mean?

Q.  Like the verb?

A.  Yeah.

Q.  And at the Cavatina, what did Cassie say about whether she wanted to go to the hotel?

MR. DONALDSON:  Objection.

A.  That she didn't want --

MS. COMEY:  No you got to wait.

THE COURT:  Overruled.

Q.  What did say about in that moment whether she wanted to go to the hotel?

A.  That she didn't want to.  She wanted to enjoy her birthday.

Q.  After the Cavatina, where did you go next?

A.  To the Blind Dragon.

Q.  What's the Blind Dragon?

A.  A karaoke club.

Q.  Who else do you remember going to the Blind Dragon?

A.  Some friends.

Q.  Did you see Cassie or Mr. Combs there?

A.  Yes, they came -- they followed behind.

Q.  What if any interactions did you see between Cassie and Mr. Combs at the Blind Dragon?

A.  He just had her in the corner.  He was like pointing in her face.

Q.  What was his demeanor when Mr. Combs was pointing in

P5SACom4                      Nash - Direct

Cassie's face?

A.   Stern.

Q.   Sorry?

A.   Stern.

Q.   Could you hear what he was saying?

A.   No.

Q.   Did you have any conversations with Cassie at the Blind Dragon or no?

A.   No.

Q.   Where did you go after the Blind Dragon?

A.   To Cassie's house.

Q.   Who else do you remember going to Cassie's house after the Blind Dragon?

A.   Bana and another girl.

Q.   Who is Bana?

A.   A friend of ours.

Q.   When you say friend of ours, who is ours?

A.   Cassie and I.

          MS. COMEY:  Can we Please pull up what is in evidence as Government Exhibit 2A-407.

Q.   Do you recognize the person in this photograph?

A.   Yes.

Q.   Who's that?

A.   Bana.

Q.   Do you know her by any other names?

P5SACom4                        Nash - Direct

A.  Bryana.

          MS. COMEY:  We can take that down.  Thank you.

Q.  Now, which, which of Cassie's homes -- which home did you go to?

A.  875 Comstock.

Q.  Comstock?

A.  Yes.

Q.  And is that in Los Angeles?

A.  Yes.

Q.  What floor was that on?

A.  I want to say -- that might have been 17A.

Q.  The 17th floor you think?

A.  Yeah.

Q.  Okay.  What do you remember happening when that small group of people went to Cassie's home after the Blind Dragon?

A.  I -- Puff and Cassie came in.

Q.  And what do you remember Mr. Combs saying?

A.  Y'all girl going to get some dick tonight.

Q.  Who did Mr. Combs say that to?

A.  Me, Bana, and the other girl that was there.

Q.  And what did you see Cassie do next?

A.  She went to her room to pack her black bag.

Q.  And did you see what she was packing?

A.  Yes.

Q.  What was she packing?

P5SACom4                        Nash - Direct

A.   Like sex toys and stuff and money.

Q.   And what did Cassie say to you as she was packing up that bag?

          MR. DONALDSON:  Objection.

          THE COURT:  Overruled.

A.   That she didn't want to go there and should she take all this money because she had a wad of cash.

Q.   So, first, when she said she didn't want to go there, what did you understand the "there" was?

A.   With Puff.

Q.   To where with Puff?

A.   She didn't want to go -- she didn't want to go with him.

Q.   And what did you say about the money?

A.   I told her to put -- leave some behind because he always makes her spend all her money.

Q.   And what if anything did Cassie say to you about where she and Puff were about to go?

A.   To the hotel.

Q.   And what if anything did Cassie say to you about, in that moment, why she was going if she did not want to?

          MR. DONALDSON:  Objection.

          THE COURT:  That needs to be rephrased.

Q.   What if anything did Cassie say to you in that moment in her bedroom on her 29th birthday about why she was going to a hotel with Mr. Combs?

P5SACom4                    Nash - Direct

A.   Because --

         MR. DONALDSON:  Objection.

         THE COURT:  That's overruled.

A.   Because he was making her do that shit.

Q.   What did you see happen next?

A.   They ended up leaving the house.

Q.   When you say "they" who do you mean?

A.   Puff and Cassie.

Q.   When did you next see them after they left the apartment?

A.   I looked over the balcony and they were driving off in a golf cart.

Q.   Now, stepping back a bit, could you tell whether Cassie was under the influence of any substances this night?

A.   Oh, yeah.

Q.   Could you tell us about that?

A.   She was super high.

Q.   How could you tell?

A.   I mean, I know her demeanor.

Q.   And could you tell anything about whether Mr. Combs was under the influence of anything that night?

A.   Yes.

Q.   Tell us about that?

A.   He was high.

Q.   Based on his demeanor and his appearance and based on Cassie's appearance and demeanor, could you tell who was more

P5SACom4                     Nash - Direct

intoxicated than the other?

MR. DONALDSON:  Objection.

THE COURT:  You can answer that yes or no if you can.

A.  Yes.

Q.  Who was more intoxicated based on your observations?

A.  Cassie.

Q.  Who did you see driving the golf cart?

A.  Puff.

Q.  And who was in the golf cart with Mr. Combs?

A.  Cassie.

Q.  And where were you when you saw the golf cart driving away?

A.  Looking off of the balcony.

Q.  Who else was with you on the balcony?

A.  I don't know.

Q.  I just want to ask you about one other event, Mr. Nash.

A.  Mm-hmm.

Q.  I want to direct your attention to New Years Eve in approximately 2017.  Okay?

A.  Yes.

Q.  Do you remember where you were then?

A.  Vegas.

Q.  Who else do you remember being in Vegas for that New Years?

A.  Puff, Cassie, and the rest of the staff.

Q.  Whose staff?

A.  Puff.

P5SACom4                         Nash - Direct

Q.  Where were Mr. Combs, Cassie, you, and the rest of the staff staying?

A.  I forget the hotel.

Q.  But at a hotel?

A.  Yes.

Q.  And were you all on different floors or the same floor?

A.  Same.

Q.  Could you describe where Mr. Combs' room was in relation to the rest of the staff's rooms?

A.  The end of the hallway.

Q.  So his was at the end of the hallway.

When you arrived in Vegas for this trip, where did you go?

A.  To their -- Puff and Cassie's room to unload Cassie's clothes.

Q.  And what happened when you went to Mr. Combs' and Cassie's room?

A.  He told me that she had been asleep for 24 hours and we needed -- I needed to wake her up.

MR. DONALDSON:  Objection.

Q.  Who told you that?

A.  Puff.

THE COURT:  It's overruled.  You can continue.

Q.  I'm sorry.  Who told you that?

A.  Puff.

P5SACom4                      Nash - Direct

Q. After Mr. Combs told you that, what did you do?

A. I went to wake her up.

Q. And did you wake her up?

A. Yeah.  She woke up right away for me.

Q. And what did she tell you she wanted to do?

A. Stay in.

Q. And then what if any conversation did you have with Mr. Combs about what he wanted to happen that night?

A. He pulled me in the hallway and told me that he spent all that money, she needed to get ready.

Q. So then what did you and Cassie do?

A. Got her ready.

Q. And then where did you, Cassie, and Mr. Combs go?

A. To a couple of clubs.

Q. After going out, where did you end up at the end of the night?

A. In Puff and Cassie's room.

Q. Who do you remember being there?

A. Me, Cassie, Rob Holladay, and Puff.

Q. Who is Rob Holladay?

A. A low budget producer.

Q. What do you remember happening in Mr. Combs' suite?

A. Well, I usually go to sleep before everybody, so I went to sleep in the room, and Cassie woke me up and said that Puff wanted to invite a guy over.

P5SACom4                      Nash - Direct

MR. DONALDSON:  Objection, Judge.

THE COURT:  It's overruled.

Q.  How did you respond when Cassie told you that Puff wanted to invite a guy over?

A.  I just went ugh, and I got up and went to my hotel room.

Q.  And what did you do when you went to your hotel room?

A.  I started packing.

Q.  And as you were packing, where were you?

A.  Going between two rooms.

Q.  Why were you going between two rooms?

A.  Because I had clothes in both rooms.

Q.  So were you out in the hallway?

A.  Yes.

Q.  What did you see when you were going in and out of rooms into the hotel hallway?

A.  A guy knocking on the door.

Q.  A guy knocking on which door?

A.  Puff and Cassie's.

Q.  Do you know what that guy looked like?

A.  I can only see him from the back.

Q.  What did you see happen after this guy knocked on Mr. Combs' and Cassie's door?

A.  Somebody opened the door and he went in.

Q.  Did you see that man again?

A.  No.

P5SACom4                        Nash - Direct

Q.  What year did you ultimately stop working as a stylist for Mr. Combs?

A.  2018.

Q.  And what year did Cassie break up with Mr. Combs once and for all?

A.  2018.

Q.  What is your relationship like with Cassie now?

A.  Very close.

Q.  How often do you talk?

A.  Pretty often.

Q.  Have you discussed the substance of your testimony here today with Cassie at all?

A.  No.

Q.  Has she discussed the substance of her testimony, if any, with you at all?

A.  No.

Q.  About how many times have you met with prosecutors in connection with this case?

A.  Too many.

Q.  Can you estimate the number?

A.  What, five.

Q.  Approximately?

A.  Maybe.

Q.  How many of those meetings did you cut off and end early because you did not want to continue participating in them?

P5SACom4                    Nash - Direct

MR. DONALDSON:  Objection.  Excuse me.  Objection.

THE COURT:  That's overruled.

Q.  How many of your meetings with prosecutors did you cut off and --

THE COURT:  Let's rephrase the question just to avoid the form objection.

Q.  How many, if any, meetings with prosecutors did you end early?

A.  Probably all of them.

Q.  And did you do that because you did not want to continue speaking with prosecutors?

A.  Yeah.

Q.  During your meetings with prosecutors, did you volunteer information or did you only answer the specific questions you were asked?

A.  Only specific questions.

Q.  Now, after you stopped working for Mr. Combs, did you still communicate with him?

A.  Absolutely.

Q.  By text and by phone?

A.  Absolutely.

Q.  Did you also occasionally see him in person?

A.  No.

Q.  What was the tone of your text messages to Mr. Combs after you stopped working for him?

P5SACom4                        Nash - Direct

A.    Loving.

Q.    Why was your tone to him loving if you had seen him do all of these things to one of your closest friends and if he had been violent with you?

A.    I mean, my -- my whole 20s, this man's sanity was my safety.  So it was just very -- it was what I was used to.

Q.    Have you personally filed any lawsuits against Mr. Combs?

A.    No.

Q.    Have you personally sent any demands for money to Mr. Combs?

A.    No.

Q.    How do you feel about Mr. Combs here today?

A.    I don't hate him.

Q.    Why is that?

A.    I mean, I don't.  It's just not in me.

          MS. COMEY:  May I have a moment, your Honor.

          THE COURT:  You may.

          MS. COMEY:  No further questions.

          THE COURT:  All right.  Cross-examination.

          MR. DONALDSON:  Yes.  But can I take a two-minute break, please?  Go to the bathroom.

          THE COURT:  Yes.  Let's take five minutes.  We'll come back at 2:30.  All rise.

          (Continued on next page)

P5SACom4                        Nash - Direct

(In open court; jury not present)

THE COURT:  Mr. Nash, we'll be back in a few minutes. You can head back to that room and we'll bring you out.

THE WITNESS:  Okay.

THE COURT:  All right.  We'll be back in five.

(Continued on next page)

P5SsCOM5                          Nash - Cross

(Jury not present)

THE COURT:  All right.  Please be seated.

Let's have Mr. Nash back.

MS. COMEY:  Your Honor, I've raised this with defense counsel.  I know this may not be possible.  If there's any way we can go a little late today.  The witness has a flight back home to Los Angeles tonight.  If we have to rebook it, we will.  If there's any way we can stay a little late and get this witness done, I think the witness will appreciate it.

THE COURT:  That's fine.  I think the jury will understand.

Mr. Donaldson, any issues with that?

MR. DONALDSON:  Not from me personally.

THE COURT:  OK.

MR. DONALDSON:  Just tell me what we think.

THE COURT:  I could be mistaken.  I think I told the jury at some point in the beginning of this case that it may be a little bit longer, we will get them out.  I think we said at some point, the latest, 4:00.  I think we have some breathing room there.

MR. DONALDSON:  OK.

(Witness returned)

THE COURT:  Welcome back.

THE WITNESS:  Thank you.

(Continued on next page)

P5SsCOM5                              Nash - Cross

(Jury present)

THE COURT:  Please be seated.

Welcome back, members of the jury.

Just to give you a heads-up, we're going to be stay ago little bit later today, just for some scheduling reasons. The bad news is we're going to be going later than 3:00.  I assure you we're not going to get out of here any later than 4:00.

The good news is, we're doing all of this is make sure that we stay on schedule, on a more general level, for the trial so we can make sure that we're keeping on track.

So, with that, thank you for your patience.

And, Mr. Donaldson, when you're ready.

MR. DONALDSON:  Thank you, Judge.

BY MR. DONALDSON:

Q.  Good afternoon, sir.  Good afternoon.

A.  How are you?

Q.  I'm pretty good.  Thank you.

How are you?

A.  Blessed.

Q.  Blessed.

I'm going to ask you to try to speak up as loud as you can so that the last person in this jury box can hear you.

All right?

A.  Sure.

Q.  Cool.

Now, you just mentioned on direct with Ms. Comey here that you met with the government several times, is that right?

A.  Yes.

Q.  And during those times you met with the government, you had an attorney present, is that right?

A.  Um, yes.

Q.  And you also said that you, a few times, you wanted to leave early, is that right?

A.  Yeah.

Q.  By leave early, you were saying that you wanted to stop whatever questions they were asking you, you wanted to just get out of there?

A.  Yes.

Q.  Because either you were tired of the questions or you just didn't want to be there, correct?

A.  Correct.

Q.  And I think you said, when you first sat down this afternoon, that you did not want to be here, right?

A.  Absolutely.

Q.  You did not want to testify in this case?

A.  Yep.

Q.  And you were told you had to be here because of a subpoena, is that right?

A.  Correct.

P5SsCOM5                         Nash - Cross

Q. And that subpoena told you, you had to come to court, correct?

A. Yes.

Q. Now, as far as you going to the government's offices to talk to them, you didn't have to go there, correct?

A. Nope.

Q. So when you went there, you went because --

Well, you went voluntarily, right?

A. Yeah.

Q. And so, you went there to answer their questions, like they said, correct?

A. Yes.

Q. And give them truthful answers?

A. Nothing but the truth.

Q. And that is what you did every time you was there?

A. Every single time.

Q. When you said you went there with the lawyer, Mr. Dunn, is that it?

A. Yes.

Q. And Mr. Dunn -- well, you also said that, I think one of your last questions -- answers was you're not -- you haven't filed a lawsuit, right?

A. No.

Q. And you haven't sent out a demand letter?

A. No.

P5SsCOM5                         Nash - Cross

Q.   You know what a demand letter is?

A.   Yes, I do.

Q.   So you haven't sent out anything to Mr. Combs demanding money?

A.   No.

Q.   But you did hire Mr. Dunn to pursue possible civil litigation against Mr. Combs, right?

        THE COURT:   Sustained.

        MS. COMEY:   Objection.

Q.   Do you have a civil --

        Are you considering a lawsuit against Mr. Combs?

A.   No.   I'm focused on getting out of here.

        MR. DONALDSON:   Could you put up 3514-5, just for the parties and the witness, please.   Would you just highlight the first hyphen, please.

Q.   Mr. Nash, could you read that first part to yourself, and let me know when you're finished reading it?

A.   Um, let me see.   Dunn representing --

Q.   No, no, no, no.   Read it to yourself.   I'm sorry about that.   Read it to yourself.

        THE COURT:   Mr. Nash, are you done reading that?

        THE WITNESS:   Yes.

        THE COURT:   Can we take it down.

        Mr. Donaldson, a question.

        MR. DONALDSON:   Thank you.

P5SsCOM5                              Nash - Cross

BY MR. DONALDSON:

Q.  Now, after reading that document, does that refresh your recollection, or does that change your testimony, whether or not you are considering civil litigation against Mr. Combs?

A.  No, it doesn't.  It seems like an assumption.

Q.  We don't want to do assumptions in the courtroom, so does that document refresh your recollection that you are considering civil --

A.  No, it doesn't.

Q.  Hold on.

A.  It doesn't.

Q.  It does not?

A.  No.

Q.  So it's fair to say then that you do not have, or not as much March -- one second -- as of March 10, 2025, you are not considering or retaining counsel to consider suing Mr. Combs in civil actions?

A.  I have counsel to protect me.  I don't -- I don't do federal court.

Q.  All right.  So you have counsel to protect you related to?

A.  This case.

Q.  Protect you related to your interests regarding civil claims against Mr. Combs, correct?

A.  No.  This case.

Q.  Did you not tell the government on March 10, 2025, that you

P5SsCOM5                     Nash - Cross

have civil counsel to consider civil claims against Mr. Combs?

MS. COMEY:  Objection, asked and answered, your Honor.

MR. DONALDSON:  Different question, Judge.

THE COURT:  I don't know about that.  I'll let you ask it one more time.

Overruled.

MR. DONALDSON:  Excuse me.

Mr. Donaldson, do you want to ask your question?

MR. DONALDSON:  Yes.  I want to make sure I get the date right.

THE COURT:  All right.

BY MR. DONALDSON:

Q.  On Mr. March 10, 2025, did you not tell the government, Ms. Comey, that you have civil counsel to consider pursuing a civil complaint against Mr. Combs?

A.  No.

MR. DONALDSON:  All right.  Could you put up 1800, please.  I want to show the witness and the parties, witness only, what's been premarked as a Defense Exhibit 1800.

A.  Yes.

Q.  Mr. Nash, do you recognize that?

A.  Yes.

Q.  What do you recognize that to be?

A.  Cassie in the *Numb* video.

Q.  I'm sorry?

P5SsCOM5                        Nash - Cross

A.   Cassie in the *Numb* video.

Q.   The *Numb* video?

A.   Yes.

Q.   What's the *Numb* video?

A.   It's a music video from a mix tape.

Q.   From the mix tape?

A.   Yes.

         MR. DONALDSON:  We would like to have that moved in as Defense Exhibit 1800?

         MS. COMEY:  No objection.

         THE COURT:  1800 will be admitted.

         (Defendant's Exhibit 1800 received in evidence)

         MR. DONALDSON:  Could you put up 1801, please.

Q.   Mr. Nash, do you see what's been marked as Defense Exhibit 1801?

A.   Yes.

Q.   What do you recognize that to be?

A.   Cassie and it looks like Usher.

         MR. DONALDSON:  Your Honor, I would like to move Defense Exhibit 1801 in.

         MS. COMEY:  I would object, your Honor.  I don't think the witness has established the relevance.

         THE COURT:  All right.  Mr. Donaldson.

BY MR. DONALDSON:

Q.   Mr. Nash, do you know where this particular picture comes

P5SsCOM5                          Nash - Cross

from?

A.   The Bad Boy Reunion tour.

Q.   Was that 2016?

A.   Maybe.

Q.   Were you a part of that tour?

A.   Yes.

Q.   You participated as a stylist in that tour?

A.   Yes.

Q.   And is this -- was Cassie your -- were you styling for Cassie at that time?

A.   Yes.

          MR. DONALDSON:  I would like to move this in as Defense Exhibit 1801.

          MS. COMEY:  No objection, your Honor.

          THE COURT:  1801 will be admitted.

          (Defendant's Exhibit 1801 received in evidence)

          MR. DONALDSON:  Publish that to the jury, please, if you don't mind.

          Take that down, please.

          Could you please put up 1802, please.

BY MR. DONALDSON:

Q.   Mr. Nash, do you recognize what's been previously marked as Defense Exhibit 1802?

A.   Yes.

Q.   What do you recognize that to be?

P5SsCOM5                          Nash - Cross

A.  This is Cassie doing her two-minute performance at the Bad Boy Reunion tour.

Q.  This is the same 2016 Bad Boy Reunion tour?

A.  This is actually the show.  This is not the tour.  She didn't do the tour.  She did the show.

Q.  OK.  This is the show from that?

A.  Yes, yes.

Q.  Were you her stylist at that time?

A.  Yes.

        MR. DONALDSON:  Your Honor, I move to in as Defense Exhibit 1802.

        MS. COMEY:  No objection.

        THE COURT:  1802 will be admitted.

        (Defendant's Exhibit 1802 received in evidence)

        MR. DONALDSON:  Please publish for the jury, please.

BY MR. DONALDSON:

Q.  Did you pick out that dress?

A.  I don't remember.

        MR. DONALDSON:  Could we go back to 1801, please.  Put back up 1801.

Q.  Did you pick out that one?

A.  I don't remember.

        MR. DONALDSON:  Could we put up 1803 just for the witness and the parties.

        Now, your Honor, can I have a word with the

P5SsCOM5                              Nash - Cross

prosecution, please?

THE COURT:  Yes, you may.

(Counsel confer)

MR. DONALDSON:  Your Honor, with the consent of the government, we have approximately ten more exhibits we would like to put in.  The government has indicated it has no objection.  We can do a batch, if that's OK, to make it quicker, or we can go through it one by one.

THE COURT:  Do you need to use those during your Honor examination or get them into evidence?

MR. DONALDSON:  I want to get them into evidence now and use them later on.

THE COURT:  In the examination?

MR. DONALDSON:  Yes.

THE COURT:  What are the exhibits?

MR. DONALDSON:  1810, 1811, 1814, 1818, 1820 -- those are over the government's objection, but the court allowed those in -- 1819, 1821 through 1826, 1828, 1829, 1833, 1835, 1837, 1839 through 1841.

MS. COMEY:  No objection, so long as 1841 has the redactions that I requested.

MR. DONALDSON:  I believe it does.  Yes, it does.

THE COURT:  All right.  Those exhibits identified by counsel will be admitted.

MR. DONALDSON:  Thank you.

P5SsCOM5                          Nash - Cross

(Defendant's Exhibits 1810, 1811, 1814, 1818, 1820 1819, 1821 through 1826, 1828, 1829, 1833, 1835, 1837, 1839 through 1841 received in evidence)

BY MR. DONALDSON:

Q.  All right.  Mr. Nash, you testified this afternoon about your relationship with Ms. Ventura, right, Cassie, right?

A.  Mrs. Fine.

Q.  I'm sorry?

A.  Mrs. Fine.

Q.  Mrs. Fine?

A.  Yes.

Q.  Because she's married to Alex?

A.  Yes.

Q.  And that was -- we'll get to that.

So, well, you testified about your relationship to Mrs. Fine?

A.  Yes.

Q.  It started in 2001 what?

A.  2009, '8.

Q.  And you mentioned back in 2008, when you started this relationship, you were a -- you still are a stylist, right?

A.  Yes.

Q.  I think when you came into there, you said that you are a celebrity stylist?

A.  Yes, correct.

P5SsCOM5                          Nash - Cross

Q.  And a celebrity stylist means someone that styles for celebrities, right?

A.  Yes.

Q.  That's contrary to someone who doesn't style for celebrities, right?

A.  Yes.

Q.  So someone that's not a celebrity stylist can call themselves just a stylist?

A.  Yes.

Q.  So you have earned the distinction of being a celebrity stylist because you style primarily for celebrities?

          MS. COMEY:  Objection, your Honor.

A.  Yes.

          THE COURT:  It's overruled.

Q.  Now, when you -- that's not how you started your career, though, correct?

          You don't just become a celebrity stylist, you have to move up to become that?

A.  No.  That's how I started it.

Q.  So, in 2007, when you were an intern at Bad Boy, you were a celebrity stylist?

A.  I started as an intern.

Q.  But were you a celebrity stylist is my question?

A.  Oh, no.

Q.  So, in 2008, you became a celebrity stylist?

P5SsCOM5                    Nash - Cross

A.   Yeah.

Q.   What do you mean yeah?

A.   Yes.

Q.   So, by working at Bad Boy between 2007 and 2008, you just became a celebrity stylist?

A.   Yes.

Q.   And that was because Mr. Combs introduced you to Cassie?

A.   I introduced myself to Cassie.

Q.   You introduced yourself to Cassie while working for Mr. Combs?

A.   Yes.

Q.   And you were still styling Mr. Combs, as well?

A.   Yes.

Q.   So that's how you became a celebrity stylist, by that kind of movement, correct?

A.   Yes.

Q.   And that was -- but that only happened, though, because you started your internship with Bad Boy, right?

A.   Yes.

Q.   So it would be fair to say that Mr. Combs or Bad Boy helped start your career you have now as a stylist, as a celebrity stylist, would that be fair to say?

A.   Yeah.  Go ahead.

Q.   I'm going.  Don't worry about it.

          So now, when you say stylist, what do you mean by

stylist?  What is a stylist?  Tell everybody what a stylist is.

A.  Someone that goes shopping for clothes, you style them for music, dress them for music videos, personal appearances, some people do personal styling, which I do, as well, where I do everyday looks for clients.

Q.  What about music?

A.  No.

Q.  You don't do any music?

A.  What do you mean?

Q.  So when you talked this morning, this afternoon, about your knowledge of studios and your knowledge of time period, your knowledge of when records get released and your knowledge of who releases records and your knowledge of all this, you were giving us that information based upon your extensive experience as a celebrity stylist, right?

MS. COMEY:  Objection, misstates the testimony, your Honor.

THE COURT:  You've got to rephrase the question, Mr. Donaldson.

Mr. Donaldson, if you can just do me a favor and stay at the lectern, just because the court reporters are having difficulty if you're not at the microphone.

MR. DONALDSON:  OK, Judge.  Got you.  Let me start over.

BY MR. DONALDSON:

P5SsCOM5                        Nash - Cross

Q.  As a celebrity stylist, you indicated that you purchased clothes, correct?

A.  Um-hmm.

Q.  Is that a yes?

A.  Yes.

Q.  You also helped people pick out clothing for their videos, correct?

A.  Um-hmm.

Q.  Is that a yes?

A.  Yes.

Q.  You also helped people pick out clothing for their photo shoots, correct?

A.  Yes.

Q.  You also helped them pick out clothing for their weddings, correct?

A.  Yes.

Q.  And, in fact, as you indicated, for Mrs. Fine, you helped pick out her wedding dress, correct?

A.  Yes.

Q.  You and who else?  A father-daughter group?

A.  Who?

Q.  Who was it?

        Who helped you pick out that dress?

A.  What do you mean father-daughter group?

Q.  Who helped you pick out Mrs. Fine's wedding dress?

P5SsCOM5                    Nash - Cross

A.  Marni Senofonte.

Q.  Did his daughter help, too?

A.  Whose daughter?

Q.  Don't worry about it.  We'll get to it.

So now, once you finished picking out the clothing for the celebrities and their photo shoots and their video shoots, is your job done?

A.  Depends.

Q.  OK.  You also helped people pick out their clothing for tours, correct?

A.  Correct.

Q.  For when they perform on these tours, correct?

A.  Yes.

Q.  So, in 2016, doing this Reunion tour, you were present to help pick out persons' clothing for their performances, correct?

A.  Yes.

Q.  And that's a very important job, right?

A.  Yes.

Q.  Because people have to look -- celebrities have to look a certain way when they walk outside, correct?

A.  Yes.

Q.  Because their look is part of their celebrity status, correct?

A.  Yes.

P5SsCOM5                        Nash - Cross

Q.  And it has to be -- I mean, it takes a lot to pick out the right outfit for the right event, correct?

A.  Yes.

Q.  And you have to have the right hair, correct?

A.  Yes.

Q.  And that's all a part of being an artist, correct?

A.  Yes.

Q.  All right.  And you help people do that, correct?

A.  Yes.

Q.  You helped Mr. Combs do that, correct?

A.  Yes.

Q.  You did that for a while with Mr. Combs, correct?

A.  Yes.

Q.  And he would send you -- you would send him pictures of what to wear, he would pick which ones he wanted, correct?

A.  Cassie would usually send them, but yes.

Q.  Cassie would send him pictures?

A.  Yes.

Q.  And he would pick out which ones he wanted from those?

A.  Yes.

Q.  You know someone named Scott Langston or Scott Langston?

A.  No.

Q.  OK.  What about -- do you know the Public School brand, the Public School clothing brand?

A.  No.

P5SsCOM5                          Nash - Cross

Q.   Do you know Murio Solomon?

A.   No.

Q.   Do you know Groovey Lew?

A.   Yes.

Q.   Who is Groovey Lew?

A.   Puff's longtime friend and one of his stylists.

Q.   Do you know Mike B?

A.   From around, yes.

Q.   Who was Mike B?

A.   One of Puff's old stylists.

Q.   Now, it would be fair to say that when you worked at Bad Boy as an intern and as a stylist for Mr. Combs and as stylist for Mrs. -- what's her name, Mrs --

A.   Fine.

Q.   -- Fine, Mrs. Fine, there were other artists that were also signed to the Bad Boy roster, would that be fair to say?

A.   Yes.

Q.   Who were they?

A.   Um, French Montana.

Q.   Wait.  French Montana, the hip-hop person, rap star?

A.   Yes.  I mean, and Puff.  That's all I can really remember right now.

Q.   Just two of them?

A.   I just -- I don't know.

     While I was there?

P5SsCOM5                        Nash - Cross

Q.  You were --

A.  Danity Kane, Day 26.

Q.  Danity Kane, Day 26.  Who else?

A.  I don't remember.

Q.  Did you ever see Gun Kelly there?

A.  Oh, yeah.

Q.  You seen Gun Kelly?

A.  Yes.

Q.  OK.  Who else?

A.  I don't remember.

Q.  All those people that were there, they also had stylists, correct?

A.  Oh, I don't know.

Q.  Well, when at a label such as Bad Boy Records or Bad Boy, period, as you said, artists have to be, well, pay attention to their clothing, correct?

A.  Yes.

Q.  You would agree that it is in the best interest, based upon your experience as indicated on direct, you would agree it's in the label's best interest to make sure that the artists signed to a label are dressed appropriately, correct?

A.  Yes.

Q.  You would agree that it's in a label's best interest that its stars or its artists that are signed to them, hair is appropriate, correct?

P5SsCOM5                        Nash - Cross

A.   Yes.

Q.   You would agree that it's in the label's best interest that the artists signed to the label represent themselves properly in public, correct?

A.   Yes.

Q.   And that's all because the label, I guess, makes more money if the artists make money, does that make sense?

A.   Yes.

Q.   OK.  And so you would agree then that if Cassie -- well, strike.

        Was Cassie signed to the Bad Boy label?

A.   Yes.

Q.   So you would agree then that the label had an interest in how Cassie looked when she went outside, correct?

A.   Yes.

Q.   You would agree that the label had an interest in how Cassie's clothing looked like, correct?

A.   Yes.

Q.   You would even agree that that --

        Do you recall a haircut that Cassie had, the side haircut?

A.   Yes.

Q.   That haircut became almost iconic status, correct?

A.   Yes.

Q.   It became the Cassie cut, correct?

P5SsCOM5                          Nash - Cross

A.  Yes.

Q.  People all around the world was getting their hair cut, correct?

MS. COMEY:  Objection, your Honor.

THE COURT:  Sustained.

Let's move on.

Q.  Who decided that haircut?  Who suggested the haircut?

A.  Puff.

Q.  Who?

A.  Puff.

Q.  Mr. Combs?

A.  Um-hmm.

Q.  Is that a yes?

A.  Yes.

Q.  So Mr. Combs suggested the haircut on Cassie that became iconic status?

A.  Yes.

Q.  And so when Cassie was wearing certain clothing outside, it would be important for the person who ran the label, that her clothing looked good, would that be fair to say?

A.  Sometimes, yeah.

Q.  You also mentioned during direct that you were -- Cassie was at studio sessions quite often.

Do you recall saying that?

A.  Yes.

P5SsCOM5                          Nash - Cross

Q.  I believe you said she was recording almost every day.

Do you recall saying that?

A.  Towards the end, yes.

Q.  And this was in a studio, correct?

A.  Correct.

Q.  I believe you also said that the something about -- we'll get to the mix tape.

When you say recording every day, this is in an actual studio, correct?

A.  Yes.

Q.  So the jury understands, we're talking about a studio that can record songs that could be released commercially, correct?

A.  Correct.

Q.  And you know the difference, you know what commercial releases mean, correct?

A.  Yes.

Q.  That means releases that are to the public so that can have some commercial profit, I guess, right?

A.  Yes.

Q.  And making those songs in those studios take time, correct?

A.  Yes.

Q.  Sometimes days and weeks, correct?

A.  Yes.

Q.  For one song, correct?

A.  Um-hmm.

P5SsCOM5                          Nash - Cross

Q.   Is that a yes?

A.   That's a little excessive, but yes.

Q.   OK.   Studios are expensive, correct?

A.   Yes.

Q.   Studio time is expensive, correct?

A.   Yes.

Q.   So when you say that you and Cassie were in the studio quite often, almost every day, recording songs, somebody had to pay for that studio, correct?

A.   Yes.

Q.   And it is in the label's best interest to ensure that the artist is putting out a commercially satisfactory song, correct, if you know?

A.   Yes.

Q.   OK.   And so the label pays for the studio time, correct?

A.   Yes.

Q.   And so the label in this situation was Bad Boy, correct?

A.   Correct.

Q.   And that would be Mr. Combs, correct?

A.   Correct.

Q.   So when you say that you and Cassie were in the studio almost every day or quite often, that means that Mr. Combs was paying for that studio time, correct?

A.   Correct.

Q.   She wouldn't be able to go to the studio unless he pays for

P5SsCOM5                         Nash - Cross

it, correct?

A.   Correct.

Q.   And so the label wants -- well, I shouldn't say wants.

     It would be fair to say that -- well, when you say a lot, you mean over the course of between 2009 and 2018, you and Cassie went to a studio quite often, paid for by Mr. Combs, correct?

A.   Um-hmm.

Q.   Yes?

A.   Yes.

Q.   Well, that would mean then that you would agree that Mr. Combs and Bad Boy had an interest in Cassie's future, correct?

A.   Yeah.

Q.   Do you know what Young & Reckless is?

A.   Yes.

Q.   And that's something that was -- well, I don't want --

     You tell the jury what that is.

A.   A streetwear brand, clothing brand.

Q.   Streetwear clubbing brand?

A.   Clothing brand.

Q.   Say that again?

A.   A streetwear clothing brand.

Q.   Clothing brand.

     And it was founded or owned or made by whom?

P5SsCOM5                    Nash - Cross

A.  I don't know.  I don't remember.

Q.  Well, Cassie had an interest in this, right?

A.  Yes.

Q.  And Cassie was part of that, correct?

A.  Yes.

Q.  That was in 2015, '16?

A.  Maybe around there.

Q.  And as part of this clothing streetwear brand, Cassie was taking photos, correct?

A.  Yes.

Q.  She was doing photo shoots, correct?

A.  Yes.

Q.  Were you styling that as well?

A.  Yes.

Q.  And that wasn't under the auspices of Bad Boy, correct?

A.  What do you mean?

Q.  Bad Boy had nothing to do with Young & Reckless, correct?

A.  No.  Puff had to approve the photos.

Q.  Puff had to approve the photos?

A.  Yes.

Q.  But Puff didn't have to approve Cassie going to do work with Young & Reckless, correct?

A.  Yes, he did.

Q.  Did he approve that?

A.  Yes.

P5SsCOM5                        Nash - Cross

Q.  When did he approve that?

A.  You say what?

Q.  When did he approve that?

A.  I don't -- it was years ago, but he approved it.

Q.  Just so I'm clear, that was also to make money, correct?

A.  Yes.

Q.  So Mr. Combs approved Cassie to go out and make money with the clothing and streetwear brand, correct?

A.  Yes.

Q.  And Mr. Combs had nothing to do with the release of Young & Reckless, correct?

A.  I mean, he was hands on.

Q.  But it wasn't his company, correct?

A.  No.

Q.  So someone else was making money off of Young & Reckless with Cassie, correct?

A.  Yes.

Q.  How long did that last?

A.  I don't remember.

Q.  Do you know someone named Bana?

A.  Yes.

Q.  Did Bana have something to do with Young & Reckless?

A.  Yes.

Q.  What did Bana have to do with Young & Reckless?

A.  She was a designer.

P5SsCOM5                          Nash - Cross

Q.  So Bana was the designer for Young & Reckless, is that right?

Is that a yes?

A.  Um, yes.

Q.  And Bana -- would it be fair to say that Bana is a friend of Cassie's?

A.  Yes.

Q.  And so Bana asked Cassie to help her with Young & Reckless, correct?

A.  Yes.

Q.  And then Cassie decides to step away from her singing and go into making money with Bana in Young & Reckless, correct?

A.  It wasn't a step-away from syncing.

Q.  OK.  In addition to her singing, she decided to do something else to help her make money, correct?

A.  Correct.

Q.  And Mr. Combs said that's fine, go ahead and do that, correct?

A.  Yes.

Q.  Did not hold her back at all, correct?

A.  No, not with that.

Q.  Now, you said you mentioned a Bad Boy tour that was in 2016.

Do you recall that?

A.  Yes.  Yes.

P5SsCOM5                          Nash - Cross

Q.  And you were part of that tour, correct?

A.  Yes.

Q.  And when I say part of it, you were a stylist for the tour, correct?

A.  Yes.

Q.  That means you traveled with the tour, correct?

A.  Oh, no, no, no.  I stayed home.

Q.  You stayed home?

A.  Yeah.

Q.  I don't blame you.

Where is home, California?

A.  Yes.

Q.  I'm not mad at you.

So you stayed home and you styled from home?

A.  No.  We did a fitting beforehand.

Q.  What does that mean?

A.  Um, you do a fitting, you prep the clothes, and Derek took the clothes with him.

Q.  When you say prep the clothes, what does prep --

We don't know what that means.  What do you mean by prep the clothes?

A.  You go shopping, you make outfits, you pack everything and, you know, we put it on garment racks, you have a fitting, and you take the edits with you.

Q.  Well, for how many people, for how many artists did you do

that for?

A.   I think maybe, like, four.

Q.   Which artists?

A.   It was Lil' Kim, Cassie, Puff, and Mase, I want to say.

Q.   So, fair to say then, that back in 2016, during this particular tour, you did the styling or helped do the styling for what would be considered major musicians at that time, correct?

A.   Yes.

Q.   Mase would be a major platinum-selling musician, correct?

A.   Not at the time.

Q.   Well, overall?

A.   Yes.

Q.   And who else was there?

A.   Lil' Kim.

Q.   Major platinum-selling artist, correct?

A.   Yes.

Q.   Mr. Combs, as well?

A.   Yes.

Q.   Major platinum-selling artist, correct?

A.   Yes.

Q.   And your personal client was Cassie?

A.   Yes.

Q.   Anyone else on that tour?

A.   No.

P5SsCOM5                          Nash - Cross

Q.  And this was after --

Just quickly, you mentioned something about seeing a black eye on FaceTime.  Do you remember saying that?

A.  Yes.

Q.  And that was after this InterContinental incident, correct, during the InterContinental incident, correct?

A.  No.  The black eye -- yes, I did see that one, yes.  I thought you meant the Vegas.  Yes.

Q.  And this tour that you styled for was after that, correct?

The tour was in May, June 2016, and the incident at InterContinental happened in March 2016, correct?

A.  Hmm.  Yes, but there was a show, maybe, like a year before, before the tour, at Barclays.  It was maybe, like, a two-night show and then, maybe, I want to say the next year, six months later, then they went out on tour.

Q.  Who was in the show?

A.  Bad Boy artists.

Q.  Who?

A.  Carl Thomas.  I don't remember.

Q.  Did you style for them as well?

A.  I actually did, yeah.

Q.  You styled for Carl Thomas, as well?

A.  Yes.

Q.  Let's get this right then.

You started as an intern 2007, 2008.  You catapulted

P5SsCOM5                        Nash - Cross

to celebrity stylist, right?

A.  Yes.

Q.  And then after that, by the time 2016 came around, you styled Carl Thomas, Sean Combs, Mase, Lil' Kim?

A.  Yes.

Q.  Who else?

A.  Cassie.

Q.  Cassie?

A.  Um-hmm.

Q.  Anybody else?

A.  Puff.  Who else?

Q.  So based upon your internship with Bad Boy, you became a serious celebrity stylist, correct?

A.  Yes.

Q.  Is that a yes?

A.  Yes.

Q.  Now, I'm going to get back to your studio stuff.

You said Cassie was inside the studio all the time. These studio sessions weren't just by herself, though, correct?

A.  What do you mean?

Q.  Well, we talked about this mix tape.

Do you recall talking about that?

A.  Yes.

Q.  All right.  And the mix tape, for some of the jurors that might not know what it is, a mix tape is a tape of a lot of

P5SsCOM5                        Nash - Cross

different songs, correct?

A.  Yes.

Q.  With various artists, correct?

A.  Yes.

Q.  And in this particular situation, the mix tape they were talking about was Cassie and a lot of different people, correct?

A.  Yes.

Q.  And all these artists had to be in studios, had to do work with Cassie to make their particular song, correct?

A.  They weren't necessarily in the studio all the time.

Q.  Not all the time?

A.  Yes.  Some of them, yes.

Q.  Some of them, right?  OK.

        So the mix tape that Cassie made while being with Bad Boy had --

        well, you recall the mix tape, correct?

A.  Yes.

Q.  You said you helped -- what did you say you helped do?  You helped make it?  You helped --

A.  Yeah.

Q.  No.  Tell us what you did.

A.  I helped Cassie pick songs, I helped her set up sessions, I helped with the creative ideas.

Q.  So you went from celebrity stylist to executive producer

status?

A.  I mean, yeah.

Q.  Say that again louder.

A.  Actually, my original interview with Bad Boy was to work in AR.

Q.  All right.  But at this point 2016, you are basically executive producing this mix tape, correct?

A.  With the team.  We have a team.

Q.  You got no credit for that, right?

A.  No.

Q.  You got paid no money for that?

A.  No one got paid for the mix tape.

Q.  You even get no acknowledgment for being the executive producer of the mix tape, correct?

A.  No.

Q.  So no one besides you and Cassie knew what you did on this mix tape, is that fair to say?

A.  No.  Rob Holiday.

Q.  Rob Holiday --

A.  Dominique.

Q.  -- rob Holiday is the low-budget producer you said earlier?

A.  Yes.

Q.  Is that what you said?

A.  Yes.

Q.  When you said low-budget producer, you were just saying

P5SsCOM5                          Nash - Cross

that because he's a low-paying producer, or he's not a good producer, he's a whack producer?

Why is he a low-budget producer?

A. Hmm, a little bit of all of the above.

Q. And he was, this low-budget producer, was also on the mix tape, correct?

A. Yes.

Q. Meek Mills on the mix tape, correct?

A. Yes.

Q. And Meek Mills at that time was a really popular internationally known rap artist, correct?

A. Correct.

Q. You also said French Montana, correct?

A. Yes.

Q. He also was a pretty well-known popular rap artist, correct?

A. Correct.

Q. Jeremih, right?

A. Yes.

Q. Platinum-selling artist?

A. Oh, I don't know his stats.

Q. Very popular at the time, correct?

A. Yes.

Q. Fabolous?

A. Yes.

P5SsCOM5                         Nash - Cross

Q.  Very popular rap artist?

A.  Yes.

Q.  Pusha T?

A.  Yes.

Q.  Pusha T was on the mix tape?

A.  Yes.

Q.  Whiz Khalifa?

A.  Yes.

Q.  And, just so we're clear, Pusha T and Whiz Khalifa are both really well-known popular major rap artists, correct?

A.  Correct.

Q.  Rick Ross?

A.  Yes.

Q.  At that time, Rick Ross was super major well-known rap artist, correct?

A.  Correct.

Q.  Too Short?

A.  Yes.

Q.  The Too Short from the West Coast?

A.  Yes.

Q.  Who decided that, you?

A.  Um...

Q.  You're from California?

A.  I'm from California, yes.

Q.  Did you pick Too Short?

P5SsCOM5                        Nash - Cross

A.   Um, no, not -- no.

Q.   But Too Short was on there, too?

A.   Yes.

Q.   And he is really well-known, correct?

A.   Moderately.

Q.   Moderately.

So this -- these rap artists, these platinum-selling popular rap artists at the time, all were on Cassie's mix tape, correct?

A.   Correct.

Q.   And that's only possible because the label got them to do that, correct?

A.   The label and Cassie, yes.

THE WITNESS:  Do you guys mind if I take a break?

THE COURT:  You need a break?

THE WITNESS:  Um-hmm, I do.

THE COURT:  OK.  Let's take a break.

THE WITNESS:  All right.

THE COURT:  Members of the jury, we'll take a short break and come back.

Let's come back at 3:30.  Thank you very much.

All rise.

(Continued on next page)

P5SsCOM5                        Nash - Cross

(Jury not present)

THE COURT:  Mr. Nash, you're not to have any discussions with the government lawyers here, but you can take your break.

We'll be back here at 3:30.

THE WITNESS:  Thank you.

(Witness temporarily excused)

THE COURT:  Please be seated.

Mr. Donaldson, about how much time do you have left?

I'm just mindful of the issues that were raised before.

MR. DONALDSON:  I have absolutely no reason to believe I'll be finished by 4:00.

THE COURT:  All right.  Then should we let the jury go home, since they are supposed to go home at 3:00?

MR. DONALDSON:  Yes.  I won't be finished by 4:00, I can tell you that clearly.

THE COURT:  Wait.  But did you know that you were not going to be finished by 4:00 when we had the discussion and I told the jury that I was going to get them out by 4:00? Because if you knew that --

MR. DONALDSON:  No.

THE COURT:  -- you should have told me that.  We would have let the jury go, and Ms. Comey or other folks from the government side could have made appropriate arrangements, given

P5SsCOM5                          Nash - Cross

that there's a flight later today.

MR. DONALDSON:  Respectfully, Judge --

THE COURT:  Is this a late-breaking development that you now think you won't be done by 4:00?

MR. DONALDSON:  Judge, respectfully, I tried to do what the court and Ms. Comey was considering, which is try to get finished by 4:00.

After going through what I'm going through, I'm telling the court that I do not think I'll be done by 4:00.

THE COURT:  I understand.

Look, you should ask the questions you need to ask. My only request is, moving forward, just let me know, because I don't want to tell the jury something and then have them leave. I don't know.  When they think they are going to be here, we can finish something up, I let them go.  I want to be able to give the right instructions to the jury in the future.

MR. DONALDSON:  I totally appreciate that.

THE COURT:  All right.  So, given that, I've told them we'll keep them here through 4:00.

Let's go ahead and see what we can do here.  Let's go to 4:00, and then at that point, we'll adjourn for the day.

Anyone from the government's side, any response or anything regarding scheduling that we need to know?

MS. COMEY:  I'll work on rebooking the witness's flight, your Honor.

P5SsCOM5                          Nash - Cross

I'll note that this witness does not seem to be fighting Mr. Donaldson.  He seems to be answering the questions.  I think many of the questions are repetitive and covering the same territory over and over again.  I'm hoping we can be more efficient.

THE COURT:  You mean, how would you define stylist?

MS. COMEY:  Exactly, your Honor.

THE COURT:  All right.  So let's go to 4:00 and then we'll take a break.  And then on the break, you know, the only thing is, we do need to move this along.  Maybe we can use the break to make sure that we're being as streamlined as possible.

Again, Mr. Donaldson, I understand what you said.  I hear you, the questions you need to ask, and you're fully permitted to ask those questions.

MR. DONALDSON:  I appreciate that, Judge.  Thank you.

THE COURT:  We'll take a break and come back at 3:30.

MR. STEEL:  Thank you, sir.

(Recess)

THE COURT:  Please be seated.

Let's have Mr. Nash back.

(Witness returned)

Welcome back.

THE WITNESS:  Thank you.

THE COURT:  It's not just you.  It's freezing in here.

THE WITNESS:  It is freezing in here.  I'm, like, how

P5SsCOM5                          Nash - Cross

y'all do this all day.

(Continued on next page)

P5SsCOM5                          Nash - Cross

(Jury present)

THE COURT:  All rise.

Please be seated.

Mr. Donaldson, you may proceed when ready.

BY MR. DONALDSON:

Q.  Mr. Nash, welcome back.

A.  Thank you.

Q.  You're welcome.  Nice coat.

A.  Ah, thank you.

Q.  You're very welcome.  What size is it?

A.  Not yo size.

Q.  That's the right answer.  You got the right answer.

I just want to ask you a few more questions about the stylist part.  I'm just going to go real quickly.

When we talk about styling for labels, for Bad Boy in particular, Mr. Combs would be the person that makes the final decision in those people -- in those artists' performance clothing, is that correct?

A.  Not all, no.

Q.  Who would be the final decision-maker?

A.  Um, most of the artists kind of did their own thing.

Q.  But they would send it to Mr. Combs or someone to get some type of consultation in the decision-making, would that be fair to say?

A.  Not that I know of.  Some of them look terrible.

P5SsCOM5                          Nash - Cross

Q.   The ones that you did, that didn't look terrible?

A.   Um, yeah.

Q.   OK.  All right.  And as far as the mix tape is concerned, several platinum-selling artists that appeared on that mix tape, those had to be approved by Mr. Combs or the label, correct?

A.   Correct.

Q.   And when you mentioned that it did well streaming but didn't get released commercially or for profit, that's a decision to be made by the label, correct?

A.   Correct.

Q.   Now, I just want to move a little bit to a different section.

You said you and Mrs. Fine are good friends, is that fair to say?

A.   Yes.

Q.   And sometimes you would even consider yourself her best friend, correct?

A.   Yes.

Q.   And when you say best friend, would it be fair to say you spoke to her a lot between 2008 and -- well, today, would that be fair to say?

A.   Yes.

Q.   And do you also speak to someone named Bana?

A.   Yes.

P5SsCOM5                        Nash - Cross

Q.  And Bana, I believe you said, is a designer, is that correct?

A.  Yes.

Q.  And how often do you speak to her?

Let me ask a different question.  When is the last time you spoke to her?

A.  Yesterday.

Q.  And I'm sure you were told not to speak to her about her -- about your testimony or her testimony, correct?

A.  Absolutely.

Q.  And you didn't do that?

A.  No.

Q.  You spoke to her about coming to New York and having to testify?

A.  Yes.

Q.  And the last time you spoke to --

A.  I didn't speak with her with it.  She saw it on the news. But yes.

Q.  OK.  And the last time you spoke to her was yesterday.  And before that was when?

A.  Oh, I don't know.  Probably a couple days.

Q.  So it would be fair to say that Bana, at least, you have spoken to her often over the last three weeks?

A.  Yeah.

Q.  Now, as far as Cassie is concerned, she's your good friend

P5SsCOM5                    Nash - Cross

or best friend.

What is the last time you spoke to her?

A.  After she had the baby yesterday.  Tell her congratulations.

Q.  Oh, you're saying congratulations or you're telling me to tell her congratulations?

A.  No, no.  No thanks.

THE COURT:  All right.  Let's keep going.

Q.  The last time you spoke to her was yesterday?

A.  Yes.

Q.  And before that was when?

A.  Probably the day before that.

Q.  So it's fair to say that you spoke to her --

You know she testified in this trial, correct?

A.  Yes.

Q.  You spoke to her before she testified, correct?

A.  Yes.

Q.  You spoke to her after she testified, correct?

A.  Yes.

Q.  Did you speak to her in the middle of her testimony?

A.  Um, not really, no.

Q.  You say not really.  What does that mean?

Did she call you?  Did you ask her how she's doing?

A.  How she was doing.  But more, like, her clothes stuff.  And Marni handled most of that because she was here in New York and

P5SsCOM5                          Nash - Cross

I was in Los Angeles.

Q.  So you spoke to her about what clothes she should wear while she was testifying, is that fair to say?

A.  Yes.

Q.  You also mentioned -- I want to talk to you a little bit about drug use or Cassie's drug use.

Do you recall testifying about that?

A.  Yes.

Q.  I believe you said she takes cocaine, is that right?

A.  Yes, yes.

Q.  Or was?

A.  Yes.

Q.  She also took prescription pills?

A.  Yes.

Q.  She also took what else?

A.  Molly and ectasy.

Q.  She also used mushrooms and acid, as well, correct?

A.  Mushrooms.  The acid, I'm not, like, privy on that.

Q.  And when she took these drugs, you actually saw her taking these drugs, correct?

A.  Sometimes.

Q.  Which drugs did you see her take?

A.  Cocaine, ectasy, and molly.

Q.  And when you saw her taking these drugs, it would be inside her house, correct?

A.  Yes.

Q.  And sometimes inside your house, correct?

A.  No.

Q.  So you would be inside her house, and at that point you would observe her taking cocaine, ectasy, or what was the other one?

A.  Molly.

Q.  Molly.  And she would have the drugs already in her house?

A.  That was so long ago.

Q.  How long ago was it?

A.  I don't recall.  Like, 2017, '18.

Q.  OK.  So in 2017 or '18, we're saying, you're saying that you were in her house and you observed Cassie taking either cocaine, molly, or some prescription pill?

A.  Yes.

Q.  But you don't know whether she got it from inside her house?

A.  Correct.

Q.  You don't know whether it was already there when she took it?

A.  No.

Q.  And it's true that nobody delivered it to her, though, correct?

A.  I have no clue.  I'm not the friend that, you know, that they indulge that stuff to.

P5SsCOM5                          Nash - Cross

Q.   OK.  Not to get too much into your business.

You have used cocaine before?

A.   Yes.

Q.   You have used ectasy and molly before?

A.   Um, I tried ectasy and I tried molly, yes.

Q.   It's fair to say that you don't do that anymore now, correct?

A.   Absolutely not.

Q.   And you still smoke marijuana --

Do you smoke marijuana?

A.   Yes.

Q.   On the few of your meetings with the government, were you -- did you arrive at the meeting before smoking marijuana?

A.   One of them Maurene cut it short.

Q.   Because of what?

A.   She said she wanted me to have a clear mind.

Q.   So you went to the meeting and you told her that you were high at that time?

A.   Yeah.  I didn't say high.  I said I'm smoking right now.  I didn't say I was high.

Q.   I'm sorry.

So you told her that you were smoking -- well, not in the meeting, before you got to the meeting?

A.   Yes.

Q.   And then Ms. Comey told you, you need to stop the meeting

P5SsCOM5                          Nash - Cross

because she wanted you to have a clear mind?

A.   Yes.

Q.   Do you know which meeting that was?

A.   I don't know.  I told her very early in the meeting.

Q.   OK.  So we know you had a meeting April 2025 and three meetings in May of 2025.

Do you know whether it was in April or May of 2025?

A.   I don't know.  It was, like, all running together at this moment.

Q.   Now, in your -- between 2008 and 2018, that's when you left Bad Boy, correct?

A.   Yes.

Q.   And you -- I believe you testified earlier that you were, you had some interactions with security guards at work for Bad Boy that worked with Mr. Combs, correct?

A.   Yes.

Q.   And in those several years, you never saw any of those security guards with guns, correct?

A.   I don't recall.

Q.   Besides -- well, strike that.

You never saw those security guards committing any acts of violence, correct?

A.   No.

(Continued on next page)

P5SACom6                        Nash - Cross

BY MR. DONALDSON:

Q.   And you never saw those security guards delivering any narcotics to Cassie, correct?

A.   No.

Q.   And you never saw those security guards delivering any narcotics to you, correct?

A.   No.

Q.   And you never saw any of those security guards delivering narcotics to Mr. Combs, correct?

A.   No.

Q.   In fact, it's fair to say that in your nine or ten years of working at Bad Boy and -- well, strike that.

Were you getting paid from Mr. Combs from 2009 to 2018?

A.   Yes.

Q.   So for all those years you were actually receiving a check from the Combs --

A.   Combs Enterprise and some of the other entities, yes.

Q.   So it would be fair to say you were an employee all that time?

A.   Yes.

Q.   And as an employee of Combs Enterprises, of Mr. Combs, you didn't participate in any criminal conduct for Mr. Combs, correct?

A.   I know that he --

P5SACom6                        Nash - Cross

Q.  You -- did you participate in any criminal conduct for Mr. Combs?

A.  Yes.

Q.  Okay.  You also said you were at a music video shoot where you got thrown against a car?

A.  Yes.

Q.  Which video shoot was that?

A.  I Love It.

Q.  When was that?

A.  2013.

Q.  And whose video shoot was that?

A.  Cassie.

Q.  Who else was in the video besides Cassie?

A.  Fabolous.

Q.  I'm sorry?

A.  Fabolous.

Q.  And was that part of the mix tape?

A.  Yes.

Q.  And the video for that particular song was -- it cost to make that video, correct?

A.  Yes.

Q.  And that cost for the video was paid for by Bad Boy, correct?

A.  Yes.  It was never released.

Q.  I understand that.  But was the video made?

P5SACom6                           Nash - Cross

A.   Yes.

Q.   Was Fabolous in the video?

A.   Yes.

Q.   Was Ms. Fine in the video?

A.   Yes.

Q.   Was there a cost associated with that video?

A.   Yes.

Q.   And Mr. Combs and Bad Boy paid for that video?

A.   Yes.

Q.   Were there other videos made for the mix tape -- well, there was.

      Did Rick Ross make a video?

A.   Yes.

Q.   Was that video with Cassie?

A.   Yes.

Q.   And was that video paid for by Bad Boy?

A.   Yes.

Q.   So then it's fair to say then that at least in 2013 or up to there Bad Boy Records or Mr. Combs invested significant money into videos and studio time for Cassie; is that correct?

A.   Yes.

Q.   Was that a yes?

A.   Yes.

Q.   And we say invested significant money, based upon your experience, videos, to make a video, costs hundreds of

P5SACom6                        Nash - Cross

thousands of dollars, correct?

A.  Not the videos we were shooting, no.

Q.  Okay.  How many videos did you all make for that particular mix tape, if you know?

A.  The first three I know Puff paid for and then there were two other ones that we did that Cassie paid for.

Q.  Now, you also mentioned earlier today about an incident where there was -- Ms. Fine sustained a cut to her head; do you recall that?

A.  Yes.

Q.  What year was that?

A.  2013. '12, '13.

Q.  I think Ms. Comey asked you a few times if you were estimating.  Do you know whether it was 2013, 2014?

A.  I'm not sure.

Q.  Estimating 2013?

A.  Yes.  Let's just say that.

Q.  Okay.  Now, at that time you had only been working for with Cassie and Mr. Combs for approximately five, approximately four, five years, correct?

A.  Correct.

Q.  And I believe you said during that incident Mr. Combs came over to Cassie's house; is that right?

A.  Yes.

Q.  And she was on the couch; is that correct?

P5SACom6                          Nash - Cross

A.   Yes.

Q.   And this was the day that you all were about to go to Toronto for a Drake concert or Drake performance, whatever it was, right?

A.   Yes.

Q.   And Mr. Combs I believe you said knocked on the door and you let him in, correct?

A.   Yes.

Q.   And when you let him in, he then grabbed Cassie's hair and started beating on her, correct?

A.   Correct.

Q.   Now, I believe you said that there was somebody else present in the house at that time.  Who was that?

A.   Mia.

Q.   And Mia at that time worked for Mr. Combs, correct?

A.   Yes.

Q.   Do you know what her position was?

A.   She was his assistant.

Q.   His assistant?

A.   Mm-hmm.

Q.   Is that a yes?

A.   Yes.

Q.   Okay.  And then you said at that time that you and Mia and Cassie ran to the bedroom, correct?

A.   Yes.

P5SACom6                          Nash - Cross

Q.   And Mr. Combs ran behind you, correct?

A.   Yes.

Q.   And then at some point he grabbed Cassie again; is that right?

A.   Yes.

Q.   And then you jumped on his back to protect Cassie, correct?

A.   Correct.

Q.   So as an employee of Mr. Combs, you jump on his back to protect Cassie from him, correct?

A.   Yes.

Q.   And as an employee -- Mia you said was an employee as well, correct?

A.   Yes.

Q.   And she jumped on his back to protect Cassie from Mr. Combs, correct?

A.   Yes.  And protect him from doing something more serious.

Q.   Okay.  So you -- both employees of Mr. Combs at that time, was trying to protect Cassie from Mr. Combs, correct?

A.   Correct.

Q.   And I believe you said on direct -- well, maybe you didn't, but this was the first time that you had saw a gash on Cassie's head as related to Mr. Combs' conduct, correct?

A.   Yes.

Q.   And that -- be fair to say that startled you, correct?

A.   Absolutely.

P5SACom6                    Nash - Cross

Q.  And it concerned you because you're -- at this time, she was still a good friend of yours, correct?

A.  Yes.

Q.  And you had been talking to her every day between -- almost every day between 2008 and 2013; is that fair to say?

A.  Yes.

Q.  So when this violent incident happened where Mr. Combs caused Cassie to hit her head on a bed frame and bleeding, that shocked you, correct?

A.  Yeah.  Completely.

Q.  Because your friend, your good friend, Cassie, was now bleeding with a gash on her head?

A.  It wasn't about her -- it wasn't about it being my friend. It was about the act in general.

Q.  So the act in general of Mr. Combs causing a gash on Cassie's head, that shocked you, correct?

A.  Yes.

Q.  But you, after that, you did still have interactions with Mr. Combs, correct?

A.  Yes.

Q.  You did still have interactions with Cassie, correct?

A.  Yes.

Q.  You did still have interactions where you invited Mr. Combs to some place where Cassie was, correct?

A.  Yes.

P5SACom6                    Nash - Cross

Q.  In fact, I believe it was, if you remember, Halloween of that year, I believe you invited both of them to the Boulevard to go to a Halloween show, correct?

A.  Yeah.

Q.  And that was after the cut, correct?

A.  Absolutely.

Q.  So after the violence by Mr. Combs, you invited him and Cassie to come with you to a Halloween function, correct?

A.  Correct.

Q.  You also mentioned an incident involving D-Roc.  Do you know who D-Roc is?

A.  Yes.

Q.  Who is D-Roc?

A.  Puff's long time friend and security.

Q.  Be fair to say he was head of security, correct?

A.  Yes.

Q.  Now, there was an incident where I believe you said you were cooking in -- was it your apartment or Cassie's apartment?

A.  Cassie's.

Q.  And I believe you said at that time Mr. Combs came over to Cassie's house, correct?

A.  Yes.

Q.  Knocked on the door and you let him in; is that right?

A.  Yes.

Q.  Mr. Combs, when he arrived inside the house, he was -- was

P5SACom6                    Nash - Cross

he angry?

A.  He was calm.

Q.  And this was after the cut as well, after the cut on the bed frame?

A.  Mm-hmm.  Yes.

Q.  All right.  So he called you before he came over, correct, or he called Cassie before he came over?

A.  Called Cassie.

Q.  And, if you know, Cassie let him know that you all were over there cooking, correct?

A.  I don't know.

Q.  And when he arrived at the home, you and -- well, him and Cassie get into an argument; is that fair to say?

A.  No, they went to the room, but I didn't hear like -- I didn't hear an argument.

Q.  So when he got there, he and Cassie went to the room and you stayed in the kitchen?

A.  Yes.

Q.  And at some point they came back outside; is that right?

A.  Yes.

Q.  And I believe you said on direct that at that moment Cassie -- he started pushing Cassie out the door; is that correct?

A.  Yes.

Q.  And then he started I think you said slapped you in the

P5SACom6                    Nash - Cross

back of the head and moving you out the door; is that right?

A.  Yes.

Q.  And when you got outside, D-Roc was outside, correct?

A.  Yes.

Q.  And D-Roc is head of security?

A.  Yes.

Q.  Or one of the heads of security?

A.  Yes.

Q.  Now, when you got outside, isn't it fair to say that security was trying to convince Mr. Combs to stop bothering you and Cassie?

A.  Yes.

Q.  And when we say that, we're saying that Mr. Combs' security, at that point, his employees, was telling him to basically leave you guys alone, correct?

A.  Yes.

Q.  They were not trying to participate in doing anything to you, correct?

A.  Correct.

Q.  They were trying to stop him from doing something to you, correct?

A.  Correct.

Q.  And they were telling him that he should leave you alone, correct?

A.  Yes.

P5SACom6                          Nash - Cross

Q.  And that was D-Roc and other members of his security team, correct?

A.  Yes.

Q.  Those are other employees of Mr. Combs, correct?

A.  Correct.

Q.  At some point I believe you said you all went to the hotel; is that right?  Is this the same instance when you went to the hotel?

A.  Mm-hmm.

Q.  Is that a yes?

A.  Yes.

Q.  Do you know who Uncle Paulie is?

A.  Yes.

Q.  In fact, on that day -- do you know who Ruben is?

A.  Yes.

Q.  On that day, Rube, Uncle Paulie, and D-Roc was there, correct?

A.  I don't recall.

        MR. DONALDSON:  Can we have one second, please, Judge.

        THE COURT:  Yes.

        MR. DONALDSON:  Can we please put up 35-1412 for the parties and witness only.

        Can we highlight the four boxes under the fifth open circle.

Q.  Mr. Nash, can you do me a favor and read that to yourself.

P5SACom6                        Nash - Cross

When you're finished reading it, lift up your head, let me know you're finished reading it, and then I'll follow up with some questions.

A.  Okay.

MR. DONALDSON:  Take that down, please.

Q.  Now, I just want to ask you some questions.

Now, after reading that does that refresh your recollection as to whether or not Rube and Uncle Paulie were there at that particular time?

A.  I don't remember.

Q.  Okay.

A.  I don't recall.

Q.  Okay.  You do recall -- well, not you do recall.

Do you recall whether or not Uncle Paulie and Rube also in the past told Mr. Combs to leave you alone?

A.  Yes.

Q.  And when Uncle Paulie and Rube told Mr. Combs to leave you all alone, they were acting in their capacity as his employees, correct?

A.  Yes.

Q.  So those moments, his employees were actually trying to protect -- stop him from doing something against you all, correct?

A.  Correct.

Q.  Now, you mentioned someone named I believe it was Toni; do

P5SACom6                        Nash - Cross

you remember saying that?

A.  Yes.

Q.  Her name was Toni Fletcher, correct?

A.  Correct.

Q.  I believe they showed you a picture of Ms. Fletcher on the screen, correct?

A.  Yes.

Q.  And I believe you said that Ms. Fletcher was Bad Boy's chief of staff; is that correct?

A.  Correct.

Q.  And I believe you mentioned on one of the occasions, on this occasion, you went to the hotel and Cassie was upstairs in one of the hotel rooms, correct?

A.  Yes.

Q.  And then you went upstairs, and who went upstairs with you?

A.  D-Roc and Toni Bias.

Q.  Toni Bias Fletcher?

A.  Correct.

Q.  I'm sorry.  I didn't know it was Bias.

So you, Toni Bias Fletcher, and D-Roc went upstairs to Cassie's room, correct?

A.  Correct.

Q.  To see if she was there, correct?

A.  Yes.

Q.  And then when you saw her -- strike that.

P5SACom6                          Nash - Cross

You went inside and she was actually there, correct?

A.  Yes.

Q.  And D-Roc and Toni Fletcher were again working as employees of Mr. Combs, correct?

A.  Yes.

Q.  Now, and Cassie at that point, according to your testimony, was running from or hiding from Mr. Combs, correct?

A.  Yes.

Q.  And, at that time, when they were at this hotel, you, D-Roc, and Toni Fletcher, Cassie eventually came downstairs, correct?

A.  Yes.

Q.  She came down stairs with Toni Fletcher and D-Roc, correct?

A.  I don't recall.

Q.  Well, they showed -- they're the ones that showed her out the back door, correct?

A.  No.  That's not what I said.

Q.  I'm not asking what you said.

Isn't it true that Toni Fletcher and D-Roc showed Cassie out the back door, or out the side door?

A.  Probably so.  But I remember walking down the front with D-Roc.

Q.  Okay.  That would mean then that Toni Fletcher, as chief of staff of Bad Boy, an employee of Mr. Combs, was actually helping you all as opposed to helping Mr. Combs, correct?

P5SACom6                          Nash - Cross

A.  Correct.

Q.  And that would mean that D-Roc, as the head of security, again, was helping you all as opposed to helping Mr. Combs, correct?

A.  Correct.

Q.  And as employees of Bad Boy, they were doing something counter to what the head of Bad Boy wanted, correct?

A.  Correct.

Q.  And that means they were -- when I say counter to, they were doing something to help you as opposed to help Mr. Combs, correct?

A.  Correct.

THE COURT:  Mr. Donaldson.

MR. DONALDSON:  Yes.

THE COURT:  We're about 4:00 p.m.

MR. DONALDSON:  I'm sorry, Judge.

THE COURT:  This is a good place?

MR. DONALDSON:  Yes, it is, Judge.  I was trying to be efficient.  I'm trying.

THE COURT:  Very good.  We'll be back tomorrow.

Thank you, members of the jury.  Again, don't speak to each other about the case.  Don't talk to anyone else about the case.  Don't look up anything about the case or reach out to anyone about the case.  We'll see you back here to start at 9:00.  Try to get here at 8:45.  (Continued on next page)

P5SACom6                          Nash - Cross

(In open court; jury not present)

THE COURT:  Mr. Nash, we will see you here tomorrow.
Again, no discussions with anyone from the government.

Please be seated.

MS. COMEY:  Your Honor, for the record, we'll need to
rebook Mr. Nash's flight, so can I coordinate with him and his
counsel just for those logistics, please.

THE COURT:  Of course.

MS. COMEY:  Thank you.

THE COURT:  Anything to address what -- I guess so
after our next witness, Mia, who do we have next after Mia?

MS. COMEY:  So I think the next witness would be
Enrique Santos, but I think that we are unlikely to get to him.
I suspect Mia will -- given how long today went, I suspect Mia
will take us close to the end of the day Friday, and then if we
get to Enrique Santos, I think he'll certainly take us into the
weekend.

THE COURT:  Very good.

Mr. Agnifilo?

MR. AGNIFILO:  Yes.  Thank you, your Honor.

THE COURT:  In terms of -- I'll get to your issues.

MR. AGNIFILO:  Yes.

THE COURT:  Just a question.  Since we're, except for
today, ending earlier, I'm going to ask you to make your
exhibit disclosure earlier.  And I think this is for your

P5SACom6                          Nash - Cross

benefit because one of the issues that happened, one of the things that happened today, is that the government's letter came in after midnight.  And I think there's a way to avoid that if we're stopping close to 3:00.

So I'm going to make the deadline, instead of 7:00 p.m., 5:00 p.m.  So there will be two extra hours.  We're only talking about the exhibits that are not being used for impeachment purposes.  There shouldn't be that many of those.  But what that is going to do is it's going to make it easier for the government to respond, to meet and confer, to let you know what their objections are, which is going to help you make sure that there's no issue getting those exhibits in if they are properly admissible.

Now, we're not going to do that today because it's 4:00 and I'm just telling you this now.  But I think looking after today, I think it's important for us to have an earlier deadline so we can avoid some of these after midnight filings.

MR. AGNIFILO:  I understand the Court's concern.  My concern is by the time we get back to our offices, it's practically 5:00.  And it's just -- and it just doesn't give us a lot of time.  So let me mix two issues together at the risk of doing that.

I think I might have a possible solution for the access to Mr. Combs.  And the solution would be this.  There's a SCIF in the marshal's lockup area.  It's typically used for

P5SACom6                          Nash - Cross

confidential information.  And we don't -- this is not the typical use of the SCIF, but it is a facility.  And I believe the Court could order things to happen that would make access to Mr. Combs there possible.

And one of the ways I think the Court can do -- the Court can do it because the Court can do lots of things.  But I also note that under the Bail Reform Act, and I think we actually cited I think it's subdivision I, there's that one sort of subdivision that no one knows --

THE COURT:  I got it.

MR. AGNIFILO:  But I think what it probably means is that when there's somewhat of an urgent situation of a defendant being able to defend one's self, that the Court can take measures, including -- and I'm not asking for this obviously -- including even letting him leave, you know, a facility.  And obviously that would somehow be paid for and ordered.

So it seems to me if that's in the Bail Reform Act and that goes as far as to do that, a more modest accommodation would be there's a room in the building, in the marshal's lockup, and we would need meaningful access.  Meaning, you know, as late as we can get.  I mean, 9:00 at night, 10:00 at night.  And it seems that if the Court has a statutory basis to order things like, well, under these circumstances, you know, the defendant who's incarcerated can temporarily be released

we're not asking for anything remotely that extreme, that this must be something that not only can the Court order of its own Article III power and authority, but it's actually rooted in a statute.  So that's the ask.  That's the target that I'm trying to shoot at.

And I don't know how that's going to play in practice.  But I think the Court certainly has the power to order that, and then the logistics of that will have to be taken care of.  Just as though if we asked your Honor to do something else, you know, to allow us access so that Mr. Combs could better defend.  And let me just add one thing to the record and this is I think the important part.

Every trial is different.  And I don't know that this is necessary in every trial.  One thing that I've seen is your Honor has given a great deal of thought to making things run as orderly as possible with deadlines that, you know, one of the deadlines is 10:00 p.m. because we want to raise issues for the next day.  The problem with this particular trial and having an incarcerated client in this particular trial, is we lose all access to him at about 7:00.  7:30 maybe.  So we, from 7:30 until 10:00, we are necessarily having to make decisions without him.  And that really isn't right.  And is certainly not preferred.  And I'm not looking to raise Constitutional issues because I know your Honor is trying to come up with a solution.  So we don't need to go there and I'm not going

P5SACom6                        Nash - Cross

there.  Except to say there seems to be, in the statute, something that contemplates this, that in this particular case, we need this degree of access.  Maybe not in every case.  I've never had a 10:00 p.m. deadline in a case so far.  We have one here.  Not because your Honor is driving a hard case, but because that's what the case requires.  That's what this particular case requires.  And it's different than other cases I've tried over the last 35 years.  And that's what this case requires.  And what this case requires is we just need more access to Mr. Combs.

The best kind of access is in-person access.  You know, we were trying with the VTC, that could have worked but it's just not easy to do because the MDC has its own, you know, situation.  My hope is that because it's in the building, that if your Honor orders something, the logistics will somehow work themselves out the way sort of the statute contemplates that these logistics would have to work themselves out.  So that's my request.

I guess the request, if I could just say it all in one sort of paragraph, is that your Honor direct that the SCIF be made available to Mr. Combs and his defense counsel every night until 10:00.  That's the ask.

THE COURT:  All right.  I hear you, and let me talk to the appropriate people about that request.

MR. AGNIFILO:  Yes, Judge.

P5SACom6                              Nash - Cross

THE COURT:  Now, what I don't understand is what that has to do with the deadlines that concern evidentiary issues. Meaning, you've had months to prepare for trial and the Court purposely had deadlines that the government didn't like, let me put it that way, for the disclosure of witnesses, exhibits, and so forth.  And the reason for that is so that you would be aware of what was coming down the pike and could prepare your case.

Now, despite all of that, when the government requested that exhibits that would go to the defendant's case in chief be produced at the beginning of this trial, the Court rejected that request and then said that you would just need to turn them over the day before.  And these are only the ones that go to your affirmative case and not to impeachment.

And so, in that regard, the problem that we're having is that because the exhibits are being turned over late, and this is just like telling here's the things we might use so that the government can lodge their evidentiary objections, is just coming in late.  Which is causing issues like getting a letter at 12:36 a.m. that the defense can't respond to until the morning.

So I don't see what that issue has to do with the issue concerning the SCIF.  So is there any issue moving the deadline up -- not today because it's 4:00 -- but for days coming up since we're ending close to 3:00.  You'll have enough

P5SACom6                         Nash - Cross

time to just get those exhibits over.  If you have, like if there's one you missed, okay, you get it over late, and that's fine because there's a good cause.  I said in my order that if there's some cause, some reason that there's an extra exhibit, that's okay.  But just to get it turned over a little bit earlier so people don't have to be up until 2:00 in the morning.

MR. AGNIFILO:  One second, Judge.

MS. GERAGOS:  Your Honor, I apologize for jumping in on this.  I heard your Honor this morning about not appreciating multiple lawyers addressing one issue.  If you would allow me to address this point.

THE COURT:  That's fine.

MS. GERAGOS:  Thank you.

Our affirmative exhibits, your Honor, change on a daily basis with each witness based on the testimony that comes out with each witness.  So while it would be great and preferred I think for us to know everything we're going to use for the witnesses in the upcoming week, it's not practical on the defense side because we are responding -- we really are responding to testimony that comes in on a daily basis.

So just practically I want to explain to your Honor why this is difficult for us and why 7:00 p.m. works.  I understand what -- none of us want to be up as late as we are every single night.  It's just what's happening.

P5SACom6                        Nash - Cross

The government preps their witnesses every night and then gets to our exhibits and we're dealing with -- we're meeting and conferring all the time.  But just so I can explain to your Honor practically what happens is we're getting the government's witnesses for the next week when they're ordered to give it over.  We spend weekends with Mr. Combs with visitation cuts off at 2:15.  We all have child care issues that's not always practical.  We have to go over with him the affirmative exhibits that we want to go over for the witnesses who are available in the upcoming week or who are going to be called by the government.  Then we are with him afterwards after court until about 5:00 p.m. going over the witnesses for the next day.

So when Mr. Agnifilo says we're just practically not at our office until, you know, 5:00, 5:30, it's because we're meeting with our client to try to figure out what do we need to get out affirmatively for the next day.  We have made great efforts to work with your Honor's deadline to get these over to the government by 7:00 p.m.  And we do over mark our exhibits because we don't really know what we'll use based on the testimony.  And that's what leads to a lot of the letters because we are over marking in an abundance of caution so that the government can see anything that we may use for each witness.

But I think it's because our affirmative exhibits

P5SACom6                          Nash - Cross

change daily based on testimony that we get in court.  It's why kind of a 5:00 p.m. makes it very difficult because we're meeting with our client after court, then going to our office, which is uptown, and then based on our conversations changing those exhibits.

I will note that for Mia, we have given the government, as your Honor knows, I think all the exhibits so far that we've marked.  There may be some that may change.  And I -- we've been meeting and conferring with Ms. Johnson about Mr. Santos.  So perhaps we could do this earlier for next week if we were to get the witnesses they're going to call like today or tomorrow, and that could speed things along.

But, practically, with respect to the -- I think that's why Mr. Agnifilo was addressing an incarcerated client, it makes it very, very difficult for us because we have to confer with him while we're addressing what affirmative exhibits to use.

THE COURT:  All right.  Look, for present purposes, do me a favor, 7:00 p.m. is the deadline.  But you're over marking as you noted.  So there's probably a set of exhibits that you can get out earlier.  Understanding that you're going through them, some of them might not work, you might have additional exhibits to add.  But it's just for your benefit to get them out earlier.  Because once you get them out by 5:00 or earlier, right, and if there's someone there who can just send those

P5SACom6                        Nash - Cross

over and say, hey, here are the exhibits we're considering, you're going to have more time to address any government objections and get these in.  So that's a request.

MS. GERAGOS:  Agree.  And we've done that for Mia.  We are doing that to the extent we can.

THE COURT:  All right.

MS. GERAGOS:  We did that.  We really did with Mia.  We sent them over I think a couple nights ago.

THE COURT:  Fair enough.

So as to the issue concerning the SCIF, I've heard you, Mr. Agnifilo.  Are you planning to put in something in writing?  And the reason why I ask that is sometimes it's easier for me if I need to speak to the marshals to understand the full nature of the question.

MR. AGNIFILO:  Yes.

THE COURT:  That you put something in writing.

MR. AGNIFILO:  Absolutely.  I wanted to raise it with your Honor now.  I'll have something to the Court in a few hours.

THE COURT:  That's helpful.  I will talk to them in the meantime, but it's helpful to have something in writing.

And the only other update, I did raise what you said yesterday about the minutes and the reason why the minutes might be helpful as well with the MDC, so I'll let you know when I hear from them.

P5SACom6                         Nash - Cross

MR. AGNIFILO:  Thank you so much, Judge.

THE COURT:  Of course.  Anything else from your side?

MR. AGNIFILO:  Nothing.

THE COURT:  Anything else from the government before we adjourn?

MS. COMEY:  One thing to flag, your Honor.  We're going to assess among ourselves, but we think we may be moving even ahead of schedule at this point.  I know today was a long today, but we're hopeful we are going to be able to cut some witnesses from the witness list, and we wanted to flag for your Honor that we'll plan to let your Honor and the defense know from this week any witnesses we've identified we can cut.  I do think we'll end up resting in less than six weeks.  I don't know how much less, but I think it will be less than six weeks.

THE COURT:  Just I'm so bad with the calendar.  But six weeks means?

MS. COMEY:  I think our hope is to be able to rest by the end of the second week of June.  We may bleed over into the third week.

THE COURT:  All right.  Very good.

Good.  So that's helpful.  And given that, I will start looking at the request to charge and then I'll have some parameters of what I'd like to do in that regard.  I think it makes a lot of sense a lot of times to have an initial charge conference where we go over to get -- address any larger

P5SACom6                        Nash - Cross

objections.  And so I can take all those into account and come up with a response from the Court based on the parties' submissions.  And then we'll have the actual charge conference closer to when we're at the end of the case.

So that's just a heads up, but I'm happy to hear any thoughts on what the parties think might be most productive.

MS. COMEY:  I think that makes sense, your Honor, if there's going to be a very short defense case.  If there's going to be a longer defense case, they've given quite a long witness list, so if there's going to be a long defense case, we might want to wait.  I defer to defense counsel on the timing there.

THE COURT:  Yeah.  Let me take a look at the requests and see how different they really are.

Anything further from the government?

MS. COMEY:  Nothing.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  Nothing.  Thank you.

THE COURT:  We'll see everyone here tomorrow at 8:30.

(Adjourned to May 29, 2025, at 8:30 a.m.)

INDEX OF EXAMINATION

Examination  of:                                    Page

 CHRIS IGNACIO

Direct By Ms. Slavik . . . . . . . . . . . . .2820

Cross By Mr. Steel . . . . . . . . . . . . . .2834

LANCE JIMENEZ

Direct By Ms. Slavik . . . . . . . . . . . . .2855

Cross By Mr. Agnifilo . . . . . . . . . . . .2913

Redirect By Ms. Slavik . . . . . . . . . . . .2941

 DEONTE NASH

Direct By Ms. Comey . . . . . . . . . . . . .2943

                  GOVERNMENT EXHIBITS

Exhibit No.                                    Received

  8C-101    . . . . . . . . . . . . . . . . . .2825

  8B-101    . . . . . . . . . . . . . . . . . .2832

  8C-103 through 141 . . . . . . . . . . . . .2873

                  DEFENDANT EXHIBITS

Exhibit No.                                    Received

  853   . . . . . . . . . . . . . . . . . . . .2922

  852   . . . . . . . . . . . . . . . . . . . .2936

  1800   . . . . . . . . . . . . . . . . . . .3037

  1801   . . . . . . . . . . . . . . . . . . .3038

  1802   . . . . . . . . . . . . . . . . . . .3039

  1810, 1811, 1814, 1818, 1820 1819, 1821 . . .3041

          through 1826, 1828, 1829,

1833, 1835, 1837, 1839 through

1841