P5SACom1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                          24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

            Defendant.         Trial

------------------------------x

                           New York, N.Y.
                           May 29, 2025
                           8:40 a.m.

Before:

          HON. ARUN SUBRAMANIAN,

                           District Judge
                           -and a Jury-

                   APPEARANCES

JAY CLAYTON
   United States Attorney for the
   Southern District of New York
BY:  MADISON R. SMYSER
     EMILY A. JOHNSON
     MAURENE R. COMEY
     MEREDITH FOSTER
     MITZI STEINER
     MARY C. SLAVIK
     Assistant United States Attorneys

P5SACom1

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:   MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
SHER TREMONTE
BY:   ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:   ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        JONATHAN P. BACH
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND

ALSO PRESENT:
LUCY GAVIN, AUSA Paralegal Specialist
SHANNON BECKER, AUSA Paralegal Specialist
RAYMOND MCLEOD, Defense Paralegal Specialist

P5SACom1

(Trial resumed; jury not present)

THE COURT:  First, any issues with the proposed instruction relating to Mia?  Given that the parties had proposed that, I didn't think there would be.  Any objection there?

MS. SMYSER:  No, your Honor.

MS. SHAPIRO:  No, your Honor.

THE COURT:  And I understand the government has an application relating to the feed that goes into the overflow room; is that right?

MS. SMYSER:  Yes, your Honor.  We would ask that the feed that shows the witness box be cut during Mia's testimony.  But they would still be able to hear the audio of what she is saying.

THE COURT:  I am not going to do that, because my understanding of how this is working is that there is not enough space in this courtroom and it is the only reason why there are overflow courtrooms, and there are press and other people who would be in this courtroom but for the space that we have here.  And that those other overflow rooms are extensions of this courtroom.

And for that reason, I think it would be improper to cut off that feed.  Although we will make the appropriate arrangements that we've discussed.  For instance, there should be no sketches of Mia when she's testifying and the Court

P5SACom1

security and the marshals have been informed and are going to remind everybody in the overflow rooms, just as they will hear that no cell phones or other devices can be used to document Mia and her appearance in any way.  So we'll make those adjustments.

MS. SMYSER:  Thank you, your Honor.

THE COURT:  All right.  Let's go to the motion to strike on Dr. Hughes.  For the reasons set forth in the government's May 28th letter, the motion to strike is denied.

As the government's letter and the defense's application observes, the Court sustained objections to numerous questions that the defense complains about and to numerous answers to the extent they began to veer off course. Because of this and the Court's pretrial rulings, which the examination stayed within, the witness's testimony stayed within the bounds of the Court's Daubert ruling.

The Court notes specifically that there were no objections lodged as to many questions, such as those regarding trauma bonds and love bombing, which were proper given the Court's pretrial ruling and limited in scope.  There were also no objections to the discussion of formal and informal coping strategies, and this testimony was consistent with the Court's Daubert ruling.

To the extent that the defense argues that this testimony was not properly disclosed, the Court disagrees.  It

P5SACom1

was fairly encompassed by the disclosure, which was extremely detailed, unlike the minimal disclosure, really a non-disclosure in the *Mrabet* case.

And the disclosure here candidly stated that: Dr. Hughes will speak about a broad range of defense mechanisms and coping strategies commonly used by victims in response to sexual abuse. As the advisory committee observed in connection with the 2022 amendments to Rule 16, the rule does not require a verbatim recitation of the testimony the expert will give at trial. And prior to trial, there was no objection on sufficiency grounds that that portion of the disclosure was insufficiently detailed. And of course, the defense was on notice given the language of the disclosure that there was a category of coping mechanisms that Dr. Hughes would testify about.

Precisely because of the Court's pretrial narrowing of Dr. Hughes' testimony and the sustaining of objections during her testimony, this case presents none of the issues raised in cases like *United States v. Zhong*, 26 F.4d 536 (2d Cir. 2022), where the government's expert not only opined upon the ultimate question of forced labor, but commented on the evidence in the case, which Dr. Hughes did not do, and the motivations of those who perpetrate forced labor, which Dr. Hughes did not do, employing prejudicial cultural stereotypes along the way. None of that happened here. And as the government observes in its

P5SACom1

letter, this testimony that is far broader than that permitted here has been allowed in numerous cases, such as *Ray*.

As for the defense's challenge to Dr. Hughes's testimony on memory as junk science, Dr. Hughes established both her academic qualifications, her 30 years of clinical experience, and her work with thousands of trauma victims. Her testimony about memory, that we can have a vivid, bright memory sort of burned into our brain, but at the same time have a lack of details and fragments for that same trauma, or that we know that trauma memories can be forgotten or not recalled and recalled at a later time, were reasonably based on her expertise, which the defense did not question, and are precisely the kind of specialized testimony that is outside of the ken of ordinary jurors.

The upshot of the defense's argument is that any testimony regarding the common behaviors of sexual abuse victims is pseudoscience, an indictment on the entire field of psychology that the Court rejects and the defense cites no case for this proposition.

Finally, the Court rejects the defense's rule 403 objection for the reasons stated above and in the government's letter, and especially given the combination of the Court's pretrial narrowing of the Dr. Hughes' opinions, the close control of Dr. Hughes' testimony during her examination, the defense's full throated cross-examination of Dr. Hughes, and

P5SACom1

the limitations on the government's use of Dr. Hughes's testimony the risk of unfair prejudice does not substantially outweigh the probative value of her testimony.

The only thing that I'll note for the government is that in the defense's submission, there's Dr. Hughes's testimony as it was offered, but one of their principal concerns is how that testimony is going to be utilized in the context of summations.

So the only thing I will flag for the government is that there are a number of representations that have been made about the limited scope of Dr. Hughes's testimony, and the government should just keep that in mind as they're doing their summations, that they don't at that point in time try to go through the back door, that the defense suggests the government really wants to go through, and instead make sure they are being true to the rulings that the Court made and which the government complied with in terms of the examination, and not try to exceed that which is going to draw a vigorous objection, I am sure, during closings if there is any violation along those lines.

So with that, the motion to strike is denied.

Let's go to the exhibits concerning Mia. Now, the defense responded with what had previously been missing, which is a response on the hearsay and relevance objections. So my question for the government is what objections remain for

P5SACom1

adjudication?

MS. SMYSER:  Your Honor, I think our objections remain across the board here.  I think every -- the relevance proffers are helpful, but I think we still maintain 403 objections.

THE COURT:  Let's break it down then.  As to the cover letter on the scrapbook, the defense explains why that would be highly relevant given the context of that letter.  So just put the scrapbook to the side.  What about the cover letter?

MS. SMYSER:  So, your Honor, I think the cover letter is being offered by the defense to prove Mia's state of mind.  But as we discussed yesterday related to Ms. Ventura, I think that state of mind needs to be tied to a particular moment in time that is relevant to the case.  What has not been proffered is how Mr. Combs' 45th birthday provides like that kind of relevant event.

THE COURT:  And I take it, whoever is going to address this from the defense's side, that it will be established what time period the letter was sent.  And so to the extent that it is coming in as state of mind evidence, then it will be that state of mind at that time.  Correct?

MS. SHAPIRO:  Yes, your Honor.

THE COURT:  All right.  So I'm going to overrule the objection to the cover letter.

Now, as to the scrapbook, why is that coming into evidence?  Meaning, the scrapbook can be referenced and the

P5SACom1

government doesn't have any objection to that being used, even I take it as a demonstrative to explain and show the jury these are the kind of things that Mia was sending at the time. So why does this have to be something that goes back into the jury room? Which is really the only distinction that we're talking about here.

MS. SHAPIRO: Well, your Honor, this is substantive evidence and I think, you know, it's important to note not only the incredible detail and care and extensive nature of the scrapbook and the highlighting, but -- and I don't think we put this in our letter, but Mia created three original versions of this for Mr. Combs. And I think it's important for the jury to see the entire book, to understand exactly how much care and attention and work she put into this. Because it really is going to undermine her testimony and demonstrate, you know, the defense's perspective on her credibility, the veracity of her tale of terror perpetrated by Mr. Combs. And, you know, it's substantive evidence.

And, clearly, we're not putting in -- we're not asking the jury to consider the truth of these articles. That's not the issue. And as we indicated in the letter, it's perfectly appropriate for the Court to instruct the jury to that effect. But that's not what this is.

And it's no different from, you know, the government puts in all kinds of evidence that one could say should be a

P5SACom1

demonstrative.  Like they were able to put in photos of guns and then parade the guns themselves before the jury.  This is no different than that.  This is substantive defense evidence which undermines the government's arguments as to Mia and her allegations against Mr. Combs.

THE COURT:  Do you have those scrapbooks?

MS. SHAPIRO:  Yes, your Honor.  Would be happy to hand up.

THE COURT:  Ms. Smyser, what's the prejudice of this?  I mean, I hear you that there's not much -- I don't know whether there's a high probative value to this evidence.  I don't think it's being put in for the truth of the matter asserted.  So there's not some other objection.  It's just the probative value is pretty low, but also the prejudicial value would seem to be pretty low from the government's perspective too, so, given that questions can be asked and everything else.

So maybe you can help me understand why you think this is a big problem in terms of going back to the jury room, which is really all we're talking about.

MS. SMYSER:  Your Honor, a few points there.  I understand the defense says they're not offering these articles for the truth of the matter, but this is the kind of thing that they have been trying to get in the entire trial about Mr. Combs' life and legacy.  And they have heard -- the jurors have heard testimony about that.  And these articles catalog

P5SACom1

his life from 1991 through 1999, and I think it would be very -- it would be difficult for the jury to ignore that. And I think the defense is trying to get it in for the truth of the matter.

But, the probative value, as your Honor said, is very low given that they can question Mia about it. We have no objection to it being a demonstrative in this case, but there is prejudicial -- this is prejudicial if it goes back to the jury room.

So I just, you know, flipping through the articles last night, for example, there are discussions of Biggie's murder, which I think don't play a role here. And there's, for example, a passage where Mr. Combs is saying in regard to Biggie's murder: I'm always spending time with my people wondering who killed my man, but the Feds are spending their time investigating us for criminal activity. And this is the kind of things that in these articles that would be going back to the jury, which is on its face prejudicial to the government.

And so I think there's -- with the probative value being so low given all the defense could do without these articles going back to the jury, given that they can question Mia on them, I don't think there's any reason to send this back with them.

MS. SHAPIRO: Your Honor, may I respond?

P5SACom1

THE COURT:  Yes.

MS. SHAPIRO:  I think it's not fair to say that this has low probative -- well, first of all, let me just say that we, in no way, intend to argue anything for the truth of any of these articles.  That is not at all the point.  And the point here is as to Mia's state of mind and her -- and I'm still speaking, counsel --

THE COURT:  Hold on.  Hold on.  Directed up here.

MS. SHAPIRO:  If you can let me finish before you respond.

THE COURT:  Okay.

MS. SHAPIRO:  So that's not at all what's going on here, so that's why we offer and agree that there should be a clear limiting instruction.  But we think it's particularly important that the jury see the scrapbook, not to read the articles, but to see the care with which Mia put it together.  And because part of the point here is that, as to Mia's state of mind, is that she loved Mr. Combs and wanted to promote his legacy.  And it's really important.  There's a big difference between eliciting oral testimony about this and showing the jury the binder with all the highlighting, etc.  So, your Honor, I respect --

THE COURT:  I take it -- well, I think, look, the objection to this, the scrapbook being put in as substantive evidence is sustained.  Because this doesn't come close to

P5SACom1

meeting the 403 bar in terms of substantive evidence that the jury could get in the jury room.  Because in the jury room, if they were doing that and looking at the articles, then I agree with the government that there is the potential for prejudice and the probative value in that context is low.

The concern that you've now raised, which is that we want to do more than just give testimony, we want to be able to show the jury the scrapbook, is a fair concern, and the government does not object to you actually showing the jury.  And I take it, as a demonstrative, Ms. Smyser, even if the defense just wanted to the hand the binder around for the jury to just kind of flip through quickly, you know, at some point, there would be no objection to that because that's something that they could do with a demonstrative.  If you had a case involving an accident and there was a ladder, the jury could, like, look at the ladder, right, in the courtroom.  It wouldn't go back as evidence, but it would be usable in that kind of quick way.

MS. SMYSER:  I think in a quick way, your Honor, I don't know that we would have an objection to that.

THE COURT:  Or counsel could simply go in front of the jury and just show them like how many articles there were and, you know, you could even -- as I am looking through this, I get the defense's point they want to show that a lot of care went into this.  And so if they just flip through it for the jury so

P5SACom1

they can see how many articles and they're nicely put in here and everything like that, then there would be no objection to that.  Right?

MS. SMYSER:  I think it's especially no objection to counsel flipping through the binder in front of the jury.  If it is passed around, I would ask for a limiting instruction that it not -- the articles here not be considered for the truth of the matter.

THE COURT:  And who's doing the cross-examination?

MS. SHAPIRO:  That's Mr. Steel, but I think we would prefer to pass -- have it passed around with a limiting instruction if the Court would do that as a demonstrative.

THE COURT:  There's a feasible way.  We're going to have a break at some point where we can figure out the mechanics of this.

So, Mr. Steel, it's your show.  You're in charge of the cross-examination, so whatever way you think is more conducive to how you want to conduct your cross, we will either do it with some limiting instruction and hand it around, but it's got to be brief, or if you want to show the jury, thumb through it, that's another way to do it.

MR. STEEL:  Thank you, your Honor.  I understand.

THE COURT:  Ms. Smyser.

MS. SMYSER:  I think, your Honor, we would ask he be allowed to thumb through it given the nature of the articles

P5SACom1

that I highlighted here that are prejudicial on their face.

If your Honor is considering two options, I think the point comes across if Mr. Steel flips through it in front of the jury.

THE COURT:  I think so too.  Look, just from a tactical perspective on cross-examination, if you give the jury something, then they're going to be focusing on that and not focusing on the cross-examination.  So think about it.  We will address it on the break.

MR. STEEL:  Can I ask a question, your Honor.

THE COURT:  Sure.

MR. STEEL:  Thank you.  And good morning to your Honor good morning to everyone.

THE COURT:  Good morning.

MR. STEEL:  Your Honor, and I understand the ruling. I will obviously follow -- I will follow the Court's ruling. But my question is this, would you consider if that's what the government, what they just highlighted about the federal authorities not looking at a murder but they're looking at us, if that could be redacted if that's all the government says, would you then reconsider?

THE COURT:  That's an example.  That's not all they're complaining about.  And the issue is this binder, the substance of what's in these articles, the defense concedes has no relevance to this case.  It is the fact that this was put

P5SACom1

together.

To that extent, there is no value at all in this going back to the jury room during deliberations. The value is met by the jury being shown the scrapbook so that they can understand the care and attention that went into this given how many articles are here. Which is something that can be done in the courtroom. And given that the actual scrapbook does not go to the substance of this case, that's the, you know, the gravamen of the government's objection.

But I will leave the mechanics of how to handle it, you have been given some leeway by the government. They're not objecting to its use in the courtroom. So I'll leave it to you to make an election how you would like to do that consistent with your cross-examination.

MR. STEEL: I understand. I don't want to waive the issue. I do want to go back, but I understand what the Court said. We will follow the Court's order. Thank you, your Honor.

THE COURT: Next, the social media post, I understand there's an objection to not the pictures but certain of the statements. I'm going to overrule the objection to the social media posts for the reasons stated in the defense's letter.

That leaves these text messages. So here is the question on the text messages. Based on what the defense says, my sense is that there may be, in fact, certain parts of these

P5SACom1

messages or certain messages in the threads that are improper hearsay to the extent that they relate to historical events and they're not properly admissible, there isn't a way to get them in.

Have the parties discussed how to get in the non-hearsay portions of those text messages or how do we want to resolve those?  What's the easiest way to do this?

MS. SHAPIRO:  Your Honor, we would be happy to confer with the government again during the break about that issue.

THE COURT:  Does that make sense, Ms. Smyser?

MS. SMYSER:  That's fine, your Honor.

THE COURT:  Help me out here.  There are two, I think there are two basic exhibits.  One is just one message and then one is a two-year string of messages; is that correct?

MS. SMYSER:  Your Honor, I think there are -- those two are two of the text messages that we have objected to, yes. And I think there are some redactions could be done to address the hearsay issues in those exhibits, yes.

THE COURT:  Okay.  And then that should resolve, that would resolve the government's objections, or am I missing anything?

MS. SMYSER:  No.  To those two, I think that is correct, your Honor.  There are in addition a few other -- or at least one other text message thread, which is Defense Exhibit 1735, which I am not sure if you are addressing now.

P5SACom1

THE COURT:  I will address it now if you don't think it's likely that you'll be able to work out the objection.

MS. SMYSER:  Yeah.  So I don't think it's likely for that exhibit.

THE COURT:  Just give me one second and I'll pull it up.

All right.  I'm there.

MS. SMYSER:  So, your Honor, there is potential hearsay throughout this thread.  But I want to focus the Court on the final text message in this thread, which is what the defense appears to be focused on.  And it seems that they are putting in this text message for its truth to show that the defendant was going through some "heavy shit" and that's why he was acting the way he was.

So we have a hearsay objection to that.  But in addition here, I think Mia is speculating about what is in the defendant's mind.  And so there is an additional objection to that for this text message.

THE COURT:  You don't have an objection to the text message where Mia is indicating that she smelled her own armpit?

MS. SMYSER:  I mean, I don't think that's relevant, your Honor.

THE COURT:  Fair.  401.

So this is really focused on the last two messages; is

P5SACom1

that right?

MS. SMYSER:  Well, I think there is hearsay throughout, but from my understanding from the defense, these are the messages that they intend to focus on in the cross-examination and they're the messages highlighted in their letter.

THE COURT:  All right.  So just to try to simplify things, prior to these last messages, just so I understand the objection, you might have an objection, but is it one that you care to assert?  Meaning that I'm looking at the back and forth communications.  It's a lot of just small talk, for a lack of a better term.  The real objection that you're raising is to the last messages?  I mean, you're not waiving anything.  I'm going to consider --

MS. SMYSER:  Yes, I think you should focus on the end of this text chain, your Honor.

THE COURT:  Let me hear from the defense.  Why is this not inadmissible hearsay?

MR. STEEL:  Your Honor, this is a date, if you notice, of March 16th, 2016.  I believe you will learn that Mia is still employed with Combs Enterprises at that time.

I believe that she will testify -- I don't know obviously -- but I believe she will testify that it was a crushing time working the eight years that she did at Combs Enterprises.  That she was in constant fear of Mr. Combs.

P5SACom1

This is a conversation between her, and I believe you will find out, her best friend, Ms. Ventura.  And Ms. Ventura is saying how she is going to not do an event because she's had it basically with Mr. Combs and his conduct.

And what Mia is saying at this time is her state of mind, this is not hearsay, I'm not asking for a diagnosis or anything, but she's protecting Mr. Combs.

The testimony may come out, we will see it, that she is so afraid of Mr. Combs, yet now she is minimizing, protecting, somehow taking up for Mr. Combs.

I believe this is highly relevant to her state of mind at that time.  This is a critical point for us as well.  If you notice the date, it is approximately 10 days after, 11 days after the InterContinental event that started the case.  And the Court may remember there was several witnesses and videos of that event.

So what I'm arguing, respectfully, to this honorable court, is I believe the jurors are entitled to see that a woman who is coming to this courtroom to announce how violent and dark Mr. Combs is, actually protects him to her best friend. That is why I believe it is non-hearsay and it goes to her state of mind at that exact time, 10 days after the video beating at the InterContinental.

THE COURT:  All right.  Ms. Smyser.

MR. STEEL:  I hope I answered your question, but

P5SACom1

that's why it's non-hearsay to me.

THE COURT:  Well, it partially answers it.  I understand why it would go to her state of mind at the time.  But it is not, in fact, a statement of her state of mind.  Right?

MR. STEEL:  I don't -- I think it is.  I think she's protecting Mr. Combs.  And it also goes to the relationship of the parties.  I believe -- and, you know, your Honor, I gave over -- the defense, not just me -- gave overall of our exhibits in an effort of good will and, you know, to try to be transparent and professional.  So a lot of these exhibits are truly for impeachment.  And I believe that she will testify that she was in fear of Mr. Combs, yet she is protecting him here.  I think that this is highly probative.  I would really like the Court to consider admitting it.  And --

THE COURT:  Well, why don't you get it in -- I mean, can you go through the steps and try to get it in as a prior inconsistent statement?

MR. STEEL:  Sure.  But I raised it now and I told the government this and I thought told the Court this, a lot of this impeachment, prior inconsistent statements to try to impeach her testimony.  But I gave it early and gave it to the government --

THE COURT:  Fair enough.  Ms. Smyser, if can you try to address, so Mr. Steel says putting impeachment aside, it's

P5SACom1

not being put in for the truth of the diagnosis that she makes as to Mr. Combs.  It's showing the fact that she's making -- she's saying that would be potentially highly relevant to show that her state of mind at that time was positive, upbeat, and not crushed and kind of negative.

MS. SMYSER:  I understand the argument for potential relevance.  But it is still inadmissible hearsay.  It doesn't fall within the scope of 803(3).  I think as your Honor pointed out, it is not a statement of her then existing state of mind such as motive, intent, plan or any emotional sensory or physical condition.

She is speculating as to Mr. Combs' state of mind. And if I asked her on the stand why was Mr. Combs upset with Cassie, I would expect an objection that would be sustained. He can't smuggle that in with this text message, your Honor. If it's for impeachment, that's a different thing and we can assess that as it comes up.  But for it to be admitted in the first instance, under 803(3), I think that's entirely inappropriate here.

THE COURT:  All right.  I agree with the government. Here, I think for purposes other than impeachment, I don't see grounds to admit this message at least.  And I don't think any other part of the message is relevant.  So 1735 is excluded.

However, Mr. Steel, we're going to see how the examination goes.  So either you'll try to introduce it and,

P5SACom1

you know, based on impeachment.  But based on the nature of the testimony, if for whatever reason you believe the government has opened the door or you want to reurge your objection, all you need to do is ask for a sidebar and we'll do that.

MR. STEEL:  And, your Honor, to note, I gave all of these over, and the government has been nothing but professional.  They will not share this in any way in any form with the lawyer or Mia herself, because I did give over the impeachment evidence, as you told us to.

THE COURT:  All right.

MR. STEEL:  And I appreciate the government giving us that validation.

THE COURT:  Ms. Smyser, anything else you see on the horizon given the disclosures you received that we should deal with now as opposed to allowing the parties a little time to meet and confer?

MS. SMYSER:  No.  I want to put on the record, your Honor, that we are in discussions with Mr. Steel about potential 412 issues that could arise on three topics during Mia's testimony.  I understand that the defense doesn't intend to come anywhere close to the 412 line, but if they do, we would strenuously object and ask that they take a sidebar before introducing any of that.

THE COURT:  All right.  Mr. Steel, I think that was really directed at you.  So I think you were listening and I

P5SACom1

take it that you will adhere to those lines that have been drawn.

MR. STEEL:  So the line that I understand, and I thought last time I was within the line, but I heard the Court. I thought it was opened, the door was opened.  But Mia had a relationship about four years with someone at the company during this time that she alleges this abuse.  And I understand that that's okay to talk about it in that context.  So that's from the government.  And if I said that wrong, I would like them to tell me now so I don't have to ask for a sidebar, but if I do, then I will do that.

MS. SMYSER:  I think, as we have discussed several times, crossing on the fact of the relationship is completely fine from the government's perspective.  It is when you get into sexual acts or anything of sexual nature that that --

THE COURT:  You don't have an objection to -- I mean, we have to explain what relationship means.  So if Mr. Steel were to say did you have a romantic relationship with this person, that wouldn't run into any 412 issues.  Right?

MS. SMYSER:  I think romantic is fine, your Honor.

THE COURT:  So I think that's a way to convey what you likely want to convey without running into a potential 412 issue.

MR. STEEL:  That's what I was trying to do last time, but I'm glad -- I will use the word romantic relationship.

P5SACom1

Thank you.

THE COURT:  All right.  Very good.

Great.  Anything else from the government?

MS. COMEY:  Yes, your Honor.  With respect to Mr. Nash, at 8:55 a.m. the defense sent me about ten new exhibits, some of which are multiple pages.  I've taken a look at some of them.  Some I won't object to, but some I would have objections to as improper impeachment, totally irrelevant, or hearsay.

So I don't know what the defense is planning to do with these messages that they've just sent to me, but I wanted to flag for your Honor that given all of those issues and given your Court's admonition that the Court needs to be sending us exhibits that they intend to offer substantively in advance, I would ask your Honor to preclude them from introducing any of these messages that they just sent me ten minutes ago.

THE COURT:  Mr. Donaldson, are these going to impeachment or what are these exhibits?

MR. DONALDSON:  Your Honor, excuse me.  I'm sorry.  Good morning, Judge.

THE COURT:  Good morning.

MR. DONALDSON:  Good morning everyone else.

I believe these -- we don't have a direct intention of admitting them I don't believe.  So the ones that I think we're talking about that might be definitely admitted are two

P5SACom1

pictures that I think that -- those are simple.  I told Ms. Comey, I think I sent an e-mail about that last night.

The other three or four I think may just be used for impeachment.  And depending on how it turns out, it may come in, but I doubt it but the ones I'm definitely talking about I sent pictures to Ms. Comey last night.

MS. COMEY:  That's correct, your Honor.  Mr. Donaldson did tell me he wanted to introduce two pictures last night and I have no objection to that.  I imagine the witness will be able to authenticate them, so that's fine.

But with respect to all of the other communications, hopefully they're only used for impeachment.  If they're not I'll renew the objection.

THE COURT:  You can renew the objection and if you reference, this is what we discussed this morning, I'll know what you're talking about.

MS. COMEY:  Yes.  Thank you, your Honor.

THE COURT:  All right.  Let's have Mr. Nash back and we'll bring our jury out.

Mr. Driscoll, if you want to grab...

MS. GERAGOS:  Your Honor, may I put this on the...

THE COURT:  You may.

MS. COMEY:  I'll note for the record, your Honor, that we rebooked this witness's flight for 2:00 p.m. today.  So we are hoping that he'll be off the stand in time to make that

P5SACom1

flight.

THE COURT:  All right.  Good morning.  How are you doing.

THE WITNESS:  Blessed.  And yourself?

THE COURT:  Thank you.

THE WITNESS:  Can I take a seat?

THE COURT:  You may.

(Continued on next page)

P5SACom1                        Nash - Cross

(In open court; jury present).

THE COURT:  Welcome back, members of the jury.

Mr. Nash, you understand you are still under oath?

THE WITNESS:  Yes, sir.

THE COURT:  Mr. Donaldson, you may proceed when ready.

MR. DONALDSON:  Yes, Judge.  Thank you, Judge.

DEONTE NASH, resumed.

CROSS-EXAMINATION, continued

BY MR. DONALDSON:

Q.  Mr. Nash, good morning.

A.  Good morning.

Q.  How you doing?

A.  Blessed.

Q.  Blessed, indeed.

MR. DONALDSON:  So I want to put up on the screen just for the parties only Defense Exhibit 1806.  For the parties only.

Q.  Mr. Nash, do you recognize your telephone number up there?

A.  Yes.

Q.  This would be text messages from you.

A.  Okay.

MR. DONALDSON:  Your Honor, I would like to move this into evidence as Defense Exhibit 1806 with the appropriate redactions that I spoke to the government about.

MS. COMEY:  No objection with the redactions, your

P5SACom1                        Nash - Cross

Honor.

THE COURT:  All right.  Defense Exhibit 1806 will be admitted.

MR. DONALDSON:  Thank you, your Honor.

(Defendant's Exhibit 1806-R received in evidence)

MS. COMEY:  1806-R for the record.

MR. DONALDSON:  My apologies.  1806-R.  I think R means redactions.

THE COURT:  Thank you.

MR. DONALDSON:  All right.  So we -- you can take that down, please.

Q.  Mr. Nash, you know someone named Capricorn Clark, correct?

A.  I know of her, yes.

Q.  And Ms. Clark worked with Bad Boy and with you and with Cassie, correct?

A.  Yes.

Q.  In 2011, if you can recall, what was her role regarding Cassie?

A.  She did -- Capricorn did everything that I did after she left for the most part.  She was base -- she was her creative.

Q.  In 2011?

A.  Yes.

Q.  So and that was right before the mix tape, correct?

A.  Yes.  But she didn't work on that.

Q.  At all?

P5SACom1                    Nash - Cross

A.   No.  She was gone.

Q.   When did she leave?

A.   Oh, I don't remember.  But she didn't really work on the mix tape.

Q.   What did she work on when she was there, if you recall, if you recall?

A.   I forget the last thing she worked on.  Maybe the photo shoot that you guys showed yesterday.

Q.   Do you know when she was there, when you were there?

A.   Yes, she was.

Q.   So what time period was that between 2008, 2011?

A.   Yeah.

Q.   Some --

A.   Yeah.

Q.   Between 2008?

A.   '8 and '11, yeah.

Q.   And Capricorn was there and you were there as well?

A.   Yes.

Q.   And you all were doing the same thing for Cassie?

A.   I will work with Capricorn, yes.

Q.   Would you --

A.   I learned a lot from Capricorn actually.

Q.   And Capricorn returned -- when did she leave?  Sorry.

A.   Maybe like 2011, '12.

Q.   And she came back in 2016?

P5SACom1                          Nash - Cross

A.  For a couple weeks, yeah.

Q.  And when she came back in 2016, what was her
responsibility?  What was her role at that time?

A.  She was helping with Love a Loser video.

Q.  Did she in fact -- she in fact did Love a Loser video,
correct?

A.  Yes.

Q.  And she also helped with the -- she was with Cassie on the
video sets, correct?

A.  Yes.

Q.  Do you recall a picture with Cassie and green hair?

A.  Yes.

Q.  And in that picture -- strike that, that picture.

        You -- that was her idea for the green hair, correct?

A.  No.  That was a group idea.

Q.  What do you mean a group idea?

A.  That was a group idea, group discussion.

Q.  Between who?

A.  Cassie, myself, Capricorn, everybody.  It was a group idea.
I actually traveled with them to New York for that trip and
walked the carpet with Cassie.

Q.  So when you said you traveled to New York with Cassie and
the group to -- for that trip?

A.  Yes.

Q.  What trip are you talking about?

P5SACom1                          Nash - Cross

A.   For the VMAs.

Q.   So in 2000 -- what year was this?

A.   I don't remember.

Q.   2016, 2015?

A.   Maybe, maybe.  '14, '15.  '14 to '16.

Q.   All right.  And when you say --

A.   Maybe -- no.  It had to be around Love a Loser because that was the whole thing.

          MR. DONALDSON:  Ray, could you put up Government Exhibit 628, please.

          I'm sorry, Defense Exhibit 628 for everyone.  You can publish it.

Q.   And this is the picture where Cassie has the dyed hair, correct?

A.   Correct.

Q.   And this is the picture that everyone worked on?

A.   Yes.

Q.   And when you say everyone, this is the whole -- you said whole?

A.   Yeah, Derek as well.

Q.   Okay.  This look that she has, the clothes, the purse, the jacket, the pants, all of that was a specifically, I guess, put together look?

A.   Curated look, yes.

Q.   You say curated?

P5SACom1                      Nash - Cross

A.  Yes.

Q.  Thank you, sorry.

So this curated look was because you or the label wanted her to look a particular way, correct?

A.  Correct.

Q.  Because she was going out to -- this was a VMA look?

A.  Yes.

Q.  So the label wanted her to look a particular way as she represents herself and the label at the VMAs, correct?

A.  Yes.

Q.  So this green hair, jacket, pants, Gucci bag was all specifically for a purpose, correct?

A.  Yeah.

Q.  To have a look, right?

A.  Yes.

Q.  And did you all have to get approvals for that from somebody?

A.  Yes. Puff.

Q.  Right.  So Mr. Combs actually approved that look, correct?

A.  Yes.

Q.  So before you all said we going to do this, you got the approval from Mr. Combs, correct?

A.  Yes.

Q.  Now, yesterday you talked about for a while -- we talked about this -- I'm sorry.  You can take that down.  Thank you.

P5SACom1                       Nash - Cross

You talked about an incident where -- an unfortunate incident -- where Cassie suffered a gash on her head; do you recall that?

A. Yes.

Q. I believe yesterday you testified that when she -- when you and Mia were on Mr. Combs' back, he was still grabbing at or assaulting Cassie, correct?

A. Yes.

Q. And then while that was happening, he shoved Cassie and she hit her head on the bed frame, correct?

A. Correct.

Q. And then I believe yesterday you said while she was bleeding on the floor, he kept kicking her; you said that right?

A. And hitting, yes.

Q. Now, we also mentioned yesterday that you had met with the government several times, correct?

A. Yes.

Q. Too many times to even remember, correct?

A. Yes.

Q. And just, in fact, you met with them in July 2024, correct?

A. Yes.

Q. You met with them in March 2025, correct?

A. I don't remember the dates but...

Q. April 2025 as well, correct?

P5SACom1                        Nash - Cross

A.   I guess so, yes.

Q.   And on May 17th, 2025; a couple weeks ago, correct?

A.   Correct.

Q.   And each one of those times you spoke about this incident, correct?

A.   Yes.

Q.   And not one of those times did you say that Mr. Combs was beating her or kicking her while she was on the floor bleeding, correct?

A.   They didn't ask.

Q.   Well, they asked you about the incident, correct?

A.   Yeah.  I gave as little as possible.

Q.   And you told them about the incident, correct?

A.   I gave as little as possible.  I only answered what I was asked.

Q.   Well, when they ask you what happened related to the incident involving you, Mia, Cassie getting a gash on her head, you gave them information about that on July 24th, correct?

A.   Yeah.

Q.   And then they ask you about the incident where you -- she got a gash on her head, you gave them information about that on March 19th, 2025; correct?

A.   Okay.

Q.   And on -- they ask you about the incident again on April 28, '25, and you gave them information about that

P5SACom1                          Nash - Cross

incident, correct?

A.  Correct.

Q.  And then again on May 17th, they ask you about this incident involving the gash on her head, and you gave them information, correct?

A.  Correct.

Q.  And that none of those four or five times did you say while he was on the floor, while she was on the floor, Mr. Combs kept kicking and punching her while she was bleeding, correct?

A.  They never asked.

Q.  The first time you telling -- saying that part is in court to the jury, correct?

A.  No.

Q.  Now, you mentioned that between September -- between 2009 and 2018, you and Cassie were good to best friends, correct?

A.  Correct.

Q.  And -- strike that.

        From 2009 to now you're still good to best friends, right?

A.  Correct.

Q.  That would be over 16 years; that fair to say?

A.  Yeah.

Q.  And I think you mentioned also yesterday that you spoke to her almost every day, correct?

A.  Correct.

P5SACom1                        Nash - Cross

Q.  Do you know someone named Kid Cudi, correct?

A.  Correct.

Q.  I'm sorry?

A.  I know of him, yes.

Q.  You know of him?

A.  Yes.

Q.  You know that Ms. Ventura was in -- sorry.  I said that wrong.  I'm sorry.  I'm sorry about that.  I know you going to correct me.  I'm sorry.

         You know that Cassie was in a relationship with Mr. -- Kid Cudi, correct?

A.  Yes.

Q.  And you know that she was in a relationship with Kid Cudi while she was in a relationship with Mr. Combs, correct?

A.  Okay.

Q.  That's a yes, correct?

A.  I didn't know that.

Q.  You didn't know that she was in a relationship with Mr. Combs at the same time she was in a relationship with Kid Cudi?

A.  No.  To my knowledge, her and Mr. Combs were broken up.

Q.  She told you that her and Mr. Combs had broken up, correct?

A.  No.  The team -- people on the team said it.

Q.  So Cassie never told you that her and Mr. Combs broke up.  Someone else told you that?

P5SACom1                          Nash - Cross

A.   Mm-hmm.

Q.   Is that a yes?

A.   Correct.

Q.   In 2015, Cassie was in South Africa; do you recall that?

A.   Yep.

Q.   And I think at that time you were at the Revolt Conference or something like that, right?

A.   Yep.

Q.   And when we say Revolt Conference, Revolt is I guess a professional web -- it's owned the --

A.   It's an entertainment conference.

Q.   Entertainment company?

A.   Conference, yeah.

Q.   It was owned by Sean Combs, correct?

A.   Correct.

Q.   It was owned by Sean Combs back in 2015, correct?

A.   Correct.

Q.   So you were at the Revolt Conference as an employee of Mr. Combs in 2015; is that correct?

A.   Correct.

Q.   And in Revolt Conference was in Miami at the time, correct?

A.   Yes.

Q.   And you were with who?  Who were you with at the Revolt Conference?

A.   I was styling -- there to style Lil' Kim.

P5SACom1                    Nash - Cross

Q.   So you were there to style Lil' Kim?

A.   Yeah.

Q.   Who else was there with you Lil' Kim, anyone else there?

A.   Yeah.  The whole team, Puff, everybody.

Q.   Okay.  And but Cassie wasn't there, correct?

A.   No.

Q.   Cassie was in South Africa, correct?

A.   Correct.

Q.   And she was there in South Africa with Mia, correct?

A.   Yes.

Q.   And some other people, correct?

A.   Correct.

Q.   And she was doing -- what was she doing in South Africa?

A.   Sooting shooting a movie.

Q.   And she was shooting this movie as a part -- she was still signed to Bad Boy, correct?

A.   Correct.

Q.   And what was the movie?

A.   Honey.

Q.   And so as an artist signed with Bad Boy, she was not only doing music, but she was also getting movie deals, correct?

A.   Mm-hmm.  She was able to do some sometimes.

Q.   So I guess I'm asking yes, no.

A.   Mm-hmm.

Q.   Was she able to do movies while she was an artist signed

with Bad Boy?

A.  Sometimes, yes.

Q.  In 2015, this is one of those times that she was allowed to do a movie, correct?

A.  Correct.

Q.  And in order for her to be allowed to do that movie, Mr. Combs, as the owner of Bad Boy, had to sign off on that, correct?

A.  Correct.

Q.  So to button that, Mr. Combs signed off on a contract to allow Cassie to do a movie, correct?

A.  Correct.

      Mr. Donaldson.

Q.  Yes, sir.

A.  Can you drive it home?  Because, yes, I did hook her up with Michael B. Jordan.  I know where we going with this.

Q.  Let's --

A.  No, no, no.

      THE COURT:  Hold on.  Mr. Donaldson, let's get a new question.

      MR. DONALDSON:  Okay.

Q.  So, Mr. Nash, you hooked her up with Michael B. Jordan, right?

A.  Indeed.

Q.  All right.

P5SACom1                          Nash - Cross

A.  He fine.  She fine.  I mean, why not?  They were broken up.
He was at the Revolt music conference with Gina.

Q.  Okay?

A.  And I was getting threats to my phone because Cassie found
out --

Q.  Wait, wait, wait, wait.

THE COURT:  Mr. Nash, let Mr. Donaldson ask questions,
you give him the answers.  And then we'll take it from there.

THE WITNESS:  Yes, sir.

THE COURT:  Mr. Donaldson.

MR. DONALDSON:  Yes.

Q.  So let's talk about that.

A.  Yeah.

Q.  So you were in Miami at the Revolt.  Let's break this down.
Right?

A.  Yep.

Q.  And Cassie was in South Africa with Mia, correct?

A.  Correct.

Q.  And then it's your information that -- not your
information, but you observe Mr. Combs with someone else in
Miami correct?

A.  Oh, no.  Oh, no.  You not putting that on me.  Uh-uh.

That was another stylist named Icon Tips that text her
and said, oh, girl, you look good coming out of the car.  And
she called me and told me, girl, is that girl Gina there?  I

P5SACom1                          Nash - Cross

said I don't know, I ain't seen her, because, you know, Puff and Derek would keep me away when Gina was there.  Never seen her or met Gina.  And that's how that went.

Q.  Okay.  So another stylist called Cassie and told -- called Cassie in South Africa and told her -- thought that she was in the picture that was posted, correct?

A.  No.  He thought he actually saw her with Puff.

Q.  He thought he actually saw Cassie with Puff?

A.  Yes.

Q.  But that wasn't Cassie?

A.  No.

Q.  That was Gina?

A.  Yes.

Q.  And when Cassie heard that, Cassie got mad?

A.  Yeah.

Q.  Cassie got upset, right?

A.  Uh-huh.

Q.  She was like, well, why is he out in public with this girl, correct?

A.  Yeah.  Why does he keep humiliating me and trying to ruin my career is what she said.

Q.  Okay.  And she was mad, correct?

A.  Yeah, she was pretty angry -- well, not really.

Q.  And she communicate -- and that was you and her talking about that, correct?

P5SACom1                        Nash - Cross

A.  Correct.

Q.  And so you told her at that point in time, listen, I could hook you up with Michael B. Jordan, correct?

A.  Uh-uh-uh.

Q.  No, that wasn't you?

A.  No, that's not how that happened.

Q.  One second.  Let me break it down.  Hold on.

So you said that you set her up with Michael B. Jordan, correct?

A.  Yeah, but that's not how that happened.

THE COURT:  Hold on.  Mr. Donaldson, let's ask a question.  And, Mr. Nash, just whatever question is asked, try your best to just answer that question, and then we'll keep going.

THE WITNESS:  Yes.

THE COURT:  Hold on.

Yes, Mr. Donaldson, let's go.

BY MR. DONALDSON:

Q.  You set her up with Michael B. Jordan, correct?

A.  Yes.

Q.  Okay.  And when you say you set her up with Michael B. Jordan, you meant that you introduced her to Michael B. Jordan?

A.  Yes.  And Mia drove it home by making sure she had the number.

Q.  So let's talk about that.

So Mia, that will be the employee of Mr. Combs, correct?

A.   Yep.

Q.   Drove the relationship home between Cassie and Michael Jordan, right?

A.   Michael B. Jordan.  Not Michael Jordan.  Yeah.  You want to get that right.

Q.   Yeah.  Mia drove the point home between Cassie and Michael B. Jordan, correct?

A.   Correct.

Q.   So Mia, being an employee of Mr. Combs, was participating in breaking up Mr. Combs from Cassie; would that be fair to say?

A.   Well, they were broken up.

Q.   They were broken up in --

A.   At that moment, yeah.

Q.   Okay.  And so -- one second.

Michael -- when we say setting up, Cassie began communicating with Michael B. Jordan, correct?

A.   Correct.

Q.   And fair to say Michael B. Jordan began communicating with Cassie, correct?

A.   Correct.

Q.   And they were -- and Cassie at this time was pursuing that relationship with Michael B. Jordan, correct?

P5SACom1                          Nash - Cross

A.  Somewhat, yeah.

Q.  She was trying to hook up with Michael B. Jordan, correct?

A.  It was like a whatever, dating starting.

Q.  They were dating?

A.  Yeah.  Talking, getting to know each other more so.

Q.  One second, please.

    Do you know someone named Andre Branch?

A.  Uh-uh.

Q.  Do you know whether or not -- isn't it true that Ms. Cassie --

    THE COURT:  Mr. Nash, you just have to answer yes or no.  Sorry.

A.  No.

Q.  Cassie was in a relationship with Andre Branch?

A.  Oh, the cute football player?

Q.  Yes, the cute football player.

A.  Oh, yeah, but I never met him.

Q.  But you were aware that Cassie was in a relationship with Andre Branch, correct?

A.  Yes.

Q.  And this was when?

A.  I don't remember.  Maybe like close to '17, maybe.

Q.  Are you also -- are you aware of a person named Brandon from the NFL?

A.  No.

P5SACom1                          Nash - Cross

Q.  2016?

A.  No.

Q.  When I say are you aware, not do you know them, but are you aware that Ms. -- that Cassie was in a relationship with someone named Brandon in 2016 while Capricorn was working there?

A.  No.

Q.  I'm sorry.  NBA.  Wrong, I was wrong.  NBA not NFL.  NBA.

A.  No.

Q.  Still no?

A.  No.

        MR. DONALDSON:  Can we put up 1806-R, please.  Can we go to page six please.

Q.  This is a text message chain between you and Cassie, correct?

A.  Yes.

Q.  And this is where you talk about -- where you're talking to her about the situation that's going on regarding Cassie and Michael B. Jordan, correct?

A.  Honestly, I don't know.

        MR. DONALDSON:  Let's go to page seven.

Q.  Now, on that second line you say:  No one better not say shit to me.  And then next thing you say is:  Ly.

        What does Ly mean?

A.  Love you.

P5SACom1                    Nash - Cross

Q.  Love you knows everything?

A.  No, no, no.  Wait.  Hold on.

Ly.  Ly.  Oh, I don't know.  Ly.

Q.  Not love you?

A.  No.  It says Ly knows everything.  I don't know what Ly is.
I think that's a typo.

Q.  Okay.  Just be calm and ignore.

That's you telling her to be calm and ignore what?

A.  I don't remember the context, but I'm sure we were being
antagonized by your client.

Q.  Isn't this about -- isn't this about Gina and her being
still upset about Gina?

A.  Honestly, she wasn't that pressed about Gina.  Like when
Puff will be with Gina, she would be like, all right, girl,
it's time to go out.

Like she wasn't that pressed about Gina.  I think in
the beginning the issue with Gina was that Gina kept popping up
and it was hurting her career with Puff running around with
other women.

Q.  Okay.  So let's break that down.  So when you said she
really wasn't pressed about that when she saw her out with
Gina -- when she saw him out with Gina, she would be like,
girl, let's get out and do our thing, correct?

A.  Correct.

Q.  And by get out and do our thing, she meant it's time for

P5SACom1                        Nash - Cross

her to get out and go have parties or date or do whatever she wanted to do, correct?

A.  Not necessarily.  She and I are both super chill.  So we spent a lot of time at home to be quite honest.

Q.  But when you said, girl, let's get out and do our thing --

A.  That's going to Toscanova.  No, boo, nothing crazy.

Q.  Right.  Nothing crazy.  But her having a personal choice to do what she wanted to do, correct?

A.  Correct.

Q.  Because now she felt like because he was dating other women, she can go out and do what she wanted to do, correct?

A.  That is fair, yes.

         MR. DONALDSON:  Now, we can take that down, please.

Q.  You mentioned yesterday that Cassie did not want to go to hotels; do you recall saying that?

A.  Correct.

         MR. DONALDSON:  Put up exhibit 1818, please.

Q.  Now, this is a text message between you and Cassie, correct?

A.  Correct.

Q.  The blue part is you and the green part is Cassie, correct?

A.  Okay.

Q.  Now, if you don't mind, I want you to read the blue part, I'll read the green part, okay?  Is that fair?

A.  Okay.

P5SACom1                    Nash - Cross

Q.  You start.  Go?

A.  Tron -- oh, y'all got people name in here.

Tron Vaughan put the DSquared shoes -- wait, it's two things.

Q.  Start on the left and go to the right.

A.  Tron Vaughan put the DSquared shoes Puff's garage right next to -- by the door in front of some boxes.  It's two pair so see which ones fit.

Q.  Okay.  Thank you.

Your turn.

A.  What you doing.

Q.  About to go out of town for a couple of days.  Getting my stuff together.

A.  Cute.

Q.  Stop.

So when she says about to go out of town for a couple days, getting my stuff together, that's her telling you she about to go out of town to a hotel, correct?

A.  No.

Q.  Okay.  Keep going.  Go to the blue.

A.  Where you going -- no, I'm the blue, right?

Q.  Yes.

A.  Where you going.

Q.  Secret trip lol.

A.  Giiiiiiiirl.

P5SACom1                          Nash - Cross

Q.   Me -- I mean her.  What.

          You go ahead.

A.   Nothing, I was just saying it.  I'm going to a family barbecue.

          MR. DONALDSON:  Okay.  You can take that down.

Q.   So when she says, when she says she's about to go some place in a secret trip, she's going some place, correct?

A.   Correct.

Q.   And she's going on a secret trip somewhere, correct?

A.   Correct.

Q.   And she didn't tell you where she was going, correct?

A.   No.

Q.   Because she didn't want you to know where she was going, correct?

A.   Probably didn't want to text it.

Q.   Well, you didn't call her back and say what's the secret trip, where you going, etc., correct?

A.   I may have.  Or she may have just told me.  A -- good friends don't like really pry like that, you know what I mean.

Q.   So --

A.   And that's not my method.

Q.   So when the good friends didn't pry, you didn't pry and ask her -- your response to secret trip was what now?

A.   I don't see it.  What was it?  Giiiiiiiirl.  Yeah, that.

Q.   What is turning -- in your mind, what does turning up too

P5SACom1                          Nash - Cross

much mean?

A.  Going out -- going out too much.

MR. DONALDSON:  Could you pull up DX 1840, please. Could you go to page two, please.

THE COURT:  Mr. Donaldson, this is already in evidence?

MR. DONALDSON:  I believe it is.  Is it not?  I thought it was, Judge.  It's not?

MS. COMEY:  It's in, your Honor.

MR. DONALDSON:  It's in, right?

THE COURT:  Yes.

MR. DONALDSON:  Okay, Judge.  I'm sorry.

Could you go to page three, please.

Q.  Now, that green part, highlight the green part.

A.  Mm-hmm.

Q.  This is Cassie telling you October 30th, 2013, this is after the incident with the cut on the face, correct?

A.  The incident with the cut, yes.

Q.  And so this part she says:  I already said I'm going to ask Puff if I can go out, but I've been turning up too much lately which is true.

You see that part, correct?

A.  Correct.

Q.  So when you just say turning up too much means going out too much, this was her telling you that she's been going out

P5SACom1                    Nash - Cross

too much in October of 2013, correct?

A. Yeah, that's what it says.

MR. DONALDSON: Okay. Put that down, please.

Q. You also mentioned that you saw via FaceTime and near the time of the premiere when she was at the InterContinental, Cassie, that you FaceTimed her and you saw her with a black eye; do you recall saying that?

A. Mm-hmm.

Q. Is that a yes?

A. Yes.

Q. Now, when you say you saw her with the black eye on FaceTime, there's -- you haven't seen a picture of this black eye around that time, have you?

A. No.

Q. You haven't seen a video of her with a black eye, correct?

A. No. But I saw it in person.

Q. You say you saw this FaceTime of her with the black eye?

A. Yes. I saw it in person, and when her makeup would wear off, you can see it. So she had a press week, the whole week after --

THE COURT: Mr. Nash, I'm going to stop you right there. Just let Mr. Donaldson ask the questions and then you can answer that question, and then let him ask the next one.

THE WITNESS: Absolutely.

THE COURT: Mr. Donaldson.

P5SACom1                          Nash - Cross

MR. DONALDSON:  Thank you, Judge.

Can you put up Defense Exhibit 1820, please.

Q.  This is a text chain between you and Cassie in March of 2020, correct?

A.  Yes.

Q.  This is her -- picture of her, correct?

A.  Correct.

MR. DONALDSON:  Could you go down to the next page, please.

Q.  That's another picture of her on the top right side, correct?

A.  Correct.

Q.  I'm going to, if you don't mind, starting on the top right-hand side, I want you to read the blue parts and I'll read the green part.  All right?

A.  Mm-hmm.

Q.  You start where it says "that?"

A.  That mug beat tho.

Q.  And when you say "beat," you mean beat, between you and Cassie means good, nice?

A.  Yeah.

Q.  Right?

A.  Yeah.

Q.  Right.  So you were telling her at that point in March of 2019, her face looked --

P5SACom1                          Nash - Cross

A.   Beat.

Q.   Nice though, right?

A.   Correct.

Q.   And then she says always.

And then you say what?

A.   What you doing.

Q.   Then she says, oh, my God, this nigga is wasted.  We both did the same of everything but he's tripping.

You see that?

A.   Yes.

(Continued on next page)

P5TMCOM2                        Nash - Cross

MR. DONALDSON:  Next page.

Q.  Top right-hand side.

A.  Girl, just honestly.

Q.  I tried to stop him from embarrassing himself, but I can't.

A.  Is it a lot of people there?  It is talking about a Gwen Stefani song.

MR. DONALDSON:  Next page.

Q.  In this particular series she is away someplace, correct?

A.  This is 2000 and what?

Q.  2016.

A.  I don't know.  I don't know.  Maybe she is.  I don't know.

Q.  Judging from your text chain she is not -- she is away with Puffy, correct?

A.  This is the same --

Q.  Yes.

A.  Yes.

Q.  She is at a hotel somewhere, correct?

A.  Yes.

Q.  And this is one of those -- she is away at a hotel and she didn't tell you that she didn't want to go to a hotel, correct?

A.  Not this day.

Q.  I'm sorry?

A.  I said probably not this day.

Q.  And she didn't tell you that she didn't want to be there, correct?

P5TMCOM2                         Nash - Cross

A.  Is it in this text thread?

Q.  I'm asking you --

A.  I don't know.  But she is telling me that several times.

Q.  Yesterday you also mentioned that Mr. Combs said he is going to leak photos and videos of Cassie, correct?

A.  Correct.

Q.  And you said you heard him say that, correct?

A.  Yes.

Q.  I believe you said, in 2013, outside Cassie's apartment, he told you -- he told Cassie in front of you that he would leak her videos, is that right?

A.  Correct.

Q.  And I think this was in the same conversation where he said to you -- you and Cassie, take your broke ass home and ride to the sunset?

A.  Yes.

Q.  You and Cassie went back home after that, correct?

A.  What do you mean?

Q.  You went back -- after he said, take your broke ass home, you and Cassie left, correct?

A.  Yeah.  We rode out to the sunset.

Q.  You then asked her what he was talking about and she told you -- you told her that she didn't need to worry because any photos would have him in them too, correct?

A.  Correct.

P5TMCOM2                    Nash - Cross

Q.  So at that point, in 2013, when that conversation allegedly came up, you told Cassie, don't worry about it because any photos or videos must have him in it, correct?

A.  Correct.

Q.  Because it was your opinion that it was talking about videos or photos between her and him, correct?

A.  Correct.

Q.  You had no idea she was talking about videos of her and other men at that time, correct?

A.  Correct.

Q.  Until she told you that, correct?

A.  Yes.

Q.  So she told you that in 2013, correct?

A.  Yes.

Q.  So the first time you heard from Cassie or knew about Cassie having any kind of involvement with other men and sex was in 2013, in this conversation, correct?

A.  Yes.

Q.  So between 2008 and 2013, you and Cassie talking every day about best friend stuff, she never mentioned anything to you about having threesomes with other men, correct?

A.  People --

Q.  Yes or no, Mr. Nash.

A.  No.

Q.  That part of her life she kept secret from you, correct?

A. Yes.

Q. She also told you that she was concerned that there were videos from her phone, correct?

A. No.

MR. DONALDSON: Can we put up 3514-10 for the parties and the witness only. Go to page 2, first box under the second circle. Highlight that, please.

Q. Mr. Nash, could you read that to yourself. When you are finished reading that, lift up, let me know you're finished reading.

A. OK.

MR. DONALDSON: Take that down, please. Thank you.

Q. Mr. Nash, does that refresh your recollection that, on May 10, 2025, when meeting with the government, you told the government that -- one second. Make sure I say it right, Judge -- that she was concerned because the videos came from her phone?

A. No. I told them that he would tape her on her phone. I didn't say anything about she was concerned because the videos were on her phone. I said he would tape her on her phone.

Q. Isn't it true that you told the government --

THE COURT: Hold on. You want him to read it again?

MR. DONALDSON: Yes, please.

THE COURT: Mr. Nash, take a second, take a look at it, and then let me know when you're done.

THE WITNESS:  OK.

THE COURT:  Let's take it down.

Mr. Donaldson.

Q.  Isn't it true that you told the government that Ms. Ventura said the videos were from her phone?

A.  I said that he would record her from her phone, and I stand firm on that.

Q.  And that the videos were on her phone, correct?

A.  Correct.

MR. DONALDSON:  Can I have one second, please, your Honor.

THE COURT:  You may.

Q.  You also yesterday spoke about Cassie's 29th birthday party.  Do you recall that?

A.  Yes.

Q.  And that was a 29th birthday -- what year was that, around 2016?

A.  Yeah.

Q.  That particular birthday party was a multi-place birthday night.  Would that be fair to say?

A.  Yes.

Q.  When I say that, you went -- you all went to different places that night, correct?

A.  Correct.

Q.  When I say you all, who was the you all?

P5TMCOM2                          Nash - Cross

A.  Everyone went.

Q.  Who is everyone?

A.  Puff, Cassie, everyone went, but they came after.

Q.  Puff, Cassie.  Who else?

A.  A lot of people.

Q.  Besides yourself, who?

A.  I don't even remember.  Derek was there.  Most people from the staff.

Q.  Bana was there, correct?

A.  Yeah.  She was, yeah.

Q.  We have Bana.  You say Derek.  You mean Derek Roche?

A.  Yes.

Q.  You had yourself?

A.  Yes.

Q.  You had Cassie?

A.  Yes.

Q.  You had Mr. Combs.  That's five?

A.  It was tons of people, yeah.

Q.  Who else?

A.  I don't remember.

Q.  In 2015 sounds better than 2016?

A.  It's ballpark.

Q.  Now, the first part of the birthday party night began at a restaurant.  Is that fair to say?

A.  Yes.

Q.  What was the name of the restaurant?

A.  Cavatina.

Q.  So you remember it was at the Cavatina, correct?

A.  Correct.

Q.  You remember it was the 29th birthday, correct?

A.  Correct.

Q.  And you also remember that it was -- was it a surprise birthday?

A.  Yes.

Q.  So this was a surprise birthday party organized by you?

A.  By Mr. Combs.

Q.  So the surprise birthday party was organized by Mr. Combs for Cassie, correct?

A.  Correct.

Q.  He knew about the surprise party then.  Would that be fair to say?

A.  Yes.

Q.  He then called you when you were at the restaurant and said he was coming over, correct?

A.  No.  He was there when we got there.  He was in Miami.  He called me from Miami and asked me should he fly back and come.

Q.  Sorry.  He called you from Miami and asked you should he fly back from Miami to come and attend this birthday party?

A.  Correct.

Q.  He flew up from Miami to attend the birthday party,

correct?

A. Correct.

Q. You knew he was coming, correct?

A. Yes.

Q. Did you tell Cassie he was coming?

A. No.

Q. You wanted him to surprise Cassie as well, correct?

A. Correct.

Q. Just so I'm clear, after the 2013 incident, where the violence happened, two years later you're at a birthday party, Mr. Combs is in Miami, and you tell him -- he asked you, can he come, and you say yes, please come up. Correct?

A. Correct.

Q. You don't tell Cassie that he is coming, correct?

A. Correct.

Q. Because you want Cassie to be surprised that her boyfriend is coming up to see her at the birthday party, correct?

A. Yes. Who wants to be the person that tells somebody the surprise?

Q. Nobody.

When you left -- I believe on direct you said when you left the party you heard Combs say, you can't do this one thing for me. Do you recall saying that?

A. Correct.

Q. Now, like the other situation, you met with the government

July 2024, May 2025, and May 17, 2025, correct?

A. Correct.

Q. And you spoke about this July 29 birthday party on July 24, 2025; May 10, 2025; and May 17, 2025, correct?

A. Correct.

Q. Each day they asked you what happened at the 29th birthday, party, right?

A. Correct.

Q. Each day you told them -- on July 24, you told them one thing, correct?

A. Correct.

Q. And on May 10, you told them again what happened, correct?

A. Correct.

Q. And on May 17, you told them what happened, correct?

A. Correct.

Q. And not one of those times did you say anything about, on the way out he says, you can't do this one thing for me, correct?

A. I don't know.

Q. Also on direct yesterday you mentioned that when you are at the Blind Dragon you saw Combs with Cassie in a corner pointing in her face. Do you recall saying that?

A. Yes.

Q. July 2024, you spoke with the government, correct?

A. Correct.

Q. You spoke about this birthday, correct?

A. Yes.

Q. On May 10, you did the same thing, correct?

A. Yes.

Q. On May 17 you did the same thing, correct?

A. Correct.

Q. And not either one of those times did you mention anything about Mr. Combs in a corner with Cassie pointing in her face at the Blind Dragon, correct?

A. Correct.

Q. The first time you're saying that was at trial, correct?

A. I guess so.

Q. You just all of a sudden remembered that.

A. No. I gave them very little by phone.

Q. You also indicated yesterday that when you were at the house with Cassie he said -- she said to you, Mr. Combs is making me go. Do you remember saying that?

A. Yeah. She said she didn't want -- she didn't want to say it was her birthday.

Q. Yesterday we also talked about, you mentioned that you were helping Cassie out with her styling for her testimony, correct?

A. Correct.

Q. You and Marne?

A. Yes.

Q. Marne is here in New York, correct?

A.   Correct.

Q.   You were in LA, correct?

A.   Correct.

Q.   Because Cassie is one of your best friends, you were helping her pick out the clothing that she was going to wear to come to court, correct?

A.   Correct.

Q.   Because, again, she is still an artist or entertainer, so that's important how she looks, correct?

A.   Oh, no, that wasn't why.

Q.   You wanted to make sure she looked good coming to court?

A.   No.  She couldn't fit anything.  She needed clothes.

Q.   Because of the pregnancy.

A.   Yes.

Q.   You wanted to get the right clothing for her pregnancy?

A.   Exactly.

Q.   You wanted to pick out the stuff that fit her for the pregnancy?

A.   Correct.

Q.   You talked to her during the trial, correct?

A.   Correct.

Q.   And when I say during trial, she was testifying you would call her and ask her how she was doing, correct?

A.   Yeah.

Q.   Not about the case, though, correct?

A.  Correct.

Q.  You would make sure she was OK but not about the case, correct?

A.  Yes.

Q.  So on her last day of testimony, that Friday, after she finished, you spoke to her that that day, correct?

A.  Yes.

Q.  Because that was her last day, and she called you and said, I'm done, that's it, correct?

A.  It wasn't like that, no.

Q.  But you did speak to her, correct?

A.  Yeah.

Q.  That Friday was May 16, the last day she testified, and she was gone, correct?

A.  Correct.

Q.  Going back to making me -- he said, making me go, again, you talked to the government in July 2024 about this birthday party, correct?

A.  Correct.

Q.  We talked -- you talked to him again on May 10, 2024 about this birthday party, correct?

A.  Correct.

Q.  But then, on May 17, you met with them, correct?

A.  Correct.

Q.  And May 17 was the date after Cassie's last day of

P5TMCOM2                         Nash - Cross

testimony, correct?

A.   Yeah.

Q.   May 17 was the first day that you told them anything about making me go to a hotel, correct?

A.   No.

Q.   You didn't tell them in July 2024, correct?

A.   I don't know.

Q.   You didn't tell them in May 2024, correct?

A.   I don't know.

Q.   You didn't tell them on May 10, 2024, correct?

A.   We would have to pull up the transcript.

Q.   The first time you told them about Cassie telling you that he made her go to the hotel was May 17, 2025, the day after Cassie finished her testimony, correct?

A.   It may have been something that they asked.

          MR. DONALDSON:  One second, please, your Honor.

Q.   You also mentioned about this party on July -- 29th birthday party.  You said that Cassie was super high, correct?

A.   Correct.

Q.   And you said that Mr. Combs was intoxicated, correct?

A.   Correct.

Q.   Did you get Cassie super high?

A.   Excuse me?

Q.   Did you give --

A.   No, no.  I did not.

THE COURT:  Hold on, Mr. Nash.

Mr. Donaldson.

Q.  But she was super high in the house, correct?

A.  Correct.

Q.  Was she getting high at the restaurant?

A.  No.

Q.  Finally, about this 29th birthday, you indicated that you and Cassie went into her bedroom and started packing a duffle bag, correct?

A.  Correct.

Q.  She started packing sex toys in that duffel bag, correct?

A.  Yeah.

Q.  And this was in her bedroom, correct?

A.  Correct.

Q.  In her house, correct?

A.  Correct.

Q.  To be clear, she had in her house in her bedroom a duffle bag, and she had sex toys in that duffel bag.

A.  Correct.

Q.  And you helped her pack that.

A.  Correct.

Q.  Then she grabbed some cash, correct?

A.  Correct.

Q.  And she took the cash with her when he left, correct?

A.  Yes.

P5TMCOM2                        Nash - Cross

Q.  And it was a thousand dollars, correct?

A.  I don't remember.

Q.  Well, she had cash in her house, right?

A.  Correct.

Q.  And she took that cash with her with the duffle bag, correct?

A.  Yes.

Q.  Now, Mr. Combs didn't -- Mr. Combs didn't tell her to grab a bag for the sex toys, correct?

A.  That's what they came to the house for.

Q.  That's not my question.

When you were sitting there, and you testified yesterday, you didn't -- you didn't hear Mr. Combs tell her, hey, go grab a bag full of sex toys, correct?

A.  No.

Q.  You didn't hear Mr. Combs say, hey, go grab some cash, correct?

A.  No.

Q.  She went and decided to go get the cash herself, right?

A.  Possibly.

Q.  To go on the golf cart to go someplace else, correct?

A.  Yes.

Q.  This was late at night, correct?

A.  Correct.

Q.  And this was her cash, correct?

P5TMCOM2                          Nash - Cross

A.  Correct.

Q.  I want to talk about Las Vegas, New Year's Eve 2017.  Do you recall that testimony from yesterday?

A.  Yes.

Q.  You mentioned that you had flew into Las Vegas because the whole crew was there, correct, staff, everybody was there, correct?

A.  Yes.

Q.  This was New Year's Eve 2016 into 2017, correct?

A.  Yes.

Q.  When you were present with them in Vegas, I believe you said you were on the floor with the whole group, and Mr. Combs had a room on one side of the floor, everyone else was on other side of the floor, correct?

A.  Correct.

Q.  Now, you also mentioned that when you got to the hotel room Cassie was asleep -- you were told that Cassie was asleep all day, correct?

A.  Correct.

Q.  Then at some point in time Cassie and Mr. Combs left to go out, correct?

A.  Yes.

        MR. DONALDSON:  Can we put up 47 for the witness and parties only, Defense Exhibit 47.

Q.  Mr. Nash, do you recognize this?

P5TMCOM2                          Nash - Cross

A.   Yes.

Q.   What do you recognize that to be?

A.   Cassie.

Q.   That's Cassie at New Year's Eve 2016/2017 in Vegas?

A.   Correct.

        MR. DONALDSON:  I would like to move that into evidence as Defense Exhibit 1847.

        MS. COMEY:  No objection.

        THE COURT:  Defense Exhibit 1847 will be admitted.

        (Defendant's Exhibit 1847 received in evidence)

        MR. DONALDSON:  You can publish that, please.  Thank you.

        You can take that down for a second.

        Could you please put up Defense Exhibit 1848 for the parties and the witness only.

Q.   Mr. Nash, do you recognize that?

A.   Yes.

Q.   Who do you recognize that to be?

A.   Puff and Cassie.

Q.   Is that from the New Year's Eve 2016/2017.

A.   Yes.

        MR. DONALDSON:  I'd like to have this moved into evidence as Defense Exhibit 1848.

        MS. COMEY:  No objection.

        THE COURT:  1848 will be admitted.

(Defendant's Exhibit 1848 received in evidence)

MR. DONALDSON:  Please publish to the jury.

Take that down.  Thank you.

Q.  Now, in this hotel room on New Year's Eve, in Vegas, with you and Cassie was a producer by the name of Holladay, correct?

A.  Correct.

Q.  This is the low-budget guy you talked about yesterday.

A.  Yes.

Q.  At some point in time Mr. Combs and Cassie came back, correct?

A.  What do you mean?

Q.  They left the hotel room and then they came back to the hotel room?

A.  No.  We all left together and came back together.

Q.  I didn't know that.

When you woke Cassie up to leave, you, Cassie, and Mr. Combs and Mr. Holladay all left together?

A.  And other people.  The whole team.  Everybody went out.

Q.  Went out for whatever activities were designed for this Bad Boys staff New Year's Eve thing, correct?

A.  Correct.

Q.  That's why you all were there to do that, correct?

A.  To get her dressed, yes.

Q.  At some point you all came back to the hotel, correct?

A.  Correct.

Q.  And then you, Cassie, and Puffy -- Mr. Combs and Mr. Holladay bent back to Mr. Combs' room, correct?

A.  Correct.

Q.  And at that time you and Mr. Holladay and Mr. Combs and Cassie were sitting around listening to music and just enjoying yourself, correct?

A.  Correct.

Q.  I believe you said on direct at some point Cassie told you that -- could you leave because we want to do -- bring a man over, correct?

MS. COMEY:  Objection.  Misstates the testimony.

THE COURT:  Mr. Donaldson, why don't you rephrase the question.

Q.  At some point Cassie asked you to step out of the room because a man is being invited over, correct?

A.  Yes.

MS. COMEY:  Objection.  Misstates the testimony.

THE COURT:  It's overruled.

Q.  That's yes, correct?

A.  Yes.

Q.  And she told you that Mr. Holladay was still there, correct?

A.  Yes.

Q.  She told you that in front of Mr. Holladay?

A.  Yeah.  While he was asleep right next to me snoring.

P5TMCOM2                        Nash - Cross

Q.  Then she woke him up too, correct?

A.  Yes.

Q.  Then asked you both to leave, correct?

A.  Yes.

Q.  So that another man could come over, correct?

A.  Correct.

Q.  And I believe on direct your reaction to that was a sigh, correct?

A.  Yes.

Q.  Not a, what are you doing, girl?  You didn't say, what are you doing, girl.  Correct?  You just left the room, correct?

A.  Yes.  I was exhausted.

Q.  You had at that time no concern about Cassie's safety, correct?

A.  I always did.

Q.  You always had concern about safety.

A.  Yes.

Q.  In this situation you left the room anyway, correct?

A.  Yes.

Q.  Then I believe you said at some point in time you were walking around the hallway and you saw a man knocking on the door, correct?

A.  Correct.

Q.  This man was inside the room, correct?

A.  Correct.

P5TMCOM2                       Nash - Cross

Q.  But you didn't know who let him in?

A.  No.

Q.  Before you left the room you didn't see any drugs or all types of things spread around Mr. Combs' room, correct?

A.  There were drugs because we were doing them.

Q.  Who was doing them?

A.  Me, Puff, Cassie, and Rob.

Q.  You all were doing drugs together?

A.  I mean, in our own separate places.

MR. DONALDSON:  One second, please, your Honor.

Q.  How much time passed between you leaving and you seeing someone knocking on the door?

A.  I don't remember.

Q.  Approximately.

A.  I don't remember.

Q.  Fifteen minutes, 20 minutes, half hour?

A.  I don't know.  Once I started working, I just start going, and I probably had about 10 huge body bags to pack, so I don't know.  That usually takes me about two hours, so somewhere in that time frame.

Q.  Somewhere within two hours?

A.  Yes.

Q.  You saw Cassie afterwards, correct?

A.  No.  They went straight to Mexico.

Q.  You didn't see her afterwards?

A.  No.

MR. DONALDSON:  One second, please.

Q.  Did you speak to her afterwards?

A.  Yes.

Q.  When did you speak to her?

A.  When they were on the flight maybe.

Q.  When you say on the flight, you said they went to Mexico?

A.  Yes, I think so, something like that.  Valley or something.

MR. DONALDSON:  Could you pull up DX-1821, please.

Q.  When you said they went to Mexico, this was in the beginning of January 2017, correct?

A.  Correct.

Q.  And this is them going to a hotel or resort, correct?

A.  Correct.

Q.  This is another one of those situations where she went to a hotel but didn't tell you she didn't want to go, correct?

A.  Actually, she did tell me that she would rather stay home and work on her music and that -- because she seen a comment online, and they told her, girl, you always on vacation.  And she said that she don't always want to go on vacation.  She wants to work.  This was a vacation that she did tell me that she didn't want to go on; not because of the freak-off, but because she wanted to work.

Q.  I am going to be the green person in this exhibit and you be the blue person, all right.

Reading again:  Puff is mad at me.  Of course.

A.  Y'all need to enjoy y'all trip.  Get back to the bullshit later.  Enjoy y'all time together.  Y'all don't get this much.

Q.  It's not bull.  This is the bitch I am gonna be this year. He can stay or go.

A.  That's right, Cassie.

Q.  I am just annoyed because he is only nice when he gets what he wants.

A.  I'm riding with her.  Not mad at the post at all, WhatsApp post at all.  Just got a charge on my phone.  Have fun and enjoy what you can of the trip.  Y'all call me if you need me.

Q.  Before we get to that, on the first page where it says, enjoy y'all time together, y'all don't get this much, you see that?

A.  Yes.

Q.  That's you telling Cassie, in January of 2017, that her and Puff needs to enjoy their time together, correct?

A.  Yes.

Q.  And that's you as her best friend letting her know that, from your advice as a best friend, she needs to enjoy the time away with Puffy on this vacation, correct?

A.  Correct.

MR. DONALDSON:  Let's go back to the second page.  I am going to read where it says:

Q.  Thank you.  I will.  Wish you were here.  I'm glad that I

did my classy clap back.  Puff was all aggy.  But I spoke up for myself.  I'm happy.

A.  I wish I was there too.

Q.  And this is you saying that you wish you were with them on the vacation, correct?

A.  No.  Like in Mexico.  Not with them.  On the vacation.  No not with them.

Q.  In Mexico?

A.  Yes.

MR. DONALDSON:  Go to the next page.

Q.  Blue part.  Top left.

A.  Y'all having fun.

Q.  Then I think the green part.  Cassie, I sent some pictures.  You say what?

A.  You look beat.  What's your tea.

Q.  When you say you look beat, that means you're referring to pictures that she just sent you where she looks really good in the pictures, correct?

A.  Oh, yeah.

Q.  Then it says:  Sleeping in the room I showed.  LOL.

That means she showed you pictures of her sleeping in a hotel room, correct?

A.  I'm not sure.  I think she maybe showed me a picture of the room.  She is saying, I'm sleeping in the room that I showed you kind of thing.

Q. You go, up top right.

A. LOL.  It looks so bomb.

Q. We're moving rooms at 10 p.m., but the other one is better and on the beach.  This one is kind of on a golf course.  I was told I'm the assistant.  You would butt out on how organized I have everything.

A. LOL.  Do y'all have a lot of shit?

Q. I definitely do, but we made it all fit and it's hung and organized.

A. What time is it there?

Q. 4:31.

MR. DONALDSON:  Next page.

A. Oh.  You only an hour off.  I was thrown off.  We was up all night.  Girl, you always on vacation.

Q. I know.  God let's me because I put up with a lot of BS.

This is Cassie and Puff away on a vacation after the New Year's thing in Vegas, correct?

A. Correct.

Q. This is after a man was invited to the hotel room, correct?

A. Correct.

Q. So immediately after a man was invited to the hotel room Puffy and Cassie are on vacation in Mexico, correct?

A. Correct.

Q. And, apparently, based upon your text messages with her, she is enjoying herself, correct?

P5TMCOM2                          Nash - Cross

A. Yes.

Q. Now, you indicated that you ended your relationship or your professional relationship with Mr. Combs in 2018, is that right?

A. Correct.

Q. But you stayed in contact with him, correct?

A. Correct.

Q. When I say stayed in contact with him, you checked in on him at times, correct?

A. We checked in on each other, yes.

Q. You checked in on him, he checked in on you, correct?

A. Correct.

Q. And you would call him or text him to see how he was doing, correct?

A. Yeah. Because he was cutting up.

Q. You would call him -- cutting up. I got it. You would call him or text him to see how he was doing. That's a yes or no answer.

A. Yes.

Q. In fact, there was this seafood fest that I believe you did for your birthday at Cassie's house, correct?

A. Correct.

Q. You invited him over to that, correct?

A. Yes.

Q. And you -- before you did that, he asked you, was it OK

P5TMCOM2                          Nash - Cross

with Cassie, correct?

A.   Correct.

Q.   And you said yes, correct?

A.   Correct.

Q.   And in September of 2018 -- strike that.

         MR. DONALDSON:   Could you put up DX-1814, please,
Defense Exhibit 1814.

Q.   This is a text message between you and Mr. Combs, correct?

A.   Yes.

Q.   This is in October of 2018, correct?

A.   Yes.

Q.   This is a month or two months after you all ended the
relationship, correct?

A.   Correct.

Q.   I'll be the green person.  You be the blue person.  Green
being Mr. Combs and you being you, all right?

A.   Um-hum.

Q.   Is that a yes?

A.   Um-hum.

Q.   That's a yes?

A.   Yes.

Q.   Mr. Combs:  Please call me.  No drama.  It's important.

A.   I just got here.  She's knocked out.

Q.   Damn.  Wake her up.  I'm concerned.  How is she?

A.   She got up and laid back down.  We hear you, but when she

P5TMCOM2                          Nash - Cross

gets up I'll call you.

Q.   That's Mr. Combs and you expressing -- or Mr. Combs

expressing concern about Cassie, correct?

A.   I guess so, yes.

Q.   This is in October 2018, correct?

A.   Yes.

Q.   And you know who Kim Porter is, correct?

A.   Yes.

Q.   She unfortunately tragically passed back in late 2018?

A.   Yeah.

Q.   You were aware of how close Mr. Combs was to Ms. Porter,

correct?

A.   Absolutely.

Q.   And you respected that, correct?

A.   Absolutely.

Q.   And you respected him and his family, correct?

A.   Absolutely.

Q.   When Ms. Porter died, you then reached out to Mr. Combs,

correct?

A.   Absolutely.

Q.   And you wanted to let him know that you were there for him

during that time period, correct?

A.   Yes.

Q.   Because you cared for him and his family, correct?

A.   Correct.

Q. You know who Andre Harrell is, correct?

A. Yes.

Q. You remember when he passed as well, correct?

A. Yes.

Q. You remember how close Mr. Combs was to Mr. Harrell, correct?

A. Yes.

Q. Same thing, you at that time -- this was well after 2018, correct?

A. Correct.

Q. You reached out to Mr. Combs in that instance, correct?

A. Absolutely.

Q. Nothing about Cassie, correct?

A. At that time.

Q. Nothing about the business, correct?

A. I have never spoken to Mr. Combs, and he has hasn't asked about Cassie.

Q. You have never spoken to Mr. Combs. He hasn't asked how Cassie was doing, correct?

A. Correct.

Q. And when Mr. Harrell died you called Mr. Combs or texted Mr. Combs to, again, make sure he was OK, correct?

A. Yes.

Q. Make sure he was all right, correct?

A. Absolutely.

P5TMCOM2                          Nash - Cross

Q.  Because you knew that he was close to Mr. Harrell, correct?

A.  Correct.

MR. DONALDSON:  One second, please, your Honor.

Would you put up Defense Exhibit 1824.

Q.  You be the person in blue.  That's yourself.  I'll be the person in green.  That's Mr. Combs.

You go first.

A.  Sending you my love.

Q.  This was January 18, 2019?

A.  Yeah.

Q.  He says:  Yeah, right, nigga.  You -- we was fam, disappointed.  Still got love.  All good.

A.  Uh-uh, Puff.  Don't do that.  My love for you don't have nothing to do with anything else.

Q.  Naw, nigga.  The trainer, the trainer.  In my Soulja Boy voice.  Damn.  Could have given a nigga a heads-up.  The trainer, question mark, shaking my head.  And then laughing emojis.

A.  Yes.

Q.  Oh, now you quiet.  We'll always be cool.  No love lost.  Love you girl.  Black heart.  But on a real note, how is she?  Please make sure she is all right.  And if she ever needs me, make sure you call me.  Fuck that.

That was the message between you and Mr. Combs, correct?

A.  Yes.

Q.  When he said, how is she, make sure she is all right, he's talking about Cassie, correct?

A.  Correct.

Q.  That's when you said earlier that, whenever you all speak, he's asking genuinely how she is doing, correct?

MS. COMEY:  Objection.  It misstates the testimony, your Honor.

THE COURT:  Let's get a new question, Mr. Donaldson.

MR. DONALDSON:  Sure, Judge.  Take that down, please.

Q.  When is Mr. Combs' birthday?

A.  I don't know.

Q.  November 4, 2019 sound familiar?

A.  Yeah, maybe.

Q.  You reached out to him on his birthday as well, correct?

A.  Absolutely.

MR. DONALDSON:  Would you put up Defense Exhibit 1829.

A.  Is there a way I can see the whole text message?

Q.  No.  Sorry.  I'm not being whatever.  This is just the evidence we have right now.

A.  It says:  I love you brother and anything you need I got you.

Q.  This was on May 9, 2020, correct?

A.  Correct.

Q.  This was two years after your professional relationship

ended with Mr. Combs, correct?

A. Correct.

Q. 2022 you were still communicating with Mr. Combs, correct?

A. Um-hum.

Q. Is that a yes?

A. Yes.

Q. In fact, that year Mr. Combs put out a song, correct?

A. Yes.

Q. I believe he won some type of award, I believe it was, right?

A. Yes.

Q. And you congratulated him on that, correct?

A. I don't think so.

        MR. DONALDSON:  Can we put up DX-18 -- Defense Exhibit 1835.

A. OK.  Hey.  How do I RSVP for your party.  I sent that text for someone else, but that's fine.

Q. This is you sending a text to Mr. Combs asking how do you RSVP for his party, correct?

A. Correct.

Q. You're saying now, though, at trial that that was you asking him to RSVP for somebody else for his party.

A. Yes.  For Claire Summers.

        MR. DONALDSON:  Can I have one second, please, Judge?

        THE COURT:  You may.

MR. DONALDSON:  Can we put up 1818, please, Defense Exhibit 1818.  Can we go to page 2, please.  Can we highlight the second part, the second green line.  First green line.

Q.  Mr. Nash, you indicated that between 2008 and say 2013, '14, you had no idea that Ms. Cassie Ventura was doing or having relationships with other men and Mr. Combs at the same time.  Do you recall saying that?

A.  Correct.

Q.  You recall saying that because -- and you all spoke every day, right?

A.  Yes.

Q.  So that part of her life was kept secret from you, correct?

A.  Yes.

Q.  So when you said back on January 3, 2016, she was going on a secret trip, that was another secret from you, correct?

A.  I'm sure when she came home.

Q.  No.  I'm not asking that.

I'm asking, on January 3 of 2016, she was, again, going on a secret trip, correct?  She specifically said, a secret trip, correct?

A.  Yeah.

MS. COMEY:  Your Honor, I'm going to object to the way this is being used.  This is referring to our --

THE COURT:  I understand.

MR. DONALDSON:  You can take it down, Judge.

THE COURT:  Sustained.

Q.  You deeply care for Cassie, correct?

A.  Correct.

Q.  And you have deeply cared for her for about 15 years, correct?

A.  Correct.

Q.  But you understand, though, for a significant part of that time she kept major secrets from you.

A.  I keep some from her.  We don't have to tell each other everything.

Q.  But you do acknowledge she kept major secrets from you, correct?

A.  Some.

Q.  Correct, yes?

A.  OK.

THE COURT:  Anything further?

MR. DONALDSON:  No.

MS. COMEY:  Briefly, your Honor.

THE COURT:  Ms. Comey.

MS. COMEY:  Thank you.

REDIRECT EXAMINATION

BY MS. COMEY:

Q.  Mr. Nash, just a few questions for you, please.

A.  OK.

Q.  First, on cross-examination do you remember saying that you

always had concerns for Cassie's safety?

A.  Yes.

Q.  Why did you always have concerns for Cassie's safety if she also told you that she was happy at times with Mr. Combs?

MR. DONALDSON:  Objection.

THE COURT:  Overruled.

A.  Because it can go from happy to chaotic in a split second.

Q.  How do you know that?

A.  Because he had done it in front of me.

Q.  How many times?

A.  Quite a few.

Q.  And when it went from happy to chaotic in front of you, what had you seen happen?

A.  Him be violent.

Q.  To who?

A.  Her or me.

Q.  Do you remember being asked on cross-examination about your conversation in the car after Mr. Combs threatened to release tapes of Cassie?

A.  Correct.

Q.  What do you remember Cassie saying to you about what devices Mr. Combs had used to record those videos?

A.  Her phone.

Q.  Do you remember her also mentioning Mr. Combs' devices?

A.  No.

MS. COMEY:  Can we pull up, please, the piece of 3500 that Mr. Donaldson showed on this point.  May I ask defense counsel to help me with that, please.

MR. DONALDSON:  Yes.  It's 3514.

Q.  I'm showing you 3514-10, page 2, the same thing that Mr. Donaldson showed you.  Can you just take a look at that.  Please don't read it out loud.  Can you take a look, please, at the very last sentence, please.  Read it to yourself.

A.  Um-hum.

MS. COMEY:  We can take that down, thank you.

Q.  Does that refresh your recollection that Cassie told you that Mr. Combs used both her devices and Mr. Combs' devices to record her having sex with other men?

A.  I remember her devices, but that was the focus at the moment.

Q.  Do you recall being asked on cross-examination about Cassie's 29th birthday?

A.  Yes.

Q.  Do you recall being asked about whether you had told the government about Mr. Combs wanting her to go to the hotel or making her go to the hotel?

A.  Correct.

Q.  Was your first meeting with the prosecutors in July of 2024, approximately?

A.  Maybe.

P5TMCOM2                          Nash - Redirect

MS. COMEY:  Can we please pull up 3514-002, page 3, the bottom paragraph, just for the witness and the parties, please.  Can we please highlight the second sentence and the third sentence and the fourth sentence of that paragraph.

Q.  Could you just read that to yourself, please.

MS. COMEY:  I'm sorry.  That highlighting is not getting the sentences I'm asking for.  I'm sorry.

Q.  Let me know when you've read it, and we can take it down.

A.  OK.

MS. COMEY:  You can take that down.  Thank you.

Q.  Does that refresh your recollection that at your very first meeting with prosecutors you told prosecutors that during Cassie's 29th birthday Mr. Combs wanted her to leave?

A.  Yes.

Q.  Focusing still on the 29th birthday, do you remember being asked questions about drug use and whether Mr. Combs and Cassie had used drugs that night, on cross-examination?

A.  Repeat the question.

Q.  Do you remember being asked on cross-examination about whether Mr. Combs and Cassie appeared high on the 29th birthday?

A.  Yes.

Q.  I want to focus on Mr. Combs.  Did he appear to understand what was going on around him throughout the 29th birthday party?

P5TMCOM2                    Nash - Redirect

A.  Yes.

Q.  Did he appear to be in control of himself and his faculties throughout the 29th birthday?

A.  Yes.

Q.  What did you hear him say at Cassie's apartment that Cassie was going to do that night?

A.  Yo, girl, you are going to get some dick tonight.

Q.  What did Cassie tell you that same night about whether she wanted to go with Mr. Combs to a hotel?

MR. DONALDSON:  Objection.

THE COURT:  Overruled.

A.  She didn't want to go.  She wanted to hang with us.

MS. COMEY:  No further questions.

THE COURT:  Thank you, Ms. Comey.

Mr. Donaldson, anything further?

MR. DONALDSON:  Absolutely not.  Thank you, Judge.

THE COURT:  Thank you very much, Mr. Nash.  You're done.

A.  Thank you.

(Witness excused)

THE COURT:  The government may call its next witness.

MS. SMYSER:  Your Honor, the government calls Mia.

As we do, we just ask that your Honor remind everyone here and in the overflow room that there shouldn't be any recording.

P5TMCOM2                          Nash - Redirect

THE COURT:  First, for the jury, you are about to hear from a witness testifying using a pseudonym.  That is not using her real name.  The government, the defense, the Court, and you, the jury, will know her real name, but the name will not be used in open court, solely to protect her privacy from disclosure to persons who are not parties to this case.

The fact that this witness is testifying using a pseudonym does mean that her testimony is deserving of greater or lesser weight than that of any other witness.

I will further remind everyone in this courtroom and in the overflow courtrooms that they are not to in any way, shape, or form document the witness in any notes or in any sketches or anything of that kind.  The courtrooms will be monitored by court security.  Any use of devices or any documenting of the witness' appearance or anything of that nature will result in severe consequences.

With that, Ms. Smyser.

MS. SMYSER:  Thank you, your Honor.

MR. DONALDSON:  Your Honor, may I grab that binder?

THE COURT:  Yes, you may.

MIA,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

THE COURT:  Ms. Smyser, you may proceed when ready.

MS. SMYSER:  Thank you, your Honor.

P5TMCOM2                          Mia - Direct

DIRECT EXAMINATION

BY MS. SMYSER:

Q.  Good morning, Mia.

A.  Good morning.

Q.  Could you please state and spell the name under which you are testifying?

A.  Mia, M-i-a.

Q.  Mia, have you asked to testify under a pseudonym to protect your privacy?

A.  Yes.

Q.  I am going to show you what's been marked for identification as Government Exhibit 3T-113 just for the witness only.

        THE COURT:  Ms. Comey, is there an issue?

        MS. COMEY:  I just wanted to make sure that the screens in the overflow room are turned off for this exhibit, your Honor, only.

        THE COURT:  Can I ask the deputy, is there a way to confirm that?

        THE DEPUTY CLERK:  That is confirmed, your Honor, so long as the monitor is also disabled.

        MS. COMEY:  Thank you so much, your Honor.

        THE COURT:  Ms. Smyser.

        MS. SMYSER:  Thank you, your Honor.

Q.  Do you see that Mia?

P5TMCOM2                         Mia - Direct

A.   Yes.

Q.   Do you recognize this?

A.   Yes.

Q.   What is it?

A.   My passport.

          MS. SMYSER:   Your Honor, the government offers Government Exhibit 3T-113 under seal pursuant to the Court's pseudonym order.

          THE COURT:   3T-113 will be admitted under seal.

          (Government Exhibit 3T-113 received in evidence)

Q.   Mia, is the name on this exhibit your true name?

A.   Yes.

Q.   Is the date of birth on this exhibit your true date of birth?

A.   Yes.

          MS. SMYSER:   And before we move on, could you please display that for the jury only.

          MR. STEEL:   May I ask a question, your Honor?

          THE COURT:   Do you need a sidebar, or can you ask this question in open court?

          MR. STEEL:   I believe so.   It's not on our monitor either.

          THE COURT:   Yes, that's correct.   Do you need to see it?

          MR. STEEL:   I would like to.   I know what it is, this

P5TMCOM2                          Mia - Direct

one, but I would like to in the future, yes.

THE COURT:  Do we have a copy of it?

MS. COMEY:  I have an iPad that I can provide to Mr. Steel that will have it.  I'll pull it up for him now, if Mr. Steel is OK with us proceeding while I do that.

THE COURT:  Ms. Smyser.

MS. SMYSER:  Thank you, your Honor.

You can take that down now.

Q.  Mia, where are you from?

A.  Virginia Beach, Virginia.

Q.  How far did you go in school?

A.  Bachelor's degree.

Q.  What was your degree in?

A.  Studio art.

Q.  I am going to show you what's in evidence as Government Exhibit 2A-101.

MS. SMYSER:  It's fine to reconnect the feed.

Q.  Do you recognize who is depicted here?

A.  Yes.

Q.  Who is that?

A.  Sean Combs.

Q.  Do you know Mr. Combs by any other names?

A.  Yes.

Q.  What names do you know him by?

A.  P. Diddy, Diddy, Puff Daddy, Puffy, Puff, PD, Mr. C.

Q.   What did you call him?

A.   Puff.

Q.   How do you know Mr. Combs?

A.   I worked for him.

Q.   When you worked for him, did Mr. Combs give you one title or more than one title?

A.   More than one.

Q.   How many?

A.   Two.

Q.   What were those two titles?

A.   Personal assistant and then director of development and acquisitions for Revolt Films.

Q.   We will discuss each of those roles in a moment, Mia.

But, first, at a high level, could you describe what the work environment was like when you were working for Mr. Combs.

A.   It was chaotic, it was -- could be toxic, it could be exciting.  The highs were really high and the lows were really, really low.

Q.   What determined what the environment was like on a particular day?

A.   Puff's mood.

Q.   How often did Mr. Combs' mood shift?

A.   All the time.

MS. SMYSER:  You can take that down, Ms. Foster.

P5TMCOM2                          Mia - Direct

Q.  Mia, was Mr. Combs ever violent toward you?

A.  Yes.

Q.  What are some of the violent things that Mr. Combs has done to you.

A.  He has thrown things at me.  He has thrown me against the wall.  He has thrown me into a pool.  He has thrown an ice bucket on my head.  He has slammed my arm into a door.  He has also sexually assaulted me.

Q.  Did Mr. Combs sexually assault you on one occasion or more than one occasion?

A.  More than one.

Q.  We will talk about this violence in more detail later, Mia.

Before we get there, I want to talk a little about your work experience before getting a job with Mr. Combs.

What were your career goals when you left college?

A.  I really loved storytelling and film and TV, especially comedy, and I really wanted to be a writer and a performer, but I didn't know how to do that because this was like a different era, before social media or iPhones or access.

So I thought I could just put a mattress on the top of my car and move to New York City and get a job somehow in the entertainment industry and work really, really, really hard, and maybe in like 10 years I would have had the education and experience to navigate that world to make whatever those dreams were come true.

P5TMCOM2                        Mia - Direct

Q.  At some point did there come a time when you got a job in the entertainment industry?

A.  Yes.

Q.  Where was that for initially?

A.  First was for Georgina Chapman, who was the owner and designer of Marchesa.

Q.  Who were Georgina's Chapman's clients?

A.  It was all like red-carpet celebrity dressing.

Q.  Where did you work next?

A.  I worked for the comedian Mike Myers.

Q.  What did you do for Mike Myers.

A.  I was his personal assistant.

Q.  Who did you work for after Mike Myers?

A.  Puff.

Q.  Approximately when did you begin working for Mr. Combs?

A.  2009.

Q.  In what year did you leave Mr. Combs' companies?

A.  2017.

Q.  I want to talk some about when you first got the job with Mr. Combs.  How old were you when you applied to work for him?

A.  When I applied I was either 25 or just turned 26.

Q.  Where were you living at the time?

A.  In New York City.

Q.  Where was Mr. Combs' business located then?

A.  He was also in New York City.

P5TMCOM2                        Mia - Direct

Q.   What were the steps in the hiring process?

A.   I met with a recruiter multiple times, and then I had
multiple interviews with the head of HR, Vashta Wilson.  Then,
after that, I had an interview with his chief of staff and
executive assistant and head of personal finance.

Q.   Who was his chief of staff at the time?

A.   Her name was Ellie Nieves.

Q.   What about the executive assistant?

A.   Karleen Roy.

Q.   Finally, who was the person in personal finance?

A.   Toni Bias Fletcher.

          MS. SMYSER:  Ms. Foster, could you please pull up
what's in evidence as Government Exhibit 2A-305.

Q.   Who is this, Mia?

A.   That's Toni Bias Fletcher.

Q.   Did Ms. Fletcher have any other titles when you were there?

A.   Yes.

Q.   What?

A.   Chief of staff.

          MS. SMYSER:  You can take that down, Ms. Foster.

Q.   Mia, were you ever interviewed by Mr. Combs himself?

A.   Yes.

Q.   Where did that interview take place?

A.   At his apartment.

Q.   Did anyone accompany you to his apartment?

P5TMCOM2                          Mia - Direct

A.   Yes.

Q.   Who?

A.   Vashta Wilson.

Q.   The head of human resources?

A.   Yes.

Q.   What happened when you got to Mr. Combs' apartment?

A.   He answered the door on the phone.

Q.   Who answered the door?

A.   Sorry.  Puff.

Q.   What was he wearing when he answered the door?

A.   His underwear.

Q.   What did Vashta do when Mr. Combs answered the door in his underwear?

A.   She just introduced me and then left.

Q.   Did Mr. Combs eventually put on clothes?

A.   Yes.

Q.   Who else was around for the interview?

A.   Derek, his stylist at the time, was in the apartment.

Q.   What's Derek's last name?

A.   Roche.

Q.   Did you ultimately get the job?

A.   Yes.

Q.   How did you feel about getting the job?

A.   I was so excited and just -- I was so excited, so nervous, but -- and just really eager and excited, I guess.

P5TMCOM2                          Mia - Direct

Q.   When you took the job, how much did you expect to work?

A.   I was explained that it would be a lot.  There were a few jokes about 24-hour nail salons thrown in.  But I guess I didn't fully understand.  Yeah.  I did expect to work more than an average job.

Q.   Did you expect to work 24/7?

A.   I thought that was like probably physically impossible, but, yes.  So not literally, but --

          (Continued on next page)

P5TACom3                          Mia - Direct

BY MS. SMYSER:

Q.  How much had you worked for Mike Myers?

A.  He also said 24/7.  But really, I just, I mean, maybe every once in a while I would get a call at 7:00 or maybe on the weekends I would have to watch his dog, but it was pretty much 10:00 to 6:00 every day, Monday through Friday.

Q.  Were you supposed to have any days off with Mr. Combs?

A.  Yes.

Q.  Did you expect to work on the weekends?

A.  Not every weekend.  I thought that there would be like a rotation of assistants.  But I didn't expect not to work at all on weekends if that makes sense.

Q.  What was your base salary when you started as a personal assistant?

A.  Well, I was told it was $55,000, but then it was -- it turned out to actually be $50,000.

Q.  And when you started the job, how many hours a week did you understand that you were expected to work to earn your salary?

A.  Forty.

Q.  How often did you work more than 40 hours a week?

A.  Every week.

Q.  And how were you supposed to be compensated when you worked more than 40 hours a week?

A.  Paid overtime.

Q.  I want to talk about your first day at work, Mia.

P5TACom3                         Mia - Direct

What's the first thing you did on your first day of work for Mr. Combs?

A.  I went to the office, and Vashta told me that I probably wouldn't see Puff for the next two weeks while I was on trial, and I was going to get accustomed to the office and sort of all the things that went into making his life run smooth.

Q.  Let me just pause you there, Mia.

You said while you were on trial.  What do you mean by that?

A.  It was -- Vashta had said that there were so many people vying for this position, that they had to -- they had a trial period that would last two weeks to see if you, I guess, like had what it took essentially.

Q.  And where did Vashta tell you to go?

A.  To his Alpine, New Jersey house.

Q.  And what did you do at the Alpine house, just at a high level?

A.  They told me, I don't know, to do like some sort of inventory or take note of what needed attention.

Q.  Did you go there?

A.  Yes.

Q.  Approximately how long were you at the Alpine house?

A.  I was there all day.  I left when it was dark out, but it wasn't super late.  Like, maybe like, yeah, just had been dark out.

P5TACom3                    Mia - Direct

Q.   And where did you go after the Alpine house?

A.   Back to the office.

Q.   And how long were you at the office?

A.   Probably like a few hours or -- it didn't feel super long. Yeah.

Q.   And what time is it around this time?

A.   For some reason I feel like it was maybe 10:00 when I left because I just was meeting with new people and learning more stuff.

Q.   Where did you go after that?

A.   Home.

Q.   Did you make it home?

A.   No.

Q.   Why not?

A.   Vashta called me and said that Puff wanted me to come to the studio.

Q.   What did you do after you got the call?

A.   I went straight to the studio.

Q.   How long were you at the studio?

A.   Until about like 1:00 the next day in the afternoon.

Q.   Did you get to go home after that, after being at the studio until 1:00 p.m. the next day?

A.   No.

Q.   Where did you go instead?

A.   Puff's apartment.

P5TACom3                        Mia - Direct

Q.   And what did you have to do there?

A.   I was learning the -- we all -- so like his security and his assistants and whoever needed to -- whenever Puff was ready to essentially settle in, you went back and made sure and had everything he needed, and they were showing me how you set up and, yeah.

Q.   And when did you get to go home?

A.   A few hours after that.

Q.   How long were you able to be home before you had to return to work?

A.   I don't remember the exact amount of time.  I just remember being too nervous to risk it by, like, taking a nap because I -- like, the time period wasn't that long.  So essentially just to kind of rest and then get ready again.

Q.   So, Mia, how much did you sleep during your first 24 hours on the job?

A.   I didn't.

Q.   What did you think about that?

A.   I sort of took it as like a challenge or maybe this was just for the trial period.  Or maybe it was a -- I don't know.  It was kind of like is this how it is?  But, you know, there had been a TV show two years prior called I Want to Work for Diddy, where it looked like this fit the norm.

          So I don't know.  I thought maybe it was a part of the trial.

P5TAcom3                         Mia - Direct

Q.   When you were working for Mr. Combs, how often were you
required to go without sleep?

A.   All the time.

Q.   What if any expectations did you have about when you would
be able to sleep next?

A.   That was the thing, I didn't.  I can usually power through,
but like I remember when I was younger, waking up for school,
being tired, I would be like, okay, Mia, you get out at 3:00,
you can sleep then --

          MR. STEEL:  Nonresponsive, your Honor.

          THE COURT:  It's overruled.

Q.   You can continue.

A.   I remember thinking, like, let's say I had been awake for
two days or something, I didn't have anything to hold onto
because I didn't have an idea of when that could happen -- when
I could go to sleep.

Q.   What was the longest period of time you went without sleep
because of your work for Mr. Combs?

A.   Five days.

Q.   Generally, what were you doing in those five days?

A.   Working.  We were traveling.  I don't -- I just remember
the last part being in Las Vegas.  So there was always a
million things going on.  I remember he had club appearances,
but also he had a few impromptu music video sets, so you're
running around doing whatever needed to be done.

P5TACom3                      Mia - Direct

Q.   Were you taking any medication at the time that had the effect of helping you stay awake?

A.   Yeah.  I guess so.  I've had ADHD and I've been -- had a prescription since I was like 17 of -- I take Adderall, so that helped.

Q.   Were you taking any particular kind of Adderall at that time?

A.   Yes.  At that time, it was extended release.

Q.   And what if any effect did that extended release Adderall have on you?

A.   It would allow me to -- yeah, I guess it was much stronger than the normal.  So it allowed me to quasi function or stay awake.

Q.   Why did you finally get to go to sleep?

A.   I had a like physical and I guess -- I had like a physical breakdown.  Like I remember just like my hearing went, like it felt like I was underwater, and my equilibrium was off and I started like not seeing things, but like blurred vision or like lights that weren't there.  And then out of nowhere, like didn't mean to, but I burst into tears, hysterical, and like couldn't stop crying.

Q.   Did anyone tell you, you could go to sleep at that point?

A.   Yes.

Q.   Who?

A.   Puff.

P5TACom3                          Mia - Direct

Q.   Why did you not sleep before that?

A.   Because I was working.

Q.   All right.  Next I want to talk about some of your duties as a personal assistant.  But before I do that, I would like to direct your attention to the binder in front of you that's on the top there.

     And could you please flip in the binder to the tabs marked for identification as Government Exhibits 3A-119, 3A-150, 3T-101, 3T-102, 3T-103, 3T-105 through 108, C-508, H-115 and H-116.

     And could you please look up when you're done?

A.   Oh.  Sure.

Q.   Do you recognize these documents, Mia?

A.   Yes.

Q.   What, generally, are they?

A.   They are correspondence between me and Puff and me and people that worked with Puff -- for Puff.

Q.   And how do you know that?

A.   Because I recognize them and I also see, like, our e-mails or phone numbers.

Q.   Now, are they a fair and accurate representations of your communications with Mr. Combs and various employees?

A.   Yes.

     MS. SMYSER:  Your Honor, the government offers the exhibits that I just mentioned under seal pursuant to the

P5TACom3                      Mia - Direct

Court's pseudonym order.

THE COURT:  Any objections?

MR. STEEL:  Same objections we previously had we'll rely upon.  Otherwise...

THE COURT:  Understood.  Those exhibits will be admitted under seal.

(Government's Exhibits 3A-119, 3A-150, 3T-101, 3T-102, 3T-103, 3T-105 through 108, C-508, H-115 and H-116 received in evidence)

Q.  Mia, could you please now look through the other binder that's sitting to your left and look through that and look up when you're done.

And this binder contains what has been marked for identification as Government Exhibit 3A-119-R, 3A-150-R, 3T-102-R, 3T-103-R, 3T-105-R, 3T-106-R, 3T-107-R, 3T-108-R, C-508-R, H-115-R, and H-116-R.

Mia, do you recognize these documents?

A.  Yes.

Q.  What did you say?

A.  Yes.

Q.  Are they redacted forums of the documents you just looked at in the other binder?

A.  Yes.

MS. SMYSER:  Your Honor, the government offers the exhibits I just listed into evidence.

P5TACom3                    Mia - Direct

THE COURT:  All right.  They will be admitted.

(Government's Exhibits 3A-119-R, 3A-150-R, 3T-102-R, 3T-103-R, 3T-105-R, 3T-106-R, 3T-107-R, 3T-108-R, C-508-R, H-115-R, and H-116-R received in evidence)

Q.  Okay.  You can set those binders to the side, Mia.

Now, I want to focus on some of your duties as a personal assistant.

MS. SMYSER:  Ms. Foster, could you please publish Government Exhibit 3T-106-R for the jury.

Q.  Mia, what is this?

A.  This was a -- just a brief informal list of things, some of the responsibilities or things that I did on a daily basis that was appropriate to put in an e-mail.

Q.  And who did you send this list of responsibilities to?

A.  To Toni Bias Fletcher.

Q.  When did you send it?

A.  I sent it on November 10th, 2011.

Q.  And why did you send this to Toni?

A.  Because I believe it was after a comment:  I don't even know what you do all day, comment from Puff.  And then Toni -- sorry.

Q.  So Mr. Combs asked what do you do all day; is that right?

A.  Yeah.  Just sort of a -- it was sort of like a threatening -- I don't know if it was a tactic, but Toni was like okay, well, let's just -- just send me this list so that

P5TAComm3                    Mia - Direct

this can't like -- this can't be said again, like.

Q.  Okay.  Let's focus on a few things that are in this document.

MS. SMYSER:  Ms. Foster, can you please highlight the line below the first paragraph that starts "all of."

Q.  Could you please read this, Mia?

A.  Yes.  All of PD's social media presence.

Q.  And who is PD here?

A.  Puff.

Q.  Did you help manage Mr. Combs' social media presence?

A.  Yes.

MS. SMYSER:  Ms. Foster, could you please now highlight where it says "main liaison" in the middle of the page.

Q.  And could you read that, Mia?

A.  Main liaison between PD and Hollywood.

Q.  Was that part of your job, too?

A.  It was.  It became that.

MS. SMYSER:  And could you please zoom out.  And, Ms. Foster, could you please highlight where it says towards the bottom of the page "PD's daily routine."

Q.  Mia, what does this say?

A.  PD's daily routine, keeping him on schedule, any request PD has either completing or making sure it's done by others.

MS. SMYSER:  Ms. Foster, could you please turn to page

two.

Q. Was everything on this page also a part of your job?

A. Yes.

MS. SMYSER: Ms. Foster, could you please highlight in the middle of the page where it says "protect him at all times." And could you highlight through the next three paragraphs.

Q. Mia, could you read this?

A. Yes. Protect him at all times. His privacy, etc. Stay attached to blackberry 24/7. Staying within PD's eyesight unless he advises otherwise always while on duty. Listening, asking, hearing, prioritizing and translating PD's situation.

Maintaining PD's daily routine in both professional and private circles from the minute he wakes up in the morning until the moment he falls asleep at night and even in the interim. Anticipating his needs, whims, and moods.

Q. Let me stop you there, Mia.

Why was it important to anticipate Mr. Combs' needs, whims, and moods?

A. Because it dictated -- it determined like the -- sorry. It dictated a day.

Q. Okay.

MS. SMYSER: Ms. Foster, could you please zoom out. Could you please highlight the bottom where it says "every single day is different."

P5TAСom3                    Mia - Direct

Q.   Could you please read this, Mia?

A.   Every single day is different.  PD can ask you to do 17,000 things at one time that range from cracking his knuckles, to writing his next movie, to doing his taxes.  He can also just have you standing next to him for 22 hours and not ask you one thing.

        MS. SMYSER:  Okay.  You can take down the exhibit, Ms. Foster.

Q.   Mia, when you started working for -- as a personal assistant for Mr. Combs, did you have an apartment?

A.   Yes.

Q.   Where was that apartment?

A.   It was in New York City.

Q.   How often did you stay there when you worked for Mr. Combs?

A.   Not very often.  My roommates always made a joke that they lived with a ghost.

Q.   Where were you staying if you weren't in your apartment?

A.   Wherever Puff was.

Q.   And what cities did Mr. Combs live when you were working for him?

A.   Besides New York, he lived in Los Angeles and Miami.

Q.   So focusing first on Los Angeles, where did you stay when you were in Los Angeles?

A.   When I first started, I stayed in the staff house, and then I was moved into Puff's house at 9933 Beverly Grove.

P5TAComg                    Mia - Direct

Q.   And focusing on Beverly Grove for a second, did Mr. Combs have that house before you started?

A.   Yes.

Q.   And approximately what years did Mr. Combs live in 9933 Beverly Grove when you were there?

A.   I believe he moved in 2010.

Q.   So 2009 and 2010?

A.   Yes.

Q.   And where did you live in LA after 9933 Beverly Grove?

A.   Then into his second house, 9374 Beverly Crest Drive.

Q.   What approximate years did Mr. Combs have that home?

A.   I think it was 2010 until 2014 I think.

Q.   Are you estimating?

A.   Yes.

Q.   At some point did you get your own apartment in Los Angeles?

A.   Yes.

Q.   Approximately when was that?

A.   I believe it was 2013.

Q.   And where did Mr. Combs move around 2014 when he moved out of the Beverly Crest house?

A.   Then he moved to Mapleton.

Q.   And what was the address there?

A.   I believe it was 200 South Mapleton Drive.

Q.   When Mr. Combs was in Miami, where would you stay?

P5TACom3                    Mia - Direct

A.  If I was lucky, the guest house.  If not, the main house.

Q.  Was that at Mr. Combs' home in Miami?

A.  Yes.

Q.  What was the address there?

A.  2 Star Island.

Q.  Mia, when you were in Mr. Combs' homes, were you able to leave them whenever you wanted?

A.  Oh, no.

Q.  Why not?

A.  I -- I wasn't allowed.  I had to ask permission.

Q.  And who would you have to ask permission?

A.  Puff.

Q.  How did you learn that you needed Mr. Combs' permission to leave?

A.  Well -- well, I -- one time -- well, I thought like -- sorry.

I thought that when we were -- when I was -- let's say everyone was asleep or I was quote, unquote off the clock, that I could leave.  But one night, I remember it was super late. It was like -- LA closes at 2:00 or something in the morning, and Puff had gone to bed, and I was like so desperate just to see some friends that I hadn't -- you know, I hadn't seen anybody outside of that world for a minute.  And I left to go meet up with them somewhere after Puff was asleep.  And I got in big trouble.

P5TACom3                        Mia - Direct

Q. And what happened when you got in big trouble?

A. Security, I'm not sure exactly who it was, like called me to let me know that he was sending them to find me. And, yeah. I didn't realize I wasn't allowed to leave.

Q. Do you remember about when this was?

A. I know it was at the first house.

Q. So 2009 or 2010 approximately?

A. Yes.

Q. Mia, when you were living in Mr. Combs' homes, were you allowed to lock your bedroom door?

A. No.

Q. Why not?

A. Because Puff said, like, this is my house, no one locks my doors. That's like so -- my room was essentially not really -- you know, that was just a place I was staying. It was still his house.

Q. Were there any other employees who lived in Mr. Combs' homes when you did?

A. Yes.

Q. Who generally?

A. Whatever security was with us.

Q. And what security regularly worked for Mr. Combs when you were there?

A. Uncle Paulie, D-Roc, Bonds, and Rube.

Q. Do you know if security was allowed to lock their bedroom

P5TACom3                    Mia - Direct

doors?

A.   Yes, they could.

Q.   And how do you know that?

A.   Because they -- the rooms were right next to mine and one had a dead bolt and the other had the keypad where the cameras were.

Q.   Were there other personal assistants working for Mr. Combs when you started work?

A.   Yes.

Q.   How many?

A.   When I started, apparently like three had just left and so there was only one at the time.

Q.   And who was that?

A.   His name was Malcolm McCrae.

Q.   What was your understanding of how the number of personal assistants would change?

A.   I was told that they were actively --

        MR. STEEL:  Objection.

A.   Oh.

        THE COURT:  It's overruled.

A.   Oh.

Q.   You can answer.

A.   I was told -- sorry.  I was told by Vashta that they were actively looking for more assistants because typically there was at least four or maybe five, something like that.  So that,

P5TAСom3                          Mia - Direct

you know, kind of like hang tight, we're filling those roles ASAP.

Q.  Approximately how long did Malcolm, the assistant who was there when you started, work for Mr. Combs while you were there?

A.  Like maybe seven or eight months.

Q.  Were you the only personal assistant when Malcolm left?

A.  Yes.

Q.  For approximately how long?

A.  A year.

Q.  How did you feel when you were the only personal assistant?

A.  I didn't have time to feel, but like insane.

Q.  What if anything did Mr. Combs tell you about being the only assistant?

A.  He -- well, he pulled me to the side sort of like, like, this was just going to be temporary, but that he, you know, trusted me and he knew we could do this together and it would be -- it was sort of like, like an I believe in you, but like an awesome pep talk, and also positioned it as though we were like going to be doing this as a team.  He's like, I just need a second brain, like I need somebody.  And he believed in me and trusted me.  And it was going to be -- it was going to be hard and it was going to be crazy, but we were going like get through, like through it.

So it felt -- I don't know how to explain that.  It

P5TACom 3                        Mia - Direct

felt -- well, A, like, wow, like you believe in me, so I'm going to prove myself.  But, yeah.

Q.  Was it difficult to be the only personal assistant?

A.  Yes.

Q.  At some point did Mr. Combs hire additional personal assistants?

A.  Yes.

Q.  Who were some of the others that you worked with?

A.  Sienna Lee and Neil Dominique were the first assistants that came in that like -- that were -- that stayed for a period of time.  And then later, later on came Kala Faulkner.

Q.  From what you could see, was your experience the same or different from these other personal assistants?

A.  Different.

Q.  How did your responsibilities compare?

A.  I felt like I was responsible for everything, even though -- if somebody didn't do something they were supposed to do, regardless of how long they had been there, it somehow -- I got in trouble for it.  I never got time off.  They -- both of them, especially Neil, had time off all the time.  I was punished if I had -- let's say it was on the schedule that I had off and both of them had on, and if at 4:00 in the morning that changed, and then Neil was given off for something, then I was like held responsible for not -- you know, if I -- if I, I guess, got the message a little too late, I didn't get to -- I

rarely ever got to, like, run errands.  I just felt like I was -- I just felt like I was bearing the brunt of everything and that I could never get like a -- I could never get like a free -- yeah, a free moment.

Q.  So you felt like you had more responsibility?

A.  Like a thousand times more.

Q.  You mentioned that you sometimes got punished.  What do you mean by that?

A.  I guess there's a -- various ways of punishment.  It was a lot of like getting cursed out and humiliated and berated, but also my intelligence insulted and my job threatened quite a bit.

Q.  And who did those things?

A.  Puff.

Q.  We'll talk about them in more detail soon, but, first, I want to ask you about a few different people.

        MS. SMYSER:  Ms. Foster, could you please pull up what's in evidence as Government Exhibit 2A-308.

Q.  Do you recognize this person, Mia?

A.  Yes.

Q.  Who is it?

A.  George Kaplan.

Q.  And what was George Kaplan's role?

A.  I believe he was the executive assistant to, at the beginning, I think to Brian Offutt, an executive.  And then I

P5TACom3                        Mia - Direct

believe he transitioned to being a personal assistant to Puff.

Q.  Was he a personal assistant to Mr. Combs before or after you?

A.  After.

MS. SMYSER:  Ms. Foster, could you please pull up what's in evidence as Government Exhibit 2A-311.

Q.  Do you recognize this person?

A.  Yes.

Q.  Who is it?

A.  Ryan Lopez.

Q.  And what was Ryan's role?

A.  He also was a personal assistant to Puff.

Q.  Before or after you?

A.  After me.

MS. SMYSER:  Ms. Foster, could you please pull up what's in evidence as Government Exhibit 2A-312.

Q.  Do you recognize this person?

A.  Yes.

Q.  Who is it?

A.  Elie Maroun.

Q.  Did Elie Maroun perform any assistant duties?

A.  Yes, he did.

Q.  For whom?

A.  For Puff.

Q.  Is that before or after you were personal assistant?

P5TACom3                        Mia - Direct

A.  After.

MS. SMYSER:  And, Ms. Foster, could you finally please display just for the witness, court, and parties what's been marked for identification as Government Exhibit 2A-318.

Q.  Do you recognize this person?

A.  Yes.

Q.  Who is it?

A.  It's David Shirley.

Q.  How do you know?

A.  From the picture.

Q.  Do you know him from working for Mr. Combs?

A.  Oh, I'm sorry.  Yes.  Yes.  For working for Puff.

Q.  Okay.  And is this a fair and accurate representation of Dave Shirley?

A.  Yes.

MS. SMYSER:  Your Honor, the government offers Government Exhibit 2A-318.

THE COURT:  All right.  2A-318 will be admitted.

(Government's Exhibit 2A-318 received in evidence)

MS. SMYSER:  Ms. Foster, could you please publish that for the jury.

Q.  What was Mr. Shirley's role?

A.  I believe he was also in an assistant role for Puff.

Q.  And before or after you?

A.  After.

P5TACom3                        Mia - Direct

MS. SMYSER:  You can take that down.

Q.  All right.  Mia, you testified earlier that your next title after personal assistant was director of development for Revolt Film; is that right?

A.  Yes.

Q.  What is Revolt Film?

A.  Revolt Films was a production company that Puff and I started together.

Q.  How, if at all, did Revolt Films differ from Revolt TV?

A.  They were completely separate.  They were just named similar for branding purposes.

Q.  What was Revolt TV?

A.  Revolt TV was the network.

Q.  When, approximately, did you become a director of development for Revolt Film?

A.  Well, the official title was granted in 2013.

Q.  Had you been doing some film work before that?

A.  Yes, lots of it for about two years.

Q.  And at this point in time in 2013 had you been a personal assistant for approximately four years?

A.  Yes.

Q.  So you had done about seven or eight months with Malcolm, right?

A.  Yes.

Q.  And then a year on your own, right?

P5TACom3                        Mia - Direct

A.   Mm-hmm.

Q.   And then some other personal assistants joined?

A.   Yes.

Q.   How many people were working for Revolt Films at the time you made the transition?

A.   It was just me.

Q.   And why did this transition happen?

A.   Because I had been doing -- I mean, so essentially I was running his film production company.  I had to beg for it.  It had been for years, and it kept being promised.  And then finally, I believe new executives in the office came in and helped move it along.

Q.   Did you want to work for Revolt Films?

A.   Yes.

Q.   Why?

A.   Oh, because that was my -- that was my dream.  That was like when I was doing -- even though I had to still do all of the insane assistant situation or just be next to him, like the joy I would get out of doing the TV and film was like over -- like, overwhelmingly awesome.

Q.   So when you started with Revolt Films, were you still performing personal assistant duties?

A.   Yes.

Q.   What was your base salary with Revolt?

A.   $70,000.

P5TACom3                          Mia - Direct

Q.  And how did that change over time, if at all?

A.  Eventually I believe a few years later I got -- it was up to 100,000.

Q.  Were you supposed to be paid anything in addition to the base salary?

A.  Yes.

Q.  What was that?

A.  Bonuses per project.

Q.  Did you always get those bonuses?

A.  No.

Q.  What were just some of your responsibilities with Revolt at a high level?

A.  At a high level, it was identifying projects for investment purposes, to also get like EP credits for Puff, and developing and creating our own projects as vehicles for Puff to star in, as well as --

            THE COURT:  Ms. Smyser, would this be a good time for a short break?

            MS. SMYSER:  Yeah, we can take a break here, your Honor.

            THE COURT:  All right.  Let's take a short break. We'll come back in ten minutes, around 11:30.

            Thank you very much.  All rise for the jury.

            (Continued on next page)

P5TACom3                    Mia - Direct

(In open court; jury not present)

THE COURT:  Thank you, Mia.  You can come back in ten minutes.

THE WITNESS:  Okay.  Thank you.

THE COURT:  Anything to address before we take our break?  Ms. Smyser?

MS. SMYSER:  No, your Honor.

THE COURT:  All right.  We will take a break.  Come back in ten.

(Recess)

THE COURT:  Please be seated.

Let's get Mia back.

(Continued on next page)

P5TACom3                      Mia - Direct

(In open court; jury present).

THE COURT:  Please be seated.

Ms. Smyser, when you're ready.

MS. SMYSER:  Thank you, your Honor.

BY MS. SMYSER:

Q.  Okay.  Mia, before we broke, we were just talking about some of your responsibilities with Revolt Film.

When you got the new title with Revolt, where were you physically working primarily?

A.  I was still working out of his house.

Q.  Whose house?

A.  I'm sorry.  Puff's house.

Q.  And at some point did you stop working primarily in Mr. Combs' homes?

A.  Yes.

Q.  Approximately when was that?

A.  I believe it was probably like late 2015 -- like somewhere around then.  There was kind of a time period where it would be office, his house, office, his house.  And then eventually it was like the office mainly after I think around end of 2016, something like that.

Q.  End of 2015, end of 2016, somewhere around there?

A.  Yes.

Q.  Next I want to transition to a new topic.

MS. SMYSER:  So, Ms. Foster, can you please display

P5TACom3                          Mia - Direct

what's in evidence as Government Exhibit 2A-401.

Q.  Mia, do you recognize the person depicted here?

A.  Yes.

Q.  Who is it?

A.  It's Casandra Ventura.

Q.  Do you know Ms. Ventura by any other names?

A.  Yes.

Q.  What?

A.  Cassie or Cass.

Q.  Is that what you call her?

A.  Yeah, I call her Cass.

Q.  How do you know Cassie?

A.  I met her working for Puff.

Q.  And how would you describe your relationship with Cassie?

A.  We became like sisters, like best friends.

Q.  Are you still friends today?

A.  Yes.

        MS. SMYSER:  You can take that down, Ms. Foster.

Q.  When you were working for Mr. Combs, what was your understanding of his relationship with Cassie?

A.  That she was his girlfriend.

Q.  How often did you see Cassie and Mr. Combs together when you were working?

A.  All the time.

Q.  At a high level, how would you describe their relationship?

A.   It was a cycle of like highs and lows.  It was unequal, inequal.  Toxic.  When I say abusive, I don't mean -- I don't mean that she had any -- like it was abusive towards her.

Q.   Was there any violence in the relationship?

A.   Yes.

Q.   We'll talk some more about that soon.

First, what was Cassie's profession?

A.   She was a recording artist.

Q.   In your role as a personal assistant for Mr. Combs, did you have exposure to aspects of Cassie's music career?

A.   Yes.

Q.   Generally, what exposure did you have?

A.   All of the executives or people doing business with or for Puff would send all of their -- any time they needed an answer through me in order to get the answers from him.  So I saw all types of correspondence, e-mails, and I was constantly with him in meetings with her.  So, I mean, I was pretty privy to a lot going on.

Q.   From what you saw, what was the relationship between Cassie's music career and Mr. Combs' business?

A.   She was signed to his label.

Q.   And what if any role did Mr. Combs himself play in her music career?

A.   He was in charge of it.

Q.   And what kinds of things did you see Mr. Combs do related

P5TACom3                    Mia - Direct

to Cassie's career?

A.  He made the -- he was always made the final decisions.

Q.  And what kind of final decisions did you observe?

A.  That could range anywhere from deciding like what music would be put out, what -- the visual aspects of any music videos, when she would be in the studio, her appearance, and any sort of shows or appearances or dates or promotions that she would be involved with.

MS. SMYSER:  Ms. Foster, could you please display what's in evidence as Government Exhibit 3T-107-R for the jury.

Q.  Mia, what are we looking at here?

A.  This is an e-mail from Cass to Puff and a number of executives or people involved in her music career and me.

Q.  Okay.

MS. SMYSER:  Ms. Foster, could you please zoom in on the bottom message.

Q.  So this says it is from Veronica Bang; who is that?

A.  It's Cass.

Q.  And who did Cassie send this message to?

A.  She sent it to Puff, Gwen Niles, Harve Pierre, Capricorn Clark, Matthew Testa, James Cruz, and me.

Q.  And you said those people were involved in Cassie's music career?

A.  Yes.

Q.  When did Cassie send this message?

P5TACom3                    Mia - Direct

A.  April 21st, 2012.

Q.  At around what time?

A.  It says 7:30 but it was actually like 4:36 in the morning because we were in Los Angeles.

Q.  If you know, where was Cassie that night?

A.  My memory, I believe they were at a hotel.

Q.  And who was she with at the hotel?

A.  Puff.

Q.  Do you have a term for this kind of night from your working with Mr. Combs?

A.  Yeah.  We called them hotel nights.

Q.  We'll talk some more about hotel nights soon.

But, first, focusing on this e-mail, what was the subject line here?

A.  It says:  Thank you team, dot, dot, dot.

Q.  And can you please read what Cassie said in the e-mail?

A.  For everything.  With regret, I have been informed that I cannot perform on Monday due to overages in costs.  I have worked very hard, but I cannot support myself on the things that I need in order to move forward and make this show happen and run smoothly.  I appreciate everyone and I hope that you can understand.  Again, I am very sorry and doubly sorry for any drama I have caused at Bad Boy or at Interscope.  I have tried my very best.  I wish everyone the best.  Anyone not attached on this e-mail I will contact directly so not to

P5TAMCom3                        Mia - Direct

disrupt anyone's travel and/or schedule.  Thank you.

Q.  And this e-mail mentions Interscope, do you know what that is?

A.  Yes.

Q.  What is it?

A.  It was a bigger like record label that -- sorry.  Record publishing company that Bad Boy was signed to.

          MS. SMYSER:  Okay.  Could you zoom out, Ms. Foster.

Q.  And did Mr. Combs respond to this message?

A.  Yes.

          MS. SMYSER:  Could we zoom in on the next two e-mails. This is fine.  This is fine.

Q.  Mia, would you please read his response?

A.  Make sure you stleven hill and let him know you're not ready and you do want to embarrass yourself again.

Q.  Do you have an understanding of what stleven hill means here?

A.  Yes, he's referring to Stephen Hill.

Q.  Who was Stephen Hill?

A.  He was the president of BET at the time.

          MS. SMYSER:  Can you zoom out please.  Could you zoom in on Cassie's response.

Q.  And, Mia, would you mind reading this response?

A.  If that were the issue, I would, so since you no longer want to support your artist I have to pull out.  No label

P5TAComm3                          Mia - Direct

support, no show, no?

MS. SMYSER:  You can zoom out.

Q.  And what did you do after you got these e-mails?

A.  I forward them to Toni.

Q.  And you mentioned earlier that Toni was the chief of staff; is that right?

A.  She was.  I don't know when her title like officially switched, but she operated in that position before.

Q.  And what was she before chief of staff?

A.  She was the head of personal finance, but she was still straddling both worlds, like the office and the personal.  So she was involved a lot with like helping navigate dramatic situations, or she was kind of someone you could go to, if that makes sense.

Q.  Why did you forward this e-mail to Toni Fletcher?

A.  Well, because I had to keep Toni aware of everything going on and because like Toni -- not everything going on.  Sorry. Anything that -- she was in charge of booking hotels, so had to keep her aware of possibly something happening.  She was also, because all those other people were on copy, I knew that it would get to her anyway.  And so this situation would have effected other situations or other plans that were in place. So I'm just keeping her alert of the things that I was, like, allowed to.

Q.  So you were saying because Cassie had e-mailed other people

involved in her career, you needed to keep Toni in the loop also?

A.   Yeah.  Those people worked like in the office too.  So, yeah.  Keeping her in the loop of everything going on.

Q.   When did you send this e-mail?

A.   At 4:00 a.m.ish.

MS. SMYSER:  You can zoom out and take that down.

Q.   Mia, do you know whether Cassie ended up performing?

A.   I believe she did.

Q.   Was Cassie involved in any other professional projects besides music when you were working for Mr. Combs?

A.   Yes.

Q.   What was she involved in?

A.   She was also an actress.

Q.   And what was your role, if any, related to her acting career?

A.   I helped her navigate -- I helped her navigate the world. I helped her find representation.  I would help her find projects.  I would run lines with her, go with her to auditions, go with her to set if she was shooting.

Q.   What if anything did you see Mr. Combs do related to Cassie's acting career?

A.   He wanted -- or he was -- he was very involved in the, like, final decision.

Q.   The final decisions?

P5TACom3                    Mia - Direct

A.  Mm-hmm.

Q.  Was there ever a time when Mr. Combs would come to Cassie's sets?

A.  Yes.

Q.  What if anything happened when he was on the sets?

MR. STEEL:  Objection, your Honor.  Timeline.

THE COURT:  Can we be a little bit more specific.

MS. SMYSER:  Sure.

Q.  Approximately when was Cassie doing these acting roles?

A.  Well, she did The Perfect Match premiered in -- about 2015 was the year.

Q.  So around 2015, did you ever see Mr. Combs on a movie set?

A.  Yes.

Q.  What if anything did he do on the set?

A.  Well, production would be really overwhelmed because they would kind of have to stop everything.  And he would -- I don't know.  Everyone would be really nervous and he would ask a lot of questions and sort of insert himself.

Q.  Did things come to a stop on the set?

A.  Yes.

Q.  Shifting gears a little.

What if anything was Mr. Combs' role related to Cassie's appearance from what you saw?

A.  He like was in charge of it.

Q.  And in what ways?

P5TACom3                    Mia - Direct

A.   She had to get approval for like -- she would have to try on outfits and we would send photos for approval of what she could wear.  I've had to send photos of, like, her nails at a nail salon, hair styles, things like that.

Q.   And who were you sending those photos to?

A.   Puff.

Q.   Why are you sending them to Mr. Combs?

A.   Because he's asking, like, he's asking for them.

Q.   During your time working for Mr. Combs, did you have any exposure to Cassie's finances?

A.   A bit, yeah.

Q.   And what was the exposure that you had?

A.   I knew that -- the exposure was I knew that -- sorry.  So how did -- like Toni, for example, I knew that the office paid her credit cards.

Q.   And how did you know that?

A.   One time I was with Cass, and Toni asked me, like, she said I'm in a bind, do you have any cash that you can --

         MR. STEEL:  Objection.

         THE COURT:  Let's get a new question.  Maybe you can rephrase, Ms. Smyser.

         MS. SMYSER:  Yes.  No problem.

Q.   So we were just focused on the credit cards.  But was there anything else that you had exposure to with regard to Cassie's finances?

P5TACom3                        Mia - Direct

A.  Yes.

Q.  What was that?

A.  I knew that he -- that her -- the places that she lived were under, like, his company names and as well as her cars.

Q.  Were there ever times when -- where you saw Mr. Combs take away things that he paid for?

A.  All the time.

Q.  What kinds of things did he take away from Cassie?

A.  Her car, her jewelry, her support, things like that.

Q.  And, generally, when did you see him take those things away?

A.  When he was upset or if he couldn't let's say get her on the phone or something like that.

Q.  How would Cassie react when that happened?

A.  She would -- she wouldn't do -- like let it happen. Like...

Q.  How often were you with Cassie when you were working for Mr. Combs?

A.  As much as I was allowed.  A lot.  All the time.

Q.  And who decided whether you were allowed to be with Cassie or not?

A.  Puff.

Q.  How did this time with Cassie relate to your job responsibilities, if at all?

A.  How did they relate, like, I mean, everything I was told to

P5TACom3                      Mia - Direct

do was I guess my job responsibility.

Q.  Let me ask you this:  What did Mr. Combs tell you to do when you went to go be with Cassie?

A.  Sometimes it would be like go help Cass.  Sometimes it would be to, you know, like accompany her to things.  But a lot of the times it would be to keep her -- like sort of like keep tabs on her and be able to get in touch with her through me or check up on her.

Q.  So Mr. Combs could check up on her?

A.  Yes.

Q.  And so was it part of your job to spend this time with Cassie?

A.  Yeah.  I had to do everything that he told me to do.

Q.  That who told you to do?

A.  That Puff told me to do.

Q.  And when you and Cassie were together, were you all able to go wherever you wanted, whenever you wanted?

A.  No.  No.

Q.  Why not?

A.  We had -- because we had to get -- I mean, we had to be wherever Puff told us we could be.

Q.  And what would happen if you and Cassie did something without Mr. Combs' permission?

A.  It would be -- it would not -- something really -- something bad, like very scary.

P5TAComm3                    Mia - Direct

Q.  When you say very scary, like what kinds of things are you talking about?

A.  We would be in trouble and be -- the punishment was typically unpredictable, but it was typically pretty terrifying.

Q.  Well, we'll talk some more about that as we get through your testimony.

But from what you could see when you were with Cassie, how would Mr. Combs communicate with her when he was not physically around her?

A.  By like phone, text, e-mail, having other people call or through me -- did you say if I was with her?

Q.  Yeah, when you were with her.

A.  Or like through -- or through me.

Q.  And who else besides Mr. Combs would contact her?

A.  Anybody within Puff's like earshot, whoever he told to get in touch with her.

Q.  What would happen if Cassie didn't answer the phone when Mr. Combs would call?

A.  Then there would be multiple people calling, texting, e-mailing her trying to find her and/or like security would show up if like she didn't -- if he couldn't find her that way.

Q.  Earlier, Mia, you mentioned that the relationship between Mr. Combs and Cassie was violent; is that right?

A.  Yes.

P5TACom3                         Mia - Direct

Q.   Did you personally see any violence?

A.   Yes.

Q.   What kinds of things did you see?

A.   I saw a lot of like aftermaths, like injuries she had.  I saw and heard like --

MR. STEEL:  Objection.

THE COURT:  Ms. Smyser, could we get a more focused question.

MS. SMYSER:  Yeah.

Q.   So from when you were working with Mr. Combs and you were around Mr. Combs and Cassie, what if any kinds of violence did you yourself, see?

A.   I've seen him attack her.  I've seen him throw her on the ground.  I've seen him -- I've seen him -- I've seen him like crack her, like, head open.  I've seen him chase her.  Things like that.

(Continued on next page)

P5TMCOM4                    Mia - Direct

Q.  Have you ever seen Cassie fight back?

A.  No.  I have just seen her like put her arms up and like beg for him to stop.

Q.  And approximately how many times have you seen this violence or signs of violence, like injuries you just mentioned?

A.  I don't know.  Like it was all the time.  I don't have a number.

Q.  When was the first time you saw or heard physical violence between Mr. Combs and Cassie?

A.  I was in the 9933 Beverly Grove Drive, so like 2009 or 2010.

Q.  What is the first thing you remember hearing when you were there?

A.  I remember upstairs like loud like thuds.  That's what it sounded like, like something hitting the wall.  And the way that the second floor was is that you can look down into the foyer from it and that's where his bedroom was, up on the second floor, and I just remember seeing suitcases being thrown over like into the foyer.

Q.  Did you see Cassie sometime after that, after the suitcases were thrown?

A.  Yes.

Q.  Where was she?

A.  She was outside hiding and crying and shaking like behind a

P5TMCOM4                         Mia - Direct

bush.

Q.   And what, if anything, did she do when you saw her?

A.   She looked at me like she had the most terrified look in her eye and was kind of like waving her hands like, don't look -- essentially, like I am going to be -- as if like I'm hiding, you know, like don't -- act like I'm not here kind of thing.

Q.   After you saw Cassie waving her hands outside, what did you do?

A.   I retreated -- like I was still outside, but I followed like her instructions.  I like put -- I went away, but I was still like outside, just pretended like I didn't see her.

Q.   Did you tell anyone about this incident?

A.   No.  I didn't know what is happening.  I went inside, and I think just at the time the chef was in the kitchen.  I don't remember what I said exactly because I was so -- I was confused as to what was going on.  And the sentiment was something like, don't --

          MR. STEEL:  Objection.

          THE COURT:  That's sustained.

Q.   What did the chef say to you, if anything?

          MR. STEEL:  Objection.

          MS. SMYSER:  It's not for the truth, your Honor.

          THE COURT:  Hold on.  It's sustained.

Q.   What are some of the locations after this where you saw or

P5TMCOM4                      Mia - Direct

heard violence between Mr. Combs and Cassie?

A.   His houses, her apartments, hotels, events, traveling, on vacation.

Q.   Let's talk about a few of those.  You mentioned that something violent happened in Cassie's apartment, is that right?

A.   Yes.

Q.   Did that happen one time or multiple times?

A.   The time that stands out to me, like I have one -- you mean like when I was present?

Q.   Yeah.  Is there one that sticks out in your mind?

A.   Yes.

Q.   Let's talk about that.  Which apartment was Cassie living in at the time?

A.   She had an apartment on Doheny in Los Angeles.

Q.   When approximately was this?  Do you remember?

A.   I was -- it was definitely the second LA house when I lived there.  I just don't remember the exact year.

Q.   At the Beverly Crest houses that you were living at the time?

A.   Yes.

Q.   Sometime between 2010 and 2014?

A.   It would have been earlier than 2014 because she moved into another apartment, I think, in 2013.

Q.   What time of day was it when you all were in Cassie's

apartment that day?

A.  I feel like it was early evening.  I think like it was dark out, but it wasn't super late.

Q.  Who all was there?

A.  It was me, Cass, and Deonte Nash.

Q.  Who is Deonte Nash?

A.  He was her stylist, but also like her friend, but her stylist.

Q.  What were you and Cassie and Deonte doing that night?

A.  Helping Cass pack for a big trip.  I think it was to London the next morning.

Q.  Did there come a time when Mr. Combs came to the apartment?

A.  Yes.

Q.  And what happened when he got to the apartment door?

A.  He was like banging on the door, like very irate.  I think he had a key.

Q.  At some point did he get inside?

A.  Yes.

Q.  Do you remember exactly how he got inside?

A.  I feel like he got a key from the front desk.  That's what my feeling is, because we had tried to talk to the doorman multiple times.

            MR. STEEL:  Objection.

            MS. SMYSER:  We can move on, your Honor.

            THE COURT:  All right.

P5TMCOM4                    Mia - Direct

Q. When Mr. Combs gets into the apartment, what, if anything, was he saying?

A. He was like screaming at Cass and like screaming but asking like, have you been -- screaming, have you been drinking, at her. Because she didn't answer the phone.

Q. How close was he to Cassie when he got into the apartment?

A. Very close. I'm seated here. My back is to like the balcony, and in front of me, like where you are, is like the entrance to the apartment and it opens up to like a living area combined with a kitchen. And on where the apartment entrance door is, like where you are, the wall to Cassie's bedroom is, and Cassie was pretty close to the door on that wall, so she was probably like a couple of feet from that entrance door to the right, to my right.

Q. What, if anything, did Mr. Combs do when he was yelling about her drinking?

A. He was -- he then came after like me and Deonte and was screaming the same thing, like, has she been drinking. He was super upset. Has she been drinking. And he was like crazy aggressive. And he started to attack her.

Q. What did you see when he started to attack her?

A. Like he threw her to the ground. I saw --

Q. How did you react when Mr. Combs threw Cassie to the ground?

A. I feel like me and Deonte like immediately jumped in and

tried to stop it because we were all alone as in like -- his -- yeah.  We jumped in to try to help.

Q.  When you say you jumped in, what did you do?

A.  I feel like we were both trying to get him off of her.  But in this quick -- I mean, I don't know how to do that, and I don't know -- Deonte is very small in comparison to Puff, and it happened so fast.  But there was some sort of, I don't know, little tornado going on, and at some point he had Deonte in like a position where I was like scared he was going to like kill him, and I jumped on his back.

Q.  What did Mr. Combs do when you jumped on his back?

A.  He threw me like against the wall like so quick and so easily, like -- and I realized we were in real danger.

Q.  How fast was this all happening?

A.  It was so fast, but it felt like I was in slow motion, but it was really fast.

Q.  What did Mr. Combs do after he threw you against the wall?

A.  He immediately like -- almost like slow motion, like I was sliding down the wall of some sort.  The bedroom was to my left, and he immediately ran in, and I saw him grab Cass, and I like couldn't get there fast enough.  Underneath her bed was like this wood -- like a bed platform, and the corner was like the sharpest, strongest corner I have ever seen, and I just saw him like pick her up, and I thought he is actually going to kill her, and he like slammed her head into the corner, like,

P5TMCOM4                         Mia - Direct

of the bed.

Q.  What injuries did Cassie have as a result of Mr. Combs slamming her head into the bed?

A.  She just started like gushing blood, and she had ended up with like a pretty big -- like a scar on her like forehead.

Q.  What did Mr. Combs do after Cassie's head was split open?

A.  He like immediately snapped into this protecter survivor mode.  He told me like to like get Kala, who was the assistant at the time, who had relationships with the doctors, get Kala on the phone and tell her to call Dr. So and So and tell him that Cassie needs to see them immediately because she was drunk and fell and hit her head.

Q.  What did you do after Mr. Combs told you to call Kala?

A.  I called Kala.

Q.  Why did you do that?

A.  Because I thought that was the only way to get her help and because Puff told me to.

Q.  Stepping back just a moment, how did Mr. Combs appear when he was in Cassie's apartment?

A.  It's like -- his eyes turned like black and he was -- there was like no getting through.  I was trying to get him to stop and it was like he was looking like through me.  And it was the first time that I -- I guess it was the first time I realized like the severe danger that we were actually in.  He was like -- completely like --

THE COURT:  Let's get the next question.

Q.  Were there other times that you saw that look in his eyes?

A.  Yes.

Q.  When typically did you see it?

A.  When he was in a fit of rage or angry or violent.

Q.  Mia, during the time you worked for Mr. Combs, were there times where you saw Mr. Combs take drugs?

A.  Yes.

Q.  Were there times when he appeared high to you?

A.  Yes.

Q.  What did you observe in the instances in which Mr. Combs appeared high?

A.  Sometimes he would be having so much fun he would be the life of the party.  Sometimes he would just be a little bit -- he would be really hyper sometimes, and sometimes drooling and his eyes would -- or sometimes he would be like wearing sunglasses.

Q.  On what occasions did you typically see him like this?

A.  Mostly partying, like Ibiza or Burning Man or clubs or at a music conference.

Q.  On this occasion when he slammed Cassie's head into her bed frame, did you see any indications that Mr. Combs was high?

A.  No.

Q.  Mia, earlier you mentioned that if you and Cassie -- when you and Cassie were together, if you would leave without

Mr. Combs' permission, sometimes scary things would happen.  Do you remember saying that?

A.  Yes.

Q.  Was there ever a time that you went to a party without Mr. Combs' permission?

A.  Yeah.  One time.  Yes, we did.

Q.  Who went with you?

A.  Cassie.

Q.  Whose party did you go to.

A.  Prince.

Q.  When approximately was this?

A.  I think it was either like 2011, 2012, something like that.

Q.  Are you estimating?

A.  Yes.  I'm estimating.

Q.  What was happening the night before the Prince part?

A.  I believe it was a big awards show of some sort, and Puff had gotten a suite at the Beverly Hills Hotel to like get ready.

Q.  Were you in that suite?

A.  Yes.

Q.  Was Cassie also?

A.  Yes.

Q.  What did Mr. Combs tell you to do that night?

A.  At the end of the night he told me to stay with Cass, like stay the night with Cass at the hotel.

P5TMCOM4                          Mia - Direct

Q.  What, if anything, did Mr. Combs say about what he was doing that night?

A.  He told me to keep her company and make sure she doesn't come to the house because he was telling her that he was going to be with the kids.

Q.  Did you expect to see Mr. Combs that night?

A.  No.

Q.  So at some point did you learn this party was happening at Prince's house?

A.  Yes.

Q.  How did you learn that?

A.  A good friend of ours called and said that he was -- Prince was having like an intimate party at his house up the street.

Q.  What did you do after you got that call?

A.  Cass and I debated like little kids if we should sneak out of the house for probably felt like forever.

Q.  Did you go to the party at Prince's?

A.  Yes.

Q.  What happened when you got to the party?

A.  We like danced on this purple uplit Plexiglas covering of an indoor pool and hung out with our friends, and Prince performed like on a little table.  We were just having fun.

Q.  Did there come a time when Mr. Combs showed up to the party?

A.  Yes.

P5TMCOM4                    Mia - Direct

Q.   What did you see when Mr. Combs showed up?

A.   I saw his like bucket hat come through the entrance and made eye contact with him.

Q.   So you and Mr. Combs locked eyes?

A.   Yes.

Q.   How did you react after that?

A.   Like oh, crap.  Me and Cass just booked it.

Q.   You and Cassie started running?

A.   Yes.

Q.   Where did you go?

A.   We ran through the house, which was quite confusing, and we are trying -- when you make it out to the yard, there was something across the street that looked like -- I don't know if it was woods or not, but somewhere to hide, like bushes, and we were trying to run to hide there.

Q.   What happened while you were running?

A.   Puff caught Cass.

Q.   When you say he caught Cass, what do you mean?

A.   Like he caught up to her and had her on the ground.

Q.   What happened after Mr. Combs got Cassie to the ground?

A.   He started to -- he started to attack her, but Prince's security like swiftly intervened.

Q.   Where did you go after you saw Prince's security intervene?

A.   I don't remember like if I was hiding or how I got there, but I ended up like hiding at a different hotel.

P5TMCOM4                    Mia - Direct

Q.   You're not at the same hotel you were earlier that night?

A.   No, I'm not.

Q.   Did you hear from anyone who worked for Mr. Combs while you were at the hotel?

A.   The next day, yes.

Q.   Who did you hear from?

A.   Vashta, I believe.

Q.   And Vashta is part of human resources?

A.   Yes.  She was the head of human resources.

Q.   What did Vashta tell you?

A.   That Puff was suspending me without pay and that I was like in big trouble.

Q.   What did she say was the reason that you were going to be suspended without pay?

A.   She just said that Puff said that I was being insubordinate.

Q.   What, if anything, did Vashta say about Mr. Combs' behavior the night before?

A.   Nothing.

         MS. SMYSER:  Your Honor, I'm about to move on to a new topic, which I can do, or it might be a good time to stop.

         THE COURT:  That's fine.  We can take our lunch break at this time.

         Thank you, members of the jury.  As always, do not speak with each other about the case and don't talk to anybody

P5TMCOM4                        Mia - Direct

else about the case and have a great lunch.  We will be back at 1:15.

All rise.

(Jury not present)

THE COURT:  Mia, we will see you back here at 1:15.

THE WITNESS:  Thank you.

THE COURT:  Please be seated.

Ms. Smyser, how much time do we have left in your direct, generally?

MS. SMYSER:  It will be the rest of the day, your Honor.

Because of that, we want to try to ensure that this witness is off the stand before the weekend.  We weren't anticipating cross being so long this morning with Mr. Nash. So we were wondering if we could come back a little early from lunch and stay maybe a little bit later today to ensure --

THE COURT:  We can do that.  We can also do the same thing tomorrow with a slightly shorter lunch break, and we can see -- there shouldn't be any issue because of what I've already told the jury.  If we need to keep them a little bit later tomorrow, we can do that as well.  I'll give them a heads-up about that today.

MS. SMYSER:  Thank you, your Honor.

THE COURT:  Anything else from the government?

MS. SMYSER:  Can we come back at 1 from the lunch

break?

THE COURT:  To address any issues we need to, or do you want to just come back at 1?

MS. SMYSER:  Just start.

THE COURT:  I told the jury 1:15.

MS. SMYSER:  That's OK.

THE COURT:  I would prefer, if we are going to add time, to do it at the end of the lunch break.  I think it's just a little bit short for that.  We will make up the time one way or the other.

MS. SMYSER:  Understood.  Thank you, your Honor.

MR. AGNIFILO:  Your Honor, the last several witnesses the government has telegraphed to the Court that they were foreseeing an end of the witness' overall testimony.  We heard one witness had a flight reservation.  Ms. Comey this morning had to tell the Court that the witness is flying back at 2:00. Now we just heard it again with this witness.

There is a telegraphing that's been happening all week where the government is, in my opinion, trying to get the Court on its side to basically put an end to when that witness should be testifying.  I think that's becoming a problem.  The reason it's becoming --

THE COURT:  How does it become a problem?  Because what I am seeing the government doing is simply advising the Court as to any anticipated scheduling issues.  However, if you

P5TMCOM4                        Mia - Direct

remember, we have not cut short in any way, shape, or form the testimony of any witness, and I have repeatedly told the defense that they should do what they need to do.  I have said that with every witness.

In fact, with the last witness, where there was a scheduling issue, you will remember that we kept the jury late to try to accommodate that issue, but when Mr. Donaldson needed more time, guess what, Mr. Nash was here the following day.

I only see this as telegraphing in terms of here is what is going on.  So really it's for the defense's benefit so they know what the government is thinking, and you can respond by saying, we need more time.

MR. AGNIFILO:  It's not really directed at the Court as much as, the government has done this now this week with several witnesses.  I am not saying that the Court has limited our cross-examination.  It hasn't.  And the Court was very clear that we brought the witness who started the day back today.  But it's a pattern that I am seeing.  I just saw it again.

THE COURT:  It's called common courtesy.  It's like this person has a plane flight.  OK.  That way you know so that you can speak with Ms. Comey or Ms. Smyser during a break and say, hey, actually, we anticipate a very long cross-examination.  So to the extent this witness has a plane flight, my advice would be that that should be moved to the

P5TMCOM4                          Mia - Direct

following Monday.  That's what it is.  That's how I understand it.

MR. AGNIFILO:  I appreciate -- maybe I'm wrong, but what I'm hearing is, we want to get this witness off the stand by the end of tomorrow.  I have no idea if the cross-examination that Mr. Steel is going to do is going to be by the end of the day tomorrow, but it sews false expectations.  No one has consulted us about that.

What I'd like is, if these things have to be discussed between the parties, that's one thing.  They don't need to put these things on the record unless they do.

THE COURT:  No.  I want to know these things because I am adjusting the schedule.

Let's take a step back.  We have a schedule that has us here from 9 to 3, which is a shortened schedule.  As everyone has noted, I think everyone has liked that because it gives more time for trial preparation in the afternoon.  As I told you the jury at the outset and as I told the parties, that gives us some flexibility to expand the time as necessary.

To the extent that we can have this witness complete her testimony this week, that's fantastic because it keeps everything moving and it means the next witnesses can come on, you can prepare for those witnesses, and we can do things in an efficient manner.  That's why the telegraphing, in my view, is happening.  I don't understand it to be anything other than

that.

I don't understand that it's any kind of posturing or pressure being exerted to shorten the defense's examination or trying to get the Court to join forces to somehow constrain the defense.  To be absolutely clear, you are not constrained in terms of the questioning that you are permitted to do as to any witness unless something happens and there is an abuse of the rules and that's brought to the Court's attention.  But to date we haven't had any of that.

MR. AGNIFILO:  Thank you, Judge.  That's all I needed to know.

MS. COMEY:  If I may, to clarify the record on this, your Honor, I think we have noted this before, but just to be very clear, many of our witnesses are flying from across the country, and we are navigating a lot of different flight schedules, and part of what we are trying to do is keep the Court and the defense on the same page about the anticipated schedule.  Part of that is we know when to book flights, including for people coming next week.  Part of our thinking about when Mia's testimony might end is about who we are flying in over the weekend and who we are flying in on Monday.  That is part of what is going on.  It really is about trying to maintain the schedule so that we can have witnesses here and not waste the Court and the jury's time.

And I also just want to note, I suspect the transcript

P5TMCOM4                          Mia - Direct

will reflect this, but Mr. Nash's cross-examination was at least twice as long as the direct.  There is no conceivable way to suggest that his cross-examination was limited in any way by our alerting the Court to his flight schedule.

I think Ms. Smyser wants to put something on the record about Mia as well.

MS. SMYSER:  Just to correct the record, your Honor, we did consult with the defense about both the length of the anticipated direct examination and cross-examination of Mia. From what I understand from Mr. Steel, not holding him to it by any account, but he anticipated cross being approximately an hour and a half to two hours, though that could change based on whatever is said in the direct, and that he certainly didn't anticipate it being longer than the direct.  We have been having these discussions with the defense also, and we just want to keep the Court apprised as to the schedule.

THE COURT:  Understood.

I don't regard what was put on the record at the beginning of the break to be anything other than here is a heads-up on scheduling, which is helpful for everybody.  I don't understand the government to be trying in any way, shape or, form to constrain the defense in terms of their timing.  If it turns out that we hit the end of the day on Friday and Mia has to come back again on Monday, that's what's going to happen.

I am not going to tell you to stop telegraphing because that's how I keep everything on schedule, so that needs to happen.

From the defense's perspective, if there are scheduling issues on your side that you think would be helpful to alert everybody to, you will let me know and that will also be helpful as well.

Anything else?

Mr. Steel.

MR. STEEL:  Can I ask a question.

When your honorable Court decides, would you let us know how late we are going potentially today and tomorrow, just for our schedules as well.

THE COURT:  The latest I will keep the jury here is 4 p.m.  I think that if we are coming back now at 1:15, I think 4 p.m. is the cutoff today.  Then we will see where we are at. Obviously, for tomorrow, depending on where we are at, we can make a determination as to whether we are going to need that late tomorrow.

Does that pose any issues from your perspective?

MR. STEEL:  Not at all.  It was helpful what you just said.  Thank you.

I don't think I have to say it, because I heard what the Court said, but my estimates are terrible.

THE COURT:  I'm not holding you to those estimates.

P5TMCOM4                        Mia - Direct

MR. STEEL:  I heard what you said.  I never thought that would be announced in court, and I don't want to be held to it, but I appreciate.  I did say that.

THE COURT:  Understood.

Mr. Donaldson.

MR. DONALDSON:  I want to go to lunch.  I'm hungry.

THE COURT:  So ordered.

(Luncheon recess)

AFTERNOON SESSION

1:15 p.m.

THE COURT:  Anything to raise before we bring the jury back, Ms. Smyser?

MS. SMYSER:  No, your Honor.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  Nothing.  Thank you, Judge.

THE COURT:  We will wait for the defendant.

MS. COMEY:  Your Honor, if I may put one thing on the record that I just conferred with Ms. Geragos about.

THE COURT:  Yes.

MS. COMEY:  It's unrelated to Mia's testimony, but while we are waiting, the government had, as I have discussed with Ms. Geragos, issued a Rule 17 subpoena for certain phone records from the month of June 2024 from Verizon.  And those records, as I understand it, are going to be sent to your Honor's chambers either this week or early next week.  We don't intend to introduce them until later in the trial.

After conferring with Ms. Geragos, she has agreed with the proposal that your Honor, upon receiving those and confirming that they are appropriate to receive in this trial, produce them to the government.  We would then stamp them with Bates numbers and produce them as Rule 16 to the defense.

THE COURT:  All right.

Ms. Geragos.

P5TMCOM4                         Mia - Direct

MS. GERAGOS:  That's fine, your Honor.

THE COURT:  We will handle it that way.

Ms. Smyser, we can get Mia back.

(Jury present)

THE COURT:  Welcome back, members of the jury.

Just a little scheduling heads-up for all of you.

For today and tomorrow we may go a little bit later than 3 p.m., although we will not go past 4 p.m.  Again, the reason for this is, I am mindful that at the beginning of this case I told you that we would be trying to get you out of here before July 4, and that's the reason why we may have some extra days.

Thank you for your patience.

Mia, you understand you're still under oath.

THE WITNESS:  Yes.

THE COURT:  Ms. Smyser, when you are ready.

MS. SMYSER:  Thank you, your Honor.  Before I get started, I just want to ensure that the record reflects that I offered Government 3T-107R into evidence earlier.

THE COURT:  I believe it was admitted.  You're just confirming that.

MS. SMYSER:  Yes.

THE COURT:  So confirmed.

BY MS. SMYSER:

Q.  Mia, before we broke you were talking about some incidents

P5TMCOM4                        Mia - Direct

of violence between Mr. Combs and Cassie, is that right?

A.  Yes.

Q.  And you had mentioned earlier that sometimes violence happened when you were on vacation with Mr. Combs and Cassie, right?

A.  Yes.

Q.  Have you ever traveled to Turks and Caicos with Mr. Combs?

A.  Yes.

Q.  Where did you go in Turks?

A.  We went to an island called Parrot Cay or Parrot Cay.

Q.  And how many times have you been to Parrot Cay?

A.  Twice.

Q.  When approximately did you go?

A.  Around 2012.

Q.  Who was on these trips?

A.  Just me, Puff, and Cass.

Q.  Did violence happen on these trips?

A.  Yes.

Q.  Once or more than once?

A.  More than once.

Q.  Focusing on violence between Cassie and Mr. Combs in Turks, is there an incident that sticks out in your mind?

A.  Yes.

Q.  Where were you when you heard about the incident?

A.  I was sleeping in my bedroom.

P5TMCOM4                          Mia - Direct

Q.  Did there come a time when you were woken up?

A.  Yes.

Q.  How were you woken up?

A.  I was woken up to Cass running and screaming into the room.

Q.  What was Cassie saying?

A.  She was screaming for help and saying, you got to help me. He is going to kill me.

Q.  What was her tone of voice when she was saying this?

A.  Cass is normally very chill, like calm, and it was like the most terrified, like someone screaming for their life.

Q.  What did you and Cassie did after she got into your room?

A.  We started pushing furniture in front of the door to block it.

Q.  What kind of furniture did you move?

A.  I just remember it being like heavy wood, like wooden furniture.  The bed was pretty close to the door.  Maybe like a chair and maybe like a trunk of some sort.  Maybe like trying to push the bed, stack them to block the door.

Q.  Did there come a time when Mr. Combs got to the door?

A.  Yes.

Q.  What did he do at the door?

A.  He was banging and screaming.

Q.  After you all barricaded the door with furniture, what did you do?

A.  So there was an entrance to the bedroom that he was at from

P5TMCOM4                    Mia - Direct

inside the house, and in the back I had like a little porch that went out to the beach, so we ran out of that entrance and down the beach.

Q. Just to clarify, you ran out the back of your room?

A. Yes.

Q. Do you remember anything about running in this situation?

A. I just remember we were running like so fast down the beach, and I remember like being shocked at the fact that we could still be attacked by mosquitoes as we were running.

Q. Do you remember how that incident ended?

A. I don't remember how it ended, but I knew -- I don't remember what happened after we got to wherever we were hiding.

Q. Were there any other times when you and Cassie had to run from Mr. Combs in Turks?

A. Yes.

Q. Was there another time you had to run on the beach?

A. Yes.

Q. Do you remember what happened before you ran?

A. I don't remember what happened before we ran. I just remember another -- I have like another visual like where we were hiding and another visual like trying to escape like two separate times.

Q. Let's talk about when you are trying to escape. Where were you running to?

A. We ran to the beach, and there was stand-up paddleboards.

P5TMCOM4                    Mia - Direct

Q.  What did you do with the paddleboards?

A.  We got them and paddled out.

Q.  Where was Mr. Combs?

A.  He was like running back and forth on the beach behind the house like screaming at us.

Q.  How did Mr. Combs appear when he was running on the beach?

A.  Irate.

Q.  Who was with you on the paddleboards?

A.  Cassie.

Q.  What were you all doing on the paddleboards?

A.  It was really flat, and we were able to get out very far. Like I just remember the house getting smaller and smaller.

Q.  What was the weather like when you all were on the paddleboards?

A.  It was perfect, and then it shifted dramatically and the sky like turned black.

Q.  What were you thinking when the sky turned black?

A.  We were both --

          MR. STEEL:  Objection.

          THE COURT:  Overruled.

Q.  You can answer.

A.  We were both debating --

          THE COURT:  Hold on.

          Can you ask the question again, Ms. Smyser.

          Mia, I'll just ask, listen to the question and make

sure you answer it.

Q.  Focusing you, Mia, not on Cassie, what were you thinking when the sky turned black?

A.  I was thinking I was trying to weigh if it was scarier to face mother nature or to go back to Puff.

Q.  What did you end up doing?

A.  We eventually went back to Puff.  It just took a long time.

Q.  We have now, Mia, talked about several times in which you saw or heard violence between Mr. Combs and Cassie.  Were those all the times that you saw or heard violence between them?

A.  No.

Q.  Just some of them?

A.  Just some of them.

Q.  Did you ever call the police after you saw incidents of violence between Mr. Combs and Cassie?

A.  No.

Q.  Why not?

A.  For multiple reasons.

I believed that Puff's authority was above the police. This was also a time period, this is years and years before social media, me Too, or any sort of example where someone had stood up successfully to someone in power such as him.  Also like I was taught to believe that this was -- fell under the confidentiality or loyalty of like Puff's business.

Q.  What did that confidentiality mean to you?

P5TMCOM4                          Mia - Direct

A.   That was the most -- that was the most important thing.
And Puff had told me that I was supposed to protect him from
people that -- because there were so many people trying to
blackmail him, so I came to believe that reporting anything was
blackmail.

Q.   Did you ever go to the police about Mr. Combs' violence
towards Cassie?

A.   No.

Q.   Mia, besides what we have talked about so far, are there
any other times you remember seeing injuries on Cassie?

A.   Yes.

Q.   What kinds of injuries did you see?

A.   I would see bruises on her body and like fat lips, busted
eyebrow, like a gash on her forehead, black eyes, things like
that.

Q.   I am going to show you what's been marked for
identification as Government Exhibit 3T-109.

          MS. SMYSER:   Ms. Foster, can you display that for the
witness and the parties and the Court.

Q.   Mia, do you recognize this?

A.   Yes.

Q.   What is it?

A.   It's a photo of Cassie eating a hot dog at the premier of
her movie, The Perfect Match.

Q.   How do you know that's what it is?

P5TMCOM4                       Mia - Direct

A.   I took that photo.

Q.   Is it a fair and accurate representation of Cassie at The Perfect Match premier?

A.   Yes.

         MS. SMYSER:  The government offers Government Exhibit 3T-109.

         THE COURT:  3T-109 will be admitted.

         (Government Exhibit 3T-109 received in evidence)

         MS. SMYSER:  Ms. Foster, can you please publish for the jury.

Q.   You said you took this photo, Mia?

A.   Yes.

Q.   Remind us where Cassie was at this time.

A.   At the premier of her movie, The Perfect Match.

         MS. SMYSER:  Ms. Foster, could you please zoom in on Cassie's face through her upper arm.

Q.   Mia, could you talk about what, if any, injuries you see on Cassie in this photograph?

A.   Yes.  She has bruising on her arm and then her -- under like her eye.

Q.   Were these injuries covered in makeup at this time?

A.   Yes.

         MS. SMYSER:  You can take that down, Ms. Foster.

Q.   Were there other times that Cassie's injuries had to be covered up on a red carpet?

P5TMCOM4                      Mia - Direct

A.   Yes.

          MS. SMYSER:  Ms. Foster, could you please pull up what's in evidence as Government Exhibit 9D-102.

Q.   Mia, do you recognize where this photo was taken?

A.   Yes.

Q.   Where was it?

A.   It was on the red carpet at the Cannes Film Festival.

Q.   When approximately was this?

A.   This was in May of 2012, I believe.

Q.   And were you at Cannes that year?

A.   Yes.

          MS. SMYSER:  Could you take that down, Ms. Foster.

Q.   Before Cassie got ready for the red carpet, what, if any, injuries did you see on Cassie?

A.   She had a busted lip, and I don't remember the other ones, but she was injured.

Q.   Where were you when you saw her injuries?

A.   I don't remember the first time, but we were -- the first time I remember was in her hotel room.

Q.   Who else was in her hotel room?

A.   It was me, Cass, and Larry Simms, her hair stylist.

Q.   Did you have an understanding of how she got these injuries?

A.   Yes.

Q.   How did you learn that?

P5TMCOM4                      Mia - Direct

A. Cass had taken an audio recording.

Q. What did Cassie say about the audio recording?

A. That it was Puff attacking her.

Q. Did you listen to the audio recording?

A. Yes.

Q. Without getting into what was said on it, did you recognize the voices on the audio recording?

A. Yes.

Q. Whose voices did you recognize?

A. Cass and Puff.

Q. What was Cassie's tone of voice in the audio recording?

MR. STEEL:  Objection.

A. Panicked.

THE COURT:  Overruled.

Q. You said panicked?

A. Panicked.

Q. What, if anything, was Mr. Combs saying on the recording?

A. He was cursing at her.  I don't remember like the exact words or what he was yelling at her.

Q. What was his tone of voice?

A. It was very, very, very angry.

Q. Besides their voices, what else did you hear on the recording?

A. Like the sound of like -- sound of someone getting hit and being attacked, essentially.

P5TMCOM4                     Mia - Direct

Q.   After you listened to this recording, Mia and saw Cassie's injuries, did the two of you go to any events at the film festival?

A.   Yes.

Q.   What events did you go to?

A.   We went to the premier of Brad Pitts' movie, Killing Them Softly.

Q.   Who else was with you at the premier?

A.   Puff.

Q.   What happened at the premier?

A.   I was sitting next to Puff and Cass and it was silent because it's a premier of a movie, and Puff was talking to Cass, but with like a grit, like talking like this, like with his teeth clenched but in an aggressive way.  I looked over and he was like digging his nails into her arm.

Q.   What happened after that?

A.   So I just remember being -- in movie premiers you don't get up and walk out, and I remember -- I don't know the order of it, but he had made her leave and maybe go get her and then made me leave with him.  It was kind of like back and forth.

Q.   Do you typically get up and leave during movie premiers?

A.   No, not at all.

Q.   Taking just a step back, Mia, were these all the times that you saw Cassie injured, or just some of them?

A.   Just some of them.

P5TMCOM4                      Mia - Direct

Q.   What, if anything, would Mr. Combs ask you to do when Cassie was injured?

A.   Sometimes he would say like go take care of her.

Q.   What kinds of things would you do when you were taking care of her?

A.   Bring her whatever she needed and just hang out with her. Yeah.

Q.   What kinds of things would you bring her?

A.   I remember specifically, because I didn't know what it was for, like Arnica gel, besides like anything that she couldn't get because she couldn't leave where she was.

Q.   Did you have an understanding of what Arnica gel is used for now?

A.   Yes.

Q.   What?

A.   It's for bruises.

Q.   When you would go take care of Cassie in these situations, where would she typically be?

A.   Before she had her own place, hotels.

Q.   What was your understanding of why she was in the hotel?

A.   Because her injuries were too obvious to cover up.

Q.   When you went to visit her, could you and Cassie leave the hotel together?

A.   Oh, no.

Q.   Why not?

A.   We were not allowed.

Q.   Who decided that?

A.   Puff.

Q.   When would Cassie leave the hotel?

A.   Once her injuries were like healed enough to cover up.

Q.   Mia, next I want to direct your attention to December 22, 2011.  Did you take a trip to New York around that time?

A.   Yes.

Q.   Where were you before you left for New York?

A.   I was in LA at Puff's 9374 address.

Q.   What was the mood at Mr. Combs' house that morning?

A.   It was like dark, it was really -- it was -- the energy felt really bad, but in a different way than normal.

Q.   What do you mean by, in a different way than normal?

A.   It was like -- because normally I was used to -- I was used to when the energy was bad and he was mad, but this was more of a like -- I don't know, like -- how do I describe it.  You know when -- like Puff was -- instead of just mad, Puff was upset but --

Q.   At some point, Mia, before you left, did you talk to Mr. Combs?

A.   Yes.

Q.   What did he tell you?

A.   He had told me that he had found out that Cass had been talking to somebody else.

Q.  Did he say who that person was?

A.  Yes.

Q.  Who was it?

A.  Kid Cudi.

Q.  How did he appear when he was saying this?

A.  Heartbroken.

Q.  How did this compare to other times in which Mr. Combs was upset with Cassie, from what you could see?

A.  Normally, he was just angry and aggressive, and this time felt like almost this dark, like calm before the storm.  Not calm before the storm.  Like some sort of ominous -- all the times before I had never witnessed Cass do something to cause him to be upset, and this was the first time that something had happened where, you know, naturally a person would be upset about.  So it felt like -- I felt like I was bracing myself for something really bad to happen.

Q.  Did you see Cassie that morning?

A.  From a distance.

Q.  Where was she?

A.  She was in like a black SUV in front of the house.

Q.  Who, if anyone, was with her?

A.  Capricorn Clark.

Q.  Then you said at some point you left to go to New York, is that right?

A.  Yes.

P5TMCOM4                    Mia - Direct

Q.   When you left, did you reach out to any other employees?

A.   Yes.

Q.   Who did you reach out to?

A.   Sienna Lee was the assistant there at the time, so her and D-Roc.

Q.   And D-Roc is security, is that right?

A.   Yes.

Q.   Why were you reaching out to Sienna and D-Roc?

A.   Because I was worried about --

          MR. STEEL:  Objection.

          THE COURT:  It's overruled.

Q.   You can answer.

A.   I was worried about Sienna -- I don't believe it ever had to navigate a situation like that on her own.  And then I was also worried about Cass, and I was worried about Puff.  And D-Roc is like my big brother, and we all -- we both were close with Puff and sort of felt responsible for making sure everybody was OK.

Q.   Would you and D-Roc communicate about this kind of thing typically?

A.   All the time.

          (Continued on next page)

P5TACom5                          Mia - Direct

BY MS. SMYSER:

Q.  All right, Mia.

MS. SMYSER:  Ms. Foster, could you please display for the witness what has been marked for identification as Government Exhibit 3T-112 side by side with Government Exhibit 3T-112-R.

Q.  Do you recognize this?

A.  Yes.

Q.  What is it?

A.  It's an e-mail between me and D-Roc.

Q.  How do you know?

A.  Because I recognize it, and our e-mail addresses.

Q.  Is it a fair and accurate representation of your e-mails?

A.  Yes.

Q.  And is Government Exhibit 3T-112-R a redacted version of 3T-112?

A.  Yes.

MS. SMYSER:  You can take those down, Ms. Foster.

Your Honor, the government offers Government Exhibit 3T-112 under seal pursuant to the Court's pseudonym order and the government offers 3T-112-R into evidence.

MR. STEEL:  Same objection.

THE COURT:  Just give me one second.

Ms. Smyser, can you lay some more foundation before we admit these two exhibits?

P5TACom5                    Mia - Direct

MS. SMYSER:  Sure, your Honor.

Q.  So focusing on your communications with D-Roc, what were some of the reasons you were communicating with D-Roc in this situation?

MR. STEEL:  Objection.

THE COURT:  That's overruled.

Q.  You can answer.

A.  Because D-Roc and Puff were really close and, and Puff had just --

MR. STEEL:  Objection.

THE COURT:  All right.  Let's get a new question.

Q.  Would you typically communicate with D-Roc as part of your job?

A.  Yes.

Q.  And would you communicate with D-Roc about situations like this as part of your job?

A.  All the time.

Q.  And why would you do that?

A.  Because D-Roc and I, to -- it was like this also family dynamic situation.  Like he was my big brother and like he would have to -- we would have to figure out -- we would have to know what was going on to like help them and also protect them.  I mean, it was just --

Q.  And were you and D-Roc both employed by Mr. Combs?

A.  Yes.

P5TAСom5                    Mia - Direct

Q.   And what was D-Roc's job?

A.   D-Roc was security.

Q.   And was it part of D-Roc's job to protect Mr. Combs?

A.   Yes.

MS. SMYSER:  Your Honor, the government would offer these two exhibits.

THE COURT:  All right.  That's 3T-112 and 112-R?

MS. SMYSER:  Yes, with 3T-112 being under seal pursuant to the Court's pseudonym order.

THE COURT:  3T-112 will be admitted under seal and 3T-112-R will be admitted.

(Government's Exhibits 3T-112, 3T-112-R received in evidence)

MS. SMYSER:  Ms. Foster, can you please display 3T-112-R for the jury and for the parties.

MR. STEEL:  Your Honor, we're preserving our objection.

THE COURT:  Yes.

MR. STEEL:  Thank you.

Q.   Mia, what are we looking at here?

A.   This is an e-mail thread between me and D-Roc.

Q.   So I want to direct your attention to the message at the bottom of the page.

A.   Mm-hmm.

Q.   Who sent that message?

P5TAComn5                      Mia - Direct

A.   I did.

Q.   And this message starts with:  I'm currently Neil's.

Who was Neil?

A.   Neil was another assistant.

Q.   Could you please read this message?

A.   I'm currently at Neil's third home right now, the sky, and I'm on my way to NYC, hit this e-mail when you land.  I got to talk to you when I get there.  Love you.

Q.   At the end of the message you said love you.  Why did you say that?

A.   Oh, that's how I talk to everybody I care about.

Q.   Were you romantically involved with D-Roc?

A.   No.

Q.   D-Roc then says:  What's up, I'm on my way to my crib.

A.   Mm-hmm.

Q.   What did you say in response?

A.   I'm just super worried about P.  I have no clue what's going on and I don't usually care to know the details since they're usually the same, but something felt wrong this morning.  This awful energy.  What is going on.  It has me sickly worried.  I'll call you when I land.

Q.   And who is P here?

A.   Puff.

Q.   And you said the details are usually the same.  What do you mean by that?

P5TACom5                         Mia - Direct

A.   As in when he was upset with Cass or they weren't getting along.

Q.   And how was this different?

A.   Because Puff was -- Puff was like -- Puff was acting different and was hurt.

Q.   All right.  D-Roc then says:  Yeah, it's crazy right now.  We deff need to talk.  Love you.

And when D-Roc said love you here, what did you understand that to mean?

A.   It was just how we always say, like love you, like...

Q.   And how did you respond?

A.   K, I'll hit you when I land, love you too.

MS. SMYSER:  You can take that down, Ms. Foster.

And could you please display for first just for the witness Government Exhibit -- or for the witness and the parties Government Exhibit 3T-111 side by side with 3T-111-R.

Q.   Do you recognize these?

A.   Yes.

Q.   What are they?

A.   An e-mail between me and Puff.

Q.   And are they fair and accurate representations of your e-mails?

A.   Yes.

Q.   And is 3T-111-R redacted version of 3T-111?

A.   Yes.

P5TACom5                    Mia - Direct

MS. SMYSER:  You can take those down, Ms. Foster.

Your Honor, the government offers Government Exhibit 3T-111 under seal pursuant to the Court's pseudonym order and the government offers Government Exhibit 3T-111-R into evidence.

THE COURT:  No objection?  I'm seeing a shake of the head.

MR. STEEL:  No opposition.

THE COURT:  All right.  No objection.  3T-111 will be admitted under seal and 3T-111-R will be admitted.

(Government's Exhibits 3T-111, 3T-111-R received in evidence)

MS. SMYSER:  Ms. Foster, will you please pull up 3T-111-R for the jury.

Q.  Who are the participants in this e-mail?

A.  Me and Puff.

Q.  And what is the date and time of the first message?

A.  December 22nd, 2011, 11:16 a.m.

Q.  And who sent it?

A.  I did.

Q.  When did you send this?

A.  I sent this when I was taking off on my flight.

Q.  To New York?

A.  Yes.

Q.  And what did you say?

P5TAСom5                    Mia - Direct

A.   About to take off.  Love you.

Q.   Were you saying love you romantically?

A.   No.

Q.   Why did you say it?

A.   I always said it.

Q.   How did Mr. Combs respond?

A.   Love you too.

Q.   And how often did he say things like that?

A.   All the time.  Just normal.

         MS. SMYSER:  You can take that down.

Q.   All right, Mia, I want to turn to a new topic now.

         Apart from when Cassie was in hotels for her injuries like we discussed earlier, when you were working for Mr. Combs, were there ever times that Mr. Combs and Cassie went to hotels together?

A.   Yes.

Q.   And how did you refer to these nights?

A.   Hotel nights.

Q.   How long did hotel nights typically last?

A.   They were all different.  It depended sometimes -- pardon me.

         If he, if Puff had worked like a bunch of stuff on his schedule, the next day, sometimes it could be one night, sometimes it could be multiple nights.

Q.   And I think you mentioned earlier that Toni Fletcher booked

P5TAC0m5                    Mia - Direct

hotels; is that right?

A.   Yes.

Q.   Were there any other employees later in your tenure who helped book hotels and travel?

A.   Yes.

Q.   Who?

A.   The executive assistants would, but also Melissa Feola later.

Q.   What if anything was your role related to these hotel nights?

A.   I would sometimes take them there, unpack, set up.  And then I would have to just be -- any time Puff wanted me to bring, like I had to be on call essentially if he needed anything.  And then pick them up and also like clean up before housekeeping.

Q.   Okay.  So you said a few things there so I want to break them down.

         You said you would sometimes take them to the hotel. Who is them?

A.   Oh, sorry.  Puff and Cass.

Q.   And you also said you would set up hotel rooms; is that right?

A.   Yes.

Q.   What kind of supplies would you bring to set up these hotel rooms?

P5TAСom5                    Mia - Direct

A.   All of his like toiletries and clothes and candles, any sort of like rider items.

Q.   And what other toiletries would you bring?

A.   Like all of his lotions and potions and like baby oil, Astroglide, condoms.

Q.   You mentioned candles.  Were there any particular brands of candles that you brought?

A.   Yeah.  There was a mixture of like the cheap and the expensive ones.  The cheap ones were -- they all had to be white, but the cheap ones were the Glade white linen with the label off.  And then the expensive ones were Diptyque.

Q.   And you mention that sometimes -- that you were on call during these nights; is that right?

A.   Yes.

Q.   Would Mr. Combs call you?

A.   Yeah.

Q.   And what typically would he contact you about?

A.   Just anything that he needed to be brought to the hotel or an unexpected to-do list.  Anything like that.

Q.   What kinds of things would he ask you to bring to the hotel?

A.   Anything he forgot at the house or like food or if he asked like security to bring him anything and I was already going there, then I would bring whatever he asked security to bring, which was usually, like, money.

P5TACom5                    Mia - Direct

Q.  And so when you would get money from security to bring to the hotel, approximately how much money would you be bringing?

A.  I never counted it, but I could see it.  It was like -- it was a lot.  It was like, like thousands of dollars.

Q.  Was there ever a time when you saw Cassie during a hotel night?

A.  Yes.

Q.  Once or more than once?

A.  More than once.

Q.  Is there a time that sticks out to you?

A.  Yes.

Q.  Where were you when you saw Cassie during that hotel night?

A.  The London Hotel in New York.

Q.  And why were you at the hotel?

A.  Puff had asked me to bring something to the hotel.  I don't remember what.

Q.  So after Mr. Combs asked you to bring something to the hotel, what did you do?

A.  I would bring it, but I would say, like, do you want me to leave it at the front desk or do you want me to bring it up.

Q.  On this occasion, did you bring something up to the room?

A.  Yes.

Q.  Who answered the door?

A.  Cass.

Q.  What was Cass wearing?

P5TACom5                    Mia - Direct

A.   A bright blue wig.

Q.   Do you remember if she was wearing clothes?

A.   She opened the door -- I don't remember her not wearing clothes.  That doesn't stick out.  She opened the door like really small.

Q.   So she just peeked out the door?

A.   Yeah.

Q.   And how did Cassie appear to you when she peeked out the door?

A.   Like she was struggling.  Different than I had seen her before.  So much that I asked, like, like are you -- like are you good.  Like essentially like are you okay.

Q.   And what did Cassie do after you asked if she was okay?

A.   She was like, like, no, no, I'm okay, I'm good, like that.  And closed the -- kind of like shh, I'm good.  And closed the door.

Q.   Mia, you mentioned that you also did cleanup of the hotel rooms; is that right?

A.   Yes.

Q.   Who instructed you to clean up the rooms?

A.   Puff, but it was also a part -- like from the office, like standard procedure that you called -- it was called sweep, like you sweep wherever he was.  Like wherever he was, yeah.

Q.   What if anything did Mr. Combs say to you about why you were supposed to clean these hotel rooms?

P5TACom5                    Mia - Direct

A.  Because you wanted to clean up enough stuff that wouldn't be like a housekeeper couldn't take and run to TMZ or expose anything of his personal, private business.

Q.  What did the hotel rooms typically look like when you cleaned them?

A.  A nightmare.

Q.  And what do you mean when you say a nightmare?

A.  Just they were just destroyed.  Really messy.

Q.  And what specific kinds of damage did you see?

A.  I saw a lot of candle wax everywhere that was like impossible to get out.  There would be lots of wet towels everywhere.  I've seen broken glass, water all over the floor, sometimes blood.  Oil all over, you know, furniture and walls and things like that.

Q.  You mentioned blood.  What if anything did Mr. Combs tell you about the source of the blood?

A.  That it was period blood.

Q.  Mia, were you ever with Cassie before a hotel night with Mr. Combs?

A.  Yes.

Q.  Once or more than once?

A.  More than once.

Q.  Is there a time that sticks out to you?

A.  Yes.

Q.  Where were you on that occasion?

P5TAСom5                    Mia - Direct

A.  I was in Cass's car in LA.

Q.  What if anything happened in Cassie's car?

A.  She got a message and was like ugh, she was like, like upset, like ugh.  Puff wants to get -- wants to have a hotel night.  And she seemed -- she was like visibly, like, upset. And, like, more, like, nervous, like really nervous.  And she started getting, like, stomach issues because of it.

Q.  Did she get sick?

A.  Yeah.

Q.  Mia, what did Mr. Combs and Cassie do after hotel nights?

A.  We called them -- well, we called it like man down because they would -- whether it was at the hotel or house or wherever, they would basically stay in a room and just -- and sleep for, you know, a day or two or three and just wake up to eat.

Q.  Next I want to talk about a different topic and I want to talk about drugs.

Aside from marijuana, before you started working with Mr. Combs, had you taken drugs?

A.  No.

Q.  While you were working for him, did you take drugs?

A.  Yes.

Q.  How often?

A.  Not often.  It was probably like, like a handful or two handfuls of times.

Q.  And when you took these drugs, was it with Mr. Combs,

P5TACom5                    Mia - Direct

without Mr. Combs, or both?

A.   Both.

Q.   The times you took drugs with Mr. Combs, who provided the drugs?

A.   Puff.

Q.   Where were you when you did drugs aside from marijuana the first time?

A.   At Puff's Miami house during Winter Music Conference party.

Q.   And do you remember when approximately this was?

A.   I don't remember the year.  Because every year he had a party during Winter Music Conference at his Miami house.  But I don't remember which year it was.

Q.   And who gave you the drugs on this occasion?

A.   Puff.

Q.   What kind of drugs was it?

A.   It was like MDMA.

Q.   And what if anything did Mr. Combs say when he gave you the MDMA?

A.   That I was now like a part of the breakfast club, and -- yeah.

Q.   And what did you understand the breakfast club to mean?

A.   It was like a close circle of friends that like partied through breakfast, like it was like the cool kids club.  I don't know.

Q.   What did Mr. Combs say about the MDMA?

P5TACom5                          Mia - Direct

A.   That it was the best because all of his stuff was pure.

Q.   And did you take the MDMA?

A.   Yes.

Q.   Why did you take it?

A.   Because I felt safe and protected by doing this under Puff's, I guess, supervision.  And I also felt -- I also knew the dynamic would shift, that now I was, you know, a friend hanging out and could enjoy myself.  Yeah.

Q.   So you felt like you were more like a friend than an employee in that instance?

A.   Yeah.

Q.   And you said that you felt safe taking the MDMA on that occasion.  Why was that?

A.   Because I -- because Puff was like my only authority and I believed -- so I believed everything he told me and -- yeah, I don't know how to explain that, but...

Q.   And he had told you that he had the best drugs?

A.   Yes.

Q.   What if any effect did the MDMA have on you?

A.   I made a lot of new friends.  I was smiling a lot.  I loved -- I hugged everybody I saw.  And, yeah, I just had a -- I was very, like, happy.

Q.   What other kinds of drugs did Mr. Combs provide you?

A.   That, that, like -- that like moll -- MDMA, and then one time ketamine.

P5TACom5                    Mia - Direct

Q.   So you remember him providing you MDMA and ketamine; is that right?

A.   Yes.

Q.   Focusing on the ketamine, where were you when Mr. Combs gave you ketamine?

A.   Burning Man.

Q.   And where exactly at Burning Man were you?

A.   We were on a tour bus where he was like -- where we were sleeping, and but he was basically hosting a bunch of people on it.  Like he was partying on it.

Q.   How did it come about that Mr. Combs gave you ketamine?

A.   He had put all the blackout shades up and like put the disco lights on and pulled out three plates, and there was like white powder on each plate.  And it was presented as some sort of game of.  Like, he said one was Molly, one was cocaine, and one was ketamine.  And people were, like, taking turns going up and I guess playing some, like, guessing game.

Q.   And what if anything did Mr. Combs say to you when these three plates of drugs were out?

A.   That, like, it was my turn.

Q.   And how did you react when Mr. Combs said it was your turn?

A.   I was -- I -- I was really nervous so I -- tried to say, like, no.

Q.   What happened after you tried to say no?

A.   I was -- Puff wouldn't let it go.  And was, at first, sort

P5TACom5                        Mia - Direct

of like making jokes about it, but then it turned a little bit more serious.

Q.  And what do you mean it turned more serious?

A.  His tone started to change.  Like, like, I was going to mess up the whole vibe and, like, he was monitoring because I tried to -- I tried to fake, I tried to fake it, like fake snort it, and he got like close to my face and was upset that I just tried to, I guess, fake it.

Q.  So you were trying to fake taking the drugs?

A.  Yeah.

Q.  And how did Mr. Combs react to that?

A.  He was like humiliating me and then was, like, going to -- he was going to separate.  Like basically monitor and separate the amount that I needed to take.

Q.  So did he separate out a dose?

A.  Yes.

Q.  And what did you understand you were supposed to do with that?

A.  Snort it.

Q.  And what did you do?

A.  I like -- I did, but then I when I got, like, away from him for a minute, I, like, tried -- I blew a lot of it out because I was so scared of the ketamine, watching what it did to others.

Q.  Had you ever taken ketamine before?

P5TACom5                          Mia - Direct

A.   No.

Q.   And you said you were watching what ketamine did to others. What did you see?

A.   We had a friend that had just gone through what looked like an exorcism, and they called it like a k-hole, which I guess means you have done too much.  It didn't look like -- I don't know.  It wasn't like you were in -- it didn't look like you were in control of yourself.  And then another friend next to me had just also gone into one, but seemed to be enjoying it. I don't know.  It just wasn't -- that wasn't the atmosphere for, for me.

Q.   Did you want to take the ketamine?

A.   No.

Q.   Why did you take it?

A.   I didn't think that, like, I had a choice.

Q.   I think, Mia, you said earlier that when you were working for Mr. Combs, you saw him do drugs; is that right?

A.   Yes.

Q.   What kinds of drugs have you seen him do?

A.   I've seen him take like Molly or MDMA, ketamine, and then prescriptions, but I don't know which ones.

Q.   And on what occasions did you see him do drugs?

A.   Mostly like in party -- like in party situations.  Yeah, like...

Q.   And were there any other occasions other than parties when

P5TACom5                          Mia - Direct

Mr. Combs appeared to be high to you?

A.   Yes.

Q.   And when were those occasions?

A.   There were -- there were a few times that -- well, at the studio, and there were, like a handful of times I remember that stuck out to me where I thought, like, this is an inappropriate time.

Like one time it was a board meeting.  One time was like going to the Chelsea Handler Show.  Like there were just a few times where it was -- where I was like, oh, gosh, when am I going to have to pull him to the side and say, like, you look a little crazy at the moment.

Q.   And so during these times when Mr. Combs appeared high, did he do any work?

A.   Well, to me, Puff was, like, always working essentially. But, yeah, he did -- yeah, he was in work situations, yes.

Q.   And from what you could see, where did Mr. Combs store his drugs?

A.   In his med bag.

Q.   What is the med bag?

A.   The med bag was like a Louis Vuitton pouch essentially that held, like, his prescriptions, and sort of like a gold traveling medicine cabinet.

Q.   From what you know, what was kept inside the med bag?

A.   A bunch of prescriptions.  I'm not really sure which.  Like

P5TACom5                          Mia - Direct

I -- I'm not sure which ones.  And I remember seeing -- like I didn't -- I tried not to, like, snoop in there.  But I remember seeing, like, a plastic baggy with, like, yellow pills and then, like, I remember maybe seeing pills with sort of stamps on them, like, I don't know, happy faces with the eyes X'ed out or something like that.

Q.  And where typically was the med bag?

A.  Wherever Puff was.

Q.  Okay.  Mia, next I want to talk about your relationship with Mr. Combs.

At a high level, how would you describe how Mr. Combs treated you when you were working for him?

A.  At a high level, he treated me -- sometimes he treated me like his, his, like, best friend, his, like, like, working partner.  Sometimes he treated me like I was a worthless piece of crap.

Q.  And so when Mr. Combs was treating you like his best friend or his working partner, what kind of things would he say to you?

A.  The mood would be different or he would be talking to me about -- like we would talk about, like, personal stuff.  He would, he would, you know, sometimes -- yeah, like compliment, compliment like the work I was doing, or he would sometimes act as my protecter.  He would sometimes give me life advice or try to -- sorry.

P5TACom5                          Mia - Direct

Q.  That's okay.

When you said there were times that he treated you like you were worthless, what kind of things would he do in those situations?

A.  He would humiliate me.  He would curse at me.  He would go on, like, really long, extended rants about how incompetent and stupid I was.  Yeah.  Threaten my job.  Just...

Q.  Would he do anything to you physically?

A.  Yeah.  He's thrown things at me.

Q.  You know, Mia, when things were good and you were talking about when you were work partners, were there times that you and Mr. Combs talked about job opportunities for you?

A.  Yes.

Q.  And what were those discussions like?

A.  Before the Revolt Films, especially when times were hard, as in like there -- you know, I had a lot of things, a billion, trillion things on my plate, he would say things like, you know, one day you can have -- you can like take -- you can do whatever you want at any of my companies.

And that's when I was like, I don't want to.  And I told him what I really wanted to do, which was like create and develop film and TV projects, especially comedy.  And he said that's what he wanted to do too.  So...

Q.  And what would he say about those creative and TV projects when he was upset with you?

P5TAСom5                      Mia - Direct

A.   Oh, he would threaten to take them away or he would take them away.  Take away my credits, tell me he's not doing them, things like that.

Q.   So I want to circle back to a few things you just talked about, Mia.  I think you mentioned that sometimes when Mr. Combs was upset, he would throw things at you.

What kinds of things would he throw at you?

A.   One time he threw, like, a bowl of spaghetti at me, turkey meat, a phone, a computer.

Q.   Let's talk about a few of those.  Focusing first on the bowl of spaghetti.  Where were you when he threw that at you?

A.   I was at the -- sorry.  I was at the -- in the kitchen, at the 9374 Beverly Crest Drive house.

Q.   And just to remind us, was Mr. Combs there from approximately 2010 to 2014?

A.   Yes.

Q.   Okay.  And what time of day was it on this particular instance?

A.   It was after -- it was like 3:00 in the morning.

Q.   Who was around at Mr. Combs' house that night?

A.   I'm not -- I don't remember, like, what security or if there were any other assistants working, but whoever was with us in that capacity, and then a bunch of people that he had brought back from his club appearance.

Q.   So Mr. Combs threw the bowl at you.  What if anything did

P5TACom5                    Mia - Direct

he tell you to do?

A.  He said go get everybody iHop right now.

Q.  And what did you do after he said that?

A.  I started to walk -- I started to go down to my room.

Q.  And why were you going to your room?

A.  Because I -- we had been out since like 8:00 in the morning, like, go, go, go, and I was next to him and barely got a break.  And I was on my period and needed to change my tampon immediately.

Q.  And how did Mr. Combs react when you started going toward your room?

A.  He was pissed.

Q.  And what if anything did he say?

A.  Like, yo, girl, I didn't tell you -- like, like, when I told you to go to iHop, I meant, like, now.  I didn't tell you you could go to your f'ing room yet.  And I tried to say something and he just -- it made him more, like, aggressive and louder and, like, going on sort of a really humiliating rant in front of everybody.

Q.  And what did you try to say to him?

A.  Well, I -- like after it went on for so long, there was -- there was literally blood dripping down my leg.  And I finally just said, like, I just have to change my tampon, I have blood dripping down my leg.

Q.  And how did Mr. Combs react to that?

P5TACom5                          Mia - Direct

A.   He immediately like -- he had a bowl of spaghetti in his hand and he immediately like threw it at -- like threw it at me aggressively and started cursing me out and telling me, like, I better get the fuck out of his house and started, and then he chased me outside.

Q.   Did the bowl hit you?

A.   No.

Q.   How close was it to you?

A.   It was like a few feet, like a couple feet.  Like, I don't know, arm's length maybe.

Q.   Did anyone intervene?

A.   No.

Q.   And you said Mr. Combs chased you outside?

A.   Yes. I don't know if he made it outside but he chased me, like, up the stairs and I ran out of the house barefoot.

Q.   Where did you go after that?

A.   I ran and hid in, like, a bush, and then eventually I escaped to I believe a hotel.

Q.   Did there come a time when someone from human resources talked to you about this incident?

A.   Yes.

Q.   Who talked to you?

A.   I believe it was Vashta.

Q.   At a high level, what do you remember Vashta telling you?

A.   That I was going to be suspended without pay.  That's

P5TACom5                        Mia - Direct

because Puff -- that's what Puff said.

Q.  And what did they say was the reason that you were going to be suspended?

A.  Because Puff is the boss and that's what he wanted.

Q.  Did she say anything about Mr. Combs throwing the bowl or chasing you out of the house?

A.  Oh, no.

Q.  All right, Mia, you also mentioned that Mr. Combs threw a computer at you; is that right?

A.  Yes.

Q.  Where were you when that happened?

A.  In LA on his trailer at a music videos set.

Q.  Do you remember when this was?

A.  I think it was like maybe 2000 like 11 I think or '12.  I get the years mixed up.

Q.  Who was around on this movie set?

A.  On his trailer was like his barber, I believe Derek, his stylist, I remember Swizz Beatz and I think Capricorn and just whoever else was working.

Q.  Okay.  What if anything did Mr. Combs ask you to do before he threw the computer at you?

A.  We had just arrived, and he was like the WiFi is not working.  So I ran to go find a production assistant and just let them know and see if they were like fixing the situation.  And they were.

P5TACom5                        Mia - Direct

So I --

Q.   Did you return to Mr. Combs after figuring out the WiFi situation?

A.   Yes.

Q.   What did you tell him about the WiFi?

A.   I was trying to regurgitate -- I was trying to tell him what the production assistant had told me, that they were working on it, but he didn't let me finish.

Q.   And what did he do at that point?

A.   He cut me off and started screaming at me that, like, I shouldn't come back here until I figured out the WiFi myself. Something about I don't care if you have to call Bill Gates, and then he chucked the computer at my head.

Q.   So he threw the computer at your head?

A.   Mm-hmm.

Q.   Did the computer hit you?

A.   No.

Q.   How close was it to your head?

A.   It was -- it was very close.  Like it -- it was, it was very close.  I just remember being like, oh, wow, he meant to -- he meant to hit me.

Q.   How hard did it appear that Mr. Combs threw the computer?

A.   Hard.

Q.   What did you do after he threw the computer?

A.   I ran out of the trailer and I went and hid between --

P5TACom5                        Mia - Direct

behind like the luggage van.

Q. Are these all of the times that Mr. Combs threw things at you or just some of them?

A. Just some of them.

Q. And how did you feel when Mr. Combs threw things at you?

A. Terrified and so humiliated and so confused, like what -- what did I -- what did I do so -- like what did I do so wrong that -- something is wrong with me that I would make him so, so upset. I just -- yeah.

Q. Were there times in which Mr. Combs physically injured or hurt you?

A. Yes.

Q. When did that happen?

Was once at Cassie's apartment like we talked about earlier?

A. Yes.

Q. Where else do you remember Mr. Combs hurting you?

A. Turks and Caicos, and the Revolt network offices.

Q. Okay. So let's take those in turn.

You mentioned once in Turks and Caicos. Was that on the same Turks trips that you testified about earlier?

A. Yes.

Q. And where were you when this happened in Turks?

A. I was, I was sleeping in a hammock behind my -- on the little porch behind my bedroom.

P5TACom5                    Mia - Direct

Q.  Did there come a time when you were woken up?

A.  Yes.

Q.  And how did you wake up?

A.  I woke up in shock by having -- it was an ice bucket, but it was like a jumbo, huge size metal one, like full of ice, like the whole thing dumped on me.

Q.  And who dumped this ice and the bucket on you?

A.  Puff.

Q.  What did Mr. Combs do after dumping this on you?

A.  He was like screaming at me about something, and then like snatched my phone.

Q.  And how did you respond to getting this ice dumped on you?

A.  Oh, I was in shock.  I like jolted up and had no idea what was happening.

Q.  What did you do after Mr. Combs took your phone?

A.  I panicked, because I didn't want him to go through my phone and I like jumped on his back.

Q.  And why didn't you want Mr. Combs to go through your phone?

A.  Because the -- so our internal team, personal team, we would keep each other, like, aware of his, like, moods.  I mean, and, like, help each other out.  So sometimes those weren't really worded the nicest and I was -- I didn't want him to like find me I guess like talking shit about him.  Because I didn't know what that would do if...

Q.  So you jumped onto his back?

P5TACom5                      Mia - Direct

A.   Yeah.

Q.   And then what did he do after you jumped onto his back?

A.   He like threw me into the -- backwards into the pool.

Q.   Mia, let's focus next on the incident you mentioned at the Revolt network office.

Is that Revolt TV not Revolt Film?

A.   Correct.

Q.   And where was that office located?

A.   It was on Hollywood and Highland in Los Angeles.

Q.   Had you been there before?

A.   If I had, only like once because I didn't remember -- I wasn't familiar with -- if I had, it hadn't been, like, a lot. Like, I wasn't familiar with the area or the building.

Q.   And when, approximately, was this?

A.   Oh, I think it was 2012.  I'm so bad with the years.

Q.   Are you estimating sometime around 2012?

A.   I think so.

Q.   And what were you doing with Mr. Combs at the Revolt office?

A.   Puff like enlisted me to help at the beginning of developing the network.  And so he had me there for some sort of like come to Jesus meeting with everybody from Revolt network -- I mean, yeah.

Q.   And what did he ask you to do?

A.   He told me to get somebody on the phone, but on my phone.

P5TAСom5                          Mia - Direct

Q.   Okay.  So what happened after you got someone on the phone?

A.   I was following pretty closely to him because Derek, his stylist, had just asked me how's Puff's mood because he had to meet with him.  And I said something like he's being -- he's -- I said something not so nice I guess, probably like he's being a jerk or an A-hole or something like that.

        And so I was following really closely I guess obviously because I didn't want him to -- I wanted to, like, get the phone back after he hung up so he didn't see it.

Q.   So what did Mr. Combs do with the phone?

A.   He started, like, looking at me and he's like why are you -- why are you following so close.  He's like what do you got on this phone.  And then he ran away.

Q.   And when he ran away, did he take the phone with him?

A.   Yes.

Q.   Did you follow him?

A.   Yes.

Q.   Where did he go?

A.   He ran into the bathroom.

Q.   Did you run into the bathroom too?

A.   Yes.

Q.   What happened in the bathroom?

A.   I got like partially in, like my arm got in the door and he -- he like slammed it on my arm.  And at first, I thought it was an accident, but then he did it multiple more times.  Like,

P5TACom5                    Mia - Direct

yeah.

Q.  And how heavy was the door?

A.  It was like a commercial building, so it was pretty heavy.

Q.  And did you have any injuries from Mr. Combs slamming the door onto your arm?

A.  Yeah.  I thought at first like -- I thought at first like there's no way this isn't going to be broken, but I just had bruises.

Q.  And what did Mr. Combs do after he slammed the door on your arm?

A.  He bolted right past me and ran down the fire stairs of the building out to the road.

Q.  Did he leave?

A.  Yes.

Q.  And did he have your phone with him?

A.  Yes.

Q.  At some point later that day, did you see Mr. Combs?

A.  Yes.

Q.  Where did you see him?

A.  At the studio.

Q.  What if anything did Mr. Combs say to you at the studio?

A.  He came outside and said something along the lines of like, yeah, I wouldn't want someone going through my phone if I had what you had in there either.  And but I sent all the -- I sent all of your, like, compromising or inappropriate or naked or

P5TACom5                    Mia - Direct

something like this photos to my phone so that I got something on you just in case you got something on me.  Or just like, you know, you know -- because you got stuff on me.  Like kind of as a -- like a bullying joke, but...

Q.  How did you take it?

A.  I was relieved because I knew he was lying and he didn't see the message from me and Derek.  But, yeah.

Q.  Did you in fact have compromising photos of yourself on your phone?

A.  No.

Q.  And so Mr. Combs said to you now you have something -- now I have something on you like you have something on me.  What did you understand that to mean?

A.  Oh, just like because I was so like enmeshed in his life and his -- you know, he would always give me his phone or his computer or something that like, I don't know, that kind of, like, I know his like -- I know some of his secrets or I've seen some of his stuff, I don't know, that now, you know, now --

Q.  Were you aware of anything specific he was referring to?

A.  No.  I was just always -- no, nothing specific.  Just like I was, you know -- so like never really could like get a -- like leave his side, so I obviously knew.

Q.  Had you ever tried to use anything like that against Mr. Combs?

P5TACom5                        Mia - Direct

A.  Oh, no.  Never.

        MS. SMYSER:  Ms. Foster, could you please pull up what's in evidence as Government Exhibit 3T-108-R.

Q.  What is this, Mia?

A.  This is an e-mail from me or between me and Toni and Shannon.

Q.  And just remind us who Toni is?

A.  Toni was -- she might have been the chief of staff at this time, but if not, she was still in that role.  Like -- or I'm sorry, still -- she still -- like -- sorry.

        Yes, she was still doing things that role would.  And Shannon was the executive assistant.

Q.  So I want to focus on the first message.  Who sent that message?

A.  I did.

Q.  And who did you send it to?

A.  To Toni and Shannon.

Q.  What did you say?

A.  Puff took my phone and left me on the street in Hollywood.  My iPhone is in his car.  Not sure when/if I'll get it back.

Q.  Why were you sending this message?

A.  Because I had to keep everybody aware of Puff's movements at all times in order to make sure he got around, or, you know, everybody was in position.  And then plus also the office would send me a million things I had to ask him constantly.  So I

P5TACom5                    Mia - Direct

didn't want them to -- I didn't want Toni or Shannon to think that I was not being responsive to them because I had to respond, like, constantly.

MS. SMYSER:  Okay.  You can zoom out, Ms. Foster.

Q.  Toni responds:  Are you okay.

What did you say in response?

A.  I found Revolt, thank goodness because I was a little lost and barefoot.

Q.  What are you talking about here?

A.  That I was on the street barefoot and I was lost and I finally found the offices again.

Q.  So after Mr. Combs ran out of Revolt with your phone, what did you do?

A.  I threw off my heels and I ran after him.

Q.  And where did he go?

A.  He meandered through some, like, dark streets, and then, like, dove into his car and his driver and him drove away.

MS. SMYSER:  You can zoom out.

Q.  And then Toni asks you next what happened.  And how do you respond?

A.  Deff an in-person story.  Anyone want to pick me up from studio.  Idk where he is.

Q.  And what do you mean an in-person story?

A.  I would never -- I would never tell anybody these sorts of stories, but especially on e-mail because -- and if there were

P5TAC0m5                          Mia - Direct

any stories that included violence, I would omit those, but I would keep like Toni and Shannon sometimes, like, aware of, again, like his moods or whatever sort of situation it was.

Q.  And why would you omit the violence when you would inform other people about this?

A.  Oh, because I would never tell anybody that.

Q.  Did you talk amongst the inner team about these things?

A.  If they saw, if they saw it.

Q.  So who are the kinds of people you would talk to about violence like this?

A.  D-Roc, sometimes Derek, or I guess like sometimes Matt. Yeah, just like people who had been around and like would witness things.

Q.  And who is Matt?

A.  Matt was Puff's engineer.

Q.  And what if anything was your relationship with Matt.

A.  Oh, at one point we dated.

        MS. SMYSER:  Mia -- we can take that down.

Q.  We've now talked about several instances in which Mr. Combs was physically violent to you.  How did you feel on those occasions?

A.  Terrified, humiliated, embarrassed.  Again, like I didn't know -- I didn't know, like, what I did wrong.  And in a weird way like, like I -- like I -- like I didn't know why I deserved it.  And but I made a lot of excuses for him in my head.

P5TAСom5                    Mia - Direct

MS. SMYSER:  Your Honor, I'm about to move on to a new topic if you would like to take an afternoon break, or I can keep going.

THE COURT:  Let's take a break.

Thank you, members of the jury.  We'll come back in 15 minutes.  So we'll be back a little before 3:00 p.m.  All rise.

(Continued on next page)

P5TACom5                          Mia - Direct

(In open court; jury not present)

THE COURT:  Mia, we'll come grab you a little bit before 3:00.

THE WITNESS:  Okay.  Thank you.  We can -- everyone at ease.

Ms. Smyser, are we still on pace for today?

MS. SMYSER:  I won't finish with her today.  I'll need to pick it up in the morning.  But we're making progress.

THE COURT:  Okay.  Good.

MR. STEEL:  Your Honor, did you say how long?

THE COURT:  I said 3:00.

MR. STEEL:  Three minutes?  I was going to go.

THE COURT:  No, 3:00 p.m.  But let's like try to start at 3:00.  Thank you.

(Recess)

(Continued on next page)

P5TMCOM6                         Mia - Direct

THE COURT:  Are we ready to go, Ms. Smyser?

Let's bring Mia back.

(Jury present)

THE COURT:  Ms. Smyser, you may proceed when ready.

MS. SMYSER:  Thank you, your Honor.

BY MS. SMYSER:

Q.  Mia, you testified earlier that Mr. Combs sexually assaulted you multiple times, is that right?

A.  Yes.

Q.  Did you ever want to engage in any sexual activity with Mr. Combs?

A.  No.

Q.  Over what period of time did the sexual assaults occur?

A.  Over -- I am not sure of the years, but there was -- they were sporadic.

Q.  Were they sporadic during your employment with Mr. Combs?

A.  Yes.

Q.  Where was Cassie when these sexual assaults occurred?

A.  Not there.

Q.  Did you tell her about them?

A.  No.

Q.  Where were you the first time you remember Mr. Combs sexually assaulting you?

A.  At the Plaza Hotel in New York for his 40th birthday.

Q.  For whose 40th birthday?

P5TMCOM6                        Mia - Direct

A.   For Puff's 40th birthday.

Q.   Why were you at the Plaza Hotel?

A.   Because I was working.

Q.   Were you Mr. Combs' personal assistant at the time?

A.   Yes.  I was very new.

Q.   Approximately how long had you been working for Mr. Combs
at this point in time?

A.   Just a few months.

Q.   How much of the hotel had Mr. Combs rented for his birthday
party?

A.   I believe it was the whole thing.

Q.   Where was Mr. Combs physically located at the party?

A.   He had like a penthouse suite, and then the downstairs of
the hotel was where the main party was, so he was going back
and forth between.

Q.   Was there a time when Mr. Combs was in the penthouse?

A.   Yes.

Q.   Did there come a time when you went to the penthouse?

A.   Yes.

Q.   Why?

A.   Because we had to stay within his eyesight and earshot.

Q.   When both you and Mr. Combs were in the penthouse, who else
was there?

A.   A lot of people.  Malcolm, whoever was working at the time,
and then other party guests, celebrities.

P5TMCOM6                          Mia - Direct

Q. Was Cassie there?

A. No.

Q. What did Mr. Combs do when you were in the penthouse?

A. At some point he asked to speak to me in the kitchen.

Q. After he asked you to speak to you in the kitchen, what did he do?

A. I guess he had everybody else clear the room, leave.

Q. Did you end up going into the kitchen?

A. Yes.

Q. Who was in the kitchen with you and Mr. Combs?

A. Just us.

Q. What did Mr. Combs tell you in the kitchen?

A. He was saying that he noticed what a good job I was doing and that I didn't have to be nervous or scared to come to him, because at that time I was just going through Malcolm, the other assistant, to ask questions or -- I wasn't really like going direct to Puff. And he was saying that he had noticed I was doing a great job and that like -- sort of like we were going to be working closer together, so we should -- things like that.

Q. What, if anything, did Mr. Combs offer you when you were in the kitchen with him?

A. Then he poured us shots of vodka to cheers for his birthday.

Q. How many shots did he give you?

P5TMCOM6                         Mia - Direct

A.  I think two.

Q.  What did you do with the shots?

A.  I took them.

Q.  Had you been drinking earlier that night?

A.  Not that I can recall, but, if so, like it wasn't affecting -- it wasn't like affecting me.

Q.  How did these shots that you took with Mr. Combs make you feel?

A.  I remember thinking like that, whoa, did I not eat or something because they affected me, like I felt like they hit me kind of hard.

Q.  How did shots normally make you feel at this point in your life?

A.  I was in my twenties in New York.  Two shots would not have made me feel that way.

Q.  What did Mr. Combs do after you took the shots?

A.  He was still talking, like, and I just remember my back -- I was like standing against the wall, and I just remember he was talking and, all of a sudden, his face got closer.  Like I remember my eyes couldn't like focus on his face because it was so close, and I didn't really know what was happening.  And he put his arm next to my head up against the wall and like leaned in to like kiss me and put his other hand up the side of my dress.

Q.  I just want to make sure I have this straight.  Did

Mr. Combs kiss you at that point?

A. Yeah.

Q. Did you want Mr. Combs to kiss you?

A. No.

Q. Did Mr. Combs put his hand up your dress?

A. Yes.

Q. Did you want him to do that?

A. No.

Q. Were you able to tell Mr. Combs no in that moment?

A. No.

Q. Why not?

A. I was shocked and -- I was shocked, and I froze. I didn't even process what was happening.

Q. What is the next thing that you remember happening after Mr. Combs kissed you?

A. My next like memory is I just remember being on a chair like in the main room in the penthouse and like coming to the chair and the sun was coming up.

Q. When you came to, were you clothed?

A. Yes.

Q. Was anyone else around?

A. I don't really remember. In my memory, I don't see anyone.

Q. At this point in time, when Mr. Combs kissed you, what did you think about Mr. Combs' role?

A. He was my boss. He was a very powerful person. He was to

P5TMCOM6                         Mia - Direct

me like -- he is younger than my dad, but I looked at him like an older -- like adult.  He was the boss or the king, very powerful person.

Q.  Mia, earlier you said the next thing you remember is coming to on a chair in the penthouse.  Do you remember how you got from the kitchen to the main penthouse?

A.  No.

Q.  What do you mean when you say like you came to?

A.  That's just my next memory.

Q.  What were your expectations about whether something like this would happen again?

A.  I thought it would never happen again.  I thought, oh, my gosh, he was so drunk, and I will never tell anybody.  It was probably like a huge accident, and I was sort of like -- I knew the confidentiality, and I was just kind of like I didn't want that to -- I thought that he would have never remembered that and that it was a huge accident, and I was never going to -- I was going to act like nothing happened.

Q.  Were there other times after this incident at the Plaza Hotel in which Mr. Combs made you feel uncomfortable sexually?

A.  Yes.

Q.  Approximately how long after his 40th birthday party was the next time you remember?

A.  I don't know how long it was, but I remember still -- I remember how I felt as far as like I was still relatively new.

P5TMCOM6                    Mia - Direct

Yeah. So I was still relatively new, but it wasn't like right after -- I don't know. Could have been months.

Q. Where were you the next time you remember this happening?

A. I was in New York at his apartment.

Q. At whose apartment?

A. At Puff's apartment.

Q. Why were you at Mr. Combs' apartment?

A. Because at the end of the -- whenever Puff was done for the day or the night, or whenever everybody went upstairs to like drop off his bags and set him up, and I was the one with his bags.

Q. When you got to the apartment to do that, did you see any other employees?

A. Downstairs outside was his driver and security.

Q. Who from security was there?

A. Uncle Paulie.

Q. What, if anything, did Uncle Paulie say to you at this time?

            MR. STEEL: Objection.

            THE COURT: Hold on.

            Grounds.

            MR. STEEL: Hearsay.

            THE COURT: Ms. Smyser.

            MS. SMYSER: It's for the effect on the listener, your Honor.

P5TMCOM6                         Mia - Direct

THE COURT:  Overruled.

Q.  What, if anything, do you remember Uncle Paulie saying to you?

A.  He said something that made like me feel super uncomfortable.  At first, I was going up to the apartment, I didn't think anything, and he said something like, not like a warning or like be careful, but something like, aha, I have seen this before.  It was something that like made my inner alarms go off.

Q.  Where did you go after speaking with Uncle Paulie?

A.  I had to go upstairs with his bags.

Q.  With whose bags?

A.  With Puff's bags.

Q.  When you went upstairs, where was Mr. Combs?

A.  He was in the apartment.

Q.  Where in the apartment?

A.  In the foyer.

Q.  What did Mr. Combs tell you to do?

A.  I was just dropping off the bags, and then he asked me to pull something up on the computer for him really quick.

Q.  What did you do after he asked you that?

A.  I went into -- his living room had like a U-shaped couch where that's where you would -- there wasn't much space in the apartment.  That's where you would basically be in.  I went to the far, far, far end and pulled up whatever he asked for.

P5TMCOM6                         Mia - Direct

Q.   What did Mr. Combs do when you were pulling this up on your computer?

A.   He came and sat next to me and then like leaned over -- leaned over me almost to like look -- put his face in the computer, but this was -- like in an uncomfortable way.

Q.   Aside from when Mr. Combs had kissed you and put his hand up your dress, had he ever been that close to you?

A.   No.

Q.   How did you feel when he was leaning over you?

A.   There was something inside of me that was like sounded the alarm bells, like I felt really uncomfortable, but I didn't know how to behave because I didn't want to make a big deal if it was nothing.

Q.   What did you do next?

A.   I faked like -- I said, oh, I have to go to the bathroom so bad, like I had to pee, and I got up and like ran to the bathroom.

Q.   What happened after you went to the bathroom?

A.   He was like:  OK.  Well, I'll see you tomorrow.  And he let me go for the night.  So I thought that -- I thought, see, he wasn't trying to do anything.  I just convinced myself that I was --

          MR. STEEL:  Objection.

          THE COURT:  That's overruled.

          Let's get a new question.

Q.  How did this incident make you feel, Mia?

A.  When he let me go, I felt like, OK, see, like he wasn't trying to do anything.  That was just -- that is all in my head.  That was just some silly joke that Uncle Paulie was saying.  I felt crazy and felt safe again.

Q.  Mia, you mentioned earlier that Mr. Combs sexually assaulted you on multiple occasions.  Where were you the next time you remember Mr. Combs sexually assaulting you?

A.  At his 9933 Beverly Grove Drive.

Q.  That's a house in Los Angeles?

A.  Yes.

Q.  And he was in that house approximately 2009 to 2010, from what you remember?

A.  Yes.

Q.  Where were you in the Beverly Grove house?

A.  The room I stayed in was upstairs in a room with bunk beds, so I was asleep on the bottom bunk bed.

Q.  Did you lock the door to your room?

A.  No.

Q.  Remind the jury why not.

        MR. STEEL:  Objection.

        THE COURT:  It's overruled.

Q.  Why didn't you lock the door to your room, Mia?

A.  Because I wasn't allowed to.  That was his house and you can't lock his doors.

P5TMCOM6                          Mia - Direct

Q.  And who did not allow to you look your door?

A.  Puff.

Q.  Did there come a time a point in time when you woke up?

A.  Yes.

Q.  What caused you to wake up?

A.  The weight of a person on top of me.

Q.  Who was on top of you?

A.  Puff.

Q.  What do you remember happening when Mr. Combs was on top of you?

A.  I remember -- I remember it was sort of like him telling you that, somehow, be quiet and using -- this just happened so fast.  Using like one hand to get -- I guess his hands or whatever off.

Q.  What did he do when he used that hand to get his hands undone?

A.  He -- he put -- he put his -- he put himself inside of me.

Q.  So you said he put himself inside of you, is that right?

A.  Yes.

Q.  Do you mean that he put his penis inside of you?

A.  Um-hum, yes.

Q.  How did you react when that happened?

A.  I just froze.  I didn't react.

Q.  How did you feel?

A.  Terrified and confused and ashamed and scared.

P5TMCOM6                        Mia - Direct

Q.  Did you want to have sex with Mr. Combs?

A.  No.

Q.  How long was this assault?

A.  It was very quick but felt like forever.

Q.  How did it end?

A.  I don't remember, but I know that he didn't -- that he didn't like leave the job unfinished, so --

Q.  He wouldn't leave a job unfinished?

A.  Yeah.  Whenever he was done or satisfied or got what he want.

Q.  Is that when it would end?

A.  Yes.

Q.  Mia, where were you the next time you remember Mr. Combs sexually assaulting you?

A.  I was at the 9374 Beverly Crest house.

Q.  What were you doing at the Beverly Crest house?

A.  I was -- we were like getting him ready to go to like a meeting or run out of the house, so I was on his bedroom closet floor, like putting stuff in a bag.

Q.  Who was in the bedroom closet with you?

A.  I thought nobody or people were always in and out, like running around.  But then Puff --

Q.  Did there come a point in time when Mr. Combs came into the closet?

A.  Yes.

P5TMCOM6                          Mia - Direct

Q.   What did Mr. Combs do when he got into the closet?

A.   I wasn't paying attention.  It was going so fast.  But the next thing, I looked up, and he was like standing right in front of me, in front of my face.

Q.   And what happened when Mr. Combs was standing right in front of your face?

A.   He had -- he had his -- he had his -- he had his penis out, and he like grabbed my head and -- and put it in -- and put it in there.

Q.   So Mr. Combs took his penis out, is that right?

A.   Yes.

Q.   And did he grab your head and pull it toward him?

A.   Yes.

Q.   Did he put his penis in your mouth?

A.   Yes.

Q.   How did you react when that happened?

A.   I was just -- just froze and -- I didn't do anything.  I just let it happen.

Q.   How did you feel when Mr. Combs put his penis in your mouth?

A.   Like trash and scared and ashamed and defeated and like an idiot.

Q.   Did you want to give Mr. Combs oral sex?

A.   No.

Q.   And how long did this last?

A.   It was very fast, really fast.

Q.   Mia, other than what we have described so far, were there any other times in which Mr. Combs sexually assaulted you?

A.   Yes.

Q.   Sitting here today, do you remember the details of those assaults?

A.   No.

Q.   What generally do you remember?

A.   I just remember a feeling, like a specific horrible dark like feeling in my stomach that I would get surrounding like certain like places, but I don't remember.

Q.   Can you describe an example of a memory you have with that kind of dark feeling?

A.   I remember one time we were flying on a private jet and everyone was asleep, our team was asleep, and in the back between the main like area and the bathroom there was a separate place where there was a bed that he would get to sleep.  And it was normal if you had to go to the bathroom you just walked through there and it was -- yeah, everyone was asleep.  I went to the bathroom and I remember, when I opened the door, that he was standing right there and like basically was trying to push me back inside, which I don't remember what happened.

Q.   Do you remember getting pushed back into the bathroom?

A.   Yeah.  I remember trying to like -- trying to squiggle out

P5TMCOM6                         Mia - Direct

of it, like, no, no, no.  I would always, in order to get out of things like, if I ever could, I would make it about other people that could potentially hear or see or whatever.  I remember being like, no, no, no.  It didn't work.

Q.  So you sometimes used other people as a distraction to get out of sexual encounters?

A.  Yes.

Q.  How did you feel in this instance when you realized you couldn't distract Mr. Combs or squiggle out of it, even when other people were around?

A.  Like helpless and like I have lost some layer of protection and so unsafe and just terrified.

Q.  Sitting here today, do you remember exactly what happened in the bathroom?

A.  No.

Q.  Mia, was there ever a time in which you initiated sexual contact with Mr. Combs?

A.  No, no.

Q.  Was there ever a time you told Mr. Combs you wanted to have sex with him?

A.  No.

Q.  I think earlier you mentioned that these assaults would happen sporadically, is that right?

A.  Yes.  There was no pattern.

Q.  When they would happen, where was Cassie?

P5TMCOM6                        Mia - Direct

A.   She was not there.

Q.   Did Mr. Combs have any other girlfriends?

A.   Yes.

Q.   Where were they in these instances?

A.   Not there.

Q.   Were you able to predict when the sexual assaults would happen?

A.   Never.  Never.  There was no -- they were always random, sporadic.  It would go so oddly spaced out where I would never think that it would happen again.  And the way that our dynamic was, I was constantly -- there were no boundaries, so it wasn't like it wasn't weird for me to be in his room at all hours of the night or waking him up or talking to him while he's on the toilet, and it never happened in situations that would be like that or when -- like during a party.  It never, no.

Q.   After an assault, what was your expectation about whether Mr. Combs would ever engage in sexual contact with you again?

A.   I always thought like that it was the last time and that the next time I would -- if there ever a next time I would somehow be more prepared.  We would have to get right back into work, and there was so much going on, I never processed it.  I never thought it would happen again.

Q.   What would you do after the sexual assaults occurred?

A.   Just keep it moving.  Like keep right back to whatever I was doing right before, which was always an insane amount of

P5TMCOM6                         Mia - Direct

work or running around.

Q.   And you mentioned that you would keep it moving.  What did you mean by that?

A.   That means just like that could never happen and keep on your like -- just stay focused on whatever you were doing before.  Keep working.  There was no time to stop and think and reflect or anything.  Just keep it moving like it never happened.

Q.   Is keep it moving a phrase that Mr. Combs would use?

A.   Yes.

Q.   Mia, during any of these sexual assaults, was there any indication to you that Mr. Combs was on drugs?

A.   No.

Q.   You have now described several times in which he has sexually assaulted you.  Just to be very clear, during any of these incidents, did you want to engage in sexual acts with Mr. Combs?

A.   No.

Q.   Did you actually tell him no?

A.   No.  I only tried to squiggle out of them if I could, but, otherwise, no.

Q.   Why didn't you tell him no?

A.   Because I couldn't tell him no -- I couldn't tell him no about a sandwich.  I couldn't tell him no about anything.  There was no way I could tell him no, because then he would

P5TMCOM6                          Mia - Direct

know that I thought he was doing was wrong, and then I would be a target.

Q. What were you afraid would happen if you told Mr. Combs no with regard to sex?

A. That he would fire me and ruin my future and somehow twist the story into making me look like a threat.

Q. Why were you afraid of those things?

A. Because I was -- because I knew his power, and I knew his control over me, and I didn't want to lose everything that I worked so hard for or this like world that I -- that was the only thing that I had anymore.

Q. What, if anything, were you worried would happen to your job?

A. It would be over, and I would have -- I would never work in that industry again.

Q. What, if anything, were you worried would happen to you physically?

A. Somehow attacked. I just -- I didn't to die or get hurt.

Q. You were worried about Mr. Combs physically hurting you if you told him no?

A. Yeah, always.

Q. When you told him no, not just about sex?

A. Yes.

Q. What, if anything, did Mr. Combs say to you about these sexual assaults?

P5TMCOM6                         Mia - Direct

A.  He didn't -- but he did threaten me sometimes with them.

Q.  And how would he threaten you with them?

A.  He threatened that he was going to tell everybody, and he was going to telecast as though I had something to do with it.

Q.  As if you had something to do with it?

A.  Yes.

Q.  How did that make you feel when he threatened to tell everyone?

A.  Like desperate and terrified and happened and the worst scariest situation.  I would have done like anything to not have it happen, like it was my fault.

Q.  Mia, when Mr. Combs was sexually assaulting you, did you tell anyone about it?

A.  No.

Q.  Why not?

A.  I was going to die with this -- I didn't want anyone to know ever.

Q.  What, if anything, were you worried would happen if you spoke up?

A.  I would have been silenced.  I would have been punished.  I would have been exiled from my like second family.  I would have had a horrible reputation.  I would have lost everything.

Q.  Who did you think would do those things to you?

A.  Puff and anybody he involved.

Q.  Why did you not tell HR or chiefs of staff about the sexual

P5TMCOM6                          Mia - Direct

assaults?

A.  HR was only around when Puff wanted to call HR to punish you.  HR was not there to protect you, but also who is going to believe me.  And this was way before me too.  This is way before social media or mental like help awareness or sexual assault, way before any of this.  I didn't have like a -- I didn't have like a -- I just thought I would be punished.  There is no way I ever told them.  Plus, this confidentiality.

Q.  Who instilled confidentiality in you?

A.  Puff and the office.

Q.  When you are working for Mr. Combs, Mia, were there ever time that you saw other employees speak up about Mr. Combs' abuse?

A.  Yes.

Q.  Who spoke up?

A.  Kala Faulkner.

Q.  Remind us who Kala is.

A.  Kala was an assistant.

Q.  Is this the same Kala Mr. Combs directed you to reach out to after he slammed Cassie's head into the bed frame?

A.  Yes.

Q.  Did Kala speak up before or after that incident?

A.  After.

Q.  How did you learn that Kala had spoken up about Mr. Combs?

A.  I was told.  There was like an urgent phone call among

P5TMCOM6                          Mia - Direct

people, like executives, yeah, in the office.

MR. STEEL:  Objection.

THE COURT:  It's overruled.

Q.  Were you on that call?

A.  Yes.

Q.  What did you understand that Kala had said when she spoke up?

THE COURT:  Hold on, Ms. Smyser.  Can you lay a little bit more context for this call.

MS. SMYSER:  Sure.

Q.  Mia, who generally was on this call?

A.  I don't remember everyone, but I know it was like HR at the time, I believe the chief of staff, I believe there were like C-suite executives.

Q.  What is your understanding of the purpose of this call?

A.  Was to discuss how to handle Kala.

THE COURT:  You may proceed.

Q.  What did you understand that Kala had said when she spoke up?

A.  She had told the new chief of staff casually that she thought that Puff had hit Cass and then the chief of staff told, I believe, HR.

MR. STEEL:  Objection.

THE COURT:  Overruled.

Q.  Who was the chief of staff at that time?

P5TMCOM6                          Mia - Direct

A.   Her name was Eureka Gillakey.  She was new.  I am probably pronouncing her last name wrong.

Q.   What happened to Kala after this phone call?

A.   She was fired.

Q.   Did Mr. Combs ever talk to you about Kala being fired?

A.   Yes.

Q.   What did he tell you?

A.   That if she was -- if she filed a lawsuit that I would have to get up on the stand.

Q.   And do what?

A.   And testify everything that he told me to say and also about an incident that had happened a month or a few months before that.

Q.   At a really high level, what had happened a few months before?

A.   A few months before, Kala had been drinking in the office in the day and had forgotten to pay a bill of Puff's, and I was in the office getting that call and I let her know.  And she threw the wallet at me, and I was like shocked, and she ended up getting aggressive and got in my face and then ended up punching me in the face, and I just left.  And then later Puff punished both of us and made -- instead of punishing her, suspended me as well and made me stay with her and like help her get back on track.

Q.   Was Kala fired after this incident when she punched you?

P5TMCOM6                    Mia - Direct

A.   No.

Q.   When was she fired?

A.   After she told the chief of staff she thought that Cass was abused by Puff.

Q.   You were just talking about Mr. Combs telling you that you may have to testify against Kala.  Was this the only time Mr. Combs told you would have to testify against someone?

A.   No.

Q.   When was the other time?

A.   After Capricorn Clark left or was fired.

Q.   Do you remember approximately when this was?

A.   I don't remember, but it was a few years -- sorry.  I feel like it was a few years before Kala.

Q.   What did Mr. Combs tell you about testifying against Capricorn?

A.   That if there was any sort of lawsuit I would have to get up on that stand and defend him and say what he wanted me to say.

Q.   You would have to say what he wanted you to say?

A.   Um-hum.

Q.   Did you actually have to testify?

A.   No.

Q.   Mia, why didn't you go to the police about Mr. Combs sexually assaulting you?

A.   I didn't even think -- that wasn't even like an option.  I

P5TMCOM6                          Mia - Direct

didn't even think that was an option.

Q.  Had you had any interactions with the police related to Mr. Combs that gave you that belief?

A.  Yeah.  Um-hum.  Yes.

Q.  One or more than one?

A.  More than one.

Q.  Did one of these interactions involve you specifically?

A.  Yes.

Q.  Why don't you tell us about that.

A.  I was driving in LA.  I was speeding as fast as possible because I had to get to Puff, because he was upset that it was taking me so long to get to where he was, and I didn't -- I hadn't had time to go get my license renewed, so I didn't even have a license, and I was pulled over, and I was panicking because I didn't want to get in trouble with Puff.

So it was like the only time I ever name dropped, and I just said, I'm so sorry, but, please, I don't want to upset my boss.  And when I told her who it was, she said, the only way -- she didn't believe me, and she needed proof, and in a very official way, to get him on the phone, so I did.  And then the second I handed the phone, she started laughing and saying like, oh, my God, Puff Daddy, I love you, like just went into this whole very excited conversation, and then she let me go.

Q.  Did you get a ticket?

A.  Oh, no.

P5TMCOM6                    Mia - Direct

Q.   And you mentioned that there were multiple interactions with the police.  Was Mr. Combs present for one of the other interactions?

A.   Yeah.

Q.   Who else was there?

A.   I don't remember.  It was security and a driver.  I don't remember which security it was.

Q.   And what happened on that occasion?

A.   We were pulled over for like doing something like speeding ridiculously or driving in the shoulder or something, and the cops approached pretty aggressively.  Then once they saw Puff, they were like, oh, my bad, yeah, and left us alone.

Q.   What city did these interactions with the police occur in?

A.   LA.

Q.   When was the first time you told someone else that Mr. Combs had sexually assaulted you?

A.   Within the past like year and a half, I think.

Q.   Was this before or after your first meeting with the government?

A.   After.

Q.   Why did you not tell the government initially about the sexual assaults?

A.   Because I didn't know that you had to tell the bad things that happened to you if nobody else saw, and I thought I could just die with it and never tell anyone because it's shameful,

P5TMCOM6                        Mia - Direct

shameful thing of my life.

Q. Did you have a lawyer when you first met with the government?

A. No.

Q. At some point did you get a lawyer to help you prepare for your testimony today?

A. Yes.

Q. Did you disclose these sexual assaults to the government before or after you got a lawyer?

A. After.

Q. Without getting into any discussions that you had with your lawyer, why are you talking about the sexual assaults today?

A. Because I have to tell the truth, the whole truth.

MR. STEEL: Objection.

THE COURT: Overruled.

Q. You can answer, Mia.

A. Because I have to tell the truth, the whole truth, and nothing but the truth. And also I now have a moral obligation because when you're scared into silence, these things continue to happen to others, and I can't --

MR. STEEL: Objection.

THE COURT: Ms. Smyser, again, another question.

Q. Do you want to be talking about the sexual assaults today, Mia?

A. Absolutely not.

P5TMCOM6

Q.  Why not?

A.  Because --

MR. STEEL:  Objection.

THE COURT:  Overruled.

Q.  Why not, Mia?

A.  Because it is the most traumatizing -- it's the worst thing and most shameful thing that ever happened to me.

Q.  Why are you testifying here today?

MR. STEEL:  Objection.

THE COURT:  Ms. Smyser, I think that has been asked.

MS. SMYSER:  I think we can break here, your Honor were, before I move on to a new topic.

THE COURT:  Very well.

Thank you, members of the jury.  We will be back here to start at 9 a.m. tomorrow.  Thank you for your hard work and close consideration.

As I always tell you, please do not speak with each other about the case.  Do not look up anything about the case or talk to anyone else about the case, and have a great night. See you here tomorrow.

All rise for the jury.

(Jury not present)

THE COURT:  Mia, we will see you tomorrow at 9 a.m.

Please be seated.

Any issues to address before we adjourn?

P5TMCOM6

Ms. Smyser.

MS. SMYSER:  No, your Honor.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  Yes, your Honor.  Two.

One, I sent a letter to the Court last night.

THE COURT:  I have dutifully made the inquiries.  I will let you know if I hear anything.  We will make some arrangements if we can.  I'm on it.

MR. AGNIFILO:  I'm sure your Honor is.

I know your Honor -- it's fairly urgent on our end.  I know the Court knows that.  I have to actually say that on the record.

THE COURT:  I appreciate that, and I appreciate you raising it.

MR. AGNIFILO:  The other thing, and this is by way of kind of keeping the Court in the loop sort of in real time. And I am not going to get into details, because the details are between the parties.

The government sent us a letter late last night indicating fairly substantial changes in their direct case to come.  That's all well and good.  The reason I bring it up to your Honor is, we have not -- we got it about 11:00 last night, which is fine, but we really have not had a chance to discuss this as a team.  It may change certain aspects of the defense case.  It may make the defense case somewhat longer based on

P5TMCOM6

who the government is not calling for a variety of reasons.  I can't say for sure.

But one of the things that I think is helpful, and I'm sort of seeing as we are going on, I want to kind of keep the Court in the loop kind of as we go, so when the kind of dust settles on this.  It's a fairly substantial change.  And we kind of see how, if at all, that changes the defense case, I will keep the Court updated.

THE COURT:  That's vague enough for me not to really understand what the issue is.

MR. AGNIFILO:  Here are the practical things.

It may be that the government rests sooner than they were planning to.  That doesn't mean that the trial is going to end sooner than we were all planning to, because there are certain things, and I don't want to give away -- one of the few things we have on our side on the defense is, we get to react.

It may be that because of witnesses the government is not calling, we might have more on the defense case.  That's really --

THE COURT:  Understood.

MR. AGNIFILO:  In terms of what the Court has been telling the jury, I think we are probably still bumping up against the 4th of July holiday.  I don't see ending that much earlier, even if the government rests a few days or a week early.

P5TMCOM6

THE COURT:  That's fair.  When I say that, that's a fair thing for you to raise so that I'm not setting expectations that we ultimately cannot meet.  As I have said throughout, if you need the time to put on your case, then you'll have that time.

MR. AGNIFILO:  Thank you, Judge.  I know that.  Thank you very much.

THE COURT:  Anything else from the defense?

MR. AGNIFILO:  I don't see anything else from us, Judge.  Thank you.

THE COURT:  We will see everyone here tomorrow at 8:30.

(Adjourned to May 30, 2025 at 8:30 a.m.)

INDEX OF EXAMINATION

Examination  of:                                    Page

DEONTE NASH

Cross By Mr. Donaldson . . . . . . . . . . . .3135

Redirect By Ms. Comey . . . . . . . . . . . .3195

MIA

Direct By Ms. Smyser . . . . . . . . . . . .3201

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

3T-113    . . . . . . . . . . . . . . . . . . .3202

3A-119, 3A-150, 3T-101, 3T-102, 3T-103, . . .3217

    3T-105 through 108, C-508,

    H-115 and H-116

3A-119-R, 3A-150-R, 3T-102-R, 3T-103-R, . . .3218

    3T-105-R, 3T-106-R, 3T-107-R,

    3T-108-R, C-508-R, H-115-R,

    and H-116-R

2A-318    . . . . . . . . . . . . . . . . . . .3230

3T-109    . . . . . . . . . . . . . . . . . . .3277

3T-112, 3T-112-R . . . . . . . . . . . . . . .3287

3T-111, 3T-111-R . . . . . . . . . . . . . . .3290

DEFENDANT EXHIBITS

Exhibit No.                                    Received

1806-R    . . . . . . . . . . . . . . . . . . .3136

1847    . . . . . . . . . . . . . . . . . . .3178

1848 . . . . . . . . . . . . . . . . . . . . . .3179