UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

                v.                        24 Cr. 542 (AS)

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

                Defendant.                Trial
------------------------------x
                                          New York, N.Y.
                                          June 10, 2025
                                          8:40 a.m.
Before:

                    HON. ARUN SUBRAMANIAN,

                                          District Judge
                                          -and a Jury-

                        APPEARANCES


JAY CLAYTON
     Interim United States Attorney for the
     Southern District of New York
BY:  MADISON R. SMYSER
     EMILY A. JOHNSON
     MAURENE R. COMEY
     MEREDITH FOSTER
     MITZI STEINER
     MARY C. SLAVIK
     Assistant United States Attorneys

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

APPEARANCES CONTINUED


AGNIFILO INTRATER LLP
       Attorneys for Defendant
BY:   MARC A. AGNIFILO
      TENY R. GERAGOS
      -and-
HARRIS TRZASKOMA LLP
BY:   ANNA M. ESTEVAO
      -and-
SHAPIRO ARATO BACH LLP
BY:   ALEXANDRA A.E. SHAPIRO
      JASON A. DRISCOLL
      -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:   Lucy Gavin
                Shannon Becker
                Paralegal Specialists
                Raymond McLeod, Paralegal

(Trial continued)

THE COURT:  First question for the government.

So at the beginning of yesterday's proceeding, an issue had arisen with respect to one of the jurors.  At the time, there was an inquiry with the juror, and at that time the defense had indicated that they had no objection to the juror continuing to hear the case.

The government was going to do some additional research and would advise the Court of its position.

Ms. Slavik, did the government have that opportunity?

MS. SLAVIK:  Your Honor, the portion of that conversation that took place in the robing room, that portion of the transcript is under seal.

The government requested the court reporters to provide that portion of the transcript, and after the government receives that, we do intend to submit something further.

THE COURT:  All right.  And in doing that, as you will see reflected in the sealed portion of the transcript, there was some inquiry as to any legal authority that would be relevant to the situation.

I will tell you that I've looked, and I was unable to find anything.  So I will just put that on your radar because you are probably better at this than I am, and you might be able to find the authority on point.

MS. SLAVIK:  Very doubtful of that, your Honor, but we will look.

THE COURT:  One other issue, just tying up a loose end to Jane's counsel's letter from last week concerning disclosure of Jane's identity online, the Court sent that letter to the marshal service to determine whether any of the individuals who had revealed Jane's identity online had been in the courtroom. And we will inform the parties if there is any issue to address along those lines and they are certainly on the lookout for anyone who was in the courtroom who in any way violated this Court's order or disclosed Jane's identity.  That's to follow up on that issue.

As to the defense's motion for a mistrial that was filed on this Saturday, for the reasons set forth in the government's June 9, 2025 letter, the motion is denied.

The only thing the Court will add to the government's letter is that to the extent that the defense's letter suggests that the government hamstrung the defense's cross-examination of Ms. Bongolan by objecting and initiating sidebars, no interference happened, and the defense was fully able to, and did, undermine or was able to attempt to undermine Ms. Bongolan's testimony that the event in question occurred on -- did not occur on the date that she testified to.  The defense was also able to, and did, attack Ms. Bongolan's testimony concerning other circumstances of the alleged

incident.

This is not fodder for a mistrial. It is the adversarial process at work. The defense engaged in vigorous cross-examination to expose inconsistencies in Ms. Bongolan's testimony and to undermine her credibility.

As for the exhibit admitted by the Court, GX-361C, for the reasons previously set forth by the Court, it was properly admissible and, if anything, the exhibit as read by the defense supports their narrative, and not the government's; namely, the way the defense reads it, Ms. Ventura only learned about the balcony incident after the fact. That's why the defense, not the prosecution, was the first to use this document during their cross-examination of Ms. Ventura in attempt to undermine her testimony that she had witnessed the alleged balcony incident. So the defense will now be able to use this exhibit to undermine both witnesses' testimony that Ms. Ventura witnessed the incident, and separately they can argue, based on their vigorous cross-examination of Ms. Bongolan, and evidence of Mr. Combs being out of town on September 26, 2016, to attack Ms. Bongolan's testimony that the incident happened at all. Given all of this, it is unclear what prejudice the admission of an exhibit that supports the defense's narrative would possibly cause.

The Court makes one additional observation. The defense was aware before trial about the nature of

Ms. Bongolan's and Ms. Ventura's account of the balcony incident from the government's 3500 material and pretrial filings. They also had Mr. Combs' travel records and even GX-3612C which they read to suggest that Ms. Ventura did not see the event in question, and yet they filed no motion before or during these witnesses' testimony to preclude inquiry on the balcony incident.

This speaks volumes. The defense didn't complain earlier because the relevance of the balcony incident is clear, and their arguments would not be the basis for exclusion, let alone a mistrial, but rather material for a strong and vigorous cross-examination which is precisely what happened.

So the motion for a mistrial is denied.

On the motion to strike exhibits --

MS. SHAPIRO: Your Honor, I apologize. Can I put a few more things on the record regarding this?

THE COURT: You certainly can. I'm going to go through the rest, and I'll give both sides a chance to respond to anything that they feel is necessary.

On the motion to strike Government Exhibits GX-E-331-FR and HR, again, for the reasons stated in the government's June 9, 2025 letter, the motion is denied.

The Court previously held that these exhibits, which the government substantially redacted after initial discussions with the Court and defense, were are admissible under Rule

803(3) or Rule 801(d)(1)(B), and the defense's letter doesn't add arguments on these issues.

In terms of the 403 objection, the exhibits are relevant to the government's contention that Jane was not willingly engaging in the incidents in question, but rather that she felt she was duped into them by promises of a relationship that never materialized. Further, the defense's proposed jury charge itself notes that to prove fraud, the government must prove a misstatement or omission of a material fact to entice the alleged victim. That's from the defense's request to charge at page 46. The exhibits in question are, at the very least, relevant to falsity of materiality and enticement.

While materiality is an objective inquiry, evidence that the alleged victim believed that they were duped, and duped as to an important matter, is certainly admissible to inform that inquiry. This is from *United States v. Livtak*, 808 F.3d 160, 175-176 (2d Cir. 2015).

This a quote from the Court:

"We conclude that on the trial record before us, a rational jury could have found that Livtak's misrepresentations were material. The trial record includes testimony from several representatives of Livtak's counterparties that his misrepresentations were important to them in the course of the transactions on which the securities fraud charges were

predicated, and that they or their employers were injured by those misrepresentations.  This testimony precludes a finding that no reasonable mind could find Livtak's statements material."

As for unfair prejudice, the Court disagrees that the notes brand Combs as a liar for all purposes, as these were Jane's private ruminations on her thoughts about Combs' behavior in a specific context.  Especially after the substantial redactions made by the government on the urging of the Court and the defense, there is nothing in the notes that is more prejudicial, and certainly not unfairly so, than what Jane has been testifying about over the past three days and what is contained in the hundreds of text messages that were admitted without objection from the defense.

So the motion to strike those exhibits is denied.

On the motion to recall Dr. Hughes to offer additional testimony, this motion is denied for the reasons set forth in the defense's June 9, 2025 letter.

As for *Ray*, the Second Circuit affirmed the admission of Dr. Hughes' testimony in that case on an abuse of discretion standard holding that the district court's admission of Dr. Hughes' testimony was not manifestly erroneous.  However, the Court of Appeals reiterated one of the main concerns voiced by the defense in this case:  That a district court may commit manifest error by admitting expert testimony where the evidence

impermissibly mirrors the testimony offered by fact witnesses or the subject matter of the expert's testimony is not beyond the ken of the average juror.  That's from the slip opinion at pages 21-22 quoting *United States v. Amuso,* 21 F.3d 1251, 1263 (2d Cir. 1994).

In applying the standard, the Second Circuit did not say that testimony of the kind offered by Dr. Hughes would be admissible in every case, but, rather, left it up to the exercise of the district court's discretion.  That's at the decision at page 25.

In this case, for reasons previously addressed on the record, the Court determined that while Dr. Hughes' explanations of the counterintuitive responses of victims to abuse met the Rule 702 and 403 standards, including why victims stay in abusive relationships, trauma bonds, love bombing, coping strategies, delayed disclosure and memory.  Other aspects of Dr. Hughes' disclosures, and specifically the explanation of coercive control and the intentions of abusers, raised the specter of the concerns noted by the Second Circuit in *Ray* on the facts of this case and the disclosure Dr. Hughes furnished here.

Indeed, much of the emphasis in *Ray* in affirming the district court's decision focused on the beneficial testimony that could be offered on contextualizing the seemingly counterintuitive behavior of the victims.  That's the slip

opinion at pages 27-28.

This is precisely the area where Dr. Hughes was permitted to testify.  In short, the court carefully weighed the admissibility of this testimony under Rule 702 and balanced the interest under Rule 403, and *Ray* does not suggest that either of those evaluations by the Court should be revisited.

The government also argues that the defense opened the door to further testimony from Dr. Hughes based on their attacks to Mia's credibility by showing her positive messages to Combs and posts throughout her employment with Combs and thereafter.  However, victims' counterintuitive responses to abuse was precisely the area that Dr. Hughes was permitted to testify, as the defense notes in their letter.  Indeed, the government elicited on direct several pieces of testimony from Dr. Hughes that would pertain to that precise area, including testimony precisely on the issue raised by the government on page 21 to 108 of the transcript:

"Q.  Dr. Hughes, can victims applying these various coping strategies that you've been testifying about still express love and loyalty to their abuser?

"A.  Yes, and often they do.  That's back to the trauma bond. Often they still have positive and loving feelings towards their abuser even after they've left for years.  There's still a part of them that loves the initial person that they fell in love with."

Now Dr. Hughes' testimony was focused on romantic relationships and not the kind of employment relationship that Mia had.  Now that may be as a virtue of the fact that Dr. Hughes was testifying right after Ms. Ventura and before Mia had testified or it might be that Dr. Hughes' disclosure was simply focused on the interpersonal dynamics of abuse and victim behavior in the context of romantic relationships as opposed to employment relationships.  Either way the government could have amplified this particular testimony to address what they knew was coming, a cross-examination of Mia based on her myriad social media posts, texts, and emails to Combs, et cetera.  But they didn't.

Under these circumstances, permitting the government to recall Dr. Hughes, an atypical step that might signal to the jury that her testimony is of elevated significance, is unnecessary and would potentially prejudice the defense, as the defense points out in their letter.

For that reason, the motion is denied.

The Court will address tomorrow the issue concerning the juror after the government has had an opportunity to review the transcript and the relevant authorities.

With that, I think that the only outstanding issue -- and, Ms. Shapiro, I'll obviously let you respond on anything you want to, and also the government.  I think the only outstanding evidentiary issue is on GX-1410 and 1411.  I think

where we last left that issue is, Ms. Shapiro, you were going to review those two summary charts to determine whether there were any hearsay issues and meet and confer with the government. We don't need to address that right now. I just wanted to make sure that there wasn't anything else that was missing.

MS. SHAPIRO: No, your Honor. And we will be meeting and conferring with the government about that.

THE COURT: Very good. Now you wanted to address the motion for a mistrial.

MS. SHAPIRO: Yes. Actually, a couple of things.

So with regard to the motion for mistrial, I just wanted to make a couple of points in response to both what the Court said and the government's letter, just so the record is complete. I understand your Honor has ruled.

So, first of all, with respect to the idea that we should have raised this before the testimony, I think that misunderstands the nature of what happened and how, you know, trials ordinarily proceed, which is that we didn't know what she was going to say until she took the stand. We were obviously prepared to cross-examine her, and did, when it turned out, certainly in our view, she perjured herself as to these events relating to the balcony incident. So I wanted to make that point as well.

The government's response kind of ignores the fact

that Ms. Bongolan insisted repeatedly that she got all the injuries at the same time at the hands of Mr. Combs from this supposed balcony incident, and the metadata from the photographs related to the leg injury was from September 26, the date on which the government certainly should have known Mr. Combs was not in Los Angeles and was in fact on the East Coast.

And, you know, sometimes it's obvious that metadata is wrong.  So, for instance, it will just have a crazy date like you know 1949 or something.  This metadata obviously looked quite accurate.  It was at or near the time of the alleged incident, and so there's really no -- there's no basis to pretend that Ms. Bongolan didn't actually testify that she got these injuries on September 26.

And then with regard to the government's claim that they were unaware of the perjured testimony, if there was any perjury, the standard is "knew or should have known," and the government offers no response regarding the hotel record or the other discovery that we cited.

The last thing --

THE COURT:  What's the response that in Ms. Bongolan's direct examination she certainly testified that she was unclear on certain of the details concerning the balcony incident.  And then on redirect examination, she clarifies that she was not a hundred percent sure about the precise timing; meaning, other

than the fact that the picture and the metadata said September 26, 2016, and on direct examination the government certainly did elicit that that picture was taken, I believe, the morning after or the same day as the balcony incident.  Is there something else that would indicate that there was a discrepancy in the timing that the government should have been aware of prior to her testimony; meaning, something in the 3500 material or elsewhere that would have indicated that Ms. Bongolan was affirmatively stating this happened on September 26, at a time when the hotel records and other materials would show that Mr. Combs was in New York?

MS. SHAPIRO:  Well, I'd say two things in response to that.  One is that she repeatedly indicated, and the government was aware and deliberately elicited the fact, that she claims she received all the injuries at the same time, and that they were all caused by Mr. Combs.

And, in addition to that, and I think we quoted this in our letter, the prosecutor asked her something to the effect of "And do you remember all the details?"  And she said no. And then the prosecutor asked, "Are there certain details that stick out in your mind?"  And she said yes.  And then the questioning proceeded to like, "Well, what details were those?" I'm not sure that's the exact question, but essentially the next question went into these injuries.

And so the clear and strong implication was that one

of the details that stuck out in her mind was that she had received this leg injury which she described in detail and, you know, talked about -- yeah -- so here's a 3500 that my colleague has recently sent to me -- provided to me.  3508-023 page 1, it's just one example.

It says:  Photos of injuries.  Bruise.  September 26, 2016.  Back of thigh deep cut with some bruising around it. Balcony incident happened early in the morning.  Photo taken later that day at BB's apartment in Beverly Hills.

So, you know, the government was aware that this was her story.  They elicited it deliberately.  They had the hotel records which they had marked as an exhibit.  You know, there was additional discovery that included material related to Mr. Combs' schedule, his travel, things that his assistants were organizing that the government had in its possession.  And so there's really no basis to conclude that the government wasn't aware that this testimony was false.

And with regard --

THE COURT:  Well, isn't an available explanation that the government screwed up, and that Ms. Westmoreland used that as an opportunity to have a real Perry Mason moment in federal court and she, you know, had a great cross-examination and, you know, blew a hole through the direct testimony of Ms. Bongolan? And so why is that grounds for a mistrial?  Isn't that grounds for when you're, you know, done for the day in the defense war

room, you're saying great job, you know, on that cross-examination. I mean, isn't that how it usually goes?

MS. SHAPIRO: It's certainly true her cross-examination was terrific, I agree with that, but I don't agree -- and I think that's what the standard is: "Knew or should have known." The government has an obligation, a very strong and important obligation here, to ensure that, you know, that -- certainly they're entitled to zealously represent themselves, but, you know, they have to act within the bounds of the law, and they have a higher duty to make sure that the testimony is true. And here there's all kinds of evidence that they should have known that this was false. And I think the fact that they elicited the other testimony from Ventura actually underscores this because when Ventura was on the stand, she testified that she saw this incident notwithstanding the evidence in the message. And I wanted to say one other thing about that in a minute as well. But so they go ahead and elicit this testimony from Ms. Ventura that she claims to have seen this. And then knowing that there's some -- there's documentary evidence that seems to refute that account, and suggests that if she heard anything about it, it was after the fact. And then they go ahead and elicit this testimony. So I would respectfully submit under all the circumstances, it's clear what was going on here, and, at a minimum, it satisfies the should-have-known standard, your Honor.

With regard to the text message, I'd also point out that, you know, the government is trying to have it both ways. They got it admitted on the premise that it supported Ms. Bongolan's testimony, and here in their letter they say, as I said when I was arguing against its admission, that it may or may not have related to Ms. Bongolan's experience on the balcony. That's at page 3 of the government's letter.

THE COURT: Well, I don't think that that's what they're saying. I think what they're saying is there are various text bubbles in that particular document, and the text bubbles that the defense relies on to suggest that Ms. Ventura did not see the balcony incident might actually pertain to other issues. For instance, an apparent phone being flung off the balcony and did someone find the phone and things like that.

And because of the rapid fire of text message communications, it's not lucidly clear what that refers to. I will say that if you actually look at Ms. Ventura's message, she appears to say that she was there and was woken up at the time that this occurred, and so if you actually look at the text talking about the balcony incident, I don't believe it's a hundred percent clear whether she saw it or not because she does agree that she was there. It's not as if she was saying, "I slept through this thing. I have no idea that he even came over and then I was told about it by somebody after the fact."

That's not what the actual exhibit says.  You can argue otherwise.  That's something you can use the exhibit to argue.

MS. SHAPIRO:  I respectfully disagree, and I also think the Court's interpretation is not even what the government says, and I don't agree with it.  I think the text message is pretty clear on its face.  She does say that she was woken up, and there was a commotion, or words to that effect, but there's nothing in the text message to suggest that she actually saw the incident that Ms. Bongolan described to the jury.  And in fact she says twice, both right after the part about the phone, and then after she describes being woken up, she again repeats, you know, "I found out about this later," so -- or words to that effect.  So I don't think that's a fair interpretation of either the text message or even what the government was arguing.  I'm sure now they'll stand up and say, of course that's what they meant.  But I don't think that's fair.

And at the very least, your Honor, we would, you know -- we understand that the Court has denied the mistrial. I also just want to point out this is only our second motion for a mistrial.  I'm not sure why the government had said we had made three.  But, in any event, we would ask in the alternative that the Court would consider a *Napue* instruction to the jury that this testimony was perjured testimony.

THE COURT:  Well, let me hear from Ms. Smyser as to

what's the kind of explanation on the timing from the government's perspective, that is consistent and does not meet the "knew or should have known" standard.

MS. SMYSER:  Your Honor, I think many things could be going on here, as we outlined in our letter.  The metadata could be wrong.  Ms. Bongolan could misremembered exactly when she took photographs.  There are many things that could be going on that explain the series of events.

I think the point is what Ms. Shapiro is focusing on is whether the government knew or should have known about alleged perjury, but that is just one part of a four-part test.  Also to meet the standard, they have to show that there was perjury, which there wasn't.  This is the exact kind of thing that can be explained by confusion, mistake, faulty memory.  Those are the kinds of things that the case law outlines.

In addition, in order to meet the four-part test, the perjury must not come out at trial, which I think, as has already been explained, there was lengthy and vigorous cross-examination here, so I think there is no question really here that the four-part test as outlined by the case law hasn't been met.

THE COURT:  And I suppose the innocent explanation is, look, this happened nine years ago.  And so Ms. Bongolan, who readily admitted that she was using drugs and various substances during this entire time period — and thank goodness

that she is now sober — but during that time period when she was living that kind of life with those substances, and so it may be understandable that she would be off a little bit on the timing and sequence of things.

So even if she had said in the 3500 material as, you know, in discussions with the government that she believed the picture had been taken the same day, it might be that the picture had been taken a few days later in which case it would be consistent with the travel records and everything else.

So, for instance, if it happened the previous week or before September 24, I believe that's the kind of key date, then, sure, it could have happened earlier in September. She took the pictures on September 26, and that would be fully consistent. But, in any event, the defense had the opportunity to, and did, on cross-examination attack the timing that was elicited on direct. So there you go.

MS. SMYSER: That's absolutely right, your Honor. And I will also say, as the Court pointed out, Ms. Bongolan has said many times she doesn't remember all the details of the events, and there could be many explanations for that, including drugs, including it's almost a decade later.

I also want to put one more thing on the record, and note that Mr. Steel did make a mistrial motion at a sidebar, which is why we said there were three mistrial motions.

THE COURT: I think he said he was going to move for a

mistrial. If the next question were asked, I think he said he's going to move for a mistrial.

MS. SMYSER: Three attempted mistrial motions, your Honor.

MS. SHAPIRO: Sorry. Just a couple more things, if I may.

I think it's very telling that Ms. Smyser has still not explained to the Court why this testimony was elicited even though the government had in its possession records demonstrating that Mr. Combs was on the East Coast from September 25 through September 29. That's the first point.

The second point with regard to Ms. Bongolan is you have to put this in the perspective, the fact that she had a strong motive to lie because of her civil lawsuit, and also to exaggerate the scope of her injuries at the alleged hands of Mr. Combs.

And then, in addition to that, with regard to the Court's comments about, oh, well, maybe this happened earlier, the fact of the matter is that if you buy the argument that the text message exchange between Ms. Ventura and Kristina Khorram, which occurred on September 30, occurred contemporaneously with the balcony incident, there's no way it could have occurred before September 26. So for those additional reasons and the other ones, we respectfully submit that a mistrial is in order, but at the very minimum, we would request a *Napue* instruction.

THE COURT:  Any further response?

You don't have to, but --

MS. SMYSER:  No, your Honor.

THE COURT:  I suppose even putting the explanation to the side, how would it make sense for the defense or for the government to knowingly put on perjured testimony that would be readily undermined on cross-examination based on documents produced by the government to the defense?  It just doesn't make -- does that make any sense to you in this context?

MS. SHAPIRO:  Yes, it does, because they -- obviously, they might think they could slip one past the goalie.  I mean, the idea that somehow because we did a really good job on cross, that that excuses the government, I don't agree with that, your Honor.  I don't think that's fair.

THE COURT:  Well, I think Ms. Smyser says that as a technical matter, given the elements that you have to prove, it does actually undermine any motion for a mistrial in this context because to the extent there was perjury, and the government says there wasn't perjury, it was revealed during the cross-examination.  It was not something that only came up after the fact.

MS. SHAPIRO:  Well, I understand that, your Honor, but under *Napue*, at a minimum, we're entitled to an instruction, so that's a sort of after-the-fact inquiry that might be appropriate if there were a conviction, and we were just

talking about this for the first time on appeal, but we would submit that --

THE COURT:  Understood.  Can you please submit to the Court the proposed instruction that you would give, and I'll certainly take a look at it.

MS. SHAPIRO:  We'd be happy to do that.

Briefly, two other quick points.  We object to ask Juror No. 6 being stricken, and I understand the colloquy is under seal, so I don't want to explain further on the record now, but if the government is going to put in a letter, you know, we'd like the opportunity to be heard either in writing or tomorrow morning.

THE COURT:  Everyone will be fully heard on this issue.

MS. SHAPIRO:  The last thing just with regard to the ruling relating to Government Exhibits E-331-FR and HR, I just want to note -- I understand the Court's ruling.  I just want to note I do think this issue of what the proof requires with regard to the fraud theory is going to come up again at Rule 29, and there will be issues we will raise about what can go to the jury.  And in that regard I just want to just to preview in one sentence.  I mean, the government says in its letter that, you know, it claims the defendant made unfulfilled promises of quality time in connection with hotel nights.  And we're going to argue that that is just -- could not be a federal crime even

if it was proven.  So I just want to preview that.  Obviously, there's nothing that needs to be done at this stage.

THE COURT:  I'll certainly hear it.  Every case brings up its own unique circumstances.  But if, for example, in a human-trafficking situation someone promised immigrants that they would get them green cards if they would participate in a venture domestically, brings them in, and it's actually a brothel, but they say, you know, we'll get you green cards, and those are the unfulfilled promises that lead to the victims being subjected to sex trafficking, you would agree that's a viable crime, right?

MS. SHAPIRO:  Absolutely, your Honor, and that's far afield from what we're talking about here.  And what we're talking about here starts to border into vagueness concerns, notice concerns, all kinds of things of that nature because it's so far afield from that sex-trafficking theory.

THE COURT:  Understood.  I'll hear you obviously at the appropriate juncture.

One question just to put it on the top of your minds, the government says as to threats of force, fraud, or coercion, these are means and not standalone elements of a 1591 violation, and so they do not bear a unanimous jury finding because this they're just means under bedrock Supreme Court and Second Circuit precedent.  You don't disagree with that.

MS. SHAPIRO:  I need to take a closer look at the

particular argument in their brief.  Obviously, I got it late last night or this morning.

THE COURT:  Understood.

MS. SHAPIRO:  I think there are other issues in terms of, you know, the time sequence of what they're going to argue here and so forth, but I think that's all better left for the Rule 29.

THE COURT:  Understood.

Anything from the government before we proceed?

MS. SLAVIK:  No, your Honor.

THE COURT:  So let's proceed.  Let's have Jane back, if we could.

MS. GERAGOS:  Your Honor, could we have a very brief sidebar?  Very, very briefly.

THE COURT:  Yes.

(At the sidebar)

(Page 5279 sealed)

(In open court; jury present)

THE COURT:  Please be seated.  Welcome back, members of the jury.

Jane, you understand you're still under oath?

THE WITNESS:  Yes, I do.

THE COURT:  Ms. Geragos, you may proceed with cross-examination.

MS. GERAGOS:  Thank you, your Honor.

JANE, resumed.

CROSS-EXAMINATION

BY MS. GERAGOS:

Q.  Good morning, Jane.

A.  Good morning, Ms. Geragos.

Q.  As Ms. Comey said, we've met before, right?

A.  Yes.

Q.  We've met several times in person prior to this case or this trial starting, right?

A.  Yes.

Q.  And then, as you said yesterday, once the trial began, you made the decision not to meet with me or Mr. Agnifilo any more, right?

A.  Yes.

Q.  Because you understood that was your choice, right?

A.  Yes.

Q.  And nobody ever pressured you to meet with us again once

you made that choice, right?

A.   That is correct.

Q.   And since January, I think you said, you've met with prosecutors and agents in this case several times.  Does that sound right?

A.   Yes.

Q.   And would you say it's about 24 times since January this year?

A.   Maybe.  Around there.

Q.   And every one of those 24 times, you went over the substance of your testimony with the prosecutors and the agents involved here, right?

A.   Yes.

Q.   And Ms. Comey asked you yesterday who was paying for your attorney, and you said Mr. Combs is, right?

A.   Yes.

Q.   Has Mr. Combs ever attempted to interfere with your attorney's representation of you?

A.   No.

Q.   And do you believe your attorney has represented you to the best of her ability?

A.   Definitely.

Q.   And you're testifying here at this trial against Mr. Combs despite him paying for your attorney, right?

A.   I'm testifying against him?

Q.  Well, you're testifying as - I should rephrase that - as a witness here at this trial?

A.  Yes.

Q.  Despite him paying for your attorney, right?

A.  Yes.

Q.  So no pressure has been exerted by him on you at this trial, right?

A.  No.

Q.  In other words, he's been paying for your attorney, and that has not prevented you from doing what you would like to do, right?

A.  Right.

Q.  It's been eight months or so since his arrest.  Does that sound right?

A.  Yes.

Q.  And you haven't spoken to him?

A.  No.

Q.  And you haven't seen him.  The first time you've seen him is this week, right, or Friday?

A.  Yes.

Q.  And in the meetings, approximately 24 meetings with the government that you had, how many times did they prep you on how to be cross-examined at this trial?

A.  I would say maybe two times.

Q.  Did they bring other prosecutors into the meetings and

cross-examine you?

A. Yes.

Q. How long did those parts of the meetings last?

A. I would say about an hour -- 30 minutes to an hour.

Q. And in the other 24 meetings, or over the approximately 24 meetings, did they go over all of your messages that we admitted yesterday over the course of your examination with you?

A. Yes.

Q. And they did that with you at pretty much every meeting. Does that sound right?

A. Yes.

Q. And some of the screenshots that we went over as well?

A. Yes.

Q. I think you said yesterday you did not go to homeland security asking to participate in this case, right?

A. Correct.

Q. They came to you?

A. Correct.

Q. They came to you in March right after the raids on Mr. Combs' home?

A. Yes.

Q. Two agents came to your home?

A. Yes.

Q. Then they came to you again after Mr. Combs' arrest in

September or October, right?

A. Yes.

Q. And you wanted -- well, in March when they came to your home, did you want anything to do with them at that point?

A. No.

Q. And those warrants, to your memory, were those in March of 2024?

A. I believe so.

Q. It was about a month after you had gotten back together with Mr. Combs after your break?

A. Yes.

Q. And you had the choice to speak to them if you wanted to, right?

A. Yes.

Q. And you chose not to speak with them, right?

A. I chose to have an attorney represent me in the matter.

Q. You chose to get an attorney, and then you and your attorney - I'm not asking about those conversations - made decisions on what to do with the agents at that time, right?

A. Yes.

Q. And at that time, you had gotten back together with Mr. Combs about a month earlier, right?

A. Yes.

Q. And so you knew he was under investigation in March of 2024, and at that time, you had done one more -- it wasn't a

hotel night, right, because you said it was at 1 Star Island, but you had done one more night with Mr. Combs, and I think you said it was Don?

A.  Yes.

MS. COMEY:  Objection.

THE COURT:  Is there an objection?

MS. COMEY:  Objection to the form of the question, your Honor.

THE COURT:  Why don't you rephrase your question.

Q.  In February -- I believe you testified yesterday in February of 2024, you had gotten back together with Mr. Combs around your birthday, right?

A.  Yes.

Q.  And you had done a night with, I believe you testified, Don in February of 2024 at his house in Miami, right?

A.  Yes.

Q.  And then at that -- and then one month later, in March of 2024 when the warrants were executed at Mr. Combs' homes, you knew at that point he was under investigation, right?

A.  Yes.

Q.  Okay.  And after Mr. Combs' arrest when they subpoenaed you, you went into the grand jury, right?

A.  Yes.

Q.  And did the government give you immunity?

A.  Yes.

Q.   And what is your understanding of what a grant of immunity is?

A.   That when I share my story, that I am immunized, the whole thing.

Q.   Is your understanding that they can't prosecute you for any federal crimes if they determine you tell the truth?

A.   Yes.

Q.   You didn't want the government to prosecute you, obviously, right?

A.   Yes.

Q.   One of the texts we looked at yesterday, you said that you had regret about some of the choices you made with Mr. Combs. Do you remember looking at that?

A.   If you have it, I would love to look at it with you.

Q.   All right.  I do have it.  We'll get to it later, but I guess I'll change my questions.

     You spoke on direct examination about regret, right?

A.   Yes.

Q.   Because you regret a lot of the choices that you made in your three and a half years of a relationship with him, right?

A.   I would say that I resent him for leading me into the lifestyle that he led me to.

Q.   And you chose to participate in that lifestyle for many years, right?

A.   I would say that my choices were made under a lot of

emotional pressure due to my relationship.

Q. Because you were in a relationship with him, right?

A. Yes.

Q. And you wanted to stay in that relationship?

A. Yes.

Q. You loved him very much?

A. Yes.

Q. And you did not want to break up?

A. No.

Q. And at times, he would say, "Okay, we could just break up," right?

A. He would say that, but his actions proved otherwise.

Q. He would say to you, "We could just break up," right?

A. He has said those things, yes.

Q. And then you did not want to break up with him, right?

A. No.

Q. There were several times that you didn't talk to him for a few weeks or even a few months, but ultimately you did not want to break up with him?

A. Of course not.

Q. And so you feel resentful at this time that you had sex with other men for a long time in your relationship with him, right?

A. Yes, I resented the way that he went about introducing me to this lifestyle was built under a lot of emotional

manipulation and pressure. Yes, I do resent that about our relationship very much.

Q. Because you wanted to just be in a relationship with him for three and a half years?

A. No. Because I was already so hooked from the beginning, I fell in love with somebody who I didn't understand like the terms and conditions of what our relationship would be like. And so once I was hooked into that and I fell in love, but my emotions were in play so it was many, many blurred lines of love and affection mixed with emotional pressure to perform these things that my lover really desired, and so I wanted to fulfill my duties as a good girlfriend and --

Q. Because you wanted to be a really good girlfriend and partner. You used the word partner over and over again?

A. Yes.

Q. On direct, you wanted to be a very good partner for him, right?

A. Yes.

Q. And lover for him?

A. I did.

Q. And you just said you were hooked on the love and affection that you felt from him, right?

A. Definitely.

Q. And you kept coming back because you loved his love and affection and the way he treated you, right?

A.   I was coming back for that, yes, not for the other things.

Q.   Right, you came back because you loved his love and affection and your relationship with him?

A.   Definitely.

Q.   And I think on direct examination, you said you're having trouble answering for yourself why you agreed to these nights over and over again, right?

A.   Yes.

Q.   And these are questions you're trying to answer for yourself now eight months later after his arrest, right?

A.   Yes.

Q.   And because sometimes, I think you testified on direct, the why was different; at times it could be because not doing these nights meant not being with him, right?

          MS. COMEY:  Objection to form.

          THE COURT:  Can you rephrase the question?

          MS. GERAGOS:  Sure.  Of course.

Q.   The why -- you spoke about on direct examination that you're having trouble understanding why even now eight months later, right?

A.   The why?  Which why?

Q.   Why you came back and started doing these nights over and over again, right?  You're having trouble understanding why eight months later still, right?

A.   I struggle with my why, but it's becoming more and more

clear as I'm in therapy and as I've had this healthy distance to really assess the situation.

Q. You're in therapy now?

A. Yes.

Q. And it's becoming clear to you now that you're in therapy, right?

A. Yes.

Q. But as -- but this is something you are trying to understand now, and it wasn't something you could be clear about until you went to therapy, is that right?

A. I think that when you're under that --

Q. Can you answer my question, which is you're in therapy now eight months later?

MS. COMEY: Your Honor, I'd ask that the witness be able to answer the questions.

THE COURT: That's a fair objection.

So, Ms. Geragos, if you're not getting a responsive answer, you can make an application to the Court, but otherwise the witness should be permitted to complete her answers.

MS. GERAGOS: Understood, your Honor.

Q. In the end, what you knew, Jane, was that you love Mr. Combs, right?

A. Yes.

Q. And I think you said even two days ago you love him currently, is that right?

A.   I do.

Q.   You would have done anything during this time to spend time with him?

A.   Yes.  I loved spending time with my partner.

Q.   You wanted to be close to your partner?

A.   Yes.

Q.   You wanted to be close to your lover?

A.   Yes.

Q.   And you wanted to cuddle with him, does that sound right?

A.   And give him foot rubs, yes.

Q.   He liked the foot rubs part of it?

A.   Yes, he did.

Q.   I think you've told me before that you enjoyed taking care of him after these hotel nights, does that sound right?

        MS. COMEY:   Objection to counsel making herself a witness, your Honor.

        THE COURT:   Overruled.

A.   Yes, he was my baby.

Q.   You liked kind of mothering, you liked taking care of your partner and your lover?

A.   Yes, I'm naturally nurturing.  Yes.

Q.   So after these nights when you guys would be up for a long time, it would be, I think you testified, sometimes 24 to 36 hours, right?

A.   Yes.

Q.   And then you would go back to his home or you would stay in the hotel, and you loved the time when you guys got to be close and spend that time together, right?

A.   Yes.

Q.   You loved to hug him and cuddle him?

A.   And bathe him.

Q.   And bathe him and give him foot rubs?

A.   Yes, watch his favorite TV show.

Q.   What was his favorite show?

A.   *Dateline*.

Q.   And you would watch that for hours, right?

A.   Till we fell asleep, yes.

Q.   I think you testified that he would take Xanax to fall asleep, right?

A.   Yes.

Q.   But that you would stay up, and that was your favorite time; you felt very close to him afterwards, right?

A.   Yes.

Q.   You also said you didn't want him to feel judged.  What does that mean?

A.   I meant -- do you mean in the context of these rooms?

Q.   Yes.

A.   In the context of these rooms, I felt that my partner was trusting me in a very vulnerable moment, and, well, so he made me believe that this was something really special; that this

was something him and I only did, and I really took that on very strongly, and I really wanted to just go along with these things because I felt like if I can be my partner's escape, then I would be. And I didn't want to judge him for the things I noticed in these rooms about his behavior and the things that he liked, and I just would kind of put blinders on and just go along with what he was telling me to do, but deep down in my heart and from what I could assess in the situation, I mean, I didn't want him to feel that eyes were on him while he was in this vulnerable state.

Q. So you viewed these rooms when you were there, he was there, and an entertainer as a vulnerable state for him, right?

A. Yes.

Q. And you also said in that answer — because I want to unpack it — that he made you believe he wasn't doing this with anybody else. Is that what you believed?

A. Within our timeline.

Q. Okay. And you -- fair to say you would look at his phone from time to time throughout your relationship?

A. I would always look at his phone, yes.

Q. His password was easy to break through on his phone?

A. Yes.

Q. So would you look at his messages with other women to see if this was something he did with anybody else?

A. Yes, I did.

Q. So you believed based on looking at his phone and reviewing his messages that he was telling the truth; that this is something within your timeline he was only doing with you, right?

A. Yes.

Q. Okay. So he was trusting only you, out of all of his girlfriends at that time and during this vulnerable time that you guys had together in the hotel rooms, right?

A. Yes.

Q. How did him trusting you make you feel?

A. Loved.

Q. And so you felt really loved by him in those rooms because he was able to be vulnerable with you?

A. I felt really loved by him because we experienced these things together and because they were something really special for him. And as time went on, it was very conflicting for me internally because I'm breaking all of my own boundaries just to make him feel extremely loved in these times.

Q. You've said to the government before that what you needed and what you craved about those nights were the loving things he said to you, do you remember that?

A. Yes.

(Continued on next page)

BY MS. GERAGOS:

Q. What were some of the loving things he said to you that you craved or that you needed from these nights?

A. I loved when we would make love and he would say that he was in love with me and that he loved me and he just wanted me and never wanted -- in some instance, like, if I had left or anything, he would say things like he never wanted me to leave. And just so many nice, beautiful, loving things.

Q. And that was something that brought you -- did you feel that that was something that brought you two together during those nights?

A. Yes.

Q. And what other loving things did you experience that he did during these hotel nights?

A. What other loving things?

Q. You talked about things he said. Were -- if there were anything, were there things that he did that you enjoyed about these nights?

A. I think it would be the affection and the lovemaking.

Q. The lovemaking between you and him afterwards?

A. Yes.

Q. That was something that you really enjoyed and craved about these nights?

A. That was truly the only reason why I endured these nights, so that at the very end I could just have my love and affection

with my partner.

Q. And did you feel during these nights that this is something that really turned him on and made him -- and he really enjoyed?

A. Yes.

Q. And he was very close to you, would you say, afterwards, like, he would be very -- I know you said he was loving; he would say nice things and there would be lovemaking, but would you feel closeness with him as well?

A. I would.

Q. And is that something you enjoyed also?

A. Yes.

Q. Because you wanted to feel closeness with your lover and your partner?

A. Yes.

Q. And you wanted him to be satisfied, right?

A. I did.

Q. Did you feel -- if you did, did feel that these nights satisfied him?

A. Yes, they did.

Q. And at the time you started dating him, did you feel that he had a very demanding life, business life, work life?

A. I would say yes.

Q. What kind of things was he working on for work at the time you started dating him, let's say from 2021 to -- we'll do what

Ms. Comey did -- to 2023?

A.   I would say he was working on his album.

Q.   And tell me about the album.

A.   He was working on, like, a final album, a collaboration with various music artists.

Q.   Ms. Comey asked you about a term called "off the grid." Was his album also called *Off the Grid*?

A.   Yes, it was.

Q.   And called *The Love Album*?

A.   Yes.

Q.   And was this something that you observed he was really pouring his heart and soul into?

A.   Yes.

Q.   And was this his first solo album in a very, very long time?

A.   Yes.

Q.   And so was he at the studio working on this album a lot?

A.   I would say, yes.

Q.   Did you join him at the studio sometimes?

A.   I would, sometimes.

Q.   Did you like to see him in that environment?

A.   I liked to see him in any environment.

Q.   Because he was your partner and your lover, and you wanted to be with him and see what excited him?

A.   Yes.

Q.   So was he working a great deal on this album?

A.   Yes.

Q.   Is this something that had a pressure on him or a demand on him in any way --

MS. COMEY:  Objection.

Q.   -- from your perspective?

THE COURT:  That's overruled.

A.   To some extent, I think he enjoyed it.  I don't know if it was bad pressure.

Q.   From what you could tell, was he working on anything else, like, business wise?  Was it just the album?

A.   From what I could tell, it was just the album.

Q.   And did it take him many years, from 2021 to eventually 2023, to complete that album?

A.   Yes.

Q.   Was he working on it the whole time?

A.   I believe so.

Q.   OK.  And then does he eventually release the album in September of 2023?

A.   Yes.

Q.   And is that the time when you went to New York that we spoke about yesterday, in September of 2023, he launched that album?

A.   I believe so.

Q.   OK.  And so did you feel that you were the only person -- I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

mean I think we talked, he had many girlfriends at the time you were dating him, right?

A.   Yes.

Q.   Do you feel that he, that you were the only person who he truly liked sexually?

A.   Yes.

Q.   Did you feel that that brought a closeness between you two because you shared a secret of his nobody else knew?

A.   Yes.

Q.   And did you feel that he entrusted you with that and you took that seriously?

A.   Yes.

Q.   And you tried -- tell me if this is right -- to be very sexy for him in those rooms because this is something he liked, right?

A.   I don't think I tried.  I think I did, and I was.

Q.   You were very sexy to him, right?

A.   Yes.

Q.   Because you're beautiful woman, right?

A.   Thank you.

Q.   And he would tell you that?

A.   Yes.

Q.   And say that -- that's why you would choose a lot of the lingerie you would wear?

A.   It was a mix of my choosing and his choosing, yes.

Q.   You can tell me, starting from the beginning, would you choose lingerie or did he, or did you learn what he liked and then you started choosing?

A.   I remember when we were in Turkos and Caicos, it was Valentine's Day, and he led me into a bedroom and he opened the closet and there was an array of outfits and high heels.  And so I would say he initiated the tone of the wardrobe of these nights at first, yes.

Q.   OK.  So that was the Turkos and Caicos trip you went on in February of 2021?

A.   Yes.

Q.   And then you started choosing, after that, when he set the tone of what he liked sexually and you said you felt sexy then, right?

A.   Yes.

Q.   And you were in those rooms to him, right?

A.   Yes.

Q.   And you started -- it was a mix of him choosing outfits and you choosing outfit, right?

A.   Yes.

Q.   All right.  And you also talked about baby oil.  You know that he liked baby oil, right?

A.   Yes.

Q.   And that was something that you used for him not just in hotel nights but regularly in your sex life, because that was

something that turned him on?

A. Yes.

Q. And that was fine with you because you wanted to turn on your partner, right?

A. Yes.

Q. And in these hotel rooms, you could see that it meant a lot to him that you were in there, right?

A. Yes.

Q. This was something that he -- that he really enjoyed, for example, when you spoke dirty to one of the guys?

A. Yes.

Q. And so you said that you, you knew the things that he liked you to say and you would say all of them during these nights, right?

A. Yes.

Q. And so to your mind, you thought he was enjoying it, right?

A. Yes.

Q. And then you also thought that the escort thought, the entertainer thought you really enjoyed it as well, right?

A. Yes.

Q. Because you were voicing, you were very vocal about the things that you were doing and the way that you were performing, right?

A. Under these drugs and ecstasy, sometimes I would just fantasy talk and fantasy talk and fantasy -- fantasy talk the

whole way through.  I can't even recall all the things I would say, but I believed that they enjoyed it, yes.

Q.   And because when you decided to take ecstasy, that was more of like an uninhibited drug when you would get on it, right?

MS. COMEY:  Objection to form.

A.   Yes.

THE COURT:  Rephrase.

BY MS. GERAGOS:

Q.   You said that on ecstasy, you would do a lot of fantasy talk, right?

A.   Yes.

Q.   And Ms. Comey asked you a lot about the ecstasy that you took during these nights, right?

A.   Yes.

Q.   And that Mr. Combs would have the ecstasy, right?

A.   Yes.

Q.   And that you chose to take the ecstasy, right?

A.   My choice to take the ecstasy, I would say that Mr. Combs would offer me the ecstasy and expect me to take it.

Q.   And you would take it, right?

A.   Yes.

Q.   How old were you at the time that you started your relationship with Mr. Combs?

A.   I would say I was 35.

Q.   OK.  And so on ecstasy, you testified that you would feel

more uninhibited, right?

A.   Yes.

Q.   And more sexual?

A.   Yes.

Q.   And so then you would be able to engage in hours and hours of fantasy talk, right?

A.   Yes.

Q.   And what kind of talk is that?

A.   I would say -- what kind of talk is fantasy talk?

Q.   No.  What are some examples of the things you would say in these rooms at hotel nights during these three years or three and a half years?

A.   I would say that Sean really enjoyed setting a tone of a role play, so he would have me and the entertainer have a role play, and then that would cue me to play into that role play.

Q.   What are examples of the role play that he liked that you would play into?

A.   I would say a lot of cheating role play; that they would be -- that Sean left town and I'm all alone with me and whoever and I'm sneaking in this entertainer and it's just me and this entertainer and I'm just fantasy talking about how Sean's on a plane and I couldn't wait to get this entertainer all alone to myself, etc.

Q.   And even when you were not in these rooms, say just times that you guys were watching porn or having a movie night, would

you engage in this same type of role play?

A.  Between me and Sean?

Q.  Yes.

A.  Yes, we would.

Q.  So role play and fantasy talk is something that would take place even if it was just you and him having sex as well, right?

A.  Yes.

Q.  All right.  And I think you testified that he would kind of give directions during these hotel nights, right?

A.  Yes.

Q.  And from your perspective, part of what turned Mr. Combs on was that he could kind of also prompt you and the entertainer to do things, right?

A.  From my perspective, it turned him on because he could prompt what me and the entertainer would do?

Q.  Would he give you directions and would that turn him on?

A.  I would assume that that turned him on.

Q.  OK.  Would Mr. Combs give you direction, you and the entertainer, during these nights?

A.  Yes.

Q.  And did that, from your perspective, excite him?

A.  Yes.

Q.  And you also then would say things for the entertainer to do, as you just said, during the role plays, right?

A.   Yes.

Q.   And -- all right.  And the high heels, are you somebody who often wears high heels?

A.   Yes.

Q.   The high heels, these ones were pretty tall, right?

A.   Yes.

Q.   How many inches?

A.   I would say six or seven.

Q.   But you're somebody who regularly wears high heels in your daily life, right?

A.   These are a particular kind of high heels, so I would say I would occasionally wear these type of heels, but in real life I would wear things that are about three to four inches, in real life.

Q.   OK, but -- so you're not, you're accustomed to wearing high heels, maybe not these ones, but in your real life, you're accustomed to wearing these high heels outside of these hotel rooms, right?

A.   Yes.

Q.   Including four-inch ones?

A.   Yes.

Q.   Maybe not five to seven inch ones?

A.   Yes.

Q.   You talked about how he liked it when you made arrangements with entertainers, right?

A. Yes.

Q. And so sometimes you did, you made the calls and you made those arrangements because you knew that he liked it, right?

A. I knew that there was a undertone of this expectation of me to set up a party or make an arrangement, and so I picked up on that fairly quickly and I would make these arrangements, because the undertone was a expectation.

Q. Because this was -- I think what you said on direct examination, fairly quickly you learned that this was the tone of your relationship, right?

A. Which part?

Q. Having hotel nights.

A. Yes.

Q. OK. And you knew that when you made arrangements, that that turned Mr. Combs on, right?

A. Yes.

Q. All right. So during this three-and-a-half-year relationship, you guys were never living in the same place, is that right?

A. That's right.

Q. So in the beginning time period, you were living on the East Coast and he was living in Florida?

A. Yes.

Q. And you were living on the East Coast from about, I would say, like, the first half of your -- of 2021, is that right?

A.   Yes.  A little bit of 20 -- yeah, the first half, yes.

Q.   OK.  And you would make the choice every time to see him to then get on a plane and come to Miami, right?

A.   Yes.

Q.   And then you moved to Los Angeles in, I think, you said June of 2021, right?

A.   Yes.

Q.   And he helped pay your moving expenses to be in Los Angeles, right?

A.   Yes.

Q.   And you were on the East Coast in 2021 because you wanted your child to be closer to the child's father, right?

A.   Yes.

Q.   And during that entire time you were on the East Coast, did your child's father see your child at all?

A.   What does that have to do with the -- this whole thing?

Q.   Why did you move to -- why did you move to Los Angeles?

A.   I moved to Los Angeles because the purpose of living on the East Coast wasn't being fulfilled.  So we moved.

Q.   And Mr. Combs was the one who helped pay for your moving expenses, right?

A.   Yes.

Q.   Your child's father didn't help you pay for those, right?

A.   That is correct.

Q.   And you wanted to be in Los Angeles to be near family?

A.   Yes.

Q.   And you were at that point across the country from Mr. Combs, right?

A.   Yes.

Q.   And you would make the choice over three and a half years every time you went to Miami to get on a plane and to go see him, right?

A.   Yes.

Q.   And you also then ended up being about 30 minutes away from his house in Los Angeles, so you would see him there as well, right?

A.   Yes.

Q.   I'm going to talk a little bit about -- I think you said you saw him every week.  So would you get on a plane every single week when he was in Miami to go from Los Angeles to Miami?

         MS. COMEY:   Objection, your Honor.  Misstates the testimony.

BY MS. GERAGOS:

Q.   How often would you say you saw him?  Once you moved to Los Angeles, how often would you say that you saw him?  So let's say May, that would have been June of 2021 to end of 2024 -- we know when you saw him in 2024, so until October of 2023?

A.   It honestly varied.  Sometimes I would see him every week and a half.  Sometimes I would see him every couple weeks.

Sometimes it would be more than five weeks.  And then just -- it would vary.

Q.  You talked about the times that you would take breaks from Mr. Combs on direct examination, and you would say that you would tell him I don't want to do this anymore sometimes and then he would say -- you said he would say -- he would be dismissive.  Does that sound right?

MS. COMEY:  Objection to form.

THE COURT:  Rephrase the question.

BY MS. GERAGOS:

Q.  On direct examination, you talked about the times that you would tell Mr. Combs that you didn't want to do this anymore. Do you remember that?

A.  To do what anymore?

Q.  Hotel nights anymore.

A.  Yes.

Q.  And he would say -- you testified that he would be dismissive in response, right?

A.  Yes.

Q.  And he would say things to you like we can just break up, right?

A.  Yes.

Q.  And we saw in texts that you would then get back together with him in; one instance it was about two weeks later, right; that was in 2023?

A.   Yes.

Q.   And that was early in 2023, I should say.

A.   Yes.

Q.   And another instance it was like two and a half months later, right?

A.   Yes.

Q.   And in 2024, it was a couple of, about a month later, right?

A.   Yes.

Q.   And each of those times, it's because you missed him dearly, right?

A.   Each of those times we would get back because we would miss each other, yes.

Q.   He also really missed you?

A.   Yes.

Q.   And so the reason you got back together is the two of you missed each other as partners?

A.   Yes.

Q.   And as lovers?

A.   Yes.

Q.   And it's because you wanted to be with him?

A.   Yes.

Q.   And so you would get back together with him on your own volition, right?

A.   Yes.

MS. GERAGOS:  Thank you for allowing my water break.

Q.  We listened to a few Voicenotes on direct examination, and I would say, by my count, it was about five, and he was a bit angry in some of those Voicenotes.  Do you remember that?

A.  Yes.

Q.  Fair to say Mr. Combs probably sent you thousands of Voicenotes over your relationship?

A.  Yes.

Q.  He is somebody who communicated quite often over voice note?

A.  Yes.

Q.  And we just listened to a very, very small sample of the total Voicenotes that he sent to you over the course of your relationship, right?

A.  Yes.

Q.  Can you please tell me -- I know you talked about -- I know you talked about this a little bit on direct, but you said that you fell in love with him because he was this larger-than-life, charismatic personality.  Can you explain what it is?  Why did you feel he was a larger-than-life, charismatic personality?

A.  He was very confident and strong and very boisterous and very sure of him, very righteous, and just beamed, beamed a very bright light when I met him.

Q.  And that bright light was something that you loved being around, right?

A.   Yes.   I was fascinated by him.

Q.   Can you explain that a little bit more?   What were you fascinated by and why did you like it?

A.   He was just something unique and different.   Like, I had never met anybody with such a big personality and very big energy and very motivating, encouraging and just larger than life.   He wasn't afraid to just have his voice heard, and it was attractive.

Q.   What about him was motivating to you?

A.   I believe that he wanted you to believe in yourself.   He was a really good motivator and had really good motivational speeches, pushed you to be your best and really had a lot of great leadership skills.

Q.   How did he push you to be your best?

A.   I would say with me, I think that when he first met me, I probably was a lot shier than I am now, and he just, you know, told me that I was -- I don't know, just saw the good in me, and I appreciated that.

Q.   Do you remember saying that he was strong and unafraid and saw you for you?

A.   Yes.

Q.   Can you explain what you mean by saw you for you?

A.   I would say that -- I would say that -- it's something I can't really describe.   It's like he just would -- I don't know -- just be encouraging, like he would just bring me up and

bring everything about me up.  He would uplift me.

Q.   In what ways would he uplift you?

A.   In what ways would Sean uplift me?

Q.   Did you feel stronger being with him?

A.   He made me feel confident, yes.

Q.   Did you struggle, maybe, with self-esteem issues beforehand?

A.   I still do.

Q.   And then being with him you felt stronger and more confident?

A.   Yes, like he gave me a bit more confidence.

Q.   Because he exuded confidence to you as well, right?

A.   He did.

Q.   And what other positives would you say came from your relationship with him?

A.   Just giving me different perspective on life and introducing me to gospel, and we would have really insightful conversations, just various topics.  And he had really good perspective on a lot of things.

Q.   So you guys would also engage in very deep conversations with one another, right?

A.   Yes.

Q.   So it was not just -- your relationship essentially was not just hotel nights; you were able to speak with him?

A.   Yes.

Q. And you enjoyed listening to his perspective on different issues, right?

A. Yes.

Q. And you were able to open up with him in a way you weren't able to with other people, right?

A. Yes.

Q. He introduced you to gospel. Can you explain that?

A. Yeah, sure. He had a favorite pastor, and he would often put a lot of sermons on the television and we would watch it together and we would talk about it. And he would send me sermons and I would start sending him sermons and I would watch them on my own and gospel music and things like that.

Q. Was that something that has stayed with you even in the months since his arrest?

A. Yes.

Q. And is that something that was a positive from your relationship with him?

A. Yes.

Q. And has -- do you still watch that same pastor today?

A. Yeah.

          MS. COMEY: Objection, your Honor.

          THE COURT: Sustained.

BY MS. GERAGOS:

Q. You said that he gave you a different perspective on life. Can you explain that?

A.   It's not really something completely concise, just that --
I would just listen to him and just gain different perspective
and insights in general.  It could be about people.  It can be
about life, family, children.

Q.   And talk to me about family.  What about family did -- what
perspective did you gain about family from him?

MS. COMEY:  Objection.

THE COURT:  Sustained.

BY MS. GERAGOS:

Q.   What about --
All right.  I'll just move on.
You said that he was strong and encouraging and motivating,
and on direct examination you talked about how when you first
met him you were a content creator and an influencer on
Instagram, right?

A.   Yes.

Q.   And was he -- I don't think you spoke about this.  Did you
also have two businesses during your relationship with him,
with a swimwear line?

A.   I did.

Q.   And you had a dress line?

A.   I did.

Q.   And he was encouraging of those as well, right?

A.   Yes.

Q.   And did he invest money into those businesses for you?

A.   He did, my dress line.

Q.   How much money did he invest in the dress line?

A.   I believe it was, like, 20,000.

Q.   And how long was your dress line in business for?

A.   It still is.  It's just I launch it and it's there and it's available.

Q.   And so you worked on the dress line during your relationship with Mr. Combs?

A.   Yes.

Q.   And was he encouraging of that business?

A.   Yes, he was.

Q.   And so much so that he invested $20,000 into it?

A.   Yes.

Q.   And is that something that you found motivating from him, that he was encouraging of your entrepreneurial ways?

A.   It was definitely something I appreciated.

Q.   And so when you said on direct examination that you weren't able to put all the time into your work as a content creator and an influencer, you were also doing other work, right?

A.   I would say that in the time that I could focus, I was able to focus and just launch something, yes.  But I still had a lot of fog during that time.

Q.   And in your dress line, what was, like, the purpose behind your dress line?  Is there -- is it just dresses for women?  Is there a tag line for it?  Tell me about the dress line.

MS. COMEY:  Objection.

THE COURT:  Overruled.

A.  I would say that it's a minimal-style dress line.

Q.  OK.  And so did your work shift from content creation to apparel?

A.  I believe that I dabbled into apparel, and then as far as content creating, that was kind of hard to upkeep because it needed my presence, and a lot of my presence were focused on Combs and my child and I definitely, probably scratched, maybe, 10 percent of my potential during those three years.

Q.  OK.  You just testified that there were times that you wouldn't fly and see him for months, right?

MS. COMEY:  Objection.

THE COURT:  That's overruled.

A.  Sometimes, yes, we could go, like, a couple -- like six weeks or so without seeing each other.

Q.  OK.  And he was, Mr. Combs was in the apparel industry, right; he had launched a clothing line?  You knew that?

A.  Can you remind me?

Q.  If you don't know, no problem.

A.  OK.

Q.  All right.  When you first met him, you had -- you said you had minimal income from the influencer side of things, is that right?

A.  Yes.

Q. How much would you say were you generating per month from the influencer business?

A. I would say when I was really active on Instagram, if I were to book maybe two brands, that would be about 50,000 or so. And then it just depended how many brands I was able to commit to.

Q. OK. And you also received child support at the time, right?

A. I did.

Q. How much was that per month?

A. It was very minimal. It was around the time, maybe, 4,700.

Q. And but you were living within your means, right?

A. Yes.

Q. You were paying your own rent?

A. Yes.

Q. Between 20 -- when you met him in January -- let's say November of 2020 and April of 2023, you were responsible for paying your own rent, right?

A. Yes.

Q. And you worked in order to pay that rent, right?

A. Yes.

Q. And Ms. Comey asked you whether you had a conversation with Mr. Combs about wanting to make your own money in the beginning, right?

A. Can you repeat that?

Q. Ms. Comey asked you on direct examination whether you had a conversation with Mr. Combs when you started dating him about wanting to make your own money, right?

A. Yes, about making an OnlyFans, yes.

Q. OK. So when she asked you about making your own money, it was specific -- you understood that question was specific to OnlyFans?

A. Yes.

Q. Because you were already making money on the Instagram side of things, right?

A. Yes.

Q. And you said that Mr. Combs, when you spoke to him about OnlyFans, he would kind of brush it off or he would say we'll talk about it or we can talk about that later, right?

A. Yes.

Q. What was your understanding of why he may not have wanted you on OnlyFans during that time of your relationship?

A. My understanding was he just didn't want, maybe, to be -- didn't want me to be a part of something that was, maybe, frowned upon.

Q. And then you eventually joined OnlyFans again in 20 -- not again, in 2024, right?

A. My decision to -- my decision to join the website was, truthfully, because it was just something that I needed. It was -- if I could get off that website, I would.

Q. You needed it financially?

A. Yes.

Q. And he didn't stop you from joining it in 2024, right?

A. I independently made it outside of him.

Q. You independently made that choice outside of him, right?

A. Yes.

Q. And he saw how lucrative it was and he was proud of you, right?

A. He was.

Q. And when you spoke to, on direct examination, to Ms. Comey about making your own income, you said that you didn't need his permission to get your own income, but you wanted his approval. Do you remember that?

A. Can you refresh my memory?

Q. Sure. Do you remember testifying on direct examination, when Ms. Comey asked you why did you need Sean's permission to get your own income, you answering that in my heart he was my boyfriend and I wanted his approval, right?

A. Yes.

Q. And that was solely about OnlyFans, right?

A. Yes.

Q. Because he was -- he was helping you in these other ventures, like your dress line, right?

A. Yes.

Q. OK. So he never explicitly told you that you needed to get

his permission to earn your own income, right?

A.   I just felt like I needed his approval.

Q.   Because --

A.   Regarding OnlyFans.

Q.   -- in your heart, he was your boyfriend and because of OnlyFans specifically you wanted his approval?

A.   Yes.

Q.   Because OnlyFans comes with it implied nudity, you said, and bikini and lingerie photos, right?

A.   Yes.

Q.   OK.  And in addition to the $20,000 he gave you for the dress line, he also gave you money sporadically throughout your relationship, right?

A.   Yes.

Q.   And most of the time you didn't have to ask for any of that money, right?

A.   Yes.

Q.   And he would just send you a wire or give you cash or just because, right?

A.   Yes.

Q.   And you were really grateful for that, right?

A.   Yes.

Q.   Do you think over -- does it sound right that over the three, three and a half years of your relationship, he wired you over $150,000?

A.   I never really counted, but I would assume, yeah, that that would be close to that.

Q.   And you've told the government previously that you've always gravitated towards providers.  Do you remember telling them that?

A.   Yes.

Q.   Can you explain that?

A.   Yes, I do find men who are successful, attractive.  As a woman, my ideal partner is a protecter and a provider.

Q.   And you found that attractive in Mr. Combs?

A.   I did.

Q.   And you testified a lot about the house, which you signed a lease in 2023.  Do you remember?

A.   Yes.

Q.   And I noticed on direct examination that you referred to it as our house and our residence.  Do you remember that?

A.   Yes, there was always -- Sean would say it was our house, and then we would say it was our house.  Sometimes I would say my house.  I don't know.  It would be a mix.

Q.   Did you view it as your house or our house?  How do you view it?

A.   When we first got it, I would say our house.  And then as time went on, it's, like, my house.

Q.   Did you envision it at the beginning as a house for you both?

A.   Yes.  The way that I was speaking about the house was that I wanted to get something bigger and also I wanted to be up to Sean's taste level as well.  And I knew that at this point in our relationship, we had just done so many hotels and privacy was starting to become just an issue for me, and I figured, in my mind, if we got a home that was to his taste level, that we could just start at least doing them here in the privacy of our own home.

Q.   OK.  So just so I understand that, when you -- your thought process at the time you got the -- you signed the lease in April, started in April of 2023, right?

A.   Yes.

Q.   So at that point it had been nearly two years since your first hotel night, right?

A.   Yes.

Q.   And privacy was becoming an issue, right?

A.   Yes.

Q.   Both of you wanted -- did not want anything about the hotel nights to leak in any way, right?

A.   No.

Q.   This was something that was very private behavior, right?

A.   Yes.

Q.   These were very private nights?

A.   Yes.

Q.   And it was important that his security didn't know about

these nights?

MS. COMEY:  Objection, your Honor.

BY MS. GERAGOS:

Q.  From your perspective, it was important that none of his employees knew about the entertainers at these nights, right?

A.  Right.

Q.  And it was important that none of the general public knew about these nights, right?

A.  Right.

Q.  And that was from your perspective, right?

A.  Yes.

Q.  And you understood that that was also from his perspective, right?

A.  Yes.

Q.  OK.  So in March or April of 2023, part of the thinking behind getting a very nice home was that you guys could shift it from hotels to the home, right?

A.  Yes.

Q.  OK.  And that was nearly two years after you started the hotel nights?

A.  Yes.

Q.  OK.  You had every intention of, if you were going to do these nights you would have them at that home instead?

A.  I'd just start mixing it up, yes.

Q.  OK.  And when you said you wanted something, you wanted

something, I think, you said for you and your XXXXXXXXX -- or your child, that was large, had a big yard, right?

A. I'm sorry. Can you reference my child as my child?

Q. I corrected myself. Of course.

For you and your child, you wanted a big yard, right?

A. I did.

Q. And you wanted a big home?

A. I did.

Q. And so you wanted something for your child, but you also wanted something up to Mr. Combs's taste levels?

A. Yes.

Q. And explain what that means, his taste levels.

A. I would say that Mr. Combs had really nice properties that were always decorated well and very manicured, and I wanted to pick a home that was a home away from home; that if he would visit me he would still feel like he was at home, to his taste level.

Q. And you had nights -- before you moved into that home, you had nights at your previous apartment with him as well, though, right?

A. Yes.

Q. He would come to that home and you guys would have entertainers there?

A. Yes.

Q. OK. I would like you to, and if we could pull it up for

the parties but it's also in your binder at tab 3, I think, 3103, defense exhibit.  If you could look at it and --

A.   Should I look at the screen or the binder?

Q.   Well, you have two options.  Really, whatever you prefer.  There's one in the binder.  There's one on the screen.

If you could just look at it and read it over very quickly.

A.   OK.

Q.   Have you read it over?

A.   I have read it over.

Q.   OK.  What is this, generally?  Is this a message between you and Mr. Combs?

A.   Yes.

Q.   OK.  And is it dated March 25, 2023?

A.   Yes.

MS. GERAGOS:  All right.  We move this into evidence, your Honor.

MS. COMEY:  No objection.

THE COURT:  3103 will be admitted.

(Defendant's Exhibit 3103 received in evidence)

MS. GERAGOS:  This is dated -- can we publish it for the jury?

Can we do pages 1 and 2 side by side.

Q.   Is this dated March 25, 2023?

A.   Yes, it is.

Q.   Is this after the Turkos and Caicos trip that you and

Mr. Combs went on?

A.   Yes.

Q.   All right.  And here, you had, if you look on page 2, you say:  You're taking off, you have no idea how torn I am right now.  I know I could have powered back up, but also I didn't want you to be distracted.  I love you so, so, so, so much.  Right?

A.   Yes.

Q.   OK.  And so this was your leaving Miami after your Turkos and Caicos trip and you were flying back home to Los Angeles, right?

A.   Yes.

MS. GERAGOS:  OK.  So if we could now play the voice note at -- we'll go to the next page, No. 3.  All right.  So then we'll have No. 2 and No. 3 side by side, if we could.

All right.  If we could play the voice note.

First, your Honor, we seek, with the government's consent, to admit 3103A, which is this first voice note on page 2.

MS. COMEY:  No objection.

MS. GERAGOS:  If we could play 3103A; this is Mr. Combs's response to your message saying taking off.

(Media played)

MS. GERAGOS:  All right.  You can turn that off now.  Thank you so much.

Q.   All right.  What is get in your bag?

A.   Get in your bag means just stay focused on what you're doing and just, like, elevating yourself and don't get out of that space.

Q.   And then he says you got your contract, right?

A.   Yes.

Q.   So is this a voice mail where it's after the love contract that you talked about after Turkos and Caicos and Miami?

A.   Yes.

Q.   All right.  And you respond with some emojis, you see with the crying-laughter face and the kissing face?

A.   Yes.

Q.   And you said:  Baby, you make me laugh, LOL.  The addiction is real.  I really had to get to this point to stop honestly. Fuck or die trying -- apologies -- nothing's going to stop me or us.

     What do you mean by that?  Is that in response to the crack pipe comment?

A.   No.  This was, this was a quote from him the night before, where he says I'm going to fuck or die trying and I think either him or me say nothing's going to stop us or nothing's going to stop me.

Q.   OK.  Now, what -- to your knowledge, what was he saying you're the crack pipe?  He had an addiction to you, is that what you understood?

A.   Yeah, to my sex.

Q.   OK.  And then at the end, he says you got your contract, and this is, again, after the Miami and Turkos and Caicos trip, right?

A.   Yes.

        MS. GERAGOS:  OK.  So can we play -- with the government's consent, we're going to admit Defendant's Exhibit 3103B, which is on the right-hand side, the audio message from you at the top at 6:51 p.m.

        MS. COMEY:  No objection.

        THE COURT:  All right.  3103A and B will be admitted.

        (Defendants' Exhibits 3103-A received in evidence)

        (Defendant's Exhibit 3103-B, sealed, received in evidence)

        (Media played)

BY MS. GERAGOS:

Q.   At the end of that voice note, you're saying yay to your contract, that refers to the love contract?

A.   Yes.

Q.   And this is after Turks, and you're saying that you had so, so, so much fun, right?

A.   I had so much with Sean, yes, so much fun.

Q.   And you told him that, right?

A.   Yes.

Q.   And you told him that you felt closer to him on another

level, right?

A.   Yes.

Q.   And, and that you were then going to, he told you get in your bag and you said you're going to focus on your health and wellness for the week, right?

A.   Yes.

Q.   All right.  And then you respond to him; you sent another message and said:  Can't get enough of your love, baby.

     Is that in response to the song that's in the background playing?

A.   Yes.

Q.   You're saying:  I'm a lucky girl, super happy and all smiles, listen to my voice mail when you can, right?

A.   Yes.

Q.   And are these two examples of Voicenotes that you and Mr. Combs would send you?

A.   Yes.

Q.   I asked you earlier if he would send you a lot of Voicenotes, and this is an example of one?

A.   Yes.

Q.   And this is right after you guys spent -- you went to Miami, right?

A.   Yes.

Q.   And then you went to Turkos and Caicos for many days?

A.   Yes.

Q.   And then you went to Miami again?

A.   Yes.

Q.   And all three of those trips, there were entertainers there, right?

A.   Unfortunately, yes.

Q.   But you're telling him in these messages on March 25 I had so, so, so much fun, I feel closer to you on another level, right?

A.   Yes.  The fact that I could parcel out those moments with Sean, those moments made me very happy, yes.

Q.   And you've been pretty clear on that, right; that you loved spending time with him?  Right?

A.   Just him, yes.

Q.   But in this voice mail that we just listened to, after this Turks and both Miami trips, you're saying I feel closer to you, I had so, so, so much fun, right?

A.   Yes.  Specifically you, meaning him.

Q.   And that you had fun?

A.   With him, yes.

Q.   And you feel close to him on another level, right?

A.   Yes.

Q.   All right.  Could we go to 3110.  That should be behind, I think, 10, tab 10 of your binder and if it's not, let me know.

A.   It's there.  Thank you.

           MS. GERAGOS:  OK.  Great.  Of course.  And it's also

on the screen.  You can put both pages up.

Q.  And if you could just take a look at it, tell me if you recognize it, and when you're done reading it, just let me know.

MS. GERAGOS:  Your Honor, while she's doing that, I realize that I didn't offer 3103 under seal.  I just wanted to make the record clear that I'm offering those under seal.

THE COURT:  All right.  3103 will be admitted under seal.

MS. GERAGOS:  3103A, I believe, can be under seal but 3103B, I believe, would be.

Is that right, Ms. Comey?

MS. COMEY:  Yes.  And thank you, Ms. Geragos.  I had also forgotten.

THE COURT:  All right.  3103B will be admitted under seal as well.

THE WITNESS:  OK.

BY MS. GERAGOS:

Q.  Have you had a chance to look at the exhibit?

A.  Yes.  All of the pages, right?

Q.  Yes.  All of the pages.

A.  OK.  Yes.

Q.  OK.  Do you recognize this as a message between you and Mr. Combs on April 4 of 2023?

A.  Yes.

MS. GERAGOS:  Your Honor, we offer this under -- we offer this under seal, and we will offer a redacted one later.

MS. COMEY:  No objection.

THE COURT:  All right.  3110 will be admitted under seal.

(Defendant's Exhibit 3110, sealed, received in evidence)

MS. GERAGOS:  OK.  Publish this for the jury.

Let's turn, have both pages side by side.  Let's go to pages 3 and 4.  All right.

Q.  Are these messages -- are you sending Mr. Combs messages of the home that you had identified that you wanted to move into?

A.  Yes.

Q.  And so on the left here --

MS. GERAGOS:  If we could zoom in to both of these photos.

Q.  -- is this the master bath on the left?

A.  Yes.

Q.  All right.  And then the outside, is that on the right-hand side?

A.  Yes.

Q.  And that's a patio area that leads out into the yard?

A.  Yes.

MS. GERAGOS:  All right.  If you can go to the next two pages.

All right.  If we could zoom in on those two photos, please.

Q.  It's a little bit blurry, but this was the large -- the kitchen and the family room?

A.  Yes.

MS. GERAGOS:  OK.  If we could take -- unzoom, I guess, would be the word.  All right.  If we go to the next page.

Q.  All right.  So then if you look at page 7, you write, and I'll read this part:  I know it's big but LOL, for everything I'm looking for for our time, family time, safety, privacy and school district, this is the perfect place.

And you say where it is.  You say where the location is

And you say:  On a good day from Mapleton, it's a 25 to 30-minute commute.

Mapleton is his home in Bel Air?

A.  Yes.

Q.  All right.  And when you talk about here, you say, for our time, is that part of what -- time together, right?

A.  Yes.

Q.  And part of what you said was times that you would have entertainers over, right?

A.  Yes.

Q.  Safety, because that was important, right?

A.  Yes.

Q. Privacy was important, of the utmost importance to him and to you, right?

A. Yes.

Q. And school district for your child, right?

A. Yes.

Q. OK. So for privacy, I think you mentioned on direct, but I want to make it clear, this is a gated community, right?

A. Yes.

Q. In order for anybody to get through, they had to go through, like, a guard essentially?

A. Yes.

Q. And nobody could just go into your home?

A. Right.

MS. GERAGOS: OK. If we could zoom out.

Q. And it was important that you were somewhat close to Mr. Combs's home in Los Angeles, right?

A. Yes.

Q. And you say: It's four bedrooms and four and a half bath. It's a brand-new home. The landscaping's waiting approval and this one is going -- skipping ahead -- for $10,000 per month?

A. Yes.

Q. OK. And on the bottom text on the left there, you say: So I got approved, yay. So now they need a first and last month's rent and two months of security deposit, totaling for the first month 10K, last month's 10K, security deposit of 20K, total of

40K, the place is ready for move-in by April 15, right?

A.  Yes.

Q.  So in order -- do you know that in order to move into your apartment, did it cost $40,000?

A.  Yes.  The home, move-in was 40,000.

MS. GERAGOS:  OK.  So if, and we can unzoom, and then if we could to, skip ahead to page 8, to the bottom text there.

Q.  You say:  Let me know what you think of the backyard.  It's your place too.  I want you to be happy wherever, whenever you're in it, so if you have any suggestions for them in the backyard.  I told my realtor once I speak to you I'll email him concerning the payment to lock it in.  Thank you so, so, so, so, so much, baby.  You have no idea how much this means.  I'm beyond grateful for you, and I thank God for you.  Right?

A.  Yes.

Q.  There are some emojis next to that?

A.  Yes.

MS. GERAGOS:  OK.  So if you unzoom on that one.

Q.  So when you moved into your apartment -- your house, there was first month already paid for, right?

A.  Yes.

Q.  Last month is already paid for, right?

A.  Yes.

Q.  And then the security deposit is two full months' rent, right?

A.   Yes.

Q.   All right.   So -- and this rent was, as you said, always been paid on time, right?

A.   Yes.

Q.   And he ensured with Robin, his accountant, that that rent gets paid on whatever day of every month it has to get paid, right?

A.   Yes.

Q.   And that has never stopped, right?

A.   No.

Q.   OK.   And even if the rent had not been paid, you would have last month's rent already paid, right?

A.   Right.

Q.   And the two months' security deposit that was with the landlord, right?

A.   Right.

Q.   So that totals about three months of rent that would be -- that was in the landlord's possession if, for some reason, he stopped paying the rent?

A.   Right.

Q.   OK.   And then you testified, it may have been --

          MS. GERAGOS:   We can take it down now.   Thank you.

Q.   You testified, it may have been yesterday, but I'm losing my track of days, frankly, that he offered, that he said at one point when you were going to break up that he would then pay

three months of rent.  Do you remember that?

A.  I do.

Q.  OK.  So at that time when he had said that he would pay three months of rent, it would be three months of rent plus the three months of rent that the landlord also already had, right?

A.  I never really took that into account, but yeah, now that you put it that way.

Q.  OK.  And in that moment, I think you testified that you felt frustrated, right?

A.  When he said that?

Q.  Yes.

A.  Yes.

Q.  And -- all right.  And at the end of the day, you never actually believed that he would withhold the rent from you, right?

A.  There were some times that I definitely felt that he would do that.  And he used it kind of as a, as a little tool.  The rent was always just like a reminder.

Q.  Well, what he said was we could discuss three more months, right; that's what we looked at?

A.  That's what we looked at.

Q.  OK.

A.  Yes.

Q.  And do you remember saying to the government that when he would use it as a tool, that you would then say to him I'm not

Cassie and I could make your life hell?

MS. COMEY:  Objection.  Could we get a time frame to when she said that?

MS. GERAGOS:  Can we pull up, Mr. McLeod, 3502-24, page 11.

MS. COMEY:  Your Honor, I don't think there's a basis --

THE COURT:  Hold on.  Hold on.  Take a step back.

MS. GERAGOS:  Let me take a step back, and I'll rephrase.

Q.  Do you remember saying to the government that when he would use the rent as a tool, that you would tell him I'm not Cassie and I could make your life hell?

A.  There was only one argument that we had towards the end when I had hit my wall and I was depressed over these nights and we got on the phone.  He was consoling me, and then he smoothly inserted that, so, what, do you need three more months' rent?  And that infuriated me because it didn't feel genuine, the previous talk of consoling me, etc.  And then we had some really nasty text exchanges.  And so in this one instance, I did bring up his ex and say I'm not either of your exes.

Q.  OK.  So, and this was the phone conversation that we spoke about yesterday?

A.  The phone conversation detailed the consoling and then

the -- the threat about rent.  And then the text messages is what you guys have --

Q.  OK.

A.  -- following that argument.

Q.  So you guys were in an argument and he was consoling you, right?

A.  On the phone call?

Q.  On the phone call.

A.  Yes.

Q.  And then after he was consoling you, that's when he brought up the three more months of rent, and that made you really upset, right?

A.  Yes.

Q.  And then that's when you said I'm not either one of your exes and you fought back to him, right?

A.  I think it was on text exchange that I said those things.

Q.  All right.  Now, after you got the house, he sent you, I think, you said a random wire of $20,000, right?

A.  Yes.

Q.  And that's because you needed furniture for the home?

A.  Yes.

Q.  And obviously it was going to cost a lot of money to furnish?

A.  Yes.

Q.  And were you grateful for that $20,000?

A. Yes.

Q. And you wanted to use that money to get furniture that was up to his taste level?

A. Yes.

Q. And we looked at some photos of the house yesterday, and you got really nice furniture for the home, right?

A. Yes.

Q. And some of that you paid for?

A. Yes.

Q. And some of it he paid for, right?

A. Yes.

Q. All right. I want to go back to the beginning of your relationship with Mr. Combs that you testified about, and you talked about going to his house in November of 2020 with your friend who had been seeing him, right?

A. Yes.

Q. And she had been seeing him for a couple of years, right?

A. I believe so.

Q. She was one of many, you would say, right?

A. Yes.

Q. And I think you said she wasn't engaged at the time, but she was seeing somebody else, right?

A. Yes.

Q. And she had been seeing him then -- seeing him as well as Mr. Combs, right?

A. Yes.

Q. And so you said you felt a little bit hesitant when he was trying to flirt with you?

A. Yes.

Q. Because you knew your friend had strong feelings for him, right?

A. I knew that they were involved, yes.

Q. And they had been seeing each other, she had had feelings for him for two years, right?

A. Yes.

Q. And you also knew that there were a lot of other things that made you conflicted about this, for example, the person that was really close to him that you had a relationship with, right?

A. Yes.

Q. And then you also talked about how he and your child's father also did not get along, right?

A. Yes.

Q. And so when you did start your relationship with Mr. Combs, privacy, as you've said, was of the utmost importance, right?

A. Yes.

Q. It was important that your relationship was essentially on the down-low, right?

A. Yes.

MS. GERAGOS:  OK.  So can we pull up for the witness

and the parties only Defense Exhibit 3003.

And Jane, this is behind tab 3 of your binder.  And this is a short exhibit, but if you could review it.

And can we just show page 1, please, only.  Thank you.

Q.  And just let me know when you're done reviewing it.

A.  OK.

Q.  OK.  So is this a message between you and Ms. Khorram?

A.  Yes.

Q.  And from April 9 of 2021?

A.  Yes.

MS. GERAGOS:  All right.  We offer this under seal, your Honor, I believe, without objection.

MS. COMEY:  No objection to it coming in under seal, your Honor.

THE COURT:  Defense Exhibit 3003 will be admitted under seal.

(Defendant's Exhibit 3003, sealed, received in evidence)

(Continued on next page)

MS. GERAGOS:  You can show this to the jury.

Q.  So this is about four months after your relationship starts with Mr. Combs, right?

A.  Yes.

Q.  And you say to Ms. Khorram, KK we got papped, right?

A.  Yes.

Q.  And were you concerned at that time because nobody really knew you were in a relationship together?

A.  Yes.

Q.  It was important for you guys that it essentially stayed on the down low because of many different reasons, right?

A.  I didn't want the public to know that we were in a relationship at that point, no.

Q.  Okay.  And you say to KK, can you have him call me, please. I don't know what to do.

A.  Yes.

Q.  And KK says, When?  Where?  Right?

A.  Yes.

Q.  And then you link to a website about where you guys got papped, which means paparazzi, right?

A.  Yes.

Q.  Can we please go to page 3 of the exhibit.  And you say, I'm shaking, right?

A.  Yes.

Q.  Because you were worried you didn't want to be out there in

the open.  You didn't want it to be public at the time, right?

A.   Yes.

Q.   And KK responds, I showed him there are other people in the pictures that helps-ish.  He said, Don't panic he has friends that come over to his house all the time, right?

A.   Yes.

Q.   And so you wanted at this point -- at this point, did your friend know that you were in a relationship with him?

A.   No.

Q.   And your child's father didn't know either, right?

A.   No.

Q.   And the person close to Mr. Combs didn't know either, right?

A.   No.

Q.   So it was important then that you keep your relationship private at the time, right?

A.   Yes.

Q.   When you flew to -- when you were in Miami that trip, you talked about how one of the friends that you were with wanted some drugs, and you weren't sure what those were, but you went with Mr. Combs to, I think you said, the studio or guest house for him to get those, right?

A.   Yes, the studio.

Q.   So you knew even in November or December of 2020 that he would purchase those drugs, right?

A.   Yes.

Q.   And then you asked is it safe, right?

A.   Yes.

Q.   And he kind of laughed, you said, right?

A.   Yes.

Q.   All right.  And so you also testified that during that trip you were drawn to him instantly.  Do you remember that?

A.   Yes.

Q.   You found that he was really hospitable?

A.   Yes.

Q.   What kind of things did he do on that trip for all of you that you thought was really hospitable?

A.   I just could appreciate that he had like the time of the yacht pull up in the evening --

Q.   So there was a yacht for all of you?

A.   Yes, in the evening.

Q.   It came to the dock at 2 Star Island?

A.   Yeah.

Q.   And that was really fun?

A.   That was really nice, yeah.

Q.   And you found -- and he was with you guys on the yacht or was it just you and the girls?

A.   He was with us.

Q.   So you thought he was really nice and really funny and really hospitable?

A.   Yes, I did.

Q.   And then you guys started flirting with each other after that?

A.   Yes.

         MS. GERAGOS:   Can we pull up what's already in evidence as A-906, and go to page 11.

Q.   And you say to him -- this is December 1, 2020, is that right?

A.   Yes.

Q.   You say, LOL, we had so much fun.  And at some points I felt like I couldn't be myself.  I didn't want to step on anyone's toes.  Just in case you felt I was a little off but just know the vibes were really great and you were a gentleman and your energy is addicting.  I'm happy I got to see this side of you.  I had a lot of fun celebrating you, love and I hope you did too, right?

A.   Yes.

Q.   What was addicting about that trip or what about his energy was addicting?

A.   Just charismatic, really charming, really funny.

         MS. GERAGOS:   If we go to page 17 of this exhibit. You could put it side by side with 18, if it's easy.

Q.   Then he starts telling you, this is on the 7th, come to Miami this weekend, right?

A.   Yes.

Q. And so pretty soon after you first saw him, he's inviting you down there, right?

A. Yes.

MS. GERAGOS: Okay. And so you can take this down.

Q. You go -- you go to Miami for a baby shower, right, maybe a month later?

A. I went to Miami for an event, yeah.

Q. An event, okay.

A. Mmm-hmm.

Q. And I may have made that up. I don't know where I got that.

And you -- he got you a hotel that trip?

A. Yes.

Q. Okay. And you ended up staying for about five days?

A. Yes.

Q. And that was a really, really fun trip, right?

A. It was.

Q. Did you fall in love with him on that trip?

A. I was starting to fall for him pretty hard, yes.

Q. Okay. And you've told the government in the past that he seemed pretty excited but also a little bit nervous on that trip, right?

A. Yes.

Q. Why did you perceive him as being a little bit nervous?

A. Well, later on he told me that because we had our first

initial big night, and then the next day he wanted to have more of a calm dinner, and he was telling me that he was just so excited to finally have this like time and date time with me that he had overdone it with drugs and stuff; that he came in with like all this energy, and he felt like he kind of ruined it.  But I was -- I was okay, I was okay with his energy, and so that's where I kind of now -- after he revealed that, then I could see why he was -- seemed a little nervous-y in the beginning.

MS. GERAGOS:  Your Honor, could we have a quick sidebar?

THE COURT:  You may.

(Continued on next page)

(At the sidebar)

MS. GERAGOS:  We have cough drops.

THE COURT:  We're checking on it right now.

MS. COMEY:  Just so the record is clear, there is a juror who is coughing.  We've given the deputy a bottle of water.  We've offered cough drops.

THE COURT:  The deputy is up there right now.  He's talking to her.

MS. GERAGOS:  We would take a break if she needs one. That's all I wanted to say because there was a lot of coughing.

THE COURT:  Fair.

(Continued on next page)

(In open court)

THE COURT:  I think we're good to proceed.

MS. GERAGOS:  Wonderful.

BY MS. GERAGOS:

Q.  After this trip, you go to Turks and Caicos in the Bahamas with Mr. Combs, right?

A.  Yes.

Q.  And I think you said you fell even deeper into your feelings on that trip, right?

A.  Yes.

Q.  Would you -- you said it was a lust-filled and passionate trip, right?

A.  Yes.

Q.  You've talked a lot about Mr. Combs speaking about his fantasies and foreplay during hotel nights.  Did he speak about those things when you guys were making love or having sex on the Turks and Bahamas trips?

A.  I would say that watching pornography started then pretty heavily; that we would -- during our lovemaking, he would have the pornography playing, and he would say little things at the time.

Q.  What were those little things that he would say even back then?

A.  Just he wanted me to focus on the man in the video.

Q.  And would you -- would he play pornography every time that

you were making love on that trip?

A.   Yes.   Mmm, here and there.   It was a mix.

Q.   It was a mix, but it started, you would say, on that trip?

A.   Yes.

Q.   And that was February of 2021?

A.   Yes.

Q.   At the end that of trip, I think you said that he gave you money but you didn't have to ask for it, right?

A.   Yes.

Q.   And he sent you a wire of, I think, approximately $10,000?

A.   Yes.

Q.   And you were really grateful, right?

A.   Yes.

Q.   You thought that was really nice?

A.   Yes.

Q.   Because you had childcare and other things you had to take care of, right?

A.   Yes.

Q.   And so you accepted it when he gave it to you?

A.   Yes.

Q.   All right.   You also talked about a time that you had -- you took a large ecstasy pill on that trip, right?

A.   Yes.

Q.   And once you -- when you took that, you said you had a pretty bad reaction, right?

A.   Yes.

Q.   And then KK helped you after that, right?

A.   Yes.

Q.   What did she do to help you with that bad reaction?

A.   She turned on the shower, and she got me in the shower, and everybody was just kind of around and making sure that I was okay.

Q.   Okay.

A.   Yeah.

Q.   And even after you felt better from that bad reaction, how long until you took the next ecstasy?

A.   I would say maybe a couple days later or so.

Q.   And then you took that on your own, right?  He provided it to you, right?

A.   He provided like a smaller dose of it.

Q.   And you took it, right?

A.   Yes.

MS. GERAGOS:  Could we look at -- this is not admitted, but Government Exhibit E-161 and E-162?  We can put them side by side up on the screen.  Those aren't in your binder.

Q.   Have you looked at -- before we started, this is E-161.  Have you looked at this video before?

A.   I have, yes.

MS. GERAGOS:  We would with Ms. Comey's consent, we move to admit Government Exhibit E-161?

MS. COMEY:  No objection if it's under seal, your Honor.

MS. GERAGOS:  Under seal.

THE COURT:  All right, government Exhibit E-161 will be admitted under seal.

(Government's Exhibit E-161 (sealed) received in evidence)

MS. GERAGOS:  Could we play that for the jury and the parties.

(Videotape played)

Q.  Did you take that video?

A.  I did.

Q.  Is that in Turks or the Bahamas?

A.  This is Turks.

Q.  And that's the villa that you guys were staying in?

A.  Yes.

Q.  And I noticed in that video, you had light-colored nails, right?

A.  Yes.

Q.  That's something that you had even before the hotel night started, right?

A.  Yes.

Q.  And that was the villa they had people there giving you

green juices, right?

A.   Yes.

Q.   It was a really nice villa, right?

A.   Yes.

MS. GERAGOS:   Can we go to E-162, which, with the government's consent, I believe we could admit under seal?

MS. COMEY:   No objection.

THE COURT:   E-162 will be admitted under seal.

(Government's Exhibit E-162 (**sealed**) received in evidence)

(Videotape played)

Q.   Where is this?

A.   This portion of the trip was in the Bahamas.

Q.   Is that you sitting with Mr. Combs?

A.   Yes.

Q.   And that's the next villa that you stayed at?

A.   Yes.

MS. GERAGOS:   If we could go for the witness and the parties only to E-165.

Q.   Did you take this video?

A.   I did.

MS. GERAGOS:   With the government's consent, I believe we'd like to admit E-165.

MS. COMEY:   No objection.

MS. GERAGOS:   And I don't think this needs to be under

seal.

MS. COMEY:  I agree, your Honor.

THE COURT:  165 will be admitted.

(Government's Exhibit E-165 received in evidence)

Q.   Let's play.

(Videotape played)

Q.   So is this Turks or Bahamas?

A.   This is Turks.

Q.   And this is one of the videos that you say you'd like to take of Mr. Combs when you were together?

A.   Yes.

Q.   And you're really enjoying your time on the beach there, right?

A.   Yes.

Q.   Okay.  And then at the end of this trip, I think you testified that — or maybe you didn't — that he gave you bags and shoes and a bracelet and money.  Do you remember that?

A.   I believe it was before this trip, kind of I think around the first time that we went to dinner, that Miami, that five-day Miami trip, there was shoes, bags and a bracelet.

Q.   What was the bracelet?

A.   It said L-O-V-E.

Q.   And did you pick that out?

A.   Yeah.  I sent him a picture of it, and he said to get it.

Q.   So then he got you that bracelet?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A. Yes.

Q. Then how many shoes did you get?

A. I think it was like one pair of shoes, one bag.

Q. What was the bag?

A. Bottega.

Q. And you were happy with those gifts, right?

A. Yes.

Q. And at this time when you guys were in Turks and the Bahamas and even before, he had told you that he was seeing many women, right?

A. Yes.

Q. Is that something he was upfront with you about from the beginning?

A. Yes.

Q. What did he tell you about seeing many women?

A. He just expressed to me that he was dating -- dating. He was just dating.

Q. And what term did he use to describe his dating life?

A. Polyamorous.

Q. And you were okay with that?

A. I was okay with dating him, yes, and knowing that, yes.

Q. You didn't exactly love that he had multiple other girlfriends, right?

A. At first it wasn't something that I minded. It was -- I was just getting to know him too; but then later on it, you

know, as emotions grew deeper and feelings get deeper, then, of course.

Q. Yeah, because you were -- he was -- you considered him your partner and your lover, right?

A. Yes.

Q. And as you got some more and more in love with him, it was harder that he had a lot of other girlfriends, right?

A. What was hard for me was the imbalance in treatment. When I walked into this relationship, I thought that, you know, he was just evenly dating. And then as many more years passed, then, you know, it was definitely difficult when there became a relationship that just publicly very -- looked like a monogamous committed relationship, and that I didn't sign up for.

Q. I'll get to that relation -- I know what you're talking about. I'll get to that in a little bit.

But do you remember right after your Turks and Caicos trip, he had another girl fly in on a trip that he was on?

A. I believe when I left -- you're talking about when I left Bahamas?

Q. That's right.

A. Yes. And then he flew in a couple more girls.

Q. That was something that even then, even though you weren't as deep in love with him as maybe later in other years, bothered you, right?

A. Yeah, it was definitely something new to see.  It was shocking even then.

Q. Even then, because you had just had kind of a wonderful 20 days with him, right?

A. Yes.

Q. And he was, from your perspective, so easily able to shift to another girl?

A. Yes.

Q. And that hurt your feelings?

A. Yes.

Q. Okay.  And do you remember calling that woman some insults?

A. Unfortunately.

Q. What kind of names would you call her?

A. And I feel very badly about this.

Q. I understand.

A. And I really do love women.

I -- back in the day, I was very colorful with my words.  I would say that I called them a hoe or, mmm, I think that was the term I probably used most often.

Q. Did you ever used like brothel escort, anything like that?

A. All of those ugly things, yes.

Q. But because you were pretty jealous, right?

A. I was -- yeah, I really was feeling my man, and I wanted him to be mine.

Q. Because he's your lover?

A.   Yes.

Q.   Okay.  So then you talked about, you know, later on in the relationship he had a public relationship that looked from the outside to be a monogamous one, and that was really hurtful, right?

A.   That was hard, yeah.

Q.   That was really hard.  So that was with someone named Yung Miami or Caresha, right?

A.   Yes.

Q.   And he started dating her after you?

A.   Yes.

Q.   And how long after you?

A.   Probably -- I don't really know, maybe six to -- six months to a year later.

Q.   Yep.  And he was really public in that relationship?

A.   Yes.

Q.   And your relationship by contrast was very private, right?

A.   Yes.

Q.   And so he would -- and he would put her on Instagram, right?

A.   Yes.

Q.   And she would put him on her Instagram, right?

A.   Yes.

Q.   And that was really hurtful?

A.   Yes, that was hard -- hard to watch.

Q.   And that was something that you, for lack of a better term, fought over for a long time in your relationship once he started dating her?

A.   Yeah, it was definitely not something that I signed up for. I didn't sign up to date a man that was in a public relationship.

Q.   And you told him that, right?

A.   Yes.

Q.   And then he was also sometimes with his ex, Gina, right?

A.   Yes.

Q.   And that would bother you too, right?

A.   Yes.

Q.   And someone named Jesse?

A.   Yes.

Q.   And he -- that was one of the people that you talked about who he took to London and he took to Wyoming, right?

A.   Yes.

Q.   And that was hurtful, right?

A.   Yes.

Q.   They got to go on those trips?

A.   Yes.

Q.   With Caresha or Yung Miami when he put her out in public, he was also kind of showering her with gifts very publicly, right?

A.   Yes.

Q. Like you had seen that he had gotten her a Maybach, right?

A. Yes.

Q. And you were really upset about that because you weren't getting the same type of gifts?

A. Mmm, probably, yes.

Q. And then you asked for a Van Cleef necklace and bracelet, right?

A. Yes.

Q. And so then he got that for you, right?

A. Yes.

Q. Because you wanted, as you said, it was the imbalance of a relationship, and you wanted something really nice as well?

A. Yes.

Q. So we've talked a little bit about your jealousy. But would you also say that Mr. Combs was very jealous?

A. Yes.

Q. Very possessive?

A. Yes.

Q. Can you explain you talked about Bear yesterday, and that was somebody who gave you $9,000 in about January of 2024, right?

A. Yes.

Q. And you hadn't even met this person, right?

A. I had met him many years ago.

Q. But you didn't meet -- I guess you didn't meet him in the

January 2024 time period when he gave you that $9,000, right?

A. Yeah, that's correct.

Q. So when Mr. Combs found out about this, he was extremely jealous, right?

A. Yes.

Q. And he was kind of going over and over and over again in his mind?

A. Yes, he was rumerating (sic).

Q. Because he didn't want his woman to be with another guy, and in his mind you were with another guy?

A. Yes.

        MS. COMEY:  Objection.

Q. You weren't with Bear, right?

A. I was not with Bear.

Q. But in his mind, you thought that he thought that, right?

        MS. COMEY:  Objection.

        THE COURT:  That's sustained.

Q. It's a confusing question.

        He was very jealous of the Bear situation, right?

        MS. COMEY:  Objection.

        THE COURT:  That's sustained.

Q. Did you perceive him as being very jealous of Bear when he found out about the $9,000?

A. Yes, I perceived him to be very jealous about that.

Q. Okay.  You spoke when, you know, you saw Mr. Combs get

those -- meet the dealer, for lack of a better term, in Miami in November, and then you had took -- started taking the ecstasy in Turks and Caicos in 2021, you knew that Mr. Combs would use a lot of drugs, right?

MS. COMEY: Objection to form.

THE COURT: It's overruled.

A. At that point, I didn't really know how much he consumed drugs, but I know that he consumed them. I didn't know like the quantity or anything.

Q. Okay. You just knew that he consumed them?

A. Yes.

Q. Do you remember telling the government that after just about two to three dates, you already thought that he was sad, depressive, and had shaky hands?

A. Yes. It was actually on our second date on our way to Turks when I was on the plane. I was facing him, and I could just see his eyes, and I could just see his hands and his teeth, and I could tell that he wasn't taking very good care of himself, maybe on the surface but not internally.

Q. What about his eyes made you feel that way?

A. I felt that he was developing jaundice. I felt that his gums were gray, probably from drug use. And I felt that his hands were shaky probably from overconsuming alcohol.

Q. Do you remember speaking to him about wanting him to go to rehab when you initially started dating?

A.   Yes, absolutely.

Q.   What did you tell him?

A.   I told him that we should actually take a trip to Thailand. I know of a rehabilitation center that my friend's parents go to that's really nice, and it's like a 30-day program.

Q.   And what was his reaction, if any, to that?

A.   He was like, What the hell, you think I need rehab?

Q.   And what did you tell him?

A.   I said, Well, yeah.  Like why not?  Like look at you.

Q.   At what point in the relationship?  Was this before Turks? Was it after Turks that you told him that?

A.   I believe it was probably during Turks.

Q.   So when you said, Look at you --

A.   Well, this was a faint memory.

Q.   Okay.

A.   But we have a lot of jokey banter, so I don't know.

Q.   Is it fair to say you wanted him to be a lot healthier?

A.   Definitely.

Q.   And you are pretty healthy, right?  You work out?

A.   Yes.

Q.   You eat well?

A.   Yes.

Q.   You eats your fruits and vegetables?

A.   Yes.

Q.   And so you wanted him to work out and to eat well, right?

A.   Yes.

Q.   And you drink tea, is that fair?

A.   Yes.

Q.   And you wanted him to drink tea instead of coffee perhaps?

A.   Yes.

Q.   And you wanted him to focus on the good parts of bettering himself, right?

A.   Absolutely.

Q.   That's part of why you wanted him to go to rehab as well?

A.   Yes.

Q.   And so you felt at the beginning that he was a drug addict, right?

A.   I felt that in the beginning I didn't really know how to label it.  I just felt that I encountered somebody that was overdoing the partying.

Q.   And is that because, for example, in Turks, he was taking ecstasy almost every day?

A.   I would say -- in that time I would say that he was more celebratory, but then as our relationship continued, I noticed a very strong pattern, and I still didn't even really label it as a drug addict.  I think now -- now I would say that, but then I just would say that he was a really big party guy.

Q.   Okay.  Do you remember saying that your friend dated Frank, the butler?

A.   Yes.

Q.   And that Frank had indicated if you would recommend a certain health protocol, he would follow it for a few days?

A.   Yes.

Q.   So you would recommend those protocols to him?

A.   Yes.

Q.   What kind of protocols would you recommend?

A.   I would recommend just like things for his digestive system.  I would recommend other types of sleep aids so that he would stop consuming the really hard-core sleep aids.  I would just try to recommend anything for him that didn't rupture just like his natural well-being.

Q.   And you knew that Mr. Combs was also on antidepressants, right?

A.   Later on I found that out, yes, maybe close to the end a little bit that they were actually antidepressants.

Q.   Do you remember telling the government that he couldn't stop cold turkey?

A.   Yes.

Q.   Right.  And you wanted to get him off of the Xanax and the antidepressants and the Prozac and all of those prescriptions, right?

A.   Yes, as you just listed them.  I didn't even know a lot of that, but yes, he was in a lot of things, and I just wanted him to get back into his natural form and his like natural state.

THE COURT:  Ms. Gergos, when you get to a good spot,

why don't we take a break?

MS. GERAGOS:  Can I just ask three more questions?

THE COURT:  Of course.

Q.  You thought that he couldn't really handle the war in his mind?

A.  Have I said that before?  Is that --

Q.  Do you remember saying that he couldn't handle the war in his mind?

A.  Those sound like my words, yes.

Q.  And do you remember even one time during a hotel night, you spoke to him about him wanting to get ketamine therapy?

A.  Oh, yes.  He mentioned that he wanted to do ketamine therapy.

Q.  And you thought that that may help him with his depression?

A.  Actually, he was telling me about ketamine therapy and all this research that he found out about it, and he was like telling me about what it was.

Q.  And is that something that you were encouraging also?

A.  I highly doubt it, yeah.

Q.  Okay.  But he was telling you that he wanted to get ketamine therapy and doing the research on it, right?

A.  Yes.

MS. GERAGOS:  Your Honor, I could stop right here.

THE COURT:  We'll take a 15 minute break and come back.

Thank you, members of the jury.  All rise.

(Continued on next page)

(Jury not present)

THE COURT:  I'm sure Ms. Comey told you this, but you're not able to have any conversations with the government.

THE WITNESS:  Thank you.

(Witness not present)

THE COURT:  Ms. Comey, anything to raise before we take our break?

MS. COMEY:  No.  Thank you, your Honor.

THE COURT:  Anything, Ms. Geragos?

MS. GERAGOS:  No.  Thank you, your Honor.

THE COURT:  All right, we'll come back in 15.

(Recess)

MS. GERAGOS:  We were just discussing, your Honor, I think we could stop at 3:00 today.  I know tomorrow is also a short day, and then it would -- I think it would still give me sufficient time and all of Thursday if I need it.  I'm seeing a nod from the front, so...

MS. COMEY:  Your Honor, we defer to Ms. Geragos.  As long as I have a little bit of time for redirect, very brief redirect on Thursday, and this witness can make her flight, we would love to end early today.

THE COURT:  So it's up to you, Ms. Geragos, but do you think you would be able to complete your cross-examination by Thursday because I'm prepared to be here until 5:00.  But if you would like to utilize that time for anything else or you

think that given what you have, you'll be able to complete it within the time you've indicated, then that's certainly fine.

MS. GERAGOS:  Then let's just check again at the lunch break, but I do think I could complete it by Thursday, it seems like that.

THE COURT:  Very good.  So I have no issues with that.

MS. GERAGOS:  Okay.  Great.

THE COURT:  Let's bring the witness back if we can.

(Witness and jury present)

THE COURT:  Ms. Geragos, you may proceed when ready.

MS. GERAGOS:  Thank you, your Honor.

Jane, resumed

CROSS-EXAMINATION CONTINUED

BY MS. GERAGOS:

Q.  Hi again, Jane.

A.  Hi, Ms. Geragos -- wait Geragos.

Q.  It's a hard one.

When we just ended, we were talking about how he had wanted to get ketamine therapy.  I'll just shift for a second.

I think you said earlier that taking care of Mr. Combs was one of your favorite parts of the relationship, right?

A.  Yes.

Q.  And you loved that quality time with him, right?

A.  Yes.

Q.  And so after these hotel nights or times when you would

just go over to his house on Mapleton and you could be in his bedroom with him, would you have quality time with him during those times?

A. Yes.

Q. Can you explain what you -- you said you got to watch *Dateline*, I think it was?

A. Yes.

Q. And that was his favorite show?

A. Yes.

Q. Would you watch other movies?

A. Every once in awhile he'd put on something different maybe.

Q. And then we also talked about your house before the break, and there were times that he came over to your house where you would have drinks and hang out and do a movie night, right?

A. He would come over, and it would usually lead to a majority of the time one of these nights.

Q. But there were times where it wouldn't be one of these nights, right?

A. I can only recall maybe like once.

Q. Do you remember telling the government that there were at least two times where he -- after you moved in, you would have drinks, hang out, and do a movie night?

A. Maybe two.

Q. Okay. And you also spoke yesterday about a time where he told you he was going to have surgery, and you felt really bad,

right?

A.   Yes.

Q.   And did he have one surgery or more than one surgery throughout your relationship with him?

A.   I believe it was one surgery.

Q.   And after that surgery, did you go to his home, and when he had downtime, assist him and take care of him and make sure he was comfortable?

A.   Yes.

Q.   And you assisted him with crutches?

A.   Yes.

Q.   And you just made sure that he wasn't in pain, and that he was okay, right?

A.   Yes.

Q.   And you liked that quality time with him, right?

A.   Yes.

Q.   Because he was your partner and your lover, and you wanted to take care of him, right?

A.   Yes.

Q.   And those times with him were sacred to you?

A.   Yes, they were.

Q.   And you really, really wanted to please him, right?

A.   Yes.

Q.   You wanted him to be happy?

A.   Yes.

Q.   You mentioned a few times on direct examination that there were times that he felt bored or you thought he felt bored, you would mention having an entertainer come, right?

A.   In that instance.

Q.   In that one instance where he seemed bored?

A.   Yeah.

Q.   Because you wanted him to be excited and feel fulfilled, right?

A.   Yes.

Q.   Do you remember telling the government that you deeply loved him and enjoyed just about every minute with him during hotel nights?

A.   I -- yeah, during hotel nights the portion of me and him, yes, I loved that part of me and him.

Q.   And can you just explain that little bit more, what that part, and that's after a round would be done or after all the entertainers or one or two of the entertainers would leave and it was just time together?

A.   I would say when we would initially first meet at the hotel, we would have some alone time, and that was one favorite part.  And then the next favorite part would then --

Q.   Let me stop you then, and then we'll go into it.

     How long would that alone time be?

A.   I would say it could vary between 30 minutes to an hour, really just the time before an entertainer comes.

Q. What would you do during that 30 minutes to an hour?

A. We would either just have drinks or start taking an ecstasy pill or we would make love or halfway make love.

Q. Okay. And would there be drinks set up, like champagne and other types of alcohol or -- and just normal beverages too, non-alcoholic?

A. Yes.

Q. And then you would like that time to connect with him, right?

A. Yes.

Q. And so that could last for like 30 to an hour, right?

A. Yes.

Q. But it could also last longer than that, right?

A. At times it has, yeah.

Q. I interrupted you when you were about to get to the next part.

A. Oh, just that whenever it was just the moments that we would start making love was the moments that I really enjoyed in these nights with him.

Q. And then how long after an entertainer would leave did you guys then end up going to his home either in Bel Air or Miami?

A. I would say after one of these nights, I guess we would just be together ourselves, and we would then have that time to just have for each other, and then we would go to one of the residences.

Q.   Would you guys during this time together -- I know you said he was really tired, but were you guys able to talk and express feelings to one another?

A.   During before we would go to the residence or after?

Q.   Umm, after.

A.   After, I would say yes, sometimes we would even continue.

Q.   And then what about before?

A.   Before, it would be like ending together in the hotel and then moving on to a residence, just me and him, and then we would have that.

Q.   Time together?

A.   That time together.

Q.   Do you remember telling the government that during these nights he was really good about being with you and being in your head and giving you the attention that you craved during these nights?

A.   Yes.

Q.   And that he would cater to you?

A.   Yes.

Q.   How would he cater to you?

A.   Mmm, I guess it was just the attention and the affection.

Q.   And that he would give you the compliments that you wanted while in those rooms?

A.   Yes.

          (Continued on next page)

BY MS. GERAGOS:

Q. Did he give you affection outside of the rooms?

A. In what context? Do you mean --

Q. You enjoyed his affection, right?

A. Yes.

Q. And so even when there were times that he came to your house and that there wouldn't be men there or entertainers, he gave you affection as well, right?

A. Yeah. Yeah.

Q. Was it on a heightened level during these nights?

A. It was not, like, that affectionate. He's not that -- that affectionate.

Q. He's more larger than life and inspiring but not as affectionate when it's not during these nights?

A. I would say he's the most affectionate during these nights.

Q. OK. Got it.

You testified that by about November of 2021, you realized that this was just becoming the dynamic of your relationship, right?

A. Yes.

Q. OK. And that -- do you remember telling the government that you accepted the dynamic at that time because you just wanted any amount of time with him?

A. I accepted the dynamic as far as -- that's a little fuzzy for me. I guess I -- yeah. I guess I kind of knew what I was

seeing this was becoming, and I was already hooked onto the love and I just kind of was going with it.

Q.  OK.  And do you remember telling the government in one of your meetings with them that you felt that you couldn't say no because you wanted to prove yourself and to make him happy and to be the one he desired?

A.  Yes.

Q.  And why is that?

A.  Why?  Because I loved him very much and I liked making him happy, and I liked to make him happy and satisfy him.

Q.  And you perceived these nights as things that could satisfy him, right?

A.  I knew that this is what he liked, yes.

Q.  OK.  Do you remember telling the government that he would say that you guys didn't have to do anything and that he didn't need these nights and that he would be defensive whenever you brought up his feelings?

A.  Yes.

Q.  OK.  And that when he would tell you he didn't need these, you knew deep down that he did?

A.  Yes.

Q.  OK.  And he knew -- when you would leave or have a break with him, he knew how to make you feel better?

        MS. COMEY:  Objection.

        THE COURT:  Sustained.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

BY MS. GERAGOS:

Q.   Do you remember telling the government that he knew how to make you feel better?

MS. COMEY:  Objection.

THE COURT:  I think you just need to rephrase the question.

MS. GERAGOS:  OK.  Thanks, your Honor.

Q.   Do you remember that there were times where you would voice something to him and that he knew how to get you to come back, essentially?

MS. COMEY:  Objection.  Vague and time frame.

BY MS. GERAGOS:

Q.   All right.  Starting in August of 2023, do you remember voicing certain things to him and he would be defensive in response?

MS. COMEY:  Objection.

THE COURT:  Sustained.

BY MS. GERAGOS:

Q.   All right.  Do you -- let me just move on.

Do you remember telling the government that Combs was driven by desires and you were driven by your love of him?

MS. COMEY:  Objection.

THE COURT:  Overruled.

A.   Driven by his desires.  Is there more, like, driven by --

Q.   If you don't remember, it's fine.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q. Do you remember saying you were driven by your love of him?

A. Oh, yes.

Q. OK. All right. I want to go back to the beginning of the relationship. You've talked a lot about red lights and oil and ecstasy during these nights.

Before you had your first hotel night with him in May of 2021, would he use red lights and oil outside of that first hotel night?

A. Yes, in our relationship he would have them also at his residence.

Q. OK. So this was not something that was exclusively used for hotel nights?

A. Right.

Q. OK. After the first time that you met him and Don -- or that you met Don, I should say, in May of 2021, did you start doing research on this lifestyle?

A. In the middle of our relationship, I think, in maybe 2022, I came upon a word called -- because I was just trying to figure out my relationship. I came upon a word that was called a "cuck," "cuckolder."

Q. And what is that?

A. That is a man who is in a relationship with a woman and he's turned on watching his woman have sex with another man.

Q. And so you came upon that word while researching what was going on in your relationship?

A.   That's correct.

Q.   OK.  And so is that -- was that word -- so what did that word mean to you?  When you were researching it, what did that mean to you?

A.   That word meant to me -- well, I was just trying to understand what was going on, so I guess I -- what did that word mean to me?  I was just, like, this is spot-on.

Q.   OK.  And were you researching what a cuck is?

A.   Yes.

Q.   And so you learned what you just said the definition was.  What else did you learn about this?

A.   I was just trying to kind of deep dive on all the reasons why they had derived so much pleasure from watching their woman be with other men.

Q.   And what effect did that have on you?

A.   It gave me more of an understanding.

Q.   And what were some of those reasons?

         MS. COMEY:  Objection.  I'm not sure if it's calling for hearsay, your Honor.

         MS. GERAGOS:  Effect on the listener, your Honor.

         THE COURT:  I don't think the question is calling for hearsay, but maybe you can rephrase the question to avoid the objection.

         MS. GERAGOS:  I think my question was what effect did it have on you, and I think that that would --

THE COURT:  Well, that wasn't the question, but why don't we get a fresh question and we'll see if there's an objection.

BY MS. GERAGOS:

Q.  What was your understanding -- you said that it helped you get an understanding.  What was your -- how did it help you get an understanding?

A.  I just wanted to know why my partner wanted so many of these nights and what was driving him.  I was just trying to find an understanding of it that he wasn't vocal about.

Q.  And so what was your understanding that you learned?

A.  I mean there was a multiple list of reasons.  One of them was that the cuck derives pleasure seeing his woman receive pleasure from the other man, and a few other things.

Q.  What were some of the other things?

MS. COMEY:  I'm going to object at this point.

THE COURT:  That's overruled.

A.  Some of the other things were that cucks could also have a real curiosity that they're too ashamed to experience themselves and so they use the woman to venture out in this curiosity without actually doing the act itself.

Q.  And did you ever say that he was using the words "voyeurism" in the wrong way?  Did you learn -- actually, let me strike that.

Did you ever learn about the word "voyeurism"?

A.   I didn't dive too deep on that word, but he liked to use the words "voyeurism" and "escapism."

Q.   And did you ever research, if you did, the word "voyeurism" or "escapism"?

A.   No.  I think I pretty much -- I had more of a -- I would use the word "cuck" for him more so.

Q.   OK.  And so when you guys started these hotel nights and an entertainer would come, did he -- I think you said that the first 30 minutes to an hour is just you and him time, time that you cherished, right?

A.   Yes.

Q.   And then the entertainer would come, right?

A.   Yes.

Q.   Did you spend and did he spend time talking and laughing with the entertainer?

A.   Yes.

Q.   I think you had mentioned some of them you grew fond of, like Paul?

A.   Yes.

Q.   And so would you guys talk and laugh with that person?

A.   Yes.

Q.   And so would you guys have conversations?

A.   Yes.

Q.   How long did that last?

A.   Conversations?

Q. Yeah. Before the sexual activity or the foreplay, I think, you mentioned or even the time where you would dance or pour oil on yourself, how long would the talking and just the conversations last?

A. Not too long. Maybe, like, 15, 20 minutes.

Q. And what kind of questions and conversations would you have?

A. I would just strike up, like, small conversation, asking them how they're doing and what's been new with them, etc.

Q. And then at that point, would you already be in the lingerie and the heels?

A. Yes.

Q. Would you change into that right when you got into the room, or at what point?

A. I would change as soon as I got to the hotel room.

Q. OK. And how long would -- I think we talked about a pattern, and so I'm just asking generally between -- I'll do what Ms. Comey did.

Between May of 2021 and October of 2023, how long would the time when you were in your lingerie and heels and you would be dancing, how long did that period last?

A. Dancing?

Q. Yes.

A. I would say I would dance for, like, maybe 15 to 20 minutes also.

Q. Would you guys play music?

A. Yes.

Q. Did you have play lists that you liked?

A. Yes.

Q. OK. And you spoke on direct how you were really good at making everybody think that you wanted to be there, right?

A. Yes.

Q. And you were very sweet to the entertainers?

A. Yes.

Q. You would ask them questions about themselves?

A. Yes.

Q. You asked him about -- you asked Mr. Combs about himself, right?

A. Yes.

Q. And you guys were all laughing and joking and talking to one another, right?

A. Yes.

Q. And then you talked about how there would be foreplay and fantasy talk for hours and hours and hours, right?

A. Yes.

Q. And I think you testified that that was what you perceived to be Mr. Combs's favorite part of the night?

A. Yes.

Q. And then you said the actual act of the sex was a lot shorter, right?

A.   At times.  It could vary.  It would be shorter or longer.  Some could last for a very, very long time.

Q.   OK.  So that was not -- that varied, the length of sex varied?

A.   Yeah.

Q.   OK.  And then you talked about filming these.  You were OK with it being filmed, right?

A.   Yes.

Q.   And he said that they were just for you and him, right?

A.   Yes.

Q.   You understood that he didn't want anybody else to have them either, right?

A.   Yes.

Q.   And that was part of why you and him ended up getting your own phone for these, right?

A.   Yes.

Q.   Because you wanted to make sure that nobody could get a hold of the recordings?

A.   That's right.

Q.   Because, as you said, it was easy to get into his phone, right?

A.   Yes.

Q.   And you liked that you and Mr. Combs could watch these videos back and that he would get pleasure out of it, right?

A.   I did not like that part.  That was just a part of the

relationship, but yeah.

Q.  You testified about a movie screen that you got him for his birthday in 2023, right?

A.  Yes.

Q.  And you said that was to watch either pornography or to watch some of these videos, right?

A.  Yes, whatever he wanted to watch on it.

Q.  And you knew that one of the things he was going to watch on it was your videos, right?

A.  Yes.

Q.  And you liked making your partner happy?

A.  I did.

Q.  And you knew that he would derive pleasure from watching these videos, right?

A.  Yes.

Q.  And so you put on a good show for him in these videos because you knew he would watch them back, right?

A.  Yes.

Q.  OK.  He was always very happy in these hotels, right?

A.  Yes.

Q.  OK.  And charming -- you said charming and loving?

A.  Yes.

Q.  And would you ask him questions, like, do you want me to do this or do you want me to do that, when you were with these entertainers?

A. Yes.

Q. And tell me why you did that.

A. Just to turn him on.

Q. And you knew the things that you could say during these nights that would turn him on?

A. Yes.

Q. And you had -- you kind of set ground rules in these rooms; I think you talked about your ground rules were that no entertainers could use drugs, right?

A. Yes.

Q. And can you tell us a little bit about why?

A. I just didn't want to have a stranger be out of their mind in a very vulnerable environment with me.

Q. And you also talked about condoms and how you wanted -- you wanted -- you asked twice for men to wear condoms, right?

A. I would say yes.

Q. The first time we listened to that recording of Don, right?

A. Yes.

Q. And ultimately, after that, he was given a condom to wear, right?

A. In the very first time with Don, there was a condom that was given, yes.

Q. OK. You testified earlier that Sean decided when a hotel night would end early, right?

A. Yes.

Q.   And that sometimes you would give him subtle cues when you wanted them to end?

A.   Yes.

Q.   And his response, you said, was let's end on a high note, right?

A.   Yes.

Q.   What did that mean to you?

A.   It meant that he wanted more.

Q.   That he wanted to end on a high note meant that he wanted more?

A.   Yes.

Q.   And what would you say in response to that?

A.   I would just do it.

Q.   And you wouldn't stop it?

A.   No.

Q.   OK.  There were a few instances that we talked about -- and I'll just lead you through these quickly -- where you did voice that you wanted something to end, right?

A.   Yes.

Q.   And then he listened?

A.   On some rare occasions, yes.

Q.   But did you remember telling the government that there were a few instances where you wanted a hotel night to end early and it would end?

A.   Yes.

Q.   OK.  And you said when you became more vocal about your feelings about this, he respected that, right?

A.   Yes.

MS. GERAGOS:  OK.  So we looked at -- and if we could just bring it up quickly -- Government Exhibit 2A634, which is in evidence.

Q.   There was this individual, right?

A.   Yes.

MS. GERAGOS:  All right.  We could take this down.

Q.   You said you were immediately repulsed by him, right?

A.   Yes.

Q.   And he did not look nice, he smelled?

A.   Uh-huh.

Q.   Just for the court reporter you have to say yes or no.

A.   Yes.

Q.   And you told Mr. Combs I'm not attracted to him, right?

A.   That's right.

Q.   And he said, are you sure, basically, and then said no worries and dismissed the man, right?

A.   No.

Q.   He didn't say no worries?

A.   I was with this man for about, I would say another hour or two, and it took some time and Sean could see that this really wasn't -- there was no chemistry, at that time he was finally, was, like, OK.

Q. Do you remember testifying that Mr. Combs said no worries?

A. Yeah, like, at the last hour or so of trying to get that going.

Q. And it just didn't work and he left, right?

A. Yes.

MS. GERAGOS: OK. And if we could bring up Government Exhibit 2A610, which is in evidence.

Q. This was another one of the individuals that you dismissed also, right?

A. Yes.

MS. GERAGOS: All right. You could take the photo down.

Q. You told Mr. Combs you did not find this man attractive, right?

A. Yes, I --

Q. I think the word was "repulsed"?

A. Yes.

Q. After two times?

I think I cut you off. I just want to make sure the record is clear

A. Yes, I told him two times.

Q. OK. So you went out with him, Mr. Combs into a different room first, right?

A. Yes.

Q. And then you gave it another go?

A.   Yes.

Q.   And then you got him into the room again, right?

A.   Yes.

Q.   And you said I am repulsed by this man?

A.   Yes.

Q.   And you said Mr. Combs seemed a little agitated, but then he let him go, right?

A.   Yes.

Q.   And then you talked about an Italian man in New York where there was also -- you also dismissed him, right?

A.   Yes.

Q.   And that was the same New York trip, that was September of 2023 that we discussed yesterday, right?

A.   Yes.

Q.   That was the trip where you guys went to a lounge after you had landed?

A.   Yes.

Q.   And while you were in air he sent you -- Mr. Combs sent you a link to a Cowboys 4 Angels person, right?

A.   Yes.

Q.   And you said that you kind of -- you felt so much anxiety on that plane flight, right?

A.   I did.

Q.   And so then when you went into the Trump Hotel later that evening, this man was there, the Italian, you called him,

right?

A.   Yes.

Q.   But you did not want to participate with him, right?

A.   Yeah.

Q.   And so after that happens, after you saw him and after you -- after you saw him, you dismissed him, right?

A.   Yes.

Q.   And Mr. Combs said OK?

A.   Yes.

Q.   OK.   Even though you thought he may be agitated, right?

A.   Yes.

Q.   And then it was after that that you were feeling badly, and so you texted Kabrale, right?

A.   There was a unspoken kind of, like, how you -- like what's the plan B?  Like, what are we going to -- I don't know, like how are you going to make this up?  There was an undertone of that, and so I --

Q.   You just said it was unspoken?

A.   There was certain energy that there needed to be someone else there in the room, and so I took it upon myself to message Kabrale.

Q.   So you felt an energy, but he didn't say something, right?

A.   Well, he would say things like what's the plan B or what else?  What else?  Like, what else?  So me being just that I understand my partner, I knew what that meant.

Q. So this Italian man came to the Trump Hotel, this was the same person he had texted you about, right?

A. Yes.

Q. You were not attracted?

A. No.

Q. You dismissed him?

A. After some time, yes.

Q. And the energy and the undertone was there should be somebody else, right?

A. Yes.

Q. And then you reached out to Kabrale?

A. Yes.

Q. All right. You also testified on direct examination about your teeth. Do you remember that?

A. Yes.

Q. The government had asked you whether this was -- I think asked, this was right after the Turks trip, right?

A. After the Turks trip was when I got the teeth?

Q. Yes.

A. Or -- which Turks trip?

Q. After the second Turks trip, in 2023.

A. I think so.

Q. OK.

A. Maybe.

Q. And the government got up and said, questioned you and said

that he did not like your teeth, right?

A.  Yes.

MS. COMEY:  Objection.

MS. GERAGOS:  I can rephrase.

THE COURT:  All right.

BY MS. GERAGOS:

Q.  Do you remember saying -- do you remember testifying that it was because Mr. Combs did not like your teeth?

A.  Yes.

Q.  OK.  You previously said that he was right and that you love your teeth now, right?

A.  I do.

Q.  OK.  And from what you understand, are you familiar with people getting veneers?  Is this bizarre behavior, to get veneers?

MS. COMEY:  Objection.

THE COURT:  Overruled.

A.  It's not bizarre behavior, no.

Q.  This was something you're OK with, right?

A.  Yes.

Q.  And so you got them, right?

A.  Yes.

MS. GERAGOS:  OK.  If you could what's admitted put up A10453, government exhibit.

All right.  If you could go to page 15, please -- I'm

sorry.  Go to page 12.

Q.  He says:  So they give natural.  I can't really see.  So they give natural.  Right?

A.  Yes.

Q.  What does that mean, they give natural?

A.  It means -- around this time I probably got temporaries.

Q.  What does --

A.  Oh, I'm sorry.

Q.  What does the term mean they give -- could you explain for those of us who don't know what give --

A.  Yeah.

Q.  -- natural means?

A.  He's just asking here if the veneers look natural.

Q.  OK.  Because was it important that your teeth look natural and very good?

A.  Yes.

Q.  And that was important to you too, right?

A.  Yes.

        MS. GERAGOS:  OK.  And you can take this down.

Q.  And you testified that you love them, right?

A.  Yes.

Q.  OK.  And then you talked about your nipple piercing that you got, right?

A.  Yes.

Q.  And that Ms. Khorram helped set up the appointment for you?

A. Yes.

Q. And did she go with you?

A. No.

Q. You went by yourself?

A. Yes.

Q. And you made that decision to do that, right?

A. After my partner requested it, yes.

Q. And then you made the decision to go, right?

A. Yes.

Q. And you made the decision to get it done?

A. Yes.

Q. And then you made the decision to take them out, right?

A. Yes.

Q. Because it snagged and it hurt?

A. Yes.

Q. OK. We also talked a lot about ecstasy in the hotel rooms and otherwise.

You were willing to do drugs with him, right, even though that wasn't part of your daily occurrence?

A. My partner had drugs around, and he would encourage me to take them. Or he would already see me and be like, here.

Q. And how old are you at this time?

A. I was --

Q. 35?

A. Yep.

Q. And when he would say here or when they were around, you would take them, right?

A. I would take them, yes.

Q. I think you've talked about several different types of drugs that you used while you were in your relationship with Mr. Combs.

You said, for example, you tried ketamine but you didn't like it, right?

A. Yes.

Q. So you decided you weren't going to take ketamine anymore, right?

A. Right.

Q. And then you talked about cocaine; you tried it maybe one or two times, I think, you said?

A. Yes.

Q. And you did not like cocaine so you didn't take it?

A. Coke -- that was, like, just around also too, but --

Q. So you had cocaine around, right?

A. Yes.

Q. But you decided after those two times that you took it that you didn't like it?

A. Not really, no.

Q. OK. So you decided not to take it more?

A. Right.

Q. OK. You talked about, but you did take ecstasy, and then

we also heard about the liquid drug that you took that we talked about yesterday?

A. Yes.

Q. And can you tell us why you liked -- why you preferred ecstasy over the other drugs?

A. I feel that ecstasy made me feel extremely sexual and liberated, and it just helped me get through these nights with men as well.

Q. You took ecstasy with Mr. Combs even when there weren't men there, right?

A. With Mr. Combs?

Q. Si -- yes. Sorry.

A. Yes. When I was with Mr. Combs, we would also take ecstasy, just me and him as well, on some occasions, yes.

Q. OK. And so it was not only when you were in hotel nights or with other men that you would take ecstasy, right?

A. Yes.

Q. OK. And it made you feel liberated. Can you explain that?

A. Yes. It just got me out of my mind, not think too much and just kind of focus in on the sexual energy and just being, like, really sexual and into the moment.

Q. OK. From your -- when you took ecstasy, Mr. Combs was doing it as well with you, right?

A. Yes.

Q. From your perspective, how was Mr. Combs on ecstasy?

A.  I felt that he was -- he was him.  He was just happy, charismatic, just big energy, sexual, high.

Q.  I think you previously said that he wasn't in his normal life or when he wasn't on ecstasy, he was, perhaps, maybe a little bit more aggressive?

A.  Oh, I see.

I feel like when I would see him before ecstasy, he would seem a bit agitated or just kind of stressed from the day.  And I feel like once he took ecstasy, he was more upbeat, happy, in a good mood.

Q.  It softened him up?

A.  Yes.

Q.  Was he more -- did you observe him to be a little bit more creative on it?

A.  Creative, yes.  I would say he would listen to music and have these good, creative thoughts.

Q.  And how long, in your experience, would an ecstasy high last?

A.  I would say I kind of had to -- from one pill, we would break them up.  At just various points in the night, I would say I would take, like, a little pill every two to three hours up until, like, the final kind of moment, or whatever.

Q.  OK.  So how many -- a small portion of one pill, is that right?

A.  Yeah.

Q. So it's not like an entire pill, like that one that you took in Turkos and Caicos; it's a smaller portion of one pill?

A. It varied. I would take small -- sometimes I would take big, a pill, and then sometimes it would be broken down. It kind of varied.

Q. You talked that there were a couple of times at hotel nights where you cried. Do you remember that? There were two times in particular?

A. Yes.

Q. And the first time you were on the bed and you cried, and he didn't know what was wrong, right?

A. Yes.

Q. And you wanted him to hold you and be there with you?

A. I just didn't want him to leave me after that type of night.

Q. And then he didn't, right; he moved what he needed around?

A. Yes.

Q. And he held you?

A. Yeah.

Q. You testified that he sat with you and held on to you, right?

A. Yes.

Q. And you held on to him, right?

A. Yes.

Q. And he provided that support that you needed at that time,

right?

A. Yes.

Q. Was he also -- he was also on ecstasy at that moment as well?

A. I believe so.

Q. OK. And then you talked about a second time in the middle of the relationship where you were in the shower with him. Do you remember that?

A. Yes.

Q. Were you in the shower because you -- first of all, why were you in the shower at that moment?

A. It was the end of everything that just happened, and I just started crying.

Q. Were you taking a shower because you needed it because of the drugs, or was it at the end of the hotel night and you would always take a shower then?

A. It was the end of a hotel night and I was taking a shower with him.

Q. OK. And do you remember testifying that you had spotty memories of this incident?

A. Yes.

Q. And that his response when you started crying was, he was too high and he couldn't see this, right?

A. Yes.

Q. So he was also on drugs at that same moment as well, right?

A. He said you're going to ruin my high, like, don't cry.

Q. Can't see this?

A. Yes.

Q. OK. And so you've also talked about how he'd be agitated from the week and he would feel a lot of pressure from work. Did he talk about something on Fridays called fuck-it Friday?

A. Yes.

Q. What is fuck-it Friday?

A. It's when he just lets loose and just wants to party really hard.

Q. And what was your impression of why he had what he called fuck-it Friday?

A. I think he just felt a lot of pressure from, I don't know, various things in his personal life, and then he would want to just party big on Fridays.

Q. And you would party big with him too when you were with him, right?

A. Yes.

Q. OK. Do you remember that Ms. Comey asked you on direct examination whether you ever carried drugs for Sean? Do you remember that?

A. Yes.

Q. And you answered twice, right?

A. Yes.

Q. And you said that you had spoken to K.K. over the phone

about this?

A.  Yes.

Q.  I want to show you what has been marked as Defense Exhibit 3246, and it should be behind 246 in your binder.  I hope that there's a 246 there.  If not, we'll put it on the screen.

A.  OK.  I can look on the screen.

          MS. GERAGOS:  OK.  If we could show both pages.

Q.  All right.  Tell me when -- if you could review it first, if you could read pages 1 and 2, tell me when you're done with that and I'll move to the next two pages.

A.  OK.

Q.  All right.  Next two pages, if you could review these two pages.

A.  OK.

Q.  All right.  Next two.

A.  OK.

Q.  All right.  And then just to make this easy, could you also look at what's marked as 3248.  That also should be in your binder, but if not, we can bring it up on the screen.

A.  OK.

Q.  Pages.

A.  OK.

Q.  OK.  Do you recognize both 3246 and 3248 as chats between you and Kristina Khorram?

A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.   OK.   Are these both from December of 2021?

A.   Yes.

Q.   One is from December 2, right?

A.   Yes.

Q.   And one is from December 30?

A.   Yes.

MS. GERAGOS:   I believe, with the government's consent, we offer these, your Honor.

MS. COMEY:   Under seal, your Honor, but no objection.

MS. GERAGOS:   Under seal.

THE COURT:   3246 and 3248 will be admitted under seal.

(Defendant's Exhibits 3246 and 3248, sealed, received in evidence)

MS. GERAGOS:   Let's go to the first one, to 3246, please, if we could put both pages, one and two.

Q.   This is a chat between you and Ms. Khorram, December 2 of 2021, and you and her are discussing flight options, right?

A.   Yes.

MS. GERAGOS:   All right.   So if we could go to pages 3 and 4.

Q.   All right.   So if you go down on page 3, and Ms. Khorram says:   On conference call.   Call you back.   Right?

A.   Yes.

Q.   And then you respond:   Hey.   In the car.   I asked if he had something for me.   He said no, right?

A.  Right.

MS. GERAGOS:  OK.  Take that down, please.

Q.  And she says:  No.  You have to go to Mapleton to get. LOL.  Security has it for you at Mapleton.  Right?

A.  Right.

Q.  And you respond:  OMG, OK.

And she said:  That's why I said call me when you're close, so security can run it out.  Right?

A.  Right.

Q.  And she said:  Sorry.  Thought that was clear where I said house.  Right?

A.  Right.

Q.  And you said:  Tell driver if you need to get it prior to getting me.

And she said:  LOL.  No he can't.  Right?

A.  Right.

Q.  And then next page, and she says:  Kind of personal.  LOL. Right?

A.  Yes.

Q.  All right.  Is this in reference to one of the times that you -- that you took, transported the drugs for Mr. Combs?

A.  Yes.

Q.  And in this message, you are not speaking on the phone with her, right?

A.  Right.

Q. OK. And she's just saying it's kind of personal, right?

A. Yes.

MS. GERAGOS: OK. All right. Could we go to 3248, under seal, already in evidence.

Q. OK. And this is a message from December 30 of 2021, right?

A. Yes.

Q. And you reach out to K.K. and say: Hey, babe. I was just trying to get a hold of Sean. It's a little bit time sensitive. Would you mind telling him to give me a call? Thanks so much, babe?

A. Yes.

Q. And she says: Hi. Yes, I'll text him now. Right?

A. Yes.

Q. At the next page, she says, at the top of the page: Also think he's going to have you pick up a package before as well, so plan extra time for picking that up. LOL. Right?

A. Yes.

Q. And say: Copy. LOL. Yup. Got it. If he wants, he can drop it off at my building as well if that's any easier. Maybe place in a shoe box or something. My front desk can hold it for me. Just an option. Right?

A. Yes.

Q. And Ms. Khorram responds: PD talks to him directly. I don't speak with him. Right?

A. Yes.

Q.   And that's in reference -- is this in reference to the drugs that you were taking to Miami?

A.   Yes.

Q.   And she says -- and then you say:  OK.  Got it.  Right?

A.   Yes.

Q.   So in that instance you guys are not talking on the phone together, right?

A.   There was conversation over the phone around one of these times.

Q.   There was conversation over the phone?

A.   Yes.

MS. GERAGOS:  OK.  Can I -- I'd like to pull up for the witness only -- well, first, can we put that back up.

Q.   Do you see that Ms. Khorram's phone number ends in 2886?

A.   Yes.

Q.   OK.  And you see your phone number, right?

A.   Yes.

MS. GERAGOS:  OK.  I'd like to offer, I believe, with the consent of the government -- no; Ms. Johnson will correct me if I'm wrong -- 3313A into evidence.

MS. COMEY:  Your Honor, I think we've had some ongoing discussions about that exhibit.  If we could have the lunch break to work those out before they come in, I think we could end up not objecting.

MS. GERAGOS:  OK.  So then I'll just show it to the

witness just to refresh right now, your Honor.

THE COURT:  All right.

MS. GERAGOS:  If we could pull up just for the witness 3313A, both pages side by side, please.

Q.  And you said you remembered having conversations in between?

A.  Yes.

Q.  All right.  So showing you, to refresh your recollection, your records from your phone number we were just looking at.

MS. COMEY:  Objection, your Honor.

THE COURT:  That's sustained.

MS. GERAGOS:  OK.  If we could please look on page 2, and if we could zoom in.

Q.  And please tell me whether this refreshes your recollection as to whether you had any phone calls with Ms. Khorram's number after that.

A.  What is the last four of her number?

Q.  2886.

A.  I see one on December 1 at 6:15 p.m.

Q.  But -- so does that refresh your recollection if you had a call with her on December 1?

A.  Yes.  It says the duration was one minute.

MS. GERAGOS:  OK.  And then if we could go --

A.  And also --

THE COURT:  Hold on.

MS. GERAGOS:  This isn't in evidence, so --

THE COURT:  Hold on.

Ms. Geragos, I think this is going to be easier if you could have the discussion with the government and use it in a different way, unless you want to take it down and ask some questions.

BY MS. GERAGOS:

Q.  All right.  Is it your testimony, Jane, that you spoke with Ms. Khorram on the phone after one of these messages?

A.  Yes.

MS. GERAGOS:  OK.  We will come back to that.

THE COURT:  Or we could have a sidebar and address it right now.

MS. GERAGOS:  Let's just do that, your Honor.  I think it would be easier.

(Continued on next page)

(At sidebar)

MS. GERAGOS:  I believe that we had agreement as to these 12 pages so long as I do not say these are all of the calls they could have possibly had, and I redacted the kind of cell-site information, the locations of the calls.

But how would you like to do this.

THE COURT:  Well, let's first hear what the nature of the objection, if there is any, is.

MS. JOHNSON:  I'm not sure there is an objection right now, but we're trying to just confirm with the defense about what this exhibit actually is and how it should come in.

What has been marked is cell-site returns for this witness's phone, so it shows -- what it shows is anything that hit a cellular number.  That is not necessarily all communications that one makes on a phone.  So while these are business records, which we agree they are a limited set of business records, in the ordinary course, to get cell-site information into the record, we need to call an expert to testify as to cell sites.

We proposed a stipulation that explains sort of what these records are and what they are not.  I understand that defense doesn't want to stipulate to that, so that's what we are trying to talk about, because they are only things that had a cellular number, not anything that went through, for example, text message, wi-fi, which can include FaceTime calls, and the

like.

That's the complication.

THE COURT:  OK.  So just walking through the steps, there's no objection on authenticity or business records grounds.

MS. JOHNSON:  Exactly.

THE COURT:  The only objection is on 403 grounds.

MS. JOHNSON:  Yes, for being confusing.

THE COURT:  All right.  I think it's going to be used --

You're just using it to show that there was not a number.  Again, I understand the objection is that the cell-site records will not record conversations such as wi-fi calls or text messages, right?

MS. JOHNSON:  Yes.  Or FaceTime, for example.

THE COURT:  Or FaceTime calls.  All right.

MS. GERAGOS:  I'll just get into this after lunch, your Honor.

THE COURT:  OK.

MS. GERAGOS:  It's fine.

THE COURT:  All right.

(Continued on next page)

(In open court)

THE COURT:  Ms. Geragos, you may proceed.

MS. GERAGOS:  Thank you, your Honor.

Q.  You testified on direct that you remembered discussing this with K.K. over the phone, right?

A.  Yes.

Q.  And you testified that you asked K.K. whether it was OK, right?

A.  Yes.

Q.  And why would K.K. know whether this is OK or not?

A.  Because she was asking me to do it, and so I just asked if it was OK to put it in my luggage like that.

MS. GERAGOS:  OK.  Could we bring up 3248 again.  That is in evidence.  And if we could go -- both pages, please.

Q.  OK.  So she says, on page 2:  Also think he's going to have you pick up a package before as well, right?

A.  Yes.

Q.  So she's not asking you to do it here, right?  She says: He's going to have you pick up a package before as well, right?

A.  Yes, she --

Q.  And she says:  Plan extra travel time for picking that up, right?

A.  Yes.

Q.  So her question was, her assertion was to plan extra travel time, right?

A.   Yes, for me to pick up a package for Sean.

Q.   And then you respond:  Got it.  Copy.  LOL.  You got it. If he wants, he can drop it off at my building as well if that's any easier.  Right?

A.   Yes.

Q.   That was about him, meaning Mr. Combs?

A.   Yes.

          MS. GERAGOS:  OK.  If we could unzoom --

A.   Actually, no.  I think if he wants, he can drop it off at my building as well, he's going to have -- I'm not sure there if I'm talking about Mr. Combs or security.

Q.   OK.  And K.K. says:  PD talks to him directly.  I do not speak with him.  Right?

A.   Yes, she did say that.

Q.   OK.  And you said, on direct examination, that K.K. said, it's fine, I do it all the time, just put it in your check-in luggage, right?

A.   Yes.

Q.   Ms. Khorram, when she travels with Mr. Combs, she travels on his private plane, right?

A.   Yes.

Q.   She's not traveling commercially, right?

A.   I don't really know.

Q.   When she travels with Mr. Combs, she travels on his private plane, right?

A.   I think so.  I don't really know her travel.

Q.   Were you and Ms. Khorram close, or no?

A.   No.

Q.   We've seen a lot of text messages between the two of you, right?

A.   Yes.

MS. COMEY:  Objection.

THE COURT:  Overruled.

BY MS. GERAGOS:

Q.   But you and Ms. Khorram would text more than you would talk on the phone, right?

A.   I would say yeah, and then sometimes talk, but more so text.

Q.   There were times over the three-and-a-half-year relationship, of course, that you guys spoke on the phone, right?

A.   Yes.

Q.   But -- but generally you and her were not close, right?

A.   Right.

Q.   OK.  And fair to say that that was a point of contention for you?

A.   Yes.

Q.   Because -- can you explain why?

A.   She didn't like me.

Q.   And that was hard, because Ms. Khorram was always with

Mr. Combs, right?

A.   Yes.

Q.   And so if Ms. Khorram didn't like you, you thought that that would be difficult for your relationship with your lover and your partner?

A.   It was difficult for our relationship, yes.

Q.   OK.  And can you explain a little bit why that was?

A.   I believe that she had very strong opinions about me, which influenced a great deal of how Sean also treated me.

Q.   OK.  We talked a lot on direct examination about the entertainers, and you said that in the beginning, Mr. Combs would find entertainers from Cowboys 4 Angels, right?

A.   Yes.

Q.   And, and that's how you -- that's how he found Don, from your understanding, right?

A.   Later on in our relationship, I realized that Sean was always saying cowboys, and then he said that Don was from Cowboys, like later on in our relationship.

Q.   OK.  And do you remember saying that you found Don to be handsome?

A.   I did.

Q.   We looked at a photo of him.  Would you a say he's much more handsome in person?

A.   Yes.

Q.   What kind of features about him that made him handsome to

you?

A.   He had blue eyes or green eyes.

Q.   And Paul -- you said that Paul was gentle and that you had chemistry with him, right?

A.   Yes.

Q.   And there was a warm energy about Paul that you liked, right?

A.   Yes.

Q.   And over time you really took a liking to Paul, right, as a friend?

A.   Given my circumstances, I found Paul -- I don't know what the word is.  If I had to do what I had to do, at least there was somebody that had a warm energy about them to do this with.

Q.   You talked yesterday on direct about the time in July of 2024 where you were in Miami, right?

A.   Yes.

Q.   And you said I miss Paul, right?

A.   Yes.

Q.   And so you guys called Paul to come over to Miami, right?

A.   Yes.

Q.   And you genuinely missed him, right?

A.   I did.

Q.   And I think you testified yesterday that after that time that Paul came over, you said it was an unbelievable sexual experience, right?

A.   At that time I had consumed a lot of ecstasy and then I was introduced to a new liquid molly, and so a lot of heightened emotions and sexual energy definitely entered that whole experience.

Q.   And that that experience really -- you held good feelings about that experience, right?

A.   Yes.

Q.   And I think you testified that you made love to Paul?

A.   Yes.

Q.   That day, right?

A.   Yes.

Q.   Do you remember what -- what was the nickname that you, Paul and Mr. Combs had for each other?

A.   Trifecta.

Q.   Can you explain that?

A.   Trifecta, I don't even know, because it's three, and I think Sean was the one who said trifecta.  And then it became trifecta.

Q.   Would you compare yourselves to sports stars?

A.   Yes.

Q.   Who?

A.   Kobe Bryant.

Q.   Who was Kobe?

A.   Me.

Q.   OK.  And who was Paul?

A.  Paul was -- I forget.  Shaq.

Q.  The Lakers help you a little?

A.  Yeah, Shaq.

Q.  Shaq.  OK.

And who was Mr. Combs?

A.  Jordan.

Q.  OK.  Michael Jordan?

A.  Yeah, MJ.

Q.  Do you remember during your experiences with Paul or when you would speak to Paul that you would call him -- you would call him your boyfriend?

A.  Playfully.

Q.  Playfully, flirtatious, like call him your boyfriend, not that he was your actual boyfriend but playfully you would call him that?

A.  In some instances I would playfully say him these things.

Q.  OK.  And you called him and Mr. Combs during these nights and on these videos your boys, right?

A.  Once I -- yeah, sure.  Yes.

Q.  Do you remember telling Paul that you were happy you got to explore your sexuality with him?

A.  Yes.

Q.  And, and was Paul really nice to you?

A.  Yes, he was nice to me.

Q.  And you really did like him as a person, right?

A. I did.

Q. And then you testified on direct that you wanted to have more control over your situation so you would find other entertainers to bring in, right?

MS. COMEY: Objection.

THE COURT: Just rephrase the question.

BY MS. GERAGOS:

Q. Do you remember testifying on direct examination that you wanted to have more control over the situation?

A. Yes.

Q. OK. And so the first way you testified that you exerted that control was DMing Kabrale, right?

A. Yes.

Q. OK. So you've -- you and -- and just tell me if I'm wrong about any of this, but that you were watching, you and Mr. Combs were watching Kabrale on Blacked, is that right?

A. Yes.

Q. And Blacked is a porn site?

A. Yes.

Q. And that you DMed him after you started watching him, right?

A. Yes.

Q. OK. So can you explain how that came about?

A. I remember it was just put on the Free Play, and then we saw a video that we liked and we kept watching the specific

actor in that video and kept watching more of that actor's video.  And that's how we found the page, that personal page.

Q.  You kept watching more and more of that pornography and you guys both liked it?

A.  Yes.

Q.  OK.  And so then you went on your Instagram and you found him on Instagram?

A.  With the encouragement of my partner, yes.

Q.  Mr. Combs was right next to you, right?

A.  Yes.

Q.  And what was he saying that was encouraging?

A.  Can you get that dick?  Do you think you can get that dick?  Do you like that dick?  Hit up that dick.

Q.  And you DMed him on Instagram?

A.  Yes.

Q.  That's a bold -- that's a bold move, right?

A.  Yes.

            MS. COMEY:  Objection, your Honor.

            THE COURT:  Sustained.

BY MS. GERAGOS:

Q.  When you DM somebody on Instagram, is that a private message?

A.  Is it a private message --

Q.  When you DM somebody on Instagram, can that person screenshot the DM?

A.   Yes, they can.

Q.   OK.  And was it your idea when -- you said on direct examination it was your idea to DM him, right?

A.   Given the context of what was happening in my relationship, yes.  Yes, I decided --

Q.   Why?

A.   -- to DM this person.

Q.   So at that time in your relationship, this was about -- does October 2021 sound right?

A.   Yes.

Q.   OK.  So at that time it had been about five months of other entertainers, right?

A.   Yes.

Q.   And so then you were alone with Mr. Combs, right?

A.   Yes.

Q.   And you were both watching this pornography?

A.   Yes.

Q.   And then you had the idea to DM Kabrale, right?

A.   Yes.

Q.   And because it -- I think you said on direct that this was the context of your relationship, and you were going to choose who the entertainers were, right?

A.   Yes.

Q.   And so you sent Kabrale a DM yourself with the encouragement, you said, of Mr. Combs, right?

A.  Yes.

Q.  OK.  And he did not ask you to reach out to him, right?  He was encouraging it, right?

A.  He was encouraging that.

Q.  OK.  And do you remember telling the government that Combs was surprised and really happy because he had never had a girl pick the guy before?  Right?

A.  Right.

Q.  And was that in the moment that he was telling you he was happy, or when did you learn that?

A.  I think when it was actually a reality.

Q.  OK.  And you also testified on direct that the first time Kabrale came, you can't remember exchanging any money, right?

A.  I can't remember.

Q.  OK.  And the first time he came, you told Combs that you were bringing somebody from Atlanta, right?

A.  Not just that vaguely, no.

Q.  OK.  On Kabrale, I think yesterday you talked about a time where he was texting you and he sold a tape to a media company, right?

A.  Yes.

Q.  Mr. Combs was really upset about that, right?

A.  Yes.

Q.  He was adamant that you should call the police, I think, you said?

A. Yes.

Q. And he told you he was so sorry that this happened?

A. Yes.

Q. And he did not want this tape released, right?

A. Right.

Q. He was livid and pissed?

A. Yes.

Q. And he was trying to figure out how to make sure that it doesn't get released, right?

A. Yes.

Q. And so then you spoke -- and I don't want to know what you talked about, but you spoke to an attorney about this?

A. Yes.

Q. And then you made the decision that you were going to ignore the extortionate threats Kabrale was making, right?

A. Yes.

Q. And when Kabrale did end up selling the tape to the media company, Combs was really angry, right?

A. Yes.

Q. He didn't want this -- from your perspective, he didn't want you to have to go through this, right?

A. Right.

Q. And he did not want this out about himself either, right?

A. Right.

Q. And then we talked, shifting gears, that you had reached

out to Kabrale, and then you talked about Antoine.

Do you remember approximately what time you reached out to Antoine?

A. I don't remember. Approximately --

Q. Would you say approximately 2022?

A. I would say 2022.

Q. OK. So after it had been many months of Kabrale, you then found Antoine?

A. Yes.

Q. And did you find Antoine the same way, through the same Blacked porn site?

A. Yes.

Q. And how often had you been, you and Mr. Combs, if at all, you and Mr. Combs been watching Antoine before you reached out to him?

A. I think it was, like, a whole night of watching this actor's films.

Q. OK. And then you reached out to him on Instagram as well?

A. Yes.

Q. Did you grow to have a nice personal relationship with Antoine also?

A. In, like -- yeah, in, like, a friendly just these nights type of way.

Q. OK.

A. Uh-huh.

Q. And I think you said Antoine never traveled, that he would meet up with you and Mr. Combs only in Los Angeles, right?

A. Right.

Q. And the first time I think that you FaceTimed Antoine -- first time you started talking to Antoine you FaceTimed him, right?

A. Yes.

Q. And was that a screen share the same way it was with Kabrale as well?

A. I believe so.

Q. Was that something you perceived made Mr. Combs really happy?

A. Yes.

Q. And so then you made arrangements to meet Antoine for the first time as well after that FaceTime, right?

A. Yes.

Q. All right. You talked also on direct about, often, a lot about Mr. Combs's assistants? You talked about Jonathan, Brendan, right?

A. Yes.

Q. And then you talked about security. You talked about J9 and Faheem and some others, right?

A. Yes.

Q. And you said that at times they would bring cash to Mr. Combs at the hotel, right?

A.  Right.

Q.  Did they ever -- from your perspective, did they ever see any of the entertainers?

A.  I don't think they did, no.

Q.  How did they -- from what you saw, how did they give Mr. Combs cash?

A.  They would just come to the door with a bag.

Q.  And he would take it, or you would take it?

A.  He would take it.

Q.  OK.  And then they would leave, right?

A.  Yes.

Q.  And they would not come into the room, from what you saw, right?

A.  Right.

Q.  OK.  And to your knowledge, only if you know, would security be the ones, the employees of his who would keep track of the cash that he had and keeping it safe?

A.  Oh, I don't know.

Q.  OK.  And then when they came, the escorts or -- I mean the security or the assistants, you also wouldn't volunteer to them that an entertainer was there, right?

A.  Right.

Q.  Because, as you've said earlier today, privacy was of utmost importance, right?

A.  Yes.

Q.   And when you had assistants -- I think you talked about how Jonathan and you, there was at least one instance where you and Jonathan got outfits after the concert or during the concert?

A.   Yes.

Q.   And you didn't say this is because an entertainer is going to come to the hotel later, right?

A.   No.

Q.   And to your knowledge, did K.K. have any knowledge that escorts were joining the hotels?

A.   I don't think so.

Q.   And you never talked to her about it, right?

A.   No.

        MS. GERAGOS:   I want to bring up what's already in evidence as A442-12.

        If we could go to page 8.

Q.   OK.  So this is a message between you and Mr. Combs, right?

A.   Yes.

Q.   All right.  And then you, in this first message, on the top, it seems to be a reply to Mr. Combs's message, is that right?

A.   Right.

Q.   OK.  And he says:  Yeah, I think the party could have been better.  No fault of yours.  And you say:  The party could have been better?  Really?  Why? .., Right?

A.   Yes.

Q. And then Mr. Combs responds: OK. Where? You find the place. I can't have K.K. know. Damn. Right?

A. Yes.

Q. Do you remember telling the government that K.K. would disapprove of him partying at the time because he was trying to focus on his business and his album?

A. Yes.

Q. OK. And so she -- he did not -- you perceived that he did not want K.K. to know that he was partying, right?

A. Yes.

MS. GERAGOS: OK. Can you take that down.

Q. Do you remember yesterday we were talking about your December 2023 messages with K.K. after your fight with Mr. Combs?

A. Yes.

Q. And you reached out to her because you felt she was really close with Mr. Combs, right?

A. Yes.

Q. And you wanted her assurance that he was not going to release anything, right?

A. Yes.

Q. And during that conversation you understood -- or she said don't worry, nothing is going to happen, right?

A. Yes.

Q. And you felt comforted by that, right?

A.   Yes.

Q.   And did you feel better after she said that, that nothing was going to happen?

A.   Yes.

Q.   And that nothing would be released?

A.   Yes.

Q.   OK.  And then she said to you, just why don't you guys give each other space, like, just please give each other space, right?

A.   Yes.

Q.   Do you remember telling the government in previous meetings with them that during this phone conversation, that she said she would ensure that he gave you space?

A.   Yes.

Q.   And that she said to you also I don't understand why you guys won't stop.  This is why we're in the predicament right now we're in, because he just won't stop?

A.   Yes.

Q.   And that was because it was right after Cassie's lawsuit?

A.   Right.

Q.   And that she said to you in that conversation the best thing for you guys right now is to just stop talking for a while, right?

A.   Yes.

Q.   And you said he actually listened to her because he gave

you your space, right?

A.  Yes.

Q.  And you were very appreciative of that, right?

A.  Yes.

Q.  And then you went to Paris, I think, you said, or Las Vegas?

A.  Paris.

Q.  And you actually had some time away, some space?

A.  Yes.

Q.  Some time to yourself?

A.  Yes.

Q.  And from your perspective K.K. made sure that happened, right?

A.  Yes.

THE COURT:  Ms. Geragos, when you get to a good spot, we'll take our lunch break.

MS. GERAGOS:  Just three more questions.  I didn't realize we were already at lunch.

Q.  All right.  So we've talked a little bit about privacy and how you perceived Mr. Combs didn't want this out, right?

A.  Yes.

MS. GERAGOS:  OK.  I would like to bring up A442-11.

If we could go to page 20.  This is admitted.

Q.  All right.  This is a message between you and Mr. Combs on April 19 of 2023, right?

A.   Yes.

Q.   And do you recall, because I believe you had looked at this with the government, that you guys are speaking about getting an Airbnb here, right?

A.   Yes.

Q.   All right.  And then he says how do we know if there's no cameras?

A.   Yes.

Q.   And you respond:  There is, but we can have security cover them.  Right?

A.   Right.

       MS. GERAGOS:  And if we could go to the next page.

Q.   And at the bottom you say:  I can just say it's my anniversary and we just want to cover cameras so we can feel comfortable.  LOL.  We can have security go in first and do a sweep.  Right?

A.   Yes.

Q.   And that was because he did not want anybody to know about this, right?

A.   And also because I was really sick and tired of hotel rooms at this point.

Q.   So this is right when you were getting the house, right?

A.   Yeah.

       MS. GERAGOS:  OK.  Your Honor, this is a perfect time for a break.

THE COURT:  All right.  Very good.  Thank you.

Members of the jury, we will take our lunch break, and we will be back around 1:20.

(Continued on next page)

(Jury not present)

THE COURT:  All right.  We'll come find you.

THE WITNESS:  OK.

(Witness not present)

THE COURT:  Please be seated.

Ms. Geragos, are we still on pace for 3 p.m.?

MS. GERAGOS:  I think so, your Honor.  Let me just -- I do think so.  I'll let you know right after the brunch break. I'm going faster than I expected.

THE COURT:  OK.  Good.

Anything that the defense would like to raise?

MS. GERAGOS:  Not for me.

THE COURT:  Anything, Ms. Comey?

MS. COMEY:  No.  Thank you, your Honor.

THE COURT:  All right.  We'll be back at 1:20.

(Luncheon recess)

AFTERNOON SESSION

1:20 p.m.

(Jury not present)

THE COURT:  The first issue to pick up, is 45 minutes not enough time for the lunch break?

MS. GERAGOS:  It is hard, your Honor.  For the defense, I can say that, but this week we were trying to be very efficient and -- but it is hard, that I will say.

THE COURT:  Good to know.

MS. GERAGOS:  I think on days that we end at 3:00, it does make sense to have the 45 minutes.

THE COURT:  If we're going to 3:00, and there isn't a time crunch, we can have some updates then, and we will take a longer break.  I understand it's a logistical hurdle to get everything ready and also have lunch 45 minutes.

MS. GERAGOS:  I do think I'd like to end at 3:00 today, and then I can cut tonight and tomorrow morning.  We have our short day tomorrow morning.  I will be done by Thursday and allow Ms. Comey time for redirect.

THE COURT:  Very good.  Any issues to address before we bring Jane back in?

MS. GERAGOS:  No.

MS. COMEY:  No, your Honor.

THE COURT:  Let's bring the witness back in.

(Continued on next page)

(Witness and jury present)

THE COURT:  Jane, you understand you're still under oath.

THE WITNESS:  Yes, I do.

THE COURT:  Ms. Geragos, you may proceed when ready.

BY MS. GERAGOS:

Q.  Good afternoon, Jane.

A.  Good afternoon, Ms. Geragos.

Q.  We talked about earlier this morning about your career before you met Mr. Combs, and we talked about content creation and how you were an influencer but you also did some modeling, right?

A.  Yes.

Q.  Can you explain what the modeling was?  What was that career?

A.  Early on I did some print modeling, which was in magazines, more like swimwear modeling.  I did music videos.  I was on commercials.  I did a couple movies.  This was just like early on.  So just various like entertainment modeling jobs.

MS. GERAGOS:  I want to bring up just for the witness and the parties Defense Exhibit 3007.  We could put both pages so that the witness can review it.  Let me know when to go to the next page.

Q.  Are these text messages between you and Mr. Combs from October 29 to about November 1 of 2021?

A.  Yes.

Q.  Do you recognize them to be messages between the two of you?

A.  Yes.

MS. GERAGOS:  Your Honor, we move to admit 3007 under seal.

MS. COMEY:  No objection.

THE COURT:  3007 will be an admitted under seal.

(Defendant's Exhibit 3007 under seal received in evidence)

MS. GERAGOS:  Could we just for the jury publish these please.  If we could quickly go to pages 10 and 11.  The next page.  Next page.  Next page.  Next one.  And then 14 and 15 side by side.

Q.  I realize this is around Halloween, right?

A.  Yes.

Q.  Are you dressed up in a Halloween costume?

A.  Yes.

Q.  Are these examples of modeling photos?

A.  This was at a Halloween party.

Q.  But would you do a shoot for the party because if you go to the next page --

A.  Yes.  So this was at a Halloween event, and this was my costume.  And then I went to a Halloween event and took some photos there too.  These are just like candid iPhone photos.

Q. Okay, so these are not modeling shoots?

A. No.

Q. These are just your Halloween shots, basically?

A. From my iPhone, yes.

Q. Okay, from your iPhone.

MS. GERAGOS: So if could we go to page 5 of this exhibit and put 4 and 5 next to each other.

Q. You guys are discussing here. You say, My spot is empty. Just chill baby whatever. Just want to see you, so LMK, which is let me know, right?

A. Yes.

Q. How to drive soon?

A. Yes.

Q. There are some audio messages. And on the next page, on page 5, he says, What you trying to do pick it up. What you trying to do?

You say, whatever baby I'm yours.

He said, I had a rough day. I want you to lead. Can you lead tonight, right?

A. Yes.

MS. GERAGOS: Can you go to the next page?

Q. He says, Can you lead me? I want to be led.

You say, of course baby. Okay let's freshen up get cute for each other. Have a little drink and see where the vibe takes us, right?

A. Yes.

Q. And what do you say after that?

A. I said, heavy on the drink I need one too. LOL. If you're not drinking, it's okay.

Q. With a heart face emoji, is that what it looks like right after?

A. Yes.

Q. And he says on the next page, Don't feel like being around people, right?

A. Yes.

Q. And you say, okay baby about to head your way. 24 minutes?

A. Yes.

Q. And do you remember that after these messages, you did a hotel night with Mr. Combs?

A. Yes.

       MS. GERAGOS: If we could go to F-101, which is in evidence, page 10 and 11 next to each other.

Q. These are messages between you and Kabrale?

A. Yes.

Q. And in these messages, which appear to be a day after and UTC time, October 30, you're reaching out to him saying, Baby send me any jerk off videos. I'm touching myself RN, right?

A. Yes.

Q. Is this -- if you recall, is this when you're with Mr. Combs at his home? Are you at a hotel, and you're reaching

out to him?  How does this come about?

A.  Yes.  I'm in a hotel with Mr. Combs partying.  We were probably under the influence, and he's asking me to reach out to Kabrale to send explicit videos or photos, and so I'm doing an outreach right here, just doing that right here.

Q.  And you're telling Kabrale, I'm touching myself right now, right?

A.  Yes.

Q.  And then you say, I love a rock hard cock jerking to me anything that's in your phone, right?

A.  Yes.

MS. GERAGOS:  If we could take that down and jump to page 23.  I just meant zoom out.  Sorry.  I'll get better at that terminology.

Q.  And this is a couple days afterwards, like three days afterwards on November 2nd.  He says, Yes please do beautiful I can't wait to meet you.  I really enjoyed your energy on FT, right?

A.  Yes.

Q.  That's the FaceTime that you spoke about on direct examination?

A.  Yes.

Q.  And then you say -- you loved the two messages, and you say, We're off to a good start then.  LOL.  Okay I'll be in touch soon, right?

A. Yes.

Q. Ant then he says, Okay love keep me updated. And then it's about five days -- four days later, I apologize, that you reach out to him again, right?

A. Yes.

Q. And that is Mr. Combs' birthday is November 4?

A. Yes.

Q. So it's like two days after his birthday that you reach out to him again?

A. Yes.

MS. GERAGOS: So if we could bring up -- and if we could go to the next page, sorry. Continue. We could have the two side by side 24 and 25? Thank you.

Q. He says -- or you say, Okay I might have a little time off if you want to spontaneously come tomorrow night or Monday, I'll organize, right?

A. Yes.

Q. And you say, But we'll talk then before then once I see it's even possible, right?

A. Yes.

Q. So here you are planning something for a few days in advance, right?

A. Yes.

Q. And was that for a planned hotel night that was going to take place in a few days?

A.   These messages kind of give me that I'm with Mr. Combs, and we're trying to figure out how we're going to see Kabrale and when we will see him.

Q.   You remember doing a hotel night October 30, a couple days before that, right?

A.   Yes.

Q.   And then you're with him in between, you're with him then a couple days after his birthday?

A.   Yes, maybe.

Q.   And then you plan -- you think that then you're planning a hotel night for a few days from then, right?

A.   Yes.

Q.   Okay.

        MS. GERAGOS:  Could we bring up Defense Exhibit 3011 for the witness and the parties only.  And we could have them side by side so she can review them.

        I actually move this in because it's a parallel exhibit, unless Ms. Comey --

        MS. COMEY:  No objection so long as it's under seal, your Honor.

        MS. GERAGOS:  It's under seal, of course.

        THE COURT:  Defense Exhibit 3011 will be admitted under seal.

        (Defendant's Exhibit 3011 under seal received in evidence)

MS. GERAGOS:  This can be published to the jury.

Q.  These messages here are November 5, 2021, right?

A.  Yes.

Q.  Same date as we were just looking at?

A.  Yes.

Q.  So you sent him some emojis there on the top left and say, Thinking of you.

He says, I have a plan.  Sunday fun day.  Fly ATL in. Paul.  Freak fest birthday celebration, right?

A.  Yes.

Q.  And you respond, Hey birthday boy.  Sounds like a bloody good time, right?

A.  Yes.

Q.  **You say, Because I'm still going to be bleeding, right?**

A.  Yes.

Q.  He says, Okay think what day works for you, right?

A.  Yes.

Q.  Because I want to see that ATL with you, right?

A.  Yes.

Q.  And ATL is Kabrale?

A.  Yes.

Q.  And he says, Have you been thinking about it?

A.  Yes, he does.

Q.  What do you respond with?

A.  I say, Maybe midweek baby.  A little bit, what am I going

to do with all that dick LOL.  What you wanna see baby.

Q.  Is that an emoji right next to what you want to see baby?

A.  Yes, it's a smirk.

Q.  It's a smirk emoji like you want him to tell you what he wants, right?

A.  Yes.

Q.  And he says, So many things?

A.  Yes.

MS. GERAGOS:  If we could go to the next one.  Page. Okay.

Q.  And if we look at page 4, you say, You can only see those videos when you're with me, and then you send him a porn video, right?

A.  Yes.

Q.  Is that Kabrale in the porn video?

A.  Yes.

Q.  Is that -- and this is an example of Blocked, the porn that you were watching --

A.  Right.

Q.  -- of Kabrale?

And he says, Girl I ask you have you been thinking about it?  And send me a picture so I can envision you, right?

A.  Right.

MS. GERAGOS:  Okay. if we could go to the next two pages.

Q.   And he says, You haven't thought about it?

And what do you say?

A.   I have.  Curious what that would feel like super deep inside me.  Pulling in and out of my tight walls and hitting past my G spot.

Q.   And he says, Damn.  I want to see it.  How you handle.

What does how you handle means?

A.   It means how you handle someone during sex like a male partner.

Q.   And then you respond to him, You'll be right there pouring the warm oil on my clit watching go slowly deep and out.

So here you say warm oil.  Can you explain for the jury why warm oil?  What is the process of the baby oil at the hotel nights or any night with Mr. Combs?

A.   Well, here I'm following his lead where he says I want you to lead, so I'm fantasy talking about the things that he likes, and one of them being about this oil which he prefers like hot, warm oil.  Like in the bathtub it like gets warm, and then we take it out and we just like pour it all over each other's body or he likes it when I pour it all over my body or an entertainer's body.

Q.   And then the next page on page 6, you continue with six more texts, right?

A.   Yes.

Q.   And about halfway down you say, Jerking Paul hovering over

me while he waits his turn, right?

A.  Yes.

Q.  When you say he waits his turn, is that reference to Kabrale?

A.  Yes.

Q.  So what you're saying to Mr. Combs in this exchange is you're giving him the fantasy talk that you believe he liked, right?

A.  Yes.

Q.  And you're telling him the fantasy talk is that you would have Kabrale, and then Paul would have to wait his turn, right?

A.  Yes.

            MS. GERAGOS:  And -- and then if we could look at -- we could take this down now -- Defense Exhibit 3014-R.  If the witness could review that, please.

Q.  And tell me when to move on to the next page.

A.  You could move on to the next page.  Okay.  Okay.  Okay.

Q.  Have you reviewed it?

A.  Yes.

Q.  Is this a message between you and Mr. Combs on November 8 of 2021?

A.  Yes.

            MS. GERAGOS:  We move to admit 3014-R under seal, your Honor.

            MS. COMEY:  No objection.

THE COURT:  So 3014-R will be admitted.

(Defendant's Exhibit 3014-R under seal received in evidence)

Q.  This is a message couple days after, right?

A.  I believe so, yes.

Q.  And you text him.  This can be published to the jury.

Night baby hope you're feeling a little better.  Sweet dreams, right?

A.  Yes.

Q.  He says, Good morning.

You say, Good morning handsome.  I just looked at my phone.  You dropped off your child and now heading home to get ready for my day how you feeling baby, right?

A.  Yes.

Q.  Next page.

Then you're saying -- he says, I'm good baby.  How are you.

You say, Good babe.  Just gonna shoot a little today, right?

A.  Yes.

Q.  What is that about, what is that shoot?

A.  I was shooting for one of the -- this post was a necklace post.  I had to shoot a quick photo with a necklace.

Q.  Okay.  That was a paid spot?

A.  Yes.

Q.  Okay.

A.  I believe.  I have to see the picture again but it's a content photo.

MS. GERAGOS:  If we could go to the next page.

Q.  And then you just you're sending him photos, right?

A.  Yes.

Q.  You go to the next page.  All right.  And he loves the photos, right?

A.  Yes.

Q.  And he sends like the heart face there?

A.  Yes.

Q.  And then he sends you a message, I want to eat your pussy.

And he says, How far from my house, right?

A.  Yes.

Q.  And then you send two emojis, right?  What are those emojis?

A.  Tongue and water.

Q.  What is that connotation?

A.  It was to just harp on his I want to eat your pussy.

MS. GERAGOS:  If we could go to the next page.

Q.  And then on page 8, you say, Wanna come over my place after 4:00 p.m., right?

A.  Yes.

Q.  With a smirk emoji?

A.  Yes.

Q. And he says, I can't. I have studio, right?

A. Yes.

Q. You say, Okay baby I'm free after 3 so tell me. I want to sit on your face, right?

A. Yes.

MS. GERAGOS: Go to the next page. If we go now to --

Q. You say at the bottom of page 9, what you want to do baby.

Come by -- he says, Come by if you want.

You say, Okay baby 5-ish, okay?

A. Yes.

MS. GERAGOS: This voice note at of November 8, 2021 at 11:46 p.m. we would like to admit under 3041-A under seal and play that?

MS. COMEY: I'm sorry, your Honor. I don't think I had the chance to listen to that.

MS. GERAGOS: We can move on.

Q. You said, Baby LOL I said I'm free after 3 so you tell me, right?

A. Yes.

MS. GERAGOS: Go to the next page.

Q. You say, I'm getting ready to head your way, right?

A. Yes.

Q. He says, I got to go somewhere at 8.

You say, Okay I'll stop by and hug in squeeze you, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   Yes.

Q.   And it's after this that you have another hotel night. Does that sound right?

A.   Maybe, yes.

MS. GERAGOS:   Why don't we go Defense Exhibit 3016 for the witness, just page 1 right now.  And then if we skip ahead to page 3 so she can review it.  And then next page.  Next page.  Next page.

Q.   Have you reviewed these messages with the government?  Are you familiar with them?

A.   A little bit, yeah.

MS. GERAGOS:   We move to admit 3016 under seal, your Honor.

MS. COMEY:   No objection.

THE COURT:   Exhibit 3016 will be admitted under seal.

(Defendant's Exhibit 3016 under seal received in evidence)

Q.   Could we go to page 2.  This is November 9, right?

A.   Yes, this is November 9.

Q.   And you write, Driving and just thinking of you, right?

A.   Yes.

Q.   And what do you say?

A.   It's good you're going baby.  I'm horny for you.

Q.   And he responds, What you wanna do?  Be explicit.  And then he has an emoji there, right?

A.   Yes.

Q.   What does that emoji mean to you?

A.   Like wild and crazy with a tongue out and eyes crossed.

Q.   And what is your response?

A.   In response to his be explicit, I say, I wanna suck Paul's dick while you give me that strong stroke game.

Q.   When he asks and says be explicit, you respond about Paul, right?

A.   Yes.

Q.   Okay.  And go to the next.  And then what do you say next?

A.   This is also in regards to the fantasy of these men.

         MS. GERAGOS:  Why don't we put them side by side so we can see that it's a continuation, those two pages.

Q.   So at 4:19 a.m. UTC time you say that, and then -- and then one minute later, you continue, right?

A.   Yes.

Q.   So in playing in this fantasy talk that I know that my lover likes, I then begin to say, I wanna suck Paul's dick while you give me that strong stroke game.

         I say, I loved you rubbed oil all over my legs my body kissed me and put it deep in me with my legs back.

         When you look me in my eyes giving me every hard inch so wet, like that's the only last dick I'm supposed to have, stroking a hard dick next to me while a hard one is inside me. And then I was thinking a heart, another emoji and water.

Q. So the white emoji is thinking?

A. Yes.

Q. And then the water is that supposed to be a sexual emoji?

A. Yes.

Q. Okay.

And he responds with, Whew, right?

A. Yes.

Q. And so he asks you to be explicit. You give him the fantasy talk that he likes. And he says whew?

A. Yes.

Q. Okay. So next page.

And you send him a photo. And then on page 5, you say, My daddy left me all alone come and keep me company. The store closest at 12 so just in case you need me to go LMK, let me know, right?

A. Yes.

Q. LOL. Me miss you.

He responds, what are you gonna get?

A. Yes.

Q. And what do you say?

A. Just need outfits. Mmm, I have some here but mostly black dominatrix style.

Q. So this is a store you could get lingerie, the outfits that he likes, right?

A. Yes.

MS. GERAGOS:  If we could go next two pages.  Go ahead.  Next two pages.  All right.

Q.  So then on page 8, you say, What do you wanna do, right?

A.  I believe that he says, What you wanna do.

Q.  Right.

And then you say -- what do you say in response?

A.  I said, Spend time with my favorite person.  I send an attachment.  And I said, These are my fav.

And I said, What do YOU wanna do?

Q.  What does he respond with?

A.  He responds with, Want me and Paul to stop by.

Q.  So he asks you, What do you want to do?

You respond with what you -- you respond that you want to spend time with your favorite person.  I assume that's Mr. Combs?

A.  Right.

Q.  And then you say, What do YOU want to do?

And he responds with, Want me and Paul to stop by, right?

A.  Right.

Q.  And then the next page there's an -- I'm not sure what that is.  What is that?

A.  It's a photo of like a funny GIF of two people with their eyeglasses down.

Q.  And then you say, I don't have all the things you like

here.  More than welcome to come baby, right?

A.  Yes.

Q.  And he says, So just us?

A.  Right.

MS. GERAGOS:  And then the next page.

Q.  He says, Wanna meet at my house?

And you say, Sure baby when.

And he says, I can't have Paul at my house, right?

A.  Yes.

Q.  And he would tell you that he can't have any of the entertainers at his house, right?

A.  Right.

Q.  At his house -- at any house he has, there's a house manager, right?

A.  Yes.

Q.  There's housekeepers.  Sometimes his employees are there, right?

A.  Yes.

Q.  And his -- sometimes his children could be there?

A.  Yes.

Q.  And his bedroom is not really set up for the privacy of having an entertainer there, right?

A.  Right.

Q.  And so it's not -- his bedroom is not exactly isolated for that, right?

A. Right.

Q. So he says, I can't have Paul at my house.

And you say, Yes, we know baby. I don't mind my place I just didn't grab a few things from the store that you like, right?

A. Right.

Q. Like your drinks and stuff. I have oils. Normally I have that, right?

A. Yes.

Q. And I think when we had looked at a lot of these messages on direct examination, you testified that you knew he would like the fantasy talk that he said. You knew it would turn him on, right?

A. Yes.

Q. And you realized that with Paul there, this was becoming the dynamic of your relationship, right?

A. Yes, as you can see here, we're talking about wanting to see each other and the option that he's giving me is him and Paul.

Q. And you say, Sure baby, right?

A. Because that was the only option I was given, and I wanted to see my lover and so I'm accepting that.

Q. And you had said -- this was -- he said, What do you want to do? You said you wanted to see him. And then you asked him, What do YOU, in all caps, want to do, right? And that was

the option that he said when you said What do YOU want to do, right?  We could go back, right?

A.  If you could go back.

Q.  Why don't we go back.  If we look at page 8.

A.  He says, What you wanna do?

I say, Spend time with my favorite person, which is him.  And then I send an attachment.  I say, These are my fav.

And then I say, What do you want to do?  And he gives me the option of Want me and Paul to stop by.  That was my option.

Q.  That was an option, and that was a question that he posed, right?

A.  Yes.

MS. GERAGOS:  Okay.  If we could bring up Defense Exhibit 3018-R.  And for your information, this is the corresponding exhibit of Government Exhibit A-1046 and A-1047.  If we could show this to the witness.

And I would move to admit this, your Honor, because I have an agreement with the --

MS. COMEY:  No objection, so long as the redaction I requested on page 16 is applied.

MS. GERAGOS:  Yes.  That's why it's 3018-R.

THE COURT:  Has this been properly redacted?

MS. COMEY:  I think it needs to be under seal, your Honor, and I think even the sealed version I have requested a

redaction on page 16.

MS. GERAGOS:  That's exactly right.  If you look, your Honor, page 16 has the requested and agreed upon redaction.

THE COURT:  3018-R will be admitted under seal.

(Defendant's Exhibit 3018-R received in evidence)

Q.  Jane, if you could look at page 2.  We could put 2 and 3 next to each other.

He says, If you could do something freak nasty today, what would it be?  Are you in the mood, right?

A.  Right.

Q.  And you respond by saying, LOL.  Is that the smirk emoji?

A.  Yes.

Q.  Can you explain the smirk emoji?

A.  The smirk emoji is kind of like, like something, like a little something -- how do I say?

Q.  Is it flirtatious?

A.  I would say yes.

Q.  Okay.  And you say, Put something sexy on just to have fun with you baby and I'm always in the mood, right?

A.  Yes.

Q.  And he says, Just me?

A.  Right.

Q.  And then it goes the next page, right?

And you love it.  And you say, Yes... right?

A.  Yes.

Q. And he says, You can't handle no more with question marks and laughing emojis, right?

A. Right.

Q. And those are says it joking, You can't handle no more, right?

A. Right.

Q. And you respond about 20 seconds later, I was just going to add unless you wanna play, right?

A. Yes.

Q. And he says, I have had so much sex that it would have to be some freak shit, but you would have to want it too. Maybe you need a break, right?

A. Yes, these are the options he's giving me.

Q. So his options are, I've had so much sex it would have to be some freak shit, but you would have to want it too, right?

A. The option he's giving me here is that he's asking me if I'm in the mood, what kind of mood you in, you can't handle no more, trying to encourage and insinuate for me to have sex with someone else.

Q. And then he says, Maybe you need a break?

A. That's more of like a tease just to kind of tease me and taunt me like as if I can't keep performing. And here I am in 2021 really madly in love and wanting to please him, appease him, and just saying like I'm in great spirits, like no worries, yes, I'm all good. So I'm agreeable here.

Q.   You're agreeable, and you're telling him, I'm just fine baby?

A.   That's right.

Q.   And you -- at that, you know, at that time you really loved Mr. Combs, and you wanted to do what he wanted to do, right?

A.   Yes.

Q.   And so here, instead of saying, I need a break, you say I'm just fine baby?

A.   That is correct.

Q.   Even though he says maybe you need a break, right?

A.   Even though he says I need a break, the undertone of that is I can't handle any more, kind of teasing and taunting me to have one of these nights.

Q.   And you see the teasing up above almost with the crying laughing emojis, right?

A.   Yes.

Q.   And you respond to that -- but he had an iPhone, right?

A.   Yes.

Q.   So you put the laughing -- you react with laughter to his laughing emojis?

A.   Right.

Q.   Okay.  So you guys are teasing and playing here with each other?

A.   Yes.

        MS. GERAGOS:  If we could go to page 4.

Q.  And you say -- after you said, I'm just fine baby, what do you say to him?

A.  Is this the top one with the --

Q.  Yes.

A.  -- kiss emoji.

Q.  With the kiss emoji, exactly.

A.  If we could zoom in, that would be nice.

I say, What fantasy do you want to happen?

Q.  What does he say?

A.  He says, I want it to come from you LOL.  To be honest, I may be talking shit.  LOL.  I don't know what I want to do. I'm lost in the sauce.  I need guidance.

Q.  And you laugh at that response from him, right?

A.  Yes.

Q.  And then you loved I need guidance, right?

A.  Yes.

Q.  And what do you write next?

A.  I start to pick up on that cue of I need guidance, and he wants me to kind of start this turn on scenario.  So I start to say, Want to see me suck some hard dick in the hotel room.  I can shower and get ready to go to the store if you want some fresh outfits.

Q.  And the next page?

A.  I say, You know I love fucking you all day.  You had me coming so good all day and night until dawn.

Q.   And he says, I need something exciting.  I'm jaded LOL, right?

A.   Yes.

Q.   And you laugh at that?

A.   Yes.

Q.   And then you send some laughing emojis, and say, Oh wee, now we've seen the best, it's like ... LOL, right?

A.   Right.

          MS. GERAGOS:  And go to next page.

Q.   And then you say, Well, ATL is a treat for when album is finished.  Paul?  You want to invite a girl.  Let's play we can do whatever.  Wanna peak into a sex party LOL, right?

A.   Yes.

Q.   So have you and him been talking about how Kabrale is the treat for when he's done with his album?

A.   Probably yes.

Q.   Is that something you would speak about during the nights with just you and him?

A.   Probably.

Q.   Do you have an independent recollection, or you don't?

A.   Can you repeat the question?  I'm sorry.  I'm putting myself like back in 2021.

Q.   You write, Well, ATL is the treat for when album is finished, right?

A.   Yes.

Q.   So do you have an independent recollection of what that means?

A.   Just probably talking about these guys.  I don't really know.

Q.   That's fine.

So do you remember then you say, Paul.. question mark, meaning Paul, the entertainer, right?

A.   Yes.

Q.   Then you say, You want to invite a girl?  Let's play.  We can do whatever.  Let's peak into a sex party, right?

A.   Yes.

MS. GERAGOS:   Next page.

Q.   Then you send -- is that a GIF, a meme, or what is that?

A.   I think so.

Q.   And then you say, I'm going to start drinking, with some playful emojis, right?

A.   Yes.

Q.   And then he says, LOL.

And you say I'm gonna shower in this other bathroom baby, right?

A.   I just want to clarify when I said, Want to peak into a sex party, I remember at this point Sean was telling me about sex parties and how we should go to one.  So that was just something I was giving him options, options that he's already explored or was telling me about.

Q. So he had brought this up with you previously?

A. Yes.

Q. And then you are saying it back to him as an option for something you guys can do, right?

A. Yes.

Q. And in response in fantasy talk essentially? Or is this an option -- are you actually wanting to go to a sex party or is this fantasy talk?

A. I am under the guidance of -- I think if we scroll back up, he's asking me to guide him, lead him.

Q. Why don't we go to page 4 and 5.

A. I'm just in response to his I need guidance, I'm giving him an array of options that I know that he would want to hear or would like to do, and these things are, as you know, things that I would have preferred not to do, but I know my lover really liked to do, so I'm just saying these things to give him options from his I need guidance text.

Q. Do you remember after this -- after these messages, you do have a hotel night?

A. I believe so.

MS. GERAGOS: Okay. If we could go ahead to page 19.

Q. You say -- this is a few days ahead on November 15 at 1:58. Hey, my love I'm home. I had an incredible time with you, with a heart emoji, right?

A. Yes.

Q.  My baby have a beautiful day in Miami, right?

A.  Yes.

Q.  He responds with a heart emoji as well?

A.  Yes.

Q.  Why is the "my baby" in quotes?

A.  Because he liked the way I would say my baby to him.

Q.  At all times or during these nights or when?

A.  Mmm, I remember this night the way I was saying like, my baby, my baby.  Like he really liked the way I said that.

        MS. GERAGOS:  Okay.  All right.

        If we could go to Defense Exhibit 3023-R, which is the corresponding exhibit to Government Exhibit A-104-10, A-104-11 and A-104-12, which is admitted.  This is redacted, your Honor.  By pre-agreement of the parties, we'd like to move to admit this under seal.

        MS. COMEY:  No objection.

        THE COURT:  What's the number?

        MS. GERAGOS:  3023-R.

        THE COURT:  All right.  The exhibit will be admitted under seal.

        (Defendant's Exhibit 3023-R under seal received in evidence)

Q.  This is a few days later --

        MS. GERAGOS:  This can be published to the jury.  Sorry.

Q.   This is a few days later, November 22, 2021?

A.   Yes.

Q.   If you go to page 6, all right.  You say, My love I just looked at some flights I can arrive tomorrow night at 8:30 and leave tomorrow morning Thursday in time for the holiday.  Text me when you wake up.  Let me know what you think.

A.   I'm so sorry, it's zoomed into one.

Q.   It is zoomed in?

A.   It says -- I'm sorry.  I have never seen these, sorry.

Q.   Take as much time as you need.  We'll go through them.

A.   Okay.

MS. GERAGOS:  I'd like to now admit with the agreement of the government 3023-A, which is the voice note at 10:19 a.m. UTC time?

MS. COMEY:  No objection.

MS. GERAGOS:  Under seal.

THE COURT:  It will be admitted under seal.

MS. GERAGOS:  Actually, your Honor, I don't think that this one would have to be under seal, now that I'm thinking about it.

THE COURT:  Any objection to it not being admitted under seal?

MS. COMEY:  If this is the voice note sent by Mr. Combs, no objection.

THE COURT:  Admitted.

(Defendant's Exhibit 3023-A received in evidence)

Q.  Can we play voice note 3023-A, which is his voice notes?

(Audio played)

Q.  Then you -- that's at 10:19 a.m. you see that audio message?

A.  Yes.

MS. GERAGOS:  And if we go to your audio message here, which is 10:52:16 a.m., which is 3023-B which we would like to admit under seal.

MS. COMEY:  No objection.

THE COURT:  This exhibit will be admitted under seal.

(Defendant's Exhibit 3023-B under seal received in evidence)

(Audio played)

MS. GERAGOS:  If we could go to the next page, to page 8.  What is page 8?  Can you put 8 and 9 next to each other?

You send another audio message at 10:53, which is 3023-C, which we move to admit under seal.

MS. COMEY:  No objection.

THE COURT:  It will be admitted under seal.

(Defendant's Exhibit 3023-R under seal received in evidence)

Q.  Can we play that, please.

(Audio played)

Q.  In these three voice notes -- you can zoom out -- he says,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

You always wanted to set some shit up.  The last vision we had, it was Don and ATL.  See you put it together baby, right?

Do you remember listening to that?

A.  I remember listening to that, yes.

Q.  And you said, That's definitely super easy for me to set up for sure, but I'm confused because didn't you say you wanted to save that for the grand finale, and this was going to be a showstopper situation, right?

A.  Yes, I'm trying to make excuses to get out of this thing that he's encouraging for me to set up.

Q.  You said, It's supposed to be the big grand finale, the big boom, just fireworks, showstopper situation, right?

A.  Yes.  Prior to this, I do remember having a hotel night and how he said that he wanted to see Don and Sly or whoever, and that's what he wanted to see, like two of the main guys.  And so I'm feeding into what he wants to hear here, and I'm hearing him kind of say like I want to see you set that up.  And --

Q.  But he says -- you agree with me that he says, You always wanted to set some shit up for tomorrow night.  The last vision we had was it was Don and ATL, right?  That's what he said in his voice mail that we listened to?

A.  Yes, but the undertone of that is -- I hear these things entirely differently, but yes that is what he said in the voicemail, and that is what I said in the voicemail, but I just know the undertones here.

Q. Okay. And then if we go ahead to page 10 and 11. All right.

So we looked at page 11 on direct examination, do you remember that? Let's sit this one out. Have a beautiful day? I'm definitely feeling some type of way. Home girls posting being there with you, so I genuinely thought you were just missing me. I thought on a quick one to two day trip you wanted to see me, but you wanted a Don and Sly moment in that time hotel vibes, right?

A. Now it makes sense, yeah. It's the first time I'm seeing kind of the context behind this.

Q. So the government went over the other text message with you in their preparation with you?

A. Just this one.

Q. They didn't show you the preceding text messages?

A. I didn't hear those voicemails prior to, no.

Q. They showed you starting at around this section, right?

A. Around I'm definitely feeling some type of way, yes.

Q. So they never showed for you the voicemails before when you guys were talking when Mr. Combs said, You always wanted to set some shit up, and the last vision we had was Don and ATL, right?

A. This is the first time that I'm hearing those three voicemails, yes.

Q. Understood. Let me ask you some questions about this. You

said, Home girls posting being there with you, right?

A. Yes.

Q. Posting, does that mean on Instagram?

A. Yes.

Q. And yesterday you had said -- we had read a message, I should say, where you were saying you didn't have any post-able from your relationship with him after three and a half years, right?

A. Right.

Q. And that was upsetting to you because you wanted to be able to post some things on Instagram, right?

A. It was upsetting to me that I had endured the majority of the pressure of this relationship, and that when I looked up, I had just been in a chaotic whirlwind of a dark life that I wasn't proud of, and I just look up and there's like I did nothing with my life in those years, but I could see that he offered really beautiful other things to the other girls that they were able to share, et cetera, et cetera, so that's what I meant there.

Q. So here when you're referring to home girls posting being there with you, that's referring to another girl he's with posting on Instagram or another social media site being with him, right?

A. This here is upsetting for me because he's reaching out to me specifically talking about a fantasy or specifically

initiating conversation regarding me having sex with two men. And so I'm here thinking assuming that he's just genuinely thinking about me, but it's about these men. And then I look online, and I see that he's spending quality time with another girl, the things that I would have preferred that he messaged me about, but this is -- this was the dynamic, so here this is where the frustration starts because I'm being woken up being -- talking about men and then --

Q. Another girl is posting being with him?

A. Exactly.

Q. And you hadn't gotten on the plane yet, right?

A. No.

Q. You were still in your bed in Los Angeles?

A. Yes.

Q. And then you said, Let's sit this one out because you were upset, right? Have a beautiful day, right?

A. Yes.

Q. I'm definitely feeling some type of way?

A. Yes.

Q. Because -- and then the next message that he reads and receives from you is: Home girl is posting being there with you, right?

A. Yes.

Q. So I genuinely thought you were just missing me, is that in reference to the voice notes that we just heard?

A.   That is correct.

Q.   Okay.  And then you say, I thought on a quick one to two day trip, you wanted to see me, but you wanted Don and Sly moment within that time hotel vibes, right?

A.   That is correct.

Q.   Let's go to the next page.

And then you say, and you hadn't gotten on the plane yet, right?  And you say, So I come in and do that while you go back to being laid up and boo'd for days.  I see what I'm turning into in your eyes while home girl is literally ran through and fucks your friends behind your back.  And did you get her a fucking Chanel bag on top of that.  LOL.  Crazy.  I don't like how you're treating me and what I'm seeing.  I need a breather and a break from you.  This doesn't make me feel good at all.  Your true intentions with me are in plain sight.  Hope you had a great Thanksgiving, right?

A.   Yes.

Q.   And you say, Don't say you fucking miss me and you're bored over there. Just don't say shit to me at all.  You don't deserve me, right?

A.   Yes.

Q.   Let's unpack that.  You are saying, So I come in, meaning if you were to travel there, he'd go back to being laid up with the girl for days, right?

A.   Just re-wind a little bit.  So I mean to say, So I come in,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

meaning and do that, meaning hotel nights.  And then while you go back, meaning after that, you go back to being laid up, which means spending quality time and boo'd up for days with another girl he's dating and giving this girl quality time, and not me after I've done a hotel night with strangers.

Q.   And then you say, And did you get her a fucking Chanel bag on top of that?  LOL.  Crazy.

A.   Yes.  My misdirected anger towards the women when my anger is truly for him and how mistreated I feel in this relationship.

Q.   And are you mistreated because this other person got a Chanel bag?  Why are you saying Chanel bag?

A.   I'm being mistreated because the pressure that my partner was putting on me was for me to have sex with strangers, and when he leaves me, he goes and spends quality time and shopping and dining, et cetera, et cetera with the others.

Q.   Did this person post a Chanel bag on their stories --

A.   Yes.

Q.   -- on Instagram?

And you didn't get the Chanel bag.  This other person was getting a Chanel bag, right?

A.   No, I only got trauma.

Q.   You got a Van Cleef necklace, right?

A.   There was that and --

Q.   You got a Bottega bag, right?

A.  After three and a half years, I really don't think I garnered much from this relationship.

Q.  What is a Bottega bag?

A.  I'm sure you have one.

Q.  I actually don't.  What is a Bottega bag?

A.  It's a high-end luxury purse for women.

Q.  How much do Bottega bags run?

A.  How much does my body cost?

THE COURT:  Jane, I'm going to ask you to just respond to Ms. Geragos' questions and your lawyer can follow it up.

A.  Okay.  Thank you.

Q.  I'm asking roughly how much a Bottega bag costs?

A.  Anywhere between 1,500 to 5,000.

Q.  Okay.  And a Chanel bag, how much does a Chanel bag cost?

A.  I don't know.

Q.  And after these text messages, you made the decision not to get on a plane?

A.  I can't recall.

Q.  Okay.  Do you recall if right after these text messages you went to Miami?

A.  Maybe.  Maybe not.

Q.  You don't have an independent recollection either way?

A.  If you can provide me something to jog my memory back.  If I did or not, I'm not really sure.

Q.  Let's look at the next page.

You say, Ain't nobody just come to work out. She's been there for days and posting the studio. Stop lying. Funny thing is I don't even care, I don't even fucking care who you lay up with, right?

A.   Yes.

Q.   And if we go to the next page.

And then we could go right here and read those messages.

A.   You want me to read them, or ...

Q.   You're saying, You been saying you miss me and want to see me, but you're lying. You just want the hotel shit, right?

A.   Yes.

Q.   And then at the bottom, you say, Bitch is super ran through and fucks your friends. You think I care about this. Off this, right?

A.   Right.

Q.   And all he responds is, Have a blessed day, right?

A.   Yes.

Q.   And good-bye right?

A.   Yes.  Can we take a break?

MS. GERAGOS:  Of course.  Let's take a break.

THE COURT:  Thank you.

Members of the jury, we'll take a break and be back in ten minutes.

All rise for the jury.

(Continued on next page)

(Jury and witness not present)

THE COURT:  Please be seated.

Anything to address during the break?

MS. COMEY:  No, your Honor.

THE COURT:  Ms. Geragos.

MS. GERAGOS:  No.

THE COURT:  All right.  Come back in ten.

(Recess)

THE COURT:  Let's bring in the witness and we will then bring in our jury.

(Continued on next page)

P6AQ1245                    Jane - Cross

(Witness present; jury present)

THE COURT:  Members of the jury, welcome back.  Just so you know, in our effort to always be streamlining the proceedings, we're going to be ending earlier today, so we will be ending around 3:00 p.m.  Just wanted to let you know that.

MS. GERAGOS:  We'll end the day with some levity, your Honor.

BY MS. GERAGOS:

Q.  Jane, are you ready to proceed?

A.  Yes.  I apologize.

Q.  No problem.

Right before our break, you said:  This was a chaotic whirlwind of a dark life I wasn't proud of.  I just look up and there's nothing else I did with my life in these years, but he offered beautiful things to the other girls that they were able to share.  Do you remember that?

A.  Yes.

Q.  And you said that quality time is shopping and dining, right?

A.  Yes.

Q.  Okay.  You just testified this morning about multiple businesses that you were running during your relationship with him, right?

A.  Yes.

Q.  You had a swimsuit brand?

A. I did.

Q. And you got to sell swimsuits and model for your swimsuit brand?

A. Yes.

Q. And you also had a dress brand, right?

A. Yes.

Q. You were an entrepreneur during your relationship with him, right?

A. Yes.

Q. And you still are, right?

A. Yes.

Q. And you also talked about the house that you live in now, right?

A. Yes.

Q. And in that house, you've lived there for how long?

A. I would say three years now or close to three years.

Q. Almost three years, right?

A. Two and a half or so.

Q. And before your house, you were living in an apartment?

A. Yes.

Q. And now you live in this home, right?

A. Yes.

Q. And how many square feet, if you know, is this home?

A. I think it's about 5,300.

Q. How big was your apartment beforehand?

A.   I think it was like 1,400.

Q.   So it's a significantly bigger home than the apartment beforehand, right?

A.   Yes.

Q.   Without telling me the location, it's in a nice area of Los Angeles, right?

A.   Yes.

Q.   And you're able to parent your child in this nice home, right?

A.   Yes.

Q.   And you're able to provide him -- her -- the child a large back yard, right?

A.   Yes.

Q.   And a big home for your child, right?

A.   Yes.

Q.   And that's important to you right?

A.   Yes.

Q.   And Mr. Combs, you testified, put $20,000 of an investment into your businesses, right?

A.   Yes.

Q.   And that was something that meant a lot to you, right?

A.   Yes.

Q.   Because you wanted to build your dress business?

A.   Yes.

Q.   You were living in L.A. for a portion of your relationship

with him?

A.   Yes.

Q.   And you traveled to New York City also with him?

A.   Yes.

Q.   Okay.  And you also did get a lot of quality time with him at his homes, right?

A.   At times, yes.

Q.   And you really appreciated and loved that quality time, right?

A.   Yes.

Q.   And that was the time you craved that you had with him?

A.   Yes.

Q.   And that was the time you looked forward to the most?

A.   Yes.

Q.   Because that's when you got to be close to your partner?

A.   Yes.

Q.   And close to your lover?

A.   Yes.

Q.   And that was really, really important to you?

A.   Yes.

Q.   Okay.  And so when you say that you looked up and there's nothing I did with my life in these years, you had two businesses, that one is now profitable, right?

A.   I would say that had I not dove headstrong on this relationship, I probably would have been a bit more successful

in that time frame, but that's neither here nor there. Umm -- so that's my answer to that.

MS. GERAGOS: Okay. I want to go ahead to Defense Exhibit 3033, which is the corresponding exhibit, your Honor, to A-104-16 and A-104-17, which is admitted. This is a defense exhibit, and I believe Ms. Comey does not have an objection to it.

MS. COMEY: That's correct, your Honor. I was checking my list. No objection.

THE COURT: All right.

MS. GERAGOS: Under seal.

THE COURT: Defense Exhibit 3033 will be admitted under seal.

(Defendant's Exhibit 3033 under seal received in evidence)

MS. GERAGOS: If we could publish this for the jury.

You could put pages side by side.

Q. This is December 13, 2021, right?

A. Yes.

Q. So it's approximately a month after the text messages that we were looking at, right?

A. Yes.

Q. All right. And in these messages you send him, Night, my love. Sexy dreams with a kiss emoji, right?

A. Yes.

Q. And he sends you an emoji back?

A. Yes.

Q. OK. And you loved that emoji. And then what emojis do you send him?

A. I send him a kiss, some clouds and something else.

Q. OK. And what do the clouds indicate, if anything?

A. No.

Q. Okay. And then he says, I'm on my plane. You turn me the fuck out for real. When am I seeing you again? You got me fiending. I can't stop thinking about being nasty with you. If I could just be nasty every day, I would. Send me one of your fav videos. What have you been thinking about, right?

A. Right.

        MS. GERAGOS: OK. And next page.

Q. And he corrects himself and says, dick. LOL.

    And what do you respond with?

A. I say, mmm, daddy. Wish I was drinking your hard dick and sliding it up and down my wet clit and pussy, up and down, love when you deep stroke me, deep and slow. I never had a dick make me come as many times as you.

Q. And he responds, Just landed in NYC, right?

A. Yes.

Q. What did you say?

A. I said, Right now, thinking about it, I could have my legs wide open for you every single day.

Q. He says, When you going to bring that back to me?  When am I going to see you again, right?

A. Yes.

Q. And you say, I don't have the videos, babe.  You got to send me good ones, but I'm def remember everything, right?

A. Yes.

Q. So when he asks when you going to bring that back to me, what is your impression of what he means by that; is it you?

A. Yeah, here.

Q. And when am I seeing you again, right?

A. Yes.

Q. So he's talking about you, right?

A. Yes.

Q. And your answer is:  I don't have the videos, babe.  You got to send me some good ones, but I def remember everything, right?

A. Right.

Q. Is this in reference to a hotel night that you had with him just a couple days beforehand?

A. Right.

Q. Okay.  And so your response is about the videos, right?

A. Yes.

Q. That you guys take during that hotel night?

A. Yes.

Q. Because he wants to see them -- these are things that you

would watch when you were together?

A.  Yes.

MS. GERAGOS:  Can we go to 3 and 4.

Q.  And then you say, You tell me, baby, and glad my daddy landed safely.  Ten wet strokes.  I'm craving you too, right?

A.  Yes.

Q.  OK.  And he says, when you free again?  I want you now, right?

A.  Yes.

Q.  Okay.  And he -- and you respond, You love it and you say, Maybe later this week.  I want you always, right?

A.  Yes.

MS. GERAGOS:  Okay.  If we could go ahead to page 5 -- 5 and 6, I should say.

Without reading the -- I'll read the first text.

Q.  What is that first emoji?  What -- can you explain those three emojis that we see?

A.  Yes.  It's like an emoji with a mind that's blown off and two monkey faces with the eyes covered.

Q.  And then you say, Nasty.  And then the nickname of your true name, right?

A.  Yes.

Q.  And what do you say after that?

A.  That's your naughty girl, baby.  Maybe we can leave like Thursday or Friday, baby.

Q.   And then what do you say?

A.   I want to get sexy and dress up for you, daddy.  Mama needs to feel sexy.  Sometimes I just like sitting next to you with some wine and take you all in with my eyes.

Q.   And he says, We don't have to be debaucherous, LOL.  Right?

A.   Yes.

Q.   And you said on direct that debaucherous means -- is it something that you guys would talk about with respect to those nights, or that's how you would refer to it, is that right?

A.   Yes.

Q.   So you're saying, I want to get sexy and dress up for you. I need to make you make me feel sexy.

     And he says, We don't have to be debaucherous, right?

A.   Right.

     MS. GERAGOS:  So if we could go to pages -- let's go to the next two pages.

Q.   And you say -- you send him a selfie, right?

A.   Yes.

Q.   And you say, Everything about us turns me on, right?

A.   Yes.

Q.   And I -- he says, I can do all that, right?

A.   Yes.

Q.   And then what do you say?

A.   I said:  LOL, with a heart eyes and a kiss face.  I've been having a little fantasy in my mind.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.  And he says:  I even know how to make love without oil and outfits.  Tell me please.

A.  I say, Next time I see you, I want to wear something different.  My lingerie and my hair.  I want to be intoxicated with wine.  That's when I feel my sexiest and have you watch me, my perfect man I ever wanted, with heart eye emojis, just looking fine for me.

Q.  And then he responds, Okay.  Let's do it.  I didn't know that.  You don't have to do molly, right?

A.  Right.

Q.  He says he didn't know that you -- that's when you feel your sexiest, right?

A.  That's what he says.

Q.  Okay.  And you say, Can we have a night of love, right?

A.  Yes.

Q.  And love is capitalized.  Why is the L in love capitalized?

A.  No specific reason.

MS. GERAGOS:  Okay.  Let's go to the next page.

Q.  And then he says, Of course, right?

A.  Yes.

Q.  And you say, Then we can get slutty the following day or so, LOL, with multiple L's, right?

A.  Yes.

Q.  So what does that mean?

A.  That means, because I want to be fair, that typically he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

doesn't really want, like, the boring, romantic stuff. He wants the debaucherous stuff. So here, I'm kind of saying let's start it off with, like, wine and romance, like, sexy with my hair down, because he often preferred my hair in a ponytail, and I just wanted to wear my hair down for him. And then he says, of course. But then, I know my partner and what he likes and what he wants. Debauchery is what we nicknamed these nights so --

Q. And that's why you say, Then we can get slutty the following day or so, LOL?

A. Yes.

Q. And you say, I want to be in a silk dress and heels, right?

A. Yes.

Q. And his response is, We don't have to go crazy for the rest of the year, right?

A. That's his response.

Q. And that's his response. You send: We can get slutty following day or so, LOL, at 5:09 -- 5:00 p.m. and 09 seconds, and he sends that response pretty much immediately after, right?

A. Yes.

Q. And then you say, Even smelling you next to me turns me on, and you emphasize we don't have to go crazy for the rest of the year, right?

A. Right.

Q.  Can you explain for those of us who don't have iPhones what does the emphasis mean?

A.  Oh.  I put exclamation points on that text that he sent.

MS. GERAGOS:  And then if we go up to page 10.

Q.  He says, Okay.  Let's switch it up, right?

A.  Right.

Q.  And you say, I will believe it when I see it, with a smirk, right?

A.  Right.

Q.  And we've talked about the smirk; you've indicated that that means flirtation, right?

A.  In this context I think it means, like, flirty and, like, a maybe.

Q.  And then what do you say next?

A.  I say, LOL, with a heart.

Q.  And I love your intensity?

A.  Yes.

Q.  And then what do you say after that?

A.  I said, it's okay with me.

Q.  With a heart?

A.  Yes.

Q.  Okay.  And he says:  What do you mean -- or what you mean.  Right?

A.  Yes, because I'm sensing some sort of, like, rejection here, like, we don't have to go crazy for the rest of the year,

after I kind of start talking about what I want. And I feel like he's feeling, like, some sort of rejection or something. And so I'm just --

MS. GERAGOS: Mr. McLeod, can you please put up page 10, please. Zoom out, please, so we can see the whole message.

Q. He says: Okay. So let's switch it up. Right?

A. Yes.

Q. Is that when you're sensing rejection?

A. Before that.

MS. GERAGOS: Why don't we put 9 and 10 back together?

A. I'm sensing rejection under we don't have to go crazy for the rest of the year.

Q. That's when you felt -- is that an example of an undertone that you felt?

A. Yes.

Q. When he says, We don't have to go crazy for the rest of the year?

A. Yes.

Q. And then you emphasize that, right?

A. Yes.

Q. And then he responds to your emphasis by saying: Okay. Let's switch it up, right?

A. Yes.

Q. And you say, I will believe it when I see it, with the flirtatious smirk emoji, right?

A. Right.

Q. And you say:  LOL, with a heart?

A. Yes.

Q. And then you tell him you love his intensity and it's okay with you, with a heart, right?

A. Right.

Q. And he asks -- he's asking you -- you say:  It's okay with me with a heart at 5:01:27 seconds p.m.  And four seconds later he says:  What you mean.  Right?

A. Right.

Q. He's asking you what you mean?

A. Right.

Q. And what do you say in response?

A. I said:  I love that we have that freedom with one another. It's a whole other level of eroticism.

MS. GERAGOS:  Can we go to the next two pages.

Q. He says, You don't think I can do it, LOL, right?

A. Right.

Q. And then what do you say?

A. I say:  I mean I think there will be debauchery before the end of the year, LOL.

Q. And can you read your next two messages?

A. Yes.

No.  I just know you, like, it -- and I don't mind it either, baby.  I just want some sexy, romance time with my baby

for a second.

Q. And he says:  Nope, I'm going to make you beg for debauchery.  Right?

A.  Right.

Q.  So he says:  We don't have to do it.  And then:  You don't think I can.

And you respond:  No.  I just know you like it, and I don't mind it either, baby.  I just want some sexy, romance time with my baby for a second.  Right?

A.  Yes.

Q.  And he -- he, reading what you just said, two seconds later, writes, Nope.  I'm going to make you beg for debauchery, right?

A.  Right.

Q.  And you put a laughing -- you laugh responding to that message?

A.  Right.

Q.  Like you emphasized the laughter with the iPhone?

A.  Right.

Q.  And you say:  Okay, baby.  Let's try this out and see how we feel.  I love it all with you, right?

A.  Right.

Q.  And then he says, Baby, you see how I've been holding back.  I don't need no help?

A.  Right.

MS. GERAGOS:  And then if we could go to the next page.

Q.  And he says, Baby, I know how and love the times where it's just me and you, right?

A.  Mmm.  Yes.

Q.  And you love that message?

A.  Yes.

Q.  And he says, LOL?

A.  Right.

Q.  And then you send him -- you send him some emojis.  What do those emojis indicate?

A.  Just heart eyes and water, water, like horny.

Q.  Okay.  And he says, I'll fuck your head up, and you emphasize that, right?

A.  Yes.

MS. GERAGOS:  So let's put 14 and 15 up next to each other.

All right.  So if we could --

Q.  Then you send him several text messages, which you don't have to read out loud, but you say:  You definitely intoxicate me mentally.  Every stroke feels like the most pleasure-filled orgasmic.  I can't even describe it.  Let's have a night of drowning in each other.  Right?

A.  Yes.

Q.  And then you respond, at the end of page 15:  Hope your

treatment goes well, my love.  Message me when you're done.

Wish I was cuddling and sleeping with you after big hug or

kiss.  Right?

A.  Yes.

MS. GERAGOS:  Your Honor, I could do one more exhibit

or we could stop now, whatever.

THE COURT:  Why don't we do one last one.

MS. GERAGOS:  Okay.  Perfect.

Let's go to Defense Exhibit 3034, which is the

corresponding exhibit to A-104-18.

MS. COMEY:  No objection if it's being offered your

Honor.

MS. GERAGOS:  We're offering this under seal your

Honor.

THE COURT:  All right.  Exhibit 3034 will be admitted

under seal.

(Defendant's Exhibit 3034, sealed, received in

evidence)

MS. GERAGOS:  Could we go to page 13, please.

Q.  All right.  So you write, on page 13 -- I skipped ahead a

bit -- I miss you, baby.  Can't stop thinking about you and

being nasty with you too.  I love, love having that intensity

with you.  Do you remember writing that?

A.  Yes.

Q.  What do you say next?

A.   I said:  Remember when we just got home from hotel and eating, just shooting the shit, and we were just staring at each other, just telling each other how much we wanted each other right in that moment.  My whole body was throbbing for you.

Should I keep reading?

Q.   So -- no.  Thank you.

Is this an example of the time where you got to have quality time with him and you get home from the hotel and you get to talk to one another?

A.   Yes.

Q.   And then you get to -- I think you said this morning you guys would make love to each other after that, and that would be a really intense and wonderful time between you two?

A.   Yes.

Q.   And so you're telling him here in this message, on December 14, do you remember that time that we had together that was really intense and my whole body was just throbbing for you?

A.   Yes.

Q.   And then you say:  Still can't believe we came at the same time too.  Wish you were in bed with me.  Night, my baby.  Right?

A.   Yes.

Q.   And then you send some more texts the next day.  Do you see

that on page 14?

A.  Yes.

MS. GERAGOS:  Okay.  If we could go to the next page, 15 and 16 next to each other.

Q.  And then at the bottom of page 15 you send him a selfie, right?

A.  Yes.

Q.  And what do you write under the selfie?

A.  I said:  Wish you were here.  We can play our videos on TV and lock each other in the room all day.

Q.  And is this a reference to the videos that you guys would record during hotel nights?

A.  Yes, because I know that's what he liked.

Q.  And so you sent him a selfie at 6:54 p.m. UTC, right?

A.  Yes.

Q.  And you told him:  I wish you were here.  We could play our videos on TV and lock each other in the room all day.  Right?

A.  Yes, because I know he liked that, watching and recapping.

Q.  And you wanted to show him videos and recap and watch and talk about it, right?

A.  I wanted to do something he liked.

Q.  Okay.

And what does he respond with on the next page?

A.  He liked the image, and then he goes:  Tomorrow night, with exclamation points.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.   And says -- and then you respond.  You say:  Okay, and then you send him several emojis, right?

A.   Yes.

Q.   And what are those emojis indicative of?

A.   Flirtation, heart eyes, water, water.

          MS. GERAGOS:  If we could go to page -- we'll skip ahead to page 29 of this exhibit.

(Continued on next page)

BY MS. GERAGOS:

Q.   OK.   This is -- there we go.

     This is several days after, right; the ones we were just looking at were December 14?

A.   Yes.

Q.   OK.   And this is December 24, 2021?

A.   Yes.

Q.   And you say:   Just looked.   I don't see anything on the blogs at all.   Night, baby.   Sweet dreams.   Right?

A.   Yes.

Q.   Is this a reference to you guys looking through the blogs to make sure nobody essentially had spotted you or caught you out?

A.   I believe so.

Q.   OK.   And then he says:   You're so sweet.   Right?

A.   Yes.

Q.   And you respond with emojis?

A.   He's responding to that photo I sent.

Q.   Oh, I see.   OK.   Explain that photo on the left with the bears.

A.   I got his three daughters Forever Flower teddy bears for Christmas.

Q.   I see.   This is Christmas Eve?

A.   Yes.

Q.   OK.  So he says:  You're so sweet.  Right?

A.   Yes.

Q.   And he says:  That shit was so fucking sexy the other night.  Damn.  Right?

A.   Yes.

Q.   And what do you say in response?

A.   I emphasized that text, and I said:  I haven't stopped thinking about it, about all of it, just keeps getting better and better.

Q.   What does he say?

A.   What part have you been thinking about?

         MS. GERAGOS:  Can we go to the next page?

Q.   What do you say in response?

A.   I said:  Just how sexy the room was, so much sexual tension.  It was all just making me wet seeing -- to see it and the way you made me come.  I'll never -- I never came so hard like that in my life.

Q.   What are those emojis next to that text message?

A.   Big puppy eyes and crying.

Q.   OK.  Is the crying upset crying or happy crying?  What does that crying indicate?

A.   Crying so hard because it feels good.

Q.   OK.  And then what do you say after that?

A.   Everything is hard but sexy, a lot of deep.  And I say:  Did you love it, baby.

Q. Are you saying that because you want to know how he felt the other night?

A. Yes, I'm making conversation.

Q. And he says: I loved it. Right?

A. Yes.

Q. And you respond with some emojis again?

A. Yes.

Q. The smurf emoji we talked about; flirtatious, right?

A. Yes.

Q. And kissing emojis?

A. Yes.

Q. And you say sheesh, right?

A. Yes.

Q. OK. And then you send him a song that says: You light my fire. I feel alive with you, baby. You blow my mind. I'm satisfied. Outstanding. Right?

A. Yes.

Q. And then afterwards you send a message: Baby, I just got my package. I haven't opened it yet. Going to wait to open it until tomorrow. You're so sweet, my baby. Right?

A. Yes.

Q. And is that in reference to your Christmas present?

A. Yes.

        MS. GERAGOS: OK. I think, your Honor, I can stop now.

THE COURT:  All right.  Very good.

Thank you, members of the jury.

We'll be back here tomorrow to start at 1 p.m., and if you are here early, there will be a lunch here.  So if you get here a little bit early, it's an incentive to get here early, there will be lunch for you.

Same instructions.  Don't speak with each other about the case.  Don't speak with anybody else, and don't look up anything about the case.

With that, we'll see you tomorrow to start at 1 p.m.

(Continued on next page)

(Jury not present)

THE COURT:  All right.  Thank you, Jane.  We'll see you here tomorrow.

(Witness not present)

THE COURT:  Please be seated.

Ms. Comey, anything to address before we adjourn?

MS. COMEY:  No.  Thank you, your Honor.

THE COURT:  Ms. Geragos.

MS. GERAGOS:  I don't have anything, your Honor.

THE COURT:  OK.

So I'll see everybody here at 12:30 tomorrow to address any issues that we need to.

(Adjourned to June 11, 2025, at 12:30 p.m.)

INDEX OF EXAMINATION

Examination  of:                                              Page

JANE

Cross By Ms. Geragos . . . . . . . . . . . . . .5280

GOVERNMENT EXHIBITS

Exhibit No.                                      Received

 E-161 (sealed)   . . . . . . . . . . . . . . .5354

 E-162 (sealed)   . . . . . . . . . . . . . . .5355

 E-165  . . . . . . . . . . . . . . . . . . . .5356

DEFENDANT EXHIBITS

Exhibit No.                                      Received

 3103   . . . . . . . . . . . . . . . . . . . .5326

 3103-A   . . . . . . . . . . . . . . . . . . .5329

 3103-B, sealed,  . . . . . . . . . . . . . . .5329

 3110, sealed,  . . . . . . . . . . . . . . . .5333

 3003, sealed,  . . . . . . . . . . . . . . . .5343

 3246 and 3248, sealed,  . . . . . . . . . . .5405

 3007 under seal  . . . . . . . . . . . . . . .5437

 3011 under seal  . . . . . . . . . . . . . . .5442

 3014-R under seal  . . . . . . . . . . . . . .5447

 3016 under seal  . . . . . . . . . . . . . . .5450

 3018-R   . . . . . . . . . . . . . . . . . . .5457

 3023-R under seal  . . . . . . . . . . . . . .5464

 3023-A   . . . . . . . . . . . . . . . . . . .5466

 3023-B under seal  . . . . . . . . . . . . . .5466

3023-R under seal   . . . . . . . . . . . . . .5466

3033 under seal    . . . . . . . . . . . . . .5481

3034, sealed,    . . . . . . . . . . . . . .5493

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300