P6bWcom1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

                    v.                    24 Cr. 542 (AS)

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

                    Defendant.            Trial
------------------------------x
                                          New York, N.Y.
                                          June 11, 2025
                                          12:40 p.m.
Before:

                    HON. ARUN SUBRAMANIAN,

                                          District Judge
                                          -and a Jury-

                              APPEARANCES

JAY CLAYTON
      Interim United States Attorney for the
      Southern District of New York
BY:   MADISON R. SMYSER
      EMILY A. JOHNSON
      MAURENE R. COMEY
      MEREDITH FOSTER
      MITZI STEINER
      MARY C. SLAVIK
      Assistant United States Attorneys

P6bWcom1

APPEARANCES CONTINUED


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:   MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
HARRIS TRZASKOMA LLP
BY:   ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:   ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:   Lucy Gavin
                Shannon Becker
                Paralegal Specialists

                Raymond McLeod, Paralegal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6bWcom1

(Trial resumed)

THE COURT:  Welcome, everybody.

Please be seated.

Good afternoon.

MR. DONALDSON:  Good afternoon.

THE COURT:  Other than the juror issue, is there any other issue that we need to address before we get started today?

From the government.

MS. COMEY:  No, your Honor.

THE COURT:  Defense counsel.

MR. AGNIFILO:  Other than that one, no.

THE COURT:  Does the defense want to be hear now, or would they like a chance to review the government's letter and then respond.

MS. SHAPIRO:  Both, if that's all right, your Honor.

THE COURT:  OK.

MS. SHAPIRO:  We would like some time to respond in writing in the next day or two, certainly by the end of the week.  We haven't had a chance to review the case law or look at the letter, other than quickly.  But I did want to just point out on the record that our reaction to the letter is that it's essentially a pretext; that there's no substance there, and we believe it's a pretext, an effort, thinly veiled effort, to dismiss a black juror, and it hearkens back to the way the

P6bWcom1

government exercised its peremptories that led to the *Batson* challenge.

I'd just also note that it does appear that the case law, although I haven't had a chance to review the cases in detail yet, but the cases, ironically, that the government is relying on are cases designed to protect the rights of the defendant, and we are going to object to the removal of this juror.  So we're happy to put in a letter by tomorrow night, if that's all right with the Court.

THE COURT:  Let me ask the government, as to the timing question, is there any issue with that timing, giving the defense 24 hours to put in a response so that we can address this issue before the weekend?

MS. COMEY:  No, your Honor.  I don't think there's any prejudice at this point to that.  No, not at all.

I just wanted to say in response to what Ms. Shapiro just said that we were very reluctant to put in the letter that we did.  It is not something that we wanted to do, but in looking back at the record, we saw what appeared to be a lack of candor with the Court that raises serious issues with us. This is not something that we were hoping to do or wanting to do.  It is something we felt compelled to do, so I wanted to state that in response to the accusation Ms. Shapiro just addressed.

THE COURT:  Understood.  I will hear the defense and

P6bWcom1

review their submission, and we will deal with this issue before the weekend.  I think that makes sense.

And so if you, Ms. Shapiro, can get in your letter by tomorrow morning -- do you need any more time, or is that sufficient?

MS. SHAPIRO:  I think that should be sufficient, your Honor.  Of course.

THE COURT:  If we receive the letter tomorrow morning, we'll be in a position to deal with it either at the end of the day tomorrow or before we get started on Friday and then can determine how we're going to logistically handle that situation, if there's any basis for removal of the juror.

I will, of course, reserve on that until I hear the defense's submission.

MS. SHAPIRO:  Thank you, your Honor.

THE COURT:  If there's nothing else, let's bring back Jane, and we'll bring in our jury.

Let's see if they're ready.  Let me ask the deputy to see if they're ready.

THE DEPUTY CLERK:  Your Honor, I do not believe they're ready, but I can check again.

All right.  Then we'll take ten minutes and come back.

(Recess)

THE COURT:  Please be seated.

I'm going to ask my deputy if we have our jury now.

P6bWcom1

THE DEPUTY CLERK:  Your Honor, I believe we're missing one juror.  I'm going to check now.

THE COURT:  All right.

THE DEPUTY CLERK:  Your Honor, we were missing two jurors.  One just arrived.  One is still on the way.

THE COURT:  On the way, though?

THE DEPUTY CLERK:  Yes.

Your Honor, all of the jurors are present.  They're lining up, so we can bring the witness in.

THE COURT:  All right.  Let's bring the witness back in.

Thank you.

JANE, resumed.

MS. GERAGOS:  Your Honor, may I approach the deputy to give the binder to the witness?

THE COURT:  Of course.

Welcome back.

THE WITNESS:  Thank you.

(Continued on next page)

P6bWcom1                          Jane - Cross

(Jury present)

THE COURT:  Please be seated.

Welcome back, members of the jury.

Jane, you understand you're still under oath.

THE WITNESS:  Yes.

THE COURT:  Ms. Geragos, you may proceed when ready.

MS. GERAGOS:  Thank you, your Honor.

CROSS-EXAMINATION CONTINUED

BY MS. GERAGOS:

Q.  Good afternoon, Jane.

A.  Good afternoon, Ms. Geragos.

MS. GERAGOS:  I'm going to start today with defense exhibit 3035, which I understand Ms. Comey has no objection to, and we're seeking to admit under seal.

MS. COMEY:  I think that's right, your Honor.  No objection.

THE COURT:  All right.  3035 will be admitted.

Under seal or not under seal?

MS. GERAGOS:  Under seal.

(Defendant's Exhibit 3035, under seal, received in evidence)

MS. GERAGOS:  And I think then if we could publish it to the jury, that would be great, and to the witness.

Q.  All right.  Can you read that, Jane, or is it only blurry on my screen?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   That would be great.

Q.   These are messages between yourself, between yourself and --

MS. GERAGOS:  I'm so sorry.

Your Honor, may I have one moment?

THE COURT:  You may.

MS. GERAGOS:  I need to clean the privacy screen.

OK.  I can see it now.

Q.   All right.  These are from December 20 of 2021, right?

A.   Yes.

Q.   And do these appear to be messages between yourself and Kabrale?

A.   Yes.

MS. GERAGOS:  OK.  And I would just --

Q.   Is this right after one of your hotel nights with him?

A.   Maybe, yes.

Q.   OK.  And here, you write -- he texts you:  Good morning, love.  How are you feeling.  Right?

A.   Yes.

Q.   And you say:  Hey.  I'm doing good.  How are you?

And he asks, he wants to check in on you, right?

A.   Yes.

Q.   And he says:  We had a pretty intense night.  Right?

A.   Yes.

MS. GERAGOS:  And if you could go back to page 2, he

P6bWcom1                    Jane - Cross

says -- we're skipping ahead.

Q.  He says:  LOL, like, that was the roughest sex we ever had.
You were talking so dirty to me and taking me so deep.  I loved
it.  Right?

A.  Yes.

Q.  And you emphasized that?

A.  Yes.

        MS. GERAGOS:  And if we just go to page 3.

Q.  And you respond, saying:  Hahaha, LOL, with many emojis.
Right?

A.  Yes.

Q.  And that emoji on the top right, is that a mind-blown
emoji?

A.  Yes.

Q.  And then you say:  Def one for the books.  Right?

A.  Yes.

Q.  And what are those emojis next to it?

A.  A sweaty emoji with a monkey who's covering his ears.

Q.  And what do you say after that?

A.  I said:  Send me something.

Q.  OK.  And is this an example -- I think you spoke yesterday
about how you were good at making the escorts -- the
entertainers also feel that you were really enjoying it, right?

A.  Yes.

Q.  And is this an example of that?

P6bWcom1                        Jane - Cross

A.   I would say I'm being friendly here, yes.

Q.   He had said, you know, that was the roughest sex we ever had, and you said one for the books, right?

A.   Yes.

          MS. GERAGOS:  OK.  We could take this down now.

          I'm so sorry, your Honor.  I just need one more minute.

          THE COURT:  That's OK.

          MS. GERAGOS:  It's difficult for me to read.

          THE COURT:  OK.

          MS. GERAGOS:  Thank you for everybody's patience.

Q.   Do you remember, Jane, on direct examination, Ms. Comey asked you the average length of times of these hotel nights? Do you remember that?

A.   Yes.

Q.   And she asked you what the longest one you ever had was, and you said that you thought it was New Year's Eve 2022?

A.   Yes.

Q.   And you said that was, you thought, approximately --

          MS. GERAGOS:  I'm sorry about that.

Q.   And you thought it was approximately three days, right?

A.   Yes.

Q.   Do you remember New Year's of 2022, you were at Mr. Combs's home at Two Star Island?

A.   Yes.

P6bWcom1                    Jane - Cross

Q.   And he was having a New Year's Eve party, right?

A.   Yes.

Q.   And so then after the New Year's Eve party, he came over to your hotel?

A.   Yes.

Q.   And then there were about three -- I think you had said that you recall three men being there that night?

A.   Yes.

MS. GERAGOS:  And after that, if we could put in, under seal, Defense Exhibit 3038, which I understand Ms. Comey does not have an objection to.

MS. COMEY:  Correct.  No objection.

MS. GERAGOS:  And publish that for the witness and the jury.

If we could go to page -- if we could skip ahead.

THE COURT:  Has this been admitted?

MS. GERAGOS:  No.  This is just for the witness and the parties right now.

THE COURT:  OK.

MS. GERAGOS:  If I could just ask the witness to authenticate it.

Q.   Is this a text chain from January 1 of 2022?

A.   Yes, it is.

Q.   All right.  Is this between you and Mr. Combs?

A.   Yes, it is.

MS. GERAGOS:  We move for admission under seal, your Honor.

THE COURT:  All right.  3038 will be admitted under seal.

(Defendant's Exhibit 3038, under seal, received in evidence)

MS. GERAGOS:  All right.  It can now be published to the jury.

Q.  Is this a message chain between you and Mr. Combs that evening of the New Year's Eve party?

A.  Yes.

MS. GERAGOS:  OK.  If we could skip ahead to page 5.

Q.  All right.  Do you remember that after this New Year's Eve party --

MS. GERAGOS:  We don't have to zoom in right now.

Q.  -- after this party Mr. Combs went on a vacation with Gina?

A.  Yes.

Q.  And you saw that on her Instagram, I believe?

A.  Yes.

Q.  And after that, did you send him this message?

MS. GERAGOS:  If you could zoom in on the fifth page now.

Q.  If you could read what you said there.

A.  Yes.  I said:  It's not right how you're treating me right now and how you're doing me.  We had such an amazing New Year's

P6bWcom1                         Jane - Cross

Eve week together, and the last thing I would expect from you is coming at me sideways about a girl you like.  To even be speaking to me about another female, worried about her to me, is something I've never seen before.  You completely had your way and more with New Year's Eve week, just to send me home to worry about a doctor's visit, handling entertainment, accuse me of lying, then take another girl on vacation.  Ignoring us for days to prioritize that right now shows where your care is, and it's not for me.  Cold.  I'd never make you feel like that.  We have been so good.  You were telling me you love me, I'm your baby, how you're not going to use me, all to treat me like this.  Why?  You have me feeling so taken advantage of and regretting everything.

Q.  All right.  Was this a message that you sent on January 9?

A.  I did.

Q.  Was it approximately a week after the last hotel night ended?

A.  Yes.

Q.  And you sent this after you saw he was already on vacation with Gina, right?

A.  Yes.

Q.  And after you saw that, you had this amazing New Year's Eve week together and that he had taken Gina on vacation, you were considering breaking up with him, right?

A.  Yes.

Q.  And he had told you that if you wanted to leave the relationship or if it was as toxic as you were saying, that you were welcome to leave, right?

A.  That's what he would say, yes.

Q.  But is that what he said after this, after this time?

A.  I believe so.

MS. GERAGOS:  OK.  And if we could take that down.

Q.  You also spoke on direct examination, if you recall, about your birthday in 2022.  Do you recall that?

A.  Yes.

Q.  All right.  And you testified that you spent your birthday in 2022 at the Waldorf in Los Angeles, right?

A.  Yes.

Q.  And Ms. Comey asked you what, if anything, had Sean told you he had planned for your birthday, and you answered, he said we were going to go to dinner and just hang out and be with each other.  Do you remember that?

A.  Yes.

Q.  And she asked you were you expecting to have sex with other men on your birthday, and you answered definitely not, right?

A.  Yes.

Q.  And your birthday -- I'm not asking you the day -- is in early February, right?

A.  Yes.

MS. GERAGOS:  If we could go to what's already in

P6bWcom1                      Jane - Cross

evidence as Government Exhibit F-101, page 207.  And if we could put 207 and 208 side by side.

Q.  All right.  These are texts between you and Kabrale, right?

A.  Yes.

Q.  All right.  And if you look at the top left, he says to you, on January 28 of 2022:  What's up, love?  I'll be in L.A. on the 12th of February.  Right?

A.  Yes.

Q.  And you write:  Hey.  OK.  Sounds good.  Right?

A.  Right.  Yes.

Q.  And he says:  I was probably going to leave on the 14th, but if you want me to stick around longer to see you, I will. Right?

A.  Yes.

Q.  And that is -- around the 12th of February is not, is around the general time of your birthday, right?

A.  Yes.

        MS. GERAGOS:  OK.  And then on -- I'm having trouble seeing.

Q.  On the 5th of February, you say:  Hey, babe.  Happy Friday. You up?  Right?

A.  Yes.

Q.  And he responds shortly after, saying:  What's up, my love? Yes, I'm up.  Right?

A.  Yes.

P6bWcom1                    Jane - Cross

Q.   And what do you respond with?

A.   I say:  How are you?  It's my birthday weekend.  You showing me love.

Q.   And he says:  I've been well, just staying active.  Right?

A.   Yes.

          MS. GERAGOS:  OK.  If we could go to page 209.

Q.   And he says:  Right, your b'day Tuesday.  Correct?

A.   Yes.

Q.   And what do you say?

A.   I say:  I haven't forgot you with your L.A. dates.  I just didn't have an answer yet.

Q.   And he says:  Let me know what I can do for you, baby. Right?

A.   Yes.

Q.   And then what did you respond?

A.   I said:  Yes, hahaha.  I'll let you know.

Q.   And then what do you say after that?

A.   I said:  Make me a little personal video just for me.

Q.   He says:  I do my research, already had my calendar marked. Right?

A.   Yes.

Q.   And do you remember on January 29, which was just the next day, you saw Mr. Combs at his home in Los Angeles on Mapleton, on Mapleton drive?

A.   What was the date?  I'm sorry.

P6bWcom1                       Jane - Cross

Q.  On -- well, just the next day, after -- the beginning

messages aren't here, but on January 29 of 2022.

A.  That I was with Mr. Combs?

Q.  Yes.

A.  On January 29?  OK.

Q.  Do you remember that?  Or if not, I can show you something

to refresh your recollection.

A.  Yes, that would be great.

         MS. GERAGOS:  OK.  Can we just pull up only for the

witness and the parties Defense Exhibit 3320 at page 11.

Q.  OK.  Read this to yourself, not out loud, and tell me if it

refreshes your recollection that on January 29, you ended up

going to Mapleton and you saw Mr. Combs.

A.  OK.

         MS. GERAGOS:  You can take it down.

Q.  Does that refresh your recollection as to whether you saw

him that day?

A.  It's a vague memory, but I see here that I did go.

Q.  OK.  And then do you recall that you did not have a hotel

night that night?

A.  I don't think so.

Q.  OK.  And then you started to celebrate your birthday on the

5th of February, you went to Ocean Prime with Mr. Combs, right?

Do you remember that?

A.  Yes.

P6bWcom1                    Jane - Cross

Q.  OK.  And then we looked at those messages between you and Kabrale on the same day, right?

A.  Yes.

Q.  All right.  And you ended up, I think, testifying that you ended up seeing the Italian entertainer that night, what we'll call the Italian?

A.  Yes.

Q.  OK.  And it was after that birthday and that night that you -- then you testified that he had started dating another woman, right, and it was really heartbreaking for you?

A.  Yes.

Q.  And that woman is Caresha, right?

A.  Yes.

Q.  Her entertainment name is Yung Miami, right?

A.  Yes.

Q.  And she has a birthday approximately the same time as you, around the time as you, as you do, right?

A.  Yes.

Q.  And so after your birthday, you saw that Mr. Combs had taken Caresha on a yacht vacation, right?

A.  Yes.

Q.  And it was a big, beautiful celebration for her, right?

A.  Yes.

Q.  And so you had told him how upset and hurt you were, right?

A.  Yes.

P6bWcom1                         Jane - Cross

MS. GERAGOS:  If you could put up for -- it's already admitted, A10421, pages 6 and 7 side by side.  And then go to the bottom left.

Q.  You say to him:  I see the entire island vacation home.  The dressed up PJ, all the effort you've put into this.  That's why you were blowing me off on my birthday, acting like you had planned so much for us, because you knew I would see all of this and what a drastic thing this is.  Right?

A.  Yes.

Q.  OK.  And so when you saw that he was celebrating Caresha's birthday, that made you very upset and we already talked about how you FaceTimed him, right?

A.  Yes.

Q.  Do you remember making him come home a day early from this vacation?

A.  I do.

Q.  And what did you say?

A.  I said if you don't come here now, we're not going to do anything that you want to do.

Q.  You told him that you weren't going to have -- do you remember telling him you weren't going to have a Valentine's Day party with him?

A.  Yes.  That was the first time that I was so upset that I pulled that card, yes.

Q.  The hotel-night card?

P6bWcom1                         Jane - Cross

A.  Yes.

Q.  And do you remember telling him if you don't get your ass out of that island, we're not going to have a party?

A.  Yes, I do.

Q.  And on the left, you -- Ms. Comey asked you whether there were any times that you had planned, like, as a surprise, hotel nights for Mr. Combs.  Do you remember that?

A.  Yes.

Q.  And you had mentioned that, from what you could remember, two or three times, right?

A.  Yes.

Q.  And one of those times, you said, was maybe a Valentine's Day.  Was this the Valentine's Day that you were talking about?

A.  Yes.

        MS. GERAGOS:  OK.  If we could put up what's already in evidence side by side as Government Exhibit E119 and E120.

Q.  Now, are these two photos from that Valentine's Day?

A.  Yes.

Q.  All right.  Is this the hotel room for the hotel night?

A.  Yes.

Q.  All right.  And is -- I remember you mentioning on direct that you would typically -- not always, but typically -- get a suite at hotels for hotel nights, right?

A.  Yes.

Q.  And so on the left, that 119, is that the living room area?

P6bWcom1                    Jane - Cross

A.   Yes.

Q.   And 120, on the right, is that the bedroom area?

A.   Yes.

        MS. GERAGOS:  OK.  If we could put up side by side E121 and E122.

Q.   OK.  Who planned this decoration?

A.   I did.

Q.   OK.  And then what is the photo on the right?

A.   The photo on the right is a photo of probably a living space; I had decorated the room with red heart balloons, rose petals, candles.  I really liked romancing Sean in this way.

        MS. GERAGOS:  All right.  If we could put up 123 and 1 -- E123 and E124 side by side.

Q.   All right.  Is this the same, a different angle of the room, the living room area?

A.   Yes.

Q.   All right.  And you put "love" in rose petals on the entertainment set?

A.   Yes.

Q.   And more balloons we see here?

A.   Yes.

Q.   And on the left-hand side, that's the kitchen area?

A.   Yes.

        MS. GERAGOS:  All right.  If we could now, last one, put up E125.

Q.   And that's just another angle of the same room?

A.   Yes.

Q.   And do you remember after the end of this Valentine's Day he wrote you a note about this, and whatever those words were in the note you said meant the world to you.  Do you remember that?

A.   Do you have the note?  I don't really remember the note.

Q.   You don't remember the note?

A.   Yeah.  No.

        MS. GERAGOS:  That's OK.  We'll come back to that.

Q.   All right.  Do you remember that you were telling K.K. when you were planning this that you wanted to organize a few things to make this really cute and romantic for him?

A.   Yes.

Q.   Did she help you plan that, or were you just giving her a heads-up that you were coming?

A.   I think just a heads-up.

Q.   Did you suggest at this Valentine's Day hotel night that you could have two men in the same room at the same time?

A.   Yes.

Q.   Was that your suggestion or his suggestion?

A.   It was my suggestion.

Q.   And did that happen?

A.   It did.

Q.   You hadn't done that before in any hotel nights, right?

P6bWcom1                        Jane - Cross

A.  We had not.

Q.  Was Mr. Combs excited when he heard about that?

A.  Yes, he was.

Q.  And you proposed this idea, you know, just a few days earlier, you said that you did not enjoy the hotel night that you had on your birthday, right?

A.  Yes.

MS. GERAGOS:  All right.  If we could jump ahead to E209, which is in evidence.

Q.  All right.  Is that a photo of Mr. Combs at Nobu?

A.  Yes.

Q.  And you took this photo?

A.  Yes.

Q.  All right.  And tell me about this night.

A.  I think we had just went out to eat dinner at Nobu before a hotel night.

Q.  So this was a time that you guys went to dinner with each other before a hotel night had even started?

A.  Yes.

Q.  And you went to Nobu in Miami?

A.  Yes.

Q.  Can you tell the jury what Nobu is?

A.  It's a high-end sushi restaurant in Miami.

Q.  And is that the Nobu chef that's with him?

A.  Yes.

P6bWcom1                          Jane - Cross

Q.  And is that a bottle of DeLeon tequila?

A.  Yes.

Q.  And is that Mr. Combs's at the time, the tequila company that he was affiliated with?

A.  Yes.

Q.  And so you were -- why did you take this picture?

A.  I thought he looked nice.

Q.  And -- OK.  So then if we could --

    After this, after this photo and you went to Nobu, you had a hotel night with Paul and Don.  Does that ring a bell?

A.  Yes.

        MS. GERAGOS:  All right.  If we could go to Defense Exhibit 3044 for the parties and the witness.

        If you could put the two pages side by side so she could see it.  Thank you.

Q.  Is this a text message chain between you and Mr. Combs that begins on March 2 of 2022?

A.  Yes.

        MS. GERAGOS:  All right.  I believe there's no objection, your Honor, for us admitting this under seal.

        MS. COMEY:  No objection, your Honor.

        THE COURT:  All right.  The exhibit will be admitted under seal.

        (Defendant's Exhibit 3044, under seal, received in evidence)

P6bWcom1                         Jane - Cross

MS. GERAGOS:  We can publish this to the jury now.

Thank you.

Q.  All right.  So on these two pages, are you coordinating coming to Miami for that trip where you guys went to Nobu?

A.  Yes.

MS. GERAGOS:  OK.  If we could go to page 9 -- 9 and 10.  All right.

Q.  Is this the same text message thread but from March 14?

A.  Yes.

Q.  All right.  And here, Mr. Combs says:  Everyone can post. Fuck it.  I can't keep up.  Have a beautiful day, beautiful. Right?

A.  Yes.

Q.  And what do you say in response?

A.  I said:  Nah.  Have her delete all that shit, like you made me delete a food post.

Give her my love bracelet too so she can match that necklace you all copied for her too.

Now you want to say fuck it after giving me anxiety and feeling unwelcome, on my toes.  Nah.

So you want to put --

Q.  Do you then say your true name?

A.  Yes.

Q.  OK.  Go ahead.

A.  Anyway:  But now you want to say fuck it, it's cool.  Oh,

P6bWcom1                         Jane - Cross

now it's cool?  LOL.  Nah.

I'm moving a past this because it's beneath me, but this is not cool.

Q.  He says:  Have a good day, baby.  Right?

A.  Yes.

Q.  Is this a fight that you guys are having the hotel night because you see that Gina's wearing a love necklace that matched the love bracelet he had got you?

A.  Yes.  After these nights -- they were really emotionally excruciating after so to see these things were deeply hurtful for me.

Q.  And you had picked out -- I think you testified yesterday you had picked out a love bracelet in the beginning of 2021, right?

A.  Yes.

Q.  And then he surprised you with that bracelet, right?

A.  Yes.

Q.  And then you saw a photo where Gina had posted on Instagram, right?

A.  Yes.

Q.  And in that photo, Gina was wearing the same, the matching love bracelet, but the necklace, right?

A.  Yes.

Q.  And this upset you because she posted it on her public Instagram, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.  Yes.

Q.  And you were upset that he had made you delete a food post that would indicate you were with him?

A.  Yes.

Q.  And so when you said give her my love bracelet too so she can match that necklace you all copied for her, that's in reference to Gina?

A.  Yes.

MS. GERAGOS:  And if we could -- this is March 14, 2022, right?  OK.

If we could take this down and bring up Government Exhibit A10425, which is already in evidence.  If we could go to pages 2 and 3 just to orient ourselves for the dates.  All right.

Q.  This is March 27, right?

A.  Yes.

MS. GERAGOS:  All right.  Could we go to pages 8 and 9, side by side, please.

Q.  Mr. Combs texts you here, right, and this is April 4, 2022?

A.  Yes.  April 4 --

Q.  Texting you, yes.  On the left-hand side he's texting you, and your response is on the left-hand side, right?

A.  Yes.

Q.  OK.  And he tells you:  I've been having crazy fantasies about Leo, you and Leo.  LOL.  Right?

P6bWcom1                    Jane - Cross

A.   Yes.

Q.   Who was Leo?

A.   This Italian entertainer.

Q.   That's the guy you guys referred to as Italian?

A.   Yes.

Q.   OK.  And what do you say in response?

A.   I said:  I'll figure out what time I can make my way there. I really want to figure out our solutions because I really feel like we waste time fighting.  Oddly I thought you had it in your mind.  Let's talk when I see you.  Let me figure out my timing first.

          MS. GERAGOS:  And if we could go to the next page, next two pages.

Q.   And what do you tell him?

A.   I say:  Baby, I want to make love to you.  I haven't selfishly -- I haven't selfishly had you to myself for five months.  I'm fine with the other stuff, but I really just need you right now.

Q.   And he says:  OK.  Whatever you want.  Right?

A.   Yes.

Q.   That's what he says?

A.   Yes.

Q.   And you say:  I really just need you right now.  Right?

A.   That's what he says.

          MS. GERAGOS:  OK.  And then take down that zoom, this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6bWcom1                         Jane - Cross

zoom.

Q.   And then he says:  Are you horny, or is it just me?  What you been thinking about.  Right?

A.   Yes.

Q.   And you laugh at his are you horny, or is it just me, right?

A.   Yes.

        MS. GERAGOS:  All right.  Let's go to the next two pages.

Q.   You say:  It's me too; and then you send him a message and say:  What you been thinking about?  Right?

A.   Yes.

Q.   OK.  And then after two more messages, he says:  See if the Italian is free at all today after we spend some one-on-one time.  Right?

A.   Yes.

        MS. GERAGOS:  OK.  If we could go to the next two.

Q.   And he says:  How many you got for me, question mark.  Right?

A.   Yes.

Q.   And you say:  Like, 100.

A.   Yes.

Q.   And then what do you say?

A.   I said:  Hey, tomorrow works much better for me to link up.  I tried for today, but no *bueno*.  Tomorrow around 12:30 or 1 I

P6bWcom1                        Jane - Cross

can be free.  Let me know if it works for you.

Q.  And he says:  Tomorrow's bad for me.  What about this weekend?  Right?

A.  I said -- yes.

Q.  And he doesn't say anything about no, it has to be today, or he doesn't change things to make it tomorrow; you guys are just planning a different day to see each other and perhaps reach out to the Italian, right?

A.  This is vague, but, I -- I don't know.  Around this time I probably still made this happen.

Q.  And he says:  Tomorrow's bad for me.  What about this weekend, right?

A.  Yes.

Q.  OK.  And you say:  Yes, this weekend works.  Right?

A.  Yes.

Q.  And then he asks you to FaceTime him, right?

A.  Yes.

Q.  OK.  Even though you guys weren't going to have a hotel room that night, he still wanted to see you over FaceTime, right?

        MS. COMEY:  Objection, your Honor.

        MS. GERAGOS:  Let me rephrase, your Honor.  I apologize.

Q.  Even though you guys -- you did not plan a hotel night this night, right?

P6bWcom1                        Jane - Cross

A.   I'm uncertain because in that FaceTime -- so many things could have happened in that FaceTime, where a hotel night ensued here despite him saying the weekend or trying to reschedule.

Q.   OK.  So you're not sure what happened after this FaceTime, but in response to you saying yeah, this weekend works, he says:  Can you FaceTime so I can see you?

A.   Yes, that's what he says.

Q.   OK.  All right.  Do you remember that about ten days later, on April 13, you had another hotel night?

A.   April 13, 2022?

Q.   Yes.

A.   Maybe.

Q.   All right.  And then do you remember not having any hotel nights with Mr. Combs for the next two months?

A.   Yes, maybe.

Q.   OK.  Do you remember seeing him on April 14 and not having a hotel night?

A.   Maybe.  I'm uncertain.

Q.   OK.  Can I show you something that may refresh your recollection?

A.   Yes.

          MS. GERAGOS:  OK.  Can I show you what's been marked for identification, just for the witness, 3259, please.  If you could read that just to yourself --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6bWcom1                       Jane - Cross

THE WITNESS:  Yes.

MS. GERAGOS:  And that is the wrong exhibit.  I'm so sorry.

If we could bring up Defense Exhibit 3310, page 549.

OK.  If you could, just the bottom part.

Q.  Look at the date, if you can look at that.  Just read it only to yourself and see if that refreshes your recollection as to whether you saw Mr. Combs on April 14.

A.  This is somebody's notes.

Q.  You don't have to say what it is.  It's just -- if it refreshes your recollection, let me know.  If not, no problem.

A.  Oh, I see.  Right here.

MS. COMEY:  Your Honor, may I ask that the witness read it and then take the document down and then ask the question, please?

THE COURT:  Jane, just so it's clear, just take a look at what you see, and without commenting on anything that's in the document, Ms. Geragos is just asking if your memory gets refreshed by what you see.  If it doesn't, then just let Ms. Geragos know.  If it does, then you can also let her know that.

THE WITNESS:  OK.

THE COURT:  Take a second to look at the document, and let us know when you're done.  And then we can take the document down.

P6bWcom1                          Jane - Cross

THE WITNESS:  OK.  Thank you.

I see the document.

BY MS. GERAGOS:

Q.  Does that refresh your recollection as to whether you were with Mr. Combs on April 14 of 2022?

A.  I don't remember this night, but if what I see here is correct --

THE COURT:  That's OK.

Ms. Geragos.

The question, for these purposes, it's just yes or no.

Q.  All right.  And do you remember seeing him several more times before June of that year, your next hotel night?

A.  Yes.

Q.  All right.  Do you remember seeing him on April 20 of 2022 at his home?

A.  I believe so.

Q.  And you didn't have a hotel night that night, right?

A.  I don't think so.

Q.  OK.  And then you spent the night and were with him April 21 OF 2022.  Do you recall that?

A.  I don't.  But maybe, yes.

Q.  It sounds like that you saw him, spent the night, were with him the next day and did not have a hotel night on April 21, 2022?

MS. COMEY:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6bWcom1                        Jane - Cross

THE COURT:  Sustained.

BY MS. GERAGOS:

Q.  Can I show you something that would refresh your recollection as to whether you saw him on April 21 of 2022?

A.  Yes.

MS. GERAGOS:  OK.

Can we pull up Defense Exhibit 3310, page 590, for the witness only.

Q.  All right.  If you could just read that only to yourself, Jane, and then let me know when to take it down, and I will ask you a question.

A.  OK.

Q.  All right.  Does it refresh your recollection as to whether you saw Mr. Combs on April 21 of 2022?

A.  I'm sure I did.

Q.  OK.  And that you did not have a hotel night that night?

A.  No.

Q.  And do you remember seeing him a week later several times and not having a hotel night either?

A.  Yes, maybe.

Q.  OK.  And do you remember then not having several more -- not having any more hotel nights until the end of June of 2022?

A.  Yes, maybe.

MS. GERAGOS:  OK.  All right.  I want to bring up what's admitted as Government Exhibit A-104-30.  And if we

P6bWcom1                     Jane - Cross

could go to page 3.

Q.  All right.  This a text message chain between you and
Mr. Combs?

A.  Yes.

Q.  OK.  And then you write on the left -- what do you write on
the left?

A.  I said:  I'm on a good vibe.  I'm with you.  How about you?

Q.  OK.  And HBU is a shorthand for how about you, right?

A.  Yes.

Q.  OK.  And that's sent on June 19 of 2022?

A.  Yes.

Q.  And he says:  What you in the mood for?  Right?

A.  Yes.

Q.  And what do you say?

A.  I say:  A good time.

Q.  And he says:  Night.  Right?

A.  Yes.

        MS. GERAGOS:  And then if we could go to the next two
pages, please.

Q.  You questioned night, and he says:  What?  LOL.  Talk to
me.  Right?

A.  Yes.

Q.  And you say:  What's up?  Right?

A.  Yes.

Q.  And what does he say?

P6bWcom1                    Jane - Cross

A.  He says:  You plan something for me.

MS. GERAGOS:  And if we could go to the next two pages.

Q.  And what do you tell him?

A.  I say:  I know what you want, baby, but not really in the mood for that part.  Don't want to make you mad.

Q.  And what does he respond with?

A.  All good.

Q.  And what do you say?

A.  OK.

Q.  And he says:  So what we doing?  Right?

A.  Right.

MS. GERAGOS:  All right.  And if we could go -- skip ahead in the same chain and go to pages 12 and 13, side by side.

Q.  He says:  Surprise me with a freak role play.  Right?

A.  Right.

Q.  And what do you say?

A.  I said:  I'm feeling good, I'm happy, if you want to keep going or if it's time -- or if it's rest time.  I'm down for whatever.  And then I put a heart on surprise me with a freak-off role foreplay.

Q.  OK.  And then what do you say?

A.  I say -- I said -- I'm sorry.  I can't see.

MS. GERAGOS:  I know.  It's quite difficult to see

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6bWcom1                         Jane - Cross

today.  If we could zoom in on that.  Thank you.

A.  I said:  I love that we go strong so good.

    And then I say:  Hmm.

    I say:  New friend of Rico's.

Q.  OK.  Do you recall --

    MS. GERAGOS:  If we could put this down.  Take it down.

Q.  Do you recall that you, that you did not have a hotel night that night?

A.  I do recall that.

Q.  And he did not make you or suggest to you that you needed to have entertainment that night?

A.  We had here what we call movie night, yes.

Q.  And movie night is, I think you said yesterday, is when you just watched old videos -- not old videos, but videos that you had recorded during hotel nights just between the two of you, right?

A.  Yes, or pornography.

Q.  OK.  Or pornography, so it could be either?

A.  Yes.

Q.  OK.  And so at this time it had been -- your last hotel night had been over two months beforehand, right?

A.  Maybe, yes.

Q.  And you told him here you're not in the mood for that tonight, and he said all good, right?

P6bWcom1                        Jane - Cross

A.   Yes.

Q.   And then he suggests the freak role play, right?

A.   Yes.

Q.   Which is the role play that you had testified about, which is essentially when you have fantasy talk, right?

A.   Yes.

        MS. GERAGOS:  OK.  So if we are now in June of 2022, could we put up for the witness and the parties only Defense Exhibit 3061.

Q.   And is this a text message chain between you and Mr. Combs on July 19 of 2022?

A.   Yes, it is.

        MS. GERAGOS:  OK.  And this is an exhibit, your Honor, that corresponds to A510A, which is not yet admitted, but we're going to seek to admit this under seal without objection from the government, I believe.

        MS. COMEY:  No objection.

        THE COURT:  All right.  It will be admitted under seal.

        (Defendant's Exhibit 3061, under seal, received in evidence)

        MS. GERAGOS:  All right.  If we could go to pages 2 and 3 next to each other.

Q.   What do you say to him?

A.   I say to him:  What you been thinking about?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6bWcom1                          Jane - Cross

Q. And he says:  I ain't been.  Just started to feel better. Ten is too long.

And then he says:  Everyone is booked.  Call Italian.  Paul is free.  Right?

A. Yes.

Q. And you said:  I did.  Waiting to see if he's free now, and you liked Paul is free, right?

A. Yes.

Q. So on the iPhone you click that message and emphasize the liking, liking it, right?

A. Given that I had to choose between this, I put a like on Paul.

Q. I'm asking on the iPhone, when you saw the message that said Paul is free --

A. Yes.

Q. -- you saw that message and you had pressed it and pressed the, like, thumbs-up button on the iPhone, right?

A. Yes.

Q. And what in this message says that you had to choose Italian or Paul?

A. In this text he's giving me an option to choose between Paul or Italian.

Q. You say:  What you been thinking about.  Right?

A. Prior to this is there conversation?

MS. GERAGOS:  Why don't we go to pages 1 and 2, side

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6bWcom1                          Jane - Cross

by side.

Q.  All right.  Does he -- you love his message where he says: I'm jerking my dick thinking about how nasty you're going to be.  Right?

A.  Yes.

Q.  And you respond with mmm and two kiss-face emojis, right --or kiss emojis?

A.  Yes.

Q.  And you tell him that you're freshening up now, right?

A.  Yes.

Q.  He asks you what you've been thinking about, right?

A.  Yes.

Q.  And you tell him how you're excited to see him and how good that he makes you come and how much you miss it, right?

A.  Yes.

Q.  And then you ask him what he's thinking about, right?

A.  Yes.

Q.  And so he responds to your message asking, where you're asking him what you're thinking about, right?

A.  He asked me what I'm thinking about, and so I'm asking him what he's been thinking about.

Q.  And so he responds and says:  Call Italian or Paul is free. Right?

A.  Yes.

Q.  And you liked Paul is free?

P6bWcom1                    Jane - Cross

A.   Yes.

Q.   And just to reorient ourselves, this is July of 2022, right?

A.   Yes.

Q.   And it had been three months since your last hotel night, right?

A.   Maybe.

Q.   So here, he said:  Call Italian or Paul is free.  Right?

A.   Yes.

Q.   And so there was -- he wasn't giving you a choice.  He said -- you asked him what he was thinking about, right?

A.   Yes.

Q.   And that's what he was thinking about?

A.   Yes.

Q.   And your response is to like -- which is to give a thumbs up on the iPhone, right?

A.   Yes.

Q.   -- the Paul is free message?

A.   Yes.

        MS. GERAGOS:  All right.  And if we could go to -- I think this is page 1 and 2.  If we could go to 3 and 4 now.

Q.   And he says:  I don't want to wait until 10.  LOL.  I want to watch some porn.  Right?

A.   Yes.

Q.   OK.  And then do you exchange some messages about you guys

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P6bWcom1                    Jane - Cross

getting ready?

A.  Yes.

Q.  OK.  And what do you send him?  What is that emoji on the bottom left?

A.  It's an emoji with the tongue out.

Q.  OK.  And you say yes.  What are you saying yes to, to him getting a haircut?

A.  Yes.

Q.  And then you ask him:  Let me know where we're meeting when you know.  Right?

A.  Yes.

Q.  And then you tell him you are heading to the store, then the London hotel, right?

A.  Yes.

Q.  And he responds:  I told Paul 11.  Is that cool?

A.  Yes.

Q.  He's asking you whether it's cool that Paul would come at 11, right?

A.  These are my options, yes.

Q.  And he says:  I don't want to wait until 10.  I want to watch some porn, on the page before.  Right?

A.  Yes.

Q.  And that would just be with you and him, right?

A.  Yes.

Q.  OK.  And then on the next page you ask him let me know when

P6bWcom1                         Jane - Cross

we're meeting --

            MS. GERAGOS:  If we could go back.

Q.  -- and he tells you the London hotel?

A.  Yes.

Q.  And you tell him you're heading to the store.  What store?

A.  Sex store.

Q.  OK.  To get outfits?

A.  Yes.

Q.  What else would you get?

A.  I'd get stripper's shoes.  I would get lube.  I would get male erection pills or liquids.  I would get shorts.  I would get, maybe whips.

Q.  OK.  So what are the shorts for?

A.  The shorts are for Sean and Paul.

Q.  OK.  And is that something you liked them to wear?

A.  Given my circumstances, I was really turned off whenever these men would come in with their regular shorts, and so I started incorporating shorts for them as well for these nights just so I could find them attractive.

Q.  And Mr. Combs would wear matching shorts with the entertainers?

A.  Yes.

            MS. GERAGOS:  Can we put that -- thank you.

Q.  And so you would get them matching shorts at the sex store?

A.  Yes.

P6bWcom1                          Jane - Cross

Q.   OK.  And the male erection pills, is that for the entertainer or for Mr. Combs or for -- who would that be for?

A.   It was really -- it was really not so fun having to wind up these guys and wait for them to be erect.  And so in order to cut my time with these entertainers, I started to get these on the side so that they can kind of start being erect already.

Q.   OK.  So you didn't want them to do any hard drugs, but you would give them these pills from the sex store, right?

A.   I figured pills at the store weren't as unhealthy as actual street drugs.

Q.   And what were the pills called?

A.   Rhino.

Q.   Rhino pills?

A.   Yes.

        MS. GERAGOS:  OK.  If we could put that exhibit back up.  I don't know if we're having technical difficulties.

        THE COURT:  We're having an issue with the screens as well.

        MS. GERAGOS:  There we go.  I thought it was just mine.

Q.   All right.  He says:  I told Paul 11.  Is that cool. Right?

A.   Yes.

Q.   He's telling you the time, and he's wanting to know if that's cool with you, right?

                   SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

P6bWcom1                         Jane - Cross

A.   Yes.

MS. GERAGOS:   All right.   If we could go to the next two pages.

Q.   He says:   Or 11:30.   Right?

A.   Yes.

Q.   And then you say:   Yeah, 11:30?

A.   Yes.

Q.   And then you guys talk about certain things that you're getting, items you're getting from the store, right?

A.   Yes.

MS. GERAGOS:   If we could go -- jump ahead to pages 12 to 13; we're at July 19 here.   But jump ahead to pages 12 to 13.   OK.   And if you could --

Q.   He says:   How are you?   Checking in -- on July 21.   Right?

A.   Yes.

Q.   This is a few days after?

A.   Yes.

Q.   And you say:   Hey, babe.   I'm good.   Just took a nap. Getting up now.   Right?

A.   Yes.

Q.   And then he -- the next page you say:   You did say you wanted to go apeshit.   LOL.   Right?

A.   Yes, I loved pleasing my partner.

Q.   You loved pleasing him, right?

A.   I do.

P6bWcom1                         Jane - Cross

Q.  And you thought he had a really good time that night,

right?

A.  I think he did.

Q.  OK.  And you said:  Whew.  OK, baby.  Enjoy the birthday.

Last night was amazing.  Right?

A.  Yes.

Q.  And then later in the message, you tell him:  Hi, baby.

Hope you're feeling good and caught up on rest.  The video

looks incredible, with the fire emoji.  Right?

A.  Yes.

        MS. GERAGOS:  OK.  If we could just bring up Defense

Exhibit 3062 for the witness and the parties only.

        Your Honor, this is a corresponding exhibit to what's

been admitted as A510B and A510C, just for the record.

Q.  And Jane, is this a message between you and Mr. Combs on --

UTC time July 22, 2022?

A.  Yes.

        MS. GERAGOS:  Your Honor, without objection, I

believe, from the government, we seek to admit this under seal.

        MS. COMEY:  No objection.

        THE COURT:  All right.  Defense Exhibit 3062 will be

admitted under seal.

        (Defendant's Exhibit 3062, under seal, received in

evidence)

BY MS. GERAGOS:

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

P6bWcom1                         Jane - Cross

Q.   OK.  And if you look at page 2 on this exhibit, on the right-hand side, you write to Mr. Combs:  Morning, baby.  I had a great time with you.  LOL.  Right?

A.   Yes.

Q.   What do you say after that?

A.   I said:  You're the cutest -- you're best and the cutest. Let me know what time you're leaving.

Q.   With some emojis as well, right?

A.   Yes.

          MS. GERAGOS:  If we could go to pages 5 and 6 of this exhibit.  All right.

Q.   He says:  Want to do dinner at nine.  Right?

A.   The next day?

Q.   The next day, yes.

A.   Yes.

Q.   And he says:  Pack a freak bag just in case.  Right?

A.   Yes.

Q.   And do you remember that you did not have a hotel night after this night?

A.   I'm not sure, to be honest.

Q.   OK.  Can I show you -- would it help if I showed you something to refresh your recollection, whether you just went to his house that night?

A.   Sure.

          MS. GERAGOS:  OK.  Can I show you Defense Exhibit 3310

P6bWcom1                        Jane - Cross

at page 1189, just for the witness and the parties, please.

Q.  All right.  If you could take a look at this and let me
know if that refreshes your recollection.

A.  Is this --

Q.  My only question is --

          MS. GERAGOS:  Take it down, so I can ask my question
again.

Q.  My only question is -- my question was, do you recall that
on July 23, 2022, you saw Mr. Combs and you did not have a
hotel night that night?

A.  I'm sure, maybe, I saw him here.  Whether we had a hotel
night or not is unclear.

Q.  OK.  And he had said in that text message chain, pack a
freak bag in case, right?

A.  Yes.

          (Continued on next page)

P6BQcom2                          Jane - Cross

BY MS. GERAGOS:  (Continued)

Q.  And what does that mean to you?

A.  It means pack lingerie, high heels and things that he likes, just in case we have a hotel night or just being together and have a movie night.

Q.  So pack a freak bag doesn't necessarily mean that you will have a hotel night, right?

A.  Not necessarily.

MS. GERAGOS:  Okay.  And if we could bring up 3064 for the witness and the parties only, which, for the record, is the corresponding Exhibit to Government Exhibit A-510-D.

Q.  Is this a text message chain between you and Mr. Combs on July 27 of 2022?

A.  Yes.

MS. GERAGOS:  Your Honor, we seek to admit this under seal, please.

MS. COMEY:  No objection.

THE COURT:  Exhibit 3064 will be admitted under seal.

(Defendant's Exhibit 3064 under seal received in evidence)

Q.  This is on July 27, as I said, right?

A.  Yes.

Q.  If we could skip ahead to 5 and 6.

He says here on July -- well, it's UTC time July 28 but July 27:  What you wanna do, right?

P6BQcom2                    Jane - Cross

A.  Yes.

Q.  You say:  See you.  I'll be home in 30.  I may be able to link later tonight, right?

A.  Yes.

Q.  And you say -- what do you say?  What does that mean?

A.  I said:  What are you doing baby?  Horny for me?  With flirtatious emojis.

Q.  Those are the smirk emojis, which are sometimes flirtatious, right?

A.  Yeah.

Q.  And then he says:  Hell yeah, right?

A.  Yes.

Q.  And you send him several different emojis back?

A.  Yes.

Q.  He says:  Can you?  I am about to work out with Paul and want to meet up with you.

A.  Yes.

Q.  What does "can you" mean -- what did "can you" mean to you in this message?

A.  I don't know what -- maybe I think it was an unfinished text that meant Can you see me.

Q.  Okay.  And I'm about to work out with Paul.  Then want to meet up with you, right?

A.  Yes.

Q.  Was Paul also Mr. Combs' trainer?

P6BQcom2                        Jane - Cross

A.  I believe so, yes.

Q.  Did Paul help Mr. Combs with his fitness from what you understood?

A.  Yes.

Q.  And so he says:  Then want to meet up with you.

And you say:  Hair up?  Right?

A.  I believe there's probably a FaceTime in between these texts, and I probably agreed to see him, yes.

Q.  And on the FaceTime, would you have said or -- the response to this message is:  Hair up?  Right?

A.  Yes, I see that he's bringing up Paul here.

MS. GERAGOS:  If we could skip ahead to pages 8 and 9, please.

Q.  And he says at the bottom:  What time we ready?  Ready, right?

A.  Yes.

Q.  And you laugh at "ready"?

A.  Yes.

Q.  So that's a response -- like an iPhone response, right?

A.  Yes.

Q.  And then you respond with several laugh crying emojis?

A.  Yes.

Q.  And he says:  Okay, what are you doing?  Did you want to hit Italian, right?

A.  This is the option he's giving me, yes.

P6BQcom2                      Jane - Cross

Q.  He asks you a question:  Did you want to hit Italian?
Isn't that what he does there in that text messages?

A.  Yes.

Q.  And your response is:  Kind of icked out up by his boo-boo
RN, which means right now, right?

A.  Yes.

Q.  So you're telling him you don't want to see Italian, right?

A.  Yes.

          MS. GERAGOS:  Can we go to the next page?

Q.  And he says:  No go.  Pretty immediately after you say
"kind of icked out," right?

A.  Yes.

Q.  His response then two minutes after:  P is all we need,
with a laughing crying emoji?

A.  Yes.

Q.  So when you say you're icked out by the Italian, he says
"No go," right?

A.  Yes.

Q.  You do not have to see the Italian?

A.  Yes.

Q.  And then he says:  P is all we need.  I think you testified
that you understood P as Paul?

A.  Yes.

Q.  He says:  LOL with a laughing emoji, right?

A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6BQcom2                          Jane - Cross

Q.   And you respond:  Right, LOL, right?

A.   Yes.

Q.   And then what do you say?

A.   I said:  Once I get in my car, I'll have to stop at store. Unless you want to get a head start and grab a couple things so we don't waste time or ...

Q.   So after he says:  Paul is all we need, you tell him you will go to the store and get -- unless you want him to get a head start, right?

A.   Yes.

Q.   What do you mean by a head start?

A.   That he can just go to the hotel ahead of me.

Q.   Okay.  To get there quicker, to have this start quicker?

A.   I believe so, yes.

Q.   And then do you recall that after this hotel night, you spent several his days with him at his home?

A.   Yes, maybe.

         MS. GERAGOS:  I want to go ahead to Defense Exhibit 3071-R, please.  Just make sure it's the redacted version, and put it up for the parties and the witness.

         Your Honor, can you give me one moment to confer to make sure it's the redacted version?  Thank you.

         (Pause)

         MS. GERAGOS:  Your Honor, we are going to put up 3071, which we will name 3071-R with the agreement of the parties to

P6BQcom2                        Jane - Cross

redact certain messages.

MS. COMEY:  Yes, your Honor.  So long as what I requested be redacted is redacted from pages 5 and 6 of this exhibit, I have no objection, and as long as those images are not shown to the jury, I have no objection.

THE COURT:  So 3071-R will be admitted under seal.

MS. GERAGOS:  Thank you, your Honor.

(Defendant's Exhibit 3071-R received in evidence)

Q.  Are these messages, Jane, between you and Mr. Combs starting on August 9, 2022?

A.  Yes.

Q.  And if we could go to page -- first, do you remember that on August 30, Paul came to your home that you were living in at the time, and you had a night in your home with Paul and Mr. Combs?

A.  Umm, I do remember something like that, yes.

MS. GERAGOS:  Okay.  So could we go to page 15, please.

Q.  And your message is on August 31 of 2022 here, UTC time.  Can you read what you write starting with the third message?

A.  I had so much fun, baby.  I'll be waiting for you.  Love you.

Q.  And what do you write after that?  It's two hours later?

A.  I said:  Baby love, before you lose service, I just genuinely wanted to tell you how much I appreciate your love

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6BQcom2                        Jane - Cross

and care for me.  I got on my knees and had a heartfelt thank you to God for my healthy --

Q.  You say for your healthy child, right?

A.  Yes.

And for our genuine friendship.  I will never take you for granted and will always make sure you always feel loved and supported by me.  My love for you is unconditional and for life.  Wishing you the most beautiful eye-opening heart chakra spiritual journey, loving trip.  Love you so much.

Q.  And you sent him several emojis, right?

A.  Yes.

Q.  And this was after your night with Paul and Mr. Combs at your home?

A.  And these nights, these feelings that I have and what I'm exuding are my feelings directed straightly just for Mr. Combs.

Q.  And that's what he received from you, right?

A.  Yes.

Q.  Okay.  Because you really did love him, right?

A.  Definitely.

Q.  And I think you testified yesterday that you felt -- what you really loved and craved about these nights were the closeness that you and him had after the entertainer left, right?

A.  Any time with him I loved.

Q.  And so then you sent this message to him and that's what he

P6BQcom2                              Jane - Cross

received after this night, right?

A.  Yes.

Q.  If we could un-zoom.

        And then he sends you, I think those are called bitmojis, is that what that is?

A.  Yes.

Q.  Do you remember -- this is August 31.  Do you remember seeing him several times in September and not having a hotel night of 2022?

A.  Yes, maybe.  I'm not sure.

Q.  Okay.  Do you remember seeing him -- do you remember seeing him on September 9 of 2022?

A.  I'm not sure, but if you have something to jog back my memory, I would love to see it.

        MS. GERAGOS:  Let's put up E-191-M, which is admitted.  Government Exhibit E-191-M.

Q.  Do you see the create date there says September 23, 2022 -- I'm sorry -- September 4 of 2022 -- I'm sorry.  If we could go down to create date/time, do you see how the create date says September 23, 2022?

A.  Yes.

Q.  In that photo, is it you and Mr. Combs?

A.  This is me and Mr. Combs.

Q.  Is that his house at Mapleton?

A.  This is us at the studio.

P6BQcom2                    Jane - Cross

Q.  Oh, this is a studio?

A.  Yes.

Q.  This is one of the times that you -- when he was recording his album, you would go to the studio?

A.  Actually, this is after a rehearsal.

Q.  Rehearsal for a show he had in September?

A.  Yes.

Q.  And you went over to his house after that?

A.  Yes.

Q.  I know that you talked about the -- the 5- to 7-inch heels that you would wear during hotel nights.  This is not it, right?

A.  No, these are not.

Q.  These are more of your kind of everyday heels, right?

A.  Yes.

Q.  That you would have worn on a normal day to day, right?

A.  Yes.

Q.  And then do you remember seeing him several more times throughout that month and not having a hotel night?

A.  That is incorrect.

Q.  That's incorrect?

A.  Yes.

Q.  You saw -- you had a hotel night at the end of the month in Las Vegas, right?

A.  This photo jogged my memory back, and I can tell you about

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

it, if you'd like, where I remember a hotel night.

Q.   You remember hotel night on September 4?

A.   After this night, we go back to his place.  We take a private jet to Vegas.  He performs.  And after that performance, we have a hotel night with an entertainer.

Q.   On September 24, right?

A.   Can't recall the date, but I know it was a couple days later we went to Vegas and had a hotel night with an entertainer.

          MS. GERAGOS:  Let's bring up that photo.  Let's look at G-E-193 and 193-M next to each other, please.

Q.   Is that the jet that you take to Las Vegas?

A.   Yes.

Q.   And did your friend also go with you on that?

A.   Yes.

Q.   And that was taken the 24th, right?

A.   It says created date/time September 4, 2024.

Q.   If we go down to the created date time that's being highlighted right now, it's the 24th?

A.   Yes.

Q.   Okay.  So that was then when you went to Vegas and you had a hotel night in Vegas after he flew you and your friend there?

A.   Around this time, he hosted an event, and I remember -- I remember those heels because I wore that same outfit on the plane at the event, and then it led into a hotel night.

P6BQcom2                        Jane - Cross

Q.  Got it.  Okay.  Do you remember seeing him several times the week before on September 18 and September 20?

A.  I'm uncertain.

MS. GERAGOS:  Okay.  Let's bring up just for the witness Defense Exhibit 3310 at page 4375.

Q.  Does this refresh your recollection -- please read it to yourself.

A.  Okay.

MS. GERAGOS:  If you could take it down.

Q.  Does that refresh your recollection as to whether you saw Mr. Combs on September 18 of 2022?

A.  Yes.

Q.  Did you go to a concert with him that night and had no hotel night?

A.  I can't recall.

Q.  But it refreshes your recollection that you saw him that night?

A.  I mean, based off what I saw, I guess I was there with him.

Q.  Do you remember seeing him two days later on September 20 and not having any hotel night with him either?

A.  I can't recall.

MS. GERAGOS:  Can we bring up for the witness 3310 at page 4376.

Q.  Please just read this to yourself and tell me once you're done, let me know, and I'll take it down.

A.   Okay.

Q.   All right.  Does that refresh your recollection as to whether you saw him on the 20th of September of 2022?

A.   I guess I did.

Q.   Okay.  Do you remember that it's about a couple weeks after these messages that you first reach out to Antoine?

A.   Maybe, yes.

Q.   Do you need to see something to refresh your recollection or does that sound right to you?

A.   Sure.

MS. GERAGOS:  Could we bring up 3309, page 3, for just the witness and the parties, please.

Q.   Read this to yourself.

A.   Okay.

Q.   You could take it down.  Does that refresh your recollection as to whether in the beginning of October you then reached out to Antoine?

A.   Yes.

Q.   And then you continue seeing Mr. Combs throughout 2022. Does that sound right?

A.   Yes.

Q.   And there were several more -- there were several more times that you saw him without a hotel night, right?

A.   Yes.

Q.   All right.  So do you remember on direct examination and

P6BQcom2                         Jane - Cross

cross yesterday, we spent a lot of time talking about your

birthday in 2023 and then the Turks trip?

A.  Yes.

Q.  So your birthday in 2023, you went to Miami, right?

A.  Yes.

           MS. GERAGOS:  So can we bring up Defense Exhibit 3288,

please, for the witness and the parties.

Q.  And at this time in February of 2023, you knew that

Mr. Combs -- that Caresha -- he was still dating Caresha,

right?

A.  Yes.

Q.  And her birthday was still the same approximate time as

your birthday, right?

A.  Yes.

           MS. GERAGOS:  Okay.  So if we look at this message --

can we zoom out just -- thank you.

Q.  If we look at this message, I don't believe there's an

objection, is this a message between you and Mr. Combs in

February 3?

A.  Yes.

           MS. GERAGOS:  Okay.  If we could admit this, your

Honor, under seal, please?

           MS. COMEY:  No objection.

           THE COURT:  3288 will be admitted under seal.

           (Defendant's Exhibit 3288 under seal received in

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6BQcom2                         Jane - Cross

evidence)

Q. On February 3, do you write to Mr. Combs:  Baby love, do you think you could send me something for my birthday festivities, please.  Just want to get a few things in time and also lock in my friends and family dinner that I would love to do.  Let me know.  Thank you.  I love you so much, right?

A. Yes.

Q. Okay.  And does he pay for your birthday party that year?

A. He pays for my birthday dinner, yes.

Q. Okay.  So tell us about the birthday dinner.

A. It was me and my friends, and we had a birthday dinner at a restaurant in the private room.

Q. What was the restaurant?

A. Mmm, I can't remember the name of the restaurant but somewhere in Los Angeles.

Q. And he paid for it, and you had a great time with your friends, right?

A. I had an okay time.

Q. Didn't have a great birthday?

A. I did not have a great birthday.

Q. You didn't have a great birthday dinner that he paid for?

A. No.

Q. And you want him to send you some money so that you could get a few things in time:  Outfits, et cetera?

A. Yes.

P6BQcom2                        Jane - Cross

Q.   Okay.  For the birthday dinner or for when you were to go to Miami?

A.   Mmm, for the birthday dinner.

Q.   What kind of things did you need for the birthday dinner?

A.   An outfit.  I wanted to cover the bill for me and my friends and just try to have a happy moment in a sad time.

Q.   You were going to be there with several of your closest friends, right?

A.   Yes.

Q.   How much did you ask him to send you?

A.   15,000.

Q.   And that covered all of the outfits and the whole birthday?

A.   Yes.

Q.   How many friends came?

A.   Mmm, I would say 13 or 14.

Q.   And you did this in Los Angeles?

A.   Yes.

        MS. GERAGOS:  If we could go to Government Exhibit A-104-41, which is already admitted and go to page 13.

Q.   Here this is February 8, 2023?

A.   Yes.

Q.   And you're planning -- at this point you're in Miami, right?

A.   Yes.

Q.   And you're planning your birthday dinner with Mr. Combs,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

P6BQcom2                        Jane - Cross

right?

A.   Yes.

Q.   And you say:  Baby, is Nobu the only dinner option tonight?
Would you want to maybe try something different?  I've heard
good things about Papi steak or Carbone.  Haven't been before,
right?

A.   Yes, I really wanted to get out of the hotel.

Q.   Well, you had a plan to go to Nobu, right?

A.   I was at the Nobu Hotel, just to go downstairs to the Nobu
restaurant, just to go back upstairs to a Nobu suite.

Q.   To the Nobu suite?  So in Miami, there's a whole hotel
dedicated to the Nobu restaurant, right?

A.   Yes.

Q.   The fancy sushi restaurant that you just told us about?

A.   Yes.  He conveniently put me in a hotel where we could just
privately go downstairs and privately go back up to a hotel
suite.

Q.   Okay.  So you're asking that you want to go to Papi Steak,
right, or Carbone?

A.   I'm asking if he could please romance me outside of hotel
rooms, yes.

Q.   You're asking is Nobu the only dinner option tonight,
right?

A.   Unfortunately, yes.

Q.   You didn't say, could you romance me outside of hotel rooms

P6BQcom2                         Jane - Cross

in this text message.  You say:  Is Nobu the only option, right?

A.  I was praying he would read in between those lines, but yes, that is what I said.

Q.  Is that an example of an undertone or subtle cue that you would second to him?

A.  This is a subtle cue to my lover and my partner, yes.

Q.  But what you say:  Is maybe would you want to try something different?  I've heard good things about Papi Steak and Carbone, right?

A.  In hopes he would take me out of the hotel, yes.

Q.  And Papi Steak is a very nice restaurant in Miami, right?

A.  I wouldn't know.

Q.  You know that it's a good restaurant because you're asking to go there, right?

            MS. COMEY:  Objection, your Honor.

            THE COURT:  Overruled.

A.  So I've heard.

Q.  It's owned by a luxury restaurateur, right?

A.  I'm sure it is.

Q.  Because you've heard of it, right?

A.  I've heard of it, yes.

Q.  And Carbone is another international Italian restaurant, right?

A.  I guess so.

P6BQcom2                      Jane - Cross

Q.  You knew of Carbone, right?

A.  I just wanted to recommend fine dining so that I can be romanced properly on my birthday.

Q.  And Papi Steak and Carbone were in your mind fine dining options, right?

A.  Yes.

Q.  And Nobu is also a fine dining option also, right?

A.  Sure.

MS. GERAGOS:  If we could look at E-198 Government Exhibit, which is already admitted.  And if we could have next to it E-196, which is already admitted.  All right.

Q.  Are these photos from the birthday?

A.  Yes.

Q.  Okay.  And is that photo down -- are both of those in the hotel room?

A.  Yes, they are.

Q.  Okay.  And do you remember that night at Nobu, Mr. Combs having his personal photographer take photos of the both of you?

A.  This is just the butler taking an iPhone photo.

Q.  These two, but do you remember the ones where his personal photographer came and took photos of the both of you?

A.  Oh yes, I do remember he stopped by for a little bit.

Q.  And he did a photo shoot of you both, right?

A.  Yes.

P6BQcom2                        Jane - Cross

Q.  Okay.  And you loved having that photo shoot with Mr. Combs, right?

A.  Yes.

MS. GERAGOS:  Okay.  And if we could take those down. Let me see.  If we could pull up E-111, which is in evidence.

Q.  Is this the photo that Mr. Combs' personal photographer took of you both?

A.  Yes.

Q.  This is just one of them, right?

A.  Yes.

Q.  He took many, right?

A.  Yes.

Q.  And you were excited to receive those photos, right?

A.  Yes.

Q.  And that night, you said -- you testified that at that night at Nobu, you were so happy to be with your lover.  He was so loving.  So sweet as always, right?

A.  Despite everything, yes.

Q.  Despite the fact that you were in a hotel room, you testified on direct examination that you were so happy to be with your lover.  He was so sweet as always, right?

A.  Yes.

Q.  Okay.  And you were just real -- you also testified you were just really happy to be around him, right?

A.  Just him, yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6BQcom2                      Jane - Cross

Q.   And he said -- you testified that he said he was excited to see what new entertainment you had, right?

A.   Yes.

Q.   And it was just what, three, four months before that you had reached out to Antoine for the first time?

A.   Yes.

Q.   And so if I have my notes right, about four months later, he was asking you, he was so excited to see what new entertainment, right?

A.   Yes.

Q.   And last year for Valentine's Day around your birthday, you had organized that hotel room that we looked at earlier this morning and earlier this afternoon, right?

A.   Unfortunately, yes.

Q.   Where you suggested two men coming to the room, right?

A.   Unfortunately, yes.

Q.   And he was really excited by that prospect because it was something that you suggested, right?

A.   Yes.

Q.   And something that you organized, right?

A.   Under my circumstances, it was something I suggested and something I organized, yes.

Q.   And your circumstances were that he was with Caresha for her birthday, and you told him:  Get your ass back to Miami otherwise you don't get a hotel night, right?

P6BQcom2                        Jane - Cross

A.   My circumstances were my options in this relationship was what I had to adjust to, which was if I see him, there is a request for a hotel night, so I'm just adapting to my circumstances, I'm adapting to my environment.  So there are moments where I suggest and organize things under the pressures of my lover, yes.

Q.   Well, Valentine's Day of the year before, he was somewhere else.  He was in a different country, right?

A.   Yes, he was.

Q.   So get your ass off of that island, right?

A.   This is a rare occasion that I pulled the hotel card, yes.

Q.   An okay and then four months before the photos that we're looking at right now, you had just reached out to Antoine?

A.   I did.

Q.   And Antoine was an example of a new entertainer, right?

A.   Yes.

Q.   So when he asked you at the Nobu Hotel, he was so excited to see what new entertainment you had, you said you accepted it, right?

A.   I wouldn't say I accepted it.  I would say I went along with it.

Q.   Okay.  On direct examination, do you remember Ms. Comey asking you how did you respond, and you saying "I just, I don't know, I just accepted it," right?

A.   My "I don't know" and all my stuttering is me trying to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

find the words of going along with something that I really didn't feel like I could say no to.

Q. Because it could mean you would break up?

A. No, because it would mean I'm sitting here across from somebody with this unspoken pressure, and this is my option and my dynamic of my relationship, so either I accept it or I would be faced with some sort of agitation or another option where it still leads me to a hotel night.

Q. Okay. So it's a new entertainer or agitation. The "or" is agitation?

A. Yes.

Q. Okay. But you agree with me that you testified on direct examination "I don't know, I just accepted it," and Ms. Comey asked you why, and you said "I don't know"?

A. That is what I said in that day, yes.

Q. Then she asked you after that dinner, you go upstairs "and he gives me my birthday gift." And do you remember saying that?

A. I do.

Q. And Ms. Comey asked you, do you remember, what it was, and you said a necklace?

A. Yes.

MS. GERAGOS: Could we put up for the witness and the parties Exhibit 3290.

Q. Jane, is this a photo that you took on your phone of you

P6BQcom2                    Jane - Cross

and Mr. Combs?

A.  Yes, it is.

Q.  Is this taken night of your birthday?

A.  Yes, it is.

        MS. GERAGOS:  We seek to admit this under seal, your
Honor.

        MS. COMEY:  No objection.

        THE COURT:  3290 will be admitted under seal.

        (Defendant's Exhibit 3290 received in evidence)

Q.  Is this the necklace -- and now it can be published to the
jury, please.

        Is this the necklace and bracelet he gave you for your
birthday?

A.  Yes.

Q.  Is this the Van Cleef necklace and bracelet that you were
talking about yesterday?

A.  Yes.

Q.  Can you please explain to the jury what Van Cleef is?

A.  It's a jewelry brand that is high end and beautiful.

        MS. GERAGOS:  We could take it down.

Q.  Were you excited to get that birthday gift?

A.  Yes.

Q.  So excited, you dressed up in lingerie and you guys took a
photo together, right?

A.  I'm receiving my gift, I'm given a pill, and I'm awaiting

P6BQcom2                         Jane - Cross

an entertainer.

Q.  Okay.  And that photo, had you already taken a pill?

A.  Yes.

Q.  Okay.  And you look --

          MS. GERAGOS:  Why don't we bring it up again, 3290,
please.

Q.  You're smiling in that photo, right?

A.  Yes, I'm being -- I'm receiving affection and love and
compliments right before an entertainer comes, and I'm given a
gift right before an entertainer comes, yes.

Q.  And you were really excited to get the necklace and
bracelet, right?

A.  Any type of affection at this point in my life that I
receive from Sean, I welcome with open arms, yes.

Q.  So you took a selfie, a mirror selfie with him, and you
took your hand, and you placed it on your chest, and you were
excited to receive it, right?

A.  I was happy to be wrapped up in my lover's arms in this
moment, yes.

          MS. GERAGOS:  Okay.  We can take it down.

Q.  And then you testified that when the entertainer came in,
you got into the same rhythm, and you were flirting, and you
made sure things were nice in the moment, right?

A.  Yes.

Q.  You knew that what your partner liked, and you wanted to

P6BQcom2                          Jane - Cross

give your partner what he liked, right?

A.   Unfortunately, yes.

Q.   Okay.  Do you remember you testified that you had asked
when that entertainer came, you asked for the entertainer to
wear a condom.  And that after what you perceive as a dirty
look, Combs gave the entertainer a condom that night?

A.   Yes.

Q.   And then do you remember saying that you don't remember the
conversation, and you don't remember how, but then Kabrale got
there?

A.   Yes.

        MS. GERAGOS:  Could we pull up F-101, which is
admitted in evidence and go to page 228, please.  We could put
the two pages next to each other.

Q.   Is this a text message -- part of a text message chain
between you and Kabrale on February 8 of 2023?

A.   Yes, it is.

Q.   And do you say:  "Hey, you, with a smiley face?

A.   At 2:40 in the morning in the middle of my high, yes,
I'm --

Q.   Is that 2:40 in the morning UTC time?

A.   It is.

Q.   So at 2:40 in the morning -- actually at night in East
Coast time, right?

A.   Yes, it is.

P6BQcom2                      Jane - Cross

Q.  So in the middle of the -- after taking the pill that you decided to take, you say:  Hey, you.  Hope all is well.  Do you have plans tomorrow, right?

            MS. COMEY:  Objection.

            THE COURT:  Sustained.

Q.  Did you take a pill that night?

A.  Yes.

Q.  Okay.  And you write:  Hey, you.  Hope all is well.  Do you have plans tomorrow?

A.  Yes, I did.

Q.  And you say:  Would you be able -- would you be available to travel to Miami?

A.  Yes.

Q.  Okay.  So I think we talked yesterday about the length of a high of ecstasy, right?

A.  Yes.

Q.  All right.  And you said that it would last a couple hours, not a full 24 hours, right?

A.  Yes.

Q.  So here in this text message on February 8, you ask him if he has plans tomorrow, the next day, right?

A.  Can you repeat that question?

Q.  In this text message on February 8, you ask him:  Hope all is well.  Do you have plans tomorrow?

A.  I did say that.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6BQcom2                         Jane - Cross

Q.  So that would be at -- and then you had just testified a couple minutes ago that this was after you had taken the pill, right?

A.  Yes.

Q.  So plans tomorrow, tomorrow would be after that pill had -- would wear off, right?

A.  In these nights, I would constantly be given pills as they wear off.

Q.  And you would take them, right?

A.  Yes.

Q.  And he says:  What's up, beautiful?  And:  Yes, I am available, right?

A.  Yes, he does.

Q.  Okay.  And then in response you loved that message, and you say:  Okay, great.  I'm just going for a couple days, right?

A.  Right.

Q.  And maybe by tonight late or tomorrow morning early, I'll organize your travel.  Can you send me your airport, your full name, DOB, and email when you can, right?

A.  More than likely under the encouragement of my partner, yes.

Q.  Do you know or are you just saying more than likely?

A.  I know.

Q.  But you just said more than likely?

A.  Under these circumstances, I know.

P6BQcom2                        Jane - Cross

Q.   Okay.  So you are encouraged by your partner?

A.   Yes.

Q.   And then you send this text message yourself, right?

A.   Yes.

Q.   And then you say you will book his travel, right?

A.   Yes.

Q.   And you indicate that it would be for the very next day, right?

A.   Yes.

     MS. GERAGOS:  Okay.  If we could pull up 3088 for the witness and the parties.

Q.   Is this a text message between you and Mr. Combs on February 10, 2023?

A.   Yes.

     MS. GERAGOS:  Your Honor, we seek to admit this under seal.

     THE COURT:  Any objection?

     MS. COMEY:  No objection, your Honor.

     THE COURT:  All right.  3088 will be admitted under seal.

     (Defendant's Exhibit 3088 under seal received in evidence)

     MS. GERAGOS:  This can be published for the jury.

     If we could zoom in on this message, please.

Q.   Can you please let me know what you write here.

P6BQcom2                          Jane - Cross

A.   I said:  I don't know which phone you'll check first.  Just wanted to say I loved and appreciated every detail you put into my birthday.  Valentine's Day is your day.  I know you're locked in, but if want to spend it together, just let me know.  I want to make sure you feel special.  I love you, baby.  Text you when I land.

Q.   So after the birthday when you went to Nobu, Kabrale came, the other entertainer, and Don came, this is a message that you sent to Mr. Combs?

A.   I appreciated the little details.

Q.   What were the little details?

A.   That my lover put into my birthday which were the flowers, the cake, the necklace, our love-making, and that's about it.

Q.   And then you tell him:  I love and appreciated every detail, right?

A.   Every detail regards to him -- in regards to him.

Q.   That he put into your day?

A.   Yes.

Q.   And then you put a heart emoji next to that?

A.   I did.

Q.   And then what is the little crying face emoji that -- what is that mean to you?

A.   Mmm, happily emotional.

Q.   And then you say:  Valentine's Day is your day.  I know you're locked in, but if you want to spend it together, just

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6BQcom2                          Jane - Cross

let me know.  I want to make sure you feel special, right?

A.  Yes.

Q.  And you say:  Love you, baby.  Text me when you land, right?

A.  Yes.

Q.  If we could go to pages 4 and 5 of this exhibit.  Do you then send him photos later that day of you guys in the hotel room?

A.  Yes, I missed him.

Q.  And that was from just a few days before for your birthday, right?

A.  Yes.

Q.  At the Nobu Hotel?

A.  Yes.

Q.  And this is a photo that we had just looked at before?

A.  Yes.

        MS. GERAGOS:  And then if you could go to page --

Q.  Then you say:  Baby, home.  I had a great time with the girls.  Thinking of you.  And another heart, right?

A.  Yes.

        MS. GERAGOS:  If we could go to page 6.

Q.  This is now the next message that you send to him after those messages, right?

A.  Yes.

Q.  And this is when you had sent -- seen that he had taken

P6BQcom2                        Jane - Cross

Caresha to Turks, right?

A.  Yes.

Q.  And you say, I asked you clear as day if you were going to take a trip, honesty and no lies.  You said no.  Knowing you had this planned and now you're in Turks, how you treat me is sad.  Have fun, right?

A.  Yes.

          MS. GERAGOS:  And then if we could go to the next page.

Q.  You write:  Grow up and call me or we're going to have problems.  I gave you a clear path to tell me the truth, and you still decided to lie to my face.  Why do you lie, right?

A.  Yes.

Q.  And then do you remember we looked at several messages where you said:  I didn't want to do all that on my birthday. You knew how tired I was, but I kept a good attitude for it.  I came home to see you on a trip I've been dying for.

A.  Yes.

Q.  It's not until you see him on a trip with Caresha in Turks that you tell him:  I didn't want to do all that, right?

A.  I think after I've been made to have sex with three guys on my birthday, it was deeply hurtful and emotional for me to see him with another woman on a beautiful vacation and all their ease and all their happiness, whereas I'm alone and recovering from having just slept with three men that I didn't want to

P6BQcom2                          Jane - Cross

sleep with.  So yes, it was very hurtful in that sense, not because of his relationship but because of how it made me feel after and during something like that.

Q.  Okay.  So on February 10, you write to him:  Just want to say I loved and appreciated every detail you put into my birthday, right?

A.  I appreciated even the smallest gestures from Sean regardless of the things that went on.

Q.  Okay.  And then you testified here and on direct examination that when Don came at your birthday, you reacted like nothing because you loved your partner, right?

A.  I just went along with whatever.

Q.  Okay.  And then you said that when he asked you at Nobu whether there would be new entertainment, you also basically reacted like nothing, right?

A.  I was just going along with what my lover was proposing to me, yes.

Q.  You accepted it, you said, right?

A.  I just complied with it.

Q.  And then you -- we looked at the messages where you reached out to Kabrale on that night as well, right?

A.  Under the pressures more than likely of my lover.

Q.  Because the alternative we heard was agitation, right?

A.  That's right.

Q.  And then when you asked for a condom that night, you said

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6BQcom2                        Jane - Cross

that he was in a bad mood, but he did it anyway, right?

A.   Thankfully.

Q.   So you were able to ask for something that night, and he complied, right?

A.   With resistance.

Q.   He gave the man a condom?

A.   At the very last minute.

Q.   And the man wore a condom?

A.   Thank God.

Q.   Okay.  And this message on February 10 after your birthday, you wrote to him, right?

A.   Yes, I did.

Q.   You were -- were you on the plane when you wrote this message?

A.   I can't recall.

Q.   But this is what you wrote to him on February 10 after your birthday?

A.   Despite enduring one of these nights, I can block them out and just focus on the love I have for Sean.  So I would always send very loving heartfelt messages that I meant every single word; that I loved him, and that I had a wonderful time with him.

Q.   Well, you wrote:  I loved and appreciated every detail you put into my Bday, right?

A.   In regards to Sean.

P6BQcom2                        Jane - Cross

Q.  Right.  But you said:  I loved and appreciated every detail you put into my Bday, right?

A.  I wrote that in regards to Sean.

Q.  You wrote that to Sean?

A.  That's what I did.

Q.  Okay.  And so after you find out that he's in -- you see the photos in Turks and Caicos, you stopped talking to him, right?

A.  Yes, I was very hurt.

Q.  You were really upset and you made the decision to stop talking to him?

A.  I was heartbroken.

Q.  And we looked at messages where you stopped talking to him for several days to over a week, right?

A.  I was extremely heartbroken.

Q.  No.  No.  I -- you were heartbroken, right?

A.  I was.

Q.  And because you were heartbroken, you stopped talking to him, right?

A.  That's right.

Q.  And we looked at those messages on direct examination?

A.  Yes, we have.

Q.  All right.  And you then made the decision to fly to Paris?

A.  Yes, I did.

Q.  And it was Paris fashion week, right?

P6BQcom2                         Jane - Cross

A.   Yes.

Q.   So you went with friends?

A.   Yes.

Q.   And you didn't talk to him then, you know, for over a week and you enjoyed your time at Paris fashion week, right?

A.   Yes.

Q.   And you then started writing in your diary, and I believe we looked at a few of those, right?

A.   Yes.

          MS. GERAGOS:  Could we bring up E-331-C-R, please, which is already in evidence.

          May I have one moment, your Honor?

          THE COURT:  You may.

          MS. GERAGOS:  May I approach, Ms. Comey?

          THE COURT:  You may.

          MS. GERAGOS:  Thank you for your patience.

          Could we bring up E-331-C, which is already in evidence.  Can we zoom out, please.

Q.   If you look at the create date here on the bottom, does it say February 12, 2023?

A.   Yes, it does.

Q.   So this is the same day that you find out that he is with Caresha on the island?

A.   Yes.

          MS. GERAGOS:  And if we could now zoom out and you can

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

P6BQcom2                    Jane - Cross

look at this one.

Q.  And so in this message, on page -- actually, sorry, if you could go to -- you say:  Then when I put the truth in your face, you ask to just be friends and break up, right?

A.  Yes.

Q.  So when you were upset about him being in Turks, which was, as you said, your dream vacation, right?  He says -- Turks was your dream vacation to go on with him, right?

A.  Yes.

Q.  And when you were upset about him and Caresha being in Turks, you put the truth to him, and he asked to be friends and break up, right?

A.  I was upset about having sex with three men.

Q.  Well, here you're talking about the lie, which was the birthday trip to Turks, right?

A.  And having to deal with the aftermath of seeing this for another woman, yes, it was painful.

Q.  And so then he says, or you write:  Then when I put the truth in your face, you ask to just be friends and break up, right?

A.  When I put the truth in his face about that he just used me before he went on this trip, he would then break up with me like he always does.

Q.  So his response was essentially we don't have to be together, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6BQcom2                    Jane - Cross

A.  That's what he says.

Q.  And that was not something you were willing to do, right? Or were you, because then you stopped talking to him for a few weeks?

A.  He would say that, but his actions would come back to me.

        MS. GERAGOS:  We can take it down.

Q.  What do you mean by his actions would tomorrow back to you?

A.  He would offer a breakup.  He would say we would be breaking up, and then a week later he would be persistent, blow up my phone.  Have other people blow up my phone.  Be looking for me.  Wanting to see me.  And he'd be right back in my face. I'd be right back in his love and then repeat.

Q.  So you would talk on Face -- because you guys didn't live in the same place at this time, right?

A.  We did not live at the same place at the same time.

Q.  You didn't live in Florida?

A.  I did not live in Florida.

Q.  And he was not -- his residence wasn't in LA at this time, right?

A.  I believe he has two residences.

Q.  He was living full time in Miami at the time, right?

A.  I'm uncertain.

Q.  Okay.  Well, at this time he was in Turks.  You were not talking to him for two weeks.  And then you said on direct examination, you missed him really dearly, and you got back

together with him after, right?

A.   Yes.

MS. GERAGOS:  Okay.  And if we could go to Defense Exhibit 3090 for the witness and the parties, please.

Q.   If we could -- is this a text message chain between you and Mr. Combs on March 2 of 2023?

A.   Yes, it is.

MS. GERAGOS:  Your Honor, we offer this under seal please.

MS. COMEY:  No objection.

THE COURT:  This exhibit will be admitted under seal.

(Defendant's Exhibit 3090 received in evidence)

MS. GERAGOS:  We jumped ahead now.  If we could publish this for the jury.

Q.   We jumped ahead to March 2 of 2023.  We were just looking at your diary entry from the 12th of February, right?

A.   Yes.

Q.   Okay.  And now March 2, he writes to you:  I'm going to end it like this.  I'm very sorry.  I didn't know I was going to lose one of my closest friends because of a stupid lie.  Everyone makes mistakes.  I tried my best to reach you, but I can't.  Sorry I got mad yesterday and said fuck you, and called you a B-I-T space H.  I was very upset.  I wish you well.  I'm sincerely sorry.  I wish I would have told the truth.  I deserve this.  Love, right?

P6BQcom2                     Jane - Cross

A.  Yes, that's what he writes.

Q.  This is several weeks after the diary entry or note entry in your phone that we just looked at, right?

A.  Yes.

Q.  And if we could go to pages 7 and 8, this is now a week later, right?

A.  Yes, it is.

Q.  And he says:  Good morning.

And you say:  Good morning, right?

A.  Yes.

Q.  Was it just 15 minutes after he says good morning?

A.  Yes.

Q.  And he asks to schedule a time to talk to you?

A.  Yes.

Q.  And you tell him a time, and he says:  Yes.  And he says:  Text me when you're free, right?

A.  Yes.

Q.  And then you say at the end of that second page:  Okay, 10:30, 10:45.  I have to leave at a certain time, so if it's any later than that, we can reschedule for tomorrow, right?

A.  Yes.

Q.  And then if we go to pages 11 to 12 of this, he says at the top left:  I miss you, and I want to see you, please.  Yes or no.  Don't make me wait for an answer, please.

And you say:  I'm open as friends, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6BQcom2                         Jane - Cross

A.  Yes.

Q.  And he says:  Okay.  So you want a hotel?  When can I see you?

A.  Yes.

Q.  And what do you say?

A.  I said -- well, I'm a bit insulted, but I said:  A hotel? That's the best you can do?

Q.  And he says:  No, you said friends.  When can you come Turks?  With a bunch of question marks, right?

A.  Yes.

Q.  Can we go to 13 and 14.

You liked, which is the thumbs up than the iPhone, right?

A.  Yes.

Q.  And you say -- you liked his question where he said Turks, right?

A.  Yes.

Q.  And you said:  That's better, right?

A.  Yes.

Q.  And what does he say?

A.  Tuesday, question mark.

Q.  And you say:  Bora Bora, right?

A.  Yes.

Q.  And he says:  Caribbean.  FaceTime me when you can, right?

A.  Yes.

P6BQcom2                        Jane - Cross

Q.  If we go to page 20.  We skipped ahead in the same exhibit. And you send him a heart emoji, right?

A.  Yes.

Q.  And you say:  What we have is special, right?

A.  Yes.

Q.  And he says:  I can't wait to see you.

And you say:  I can't wait to see you too, my darling, right?

A.  Yes.

Q.  And so after this, you guys start planning a trip to Turks, right?

A.  Yes.

Q.  Okay.  And do you remember you start looking -- you start looking at different houses to go to and things like that?

A.  Yes.

Q.  And he approves.  Do you remember he was looking at a budget of over a hundred thousand dollars for your trip?

A.  Yes.

Q.  And he ended up spending almost $55,000 on this trip?

A.  I guess so.

Q.  Do you remember that?

A.  I don't know the exact amount.

Q.  Okay.  And you started -- you started planning this trip with him, and you were really excited to go, right?

A.  Yes.

P6BQcom2                      Jane - Cross

Q.  I think you said on direct examination that you really missed him dearly, and you couldn't wait to be back with him, right?

A.  Yes.

MS. GERAGOS:  And if we look at -- if we could bring up for the witness and the parties Defense Exhibit 3094 -- actually, I don't need this.  We can take it down.  Can we bring in what's already in evidence as Government Exhibit E-145.  All right.

Q.  This is the dinner that you go to after you fly to Miami before Turks, right?

A.  Yes, it is.

Q.  You said this was a wonderful -- that was the first time you saw each other after Paris fashion week, right?

A.  Yes.

Q.  And you said you took these photos because you liked this moment a lot, right?

A.  This photo is funny to me because he's pissed here.

Q.  Is there something you could see in his face that he's agitated or angry or what?

A.  In the middle of us bickering, I said, let's take a photo together, and I thought it was funny because he looked so pissed.

Q.  You testified though that at this dinner, you could tell he really missed you too, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6BQcom2                          Jane - Cross

A.  Yes.  I thought it was cute that he was still mad about Paris.

MS. GERAGOS:  Could we side by side bring up Defense Exhibit 304.  Actually, this is not in evidence yet.  So if we could just pull up for the witness and the parties Defense Exhibit 304.  If we could zoom in.

Q.  Do you recognize these photos?

A.  These are nice.

Q.  Did you frame these photos for Mr. Combs?

A.  Mmm, I did.

MS. GERAGOS:  With seek to admit under seal Defense Exhibit 304.

MS. COMEY:  No objection.

THE COURT:  Defense Exhibit 304 will be admitted.

(Defendant's Exhibit 304 under seal received in evidence)

MS. GERAGOS:  So now we can publish both.

Q.  Is this photo on the right another photo from that dinner?

A.  Yes, it is.

Q.  And is he still pissed in that photo as well?

A.  Yes, he is.

Q.  But you loved these photos so much, you framed them to put them in his home, right?

A.  Yes, I thought they were cute.

Q.  And he was upset because you up and left him after your

P6BQcom2                         Jane - Cross

trip and went to Paris, right?

          MS. COMEY:  Objection.

          THE COURT:  Overruled.

A.  Can you repeat the question, please?

Q.  Sure.  Do you remember testifying on direct examination that you felt he didn't like you up and leaving, I think was the exact quote?

A.  No, he didn't.

Q.  And then you testified after this dinner, you took a pill and you went to the Mandarin Oriental room, right?  Do you remember that?

A.  Yes, we did.

Q.  All right.  And then you were dressed up in lingerie, you dressed up in heels, and you guys were watching pornography?

A.  Yes.

Q.  And then Combs asked you if Don could come for just one round, right?

A.  Yes, he did.

Q.  And you agreed, right?

A.  Under that circumstance, I did.

Q.  While you were in the hotel room with him, he asked you a question, and you agreed, right?

A.  I'm just going along with it because this is what he wants, so I say yes.

Q.  And then you testified that you guys went to Turks and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Caicos, right?

A.  Yes.

Q.  And do you remember that Ms. Comey asked you that if you had known if Paul would be on the Turks trip, would you have gone?

A.  I remember her asking me that, yes.

Q.  And you said:  Not at all, right?

A.  Right.

Q.  Do you remember looking at Government Exhibit F-101 — we can pull it up, page 249 — with Ms. Comey, and looking at the messages you sent to Kabrale while you were in Turks?

Let me ask a better question.  Do you remember sending text messages to Kabrale while you were in Turks and Caicos?

A.  I believe my lover wanted me to send a message to Kabrale to invite him on the trip, so, yes, I do remember these text messages.

Q.  Do you remember going over these with Ms. Comey a few days ago?

A.  Mmm, yes.

Q.  And if we could -- if we could have page 249, did you write:  Hey, how are you?  Hope all is well.  Sorry haven't been in touch.  Just been busy with life.  I was wondering, I have some time off this Friday through Saturday.  Would you be available to come to Turks, by any chance?  You would need a passport, and I think a vaccination card.  LMK, let me know,

P6BQcom2                        Jane - Cross

what you think, right?

A.  Yes.

Q.  And so you sent this message to Kabrale on March 16?

A.  Under the encouragement of my partner, yes.

Q.  So your partner was encouraging you, and you wrote this message, right?

A.  Yes, I did.

Q.  You asked him if he would be available to come to Turks, right?

A.  Yes, I did.

Q.  Okay.  You said that during Turks Paul was pleasant and nice, right?

A.  Yes, he was.

Q.  And you were really happy because Mr. Combs got you a diamond bracelet there?

A.  Mmm, I remember being really tired, but I was happy about this diamond bracelet.

Q.  You were really tired at Turks, right?

A.  Yes.

Q.  But you testified that Mr. Combs got you a diamond bracelet on the trip, right?

A.  At the very end, he shows me a diamond bracelet, yes.

Q.  And you were really excited, right?

A.  I thought it was very sweet.

Q.  Because you wanted diamonds, right?

P6BQcom2                    Jane - Cross

A.  I just wanted Sean.

Q.  Do you remember writing to yourself that you had wanted diamonds?

A.  Mmm, maybe.

Q.  Could I show you something to refresh your recollection?

A.  Sure.

        MS. GERAGOS:  Okay.  Just for the witness, can I show you Defense Exhibit 3256, please.

Q.  Just read this to yourself and tell me when you're done reading?

A.  I read it.

        MS. GERAGOS:  We can take it down.

Q.  Do you remember wanting -- that Mr. Combs would tell you to get you diamonds, and you wanted diamonds?

        MS. COMEY:  Objection to form.

        THE COURT:  That needs to be rephrased.

Q.  Does this refresh -- I apologize for that.

        Does this refresh your recollection that you had wanted diamonds?

A.  This refreshes my recollection that --

Q.  It's just a -- we have to do this technically, Jane.  Does this refresh your recollection as to whether you had wanted diamonds?

A.  What I'm seeing here --

        THE COURT:  Hold on.  Ms. Geragos -- so, Jane,

P6BQcom2                         Jane - Cross

Ms. Geragos is just asking you about your own recollection, and not anything that's in the document.  So if it did not refresh your recollection, you can tell her that.  If it did, you can tell her that too.

Ms. Geragos, can we get a question?

Q.  Yes.  You were really excited to get the diamond bracelet in Turks, right?

A.  I was happy to receive it, yes.

Q.  You had wanted to go to Turks with Mr. Combs, right?

A.  Yes.

Q.  This was your dream vacation?

A.  Yes.

Q.  Okay.  And you were also very excited when you got the diamond bracelet, right?

A.  I appreciated it, yes.

Q.  Okay.  If we could -- and then you talked about how you had the night with Paul and then he came over to the villa, and you threw the diamond bracelet, right?

A.  Yes, I did.

Q.  Do you remember telling Paul that you agreed because you know that this makes him happy, and you like when he is happy?

A.  Yes.

Q.  And do you remember telling Paul that you've allowed Mr. Combs too much, and that's your fault?

A.  Yes, I do remember that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6BQcom2                        Jane - Cross

MS. GERAGOS:  Your Honor, I think right now would be a great time for a break.

THE COURT:  We'll take a break at this point.  Come back in 15 minutes.

Thank you, members of the jury.

All rise.

(Jury not present)

THE COURT:  Thank you, Jane.

You can come back in 15.

(Recess)

(Continued on next page)

P6bWcom3                      Jane - Cross

THE COURT:  All right.  Let's come back.

Ms. Comey, are we prepared to move forward?

MS. COMEY:  Yes, your Honor.

THE COURT:  Let's bring the witness back.

MS. COMEY:  I'm going to check and see what the holdup is.

THE COURT:  That would be good.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6bWcom3                         Jane - Cross

                (Jury present)

                THE COURT:  Ms. Geragos, you may proceed when ready.

                MS. GERAGOS:  Thank you, your Honor.

Q.  Good afternoon, Jane.

A.  Good afternoon, Ms. Geragos.

Q.  I believe we left off on the Turks trip.

    Do you remember you and Mr. Combs flew back to Miami after the Turks trip?

A.  Yes, we did.

Q.  OK.  So -- and you were there for about a day, and Mr. Combs asked you what you wanted to do, right?

A.  Yes.

Q.  And you thought that he wanted you to have Kabrale, so you invited Kabrale to Miami, right?

A.  Yes.

Q.  And then it was after this trip that you guys came up with the love contract, right?

A.  Yes.

                MS. GERAGOS:  All right.  And then that's when you listened to the Voicenote we listened to yesterday.  If we could bring up what's already in evidence as Defense Exhibit 3103.

Q.  And that's when you sent him this message, and you said: I'm glad we can celebrate.

                MS. GERAGOS:  If we could go to the next page.

P6bWcom3                        Jane - Cross

Q.   The first page you say:  All I have in my mind right now is all your passion and lovemaking on top of me.  The addiction is mutual.

On the next page, you said:  I miss you so bad already. But, also, I know I'm distracting you.  Right?

A.   Yes.

Q.   And at the bottom you say:  Baby, you make me laugh.  And we looked at these messages yesterday, right?

A.   Yes.

Q.   And these were sent after you were in Miami first, right?

A.   Yes.

Q.   And then you went to Turks?

A.   Yes.

Q.   And then you went to Miami again afterwards, right?

A.   Yes.

Q.   OK.  And then you -- we listened to the voice message yesterday, where you told him Turks was just absolutely incredible, the whole trip, and just getting closer to you. It's on another level for us, period.  Right?

A.   Yes.

MS. GERAGOS:  OK.  We can take this down.

All right.  Could we pull up Defense Exhibit 3105, please, for the witness and the parties.

Q.   And is this a message between you and Mr. Combs on March 28 of 2023?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.  Yes, it is.

MS. GERAGOS:  All right.  And then, your Honor, I believe without objection, we'd like to move this in under seal.

MS. COMEY:  No objection.

THE COURT:  All right.  This exhibit will be admitted under seal.

(Defendant's Exhibit 3105, under seal, received in evidence)

MS. GERAGOS:  All right.  Could we go to page 5, please, and 6, side by side.  All right.

Q.  And then these were sent three days after the messages we just saw, right?

A.  Yes, it is.

Q.  OK.  You sent him three heart-face emojis?

A.  Yes.

Q.  What do you write in the second message?

A.  I say:  Beyond sex, it was the passion for me.  I can't ever forget your face and how your love inside me feels.  It was the perfect balance of love, passion and the freakiest, nastiest moments.  Love and miss you too.  I'm extremely satisfied too, baby.

It was on my mind last night too.  I sent you a Voicenote. LOL.  Just was saying that actually we had more sex than we thought.  LOL.

I'd make love to you every single day.  I love our sex so much.

Q.  OK.  Then do you remember -- this is the 28th -- you saw him about time weeks later, and you did not have a hotel night after that?  I mean two weeks later when you saw him.

A.  Maybe.

Q.  OK.

A.  Yes.

Q.  Do you remember that being approximately April 10 of 2023?

A.  If you have something --

Q.  OK.

A.  But maybe.

Q.  OK.  It sounds like that you saw him -- the next time that you saw him after this, you did not have a hotel night?

A.  Maybe not, no.

        MS. GERAGOS:  OK.  And if we could now pull up for the witness and the parties Defense Exhibit 3122.

        Your Honor, for the record, this is the defense corresponding exhibit to A44211.

Q.  And Jane, is this a text message sent between you and Mr. Combs on April 18, 2023?

A.  Yes, it is.

        MS. GERAGOS:  Your Honor, I believe, without objection, we'd like to move this in under seal.

        THE COURT:  All right.  Defense Exhibit 3122 will be

P6bWcom3                      Jane - Cross

admitted under seal.

(Defendant's Exhibit 3122, under seal, received in evidence)

MS. GERAGOS:  All right.  Could we put pages 3 and 4 side by side, please.

Q.  If you could look at the left side of the screen, do you see Mr. Combs's messages at the bottom; it says:  6 p.m. dinner.  Then party.  Are you cool with that?  I mean 5 p.m.?

A.  Yes, I do see it.

Q.  And then your response, what do you respond?

A.  I said:  Yes, baby.

Q.  And he says OK?

A.  Yes, he does.

Q.  And what do you respond with?

A.  I said:  Love you, with kiss emojis.

Q.  Do you remember then reaching out to Paul after this?

A.  Maybe.

MS. GERAGOS:  OK.  I believe without objection -- could we go to page 6 first.  All right.

Q.  Do you see here that Mr. Combs sends you an audio message at 9:41 p.m.?

A.  Yes, he does.

MS. GERAGOS:  OK.  If we could play -- your Honor, if we could admit 3122A, which is this Voicenote, I believe, without objection.

P6bWcom3                          Jane - Cross

MS. COMEY:  Just checking my list, your Honor.  Sorry.

I don't see it on my list, but if Ms. Geragos is representing that I've confirmed no objection, I won't assert an objection.

MS. GERAGOS:  That's what I have, your Honor.

THE COURT:  Is that confirmed?

MS. GERAGOS:  That's what I have down, but I want to double-check before.

THE COURT:  All right.  Please double-check.

MS. GERAGOS:  Let's double-check.

One moment, your Honor?

Your Honor, I can't find it, so I'm just going to move on and just ask the witness.

Q.  Do you remember reaching out to Paul after this message?

A.  Maybe.

Q.  OK.  And do you respond here and say:  My baby, yes, he's aware of Wednesday.  Let me just get myself organized here and text you with the time.  I want to see my baby always.  Right?

A.  Yes.

Q.  OK.  And then Mr. Combs -- you say:  I can leave here around 7 p.m., baby.  Does that work?

A.  Yes.

Q.  And does he say yes?

A.  Yes, he does.

MS. GERAGOS:  And if we could go to pages 10 and 11.

P6bWcom3                    Jane - Cross

All right.

Q. Do you remember asking him about options for a hotel night and sending an Airbnb? I think you told me yesterday that you had been wanting to move on from hotels at this time so you were looking for Airbnbs.

A. Yes.

Q. OK. And so do you remember this being the time where you were looking for Airbnbs?

A. Yes.

Q. OK. And then, here, you send him -- you say: $2,500 a night plus tax. It's in a corner and secluded?

A. Yes.

MS. GERAGOS: And if we could go to the next two pages.

Q. All right. And you're sending him some suites as well, right?

A. Yes.

MS. GERAGOS: If we could go to the next two pages -- oh, sorry. Go back one.

Q. And he says, on the right side: How do we know if there's no cameras. Right?

A. Yes.

Q. And you say: There is, but we can have security cover them. Got a hold of the people. They're going to see if there's other properties so you can see a variety of what's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6bWcom3                    Jane - Cross

available within that same price, not too big but cozy.  Right?

A.  Yes.

MS. GERAGOS:  All right.  If we could go to the next two.

Q.  And then you say:  I can just say it's my anniversary and we want to cover the cameras so we can feel comfortable.  LOL. We can have security go in first and do a sweep.  Right?

A.  Right.

Q.  And he says:  You're not scared of the cameras.  I -- the cams.  I am.  Right?

A.  Yes.

Q.  OK.  Is he -- did you understand him to be telling you he's scared that there would be cameras watching you?

A.  Yes.

Q.  And you say:  I can see where the cameras are, mostly outside in the corner.  Right?

A.  Yes.

MS. GERAGOS:  OK.  Could we put up Defense Exhibit 3125.

Q.  I believe -- is this a text message between you and Mr. Combs on April 21, 2023?

A.  Yes.

MS. GERAGOS:  All right.  Your Honor, without objection, I believe we'd like to move this in under seal.

MS. COMEY:  No objection.

P6bWcom3                    Jane - Cross

THE COURT:  All right.  Exhibit 3125 will be admitted under seal.

(Defendant's Exhibit 3125, under seal, received in evidence)

MS. GERAGOS:  Can we please display this to the jury.

Q.  Jane, what do you write here to Mr. Combs?

A.  I say:  My thoughts tonight.  You are truly a blessing in our life.  I have never had a man take care of me like you do. The fact that you are -- the fact that you are the reason for my child's joy is a feeling inside me that I can't explain.  It means the world to us.  I love you so much as my friend, my lover, my boyfriend, even though you don't like that word. LOL.  But I mean you are.  LOL.  You are mine and I am yours. There's nothing I wouldn't do for you.  I feel blessed having you in my life, and I only wish to be a blessing in yours.

MS. GERAGOS:  I can finish it.

You say:  I love you, baby, and will always be by your side, my baby.  Love, lamb chop Bert.

Jane, take as much time as you need.

THE WITNESS:  I do remember this message, yes.

BY MS. GERAGOS:

Q.  Did you send this after --

MS. GERAGOS:  Why don't I just wait then.

THE WITNESS:  It's OK.  You can go.

MS. GERAGOS:  Are you ready?

P6bWcom3                         Jane - Cross

THE WITNESS:  Yes, I am.

BY MS. GERAGOS:

Q.  OK.  Did you send this after that night?

A.  Yes.

MS. GERAGOS:  All right.  We can take this down.

All right.  If we could pull up what is in evidence as Government Exhibit E113 and E113M, side by side.

Q.  Jane, do you need to take any time?

A.  I do not.

Q.  Are you OK to proceed?

A.  Yes.

MS. GERAGOS:  OK.  If we could zoom in on the side on the right.  All right.

Q.  Do you see that the create date for this is May 20?

A.  Yes, I see that.

Q.  OK.  And this is a photo from your iPhone, I take it, of you and Mr. Combs?

A.  Yes.

Q.  And where are you guys here?

A.  We're at the 1 Hotel in Miami.

Q.  And do you guys have a hotel night after this?

A.  Yes, we do.

MS. GERAGOS:  OK.  Can we put up Defense Exhibit 3136, please, for the witness and the parties only.

Q.  Is this a message between you and Mr. Combs on May 22 of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6bWcom3                    Jane - Cross

2023?

A.  Yes, it is.

          MS. GERAGOS:  We move to admit 3136 under seal, your Honor.

          THE COURT:  All right.  3136 will be admitted under seal.

          (Defendant's Exhibit 3136, under seal, received in evidence)

          MS. GERAGOS:  If we could publish this to the jury.

Q.  You write here, right after -- not right after, but after you take that photo:  I love you baby.  I thank God for you every day.  You are so special to me.  I love every single moment -- WU, does that mean with you?

A.  Yes.

Q.  Congrats on your interview today, can't wait to see you, with many emojis?

A.  Yes.

Q.  And that was after the 1 Hotel, right?

A.  Yes.

          MS. GERAGOS:  OK.  We could take this down.

Q.  So what we just looked at was in May of 2023.

    Do you remember seeing Mr. Combs for several times in June of 2023 without hotel nights?

A.  Yes, maybe.

Q.  Do you remember that he got surgery that month?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6bWcom3                        Jane - Cross

A.   Yes.

Q.   And you went to take care of him at his home?

A.   Yes.

Q.   And you didn't have any hotel nights that month, right?

A.   No.

THE COURT:  Ms. Geragos.

MS. GERAGOS:  I promise that's not me.  I'm not sure. I'm just not working with the technology today.

THE COURT:  All right.  Let's make sure that we mute our audio on our computers, please.

MS. GERAGOS:  Can we bring up what's already in evidence as Government Exhibit G-101.

Could we go to pages 27 and 28.

All right.  This is a message between you -- I'm sorry -- between Mr. Combs and -- actually, if we could take this down.

If we go to the first page of G-101.

OK.  Let's take this down.  Sorry about that.

Q.   Do you remember on July 4 of 2023, you and Mr. Combs have a hotel night with Paul again?

A.   I believe so.

MS. GERAGOS:  OK.  Could we pull up Defense Exhibit 3152, please, for just the witness and the parties.

Q.   Is this a message, Jane, between you and Mr. Combs July 7 of 2023?

A.   Yes.

          MS. GERAGOS:  All right.  And your Honor, we move to
admit this message under seal.

          MS. COMEY:  No objection.

          THE COURT:  All right.  3152 will be admitted under
seal.

          (Defendant's Exhibit 3152, under seal, received in
evidence)

          MS. GERAGOS:  Let's quickly publish to the jury.

Q.   Do you remember after that hotel night that you sent this
message to Mr. Combs; you say:  Just wanted to make you smile.
I loved being in the moment with you?

A.   Yes.

Q.   WU, do you see that?

A.   Yes.

Q.   WU means with you?

A.   Yes.

Q.   Just spending time in the sunshine and laughing.  Listening
to your music and making love to you.  It was our little
partay, soirée, all day, rosé, whatever we were saying.  LOL.
Love you to the -- is that a moon emoji?

          MS. GERAGOS:  Your Honor, can we approach?

          THE COURT:  You may.

          (Continued on next page)

P6bWcom3                        Jane - Cross

(At sidebar)

MS. GERAGOS:  The witness has been crying a lot this afternoon.  I would ask if you want to give the witness an opportunity to take a break if she needs it.  I feel badly to have her continue crying throughout the afternoon.

I really am ahead of schedule, and so I just am -- I'm just bringing this to your Honor's attention.  I know you can see it, but I also have to get through my examination.  So I'm just bringing this up to make sure that the witness is OK to proceed.

THE COURT:  Well, the witness indicated that she can proceed.  I'm not sure that the reaction from the witness is going to be any different if we do this at a later time.

MS. GERAGOS:  OK.

THE COURT:  I'm happy to inquire with the witness to ensure that she's able to proceed.

Ms. Comey, I'll hear from you.

MS. COMEY:  Thank you, your Honor.

I have the same thought.  She cried multiple times during direct, as I'm sure everyone will recall, and each time I offered her a break or your Honor offered her a break.  She said no, she wants to keep going.  And that has been her attitude whenever I've met with her to prepare for her testimony, that she wants to push through even when she's emotional.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6bWcom3                          Jane - Cross

MS. GERAGOS:  OK.  I just wanted to bring it up.

MR. AGNIFILO:  I have one clarifying question, your Honor.

We have the entire day tomorrow; we would have the entire day to sit if we needed the entire day?

THE COURT:  We have the entire day tomorrow.

MR. AGNIFILO:  OK.

THE COURT:  You have as much time as you need.

MR. AGNIFILO:  No, no.  I'm asking, actually, kind of the reverse.

I think we will not be bumping up against the end of the day.  I think what Ms. Geragos's point was -- and I'm not saying this is for now; I think this is just in general -- is we would probably finish tomorrow in the morning.

So I think we would finish tomorrow in the morning. And the only reason I throw that out there is if your Honor thought it was appropriate or if the government thought it was appropriate to say we need five minutes here or there, we have that in the schedule.  I only offer that.

THE COURT:  I'll certainly inquire with the witness.

MR. AGNIFILO:  OK.  Thank you.

(Continued on next page)

P6bWcom3                              Jane - Cross

(In open court)

THE COURT:  Ms. Geragos, you may proceed.

MS. GERAGOS:  Thank you, your Honor.

Jane, jumping ahead, could we look at, for the parties and witness only, Defense Exhibit 3171, please.

Q.  Is this, Jane, a message between you and Mr. Combs on August 9 of 2023?

A.  Yes, it is.

MS. GERAGOS:  OK.  And we would like to move this into evidence under seal.

MS. COMEY:  No objection.

THE COURT:  All right.  It will be admitted under seal.

(Defendant's Exhibit 3171, under seal, received in evidence)

MS. GERAGOS:  Could we please jump to page 9, please.

All right.

Q.  Do you see Mr. Combs writes there:  Movie night was off the chain.  You tell me?

A.  Yes.

Q.  And you respond, loving that, and saying delicious, with the emoji, right?

A.  Yes.

Q.  OK.  And movie night, again, was just a night that was just you and him, right?

P6bWcom3                        Jane - Cross

A.   Yes.

Q.   There was no hotel night that night, right?

A.   Right.

Q.   Is that what this indicates to you?

A.   Yes.

         MS. GERAGOS:  OK.  We can take this down.

Q.   On direct you testified about a time in August of 2023, which is after this message, where you planned an all-star hotel night for Mr. Combs.  Do you recall that?

A.   I do.

Q.   OK.  And when we looked at these messages, you canceled this night because of a hurricane -- or in the messages, you sort of indicated you canceled the night because of a hurricane, right?

A.   Yes.

Q.   And then you had said that you had gotten your period that night?

A.   Yes.

Q.   And then you testified that when you raised these concerns to Mr. Combs you felt like he had guilt tripped you, right?

A.   Yes.

         MS. GERAGOS:  OK.  If we could go to Government Exhibit A-442-35, already in evidence.

         All right.  Could we go to page 40 and 41, side by side.

P6bWcom3                    Jane - Cross

Can we just go to pages -- all right.  If we could put them side by side.

Q.  You had said:  Let's move on.  Let's stay in the light. Right?

A.  Yes.

Q.  Do you remember that in these text messages --

MS. GERAGOS:  You can unzoom.

Q.  -- in these text messages you had indicated that you were -- he had sent you some flowers.  Do you remember that?

A.  Yes.

Q.  OK.  And then do you remember later you had seen a screenshot that he sent flowers to another girl that made you jealous?

A.  Yes.

MS. GERAGOS:  All right.  We could actually take this down.

Q.  And you were upset because you saw the card that he sent to another girl, right?  Do you remember that?

A.  Yes.

Q.  And you didn't like how he had sent, maybe, a more heartfelt message to the other girl than he did to you with the flowers, right?

A.  Yes.

Q.  And so you told him that it made you really upset, right?

A.  Yes.

Q.   OK.  And you told each other after this that you would break up.  Do you remember that?

A.   Possibly, yes.

Q.   OK.  And then we talked about how -- you talked about, on direct examination, a time where he was in New York in September of 2023, right?

A.   Yes.

Q.   And you were planning to go to New York to visit him.  Do you remember that?

A.   Yes.

Q.   And then you had watched a podcast that he was doing with him and Caresha that you thought sounded familiar, and he talked about the yacht trip, right?

A.   Yes.

Q.   And you were upset because he talked about how much sex he had had on the yacht trip, and that was the yacht trip that you had wanted to go on, right?

A.   I was upset that he lied to me about the trip and what happened in the trip.

Q.   You were upset because he had told you they didn't have any sex on this yacht trip, right?

A.   That's right.

Q.   And had you believed him?

A.   I did.

Q.   OK.  And so you thought then when you heard them on the

P6bWcom3                          Jane - Cross

podcast, you were upset because he lied to you, right?

A.  Yes.

Q.  And you were also upset because you said that you really wanted to go on that yacht trip, right?

A.  Yes.  It hurts my feelings that he promised this trip and then ends up doing it with somebody else.

Q.  OK.  So you were then upset because you were supposed to go to New York, and then you had seen that podcast, right?

A.  I believe I was upset here because of the lie.

        MS. GERAGOS:  OK.  If we could put up Government Exhibit A10459-P, which is already in evidence, and go to page 3.

Q.  And this is the text message you send him:  I'm not coming to New York.  I feel disrespected that you have to unnecessarily brag online that you fucked for 48 hours straight on the trip you said you were asleep on, then text me that you're horny and need my videos.

    And you're talking about when he asked you for the videos between you and him that you had on your phone, right?

A.  I believe he was asking me for explicit videos between me and another man.

Q.  From hotel nights?

A.  Yes.

Q.  And those videos you believed he would need when he was with other women, right?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P6bWcom3                          Jane - Cross

A.  Yes.

Q.  Because he needed to watch you, right?

A.   It was just a pattern of his, to be with another woman and then text me in the middle of the night requesting these videos.

Q.  I said that he would ask you for these videos when he was with other women, or at any other time.  Right?

A.  Yes.

Q.  OK.  And you said:  It's clear to me you just want me there for a hotel binge.  You got plenty of hoes for that.  Right?

A.  Yes.

Q.  And you said:  I don't want to be used and locked in a room to perform your various fantasies.  Coming to the realization of what this really is.  Right?

A.  Yes.

Q.  And you sent that on September 16, 2023?

A.  Yes.

Q.  All right.  And then you sent him -- we looked at the message where you told him that you thought you opened Pandora's box, right?

A.  Yes.

        MS. GERAGOS:  And if we could go -- if we could put in, put up on the screen, for just the witness and the parties, 3183, please.  All right.

Q.  And is this a message between you and Mr. Combs on

                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

September 15, 2023?

A.   Yes.

MS. GERAGOS:  All right.  We'd move to admit this under seal.

MS. COMEY:  No objection to the first 21 pages, your Honor.  I've conveyed an objection to the remainder of that exhibit to Ms. Geragos.

MS. GERAGOS:  Yes, I believe it's revised for what Ms. Comey asked for just for the first 21 pages, and then the second part of the exhibit we will go through next.

MS. COMEY:  Then no objection.

THE COURT:  Defense exhibit 31 will be admitted under seal.

(Defendant's Exhibit 3183, under seal, received in evidence)

MS. GERAGOS:  OK.  We can publish this now.

If we could put up pages 1 and 2.

Q.   These are the preceding messages, Jane?

A.   Yes, they are.

Q.   OK.  And so do you remember at this time, September 15, 2023, that's when his album, *The Love Album: Off the Grid*, was released?

A.   Yes.

Q.   And that's why he was in New York, right?

A.   Yes.

P6bWcom3                              Jane - Cross

MS. GERAGOS:  OK.  So if we could go to page 9 and 10.

Q.  And this is a message where you, what we just talked about, the Pandora's message, right?

A.  Yes.

Q.  And he responds:  Girl, stop.  Right?

A.  Yes.

Q.  OK.  And then you guys end up speaking.  Do you remember that, you testifying to that?

A.  Yes.

Q.  And then you say:  Call me back.

And he says:  Love you, baby.  Can't wait to see you. Right?

A.  Yes.

Q.  And you say:  I love you too, with two emojis.  Right?

A.  Yes.

Q.  And he says:  Baby, come whenever.  I don't want no bad vibes.  For real.  Right?

A.  Yes.

Q.  And what do you say in response?

A.  I said:  It's not bad vibes.  I think we need to be around each other right now.

Did you change your mind?

MS. GERAGOS:  OK.  Can we go to the next page.

Q.  He says:  OK.  Just come with the right energy, PLS.

Do you know that to mean please?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6bWcom3                         Jane - Cross

A.  Yes, that's what he says.

Q.  He says:  I miss you.  That's it.  Right?

A.  Yes.

Q.  And what do you say in response?

A.  I said -- I loved it, and then I said:  I miss you too.  I see where I overreacted.  We'll be good once we're together.

Q.  How long was your FaceTime?  Because those messages are about 17 minutes apart.

A.  We probably had a FaceTime in between.

Q.  OK.  Because you testified that you thought that you spoke on the phone, right?

A.  Yes.

Q.  So it was a less-than-17-minute FaceTime?

A.  Yeah, more than likely.

        MS. GERAGOS:  OK.  Then if we could go to pages 20 and 21, side by side.

Q.  You said on direct examination that you were already in the air when he sent you this link to the Cowboys 4 Angels site, right?

A.  Yes.

        MS. GERAGOS:  It's on everyone else's screen, but it is now not on mine.

        Oh, there we go.  OK.  All right.

Q.  And you say:  You turn me on so crazy.  Can't wait.

        And he responds:  Hey, where's Chef.  Right?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

P6bWcom3                        Jane - Cross

A.  Yes.

Q.  And your response is:  Just got to wi-fi again.  Not sure, baby.  Right?

A.  Right.

Q.  And he says OK.  Three minutes later:  I have a surprise if that's OK.  Just one.  Don't want you to feel like any sexy.  Sending pict now.  Right?

A.  Yes.

Q.  And he sends you the link to the Cowboys 4 Angels, right?

A.  Yes.

Q.  And your response after he sends that link is 11 minutes later, right?

A.  Yes.

Q.  And you say:  It's not loading, but we're about to land now?

A.  Yes.

        MS. GERAGOS:  OK.  Could we take this down and go to, just for the witness and the parties, Defense Exhibit 3327.

        All right.

Q.  And is this a continuation of the message we just looked at between you and Mr. Combs?

A.  Yes.

        MS. GERAGOS:  All right.  We would move to admit this, your Honor.  This was the revised exhibit Ms. Comey and I were just talking about.

P6bWcom3                        Jane - Cross

MS. COMEY:  No objection.

THE COURT:  All right.  Defense Exhibit 3327 will be admitted under seal.

(Defendant's Exhibit 3327, under seal, received in evidence)

MS. GERAGOS:  Thank you.  We can publish to the jury.

Q.   OK.  Do you see, on the left-hand side, you liked the link with the Cowboys 4 Angels?

A.   Yes.

Q.   And you tell him:  Just waiting for my luggage now?

A.   Yes.

Q.   OK.  And so he sent you the link, and this was your response?

A.   I wanted to just tell him that I had seen, like, I had received the link.

Q.   OK.  And on an iPhone, to like a link is a thumbs up, right?

A.   Yes.

Q.   So when someone receives a like on a message, it's a thumbs up, right?

A.   A thumbs up can also be a little bit sarcastic.

Q.   I know that you're answering that question, but I'm asking a question as to whether someone receives a thumbs up.

Does someone receive a thumbs up when you like a message?

A.   Yes.

P6bWcom3                         Jane - Cross

Q.   OK.  And then you respond to him, right?

A.   Yes.

Q.   And you say:  Zero Bond?

A.   Yes.

Q.   And Casa Cipriani, right?

A.   Yes.

Q.   Are those two members-only clubs in New York?

A.   Yes.

Q.   And you said:  My friend said for private just chill drinks bought if you're up for it.  Right?

A.   Yes.

Q.   OK.  And you understood that Mr. Combs was in New York for the album launch party, right?

A.   Yes.

Q.   All right.  And you end up -- you take -- was it around an 11:30 flight to New York; you landed around, maybe, 8 p.m.?

A.   Yes.

Q.   OK.  And so this was a very busy week for Mr. Combs, from what you understood, right?

A.   Yes.

Q.   And he had told you that you guys would be shopping and going out.  Do you remember that?

A.   Yes.

Q.   And you were happy because of that, right?

A.   Yes.

P6bWcom3                          Jane - Cross

Q.  You had bought a dress, which we looked at on direct?

A.  Yes.

Q.  And you said that you needed shoes, and then when you arrived at the hotel his stylist had shoes there that matched your dress for you, right?

A.  Yes.

Q.  OK.  And you were happy to see that, right?

A.  Yes.

Q.  OK.  And so you arrived at the Trump Hotel and you said you had to wait a little bit for him, right, because he was talking to people?

A.  Yes.

Q.  And then you end up going to a lounge that evening?

A.  Yes.

Q.  And you didn't have time that night to go to dinner, right?

A.  No.

Q.  You went and you had a drink and you had time together at that lounge at the hotel, right?

A.  Yes.

Q.  And then he -- you said that you told him at the lounge that you were done with this and you didn't want to do it, right?

A.  Yes.

Q.  And then in response, you testified, he was being defensive, and he said we don't have to do it, we don't have to

P6bWcom3                      Jane - Cross

do it at all?

A.   Right.

Q.   Do you remember that?

A.   Yes.

Q.   And that you were just listening?

A.   Yes.

Q.   And I think you testified he was defensive whenever you brought up these feelings?

A.   Yes.

Q.   And he said -- he tried to say he didn't need these nights, right?

A.   Right.

Q.   And you believed -- do you remember telling the government that you believed that he did?

A.   Yes.

Q.   And so you then ultimately agreed to meet the new Cowboy 4 Angel entertainer that we just looked at the link to, right?

A.   Yes.

Q.   But you -- when you met him, you did not like the chemistry of that individual, right?

A.   No.

Q.   And so after trying, you said, you released him, essentially?

A.   Yes.

Q.   And -- and do you remember that even though you didn't have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6bWcom3                        Jane - Cross

sex with this individual, you and Mr. Combs paid him anyway?

A.  Maybe --

Q.  All right.

A.  -- yes.

MS. GERAGOS:  If we could put up 3187 for the witness and the parties.

Q.  Is this a message on September 21 between you and Mr. Combs?

A.  Yes.

MS. GERAGOS:  OK.  We'd move to admit this under seal, your Honor.

MS. COMEY:  No objection, your Honor.

THE COURT:  All right.  Defense exhibit 3187 will be admitted under seal.

(Defendant's Exhibit 3187, under seal, received in evidence)

MS. GERAGOS:  If we can now publish this to the jury and if we could put pages 1 and 2 side by side.

All right.

Q.  Do you see here that Mr. Combs says:  Hey, baby.  What you doing?

And you say you have body aches and head pressure; this was when you said that he gave you Covid?

A.  Yes.

Q.  And he says:  I feel so bad.  Right?

P6bWcom3                    Jane - Cross

A. Yes.

Q. And you say:  How are you feeling?  Are you in D.C. safely?

A. Yes.

Q. Do you remember he went to D.C. after this trip?

A. Yes.

Q. OK.  And he says -- you say:  It's OK, baby.  We really wanted to see each other.  Still happy we did.  Just going to stock up on my sick stuff and take it easy.  Right?

A. Yes.

Q. OK.  And then he sends you the link to send to the Cowboys 4 Angels person to pay for the person.  Does that sound right?

A. Yes.

Q. Payments to advance to each other?

A. Yes.

Q. All right.  And do you see that you send the payment to the Cowboys owner?

A. Yes.

Q. And then you say:  For her bum ass cowboy?

A. Yes.

Q. OK.  So after that individual came to your hotel room and you turned him -- you told Mr. Combs you didn't feel any chemistry with him and you guys turned him away, you still paid this individual, right?

A. Yes.

Q. OK.  And do you remember testifying that when you rejected

P6bWcom3                        Jane - Cross

this man, you then felt like you needed to make up for

rejecting him, so that's when you called in Kabrale?

A.  Yes.

Q.  And do you remember telling the government that you felt

freer and you tried to give it your all and make it a wonderful

show?

A.  With -- when Kabrale came, do you mean?

Q.  When Kabrale came to New York, at that trip, do you

remember telling the government with respect to that that you

felt freer and you tried to give it your all?

A.  Yes.

Q.  And do you remember telling them that you tried to make it

a show?

A.  Yes.

Q.  And do you remember telling them that you were open that

night to Kabrale doing a lot more to you and that you were

taking it?

A.  Yes.

Q.  And do you remember telling them that you were very high

that night and you were more loose because of the drugs and you

were more comfortable because it was Kabrale?

A.  Yes.

Q.  And you were happy because it was Kabrale, who you knew,

and Combs, who you were in love with.  Does that sound right?

A.  Yes.

P6bWcom3                         Jane - Cross

Q.  And then do you remember testifying that Combs was really happy after this night?

A.  Yes.

Q.  And you were really happy that you made Mr. Combs happy, right?

A.  Yes.

        MS. GERAGOS:  All right.  Could we put up, for the witness and the parties only, 3188, please.

Q.  Is this a message between you and Mr. Combs from September 23, 2023?

A.  Yes, it is.

        MS. GERAGOS:  We move to admit this under seal.

        MS. COMEY:  No objection?

        THE COURT:  All right.  3188 will be admitted under seal.

        (Defendant's Exhibit 3188, under seal, received in evidence)

        MS. GERAGOS:  All right.  Could we go to page 3, please.

        All right.

Q.  Do you see a message to Mr. Combs here?

A.  Yes.

Q.  All right.  And what do you write in this message?

A.  I say:  Thinking about you, baby.  I actually want to apologize for the mess of things I was saying that were making

P6bWcom3                              Jane - Cross

me unhappy, when I have even a longer list of sweet moments and sweet things you've always consistently done for me.  You mean so much to me, and I love having you in my life.  I love making you happy.  I love making you smile.  I love being around you and kissing you, connecting with you, hugging you.  Everything. I don't want anyone else but you.  I love you.  Thank you for everything.  I love you so much.  No one can ever compare to you, with a sad face and about six hearts.

Q.  OK.  And this was after your New York trip, right?

A.  Yes.

Q.  And do you remember that right after your New York trip you then flew back to Miami to see him?

A.  Yes.  I think, yes.

MS. GERAGOS:  All right.  I can put up -- do you remember government exhibit -- these are in evidence, E139 and E141.  If we can put them side by side.

Q.  Do you remember these photos?

A.  I do, yes.

Q.  And you took these, I think you testified, but please correct me if I'm wrong, that you took these outside of the hotel?

A.  Yes.

Q.  What hotel were you at here?

A.  This is The Edition hotel in Miami.

Q.  OK.  And you guys got a drink at the hotel bar, and then

P6bWcom3                    Jane - Cross

you ended up taking photos outside?

A.  Yes.

Q.  And do you remember that during this trip he was watching the videos from the New York trip?

A.  Yes, I do.

Q.  And then he was really excited seeing Kabrale and you on those videos, right?

A.  Yes, he was.

Q.  And these were the videos that you said you felt freer because it was Kabrale, who you knew; you were on -- you were very high, I think you've said, right?

A.  Yes.

Q.  And Mr. Combs was very happy, and you were really in love with Mr. Combs, right?

A.  Yes.

Q.  And he really, really enjoyed watching these videos that night?

A.  Yes, he did.

Q.  And so when you watched the footage at dinner, you then invited Kabrale to Miami, right?

A.  Yes.

Q.  OK.  Skipping ahead to October, we talked a little bit on direct examination about this sobriety party.  Do you recall?

A.  I do.

Q.  OK.  And you testified that around the time, around that

P6bWcom3                          Jane - Cross

time, you saw -- I think you testified you saw a photo of an ex

girlfriend of his at a hotel in Los Angeles.  Do you remember

that?

A.  I do.

Q.  Do you remember seeing somebody you thought -- it was Gina,

right?

A.  Yes.

Q.  You thought he was no longer with her, and you saw that she

was at The Edition in Los Angeles?

A.  Yes.

Q.  And so you saw -- and indicated that he was with her,

right?

A.  Yes.

        MS. GERAGOS:  And if we could pull up Defense Exhibit

3200.

        Your Honor, this is the corresponding exhibit to

A10463.

Q.  Is this a message between you and Mr. Combs on October 15,

2023?

A.  Yes, it is.

        MS. GERAGOS:  Your Honor, we move to admit this under

seal.

        MS. COMEY:  No objection.

        THE COURT:  It will be admitted under seal.

        (Defendant's Exhibit 3200, under seal, received in

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6bWcom3                          Jane - Cross

evidence)

MS. GERAGOS:  You can publish this to the jury.

Q.  Are you and Mr. Combs planning a time to meet?

A.  Yes, we are.

Q.  OK.  And then he asks you:  What time are we meeting?

And you say:  Ew.  No thank you.  Right?

A.  Right.

Q.  And he says:  You serious?  I need you.

And you say:  Why would you bring the trash back in and not answer my FaceTimes on top of that.

You need me.  You're with what you want.  Right?

A.  I believe I said:  You don't need me.  You're with what you want.

MS. GERAGOS:  Thank you.  Maybe I should have you read it (inaudible).

THE WITNESS:  It's OK.

BY MS. GERAGOS:

Q.  OK.  And then he says:  Girl, I fell asleep.  You tripping. Baby, I need you bad.  Please don't do this.  I need you. Right?

A.  Yes.

Q.  OK.  And he says:  Whatever you decided, let me know.

A.  Yes.

Q.  And what did you understand that to mean, whatever you decided, let me know?

P6bWcom3                    Jane - Cross

A.  He's just saying whatever.  I'm not really sure.  He's just --

Q.  Whatever you decide -- do you understand it to mean whatever you decide to do, let me know?

A.  This seems like a fluffer text, like a -- I don't know, like a nothing text.

Q.  OK.  And you say:  You partied with Gina at The Edition. Please stop lying to me.  I'm not touching you after you dipped in trash and toxic energy.  Put some entertainment next to her. You all figure that shit out.  Right?

A.  Yes.

Q.  You brought the messiness and drama back in.  I don't want that shit back in my aura.  I rebuke it.  Right?

A.  Right.

Q.  And did Gina have a tendency for dramatics at times?

A.  Yes.

Q.  From your perspective?

A.  Yes.

         MS. GERAGOS:  And if you could go to page 3, please, and 4.

Q.  Did you say:  I want to protect my peace and we were doing so good?

A.  Yes.

Q.  And then you write:  Here you go bringing the bullshit back in.  It's a toxic cycle for you, and it bleeds into our

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6bWcom3                    Jane - Cross

relationship.  Right?

A.  Yes.

Q.  Is the cycle referring to Gina?  What is the toxic cycle, in your mind?

A.  Yes, it was referring to his ex.  Yeah.

Q.  Because when she would come in, it would -- if you could explain, what does that mean?

A.  From what I gathered from their relationship and from our own conversations, it just seemed that they constantly had problems and a lot of public problems.

Q.  OK.  And so then you said:  That bad energy goes on you and goes on to me.  Right?

A.  Yes.

Q.  Because you didn't like how negative it was when Gina was around, right?

A.  Right.

        MS. GERAGOS:  OK.  If we could zoom out.

Q.  And he says, he says after a few messages:  Girl, stop. You know I don't feed into this.  I need you.  You're the only thing that's going to put me at peace.  Please.  Right?

A.  Yes.

Q.  And you felt that the hotel nights really put him at peace, right?

A.  Yes.

Q.  And that's part of why -- part of why you did them, right?

P6bWcom3                        Jane - Cross

A.  Yes.

Q.  Because you felt that they brought him peace, right?

A.  Yes.

Q.  And that you being there with him helped bring him that peace, right?

A.  Yeah.

        MS. GERAGOS:  OK.  All right.  If we could take that down.

Q.  Do you remember the next day Combs asked to see you after these messages?

A.  Yes.

Q.  OK.  And you -- would it be fair to say you kind of fought back some more because of the fact that he was just with Gina?

A.  Yes.

Q.  All right.  And you had told him that you needed a mental break from this?

A.  Yes.

Q.  OK.  And then he said, well, do you want to break up?

A.  Yes.

Q.  And that it was around this time that you were encouraging him that you wanted him to go to rehab and get sober?

A.  Yes.

Q.  And what were you doing to encourage that?

A.  Just trying to be an example of somebody who herself was trying to just be healthy and I would just want him to eat,

P6bWcom3                          Jane - Cross

like, good foods, vitamins, get off his drugs, get off everything.  I would just send him recipes, try to tell him to meditate, have yoga.  Anything just to push him towards health and wellness.

Q.  And so you told him you were going to do 30 days without doing anything, right?  Or does he say that to you?  Did he say he would do 30 days without doing anything?

A.  He said it, yes.

Q.  And he said but could we just have one more sobriety party?

A.  Yes.

Q.  And after he said that you agreed?

A.  Yes.

Q.  And that's the hotel night where you didn't take any drugs, right?

A.  Right.

Q.  And then there was three different guys, right?

A.  Yes.

Q.  And earlier that night -- I think we looked at some photos -- you went to see him in concert that night?

A.  Yes.

Q.  And, and then there were several entertainers at the hotel?

A.  Unfortunately, yes.

Q.  And the sobriety party, you said, lasted 12 to 18 hours, right?

A.  Yes.

P6bWcom3                          Jane - Cross

Q.   And you had agreed to it, right?

A.   Unfortunately, yes.

Q.   You keep saying unfortunately, but you had agreed to it, right?

A.   Yes.

Q.   You regret now that you agreed to it; is that fair?

A.   I resent him for knowing how much I loved him and knowing I couldn't say no to him.

Q.   My question is you regret that now, right?

A.   I resent him for it, yes.

Q.   You resent him for the fact that you did the sobriety party?

A.   I resent him for all of it.

Q.   OK.  And you regret it, right?

A.   I believe resent and regret lie in the same feelings.

Q.   OK.  And you just said because he knew how much you loved him, right?

A.   Yes.

Q.   And you had wanted to break up with him because you saw him with Gina, right?

A.   There were so many times I wanted to break up with him.

Q.   And then he would say -- you either would, right?  We talked about a few times where you would take breaks from him, right?

A.   Yes.

P6bWcom3                        Jane - Cross

Q.  And you made the decision not to answer his phone calls or respond to his text message, right?

A.  Right.

Q.  And then sometimes you made the decision to answer those phone calls and answer those text messages, right?

A.  Yes.

Q.  And then there were times where you told him that you didn't want to have hotel nights, right?

A.  Yes.

Q.  And we looked at some of those times today?

A.  Yes.

Q.  And then there were times where he asked for hotel nights and asked for entertainers and you agreed, right?

A.  Yes, I would.

            (Continued on next page)

P6BQcom4                          Jane - Cross

BY MS. GERAGOS:

Q.  If we could -- do you remember then that after the sobriety party, you then tried to break up with him again?

A.  I believe so, yes.

Q.  Do you remember you were in an Equinox parking lot, and you tried to break up with him?

A.  Yes.

Q.  And he told you -- and you remember --

MS. GERAGOS:  Let's look at Government Exhibit -- I believe it's already in evidence -- E-115 and E-116 side by side.  We can publish these for the jury.

Q.  And you remember -- I think you testified you were in a depressed state at this time, right?

A.  Yes.

Q.  And that you went over to his house, right?

A.  Yes.

Q.  And you were -- you were having -- at the time, you were pretty depressed you said, right?

A.  Yes.  Very.

Q.  And Mr. Combs told you at the same time he was feeling depressed as well, right?

A.  Yes.

Q.  And he was saying -- and then you slept over that night, right?

A.  Yes.

P6BQcom4                        Jane - Cross

Q.   And no hotel night, right?

A.   No.

Q.   No entertainer at his house that evening?

A.   No.

        MS. GERAGOS:  Okay.  And I'd like to show for just the witness -- if we could pull up Defense Exhibit 3299.

Q.   Do you recognize this video?

A.   Yes, I do.

Q.   Is this a video that you took from that day?

A.   Yes.

        MS. GERAGOS:  Your Honor, we would move to admit this video.

        MS. COMEY:  No objection.

        MS. GERAGOS:  Under seal.

        THE COURT:  3299 will be admitted under seal.

        (Defendant's Exhibit 3299 under seal received in evidence)

        MS. GERAGOS:  Could we publish and plate for the jury with sound -- let's not play it yet.

Q.   This is the video that you took at the same time you took those photos, is that correct?

A.   Yes.

        MS. GERAGOS:  Could we play it with sound, please.

        (Media played)

        MS. GERAGOS:  We can take this down.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P6BQcom4                        Jane - Cross

Q.   In that video, he's saying:  We need to pick each other up?

A.   Yes.

Q.   Is this in reference to the fact that you were feeling low that day, and he was also feeling low that day?

A.   At this point in my relationship, I had really hit a wall, and I was really depressed here.

Q.   And you said:  You did some saving on me and I didn't even know.  Do you recall that?

A.   I do.

Q.   That was in reference to Mr. Combs doing some saving on you?

A.   That was in reference to just his kind words at the time.

Q.   So when you told him that you were feeling down after this night, he had you come over to his house, right?

A.   Yes.

Q.   And he was telling you these kind words, and says we need to listen to each other, right?

A.   Yes.

Q.   And you spent the night that night, and you did not have any entertainers at the house, right?

A.   Right.

Q.   And then this was in -- this was at the end of October, right?

A.   Yes.

Q.   And you also testified that you saw him again around

P6BQcom4                        Jane - Cross

Halloween, and you were there for his shoot, right?

A.   Yes.

Q.   What did he dress up as Batman or something like that?

A.   Yes.

Q.   And no entertainers that night either?

A.   No.

Q.   And then you were also trying to plan perhaps a dinner with him for his birthday, which was a couple days later?

A.   Yes.

Q.   And no entertainers that night either, right?

A.   I'm not sure if we ended up having a dinner, but no, I didn't spend his birthday with him.

Q.   Do you remember texting with KK about his birthday, and saying we're not going to have any hotel nights and that you just wanted to plan a nice dinner?

A.   Umm, yes.

Q.   And you were discussing perhaps going to a few restaurants in LA, right?

A.   Yes.

Q.   Okay.  And then it was after this, these videos that Cassie's lawsuit was made public, right?

A.   Yes.

Q.   And we looked at all of those messages on direct examination, right?

A.   Yes.

P6BQcom4                        Jane - Cross

Q.   And you had said that you hadn't -- you had broken up about two weeks earlier, right, and you hadn't had any hotel nights?

A.   Right.

Q.   And you were really upset right before Cassie's lawsuit because you saw that he was in London, and he had brought another girlfriend to London, right?

A.   That added -- yeah, that was like -- that added to the -- everything --

Q.   That contributed to everything, sorry?

A.   Yeah, the -- I noticed he was with somebody in London, and so I became upset about that.  And then I believe the lawsuit was just like a couple days later, I think too.

Q.   And then that's when you texted him a few days later?

A.   Yes.

Q.   All right.  And that's when we then heard the recordings that we played the other day on direct examination?

A.   Yes.

Q.   And at this time you were fully broken up with Mr. Combs, right?

A.   Yes.

Q.   You were not going to get back with him, right?

A.   No.

Q.   You made the decision that you were going to break up?

A.   Yes.

Q.   And that was your choice at that time in November of 2023,

P6BQcom4                         Jane - Cross

right?

A.  Yes.

Q.  And did Mr. Combs ever talk to you about Cassie in the course of your relationship?

A.  Mmm, I would say here and there.

Q.  Do you remember him telling you that she was one of his greatest loves?

A.  Yes.

Q.  And during times when he would be high with you, he would write her love letters.  Do you remember that?

A.  Mmm, I'm not sure about that one.

Q.  If I could show you something to refresh your recollection, could I bring up Defendant's Exhibit 3265 page 2.  If you could just read this and tell me if that refreshes your recollection.

A.  Oh, yeah.  Yeah, I remember that.

       MS. GERAGOS:  We could take that down.

Q.  So do you remember -- do you remember saying that Gina -- that Cassie was one of his greatest loves, and that Gina tormented that relationship?

A.  Yes.

Q.  And that was one of the toxic cycles that he would get into with Gina?

A.  Yes.

Q.  Do you remember following Cassie's lawsuit quite closely on Instagram and other public means?

P6BQcom4                     Jane - Cross

A.   Yes.

          MS. GERAGOS:  Your Honor, could we have a very quick sidebar?

          THE COURT:  Yes.

          MS. GERAGOS:  Thank you.

          (Continued on next page)

P6BQcom4                          Jane - Cross

(At the sidebar)

MS. GERAGOS:  I'm very ahead of schedule.  I'm going to get into a few voice notes that I did not expect to get to today that Ms. Comey has not listened to and I wanted to admit into evidence.

With your Honor's permission, if we break today, I don't expect we'd go more than an hour tomorrow.

MR. AGNIFILO:  From someone who has turned one hour into three, I think you will definitely finish in the morning.

MS. GERAGOS:  Certainly we'll finish.

THE COURT:  In any event, you will finish tomorrow so you'd like to have an opportunity to discuss those exhibits.

MS. GERAGOS:  Thank you, your Honor.  I went through two full years in a few hours.  I think I can get through the rest of the relationship.  I'm very sorry about this.  I didn't expect to get through so much.

THE COURT:  That's fine.

(Continued on next page)

P6BQcom4                    Jane - Cross

(In open court)

THE COURT:  Members of the jury, good news.  We are going to break early today, and we will be back here at 9:00 a.m. tomorrow.

Same instructions as always.  Do not speak with each other about the case.  Don't speak with anybody else about the case.  And do not watch or look up or investigate anything about the case.

With that, we'll see you here at 8:45 so that we can get started at 9:00 a.m.

All rise for the jury.

(Continued on next page)

P6BQcom4                          Jane - Cross

(Jury not present)

THE COURT:  Jane, we'll see you back here tomorrow.

(Witness not present)

THE COURT:  Ms. Geragos, I understand that you have some additional cross, but you should be complete in the morning tomorrow?

MS. GERAGOS:  Definitely.

THE COURT:  So, Ms. Comey, who are the next government witnesses?

MS. COMEY:  Andre LaMon and Jonathan Perez will definitely take us through the end of the day tomorrow, your Honor.

After that, we would expect to call Ananya Sankar, who is our first summary witness.  Sankar, I apologize, S-A-N-K-A-R.

THE COURT:  Who do we have after the first summary witness?

MS. COMEY:  Well, we're still working on travel logistics, your Honor, but we think that may end up taking us through the end of the week.  If we could regroup at the end of the day, given how quickly Ms. Geragos' cross has gone and then reach out to the Court and the parties.

THE COURT:  That's fine.  Can you give me a general sense of what's left in the government's case so we can just figure out timing?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6BQcom4                        Jane - Cross

MS. COMEY:  Yes, your Honor.

THE COURT:  What I'd like to do, at the very latest at the beginning of next week, I'd like to give the jury some sense of where we are in the case.

MS. COMEY:  I expect we will rest no later than a week from Friday, so next Friday we may rest.  We may rest as early as Wednesday of next week, your Honor.

After the cross of Jane finishes tomorrow, I expect we'll be able to confirm that we are prepared to cut a number of additional witnesses from our witness list.  I think we'll be able to tell the defense and the Court who we are cutting after the end of the day tomorrow, after Jane's cross concludes, and then I think we'll be able to give the remaining witness order through the rest of the government's case in chief as well.

THE COURT:  Mr. Agnifilo, you knew I was going to come to you next.  I'm not going to put you on the spot right now.  Again, what I'd like to do is be able to give the jury some sense of where we are in the case.  I understand what you said, I believe it was last week or maybe two weeks ago, about adjustments that you may need to make in the defense case, so I'm not asking for you to respond right now.

But to the extent that you can give us a sense of the timing or the scope of the defense case, whatever you're comfortable doing, I think that would be better for all of us,

P6BQcom4                         Jane - Cross

just so the jury has in mind what we are looking for in terms

of timing.  I'm putting that on your radar right now.

MR. AGNIFILO:  I think I would have -- I have a sense

of who the witnesses are that the government might cut.  That

could impact on my answer.  So if I could refrain from

giving -- I think everything your Honor has told the jury is

absolutely accurate.  I have no reason to think everything

you've told the jury in terms of when the trial would end is

inaccurate, and if I thought that, I would certainly pipe up

and say that.  So I don't think that's in play.  Rather than

giving what really would be somewhat of an imperfect guess,

when we see who the government is going to call and not call, I

think I would be able to give the Court a much clearer idea.

THE COURT:  Very good.  Thank you.

That brings us back to the summary exhibits.  Anything

to address right now along those lines or are the parties still

working on meeting and conferring on those?

MS. COMEY:  I believe the parties are still meeting

and conferring.  I'm looking at Ms. Foster to confirm.

MS. FOSTER:  Yes, my understanding is that defense is

ready to meet and confer today after court.

THE COURT:  Very good.

MS. COMEY:  Your Honor, one other thing we'd like to

put on the record.  I know your Honor's pretrial order directed

that the defense provide 26.2 material when the government

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

rests.  We just want to confirm that that means either Wednesday or Friday when we rest, there will be 26.2 material ready to provide to us, given that we don't want to further delay any proceedings if something comes up in the 26.2 material that requires us to address it with the Court or otherwise.

THE COURT:  That is correct.

Mr. Agnifilo?

MR. AGNIFILO:  Yes, we agree.

THE COURT:  Anything further from the government?

MS. COMEY:  Just one thing to flag, and I don't think we need to take it up today, but just to flag since my redirect will likely come up tomorrow.  I do think the door has been opened to the prior consistent statements in Jane's notes from after Ms. Ventura's lawsuit.  And the reason is the line of cross-examination that Ms. Geragos pursued regarding the immunity that Jane received in the grand jury.

As your Honor may recall, Ms. Geragos asked Jane about a topic that I did not address on direct, which was the fact that Jane received immunity when she went into the grand jury, and then Ms. Geragos asked Jane who decides whether she's telling the truth under that immunity order.  And Jane I believe answered "the prosecutors" or may have even been a leading question, saying the prosecutors decide whether you're telling truth.  That raises the implied argument that she is

lying or shaping her testimony to fit with the prosecutors' theory, and that she is changing her testimony from the moment that she gets that immunity through to her trial testimony today in order to fit with what she thinks the prosecutors want to hear.

So that's a new motive to lie that Ms. Geragos introduced through her cross-examination of Jane. And Jane's notes before November of 2024 would therefore be prior consistent statements that she made before Ms. Geragos -- before Jane went in to the grand jury and received immunity in November of 2024. So I think that door has been opened, your Honor, and on redirect I'm going to ask to admit those notes.

THE COURT: Response?

MR. DRISCOLL: Yes, your Honor.

With respect to the line of cross-examination about immunity, the attack is about whose view of the witness's truthful testimony governs, and I think what Ms. Geragos was implying is that it's the government that gets to determine whether the witness is being truthful.

And just going back to the rule on prior consistent statements, the issue under *Tome* is the temporal relationship between the statement and when a motive to fabricate first appears. And clearly this witness has testified that she saw Ms. Ventura's lawsuit. She was aware that there was a settlement. And she testified also that she was aware that the

P6BQcom4                        Jane - Cross

settlement was quite large in nature.  And she actually saw the demand in the complaint.  So it's clear that at that point there was a clear motive to fabricate and exaggerate her story.  Also, the government's investigation promptly began at that point.  So under *Tome*, these just can't be considered prior consistent statements.

MS. COMEY:  If I may, your Honor --

THE COURT:  Well, just walking through the rule, the government's position is that Ms. -- so Jane's statements, the voice notes or the written notes postdating Ms. Ventura's lawsuit are consistent with her testimony, and then how are they offered to rebut an implied, I suppose, charge that she recently fabricated the statements?

MS. COMEY:  Because the only relevance of the line of questioning about who decides whether or not she's telling the truth is to suggest that she is shading her testimony in order to please the prosecutors who decide whether or not she's telling the truth.  That's the only relevance of that line of cross-examination is to suggest that she has a motive to lie to please the prosecutors.

THE COURT:  Well, isn't that true of the entire line of cross?  I mean, isn't the cross directed to exposing that to the extent the witness testified that she was not willingly participating in these events, Ms. Geragos is going through text messages that might suggest otherwise.  And so the

P6BQcom4                         Jane - Cross

suggestion is that while you are saying that now in real-time when these things were happening, you had a different view that you expressed in these messages.

MS. COMEY:  Yes, your Honor.

THE COURT:  No, I apologize.  I think Ms. Geragos had one line of questioning that we just heard about whether the witness regretted it now or resented it now, which the witness equated.  And so what's the difference between that kind of inquiry and inquiry into the grand jury process?

MS. COMEY:  So the difference is that the inquiry into the impact of the immunity order that she received in the grand jury goes directly to whether or not this witness has a particular motive to change her testimony and change her account of what happened as a result of the immunity order that was issued in November of 2024.

THE COURT:  Understood.  So it's really the timing.

MS. COMEY:  Exactly, your Honor.

THE COURT:  Got it, okay.

MS. COMEY:  So I think what Mr. Driscoll said before Jane took the stand was that the only motive that the defense was proffering at that point was Ms. Ventura's lawsuit.  So that was the timing -- that was the cutoff for me to offer prior consistent statements because they were arguing that the motive to fabricate, the motive to lie occurred when Ms. Ventura's lawsuit came out, so anything predating that

P6BQcom4                          Jane - Cross

would rebut any allegation of changing her -- of fabricating her story exaggerating her account.

They have now introduced a second motive point, which is the immunity order in November of 2024.  They have now introduced a specter of and the suggestion that she is shaping her testimony in response to that immunity order, and as a result of it in November of 2024.  So I think that moves the cutoff date to November of 2024 to rebut any implied allegation that she is shaping her testimony, changing her testimony, or fabricating her testimony in order to please prosecutors.

THE COURT:  Well, maybe help me with this.  So if she -- if the cut off was previously when Ms. Ventura's lawsuit was made public and the witness was aware of it, and so only the prior statements would be admissible under the rule, then how does anything that happened later really matter?  Meaning, let's say that there was some other additional cumulative motive to lie that came up later, how would that move the goalpost forward in time?

MS. COMEY:  So I think it allows -- we are allowed, I think, your Honor, to rebut any allegation that there was any additional motive at all that caused her to change her story. I think we've already rebutted it through the notes that we introduced before Ms. Ventura's lawsuit.  I think we're also entitled to rebut the suggestion that she fabricated at the point of the grand jury in 2024 and onwards.

If Ms. Geragos had not asked those questions, I would not be raising this.  But she raised the suggestion that this witness would change her story in order to please prosecutors because prosecutors decide whether or not she's telling the truth, and I think we are entitled to rebut that implication.

THE COURT:  What is the date of the immunity order?

MS. COMEY:  November 2024.  I don't remember the specific date, your Honor, but it is in November of 2024, and the notes all predate that.

THE COURT:  So the idea is that these are really separate things and should be viewed separately.

MS. COMEY:  Yes, your Honor.

THE COURT:  So the statements about Ventura's lawsuit, fine, the earlier statements can come in.  The later statements wouldn't otherwise come in.  But there's a separate charge that's been levied against -- that related to the immunity order that's November of 2024, so now at that point you should be permitted to introduce the statements that predate that order.

MS. COMEY:  Exactly, your Honor.

THE COURT:  Any further response, Mr. Driscoll?

MR. DRISCOLL:  Yes, Judge.  I just don't think that view is consistent with the rule announced in *Tome*.

THE COURT:  You mentioned *Tome*, and I know it's in the papers, but what's the citation?

P6BQcom4                         Jane - Cross

MR. DRISCOLL:  Judge, I would have to pull it up. It's also mentioned in the Advisory Committee Notes to the rule, which gives a good overview of its rationale.  But the point is that once the witness has a motive to fabricate on the subject matter of the testimony that the witness is giving, whether the statement is a prior consistent statement or not, it doesn't meet -- it doesn't satisfy the temporal requirement of the rule, which isn't exactly listed in the rule itself, but it's a feature of the common law as announced in *Tome* and in the Advisory Committee Notes.

THE COURT:  All right.

MR. DRISCOLL:  And the point about the immunity order, I think if that's the relevance that they're offering these prior consistent statements for, then it doesn't pass 403 either.  The probative value there would be much lower than offering them as prior consistent statements at an earlier time.  Here our position is basically that these notes are her papering the file once the government's investigation begins.

THE COURT:  Ms. Comey, what are the exhibit numbers if you have them?

MS. COMEY:  Sure, your Honor.  I have E-331-N, E-331-O, E-331-K and E-3331-L, so those four.  And E-331-P, so those five are the five I have pulled.  They are between November of 2023 and March of 2024.  And I think they have exceptional probative value given that the relationship does

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6BQcom4                         Jane - Cross

not end with Ms. Ventura's lawsuit.  So Jane does not leave the defendant.  She does not leave his orbit.  She does not leave the relationship.  She remains in it.  And so her notes in her notes app are her contemporaneous thoughts and feelings while she is still in the relationship, still communicating with Mr. Combs, still communicating with his chief of staff and is in the middle of the charged conduct.

Perhaps Mr. Driscoll's argument about probative value might have some force if these postdated the relationship, but they are still in the heartland of the relationship, and especially the March 2024 note comes when she is back together with him after the break that they take in November, December and January.

So I think that these have extraordinary probative value, and that is especially true because I don't think anything in the cross-examination has suggested that she had any motive to "paper the file."  There is no evidence in this record, and nothing has come through from the examination of this witness to suggest that she is trying to make a law enforcement report; that she was trying to prepare for a civil suit.  Ms. Geragos has not even suggested that on cross-examination.  So the suggestion that she's trying to "paper the file" I think finds absolutely no basis in the record.

THE COURT:  Understood.  So I will take a look at the

P6BQcom4                        Jane - Cross

testimony, Ms. Comey, that you've pointed to as well as these five exhibits, and I'll give you my ruling in the morning before we begin and continue with the cross-examination.

MR. AGNIFILO:  Your Honor, can I add one thing?  I tried to wait so it didn't seem like there was a double team relay.

(Counsel and Court crosstalk)

MR. AGNIFILO:  It's like a relay race.

I've certainly seen cross-examinations where the cross is you want to make the prosecutors happy because you're afraid of being prosecuted.  This simply is just not close to that cross.  I think everyone in courtroom realizes at a very early stage the government did not view this witness as a co-conspirator.  And so I think that what Ms. Comey is suggesting is much more relevant in the scenario where you have someone who really could be a co-conspirator but is trying to walk that line and make the prosecutors, for lack of a better word, happy.  And I see the relevance there.

This just simply is the polar opposite from that situation.  There is no realistic possibility that I've ever heard of that this witness thought she was going to be prosecuted.  That certainly wasn't brought out in the direct. We haven't suggested that in the cross.  I mean, there's a very strong cross-examination when a defense lawyer thinks that's the truth.  "you were afraid of being prosecuted.  You said

P6BQcom4                         Jane - Cross

things so you wouldn't be prosecuted.  And now you're just trying to like toe that line so that you don't get prosecuted."

That is just a different universe than what we have with this witness.  So I wanted to share that perspective and so I think --

THE COURT:  What about the, you know, potential Mann Act charges or potential drug-related charges?  We've heard testimony about drugs being carried by Jane on the request of --

MR. AGNIFILO:  I'm just not hearing in the direct, I mean, I -- I'm just not hearing in the actual examination that any of these things are a factor.  In other words, I mean, the government hasn't suggested, you know, that there were -- she had broken the law voluntarily; that she was committing violations of the Mann Act or violating prostitution laws.  It just -- I mean, we have -- you know, we have now, I don't know how many days it is, five days of an examination, we have a record of that, and that's just not the nature of this witness' testimony.

THE COURT:  If that's so, then what was the reason for the inquiry concerning the grand jury process?

MR. AGNIFILO:  There is a reason for that.  Because I think what the government did is they told half the story, right, as though the truth is this objective thing that comes down from someplace other than the government's opinion.  And

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6BQcom4                         Jane - Cross

that just completes the narrative.  You said if you tell the truth.  We don't want the jury thinking your Honor is involved in that process.  Your Honor doesn't sit there and say you're telling the truth or you're not.  It's a single question that just provides a very simple clarification of the government's point.  The truth doesn't exist in some vacuum.  It's an agreement with the government, and the government determines what the truth is.  It's one question, and it's clarifying in nature.  That's all it is.

THE COURT:  The grand jury -- well, I've got to take a look at -- I'll take at a look at the testimony.  I appreciate the views that you've expressed.

MS. COMEY:  If I may, your Honor.

What Mr. Agnifilo said I think just gave away the game.  The whole point of that line of cross-examination was to suggest that Jane is parroting back the government's version of the truth.  She wrote these notes saying essentially the exact same thing she said on the stand long before she ever met a single prosecutor in this office or a single federal agent, and we should be able to put those in to show that there is absolutely nothing to the suggestion that this witness is just regurgitating what she thinks prosecutors have said or want her to say.  So I think that these notes need to come in as prior consistent statements to rebut exactly the argument that Mr. Agnifilo just said he wants to make about this immunity

P6BQcom4                    Jane - Cross

order.

THE COURT:  Understood.  I'll take a look at the materials, and we can address it first thing in the morning.

Anything else from the government?

MS. COMEY:  No, your Honor.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  Nothing, your Honor.  Thank you.

THE COURT:  We'll see everyone here at 8:30.

(Adjourned to June 12, 2025, at 8:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 JANE

Cross By Ms. Geragos . . . . . . . . . . . . .5510

DEFENDANT EXHIBITS

Exhibit No.                                     Received

 3035, under seal,   . . . . . . . . . . . . . .5510

 3038, under seal,   . . . . . . . . . . . . . .5515

 3044, under seal,   . . . . . . . . . . . . . .5527

 3061, under seal,   . . . . . . . . . . . . . .5541

 3062, under seal,   . . . . . . . . . . . . . .5549

 3064 under seal   . . . . . . . . . . . . . . .5552

 3071-R    . . . . . . . . . . . . . . . . . . .5557

 3288 under seal   . . . . . . . . . . . . . . .5564

 3290    . . . . . . . . . . . . . . . . . . . .5574

 3088 under seal   . . . . . . . . . . . . . . .5579

 3090    . . . . . . . . . . . . . . . . . . . .5589

 304 under seal   . . . . . . . . . . . . . . . .5594

 3105, under seal,   . . . . . . . . . . . . . .5604

 3122, under seal,   . . . . . . . . . . . . . .5606

 3125, under seal,   . . . . . . . . . . . . . .5610

 3136, under seal,   . . . . . . . . . . . . . .5612

 3152, under seal,   . . . . . . . . . . . . . .5614

 3171, under seal,   . . . . . . . . . . . . . .5617

 3183, under seal,   . . . . . . . . . . . . . .5623

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3327, under seal,    . . . . . . . . . . . .5627

3187, under seal,    . . . . . . . . . . . .5631

3188, under seal,    . . . . . . . . . . . .5634

3200, under seal,    . . . . . . . . . . . .5637

3299 under seal    . . . . . . . . . . . . .5646