P6CQcom1 - Corrected

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

              v.                        24 Cr. 542 (AS)

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

              Defendant.               Trial
------------------------------x
                                       New York, N.Y.
                                       June 12, 2025
                                       8:50 a.m.
Before:

                    HON. ARUN SUBRAMANIAN,

                                       District Judge
                                       -and a Jury-

                           APPEARANCES

JAY CLAYTON
     Interim United States Attorney for the
     Southern District of New York
BY:  MADISON R. SMYSER
     EMILY A. JOHNSON
     MAURENE R. COMEY
     MEREDITH FOSTER
     MITZI STEINER
     MARY C. SLAVIK
     Assistant United States Attorneys

SOUTHERN DISTRICT REPORTERS, P.C.
          (212) 805-0300

P6CQcom1 - Corrected

APPEARANCES CONTINUED


AGNIFILO INTRATER LLP
      Attorneys for Defendant
BY:  MARC A. AGNIFILO
      TENY R. GERAGOS
      -and-
HARRIS TRZASKOMA LLP
BY:  ANNA M. ESTEVAO
      -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
      JASON A. DRISCOLL
      -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:   Lucy Gavin
                Shannon Becker
                Paralegal Specialists
                Raymond McLeod, Paralegal

P6CQcom1 - Corrected

(Trial continued; jury not present)

THE COURT:  Good morning everyone.

There are two evidentiary issues raised with respect to Jane's testimony.  Let's address first the issue concerning Defense Exhibit 3226-A.  I'm happy to hear from the defense, but I don't see any way in which the unredacted recording, those snippets that were identified in the email would not be, as the government puts it, rank hearsay given that they don't relate to the defendant's then existing state of mind, and the government indicates that it has not introduced the actual conversation in which the audio message is included and so would not be a completing statement and also would not be necessary to provide context to the actual discussion that happened at that time

MS. GERAGOS:  Thank you, your Honor.

The government on direct examination -- I didn't put this in my email to the Court yesterday so I understand what your Honor is asking.  I know that your Honor has read what my argument was in the email yesterday, but I just would like to supplement it with this.  In her direct testimony at pages 4835 to 4836, Ms. Comey asked her:

"Q.  Toward the end of your relationship with Sean, what if anything did Sean tell you or say to you about whether you had ever told him you wanted to stop these hotel nights?"

She answers:  "I just remember he said that, that I

P6CQcom1 - Corrected

never told him or that, like, he wasn't aware of how I was feeling.

"Q.  At the time he told you that toward the end of your relationship, did you believe him?"

She says, "I did."

"Q.  Since then, have you reviewed some of your text messages with Sean from your relationship?

"A.  I have.

"Q.  What did you realize when you reviewed those text messages?

"A.  I realized that since 2021 that I have been saying the same things over and over again."

So I had not initially marked this exhibit, but in the context of what the direct was of Jane with respect to this, I thought it was important to respond to the government's direct examination for the effect on Jane as the listener, and to have this exhibit in.  And so that is our main thrust.  I know we had argued state of mind.  I understand your Honor doesn't see that it's a state of mind exception, but I think it is important for effect on the listener.

THE COURT:  Right.  It doesn't go to the then existing state of mind because it relates to a prior state of mind; namely, the defendant's previous state of mind that he was not aware that Jane felt the way that she did when they were having the conversation about the sexual encounters that they were

P6CQcom1 - Corrected

having.  So putting that to the side, you say effective on the listener.  I'm not understanding how this would bear on the -- how it would have any bearing there.

The testimony that you just identified in the direct examination I think is consistent with what the defense is saying, which is that, yes, at the end of the relationship, which is when this audio message takes place, the defendant indicated to Jane that he had not previously understood that she felt that way, and on direct the government elicits that Jane believed him at that time, but then subsequently reviewed earlier text message exchanges and -- in which Jane indicates that she had previously said these things to the defendant. And so I'm not understanding how the audio recording that is consistent with what the government elicited on direct would be relevant or probative.

MS. GERAGOS:  It's probative because for us it's -- they put it in on direct.  They opened the door to this exact issue.  And it's probative because it's important as to his state of mind - what did he believe at the time.  That's the entire reason why we're here.  He's charged with sex trafficking this individual.

THE COURT:  When you say "at the time," you're saying on December 20?

MS. GERAGOS:  December 20, 2023.

THE COURT:  Right.  But the government has no

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom1 - Corrected

objection to you putting in the portions of the audio message that bear on his then existing state of mind; meaning, there are portions of the audio message in which the defendant indicates "I did not -- I'm telling you right now, I didn't know this."

There are other statements that I understand the government has no objection to you introducing and they suggested that you could redact the audio message so that those statements that fall within the 803(3) exception could be brought in. And so it's really just a question of a few isolated statements that don't go to the defendant's then existing state of mind but go to a previous state of mind. For instance, "I never understood through the three years that you felt this way." And so really it's just -- can you redact the message so that you can get in the statements that would bear on the state of mind as to December 20, 2023 and not have what the government characterizes as rank hearsay concerning the defendant's prior state of mind?

MS. GERAGOS: We can, your Honor, but what I would like to argue is that we do not have to because they opened the door to this exact type of questioning on cross during their direct. And so we believe that it's consistent with our theory, it's important context, and --

THE COURT: Well, due to the door opening so let's -- I think what I was saying was that they didn't really open any

P6CQcom1 - Corrected

door because the testimony that was elicited on direct is not inconsistent with the notion that the defendant indicated on December 20 that he had previously not understood that Jane felt this way about their sexual encounter.  That is not a door-opening issue.

Let me turn to the government.  I take it that you have no objection to Ms. Geragos inquiring of the witness as to whether she was told by the defendant that he had not previously understood that their relationship had this dynamic, which would be consistent with what happened on direct.  And if the witness said that she either didn't remember or that she denied it, then that would open a separate perhaps avenue to introduce the messages.

MS. COMEY:  If I may clarify, your Honor.  That piece of direct testimony that Ms. Geragos quoted from was with respect to the total end of the relationship in 2024, and so that's a different time period than what we're talking about here in December 2023, because in December 2023 Jane clearly did not believe the defendant.  She pushed back aggressively and said, "I've been saying this over and over again."  In December 2023, Jane was pretty clear in her mind that she had been communicating to Mr. Combs that she did not want to be doing this, and so that was not the time period that was elicited on direct.  The time period that was elicited on direct was the end of the relationship in 2024, at which point

there was not, as far as I know, a text conversation but an oral conversation toward the end of the relationship, and that is what I elicited, and I elicited it because there are prior notes and statements of Jane before she started reviewing her text messages where she said, "I never told him that I didn't want to do this.  I never said anything."  And I asked -- I remember asking her in an interview, like, who said that to you?  And she said, "Well, Sean told me I never told him." Then we looked at her text messages, and she realized, oh, that's not true.

That was why I elicited that conversation at the end. So I don't think that that has anything to do with a self-serving hearsay voice note that the defendant made in December of 2023.

And I would also note that we would have a 403 issue with that particular voice note coming in because I think the record at this point shows that in December of 2023, the defendant was certainly trying to create a record in anticipation of future litigation.  We already heard two recordings that he made of Jane trying to feed her a false narrative during which he accuses her of recording him, apparently trying to throw her off the scent of him recording her.

We have also seen him respond in December of 2023 to Jane's texts expressing her feelings about these nights by

saying "You're trying to set me up."  So he was clearly in December of 2023 very cognizant of the record that was being created through his communications with Jane, so there's even less reason to believe that his statement on that audio recording was truthful, and it is even higher risk of confusing the jury and misleading the jury if that statement were to be introduced.

THE COURT:  All right.  What about the initial inquiry as to whether Ms. Geragos can inquire of Jane as to what conversations they had without introducing the audio message with these excerpts into evidence?

MS. COMEY:  So, your Honor, I think that it raises a similar concern if it's focused on the voice note.  If what Ms. Geragos is trying to elicit is:  Did he tell you in a voice note or in a text message this, I would be concerned that that is a back door in to getting this hearsay in.

THE COURT:  I think it would be -- in December 20, you know, around that timeframe December 2023, you had conversations with Mr. Combs where you indicated your view that the relationship had this dimension.

MS. COMEY:  Mmm-hmm.

THE COURT:  And at that time, he told you that he never understood that that was what he thought.  Isn't that fair?  And what was your reaction to that?

She could ask that line of questioning, I'm just

P6CQcom1 - Corrected

asking you.

MS. COMEY:  I don't think she could, your Honor, because -- so I think in that situation, you are less likely to have the 403 problem that I just identified because it's less likely to be creating a record, though I do think there is reason to believe from the record we have that Mr. Combs was trying to feed Jane a narrative throughout their relationship.

But it is also just an attempt to get in the defendant's statement about his state of mind over a three-year period without subjecting him to cross-examination.  It is attempting to get in his own statement that is hearsay asserted for the truth of the matter, which is that he did not know for three years, that would be the purpose of eliciting that.

And I think the hearsay rule just precludes the defense from putting in a self-serving statement by the defendant asserting what was in his mind for a full three-year period.  If he wants to take the stand and say that and subject himself to cross-examination, that's a different thing.

THE COURT:  Understood.  But wouldn't it be relevant to -- I think it's -- if that's the predicate question and then the followup question is:  In response to Mr. Combs telling you this, did you then say to Mr. Combs, "No, I've felt this way the entire time" or "No, I did tell you all these things for three years," because that would go to what the defense has been doing for the last couple of days, which is to show text

P6CQcom1 - Corrected

messages over the course of the relationship in which the witness indicated to Mr. Combs that she had fun during these nights, et cetera.  And so it would be to further bolster that kind of testimony.

So it would be relevant in that respect.  It would probably overcome a 403 objection, and the purpose of eliciting that testimony, right, without putting the voice note in would not be for the statement and for the truth of the matter.  The it would just be to like set up the predicate -- the next questions, which is like:  What did you say in response?  What did you do in response?

MS. COMEY:  Well, your Honor, I think we know what she did in response from the text messages in December.  In December of 2023, she is repeatedly saying, "No, this happened," and, "No, I told you I didn't want to do this."  And so I don't think that they will get a probative answer in response to that kind of question.  I think that the only probative value for the defense in asking that question is to find a back door in to having the jury hear that the defendant said in December of 2023 "I did not know this for three years." And that's a bell that can't be unrung, and the jury will hear that, and where it will land in their minds is that it's being offered for the truth.  The jury is not going to hear that and think, oh, I'm hearing this to understand how Jane responded.

THE COURT:  I understand, and I agree with the

government's position on introduction of these particular statements contained in the voice note.  And so the objection is sustained as to those portions of the note for the reasons the government has indicated and as we've discussed.

However, Ms. Geragos, I think it would be -- if you wanted to inquire along the lines that we've discussed as to the nature of discussions that took place in December 2023, I think that that would be fair because there would be a non-hearsay purpose for saying "Did he tell you this?"  And then your response, "What did you say back?  You didn't say X, Y, Z."  Questions along those lines I think would properly bear on the issues that are raised.  And then if, depending on the questioning, at some point you believe that there is an evidentiary basis to put in this voice message, you can call for a sidebar, and we can address it at that time.

MS. GERAGOS:  Thank you, your Honor.  I understand the Court's ruling, and I will abide by it.  Thank you.

THE COURT:  Now, the remaining issue concerns E-331-K through P.  The government seeks to introduce six exhibits on redirect that they did not seek to admit on Jane's direct examination.  These exhibits from November 2023 to March 2024 reflect Jane's entries in a Notes application in a time after Ms. Ventura's lawsuit became public, essentially they are Jane's diary.  As Jane explained, to collect her thoughts and prepare to tell Mr. Combs how she felt, she would often go into

P6CQcom1 - Corrected

her Notes app on her phone and write her thoughts and her feelings.  That's from the transcript at page 4835.

These entries, in particular, reflect Jane's thoughts about Ms. Ventura's lawsuit and the allegations therein and how the allegations relate to Jane's own situation.  It also reflects Jane's pain and trauma concerning her relationship with can combs in the months following the lawsuit filing.

The government previously did not seek to admit these diary entries after a colloquy with the court And with the defense because the government understood that the defense's attack on Jane's credibility was that she had altered her view of Combs' behavior after Ms. Ventura's lawsuit.  So the entries from the period after Jane reviewed that lawsuit would not be admissible as prior consistent statements.

As the government explained before Jane took the stand, the only motive to lie that the defense was proffering pertained to Ms. Ventura's lawsuit, so that was the cutoff for the government to offer prior consistent statements.  Anything predating the lawsuit would rebut any allegation that Jane changed, fabricated, or exaggerated her story but anything after would not be admissible.  This is from the transcript at pages 5660 through -61.

Now the government says that the defense has opened the door to the admission of the post Ventura lawsuit exhibits based on cross-examination at pages 5285 through -86.

P6CQcom1 - Corrected

Essentially the defense on cross-examination inquired as to the grand jury proceeding and whether the government gave Jane immunity and what her understanding of that grant of immunity was.  And then they asked the final questions, which are:

"Q.  Is it your understanding that they can't prosecute you for federal crimes if they determine you tell the truth?

"A.  Yes.

"Q.  You didn't want the government to prosecute you, right?

"A.  Yes."

So the government's argument goes like this:  In the cross exam, the defense impliedly attacked Jane's credibility not based solely on Ms. Ventura's lawsuit, but in addition on the later immunity she was granted in 2024 in the grand jury investigation.  The exhibits are prior consistent statements as to that charge is the government's argument.

As a technical matter, that would seem to fall within the parameters of Rule of Evidence 801(d)(1)(B).  Now, the defense in their letter points to a few cases, and what they say is that it's not the -- the inquiry is not focused on *the* motive to fabricate.  The inquiry is focused on *a* motive to fabricate.  So once there is a motive to fabricate, a statement can't be brought in as a prior consistent statement.

Now, most of the cases the defense cites are not really on point.  However, in *United States v. Forrester*, 60 F.3d 52 (2d Cir. 1995), the court there said:  "A statement

made after an improper motive exists is not within the scope of Federal Rule of Evidence 801(d)(1)(B)."  Now, that's the statement in the case.

This particular fact pattern does not appear to have previously arisen.  Where there are two motives to fabricate, one comes at time one, one comes at time two, and the question is whether statements that fall between those two times would be admissible as prior consistent statements.

But to the extent that there's any question -- and then defense's arguments goes both to 801 and also Rule 403. So their point is that it would be improper, no matter how you look at it, to put in these statements that postdate the lawsuit because at that time the defense would argue there is already at least one motive to fabricate or skew testimony, and so putting in those statements would be either unfairly prejudicial or they would fall outside Rule 801(d)(1)(B) properly understood.

The Court is convinced by that argument, especially under the circumstances here, during the direct examination in pages 5071 through 5149, the government went through Jane's text messages with both Mr. Combs and Ms. Khorram in detail. In those text messages, and consistent with Jane's testimony concerning how she utilized the notes, Jane told Mr. Combs and Ms. Khorram many of the things that are contained within these notes.

In fact, it's unclear, having reviewed the notes and having reviewed the testimony, which parts of which of these exhibits the government believes are necessary to rebut any implied charge of fabrication that may have arisen from the portion of the cross-examination that the Court pointed to because it's already in the record that post Ms. Ventura's lawsuit, Jane told Mr. Combs and Ms. Khorram that she believed the hotel nights were sexual exploitation; that she was gaslit and manipulated; that she was treated like a sex worker; that she was drugged, and the testimony goes on and on for a number of pages.

So to the extent that there was any implied charge of fabrication, it has already been rebutted by the testimony that was elicited in direct and through the text messages.  So it's unclear which part of these exhibits is necessary to rebut any implied charge of fabrication.  And as the Court indicated there's further reason for caution here because the defense -- because of the defense's argument that during this time period they will submit that there was already a prior improper motive or influence to fabricate or skew testimony; namely, Ms. Ventura's lawsuit.

Now let's stop for a moment.  That means at this particular time there is no basis that I can see on a door-opening argument for the introduction of these particular exhibits.  I'll certainly hear from the government so that you

can tell me anything I got wrong, okay, as to these particular exhibits. That does not mean that based on the remaining cross-examination the door might be further opened or that circumstances might change.

And here is what I mean by that: We have not gotten to the cross-examination as it pertains to these statements because we only got to the pre-Ventura lawsuit portion of the cross-examination. So, Ms. Geragos, you understand that if you were to go over these text messages that I'm referring to, and if your argument is that she wasn't telling the truth or somehow these weren't her real thoughts because they were interspersed with messages of love and affection and displays of -- you know, indications that really she was a willing participant in all of these events, then at that time the government could say, well, let me show you the notes that really show that Jane had these true views, views that she did not believe that she could express to Mr. Combs because of the reasons Jane has said: That every time she would try to tell Mr. Combs these things, he would cut her off, he would shut her down, he would put her down, he would make threats; all those things Jane has previously said.

At that point I think the door would be open for the government to say these statements would be relevant to come in, and I think that there would be a closer question as to whether they would be properly admissible, and one that we

P6CQcom1 - Corrected

could address after the cross-examination has concluded.

MS. GERAGOS:  I understand, your Honor.

THE COURT:  Ms. Comey.

MS. COMEY:  Thank you, your Honor.

I understand your Honor's ruling on 801(b)(1)(B)(i), but that is the only subsection that any of the cases the defense cites refers to.  *Forrester* itself was in 1995, which was before (ii) was introduced.  And (ii) allows the introduction of a prior consistent statement to rehabilitate the declarant's credibility as a witness when attacked on another ground.

I don't think anyone could conceivably suggest that the defense has not attacked Jane up and down in this courtroom about her testimony that she felt coerced and felt forced and did not want to participate in hotel nights.  Ms. Geragos spent many hours going through text message after text message with expressions of love and enthusiasm and apparent affection for different entertainers and apparent excitement or willingness to participate in hotel nights, and Ms. Geragos' questioning made very clear that she was seeking to point out or suggest that Jane in fact enjoyed hotel nights, wanted to participate in hotel nights, did not feel forced and made a free adult choice, just like Ms. Geragos previewed for the jury that she expected the cross-examination would show.

And so I think on that ground, at the very least,

P6CQcom1 - Corrected

there is one line from Government Exhibit E 331-M, which is a note from December 1, 2023 that should be admitted under (ii), and that is the sentence:  "The one thing I will say is, yes, I did feel forced and taken advantage of, manipulated, deceived heartbroken, and felt too close to the edge of depression.  I hit a very dark point in me life.  I felt obligated 98 percent of the time."  That is with a very, very short subset of the very lengthy notes that we still think should be admitted, but we understand your Honor's ruling.  There should not be a 403 are issue with admitting that very short subsection because it is a very targeted statement, and it specifically rebuts the lengthy cross-examination that Ms. Geragos has engaged in to suggest that Jane did not feel obligated and was freely exercising her own free will when she participated in these hotel nights, and that she enjoyed them and liked them.  So we would ask at the very least we be prepared to put in that particular portion of E-331-M.

MR. DRISCOLL:  Your Honor, could I just be heard on that basis?

THE COURT:  Yes.

MR. DRISCOLL:  That argument is an incorrect reading of the rule.  (ii) was an amendment to the Rule.  And the Rule's Advisory Committee Notes specifically state that amendment retains the requirement set forth in *Tome*.  And the statement that Ms. Comey just cited is from Exhibit 331-M,

which was written on December 1, 2023.  That's just shortly after Ms. Ventura's lawsuit during the relevant period that our letter discusses when an improper motive to fabricate has already been introduced.  So it's clearly not admissible as a prior consistent statement.

MS. COMEY:  Your Honor, I'm looking at the Advisory Notes now, and I don't see what Mr. Driscoll is referring to.

MR. DRISCOLL:  These are the notes of the 2014 Amendments.

THE COURT:  Ms. Comey, I guess the question is -- I think the defense's argument is that (ii) was added to address situations where there is not a charge of recent fabrication or improper influence or motive but there is some other basis to introduce the statements, and there are two examples given in the Advisory Committee Note.

So I think what they're saying is -- that's not this case because where there is a recent motive, then that is how you analyze the rule because, otherwise, right, it would just -- there would be no purpose to (i).  It would just be (ii); meaning, the rule would just say:  You can bring in a consistent statement anytime the declarant's credibility has been attacked on any ground, which is not what it says.

MS. COMEY:  I would want to take a closer look at the Advisory Notes, your Honor, but I know how delayed we are.  If I may, I do think that this one sentence that I just read out

P6CQcom1 - Corrected

loud should also be -- I don't want to push your Honor on the ruling if your Honor is not --

THE COURT:  Feel free to push.

MS. COMEY:  The only purpose of Ms. Geragos' cross-examination about the immunity was to suggest that she was somehow afraid of going to jail or going to prison as of November of 2024 or being prosecuted as of November 2024, and the only possible relevance of that cross-examination was to suggest that she had an incentive to change her testimony in some way, to alter her testimony in some way, and in particular to alter her testimony to provide an account that was different from or inconsistent with, according to Ms. Geragos, the text messages that Ms. Geragos walked Jane through throughout her cross-examination.  And I understand that the view is --

THE COURT:  Here is my -- as to that point, I mean, understand the government's position, but this is just from the very beginning of the transcript pages I pointed to.  This is in the record.  This came in without any objection.  "I just woke up because I'm nauseous.  I've been crying for three days and under stress from reading all of this.  I keep having nightmares about forced nights and all the times I felt like I couldn't say no.  I feel like I'm reading my own sexual trauma. It makes me sick how three pages word for word is exactly my experience and my anguish, even two of my own birthdays and had me perform so many countless" - there's an error in

P6CQcom1 - Corrected

transcription -- "national toxic years together, even recently throwing up at a hotel in LA," and goes on and on.

THE COURT: So what does this add? Given that it raises questions as to whether technically speaking it would be admissible --

MS. COMEY: Yes, your Honor.

THE COURT: -- given that there are literally 40 pages worth of testimony of text messages the government put in during this time period that are absolutely consistent with its position that there could not be any plausible claim that there was some influence by the government connected to the immunity or grand jury process.

MS. COMEY: Yes, your Honor. The piece of this sentence that I am pushing for is: "I did feel forced and taken advantage of, and I felt obligated 98 percent of the time." That covers the broader time period of the relationship in a way that the text messages that are in do not.

And what Ms. Geragos has done through her cross-examination is go month by month suggesting that there were many, many times throughout the relationship where Jane did not feel obligated, and this specifically rebuts that.

MR. DRISCOLL: Your Honor, this type of backward-looking statement referring to a year's long period is exactly the type of backward-looking statement that the hearsay rules do not permit. That's why it's not probative, particularly after the witness has been made aware of a lawsuit

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom1 - Corrected

in which somebody received a very large settlement.  So it can't be admitted as prior consistent statement.  And before your Honor conducts any Rule 403 balancing, you first have to determine what the probative worth of the statement is and whether it's even admissible.  So for all those reasons, it should just be excluded.

And I think Ms. Shapiro has something to add, if I can just pass it off to her.

THE COURT:  All right.

MS. SHAPIRO:  Your Honor, I just wanted to put this in a broader context, as the testimony your Honor pointed out demonstrates, or I guess that was from another note.  There has been hours and hours of testimony about --

THE COURT:  The testimony I read was from -- that's in the record.

MS. SHAPIRO:  Right.  Right.  And what I'm getting to is the 403 issue, which is that there's been hours and hours of testimony about how Jane felt, and that's fine, it's relevant, but the ultimate issue here is what was in Mr. Combs' head and what he understood based on what Jane communicated to him.  And I just want to highlight for the Court that allowing more of this, even apart from the hearsay issue, is just completely cumulative, unnecessary, and unfairly prejudicial because it's detracting the jury from the issue of what Jane in fact communicated to Mr. Combs, and that's the issue for Mr. -- for

the jury, is what was in his head, how -- what was communicated to him, was it reasonable for him to interpret it in the way that he did as to her consenting to these hotel nights.

And I think that more of this is just piling on to an issue that's distracting from the ultimate issue in the case, and given how much evidence has already been put in by the government and has already been testified to by Jane and in some of the later text messages, this is just completely unnecessary, cumulative, and misleading.

THE COURT:  Right.  Understood.  Just one last thing I know that we're running late, and that's my fault.

But, Ms. Comey, on the small excerpt from Exhibit M--

MS. COMEY:  Yes, your Honor.

THE COURT:  -- how do you get that into evidence given what we previously discussed about the prior consistent statement rule; meaning, that it's a statement from after Ms. Ventura's lawsuit, so Mr. Driscoll says, look, you can make it one sentence but it still doesn't overcome that ground.  So is there some other basis to get that hearsay statement into evidence?

MS. COMEY:  Your Honor, I don't think it comes in for her state of mind, because for the same reason I asked to keep out Mr. Combs's state of mind.  I don't think it comes in for her state of mind.

My argument is that it is a smaller response to the smaller impeachment point that Ms. Geragos made, suggesting that Jane had a motive or an incentive, upon receiving immunity in November of 2024, to shave her testimony, to suggest that she felt forced or obligated, when she didn't, because it would make the prosecutors, who held her fate in their hands, happier; that it would help the prosecutors' case.  And so I understand, as a 403 matter, that letting in five-some multi-page notes may go too far, but this one sentence that is narrowly targeted to a specific argument that has been raised for hours on cross-examination, I think, is appropriate under 403.  It is not cumulative, because the statement "I felt obligated" 98 percent of the time is not something that we see in other text messages.  That is something that she wrote in other text messages.  That is something we can only get in through this note.  And so it is, I think, extremely probative. It is not cumulative.  It is not unduly prejudicial.  I think it is narrowly targeted at --

THE COURT:  I hear you on Rule 403.

My question was, mechanically, how do you get that in, given what we've discussed about 801(d)(1)(D)?

MS. COMEY:  I think that I would need to convince your Honor of the prior consistent statement rule and find that, in fact, the defense has suggested there was a new incentive and that we should be able to rebut the argument that there was that new incentive.  And I think that it's telling and important that this note was in her own private Notes app.  This is not something that she was sending to a friend.  This is not something that she appeared to be documenting thinking how am I going to collect evidence for a case or put together a civil suit.  This was her writing essentially a diary.

There is no reason to think that she was doing this in anticipation of litigation or anticipation of a criminal investigation.  And I think it is palpable to be able to point out that she said this before she ever met a single prosecutor or a single federal agent.

THE COURT:  All right.  I'm going to reserve on this small issue of that one sentence, and we'll see where the cross-examination goes and we can pick it up right after.

With that, apologies again for the delay.

Let's bring the witness in.

Ms. Geragos, did you have something before we do that?

MS. GERAGOS:  I want to confer with Ms. Comey for a moment.

MS. COMEY:  Your Honor, we had flagged an issue for your Honor's deputy before we bring Jane back out.  I don't

P6CQcom3

know if you had the opportunity --

THE COURT:  I think it's reflected on this Post-it.

OK.  Let's have a brief discussion in the robing room.
So let's have Jane's counsel and lead counsel for each side and
the court reporter.

MS. GERAGOS:  Your Honor, may I come as well, please?

THE COURT:  Yes, you may.

MS. GERAGOS:  Thank you.

THE COURT:  Yeah, of course.

(Pages 5698-5727 SEALED)


(Pages 5728-5729 sealed)

P6CQcom3

(In open court; jury not present)

THE COURT:  Ms. Geragos, are we ready to proceed or do we need a few minutes?

MR. AGNIFILO:  Can I be heard and make a record?  I think Ms. Geragos needs a few minutes to incorporate what we talked about in the back.  Can I use that time to make a quick record?

THE COURT:  Maybe.  On what issue?

MR. AGNIFILO:  So we had this discussion in the back.  Mr. Combs was not present, and so I think I would like to lodge our objection.  I'm not going to get into any of the details, of course, but so that my client can hear it and so that I've made the objection and that it is clear from the record, and it will take no more than two minutes.

There is one point I think we didn't bring up as clearly as we could have, and we brought this point up in our litigation over pseudonyms for the other witness.

THE COURT:  Well, hold on.

MR. AGNIFILO:  Yes, Judge.

THE COURT:  I mean, if you want -- let's take a step back.  If your client wishes to be heard on a particular issue or wishes to express some points related to the issue that we addressed in the back, then we can do that.  We can clear this courtroom if we need to, to address that so that I want to make sure you understand that I don't want anyone to think that in

any way, shape or form the defendant was excluded from a discussion on this issue if that's what you're requesting.  So we can do that if you want to.  That's not what I'm understanding you're asking for.

MR. AGNIFILO:  We do not need to clear the courtroom. I will conform my remarks to the point we do not have to clear the courtroom, and that's not what we're asking.

THE COURT:  Okay.  Proceed.

MR. AGNIFILO:  Thank you.

So the event that we are talking about in January 2024 took place behind closed doors in a hotel room, but there were many people -- there were other people there.  One of the concerns that we have — and this is a concern of constitutional dimension, we believe — is part of the reason a trial is -- I sound like I'm being rhetorical, but I'm making this point for a reason.  Part of the reason that trials are fully public is so if other people realize they know something about an event that's discussed in a public courtroom, they could come forward and they could share whatever their recollection is about it.

Now, that typically doesn't happen, but it does happen from time to time.  And I know that was one of our objections when we objected to the witness who went under the name Mia, you know, that there's going to be other people who might have information about this.  And it's the same with the event in the hotel room.

And I think that is kind of the practical side of the constitutional right to a public trial; that it's public for a reason, and the facts are public for a reason, and the names are public for a reason. And that reason is so the public can do what the public does in all issues of importance, which is receive them, and if someone has something to add, that person can come forward and add whatever it is that person has to add.

I am very aware of the balancing that your Honor is undertaking on both sides of the ledger. And I've listened to the Court very closely, and I appreciate the balancing. But we still maintain that the constitutional right to a fully public trial, now understanding we have consented to the pseudonymity of this witness, what we didn't consent to, and we don't, most respectfully, is that these events which play important parts in the background of some of the most critical events in the trial, should be in any way not fully public.

And so the reason the names are important, and the reason the names are important publicly is in addition to the reasons that we raised for your Honor that I don't want the jury to think that this evidence is somehow different than other evidence in the case. And we've discussed that in the back, and I understand the Court's reasons for that. But something that I don't think we made as clear, at least in terms of the most recent application, which I think we had made clear in the past, is part of the public nature of these trials

is for the information to reach the public so that other witnesses could come forward, other accounts could come forward. And so we didn't make that as clear as perhaps we could have. So I wanted to add that to the record that we've made.

And also to say that I wanted to discuss this also with the Court in the presence of my client because it's an important issue, it's a constitutional issue, and so I didn't want to have all the discussion out of his presence, so I wanted to discuss it with the Court here in open court. And thank you for that opportunity.

THE COURT: All right. Understood.

Anything further, Ms. Comey, if you have anything?

MS. COMEY: As long as your Honor's ruling remains no. Otherwise, I would want to respond, but I don't think there's a reason to change your Honor's ruling.

THE COURT: I don't intend to change my ruling, but what's the government's response as to the issue that Mr. Agnifilo raised, which is that the other component is for the public revelation of certain details is so that it might aid in some kind of investigation of the facts based on that public revelation.

MS. COMEY: Enough information has been revealed to the public that anyone who witnessed these events would be able to tell the defense if they wanted to. The defense made a

similar argument about Mia, and, as we know, the defense in fact received exhibits from the public that they then used during Mia's cross-examination.

The suggestion they need to say these names in order to get some sort of information from the public appears to be nothing more than a pretense to attempt to harass and intimidate this witness, and the Court should not countenance it.

THE COURT:  And I take it as to the specific issue that we are discussing, the actual event in question and the identities involved is not actually one of the alleged acts of sex trafficking underlying the indicted charges.

MS. COMEY:  Yes.

THE COURT:  It is a collateral issue, and so the idea that somehow public revelation of the details that we discussed would in any way, shape -- in any way would result in some kind of investigation that would bear on the actual charges raised is not a real concern.

MS. COMEY:  That is correct, your Honor.  And I will also note that the identity of the people who were on that particular event is not a defense to any of the conduct that Jane testified the defendant engaged in on June 18 and 19 of 2024.  So it is extreme -- its probative value is extremely minimal and has nothing to do, from our perspective certainly, with the defendant's guilt or innocence of the sex trafficking

P6CQcom3                      Jane - Cross

charges.

THE COURT:  All right.  Now, anything further from the government before we finally get started close to 11:00 a.m.?

MS. COMEY:  No, your Honor.

MR. DONALDSON:  May I have one second, please.

THE COURT:  Yes, Mr. Donaldson.

MS. GERAGOS:  Your Honor, I'm almost ready.  I just need to double check my outline one more time to make sure there is no issue.  I need 30 more seconds.

THE COURT:  Take your time.  I've been responsible for most of the time that we've lost here this morning.

(Pause)

MR. DONALDSON:  Thank you.

MS. GERAGOS:  I have made all the changes I needed to make, and I am ready to proceed when the Court is ready to proceed.

THE COURT:  All right.  Let's proceed.  Can we have Jane back on the stand.

JANE, resumed.

CROSS-EXAMINATION CONTINUED

BY MS. GERAGOS:

(Jury present)

THE COURT:  Please be seated.

Welcome back, members of the jury.  You've been here for awhile.  I think this is a record for how long we've made

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom3                        Jane - Cross

you wait back there.  I do apologize about that, but it is my

expectation that we -- we often do things while you're in the

back room to help save time that's what we were doing so I

think we can save some of your time based on what we've been

doing.  So I thank you for your patience

            With that, Jane, you understand you're still under

oath.

            THE WITNESS:  Yes.

            THE COURT:  Ms. Geragos, you may proceed with your

examination.

BY MS. GERAGOS:

Q.  Good morning, Jane.

A.  Good morning, Ms. Geragos.

            MS. GERAGOS:  Yesterday, right before we left off, we

were looking at photos and videos if we could just bring one up

really quick Government Exhibit E-115, which is already in

evidence, and if we could bring up E-115-M to the right of it,

please.

Q.  And I believe that we looked at the created date of this

photo, which is October 26 of 2023, 14:03:05, right?

A.  Yes.

            MS. GERAGOS:  If we could take that down and bring up

Government Exhibit 104-74, please, and go to page 23.

            Go to page 23 and 24.

Q.  Do you recall looking at these text messages on direct

P6CQcom3                        Jane - Cross

examination, Jane?

A.  Yes, I do.

Q.  And these are on the same day as the photos and the videos that we just -- or the photo we just pulled up, but the video we looked at yesterday?

A.  Yes.

Q.  And do you recall these text messages to be before you saw Mr. Combs at his home?

A.  I believe so.

Q.  So you had sent these text messages to him.  If we could just -- I know we looked at them on direct, so we'll go through them very briefly so you don't have to do it all again, but you sent him a message, and you said:  I'm saying all of this with light-heartedness.  I truthfully think I'm processing some sort of trauma and just need some healing time to get back to myself.  Sometimes these things can hit you weeks or months later because you don't know how to pinpoint your complex ill feelings.  I feel as your lover I wanted to please you and destress you, and I pushed through and went along with things even when deep down I just wanted the night to be over or didn't want to do anything more.  You would say things like finish strong or are you tired?  You're getting tired on me?  And I would just push through and perform and feel exhausted and just crave to already be in bed and just finish the night.  The only thing I'd truly look forward to was finally being able

P6CQcom3                          Jane - Cross

to be cuddled in bed with you, right?

A.  Yes.

Q.  I think you testified many times that what you really looked forward to these nights was essentially to cuddle with Mr. Combs, is that right?

A.  Yes, our intimate time.

Q.  Your time together, yours and his at the end of -- once the entertainer left, right?

A.  Yes.

Q.  And then I think we talked about on direct examination that you think there was a phone call in between these messages, and then you sent the text message that said:  I know I was consenting.  Like you say on tape, you could never tell I was uncomfortable, right?

A.  Yes.

        MS. GERAGOS:  So we could take it down.

Q.  Right after this conversation, you went to his house in Bel Air, and you spent the night, and you connected with each other, right?

A.  Yes.

Q.  And then you said that you didn't have any hotel nights between that time and Cassie's lawsuit, and you were relieved about that, right?

A.  Yes.

Q.  And I think you spoke about this on direct, but I don't

P6CQcom3                         Jane - Cross

recall asking you about this, about his birthday, I think you said that you didn't remember if you actually went to dinner with him on that night?

A.   Actually, I don't think I did at all.

Q.   But you did testify that you had gotten him a portable TV screen, right?

A.   Yes.

Q.   Tell me about that TV screen.

A.   It's like an LG monitor TV screen that you can kind of bring all around the room.  It's like cordless, and it's as big as this monitor here in front of me.

Q.   So it's about this size OF all of our screens that we're looking at?

A.   Yes, exactly.

Q.   You said on direct that that way you and Mr. Combs could watch the videos that you guys had on your phone or our phone on this movie night or watch them and have them be movie nights, right?

A.   Yes.

Q.   So you also testified on direct, I think we were just getting to that, that you then learned about -- he then went to London, right?

A.   Yes.

Q.   And you were really upset about that because he took another -- another female to London, right?

P6CQcom3                    Jane - Cross

A.  Yes.

Q.  And then you saw that Cassie's lawsuit became public on November 16 or so, right?

A.  Yes.

Q.  And you saw that on social media, right?

A.  Yes.

Q.  And you saw her -- his subsequent settlement with her?

A.  It was a part of a headline following that lawsuit, but I just saw the lawsuit first.

Q.  You saw the lawsuit the first -- you saw the lawsuit when it first came out, right?

A.  Yes.

Q.  And then subsequently after the lawsuit was revealed publicly, then you saw the settlement, right?

A.  Yes.

Q.  It didn't happen in that same day, right?

A.  Right.

Q.  And then after you saw both of those is when you then spoke to Mr. Combs, I believe it was November 19 from those messages we saw?

A.  I believe so, yes.

Q.  And then after the lawsuit and after the settlement, you stood your ground about not seeing him, about your break from him, right?

A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom3                      Jane - Cross

Q.  And you said you took a break from him because you needed to work on yourself and work through your feelings, right?

A.  Yes.

Q.  And he had, fair to say, been reaching out to you because he wanted to see you, right?

A.  Yes.

Q.  And he was asking for your support, right?

A.  Yes.

Q.  And he was reaching out and reaching out, and you were standing your ground, right?

A.  Yes.

Q.  Okay.  He would try to reach you via phone?

A.  Yes.

Q.  And was that -- you have testified a few times that he would try -- when you would attempt to not talk to him, he tried to reach out over and over to you, and you would sometimes answer then, right?

A.  Right.

Q.  And here you were eventually just not answering, you were standing your ground, right?

A.  Yes.

Q.  And we went over on direct, and we won't have to do it in depth all again, but we went over then a few messages that we saw in November and the recordings that we heard in November as well, remember that?

P6CQcom3                        Jane - Cross

A.   Yes.

Q.   And then he reached out to you a few times in December as well, does that sound right?

A.   Yes.

Q.   And you guys would communicate via text message?

A.   And FaceTime and phone call, yes.

Q.   Oh, you would speak on the phone in December as well?

A.   And FaceTime, yes.

          MS. GERAGOS:  Can we pull up just for the witness and the parties Defense Exhibit 3226.

Q.   Jane, is this a message between you and Mr. Combs on December 20, 2023?

A.   Yes.

          MS. GERAGOS:  I believe without objection, we move to admit this exhibit, your Honor, not the underlying ones yet, but this exhibit -- not the underlying ones, but this exhibit under seal.

          THE COURT:  Any objection?

          MS. COMEY:  No objection to 3226, your Honor.

          THE COURT:  Defense Exhibit 3226 will be admitted under seal.

          (Defendant's Exhibit 3226 received in evidence)

Q.   This is December 20.  To orient ourselves, it's about a month after Cassie's lawsuit, right?

A.   Yes.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

P6CQcom3                        Jane - Cross

Q.  And you text him:  You only reach out to me because maybe you had a second while you're waiting for someone else to come over.  You see how you just go ghost after opening up conversation, right?

A.  Yes.

Q.  Is it fair to say that you were trying to cordially speak to him around this time?

A.  I would say yes.

Q.  Okay.  And he says:  Not at all, beautiful.  I just read it three times on the bridge after my prayers and was going to respond, and then you hit me mad.  LOL.  SMH, right

A.  Yes.

Q.  Just to be clear, hit in this context is reach out, right?

A.  Yes.

Q.  It's not a physical hit, right?

A.  That's right.

Q.  And he asks you:  Can you please take some serious quiet time to read everything I said.  I poured my heart and truth out here.  Take your time.  I pray for us because I know we are connected.  I want our friendship to last a lifetime.  Coming to an emotional understanding would mean everything to our friendship.  Thank you.  I love you.  Right?

A.  Yes.

Q.  And on direct examination you had said that you remembered that around this time you had said that you remembered that he

P6CQcom3                          Jane - Cross

never -- that he said that you never told him anything or that
he wasn't aware of how you were feeling, right?

A.  Yes.

Q.  And was it around this time that he was telling you that
he -- that you never told him and he wasn't aware of how you
were feeling?

A.  Yes.

Q.  And were you guys having conversations about how you were
feeling and what he knew around that time?

A.  Yes, we were more vocal here around the end.

Q.  And you had really vulnerable and honest conversations
while you were on this break in 2023?

A.  We would have like moments where we would have that.
They'd be really intense like back and forth.

Q.  Would this be over the phone or over FaceTime or on text?
How would you --

A.  I would say over the phone.  If it would get intense, like
he would rush off or I would start crying or -- it was really
hard around this time to really get out how I was feeling mixed
with everything.  This was a really emotional timeframe for us
for sure.

Q.  And can you explain by what you mean by "we'd get really
intense"?

A.  I think because this was when our relationship really
started to deteriorate, like I think that I had just really hit

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom3                      Jane - Cross

my wall here.  I was a mix of emotions of just depression, my resent for the relationship, and then coming to find out that, you know, another woman had these same experiences that I never knew about.  So it was just like a lot to wrap my head around.  And then I was really spewing out a lot of that energy to him while he was under fire for a lot of other things, so it's like we were both just emotionally down and like just in a constant pulling battle but like with still love there and still pain with like resentment and trying to be there for one another, but also everything was just hard around this time very, very hard.

Q.  This was a hard month for you because you had just broken up with him at the end of October, and then Cassie's lawsuit came out, right?

A.  Yes.

Q.  And this was a hard time for him because he was in the eye of a, for lack of a better term, media firestorm, right?

A.  Yes.

Q.  And so you wanted to process your own feelings, right?

A.  Yes.

Q.  While simultaneously trying to be there for him during this unprecedented time in his life, right?

A.  Yeah, we were just I think both equally being pulled in --

Q.  I'm sorry?

A.  I'm sorry.  I felt we were equally pulled in our own like

P6CQcom3                          Jane - Cross

emotional battlefield like every which way.

Q.  Okay.  And at that time he indicated to you that he was not aware that you felt this way, right?

A.  Well, I think that he was aware, because since I --

Q.  I'm asking you what he indicated.

MS. COMEY:  Your Honor, I ask the witness be able to finish her his answer.

MS. GERAGOS:  I ask the witness just answer my question.

THE COURT:  Jane --

THE WITNESS:  Yes.

THE COURT:  -- listen to the question.  If it's asking for a yes no answer, answer that way and just try to respond to what's being asked, and then there will be a chance for redirect examination afterwards.

THE WITNESS:  Okay.  Thank you.

THE COURT:  Ms. Geragos.

MS. GERAGOS:  Thank you, your Honor.

BY MS. GERAGOS:

Q.  You testified on direct examination with Ms. Comey that at the time he had told you that you had never told him or he was not aware of how you were feeling, right?

A.  Right.

Q.  And that it wasn't until after Ms. Comey and other members of the government team showed you many messages that you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom3                        Jane - Cross

realized something different, right?

A.   Right.

Q.   So at this time, at approximately December of 2023, he had indicated to you he was not aware of how you were feeling, right?

A.   That's right.

Q.   Okay.  And would he tell you that he was sorry that you felt this way?

A.   Yes, he would.

Q.   And that he didn't want you to feel this way any more?

A.   Yes, he would say that.

Q.   And that he did not want you to be upset?

A.   Yes.

Q.   And then is this when you guys would have these emotional conversations with one another?

A.   Yes.

Q.   And you weren't in person.  It was over the phone, right?

A.   Yes.

Q.   And he would express that to you, right?

A.   Yes.

Q.   And did you appreciate that?

A.   Definitely.

Q.   And at the time you believed him, right?

A.   Yes, I did.

Q.   And would he tell you that all the way around he -- I think

P6CQcom3                      Jane - Cross

you said on direct examination he was encouraging you from December 2023 onwards to be more communicative with you (sic), right?

A.  Yes.

Q.  And so was he expressing that at this time with you to be more communicative?

A.  I would say yes.

Q.  And -- all right.  If we could bring up just that exhibit again, 3226, please.  And if we could -- you see there is an audio message on the second page at 6:21:28 p.m.?

A.  Yes.

          MS. GERAGOS:  I believe without objection, your Honor, we seek to admit that audio message which is 3226-C-R, which has the requested redactions that the government requested?

          MS. COMEY:  No objection to the redacted version, your Honor.

          THE COURT:  The redacted version of that exhibit will be admitted.

          (Defendant's Exhibit 3226-C-R received in evidence)

          MS. GERAGOS:  Could we please play 3226-C-R, please.

          (Audio played)

          MS. GERAGOS:  You could stop it.  Thank you.

Q.  Is this one of the audio messages you recall him sending to you at that time?

A.  Yes.

P6CQcom3                         Jane - Cross

Q.   Is this an example of the types of conversations you guys were having at that time?

A.   Yes.

          MS. GERAGOS:  If we could go to what's already in evidence as A-301-H.

Q.   We looked at this on direct examination, and this is a message between you and Mr. Combs.

          Well, if we could go to page 3, please, 3 and 4, side by side.

          So this is a message about a week later on December 27, right?

A.   Yes.

Q.   And so I think that you -- if we could just -- we just talked about how these conversations would get really intense, right?

A.   Yes.

Q.   So he says:  So what's the solution?  We just saw that, right?  We just heard that, he was asking what the solution is, right?

A.   Yes.

Q.   Would he often say:  I'm solutions person.  I just need solutions?

A.   Yes.

Q.   That's something he often says, right, over the three years of your relationship?

          SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

A.   Yes.

Q.   Okay.  So he's saying:  So what's the solution?  We're going into a new year.

And then he questioned that message, two messages down, right?

A.   Yes.

Q.   He says:  I don't want to fight.  How do we move on, right?

A.   Yes.

Q.   Around that time, I think you just said it was a very intense time period between you two, right?

A.   Yes.

Q.   You said, I tolerated and dimmed myself for you, Puff.  Please don't discredit me.

And he says:  Never discredit you, right?

A.   Yes.

Q.   And you say:  I lifted you up any time you needed me in those rooms.  I took on a lot to make you happy, right?

A.   Yes.

MS. GERAGOS:  If we could go to pages 4 and 5.

Q.   These are your messages that you have in the remainder of this conversation, right?

A.   Yes.

MS. GERAGOS:  If we could go to the next few pages.  And the next two pages.  If we could just go to page 12.  I think that's what I'm looking for.

P6CQcom3                       Jane - Cross

Q.   There we go.

So then you testified on direct examination -- I'm not going to make you go through all of these.  we looked at them in great detail.  You testified on direct examination that you FaceTimed during the course of this argument, and he said -- you said that he said:  Charge me.  Charge me for your resentment.  I just need to get over this.  Just tell me what it is.  I don't want any loose ends.  Just charge me, right?

A.   Yes.

Q.   And you said you hadn't hired a lawyer at this time?

A.   Right.

Q.   That's when you write to him:  I was confused and couldn't concentrate for three years and feel extremely exploited, right?

A.   Yes.

Q.   And you had this entire message.  And at the end you say: I want my wasted three years of time reimbursed and given back to me in the monetary amount of 100K per year and 15 months left of our two-year agreement of rent, 450K to move on from the resentment of feeling exploited, manipulated, heartbroken, drugged and all of the loss of potential income, right?

A.   Right.

Q.   This wasn't sent by an attorney, right?

A.   No.

Q.   This was sent by you?

P6CQcom3                    Jane - Cross

A.  Yes.

Q.  On direct examination, you said you were not planning to pursue a lawsuit against Sean Combs, right?

A.  That's right.

Q.  And you're still not planning that?

A.  No.

Q.  And throughout this message, and we looked at it, you then express that were going to hurt yourself, right?

A.  Yes.

Q.  And then we looked at the message where he asked you: Please don't hurt yourself, the next day, right?

A.  Yes.

Q.  He does not want that for you, and you understood he wanted to be there for you, right?

A.  Umm, I'm not sure about that.

Q.  Okay.  He did not want you to hurt yourself, right?

A.  Yes.

Q.  On direct with Ms. Comey, you said that you didn't have any friends around this time to talk about this with.  Do you remember that?

        MS. COMEY:  Objection, your Honor.  Misstates the testimony.

        THE COURT:  Can you rephrase?

Q.  Do you remember on direct examination stating that you would talk to Mr. Combs about your feelings because you didn't

P6CQcom3                         Jane - Cross

have anybody else -- I think you may not have said friends -- anybody else to speak to about this?

A.  Yes.

Q.  Okay.  You had a couple friends that you would speak to about your relationship with Mr. Combs, right?

A.  Yes.

Q.  And around this time in December and January of 2023, you would -- I'm not going to name them, but you would go to these two specific friends about your relationship with him, right?

        MS. COMEY:  Objection, your Honor.  December and January 2023.

Q.  I'm sorry.  December of 2023 and January of 2024 — apologies for that — you would speak to them, right?

A.  Yes.

Q.  Okay.  And so you were able to confide in them about your feelings about the relationship and your feelings about Mr. Combs, right?

A.  Yes.

Q.  And fair to say that one of your friends would say, well, you've set the tone for the relationship.  You know, what do you expect at this time?  Do you remember that?

        MS. COMEY:  Objection, your Honor.

        THE COURT:  That's overruled.

A.  **I'm** familiar, yes.

Q.  And you had their support during this time as well, right?

A.   Yes.

Q.   You talked about how in January of 2024 you -- I think you talked about how you went to Las Vegas, right?

A.   Yes.

Q.   Did you also go to Paris?

A.   Yes.

Q.   You went to Paris, okay.  And you had a great time, right?

A.   Yes.

Q.   And do you remember telling your friend after Paris, now I just need a Saudi prince?

A.   Yes.

Q.   And basically that entire time in January of 2024, I think you testified Mr. Combs left you alone.  He didn't reach out, right?

A.   Yes.

Q.   And he paid your rent that month and in December, right?

A.   Yes.

Q.   And you were grateful because you had confided in KK the month before?

A.   Yes.

Q.   And she assured you she would talk to him and ensure that he left you alone, right?

A.   Yes.

Q.   And for once he left you alone for that entire month, right?

P6CQcom3                         Jane - Cross

A.  Yes.

Q.  And fair to say that in that month though you still missed him and loved him?

A.  Yes, very much so.

Q.  And there were no threats about payments of rent or anything from anybody or anybody on his side during that time, right?

A.  No.

Q.  Okay.  And I want to go -- you also spoke on direct examination about a $9,000 payment from somebody named Bear, right?

A.  Yes.

Q.  And you had known Bear through your modeling years, right?

A.  Yes.

Q.  And you said that in January you were texting but you had not seen each other in person?

A.  Yes.

Q.  Do you recall that you were still asking for him to come over via text message around that time?

A.  Yes.

Q.  But he didn't come over?

A.  No.

Q.  But he ended up sending you that $9,000?

A.  Yes.

Q.  But that $9,000 you -- did you have to do anything for his

P6CQcom3                          Jane - Cross

companies or model or anything like that?

A.  No.

Q.  He had -- he had several -- he had several companies that you could have influenced for, I think that would be the word, is that right?

A.  I would say like several companies that I could post and promote.

Q.  But he didn't ask you to do any of that, right?

A.  No.

Q.  So you also went to Las Vegas during that time as well, right?

A.  Yes.

Q.  And you went with your friend?

A.  Yes.

Q.  Okay.  And because you and Mr. Combs were not speaking during that month, he didn't know that you had gone to Las Vegas, right?

A.  Right.

Q.  And so you went to Las Vegas with your friend on a very successful rapper's private plane, right?

A.  Yes.

Q.  And it was for that rapper's girlfriend's birthday?

A.  Yes.

Q.  Okay.  And that rapper, fair to say, is a rapper who is very close to Mr. Combs?

P6CQcom3                      Jane - Cross

A.   Yes.

MS. GERAGOS:  Okay.  Just without sound, please could we bring up Government Exhibit E-332, pause it at five seconds just for the jury and the parties, please.

Q.   I think I just asked this, but maybe I didn't.  Fair to say that Mr. Combs and this individual were really close to one another?

A.   Yes.

MS. GERAGOS:  We are having a technical difficulty. Here we go.  If you could pause it at five seconds without sound, please.  We could stop it there.

If you could look up at the text, four up from the bottom, and if we could highlight that, please, for the jury, just the name, please.  Thank you.

So the jury doesn't see it, okay.  Could we please publish this for the jury.  All right.  Is that individual -- give me -- your Honor, may I have one second, please?

THE COURT:  Yes.

(Pause)

MS. GERAGOS:  Thank you, your Honor.

Q.   Is that -- where the cursor is on the screen, is that the individual who you went to Las Vegas with?

A.   Yes.

Q.   And fair to say that this is an individual who is at the top of the music industry as well, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   Yes.

Q.   And he was very -- he is very close with Mr. Combs, right?

A.   Yes.

Q.   And fair to say they would record together?

A.   Yes.

Q.   And that they had an ongoing both professional and personal relationship with one another?

A.   Yes.

Q.   Okay.  And an icon in the music industry?

A.   Yes.

Q.   And you said that you -- when you got there, you went to a dinner for the -- this person's wife or girlfriend, right?

A.   Yes.

Q.   Okay.  And that's when you first saw Antoine?

A.   Yes.

Q.   Were you surprised to see Antoine?

A.   A little bit, yeah.

Q.   Did you know prior that Antoine had a relationship of some sort with this rapper and his girlfriend or wife?

A.   He had briefly mentioned it in the past, yes.

Q.   And he would travel with them?

A.   Yes.

Q.   And so you had understood that Antoine would be around them sometimes, right?

A.   Yes.

P6CQcom3                        Jane - Cross

Q.   Did you know if Mr. Combs knew that?

A.   Yes.

Q.   Oh, he was aware of that?

A.   Yes.

Q.   From before?

A.   Yes.

Q.   From before January of 2024?

A.   Yes.

Q.   So when you see Antoine at dinner, you're a little bit surprised, but you give him a hug and you're nice to him?

A.   Yes.

Q.   Did anybody ask you, just curious, of how you --

A.   No.

Q.   -- knew Antoine?

A.   No.

Q.   After the dinner, at some point does anybody invite you straight to the hotel room after that or at what point did you go to the hotel room?

A.   We landed and went to a play, and then we went to dinner, and then we went to a strip club, and with a hotel invitation.

Q.   So you testified on direct examination that you remember walking into the hotel room, and then Antoine was having sex with a woman and everybody was watching, right?

A.   Yes.

Q.   How many people were in the room?

P6CQcom3                        Jane - Cross

A.   I'd say maybe seven or eight people total.

Q.   Were -- where was the hotel -- what hotel was this?

A.   I want to say it was like The Encore.

Q.   Were Antoine and the woman on the bed or what area of this room were they in?

A.   Yes, they were on the bed.

Q.   And everybody was just watching them?  Were they talking?  Was there music playing?  What was going on?

A.   Just watching.

Q.   And you testified on direct examination that there was some flirtatious banter with the rapper, right?

A.   Yes.

Q.   And fair to say you and him had crossed paths in the past; you had known each other like from afar, essentially?

A.   Yes.

Q.   So he was flirting with you while there were other people in the room, in this hotel room?

A.   Yes.

Q.   And on direct examination, you said -- Ms. Comey asked you: Other than verbally flirting with the rapper, did anything happen with the rapper, right?

A.   Right.

Q.   And you said no, right?

A.   Right.

Q.   Do you remember telling the government in previous

P6CQcom3                       Jane - Cross

interviews that you were also dancing and that you flashed your breasts to the room?

A.  Yes.

Q.  But you didn't testify to that on direct examination?

A.  No.

Q.  Okay.  Who asked you to flash your breasts to the room?

A.  I think just in the moment, just we were all just hanging out and, I don't know, in the moment.

Q.  Okay.  What did the rapper say to you when you guys were flirting?

A.  I think he said something along the lines of that he thought I was beautiful, and he always wanted to blank me.

Q.  Have a relation -- have a relationship of some sort?

A.  Yeah.

Q.  Okay.  And is that at the point where you started dancing and flashed or at what point was that?

A.  I can't recall, but just sometime in the moment that I was there.

Q.  Okay.  He had basically -- the rapper basically told you in that moment he had always had a crush on you?

A.  Yes.

Q.  And -- all right.  So then we're in January.

Right before, do you recall -- if we could pull up for the witness F-101 at page 450 and have 450 and 451 next to one another.

P6CQcom3                    Jane - Cross

This is a text message chain between you and Kabrale, right?

A.  Yes.

Q.  And do you see that he -- on the bottom left you text him on the 25th of 2023 and you say:  Merry Christmas to you and yours.  Hope you have a blessed one, with a smiley face, right?

A.  Yes.

Q.  And he says:  Thank you beautiful.  Merry Christmas to you too, my love.  My apologies I thought I sent that yesterday. He says:  Good afternoon beautiful.  **I'm** in your city, about two weeks later, on January 9, right?

A.  Yes.

MS. GERAGOS:  Could you go to the next page, please.

Q.  And you text him:  Happy new year.  I'm pretty tied up with work and fam for awhile.  How is your trip so far?

And you and him have a conversation throughout January 10, right?

A.  Yes.

Q.  Then on the 10th you text him:  Hey, Kabrale.  Good morning.  What time is your flight today, right?

A.  Yes.

Q.  Is that his flight to Los Angeles or where?

A.  I think he was saying that he was in town, but that he was leaving, so maybe back to Atlanta.

Q.  Okay.  And do you remember when you were in Las Vegas and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

you were in that hotel room with that rapper and Antoine and the other people who were there, that you also -- do you remember if you brought up Kabrale as well?

A.  Yes.

Q.  How did you bring up Kabrale?

A.  They were asking me if I knew anybody else in the lifestyle, and that they were looking for someone, and so this is why I made an outreach to Kabrale because at this time if I were to recommend somebody, I would recommend somebody that I've kind of known for awhile.

Q.  And that you trusted, right?

A.  Yes.

Q.  And that you believed at that time in January would be discreet?

A.  I believed that he would be discreet and somebody who was like private.  At the time I thought Kabrale was a safe person to recommend.

Q.  Back in January -- putting aside later, but back in January that's what you believed?

A.  Yes.

Q.  So when you say "they," is that the rapper and his partner?

A.  Yes.

Q.  So those were the two individuals who were asking you?

A.  Yes.

Q.  Why did you believe they were asking you if you knew

P6CQcom3                    Jane - Cross

anybody who was in the lifestyle?

MS. COMEY:  Objection.

THE COURT:  Overruled.

A.   I believe they were asking me because maybe they just picked up the energy from me or I just maybe assumed that maybe they had already got an inclination that me and Sean had been doing kind of similar things, so ...

Q.   Okay.  And was it away from the other individuals who were at the party that they asked you this?

A.   Umm, yes.

MS. GERAGOS:  All right.  We can take that down.

Q.   Then on direct we spoke about your birthday in February 2024, and Mr. Combs had reached out to you about a dream he had about the Concord, right?

A.   Yes.

Q.   And that's how you two started speaking again?

A.   Yes.

Q.   And you ended up flying to Miami to be with him around the time of your birthday, right?

A.   Yes.

Q.   You hadn't seen him in -- since early, early November, right?

A.   Yes.

Q.   It was his -- I think around his birthday that you saw him, right?  Early, early November?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom3                        Jane - Cross

A.   Probably like around Halloween.

Q.   Oh, right, you saw him for the Halloween shoot.  So you hadn't seen him --

A.   For quite some time.

Q.   You so you decided to get on a plane and go see him in Miami, right?

A.   Yes.

Q.   Fair to say that a media firestorm around Mr. Combs at that time had intensified even more?

A.   Yeah.

Q.   And you said that you went to see him because you really missed him, right?

A.   Yes.

Q.   And you were excited to see him after all that time?

A.   Very much so.

Q.   And, if you recall, was KK at the house when you arrived?

A.   No.

Q.   Was she there that entire time that you were there in February?

A.   No.

Q.   How many days, if you remember, did you spend?  I think you said five days?

A.   Yes.

Q.   So it was almost a week that you spent there?

A.   Yeah.

P6CQcom3                          Jane - Cross

Q.   And for your birthday, he had set up, I think you talked about there was an entryway from Two to One Star, and he had set up a grandiose birthday dinner for you, right?

A.   Yes, it was very romantic.

Q.   So tell me about the birthday dinner.

A.   He had a candlelit walkway from 2Star to 1Star, and it just was --

Q.   If I could just stop for a second was that walkway by where the water is?  There's a walkway in front of the two homes, right, that's on the water?

A.   Yes, with music playing.

Q.   So you would walk down 2Star to where the water is and the dock is, right?

A.   Yes.

Q.   And then there's a bunch of palm trees, and you can see the water, and it's very beautiful, right?

A.   Yes.

Q.   And then you walk from 2Star to 1Star on that walkway with palm trees, and it was candlelit?

A.   Yes.

Q.   Go ahead.  Sorry for interrupting.

A.   Oh, no.  It was very romantic.  And I walk up, and I see him sitting there smiling.  I feel like I could see his heart beating out of his shirt and --

Q.   Was your heart beating as well?

P6CQcom3                         Jane - Cross

A.  Yeah.  I was just about to say, same as mine.  And I felt like -- it felt like prom.  Like it was just cute.  Like we had butterflies, and we both said we were feeling nervous and had butterflies.  And it was just really sweet.  And like I walk in, and there's a round table full of like gifts and balloons, all coordinated like pink and silver, and there was another table with candlelight and a five-course dinner.  It was literally everything that I've always want from my relationship for sure.  It was very nice.

Q.  You had wanted the really nice, romantic dinner and gesture, right?

A.  Yeah, these were like my love languages for sure.

Q.  And so you got the balloons and the romantic setup, right?

A.  Yes.

Q.  And you were really appreciative at the time as to all the effort that had been put into this dinner, right?

A.  I still am.

Q.  Okay.  And you remember thinking to yourself I finally -- this is what I wanted, right?

A.  Yes.

Q.  And you were very -- also very happy because you also got this one-on-one time with him as well, right?

A.  Yes.

Q.  And you also testified that after this -- after the dinner, you guys had not taken any ecstasy at the dinner, right?

P6CQcom3                         Jane - Cross

A.  No.

Q.  So you had the five-course dinner, you had drinks, right?

A.  Yes.

Q.  But no ecstasy at that time?

A.  Umm, no.

Q.  After -- I think you testified that after the dinner, you took a pill, he took a pill, and you were then in 2 Star Island?

A.  Yes.

Q.  And then he -- you testified that Don came over afterwards, right?

A.  Yes.

Q.  So you did not go to a hotel; it was there at the house?

A.  Yes, at 1Star.

Q.  Okay.  And that you were -- do you remember saying previously that you were willing to have sex with Don that night because Combs had done everything that you had wanted for your birthday?

A.  Umm, did I say that on direct or ...

Q.  Do you remember meeting with me about a month and a half ago with my investigator and your counsel?

A.  Yes.

Q.  And do you remember during that meeting you said you were willing to have sex with Don because Combs had done everything you had wanted?

P6CQcom3                          Jane - Cross

A.  Yes, it was nice.

Q.  Okay.  And do you remember talking to the government previously and telling them that after this, you realized that this was just going to be a forever thing with Mr. Combs, right?

A.  Yes.

        MS. GERAGOS:  If we could pull up what's already in evidence as G-103, page 132, please.

Q.  This is a text message can chain between you and Paul Arthur, do you see that?

A.  Yes.

Q.  And I'm going to read your text message, which is sent on February 10, 2024:  Are you already -- by February 10, 2024 are you already in Miami?

A.  Yes.

Q.  And you say:  Hey P., I hope you're well.  Is this still your number, right?

A.  Yes.

Q.  And then he jokes with you and says:  No.  Right?

A.  Right.

        MS. GERAGOS:  Can we go to the next page?

Q.  Then he says:  Just kidding.

        You guys talk for a little bit and you're sending him exclamation points and laughing, right?

A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom3                        Jane - Cross

MS. GERAGOS:  Okay.  If we could go to the next two pages.

Q.  And, okay, so if we could go to the page on right, you see you send him a message on February 10 and you say:  Writing to say hello and how are you.  Also, do you have plans on Valentine's Day, Wednesday 2/14, right?

A.  Right.

Q.  This is a reach-out to Paul when you're in Miami staying with Mr. Combs, right?

A.  Right.

Q.  Do you remember telling the government that around this time, you would have been high and excited and looking forward to seeing Paul as a person, right?

A.  Umm --

Q.  Do you recall that?

A.  Can you repeat that?  Sorry.

Q.  Of course.

MS. GERAGOS:  Do you remember telling -- we can take it down, actually, as I ask the question.  Thank you.

Q.  Do you remember telling the government in the meeting with them that you were with Mr. Combs at the time of this text message?

A.  Yes.

Q.  And that you were texting him about Valentine's Day, and you would have been high and excited and looking forward to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom3                        Jane - Cross

seeing Paul as a person?

A.  Yes.

Q.  Okay.  Because Paul is one of the entertainers that was warm and that you actually had a friendship with, right?

A.  Yes.

Q.  I just asked you about a previous meeting that you had with the defense, and I want to ask you a little bit more about that.

Do you remember that you told me that after Cassie's lawsuit, that you saw changes in Mr. Combs?

A.  Yes.

Q.  That you saw -- and that you felt yourself getting much closer to him and that your love was getting stronger?

A.  Yes.

Q.  And do you remember talking about the differences you felt in Mr. Combs' char -- well, sorry, the differences in Mr. Combs' -- the way he acted with you after the lawsuit?

A.  Yes.

Q.  Okay.  So do you remember saying that previously in your relationship — and I'll do it as Ms. Comey does it — from May of 2021 to October of 2023, he was previously egotistical at times and at times would be very cold?

A.  Yes.

Q.  And then after the lawsuit, when you reconnected in February of 2024, and up until his arrest, you felt so much

P6CQcom3                         Jane - Cross

more love from him?

A.  Yes.

Q.  Do you recall saying that previously before October of 2023, he could disappear for days?

A.  Yes.

Q.  And that really hurt you, right?

A.  Yes.

Q.  And afterwards, after the lawsuit, you saw positive change in him?

A.  Yes.

Q.  And you saw that he could be more apologetic?

A.  Yes.

Q.  And that really meant a lot to you, right?

A.  Yes.

Q.  And you saw that he listened better?

A.  Yes.

Q.  And he spent more time at home, right?

A.  Yes.

Q.  He was not as on-the-go all the time, right?

A.  Right.

Q.  Because prev -- so you broke up in October of 2023, he had just launched the album, and he was very busy at that time, right?

A.  Right.

Q.  And then post lawsuit, post media firestorm, it was very --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom3                         Jane - Cross

he was not doing as many engagements, would you say?

A.   Right.

Q.   Okay.  And so you saw he was able to spend much more quality time with you, right?

A.   Right.

Q.   And he spent more time talking to you on the phone?

A.   Right.

Q.   And Facetiming with you?

A.   Yes.

Q.   And you felt really listening to your feelings around that time, right?

A.   Right.

Q.   And that was really important to you?

A.   Right.

Q.   And especially important to you because he was your partner and your lover at that time?

A.   Right.

Q.   And I think you flew -- you spent time in -- you went to Miamai a few times in 2024, right?

A.   Yes.

Q.   And he went to Los Angeles maybe three times, you saw him maybe three times between February of 2024 and September, you saw him in LA about three times?

A.   Yes.

Q.   Does that sound about right?

P6CQcom3                          Jane - Cross

A.  Yeah, about.  Yeah.

Q.  And would you say there was less chaos in the house around, you know, post Cassie lawsuit?

A.  Yes.

Q.  Less people were around, right?

A.  Yes.

Q.  Less people were asking stuff from him, you felt?

A.  Yes.

Q.  Okay.  And so you would be able to talk a lot to him, right?

A.  Yes.

Q.  And you would still during that time even when an entertainer didn't come, get high together during those nights, right?

A.  Right.

Q.  And you liked the ability to just be close with him and talk to him, right?

A.  Yes.

Q.  I think you have said that when you would take ecstasy and when he would take ecstasy, you guys could be very vulnerable with each other, right?

A.  Yes.

Q.  So during that time when you guys got back together from February of 2024 until September, you were able to reconnect in a way that was meaningful to you?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom3                        Jane - Cross

A.   Right.

Q.   Do you recall that the terminology that he used around your relationship changed a lot after you got back together?

A.   Yes.

Q.   So before the lawsuit, from February of 2021 to October of 2023, he would -- and I think we've seen some messages like this, say, I'm single, I'm polyamorous, I'm single, and he wouldn't say that you guys were in a relationship, right?

A.   Right.

Q.   But you during that time considered him to be your partner and lover, right?

A.   Right.

Q.   And that really hurt you, is that fair?

A.   Yeah.

Q.   Because during that time you saw him in, as we talked about, a public relationship with Caresha?

A.   Right.

Q.   And so after the lawsuit, his terminology around your relationship changed a lot, right?

A.   Right.

Q.   He went from saying he's single, he's single and constantly saying that to you to changing and saying we're in a relationship, you're my girlfriend, right?

A.   Right.

Q.   And that really meant a lot to you as well, right?

P6CQcom3                        Jane - Cross

A.   Right.

Q.   And I think you've said during that meeting that we had that he had never previously really expressed that to you, right?

A.   Right.

Q.   And you felt not only did he express it, you felt that he was more lovely and making it seem more like a relationship?

A.   Right.

Q.   And he would also FaceTime you and tell you how much he loved you during that time?

A.   Yes.

Q.   And you appreciated that, right?

A.   Yes.

Q.   And he didn't seem high during some of those Facetimes, right?

A.   Right.

Q.   Which you liked as well, right?

A.   Right.

Q.   Because you wanted him to get off of the drugs, right?

A.   Yes.

Q.   And you cared a lot about his health and his wellness?

A.   Definitely.

Q.   During 2024, even you would care about him getting to the gym and working on himself, right?

A.   Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom3                        Jane - Cross

Q.  And not fall into a depressive state despite everything that was happening?

A.  Right.

Q.  And you really cared about him eating well?

A.  Definitely.

Q.  And making sure he got his endorphins?

A.  Yes.

Q.  And you would check in on him as much as you could to make sure he was doing well in the middle of this, right?

A.  Definitely.

Q.  And sometime during that time period when you guys got back together, you and him both realized there was a federal investigation into him, right?

A.  Yes.

Q.  And that really contributed to his stress?

A.  Yes.

Q.  And so during that stressful time of his, you were really trying to be there for him to make sure he was healthy and doing well, right?

A.  Yes.

Q.  And do you remember telling the government that during -- when you guys got back together in 2024, you felt you had more control in your relationship?

A.  I felt that I could assert myself a little bit more, yes.

Q.  And you were grateful for that, right?

A.  I felt like, yeah, we -- I felt like we had some growth in our relationship.

Q.  All right.  So we just talked about you going there in February.  You were in Miami again in May of 2024.  Do you remember testifying to that on direct?

A.  Yes.

Q.  And during this trip, there were no entertainers on that trip, right?

A.  No.

Q.  And you were staying with him at 2 Star Island?

A.  Yes.

Q.  And when you got there, also KK was not there, right?

A.  Right.

Q.  I think you testified on direct, it wasn't until maybe like a day or two after the CNN video came out that KK came to the house?

A.  Right.

Q.  And you went into that different room, right?

A.  Yes.

Q.  And fair to say that after watching that video on CNN you lost your appetite?

A.  Yes.

Q.  You were sick to your stomach?

A.  Yes.

Q.  You had never seen Mr. Combs in your relationship at that

P6CQcom3                        Jane - Cross

point act like that before, right?

A.   Right.

Q.   That was just not consistent with the man you knew for three and a half years?

A.   Right.

Q.   He had never laid a hand on you prior to this night?

A.   No.

Q.   You hadn't seen him lay a hand on another individual during that time, right?

A.   No.

Q.   And you were really shocked to see that behavior, right?

A.   Yes.

Q.   And that was just not the man that you knew, right?

A.   Right.

Q.   And your friends were telling you, you cannot be with him any more, right?

A.   Right.

Q.   But you wanted to be there for him, right?

A.   Right.

Q.   Fair to say after this video came out, the public sentiment that you felt about him got even stronger against him?

A.   The public what?  I'm sorry.

Q.   That was a bad sentence.  Let me rephrase it.

          That you felt the public sentiment against him got even stronger against him?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MS. COMEY:  Objection, your Honor.

MS. GERAGOS:  Well, looks like the witness doesn't understand my question, so I'll just withdraw it anyway, your Honor.

Q.  Anyway, you were really shocked, and your friends told you not to be with him any more, right?

A.  Right.

Q.  But you really wanted to help your partner through this, right?

A.  Yes.

Q.  Because you had been working on his health, you had been working on getting him better during this time, right?

A.  Yes.

Q.  And we discussed on I think throughout your testimony that Mr. Combs was a very complicated person, right?

A.  Yes.

Q.  And you felt that this was another example of how complicated he was, right?

A.  Like in his past or --

Q.  Yes.

A.  Yes, mmm-hmm.

Q.  And you knew -- when we ended the day yesterday, you knew how much Cassie meant to Combs, right?

A.  Yes.

Q.  And you also felt for Cassie, right?

P6CQcom3                    Jane - Cross

A.  Yes.

Q.  You talked about that extensively?

A.  Yes.

Q.  So when you saw this video, it was very difficult for you because you knew that Mr. Combs really loved her, right?

A.  Yes.

Q.  And it was really hard to see this domestic violence on tape?

A.  Yes.

        MS. COMEY:  Objection, your Honor.

        THE COURT:  Can you rephrase?

Q.  It was really hard for you to see this incident on your phone that you were looking at, right?

A.  Yes.

Q.  So you were helping Mr. Combs with what to say, right?

A.  Yes.

Q.  After this, do you recall Mr. Combs attempting to get into a program to address his -- to address his actions in that video?

        MS. COMEY:  Objection, your Honor.

        THE COURT:  That's overruled.

A.  Yes, I do recall that.

Q.  And do you recall that this program did not accept him into their program?

        MS. COMEY:  Objection, your Honor.  Calls for hearsay.

P6CQcom3                    Jane - Cross

Also 403.

        MS. GERAGOS:  Could we approach, your Honor?

        THE COURT:  You may.

        MS. GERAGOS:  Thank you.

        (Continued on next page)

P6CQcom3                          Jane - Cross

(At the sidebar)

MS. GERAGOS:  I could speak, but it was her objection.

THE COURT:  What's the nature of the objection?

MS. COMEY:  My objection is the witness only knows what the defendant told her, and the defendant only knows what he was told by people about the program.  So it's double hearsay.  It's offered to prove that the program in fact rejected him and offered to prove that the defendant said to Jane that the program rejected him.

I also don't understand the relevance.  This appears to be an attempt to get sympathy from the jury to suggest he was trying to better himself, and that because of the media firestorm, as Ms. Geragos has put it, he was not able to.  It's neither here nor there with respect to the elements of the offense he's charged with and appears to be an attempt to garner sympathy.

MS. GERAGOS:  I'm about to get into she was helping him write a letter to get into this program.  I understand the nature of the previous objection to be the words domestic violence, which I took out of my question.  What I was going to get into next was she helped him write this letter.  This is obviously a critical time period between May 17 and June 18.  She's helping him write a letter if it's not objectionable, I can ask were you helping him write a letter to get into this program, I believe that would not call for hearsay.

MS. COMEY:  I would have a 403 objection.  I don't understand the relevance of the probative value here of trying to get into the program for men who struggle with anger issues or domestic violence issues.  It appears only relevant to improper considerations like sympathy or attempting to suggest that what happened with Ms. Ventura was only domestic violence or suggesting that, again, Mr. Combs was trying to better himself but just couldn't because of the media firestorm, none of which is probative to any of the elements of the charged offenses.

THE COURT:  Why wouldn't it go to intent given that one of the alleged sex-trafficking events was -- post dated preparation of the letter?  So it would go to his intent to engage in either force, threats of force, et cetera.  He was writing to letter to try to get into a program to address certain issues he had.

MS. COMEY:  Your Honor, the mens rea with respect to sex trafficking is knowledge or reckless disregard of the fact that the victim is engaging in sex acts because of force, fraud, or coercion.  It's not about his intent to commit domestic violence or not or his intent to assault or not.

Again, I think it's neither here nor there with respect to the elements of the charged offenses.  I also think it's an attempt to re-cast his conduct as domestic violence in an improper way.

P6CQcom3                    Jane - Cross

MS. GERAGOS:  If I may respond to that, your Honor?
It has already been elicited on direct examination that she
started the fight.  She started the fight on June 18.  I don't
think that the government is going to change anything on their
redirect by saying that he started it.  It is in the record
that she slammed his face or I think she says gave it a good go
into the counter.  And so the context of her knowing that he
was trying to get into this program, she was helping.  She
was -- if she was not assisting, I could see it possibly not
getting into this, but she was he assisting him in trying to
get -- maybe not getting in, but trying to get into this
program.  And in the context of that, in the short, short
timeframe between May 17 and June 18, when she is assisting him
to get into this program, she starts a fight with him almost
the very next time she sees him and it is important context for
the jury to know because --

THE COURT:  Connect the dots for me.  Is this like
victim blaming?

MS. GERAGOS:  I expect that the government is --
they've already said, and, your Honor, said it again -- first
of all, I'm not -- I think -- again, this morning I've shown
total respect to this witness.  I just want to say that again.
Second of all, she does begin the fight.  I opened on that.
They kept that from the jury in their opening, and I opened on
it.  She starts it.  I'm not blaming her for --

THE COURT:  I understand that.  I appreciate that.  I think what Ms. Comey is saying is that she doesn't understand the relevance of her helping Mr. Combs with the letter to any of the elements that the government has to prove as to sex trafficking even with respect to the June incident.  That's why I was asking what's the relevance.

MS. GERAGOS:  The force element of sex trafficking is I expect them on summation to talk in detail about the force that he used that evening.  I will go in detail into the June fight, but they will go, I expect in detail, in their summation as to the force that he used that evening in order to have Antoine then come over.  I'm going to go into this, but it is important context for the jury to know that in the context of him writing this letter, her helping him, the fight begins and that that's -- that's important for them to know when they look into the force, fraud or coercion of commercial sex.

MS. COMEY:  Your Honor, the only relevance I'm hearing is to suggest that Jane should have known better when she was -- that she was poking a violent man, and when she started the fight was putting herself at risk of being assaulted.  That is victim blaming.  That is suggesting she was asking for it.  That is suggesting she brought this violence upon herself and it somehow justified which finds no basis in the law whatsoever.

There is no argument that because she knew he was

P6CQcom3                        Jane - Cross

trying to get help for domestic violence or his anger issues that it somehow justifies his response to her behavior that night, and I think it would mislead the jury to suggest that that is somehow relevant or could somehow be a defense to the way the defendant behaved that night.

MR. AGNIFILO:  If I could just --

THE COURT:  I would agree with Ms. Comey, I'm not hearing any relevance of this particular line of questioning except that it's context, and I don't see the context that in any way would be relevant to any of the elements that the government must prove.

MR. AGNIFILO:  We are not victim blaming.  I just want to say that out loud.  We wouldn't victim blame, and we are not victim blaming.  It's important context because it's something that Mr. Combs and this witness share, a vulnerable thing, a thing that makes Mr. Combs vulnerable in her eyes.  She is writing a letter on his behalf to get him into a program.  And it's significant that she -- when she slams his head on the counter and beats him up, I'm not saying that means he has to fight back, but that you vulnerability and all of the things that lead up to that moment are relevant.  And the fact that --

THE COURT:  How is it relevant?  That's what I'm trying to understand.

MR. AGNIFILO:  He's relying on her.  You know, I have this issue.  I'm trying to get into a program.  You're helping

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom3                          Jane - Cross

me.  You're now, you know -- why are you then now fighting with me?  It's an unprovoked fight.  For the first time ever she starts an unprovoked fight.  They've never been physical.  And she chooses to be physical with him on the heels of trying to get him into a domestic violence program?  I don't know why she did that, but she did it.  I mean, there's no dispute that it happened.

THE COURT:  Well, that is victim blaming.  That is literally that's like if you had a dictionary that had a term victim blaming, like that would be the explanation that you'd be given, so it can't be that.  It has to be something else.

MR. AGNIFILO:  He's vulnerable.  I'm not victim blaming, and I wouldn't victim blame.

THE COURT:  I'm not saying you.  I'm saying that line of questioning would only have relevance to that.

MR. AGNIFILO:  He's vulnerable to her.  This whole examination is about she is vulnerable to him in this way, and now he's vulnerable to her in this way.  That's significant, you know, to all the events that come after it.  There's only a few months left in their relationship, you know, and he is relying on her.  There's context; they're getting closer.  She just testified to that.  And a continuation of them continuing to get closer is she is writing this letter on his behalf.  It's all part of the fabric of their relationship.  I don't know why this should be eliminated from the continuity their

P6CQcom3                        Jane - Cross

relationship.  And it's important in terms of how the relation progresses that he goes to her about this.  He doesn't go to talk with Yung Miami or other people.  He doesn't go to them.  He goes to her.  They're sharing this.  They're actually getting closer.  It's not a matter of blaming.  It's the next step.

I don't think it's a lot of questions.  I think it's probably three questions, and we're done.  But I think the questions are important because it is part and parcel of the relationship that Ms. Geragos has been able to develop without objection because the relationship is significant, and this is a significant part of the relationship.  Along with all the other forms of closeness, they're communicating more.  I mean, it's all part and parcel of the time.

THE COURT:  I think that you've made the argument for why on Rule 403 grounds it should be excluded because there's other ways in which the testimony can establish the parameters of the relationship:  The closeness between Jane and Mr. Combs, et cetera.  But the government has raised an issue of unfair prejudice that the only -- what the jury would be potentially like led to believe is that the defense should or the defendant should be looked at in a sympathetic way for reasons that would not be relevant to any element of the claims or that this is an attempt at victim blaming; that it was really Jane's fault that any of this happened because she instigated the incident that

P6CQcom3                          Jane - Cross

took place in June, both of which I'm not even hearing any response that those would be -- the defense agrees that those attempts would be improper.  So I'm not hearing anything other than that.

And to the extent that there is some argument that this would be relevant to the context of the relationship, the defense has for two days and can continue to establish that at that time there was attempts to -- that they were very close; that Jane wanted the relationship to continue; and that they were -- they had that proximity that the defense indicates it finds relevant.

MR. AGNIFILO:  This is one of the few times when he's actually going to her and saying I need your help with something.  That is not anywhere else in the evidence.  That's not in evidence.  That just doesn't happen that way.  There's this talk about communication.  But this is one of the first times when he goes to her and says:  I need your help doing this.  So I think that's what it makes it new.  That's what makes it different.  That's what the other evidence can't do that this evidence does.

Like I said, we're talking about a question or two. This is not -- this will be over and done in 15 seconds, and it's important in terms of the context of their overall relationship, which we've been developing for five days.

MS. COMEY:  Your Honor, there has been evidence in the

P6CQcom3                          Jane - Cross

record through cross-examination that the defendant spoke to and came to Jane about his drug addiction, about wanting help with his drug addiction, about wanting to go to rehab possibly, and he reached out to her and had those conversations as well. So I do think the defense has been able to establish the points Mr. Agnifilo wants to.  The thrust of the relevance of this particular piece of testimony that Ms. Geragos is trying to elicit is Jane should have known better and, therefore, she deserved what she got on June 18 and 19.  That is the inference that the jury is going to be implicitly asked to draw by asking these questions.  It's wholly improper, and your Honor's order should remain.  You should sustain the objection.

THE COURT:  The objection is sustained.

(Continued on next page)

P6CQcom3                        Jane - Cross

(In open court)

THE COURT:  Ms. Geragos, you may proceed.

MS. GERAGOS:  Thank you, your Honor.

Q.  So you remained, Jane, in contact with Mr. Combs after the video at the Intercontinental was publicized, right?

A.  Yes.

Q.  And it was fair to say publicized a great deal between May 17 and throughout that summer?

A.  Yes.

Q.  And you stayed in Miami for a few days with him, right, and then you ended up leaving?

A.  Yes.

Q.  All right.  And this was, fair to say, a very difficult time, from what you understood for Mr. Combs?

A.  Yes.

Q.  And then you -- he flew to Los Angeles in June, do you recall that?

A.  Yes.

Q.  And he went on a family trip with him and all of his children, right?

A.  Yes.

Q.  And it was a road trip?

A.  Yes.

Q.  And was this road trip put on his kids' social media, fair to say?

P6CQcom3                        Jane - Cross

A.  Yes.

Q.  And so during this time he was on this road trip with his children, you had seen some videos and photos of the road trip?

A.  Yes.

Q.  After he got back from the trip with his children, he comes to your house on June 18, right?

A.  Yes.

Q.  And you had set up --

         MS. GERAGOS:  If we could bring it up, E-247 please. It's already in evidence.

Q.  You had set up these champagne flutes, wine glasses and more champagne flutes, right?

A.  Yes.

         MS. GERAGOS:  If we could put up E-247-M next to it.

Q.  This is in your kitchen, right?

A.  Yes.

Q.  Is this before or after Jonathan comes to set up the house?

A.  I believe this is before.

Q.  So you had -- what were you -- what did you set up at the house, and what did Jonathan set up at the house?

A.  I set up this, and Jonathan set up candles and lights.

Q.  The red lights that we see?

A.  Yes.

Q.  And so in this photo, there is the magnum bottle of champagne the Veuve Clicquot, right?

P6CQcom3                        Jane - Cross

A.  Yes.

Q.  Hope I said that right.  That is bigger than a traditional bottle of champagne, right?

A.  Yes.

Q.  It is about twice the volume of a standard bottle of champagne?

A.  Yes.

Q.  Which is approximately like about 12 flutes of champagne, would you say?

A.  Right.

Q.  And then you have the two shot glasses right next to it, right?

A.  Yes.

Q.  Are those for tequila?

A.  Yes.

Q.  And I think you testified that that night you were both drinking champagne, and then you had -- drank some tequila as well, right?

A.  Yes.

Q.  So you took this photo and -- at 6/18/2024, June 18, 2024 at 19:01, right?

A.  Yes.

Q.  And if we could pull up -- so later that evening, do you remember at what time Mr. Combs arrived?

A.  I think it was early evening.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom3                         Jane - Cross

MS. GERAGOS:  If we could -- I think that's right -- pull up 250 in evidence and 250-M right next to it.

Q.  And this is a photo that you took of Mr. Combs, right?

A.  Right.

Q.  And this is taken at 19:35 right, so about 30 minutes later?

A.  Yes.

Q.  Were the candles lit at this time, or not yet?  Because it's still light outside?

A.  Not yet.

Q.  Okay.  So at this time he had come over, he's wearing his Sean John sweater, right?

A.  Yes.

Q.  Is that the clothing company that he had?

A.  Yes.

Q.  And you and him are just hanging out in your home, right?

A.  Yes.

Q.  And you took a photo of him.  Is that because you had liked taking photos of him when you guys were together?

A.  Yes.

MS. GERAGOS:  So if we could put up 251 already in evidence and 251-M next to it.

Q.  Is this -- this is a photo on the patio, right?

A.  Yes.

Q.  So it's outside of the kitchen and living room, and this is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom3                        Jane - Cross

an outside area, right?

A.  Right.

Q.  So by about 7:35, you and him had already started drinking the champagne, right?

A.  Right.

MS. GERAGOS:  Could we go to 258, please, already in evidence with 258-M next to it.

Q.  At this time, it looks like it's about 8:30, does that sound right?

A.  Right.

Q.  So at this time, was it already dark outside?

A.  Yes.

Q.  It's in Los Angeles, in the summer it gets dark around 8:00, 8:15, right?

A.  Right.

Q.  At that point, you turn on the red lights?

A.  Yes.

Q.  Are you guys still drinking champagne at this time?

A.  Yes.

Q.  Had you taken by this time any tequila shots?

A.  I believe so.

Q.  No ecstasy at this point, right?

A.  No.

MS. GERAGOS:  Could we put up 261, please, and 261-M.

Q.  This is a photo that this is taken around 8:34, right?

P6CQcom3                    Jane - Cross

A.  Yes.

Q.  Are these the candles that Jonathan brought over?

A.  Yes.

Q.  And this is your kitchen counter, right?

A.  Yes.

Q.  And you can see it your view up there, and at this point it's dark, right?

A.  Yes.

        MS. GERAGOS:  If we could play Government Exhibit 260, please.

        MS. COMEY:  Confirm it's E-260 for the record.

        MS. GERAGOS:  I'm sorry, yes, E-260.

        (Videotape played)

Q.  You testified on direct that about 30 minutes after this video, that's when you started the fight with Mr. Combs, right?

A.  Right.

        MS. GERAGOS:  If we could go to E-260-M.  Yes, E-260-M.  Or E-261-M, and put up the metadata of that.  Of 260, not 261.  I think it's E-260-1-M.

Q.  This is a metadata of the video we just looked at, right?

A.  Yes.

Q.  If you look at the created date here, it shows the next day of June 19, right?

A.  Right.

Q.  At 3:32 a.m.?

P6CQcom3                    Jane - Cross

A.   Yes.

Q.   At this point, it's been approximately how many -- five, six, seven hours since he had come over?

A.   Right.

MS. COMEY:   I'm going to object.  I don't think this is in evidence -- I think the question may be misleading.  If I can confer with Ms. Geragos briefly, please.

THE COURT:   All right.

(Counsel consult)

MS. GERAGOS:   Your Honor, with the government's consent, can we please move into evidence Government Exhibit E-260-1-M?

MS. COMEY:   No objection, your Honor.  And I understand Ms. Geragos is going to clarify the time.

(Government's Exhibit E-260-1-M received in evidence)

Q.   Yes.  This is, as you see on the left-hand side there, it says UTC plus zeros, right?

A.   Yes.

Q.   So it's about seven hours in Los Angeles before 3:32:54 a.m., right?

A.   Yes.

Q.   So approximately 8:30 a.m.?

A.   Yes.

Q.   So you testified on direct examination that about 30 minutes after this is when you start the fight with Mr. Combs,

P6CQcom3                      Jane - Cross

right?

A.   Yes.

          (Continued on next page)

P6cWcom4                          Jane - Cross

BY MS. GERAGOS:

Q.  OK.  And at that point how many glasses of champagne would you estimate you had had and that he had had?

A.  I probably had, like, two.  He's probably had, like, two or three and maybe some shots in between.

Q.  OK.  How many shots would you say that each of you had?

A.  I would say maybe, like, two.

Q.  OK.  And two -- he had two; you had two?

A.  Yeah.

Q.  OK.  And you say that, you said that you had a weird, or I think you previously said you had a weird feeling that he had taken the woman that we spoke about on direct examination on that family trip with him, right?

A.  Yes.

Q.  But you didn't have anything, like, concrete to point to there, right?

A.  Right.

Q.  You just had had a feeling that night that she was there?

A.  Yes.

Q.  And that really angered you, right?

A.  Yes.

Q.  OK.  And so you told us previously, on direct -- I'm sorry, on cross-examination, that you would see social media postings from other women.  Yesterday we talked about Gina, right?

A.  Yes.

P6cWcom4                          Jane - Cross

Q.  And you saw Gina staying at The Edition, and so that's
something that started that discussion with you and Mr. Combs
in October, right?

A.  Right.

Q.  And then we talked about Caresha's Turks trip, and you had
seen some photos on social media there, right?

A.  Right.

Q.  And so those were examples of times when you had hard
evidence that you believed that these women were with
Mr. Combs, right?

A.  Right.

Q.  But, here, you didn't have anything showing that that woman
had been with Mr. Combs on that trip, right?

A.  Right.

Q.  You just that this feeling, right?

A.  Right.

Q.  And so -- there weren't any postings or anything else that
you saw, right?

A.  Right.

Q.  There was no real indication that you had that she was
actually there, right?

A.  Right.

Q.  And fair to say that this individual is somebody who you
and Mr. Combs had fought about -- not physically but fought
about verbally during the course of your relationship?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom4                      Jane - Cross

A.   Yes.

Q.   She lived in Miami when he lived in Miami, right?

A.   Yes.

Q.   And that was hard for you because he could see her a lot more when you were actually on the other side of the country, right?

A.   Right.

Q.   And so she would spend a lot of time with him, and that was hard for you to deal with, right?

A.   Right.

Q.   Because you wanted to spend -- as we've talked about you wanted to spend all of that time with Mr. Combs, but you didn't live physically in the same place?

A.   Right.

Q.   OK.  And so you had this feeling that you thought that she was on this trip.

     Were you upset because you were in L.A. and he had left from L.A. and he could have taken you?

A.   I think it was just a ball of emotions that night.  There was a lot of just resentment for so many things.  It was a ball of emotions that night.

Q.   OK.  And you guys were sitting -- after this video you were then sitting at that counter together, right?

A.   Right.

Q.   OK.  And you started telling Mr. Combs things like don't

P6cWcom4                        Jane - Cross

you think it's weird to date someone who can't buy their own
alcohol, right?

A.  Yes.

Q.  And you started saying some pretty mean and hurtful things,
right?

A.  Right.

Q.  You called him a pedophile?

A.  Right.

Q.  Even though you knew that she was not underage, right?

A.  Right.

Q.  OK.  And at one point you said he was leaning to tie his
shoe, and he was leaning down and you took his head and you
gave it a good go into the counter, right?

A.  Right.

Q.  When you met with the defense initially, did you tell
defense counsel that you slammed his head into the counter?

A.  I think I did.

Q.  OK.  And did you tell the government, when you first told
them about this incident, that you pushed his head into the
counter?

A.  Yes.

Q.  OK.  And then you said on direct that you gave it a good
go, right?

A.  Right.

Q.  Have you ever done something like this before?

P6cWcom4                        Jane - Cross

A.  No.

Q.  This is the first time you've done anything like this, right?

A.  Right.

Q.  And have you and Mr. Combs ever had a physical altercation like this before?

A.  No.

Q.  This was the first time, right?

A.  Yes.

Q.  You had never gotten into a physical fight with him, right?

A.  No.

Q.  You had gotten into many verbal arguments, right?

A.  Right.

Q.  And we've heard some of those phone calls in this courtroom, right?

A.  Right.

Q.  But never anything physical, right?

A.  Right.

Q.  And do you recall saying to the government that this push was medium hard?

A.  Yes.

Q.  OK.  And after you pushed his head into the counter, do you recall that you then testified that you took one of the candles that was lit nearby and threw it at him?

A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom4                        Jane - Cross

Q.  Was that the candle that was on the counter that we just saw in the photo?

A.  Yes.

Q.  OK.  And you testified that you don't recall it hitting him, but you recall wax splattering on him, right?

A.  Right.

MS. GERAGOS:  I think we're good to continue.

THE COURT:  I don't think that was -- I'm getting a shaking of the head, but I don't think that was anything official, Ms. Geragos.

MS. GERAGOS:  OK.  There's no fire drill?  OK.

Q.  And you do this because you're making an assumption about him and this woman, right?

A.  It was a mix of feelings here, yes.

Q.  You had a lot of complicated feelings at this time for Mr. Combs, right?

A.  Yes, I did.

Q.  You still deeply loved him?

A.  I did.  I --

Q.  But you had a lot of mixed feelings that you testified you were trying to work through, right?

A.  I had a lot of resentment for him here, yes.

Q.  And we talked about the resentment and the regret that you felt, right?

MS. COMEY:  Objection.  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom4                        Jane - Cross

THE COURT:  Hold on.

Can you rephrase.

BY MS. GERAGOS:

Q.  We talked about the resentment yesterday?

A.  Yes.

Q.  And you said that you thought that regret and resentment are similar to one another, right?

A.  Yes.

Q.  OK.  So during this time you felt resentment, right?

A.  Yes.

Q.  OK.  And do you recall telling the government that at this time you were edgy and you were agitated?

A.  Yes.

Q.  All right.  And you would go back and forth between loving and hating and resenting Mr. Combs?

A.  Yes.

Q.  All right.  And so then you testified that after you threw the candles, that you then threw the glasses at him, right?

A.  Right.

Q.  How many initially, just at this part of the night, how many glasses did you throw at him?

A.  I think maybe one.

Q.  OK.  Do you remember which, only if you remember, which of those champagne glasses you threw?  Was it the wine glasses or the champagne flute?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom4                        Jane - Cross

A.   Maybe the wine glasses.

Q.   OK.  And then as you yelled and threw these candles and glasses -- this one glass at him, you were yelling at him, right?

A.   Yes.

Q.   And you were still calling him a pedophile?

A.   Yes.

Q.   And do you remember calling him disgusting?

A.   Yes.

Q.   And a monster?

A.   Yes.

Q.   And do you remember telling the government that you did that over and over again?

A.   Yes.

Q.   OK.  And in response, he was saying to you you're crazy, right?

A.   Yes.

Q.   And he had wax on him?

A.   Yes.

Q.   OK.  And at this point I think you said you felt things were escalating, and so you went into the bedroom, right?

A.   Right.

Q.   And so at the time that you went into the bedroom, at this point he had not laid his hands on you, right?

A.   Right.

P6cWcom4                    Jane - Cross

Q.   OK.  But at this point when you went into the bedroom, you had thrown the glass at him, right?

A.   Right.

Q.   You threw the candle at him?

A.   Yes.

Q.   Was just one candle at that point or another candle?

A.   I think two.

Q.   Two.  Where was the second one?  We saw the first one on the counter.  Where was the second one?

A.   I can't recall.

Q.   And you had been calling him a pedophile, right?

A.   Yes.

Q.   And a monster?

A.   Yes.

Q.   And saying he was disgusting?

A.   Yes.

Q.   And he was saying you're crazy, right?

A.   Yes.

Q.   And so you go into the bedroom at this point.  Is that -- how far away -- from the photos we've been looking at, at the kitchen area, how far away is the bedroom?

A.   Just a few steps.

Q.   And so you locked yourself in your bedroom at this point, right?

A.   Yes.

P6cWcom4                        Jane - Cross

Q.   And then you testified that he then, I think, kicked the bedroom door open, right?

A.   Right.

Q.   OK.  And I don't think you testified to this, but do you remember telling the government that he kept saying are you just not going to talk to me?

A.   Yes.

Q.   OK.  And at this point when he went into the bedroom, he still had not touched you, right?

A.   Right.

Q.   And you knew by this point, because you had seen the videos, that he had had -- that he had had an incident with Cassie at the InterContinental, right?

        MS. COMEY:  Objection, your Honor.

        THE COURT:  Could you rephrase the question.

BY MS. GERAGOS:

Q.   This is about one month after the video had aired on CNN, right?

A.   Yes.

Q.   When you had seen his actions in that video, right?

A.   Yes.

Q.   OK.  All right.  So he says you're not going to talk to me, right?

A.   Right.

Q.   And so then you go, after he kicked that door open, you go

P6cWcom4                    Jane - Cross

into the bathroom, right?

A.  Right.

Q.  And then he kicks through that door as well, right?

A.  Right.

Q.  And does that door lock from the inside?

A.  Yes, it does.

Q.  Is it a -- there are some doors that lock with a physical lock that goes to the right or some doors that have a button that you press to lock it.

Do you know which kind of lock you have?

A.  It was a button.

Q.  OK.  And so when he kicked through that door, it wasn't so much that he forced a physical lock; it was a button lock?

A.  Yes.

Q.  OK.

A.  Yeah.

Q.  OK.  And then at that time, do you remember him saying again are you just not going to talk to me?

A.  Something like that.

Q.  OK.  And you were telling him to leave at that point.  Does that sound right?

A.  Yes.

Q.  OK.  You weren't saying -- is that all you were saying?

A.  I was saying for him to leave and that I hated him.

Q.  Did you keep saying that you hated him too, or did you only

P6cWcom4                          Jane - Cross

say that you hated him one time?

A. I believe there was a plethora of things that I was saying.

Q. What else were you saying?

A. That I hated him and I wanted him to leave and to leave me alone and to stop.

Q. OK. And he was trying to get you to talk to him?

MS. COMEY: Objection, your Honor.

THE COURT: That's overruled.

A. Yes.

Q. OK. What was he saying to try to get you to talk to him?

A. Just that I was crazy, just a lot of yelling. Like you're not going to not talk to me, and -- I can't really remember, but a lot of --

MS. GERAGOS: OK. If you can't remember, we don't want to push you to remember.

Q. OK. So at this point you then go into the closet and you lock that door, right?

A. Yes.

Q. OK. And is this lock another push lock?

A. Yes, it is.

Q. It is not, like, a physical turn lock, right?

A. Right.

Q. OK. And at that point it locks from the inside, and he -- you take this opportunity to try to change your clothes, right?

A. Yes.

P6cWcom4                         Jane - Cross

Q.   And you say that you changed from your dress, which we saw was that brown dress, right?

A.   Yes.

Q.   And you change into a larger, more comfortable summer dress, right?

A.   Yes.

Q.   OK.  And what kind of heels are you wearing?

A.   I'm still wearing the same heels.

Q.   What heels are those, if you recall?

A.   High heels with a strap around the ankle.

Q.   OK.  And so you were not able to take off those heels?

A.   No, I wasn't.

Q.   OK.  So you were able to put on a dress?

A.   Yes.

Q.   OK.  You're an active -- you take your working out very seriously, right?

A.   Yes.

Q.   And you had wanted, I think you testified, to change into something that would make it easier for you to leave the house, right?

A.   Yes.

Q.   You didn't put on any of your active wear, right?

A.   Yes.

Q.   You put on the dress?

A.   Right.

P6cWcom4                        Jane - Cross

Q.   Why did you choose that dress?

A.   Because I slipped out of the tight one and just slipped into a dress I could pull up quickly.

Q.   OK.  And once you pulled that dress up quickly, how did you get out of that closet?

A.   He kicked it open.

Q.   OK.  And when he goes into the closet at that point, he still does not hit you, right?

A.   No.

Q.   OK.  And it's not until you guys come out of the closet, I think you testified, that you walked towards -- help orient me. Where are you at the next altercation?

A.   I would call it maybe the hallway.

Q.   OK.  Is it the hallway that's next to the chair?

A.   It's the hallway with the big round mirror, where I'd take a selfie.

Q.   OK.  And does he say again to you you're just not going to talk to me?

A.   He says a lot of things.  Just a lot of yelling.  I can't remember exactly the quotes, but --

Q.   Are you yelling as well?

A.   I'm just saying, like, leave me alone and just telling him to leave me alone and for him to leave.

Q.   OK.  And then you said on direct that that's at that point when you're in, I think when you're in that hallway area is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom4                          Jane - Cross

when he comes up behind you and puts you in, I think you said the choke hold?

A.  He kicks me on the back of the leg, and then I fell on my buttocks and then I was lifted up in a choke hold.

Q.  OK.  And you said on direct that you couldn't breathe.  Do you recall that?

A.  Yes.  I was on my tippy-toes.

Q.  OK.  Do you recall telling the government, when you first told them this, that you almost couldn't breathe?

A.  Yes.

MS. GERAGOS:  And I just want, if we could just pull up E272, which is already in evidence.

Q.  All right.  This is a video from a few days later, right?

A.  Right.

Q.  And this is taken at his house in Bel Air?

A.  Yes.

Q.  And it's about five days later?

A.  Yes.

Q.  And in this video we're looking at right now, on zero seconds -- it has not started -- we see the discoloration to your eye here, right?

A.  Right.

Q.  OK.  And then a little bit later, we see -- you could see it right here -- discoloration to the top right part of your head, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom4                    Jane - Cross

A.   Right.

MS. GERAGOS:  OK.  If we could just play it for a couple seconds.  I'll tell you when to stop.

(Media played)

MS. GERAGOS:  All right.  If we could stop there. Thank you.

Q.   There was no discoloration to your neck at any point, right?

A.   No.

MS. GERAGOS:  OK.  And we can take that down.

Q.   And then you said you want to do run away from him because you didn't want to wake up the neighbors, right?

A.   Right.

Q.   Because you guys were yelling a lot?

A.   Yes.

Q.   And you are in a gated community?

A.   Yes.

Q.   Are the houses very close to one another?

A.   No.

Q.   OK.  But you were scared; you didn't want the neighbors to wake up, right?

A.   Yes.

Q.   And so what time would it have been, if you recall, that you ran out of the house?

A.   Very, very late.

P6cWcom4                          Jane - Cross

Q.  Do you have any sense of how long it was up until, the fight had lasted up until that point?

A.  I don't really remember the timing of things that night.

Q.  OK.  And you opened your front door and you said you went and you hid behind a wall for, I think, you said approximately two hours, right?

A.  Yeah.  I managed to take off my heels before I walked really fast to the wall.

Q.  And so when you took off your heels, what was Mr. Combs doing?  Was he yelling?  Where was he?

A.  He was starting to yell, but I just kind of kept walking really, really fast.

Q.  OK.  And he stayed on your yard or in your house?  Where was he when you were leaving?

A.  I believe he stayed behind.

Q.  OK.  And then you walked -- how long would you say you walked?  How far?

A.  Maybe, maybe I walked for, like, just -- I sprinted like, for, like, ten minutes to go behind this wall.

Q.  OK.  And so you hid behind the wall?

A.  Yes.

Q.  All right.  And where was your phone?

A.  In the house.

Q.  Where in the house?

A.  I'm not sure.

Q. And then you said you waited approximately two hours, which was an approximation, right?

A. Yes.

Q. And then you walked back home, right?

A. Yeah. I took the long way home.

Q. OK. And then you saw Mr. Combs when you walked back home, right?

A. Yes.

Q. OK. And he -- he was outside?

A. He was outside, yes, on the street.

Q. OK. And you and him walked back into the house, right?

A. Yes.

Q. And at that point you approximated it had been several hours, right?

A. Yes.

Q. And so you were -- and I think you were still very upset, right?

A. Yes.

Q. And so when you came back into the house after approximately two hours, you started yelling at him again, right?

A. Right.

Q. And at that time you start -- would it be fair to say you start going off again about the female?

A. Yes.

P6cWcom4                         Jane - Cross

Q.  And you start telling him again that he's a pedophile?

A.  Yes.

Q.  And what other things were you saying to him at that time?

A.  That he was a monster and I hated him.

Q.  And at that time, just at that time, when you had walked back into the house and you were saying that, he didn't kick you again, right?

A.  When I walked in --

Q.  Before the patio, when you walked in and you were yelling at him, he didn't kick you when you walked in, right?

A.  No.

Q.  OK.  And then do you remember that then you go to the patio area?

A.  Yes.

Q.  And is that the area that we were just looking at, that photo of Mr. Combs, that's that area?

A.  Yes.

Q.  And do you recall that after you started yelling at him, that then you then punched him on the back of his head?

A.  Yes.

Q.  OK.  And at that point -- do you recall telling the government that it was a solid punch?

A.  Yes.

Q.  And at that point, Mr. Combs responded by punching you, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom4                     Jane - Cross

A.   Yes.

Q.   And he punched you in your eye, right?

A.   I believe he punched me twice.

Q.   Your eye and then the forehead, right?

A.   Yes.

Q.   I was just saying eye first.  Was it the forehead first?

A.   I don't know.

Q.   You don't know.  OK.

     And is that what led to what we just saw here in that video?

A.   I believe so.

Q.   And you then went into the backyard around the corner, right?

A.   Yes.

Q.   And that's when you testified that you tried to cover yourself and curl up, right?

A.   Yes.

Q.   OK.  And at that point I think you testified that he kept saying things like I have seven kids and you're trying to make it so that I don't see my kids, right?

A.   Yes.

Q.   And it was after the point of the fact that -- after you punched him and after he punched you that you said that, right -- that he said that, right?

A.   He was also punching and kicking me at this time while he's

P6cWcom4                          Jane - Cross

saying that.

Q. While he's saying that is when you were -- when you said that you were on the ground?

A. Yes.

Q. And that's when you say that he started kicking you, right?

A. Yes.

Q. And that's -- at that point you're still telling him that he's a monster and disgusting, right?

A. I said no, I'm not, just leave me alone. Just leave.

Q. At the point when you're in the backyard you say just leave, right?

A. Yes.

Q. And do you recall on direct that you didn't first mention the patio incident until you started talking about getting Mr. Combs's phone?

A. Can you repeat that question? I'm sorry.

Q. Sure.

Do you remember on direct examination you talked about coming back into the house after the period that you had left, right?

A. Yes.

Q. And that you -- Ms. Comey asked you what happened next and, you said I got his phone, right?

A. Yes.

Q. And then Ms. Comey redirected you to say, well, did you go

P6cWcom4                          Jane - Cross

to the patio area.  Do you remember that?

            MS. COMEY:  Objection, your Honor.

            THE COURT:  That's sustained.  Rephrase.

BY MS. GERAGOS:

Q.  All right.  Do you recall --

            THE COURT:  While we're at this point, is there an

appropriate time for us to take our lunch break?

            MS. GERAGOS:  Could I finish this portion and then --

            THE COURT:  OK.  That's why I'm asking.

            MS. GERAGOS:  OK.  Mr. Agnifilo would like me to do it

now, so --

            THE COURT:  All right.  We're good.

            Thank you, members of the jury.  We'll be taking our

lunch break at this time.  Don't talk to each other about the

case.  Do not look up anything about the case.  And do not talk

to anyone else about the case.

            With that, we'll be back after lunch.

            (Continued on next page)

P6cWcom4

(Jury not present)

THE COURT:  Jane, we'll see you after lunch.

(Witness not present)

THE COURT:  Please be seated.

Anything to address before we take our lunch break?

MS. GERAGOS:  Not from the defense.

MS. COMEY:  No, your Honor, though we'll note that there are some evidentiary issues that we need to address before the next witness, so maybe we could come back a little bit early from lunch to address those.

THE COURT:  All right.  It's 12:35, and consistent with my earlier allowance of giving a little bit of time for lunch, we'll come back at 1:30.

MS. COMEY:  Is that when we should come back to argue those issues, your Honor, or should we come back a little before 1:30 to argue those issues?

THE COURT:  Sorry.  Excuse me.  1:20.

MS. COMEY:  Thank you, your Honor.

THE COURT:  How many issues are we talking about?

MS. COMEY:  I will defer to my colleagues.  I'm not sure.  Just one, it sounds like.

MR. DRISCOLL:  I think it's probably more than one.

THE COURT:  All right.  12:15 -- 1:15, but I would like to see lead counsel for both sides as well as Jane's counsel in the robing room with the court reporter.

P6cWcom4

MR. AGNIFILO:  Your Honor, I'm sorry.  Would it be possible to do this in the presence of the defendant?

THE COURT:  Yes.  Clear the courtroom then?

MR. AGNIFILO:  I guess we'll have to do it that way.

THE COURT:  Let me have an initial discussion in the robing room and then I'll hear you there.  And we can come back out.

MR. AGNIFILO:  I'm sorry, Judge.  I prefer to do it in the presence of my client.

THE COURT:  Fine.  We'll do it right here.

MS. COMEY:  Your Honor, if it's about the issue we talked about this morning, I do have concerns.

THE COURT:  Then let's have a brief sidebar, and then we'll come back.

MS. COMEY:  Thank you, your Honor.

(Pages 5824-5831 SEALED)

P6cWcom4

AFTERNOON SESSION

1:20 p.m.

THE COURT:  Please be seated.

MS. GERAGOS:  Your Honor, if I could just let you know, that we are setting up the headphones for the very end of the cross, which should happen very soon.  We will be using those because of the Voicenotes that we'll play.  That way the jurors can hear everything without disclosing identifying information.

THE COURT:  That's fine.  Do we need to hold off for five minutes before proceeding?

MS. GERAGOS:  No.  We can -- I'm just letting you know what's going on right now.

MR. DONALDSON:  Judge, could we have five minutes, please?

THE COURT:  You may.

MR. DONALDSON:  Thank you, your Honor.

THE COURT:  Mr. Agnifilo, are we prepared to proceed at this point?

MR. AGNIFILO:  I don't see Ms. Geragos.  Let me just check.

MS. SLAVIK:  Your Honor, there were two issues that we wanted to take up before the next witness.

THE COURT:  In addition to the exhibit issues?

MS. SLAVIK:  So, the exhibit issues, I think, as

Mr. Driscoll noted, are multiple, but there are only two specific issues that we need to address before the next witness takes the stand.

THE COURT:  Well, here's a question for you.  It's 1:30 p.m., and the government has indicated that, if all goes as the government has planned, we may be ending early tomorrow too.  I don't have a response to these exhibits that have been identified, so I could just rule on this in real time, but that process is going to take some time.  And so the question is, do we need to deal with it now, or should we complete Jane's testimony and then start fresh in the morning?

MS. SLAVIK:  That's fine, your Honor.  The only thing that I'll flag is that a lot of these evidentiary issues will affect the testimony of a summary witness, who we plan to put on tomorrow.  So it's fine.  We can, you know, it's been a busy day.  We can definitely take this up in the morning, but if we do that, I think that our witness list could change.

THE COURT:  Or we could just sequence it.

MS. SLAVIK:  Is the Court proposing that we argue after Jane's testimony?

THE COURT:  Sure.  That wasn't exactly what I had proposed, but --

MS. SLAVIK:  Either way, your Honor.  The point that I'm trying to make is that the Court's rulings are required for the summary witness, who we planned to put on on Friday.

THE COURT:  That's fair.  Why don't we complete this witness and then address the exhibits, and then, obviously, if there's some loose end that needs further attention, we can deal with it in the morning, and it won't prevent you from making sure that the summary witness is prepared to testify.

MS. SLAVIK:  I think that's fine, your Honor.

MS. GERAGOS:  Your Honor, I'm going to keep this device right here.  I just want your Honor's permission to do that.  I know there has been some argument about things on this side.  I just wanted to let you know.

MS. COMEY:  No objection, your Honor.

THE COURT:  OK.  Just so everyone is on the same page, because this issue came up before we took our break.  My understanding is that with the exception of that last sidebar, there might have been a technical issue.  Otherwise, Mr. Combs has been able to view what is happening at the sidebars.  So we'll continue with that approach, and we'll make sure that, to the extent there's any sidebar, Mr. Combs can see exactly what's being said.  If there's ever any technical issue that is preventing that from happening, all you need to do is let me know, because it can be a distance issue, so we can make adjustments to make sure Mr. Combs can participate.  And if need be, if there's a real technical issue, we can accommodate that with the marshals service.

Any issues along those lines, Mr. Agnifilo?

P6cWcom4

MR. AGNIFILO:  No, your Honor.

The live feed that we didn't get obviously will be in a transcript that's going to be available for us.  Just confirming.

THE COURT:  Right.  But am I correct that with the exception of that last sidebar --

MR. AGNIFILO:  Yes, yes.

THE COURT:  -- there's been live access to what has been happening?

MR. AGNIFILO:  Sometimes it doesn't work, but if that happens in the future, we'll make sure that your Honor knows.

THE COURT:  In the future let me know.

MR. AGNIFILO:  Yes.

THE COURT:  Because my assumption, and based on consultations with the court reporter's office, that's how the system is designed to work.  So let me know if that's not happening.

MR. AGNIFILO:  Thank you.

THE COURT:  And I'll make sure that it happens.

Otherwise, if we have anything that a party requests to be sealed, I think that in those circumstances, what I'm going to do is to keep the broadcast going but then indicate that the transcript will be sealed.  This will create a situation where Mr. Combs should be able to see live what is happening, even if that portion of the proceeding needs to be

P6cWcom4

sealed for some reason, but the transcript that ultimately goes out to the public will then be sealed.

MR. AGNIFILO:  Understood.

THE COURT:  I think that's the way to handle that, and we'll do it at sidebar so that we can afford full access.

MR. AGNIFILO:  Thank you, Judge.

THE COURT:  With that --

MS. GERAGOS:  I'm ready to proceed.

THE COURT:  You're ready.

All right.  Let's have Jane back.

(Continued on next page)

P6cWcom4                          Jane - Cross

(Jury present)

THE COURT:  Please be seated.

Welcome back, members of the jury.

Jane, you understand you're still under oath.

Ms. Geragos, you may proceed when ready.

MS. GERAGOS:  Thank you, your Honor.

BY MS. GERAGOS:

Q.  Good afternoon, Jane.

A.  Good afternoon, Ms. Geragos.

Q.  When we broke for lunch, we were talking about the fight and we were on the early, early hours of June 19.  And we were talking about you guys being on the patio of your house.  Do you remember that?

A.  Yes.

Q.  OK.  And we talked about how during that argument on the patio you said that you punched the back of Mr. Combs's head, right?

A.  Yes.

Q.  And that you recalled it being a solid, a medium force punch, right?

A.  Yes.

Q.  And you don't recall leaving any type of injury, right?

A.  No.

Q.  And then after that, you then said that he punched you twice in the face, right?

P6cWcom4                      Jane - Cross

A.   Yes.

Q.   OK.  And you said one was your eye and one was your forehead, right?

A.   Right.

Q.   And that's when you went to the backyard and you said that you curled up in a ball, right?

A.   Yes.

Q.   OK.  And at that time you said he was kicking you, right?

A.   Yes.

Q.   And at that time is when you said that he was saying you're trying to get me to never see my kids again, right?

A.   Yes.

Q.   And he was talking about his children, right?

A.   Right.

Q.   And after that, I think that you testified that he then dragged you into the house by your hair and your arm, right?

A.   Yes.

Q.   And at this time, are you yelling at him, or you're telling him you have to leave, right?

A.   I was asking him to stop.

Q.   To stop.  OK.  And right before that you were saying, I believe you said just leave, leave, leave me alone, right?

A.   Yes.

Q.   OK.  And once you're inside the house, I believe that you testified that you then got his phone, right?

P6cWcom4                       Jane - Cross

A.  Yes.

Q.  OK.  And you took his phone, and at that time you then called the woman that you were fighting about, right?

A.  Right.

Q.  OK.  And so you do that from his phone, not from yours?

A.  Right.

Q.  And does she answer immediately?

A.  Yes.

Q.  And do you say who you are on the phone?  I'm not asking if you said your true name, but do you say who it is?  What do you tell her when she answers the phone?

A.  I'm not sure if I say who I am.

Q.  Are you FaceTimeing her, are you just calling her regular, do you remember?

A.  I'm calling regular.

Q.  And do you say -- do you remember her saying:  What are you doing calling me from his phone?

A.  Yes.

Q.  And do you then ask her:  Did you go to the Grand Canyon with him, I'm asking you woman to woman?

A.  Yes.

Q.  And at this point it had been approximately a couple hours since the beginning of the fight, right?

A.  Yes.

Q.  And you're still wondering whether or not she went on the

P6cWcom4                    Jane - Cross

road trip with him, right?

A.  Right.

Q.  And she said:  Girl, what are you going through right now?
You're worried about the wrong things.  Right?

A.  Right.

Q.  And she said:  Woman to woman, you should not be panicking.
Right?

A.  Right.

Q.  And do you remember that you then hung up the call?

A.  Well, I said he's beating my ass right now and then he
hangs up the call.

Q.  Do you remember that first -- is it your testimony that you
did not first hang up the call before she called back?

A.  Can you repeat that?

Q.  Do you remember her calling multiple times that night?

A.  Yes.  So, after I said that he hung up the phone, and then
I think that she called him back to back after that.

Q.  OK.  So she called him multiple times after he hung up the
phone?

A.  Yes.

Q.  When she called back multiple times, he answers or do you
answer?

A.  I don't think either of us answer.

Q.  OK.  So you only remember just that short portion of the
phone call?

P6cWcom4                        Jane - Cross

A.  I do, yes.

Q.  How are you able to then see that she called back multiple times afterwards?

A.  Because the phone was ringing, I think his phone was just, like, lighting up.

Q.  OK.  Before she hung up or at the time when you were speaking, do you recall her calling you some mean names?

A.  I believe so.

Q.  And do you recall her calling you a bitch?

A.  Yes.

Q.  And that made you pretty upset, right?

A.  Yes.

Q.  OK.  Do you recall then calling her some names?

A.  Yes, maybe.

Q.  OK.  Do you recall talking about some of her previous relationships?

A.  Maybe, yes.

Q.  OK.  And do you recall, in other words, trading insults with this woman on the phone at this night?

A.  Yes, I do.

Q.  OK.  And do you recall Mr. Combs saying to her:  She wants to know if you went on the family trip?

A.  Yes.

Q.  OK.  And what did she say in response?

A.  I can't remember.

P6cWcom4                        Jane - Cross

Q.   OK.  Did she say anything -- did she say:  Let her mind wander, she needs to fix her life for real?

A.   Probably.

Q.   She said some pretty insulting things on that phone call, right?

A.   Yeah.

Q.   Did she say you want to make this a beef for no reason?

A.   I can't really remember.

Q.   OK.

A.   Yeah.

Q.   Do you then remember the call ending?

A.   Yes, I do.

Q.   OK.  And was it after this point that then Mr. Combs calls Jonathan?

A.   Yes.

Q.   OK.  And when he calls Jonathan, did he want Jonathan to also tell you that this woman was not on the family trip?

A.   Yes.

Q.   OK.  And after the FaceTime -- was it FaceTime or a call with Jonathan?

A.   FaceTime.

Q.   OK.  And after the FaceTime with Jonathan, do you recall then you got into the shower?

A.   Yes.

Q.   All right.  And do you remember that at that point when you

P6cWcom4                        Jane - Cross

got into the shower, I think you testified you were naked but that Mr. Combs was still wearing his pants, right?

A.   Yes.

Q.   Or shorts or something?

A.   Pants, yes.

Q.   Do you remember that when you got into the shower, you were still calling Mr. Combs names?

A.   Yes.

Q.   You were calling him a pedophile in the shower?

A.   Yes.

Q.   OK.  You were saying that he's a son of a bitch?

A.   I think I was just calling him a bitch.

Q.   OK.  Just a bitch?

A.   Yeah.

Q.   OK.  Do you remember calling him a piece of shit?

A.   Probably.

Q.   Do you remember calling him a fraud?

A.   Yes.

Q.   Do you remember letting out, releasing a lot of feelings you were feeling at that moment while you were in the shower?

A.   Yes.

Q.   And then I believe that you testified on direct that after you called him those names, then he hit you in the face, right?

A.   Yes.

Q.   And this wasn't a punch, right?

P6cWcom4                        Jane - Cross

A.  No.

Q.  That was a slap in your face?

A.  A very hard slap, yeah.

Q.  And then you kept calling him those names?

A.  Yes.

Q.  And the slap happened two more times?

A.  Yes.

Q.  It was three times total?

A.  Yes.

Q.  And after that, I believe you testified that then you sat down and you kind of froze, right?

A.  Yes.

Q.  OK.  And then do you remember Mr. Combs saying to you: We've never fought like this before and now the lawsuit comes out and now you're attacking me?

A.  I heard him say that, yes.

Q.  And it was after those points?

A.  I think at this point I had just reached my breaking point in the relationship just for my own feelings, not anything lawsuit-related, just even in my own ending of the relationship, as you all know how I was feeling.

Q.  OK.  But it was after the point of the shower where then he says to you:  We've never fought like this before.  Right?

A.  Yes.

Q.  And he says:  And then the lawsuit comes out and now this

P6cWcom4                          Jane - Cross

happens?

A.   Yes, he did say that.

Q.   And he says:  Now you want to attack me.  Right?

A.   Yes.

Q.   Then he said:  Why would you think that this woman is on the family trip.  Right?

A.   Right.

Q.   OK.  And it's after this point, I believe, that then the fighting is over, right, after the shower, the physical part of the fight, I should say?

A.   Yes.

Q.   OK.  So if you could orient me so that I have a total understanding and the jury has an understanding, the last time that there was a physical altercation between you two that night is when you were in the shower, right?

A.   Right.

Q.   OK.  And at that time did you then turn the water off?

A.   Yes.

Q.   OK.  And then you sat down in the shower?

A.   I remember I was sitting by the bathtub.  I was just sitting down.  I think I had a pounding headache.

Q.   OK.  And then he's saying to you:  Why would you think this woman was on the family trip.  Right?

A.   There was a lot of arguing and yelling.

Q.   OK.  So at this point you had sat down near the bathtub,

P6cWcom4                    Jane - Cross

and I think we looked at the bathtub in some of the photos maybe yesterday or the day before when you were looking for the house, right?

A.  Yes.

Q.  Was that the bathtub, is it the same bathroom?

A.  Yes.

Q.  OK.  And at that time you were still yelling at one another?

A.  Not anymore.

Q.  Oh, you're not anymore?

A.  No.

Q.  OK.  So by then there was no more physical violence between the two of you?

A.  Right.

Q.  OK.  And at that point he says put on an outfit, right?

A.  Yes.

Q.  And that's when you understood that to mean a lingerie outfit, right?

A.  Right.

Q.  OK.  And then did you put on the outfit?

A.  Yes.

Q.  OK.  And where do you guys, where do you guys go from there?

A.  From there --

Q.  Let me make my question more specific.  What room of the

P6cWcom4                          Jane - Cross

house, if any, do you go from there?

A.  The living room.

Q.  And is that the room where you have the screen share for the TV?

A.  Yes.

Q.  OK.  And at that point you say that he takes your phone to text Antoine, right?

A.  Yes.

Q.  OK.  And you say let me think about it and you walk away, right?  Is that what happened?

A.  No.  I think he just takes the liberty to text Antoine himself.

Q.  OK.  Do you remember telling the government that at that point you said let me think about it and then you walked out of the room?

A.  Oh, yes.

Q.  OK.  So he was in the room at one point without you being in the room, right?

A.  Yeah.

Q.  And I think you testified, or correct me if I'm wrong, that's when you think that he scrolled up on your phone to see the messages between you and Antoine, right?

A.  I think he was already in the messages and had already said hi to Antoine when I walked in, so he was already in the text thread.

P6cWcom4                         Jane - Cross

Q.   OK.   So in the text thread then he sees a message between you and Antoine, where Antoine mentions something about your mutual friend, right?

A.   Right.

Q.   And that is in reference to the night in January when you go to Las Vegas?

A.   Right.

Q.   OK.   And up to that point, Mr. Combs didn't know anything about your trip to Las Vegas, right?

A.   Right.

Q.   OK.   So then you remember, and I think you said on direct that you weren't sure how long it was but then Antoine comes over to your house, right?

A.   Yes.

Q.   And we've talked about how you live in a gated community, right?

A.   Right.

Q.   So you had been wearing lingerie, and then I think on direct you said you changed into sweats or something to go get into your car and to go and get Antoine, right?

A.   Yes, I just, like, slipped them on.

Q.   OK.   And how long of a drive is it from where you are in your gated community to where the guard is?

A.   Just like a minute or two.

Q.   OK.   So about half a mile, maybe?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom4                         Jane - Cross

A.   Yes.

Q.   OK.  And so you drive and you go and get Antoine from the guard station?

A.   The back entrance.

Q.   OK.  Does he call you to say he's there, or how does he alert you to say that he's at your home?

A.   Yes, he says he's at the back entrance, and I would need my card to open that gate, so I have to go and get him, and then he follows me through the gate.

Q.   OK.  Had he been to your home before?

A.   Yes.

Q.   All right.  And so did you pick him up into your car or you just let him in his vehicle and drive into where your house is?

A.   Yes, he follows my car.

Q.   All right.  And at this point you let him in, you don't drive away, right?

A.   Right.

Q.   And when you come back in -- how long, actually, how long does it take Antoine to get to your house after Mr. Combs texts him from your phone?

A.   It seemed pretty quick, like -- like 45 minutes.

Q.   OK.  And at this point you had not -- we talked about you had some champagne and tequila, right?

A.   Right.

Q.   But you had not taken any drugs yet, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom4                      Jane - Cross

A.   No.

Q.   So when Antoine comes, the three of you -- at this point it's light outside?

A.   Yes.

Q.   OK.  And the three of you, where do you go from there when he arrives?

A.   When he arrives, we just make small talk and -- and then he just is, like, in the living room area, and he just waits around a bit.  And then we invite him into the bedroom.

Q.   OK.  And so the three of you go into the bedroom, right?

A.   Right.

Q.   And then I think you testified that you remember Mr. Combs staring at you when you were in the bedroom, right?

A.   Yes.

Q.   And he wanted -- he asked you to leave, and you guys went to the guest bedroom at that point, right?

A.   Right.

Q.   And he asks about the text exchange.  He said:  You don't have a mutual friend with this guy.  What is he talking about?  Right?

A.   Right.

Q.   And at that point you tell him about the Vegas trip, right?

A.   Right.

Q.   Did you tell him -- did you tell him about going on the private plane?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom4                    Jane - Cross

A.   Yes.

Q.   OK.  Did you tell him about flashing your breasts?

A.   At that point, no.

Q.   OK.  Did you tell him at that point about putting the rapper in touch with Kabrale?

A.   No.

Q.   OK.  At that point what did you tell him?

A.   I just told him that I went to, with my friend, to this rapper's birthday party celebration for his girlfriend in Las Vegas and that -- I told him all the events that we did, and up to the hotel room, and how I just saw Antoine doing what he was doing, and then -- but we left in, like, 20 minutes and nothing happened.

Q.   OK.  And fair to say Mr. Combs got real upset about this event, right?

A.   Yes.

Q.   And he said how could you go to another man's freak-off?

A.   Yes.

Q.   And he was really upset that -- I think you said on direct that he thought that Antoine had something over him, right?

A.   Right.

Q.   And because he didn't know, he being Mr. Combs didn't know that you had gone to Las Vegas, right?

A.   Yes.

Q.   OK.  And he was, I think you said, pretty crazed, right?

P6cWcom4                        Jane - Cross

A.   Yeah.

Q.   And then you guys go back to the bedroom, right?

A.   Yes.

Q.   And that's the point, at which point I think you said you were either in the bedroom or the bathroom, where he then gives you the pill, right?

A.   Yes.  Well --

Q.   It was around this time?

A.   We were in the bathroom and he's in my face telling me to take a pill, yes.

Q.   OK.  And at that point you testified that Antoine's in the living room part of the master bedroom, right?

A.   Right.

Q.   And you said that the bathroom door wasn't able to fully close but it was as closed as fully possible?

A.   Yes.

Q.   And then Mr. Combs was saying go out there and fuck him, and you said I don't want to, right?

A.   Yes.

Q.   And so then after that, you testified that he said is this coercion and you just looked at him, right?

A.   Yes.

Q.   OK.  And then you said he was really close to your face, right?

A.   Yes.

P6cWcom4                        Jane - Cross

Q.  OK.  And then you went out into the bedroom and you had consumed the pill after that.  Do you remember that?

A.  Yes.

Q.  And that was an ecstasy pill?

A.  Yes.

Q.  And did Mr. Combs take an ecstasy pill?

A.  Yes.

Q.  OK.  And then after that, you performed -- you didn't have sex with Antoine, right?

A.  Not that type of sex.

Q.  You performed oral sex on Antoine, right?

A.  Yes.

Q.  And then no other sexual acts on Antoine, is that right?

A.  No.

Q.  OK.  And you said that it lasted until he finished, right?

A.  Yes.

Q.  OK.  And after that, you excused Antoine, right?

A.  Yes.

Q.  You told him he could leave?

A.  Yes.

Q.  And did Antoine leave after that?

A.  Yes.

Q.  And did Mr. Combs have any interactions with Antoine?

A.  No.

Q.  And you didn't tell him about any of the violence, right?

P6cWcom4                         Jane - Cross

A.  I was just trying to cover my wounds with my hand as much as possible.

Q.  Because you had put on makeup, right?

A.  Yes.

Q.  Who cleaned up the glass before Antoine came over?

A.  I did.

Q.  OK.  How long did that take?

A.  I can't remember.

Q.  And did you clean up the candles as well?

A.  Maybe.  I'm not sure.

Q.  OK.  And you then told -- once you excuse Antoine, you told him that you would send him money later?

A.  Yes.

Q.  OK.  And do you remember after that, I think you testified that Mr. Combs started getting dressed immediately, right?

A.  Yes.

Q.  And usually after hotel nights or entertainment nights, after the entertainment leaves, that's when you guys have the time to finally connect, right?

A.  Yeah.

Q.  And that's when you guys have quality time together, right?

A.  Yeah.

Q.  And you cuddle and you say nice things to one another, right?

A.  Yes.

P6cWcom4                        Jane - Cross

Q.  You talk about your love for one another?

A.  Yes.

Q.  And so, am I fair to say that this is the only night that you don't do that when entertainment leaves?

A.  Yes.

Q.  And that was pretty surprising to you, right?

A.  I don't know how I was feeling then.  I was just in a daze.

Q.  OK.  You were in a daze, and it was the only time where you didn't have the loving connection time with your partner after entertainment left, right?

A.  Right.

Q.  OK.  And that's when Mr. Combs again started saying, I can't believe you went outside of us, I can't believe you went to another man's freak-off, right?

A.  Yes.

Q.  OK.  And he was talking about that rapper?

A.  Yes.

Q.  OK.  And you also had your hair down and were covering your injuries as well, right?

A.  Yes.

Q.  And at this point it was fully morning?

A.  Yes.

Q.  And when Mr. Combs -- afterwards and after Antoine left, was there any further physical violence between the two of you?

A.  No.

P6cWcom4                         Jane - Cross

Q.  Were you just sitting there or did you say anything else after he was talking on and on about how you went to another rapper's freak-off?

A.  I was just quiet and in a daze.

Q.  At that point you said finally J9, his security, picked him up, right?

A.  Yes.

Q.  And then you testified that you and Mr. Combs were missing each other so much over the next few days.  Do you remember that?

A.  Yes.

Q.  And at this point you guys kept calling one another, right?

A.  I believe so.  A lot of text messages.

Q.  A lot of text messages and calling each other?

A.  Yes.

Q.  OK.  And then you end up going to his house in Bel Air a couple of days later, right?

A.  Yes.

Q.  And you guys spent a lot of time together, that entire day together, right?

A.  Yes.

Q.  And the next, like, one to two days with one another?

A.  Yes.

Q.  And that's when you testified that he broke up with you, right?

A.  He was trying to, like, have this conversation about how we would be breaking up.

Q.  OK.  What do you mean by that, how you would be breaking up?

A.  It seemed like he was proposing the idea of breaking up, and I was just listening to him.  It was like eight or nine hours of the breakup conversation.

Q.  OK.  And then you -- in that time when you were at his house, on the 24th or the 25th, for those two days, you both took drugs together that day, right?

A.  Right.

Q.  And no entertainer comes that day, right?

A.  No.

Q.  Or the next day, right?

A.  No.

Q.  And you spent those evenings with him?

A.  Yes.

Q.  OK.

        MS. GERAGOS:  And could we pull up what is -- let me see, one moment -- already in evidence -- give me one second.

        All right.  Could we pull up what's already in evidence as E272.

        It's not working.  My screen is not working.

        THE COURT:  I don't think it's coming up anywhere.

        MS. GERAGOS:  Your Honor, may I have a moment?

P6cWcom4                          Jane - Cross

THE COURT:  You may.

(Media played)

BY MS. GERAGOS:

Q.  All right.  And that was the day that then, or one of the days where you were there at his house on Mapleton for several days, right?

A.  I would say a couple of days.

Q.  A couple of days?

A.  Yeah.

Q.  You spent maybe two nights there, does that sound right?

A.  About, yeah.

Q.  And I think you said on direct that he was saying, we'll break up but we'll be best friends, right?

A.  Right.

Q.  Because you guys had been talking about what a deep connection you were really forming that year in 2024, right?

A.  Right.

Q.  And so you were trying to use the same word that he was using, which was bestie, afterwards, right?

A.  Yes.

Q.  OK.  And after that, you also -- fair to say that you had sex those two days?

A.  Yes, we did.

Q.  And again, no entertainer was there?

A.  Right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom4                        Jane - Cross

Q.   OK.  And afterwards, you left Mr. Combs, you went back to your home, right?

A.   Yes.

Q.   OK.  And you didn't ask Mr. Combs what he was doing over the next few days, right?

A.   Right.

Q.   And then you find out from a media company that he ended up going to Wyoming over Fourth of July, and you saw some photos, right?

A.   Yes.

Q.   And that's when you testified that you, too, were on board with breaking up, right?

A.   Yes.

Q.   That really hurt you, right?

A.   Yes.

Q.   OK.  Because you were home and you were upset to see him traveling with another woman?

A.   I was home with a black eye and just recovering from a really bad night and being forced to have sex with Antoine and --

Q.   OK.  Just --

A.   Yeah.

Q.   -- my question is, you were home with a black eye, right?

A.   Yes.

Q.   And you didn't have sex, you didn't have intercourse with

P6cWcom4                         Jane - Cross

Antoine, right?

A.  No, but that's a form of sex.

Q.  You had oral sex, right?

A.  Yes, forced oral sex.

Q.  And I just want to be clear.  At the time that Antoine came over to your home, the fighting had stopped, right?

A.  Right.

Q.  OK.  I just want to be clear on that.

And so after that, you had also agreed to break up with him, right?

A.  After the Wyoming?

Q.  After you saw Wyoming, you testified on direct that you were clear that you wanted to break up with him, right?

A.  Right.

Q.  And after, I think you testified but say it again, after the evening on June 19, you were telling Mr. Combs how much you really missed him, you had a lot of texts and phone calls back and forth, right?

A.  Right.

Q.  So that's why you then went to his home for multiple days, right?

A.  Right.

Q.  And he was saying let's figure out a way to break up, right?

A.  Right.

P6cWcom4                        Jane - Cross

Q.  After you saw he was in Wyoming, then you block him and really everyone associated with him, right?

A.  Right.

Q.  And then you testified that you saw, in July, that his mom was sick, right?

A.  Yes.

Q.  And so you unblock him and you reach out to him?

A.  Yes.

MS. GERAGOS:  All right.  I would like to admit into evidence under seal, your Honor, I believe with consent of the government, Defense Exhibit 3311, please.

MS. COMEY:  No objection, your Honor.

MS. GERAGOS:  This is something that we will play using these headphones.  I'm not really sure how to use them, but if the jurors could use them and the witness as well.

THE COURT:  Is there someone who could give the jurors an appropriate instruction as to their use?

MS. COMEY:  If it's all right, your Honor, I can try.

THE COURT:  Cooperation is always good.

(Defendant's Exhibit 3311, under seal, received in evidence)

MS. GERAGOS:  All right.  And could we -- I hear music.  Is that right?

MS. COMEY:  The music was apparently a test to make sure they work.  So if you're hearing music, it's working.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom4                         Jane - Cross

MS. GERAGOS:  All right.  If we could start at 34 seconds.

THE COURT:  It's OK if you're not hearing music now. I think that there was music playing.  Now there's not music playing.  When we start with the exhibit, if any of the jurors cannot hear, just raise your hand and we'll resolve the issue.

Ms. Geragos.

(Continued on next page)

BY MS. GERAGOS:  (Continued)

Q.  Could we please start at -- we won't start it right now, but 34 seconds on 3311, do you see you write to Mr. Combs:  And I take accountability for participating in these nights with you.  I should have known I was never going to get a trip after the first year.  I just feel stupid about myself.

A.  Yes.

Q.  And he says:  And I'm sorry that I didn't tell you that night exactly how I felt and how do you know it was time to move on, but I just really want to get out the house safe that was, right?

A.  Yes.

Q.  And you respond:  Yeah, it was a painful night for the both of us, very heartbreaking.  Both just done in our own way.

And you say:  We did too much.  We were trying to operate in a relationship that was bound to end like this, disastrous.  The math was there.  It was inevitable.  Both of our feelings are extremely hurt.  Trust me.  I know your heart hurts like mine does, and there's no going back, right?

A.  Right.

Q.  Could you play until 41 seconds?

(Audio played)

Q.  I will read this part so that -- it's okay we don't need it right now I'm realizing.

THE COURT:  Are we going to need the headphones?

P6CQcom5                    Jane - Cross

MS. GERAGOS:  We will need them but not at this moment.

Q.  I'm going to read his response, okay?

He says:  Yeah, but don't get it twisted baby.  I still got love for you.  It's just like I'm Puff.  Like you doing too much running around.  I'm not going to belittle myself for somebody named Bear or my friends.  This just overwhelming, right?

A.  Yes.

Q.  And Bear is in reference to the Bear who sent the $9,000, right?

A.  Yes.

Q.  And the friend is in reference to the rapper, right?

A.  Yes.

Q.  He says:  I'm dealing with this shit with my mother.  I'm dealing with this shit that's all over the news.  I can't deal with this shit, right?

A.  Right.

Q.  He says:  I don't really care you will be.  I just wanna be friends, you know saying I'm so so so so so so sorry.  Any time I hurt you.  Any time I made you feel nasty any time.  And I didn't take you on a trip because I was tripping, and not just one in the fucking whole scandal with a baby daddy, I should have.  I'm on the fuck now and as friends we're going to go to grease, we go to Italy, we're going to do some traveling and we

P6CQcom5                         Jane - Cross

want to make this, right?

A.  Right.

Q.  And if we could press play, I don't think there's any sound right now.  You can keep going.

Then you write:  Trust has been broken on both ends, and we both understand that.  I wish you the very, very best with you and Jesse and Yung.  it was never going to be me anyways.  I don't really want to hear the fake future planning with me.  You and KK would have talked yourselves into paranoia before you allowed any trip to finally happen for us, so we're both doing ourselves a favor, right?

A.  Right.

Q.  And that reference to you and KK would have talked yourself into paranoia because as you discussed earlier on examination, you and KK didn't necessarily get along, right?

A.  Right.

Q.  And so you felt like she would sabotage the relationship, right?

A.  Right.

Q.  And not bring you on trips, right?

A.  Right.

MS. GERAGOS:  All right.  Now I think if you play this -- now I believe it's the time for the headphones.  We press play.

(Audio played on headphones)

P6CQcom5                         Jane - Cross

MS. GERAGOS:  Can we pause it, please.  I'd like to give the witness headphones.  I didn't realize she didn't have any.

THE COURT:  Let's do it again from the top.

MS. GERAGOS:  Now we can press play.

(Audio played)

MS. GERAGOS:  Pause it there.  Thank you.

Q.  So there you respond:  In all honesty.

And he says:  I love you, right?

A.  Yes.

Q.  And he brings up OnlyFans there.  And at that time, it's approximately July of 2024.  You have been on OnlyFans for like four or five months?

A.  Yes.

Q.  So you're earning a pretty good income from it, right?

A.  Yes.

Q.  And he's saying, you know, you can have the house, he just doesn't want any problems, right?

A.  Right.

Q.  He's indicating he's going to continue paying for the house, right?

A.  Yes.

Q.  And that he just needs some grace, he loves you, right?

A.  Yes.

Q.  And you guys -- is this one of kind of the conversations

P6CQcom5                         Jane - Cross

you would have with one another about your feelings around this time?

A.   Umm, I guess so.

Q.   Okay.  And then you respond to him and you say:  I didn't do no running around.  I sat down for three and a half years. Please stop acting like I didn't shelf myself to be just only your girl.  It's rude to not give me that credit, right?

A.   Yes.

Q.   And if we could play again -- I don't think we're going to listen to a voice note.  We could just play it.  Pause it.

     He says:  I don't care about them.  I care about you, but it's your life, we do what we want to do, right?

A.   Right.

Q.   That's when you ask him:  Why was it so hard to compromise with me?  Why couldn't we do hotel nights and also balance it with traveling privately, right?

A.   Right.

Q.   And the privately is because you guys had agreed to keep your relationship for many reasons on the -- private, right?

A.   Yes.

Q.   And you said:  Why did I always have to do what you wanted to do and we never did things I wanted to do, right?

A.   Right.

Q.   And then a couple messages down you say:  I just catered to your needs so that's also something I enjoyed, right?

A.  Right.

Q.  And then you ask:  Did the other girls just pressure you more for trips?  I just want to see where I went wrong because it bothers me, right?

A.  Right.

Q.  Okay.  And so then you guys are -- continue to speak throughout the month of July once you unblock him, right?

A.  Yes.

MS. GERAGOS:  And if we could take this one down and pull up what's already in evidence as Government Exhibit E-332, okay.  And if we play that, I think we can play it without headphones first, I think.

(Audio played)

Q.  You say -- he says:  Baby, we was about to start traveling but at the end of the day just so unhealthy, and I have nothing but love, anything I've done to you.  I'm sorry.  The only thing I can wake up the sun shines in the morning, and I could just to try to do better.  I just wanted you to just really like know honestly you know rapper as Puff as me like, there's a lot of things that can be done, but this one was just too far for me being who I am saying.  You could talk about like Jesse and talk about you getting on the jet being in a freak off, and it's just like I got to accept that light.  You are sneaky, you are curious, and you should be able to be free life, but like disrespecting me, and then with my friends.  That is my friend

P6CQcom5                          Jane - Cross

and I'm saying we having to be all right.  We just disagree.  I realize everything that was going down in my heart I was okay like where we should stop at to keep everything healthy.  We need to stop some toxic shit.  I wish you the best love, right?

A.  Right.

MS. GERAGOS:  If you could press play to -- press play.

(Audio played)

MS. GERAGOS:  And stop.

Q.  At the bottom you say here -- you guys talk back and forth to each other.  We looked at this exhibit, right?

A.  Right.

Q.  And he asks you:  What happened?  You okay?  Anything I can help with, right?

A.  Right.

Q.  And you say:  I'm the problem and always had been and treating me like that was unfair, right?

A.  Yes.

Q.  And you said:  I had to accept you.  You didn't accept me and uncomfortable.  And when we broke up, I went to one birthday party, right?

A.  Right.

Q.  And you say:  Not with the rapper.  Not for a freak off.  I was with my friend, right?

A.  Right.

Q. And you say: At least you could understand that it wasn't cool to just have me doing hotel nights and everyone got private jets around the world, right?

A. Right.

Q. And you say: I don't even have anything post worthy from this relationship, right?

A. Right.

Q. Post worthy there I think we talked about means something that you could put on Instagram or otherwise. You talked about that's what post worthy means, right?

A. Right.

Q. If you could play until the second ten. Pause it.

And then you say here: And it's my fault -- there's some texts in between.

You say: It's my fault for doing things that didn't align with me just to impress you and hope to finally get out of the box you put me in, right?

A. Right.

MS. GERAGOS: And if we could go ahead, because this is a long exhibit, to two minutes and 58 seconds.

Q. And you write there: I had pent up frustration that I could have been living a beautiful life, and I wasted inside of hotel rooms doing things ultimately led me to one of the biggest scandals and nightmares of my life publicly and privately and now with your child's father, correct?

P6CQcom5                        Jane - Cross

A.   Yes.

            MS. GERAGOS:  And if we could press play now.

            (Audio played)

            MS. GERAGOS:  Hit pause.

Q.   You say:  I'm dealing with a lot of disappointment with myself.  I should have stayed away.  I was frustrated that in my late 30s I didn't have that time to give.

            Is that in reference to your age and you didn't have the time to dedicate to another man where it wasn't going to lead to something in the future?

A.   I would say just dedicate to, I guess, all the -- just stuff I didn't anticipate in this relationship, yeah.

            MS. GERAGOS:  Okay.  And we can play again.

            (Audio played)

            MS. GERAGOS:  All right.  If we could pause it.  Thank you.

Q.   And the last thing that you reference, is that in reference to your child's father?

A.   Yes.

Q.   And then he says -- then sends another message and says:  Let's just -- when he says making so we couldn't move like that, that's in reference to you guys keeping the relationship private, right?

A.   Right.

Q.   And he says:  Let's just with no beef just stay away from

P6CQcom5                        Jane - Cross

each other now, right?

A.  Yes.

Q.  And you said:  All I wanted was to give that time to you and experience traveling with you.  That's it.  I could have traveled the world and back in three and a half years, but I just wanted to experience those moments with you, right?

A.  Right.

Q.  And then he responds.

And then you say:  And my dumb ass thought maybe if I fucked more and did more hotels, I'll finally get a trip, right?

A.  Right.

Q.  And then you send a clown emoji?

A.  Yeah.

Q.  He says:  The Bear shit let me know what it really is, right?

A.  Right.

Q.  After these messages, this one was July 15, after these messages, he then says something like:  Let's just hit the reset button and get away and plan a trip, right?

A.  I believe so, yes.

Q.  That's when you fly to Miami and stay at the Four Seasons?

A.  Yes.

Q.  And you were looking forward to doing that and having a small get away with him, right?

P6CQcom5                          Jane - Cross

A.  Yes.

Q.  And that was the first time since the video that we saw when you were at his house that you saw Mr. Combs, right?

A.  Right.

MS. GERAGOS:  And that's what we saw if you pull up Government Exhibit E-102, which is already in evidence.

Q.  I think you said that that was this message that you screenshotted where you say:  Get on the plane.  Get on the plane.  Get on the plane, right?

A.  Yes.

Q.  And then you see him in July, and you guys go to the Four Seasons in Miami, right?

A.  Yes.

Q.  And you said it was a really nice time, right?

A.  Yes.

Q.  And when you saw him, he was calm, right?

A.  Yes.

Q.  And you were happy to be staying at the Four Seasons, right?

A.  Yes.

Q.  You personally chose that hotel, right?

A.  Right.

MS. GERAGOS:  We could take this down.

Q.  And when you were in Miami, you and him started taking drugs when you saw each other, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom5                    Jane - Cross

A.  Right.

Q.  And you were enjoying yourself, and you were laughing, and you were dancing, right?

A.  Yes.

Q.  And you were really having a good time together, right?

A.  To a point.  There was a little moment, but yes for the most part, we were having a good time.

Q.  Okay.  And you were having intimate conversations, right?

A.  Yes.

Q.  And do you remember telling the government you were finally getting the princess treatment that you wanted?

A.  Yes.

Q.  And you were talking to each other that trip about how much you loved each other, right?

A.  Yes.

Q.  And you were spending time with him in the way that you had craved, right?

A.  Yes.

Q.  And then at one point, do you recall telling Mr. Combs that you kind of missed Paul?

A.  Yes.

Q.  Okay.  And he was really -- and this was because you genuinely did miss Paul?

A.  I had taken ecstasy, and I said that, but I did genuinely miss Paul at that moment, yes.

P6CQcom5                         Jane - Cross

Q.  Okay.  So you -- as we said, you had taken drugs with Mr. Combs, right?

A.  Yes.

Q.  And then when you were with him, and you were both taking drugs, you said you missed him, and you genuinely missed him at that moment, right?

A.  Yes.

Q.  Okay.  And you also wanted to make Mr. Combs happy, and he was happy when you suggested that, right?

A.  Right.

Q.  So you guys ended up calling Paul?

A.  Yes.

Q.  Okay.  And he picked up, and he said:  I'm not in Miami, right?

A.  Yes.

Q.  And then he said:  I'll be there in a few days, right?

A.  Right.

Q.  Over the course of the next few days, you and Mr. Combs stayed with each other, right?

A.  Right.

Q.  And then Paul comes over.  At that point, you weren't at the Four Seasons any more, right?

A.  Right.

Q.  At that point, you had gone back to his home?

A.  Yes.

P6CQcom5                    Jane - Cross

Q.  Okay.  And Paul ends upcoming over a few days later, right?

A.  Right.

Q.  And then when Paul comes over, you then said you took a different type of drug, right?

A.  Yes.

Q.  And you had -- it had been many, many -- at least three days, I think you said, from the time you called him to the time Paul came over, right?

A.  Right.

Q.  And I think it was about a Wednesday, you said, that he ended up coming?

A.  Yes.

Q.  Okay.  And when -- that was your last time that you ended up seeing Paul, right?

A.  Right.

Q.  And you said that you made love to him that night?

A.  Yes.

Q.  And it was a really great sexual experience, right?

A.  Yes.

Q.  And you felt in control, right?

A.  Yes.

Q.  And that trip, it holds really good memories for you, right?

A.  It does.

Q.  And you got to do what you wanted to could that night?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom5                      Jane - Cross

A.   Yes.

Q.   And it felt -- do you remember saying it felt less like a live performance and more just like a fun group activity?

A.   Yes.

Q.   Do you remember telling the prosecutors that that night was a love fest?

A.   Yes.

Q.   And you testified that when you were with Mr. Combs that night, that you got tired, and Mr. Combs got angry and he splashed water on you.  Do you remember that?

A.   Yes.  I think it was before I phoned.

Q.   It was before you phoned Paul?

A.   Yes.

Q.   Do you remember the first time you told that to the government?

A.   Yes, it was a new memory.

Q.   You had a new memory.  Do you remember that being on June 1 of this year?

A.   Yes.

Q.   And so you had told the government many times about this night with Paul, right?

A.   Yes.

Q.   You had told them approximately four times before June 1 of this year, right?

A.   Right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom5                        Jane - Cross

Q.  And on June 1 of this year, that was five days before you started your testimony, right?

A.  Right.

Q.  And you told them about this new memory of him splashing the water on you, right?

A.  Right.

Q.  And at that point, you had been doing drugs with Mr. Combs, right?

A.  Yeah.

Q.  And you told them on June 1, well, I have this new memory, and he splashed water on you after you took ecstasy, right?

A.  Oh, if I may explain.

Q.  I'm only asking if that's what you told the government on June 1?

A.  Can you repeat the -- how the story goes?

Q.  On June 1, that was five days before you started your testimony, right?

A.  Yes.

Q.  Do you remember telling the government on that day that you had a new memory of the July trip in Miami?

A.  Yes.

Q.  Do you remember telling them that he was yelling at you, and he started -- he took a water bottle, he was pacing and, he started splashing water in your face?

A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom5                          Jane - Cross

Q.  And that he at the point was saying:  Fucking bitch, I fly you out here.  And then said:  You're not a bitch.  I'm sorry for calling you a bitch?

A.  Yes.

Q.  And that the very first time you told that to the government was five days before you testified today -- at this trial?

A.  Yes.

Q.  Okay.  So then you leave Miami, and you and Mr. Combs -- do you stay together?  You keep talking?

A.  I believe we ended that trip on a fight, and then we did still keep talking.

Q.  Okay.  And you ended it on a fight because he was talking to either Jesse or Caresha, right?

A.  After that night, yeah.

Q.  Okay.  And do you remember then screen recording more conversations between you and Mr. Combs on August 6 of 2024?

A.  Yes.

Q.  Could we pull up Defense Exhibit 3306, please, if is this the recording you took on August 6 of 2024?

A.  Yes.

        MS. GERAGOS:  I believe with consent of the government, we'll be offering this under seal.

        MS. COMEY:  No objection, your Honor.

        THE COURT:  Defense Exhibit 3306 will be admitted

P6CQcom5                        Jane - Cross

under seal.

(Defendant's Exhibit 3306 received in evidence)

Q.  Here we are at nine minutes and 31 seconds into this recording, and here you say to him -- is it fair to say in the first nine minutes, you and him are going back and forth and bickering with each other?

A.  Yes.

Q.  You reviewed this exhibit before, right?

A.  Yes.

Q.  Okay.  And this is a screen recording from your phone, right?

A.  Yes.

Q.  So you say at the top:  I appreciate and love you so much. I still will and always will mean all the loving things I say to you.  I just thought about hugging you and kissing you and feeling so close to you in many of our moments in the room and at your place, right?

A.  Right.

MS. GERAGOS:  If we could play.  I think the recording will play.

(Audio played)

MS. GERAGOS:  Pause there, please.  Go up a little.

Q.  So there you say:  You're so right, I'm back in love with your ass.  Damn, these were some of the best moments together we've ever had, right?

P6CQcom5                         Jane - Cross

A.  Right.

Q.  He says in that voice mail:  You hit me with the pill, right?

A.  Yes.

Q.  That was in respect to ecstasy, right?

A.  Right.

Q.  He's not saying you hit him physically.  He's saying you hit him with the ecstasy.  You gave him the ecstasy pill, right?

A.  Right.

Q.  If we could play so we could see those messages below it, and then pause.  Pause.  Thank you.

You say:  The love energy is so undeniable.  It's electrifying, right?

A.  Right.

Q.  Then you say:  Baby, you're so right.  I just got here and I just like really took a trip again.

And then you talk about the date you sent that, 1/23, our anniversary date.  Love you so much.  I love us and our friendship, our connection, our love, every single day was everything, right?

A.  Right.

Q.  If we could keep playing.  Pause. Go back a little so we could see those messages.

He says:  Have a happy day, right?

P6CQcom5                    Jane - Cross

A.  Yes.

Q.  And you say:  You too my love.  Our kiss rhythm.  Cold plunge.  Fuck it button finally.

And you say Kobe Jordan, with some emojis, right?

A.  Mmm-hmm.

Q.  Is that in reference to you guys calling each other Kobe, Jordan and Shaq?

A.  Yes.

Q.  Why are you Kobe?

A.  Because I'm the best.

Q.  Okay.  Why is he Jordan?

A.  Because he's the best.

Q.  New Hall of Famer, what does that mean?

A.  Oh, I guess -- should I detail that?  I mean, he's just saying that like I'm in the hall of fame.

Q.  Because you guys would refer to each other as like the best basketball stars who have ever lived, right?

A.  Yes.

Q.  And then you sent him some more emojis, right?

A.  Yes.

Q.  And you say:  Dinner giving Pamela Anderson Carmen Electra, are those melons?

A.  Yes.

Q.  Is that referring to you?

A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom5                        Jane - Cross

Q.  And then it says:  Baby, can we take five minutes?  My heart is beating out my chest.  It's too much for me, right?

A.  Right.

Q.  And that's referring to the love you guys had for one another at the dinner?

A.  No.  That's me quoting him.  That's what he was saying.

Q.  About you?

A.  Yes.

Q.  If we could play just one more second and pause.  Is that Kobe?

A.  Yes.

Q.  And then he sends some laughing emojis?

A.  Yes.

Q.  And then Kobe again dunking?

A.  Yes.

Q.  Can we play again?

        And pause.

        Kobe and Jordan, right?

A.  Yes.

Q.  And you say:  Learn from the best.  This is so us, right?

A.  Yes.

Q.  And you said:  I need to get better at taking pics of us together, right?

A.  Yes.

Q.  And you said that you often took photos of just him?

A.   Yes.

Q.   And you wanted to take photos of you guys, right?

A.   Yes.

Q.   And this was after your trip in July, right?

A.   Yes.

Q.   Okay.  And you said:  You did, you beyond did your best.  You surpassed it.  You made me very happy.  You gave me so much love.  And you say -- you do a heart emoji, right?

A.   Yes.

Q.   And then what do you say in the rest of that?

A.   I say:  I value your energy for me so much.  You always show up for me.  You do.  I deeply cherish you.  Never take you for granted.  Always going to reciprocate and multiply how you make me feel.  You def my Michael Jordan, and I'm Kobe for sure LOL.  You're the greatest.  Detox weekend and week babe.  We got to reset our gut health, hormone levels, and mental clarity.

         MS. GERAGOS:  We can take this down now.  Actually, we can go ahead to 10:38, I think.

Q.   Do you say -- he says here -- you say at 10:40:  Good morning handsome.  Wishing you a beautiful day.  Do you see that?

A.   Yes.

Q.   And he says:  You too beautiful.  Can you please find a therapist, right?

P6CQcom5                        Jane - Cross

A.  Yes.

Q.  At that time, were you guys talking about seeing couples therapist?

A.  I think that at this time it's like we loved each other so much, but then all like the toxic stuff was still coming up.

Q.  And you were talking through it, and he says:  Can you please find a therapist, right?

A.  Yes.

Q.  And you say:  Yes, I will babe, right?

A.  Yes.

Q.  And thank you again for a beautiful time.  I had the best memories with you, right?

A.  Yes.

Q.  And then you saw him one more time after that you flew to Miami in August, right?

A.  Yes.

Q.  And you also said that trip ended on a positive note as well, right?

A.  I would say it was okay.

Q.  Do you remember meeting with defense counsel and saying that that trip ended on a positive note?

A.  Yes.

            MS. GERAGOS:  May I have one moment, your Honor?

            THE COURT:  Yes.

            MS. GERAGOS:  Thank you, your Honor.  No further

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6CQcom5                        Jane - Cross

questions.

THE COURT:  All right.  Ms. Comey, redirect.

(Pause)

THE COURT:  Members of the jury, rather than subjecting you to the white noise, we are going to take a very short comfort break, and we will be back in ten minutes.  All rise for the jury.

(Continued on next page)

P6CQcom5                        Jane - Cross

(Jury not present)

THE COURT:  Please be seated.

Mr. Agnifilo, does anyone need to take a break on your end

MR. AGNIFILO:  Someone does.

THE COURT:  It's okay for us to address the issue?

MR. DRISCOLL:  Your Honor, can I be heard first on this issue?  I just want to address --

THE COURT:  What issue are we addressing?  We didn't get that far.  There was a request for break, which I was happy to honor.

Are we talking about the note?

MS. COMEY:  Yes, your Honor.

THE COURT:  Okay.  Mr. Driscoll.

MR. DRISCOLL:  Right.  I just want to address the issue of whether a party can open the door to otherwise inadmissible hearsay.  And I just want to draw the Court's attention to Section 2(c) of the Supreme Court's *Tome* decision where this flavor of an argument was made by the government and it was squarely rejected.

There the Court said:  "That certain out-of-court statements may be relevant does not dispose of the question whether they are admissible."

The first thing the Court has to determine is whether they're hearsay and whether they fall under an exception, and

P6CQcom5                         Jane - Cross

that's just not the case here.  They are not prior consistent statements.  The government has already disclaimed any reliance on the state of mind exception, and therefore they don't come in.

THE COURT:  Yes, I agree with the last part of what you said.

The first part of what you said as to door opening, of course you can open the door to otherwise inadmissible hearsay if you open to door to that hearsay; meaning, if, for instance, there was no suggestion or attack on credibility or there was no intent to show that there was an improper motive.  But then on cross-examination you introduce that improper motive and you suggest that, that -- you can open the door that way to hearsay to come in under 801(d)(1)(B), right?

MR. DRISCOLL:  Well, assuming the statement satisfies the temporal requirement.  Here it doesn't.

THE COURT:  Yes.  I'm just saying you can open the door to anything if you open the right door, right?

MR. DRISCOLL:  In the right way if the opposing party can satisfy an exception to the hearsay rule.

THE COURT:  You're just saying that the door -- there may have been a door on relevance opened, but there was not a door opened on 801(d)(1)(B) that would allow this to come in in the first place.

MR. DRISCOLL:  Correct.

P6CQcom5                          Jane - Cross

THE COURT:  You never really get to the relevance inquiry.

MR. DRISCOLL:  Exactly.

THE COURT:  Ms. Comey.

MS. COMEY:  May I, your Honor.

THE COURT:  You may.

MS. COMEY:  There were four different aspects to the cross-examination that I think in culmination implied that this witness had a motive to lie and in particular a motive to shade her testimony to please the prosecution and to match the prosecution's theory.  Those four in combination I think opened the door.

So the first was the one I already flagged, which was the cross-examination about this witness's immunity in the grand jury and pointing out that the witness understood that the prosecutors would be deciding whether or not she told the truth and that she did not want to be prosecuted.

The second would be the reference to this witness reviewing her text messages with Ms. Comey and other members of the government team, and then realizing after that that she had made past statements to Mr. Combs saying she did not want to participate in hotel nights.  I think that implies that she may have had a motive to feed us more information along those lines after Ms. Comey and other members of the government team showed her those text messages in those meetings, especially after she

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom5                          Jane - Cross

had been in the grand jury with that immunity order.

There was also a sustained objection to this.  I'm sorry?

THE COURT:  Can you stop right there?

As to that second issue, was that either yesterday or the previous today?

MS. COMEY:  It was today, your Honor.

THE COURT:  It was today.  Can you remind me of the context.

MS. COMEY:  The context was when Ms. Geragos elicited the statements that I objected to that we talked about this morning about how Mr. Combs had told her that he did not realize that she felt this way and did not realize for all of the three years that she did not want to participate in these hotel nights.  In that context, Ms. Geragos said, And "then you reviewed text messages with Ms. Comey and the government team and after that you started" -- I don't remember the exact testimony, but essentially it was after meeting with, she said my name, "Ms. Comey and the other members of the government team, that you then started remembering times that you had told Mr. Combs that you did not want to participate in hotel nights."

MR. DRISCOLL:  Your Honor, on that point that was elicited during direct as well.

MS. COMEY:  The fact that she reviewed her text

P6CQcom5                        Jane - Cross

messages and then remembered, yes.  But I thought the context in which Ms. Geragos asked that question, pointing out it was with me and other members of the government team, I thought in combination with the others raised the implication that she is shaping her testimony to match our case.  The other two --

MR. DRISCOLL:  Can I just respond to that point?

THE COURT:  Hold on.  Hold on.  I need to get three and four.

MS. COMEY:  The other two:  One is -- there was a sustained objection to this, but Ms. Geragos pointed out or suggested that I had redirected the witness in her recounting of the June 18 and 19, 2024 incident and used the word, I think actually said, "Ms. Comey redirected you."  I think that phrase also feeds into the sense that the defense has created through this cross-examination that this witness is somehow being coached or trying to follow the lead of me or my colleagues.

And then finally the cross-examination about -- at the end of the cross-examination about this witness's new memory, which she shared in a recent meeting with the prosecutors and which Ms. Geragos just cross-examined her on suggesting that she's making it up essentially, and that she's making it up on the eve of trial right before testifying as a government witness, I think together with the other aspects of the cross-examination I just pointed out create the implication that this witness has been shaping her testimony to feed into

P6CQcom5                        Jane - Cross

the government's narrative and to fit with the prosecution's theory of the case.  And I think that that opens the door to a prior consistent statement, just the one sentence I asked from go Government Exhibit E-331-M.

THE COURT:  Can we get that exhibit on the screen?

MS COMEY:  It's now E-331-M-R.  And I think we further redacted it to just have that one part that I read out earlier.

The point is, your Honor, that she wrote this, which is an unequivocal prior consistent statement that goes to the heart of what she has testified to here before she ever met a single prosecutor, before she ever met a single member of the government team.  And I think that we are entitled to introduce just this one phrase, this one piece of text, to show that she was saying essentially the core of what she said on the stand before she ever met a single prosecutor.

THE COURT:  So starting with the fourth ground that you gave, the witness's new memory of the water throwing incident, that was in either July or August of 2024.  So how could this statement pertain to that particular episode?

MS. COMEY:  Your Honor, I think the idea that it rebut not just the particular episode but the attack on the credibility more generally, and the attack on the credibility more generally through the totality of all four of the pieces of the cross that I just pointed out create the implication that this witness is shading her testimony to suggest that she

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom5                        Jane - Cross

felt coerced when she didn't.  That is the thrust of this cross-examination; that she is shading her testimony, essentially that she is lying when she says that she felt coerced and felt forced throughout the entire course of the relationship.

THE COURT:  Right, but how would this statement from December of 2023 be probative of that particular account to the line of questioning concerning an event that happened months later?

MS. COMEY:  Your Honor, it does not go to that specific event.  I will agree with your Honor.  It does not go to that specific event.  It rebuts the broader attack on credibility.  The broader attack, which I do think the revised rule allows us to do.  And the broader attack is not just as to that specific incident but more generally that she is shading her testimony to match the government's narrative.

THE COURT:  And as to the redirecting of the witness, which was part of Ms. Geragos' question, I understood that to just be poor phrasing of the question, but I understand that position is, well, even if it was just poor phrasing, that you objected to it and the objection was sustained, perhaps the jury would draw some inference from that suggestion in the question?

MS COMEY:  I think on its own I wouldn't be making that argument, your Honor.  But what I'm saying is that these

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

were peppered in at various points throughout the cross-examination, and I think it was to leave an impression with this jury that this witness is trying to shape her testimony to please prosecutors.

THE COURT:  Then to go back to the second issue which Mr. Driscoll addressed, you, in response to Mr. Driscoll, indicated that it was the suggestion that -- not so much the text messages because that had come out on direct examination; it was the reference to yourself and the prosecutors of having reviewed them.  That repeated suggestion again in your mind would reinforce the narrative that was drawn out by the direct line of questioning about immunity.

MS. COMEY:  Exactly, your Honor.  The reference to me by name and the other members of the government team.

THE COURT:  All right.  So, in essence, it comes back to the immunity discussion.

MS. COMEY:  It does, but I think it's stronger this time, your Honor.

THE COURT:  So it comes back to immunity.  And then to recap where we left things in the morning, Mr. Driscoll's argument was that, well, if it gets -- if it's coming back to immunity, it doesn't matter, because at the time that the note was made, it was after an improper motive had already been introduced, which was Ms. Ventura's lawsuit and the review of that lawsuit.

So given that fact, there would be no basis to introduce the statement under 801(d)(1)(B) regardless of what happened later, because anything that happened later, even if it was a different reason for an improper motive, it is cumulative of the motive that already exists, meaning that there was already this weight on the witness's testimony that would skew it in precisely the same direction of characterizing these events in a way that would sound in the language of sexual exploitation as opposed to normal relationship dynamics. And he cited in that case to the authorities that are cited in the letter, but also he generally relies on the *Tome* case --

MS. COMEY:  Yes, your Honor.

THE COURT:  -- having that general principle.  So that is an 801(d)(1)(B) argument.

If you go down then to Rule 403, the defense says two things:  One -- and I need to find -- I need to go back to see what was actually elicited through the text messages, but at least some of what's communicated here was actually elicited through text messages during that period of time, you may go back to it on redirect examination or in closing argument, but it's already in the record.  So anything that you would add by virtue of the statement would be cumulative of those things that you already elicited through the text message exchanges that were not objected to or in the case of, I believe it's, Government Exhibit 251-C, which is the exchange with

P6CQcom5                          Jane - Cross

Ms. Khorram.  In that exchange, Ms. Jane actually recounts the nature of the relationship, right, and actually says like "I've been going through this for three years, and this is how it's been, I can't believe this is happening," right.

MS. COMEY:  Yes, your Honor.

THE COURT:  They say on Rule 403 grounds, there's that issue that's already in the record, but further they go back to what they have already said, which is there's an unfair prejudice because of the overhang of Ventura lawsuit.

So what's your response?

MS. COMEY:  On 403, the part that is not cumulative is the part I flagged for your Honor this morning, which is "I felt obligated 98 percent of the time."

She is not sending that in a text message to Mr. Combs.  That is a hugely corroborative statement of what she testified to.  It is not in any of the text messages, and it is extremely probative and extremely corroborative of what this witness has testified to at this trial and what the defense has tried desperately tried to undermine.  So that's why on 403 I don't think that they in any way can show that that extraordinary probative value is outweighed by any unfair prejudice.  It's extremely probative, and the only reason it would be prejudicial is because of how probative it is.

With respect to the incentive, I think the record here makes clear that that is a false flag because Jane did not in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom5                              Jane - Cross

fact seek out a lawsuit.  She did not in fact file a lawsuit. She did not in fact send a demand.  What she did do is meet with prosecutors.  What she did do is testify on the stand for days.  And so what we see that she did actually do is meet with prosecutors, get immunity from prosecutors, and testify for the prosecution.

So when the jury is thinking about what her incentives are or what her motives are, they are much less likely to think that she is matching up her testimony to get a payday because she didn't try to get a payday.  She never did.

But what they might be thinking, given the bread crumbs that have been left for them throughout this cross-examination is that she is trying to shade her testimony to please the prosecution.  And I think that it is entirely fair for us to put in this one statement that goes to the core of her testimony that, in essence, throughout this entire relationship she felt coerced and she felt forced and she felt obligated to put in this one statement that corroborates that she wrote before she ever met prosecutors.

THE COURT:  Mr. Driscoll.

MR. DRISCOLL:  Your Honor, it doesn't matter if this statement is relevant or is incredibly probative.  It doesn't matter it would be fair to admit it.  It's hearsay, and the government hasn't cited any authority demonstrating otherwise, and I don't think the Court should adopt what I would refer to

P6CQcom5                        Jane - Cross

as this fringe theory of prior consistent statements when the Supreme Court has squarely rejected this exact argument.

THE COURT:  Well, if you saying the Supreme Court has rejected that exact argument, what's the citation and pin cite?

MR. DRISCOLL:  As I said before, I would direct you to Section 2(c) of the opinion.

THE COURT:  I'm not looking at the slip opinion, so do you have a citation and page number?

MR. DRISCOLL:  Sure, your Honor.  Starting at 163 through 164.

THE COURT:  Do you have the rest of the citation just because I need to pull it up on WestLaw.

MR. DRISCOLL:  Sure.  513 U.S. 150.

Just to highlight some of the opinion:  "Hearsay evidence is often relevant.  That does not resolve matter, however.  Relevance is not the sole criteria of admissibility."

THE COURT:  Hold on give me the page again.

MR. DRISCOLL:  163 to 164.

And the Court goes on:  "the Advisory Committee, however, was explicit in rejecting this balancing approach to hearsay."

MS. COMEY:  Your Honor, what I'm not seeing as I'm reading this is any -- is addressing anything about the situation where the defense suggests that there are two different motives to lie.  I'm not seeing anything suggesting

P6CQcom5                        Jane - Cross

that there can't be two different motives that are suggested, and that we can't put in a prior consistent statement to rebut a second motive that has been raised, especially when the first one, as I said, appears to be a false flag.

MR. DRISCOLL:  Your Honor, the government's argument also just doesn't make sense in practice.  I mean, the first thing the government does prior to seeking an indictment is they put witnesses before the grand jury, sometimes they immunize them.  Basically what they're saying is anytime you cross-examine a witness that's been immunized, it opens the door to any prior consistent statements that they might have made, regardless of any motive to falsify that might take place in time earlier than their immunization.  It just doesn't make sense.  It's far too **broad** of a rule.

MS. COMEY:  That's not what I'm saying, your Honor. I'm saying if an immunized witness is cross-examined and through the cross-examination a suggestion is made that the prosecutors decide whether or not that witness is lying, and, therefore, whether or not this witness will be prosecuted, that suggests an improper motive.  If they -- if the defense chooses not to raise that line of cross-examination, then the door wouldn't be opened.

THE COURT:  Understood.

Ms. Comey, putting this issue to the side, how long do you anticipate for your redirect examination?

P6CQcom5                        Jane - Cross

MS. COMEY:  Maybe half hour, your Honor.

THE COURT:  Half hour.  Let's take a very short break, ten minutes, come back, and then I'll given you the ruling, and then we can proceed with the redirect.

MS. SHAPIRO:  Your Honor, I'm sorry.  Can I just add one other thing to the record?

THE COURT:  No, I've heard enough.  I'll make my ruling.

(Recess)

THE COURT:  Mr. Driscoll, in terms of the Ventura lawsuit, Ms. Comey raises the issue that looking at the text of the rule, the Ventura lawsuit for Jane would not constitute an improper influence or motive in so testifying, and so could you respond to that?  She points out that Jane did not file a lawsuit.  She didn't try to do anything along those lines.  So in what way did the lawsuit for Jane constitute the kind of improper motive that's discussed in *Tome* and other cases?

MR. DRISCOLL:  Your Honor, the witness testified that she saw the lawsuit.  She saw headlines about the settlement amount.  And as we noted in our letter last night, within days after that, she started talking to Mr. Combs about a possible monetary settlement herself.  And we've seen messages where she discusses needing compensation for the three years that she was with Mr. Combs.  So at that point, there's clearly a monetary incentive for her to color her story.  I think that's pretty

P6CQcom5                          Jane - Cross

clear from the testimony and from the evidence we've seen so far.

Just because she hasn't filed a lawsuit yet doesn't mean that she doesn't have an improper influence or motive to shade her testimony today. Particularly given the nature of a possible charge, I mean she wouldn't have a statute of limitations concern or anything like that, and there would be no reason for her to file a suit yet.

THE COURT: And I take it from your answer that referring to the conversation that you're talking about in terms of the monetary settlement, that the communications between Jane and Mr. Combs indicate or reflect an effort in the wake of the Ventura lawsuit to -- from the defense's perspective, right? This is not -- this is disputed, hotly disputed, but from the defense's perspective, it is a motive to use the lawsuit and the allegations there as leverage in one way -- in some shape or form.

MR. DRISCOLL: Exactly.

THE COURT: It could be economic leverage. It could be other leverage.

MR. DRISCOLL: Exactly.

THE COURT: So the application to admit the exhibit that we've been discussing is denied and 802(d)(1)(B) grounds.

As Ms. Comey notes, there is not a case that has been cited by the defense that addresses the particular situation of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom5                         Jane - Cross

different motives to fabricate testimony or shade testimony. However, it is also true that the government has not raised any authority suggesting that where there are separate motives, a statement that arises after one alleged motive would be admissible if it is prior to the second alleged motive.

As the Court had previously noted, the Second Circuit in the *Forrester* case has language that certainly suggests that the inquiry is focused on whether there is an alleged motive to fabricate. And later in *United States v. Al Moayad*, 545 F.3d 139, 167 (2d Cir. 2008), the Court repeated the language from Forrester and states that the statement must have been made before the declarant developed an alleged motive to fabricate, citing back to the *Forrester* case. And the Court further stated that a prior consistent statement made after an improper motive exists is simply not within the scope of rule 801(d)(1)(B), and the Court in that case actually vacated convictions at issue where handwritten notes that had arisen after a motive to falsify arose were admitted.

So on those grounds, the Court will deny the application to admit the statement in question.

With that, let's have Jane back, and we'll proceed with redirect examination.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom6                          Jane - Redirect

(Jury present)

THE COURT:  Please be seated.

Ms. Comey, you may proceed when ready.

MS. COMEY:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MS. COMEY:

Q.  Good afternoon, Jane.

A.  Good afternoon, Ms. Comey.

MS. COMEY:  I'd like to start by looking at a few text messages that Ms. Geragos showed you on cross-examination.

Ms. Becker, would you please up A-104-30, pages 7 and 8.

Can you zoom in on the bottom two texts on the left.

Q.  Jane, do you remember looking at these texts you sent to Sean during cross-examination?

A.  Yes.

Q.  Can you read us what you wrote here, please?

A.  I said:  I know what you want, baby, but not really in the mood for that part.

Q.  What were you referring to?

A.  I was referring to his kind of hints about having an entertainment night.

Q.  And then what did you say in the next text?

A.  Don't want to make you mad.

Q.  Why did you say I don't want to make you mad?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom6                          Jane - Redirect

A.   Because I don't want to make him agitated or upset.

Q.   Why did you think that would make him agitated or upset?

A.   Because typically, that's usually the response that I get from him when I declined those things.

Q.   And how did Sean respond?

A.   He said:  All good.

MS. COMEY:  Can we zoom in on that message.

Q.   What's the date and time of that message?

A.   He writes it on June 19, 2022, at 2:37 a.m.

MS. COMEY:  Can we now please pull up what's in evidence as Government Exhibit G-101, pages 6 and 7.

And can we zoom in on the blue text on the right side at the top, please.  On the right side, please.

Q.   Jane, is this the same date as the texts we were just looking at?

A.   Yes.

Q.   And is this just about an hour and a half later?

A.   Yes.

Q.   And does this appear to be a text from Sean to Paul?

A.   Yes.

Q.   Could you read what Sean texted Paul about an hour and a half after the messages we just looked at?

A.   He said:  I'm going to need you to persuade her.  Call me in five minutes, and tell her we've been holding it since last week.  If she hears from you, we in.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom6                        Jane - Redirect

Q.  Before this very moment, did you know that Sean had sent this text to Paul saying I'm going to need you to persuade her?

A.  I've never seen these messages.

MS. COMEY:  We can take that down.  Thank you.

Q.  Jane, how often in your relationship did Sean push you to have a hotel night after you told him or indicated to him that you did not want one?

MS. GERAGOS:  Objection.

THE COURT:  Overruled.

A.  All the time.

Q.  Jane, do you remember being asked on cross-examination about the loving messages that you sent to Sean after the trip you took in March of 2023 to Turks and Miami?

A.  Yes.

Q.  Before you went on that trip, what did you expect it would be?

A.  Just a makeup trip for my birthday, just us two.

Q.  What did the trip end up being?

A.  It ended up being a hotel night with Don and then a Turks trip with Paul.

Q.  During that trip, did you send texts to Paul expressing frustration with how it turned out?

A.  Yes.

MS. COMEY:  Can we pull up what's in evidence, please, as Government Exhibit G-103, pages 75 and 76.

P6cWcom6                      Jane - Redirect

Q.   Jane, are these texts that you exchanged with Paul during that Turks trip?

A.   Yes.

MS. COMEY:  Can we zoom in on the bottom two texts on the left, please.

Q.   Jane, what's the date of these?

A.   This is March 19, 2023.

Q.   Is this when you were in Turks?

A.   Yes.

Q.   Would you read what you wrote, please?

A.   I said:  Thanks again for coming over last night.  It had been 24 hours with no breaks for me and at first I was going with the flow for the second linkup, but I had warned him that I just felt overwhelmed to over-perform along with every other night before.

I said:  I'm not a robot, just a mix of tired, hungry, sleepy, sore.

MS. COMEY:  Could we go now to pages 77 and 78.

Q.   Jane, can you read the bottom left text here?

A.   I say:  And then to insult me three times about my bracelet and demeaning its value to me just crushed me.  He's never talked disrespectfully to me in front of anyone before.  The more he kept telling me about the bracelet and trying to get me to perform and have a good attitude because he bought me this bracelet just devalued and robbed me completely of its loving

sentiment.  And that completely crushed me.

Q.  What were you referring to here?

A.  I was referring to the bracelet he had just given me and some insults he was throwing at me about the bracelet.

Q.  When was he throwing you insults about the bracelet?

A.  Just saying, like, how he just got me the bracelet and then just like pushing me to perform and just kind of dangling the bracelet in my face when I had just gotten it.

Q.  Why were you resisting?

A.  Because I was sore.  I was tired.  I didn't want to do it anymore, and I was just already exhausted and alone.

Q.  Can you read the next two texts you sent to Paul, please?

A.  I said:  In that moment, he just didn't even make me feel like a human being in that room, and I felt completely like a whore.  Things weren't going as planned in his mind and as fast as he wanted.  I'm not a trained actress, porn star.  Myself discovering my own sexuality every time we all meet or take a long ass time to get in the mood.  But also what do you expect from a woman after 24 hours of drugs and nonstop performance?

          MS. COMEY:  Can we go to pages 79 and 80, please.

Q.  Jane, I'd like to now please look at just the text you sent on the top right.

    What did you write there?

A.  I said:  We tried to argue about it last night, and he feels he didn't do anything wrong.

P6cWcom6                          Jane - Redirect

Q.   What were you referring to?

A.   I was referring to the argument regarding me not just throwing the bracelet, leaving; me trying to explain why I felt that way and just trying to argue about it.

Q.   And when you tried to explain why you felt that way, how did Sean respond during that conversation?

A.   He told me I needed to apologize to Paul.

Q.   For what?

A.   Being disrespectful.

Q.   Can you read the next text you send on this page, please?

A.   I say:  Turks was supposed to be us reconnecting again.  We didn't speak for one and a half months because of how he handled me on my birthday.  This is our first time seeing each other, and I did not want to be with anyone else but him.

Q.   What were you referring to when you wrote I didn't want to be with anyone else?

A.   Exactly that.

        MS. COMEY:  We can take this down.

Q.   Jane, if that trip was so disappointing, then why did you send loving messages to Sean after you got home thanking him for it?

A.   When I got home, we spent some time together, and -- in Miami, and then just -- I think this is when the love contract comes in.  I don't even know.  But he's just so good at showering me with love and affection with all the sexual

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6cWcom6                              Jane - Redirect

exploitation in between and then showering me with love and affection and all the sex and violating exploitation in between.  It's just so confusing, and whenever I would send Sean loving messages, I was just able to, like, compartmentalize all the bad stuff and put it to the side, and all the loving messages are just me focusing on the good parts of this.

Q.  Jane, I want to switch topics.

Do you remember being asked on cross-examination about whether Don wore a condom when you had sex with him during one of these nights?

A.  Yes.

Q.  I want to make sure we have that clear.

The first time you had sex with Don in May of 2021, did you ask for a condom?

A.  Yes.

Q.  How did Sean respond?

A.  He resisted, but then he eventually gave in.

Q.  And then do you remember listening to a recording during your direct examination from December of 2021 of a different hotel night with Don?

A.  Yes.

Q.  And during that different night, what did Sean do when he saw you and Don looking for a condom in December of 2021?

A.  He intervened.

P6cWcom6                          Jane - Redirect

Q.  And what did he do?

A.  He taunted me, made me feel silly for asking and just kind of dismissed me, and there was no condom that was used.

Q.  So during that hotel night with Don in December of 2021, did Sean let you use a condom with Don?

A.  No.

Q.  Do you remember being asked several questions on cross-examination about your text messages with Kabrale?

A.  Yes.

Q.  Whenever you sent a sexual message to Kabrale, who were you with?

A.  Sean.

Q.  Whenever you asked for nude images from Kabrale, who were you with?

A.  Sean.

Q.  And do you remember being asked about texting Kabrale in connection with your birthday in 2022?

A.  Yes.

Q.  Do you remember who you were with when you sent those text messages?

A.  Sean.

Q.  Did you ever want to have sex with Kabrale?

A.  No.

Q.  Then why did you text him saying you had a mind-blowing experience with him?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom6                        Jane - Redirect

A.   Just to make him feel good.

Q.   Why did you want to make him feel good?

A.   Because I didn't want him to feel used.

Q.   Jane, did you derive physical pleasure from sex with entertainers during hotel nights?

A.   No.

Q.   Did you pretend to?

A.   Yes.

Q.   Why?

A.   I was putting on a show.

Q.   For who?

A.   Sean.

Q.   Jane, did you orgasm during sex with entertainers during hotel nights?

A.   No.

Q.   Did you fake orgasms with entertainers?

A.   Yes.

Q.   Why?

A.   Because I was putting on a show.

Q.   For who?

A.   Sean.

Q.   Do you remember being asked on cross-examination about Sean's reaction to Kabrale extorting you by saying that he would release a video of the two of you from a hotel night?

A.   Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom6                          Jane - Redirect

Q.   And do you remember testifying on cross-examination that Sean said he did not want that video released?

A.   Yes.

Q.   At the time Sean told you that, had his homes already been searched by federal agents?

A.   Yes.

Q.   So at the time Sean told you that, did he know he was under criminal investigation?

A.   Yes.

Q.   Other than Kabrale, who else threatened to release video of you having sex with other men during hotel nights?

A.   The media company and Sean.

Q.   When did Sean threaten to release video of you having sex with other men?

A.   December of 2024.

Q.   '24?

A.   2023.

Q.   How did you react when Sean threatened to do that?

A.   Scared, and I called K.K.

Q.   Why were you scared?

A.   Because I thought he would actually do it.

Q.   Why did you think he would actually do it?

A.   Because he was just a loose cannon then.

Q.   So did you believe him?

A.   Yes.

P6cWcom6                         Jane - Redirect

Q.  Do you remember being asked on cross-examination about Sean's drug use?

A.  Yes.

Q.  And do you remember testifying that Sean would become like a different person when he took ecstasy?

A.  Yes.

Q.  When Sean took drugs during hotel nights, were there times when you gave him subtle cues that you were tired and wanted to stop?

A.  Yes.

Q.  Can you remind us what some of those were?

A.  I would lay on the bed.  I would try to lean my head on his shoulder.  I would say that I'm hungry.  I would say that my stomach hurt.  Or I would just -- I don't know -- like, make little faces or kind of sigh and just hope that he'd take the lead to end the night.

Q.  On those occasions when Sean had taken drugs and you gave those subtle cues, how did Sean respond each time?

A.  He would say are you getting tired on me?  You're not getting tired on me, are you?  Let's end on a high note.  Just push through.  One more round.

Q.  So based on those responses and your observations of him, from your perspective, did it appear that Sean picked up on and understood your subtle cues even when he had been using drugs?

            MS. GERAGOS:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom6                        Jane - Redirect

THE COURT:  Sustained.

BY MS. COMEY:

Q.  Based on your observations of him and his responses, did you understand that he had understood what you were communicating to him?

MS. GERAGOS:  Objection.

THE COURT:  That's sustained.

BY MS. COMEY:

Q.  What did you understand about why Sean was saying the things you just described?

MS. GERAGOS:  Objection.

THE COURT:  That's sustained.

BY MS. COMEY:

Q.  Did Sean ever miss one of the subtle cues, to your memory?

MS. GERAGOS:  Objection.

THE COURT:  That's sustained.

BY MS. COMEY:

Q.  Whenever you made those subtle cues, can you remember anytime that Sean did not respond in one of the ways that you just described?

MS. GERAGOS:  Objection.

THE COURT:  That's overruled.

A.  I can't.

Q.  You can or you cannot?

A.  Cannot.

P6cWcom6                          Jane - Redirect

Q.  Do you remember being asked on cross-examination about how you would read between the lines of some of Sean's text messages?

A.  Yes.

Q.  What kind of texts do you remember Sean sending you during your relationship that indicated to you that he wanted you to set up a hotel night?

MS. GERAGOS:  Objection.

THE COURT:  Hold on.

Is there a time frame?

MS. GERAGOS:  And form.

THE COURT:  All right.  Can you rephrase.

BY MS. COMEY:

Q.  What texts do you remember Sean sending you that you understood were asking you to set up a hotel night?

A.  Things like I know you have a surprise for me, or what do you have planned or what do you want to do?  What have you been thinking about?  Have you been watching the videos?  I'm coming home.

I mean so many things that I just knew that there was about to be a hotel night.

Q.  When Sean sent you those texts, how, if at all, did you try to avoid setting up hotel nights?

A.  I would -- I don't know if I avoided them very often.

Q.  Would you try?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom6                        Jane - Redirect

A.   Yes.

Q.   How?

A.   I would just try to navigate the night to something else or say I wasn't into it or -- I don't know.  These are very rare moments.

Q.   Do you remember being asked on cross-examination about how Sean did not want entertainers at his residence?

A.   Yes.

Q.   Did you, in fact, have sex with entertainers in front of Sean at some of his residences?

A.   Yes.

Q.   How many times did that happen in 200 Mapleton?

A.   Once.

Q.   How many times did that happen in Two Star?

A.   Three times.

Q.   How many times did it happen in One Star?

A.   Maybe two times.

Q.   Do you remember being asked on cross-examination about the specific dates when hotel nights happened?

A.   Yes.

Q.   As you sit here today, can you remember the specific date of every single hotel night you had with Sean over your entire relationship?

A.   No.

Q.   Do you want to remember every single hotel night with Sean?

P6cWcom6                          Jane - Redirect

A.  I wish --

          MS. GERAGOS:  Objection.

          THE COURT:  That's overruled.

BY MS. COMEY:

Q.  You can answer.

A.  I wish I could forget them.

Q.  Do you remember being asked on cross-examination about times that you saw Sean at his home when you did not have a hotel night?

A.  Can you repeat the question?

Q.  Do you remember on cross-examination Ms. Geragos asked you about times when you saw Sean at his homes and you didn't have an entertainer there?

A.  Yes.

Q.  And do you remember Ms. Geragos asking you if you got to spend the quality time you wanted with Sean on those occasions?

A.  Yes.

          MS. COMEY:  Can we pull up what's in evidence as Government Exhibit E-331-ER, please.

Q.  Jane, is this one of your notes?

A.  Yes.

Q.  That you wrote during your relationship with Sean?

A.  Yes.

Q.  In November of 2022?

A.  Yes.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

Q.   Can you read just that top sentence, please?

A.   "I've just been waiting for you to do all the things you promised me, and nothing."

Q.   What things had Sean promised you?

A.   Trips, dates, romance, just normalcy.

Q.   So were the times you got to spend with Sean at his home alone the kinds of things that he had promised you?

A.   No.

Q.   What's the difference?

A.   There's no dates.  It's just sleeping and being at home.

        MS. COMEY:  We can take that down.  Thank you.

Q.   Jane, did you get jealous of the other women Sean was seeing throughout your relationship with him?

A.   Yes.

Q.   What were you jealous of?

A.   How they -- how they just had more ease and I had more pressure and that I was just made to be -- they weren't forced to just carry this impossible pressure and that they didn't have to hold any of that; that they didn't -- that they weren't asked to hold that pressure like I did.  And I just felt that it was unfair that I was the one being -- being asked to just hold all of that pressure.

Q.   What are you referring to when you say all of that pressure?

A.   All the -- all the nights with these men.

P6cWcom6                          Jane - Redirect

MS. COMEY:  Can we put up -- well --

Q.  Jane, why did you bring up hotel nights to Sean when you were also talking to him about the other women he was with?

A.  Because that was the most bothersome part about it.  That was the main concern.

Q.  What do you mean?

A.  That what I was -- what I was trying to express every time I brought up women was why, why do I have to be degraded in order to be with you?  Why do I have to break all of my boundaries and compromise myself and they don't have to, but then they can still experience you in ways that I want to?  It was never about the women.  It was the why was I being treated like this and they weren't?

MS. COMEY:  Ms. Becker, would you please pull up what's in evidence as Government Exhibit A-442-34, pages 83 and 84.

Q.  Jane, are these text messages between you and Sean from August 19, 2023?

A.  Yes.

Q.  Do you remember looking at these on direct examination?

A.  Yes.

Q.  Do you remember what you and Sean were arguing about in these texts?

A.  Yes, I do.

Q.  What were you arguing about?

P6cWcom6                         Jane - Redirect

A.  He's upset because while I was high, I had fantasized this whole thing, and I told him that I would do this fantasy all-star thing and -- and at the end of that night, I remember just being so exhausted, like in my heart I knew that that was not going to happen and I hoped that he wasn't going to ask me about it.  And this night, he's kind of checking up on that, that fantasy play.  And in this fight I'm just kind of making, like, excuses that I'm, like, that I'm not feeling good, that, like, I'm feeling a little bit, like, overwhelmed.  And this is how he responds to me.

Q.  Jane, was this fight about another woman?

A.  No.

Q.  What excuse did you send to Sean on this page?

A.  I sent him a photo of my bloody tampon and just to prove to him that, like, I really wasn't feeling well, and I felt like I had to, like, really show him that I was -- like I can't do anything.

Q.  Jane, can you please read the text at the bottom left after that picture.

    What do you write, Jane?

A.  I said:  I wasn't playing any games.

    I said:  I was still making it happen last night.  Even when I got, even when I admitted just didn't want to do drugs.  We said champagne.  I canceled all plans and got child care.

    And then the last thing I said was:  You pick and

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6cWcom6                          Jane - Redirect

everything went left.

Q.  Can you read the next two messages you sent, please?

A.  I say:  You asked me what was wrong.  I admitted I finally wasn't feeling good and said I just got my period.  I politely just asked if I could sit this one out.  Movie night was not on my mind because my first day period does not feel good to me.  I had a week of coming down and pushing through to the gym and handling for school week.  I still had not caught up on last week's rest.

And then I say:  I agree that all of our texts switch up to not feeling good to the accusations of me lying and playing you for money, and everything was fuck me all because I ended up not feeling good and asking if I can postpone.  You have flaked and disappeared so many countless times on me.  I have nonstop given you these nights for two and a half years, and this was the first time I just hit a wall and was honest and asking for space to go feel better.  Now I'm waking up to more fuck me.  I'm not a liar, a cheater, a user or a sex robot.  I'm just as hurt and upset, and we need to have a serious talk about everything.

MS. COMEY:  We can take that down.  Thank you.

Q.  Jane, switching topics, do you remember being asked on cross-examination about your dress line and your swimsuit line?

A.  Yes.

Q.  When did you launch those?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

A.   I believe in 2022 and 2023.

Q.   How long did it take for them to become profitable?

A.   It -- it was quite a while.

Q.   And even when they became profitable, did you make enough money to pay your rent?

A.   No.

Q.   Even when they became profitable, did you make enough money to pay off the debt you acquired during the relationship with Sean?

A.   No.

Q.   Do you remember being shown on cross-examination some texts from 2021 and 2022, where you spoke positively about entertainers and hotel nights?

A.   Yes.

Q.   Approximately when did you start voicing to Sean that you wanted to stop doing hotel nights?

A.   Since 2021.

Q.   And after that, throughout the rest of 2021 and 2022, did you still go along with hotel nights even though you didn't want them?

A.   Yes.

Q.   And over that time, did you tell Sean sometimes that you didn't want to do hotel nights?

A.   Yes.

Q.   And in 2023, did you become more vocal about wanting to

P6cWcom6                          Jane - Redirect

stop hotel nights?

A.   Yes.

Q.   When did Sean start paying your rent?

A.   2023.

Q.   After that, what, if any, obligation did you feel to continue to hotel nights?

A.   I felt all the obligation.

Q.   Why?

A.   Because of my livelihood.

Q.   What do you mean?

A.   I just felt like I had to maintain not just emotional stability with these nights but just maintain, just my livelihood at this point, because my partner was responsible for that now, and so I just felt obligated to do what he wanted me to do.

Q.   After April of 2023, how often did Sean bring up your rent in the context of hotel nights?

A.   Often.

Q.   Do you remember being asked on cross-examination whether you agreed to the sobriety party in October of 2023?

A.   Yes.

Q.   By the time of the sobriety party, how long had Sean been paying your rent?

A.   A few months.

Q.   By the time of that sobriety party, how many times had Sean

P6cWcom6                         Jane - Redirect

threatened to stop paying your rent when you brought up wanting to stop hotel nights?

A.   He would, in all different types of ways.

Q.   So multiple times?

A.   Yes.

          MS. COMEY:  Can we please pull up what's in evidence as Government Exhibit E-303-M.

Q.   Jane, is this a photo you took at Sean's concert before going to the hotel for the sobriety party that same night?

A.   Yes.

          MS. COMEY:  Let's zoom in on the created date, please.

Q.   What's the date you took this photo?

A.   I took it on October 17, 2023.

          MS. COMEY:  Can we please pull up what's in evidence as Government Exhibit A-104-66, pages 2 and 3, please.

          Let's start at the top.

Q.   Jane, what's the date of these texts?

A.   This is October 16, 2023.

Q.   So is this the day before you went to that concert and then went to the sobriety party?

A.   Yes.

Q.   What did you write to Sean the day before you went to that concert and then the sobriety party?

A.   I said:  I don't want to be fucked and mistreated.  I don't feel like performing loveless, cold sex.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6cWcom6                        Jane - Redirect

Q.  Let's read the next two texts you sent him on that same day, please.

A.  I said:  I'm not a porn star.  I'm not an animal.  I need a break.  I don't want to do anything.  I've hit a wall.

Q.  Let's read the next two texts you sent him, please.

A.  I said:  It's been three years of me having to fuck strangers.  I'm tired.

MS. COMEY:  Let's go to pages 4 and 5, please.

Q.  What's the next text you sent him?

A.  I said:  My spirit and my soul is tired.  I need a break mentally and spiritually.

Q.  Let's read the next three messages you sent him, please.

A.  I said:  Sex is sacred to me, and I can't be used like this anymore.  I just wanted to make you happy, but it's creating a war inside me.  I need a break.  I can't be in another hotel room doing drugs and performing, exhausted for days and can't concentrate.

MS. COMEY:  Let's go to pages 6 and 7, please.

Q.  Would you please read the next message you sent?

A.  I said:  I need a break.

Q.  And would you please read the next message you sent?

A.  I said:  It's loveless for me and nothing satisfies you and you always push me to do more and more.

Q.  Did Sean push you to do more and more on the sobriety party night?

P6cWcom6                    Jane - Redirect

A.  Yes.

Q.  What happened between the second and third man on the sobriety party?

A.  I threw up.

Q.  How did Sean respond when you threw up?

A.  He just -- he just encouraged me to go back out.

Q.  Go back out and do what, Jane?

A.  Have sex with another man.

        MS. COMEY:  We can take this down.  Thank you.

Q.  Jane, do you remember being asked about, in December of 2023, whether Sean knew that you didn't want hotel nights?

A.  Sorry.  Can you repeat that again?

Q.  Do you remember earlier today during cross-examination you and Ms. Geragos were talking about December of 2023?

A.  Yes.

Q.  And do you remember you were talking about whether Sean knew that you wanted to stop doing hotel nights?  Do you remember that, on cross-examination?

A.  Yes.

Q.  And do you remember you were starting to explain your understanding of what Sean knew at that time, and Ms. Geragos interrupted you.  Do you remember that?

A.  Yes.

Q.  What were you going to say?

A.  I was going to say but I have been telling him.  I have

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

been telling him since 2021 that I wanted to stop.

Q.  And Jane, do you remember on cross-examination when Ms. Geragos was asking you about the July 2024 night that you had with Paul and Sean?

A.  Yes.

Q.  And do you remember you wanted to explain why you didn't remember that until recently?

A.  Yes.

Q.  And do you remember Ms. Geragos cut you off?

A.  Yes.

        MS. GERAGOS:  Objection.

        THE COURT:  That's sustained.

BY MS. COMEY:

Q.  Would you please explain?

A.  I just was --

        MS. GERAGOS:  Objection.

        THE COURT:  Sustained.  So let's get a fresh question, please.

BY MS. COMEY:

Q.  Jane, can you explain why you didn't remember details of July of 2024 before a few days ago?

A.  I remember it was after one of our meetings, and we were just talking about it and how that night was different.  And as I was walking, I'm asking myself why was that night so different?  And then I remember that I had taken this

P6cWcom6                          Jane - Redirect

brand-new, like, liquid molly, and I remember when I had

sprayed that in my mouth, like, 14 times, that's when it hit

me.  And as soon as it hit me, that's when Paul walks in the

door, and then, otherwise that's one of the first nights that I

had ever had that type of reaction with Paul.

Q.  And was that the only night when you used that liquid

molly?

A.  Yes.

Q.  Jane, do you remember being asked on cross-examination

about whether Sean was vulnerable with you during hotel nights?

A.  Yes.

Q.  Was Sean vulnerable with you when he forced you to perform

oral sex on Antoine on June 18?

A.  No.

          MS. GERAGOS:  Objection.

          THE COURT:  Overruled.

A.  No.

Q.  Do you remember being asked on cross-examination about

whether Sean was affectionate with you during hotel nights?

A.  Yes.

Q.  Was Sean affectionate with you at any point when Antoine

was in your home on June 18 and 19, 2024?

          MS. GERAGOS:  Objection.

          THE COURT:  Is it a form objection?

          MS. GERAGOS:  He wasn't in the house on June 18.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6cWcom6                          Jane - Redirect

THE COURT:  Can you rephrase the question.

BY MS. COMEY:

Q.  Do you remember Antoine coming over to your home at some point between June 18 and June 19, 2024?

A.  Yes.

Q.  And at the time that he was in your home, was Sean affectionate with you at all?

A.  No.

Q.  What was his demeanor toward you the entire time Antoine was in your home?

A.  Evil.

Q.  Do you remember being asked on cross-examination about how Sean was more loving to you after Cassie's lawsuit was filed?

A.  Yes.

Q.  Was he loving to you at all after the violence started on June 18, 2024?

A.  No.

Q.  Do you remember being asked on cross-examination about how Sean offered you ecstasy during hotel nights?

A.  Yes.

Q.  What did Sean say to you when he held an ecstasy pill out to you on that night of June 18 into 19th, 2024?

A.  He said take this pill because you're not going to ruin my night.  And then he says this is coercion.

Q.  What did you tell him during that same conversation?

P6cWcom6                          Jane - Redirect

A.   I just looked at him.

Q.   What did you say to him that night about whether you wanted to have sex of any kind with Antoine?

A.   I said I don't want to.  I don't want to.

Q.   Did you say that once or more than once?

A.   More than once.

Q.   How did Sean respond when you told him I don't want to?

A.   You'd better get the fuck out there.  You're not going to ruin my night.  Go suck some dick.  Go fuck him.  Go do something.

Q.   How long before he said that had he kicked down four of the doors in your home?

A.   Couple hours later.

Q.   How long before he said that had he kicked you to the ground when you tried to leave your home?

         MS. GERAGOS:  Objection.

         THE COURT:  Overruled.

A.   A couple hours before.

Q.   How long before he said that had he put you in a choke hold and lifted you off the ground by your neck?

         MS. GERAGOS:  Objection.

         THE COURT:  Sustained.

BY MS. COMEY:

Q.   Jane, at the time Sean said that, what injuries did you have on your body?

P6cWcom6                         Jane - Redirect

A.  I had a bruise behind my leg.  I had a black eye forming, and I had balls -- three size balls on the forehead topping my head.

Q.  What injuries did Sean have?

A.  None.

Q.  Jane, were you physically capable of stopping Sean from leaving your home that night?

        MS. GERAGOS:  Objection.

        THE COURT:  That's sustained.  It needs to be rephrased.

BY MS. COMEY:

Q.  Jane, how do you compare in strength to Sean?

A.  I don't.

Q.  Jane, do you remember being asked about what you and Sean had to drink on June 18, 2024?

A.  Yes.

Q.  Did you and Sean have essentially the same amount of alcohol to drink before the fighting started?

A.  Yes.

Q.  Based on your experience with Sean, does he generally have the same, less or higher tolerance for alcohol as you?

        MS. GERAGOS:  Objection.

        THE COURT:  Overruled.

A.  Higher.

Q.  At the time when the fighting started, were you blackout

drunk?

A.   No.

Q.   Do you have a clear memory of what happened?

A.   Yes.

Q.   Were you aware of your surroundings?

A.   Yes.

Q.   Were you aware of what was going on?

A.   Yes.

Q.   Do you remember being asked about Sean following you when you locked yourself behind multiple doors?

A.   Yes.

Q.   What were you saying to Sean as he followed you through the house on June 18, 2024?

A.   I was saying leave me alone.  I hate you.  Just leave.  Just leave.

Q.   And what did Sean do each time you locked a door between you and him?

A.   He kicked every door that I was behind.

Q.   When he kicked it, what damage did it cause to the doors?

A.   It broke them.

Q.   Did it rip off some wood from the doors?

A.   Yes.

Q.   Did his kicks dent the doors?

A.   Yes.

Q.   Jane, do you remember being asked about putting on or

P6cWcom6                          Jane - Redirect

changing your clothes during this night?

A.  Yes.

Q.  Why were you putting on a dress so quickly?

A.  Because I wanted to run away from him.

Q.  Jane, when you were locking these doors between you and Sean, were you trying to get him to chase you?

A.  No.

Q.  Were you trying to get him to hit you?

A.  No.

Q.  What were you saying to him?

A.  I wanted him to leave me alone.  I wanted him to leave.

Q.  Do you remember being asked about whether there was any bruising on your neck after this night?

A.  Yes.

Q.  Can you explain to us, using your arms and your hands, how Sean actually put you into that choke hold?

A.  I remember he came up behind me and just squeezed my neck in between his arms, and I just remember just grabbing his arm, and I couldn't even touch my neck, it was so tight.  And I was on my tippy-toes, and I thought I was going to pass out.

Q.  So did he put his arm over your neck?

A.  Yes.  He went like this, and I was just being lifted up by my neck in a choke hold.

        MS. COMEY:  Let's the record reflect that the witness is crossing her left arm across her body such that her elbow is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom6                        Jane - Redirect

in front of her throat.

Q. So in other words, does he use his hands and his fingers to press your throat, or was his arm across your throat?

A. His arm.

Q. Jane, do you remember being asked on cross-examination about when Sean slapped you in the shower?

A. Yes.

Q. What were you saying to Sean in the shower?

A. I was calling him a bitch. I was calling him a pedophile. I was calling him a monster.

Q. Were you trying to get him to hit you?

A. No.

Q. Did you want him to hit you?

A. No.

Q. How hard did he hit you?

A. So, so hard.

Q. What happened when he hit you?

A. I fell eventually.

Q. To the ground?

A. Yes.

Q. After you got out of the shower, you said you were sitting on the floor of your bathroom, is that right?

A. Yes.

Q. And at that point you said you were quiet?

A. Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom6                      Jane - Redirect

Q.   What was Sean doing while you were sitting on the floor of

your bathroom?

A.   Yelling at me.

Q.   What was he yelling at you?

A.   That I was crazy and I was just fucking crazy.

Q.   What did Sean tell you to do after that?

A.   Get in a fucking outfit.

Q.   What was his tone when he told you get in a fucking outfit?

A.   Angry.

Q.   Jane, do you remember being asked on cross-examination

about text messages that you and Sean exchanged after June 18

and 19 of 2024?

A.   Yes.

Q.   Do you remember being shown a text message where Sean

referenced that he just wanted to get out safe?

A.   Yes.

Q.   Did you understand he was referring to June 18 and 19,

2024?

A.   Yes.

Q.   Jane, when you locked yourself behind your bedroom door,

could Sean have left safely?

A.   Yes.

Q.   When you locked yourself behind your closet door, could

Sean have left safely?

A.   Yes.

P6cWcom6                        Jane - Redirect

Q. When you locked yourself behind your bathroom door, could Sean have left safely?

A. Yes.

Q. When you locked yourself behind your guest bedroom door, could Sean have left safely?

A. Yes.

Q. When you tried to run out and he kicked you and then put you in a choke hold, could Sean have left safely?

A. Yes.

Q. When you hid for two hours away from your home, could Sean have left safely?

          MS. GERAGOS:  Objection.  Argumentative.

          THE COURT:  Overruled.

A. Yes.

Q. And just two more of these questions, Jane.

     When you were curled up in a ball in your yard, could Sean have left safely?

A. Yes.

Q. And when you were in the shower, could Sean have left safely?

A. Yes.

Q. Jane, did you want to have sex with Antoine that night?

A. No.

Q. Who told you to have sex with Antoine that night?

A. Sean.

P6cWcom6                     Jane - Redirect

Q.  What did he say to you?

A.  I'd better go out there and suck some dick or fuck something.  And that I wasn't going to ruin his night.

Q.  Jane, do you remember being asked on cross-examination about meeting with prosecutors?

A.  Yes.

Q.  Throughout all of your meetings with prosecutors, what have prosecutors asked you to do in this trial?

A.  Tell the truth.

Q.  Do you remember being asked on cross-examination about the gifts and the money that Sean gave you during your relationship?

A.  Yes.

Q.  Would you give all of that back if it meant you never had to have sex with another man during your relationship with Sean?

        MS. GERAGOS:  Objection.

        THE COURT:  Overruled.

A.  Yes.

Q.  Do you have any financial stake in the outcome of this trial?

A.  None.

Q.  Are you expecting to get any money at all from testifying in this trial?

A.  No.

P6cWcom6                        Jane - Recross

Q.  Why are you testifying here?

A.  Because I was subpoenaed, and I'm here.

        MS. COMEY:  No further questions, your Honor.

        THE COURT:  Ms. Geragos.

        MS. GERAGOS:  Thank you, your Honor.

RECROSS EXAMINATION

BY MS. GERAGOS:

Q.  Good afternoon, Jane.  Just a few more questions.

    You just testified there were hours between the physical fight and Antoine coming over, right?

A.  Right.

Q.  And that's an approximation, right?

A.  Right.

Q.  OK.  And you knew from the phone that Antoine was coming over, right?

A.  Right.

Q.  OK.  And you got dressed to go get him, to go into your car, right?

A.  Yes.

Q.  And you got into your car when he arrived, right?

A.  Yes.

Q.  He only had your phone number, right?

A.  Yes.

Q.  He didn't have Mr. Combs's phone number?

A.  No.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P6cWcom6                          Jane - Recross

Q.  He had only your phone number?

A.  Yes.

Q.  When he called, when he was there, did you pick up the phone?

A.  Yes.

Q.  Did you leave your home and get in your car and drive the half a mile to your back gate?

A.  Yes.

Q.  OK.  And did you open the gate for Antoine?

A.  I did.

Q.  Does the back gate have a capability for you to leave the house?

A.  Does the back gate --

Q.  Do any of the gates in the gated community have the capability to open so that you can leave your home?

A.  Yes.

Q.  OK.  And without telling me which family members, you have several family members in Los Angeles, right?

A.  Right.

Q.  And they were somewhat near you, right?

A.  Yes.

Q.  OK.  And you went to the gate in your vehicle, right?

A.  Right.

Q.  You hadn't taken any drugs at this time?

A.  No.

P6cWcom6                    Jane - Recross

Q.   OK.  And you had had -- it had been hours since you had the last sips of alcohol, right?

A.   Yes.

Q.   Because at this time the glasses were broken, right?

A.   Yes.

Q.   OK.  And you let Antoine into the gate at your home, right?

A.   Yes.

Q.   And then did he follow you in your car back to your home?

A.   Yes.

Q.   And then you let him into your home, right?

A.   Yes.

Q.   OK.  And then did he -- he came into your home and immediately Antoine and Mr. Combs went into your bedroom, is that right?

A.   Yes.

Q.   All right.  And Since you reached out to Antoine for the first time in October of 2022, had there been a time, aside from the January 2024 time that you saw him in Las Vegas, that you saw Antoine and nothing sexual happened?

A.   No.

Q.   OK.  The only time that nothing sexual happened between you and Antoine was January of 2024, right?

A.   Right.

Q.   And you had reached out to him yourself for the first time in October of 2022, right?

A.  Right.

Q.  OK.  And so you went into the gate, the back gate at your gated complex, right?

A.  Right.

Q.  And you opened the back gate for him?

A.  Yes.

Q.  And you allowed him, and he drove in his car into your property, right?

A.  Yes.

Q.  And you allowed him into your home?

A.  Yes.

Q.  You opened the door for him?

A.  I was requested, yes.

Q.  And you opened the door for him, right?

A.  Yes.

Q.  You didn't drive outside of your gated community, right?

A.  No.

Q.  And you allowed him into your bedroom, right?

A.  As requested, yes.

Q.  OK.  And you did that?

A.  Yes.

Q.  All right.  And in June of 2024 you had -- so you had your phone when he called you, right?

A.  To tell me that he was there, yes.

Q.  OK.  And in June of 2024, you had your own attorney, right?

A.  Yes.

Q.  OK.  And you've already told us on cross-examination and on direct examination that that attorney represented you to the best of her ability, right?

A.  Yes.

Q.  And you could go to that attorney, and you did go to that attorney over the summer for any issues that you had, right?

        MS. COMEY:  Objection, your Honor.

        THE COURT:  I think it needs to be rephrased.  And you should clarify that you're not looking for any of the discussions between Jane and her attorney.

BY MS. GERAGOS:

Q.  Jane, I am not asking for any -- just like every time I've asked you about your attorney this entire examination, I'm not looking for anything that you have spoken to your attorney about.  OK?

A.  Yes.

Q.  In June of 2024, were you represented by counsel?

A.  Yes.

Q.  OK.  You were represented by criminal counsel, right?

A.  Yes.

Q.  And you had your phone that night, correct?

A.  Yes.

Q.  And without telling me if anything was said, did you reach out to your attorney that night?

P6cWcom6                      Jane - Recross

A.   No.

Q.   OK.  And by June of 2024, federal agents had come to your house a couple months earlier.  Do you remember that?

A.   Yes.

Q.   And they left their card for you, right?

A.   Yes.

Q.   And that they told you they were interested in you in their investigation.  Do you remember that?

A.   Yes.

Q.   OK.  And so you had also the card of federal agents related to this case, right?

A.   Yes.

Q.   OK.  And you knew at this time that he was under investigation related to this case, right?

A.   Yes.

Q.   OK.  Do you remember Ms. Comey -- sorry.

     When Antoine came in, you had already put on makeup?

A.   As requested, yes.

Q.   OK.  And you covered your hair?

A.   I covered my bruising and my welts with my hair, yes.

Q.   OK.  And you cleaned up the glass that was on the ground?

A.   Yes.

Q.   OK.  And did you tell Antoine I don't want to do this?

A.   No.

Q.   In your experience with Antoine, would he have done

P6cWcom6                          Jane - Recross

something that he thought you did not want him to do?

MS. COMEY:  Objection, your Honor.

THE COURT:  That's overruled.

A.  I don't know.

Q.  You don't know if Antoine -- OK.

And did you at any point in the night when you saw Antoine tell him you did not want to do this?

A.  No.

Q.  OK.  When you let Antoine into your house, did you say I don't want you to come in?

A.  No.

Q.  OK.  When you let Antoine into your bedroom, did you tell him I don't want you to come in?

A.  No.

Q.  OK.  When you let Antoine into the back gate, did you tell him I don't want you to come in?

A.  No.

Q.  Ms. Comey asked you if Mr. Combs was loving to you that night on June 18.  Do you remember that?

A.  Yes.

Q.  OK.  Were you loving to Mr. Combs when you were calling him a pedophile?

A.  No.

Q.  Were you loving to Mr. Combs when you were calling him disgusting?

P6cWcom6                         Jane - Recross

A.   No.

Q.   Were you loving to him when you called him a monster?

A.   No.

Q.   OK.  Do you remember Ms. Comey asked you what your strength was in comparison to Mr. Combs?

A.   Yes.

Q.   You're a very active woman; would you say that?

A.   Yes.

Q.   You go to the gym every day?

A.   Yes.

Q.   You lift heavy weights, right?

A.   Yes.

Q.   You care very much about the strength that you have, right?

A.   Yes.

Q.   And about taking care of yourself and your body, right?

A.   Yes.

Q.   And you lift very heavy weights, right?

A.   Yes.

Q.   And that's because you want to be a strong woman, right?

A.   Yes.

Q.   OK.  And would you consider yourself strong?

A.   Yes.  But a woman's power does not override a man's.

Q.   A woman's power does not override a man's.

     On the night of June 18, did you start calling Mr. Combs a pedophile when you were sitting next to him at the counter?

P6cWcom6                    Jane - Recross

A.   Yes.

Q.   Did you push his head into the counter?

A.   Yes.

Q.   OK.   And after that, did you start throwing candles at him?

A.   Yes.

Q.   And did you start throwing glasses at him?

A.   Yes.

Q.   OK.   And at any of that point, did he throw anything back to you at that point?

A.   No.

Q.   OK.   And were you continuously calling him a pedophile and a monster throughout that?

A.   Yes.

Q.   And were you telling him fuck you at that time?

A.   Yes.

Q.   OK.   And in response, at that point was he calling you crazy and a crazy bitch?

A.   Yes.

Q.   OK.   And at that point, a month earlier, you had seen Mr. Combs in the video at the InterContinental Hotel, right?

A.   Can you repeat that?

Q.   A month before that incident, you had seen Mr. Combs on that video at the InterContinental Hotel, right?

A.   Yes.

Q.   OK.   Do you remember Ms. Comey asking you on redirect

examination about whether you had ever reached out to Kabrale

without Mr. Combs?

A.   Yes.

Q.   And you had said you hadn't, right?

          MS. COMEY:  Objection.  Misstates the testimony.

          THE COURT:  All right.  Can you rephrase.

BY MS. GERAGOS:

Q.   Do you remember Ms. Comey saying that -- whether or not you

had reached out to Kabrale without Mr. Combs?

          MS. COMEY:  Objection, your Honor.

          THE COURT:  I'll overrule the objection.

          The witness can answer.

A.   Can you repeat the question?

Q.   Do you remember Ms. Comey asking you whether you had ever

reached out to Kabrale without Mr. Combs?

          MS. COMEY:  Same objection, your Honor.

          THE COURT:  Is it the wrong person?

          MS. COMEY:  There was a qualifier to my question, your

Honor.

          THE COURT:  All right.  What is the qualifier?

          MS. COMEY:  Sending sexual texts or requesting sexual

images.

          THE COURT:  All right.

          Ms. Geragos.

BY MS. GERAGOS:

Q.   OK.  Do you remember reaching out to Kabrale in January of 2024, when you were no longer with Mr. Combs?

A.   Yes.

Q.   And do you remember reaching out to Kabrale in January of 2024 because you wanted to recommend him to another rapper in the lifestyle?

A.   Yes.

Q.   OK.  And that was because you believed that that other rapper in the lifestyle believed that you would know of other good entertainers?

A.   Yes.

Q.   Do you remember Ms. Comey asking you about all the times that Mr. Combs could have left that evening when you had locked yourself in your closet, the bedroom and other areas of your home?

A.   Yes.

Q.   OK.  Mr. Combs's car was not there that evening, right?

A.   No.

Q.   OK.  Your car was there that evening, right?

A.   Yes.  He drove it looking for me as well.  That's what he told me.

Q.   He drove it looking for you?

A.   Yeah.

Q.   And then you drove it to go and get Antoine from the back gate, right?

A.   Yes.

Q.   And so then when -- Mr. Combs's security, J9, finally picked Mr. Combs up, right?

A.   In the morning, after Antoine left.

Q.   OK.  And then Mr. Combs left, right?

A.   Yes.

Q.   And you left twice that evening, right?

A.   To get Antoine?

Q.   You left one time when you were in your dress and no heels, right?

A.   Yes.

Q.   And you left another time in your vehicle, right?

A.   Yes.

Q.   To leave and go get Antoine, right?

A.   Yes.

Q.   You went and got Antoine from the back gate at your complex, right?

A.   Yes.

Q.   While Mr. Combs stayed, right?

A.   Yes.

Q.   You were just asked by Ms. Comey whether you would give up all of the things Mr. Combs gave you if you didn't have to do any of this, right?

A.   Right.

Q.   You were not willing to give up your home, right?

P6cWcom6                         Jane - Recross

A.   That's where me and my child live.  That's a very hard question to answer.

Q.   You wanted to stay in the home that you and your child lived in, right?

A.   I was in a position to -- that was -- that's a very hard question for me.

Q.   OK.  You receive, I think, you testified, almost $5,000 a month in child support, right?

A.   Yes.

Q.   OK.  And your child's father is a very, very wealthy individual at the top of the entertainment industry, right?

A.   Yes.

Q.   OK.  And how much do you make per month now on OnlyFans?

A.   It varies.

Q.   Do you make over $10,000 a month?

A.   Yes.

Q.   OK.  And so you have the financial ability to pay for this home yourself, right?

A.   I'm catching up on three years of debt.

Q.   And this three years of debt that you're referencing, during those three years, Mr. Combs has sent you wires of over $150,000, right?

A.   Is that a healthy three years?

Q.   I'm asking you a question as to whether Mr. Combs has sent you over $150,000 during your three years with him.

P6cWcom6                          Jane - Recross

A.   Yes.

Q.   Did you want more than that?

A.   Does he think I'm worth want more than that?

Q.   I'm asking if you wanted more than that.

A.   No.

Q.   OK.  Are there months that you make even more than $10,000 a month on OnlyFans?

A.   Yes.

Q.   OK.  How much is the most you've made per month on OnlyFans?

A.   50,000.

Q.   Do you remember Ms. Comey asking you about when Kabrale had threatened to release the tape that he had of you to the media company?

A.   Yes.

Q.   OK.  And Ms. Comey asked you whether you knew that Mr. Combs was under investigation at the time that Kabrale was releasing those tapes?

A.   Yes.

Q.   OK.  And do you remember that at the time that Kabrale was threatening to release that tape, Mr. Combs said to you we need to call the police?

A.   Yes.

Q.   So while Mr. Combs was under federal investigation and an entertainer was threatening to release those tapes, he said we

need to call the police, right?

A. Yes.

Q. All right. And he said that several times to you, right?

A. Yes.

Q. Because he did not want those tapes released?

A. Yes.

Q. OK. And you did not want them released either?

A. Yes.

Q. Do you remember several times on cross-examination we saw the exhibit where he wanted to cover up cameras at an Airbnb that you guys would go to, right?

A. Yes.

Q. And he didn't want anybody to see him because he wanted to be private, right?

A. Yes.

Q. And you wanted your sex life to be private as well?

A. Yes.

Q. And he didn't even want K.K. to know, right?

A. Yes.

Q. OK. And do you remember saying on redirect examination about how you called K.K. after he threatened to release the tapes and you were worried?

A. Yes.

Q. And K.K. assured you it wouldn't happen, right?

A. Yes.

P6cWcom6                              Jane - Recross

Q.  She said she would talk to him and she would make sure that those tapes were not released, right?

A.  Yes.

Q.  And they weren't, right?

A.  Right.

Q.  OK.  And after you spoke to K.K., you felt calm and comforted because he left you alone for a month, right?

A.  Yes.

Q.  He didn't reach out to you?

A.  No.

Q.  OK.  You talked about subtle cues on redirect examination. Do you remember that?

A.  Yes.

Q.  And you would say things like I'm hungry or things like that, right?

A.  Yes.

Q.  Do you remember that oftentimes you would get food and protein shakes after each round with the entertainers?

A.  That's not the type of reaction I wanted, but --

Q.  You would say you were hungry, right?

A.  That's an excuse to leave, but instead of actually saying let's go home, he would just order food.

Q.  OK.  So you would use an excuse, correct?

A.  Yes.

Q.  And your excuse would be I am hungry, right?

P6cWcom6                          Jane - Recross

A.   Yes.

Q.   And Mr. Combs would be on ecstasy?

A.   Yes.

Q.   And you would be on ecstasy?

A.   Yes.

Q.   And when you asked for food, he would get you food, right?

A.   He knows what I meant by that.  He knows --

Q.   You asked for food, correct?

A.   Yes.

Q.   And you got food, right?

A.   Yes.

Q.   And you're saying now he knows what you meant by that, right?

A.   He should have.

Q.   He should have known what you meant by that?

A.   Yes.

Q.   Did the entertainers think that you wanted to stop?

          MS. COMEY:  Objection, your Honor.

          THE COURT:  Rephrase.

BY MS. GERAGOS:

Q.   To your knowledge, do you think that the entertainers knew that you wanted to stop?

          MS. COMEY:  Objection, your Honor.

          THE COURT:  Sustained.

BY MS. GERAGOS:

P6cWcom6                         Jane - Recross

Q.   When you said I'm hungry, did the sex stop?

A.   Unfortunately, no.

Q.   OK.  It kept going?

A.   Yes.

Q.   And then you would put on a show, right?

A.   Yes.

Q.   And you would fake orgasms?

A.   Yes.

Q.   And to your understanding did the entertainers think that you were enjoying yourself?

A.   Yes.

Q.   OK.  Because you had spoken to Paul about that, right?

A.   About?

Q.   Enjoying yourself during these nights, right?

A.   Spoken to Paul --

Q.   Over the three years of knowing Paul, you had spoken to him about enjoying these nights, right?

A.   Yes.

Q.   OK.  And you had spoken to Kabrale over the three years of knowing Kabrale about enjoying these nights, right?

A.   Yes.

Q.   And you had told Kabrale we had crazy sex last night, right?

A.   Yes.

Q.   OK.  Do you remember talking on redirect examination about

P6cWcom6                          Jane - Recross

the sobriety party?

A.   Yes.

Q.   The sobriety party you did not do any drugs, right?

A.   No.

Q.   You were completely sober?

A.   I hated it.

Q.   You hated it, right?

A.   Yes.

Q.   And you were completely sober?

A.   Yes.

Q.   And you kept going with three men, right?

A.   Yes.

Q.   OK.  And then after the sobriety party, we looked at those messages -- I think we were just looking at them this morning -- where you were confiding in Mr. Combs, right?

A.   Yes.

Q.   And he brought you over to his house; he said I'm depressed too, we need to be together, right?

A.   He was causing my depression.

Q.   I'm asking what he said.  He said I'm depressed too, we need to be together, right?

A.   Yes.

Q.   And you wanted to be with him, right?

A.   Yes.

Q.   You went to his home and you spent the night there and were

P6cWcom6                        Jane - Recross

there for two days, right?

A.  Yes.

Q.  And then you saw him a week later, five days later for Halloween, right?

A.  Yes.

Q.  And then four days later, for his birthday, you got him a moving TV so that he could watch porn videos with you and these entertainers, right?

A.  So I could protect myself from not having sex with other men, yes.

Q.  To protect yourself from not having sex with other men and wanting to show him videos of you having sex with other entertainers, right?

        MS. COMEY:  Objection.

        THE COURT:  That's overruled.

A.  No.  I bought the TV so that that could be an option instead of me having to have sex with other men.

Q.  Because we went through this; over the three years of your relationship, there were several times where you did not have sex with other men and instead you watched the other videos, right?

A.  All of it was shit.

Q.  All of it was shit, but I'm asking you a question.

    Over those four years --

        THE COURT:  Hold on, Ms. Geragos.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

Jane, if you can, please just answer Ms. Geragos's question, and then we'll proceed from there.  OK?

THE WITNESS:  Thank you.

THE COURT:  Ms. Geragos.

MS. GERAGOS:  Thank you, your Honor.

Q.  Over those three years, there were several times where you did not have entertainers over and you did what you called movie night instead, right?

A.  Yes.

Q.  OK.  You would either watch porn or you would watch the videos that you recorded, right?

A.  Yes.

Q.  And you said you put on a performance and you put on a show, right?

A.  Yes.

Q.  Because in those videos you wanted to look like you were really enjoying yourself?

Is that what you wanted it to look like in the videos?

A.  Yes.

Q.  OK.  And then it did look like that in the videos, right, because then Mr. Combs and you would watch the videos, and it would really turn him on, right?

A.  Yes.

Q.  Do you remember Ms. Comey started her redirect by showing you an exhibit from June of 2022?

A.  Yes.

Q.  And it was an exhibit you had never seen before, but she showed it to you, right?

A.  Yes.

Q.  OK.  Throughout your preparation with the government, would you see several things you had never seen before?

A.  Yes.

Q.  OK.  What types of things would they show you that you had never seen before?

A.  My truth.

Q.  And you had never seen them before?

A.  No.

Q.  And that exhibit that we had seen was in June of 2022, is that right?

A.  Yes.

Q.  Do you remember yesterday on cross-examination we went through several times between April and June of 2022 that you had no hotel nights with Mr. Combs?

A.  I don't.

Q.  I'm asking a question.  Do you remember yesterday on cross-examination we went through several days where you had no hotel nights with Mr. Combs between April 2022 and June of 2022?

A.  Yes.

Q.  OK.  There were several times that you saw him between

P6cWcom6                         Jane - Recross

April 20 and July, actually, where you saw each other and there were no hotel nights, right?

A.   Thank God.

Q.   And there wasn't any, right?

A.   Right.

Q.   And now you're saying thank God, right?

A.   Yes.

Q.   Because you said yesterday on cross-examination that you remembered those times as times where he let you off the hook, right?

A.   Yes.

Q.   And you had no entertainment that night, right?

A.   Yes.

Q.   And there were several other times throughout April when you spent the night at his home and there were no entertainers, right?

A.   Right.

Q.   OK.  And you made a choice when you told him you didn't want to do it and you did not do it, right?

A.   Can you repeat that?

Q.   There were several times in this time period that Ms. Comey brought up on redirect examination where you did not want to do it and you did not do it, right?

A.   Can you break down that question for me again?

Q.   OK.  When you saw Mr. Combs on April 20 of 2022 and you

P6cWcom6                        Jane - Recross

spent the night at his home in Los Angeles, you did not have a entertainer, right?

A.  Right.

Q.  OK.  When you saw Mr. Combs the next day, you spent the night at his home on April 21 of 2022 in Los Angeles, you did not have an entertainer, right?

A.  Right.

Q.  OK.  When you saw him a week later, on April 28 of 2022, you did not want an entertainer and no one came over, right?

A.  Right.

Q.  When you saw him on April 30 of 2022, you spent the night at his home, you did not want an entertainer and you did not have one, right?

A.  Right.

Q.  OK.  And we just looked at an exhibit from June 19 of 2022, Ms. Comey brought it up for you, right?

A.  Yes.

Q.  And you had never seen it before, right?

A.  Yes.

Q.  And it said you have to convince her, right?

A.  Yes.

Q.  And nobody had convinced you, right; you did not have an entertainer on June 19 of 2022?

A.  You just went from April to June.

Q.  I just went from April to June.  That's right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6cWcom6                         Jane - Recross

A.  I don't know what happened in June.  I probably was
persuaded.

Q.  Do you remember testifying yesterday on cross-examination
that you were not persuaded on June 19 of 2022?

A.  I don't even know at this point.

Q.  Do you remember where Mr. Combs says -- you said --

        MS. GERAGOS:  If we can bring up the exhibit.

Q.  -- you planned something for me?  And you said:  I know
what you want, baby, but I'm not really in the mood for that
part; don't want to make you mad.  Do you remember seeing that?

A.  Yes.

Q.  You've seen it a couple times now?

A.  I remember seeing what he says to Paul.

Q.  And you saw what he said to Paul, right; and that made you
upset?

A.  Wouldn't that make you upset?

Q.  I'm asking if it made you upset.

A.  Of course.

Q.  And he replied to you:  All good.  Right?

A.  Yes.

Q.  And you testified yesterday that he let you off the hook
that night, right?

A.  I don't know.

Q.  You don't remember testifying to that yesterday?

A.  After seeing Paul's message and Sean's message, I probably

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

was persuaded to have a hotel night.

Q.   Now you're changing your testimony and saying that you ended up having a hotel night that night?

A.   I don't know.  I guess so.

Q.   OK.  You did not have a hotel night again until July.  Does that sound right?

A.   Yes.

            (Continued on next page)

P6CQcom7                          Jane - Recross

BY MS. GERAGOS:

Q.  Do you remember Ms. Comey asking you about your dress line that you launched during your relationship?

A.  Yes.

Q.  You got a $20,000 investment in that clothing line during your relationship, right?

A.  Yes.

Q.  You got to start your own business?

A.  Yes.

Q.  And be entrepreneurial, right?

A.  Yes.

Q.  Now, Ms. Comey asked you about several instances that you did not want to engage in between those three and a half years. We went over several text messages yesterday and today where Mr. Combs told you that if you guys did not -- if you did not want to do, this you guys could just break up, right?

A.  Just because he said that, that's not what he meant.

Q.  Well, there were times that you said you didn't want to do it, right?  We went over October 2023 messages?

A.  Yes.

Q.  You say you didn't want to do it?

A.  Yes.

Q.  And then Cassie's lawsuit came out?

A.  Yes.

Q.  And that was in November?

P6CQcom7                         Jane - Redirect

A.   Yes.

Q.   And you just broke up, right?

A.   Yes.

Q.   For three months, right?

A.   Yes.

Q.   And your rent was paid?

A.   Yes.

Q.   And he said -- that's what he said several times over several messages over those years, you could just break up, right?

          MS. COMEY:  Objection, your Honor.

          THE COURT:  Overruled.

A.   Yes.

Q.   You didn't want that because you loved him, right?

A.   Yes.

          MS. GERAGOS:  One moment, your Honor.

          THE COURT:  Okay.

          MS. GERAGOS:  No further questions.

          MS. COMEY:  Two questions, your Honor.

REDIRECT EXAMINATION

BY MS. COMEY:

Q.   Jane, who told you to get in your car and let Antoine into your neighborhood?

A.   Sean.

Q.   What had he done to you shortly before he told you to do

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

P6CQcom7

that?

MS. GERAGOS:  Objection.

THE COURT:  Can we be a little more clear about what you're asking about?

Q.  What, if any, violence had he done to you shortly before he told you to do that?

MS. GERAGOS:  Objection.

THE COURT:  Overruled.

A.  He slapped me and he punched me.

MS. COMEY:  No further questions.

THE COURT:  Thank you very much, Jane.  You're done.

(Witness excused)

THE COURT:  Ms. Comey, I understand that the government's next witness will be presented tomorrow morning, is that correct?

MS. COMEY:  That's right, your Honor.

THE COURT:  Members of the jury, we are done for the day.  Thank you for your patience and for your close attention today.

As always, don't speak to each other about the case.  Don't talk to anyone else about the case.  Do not look up anything about the case or investigate the case in any way.

With that, we will see you here tomorrow to start at 9:00 a.m.

All rise for the jury.

(Jury not present)

THE COURT:  Ms. Comey, you have previously reminded me of this on several occasions, but who are our next witnesses.

MS. COMEY:  It's Ms. Slavik.  Your Honor, the next witness will be special agent Andre LaMon.  I think I'm saying that correctly.  And the following witness will be Ananya Sankar -- I forgot a witness.  The first witness will be Jonathan Perez tomorrow, followed by Special Agent LaMon, followed by -- your Honor, I'm very, very sorry.  It's been a long day.  The next witness will be Special Agent LaMon.  The following witness will be Jonathan Perez.  And then Ananya Shankar.

THE COURT:  That should take us through the end of the day.

MS. SLAVIK:  That should take us through the end of the day.

The thing I wanted to flag for the Court that maybe I didn't make totally clear, if during one of the breaks for Ananya Shankar, one of the summary witnesses, the reason we need rulings on different exhibits is because we're using the exhibits to make the summary chart, and we won't be able to finalize the summary chart until we have rulings on those exhibits.

So whether we take it up this afternoon or whether we take it up tomorrow is up to the Court, of course, but we won't

be able to put Ms. Sankar on until the summary chart is finalized. That's the point I was trying to make to the Court.

THE COURT: So I have a letter from the government that was submitted yesterday or today, actually dated today. I think it was submitted in the wee hours of the day. And I do not have a written response from the defense.

Is the defense prepared to address the exhibit objections that have been raised? I would think so given that they raised the objections in the first instance, but I'll hear from the defense and I'm prepared to pick these up right now.

MS. GERAGOS: We're talking about the exhibits to the summary charts, right?

THE COURT: No. So I received a letter. What I understand the sequence of events is, there's a letter that has seven exhibits that have been identified that the defense either previously objected to and the objection was sustained, or now objects to. The government has identified five of those, which largely it says are admissible under 801(d)(2)(D), among other exceptions. I don't have the defense's response to those objections. Then there is a discussion of GX-A-629-A, which the Court previously ruled was not admissible, and the government re-urges the admissibility of that particular exhibit.

MS. GERAGOS: So on those -- Mr. Driscoll's handling those. I will sit down now.

P6CQcom7

THE COURT:  So, Mr. Driscoll, as to these five exhibits that --

MR. DRISCOLL:  In the letter chart?

THE COURT:  Yes.

MR. DRISCOLL:  Those ones?  Yes.

Our position is that the government hasn't met the foundation requirements for the hearsay exception cited.  And if I could just point the Court -- well, how would your Honor like to do this?  We could take each exhibit or each exception in turn.

THE COURT:  Well, it's the government's burden to establish the admissibility of these exhibits.  So let me hear -- let's go exhibit by exhibit if we need to.  Maybe as a general matter, Ms. Slavik, you can address how these are admissible by reference to the people and prior testimony that were laid --

MS. SLAVIK:  Exactly, your Honor.  I think there are multiple bases for admission here, but just sort of as an overall organizing principle, all of these messages are exchanged between employees and/or agents of the defendant, and in some cases involving the defendant.

There's been plenty of testimony on the record to support the application of this exception with respect to each of the messages, and indeed the content of the messages discuss matters very much within the scope of each employee's or

P6CQcom7

agent's employment.

THE COURT:  Why don't we start with GX-A-417.

MS. SLAVIK:  Sure.

THE COURT:  Put it up on the screen, please.

MR. DRISCOLL:  Judge, before we go through them, I should clarify that we also have 403 objections to certain of these, and this is one of the ones that we have 403 objections to.

MS. SLAVIK:  Your Honor, this is a chat between the defendant, KK, Faheem and Robin.  There has been testimony from various witnesses that Robin is the defendant's accountant.  KK has come up multiple times.

THE COURT:  Is this just two pages?

MS. SLAVIK:  No.  I'm sorry, this is a longer exhibit. I can give your Honor a paper copy if that would be helpful.

THE COURT:  Is there a particular portion of this exhibit that is --

MS. SLAVIK:  Your Honor, I think the entire thing is admissible.  It's essentially a group chat -- I'm sorry.  The government would propose redacting, I believe, the first page which discusses purchase of a Maybach truck.

But with respect to the remaining messages, these are all messages between the parties about securing cash for the defendant.  This appears to be the process by which the defendant gets cash in that KK or Faheem states in the group

P6CQcom7

text, you know, Mr. Combs needs 50K.  Mr. Combs then has to respond approved, and then Robin sets in motion whatever banking procedures are needed to actually get and deliver the cash.

THE COURT:  Hold on for one second.

So if people want to leave, they need to leave before we start any session.  And if you're sitting here now, then you should remain until we are done.  Thank you.

Ms. Slavik.

MS. SLAVIK:  In essence, your Honor, all of these messages relate to the defendant's employees getting cash for the defendant at the request of the defendant.

THE COURT:  I'll take that paper copy.  I think that will be easier.

MS. SLAVIK:  I will note, your Honor, the chat spans, I think, a couple of years.  But I will note that for several of the transactions in which an employee requests cash on behalf of the defendant, the date that that cash is requested is a date on which there is a hotel night that Jane either testified about or that there will be evidence of when the summary witness testifies.

THE COURT:  So I take it that this goes to the means and methods of the alleged enterprise?

MS. SLAVIK:  Precisely, and the way the conduct is facilitated, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom7

MR. DRISCOLL:  Your Honor, this exhibit spans from June of 2021 to August of 2023.  It's 49 pages long, and we asked the government which particular messages they think are related to the alleged conspiracy or could be relevant to the alleged conduct here.  They didn't get back to us on that, and it's just impossible to tell from this three-year long chain why, you know, various approvals to obtain cash or to make certain wire transactions could pass 403.  It's sprawling.

I hear the government with respect to the agency exception to the hearsay rule because Robin is the defendant's accountant, but with respect to the messages in total, I mean, the 49 pages is just -- there's no way this could come in like this.

MS. SLAVIK:  Your Honor, the government respectfully disagrees.  This entire chain is well within the timeframe of the conspiracy.

MR. DRISCOLL:  I understand that, your Honor, but with respect to the particular wire approvals or cash approvals, without a proffer of relevance as to those particular approvals, it's --

THE COURT:  Let me put it this way, Mr. Driscoll.  You don't have an argument as to prejudice with respect to this exhibit.  Your argument is that it lacks sufficient probative value in general.  There may be certain aspects of this exhibit that are probative -- relevant and probative, but as a general

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom7

matter, the 49 pages lack sufficient probative value.  However, you're not arguing that there's something in these 49 pages of text that is prejudicial.

MR. DRISCOLL:  No, I think that's not our argument. Our argument is the message chain in its entirety is prejudicial because the jury is going to draw an inference against the defense when there's been no foundation laid as to what these particular transactions are even about.

THE COURT:  What inference would they draw from a --

MR. DRISCOLL:  That somehow large amounts of cash or large transactions in this context suggest some type of guilt.

THE COURT:  That's not the reason why the government is introducing this, right?

MS. SLAVIK:  Your Honor, the government is introducing this -- there's been testimony that employees of the defendant deliver cash to the defendant at hotel rooms, both to pay commercial sex workers, to pay for drugs, things like that. This document shows that the cash is being requested by the defendant and being gathered and provided to the defendant by his employees and co-conspirators.

Like I said --

THE COURT:  Can you cut down this exhibit so that it achieves that purpose without being 49 pages worth of text messages, some of which appear to be for non-illicit purposes, such as the text message on April 23, 2023 on spending money on

P6CQcom7

flowers or --

MS. SLAVIK:  Your Honor, flower refers to marijuana.

MR. DRISCOLL:  That testimony has not been elicited. We haven't heard that, for example.

MS. SLAVIK:  Your Honor, within -- I believe I'm looking at this, excuse me, the text message that you are referring to.  $1200 spent on flower today.  Witnesses will testify that that refers to marijuana.  $1500 owed to Guido for miscellaneous.  We've heard testimony that Guido is a drug dealer used by the defendant.

THE COURT:  I stand doubly corrected.

As to the other messages, is the government's submission that all of these text messages relate in some way, shape, or form to what has been alleged in this case; meaning, Mr. Driscoll suggests that there's 49 pages here, and this all can't be conduct that is related to this case, and you're saying that's just not right.

MS. SLAVIK:  Your Honor, I don't think it's necessarily conduct tied specifically to hotel nights, although, as I mentioned, there are certainly transactions that take place when a hotel night is taking place.  But I think the larger point, your Honor, is the one that you made, which is that this communication relates to the means and methods of the conspiracy.

49 pages, you know, I believe that there have been

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom7

many chats that have far exceeded 49 pages that are in evidence. I don't think the length alone should suggest any sort of relevance or lack of probative value.

THE COURT: And who is going to explain what flower is and who Guido is, and things of that nature?

MS. SLAVIK: Your Honor, Jane has already testified as to who Guido is, and we believe that two witnesses who have yet to be called will testify that flower refers to marijuana.

THE COURT: So the objection to GX-A-417 is overruled.

A-518.

MS. SLAVIK: 518 is kind of a much shorter version of the same type of idea. This is a communication between D-Roc, who is a former security personnel for the defendant, Faheem, and the defendant. They're discussing cash in the safe. The defendant is instructing Faheem to count over a million dollars in cash by hand. And Faheem is explaining what he did. This is kind of the same type of idea. This is about the defendant's access to the cash that is used to facilitate his criminal conduct and his co-conspirators' awareness of that cash and their role in securing that cash.

THE COURT: All right. Mr. Driscoll, what's the prejudice? Let's start there arising from this exhibit.

MR. DRISCOLL: Can I start with the limited probative value, your Honor? Because here the only discussion is about counting money in a safe and what the total amount is. It's

P6CQcom7

not clear at all what that proves or why it's material to this case. I understand that perhaps the security guards are involved in the money-handling process, but the government doesn't need this exhibit to prove that. They've already demonstrated that. So its probative value is incredibly low.

On the other hand, there is high unfair prejudice for the reasons I stated earlier. The exhibit talks about a million dollars of cash in the safe, $1,137,000 in the safe. The jury is going to draw a negative inference against the defense just because of the sheer volume of cash that's identified as being in Mr. Combs possession

MS. SLAVIK: Your Honor, there's been testimony from Derek Ferguson that the defendant's companies drew in tens of millions of dollars per year. I don't think that's a fair inference to argue.

THE COURT: Right. But there's a different inference that might be drawn from a text message with no context and no further discussion that indicates that the defendant had safe cash of over a million dollars, right?

MS. SLAVIK: I'm not sure I agree. There's been plenty of testimony on the record that the defendant keeps money in safes. This text message conclusively establishes who controlled that money.

THE COURT: The objection to 518 is sustained.

Let's go H-101-A

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom7

MS. SLAVIK:  H-101-A is a text message communication between D-Roc and Cassie Ventura.  In this exchange, which takes place in January of 2017, Cassie is telling D-Roc that her bathroom door is broken down.  This appears to be in reference to a fight with the defendant.  She says, "He has my key, so I'm leaving.  I do not feel safe."

I apologize, this is another multipage exhibit.  I have kind of a marked-up copy, but if your Honor would like the paper copy, that's fine.

THE COURT:  No.  How many pages is it?

MR. DRISCOLL:  11.

THE COURT:  I can read those here, so can we go to the next page?  Can you go to 28.  Next page.  Next page.  Next page.  Next page.  Next page.  Next page.  Is that the end?

MS. SLAVIK:  Yes.

THE COURT:  All right.  Understood.  So this is -- the basis for admissibility is 801(d)(2)(D) or (d)(2)(E).

MS. SLAVIK:  I think there are multiple bases in addition to that, but you're right, this conversation takes place in that context.

THE COURT:  So D-Roc's statements would come in under those exceptions and then Ms. Ventura's statements come in as providing context for the statements that D-Roc then makes.

MS. SLAVIK:  Exactly, your Honor.  I think they provide context, I think they provide present sense impression,

P6CQcom7

statements of future intent, state of mind, et cetera et cetera.

MR. DRISCOLL:  Your Honor, I disagree with the idea that Ms. Ventura's statements can come in just for context. The government is surely going to use this exhibit to highlight Ms. Ventura's statements, not D-Roc's statements.

THE COURT:  What about the several exceptions, other exceptions that Ms. Slavik just identified?  So let's start with present sense impression.  Why wouldn't that apply?

MR. DRISCOLL:  Well, you can tell from the context of this exhibit that Ms. Ventura is traveling.  Here, just starting with the first message:  My bathroom door is broken down.  We don't have a foundation that she is observing that or -- basically, it doesn't meet the contemporaneous requirement of the rule.  This is all looking backward at events.  They want these messages to prove that these events actually occurred, so for that reason it doesn't satisfy that.

MS. SLAVIK:  Your Honor the statements from Ms. Ventura "He has my keys, so I'm leaving.  I do not feel safe.  I don't feel safe.  He has my keys.  Puff has my house keys.  Please take his keys."  I think this very much describes something that is taking place and her reaction to it.  So.

MR. DRISCOLL:  She is not with Mr. Combs, so stating those things as a matter of fact, they're not present sense impressions.

THE COURT:  Well, so first of all, we covered this before, but 803 applies to situations where statements are being brought in for the truth of the matter.  They just happen to fall into one of the exceptions, and so they're admissible.  So 803(1) says that one of these exceptions would cover a statement are describing or explaining an event made while or immediately after the declarant perceived it.

And so I take it -- I've reviewed the exhibit and Ms. Ventura is describing what she perceived in terms of the event, and so the fact that Mr. Combs had her keys would be based on her perception of the event that is being described that immediately preceded the text chain.  And so for that reason Ms. Ventura's statements would be admissible under Section 803(1).

Then you turn to D-Roc's statements, and those would be admissible either under 802 -- 801, excuse me, (d)(1) -- (d)(2)(D) or (E).  Let's shift there for a second.  Do you agree those would be admissible -- that D-Roc's statements would be admissible under one of those two exceptions given the nature of the communication and given the prior testimony that has been offered concerning D-Roc's relationship and his role working for Mr. Combs?

MR. DRISCOLL:  Certainly not the co-conspirator exception.  Perhaps the agency exception, but not with respect to all of these messages.

P6CQcom7

He is coming to the house.  He just text me.

Someone was following you home?  You safe?

These are not on matters related to his employment. They're just random statements.

THE COURT:  Well, I believe that sufficient testimony has been introduced that during the time period of Ms. Ventura's relationship with Mr. Combs, D-Roc was a trusted adviser and worked his security detail, and so functioned to provide security to both Ms. Ventura and Mr. Combs and would oversee issues that arose of this nature, whether they are criminal in nature and would fall into the Subsection E exception, that was -- I think there's been sufficient evidence that's been put into cross the Rule 104 bar to establish the admissibility of D-Roc's statements under the exception in 801(d)(2)(D) at the very least.

And for the reasons I previously stated, the exception for present sense impression would cover the communications from Ms. Ventura.  So the objection to GX-H-101-A s overruled.

Let's go to GX J 308.

MS. SLAVIK:  J-308, your Honor, is a text message exchange between Faheem, a member of the defendant's security personnel, and Guido.  This is a conversation about Faheem engaging in drug transactions for the defendant, and so that certainly falls within the scope of Faheems's employment based on the testimony that's been elicited so far and for that

P6CQcom7

reason the --

THE COURT:  How many pages is this?

MS. SLAVIK:  Seven.

THE COURT:  Can you just take me through the pages briefly.  I have the first page.  All right.  Can you go to the next page.  Go to the next page.  Go to the next page.  Go to the next page.  Go to the next page.  All right.

So let me ask, Mr. Driscoll, how would this not fall into one of the exceptions that have been identified so again 801(d)(2)(D) or (d)(2)(E)?

MR. DRISCOLL:  So with respect to 801(d)(2)(D), we haven't heard testimony that the scope of Faheem's job required him to engage in these types of transactions.  No context has been provided for this chat message chain.  We've heard limited testimony about someone named Guido, but we don't know the person in this exhibit is actually that individual.

I understand the exhibit says, "Yo, it's Guido," but that's the only foundation that's been proffered.  It doesn't mention anything about drugs.  It just mentions outstanding balances.

So for those reasons, I don't think it satisfies the exceptions that the government has cited, and also we have a 403 objection to this given its limited probative value.

THE COURT:  Understood.  And I think the outstanding issue is has enough of a foundation been laid as to

Mr. Muhammad to establish that this type of transaction would be within the scope of relationship, agency relationship with the defendant.

MS. SLAVIK:  Certainly, your Honor.  Jane testified, I believe in direct, that Faheem dropped off drugs to Jane and defendant at hotel rooms.  Jane also testified that Faheem dropped off cash.  And Jane testified that Guido supplied drugs to the defendant.

MR. DRISCOLL:  Your Honor, there's a difference between just dropping drugs off and going to purchase them from a drug dealer.

THE COURT:  Well, I think that on a Rule 104 basis, so the question is, is there a preponderance of the available information that would permit a reasonable juror to connect the dots that Mr. Muhammad, as one of Mr. Combs' agent who Jane testified would drop off drugs and cash or on Mr. Combs' behalf, that he also engaged on the other side of those transactions to acquire drugs from an individual who has also been identified by Jane to be the source of drugs that Mr. Combs used.  I think given all of that information, there is more than a sufficient basis under Rule 1048 to establish the predicate for 801(d)(2)(D).

As to the probative value of the drug transaction, Ms. Slavik, I take it that this, again, goes to the drug-related racketeering acts that are alleged in the

P6CQcom7

indictment as under the RICO charge?

MS. SLAVIK:  That's exactly right, your Honor.

THE COURT:  On that basis, I will overrule the objection to J-308.

That leaves is with GX-J-141.

MS. SLAVIK:  This is from the notes application from Faheem's phone.  It's kind of similar in kind to the group text message about money, but this document or these documents, I guess, they're separate notes, they appear to be like a ledger that Faheem kept that tracked incoming cash and outgoing cash.

In several situations in several notes, the outgoing cash relates to drug -- payments for drugs, and payments for hotel nights, things like that.  But the broader point, I think, your Honor, is that this shows that Faheem really was like the, you know, the CFO of sorts with respect to Mr. Combs' cash.

MR. DRISCOLL:  Your Honor, the Court can't admit this exhibit merely based on its own contents.  It is a highly suspect document.  We've heard no foundation from any witness about what this document is.  So to rely on this document alone in satisfying the exception to the hearsay rules would be improper.

And that's all the government has offered.  We don't know what this is.  I agree with the government, it appears to be a ledger, but we don't know that it is.  We don't know when

P6CQcom7

these transactions occurred or even if they occurred.

THE COURT:  Can I see some other pages here?

MS. SLAVIK:  I apologize, your Honor.  This is another long one.  If you'd like to see a hard copy, I can pass it up.

MR. DRISCOLL:  And, furthermore, this is another example where we would have 403 objections to just admitting this in full without a proffer of relevance as to each transaction in this document, if they are indeed transactions.

THE COURT:  Ms. Slavik, at least some of these entries have nothing to do with the alleged RICO enterprise, right?

MS. SLAVIK:  Yes, your Honor, that's true.  They're all cash transactions, and what we've heard from witness testimony so far is that Faheem was the head of security for the defendant at one point; that security handled the defendant's cash.  And that the defendant used cash to pay for things like not only like drugs and hotel nights but also gave cash to romantic partners, and assistants were reimbursed with cash for purchasing personal items for the defendant.

So I think, yes, there certainly are more transactions than necessarily relate to the criminal activity alleged in this case, but I don't think that suggests that this should be inadmissible.

MR. DRISCOLL:  Judge, the reality is we have no idea what these notes refer to.  The government just said they are all cash transactions.  We don't know that because no

foundation has been laid as to what they describe or what they are. So on that basis to just --

THE COURT: Meaning, that what you're saying is that in contrast, you know, you obviously disagree with some of the rulings that I've made, but you would say in contrast to the chats, where it would be at least clear who the people were, it's a communication among these people. Here, we just have a document that appears to be a set of notes, but we don't have anyone to explain exactly what they are, and so they're just being put in based on what I guess someone might infer by just looking at the notes, and that raises its own set of issues.

MR. DRISCOLL: That's right. In the previous exhibit, there were statements, for example, from Mr. Combs approving certain transactions. These are not hearsay that can be established for the rest of the exhibit to come in. But here, again, we just have no idea what these are, and there's when no testimony about it. And if the government wanted to call the person who created these notes, they could, and they've chosen not to. So here they would just unfairly prejudice the defense to blindly admit this. So the government could make whatever speculative arguments they think these notes reflect with no basis to do so.

THE COURT: The objection to GX-J-141 is sustained. I'll entertain -- if there's further foundation laid through a witness or there is a redacted version of this report that

perhaps the parties can agree to, then I'll certainly entertain a request along those lines at the appropriate time, but right now the objection is sustained.

That leaves GX-A-629-A, part two.

MS. SLAVIK:  Yes.  Another bite at the apple, your Honor.  I think at this point there's been additional testimony.  I think the foundation that your Honor thought was lacking a couple of weeks ago I think has now been laid.

I think your Honor is familiar with the exhibit. Maybe we can pull up A-629-A.  But essentially this is a message from Uncle Paulie, the former head of the defendant's security detail in October of 2015, in which Uncle Paulie recounts an incident that took place the previous night between the defendant and Gina, and warns the defendant that "If anyone called the police, the police is a hundred percent going to lock you.  Even if she begs them not to, it's the law. So once they put the cuffs on you, your life and career is over.  Puff, really all over her.  Puff, really your family is going to go down the hill"  Excuse me.  It goes on.

And Uncle Paulie then notes that "newspapers and magazines will be paying her top dollar to tell everything," and that if the defendant was locked up, none of his co-conspirators essentially would be able to talk to Gina and get the defendant out of the situation because she would go into hiding.

The probative value of this message is extremely significant, particularly because this message which the defendant responds to by saying: "Thanks. I feel you." This message was sent by Uncle Paulie to the defendant about six months before the incident at the Intercontinental, and essentially the defendant's defense to the bribery that's alleged in connection with the Intercontinental incident is that the defendant had -- he was motivated to bribe the security officers solely due to his interest in preventing bad publicity. This message conclusively establishes that he knew or should have known that physical violence with romantic partners could result in law enforcement action and potentially severe consequences with respect to law enforcement.

THE COURT: All right. What's the response.

MR. DRISCOLL: Yes. So first, your Honor, I think the government's argument now was a 404(b) argument, and we didn't receive any notice that they intended to rely on this particular episode or this particular message to prove either intent or motive or plan between Uncle Paulie and the defendant. So it should be excluded on that ground alone.

And I'll just go back to the foundational point. The reason that the Court excluded this to begin with there was no foundation to tie what's communicated in this message to any actual event that took place. The government tried to elicit that foundation through, I believe it was, George Kaplan. He

said the event did not take place at the time of this message. That contradicts the foundation that the government is now trying to lay.

So we don't think there has been a foundation for relevance. It's not admissible for 404(b) evidence, and it should separately be precluded under Rule 403. This message concerns somebody who is not an alleged victim in this case. The government does not plan to call her, and basically the government just wants another bite at the apple to show that the defendant is purportedly a bad or violent person, and that's how they're going to use this.

THE COURT: And amplifying the potential prejudice, we actually have no idea what happened.

MR. DRISCOLL: Correct. The government said earlier that what occurred vis-a-vis this message is what George Kaplan observed, but it was clear from his testimony that was not the case.

MS. SLAVIK: No, your Honor. To be clear, I think what we have in the record right now is that Gina was a romantic partner of the defendant. The defense has emphasized that point repeatedly throughout multiple witnesses. Gina, though she will not be testifying, is a main character in this trial. George Kaplan testified that he observed a specific incident of violence related to Gina. And I am not suggesting that that act of violence relates to the incident that George

P6CQcom7

Kaplan recounted.

In fact, I think the evidence in the documents suggest that it's completely different incident.  The travel records that are referenced by exhibit number in the government's letter indicate that the defendant paid for Gina to fly to Atlanta on the 8th of October 2015, and that the defendant and Uncle Paulie then traveled from Atlanta elsewhere on the 10th of October.  So we know that the defendant, Uncle Paulie, and Gina were all together in Atlanta on this date.  We know that there was violence against Gina, and we know that Gina was in a long-term relationship with the defendant, that I think most witnesses have testified was extremely toxic.

This is not 404(b) evidence, your Honor.  This exhibit would be used to show membership in the conspiracy, knowledge of co-conspirators, knowledge of the defendant, completely proper purposes; not 404(b).

THE COURT:  Well, it is 404(b).  It's just 404(b)(2), right, meaning you're saying it's admissible for a valid purpose under Rule 404(b), but don't you still have to comply with 404(b)(3), and Mr. Driscoll says that prior to you just saying that it was admissible under --

MS. SLAVIK:  Your Honor, I think the important thing with respect to this text message is to show its effect on the defendant.  Its effect on the defendant unequivocally gives him notice that these situations that he has with romantic partners

P6CQcom7

can prompt law enforcement attention.  That is completely contradictory to the argument that the defense is advancing with respect to the bribery in the Intercontinental Hotel incident, and the fact that this communication takes place immediately prior to the Intercontinental Hotel incident I think is are extremely probative.

THE COURT:  That's fair, but I don't think I heard an answer.  I mean, this is not part of the actual charged conduct that's at issue in this case.  You're bringing it in for a purpose which is to show the various things you've identified.  That's all well and good, but Mr. Driscoll says in addition to all the issues we've now addressed over the course of two hearings, there was no compliance with 404(b)(3), and this is the first time literally about ten minutes ago that this rule has been invoked as a basis for admissibility of this evidence so ...

MS. SLAVIK:  Your Honor, to be clear, Gina is identified in the indictment as victim 2 -- excuse me -- victim 3, and incidents of violence were laid out in the enterprise letter.  The defense has been on notice of Gina and the violent acts against Gina for quite some time.

THE COURT:  All right.  Understood.  So I'm going to reserve decision on this exhibit because I need to look at what the government has indicated in its letter and consider Mr. Driscoll's arguments.  I also want to take a look back at

P6CQcom7

the last time we addressed this exhibit, which was awhile ago, and I'll take a look at the transcript.

So I've hopefully simplified things with respect to the summary exhibit. I take it the only thing is you might want to have two versions of the summary exhibit

MS. SLAVIK: Your Honor, I apologize --

THE COURT: I was still talking, so we got to do it sequentially. It's getting late. It's late and it's been a long day. So if you have two versions of it, we can deal with that in the morning, and then you can proceed with the witness with this one outstanding issue. So now we've eliminated except this one thing because I want to take a closer look and consider your arguments here.

MS. SLAVIK: Your Honor, with apologies, the exhibits we just addressed are actually not part of the summary chart.

THE COURT: We still need to go there?

MS. SLAVIK: We still need to go there.

MR. DRISCOLL: Can I be heard for ten seconds on this last exhibit?

THE COURT: If there's anything that you want to say, because we need to now move on. The parties know where to find us, not to keep you up until 3:00 a.m. but everyone seems to be used to it at this point.

MR. AGNIFILO: Your Honor, I apologize.

Could we have a quick bathroom break?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT:  To be honest -- yes, if someone is not addressing an issue, and you want to take a break, you should do so.  There you go.  Okay.

MS. SLAVIK:  Your Honor, one possible solution.  I know it's been a long day.  Ms. Sankar to whom these issues relate, she would be our third witness tomorrow.  One possibility that the Court could consider is to take up these evidentiary issues after the second witness tomorrow, such that Ms. Sankar would be ready to testify first thing Monday morning.

THE COURT:  Well, what are the issues?

MS. FOSTER:  I think in favor of potentially differing is the fact that my understanding is there's dozens of objections that the defense has to exhibits cited in the summary charts.  This was -- we were notified of this yesterday, and we submitted a letter a very early hour of the morning which outlined sort of generally what the documents are that are disputed and the bases.  My understanding is basically virtually all of the objections are on hearsay grounds, and I think that the key dispute is over the scope of the agency exception.

In the government's view, every single one of these chats is -- every single one of the chats cited in the summary judgment chart involves Kristina Khorram.  As your Honor heard, her duties as Mr. Combs' chief of staff were extremely broad.

P6CQcom7

They involved setting up hotel nights, purchasing facilitating the transportation of narcotics, various items such as that, and all of these chats are between -- virtually all of these chats are between Ms. Khorram and another employee of Mr. Combs, such as a personal assistant and/or security, Ms. Khorram and the defendant himself or Ms. Khorram and one of either Ms. Ventura or Jane.

THE COURT:  So what we'll do is I'll take a look at the letter.  Has the defense had an opportunity to provide a written response to this letter?

MR. DRISCOLL:  No, we haven't.  This was filed at 2:00 a.m.

THE COURT:  You weren't up at 2:00 a.m.?

MR. DRISCOLL:  I wasn't.

THE COURT:  So I'll give the defense a chance to respond.  I'll try to get through as much as I can at the beginning of the day tomorrow.  If we are unable to do that, then we'll pick it up during the day.  And I think the suggestion was that Mr. Sankar could testify on Monday.

MS. FOSTER:  That would be great because whatever happens, we have to then make edits to the summary charts, show them to Ms. Sankar, and so actually the weekend would be perfect for being able to do all of that.

THE COURT:  Let's handle it that way.  That way we'll have a full record, and we can do this without having to sit

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6CQcom7

here until 10:00 p.m. today with no written record.

Anything further from the government?

MS. SLAVIK:  No, your Honor.

THE COURT:  Anything further from the defense?

MS. SHAPIRO:  At the risk of annoying the Court, one quick request.  I know your Honor asked to us submit our response to the juror by 7:00 p.m.  I have done a substantial amount of work on the letter, and I might get it in by 7:00, but if I -- I just need a little leeway in case it's not ready.

THE COURT:  That's fine.

MS. SHAPIRO:  By 8:30 or so.

THE COURT:  That's fine.

Anything further from the defense.

MR. AGNIFILO:  No.  Thank you.

THE COURT:  Tomorrow we'll be here to start at 8:30. I have a short matter that I have to attend to at 8:00.  It might be just a little after 8:30.  I want to give you a heads up.  If I'm not here at 8:30, I'll have my staff come down and inform you so you're not sitting and waiting so you can continue working.

Everyone have a great night.

(Adjourned to June 13, 2025, at 8:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                          Page

JANE

Cross By Ms. Geragos . . . . . . . . . . . . . .5735

Redirect By Ms. Comey . . . . . . . . . . . . .5903

Recross By Ms. Geragos . . . . . . . . . . . .5938

Redirect By Ms. Comey . . . . . . . . . . . . .5965

GOVERNMENT EXHIBITS

Exhibit No.                                          Received

E-260-1-M   . . . . . . . . . . . . . . . . . .5798

DEFENDANT EXHIBITS

Exhibit No.                                          Received

3226   . . . . . . . . . . . . . . . . . . . .5742

3226-C-R   . . . . . . . . . . . . . . . . .5748

3311, under seal,   . . . . . . . . . . . . .5861

3306   . . . . . . . . . . . . . . . . . . .5880