P6dWcom1- Corrected

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
UNITED STATES OF AMERICA,

            v.                    24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

            Defendant.          Trial
-------------------------------x

                          New York, N.Y.
                          June 13, 2025
                          8:30 a.m.
Before:

             HON. ARUN SUBRAMANIAN,

                          District Judge
                          -and a Jury-

                  APPEARANCES

JAY CLAYTON
    Interim United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
    EMILY A. JOHNSON
    MAURENE R. COMEY
    MEREDITH FOSTER
    MITZI STEINER
    MARY C. SLAVIK
    Assistant United States Attorneys

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6dWcom1- Corrected

APPEARANCES CONTINUED


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:   MARC A. AGNIFILO
      TENY R. GERAGOS
      -and-
HARRIS TRZASKOMA LLP
BY:   ANNA M. ESTEVAO
      -and-
SHAPIRO ARATO BACH LLP
BY:   ALEXANDRA A.E. SHAPIRO
      JASON A. DRISCOLL
      -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:   Lucy Gavin
                Shannon Becker
                Paralegal Specialists

                Raymond McLeod, Paralegal

P6dWcom1- Corrected

(Trial resumed)

THE COURT:  Good morning, everyone.

Please be seated.

Let me ask the government, in terms of the exhibit objections, if Ms. Sankar is testifying on Monday, does it make the most sense to run through those after the jury has gone home?

The reason why I say that is because there's a number of exhibit objections, and while the defense kind of puts a category around a bunch of hearsay objections and says, well, given your Honor's view of this rule, we preserve our objection, but we're not going to address any specific one, that's not how you preserve an objection.  If you have an objection, then raise it as to the exhibits.  I'm happy to walk through all of them, but given that that might take some time, it seems like we might do that at the end of the day as opposed to the beginning of the day, but I wanted to make sure that that did not impair the presentation of any witness.

MS. FOSTER:  That's fine, from the government's point of view.

THE COURT:  All right.

The one issue that was raised with respect to Special Agent LaMon had to do with a certain line of cross-examination, right?

MS. FOSTER:  That's correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6dWcom1- Corrected

THE COURT:  Let me hear from the defense as to the basis and the relevance of the line of testimony that that was indicated in the government's letter, which is the nature of the search as opposed to what the fruits of the search were.

MR. AGNIFILO:  Thank you.

I think what's important, I'm imagining that the government is going to say something along the lines of that the house was cleared and made safe for the search, and that happens a certain way.  And we have to be, I think, full and complete and accurate about the way it happens.  I don't intend to say that anyone did anything wrong.  I don't intend to say that anyone did anything illegal.  I don't intend to use words like "unnecessary force," or things like that.

It's a brief factual series of questions, and the questions that I think are appropriate questions is that when they got there, they knew Mr. Combs was not there.  They found that two of his sons were there, and they had long guns pointed at the sons, and they brought the sons, with long guns pointed at them, to a place where they were out of the way of the search.

It's also, I think, very relevant that they were handcuffed and that other people were handcuffed.  And the reason that's important is because if it turns out that the search -- there were certain things in the search that were hastily done or not properly documented, the searching agents

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6dWcom1- Corrected

had all the time in the world to do whatever search they wanted to do, because the inhabitants of the house were either removed from the house at gunpoint or were handcuffed.  And so I think that is important.

It's probably all of three minutes of cross, but in terms of how the location was cleared, it was cleared a certain way, and it was cleared with the use of guns and handcuffs, and I think that's important to point out in an appropriate, nonaccusatory way.  And that's my application.

THE COURT:  All right.  Now, on both sides, the parties have, at various points, indicated that certain lines of testimony or certain exhibits are admissible because they are limited in nature; exhibits are redacted and so the Court should overlook certain limitations on hearsay, or questions may take only a minute or two, and so for that reason, there's no harm, no foul.  And that's just not what the law is.

As both sides know, even if a question takes ten seconds, it can be unfairly prejudicial to the other side. Cases are won and lost on the basis of single questions and single answers, and so that's not a good reason.

Now, I understand that to the extent the defense claims that certain evidence is suspect because of the nature of the collection of the items, that it might be relevant that there was no time pressure in terms of acquiring that evidence. And I understand, Mr. Agnifilo, that that's what you're saying.

P6dWcom1- Corrected

MR. AGNIFILO:  That is part of what I'm saying, yes.

THE COURT:  Well, that's the only proffer of relevance that I've heard.  So that is what you are saying.  In that respect, I don't understand why it would be relevant at all to go into the fact that people were held at gunpoint or were handcuffed.  The only relevant thing is that there was no one there.

Now, to the extent that the government, where you started, opens the door by talking about the nature of the search in that way, then of course, you'd be able to inquire on those grounds.  And this happened before.

There was a prior witness who testified and talked affirmatively about the 80 or 90 agents that came onto the scene and the fact that the doors had been moved in created this atmosphere of a military-style encroachment into the premises, and so I permitted the defense to respond by cross-examining that witness on those areas.  But if the government does not go there with this witness and simply talks about the items that were recovered, then the door would not be opened to similar cross-examination concerning, for instance, the fact that people were held at gunpoint or handcuffed or anything of those lines.

Do you have a further proffer of relevance as to that particular testimony?

MR. AGNIFILO:  I do.  I do, your Honor.

P6dWcom1- Corrected

I think the nature of, the way that the premises were secured is important for a number of reasons.

One, they used, the agents moved swiftly.  The agents got people from one place to another swiftly and decisively, meaning that there's no indication that things were changed in location, that things were destroyed, things like that.  And I think that's important.

THE COURT:  That's fine.  I don't think the government has an objection to that.

MR. AGNIFILO:  But the way it was done -- I don't think we should be unable to explain how it was done.

Now, I understand that your Honor would not let me -- and I wouldn't ask to, and my point -- and maybe I led with the wrong thing.  I'm not saying this is relevant because it's short testimony.  I'm saying it's relevant because the way that this house became secured is important to know, and the fact that the agents had numbers, that the agents were moving quickly and forcefully -- the force part is relevant because there's no opportunity, and there's not going to be any testimony, that anyone could have moved things around or hid phones or hid baby oil or whatever things that this agent's going to talk about that he found in the location.

And the fact that, how the agent did it and that they, A, got to the location quickly, moved people out quickly and then had all the time in the world not just because people

P6dWcom1- Corrected

weren't around but because they knew that the people who lived in the house were handcuffed, that's not irrelevant.  That the agents have all the time in the world --

THE COURT:  Nobody's saying that that -- well, the government may say that that's irrelevant.  But I'm not understanding that that's what they're objecting to.  Let me just make sure I understand the nature of the objection.

Just to be very precise about it, I understood the objection to be the defense should not be able to elicit testimony about any force used against whoever was in the house.  However, the defense, if they wanted to, could confirm that it was a secure location, that there was no time pressure, that they had made sure to do all those things.

Is that fair, or is it a larger objection?

MS. FOSTER:  That is correct.

My understanding is that no one, by the time the search team was there, the people in the property had been cleared from the premises.  If they want to ask that question, was there any time pressure based on people, residents being in the location, that's fine.  The issue is just them mentioning handcuffs or being pointed -- having firearms pointed at them.

THE COURT:  OK.  The government's application is granted.

The only relevance as to the particular means used to make sure that the premises are secure would be to unfairly

P6dWcom1- Corrected

prejudice the jury and to suggest that they should make their determination of the issues in this case based on things that have nothing to do with the actual issues that the jury is set to decide.  And I've asked the defense for a proffer of relevance.  To the extent that a proffer has been made, the government has indicated that it has no objection to questions along the lines of what Mr. Agnifilo has indicated, meaning that it was a secure premises; they had time to catalog anything they needed to and that there was no opportunity for any kind of hiding of things of that kind, because they had secured the premises and had moved swiftly, as Mr. Agnifilo had put it.

The only thing the government objects to is questioning on the means by which they did that, and the means have nothing to do with the issues in this case but are unfairly prejudicial, and substantially so, given the nature of what the defense was hoping to go into on cross-examination. So the government's application is granted.

Now let's move to the issue of the juror.

MS. FOSTER:  Your Honor, just one -- I just want to, based on what Mr. Agnifilo said, I want to make sure that I don't open the door with certain questions.

One of the photographs that Special Agent LaMon will, that will be shown to the jury and that he'll speak about is a photo of a number of firearms that are laid out in the security

P6dWcom1- Corrected

office.  Without the context that the property was cleared and that one of the steps in clearing the property would be to remove the firearms if they were in plain view from a specific location and make them secure, basically take out the magazine from the firearm, the photo actually sort of gives the impression and, I think, gives the false impression, in a negative light for Mr. Combs that sort of firearms were all, like, laid out in the security room.

And so we just wanted to briefly get into the nature of the fact -- I was planning to ask Special Agent LaMon, do you know if the firearms were laid out that way prior to law enforcement entering the property?  And his answer would just be I do not know because a specialized team would have entered the property prior to the search team getting on the property and made any firearms secure and that one of the steps would be to remove any magazine from the firearm.

THE COURT:  If his answer starts out with I don't know, then why wouldn't there be an objection and a motion to strike the answer, if he doesn't know?  If he doesn't know something, he doesn't know it.

MS. FOSTER:  I think my only thought of that is just to try to correct any misimpression that this is sort of how Mr. Combs sort of laid out his firearms.  So if there's some way to do that --

THE COURT:  Why don't you just ask him if it's his

P6dWcom1- Corrected

understanding that the agents laid out the weapons in this way after they commenced their search?

MS. FOSTER:  I think that he actually can't really answer that because he wasn't there when they cleared the property, so he doesn't actually know whether or not they actually were or that they were not laid out.

THE COURT:  Then why is he testifying?  Why isn't someone testifying who actually has personal knowledge of what happened?  If you want to get into that, is what I'm saying.

MS. FOSTER:  So, the only purpose, one of the key reasons we're having him testify is that he knows that these firearms were found in the premises, and that's all we are asking him to testify to.  I just don't want to -- and maybe this is not an issue and maybe defense doesn't have an issue with this.  I don't want to leave the jury with this sort of misimpression that when the law enforcement got to the property, that Mr. Combs just had a bunch of firearms laid out in his security room.  And so I am happy to figure out what the Court finds appropriate or Mr. Agnifilo finds appropriate. Maybe that's just not an issue that they're concerned with, but that is my only concern, is just not leaving the jury with some sort of misimpression.

THE COURT:  Mr. Agnifilo, I'm sure that you would like the government to clarify that Mr. Combs did not have these firearms just laid out in his house.

P6dWcom1- Corrected

MR. AGNIFILO:  I want a lot better than that.

I want to know exactly where they were when the agents came.  And I'm hearing this for the first time, that this agent has no idea what the state of -- to your Honor's left are a bunch of long guns and a bunch of firearms.  And if the only things that this jury is going to hear is that they were spread out somewhere in the house and this witness is going to say I have no idea where they were beforehand, I don't think this witness should testify.  I think we should get a witness who is going to say this gun was in a gun safe.  I got into the gun safe and took the gun out of the gun safe that was in the security room.  Or this long gun was in the security room; it was in a place you'd expect a long gun to be in a security room.

My understanding is every single one of these guns were recovered from a locked security room in the premises, and I think it has to be crystal clear how these guns were when the agents came.  And if this agent's going to say I don't know, I think this agent's testimony is irrelevant and prejudicial, and he should not testify.  They should get the agent who came there, and if there's a gun that was taken from a safe or from somewhere in the security room, the jury should know that testimony and that evidence, not this witness that's downstream, who's going to say I don't know where it came from.  By the time I got there, the safe in the security room was

open.  By the time I got there, these magazines were removed from the guns and the guns were placed in different places, I don't even know who did it.  I think that's irrelevant and deeply prejudicial, and we object to this witness's testimony.

THE COURT:  Ms. Foster.

MS. FOSTER:  Your Honor, this witness, what he will testify about is that it is standard practice for a team to enter the property prior to the search team to secure the property, and one of the ways that they secure the property is to make sure that any active firearms have their magazine removed so that they're not a threat to any of the law enforcement officers at that property.

He, though, will testify that the firearms were found in the security room.  And so this is --

THE COURT:  Maybe you can help me out with this, and this might just be me missing something.

Special Agent LaMon is not testifying as an expert witness, right?  He's testifying as a fact witness in this case?

MS. FOSTER:  That's correct.

THE COURT:  OK.  So how can he testify as to things that he doesn't have personal knowledge about, meaning he was on the scene during the search.  Is that fair?

MS. FOSTER:  That's correct.

So, your Honor, he will -- so he knows -- he was part

P6dWcom1- Corrected

of the team lead.  He planned the search, so he knows that there was a plan by which a prior team was supposed to go into the property and secure the property.  So he has personal knowledge that every single one of these firearms when he was at the locations conducting the search was in the security room.

And personally, I am a bit surprised about the defense's objections to this because we are just going to be eliciting that the firearms were found in a security room and that he does not know whether they were in a safe or they were not.  And so we are not creating any sort of misimpression about this or saying the firearms were found in Mr. Combs's bedroom, anything like that.  It's just that when he was at the premises, the firearms were found in the security room.  If they want to cross-examine him about whether or not he knows whether SRT would have moved possibly the security, the team that secured the property potentially found them in his bedroom or in a closet, they can do that.  But there's nothing prejudicial.

THE COURT:  It's not about prejudice.

This is what's going to happen.  All right?

Special Agent LaMon is going to take the stand. Mr. Agnifilo will not be sitting down during the direct examination.  He will be standing up because he's going to object to every question that is asked as to which there is not

P6dWcom1- Corrected

a proper foundation laid that the witness has personal knowledge of what he is testifying about.  And so that's the issue.  To the extent that Special Agent LaMon is going to testify about standard practice or that he understood from other people that certain things happened or did not happen, there's going to be an objection raised that this witness is not competent to testify as to those matters, and that's what I'm trying to work through, because I would like to avoid a situation where the direct examination is a series of objections that are sustained on various questions.

MS. FOSTER:  Yes, your Honor.

So, this has happened in every other, well, every one of the search witnesses that has been called in this case has had the same exact scenario occur, whereby a team goes and clears the property.  And then he will only be testifying about his personal knowledge, which is that when he searched the property, those firearms were in the security room and he saw them in the security room.

If the defense does not want me to elicit testimony about the details of the clearing of the property, I don't have to.  Your Honor's right.  He doesn't know exactly what they did to the firearms when the property was cleared.  However, my purpose only in asking those questions was just to correct any potential misimpression about how the firearms were displayed when he saw them.

P6dWcom1- Corrected

MR. AGNIFILO:  Your Honor, if I may?

I appreciate your Honor's observation about I can object to questions.  Here's my application.

I don't want to be put in that position.  I don't want the jury seeing me objecting to firearms that were in the security room as though there's something that I'm worried about in the nature of that evidence.  Because this evidence is not evidence of guilt of anything.

Mr. Combs has a professional security company, and the professional security company has a dedicated, locked room in the house at Mapleton and all the guns were in the security room, either in a safe, which I think is independently significant, or somewhere else in the locked security room. And if this witness can't tell this jury where these guns were found, this witness's testimony is irrelevant as to that point and also, I think, runs the risk of being unduly prejudicial.

The government certainly knows the agent who got into that security room, who got access to the safe and who found the guns in their natural, pre-law enforcement arrival condition and position.

These are guns.  This is not like -- if they don't know where they got the baby oil.  That's fine.  If they don't know where they got the Astroglide, that's fine.  I'm not objecting to that.  I don't know where they found the Astroglide.  Great.  Where it was when you saw it?  No problem.

P6dWcom1- Corrected

These are firearms, and they're putting these firearms in front of the jury for a reason, and that reason has nothing to do, in my opinion, with a fair trial for Sean Combs.

Now, why didn't I object to the firearms as a general matter? Because I thought there was going to be eyewitness, direct testimony that there was a safe in the security room and the guns were in this locked security room. That's a very significant fact. And if I ask this witness, isn't it true the security room was locked, I don't know. Well, isn't it true that the guns -- where was this gun found? This is a Glock, a Glock semiautomatic pistol, where was this gun found? I really have no idea. Where was this long gun found? I really have no idea.

That is prejudicial, inadmissible testimony. I understand in terms of the rules of evidence, your Honor's right; I can object to everything on a question-by-question basis. But since we know this going in, it's much easier that they can call the witness who found the guns, or they don't have to put the guns in evidence. That security has guns is neither nor there, and the only way that makes it not unduly prejudicial is if I can get out direct evidence from a witness with direct, eyewitness knowledge of where the guns were found and what the state of the guns were when the agents arrived at the scene. And if this witness can't do that -- and what I'm hearing is that this witness can't do that -- then this witness

P6dWcom1- Corrected

should not testify.

MS. FOSTER:  Your Honor, this is how every single law enforcement search is done.  A team goes on and secures the property prior to the search team arriving at the property.  So this is something that arises in every single law enforcement search.  And if the defense would like to call the person who was initially on the property in the security room, they could do that, and they can ask this witness, does he know whether the guns were found, initially when they were, prior to the team that secured the property arriving, were they in the security -- in the safe, were they on a different chair, they can ask those questions.

What he will testify to is what he knows, which is that when he was there, the firearms were in the security room.

THE COURT:  Well, I'm hearing that there's no -- let me just make sure I understand this.

Mr. Agnifilo, you're not objecting, you would stipulate that the firearms that we're discussing were found on the property.

MR. AGNIFILO:  Well, I would stipulate to -- well, I'm not sure.  Your Honor's asking me the question for the first time.

My belief is that these firearms were, A, all in the security office, that the security office locks, that Mr. Combs, as your Honor knows, wasn't on the property at the

P6dWcom1- Corrected

time.  He was on an airplane in Florida, so I don't have any eyewitness knowledge as to whether the locking door was, in fact, locked.  I can tell the Court I've been to the house many times.  If I ever want to go in there, I have to ask someone to unlock the door.  So I know that that door is typically locked to the security room.

The security room has a, you walk into the security room.  There's a safe on the far side.  That safe locks, and I think it's very important that this jury know exactly -- and I don't know, because we don't have any -- I mean the people who are going to know are law enforcement witnesses who are going to go in there and say I got access to the security office, and this was the state of the security office and the firearms in the security office when I got there.

THE COURT:  All right.

Let me ask a question.  Can we find the person who actually did this?  Even if there's a team of people, isn't there one of those people who can just come in and say what they did: we opened the door, we opened the lock, we went in, we got it out of the safe, and there you go?

MS. COMEY:  Your Honor, is it all right if I step up for this?

THE COURT:  Of course.

MS. COMEY:  Thank you.

Here's the issue.  The way that HSI conducts searches

P6dWcom1- Corrected

is they send in a specialized team that is not trained in or responsible for the collection of evidence or the documenting of items. Their only job is security, so they go in, they sweep the premises, make any guns safe. They know to keep the guns in the place generally where they're found, and then they leave. And then the search team that's waiting right outside goes in and searches for evidence and collects the evidence.

So the team that sweeps and makes it safe is not documenting who found what where. Their job is only to focus on security, to make sure that there isn't any threat to safety. So they're not documenting who made what firearms safe. They're not documenting who went into what room.

Your Honor, part of the issue here is this is a sprawling, huge mansion, and so there was a very, very big team. So I don't know that we'll be able to figure out who specifically went into this security room and who specifically made these guns safe. But I don't know we need to in order to satisfy the chain of custody, because what this witness will testify to is the same thing that the other search witness testified to with respect to the Miami search, which is a team who I was in charge of in terms of making out the plan to make this location safe went in after they had received instructions to make it safe and not move anything other than necessary to make safe, to leave all property and evidence in the home in and around the place where it was found and then leave. And

P6dWcom1- Corrected

then search team went in, and when I went in to do the search, I found these pieces of evidence. And that's what this witness will say. He will say that a security team went in, made the property safe, including the instructions were to make any guns safe. They went in, did that, left. And then I went in, and when I went in, I found a variety of evidence, including guns in a security room.

I believe that the testimony will be that it was in a security room that was capable of being locked. I assume that the door wasn't locked when he went in because part of making a premises safe, which I'm sure this witness could testify to, is making sure there are no locked doors behind which a potential threat could hide. So the whole purpose of making it safe is to make sure there aren't locked doors or locked areas where a person who could be a threat could hide. So all of the doors would've been opened.

But what he will say is inside the security room, which could lock and had safes that could lock, there are firearms that had been made safe. And I imagine if your Honor permitted Ms. Foster to ask the question, she could ask based on the instructions you had given the security sweep team and based on your own experience in law enforcement, what is your understanding of why those firearms were laid out with their magazines removed? And I expect his answer will be I understood that they had been made safe by the security team.

And so I think that is what we're talking about here. I don't think that that interferes with chain of custody.  I don't think that that raises any questions about whether these firearms were found in that room.  And I don't think that it raises any of the concerns that Mr. Agnifilo is raising in terms of the admissibility of this evidence or in terms of the appropriateness and relevance of this testimony.

MR. AGNIFILO:  First, I'm not seeing how the guns are relevant.  I'm just not.  I'm not seeing how guns which are in a locked security room, which is what the government has agreed to be the state of the situation, is relevant to any of the charges in this case.  And this is highlighting -- so here's where I think my request is.

I think that it's not an answer from the government to say we don't have a witness who is going to be in a position to testify as to whether that security door was locked or unlocked.  They have to find that person, because if it's locked, if all of these guns are behind a locked security door and possibly in a locked safe, that is just a very different situation than having loose guns in a house where children live.  And people have strong feelings, as they should, about guns and home safety and it's a very divisive issue.  And I don't mean this in a disrespectful way, I think the proposed presentation of evidence is irresponsible.

They should get the witness who's going to say I

P6dWcom1- Corrected

gained entrance to a locked door, to go into a locked security area, and when I went into this locked security area, this is what I saw.  And if they don't have that, I don't think these firearms should be brought into this trial in any form or fashion.

THE COURT:  Well, that's not what this witness is coming in to testify about.  He is only testifying that the firearms were on the premises, and then he maintained the chain of custody to now present them in court today.  That is literally all this person is testifying about.

So I think Ms. Foster's suggestion was that she is happy to clarify precisely along the lines that you've indicated: that they were not splayed out on the floor in the residence in a way that would be potentially irresponsible in light of the children there.  And I'm sure if you wanted, she would, with leading questions, indicate that he had no knowledge about whether they were behind locked doors, whether they were safely maintained, all of those things, because he simply just is not commenting on those types of issues.

But he is relevant for a purpose that is proper for the government to bring him in, which is he saw them there and that he maintained the chain of custody to today's date, and that's why he's testifying.  So I don't see the objection to his general testimony.  I think it's the parameters of what he's going to say.  We'll see on direct what Special Agent

P6dWcom1- Corrected

LaMon is going to say, and you can make appropriate objections if Ms. Foster veers from the course.  Right?

Ms. Foster, I think the issue is just you wanted to clarify that when you're showing, for instance, the picture that is part of the chain that shows that the firearms were on the property, that they were not that way as an original matter.  And the witness might say, well, I don't know the original way in which these weapons were stored, but they were not stored this way.  And Ms. Comey clarifies it.  The way the questioning would go is that, in his experience, they would have been moved by other people who were on the team.

And then at that point Mr. Agnifilo can ask anything on cross-examination he wants about where the guns might have been or where they aren't and what's the scope of the witness's knowledge is.  All right?

That's how we're going to proceed with Special Agent LaMon.

MR. AGNIFILO:  Can I add one thing, though?

THE COURT:  Yes.

MR. AGNIFILO:  I think the way that we're about to do this is a violation.  It violates 403.  I don't think lack of knowledge should all of a sudden --

THE COURT:  Let me stop you for just one second, and then I'll let you continue.  You knew what this witness was going to testify about.

P6dWcom1- Corrected

MR. AGNIFILO:  I didn't know he had no idea where the guns were.  I didn't know that.  I didn't know that he had no idea, that he's going to say I have no idea where they were.  I thought he had some indication of where these guns were.

THE COURT:  What's the 403 issue if he's going to say I have no idea and I'm not saying they were here, I have no idea where they came from, why does that help your case?

MR. AGNIFILO:  It doesn't help my case.  I want to know exactly where the guns were because the guns were responsibly maintained by a special security service behind a locked security door.  I want to know exactly where these guns were.  I don't want to start playing Russian roulette with guns, which is the way you play Russian roulette, but I don't want to do it.

It's risky and it's unnecessary, and so I have a 403 objection to the testimony as I understand it to be coming in.

THE COURT:  Do we have a person who can testify as to where the guns were actually found?

MS. COMEY:  Like I said, your Honor, I don't think we can reasonably do that because that is not a function of the search team.  But what I think what Mr. Agnifilo can do to make the point that he wants to make is he could ask this agent were all of the guns found in a security room?  Did that security room appear to be maintained in a professional manner based on your own experience in law enforcement?  I expect he would say

P6dWcom1- Corrected

yes.

Was there a gun safe?  Was there a gun safe that would fit all of these guns?  Did there appear to be a place where all of these guns would have been stored?  Do you have any reason to think that those guns weren't stored there safely before your team removed them?  I think that he will get the answers he wants for all of them, and we're not going to fight him on that.  So our goal here and the reason we're in this argument is because we're trying not to leave a misimpression with the jury while also getting in relevant evidence with the individual who maintained the chain of custody.

THE COURT:  Why doesn't the government just ask those questions on direct?  Because I think Mr. Agnifilo's issue is that if he has to do it on cross, then that has a different --

MS. COMEY:  That's fine.

THE COURT:  -- atmosphere for the jury.  But if the government does it, then it will be crystal clear that no suggestion is being made that these guns were not in a very secured environment within the security office of his home.

MS. FOSTER:  Yes.  Actually, we are going to ask the questions already on direct, what does this room appear to be?  It appears to be a security room.  We're going to say, show him a picture of the firearms, gun safe and say what is this.  He'll say it's a gun safe, and we can ask the questions of --

THE COURT:  Ms. Comey, she said it very nicely in her

P6dWcom1- Corrected

answer.  So I think that's the proper sequence of questions.  If you can just elicit that testimony, then I think that to the extent that there's any potential 403 issue -- I'm not sure that there is -- but you would eliminate any suggestion along those lines, and it doesn't matter for the government's case and the reason this witness is testifying.

MS. FOSTER:  No.  We're actually affirmatively not trying to create some impression that these firearms were in some unsecured location that was a threat to children.

THE COURT:  Based on this discussion, you are going to affirmatively --

MS. FOSTER:  Yes.

THE COURT:  -- suggest that they were, in fact, maintained in a very safe way within the residence.

MS. FOSTER:  That's right.

THE COURT:  OK.

All right.  So that resolves that issue.  I think I know how we're going to proceed with Special Agent LaMon.

This is what I was hoping to spend more of our time on.

On the issue concerning the juror, is there any reason why at some point today -- it can be now or it can be later -- we don't simply bring the juror out to address a couple questions that appear to be left open from the parties' submissions to just figure this out and get to the bottom of

P6dWcom1- Corrected

it?

Mr. Agnifilo, I take it that if there's, like, a rational explanation, as Ms. Shapiro suggests, for the juror's answers to these questions, then there's no issue.  But if there was some deceit, then I don't know that the defense would have an argument that there is no legally sufficient reason to dismiss the juror.

Am I generally right about all that?  That's what I'm trying to get to the bottom of.

MR. AGNIFILO:  My position is I don't think we're even at the point where we need follow-up.  I think it's so clear that these were innocuous, harmless, you know -- I'm going to say something and then I'm going to regret that I said it.

He doesn't speak for a living.  We're held, we're tossed on our own petard with the way we say things in court, because we speak for a living.  I don't know that this juror is held to the point of precision and things like that.  And I think everything that we pointed out in our letter, I think, indicates that these were harmless, nondeceitful responses of a juror under, you know, not rushed in a bad way, but unfamiliar. He's in courtroom conditions doing the best he can.  And I haven't had a chance to talk about your Honor's proposal with the rest of the lawyers and Mr. Combs, but I am hesitant to raise this issue again and lead this juror to think that we think that the juror said something wrong.

Now, there's obviously a standard of facts and evidence and belief where that is appropriate. I just don't think we meet that standard. I think that the juror's answers are innocuous and much more consistent with a mistake. The whole way we got into this terrain is we were concerned about his residency, which seems to no longer be an issue. And I think the juror has shown -- this is one of the most diligent juries I think I've seen in 35 years -- and he's part of that very diligent jury. They're here on time. They stay as late as we need them to stay. They've done everything we've asked them to, and so I think there's a measure of good faith that I think should be bestowed on each and every member of the jury, including the juror we're talking about.

I want to talk about the rest of the team to bat around your Honor's suggestion, but my initial reaction is I don't think we're at that point.

THE COURT: Does anyone from the government want to be heard on that question?

Let's take a step back to what the inquiry is and the questions I had asked of the parties.

So, there was a question really of just residence, as Mr. Agnifilo noted. And I think based on the submissions that no one is of the belief that there's authority to suggest that there's any issue with this juror concerning qualifications to serve. Because basically you have 28 U.S.C. 1865, and there's

P6dWcom1- Corrected

no question that this juror was drawn from the list of qualified jurors and that he met the qualifications set forth in the statute and that's why he was here for jury selection.

And there's also no real question, at least on the record that we have, that he lived in the district, at least as of the time of jury selection. And it's not clear that that would really matter for purposes of qualification anyway. No one has cited to a single case or authority that would suggest otherwise.

So the real question goes to whether Rule 24(c) applies here, which states that alternate jurors may replace any jurors who are unable to perform or who are disqualified from performing their duties.

In terms of what disqualified means, the Second Circuit has been unhelpfully vague. They indicate that I have limitless discretion, virtually limitless discretion in all matters concerning this issue.

If someone would tell my eight and ten-year-old kids that I have that power, then it would be much appreciated.

The only thing that the Second Circuit has really indicated is that the bounds of that discretion are that the juror cannot be removed for issues of bias, where there's a bias in the removal of the juror, or where there would be prejudice to the defendant, with prejudice meaning that the discharge is without factual support or for a legally

P6dWcom1- Corrected

irrelevant reason.

And so the defense's submission is really that the answers, given the nature of the inquiry both in jury selection and during the current process, was vague enough so that the answers could easily be reconciled with each other.  And the subject matter of what was being addressed is so far afield from the juror's performance of duties that that's not a reason to remove the juror.

The real suggestion from the government as to the reason why the juror should be removed is because if you take the inference against the juror's credibility, there is a view that if you can't reconcile the answers and the juror was being deceitful, and intentionally so, either in jury selection or in the colloquy in the robing room, then that would be grounds to disqualify the juror.

For that to happen, we would need to have a further inquiry with the juror, because on the current record, there's an insufficient basis to make that determination.  And in terms of how we view the inquiry postjury selection, I think that there's a difference.  I think that when we address these types of questions during the juror selection process, there may be an inkling or a suggestion that there's a reason to disqualify a juror for cause.  And that has one standard, but it's before the exercise of peremptory challenges and impaneling of the jury.  And so that has one standard.

P6dWcom1- Corrected

I think the defense's suggestion, and I think it's consistent with a lot of the cases, is that that default actually flips once you have the jury actually in the box and you have a regular jury and alternates.  At that point you need something more to disqualify a juror.  And the cases cited by both sides have situations presented that are far more extreme than what's been presented here.

And so that's the backdrop for Ms. Steiner.

How do you think we should proceed here?  Because the defense is leveling serious claims of prejudice.  There's the Sixth Amendment that's involved.  So I guess the question for the government is understanding what was in the government's submission, is it the better part of valor to just kind of continue and proceed, given there's maybe an inkling of something but not really much more than that?

MS. STEINER:  I think the issue, your Honor, is it's very important given that this issue has now been raised, and in the government's view, there has been a lack of candor with the Court.  From the government's perspective, the juror has said multiple things that cannot all be true.  And so that creates an issue with the record, and so I think that the government's concern is with protecting the record now that this issue has been brought to the fore.

I think, again, the government's view is that based on these inconsistencies in this juror's own statements, some of

P6dWcom1- Corrected

which have been under oath, that that does provide sufficient reasonable cause, in your Honor's very broad discretion, as you noted, to dismiss this juror.  That's why we have six alternates.

Of course, if the Court thinks that additional fact finding is appropriate and necessary, then the government would have no objection to that.  But I do think, given where we are, with the record that we have, additional steps would need to be taken to flesh this issue out such that the record can be protected.

THE COURT:  My preference would be to hear from the juror, because I think that it is likely that what we will hear will be a perfectly innocent explanation for the answers.  I don't think that they're irreconcilable.  I think that for the reasons that the defense has stated, there's a way to reconcile the entire record.  So my preference would be to run that to the ground, because I understand the government's concerns that -- and Ms. Steiner, you just indicated that there's kind of, maybe an ambiguity, at least, in the record.  And I don't think the defense would disagree with that.

And so that would be my preference, because I think on the current record, I would have to look and really kind of figure this out and probably do some more research.  But that's what I prefer to do, because it might be that we can just quickly resolve this and put this issue to bed without further

P6dWcom1- Corrected

inquiry.

While the defense is mulling this over, I will address one thing, which is the suggestion that was made in court and repeated in the defense's submission that there is somehow a biased reason for the government making the application that they did.

There is absolutely no basis for that suggestion, absolutely zero. And so to be perfectly clear, from the outset of this proceeding to the current date, there has been no evidence and no showing of any kind of any biased conduct or biased manner of proceeding from the government. And that goes from the nature in which the government exercised its challenge or suggested challenges for cause of the veneer, which they did in a controlled, reasonable and reserved manner, consistent with the highest standards of their office, to the present time.

There's nothing here in what arose in this situation to suggest any biased reason of any kind. The only reason why this situation even came up is because of a statement that was made on the juror's own volition to jury department staff in a friendly and in an offhand banter. And the only reason the jury staff informed the Court about it is because they just wanted to keep the Court in the loop. They didn't understand there was an issue. Neither did the Court. Neither did the parties when this first came up.

P6dWcom1- Corrected

It was only when the government did a further review of the jury instruction, the voir dire transcript compared with the transcript of what had occurred in the robing room that any issue came up.  And there is a facial inconsistency between some of those answers.  And so it is absolutely fair and understandable that the government would raise that to the Court.  And there is not an inkling of any kind of bias here or in any other part of this proceeding.

As the defense itself notes in its letter, this was an unusually diverse group of jurors that came in, and we have a diverse juror regardless of what happens on this current application.

So I just want to put that issue to rest because there's absolutely no basis for it on the current record.

With that, now that I've, in a long winded way, addressed that, anything from the defense?

MR. AGNIFILO:  Could we just speak a few minutes about your Honor's proposal?

THE COURT:  Yes.

MR. AGNIFILO:  We can do it quickly.

Your Honor, we had a chance to talk.  I think I'm going to defer to my colleague, if that's OK?

THE COURT:  That is OK.

MS. SHAPIRO:  Your Honor, I think our concern is twofold.

P6dWcom1- Corrected

We don't think that the purported inconsistencies rise anywhere close to the level of what would suggest a problem, and we're very concerned that calling this juror back for questioning for what will now be a third time will have a negative impact on the juror, and the juror will feel singled out and picked on. And we're very concerned about how that might impact the deliberations going forward, and we think it's totally unnecessary.

And with regard to the issue alluded to about the record, we can be very clear, to the extent leaving the juror on might otherwise -- and I can't imagine this would be the case, given the standard, create some sort of appellate issue if there's a conviction here, we waive that knowingly and voluntarily. There is no issue there that would require it.

But I think we're very concerned about the impact on the juror of any further questioning on this issue. And we think there's really no reason for this. This is clearly, on the record that we have from the voir dire, the questionnaire the juror filled out as well as his answers to your Honor's questions in the initial part of the voir dire process and then in open court to those questions that were asked of all the jurors together as well as his answers on the two times in the robing room, I think it's quite clear what's sort of going on with his residency.

And as your Honor indicated, there's no legal issue

P6dWcom1- Corrected

with that.  So we really feel like the record is sufficient to establish that there's no inconsistency that remotely rises to the level of any concern of bias indicated in the cases.

I can also tell your Honor I personally was involved in the *Parse* litigation, and that's the kind of extreme case where something has to be done if it's caught during the trial. In that case it wasn't, and even in that case, the government opposed any finding that that juror was biased or should have been removed.  So I just think this doesn't, you know, as all the cases we cite in our letter involving other issues that arose with misstatements on voir dire, where the Supreme Court, the Second Circuit, district courts in this district have held these are innocent mistakes, they don't rise to the level that a juror should have been disqualified for cause.  And I think that's what we have here.  It doesn't even remotely approach the need for further inquiry.  And we are very concerned about the impact on the juror that that would have.

THE COURT:  All right.  Well, we don't need to get into this right now, but is there a response from the government?

MS. SHAPIRO:  And I just want to add that Mr. Combs is present in court, and if your Honor wants to inquire, he will confirm that he's waiving this as an issue going forward.

THE COURT:  Mr. Combs, are you waiving the issue?

THE DEFENDANT:  Waive it, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6dWcom1- Corrected

THE COURT:  All right.

This is for the government.  Here's one thing you probably don't disagree with.  I've read the cases in your submission.  I've read the cases in the defense's submission.  As I've said, they are unhelpfully vague as to the legal standards that apply here, but it is true that across the cases the nature of the issues that came up were far more extreme than those presented in the current case.  And there's perhaps an understandable way to reconcile all of these issues, which is that I believe that the question that was initially asked during voir dire, during the group proceeding, was where do you live, and then kind of who do you live with?  But based on the answers that were being given by the group, it could have been that the juror thought where do I live, I live in the Bronx, and that would be consistent with everything that we've heard, because he indicated that he had moved out of the Bronx in the last two weeks, and there might be some ambiguity about how much time he was spending in each place.  But that's at least what he said.

As to the second question he might have understood it to be who is in your family group.  As to that question he indicated his fiancée and his baby daughter.  And so you can reconcile these things, and given what we're talking about, which is where do you live and kind of basic questions, it would be surprising that someone would try to make up something

P6dWcom1- Corrected

about it.  Maybe even if there was some inconsistency it wouldn't rise to the level of removal of a juror, given the various constitutional and other rights that the defendant enjoys.

So I'm just putting that in front of you so that you can react to it.

(Continued on next page)

P6DQcom2

MS. STEINER:  Yes, your Honor.  Thank you.

Look, I would agree with you that some of these cases have more extreme circumstances.  I think that's also because the cases cited to by the defense are in the case of a Rule 33 motion after the conclusion of trial.  Here I think we're in a position, as your Honor noted, where Rule 24(c) is operative because we're still very much in the middle of trial.  The jury hasn't started deliberating.  Your Honor has broad discretion. I think this is most akin to the *Figueroa* case where the Court figured out in the middle of trial that the particular juror did not satisfy one of the requirements under the JSSA.  They are the literacy requirement, and at that point excused the juror for that reason.  I think similarly here we're talking about a requirement under the JSSA, which is why I think it is a significant issue.  So that's one.

I think the other point that I want to make, your Honor, is given where we are now it's the government's position that the most prudent thing to do to ensure the integrity of the proceedings would be to get to the bottom of this issue, and have additional inquiry.

The government has at least one question with respect to this juror that we think it would be prudent to ask; namely, whether or not their employer has a residency requirement because that could also be a reason why, despite the fact that they're not living in the district, they may have indicated

P6DQcom2

that they live in New York.  It's the government's understanding that at least some of the positions for that employer do require residency in New York, so that would be one example of a question that may help elucidate this issue further.

MS. SHAPIRO:  Your Honor, now we're talking about involving his employer in this.  This just goes further to illustrate the point about how this is really harassing this juror.  And I would note that the literacy requirement is presumptively prejudicial and obviously for good reason because we're talking about a case in which evidence involves documents that people have to be able to read.  This has really gone far afield, and I think the suggestion is troubling that we would further harass the juror in the manner proposed by the government.

MS. STEINER:  Your Honor, if I could briefly respond.

I really don't understand why the defense is so averse to asking this juror further questions.  I wasn't present in the robing room when your Honor inquired of this juror a couple of days ago, but I have no doubt that the Court in a very non-confrontational and pleasant way can ask additional questions of this juror to conduct the fact-finding that is necessary, again, to ensure the integrity of the proceedings.

THE COURT:  All right.  So the way we're going to handle this is:  I'm going to think about the arguments that

P6DQcom2

the parties have made, and if there needs to be further inquiry with the juror, we'll do it at the end of the day.  I think that's better.  Because I think if we do it now, that will be disruptive to the jury that is all sitting there.  I think it will be easier to do that if the remaining jurors are excused and we just ask him to stick around for a little bit of time, and we can have that inquiry if I think it's appropriate.  So I will think about that.

Anything further before we finally begin?

MS. STEINER:  Not from the government, your Honor.

MR. AGNIFILO:  Not from us either.  Thank you judge.

THE COURT:  So we will proceed with the next witness.

MS. COMEY:  That's Agent LaMon, your Honor.

Ms. Foster is just going back to alert him that she's going to ask a series of questions that I've written out for here along the lines of what we discussed earlier, so she's going to let him know about those questions, and he'll be ready to proceed.

THE COURT:  So should we take five minutes?

MS. COMEY:  I think it will take two.

THE COURT:  Then I will ask the deputy to check on our jury.  Give us a couple minutes, and then we'll come out.

MS. COMEY:  Your Honor, before we call Agent LaMon, we plan to offer a few exhibits.  Our paralegals have pointed out to us that I've made a less-than-clean record of what exhibits

P6DQcom2

are in after Jane's testimony, so I'll being cleaning that up a little bit.

THE COURT:  Very good.  Thank you.

(Recess)

(Continued on next page)

P6DQcom2

(Jury present)

THE COURT:  Welcome back, members of the jury.  As you can see we're only 50 minutes delayed today so we made progress from yesterday and we'll keep working for more progress.

With that, the government has its next witness, or I understand there are some exhibits to address.

MS. COMEY:  Yes, your Honor.  We have a few exhibits to clarify for the record that I believe may not have been properly offered, and I apologize for that.

For the record, we offer the following exhibits: A-104-11A, A-104-11B, A-104-74A, A-104-74B, A-104-74C and A-104-74D, none of which we are asking be filed under seal, so those would be public.  We offer those.

THE COURT:  Any objection?

MS. GERAGOS:  No objection.

THE COURT:  Those exhibits will be admitted.

(Government's Exhibits A-104-11A, A-104-11B, A-104-74A, A-104-74B received in evidence)

(Government's Exhibits A-104-74C and A-104-74D received in evidence)

MS. COMEY:  Then we offer the following exhibits under seal, your Honor:

E-331-AR, E-331-BR, E-331-C, E-331-FR, E-331-HR, A-104-59P, A-104-60P, A-104-61P, C-251, C-348-AR, C-348-BR, E-331-I, E-331-JR, A-104-59A, A-104-70A, A-104-72A, A-442-33

P6DQcom2

and finally A-104-18.  We offer all of those under seal pursuant to your Honor's pseudonym order.

THE COURT:  Those exhibits will be admitted under seal.

MS. COMEY:  Thank you, your Honor.

(Government's Exhibits E-331-AR, E-331-BR, E-331-C, E-331-FR received in evidence)

(Government's Exhibits E-331-HR, A-104-59P, A-104-60P, A-104-61P received in evidence)

(Government's Exhibits C-251, C-348-AR, C-348-BR, E-331-I received in evidence)

(Government's Exhibits E-331-JR, A-104-59A, A-104-70A, A-104-72A received in evidence)

(Government's Exhibits A-442-33 and A-104-18 received in evidence)

THE COURT:  With that, the government may call its next witness.

MS. COMEY:  Forgive me, your Honor.  I think Ms. Slavik also has exhibits to offer.

MS. SLAVIK:  Your Honor, pursuant to the parties' discussion yesterday, the government offers the following exhibits:

C-653-1, H-101-A, A-417 and J-308.

THE COURT:  Those exhibits be will be admitted.

(Government's Exhibits C-653-1, H-101-A, A-417 and

P6DQcom2

J-308 received in evidence)

MS. JOHNSON:  And, Ms. Gavin, could you please pull up Government Exhibit 1505, which is a demonstrative?

The government offers at this time all of the exhibits listed in Government Exhibit 1505, which the government will provide the Court and the court reporters copies of those, but specifically noting that the government offers 3A-113 under seal pursuant to the pseudonym order and 3A-113R not under seal.

THE COURT:  All right.  The exhibits identified in Government Exhibit 1505 will be admitted on the basis specified by Ms. Johnson.

(Government's Exhibits 1505, C-303, C-311, C-312, C-317, C-319, C-320, C-330, C-330-AF, C-332-A TO GX C-332-E, C-334-A TO C-334-B, C-335-A, C-343-A, C-364-1, C-364-2, C-364-4, C-364-6, C-364-6A, C-364-6B, H-104-B, 3A-101, 3A-102, 3A-103, 3A-105, 3A-106, 3A-107, 3A-108, 3A-109, 3A-111, 3A-112, 3A-113 (SEALED), 3A-113-R, 3A-114, 3A-115, 3A-116, 3A-124, 3A-130, 3A-134, 3A-139, 3N-102, 4C-101, 4C-102, 4A-107, 4A-114, 4A-115, 4A-124, 4A-126, 4A-130, 4A-132, 4A-134, 4A-136, 4A-140, 4G-111, 4G-122, 4G-130, 4G-141, 4G-151, 4G-161, 4G-171, 4G-180, 4G-192, 5A-141, 5A-144, 6B-103, 7H-149, 7H-152, 7H-155-1, 7H-155-2, 7H-155-3, 7H-159, 7H-160, 7R-101, 7R-125, 7R-129, 7R-129-A, 7R-129-B, 7U-101, 7U-107, 7Y-107M 7Y-107-A, 7Y-108, 7Y-108-A, 7Y-114-A, 7Y-114-B, 1308 received in evidence)

P6DQcom2

MS. SLAVIK:  Your Honor, before the government calls its next witness, we'd like to publish two of the exhibits in evidence.

THE COURT:  Proceed.

MS. SLAVIK:  Ms. Gavin, could you please publish what's in evidence as Government Exhibit C-653-1 alongside the stipulation at Government Exhibit 1301 paragraph 28.

Reading from Government Exhibit 1301 paragraph 28:

Government Exhibits C-601 through C-653, including the subdivisions thereof are true and accurate excerpts of data extracted from cellphones used by Kristina Khorram.

Thank you.  You can unzoom that.

Could you please zoom in on the text in 653-1, starting at the first blue text.

Could you zoom in on the entire page, please.

Puff music phone two, November 21, 2023.

Make sure Robin is not doing anything dumb like not having that rent paid on time.  Can you make sure she paid for this month, please.

And please let me know when she hits me because when you don't, it's not the best decision.  Call me.  Why you not picking up?

Kristina Khorram, November 21, 2023, 10:29 p.m.  Robin said her rent was paid.

Can you go to the next page, please?

Puff music phone 2.

Okay.

You can take that down, please.  And could you keep up Government Exhibit 1301 but put up Government Exhibit H-101-A in evidence.

And focusing on paragraph 26 and 27 of Government Exhibit 1301, on or about September 22, 2024 in the vicinity of Newark International Airport, HSI seized the Government Exhibit H-100, a cellphone from Damien Butler's person.

Government Exhibits H-100-A through H-116, including the subdivisions thereof are true and accurate excerpts of data extracted from Government Exhibit H-100.

You can take that down.  And could you turn to page 2 of H-101-A.  Maybe we could put this -- the full pages or both pages of H-101-A on the screen.

Thank you, Ms. Foster.

Starting with the text on January 11, 2017 from Cassie:

My bathroom door is broken down.  He's blaming me for going to someone else's house when I drove around and pulled over to see if I was being followed.  And I was.

He has my key so I'm leaving.  I do not feel safe. I'm not fucking with anyone else.

Could you focus on the next page, please.

And I wasn't going to anyone's house.  I was going

P6DQcom2

home.  Three of my doors are now broken.  This is crazy.

D-Roc:  He is coming to the house.  He just text me. Someone was following you home?  You're safe.  I don't think it's a good idea to leave your place.  That's not going to make it better.  The driver.

He has my key.  I don't feel safe.

Your house keys?

Yes.  Puff has my house keys.  He has to because I locked it, and he came back in.  He thinks I was going somewhere else when I was just trying not to be followed.  This is crazy.  The key has a blue fuzzy tail.  Please take it. Thank you and sorry.

Just stay in your crib.  The last thing you want to do is leave your house.  I'm at the house.  Puff is here.  You know I can't take your keys from him.  He is here.  You are there.  I think that's the best thing for now until things calm down.

Thank you, you can take that down.

THE COURT:  Thank you.  The government may now call its next witness.

MS. FOSTER:  The government calls Special Agent LaMon. Your Honor may I approach just to put a binder on the witness stand?

THE COURT:  You may.

ANDRE LaMON,

called as a witness by the Government,

having been duly sworn, testified as follows:

DEPUTY CLERK:  Sir, could you please give the Court your first and last name and spell your first and last name.

THE WITNESS:  Andre LaMon.  That's A-N-D-R-E; L-A-M-O-N.

DIRECT EXAMINATION

BY MS. FOSTER:

Q.  Good morning, Special Agent LaMon?

A.  Good morning.

Q.  Where do you work?

A.  Homeland Security Investigations, HSI, Los Angeles.

Q.  What is your title at HSI?

A.  Special agent.

Q.  How long have you worked as a special agent for HSI?

A.  2018.

Q.  That's when you started?

A.  Yes, I started in 2018.

Q.  Do you work in a particular group at HSI?

A.  Currently assigned to the human trafficking and smuggling group.

Q.  When did you begin working in that group?

A.  Around July of 2023.

Q.  What are some of your responsibilities as a special agent at HSI?

P6DQcom2                         LaMon - Direct

A.   Take tips that may come in as regarding to human traffickinng and investigate them, or human smuggling, conduct investigation, do surveillance, execute search warrants of residence, phones, arrest of persons, manage case.

Q.   As a special agent, do you participate in the execution of search warrants of homes?

A.   Yes.

Q.   Have you received training on how to execute premises search warrants?

A.   Yes.

Q.   Approximately how many searches of homes have you done or assisted with?

A.   At least 50, 60.

Q.   Now, I want to direct your attention to March 25, 2024. Did you participate in a search of a property on that day?

A.   Yes.

Q.   What was the address of that property?

A.   200 South Mapleton Drive, Los Angeles, California.

Q.   Who did you understand was the owner of that property?

A.   Sean Combs.

Q.   Was the search of 200 Mapleton authorized by a search warrant?

A.   Yes.

Q.   What HSI office obtained that search warrant?

A.   HSI New York.

Q.   How did HSI Los Angeles get involved?

A.   HSI New York sent a collateral case request to HSI Los Angeles asking for assistance with the execution of a search warrant.

Q.   What was your role during that search?

A.   I was assigned to be the case agent for the collateral and the team lead for the execution of the search warrant.

Q.   At a high level, what were some of your responsibilities as a team lead for the search?

A.   Prior to the execution of the search warrant, I was assigned with personnel that would be on the operation.

     Once the search warrant was executed at the residence, I was assigned as a team lead to help answer any questions that may have arised, be a liaison between HSI LA and SDNY and HSI New York, seize the evidence, process the evidence for New York.

Q.   Special Agent LaMon, could you please look at the first tab in the binder in front of you which contains what has been marked for identification as Government Exhibit 2B-103 and 2B-104, and could you look at the photos and look up when you're finished.

     Do you recognize what these photos depict?

A.   Yes.

Q.   What address do they depict?

A.   200 South Mapleton Drive, Los Angeles, California.

P6DQcom2                          LaMon - Direct

Q.   How do you know?

A.   I had been to the residence.

Q.   Are they fair and accurate representations of the property
on the day of the search?

A.   Yes.

          MS. FOSTER:   The government offers exhibit 2B-103 and
2B-104.

          MR. AGNIFILO:   No objection.

          THE COURT:   Those exhibits will be admitted.

          (Government's Exhibits 2B-103 and 2B-104 received in
evidence)

          MS. FOSTER:   Ms. Foster, could you please pull up
Government Exhibit 2B-103.

Q.   Special Agent LaMon, you mentioned this is a photo of 200
Mapleton, is that right?

A.   Yes.

Q.   What angle of the property does this image show?

A.   This is the front of the property from the street.

          MS. FOSTER:   Ms. Foster, could you now please pull up
2B-104.

Q.   Is this another image of that same property?

A.   Yes.

Q.   What angle of the property does this depict?

A.   The rear.

Q.   How many different buildings are located on this property?

A.   Three.

Q.   Are they all shown in this photo?

A.   Yes.

Q.   What is the big building?

A.   It's the main house.

Q.   What is the structure towards the back left of the property?

A.   It's like a sauna-steam room kind of.

Q.   What about the structure towards the right of that -- of this photo?

A.   The gym and studio.

Q.   On March 25, which of these three buildings did law enforcement search?

A.   All three.

Q.   Now, I'd like to talk about --

          MS. FOSTER:  Ms. Foster, you can take this photo down.

Q.   I'd like to talk about how the search was conducted.  What rooms of the property were searched?

A.   All rooms.

Q.   How many agents searched each room?

A.   At least two, sometimes four to six.

Q.   If law enforcement found an item of interest in the room while they were searching, what would they do?

A.   Depending on what the item was, if it was something they immediately thought was in the warrant, they would contact the

photo person to take a picture of the item in the area where it was located.  Once the photo was taken of the item, it would then be taken down to our evidence kind of command center, which was on the first floor on the kitchen island.  They would take it down there for it to be inventoried, bagged, and prepped to be transported to our office.

Q.  What does inventory involve?

A.  Inventory involves if we determine the item is to be seized, we want to make sure we get pictures of where it was located, and then we will put a description of what that item was, where it was seized, and then bag it up.  And then once we get it back to our office, we'll put it in our computer systems for tracking to make sure we maintain the type of evidence the way it should be.

Q.  Where were you typically during this search?

A.  All over.

Q.  All over the property?

A.  All over the property.

Q.  Were there times you went into the rooms that were being searched?

A.  Yes.

Q.  And what were you doing in those rooms?

A.  Making sure that the team, if they had any questions, it's a -- it was a very large property, that I could be available for them to ask questions in case they needed guidance or

clarification on something.

Q. After the search, did you have any role in ensure the items that were seized were properly inventoried?

A. Yes.

Q. And what was that role?

A. Well, once we decided we had everything that was going to be seized, we transported everything to our office. Once we got it back to our office, I then went through each one of the items, the line items that was seized, and then entered them individually into our case management system.

Q. Did you physically look at each item when you inventoried it?

A. Yes.

Q. And what was the purpose of entering the items into your case management system?

A. Well, because there are different types of evidence. Like electronics or weapons or whatever it may be, they have to be managed differently, so -- and because the evidence would be coming to New York also, we put it in the system so that way we can properly maintain what has been seized, where it's currently located, if it's in our storage or if it's in a warehouse storage or if it's in another AOR like New York.

Q. Next I want to discuss items that were found in the house.

Special Agent LaMon, can you please look at the second tab of the binder, which contains what has been marked for

identification as Government Exhibit 1A-200, 1A-201, 1A-202, 1A-203, 1A-205, 1A-211, 1A-212, 1A-214, 1A-216, 1A-218, 1A-227, 1A-229, 1A-231, 1A-236, 1A-237, 1A-242, 1A-244, 1A-245, 1A-246, 1A-247, 1A-248 and 1A-249.  Could you please look up when you're done?

Do you recognize these?

A.  Yes.

Q.  What do they show?

A.  Items seized during the execution of the search warrant from 200 South Mapleton -- some items seized.

Q.  Were they otherwise items found in the residence?

A.  Yes.

Q.  And how do you know?

A.  I was the seizing agent.

Q.  Do you also recognize them from the day of the search?

A.  Yes.

Q.  And are they fair and accurate representations of items that were found in the 200 Mapleton property on March 25?

A.  Yes.

MS. FOSTER:  Your Honor, the government would offer the exhibits I just listed for identification into evidence.

MR. AGNIFILO:  I have no objection subject to the discussion we had this morning.

THE COURT:  A little vague, but do you need a sidebar or is there --

P6DQcom2                         LaMon - Direct

MR. AGNIFILO:  Yes.  Very, very quick.

(Continued on next page)

(At the sidebar)

MR. AGNIFILO:  So I retain my objection to the guns and the photographs of the guns which I think is 200, 201, 202, 203, 236, 245, 246 and 247.  So I do think that I retain that objection under 403.

THE COURT:  I don't remember there being any objection to any of the exhibits, but maybe I'm just misunderstanding.

MR. AGNIFILO:  Well, the objection was in light of this witness' lack of knowledge as to where these firearms were recovered from, I objected to the witness's testimony in total, but I still object to him discussing firearms and showing firearms to the jury that he's not going to be able to tell this jury where he found them.

MS. COMEY:  Your Honor the witness just testified that all of these photos, including the ones Mr. Agnifilo identified, are fair and accurate depictions of what he saw during an execution of the search of a premises that Mr. Combs owns.  I don't understand the 403 objection.  There's no prejudice here to putting in what this witness who was the team lead of the search saw during the search.

What Mr. Agnifilo is flagging can certainly be explored during cross-examination if he wants to, but these are all items that were found during the search.  That's what the record says and that's what this witness just testified to.

THE COURT:  I think that the objection, if there is an

objection, would be to testimony elicited that we haven't heard yet. So you can obviously preserve that. But as to the pictures themselves, you don't have an authenticity objection, do you?

MR. AGNIFILO: Not authenticity, Judge. It's a relevance and 403 objection based on the fact that this witness lacks personal knowledge as to where the guns were recovered, so he's about to show the jury photos of guns and guns, and he's not going to be able to tell the jury where he found them.

THE COURT: And he's not going to testify that he found them somewhere on the premises.

In any event, the objection is overruled. It's understood. You made your objection.

(Continued on next page)

(In open court)

THE COURT:  The exhibits that you've identified, Ms. Foster, will be admitted.

(Government's Exhibits 1A-200, 1A-201, 1A-202, 1A-203, 1A-205 received in evidence)

(Government's Exhibits 1A-211, 1A-212, 1A-214, 1A-216, 1A-218 received in evidence)

(Government's Exhibits 1A-227, 1A-229, 1A-231, 1A-236, 1A-237 received in evidence)

(Government's Exhibits 1A-242, 1A-244, 1A-245, 1A-246, 1A-247 received in evidence)

(Government's Exhibits 1A-248 and 1A-249 received in evidence)

BY MS. FOSTER:

Q.  Special Agent LaMon, you mentioned there were three buildings located on the property, is that right?

A.  Yes.

Q.  What buildings were the items shown in these pictures found in?

A.  The main building.

Q.  And we will go through these items one by one, but first I want to orient everyone.

Ms. Foster, could you please pull up Government Exhibit A-101 just for the witness and the parties.

Special Agent LaMon, do you recognize this?

A.   I don't see that image here.  Now I do.  Yes.

Q.   You can put the binder away, actually.  Thank you.

And what is the image in A-101?

A.   This is a detailed layout of the property at 200 South Mapleton.

Q.   And are any levels of the house missing from this sketch?

A.   From what we can tell, yes, the basement.

Q.   Other than the basement, is it a fair and accurate representation of the layout of the main house on 200 Mapleton?

A.   Yes.

Q.   How do you know?

A.   I've been there.

MS. FOSTER:  Your Honor, the government offers Government Exhibit 1A-101.

MR. AGNIFILO:  No objection.

THE COURT:  1A-101 will be admitted.

(Government's Exhibit 1A-101 received in evidence)

MS. FOSTER:  Ms. Foster, could you please publish this to the jury.

Q.   Special Agent LaMon, at a high level, what floor of the property is displayed on this page?

A.   The first floor.

Q.   Could you just describe where the front door is located?

A.   If you're looking at the image towards the lower part to the right, there's like a circular kind of stairwell-looking

P6DQcom2                         LaMon - Direct

kind of thing.  Just to the left of that is a -- a square with some like doors, kind of what's supposed to represent doors kind of swinging open.  Yes.

Q.  Is that the room that was just highlighted?

A.  Correct.

Q.  And focusing you on the bottom left half of this page and directing your attention to the room that's sticking out sort of at the bottom, what is that room?

A.  That is the security room.

Q.  And did that room appear to be associated with a security team on the property?

A.  Yes.

Q.  Is there also a garage connected to the property?

A.  Yes.

Q.  Can you please describe where that's shown on this?

A.  It would be the large rectangle at the bottom.  Yes.

Q.  And what was the general layout of the garage?

A.  It's like a garage, but it had like a little storage area in it, above it.

         MS. FOSTER:  Ms. Foster, could you now please turn to page 2.

Q.  What floor is shown on this page?

A.  Second floor.

         MS. FOSTER:  Ms. Foster, could you please zoom in on the top half of this page.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6DQcom2                    LaMon - Direct

Q.  Special Agent LaMon, was there a master bedroom on the property?

A.  Yes.

Q.  Is that shown in this image?

A.  Yes.

Q.  Where is it shown?

A.  It's the square shape to the right that kind of protrudes up.  Yes.

Q.  Is there a bathroom near the master bedroom?

A.  Yes, there are two.

Q.  And where generally were they located relative to the bedroom?

A.  To the right and to the left.

Q.  And was there a closet near the master bedroom?

A.  Yes, two.

Q.  And where were they located relative to the bedroom?

A.  One is just opposite of where the bedroom is -- the master bed is, that one highlighted.  And then one to the left just below the bathroom.

Q.  And were you personally in all of these rooms we just discussed at some point during the search?

A.  Yes.

        MS. FOSTER:  Ms. Foster, you can take down this exhibit.

        Can you please display Government Exhibit A-244?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P6DQcom2                          LaMon - Direct

Q.  Special Agent LaMon, what does this image show?

A.  The master bedroom, or part of it.

Q.  Why did you conclude this was the master bedroom?

A.  The layout of the room, the items found in -- some of the items found in the room suggesting it was belonging to the -- Mr. Combs.

Q.  What about the layout of the room made you think it was the master?

A.  Having the two attached kind of bathrooms to it, and with the diagram that we previously saw.

Q.  What are shown on either side of the bed in this photo?

A.  Nightstands, drawers.

        MS. FOSTER:  Ms. Foster, could you please display Government Exhibit A-231.

Q.  What does this show?

A.  That is inside the nightstands, one of the drawers on the nightstands.

Q.  One of the nightstands we just saw?

A.  Yes.

Q.  Focusing your attention on the manila envelopes, how many manila envelopes were found in the nightstand?

A.  Six.

Q.  What did each of these envelopes have written on them?

A.  The letter K.

Q.  Were these envelopes seized by law enforcement during the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

P6DQcom2                           LaMon - Direct

search?

A.   Yes.

Q.   Special Agent LaMon, in the cart beside you is a bag that has been marked as Government Exhibit A-110.  Do you mind going and retrieving that item?

A.   Yes.

Q.   Do you recognize this?

A.   Yes.

Q.   What is it?

A.   The manila folders or envelopes that are seen in this photo that were in the nightstand.

Q.   And how do you know?

A.   I seized them.

          MS. FOSTER:  Ms. Foster, could you now please display Government Exhibit 1306, which is a stipulation between the parties, and zoom in on paragraphs 13 and 14.

          I will read:  Government Exhibit A-110 was seized during a search of 200 South Mapleton in Los Angeles, California on or about March 25, 2024 and were analyzed for the presence of controlled substances by a U.S. Department of Homeland Security and U.S. Customs and Border Protection Laboratory.  Details of this search and the results of the laboratory analysis are described below.

          Government Exhibit A-110 contains six yellow envelopes marked with a K, which were found in the master bedroom and are

P6DQcom2                          LaMon - Direct

pictured in Government Exhibit 10A-101-A.  Prior to testing, five of these yellow envelopes each contained a resealable bag that was printed with shamrocks and contained white powder, and one of the yellow envelopes contained two resealable bags that were printed with shamrocks and contained white powder.  The white powder from each of the seven resealable bags tested positive for ketamine.

Your Honor, the government now -- and then, sorry, could you just go down.  And one more.

Pursuant to this stipulation, at the end, the government offers 1A-110 and Government Exhibit 10A-101-A-1.

THE COURT:  Those exhibits will be admitted.

(Government's Exhibits 1A-110 and 10A-101-A-1 received in evidence)

MS. FOSTER:  Ms. Foster, could you please display Government Exhibit 10A-101-A-1.  Thank you.  You can take this down.

Q.  I want to go back to the bedside tables in the master bedroom.  What else was seized from those tables?

A.  Electronic devices.

Q.  What type of electronic devices?

A.  Cellphones and iPad.

MS. FOSTER:  Ms. Foster, could you now display Government Exhibit A-218.

Q.  Special Agent LaMon, what is this?

P6DQcom2                    LaMon - Direct

A.   The inside of one of the nightstand drawers, and those are the electronics seized, the phones and the iPad.

Q.   Special Agent LaMon, I'm directing your attention to what has been marked for identification as Government Exhibit A-800 in the cart beside you.

Special Agent LaMon, do you recognize this?

A.   Yes.

Q.   And what is it?

A.   It is the iPhone pictured in this photo.

Q.   It's one of the two iPhones?

A.   One of the two, the larger.

Q.   How do you know that?

A.   I seized them.

Q.   Can you speak into the microphone?

A.   I seized them.

MS. FOSTER:  Ms. Foster, can you please pull up Government Exhibit 1301, which is a stipulation between the parties and go to page 2, paragraph 7.  I will read paragraph 7(c):

On or about March 25, 2024, as part of a search of the residence located at 200 South Mapleton Drive, Los Angeles, California, HSI seized the following electronic devices:

Government Exhibit A-800, a cellphone from a bedside table in the master bedroom.

Ms. Foster, you can take this down.

P6DQcom2                      LaMon - Direct

Q.   Special Agent LaMon, were additional electronic devices
seized from 200 Mapleton?

A.   Yes.

Q.   I'm also now directing your attention to what has been
marked for identification as Government Exhibit 400 and 500 in
the cart beside you as well.

         What are these two items?

A.   Two cellphones.

Q.   And where were they seized?

A.   At 200 South Mapleton.

Q.   How do you know that?

A.   I seized these also.

         MS. FOSTER:  Ms. Foster, can you now again pull up
Government Exhibit 1301 and return to page 2, paragraph 7.

         I will read:  On or about March 25, 2024, as part of a
search of the residence located at 200 South Mapleton Drive,
Los Angeles, California HSI seized the following electronic
devices:

         Government Exhibit A-400, a cellphone from a desk
drawer in an office, and Government Exhibit A-500, a cellphone
from a desk drawer in an office.

         Thank you, Ms. Foster.  You can take that down.

         I want to now move to another room in the house.
Ms. Foster, can you please display Government Exhibit A-242.

Q.   Special Agent LaMon, what is this?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

P6DQcom2                    LaMon - Direct

A.   The closet that's opposite of the -- opposite of the wall in the master bedroom.

Q.   And you mentioned there are multiple closets near the master bedroom.  Which one is this?

A.   The one that was just on the opposite side of the wall from the bed.

Q.   Was there a safe in this closet?

A.   Yes.

Q.   Is that safe shown in this photograph?

A.   Yes.

Q.   And where?

A.   To the right of the photo, there's like a -- like a door, white door swung up.  Next to that door is a gray safe door.

          MS. FOSTER:  Ms. Foster, could you please display Government Exhibits A-214 and A-227 side by side.

Q.   What do these images show?

A.   The left image 214 shows like a top kind of drawer from inside of the safe with a passport for Sean Combs.

          The image on the right 227 shows the bottom corner of the safe with a plastic bag and a substance in it.

Q.   And that's the safe we just saw?

A.   Yes.

          MS. FOSTER:  Ms. Foster, could you please display Government Exhibit A-229.

Q.   Special Agent LaMon, what does that show?

P6DQcom2                         LaMon - Direct

A.   That is a larger more clear view of that bag we just saw in the safe.

Q.   And that's taken out of the safe now?

A.   Yes.

Q.   Was this item seized by law enforcement?

A.   Yes.

Q.   Special Agent LaMon, I now want to direct your attention to what has been marked for identification as Government Exhibit A-111, and it's also in the cart beside you.

Special Agent LaMon, do you recognize that?

A.   Yes.

Q.   What is it?

A.   The bag from this photo that was inside of the safe.

Q.   How do you know that?

A.   I seized it.

MS. FOSTER:  Ms. Foster, can you now display Government Exhibit 1306, which is the stipulation between the parties that we saw earlier, and go to paragraph 13 and 15 on pages 5 and 6.

I will read:  Government Exhibit A-111 described below was seized during a search of 200 South Mapleton in Los Angeles, California on or about March 25, 2024, and was analyzed for the presence of controlled substances by a U.S. Department of Homeland Security and U.S. Customs and Border Protection laboratory.  Details of the search and the results

P6DQcom2                          LaMon - Direct

of this laboratory analysis are described below.

Government Exhibit A-111 contains a resealable plastic bag which was found in a safe in the closet of the master bedroom.  The resealable plastic bag contains a mixture of brown granular particles and brown pebbles as pictured in Government Exhibit 10A-102-A.  The mixture tested positive for MDMA.

Could we go to that last paragraph that we saw previously on the last page?

Your Honor, the government offers Government Exhibits 1A-111 and Government Exhibit 10A-102-A-1.

MR. AGNIFILO:  No objection, Judge.

THE COURT:  It will be admitted.

(Government's Exhibits 1A-111 and 10A-102-A-1 received in evidence)

MS. FOSTER:  Ms. Foster, can you now display Government Exhibit 10A-102-A-1.  You can take this down.  Thank you.

Now I want to move on to some other items.

Ms. Foster, could you please display Government Exhibit 1A-216?

Q.  Special Agent LaMon, what is this?

A.  That is a bag of Johnson & Johnson baby oil and Astroglide, and a pack of like lingerie.

Q.  Where were these items found?

P6DQcom2                        LaMon - Direct

A.   In one of the closet slits that were in that closet we were previously looking at where the safe is.

Q.   Was baby oil and Astroglide found additional rooms in the house?

A.   Yes.

Q.   What are some of the rooms you remember?

A.   Bathroom, garage -- bathrooms and the garage.

          MS. FOSTER:  Ms. Foster, could you please display side by side Government Exhibit 1A-211 and 212 side by side.

Q.   What room were these items taken in, these photos taken in?

A.   The bathroom to the right of the master bedroom.

          MS. FOSTER:  And, Ms. Foster, can you now display side by side Government Exhibits 1A-248 and 249.

Q.   Special Agent LaMon, what room were those photos taken in?

A.   The bathroom to the left of the master.

          (Continued on next page)

P6dWcom3                          LaMon - Direct

MS. FOSTER:  You also mentioned the garage.

Ms. Foster, could you now display Government Exhibit 1A-205.

Q.   Special Agent LaMon, what does this image show?

A.   A stack of boxes of Astroglide.

Q.   And where were those items located?

A.   In the garage.

Q.   Were each of these boxes full?

A.   Just about.

Q.   Just about all of them were?

A.   Yes.

Q.   And how do you know?

A.   We inventoried them.

Q.   In addition, generally, were the bottles of Astroglide and baby oil that were found in the house seized by law enforcement?

A.   Generally.

Q.   Approximately how many bottles of baby oil were seized from the house at Mapleton?

A.   200 or so.

Q.   Bottles?

A.   Bottles of baby oil.

Q.   What about bottles of Astroglide?

A.   I think around 900 or so.

MS. FOSTER:  Ms. Foster, you can take this down.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6dWcom3                          LaMon - Direct

Q.  You mentioned before a security room, is that right?

A.  Correct.

Q.  And can you remind everyone what floor the security room was located on?

A.  The first floor.

Q.  And was that a room that had a door?

A.  It did.

Q.  Before you entered the security room, had a team of agents already swept the house to make sure it was safe?

A.  Yes.

Q.  And as part of that safety sweep, is it the team's procedure to make any firearms safe?

A.  Yes.

Q.  And does making firearms safe involve removing the magazine from any firearm and laying out the firearm in a safe manner in the room where it was found?

A.  Yes.

Q.  Before we go on to some of these photos, was there a gun safe in that security room?

A.  Yes.

Q.  And was that safe large enough to fit some of the items we're about to talk about?

A.  Yes.

        MS. FOSTER:  OK.  Ms. Foster, can you please display Government Exhibit 1A-200.

Q.   What is generally shown in this photo?

A.   This photo is two chairs that were in the security room, and on the chairs are multiple firearms that were inside that room.

Q.   And before we go through these, were these firearms, when you entered the room, laid out with their magazines removed?

A.   Yes.

Q.   And was that consistent with the instructions given to that team that did the safety sweep?

A.   I don't know there was instructions.  It's more of a standard operational procedure for them to do that if they encounter weapons.

Q.   OK.  So they were laid out consistent with that, is that right?

A.   Yes.

Q.   So am I right that you do not know whether these guns were found in the gun safe prior to entering?

A.   Correct.

     MS. FOSTER:  OK.  Got it.

Q.   Now, before we go on, are you familiar with different types of guns?

A.   Yes.

Q.   And how are you familiar with them?

A.   Training and experience.

Q.   Now I want to go through the firearms shown in this

P6dWcom3                         LaMon - Direct

picture.

Starting with the left chair, what is the item on the leftmost side of the chair?

A.   On the leftmost side of the left chair is a bolt-action Ruger rifle.

Q.   And is Ruger the manufacturer?

A.   It is.

Q.   And how many firearms are next to the rifle on the left shown in this photograph?

A.   Two additional firearms.

Q.   What type of firearms are shown next to it?

A.   A Smith & Wesson M&P rifle and a Glock pistol.

Q.   And what type of firearm is the Smith & Wesson M&P firearm?

A.   It's a semiauto AR platform, AR-15 platform.

MS. FOSTER:  Ms. Foster, could you please display Government Exhibit 1A-201.

Q.   What does this show?

A.   That's a close-up of the left chair of the Glock pistol and the Smith & Wesson M&P rifle with those orange-colored features on it.

Q.   Those are two of the firearms that were on that prior chair?

A.   Yes.

Q.   Now, what else is shown next to these firearms on this image?

P6dWcom3                          LaMon - Direct

A.   There are three 30-round P magazines, a Glock magazine with ammunition sticking out that you can see and two locks, a holder for a pistol, a pistol holster and some type of 5.11 bag.

Q.   And what is a 5.11 bag?

A.   Just a bag you can, you know, hold things.  It's just a bag.

Q.   OK.  Are those locks potentially associated with that bag?

A.   It looks as it could be.  There's -- on the 5.11 bag, there's a zipper that has a hole in it that would accommodate those type of locks.

Q.   OK.  You mentioned four magazines, is that right?

A.   Yes.

Q.   And what are magazines?

A.   Magazines are essentially what holds the ammunition for a firearm.

Q.   And you mentioned that three of the magazines were 30-round P mags, is that right?

A.   Correct.

Q.   What does that mean, 30 round?

A.   30 rounds means that it can hold 30 rounds of ammunition.

Q.   What type of firearm would those magazines be associated with?

A.   Those would be associated with the M&P rifle.

Q.   And then turning to the fourth magazine, how many rounds

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6dWcom3                        LaMon - Direct

would fit in that magazine?

A.   The smaller one you're saying?

Q.   Yes.

A.   I believe that one was, like, ten.

Q.   And what firearm would that magazine fit in?

A.   It can go in a Glock pistol.

Q.   What, if anything, was found inside each of these magazines?

A.   For the pistol magazine was ten rounds of ammunition.  The 30-round P magazines for the rifle, there was 30 rounds in each one of them.

          MS. FOSTER:  Now, Ms. Foster, could you please take this down and go back to Government Exhibit 1A-200.

Q.   Now, turning to the right chair, how many firearms are shown on that chair?

A.   Three.

Q.   And what type of firearms are pictured on that chair?

A.   To the left is a Mossberg pump-action shotgun, and then there are two Smith & Wesson M&P rifles.

Q.   And for the shotgun, is Mossberg the manufacturer?

A.   Yes.

Q.   And are the two M&P rifles the same make and model of that M&P rifle we saw on the left chair?

A.   Yes.

Q.   And were these six firearms seized by law enforcement

during the search?

A.   Yes.

        MS. FOSTER:  Just focusing briefly on this round object on the right chair in the very bottom -- actually, could you please display, Ms. Foster, 1A-247.

Q.   Special Agent LaMon, what does this show?

A.   A drum magazine.

Q.   And what is a drum magazine?

A.   It's just a circular-shaped magazine that typically hold larger capacities of ammunition.

Q.   And how much ammunition could be loaded into this drum magazine?

A.   This one was a 60 round.

Q.   And was anything found inside of this drum magazine?

A.   59 rounds of green-tip ammunition.

Q.   And what is green-tip ammunition?

A.   Green-tip ammunition is manufactured to kind of penetrate body armor better than normal ammunition.

Q.   What, if any, of the firearms that we just walked through could this drum magazine connect to?

A.   That drum magazine could connect to the Smith & Wesson M&P rifles.

Q.   Now, Special Agent LaMon, I want to direct your attention to what is being marked for identification as Government Exhibit 1A-112, 1A-113, 1A-114, 1A-115, 1A-116 and 1A-117.  And

P6dWcom3                        LaMon - Direct

those are all in the boxes in the cart beside you.  Would you

mind just going up and taking a look at these.

And what are these?

A.   These are the boxes of the firearms individually packaged.

MS. FOSTER:  OK.  You can sit down with the microphone

again.

Q.   Oh, is another one at the bottom of the cart?

A.   Yeah, this smaller box down there.

Q.   And are those the same six firearms that were shown in that

photo?

A.   Yes.

Q.   And how do you know that?

A.   We looked in the box to make sure that the serial numbers

on -- that are present are, match the ones that we put on our

form.

Q.   The serial numbers of the firearms that were inventoried on

the day of the search?

A.   Yes.

MS. FOSTER:  Your Honor, the government offers only

Government Exhibit 1A-116.

MR. AGNIFILO:  Same objection, Judge.

THE COURT:  1A116 will be admitted.

(Government Exhibit 1A-116 received in evidence)

MS. FOSTER:  Special Agent LaMon, would you mind using

the scissors in that folder in front of you, would you mind

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6dWcom3                          LaMon - Direct

using that to just open Government Exhibit 1A-116.

        And I also -- sorry -- believe there's gloves if you'd those in there.

        Could you just hold that up very briefly.

        Thank you.  And you can return to your seat.

Q.  Is there anything on that firearm that was not there when it was found?

A.  Yes.

Q.  What is being added to it?

A.  A tie, zip tie.

Q.  A zip tie?

A.  Yes.

Q.  And where is that zip tie located?

A.  Through the bolt carrier opening into the magazine well.

Q.  And what is the purpose of the zip tie?

A.  To present -- prevent the bolt carrier from closing and prevent a magazine from being loaded into the firearm.

        MS. FOSTER:  And you can put that down for a second.

Q.  As part of your job, are you familiar with gun serial numbers?

A.  Yes.

Q.  And what is the purpose of a serial number?

A.  A serial number can help the manufacturer of the weapon track if they have quality control issues.  It also is used -- well, it is used in the sale of firearms to track who the

P6dWcom3                          LaMon - Direct

person is that bought the firearm.  For law enforcement, we use serial numbers to track the person who the gun is registered to, if the gun may have ever been reported as lost or stolen when we encounter them.

Q.  Are firearms generally manufactured with a serial number?

A.  Generally.

Q.  Where is that serial number typically located?

A.  It depends on the type of firearm.  For rifle-style firearms like these, they are typically located on the lower receiver.

For pistols, they can be on barrels, slides, anywhere else.

Q.  We've talked about six firearms that were found in the security room of 200 Mapleton.

Do all of those firearms have serial numbers?

A.  No.

Q.  How many do not?

A.  One.

Q.  And focusing on the five firearms that did have serial numbers, was law enforcement able to conduct tracing on those firearms?

A.  Yes.

Q.  And were they traced to a registered owner?

A.  Yes.

Q.  Which of the firearms did not have a serial number?

A.  This one, the rifle.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.   1A-116?

A.   Yes.

Q.   And can you point out just on that firearm where the serial number would have been?  Can you just stand up and show --

A.   So, for this rifle, the serial number would have been here where you see this lighter color metal.

          MS. FOSTER:  And you can sit back down.  Thank you, Special Agent LaMon.

Q.   In your job, have you become familiar with processes for eliminating a serial number?

A.   Yes.  Yes.

Q.   And how does the serial number on this firearm appear to have been eliminated?

A.   It was scratched off or, like, sanded off, probably with a machine.

Q.   What makes you think that?

A.   It's very smooth.  When they, in my experience in seeing people remove serial numbers with like a screwdriver or something like that just to damage the number, it's pretty rough.  This is very smooth to touch, so usually it's, like, a machine, a sanding machine, or something like that.

          MS. FOSTER:  Thank you.  And you can put that firearm back in the box.

          Actually, Ms. Foster, you can take down 1A-247.

          Now, Ms. Foster, could you please display Government

Exhibit 1A-203.

Q.  Special Agent LaMon, what is shown in this photo?

A.  That is the safe that was in the security room.

Q.  And that's the security room where the firearms were found?

A.  Yes.

Q.  And what type of safe is it?

A.  A firearm -- appears to be a firearms safe.

Q.  And again, I believe you mentioned this before, but this firearm safe would have been big enough, you believe, to fit the various firearms that we saw?

A.  Yes.  There looks like there are -- one, two, three -- four or so slots to slide firearms into, just from this photo.

Q.  Understood.

And what is on the top of the safe?

A.  Shotgun ammunition.  Some books and a cable.  Some type of lip balm, maybe.

Q.  And was additional ammunition found in the security room other than the ones we've just gone through?

A.  Yes.

MS. FOSTER:  OK.  Your Honor, may I have a brief moment?

THE COURT:  You may.

MS. FOSTER:  No further questions.

THE COURT:  Mr. Agnifilo.

MR. AGNIFILO:  Yes, Judge.

CROSS-EXAMINATION

BY MR. AGNIFILO:

Q.   Good morning, Special Agent LaMon.

A.   Good morning, sir.

Q.   My name is Marc Agnifilo.  I'm going to ask you some questions.  I'm one of Mr. Combs's lawyers.  If I ask you a question and you don't understand it, just tell me to rephrase it and I'm happy to do that.

A.   OK.

Q.   You're aware that Mr. Combs has a security service that protects that home at Mapleton, am I right?

A.   Yes.

Q.   OK.  And I think what you said on direct examination is that there's a dedicated security room.  Am I right about that?

A.   It appears as so.

         MR. AGNIFILO:  OK.  And I just want to see if I can orient us.  Can we look at 1A101, already in evidence.

         OK.  Can everyone see that?

         Can you see that OK?  OK.

Q.   So as we look at it, you see there's sort of two parts of the house that protrude outward from the house; do you see that?

A.   That is correct.

Q.   OK.  As you're looking at this, there's one on the right and then there's one on the left?

P6dWcom3                        LaMon - Cross

A.  Yes.

Q.  Let's focus on the one on the left.

A.  Yes.

Q.  Is that the security office?

A.  Yes.

Q.  OK.  So that security office, so every single gun and every single piece of ammunition that you talked about today, just to be clear, was recovered from that security office?

A.  That is correct.

Q.  OK.  And just to be clear, you went through the whole house, right?

A.  From my knowledge.

Q.  OK.  Again, I am not going to ask you one question you can't answer.  All right?

So you can tell children live in the house, right; you saw bedrooms consistent with children living in the house?

A.  Yes.

Q.  OK.  All right.  And I just want to be crystal clear. There were no guns in any of those bedrooms, right?

A.  Correct.

Q.  All right.  There was no ammunition in any of those bedrooms, right?

A.  Correct.

Q.  There was no guns and ammunition anywhere in this house other than that one security office that you just identified

P6dWcom3                          LaMon - Cross

for this jury, right?

A.   Correct.

Q.   OK.   Now, by the time you saw -- when you got to the location, was that security office door open?

A.   When I got there, yes.

Q.   OK.   And do you know if it was locked before law enforcement got there that day?

A.   I do not.

Q.   OK.   You don't know.   OK.

     Can I ask you a question?   I'm not trying to put you on the spot.   Wouldn't that be something important to know?

A.   Not particularly.   No.

Q.   OK.   And the reason I ask, the reason I ask is because this is a home, right?   People live here, children live here, right?

A.   Yes.

Q.   OK.   So you don't know whether when law enforcement got there on that day if that security office that we're looking at that kind of protrudes here off to the left, if that security office door was locked?   And if you don't know, you don't know.

A.   Yeah.   I don't know that it was.

Q.   OK.   Could you see, when you got there, was it in an open position?

A.   It was.

Q.   OK.   Could you see if it had a lock?

A.   If it had a lock on, like, a doorknob are you referring to?

P6dWcom3                          LaMon - Cross

Q.  Yes, a bolt lock, a doorknob lock, anything that would lock that door.

A.  It had a doorknob.

Q.  OK.

A.  I didn't look for a lock to it.

Q.  OK.  Have you ever seen any photographs of that door so we could all see that that is a locking door?

A.  I don't know that anybody took a picture of the door specifically.

Q.  OK.  All right.  So when you get there, that door is ajar?

A.  Yes.

Q.  It's open; you don't have to force it open.

Let me ask you another question.  Could you tell if it appeared to have been forced open, meaning there was some sort of damage to the door or something like that?

A.  I would think I would, yes.  And I don't recall that being --

Q.  OK.  So we don't have any photographs of the state of the door to tell us whether the door was forced open by law enforcement or whether it got opened some other way; we just don't know the answer to that question?

A.  We don't.

Q.  All right.  OK.

A.  We just know that it was open.

Q.  OK.  So the first time that you got into the security room,

P6dWcom3                          LaMon - Cross

what I think you told the prosecutors is that these guns were already laid out on those two chairs, correct?

A. Correct.

Q. And I think we saw a photograph of the safe, and the safe was open when we saw the photograph of it, right?

A. Correct.

Q. You have no reason to think that that safe was open before law enforcement got there, do you?

A. I don't.

Q. OK. Could you see any marks on the safe consistent with law enforcement forcibly opening the safe?

A. We had a locksmith on site, and I don't recall a locksmith touching that safe.

Q. OK. Do you know -- only if you know -- if you asked anyone -- let me back up one more second.

Mr. Combs was not at this house at the time of the search, right?

A. No.

Q. OK. To your knowledge, he was in Florida about to get on a plane with his family, is that right?

A. I think that's where he was.

Q. OK.

A. I don't --

Q. All right. If you don't know something, you're totally allowed to say I don't know. That's cool.

Q.   OK.   So You think that's where he was, right?

A.   Yes.

Q.   But he was not in the house?

A.   He was not.

Q.   Do you know, only if you know, if any of the law enforcement officers executing the search asked any of the security personnel, hey, we could break the safe or you could open the safe, what do you think you want to do?  Anything like that?

A.   No, I don't know that they did any of that.

Q.   All right.  You don't know one way or the other?

A.   I don't know that they asked the guy to open, the guy that was on site to open.

Q.   OK.  Was there a guy on site?

A.   There was.

Q.   And do you know -- and these are just questions, do you know or do you not know.  Do you know how that safe got opened?

A.   No.

Q.   OK.  And what you told the members of the jury is that that safe is a gun safe, correct?

A.   It is.

Q.   OK.  So we're in Manhattan.  We don't know a lot about guns, but --

MS. FOSTER:  Objection.

MR. AGNIFILO:  I'm sorry about the comment, your

P6dWcom3                         LaMon - Cross

Honor.

THE COURT:  Move on.

BY MR. AGNIFILO:

Q.  You can buy safes that are specifically gun safes, right?

A.  Yes.

Q.  And then there are safes that are for other things, people keep objects in or money or passports and stuff, right?

A.  Yes.

Q.  OK.  But this was specifically a gun safe?

A.  From the photo and the features in the photo, it looks like it was manufactured for the purpose of holding a gun, yes.

MR. AGNIFILO:  OK.  And the reason -- let me see if I can pull it up and take a look.  Give me one second.  All right.  Could we look at 1A203?  It's already in evidence.  I think that's going to be a picture of the safe, and we can kind of look at it.

All right.  OK.  Could we zoom in on -- actually, we don't have to zoom in.

Q.  You see in there it looks like there's kind of a place there on the left with little ridges in it that look like it might be able to hold long guns?

A.  Yes, the four little indentations.

Q.  OK.  So, and tell me if this is right, this is one of the things that leads you to conclude that this is a gun safe?

A.  Yes, that, the felt lining on the inside of it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6dWcom3                          LaMon - Cross

Q.   OK.

A.   Yeah, it resembles a gun safe.

Q.   And when you saw this safe for the first time, it was in this position; the door was open?

A.   Correct.

Q.   OK.  And you said you had a locksmith on site.  Would -- looking at this photo -- I don't know -- do you know of another photo of the safe other than the one we're all looking at right now?

A.   Not to my knowledge.

Q.   OK.  Fair enough.

     Is there anything that you can see, looking at this photo, that would lead you to conclude whether this door was opened by a locksmith, by someone who had the combination or the key or in some other manner, or does this photo not tell you the answer to that question?

A.   This photo doesn't tell me if it was manipulated to be unlocked or it was unlocked already.

Q.   Understood.  OK.

     And on those long guns -- and you showed the jury one of the long guns a few minutes ago, you're saying those long guns could have fit lengthwise in the safe?

A.   Yes.

Q.   OK.  And you don't know, you don't know as you sit here today and testify at this trial whether those long guns were in

P6dWcom3                        LaMon - Cross

that safe or not?

A. Correct.

Q. OK. Do you know who would know the answer to that question?

A. Maybe someone from SRT. I'm not sure.

Q. OK. And what's SRT?

A. Special response team.

Q. Part of the Department of Homeland Security, or no, maybe not?

A. Yeah. It's a team of specialized agents, a part of HSI that's sometimes utilized for larger scale search warrants, cleanings or high-risk search warrants, just depends.

Q. OK.

A. But yes, they are the ones that made entry first. They may or may not know.

Q. OK. As the lead agent -- you said you were the lead agent on this search, correct?

A. Correct.

Q. What does that mean? What do you do as the lead agent on this search?

A. For this search? My responsibility is, once the location was made safe by SRT, my responsibility was to go in and look for items to be seized; provide guidance to the search teams; seize the items ultimately, once it's determined that they will be taken; inventory them; do a report on those and provide them

P6dWcom3                          LaMon - Cross

to HSI New York.

Q.   OK.  And wouldn't it be important to you, as the lead agent, to know exactly where these firearms were found?

A.   Yes and no.  I mean as long as they -- if I had a reason to ask them, I don't know that, you know -- in my previous experience dealing with SRT, if they found a weapon that was somewhere that they felt they needed to pass on some information to me, they would.

In this case they just advised us that they encountered firearms in the residence.  They made the firearms safe, so they should not be loaded.  And then they left.

Q.   OK.  So you don't know, all the guns and all the ammunition we looked at photographs of and the gun you showed the jury, you don't know whether all of that stuff was in a locked security room, inside a locked firearms safe, right?  You don't know one way or the other?

A.   Correct.

Q.   OK.  And have you ever seen a photograph of the safe in a closed position before it was opened?

A.   Not that I can think of, no.

Q.   OK.  Have you ever seen photographs or a video of how the safe was opened?

A.   No.

Q.   No?

A.   No.

P6dWcom3                    LaMon - Cross

Q.   OK.  Have you ever seen a photograph of what the contents of the safe looked like after the door was opened?

A.   No.

Q.   OK.  Because that photograph, you agree with me -- forget the photograph.

That view -- at some point the safe was open; someone looked inside of it -- that would tell us definitively, wouldn't it, what items were in the safe and what items were not in the safe?

A.   Correct.

Q.   OK.  Was there anything in the operation protocol that would have called for that type of photographing?

A.   Can you say that -- can you say that again?

Q.   Sure.  Sure.

Was there anything in the protocol -- let me take a step back.

This is an important search, right?  It's a big house, right?  Yes?

A.   Oh, yes.

Q.   It's a big house; it's a lot of agents, right?

A.   Yes.

Q.   And just to be clear, this is solely Department of Homeland Security, there are no other federal agents involved, correct?

A.   Task force.  Not like an entire agency, but we do have agents from, like, the ATF that was task force.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6dWcom3                         LaMon - Cross

Q.   OK.   No FBI?

A.   No.

Q.   OK.   So you all at Homeland Security at some point come up with some sort of protocol, am I right, of how you're going to do this search?

A.   Correct.

Q.   OK.   And just tell the jury -- I don't want any inside baseball stuff.   Just tell the jury, real quickly, what does that involve?

A.   With coming up to do the search?

Q.   Yeah.   Before the search, you guys say we're going to get a search warrant.

A.   Yes.

Q.   What are we going to search?   We are going to search this house.   Whose house?   Sean Combs' house.   What's the house like?   You ask a million questions, right?

A.   Correct.

Q.   And you know that one of the things you're looking for in the premises is firearms, right?

A.   Yes.

Q.   OK.   And so, what I'm wondering is whether you all had a meeting and came up with a general protocol -- protocol might not be the right word, that's my word -- of how you're going to conduct this search?

A.   Yes.

Q.   OK.  And my question is, was part of that protocol photographing items before they were moved from one place to another place?

A.   Yes.

Q.   OK.  All right.  Because what you're really trying to make sure you know is where an item was before law enforcement got there and then moved it to another place, right?

A.   Yes.

Q.   OK.  Because you told the jury a little while ago you found some things on Mr. Combs's nightstand by his bed, right?

A.   Inside of it, yes.

Q.   Yeah, yeah.  And do you know if that stuff was moved before you saw it?

A.   Before I saw it?

Q.   Yes, sir.

A.   The agent who discovered it probably in the process of looking for something, if it was covered or it was underneath, they would have to move things.  But if they determined that it was something they might need, we're going to try to sit it back in the spot where it was originally found.

Q.   OK.  So my question is did that happen with these firearms?  And the specific question is this:  Someone opened -- the safe is opened somehow.  Someone could take a photograph of the inside of the safe so we can all know what was in the safe or what wasn't in the safe, isn't that right?

P6dWcom3                        LaMon - Cross

A.   For SRT, no.  And that's --

Q.   For?

A.   For the SRT team, no, that's not their procedures.  SRT's sole purpose upon entering the location is to look for people, or if they encounter weapons, to make weapons safe.  They would not go in with a camera and take a picture of things.  Their primary focus is to make sure that myself and the rest of the search team, once we are on premise, are in an area where we deem it to be safe now for us to conduct our business.  If SRT was not involved, then I myself, as the case agent and the team lead, may have instructed our entry team to, if they encountered firearms, to remember that.  But SRT has their set of procedures and protocols.  I'm not on that team, so I can't say that.  In my training and experience with SRT, I've never seen them, whether it's Homeland Security or operating with FBI SWAT or ATF specialized team, even LAPD or the L.A. County Sheriffs, I've never seen them go in, in the process of trying to make an area safe, take a phone out or a camera and take a picture of something when they encounter firearms.

Q.   Is there anything preventing you from having someone with a phone or someone with a camera go in with the SRT team so we can understand where these guns were when you encountered them?

A.   The thing that would be preventing me or my search team? Yes.  And that would be the SRT team because we are not trained to operate with them and how they conduct their tactics.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6dWcom3                        LaMon - Cross

Therefore, I would not be allowed to follow in behind them, for safety procedures. I don't wear the same gear that they wear. I don't know how to move amongst rooms and hallways and clear rooms the way that they do it. So, no, they would not allow me to just follow behind them and kind of take pictures of things.

Q. So we don't have any pictures -- because of this protocol that you're laying out for this jury, we have no idea where these guns were, right?

A. Outside of them being in the security room?

Q. Yeah. We don't know if all of these guns were in a safe or if all of these guns were scattered on a bunch of chairs in the security room; we don't know the answer to that question, right?

A. Yeah. Yes.

Q. And part of the reason we don't know the answer to that question is because——and you explained the reason——nobody took any photographs of how things were before law enforcement got there, right?

A. Yes.

Q. Now, you guys don't wear body cameras, right?

A. No.

Q. Unlike some, we've heard of police departments wearing body cameras, you guys don't do that, right?

A. At the moment, no. I think it was supposed to be implemented, but I don't know that that's --

P6dWcom3                        LaMon - Cross

Q.  OK.  All right.  And you never -- when you came into that security room, you didn't say to yourself, hey, as the lead case agent, I want to know where these guns were before law enforcement got here, you didn't talk to anybody from SRT to answer that question, am I right?

A.  I did not.

Q.  Now, I think you said -- how many search warrants have you been involved in executing?

A.  At least 50 or 60.

Q.  60?

A.  At least 50 or 60.

Q.  And you said you're with human trafficking and smuggling, what is it, a unit, what is it?

A.  It's a group.

Q.  OK.  And in your 60 or so search warrant executions as part of the human trafficking and smuggling investigation group, how many times have you recovered Astroglide?

A.  One.

Q.  Yeah?  Other than this day?

A.  No.  This is the only.

Q.  This is the only time, right?

How about baby oil?  So tell the jury all the human trafficking and smuggling investigation search warrants that you conducted when you walked out with boxes of baby oil.

A.  It's only been in this one.

P6dWcom3                          LaMon - Cross

Q.   That's what I thought.

         MS. FOSTER:  Objection.

         THE COURT:  All right.  No comments, please.

BY MR. AGNIFILO:

Q.   And there's a lot, we saw boxes and boxes of Astroglide, right?

A.   Yes.

Q.   You just saw it a little while ago, right?

A.   Yes.

Q.   And baby oil was in the garage and baby oil was in a bathroom, right?

A.    I don't know if baby oil was in the garage, but --

Q.    I thought that's what you said.  Maybe I have it wrong.  In boxes, maybe?

A.    Astroglide was in the boxes.

Q.    OK.  Astroglide was in the boxes, buying in bulk, buying Astroglide in bulk; that's what it looks like to you?

A.    Sure.

Q.   So the baby oil and the Astroglide was in the living parts of the house, but those guns, tell the jury where every single one of those guns were.

A.   Security room.

Q.   Yes, in the security room.  There was no gun anywhere in any of those three houses that you looked in, anywhere other than in that one security room, right?

P6dWcom3

A.   Correct.

Q.   All right.  You're from Los Angeles?

A.   Yes.

Q.   All right.  I hope you enjoy New York.  Thank you.

          THE COURT:  Ms. Foster, anything further?

          MS. FOSTER:  Nothing from the government.

          THE COURT:  All right.  Thank you, Special Agent LaMon.

          (Witness excused)

          MS. COMEY:  Your Honor, there's a logistical issue we need to take care of before the next witness.  Would you mind taking a brief break for us, please?

          THE COURT:  All right.

          Thank you, members of the jury.  We'll take a 15-minute break and then we'll be back.

          (Continued on next page)

P6dWcom3

(Jury not present)

THE COURT:  Please be seated.

MS. COMEY:  Your Honor, I apologize.  I forgot to flag this, but the next witness, I believe we sent a proposed immunity order to your Honor's chambers a couple of nights ago. So he'll just need to invoke before he takes the stand.

THE COURT:  I understood that to be the case.  Do you have an extra copy of the proposed order?

MS. SMYSER:  Yes, your Honor.

THE COURT:  Please hand it up, and we can bring in Mr. Pérez.

MR. AGNIFILO:  Your Honor, can we take this opportunity for a brief bathroom break?

THE COURT:  Yes.

MR. AGNIFILO:  Thank you.

(Recess)

JONATHAN PEREZ,

     called as a witness by the government,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. SMYSER:

Q.  Good morning, Mr. Pérez.

Would you mind stating your name for the record.

A.  Jonathan Pérez.

Q.  Mr. Pérez, did you receive a subpoena requiring you to

P6dWcom3

testify at trial today?

A.  Yes.

Q.  Do you have an attorney who represents you in connection with this case?

A.  Yes.

Q.  And based on your discussions with your attorney, do you intend to invoke your constitutional right not to testify and not to answer all questions put to you on the grounds of potential self-incrimination?

A.  Yes.

Q.  And do you understand that if the Court enters an order granting you immunity, that you'll be required to answer all questions truthfully here today?

A.  Yes.

Q.  Do you understand that the order will not protect you from prosecution for perjury if you intentionally make false statements today?

A.  Yes.

        MS. SMYSER:  Your Honor, the government asks, based on the witness's answers, that you enter the proposed order of immunity.

        THE COURT:  All right.  I'll enter the proposed order and enter it as a court exhibit.

        Is there anything further, Ms. Smyser?

        MS. SMYSER:  No, your Honor.

P6dWcom3

THE COURT:  All right.  Thank you very much.

Thank you very much, Mr. Pérez.

(Witness excused)

THE COURT:  Ms. Comey, anything further at this time?

MS. COMEY:  Yes, your Honor.  There is just one thing I wanted to note.

I obviously can't see Mr. Combs during the examination, for the most part because my back is to him, but my colleagues in the back of the courtroom inform me that Mr. Combs has been nodding during cross-examination, did so for this most recent witness and has done so at times during Jane's examination as well.  We'd just ask that your Honor remind Mr. Combs that even if he's not looking at the jury, nodding, especially emphatically, during cross-examination is not appropriate and is not something he should be doing.

MR. STEEL:  Your Honor, can I?

THE COURT:  Yes.

MR. STEEL:  I just want the record to reflect that for most of the trial before this honorable Court I've been sitting to the left of Mr. Combs, and I understand that the AUSA's just repeating what other people said.  He has been nothing but professional, your Honor.  I know what you said.  I heard what you said days ago.  Mr. Combs since that time is not even looking at the jurors because he does not want to defy the Court's order.  So the Court's looking directly at Mr. Combs.

P6dWcom3

I'm to his left, I pay close attention to the goings-on in the courtroom, and it's my affirmation Mr. Combs did nothing inappropriate at all today or any day, actually.  But I just wanted that for the record.

THE COURT:  All right.  Very good.

Look, we had an exchange about this a few days ago.  I reiterated it later in the day, and my understanding is, unless someone tells me different, is that counsel on both sides have made clear to their respective teams to be following those rules.

There is going to be some amount of reaction to testimony that is given, and it is impossible to police every reaction from every person in this courtroom to testimony that's given or other things that happen, but I was clear initially that there should be no attempt to, through facial expressions or otherwise, make any effort to either communicate with or influence the jury.  And unless I see things or hear that anyone's trying to violate that, I will assume that counsel have properly advised their clients and the other members of their teams, and we'll proceed on that basis.

Ms. Comey, if anything further comes to your attention, please let us know.  And since we are facing the opposite way, we will certainly keep an eye out for anything that happens.

MS. COMEY:  Thank you, your Honor.  I'm not asking for

P6dWcom3

a curative instruction.  I'm not suggesting Mr. Combs should be removed.  I just would note that Mr. Combs nodding emphatically, when his attorney is asking a yes-or-no question for which he wants a "yes" answer, could raise the problems that we flagged before, and I just wanted to put on the record our request that he not do so.

THE COURT:  All right.  That's fair.

Anything further, Ms. Comey, before we proceed?

MS. COMEY:  No, thank you.

MR. AGNIFILO:  Unless we're going to need the guns, you can return them back to the gun safe.

MS. COMEY:  We agree, your Honor.  That was my oversight.  We'll remove the guns.

THE COURT:  All right.  So let's remove the guns and then we'll come back at 11:30.

Ms. Smyser, are you presenting the next witness?

MS. SMYSER:  Yes, your Honor.

THE COURT:  Do you have a general estimate as to the length of the direct examination?

MS. SMYSER:  About an hour, probably.

THE COURT:  We should be able to complete that and then take a lunch break and then come back for cross-examination.

Good.  We'll take a break.  We'll come back promptly at 11:30.

(Recess)

THE COURT:  Are we ready to proceed, Ms. Smyser?

MS. SMYSER:  Yes, your Honor.

THE COURT:  Let's get our jury and then we will call the next witness.

(Jury present)

THE COURT:  The government may call its next witness.

MS. SMYSER:  The government calls Jonathan Perez.

JONATHAN PEREZ,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DEPUTY CLERK:  Mr. Perez, can I ask you to give your first and last name to the Court and spell your first and last name.

THE WITNESS:  Jonathan Perez, J-O-N-A-T-H-A-N; P-E-R-E-Z.

DIRECT EXAMINATION

BY MS. SMYSER:

Q.  Good morning, Mr. Perez.

A.  Good morning.

Q.  How old are you?

A.  35.

Q.  Where are you from?

A.  Fort Lauderdale, Florida.

Q.  How far did you go in school?

A.  Bachelor's in communications.

P6DQcom4                          Perez - Direct

Q.   I want to direct your attention to the end of 2021.  Were you working around that time?

A.   Yes.

Q.   Where were you working?

A.   I started working for Combs Entertainment.

Q.   Combs Entertainment or Combs Enterprises?

A.   Combs Enterprises.

Q.   Would you mind just pulling the mic closer to you?

        When you were at Combs Enterprise, did the company ever change its name?

A.   To Combs Global.

Q.   What was your role at Combs Enterprises or Combs Global?

A.   Personal assistant.

Q.   Whose personal assistant were you?

A.   Mr. Combs.

        MS. SMYSER:  Ms. Foster, could you please pull up what's in evidence as Government Exhibit 2A-101.

Q.   Mr. Perez, on the screen in front of you, do you recognize the person who's depicted here?

A.   Yes.

Q.   Who is that?

A.   Mr. Combs.

Q.   Do you know Mr. Combs by any other names?

A.   Diddy, P.Diddy, Mr. C, Love.

Q.   What did you call him?

P6DQcom4                          Perez - Direct

A.   Mr. Combs or Mr. C.

          MS. SMYSER:  You can take that down, Ms. Foster.

Q.   Mr. Perez, when did you start working for Mr. Combs?

A.   December 2021.

Q.   Do you still work for him?

A.   No.

Q.   When did you stop?

A.   September 2024.

Q.   How did you first learn about the job opening as Mr. Combs' assistant?

A.   KK reached out to me.

Q.   Who is KK?

A.   Kristina Khorram.

Q.   What's Ms. Khorram's title?

A.   Chief of staff.

Q.   How did you know Ms. Khorram when she reached out?

A.   I had interviewed with her a few years prior for the same role.

Q.   And did you get or take a job at that time?

A.   No.

Q.   Okay.  Mr. Perez, next I want to show you what's in evidence as Government Exhibit 2A-301.  Do you recognize this person?

A.   Yes.

Q.   Who is that?

A.   KK, Kristina Khorram.

Q.   And when approximately did Ms. Khorram reach out to you about the job as personal assistant?

A.   December 2021.

        MS. SMYSER:  You can take that down, Ms. Foster.

Q.   When Ms. Khorram reached out, what did she say?

A.   She just said that she had an opening, and she wanted to see if I was available, what I was doing.

Q.   How did you respond?

A.   I told her that I was available, not working, and then we arranged for me to go to Miami to do a trial.

Q.   When you say "to do a trial," what are you talking about?

A.   Like a test run of the job working with the other employees to see if it would be a good fit.

Q.   Did you end up doing that trial?

A.   Yes.

Q.   How long did that last?

A.   One week.

Q.   What happened at the end of that week?

A.   I was offered employment.

Q.   Did you take that job?

A.   Yes.

Q.   So when you became a personal assistant for Mr. Combs, what were your responsibilities at the high level?

A.   Doing research, making -- helping make sure that he was

where he needed to be in terms of making sure he was at the meetings, making sure he had any materials to be prepped for his meetings, his buying, packing, organizing, working closely with the house managers to make sure the homes had everything they need.

Q. When you were working as a personal assistant, where were you physically working?

A. Between his homes and LA and Miami.

Q. Where did Mr. Combs live in LA?

A. 200 South Mapleton.

Q. What about in Miami?

A. 1- and 2 Star Island.

Q. Mr. Perez, what was your salary when you were a personal assistant?

A. I started making 85,000 a year and ended making a hundred.

Q. How often were you paid?

A. Biweekly.

Q. What entity paid you when you were a personal assistant?

A. Combs Enterprises and Combs Global.

Q. Who was your direct supervisor when you were a personal assistant?

A. KK.

Q. And you said she was chief of staff, right?

A. Correct.

Q. How often about, if at all, did you see Ms. Khorram

P6DQcom4                        Perez - Direct

interact with Mr. Combs?

A.  Almost every day.

Q.  For from what you could see, how would you describe
Ms. Khorram's relationship with Mr. Combs?

A.  They seemed to have a good working relationship.

Q.  Did they also appear to have a personal relationship?

A.  Yes, some days.

Q.  And what was that from your perspective?

A.  Umm, I think that when you're working with -- in jobs like
especially working in someone's home, some of the personal and
the business mix sometimes, so it would just depend on the day
and what was going on.

Q.  And when you started as a personal assistant, what were the
nature of your interactions with Mr. Combs?

A.  When I first started probably for the first six months or
so, there wasn't a lot of interaction, just kind of playing in
the background, helping the other staff, like providing support
for the other staff.  Me and Mr. Combs didn't have a lot of
interaction probably the first six to eight months.

Q.  How were you getting instructions on what to do in those
months?

A.  From KK.

Q.  When you started communicating more with Mr. Combs, did he
also provide you instruction?

A.  Yes.

Q. When your interactions with Mr. Combs increased, did you continue to get instruction from Ms. Khorram also?

A. Yes.

Q. When you started working for Mr. Combs, were there any other personal assistants?

A. Yes.

Q. How many?

A. Three to four.

Q. How many personal assistants did Mr. Combs typically have when you were there?

A. Three to four.

Q. What other personal assistants did you work with?

A. When I first started, I overlapped with Phil Pines, and I also overlapped with Frankie Santella, he was in the process of transitioning into a different role. There was also an assistant named Joey Chavez when I first started. And throughout my time there, there was an assistant named Rob and Brendan.

Q. And did Mr. Combs have any butlers when you were there?

A. There was a butler named Frank Rodriguez.

Q. And how often did Mr. Rodriguez and the personal assistants you listed interact with Mr. Combs?

A. Every day.

Q. I want to talk about some of the people you mentioned.

MS. SMYSER: First, Ms. Foster, can we show the

P6DQcom4                        Perez - Direct

witness, the Court and parties what's been marked for

identification as Government Exhibit 2A-315.

Q.  Do you recognize the person depicted here?

A.  Yes.

Q.  Who is this?

A.  Phil Pines.

Q.  How do you know Mr. Pines?

A.  From being one of Mr. Combs' assistants.

Q.  Is it a fair and accurate depiction of him?

A.  Yes.

        MS. SMYSER:  Your Honor, the government offers

Government Exhibit 2A-315.

        MR. STEEL:  No opposition.

        THE COURT:  2A-315 will be admitted.

        (Government's Exhibit 2A-315 received in evidence)

        MS. SMYSER:  Ms. Foster, could you please publish that

for the jury.

Q.  Mr. Perez how often did -- or how long did Mr. Pines work

for Mr. Combs while you were there?

A.  About a week or two.

Q.  Did you interact with Mr. Pines after he left his job with

Mr. Combs?

A.  Yes.

Q.  Under what circumstances?

A.  He would attend some of the events that we had, and he

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P6DQcom4                        Perez - Direct

would help us procure marijuana.

Q.  And when you were getting marijuana with Mr. Pines, were you getting it for yourself or for someone else?

A.  For Mr. Combs.

Q.  For Mr. Combs?

A.  (Indicating)

MS. SMYSER:  I want to show you next what's been marked for identification as Government Exhibit A-322.  So this is just for the witness, Court and parties.

Q.  Mr. Perez, do you recognize this person?

A.  Yes.

Q.  Who is it?

A.  Frankie.

Q.  Do you know Frankie's last name?

A.  Frankie Santella.

Q.  How do you know Mr. Santella?

A.  From working with Mr. Combs.

Q.  Is it a fair and accurate depiction of Mr. Santella?

A.  Yes.

MS. SMYSER:  Your Honor, the government offers Government Exhibit 2A-322?

MR. STEEL:  No objection.

THE COURT:  2A-322 will be admitted.

(Government's Exhibit 2A-322 received in evidence)

MS. SMYSER:  Ms. Foster, could you please publish that

for the jury.

Q.  Mr. Perez how long did Mr. Santella work as a personal assistant while you were there?

A.  I believe we overlapped in his personal assistant duties like two to four weeks.

Q.  What did he do after being a personal assistant?

A.  He become -- he became a music manager.

Q.  For whom?

A.  Mr. Combs.

MS. SMYSER:  You can take that down, Ms. Foster.

And next I want to show you what's been marked for Government Exhibit A-303.  This is also for the witness, Court and parties.

Q.  Do you recognize this person, Mr. Perez?

A.  Yes.

Q.  Who is it?

A.  Joey Chavez.

Q.  How do you know Mr. Chavez?

A.  As being one of Mr. Combs' personal assistants.

Q.  Is it a fair and accurate depiction of Mr. Chavez?

A.  Yes.

MS. SMYSER:  Your Honor the government offers Government Exhibit 2A-303?

MR. STEEL:  Your Honor, no objection.

THE COURT:  2A-303 will be admitted.

P6DQcom4                          Perez - Direct

(Government's Exhibit 2A-303 received in evidence)

MS. SMYSER:  Ms. Foster, will you please publish that for the jury.

Q.  Mr. Perez, when did Mr. Chavez work for Mr. Combs relative to you?

A.  He was already working there when I started, and I think he stopped working maybe around January of 2024.

MS. SMYSER:  You can take that down, Ms. Foster.

Next I want to show you what's already in evidence as Government Exhibit 2A-313.

Q.  Do you recognize this person

A.  Yes.

Q.  And who is that?

A.  Brendan Paul.

Q.  How do you know Mr. Paul?

A.  From being one of Mr. Combs' personal assistants.

Q.  And when did Mr. Paul work for Mr. Combs relative to you?

A.  I believe he started about a year after me, and up until, I think, March 2024.

MS. SMYSER:  Okay.  You can take that down, Ms. Foster.

And next I'm going to show you what's in evidence already as Government Exhibit 2A-317.

Q.  Do you recognize this person?

A.  Yes.

Q.   Who is it?

A.   Frank Rodriguez.

Q.   And is that the butler you mentioned earlier?

A.   Yes.

Q.   When did Mr. Rodriguez work for Mr. Combs, if you know?

A.   He started a few months I think after me, and up until almost the end.

Q.   From what you could see, what were Mr. Rodriguez's responsibilities as compared to those of personal assistants?

A.   His primary focus was making sure all the food and beverage items that Mr. Combs would want were always readily available, and staying close to him by his side for whatever he would potentially need.

         MS. SMYSER:  Ms. Foster, you can take that down.

Q.   Mr. Perez, when you were working as a personal assistant, what were your typical hours?

A.   I generally worked 9:00 a.m. to 9:00 p.m.

Q.   Were there other assistants who typically worked at night?

A.   Yeah.  I mean, our shifts changed a little bit depending on what assistants were employed at the time or what was actually happening with the schedule, but typically Joey or Frank worked in the evening.

Q.   When you say Frank, are you referring to Frank Rodriguez?

A.   Yes.

Q.   Did Mr. Combs have security when you were there?

P6DQcom4                          Perez - Direct

A.  Yes.

Q.  Who were some of the security personnel?

A.  Faheem Muhammad was the head of security.

Q.  I want to show you what's in evidence as Government Exhibit 2A-203.  Do you recognize this person?

A.  Yes.

Q.  Who is that?

A.  Faheem.

Q.  What was Faheem's role?

A.  The head of security.

Q.  What, if any, role did Mr. Muhammad have with regard to cash?

A.  Well, the security guards kept the cash in a safe somewhere in the home.

Q.  And if you needed cash in your capacity as a personal assistant, how would you go about getting it?

A.  By asking Faheem.

          MS. SMYSER:  You can take that down, Ms. Foster.

Q.  Next I want to show you what's in evidence as Government Exhibit 2A-206.  Do you recognize this person?

A.  Yes.

Q.  Who is that?

A.  J9.

Q.  Do you know J9 by any other names?

A.  James.

P6DQcom4                        Perez - Direct

Q.  Do you know his last name?

A.  Fountain.

Q.  What was J9's role?

A.  He was one of the security guards and drivers for Mr. Combs.

          MS. SMYSER:  You can take that down.

Q.  Were you aware of someone named Abdu?

A.  Yes.

Q.  Who is that?

A.  One of the security guards.

Q.  What about someone named Duke?

A.  Also one of the security guards.

Q.  When you were working for Mr. Combs, did Mr. Combs have any stylists?

A.  Yes, there was a wardrobe manager.

Q.  Who was that?

A.  Jun.

Q.  Do you know Jun's last name?

A.  Choi.

Q.  All right.  Mr. Perez, I want to shift topics.

          When you were employed by Mr. Combs, were you aware of the term "king night"?

A.  Yes.

Q.  How did you learn that term?

A.  Through can KK or one of the other assistants.

Q.   What did you understand the term king night to mean?

A.   I understood it to be Mr. Combs going to a hotel to have private time with a female.

Q.   I want to show you a document, Mr. Perez.  Could you just look in the binder that's to your left, the one closest to you. If you open it up, there's a picture in the front left.  Do you see that?

A.   Yes.

Q.   That's marked as Government Exhibit A-402, which is an exhibit that's in evidence under seal.

      Mr. Perez, I'm going to refer to the person in this photograph as Jane, and I ask you to do the same, okay?

A.   Okay.

Q.   Do you recognize Jane?

A.   Yes.

Q.   How do you recognize her?

A.   As being one of Mr. Combs' guests.

Q.   When you say "guest," what do you mean?

A.   Like a female friend, companion.  I'm not sure exactly how --

Q.   Was Jane with Mr. Combs for any king nights when you were there?

A.   Yes.

Q.   How would you typically learn that Mr. Combs was going to have a king night?

P6DQcom4                          Perez - Direct

A.   Through KK or one of the assistants.

Q.   How much notice would you generally get from Ms. Khorram or other assistants about a king night?

A.   Anywhere from two hours to a full day.

Q.   At a high level, what were personal assistants required to do for king nights?

A.   There was a lot of packing materials, making sure that he was going to have everything he would need for 12 to 24 hours without having to bother anybody:  So drinks, food.  We would bring liquor, music, lights, and other personal items.

Q.   We'll talk about some of those items in a bit.  But where did these king nights typically take place?

A.   In hotels.

Q.   And who would book the hotel rooms?

A.   Our travel manager.

Q.   What was her name?

A.   Jessica Ruiz.

Q.   How did you know Jessica Ruiz was the one who helped book hotels?

A.   From being in contact with her.

Q.   Did you ever talk with her about hotel nights?

A.   In what regard?

Q.   About the rooms used for hotel nights?

A.   About the rooms, yes.

Q.   Was Jessica saved in your phone?

P6DQcom4                          Perez - Direct

A.   Yes.

Q.   What was her contact in your phone?

A.   I believe it was Jess Travel.

Q.   Were there times when king nights were not in hotel rooms?

A.   Yes.

Q.   Where did they occur when they weren't in hotel rooms?

A.   At a guest's home.

Q.   Were there any at Jane's home?

A.   Yes.

Q.   Which assistants were primarily responsible for helping with king nights when you were there?

A.   Typically whatever assistant was working in the evening.

Q.   And were there assistants who typically helped in the evenings?

A.   Joey or Frank.

Q.   Were there ever times when you set up king rooms yourself?

A.   Yes.

Q.   Approximately how many times?

A.   I can't give you an exact number, but somewhere around five.

Q.   And why were you not involved with setting up king nights more often?

A.   I typically worked during the day.

Q.   When you set up hotel rooms, what kind of items did you bring to the hotel room?

P6DQcom4                          Perez - Direct

A.  Food, liquor, other beverages, a change of clothes, lights, music, and other personal items.

Q.  What kinds of personal items would you bring?

A.  Like condoms and lube.

Q.  Did you ever include honey in your setup for king nights?

A.  Yes.

Q.  What was your understanding of what that was used for?

A.  The honey like enhances a man's libido.

Q.  I want to show you what's in evidence as Government Exhibit 1B-265?

A.  Okay.

Q.  Do you recognize what's in this photo?

A.  Yes.

Q.  What is it?

A.  Honey.

Q.  Is it the same honey that you would use for king nights?

A.  Yes.

        MS. SMYSER:  You can take that down.

Q.  Mr. Perez, you mentioned bringing lights to these hotel rooms.  What kinds of lights did you bring?

A.  Like small uplights.

Q.  Were those lights set to a particular color?

A.  They were usually set to red, but they could change colors.

Q.  Where would you get the items that you needed to set up a king night at a hotel?

P6DQcom4                          Perez - Direct

A.   Typically from the house.

Q.   And if they weren't in the house, where would you purchase them?

A.   Stores, like regular stores like Target, Walgreens, CVS or on Amazon.

Q.   Were there any other stores that you went to in order to purchase these kinds of items?

A.   No.

Q.   Did you ever go to sex stores?

A.   Yes.

Q.   Who told you to go to those sex stores?

A.   Either Mr. Combs or a guest.

Q.   And what, if anything, would you purchase there?

A.   Like adult outfits and shoes.

Q.   What kinds of shoes?

A.   High heels.

Q.   And how would you pay for the items that you purchased for king nights?

A.   Either on my company card or cash.

Q.   Where would you get the cash to purchase these items?

A.   Typically from security.

        MS. SMYSER:   Ms. Foster, could you please pull up what has been marked for identification as Government Exhibit 1A-205.

Q.   Do you recognize this, Mr. Perez?

P6DQcom4                          Perez - Direct

A.   Yes.

Q.   What is it?

A.   Boxes of Astroglide.

Q.   Where is this Astroglide being stored?

A.   At Mapleton.

Q.   And how do you know that?

A.   From being there and working there.

        MS. SMYSER:  Your Honor, the government offers
Government Exhibit A-205.

        MR. STEEL:  No opposition.

        THE COURT:  A-205 will be admitted.

        (Government's Exhibit A-205 received in evidence)

        MS. SMYSER:  Could we please publish that for the
jury.

Q.   You mentioned these were being stored at Mapleton, is that
right

A.   Yes.

        MS. SMYSER:  You can take that down, Ms. Foster.

Q.   Mr. Perez, when you were there, did personal assistants
have any role related to cleanup from a king night?

A.   Yes.

Q.   Did you ever clean up from a king night?

A.   Yes.

Q.   When you went to clean up hotel rooms after a king night,
what generally did they look like?

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

P6DQcom4                          Perez - Direct

A.  They were just a bit of a mess and disarray.

Q.  And how so?

A.  Just like lots of sheets and towels and oils.

Q.  What did you do when you cleaned up these hotel rooms?

A.  Typically, the reason for going was to collect all of the items that were left behind.  So anything we brought, we would typically bring back with us.

Q.  Would you do anything else when you were in the room?

A.  Sometimes like a quick clean, just putting the room back together in some way or gathering towels and sheets together, just to -- so the room wasn't a mess.

Q.  Did you do that cleaning before or after hotel staff helped clean?

A.  Before.

Q.  Why would you do it before?

A.  Just to -- sometimes the hotels would know who was staying in the room, so just to kind of out of respect for the staff and, you know, just to kind of help the clean-up crew.

Q.  When there were king nights, how long would Mr. Combs generally be away for?

A.  Anywhere from 12 hours to a full day.

Q.  Were there any times you saw Mr. Combs and his guest after a king night?

A.  Yes.

Q.  How would they typically appear?

P6DQcom4                              Perez - Direct

A.   Tired.

Q.   At the end of king nights, what, if anything, would assistants arrange for Mr. Combs and his guest?

A.   A good meal, a massage or a drip, like an IV.

Q.   What's the purpose of a drip or an IV?

A.   To put them to sleep.

Q.   I want to direct your attention to the binder that's closest to you first.

A.   Okay.

Q.   Could you please look through that binder and look up to me when you're done.

MS. SMYSER:  And for the record, what's contained in this binder is what's been marked for identification as Government Exhibits 3D-108, 3D-110, 3D-117, 3D-118, 3D-123, 3D-125, 3D-126, 3D-127, 3D-129 and 3D-130.

A.   Okay.

Q.   Do you recognize these documents?

A.   Yes.

Q.   What are they?

A.   Text messages.

Q.   Whose text messages are they?

A.   Mine.

Q.   And who generally are you communicating with?

A.   Other assistants or staff.

Q.   Are some of the communications with Mr. Combs?

A.   Yes.

Q.   What about with Jane?

A.   Yes.

Q.   Are these fair and accurate representations of your text messages with these individuals?

A.   Yes.

Q.   Next I want to direct your attention to a second binder in front of you.  Do you see that?

A.   Yes.

Q.   Could you again please look through the contents of this binder and look up when you're done.

        MS. SMYSER:  The record this binder contains what's been marked for identification as Government Exhibits 3D-103-A, 3D-107-A, 3D-107-BR, 3D-108-AR, 3D-109, 3D-112-AR, 3D-113-A, 3D-114-AR, 3D-115-A, 3D-116-A, 3D-117-A, 3D-120-A, 3D-123-AR, 3D-123-BR, 3D-129-A, 3D-129-BR, C-404-A, J-120, J-121, and J-122.

Q.   Do you recognize those documents, Mr. Perez?

A.   Yes.

Q.   And what are they?

A.   Text messages.

Q.   Whose text messages are they?

A.   Mine.

Q.   And how do you know they are your communications?

A.   From recognizing them.

Q.   Is that the same for the binder you looked at previously also?

A.   Yes.

Q.   And who generally are you communicating with in these text messages?

A.   Staff.

Q.   Are there some with Mr. Combs?

A.   Yes.

Q.   And are there some with Jane?

A.   Yes.

Q.   Do some of these communications contain redactions?

A.   Yes.

Q.   Are those redactions of Jane's true name?

A.   Yes.

Q.   Are these fair and accurate representations of your text messages?

A.   Yes.

          MS. SMYSER:  So, your Honor, the government now offers Government Exhibits 3D-103-A, 3D-107-A, 3D-107-BR, 3D-108-AR, 3D-109, 3D-112-AR, 3D-113-A, 3D-114-AR, 3D-115-A, 3D-116-A, 3D-117-A, 3D-120-A, 3D-123-AR, 3D-123-BR, 3D-129-A, 3D-129-BR, C-404-A, J-120, J-121 and J-122?

          MR. STEEL:  No opposition, your Honor.

          THE COURT:  Those exhibits will be admitted.

          (Government's Exhibits 3D-103-A, 3D-107-A, 3D-107-BR,

P6DQcom4                         Perez - Direct

3D-108-AR received in evidence)

(Government's Exhibits 3D-109, 3D-112-AR, 3D-113-A,

3D-114-AR received in evidence)

(Government's Exhibits 3D-115-A, 3D-116-A, 3D-117-A,

3D-120-A received in evidence)

(Government's Exhibits 3D-123-AR, 3D-123-BR, 3D-129-A,

3D-129-BR received in evidence)

(Government's Exhibits C-404-A, J-120, J-121 and J-122

received in evidence)

MS. SMYSER:  Ms. Foster, could you please pull up

Government Exhibit 3D-112-A.

Q.  Mr. Perez, did you sometimes communicate with Mr. Combs and

other employees regarding hotel nights?

A.  Yes.

Q.  So here what are we generally looking at?

A.  A text message thread.

Q.  And are you on this text message thread?

A.  Yes.

Q.  Who are the other participants in this thread?

A.  Mr. Combs and Jane.

MS. SMYSER:  So I want to zoom in, Ms. Foster, on the

heading on the top left.

Q.  This says Frank Black (Yellow) and Frank Black (Red). What

does that mean?

A.  Frank Black is Mr. Combs alias, and he had two phones so I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

saved them in my phone by the color case.

Q. So did he have a yellow phone and a red phone?

A. Yes.

Q. And was Jane also in this group text?

A. Yes.

Q. So these are the participants in the text, is that right?

A. Correct.

MS. SMYSER:  You can zoom out, Ms. Foster.  I want to zoom in on the last two messages from August 12, 2023.

Q. Mr. Perez, did you send these messages here?

A. Yes.

Q. And what did you say in the first text?

A. The Edition, Jonathan Perez, Room 439.

Q. And here why are you sending this text?

A. From what I remember, to let them know what the hotel was and the room number and what name it was booked under.

Q. And were hotels often in your name or other personal assistants' names?

A. Yes.

Q. What did you say next?

A. Just left two candles and room phone in front of room door. I'm only nine minutes away if y'all need anything.

Q. Was this about a king night?

A. Potentially.

MS. SMYSER:  You can take that down, Ms. Foster.

Could you please pull up Government Exhibit 3D-114-A.

Q. Is this another one of your text messages?

A. Yes.

Q. Who are the participants in this particular chat?

A. KK and Joey.

MS. SMYSER: So can we zoom in on the bottom half of the page?

Q. So KK first says: Checking in. How's the setup going? How much longer do y'all need?

What did you understand her to be talking about?

A. The setting up of a hotel room.

Q. Joey responds: It's going. Should be done in 30.

And then Kristina says: Okay, please keep me posted. List of what Jane wants for hotel. Maybe new outfits, shorts for him size large. Fruits, shakes, juices.

And how did you respond?

A. Copy. We got fruits, shakes and juices. I'm about to run to store quick and send her outfit options.

Q. What store are you referring to?

A. The adult store.

Q. And what kinds of outfits are you talking about here?

A. Like lingerie-type outfits for women.

Q. So Kristina responds: Just send to me, and I'll send to her for now. Thanks.

What did you understand her to be talking about?

A.  For me to send KK the images of the outfits, and she would send them to Jane directly.

MS. SMYSER:  Ms. Foster, could we please turn to page 2 of this chat.

Could we zoom in on the top half before there is a new date.

Q.  How did you respond to Kristina's message?

A.  I loved the message.

Q.  Then Kristina says:  Is room done yet?

Joey says:  Bellmen coming up to get our luggages.

Kristina says:  So how much longer till room is done done?

How did you respond?

A.  Room is done.  Just trying to get all bags back down in truck then going to store.

Q.  And what did you mean when you said "room is done"?

A.  That the setting up of the room is done.

Q.  And what store are you going to?

A.  The adult store.

Q.  Kristina then says: Copy.  Let me all when y'all are on way to store.

And how did you respond?

A.  Copy.  En route to store.

Q.  Then Kristina liked your message.

MR. STEEL:  Can we please zoom out and let's zoom in

on the next chunk of text messages, please.

Q.  When were these text messages sent?

A.  May 20, 2023.

Q.  At what time?

A.  12:38 a.m.

Q.  Kristina says:  Is PD at hotel yet?

Who is she referring to here?

A.  Mr. Combs.

Q.  Joey said:  He's on the way per security.

And then Kristina liked that message.

MS. SMYSER:  Could we please zoom out, and could we zoom in on the last two texts of this chat.

Q.  Mr. Perez, Joey says:  Here Ricky 40 away.

Who is Ricky

A.  Ricky is one of the IV people, like one.  Drip people.

Q.  Did Mr. Combs have any other people who provided him IV's during this time period?

A.  Yes.

Q.  And who were some of those people?

A.  There was various people -- I mean, this was our main guy in Miami, but there were various people in LA.

Q.  Was there an individual named Garrett?

A.  Yes.

Q.  Then when Joey says "Ricky 40 away," what do you understand him to be talking about there?

A.   That Ricky is 40 minutes away.

Q.   Kristina then says:  Joey, how's cleanup going?

         What did you understand her to be asking about?

A.   The cleanup of the room.

         MS. SMYSER:  Let's zoom out, Ms. Foster.  And could you turn to the next page and zoom in on the top two messages.

Q.   Joey then said:  Slipped and fell twice.  But calling bell cart in about ten minutes.

         MS. SMYSER:  Could you zoom out, please.

         And you can take that down.

Q.   Mr. Perez, I want to talk about another topic.

         Was there ever a time that you saw a video of Jane and someone other than Mr. Combs?

A.   Yes.

Q.   Remember approximately when this was?

A.   Maybe about a year into my employment.

Q.   Where were you at the time you heard about this video?

A.   At Mapleton.

Q.   How did it come about that you learned of the video?

A.   There was a videographer who was screaming the name of one of the other assistants that was working at the time.  And that assistant was with Mr. Combs.  So I went into the theater to see what the commotion was about, and he showed me the video.

Q.   And what was the videographer's name who showed you the video?

P6DQcom4                          Perez - Direct

A.   Brandon.

Q.   Where did you go after you heard Brandon yelling?

A.   I took the iPad, and I went into the office.

Q.   Where was Brandon at the time you went to go meet him?

A.   In the theater.

Q.   Was there anyone else in the theater with you?

A.   Yes.

Q.   And did you end up watching the video?

A.   A portion of it.

Q.   What device was the video on?

A.   An iPad.

Q.   Who generally used that iPad?

A.   The staff.

Q.   And from what you saw, what did the video show?

A.   Jane and another man engaging in sexual activity.

Q.   And was there anyone else in the video?

A.   Mr. Combs in the background.

Q.   What did the other man look like?

A.   I didn't see him.  It was a Black man.

Q.   Did you recognize that man?

A.   No.

Q.   Who, if anyone, did you tell about the video?

A.   Mr. Combs and KK.

Q.   Who did you tell first?

A.   Mr. Combs.

P6DQcom4                          Perez - Direct

Q.  How soon after seeing the video did you tell Mr. Combs?

A.  Maybe an hour or two.

Q.  And what did you tell him?

A.  I told him the same story I just told you:  That the videographer had found a video on the iPad, and that I'm pretty sure it shouldn't be there so I was bringing it to his attention so he can either delete it or do whatever he wanted to do with it.

Q.  And how did he react?

A.  He was surprised.

Q.  Did you have any further conversations with Mr. Combs about this video?

A.  No.

Q.  You mentioned that you told KK, is that right?

A.  Yes.

Q.  How soon after you told Mr. Combs did you tell KK?

A.  It was the same day, so whenever she got to the house is when I told her.

Q.  What did KK say to you in this conversation?

A.  She said that in the future, I should just -- in the future, things like that I should just bring to her, and she would communicate them to Mr. Combs.

Q.  What did you tell KK about what was on the video?

A.  I can't remember exactly what I told her, but I gave her the general gist of the video; that it was Jane and another

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

man.

Q.  Did you tell her that Mr. Combs was on the video?

A.  I can't remember.

Q.  Did there come a time when you spoke with KK about this video a second time?

A.  Yes.

Q.  When approximately was that?

A.  Maybe six months after.

Q.  Where were you when you had this conversation with KK?

A.  At 2Star in Miami.

Q.  And how did that conversation come about?

A.  KK said she wanted to have a chat about something, so we went into the gym, and she asked me to reiterate to her exactly what happened the day I found the video, everyone who was there, where I was, just to run down all the details to her.

Q.  Did she say why she wanted you to reiterate this --

A.  She said that she had got a call from someone outside of the company talking about the video in some capacity.

Q.  And did you convey to her the same things you've been talking about today?

A.  Yes.

Q.  Did you record that conversation, Mr. Perez?

A.  No.

Q.  What was your understanding of whether that conversation was being recorded?

A.   I wasn't aware it was being recorded.

MS. SMYSER:  Ms. Foster, could you please pull up what's in evidence as Government Exhibit 1301 which is a stipulation between the parties.

First I want to focus in on paragraph 1B.

It says:  On or about March 25, 2024 at the Miami Opa-Locka Airport in Opa-Locka, Florida, law enforcement agents from Homeland Security Investigations seized Government Exhibit C-300 a cellphone from 1's person.

Could we now zoom in on paragraph 4, which is on the next page.

This paragraph says:  Government Exhibits C-300-A through C-364, including the subdivisions thereof, are true and accurate excerpts of data extracted from Government Exhibit C-300.

Your Honor, the government offers pursuant to this stipulation Government Exhibit C-349, C-349-B and C-349-C.

THE COURT:  All right.  Those exhibits will be admitted.

(Government's Exhibits C-349, C-349-B and C-349-C received in evidence)

Q.   Mr. Perez, I want to direct you attention to a disk which should be next to the binders in front of you.  Do you see that?

A.   Yes.

P6DQcom4                         Perez - Direct

Q.  Could you pick it up?

          That disk contains Government Exhibit C-349-B and
C-349-C.  Did you review that disk in advance of your
testimony?

A.  Yes.

Q.  What does it contain?

A.  The audio from me and KK's conversation.

Q.  And how do you know that's what's on the disk?

A.  Because I reviewed it.

Q.  Did you also sign the disk?

A.  Yes.

          MS. SMYSER:  All right.  Ms. Foster, could you please
first pull up for the witness and parties only what has been
marked for identification as Government Exhibit T-349-BT side
by side with C-349-CT.

Q.  Mr. Perez, do you recognize these documents here?

A.  Yes.

Q.  What are they?

A.  The transcripts from like the -- the audio transcripts from
me and KK's second conversation about the video.

Q.  And did you review these transcripts before testifying
today?

A.  Yes.

Q.  Are they accurate transcripts of what was on the recordings
on the CD you reviewed Government Exhibits C-349-B and C?

P6DQcom4                         Perez - Direct

A.   Yes.

          MS. SMYSER:  Your Honor, the government offers

Government Exhibit C-349-BT and C-349-CT as aids to the jury.

          MR. STEEL:  No opposition.

          THE COURT:  They may be used.

          MS. SMYSER:  We can take that down for now,

Ms. Foster.

          Before we listen to the recordings, can we please pull

up Government Exhibit C-349 for the jury.  I just want to focus

on a few things here.  Could you please zoom in on the first

four columns.

Q.   Mr. Perez, I want to direct your attention to the column

labeled Title.  What does that say below it?

A.   New recording 188.

Q.   Next I want to direct your attention to the column labeled

Time Information.  What is under the heading timestamp?

A.   January 30, 2023.

Q.   And what is the time listed?

A.   9:20 a.m. UTC minus 8.

          MS. SMYSER:  You can take that down, Ms. Foster.

          Ms. Foster, could you please display for the jury

Government Exhibit C-349-BT.

          Could we also please pull up Government

Exhibit C-349-B for the jury to listen to.

          Could we start by playing the first 15 seconds that of

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

recording, Ms. Foster.

(Audio played)

Q.  Whose voice did you just hear, Mr. Perez?

A.  KK's.

Q.  Could we continue playing.

(Audio played)

MS. SMYSER:  Stop right there.

Q.  When Ms. Khorram says "an outside person brought up something about it," what did you understand her to be referring to

A.  Like someone from outside of the people who knew about the video.

Q.  So someone who didn't work for Mr. Combs?

A.  Correct.

MS. SMYSER:  Let's continue playing through 128, please.

(Audio played)

Q.  Was that your voice on the recording just now?

A.  Yes.

Q.  When you say, "Brandon the shooter," what did you mean by the shooter?

A.  Videographer.

MS. SMYSER:  Could we please continue playing through two minutes and 13 seconds.

(Audio played)

P6DQcom4                          Perez - Direct

MS. SMYSER:  Can you pause it there.

Q.  Did you ever learn what, if anything, was on the camera footage Ms. Khorram was referencing?

A.  No.

MS. SMYSER:  Let's continue playing through 356 please.

(Audio played)

MS. SMYSER:  Can we just pause it right there.

Q.  So you just referenced PD.  Who are you talking about there?

A.  Mr. Combs.

Q.  Earlier you referenced Rob.  Who is that?

A.  One of the other assistants at the time.

Q.  And you also referenced Geo.  Who is that?

A.  One of the videographers.

MS. SMYSER:  Let's continue playing, please.

(Audio played)

MS. SMYSER:  Could you please pause it there.

Q.  Why did you not feel comfortable deleting the video?

A.  Because, like I said, I didn't want to delete it and then it end up coming up later, and -- I didn't feel like it was my decision -- like my choice to do anything with the video.

MS. SMYSER:  Could we please continue to play through 4:05.

(Audio played)

Q.   What investigation are you referring to?

A.   I think that Mr. Combs thought he may have been compromised in some way, so when I spoke to KK on our original conversation, she said something about needing an investigation to be had in terms of whether or not like he had been compromised in some way, in terms of like his data or his phone.

Q.   And who ordered that investigation?

A.   I don't necessarily know if it was -- I don't really know if the -- what the investigation -- if it even occurred, but KK mentioned that Mr. Combs wanted an investigation to happen regarding the video and how it got on that device.

          MS. SMYSER:  Let's continue playing now through 4:20.

          (Audio played)

Q.   What did you mean when you were talking about it being filmed on that device?

A.   I mentioned to her that I thought that the video looked like it could have been filmed on that device.

Q.   And the investigation you referred to earlier, was that an investigation by staff?

A.   I'm not sure.

          MS. SMYSER:  Let's continue playing, please.

          (Audio played)

          MS. SMYSER:  Pause it there, Ms. Foster.

Q.   Who is Deon?

A.  He was -- he was like one of the executives that worked for Mr. Combs.

MS. SMYSER:  Please continue playing.

(Audio played)

MS. SMYSER:  Ms. Foster, you can take that down.

And let's pull up Exhibit C-349CT for the jury.  Can we also start playing Government Exhibit T-349C T just for about the first six seconds.

(Audio played)

Q.  Who is talking here?

A.  Me and KK.

Q.  Is this a continuation of that prior recording that we just listened to?

A.  Yes.

MS. SMYSER:  Let's continue playing through one minute and two seconds.

(Audio played)

MS. SMYSER:  Could we pause it there.

Q.  Was it true that no one else was in the theater besides you and maybe Geo and Brandon?

A.  Chef K was also in the theater.

Q.  Why did you not tell KK about Chef K?

A.  I didn't mention she was in the theater the original time we spoke, so I just didn't mention it.

Q.  Why did you not mention the original time that she was in

P6DQcom4                         Perez - Direct

the theater?

A.   I was just trying to diffuse it and minimize, I guess, the details, hoping that it wasn't going to become a big thing.

          MS. SMYSER:  Could we please play through the end.

          (Audio played)

          MS. SMYSER:  You can take that down, Ms. Foster.

Q.   Mr. Perez, were these two recordings we just listened to part of a larger conversation with KK?

A.   Yes.

Q.   Aside from Chef K not being in the theater, was anything else you told KK not true?

A.   No.

Q.   Did you have any follow-ups with KK about this?

A.   No.

Q.   And after these conversations with KK, did anyone else who worked for Mr. Combs ever bring up this video to you?

A.   Faheem.

Q.   And when did Faheem bring up the video relative to this conversation?

A.   Maybe a few months after.

Q.   Where were you when this conversation took place with Faheem?

A.   Me and Faheem were in a car.

Q.   And what did Faheem say to you?

A.   He just said, "Hey I never asked you what happened the day

P6DQcom4                        Perez - Direct

you found the video of Jane on the iPad."

Q.  And how did you respond to Faheem?

A.  And then I told him the same story that I told KK and that we just heard.

Q.  Had you ever told Faheem about the video before this conversation with him?

A.  No.

Q.  Are you aware of how Faheem knew about that incident?

A.  No.

          MS. SMYSER:  Your Honor, I probably have another 15 or 20 minutes if you would like to break now.

          THE COURT:  Why don't we break now.  Then we'll come back.

          Thank you, members of the jury.  We'll take a break now and come back around 1:30.

           All rise.

          (Continued on next page)

P6DQcom4                            Perez - Direct

(Jury not present)

THE COURT:  Thank you, Mr. Perez.  We'll see you back here at 1:30.

Please be seated.

Ms. Smyser, anything to address before we come back from lunch?

MS. SMYSER:  No, your Honor.

THE COURT:  Anything from defense?

MR. STEEL:  No.

THE COURT:  We'll see you back here at 1:30.

(Luncheon recess)

(Continued on next page)

P6dWcom5

                         AFTERNOON SESSION

                            1:30 p.m.

          THE COURT:  Good afternoon.

          Please be seated.

          Ms. Smyser, are we ready to proceed?

          MS. SMYSER:  Yes, we'll get Mr. Pérez.

          MR. DONALDSON:  Judge, I think you said you wanted to
think more about what you were going to do with juror No. 6.

          THE COURT:  Yes.  We can address that after
Mr. Pérez's testimony.

          MR. DONALDSON:  Very good.

          THE COURT:  All right.

          MS. COMEY:  Your Honor, if I may?

          When Mr. Pérez is done but before the jury is
dismissed, we have another big list of exhibits to admit that
will help us get all of our summary charts together over the
weekend once these are in.

          THE COURT:  Very good.

          MS. COMEY:  Thank you, your Honor.

          (Continued on next page)

P6dWcom5                         Perez - Direct

(Jury present)

THE COURT:  Please be seated.

Welcome back, members of the jury.

Mr. Pérez, you understand you are still under oath.

THE WITNESS:  Yes.

THE COURT:  Ms. Smyser, you may proceed when ready.

MS. SMYSER:  Thank you, your Honor.

Q.  Mr. Pérez, did you receive a subpoena requiring you to testify at this trial?

A.  Yes.

Q.  Do you want to be testifying at this trial?

A.  No.

Q.  Is there also an order compelling you to testify even if your testimony might incriminate you?

A.  Yes.

Q.  What is your understanding of what that order requires you to do?

A.  That nothing I say can -- I can't incriminate myself as long as I'm telling the truth.

Q.  Does it require you to tell the truth?

A.  Yes.

Q.  Does the order protect you if you intentionally make false statements today?

A.  No.

Q.  In other words, can you still be prosecuted for perjury if

P6dWcom5                         Perez - Direct

you were to lie?

A.  Yes.

MS. SMYSER:  I want to show you what's in evidence as Government Exhibit 1B236.

Q.  Do you recognize this, Mr. Pérez?

A.  Yes.

Q.  What is it?

A.  Mr. Combs's Gucci pouch.

Q.  What was typically kept inside of Mr. Combs's Gucci pouch?

A.  Drugs and money.

MS. SMYSER:  Would you mind pulling the mike just a little bit closer to you.

A.  Drugs and money.  Oh, sorry.

Q.  What kind of drugs?

A.  Cocaine, ketamine, molly, Adderall, Xanax.

Q.  And before king nights, what, if any, responsibilities did you have related to the Gucci pouch?

A.  Can you rephrase?  Sorry.

Q.  What responsibilities, if any, did you have related to the Gucci pouch here?

A.  In relation to king nights?

Q.  Yes.

A.  Oh.  Just making sure that it was in Mr. Combs's personal backpack that would travel with him.

Q.  Where typically was the Gucci pouch located?

P6dWcom5                        Perez - Direct

A.   In his backpack.

Q.   Was that backpack typically with Mr. Combs?

A.   Yes, sometimes.

Q.   When he went to king nights, was it typically with him?

A.   Yes.

        MS. SMYSER:  Ms. Foster, you can take that down, and let's pull up Government Exhibit 3D115A.

Q.   Who is part of this conversation?

        MS. SMYSER:  Could you zoom out for a second.

A.   It's between me and Rob, one of the old assistants.

        MS. SMYSER:  And let's zoom in on the bottom half of the page, please.

Q.   What date were these sent?

A.   July 31, 2022.

Q.   So Rob says:  Yo, will you locate his Gucci pouch in his bathroom.

     Here, when Rob says his Gucci pouch in his bathroom, who did you understand Rob to be referring to?

A.   Mr. Combs.

Q.   And how do you respond?

A.   Yes.

Q.   What did Rob say next?

A.   "Make sure it's in there, please, and if anything's out and around, just kind of stuff it back in, I guess."

Q.   And does that finish LOL?

A.   LOL.

Q.   What did you say in response?

A.   "I zipped it up, no residue, and I didn't steal one addy."

Q.   What did you mean in that text?

A.   That I zipped the Gucci pouch back up and there was drug residue and I didn't take any Adderall out of the pouch.

        MS. SMYSER:  You can take that down, Ms. Foster.

        And I want to pull up Government Exhibit 3D107A.

Q.   Who is part of this chat, generally?

A.   Whatever assistants were working at the time.

Q.   I want to focus you on your first text message here, which --

        MS. SMYSER:  Ms. Foster, could we please zoom in on the middle of the page.

Q.   What date was this text sent?

A.   October 10, 2022.

Q.   And what did you say?

A.   "Hi, I just found items in the Balenciaga pouch that should never leave the Gucci pouch.

Q.   What is the Balenciaga pouch?

A.   It was a pouch that we kept in Mr. Combs's car that had, like, personal hygiene items, like Listerine, Advil, just like personal toiletry identity items that we would have on the go.

        MS. SMYSER:  Let's zoom out.

Q.   And can we look at Joey's response and the next four texts?

P6dWcom5                              Perez - Direct

A.  Yes.

Q.  How does Joey respond here?

A.  With an emoji.

Q.  What do you say in response?

A.  Cocaine.

Q.  Why did you say cocaine?

A.  The emoji was, like, with a confused face, so I was clarifying what I meant by the item that I found in the Balenciaga pouch.

Q.  And where should that cocaine have been?

A.  In the Gucci pouch.

Q.  And Rob says in response:  He prob needs it at PT.  What did you understand him to be referring to?

A.  He was just making a joke.

Q.  What is PT here?

A.  Physical therapy.

          MS. SMYSER:  All right.  Let's take that down, please.

Q.  Mr. Pérez, as part of your employment, did you have any role in obtaining drugs?

A.  A handful of times.

Q.  And what did you do, generally?

A.  What do you mean?

Q.  What did you do related to drugs?

A.  Either purchased them or grabbed them from someone outside.

Q.  And who would ask you to grab or purchase drugs?

P6dWcom5                        Perez - Direct

A.   Mr. Combs or one of the assistants.

Q.   And who were you getting those drugs for?

A.   Mr. Combs.

Q.   Did other personal assistants also purchase or grab drugs for Mr. Combs?

A.   I'm not sure.

        THE COURT:  Hold on.  There was an objection.

        Grounds.

        MR. STEEL:  Speculation.

        THE COURT:  And I think the witness said he was not sure, so I'll sustain that.

        Ms. Smyser, you may move on.

        MS. SMYSER:  Thank you, your Honor.

Q.   Mr. Pérez, what drugs did you purchase or grab for Mr. Combs?

A.   Xanax, cocaine and molly.

Q.   Who did you get these drugs from?

A.   There was someone named Baby Girl and someone named Guido.

Q.   And how did you learn of this person named Baby Girl and this person named Guido?

A.   Just from being around, just being in the assistant circle.

Q.   And who told you about them?

A.   One of the assistants or Mr. Combs.

Q.   How would you pay for the drugs when you were purchasing them?

P6dWcom5                          Perez - Direct

A.  Cash.

Q.  Where did you get the cash?

A.  Either from security or from Mr. Combs's Gucci pouch or top drawer.

Q.  And if you're going to security, who from security would you ask for cash?

A.  Faheem.

Q.  Would you submit receipts to Faheem for cash purchases?

A.  On occasion.

        MS. SMYSER:  Ms. Foster, could you please pull up Government Exhibit 3D129A.

Q.  What are we generally looking at here?

A.  A text between me and Faheem.

        MS. SMYSER:  Could we zoom in on the first text message.

Q.  What date did you send that message?

A.  February 15, 2024.

Q.  Could you read the message?

A.  "Hi, Fah.  Diddy just has Dontray pull out $1,200.  700 went to Guido, and I'm about to get some food from the store for him with the remaining 500.  I'll send the receipts.  I didn't know Guido was even coming.  Happened all too fast."

Q.  You referenced Fah here.  Who is that?

A.  Faheem.

Q.  What about Dontray?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P6dWcom5                            Perez - Direct

A.  One of the security guards.

Q.  And who is Guido?

A.  A drug dealer.

Q.  And why did $700 go to Guido?

A.  I'm assuming for drugs.

Q.  Did you submit receipts to Faheem when you purchased drugs?

A.  No.

          MS. SMYSER:  All right.  Let's zoom out.

Q.  And the next two messages, what are those?

A.  Receipts.

Q.  Are those some of the receipts that you were referring to in your prior text message?

A.  Yes.

          MS. SMYSER:  Let's turn to the last page of this chat, please, Ms. Foster.

          And could you please zoom in on the last text message.

Q.  Mr. Pérez, could you please read that message.

A.  "Hi, can you pull 2,100.  Guy coming tonight, plus $1,524.60, my cash that I spent while in L.A.  Still waiting on TriStar for my other funds."  And then I wrote the total.

Q.  And you mentioned TriStar.  What is TriStar?

A.  TriStar is or was Mr. Combs's business managers.

Q.  What did TriStar do for Mr. Combs?

A.  So, they helped onboard employees, and they managed, helped manage his homes and his overall money, yes, my understanding.

P6dWcom5                              Perez - Direct

Q.   Who, if anyone, did you interact with from TriStar?

A.   Robin Greenhill.

Q.   What was Robin Greenhill's role?

A.   I don't know what her exact role at TriStar is or was, but she was like our account manager.

          MS. SMYSER:  You can take that down, Ms. Foster.

Q.   Mr. Pérez, I now want to direct your attention to June of 2024.

     Around that time did you receive a FaceTime from Mr. Combs when he was with Jane?

A.   Yes.

Q.   Where was Mr. Combs at the time of the FaceTime?

A.   At Jane's house.

Q.   How did he get to Jane's?

A.   I brought him there.

Q.   When you brought Mr. Combs to Jane's, what, if anything, did you do at Jane's?

A.   I can't recall.  I know that I brought bags in, like bags, some of his toiletries, an extra pair of clothes, food, drinks.

Q.   After you brought Mr. Combs to Jane's house, where did you go?

A.   I went back to where I was staying.

Q.   How soon did Mr. Combs FaceTime you, approximately, after you dropped him off?

A.   A few hours later.

P6dWcom5                          Perez - Direct

Q.   When Mr. Combs FaceTimed you, what did you see on the
FaceTime?

A.   Mr. Combs and Jane.

Q.   And where did Mr. Combs and Jane appear to be?

A.   I'm not sure where they were.  I'm assuming they were still
at her house, but I'm not sure exactly where.

Q.   And how did Mr. Combs appear on the FaceTime?

A.   Angry and annoyed.

Q.   Could you see Jane on the FaceTime?

A.   Yes.

Q.   Could you see her face?

A.   No.

Q.   Why could you not see her face?

A.   She was turned away from the camera.

Q.   How was her body positioned as compared to the camera?

A.   So, the camera's here, so she was facing, like, this way.

Q.   OK.  And so are you facing the other direction from the
camera?

A.   Facing -- yeah, not fully the other direction, just turned
away.

Q.   OK.  So she was turned away?

A.   Yeah.

Q.   What, if anything, did Mr. Combs say to you on the
FaceTime?

A.   He was asking me to confirm whether or not another female

P6dWcom5                          Perez - Direct

had been on a trip that we went on the week prior.

Q.  And what was Mr. Combs's tone of voice when he was talking?

A.  It was raised.  I mean I believe he also mentioned that Jane had been accusing him of there being another female on the trip the week prior, so it seemed like they had been arguing.

Q.  And how did you respond to Mr. Combs?

A.  I let him and Jane know that there was not a female on the trip, and then he thanked me and we hung up.

Q.  And was that true?

A.  Yes.

Q.  Approximately how long did this FaceTime last?

A.  Maybe 20 seconds.

Q.  Did Jane say anything on the FaceTime?

A.  No.

Q.  Did you ever see her face?

A.  No.

Q.  Had you had any other calls like this with Mr. Combs before?

A.  Well, FaceTime is how he, how we primarily communicated, but I had never been involved in an argument that he was having with a guest, no.

Q.  And how did you feel during this FaceTime?

          MR. STEEL:  Objection.

          THE COURT:  Can you rephrase.

BY MS. SMYSER:

P6dWcom5                           Perez - Direct

Q.   How did you react to the FaceTime?

A.   Just, like, normal.  I mean I had a pretty normal reaction, I think.  I understood what they were arguing about, and I gave the answer that I had.

Q.   And after that, did your FaceTime end?

A.   Yes.

Q.   What happened after the FaceTime call?

A.   After the FaceTime call, I can't remember if Mr. Combs called me again or texted me, but I let Faheem and K.K. know that Mr. Combs and his guests were fighting and that I was going to go pick him up.

Q.   Did you end up picking him up at that time?

A.   No.

         MS. SMYSER:  I want to walk through some of your communications from around this time, so Ms. Foster, could you please pull up Government Exhibit C404A, please.

         Let's turn to page 2.

Q.   Who is this chat with, Mr. Pérez?

A.   Me and K.K.

         MS. SMYSER:  Could we zoom in on the bottom text here.

Q.   What date was this text sent?

A.   June 18, 2024.

Q.   And what does it say the time is?

A.   5:19 p.m. UTC plus zero.

Q.   And what did K.K. say in this text?

                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

A.   "Heads-up.  PD going to guest house tonight."

Q.   What did you understand K.K. to be referring to here?

A.   That Mr. Combs was going to Jane's house.

Q.   Is this the same day as the FaceTime you talked about earlier?

A.   Yes.

          MS. SMYSER:  All right.  Ms. Foster, could you take that down.  And could you please pull up Government Exhibit J122.

Q.   What is this?

A.   Group text between me, K.K. and Faheem.

          MS. SMYSER:  OK.  And could we please zoom in on the bottom two texts.

Q.   When was the first text sent?

A.   January 19, 2024, 1:13 a.m. UTC plus zero.

Q.   You just said January --

A.   Oh, sorry.  June.  June 19, 2024.

Q.   In the first text, you say:  Me and PD en route to a location.  Is that where -- who was at that location?

A.   Jane.

          MS. SMYSER:  OK.  And could we zoom in on the bottom text, please.

Q.   What did you say next?

A.   "Heads-up, him and guest are fighting.  I'm about to head back and pick him up."

P6dWcom5                              Perez - Direct

Q.  Did you send this before or after your FaceTime with Mr. Combs?

A.  After.

MS. SMYSER:  Can we turn to the next page, please.

Q.  Looking at this top message here, what did you say here?

A.  "Just the normal her being jealous over other women and yelling at him."

Q.  And what time did you send this text message?

A.  5:42 a.m.

Q.  And how long after the prior text message was this?

A.  About -- about a half an hour.

Q.  And here, you say that Jane was yelling at Mr. Combs.  Did you actually see that?

A.  No.

Q.  Aside from the FaceTime, did you ever talk to Jane about the fight?

A.  No.

Q.  Did you ever talk to Mr. Combs about the fight?

A.  No.

Q.  Did you have any other knowledge about the fight other than the FaceTime?

A.  No.

Q.  Why did you send this second text message?

A.  After I sent the first one about them fighting, K.K. called me and asked me to clarify what fighting meant.

Q.  And what did you say to K.K. when she asked you to do that?

A.  I told her that they were arguing on the FaceTime and what the FaceTime call was about, and then I sent this text.

        MS. SMYSER:  Let's look at the last text message, please.

Q.  What did you say in this text message?

A.  "Just heard from him.  He said not to come.  All good."

Q.  And who are you talking about here?

A.  Mr. Combs.

        MS. SMYSER:  Let's take that down, please.

        Ms. Foster, could you please pull up J121.

Q.  What is this, Mr. Pérez?

A.  Group text between me and K.K. and Faheem.

        MS. SMYSER:  Could we zoom in on the two texts here.

Q.  What is the date and time of the first text?

A.  June 19, 2024, 4:26 p.m.

Q.  4:26, or is it another time?

A.  June 19, 2024 -- June 19, 2024, 4:26 p.m.

Q.  Is it 4:22:26 p.m.?

A.  4:22 -- 4:26 p.m., yes.

Q.  All right.  And does it say UTC plus zero there?

A.  Yes.

Q.  What does Kristina say in this text message?

A.  "Hi.  Can someone go pick up PD ASAP, please."

Q.  And when she says PD, who was she referring to?

A.   Mr. Combs.

Q.   Where was Mr. Combs at this time?

A.   At Jane's house.

Q.   And how did you respond?

A.   I liked the message.

        MS. SMYSER:  OK.  Let's turn to the next page, please, and could we zoom in on this text here.

Q.   What did you say next?

A.   "Fah, he's asking me to bring him his cash.  Is it at house?  He wasn't sure how much you were holding for him.  He said he thinks ten.  Let me know.  I'm going to head out shortly."

Q.   Who is the "he" here you're talking about?

A.   Mr. Combs.

Q.   How did Faheem respond?

A.   "Robin never gave us the cash.  She said it was too late. We left that day, but we'll get more dropped off today.  We don't have more on hand but trying to get more now."

Q.   And who is Robin?

A.   Robin Greenhill from TriStar.

Q.   And how do you respond to this message?

        MS. SMYSER:  Could we zoom out, please.

A.   I liked the message.

        MS. SMYSER:  Could you please zoom out.  We can take down this exhibit.

P6dWcom5                          Perez - Direct

Ms. Foster, could you please pull up J120.

Q.  What is this?

A.  A group message between me K -- between me and Faheem and Mr. Combs.

MS. SMYSER:  Can we zoom in on the bottom two texts.

Q.  When is this first message sent?

A.  January 20, 2024.

Q.  Is it January or --

A.  Oh, I'm sorry.  June 20, 2024.

Q.  And what did you say?

A.  "Hi, Fah.  Putting PD on this text with us.  Need 3,500 cash ASAP for his guest.  I'm going to take it to her.  Let me know how to get it."

Q.  And what guest are you referring to here?

A.  Jane.

Q.  And how did Faheem respond?

A.  "Copy.  I can give it to you now."

MS. SMYSER:  Let's go to the next messages, please, and could you zoom.

Q.  What did you say in this message?

A.  "Can you leave it in an envelope with security and I'll come grab in a little and take to her.  Thank you."

Q.  How did he respond?

A.  OK.

MS. SMYSER:  We can take that down.

P6dWcom5                          Perez - Direct

Q.  Mr. Pérez, did you meet with the government before testifying today?

A.  Yes.

Q.  And at some point in meeting with the government, did you discuss what might have happened with that money that was being discussed in the text messages?

A.  Yes.

Q.  Sitting here today, do you have an independent, clear memory of what actually ended up happening with that money separate and apart from the text messages?

A.  No.

        MS. SMYSER:  Just some final questions, Mr. Pérez.

Q.  You said you left your employment in September of 2024.  Is that right?

A.  Yes.

Q.  Why did you leave?

A.  There was a lot going on personally for Mr. Combs and there wasn't a lot of communication around what was happening, so I thought it was a good time to leave to hopefully avoid a situation like this.

Q.  When was the last time you talked to Mr. Combs?

A.  The day that he was arrested.

Q.  How do you feel about Mr. Combs now?

A.  I feel great about him, the same way I felt when I was leaving my employment.

MS. SMYSER:  Your Honor, no further questions.

THE COURT:  Thank you, Ms. Smyser.

Mr. Steel.

CROSS-EXAMINATION

BY MR. STEEL:

Q.  Good afternoon.

A.  Hi.

Q.  September of 2024, I believe, you just said was when you ended your employment with Mr. Combs.  Is that fair to say?

A.  Yes.

Q.  And that's the same month that Mr. Combs was actually arrested, true?

A.  Correct.

Q.  And that's what you were referring to just a moment ago, true?

A.  Correct.

Q.  And Mr. Combs is somebody who you say you feel the same way today as you did previously.  You respect Mr. Combs, is that --

A.  Correct.

Q.  And he's extremely intelligent, true?

A.  Correct.

Q.  And he's a motivator.  Is that true?

A.  Yes.

Q.  And he would even have motivational, inspirational postings that you would see on his bathroom mirror.  Is that true?

P6dWcom5                          Perez - Cross

A.   Yes.

Q.   He also, you noticed, at times was sad?

A.   Yes.

Q.   And you've seen him cry, right?

A.   Right.  Yes.

Q.   And in fact, on October 26 of 2023, do you remember seeing him cry?

A.   I can't -- I can't remember specifically.

Q.   If I showed you something, would that refresh your memory?

A.   Potentially.

          MR. STEEL:  Let me just see if I have -- do you still have the -- give me one second.

          Your Honor, can I hand a book --

          THE COURT:  You may.

          MR. STEEL:  -- to Mr. Pérez?

          Hand it directly to him, your Honor?

          THE COURT:  You may.

BY MR. STEEL:

Q.   In that book, if you would just look at, I believe it's going to be tab 5, and that's Mr. Combs's 3605.  And if you could just acquaint yourself with that and notice the date?

A.   OK.

Q.   And then if you look at the next tab, which is tab 6, 3606 --

A.   I only have four tabs.

P6dWcom5                           Perez - Cross

Q.   You only have four tabs?

A.   Yes, but I can see it on my screen.

Q.   OK.   That's fine.

     Tell me when you acquaint yourself with it, if you don't mind.

     You got it?

A.   Yeah.

Q.   OK.   And does this refresh your memory, the two exhibits that you just looked at, 3605 and 3606, about October 26, 2023?

          MS. SMYSER:   Your Honor, can I have just a moment to confer with Mr. Steel?

          THE COURT:   You may.

          MS. SMYSER:   Thank you, your Honor.

BY MR. STEEL:

Q.   Are these items that help refresh your memory about October 26, 2023, sir?

A.   Vaguely, yes.

Q.   And is it fair to say, if your memory is refreshed and you don't look at anything more, that on that specific day you noticed and observed Mr. Combs was crying?

A.   I can't remember if he was crying, but this refreshes my memory as to the fact that he was upset that day, yes.

Q.   Let me just ask you to do something -- if it doesn't refresh your memory, that's fine, but 3606 again, the second page.

P6dWcom5                         Perez - Cross

A.   Uh-huh.

Q.   If you could just look at whether -- at the top of it, on the left-hand side?

A.   Yes.

          MR. STEEL:  You can take it down.

Q.   Does that refresh your memory by any chance about Mr. Combs crying that day?

A.   It does not.

Q.   OK.  That's fine.

     All right.  So let me ask you a couple things.

     You were working with Mr. Combs in March of 2024, correct?

A.   Yes.

Q.   And you told the jurors that there was a lot going on and you were not kept with open communication at the time you left, true?

A.   Yeah.

Q.   And do you remember March 2024, there were search warrants executed on Mr. Combs's different residences?

A.   Yes.

Q.   And you've been in all those residences, true?

A.   Correct.

Q.   And you saw the news about it, true?

A.   Correct.

Q.   And you also obviously worked at these places, so we've talked about the authorities, federal authorities came in and

P6dWcom5                              Perez - Cross

executed the search warrants?

A.   Right.

Q.   Are you familiar with Two Star?

A.   Yes.

Q.   And is that a location you've been in and around and have free access to?

A.   Yes.

Q.   And were you in Mr. Combs's bedroom at Two Star?

A.   Yes.

Q.   Frequently?

A.   Yes.

Q.   Other people, to your knowledge, had equal access to that bedroom besides you and Mr. Combs?

A.   Yes.

Q.   How about the bathroom connected to that bedroom; same thing, have you been in that bathroom several times?

A.   Yes.

Q.   And how about the closet in that bedroom bathroom; did you have free access to that?

A.   Yes.

Q.   And when I say you, Mr. Pérez, I'm not just saying -- you know other people, lots of people, had access to Mr. Combs's bedroom, bathroom, bathroom closet, true?

A.   Correct.

Q.   At any time -- at any time -- did you ever see any firearms

in and around that bathroom?

A.  No.

Q.  At any time did you ever see firearms in around the bathroom closet?

A.  No.

Q.  Did you ever see Mr. Combs with a firearm --

A.  No.

Q.  -- in your years of employment with him?

A.  No.

Q.  Now, there are firearms around the properties, true?

A.  Yes.  The only firearms I've ever seen were with security.

Q.  And those are the people hired to protect Mr. Combs, his coworkers, guests, the property, etc., right?

A.  Correct.

Q.  And that's because Mr. Combs, to your knowledge, is a man of note, true?

A.  Yes.

Q.  And beyond celebrity, he is well-known in totally different fashions of life.  Is that true?

A.  Yes.

          MS. SMYSER:  Objection.

          THE COURT:  Overruled.

BY MR. STEEL:

Q.  And you've worked with other celebrities, is that correct?

A.  Correct.

P6dWcom5                          Perez - Cross

Q. And did they also have security?

A. Yes.

Q. And this is common with people who have securities,
right --

A. Correct.

Q. -- who need security, I mean, protection. True?

A. Yes.

THE COURT: Mr. Pérez, could you just wait one second
after Mr. Steel asks you these questions. That way if there's
an objection --

THE WITNESS: Copy. Thank you.

THE COURT: OK. Mr. Steel, you may proceed.

BY MR. STEEL:

Q. And it may be unfortunate, but it's the reality that
certain people need to have security with them. Is that true?

A. Yes.

Q. And there is a lot of wealth in that house, right?

A. Yes.

Q. By that I mean expensive cars, jewelry, furniture,
paintings, etc. True?

A. Yes.

Q. The fact that there were search warrants in March, that
means that you continued to work with Mr. Combs even after the
execution of those search warrants for approximately six
months. Does that sound about right?

P6dWcom5                         Perez - Cross

A.   Yes.

Q.   OK.  Now, you mentioned Jane?

A.   Yes.

Q.   And would it be fair to characterize your relationship with her as -- it was good?

A.   Yes.

Q.   She was nice to you?

A.   Yes.

Q.   You were kind to her?

A.   Yes.

Q.   And you know from her that she wanted to actually marry Sean -- or Mr. Combs.  Is that true?

A.   I'm not sure.

Q.   OK.  You don't remember having those type of conversations with her?

A.   No.

Q.   OK.  And you mentioned king nights?

A.   Yes.

Q.   And that's nights being set up either at a hotel or at somebody's home for the -- Mr. Combs and a girlfriend to spend time together, true?

A.   Yes.

Q.   And you call that, I think, personal time; is that how you feel about that?

A.   Yes.

P6dWcom5                              Perez - Cross

Q.  Because Mr. Combs is a very busy person when you were around him.  Is that true?

A.  Yes.

Q.  I mean you were with him from morning to night when you were working.  Is that all true?

A.  Yes.

Q.  And you said it's about 12 hours a day, about five days a week, generally, right?

A.  Yes.

Q.  And phones are ringing for him, text messages are coming in, FaceTime calls, meetings, emails and the like, right?

A.  Yes.

Q.  And this personal time or this king night, you would help set it up, right?

A.  On occasion.

Q.  Yeah.  I'm not saying all the time.

A.  Yes.

Q.  And that was the way you looked at it; it was personal to Mr. Combs.  It was his personal time.  Is that true?

A.  Yes.

Q.  And you mentioned something that I think I'm quoting.  If I'm not quoting I'm not trying to misquote you, but you said because we are working out of Mr. Combs's homes, sometimes personal matters and business were sometimes mixed, or something to that effect?

P6dWcom5                          Perez - Cross

A.  Yes.

Q.  And by that you're saying that sometimes even though it's not in your employment, you do things that are in personal nature for Mr. Combs.  Is that true?

A.  Yes.

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

BY MR. STEEL:

Q.  Is that accurate?

A.  Yes.

Q.  And by that, personal, would you classify it as personal or work-related, setting up the king night?

A.  Personal.

Q.  And would you consider it personal or work-related the few times -- I'm not saying it's many times -- purchasing or obtaining or transporting or taking possession of drugs for Mr. Combs?

A.  Personal.

Q.  And you're not proud you did that -- I'm not saying it's great judgment -- but you did it just because it was really Mr. Combs's personal habit; that's how you looked at it, right?

A.  Yes.

Q.  It had nothing to do with your work, right?

A.  No.

Q.  You weren't getting paid to buy drugs or set up king nights

P6dWcom5                         Perez - Cross

in hotel rooms, right?

A.  No.

Q.  You just did it because you're a nice person, right?

A.  Yes.

Q.  And in addition to that, you helped Jane.  She trusted your fashion sense, is that right?

A.  Yes.

Q.  In fact, she trusted you more than she trusted herself at times to buy certain things for her, for dresses and the like, right?

A.  Yes.

Q.  And she would ask you to go out and go shopping for her, true?

A.  Yes.

Q.  And what she wanted to do was impress Mr. Combs and get your thoughts on it so that she can look her best; that's what she told you?

          MS. SMYSER:  Objection.

          THE COURT:  Sustained.

BY MR. STEEL:

Q.  You would -- when you would go out, would you buy sometimes high heels for Jane?

A.  Yes.

Q.  And would you look for her for lingerie?

A.  Yes.

P6dWcom5                           Perez - Cross

Q.   And would you look for her for dresses?

A.   Yes.

Q.   And the goal of that was to help her look as good as she could for Mr. Combs; that's what you believed the mission was, true?

A.   Yes.

Q.   As well as for herself?

A.   Yes.

Q.   And when you did all that, that was something personal also, true?

A.   Yes.

Q.   The fact that you would go over and set up these hotels or homes with the lighting and the baby oil and all these other -- drugs, whatever, the food, the drink, the beverages, the lighting, all of that, you would do it, and then you would be away and Mr. Combs would be on his personal time for, I think, you said, usually 12 to 24 hours, true?

A.   Yes.

Q.   And then sometimes you even helped clean up, right?

A.   Yes.

Q.   And if there was a hotel, you did that because you're a professional, you're courteous, it was not nice, maybe, to the hotel work to have to clean up, you know stains from baby oil or whatever, and so you guys went in first and tried to assist?

A.   Yes.

P6dWcom5                          Perez - Cross

Q.  Is that true?

A.  Yes.

Q.  That was also personal, right?

A.  Yes.

Q.  Now, at any time in preparing for this, what you're calling a king night, when you were speaking with Jane about her dress and getting items for her and setting up either her house or a hotel, did you ever get the feeling that she was hesitant of joining the king night?

A.  No.

Q.  Did she always appear to you that she was a willing participant in the king night?

A.  Yes.

        MS. SMYSER:  Objection.

        THE COURT:  That's overruled.

BY MR. STEEL:

Q.  I couldn't hear your answer.

A.  Yes.

Q.  Then you were asked questions about did you ever see Jane and Mr. Combs after the 12 hours, 24 hours king night ended. Do you remember that?

A.  Yes.

Q.  And I think your word was they appeared to be tired.  Do you remember that?

A.  Yes.

P6dWcom5                          Perez - Cross

Q.  OK.  Now, did Jane ever appear to you, from your observation, that she was in any way upset or unhappy after the king night?

A.  No.

Q.  When we talk about drugs for Mr. Combs, are we talking about thousands, hundreds of thousands of dollars of drug, trafficking amounts, or are we talking about smaller amounts of drugs?

MS. SMYSER:  Objection.

THE COURT:  Rephrase.

BY MR. STEEL:

Q.  Talk about couple hundred dollars spent in drugs?

A.  Yes.

Q.  Would you consider, if you have any foundation -- if you don't know, just say I don't know.  It's personal use; that's what you looked at it?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

BY MR. STEEL:

Q.  The iPad, remember the iPad incident and we heard the recording with you and the person you call K.K.?

A.  Yes.

Q.  Remember that?  OK.

    Now, that iPad was actually used by coworkers of yourself, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6dWcom5                              Perez - Cross

A.   Yes.

Q.   And it was, like, a business iPad, it was used for music, it was used for directing, things that people can actually use who were working for the business, right?

A.   Yes.

Q.   But on this one occasion, there was personal -- that's how you understood, there was personal matter.  It was a sexual recording of Jane, another person, Mr. Combs, you said, on the -- I'll call it a business iPad.  Is that fair?  Fair to say that's how you understood it?

A.   Yes.

Q.   And that's why it was a concern, because this personal matter, this personal, private sex, king night happened to get on to a business iPad.  Is that really the issue?

A.   Yes.

Q.   And when K.K. -- we have it on recording, and the ladies and gentlemen of the jury were able to hear it with your assistance -- she was interested in understanding how did that iPad obtain this personal data.  Is that your understanding?

          MS. SMYSER:  Objection.

          THE COURT:  Just give me one second.

          That needs to be rephrased.

BY MR. STEEL:

Q.   Was it your understanding that the inquiry asked of you, from your viewpoint, was because this personal matter was on

P6dWcom5                          Perez - Cross

the business iPad?  Is that really what it was about?

A.  Yes.

Q.  And that sexual depiction, that sex tape, that was not connected to the business, right?  That was personal; you made that clear.  Is that true?

A.  Yes:

Q.  Can you put, if you could just think about your three years of working with Mr. Combs, if you were to put a percentage on it, if you could just help us, just take your time and think about it, how much time you dedicated in this mix that you talked about for personal errands or matters that you did for Mr. Combs versus the business that you put your time into, how would you break down that percentage?  How much time for personal versus business?

A.  Like in terms of the personal matters that we are discussing here today?

Q.  Yes.

A.  I'd say 1 percent.

Q.  OK.  So the drugs combined with the king night combined with the iPad-type incident, that would be 1 percent; the other 99 percent you're doing work that helps the business, true?

A.  Yes.

Q.  Now, although you had a good relationship with Jane, from your observation, did K.K. not have such a good relationship with Jane?

P6dWcom5                          Perez - Cross

A.   That is correct.

Q.   In fact, K.K. tried to avoid Jane, is that true, from your observations?

A.   From my observation, yes.

Q.   From being around Mr. Combs, did you have the ability to observe his savvy or his, his knowledge of working computers and iPhone, iPad?

A.   Yes.

Q.   And how would you describe Mr. Combs's ability and knowledge of those items, working with those items?

A.   He was not the most proficient when it came to technology, so we set up a lot of -- we set up all technology stuff for him.

Q.   And it was to the point, so basic, that Mr. Combs would need help connecting to Bluetooth.  Is that fair to say?

A.   Yes.

Q.   OK.  And that's pretty elementary -- I'm not insulting him. That's the truth, right?

A.   Yes.

Q.   OK.  With the recorded communication that we heard, going back to you and K.K., you clearly didn't know you were being recorded, right?

A.   Correct.

Q.   But you were recorded and you told the truth except for you didn't want to get somebody else potentially involved.  Is that

P6dWcom5                              Perez - Cross

true?

A.   Correct.

Q.   And there's nothing about -- there was nothing untoward about that.  It was an internal -- these are my words -- internal investigation how did this happen?  Is that true?

A.   Yes.

Q.   Nothing to do with obstructing law enforcement or anything like that.  Is that true?

A.   Correct.

Q.   Now, speaking of investigations, clearly you knew that Mr. Combs was under investigation at least, if not earlier, March of 2024 when the federal authorities executed the search warrants at Mr. Combs's homes, right?

A.   Yes.

Q.   And do you remember going to K.K. and inquiring of her, you know, as a co-worker, as your boss, and saying, you know, what do I do when and if the authorities reach out to me?

A.   Yes.

Q.   And the advice you got, and you followed, is tell the complete truth, right?

A.   Yes.

Q.   And that came from K.K., right?

A.   Yes.

Q.   Mr. Combs didn't ask you in any way to lie to law enforcement, did he?

A.   No.

Q.   Nobody?  Would Mr. Combs himself or anybody else ask you to obstruct or don't talk about king night or drugs or anything, true?

A.   Correct.

Q.   In fact, it was the opposite.  It was all just tell the truth, right?

A.   Correct.

Q.   So I know that you were asked questions by the prosecutor about an order that you were given today to tell the truth, but that's what you've done, right?

A.   Yes.

Q.   And that's what was told by Mr. Combs and other people with Mr. Combs, true?

A.   I'm sorry?

Q.   That's what was told to you to do by Mr. Combs and other people like K.K., true?

A.   Yes.

Q.   OK.  You mentioned Frank, or Frankie, Santella.  Do you remember that?

A.   Yes.

Q.   And he actually transitioned and became, I believe -- you might have said it, actually -- the music manager, right?

A.   Yes.

Q.   And while working for Mr. Combs, you were involved with

P6dWcom5                          Perez - Cross

helping create an album.  Is that true?

A.  Yes.

Q.  And that album Mr. Combs worked on very hard.  Do you remember that?

A.  Yes.

Q.  In fact, you would go to the studio with him at times?

A.  Yes.

Q.  And that album was very, very well received by the public, true?

A.  Yes.

        MS. SMYSER:  Objection.

        THE COURT:  Overruled.

BY MR. STEEL:

Q.  And is it fair to say, from your experience, your observations, that Mr. Combs is a very hardworking person?

A.  Yes.

Q.  Now, you mentioned that K.K. and Mr. Combs had a very close relationship.  Do you remember saying that --

A.  Yes.

Q.  -- earlier today to the jurors?

    You are not suggesting that it was sexual in nature, are you?

A.  No.

Q.  You're just saying that they worked hand in -- they were like best friends and coworkers, true?

P6dWcom5                              Perez - Cross

A.   Yes.

Q.   Now, that argument on June 18, 2024, that you talked about when you get the 20-second FaceTime call -- do you remember that?

A.   Yes.

Q.   Now, that was a verbal argument, from what you understood, right?

A.   Correct.

Q.   And you being around Mr. Combs, you've never seen him strike a woman while you were there.  Is that true?

A.   Correct.

Q.   You've never seen him strike anyone, right?

A.   Correct.

                (Continued on next page)

P6DQcom6                          Perez - Cross

BY MR. STEEL:

Q.  And that argument on June 18, 2024, you found out was because Jane was jealous of another woman, right?

A.  Yes.

Q.  And many other women were dating Mr. Combs at the time that you were employed with Mr. Combs, right?

A.  Yes.

Q.  And you would see these different women come in and out of the places that you were around Mr. Combs.  Is that true?

A.  Yes.

Q.  Is it fair to say that there was a lot of jealousy by all these different women because Mr. Combs dated other women?

        MS. SMYSER:  Objection.

        THE COURT:  Sustained.

Q.  Did you hear arguments?  Did you personally hear arguments from other women because they were jealous about another person that Mr. Combs was dating?

        MS. SMYSER:  Objection.

        THE COURT:  That's sustained.

Q.  The -- going back to Jane, is it true that she was extremely jealous of the other women that Mr. Combs was dating?

        MS. SMYSER:  Objection.

        THE COURT:  Sustained.

Q.  Did you hear Jane argue verbally with Mr. Combs because she professed her jealousy about other women that he was dating?

                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

P6DQcom6                          Perez - Cross

A.  No.

Q.  Now, you're about the same age as Jane, do you know that or is that -- you don't know that?

A.  Yes.

Q.  Okay.  And when you were with her, you were with her for years.  You knew her for years, right?

A.  When I was with who?

Q.  When you were with Mr. Combs?

A.  When I was with Mr. Combs, yes.

Q.  And to you from your observation, she was a strong woman, true?

A.  Yes.

        MS. SMYSER:  Objection.

        THE COURT:  That's overruled.

        Mr. Steel.

Q.  Was she a strong woman?

A.  From what I know, yes.

Q.  Yeah, from your observations?

A.  Yes.

Q.  Independent?

A.  Yes.

Q.  And she was confident in herself?

A.  Yes.

        MS. SMYSER:  Objection.

        THE COURT:  Overruled.

P6DQcom6                         Perez - Cross

Q.  You mentioned that security personnel would keep custody and control — that may be my words — of cash in a safe and sometimes you would have to ask Faheem or other persons with security for U.S. currency, is that accurate?

A.  Yes.

Q.  And the reason for that is, first of all, they can guard U.S. currency, right?  They had weapons, right?

A.  Yes.

Q.  And that money, that U.S. currency, do you know whether that was Mr. Combs personal money?

A.  I'm not sure.

Q.  Right, you don't know if they're mixing the business money to reimburse you for like drugs or king night, you don't know that, do you?

          MS. SMYSER:  Objection.

          THE COURT:  That's sustained.

Q.  Do you know -- do you know whether you were being repaid for, let's say, drug money by Mr. Combs' personal cash?  Do you know?

A.  No.

          MS. SMYSER:  Objection.

          THE COURT:  That's overruled.

Q.  Now, where you currently work, and from your knowledge of being around celebrities of your prior work as well before Mr. Combs, do those individuals in the industry also have

P6DQcom6                        Perez - Cross

personal assistants?

A.  Yes.

Q.  And do those personal assistants from your experience, your work experience and observation, do they also do not only the work related but some personal errands?

A.  Yes.

Q.  And that's part of what you call the mix of just being around somebody, is that true?

A.  Yes.

Q.  You mentioned you would go to sex stores, buy the outfits and high heels, and the prosecutor asked you if you would put that on a company card, a company credit card.  Do you remember that?

A.  Yes.

Q.  Do you know how that company credit card was paid with company money versus Mr. Combs' personal money?

A.  I'm not sure.

Q.  You said in a text message or you said, I'm sorry, on that recording with KK when she recorded you, I believe, if you remember, you said something "I found something personal on the iPad."  Do you remember that?

A.  Yes.

Q.  And that's exactly what you're talking about; that had no reason to be on the work; that was a personal matter for Mr. Combs, right?

P6DQcom6                        Perez - Cross

A.   Yes.

Q.   With regards to --

          MR. STEEL:  If you can pull up, I believe it's in evidence Government Exhibit 3D-11-AR.

Q.   Do you remember the hotel you went through some of these messages with the prosecutor, and the hotel was actually in your name.  Do you remember that text message?

A.   Yes.

Q.   The last two messages of this document that's on the court's screen, do you see that on the right-hand side with your name?

A.   Yes.

Q.   Now, that hotel is put in your name --

          MR. STEEL:  You could take it down, if you don't mind.

Q.   That hotel is in your name in that particular instance, right?

A.   Yes.

Q.   And you had to get to that hotel in order to bring in the food, the beverage, the lighting, the Gucci bag, et cetera, right?

A.   Yes.

Q.   So you put the hotel or someone put the hotel in your name, is that true?

A.   Yes.

Q.   Is there anything sinister to your knowledge about that?

P6DQcom6                            Perez - Cross

MS. SMYSER:  Objection.

THE COURT:  Overruled.

Well, can you rephrase that.

Q.  Yeah.  Is there any type of coverup that you're aware of because the hotel is in your name?

A.  No.

Q.  Also, if that hotel was in the name of Sean Combs, that might bring a lot of people's attention to it, right?

A.  Yes.

Q.  And there might be people with cameras outside or the like, right?

A.  Yes.

Q.  And that could defeat the personal time, the private time, right?

A.  Yes.

Q.  And in your experience with other celebrities, do they sometimes when they're going to public places like a hotel sometimes put the hotel name in someone else's register?

A.  Yes.

Q.  Now, you talked about TriStar, do you remember that?

A.  Yes.

Q.  And TriStar is basically, you said, the business manager for Mr. Combs, fair to say?

A.  Yes.

Q.  I think that's how you described them.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6DQcom6                        Perez - Cross

So you would have to submit any type -- if you wanted reimbursement, you would have to submit receipts to TriStar, is that true?

A.  Yes.

Q.  Okay.  Do you remember the book I gave you?  That should be right there in your hands.  And it could be on the screen as well.

If you look at -- let's do tab 4.  I think you said you had tab 4?

A.  Yes.

Q.  And that's 36 -- Mr. Combs Exhibit 3604, your Honor.

And if you could just look at that yourself.  Just tell me whether you recognize this?

A.  Yes.

Q.  And is this a typical way that you would support your expenses to TriStar?

A.  Yes.

MR. STEEL:  Your Honor, I'll move for the admission of Mr. Combs 3604.

MS. SMYSER:  No objection.

THE COURT:  Defense Exhibit 3604 will be admitted.

(Defendant's Exhibit 3604 received in evidence)

MR. STEEL:  If it could be shown and shared, your Honor.

Q.  This is just one example, you did this a lot, is that true?

P6DQcom6                          Perez - Cross

A.  Yes.

Q.  And this one happens to be from right before Thanksgiving of 2022, right?

A.  Yes.

Q.  And this is just listing -- these are things that I did and I paid cash for basically, is that right?

A.  Things that I paid for personally, yes.

Q.  And then if you scroll down, just to give the jurors a sense, you have to document with receipts as best you could what this -- why you were asking for this money back, right?

A.  Yes.

Q.  And if you could scroll down, just show the jurors, and these would be the type of receipts that you would save to show the expense, true?

A.  Yes.

Q.  And you did that because TriStar would not just cut you a check or reimburse something to you unless you had backup, is that true?

A.  Yes.

Q.  But if you didn't have backup, then you could explain it away, but it's best to have the receipt, right?

A.  Yes.

Q.  And that's because this wasn't just combined personal funds and business funds.  This was you have to support is this a business expense, true?

A.   Yes.

Q.   With regards to be Government Exhibit number -- and I think you have the government binder in front of you?

A.   Yeah.

Q.   And I think it's Government Exhibit number 3D-126.  I think you've already looked at it, but do me a courtesy and look at it, if you don't mind.  Tell me whether you remember this.

A.   Okay --

MS. SMYSER:  Your Honor, this isn't in evidence, I don't believe.

THE COURT:  Let's turn the jury view off.

Q.   Would you take a look at it?

A.   Yeah.

Q.   And just tell me whether you recognize it and if it's accurate.

A.   Yes.

Q.   So we're not going to show this to anyone because it's not -- we're just going to leave it with us right now because it's not redacted.

MR. STEEL:  But, your Honor, I would like to admit Government Exhibit 3D-126 and then we will send it in a redacted form as well.

MS. SMYSER:  Can we take it down?  And we object, your Honor.

THE COURT:  All right.  Let's take it down.  What's

P6DQcom6                        Perez - Cross

the objection or do we need a sidebar?

            MS. SMYSER:  I think there are a number of objections.

We may need a sidebar, your Honor.

            THE COURT:  All right.

            (Continued on next page)

P6DQcom6                          Perez - Cross

(At the sidebar)

THE COURT:  All right.  My first question is what does this text exchange go to?

MR. STEEL:  It's a conversation between the witness and Jane.  And it just so Jane is asking -- politely asking the witness, hey, I'd like to buy things.  Would you go for me, I would like this for king night.  Can you make sure you get me some high heels?  Can you make sure you get me dresses.  It's just an example of her desire to prepare for the king night.

THE COURT:  If it's not coming in for impeachment, why wasn't this previously disclosed as an exhibit?

MS. GERAGOS:  If I may, your Honor, they are going to put this in next week.  This is a Government Exhibit that has already been marked.  They had him authenticate it.  It's coming into their summary charts.  We would like to ask him questions about something being put into evidence next week because it's now the type of issue where at multiple for the Court, if they're going to put something in for a summary chart, we want to be able to question the witnesses.  In several exhibits he gave to the government several thousand pages of subpoena production, 33 pages that they excerpted that we just want to ask about.

THE COURT:  Ms. Smyser.

MS. SMYSER:  Your Honor, we had the witness authenticate these documents.  We don't intend to put this full

P6DQcom6                           Perez - Cross

chat in next week.  That's part of our objection here.  It's a

36-page document which has hearsay in it.  Not everything in

this document is relevant, so we were going to propose cutting

it down to smaller portions, which is why I had Mr. Perez

authenticate it today.  We're not moving to admit it today.  It

has hearsay in it, and as a result it's not admissible.

THE COURT:  Well, I think the problem is that it's not

being put in for impeachment, and so it should have been turned

over to the government.  It doesn't matter if the government

was going to put in some portion of this.  Was it your

understanding this entire chain was going to be put into

evidence?

MS. GERAGOS:  Yes.  Perhaps there was a

miscommunication it's my understanding that this short 33-page

document, when in reality they had -- they had -- Jane and this

witness had extensive communications with one another for three

years, so it was my understanding that this short 33-page

document was going to be put into evidence.

THE COURT:  Do you have the document?

MR. STEEL:  Yes, your Honor.

THE COURT:  Ms. Smyser, do you know which portion of

this the government intends to include in its summary chart?

MS. SMYSER:  I don't know off the top of my head, but

what we intend to include has been included in the summary

charts turned over to defense several weeks ago.  1407, the

summary charts, has particular text message from this chain in it.

THE COURT:  What is the basis for admission of these text exchanges if the government were to put it in?

MS. SMYSER:  If the government put them in, your Honor, they're going to be employee statements, and part of what Mr. Perez has already discussed is that as part of his job he would, for example, get items for king nights and was some sometimes requested by Jane to do so.  And he has also said that he communicates on king nights sometimes with Jane and other employees, so we would move to admit smaller portions that are relevant to those nights, not this whole 33-page chat.

THE COURT:  Why wouldn't the defense be able to put it in as a completed statement, meaning, if you were going to put in portions of this exchange, then why wouldn't it be proper for the defense to put in the remainder?

MS. SMYSER:  I understand, your Honor.  I think we'd have to look at those particular small portions because the completing statement is just to complete that thought to make sure that nothing is misleading.  It's not necessarily true that the whole 36-page chat needs to come in.  These are on different dates, your Honor.  I'm not sure the exact timeframe stands, but it is the period of time from my memory.  I think we'd have to look at things on a case-by-case basis.  If we move to put in smaller portions, and the defense has a rule of

completeness objection, then we can certainly address them. But right now this witness has just authenticated the documents.

THE COURT:  So you're not going to put in this exhibit?

MS. SMYSER:  Not the full exhibit, no.

THE COURT:  But this is the exhibit that's identified in the summary chart.

MS. SMYSER:  It is right now, but we've identified page numbers from those exhibits in the summary chart, and we're going to shorten it down.

MS. GERAGOS:  I spent a great deal of time reviewing the summary charts, as you can imagine.  I want to talk about this general exhibit.  It's a very -- nothing here is going to her.  I think you could just tell from reviewing this quickly it's not even really hearsay because there's nothing in here that we're saying is for the truth of the matter asserted. They're getting heels.  They're getting dresses.  There's nothing here.  I don't think the government takes issue with if we were to question about it.  We're completing the record as to what Jane has already testified about, what Mr. Perez has already testified.  I'm really not sure if there is anything in here that is even hearsay, and that would even be -- that would be even hearsay.  I will just say that.

THE COURT:  Ms. Smyser -- or, Mr. Steel, how --

ballpark, how much do you have left of your cross?

MR. STEEL:  Not much.

THE COURT:  If we went through the -- do you need Mr. Perez's testimony about the document because you can elicit his testimony about the document without putting the exhibit in, and I don't think the government is going to make some kind of authenticity argument.  You can put the exhibit in without having Perez here.  Why don't you ask him about the document without introducing it into evidence?  You can ask him about anything you want.  We can hash out the exhibit issue after Mr. Perez has left the stand.  I'm trying to triage the situation while we have the witness here.  You're almost done with cross-examination, and I want to try to give us time so I can hear your concerns but not allow in rank hearsay without being able to give it proper deliberation.  Does that seem like a workable solution?

MS. SMYSER:  Yes, your Honor.

THE COURT:  Does that seem like a workable solution?

MR. STEEL:  I think so.  Would the Court consider a 7-minute break?

THE COURT:  If we're going to take a break now, what I propose is we just adjourn for the, day hash out all the exhibit issues, we have a lot of them, and bring Mr. Perez back on Monday.

MS. SMYSER:  If I may -- sorry to cut you off.

P6DQcom6                          Perez - Cross

Mr. Perez is from Miami.  He's been here all week prepared to testify in case Jane's testimony ended early.  He has requested to be able to go home this morning.  If there's any way possible to do it, to finish his testimony...

THE COURT:  I think the way to do it would be this way, which would be pertinent to -- so that any testimony about the exhibit is elicited, and then the remaining issue would just be an evidentiary one of understanding what exactly the government is going to put in and what would be proper in light of that.

MS. GERAGOS:  I was just going to suggest it may take the rest of the cross slightly longer if Mr. Steel asked about certain pages.  The government would have it in front of them.  The government could object.  You could make the ruling based on the pages in front of you.  I don't think he's going to do this extensively.

MS. SMYSER:  I have a proposal.

I think we are willing to admit it at this point subject to further redactions allowing the defense to complete your cross-examination if we could engage in good faith to redact that.

MS. GERAGOS:  Of course we can do that.  The only thing that would need to be done is that screen would need to be turned off in the overflow room screen.

MR. STEEL:  I don't think we need a screen because the

P6DQcom6                          Perez - Cross

witness has a book.

MR. STEEL:  I'll do whatever you say.

THE COURT:  We'll turn off the screens.

MR. STEEL:  I'll move into evidence.  I'll read a couple of pages, and then we're done, by the way.

THE COURT:  All right.

(Continued on next page)

(In open court)

THE COURT:  Members of the jury, we just have one technical issue to work out.  While we are waiting, I will let you know that we are almost done for the day.  So you're waiting now, but you will not be waiting for too long after this.

Let's go ahead.  I think, Mr. Steel, we can turn off the gallery view as well as the overflow rooms.

Can I confirm that with the deputy?

DEPUTY CLERK:  Yes, your Honor.

THE COURT:  We've now done that.

With that, Mr. Steel, you may proceed.

MR. STEEL:  Your Honor, I move to admit Government Exhibit 3D-126 understanding we will then go through it later.

THE COURT:  All right.  3D-126 will be admitted.

(Government's Exhibit 3D-126 received in evidence)

BY MR. STEEL:

Q.  Mr. Perez, do you have the government or you could see it on your screen maybe it might be as easy.  If we could turn on 3D-126.

MS. SMYSER:  Mr. Steel, could we confirm the overflow screens are off and the public screens are off?

DEPUTY CLERK:  They're off.

MS. SMYSER:  Thank you.

Q.  And if we can go to page 16 of 148, you see that,

P6DQcom6                         Perez - Cross

Mr. Perez?  It's actually page 16 of 148, the page before.

A.  Yes.

Q.  Yes, that's perfect.

And this is a communication between who?

A.  Me and Jane.

Q.  Are you in the blue on the right side or are you in the gray on the left side?

A.  In the blue.

Q.  And this is dated -- I'm going to the day where -- so you may have to look at it.  January 20, 2023.  Does that look right?  If you could look at it on the screen?

A.  Yes.

Q.  Okay.  And what did you say to Jane?

A.  Hi sweet.  I refreshed everything.  Packed shoes and dust bags and labeled outfits and Ziplocks.  Also have a bag of undies for him, including Tom Ford.  I'll send this bag with the boys to your place.  I'm the only one who had eyes on this stuff.

Q.  And then Jane emphasized what you wrote in the first line.  And then OMG.  Stop it, with exclamation points.  No way.  You are amazing.  What the, exclamation points with emojis.  Our little secret, hehehe.  Okay.  But listen, I think they're switching now to a hotel.  He just called me and said he may not wanna come here.  So Frank is aware.  Maybe text him just so you are fully updated, with a question mark?  Would hate if

P6DQcom6                          Perez - Cross

the things got Uber here, et cetera and then we didn't need it here.

And you wrote?

A.  Copy.  They are figuring out hotel.  I'll have the boys bringing bag and leave it when they set up.

Q.  You are the best, with emojis.  Beyond appreciate.  I thought I was organized.  I love that it's ziplocks and Tom Ford for me, with three E's.

So this is setting up a king night, is that your understanding?

A.  Yes.

Q.  And Jane is communicating with you telling you what she would like and thanking you for your efforts, right?

A.  Yes.

Q.  And she is helping coordinate the night?

A.  Yes.

Q.  And then on the lower part of that page, now it's a different date.  You see it's February now 10th, 2023?

A.  Yes.

Q.  And what did you write to Jane?

A.  Hi babe.  Chef Patrick here making you avocado toast with fried egg on top to go.

Q.  Jane responded:  Hi.  Good morning Ah amazing, with exclamation.  Okay, cool.  Driver is going to be there by 11:20.  I'll be down by 11:45.  TYSM, exclamation point.  Can I

P6DQcom6                          Perez - Cross

request some OJ and hot tea with honey, just like chamomile to

go please, with heart emoji, right?

A.   Yes.

Q.   And you responded?

A.   I loved the message.

Q.   And then you respond on the next page?

A.   I put bag of few things outside his bedroom door that I

think are yours from hotel.  Also let me know if you want any

of this sexy stuff before I bring back later.  You can roll

your bags out when they are ready and I'll take them down.

Q.   And the response by Jane.

         Hey, he wants you.  And you liked that, correct?

A.   Correct.

Q.   And then Jane wrote same day in the afternoon though:

         Hey love so that iron for my hair lady her salon Addy

is, and then gives an address.  Thank you so much.

         And then you respond, correct?

A.   Yes.

Q.   And what do you say?

A.   I wrote heart emojis and wrote:  Have a good flight and

amazing dinner tonight.  I want the pics of JOY gang in their

dresses.

Q.   And then Jane wrote to you:  That was so cute how you said

that, exclamation points three times.  Yes.  Hehehe.  Thank you

my love, with an emoji.  And then a phone number, correct, to

P6DQcom6                           Perez - Cross

the hairdresser?

A.   Yes.

Q.   And this is how -- this is just typical, is it not, how Jane would respond with you to these nights at her home or hotels, is that true?

A.   Yes.

          MS. SMYSER:  Objection.

          THE COURT:  That's sustained.

Q.   Is this an ordinary communication between you and Jane when king nights were about to occur?

          MS. SMYSER:  Objection.

          THE COURT:  That's overruled.

A.   Oh, this is typically how we would communicate across the board.

Q.   Then if you go to page 75 of 148.

          MS. SMYSER:  Your Honor, I'm not sure what exhibit we're talking about.

          MR. STEEL:  Same exhibit.

          MS. SMYSER:  This one is 36 pages, I think.

          MR. STEEL:  I have 148.

          THE COURT:  Is this a different exhibit.

          MR. STEEL:  I don't think so.

          THE COURT:  Mr. Steel?

          MR. STEEL:  Can I have a second, your Honor?

          THE COURT:  Why don't we turn the jury view off for

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6DQcom6                          Perez - Cross

the moment.

MR. STEEL:  Your Honor, it's the same exhibit.  It's different pagination.  We will get the number that corresponds to what the government has.  It's page 18, your Honor.

THE COURT:  All right.  Let's put the document back up for the jury.

Ms. Smyser, does 18 look right?

MS. SMYSER:  Just trying to confirm, your Honor.  Yes, I think that was right.

THE COURT:  All right.  Please proceed, Mr. Steel.

BY MR. STEEL:

Q.  Then at the top, you see it's September 24, 2023, 7:16 p.m.  Your first writing?

A.  Yes.

Q.  Can you please do me the courtesy, just read to the jury what you wrote?

A.  You'll def see me.  We have to.  I land in Miami tomorrow at 9:30 a.m.  Have a good night.  Call me if there's anything I can do remotely.

Q.  Okay.  And then later, three days later on 9/27/23, Jane writes to you, Hey Jon, he's looking for smoke, please.

You see that?

A.  Yes.

Q.  And you wrote back:  Coming?

A.  Yes.

Q.  And then on -- we'll have to get the correct page.  Page 20, your Honor.  If you could look at that.  And if you go back to the page before just for the date or two pages before, you see where it's September 27, 2023?

A.  Yes.

Q.  And then going to page 20, you see Jane wrote to you:  I'm just going to shower here and freshen up.

Then you loved it and you wrote:  Is he sleeping.  Is that correct?

A.  Yes.

Q.  Then Jane wrote back to you:  Yeah, just gave him a rubdown, and he turned over.  Not sure if it will be a deep sleep or just little nap.  But let me know if the tanning stuff is available cuz while he sleeps maybe I'll just tan myself. I'm as pale as a chicken cutlet.

Do you see that?

A.  Yes.

Q.  And if you remember, this is after a king night, is that true?

A.  I'm not sure.

Q.  But this is Jane talking but while Mr. Combs is asleep. That's how you understand that?

A.  Yes.

Q.  And then I believe it will be on page 21, and it should be the same date, September 27, 2023.  You see where Jane wrote to

P6DQcom6                            Perez - Cross

you:  Text me when you find some stuff.  I'm just going to sit here with him till then, with an emoji?

A.  Yes.

Q.  Babe, can you bring me up my purse please.  It's in the living room inside the formal one.  Ahh.

And then you respond by loving it, and you didn't see it, correct?

A.  Correct.

Q.  Then Jane wrote to you:  Hi my love.  Can I please bother you for a hair tie I had one upstairs.  Oops.  I'm sorry unless you see one down here and maybe a cold beverage if you're not busy.  Thank you love.  And you loved it, right?

A.  Yes.

Q.  And then she says:  Hi, my sweet.  No rush.  Do you think Taj sees a scarf or anything I can wrap around my hips that might match just in case I'm just walking around here with him. No more sun, LOL, emoji?

A.  Yes.

Q.  Then you respond to that.  Then you respond.  Sorry, I've been in the office with my head down trying to figure something out, true?

A.  Yes.

Q.  This is all Jane being at one of the locations of Mr. Combs' residences, right?

A.  Yes.

P6DQcom6                          Perez - Redirect

Q.  And you're at the location, right?

A.  Yes.

Q.  And she's asking if you would help her out and do things, true?

A.  Yes.

Q.  And you're a kind man, and you'll do it if you can, right?

A.  Yes.

Q.  You don't see any pressure or she's upset or anything in these messages or anything do you?

A.  No.

        MS. SMYSER:  Objection.

        THE COURT:  That needs to be rephrased.

        MR. STEEL:  All right.  Your Honor, I don't have any other questions.

        Thank you, sir.

        THE COURT:  Ms. Smyser.

        MS. SMYSER:  Yes.

REDIRECT EXAMINATION

BY MS. SMYSER:

Q.  Mr. Perez, you were just asked about some conversations with Jane, is that right?

A.  Yes.

Q.  Where Jane was asking you to get certain things, right?

A.  Yes.

Q.  And was getting those things for Jane part of your job?

P6DQcom6                          Perez - Redirect

A.   Yes.

Q.   And was your title a personal assistant or a business assistant?

A.   Personal assistant.

Q.   So did your job include doing personal things for Mr. Combs?

A.   Yes.

Q.   Did you, for example, write cards for his girlfriend sometimes?

A.   Yes.

Q.   Did you sometimes get them flowers?

A.   Yes.

Q.   Did you sometimes buy them gifts?

A.   Yes.

Q.   And do you remember being asked about king nights on cross-examination?

A.   Yes.

Q.   Who told you to set up for those king nights?

A.   KK.

Q.   Did you set up those king nights for free?

A.   No.

Q.   Was that part of your job?

A.   Yes.

Q.   Did you ever set up king nights on vacation?

A.   No.

P6DQcom6                              Perez - Redirect

MS. SMYSER:  Ms. Foster, could you please pull up Defense Exhibit 3604, please.  We can turn the TV back on for overflow feed now.  Thank you.  Thank you, Ms. Foster.

Q.  Do you remember looking at this document on cross-examination?

A.  Yes.

Q.  I just want to look at a few lines here.  The second line, I think the description says:  New hookah.  Do you see that?

A.  Yes.

Q.  Is that something that's personal?

A.  Not necessarily.

Q.  Let's just go down a little bit.  Five lines from the bottom, it says:  Baby oil and snacks for PD.  Do you see that?

A.  Yes.

Q.  Is that something that's personal for Mr. Combs?

A.  Yes.

Q.  And then can you go down two more lines where it says personal for PD?

A.  Yes.

Q.  That's really just personal things for Mr. Combs that you were doing as part of your job?

A.  Yes.

MS. SMYSER:  No further questions, your Honor.

THE COURT:  Anything further, Mr. Steel?

MR. STEEL:  Very briefly, sir.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6DQcom6                          Perez - Recross

THE COURT:  All right.

RECROSS EXAMINATION

BY MR. STEEL:

Q.  When you wrote on Mr. Combs' Exhibit 3604 that was just shown to you, personal for Mr. Combs or PD or baby oil and snacks for Mr. Combs or PD, you don't know, do you, whether that money was charged personally to Mr. Combs?

A.  No.

Q.  You just got reimbursed for it, but you wrote the truth, right?

A.  Yes.

Q.  And then you were asked about were you paid to set up for king nights, remember that, the question just now?

A.  Yes.

Q.  You're on salary, right?

A.  Yes.

Q.  And then TriStar going back to the baby oil, the personal expense for Mr. Combs, they're the people who designate the accounting on the monies, right, you don't do that?

A.  Yes.

MR. STEEL:  Thank you, sir.  Thank you, your Honor.

THE COURT:  Let me -- here is what we're going to do.  Let me see the attorneys at sidebar briefly.

(Continued on next page)

P6DQcom6                          Perez - Recross

(At the sidebar)

THE COURT:  So in the transcript based on Mr. Steel's cross-examination, there was a reference to xxx gang in their dresses.  That's not in any way a reference to the witness's name, is it?

MS. COMEY:  Your Honor, I think it is a reference to her middle name.  We ask it be redacted in the transcript that gets released.  Thank you for catching that.

THE COURT:  Is that something we need to do right now?

MS. COMEY:  No.

THE COURT:  That was the immediate issue.

In terms of what is coming next.  So at this point the government has no further witnesses for today, right?

MS. COMEY:  For today, we'll offer these exhibits, but then we're done.

THE COURT:  You'll offer the exhibits.  Then we're done for the day.  We'll release the jurors, and we'll address the issues that have come up.  I just wanted to check.  Thank you.

(Continued on next page)

P6DQcom6                          Perez - Recross

(In open court)

THE COURT:  Thank you, Mr. Perez.  You're done.

(Witness excused)

THE COURT:  Anything further from the government?

MS. COMEY:  Yes, your Honor.  At this time the government would offer all the exhibits in Demonstrative Exhibit 1506, and we'd ask the exhibits with the word sealed next to them be admitted under seal pursuant to Court's pseudonym order.

THE COURT:  The exhibits identified in 1506 will be admitted under the terms Ms. Comey just indicated.

(Government's Exhibits 3P-100, 3P-104, 3P-106, 3P-108, 3P-110, 3P-120, 3P-131, 3P-132 Sealed, 3P-140 Sealed, 3P-150 Sealed, 4A-121 Sealed, 4A-150 Sealed, 4B-101 Sealed, 4B-103 Sealed, 4D-131, 4D-132 Sealed, 4D-191, 4E-101 Sealed, 4H-126 Sealed, 4H-128 Sealed, 4H-129 Sealed, 4H-130 Sealed, 4H-141 Sealed, 4K-101, 4K-102 Sealed, 4K-103 Sealed, 4K-104 Sealed, 4K-105, 4K-106, 4L-101 Sealed, 4L-102 Sealed, 5A-100, 5A-101, 5A-102, 5A-171, 5A-172, 5A-173, 5A-174, 5A-175, 5A-176, 5A-177, 5A-178, 5A-179, 5A-181, 5A-182, 5A-183, 5A-184, 5A-185, 5A-201-1, 5A-201-2, 5A-202-1, 5A-202-2, 5A-203-1, 5A-203-2, 5A-204-1, 5A-204-2, 5A-205-1, 5A-205-2, 5A-206-2, 5A-207-1, 5A-207-2, 5A-208, 5A-211, 5A-212, 5A-213, 5A-214, 5A-215, 5A-216, 5A-217, 5A-218, 5A-221, 5A-222, 5A-223, 5A-224, 5A-225, 5A-231, 5A-232, 5A-233, 5A-234, 5A-235, 5B-100, 5B-101, 5B-121,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6DQcom6                         Perez - Recross

5B-131, 5C-100, 5C-101, 5C-102, 5C-103, 5C-104, 5C-105, 5C-106,

5C-107, 5C-108, 5C-109, 5C-110, 5C-111, 5C-112, 5C-113, 5C-114,

5C-115, 5C-116, 5C-117, 5C-121, 5C-122, 5C-123, 5C-124, 5C-125,

5C-126, 5C-141, 5C-142, 5C-143, 5C-144, 5C-145, 5C-146, 5C-147,

5C-281, 5C-282, 5C-283, 5C-284, 5C-285, 5C-286, 5C-287, 5C-301,

5C-302, 5C-303, 5C-304, 5C-305, 5C-306, 5C-307, 5C-308, 5C-309,

5C-310, 5C-321-1, 5C-321-2, 5C-322-1, 5C-322-2, 5C-323-1,

5C-323-2, 5C-324-1, 5C-324-2, 5C-325-1, 5C-325-2, 5C-326-1,

5C-326-2, 5C-327-1, 5C-327-2, 5C-328-1, 5C-328-2, 5C-329-1,

5C-329-2, 5C-341, 5C-342, 5C-343, 5C-344, 5C-345, 6A-101

Sealed, 6A-102 Sealed, 6A-103, 6A-104, 6A-105, 6A-106, 6B-101,

6B-102, 6B-107 Sealed, 6B-108 Sealed, 6B-109, 6B-110 Sealed,

6C-101, 6C-104 Sealed, 6C-105 Sealed, 6D-101 Sealed, 6D-103,

6G-111 Sealed, 6G-112 Sealed, 6G-118 Sealed, 6G-119, 6H-103,

6H-104, 6J-103, 6J-104 Sealed, 6K-102, 6K-104 Sealed, 6L-101

Sealed, 6L-102, 6Q-101 Sealed, 6Q-102 Sealed, 6Q-103, 6S-103

Sealed, 6U-101 Sealed, 6U-102, 6W-101 Sealed, 6W-102 Sealed,

7A-132 Sealed, 7A-133 Sealed, 7A-133-A Sealed, 7A-134 Sealed,

7A-135 Sealed, 7A-136 Sealed, 7A-137 Sealed, 7A-137-A Sealed,

7A-137-B Sealed, 7C-108 Sealed, 7C-109 Sealed, 7D-141 Sealed,

7D-142 Sealed, 7E-101 Sealed, 7E-102 Sealed, 7E-103 Sealed,

7F-104 Sealed, 7F-105 Sealed, 7F-106 Sealed, 7G-103 Sealed,

7G-103-A Sealed, 7H-179 Sealed, 7H-180 Sealed, 7H-181 Sealed,

7H-182 Sealed, 7H-183 Sealed, 7H-184 Sealed, 7H-185 Sealed,

7H-186 Sealed, 7H-187 Sealed, 7H-188 Sealed, 7J-101, 7J-104

P6DQcom6                          Perez - Recross

Sealed, 7J-104-A Sealed, 7J-106 Sealed, 7J-106-A Sealed, 7J-106-B Sealed, 7J-107 Sealed, 7J-107-A Sealed, 7J-107-B Sealed, 7J-108-A Sealed, 7J-109 Sealed, 7J-109-A Sealed, 7J-109-B Sealed, 7J-110 Sealed, 7J-110-A Sealed, 7J-110-B Sealed, 7J-111 Sealed, 7J-111-A Sealed, 7J-112 Sealed, 7J-112-A Sealed, 7J-113 Sealed, 7J-113-A Sealed, 7J-114 Sealed, 7J-114-A Sealed, 7J-114-B Sealed, 7J-115 Sealed, 7J-115-A Sealed, 7J-115-B Sealed, 7J-115-C Sealed, 7J-116 Sealed, 7J-116-A Sealed, 7J-116-B Sealed, 7J-117 Sealed, 7J-117-A Sealed, 7J-117-B Sealed, 7J-118 Sealed, 7J-118-A Sealed, 7J-118-B Sealed, 7J-119 Sealed, 7J-119-A Sealed, 7J-119-B Sealed, 7L-101, 7L-102, 7P-101 Sealed, 7P-102 Sealed, 7P-102-A Sealed, 7P-103 Sealed, 7P-103-A Sealed, 7P-104 Sealed, 7P-104-A Sealed, 7P-105 Sealed, 7P-105-A Sealed, 7P-106 Sealed, 7P-106-A Sealed, 7S-101 Sealed, 7X-150 Sealed, 7Y-120 Sealed, 7Y-120-A Sealed, 7Y-120-B Sealed, 7Y-120-C Sealed, 7Y-121 Sealed, 7Y-121-A Sealed, 7Y-121-B Sealed, 7Y-121-C Sealed, 8A-101 Sealed received in evidence)

          MS. COMEY:  Thank you, your Honor.  Otherwise, we have nothing further today.

          THE COURT:  Very good.

          Thank you, members of the jury, for your attention and all your hard work.  It's been a long week I know for all of

P6DQcom6                          Perez - Recross

you, so I really appreciate, and I know the parties appreciate it to.

Since we're getting to a weekend, I'll give you the same instructions that I have previously.  Obviously, don't speak with each other about the case.  Over the weekend it's very important that you do not talk to anyone about the case.  If someone tries to talk to you about the case, tell them "I can't talk about the case because the judge has ordered me not to" because I am ordering you not to.  Do not read or look up anything on the case.  I've already told you to turn off your notifications.  But if you see something in an article that comes up, anything like that, just look away.  Turn it off.  And we'll see you here starting on Monday to get started at 9:00 a.m.  Have a great weekend everybody.  And, again, thank you for your hard work.

(Continued on next page)

P6DQcom6

(Jury not present)

THE COURT:  Please be seated.

Let's first begin with the issue concerning the juror. Just starting with the standard that applies.  As stated by the Second Circuit in *United States v. Fazio*, 77 F.3d 160, 169-170 (2d Cir. 2014).

District courts have broad discretion under Federal Rules of Criminal Procedure 24(c) to replace a juror at any time before the jury retires if the Court finds that a juror is unable or disqualified to perform their duties.  Removal of a juror is the prerogative of the Court and does not require the consent of any party.  Moreover, the Federal Rules of Criminal Procedure do not require any inquiry prior to the dismissal of a juror.

In discussing the standard applicable to review of a district court's decision, the Court in *Fazio* noted that a reviewing court should not disturb the trial judge's exercise of discretion in dismissing a juror unless there is a bias or prejudice to the defendant.

Prejudice, in this context, the Court clarified, exists when the discharge is without factual support or for a legally irrelevant reason.

While most of the cases that have been cited involve requests to dismiss a juror from the defendant, that is not always the case.  As always, the Court's role is to maintain

P6DQcom6

the integrity of the process, ensure fairness, and confirm that jurors that hear the case will follow its instructions and dutifully apply the law to the facts impartially.

The government cited, among other cases, to *United States v. Arline*, 660 F.App'x 35, 39-40 (2d Cir. 2016).  In that case, the district court dismissed a juror after that juror was observed listening and watching a proceeding not meant for the jury.  When questioned about the incident, the juror gave inconsistent answers about what had happened.  Based on that conduct, the district court had reasonable cause to dismiss the juror.  The district court confirmed that even a brief hearing was not required under those circumstances, again citing to the Second Circuit's decision in *Fazio*.

That takes us to the circumstances of this case.  Now, in the morning when we addressed this, I had indicated views that based on what was in the record, I had a question as to whether it met a -- whether it was sufficient to dismiss the juror.  We had a colloquy among the parties, and Ms. Steiner had indicated that on the government's view, based on a close review of the transcripts, there was more than sufficient information to dismiss this juror.  And so during the break, during the lunch break and some of the other breaks we had, I took a close look at both the transcript from the colloquy in the robing room, as well as the transcript from the voir dire proceeding, and so let's start there.

P6DQcom6

First of all, to address any suggestion of bias, the Court previously in the morning today noted that there is no evidence whatsoever, no basis for any charge of any claim of bias. The way in which this issue came up was simply an offhand conversation that the juror had with a member of the jury department, which was innocent enough. And that is described at the transcript on pages 4950 through 4951. It was simply the answer to a question in conversation where the juror indicated that he recently moved to New Jersey. Those are the words of the juror. He further indicated on questioning from the Court that he moved in with his girlfriend. He said it may not be permanent, but that is where I've been staying for the last couple of weeks. So that's what the juror initially said.

He further indicated that he has been staying there, meaning the place in New Jersey, most of the time. That's on transcript page 4953. That is what the juror initially said. There was then a long break while counsel conferred with their respective teams and clients to confirm and discuss whether any further questions should be asked of the juror. Each side came back and they had some followup questions.

The juror, meanwhile, was outside waiting in the hallway. When the juror returned, the Court asked some of the questions that the parties had requested. So the discussion continues on transcript page 4959.

Now, here when the juror was asked about the apartment

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6DQcom6

that he previously had in New York, the Court asked:  You're still staying there?  And the juror said yes.

The Court asked:  How many nights per week do you stay there?

The juror answered:  Four to five, mostly during the week.  I've been working.  Monday through Friday I work.

So between the breaks here, the juror started by saying that he had moved to New Jersey, moved in with his girlfriend, and that that is where he was staying for the last couple of weeks.  And also saying that he stays there most of the time.

After the break, when the parties were discussing what further inquiry was appropriate, the juror said that actually he was spending four to five nights in his New York apartment, mostly during the week.

Now, on further questioning about the juror's child and whether she lived in the New Jersey apartment, the juror was asked:  Has she always lived in the New Jersey apartment?

And the juror answered:  She was born in New Jersey, yeah.

And so the Court asked:  She was born in New Jersey so she's been living there?

And the juror said, Yeah.

And then you've been in New York?  Meaning the juror.

And the juror said:  Yes.

P6DQcom6

And now this is the Court:  And then now your girlfriend has an apartment in New Jersey, so that's where your daughter is living?

And the juror answered:  Right.

So in this questioning, the juror clearly indicated that he had been previously living in New York but then was moving into the New Jersey apartment to where his daughter was then living and had been living because that was the question the Court had asked.

As to this portion of the transcript, the government after receiving this transcript noted that in voir dire this juror had answered in response to the very simple and straightforward questions of where do you live and who do you live with:  I live in the Bronx.  I live with my fiancée and my baby daughter.

Now there's a couple problems there.  That when the juror was asked in the robing room where his daughter lives, he indicated that his daughter lived in New Jersey with his -- he said girlfriend, but the Court assumes that the fiancée is the girlfriend.  And so there's an inconsistency between the voir dire transcript and the robing room transcript on that particular issue.

The other and separate inconsistency is that in the robing room transcript when explaining the living situation of the juror in New York, he indicated that in New York he lived

P6DQcom6

in an apartment with his aunt.  But in the voir dire transcript
when asked about who he lived with, he identified his fiancée
and daughter, who, the robing room transcript indicated lived
in New Jersey, not in New York, but omitted the aunt who did
live in New York, according to the juror in the robing room
transcript.

So within the transcript from the robing room
proceeding there are several inconsistencies.  And, more
importantly, between that transcript and the transcript of the
voir dire proceeding, there are additional inconsistencies.  As
detailed in the government's letter, there are also separate
issues concerning some of the information that they point to
there.  I'll just direct the parties to that information that
is repeated in the government's submission.

Now, where does that leave us?  The issue here is that
where there is some suggestion that either the juror was unable
to follow simple instructions and answer simple questions, or
if there was any effort to be -- to shade the truth or be
deceptive about matters that were inquired upon both in the
voir dire proceeding, which is a critical part of this case
where the parties have the chance to address issues that were
central to the qualifications of the juror, as well as
potential bias or other things that might be important to the
exercise of the parties' peremptory challenges, as well as any
applications to exclude jurors for cause, there are serious

P6DQcom6

questions about the juror's candor and the juror's ability to follow the Court's instructions; and when we get to the point of the case later, the ability of the juror to apply the law to the facts clearly given the discrepancies in the record thus far.

It is for those reasons that the Court does not feel that further inquiry of the juror is necessary. Put aside that neither side advocated for such an inquiry, and the defense raised deep concerns if the juror was further inquired of.

The reason why we have alternate jurors in this case is to address the potential situation of a juror as to whom there are concerns about either their ability to give honest answers to questions, their ability to follow the rules, and so what the Court is concerned about, even if as a technical matter this juror would be qualified to be a juror, is that the changing answers and inconsistency give the Court worry about deception and lying, which further implicates the veracity of other answers that the juror answered during the voir dire process, including about the myriad questions that go to the heart of the case. And even as to the issue we are addressing, it seems like a trivial matter in one sense, but the issue that came up, and the only reason why the Court had a discussion about it is that there was a concern at that time that it goes to the question of the juror's basic qualifications to serve under the criteria that's spelled out in the governing statute

P6DQcom6

28 U.S.C. 1865.

Even if the juror is, as a technical matter, qualified, omissions or inconsistencies as to such a basic question as to where you live raise serious questions concerning the propriety of maintaining this juror.

Again, the purpose of having alternate jurors is to maintain the integrity of the process so that all sides in this case can be comfortable that the jurors that are deciding this case have no questions about whether they can fairly and impartially apply the rules of law of the court to the facts of this case, to consider the evidence in a fair way, and to follow the instructions of the Court. Where there is a question like this on this record raised as to those points, removal of the juror is required in this Court's view. And so for that reason, the juror will be dismissed, and we will inform the juror so that he does not return on Monday.

MR. DONALDSON: Judge, may we make a record, please?

THE COURT: Yes.

MR. DONALDSON: First of all, I think -- we, not I, we, of course, we lodge our objection to the Court's decision, but let me just make a quick record.

As an initial matter, we did not want the juror questioned, not because we believe that there was a complete clarity on the record related to his house or residence, but because we did not want the Court to send a chilling effect to

P6DQcom6

the juror to what we believe the government was asking regarding where he lived and how his employment has residence requirements.  That was our concern because that would, in our opinion, literally chill this juror in case the Court had decided he could stay.  So that was our concern about asking the questions.

Relating to bringing the juror back to clear up, I'm inclined to believe that these answers are not as significant as to his ability to serve at the court.  I'm going to say why.  I don't believe that where we reside, New York versus New Jersey, and how persons sometimes have fiancee, girlfriends, boyfriends, whoever, who live in New Jersey, and then they go back and forth.  If -- not if -- since the juror has indicated he lives in New York and goes back to see his fiancée or girlfriend in New Jersey, that is in my experience, a very, very, very, very, very common thing, particularly in New York and New Jersey.  Very often people have loved ones or girlfriends or boyfriends who live in New York, they go there four times a week, but they live where they live.

This juror indicated he lived here when he was sworn, he goes back and forth to New Jersey, which is normal, and I don't know when that changed or if it did change or if there's something he can explain, I think he should be the opportunity to explain.

Like my colleague said this morning, these jurors have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6DQcom6

been particularly attentive for approximately four weeks or five weeks.  They have sacrificed, I think, a great deal to be on this jury.  And number six, in my opinion, has been awake — I can't say that for all of them — has been awake every day for five, six hours listening attentively to the evidence.  I think, and I disagree with the Court, respectfully, I do not believe that this particular juror cannot perform his duties. I do believe that his participation in the jury will maintain the integrity.

I do believe that he will be able to follow instructions and apply the law.  I don't think there is anything on the record that says he will not.  The fact that he has some, and the Court is saying inconsistencies, and I'm concerned that the Court is equating inconsistencies with lying.  I'm concerned the Court is equating inconsistencies with the possibility of being untruthful or shading the truth. I don't think that this is the case.  I think this particular juror answered the questions as truthfully as he could.  I think we put questions to this juror in the back, and we are, as attorneys in the court, analyzing his answers in a way that produces inconsistencies, that may be true, but I don't think they are indicative of him not being truthful or trying to hide something from the Court.  I think if we bring him out here and ask him questions without asking questions related to his job, I think that we can come to some understanding of what really

happened.  I think it's worth it, particularly to the defendant that he be given that opportunity because clearly he has come here every day.  Clearly, he has been here on time.  Clearly, he has stayed here until 5:00, sometimes later.  Clearly, he wants to be on the jury.  And he's dedicated time to be here. I think these questions and answers are not of the magnitude that would discharge him from this jury.

I know that the Court started earlier with how this came up, and I appreciate -- that part aside, I appreciate the Court saying the issue came up accidently, innocently, et cetera.  That is all true.  I don't doubt that, and I appreciate the Court saying there was no bias, and the prosecution did everything they were supposed to do from jury selection on through.  I understand that.  I'm not disagreeing with the Court specifically on that.

But what I will say, and I have to say, I feel obligated to say, and that is that I have been here in this district court for 25, 30 years.  I have had a lot of trials in this district, particularly with some people in this group and other persons.  And this is the first time I can say in this 25 years we have this type of diverse jury in this district.  It hasn't happened in my 25, 30 years practicing.  I think we are moving in the right direction.

As the Court has stated, and I think my colleague provided the court a letter, and *U.S. v. Slaughter* indicated,

P6DQcom6

we have been going in the opposite direction since 1990 in this particular district when it comes to Black and Hispanic jurors. For whatever reason, the process that this Court used for us to get a jury worked, and it worked wonderfully in that we got a diverse jury. How this happened is one thing. But the result of what's going to happen if we take this juror off on this record, the result is, in my opinion, going backwards.

Now, it may not be intentional. It's not. It's clearly not. No one is saying that's what's happening. But I would be reluctant to say we've taken strides to get to a point where we get a diverse jury, that we are now going to do something that will result in the diversity of that jury being shortened. That part is important to me, to, I believe, my client, and to, I believe, the defense table, and to, I'm sure, the prosecutors. We don't want to be doing things that appears to take steps backwards. I'm not saying we're doing it intentionally, but I think it's important to note that.

So with the record that we have, and I know the Court -- and I've been watching the Court for six weeks take great steps to make sure everything is done properly, and I've been actually quite amazed at how you do that. I don't know how you do that on the fly like that, but it's been incredible to watch. However, in this particular situation I think that it is the least we can do is bring that juror back out and make sure the best we can that what we are coming to the conclusion

P6DQcom6

of that he is unable to -- I think the elements are unable to follow the Court's instructions or apply the law properly, if we're coming to that conclusion based upon the answer that he gave, I think it's important for us to make sure that's the right conclusion.  Because he's been here.  He clearly wants to be here.  I think one of the factors that the prosecution was arguing is the reason there is not enough Black and Hispanic jurors is because Black and Hispanic jurors don't answer the call enough.  That was their reasoning, and that was found okay by the Court.  Well, he did answer the call.  He's here.  He wants to be here, and he's been here for four or five weeks.  So to kick him off now without being sure what's going on, I think in my opinion - this is just my opinion.  It's not anything else - but in my opinion doesn't show the appearance that we want to show.  And now I think that's important.

We have to be doing what we think is the right thing to do at all times, and we must also have the appearance that we're doing the right thing all the time.  If the man came here, which he did; he sat in the jury, which he did; he has been here five and six weeks, which he has.  He can do all those things, and I think we have to make sure what we are concluding is correct before we dismiss this juror.

THE COURT:  All right.  Anything from the government.

MS. STEINER:  Your Honor, I have nothing to add to your Honor's ruling.  As we did indicate earlier this morning,

and as your Honor has weighed out very carefully in the record, we do think the record is complete on these facts, and that no additional inquiry is required.

I do want to respond to what Mr. Donaldson is suggesting. As your Honor is aware, and as all the parties are aware, we have a very diverse jury in this case, which is a wonderful thing. And Mr. Donaldson is suggesting that we make a decision here based on race. And the important thing in a situation such as this one, as your Honor has noted, is to ensure the integrity of the proceeding which requires us and the Court to do the hard work of establishing whether or not there is reasonable cause to dismiss this juror because of a lack of candor with the Court, and I think your Honor has more than outlined a sufficient basis for that finding.

I will also note, your Honor, that -- and it's true Mr. Donaldson has noted that juror has been very attentive, has come on time, and I will say also to compliment this jury they really have been showing up in a timely manner, I think all the jurors have been paying close attention, including the alternates. So we have no reason to doubt the ability of an alternate or any of the other jurors to continue on in this case and to fulfill their obligations.

THE COURT: All right. So Mr. Donaldson, you know, I hear -- and I heard you, and I hear the concerns that you're raising, and in terms of the issues that I raised in terms of

P6DQcom6

the discrepancies in the transcript, what you noted is we're talking about where the juror lived. And in voir dire, it was, I think literally one of the first two questions in the group questions, which is where do you live and who do you live with. And as you noted, those are pretty straightforward questions, and people have a lot of situations that would be responsive to that question. And so if the juror had indicated that he was sharing time between the Bronx and New Jersey or that he explained the situation in any way, shape, or form, that would be something, and I think no one would have had an issue with that.

The problem really is, is that in voir dire, the juror was pretty categorical. He said:  I live in the Bronx, and I live with my fiancée and my baby daughter. And those are simple questions that anyone can answer and has no reason to answer in a different way unless there's an effort to try to get on to the jury.

(Continued on next page)

6042

THE COURT:  That's the only reason why you would say anything that would be inaccurate about that particular line of questioning, because it doesn't have any other bearing.  No one would think it would have any other bearing other than on the qualification to be on a jury in a case that's pending in the Southern District of New York.  And so that's sort of the starting place there.

And then we get to what happened when we had a colloquy with the juror.  And as I noted, the juror initially said that he moved to New Jersey and was living in New Jersey and later clarified that that's where his daughter had been living, because the Court asked the juror, again, just inquiring as to the living situation.  So it's not just an issue of -- and just to add to that, initially, when the juror indicated that he was living in -- he had recently moved to New Jersey and he moved in with his girlfriend, the Court asked where he was living previously, and the juror answered in the Bronx.

And then while the Court was attempting to ask a question, the juror answered, I still have a New York license. I still maintain that residence.  All my bills go to the Bronx, so nothing has changed.

And that again would suggest an effort to, in the juror's mind, try to get onto the jury.  He wants to be on the jury, and so he's making that clarification.  And the reason

6042

why that's significant is that after there's a break, that's when there's questioning about where the juror lives and where, in stark contrast to what the juror initially said, he then indicates that he actually spends most of his time in the Bronx, in New York, and not in New Jersey, which is just flat inconsistent with what he previously said during the early part of the colloquy.  He said he spends four to five nights a week still in New York.

So then your suggestion is, well, why don't we have the juror actually come forward and answer some of these questions to clarify that, and I hear that.  The issue, though, is not having the juror try to reconcile those inconsistencies. That might provide a rationale to put these things together, but it would not address why there were inconsistencies in the first place, and it would not address the concern of whether the juror is shading answers or trying to provide an explanation in an attempt to stay on the jury, which the cases have indicated raises questions about the integrity of the process, about the fairness of the process.  And that is the reason why we have alternate jurors.

And as to those alternate jurors, we engaged in a fair process, where each side had the ability to have peremptory challenges to strike the jurors they didn't like.  As you point out, that's why I said earlier today, and it's very true, that regardless of this application, we have a very diverse jury,

6042

and that would continue to be the case. But the concern, even if we were to hear from the juror and have some explanation to reconcile the different answers, is that there would be an appearance and a reasonable perception that the process may have been tainted; that there may be a juror on the jury who has an agenda, who wants to be here and is not going to be either able or willing to follow the rules.

And that is a determination that the Court has to make without regard to any other considerations, because if the integrity of the process is compromised in that way, then the commitment that I made to the jury, and that the jury made in response, to have a fair and impartial proceeding and to decide this case based on the facts and the law and not based on any other considerations of prejudice or bias, would be compromised. And that is the reason -- if there is a concern about that, that is where we have the alternate juror step in, and that is why this is the right step to take at this juncture.

MR. DONALDSON: Your Honor, may I say one more thing, and I'll sit down?

THE COURT: Of course.

MR. DONALDSON: And I'm sorry, Judge. I'm trying not to say too much.

I understand what you're saying. I truly do, but it is going to be a less diverse jury when you do what you said

6042

you're going to do.  That is a fact.  And I, for one, believe that that is, in my mind, particularly practicing in this district so long and seeing what I've seen, I think that is of paramount importance, sometimes above just about all else, that we have a jury that is representative of who they're making decisions against, particularly in this city.  So I wholeheartedly but respectfully disagree with the Court in that respect.  I think that we do compromise the integrity of this process when we make a jury less diverse.

I think that -- and I'm not saying that in all situations.  If the right reason comes up, then fine.  I just say keep it fair.  That's my motto.  But I think in this particular situation, I don't think it's an unreasonable or -- and it's completely in the Court's discretion, and I respect that as well.  But in this particular situation, I don't think it's that much of a burden on the process or something that we all shouldn't want to ensure that we're coming to the right conclusion.  That's why I do not think that simply bringing him back out or going in the back or doing whatever has to be done to make sure that we're making the right decision.  In my opinion, it's just that important.  I shouldn't say my opinion.  In our opinion, it's just that important.

So I understand what the Court's saying.  I can see, for the record, that the Court has thought about this extremely well.  I see that, and I respect that.  But I just -- I'm

6042

basing everything else, my experiences in this courthouse, on several of these floors, that what we have here is something that we should be striving for. And if we're going to reduce that, then I think we should have an extremely good reason to do that.

And last thing, in response to what my adversary said about Mr. Johnson asking us to make a decision on race, I have a rule. I don't generally play the race card unless I have it in my hand. And I'm not saying I'm playing it now, but the facts are the facts, and I'll go with what the facts are. And all I'm suggesting to the Court, and I'll sit down, for this type of decision, we do have alternates that were -- you know, we all picked those alternates just like we all picked the sitting juror because we select those that we want to preserve. So I do understand that they are equally appropriate for the jury. But to remove one during the trial, I think it wouldn't burden us too much just to make sure and bring him out here for however many minutes the Court deems appropriate to ensure we're doing the right thing -- not to ensure we're doing the right thing but to ensure as best we can that the conclusions drawn are the right ones.

That's all I have.

THE COURT: All right. I hear you, Mr. Donaldson.

MR. AGNIFILO: I have preservation issues, and it's an argument that we haven't made. I see where the Court's going,

6042

but I want to just say this for the record, and I can do that very quickly, if that's OK.

I had this exact issue in a state case, and there's a body of state law. And the state, it's the Court of Appeals of the State of New York interpreting the U.S. Constitution. I just want to bring your Honor's attention to the case.

It's not a federal case. The case is *People v. Jeanty*, 94 N.Y.2d 507, from the Court of Appeals. And what it basically says is that there are differences between the principal jurors and alternate jurors and that a defendant has a constitutional right to a jury of his or her choosing, that being the principal jurors.

Now, one of the things that I'm seeing, I'm not seeing -- there's a wide disparity from the way certainly that federal law has been enunciated in this courtroom and possibly, you know, accurately so in terms of the cases that have come before federal courts. The state courts are very different. And the states are interpreting the same Constitution that the Second Circuit's interpreting and that the district courts are interpreting. And the way that *Jeanty*, which is the highest court in the state of New York, interprets the Constitution, it is to say that there is a difference between the principal jurors and the alternate jurors. And that's really what that decision is about; and that a defendant has a right absent conditions that are far more compelling, I think, than the ones

6042

we have here, to a jury of his or her choosing.

I know I'm throwing the ball into the corner of the end zone by bringing up state cases, but this is actually an issue that I had in another case, and I was trying to check why there's this wide distinction between state cases, which seem to be interpreting the same Constitution, and the federal cases that we've discussed today.

For all those reasons, I just want to make the record clear that that's our position, Judge.

Thank you.

MR. STEEL:  May I, sir?

THE COURT:  All right.

MR. STEEL:  Your Honor, I'd like you to consider just one additional point.

I feel it's important for the Court to potentially consider, if you haven't, that all of this information that this honorable Court based its decision upon has been known during voir dire, and all these people in front of this Court heard it and did not raise the issue.  And now, after weeks of trial, after watching which, each juror makes faces at certain times or may have some sort of reflection in their body language, now, all of a sudden, we go back to voir dire and something that should have been picked up at the time and say now it's obvious that the juror made inconsistencies, which may have -- well, would cause the Court to believe that the juror

6042

wanted to be on the jury and made some potential falsehoods.

And I think that that's a very bad road to go down, because that's how people gain the system. I'm not poking at the prosecution or anybody else. I'm just saying that it seems like it's an issue that everybody knew about, but nobody was concerned with it to raise it when we were striking the jury and exercising our peremptory challenges. And it does not -- that needs to be factored, in my request for the honorable Court, into your consideration and I would ask you to do so and at least bring in the juror to potentially explain any questions the Court may have.

THE COURT: I want to fully consider the things that everyone has said, as I always try to do.

I will say as to the last point, I don't know, Mr. Steel, what you are referring to exactly. The entire premise and the reason why we are here talking about this issue is because there was information that came to light this week when we had a colloquy with this juror. That is the reason why we're talking about this.

This was certainly not known to the Court at voir dire. And if it was known to the defense, then I think that's a separate issue. But it was certainly not known to the Court, and it's certainly not something that was raised during the voir dire process. In fact, the juror's explanation turns on things that he says happened after the voir dire process began.

6042

Now, it's the inconsistencies in the answers there and the inconsistencies between those answers and the voir dire colloquy that are raising the concerns here.  And to be very clear, it's not just this particular issue that is at stake. The problem is that where there are these types of concerns raised as to these specific questions, that opens up the questions about the other answers, the other issues that were raised during the voir dire process, that the parties and the Court went back and forth on to develop a questionnaire about over a series of weeks.  And the questions, everyone agreed, were very important in this case to make sure that the jury that we drew was going to be a fair and impartial jury that could follow the Court's instructions and consider the evidence presented in an unbiased way.

And so when there are these issues that come to light during the process -- and they came to light in an organic way just based on an issue that had come up with respect to the juror -- it is the Court's job to make sure that the process is not threatened.  And that's why we have six alternate jurors, because the Court anticipated that some things might happen during this very long trial.  And to have a trial like this but to have some people wondering was there a juror who was seated who did not have the intent to follow the Court's instructions or could not follow the Court's instructions but instead was acting on a personal agenda -- and there was some evidence of

that -- and action that was readily available, to seat one of the alternate jurors, was not taken, and instead that juror was allowed to deliberate on the case, I think, goes to the core of undermining the trial process. And that's something that the Court has to monitor.

That's just, Mr. Steel, to your concern.

But I'm going to think, Mr. Donaldson and Mr. Agnifilo, about the issues that you've raised. And so if there's any change, if I think it's warranted to bring the juror back to have a discussion, then I'll let you know. The entire jury is gone today, so it's not something that can be done today anyway. So I think the better part of valor is to make sure that I've considered everything that you've raised, because again, I always try to. So I will make sure to do that, and I'll advise the parties if there's any change in how we're going to proceed.

THE DEPUTY CLERK: Your Honor, may I speak to you very briefly?

THE COURT: Yes.

All right. Ms. Steiner.

MS. STEINER: Your Honor, just very, very briefly.

I just wanted to make the record clear, if it wasn't already, that no one on the government's side had any awareness at the time of voir dire that this juror was living anywhere other than New York, that he was living with anyone other than

6042

his fiancée and daughter and that those family members lived anywhere other than New York.

MS. GERAGOS:  We didn't either, your Honor.  I just want to make that very clear as well.

THE COURT:  All right.  So this is something that came to light during the process, and it happens from time to time.

All right.  Let me have the parties at a brief sidebar.

(Pages 6244-6249 SEALED)

6042

(In open court)

THE COURT:  All right.  We have a sensitive matter that we have to address in the courtroom, so at this time I'm going to close the courtroom.  We're going to need everyone in the gallery to be cleared out.  No one will remain except for the parties and the attorneys on the case.  Everyone else should leave the courtroom, and the courtroom will be sealed.

MS. COMEY:  Your Honor, may I ask for authorization for AUSA Jacqueline Kelly to remain in the courtroom?  She's our supervisor.

THE COURT:  So given.

MS. COMEY:  Thank you, your Honor.

MS. SHAPIRO:  Your Honor, there's also a lawyer on the defense team.

THE COURT:  That's fine.

(Pages 6251-6260 SEALED)

6042

(In open court)

THE COURT:  All right.  Are we ready to proceed?

MR. AGNIFILO:  I'm going to save your Honor ten minutes of work.

THE COURT:  OK.

MR. AGNIFILO:  The *Jeanty* case that I cited says it is expressly based on the New York State Constitution.

MR. DONALDSON:  That's still a Constitution, though.

THE COURT:  All right.  Where do you want to start?  We have the videos and images, GX 361-BFG and 362-DF.

MS. GERAGOS:  Should I start, your Honor?

THE COURT:  Well, as to these, the videos and the images, the response from the defense is that in order to address the issue as to the reason why these videos and images are being put in, the defense would have to get into privilege.  So maybe the defense can explain this, because they requested to be heard orally on their privilege issue.

MS. GERAGOS:  Yes, that's right, your Honor.  I just thought it might be easier to do this orally, and I promise to keep it short.

The thrust of our argument here is yes, that we would have to explain privilege issues here.  As your Honor is well aware, Ms. Khorram was the primary agent for Mr. Combs at the time that the lawsuits started, you know, from Ms. Ventura's lawsuit and afterwards, in terms of coordinating things with

6042

his attorneys and being his primary agent for all privileged communications with counsel.

At this time that she took these screenshots, and they're videos but they're kind of live photos from iPhones, so they're essentially screenshots as well. We had been sued by -- I think there were at least three different lawsuits at that time, two by Doug Wigdor and another one. And they had been expressly directed by counsel -- Mr. Combs had two civil counsel at the time -- to document, to take photos of these, any types of threats like these. And I can represent to your Honor that when Mr. Agnifilo and I came on board, right after the raid, these were some of the very first pieces of information that we received from them.

And so to have these in evidence -- we understand why the government wants them. Of course, they've charged a conspiracy that ended in 2024 with Mr. Combs's arrest. So we understand that the probative value for the government is to be able to show that by December 28 of 2023, Ms. Khorram knew about the Jane's allegations, knew about their sexual life. And I assume they will argue, in summation and through the summary charts, stating the alleged conspiracy.

I don't think that taking these photos and screenshots out of the chart will harm the government because they are going to be able to make that argument by showing that Jane herself went to Ms. Khorram and detailed these things to her

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6042

extensively in the exhibit that your Honor's already seen and your Honor has already ruled in. And so our argument here is really is based on 403 because they were taken at the direction of counsel at this time. But obviously the communications themselves, because they are not with an attorney and they were just taken with a phone, are not itself privileged. But the explanation just goes a lot deeper.

And so our argument here is that we would be unduly prejudiced because to explain this and explain why she's taking these photos would be to explain that he had multiple civil law firms at the time. He's been sued by several different people.

THE COURT: Let me just make sure that I understand.

The only reason, in the defense's view, that Ms. Khorram took videos and images of these communications is because she was directed to by counsel?

MS. GERAGOS: At the time, she was directed to, yes. I don't know if it's the only reason, but yes, she was directed to. Yes.

THE COURT: That's at least one reason.

MS. GERAGOS: That's at least one reason, yeah.

THE COURT: From the government's perspective then, what probative value can be drawn from Ms. Khorram's possession of those communications where at least one reason why she had them is because she was told to get them by civil counsel?

MS. JOHNSON: Your Honor, I think the probative value

here is exceptionally high when it comes to Ms. Khorram's knowledge. At this time -- and I don't think that it's unduly prejudicial or confusing.

At this exact same time, Jane testified that she is talking to Ms. Khorram about the sex tapes, and it's another piece of information that Ms. Khorram has about Jane and Mr. Combs. And tellingly, the defense doesn't cite a single case saying that these are privileged materials, because they can't, because they simply are not. And I don't think it's necessary to provide any context as to how Ms. Khorram ended up with these materials.

One of the witnesses testifying next week is expected to testify that Ms. Khorram had regular access to the defendant's phone, and the reason he knew that is because Ms. Khorram would text from the defendant's phone. So it won't be a piece of evidence that stands out or is unusual that she had access to his phone, and it is exceptionally probative.

The amount and specificity of her knowledge as to the defendant's relationship with Jane is very probative.

THE COURT: All right. So in light of the -- let me make sure I understand.

From the government's perspective, Ms. Khorram's possession of the communications is what they're being introduced to show, right?

MS. JOHNSON: Exactly. And Ms. Khorram's continued

6042

facilitation of hotel nights after December of 2023.  Her knowledge is relevant because she continues to facilitate hotel nights into 2024.

THE COURT:  So the point being that it doesn't really matter why she had these things --

MS. JOHNSON:  Exactly right.

THE COURT:  -- because she had them.  Even if she was told by lawyers to go get them, it's fine, because she knows about it.  But what's relevant really, and the reason why it's relevant is because the alleged illegal conduct continues after that time.

MS. JOHNSON:  Precisely.

THE COURT:  All right.

MS. GERAGOS:  If I could respond to that specific argument.  Jane testified the only hotel night that they had, actually had a hotel night that they had after this, she asked for it.  She picked out the Four Seasons.  She wanted to have this getaway there, and so for them to then say that Ms. Khorram is the one that facilitated this or in any way arranged this, when this was specifically asked for by Jane, that's just counter to the evidence.

MS. COMEY:  If I may, your Honor?

MS. GERAGOS:  And then one more point -- I'm so sorry -- and Ms. Comey can go.

I also brought out from Jane that anytime she went to

6042

his house in 2024 at Two Star Island, Ms. Khorram was not there.  Left the premises.

MS. COMEY:  If I may, your Honor?

THE COURT:  Yes.

MS. COMEY:  There are texts that we introduced during Jane's testimony showing that she coordinated with Ms. Khorram to schedule her flight to Miami for her birthday.  Your Honor may recall the defendant introduced Don.  And there are also texts that Mr. Pérez read today where Ms. Khorram told him that the defendant would be going over to Jane's home on June 18.

Those are two instances of alleged sex trafficking that Ms. Khorram was at least involved in facilitating, and so I think that at least based on just those two alone, the fact that she already knew in detail about Jane's views of the defendant and her time with the defendant is highly probative.

In addition, Jane testified that the July 2024 incident that Ms. Geragos just referenced was coercive.  It involved the defendant reacting in a very aggressive manner, insulting her, belittling her and splashing her from a water bottle when she tried to tell him that she wanted to sleep and that the defendant provided her with a new drug that she had never tried before called liquid molly before the hotel night with Paul.  And that's a hotel night that Ms. Khorram also facilitated.

And so I do think that there was relevant activity

6042

after Ms. Khorram was in possession of these messages and makes Ms. Khorram's state of mind and knowledge extremely relevant to this jury.

MS. GERAGOS:  Just, again, very briefly, take those in turn.

In June of 2024, when Mr. Combs is in Los Angeles and Ms. Khorram was not in Los Angeles with him.  So Mr. Pérez just said he told his supervisor where Mr. Combs was going.

In July of 2024, when Jane herself asked for the hotel, at the Four Seasons -- she testified to that -- Ms. Khorram was not in Miami.

Those are just my two responses.  She was not there. That was my brief response to those two points.

MS. COMEY:  I have to correct the record, your Honor.

The text message was from Ms. Khorram to Mr. Pérez, and Ms. Khorram was saying PD going to guest house.  So it was Ms. Khorram informing Mr. Pérez.

THE COURT:  All right.  So the objections to the C361 and C362 exhibits on Rule 403 grounds, which is the sole ground that's been invoked, are overruled for the reasons stated by the government in colloquy today.

Next.

MS. GERAGOS:  And one other issue we wanted to be heard orally about too, your Honor, is with respect to the 2021 message for -- I'm just trying to pull it up so I can get the

6042

exhibit number.  C501, which is Ms. Khorram to Ms. Greenhill about Mr. Combs sending D-Roc $15,000 in 2021.

I recalled, but I wanted to double-check the discovery and make sure I was correct, that at that time -- first, at that time Mr. Butler had left his employment, I think, four to five years earlier.  I think he ended his employment in 2017. At this time he had significant financial issues, and he needed to pay for his grandmother's gravestone, and I have that in a text message that I would like to just pull up this.

Mr. Butler asked Mr. Combs if he could -- if Mr. Combs could send him some money, that he was in a tight financial spot.  And when Mr. Combs then sends out money, Mr. Butler is grateful so that he can pay for his grandmother's tombstone. And so I just don't understand how there's any relevance to this.

He is out of his employment, and he is asking his long-time friend -- putting aside that he was at one point Mr. Combs's employee, these two have been friends for decades and remain friends to this day.  And so to add this in is -- it really is, also is prejudicial and irrelevant.

So this is, what I'm showing you on the screen is Mr. Butler's initial outreach on January 5 of 2021 to Mr. Combs, asking for the financial help.

And then if you could put up the next one.

All right.  He asks him again on January 13 of 2021,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6042

because Mr. Combs didn't respond to the initial message, and your Honor can just read this. He requests the money: I'm 15K in the hole.

And then if we could just put up the message after.

And then this is January 21. He says: Thank you. I'll pay for my grandma's tombstone today.

I mean why is this relevant? Why should this come in?

THE COURT: This is all in GX C501?

MS. GERAGOS: No. GX501 is just Ms. Khorram's message to Ms. Greenhill asking for the $15,000 wire.

My argument against this is it's not -- this message, C501, is just not relevant because Mr. Butler is no longer in his employment. He left four years earlier. He is living across the country from Mr. Combs, and he's asking Mr. Combs for financial help. He's asking his long-time, long-time friend of many decades for financial help. And it shows it's because he wants to pay for his grandmother's tombstone.

THE COURT: All right. And it's not as if -- given the timing -- this is 2021 -- so it's not as if it was money that was sent over in 2024, for instance, where there might be some improper purpose for the transfer of funds.

MS. GERAGOS: If it was 2024, around the time that the Mia text messages that were introduced, I could understand arguable relevance of it. But here, I don't see an argument for relevance.

6042

THE COURT:  All right.  I'll hear the government briefly if they have any response, but I think that's persuasive.  Just in terms of the relevance, it's attenuated given the messages that we've looked at.

MS. FOSTER:  Your Honor, the government's purpose in introducing this message was just to make the point that their relationship did not end at the end of Mr. Butler's employment with Mr. Combs, and that's relevant because of the later action by Mr. Butler with respect to Mia.

It also does establish some form of, you know, financial indebtedness to Mr. Combs.  And that's why the government was seeking to admit those messages.

(Continued on next page)

P6DQcom8

THE COURT:  All right, the defense's objection to GX-C-501 is sustained.

What is next that we should cover?  Since they're the defense's objections, I'll let you guide me through.  What else we should do?

MS. GERAGOS:  I'm going to do the relay, and pass it off to Mr. Driscoll.

THE COURT:  Mr. Driscoll, why don't we start with just to take care of loose ends, GX -- I'm going to get the number wrong now -- 629.

MR. DRISCOLL:  Sure.

THE COURT:  So the response that came in from Ms. Slavik -- you may have addressed this in one of the myriad filings overnight.  Ms. Slavik said it's not a 404(b) issue because the sex trafficking involving victim number 3 would be part of the charged RICO conduct.

MR. DRISCOLL:  Yes, your Honor.

Our response to that is we are now I think on day 31 of this trial.  It started on May 12.  The government has clearly abandoned any argument that Gina is a victim in this case.  We've heard not one piece of evidence that she is in fact a victim other than Mr. Kaplan testifying that he once observed a fight between Mr. Combs and Gina.  So --

THE COURT:  Which doesn't correspond to this particular episode anyway.

P6DQcom8

MR. DRISCOLL:  Correct, which the witness confirmed.

THE COURT:  And even if it -- let's say it did, how would that be part of the charged conduct?  Meaning, is there some other evidence that the defense is aware of that would connect that to an alleged sex-trafficking episode as opposed to just an incidence of violence?

MR. DRISCOLL:  No, your Honor.  In fact, the portion of the enterprise letter cited by the government -- and if you read further in those paragraphs in the enterprise letter, the government intended to argue that Gina was essentially sex trafficked; that they were forced instances of sexual conduct; and I think they were probably going to use this message in hindsight I realize this, to argue that that there was force and coerced sex.  They abandoned that theory at trial.

So to allow them to back door this evidence in now, it is impermissible 404(b) evidence.  They're using it to show Mr. Combs is a bad, violent person, and for those reasons it's inadmissible.  The reason why they didn't notice this particular evidence or they claim it was direct evidence is for the reasons your Honor just stated:  They previously had a theory that Gina was victim 3 in the indictment.  They've abandoned that theory.  Rule 404(b) provides for more specific required notice under the rule.  And when Ms. Slavik started proffering additional relevance for the exhibit, it was clear that they are now intending to use this under Rule 404(b).

P6DQcom8

So we think it should be excluded just for failure to provide adequate notice. The rule requires not only notice under the Rule itself but also the type of evidence that will be admitted under the rule and the chain of logic leading to the permitted purpose under the Rule and neither of those things were noticed to the defense. Otherwise, we might have been prepared to meet the evidence with respect to this particular text message, in particular which refers to purportedly a specific date of an instance in which Mr. Combs might have been violent.

Just taking a step back, the reason your Honor initially excluded the reference was for lack of foundation to tie the message of relevance in this case and also under Rule 403 because without that foundation, the jury is just going to be left speculating as to what happened. The language in the message is clearly inflammatory. The jury is going to hold that against the defense in an unfairly prejudicial way, and we have no additional evidence to elucidate what actually happened. So we also stand on our 403 and 401 objections. The additional foundation the government laid. It's just travel records. It doesn't elucidate what actually happened. So they haven't cured the fundamental problem with the Court's initial ruling.

THE COURT: Very briefly, Ms. Slavik.

MS. SLAVIK: Your Honor, the relevance of this message

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6DQcom8

is that the defense will get up there, the defense will get up there in closing and argue that the bribe that the defendant offered to the hotel security guard to make the video of the brutal assault of Cassie Ventura at the hotel go away; that that bribe was motivated solely by the defendant's interest in preventing bad publicity.  We know that's what they're going to say.  They opened on that.

And this chat directly rebuts that argument.  It shows the defendant was aware of the possibility of law enforcement intervening in domestic violence situations, and it shows, importantly, the defendant's awareness of what would happen if law enforcement became involved in those sorts of situations. So this is important evidence that rebuts that argument that will most surely be advanced by the defendant in closing.  So I think that's the importance of this message.

In terms of the 403 argument, the defense seems to be advancing this argument that chats have to tie to a specific incident in order to be relevant, and otherwise it will become confusing.  And I just don't think that that's warranted, especially here, and that's in large part because of the defense's own strategy of injecting Gina into this case as significantly as they have.  For that reason, for the defense -- to support the defense's theory on this issue, Gina has become a major part of this case, and so them wanting now to keep a message out relating to Gina is kind of having their

P6DQcom8

cake and eating it too.

At this point, the jury knows who Gina is. They know the relationship between the defendant and Gina spans between Cassie and Jane. They know the defendant was violent towards Gina. They know security was deeply involved in the defendant's personal life, and they know that security often observes and/or was involved in incidents of violence.

So I don't think it's right to say that these messages will confuse the jury in any way. I don't think that they're unfairly prejudicial. As your Honor knows, the defense opened on domestic violence. They conceded that the defendant was abusive. So proof that domestic violence was directed at Gina who was identified in the indictment and in the enterprise letter as a sex-trafficking victim, there's no unfair prejudice as to that.

THE COURT: How do you overcome -- now I think you're admitting that it would be 404(b) evidence based on the fact that there hasn't been any foundation laid as to sex trafficking with respect to the incident in the exhibit. And so on that ground, wouldn't it just be out because it doesn't comply with 404(b)(3)?

MS. SLAVIK: Your Honor, this is an argument about notice. I think that notice was given in the enterprise letter, but I don't think we are conceding that this is a 404(b) issue. This is direct evidence of charged conduct in

P6DQcom8

the indictment, and for that reason we should be able to present it as such.

THE COURT:  All right.  I'm not going to revisit my decision to exclude this exhibit.  629 -- did I get the number right?

MR. DRISCOLL:  629-A -- A-629-A.

THE COURT:  A-629-A.  For the reasons stated by the defense, I think it would be inadmissible under -- as a Rule 404(b)(3), and as I previously said, it would also be inadmissible because I don't think a proper foundation has been laid, and it would be given that and given the lack of corresponding testimony or evidence to understand what exactly happened during the incident in question, it would be unfairly prejudicial, and that unfair prejudice would substantially outweigh the probative value.  So that's deals with that.

Now, back to either Mr. Driscoll or Ms. Geragos, what else do we need to address here?  There are a number of exhibits that I understand the defense is preserving essentially an opposition to the suggestion from the government that they would qualify under the exception in 801(d)(2)(D), but if you are just assuming that you're going to lose there, and you're just preserving the objection, then in the interest of time, we can proceed now.  But I'm happy to address any of these that you feel like you want to raise and have a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6DQcom8

discussion about.

MR. DRISCOLL: Your Honor, just to preserve the point, our position with respect to the agency exception is that it really requires some elucidation of what the agency relationship between the declarant and the defendant actually is. Normally in an agency relationship, that relationship is defined by the parties to the relationship. It's not defined by a random third-party percipient witness who observes certain things. And with respect to some of the declarants in these messages, we just haven't heard what the scope of the agency actually entails. And that's the nature of the objection.

THE COURT: All right. Well, let's hear it. What are we talking about? Because I agree with you. Not in terms of the sources of evidence. I think that Rule 104 contemplates that there may be lots of different types of information and not even necessarily evidence that would inform the inquiry as to whether evidence is admissible or not.

But I agree with you that you need to have some predicate as to what the agency relationship is so that you can evaluate whether the communications are within the scope of the agency relationship. So if you want to address any of these in particular, I'm happy to do that. If you'd like the Court -- I mean, I'm just --

MR. DRISCOLL: Sure.

THE COURT: There's a lot of them here, that's why I'm

P6DQcom8

asking.

MR. DRISCOLL:  Perhaps it's best to identify the particular declarants.  So, for example, 3G-118, 3G-127, 3G-135, 3G-136, these are message chains between Brendan Paul and Kristina Khorram.  We haven't heard anything about Brendan Paul, the scope of his agency vis-a-vis the defendant.  We've heard limited testimony about what assistants might do, various interactions with Brendan Paul, but nothing about his employment, what his employment actually entailed.

THE COURT:  Generally speaking, what do these communications pertain to?  Is there a subject matter that we can use as a category?

MR. DRISCOLL:  It's the typical subject matter that we've been seeing in these communications, which is why hence our paragraph in the letter about preservation about addresses, about people going en route to certain locations, things of that nature.

THE COURT:  All right.  If that's what these communications pertain to, then I think that there's been extensive evidence concerning that role of the assistant to Mr. Combs and the nature of that relationship, and it doesn't need to be part of the formal employment relationship.

The real question is whether the -- in that role the people acted as an agent for the principal with respect to a set of tasks, and there's been numerous witnesses testifying as

P6DQcom8

to the broad scope of activities that those types of people would be engaging in. And they would -- unless I'm missing something, they would include precisely the types of things you've identified as these documents would be pertaining to. So for that -- unless there's something else, I would overrule the objection, and you've preserved it, obviously.

MR. DRISCOLL: Sure, your Honor. Just reflecting on the last thing you said. I don't think it has to be a formal employment relationship, but it does need to constitute an agency relationship formally. And that does have legal meaning. There are legal standards regarding what constitutes an agency relationship.

THE COURT: Are you saying as to Mr. Paul that that simply hasn't been established in this case?

MR. DRISCOLL: No, because we know he is an employee. We just don't know what the scope of the relationship is.

THE COURT: Maybe the government can address that specific point. I think the suggestion is that while technically the employment of Mr. Paul has been addressed, no testimony or other evidence has been elicited as to the actual nature of Mr. Paul's employment.

MS. FOSTER: Your Honor, as both Jane and Jonathan Perez testified, Brendan Paul is an assistant, and Jane testified about how he had a role in setting up these hotel nights for her. Every single one of the other assistants who

have testified in this case have testified about how one of the roles of their job was setting up hotel rooms, taking them down, and then supplying communications. I will also note a number of communications have been admitted that are substantially similar in this case on that basis. He will also testify next week on Monday to, I anticipate, precisely what I'm saying.

THE COURT: Meaning, Mr. Paul is going to testify?

MS. FOSTER: Yes, your Honor.

THE COURT: I think in terms of the sequence of information that would ultimately support the admissibility of information, I can consider what Mr. Paul would testify to as augmenting the basis for admissibility of these exhibits. So I think on that basis, and assuming that Mr. Paul is going to testify that this was the relationship and these are the types of things that he would do, I would think that there would be a strong basis to further support the admissibility of these exhibits.

So I will overrule that category of exhibits where there is an objection raised involving Mr. Paul.

So then I'll turn back to you, Mr. Driscoll. What else?

MR. DRISCOLL: So I'm hearing the Court with the agency exception, and I don't want to waste the Court's time, so C-365, C-654, these are messages between Phil Pines and

P6DQcom8

Kristina Khorram, and we just have the same objection.

THE COURT:  365?

MR. DRISCOLL:  C-365 and C-654.

THE COURT:  All right.  Ms. Foster, if you are going to be addressing these.

MS. FOSTER:  Yes, your Honor.

So it is the same basis.  There are hotel records in evidence that have Mr. Pine's name on them.  We heard about -- he was also personal assistant.  We have heard about how the names of hotels be in the names of the assistants so that they could help to go to the hotel to set them up.  And we also heard today about how he continued to have a relationship with the defendant after the fact.

And so, again, it's the same basis.  All of these messages are between or virtually all of them are between an assistant, here Phillip Pines and Kristina Khorram, who, again, was the supervisor of the personal assistants discussing their responsibilities and one of those responsibilities being the setting up of hotel nights.

THE COURT:  I'm looking at these exhibits, and they appear to fit the profile of what Ms. Foster is saying, which is, given his role, there are communications between him and Ms. Khorram about Mr. Pine's doing the tasks that an assistant, someone in this role would do, and so that establishes both -- and I don't think there is a question of the general agency.  I

P6DQcom8

think your objection is on the scope of that agency.

MR. DRISCOLL:  Yes.

THE COURT:  So Ms. Foster says that there's been testimony, the same kind of testimony that's been admitted as to all of these assistants.  And now looking at the communications, they seem to be consistent and fit within the scope of that agency relationship.  So the objection is overruled as to these two communications 365 and 654.

What is next?

MR. DRISCOLL:  We can move on to GX-259-D.

MS. GERAGOS:  Regarding this exhibit, your Honor, we are also going to put something on the screen in a moment.  I imagine the government wants this exhibit to try to show somehow Ms. Khorram's knowledge of Kabrale Williams and charge there.

We pointed the government to their own discovery that they turned over to us that the actual record, the Kabrale Williams record, at the Marriott, which we would not set -- we would not object to, but here, this email, this screenshot of an email is filled with hearsay.  And we looked into the actual source of this screenshot, and it was actually sent to Ms. Khorram from the travel agent Jess, who asked about Brittany Hall, a totally separate person, not Kabrale, and Ms. Khorram doesn't seem to have any knowledge of who Kabrale is, nor does she respond to that part of the email.

P6DQcom8

So I want to bring that up on the screen so your Honor can see it because not only do we have an objection here based on hearsay, but for the government to then use this to argue Ms. Khorram's knowledge of Kabrale Williams to try to make her a sex-trafficking co-conspirator, we think would be prejudicial.

So if your Honor looks at the screen, there is a message from Jess Ruiz to Kristina December 1 of 2023. Ms. Ruiz is asking:  Do you remember why we flew Brittany Hall out in June?  Brittany Hall, I think there's been only two questions, I think, about her at this whole trial.

If you could see here on the third page, Ms. Ruiz sends a screenshot, so clearly Ms. Ruiz got that email, sends a screenshot to Kristina who says:  PD personal request for Britt.  Doesn't respond to anything here about Kabrale.  And so our issues with this exhibit is it doesn't -- it's hearsay, first of all.  And, second of all, putting it in here would be completely confusing for the jury because it doesn't show Ms. Khorram's knowledge at all of Kabrale Williams.  She's being asked a question by another employee from the business manager.

I've pointed the government to the exact underlying record from their own discovery that they can use to show that Kabrale stayed at the Marriott at that specific day, the folio. I have it for your Honor.  I can bring that up on the screen as

P6DQcom8

well, but we just think -- we have a hearsay objection here, we have a 403 objection, and that's our record with respect to this exhibit.

THE COURT:  Can you put up the actual.

MS. GERAGOS:  That's the actual exhibit.  If you could zoom on the names Need Info please.  That's the actual exhibit. That's the actual exhibit, the underlying screenshot.

What happens a lot of times, your Honor, in iPhones is when you receive a screenshot from somebody, the screenshot saves in your phone.  So that's the reason, from what I can tell based on my review of Ms. Khorram's phone, that she has a screenshot in her phone in the first place.

THE COURT:  What is Ms. Khorram's response to this?

MS. GERAGOS:  She says personal request for Britt.  PD personal request.  She responds to the question given.  Why did we fly out Brittany Hall in June?  And she says PD personal.

THE COURT:  She doesn't mention Mr. Williams.

MS. GERAGOS:  At all.

THE COURT:  Just very briefly, what's the response?

MS. FOSTER:  Very briefly, as your Honor knows, Count One is racketeering count, and as part of that, Ms. Khorram's knowledge, including the defendant's use of male escorts, is relevant.  And so the government is just offering this screenshot as a small piece of evidence that helps to establish Ms. Khorram's notice of the defendant using escorts.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6DQcom8

THE COURT:  Given that it's a small piece, it will be easy to remove.  So the objection is sustained as to 259. Ms. Geragos --

MR. DRISCOLL:  Your Honor, just for the record the exhibit is numbered C-259-D.

THE COURT:  C-259-D.

MR. DRISCOLL:  Yes.

THE COURT:  Thank you.

What else?

MR. DRISCOLL:  C-263, 264 and 265.  These are text message chains between Jane and Ms. Khorram, and our position is that Jane's statements do not constitute agency statements as the government proffered them, and they should be excluded on that basis.  And the same for Ms. Khorram's statements.

THE COURT:  All right.  Unless these are mega exhibits of substantial length, can someone put them on the screen C-263, 264, 265.  Next.

Mr. Driscoll, looking just as Ms. Khorram's statements, why wouldn't those be admissible under 801(d)(2)(D)?

MR. DRISCOLL:  Because it wasn't Ms. Khorram's job to interact with Jane in this way.

THE COURT:  Hasn't there been extensive testimony that one of her roles was to coordinate travel and arrangements for Jane to -- on behalf of Mr. Combs?

P6DQcom8

MR. DRISCOLL:  I don't think that's how the testimony came out.  What I remember Jane saying is that she actually didn't get to engage in this way with the defendant or his agents.

THE COURT:  All right.  So if Ms. Khorram's statements come in, then wouldn't Jane's statements simply be context to understand Ms. Khorram's statements?  Because the point isn't what Jane is saying.  The point, I take it of these exhibits is to show Ms. Khorram's knowledge and involvement in these incidents.

And so if her statements are the only thing that would be relevant and the government really doesn't care what Jane is saying in response, then on that basis, wouldn't these be admissible as exceptions, or not hearsay and then the other statements would be context as the government explained in this specific instance.  There may be other communications where you can't expand the context loophole that wide, but in this context it's really about Ms. Khorram's statements.

MR. DRISCOLL:  I think I would agree with you, your Honor, but just looking at the government's draft summary chart, I think they are intending to use some of Jane's statements for their truth.  But maybe the government can answer that question.

MS. FOSTER:  Your Honor, nothing -- I think that your interpretation of these next three exhibits is exactly correct.

P6DQcom8

Jane's statements here really are not all that important to the government or truth of them.  It is Ms. Khorram's statements, and I think it is also just very obvious when you look at this message that she is acting as an agent of the defendant.  She literally says -- Kristina writes:  Ask them if they can bring up like 15 bath towels.  And then:  I'll remind him.  He's got his cash with him.  It's all part of her agency relationship.  We also heard from Mr. Perez they're not friends.  They don't like each other.  Their interactions are as Ms. Khorram facilitating communications between Jane and Mr. Combs.

THE COURT:  And to the extent that you're putting in anything as to Jane -- as legal conduct with respect to Jane, that's coming in through other evidence and testimony.

MS. FOSTER:  Yes.

THE COURT:  It's not these communications because as I'm just looking at them, they seem benign on their face in terms of what Jane is saying.

MS. FOSTER:  That's correct.

THE COURT:  So on that basis, the objections to 263, 264 and 265 - those are all with the C - is overruled.

Mr. Driscoll.

MR. DRISCOLL:  C-341-B.  And our objection to this chat message is similar to the Uncle Paulie message we previously discussed.  This is a chat message between Kerry Morgan and Ms. Khorram that vaguely alludes to -- I don't know

P6DQcom8

exactly, but some instance in which Ms. Ventura apparently locked herself in a wardrobe. So we have a 401 and 403 objection to this exhibit and also hearsay objections to Ms. Morgan's statements.

THE COURT: Just because my eyes are failing me now, who is in blue and who is in green?

MS. FOSTER: Green is Ms. Khorram, and blue is Ms. Morgan. And I think the point here is that we have heard extensive testimony about Ms. Khorram's role in various aspects of the defendant's personal life, including related to the Intercontinental Hotel. So it's very clear at this point how extensive of a role she had and that her communications with Ms. Morgan, it is clear are related to that employment.

She says, it's going to turn into an issue if she doesn't. She's locked herself in a wardrobe room. It is clear that this is part of her relationship with Mr. Combs. And I will say none of Ms. Morgan's comments here are being offered for their truth. Oh my God. What door. It's a question. I called her, but her phone is off. It's purely to show Ms. Khorram's knowledge of this situation.

THE COURT: And are there more pages to this?

MS. FOSTER: I am okay redacting actually these later pages.

THE COURT: So these two pages are not coming in.

MS. FOSTER: It actually -- I think if we went to the

P6DQcom8

first two pages.  Need her to unlock this door.  It's going to be an issue if she doesn't.  Oh my God.  What door?  She locked herself in a wardrobe room.

That is all the government is really seeking to focus on.

MR. DRISCOLL:  Your Honor, I don't know if that's responsive to the 403 objection.

THE COURT:  I'm sustaining the Rule 403 objection, so the objection is sustained as to 341-B.  C-341-B.

Mr. Driscoll.

MR. DRISCOLL:  C-366.  So we think this whole chain is hearsay because it's basically just random banter and gossip that does not relate to either Ryan Lopez or Ms. Khorram's employment.  There's one particular statement that the government has placed on its summary chart.  Go to the next page.

THE COURT:  How many pages is this exhibit?

MR. DRISCOLL:  Six.  Can you go to the next page?  On the left side, the bottom three blue boxes, your Honor.

I think I saw one of the Cowboys today.  You can spot them in the lobby like an escort.  I forgot to tell you about it.

So we think that's hearsay.  It's not present sense impression because it's backward looking.  It sounds like it took place a day or more prior.  And it's not relevant.  And to

the extent it has any relevance, we think it should be precluded under Rule 403 because it's a speculative statement, and it's just going to prejudice the defense.

MS. FOSTER:  And the relevance reason, your Honor, is the date.  It's after the time period of the Cassie relationship.  It's before the time period of Jane's relationship.  Your Honor, this message is not -- the key purpose in admitting this message is actually not a hearsay purpose.  It's not being offered for its truth that there was actually a cowboy.  The reason this message is so probative.  When I said before it's a small part, this message is very important to the government because we have heard extensive testimony about who Cowboys were and the defendants use of Cowboys.  That was the escort service that both Jane and Cassie both testified that were used for their hotel nights.

And the important thing here is Ms. Khorram's reaction.  She does not say, what is a cowboy?  What are you talking about?  And so it is not being offered for -- whether or not there was actually a cowboy on that date, to Ms. Geragos' point, is actually not all that relevant to the government.  It is being offered to show Ms. Khorram's state of mind, and it is extremely probative important evidence of Ms. Khorram's state of mind.

MR. DRISCOLL:  Your Honor, I think that's a very loose chain of inferences merely to prove knowledge.  And, again, it

P6DQcom8

doesn't relate to the time period at issue.  So --

THE COURT:  I think the submission is that its effect on the listener, meaning it doesn't even matter if it's true or not.  So if you just excerpt the Mr. Lopez's three messages and then Ms. Khorram's response with the four laughing faces, that's all the government -- that's really all you're putting in Ms. Foster, right?

MS. FOSTER:  Yes, exactly.  The rest of it is really pretty irrelevant.  It's just discussions between coworkers. And another point that Ms. Comey me just reminded me of, it's so important her knowledge at this time because it informs her entire knowledge and the jury's understanding of her knowledge throughout the entire relationship with Jane.  And we will see, and we've seen messages where large sums of money are being delivered and facilitated by her to hotel rooms.  So this text message directly informs her knowledge, and they are going to argue, and they've crossed many people on their knowledge on what is going on inside the hotel rooms, and I strongly anticipate that that will be a large part of one of their defenses to Count One is that Ms. Khorram had no idea what that money was being used for or about defendant's use of this cowboy escort service, and this message is extremely probative on that point.

THE COURT:  At this time, just help me because now there's been so many names.  Ryan Lopez is one of Mr. Combs'

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6DQcom8

assistants?

MS. FOSTER: Yes.

THE COURT: So in addition to your argument that it would be going to Ms. Khorram's knowledge or effect on the listener, it also would fall into either the agency or co-conspirator exceptions?

MS. FOSTER: That's correct.

THE COURT: You're saying this is part of their job even if we take the co-conspirator exception out of it. This is part of their jobs at the time, meaning to facilitate Mr. Comb's hotel visits. Whether they were benign or had a criminal element, whatever they were, this was part of their job, and so any comments made about what was going on during those experiences would be within the scope of the agency relationship. And even if that wasn't the case, then we're talking effect on the listener for a non-hearsay purpose.

MS. FOSTER: Exactly.

THE COURT: So the objection to 366 is overruled.

MR. DRISCOLL: The next exhibit is GX-367. It's a message chain between Mr. Combs and Ms. Khorram. We object to one particular statement in the chain as hearsay within hearsay. It's the statement on page 7 of the exhibit that states: Paul cowboy wrote "available."

THE COURT: This is coming in, I suppose, for Ms. Khorram's knowledge.

MS. FOSTER:  Exactly, your Honor.  Ms. -- we have heard extensive testimony about Paul Arthur, who is a cowboy, and so this is going directly to Ms. Khorram's knowledge.  I will also note that it also is evidence of Ms. Khorram's access to Mr. Combs' phone and his messages, and that is something that another witness, Mr. Paul, will also testify, is that Ms. Khorram frequently used Mr. Combs' phone, had access to his messages and would respond accordingly.

MR. DRISCOLL:  Your Honor, if we're going to hear that evidence, then under *Old Chief* that's the less prejudicial evidence that the government can elicit.  They don't need this message to prove that Ms. Khorram had access to his phone.

MS. FOSTER:  To be clear, Mr. Paul will not testify about a message involving Paul cowboy writing "available."

THE COURT:  All right.  So let me make sure I understand the hearsay within hearsay.  As to the communication from Paul writing "available," you overcome that because you're not putting it in for the truth of the matter.  It's just the fact it was communicated to Mr. Combs.

MS. FOSTER:  Exactly.

THE COURT:  And any statement by Ms. Khorram is firmly within the agency exception, so that's how that statement comes in.

MS. FOSTER:  Exactly.  I don't anticipate us putting on any evidence that is based on the premise that he was

P6DQcom8

available at that moment in time.

THE COURT:  Right.  And as to -- there's other evidence -- I mean, I've heard a lot of evidence.  So is there other evidence that Ms. Khorram was aware of Paul and his involvement with Cowboys and Angels?

MS. FOSTER:  Your Honor, she was aware of Paul.  He was a trainer as well as being a cowboy.  And so this also goes to her knowledge of his dual role as -- in Mr. Combs' life.

MR. DRISCOLL:  Your Honor, that's another reason why this is unfairly prejudicial evidence because Paul had an ongoing relationship with Mr. Combs completely separate from the charged conspiracy.  So the government is going to argue the inference that they just argued to the jury, and there is no foundation for it.  There is no evidence in the record as to what the statement actually means in context because it's hearsay within hearsay, so we won't be able to rebut it in any way.

THE COURT:  Do you have any piece of evidence in which Ms. Khorram shows any understanding that Paul is actually an escort working for Cowboys and Angels?

MS. FOSTER:  There's an earlier message also cited in our charge where they're arranging for a hotel night between Jane and Mr. Combs, and she writes to, I believe, it's Mr. Combs or -- I believe it's Mr. Combs:  Paul coming up to the hotel room.

P6DQcom8

And so this also supports her knowledge of his -- this was his contact, how it was saved in Mr. Combs' phone and supports her knowledge of his association with the Cowboys and this additional role that he had.

THE COURT:  I think that that is sufficient to establish the admissibility of C-366, so the -- we are not on 366.  That was which number?

MR. DRISCOLL:  367.  C-367.

THE COURT:  C-367.  So the objection is overruled and it will be admitted.

MR. DRISCOLL:  Okay.  C-625 on page 5 of the exhibit.  This is also a chat Jane between Mr. Combs and Ms. Khorram.  We have a hearsay within hearsay exception.

THE COURT:  Is there any daylight here?  Are we almost done with this list?

MR. DRISCOLL:  I think we're very close, your Honor.

They said Guido still hasn't dropped off package to house.  That's the objection.

THE COURT:  What is this being used for?

MS. FOSTER:  This, again, is being -- so now a number of different witnesses have described Guido as Mr. Combs' drug dealer, and so this is one just being offered to show Ms. Khorram's knowledge of that.  But I would also say that it falls into several hearsay exceptions.  We've heard from Jane how Ms. Khorram, one of her roles was to facilitate drug

P6DQcom8

transactions for Mr. Combs.  She testified about Ms. Khorram's facilitating the picking up of a package which was drugs to take to Mr. Combs in Miami.  And it's pretty clear from the rest of the context of this message when they said, "They said Guido still hasn't dropped off package to house," that the "they" there would be another employee.  He later, I believe, responds like:  So I won't have any party favors.  It's clear he's setting up a party, and the "they" there would be somebody who was acting in an agency capacity for him.  However, I will note that this is also being offered for an entirely non-hearsay purpose, which is just to show her knowledge of Guido.

THE COURT:  All right.  The objection will be overruled.

Next.

MR. DRISCOLL:  There are two exhibits relevant to the government's summary chart GX-1410, the two exhibits are H-105-A and H-105-B, and we object to both of these exhibits on hearsay grounds as well as on 403 grounds.

THE COURT:  These are the exhibits where Mr. Butler and the defendant are discussing someone attempting to be contacted, right?

MR. DRISCOLL:  Correct.

MS. FOSTER:  That's correct.  I actually think it's helpful to go through this message because I think what becomes

increasingly obvious is really Mr. Butler's statements are not being offered for their truth in this message. They're being offered almost totally for the purpose of giving context to Mr. Combs' statements.

So he says: Wanted you to have this number since I'm on this phone today. Thank you again for coming and being here with me. I think possibly the only part of this -- yeah, the only part of Mr. Butler's response that could -- that the government would rely on for its truth is, again, I'm coming back, but again that is a statement of future intent, so it would fall into a hearsay exception.

He then writes: I reached out. No reply. They didn't pick up. That's definitely weird.

So the government isn't actually offering that statement for its truth because the government has Mia's testimony about her lack of response, but it also will be obvious in the chart that these messages are being interspersed with messages with Mr. Butler and Mia and calls between Mr. Butler and Mia, and it's those messages and those calls that the government would be using to demonstrate the truth that of statement.

THE COURT: Can we move through the pages here? Is that it?

MS. FOSTER: That's it.

THE COURT: Sorry to interrupt. Can we go to the next

P6DQcom8

exhibit 105-B.  Let's go to the next page.  Let's go to the next page.

MR. DRISCOLL:  That's the last page, your Honor, for that exhibit.

MS. FOSTER:  I will note these very long messages, those are Mia's messages to Mr. Butler which we separately will put into evidence as part of their direct --

MS. COMEY:  They're already in.

MS. FOSTER:  They are already in as part of their direct chain, so we're really only offering them for the purpose of showing he sent them to Mr. Combs and then showing Mr. Combs' reaction.  And, again, we also would submit this is co-conspirator statements, but I don't think you need to get there because of the fact that none of Mr. Butler's statements other than statements of sort of future intent, and he says I love you a few times which would be a statement of his then emotional state.  Those are the only statements --

THE COURT:  Why don't you just put in -- forget about 105-A.  Why don't you just put in the text:  Let me know when you reach her.  Call me when you can, king.

Then you have the two statements from Mr. Butler's phone, but like you say, those are in separately from Mia, and then you can have the final message.  Doesn't that do everything you would want to do, meaning to the extent you were trying to indicate that Mr. Combs was behind the outreach to

P6DQcom8

Mia and Mia provides the testimony concerning that outreach, wouldn't that do it, and you would avoid any kind of objection because there would be no even plausible objection to that portion of the message?

MS. FOSTER:  I think actually almost every single one of his statements where he's conveying some form of information like "that's the last text I got from her" and then "call me back when you can" provides important context for Mr. Combs --

THE COURT:  I'm saying that -- sure, because there is not any real content in that message.  He's just -- you're saying the first message is in a separate exhibit that is already in evidence, right.

MS. FOSTER:  That's correct.

THE COURT:  The second one says here's the text I got from her, which is something else that is just independently in evidence.  So then the only statement that wouldn't be just plainly admissible would be the one message from D-Roc that you're pointing to, and you're saying that that, if anything, is context and admissible for that purpose, it would be that message, which merely says that Mr. Butler is just relaying a message from Mia.  That's what I'm saying.  I'm saying can't you just get everything you want without running into the 403 and other arguments made with respect to the other communications in the chains?

MS. FOSTER:  I'm sorry, which ones are you saying that

P6DQcom8

we would -- maybe somebody else can do it.

THE COURT:  No, it's late.  I might not be making sense.  I'm saying if the purpose of this is just to show Mr. Combs was behind this outreach, which I understand that's the main purpose, saying let me know when you reach her, call me when you can, king, which is obviously admissible under 801, then having the message that is separately evidence elsewhere from Mr. Butler, that's not really his statement.  It's a statement from Mia that is otherwise in evidence.  So I don't understand what the objection could be to that message.  The next message from Mr. Butler would be clear context to understand what's going on.  And it couldn't be -- he's not saying anything else.  He's saying this is a text I received from her.  And Mr. Combs responds, "Call me back when you can." So what else do you need other than that?

MS. SLAVIK:  Your Honor, we might be all saying the same thing.  You are saying why do we need to show that D-Roc is copying Mia's text to D-Roc and send it to?

THE COURT:  I'm being totally unclear.  I'm saying if you had these five messages in, okay, and then did whatever you were going to do with them on the summary chart, why do you need the rest of the back and forth?

MS. SMYSER:  I'm happy to speak to that, your Honor. So all of these text messages line up to dates in which D-Roc is communicating with Mia, so there are some that are earlier

P6DQcom8

in December. And if you remember Mia's testimony about reach-outs from D-Roc at the end of November, there's a call followed by text messages with D-Roc. And these show D-Roc's communications with Mr. Combs around that time. These reach-outs then continue into February when both of them are separately reaching out to Mia. And so these are two important pages that have been highlighted, but the entirety of both exhibits is extremely important to give context to D-Roc's reach-out to Mia which is going to be captured in the summary charts. So you see the interspersing of the communications between D-Roc and Combs and D-Roc and Mia and also Combs and Mia, which really just crystallizes that D-Roc is acting in conjunction with Combs in reaching out to Mia, which is very key for the obstruction predicate in Count One.

THE COURT: All right. Mr. Driscoll.

MR. DRISCOLL: Your Honor, I think you have it right, that all the government really needs is these last messages. Everything that comes before our position is it is hearsay. They want D-Roc's statements for, for example, "I reached out. No reply, and they didn't pick up. That's definitely weird." Or "Hey, bro, she hit me back. I'm trying to call her now." They want to use those messages to prove that D-Roc was in fact conducting this outreach, and that's hearsay being offered for its truth. It's not just context for the defendant's statements.

THE COURT:  Why wouldn't it fall into (d)(2)(E)?

MR. DRISCOLL:  For the reasons we outlined in our letter, they haven't made the requisite showing to show that this particular exchange was in furtherance of some conspiracy.

THE COURT:  Why doesn't Mia's testimony establish the basis under Rule 104 for that purpose?

MR. DRISCOLL:  Because it was entirely speculative. All she offered was her subjective views as to what D-Roc's outreach, of which she didn't even answer or respond to, what that outreach was.  And she testified in wholly speculative fashion over our objection that it was somehow obstructive or indicative of witness tampering, and that's not a sufficient foundation.

MS. SMYSER:  Your Honor, I think Mia's testimony certainly provides a basis that these two were working together in furtherance of the obstruction predicate.  Mia testified about her phone call with D-Roc.  She hadn't heard from D-Roc in a very long time.  Mia understood from the context of that phone call that not only was D-Roc in Miami with Mr. Combs, but that Mr. Combs was likely in the room with D-Roc and instructing him to do this.  And right after that phone call is when she starts getting reached out to by Mr. Combs, and she ignores those.

And then when she ignores those she is then reached out to again by D-Roc who is saying:  Why aren't you

P6DQcom8

responding?  Have you called Mr. Combs?

So I think all of this is admissible on many bases, including the co-conspirator exception, including D-Roc is acting as Mr. Combs agent, and including many of these are not offered for their truth or are admissible under various non-hearsay exceptions.  And I will also say to some of the particular statements that Mr. Driscoll raised as to what D-Roc had just done, they would be admissible as present sense impressions.  So for all of these reasons, these two exhibits are admissible, your Honor.

MR. DRISCOLL:  Your Honor, just to respond to that last point.  The government said Mia understood from the context of the phone call that not only was D-Roc in Miami with Mr. Combs, but that Mr. Combs was likely in the room with D-Roc and instructing him to do this.  These messages completely contradict that.  We maintain our objection.  Her testimony was entirely speculative.  She was testifying about her subjective fears.  They weren't based -- they didn't have any rational basis whatsoever as these messages prove.

MS. SMYSER:  Your Honor, I think these messages prove exactly the point, which is that Mr. Combs and D-Roc were working together, and so there was a basis for Mia's understanding that they were working together, and plus she has you know, eight years, of experience of understanding how Mr. Combs operates and how he uses the people around him to

reach out to others, and in fact he had done that very same thing with Mia to reach out to Cassie, for example, over and over again through the course of her employment.

THE COURT:  H-105-A, the objection is sustained.

As to H-105-B, the objection is overruled as to the portion of the exhibit starting with the -- on the second page of the exhibit the first communication from Mr. Combs "Call me. Important."  And then the responding messages from Mr. Butler are nothing more than simply relaying the messages that are coming from Mia and which I understand are separately in evidence, and otherwise the statements would be either party opponent statements or just completing context from Mr. Butler about the communications that he's relaying.  And so as to that part, the objection is overruled.  As to the remainder of these two exhibits the objection is sustained.

Mr. Driscoll, what else.

MS. SMYSER:  Your Honor, can I say one more thing on this topic?  And I apologize.

THE COURT:  Yes.

MS. SMYSER:  I think would be really helpful if your Honor took a look at Government Exhibit 1410, which puts all of these things into context and shows the importance of even the earlier message that your Honor just ruled the objection to be sustained as to.  And so we're happy to, you know, submit something over the weekend on this.

THE COURT:  Well, I know because you have to get it in somehow first and the argument that has been raised is either context or co-conspirator.

MS. SMYSER:  Or that he's acting as an agent, your Honor, and I think all of those things are true.

THE COURT:  2023?

MS. SMYSER:  Yes, because he is acting on Mr. Combs' behalf in reaching out to Mia, and you see that over the course of those communications between Mr. Combs and D-Roc.  He's reporting back to Mr. Combs as to what Mia is saying.  He is saying like she didn't pick up.  So why is D-Roc doing this? He's doing it on behalf of Mr. Combs.

THE COURT:  He may be doing something on behalf of him.  Like you might do something on behalf of a friend but that doesn't mean there's an agency relationship, and it's in the scope of that agency relationship.

And in one of the later messages from February 1, 2024, Mr. Butler's response is, "I would move past that.  It's weird.  No reply bro."

Okay, like that's not enough to establish some kind of -- that when that message is being sent, that there was some kind of conspiracy for an illegal purpose.  So you have to establish its admissible under (d)(2)(D), and I'm not seeing how you would do that at this time period given what we're discussing.

But, as I said, I don't know why we need further inquiry about this because the later messages show enough that there is an outreach from Mr. Combs. Then obviously Mr. Butler is trying to make contact with Mia. Then there's a response from Mia. Then there are two messages from Mr. Combs. There's another response from Mia. There's the response from Mr. Butler. And finally there's the response from Mr. Combs, all of which would be admissible for other reasons and which provide the basis -- provide what the government needs, maybe not a hundred percent of what the government would like to put in the summary exhibit, but a lot of what the government would like to put in the summary exhibit.

Next, Mr. Driscoll.

MR. DRISCOLL: That is it.

MS. FOSTER: Can I ask for one request? Sorry to beat a dead horse. Just the first page of 105-A where Combs writes: "Hey Puff, wanted you to have this number since I'm on this phone today. Thank you for coming and being here with me. And he writes, "Thank you. Okay. I'm coming back.

First Combs statement and his statement of future intent, just the context of showing them being together very recently.

THE COURT: Is there any objection to that? I don't see why you would have an objection to that, but let's see from Mr. Driscoll.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6DQcom8

MR. DRISCOLL:  It's the just the first blue bubble?

THE COURT:  I'm looking at black and white.  The darker bubble and lighter double bubble on the first page of 105-A.

MR. DRISCOLL:  We are fine with that, your Honor.

MS. FOSTER:  Thank you.

THE COURT:  All right.  Anything further from the government before we adjourn other than to hear who our next witnesses are going to be?

MS. COMEY:  Nothing further, your Honor.

Our next witnesses will be Ms. Sankar, the summary witness who will put in the charts that were the subject of this discussion.  DeLeassa Penland will be another summary witness who will put in the demonstrative about the Intercontinental timeline, as well as summary charts relating to Ms. Ventura.  Then we will have Brendan Paul, the assistant we talked about.  Then we have will Joseph Cerciello who will be our final summary witness who will put in the charts relating to Jane.  And then our last witness will be Omar Hazoury, who is a law enforcement agent.  Then we expect to rest at that point.

Over the weekend we are going to work on getting all of our exhibits in order, making sure all of our exhibits are in.  We may need to take some time to work out some remaining evidentiary issues in front of your Honor, but given those are

P6DQcom8

the only witnesses we have left in our case, I'm confident we will rest by the end of next week, and I think we may even rest as early as Wednesday.

THE COURT:  Very good.

Mr. Agnifilo, anything to raise on your side?

MR. AGNIFILO:  So we are going to take the weekend.  I mean, so Thursday is a day -- Thursday is a day we do not have court, am I right, Juneteenth?

THE COURT:  And just as a reminder, on the 20th, we are ending early because we have a juror who has a son's graduation.

MR. AGNIFILO:  That's right.  Okay.  So let us take the weekend.  We have been in touch with the government about their resting time.  We will be ready to start whenever the government rests.  Oh yeah, after the Rule 29 argument, Judge.  I'm selling ourselves short.  After that.

So let us take the weekend, and we will get in touch with the government about --

THE COURT:  So we'll have the Rule 29 argument, and then if there is anything further to do here.

MR. AGNIFILO:  Yes, then we would start calling witnesses.

MS. COMEY:  Your Honor, we'd ask for the anticipated defense witnesses if they expect to call witnesses on Friday, we'd ask to know who those are by Sunday consistent with your

P6DQcom8

Honor's order, understanding that that is contingent on the Rule 29.

THE COURT:  Any reason, Mr. Agnifilo, why we can't do that?

MR. AGNIFILO:  No.  I mean, that's my understanding of your Honor's order is we were supposed to give notification of the witnesses for the coming week.

THE COURT:  All right.  Very good.

Anything else from anyone for the good of the order?  No?  I'm not hearing anything.  We'll see everyone here 8:30 on Monday.

(Adjourned to June 16, 2025, at 8:30 a.m.)

INDEX OF EXAMINATION

Examination  of:                                        Page

ANDRE LaMON

Direct By Ms. Foster . . . . . . . . . . . . .6045
Cross By Mr. Agnifilo . . . . . . . . . . . .6080
JONATHAN PEREZ

Direct By Ms. Smyser . . . . . . . . . . . . .6103
Cross By Mr. Steel . . . . . . . . . . . . . .6165
Redirect By Ms. Smyser . . . . . . . . . . . .6211
Recross By Mr. Steel . . . . . . . . . . . . .6214
GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 A-104-11A, A-104-11B, A-104-74A, A-104-74B   6039

 A-104-74C and A-104-74D   . . . . . . . . . .6039

 E-331-AR, E-331-BR, E-331-C, E-331-FR   . . .6040

 E-331-HR, A-104-59P, A-104-60P, A-104-61P   .6040

 C-251, C-348-AR, C-348-BR, E-331-I   . . . .6040

 E-331-JR, A-104-59A, A-104-70A, A-104-72A   .6040

 A-442-33 and A-104-18   . . . . . . . . . . .6040

 C-653-1, H-101-A, A-417 and J-308   . . . . .6040

 1505, C-303, C-311, C-312, C-317, . . . . . .6041
         C-319, C-320, C-330, C-330-AF,
         C-332-A TO GX C-332-E, C-334-A
         TO C-334-B, C-335-A, C-343-A,
         C-364-1, C-364-2, C-364-4,
         C-364-6, C-364-6A, C-364-6B,
         H-104-B, 3A-101, 3A-102,
         3A-103, 3A-105, 3A-106,
         3A-107, 3A-108, 3A-109,
         3A-111, 3A-112, 3A-113
         (SEALED), 3A-113-R, 3A-114,
         3A-115, 3A-116, 3A-124,
         3A-130, 3A-134, 3A-139,
         3N-102, 4C-101, 4C-102,
         4A-107, 4A-114, 4A-115,
         4A-124, 4A-126, 4A-130,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4A-132, 4A-134, 4A-136, 4A-140, 4G-111, 4G-122, 4G-130, 4G-141, 4G-151, 4G-161, 4G-171, 4G-180, 4G-192, 5A-141, 5A-144, 6B-103, 7H-149, 7H-152, 7H-155-1, 7H-155-2, 7H-155-3, 7H-159, 7H-160, 7R-101, 7R-125, 7R-129, 7R-129-A, 7R-129-B, 7U-101, 7U-107, 7Y-107M 7Y-107-A, 7Y-108, 7Y-108-A, 7Y-114-A, 7Y-114-B, 1308

2B-103 and 2B-104  . . . . . . . . . . . . . .6048

1A-200, 1A-201, 1A-202, 1A-203, 1A-205   . .6056

1A-211, 1A-212, 1A-214, 1A-216, 1A-218   . .6056

1A-227, 1A-229, 1A-231, 1A-236, 1A-237   . .6056

1A-242, 1A-244, 1A-245, 1A-246, 1A-247   . .6056

1A-248 and 1A-249  . . . . . . . . . . . . .6056

1A-101   . . . . . . . . . . . . . . . . . .6057

1A-110 and 10A-101-A-1   . . . . . . . . . .6062

1A-111 and 10A-102-A-1   . . . . . . . . . .6067

1A-116   . . . . . . . . . . . . . . . . . .6075

2A-315   . . . . . . . . . . . . . . . . . .6110

2A-322   . . . . . . . . . . . . . . . . . .6111

2A-303   . . . . . . . . . . . . . . . . . .6113

A-205   . . . . . . . . . . . . . . . . . . .6122

3D-103-A, 3D-107-A, 3D-107-BR, 3D-108-AR   .6126

3D-109, 3D-112-AR, 3D-113-A, 3D-114-AR   . .6127

3D-115-A, 3D-116-A, 3D-117-A, 3D-120-A   . .6127

3D-123-AR, 3D-123-BR, 3D-129-A, 3D-129-BR   .6127

C-404-A, J-120, J-121 and J-122   . . . . . . .6127

C-349, C-349-B and C-349-C   . . . . . . . .6136

3D-126   . . . . . . . . . . . . . . . . . .6203

3P-100, 3P-104, 3P-106, 3P-108, 3P-110, . . .6216
        3P-120, 3P-131, 3P-132 Sealed,
        3P-140 Sealed, 3P-150 Sealed,
        4A-121 Sealed, 4A-150 Sealed,
        4B-101 Sealed, 4B-103 Sealed,
        4D-131, 4D-132 Sealed, 4D-191,
        4E-101 Sealed, 4H-126 Sealed,
        4H-128 Sealed, 4H-129 Sealed,
        4H-130 Sealed, 4H-141 Sealed,
        4K-101, 4K-102 Sealed, 4K-103
        Sealed, 4K-104 Sealed, 4K-105,
        4K-106, 4L-101 Sealed, 4L-102
        Sealed, 5A-100, 5A-101,
        5A-102, 5A-171, 5A-172,
        5A-173, 5A-174, 5A-175,
        5A-176, 5A-177, 5A-178,
        5A-179, 5A-181, 5A-182,
        5A-183, 5A-184, 5A-185,
        5A-201-1, 5A-201-2, 5A-202-1,
        5A-202-2, 5A-203-1, 5A-203-2,
        5A-204-1, 5A-204-2, 5A-205-1,
        5A-205-2, 5A-206-2, 5A-207-1,
        5A-207-2, 5A-208, 5A-211,
        5A-212, 5A-213, 5A-214,
        5A-215, 5A-216, 5A-217,
        5A-218, 5A-221, 5A-222,
        5A-223, 5A-224, 5A-225,
        5A-231, 5A-232, 5A-233,
        5A-234, 5A-235, 5B-100,
        5B-101, 5B-121, 5B-131,
        5C-100, 5C-101, 5C-102,
        5C-103, 5C-104, 5C-105,
        5C-106, 5C-107, 5C-108,
        5C-109, 5C-110, 5C-111,
        5C-112, 5C-113, 5C-114,
        5C-115, 5C-116, 5C-117,
        5C-121, 5C-122, 5C-123,
        5C-124, 5C-125, 5C-126,
        5C-141, 5C-142, 5C-143,
        5C-144, 5C-145, 5C-146,
        5C-147, 5C-281, 5C-282,
        5C-283, 5C-284, 5C-285,
        5C-286, 5C-287, 5C-301,
        5C-302, 5C-303, 5C-304,

5C-305, 5C-306, 5C-307,
5C-308, 5C-309, 5C-310,
5C-321-1, 5C-321-2, 5C-322-1,
5C-322-2, 5C-323-1, 5C-323-2,
5C-324-1, 5C-324-2, 5C-325-1,
5C-325-2, 5C-326-1, 5C-326-2,
5C-327-1, 5C-327-2, 5C-328-1,
5C-328-2, 5C-329-1, 5C-329-2,
5C-341, 5C-342, 5C-343,
5C-344, 5C-345, 6A-101 Sealed,
6A-102 Sealed, 6A-103, 6A-104,
6A-105, 6A-106, 6B-101,
6B-102, 6B-107 Sealed, 6B-108
Sealed, 6B-109, 6B-110 Sealed,
6C-101, 6C-104 Sealed, 6C-105
Sealed, 6D-101 Sealed, 6D-103,
6G-111 Sealed, 6G-112 Sealed,
6G-118 Sealed, 6G-119, 6H-103,
6H-104, 6J-103, 6J-104 Sealed,
6K-102, 6K-104 Sealed, 6L-101
Sealed, 6L-102, 6Q-101 Sealed,
6Q-102 Sealed, 6Q-103, 6S-103
Sealed, 6U-101 Sealed, 6U-102,
6W-101 Sealed, 6W-102 Sealed,
7A-132 Sealed, 7A-133 Sealed,
7A-133-A Sealed, 7A-134
Sealed, 7A-135 Sealed, 7A-136
Sealed, 7A-137 Sealed,
7A-137-A Sealed, 7A-137-B
Sealed, 7C-108 Sealed, 7C-109
Sealed, 7D-141 Sealed, 7D-142
Sealed, 7E-101 Sealed, 7E-102
Sealed, 7E-103 Sealed, 7F-104
Sealed, 7F-105 Sealed, 7F-106
Sealed, 7G-103 Sealed,
7G-103-A Sealed, 7H-179
Sealed, 7H-180 Sealed, 7H-181
Sealed, 7H-182 Sealed, 7H-183
Sealed, 7H-184 Sealed, 7H-185
Sealed, 7H-186 Sealed, 7H-187
Sealed, 7H-188 Sealed, 7J-101,
7J-104 Sealed, 7J-104-A
Sealed, 7J-106 Sealed,
7J-106-A Sealed, 7J-106-B
Sealed, 7J-107 Sealed,
7J-107-A Sealed, 7J-107-B
Sealed, 7J-108-A Sealed,
7J-109 Sealed, 7J-109-A
Sealed, 7J-109-B Sealed,
7J-110 Sealed, 7J-110-A

Sealed, 7J-110-B Sealed, 7J-111 Sealed, 7J-111-A Sealed, 7J-112 Sealed, 7J-112-A Sealed, 7J-113 Sealed, 7J-113-A Sealed, 7J-114 Sealed, 7J-114-A Sealed, 7J-114-B Sealed, 7J-115 Sealed, 7J-115-A Sealed, 7J-115-B Sealed, 7J-115-C Sealed, 7J-116 Sealed, 7J-116-A Sealed, 7J-116-B Sealed, 7J-117 Sealed, 7J-117-A Sealed, 7J-117-B Sealed, 7J-118 Sealed, 7J-118-A Sealed, 7J-118-B Sealed, 7J-119 Sealed, 7J-119-A Sealed, 7J-119-B Sealed, 7L-101, 7L-102, 7P-101 Sealed, 7P-102 Sealed, 7P-102-A Sealed, 7P-103 Sealed, 7P-103-A Sealed, 7P-104 Sealed, 7P-104-A Sealed, 7P-105 Sealed, 7P-105-A Sealed, 7P-106 Sealed, 7P-106-A Sealed, 7S-101 Sealed, 7X-150 Sealed, 7Y-120 Sealed, 7Y-120-A Sealed, 7Y-120-B Sealed, 7Y-120-C Sealed, 7Y-121 Sealed, 7Y-121-A Sealed, 7Y-121-B Sealed, 7Y-121-C Sealed, 8A-101 Sealed

DEFENDANT EXHIBITS

Exhibit No.                                      Received

 3604     . . . . . . . . . . . . . . . . . . .6192