P6gWcom1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

                    v.                          24 Cr. 542 (AS)

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

                    Defendant.                  Trial
------------------------------x
                                                New York, N.Y.
                                                June 16, 2025
                                                8:45 a.m.
Before:

                    HON. ARUN SUBRAMANIAN,

                                                District Judge
                                                -and a Jury-

                              APPEARANCES

JAY CLAYTON
        Interim United States Attorney for the
        Southern District of New York
BY:  MADISON R. SMYSER
     EMILY A. JOHNSON
     MAURENE R. COMEY
     MEREDITH FOSTER
     MITZI STEINER
     MARY C. SLAVIK
     Assistant United States Attorneys

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6gWcom1

APPEARANCES CONTINUED


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:  MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
HARRIS TRZASKOMA LLP
BY:  ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:   Lucy Gavin
                Shannon Becker
                Paralegal Specialists

                Raymond McLeod, Paralegal

P6gWcom1

(Trial resumed)

THE COURT:  Welcome.  Good morning.

Please be seated.

I hope everyone had a great weekend.

First issue that I neglected to address last Friday is the defense's request for a *Napue* instruction relating to the testimony of Ms. Bongolan, and for the same reasons that the Court denied the application for a mistrial, the application for a *Napue* instruction is denied.

As the government noted in its letter relating to the mistrial application, in this circuit, to make a *Napue* claim, the defendant must show that, one, the witness actually committed perjury; two, the alleged perjury was material; three, the government knew or should have known of the perjury at the time of the trial; and four, the perjured testimony remained undisclosed during trial.  *United States v. Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013).

As the government noted and as the Court noted, during the cross-examination the inconsistency in Ms. Bongolan's testimony concerning the date of the alleged incident was laid bare and was one of the primary subjects of cross-examination in addition to the other alleged inconsistencies in Ms. Bongolan's testimony.

Further, to the extent that there was a separate inconsistency regarding whether Ms. Ventura had actually viewed

the incident in question, that was also the subject of cross-examination, and in fact, based on the cross-examination of Ms. Bongolan, an exhibit was introduced by the government that the defense actually used in the first instance to establish that Ms. Ventura was not credibly testifying when she indicated that she had viewed the event in question.

So all of that was laid bare, and so the standard that would be required for a *Napue* instruction has not been satisfied on that ground alone.

In addition, as the Court had previously noted, there is an alternative explanation for the inconsistent testimony; namely, that the government had overlooked the records produced that established or indicated that Mr. Combs was in New York at the time of the alleged incident, as Ms. Bongolan had reported it, and that became the subject of redirect examination. It was raised in cross-examination. And in closing argument, the Court imagines that the defense will focus attention on those subjects that it attacked in cross-examination. As the Court previously noted, that is the adversarial process at work. It is not grounds for a mistrial, as the Court previously noted. Neither is it grounds for the kind of instruction that the defense has asked for, which requests that the Court instruct the jury that the government presented perjured testimony. That would be inconsistent with the facts as we have them on the current record.

P6gWcom1

So for those reasons, the application for a *Napue* instruction is denied.

Next, let's briefly discuss juror No. 6.

First, I hope the parties understand that the reason we have discussed this issue several times over the past few days is that I understand its importance and I want to make sure I've considered all the arguments from both sides that have been presented.  This amount of scrutiny is not required.  As the Court previously observed, the Second Circuit, in *United States v. Fazio*, confirmed that removal of a juror is the prerogative of the Court and does not require the consent of any party.  Indeed, the court noted in *Fazio*, the Federal Rules of Criminal Procedure do not require any inquiry prior to the dismissal of a juror.  770 F.3d 160, 169 (2d Cir. 2014).

With that, last Friday, both in the morning and in the afternoon, we discussed whether there was cause to dismiss juror No. 6.  In the morning, I expressed the preliminary view that further inquiry of the juror would be appropriate because the record, as it stood, was insufficient to justify removing the juror.  The government's position was that the record of the juror's conflicting answers during voir dire and from last week's robing room discussion sufficed for removal.  In their view, the inconsistencies raised serious questions as to the juror's candor and his basic qualifications to serve.  The government did not object at that time to further inquiry of

P6gWcom1

the juror if the Court deemed it necessary, but the defense indicated that further questioning of the juror would have a negative impact on the juror that might impact the deliberations going forward.  That's from the transcript at page 6031.

I didn't reach a decision at that time but rather took time to consider both sides' submissions and arguments.

Now, the defense observes, in its June 15 letter, that in the morning on Friday, I offered that there could be ways to reconcile the juror's testimony and that the record, as I saw it at that time, would not be enough for dismissal.  I then did what judges are supposed to do.  I thought about what the parties had said, the authorities they raised and I went back to look at the record closely to make sure that I was making the right call.

Over the course of the day, during breaks in the proceeding, I re-reviewed the transcript in jury selection and from last week's robing room discussion as well as the authority cited in the parties' submissions.  The issue was further addressed at the conclusion of the day.

As I indicated at that time, after further review, there were clear inconsistencies between the juror's voir dire answers, given under oath, and the juror's answers during the robing room discussion and further inconsistencies within the robing room discussion itself.

P6gWcom1

Taking these all together and considering the arguments laid out in the government's June 11, 2025, letter, the record raised serious concerns as to the juror's candor and whether he shaded answers to get on and stay on the jury. These concerns were amplified, given that the subject matter of the inconsistencies -- where the juror has lived and with whom -- go to straightforward issues as to which there should not have been any doubts, and the answers also go to something vital -- the basic qualifications of a juror to serve.

To top it off, the inconsistencies and shifting answers on that issue raise questions about the juror's candor as to the numerous other questions asked by the Court in the juror questionnaire and in-person voir dire process, threatening the integrity of the judicial process.

On this basis, the Court indicated that juror 6 should be dismissed.

While the defense questioned the relevance and importance of the inconsistencies, they didn't deny that they existed. The defense invited the Court to further question the juror to see if he could explain them, this despite the earlier expressed concerns about chilling the juror.

The defense cited a concern with reducing the diversity of the jury by replacing a Black juror with a white one and referenced the Second Circuit's decision in *United States v. Slaughter*, 110 F.4th 569 (2d Cir. 2024), which raised

P6gWcom1

questions concerning the underrepresentation of Black and Hispanic or Latino jurors on veneers in this district.

The Court took the weekend to consider the defense's arguments, and it takes seriously the defense's concerns about race, diversity and the issues raised in *Slaughter*. Taking into account all the circumstances presented, further inquiry of the juror is inappropriate. Even if this juror had an excuse or explanation for the inconsistencies in the record, that would be yet another set of shifting answers on basic questions about the juror's residence. This would only heighten the specter that the juror's trying to shade answers in an effort to remain on the jury. In other words, there's nothing the juror could say at this point that would put the genie back in the bottle and repair the damage to his credibility.

Further, the Court agrees with the defense that even if the Court were inclined to retain the juror, which could only happen with further questioning, that inquiry would almost certainly have a negative impact on the juror that might impact the deliberations going forward in unpredictable ways, potentially compromising the jury's functioning.

As the Court observed on Friday, this is precisely why we have alternate jurors. We are not equipped in this setting to do a forensic investigation into the issues raised. So we have alternate jurors precisely for this kind of situation, to

P6gWcom1

avoid even the appearance that the fair and impartial nature of the process has been undermined.

As to concerns about diversity and *Slaughter*, as the defense itself noted on Friday, this jury does not raise those concerns. Defense counsel, Mr. Donaldson himself, observed that "this is the first time I can say in this 25 years we have this type of diverse jury in this district and that the process that this Court used for us to get a jury worked and worked wonderfully in that we got a diverse jury." Tr. 6228-29. The defense also agreed, given the discussions that we had on Friday, that there was no intentional discrimination at play in the issue raised as to juror No. 6. Tr. 6229: Now, it may not be intentional. Mr. Donaldson: "It's not. It's clearly not. No one is saying that's what happened."

The defense asks this Court to base its decision-making on race, but it would be improper to allow the race of juror No. 6 and the alternate juror to factor into the proper course here at all. The Supreme Court has prohibited precisely that kind of injection of race into the process. As the court observed in *Batson v. Kentucky* itself nearly 40 years ago, the defendant has no right to a petit jury composed, in whole or in part, of persons of his own race, because the number of our races and nationalities stands in the way of evolution of such a conception of the demand of equal protection. The court there confirmed a person's race simply

P6gWcom1

is unrelated to his fitness as a juror.

Now, the current situation is obviously not governed by *Batson*, which involved peremptory challenges, but the import of that decision is straightforward.  The Court should not -- indeed, cannot -- let race factor into the decision of what to do here.  At that point the answer is clear.  Juror No. 6 is excused.  Pursuant to Federal Rule of Criminal Procedure 24(c)(2)(B)., he will be replaced by the first alternate juror.

As to the other accusations against the prosecution lodged in the defense's June 15 letter, there has been no evidence of prosecutorial misconduct brought to the Court's attention.  Zero.  To the extent that these accusations are an effort to pressure the Court to make a decision on the juror issues before it based on race, the Court rejects that invitation.  If the defense has a specific, good faith application based on any of the issues raised in its letter or anything else, then it should make that application.

In each instance in this case where an application for any kind of relief has been raised, this Court has given it close attention and has resolved it -- many times in the defense's favor.  But inviting the Court to make a decision based on race would be doing what the Supreme Court for decades has flatly prohibited.

As for the separate juror issue that we addressed on Friday, let me say a couple of things.

P6gWcom1

First of all, the issues concerning the two jurors are in no way linked.  The Court will apply the same standards and procedures as to any juror issue that arises, apply nondiscriminatory criteria and the governing standards to determine whether there are grounds for dismissal and proceed based on what the law and facts dictate.  Tying these two issues together, urging race to factor into the process and then suggesting that if the outcome isn't in the defense's favor a mistrial is warranted has no basis in law, logic or basic notions of fairness and justice.

The government says it does not oppose further questioning of this juror, so at the conclusion of the day, after the remaining jurors have left, we will ask that juror to stay so that I can ask questions that the parties have for me to ask.  The parties should meet and confer on that score and furnish to me an agreed set of questions.  They should also confer as to the method of questioning, whether we should clear the courtroom and have that questioning occur here or whether the parties agree that the questioning can occur in the robing room.

That resolves the issues concerning the two jurors.

Are there any further applications relating to any evidentiary issues that will be raised today?

Ms. Foster.

MS. FOSTER:  Nothing from the government.

P6gWcom1

THE COURT:  All right.

Mr. Agnifilo.

MR. AGNIFILO:  Nothing, your Honor.  Thank you.

THE COURT:  All right.

With that, are we ready to go, Ms. Foster?

MS. FOSTER:  Yes, your Honor.

THE COURT:  All right.  Let's bring in the jury.

(Continued on next page)

P6gWcom1

(Jury present)

THE COURT:  Please be seated.

Welcome back, members of the jury.  I hope you had a great weekend and a great Father's Day, for all the fathers here.

With that, the government may call its next witness.

MS. FOSTER:  Yes, your Honor.

Just before I call the first witness, the government offers Government Exhibit 1507, which is a demonstrative that contains a list of exhibits that the government is offering along with certain exhibits under seal, and a copy of that has been provided to the defense and the court reporter.

Would you like it up on the screen?

THE COURT:  Well, are you going to be using this with the next witness?

MS. FOSTER:  No.  It's just a list of exhibits that are being admitted.

THE COURT:  All right.  Let's put it up on the screen.

MS. FOSTER:  And can we go to the second page, please.

THE COURT:  All right.  So you're offering those exhibits to admit into evidence.

MS. FOSTER:  All right.  Those exhibits will be admitted under the terms spelled out in the demonstrative.

(Government Exhibits 1311; 1312, sealed; 5A-209, sealed; 5A-226, sealed; 5A-227, sealed; 5C-311, sealed; 5C-360;

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom1

5C-361; 5C-362; 7T-101; 7T-102; 7X-151; 7X-152; H-104-A1, sealed; H-104-A1-R; H-104-A2, sealed; H-104-A2-R; H-104-A2-A, sealed; H-105-A; H-105-B; C-250, sealed; C-250-A; C-250-B, sealed; C-257-A; C-262, sealed; C-263, sealed; C-264, sealed; C-265, sealed; C-268; C-269; C-270, sealed; C-270-R; C-270A; C-270-B; C-332-F; C-343-B; C-352; C-353; C-354; C-354-B; C-354-C; C-355; C-356; C-357; C-361; C-361-F; C-361-B; C-361-G; C-362; C-362-D; C-362-E; C-362-F; C-365; C-366; C-367; C-506; C-507; C-622-1, sealed; C-622-1-R; C-625; C-629-2; C-629-3, sealed; C-629-3-R; C-629-3A; C-639-1; C-639-1-A; 6-639-2; C-641, C-642-2, sealed; C-642-2-R; C-653-2, C-654; C-657; C-657-A; C-657-B; C-657-C; C-658; C-309 and 1507 received in evidence)

MS. FOSTER:  The government also would offer the following exhibits subject to connection:  Government Exhibit 3G-118, which it offers under seal; Government Exhibit 3G-118-R; Government Exhibit 3G-127; Government Exhibit 3G-135; Government Exhibit 3G-136, which the government offers under seal; and then finally Government Exhibit 3G-136-R.

THE COURT:  Are there any objections to those exhibits other than those the Court has previously addressed and resolved?

MS. GERAGOS:  No, your Honor.  Just subject to connection.

THE COURT:  All right.  So they will be -- I suppose

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom1                    Sankar - Direct

they're not being admitted right now.  You're going to offer them into evidence once the connection has been made.

MS. FOSTER:  Yes, that's correct.

THE COURT:  OK.

MS. FOSTER:  And now the government calls its first witness of the day, Ananya Sankar.

THE COURT:  Very good.

 ANANYA SANKAR,

     called as a witness by the government,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. FOSTER:

Q.  Good morning, Ms. Sankar.

A.  Good morning.

Q.  Are you currently employed?

A.  Yes.

Q.  Where do you work?

A.  At the U.S. Attorney's Office for the Southern District of New York.

Q.  What is your title?

A.  I'm a paralegal specialist.

Q.  How long have you worked at the U.S. Attorney's Office?

A.  A little over two years.

Q.  What are your duties and responsibilities as a paralegal specialist at the U.S. Attorney's Office?

A.  I help organize anything in evidence from various federal
agencies, and I also assist attorneys with trial preparation.

Q.  You just listed a number of duties and responsibilities
that you have as a paralegal specialist.

    Are those the roles that you played in this case?

A.  No.

Q.  What was your role, if any, in this case?

A.  I had no role.

Q.  Besides what we're going to talk about today?

A.  Correct.

Q.  Turning to this case, were you asked to confirm the
accuracy of charts summarizing certain evidence?

A.  Yes.

Q.  How many charts did you review?

A.  I reviewed two charts.

Q.  Ms. Sankar, there's a binder in front of you.  Do you see
that?

A.  Yes.

Q.  Could you please look at the documents marked Government
Exhibit 1410, Government Exhibit 1410-R, Government Exhibit
1411 and Government Exhibit 1411-R and look up at me when
you're done.

A.  OK.

Q.  Do you recognize those documents?

A.  Yes.

Q.   What are they?

A.   These are the summary charts I was asked to verify the accuracy of.

Q.   And are Government Exhibits 1410-R and 1411-R just redacted versions of Government Exhibits 1410 and 1411?

A.   Yes.

Q.   Who prepared these summary charts?

A.   The prosecutors did.

Q.   Who confirmed their accuracy?

A.   I did.

Q.   What did you do to confirm their accuracy?

A.   I was given government exhibits that I used to verify the accuracy of the information in the charts, which summarizes those exhibits.

Q.   At a high level, what kind of underlying documents did you review to check the accuracy of the charts?

A.   I reviewed text messages from cell-phone extractions, I reviewed call logs containing call records and I reviewed audio files, images and videos pulled from devices.

Q.   Were all of those various documents, the source documents that you listed and that the charts rely on, exhibits in this case?

A.   Yes.

Q.   Did you select the exhibits that would be used in this chart?

A.   No, I did not.

Q.   Who selected the exhibits?

A.   The attorneys did.

Q.   Can you describe the volume of exhibits that were included in these charts?

A.   They were hundreds and hundreds of pages of documents.

Q.   Are the charts that you reviewed fair and accurate summaries of the underlying exhibits that you reviewed?

A.   Yes.

        MS. FOSTER:  Your Honor, the government now offers Government Exhibits 1410, Government Exhibit 1410-R, Government Exhibit 1411 and Government Exhibit 1411-R into evidence.

        THE COURT:  Are there any objections that have not been previously resolved by the Court?

        MS. GERAGOS:  Nothing other than our previous objections, your Honor.

        THE COURT:  All right.  Those exhibits will be admitted on the terms indicated by Ms. Foster.

        (Government Exhibits 1410, under seal; 1410-R; 1411, under seal; and 1411-R received in evidence)

        MS. FOSTER:  Your Honor, my apologies, but the government would offer 1410 and 1411 under seal.

        THE COURT:  Those will be admitted under seal and the redacted exhibits will be admitted.

        MS. FOSTER:  Ms. Foster, could you please display

P6gWcom1                        Sankar - Direct

Government Exhibit 1411-R.

Q.  Ms. Sankar, is this one of the charts that you reviewed for accuracy?

A.  Yes.

Q.  Can you please explain to the jury what Government Exhibit 1411-R shows, at a high level?

A.  This is a timeline that involves text messages between various different participants and then also audio file, images and videos pulled from particular devices.

        MS. FOSTER:  OK.  I want to break that down.

Q.  You mentioned that this chart includes text messages, is that right?

A.  Correct.

Q.  Is it fair to say that the majority of the records on this chart are text messages?

A.  Yes.

Q.  Were those text messages found on multiple people's devices or just one person's devices?

A.  On multiple people's devices.

Q.  How do you know that?

A.  They were pulled from various cell-phone extractions, which could have been from various different devices.

Q.  And do you know that based on a stipulation?

A.  Yes.

Q.  Who, if anyone, is a party to each of the text messages

P6gWcom1                          Sankar - Direct

that appears on this chart?

A.   Kristina Khorram.

Q.   And is Ms. Khorram speaking with different people in these messages or the same person?

A.   With different people.

Q.   Are the text communications on this chart between Ms. Khorram and one other person, or are some group chats?

A.   Some of them are group chats.

Q.   You also mentioned that this chart includes photos, videos and audios, is that right?

A.   Correct.

Q.   Were those photos, videos and audios found on one person's device or multiple people's devices?

A.   Those files were all found on one person's device.

Q.   And whose device were those found on?

A.   Kristina Khorram.

Q.   How do you know that?

A.   I was also given a stipulation verifying that.

        MS. FOSTER:  Ms. Foster, could you please pull up Government Exhibit 1301, briefly.

Q.   Ms. Sankar, what does this show?

A.   This is the stipulation that verifies particular exhibits come from Kristina Khorram's device.

        MS. FOSTER:  OK.  We will come back to exactly how you did that using the stipulation in a second.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6gWcom1                        Sankar - Direct

But Ms. Foster, can you now take down Government Exhibit 1301 and return to 1411-R.  Thank you.

Q.  Now, let's look at this chart.

In what order are the records listed in this chart?

A.  These are in chronological order.

Q.  And how many pages is this chart?

A.  It's about -- it's 33 pages.

Q.  Focusing on the top row of page 1, what is the date of the earliest record on this chart?

A.  March 18, 2016.

MS. FOSTER:  Ms. Foster, can we please go to page 33, and can you please highlight the last row.

Q.  Ms. Sankar, what is the date of the last record on this chart?

A.  February 26, 2024.

Q.  Does this chart include all text messages, audio files, videos or photos that Ms. Khorram had over this time period or just some?

A.  Just some.

Q.  And do you know why these specific records were included on the chart?

A.  No, I do not.

MS. FOSTER:  Ms. Foster, can we please go back to page 1.

Q.  Ms. Sankar, there are various gray bars shown on this page.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom1                         Sankar - Direct

What do those indicate?

A.   Those indicate shorter lapses in time.  So it could be, maybe, a couple hours or just a few days.

Q.   OK.  And sometimes is it just a few minutes too?

A.   Yes.

        MS. FOSTER:  Ms. Foster, can we go to the second page.

Q.   On this page there appears to be blue bars.  What do those indicate?

A.   Those indicate larger lapses in time.  So it could be multiple weeks or multiple months.

Q.   Now I want to go through the columns.

    What does the column titled date and time, time zone show?

A.   That is the date and time the original text message was sent, or it's the date and time the audio, image or video was created on the device.

Q.   And is the time zone of the date and time of the record also indicated in this column, where available?

A.   Yes.

Q.   What is the time zone listed for most of the records on this chart?

A.   A majority of them are in Universal Coordinated Time.

Q.   Is that UTC?

A.   Yes.

Q.   Were there certain times you could not tell from the underlying records what time zone the record is in?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P6gWcom1                          Sankar - Direct

A.   Yes.

Q.   In those cases, what is indicated in that first column?

A.   There's either no time zone indicated or an asterisk.

Q.   Turning to the next column, what does record type indicate?

A.   That indicates whether it's a text message that's being displayed in the row or whether it's an audio file, image or video taken from a device.

Q.   And where it's an audio, image or video file, what else does it indicate in this column?

A.   It will indicate whose device it was taken from.

Q.   Focusing on this first page, what is the record type of each of the files on this page?

A.   These are text messages.

        MS. FOSTER:  Ms. Foster, can we please turn to page 16.

Q.   Ms. Sankar, directing your attention to that last row, row 251, what is the record type for this row?

A.   This is an audio file found on Kristina Khorram's device.

        MS. FOSTER:  Now, Ms. Foster, can we go back one page, to page 15.

Q.   Ms. Sankar, directing your attention to row 223, what is the record type for this row?

A.   This is an audio message.

Q.   Is an audio message different than an audio file?

A.   Yes.  An audio message is sent within a text message chat,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

and an audio file is just a file found on the device.

MS. FOSTER:  Ms. Foster, can we go now back to page 1.

Q.  Turning to the next two columns, what does the "from" column indicate?

A.  "From" is the sender of the text message and "to" is the recipient of the text message.

Q.  Looking at these first few rows, there appears to be a name associated with each of the numbers in these columns.  Is that the name of the person believed to use that phone number?

A.  Correct.

MS. FOSTER:  Now, I want to walk through how that is reflected in the underlying exhibits that you checked.

Ms. Foster, could you please pull up Government Exhibit 1312-R.

Q.  Ms. Sankar, what is this?

A.  This is a stipulation I was given identifying which phone numbers are used by which individuals.

Q.  OK.  And so focusing just on the first row, who does it say is the user of the 4111 number?

A.  Brendan Paul.

Q.  Are all of the numbers listed on that summary chart listed in this stipulation?

A.  No, they are not.

Q.  For where they aren't listed and identified next to an individual user, what name on the summary chart is listed next

to the number?

A.   The contact name from the original government exhibit.

MS. FOSTER:  Now, Ms. Foster, can you please take this down and pull up Government Exhibit 1411-R again.

Q.   Going to the next column, what does the column titled content or file name show?

A.   This is the content of the actual text message or it's the file name of that audio, image, video file, and sometimes it's just the picture of the image found on the phone.

Q.   And now finally the last column, what does source GX indicate?

A.   This is the original government exhibit I used to verify the accuracy of the information in each row.

MS. FOSTER:  Now I want to just walk through a few examples of how you confirmed the information on this chart.

Ms. Foster, can you please go to page 7, rows 44 to 99.

Q.   Ms. Sankar, what type of records do these rows show?

A.   These are text messages.

Q.   And how can you tell that from this chart?

A.   It's listed under record type.

Q.   Are all of the text messages shown here from the same date?

A.   Yes.

Q.   What is that date?

A.   December 29, 2019.

P6gWcom1                        Sankar - Direct

Q.   And is that indicated in the date and time column?

A.   Yes.

Q.   Who were these messages between?

A.   Ryan Lopez and Kristina Khorram.

Q.   Where do you see that on this chart?

A.   In the "from" and "to" columns.

Q.   Ms. Sankar, can you please read Mr. Lopez's first three text messages?

A.   "LOL.  Think I saw one of the cowboys today.  You can spot them in the lobby like an escort.  I forgot to tell you about it."

Q.   How does Ms. Khorram respond to Mr. Lopez's messages about seeing one of the cowboys?

A.   She responds by sending four laughing emojis and then says: BTW, how long is he going to stay awake?

Q.   What does Mr. Lopez then respond?

A.   "LOL.  I'm guessing until tomorrow night."

Q.   What exhibit did you review to check the accuracy of the information in these rows?

A.   Government Exhibit C366.

Q.   And is that indicated in the source column?

A.   Yes.

          MS. FOSTER:  Ms. Foster, could you please pull up Government Exhibit C-366 and go to page 2.

Q.   Starting with the message three from the bottom,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ms. Sankar, could you just walk through how you confirmed the accuracy of the information on each of the rows you just walked through?

A.   So, first, I verified that the date and time listed on the government exhibit -- so December 29, 2019 -- and each of those times was correct in the date time column.  And then I made sure that the phone number listed for the sender or the recipient -- in this case, this is the sender -- of the text messages, was accurate.  And then I verified whether, based on that earlier stipulation we saw, there was a name of an individual we knew was attached to the phone number.  Otherwise, I listed the contact name, Ryan Lopez.  And then I made sure that the content of the text message was also accurate.

          MS. FOSTER:  Ms. Foster, can we turn to the second page, or the next page.

Q.   And does this page show the remaining text messages that were excerpted on that chart?

A.   Correct.

Q.   Here, the 2886 number is listed as associated with the contact K.K. main phone.

     Why did the chart say the person associated with this number was Kristina Khorram?

A.   Based on the stipulation I was given, it listed that 2886 number as belonging to an individual named Kristina Khorram.

P6gWcom1                         Sankar - Direct

Q.   And that's that stipulation we just walked through?

A.   Yes.

Q.   To confirm, is this entire exhibit, C366, longer than the excerpt in the chart?

A.   Yes, it is.

Q.   So the chart just includes an excerpt of this exhibit, is that right?

A.   Yes.

Q.   If someone wanted to look at the longer chat that is excerpted in the chart, where would they go?

A.   To the original government exhibit.

Q.   That's cited in the chart?

A.   Yes.

          MS. FOSTER:   Now I want to walk through another example.

          Ms. Foster, can we please go back to page 16 of Government Exhibit 1411-R.

Q.   Ms. Sankar, directing your attention to that last row, row 251, what type of record does that row show?

A.   This is an audio file found on the device.

Q.   And whose device was it found on?

A.   Kristina Khorram.

Q.   What does it state is the date of this audio file?

A.   January 30, 2023.

Q.   What is indicated in the content or file name column?

A.   This is the file name of that audio file on the phone, on the device.

Q.   What exhibits did you review to check the accuracy of this row?

A.   I used Government Exhibit 349 -- C349B and then 1301, which is the stipulation.

Q.   And are those all indicated in that source column?

A.   Yes.

        MS. FOSTER:   Now I want to walk through each of these exhibits.

        Ms. Foster, could you please pull up Government Exhibit 1301.

Q.   Is this that stipulation that we looked at earlier?

A.   Yes.

Q.   And generally, what does this stipulation show?

A.   This shows that certain ranges of government exhibits given to me contain information pulled from devices.

        MS. FOSTER:   OK.   Can we turn to page 2, paragraph 4.

Q.   What government exhibit does it state that C349 and C349B, which were the other exhibits cited in that chart for row, what exhibit they're extracted from?

A.   They're subdivisions of C300.

        MS. FOSTER:   And Ms. Foster, can we go back to page 1 and highlight paragraph 1b.

Q.   Who does it state in paragraph B is the person who that

P6gWcom1                          Sankar - Direct

C300 was seized from?

A.   Kristina Khorram.

         MS. FOSTER:  Ms. Foster, could we now please pull up
Government Exhibit C-349.

Q.   Ms. Sankar, what does this show?

A.   This is an extraction report from that device seized from
Kristina Khorram.

Q.   And does this show metadata for that audio recording on
line 251?

A.   Yes.

Q.   What is the file type indicated on this metadata?

A.   This is a recording, an audio recording.

Q.   And is that indicated under type?

A.   Yes.

Q.   What date is associated with the audio file in this
exhibit?

A.   Under time stamp, it says January 30, 2023.

Q.   Is that the same time stamp and date that was listed on the
summary chart?

A.   Yes.

Q.   And does it have the name of the -- the file name of the
audio file?

A.   Yes.  Under file.

         MS. FOSTER:  Ms. Foster, can we now go back to
Government Exhibit 1411-R and go back to page 16.

Q.  OK.  Again, focusing on row 251, so, we've now walked through two of the exhibits cited in that source column, C349 and 1301.

What is that last exhibit cited there?

A.  1301.

Q.  Sorry?

A.  Oh, sorry.

Q.  C349B, what is that one?

A.  That is the audio file itself.

MS. FOSTER:  Ms. Foster, could you please play the first minute and ten seconds of Government Exhibit C349B.

(Media played)

MS. FOSTER:  Thank you, Ms. Foster.

OK.  Now that we've walked through two examples of how you confirmed the accuracy of certain of the rows on this chart, I now want to walk through some of the other records that are included here.

So Ms. Foster, can we please go back to page 1.

Q.  We're going to start by talking about rows 1 through 31, which are on pages 1 to 2.  And using that paper copy in front of you, Ms. Sankar, what is the date of the messages in these rows?

A.  March 18, 2016.

Q.  Through when?  Sorry.

A.  Through March 20, 2016.

P6gWcom1                    Sankar - Direct

Q. So these messages are from that two-day period?

A. Yes.

Q. What type of records are shown in rows 1 through 31?

A. These are text messages.

Q. Who were the parties who send and receive the text messages in these rows?

A. Some are Kristina Khorram and Dave Shirley Assist and others include Melissa Feola.

Q. Let's start at the beginning.

So, directing your attention to the first four rows, who are these first four messages between?

A. Kristina Khorram and Dave Shirley Assist.

Q. What generally do these seem to be about?

A. Setting up a hotel room.

Q. Can you please read Ms. Khorram's messages in these rows, and I'll read Dave Shirley's.

A. March 18, 2016, at 7:49 p.m., Kristina Khorram says to Dave Shirley Assist: "Can you head to the Four Seasons on Brickell side and set up his room. He's about to go now. He said bring Gatorade, water, chicken noodle soup too. Thank you. He wants you to go right now, please."

Q. "OK. Cool."

After these four messages, is there then a gray bar denoting a jump in time?

A. Yes.

P6gWcom1                           Sankar - Direct

Q.  And approximately how long is that jump in time?

A.  About 30 minutes.

Q.  And then turning to the set of messages after this gray bar, who are the participants in the messages shown in rows 6 to 15?

A.  Kristina Khorram and Dave Shirley Assist.

Q.  So the same participants?

A.  Yes.

Q.  And do these text messages appear to be related to the earlier conversation about setting up a hotel?

A.  Yes.

Q.  Now focusing on the next batch of messages from rows 16 to 20, are these still messages between Kristina Khorram and Dave Shirley?

A.  Yes.

Q.  And can you please read Ms. Khorram's messages in these rows and I'll read Dave Shirley's:  "OK.  Is an Uber taking them still?"

A.  "Yeah, he's on way."

Q.  "Roc riding with him.

    "OK."

A.  "No to Roc.  Just CC and PD."

Q.  And now, after these messages, is there another gray bar?

A.  Yes.

Q.  And what time jump does that indicate?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   It's about an hour.

Q.   Now, focusing on line 22, who is this text between?

A.   Melissa Feola and Kristina Khorram.

Q.   And can you read that text?

A.   "Adjoining room not avail.  Hotel now sold out.  Talked one-bedroom down to 2,550 per his request plus booked it."

Q.   And after this message, is there another jump in time?

A.   Yes.

Q.   Approximately how long?

A.   About a day, to the next morning.

Q.   Now I will -- and who are these messages between?

A.   Dave Shirley Assist and Kristina Khorram and Melissa Feola.

Q.   OK.  I will read Mr. Shirley's messages.  And can you please read Ms. Khorram's?  Dave Shirley to Kristina Khorram: "Clayton Howard needs access to room."

A.   "Hey, M.  Dave needs to add the name Clayton Howard to the Four Seasons hotel room.  He needs access ASAP.  Can you help?"

        MS. FOSTER:  Ms. Foster, can you please turn to the next page.

Q.   Keep reading.

A.   "They are giving him a hard time."

Q.   Dave Shirley Assist:  "I got it added."

     Now, after these messages, is there a subsequent jump in time?

A.   Yes.  Again, about a day.

P6gWcom1                          Sankar - Direct

Q.   And can you please read Ms. Khorram -- and is it again between Ms. Khorram and Dave Shirley after that jump in time?

A.   Yes.

Q.   Can you read Ms. Khorram's messages, and I'll read Mr. Shirley's.

A.   At 6:29 p.m.:  "Definitely yes to your mom's.  Also can you $4,000 cash from Roc to PD hotel.  He said just ask Roc for it. Thanks."

Q.   Dave Shirley:  "OK.  Did you ask Roc already or should I hit him?"

A.   "Haven't asked him yet so you can just hit him."

Q.   Thank you.  And are all those messages we just went through, are they from that two-day time period you just mentioned?

A.   Yes.

        MS. FOSTER:  Now, I want to jump ahead and talk about another set of records on this chart.

Q.   Can we look at rows 33 to 49, and before these rows, is there a blue bar?

A.   Yes.

Q.   And again, what does that blue bar indicate?

A.   A larger lapse in time, so this one looks like about three months.

Q.   OK.  And what is the type of record shown in these rows?

A.   These are text messages.

Q.   Who are the participants in these text messages?

A.   Kristina Khorram, Ryan Lopez and Dave Shirley Assist.

Q.   Can you please read Ms. Khorram's messages, starting at row 33, and I'll read the others.

A.   At 2:35 a.m.:  "Heads-up.  He's probably about to do wild king tonight."

Q.   Mr. Shirley:  Shit.  Need to re-up on baby oil and shit."

A.   "Yeah, you can head out and get everything ready.  Also sounds like now he is going to Malibu."

Q.   Is there a jump in time?

A.   Yes.

Q.   Approximately how long?

A.   About an hour.

Q.   Mr. Shirley:  "Forgot to grab the money and package from you.  SMFH."

A.   "Ugh."  Dave:  "Well, you still might see me.  LOL."

Q.   Dave Shirley:  LOL.  Just give it to Fah just in case."
     And now is there a subsequent jump in time?

A.   Again, about half an hour.

Q.   Can you read Ms. Khorram's message?

A.   "Dave, get the envelope from Fah."

Q.   "I got it.  Thank you."
     Is there then about 36 hours of a jump in time?

A.   Yes.

Q.   Can you keep reading?

A.   "Hey, have you heard from him at all?"

Q.   Mr. Shirley:  "Nope, not at all."

      Is there then about a six-hour jump in time?

A.   Yes.

Q.   And I'll read Mr. Shirley's message:  "If he doesn't answer, I can get an envelope from downstairs and leave it at the door."

      Is there then about a minute between the next two -- between that message and the next one?

A.   Yes.

Q.   And who is the next message from and to?

A.   From Kristina Khorram to Cassie Ventura.

Q.   And what does Ms. Khorram say to Cassie Ventura?

A.   "Hi.  Dave is at your door with the green."

            MS. FOSTER:  Now I want to jump ahead in time to another set of records on this chart.

            Ms. Foster, can we please go to page 8.  And can we please focus on rows 124 to 133, which appear at the bottom of -- and these -- sorry.  124 starts at the bottom of page 8 and 133 goes through page 9.

Q.   Ms. Sankar, are all of the communications in these rows from the same date?

A.   Yes.

Q.   What is that date?

A.   November 14, 2021.

P6gWcom1                    Sankar - Direct

Q.   What type of record is shown in these rows?

A.   These are text messages.

Q.   Who are the participants in all of the text messages in
that batch I just spoke about?

A.   Sean Combs and Kristina Khorram.

Q.   Ms. Sankar, starting at row 124, can you please read
Ms. Khorram's messages, and I'll read Mr. Combs's messages:
     "Is room ready now?"

A.   "On with them now.  Any minute.  Joey's there to check in
and heard Jane on the way to hotel too, so he can drop bags and
let her in."

Q.   "I'm on way.  I really don't want them to know it's me.
LOL.  No unneeded charges."

A.   "OK.  I would wait until at least Joey and Jane get into
the room."

          MS. FOSTER:  Ms. Foster, turn to the next page.

A.   "And then you go, so maybe like 20 min and maybe you are up
in the room and stuff is too."

Q.   What does this chart show happens about 30 minutes later,
after Ms. Khorram sends that prior text?

          MS. GERAGOS:  Objection.

          THE COURT:  Hold on for one second.

          Can you rephrase the question.

BY MS. FOSTER:

Q.   Is there a jump in time?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   Yes.

Q.   And approximately how long is that?

A.   About 30 minutes.

Q.   And can you read the next message?

A.   From Sean Combs to Kristina Khorram:  "I'm room.  Thank you."

Q.   And then is there another jump in time?

A.   Yes.

Q.   About how many minutes?

A.   Again, about, maybe, 20 minutes.

Q.   What does Ms. Khorram then write to Mr. Combs?

A.   "Hotel called.  Paul coming up."

Q.   This message mentioned someone named Paul, is that right?

A.   Yes.

Q.   Are there additional messages in this chart that mention a Paul?

A.   Yes, there are.

        MS. FOSTER:  OK.  We'll come back to that, but let's skip ahead in time again.

        Ms. Foster, can we please go to page 11.

Q.   Ms. Sankar, directing your attention to rows 169 to 191, which start on this page and then go through the following page, what is the date range of these records?

A.   February 12, 2022, until March 3, 2022.

Q.   Sorry.  Through 191.

P6gWcom1                            Sankar - Direct

A.   Oh.  Apologies.  February 12, 2022, until February 14, 2022.

Q.   So about a two-day period?

A.   Yes.

Q.   What type of record is shown in all these rows?

A.   These are text messages.

Q.   And who are these messages between?

A.   Kristina Khorram and Sean Combs and some Jane and Kristina Khorram.

Q.   OK.  You mentioned that one of the participants in these messages is someone named Jane.

     Was Jane a real name of a person on the records you reviewed?

A.   No.

          MS. FOSTER:  OK.  Your Honor, before I display the next exhibits, could we turn off the overflow feed and the TV screen?

          THE COURT:  All right.  I'll ask the deputy to turn off those feeds.  Just let us know when we have that off.

          THE DEPUTY CLERK:  Yes, your Honor.  One moment.

          Ready to proceed, your Honor.

          THE COURT:  All right.

          Ms. Foster, you may proceed.

          MS. FOSTER:  Ms. Foster, would you please display just for the witness, the Court and the jury what is in evidence as

P6gWcom1                    Sankar - Direct

Government Exhibit 3R-121.

Q.  Do you see that document, Ms. Sankar?

A.  Yes.

Q.  Without saying the name, what type of document is shown in this exhibit?

A.  This is a driver's license.

Q.  And how do you refer to the person on this driver's license in your chart?

A.  Jane.

Q.  Why did you refer to this person as Jane?

A.  That was the alias told to me by the attorneys to be used for this individual.

        MS. FOSTER:  OK.  Thank you, Ms. Foster.  You can take this down, and we can turn back on the screens.

        Ms. Foster, can you please display Government Exhibit 1411R again and go back to page 11.

Q.  OK.  Ms. Sankar, could you now read rows 169 -- read Ms. Khorram's messages in rows 169 to 171.

A.  February 12, 2022, at 3:44 p.m.:  "You just told me the One a few hours ago.

    "We had hotel already.

    "Also, just FYI, just to share, your damage charges on the One hotel are always high because of all the white."

Q.  Is there then a jump in time?

A.  Yes.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

Q.   How long is that?

A.   Four hours.

Q.   Sorry.  Is it also the next day?

A.   Oh.  Apologies.  Yes, the next day.

Q.   And who are the messages between after the gray bar?

A.   Jane and Kristina Khorram.

Q.   Can you please read Ms. Khorram's messages, and I'll read Jane's:

Jane:  "Hi, hon.  Yes, pulling up to airport, yay.  How are you?  Hopefully, the 14th, morning is OK with the room.  I'm excited to surprise him."

A.   "OK.  Great.  I'm good.  It all always works out."

Q.   Is there then another jump in time?

A.   Yes.

Q.   And how long?

A.   Through the next day.

Q.   Can you keep reading Ms. Khorram's messages?

A.   "Also, ask them if they can bring up, like, 15 bath towels for two."

Q.   "OK.  Will do.  Hey, just thinking ahead.  He's always bringing cash.  Maybe when security arrives, he could also have that with him.  He always brings around 5 to 10K."

A.   "I'll remind him.  He's got his cash with him."

          (Continued on next page)

P6GQcom2                          Sankar - Direct

By Ms. Foster (Continued)

Q.  Can we turn to the next page.

          Is there then a jump in time indicated by the gray bar?

A.  Yes.

Q.  Approximately how long is that?  Do you need us to go back to the prior page?  We can do that.

          Ms. Foster, could we just briefly go back?

A.  About 20 minutes.

Q.  Thank you.

          Can we go back?  Thank you.

          Then can you read Ms. Khorram's messages?  And who are the messages to directly after that gray bar?

A.  They're from Kristina Khorram to Sean Combs.

Q.  Can you please read them?

A.  FYI.  They are going through bags at FBO, so you should carry your black with backpack.

Q.  Is there another gray bar?

A.  Yes.

Q.  How long of a jump in time does that indicate?

A.  About an hour.

Q.  I'll read Jane's message, if you can read Ms. Khorram's.

          KK still landing at 2P, right, then 45 min drive to hotel.  I went to run an errand, and also they're expecting people to leave the presidential suite by 12P hopefully.  Room

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6GQcom2                      Sankar - Direct

decor begins at 1P.  Take 30 to 40 min.

A.  Hey, you will be good on timing.  We are just now taking off.

Q.  Is there then another jump in time?

A.  Yes.

Q.  Approximately how long?

A.  About three hours.

Q.  Who are those messages from and to?

A.  From Kristina Khorram to Sean Combs.

Q.  Can you please read those two messages?

A.  Also Jane asked if you could bring 5 to 10K in cash.  It's all in your safe.

Q.  Is there then another jump in time?

A.  Yes.

Q.  How long approximately?

A.  An hour.

Q.  What is shown after that gray bar?

A.  This is an audio message sent in the text message chain.

Q.  Just focusing on the source row, which I think is hidden now, what is the source for that audio file?

A.  C-629-3-A.

        MS. FOSTER:  Ms. Foster, can you just please quickly play C-629-3-A.

        (Audio played)

Q.  I want to turn to another batch of records on this chart.

Ms. Sankar, directing your attention to the rows starting at row 193 on this page, through 218, which follows onto -- which continues onto page 14.  Do you see those in the chart in front of you?

A.   Yes.

Q.   What is the date range of this batch of records?

A.   March 3, 2022 until March 4, 2022.

Q.   So about a day period?

A.   Yes.

Q.   What type of record is shown in those rows?

A.   These are text messages.

Q.   And who are the text messages between in all of these rows?

A.   Kristina Khorram and Jane.

Q.   At some point does it change?

A.   Yes.

Q.   And who does it then become?

A.   Jessica Ruiz and Kristina Khorram.

Q.   Just focusing on the messages from row 193 through the end of page 12, just generally what is the substance of these messages?

A.   It looks like they're's setting up a flight.

Q.   Who is the flight for?

A.   Jane.

MS. FOSTER:  Okay.  Ms. Foster, can we turn to the next page.

Q.   How much longer is this message from the ones we just read?
How much after?

A.   It's about an hour later.

Q.   And what appears to be shown in this message?

A.   This is flight information.

Q.   And who sends that flight information?

A.   Jessica Ruiz.

Q.   To?

A.   To Kristina Khorram.

Q.   Who does the flight appear to be for?

A.   Arthur, Jr., Paul.

Q.   Where is the flight from?

A.   It's from Los Angeles.

Q.   And where does it appear to be to?

A.   Miami International Airport.

Q.   What does it appear that the date of the flight is?

A.   March 6, 2022.

        MS. FOSTER:   Now, Ms. Foster, can we turn to the next
page.

Q.   Ms. Sankar what does CTD indicate at the top of that row?

A.   That just means the entire message didn't fit in the box on
the previous page, so it's just continued in the next column.

Q.   Is there then a message after this one?

A.   Yes.

Q.   Who is that from?

A.   From Jessica Ruiz.

Q.   Is it also to Ms. Khorram?

A.   Why.

Q.   What does she write in that message?

A.   Paul.

Q.   Is there then a gray bar after that message?

A.   Yes.

Q.   And does that -- how long of a time does that denote?

A.   About two and a half hours.

Q.   And who are the messages between after that gray bar?

A.   Kristina Khorram and Jane.

Q.   Can you please read Ms. Khorram's messages, and I'll read Jane's.

A.   At 11:38 p.m.

          Hey, per PD, can you swing by Mapleton on your way to airport to pick up Guido package?

Q.   Hey babe.  Yes, of course.  I asked Jess if they could grab me earlier.

A.   Yeah.  Just text her and let her know when you want the car.

Q.   Okay, cool.

A.   Hi.  Security at the Mapleton house has the package.  LMK when you are on the way.

Q.   Sound good babe.

A.   Loved the previous message.

P6GQcom2                         Sankar - Direct

Q.   Hey babe, we'll be at Mapleton by 7:45P.

A.   Loved the previous message.

Q.   Hi hun.  I'm here at back gate.

A.   Hey, sorry.  Just saw you called.  All good

Q.   Yes, all good, smiley face.  I'll message you once I'm on plane?

A.   Loved the previous message.

Q.   Hi KK.  Taking off now, exclamation mark.  See you in the a.m.

     Now, just focusing on the row 205, who is the individual who is mentioned as associated with the package in that row?

A.   Guido.

Q.   Are there additional chats in this chart that mention Guido?

A.   Yes.

Q.   Okay.  I want to talk about those.

     MS. FOSTER:  So, Ms. Foster, can we please go ahead in time to page 10.

Q.   Now, directing your attention to row 141, what type of record is shown in this?

     MS. GERAGOS:  Objection to going ahead in time.

     THE COURT:  I'm sorry.

     MS. GERAGOS:  Objection to going ahead in time.

     THE COURT:  All right.  Can you rephrase?

P6GQcom2                         Sankar - Direct

Q.   Oh.   What is this -- I withdraw "going ahead in time."

     And what is the record showing here in row 141?

A.   This is a text message.

Q.   Who is it between?

A.   Jane and Kristina Khorram.

Q.   Oh sorry, 144.

     I'm sorry, who is this one between?

A.   Kristina Khorram and Sean Combs.

Q.   And who sends the message?

A.   Kristina Khorram.

Q.   What is the date?

A.   December 16, 2021.

Q.   What does Ms. Khorram write in this message?

A.   They said Guido still hasn't dropped off package to house.

     MS. FOSTER:   Now, Ms. Foster, could we please go to page 15.   Could you please focus on rows 223 to 234.

Q.   Ms. Sankar, what is the date of all the messages in this group?

A.   July 23, 2022.

Q.   What type of records are shown in those rows?

A.   These are a mix of text messages and audio messages.

Q.   Who are the audio and text messages between?

A.   Sean Combs and Kristina Khorram.

Q.   What type of message is the first message that's shown in that row 223?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   It's an audio message.

Q.   What is the source for that audio message?

A.   C-657-A.

          MS. FOSTER:  Ms. Foster, can you please play C-657-A.

          (Audio played)

Q.   What does Ms. Khorram write after that audio message?

A.   Yeah, been working on it.  London sold out, so waiting on
other options.

Q.   Is there then a gap in time?

A.   Yes.

Q.   Approximately how long?

A.   About 30 minutes.

Q.   What is the file after that gap in time?

A.   It's an audio message.

Q.   What is the source for that audio message?

A.   C-657-B.

          MS. FOSTER:  Ms. Foster, could we please play C-657-B.

          (Audio played)

Q.   Is there a response from Ms. Khorram to that message?

A.   Yes.

Q.   What is the response?

A.   Okay.

Q.   Is there then a gap in time?

A.   Yes.

Q.   Approximately how long?

P6GQcom2                     Sankar - Direct

A.   20 minutes.

Q.   What is then -- who then writes the text message?

A.   Kristina Khorram.

Q.   To whom?

A.   Sean Combs.

Q.   What does Ms. Khorram write?

A.   Guido outside.

Q.   Is there another gray bar indicating a lapse in time?

A.   Yes.

Q.   Approximately how long is that lapse?

A.   About 12 minutes.

Q.   What then is sent by Mr. Combs?

A.   Another audio message.

Q.   What is the source for that audio message?

A.   C-657-C.

Q.   Ms. Foster, could we please play C-657-C.

        (Audio played)

Q.   Does Ms. Khorram respond to that message?

A.   Yes.

Q.   What does she write?

A.   Yeah, it's been handled.

Q.   Ms. Foster, can we please go to page 17.  And I want to
direct your attention to another group of messages starting at
row 271 through 275 which continue on to that next page.

        Are all of these messages from the same date?

A.   Yes.

Q.   And what is that date?

A.   April 14, 2023.

Q.   Who are the messages between?

A.   Faheem Muhammad, Robin Greenhill, Sean Combs and Kristina Khorram.

Q.   Okay.  Can you please read Mr. Muhammad's messages, and I'll read Mr. Combs' messages?

A.   12:26 a.m. Faheem says $1,200 spend on flower today. $1,500 owed to Guido for misc.  Let me know if approved to pay.

Q.   Ms. Foster, can you please turn to the next page.

          No, hold up.

A.   About three hours later.  This has been approved by PD. Paying now.  Same vendor from above.  An additional $1,800 has been approved.

Q.   Approved.

          Does this chart summarize any chats in which drugs are mentioned?

A.   Yeah.

          MS. FOSTER:  Ms. Foster, can we go back to page 16.

Q.   Ms. Sankar, directing your attention to rows 245 to 249, what date are all of these messages and time?

A.   November 24, 2022.

Q.   What type of records are shown in these rows?

A.   Text messages.

P6GQcom2                          Sankar - Direct

Q.  Who are these text messages between?

A.  Kristina Khorram, two different numbers for Sean Combs, and Faheem Muhammad.

Q.  Could you please read Ms. Khorram's messages and I'll read Mr. Combs?

A.  At 1:00 a.m., Puff can you text Fah what you need him to pick up before his flight to Miami, please.

Q.  Audio message.  I told you.

A.  No, all you asked was if someone was coming from Miami to bring something.  You didn't give the final info.  I'll call you when off this group call or you can just call Fah directly as well.

Q.  Molly 15 pills.  Don't text though.

        MS. GERAGOS:  Objection.

Q.  Oh don't.  Text think though.

        THE COURT:  I thought that resolved the objection. I'm not hearing anything --

        MS. GERAGOS:  That resolved the objection.

        THE COURT:  Let's proceed.

Q.  You previously walked through some messages about money in connection with hotel room messages, is that right?

A.  Yes.

Q.  Are there additional messages summarized in this chart on that topic?

A.  Yes.

Q.  Ms. Foster, can you please turn to page 18.

Now, directing your attention to rows 277 to 278, what is the date of both mention on those rows

A.  April 20, 2023.

Q.  And what type of messages are shown here?

A.  Text messages.

Q.  Who are those texts between?

A.  Faheem Muhammad, Robin Greenhill, Sean Combs and Kristina Khorram.

Q.  And can you please read Mr. Muhammad's texts, and I'll read Mr. Combs.

A.  2:17 a.m. just gave 5K to Brendan for hotel.

Q.  Sean Combs:  Okay.

Are there also additional messages in this chart that discuss cash?

A.  Yes.

Q.  Does this chart also summarize certain messages involving Ms. Cassie Ventura?

A.  Yes.

Q.  Have we previously reviewed some of those messages?

A.  Yes.

Q.  And are there additional messages in which Ms. Vent is a participant, or is discussed?

A.  Yes, there are.

MS. FOSTER:  Ms. Foster, can we go back to page 5.

Q.  Ms. Sankar, directing your attention to rows 71, which start on this page, through row 85 on the following page, do all of these messages happen on the same day?

A.  Could you go to the next page, please.

Yes they do.

Q.  What is that date?

A.  May 2, 2017.

Q.  What type of records are shown in those rows?

A.  These are text messages.

Q.  And who are they between?

A.  Cassie Ventura and two different numbers for Kristina Khorram.

Q.  Is there also a few messages between Ms. Khorram and Mr. Roche, Derek Roche?

A.  Yes, I believe on the previous page.

Q.  Oh, sorry -- we'll come back to it.

Can you please read Ms. Khorram's message, and I'll read Ms. Ventura's message.

Ms. Ventura to Ms. Khorram:  WTF

A.  A couple hours later.

You okay?

Q.  No, but you should talk to him.  I'm sure you don't want to get involved, but he said I was an asshole which I owned up to but no one deserves being dragged by their hair.  I locked the door for my safety.  I invited one girl BC he wanted her there.

P6GQcom2                        Sankar - Direct

I don't have my stuff.  I don't even have money.  I'm fucked.

A.  He went right up after you left and haven't seen him since, but I will try and talk to him when he's up.  And I can help when you want your stuff.  That red money pouch with cash should be in one of your bags.  I threw it to Ralph to put in there, so hopefully that will help till you come back here.

Q.  Thanks babe.  He's up texting me.

Then who are the next two messages between?

A.  Derek Roche and two different numbers for Kristina Khorram.

Q.  And how long after the prior message we read with Ms. Ventura and Mr. Khorram do those messages occur?

A.  A minute later.

Q.  I'll read Mr. Roche's messages if you can read Ms. Khorram's.

WTF.

A.  Ugh, I know.

Q.  Could we go to another batch of records starting at row 87 which is at the bottom of this page, through 92, at the bottom of -- at the bottom of the following page.

Okay.

When do these messages occur relative to the prior messages we read, approximately?

A.  These are about a year later.

Q.  What is the date of all the messages in rows 87 to 93?

A.  April 20, 2018.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.   What type of records are shown in these rows?

A.   These are text messages.

Q.   And who are they between?

A.   Cassie Ventura and Kristina Khorram.

Q.   Again, I'll read Ms. Ventura's message if you could please read Ms. Khorram's.

Hey, I'm sorry about last night.  I can't do the violent scary kick me out of my own house stuff any more.  I got Kerry and bounced.  I hope your night didn't suck.  I didn't get to do my sleep study last night because I rushed out and didn't even bring anything.  I have a lot to do today, including going to their office.  I called.  They haven't charged for canceling.  I don't even know what to say.  I just can't any more.

A.   Two hours later.  Are you okay?  I don't know what else to say but I'm here if you need anything, heart emoji.

Q.   Ms. Foster could we turn to the next page.  I'll just read the remaining messages on -- in the top three rows.  Or I'll read Ms. Ventura's if you could read Ms. Khorram's.

I'm okay, just bummed.  I don't know what's going on, but I just want to stay focused.

A.   I'm sure.  Stay focused though.  It's not worth de-railing, that much I know.

Q.   Definitely.

Does this chart also summarize certain records in

P6GQcom2                          Sankar - Direct

which Jane is a participant or is discussed?

A.   Yes.

Q.   Did we walk through some of those messages already?

A.   Yes, we did.

Q.   Now I want to talk about some other messages involving Jane on this chart and walk through those chronologically.

MS. FOSTER:   Ms. Foster, could we go to page 20.

Q.   Now, focusing on row 300, what is shown on that row

A.   A text message.

Q.   From and to whom?

A.   From Kristina Khorram to Sean Combs.

Q.   What is the date of that message?

A.   May 16, 2023.

Q.   Could you please read this message?

A.   FYI - Robin said she paid Jane's rent last week.

MS. FOSTER:   Okay.   I want to go to page 23.   Focusing on the group of records in rows 328 to 361, which continues through page 26.

Q.   How long of a time jump is there between these records and that one we just saw?

A.   Could we go back to the previous record?

Q.   Yeah.   It is 20 -- sorry, page 20.

A.   So about six months.

Q.   Okay.

A.   Five, six months.

MS. FOSTER:  Could we please go back to 23.

Q.  Are all of the messages in rows 328 to 361 sent on the same date?

A.  Could we scroll to 361, please.  Yes, they are.

Q.  Except for the last message -- oh no, you're right.  Sorry.

MS. FOSTER:  Could we go back to page 23?

Q.  What type of record are shown in these rows?

A.  These are text messages.

Q.  Who are they between?

A.  Jane and Kristina Khorram.

Q.  And are they all from the same exhibit, just looking at the source column, briefly?

A.  Yes, they are.

Q.  Could you please read just the first three messages from Jane to Ms. Khorram?

A.  Also just keeping it real W you.  I'm not doing any more hard partying.  We recently got into a pretty big fight, and I'm putting my foot down about it.  No more hotel nights and all of that stuff.  So I hope he's not expecting a hotel night type of vibe for me because I just can't.  I don't want to turn up like that.  Just wanna celebrate him like a normal person would.  I can definitely bring a cake and some flowers, and I can work on balloons.  Then Friday I'm going to wrap his gift up really cute and have it sent to the house and all that.

Q.  What is the date of this chat?

A.   November 2, 2023.

Q.   Can we please now go to page 26.  What is shown in row 363?

A.   That is a legal filing.

Q.   What is the name of that legal filing?

A.   Ventura v. Sean Combs, et al.

Q.   And what is the date of that filing?

A.   November 16, 2023.

Q.   How long after those last messages in which Jane said she's not doing any more hard partying is this legal filing from?

A.   Two weeks.

Q.   What are the next rows shown on this chart, 365 and 366?

A.   These are audio files found on Kristina Khorram's device.

Q.   What is the date of these two audio files?

A.   November 19, 2023.

Q.   How far apart are the times of the audio files?

A.   About 20 minutes.

Q.   And how much after the legal filing are these audio files?

A.   Three days later.

Q.   Now, again, what device were these found on?

A.   Kristina Khorram's device.

Q.   Directing your attention to the from and to columns, what does that indicate?

A.   That indicates who the participants within that audio recording might be.

Q.   And how did you determine that?

P6GQcom2                          Sankar - Direct

A.   I was shown a transcript by the prosecutors of prior
testimony which indicates that Jane acknowledges she listened
to this audio file, and it was her speaking on both with Sean
Combs.

Q.   And what is indicated in the content or file name column?

A.   That is the file name of the audio file found on the
device.

Q.   What is the audio file exhibit number for both of these
audio files?

A.   The first one is C-348-A-R, and the second one is
C-348-B-R.

         MS. FOSTER:  Ms. Foster, could we please play
Government Exhibit C-348-A-R.

         (Audio played)

         MS. FOSTER:  Can you also please play C-348-B-R.

         (Audio played)

         MS. FOSTER:  Thank you.

Q.   Again, whose device were those found on?

A.   Kristina Khorram's.

Q.   Now, is there a jump in time after these audio files?

A.   Yes.

Q.   Approximately how long?

A.   About three days -- two days.

Q.   What are the messages in the three rows below?  What date
are those from?

P6GQcom2                        Sankar - Direct

A.   November 21, 2023.

Q.   Who are they between?

A.   Kristina Khorram and Sean Combs.

Q.   And are these text messages?

A.   Yes.

Q.   Could you please read Ms. Khorram's messages, and I'll read Mr. Combs.

A.   If you cannot be honest with me, this doesn't work.  We literally just went through you choosing to keep things to yourself and hide them, and we know this put us where we all are now.  We all know what your kryptonite is and where you don't make the best choices.  And that downstairs was weird and felt like a lie.  It's not sitting right with me at all.

Q.   Come take my phone.

A.   Has nothing to do with taking your phone if you're starting to lie about anything to me.  I'm just saying that will break me.  And I'll just feel like we are about to live this shit all over again.

         MS. FOSTER:  Ms. Foster, could we go to the next page.

Q.   Focusing on the first five messages on this page, when are these sent relative to the ones we just read?

A.   A few hours later.

Q.   Can we go back?

A.   Few minutes later.

Q.   And who are the messages on this next page between?

P6GQcom2                          Sankar - Direct

A.   Sean Combs and Kristina Khorram.

Q.   Are these text messages again?

A.   Yes.

Q.   Can you read Ms. Khorram's messages and I'll read Mr. Combs.

     Make sure Robin is not doing anything dumb like not having that rent paid on time.  Can you make sure she paid for this month please.  And please let me know when she hits me because when you don't, it's not the best decision.  Call me. Why you not picking up?

A.   Robin said her rent was paid.

Q.   Okay.

     Now, turning to the next row, row 378, what is shown here

A.   This is an image found on Kristina Khorram's device.

Q.   And what does that image appear to be of?

A.   It's a picture of a phone screen with text messages on it.

Q.   Why do you say a phone screen with text messages on it?

A.   You can see the edges of the screen which indicates it's probably not a screenshot and most likely a picture of a phone screen.

Q.   What is the creation date and time of this image?

A.   December 28, 2023 at 12:23 a.m.

Q.   Do you know who sent and received this message?

A.   No.

Q.   Why not?

A.   There is no phone number or contact name listed in this image.

Q.   Can you read just the first three sentences of the message?

A.   I don't believe the lovely dovey stuff.  You don't need to go there with me.  I was confused and couldn't concentrate for three years and feel extremely exploited, heartbroken and manipulated by you.  In that time I lost many work opportunities following you around being high and coerced into this dark and humiliating lifestyle.

Q.   And does it continue?

A.   Yes.

          MS. FOSTER:  Now, Ms. Foster, can we turn to the next page.

Q.   What appears on this page?

A.   This is also an image of text messages chats on a phone.

Q.   Is that from the same date?

A.   Yes.

Q.   What is that date?

A.   December 28, 2023.

Q.   Can you read the last four gray bubbles shown in this photo?

A.   You are the only opportunist here.  You exploited the fuck out of me.  You win.  Three years of being used, and you had three years of fun with my body.  You broke me.  Our situation

P6GQcom2                       Sankar - Direct

has never ever been fair to me.  You asked me what I needed to move on, and now you're upset.

MS. FOSTER:  And, Ms. Foster, can we turn to the next page.

Q.   What is shown on this page?

A.   Text messages.

Q.   And when are these messages sent relative to that image we just looked at?

A.   On the same day.

Q.   Approximately how long after?

A.   Maybe a few hours after.

Q.   Who are the text messages between?

A.   Jane and Kristina Khorram.

Q.   Could you please read Jane's messages here?

A.   Hey, I know I would normally not involve you in anything, but he just threatened me about my sex tapes that he has of me on two phones.  He said that he would expose me and send them to my baby daddy.  He has been bothering me for two months after all I've been asking for is my space.  I keep telling him that I just need some time with God and that I need time to move on from him.

We broke up two weeks before the controversy for a lot of things stated in that lawsuit that I personally felt in my experience with him.  When shit hit the fan, I had already entered into my own depression caused by him.  He knew that and

all I asked for was my space and quiet time.  I'm traumatized from my experience with him, and I'm just privately healing and he keeps bothering me.  He invites to fly me out, and I politely decline each time.  Today he went from asking me who I'm seeing over and over again and saying he feels abandoned by him, how I've hurt him.  And when I reiterate all the trauma he's caused me and how mistreated I feel, he says I'm blackmailing him and started yelling and going crazy and saying charge him so we can both move on.

And after I did what he asked me to do, came up with a number for everything he's put me through.  Now he is threatening me and saying he would call the police and expose my tapes and send them to my child's father, and all of these evil ass bipolar psychotic episodes he's fucking having on me.  Mind you, these are sex tapes where I am heavily drugged and doing things that he asked of me for the past three years that I am currently recovering from.  It's all so extremely hurtful, very hurtful.  For him to exploit me all this time and then threaten me W sex tapes.  Please talk some sense into him because it isn't fair to me at all whatsoever. I'm beyond hurt by him.

MS. FOSTER:  Ms. Foster, can we turn to the next page?

Q.  What does Ms. Khorram respond?

A.  Hey there, about to read all this, and then call you in a bit.  I really haven't seen or spoken to him in two days

though.

Q.   And what does Jane respond?

A.   Yes.

Q.   Can you just read the first few sentences?

A.   I'm sure we're both emotionally drained right now.  It's okay, no need to call.  I'm just really stressed with him saying he would expose my sex tapes.

Q.   Sorry.  Can you just finish actually?

A.   I just sincerely want him to give me my space and quiet time.  I'm not bothering him at all for anything at all.  You are his right-hand woman, and woman to woman maybe if you hear my side, you can just simmer him down because he listens to you.  It's okay just enjoy your night.  I'm drained.  Been crying all day.  I'm fine.  Thank you KK.

Q.   Thank you.

          What shows up next on this chart?

A.   This is another image of a text message chat on the phone.

Q.   Does it appear to be related to the prior images?

A.   Yes.

Q.   When is this sent relative to that last text that we saw from Jane to Ms. Khorram?

A.   Two hours later.

Q.   And can you just read the last three bubbles in this photo?

A.   Threatening me with sex tapes with men you had me fuck for your entertainment.  Low.  You are the one who has shown your

truest colors to me.  I'm clearer than I've ever been.  So stop texting me and move on.  You have taken me away from my family and fucked up the whole move.  You win.

MS. FOSTER:  Can we please turn to the next page, Ms. Foster.

Q.  Does Ms. Khorram then write Jane a message?

A.  Yes.

Q.  At what time?

A.  5:34 a.m.

Q.  What does she write?

A.  Just tried you.

Q.  Okay.  Turning to the next three rows, rows 390 to 392, what is shown in these rows?

A.  These are videos found on Kristina Khorram's device.

Q.  Whose device were -- you've already answered.  Again, whose device were these found on?

A.  Kristina Khorram.

Q.  What is the date and time of these videos?

A.  December 28, 2023 at 6:07 a.m.

Q.  How long after that is that last text from Ms. Khorram to Jane?

A.  Half an hour later.

Q.  What generally do these videos show?

A.  These are videos of a phone with text messages pulled up on it.

P6GQcom2                         Sankar - Direct

Q.  Do they appear to be the same text messages we saw photos of?

A.  Yes.

MS. FOSTER:  Ms. Foster, can we just pull up the exhibit cited in the last row GX-C-362-E and play it.

(Audio played)

Q.  What do you hear in the background of this video?

A.  A woman's voice.

Q.  What appears to be holding the phone?

A.  Someone's hand.

Q.  Okay.  Do you see that hand in this picture?

A.  Yes.

Q.  What do you notice about the hand?

A.  It has like a long kind of manicured nail.

MS. FOSTER:  Now, Ms. Foster, can we go back to Government Exhibit 1411-R.  I want to walk through a final batch of mention from this chart.  Can we turn to page 31.

Q.  Ms. Sankar, directing you to the messages starting at rows 398 through 4014, which is on the next page, what is the date of all of these messages?

A.  February 18, 2024.

Q.  How long is that after which that conversation between Jane and Ms. Khorram and those photos were on her device?

A.  A year later.

Q.  Is it a full year?

P6GQcom2                          Sankar - Direct

A.   A little over a year later.

Q.   Sorry?

A.   Apologies.  It is two months later.

Q.   Okay.  And who are these messages between?

A.   Brendan Paul and Kristina Khorram.

Q.   Can you please read Ms. Khorram's messages, and I'll read Mr. Paul's.

        About to head to Jane's.  he's on a call walking around out back.  Seeing if he wants me to go as well.  Ask J9 to drive.

A.   Liked the previous message.

Q.   En route to guests.

A.   Yeah, that was me he was on the phone with.  LOL.  He mentioned going there.  You might need king stuff potentially.

Q.   He had me hop in super fast, so I don't have, but I'll make it happen if so.  I think he just wants to say what's up and check on her because she's been sick, so fingers crossed, I'll keep you updated.

        Is there a lapse of time between that message and the next one?

A.   Yes.

Q.   And how long?

A.   About three hours.

Q.   What does Ms. Khorram write?

A.   They just chilling at her house?

P6GQcom2                         Sankar - Direct

Q.   Yeah, he's just going with the flow.

A.   LOL, so basically he's lit?

Q.   Isn't lit lit.  I just spoke with him over the phone, maybe a little but seemed totally fine.

     And then is there another gap in time?

A.   Yes.

Q.   About how long?

A.   Six hours.

Q.   PD act -- is it the same participants?

A.   Yes.

Q.   PD active now.  Running to Wal-Mart for them.

A.   Like wild king mode active or Gucci bag active?

Q.   In between the two.

A.   Copy.

Q.   If that makes sense, LOL.

     Now that we've gone through a number of different mention from Government Exhibit 1411-R, did we go through all of the messages in this Government Exhibit or just some of them?

A.   Just some of them.

     MS. FOSTER:  Your Honor, if you want to take a break, we're about to turn to another chart.

     THE COURT:  Very good.  We're about to take a break at this time.  Be back in 15 minutes.  Thank you all members of the jury.

P6GQcom2

                    All rise

                    (Jury not present)

                    THE COURT:  Be back in 15.

                    (Recess)

                    THE COURT:  Ms. Foster, are we prepared to move
forward.

                    MS. FOSTER:  Yes, we are.

                    THE COURT:  Let's bring back Ms. Sankar, and then
we'll bring our jury in.

                    (Witness and jury present)

                    THE COURT:  Ms. Foster, you may proceed when ready.

                    MS. FOSTER:  Ms. Foster, can you now pull up
Government Exhibit 1410-R.

BY MS. FOSTER:

Q.  Ms. Sankar, is this another summary chart that you reviewed
for accuracy?

A.  Yes.

Q.  Can you please explain what Government Exhibit 1410-R
shows.

A.  This is a timeline of communications including text
messages between three participants:  Sean Combs Damion Butler
and Mia.  It also includes call records taken from call logs.

Q.  And is Mr. Butler also listed by an a/k/a here?

A.  Yes.

Q.  What is it?

P6GQcom2

A.   D-Roc.

Q.   What order are these calls and text messages listed in the summary chart?

A.   In chronological order.

Q.   Can we focus on the top row of page 1.

What is the earliest communication on this chart?

A.   November 18, 2023.

Q.   How many pages is this chart?

A.   11 pages.

MS. FOSTER:  Ms. Foster, can we go to page 11?

Q.   What is the last entry on this chart?

A.   February 7, 2024.

Q.   You mentioned before that one of the participants in these communications is someone named Mia, is that right?

A.   Correct.

Q.   Was Mia the real name of the person on the records you reviewed?

A.   No.

MS. FOSTER:  Your Honor, before I display the next exhibit, I would ask we turn over the overflow feed and TV screen again.

THE COURT:  Let me ask the deputy to confirm when that has been done.

DEPUTY CLERK:  Ready to proceed, your Honor.

THE COURT:  Ms. Foster.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MS. FOSTER:  Ms. Foster, can you display for the witness, the Court, and the jury what is in he evidence as Exhibit 3T-113.

Q.  Ms. Sankar, can you let me know when you see that.

A.  I see it.

Q.  Without saying the name, what type of document is shown in this exhibit?

A.  This is a passport.

Q.  How did you refer to the person shown in the passport in your chart?

A.  Mia.

Q.  Why did you refer to this person as Mia?

A.  I was told that Mia is the alias being used for this individual.

MS. FOSTER:  Thank you, Ms. Foster.  You can take this down.

Can you please publish Government Exhibit 1410-R again.

Q.  Now I want to go through each of the columns on this chart. Can we start with the first column titled date and time ET. What does that show

A.  That is the date and time the text message was sent or when the call was initiated.

MS. FOSTER:  We can turn back on the overflow screen. Great.  Thank you.

P6GQcom2

Q.   Is there a time zone listed for these records?

A.   Yes.

Q.   And what is that time zone?

A.   Eastern Standard Time.

Q.   Is that indicated by the ET?

A.   Yes.

Q.   What does the second column record type show?

A.   This indicates whether the row represents a text message or a call record.

Q.   And what does the from and to columns indicate?

A.   From is the sender of the text message or the initiator of the phone call, and then to is the recipient of the text message or the call.

Q.   Turning to the next column content/duration of call, what does that show?

A.   That shows the content of the text message sent or the duration of the phone call.

Q.   And finally, turning to the final column source, what does that show?

A.   That is the Government Exhibit I used to verify the accuracy of each row.

Q.   Now, before we go through this chart, I want to go through an example of how you verified the information of it.

        Ms. Sankar, can you please read the first two rows?

A.   November 18, 2023 at 7:12 a.m. Damien Butler to Sean Combs.

P6GQcom2

I need to hear your voice bro.  Love you, heart emoji.

Q.  11/19/2023, 10:36 a.m.  Text message from Sean Combs to Damien Butler.

Thank you for checking on me.  Really appreciate you. Love you.

Q.  What is the source for both of these messages?

A.  H-104-A1 and H-104-A1-R.

Q.  Is that the source you checked these text messages against?

A.  Yes.

MS. FOSTER:  Ms. Foster, can you pull up H-104-A1-R and turn to page 2.

A.  These are text messages shown in a cellphone extraction.

Q.  Are those the two texts we just went through in the chart?

A.  Yes.

Q.  Can you just walk through briefly how you confirmed the information on this chart using this exhibit?

A.  So first at the bottom right corner, that lists the date and time the text message was sent, so I made sure that was accurate.  And then if you look at top left corner, that is the from, the sender of the message, and the to, the recipient.  So I verified that the phone numbers were accurate, and then I used the stipulation we talked about previously to make sure that the owner or the contact name was connected to an individual we knew that used the phone number, and then I verified that the actual content of the message was also

P6GQcom2

accurate.

Q.   Here what time zone are the messages listed in?

A.   These are in Universal Coordinated Time.

Q.   What times were they listed than the chart we looked at?

A.   Eastern Standard Time.

Q.   How did you determine what time these messages were sent in Eastern Standard Time?

A.   I used a time converter.

Q.   From UTC to ET?

A.   Yes.

          MS. FOSTER:  Ms. Foster, can we go back to the first page of Government Exhibit 1410-R.

Q.   I now want to walk through the various entries on this chart in chronological order, and starting after the first two rows.

          Can you please read Mr. Butler's messages and calls, and I'll read the other party's messages and calls.

A.   November 23 at 1:14 p.m.  Damion Butler to Sean Combs.

          Happy Thanksgiving to you and the family.  I miss y'all.  I will send you a picture of my plate later.  Let's keep the tradition going on.  Let me see what your plate looking like.  Love you man.  Heart emoji.  See you soon.

          Then the next day in the evening.  Love you man.  I'm here for you.  I feel I need to see you and chill with you for a couple of days.  I didn't wanna be in your space.  I haven't

P6GQcom2

spoken to you, but just letting you know if you need a real friend I'm here.

Q. The following day, Sean Combs to Damion Butler: Love you. Calling you.

That same minute Sean Combs to Damion Butler. Call me.

A. Few minutes later, Damion Butler to Sean Combs: I tried calling you back. I will try again in ten minutes.

Q. About 20 minutes later Sean Combs to Damion Butler: Call you back, talking to the kids.

And just stopping there, it indicates that there are some calls between Mr. Combs and Mr. Butler. Does this chart summarize every single communication between them or just some?

A. Just some.

Q. Understood.

Can you read now starting at row 11?

A. Three days later, Damion Butler to Sean Combs: Hey, I will see you tomorrow this time. Love you.

Q. A few hours later Sean Combs to Damion Butler: Love you?

A. The next day Damion Butler to Sean Combs: Heading to the house.

And then the next day, Damion Butler to Mia: Hey what's up, Mia?

(Continued on next page)

MS. FOSTER:  Could we please turn to the next page.

Q.  That day, November 30, 2023, Mia to Damion Butler:  D-Roc, exclamation marks.

That same minute, Mia to Damion Butler:  "Hi, hi, hi.  How are you?"  Exclamation marks.

A minute later, Mia to Damion Butler:  "I miss so fucking much," exclamation marks, "ah."  Exclamation marks.

A.  A minute later, Damion Butler to Mia:  "A lot has been going on.  Where are you in the world?"

Q.  A minute later, Mia to Damion Butler:  "E.  Are you all good.  I'm in Virginia Beach at the moment.  Are you in NYC? How have you been with everything going on?"

A.  A few minutes later, Damion Butler to Mia:  "I'm about to call you."  And then Damion Butler calls Mia for 13 minutes and 29 seconds.

About an hour later Damion Butler to Sean Combs:  "can you text Mia's phone number."

Q.  About 15 minutes later, Sean Combs calls Mia for zero seconds.

A few days later, Sean Combs texts Damion Butler:  "hey, it's Puff.  Wanted you to have this number too since I'm on this phone today.  Thank you again for coming and being here with me today.  Love you brother."

A.  A few minutes later, Damion Butler to Sean Combs:  "OK, bro.  I'm coming back."

P6gWcom3                        Sankar - Direct

Q.  The next day, Sean Combs calls Damion Butler for 47 seconds.

The following day, Sean Combs calls Damion Butler for seven seconds.

On December 5, 2023 -- oh.  I read yours.  I'm sorry.

A.  On December 5, 2023, at 6:49 p.m., Damion Butler calls Sean Combs for one minute and ten seconds.

And then ten minutes later, Damion Butler texts Mia:  "Your boy said to call him.  He doesn't want anything or need you to do anything.  He just called me."

And then on February 2, 2024, about two months later, Damion Butler texts Mia:  "Good morning.  How are you doing?  Did you ever speak to P?  He called me a couple of days ago."

Q.  Later that day, Sean Combs texts Damion Butler:  "Call me, King."

A minute later, Sean Combs calls Damion Butler for four seconds.

A minute later, Sean Combs calls Damion Butler for two seconds.

That same minute, Sean Combs texts Damion Butler:  "call me.  Important."

A.  Ten minutes later, Damion Butler calls Sean Combs for four minutes and 57 seconds.

And then ten minutes later, Damion Butler texts Mia:  Are you OK?  I can't believe you're not hitting me back."

P6gWcom3                        Sankar - Direct

Q.  Later that day, Mia writes to Damion Butler:  "Hi, D.  So sorry.  I've just been scuba diving all day, and I didn't have my phone on the boat.  I'm OK.  I've been better, but I'm alive.  Hahaha.  How are you?  No, I haven't talked to him.  He only tried me once, and I missed it, b I don't have my phone alerts on ever, and I called back W no answer & left it at that and have terrible service here just in case my messages come through late.  What are you up to?"

A.  And then, I believe a few minutes later, Damion Butler texts Mia:  "I'm glad you're good.  Of course you're scuba diving.  You're crazy.  We're chilling in PA.  We're opening up another restaurant on the 17th.  Where you scuba diving at? Honestly, I haven't been seeing or dealing with people.  I'm in my own bubble.  I had enough.  I'll just keep in touch with the people that reach out to me and dude hits me from Tom Tom.  All I can do is give advice, moral support.  Love have a way.  Call me.  Feel me?  He told me he just wants to ask you something. He doesn't want nothing from you or anything.  Enjoy your time. When you get a minute, call me.  But where you scuba diving at? I seem to need skiing.  I need to show you off."

Q.  Later that day, Mia to Damion Butler:  "Ah, D.  Miss you so much," exclamation marks.  "I know how much shit you deal with all over and in every direction, and staying in your bubble is super smart to protect your mentality from any more bullshit than you need.  We've all got our own bullshit to take care of,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom3                          Sankar - Direct

right?  And sometimes when we are natural caretakers we tend to ignore our needs, and everyone assumes we're OK, but we need love/help/empathy too.  So just know it's OK to not be OK or to remove yourself from the takers from time to time so you can recharge and relax and take care of D-Roc.  I've been in my own bubble too, and I have all of my phone alerts on silent and hidden just to take steps to help myself because those alerts remind me of being in trouble, which is why I'm not quick at replying, so never take it personal.  It just means I haven't seen your message.  And I see your message, of course, I'll reply ASAP.  I love you so much."

And what does the CTP indicate at the bottom there?

A.  That just indicates that the message is so long it didn't all fit into one text block, and so it's continued on the next page in the next row.

MS. FOSTER:  Ms. Foster, can we go to the next page.

Q.  "I'm in this tiny little third world country island off of Honduras, where you don't have to wear shoes or brush your hair and you're in a bathing suit all day and drinks are like a dollar and nobody judges hashtag island life, but not glamorous, covered in mosquitoes and just in love with nature.  But I do charitable shit here, like helping out local families, grow small businesses, building their little houses, whatever they need, etc., (that I can physically do because I'm out of scrilla money).  Congratulations on your new restaurant.

That's fucking huge.  I'm so, so, so proud of you.  And APs love you all so much.  I def want to snowboard with you.  That would be the best video ever."

A.  Ten minutes later, Damion Butler to Mia:  "I'm so proud of you.  You're my sister for real.  If you need anything, I can help.  I'm not rich, but I'm not broke either.  I love you. Let's talk sometime tomorrow.  I want to hear your voice.  Plus I want to hear about Honduras.  I'm sure it's beautiful and peaceful.  Is there a time difference?  That might have been a stupid question, but hey, let me know so I can call you tomorrow."

Four minutes later, Damion Butler to Mia:  "Let me know how I can send you something."

Q.  Later that day, Mia to Damion Butler:  "You're my brother for real, forever, ever.  I don't care how many days, weeks go by.  I always know we pick up where we left off, and you're always my heart.  No, I'd never ask for anything.  I've never been in such a low spot/in debt.  But that's no problemo, and I'll figure it out one day, I hope.  But I'm always here to help you all out in any ventures or anything you all need, etc.," exclamation mark; Can sell dah.  That's not a dumb question about the time zone.  It's usually one hour behind NY, but they don't have Daylight Savings Time here, so sometimes it's two hours behind, like right now it's 8:53 p.m.  Tomorrow I'm diving, but call me whenever, and when I resurface I'll

call you back, of course, when/if I can find wi-fi," exclamation mark.  "Love you so much, D."  Exclamation mark.

A.   Three minutes later, Damion Butler to Mia:  "OK.  I will try you tomorrow.  And I know you didn't ask me for anything.  I'm allowed to send my sister a gift."

Q.   Thirty minutes later, Mia to Damion Butler:  "Hahaha.  Send me anything at all.  The little GPH file only pays for ages, big pop out of nowhere, universe synchronicities."

A.   A minute later, Damion Butler loved Mia's previous message.

The next day, Damion Butler texts Mia:  "I'm going to try to call you in 15 minutes.  If I don't catch you, I will try you later or tomorrow."

Q.   Later that day, Mia responds to Damion Butler:  "Hi, D.  Love you.  Try me manana, of course.  I was on a little boat all day and didn't have service."

That day, Mia writes to Damion Butler:  "staying in a tiny bungalow shack with no electricity or running water, but who cares when you can poop in this."  sends photo.

A.   The next morning, Damion Butler to Mia:  He laughed at the previous message and loved the previous image.  "I feel asleep last night.  I'm an early bird.  I'm up, like, 5 a.m. every day.  That water looks so good."

And then about six hours later, Damion Butler texts Mia:  "You up?"

And then about three hours later, Damion Butler calls Mia

for two seconds.

And then two minutes later, Damion Butler texts Sean Combs: "Hey, bro.  She hit me back.  I'm trying to call her now."

A minute later, Damion Butler texts Sean Combs a copy of a previous message that Mia had sent him.

Q.  Approximately three hours, later Sean Combs writes to Damion Butler:  "Let me know when you reach her."

Later that night, Sean Combs writes to Mia:  "Hey, Mia. It's Puff.  Let me know when you get ten min to talk.  Love."

Why are there -- just focusing on that row again, why are there asterisks on the date/time and from and to columns?

A.  So, these particular messages are actually a screenshot of a text conversation, and so we're not exactly sure of the time zone or who the participants in the conversation are.  We just have the contact names to go off of.

MS. FOSTER:  Can we pull up that screenshot, which is in evidence as 3T-102-R.

Q.  Is this the screenshot?

A.  Yes.

Q.  And does it say 9:10 p.m., February 4, 2024?

A.  Yes.

Q.  And you're saying you can't tell the time zone, is that right?

A.  Yes.

Q.  Why did you list the participants as Mia and Sean Combs for

this chat?

A.  In the first message, you can see that it says:  "Hey, Mia, it's Puff," indicating that this message is addressed to Mia. And it looks like Puff or Puff Daddy 2017 is the sender.

MS. FOSTER:  Can we go back to the 1410R chart.

Going to the next page -- oh, sorry.  We have two more.

The next day, Sean Combs called -- sorry, can we go back one page.

Q.  After Sean Combs writes:  "Hey, Mia.  It's Puff.  Let me know when get 10 min to talk, love," Sean Combs, the next day, called Mia for two seconds.

A.  And then about an hour later, Damion Butler calls Mia for three seconds.

MS. FOSTER:  Now can we go to the next page.

Q.  On February 6, 2024, at 6:12 a.m., Sean Combs calls Mia three times:  One time for three seconds; one time for two seconds; one time for zero seconds.

Two minutes later, he calls for six seconds and 11 seconds, and then about an hour later, he calls for four seconds.

And why are there asterisks in the time in rows 65 and 66?

A.  We also don't have time zones for those two calls.

Q.  They're not listed in the records?

A.  Correct.

MS. FOSTER: OK.  Can we go to the next rows.

P6gWcom3                          Sankar - Direct

Q.   The next day, at 6:08 p.m., Sean Combs writes to Mia:
"Hey, I don't want to be blowing up your phone.  Just needed to
talk to you for ten minutes.  Just need my memory jogged on
somethings.  You were my right hand for years.  I just need to
speak to you to remember who was even around me, and it would
be good to hear your voice.  But if you don't want to, all
good.  Just let me know.  Love.  Hope you're well."  Heart
hands emoji, prayer hands emoji, heart.
     And is this from that same screenshot we saw previously?
A.   Yes.
Q.   And is that why there's asterisks?
A.   Yes, correct.
Q.   That same day, at 5:20 p.m., Sean Combs writes to Damion
Butler:  "Hey, I don't want to be blowing up your phone.  Just
needed to talk to you for ten minutes," and continues to send
the message that he had just sent to Mia.
     Why are these messages out of order in this chart?
A.   So, because we don't have the time zone for the message in
row 68, in the screenshot it's listed as 6:08 p.m.  However,
due to later context in these messages, we can understand it
was sent before.
Q.   You mean it was sent, row 68 was sent after 69; is that
what you're saying?
A.   Yeah.
Q.   Sorry.  Before.

A.  Yeah.  Row 68 was sent before row 69.

Q.  I see.  So the time is after, but the context indicates that it may be before?

A.  Yes.

Q.  Got it.

15 minutes later, Sean Combs calls Damion Butler for four seconds.  And that same minute Sean Combs texts Damion Butler: "Call me when you can, king."

Can we go to the next page, please?

A.  At 5:40 p.m., on February 7, Damion Butler texts Sean Combs:  "I'm calling in ten minutes.  I'm pulling up to my house.  You're never blowing up my phone, bro.  Don't talk even talk like that.  I'm here whenever you want to talk.  I'm here to help in any way I can."

And then nine minutes later, Sean -- sorry.

Q.  Nine minutes later, Sean Combs sends an audio message to Damion Butler:  "No.  That's my fault.  That's what I sent to Mia.  I sent that message to Mia because I've been trying to reach her.  She ain't picking up the phone.  But yeah.  But hit me, when you get a couple of minutes.  Love.  Hope you're doing well."

And is that that context you meant?

A.  Yes.

Q.  Got it.

A.  And then a couple minutes later, Damion Butler calls Mia

for five seconds and then again for two seconds.

And then four minutes later, Damion Butler texts Sean Combs another copy of a message that Mia had previously sent to Damion Butler.

Q.   And is that a message we previously walked through?

A.   Yes.

Q.   And can we turn to the next page.

A.   And then a few minutes later, Damion Butler calls Sean Combs for one second and then texts Sean Combs:  "That's the last text I got from her, and now the phone is not even ringing but it's ringing like out the country."

And then Damion Butler calls Sean Combs two more times, once for three seconds and then another for two seconds.

A few minutes later, he texts:  "I feel like you text music phone.  I'm in the crib for the day.  I'm not going nowhere. I'm going to jump in the shower, so hit me back when you can."

Q.   Approximately 18 minutes later, Sean Combs calls Damion Butler for five seconds.

A.   And then about an hour later, Damion Butler calls Sean Combs for zero seconds.

MS. FOSTER:  We can take this down.

Q.   Aside from reviewing the charts you just testified about and preparing to testify today, did you have any other involvement in this case?

A.   No.

P6gWcom3                        Sankar - Cross

MS. FOSTER:  No further questions.

THE COURT:  All right.  Thank you, Ms. Foster.

Ms. Geragos.

MS. GERAGOS:  Thank you, your Honor.

CROSS-EXAMINATION

BY MS. GERAGOS:

Q.  Good morning, Ms. Sankar.  My name is Teny Geragos.  I just have a few questions for you.

A.  Good morning.

Q.  Why don't we just start with what we just left on, Government Exhibit 1410-R.  All right.

And this is the chart we just walked through, right?

A.  Correct.

Q.  OK.  And this chart starts on November 18, 2023, right?

A.  Correct.

Q.  OK.  And the first message there is from Damion Butler to Sean Combs saying:  "I need to hear your voice, bro.  Love you."  Right?

A.  Correct.

MS. GERAGOS:  And if we could pull up just very briefly 1411-R, page 26, please.

All right.  If we could go to line 363.

Q.  That is two days earlier, right, 11/16/23?

A.  Yes.

Q.  And it's a legal filing?

P6gWcom3                          Sankar - Cross

A.   Correct.

Q.   And it's Ventura v. Sean Combs, *et al.*, right?

A.   Correct.

        MS. GERAGOS:   If we could go back to 1410-R.  All right.  1410-R, the one we were at previously.

        OK.   We went through this in detail, so I won't spend too much time on it, but could we turn to page 4.  All right.

Q.   And this is a text message from Damion Butler to Mia, right?

A.   Yes.

Q.   Oak.   And here -- I won't go through the whole thing again, but Damion Butler says, about halfway down, "He told me he just wants to ask you something.  He doesn't want nothing from you or anything.  Enjoy your time.  When you get a minute call me." Right?

A.   Yes.

        MS. GERAGOS:   And if we could go to page 6.  All right.

Q.   And then line 41 is a message from Mia to Damion Butler, right?

A.   Yes.

Q.   OK.   And then if you look about halfway down that message, she writes, in parentheses, "that I can physically do BC I'm out of scrilla dollars," right?

A.   Yes.

P6gWcom3                        Sankar - Cross

Q.   OK.  And in response to that, Mr. Butler writes:  "I'm so proud of you.  You're my sister for real.  If you need anything, I can help.  I'm not rich, but I'm not broke either. I love you."  Right?

A.   Yes.

          MS. GERAGOS:  OK.  And could we go to the next page to see her response.  All right.

Q.   And then she says -- I'm skipping over some texts because we just went over them, but she says:  "No, I've never asked for anything.  I've never been in such a low spot/in debt, but that's my problem.  I'll figure it out one day, I hope," right?

A.   Yes.

          MS. GERAGOS:  If we could jump ahead to page 9.  All right.

Q.   Now we are on February 7 of 2024, right, from line 68, February 7 of 2024?

A.   Correct.

Q.   OK.  And now this is Mr. Combs's message to Mia, right?

A.   Yes.

Q.   OK.  And he says:  "Hey, I don't want to be blowing up your phone.  Just need to talk to you for ten minutes.  Just need my memory jogged on some things.  You were my right hand for years so I just want to speak to you to remember who was even around me.  It would be good to hear your voice, but if you don't want to, all good.  Just let me know."  Right?

P6gWcom3                        Sankar - Cross

A.  Yes.

            MS. GERAGOS:  OK.  And if we could go to the next

page, to line 72.  All right.

Q.  Now, this is the same day, right, February 7?

A.  Yes.

Q.  And this is Mr. Butler to Mr. Combs?

A.  Yes.

Q.  OK.  And Mr. Butler says:  "I'm here whenever you want to

talk and I'm here to help in any way I can."  Right?

A.  Yes.

Q.  And then Mr. Combs responds, right below this -- he has a

few lines, and he says:  "Because I've been trying to reach

her.  She ain't picking up the phone."  Right?

A.  Yes.

            MS. GERAGOS:  Now, if we could go to the last page,

page 11.  All right.

Q.  And this is same day, February 7?

A.  Correct.

Q.  OK.  And Mr. Butler says:  "That's the last text I got from

her, and now the phone is not even ringing but it's ringing

like out of the country."  Right?

A.  Yes.

Q.  And there's no -- after Mr. Butler says that to Mr. Combs,

there's no more calls recorded between Mr. Combs and Mia on

this chart, right?

P6gWcom3                        Sankar - Cross

A.   Not on this chart.

Q.   OK.  And there's no more calls recorded between Mr. Butler and Mia on this chart, right?

A.   Yeah.  Not on this chart.

Q.   OK.  And there's no more texts between Mr. Combs and Mia after this message, right?

A.   Not on this chart.

Q.   OK.  And there's no more messages between Mr. Butler and Mia, right?

A.   Not on this chart.

        MS. GERAGOS:  Not on this chart.  OK.

        All right.  We'll take that down.

        If we could pull up 1411-R, please.

Q.   All right.  So we went through how this was put together and your involvement in this, but generally, these -- this is a 33-page exhibit, right?

A.   Correct.

Q.   And it spans from 2016 to 2024?

A.   Yes.

Q.   OK.  So eight years?

A.   Yes.

Q.   All right.  And they're select messages from eight years into 33 pages, right?

A.   Yes.

Q.   Certainly not all of the messages sent on Ms. Khorram's

P6gWcom3                        Sankar - Cross

phone in those eight years, right?

A. Yes.

Q. OK. And generally, we looked at some text messages regarding flower or green and tree, right?

A. Yes.

Q. And then there were a few text messages about someone named Guido?

A. Yes.

Q. All right. And we saw some audio messages, right?

A. Yes.

Q. OK. And so this chart here starts on March 18 of 2016, right?

A. Correct.

Q. And are you aware that Ms. Khorram was working for many years before that?

A. No.

Q. OK. That's not part of what your review was?

A. No.

Q. OK. So you just received this, and this chart starts in 2016?

A. Yes.

        MS. GERAGOS: All right. If we could -- well, we looked at the chicken noodle soup text. So let's go to page 2. All right.

Q. So it jumps ahead from March 19 of 2016 to June 16 of 2016,

P6gWcom3                    Sankar - Cross

right?

A.  Yes.

        MS. GERAGOS:  All right.  Actually, let's go back to
page 1.  Sorry.  I missed a question.

Q.  All right.  Those bottom two messages, lines 24 to 25, you
see there's a message from Dave Shirley to Kristina Khorram
that says:  "Clayton Howard needs access to room"?

A.  Yes.

Q.  Was this the only message that you reviewed where Clayton
Howard is mentioned?

A.  I believe the one below it also mentions that name.

Q.  OK.  So right underneath it, one minute later, it's the
same message -- it's the same.  Sorry.  One minute later it
says the name Clayton Howard needs to be added to the hotel
room, right?

A.  Yes.

Q.  So these messages within one minute of each other are the
only times that Clayton Howard is mentioned, from what you saw?

A.  From what I remember -- I don't really want to look at the
whole chart again, but I believe so, in this chart.

Q.  OK.  And understand it's 33 pages, but from what you
recall, right?

A.  Yes.

        MS. GERAGOS:  OK.  So let's go to the next page.  All
right.  So we, if we go down to line 51 -- we didn't go through

these on direct so I just want to briefly go through them.

Q. We skip from March 2016 to June 2016, right, up ahead -- I mean up above?

A. Yes.

Q. All right. And then it skips ahead from June to August of 2016, right?

A. Yes.

Q. And this message is between -- what date is this message?

A. August 18, 2016.

Q. All right. And this is from Nat Moar 2022 to Kristina Khorram?

A. Yes.

Q. All right. So if you want to be Nat and I will be Kristina, what does Nat say?

A. "The story will run."

Q. All right. Can we go to the next page: "Shit, tonight?"

A. "Yes, we are all waiting.

    "The only reason it's running is because of police report.

    "TMZ has not run yet."

Q. And then Kristina sends Nat a screenshot there. Do you see that?

A. Yes.

Q. OK. And this says: "Diddy and Cassie have called it quits following an explosive argument that ended with cops rushing to her home, TMZ has learned.

P6gWcom3                         Sankar - Cross

"Sources close to the couple tell TMZ they got into a heated argument in a car Wednesday afternoon after Cassie told Diddy she wanted to break up. We're told Diddy got pissed off and suspicious enough to grab her phone and started scrolling through.

"Our sources say Diddy jumped out of the car in Beverly Hills, phone in hand, and she took off with the driver.

"Diddy eventually came home and returned the phone but then took two cars parked outside.

"Cassie told her mom about the phone incident before Diddy came home and returned it, and the mom called the cops on him."

Right?

A.  Yes.

     MS. GERAGOS:  Then it continues.  OK.  And then Nat --

Q.  You can be Nat.

A.  "Is it bad?"

Q.  "They spun it so it looks like a breakup fight.  But it's what I expected/it's short."

Next page.  And then she sends a TMZ article?

A.  "It's better than it was.  It's fine.  I'm so happy it's just this."

Q.  "It definitely could have been worse."

And can we -- do you see how it says the source for this is C-354?

A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom3                       Sankar - Cross

MS. GERAGOS:  OK.  Could we go to C-354C, please, which is in evidence.

Q.  OK.  Is this a message between Nat Moar and K.K. main phone on the same date, August 18, 2016?

A.  Yes.

Q.  OK.  And again, we went over this, but the 2886 number associated with K.K. main phone, you saw from the stipulation is Ms. Khorram, right?

A.  Yes.

MS. GERAGOS:  OK.  Could we go to page -- could we go to page, the last page of this exhibit.

OK.  If we could go -- sorry, the page before and this page next to each other.

Q.  All right.  Does Nat say there:  "On with Cassie"?

A.  Yes.

Q.  All right.  And Ms. Khorram says:  "OK.  After?"

A.  Yes.

Q.  All right.  And Nat says:  "Who gave you this?  Call office."  Right?

A.  Yes.

Q.  And Ms. Khorram writes:  "They're running it now"?

A.  Yes.

Q.  And then it says:  The story will run -- shit -- tonight."  Right?

A.  Yes.

P6gWcom3                          Sankar - Cross

Q.  OK.  So the "on with Cassie" and "OK, after," those were not included in the chart, right?

A.  No, I don't think so.

Q.  OK.  And then if we go to the next page, Nat says, about halfway down the page, "The only reason it's running is because of police report."  Right?

A.  Yes.

Q.  And Ms. Khorram says:  "He says can you text me what they say after you speak to them, please, so I can show to him?"

A.  Yes.

Q.  And then Nat responds:  "She is worried it's running and wanted me to get story in advance.  I told her that cannot happen."  Right?

A.  Yes.

        MS. GERAGOS:  All right.  We can take that down.

        OK.  If we could pull up again -- get the numbers right, 1411.  Perfect.  OK.

Q.  If we go to those last two lines, lines 66 and 67.  Those are messages from Ms. Khorram to Ms. Ventura?

A.  Yes.

Q.  OK.  Can you read those?

A.  "Hey, love.  Just wanted to send to you in case PR hasn't already so you don't get blindsided.  How are you doing through all this?  Know it's a lot for you too.  Here for you if you need me."

P6gWcom3                          Sankar - Cross

MS. GERAGOS:  OK.  Let's go to the next page.  All right.

Q.  So we've skipped ahead from August 2016, and now the create date of this message in line 69 is September 30 of 2016, correct?

A.  Correct.

Q.  So that date and time and time zone reflects the metadata, but it doesn't reflect the actual date of the messages, right?

A.  Correct.

Q.  OK.  And then there's a blue line there, and we skip ahead almost a year, until May 2 of 2017, right?

A.  Correct.

Q.  OK.  And these messages we went through on direct examination, so I won't go through them all again, but were you asked to include any other exhibit from May 2 of 2017?

A.  No.

MS. GERAGOS:  OK.  Could we pull up what's already in evidence as Defense Exhibit 1616.  All right.

Q.  Is this -- if you tilt your head to the right, are these messages on May 2 of 2017?

A.  Yes.

Q.  OK.  And these were not included in your chart, right?

A.  No.

MS. GERAGOS:  OK.  Could we go to the next page, please.

P6gWcom3                        Sankar - Cross

Q.  Have you seen these messages before?

A.  No.

        MS. GERAGOS:  OK.  Could we go to the next page, please.

Q.  Have you seen this before?

A.  No.  Not that I remember.

        MS. GERAGOS:  OK.  All right.

        Could we go now back to 1411-R.  Thank you.  And go to page 6.

Q.  All right.  So if we look at lines 82 -- 80 to 85, I can be Ms. Ventura and you can be Ms. Khorram.

    Ms. Ventura says:  If I can come get my stuff when he's knocked, LMK, BC I might go home to FT."

A.  "Of course.  Always here for you, hope you know that."

Q.  "I do.  Love you."

A.  "Love you too."

Q.  All right.  And then if you look, then there's another, about a year period between these two messages; that's what the blue indicates?

A.  Correct.

Q.  OK.  And then again, we went through these messages on direct, so I'm not going to belabor it, but on 89, what does Ms. Khorram write to Ms. Ventura?

A.  "Are you OK?  I don't know what else to say, but I'm here if you need anything."  Heart emoji.

P6gWcom3                              Sankar - Cross

Q.   All right.  And then we leave off at April 20 of 2018.  And
how long of a gap is there between 92 and 94?

A.   About six months, maybe -- sorry, about a year.

Q.   Year and a half?

A.   Year and a half.

Q.   OK.  There's no messages included here from the summer of
2018, right?

A.   No.

Q.   And nothing from the fall of 2018?

A.   No.

Q.   And really nothing until almost the very last day of 2019,
right?

A.   Correct.

Q.   OK.  And if we look at the messages 94 to 99, those are the
only messages included from the year 2019, right?

A.   Correct.

Q.   OK.  And they're all from the same day, does that sound --
does that look right?

A.   Correct.

Q.   OK.  And then if you look at 2020, 2020 is fully captured
in lines 101 to 110, right?

A.   Correct.

Q.   OK.  And the messages here, in 2020, they span four
different days, right; there's May 17 of 2020, May 18 of 2020,
May 19 and then July 24 of 2020?

P6gWcom3                        Sankar - Cross

A.   Correct.

Q.   OK.  And if you look at line 106, let's just -- let's take 105 to 110, Phil Pines writes:  "Is he going somewhere?"  And you can be Ms. Khorram.

A.   "Personal store run.

     "With Faheem."

Q.   "He dismissed me.  About to do EOD."

A.   "Copy thanks.  Think they will go for a while?

     "Liked 'yeah with Guido stopping by for sure.'"

Q.   OK.  If we go up ahead, to line 101, Phil Pines write to say Ms. Khorram:  "He got somebody from someone, blue pills, probably molly.

     "Just FYI."  right?

A.   Yes.

Q.   And then is Ms. Khorram's response with the face palm emoji?

A.   Yes.

Q.   OK.  All right.  And so then the blue indicates another about year, over a year has passed between messages, right?

A.   Yes.

Q.   OK.  And here, I can bring it up if you want, but this is a message between Ms. Khorram and Sean Combs in response to him asking if she can look at his phone.  Does that sound right?

A.   If I could take a look at the exhibit, I could verify that.

          MS. GERAGOS:  OK.  Let's look up C367.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6gWcom3                          Sankar - Cross

All right.  If we go to the next page, next page, next page.  Let's just keep going until we find it.  Next page, next one, next one.

All right.  Let's go back.

We don't have to do it.  We can take it down.

All right.  It's because we pulled up the wrong message.  I think that's the problem.  It's C367.  OK.  Next page.  All right.

Q.  So do you see here your message, which is included -- not your message, the message which is included in your chart: "Yes, I have been checking.  Only new messages that haven't been opened."

A.  Yes.

Q.  Did you listen to the audio message right before it?

A.  I don't believe I listened to it, no.

Q.  OK.  You just verified that the message that was on the chart was the message that was in the original message?

A.  Correct.

MS. GERAGOS:  OK.  So let's go back to the chart then. OK.

Q.  So here it says:  Yes, I've been checking, only new messages that haven't been opened."

And then if we skip ahead, it says:  "Paul Cowboy wrote available."  right?

A.  Yes.

P6gWcom3                        Sankar - Cross

MS. GERAGOS:  And could we pull up what's already in evidence as Defense Exhibit 3016, page 14.

Q.  All right.  Have you reviewed this message at all?

A.  I don't believe so.

Q.  OK.  And is the contact name here Paul Cowboy?

A.  Yes.

MS. GERAGOS:  All right.  We can take it down.

OK.  We can go to the next page, please.  All right.

Q.  We went through some of these, but do you see down below, on November 14 of 2021, there were text messages between Mr. Combs and Ms. Khorram?

A.  Yes.

Q.  OK.  If we could go to -- so you included several text messages here, right?

A.  Yes.

MS. GERAGOS:  All right.  So if we go to the next page.  All right.

Q.  And then it ends at line 129, right, that message chain?

A.  Yes.

MS. GERAGOS:  OK.  If we could go to the underlying record, C-622-1-R, please.  And go to page 12.  OK.

Q.  Is that a message from Ms. Khorram to Mr. Combs on that date, at the top?

A.  Yes.

Q.  And she says:  "Checking in on you.  You OK over there?"

A.   Yes.

Q.   And that wasn't included in the chart, right?

A.   No.

MS. GERAGOS:   OK.   We could go back to the exhibit. All right.

Could we go, please, to page 9.   OK.

Q.   If we could go to lines 139 to 140, I don't think we read through these on direct, these are from several days later, right?

A.   Yes, three days later.

Q.   OK.   Could you be Jane and I'll be Ms. Khorram?

A.   "Hey, hun.   Hope you're doing well.   Sorry for this late text.   I think I'm having a bad comedown from the week.   I just want to make sure Sean is OK and not feeling bad.   Just checking in.   TY.   Good night."

Q.   "Hi, love.   Aww.   I'm sorry to hear that.   Yeah, he's been good actually since we got here.   He's been up and moving and in great spirits.   Maybe try taking 5HTP.   Sometimes I know that helps people.   Also trying to think of the other stuff that helps...maybe like happy weed?   To help with an upswing? Also I know like pure chocolate helps with something in your brain too.   I'll see if there are any other tricks too.   You might also just need extra sleep," exclamation point.

Can we go to the next page, please?

A.   "Hey, hun.   Good morning.   OK.   That's so good to hear.

Honestly you're right.  Maybe I was just going and going because I was having a bit of vertigo for about two days.  I drank OJ AND vitamins yesterday.  I'm waking up finally feeling normally.  Going to get all those things you listed.  Thank you, hun.  Have a great day today."

Q.  We didn't look at these on direct, but if we go down to lines 146 to 160, and these are from about a month later, right, December 30, 2021?

A.  Yes.

Q.  OK.  And if you could, Jane writes to Ms. Khorram:  Hey, babe.  I was just trying to get a hold of Sean.  It's a little time sensitive.  Would you mind telling him to give me a call?  Thanks so much, babe."  Right?

A.  Yes.

Q.  Then if we could go down to line 55, Jane writes:  If he wants he can drop it off at my building as well if it's any easier.  Maybe place in a shoe box or something.  My front desk can hold for me.  Just an option."

    And Ms. Khorram responds:  "PD talks to him directly.

    "I don't speak with him.  LOL."  right?

A.  Yes.

Q.  Then line 159, Ms. Khorram writes:  FYI, PD said the package will be dropped to Mapleton for you to pick up."  Right?

A.  Yes.

P6gWcom3                          Sankar - Cross

Q.  You don't list any calls between them in these messages, right, between Jane and Ms. Khorram?

A.  Not on this chart.

MS. GERAGOS:  OK.  If we go to the next page, please.

Q.  All right.  So we -- if we could look at lines 169 and below, these are from February 12, 2022, right?

A.  Yes.

Q.  And we looked at those, 169 to 171, right?

A.  Yes.

Q.  On direct.

OK.  So if we go to line 163, these are between Jane and Ms. Khorram, right?

A.  No.

Q.  Did I say the wrong -- I should have -- 173 to 175 are between Jane and Ms. Khorram, right?

A.  Yes.

Q.  OK.  So Jane writes:  "Hi, hun.  Yes, pulling up to airport, yay," with a smiley face, right?

A.  Yes.

Q.  "How are you?

"Hopefully the 14th morning is OK w the room.  I'm excited to surprise him."

And what does Ms. Khorram respond?

A.  "OK.  Great.  I'm good.  It all always works out."

Q.  OK.  And if we could unzoom, then Jane asked, on line 179:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

"Just thinking ahead.  He always bringing cash, so maybe when security arrives, should they also have that with them?  He always bring around 5 to 10K."  Right?

A.  Yes.

Q.  If we could go to the next page, line 185, this is from Jane to Ms. Khorram, right?

A.  Yes.

Q.  And she says:  "K.K.  Still landing at 2P, right?  Then 45-min drive to hotel?  I went to run an errand and also they're expecting ppl to leave the presidential suite by 12P hopefully and room decor begins at 1P, takes 30 to 40 minutes."  Right?

A.  Yes.

Q.  You didn't include any photos of the room decor in this chart, right?

A.  Not in this chart.

MS. GERAGOS:  OK.  Could we just bring up very briefly for the witness what's already in evidence as Government Exhibit E-119 and E-120 next to each other -- E -- yeah, perfect.  And E-120.

Q.  Have you seen these before?

A.  No.

MS. GERAGOS:  OK.  We can take those down, and we could bring up E122 and E123 next to each other.

Q.  All right.  Have you seen these before?

P6gWcom3                        Sankar - Cross

A.  No.

Q.  OK.  And they were not included in your chart, right?

A.  Not in the chart, no.

MS. GERAGOS:  OK.  If we could go back to our exhibit, please.  If we could go to -- we were just on page 12 -- perfect -- lines 193 to 195.

Q.  Jane -- Ms. Khorram texts Jane:  "Hi, love.  Here with P now and wanted to work on booking you on the Thursday night redeye he said so you can land Friday morning.  LMK if that still works and we will get locked in," exclamation, right?

A.  Yes.

Q.  And that's about, almost, a little over two weeks after the messages we just looked at?

A.  Yes.

Q.  And Jane responds:  "Hey, love.  Yes let's do it," with a winkie, a wink face?

A.  Yes.

MS. GERAGOS:  Let's skip ahead to page 15 -- actually, sorry.  Page 14.  I misread.  All right.  Lines -- starting at lines 205.

Q.  This is again March 3 of 2022?

A.  Yes.

Q.  All right.  And these are more texts between Ms. Khorram and Jane?

A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom3                        Sankar - Cross

Q.  And Ms. Khorram writes, in line 205:  Hey, per PD, can you swing by Mapleton on your way to airport to pick up Guido package?"  Right?

A.  Yes.

Q.  And you don't note in here any phone calls between Ms. Khorram and Jane, right?

A.  No.

MS. GERAGOS:  OK.  All right.  Now let's go to page 15.  OK.

Q.  So if we look at July 23 of 2022, there are several messages here between Ms. Khorram and Mr. Combs, right?

A.  Yes.

Q.  All right.  And the underlying exhibit here is C657, right? Do you see that, and C657A?

A.  Yes.

Q.  OK.  And here the messages that are included are:  "Yeah, been working on it.  London sold out so waiting on other options."  Right?

A.  Yes.

Q.  And that's -- and then we go -- there's an audio message, an "OK," and "Guido outside," right?

A.  Yes.

MS. GERAGOS:  All right.  And if we could go to the underlying exhibit, please, C657.

All right.  And if we could go to the last page --

P6gWcom3                          Sankar - Cross

sorry.  Page 14.  For C657.

I think this is the wrong exhibit.  OK.  Sorry.

Could we go back to the actual exhibit, 1411R, to page 15, please.  OK.  That appears to be a mistake.

Can I confer with Ms. Foster, please?

THE COURT:  Yes, you may.

MS. GERAGOS:  Thank you.

Could you give me two minutes to check my computer?

THE COURT:  Yes.  That's fine.  While we're waiting, I'm going to stand up for a second, if anyone wants to join me.

MS. GERAGOS:  The collaboration is working again, and I believe Ms. Foster will pull up the new 657.

THE COURT:  All right.

MS. GERAGOS:  And then we'll go back to our system.

THE COURT:  All right.  OK.

So everyone can be seated at this time and we'll proceed.

BY MS. GERAGOS:

Q.  All right.  Just to reorient ourselves, we were looking at 23 of 2022 on 1411-R.  Remember that?

A.  Yes.

Q.  Then I had asked to go to the underlying record, which was C657, right?

A.  Correct.

Q.  OK.  And so these were the messages that we were just

looking at:  "Yeah, been working on it, London sold out.  Still waiting on other options."  Right?

A.  Yes.

MS. GERAGOS:  If we could go to page 14 of that exhibit.  OK.

Q.  If you go to the bottom, Ms. Khorram writes:  "Booking Waldorf same room.  Joey there now.  Room will be ready in two hours."  Do you see that?

A.  Yes.

Q.  The number associated with Mr. Combs writes:  No, don't book."  See that?

A.  Yes.

MS. GERAGOS:  OK.  Thank you so much, Ms. Foster.  I think we can move back to Mr. McLeod.  Thank you.

OK.  He's got it.

Q.  OK.  Those messages, "no, don't book," are not included in this chart, right?

A.  No.

Q.  OK.  Just "London sold out" and "waiting on other options," right?

A.  Correct.

Q.  And "Guido outside" below is also included, right?

A.  Correct.

Q.  All right.  And these messages on page 15 are all from 2022?

P6gWcom3                        Sankar - Cross

A.  Yes.

MS. GERAGOS:  If we could go to the next page, page 16.  All right.

Q.  This is now -- if you look at line 248, which we went through on direct, that is November 24 of 2022?

A.  Yes.

Q.  About five months after the message we just saw, right?

A.  Yes.

Q.  And then Mr. Combs writes:  "Molly 15 pills/don't.  Text think -- though."  Right?

A.  Yes.

MS. GERAGOS:  All right.  And let's go to -- let's go to the next page, to page 17.  All right.

Q.  Now these messages are February 25 of 2023, between Ms. Khorram and Jane.  Do you see that, lines 253 to 256?

A.  Yes.

Q.  OK.  And Ms. Khorram write to say Jane:  "Hi, hope you're great.  Call me when you get five min.  Thanks."

And how about two hours later:  "sorry to bother but trying to make plans and he is pushing me to get an answer today," exclamation point, "LMK.  Will just be a two min call."  right?

A.  Yes.

Q.  About two minutes later, what does Jane write to Ms. Khorram?

A.  "Hey, K.K.  Happy belated birthday.  Sorry.  Just not in

the mood to talk on the phone.  My answer to him was no and it is still no.  Thank you.  Hope you're great too."

Q.  And then two minutes later, Ms. Khorram writes to Jane: "Aww, thank you," exclamation, exclamation, "Ahh.  OK.  Sorry. Didn't know that part.  Will let him know.  Keep me posted if anything changes.  XX," exclamation point, right?

A.  Yes.

MS. GERAGOS:  And if we could go to page -- just go to the bottom.

Q.  On April 14 of 2023, this is a text message from Faheem to Robin, Mr. Combs and Ms. Khorram, right?

A.  Yes.

Q.  And here, it says:  $1,200 spent on flower today.  $1,500 owed to Guido for misc.  Let me know if approved to pay." Right?

A.  Yes.

MS. GERAGOS:  All right.  Could we go to the next page, page 18, line 280, and -- all right.

Q.  That message is April 24, 2023, again from Faheem, right?

A.  Yes.

Q.  And it says:  "Per Joey looking to get $4,800 approval for tree today.  This should be enough to last four weeks.  Let me know if approved."  Right?

A.  Yes.

MS. GERAGOS:  OK.  If we go to page 19, please, we

P6gWcom3                          Sankar - Cross

didn't go through some of these messages.

Q.  At the top, lines 287 to 288, and bottom part of Ms. Khorram's message to Mr. Combs, on line 287, says:  Today seems stress driven.  Let's turn it around and breathe.  Try and have fun at the game and then you will have your release moment tonight at the studio.  We control our own energy.  Stay light."  Right?

A.  Yes.

Q.  And he says:  "I want Frank.  I don't want to speak to anyone.  I'm done.  And if you can't get me better, I can't take no more.  I can't.  My life is the same bullshit every day.  I'm about to cancel everything.  Presentation not done. Album not done.  Video not done.  New video not done.  Roots not done.  Assistants out of wack.  June can't remember a T-shirt.  Ect.  Ect.  Ect.  Wack."  Right?

A.  Yes.

Q.  If we go to line 290, right below it, this is another message from Faheem, right?

A.  Yes.

Q.  And it says:  "$2,000 PD personal," right?

A.  Yes.

Q.  And then:  "$5,000 PD personal"?

A.  Yes.

Q.  And "$5,300PD personal"?

A.  Yes.

P6gWcom3                          Sankar - Cross

Q.   And "$2,500 approved for Flower approved 4/25 Joey," right?

A.   Yes.

          MS. GERAGOS:   Could we just go to the next page to line 302.   OK.

Q.   And this is another message from Faheem to the same group chat, right -- same group of people, I should say.   I don't know if it's same group chat.

A.   Yes, same group of people.

Q.   OK.   And this is:   "Joey expenses spent out of pocket and need to be reimbursed," and this says -- I'm paraphrasing -- flower $3,100, right?

A.   Yes.

Q.   "Tips at clubs, $200"?

A.   Yes.

Q.   "Space 2560," right?

A.   Yes.

Q.   Bathroom attendant 1,000?

A.   Yes.

Q.   "New flower to be delivered soon, 3350," right?

A.   Yes.

Q.   OK.   And then Mr. Combs writes "approved," right?

A.   Yes.

          MS. GERAGOS:   If we could go to page 21, please.   All right.   Lines 309 to 313, I don't think we went through these on direct, so I'll go through them quickly.

P6gWcom3                          Sankar - Cross

Q.   These are from June 17 of 2023?

A.   Yes.

Q.   OK.  And Ms. Ruiz writes, I put Jane's number on there as well, right?

A.   "I put Jane's name on there."

Q.   I'm sorry.  Name on there as well.  Thank you for catching that.

     And Ms. Khorram responds:  "and Paul the trainer was added to the manifest."  right?

A.   Yes.

          MS. GERAGOS:  Could we go to the next page, page 22, and -- all right.

Q.   Lines 316 to 318, these are July 17 of 2023?

A.   Yes.

Q.   And OK, this is again same, same group, Faheem, Robin, Mr. Combs and Kristina Khorram?

A.   Correct.

Q.   And then he says:  "Team need to approve this request from PD/15K cash approval in L.A. for PD personal," right?

A.   Yes.

Q.   And Mr. Combs, on line 318, approves it, right?

A.   Yes.

Q.   And you didn't have any -- you don't have any messages around here about hotels or anything like that included in the chart, right?

P6gWcom3                         Sankar - Cross

A.   Not in the chart.

         MS. GERAGOS:  Not in the chart.  OK.

         OK.  Could we go to page 23.  I think that for this
next part, your Honor, we would need to shut off these screens
and the overflow screens because I don't think the source
exhibit is redacted.

         THE COURT:  I'll ask the deputy to confirm when that's
done.

         (Continued on next page)

BY MS. GERAGOS:  (Continued)

Q.  These on page 23, these are messages on November 2 of 2023, right?

A.  Correct.

Q.  And these that we're looking at generally are between Jane and Ms. Khorram, right?

A.  Yes.

Q.  And it starts with Jane to Ms. Khorram saying:  Also just keeping it real W you, I'm not doing any more hard partying.

And we read those messages on direct, right?

A.  Yes.

Q.  Do you recall that?  Okay.

THE COURT:  Ms. Geragos, I think we're ready to go.

MS. GERAGOS:  Perfect.

Q.  If we could pull up C-250, please.  This is the underlying source Government Exhibit, right?

A.  Yes.

MS. GERAGOS:  Okay.  If we could zoom out, please. This starts at 6.  Could we go page before, please.

All right.  So it starts if we could go to line 1 through 3 and zoom there.  Perfect.

Q.  And these are messages between Jane and Ms. Khorram, right?

A.  Yes.

Q.  And these are the earlier messages from what we just saw?

A.  Yes.

P6GQcom4                          Sankar - Cross

Q.   Okay.  And, again, on November 2 of 2023?

A.   Yes.

Q.   And Ms. Khorram writes to Jane:  Hi.  Call me when you can.

And Jane responds:  Okay.  Gonna FT audio call you, right?

A.   Yes.

Q.   And about 40 minutes later, Jane writes to Ms. Khorram: Feeling so bad and ill prepared.  I would have had this super cute, but honestly wasn't prepared till after London.  Loose what he was telling me, so I had a take care of a lot of things on my end today, you know.  Would it be okay if you guys booked a private room for us maybe for dinner?

I thought the private room at Cecconi's was cute because it has a heart in it, but I don't know about the food or ...  go to the next page.

He also enjoys the food at Ocean Prime, but it's kinda running joke place with us cus it's always where we go, LOL, like good old Ocean Prime.  Or Baltaire is really sleek and cute, the room there too, right?

A.   Yes.

Q.   You see those messages?

And then the message is the one in the chart.  Does that look right?

A.   Yes.

MS. GERAGOS:  Let's take this down.  And once we take

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6GQcom4                          Sankar - Cross

it down, now we can put the screens back on, your Honor.

Is it on in the overflow?  Great.  We can now let's skip ahead to page 26.

Q.  Here we listened to the audio at lines 365 and 366 on direct, and then the next message is about five hours later that -- I'm sorry -- two days later that Ms. Khorram writes to Mr. Combs, right?

A.  Yes.

Q.  She says:  If you cannot be honest with me, this doesn't work.  We literally just went through you choosing to keep things to yourself and hide them, and we know this put us where we all are now.  We all know what your kryptonite is and where you don't make the best choices.  And that downstairs was weird and felt like a lie, and it's not sitting right with me at all, right?

A.  Yes.

Q.  And he says:  Come take my phone.

And she says:  Has nothing to do with taking your phone.  If you're starting to lie about anything to me, I'm just saying that will break me, and I'll just feel like we are all about to live this shit all over again, right?

A.  Yes.

Q.  And if we look at the next page on page 27, the messages now jump from November 21 of 2023 to December 28 of 2023, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6GQcom4                         Sankar - Cross

A.   Yes.

Q.   And we read part of the message in line 378 here, do you remember that?

A.   Yes.

Q.   Can you read that entire message starting at "I was confused" and read the whole one this time?

A.   I was confused and couldn't concentrate for three years and feel extremely exploited, heartbroken and manipulated by you. In that time I lost many work opportunities following you around, being high and coerced into this dark and humiliating lifestyle.  Meanwhile, my peers and colleagues excelled in both meaningful and personal relationships and financial stability. Whereas in three years I turned down work opportunities and healthy relationships to cater to all your exhausting fetishes and needs.  I feel sexually exploited, mentally damaged, and emotionally drained by you.  I want my wasted three years of time reimbursed and given back to me in the monetary amount of 100K per year and 15 months left of our two year agreement of rent.  $450K to move on from the resentment of feeling exploited, manipulated, heartbroken, drugged, and all the loss of potential income.

          MS. GERAGOS:  We can unzoom.  Skip ahead to page 30, please.

Q.   All right.  There these are on the same date of December 28 of 2023?

P6GQcom4                         Sankar - Cross

A.  Yes.

Q.  And then there's another screenshot on 386 at 12/28/2023.
Do you see that?

A.  Yes.

Q.  I shouldn't say screenshot.  There's a -- I think you said
it appeared to be a photograph of a screen?

A.  Yes.

Q.  Which is slightly different, right?

A.  Correct.

Q.  And then here, it says:  You baited me into this psychotic
bipolar episode today.  I have been leaving you alone.  I
should have never engaged, right?

A.  Yes.

Q.  Do you see that message?  Okay.

        MS. GERAGOS:  If we could go to page 31, please.

        If we could look at lines -- sorry -- line 394.  This
is a different group chat.

Q.  This is February 9 of 2024 between Brendan Paul,
Ms. Khorram, J9 and Faheem, right?

A.  Yes.

Q.  This says:  Hi.  Following up on cash reimbursement.  KK is
aware and wanted me to make this thread.  The following is
downward arrow $4,200 flower, $125 store run for personal
items, $85 for online personal order, $780 for personal Gucci
items, right?

P6GQcom4                        Sankar - Cross

A.  Yes.

Q.  And Faheem says:  We got you covered once Duke come on shift, right?

A.  Yes.

Q.  And then these next chats on February 18 of 2024, do you see those from 398 down?

A.  Yes.

Q.  These messages -- these messages don't mention anything about a hotel, right?

A.  Not that I can see.

Q.  Fair to say that the -- what's redacted here is the location of Jane's home?

A.  Yes.

Q.  And he -- and it says here, if you look at line 402 from Brendan Paul to Ms. Khorram:  I think he wants to say what's up and check on her because she's been sick so fingers crossed. I'll keep you updated, right?  Do you see that?

A.  Yes.

Q.  We looked at these before, but lines 404 to 405, Ms. Khorram writes to Mr. Paul:  They're just chilling at her house?

A.  Yes.

Q.  And Mr. Paul writes:  Yeah, he said he's going with the flow LOL.  Right?

A.  Yes.

P6GQcom4                          Sankar - Cross

Q.  So it indicates that they're at her home, right?

A.  Yes.

Q.  If you go to next page, page 32, Ms. Khorram writes:  LOL.
So basically he's lit?

        Paul writes:  Isn't lit lit.  I just spoke with him
over the phone.  Maybe a little but seem totally fine, right?

A.  Yes.

Q.  If we go to the next day, February 19 of 2024, these are
messages between Mr. Paul and Ms. Khorram again, right?

A.  Correct.

Q.  And this says:  PD active now.  Running to Wal-Mart for
them.

        And Ms. Khorram says:  Like wild king mode active or
Gucci bag active?

        And Mr. Paul says:  In between the two, right?

A.  Yes.

Q.  If that makes sense.  He says that below, right?

A.  Yes.

Q.  And if you go to -- there's no messages here between
Ms. Khorram and Jane, right, in February that you see from this
date?

A.  Not that I can see on this page.

Q.  Okay.  And then line 416 is from Brendan Paul to
Ms. Khorram, right?

A.  Yes.

P6GQcom4                          Sankar - Cross

Q.  He says:  Hey B.  So TMW he's coming to visit me.  He told me to text you.  In regards to have everything set up here. I'm here tonight and TMw morning if you want to start early. We can joosh up the place together.

He writes:  Just got this from Jane, right?

A.  Yes.

Q.  There's no messages here regarding cash, right, not in this chart from this day?

A.  Not that I can see.

Q.  If we go down to February 26, you see on lines 429 to 430, Ms. Khorram to Mr. Perez, do you see that?

A.  Yes.

Q.  And she writes:  How does he look.  Do you see that?

A.  Yes.

Q.  And he writes:  Shockingly okay.  Way better than usual, right?

A.  Yes.

Q.  If we go to the next and last page, this is page 33, right?

A.  Yes.

Q.  All right.  And the chart ends here at February 26 of 2024, right?

A.  Yes.

Q.  There is no messages after this in the chart that you had to review, right?

A.  Correct.

Q.  Okay.  And here it says:  His messages have been little.
Copy.  Okay, keep me posted from Ms. Khorram to Mr. Perez,
right?

A.  Yes.

Q.  And Mr. Perez says:  I don't know mood yet, but he
physically looks fine if you had to put him in front of someone
today, but he did just take a full bar so I think he'll be
sleep soon, right?

A.  Yeah.

Q.  Then Mr. Perez says:  Ordered him breakfast.  Checking on
drip and masseuse, right?

A.  Yes.

Q.  Okay.

          MS. GERAGOS:  May I have one moment?

          THE COURT:  You may.

          MS. GERAGOS:  No further questions.

          THE COURT:  Thank you, Ms. Geragos.

          Ms. Foster, any redirect?

          MS. FOSTER:  Just a minute.

REDIRECT EXAMINATION

          MS. FOSTER:  Could we please pull up Defense Exhibit
1616.

BY MS. FOSTER:

Q.  Ms. Sankar, do you remember being shown this on
cross-examination?

P6GQcom4                        Sankar - Redirect

A.  Yes.

Q.  Is Ms. Khorram a participant in this chat?

A.  No.

Q.  And going to the chart that you have been walking through 1411-R, is Ms. Khorram a participant at all of those chats?

A.  Yes.

Q.  And do you also remember being shown some photos of a room on cross-examination?

A.  Yes.

Q.  And do you remember that they had the prefix Government Exhibit E dash?

A.  Yes.

MS. FOSTER:  Ms. Foster, could we pull up Government Exhibit 1301 and go to page 5?  Can you highlight paragraph 32.

Q.  What does it say on the stipulation?  What device does it say the Government Exhibits with the prefix E come from?

A.  They are from a iCloud account for a Jane Doe user.

Q.  And, again, the photos on 1411-R, whose device were those found from?

A.  Kristina Khorram.

MS. FOSTER:  No further questions.

THE COURT:  Thank you, Ms. Foster.

Anything further, Ms. Geragos?

MS. GERAGOS:  No, your Honor, thank you.

THE COURT:  Thank you, Ms. Sankar.

(Witness excused)

THE COURT:  The government may call its next witness.

MS. JOHNSON:  Your Honor, the government calls Special Agent DeLeassa Penland.

THE COURT:  All right.

MS. JOHNSON:  May I approach the witness and to put some binders?

THE COURT:  You may.

MS. JOHNSON:  Thank you.

DeLEASSA PENLAND,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DEPUTY CLERK:  Can I ask you to give the Court your first and last name and please spell your first and last name.

THE WITNESS:  DeLeassa Penland:  D-E capital L-E-A-S-S-A; P-E-N-L-A-N-D.

THE COURT:  Ms. Johnson, you may proceed when ready.

MS. JOHNSON:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. JOHNSON:

Q.  Special Agent Penland, where do you work?

A.  For the United States Attorney's Office in the Southern District of New York.

Q.  How long have you worked for the United States Attorney's Office for the Southern District of New York?

A.   Approximately ten years.

Q.   What is your title there?

A.   Special agent.

Q.   What are some of your duties and responsibilities as a special agent at the U.S. Attorney's Office?

A.   I investigate federal crimes, and that includes conducting search warrants, serving subpoenas, and analyzing data.

Q.   Now, conducting search warrants, serving subpoenas and analyzing data, did you play a -- did you do any of those things with respect to this case?

A.   I did not.

Q.   And did you perform any duties associated with your roles as special agent in connection with the investigation or prosecution of Sean Combs?

A.   No.

Q.   What was your role, if any, in this case?

A.   My role was to review charts and data and verify that it was correct.

Q.   Next to you are two binders.  If you could please take the smaller of the two binders, and would you mind looking through all of the materials behind the first tab.

         MS. JOHNSON:  For the records those are Government Exhibits 1402, 1404, 1405-A, 1405-B, 1405-C, 1405-D, 1551, 1552, 1553, 1554 and 1555 for identification.

Q.   Have you had a moment to look at all those documents?

A.  Yes.

Q.  Do you recognize them?

A.  I do.

Q.  What are they?

A.  These are charts that I reviewed for accuracy.

Q.  And Special Agent Penland, would you mind pulling the microphone a little bit closer to you?

         Who prepared the charts initially?

A.  The trial team or I did.

Q.  And who confirmed the accuracy of all the charts behind the first tab?

A.  I did.

Q.  What did you do to confirm the accuracy of the charts?

A.  I reviewed evidence that was provided to me to substantiate the information in the chart.

Q.  Who provided the evidence to you?

A.  The trial team.

Q.  And at a high level, what kind of underlying documents did you review in connection with confirming your accuracy of the charts?

A.  Phone records, text messages, hotel invoices, travel records, among other documents.

Q.  What, if any, videos did you review?

A.  I did review document -- videos.

Q.  Are all of the source documents that you reviewed on and

the charts relied upon cited in the charts themselves?

A.  They are.

Q.  And were the source documents that the charts rely on exhibits in this case?

A.  Yes.

Q.  And you mentioned that you did review videos.  In connection with your review of videos, were you provided with any testimony identifying the participants in those videos?

A.  I was.

Q.  And approximately how much testimony identified the participants in those videos?

A.  Maybe one to three pages.

Q.  Did you have any role in selecting the exhibits that would be used in the charts that you either prepared yourself or confirmed for accuracy?

A.  I did not.

Q.  And, again, who selected those exhibits?

A.  The trial team.

Q.  Can you describe the volume of exhibits that were included as source material for these charts?

A.  They were voluminous.

Q.  How voluminous?

A.  Hundreds of pages.

Q.  Do the current charts reflect any corrections you made after the process by which you confirmed the accuracy of the

information in the chart?

A.   They do.

Q.   And are the charts and graphs that you prepared fair and accurate -- that you prepared and reviewed the accuracy of fair and accurate summaries of the underlying evidence that you reviewed?

A.   They are.

MS. JOHNSON:  Your Honor, at this time the government would offer Government Exhibit 1402, 1404, 1405-A, 1405-B, 1405-C and 1405-D as exhibits into evidence.

And we would offer 1551 through 1555 as demonstratives.

THE COURT:  As to those exhibits and demonstratives, are there any objections that the Court has not previously resolved?

MS. GERAGOS:  No other objections, your Honor.

THE COURT:  Those exhibits will be admitted and the demonstratives may be used as aids.

(Government's Exhibits 1402, 1404, 1405-A, 1405-B, 1405-C and 1405-D and 1551 through 1555 as aids received in evidence)

Q.   I'm hearing that it may be hard to hear you, Special Agent Penland.

Can you just check the mic is working and the binder didn't turn it off?

A.   Is this better?

Q.   Yes.

          MS. JOHNSON:  Ms. Gavin, could you please pull up
Government Exhibit 1402 in evidence?

Q.   Special Agent Penland, is this one of the charts that you
reviewed for accuracy?

A.   It is.

Q.   And can you please explain to the jury what Government
Exhibit 1402 shows?

A.   This chart indicates certain meetings that were attended by
certain individuals at certain cities and certain locations.

Q.   I'd like to walk through the columns in Government
Exhibit 1402.  Starting on the left with the date column, what
does the date column reflect?

A.   This reflects the date or the time period where the
meetings potentially occurred.

Q.   And below the date in the date column, what is the
reference to GX underneath the day?

A.   That's the evidence that has been provided to me that
substantiates those dates.

Q.   And moving next to the column that the header reads
location (city), what does that column reflect?

A.   This is the city in which the meeting occurred.

Q.   And, again, in that column, does the Government
Exhibit number refer to the underlying documentation that

P6GQcom4                     Penland - Direct

reflects the information that you confirmed for that column?

A.   Yes.

Q.   Moving to the next column which says location (hotel/address), what does that column reflect?

A.   This is the hotel or the address of the location where the meeting occurred.

Q.   Moving next to that in reservation name (hotel), what information is reflected in that column?

A.   If the hotel had a name listed for the reservation, that's where that would be located.

Q.   And next there's a column with a heading names, what information is reflected in the names column?

A.   These are individuals that would have attended the meeting during this time period.

Q.   Are you aware if any of the individuals listed in this column were actually present at the location on the date listed in Government Exhibit 1402?

A.   Yes.

Q.   When would you be aware of that?

A.   When there's video footage.

Q.   Aside from instances where there's video footage, are you aware whether any of the individuals listed were actually present?

A.   No.

Q.   In your review of evidence, were there other names

P6GQcom4                          Penland - Direct

contained on some of the exhibits that you reviewed that are

not included in this names column?

A.  Yes.

Q.  And how did you determine which names to include in the

names column and which names to not include?

A.  If there was evidence suggesting that a person that was

potentially coming to the meeting maybe didn't show up, then we

did not include their name.  Also, there were individuals that

indicated they were coming to the meeting but we didn't have

their name, so they're not included either.

Q.  And, finally, looking at the final column, flight records,

what is included in the flight records column?

A.  These include travel records that indicate travel related

to these meetings.

Q.  How, if at all, does the information in the flight records

column relate to the last column, the date column?

A.  The dates would have been close in time, not maybe exact,

but maybe a day or two before or after the travel date.

Q.  Are there some instances where the travel is somewhat

further attenuated than a day or two in this chart?

A.  There are a few, yes.

Q.  Now I'd like to talk about the rows.

        MS. JOHNSON:  Ms. Gavin, could you go to page 23 of

Government Exhibit 1402.

Q.  How many rows are in this chart?

A.   71.

Q.   And does each row reflect a different date or date range that people gathered at a potential location?

A.   Yes.

Q.   And in what order are the rows listed in Government Exhibit 1402?

A.   Chronologically by date.

Q.   And does it start with the earliest date to the most recent date?

A.   Yes.

Q.   So I'd like to work through an example with you to see how this works.

          MS. JOHNSON:  Judge, just let me know if you -- when you're contemplating lunch

          THE COURT:  Let's go on for another like 15 minutes.

          MS. JOHNSON:  Okay.  That's perfect.

          THE COURT:  Perfect.

Q.   Ms. Gavin, could we please go to page 1, and could you please blow up or highlight line item 3.

          Special Agent Penland, could you please summarize the information contained in line item 3 of Government Exhibit 1402?

A.   This indicates that a meeting occurred from December 11, 2009 to December 13, 2009; that the location was in New York City at the London Hotel, 151 W. 54th Street, New York, New

P6GQcom4                         Penland - Direct

York.

The individuals that attended the meeting would have been Sean Combs, Casandra Ventura, and Jules Theodore, a/k/a Jules.  Also, we have flight records pertaining to Jules Theodore and Casandra Ventura relating to that meeting.

MS. GERAGOS:  Objection to the characterization.

THE COURT:  Do we need a sidebar briefly?

MS. GERAGOS:  I think so.

THE COURT:  All right.

(Continued on next page)

(At the sidebar)

MS. GERAGOS:  My objection, your Honor, is to her characterization of those who attended that meeting.  I would ask that the witness just say what the records show rather than who attended what.  She has no personal knowledge.  She has reviewed records, of course, but I think that's just her language in terms of who attended

THE COURT:  That's a fair objection.  I don't there is any issue with that.

MS. JOHNSON:  That's fine.  I already asked some questions to that point, and I'm happy to clarify that those names are based on the records that were reviewed.

MS. GERAGOS:  That would make me feel better.

MS. COMEY:  It might be helpful to come up with shorthand, otherwise, it would take a very, very long time.  So maybe if Ms. Johnson could lay a foundation that when she says attended what she means is record suggests that they were in the location at the time, but she does not for sure absent the video.  The records reflects that the people were at or around the location at a time, but she does not know absent video footage.  I think that might save us time would be my suggestion.

MS. GERAGOS:  That's fine with us.

MR. DRISCOLL:  Your Honor, our objection is also to the characterization that certain travel records are related to

P6GQcom4                          Penland - Direct

the meetings.

THE COURT:  And on what basis?

MR. DRISCOLL:  On the basis that she doesn't have personal knowledge as to whether the travel was actually for purposes of attending the meeting.

THE COURT:  She just has the records?

MR. DRISCOLL:  Yes.

THE COURT:  You wouldn't have an objection to phrasing the questions and hopefully eliciting answers that indicate that the records correspond to the dates reflected in the chart?

MR. DRISCOLL:  Right.

THE COURT:  Let's just say it that way.

MS. COMEY:  Again, your Honor, I think the shorthand could be used to say when you say related, do you mean they correspond by date?  Going forward, when you say related, do you mean they correspond by date, and that way we can move this along.

THE COURT:  Right.  That makes sense.

MS. GERAGOS:  Thank you.

(Continued on next page)

P6GQcom4                         Penland - Direct

(In open court)

THE COURT:  Ms. Johnson.

MS. JOHNSON:  Thank you, your Honor.

BY MS. JOHNSON:

Q.  Special Agent Penland, I just want to clarify one thing related to the names that you described in line item 3.  When you said "attended the meeting," are you referring to your review of the exhibits listed in that column?

A.  Yes.

Q.  And when you say "attended," are you referring to the fact that those exhibits contained those names and suggest that those people might have been present?

A.  Yes.

Q.  And as you testified to previously, absent a video, you are not certain whether any individual was actually present at that date and location, is that right?

A.  That's correct.

Q.  So going forward, if you say "attended" in relation to the names, is that what you will be meaning?

A.  Yes.

Q.  And then on the flight records column, you mentioned that the flights are related to the meeting.  Do you remember that testimony?

A.  Yes.

Q.  When you say "related to," what are you referring to?

P6GQcom4                        Penland - Direct

A.   Meaning that the travel would have allowed the person to be able to attend that meeting.  They would be in the town where the meeting occurred.

Q.   So, again, that is based on your review of the records cited in the flight records column, is that right?

A.   Yes.

Q.   And going forward, when you say "related to," is that what you will be referring to, that those records indicate the person was in the city at that date and time?

A.   Yes.

Q.   So now I'd like to focus on some of the underlying records starting on the date column of line item 3.  Is Government Exhibit 3A-107 one of the records that's cited?

A.   It is.

          MS. JOHNSON:  Ms. Gavin, could you please take this down and pull up Government Exhibit 3A-107?

Q.   Special Agent Penland, what kind of communication is Government Exhibit 3A-107

A.   These are text messages.

Q.   Were you able to determine whose account or device these text messages came from?

A.   Yes.

Q.   How were you able to determine that?

A.   By a stipulation that I reviewed.

          MS. JOHNSON:  Ms. Gavin, can you please pull up next

to this exhibit Government Exhibit 1308.

Could you zoom in on paragraph 1 of Government Exhibit 1308, which I'll read into the record and it says: Government Exhibit 3A-107 are communications from an electronic device for which Sean Combs is the device owner.

You can take 1308 down now, Ms. Gavin.

Q.  And looking back at Government Exhibit 3A-107, focusing on the top, who are the participants in this chat?

A.  Jules and Sean Combs.

Q.  And whose messages are aligned to the left side of the chat?

A.  Jules.

Q.  And whose messages are aligned to the right side of the chat?

A.  Sean Combs.

MS. JOHNSON:  Ms. Gavin, can we please move to page 8 of Government Exhibit 3A-107.  Could you please zoom in on the bottom half of the screen?

Q.  Special Agent Penland, directing your attention to the top of the zoom, what is the date in the middle of the page?

A.  December 7, 2009.

Q.  If you will read the messages from Jules, I'll read the messages from Mr. Combs.

A.  I will have to cancel some parties, but I still have same traveling alone issue.

P6GQcom4                        Penland - Direct

Q.  LOL.

A.  LOL.  Sorry.  I'd have to bring her.

Q.  Call when you can.

MS. JOHNSON:  Can you go to the next page, Ms. Gavin.

A.  Just tried to call you.  Can you shoot me a text just saying you guys will be somewhere else this weekend, so I can show her.

Q.  I don't understand.  Ima call you.

A.  Okay.  I'll explain.

Q.  Just pausing you there before you read the next message, what is the timestamp of the message "okay, I'll explain"?

A.  12:53 a.m.

Q.  If you could continue reading the Jules messages.

A.  Hey, it's Jules.  Just wondering if you guys will be at your New York promotion event this weekend.

Q.  No, we're not.  She's in London.  And I have to be in Chicago for a show.  So no, sorry about that.  Man, they got me working too much man.  How are you?

A.  Good.  Maybe we can all hang out again sometime.  Take care.

Q.  Peace.

Before you move on, Special Agent Penland, can you read the timestamp associated with that last message peace?

A.  1:08 a.m.

MS. JOHNSON:  Ms. Gavin, can you please go to page 11

now?  I'm sorry, Ms. Gavin, could you go to page 10?

Q.  Special Agent Penland, if you could continue reading the Jules messages.

A.  It worked.  Just leave me with voice mails.  I'm avail fri through Sunday.  Whatever flights are fine.  I don't need a reply tonight.  She's home now.  Know what day I will come yet?

Q.  Yes, Friday like 4:00 p.m. or YYOU can come on red eye on Friday.  Party is going to be sat in morning like 7:00 a.m. so it's up to you.

A.  Friday at 4 is good.

Q.  Okay.  Doing now.

        MS. JOHNSON:  And now, Ms. Gavin, if you could please go to page 11 of Government Exhibit 3A-107 and zoom in on that message.

Q.  Special Agent Penland, what is the substance of the information contained in this text message from Mr. Combs?

A.  It appears to be a flight itinerary.

Q.  And on what day is this message sent?

A.  December 9, 2009.

Q.  What is the name associated with the flight itinerary?

A.  Jules Theodore.

Q.  What day is the departure?

A.  December 11, 2009.

Q.  And what day is the return flight?

A.  December 13, 2009.

Q.   And what city is the flight traveling between?

A.   Los Angeles, California - New York, Kennedy.

Q.   Directing your attention to the line that says 11 December '09, what day of the week was December 11, '09?

A.   Friday.

Q.   And then directing your attention to the line that starts 13 December, '09.  What day of the week was that?

A.   Sunday.

Q.   And directing your attention to the very middle of the message, next to SLS pick up.  Can you please read that line?

A.   SLS pick up inside baggage claim to London Hotel.

     MS. JOHNSON:  Let's take that down and pull back up Government Exhibit 1402 at row 3.

Q.   So we just looked at the first exhibit cited in the date column of row 3.  Are there two other exhibits cited?

A.   Yes.

Q.   And does the Government Exhibit 3A-107 that we just looked at, is that also cited in other columns of this chart?

A.   It is.

Q.   Which other columns is that cited in?

A.   The city location, the location hotel address, as well as names and flight records.

Q.   Which names is that associated with?

A.   Sean Combs and Jules Theodore.

     MS. JOHNSON:  So let's turn next to the other two

P6GQcom4                         Penland - Direct

documents cited in the date column of row 3.

          Ms. Gavin, could you please pull back up Government Exhibit 3A-107 at page 11 side by side with Government Exhibit 3A-112.

Q.   Special Agent Penland, how do these two documents compare?

A.   They are the exact same flight itinerary.

          MS. JOHNSON:  You can take down Government Exhibit 3A-107.

          Were you able to determine where the record located at 3A-112 came from?

A.   Yes.

Q.   How did you do that?

A.   Based on the stipulation.

          MS. JOHNSON:  Ms. Gavin, can you please pull up Government Exhibit 1302 page 1 next to Government Exhibit 3A-112?  And if you could zoom in on paragraph 1 which reads -- I'll only cite the pertinent exhibits.

          Government Exhibit 3A-109 and 3A-112 are true and accurate records from Combs Global.  You can take that down.

          When we looked at 1402, was Government Exhibit 3A-109 also cited in the dates column?

A.   Yes.

Q.   Is that also listed in the stipulation as a Combs Global record?

A.   Yes.

P6GQcom4                        Penland - Direct

MS. JOHNSON:  Ms. Gavin, can you please pull up Government Exhibit 3A-109.

Q.  I'd like to focus first on the bottom half of Government Exhibit 3A-109.  What does this appear to be?

A.  An email.

Q.  And who sent the email?

A.  Sean Combs.

Q.  Who was the email sent to?

A.  Toni Bias.

Q.  What was the date the email was sent?

A.  December 8, 2009.

Q.  Could you please read the subject line and contents of the email?

A.  Hey, I need a FLT booked for Friday 4:00 p.m. or 3:00 p.m. from LA to NYC, reg room at London Hotel under Jules Theodore, ASAP.  Let me know when it's done PLS.

MS. JOHNSON:  If you can take that zoom down, Ms. Gavin and, if you could please zoom in on the top half of the document.  And we will walk through this from the top to the bottom.

Q.  The first few lines at the top, what does that appear to reflect?

A.  A flight itinerary.

Q.  And how, if at all, does this flight itinerary relate to the other two flight itineraries we just looked at?

A.   It's the same.

Q.   What are the cities that the travel is between?

A.   Los Angeles, California and New York, New York.

Q.   Moving down under hotel info, what is reflected under hotel info?

A.   This is a confirmation at the London Hotel.

Q.   And where is the London Hotel located?

A.   New York, New York.

Q.   What are the dates of reservation for this confirmation number?

A.   December 11 to December 14.

Q.   Whose signature block is under this communication?

A.   Toni Bias.

Q.   What, according to this signature block, is Ms. Bias' title?

A.   Personal finance director, Sean Combs' executive office.

Q.   You can take that down now, Ms. Gavin.

     If you can pull back up the chart at Government Exhibit 1402, line 3.

Q.   So focusing on the first three columns, we just reviewed 3A-1078, 3A-109 and 3A-112, are those all cited in the first three columns?

A.   Yes.

Q.   Can you explain to the jury how the three exhibits we just looked at relate to the first three columns?

A.   Based on the conversation that we saw described, as well as the flight travel records, it appears that a meeting took place between December 11, 2009 to December 13, 2009 in New York City at the London Hotel.  And based on those documents, it appears that Sean Combs and Jules Theodore would have attended that meeting.

MS. GERAGOS:  Objection to the characterization.

THE COURT:  All right.  Hold on for one second.  Let's do this.

The jury should disregard the witness last answer.

Ms. Johnson can we get a fresh question?

MS. JOHNSON:  Just to clarify are you striking the answer?

THE COURT:  I'm going to strike the answer.  You can re-ask the question.  Let's try to avoid the objection based on what we discussed at sidebar.

Q.   Special Agent Penland, focusing your attention on the first three columns:  Date, location, and city, what Government Exhibits are cited as sources for those columns?

A.   3A-107, 3A-109 and 3A-112.

Q.   Based on your review of those cited sources, how did you confirm the accuracy of the other information in those columns?

A.   Based on those sources, I was able to verify that those dates were the dates that the potential meeting took place in New York City at the London Hotel.

Q.   And focusing on the next column, hotel reservation, is there any entry in the hotel reservation, I'm sorry, reservation name column?

A.   There is not.

Q.   Were you provided with any hotel records that corresponded with December 11, 2009 to December 13, 2009 other than what we've already looked at?

A.   No.

Q.   Based only your experience as a law enforcement officer in other cases, have you tried obtain records from businesses in the course of your job?

A.   I have.

Q.   How, if at all, do document retention policies affect your ability to obtain records?

A.   It affects my ability because if a company does not retain the records, I'm unable to retrieve them from the company. Companies have a wide range of retention periods, anywhere from 30 days to sometimes ten years, so it all depends on that particular company.

Q.   And approximately how many years ago was December 11 to December 13, 2009?

A.   Approximately 15 years.

         MS. JOHNSON:  Your Honor, now might be a good time for the lunch break.

         THE COURT:  Very good we'll take a break.  We will

come back at 1:30.

Thank you members of the jury.  As always, do not discuss anything about the case with each other.  We'll see you back here at 1:30.  All rise.

(Continued on next page)

(Jury not present)

THE COURT:  Thank you, Ms. Penland.  We'll see you back here at 1:30.

(Witness not present)

THE COURT:  Ms. Smyser, is this an appropriate time to take care of the issue relating to Mr. Paul or would you prefer to do that at a later time?

MS. SLAVIK:  Your Honor, I'll be handling the direct examination of Mr. Paul.  I think it makes more sense to take care of that tomorrow morning, as Mr. Paul is not in the building at the moment.

THE COURT:  Okay.  That would make a lot of sense.

And then who do we have left after Agent Penland?

MS. COMEY:  After Agent Penland is Brendan Paul, AND then Special Agent Cerciello, and then I think we will be ready to rest after Agent Cerciello, your Honor.

THE COURT:  Do we anticipating Agent Penland's testimony to take the rest of the day?

MS. COMEY:  Certainly, your Honor.  I think we would suggest breaking at 3:00.  I suspect she will still be on the stand tomorrow morning.  I suspect Brendan Paul will take most of the day tomorrow, and I suspect Agent Cerciello will take up most of the day Wednesday, which will work out well because I think the parties may have issues to tee up for your Honor with respect to that last witness who is our final summary witness

tomorrow, so I think it might work out well to end early today and tomorrow and get him on and off the stand Wednesday so that we can work out any disputes about those charts before Wednesday.

THE COURT:  Very good.

Let me turn to Mr. Agnifilo.

MR. AGNIFILO:  Yes, Judge.

THE COURT:  Who do we have waiting in the wings as the defense case starts up, if we are going to proceed with the defense case, as Ms. Shapiro reminded us, as we have motions.

MR. AGNIFILO:  She reminded all of us.

So I notified the government last evening at 5:00 of the first witnesses.  So Friday is 9:00 to 1:00?  I know I've asked that before, but is that --

THE COURT:  That's correct.

MR. AGNIFILO:  We have three potential witnesses lined up for Friday.

THE COURT:  Who are they?

MR. AGNIFILO:  Vashta Dunlap, Stefan Vandewalle and a potential summary witness who is a paralegal in our office.

THE COURT:  Very good.

MR. AGNIFILO:  Yes, Judge.

MS. COMEY:  Your Honor, if I may just note, as to the summary witness, we have not received any draft summary charts or any exhibits whatsoever.  So if there are any, we'd ask that

P6GQcom4                        Penland - Direct

they be produced immediately.  Our position is they should have been produced quite awhile ago, but at the very least, we ask that they be produced today.

MS. GERAGOS:  Thank you, your Honor.  That's not accurate.  We've  produced all of the exhibits and have been conferring with Ms. Johnson on these for awhile now.  And there's going to be nothing other than what we have been conferring on with Ms. Johnson.

It's her position that these should come in on the defense case, not on the prosecution case.  So because of the government's position with respect to these exhibits, which are just additional exhibits between Ms. Ventura -- well not additional.  Exhibits that we had produced during Ms. Ventura's examination between Ms. Ventura and Mr. Combs.  We are conferring with her about those.  We are shortening them.  We are trying to reduce any disputes we would have to bring to the Court on these exhibits.  It is the government's position we would have to put these in on our case, and so we just want to put them in through somebody.  I think Mr. Agnifilo used the term summary witness, but it's really just to have somebody read the exhibits that we have already been discussing and that the government has had in their possession for about four to five weeks.

MS. COMEY:  I apologize.  I was unclear.  I meant we hadn't received any summary charts.  I do know the exhibits

that Ms. Geragos is referencing, and she is right, she has produced those to us, and she Ms. Johnson is conferring with her about those.  I meant if there are any charts that that witness plans to put in, we don't have them.

THE COURT:  Ms. Geragos, are there going to be charts?

MS. GERAGOS:  We are trying to still determine that after they -- well, after this witness and after we finalize the chart for the special agent who is testifying last will do. I don't expect it's going to be anything different than what we're already looking at right now.

THE COURT:  That is what I was going to say because in response to some of the defense's objections we made significant modifications to the summary charts put in by the government, and so I assume that the defense summary charts will correspond to the form in which we've put in the government summary charts.  That is the only thing I was going to put on your radar.

MS. GERAGOS:  That's right.  I think once we've come to an agreement on these exhibits -- and I will come back to your Honor if this changes, but we would just add some defense exhibits to the charts that already exist.  So we just have to come to agreement first.  We are really trying to do that.  We are working together to get that done, and then if we add -- you know, add exhibits to charts that already exist, once we do that, we will produce those to the government immediately.

THE COURT:  Very good.  In terms of verdict forms, I don't believe I have those.  I may have missed it, but I have the requests to charge.  I do not have proposed verdict forms. Is that correct or did I miss it?

MS. COMEY:  That's correct, your Honor.  What feels like a lifetime ago, I think we all agreed that we could kick that can down the road, but maybe it is time for us to provide your Honor with proposed verdict forms.

THE COURT:  How much time do the parties need to get me those?  Because I'd like to get you -- the way I usually do this is I will give you back the proposed request -- the proposed charge.  I'd also like to get you the proposed verdict form, and that will kick off the process of going back and forth to make sure I've addressed both sides' objections.  How much time would the government need?

MS. COMEY:  I don't think we need much time, your Honor.  I think if we have a day, we should be able to get ours over to you.

THE COURT:  Ms. Geragos, does that sound good on your end, or whoever?

MS. SHAPIRO:  That's fine, your Honor.  We may also have a few additional requests to charge.  We'll try to get those to the Court soon.

THE COURT:  So does it make sense, Ms. Shapiro, sometime tomorrow?  It can be late, but that way--

MS. SHAPIRO:  Sure, as long as there's no time.

THE COURT:  This is the initial proposal.  If things change, you can obviously augment then or modify them in any way.

MS. COMEY:  Your Honor, Ms. Shapiro's comment about additional requests to charge reminds me, we would like an opportunity to respond to the new requests to charge that Ms. Shapiro filed a few days ago, I think, if that's all right with your Honor.

THE COURT:  Of course.

MS. SHAPIRO:  Just to be clear, we assumed -- we obviously, not surprisingly, object to a lot of the government's requests to charge, but we figured it made more sense to wait to see the Court's proposal and react to that.

THE COURT:  What I'm working on is to come back with a proposed charge, and at that the point, you will have full opportunity to make any objections to anything that's in there or anything that the other side wants to put in there.

MS. SHAPIRO:  Okay.  Thanks.

THE COURT:  Very good.  In terms of the defense's experts, whenever we get to that point, one thing that was helpful with Dr. Hughes is that I believe it was the defense had given me a redline disclosure indicating from their perspective what the Daubert ruling had been and which part of the testimony was permissible.  Can I ask to the government to

do that as well?  Because when the defense did that, it teed up a discussion so we were pretty certain as to what the boundaries were.  I think it might be helpful as to also do that as to the defense.

MS. COMEY:  Yes, your Honor.  I think that makes good sense.  We will work on that.

THE COURT:  Very good.  Anything else from the government before we take our lunch break?

MS. COMEY:  No.  Thank you, your Honor.

THE COURT:  Anything Mr. Agnifilo or Ms. Shapiro.

MS. SHAPIRO:  Just two quick things. With regard to the point about Dr. Bardey, we will also be providing the government with very, very short supplemental disclosure that is just a reaction to Dr. Hughes' actual testimony.  So just to be clear on that.

And then I did want to raise one issue relating to the issue that came up at the sidebar, which we -- the other lawyers were not present for, and the real-time wasn't working, so we're not quite sure exactly what your Honor ruled, but I just wanted to put on the record that we object to any questions and answers elicited from this witness in which the witness is inferring things like who was actually present in a hotel room based on flight records or hotel records.  Our position is that that is precisely what is kind of out of bounds for this kind of summary testimony or summary exhibits.

That's the job of the jury.  That's what people can argue in summation.  But a witness with no personal knowledge as to the events depicted on the chart shouldn't be permitted even to say probably or possibly or whatever word was used at the end before we broke.  So we would respectfully ask the Court direct the government to stay away from that and just stick to what was in these exhibits, you know, does the chart accurately reflect the information in the exhibits, and, you know, if appropriate meeting, whatever is in the chart.

THE COURT:  I thought that's what we had addressed and resolved at the sidebar.  As to the last question, I struck the answer and then had the question re-asked, and there was no objection to that question.  So what is it in the questioning and answers from what we just saw that is problematic?  Because Ms. Johnson clarified the limited scope of this witness' testimony.

I think just as a matter of like basic human communication, it is hard to address what we're talking about without having some kind of -- you need words to explain what the charts are showing.  So what is it in particular that you have an objection to?

MS. SHAPIRO:  I have to read the transcript to look at the question.  I think she said something like probably or -- she said something.

THE COURT:  You're saying that this witness does not

actually need to refer to a meeting at all because --

MS. SHAPIRO:  Exactly.

THE COURT:  Because she doesn't know what happened.

MS. SHAPIRO:  Right.

THE COURT:  All she has is the communications, and so she should just be saying that I see the communications, and the communications are reflected here in this chart because they're in the same time period.

MS. SHAPIRO:  Exactly, your Honor.  That's the point. We can't find it, but even in that last question and answer which wasn't as bad.  I'll say as the one when your Honor sustained the answer and struck it, there was some suggestion that she used the word meeting I think or I don't know maybe -- I can't find the transcript, but she said something that was going beyond what your Honor was describing is appropriate.

MS. COMEY:  Your Honor, if I may.  I think the human language may become very difficult to work through this witness's testimony.  Ms. Johnson was very careful in her introduction to this witness's testimony not to mislead this jury into thinking that she has personal knowledge.  She has caveated this testimony quite clearly.  I don't think we have run afoul of any the rulings around the summary chart.  I think the reference to meeting, again, Ms. Johnson could preface it once again when we come back from the lunch break, it's just the word that we need to use for what appears from the faces of

the documents.  We have travel records suggesting people are in

a particular city, hotel records suggesting that there was a

hotel reservation during that same time, and then communication

records suggesting that certain people may have met.

This witness is not suggesting that they in fact met;

that she knows they met; doesn't know if they in fact met.  She

has already said she doesn't know if they met.  She is just

trying to explain what's in these records, and I thin we need

to be able to use some colloquial language in order to make the

testimony useful to the jury and comprehensible to the jury.

Perhaps Ms. Johnson could caveat again our attempt -- our

intent is not to mislead the jury, but instead move through

this as efficiently as we can.

THE COURT:  Well, I think that there is a different

objection that is being raised.  You just mentioned the

suggestions of things that may have happened, but this witness

is not competent to testify as to those suggestions, as I think

you recognize.

So what Ms. Shapiro is saying is that, like

Ms. Sankar -- Ms. Sankar came in, and she just said these are

communications.  I reviewed the communications.  They're here

in this chart.  That's literally all she said.

So Ms. Shapiro is suggesting that Agent Penland should

do the same thing.  These are records.  She looked at the

records.  The chart accurately reflects those records.  The

time period is the same.  I don't think there's any objection to that.  But beyond that, the suggestions are really for argument in closing now that these are in evidence.

MS. COMEY:  Yes, but, your Honor, I think what Agent Penland testified her role was with this chart was to actually pick and choose among text messages and people to include.  I think she testified that she excluded people whose communications suggested that they were planning to come but did not come, or suggested they might end up meeting but there was no confirmation within the text messages that they attended a meeting, and that she in fact looked to the substance of the communications to decide who would be included in this chart.  So this is a different chart, and this witness undertook a slightly different task of doing a little bit of reviewing of the substance of the communications in order to discern what names should go into the chart or not.  So it's not as simple as just she looked at the records, and then if the record was during the timeline, she put it in the chart.  It was she looked at the record, and if the records were in the timeline and the substance suggested that it is possible that these people may have met, she included them in the chart.  And she is not saying they did meet.  She is not going to testify that they did meet.  She would testify it is entirely possible these people never met.  She only included message that both fell in the date range and the substance of which suggested they might

have met.

THE COURT:  So just to put a finer point on it, based only her review of the messages, she was able to discern the time period.  She was able to discern the location in terms of the city, and then she was able to discern based on her review who was at the location, more specifically if it's a hotel, a hotel for instance.

MS. COMEY:  That actually goes farther, your Honor, than she would say.  She would say may have been at the location.  She will not testify that they were at the location.  She will testify they may have been at the location.

THE COURT:  Ms. Shapiro, is there an objection to that?  Because without saying meeting --

MS. SHAPIRO:  Yes.

THE COURT:  If Agent Penland were to say that she was at -- she used the information to determine who was -- may have been at a location, whether it's New York, more generally, just to give an example or a specific hotel, based on communications, would that still be objectionable in your view?

MS. SHAPIRO:  Yes, your Honor, because I think it still poses the problem that when you have the agent who has no personal knowledge about anything, what the agent is doing is trying to connect up the exhibits in a way that is essentially making an argument that the jury can draw an inference that the people were at the meeting, and that is not appropriate for a

summary witness.  I mean, this is -- it's the same problem, you know, having her say, well, they may have been at the meeting doesn't solve the problem because there's nothing from the documents on the chart about a meeting.  It's about hotel records, flight records, and, you know, it's --

THE COURT:  Let me make sure I understand.  This is what I think the objection is really.  I think that Ms. Shapiro is saying we have the summary chart, which we went back and forth over and ultimately this is the final version we got to.

I think what Ms. Shapiro is saying is that goes into evidence, and perhaps Agent Penland needs to explain how she put it together just, right?  That's what the summary witness is really doing.  Other than that, she has nothing to testify about, so she shouldn't be testifying about what the -- even if it's potentially or may or anything else, she has nothing to say about any of that stuff.  Even if it's something very simple like these people were there for a meeting, is that fair, Ms. Shapiro?

MS. SHAPIRO:  Yes, your Honor, that's exactly correct.

THE COURT:  The government may spend a lot of time going through the summary chart because they want to present what's in the chart to the jury.  But other than, there's really nothing more for Agent Penland to really testify about.

MS. COMEY:  Your Honor, just to clarify, Ms. Shapiro listed out the kinds of records, but she didn't get to text

messages.  And when Agent Penland explains why certain text messages are cited in this chart, the reason is because the content of the text messages, the words on the page appeared consistent with people gathering in a place, meeting, whatever word you want to use, the point is that she reviewed messages.

(Continued on next page)

P6gWcom5

THE COURT:  But why is Agent Penland, like, her thought processes about why she chose particular things, like, how does that even get into evidence?  On what basis?

MS. COMEY:  On the basis that she's allowed to lay the foundation for how this chart was put together and explain to the jury why certain messages were included in the chart and others were not included in the chart, which I would point out was subject of cross-examination for the last witness.

THE COURT:  Ms. Sankar didn't do any -- she didn't choose the text messages she put in.  And by the way, wouldn't the selection of particular texts and particular people be something that the case team put together with this agent?

MS. COMEY:  Yes, your Honor.

Yes, your Honor, but I think this witness has explained already that this is a different kind of chart than the last witness put together, and it's different in that this agent, who is reviewing the messages, actually said you need to take these messages out because they don't, on their face, suggest that these people were actually meeting.  That is what this agent did.  She only kept messages in, when she was checking the accuracy of the chart, where the face of the messages appear, on a common reading, on their face, to suggest a meeting.  And I think we just saw an example where Mr. Combs and Mr. Theodore were having an email communication, in which, on the plain face of the messages, they were discussing being

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom5

in the same place at the same time.  And that's the face of the messages.

And otherwise, if we can't -- if the answer is that we have to read every single message and she can't characterize them, then this is no longer a useful summary chart, because what we're going to have to do is pull up every single message and have her just read every single message instead of summarizing for the jury and saying those are text messages in which they appear to be discussing meeting in the same location.  If she can't do that, then we're going to have to just go through and read every single message, and the utility of this chart and the efficiency of this chart is lessened significantly.

We are not trying to mislead this jury.  We are not trying to be argumentative, your Honor.  We're really not. We're trying to be efficient.

THE COURT:  I don't think that's the objection.  I really don't think that's the objection.

MS. COMEY:  I think it is, your Honor.

THE COURT:  It's not.

MS. SHAPIRO:  No, it's not.

THE COURT:  Hold on.

MS. SHAPIRO:  That's not.  It's exactly what the judge is saying.

We can't have a witness who is telling the jury what

P6gWcom5

inferences to draw because that's what -- those are the inferences the witness drew in putting the chart together.

MS. COMEY:  Your Honor, we're not trying to have the witness tell the jury what inferences to draw.  We're trying to have the witness explain why the particular exhibit is in the chart.

MS. SHAPIRO:  That's the same thing.

THE COURT:  I think the why -- and that's what I'm trying to understand, like, how is the "why" admissible evidence that can be presented through testimony of this witness when this witness has no personal knowledge of anything in the case?

So her selection process and the selection process used by the government in putting these in, how does that get into evidence?  Because it obviously bears a suggestion of what the government believes is the relevance of one communication versus another.  And so to give you an example, if Ms. Sankar had come up on the stand and had said, well, I chose these text messages because they showed potential involvement in a hotel night by Ms. Khorram, right, and I took out and I did not consider those text messages that did not bear that suggestion, there would be the same objection.  And I don't know that the government would have a good reason why Ms. Sankar should be able to testify as to those matters.

All that the defense is saying is the same thing

applies here.  And in terms of the utility of the witness, I understood in these circumstances the utility of the summary witness is she put together the chart and it is based on accurate, an accurate depiction or summary of other documents. And so now that they're in a chart form, the witness is able to walk through each item on the chart to show that the dates correspond, the locations correspond, etc.  And then from that, in closing argument, you or one of your colleagues will argue that those events correspond to the events that are at issue in this case and that they showed that people met and all the things that Ms. Shapiro has identified it would be improper for Agent Penland to talk about.

She would not object that you can definitely do that in closing, right?

MS. SHAPIRO:  Correct.

THE COURT:  That's the only objection that's being raised, but the utility of the witness is still there because otherwise all you have is the charts in evidence and the jury would have never seen them.

MS. COMEY:  So I understand the ground rules then, is Agent Penland allowed to say there are text messages in which there are references to a location?  Is she allowed to say that?

THE COURT:  Of course.

There's no objection, right.

P6gWcom5

MS. SHAPIRO:  If it's factual.

THE COURT:  Yeah, I think that's fine.

MS. COMEY:  All right.  We will go with that then, your Honor.

THE COURT:  All right.  Very good.

Anything further from the defense?

MS. SHAPIRO:  No.

THE COURT:  All right.  Very good.

We'll be back at -- I'll give you a little bit of time for lunch, so let's say 1:45.

(Luncheon recess)

P6gWcom5

AFTERNOON SESSION

1:45 p.m.

THE COURT:  Let's get started.

Let's get Agent Penland back.

(Jury present)

THE COURT:  Please be seated.

Ms. Johnson, you may proceed when ready.

MS. JOHNSON:  Thank you, your Honor.

Special Agent Penland -- actually, before I ask you a question, Ms. Gavin, can you please pull up Government Exhibit 1402 again.

Q.  And Special Agent Penland, when we broke before lunch, do you recall that you were testifying about the first three columns in line 3 of 1402?

A.  Yes.

Q.  And directing your attention to -- strike that.

And do you recall reviewing flight itineraries that are cited in those three columns?

A.  Yes.

Q.  Whose name was the flight itineraries in?

A.  Jules Theodore.

Q.  Where else, if at all, is that name listed on row 3?

A.  Under names as well as flight records.

Q.  And based on your work in confirming the accuracy of the chart at 1402, have you seen any Jules Theodore listed

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom5

elsewhere on this chart?

A. Yes.

Q. So I'd like to focus on the names column now.  Have we reviewed Government Exhibit 3A-107?

A. Yes.

Q. Before lunch?

A. Yes.

MS. JOHNSON:  So I'd like to pull up the citation under Casandra Ventura, Government Exhibit 4A-124, at page 243, please, Ms. Gavin.

Q. Special Agent Penland, what kind of document is Government Exhibit 4A-124?

A. This is an American Express statement.

MS. JOHNSON:  And Ms. Gavin, could you please zoom in on that bottom charge on this page.

Q. In the course of your work as a law enforcement officer, have you reviewed American Express statements before?

A. Yes.

Q. And are you aware whether American Express statements sometimes contain point of sale information in the statement?

A. They do.

Q. And what, if anything, does this line reflect about the American Air Lines charge to the American Express statement?

A. There was a charge on December 1, 2009, to American Air Lines for a ticket from Miami, Florida, to LaGuardia

International Airport in the name of Casandra Ventura, and the date of departure is December 2, 2009.

MS. JOHNSON:  Ms. Gavin, could you please now take this one down and go to page 247.  And could you please zoom in on the middle of the page, the charge for United Airlines on December 10.

Q.  Special Agent Penland, what charge is listed for United Airlines in this American Express statement?

A.  On December 7, 2009, there's a charge to United Airlines for a ticket from JF Kennedy Airport to Los Angeles, California.  The passenger name is Casandra Ventura, and the date of departure is December 16, 2009.

MS. JOHNSON:  We can take that down, Ms. Gavin.

And can you please pull back up Government Exhibit 1402, line 3.

Q.  Special Agent Penland, are the government exhibits we just reviewed, 4A124, the citations for the Casandra Ventura name in both -- in the last two columns?

A.  Yes.

Q.  Finally, focusing on the last column, where Mr. Theodore's name is listed, have you already reviewed the first three citations, 3A107, 3A109 and 3A112?

A.  Yes.

MS. JOHNSON:  I'd like to turn back now to Government Exhibit 4A-124, at page 247.  And Ms. Gavin, can you please

P6gWcom5

zoom in on the second-from-the-bottom row.

Q.  And Special Agent Penland, what charge from American Air Lines is listed on this American Express statement?

A.  There's a charge on December 11, 2009, by American Air Lines for a ticket from Los Angeles, California, to JF Kennedy Airport.  The passenger name is Jules Theodore, and the date of departure is December 11, 2009.

MS. JOHNSON:  So I'd like to take that down now, and pull up Government Exhibit 1405B, as in boy.

Q.  Is this a chart that you were asked to review for accuracy?

A.  Yes.

Q.  Can you please explain what this chart shows?

A.  This -- this chart shows selected charges that were made on American Express statement ending in 6009.

Q.  Who selected the charges that are contained in Government Exhibit 1405B?

A.  The trial team.

Q.  And going through the columns, what does the color coding on the left-hand side indicate?

A.  This color coding ties to another chart.

MS. JOHNSON:  And we'll look at that in a moment.

Q.  What is actually depicted in the charged on American Express statement column?

A.  These are screenshots of the actual charge in the American Express statement.

P6gWcom5

Q.   And what, if you know, does the date listed on the American Express statement reflect?

A.   The posting date.

Q.   Would that be the date the charge posted to the credit card?

A.   Yes.

Q.   And what is the amount column?

A.   This is the amount of the charge.

Q.   What is the payment method column?

A.   The American Express statement that was being charged and also includes the state -- the government exhibit number as well as the page number.

Q.   And what is the account holder column?

A.   This is who the account holder for that American Express statement or number is.

Q.   And that's the American Express card ending in, American Express account ending in 6009 for this particular exhibit?

A.   Yes.

          MS. JOHNSON:   So I'd like to walk through the rows now.

Q.   Starting at the top row, is this -- did we previously look at this first row in connection with Government Exhibit 1402?

A.   We did.

Q.   And what does this row show?

A.   This is the December 10, 2009, charge by United Airlines

P6gWcom5

for the ticket for Casandra Ventura.

Q.  And what city does that flight depart from?

A.  JF Kennedy Airport.

Q.  And what city is that associated, is that airport associated with?

A.  Los Angeles -- oh, I'm sorry.  What city?

Q.  What city is JFK airport associated with?

A.  New York City.

Q.  How, if at all, does the final line that's color coded the same dark blue relate to the first charge that's highlighted in yellow?

A.  This indicates they are both United Airlines charges.

Q.  And focusing now on the final line, did the date of departure change in the final line?

A.  It did.

Q.  What's the updated date of departure?

A.  December 15.

Q.  Focusing on the second line, that's the overage next to it, what does the second line show?

A.  There was a charge on December 13, 2009, by London NYC Hotel.  The arrival date was December 11, 2009.  And the departure date was December 13, 2009.  The total charge was $1,977.50.

Q.  Looking at the line below that, the third line, the charge for American Air Lines, have we already reviewed that charge in

P6gWcom5

connection with Government Exhibit 1402?

A. Yes.

Q. How, if at all, does the line underneath this line, the fourth line, relate to the American Air Lines charge?

A. The next line indicates there's a travel agency service fee in relation to the Jules Theodore ticket.

Q. For every charge listed on Government Exhibit 1405, what account paid that charge?

A. The American Express ending in 6009.

Q. Who was the account holder at this time for the American Express ending in 6009?

A. Sean Combs.

MS. JOHNSON: We can take that down now, Ms. Gavin.

If you could please pull up Government Exhibit 1553, which is just a demonstrative.

Q. Special Agent Penland, what does this show?

A. This shows that the Sean Combs American Express statement ending December 24, 2009, it indicates each of the charges that we previously looked at and indicates that at the end of that statement, there were other charges totaling $363,749, for a total amount due at the end of that statement of $369,279.

MS. JOHNSON: Ms. Gavin, can you please go to page 2 of Government Exhibit 1553.

Q. And what is shown on page 2 of Government Exhibit 1553?

A. This shows that of that $369,279, that a single Signature

Bank account was used to pay off that full amount, and that was an account ending 9686.

Q.  And who is the account holder of the account ending at Signature Bank ending in 9686?

A.  207 Anderson LLC, care of Bad Boy Entertainment Worldwide.

          MS. JOHNSON:  Ms. Gavin, can you please take this down and pull up Government Exhibit 1402, page 6.  And I want to focus now on line 16.

Q.  Special Agent Penland, you testified earlier that you reviewed some text message communications in connection with your confirmation of the accuracy of this chart.  Do you recall that testimony?

A.  Yes.

Q.  So before we review those communications, what time zone were the communications that you reviewed made in?

A.  UTC.

Q.  And have you reviewed copies of the exhibits cited in certain lines that we'll walk through of this chart that contain conversions of the UTC time to other Eastern Time or Pacific Time?

A.  Yes.

Q.  Have you confirmed the accuracy of the time conversions?

A.  Yes.

          MS. JOHNSON:  Your Honor, we're going to offer, as we walk through the chart as an aid to the jury, certain

P6gWcom5

communications with time zone conversions that we've marked B354Z, B233Z, B325Z, B361Z, B362Z, B626Z, B322Z, B327Z, B260Z, B218Z and B217Z.

THE COURT:  Any objection to those demonstratives?  Is.

MS. GERAGOS:  Not as demonstratives, your Honor.

BY MS. JOHNSON:

Q.  Directing your attention back to Government Exhibit 1402 at line 16, what city is listed in the location column?

A.  New York City.

Q.  So for the communications you reviewed in connection with line 16, what time zone were the chats converted to?

A.  Eastern.

MS. JOHNSON:  I want to start by looking at the citation to the flight records column.

Ms. Gavin, can you please pull up Government Exhibit 6T-107 at page 68.

If you could zoom in on the top half, please.

Q.  Special Agent Penland, what kind of document is this?

A.  This is a travel invoice.

Q.  And directing your attention to the top half, below the letterhead, what does it say below the letterhead of Alpha International Travel?

A.  Bad Boy Entertainment.

Q.  And who is the passenger on this flight?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom5

A.   Casandra Ventura.

Q.   And what's the departure date of the flight?

A.   October 10, 2012.

Q.   What is the route of the flight?

A.   From Los Angeles to New York, Kennedy.

         MS. JOHNSON:  You can take that down now, Ms. Gavin.

         Can you pull back up Government Exhibit 1402, page 6, row 16.

Q.   Special Agent Penland, are there a number of other government exhibits cited underneath the other columns of this chart?

A.   Yes.

         MS. JOHNSON:  So we'll walk through a few of those, starting with the communications in the names column.  I'm going to pull up now Government Exhibit E354Z.

Q.   The first page of this, who are the participants in this chat?

A.   Casandra Ventura and Sean Combs.

Q.   And is Casandra Ventura the local user as it's depicted on the screen?

A.   Yes.

Q.   And how do you know that?

A.   I know that, based on testimony, that this device was hers.

         MS. JOHNSON:  OK.  Can you please zoom out and go to page 2.

P6gWcom5

Q.   Focusing your attention on the top bubble, what is the date and time converted to Eastern Time of the top bubble?

A.   5:12 p.m., October 13, 2012.

Q.   So as we go through this chart, I'll read the gray bubbles that Mr. Combs sent if you read the blue bubbles that Ms. Ventura sent.

Starting with Mr. Combs:  You ready for tonight?"

A.   "Yes.  I just GTA get stuff."

Q.   "You got all you need?  Man, you had all day.  All day. It's always something."

MS. GERAGOS:  Judge, can we have a quick sidebar, please?

THE COURT:  Yes.

(Continued on next page)

P6gWcom5

(At sidebar)

MR. DRISCOLL:  Your Honor, we just wanted to clarify. The witness just said that she had reviewed testimony, and that's how she had a basis for certain knowledge.  Our understanding is that the government's witnesses were sequestered, so we're just confused as to why she would have done that.

MS. JOHNSON:  This was in the 3500 that she reviewed. Her testimony is that she had an understanding in particular that the devices came from Ms. Ventura.

MR. DRISCOLL:  I guess the question is why, given that both parties agreed to a sequestration?

MS. JOHNSON:  She's not a fact witness.  She's not testifying to personal knowledge.  She needs a basis to understand who the local user is of this device.

THE COURT:  Well, why did you -- let me take a step back.

She didn't need to review the testimony.  She could have just been told by the government that this was her device, right?

MS. JOHNSON:  I don't think she could testify to what I told her.

THE COURT:  But then how is she able to discern anything from the review of testimony if she was supposed to be sequestered?  And she was supposed to be sequestered because

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom5

she's not testifying as an expert witness, so she necessarily is testifying as a fact witness, right?

MS. JOHNSON:  Well, she's not testifying from any personal knowledge.

THE COURT:  Well, that would be a separate problem.

MS. JOHNSON:  Right.

THE COURT:  I thought the personal knowledge that she had was on the chart and the preparation of the chart.  And that's why she's even able to testify.  You can't just put a witness up there just to testify not based on personal knowledge unless they're an expert, right?

MS. JOHNSON:  Correct.

THE COURT:  OK.  So that gets back to the question as to, like, what is she testifying about now?

MS. JOHNSON:  She testified that she knows that these devices are -- that local user is Casandra Ventura because she has reviewed the testimony and knows that this particular series of devices was Casandra Ventura's devices.

THE COURT:  Do you have a stipulation or something that addresses this?

MS. JOHNSON:  We only recently entered into a stipulation about this.

MS. GERAGOS:  We can just show the stipulation.

MS. JOHNSON:  We can show the stipulation.  I won't ask the question again.

P6gWcom5

THE COURT:  Show the stipulation.  I think it's a tiny objection.  If there's a way around it, let's --

MS. JOHNSON:  I didn't have a chance to show that part of the stipulation yet.

THE COURT:  You don't have an objection to the witness being shown the stipulation?

MS. GERAGOS:  Not at all.

THE COURT:  All right.  OK.  I think the objection is because it might come up again in a different context.  But if we have a stipulation, great.  Let's do it that way.

(Continued on next page)

P6gWcom5

(In open court)

MS. JOHNSON:  Ms. Gavin, could we please pull up Government Exhibit B1312R -- I'm sorry.  Not B.  Government Exhibit 1312R.

Thank you.  And go to page 2.  And I'll just read into the record that Casandra Ventura is the user -- the local user of MacBook Pro A1278 and the local user of MacBook Air, with a number of letters and numbers following it.

You can take that down now.

Let's go back to Government Exhibit B354 at page 2.

I'm so sorry.  We've finished this one.

Let's go to B325 at page 1.

Q.  Special Agent Penland, who are the participants in this chat?

A.  Casandra Ventura and Dave.

MS. JOHNSON:  Can you pull up side by side with this, Ms. Gavin, Government Exhibit 1312R at page 2.  And can you please highlight the second entry under Clayton Howard, a/k/a "Dave."

Q.  Special Agent Penland, is the same number on Government Exhibit E325Z listed as the contact phone number for Clayton Howard, a/k/a "Dave" in this stipulation?

A.  Yes.

MS. JOHNSON:  We can take that down now.

Ms. Gavin, can you please go to pages 18 and 19 side

P6gWcom5

by side.

Q. What is the date and time of the first message converted to Eastern Time?

A. 3:37 p.m., October 13, 2012.

Q. And who is the local user of MacBook Pro A1278, based on the stipulation?

A. Casandra Ventura.

Q. If you read the blue bubbles for Ms. Ventura, I'll read the gray bubbles for Dave.

A. "Hey, are you avail tonight?"

Q. "Hey. Yes, I am, after like 9 p.m."

A. "OK. Cool. Will hit you soon with details."

MS. JOHNSON: Sorry. Can you zoom out, Ms. Gavin.

Q. "Koo."

MS. JOHNSON: Go to the next page.

A. "Hey. Sorry to hit you so late. It's the Trump in Columbus Circle. I'm headed there now so I'll text you the room number when I get there, but start getting there now."

Q. "Koo."

A. "Janet Clark. 408. How long you thinking? You got the name who to say you are dropping off to?"

MS. JOHNSON: Can you go to the next page, please, Ms. Gavin?

A. "Tree Janet Clark. Yes, here."

Q. What is the date and time converted to Eastern Time of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom5

message here?

A.  1:08 a.m. on October 14, 2012.

Q.  And the next message, which reads:  "Hey, can.you.contact front desk.  And in lock porn.  Channel."

What is the converted date and time of that message?

A.  3:24 a.m., October 14, 2012.

MS. JOHNSON:  Can you zoom out and then zoom in to the next two messages, please, Ms. Gavin.

Q.  In response to the previous question, what does Ms. Ventura say?

A.  "Just called them and told them food and movies.  What room is it?  I didn't look."

Q.  And what room number does Dave respond with?

A.  612.

MS. JOHNSON:  You can take that down now, Ms. Gavin.

Can you please pull up Government Exhibit 7Y-108.

Q.  Special Agent Penland, what kind of document is Government Exhibit 7Y-108?

A.  This is a hotel invoice.

Q.  And what hotel is it an invoice for?

A.  Trump International Hotel & Tower.

Q.  In what city is the Trump International Hotel & Tower located?

A.  New York City.

MS. JOHNSON:  Can you zoom in on the right-hand side

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom5

above the charges, Ms. Gavin.

Q.   What's the room number associated with this invoice?

A.   612.

Q.   And what is the arrival date of this invoice?

A.   October 14, 2012.

Q.   What's the departure date of this invoice?

A.   October 14, 2012.

Q.   What is the name associated with the invoice on the left?

A.   Mr. Frank Black.

Q.   Directing your attention now to the descriptions, what is the description of the first charge?

A.   "Room charge, guest request room at 3 a.m."

Q.   Moving down a few lines after the tax, there's a line for movie.  What is the charge associated for movie?

A.   34.95.

Q.   And moving down to the in-room dining breakfast, what's the charge associated with that?

A.   67.24.

Q.   And what charge is associated in two lines down with refreshment center?

A.   $200.33.

Q.   And how was this invoice paid according to the detail -- to the descriptions?

A.   American Express ending 3004.

Q.   And directing your attention to the line between in-room

P6gWcom5

dining and refreshment center, is there another source of payment?

A. Cash.

Q. And how much is the cash payment?

A. $793.56.

MS. JOHNSON: You can take that down, Ms. Gavin.

Please pull up Government Exhibit 7Y-107.

Q. What kind of document is this?

A. This is also a hotel invoice for Trump International Hotel & Tower.

Q. And what room number is associated with this invoice?

A. 408.

Q. What is the arrival date of this invoice?

A. October 13, 2012.

Q. And what is the departure date?

A. October 14, 2012.

Q. And what name is associated with this reservation?

A. Janet Clark.

Q. In your review of the message we just looked at, did you recall seeing the name Janet Clark?

A. Yes.

Q. How was this room paid, according to the invoice?

A. Cash.

MS. JOHNSON: And take this down now, Ms. Gavin.

Can you please pull up Government Exhibit E233Z.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom5

Q.   Zooming in on the top, who are the participants in this communication?

A.   Casandra Ventura and New York Punish.

MS. JOHNSON:  Ms. Gavin, can you please pull up next to this Government Exhibit 1312R at page 3.

Can you magnify the final line on page 3.

Q.   Special Agent Penland, does the number associated with Sharay Hayes, a/k/a "New York Punish," the same number that you see on Government Exhibit E233Z?

A.   Yes.

MS. JOHNSON:  We can take that down.

Q.   And what is the date and time converted to Eastern Time in the first message?

A.   11:15 p.m., October 13, 2012.

MS. JOHNSON:  Let's go to pages 3 and 4, side by side, please.

Q.   If you can read the gray bubbles associated with Ms. Ventura, I'll read the -- if you can read the blue bubbles associated with Ms. Ventura, I'll read the gray bubbles.

A.   "Great.  Thank you.  And can we actually do 3 a.m.?  At the Trump Hotel, Columbus Circle."

Q.   Just pausing you there, in what borough is Columbus Circle?

A.   Manhattan.

Q.   "3 a.m. is perfect.  I'll text when I'm on the way.  The cost is $200 cash?"

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom5

A.   "Great.  Will send you room number and name in ten min.
Thank you.

     "Janet Clark 408.

     "Hit me when you are on the way."

Q.   "OK.  Call me when free.  Is the show still on?"

A.   "Yeah.  4."

          MS. JOHNSON:  Can you go to the next page, Ms. Gavin.

Q.   "OK.  OK."

A.   "Can you do 3:30?"

Q.   What's the date and time of the last message you read
converted to Eastern Time?

A.   2:49 a.m., October 14, 2012.

          MS. JOHNSON:  We can take this down now.

          Can you please pull up Government Exhibit E325Z.

Q.   And have you previously looked at this exhibit?

A.   Yes.

Q.   Who are the participants?

A.   Casandra Ventura and Dave.

          MS. JOHNSON:  And going to pages 20 and 21 side by
side.

Q.   We left off at the messages about contacting the front
desk.  Can you remind the jury of the time stamp of the, on
page, the last message with the converted time stamp on page 20
on the left-hand side?

A.   3:24 a.m., October 14, 2012.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6gWcom5

MS. JOHNSON:  OK.  Going to page 21 now, if you can zoom in on that, please, Ms. Gavin.

Q.  What is the converted time stamp in Eastern Time of the gray bubble?

A.  6:58 a.m., October 142012.

Q.  So, again, I'll read the gray bubbles for Dave, and you'll read the blue bubbles for Ms. Ventura.

"Dave, New York now.  On my way.down," question mark.

"About to.head down.  OK," question mark.  "just TXT when URE ready.  I'm here."

A.  "Ready."

Q.  "OK.  Coming now."

"Here."

And what is the date and time converted to Eastern Time of the text here?

A.  7:40 a.m., October 14, 2012.

MS. JOHNSON:  So if you can take that down now, Ms. Gavin.

Can you please go back to Government Exhibit 1402, page 6, line 16.

Q.  And focusing on the date column, I want to direct your attention to the citations BX204, BX206 and BX207.

What kind of exhibits are those materials?

A.  Videos.

MS. JOHNSON:  Ms. Gavin, can you please pull up side

P6gWcom5

by side Government Exhibit 1307 at page 2.  And I will read paragraphs 5, 7 and 8.

5 reads:  "Government Exhibit BX204 is an enhanced version of Government Exhibit BX204A, an original video that was created on October 14, 2012."

Paragraph 7 reads:  "Government Exhibit BX206 is an enhanced version of Government Exhibit BX206A, an original video that was created on October 14, 2012."

And paragraph 8 reads:  "Government Exhibit BX207 is an enhanced version of BX207A, an original video that was created on October 14, 2012."

So, we'll get back to those videos in a moment.

If we can go back to Government Exhibit 1402, can you please go to line 7, and -- I'm so sorry.  Page 7, line 17.

Q.  Special Agent Penland, are there also video exhibits cited in line 17?

A.  Yes.

Q.  Which exhibits are those?

A.  GX BX205 and GX BX210.

MS. JOHNSON:  Ms. Gavin, can you please pull up next to it Government Exhibit 1307 at page 2.

And I will read paragraphs 6 and 11.  Each state that Government Exhibit BX205 and Government Exhibit 210 are enhanced versions of Government Exhibits BX205A and BX210A, original videos created on October 20, 2012.

P6gWcom5

We can take that down now.

Ms. Gavin, can you please go to page 16, line 47.

Q.  Special Agent Penland, are there also video exhibits cited in line 47?

A.  Yes.

Q.  Which exhibits are those?

A.  GX BX201 and GX BX202.

MS. JOHNSON:  OK.  Taking that down, can you put that next to it 1312R -- not 1312, 1307.

I'll read paragraphs 2 and 3.

Sorry.  Can you go back to page 1, please.

So "Government Exhibits BX201 and BX202 are enhanced versions of Government Exhibit BX201A and Government Exhibit BX202A, original videos created on October 8, 2014."

And finally can we please go to page 17, line 48.

Q.  Directing your attention to the top, are there also video exhibits cited in line 48?

A.  Yes.

MS. JOHNSON:  Can you please pull up --

Q.  Which exhibits are those?

A.  GX BX203, GX BX208 and GX BX209.

MS. JOHNSON:  Ms. Gavin, can you please pull up next to it Government Exhibit 1307 at page 2, and reading paragraphs 4, 9 and 10:  "Government Exhibit BX203, BX209 and BX210 are enhanced versions of Government Exhibit BX203A, BX209A and

P6gWcom5

BX210A, which are original videos created on October 20, 2012, 2012" -- No.  I read that totally wrong -- "created on December 4, 2014."

OK.  So, your Honor, at this time I would ask that we turn off the overflow room feed, and we've previously passed -- and the screen in the gallery.

We've previously passed out headphones, and we're going to watch short clips of videos.

THE COURT:  Let me ask the deputy to confirm when those feeds have been turned off.

THE DEPUTY CLERK:  Yes, your Honor.  Confirmed.

THE COURT:  Ms. Johnson, do you want to remind the jury how to use these things?

MS. JOHNSON:  Yes.  I believe, and I may need Ms. Gavin's assistance, that there's a button that you press.

And are you playing the sound, Ms. Gavin, to test it?  Can you play the sound to test it.

THE COURT:  Is anyone not hearing a sound?

I see a thumbs up, so I think we're good to go.

MS. JOHNSON:  OK.  Your Honor, we are only going to play the videos for the Court, the witness and the jury, due to the counsels' screen being visible in the gallery.

THE COURT:  All right.

MS. JOHNSON:  We've previously conferred with defense counsel on this point.

P6gWcom5

MS. GERAGOS:  I had my headphones in, but that's right.

THE COURT:  Good.

MS. JOHNSON:  Your Honor, may I go over to Ms. Gavin to conduct the examination, because that's the only place where I'll be able to see the screen?

Q.  Special Agent Penland, can you see Government Exhibit BX206?

MS. JOHNSON:  Ms. Gavin, can you please pull up for only the witness, the Court and the jury Government Exhibit BX206.

Q.  Special Agent Penland, can you see that on your screen?

A.  Yes.

Q.  How long is this video clip in total?

A.  11 minutes, 23 seconds.

Q.  I'm just going to play from minute 10:40 until the end of the video.

(Media played)

MS. JOHNSON:  OK.  You can take that down now.

And pulling up for the witness, the Court and the jury only Government Exhibit BX205.

Q.  And Special Agent Penland, how long in total is this video clip?

A.  11 minutes, 18 seconds.

MS. JOHNSON:  Ms. Gavin, can you please play from

P6gWcom5

minute 6:30 to minute 7.

(Media played)

MS. JOHNSON:  And then can you please play from minute 9:53 to 10:15.

(Media played)

MS. JOHNSON:  And can you please take that down.

OK, Ms. Gavin, please play Government Exhibit BX209 for the witness, the Court and the jury only.

(Media played)

BY MS. JOHNSON:

Q.  Can you see that Special Agent Penland?

A.  Yes.

Q.  How long in total is this video clip?

A.  39 minutes and 50 seconds.

MS. JOHNSON:  OK.  We're going to play from time stamp 10:30 to 11 minutes.

THE COURT:  Ms. Johnson, we're not seeing it up here.

MS. JOHNSON:  Oh, you're not?

Are you able to see it now?

THE COURT:  Yes.

MS. JOHNSON:  So we'll play again from time stamp 10:30 to 11 minutes.

(Media played)

MS. JOHNSON:  We can take that down now.  And that ends the video portion.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom5

THE COURT:  Ms. Johnson, we can at this time turn on the overflow feed.

MS. JOHNSON:  Absolutely.  We can turn on the overflow feed and the gallery.

THE COURT:  All right.

MS. JOHNSON:  I will ask Ms. Gavin to pull up Government Exhibit 1402, page 9.

Q.  Special Agent Penland, I'm going to direct your attention to line 23.

MS. JOHNSON:  I'll give it a moment.

OK.  The gallery screen is back up online.

Q.  Directing your attention to line 23, what dates are listed in the first column?

A.  January 11, 2013, to January 12, 2013.

Q.  OK.  And what location is listed in the second column?

A.  L.A.

Q.  And are there communications that you reviewed in connection with this, with checking the accuracy of this line, have those been converted to Pacific Time?

A.  Yes.

MS. JOHNSON:  So let's look at some of those communications.

Q.  And before we get there, though, turning to the names column, the citations in the names column communications that you reviewed?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom5

A.   Yes.

MS. JOHNSON:  So let's go through those.  Can we pull up Government Exhibit B361Z, please.  And zoom in on the top.

Q.   Who are the participants in this chat?

A.   Casandra Ventura and Sean Combs.

MS. JOHNSON:  Could you go, please, to pages 2 and 3 side by side, Ms. Gavin.

Q.   What is the date and time of the first message in gray converted to Pacific Time?

A.   5:52 p.m., January 9, 2013.

Q.   I will read the gray bubbles for Mr. Combs if you read the blue bubbles for Ms. Ventura.

Mr. Combs starts:  "you horny?"

A.   "LOL, yeah."

Q.   "Would you want to celebrate Christmas and have a freak-off tonight or Friday?"

A.   "Hmmmmm.

"Friday so we can plan it and get the right PPL."

Q.   Would you want to celebrate Christmas and have a freak-off tonight or Friday?  Cool?"

A.   "Right?"

Q.   "I have your Christmas presents and stuff.  What you about to do.  Oooh, you on your period too, RT."

MS. JOHNSON:  So taking that down now.

If you can pull up, please, Government Exhibit B362Z.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom5

Q.  Who are the participants in this chat?

A.  Casandra Ventura and Sean Combs.

         MS. JOHNSON:  Going to pages 2 and 3 side by side, please.

Q.  Starting with the top blue bubble, what is the date and time of the first message converted to Pacific Time?

A.  3:10 p.m., January 11, 2013.

Q.  If you read the blue bubbles for Ms. Ventura, I'll continue to read the gray bubbles for Mr. Combs.

A.  "U GNA hit Jules?  Got then, but not until 11.  The other place is calling me back."

Q.  "Got him.  7 p.m."

A.  "Cool."

Q.  "Call HS."

A.  "Can you send me the hotel info?  Only found four tea lights."

Q.  "What you are doing?"

A.  Question mark, "at the hotel, waiting on you, about to smoke.  What are you doing?"

         MS. JOHNSON:  Can you turn the page, please, Ms. Gavin.

Q.  "Call HS."  What's our RM num?"

A.  "817.  He's five min away.  I told him to drive around the area and I will hit him when we want him to come up."

Q.  What is the date and time of the last message you just read

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P6gWcom5

converted to Pacific Time?

A.   6:19 a.m., January 12, 2013.

Q.   And comparing the last two blue three bubbles, is there a jump in time between the last two blue bubbles?

A.   Yes.

Q.   Approximately how many hours elapse between those, between the first blue bubble and the last blue bubble?

A.   12 hours.

Q.   Approximately 12 hours?

A.   Yes.

          MS. JOHNSON:   Can you please take that down now and pull up Government Exhibit B326 at page 1.

          Can you please zoom in on the top.

Q.   Who are the participants in this message?

A.   Casandra Ventura and Garren Cb4a.

          MS. JOHNSON:   You can take that down now, Ms. Gavin.

          Can you please go to pages 38 and 39 side by side.

Q.   Directing your attention to the blue bubble with the time conversion next to it, what is the date and time of that message converted to Pacific Time?

A.   3:34 p.m., January 11, 2013.

Q.   OK.   If you read the blue bubbles for Ms. Ventura, I'll read the gray bubbles for Garren.

A.   "Hey, how are you?  Do you have Vin in L.A. tonight?"

Q.   "Hello, honey," exclamation points.   "Actually he is there

P6gWcom5

but think he is at a family function.  What time were you thinking?

"He can actually meet around 11 p.m. if that works for you."

A.  "That's great."

Q.  Hopefully not a super late meeting time as he has to drive back to Vegas in the a.m.

"OK.  I will put him on hold for 11 p.m.  Send me location when you can.  Been missing you guys.  Glad you texted."

A.  "Me too.  Thank you.  Will send soon.  Getting hotel. Sorry.  Soon."

Q.  "No problemo."

A.  "It will be the L'Ermitage."

Q.  "Perfect.  I will text you when he is outside."

A.  "Thanks.  Hey, can we say 12.  Promise that will be the only change."

Q.  "Yup."

A.  "Thanks."

Q.  "Hey, sorry, this just came in from Vin...I have to handle something for my fam.  I'm stuck here.  I can't make it at midnight.  1 a.m. I can do.  I'm so sorry, dude.  I'm sitting here putting out fires with my cousins.  Is 1 a.m. OK?"

A.  "2 a.m. is great.

"Sorry.  3."

Q.  "No.  1 a.m.?"

P6gWcom5

A. "Is 3 OK?"

Q. "Yikes.  I don't know.  Let me call him."

A. "K".

Q. "OK.  He didn't respond yet.  Let you know as soon as he does.

"OK.  He said he can do 1 a.m. but has to be back to Vegas in the a.m., so if he gets there 2 or 3 it won't work."

A. "OK.  Cool."

Q. "I can maybe try for Jake at 3 a.m."

A. "1 a.m. is good."

Q. "OK.  Thank you.  I will hit you up when he is outside."

A. "Thank you."

Q. "Vin is ten min away."

A. K.

Q. And at the message "Vin is ten min away," what is the date and time stamp converted to Pacific Time of that message?

A. 12:59 a.m., January 12, 2013.

MS. JOHNSON:  You can take that down now, Ms. Gavin.

And can you please pull up Government Exhibit B322Z.

Can you zoom in on the top.

Q. Who are the participants in this chat?

A. Casandra Ventura and someone using the number 1539.

MS. JOHNSON:  Can you take that down.

And Ms. Gavin, can you zoom in on just the first bubble.

P6gWcom5

Q. And can you please read this message?

A. "Hello star....this is Santiago. I hope we can do another voyeur encounter again. I would be most willing. And if you have any other fetishes or want to try something else with me or any ideas, let be know. I really want to do this again with you guys." Smiley face.

MS. JOHNSON: Can we go to pages 2 and 3 in this exhibit.

Q. Directing your attention to the top, what's date and time converted to Pacific Time of the first message?

A. 6:57 a.m., January 11, 2013.

Q. If you read the blue bubbles for Ms. Ventura, I'll read the gray bubbles for the user ending in in 1539.

A. "Hey, how are you? Are you in L.A.?"

Q. "Yes, I am," exclamation point. "How are you? Waiting.to hear back from you...I want to try what we did again."

A. "Great. It's GNA be kinda late though."

Q. "Oh, I don't mind," exclamation point. "When and what time?" Question mark, question mark, question mark. "And if there's anything you want me to do or perform on you?" Question mark.

A. "We can talk about it when you get here. It will be around 3 a.m. if that's OK. At the Raffles L'Ermitage in Beverly Hills."

Q. "When tonight?" Question mark, question mark, question

P6gWcom5

mark.

A.  "Yes."

Q.  "Great.  What time and what's the address?"

A.  "3 a.m. tonight, 9291 Burton Way, Beverly Hills, CA."

Q.  "OK.  Got it," exclamation point.  "I'm so down for it....so you know I'm a bit more sexually excited than last time.  I also know the rules.  Dress casual nice and bring baby oil, right?"

A.  "Casual, yes.  No oil.  Thanks."  Smiley face.

Q.  "Oh, OK.  I'll see you at 3 a.m.", smiley face.

MS. JOHNSON:  We can take that down now, Ms. Gavin.

Can you please pull up Government Exhibit B327Z at page 1.  And can you zoom in on the top.

Q.  Who are the participants in this chat?

A.  Casandra Ventura and Johnny L.A. Strip.

MS. JOHNSON:  Can you please go to pages 11 and 12, side by side, please.

Q.  Directing your attention to the bottom message, blue message, what is the date and time of the message converted to Pacific Time?

A.  4:36 a.m., January 12, 2013.

Q.  If you read the blue bubbles for Ms. Ventura, I'll read the gray bubbles for Johnny L.A. Strip.

A.  "You free?"

Q.  "Yes."

P6gWcom5

A.    "L'Ermitage hotel."

Q.    "OK.  Be on my way."

A.    "K.

"In 45."

Q.    "OK."

A.    "I'm sorry.  We don't need you actually."

Q.    "OK.  No problem."

A.    "How long would it take for you to get here?  Text me when you are parking or valet."

Q.    "OK."

A.    "How long you thinking?  No rush."

Q.    "Five mins."

A.    "OK.  I might need you to wait a little bit.  Not long.  Do you mind driving around until I tell you?"

Q.    And what was the date and time stamp converted to Pacific Time of the last message you just read about driving around?

A.    6:18 a.m., January 12, 2013.

MS. JOHNSON:  OK.  Ms. Gavin, can you keep that page up and put next to it side by side Government Exhibit B362Z, page 4.

Can you zoom in on the last message of B362Z.

Q.    Special Agent Penland, did we already review this message?

A.    Yes.

Q.    And how does the time stamp on this message -- "He's five min away, I told him to drive around the area and we will hit

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom5

him when we want him to come up" -- compare to the last message below?

A. They're less than a minute apart.

MS. JOHNSON: You can take that down now.

Ms. Gavin, can you please turn back to Government Exhibit 1402, page 9.

Q. Special Agent Penland, are the communications we reviewed for some of the sources for all of the items on line item 23 or just some of the sources for the items on line item 23?

A. Just some.

MS. JOHNSON: So I'll move on to a different item. I'm going to go to line 40 now at page 14. I'm going to start with the photo records column. If you can pull up Government Exhibit 6T107, at page 131, please.

Can you please zoom in to the top half, please, Ms. Gavin.

Q. What type of document is this, Special Agent Penland?

A. This is a travel invoice.

Q. And can you read what is on the document below Alpha International?

A. Bad Boy Entertainment.

Q. Who is the passenger for this invoice?

A. Casandra Ventura.

Q. And what is the departure date of this flight?

A. October 20, 2013.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom5

Q.   And what is the route of the flight?

A.   Los Angeles to Newark.

          MS. JOHNSON:   If we can go back to Government Exhibit 1402 at page 14, line ending 40.

Q.   What location is listed in this city column for line item 40?

A.   New York City.

Q.   And are some of the sources that you reviewed in connection with confirming the accuracy of line item 40 text communications?

A.   Yes.

Q.   Were those communications converted to Eastern Time?

A.   They were.

          MS. JOHNSON:   Let's take this down and pull up Government Exhibit B260.

Q.   Zooming in at the top, who are the participants of this communication?

A.   Casandra Ventura and Sean Combs.

          MS. JOHNSON:   If we can please go to page 2.

          Can you zoom in.   Thank you, Ms. Gavin.

Q.   What is the date and time of the top message converted to Eastern Time?

A.   5:05 p.m., October 21, 2013.

Q.   So I'll read the gray bubbles associated with Mr. Combs if you read the blue bubbles for Ms. Ventura.

P6gWcom5

Q.  "Call up."

A.  "He's avail.

"You didn't film anything on your phone RT."

Q.  Just pausing you there, what is the date and time converted to Eastern Time of the message you just read about filming anything?

A.  8:40 p.m., October 22, 2013.

Q.  And approximately how much time has elapsed since the previous blue bubble right above?

A.  Over 24 hours.

Q.  So continuing to read the gray bubble for Mr. Combs:  "No. No way."

A.  "LOL.  OK.  Cool."

MS. JOHNSON:  OK.  Can you please take this down, Ms. Gavin, and pull up Government Exhibit B218Z at page 1 side by side with Government Exhibit 1312R at page 2.

And can you please zoom in on the first phone number associated with the Clayton Howard, a/k/a "Dave" entry.

Q.  Special Agent Penland, how does the number, phone number for Dave on Government Exhibit B218Z compare to the phone number in the stipulation for Clayton Howard, a/k/a "Dave"?

A.  They're the same.

MS. JOHNSON:  OK.  You can take that down.

Q.  And who are the participants in your chat at Government Exhibit B218Z?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6gWcom5

A.   Dave and Casandra Ventura.

          MS. JOHNSON:   Can we please go to pages 10 and 11 side by side.

Q.   What is the date of the first message converted to Eastern Time?

A.   6:31 p.m., October 21, 2013.

Q.   If you read the blue bubbles for Ms. Ventura, I'll read the gray bubbles for Dave.

A.   "Hey, are you available tonight?"

Q.   "Hey, yeah."

A.   "Cool, 1 a.m.?"

Q.   "That's fine."

A.   "Cool.  Hit you shortly with details."

Q.   "Cool."

A.   "Hey.  I'm sorry.  We're prob GNA be a little later."

Q.   "That's OK."

A.   "OK.  Hit you in a few."

Q.   "OK."

A.   "We're good for one, the London."

Q.   "OK.  So be at London at 1?"

A.   "1:15."

Q.   "OK.  Cool."

A.   "Running a little late."

Q.   "Me too.  LOL.

     "1:30, 1:45?"

P6gWcom5

A.    "LOL.  OK."

Q.    "Here."

A.    "Shit.  We're on the way.

      "Did you drive?"

Q.    "I'm cool.  Just let me know."

A.    "OK.  Literally 5 min.

      "OK.  You can come up.  Don't stope at desk.  3209."

Q.    "OK.  On way up."

A.    "OK."

Q.    "Here.  Thanks.  LOL."

      What was the date and time of, converted to Eastern Time of the last message -- "thanks.  LOL"?

A.    8:01 a.m., October 22, 2013.

Q.    And approximately how many hours elapsed between the previous message that said "here" and the message that says "thanks"?

A.    Six hours.

            MS. JOHNSON:  We can take this down and please pull up Government Exhibit B217 at page 1.

            (Continued on next page)

P6GQcom6                      Penland - Direct

MS. SHAPIRO:  If you can pull up next to it, Ms. Gavin, Government Exhibit 1312-R at page 2.

On the stipulation, if you can please zoom in on the row for Daniel Phillip a/k/a Daniel New York-LA.

Q.  Special Agent Penland, how does the number that the parties stipulate belongs to Daniel Phillip compare to the number in Government Exhibit B 217 for Daniel New York-LA?

A.  They are the same.

MS. SHAPIRO:  You can take 1312 down now, Ms. Gavin. Zoom in on the top.

Q.  Who are the participants in this communication?

A.  Casandra Ventura and Daniel New York-LA.

Q.  Based on your work and confirming the accuracy of the entries in Government Exhibit 1402, have you seen one or more than one entry for Daniel Phillip?

A.  More than one.

MS. SHAPIRO:  Can you please go to page 2, please, Ms. Gavin.

Q.  What is the date and time of the first message converted to Eastern Time?

A.  6:10 a.m., October 22, 2013.

Q.  If I will read the gray bubbles for Daniel New York-LA if you read the blue bubbles for Ms. Ventura.

My phone's dying.  I'll send another one in a bit. Can't wait to see you.  Smiley face.

P6GQcom6                      Penland - Direct

Hey love, do you need me to pick you up anything?

A.  Hey, sorry.  CPL more minutes.

Q.  NP.

What is the date and time of the message NP converted to Eastern Time?

A.  7:39 a.m. October 22, 2013.

MS. SHAPIRO:  Going back -- taking this down and putting back up Government Exhibit 1402, going to page 14 for line item 40.

Q.  We just walked through some of the -- some exhibits.  Are these all the exhibits cited in line item 40 or just some of them?

A.  Some of them.

MS. SHAPIRO:  Ms. Gavin, if you can take -- go to page 23.

Q.  And how many line items are in Government Exhibit 1402?

A.  71.

MS. JOHNSON:  Your Honor, if we're looking for a breaking point, I think this is a good time because we're going to go to a different chart.

THE COURT:  Very good.  Let me see counsel at sidebar for just a moment.

(Continued on next page)

Case 1:24-cr-00542-AS   Document 592   Filed 12/19/25   Page 217 of 224   6531

P6GQcom6                        Penland - Direct

(At the sidebar)

THE COURT:  Did the parties discuss what they wanted to do in terms of Juror No. 7.

MS. SHAPIRO:  No.  We received an email from the government, and we haven't had a chance to confer internally.

THE COURT:  Should we handle this tomorrow?

MS. SHAPIRO:  I think that's fine with us.

(Continued on next page)

(212) 805-0300

P6GQcom6                         Penland - Direct

(In open court)

THE COURT:  Thank you, members of the jury, for all your close attention today.  We will see you here to start at 9:00 a.m. tomorrow.

Same instructions as always.  Don't speak with each other about anything having to do with the case.  Don't speak with anyone else about anything to do with the case.  Don't look up or research anything about the case.  With that, have a great evening.  We'll see you tomorrow.

All rise.

Agent Penland, we'll see you tomorrow.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6GQcom6

(Witness and jury not present)

THE COURT:  Please be seated.

Anything from the government before we adjourn for the day?

MS. STEINER:  Your Honor, just a couple things briefly.

With respect to the supplemental notice that the defense had indicated they intend to provide with respect to Dr. Bardey, the government would request that they do that as soon as possible.  Perhaps the Court could set a deadline for that notice.  It would be helpful I think to be able to tee up for the Court any issues both regarding the supplemental notice and the original notice.

THE COURT:  What deadline do you want?

MS. STEINER:  Tomorrow, if possible.

THE COURT:  Ms. Shapiro?

MS. SHAPIRO:  I think that's fine, your Honor.  My colleague --

THE COURT:  There you go.  Tomorrow, let's say, at 7:00 p.m.

MS. SHAPIRO:  Sure.  Could we say 8:00?  There's a reason for it, but I can't get into it.

THE COURT:  8:00 p.m.  Sold.

Anything further?

MS. COMEY:  Yes, your Honor.  One other issue we

P6GQcom6

wanted to flag is that it would be helpful for us to get a somewhat narrowed witness list from the defense. We realized over the lunch break that the defense witness list that they gave us at their deadline was very, very, very long, much longer than could possibly be realistic if we were actually going to be done with this trial by July 4. So it would be helpful if we could get a narrowed-down more realistic list sooner than Sunday. I know the Court order contemplates Sunday, but it would be very helpful to understand a more realistic set of witnesses. We're not asking for the final set, but I just imagine defense knows there are some they are not going to call.

THE COURT: That's fair.

Mr. Agnifilo.

MR. AGNIFILO: That is fair. We can do that in the next couple of days. I mean, we're still running things down. We're still trying to take care of timing on our end. We did give them the witnesses for this week, so give us a few days, and we'll be in touch between the parties, and we'll get them.

THE COURT: So just so we have some certainty about this, can we have at least a category of witnesses who are out that you can identify for the government and for the Court by the time we adjourn on Wednesday? Would that be doable?

MR. AGNIFILO: Yes, I just want to understand. A category of witnesses that are out?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6GQcom6

THE COURT:  I think that's what Ms. Comey is asking because the list was so long --

MR. AGNIFILO:  Oh, the ones we're not calling.

THE COURT:  Yes.  I think that would be helpful.  Then there would be a category of those who might be in.

MR. AGNIFILO:  Right.

THE COURT:  And then you'll follow up that with a Sunday disclosure of the following week's witnesses, so that will hopefully help things out.  If we need further clarity, we'll address that.

MR. AGNIFILO:  We'll do all of that.

THE COURT:  Anything for the government?

MS. SLAVIK:  One more issue, your Honor.

With respect to Mr. Paul, who is the next scheduled witness, would the Court prefer for Mr. Paul to invoke in the morning before we start or just before he testifies?

THE COURT:  Let's do it in the morning.

MS. SLAVIK:  Sure.

THE COURT:  Is there a preview as to the issues that may come up as to the last witness?

MS. COMEY:  I am hoping that we can resolve almost all of them, your Honor.  Given we've gone through this quite a few times with your Honor, I'm hoping that the parties can confer and resolve most, if not all, this evening, but we will let you know if not.

P6GQcom6

THE COURT:  Very good.

Anything else from defense before we adjourn?

MR. AGNIFILO:  One second, your Honor.

MS. SHAPIRO:  Your Honor, we were just wondering if the Court could just tell us sort of what if anything was told to the other jurors when Juror 6 was dismissed.  We were sort of concerned on the impact it might have had on the remaining jurors, so we wanted to inquire as to how it was dealt with.

THE COURT:  Let me figure that out, and then I'll advise the parties when we start on Monday -- or Tuesday.

MS. SHAPIRO:  Thank you.

THE COURT:  Very good.

Anything else from the defense?

MS. SHAPIRO:  Nothing further from us.

THE COURT:  Very good.  Thank you very much.  We'll see everybody here tomorrow at 8:30.

(Adjourned to June 17, 2025, at 8:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                        Page

ANANYA SANKAR

Direct By Ms. Foster . . . . . . . . . . . . . .6329

Cross By Ms. Geragos . . . . . . . . . . . . . .6404

Redirect Ms. Foster  . . . . . . . . . . . . . .6443

DeLEASSA PENLAND

Direct By Ms. Johnson  . . . . . . . . . . . . .6445

GOVERNMENT EXHIBITS

Exhibit No.                                      Received

 1311; 1312, sealed; 5A-209, sealed; . . . . . .6327

            5A-226, sealed; 5A-227,

            sealed; 5C-311, sealed;

            5C-360; 5C-361; 5C-362;

            7T-101; 7T-102; 7X-151;

            7X-152; H-104-A1, sealed;

            H-104-A1-R; H-104-A2, sealed;

            H-104-A2-R; H-104-A2-A,

            sealed; H-105-A; H-105-B;

            C-250, sealed; C-250-A;

            C-250-B, sealed; C-257-A;

            C-262, sealed; C-263, sealed;

            C-264, sealed; C-265, sealed;

            C-268; C-269; C-270, sealed;

            C-270-R; C-270A; C-270-B;

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C-332-F; C-343-B; C-352;

C-353; C-354; C-354-B;

C-354-C; C-355; C-356; C-357;

C-361; C-361-F; C-361-B;

C-361-G; C-362; C-362-D;

C-362-E; C-362-F; C-365;

C-366; C-367; C-506; C-507;

C-622-1, sealed; C-622-1-R;

C-625; C-629-2; C-629-3,

sealed; C-629-3-R; C-629-3A;

C-639-1; C-639-1-A; 6-639-2;

C-641, C-642-2, sealed;

C-642-2-R; C-653-2, C-654;

C-657; C-657-A; C-657-B;

C-657-C; C-658; C-309 and 1507

1410, under seal; 1410-R; 1411, under . . . .6332

seal; and 1411-R

1402, 1404, 1405-A, 1405-B, 1405-C and  . . .6449

1405-D and 1551 through 1555

as aids