P6HQcom1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

           v.                        24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

           Defendant.              Trial
------------------------------x
                         New York, N.Y.
                         June 17, 2025
                         8:15 a.m.
Before:

              HON. ARUN SUBRAMANIAN,

                         District Judge
                         -and a Jury-

                 APPEARANCES

JAY CLAYTON
    Interim United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
    EMILY A. JOHNSON
    MAURENE R. COMEY
    MEREDITH FOSTER
    MITZI STEINER
    MARY C. SLAVIK
    Assistant United States Attorneys

P6HQcom1

APPEARANCES CONTINUED


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:   MARC A. AGNIFILO
      TENY R. GERAGOS
      -and-
HARRIS TRZASKOMA LLP
BY:   ANNA M. ESTEVAO
      -and-
SHAPIRO ARATO BACH LLP
BY:   ALEXANDRA A.E. SHAPIRO
      JASON A. DRISCOLL
      -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:   Lucy Gavin
                Shannon Becker
                Paralegal Specialists
                Raymond McLeod, Paralegal

P6HQcom1

(Trial continued)

THE COURT:  Ms. Comey, do you know who the source of the article in question was?

MS. COMEY:  We do not, your Honor.

THE COURT:  Have you spoken to the members of your team and the people who are in the courtroom on your side to confirm that they were not the source of the article?

MS. COMEY:  I have, your Honor.

THE COURT:  Mr. Agnifilo, do you know who the source of the article was?

MR. AGNIFILO:  I do not.

THE COURT:  Have you talked to everyone on your side--

MR. AGNIFILO:  I have.

THE COURT:  -- to confirm --

MR. AGNIFILO:  Yes.

THE COURT:  -- that they had nothing to do with this article?

MR. AGNIFILO:  I have confirmed that, yes, your Honor.

THE COURT:  Well, someone is lying, because the courtroom was sealed.  The transcript was -- the courtroom was closed.  The transcript was sealed.  I have inquired of the court staff.  Nobody has done it on the court's behalf, and there would be no reason for anyone in the court to do anything.

So, Ms. Comey, do you have any explanation for what

P6HQcom1

happened that might point to someone outside of this courtroom? There were only a few people here.  It's all on the record because it's only the people who are sitting here at counsel table and designated people from each side.

Ms. Comey, you stood up, you identified certain people that should be in the courtroom so we have that on the record.

Ms. Geragos, you got up and you identified certain people on the record, and that's on the record.

So Ms. Comey, do you have an explanation for this?

MS. COMEY:  The only explanation, your Honor, is the one your Honor set forth, which is someone who was present for the sealed proceeding violated the Court's sealing order and disclosed sealed information.

THE COURT:  Mr. Agnifilo, do you have some other explanation?

MR. AGNIFILO:  I don't, your Honor.  I have no explanation.  I've talked with my team about it.  I have no explanation whatsoever.

THE COURT:  Were you aware of the article during yesterday's proceedings?

MR. AGNIFILO:  No.  No.  I was not aware during yesterday's proceedings.

THE COURT:  When did you become aware of the article?

MR. AGNIFILO:  I'm -- late last -- I'm not sure.  Oh, yes.  Yes.  We -- the government sent it to us.  I don't know

P6HQcom1

the time that was, but it was after the court proceeding.

THE COURT:  All right.  One or more people in this courtroom or the designated people who were here on Friday flagrantly violated this Court's orders.  Now, to be very clear about that, what happened here was a violation of the Court's sealing order for sure, but it wasn't just that.  What happened necessarily involved a violation of Local Rule 23A and C as well.  A violation that of rule subjects attorneys to discipline under Local Civil Rule 1.5.

But in this case on the defense's own application, this Court itself imposed a gag order in which the government, as well as the defendant, Sean Combs, all attorneys for the defendant, and any individuals working under the defendant's or the attorneys' supervision or at their direction were made accountable.  The

Court emphasized in that order that it expects that the parties and any individual or agency subject to the order will strictly adhere to the terms of the order and the governing rules.  A violation of that order, exactly what happened here, there is no doubt about that, may result in civil or criminal contempt charges for all those involved.

The Court issued that order so that this case could be tried on the facts presented in this courtroom, not through the media.  That is exactly what the defense asked for.  The Court's commitment to trying this case based on the facts and

P6HQcom1

evidence presented here alone was reaffirmed by the parties repeatedly, including through jury selection. That commitment is what I asked of each juror in this case before they were selected. That commitment is what I instructed the jury on before this trial commenced. That is the commitment that the participants in this courtroom responsible for what happened violated. I will make sure that this commitment is honored, and I will swiftly investigate and punish any violations that take place.

As for what we are going to do here, I will hear from the parties, but Ms. Comey and Mr. Agnifilo, you are each personally responsible for the conduct of your teams and your clients. You will review each action taken and sign all pleadings and applications regardless of who prepares them. There is no passing the buck any more. The buck stops with you. If anything happens, then lead counsel is responsible.

What does that mean?

Well, as I said, it could result in criminal contempt charges at the most extreme level, but, more basically, and as I'm sure the counsel on both sides are aware, if a judge in this court were to write an opinion documenting lead counsel's knowing or reckless violation of this Court's orders potentially compromising an ongoing judicial proceeding, that would be a bad thing.

You'd agree with that, Ms. Comey, right?

P6HQcom1

MS. COMEY:  Yes, your Honor.

THE COURT:  Mr. Agnifilo, fair?

MR. AGNIFILO:  Very bad, your Honor.

THE COURT:  This is the only warning I will give. Everyone here is on notice that if there is any further violation of this Court's orders or the rules of conduct applicable to these proceedings, that violation will be met with a formal inquiry with people testifying under oath, the delivery of devices and communications to this Court for review and possible civil or criminal sanctions.  So don't do it.

Do I have each side's affirmation that they will reiterate to everyone affiliated with their sides to adhere to the rules and orders of this Court moving forward, and do you understand lead counsel's responsibility and obligations here?

Ms. Comey?

MS. COMEY:  Yes, your Honor.

THE COURT:  Mr. Agnifilo?

MR. AGNIFILO:  I do as well.  Thank you, your Honor.

THE COURT:  All right.  Are there any further applications related to this issue?

MS. COMEY:  Not from the government, your Honor.

MR. AGNIFILO:  Not from us, Judge.  Thanks.

THE COURT:  All right.  Second, Ms. Shapiro, you had asked yesterday what the jurors were told with respect to Juror No. 6.  So I followed up on that.  The jurors were told solely

P6HQcom1

that Juror 6 was excused; that we could not discuss the circumstances of that; and to not discuss that amongst themselves.  That was all they were told, and they were given that instruction.

MS. SHAPIRO:  Thank you, your Honor.

THE COURT:  What other issues do we need to address here?

Do we have Mr. Paul we can handle the immunity order at this time?

MS. SLAVIK:  Your Honor, I'm not sure he's arrived yet, but I will keep the Court posted.

THE COURT:  From the government, what further issues are there to address this morning?

MS. COMEY:  Your Honor, I'm pleased to report that Ms. Geragos, Mr. Driscoll and I resolved all of our issues with respect to Mr. Cerciello's charts and exhibits, so we have nothing to tee up for your Honor with respect to that witness.

THE COURT:  Very good.

Mr. Agnifilo?

MS. GERAGOS:  We don't have any issues, your Honor. With the Court's permission, until Mr. Paul arrives, we wanted the ability to be able to show our client the videos that were played yesterday and are going to be played today through Penland because, as we've told your Honor, in the lockup it's impossible to see the computer screens.  So we are going to ask

P6HQcom1

that until the jury gets here or until Mr. Paul gets here, we have the opportunity to confer with our client to the side to show him the evidence that's going to be presented.

THE COURT:  That's fine.  Do we need to make any adjustments of in terms of who is in the courtroom?

MS. GERAGOS:  No.  I think we can move it so the audience doesn't see, and he's seated kind of where Mr. Driscoll is, or we can go in the back, just right in the back here.  And then the only slight adjustment I would ask for is a brief modification of the amended protective order that it mandates that I am in possession of this USB at all times, and I would just ask our defense team is allowed to be in possession of it during the 20 minute period where I show him the videos so I can step out and print some things.

THE COURT:  Any objection to that understanding, Mr. Agnifilo, as I just said, is responsible for the whereabouts of that USB and anything that happens to it?

MS. COMEY:  No objection, your Honor.

MS. GERAGOS:  Although I do believe the order mandated that I am personally responsible for it, but I don't want to pass the buck on this USB to him.  It is court ordered that I am in possession of it at all times.

THE COURT:  The buck is shared in that respect.  Very good.

As to the questions concerning Juror No. 7.  Just as I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HQcom1

indicated yesterday, I think it makes most sense to handle that at the end of the day because of the coordination issues just in terms of people arriving.

Have the parties discussed how they want the Court to answer those questions?  Meaning, in the robing room, here with the court sealed, et cetera.

MS. STEINER:  Your Honor, the parties have not discussed that.  We can confer briefly, if that's possible.

THE COURT:  Very good.  Please confirm that, and then we'll handle that at the end of the day today.

MS. STEINER:  Thank you, your Honor.

THE COURT:  Before we give you a break so you can handle the issues that you need to handle, Mr. Agnifilo, do you have a general sense -- again, I'm not holding you to anything, but given what you know now, do you have a sense of the duration of the defense's case here?

The reason I ask this is because I'm working on the charge right now, and I didn't know what pace I need to maintain.  I'm happy to burn the midnight oil and be here all night, but I just need to know how long the defense case is anticipated at the present time.  Ballpark, not final.

MR. AGNIFILO:  I understand; Judge.

I would think it would be between two and five days of trial days, not longer than five.  It could be shorter than two.  I know that we're making, you know, adjustments as we go.

P6HQcom1

So I would say the ballpark is between two and five trial days.

THE COURT:  All right.  So I think the government said that their case would likely take through the end of the day tomorrow.  Is that still the projection?

MS. COMEY:  Yes, your Honor, depending on the length of cross today and the length of cross of Agent Cerciello, it could spill into Friday morning, but I think it's very likely we'll rest tomorrow.

THE COURT:  Ms. Shapiro, you have motions.  And how long is that going to take.

MS. SHAPIRO:  Not that long.

THE COURT:  All right.  So but we have a short day on Friday.  So, Mr. Agnifilo, if I'm hearing you right, and the defense case takes a couple of days next week at minimum, then we could be looking at charging the jury at some point next week.

MR. AGNIFILO:  Yes, I think that's right.

THE COURT:  I will get some of the Celsius that the kids are drinking these days.  Very good.  We'll come back at close to 9:00 a.m. to get started.

(Recess)

THE COURT:  Anything to address before we get started?

Ms. Slavik, you're standing up.

MS. SLAVIK:  I'm standing up because I'm ready to bring Mr. Paul up to the stand.

P6HQcom1

THE COURT:  Let's give Mr. Combs a second to come out.

MR. AGNIFILO:  I'll go tell them that we're ready to go.

MS. SLAVIK:  Your Honor, does the Court have a copy of the paperwork, the immunity paperwork?

THE COURT:  I believe I do.  Yes, I do.

Mr. Agnifilo, I believe that your client would like ten minutes to review the materials.

MR. AGNIFILO:  I see.

THE COURT:  So do we feed to wait ten minutes or can we proceed with the immunity application?

MR. AGNIFILO:  Can I ask him that question?

THE COURT:  Yes.

MR. AGNIFILO:  Thank you, Judge.

(Pause)

THE COURT:  I know I sent you back in there, but why don't we just wait.

MR. AGNIFILO:  No.  You know, I spoke to him to the extent he has a right to be present for the immunity application, I told him he had that right, and he said he thanks the Court for the opportunity to watch the videos.  He does not want to be present in ways that he has a right to be present for the immunity application.

THE COURT:  Does anyone have a problem with us proceeding or perceive an issue with us proceeding?

P6HQcom1                     Brendan Paul

MS. SLAVIK:  No, your Honor.

THE COURT:  All right.  Let's proceed then.

Good morning.

DEPUTY CLERK:  Can you please give the Court your first and last name, please.

THE WITNESS:  Brendan Paul.

MS. SLAVIK:  May I inquire, your Honor?

THE COURT:  You may.

BRENDAN PAUL, sworn

EXAMINATION

BY MS. SLAVIK:

Q.  Good morning, Mr. Paul.

A.  Good morning.

Q.  Mr. Paul, did you receive a subpoena requesting you to testify at trial?

A.  Yes.

Q.  Do you have an attorney who represents you in connection with this matter?

A.  I do.

Q.  Based on your discussions with your attorney, do you intend to invoke your constitutional right not to testify and not to answer any and all questions put to you on the grounds of potential self-incrimination?

A.  Yes.

Q.  Do you understand that if the Court enters an order

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HQcom1                     Brendan Paul

granting you immunity, that you will be required to answer any and all questions truthfully here?

A.  Yes.

Q.  Do you understand that the order will not protect you from prosecution for perjury if you intentionally make false statements here today?

A.  Yes.

MS. SLAVIK:  Your Honor, on the basis of the witness's answers to these questions, the government asks that you enter the proposed order that has been submitted to the Court.

THE COURT:  I will enter the proposed order dated today, and it will be made a Court exhibit.

Anything further, Ms. Slavik?

MS. SLAVIK:  No, your Honor.

THE COURT:  Thank you very much, Mr. Paul.

Mr. Agnifilo, are you prepared to proceed.

MR. AGNIFILO:  We are.  Thank you.

THE COURT:  Mr. Combs, while you were reviewing the materials, we handled the immunity application of Mr. Paul, and I understand, Mr. Combs, that you waived your appearance at that time.

THE DEFENDANT:  Yes, your Honor.

(Jury present)

THE COURT:  Welcome, back members of the jury.

Agent Penland, you understand you are still under

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HQcom1                          Brendan Paul

oath?

THE WITNESS:  Yes.

THE COURT:  Ms. Johnson, you may proceed when ready.

MS. JOHNSON:  Thank you, your Honor.

DeLEASSA PENLAND, resumed.

DIRECT EXAMINATION CONTINUED

P6HQcom1                     Penland - Direct

BY MS. JOHNSON:

Q.  Good morning, Special Agent Penland.

A.  Good morning.

Q.  When we left off yesterday, you were testifying about Government Exhibit 1402.  Do you recall that testimony?

A.  Yes.

MS. JOHNSON:  Ms. Foster, could you please pull up Government Exhibit 1402.  And could you please zoom in on page 1, line item 2.

Q.  Special Agent Penland, what is the date associated with line item 2?

A.  August 26, 2009 to August 28, 2009.

Q.  And what city is listed for the second column?

A.  New York City.

Q.  What hotel and address is listed in the third column?

A.  The London Hotel, 151 W. 54th Street, New York, New York.

Q.  In what borough is 151 W. 54th Street?

A.  Manhattan.

P6HQcom1                    Brendan Paul

Q.   What names are listed in the names column?

A.   Sean Combs, Casandra Ventura and Jules Theodore, a/k/a Jules.

Q.   What flight records are listed in the flight records column?

A.   Jules Theodore.

Q.   So I want to focus on Government Exhibit 4A-124.

     Do you see that as a citation for some of the entries on line item 2?

A.   I do.

Q.   Which entries?

A.   The location hotel address, as well as flight records.

Q.   What type of document is Government Exhibit 4A-124?

A.   An American Express statement.

     MS. JOHNSON:  I'd like to take this down now and pull up Government Exhibit 1405-A.

Q.   Is this a chart that you were asked to review for accuracy?

A.   Yes.

Q.   Can you please explain what this chart shows?

A.   This chart indicates there were selected expenses that were charged to an American Express statement ending account number 6009.

Q.   Who selected the charges to include on Government Exhibit 1405-A?

A.   The trial team.

P6HQcom1                    Brendan Paul

Q.   And looking at the dates and the charge on American Express statement column, what is the date range of the dates that are listed?

A.   August 26, 2009 through August 29, 2009.

Q.   Let's walk through the charges.

          What types of charges are the first three rows?

A.   These are charges to the London New York City Hotel.

          MS. JOHNSON:  You can take that zoom down, Ms. Foster.

Q.   What about the next row with the orange next to it?

A.   This is a charge to Virgin America for a ticket from Los Angeles to JF Kennedy for Jules Theodore.

Q.   What is the date of departure for that ticket?

A.   August 26.

Q.   Just circling back quickly, I forgot to ask you one thing about the London Hotel charges.  What are the arrival and departure dates associated with those charges?

A.   August 26, 2009 to August 29, 2009.

          MS. JOHNSON:  You can take that zoom down, Ms. Foster.

Q.   Focusing in the middle on the travel agency service charge, how, if at all, does that relate to another charge on this chart?

A.   This is the travel agency service fee for the ticket purchased for Jules Theodore.

          MS. JOHNSON:  You can take that zoom off.

Q.   Can you describe the charge underneath on August 27, 2009

P6HQcom1                        Brendan Paul

for Select Limousine?

A.   Yes, this charge is for a pickup from a flight coming in

Virgin America and a dropoff at the London New York City for

Jules Theodore.

Q.   And what date is associated with this pick up?

A.   August 26, 2009.

Q.   Can you take that zoom down.  Then zooming in on the last

two.  Can you describe the American Airlines charge?

A.   This is a charge for a ticket from JF Kennedy airport to

Los Angeles California for Jules Theodore departing on

August 28, 2009.

Q.   How, if at all, does the travel agency charge relate to the

American Airlines charge?

A.   That's the travel agency service fee for that ticket.

        MS. JOHNSON:  You can take that zoom down now,

Ms. Foster.

Q.   Turning to the payment method column, how was each of the

charges listed in the charge column paid?

A.   They were paid with the American Express account number

ending 6009.

Q.   Who is the account holder for the American Express account

ending 6009?

A.   Sean Combs.

        MS. JOHNSON:  You can take that down now, Ms. Foster,

and please pull up Government Exhibit 1552.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HQcom1                        Brendan Paul

Q.  Special Agent Penland, what does Government Exhibit 1552 shows?

A.  This shows that the American Express statement ending September 24, 2009 includes those select charges that we just looked at, among other charges as well, for a total bill of $218,353.

Q.  Moving to page 2 of this demonstrative, what does page 2 show?

A.  This indicates that there was one account at Signature Bank that was used to pay off the total $218,353 of charges, and that account was ending numbers 9686.

Q.  Who is the account holder for the Signature Bank account ending?

A.  207 Anderson LLC care of Bad Boy Entertainment Worldwide.

        MS. JOHNSON:  Take that down now, Ms. Foster.

        Pull up Government Exhibit 1402 page 1, and zooming in on line 2.

Q.  Which exhibits are cited in the names column under Casandra Ventura's name?

A.  GX-3A-106 and GX-1308.

        MS. JOHNSON:  Ms. Foster, can you pull up those two exhibits side by side.

        Ms. Foster, can you please zoom in on paragraph 2 of Government Exhibit 1308.

        I'll read the stipulation between the parties into the

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P6HQcom1                          Brendan Paul

record:  Paragraph 2 states that Government Exhibit 3A-106 are communications from an electronic device for which Casandra Venture is the device owner.

You can undo that zoom now.

Ms. Foster, can you zoom in on the top of Government Exhibit 3A 106?

Q.  Special Agent Penland, who are the participants in this communication?

A.  Jules and Casandra Ventura.

Q.  Whose messages -- if you undo that zoom, whose messages are assigned to the left?

A.  Jules.

Q.  Whose messages are assigned to the right?

A.  Cassie Ventura.

Q.  What are the date range this covers?

A.  August 26, 2009 to August 28, 2009.

Q.  If you read the chats associated with Ms. Ventura, I'll read the chats associated with Jules.

A.  Hey, how are you?  Give me a call when you get this.

Q.  Did you two leave?

A.  Here's your book locater.  CYQSUR, 6:35 a.m. American Airlines flight 201 leaving from JFK.

Q.  Thank you.

A.  Thank you.  Safe flight.

Q.  Thanks again and happy Bday.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HQcom1                    Brendan Paul

MS. JOHNSON:  You can take that down now Ms. Foster.

If you could pull back up Government Exhibit 1405-A.

Just zooming in on the purple line.

Q.  What airline is associated with this charge?

A.  American Airlines.

Q.  Is that the same airlines that was mentioned in the

communication we just read?

A.  Yes.

Q.  And what's the flight itinerary between cities for this?

A.  JF Kennedy airport to Los Angeles, California.

MS. JOHNSON:  You can take that down now, Ms. Foster.

Can we go back to 1402, page 16 line 46.

Q.  Special Agent Penland, what are the dates associated with

line item 46?

A.  September 15, 2014.

Q.  And what city?

A.  Los Angeles.

Q.  What hotel is listed in that column?

A.  Four Seasons Hotel and Resorts.

Q.  And what is the reservation name for the hotel?

A.  Eli Maroun.

Q.  What names are listed in the names column?

A.  Sean Combs, Clayton Howard a/k/a Dave.

Q.  Whose flight records are listed in the flight records

column?

P6HQcom1                        Brendan Paul

A.   Clayton Howard.

Q.   I want to focus again on the Government Exhibit 4A-130. Which columns rely on 4A-130 as a source?

A.   The location hotel/address and the flight records.

         MS. JOHNSON:  Ms. Foster, can you please pull up Government Exhibit 1405-D page 1.

Q.   Is this another chart you were asked to review for accuracy?

A.   Yes.

Q.   Can you please explain what 1405-D shows?

A.   This shows selected charges on the American Express statement ending 5002.

Q.   Who selected the charges to include in this chart?

A.   The trial team.

Q.   Can you summarize the first four charges next to the purple column?

A.   These are all charges by Four Seasons Hotels, and the arrival date is September 15, 2014 with a departure date of September 17, 2014.

Q.   What location of the Four Seasons are these charges associated with?

A.   Los Angeles.

         MS. JOHNSON:  You can take that down.

Q.   Zooming in on the bottom three charges, what are those three charges?

P6HQcom1                          Brendan Paul

A.   These are charges by Journey Corporation, a travel agency,
service for travel itinerary.

Q.   Can you tell from these charges the passenger name
associated with the travel itinerary?

A.   Clayton Howard.

        MS. JOHNSON:  You can take that zoom down now.

Q.   And focusing on the payment method column, who is each
charge that's listed in this charge paid?

A.   By the American Express statements ending 5002.

Q.   Who is the account holding for the American Express account
ending 5002?

A.   Sean Combs.

        MS. JOHNSON:  You can take that down, Ms. Foster.

        Can you please pull up Government Exhibit 1555 as a
demonstrative.

Q.   Special Agent Penland, what does this first page show?

A.   This shows the American Express statement ending
September 23, 2014 which included the charges that we just
reviewed at the Four Seasons Hotel, and the travel agency, also
included other charges totaling $298,810 for a total amount due
at the end of that statement of $307,424.

Q.   Turning to page 2, what does page 2 show?

A.   This indicates that that balance of $307,424 on that
American Express statement ending September 23, 2014 was paid
by five different Signature Bank accounts.

P6HQcom1                         Brendan Paul

MS. JOHNSON:  We can take that down please and pull up Government Exhibit 1405-D at page 2.

Q.  Was this another chart that you were asked to verify the accuracy of?

A.  Yes.

Q.  Can you explain to the jury what this chart shows?

A.  This chart is color coded to the previous chart we just saw.  It shows the five different bank accounts that payments were made from, the date of the payment, the check number that was used to make the payment, and the total amount that was paid by each Signature Bank account.

Q.  And who are the account holders for the Signature Bank accounts used to make the statements as depicted in this chart?

A.  Combs Enterprises LLC, care of Bad Boy Entertainment, 40 Hedges Realty Inc., care of Bad Boy Entertainment Worldwide, 207 Anderson LLC, care of Bad Boy Entertainment Worldwide, 56th and Broadway LLC care of Bad Boy Entertainment, and Bad Boy Productions.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

BY MS. JOHNSON:

Q.   And on the top line, for the November 21 payment, the box is shaded in light blue.  Can you explain why that box is shaded?

A.   So, this total amount of charges were paid over time; they weren't paid on a single date.  And over that time, the American Express statement is used and additional charges are made to that statement.  And so the final payment was paid to apply to some of those other charges.

So if you see at the bottom in blue, it shows that the $33,229 payment is part of a larger payment totaling $86,757, but only the 33,229 would have went toward these charges that we are looking at.

Q.   When you say these charges, are you referring to the entire bill as of the end of, I believe, September 2014?

A.   Correct.

MS. JOHNSON:  You can take that down now, Ms. Foster.

And now can we please pull up Government Exhibit 1402 at page 16, line 46.

Q.   And focusing your attention on the location column, what are the other sources cited for the location column?

A.   There is a GX 7D123 and GX 1304.

MS. JOHNSON:  Ms. Foster, can you please pull up GX7D123 side by side with Government Exhibit 1304, page 7.  And zooming in on paragraph 41 of Government Exhibit 1304, please.

PghWcom2                    Penland - Direct

This is a stipulation between the parties that reads: Government Exhibits 7D101 through 7D153 are true and accurate records from Four Seasons Hotels and Resorts.

You can take that down now and take the stipulation off the screen.

Q.   Special Agent Penland, I want to walk through a few boxes on Government Exhibit 7D123.  Focusing first on the top left, what's the name associated in the top left two boxes?

A.   Elie Maroun.

Q.   And moving down, what are the dates of arrival and departure?

A.   September 15, 2014, and September 17, 2014.

Q.   And below that, what's the room rate?

A.   $2,200.

Q.   And going over into the middle, under payment and credit card number, how -- what's the payment and credit card number listed in this Four Seasons document?

A.   The payment method is an American Express ending in 5002.

Q.   Is that the same account that we just looked at in the chart?

A.   Yes.

Q.   And turning your attention to the, all the way on the right, there's a contact first and last name.  Can you read that name?

A.   Kristina Khorram.

PghWcom2                    Penland - Direct

Q.   And then moving all the way down to the bottom, the second box, there's a box that says old cardholder.  Whose name is next to old cardholder?

A.   Sean Combs.

        MS. JOHNSON:  Ms. Foster, can you please now pull up, in the same and exhibit, pages 4 and 6 side by side.

Q.   So still looking at Government Exhibit 7D123, starting on page 6, on the right, Special Agent Penland, can you read the text in the bottom box?

A.   "Mr. Elie Maroun asked for a room to be added to his reservation."

        MS. JOHNSON:  We can take that down.

        And then focusing -- Ms. Foster, can you zoom in on the bottom box on page 4 on the left.

Q.   OK.  So walking through some of the boxes, whose name is at the top left?

A.   Eli Maroun.

Q.   And what's the arrival and departure dates?

A.   September 15, 2014, and September 17, 2014.

Q.   Going down below, What's the room rate for this particular room?

A.   $495.

Q.   And moving into the middle, what card is listed under payment?

A.   The American Express ending in 5002.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.   Is that the same American Express for which we looked at the charges in Government Exhibit 1405D?

A.   Yes.

Q.   Who is the contact first and last name on the bottom right-hand side?

A.   Kristina Khorram.

        MS. JOHNSON:   You can take that down now.

        Ms. Foster, can you pull up again 1402, page 16, line 46.

Q.   And looking at the flight records column, are there additional sources besides the Government Exhibit 4A130 cited under flight records?

A.   Yes.

        MS. JOHNSON:   I'm going to look at just one of those. Could we pull up Government Exhibit 6T108.

Q.   And what type of document is this?

A.   This is a travel invoice.

Q.   Under the letterhead, what is the name that is listed under the letterhead?

A.   Bad Boy Entertainment.

Q.   And who is the passenger for this flight?

A.   Clayton Howard.

Q.   And what is the departure date and arrival date of the first flight?

A.   September 15, 2014, to September 16, 2014.

PghWcom2                       Penland - Direct

Q.   And what route is that flight?

A.   New York Kennedy to Los Angeles.

Q.   And then underneath, what is the departure date of the
second flight?

A.   September 16, 2014.

Q.   And what's the arrival date?

A.   September 17, 2014.

Q.   And what's the itinerary of that flight?

A.   Los Angeles to New York Kennedy.

Q.   And which city is associated with New York Kennedy Airport?

A.   New York City.

          MS. JOHNSON:  You can take that down now, Ms. Foster.

          Can you please pull up Government Exhibit 1405C.

Q.   Special Agent Penland, is this another chart that you
reviewed for accuracy?

A.   It is.

Q.   And can you please explain what this chart shows?

A.   This shows selected charges on an American Express
statement ending in 9005.

Q.   And who selected the charges to include in Government
Exhibit 1405C?

A.   The trial team.

Q.   So let's just walk through these charges briefly.

     What are the top two rows?

A.   This is a charge by American Air Lines for a ticket from

Los Angeles to JF Kennedy Airport with a passenger name of Jules Theodore departing on July 29, 2010, and the top charge is the travel agency service fee related to that ticket.

MS. JOHNSON:  You can pull that down, Ms. Foster.

Q.  Focusing on the middle charge next to the orange box, what's that charge for?

A.  This is a charge by Diptyque for $740.35 on July 30, 2010.

Q.  Pulling that down, what's the next charge?

A.  A charge by Astor Wine & Spirits in New York for $435.48 on July 30, 2010.

MS. JOHNSON:  Pulling that down again, can you zoom in on the bottom box.

Q.  What is this charge?

A.  This is a charge by United Airlines for a ticket from JF Kennedy Airport to Los Angeles, California, for July Theodore departing August 1, 2010.

Q.  And for all the charges we just walked through, what was the payment method for each of those charges?

A.  The American Express statement ending 9005.

Q.  And who is the account holder for the American Express card ending 9005?

A.  Sean Combs.

MS. JOHNSON:  You can pull that down, please, and put up Government Exhibit 1554.

Q.  What does this show, Special Agent Penland?

A.   This shows that the American Express statement ending August 23, 2010, which includes the charges we just reviewed by United Airlines, Diptyque, Astor Wine & Spirits, American Air Lines and the travel agency fees; also included, other charges of $106,314 for a total bill of charges due at the end of August 23, 2010, statement of $108,656.

Q.   Moving to the second page of 1554, what does this slide show?

A.   This slide shows that the $108,656 of charges that were due on the August ending -- on the account ending August 23, 2010, statement was paid by a single Signature Bank account ending in 9686.

Q.   And who is the account holder for the Signature Bank account ending in 9686?

A.   207 Anderson LLC, care of Bad Boy Entertainment Worldwide.

          MS. JOHNSON:   We can pull that down now, and pulling up Government Exhibit 1402 again, if we could please go to line 26 on page 10.

Q.   And focusing your attention on the location column, the third column, can you read what that says?

A.   Beverly Hill Hotel, room 121, 9641 West Sunset Boulevard, Beverly Hills, California, 500 miscellaneous damage to drapes/carpet.

Q.   What source shows the miscellaneous damage that's listed in line 26?

A.   GX 7B-130.

MS. JOHNSON:  Let's pull up GX 7B-130, please, Ms. Foster.

Q.   What type of document is this, Special Agent Penland?

A.   This is a hotel invoice.

Q.   And directing your attention to the top line, whose name is the invoice in?

A.   Mr. Philip Pines.

Q.   And then directing your attention to the second from the bottom line charge on 2/25/13, what does that charge say?

A.   Miscellaneous damage to drapes/carpet.

Q.   And what's the amount of that charge?

A.   $500.

MS. JOHNSON:  You can take that down now, Ms. Foster, and please pull up again Government Exhibit 1402, page 18, line 52.

Q.   Special Agent Penland, can you please read what it says under location?

A.   L'Ermitage Hotel, room 505, 9291 Burton Way, Beverly Hills, California 90210, $950 for linen damage/deep cleaning.

Q.   And what is the source for the $950 for linen damage/deep cleaning?

A.   It's going to be GX 7H-155-1, -2, and -3.

MS. JOHNSON:  Ms. Foster, can we please pull up Government Exhibit 7H-155-1, please.

PghWcom2                        Penland - Direct

Q.   Special Agent Penland, what type of document is this?

A.   This is a hotel invoice.

Q.   And what hotel is this for?

A.   L'Ermitage, Beverly Hills.

Q.   And directing your attention to the top left, whose name is this invoice in?

A.   Ryan Lopez.

Q.   And directing your attention to the middle of the charges on December 9, 2015, the miscellaneous charge, can you please read what that says?

A.   "Miscellaneous charge due to linen damage and deep cleaning."

Q.   What's the amount of that charge?

A.   $1,700.

Q.   And below it, what's the line item below it?

A.   It appears to be an adjustment to the 1,700 by reducing it by $750.

Q.   And is 1,700 less 750 950?

A.   Yes.

Q.   And is that how the $950 is listed on 1402?

A.   Yes.

          MS. JOHNSON:  So I'd like to now pull up Government Exhibit 1551 side by side with Government Exhibit 7R-129.

Q.   First, I'd like to look at Government Exhibit 7R-129.

     What type of document is this?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

PghWcom2                         Penland - Direct

A.   This is a hotel invoice for InterContinental New York, Times Square.

Q.   And what's the name on this invoice?

A.   Mr. Frank Black.

Q.   And what's the date associated with this invoice?

A.   October 5, 2012.

Q.   And can you please read the last line item, the charge?

A.   "Petty cash A&G loss and DA penthouse damage."

Q.   What is the amount of the charge associated with that line item?

A.   $46,786.

Q.   How was that charge paid?

A.   American Express statement ending 3004.

        MS. JOHNSON:  Ms. Foster, if you can take the zoom down now, and then we'll refer to 1551 on the left.

Q.   What does that show?

A.   This chart indicates that the $46,786 charge that we just looked at is represented on the American Express statement ending October 11, 2012.  There are other charges on that statement for a total due of $944,059.

        MS. JOHNSON:  Can you please go to page 2 of Government Exhibit 1551.

Q.   What does this show?

A.   This chart shows that that ending balance on the American Express statement ending October 11, 2012, was paid by multiple

PghWcom2                       Penland - Direct

bank accounts at Signature Bank.

MS. JOHNSON:  And you can take this down now, Ms. Foster.  And can you please pull up Government Exhibit 1404.

Q.  Is this another chart you were asked to review for accuracy?

A.  Yes.

Q.  Can you please explain what Government Exhibit 1404 shows?

A.  This indicates -- the color coding ties to the previous chart that we just looked at.  It indicates every bank account that was used to make payments toward that balance.  It includes the name of the account and the account holder, the dates payments were made and the check numbers used to make those payments, the total amount of payments that were made by bank account.

Q.  Is this the same type of chart we looked at in connection with one of the earlier charges with multiple payments?

A.  Yes.

Q.  And is the explanation for the blue shaded box on December 22, 2012, the same explanation you provided earlier with respect to that other chart?

A.  Yes.

MS. JOHNSON:  You can take that down now, Ms. Foster.

I'd like to pull up Government Exhibit 1402 again.

Q.  And just zooming in on page -- line item 2, what dates are associated with this particular line item?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   August 26, 2009, to August 28, 2009.

MS. JOHNSON:   I'm sorry.   I meant to pull up No. 3.

Q.   Which dates are associated with No. 3?

A.   December 11, 2009, to December 13, 2009.

Q.   And is this one of the line items we went through in detail yesterday?

A.   Yes.

MS. JOHNSON:   Ms. Foster, can you please pull up Government Exhibit 3A-111 side by side with 1308, paragraph 1.

Q.   Before we get to the stipulation, just zooming in on the date on the top of 3A111, what's the date on the top of 3A111?

A.   December 9, 2009.

Q.   And how, if at all, how does that date relate to line item 3, the dates in line item 3?

A.   It's included in the time period that's indicated.

Q.   Is it -- do you have, do you have the chart in front of you?

A.   Yeah.   Let me --

It's two days before the date.

Q.   OK.   So to be clear, the dates indicated in line item 3 are December 11 to December 13, 2009, is that right?

A.   Correct.

MS. JOHNSON:   Now, Ms. Foster, zooming in on paragraph 1 of the stipulation, which reads that "Government Exhibit 3A-111 are communications from an electronic device for which

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

PghWcom2                        Penland - Direct

Sean Combs is the device owner."

You can take that down now.

Q.  Special Agent Penland, who are the participants in this communication?

A.  New York Strip and Sean Combs.

Q.  And taking that zoom down, if you read the Sean Combs lines, I'll read the New York Strip lines.

A.  From the beginning?

Q.  Yes, please.

A.  "Calling about 12 o'clock massage POS text when you can. Need to push to 12:40.  POS GIT back to confirm.  Thank you.

"Hello.  What time do you think?  Are you lost?

"Can you let me know if there's a problem, so if there is I have time to get her another present.  Thank you."

Q.  "Hey, are you a cop?"  Exclamation point, question mark.

"I'm sorry, but I was a little uneasy about meeting you, seems a bit too good to be true..."

A.  "No, man.  Are you crazy?  No, are you?"

Q.  "You got the hotel room for one night, didn't you... sorry about all that, I'.m a few mins away."  Winkie face.

MS. JOHNSON:  You can take that down now, Ms. Foster.

And can you pull up Government Exhibit 1402.

Q.  Special Agent Penland, please feel free to refer to the printout that you have in front of you.  Could you review 1402 and let us know how many lines of 1402 list New York City as a

PghWcom2                          Penland - Direct

location?

A.   14.

Q.   And just focusing first on line item 1, what is the address associated with line item 1?

A.   151 West 54th Street, New York, New York.

Q.   And what borough is that in?

A.   Manhattan.

Q.   And could you, for the 14 line items that are in New York City that have associated addresses, could you please review those addresses and advise what borough those addresses are in?

A.   One of them doesn't have an address, but all of them -- all of the remaining are in Manhattan.

         MS. JOHNSON:  And Ms. Foster, could you please turn to page 13, line 36 -- I'm sorry.  Line 35.

Q.   What is the date associated with line 35?

A.   August 9, 2013.

Q.   And could you read the location associated with line 35?

A.   Hilton Garden Inn Riverhead, room 240, 2038 Old Country Road, Riverhead, New York.

Q.   And where, if you know, is Riverhead, New York?

A.   On Long Island.

Q.   And where are the Hamptons, if you know?

A.   On Long Island.

         MS. JOHNSON:  You can take that down now, Ms. Foster.

         Oh, I'm sorry.  Could you leave up 1402.

PghWcom2                    Penland - Direct

Q.  Special Agent Penland, with respect to the flight records
column, could you review the chart in the same way we did for
the city column and advise how many entries have flight records
listed?

A.  20.

Q.  And could you read the names of the individuals for whom
flight records are listed in that column in Government Exhibit
1402?

A.  Julian Sapp, Jules Theodore, Casandra Ventura, Clayton
Howard.  That's it.

          MS. JOHNSON:  OK.  I would now like to take this down,
please.

          If you could please look at what's in your binder as
Government Exhibit 1550, and if we could pull that up for
identification for the Court, the witness and the parties.

Q.  Special Agent Penland, do you recognize what's depicted in
Government Exhibit 1550?

A.  I do.

Q.  What is it?

A.  This is a timeline of events during the month of March
2016.

Q.  Who prepared the timeline initially?

A.  The trial team.

Q.  Who confirmed the accuracy of the items in the timeline?

A.  I did.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Q.   What did you do to confirm the accuracy?

A.   I reviewed the evidence that was provided to me and made corrections as needed.

Q.   And at a high level, what types of underlying documents did you review in connection with confirming the accuracy of the timeline?

A.   I reviewed text messages, call records -- phone call records, photographs and other data.

Q.   What time zone were the underlying communications in?

A.   UTC.

Q.   And what, if any, conversion was applied for the purposes of listing them on the timeline?

A.   They were converted to Pacific Time.

Q.   Are all the underlying documents cited in the timeline?

A.   Yes.

Q.   Are all of them exhibits in this case, to your knowledge?

A.   Yes.

Q.   Who selected the exhibits that were used in this timeline?

A.   The trial team.

Q.   And can you describe the volume of exhibits that were included?

A.   There were hundreds of pages of exhibits.

Q.   Did you have any role in selecting them?

A.   I did not.

Q.   If you found any errors, did you have the opportunity to

correct the errors?

A.  Yes.

Q.  And does the current timeline in Government Exhibit 1550 reflect corrections that you made?

A.  Yes.

MS. JOHNSON:  The government offers Government Exhibit 1550 as a demonstrative.

THE COURT:  Any objection to its use as a demonstrative?

MS. GERAGOS:  Not other than what we've already said to your Honor.

THE COURT:  All right.  It can be used as a demonstrative.

MS. JOHNSON:  Ms. Foster, could you please publish to the jury.

Q.  OK.  Before we go through the timeline, Special Agent Penland, I want to talk about the formatting.

Directing your attention to the gray bar in the middle of the page, what does that show?

A.  This gives the time beginning and ending for this particular slide as well as the sequence of events by what happened.

Q.  And there are icons on the timeline.  What do those icons show?

A.  The one that looks like a telephone indicates a phone call

PghWcom2                        Penland - Direct

was made.  The one that looks like a text message indicates a text message is made.

Q.  Are there other icons we'll see in subsequent slides that show, for example, photographs?

A.  Yes.

Q.  And what does the photograph icon look like?

A.  A camera.

Q.  What is reflected above the gray bar?

A.  These are communications related to Sean Combs.

Q.  And directing your attention to the first box, there's text in both black and text in white.

What, if any, difference is there between the color of the text?

A.  If Sean Combs initiated the communication, it's in black. If Casandra Ventura initiated the communication, it's in white.

Q.  And what color are the boxes associated above the line with communications related to Mr. Combs?

A.  It's a dark orange.

Q.  And what, if any, other colors are used in the timeline in the communications boxes?

A.  The pink color that you see below the line relates to individuals communicating about the relation -- in relation to the previous chart we looked at, the 1402, there are green communications that are friends or some known individual, and there are also light orange communications that relate to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

employees of Sean Combs.

MS. JOHNSON:  I'd like to walk through all of the slides in Government Exhibit 1550.  We'll start on slide 1.

Q.  What date is slide 1, is associated with slide 1?

A.  March 4, 2016.

Q.  So first, on the left, what does the box on the left show?

A.  This indicates that a call was made from Combs to Ventura at 6:04 p.m., and that call connected for 41 seconds.

Q.  And just pausing you there, is the 41S in parentheses indication of the length of the call?

A.  Yes.

Q.  You can continue.

A.  Then a call was made from Ventura to Combs at 6:05 p.m., and that call connected for 17 seconds.

Q.  And the GX B-601 that's listed beneath that, is that the source that you used to verify the accuracy of those two calls?

A.  Yes.

Q.  And is that format you used consistently throughout the timeline where the source is listed underneath the evidence?

A.  Yes.

MS. JOHNSON:  You can take that down now.

Q.  Turning to the communications below the gray bar, can you read the message from Garren Cb4a to Ventura?

A.  "Fun tonight?"

Q.  What time is that sent?

PghWcom2                          Penland - Direct

A.   6:21 p.m.

Q.   And at 6:33 p.m., what is Ms. Ventura's response to Garren Cb4a?

A.   "Yes.  L.A.?"

Q.   And can you read the next two communications?

A.   Garren Cb4a messages Ventura:  "Mr. Skyler?"  And Ventura responds to Garren Cb4a:  "Yes, but anyone new."

Q.   And what time is that communication?

A.   6:34 p.m.

          MS. JOHNSON:  We can take that zoom down now, Ms. Foster.

Q.   And turning to the last box on slide 1, what does that box show?

A.   This indicates that a call was made from Combs to Ventura. The call was not answered at 6:39 p.m.

Q.   And is the NA in parentheses in the timeline an indication that the call was not answered?

A.   Yes.

Q.   And is that abbreviation used consistently throughout the timeline?

A.   Yes.

Q.   Turning now to slide 2, what date is slide 2?

A.   March 4, 2016.

Q.   And what is the time range of communications on slide 2?

A.   6:47 p.m. to 7:47 p.m.

PghWcom2                        Penland - Direct

Q.   On this slide, are the communications between Ms. Ventura and Garren Cb4a?

A.   Yes.

Q.   If you read the Ms. Ventura communications, I'll read the Garren Cb4a communications.

A.   "OK.

"Can you put him on notice that it might be like 7:30?

"Just Skyler is good."

Q.   "K."

A.   "And I'll let you know about the other guy."

Q.   "K.   Skyler said he has family dinner at 9 p.m. but can come after."

A.   "OK.   Will hit you back soon.

"OK.   Let's do Skyler.   What time will you think that will be."

Q.   "Checking.

"10:30 p.m."

        MS. LEWIS:   You can take that down now and move to the third slide, please, Ms. Foster.

Q.   And what date is the third slide?

A.   March 4, 2016.

Q.   What's the time period of the third slide?

A.   7:48 p.m. to 11:15 p.m.

Q.   What calls are associated with the first box all the way on the left?

A.   These are calls from Combs to Ventura.

Q.   And when did they happen and what is their duration?

A.   The first one is at 7:48 p.m.  It is not answered.

     The second one is at 7:49 p.m.  It is connected for one minute, 54 seconds.

     And the third call is at 7:51 p.m., and it connects for 27 seconds.

          MS. JOHNSON:  You can take that zoom down now.

Q.   Directing your attention below the line to the pink box, can you read the message in that pink box?

A.   Skyler messages Ventura:  "Hey you," smiley face.  "G told me to say hello and let you know I can be there around 10:30 to 11."

Q.   What time was that sent?

A.   7:49 p.m.

          MS. JOHNSON:  You can take that down.

Q.   What does the next box show?

A.   There are three calls from Combs to Ventura from 8:17 p.m. to 8:20 p.m., and none of them are answered.

          MS. LEWIS:  You can take that down.

Q.   And directing your attention to the pink boxes on the bottom right-hand side, can you walk us through those pink boxes?

A.   At 10:15 p.m. Skyler messages Ventura:  "What time and where would you like me to meet?"

Ventura responds to Skyler:  "Can you do 3."

Skyler then responds to Ventura and says:  "possibly.  I will definitely try."

At 11:15 p.m., Ventura makes a call to Skyler.  That call connects for one minute, 20 seconds.

MS. JOHNSON:  You can take that down and go to slide 4, please.

Q.  What is the time -- sorry.  Starting first with the date, what's the date associated with slide 4?

A.  March 5, 2016.

Q.  And what are the times associated with slide 4?

A.  1:27 a.m. to 4:18 a.m.

Q.  And can you walk us through the communications between Skyler and Ventura on slide 4?

A.  At 1:27 a.m. Skyler messages Ventura:  "Which area will I be meeting you in?"

Ventura then calls Skyler at 3:04 a.m. and there is no answer.

Skyler then messages Ventura:  "hey, are we on?"

Ventura then calls Skyler at 3:05 a.m., and the call connects for 47 seconds.

At 4:08 a.m., Ventura messages Skyler:  "Hey."

Skyler responds to Ventura:  "Hello," smiley face.

And at 4:18 a.m., Ventura calls Skyler, and that call connects for two minutes and three seconds.

MS. JOHNSON:  You can take that down.  Let's move to slide 5, please.

Q.  What date is slide 5?

A.  March 5, 2016.

Q.  What is the time range on slide 5?

A.  6:23 a.m. to 11:44 a.m.

Q.  And before we get to the content of slide 5, directing your attention to the icons, is this the camera icon we had talked about earlier that is associated with a photograph in the middle of the page?

A.  Yes.

Q.  Starting with the communication at 6:23 a.m., what does Skyler message Ventura?

A.  "I know you're doing a damn good job.  I wanted to say keep it up.  I'm going to lay my head down soon, so just call me if we're getting together."

MS. JOHNSON:  You can pull that down.

Q.  Before we get to the details of the next box, approximately what times are listed in the next box?

A.  11:28 a.m. to 11:35 a.m.

Q.  And approximately how much time has elapsed between Skyler's messages at 6:23 a.m. and that first call at 11:28 a.m.?

A.  Around five hours.

Q.  Can you please walk us through the phone calls that start

PghWcom2                    Penland - Direct

at 11:28 a.m.?

A.   There are two calls at 11:28 a.m. from Combs to Ventura. Neither of those are answered.

There are two calls at 11:29 a.m. from Combs to Ventura. Neither of those are answered.

There are two calls at 11:30 a.m. from Combs to Ventura. Neither of those are answered.

There's a call at 11:32 a.m. from Combs to Ventura that is not answered, and there is a call at 11:35 a.m. from Combs to Ventura that is not answered.

MS. JOHNSON:  You can pull that screen down.

Ms. Foster, can you zoom in on the next boxes at the middle of the page.

Q.   Special Agent Penland, what do these boxes show?  What do these boxes show?

A.   These are three photographs that were taken at 11:35 a.m.

Q.   And what device, if you know, is the source of these photographs?

A.   Casandra Ventura.

MS. JOHNSON:  You can take those down now.  And zoom in on the box on the top right.

Q.   What communication -- can you walk us through the communications in that box?

A.   At 11:36 a.m., Combs makes a call to Ventura that is not answered, and at 11:37 a.m., Combs makes two phone calls to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

Ventura that are not answered.

At 11:38 a.m., Ventura calls Combs, and that call connects for one minute and 18 seconds, and at 11:44 a.m., Ventura calls Combs, and that call connects for one minute, nine seconds.

MS. JOHNSON:  You can take that down now.

Let's please go to slide 6, Ms. Foster.

Q.  And what date is associated with slide 6?

A.  March 5, 2016.

Q.  And what is the time range on slide 6?

A.  11:48 a.m. to 12:09 p.m.

Q.  Is that approximately 20 minutes of time?

A.  Yes.

Q.  Starting with the box all the way on the left, can you walk us through those communications?

A.  At 11:48 a.m., Combs makes a call to Ventura that is not answered.

At 11:53 a.m., Combs making a call to Ventura that is not answered.

And 11:54 a.m., Combs makes a call to Ventura that is not answered.

Q.  Turning your attention to the top message, at 11:54 a.m., what does Mr. Combs message Ms. Ventura?

A.  "Call now."

Q.  Underneath that, what does Ms. Ventura respond at 11:56 a.m.?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

PghWcom2                         Penland - Direct

A.   "I went and checked everything and spoke to security. Jules left so you're good and as long as you don't disturb the other guests they'll leave you be."

            MS. JOHNSON:  You can take that down.

Q.   Turning to the next box of calls, at 11:59, can you describe those communications?

A.   Combs makes a call to Ventura at 11:59 a.m. that is not answered.  And Combs makes a call to Ventura at 12:04 p.m. that is not answered.

            MS. JOHNSON:  You can pull that down.

Q.   And what does Mr. Combs text Ms. Ventura at 12:05 p.m.?

A.   "Call me now."

            MS. JOHNSON:  You can take that down.

Q.   What is the next communication?

A.   Combs makes a call to Ventura at 12:06 p.m., and that call is not answered.

Q.   And directing your attention underneath that, what does Mr. Combs message Ms. Ventura at 12:07 p.m.?

A.   "Call me.  The cops are here."

            MS. JOHNSON:  Take that down.

Q.   And can you walk us through -- before we get to that, directing your attention to the top box on the right-hand side, can you describe the phone calls at 12:08 p.m.?

A.   There are three calls at 12:08 p.m.  The first one is from Combs to Ventura and connects for 18 seconds.  The following

two calls are not answered.

MS. JOHNSON:  You can pull that down.

Q.  And before we go to the final two boxes, can you look below the line at the box shaded in light orange.  What is contained in that box?

A.  Ventura makes a call to D-Roc at 12:09 p.m., and that call connects for 22 seconds.

Q.  And go back above the line.

Can you describe the final communications on this slide?

A.  Combs messages Ventura at 12:09 p.m.:  "You gonna abandon me all alone" and also makes two calls to Ventura at 12:09 p.m., and neither call is answered.

MS. JOHNSON:  Let's go to slide 7 now, please, Ms. Foster.

Q.  What date is slide 7?

A.  March 5, 2016.

Q.  And what's the timing in slide 7?

A.  12:10 p.m. to 12:59 p.m.

Q.  So slightly under an hour of time?

A.  Yes.

Q.  Starting on the left, in the first two communications on the top, what does Mr. Combs message Ventura at 12:10 p.m.?

A.  "Call me pls."

Q.  And what does Ms. Ventura respond?

A.  "I have a premier Monday for the biggest thing I've ever

PghWcom2                        Penland - Direct

done in my life.  I have a black eye and a fat lip.  It was time for me to go.  You are sick for thinking it's OK to do what you've done."

Q.  And what does Ms. Ventura stay at 12:11 p.m.?

A.  "Please stay far away from me."

MS. JOHNSON:  You can take that down.

Q.  Starting first with the communications above the line, what phone call is documented at 12:11 p.m.?

A.  Combs makes a call to Ventura, and that is not answered.

Q.  And looking below the line, can you describe the other phone calls at 12:11 p.m.?

A.  D-Roc calls Ventura at 12:11 p.m.  That call is not answered.

And then Ventura calls D-Roc and that call -- excuse me.  That call connects for one minute, 37 seconds.

MS. JOHNSON:  You can undo that zoom now.

Q.  Moving back to the top line, what does Mr. Combs message Ms. Ventura at 12:11 p.m.?

A.  "Call me" and "help."

Q.  And can you go through the first three phone calls in the box below it?

A.  There are two calls from Combs to Ventura at 12:12 p.m. that are not answered.

And at 12:13 p.m., Ventura calls Combs, and that call connects for 34 seconds.

MS. JOHNSON:  Before we go through the rest of that box, Ms. Foster, can you undo the zoom and then zoom in on the box below the line at 12:14 p.m.

Q.  What other communication occurs at 12:14 p.m.?

A.  Ventura makes a call to D-Roc, and it connects for one second.

MS. JOHNSON:  You can pull that down.

Q.  And returning back above the line, can you finish describing the communications at 12:18 and 12:19 p.m.?

A.  At 12:18 p.m., Combs makes two calls to Ventura.  Both of those are not answered.

And at 12:19 p.m., Combs makes another two calls to Ventura, and neither of those are answered.

Q.  Zooming back out, and going below the line, can you describe the other communication at 12:19 p.m. below the line?

A.  Ventura makes a call to D-Roc.  That call connects for one minute and 33 seconds.

Q.  Going back to the top, can you read Mr. Combs's communications starting at 12:19 p.m.?

A.  "I'm about to be arrested."

Q.  And then what does he say at 12:21 p.m.?

A.  "Thanks."

Q.  And what happens after that?

A.  At 12:22 p.m., Combs makes a call to Ventura.  That call is not answered.

PghWcom2                          Penland - Direct

Q.  Zooming out to the side, can you read the communication at
12:23 p.m. between Combs and Ventura?

A.  "If you don't pick up you'll never here my voice again."

          MS. JOHNSON:  Bring that down.

Q.  And focusing on the calls on the right-hand side, can you
describe the calls both above and below the line?

A.  At 12:27 p.m., Combs makes a call to Ventura that is not
answered.

     At 12:35 p.m., Combs makes a call to Ventura that is not
answered.

     At 12:42 p.m., Khorram makes a call to Ventura.  That call
is not answered.

     At 12:43 p.m., Combs makes a call to Ventura.  That call
was not answered.

     At 12:49 p.m., Combs makes a call to Ventura.  That call
was not answered.

     And at 12:59 p.m., combs makes a call to Ventura.  That
call was not answered.

          MS. JOHNSON:  OK.  Can we pull this down and move to
slide 8.

Q.  What date is slide 8?

A.  March 5, 2016.

Q.  And what's the timing on slide 8?

A.  1:04 p.m. to 2:31 p.m.

Q.  Is this about an hour and a half of time on this slide?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

PghWcom2                         Penland - Direct

A.   Yes.

Q.   Starting all the way on the left, what does Mr. Combs message Ventura at 1:04 p.m.?

A.   "I'm getting arrested."

        MS. JOHNSON:  You can pull that down.

Q.   And can you describe the next series of phone calls starting at 1:05 p.m. between Combs and Ventura?

A.   At 1:05 p.m., Combs makes a call to Ventura that is not answered.

     At 1:07 p.m., Combs makes a call to Ventura that is not answered.

     At 1:25 p.m., Combs makes a call to Ventura that is not answered.

     And at 1:26 p.m., Combs makes a call to Ventura, and that is not answered.

        MS. JOHNSON:  We can take that down.

Q.   And turning to the bottom of the chart, starting with the communication at 1:09 p.m., what does Ms. Khorram message Mr. Maroun?

A.   "What room number is he in," question mark?

Q.   Is the number a number sign?

A.   Yes.

        MS. JOHNSON:  We can take that down.

Q.   Turning to the communication between D-Roc and Ms. Khorram at 2:08 p.m., what does D-Roc say to Ms. Khorram?

A.   "Is Puff at the house?"

MS. JOHNSON:   We can pull that down.

Q.   Can you describe the phone calls that are contained in the next box?

A.   At 2:18 p.m., Ventura calls D-Roc.  That call connects for one second.

At 2:19 p.m., Ventura makes a call to D-Roc.  That call connects for two seconds.

At 2:19 p.m., Ventura calls the Comstock.  That call connects for one minute and ten seconds.

At 2:21 p.m., Ventura calls D-Roc.  That call connects for one second.

And also at 2:21 p.m., Ventura calls Khorram.  That call connects for 13 seconds.

At 2:26 p.m., Ventura calls Khorram.  That call connects for 56 seconds.

At 2:27 p.m., Ventura calls D-Roc.  That call connects for one second.

Another call is made at 2:27 p.m. from Ventura to D-Roc.  That call connects for two seconds.

And a call is made at 2:28 p.m. from Ventura to D-Roc.  That call connects for 39 seconds.

Q.   Bringing that down and looking at the middle, the next series of communications, at 2:29 p.m., what does D-Roc say to Ms. Khorram?

A.   "I'm in the car headed to you.  Call me pls."

Q.   Right below that, what does Ms. Ventura message Ms. Khorram at 2:30 p.m.?

A.   "Roc said he's 15 away."

Q.   And then what does she say next?

A.   "This is crazy.  He won't stop."

        MS. JOHNSON:  OK.  Pull that down.

Q.   And zooming in on the next series of messages, what is Ms. Ventura's next message to Ms. Khorram at 2:30 p.m.?

A.   "Can you please tell him that the neighbors are about to call the police."

Q.   How does Ms. Khorram respond at 2:30 p.m.?

A.   "I got him."

Q.   And what is her next message?

A.   "We are in elevator going down."

Q.   And then zooming on the final two messages, what does Ms. Ventura say to Ms. Khorram?

A.   "Thank you."

Q.   What does D-Roc message Ms. Khorram at 2:31 p.m.?

A.   "Tell him he needs to get out of there before they call the police.  He not picking up."

        MS. JOHNSON:  You can take that down and please move to slide 9.

Q.   What date does slide 9 depict?

A.   March 5, 2016.

PghWcom2                     Penland - Direct

Q.   And what's the time period depicted on slide 9?

A.   2:34 p.m. to 2:50 p.m.

Q.   So it's about 15 minutes of time?

A.   Yes.

Q.   Starting on the left, at 2:34 p.m., what is depicted in that box?

A.   D-Roc makes a call to Ventura.  The call connects for 50 seconds.

        MS. JOHNSON:  You can pull that down.

Q.   Directing your attention to the bubble below it, at 2:34 p.m., what does Ms. Khorram message Ms. Ventura?

A.   "It's me calling now.  He's at home."

        MS. JOHNSON:  Pull that down.

Q.   Can you describe the next two phone calls at 2:35 p.m.?

A.   Khorram makes a call to Ventura.  The call is not answered, and then Ventura makes a call to Khorram.  That call connects for one minute, 36 seconds.

        MS. JOHNSON:  Bring that down.

Q.   And then looking at the text that's sent at 2:37 p.m., what does that text say?

A.   Khorram messages D-Roc:  "I got him back to Mapleton."

        MS. JOHNSON:  Take that down.

Q.   Can you describe the phone calls starting at 2:38 p.m.?

A.   At 2:38 p.m., Ventura makes a call to Roche.  That call lasts five minutes -- five minutes, five seconds.

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

PghWcom2                          Penland - Direct

At 2:40 p.m., Khorram makes a call to Ventura. That call is not answered at.

And 2:41 p.m., Khorram makes a call to Ventura that is not answered.

MS. JOHNSON: Pull that down.

Q. What does Ms. Khorram message Ms. Ventura at 2:41 p.m.?

A. "Sorry. Urgent. Please call me back."

Q. Looking directly below that, can you describe the phone calls in the next box?

A. Ventura makes a call to Khorram at 2:43 p.m. That call connects for 23 seconds.

And at 2:46 p.m., Ventura makes a call to the Comstock. That call connects for one minute, 16 seconds.

MS. JOHNSON: Pull that down.

Q. Zooming in on the last three boxes, what does Ms. Khorram say to Ms. Ventura at 2:47 p.m.?

A. "I got him. We are leaving."

Q. And what are Ms. Ventura's responses to Ms. Khorram at 2:50 p.m.?

A. "Thank you.

"Please take away whatever keys he thinks he has."

Q. What's the final response?

A. "He needs to sleep."

MS. JOHNSON: Pulling that down and going to slide 10.

Q. What date is slide 10?

A.   March 5, 2016.

Q.   And what's the time period of slide 10?

A.   2:51 p.m. to 3:36 p.m.

Q.   Is that about an hour and 40 minutes of time -- oh, I'm sorry.  About 40 minutes of time?

A.   Yes.

            MS. JOHNSON:  Thank you.

            Starting on the left, can you zoom in on that communication.

Q.   What does Ms. Ventura tell Ms. Khorram at 2:51 p.m.?

A.   "Tell him that we FaceTimed and it's bad so he needs to chill."

Q.   And can you describe the phone calls that occur after that?

A.   At 2:53 p.m., Ventura makes a call to D-Roc.  That call connects for one second.

     At 2:54 p.m., Roche makes a call to Ventura.  That call connects for one minute and seven seconds.

Q.   Zooming in on the next series of messages, what does Ms. Khorram tell D-Roc at 3 p.m.?

A.   "Back at Mapleton."

Q.   What does she tell Ms. Ventura at 3:01 p.m.?

A.   "Will do."

Q.   What does D-Roc message Ms. Khorram at 3:03 p.m.?

A.   "I'm at Cas outside."

Q.   Can you describe the communications above the line at 3:01

PghWcom2                        Penland - Direct

p.m.?

A.  Combs makes two calls to Ventura, and neither call is answered.

MS. JOHNSON:  You can pull that down.

Q.  Picking back up in the middle boxes below the line, what does Ms. Khorram message D-Roc at 3:05 p.m.?

A.  "We are at Mapleton."

Q.  How does D-Roc respond at 3:08 p.m.?

A.  "Shit.  I'm going to walk up.  The Uber left."

Q.  How does Ms. Khorram respond at 3:09 p.m.?

A.  "We can come get you."

MS. JOHNSON:  Pull that down.

Q.  What are the next phone calls in the next box starting at 3:09 p.m.?

A.  Ventura calls D-Roc.  That call connects for two minutes, 13 seconds.

And D-Roc makes a call to Ventura at 3:22 p.m.  That call is not answered.

Q.  And at 3:27 p.m., what does Ms. Khorram message Ms. Ventura?

A.  "Talked to him.  He promised me he won't go back over if you will just talk to him on the phone for five minutes."

MS. JOHNSON:  We can take that down.

Q.  And zooming in on the next message, what does Ms. Khorram also say at 3:27 p.m. to Ms. Ventura?

PghWcom2                          Penland - Direct

A.   "Sorry.  Don't want to be in the middle.  Just don't want him to go back over there."

Q.   And can you describe the final communication at 3:36 p.m.?

A.   D-Roc makes a call to Ventura.  That call is not answered.

        MS. JOHNSON:  We can move to slide 11 now, please.

Q.   And what date is slide 11?

A.   March 5, 2016.

Q.   And what is the time period of slide 11?

A.   4:28 p.m. to 6 p.m.

Q.   And is that about an hour and a half of time?

A.   Yes.

Q.   OK.  So focused first on the left communication at 4:28, what does Ms. Morgan say to Ms. Khorram at 4:28 p.m.?

A.   "I'm so sorry I missed your calls.  I'm just so not used to this shit."

Q.   Taking that down and going above the line at 4:47 and 4:48, what does Ms. Ventura message Mr. Combs?

A.   "Plugging my phone in and going to bed.  You should do the same."

Q.   Below that, can you describe the phone calls starting at 4:49 p.m.?

A.   Combs makes a call to Ventura.  That call connects for 18 minutes and one second.

     And at 5:15 p.m., Combs makes another call to Ventura. That call connects for ten minutes, six seconds.

Q.   And then going below the line, what communication is documented at 5:31 p.m.?

A.   Ventura makes a call to Maroun.  That call lasts three minutes, 59 seconds.

Q.   And then is that call -- does Maroun make another call to Ventura at 5:40 p.m.?

A.   Yes.

Q.   What's the duration of that call?

A.   One minute, 23 seconds.

Q.   So going back up above the line, can you describe the communications at 5:38 p.m.?

A.   Combs makes a call to Ventura at 5:38 p.m. that connects for 41 seconds.

     And Combs also makes a call to Ventura at 5:40 p.m.  That call connects for 16 seconds.

Q.   And turning to the box to the right, can you describe the communications in that box?

A.   At 5:42 p.m., there are two calls from Ventura to Combs. One connects for three seconds.  The other connects for two seconds.

     At 5:43 p.m., Combs makes a call to Ventura.  That call connects for one minute and 19 seconds.

     And at 5:51 p.m., Combs makes a call to Ventura, and that call connects for four minutes, 50 seconds.

Q.   And zooming in on the bottom four messages, please, are

these all messages between Ms. Khorram and Mr. Maroun?

A.  Yes.

Q.  Do these all occur at 5:52 p.m.?

A.  Yes.

Q.  What's the first message between Khorram and Maroun on the top left?

A.  "I'm going to ask just to cover damages."

Q.  What does Mr. Maroun respond?

A.  "He wants to speak to Spanish security guard."

Q.  What does Ms. Khorram say on the top right?

A.  "Say they had a fun drunk night to try and get more info."

Q.  What does Mr. Maroun respond to that message?

A.  "LOL.  No shot.  They aren't playing nice."

Q.  OK.  Turning to slide 12 now, what date is slide 12?

A.  March 5, 2016.

Q.  And what are the times on slide 12?

A.  6:04 p.m. to 9:56 p.m.

Q.  Is that about ten hours of time -- I mean about four hours of time?

A.  Yes.

Q.  Starting with the communications in the top box on the left, can you walk through those, please?

A.  There's a call from Combs to Ventura at 6:04 p.m.  That call connects for one minute, 18 seconds.

    There's a call from Combs to Ventura at 6:18 p.m.  That

PghWcom2                         Penland - Direct

call connects for ten minutes, 32 seconds.

There's a call at 6:32 p.m. from Combs to Ventura that is not answered.

And then at 6:32 p.m., there is another call from Combs to Ventura that connects for three minutes, 25 seconds.

MS. JOHNSON:  We can pull that down.

Q.  Can you describe the communications below the gray bar starting at 6:44 p.m.?

A.  There's a call from D-Roc to Ventura at 6:44 p.m.  It connects for three minutes, 19 seconds.

There is a call at 6:48 p.m. from D-Roc to Ventura.  That call connects for one minute, seven seconds.

At 6:49 p.m., there's a call from D-Roc to Ventura where there's no answer.

And there is also a call at 6:49 p.m. from D-Roc to Ventura that connects for one minute, 49 seconds.

Q.  And at 6:55 p.m., can you read the message that Ms. Morgan sends to Ms. Khorram?

A.  "I don't think anyone should call her."

Q.  And what is to the right of that message on the timeline?

A.  There's a business card from the Los Angeles Police Department sergeant.

Q.  And is that business, is that image of a business card sent in these communications between Ms. Morgan and Ms. Khorram that you reviewed?

PghWcom2                          Penland - Direct

A.   Yes.

          MS. JOHNSON:  We can take that down now.

Q.   Turning to the next series of boxes starting at 6:56 p.m., what does Ms. Khorram say to Ms. Morgan?

A.   "Can I call you in a bit?  When I'm alone."

Q.   How does Ms. Morgan respond at 6:56 p.m.?

A.   "She was looking for anyone to say the wrong thing so she can call domestic abuse."

Q.   What does Morgan say again at 6:56 p.m.?

A.   "Of course."

Q.   And turning to the next boxes, what is Ms. Morgan's final message to Ms. Khorram at 6:56 p.m.?

A.   "Cas just asked me to send you that."

          MS. JOHNSON:  Pull that down.

Q.   Can you describe the communications in the box below that starting at 7:02 p.m.?

A.   D-Roc makes a call to Ventura.  The call connects for 25 seconds.

     At 7:19 p.m., Khorram makes a call to Ventura.  The call connects for one minute, 28 seconds.

     At 7:20 p.m., Khorram makes a call to Ventura.  The call connects for 55 seconds.

     And at 7:56 p.m., Khorram makes a call to Ventura, and there's no answer.

          (Continued on next page)

MS. JOHNSON:  You can pull that down.  And can you please zoom in, Ms. Foster, on the final three messages on slide 12.

Q.  Are these all messages between Ms. Khorram and Mr. Maroun?

A.  Yes.

Q.  What does Ms. Khorram message Mr. Maroun at 9:55 p.m.?

A.  Did you get security #?  PD is asking.

Q.  How does Mr. Maroun respond at 9:56 p.m.?

A.  Wouldn't give it to me.

Q.  What does Ms. Khorram say in response at 9:56 p.m.?

A.  What is Eddy's last name?

MS. JOHNSON:  You can pull that down now and go to slide 13.

Q.  What day is slide 13?

A.  March 6, 2016.

Q.  Is this the following day?

A.  Yes.

Q.  What is the time period associated with 5:13?

A.  7:09 a.m. to 12:01 p.m.

Q.  That's about five hours of time?

A.  Yes.

Q.  Starting first on the two images on the top left, what is the source, if you know, for those images?

A.  A device owned by Casandra Ventura.

Q.  You can pull that down now.

Case 1:24-cr-00542-AS   Document 594   Filed 12/19/25   Page 69 of 193   6607

P6HQcom3                         Penland - Direct

Turning your attention to the dark orange box at 9:32 a.m., what does Mr. Combs say to D-Roc at 9:32 a.m.?

A.   How is she?

MS. JOHNSON:   Take that down.

Q.   How does D-Roc respond to Mr. Combs at 9:35 and 9:37:00 a.m.?

A.   She's okay.  She's eating breakfast.  Her face don't look bad.  She good.  Call her.  She smiling and laughing with yum.

Q.   What does D-Roc's final message at 9:37 a.m.?

A.   Or call the house.

Q.   Above the line, can you describe the calls at 9:38 and 9:39 a.m.?

A.   There's a call from Combs to Ventura at 9:38 that is not answered, and there is a call from Combs to Ventura at 9:39 a.m.  That call connected for 13 minutes and 23 seconds.

MS. JOHNSON:   Pull that down.

Q.   Turning now to the message below the line from Mr. Nash to Ms. Ventura.  What does Mr. Nash say to Ms. Ventura at 10:58 a.m.?

A.   Hey what time can you fit today?  Arturo is available until 2:00 p.m.

MS. JOHNSON:   And pull that down.

Q.   How does Ms. Ventura respond at 11:20 a.m.?

A.   Hey, can he come to Roc and April's?

Q.   We'll finish with the next few messages before going to the

(212) 805-0300

next line.

How does Mr. Nash respond at 11:20 a.m.?

A. Address?

Q. What does Ms. Ventura say?

A. Hit Roc.

Q. What does Mr. Nash respond with?

A. Cool he, said 3/4.

MS. JOHNSON:  Pulling that down and zooming in on the top right-hand boxes of slide 13, Ms. Foster, can you make sure to include the one at 11:18 a.m. please.  Thank you.

Q. What phone call occurs at 11:18 a.m.?

A. Combs makes a call to Eddy Garcia.  The call connects for 7 seconds and goes to voicemail.

Q. When it says VM, is that referring to voicemail?

A. Yes.

Q. Is that a consistent abbreviation you used throughout the timeline?

A. Yes.

Q. Moving to the next series of communications, can you describe the phone calls in the next box?

A. Combs makes a call to Ventura at 11:38 a.m.  The call connects for 44 seconds.

Combs then makes a call to Eddy Garcia at 11:40 a.m. The call connects for 4 seconds and goes to voicemail.

At 11:50 a.m. Eddy makes a call to Combs.  That call

P6HQcom3                          Penland - Direct

connects for 4 minutes and 3 seconds.

At 11:54 a.m. Combs makes a call to Eddy Garcia.  That call connects for 2 minutes 4 seconds.

Combs makes a call to Ventura at 12:00 p.m.  The call connects for 26 seconds.

At 12:01 p.m., Combs makes another call to Ventura.  That call connects for 37 seconds.

Q.  Going to the final box on the bottom right, what does that box show?

A.  Khorram makes a call to Eddy Garcia at 11:43 a.m.  The call connects for 4 seconds and goes to voicemail.

Q.  Where does Ms. Khorram's call to Eddy Garcia at 11:43 a.m. fit in relative to the calls that were just described above the gray bar?

MS. JOHNSON:  Zoom back out, please, Ms. Foster.

A.  It goes after the call from Combs to Eddy Garcia that goes to voicemail at 11:40 a.m.

Q.  Is it prior to Eddy Garcia calling Mr. Combs at 11:50?

A.  Yes.

Q.  We can move to slide 14.  What day is slide 14?

A.  March 6, 2016.

Q.  What are the times associated with slide 14?

A.  3:19 p.m. to 10:55 p.m.

Q.  Is this about eight hours of time, roughly?

A.  Yes.

Q.   Starting first with the messages on the left, what does
Ms. Khorram message Ms. Ventura at 3:19 p.m.?

A.   Arturo's here.  Should I bring him up?

Q.   Okay.  And what does Ms. Ventura respond to Ms. Khorram at
3:19 p.m.?

A.   Sure.  Can you have Derek bring him?

          MS. JOHNSON:  Zooming in on the photograph above the
line.

Q.   What source, if you know, had that photograph?

A.   The device owned by Casandra Ventura.

Q.   Going to the next phone call, can you describe the phone
call at 6:14 p.m.?

A.   A call was made from Combs to Eddy Garcia.  The call
connects for 5 minutes 23 seconds.

Q.   Can you describe the two boxes in green starting at
6:46 p.m.?

A.   Cobb messages Ventura.  Are you home?

          Ventura responds to Cobb:  Puff's.

Q.   Can you describe the communications in the final box at
10:54 and 10:55 p.m.?

A.   At 10:54 p.m., Combs makes a call to Eddy Garcia.  The call
connects for 4 seconds and goes to voicemail.  And at
10:55 p.m., a call is made from Combs to Eddy Garcia.  That
call connect for 53 seconds.

Q.   Can we please go to slide 15.  What day is slide 15?

A.   March 7, 2016.

Q.   So is this the following day?

A.   Yes.

Q.   What's the time period of slide 15?

A.   7:29 a.m. to 10:09 a.m.

Q.   Starting with the green messages on the left, can you read those messages between Mr. Cobb and Ms. Ventura starting at 7:29 a.m.?

A.   Cobb messages Ventura:  Hey Cas.  Tiger and I are at your place, and Hrush is on the way.

        Ventura responds to Cobb.  Okay.  Can you come scoop me from Puffs.

        Cobb responds to Ventura:  Yes.

Q.   Moving now to the next set of phone calls above the line, can you describe those phone calls, please?

A.   At 8:36 a.m. Combs makes a call to Ventura.  The call connects for 1 minute 1 second.

        At 8:50 a.m., Combs makes a call to Ventura.  The call is not answered.

        Another call is made at 8:50 a.m. from Ventura to Combs.  That call connects for 3 minutes, 52 seconds.

        At 9:08 a.m., Combs makes a call to Ventura.  The call connects for 34 seconds.

        MS. JOHNSON:  You can pull that down.  Zooming in on the next photograph.

Q.   What's the source for this photograph if you know?

A.   A device owned by Casandra Ventura.

Q.   Can you please read the message between Ms. Ventura and Mr. Combs at 9:46 a.m.?

A.   I'm serious, but I'm not.  This was supposed to be a really exciting day for me, and I wish I could just crawl in bed and stay there until I look better.

Q.   What are the next periods of phone calls starting at 9:52 a.m.?

A.   Combs makes a call to Ventura that connects for 12 seconds.

At 9:53 a.m., Combs makes a call to Ventura that connects for 1 minute 37 seconds.

MS. JOHNSON:   Zooming into on the photograph all the way to the right.

Q.   What device, if you know, is that photograph from?

A.   A device owned by Casandra Ventura.

MS. JOHNSON:   Take that down and go to slide 16, please.

Q.   **What day is slide 16?**

A.   March 7, 2016.

Q.   What is the time period of slide 16?

A.   11:03 a.m. to 3:26 p.m.

Q.   Is this about four and a half hours of time?

A.   Yes.

Q.   Starting at the box on the left, can you please describe

P6HQcom3                          Penland - Direct

the communications in the box on the left?

A.   At 11:03 a.m., there's a call from Combs to Eddy Garcia that is not answered.

       Also at 11:03 a.m., there's another call from Combs to Eddy Garcia.  This call connects for 6 seconds and goes to voicemail.

       At 11:04 a.m., Eddy Garcia makes a call to Combs.  The call connects for 7 minutes.

       At 11:19 a.m., Combs makes a call to Eddy Garcia.  The call connects for 2 minutes, 38 seconds.

       At 12:05 p.m., Combs makes a call to Eddy Garcia.  The call is not answered.

       At 12:18 p.m., Combs makes a call to Ventura.  The call connects for 2 minutes, 35 seconds.

       At 12:31 p.m., Eddy Garcia makes a call to Combs.  The call connection for 4 minutes 35 seconds.

       At 1:04 p.m., Combs makes a call to Eddy Garcia.  The call connects for 38 seconds.

       At 1:22 p.m., Eddy Garcia makes a call to Combs.  The call connects for 59 seconds.

       MS. JOHNSON:  You can pull that down now.

       Can you zoom in on the next box.

Q.   Can you describe the communications in the next box

A.   At 1:25 p.m. there are two calls from Combs to Eddy Garcia. Neither are answered.

P6HQcom3                      Penland - Direct

At 1:27 p.m., there's a call from Eddy Garcia to Combs.  That call connects for 33 seconds.

At 1:33 p.m., there's a call from Combs to Eddy Garcia.  That call is not answered.

At 1:34 p.m., there's a call from Combs to Eddy Garcia.  The call connects for four seconds and goes to voicemail.

At 1:35 p.m., Eddy Garcia makes a call to Combs.  The call connects for 1 minute 9 seconds.

And at 2:02 p.m., Combs makes a call to Eddy Garcia.  That call connects for 26 seconds.

MS. JOHNSON:  Pulling that down.  Can you please zoom in on the images below the line?

Q.   Where, if you know, were these images located?

A.   On a phone owned by Kristina Khorram.

Q.   What is the captured time of these images?

A.   2:21 p.m.

MS. JOHNSON:  Ms. Foster, could you please pull up what's in evidence at Government Exhibit C-364-6-A side by side if you can.

Q.   Whose driver's license is this?

A.   Eddy Garcia.

MS. JOHNSON:  You can return to 1550 please, Ms. Foster.  Take that zoom down.

Q.   Going forward to the phone call bubble line at 2:25, what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HQcom3                         Penland - Direct

happens there?

A.   Ventura makes a call to Combs.  The call connects for 8 minutes 29 seconds.

Q.   And then below, starting at 2:44 p.m., can you describe those calls, please?

A.   Ventura makes a call to D-Roc.  That call connects for 1 minute 1 second.

At 2:46 p.m., Ventura makes a call to the Comstock. That call connects for 48 seconds.

And at 2:54 p.m., D-Roc makes a call to Ventura.  That call connects for 15 seconds.

MS. JOHNSON:  And zooming in on the messages at 2:54 p.m.

Q.   What his does Ventura message Ms. Morgan?

A.   I should have sued LOL.

Q.   What does Ms. Morgan respond?

A.   Totally.

MS. JOHNSON:  Going now to the photograph on the right, can you please zoom in on this, Ms. Foster?

Q.   Who sent these images to whom?

A.   Eddy Garcia sent these to Kristina Khorram.

Q.   At what time?

A.   3:15 p.m.

Q.   What do the images appear to be depicting?

A.   Driver's license of two individuals.

P6HQcom3                    Penland - Direct

MS. JOHNSON:  You can take that down now.

Q.  And what's the communication at 3:26 p.m.?

A.  Combs makes a call to Ventura.  It connects for 1 minute 19 seconds.

MS. JOHNSON:  You can take that down now.

Q.  Moving to slide 17, what day is slide 17?

A.  March 7, 2016.

Q.  What's the time period of slide 17?

A.  5:13 p.m. to 6:31 p.m.

Q.  So is that about an hour and 15 minutes of time?

A.  Yes.

Q.  Starting on the left-hand side, what are the communications in the box starting at 5:13 p.m.?

A.  Combs makes a call to Eddy Garcia.  The call connects for 4 seconds and goes to voicemail.

At 5:14 p.m., Eddy Garcia makes a call to Combs.  That call connects for 1 minute 24 seconds.

MS. JOHNSON:  Pulling that down.

Q.  Zooming in on the images to the right, whose device if you know were these images found on?

A.  Casandra Ventura.

Q.  What do they appear to depict?

A.  Pictures of her and Sean Combs.

MS. JOHNSON:  Take that down now.  Please go to slide 18.

P6HQcom3                        Penland - Direct

Q.   What day is slide 18

A.   March 8, 2016.

Q.   What occurred at 4:50 p.m. on March 8, 2016 as documented on the timeline?

A.   Eddy Garcia makes a call to Combs.  That call is at 4:50 p.m. and connects for 56 seconds.

Q.   Now moving to 9:58 p.m., what occurs at 9:58 p.m.?

A.   Combs makes a call to Eddy Garcia.  That call connects for 5 seconds and goes to voicemail.

Q.   Pulling that down, going to March 9.  Sorry, going to the next slide.

        What day is slide 19?

A.   March 9, 2016.

Q.   What occurs at 11:24 p.m. on March 9?

A.   11:24 a.m.?

Q.   I'm sorry, 11:24 a.m.

A.   Combs makes a call to Eddy Garcia.  That call connects for 5 seconds and goes to voicemail.

        And at 11:29 a.m., Eddy Garcia makes a call to Combs.  That call connects for 1 minute 49 seconds.

Q.   Pulling that down and then going to slide 20, what day is slide 20?

A.   March 25, 2016.

Q.   Approximately how much time elapsed between March 9 and March 25?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6HQcom3                    Penland - Direct

A.   About 14 days.

Q.   What occurred at 1:49 p.m. on March 25 as documented on the timeline?

A.   Combs makes a call to Eddy Garcia.  That call connects for one minute 12 seconds.

        MS. JOHNSON:  You can take that down now, Ms. Foster.

Q.   Special Agent Penland, aside from reviewing or preparing the charts you testified to today and confirming their accuracy, did you have any other involvement in this case

A.   I did not.

        MS. JOHNSON:  Thank you.  I have no further questions at this time.

        THE COURT:  Very good.  We'll take a break at this time.  Come back in 15 minutes.

        Thank you, members of the jury.  All rise.

        (Jury not present)

        THE COURT:  Be back in 15.

        (Recess)

        (In open court)

        THE COURT:  Let's have Agent Penland back.

        Witness resumed.

        (Jury present)

        THE COURT:  Ms. Geragos, you may proceed with cross-examination.

        MS. GERAGOS:  Thank you, your Honor.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

CROSS-EXAMINATION

BY MS. GERAGOS:

Q.   Good morning, Agent Penland.

A.   Good morning.

Q.   You've been employed at the U.S. Attorney's Office for approximately ten years, right?

A.   Yes.

Q.   During that entire time, have you been a special agent?

A.   I have.

Q.   Tell us how the duties of a special agent compare to the duties of a paralegal specialist?

A.   So a special agent is actually doing the investigation of a case.  We are out, you know, actively in the field conducting search warrants, serving subpoenas, you know, whereas the paralegal is more taking care of like the paperwork within the office, helping us prepare subpoenas or prepare documents that need to be filed or whatever.

Q.   Okay.  And so you analyze data as part of your duties as a special agent and investigate federal crimes, right?

A.   I do.

Q.   And it's important as a special agent to have the information that you present be completely accurate, right?

A.   Yes.

Q.   Okay.  Because you're representing the United States Attorney's Office for the Southern District of New York?

P6HQcom3                              Penland - Cross

A.   I am.

Q.   And you need to make sure that your investigation or the data that you present is completely accurate?

A.   Correct.

Q.   All right.  And so you work for the Southern District of New York, and that's the office that's prosecuting Mr. Combs, right?

A.   Yes.

Q.   All right.  And so you did not perform any duties in connection with this investigation aside from what your testimony is here, right?

A.   Correct.

Q.   You were not essentially part of the trial team leading the investigation?

A.   I was not.

Q.   And so your job was to review the charts that we've -- that we looked at yesterday and today?

A.   Yes.

Q.   And to review them for accuracy, right?

A.   Correct.

Q.   And you wanted to make sure as a special agent that the data contained within these charts is completely accurate?

A.   Yes.

Q.   And so you made multiple revisions to all the charts that we've looked at, right?

P6HQcom3                        Penland - Cross

A.   Yes.

Q.   And so you had to double check that and review the evidence to ensure that these charts were accurate?

A.   Yes.

Q.   And with respect to these charts, you testified yesterday that you or the trial team prepared the charts initially, right?

A.   That's correct.

Q.   And that the trial team had a role in selecting the exhibits that were used in the charts?

A.   Yes.

Q.   And you stated that the source material for these charts were quite voluminous, hundreds of pages, maybe thousands of pages?

A.   Yes.

Q.   And so you had to comb through all of that in order to prepare these charts and confirm them for accuracy, right?

A.   Correct.

        MS. GERAGOS:   So can we pull up 1402, Government Exhibit 1402, which we've been looking at today and yesterday.

Q.   So this is one of the charts you prepared.  It's 23 pages, right?

A.   It is.

Q.   In the names column in this chart, you list Sean Combs at least on the first page, Sean Combs and Casandra Ventura on all

P6HQcom3                        Penland - Cross

three of those entries, right?

A.   That's correct.

Q.   If we could go to the next page, you list Sean Combs and Casandra Ventura as two of the names in all three of those entries on page 2, right?

A.   Yes.

Q.   Could we scroll ahead to page 18.  Do you see item 52 there at the top?

A.   Yes.

Q.   Or row 52.  Okay.

        We looked at this on direct earlier this morning.  Do you recall that?

A.   I do.

Q.   And it lists Sean Combs here.  It does not list Casandra Ventura, right?

A.   Correct.

Q.   We land at the L'Ermitage Hotel.  And you wrote in this chart $950 for linen damage/deep cleaning, correct?

A.   Correct.

Q.   And you did not list anybody other than Sean Combs on this chart, right?

A.   Correct.

Q.   And if you go to the source info, there's a source Government Exhibit underneath that.  Can you explain what that source exhibit number is under Sean Combs' name?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HQcom3                         Penland - Cross

A.  Can you pull it up for me?

Q.  Of course.

MS. GERAGOS:  Can we pull up C-334-A already in evidence.  Welcome to this courtroom.  We sometimes have technical difficulties:

Q.  Is this a chat between KK's main phone and Eli Maroun?

A.  That's correct.

Q.  Did you review this?

A.  I did.

MS. GERAGOS:  Can we go to page 2.  If we can go to page 3, actually, I'm sorry.

Q.  Is the green Ms. Khorram?

A.  Correct.

Q.  And she says:  They are both out.  Room is checking out now.  Right?

A.  Yes.

Q.  And Eli says:  Okay.  I'm here, right?

A.  Yes.

Q.  So this is a message between Eli and Ms. Khorram but not Mr. Combs and anybody else, right?

A.  That's correct.

Q.  And it indicates they are both out, but it doesn't indicate who, right?

A.  That is correct.

Q.  Doesn't indicate Sean Combs, right?

P6HQcom3                         Penland - Cross

A.   It does not say his name, no.

Q.   And it doesn't indicate Casandra Ventura?

A.   Correct.

Q.   So if we could go back to 1402 page -- perfect, page 18. Did you make any attempt to locate messages between Mr. Combs and Ms. Ventura on this date?

A.   I did not.

Q.   Are you aware that Ms. Ventura is in South Africa on December 8 of 2015?

A.   I am not.

Q.   Did you review anything to see where she was on this date?

A.   No.

Q.   If I show you something, will it help you refresh your recollection as to where she was on that date?

         MS. JOHNSON:   Objection.

         THE COURT:   That's sustained.

Q.   Are you -- did you do any investigation to see who, if anybody, Sean Combs was with on December 8 of 2015?

A.   I did not conduct an investigation on this case.

Q.   But you conducted -- you conducted a review of underlying records for this chart, right?

A.   Correct, the records that are in evidence.

Q.   Okay.  So you wrote here:  Sean Combs, right?

A.   Correct.

Q.   And you listed below that a source document which we just

                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

looked at, right?

A. Yes.

Q. And it said: They are both out now, right?

A. Correct.

Q. So did you do any investigation at that point just to review the accuracy of this document to see who "they" was or where Sean Combs was on December 8 of 2015?

A. No. I think if you go further in the chat, it's talking a little more about it, and that's why his name is here but Casandra's name is not here under names.

Q. And you put Casandra Ventura's name on several of the other rows in this chart, right?

A. Correct.

Q. Because you looked to see -- you looked at chats between her on these specific dates, right?

A. There was a variety of records I would have looked at.

Q. So did you ask at any point to look at any records of where Ms. Ventura was on December 8 of 2015?

A. No.

Q. Okay. But you needed to look into the accuracy of this chart?

A. Yes. Her name is not under names.

Q. Okay. And so the only person that you think that was there on this date, 12/8/15 to 12/9/15 is Sean Combs?

A. No. It's clear someone else is there we don't know who it

is.  That's why we don't see another name.

Q.  And you didn't look to see who else was there?

MS. JOHNSON:  Objection.

THE COURT:  That's overruled.  You can answer.

A.  No, I did not.

Q.  But you're a special agent at -- employed for ten years at the Southern District of New York U.S. Attorney's Office, right?

MS. JOHNSON:  Objection.

THE COURT:  Well, as to that question, the objection is overruled.

Q.  I suppose she can answer.  Okay.

You've been employed as a special agent at the U.S. Attorney's Office for ten years, right?

A.  I have.

Q.  So it is important for you to accurately present data, right?

A.  Correct.

Q.  Okay.  And so when you saw an underlying message that said they both left the room, did you ask yourself who is the other person in the room?

A.  There are many times in this chart where there are other individuals that are possibly in the room, but if I did not have the evidence, their name is not in this chart.

Q.  As a special agent, you know how to look for evidence,

P6HQcom3                        Penland - Cross

right?

        MS. JOHNSON:  Objection.

        THE COURT:  That's sustained.

Q.  As a special agent, you know how to review data, correct?

A.  I do.

Q.  You know that there are oftentimes when -- you know that there was many chats that came from Ms. Ventura's devices in this case, right?

        MS. JOHNSON:  Objection.

        THE COURT:  Overruled.

A.  I was able to review what I was provided by the trial team.

Q.  Okay.  But you did not conduct any further investigation to see who the other individual was?

A.  That was not my role.

Q.  Your role was to make sure that these charts were accurate, right?

A.  That's correct.

Q.  And that's -- it says here names at the top of this, right?

A.  Yes.

Q.  Okay, so you want to make sure you accurately present the names under where it says names, right?

A.  It does not have the name of every potential person that was at this gathering.

Q.  This line -- row 52 does not have the name of every potential person?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HQcom3                         Penland - Cross

A.   Correct.

Q.   So when you write Names at the top and Sean Combs there right underneath it, you then did not do anything further to see who else could have possibly been there, correct?

A.   Correct.

Q.   Okay.

          MS. GERAGOS:   Could we go to page 2, please.

Q.   Do you see row 4 here is April 7 -- it begins April 7, 2010 to April 9 of 2010?

A.   Yes.

Q.   Then the next entry after that is over two years later, right?

A.   Yes.

Q.   Is June 29 of 2012?

A.   Yes.

Q.   And were you provided or did you review any records relating to any incident, if they existed, on December 22 of 2011?

A.   I'm not sure.

Q.   You didn't add anything here on this chart from December 22 of 2011, right?

A.   No.

Q.   There's no flight information from 2011, right?

A.   On this chart?   No.

Q.   There's no text messages related to December 22 of 2011,

P6HQcom3                         Penland - Cross

right?

A.   Not cited on this chart.

Q.   Okay.  And if we could go to -- let's pull up 3A-106.  We looked at this earlier this morning.  This was, you testified, a message between someone who appears under the name of Jules, right?

A.   Correct.

Q.   And device owner, who I believe you testified pursuant to the stipulation, is Casandra Ventura, right?

A.   Yes.

Q.   And here, the date here that we're looking at is between August 26 of 2009 to August 28 of 2009, right?

A.   Yes.

Q.   And the very last message from Jules at the bottom says: Thanks again and happy Bday, right?

A.   Yes.

Q.   That's August 28 of 2009, right?

A.   Correct.

Q.   Could we please go to page 17 of 1402.

        Do you see row 50 to 51 here.  If we look at row 50, that's May 30, 2015 to May 31, 2015, right?

A.   Yes.

Q.   Then it jumps ahead -- the next row is October 5 of 2015 to October 6 of 2015, right?

A.   Yes.

P6HQcom3                         Penland - Cross

Q.  Did you review any records from August 26 of 2015 to August 28 of 2016 -- I mean, 2015?

A.  I don't know.

Q.  You did not include anything here related to August 26 to August 28 of 2015, right?

A.  No.

Q.  There's no flight records or hotel records for those days?

A.  Not cited in this chart, no.

Q.  There's no text messages cited in this chart from those days, right?

A.  Correct.

Q.  Can we please go to pages -- the end of page 21 to the top of page 22 of this.

     If you look at row 65, what are the dates listed there?

A.  December 17, 2016 to December 19, 2016.

Q.  What are the dates on row 66?

A.  February 14, 2017 to February 16, 2017.

Q.  And there is no hotel record for New Year's Eve, which would be December 31 of 2016 to January 1 of 2017, listed in this chart, right?

A.  Correct.

Q.  There's no text messages between Ms. Ventura and Mr. Combs for those dates?

A.  Correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HQcom3                         Penland - Cross

Q.  And there's no text messages from Ms. Ventura to anybody else on those dates, right?

A.  Not cited in this chart.

MS. GERAGOS:  Could we go to -- just down to page 23.

Q.  This is the last page of this chart, right?

A.  Yes.

Q.  And it ends at June -- it ends at June 2017?

A.  Correct.

Q.  So did you review anything from after June of 2017 to include in this chart?

A.  No.

Q.  So you ended the chart in June of 2017, right?

A.  That's the last entry, yes.

Q.  The last entry.  Is there any -- there are no records on this chart from May 2 of 2017, right?

A.  No.

Q.  It jumps from April 27, 2017 to May 25 of 2017?

A.  Yes.

Q.  Let's go to page 1.

You start here August 7 of 2009 to August 10 of 2009, right?

A.  Yes.

Q.  And here you included under the name Sean Combs, you include several Government Exhibits, GX 3A-101, 102 and 103. Do you see that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HQcom3                      Penland - Cross

A.   Yes.

Q.   And then 101 and 102 for Ms. Ventura, right?

A.   Correct.

Q.   If we could go -- could we pull up GX-3A-101.  This is --
you understand BG New Pin to be associated with Ms. Ventura,
right?

A.   Yes.

Q.   And Puffy to be associated with Mr. Combs?

A.   Yes.

Q.   And here at the bottom on August 5, 2009, Mr. Combs says:
When do you want to freak off, LOL?  Do you see that?

A.   Yes.

Q.   And then what does Ms. Ventura respond with on August 5
right up above?

A.   Do you want me to read that?

Q.   Yes.  If you could read that.

A.   LOL.  I'm just going up to change and put my ring in.  I
just picked it up ... I'm always ready to freak off LOLOL.

Q.   And he responds:  You tell me the day you choose.

         And what does she say?

A.   It can be whenever.

Q.   Name the name.

         What does she say?

A.   I feel like the weekend, like a Friday night would be best,
B/C we'd want time to recover for the work week, right?  This

P6HQcom3                         Penland - Cross

upcoming weekend (The 8th) is the only one I have until the 28th.

Q.  Okay.  Side by side could we put up Defense Exhibit 1162 already in evidence, please.

So Government Exhibit 3A-101, which is in your chart is from August 5, 2009, right?

A.  Yes.

Q.  And here, this message on the right, Defense Exhibit 1162, that's not included in your chart, right?

A.  It is not.

Q.  And that's from the day of the first entry, which is August 7, 2009.  Do you see that?

A.  Yes.

Q.  And here Ms. Ventura writes:  I can't wait to stare at some big black dick.  Do you see that?

A.  I do.

Q.  And he says:  I can't wait to watch you.  I want you to get real hot, right?

A.  Yes.

Q.  And she says:  Me too.  I just want it to be uncontrollable, right?

A.  Yes.

Q.  And that was not included in your chart?

A.  It was not.

Q.  Okay.  Could you please replace that exhibit with 1164,

please.  This -- is this another message -- sorry.

Is this another message from August 7 of 2009?

A.  Yes.

Q.  This is 1164 already in evidence.  Did you include this in your chart?

A.  No.

Q.  Could we please pull up 1165 Defense Exhibit already in evidence.

Is this from the same date August 7, 2009?

A.  Yes.

Q.  And are these, again, messages between Mr. Combs and Ms. Ventura?

A.  Yes.

Q.  And this is two days after the one we just looked at, right, the first one?

A.  From the very first.

Q.  3A-101?

A.  Correct.

Q.  And here Mr. Combs writes to Ms. Ventura:  What you thinking about, right?

A.  Yes.

Q.  And she responds to him:  I'm thinking about licking those dicks from balls to the head and slowly lowering my mouth down on it to let it in the back of my throat and choke me, right?

A.  Yes.

Q.   And he says:  I can't wait.  That's why I wanna see, right?

A.   Yes.

Q.   And she says:  I can't wait either, right?

A.   Yes.

Q.   Okay.  If we could go pull up 1167 already in evidence.  Is this a message again from Mr. Combs to Ms. Ventura on the same date?

A.   Yes.

Q.   This was again not included in your chart?

A.   No.

Q.   Here Mr. Combs writes to Ms. Ventura:  I'm so horny, I can't concentrate, right?

A.   Yes.

Q.   And she responds:  So what do we want to do?  I'm just going to Duane Reade to grab candles, then going home to pack us a bag, right?  Then she says several other sentences, right?

A.   Yes.

Q.   Could we pull up 1402 again, please.  And then we looked, I think, extensively on row 2 on examination yesterday.  Do you recall that?

A.   Yes.

Q.   If we go to -- I don't think we looked at this one, which is Government Exhibit 3A-107 that's listed under Sean Combs, right?

A.   Yes.

P6HQcom3                          Penland - Cross

Q.   If you look here it's because device owner for this message was associated with a phone belonging to Sean Combs?

A.   Yes.

Q.   So if you could go to page 5, please.  I don't believe we looked at this message.  If you look at the message in the middle, Jules writes to Mr. Combs:  I just need to be back by 12 noon fri.  I need a little more rest than one hour.  Is that ok?  I haven't slept in almost two days and you guys are rabbits.  LOL.  Do you see that?

A.   Yes.

Q.   What does Mr. Comb respond with?

A.   LOL.  Okay.  Hit me when you wake.  Sorry bro.  No stress. You let me know.

Q.   If you could take that down, please.  I think you testified, but I just wanted to make sure I had the testimony right, there's several locations and hotel addresses here on page 1 that list the London Hotel in New York, right?

A.   Yes.

Q.   But you didn't have the underlying record from the London Hotel itself, right?

A.   Correct.

Q.   So you -- you reviewed any records relating to the London Hotel, right, that you had been given, but there was just none from 2009?

A.   I was not given any records from the London Hotel for these

P6HQcom3                        Penland - Cross

time periods.

Q. Right. You didn't get any records from the London Hotel for these time periods, but you did review London Hotel records elsewhere, or did you not review any London Hotel records?

A. I believe I reviewed for other time periods.

Q. There were other time periods but not 2009?

A. Correct.

Q. Okay. That's what I wanted to make sure I understood.

Could we go to the second page, please.

So row four here, we've jumped ahead in time to April 2010. Do you see that?

A. Yes.

Q. There were three entries in 2009 and then now we've jumped ahead to 2010?

A. Yes.

MS. GERAGOS: If we look at -- there's several Exhibits listed under Sean Combs and Casandra Ventura. Could we pull up Defense Exhibit 1360 which is already in evidence.

Q. This is a communication on April 4, 2010. Do you see that?

A. Yes.

Q. And this is just a few days before the April 7 entry?

A. Yes.

Q. This is not included in your chart?

A. It is not.

Q. And at the bottom, you can see that Pop Pop writes to

P6HQcom3                          Penland - Cross

Casandra Ventura:  I love you so much, it consumes my life.
How did this happen?  Do you see that?

A.  Yes.

Q.  And she responded:  I don't know.  I wonder the same thing
for myself all the time, like who was I before we decided to be
together, right?

A.  Yes.

MS. GERAGOS:  Okay.  If we could now pull up 3A-114,
please.

Q.  This is, if you look at your chart that's in front of you,
this is a communication that's listed under Casandra Ventura,
do you see that?

A.  Yes.

Q.  So this was -- device owner here says Casandra Ventura,
right?

A.  Yes.

Q.  This is a communication between her and Jules?

A.  Yes.

Q.  He says:  Great seeing you again sexy, on April 8 of 2010,
right?

A.  Yes.

Q.  And then the next day on April 9, 2010, he says:  I'm at
your door, right?

A.  Yes.

MS. GERAGOS:  We can go back to 1402, please.

P6HQcom3                        Penland - Cross

Q.  And as we discussed just a little bit ago, there are no
entries in the rest of 2010 or all of 2011, right?

A.  Correct.

Q.  And then we get to the middle of 2012, and we're in June 29
of 2012.  Do you see that on row 5?

A.  Yes.

Q.  Okay.  And you list a couple Government Exhibits under
Mr. Combs' name and Ms. Ventura's name?

A.  Yes.

Q.  Okay.  If we go to the next row, is about a couple weeks
later, you list July 13 of 2012, right?

A.  Yes.

        MS. GERAGOS:  If we go to Defense Exhibit 1003, page
7 -- I'm sorry, yes, 1003, page 8, which is already in
evidence.

Q.  Do you see that this is a message between Mr. Combs and
Ms. Ventura?

A.  Yes.

Q.  And the bottom line is July 13, 2012, Ms. Ventura writes:
I just woke up.  I miss you, sad face.  Do you see that?

A.  Yes.

Q.  And if we could -- this was not part of -- this Defense
Exhibit was not part of your chart, right?

A.  Correct.

Q.  Okay.  If we go to -- back to 1402.  If you go to -- if you

                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6HQcom3                        Penland - Cross

look under Casandra Ventura and Sean Combs, you don't cite to Government Exhibit B-326 here, right?  You cite for Casandra Ventura, you cite to B-339 and B-340.  Do you see that?

A.  Yes.

MS. GERAGOS:  Can we bring up Government Exhibit B-326 and go to page 6.

Q.  Is this a communication between Ms. Ventura and Garren CB4A?

A.  Yes.

Q.  We looked at several communications between Ms. Ventura and Garren CB4A on direct, right?

A.  Yes.

Q.  And here, this lists a date of July 13, 2012, right?

A.  Yes.

Q.  And here, if you look, she says:  Hey, hit me when you can.

He said:  Missed the last thing, right?  Do you see that?

A.  Yes.

Q.  Okay.  And then what does she say what's her last message?

A.  Vin was telling us about some good swing clubs in Vegas, but we never got the names or addresses.

MS. GERAGOS:  And if you could go ahead to page 10.

Q.  All right, this is the same date, right?

A.  Yes.

Q.  And she says:  Not to be paranoid, but we know you guys are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

shooting the show out there.  We just want to keep everything super discreet still.  Please don't be offended by this message, smiley face, right?

A.  Yes.

Q.  He said:  I'm always concerned with you guys.  I tell the guys you are very private people and to never ask any questions.  We actually wrapped the show about a month ago, so no filming, and the cameras don't just follow guys around.  Everything filmed is completely staged and planned.  It's reality TV, so very of course it's all fake LOL, right?

A.  Yes.

Q.  He says:  I'm very strict with the men for many of my very private clients?

And she says:  Thank you, right?

A.  Yes.

MS. GERAGOS:  Can we go to the one directly below that?

Q.  He says:  I also have Vin on hold for 5:00 a.m., right?

A.  Yes.

Q.  If we could go to B-339 at page 8, which is a message that you list under Sean Combs.

This is, again, a message you listed because it was between Mr. Combs and Ms. Ventura, right?

A.  Yes.

Q.  This is a day or -- UTC time 7/14/2012, right?

P6HQcom3                        Penland - Cross

A.   Correct.

Q.   If you look at the middle of the page, Ms. Ventura writes: I'm horny and bored.  I tipped the cleaning ladies.  Hope you don't mind.  Do you see that at 11:45 UTC times?

A.   Yes.

Q.   15 minutes later, she says:  Hello.  I need your dick!!! Dying.  I feel like I'm trapped.

     And he says:  On my way back.  Call me, right?

A.   Yes.

Q.   And then you also cite to B-340 if we could go to that. And if we go to the second page.  All right.  This is UTC time on July 16 of 2012, right?

A.   Yes.

Q.   She says:  I feel okay just a little achy and tired.  How are you feeling?

     And he says:  I feel good.  Miss you though.  Shake it off and smile all day.  I had a great time with you this weekend.  Thank you.

     And what does she respond with?

A.   Me too.  I love you.  I miss you.

     MS. GERAGOS:  All right.  Let's go back to 1402, go to page 3 of the chart.

Q.   See -- actually this is 7 -- this is July 13 of 2012, right?  You list it on its own date?

A.   Correct.

P6HQcom3                        Penland - Cross

Q.   Then the next page is row 7, and you list the next day July 14 of 2012 on its own date, right?

A.   Yes.

Q.   And those cite to the same exhibits we just looked at, B-339 and B-340, do you see that?

A.   Yes.

Q.   Now row 8, I think we looked at row 8.  Under Casandra Ventura, you don't list Sean Combs, under the Names column here, right?

A.   That's correct.

Q.   Were there no messages that you could find between the two of them on this date?

A.   I did not have any in my possession, no.

Q.   You just had ones that were from Ms. Ventura's devices, right?

A.   Correct.

Q.   I'll just pull up an example.  The first one under Ms. Ventura is B-229, right?

A.   Yes.

Q.   So that's between Ms. Ventura and Islander LA, right?

A.   Yes.

Q.   And he says:  I'm sorry.  I feel bad I got so drunk.  I'm embarrassed.  If there is a next time, I won't dirk.  Sorry one love.  I won't drink.  Right?

A.   Yes.

P6HQcom3                          Penland - Cross

Q.  And then next page:  And then she sends him a message as to where the location -- where the address is.  She says:  Are you available now, and gives an address, right?

A.  Yes.

Q.  And at the bottom, the last text says:  I'm sorry to rush you, but I have a flight to catch very soon.  So try to head to me as soon as you can.  You're more than welcome to shower here, right?

A.  Yes.

          MS. GERAGOS:  Okay.  Let's go back if we can to 1402.

          We go to the next page and move on to page 4.

Q.  Page 4, row number 9, you list -- different than the last chat you list Sean Combs and you list Casandra Ventura there, right

A.  Yes.

Q.  And then there is the communication under Sean Combs is B-346.  Do you see that?

A.  Yes.

          MS. GERAGOS:  Could we pull that up at page 3?

          And he asks halfway down the page:  What you wanna do tonight?  Do you see?

A.  Yes.

Q.  And what is her response?

A.  I don't know ...  What are the options.  Am I meeting you in the Hamptons or will we be in the city?

Q.   In city.  Whatever your heart desires.  Do you see that?

A.   Yes.

Q.   That is the same date what we just looked at.  It's 7/29/2012.  That's UTC time being sent around 6:40 p.m., right?

A.   Yes.

Q.   Can we go to the next page.  What does she say?

A.   Well I get in kinda late.  Hmm.

Q.   We can just go to bed.  Yopull prob be tired.

          What does she say?

A.   I doubt that.  I'm GNA sleep on the plane.  LOL.

Q.   Go to the next message.  So what you wanna do woman?  And no, I'm not asking you to FO.  I wanna know what you wanna do?

A.   Get something to eat.  Smoke.  Take a walk.

          MS. GERAGOS:  Let's put the next two pages side by side.

Q.   And then you see several different messages between the two of them here?

A.   Yes.

Q.   And this is over about the next hour.  We looked at messages on the second page that were from about 6:40 p.m. UTC time, right?

A.   Yes.

Q.   And then these are at about 7:30 to 8:50 in the next hour, right?

A.   Yes.

P6HQcom3                        Penland - Cross

Q.   And then if you look at the page on the right, page 6, Ms. Ventura writes:  Let's go out and have some carefree fun. Don't tell her I'm coming.  I want to surprise her if we go. I'll go get the Valium when Greg comes to get me.  I really need to go pack.  He comes in one.  He and I haven't even started packing yet, right?

A.   Yes.

Q.   At the bottom, he writes when are yo on your period.  Do you see that?

A.   Yes.

        MS. GERAGOS:  Let's go to the next two pages, please.

Q.   He writes:  And what's carefree fun?

        And what does she say?

A.   I'm skipping it.  Just taking it as it comes.

        MS. GERAGOS:  Okay.  Can we go to the next two pages, please.  All right.

Q.   And do you see at the top, he writes:  One of my favorite times is when we FO and then we made love after.  I also like it when we make love before and then Jules was in the next room.  Then he came in and I blindfolded you.  Do you see that?

A.   Yes.

Q.   And what's her response?

A.   Yeah, I liked those times.  I love when we make love after. The last time was so good.  When we were at my place I came so hard for so long.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

MS. GERAGOS:  All right.  We can take that down.  Thank you.

Q.  If we go back to -- perfect.  Row 10 is August 17, 2012 to August 19 of 2012, right?

A.  Yes.

Q.  And I think you said if you look at the names here, Sean Combs and Casandra Ventura, the 4A series you said refers to American Express statements, I think?

A.  That's right.

Q.  So you didn't see any messages between Mr. Combs and Ms. Ventura from this date?

A.  Correct.

Q.  Did you look for any messages from them, either the day before or the day of?

A.  I did not have access to all her messages.

Q.  But when you didn't review any messages between them, did you ask if you could see -- if you could have all the messages between them?

A.  I was only provided certain messages.

Q.  But as a special agent when you need to review the accuracy of charts, do you ask --

MS. JOHNSON:  Objection.

THE COURT:  Complete the question.  I understand there's an objection.

Let's hear what the question is.

P6HQcom3                          Penland - Cross

Q.  As a special agent, when you review accuracy of charts and you don't find complete messages, do you ask for complete messages?

MS. JOHNSON:  Objection.

THE COURT:  That's overruled.

A.  My job wasn't to add additional items into the chart.  It was to verify that the items in the chart were correct, and so that's what I was doing.

Q.  Did you view it as correct that there were no messages between Mr. Combs and Ms. Ventura around the time of August 17 of 2012?

MS. JOHNSON:  Objection.

THE COURT:  Overruled.

A.  This chart doesn't indicate that there were or were not mention between Casandra Ventura and Sean Combs during these times.  This chart indicates that based on the evidence that is cited in the chart, this individual was at this gathering at this particular time and location.

Q.  You believe that shows that they were at this individual -- at this gathering.  You don't actually know.  That's just what the underlying records are put together to show, right?

A.  Only in several instances do we know for sure, correct.

MS. GERAGOS:  Okay.  And then if we go to next page, please.

Q.  And row 12 also doesn't show Sean Combs under the names

P6HQcom3                          Penland - Cross

column, right?

A.   Correct.

Q.   If we look at row 13, it shows Sean Combs and Casandra Ventura, do you see that?

A.   Yes.

Q.   Under Sean Combs, it cites to Government Exhibit B-349.  So could we please bring that up.  Could we go to the next page. If we look at -- this is a message from Mr. Combs to Ms. Ventura?

A.   Yes.

Q.   He says:  What you wanna do tonight, right?

A.   Yes.

          MS. GERAGOS:  Can we please do the next two pages side by side.

Q.   She responded with a selfie.  Did you see that right before?

A.   Yes.

Q.   Her very next message is a screenshot, do you see that?

A.   Yes.

Q.   So do you see that the name of the profile for that screenshot is Keith CB4A?

A.   Yes.

Q.   And it -- the green -- tell me if this indicates to you the green in that screenshot is the owner of the device and the gray is Keith CB4A?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HQcom3                      Penland - Cross

A.   Yes.

Q.   Okay.  And so on September 9 at 3:13, Keith CB4A says:  You guys in town, do you see that?

A.   Yes.

Q.   And the next message is Mr. Combs to her saying:  I said I love you woman, do you see that?

A.   Yes.

Q.   And she says:  I love you.

And he responds with:  What you wanna do tonight babe, right?

A.   Yes.

Q.   And she says:  I want to make love and drink wine and eat cheese and crackers, and talk and make love and show you how much I love you.  You?

And he says:  Whatever makes my love happy.  Why did you show me the Keith thing, winky face, LOL, right?

A.   Yes.

Q.   And she writes:  Because I never show you when they hit me, and we were talking about the FO yest.  No real reason.  I just want to be with you.

And he says:  So you trying to FO tonight.

And she says:  No.  I mean, we can LOL.  I have that Makeba session Tom day.  I was just showing you.

And he responds with:  It's whatever you want to do, right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HQcom3                         Penland - Cross

A.  Yes.

        MS. GERAGOS:  Okay.  If we could take that down and go back to 1402.

Q.  And then next row is row 14, do you see that?  That's two weeks later, approximately 12 days later?

A.  Yes.

Q.  And here it lists Sean Combs and Casandra Ventura as two of the names, right?

A.  Yes.

Q.  And if we could underneath Sean Combs, it lists B-351, right?

A.  Yes.

        MS. GERAGOS:  Could we bring that up, and go to page 2 to 3, like have them side by side.

Q.  And do you see that he writes on UTC time, 9/23/2012: Wanna freak off one last time tonight?

        And she says:  What???? with many question marks?

A.  Yes.

Q.  And he said:  You can't read?

        And she responds:  I don't want to freak off for a last time.  I want it to be the first time for the rest of our lives, right?

A.  Yes.

Q.  And then you see more photos of her here on the right-hand side, do you see that?

P6HQcom3                          Penland - Cross

A.  Yes.

MS. GERAGOS:  Okay.  Can we take it down and go back to page -- Exhibit 1402, go to page 6.

Q.  Is this from about approximately two weeks after the last entry?

A.  Yes.

Q.  And here also lists Sean Combs and Casandra Ventura, do you see that?

A.  Yes.

Q.  And then the next exhibit -- I mean, the next entry is -- well, let me pull up, under Sean Combs, it says B-352, right?

A.  Yes.

MS. GERAGOS:  Can we pull that up and put 2 to 3 side by side.

Q.  This is Ms. Ventura saying:  Let's go out and have a sexy night, right?

A.  Yes.

Q.  And he says:  Whatever you want, I'm down.

What does she say?

A.  Should I ask around of where is fun tonight?

Q.  And he says:  Hit me when you're ready, right?

A.  Yes.

Q.  And then if you look on page 3 at the bottom on the right-hand side, and that's October 7, 2012, UTC time, she says:  In car, calling L'Ermitage on way to hustler.  Need me

P6HQcom3                    Penland - Cross

to get candles.  The other ones are almost done and not many, right?

A.  Yes.

MS. GERAGOS:  If we could now go back to our chart. We looked at lines -- next page.

We looked at October 13, 2012 to October 14, 2012 on direct examination.  Do you recall that?

A.  Yes.

Q.  And then we looked at -- yesterday, it says -- do you see underneath the dates, it says GX-B-233, B-325, B-354.  And then there's several BX Government Exhibits?

A.  Yes.

Q.  And the three BX exhibits are 204, 206 and 207, right?

A.  Yes.

Q.  And yesterday on direct, I believe you looked at portions of BX-206, right?

A.  Yes.

Q.  And I think now -- let me just go through the next, and then we'll watch the 206 again.  If we could go to number 17, just the next page.

Number 17 lists about a week later it is October 20 of 2012, right?

A.  Yes.

Q.  And if you could bring up Defense Exhibit 1021.10-11, have those two pages.

P6HQcom3                         Penland - Cross

Is this from that date, 10/20/2012, UTC time?

A.   Yes.

Q.   And if you look at the message -- this is not included in your chart, right?

A.   No.

Q.   If you look at the message on the bottom:  You up?  Wanna have some freak fun this afternoon, smiley face.  That's from Mr. Combs?

A.   Yes.

Q.   He says:  You horny or sleepy?  We can sleep or make love today, right?

A.   Yes.

Q.   And what does she respond with?

A.   I'm both.  LOL.  I thought we were GNA lay up and spend time, but you wanna just come here so we can talk about in person?  I was thinking I wasn't going to see you until tomorrow ... I had stuff planned for the day, but I'm good to cancel.  Either way.

MS. GERAGOS:  Okay.  If we could go back to the chart please.  Is there a way to show both line 16 and line 17?  Great.

Q.   So for line 16, as we just talked about, there's three BX which indicates the videos, right?

A.   Yes.

Q.   That's 204, 206 and 207?

P6HQcom3                         Penland - Cross

A.  Yes.

Q.  And then for lines 17, there's two BX videos, which is 205 and 210, right?

A.  Yes.

Q.  So I think what we will do now if we could shut off the feed, your Honor.  Mr. Deputy, we can go to those exhibits?

THE COURT:  I'll ask the deputy to shut off the feed to the overflow.  Please confirm when that's done, and then the jurors should have their headsets.

MS. GERAGOS:  If it is all right with your Honor, I'm going to walk over to Ms. Foster who is graciously going to do this for us today and conduct this part of the examination from over there.  Is that all right?

THE COURT:  That's fine.

MS. GERAGOS:  All right.

DEPUTY CLERK:  Your Honor, I have disabled the feed so long as the monitor is also turned off.

MS. GERAGOS:  The monitor appears to be turned off, your Honor.

THE COURT:  Okay.  Let's proceed.

BY MS. GERAGOS:

Q.  Do you remember yesterday for BX-206, we watched from 10:40 to the end?

A.  Yes.

Q.  So if we could -- Ms. Foster is getting it ready, I will

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HQcom3                         Penland - Cross

give her some time.  First we want to see if it's working.

THE COURT:  Does everyone hear some soothing piano music?

Q.  Ms. Foster, could we please start at 57 seconds and play until a minute and 15 seconds of BX 206.

(Media played)

(Continued on next page)

PghWcom4                         Penland - Cross

MS. GERAGOS:  OK.  Could we play next at a minute and 42 seconds to two minutes and 51 seconds.

(Media played)

THE MARSHAL:  I can hear whatever you're playing.  You have it too close to the microphone.  You can hear it in the gallery.

THE COURT:  Let me just make sure I'm understanding.  You can hear what's coming out on the headsets.

THE MARSHAL:  On the headsets, we can hear that in the gallery.  Yes, your Honor.

THE COURT:  All right.  Let's just make sure are on.  I think you have them off, and they're close to the microphone.  It's going to show up in the -- it's going to be reflected.

Let's continue.

MS. GERAGOS:  Just for the record, your Honor, we are at 2:33, and we'll continue playing until 2:51.

(Media played)

MS. GERAGOS:  OK.  Did the mike issue resolve?

THE MARSHAL:  Resolved.

MS. GERAGOS:  OK.

Could we next play three minutes and 23 seconds for approximately five minutes, until eight minutes.

(Media played)

MS. GERAGOS:  OK.  So that was 3:23 to 8:12.

Q.  And on direct, you watched 10:40 to the end.  Do you recall

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

PghWcom4                        Penland - Cross

that, Agent Penland?

A.  Yes.

         MS. GERAGOS:  OK.  We'll scroll a little before that.
We'll start at nine minutes and 45 seconds and go through to
the end.

         (Media played)

BY MS. GERAGOS:

Q.  Agent Penland, the video cuts off at that point, right?

A.  Yes.

Q.  And in your chart, on line 16, as I said -- or as you
testified, there are two other videos from that -- that have
the same metadata, reflecting the same date -- do you recall
that -- 204 and 207?

A.  Yes.

         MS. GERAGOS:  OK.  So we will, with Ms. Foster's
assistance, if we could bring up BX207, which metadata reflects
right after 206.  If we could bring up 207 and start at nine
minutes and 15 seconds.  And then we will play from nine
minutes and 15 seconds to 11 minutes and seven seconds.

         (Media played)

         MS. GERAGOS:  OK.  For the record, we paused that at
11 minutes and seven seconds.  And Ms. Foster will start again
at 13 minutes and 35 seconds and go until 14 minutes and 47
seconds.

         (Media played)

MS. GERAGOS:  OK.  Again, for the record, we paused that at 14 minutes and 47 seconds.

And then we will now play from 16 minutes and 42 seconds to 17 minutes and four seconds.

(Media played)

MS. GERAGOS:  All right.  And the final clip of this video will be from 23 minutes and 21 seconds until the end.

(Media played)

MS. GERAGOS:  OK.

Q.  Agent Penland, we just reviewed BX206 and BX207.  Those are both videos reflected from the same date, I think, October 14 of 2012, right?

A.  Yes.

Q.  Just for efficiency's sake, if you have it in front of you, the chart, on page 7, row 17, again, lists two BX videos at 205 and 210, right?

A.  Yes.

Q.  All right.  And yesterday we looked at two clips from 205, from 6:30 to 7 and from 9:53 to 10:15.  Do you remember that?

A.  Yes.

MS. GERAGOS:  OK.  So if we could just go, if we could go to BX205 and just play something in between.  If we could start at seven minutes, which is where we left off yesterday, and play to eight minutes and 23 seconds.

(Media played)

PghWcom4                        Penland - Cross

MS. GERAGOS:  OK.  That concludes BX205.

Q.  Yesterday, Agent Penland, do you remember also watching a 30-second clip from BX209?

A.  Yes.

MS. GERAGOS:  OK.  And that, I'm just going to jump ahead for efficiency's sake.

Q.  BX209, the metadata associated with that was 2014, do you recall that?  If you go to page 17 of your chart.

A.  Yes.

Q.  OK.  And so the videos we just watched were, the metadata associated with them was October 14 of 2012, right?

A.  The one we just watched?

Q.  The -- I'm sorry.  There were two that we watched that were October 14 of 2012.  And then there was one that we watched that was October 20 of 2012.  Do you recall that?

A.  Yes.

Q.  Just for efficiency's sake, I'm going to jump ahead in time to December of 2014, and if you see on row 48 of your chart, there's three videos associated with that date.  Do you see that?

A.  Yes.

Q.  And that's BX203, BX208 and BX209, right?

A.  Yes.

MS. GERAGOS:  OK.  If we could go to BX209, I just will pull that up shortly.

Q.  You played yesterday during direct testimony from ten minutes and 30 seconds to 11 minutes.  Do you recall that?

A.  Yes.

MS. GERAGOS:  OK.  Can we play, just go a little bit forward in time to seven minutes and one second to seven minutes and 41 seconds.

(Media played)

MS. GERAGOS:  OK.  And just one more clip from this video, which jumps ahead to after what you looked at yesterday, if we could go to 19 minutes and 19 seconds to 19 minutes and 43 seconds.

(Media played)

BY MS. GERAGOS:

Q.  OK.  And again, that's a video from December of 2014, right, Agent Penland?

A.  Correct.

MS. GERAGOS:  OK.  And last one is from the same line item, 48, which would be BX203, and we're just going to play it from the beginning until three minutes and 50 seconds.

(Media played)

MS. GERAGOS:  OK.  For the record, we paused it on three minutes and 50 seconds.

Your Honor, would you like to take a break now, or should I keep going a couple minutes?

THE COURT:  How much time do you have left?

PghWcom4                     Penland - Cross

MS. GERAGOS:  More than I thought I would, your Honor. Maybe less than an hour.

THE COURT:  All right.  Then we will take our break.

Thank you, members of the jury.  We will come back around 1:30.

(Continued on next page)

P6hWcom4

(Jury not present)

THE COURT:  Thank you, Agent Penland.  I'm sure you know this, but you're not to have any communications with the government.

(Witness not present)

THE COURT:  Please be seated.

Ms. Johnson, anything to pick up before we take our break?

MS. JOHNSON:  No, your Honor.

THE COURT:  Mr. Agnifilo, anything?

MR. AGNIFILO:  Nothing, Judge.

THE COURT:  All right.  We'll see everyone at 1:30.

(Luncheon recess)

P6hWcom4

AFTERNOON SESSION

1:30 p.m.

THE COURT:  Ms. Geragos, are we ready to proceed on your end?

MS. GERAGOS:  As soon as Mr. Combs is out, we are ready.  I think they are getting him.

THE COURT:  Have the parties met and conferred concerning the inquiry that we're going to do at the conclusion of the day?

MS. STEINER:  Yes, your Honor.

The parties would like the procedure to be as follows:

That the Court should inquire of the juror, and then if there are any additional questions that the parties would wish to have asked, they would wait until the juror is excused to raise them with the Court.  And then if the Court wishes to ask the additional questions, the juror would be released into either the courtroom or the robing room.

I'll defer to the defense as to the location of the inquiry.

MS. SHAPIRO:  Sorry.  I didn't hear the last part, but I can guess what it was.

THE COURT:  Just where.

MS. SHAPIRO:  Yeah, that's what I thought.

We thought it made sense, if the Court is OK with it -- I know the government can't officially consent, but to do

P6hWcom4

what we did last time and just do it in the courtroom so that -- it just seems logistically easier, since Mr. Combs would like to be here and there are a lot of lawyers.

THE COURT:  All right.  Very good.

Let's get Agent Penland back.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6hWcom4                         Penland - Cross

(Jury present)

THE COURT:  Please be seated.

Ms. Geragos, you may proceed when ready.

MS. GERAGOS:  Thank you, your Honor.

Q.  Good afternoon, Agent Penland.

A.  Good afternoon.

MS. GERAGOS:  All right.  We left off watching several videos.

Can we bring up Government Exhibit 1307, please.

Q.  All right.  Do you see that on your screen?

A.  Yes.

MS. GERAGOS:  I just want to make sure -- and this is admitted.  I think we can put it on the screen, your Honor, for the audience.

THE COURT:  Are those screens on back there?

MS. GERAGOS:  They're not.  Do you mind giving me one moment?

THE COURT:  All right.  Let's turn on the gallery view and the overflow feed if that is off.

THE DEPUTY CLERK:  I'm sorry, your Honor.  Could please you repeat that?

THE COURT:  Just turn everything on.

THE DEPUTY CLERK:  Yes, your Honor.

MS. GERAGOS:  OK.  Are we ready?

THE DEPUTY CLERK:  Everything is on.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MS. GERAGOS:  Oh, everything is on.  I'm sorry.  I must've misheard.

THE DEPUTY CLERK:  No.  That's my fault.

BY MS. GERAGOS:

Q.  This is a stipulation about the videos we just watched.  Do you see that?

A.  Yes.

Q.  The first paragraph there states -- and we watched BX206, 207, 203, 205 and 209.  Do you recall that?

A.  Yes.

Q.  OK.  And this states that those government exhibits are video files that were recovered from the Frank Black user profile on GX B-200, a device that Casandra Ventura provided to the government.  Do you see that?

A.  Yes.

MS. GERAGOS:  OK.  If we could go to the next page, please.

All right.  And we started on BX206, which is paragraph 7.  Do you see that, and -- if we could blow up 7 and 8.  Perfect.

Q.  And I have been asking you about the metadata, but I was away from this screen and over there, so I want to ask it again.  Do you see that both of these original videos were created on October 14 of 2012?

A.  Yes.

P6hWcom4                         Penland - Cross

MS. GERAGOS:  All right.  We can zoom out.

Q.  And we also watched BX205.

And do you see paragraph 6 that says that that video was created on October 20, 2012?

A.  Yes.

Q.  OK.  And then we watched 209, which is paragraph 10, which says it was created on December 4 of 2014?

A.  Yes.

Q.  OK.  And finally, 203, which is paragraph 4, which has the same create date as December 4 of 2014, right?

A.  Yes.

MS. GERAGOS:  OK.  Perfect.

If we could take that down and bring back up again Government Exhibit 1402 and go to page 6.

Q.  All right.  Row 16 is the row that corresponds to the videos from October 14 of 2012, right?

A.  Yes.

MS. GERAGOS:  OK.  If we could pull up Defense Exhibit 1019, please, pages 1 and 2.

Q.  All right.  This is a communication from that same date but in UTC time, right?

A.  Yes.

Q.  And this is not included in your chart, right?

A.  Correct.

Q.  OK.  And if you look at the top three messages, Mr. Combs

writes:  "What can we do in NYC this weekend?"

And Ms. Ventura responds:  "Let's do something different," exclamation point.

And he says:  "I have one idea.  Let's see a B'way play." Right?

A.  Yes.

MS. GERAGOS:  OK.  And if you go to page 3, if we could jump ahead.

Q.  All right.  Do you see Mr. Combs, halfway down the page, says:  "FYI, fucking Dave hit me"?  Do you see that?

A.  Yes.

Q.  And this is again October 12 of 2012, 6:58 UTC time, right?

A.  Yes.

Q.  OK.  And then she says:  "LOL.  Me too.  So did Daniel"?

A.  Yes.

MS. GERAGOS:  OK.  If we could scroll ahead to 5 and 6.

Q.  All right.  Do you see on the right side of the screen, Mr. Combs writes:  "Is coming to NYC this weekend, RT move"? Do you see that?

A.  Yes.

Q.  And what is her response?

A.  "It's totally up to you and how you feel.  It's really nice being here actually if you want a change of scenery and weather.  If not, I can come home tomorrow.  I will just need

to know so I can book a new flight."

Q.  He responds:  "You make the decision pls."  Right?

A.  Yes.

          MS. GERAGOS:  If we could skip ahead to page 10.  All right.  And if we could go to --

Q.  He says:  "Miss you baby."

     And she responds:  "I miss you so much."

     And he responds:  "What you doing?"  I got us tix for Book of Mormon."  Right?

A.  Yes.

          MS. GERAGOS:  And then if we go to the very end, pages 13 to 14.

Q.  All right.  So if you look here, they continue their conversation that same day, right?

A.  Yes.

Q.  OK.  And then if you look at her message on the bottom left, she writes:  "Lifestyle lounge email," at -- the next day, the UTC time is 6:33 a.m., right?

A.  Yes.

Q.  OK.  And then this appears to be a screenshot on the right-hand side.  Do you see that?

A.  Yes.

Q.  OK.  And that's October 13, UTC time, right?

A.  Yes.

          MS. GERAGOS:  OK.  And if we go to the next page.  All

P6hWcom4                    Penland - Cross

right.

And then if we could go to -- we could take that down and go pull up 1402 again.

Q.  All right.  Again, that was not in your exhibit, right, that exhibit we just looked at?

A.  Correct.

Q.  OK.  You have here B354 listed under Sean Combs.  Do you see that?

A.  Yes.

MS. GERAGOS:  OK.  So if we could pull that up, please.

All right.  Next page.

Q.  All right.  And then here, at 10/13, 2012, he writes:  "You ready for tonight."  Right?

A.  Yes.

Q.  And she says:  "Yes, I just gta get stuff."  Right?

A.  Yes.

Q.  And that's the same day -- or that's the day before the videos we looked at, BX206 and BX207, right?

A.  Correct.

MS. GERAGOS:  If we could take that down and go back to the chart.  If we could go to the next page, please.

Q.  OK.  So then line 17 is October 20, 2012, and under Sean Combs, you write GX B-355 and GX BX205, and that is one of the videos we just looked at, right?

A.  Correct.

MS. GERAGOS:  OK.  So can we bring up B355, please.

All right.  Could we go to the ending of that exhibit, last few pages.

Q.  All right.  Do you see at the bottom right Mr. Combs writes, on the 20th:  "You up?  Want to have some freak fun in da afternoon," with a smiley face?

A.  Yes.

MS. GERAGOS:  And next page there -- is that the last page?

OK.  And then if we could pull up what's already in evidence as Defense Exhibit 1021, page 18, please.

Q.  All right.  And do you see that the date -- this is not included in your chart, right?

A.  Correct.

Q.  And do you see the date here is October 22 of 2012?

A.  Yes.

Q.  All right.  And that's two days UTC time after the line, row 17 that we looked at?

A.  Yes.

Q.  OK.  And then Ms. Ventura writes:  "Keep having sexy flashbacks of yesterday.  Well, you must be busy or asleep. Talk to you tom."  Do you see that?

A.  Yes.

MS. GERAGOS:  All right.  We could pull the chart back

P6hWcom4                          Penland - Cross

up, 1402.

All right.  Let's look at 18, next page.

Q.  All right.  So then about a week later is your next row, which is October 27 of 2012.  Do you see that?

A.  Yes.

Q.  OK.  And under Sean Combs, you list GXB357.

MS. GERAGOS:  So could we bring that up, please.

Q.  All right.  And here, this is from the same date -- do you see that -- October 27?

A.  Yes.

Q.  OK.  And Mr. Combs writes:  "Let's have an FO at 5 p.m.," with a winkie face.  Do you see?

A.  Yes.

Q.  OK.  And what does Ms. Ventura respond?

A.  "LOL.  That's in less than three hours."

Q.  "OK.  You busy?  LOL.  6 p.m.  What you got to do?  "
     What does she respond?

A.  "I'm with April, almost at Hollywood.  We're shopping.  LOL."

Q.  "For how long?  You want to or you can't or don't?  It was just an idea."
     What does she say?

A.  "It just sucks for me when we have something to do after and I have to get ready high.  Why not after the party?"

Q.  OK.  What does she say after that?

P6hWcom4                          Penland - Cross

A.   "I feel like your gna do it with someone else.

     "Let's do it at 6 or 7.

     "Hello."

          MS. GERAGOS:  Go to the next two pages.

Q.   What does she say after that?

A.   "Wow.  OK.  LOL.  Sorry.  You are asleep?"

Q.   "Just woke up.  Don't sweat it.  I'm not."

     How does she respond one minute later?

A.   "I bought the best sexy outfits for later.  We can play it
by ear, but I'm gna check availability of cowboys."

Q.   OK.  And he responds:  "I'll meet you at 11:30."

     What does she say after that?

A.   "And shoes."

          MS. GERAGOS:  OK.  You can take that down.

          All right.  And could we please go now to the next
page.  All right.

Q.   So there's an entry for December 3, 2012.  Do you see that?

A.   Yes.

Q.   OK.  And then December 14th to 15th of 2012?

A.   Yes.

          MS. GERAGOS:  OK.  If we could -- try to make this
more efficient, go to -- we'll go to December 14 of 2012, and
underneath both Sean Combs and Casandra Ventura, there's an
indication of B359.  So can we pull that exhibit up.

Q.   All right.  And that's the same date, the 14th, right?

P6hWcom4                          Penland - Cross

A.   Yes.

Q.   And he says:  "You call Dave?  Hello."

     What does she respond with?

A.   "Hey, yes.  Haven't heard bk."

          MS. GERAGOS:  Can we scroll to page 5 and 6.  All right.

Q.   And he says:  "I need to have fun.  Let's go.  You plan pls, baby.  I need to be taken care of by my woman."

     And how does she respond?

A.   "OK.  You got it."

Q.   "What's the plan?"

     What does she say?

A.   "I'm finished soon.  Can we do 6?  I'm gna book the hotel now.  Should I say it's you.  Gna bev hills."

Q.   "I'm fine and I'm horny."

     How does she respond?

A.   "Can you answer my questions?  LOL.  I gta do nails."

Q.   "I'll boke hotel.  When you going be ready?"

     What does she say?

A.   "I'm just listening down now and going to get my nails done, so if I hurry.5," question mark.

Q.   And he says "K."  And then what does she say in the next two messages?

A.   "I'm really sorry.  I just really wanted to get my work done.  House is a mess and no nails and tan," unhappy face.

P6hWcom4                          Penland - Cross

"Sorry," exclamation point, exclamation point.

"I promise I will be the nastiest freak bitch in the world to make up for it."

MS. GERAGOS:  OK.  Can we now go back to the chart, please, and go to page 9, and then jump ahead.

Q.  So line 23, we looked at this line yesterday on direct.  Do you recall that?

A.  Yes.

MS. GERAGOS:  OK.  So we will move forward, and then if we could go to the next page.

OK.  So let's jump ahead to 2013.

Q.  If we could go, do you see that there's an entry for February 24 of 2013?

A.  Yes.

Q.  OK.  And you list under Sean Combs there GXB236, right?

A.  Yes.

MS. GERAGOS:  All right.  Could we go to that exhibit, please.

Q.  All right.  And this is approximately the same day as line 26, and he writes:  "Maybe one of those nights."  Right?

And she responds yes, with multiple Ss.  Do you see that?

A.  Yes.

Q.  OK.  And so he says:  "Send me a pict."

And what does she respond with?

A.  "Is my hair the condition of what we do."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6hWcom4                         Penland - Cross

Q.  And she sends a selfie?

A.  Yes.

MS. GERAGOS:  All right.  Could we go to the next two pages.

Q.  All right.  And he responds, "yeah," with multiple As and exclamation point, right?  You see that:  "Yeah, bitch"?

A.  Yes.

Q.  OK.  And she sends another two selfies.  Do you see that?

A.  Yes.

Q.  And he writes:  "She's back, thank God," with multiple exclamations.  Do you see that over there?

A.  Yes.

MS. GERAGOS:  OK.  Could we go to the next two pages.

Q.  OK.  And she sends multiple messages and says:  "I feel so much better."  Right?

A.  Yes.

Q.  And he writes:  "What you want to do, or should we not fuck up our week?  LOL.  I need guidance."  Right?

A.  Yes.

Q.  And what does she respond with, those three messages?

A.  "LOL.  I worried to fuck up your week cuz you get stuck in bed after sometimes.

"But.

"I'm feeling myself and I've been really horny."

MS. GERAGOS:  We can scroll down.

P6hWcom4                          Penland - Cross

Q.  He writes:  "Call Garren," and "We gonna need a place."

And she writes OK, right?

A.  Yes.

Q.  And the next two pages, and she says:  Damn how we gna find a place?"

And he says:  "I'm on it.  You get on Garren."  Right?

A.  Yes.

Q.  And then there are several different messages which you've reviewed about coordinating in this text thread, right?

A.  Yes.

MS. GERAGOS:  OK.  All right.  Let's go back to the chart, please.

OK.  So could we go -- let's go to the next page.  If we could go to page 10.  All right.  Do you see -- we'll jump ahead to page --

Q.  There are several entries here.  There's two that we just reviewed in February, and then there's one from March of 2013. Do you see that?

A.  Yes.

MS. GERAGOS:  All right.  So let's head to page 11.

Q.  All right.  And the entry here for 28 is March 23 of 2013 to the 24th, right?

A.  Yes.

Q.  And you write W Hotel, room 322.  Do you know what city that's in?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6hWcom4                         Penland - Cross

A.   No.

Q.   OK.  And there's -- you write Sean Combs and Casandra Ventura; those are two of the names that we see, right?

A.   Yes.

         MS. GERAGOS:  OK.  If we could pull up what's under Sean Combs, B243, please.  All right.

Q.   And that's a message between Sean Combs and Ms. Ventura, right?

A.   Yes.

Q.   And he says:  "Wanna check on the entertainment," and she writes, "yar," with multiple Rs.  Right?

A.   Yes.

Q.   And he writes:  "Found a room at Setai.  Call me."

     And what does she say?

A.   "OK.  Can't call.  At party.  Just got here.  Cool.  Tell Garren 4:45."

Q.   He writes:  "I just got a suite at the W.  Hashtag winning."

     What does she say?

A.   "LOL.  So not the Setai??"

Q.   "No.  Suite at W.  How's party?  What do I need to do or get.  You sure you got Garren booking?  What do I tell G?"

     And she writes:  "What do you want first."  Right?

A.   Yes.

         MS. GERAGOS:  OK.  If we could go to the next two

                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6hWcom4                    Penland - Cross

pages.

Q. And he writes: "Want me to pack your bag? I'm at drugstore now. Let's do new first. What time can we be there? What time can we be there? It's W, rm322."

How does she respond?

A. "He's coming at 4:45. I'm leaving in ten, my shoes and wig piece are in my red luggage."

Q. All right. And then he asks again whether -- "want me to pack bag." Right?

A. Yes.

MS. GERAGOS: OK. Let's go back to the chart, please. OK. And we're on page 11. And then there's --

Q. You have an entry April of 2013 and June of 2013, right?

A. Yes.

MS. GERAGOS: And under April 2013, you cite to GXB244. So let's bring that up. And if we could go to page 5. OK.

Q. And then this is, again, a message between Mr. Combs and Ms. Ventura?

A. Yes.

Q. OK. And she writes: "Can't buy astro. It's too much. I'm buying crazy stuff." Right?

A. Yes.

Q. And he says: "OK. LOL. I got. LOL." Right?

A. Yes.

P6hWcom4                          Penland - Cross

Q.   And what does she respond with?

A.   "LOL.  Cool.  When should I take the thing?

     "Daniel isn't hitting bk."

Q.   He writes:  "OK.  So book other through Garren.  Want me to hit Garren?"

     And how does she respond?

A.   "All set.  When so I take it?  Where is it?  When will you be there?"

Q.   He writes:  "It's in the bag to there."

     And what does she say?

A.   "Yes."

Q.   He says:  "Did you book with Garren?"

     And what does she say?

A.   "Yes.  3 a.m., the Y guy."

Q.   And he writes:  "Do you want to take now and push up to 2:45?"

         MS. GERAGOS:  Can we go to the next two pages.

Q.   He says:  "Push up to 2:45 or I can."

     And what does she say?

A.   "No.  That's in 45 min.  You said you'll be here in 20.  I haven't even seen you.  Damn."

Q.   "LOL.  I'm ready.  Did you get orange pill?"

     And what does she respond with?

A.   "No.  You told me not to take."

Q.   He says:  "Can you take now?  It's in the orange, in the

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

5HTP bottle."

What does she say?

A.  "OK."

MS. GERAGOS:  OK.  We can take those down and go back to the chart.

All right.  Let's go to page 12.  All right.

Q.  There are several entries listed here in 2013.  If you look at line 31, B248 is listed under Sean Combs, right?

A.  Yes.

MS. GERAGOS:  OK.  If we go to B248, please.  All right.

Q.  And you see the first page, Ms. Ventura writes:  "Your sex makes me high.  No.  Like literally.  I feel like I just took a PK.  LOL."  Right?

A.  Yes.

Q.  And he writes:  Dope.  I was thinking about a freak-off but I need to be focused.

"Hello."

What does she respond?

A.  "You do or I do?

"Hello."

Q.  "We both do.  I was just telling you my thoughts."

And what does she respond with?

A.  "LOL.  I've been thinking about one too.  We were pretty focused last time.  Just has to be the right ppl or person."

P6hWcom4                            Penland - Cross

MS. GERAGOS:  He says:  "The only way I could do it is if it was all right," and "I got some more G."  Right?

OK.  If we could go to the next two pages.

And if we could go to the next few pages.  All right.

Q.  And basically in these pages they're conversing more.  Do you see that in this chat?

A.  Yes.

Q.  Over this same day period?

A.  Yes.

MS. GERAGOS:  OK.  If we could go to the next page.

All right.  And then next two pages.

OK.  Perfect.

Q.  And here, on the right side, on page 11, this is June 16 of 2013, right?

A.  Yes.

Q.  And that's the 7:08 p.m. UTC time, right?

A.  Yes.

Q.  And that's the ending date of line 31, right; that says June 15 to June 16?

A.  Yes.

Q.  OK.  And here she writes:  "You are truly the most extraordinary man.  I love you so much.  You make me a better woman, daughter, sister....person," exclamation point.  "I hope you always know how much I love and appreciate you.  Thank you for always showing me love and happiness the way it's supposed

P6hWcom4                        Penland - Cross

to be.  Can't wait until we have a baby of our own to celebrate Father's Day.  I love you with all of my heart.  Happy Father's Day again," smiley face.  Right?

A.  Yes.

Q.  And he says:  "Thank you, babe.  I love you," and sends twice, right?

A.  Yes.

MS. GERAGOS:  OK.  If we could go back to the chart. OK.

Q.  And line 32 cites to B249.  Do you see that?

A.  Yes.

MS. GERAGOS:  OK.  Could we pull that up, please.

Q.  Well, first, let me just -- this is between June 23 to June 24 of 2013?

A.  Yes.

Q.  So then you verified and you checked this conversation -- that's B249 -- between Mr. Combs and Ms. Ventura, right?

A.  Yes.

MS. GERAGOS:  OK.  If we go to pages 2 and 3 next to each other.

Q.  All right.  Now, that conversation starts off with Ms. Ventura sending a message to Mr. Combs.  Do you see that?

A.  Yes.

Q.  And that is another what looks to be a screenshot?

A.  Yes.

P6hWcom4                         Penland - Cross

Q.  OK.  And the person, the profile is Dave Newest, right?

A.  Yes.

Q.  And Dave Newest had sent a text message saying:  "I wanna put that pussy on my face.  Then I wanna bit and suck your body," and then he continues, on June 22, 2013, at 8:41 p.m., right?

A.  Yes.

Q.  And we're not sure the time zone of June 22 of 2013 at 8:41 p.m., right?

A.  Correct.

Q.  OK.  So that message is sent to Mr. Combs June 23, 2013, at 12:56 a.m. UTC time, right?

A.  Yes.

Q.  OK.  And he responds on the next page:  "LOL.  You up." Right?

A.  Yes.

        MS. GERAGOS:  OK.  And they talk to one another.  And if we could go to the next two pages.  OK.

Q.  And they correspond here in these messages.  Do you see that?

A.  Yes.

        MS. GERAGOS:  OK.  And if you could go to the next two pages.  All right.

Q.  And if you go to the right side, he writes, later that day: "What do you want to do baby?  I want to do what you want to

P6hWcom4                          Penland - Cross

do."  Right?

A.  Yes.

Q.  And she responds:  "Hmmmmm.  I'm horny."  Right?

A.  Yes.

Q.  And he writes:  "Want to freak off?  Got room."  Do you see
that?

A.  Yes.

        MS. GERAGOS:  And if we could now pull up Defense
Exhibit 1035 at page 5.

Q.  All right.  This is a message -- you see it's already in
evidence -- from July 22 of 2013, and this is not included in
your chart, right?

A.  No.

Q.  And this is approximately seven days after line 32?

A.  Yes.

Q.  OK.  And here, she writes -- do you see halfway down the
page:  "I don't trust that after the type of sexual
relationship you have with me you had that with her --" one
second -- "I don't trust that after the type of sexual
relationship you have with me, you had that with her and have
in the recent past.  Today I texted you that I wish we could
have FO'd before you left, by the way.  All good.  That was
like I didn't get to say, so I'm done venting.  Thank you for
hearing me out somewhat.  Hope you don't shut down your phone
like you said you were going to.  That would break my heart."

P6hWcom4                        Penland - Cross

And he says:  "I won't."  Do you see that?

A.  Yes.

Q.  And she says:  "And you still have no response to what I said about an FO."  Do you see that?

A.  Yes.

MS. GERAGOS:  OK.  If we could now go back to the chart.

Q.  And if you look at line 33, that's a few -- about two weeks after July 19 of 2013, right?

A.  Two weeks after the last message we looked at?

Q.  Two weeks after the last -- well, it's a little bit more than that.  A little bit more than two weeks after the last message we looked at?

A.  Yes.

Q.  OK.  And you cite to B251 there, right?

A.  Yes.

MS. GERAGOS:  OK.  All right.  Could we pull up B251 and go to pages 5 through 9.  All right.

Q.  And she says to him:  "So you're busy tonight.  See you tomorrow maybe."  Do you see that?

A.  Yes.

Q.  And he writes:  "No, I was thinking about an FO tonight.  LOL."

And she says:  Question mark, "really."

And he responds:  "Bad idea?"  do you see that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.  Yes.

Q.  And the next page she says:  "Not a bad idea.  I've been stressed."  Right?

A.  Yes.

MS. GERAGOS:  And if we could go to the next two pages.  All right.

Q.  And then if you see down on that left side of the page, he says:  "I want to.  I didn't realize it's so late.  We don't have nothing set up.  Etc.  Hello."  Right?

A.  Yes.

MS. GERAGOS:  OK.  And if we could go to the next few pages.

All right.  We could take this down.  And go to the chart and go to page 12, please.  All right.

So there's several more entries you have written -- well, if we could go to page 13.  We just looked at page 12, line 33, so we can go to page 13.

Q.  And here you have several more entries in 2013, in August and then one in September of 2013.  Do you see that?

A.  Yes.

Q.  OK.  And if we could go to line 37, under that line, under Sean Combs, you cite to B257.  Do you see it right there?

A.  Yes.

MS. GERAGOS:  OK.  Could we go, bring up 257 at 10 and 11.

P6hWcom4                           Penland - Cross

Q.  And do you see on the left side Ms. Ventura writes:  "I always do this.  I hate how I feel after I'm high.  I don't know why I keep doing it unprotected..."  Do you see that?

A.  Yes.

Q.  And Mr. Combs writes:  "Let's stop.  I'm sorry."

And how does she respond?

A.  "No, we don't have to stop.  I just don't really think when I'm high.  It doesn't worry you for yourself at all."

Q.  And how does she continue?

A.  "I'm just gna get new tests next week to clear my mind. How do you feel?  Not in terms of all that stuff.  Like how do you physically feel after our party?"

Q.  He says:  "I feel great, but we need to be more careful. Let's not panic.  I just got tested last week.  Get tested and we'll do new rules.  I'm sorry.  I should have been more careful."

And how does she respond?

A.  "We're good.  I love you for that response.  I had fun with you either way.  Having trouble sleeping.  LOL.  But I might take a Benadryl."

Q.  OK.  And this message is sent on the 21st of 2015 at 12:55 a.m. UTC time, right?

A.  Yes.

Q.  So, that's at the very end of the -- if we go back to 1402, that entry was to 9/20/13, right?

P6hWcom4                         Penland - Cross

A.  Correct.

            MS. GERAGOS:  OK.  Let's go to next page, page 14.
All right.

Q.  And there's entries here all for October of 2013, right?

A.  Yes.

Q.  OK.  If we could -- we'll just skip ahead to line 40.
There's two entries under Sean Combs.  One is B218 and one is
B260, right?

A.  Yes.

            MS. GERAGOS:  If we could go to B260.  And go to pages
2 and 3.

Q.  OK.  And I think we looked at part of this yesterday, so I
just wanted to look at the rest.  Here, Ms. Ventura writes:
"You didn't film anything on your phone RT?"  Right?

A.  Correct.

Q.  And he writes:  "No."  And the next page he says:  "No
way."  Right?

A.  Yes.

Q.  And she writes:  "LOL.  OK.  Cool."  Right?

A.  Yes.

            MS. GERAGOS:  OK.  I just wanted to make sure we
looked at that.  If we could now take that down.  And then if
we go to the next page, we're on page 15.  All right.

Q.  And this is October 31 of 2013 -- do you see that -- line
41?

A.   Yes.

Q.   OK.  And under Sean Combs is B262, right?

A.   Yes.

          MS. GERAGOS:  So let's pull that up and go to page 2.
All right.

Q.   And if you see his message at the top, he writes:  Want to
freak off?"

     And what is her response?

A.   "LOL.  Sure," happy face.  "When?"

Q.   He responds:  "Now."

     And what does she say?

A.   "OK.  I'll just need to make a quick store run.  What hotel
you want me to get?  And who should I call?"

Q.   He says:  "Mondrian.  I'll call James and.the ballplayer.
Call Garren.  Tell him 5 p.m. start."

     How does she respond?

A.   "He's available.  So I'm gna get ready and try to go get
stuff."

Q.   He says:  "Yeah.  LOL."

     What does she say in response?

A.   "LOL.  At least I won't feel crazy getting a new wig."

          MS. GERAGOS:  OK.  We can go back to our chart, 1402.
All right.

Q.   And there's several entries here for 2014, right?

A.   Yes.

P6hWcom4                          Penland - Cross

Q.  OK.  And if we could -- we'll go to the last line, 44.

That's March 26 of 2014.  Do you see that?

A.  Yes.

Q.  OK.  And then underneath Sean Combs, you wrote B266.  Do

you see that?

A.  Yes.

        MS. GERAGOS:  OK.  Can we pull up B266 and go to pages

2 and 3.  All right.

Q.  Do you see the first message here is Ms. Ventura sending a

photo to Mr. Combs?  Do you see that?

A.  Yes.

Q.  OK.  And that's the first message she sends?

A.  Yes.

Q.  OK.  And he responds:  "I feel like having one of those

nights, but I have studio.  Fuck."  Right?

A.  Yes.

Q.  And she responds:  "Ugh.  Me too," exclamation,

exclamation, exclamation, "fuck," with two exclamations.

Right?

A.  Yes.

Q.  And he says:  "Want to try?  I leave tomorrow a.m.  WYA."

Do you see that?

A.  Yes.

        MS. GERAGOS:  Could we zoom out, or zoom to the next

page.

P6hWcom4                        Penland - Cross

Q.  And her response is:  "Yeah.  Why not?  LOL."  Right?

A.  Yes.

        MS. GERAGOS:  OK.  Let's go to page 16 of the chart.
All right.

Q.  So page 16 of the chart we've moved ahead several months.
The last thing we just looked at was March of 2014, right?

A.  Yes.

Q.  So you've moved ahead to June of 2014, a couple months,
right?

A.  Yes.

Q.  OK.  And then the next entry after that is September of
2014.  Do you see that?

A.  Yes.

Q.  And then the last one on this page is October of 2014,
right?

A.  Yes.

Q.  OK.  And October of 2014, under that, on line item 47 -- we
did this right before the break, but I'll just do it again --
those are those two BX videos, 201 and 202.  Those are two
videos, correct?

A.  Yes.

Q.  And we didn't watch those videos before the break, but
those are two videos that correspond to that date?

A.  Yes.

        MS. GERAGOS:  OK.  And then if we could go to the next

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6hWcom4                          Penland - Cross

page.  All right.

Q.  And this is December.  We've now gone from October of 2014, and the next entry after October is December of 2014, right?

A.  Yes.

Q.  OK.  And those are videos 203, 208 and 209?

A.  Yes.

Q.  All right.  And we watched 203 -- portions, I should say of 203 and 209 right before the lunch break, right?

A.  Yes.

Q.  OK.  Then the rest of the entries on this chart -- this is in 2015 -- are February of 2015, May of 2015 and October of 2015, right?

A.  Yes.

Q.  OK.  And if you go under October of 2015, under Sean Combs, you've listed B-617?

A.  Yes.

        MS. GERAGOS:  OK.  Could we pull that up and go to pages 2 and 3.

Q.  OK.  And do you see the message, here, she writes, at the bottom:  "Dave hit back."  Do you see that?

A.  Yes.

Q.  OK.  And then at the message on the bottom right she writes to Mr. Combs:  "I know you're knocked out and you probably don't remember anything but I had so much fun with you.  Heart was aching for you.  I love you most," exclamation,

P6hWcom4                        Penland - Cross

exclamation, "forever and ever and ever."  Right?

A.  Yes.

Q.  And that corresponds to the entry we were just looking at from October 5 --

MS. GERAGOS:  Could we go back to it?

Q.  -- October 5 to October 6 of 2015, right?

A.  Yes.

MS. GERAGOS:  OK.  And if we could go to the next page.

Q.  So from October, the next entry you have is December of that year?

A.  Yes.

Q.  All right.  And then the next entry after that, we talked about at the very beginning of the cross-examination that -- go to the next entry after that, is January 2016, right?

A.  Yes.

Q.  OK.  And under January of 2016, you list several -- you list a BX video and then B620.  Do you see?

A.  Yes.

MS. GERAGOS:  OK.  Could we go to B620 and go to page 8.  All right.

Q.  And page 8, if you look at that message on the bottom of the page, she writes, January 19 of 2016:  "You make my heart melt.  You are so loving and I love you now and forever.  These flowers are gorgeous and my house looks flawless.  Thank you so

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6hWcom4                        Penland - Cross

much," with multiple exclamation points; "I had fun with you Sunday/Monday.  Thank you for calming me down, helping me and being nice to me.  Starting of my week so happy," exclamation, exclamation.  Right?

A.  Yes.

Q.  And that is the 19th, right; January 19, UTC plus zero, so that's UTC time?

A.  Yes.

MS. GERAGOS:  All right.  Let's go back to our chart. All right.  And let me orient myself.  All right.  If we go to -- all right.

Q.  If we go to line 54, underneath Sean, that's -- we've now skipped ahead to January of 2016, right?

A.  Yes.

Q.  OK.  And we already looked at line 52 extensively, and then line 53 is about one month after that, right?

A.  Yes.

Q.  OK.  And then line 54, under Sean Combs, you write C-303, right?

A.  Yes.

MS. GERAGOS:  OK.  Could we go to C-303 and go to the next page.  All right.

Q.  These are messages not between Mr. Combs and Ms. Ventura, right?

A.  Correct.

P6hWcom4                          Penland - Cross

MS. GERAGOS:  OK.  These are between, could we go to the next page.  All right.  So if we could go to message No. 8, please.  All right.

Q.  That's a message between Dave Shirley, Melissa Feola, Matt Testa, Sean cell C and several other individuals, right?

A.  Yes.

Q.  And the message there says:  "Hi, all.  PD wants to go to Joshua Tree tonight through Tuesday to create music and vibe and wants you all to come."  Right?

A.  Yes.

Q.  OK.  And are you aware whether Dave Shirley and Melissa Feola and Matt Testa are employees of his?

A.  I am not.

Q.  OK.  You didn't review that in your review of messages?

A.  Some of them I did, but not all three names.

Q.  OK.  That's fine.

Which ones are you aware of is his employees?

A.  Dave Shirley.

MS. GERAGOS:  All right.  We can take that down.

And if we go back to our chart, perfect.

Q.  If we look at the next -- the next entry is February 9 of 2016.  Do you see that?

A.  Yes.

MS. GERAGOS:  OK.  And if we go to the B623, that's under Sean Combs.  Pull that up.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.  All right.  This is between Mr. Combs and Ms. Ventura, right?

A.  Yes.

MS. GERAGOS:  All right.  Go to the next two pages. All right.

Q.  And you see that that initial message is a message from Ms. Ventura to Mr. Combs?

A.  Yes.

Q.  All right.  And it's attaching a photo?

A.  Yes.

MS. GERAGOS:  OK.  Could we bring up 623A, which is that photo, just quickly to show what that is.

Q.  All right.  Is that the photo that's depicted on February 9 of 2016?

A.  Yes.

MS. GERAGOS:  OK.  We could take the photo down, and put the two pages next to each other.  All right.

Q.  So she sends that message to Mr. Combs and says:  "Dying for these, but I can't figure out how to make them stay up. GTA ask that these square girls tomorrow.  Might send them back.  They reminded me of you."  Right?

A.  Yes.

Q.  And he says:  "Why you teasing a freak-off like that?  Not fair."  Right?

A.  Yes.

P6hWcom4                          Penland - Cross

Q.   And what does she say?

A.   "BC I just tried them on and they made me think of you,"
exclamation point, exclamation point; "not teasing,"
exclamation point, exclamation point.

        MS. GERAGOS:  All right.  Could we go to the next two
pages.

Q.   And she says:  They're a little over G anyway.  I fucked up
and wore the other ones, those rope ones, but they were too
tight, and I can't return them, but I want the black ones."
And he says:  "Get them."
        And how does she respond?

A.   "Sorry.  I'm so over all my clothes."

Q.   And what does she say next?

A.   "I need new ones.  I was distracted when I was talking to
you."

        MS. GERAGOS:  All right.  And he says:  "All good."
        Let's go to the next two pages.  All right.

Q.   And they keep talking to one another on the left side of
the page.  And he says:  "What am I supposed to do?"
        And how does she respond?

A.   "I don't want to do it at home.  I don't want anything to
stress me out."

Q.   "He's available.  He just hit me back after that."  Right?

A.   Yes.

        MS. GERAGOS:  Let's go to the next two pages.

Q.   And he says:  "Want to get hotel?  What do you want me to do?  Hello."

And what does she say?

A.   "Yes, hotel.  What time am I telling him?"

Q.   "Babe, I don't want to fuck up your week.  We can just go to your crib and chill."  Right?

A.   Yes.

MS. GERAGOS:  And can we go to the next page.

Q.   And she says:  "Baby, I was in the mood, but maybe I'm tripping."  Right?

A.   Yes.

Q.   And then they continue corresponding after that?

A.   Yes.

MS. GERAGOS:  OK.  We can take this down and go back to our chart.  All right.  Let's go to the next page.  All right.  We will look at March when we get to 1550, but let's go to March 4 to March 5, 2016, 1550.

Q.   But let's go to line 59, is March 18, 2016, to March 20 of 2016, right?

A.   Yes.

Q.   All right.  And the exhibit under Sean Combs there is B638?

A.   Yes.

MS. GERAGOS:  OK.  Could we -- let's go to that exhibit first.

Q.   All right.  Again, messages between Sean Combs and Ms.

Ventura?

A.  Yes.

MS. GERAGOS:  All right.  Let's go to the second and third page.  All right.

Q.  She says:  "Want to do something today just in case." Right?

A.  Yes.

Q.  And he says:  "All fucking day."

And she says:  "LOL."

And he says:  "want to get Dave out?  For the day."  Right?

A.  Yes.

MS. GERAGOS:  All right.  Let's go to the next two pages.  All right.

Q.  And they're speaking about Dave in this text message thread?

A.  Yes.

MS. GERAGOS:  Let's go to the next two pages.  All right.  And -- all right.

Q.  They're again speaking about Dave, and then he writes: "I'm locked in my bathroom talking to my therapist, btw. Hello.  Send me the contact."

And she says:  "Why?"  Right?

A.  Yes.

MS. GERAGOS:  OK.  And let's go to the next two pages.

Q.  And he asks:  "I said is there anything out here you

P6hWcom4                          Penland - Cross

trust?"

And she says:  "Nope."  Right?

A.  Yes.

Q.  And she says:  "I'm scared to try something new bc of all the random stories we have on the guys from here.  Let me think.  But you called Dave."  Right?

A.  Yes.

MS. GERAGOS:  OK.  Let's go to the next two.

Q.  And he proposes Greg, Jules.  And she writes:  "Greg is a weirdo, but I don't mind him.  LOL."  Right?

A.  Yes.

Q.  "If I get my period, he might trip.  LOL.  Jules, yeah, but it takes six hours for him to get here."  Do you see that?

A.  Yes.

MS. GERAGOS:  All right.  Next two pages.

Q.  And he writes:  "Greg is free from now to 11.  Jay is ready to get on a flight, but we got to book.  That's the best I could get.  What's your vibe on baldy?  LOL.  Come to the room."  Do you see that?

A.  Yes.

Q.  And she writes:  "The hotel needs you to call to give Dave access.  Pls do that because he's waiting."  Do you see that?

A.  Yes.

MS. GERAGOS:  All right.  Can we bring up 1411-R that's in evidence.

P6hWcom4                        Penland - Cross

Sorry.  No.  Government Exhibit 1411-R.

Q.  All right.  Do you see -- if we could look at the messages, the two bottom messages on the page, from March 19 of 2016?

A.  Yes.

Q.  Do you see these messages?

A.  Yes.

Q.  All right.  And then do you see that Dave Shirley writes to Kristina Khorram:  "Clayton Howard needs access to the room"?

A.  Yes.

Q.  All right.  And Ms. Khorram responds -- or doesn't respond. She writes to Dave Shirley and Melissa Feola:  "Hey, M.  Dave needs to add the name Clayton Howard to the Four Seasons hotel room.  He needs access ASAP.  Could you help?"  Do you see that?

A.  Yes.

Q.  All right.  And these were not in your chart?

A.  They are not.

Q.  Have you seen those messages before?

A.  No.

MS. GERAGOS:  OK.  We can take that down.

All right.  If we could go back to 1402.

All right.  Let's go to the next page.  All right.

Q.  These are after the date in March that we just saw, the next thing that you wrote down was June 17 of 2016, right?

A.  Yes.

Q.   And then October 17 of 2016.  See that?

A.   Yes.

Q.   And then November 4 of 2016?

A.   Yes.

          MS. GERAGOS:  OK.  And we could go to the next page.

Q.   And then November 10 of 2016?

A.   Yes.

Q.   OK.  And December 5 of 2016 and then December 17 of 2016, right?

A.   Yes.

          MS. GERAGOS:  All right.  And then if we could go to the next page, please.  All right.

Q.   And the next entry -- we already discussed this a little bit earlier, but there was nothing that you reviewed that indicated anything that should be an entry in there between, from New Year's Eve of 2016 into 2017, right?

A.   Correct.

Q.   OK.  So if we look at February 14, 2017, you have Government Exhibit B409, right?

A.   Yes.

          MS. GERAGOS:  OK.  And -- OK.  If you could go to Defense Exhibit, Mr. McLeod, 1122, please.  All right.

Q.   If you see the message at 1386, the bottom message, Ms. Ventura writes to Mr. Combs here:  "I adore you so.  I love you so.  I'm so blessed to have you in my life.  You drive me

crazy, but I can't get enough of you at the same time."  Right?

A.  Yes.

Q.  And that's a few days before the message that, the February 14 entry that we just looked at?

A.  Say that again?

Q.  That's a few days -- that's, this message is February 11 of 2017, right?

A.  Yes.

Q.  That's three days before February 14, the February 14 entry?

A.  Yes.

Q.  But it's not in your chart, right?

A.  The exhibit's not cited?

Q.  Yeah.  The exhibit's not cited, right?

A.  Correct.

        MS. GERAGOS:  OK.  We can go back to our chart.  OK. And I think we can look at --

Q.  The next few entries here are from March of 2017, right?

A.  Yes.

Q.  OK.  And then you write, on line 68, Casandra Ventura apartment.  Is there a reason you don't write the address there?

A.  That's how it's indicated in the chat message.

        MS. GERAGOS:  OK.  All right.  Let's go to page -- perfect -- 23.  All right.

P6hWcom4                          Penland - Cross

Q.   And these are the last entries that you have in your chart, right?

A.   Yes.

Q.   OK.   And these are all -- we already talked about this, but all from 2017?

A.   Yes.

Q.   OK.   And let's look at, on April 27 of 2017, there's an entry under Sean Combs; it's B420, right?

A.   Yes.

        MS. GERAGOS:   And, all right.   Let's go to B420.

Q.   And this is again a message between the two of them?

A.   Yes.

        MS. GERAGOS:   OK.   Let's go to the next few pages. All right.

Q.   And he writes:   I want us to have one of our night.   I found this new store.   Dope.   We'll drink a lot of water. Don't overdo but have us some freaky fun.   Do I have your permission to set up?"

        And she writes:   "Yeah, but I'm ovulating.   Ovulation. Ugh, ovulating."

        And he writes:   "That's good.   We be extra careful with anything else."   Right?

A.   Yes.

        MS. GERAGOS:   OK.   Let's go to the next two pages.
        All right.

P6hWcom4                          Penland - Cross

Q.  And he says:  "You ain't super horny," with multiple

exclamation points and question marks, "WTF."  Right?

A.  Yes.

Q.  And she says:  "Poor me.  Of course I am.  I'm retouched,"

and sends him many photos.  Do you see that on the right-hand

side?

A.  Yes.

        MS. GERAGOS:  All right.  Let's go to the next two

pages.  All right.

Q.  He says:  "So can I set up something with extra

precautions."  Right?

A.  Yes.

        MS. GERAGOS:  All right.  And let's go to the next two

pages.

Q.  And she says, on the right-hand side, and I'm skipping over

many messages.  But she says:  "I'm so excited for you

tonight."  Right?

A.  Yes.

        MS. GERAGOS:  All right.  We can take that down.

        All right.  And pull up the chart again.

Q.  And then the last entry here on the chart is June 9 of

2017, right?

A.  Yes.

Q.  OK.  If we could go to, underneath Sean Combs one of the

exhibits you cite there is B431, right?

P6hWcom4                          Penland - Cross

A.   Yes.

         MS. GERAGOS:  OK.  Could we pull that up.

Q.   All right.  What does she write in the second message?

A.   You want me to read the entire message?

Q.   Yeah.  Could you?

A.   "The game starts at 10 p.m.  No texting after this.  Create a character that you will be that is nothing like who you really are and so will I....different name.  Different occupation.  Different style of dress.  Different background story.  We cannot break character until 8 a.m. when you see me. I am no one you have ever met before.  I am not Cassie and you are not Sean, Puff, Diddy, Mr. C, etc.  LOL.  Example, pilot, doctor, author, professor or whatever you decide.  We do not know each other," smiley face.  "All you need to know is I will be at the bar at the L'Ermitage at 11 p.m.  We don't know each other, so we cannot text each other.  Your main objective to is to pick up the prettiest girl in the place.  Me.  Try and get to know her.  I have a feeling she's dope...in case of emergency the safe word is pineapple to break character.  Let's try not to break character.  Let's have fun, babe.  Love you," exclamation point, "signing off as Cassie....."

Q.   OK.  And this is the last, this relates to the last entry in the chart, right?

A.   Yes.

         MS. GERAGOS:  OK.  All right.  We've made it through

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P6hWcom4                          Penland - Cross

all of 1402.

If we could bring up 1550, please.  All right.

Q.  And this is, what you title there is timeline of events starting at March 4, 2016, PST, right?

A.  Yes.

Q.  These first few slides, there are some red or dark orange at the top, which are phone calls from Combs to Ventura and Ventura to Combs.  But there are no text messages between the two of them, right?

A.  Not -- they are not included on this chart if there are.

Q.  OK.  Did you review any of the text messages from March 4, PST, between Ventura and Combs?

A.  I don't know right --

MS. GERAGOS:  OK.  Why don't we pull up Defense Exhibit 1088, which is already in evidence.

All right.  You could put them side by side, like we've been doing.

Q.  This is UTC March 4, 2016.  Do you see that on the bottom?

It's not PST converted yet.  Do you see that on the bottom?

A.  Yes.

Q.  OK.  And do you see that the message on the bottom right-hand side --

MS. GERAGOS:  If we could, like, scroll up.

Q.  And that's March 4, 5:12, but that's UTC time, right?

A.  Correct.

Q.  So that's a little bit beforehand, and she's texting him:
"I know you're sick, but I have to tell you this and maybe you
can read this later and enjoy it.  My pussy has been so hot
since we've been making love this past week.  For the past two
days I'll just think about it."  Do you see that?
A.  Yes.
        MS. GERAGOS:  OK.  Could we go to the next two pages.
Q.  And basically they're corresponding over the course of
March 4, but 5:20 UTC time, not PST time, right?
A.  Correct.
Q.  And you didn't review any of these messages?
A.  I don't believe I reviewed these specific messages.
        MS. GERAGOS:  OK.  Let's go to the next two pages.
Q.  And they again correspond and ask -- they're speaking to
each other, saying they love each other, right?
A.  Correct.
        MS. GERAGOS:  Let's go to the next two pages.  All
right.  If we could now go to -- actually, let's go to page 11,
11 and 12.
Q.  All right.  And he says at the bottom:  "Are you getting
rest tonight, or are you all going out," and that's March 5 at
1:20 a.m. UTC time, right?
A.  Yes.
Q.  OK.  So that's now -- that is March 4 in Pacific Time,
right?

P6hWcom4                          Penland - Cross

A.  Yes.

Q.  OK.  And they're speaking.  At the bottom right she says:
"I want to spend time with my baby."  Right?

A.  Yes.

           MS. GERAGOS:  OK.  Let's go to the next two pages.

Q.  And he says:  OK.  Well, let me know either way so I can
plan my night.  Love you so much.  You looked so sexy today.
Hello.  Well, hit me when you have time."  Do you see that?

A.  Yes.

           MS. GERAGOS:  OK.  Let's go to the next two pages.

Q.  And she responds:  "Thank you, baby.  I love you so much
and you looked so sexy today."

     And he says:  "So what you going to do so I can plan the
rest of my night."  Right?

A.  Yes.

Q.  And she responds:  "Baby, I want to FO so bad, but I don't
want to fuck myself up.  What am I to do?"  And that is March
5, 2016, at 1:43 UTC time, right?

A.  Correct.

Q.  So that's March 4 Pacific Time, right?

A.  Yes.

Q.  OK.  And he says:  "What would you want to do," in
response, right?

A.  Yes.

Q.  And she says:  "I'm going to go quickly to see Erin bc I

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P6hWcom4                         Penland - Cross

didn't get to see her and...we can have fun...I don't want you thinking I don't want to."  Right?

A.  Yes.

MS. GERAGOS:  OK.  So can we go back to 1550, please. All right.

Q.  So here we have phone calls between the two of them on March 4, but there's no text messages between the two of them that starts out that chart, right?

A.  Correct.

Q.  OK.  And if we could go to the next page of this chart, there are several messages here which are Ms. Ventura's messages to Garren Cb4a, right?

A.  Correct.

Q.  OK.  And it still does not include any text messages between Ms. Ventura and Mr. Combs during this period, right?

A.  Correct.

Q.  Did you decide not to include those messages?

A.  Include what messages?

Q.  Any messages between Mr. Combs and Ms. Ventura during this period.

A.  I did not.

Q.  OK.  Who did?

A.  The trial --

Q.  Who decided what to include in this chart?

A.  The trial team.

P6hWcom4                          Penland - Cross

MS. GERAGOS:  OK.  And if we could go to the next page, slide 3.

Q.  Here, you included more calls between Combs and Ventura, right, on March 4?

A.  Yes.

Q.  All right.  And messages between someone named Skyler and Ms. Ventura, right?

A.  Yes.

Q.  OK.  And you then see a message here where Ventura responds to Skyler saying:  "Could you do 3."  Right?

A.  Yes.

Q.  And Ventura calling Skyler, right?

A.  Yes.

Q.  But again, no messages between Combs and Ventura, right?

A.  Correct.

MS. GERAGOS:  OK.  And could we just skip ahead to slide 6.  All right.

Q.  And you start including -- here, you include a message between Ventura and Combs starting on March 5 of 2016 Pacific Time, right?

A.  Yes.

Q.  OK.  So you reviewed B626; you reviewed the messages between them, right?

A.  Yes.

Q.  And you then start including here where he says:  "Call

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6hWcom4                          Penland - Cross

now."  Do you see that?

A.  Yes.

Q.  And she responds:  "I went and checked everything and spoke to security.  Jules left so you're good and as long as you don't disturb the other guests they'll leave you be."  Right?

A.  Yes.

Q.  And then the trial team or you decided that those would be the messages that are in that slide?

A.  The trial team.

Q.  OK.  And there's no evidence here -- you see a message that says:  "Call me.  The cops are here."  Do you see that, at 12:07?

A.  Yes.

Q.  And you didn't see any phone calls when you reviewed the 601 or any other documents that showed that the cops were actually there, right?

A.  I did not.

Q.  OK.  You didn't see a call to 911, right?

A.  No.

          (Continued on next page)

P6HQcom5                        Penland - Cross

BY MS. GERAGOS:  (Continued).

Q.  You didn't see any LAPD calls to Ms. Ventura's phone?

A.  I did not.

Q.  And if you go to -- let's go to slide 8.  I'm skipping ahead a bit.  There is a message that you included from B-626 where Combs messages Ms. Ventura, and says:  I'm getting arrested, right?

A.  Yes.

Q.  And you were provided a lot of information to make this chart, right?

A.  Correct.

Q.  You didn't see any reports from the Los Angeles Police Department, right?

A.  Correct.

Q.  You didn't see any reports from the Los Angeles Sheriff's Department, right?

A.  Correct.

Q.  You didn't review any incident reports or anything like that?

A.  No.

Q.  You're familiar as a special agent with incident reports and how to review those, right?

A.  Yes.

Q.  And you didn't come across any in your review in making this chart?

P6HQcom5                          Penland - Cross

A.   No, I didn't come across any incident reports.

          MS. GERAGOS:   And if we go to the next slide, please.

Q.   You included several different phone calls here from D-Roc
to Ms. Ventura and Ms. Khorram to Ms. Ventura, right?

A.   Yes.

Q.   And Khorram messages D-Roc and says:   I got him back to
Mapleton, right?   You see that at 2:37?

A.   Yes.

Q.   At 2:34, she writes:   It's me calling now.   He's at home,
right?

A.   Yes.

Q.   And then at 2:47, she says:   I got him.   We are leaving,
right?

A.   Yes.

Q.   So those are three different messages:   Two to Ms. Ventura
and one to D-Roc about Mr. Combs or about somebody at home,
right, or at Mapleton?

A.   One says home.   One says Mapleton.

Q.   Okay.   And Ventura responds at 2:50.   Thank you.   Please
take away whatever keys he thinks he has.   He needs to sleep,
right?

A.   Yes.

Q.   Now, I've skipped ahead to page 11.

          Do you see that, slide 11?

A.   Yes.

P6HQcom5                          Penland - Cross

Q.  Ventura messages Combs here, which is a Combs message you choose to include, and it says:  Plugging my phone in and going to bed.  You should do the same, right?

A.  Yes.

MS. GERAGOS:  And if we could go to the -- why don't we scroll ahead to slide -- well, the next page is fine.

Q.  We looked at this message on direct where Morgan messages Khorram on the bottom at 6:55, it's an LAPD card, right?

A.  Yes.

Q.  That's the only message that you saw that indicated anything related to a police department, right?

MS. JOHNSON:  Objection.

THE COURT:  Sustained.

Q.  You saw this message IMG_4175.JPG, right?

A.  Yes.

Q.  Is that the only thing you included here that has the name Los Angeles Police Department?

A.  Yes.

Q.  You don't have to look there.  You can just look at me and the jury.  Thank you.

MS. GERAGOS:  You can unzoom and go to the next page.

Q.  We looked at these photos as well, right?

A.  Yes.

Q.  And just at the bottom, Ventura messages Nash and says:  Hey, can he come to Roc and April's, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HQcom5                          Penland - Cross

A.   Show me where you're looking.

Q.   Right there where the cursor is.

A.   Yes.

          MS. GERAGOS:  Let's go ahead to slide 16.

Q.   Here you included several different phone calls between Combs and Eddy Garcia on March 7, 2016, Pacific Time, right?

A.   Yes.

Q.   There are no phone calls that you included here on this page between Ms. Khorram and Eddy Garcia, right?

A.   No.

Q.   And then you included at 2:25 p.m., an 8 minute and 29 second call from Ventura to Combs, right?

A.   Yes.

Q.   Was that a FaceTime call?

A.   I don't know.

Q.   If you go to the bottom here, Ventura then messages Morgan and said:  I should have sued, right?

A.   Yes.

Q.   And she responds:  Totally?

A.   Yes.

          MS. GERAGOS:  If we -- we could take that down, actually.

          Your Honor, may I have one minute?

          THE COURT:  You may.

          MS. GERAGOS:  No further questions.

THE COURT:  Any redirect?

MS. JOHNSON:  Yes, your Honor, briefly.

REDIRECT EXAMINATION

BY MS. JOHNSON:

Q.  Special Agent Penland, do you recall Ms. Geragos asking you several questions on cross-examination about the time periods at and around the dates in Government Exhibit 1402?

A.  Yes.

Q.  And do you recall that she showed you some exhibits at dates other than the times listed in Government Exhibit 1402?

A.  Yes.

MS. JOHNSON:  Ms. Foster, could you please pull up Government Exhibit 1402 at page 13, line 35.

Q.  Special Agent Penland, what is the date of line 35?

A.  August 9, 2013.

Q.  What is the location?

A.  New York.

Q.  What is the hotel's location?

A.  Hilton Garden Inn, Riverhead, Room 240, 2038 Old Country Road, Riverhead, New York 11901.

Q.  And you testified on be direct examination that Riverhead, New York is in Long Island, right?

A.  Correct.

Q.  Who are the names listed in line item 35?

A.  Casandra Ventura and Clayton Howard.

MS. JOHNSON:  You can take that down, Ms. Foster.

Can you please pull up what's in evidence as Government Exhibit B-247.  Could you go to the second page, please.

Q.  Special Agent Penland, what's the date of this photograph?

A.  August 5, 2013, 11:48 a.m. UTC.

Q.  Is that approximately four days prior to August 9, the date of line item 35?

A.  Yes.

Q.  Can you read the text that accompanies this photograph?

A.  So you can remember.

MS. JOHNSON:  And Ms. Foster, can you please turn to the next page.

Q.  What is the date of the photograph sent on page 3?

A.  August 13, 2013, 12:59 a.m. UTC.

Q.  And approximately how many days after August 9 is August 13, 2013?

A.  Four days.

MS. JOHNSON:  You can take that down now, Ms. Foster.

Could you please pull up Government Exhibit 1402, page 19, line 58.

Q.  We spent some time on this line.  This is from March 4 and 5 date that the timeline corresponds to, is that correct?

A.  Correct.

Q.  And what is the location listed in the chart?

A.   LA.

Q.   What's the hotel?

A.   Intercontinental.

Q.   Do you recall you were asked a number of questions about the timeline you prepared or you that you tested for accuracy, correct?

A.   Correct.

Q.   And to be clear, who provided you with the items in the timeline?

A.   The trial team.

          MS. JOHNSON:  Ms. Foster, could you please pull up Government Exhibit B-625.

Q.   Who is this communication between?

A.   Casandra Ventura and Sean Combs.

          MS. JOHNSON:  Ms. Foster, could you please go to page 4 of this PDF.  Could you please zoom in on the bottom message.

Q.   Special Agent Penland, could you please read that message?

A.   I think if we start at 7 or 8 and end at 4 at the latest. Take a Xanax and/or Ambien and go to sleep.  We'll be okay. And you rest tomorrow and all day Sunday, you'll be good.  And drink a lot of water.  We'll be good.  But we won't have hours to be caught in a matrix.  If we do it, I want you to call Garren and see what he has, so it can really be a turn on.  But if we're going to do something, the sooner the better.

Q.   And what is the date and time of UTC that that's sent?

A.   March 5, 2016, 1:49 a.m. UTC.

Q.   At this time in March of 2016, is UTC approximately eight hours ahead of Pacific time?

A.   Yes.

Q.   And so would that mean that this message is sent at approximately March 4 at approximately 5:49 p.m.?

A.   Yes.

          MS. JOHNSON:   Could you pull up and publish Government Exhibit 1550, please, Ms. Foster.

Q.   What time does the timeline start on page 1, Special Agent Penland?

A.   6:04 p.m.

          MS. JOHNSON:   Could you please pull back up Government Exhibit B 625, Ms. Foster?   Could you go to page 11 and 12, please.

Q.   Could you please read those messages, Special Agent Penland?

A.   What?   Call Garren?   Can you do that and go get your stuff? Where you wanna stay?   Can you see who Garren has?   Hello?

Q.   And who sent all of these messages?

A.   Sean Combs.

Q.   Who are they sent to?

A.   Casandra Ventura.

          MS. JOHNSON:   Can you now take this down and pull up Government Exhibit B-631, Ms. Foster.

P6HQcom5                          Penland - Redirect

Q.  Who are the participants in this chat thread?

A.  Casandra Ventura and Sean Combs.

MS. JOHNSON:  And could you please go to page 2 Ms. Foster.  Can you zoom in on the top message?

Q.  What's the date of this top message?

A.  March 10, 2016.

Q.  Is March 10, 2016 approximately five days after March 4 and March 5 of 2016?

A.  Yes.

Q.  Can you read this message?

A.  Baby, I can't say it enough.  I'm so sorry, exclamation point five times.

MS. JOHNSON:  Can you take that down.  Can you please go to pages 6 and 7.  I'm sorry, Ms. Foster, Government Exhibit B-631 at pages 6 and 7.

Q.  Special Agent Penland, what's the date on these messages?

A.  March 10.

Q.  Of 2016?

A.  Yes.

Q.  Again, is that approximately five days after the events of March 4 and 5?

A.  Yes.

Q.  Could you please read these messages?

A.  I still have crazy bruising from Friday.  I would be a dummy to subject myself to that possibly happening again.  How

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

would I know if the drugs are GNA B bad or that you won't drink too much. When you get fucked up the wrong way, you always want to show me that you have the power and you knock me around I'm not a rag doll. I'm someone's child. People love me, and I can't keep hiding from them B/C of your mistakes.

MS. JOHNSON: Thank you. Ms. Foster, please pull up Government Exhibit 1402 at number line 65 which is on page 21.

Q. What is the date of the entry on line 65?

A. December 17, 2016 to December 19, 2016.

MS. JOHNSON: Can you take that down, Ms. Foster and can you pull up Government Exhibit B-512. And can you please go to the second page. Can you zoom in on this chat?

Q. What's the date of this chat?

A. January 7, 2017.

Q. Is this approximately a few weeks after the line in -- line 65?

A. Yes.

Q. And can you read the body of this message?

A. Nothing good comes out of FOs any more. You treat me like you're Ike Turner.

MS. JOHNSON: Thank you. You can take that down now, Ms. Foster.

Q. Special Agent Penland what was your role in this case

A. To review the evidence provided to me and verify the accuracy of the charts.

P6HQcom5                          Penland - Redirect

Q.  Were you provided with all of the evidence in this case?

A.  No.

Q.  Do you know what all of the evidence in this case is?

A.  I do not.

Q.  You were asked several questions about gaps in dates.  Were you provided records of all of those times where there are gaps in dates?

A.  No.

Q.  Are you aware either way if it means the individual did not gather -- may not have gathered at particular locations during those gaps in dates?

A.  I do not.

        MS. GERAGOS:  Objection.

        THE COURT:  The question was interrupted.  Let's get the question, and see if there's still an objection.

Q.  You testified -- Ms. Geragos asked you many questions about gaps in dates on Government Exhibit 1402.  Do you recall that testimony?

A.  Yes.

Q.  Are you aware either way if a gap in date means that there was not individuals gathering at a particular location?

        MS. GERAGOS:  Objection.

        THE COURT:  That's sustained.

Q.  Are you aware either way if there are records for those gaps in dates?

P6HQcom5                         Penland - Redirect

MS. GERAGOS:  Objection.

THE COURT:  That's sustained.

Q.  You testified that you checked Government Exhibit 1402 for accuracy, is that right?

A.  Yes.

Q.  Were there lines or citations that you removed from Government Exhibit 1402 during that process?

A.  Yes.

Q.  Were there other items of evidence that you reviewed that are not listed on Government Exhibit 1402?

A.  Yes.

MS. JOHNSON:  Can you please pull up Government Exhibit 1405-C, Ms. Foster?

Q.  Do you recall looking at Government Exhibit 1405-C on direct examination?

A.  Yes.

Q.  And can you remind the jury what the second line item shows?

MS. GERAGOS:  Objection.

THE COURT:  That's overruled.

A.  This is an American Airlines charge from Los Angeles for a ticket from Los Angeles to JF Kennedy Airport for Jules Theodore date of departure July 29.

Q.  Is that July 29, 2010?

A.  Yes.

P6HQcom5

Q.   Do you have a copy of Government Exhibit 1402 in front of you?

A.   Yes.

Q.   Is there a corresponding entry for any line item in July of 2010 on Government Exhibit 1402?

A.   No.

MS. JOHNSON:  May I have one moment, your Honor.

THE COURT:  You may.

MS. JOHNSON:  No further questions.

THE COURT:  Anything further, Ms. Geragos?

MS. GERAGOS:  No, your Honor.  Thank you.

THE COURT:  Thank you, Agent Penland.

(Witness excused)

THE COURT:  Before we adjourn for the day, are there any other exhibits or any other materials that the government would like to put into the record?

MS. COMEY:  Not at this time, your Honor.  Thank you. Wait.

THE COURT:  Oh, there is.

MS. JOHNSON:  I'm so sorry, Judge.  I just wanted to clarify there is one transcript issue I just wanted to put on the record from Ms. Ventura's testimony.  The government had offered 3Q-117 at that time, and it's reflected in the transcript at 3Q-107.  I wanted to make sure 3Q-117 was admitted.

P6HQcom5

THE COURT:  Any objection?

MS. GERAGOS:  No objection.

(Government's Exhibit 3Q-117 received in evidence)

MS. JOHNSON:  There is one more.

We offered A-441-G, and it's reflected in the record as A-41-G.  I just wanted to make sure that A-441-G is admitted.

THE COURT:  Any objection?

MS. GERAGOS:  No objection.

THE COURT:  Those exhibits will be admitted.

(Government's Exhibit A-441-G received in evidence)

THE COURT:  With that, thank you, members of the jury for your attention today.

As I tell you always:  Do not talk with each other about the case.  Do not speak with anyone else about the case. Do not look up anything about the case or do any kind of online research or non-online research or investigation into the case.

With that, we will see you here tomorrow to get started at 9:00 a.m.

Remember, it's our last day before the break on Thursday, and then we'll have a shorter day on Friday.  So we're almost there.

All rise.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HQcom5

(Jury not present)

THE COURT:  Please be seated.

Anything from the government to address for tomorrow?

MS. COMEY:  No, your Honor.  I just wanted to flag in terms of timing, given the length of Agent Penland's testimony, I don't think we're likely to rest tomorrow.  I think we're more likely to rest on Friday.  If there's going to be a similar cross of Agent Cerciello, I suspected we're going to go into Friday.  Just wanted to put that on radar.

THE COURT:  How long do you anticipate for Mr. Paul's direct examination?

MS. COMEY:  I think it's about 90 minutes, your Honor.

THE COURT:  Understood.  Thank you.

Anything from the defense before we get to the other issue that we had previously discussed?

MS. GERAGOS:  No.  I just wanted to let your Honor know based on the question you had for the government, I expect they're going to have several exhibits to admit tomorrow.  We have several clean-up exhibits to admit as well after that. Maybe we can do that in the morning before we call Ms. Paul.

MS. COMEY:  Yes, your Honor.  I've conferred with Ms. Geragos, and we both have a set of clean-up exhibits that we will be offering, and there's no objection to Ms. Geragos similarly offering those.

THE COURT:  Very good.  With that, we have an

P6HQcom5

application that requires us to close the courtroom, so I'm ordering that the courtroom be closed at this time.  So everyone, with the exception of the parties and any individuals that they designate from their team, should now exit the courtroom.

MS. SHAPIRO:  Your Honor, are you also going to cut off both the audio and video feed to the other room?

THE COURT:  Yes, now that you've raised it.

(Pages 6731-6754 SEALED)

INDEX OF EXAMINATION

Examination of:                                    Page

DeLEASSA PENLAND

Direct By Ms. Johnson  . . . . . . . . . . . . .6553

Cross By Ms. Geragos . . . . . . . . . . . . . .6619

Redirect By Ms. Johnson  . . . . . . . . . . 6719?

GOVERNMENT EXHIBITS

Exhibit No.                                     Received

 3Q-117     . . . . . . . . . . . . . . . . . .6728

 A-441-G    . . . . . . . . . . . . . . . . . .6728