P6iWcom1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
UNITED STATES OF AMERICA,

          v.                              24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

          Defendant.                    Trial
-------------------------------x
                                  New York, N.Y.
                                  June 18, 2025
                                  8:45 a.m.
Before:

                 HON. ARUN SUBRAMANIAN,

                                District Judge
                                -and a Jury-

                    APPEARANCES

JAY CLAYTON
    Interim United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
    EMILY A. JOHNSON
    MAURENE R. COMEY
    MEREDITH FOSTER
    MITZI STEINER
    MARY C. SLAVIK
    Assistant United States Attorneys

P6iWcom1

APPEARANCES CONTINUED


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:  MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
HARRIS TRZASKOMA LLP
BY:  ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:   Lucy Gavin
                Shannon Becker
                Paralegal Specialists

                Raymond McLeod, Paralegal

P6iWcom1

(Trial resumed)

THE COURT:  All right.  Please be seated.

We have a sick juror, who is unable to be here today. He was on his way here and had vertigo symptoms and had to turn back and go home.  And the juror's partner dutifully notified us, so we have his contact information if we need any further information, but he's not here.  And he's on the regular jury, so I don't think there's any way to proceed today.  But I'll hear from the parties if they have some other ideas here.

MS. COMEY:  I suppose my only question is, your Honor, does this sound like a sort of temporary impairment that may resolve itself such that we can resume on Friday, or is this a longer term issue?

THE COURT:  We'll make a call.

The sense that I got, and I'll ask the deputy to correct me if I'm wrong, is that it was literally an unexpected and possibly momentary issue.  But we'll obviously monitor the situation to see if it's something more serious.  But as far as what we know now, it was just a today situation.

MS. COMEY:  OK.  Understood, your Honor.

In that case, I agree we can't proceed, but I also don't see a basis to remove this juror at this point.

THE COURT:  All right.

Mr. Agnifilo, any different thoughts?

MR. AGNIFILO:  Probably not, but let me just run it

P6iWcom1

down for a second, Judge.

THE COURT:  OK.

MR. AGNIFILO:  Your Honor, thank you.

Would the Court be open -- and we have the explicit consent of my client to do this -- to meet at the sidebar and have a sealed record so I could ask the Court possibly a couple of questions?

THE COURT:  Any objection from the government?

MS. COMEY:  No objection, your Honor.

I imagine sealing would be appropriate because Mr. Agnifilo is going to be asking about medical information of a juror that should be private.

MR. AGNIFILO:  That is correct.

THE COURT:  All right.  That is fine.  Let's do that.

We're going to keep the real time running, because my understanding, based on our prior discussions, is that we can keep the feed going so the attorneys and Mr. Combs can see what is happening at the sidebar and then seal the transcript, and that should resolve things.  But I'm saying that here to make sure that I'm not missing something, and the court reporter or anyone can speak if I've got it wrong.

MS. COMEY:  We'll just have to confirm that the same process that was used during sealed sidebars in voir dire can be sealed here to make sure that the real time doesn't go out to the public.  But I understood Mr. Agnifilo to be saying that

P6iWcom1

even if the real times does not work, Mr. Combs is comfortable with Mr. Agnifilo asking these questions and then conveying the information back to Mr. Combs.

THE COURT:  Is that correct, Mr. Agnifilo?

MR. AGNIFILO:  That is correct.  But I believe the real time is now working.

THE COURT:  Is not working?

MR. AGNIFILO:  No.  It is.  It wasn't until ten seconds ago, but it is now working.

THE COURT:  OK.  Let's have a sidebar.

(Pages 6761-6763 SEALED)

P6iWcom1

(In open court)

THE COURT:  Thank you very much.

We're going to make some further inquiries to address the juror situation.

In the meantime, there are two exhibits that have been flagged that have been objected to by the defense.

Ms. Shapiro, are you prepared to address those?

MS. SHAPIRO:  Mr. Driscoll can handle it.

THE COURT:  All right.

Mr. Driscoll.

MR. DRISCOLL:  Yes, Judge.  Good morning.  Thank you.

THE COURT:  All right.

So, as to GXH110, the government says that D-Roc's messages would be admissible under 801(d)(2)(D) or (E) -- let's put (E) aside for the moment -- (d)(2)(D).  And so why wouldn't the entire text communication be admissible because One Stop's statements, as to whom there has been laid a foundation that he furnished drugs from time to time to Mr. Combs, would be admissible just as necessary context to understand the requests and other inquiries that D-Roc was making?

MR. DRISCOLL:  Your Honor, there has been no foundation laid that this is actually One Stop.  The government is using, I presume, the contact information as the foundation to prove that it's One Stop.  But that would be impermissible bootstrapping under the hearsay rules, and I would just draw

P6iWcom1

the Court's attention to the *Al-Moayad* case, 545 F.3d 139 (2d Cir. 2008).

There, the court admitted an address book to prove contact information, but it said it did so only because the government did not rely on the address book to establish that the phone number listed next to Al-Moayad's name was, in fact, his phone number. But here, that's exactly what the government is doing. So in the absence of some foundation that the conversation is actually with One Stop, we just don't think the foundation's been laid.

THE COURT: You don't think that the data surrounding the communication indicating that the number corresponds to One Stop does the trick.

MR. DRISCOLL: That's correct.

THE COURT: Because that's just like an address book in that case.

MR. DRISCOLL: Yes.

THE COURT: So you would need -- what would you need?

MR. DRISCOLL: The government's put on case agents who have pulled phone extractions. We've heard testimony from other witnesses authenticating phone numbers.

Here, they haven't put a witness on the stand to testify who this conversation is with or what phone number this is.

THE COURT: OK. So it's fair to say that if the

P6iWcom1

government were able to do that, then as to both of these exhibits there would be no remaining objection.

MR. DRISCOLL:  Correct.

THE COURT:  OK.

Ms. Steiner.

MS. STEINER:  Yes, your Honor.

I'm a bit surprised by this argument.  This is a communication that was taken from D-Roc's phone.  Of course, it does have the One Stop contact, but even setting that aside, the entire content of this communication pertains to drugs and D-Roc obtaining drugs on behalf of Mr. Combs through One Stop. So there's certainly, it's authentic and there's certainly enough in the exhibit itself to corroborate what the government is representing and what other witnesses have testified to, which is that this is, in fact, a drug dealer that provided drugs to Mr. Combs.  Full stop.

MR. DRISCOLL:  Your Honor, it's the link in the chains there that this individual is the drug dealer that has not been established.

THE COURT:  What's the citation again?

MR. DRISCOLL:  It's *united States v. Al-Moayad*, 545 F.3d 139.  And the pin cite is 176.

I would also point the Court to *United States v. Chavez*, from the Tenth Circuit, 229 F.3d 946 at 953-54.

THE COURT:  I'm looking at the *Al-Moayad* decision, and

P6iWcom1

I suppose I'm not understanding how that supports the defense's theory. Given that in addition to noting that the government did not rely on the address books to establish that the phone number listed next to Al-Moayad's name was his phone number, the court then went on to say that under the very low standard for relevance, the evidence would have been admissible, citing to *United States v. Quattrone*, 441 F.3d 153 at 188 (2d Cir. 2006), which stated that so long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry.

MR. DRISCOLL:  I understand that, your Honor.

The issue in *Al-Moayad* is the government wasn't using the exhibit to prove that the contact information was, in fact, the individual at issue. Here, they need that step in the chain --

THE COURT:  Why?

MR. DRISCOLL:  -- in order to demonstrate the relevance.

THE COURT:  Why?

MR. DRISCOLL:  Because in the absence of proof that this actually is One Stop, there is no relevance.

THE COURT:  Well, no. They're saying that if you just look at the text communication, it's clearly a drug transaction.

P6iWcom1

MR. DRISCOLL:  I don't think it is, your Honor, just looking at the substance of the communication.

THE COURT:  Let me ask Ms. Steiner.

Who are these documents going to be used with?

MS. STEINER:  Your Honor, we don't expect to use it with any particular witness.

MR. DRISCOLL:  And this is the issue.  The government could use exhibits in this fashion anytime they wanted to just bootstrap in part of their case, but we haven't heard any foundation that this is One Stop.

MS. STEINER:  Your Honor, even setting aside -- just to respond to Mr. Driscoll, even setting aside whether or not this is, in fact, One Stop, which again, the contact indicates that it is, and there's been plenty of testimony about him, there's been much testimony that's on the record about how Mr. Combs's inner circle, which includes D-Roc as well as his personal assistants, would obtain drugs for him; that was part of their duties and responsibilities.  It's very clear that D-Roc is doing that here.  He says on a number of occasions in this chat that he's acting on behalf of big brother, or P, clearly indicating the defendant.

With respect to the substance of the communication, I don't think it could be any more plain that these communications are about drugs.  I mean the second chat is talking about three bottles, four bottles for 5K, five bottles

P6iWcom1

for 10K.  It's explicitly about drugs.

THE COURT:  Right, but you're not going to have any witness explain that or lay any kind of foundation for what happened here.  If you had someone who was going to testify that he corresponded with One Stop and he understood the number here to be the One Stop that furnished drugs to Mr. Combs, then I think you'd be fine at that point for purposes of this communication.  But I've just read this, and you're right that it references some kind of transaction, but the text communication itself does not reference any kind of drugs, at least GX H110.  We can separately address the other communication.

This does not seem to, in any part of this, address drugs.  So the way in which the government is establishing that this communication is about a drug transaction would have to be because one of the contacts here identified is One Stop with his phone number.  And if that's the case, then I think Mr. Driscoll is saying that's the thing that, in the *Al-Moayad* case, the Second Circuit noted was not being done by the prosecution there.  Not to say that that's dispositive, because the Second Circuit didn't say much more than what's in that sentence.

MS. STEINER:  Of course, your Honor.

I believe we have another exhibit which may be able to help establish the proper foundation, so if we can just be

P6iWcom1

permitted to do that, and we can provide it to the Court.

THE COURT:  All right.

Now, do we need to look at the other exhibit, Mr. Driscoll, or do you have the same objection there?

MR. DRISCOLL:  Correct.

THE COURT:  All right.  So why don't we see what the government has as additional foundation to establish the necessary linkage without relying on the phone number and name that is identified in the text messages, and we'll proceed on that basis.

MR. DRISCOLL:  Sounds good, your Honor.  Thank you.

THE COURT:  All right.  Very good.

Anything else that we can address here -- let me ask one question to Ms. Shapiro, if she's here.

In the defendant's requests to charge, there's a footnote referring to the grand jury issue that we've addressed from time to time with reference to the RICO predicate of sex trafficking.  There's an objection that it would be a constructive amendment of the indictment to charge the jury as to the RICO predicate with 1591(d).

Is that a live objection, or has that been resolved?  Because these requests to charge were furnished to the Court weeks ago.

Do you know what I'm referring to?

MS. SHAPIRO:  Not off the top of my head.

P6iWcom1

THE COURT:  Just to refresh your recollection, the defendant's requests to charge in addressing the RICO charge noted that in April the government had informed the defense that it was potentially proceeding not only on the basis of 1591(a)(1) but also 1591(a)(2) and 1591(d).  And the defense's position, in that footnote at least, is that 1591(d), that would be a constructive amendment of the indictment.

And so I'm asking whether that's a live objection at this point.  And the only thing I would note is that in the indictment as to the predicate, it refers to 1591.  It does not specify 1591(a)(1), although Counts Two and Four do refer specifically to 1591(a)(1) without referring to 1591(d).

MS. SHAPIRO:  Yes.  So I think that is a live objection for that reason.

THE COURT:  What is the basis for the objection, given what I've said, which is that the indictment just refers generally to 1591 but does not refer specifically to 1591, like a specific subpart of 1591?

So just as with the other offenses, which the parties' instructions are virtually identical, as to the predicates, it covers all branches of that particular statute.  So what's the constructive amendment issue?

MS. SHAPIRO:  I think that, at a minimum, from a notice perspective, given the way the substantive count was charged, and the racketeering act is clearly referring to the

P6iWcom1

same conduct, we're relying on the way the count, the substantive count is charged.

THE COURT:  All right.  But it's a live objection, in any event.

MS. SHAPIRO:  Yes, your Honor.

THE COURT:  The government can address it.  I just wanted to know whether it was actually a pending objection.

MS. COMEY:  Off the top of my head, your Honor, my response would be that Count One's speaking language refers repeatedly to obstruction and covering up all of the crimes of the enterprise.  And so I would think that that would provide adequate notice that the reference to 1591 covered not only substantive sex trafficking but also the obstruction provision in sub (d), would be my immediate response just on the face of the indictment.

THE COURT:  All right.  We can address it once I've gotten back to you with the proposed charge.  But as I read the Second Circuit case, it had to do with actually charging a different pattern of racketeering that was not reflected in the indictment and not an issue of notice or things that of nature. It was literally a different pattern being charged and the fact that that was not reflected in the indictment, and that was the basis for the objection in that case, which the Second Circuit recognized.

So I'll take a look, and everyone has preserved their

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6iWcom1

ability to continue to argue this.  I just had a question about it.

MS. SHAPIRO:  Sure.

The only other thing I'd add, and we can take this up later as well in connection with that if it becomes necessary, is that the enterprise letters only identify two instances of alleged obstruction, and they're not couched that way.

THE COURT:  OK.  Understood.

Anything further from the government before we adjourn today?

MS. SLAVIK:  Your Honor, could I just bring your Honor's attention to one more aspect of this chat between D-Roc and One Stop?

THE COURT:  Yes.

MS. SLAVIK:  The phone number assigned to the contact One Stop that we see in the communication at Government Exhibit H110 is a number that ends in 7333.  The government will seek to admit a separate exhibit, which is at Government Exhibit A432.  That's a chat from one of the defendant's phones, and that chat is between the defendant and One Stop, using the same number.

Both chats on their face relate to drug transactions, which is not surprising, because as I think at least four, maybe five, witnesses have testified, One Stop was a drug dealer that the defendant obtained drugs from regularly.  So

P6iWcom1

between the witness testimony, the content of the chats and the overlapping contact information, I think the government has well established, by a preponderance, that these chats are admissible.

I'm happy to pull up both exhibits if that would be helpful to your Honor.

THE COURT:  I'm looking at 432 right now.

MS. SLAVIK:  A432.

THE COURT:  Yes.

Here, I take it that you're saying this communication has verbiage that can only be understood as reflecting a drug transaction, the references to FB, V, etc.

MS. SLAVIK:  Exactly, your Honor.

THE COURT:  All right.

Mr. Driscoll, if that was the objection, then I think what the government is saying is that if A432 has content that actually demonstrates that what is being discussed is a drug transaction with the number identified here, ending in 7333, identified as One Stop, on that basis H110 would also be admissible on that same ground without implicating the issue that's raised in *Al-Moayad*.

MR. DRISCOLL:  Your Honor, I still don't think this chat on its face can clearly be said to relate to drugs.

THE COURT:  Well, I take it that the government can elicit testimony to explain, like, what those abbreviations

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6iWcom1

mean.

Is there someone that can do that?

MS. SLAVIK:  Yes.  Certain, on their face, relate to drugs.  For instance, within the chat between D-Roc and One Stop, there are references to vals and relaxers.  I think that's pretty obvious what that relates to.

THE COURT:  What's FB?

MS. SLAVIK:  Football, your Honor.

I believe that Cassie Ventura testified as to the meaning of PK, which is painkiller.

THE COURT:  Painkiller.  All right.

FB is what?  Football?

MS. SLAVIK:  Yes.  That relates to the shape of the pill, your Honor.

Ms. Ventura also testified that Percocets are yellow in color, which explains the reference to yellows.

THE COURT:  All right.  I'll consider those arguments.

And Ms. Steiner, you had indicated that there was some other document that you were going to seek to admit.  Is this that document, or is there something else?

MS. SLAVIK:  I'm sorry.

Before Ms. Steiner jumps up, I just want to point out that with respect to the defendant's chat with One Stop, the defendant's identification of One Stop as this contact comes in as the defendant's statement.  That is not hearsay.  I think

P6iWcom1

that comes in, and so I think that that can apply to the D-Roc chat as well, your Honor.

THE COURT: Well, I don't think that addresses the issue that Mr. Driscoll raised. I mean even if you just looked at the D-Roc communication, I think Mr. Driscoll is basically conceding that D-Roc's statements would come in either under 801(d)(2)(D) or (E). He's just saying that there's nothing to show that this was a drug transaction other than the fact that there's the name One Stop. That was what he said.

And you're suggesting that that's not the only basis --

MS. SLAVIK: Exactly.

THE COURT: -- additional basis other than the name of One Stop.

MS. SLAVIK: Right. I was addressing more the contact information. I think Mr. Driscoll made the argument that we couldn't be sure that this is One Stop. And I think the defendant's statement that this is One Stop rebuts that argument that Mr. Driscoll made.

THE COURT: All right. Very good.

Well, I will consider that. I'll take a look at these two documents.

With that, Ms. Steiner, there's nothing else; is this the other document you were referring to?

MS. STEINER: It was, your Honor. And I'll just note,

P6iWcom1

though, that A432 is an excerpt from a longer chat exchange, which does have additional references to drugs, such as yellow footballs.  If your Honor wishes to see the full chat exchange, the government is happy to provide that to your Honor.

THE COURT:  All right.  Why don't you send that to the Court.

Just for planning purposes, based on the submissions that have been made, I would overrule the objection to both of these exhibits.

But I'll take a closer look, Mr. Driscoll, at the two cases.  I already looked at *Al-Moayad*, but you referenced another case.  I'll take a look at that, and I'll take a look at the additional communication that Ms. Steiner submits, and I'll give you a final, definitive ruling before we get started on Friday.

All right.  Anything further?

MS. STEINER:  No, your Honor.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  Could I have a minute to confer, your Honor?

THE COURT:  Yes.

MR. AGNIFILO:  We have nothing.  Thank you, Judge.

THE COURT:  All right.  Thank you very much.  We are adjourned.  See everybody here at 8:30 on Friday.

(Adjourned to June 20, 2025, at 8:30 a.m.)