P6KQcom1 - Corrected

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
UNITED STATES OF AMERICA,

          v.                         24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

           Defendant.                Trial
-------------------------------x

                           New York, N.Y.
                           June 20, 2025
                           8:35 a.m.
Before:

               HON. ARUN SUBRAMANIAN,

                         District Judge
                         -and a Jury-

                  APPEARANCES

JAY CLAYTON
    Interim United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
    EMILY A. JOHNSON
    MAURENE R. COMEY
    MEREDITH FOSTER
    MITZI STEINER
    MARY C. SLAVIK
    Assistant United States Attorneys

P6KQcom1 - Corrected

APPEARANCES CONTINUED


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:  MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
HARRIS TRZASKOMA LLP
BY:  ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:   Lucy Gavin
                Shannon Becker
                Paralegal Specialists
                Raymond McLeod, Paralegal

(Trial continued)

THE COURT:  Good morning.  Welcome.  Please be seated.

Earlier this week we discussed the defense application in relation to a juror.  I have reviewed the record and the parties' submissions, and we have questioned the juror.  The defense's application is denied.

Remaining exhibit objections:  The only exhibit objection that I have before me has to do with GX-H-110 and GX-A-432.  Both exhibits are admitted.  The sole objection raised is under Rule 401, and the argument from the defense is that for two reasons, there's not a proper foundation as to the relevance of these two exhibits.  The defense first argues that no foundation has been laid; that the communications actually involve One Stop, the drug dealer.  And, second, the defense argues that it is not clear that the text message communications are about drug transactions.  The defense's objections are overruled.

As to the first objection about One Stop's identity, the Court notes that GX-H-110 and GX-A-432 are pulled from two different phones.  One is D-Roc's and the other is Mr. Combs' but in both phones the same phone number ending in 7333 is listed with the contact name One Stop.  Importantly by connecting this phone number with the name One Stop in his phone, Mr. Combs himself identified this number as longing to One Stop.

As to the second objection about to the content of the chats, the government on Wednesday explained, and the Court has reviewed the communications and confirms, that the chats in the exhibits are on their face about drugs.  For example, including terms like vals and relaxers, while other text communications use abbreviations that Ms. Ventura explained during her testimony were used for drugs.  For example, PK means pain killer, and PK is an abbreviation used in the text communications.

The Court finds that within the context of other exhibits and previous testimony, the government has more than satisfied its burden to show by a preponderance of the available information that there is a foundation for relevance of these two communications, and for those reasons the objections are overruled.

There was a letter yesterday submitted concerning certain other exhibits that were to be used in today's proceeding.  My understanding is that those objections have been resolved by agreement of the parties.

As to the jury charge, the Court will provide the parties with its proposed jury charge today, and I will have certain instructions for what the parties need to do in terms of meeting and conferring to determine what objections or additional instructions or modifications the parties may have.

Big picture:  The parties' submissions were largely

the same, although structured in completely different ways, so I have a way of presenting the charges, but the parties will have an opportunity, obviously, to ensure that there is nothing missing in the Court's proposal.

The only really -- there is one issue -- let me take a step back.

So in terms of the charge, what I'd ask the government to do is really look through especially on the RICO charge, which is by its nature very complicated, and see if there are ways to simplify that. The complexity in some ways arises because of the number of the predicates. So obviously one question is whether the government intends to proceed on all the predicates. But then underlying some of the predicates, there is not only the actual offense charged but also attempts aiding and abetting, willfully causing, and so there's a complexity there that I don't know the government had intended. It might just be in the initial submissions all the bases were covered, so I would just ask the government to look at that.

Substantively, the one dispute I think has to do with the drug predicate. The way that the government had proposed the drug predicate was that there's a RICO conspiracy to engage in a drug conspiracy, so a conspiracy to engage in a conspiracy, which if you had to use emojis would be the mind-blown emoji. So I think that the defense's proposal was that it's a RICO conspiracy to engage in the possession with

intent to distribute or distribution of controlled substances. I think that makes sense. And I don't think that it's -- anything is lost in treating things in that manner, so I'd ask the government to look at that.

On the defense side, the government on the interstate commerce portion of the RICO conspiracy charge indicates that under *Taylor v. United States*, which involved Hobbs Act conspiracy, the Court said that anything pretty much having to do with drugs automatically satisfies the jurisdictional predicate.

I wasn't able to find a case applying *Taylor* in the context of a RICO conspiracy, and the language of the Hobbs Act is a little bit different, it's interstate commerce, but then any matter that the United States would have jurisdiction over, and that's really the language that was interpreted in *Taylor*. So I'll just flag that for the parties. It may be that there's not a dispute that if there's a drug allegation, that that would satisfy the interstate commerce element given *Taylor* and some other cases. I'm just flagging that because it's a proposal that the government made, and the defense didn't have an opportunity to respond to that given the submission of the charges. So I'm just flagging that.

But, Ms. Shapiro, happy to hear you if you have a reaction

MS. SHAPIRO: No, that's fine. I'll take a look at

that.  I wanted to flag for your Honor, and we're happy to do this in response to the draft charge, but we were going to submit some amended requests on a couple of the predicates this weekend because I'm preparing for the Rule 29 and doing more research.

There were some additional things that -- and in light of the way the evidence has come in that we wanted to modify our requests, but we can just do that in response to the charge.

THE COURT:  I think the best way to do it — and I'll put this in an email when I send you the proposed charge — is to put in what you would like to add or modify, and then just include a comment so that I can see what case or authority or the reason why you're making that proposal, and then we're going to have the opportunity for you to fully air any objections or, you know, we're going to have a whole proceeding to determine what the charge should look like.  So that's the easiest way I think to handle it so I can see -- what I'd like to get back from the parties, and we can determine the right timing, is one document that has both sides' proposed modifications with the reasons why.

That way I can go through all of the proposed changes and figure it out.  I think that's a little bit more helpful.  If you need an additional letter in addition to that to just make your points clear, that's fine.

MS. SHAPIRO:  That's fine, your Honor.  I think we'll probably want to do a letter as well just so that our points are crystal clear on the record.  And then, the other additional charge that we hadn't submitted yet, because we had to see how the evidence came out, is the theory of defense charge.

THE COURT:  Sorry, I didn't hear it.

MS. SHAPIRO:  The theory of defense charge.

THE COURT:  Yes, I have an insert for that.

MS. SHAPIRO:  Thank you.

THE COURT:  Anything further from the government before we get started today?

MS. SLAVIK:  No, your Honor.

MS. SHAPIRO:  Judge, there's one other thing we may want to put on the record, but we'll want to do it under seal regarding the other matter the Court just ruled on so we can submit a paragraph or something.

THE COURT:  Anything else from the defense?

MR. AGNIFILO:  One issue, your Honor.  I know in the past we've had some success, if it's free, using your Honor's courtroom.  And my question, so what we want to do today is we want to be able to go through some of the videos with Mr. Combs.  It would be much easier to do it here, and I know that this is something that your Honor has talked to someone at the marshal service about.  And since we have an early day, if

no one was using the courtroom after 1:00, that would really just be very convenient to us, and it would allow us to do it here in a controlled place.

Again, I mean, the marshals stay here with us, and they've been wonderful, and I have no issue with that.  So if your Honor can work your Article III magic, we would really appreciate it.  So that is our request.

THE COURT:  All right.  I'll check on that during a break.  We are not going to have a lunch break today, but I take it that after -- is Mr. Paul the next witness?

MS. SLAVIK:  He is, your Honor.

THE COURT:  So I believe that what I was told is that there's approximately 90 minutes in the direct.  So I think we'll take a break after the direct.  During that time, I'll consult with the marshals and see if that poses any issues.

MR. AGNIFILO:  This would likely be the last time we'd need the courtroom.

THE COURT:  Don't say that.

MR. AGNIFILO:  I said likely.  I said likely.

MS. SLAVIK:  Your Honor, I don't anticipate this being an issue, but I did just want to flag for the Court that the next witness, Mr. Paul, has been here in New York City prepared to testify since Tuesday.  It's obviously now Friday.  The direct examination I estimate to be about 90 minutes or so.  My conversations with Mr. Steel indicate that his

cross-examination should wrap up by the 1:00 cutoff.  But I just want to put on your Honor's radar that we are really trying to get this witness back home after today's proceedings.

THE COURT:  I think that we are okay.

MS. SLAVIK:  I think you're right, your Honor.  I'm just putting it on the record because I really want to get this witness home.

THE COURT:  And we'll take care of that.  I don't think it will pose an issue.

Anything further?

Mr. Donaldson?

MR. DONALDSON:  Yes, your Honor.  While you're working all your magic, we still have to -- Mr. Combs is still without those minutes we talked about earlier, and --

THE COURT:  Did you hear back from MDC counsel?

MR. DONALDSON:  I did, and I want to preface it with saying that they are magnificent with me for the last five years, so I don't have any problem with legal.  But for some reason he still doesn't have those minutes, and we kind of need those right now so that we can communicate with him during these off hours.  So if there's any magic the Court has left in those magic stuff, we'll take that.

THE COURT:  Okay.  Let me check in with them and let me see if I can figure anything out before we adjourn for the day.

P6KQcom1 - Corrected

MR. DONALDSON:  I appreciate that.  Thank you.

THE COURT:  With that, I'll ask the deputy just check to see if we have our jurors here.  If we don't, we can take a break and come back at 9:00.

DEPUTY CLERK:  Yes, your Honor.

THE COURT:  I think we're still waiting for a couple jurors to trickle in, so we'll take ten minutes and come pack at 9:00.

(Recess)

THE COURT:  We have our jury here.  Let's get started.

MS. SLAVIK:  Your Honor, may I place a binder of documents on the stand?

THE COURT:  You may.

(Jury present)

THE COURT:  Please be seated.

Welcome back, members of the jury.

The government may call its next witness.

MS. COMEY:  Your Honor, before the government calls its next witness, we have some exhibits to offer if that's all right.

THE COURT:  Of course.

MS COMEY:  May we please pull up, Ms. Foster, Government Exhibit 1508 as a demonstrative.

Your Honor, the government offers all exhibits listed in the demonstrative marked as 1508, and we would ask that the

P6KQcom1 - Corrected

exhibit numbers with the word sealed in red next to them be admitted under seal pursuant to your Honor's pseudonym order.

THE COURT:  Any objection?

MS. GERAGOS:  No objection, your Honor.

THE COURT:  The exhibits listed in 1508 will be admitted, and those identified as sealed will be admitted under seal.

(Government's Exhibits 3D-118-A, 3D-120-B, 3D-130-AR, 5A-204-3, 6G-116 SEALED, 6G-117 SEALED, 6K-101, 6L-102, A-102, A-103, A-103-A, A-103-B, A-104-35 SEALED, A-104-5-A, A-106-A, A-111, A-112, A-112-A, A-112-B, A-112-C, A-112-D, A-112-E, A-112-F, A-116-A SEALED, A-116-A1, A-116-A2, A-116-A3, A-120-A, A-121-A, A-121-A1, A-121-A2, A-121-A3, A-121-A4, A-121-A5, A-121-A6, A-122, A-124, A-138-41, A-141 (excerpted p. 41, 56-76, 234-38, 242-43) SEALED, A-141-A, A-141-B, A-141-C, A-141-D, A-141-E, A-141-F, A-141-G, A-141-H, A-141-I, A-141-J, A-141-K, A-141-L, A-141-M, A-141-N, A-141-O, A-141-P, A-141-Q, A-141-R, A-141-S, A-159 (excerpted to p. 5-12, 32, 34-40, 43, 47-52, 56-61, 75-77, 82, 86) SEALED, A-159-B, A-159-C, A-159-D, A-159-E, A-159-F, A-159-G, A-159-H, A-159-I, A-159-K, A-159-L, A-159-M, A-159-N, A-159-O, A-159-P, A-159-Q, A-159-R, A-159-S, A-159-T, A-159-U, A-159-V, A-159-W, A-159-X, A-166 (excerpted to p. 2, 9-10, 52-55, 59-64, 86) SEALED, A-166-F, A-166-G, A-166-H, A-166-I, A-166-J, A-166-K, A-168 (excerpted to p. 5, 63, 66-67, 71, 79-87, 117-23, 134-35) SEALED, A-168-A, A-168-B,

P6KQcom1 - Corrected

A-168-C, A-205, A-205-A, A-207-D SEALED, A-207-E SEALED, A-207-G SEALED, A-209-B, A-209-B1, A-210-A, A-210-A1, A-210-A2, A-210-A3, A-210-A4, A-210-A5, A-210-B, A-210-B1, A-301-L SEALED, A-407, A-426, A-430-A, A-510-A SEALED, A-510-F SEALED, A-513 SEALED, AX-102-G SEALED, AX-102-S SEALED, AX-701-114 SEALED, AX-701-145 SEALED, C-229 (excerpted to p. 6) SEALED, C-231 (excerpted to p. 20-21) SEALED, C-621, C-621-A, C-621-B, C-621-C, C-621-D, C-622-2, C-627-1, C-647, C-648-1 SEALED, C-648-2 SEALED, E-334 SEALED, EX-173 SEALED, EX-173-M SEALED, EX-176 SEALED, EX-176-M SEALED, F-101-A SEALED, G-101-AF, G-104 SEALED, G-106, G-107, J-106-L, J-106-O, J-106-P, J-108-I, J-110-B, J-110-B1, J-112-A, J-112-B, J-112-K, J-112-L, J-112-M, J-113, J-114, J-116, J-118-A, J-120, J-123, J-124-B, J-124-D, J-141-A (only p. 1), J-304-A, J-307 (only p. 129-130), J-314 (only p. 75-78), J-314-A received in evidence)

MS. COMEY:  Thank you, your Honor.

I understand Ms. Geragos has some corresponding exhibits to offer at this time as well.

THE COURT:  Very well.

MS. GERAGOS:  Yes.  We don't have it up on the screen, your Honor, but I will provide a copy to the court reporter and the Court.  It's demonstrative defendants 3330.  We offer all of these under seal except for 1748-R and 1794-R, with the consent of the government.

MS. COMEY:  No objection, your Honor.

P6KQcom1 - Corrected

THE COURT:  Those exhibits will be admitted under the terms specified by Ms. Geragos.

(Defendant's Exhibits 3330, 1748 (sealed) 1748-R, 1794 (sealed), 1794-R, 3080-R, 3082, 3083, 3084, 3088-A, 3093, 3094, 3100, 3106, 3106-A, 3127, 3130, 3136, 3137, 3145, 3152, 3171, 3171-A, 3172, 3191, 3206-B, 3288, 3306-M, 3311, 3311-M, 3328 received in evidence)

MS. SMYSER:  Your Honor, the government also offers Government Exhibit 3D-126, which was offered by the defense last week subject to further redactions.  The parties have conferred on those and jointly offer 3D-126 under seal pursuant to the Court's pseudonym order and 3D-126-R into evidence.

And the government also offers under seal pursuant to the pseudonym offer Government Exhibits 3D-107-B, 3D-108-A, 3D-112-A, 3d-114-A, 3D-123-A, 3D-123-B, 3D-129-B, 3D-130-A. And the government also offers J-122 which was offered last week under seal pursuant to the Court's pseudonym order and offers J-122-R into evidence, and I understand there are no objections.

MS. GERAGOS:  No objection.

THE COURT:  I'm not going to repeat all those exhibit numbers, so those exhibits specified by Ms. Smyser will be admitted under the terms specified by her.

(Government's Exhibits 3D-126 (sealed) 3D-126-R received in evidence)

P6KQcom1                    Paul - Direct

(Government's Exhibits 3D-107-B, 3D-108-A, 3D-112-A, 3d-114-A, 3D-123-A, 3D-123-B, 3D-129-B, 3D-130-A received in evidence)

(Government's Exhibits J-122 and J-122R received in evidence)

Anything further?

MS. SLAVIK:  No, your Honor.

THE COURT:  All right.  The government may now call its next witness.

MS. SLAVIK:  The government calls Brendan Paul.

BRENDAN PAUL,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DEPUTY CLERK:  Please provide the Court your first and last name and spell your first and last name.

THE WITNESS:  First name is Brendan.  Last name is Paul.  B-R-E-N-D-A-N; P-A-U-L.

THE COURT:  Ms. Slavik, you may proceed.

DIRECT EXAMINATION

BY MS. SLAVIK:

Q.  Good morning, Mr. Paul.

A.  Good morning.

MS. SLAVIK:  Ms. Foster, could you please publish what's in evidence as Government Exhibit A-101.

Q.  Mr. Paul, do you recognize the individual in this photo?

A.   I do.

Q.   Who is that?

A.   Sean Combs.

Q.   How do you know Mr. Combs?

A.   That was my former boss.

Q.   What was your position under Mr. Combs?

A.   An assistant to him.

Q.   How long did you work as Mr. Combs' assistant?

A.   Around 18 months.

Q.   And during what timeframe?

A.   Late 2022 to March of 2024.

Q.   What was the last date of your employment?

A.   March 25, 2024.

Q.   What happened on March 25, 2024?

A.   I was arrested at the Opa-Locka Airport when we were on our way to a family vacation.

Q.   Where is the Opa-Locka Airport?

A.   Miami, Florida.

Q.   Why were you arrested?

A.   Possession of cocaine.

Q.   Why were you in possession of cocaine?

A.   It was in my go Goyard, which was my bag for personal assistant duties.

Q.   Why was cocaine in your Goyard bag?

A.   I was sweeping his room early that morning and put it in my

P6KQcom1                        Paul - Direct

bag to put it elsewhere and forgot about it while I was

packing.

Q.   When you say "his" room, whose room are you referring to?

A.   Mr. Combs.

Q.   We'll circle back to this, Mr. Paul, but first I want to

talk about how you came to work for Mr. Combs.  Where are you

from?

A.   Cleveland, Ohio.

Q.   Did you go to college?

A.   I did.

Q.   When did you graduate?

A.   2022.

Q.   What did you do after you graduated?

A.   I built a studio in my parents' basement with my dad

pursuing music production.

Q.   So it was a music studio that you built?

A.   Correct.

Q.   Approximately when did you learn about the position as

Mr. Combs' personal assistant?

A.   Middle of 2022, a couple months after graduation.

Q.   How did you learn about this position?

A.   I was called to help manage direct the Crew League Season

4, which was owned by Revolt through Elie Maroun.

         MS. SLAVIK:  Ms. Foster, could you please publish

what's in evidence as Government Exhibit 2A-312.

Q.  Do you recognize the individual in this photo, Mr. Paul?

A.  I do.

Q.  Who is this?

A.  Elie Maroun.

Q.  Can you explain to the jury who Mr. Maroun is?

A.  He was a former assistant to Mr. Combs and also helped with his tour management, other things.

Q.  And Mr. Maroun is the individual who told you about the personal assistant position for Mr. Combs?

A.  Correct.

        MS. SLAVIK:  Thank you.  You can take this down, Ms. Foster.

Q.  When Mr. Maroun told you about the assistant position, what, if any, advice did he give you?

A.  He told me to get in to get out.  If you have a girlfriend, break up with her, and you're never going to see your family.

Q.  What did you understand him to mean when he said get in to get out?

A.  Build a Rolodex of, you know, clientele and get out.

Q.  In other words, make connections, is that right?

A.  Correct.

Q.  And what did you understand him to mean when he said break up with your girlfriend?

A.  Just that it was going to be a really tumultuous job that required all of my attention.

P6KQcom1                        Paul - Direct

Q.   Same thing about never seeing your family?

A.   Correct.

Q.   Did you interview for the position, Mr. Paul?

A.   I did.

Q.   When was that?

A.   I want to say late October, early November of 2022.

Q.   Where did the interview take place?

A.   At Mr. Combs' residence in Los Angeles.

Q.   Do you remember the address of that residence?

A.   200 South Mapleton Drive.

Q.   What happened once you arrived at the Mapleton address for the interview?

A.   I arrived, entered the middle gate.  A former assistant let me in.  And I went to the left of the house where the security office was, walked in those doors, was greeted by a security officer and gave him my ID.  They scanned it, and I signed an NDA, and then was walked to the home office inside of the house.

Q.   Who was in the home office when you arrived?

A.   Kristina Khorram and Frankie Santella.

Q.   Who is Frankie Santella?

A.   He was Puff's music manager.

          MS. SLAVIK:  Ms. Foster, could you please publish what's in evidence as Government Exhibit A-322.

Q.   Do you recognize the individual in this photo, Mr. Paul?

P6KQcom1                        Paul - Direct

A.   I do.

Q.   Who is that?

A.   Frankie Santella.

Q.   He is one of the individuals who was there in the home office that day?

A.   Correct.

Q.   And who is Kristina Khorram?

A.   That is Puff's chief of staff.

Q.   Did you know her by any other names?

A.   KK.

          MS. SLAVIK:  Ms. Foster, could you please publish what's in evidence as Government Exhibit 2A-301.

Q.   Do you recognize the individual in this photo, Mr. Paul?

A.   I do.

Q.   Who is this?

A.   KK.

          MS. SLAVIK:  Thank you.  You can take this down.

Q.   So what happened when you arrived in the office where Mr. Santella and KK were?

A.   I had about a 20-minute interview, and then they asked me how soon I could start.

Q.   Did you accept the position?

A.   I did.

Q.   When did you start working as Mr. Combs' assistant?

A.   I had to travel to Nebraska because my dad was recently

P6KQcom1                         Paul - Direct

diagnosed with prostate cancer, to catch a football game where he went to college, and then I came back that Monday to LA.

Q.   So A couple of days later after the interview?

A.   Four days.

Q.   During your first couple of weeks on the job, where did you work?

A.   Out of his residence in Los Angeles.

Q.   That's the 200 South Mapleton address?

A.   Correct.

Q.   Who gave you instructions during that time period?

A.   It mainly came from assistants who were there before me.

Q.   Did KK provide you instructions as well?

A.   Not much.

Q.   What were you instructed to do by the other assistants?

A.   I helped organize suitcases, do Amazon returns, pick up things at pharmacies, packed a lot of joints in the garage, coordinated with chef on meals and timing, things like that.

Q.   What do you mean by "pack a lot of joints"?

A.   Just like cones, I stuffed marijuana into cones.

Q.   What, if any, interactions with Mr. Combs did you have during this first couple of weeks on the job?

A.   Almost zero.

Q.   Were you given instructions on how to interact with Mr. Combs?

A.   KK told me to kind of just stay clear while I got used to

the environment before I met him.

Q.   Were you eventually introduced to Mr. Combs?

A.   I was.

Q.   At what point?

A.   Two or three weeks into the job.

Q.   Who introduced you to Mr. Combs?

A.   Kristina did.

Q.   Can you describe that interaction?

A.   She came to the garage, told me to grab something to take notes with.  They were having a listening party out back for his new album.  I sat in on that.  Took notes on what I thought.  And then once it was over, she grabbed me and introduced me to Mr. Combs in the back yard.

Q.   When you say "she," you mean KK?

A.   I do.

Q.   After this interaction, how frequently did you interact with Mr. Combs throughout your tenure?

A.   Almost every day.

Q.   Who was your direct supervisor?

A.   KK.

Q.   And what was KK's role?

A.   Chief of staff.

Q.   What was your understanding of KK's job responsibilities as Mr. Combs' chief of staff?

A.   She basically ran the enterprise, maintained all of his

P6KQcom1                        Paul - Direct

schedule, helped out with the family, things of that nature.

Q.  How often did Mr. Combs and KK communicate throughout the day?

A.  Like all day every day.

Q.  How did they communicate?

A.  Texts, phone calls, in person.

Q.  What, if any, access did Ms. Khorram or KK have to Mr. Combs' electronic devices?

A.  I believe, I mean, full access to his business phone.

Q.  Did you observe KK use Mr. Combs' business phone?

A.  I did.

Q.  In what way?

A.  Just responding to all the texts he would get because it would be thousands and thousands a day.

Q.  Now, you mentioned a couple of your tasks during the first few weeks on the job, but can you describe more generally your responsibilities as a personal assistant for Mr. Combs?

A.  Yeah.  Make sure he was on time to appointments, make sure that his meals were on time, his workouts were in order, packing bags, unpacking bags, making sure travel was on point.

Q.  Did Mr. Combs have other personal assistants when you worked for him?

A.  He did.

Q.  Approximately how many?

A.  At one point there was five of us, then four, and then two.

Q.   Were their responsibilities similar to what you just described?

A.   Yeah, we all had basically the same responsibilities, but we divided our task on our strong suits.

Q.   And what do you mean by that?

A.   Like being a former college basketball player, I focused a lot with Mr. Combs on his workouts, his meal plans, music because of my music background, and then we kind of just divvied and conquered.

Q.   Mr. Paul, I want to run through a few of the assistants that you worked with.

          MS. SLAVIK:   Ms. Foster, could you please publish what's in evidence as Government Exhibit 2A-314.

Q.   Mr. Paul, do you recognize the individual in this photo?

A.   I do.

Q.   Who is this?

A.   Jonathan Perez.

Q.   How do you know Jonathan Perez?

A.   He was an assistant with me.

Q.   Did his employment as an assistant overlap with yours?

A.   It did.

          MS. SLAVIK:   Thank you, Ms. Foster.

          Could you take this down and publish what's in evidence as Government Exhibit 2A-317.

Q.   Who is depicted in this photo, Mr. Paul?

P6KQcom1                         Paul - Direct

A.   Frank Rodriguez.

Q.   And how do you know Frank Rodriguez?

A.   He's Mr. Combs' butler.

Q.   How did the role of butler compare with the role of personal assistant?

A.   It was pretty similar.  Just he was -- basically just would never leave Puff's side when it came to if he needed water, chapstick, a lighter, whatever it was, he was there for it.

Q.   Did Frank's employment overlap with yours?

A.   It did.

Q.   Did Mr. Combs have a butler before Frank Rodriguez?

A.   Yes.

Q.   What was that butler's name?

A.   I believe his name was Dean.

        MS. SLAVIK:  Thank you Ms. Foster.  You can take this down, and please publish what's in evidence as Government Exhibit 2A-303.

Q.   Do you recognize who's depicted in this photo, Mr. Paul?

A.   I do.

Q.   Who is this?

A.   Joey Chavez.

Q.   How do you know Joey Chavez?

A.   He was an assistant with me.

Q.   Did his employment overlap with yours?

A.   It did.

P6KQcom1                      Paul - Direct

MS. SLAVIK:  Thank you, Ms. Foster.  You can take this down.

Q.  Mr. Paul, did you speak with the assistants that we just looked at throughout the day?

A.  Yeah, all day every day

Q.  What modes of communication did you use?

A.  Mainly group chat text messages, but also, you know, FaceTime, in person.

Q.  Did you have any group chats involving KK?

A.  I did.

Q.  What did you discuss in these group chats?

A.  Just Mr. Combs' whereabouts, what was on the daily schedule, what was happening, basically a play-by-play of the day.

Q.  Mr. Paul, in preparation for your testimony today, did you review certain communications from when you were Mr. Combs' assistant?

A.  I did.

Q.  There should be a binder next to you on the witness stand. Do you see that?

A.  I do.

Q.  Can you grab that and flip through it.  Just look up at me when you finished flipping through it.

What is contained in this binder Mr. Paul?

A.  Text messages, photos, anything from my time of employment

P6KQcom1                          Paul - Direct

with Mr. Combs.

Q.   Did these text messages and photos come from your phone?

A.   They did.

Q.   Did you review the contents of that binder before you testified today?

A.   I did.

Q.   How do you know that?

A.   Because we did it together.

Q.   Did you initial the binder?

A.   Correct.

Q.   Are the communications and the photos contained in the binder fair and accurate?

A.   Yes.

          MS. SLAVIK:  Your Honor, the government moves to admit the exhibits contained in the binder which are available at Government Exhibit 1510.

          Ms. Foster, could you please pull up Government Exhibit 1510.

          Your Honor, the government moves to admit the exhibits listed on the demonstrative at Government Exhibit 1510 with certain exhibits as indicated offered under seal pursuant to the Court's pseudonym order.

          THE COURT:  Any objection?

          MR. STEEL:  No, sir.

          THE COURT:  These exhibits will be admitted and the

P6KQcom1                          Paul - Direct

sealed exhibits will be admitted under seal.

(Government's Exhibits  3G-105; 3G-107; 3G-108; 3G-111; 3G-112, sealed; 3G-112-R; 3G-113; 3G-116; 3G-118, sealed; 3G-118-R; 3G-119; 3G-123; 3G-126; 3G-127; 3G-129; 3G-133; 3G-135; 3G-136, sealed; 3G-136-R; 3G-137; 3G-142; 3G-149; 3G-149; 3G-154, and 3G-157 received in evidence)

MS. SLAVIK:  Thank you.  You can take that down, Ms. Foster.

Q.  Mr. Paul, did Mr. Combs have other staff that you interacted with regularly?

A.  Yeah.

Q.  Did he have security staff?

A.  He did.

Q.  Who do you remember being part of Mr. Combs' security staff?

A.  Faheem Muhammad was the head of his security.  Duke Ellington and Abdul were like the Miami main guys, and then J9 who was also known as James, and Diontae were the LA guys.

MS. SLAVIK:  Ms. Foster, could you please publish what's in evidence as Government Exhibit 2A-203.

Q.  Mr. Paul, do you recognize the individual in this photo

A.  I do.

Q.  Who is this?

A.  Faheem Muhammad.

Q.  Do you know Faheem by any other names?

P6KQcom1                          Paul - Direct

A.   We just call him Fah.

          MS. SLAVIK:  You could take this down, Ms. Foster.
Could you please publish what's in evidence as 2A-206.

Q.   Do you recognize this individual, Mr. Paul?

A.   I do.

Q.   Who is this?

A.   J9.

Q.   And did you know J9 by any other names?

A.   Just James.

Q.   Can you remind the jury of what James' position was?

A.   He was basically Puff's driver, also security.

Q.   And he was primarily located in Los Angeles, you said?

A.   Yes.

          MS. SLAVIK:  Thank you.  You can take that down,
Ms. Foster.

Q.   Mr. Paul how many hours per week would you typically work
as a personal assistant?

A.   Anywhere from 80 to a hundred.

Q.   How many days per week?

A.   It -- I mean, it varied depending on his schedule and what
assistants were around, but anywhere from four to six.

Q.   Were you off on the days that you didn't work?

A.   I was always on call.

Q.   Were you paid a salary?

A.   I was.

P6KQcom1                        Paul - Direct

Q.   What was your salary?

A.   $75,000 to start.

Q.   And did that change eventually?

A.   January of 2024, I got a raise so -- to a hundred thousand.

Q.   So you started being paid a hundred thousand dollars in January of 2024?

A.   Correct.

Q.   How often were you paid?

A.   Biweekly.

Q.   Were you paid by a corporate entity?

A.   I was.

Q.   Do you remember what corporate entity?

A.   Combs Enterprises.

          MS. SLAVIK:  Ms. Foster, could you please publish for the parties, the witness, and the Court what's been marked for identification as Government Exhibit 3A-158.

Q.   Mr. Paul, do you see your name on this spreadsheet?

A.   I do.

Q.   Looking at the line for salary, was this the approximate amount of your biweekly paycheck in January of 2024?

A.   Yes.

          MS. SLAVIK:  Your Honor the government offers Government Exhibit 3A-158 into evidence?

          MR. STEEL:  No opposition.

          THE COURT:  3A-158 will be admitted.

(Government's Exhibit 3A-158 received in evidence)

MS. SLAVIK:  Could you please publish this for the jury, Ms. Foster?  Could you highlight the row that says Brendan Paul, please.

Q.  Mr. Paul, can you point out the amount of your biweekly paycheck in January 2024?

A.  $4,166.67.

Q.  And that's when you were earning approximately $100,000 per year?

A.  Correct.

MS. SLAVIK:  Thank you.  You can take this down.

Q.  When you worked as an assistant for Mr. Combs, where were you based?

A.  Both Los Angeles and Miami Beach, Florida.

Q.  Why did you work in both Los Angeles and Miami?

A.  Because that's where his residence were.

Q.  You mentioned the address of the Los Angeles residence. What was the address of the Miami residence?

A.  1 and 2Star Island Drive.

MS. SLAVIK:  Ms. Foster, could you please publish for the witness, Court, and parties only Government Exhibits 1B-288 and 1B-289 side by side.

Q.  Mr. Paul, what's depicted in these photos?

A.  That's his adjacent bathroom in 2 Star Island, his Miami home.  We would call that her bathroom.

P6KQcom1                           Paul - Direct

Q.   Are these fair and accurate photos of the her bathroom in Mr. Combs' Miami residence?

A.   They are.

        MS. SLAVIK:  Your Honor the government offers 1B-288 and 1B-289 into evidence.

        MR. STEEL:  No objection.

        THE COURT:  1B-288 and 1B-289 will be admitted.

        (Government's Exhibits 1B-288 and 1B-289 received in evidence)

        MS. SLAVIK:  Ms. Foster, can you please publish this for the jury.

Q.   Mr. Paul, can you explain to the jury what they're looking at?

A.   Just a bathroom in his home.

Q.   Which bathroom is this?

A.   His -- not his main bathroom.  It was the adjacent bathroom to his main bathroom.  We would call this her bathroom.

Q.   What residence was this in?

A.   2 Star Island.

Q.   In Miami?

A.   Correct.

        MS. SLAVIK:  You can take this down, Ms. Foster.

Q.   Mr. Paul, when you were based in Los Angeles, where did you live?

A.   Airbnb's all over Los Angeles.

Q.   And what about when you were in Miami?

A.   Airbnb's all over Miami.

Q.   Was KK based in Miami as well?

A.   She was.

Q.   Where did KK live in Los Angeles?

A.   She had an apartment up the street.

Q.   How close was that to the Mapleton residence?

A.   Maybe four minutes.

Q.   Where did KK live in Miami?

A.   In 2 Star Island.

Q.   Did you ever travel for work, Mr. Paul?

A.   I did.

Q.   How frequently?

A.   Pretty frequently.

Q.   How often did you travel with Mr. Combs?

A.   I think I was on his private jet three or four times.

Q.   When you did travel with him, did you travel by private jet?

A.   I did.

Q.   Otherwise you traveled separate from Mr. Combs, is that right?

A.   Yes, majority of the time.

Q.   What was the purpose of traveling separately from Mr. Combs?

A.   It was my duty to advance any travel that he had.  By

P6KQcom1                          Paul - Direct

advance, I mean basically I would go there early with his stylist, and we would set up his rooms.

Q. What was the purpose of advancing locations?

A. Just so when he walked in, everything was seamless and he had everything he needed.

Q. Did others travel with you when you advanced locations?

A. Yes.

Q. Who was that?

A. Stylists, sometimes photographers.  Really just depended on what we were doing, where we were going.

Q. When you traveled separate from Mr. Combs, how would you travel?

A. Commercial.

Q. Who booked your travel when you traveled in connection with your employment?

A. His travel manager.

Q. Who was that?

A. Jessica Ruiz.

Q. What was her role?

A. Travel manager.

Q. What did she do?

A. Booked flights for the entire, I guess, organization.

Q. During your tenure as an assistant, did you ever accompany Mr. Combs to club appearances?

A. Couple times.

P6KQcom1                          Paul - Direct

Q.   Can you explain to the jury what a club appearance is?

A.   It's when you get paid to show up at a club.

Q.   What, if anything, did Mr. Combs say about how much money he made from club appearances?

A.   I never heard him say anything about how much he made in club appearances.

Q.   Did you ever hear discussions about payment for club appearances?

A.   I did.

Q.   What were those discussions?

A.   That if he was going to do a club appearance, they needed to sell cases of Deleón, and I think he normally would ask for $150,000.

Q.   How frequently did Mr. Combs do club appearances when you were a personal assistant?

A.   Not very frequently.

Q.   Can you ballpark?

A.   Maybe eight times in total while I was there.

Q.   Do you remember which clubs?

A.   **LIV** in Miami, Vendôme in Miami.  Those were the two I went to.

Q.   Who accompanied Mr. Combs to club appearances?

A.   Security, his butler, always another assistant, family sometimes.

Q.   Now, Mr. Paul, you said that you worked approximately 80 to

P6KQcom1                          Paul - Direct

a hundred hours per week as Mr. Combs personal assistant?

A.   I did.

Q.   Did you ever go for long stretches without sleep?

A.   I did.

Q.   What was the longest period you went without sleep?

A.   There was some naps in between, close to three days.

Q.   You said there were naps in between --

A.   Yes.

Q.   -- out of three days?

         Why did you go without sleep for that long?

A.   We were in New York releasing his last album.

Q.   How did you feel after you stayed awake for three days?

A.   I was young so I was able to handle it.

Q.   What, if anything, did you do to stay awake and alert
during your employment for Mr. Combs?

A.   Prescription Adderall and the rare, rare use of cocaine.

Q.   Prior to working for Mr. Combs, what, if any, drugs did you
take?

A.   Smoked marijuana.

Q.   No other drugs?

A.   No.

Q.   So just stepping back a little bit, Mr. Paul, can you
describe the work environment when you were Mr. Combs'
assistant?

A.   I mean, it was intense.  There was a lot to get done, but

P6KQcom1                        Paul - Direct

we managed.

Q. How would you describe the mission as Mr. Combs' personal assistant?

A. Just make sure he's always happy.

Q. And what happened if Mr. Combs wasn't happy?

A. I mean, we would just do whatever we could to make sure that that didn't happen.

Q. What, if anything, did Mr. Combs say if you told him no?

A. That he doesn't take no for an answer.

Q. What was Mr. Combs' expectation of his assistants?

A. He used to say that he wants us to move like SEAL Team Six.

Q. What was your understanding of what he meant by moving like SEAL Team Six?

A. Just being militant, get things done without him asking, nothing taken by surprise.

Q. Was there ever a time that Mr. Combs fired you?

A. There was.

Q. How many times did he fire you?

A. Two or three times.

Q. Is there a particular time that stands out in your mind?

A. Yeah, there was one instance.

Q. Approximately when was that?

A. I want to say late October, early November of 2023.

Q. And what were the circumstances?

A. I forgot his lululemon fanny pack when he wanted to go on a

P6KQcom1                        Paul - Direct

walk.

Q.   What do you remember Mr. Combs saying to you after you

forgot his lululemon fanny pack?

A.   Just like I don't want to see your face.  Call KK.  Tell

her you're fired.

Q.   What was Mr. Combs' demeanor when he said that to you?

A.   Just as if like a parent or coach was disappointed with

you.

Q.   What was his tone?

A.   Angry.

Q.   Had you ever seen Mr. Combs angry like that before?

A.   Rarely.

Q.   What did you do after he fired you?

A.   I went to lululemon, bought fanny pack, gave it to the

assistant who came to cover me, and I went back to my Airbnb.

Q.   Did you call KK?

A.   I did.

Q.   What did she say?

A.   Just to lay low for a little bit, and that she'll figure it

out, and everything should be fine.

Q.   What did you do next?

A.   Laid low, took her advice.

Q.   Did you eventually resume your job?

A.   I did.

Q.   How did that happen?

P6KQcom1                          Paul - Direct

A.  I advanced London after his birthday, and a few days while in -- after being in London, I saw him again, and he was like, "Oh hey."  I was like, "Hey."

Q.  Who told you to advance London?

A.  KK.

Q.  By advancing London, you mean setting things up before Mr. Combs arrived?

A.  Correct.

Q.  Did you ever speak to Mr. Combs about this incident?

A.  No.

Q.  Did you ever speak to KK about it?

A.  A few times.

Q.  Did you ever bring concerns to human resources when you were Mr. Combs' assistant?

A.  No.

Q.  Why not?

A.  I mean, it just wasn't a thing.

Q.  And what do you mean by that?

A.  I mean, it -- HR even forgot to pull my federal taxes like my first six to eight months.  So if we had problems, we'd go directly to Mr. Combs or Kristina.

Q.  Before we move on, Mr. Paul, did you receive a subpoena requiring you to testify at this trial today?

A.  I did.

Q.  And is there also an order compelling you to testify even

P6KQcom1                          Paul - Direct

if your testimony might incriminate you?

A.   Yes.

Q.   What is your understanding of what that order requires you to do?

A.   Tell the truth.

Q.   What is your understanding of the protections that you get under this order?

A.   That what I say can't be used against me.

Q.   Does this order protect you from prosecution from any crimes that you may have committed in the past?

A.   No.

Q.   Does this order protect you if you lie today?

A.   No.

Q.   In other words, you could still be prosecuted for perjury if you lie?

A.   Yes.

Q.   Mr. Paul, did you ever witness Mr. Combs use drugs while you were an assistant?

A.   I did.

Q.   What type of drugs?

A.   Cocaine, ketamine, ecstasy, marijuana.

Q.   How often did you observe Mr. Combs use drugs?

A.   Not like too often.

Q.   Ballpark?

A.   Once a month.

Q.  Were there other times where you didn't see Mr. Combs actually use drugs but he seemed high?

A.  Yeah.

Q.  Did Mr. Combs keep drugs in his homes?

A.  It wasn't like a planned thing to just like keep drugs in his home, but there were drugs in his home sometimes, yes.

            MS. SLAVIK:  Ms. Foster, could you please publish what's in evidence as Government Exhibit 3G-149.

Q.  Do you recognize this photo, Mr. Paul?

A.  I do.

Q.  What is it?

A.  That's my hand.

Q.  And what is in your hand?

A.  On the left is ecstasy.  On the right is 2C.

Q.  Can you explain to the jury what 2C is?

A.  It's basically just ketamine and some Molly in powder form, dyed pink for the aesthetic.

Q.  Did you take this photo?

A.  I did.

Q.  When did you take it?

A.  Really early in my employment, in the first few weeks of the new year of 2023.

Q.  Where was this photo taken?

A.  In the office of his Mapleton home.

Q.  And when you say his Mapleton home, you mean Mr. Combs'?

A.  Yes.

Q.  Why did you take this picture?

A.  Because it was left on the desk, and me not knowing -- being new not knowing where it should go, I sent it to the assistants asking where I should put it.

Q.  Do you remember what you ultimately did with ecstasy and 2C that was in your hand?

A.  I assume I put it in one of his bags.

MS. SLAVIK:  You can take this down, Ms. Foster.

Q.  Mr. Paul, were you ever instructed to obtain drugs for Mr. Combs?

A.  I was.

Q.  Who instructed you to obtain drugs for Mr. Combs?

A.  He did himself or other assistants.

Q.  What types of drugs did you buy for Mr. Combs?

A.  Marijuana, 2C, cocaine, ketamine, ecstasy.

Q.  Let's start with marijuana.  How often did you buy marijuana for Mr. Combs?

A.  Whenever we were low, I would say like once every two months.

Q.  And in what quantity did you buy marijuana?

A.  We bought two different strains, eight ounces each.

Q.  What do you mean by two different strains?

A.  There were two types of marijuana strains that he liked.

Q.  Which were those?

P6KQcom1                          Paul - Direct

A.   King Louis and Sunset Sherbet.

Q.   How much did you pay for these marijuana purchases?

A.   In total, it was $4,200.

Q.   Who did you buy marijuana from?

A.   Phillip Pines.

          MS. SLAVIK:  Ms. Foster, could you please publish what's in evidence as Government Exhibit 2A-315.

Q.   Do you recognize the individual in this photo?

A.   I do.

Q.   Who is it?

A.   Phillip Pines.

Q.   Who is Mr. Pines?

A.   He was one of Puff's former assistants before me.

Q.   And you bought marijuana from Mr. Pines?

A.   I did.

          MS. SLAVIK:  Thank you.  You can take this down, Ms. Foster.

Q.   Besides marijuana, you said that you were instructed to purchase ecstasy, cocaine, 2C and ketamine, right?

A.   Yes.

Q.   You explained that 2C is the pink powder that we saw in the previous photo?

A.   Yes.

Q.   What is ketamine?

A.   Horse tranquilizer.

P6KQcom1                        Paul - Direct

Q.   Are you familiar with the term K-Pops?

A.   Yes.

Q.   What does that mean?

A.   It's just ketamine in a lollipop form.

Q.   How many times did you buy these types of drugs for Mr. Combs?

A.   Less than ten, more than five.

Q.   In what quantity did you buy the drugs?

A.   I mean, what I would consider personal use, one to two grams at a time.

Q.   How much did you typically pay for a purchase?

A.   Anywhere from $3- to $500.

Q.   Now, you said that sometimes other assistants asked you to get drugs for Mr. Combs?

A.   I did.

Q.   Can you explain what you mean by that?

A.   Just like if they were with him, and he asked or they knew that it would come up, and I was not with him and also at work, I would just be like, okay, what time are they coming?  And I would just go grab it and bring it to them.

Q.   So occasionally you would pick up packages without actually purchasing the drugs.  Do I have that right?

A.   Correct.

Q.   What did that involve exactly?

A.   What I just explained.

P6KQcom1                          Paul - Direct

Q.  How did you and Mr. -- excuse me -- how did you and other assistants obtain drugs for Mr. Combs?

A.  We would text the drug dealer and then the drug dealer would come to either of the homes.

Q.  Do you remember the names of some of these drug dealers?

A.  I do.

Q.  What are they?

A.  Guido, One Stop, Baby Girl.

Q.  Any others?

A.  There's an Ovi.

Q.  How do you spell Ovi?

A.  I think it's O-V-I.

Q.  Did you communicate with all these individuals you just mentioned?

A.  Not all of them, no.

Q.  With the individuals you did communicate, how did you communicate?

A.  I was introduced to them either through texts or phone calls.

        MS. SLAVIK:  Ms. Foster, could you please publish for the parties only what's been marked for identification as Government Exhibit 2A-508.

Q.  Do you recognize the individual in this photo, Mr. Paul?

A.  I do.

Q.  Who is it?

P6KQcom1                        Paul - Direct

A.   He goes by the name Guido.

Q.   Is this a true and accurate picture of Guido?

A.   Yeah.

          MS. SLAVIK:  The government offers Government
Exhibit 2A-508.

          MR. STEEL:  No objection, your Honor.

          THE COURT:  2A-508 will be admitted.

          (Government's Exhibit 2A-508 received in evidence)

          MS. SLAVIK:  Could you publish for the jury,
Ms. Foster.

Q.   Can you explain to the jury who is depicted in this photo,
Mr. Paul?

A.   Guido.

Q.   Who is Guido?

A.   The drug dealer in Los Angeles.

Q.   Did you see Guido at Mr. Combs' home?

A.   I did.

Q.   Once or more than once?

A.   Maybe two times.

          MS. SLAVIK:  You can take this down.

Q.   You mentioned a drug dealer named Baby Girl as well, is
that right

A.   Yes.

Q.   What, if any, drugs did you buy from her?

A.   Honestly, I don't remember off the top of my head.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

MS. SLAVIK:  Ms. Foster, could you please publish what's in evidence as Government Exhibit 3G-123, and put pages 1 and 2 side by side.

Q.  Mr. Paul, what is this?

A.  It's a conversation between me, Jonathan Perez, who was another assistant, and Baby Girl.

Q.  And what is the date of this conversation?

A.  February 20, 2024.

MS. SLAVIK:  Could you zoom out, Ms. Foster, and please blow up the chat on page 2.

Q.  And could you explain to the jury what's happening in this chat?

A.  I'm being introduced to Baby Girl through Jonathan Perez.

Q.  Jonathan Perez is introducing you to Baby Girl?

A.  Yes.

Q.  How were you introduced to other drug dealers?

A.  Same kind of thing or just given a number and handled it from there.

Q.  Who gave you their numbers?

A.  Most of the time it was other assistants.

Q.  Did Mr. Combs ever give you contact information for drug dealers?

A.  Once or twice.

Q.  And focusing back on this particular chat, why were you reaching out to Baby Girl?

P6KQcom1                         Paul - Direct

A.   I believe to secure drugs.

Q.   For who?

A.   Mr. Combs.

Q.   And focusing on the last couple of chats, do you see the message from Baby Girl LA Plug at 11:47 that says:  "Is it for you or Puff?"

A.   I do.

Q.   What do you say in response?

A.   "Puff."

Q.   Can you read your next chat?

A.   "But please don't disclose that.  You can tell whoever it's for me."

Q.   What did you mean by that?

A.   It was just very important to keep his profile low as he was a celebrity, and people could screenshot this and could say, hey, I was asked to get drugs for Diddy.

          MS. SLAVIK:  Thank you, Ms. Foster.  You can take this down.

Q.   After you obtained drugs for Mr. Combs, what typically did you do with them?

A.   Either gave them directly to him or put them in his Gucci pouch.

Q.   What is the Gucci pouch?

A.   It's just a place where we would keep drugs.

Q.   Who told you to put the drugs in the Gucci pouch?

P6KQcom1                        Paul - Direct

A.   Something I learned from former assistants.

MS. SLAVIK:  Ms. Foster, could you please publish what's in evidence as Government Exhibit 1B-236.

Q.   Do you recognize this photo, Mr. Paul?

A.   I do.

Q.   What is this?

A.   The Gucci pouch.

Q.   Who did the Gucci pouch belong to?

A.   Mr. Combs.

Q.   Where did Mr. Combs keep the Gucci pouch?

A.   Kept it in a backpack or he kept it in his room or on his person.

Q.   Which staff members, if any, handled the Gucci pouch?

A.   Assistants.

Q.   Did the security ever handle the Gucci pouch?

A.   Not that I'm aware of.

Q.   Under what circumstances did the assistants handle the Gucci pouch?

A.   Just whenever he'd ask for it.

MS. SLAVIK:  You can take this down.  Thank you.

Q.   Did you ever pick up prescription drugs for Mr. Combs?

A.   Yes.

Q.   Where did you pick up the prescriptions?

A.   Pharmacies.

Q.   Under whose names were the prescriptions?

P6KQcom1                        Paul - Direct

A.   Sean Combs and Frank Black.

Q.   Can you explain who Frank Black is?

A.   It was his alias for discretion.

Q.   What do you mean by that?

A.   We would use an alias so pharmacists or hotels wouldn't know that it was Sean Combs.

Q.   Mr. Paul, are you familiar with Cialis?

A.   I am.

Q.   What is that?

A.   Just like another form of saga.

Q.   Did Mr. Combs use Cialis?

A.   He did.

Q.   Where did he keep that?

A.   I mean, we kept it in med bags, and we also kept it in his nightstand like pill case.

Q.   Were you ever asked to pick up prescription drugs without a prescription for Mr. Combs?

A.   Once.

Q.   Who asked you to do that?

A.   He did.

Q.   And what type of drugs did he ask you to pick up?

A.   Xanax.

Q.   Where did you get the prescription drugs without the prescription?

A.   I didn't.

P6KQcom1                     Paul - Direct

MS. SLAVIK:  Ms. Foster, could you please publish what's in evidence as Government Exhibit 3G-119 and place pages 1 and 2 side by side.

Q.  Mr. Paul, what is this communication?

A.  Text between Mr. Combs and I.

Q.  And do you see the contact that says, Love red phone?

A.  Yes.

Q.  What is that?

A.  I refer to Mr. Combs as Love, and that was his personal phone, the red phone.

Q.  You mentioned earlier in your testimony that he had a business phone and a personal phone?

A.  Yes.

Q.  So you said the red phone is his personal phone?

A.  Correct.

Q.  What was his business phone?

A.  The yellow phone.

Q.  What is the date of this chat that we're looking at?

A.  February 14, 2024.

MS. SLAVIK:  And, Ms. Foster, could you please zoom in on the chat on the second page.

Q.  So Mr. Combs says:  You get me zans.

And what do you say?

A.  Still working on it.  Have two leads should be able to get by tomorrow.  Waiting to hear back from one more person too.

P6KQcom1                      Paul - Direct

Q.   What was your understanding of what Mr. Combs meant by you
get me zans?

A.   He wanted xanax.

Q.   The zans refers to xanax?

A.   Yes.

Q.   Are you familiar with any other names for xanax?

A.   Sticks, bars.

Q.   And what did you mean by "I have two leads"?

A.   Just that I was asking around to see if anybody had them.

Q.   Who were you asking?

A.   Friends.

Q.   Did you ultimately obtain xanax for Mr. Combs?

A.   He got it, but it wasn't from me.

          MS. SLAVIK:   Thank you, Ms. Foster.   You can take this
down.

Q.   Did you speak with other assistants about buying drugs for
Mr. Combs?

A.   Yeah.

Q.   In what context?

A.   I mean, I guess just talking about it.

Q.   With other assistants?

A.   Yeah.

Q.   Now, you talked about how much you would have to pay for
the drugs that you bought for Mr. Combs.  How did you pay for
those drugs?

P6KQcom1                        Paul - Direct

A.   Mainly in cash.

Q.   Where did you get cash from?

A.   Either from the Gucci pouch or from security.

Q.   And how many times did security give you cash for drugs?

A.   Less than ten, more than five.

Q.   Do you remember who specifically from security gave you cash?

A.   It mainly came from Faheem or whoever Faheem directed.

Q.   What did you tell security or Faheem about why you needed cash?

A.   That I needed cash for PD, who was P.Diddy's personal items.

Q.   Did you have to make any sort of formal request to get cash?

A.   No formal request, but I would always put it in writing.

Q.   How did you put it in writing?

A.   Through texts.

Q.   Did you have to file any sort of report with the finance team that you had taken cash to pay for Mr. Combs' drugs?

A.   No.

          MS. SLAVIK:  Ms. Foster, could you please publish what's in evidence as Government Exhibit 3G-135 and put up pages 1 and 2 side by side.

Q.   What is this communication, Mr. Paul?

A.   It's a group chat between J9, KK, Faheem and myself.

P6KQcom1                          Paul - Direct

Q.   Can you remind the jury who J9 is?

A.   One of Mr. Combs' security.

Q.   What is the date of this chat?

A.   February 9, 2024.

            MS. SLAVIK:  Ms. Foster, could you please zoom in on the conversation.

Q.   Mr. Paul, could you please read your first message?

A.   "Yeah.  Hi.  Following up on cash reimbursement.  KK is aware and wanted me to make this thread.  The following is 44,200 flower, which is marijuana, $125 store run for personal items, $85 for online personal order, $780 for personal Gucci items.  Total $5,190."

Q.   What does Faheem respond?

A.   "We got you covered once Duke come on shift."

Q.   Mr. Paul, focusing on your first message, what did you mean by "KK is aware"?

A.   Just that I told her that I was making this group chat because I hadn't been reimbursed in months.

Q.   And this reimbursement was for things that you purchased for Mr. Combs?

A.   Correct.

Q.   What does $4,200 flower mean?

A.   Just as the amount of money that was spent on marijuana.

Q.   Are you familiar with any other terms for marijuana?

A.   Weed.

P6KQcom1                        Paul - Direct

Q.   What about tree?

A.   Sure.

Q.   Focusing on the line that says $780 for personal Gucci items, what did you mean by that?

A.   Hard drugs.

Q.   And what about Gucci items, what did you mean by that?

A.   Exactly what I just said, hard drugs.

Q.   That you later put in the Gucci pouch?

A.   I don't know if I put them there.  That's just the money that I was owed.

Q.   And Faheem responds:  "We got you covered once Duke comes on shift."  Who is Duke?

A.   Security in Miami.

         MS. SLAVIK:  Thank you, Ms. Foster.  You can take this down.

Q.   Mr. Paul was there ever a time that you took drugs in Mr. Combs' presence?

A.   Once.

Q.   Approximately when was that?

A.   At an after-party at Coachella.

Q.   Where were you and Mr. Combs?

A.   In a master bathroom of the Airbnb.

Q.   Were you working?

A.   I was.

Q.   Can you describe what happened?

P6KQcom1                        Paul - Direct

A.  He had 2C with him.  He asked me to try it to see if it was good.

Q.  Did he give you anything?

A.  I did it, yes.

Q.  What did the 2C look like?

A.  It was pink.

Q.  Had you ever tried 2C before?

A.  I had not.

Q.  I'm sorry?

A.  I had not.

Q.  Is this something wanted to do?

A.  I wanted to prove my loyalty, yeah.

Q.  How did you feel after you took the 2C?

A.  A little euphoric, but I don't think I did enough to actually like feel the full effect.

Q.  Were you able to continue working after that?

A.  Yes.

Q.  What did Mr. Combs say to you after you took the 2C?

A.  He asked if it was good.

Q.  And then what happened?

A.  I said I think so.

Q.  And what happened after that?

A.  We continued on with our night.

Q.  Shifting to a different topic, Mr. Paul, are you familiar with the term wild king nights?

P6KQcom1                        Paul - Direct

A.   I am.

Q.   Can you tell the jury what wild king nights are?

A.   Mr. Combs and a significant other were going to a hotel for the night.

Q.   And what did you understand wild king nights to involve?

A.   Partying, alcohol, sex, drugs.

            MS. SLAVIK:   Your Honor may I approach the witness?

            THE COURT:   You may.

Q.   Mr. Paul, I've handed you what's in evidence as a sealed exhibit, Government Exhibit 2A-402.   Without saying the name, do you recognize the individual depicted in this exhibit?

A.   I do.

Q.   I'm going to refer to her as Jane, and I'm going to ask you to do the same thing, okay?

A.   Okay.

Q.   Do you know Jane?

A.   I do.

Q.   How do you know her?

A.   One of Mr. Combs' girlfriends while I was employed.

Q.   Did Jane participate in wild king nights during your employment are with Mr. Combs?

A.   She did.

Q.   Did Mr. Combs have other girlfriends?

A.   He did.

Q.   Did girlfriends other than Jane participate in wild king

nights?

A.  Not that I'm aware of.

Q.  Mr. Paul, who called these nights, these hotel stays wild king nights?

A.  Kristina.

Q.  Did you call them that?

A.  No.

Q.  What did you call them?

A.  Just he's going to the hotel.

Q.  Did they always take place at hotels?

A.  Not always.

Q.  Where else did they take place?

A.  His residence.  Her residence.

Q.  Was there a point in time when these wild king nights stopped being at hotels?

A.  Sure.

Q.  Approximately when was that?

A.  After the Cassie lawsuit.

Q.  What, if any, role did assistants have with respect to wild king nights?

A.  Setting up and cleaning up.

Q.  Did you personally set up hotel rooms for wild king nights?

A.  On a few occasions.

Q.  And did you personally clean hotel rooms after wild king nights?

P6KQcom1                        Paul - Direct

A.   On a few occasions.

Q.   When in your tenure did you begin setting up and cleaning up hotel rooms for wild king nights?

A.   Six to eight months in probably.

Q.   What, if anything, did KK tell you about what role you should have in wild king nights?

A.   She didn't really want me involved in them.

Q.   Did she explain why?

A.   No.

Q.   Which assistants primarily were responsible for setting up and cleaning up wild king nights?

A.   Frank, our butler, and Joey Chavez.

Q.   Approximately how many times did you personally set up hotel rooms for wild king nights?

A.   Three or four times.

Q.   Who instructed you to do that?

A.   Kristina.

Q.   Approximately how many times did you clean up hotel rooms after wild king nights?

A.   Also three or four times.

Q.   And who instructed you to do that?

A.   Kristina.

Q.   Mr. Paul, I want to show you a couple of documents.

        MS. SLAVIK:  Ms. Foster, could you please publish what's in evidence as Government Exhibit 3G-112-R.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6KQcom1                          Paul - Direct

Q.  Mr. Paul, can you explain to the jury what they're looking at?

A.  Yeah.  This is from like an iPhone notes app of his schedule that KK would create.

Q.  And why did you have this note in your phone?

A.  Because that's how we referred to our schedule.

Q.  And you said that KK wrote this note?

A.  Correct.

Q.  What was KK's role in maintaining Mr. Combs' schedule through notes?

A.  That was her role.

Q.  Did you ever make a note like this?

A.  No.

Q.  I want to direct your attention to the third line, starting with Wednesday 2/8.  Could you please read that from there until Friday 2/10?

A.  "Finance meeting at house (then no other work for the day). Jane arrives early Wednesday morning and going to hotel.  PD doing dinner with Jane for her birthday (Brendan working on reservation). Be ready for a wild king night at her hotel. Jess finalizing hotel today.  I have her gift arriving Tuesday morning so will send info so y'all can wrap for him to give when he's ready.  Thursday 2/9 no work.  Most likely wild king day continued at hotel.  Friday 2/10 Jane leaves town around noon.  PD has video shoot that night.  Frankie has all info and

P6KQcom1                          Paul - Direct

running point on this."

Q.   Focusing on the entry for Wednesday 2/8 where it says "Brendan working on reservation," what reservation were you working on?

A.   I believe it was Nobu.

Q.   Nobu, the restaurant?

A.   Yes.

Q.   Did you make a dinner reservation for Jane's birthday?

A.   I believe so.

Q.   That was at Nobu?

A.   Yes.

Q.   Then it says:  "Be ready for a wild king night at her hotel."  What does that mean?

A.   Exactly what it says.

Q.   Can you explain your interpretation?

A.   Yeah.  That he's going to go party at the hotel after dinner.

Q.   And it says:  "Jess finalizing hotel today."  Just remind the jury who Jess is?

A.   That was his travel manager.

Q.   And for Thursday 2/9, it says:  "No work most likely wild king day continued at hotel."  What does that mean?

A.   That he's just going to continue partying.

          MS. SLAVIK:  You can take this down, Ms. Foster.  Thank you.

P6KQcom1                      Paul - Direct

Q.   Approximately how often did wild king nights take place?

A.   I mean, not extremely often.  Probably once a month.

Q.   And you mentioned that wild king nights took place sometimes in hotels?

A.   Correct.

Q.   In what cities did those wild king nights take place?

A.   Los Angeles and Miami.

Q.   Do you recall do you remember what hotels?

A.   L'Ermitage, the London, and then there was one in Miami, The Edition.

Q.   Under whose name were these hotels generally booked?

A.   Under assistants' names or under Frank Black.

Q.   Did wild king nights ever take place at Mr. Combs' residences?

A.   Yes.

Q.   Which residence?

A.   Both Miami and Los Angeles.

Q.   Did wild king nights take place in any other residences?

A.   Jane's home.

        MS. SLAVIK:  Ms. Foster, could you please publish what's in evidence as Government Exhibit 3G-127.

Q.   Focusing now on the first page, Mr. Paul, what is this?

A.   It's a text message between KK and I.

Q.   What is the date of this communication?

A.   February 19, 2024.

P6KQcom1                        Paul - Direct

MS. SLAVIK:  Ms. Foster, could you zoom in on the conversation.

Q.  And, Mr. Paul, could you read your first text?

A.  "PD active now.  Running to Wal-Mart for them."

Q.  And KK says:  "Like wild king mode active or Gucci bag active?"

And what do you say in response?

A.  "In between the two."

Q.  "Copy."

A.  "If that makes sense LOL."

Q.  "LOL."

So does this chat relate to a wild king night?

A.  Yes.

Q.  Do you remember where this particular wild king night was?

A.  Jane's residence.

Q.  And reading your first text what -- excuse me -- "PD active now," what did you mean by that?

A.  Just like he was up and moving about.

Q.  And what did you mean when you said:  "Running to Wal-Mart for them?"

A.  I believe I went to get like soups, towels, a few other things that they both had requested.

Q.  Why did you get towels?

A.  I don't know.

Q.  KK then asked:  "Like wild king mode active or Gucci bag

active."  What did you understand that to mean?

A.  Like is he partying, is he getting high.

Q.  And when you respond "in between the two," what did you mean by that?

A.  Like I think he's about to start partying, and I think he's about to get high.

Q.  Did you set up for this wild king night?

A.  Yeah.

Q.  At Jane's residence?

A.  Correct.

          MS. SLAVIK:  Thank you.  You can take this down, Ms. Foster.

Q.  So what exactly did setting up a hotel or residence for a wild king night entail?

A.  You would go before he got there.  You would call room service, have them bring up extra sheets, extra towels, water, fruit plates.  And then myself would bring lights, Astroglide, baby oil, liquor, champagne, small toiletries, toothbrush, toothpaste, cologne, that sort of thing.

Q.  How did assistants know what to bring during a wild king night?

A.  We created a running list.  We had a lot of lists.

Q.  Where did you keep the lists?

A.  In the shared notes like in the notes app and shared file that we named PD personal.

Q.   Who did you share that note with?

A.   All the other assistants.  I wasn't the one who created it.

Q.   You mentioned the Gucci pouch a moment ago?

A.   Yes.

Q.   Did the Gucci pouch go to wild king nights?

A.   It did.

Q.   Who brought the Gucci pouch to wild king nights?

A.   It would be on Mr. Combs' person.

Q.   You ran through a bunch of different supplies for wild king nights?

A.   Yes.

Q.   How did you obtain those supplies?

A.   We would just tell the house, the property managers of both locations what we were running low on and what to order, and make sure we were always stocked on everything.

Q.   Who was in charge of stocking those supplies at Mr. Combs' residences?

A.   It kind of just depends what it was.

Q.   In terms of the baby oil and Astroglide, who was responsible for stocking those items?

A.   Property manager.

         MS. SLAVIK:  Ms. Foster, could you please publish what's in evidence as Government Exhibit 3G-154.

Q.   What does this photo show, Mr. Paul

A.   A cabinet in her bathroom, which wasn't his main bathroom,

P6KQcom1                         Paul - Direct

in the Mapleton residence.

Q.  And why did you take this photo?

A.  Because we had a new property manager who I didn't think was very good, and I sent him a picture of this on how I wanted things organized.

Q.  What exactly is being organized in this photo?

A.  As it shows, baby oil and Astroglide.

MS. SLAVIK:  Thank you.  You can take that down, Ms. Foster.

Q.  Did you ever have to buy the supplies that you -- for a wild king night yourself?

A.  Once.

Q.  How did you pay for those supplies?

A.  Credit card.

Q.  Your personal credit card?

A.  Personal credit card.

Q.  And when you paid for those supplies with your personal credit card, were you reimbursed?

A.  Yeah.  It took a long time, but I was.

Q.  How did the reimbursement process work?

A.  You would take pictures of all your personal receipts, write out exactly why you paid for what you paid for.  Then KK would need to approve it, send it back to you, and then you would put Robin and the rest of them in an email chain.

Q.  You mentioned Robin, who is Robin?

P6KQcom1                              Paul - Direct

A.   Robin Greenhill.

Q.   And who is that?

A.   One of his financial people at TriStar.

Q.   And what is TriStar?

A.   A financial company, to my knowledge.

Q.   Did you ever provide Mr. Combs with cash in connection with wild king nights?

A.   If he would ask for it, yeah, one time.

Q.   Who instructed you to bring Mr. Combs cash in that instance?

A.   He did himself, but I didn't bring it to him.  I gave it to him before he went.

          (Continued on next page)

P6kWcom2                              Paul - Direct

BY MS. SLAVIK:

Q.   How much cash did you give him?

A.   $5,000.

Q.   How did you get that cash?

A.   Through security.

Q.   And you said this was before a wild king night?

A.   I did.

Q.   Who specifically from security, if you remember?

A.   I don't.

Q.   Were you aware of other assistants bringing or getting cash for Mr. Combs before wild king nights?

A.   Yeah, once or twice.

Q.   Did assistants typically deliver cash to Mr. Combs before wild king nights?

A.   I don't know the exact answer to that.  It just varied on the situation.

Q.   Were you aware of any instances in which cash was delivered during a wild king night?

A.   One time.

Q.   What were those circumstances?

A.   Frank left it at the front desk of a hotel.

Q.   Frank left cash at a hotel?

A.   Yes.

Q.   And did Frank tell you about this?

A.   Yeah, because he, I was, like, where you going?  He said I

P6kWcom2                          Paul - Direct

have to run back to a hotel.

Q.  What did he tell you about leaving cash at a hotel?

A.  That he left it at the front desk.

Q.  How did he leave it?

A.  I believe in an envelope.

Q.  Mr. Paul, were there ever times that Mr. Combs contacted you during a wild king night?

A.  A couple times.

Q.  How would he contact you?

A.  Via FaceTime or audio text messages.

        MS. SLAVIK:  Ms. Foster, could you please publish what's in evidence as Government Exhibit 3G142.

Q.  Mr. Paul, can you explain to the jury what this shows?

A.  Just, like, outfits from a sex store.

Q.  And why did you take this photo?

A.  He had asked me to run to the sex store, so I took pictures of things, sent it to them -- sent it to him.  He never responded, so I went back to his residence.

Q.  And who was with Mr. Combs at the time that he made this request of you?

A.  Jane.

Q.  And you said he didn't respond?

A.  Correct.

Q.  So what did you do?

A.  I went back to his residence.

P6kWcom2                          Paul - Direct

MS. SLAVIK:  Thank you, Ms. Foster.  You can take those down.

Q.  Mr. Paul, you also mentioned that you cleaned up hotel rooms after wild king nights.  Do you remember that?

A.  Correct.

Q.  Approximately how many times did you do that?

A.  Three or four times.

Q.  What did that involve?

A.  Just going to the hotel room after he left, putting on gloves and putting towels and sheets in a nice pile; cleaning up as best you could, throwing out empty bottles of baby oil, liquor.  Just cleaning, in a sense.

Q.  You said that you put on gloves?

A.  Yeah.

Q.  Why did you put on gloves?

A.  For sanitary reasons.

Q.  What, if anything, did you observe when you cleaned up hotel rooms after wild king nights?

A.  Just that it was kind of in disarray.

Q.  Did you ever observe drug residue?

A.  One time.

Q.  And can you explain what you saw?

A.  Saw a white powder substance.  I don't know what it was.

Q.  What was the purpose of cleaning up hotel rooms after wild king nights?

A.  To avoid getting damages charges.

Q.  Did you leave tips for hotel cleaning staff?

A.  I did.

Q.  In cash?

A.  Yes.

Q.  How did you get the cash for the tips?

A.  I just always had some cash on me.

Q.  Was it your personal cash?

A.  Yes.

        MS. SLAVIK:  Ms. Foster, could you please pull up what's in evidence as Government Exhibit 3G157.

Q.  Mr. Paul, what does this photo show?

A.  A hotel room after he had left.

Q.  And do you remember when you took this photo?

A.  Sometime in late 2023, I would assume.

Q.  And this was in connection with your cleanup of a hotel room after a wild king night?

A.  Correct.

Q.  Why did you take this photo?

A.  To send it to the travel manager, to be, like, hey, there's probably going to be some damage charges just in case she wanted to dispute them with the hotel.

Q.  Can you remind the jury who the travel manager was?

A.  Jessica Ruiz.

        MS. SLAVIK:  Thank you.  You can take that down.

P6kWcom2                              Paul - Direct

Q.   Now, Mr. Paul, you said that you would set up hotel rooms with a variety of supplies before wild king nights.  Do you remember that?

A.   Correct.

Q.   So, typically when you'd set up hotel rooms for wild king nights, what would already be in the room when Mr. Combs arrived?

A.   I guess what do you mean by that?

Q.   What supplies did you bring to wild king nights before Mr. Combs arrived?

A.   Toiletries, lights, candles, incense, baby oil, Astroglide, condoms, liquor, champagne, soup.  I mean the list goes on.

Q.   And you also testified that Mr. Combs brought his Gucci pouch to wild king nights?

A.   I mean -- yeah, I had seen him bring it a few times.

Q.   And just remind the jury what was in the Gucci pouch.

A.   Drugs.

Q.   And you testified that on occasion you purchased drugs for Mr. Combs, is that right?

A.   Yes.

Q.   And on those occasions when you purchased drugs, other than marijuana, can you just remind the jury approximately how much money you paid for those drugs?

A.   Anywhere from a hundred to $500.

Q.   What, if anything, did Mr. Combs do if he needed something

P6kWcom2                          Paul - Direct

during a wild king night?

A.   Called us, as in assistants.

Q.   You or other assistants, is that right?

A.   Yes.

Q.   And you also testified that occasionally you cleaned up after wild king nights, is that right?

A.   Correct.

Q.   And when a wild king night was at a hotel, you left cash tips for the cleaning staff?

         MR. STEEL:  Objection, your Honor.

A.   Correct.

         THE COURT:  Hold on.

         Sorry.  If there's an objection, just hold on for a second until we resolve that.

         Grounds.

         MR. STEEL:  Asked and answered.

         THE COURT:  That's overruled.

         Ms. Slavik.

BY MS. SLAVIK:

Q.   You can answer, Mr. Paul.

A.   Can you ask the question again?

Q.   The question was whether you left cash tips for the hotel cleaning staff when you cleaned up after wild king nights.

A.   I did.

Q.   And separately, Mr. Paul, you testified that you and other

assistants provided Mr. Combs with cash in connection with wild king nights?

A.   Occasionally, yeah.

Q.   And the one time that you did it, just remind the jury of how much you gave him.

A.   $5,000.

Q.   Did you provide Mr. Combs with cash in that amount in any other context?

A.   Not that I'm aware of.

Q.   Just wrapping up, Mr. Paul, you said that your last day working for Mr. Combs was on March 25, 2024?

A.   Correct.

        MS. SLAVIK:  Ms. Foster, could you please publish for the witness, Court and parties what's been marked for identification as Government Exhibit 1C109.

Q.   Mr. Paul, do you see this photo?

A.   I do.

Q.   What is it?

A.   That's me, Kristina and Mr. Combs.

        MS. SLAVIK:  Your Honor, the government moves to admit Government Exhibit 1C109.

        MR. STEEL:  No objection.

        THE COURT:  All right.  1C109 will be admitted.

        (Government Exhibit 1C109 received in evidence)

        MS. SLAVIK:  Ms. Foster, could you please publish this

to the jury.

Q.  Mr. Paul, can you explain to the jury what they're looking at?

A.  This is Mr. Combs, Kristina and I boarding a private jet to go on a vacation to the Bahamas.

Q.  Whose private jet were you on?

A.  It's not his.  It was rented.

Q.  Where was this photo taken?

A.  At the Miami Opa-Locka Airport.

Q.  When was this photo taken?

A.  March 25, 2024.

Q.  Where were you planning to travel before you were arrested?

A.  The Bahamas.

Q.  And you were getting to the Bahamas on this private plane?

A.  Correct.

Q.  This was work travel for you?

A.  Yes.

Q.  You said that you were arrested for cocaine possession on that day, is that right?

A.  Yes.

Q.  Just remind the jury why you had cocaine that day.

MR. STEEL:  Objection.

THE COURT:  That's sustained.

BY MS. SLAVIK:

Q.  Why did you have cocaine that day, Mr. Paul?

THE COURT:  That's sustained, right?

I think the grounds are asked and answered.

MR. STEEL:  Yes.

THE COURT:  Yes.

Sustained.

BY MS. SLAVIK:

Q.  Was the cocaine yours, Mr. Paul?

A.  No.

THE COURT:  That's overruled.

BY MS. SLAVIK:

Q.  It was not your cocaine?

A.  Correct.

Q.  Did you tell law enforcement that it wasn't your cocaine?

A.  No.

Q.  Why not?

A.  Loyalty.

Q.  Whose cocaine was it?

A.  Mr. Combs's.

Q.  Mr. Paul, you were arrested that day?

A.  I was.

Q.  What is the status of your criminal case?

A.  My charges have been dropped, because I have a really good lawyer.

Q.  What, if anything, did you do to have those charges dropped?

P6kWcom2                         Paul - Cross

A.   I went into a pretrial diversion program where I took over 20 drug classes and a bunch of random drug testing.

Q.   What, if any, interactions did you have with Mr. Combs after you were arrested?

A.   Zero.

Q.   When was the last time you saw Mr. Combs?

A.   In this photo, basically, March 25.

Q.   When was the last time you spoke with Mr. Combs?

A.   Same day.

         MS. SLAVIK:  One moment, your Honor.

         No further questions at this time.

         THE COURT:  All right.  Thank you.

         Cross-examination.

CROSS-EXAMINATION

BY MR. STEEL:

Q.   Good morning.

A.   How you doing?

Q.   I'd like to put into perspective some of your answers.  OK?

A.   OK.

Q.   You are -- would you describe yourself as an extremely hard worker?

A.   Correct.

Q.   And you set your sights on goals, and then you go after those goals.  Is that fair to say?

A.   100 percent.

Q.   And you give everything that you have to accomplishing these goals, mentally and physically, true?

A.   That's how I was raised.

Q.   And you strive for perfection, fair?

A.   Yeah.

Q.   And I'm not saying this is the only example, but you actually worked so hard that you walked on to college basketball, true?

A.   Correct.

Q.   And it's not just any basketball program; you walked on to a school in this state a couple hours away at Syracuse University, right?

A.   Yes.

Q.   And you were able to do that and you played for, you mentioned, like, a coach?

A.   Yeah, Jim Boeheim.

Q.   Yeah.  An iconic coach, right?

A.   Yeah.

Q.   And you actually had time in the games where you played, in fact, in the ACC tournament, true?

A.   Correct.

Q.   And you played against North Carolina?

A.   I did.

Q.   And I know Syracuse, your team, won the game, right?

A.   Yeah.

P6kWcom2                        Paul - Cross

Q.   But then Covid hit, and everything shut down, true?

A.   Yeah.

Q.   I know that's just one example of athletics, but you also studied hard, you worked hard academically, true?

A.   I did.

Q.   And sir, is it correct that you achieved ACC academic honors in 2019, 2020?

A.   It is.

Q.   Same year as you're playing for the team, right?

A.   Yes.

Q.   And that is -- and you say that's how you were raised, that's your makeup, right?

A.   100 percent.

Q.   And it's still your makeup today, right?

A.   Yes.

Q.   And it was your makeup when you asked for and you did get the opportunity to work for Sean?

A.   Yes.

Q.   True?

A.   True.

Q.   And after graduating college, I think you said you were -- I previously said it was in 2022, correct?

A.   Yes.

Q.   And then you told about, you wanted to do work, you wanted to focus your concentration with your work ethic on the music

P6kWcom2                          Paul - Cross

industry, right?

A.  Music/entertainment, yeah.

Q.  And the business side of it as well, right; you wanted to learn everything?

A.  Yeah.

Q.  You wanted to soak it all in, true?

A.  Yes.

Q.  And you mentioned that you and your father actually built out a music studio for you?

A.  We did.

Q.  And then you used your contacts through basketball to eventually get you, and you explained the gentleman, who it was, but you got to work with another iconic person -- Sean Combs, true?

A.  I did.

Q.  And you were excited about that job, right?

A.  For sure.

Q.  And that is something that you undertook because even you were told get in, get out, break up with your girlfriend, you're not going to see your family, you took that just like you do all of your goals; you took that as this is a great opportunity, true?

A.  Yes.

Q.  And you did it with eyes open, right?

A.  I did.

Q.   Nobody fooled you about how hard it was going to be work with such an iconic person as Mr. Combs, right?

A.   No.

Q.   And you welcomed that?

A.   I did.

Q.   Because you wanted to learn the business side of music, true?

A.   Yes.

Q.   The music side of music, the actual songs, true?

A.   Yes.

Q.   The production, right?

A.   Yup.

Q.   You also were going to be with a billionaire and see what that lifestyle's like and how to react and how to attract good people, right?

A.   Yes.

Q.   And you're how old in 2022?

A.   23 years old.

Q.   And you're making $75,000 a year, true?

A.   Yes.

Q.   And you are getting unbelievable opportunities because of Sean Combs, right?

A.   Yes.

Q.   Now, you mentioned some of the things that you did to the jury, and they were, you know, important; I'm not saying

P6kWcom2                         Paul - Cross

they're not important, but, you know, workouts and meals and packing and unpacking and travel, calling, and timeliness, those are all things that you did every day, right?

A.   Correct.

Q.   Because Mr. Combs gets, I think your word was thousands of text messages a day, true?

A.   Yes.

Q.   No one can handle that, right?

A.   No.

Q.   So he needed a support staff to really get him through where he's going to be and how he has to answer and to dissect what is important and what has to be prioritized, right?

A.   He did.

Q.   And that was one of your responsibilities, right?

A.   Yes.

Q.   And he trusted you; you know that?

A.   Yes.

Q.   And he let you about be around him and see his phone and see his activities, true?

A.   He did.

Q.   And you welcomed that?

A.   I did.

Q.   And you enjoyed being with Sean Combs, true?

A.   Yes.

Q.   And what you stated is that you worked approximately, you

P6kWcom2                        Paul - Cross

know, the number of hours that you talked about, four to six days a week, is that true?

A.   Yeah, 80 to 100 hours a week.

Q.   And that's approximately -- I'm not saying this is perfect math, but it's approximately nine in the morning to 11 o'clock p.m., four days a week.  Is that fair?

A.   Yeah, sometimes later.

Q.   OK.  And during that time you are definitely helping Sean Combs, right?

A.   Yes.

Q.   And you're helping your coworkers, right?

A.   Yeah.

Q.   You're also helping yourself, true?

A.   Depends what you mean by that.

Q.   You're learning?

A.   Yes.

Q.   And this was, like, an amazing opportunity for growth in your mind, right?

A.   23, it was pretty incredible.

Q.   Yeah, and we'll talk about that in a minute, if you don't mind, but you're referring to the release of a record album, right?

A.   Yes.

Q.   OK.  Now, the prosecutor was asking you a lot about drugs. Do you remember a lot of those questions?

P6kWcom2                         Paul - Cross

A.   Yes.

Q.   You made it clear to the jury, and you've always made it clear, you are not some drug mule, right?

A.   Absolutely not.

          MS. SLAVIK:  Objection.

          THE COURT:  Overruled.

BY MR. STEEL:

Q.   Am I right?

A.   Absolutely not.

Q.   And that means -- some jurors may not know what that means. That means somebody who was just sneaking around --

          MS. SLAVIK:  Objection.

BY MR. STEEL:

Q.   -- getting drugs for a person.  Is that true?

          THE COURT:  That's sustained.

A.   My understanding --

          THE COURT:  That's sustained.

BY MR. STEEL:

Q.   What's your understanding of what a drug mule is?

A.   Someone who traffics kilos and kilos of drugs across the world.

Q.   And what you're doing is, on a few occasions, I think you said between five and ten?

A.   Correct.

Q.   Out of 18 months of working next to Sean Combs for

P6kWcom2                        Paul - Cross

sometimes 10, 12, 14 hours a day, you're talking about a minuscule amount of times dealing with drugs, true?

A.  Me personally handling them, yes.

Q.  Yeah.

And this was a minor part of what you did with Sean Combs and the other coworkers, right?

A.  Absolutely.

Q.  And we're also talking about -- when you said trafficking, we're also talking about between $100 of drugs or $200, $300, $400, maybe a maximum of $500, that's what we're talking about, right?

A.  It is.

Q.  That's it, correct?

A.  Yes.

Q.  And but the prosecutor was asking you all these questions about drugs --

        MS. SLAVIK:  Objection.

        THE COURT:  Yes.  No preambles.  Just ask questions.

BY MR. STEEL:

Q.  OK.  This was clearly just personal use for Mr. Combs?

        MS. SLAVIK:  Objection.

        THE COURT:  Rephrase.

BY MR. STEEL:

Q.  To your observation, this was clearly just personal-use amount of drugs for Mr. Combs --

P6kWcom2                         Paul - Cross

MS. SLAVIK:  Objection.

Q.  -- is that your understanding?

THE COURT:  That's overruled.

A.  Yes, that's my understanding.

Q.  Now, you mentioned one time that Sean -- excuse me,

Mr. Combs asked you to see whether drugs were good; that's the

only time that you ever saw Sean Combs ask anybody to do drugs,

is that right?

A.  Correct.

Q.  Now, you mentioned -- I'm going to call her what I think

you call her.  You call her K.K., right?

A.  Uh-huh.

Q.  True?

A.  Yes.

Q.  And K.K.'s not a drug user, is she, to your knowledge?

A.  Not that I'm aware of.

Q.  And K.K.'s not even a drinker of alcohol, to your

knowledge, true?

A.  Correct.

Q.  Now, you were also asked about wild king night, or you

called it, I think, you know, hotel night or setup night, or

something like that, right?

A.  Yes.

Q.  And that was like the drugs; that's also personal to

Mr. Combs, right?

P6kWcom2                        Paul - Cross

MS. SLAVIK:  Objection.

THE COURT:  Sustained.  Rephrase.

BY MR. STEEL:

Q.  Did you consider it to be his personal time?

A.  Yeah, I considered it to be like an escape, alone time.

Q.  And that's because you noticed that it's with his significant other or one of -- he had several girlfriends, you made clear, right?

A.  Yes.

Q.  But it was with a significant other, one of the girlfriends, Jane, right?

A.  Correct.

Q.  And it was Mr. Combs's opportunity to escape the thousands of texts and go off somewhere to be by himself along with Jane, true?

A.  Yes.

Q.  And just like the drugs, that was his personal event, is that -- from your observation, is that true?

MS. SLAVIK:  Objection.

THE COURT:  That needs to be rephrased.

BY MR. STEEL:

Q.  From your observation, that was his personal time, right?

A.  Yes.

Q.  Much like the drugs, that was his personal use --

MS. SLAVIK:  Objection.

P6kWcom2                         Paul - Cross

BY MR. STEEL:

Q.  -- right?

          THE COURT:  Sustained.

BY MR. STEEL:

Q.  Now, when you would set up either a hotel or at a home, did you ever notice Jane to be hesitant when you spoke with her in preparing for one of these nights?

A.  I did not.

Q.  Did you ever notice that she was apprehensive about appearing at one of these nights that you're describing?

A.  No.

Q.  Did you ever, afterwards, when you spoke with Jane, think that she was in any way sorry or, or upset that she participated --

          MS. SLAVIK:  Objection.

BY MR. STEEL:

Q.  -- with Mr. Combs?

          THE COURT:  That's sustained.

BY MR. STEEL:

Q.  From your personal observation, did you speak with Jane after one of these nights?

A.  Almost every time.

Q.  And did you ever notice anything that would cause you pause to think that she was not a willing participant?

          MS. SLAVIK:  Objection.

P6kWcom2                         Paul - Cross

THE COURT:  Overruled.

A.  Absolutely not.

Q.  Now, if you would have noticed that there was any type of what you believed to be nonconsented-to sexual conduct, you would not have worked there, true?

MS. SLAVIK:  Objection.

THE COURT:  Sustained.

BY MR. STEEL:

Q.  You mentioned on your direct examination, I believe, that K.K. ran the enterprise.  Do you remember something like that you saying?

A.  Around there.

Q.  Now, you're not saying a criminal enterprise, are you?

MS. SLAVIK:  Objection.

THE COURT:  That's overruled.

A.  No.

Q.  You're saying because the title of the company you got paid for was Combs Enterprises, right?

A.  Yes.

Q.  And you would not work for a criminal, would you?

MS. SLAVIK:  Objection.

THE COURT:  That's overruled.

A.  Absolutely not.

Q.  And you didn't work for a criminal, as you sit here today, looking back, right?

P6kWcom2                        Paul - Cross

MS. SLAVIK:  Objection.

BY MR. STEEL:

Q.  Am I right?

THE COURT:  Sustained.

MR. STEEL:  I didn't hear you, your Honor.

Q.  You never thought that the king night included anything that was criminal, did you?

MS. SLAVIK:  Objection.

THE COURT:  Overruled.

A.  No.

Q.  Now, you care about your reputation, right?

A.  Absolutely.

Q.  And you care about your family; you said that's how you were raised, right?

A.  That's the most important thing to me.

Q.  And you're a reflection on your family, true?

A.  Thousand percent.

Q.  Now, when you got arrested in March 2024, you hired one of the best lawyers in the country, true?

A.  I did.

Q.  And your lawyer's here today?

A.  He is.

Q.  And that's Brian Bieber, from the state of Florida, right?

A.  Yes, sir.

Q.  And your case eventually -- you said you went through some

P6kWcom2                        Paul - Cross

program -- I'm not saying it was rigorous, but it got dismissed in the state of Florida, right?

A.    Correct.

Q.    And that a small amount of drug case?

A.    .7 grams.

Q.    And it was personal use, at best, right?

            MS. SLAVIK:  Objection.

            THE COURT:  Sustained.

BY MR. STEEL:

Q.    And the only reason you had those drugs is because you said you were cleaning in Sean's, in or around Sean's room and you found the drugs, right?

A.    Correct.

Q.    And you put them into your bag and you forgot you put them in there when you got on the plane, true?

A.    Correct.

Q.    Sean Combs didn't ask you to bring these drugs with you, right?

A.    He did not.

Q.    He didn't even know you had them on you, right?

A.    No.

Q.    And K.K. didn't ask you to bring these drugs with you, did she?

A.    No.

Q.    It was a mistake, right?

P6kWcom2                        Paul - Cross

A.  Yes.

Q.  So when you told the officers everything in that bag belongs to me, you did not realize that you had left this small amount of drugs in the bag, right?

A.  That is correct.

Q.  And then when they pulled it out, you're like, oh, my God, I forgot I put it in there, right?

A.  Heart drop.

Q.  That's it; that's the whole case, right?

A.  Yes.

Q.  And that case is dismissed?

A.  Correct.

Q.  Now let's talk about -- you mentioned 2023; that was an incredible time, true?

A.  Yeah.

Q.  And you started at the very end, maybe November, of 2022 with Sean, true?

A.  Yeah.

Q.  And we'll --

A.  Trial, trial period, but --

Q.  We'll say November, December --

A.  Yeah.

Q.  And by 2023, there's a gigantic focus on an album release, right?

A.  Yes.

Q.  And you had front-row seats, and actually your fingerprints are on that album; you participate in that, true?

A.  Correct.

Q.  And you did everything from the business side as well as the music side, in the studio or outside the studio, to get that album released, true?

A.  Yes.

Q.  And you were asked about staying up three days, which sounds like a lot, but this was also exhilarating, wasn't it?

A.  Correct.

Q.  You wanted to stay up those three days because that's -- the end of those three days is when the album actually got finished and released, right?

A.  I don't know if I wanted to.

Q.  It was a requirement to get this out on time, true?

A.  Yes.

Q.  And everybody was working like that, right?

A.  Correct.

Q.  Including Mr. Combs?

A.  Yes.

Q.  He is not just demanding people to work hard; he's like you, he works hard himself, right?

A.  Yes.

Q.  And when that album was released, do you remember the name of it, by any chance?

P6kWcom2                          Paul - Cross

A.   *The Love Album:  Off the Grid.*

Q.   And it got tremendous receipt by the community, right?

A.   It did.

Q.   That you were getting your lessons, your teachings too, you got a lot out of this, right?

A.   I did.

Q.   The drugs that you saw Sean take at times --

A.   Yes.

Q.   -- you said a couple times you noticed he was under the influence, you watched him take drugs and then observed him thereafter?

A.   Yes.

Q.   And when I say drugs, you call them, quote, hard drugs, right?

A.   Yes.

Q.   And is it true that from your observation, Sean became even more focused on what he was doing under the influence of those drugs?

A.   I mean yeah, he got extremely creative.

Q.   And it was even better than -- from your observation, than when he wasn't on those hard drugs, right?

A.   I think it was different.

Q.   And he would work for hours and hours, notebooks all over and come up with ideas that was just an explosion, and you witnessed that, right?

P6kWcom2                          Paul - Cross

A.   Correct.

Q.   And he was happy; he didn't hurt anybody, right?

A.   No.

Q.   As of today, Mr. Paul, looking back, would you think that -- everything you've gone through, as you sit here today, would you think that you are indebted to Sean Combs for the experiences that he has opened up to you?

A.   I guess what do you mean by indebted?

Q.   Was it a good -- did you learn lot with him?

A.   I did.

Q.   Good experiences?

A.   I would say for the most part.

Q.   And you have no ax to grind against Mr. Combs, do you?

         MS. SLAVIK:  Objection.

         THE COURT:  That's sustained.

BY MR. STEEL:

Q.   You had mentioned with the prosecutor that you received immunity, the honorable attorney Bieber got you immunity. Remember those questionings?

A.   Yes.

Q.   And that forces you or compels you to tell the truth, right; that allows you to tell the truth?  Right?

A.   It does.

Q.   But even without immunity, you were going to tell the truth, right?

P6kWcom2                        Paul - Cross

            MS. SLAVIK:  Objection.

A.  Of course.

            THE COURT:  Overruled.

A.  Of course.

            MR. STEEL:  Your Honor, may I just have one moment to look over notes?

            THE COURT:  You may.

            MR. STEEL:  Thank you, your Honor.

            Thank you so much, and good luck to you.

            THE WITNESS:  Thank you.

            THE COURT:  Any redirect?

            MS. SLAVIK:  Yes, your Honor, but before we do that, could we have a brief sidebar?

            THE COURT:  You may.

            (Continued on next page)

P6kWcom2                        Paul - Cross

(At sidebar)

MS. COMEY:  Your Honor, are we allowed to have three now?  Because if so --

THE COURT:  I was going to mention it, but --

We don't need three people.  We said two.  So who wants to retreat?

MR. AGNIFILO:  Can I just hear what it is and then we'll --

THE COURT:  No.  Let's just have someone retreat.  Stick to the rules.  So who's going to retreat?

MR. AGNIFILO:  All right.

MS. SHAPIRO:  Make sure you object.

MS. SLAVIK:  Your Honor, I believe there was a line of cross from Mr. Steel that opened the door to an issue that I didn't bring up on direct.

On cross-examination, Mr. Steel asked about whether the witness understood that anything criminal was taking place in the hotel rooms.  I did not elicit on direct examination what, if any, understanding Mr. Paul had as to what the cash that he brought Mr. Combs to these wild king nights was used for, because my understanding is that he would say, well, I didn't know for sure, but we thought that it was used for escorts.

I understand that that's speculative, and that's why I didn't bring it up on cross-examination, but I believe that Mr.

P6kWcom2                          Paul - Cross

Steel's line of cross, which also called for speculation as to whether anything criminal was taking place in those hotel rooms, has opened the door to my questioning.

THE COURT:  Well, it may, in fact, have opened the door, but that doesn't -- he's still not allowed to speculate. So how do you get around that issue?  I think that's fair. It's what you're saying, but given the questioning that if you wanted to probe into what his understanding was, then that would be fair game.  In fact, I don't know that Mr. Steel would object to that.

Would you?

MR. STEEL:  I would just object -- we raised the issue before and didn't come to your Honor before because we resolved it.  But it's speculation.  I didn't ask him to speculate.  I asked did you know anything criminal, did you believe anything criminal, from what you were doing.  I wasn't going to ask him to speculate.

MS. SLAVIK:  Your Honor, it clearly calls for speculation, and I think that we're entitled to ask Mr. Paul the questions that I just mentioned to impeach that testimony.

Alternatively, we could strike the answer to the question that Mr. Steel asked, because it did call for speculation.  I think it either opens the door to our question, or it has to be struck from the record.

THE COURT:  All right.  I understand.  Let me take a

P6kWcom2                          Paul - Cross

look at the transcript.

          MR. STEEL:  Step back?

          THE COURT:  Yes.

          (Continued on next page)

Case 1:24-cr-00542-AS    Document 598    Filed 12/19/25    Page 100 of 199    6877

P6kWcom2                        Paul - Cross

(In open court)

THE COURT:  Members of the jury, just wait one second. We're just checking something, and we'll be right back with you.

Ms. Slavik, on redirect examination, you can ask what the witness's understanding was as to the issue that we addressed.  However, if he doesn't have a basis for personal knowledge, then there would be an objection, I take it, and so we'll see what knowledge the witness has.

MR. STEEL:  Your Honor, could we approach again or -- just for a moment?

THE COURT:  Yes, you may.

(Continued on next page)

(212) 805-0300

P6kWcom2                          Paul - Cross

(At sidebar)

MR. STEEL:  Thank you.

THE COURT:  The question that was asked was you never thought that there was anything criminal involved in the king nights, right?

MR. STEEL:  Maybe.

THE COURT:  It is what you asked.

MR. STEEL:  Whatever was said.

THE COURT:  May not gotten every letter or every word, but that's what you asked.

So why wouldn't Ms. Slavik be able to ask a parallel question?  You didn't establish foundation for asking what his basis was for having one view one way or the other.  You asked the question.  He answered it.  And so why wouldn't Ms. Slavik be able to ask essentially the same question?

MR. STEEL:  Because I think we know the answer.  And the answer's going to be I just assumed, I just --

THE COURT:  Then she can ask without assuming.

MR. STEEL:  It's a dead end to say that because I raised the issue, the government went back to the witness, gave us some notes and said I'm just assuming.

THE COURT:  I think you're talking about one form of the question.  However, Ms. Slavik, in response to what you asked, would be able to, in fact, ask the witness about his lack of understanding as to, for instance, the purpose for

which cash was to be used at the king nights, right,

establishing that he didn't know what --

MR. STEEL:  If he didn't know, that's fine.

THE COURT:  So there are some questions that you can

ask in response to the question that Mr. Steel asked to

establish that he would have a lack of knowledge as to certain

things that in other testimony and evidence the government has

argued shows a criminal, you know, basis, whether it's for

escorts -- do you understand what I'm saying?

MS. SLAVIK:  No.  I'm sorry.

THE COURT:  I'm saying that to the extent that your

understanding is that the witness will say that he doesn't know

what the money was for, right, that part of it, Mr. Steel

doesn't object to, because there would be no objection to that.

So you would, I think, fairly be able to say so you don't know

one way or the other what the money was used for, whether its

purposes were legitimate or whether its purposes were criminal.

And I take it there would be no objection to that question.

MR. STEEL:  That question I would not have an

objection to.

MS. SLAVIK:  Your Honor --

THE COURT:  And so I'm not sure what the difference

is.

MS. SLAVIK:  -- I just don't think that that

necessarily covers it, and I think that the colloquy that we're

P6kWcom2                          Paul - Cross

having right now illustrates that that line of
cross-examination was improper from Mr. Steel, because as you
never thought anything criminal was going on at a wild king
night -- first of all, it calls for speculation.

Secondly, this is a lay witness who can't opine on
whether something is criminal or not.  That's not an
appropriate question to ask.

THE COURT:  I didn't understand him as opining on
whether it was criminal.  It's just whether he believed that he
was --

MR. STEEL:  He's not.

THE COURT:  -- involved in something that was
criminal.

MS. SLAVIK:  Your Honor, I think it's an improper line
of questioning, and I think that because Mr. Steel asked him to
speculate as to whether anything criminal was taking place, I
think that we're entitled to ask him to speculate as to what he
thought was going on at these hotel nights.

THE COURT:  I'm not going to go down that route.
However, I'll consider what happens in redirect, and if there's
any testimony that should be stricken, then I'll make that
determination.  But for present purposes, I think there's no
objection to establishing his lack of knowledge.  So you can
establish his lack of knowledge as to the purposes, whether
legitimate or criminal, or anything that was happening.  And he

P6kWcom2                         Paul - Cross

if he says I just don't know one way or the other, then that's, I think, responsive to the concern raised on the cross-examination.  So let's take it from there, and then we'll address it after we hear the testimony.

(Continued on next page)

P6kWcom2                        Paul - Redirect

(In open court)

THE COURT:  Ms. Slavik, you may proceed.

REDIRECT EXAMINATION

BY MS. SLAVIK:

Q.  Mr. Paul, do you remember Mr. Steel asking you on cross-examination whether you thought that anything criminal was taking place in hotel rooms during wild king nights?

A.  Yes.

Q.  Did you know what was taking place during wild king nights?

A.  There was sex happening, maybe partying.

Q.  Were you there?

A.  I was not.

Q.  So do you have any reason to believe that you know whether what was going on that the wild king nights were legitimate or illegitimate?

A.  No.

Q.  And Mr. Steel asked you whether you believed that anything was, anything illegal was happening in those hotel rooms, right?

A.  Correct.

Q.  What did you believe the money that you provided Mr. Combs with was being used for?

MR. STEEL:  Objection.

THE COURT:  That's sustained.  Lay some foundation to ask that question.

P6kWcom2                              Paul - Redirect

BY MS. SLAVIK:

Q.  Mr. Paul, you testified about supplying Mr. Combs with money before wild king nights, right?

A.  I did.

Q.  And just remind the jury of how much that was.

A.  $5,000.

Q.  And you set up supplies before wild king night --

A.  Yes.

        MR. STEEL:  Objection.

BY MS. SLAVIK:

Q.  And you obtained supplies for Mr. Combs during wild king nights when he needed them during wild king nights, is that right?

        MR. STEEL:  Objection.

        THE COURT:  That's overruled.

A.  Can you repeat that?

Q.  Yes.

    When Mr. Combs asked you for items during wild king nights, you provided those?

A.  No.

Q.  When you asked -- or excuse me, did Mr. Combs ask you for items during wild king nights?

A.  Once.

Q.  And then he didn't respond when you got back to him?

A.  Correct.

Case 1:24-cr-00542-AS   Document 598   Filed 12/19/25   Page 107 of 199   6884

P6kWcom2                        Paul - Redirect

MR. STEEL:  Objection, your Honor.

THE COURT:  Overruled.  You've got to get closer to the microphone.  We can't hear you.

BY MS. SLAVIK:

Q.  So you got things for Mr. Combs before wild king nights --

MR. STEEL:  Objection.

THE COURT:  Leading or --

MR. STEEL:  Yes.

THE COURT:  OK.

Can we rephrase some of these questions, and then you can ask them.

MS. SLAVIK:  Yes, your Honor.

Q.  Mr. Paul, what did you supply hotel rooms with before wild king nights?

MR. STEEL:  Objection.

THE COURT:  Overruled.

A.  Liquor, baby oil, Astroglide, lights, candles, incense, toiletries.

Q.  And if Mr. Combs needed things during wild king nights, who did he reach out to?

A.  Assistants.

Q.  And what would assistants do when Mr. Combs asked for things during wild king nights?

A.  Tell him where it was.

Q.  And after wild king nights, what was your responsibility?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6kWcom2                         Paul - Redirect

MR. STEEL:  Objection, your Honor.

THE COURT:  That's overruled.

A.  To clean up the hotels.

Q.  And you said that when you cleaned up hotels, you left cash tips for hotel cleaning staff?

MR. STEEL:  I'm going to object for two bases, your Honor.

THE COURT:  Excuse me?

MR. STEEL:  Basis for objection.

THE COURT:  Can you just move that microphone closer to you.

MR. STEEL:  Two bases for objection, your Honor.

THE COURT:  Two bases?  Well, which one -- I know one of them.  What's the other one?

MR. STEEL:  Leading.  Asked and answered.

THE COURT:  OK.  That's overruled.

Ms. Slavik.

BY MS. SLAVIK:

Q.  Do you need me to remind you of what the question was?

A.  Yes.

Q.  When you cleaned up hotel rooms, you left cash tips for hotel workers?

A.  I did.

Q.  And did Mr. Combs supply you with that cash?

A.  No.

P6kWcom2                          Paul - Redirect

Q.   That was cash that came from your own pocket, is that
right?

A.   Correct.

          MR. STEEL:  Objection.

          THE COURT:  Overruled.

BY MS. SLAVIK:

Q.   So, and you also testified that you provided Mr. Combs with
cash before wild king nights?

A.   Once.

Q.   And what was the amount of that cash?

          MR. STEEL:  Objection.

          THE COURT:  Overruled.

A.   $5,000.

Q.   So, Mr. Paul, if assistants were available to bring
Mr. Combs whatever he needed during wild king nights, what was
your understanding of why he needed $5,000 in advance of the
wild king night?

          MR. STEEL:  Objection.

          THE COURT:  That's sustained.

BY MS. SLAVIK:

Q.   Mr. Paul, did you have any understanding -- excuse me.
Strike that.

          Mr. Paul, you provided Mr. Combs with $5,000 in
advance of a wild king night?

          MR. STEEL:  Objection.

P6kWcom2                        Paul - Redirect

THE COURT:  That's overruled.

Last time.

A.  Yes.

Q.  Did you provide Mr. Combs with similar amounts of cash in any other contexts?

A.  Not that I remember.

Q.  You were asked by Mr. Steel about working for a criminal. Do you remember that?

A.  Yes.

Q.  How many times did you buy drugs for Mr. Combs?

A.  Less than ten, more than five.

Q.  And did other assistants buy drugs for Mr. Combs?

A.  Yes.

Q.  How often?

A.  I don't know.

Q.  You were also asked on cross-examination about whether you viewed the opportunity to work for Mr. Combs as an unbelievable opportunity.  Do you remember that?

A.  I do.

Q.  And you also were asked about whether you thought it was an amazing opportunity for growth.  Do you remember that?

A.  I do.

Q.  Can you remind the jury how your employment with Mr. Combs ended?

A.  I was arrested.

P6kWcom2

Q.  Sitting here today, Mr. Paul, how do you feel about Mr. Combs?

A.  It's complicated.

MS. SLAVIK:  Nothing further, your Honor.

THE COURT:  All right.  Thank you, Ms. Slavik.

Mr. Steel, anything further?

MR. STEEL:  Thank you.  No.

THE COURT:  All right.

Thank you very much, Mr. Paul.

(Witness excused)

THE COURT:  The government may call its next witness.

MS. COMEY:  Your Honor, I believe that we have some exhibits that we wanted to read into the record first, if that's all right.  I'll defer to Ms. Smyser.

MS. SMYSER:  Your Honor, the government next will offer exhibits that are listed in Government Exhibit 1511, which is a demonstrative.

And Ms. Foster, could you please put that up on the screen.  I will hand a copy up to the court reporters, but this demonstrative, Government Exhibit 1511, contains exhibits, some of which are designated as sealed pursuant to a court pseudonym order, and I would ask that all of these be admitted per the terms in Government Exhibit 1511.

THE COURT:  Any objection, Mr. Driscoll?

MR. DRISCOLL:  I'm just waiting to see it on the

P6kWcom2

screen, your Honor.

MS. GERAGOS:  I don't believe we have any objection to these, your Honor.

THE COURT:  Did you say hopefully?

MS. GERAGOS:  No.  We do not have any objection to these.

THE COURT:  All right.  The exhibits referenced in Government Exhibit 1511 will be admitted with the sealed items being admitted under seal.

(Government Exhibits A-134; A-134-A; A-134-B; A-134-C; A-137; A-137-A; A-137-B; A-137-C; A-415; A-416-A; A-416-B; A-416-C; A-430-E; A-430-E1; A-430-E2; A-432; A-515-A; A-515-A1; A-515-A2; A-515-A3; A-516-A; A-551; A-926; C-271-A, sealed; C-271-A-R; C-271-A1, sealed; C-271-A2, sealed; C-271-A3, sealed; C-271-A4, sealed; C-271-A5, sealed; C-271-A6, sealed; C-271-A7, sealed; C-271-A8, sealed; C-271-A9, sealed; C-271-A10, sealed; C-626-5, sealed; C-626-5-R; C-626-7 and H-110 received in evidence)

MS. SMYSER:  Thank you, your Honor.

Ms. Foster, you can take that down.

And could you please pull up what is in evidence as Government Exhibit C641.  And turn to page 4, please.  I'm going to start reading with the second text message on this page, which is from Mr. Combs:

"After studio I'm going off the grid until 12 p.m.  Be

at the house at one for the 3 p.m.  You clear now?  And spoke to Ben and team.  They're cool.  Love.

"I'm done.  Not speaking anymore.

"Do you have one person's I can count on because I can't do it.  The rest can.something else."

Kristina Khorram:  "OK," and liked after studio I'm going after grid until 12 p.m.

Can we go to the next page.

Kristina Khorram:  "For off the grid moment, I prefer you use Joey.  He is most trustworthy, as you know.  Or we can also ask Frank to come in, if I can get him to answer his phone.  I just had a talk with all of them as well.  Today seems stress-driven.  Let's turn it around and breathe.  Try and have fun at the game, and then you won't have your release moment tonight after studio.  We control our own energy.  Stay light."

Mr. Combs:  "I want Frank.  I don't want to speak to anyone.  I'm done.  And if you can't give me better, I can't take no more.  I can't.  My life is the same bullshit every day.  I'm about to cancel everything.  The presentation is not done, album not done, video not done, new video not done, roots not done.  Assistants out of wack and on and on.  June can't remember a T-shirt.  ECT, ECT, ECT.  Wack."

Ms. Khorram:  "I'll call Frank again now."

Mr. Combs:  "Whatever.  What's the plan?"

P6kWcom2

Ms. Khorram:  "Sending someone to Frank's apartment because he's not answering anyone's calls.  I will track him down, and he can help you.  If you need any setup or anything, just let me know and I can have the guys help but stay out of your sight and do before you even get anywhere.  June is making sure he always has three to four backups of all basic things you ever ask for.  He will be making sure he has all those by tomorrow.  Assistants are on track to make sure they stay on point and not drop the ball on any little thing.  They will be staying clear away from you tonight unless you change your mind."

Mr. Combs:  "OK.  So have Joey stay.  Don't worry about Frank."

And these were sent on April 25 of 2023.

Could you take that down, please, and pull up Government Exhibit A430E, and let's turn to the first page.

Can you zoom in on these texts, please.

The first one is sent on May 15, 2023, from Mr. Combs to Ms. Khorram:

"Who can go set room?"

Ms. Khorram:  I'll get it handled.  Can they go now?"

Can we turn to the next page, please.

Mr. Combs:  "Who is it?"

Ms. Khorram:  John or Brendan.  They can both help to make it faster.  Normally I would send Frank or Joey, but my

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6kWcom2

hands are tied.  Frank called out from work again today, and it's Joey's birthday today so he's off."

Then there is an audio message, so could we please play Government Exhibit A430E1.

(Media played)

MS. SMYSER:  Please go to the next page.

Mr. Khorram responds:  I don't but right now he's at the house.  So having him help gather stuff if you are moving fast.  Then John can go put in the room.  If possible.  How fast are you moving?"

Mr. Combs sends an audio message, so could you please play Government Exhibit A430E2.

(Media played)

MS. SMYSER:  Ms. Khorram responds:  "OK.  John will go to hotel."

Mr. Combs:  "I need John to go to her now, please."

Ms. Khorram:  "OK.  He is leaving now."

Mr. Combs:  "Please now.  He should have been left."

You can take that down.

MS. JOHNSON:  And your Honor, we have another few message threads to enter into the record, and if it's OK with the Court, we would propose a break after these threads.

THE COURT:  All right.  Very good.

MS. JOHNSON:  Ms. Foster, could you please pull up Government Exhibit 1402, page 22, line 67.  And can you please

P6kWcom2

highlight line 67, the date of March 12, 2017, to March 14, 2017, in New York City.

Can you please pull up Government Exhibit B413.  B413, not 314.  Thank you.

Thank you so much.

Can you please turn to page 2, and starting at the second thread, which is from Mr. Combs, sent on March 13, 2017, at 2:15 a.m. UTC from Mr. Combs to Casandra Ventura:

"Do you want me to hit Garren for big man?  LOL."

Go to the next page, please.

Ms. Ventura:  "You can if you want.  You only sent one pic."

Next message, from Mr. Combs:  "RM 4901."

From Mr. Combs:  "Call me."

That message is sent at 3/13 -- March 13, 2017, at 4:37 a.m.

The next message, from Ms. Ventura to Mr. Combs, is sent March 13, 2017, at 1:59 p.m. UTC.  It reads:  "WTF.  Really?"

Next page, please.  "I think it will always be black and white.  You threw out all my shit.  I can dig it."

Can you skip the next two pages, please.

Picking up at 2:03 p.m. UTC from Ms. Ventura:  Nah, I didn't.  You bust my head in.  Beat."  Asterisk, asterisk.

From Mr. Combs:  "You're crazy."

P6kWcom2

From Ms. Ventura:  "OK."

From Mr. Combs:  "Let's stop talking.  You dead wrong.  Flipping on me for what?"

Ms. Ventura:  "Ain't flipping.  I can come back so we can talk, but you know I fight."

Mr. Combs:  "Wat?  Fight who?"  Exclamation point, question mark.

From Ms. Ventura:  "I'm just at the door.  Just LMK what I'm supposed to do."

From Mr. Combs:  "So we're clear this time.  We're taking a.Break?  This is really how you wanna leave this?  You sure."

From Ms. Ventura:  "No.  I just don't want to be beat down for being defiant or.ever.  You treat me and make me feel like I don't matter."

From Mr. Combs:  "You started all of this.  You really think you can have me jerk my dick for ten hours and not come.  Your nuts.  One minute you down asking about shit.  Then the next minute you acting like you doing something you don't want to.  Make up your minds.  I'm trying to figure out how I get this nut out my dick."

From Ms. Ventura:  "I guess I'm not down with abuse.  It doesn't make sense to me."

From Mr. Combs:  "I got you.  So all this is happening without you tripping."

P6kWcom2

From Mr. Combs:  "I damn sure don't MK sense to me."

From Ms. Ventura:  "You hit me in the head two good times.  That didn't make me feel good.  I know I'm not crazy."

From Mr. Combs:  "I'm hurt.  I'm tired of this fuck shit.  You have disrespected so much in last 12 months.  I have no respect for you to play me in friont a dick.  Wow.  You think you talking to on of your little fuck boys.  They can have you with that shit.  I'm not taking no more."

Ms. Ventura:  "OK."

And if you can skip ahead two pages, to the bottom, from Mr. Combs, on March 13 at 2:46 p.m.:  "Did you ever get any female escorts num's."

You can take that down now, and please pull up Government Exhibit B414.

Can you go to page 2, please.

And from Ms. Ventura to Mr. Combs on March 18, 2017, at 5:53 p.m. UTC:  "At this point you can tell me and I'm listening...you at a point in your life where you want to party and have a good time and I'm at a point where I have to focus or I'll never become anything.  I'm not saying I can't ever party.  I had so much fun in Miami, but then I realized that doing that opened the door to that being my sole purpose in seeing you.  I know if I said no to it in New York, it would have been a problem.  Those were my last nights with you.  You only see me one way.  You treat me like a hooker, to be honest.

You always want to call one so bad, and you have one.  This hooker has been here for ten years."

Mr. Combs:  "Wow."

We can take that down and can you please pull up Government Exhibit 421A, which is a photograph.

I'm sorry.  That's my fault.  B421A.

You can take that down now, Ms. Foster, and can you please pull up Government Exhibit B421.  And can you start at page 4, please.

From a communication on May 2, 2017, at 3:18 p.m. UTC from Ms. Ventura to Mr. Combs:  "That was you.  You hurt me so bad.  I'm so fucked up.  And so heartbroken.  I never intended to show you did respect if that's what you felt but some of your values are loose.  All I wanted was to have a good time, and you took all of your anger out on me per usual.  I know I don't treat you badly.  I might say some bullshit here and there, but I'm not a bad persons."

Next page, please:

"Person.  I just appreciate and love you.  I can't sleep.  I've been crying since I got here.  I don't understand what you expect of me sometimes.  I smile.  I'm happy.  I love you.  I give you love, and as soon as I turn my head for a second and you get fucked up, you drag me down the hall by my hair.  I'm 30 years old.  This isn't play play anymore.  I felt like I was dead last night and it wasn't happening to me bc

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

seeing my light was so beautiful."

Focusing on the bottom message, please:

"I was serious about Rita coming over because that's what you wanted and I had no attitude despite what you felt. I was scared of your rage. I talk out of line sometimes and I do apologize, but that doesn't mean J don't love you. And the love you have for me shouldn't equate to what you 'do' for me. I'm so in love with you, and you can't even see it. And my heart is shattered that you acted the way you did. Physicalities, take it somewhere else. Boris had to tackle you, Puff. That's not love. That's possession. I have been getting cuts."

From Mr. Combs to Ms. Ventura on May 7, 2017, at 3:26 p.m. UTC: "Thant makes two of us. But I'm not gonna let someone shit on me when all I've done was be nice. You broke my heart this time. You were negative all night. And then when owner said we can't have people over, you flip. You don't treat me like the king. Any other woman in the world would have been so happy, but not you. You're wack for not keeping it real. I'm not gonna go back and forth when I and everyone knows you was acting like a bitch. I can't take it anymore. I want after a night like that for my woman to be so happy. If you a different type of unappreciative chick. You did and you fucked up."

Can you take that down, please, and pull up Government

P6kWcom2

Exhibit B424, please.

This is from Mr. Combs to Ms. Ventura on May 2 at 3:38 p.m. UTC:  "You need to ask someone how you were acting.  If I would have did all of that for any girl in the world, she would have been so happy and so nice to me, but no, not you.  Always talking back and all fucking night.  I wish I didn't waste my time, money and energy.  I'm heartbroken and going back to bed.  You should get some rest also.  Maybe you'll see clearer."

From Mr. Ventura to Mr. Combs:  "Talk to your people.  They'll tell you.  Or they won't because all they do is suck you.  K.K. won't.  Talk to her.  And I didn't ask to go to met, so don't put that on me.  I asked to have my record come out after a million years."

And can you take that down and pull up Government Exhibit 1411, page 5, line 74.  Which is a text from Ms. Ventura to Ms. Khorram.

Sorry.  Line 74.  Thank you.

A text from Ms. Ventura to Ms. Khorram, reading:  "I'm sure" -- on May 2, 2017, at 3:54 p.m. UTC:  "I'm sure you don't want to get involved, but he said I was an asshole, which I owned up, but no one deserves being dragged by their hair.  I locked the door for my safety."

MS. GERAGOS:  We have 106 issues, your Honor.  I would like to read other parts of those messages right now, please.

THE COURT:  All right.

P6kWcom2

Any objection?

MS. JOHNSON:  Of the ones I displayed?

MS. GERAGOS:  Yes.

THE COURT:  All right.  Ms. Geragos, you may proceed.

MS. GERAGOS:  Thank you.  Can we please bring up Government Exhibit B-414, please.  Could we go to page 2.

THE COURT:  Ms. Johnson, you're standing up.  Before you start reading, is there an issue?

MS. JOHNSON:  Yes.  Can I confer with Ms. Geragos briefly?

THE COURT:  Yes, you may.

(Continued on next page)

P6KQcom3

THE COURT:  Ms. Geragos, are you prepared to proceed?

MS. GERAGOS:  I'm sorry.  I think we need a break, your Honor, to discuss some things.

THE COURT:  We're going to take a short break.  We're going to be ending early today around 1:00 p.m.  So we'll take a 20-minute break and come back at about 1:30.

(Jury not present)

THE COURT:  Ms. Geragos, is there anything to raise now or do you need time to work things out with Ms. Johnson?

MS. GERAGOS:  I think I could put this on the record.  There was a 106 objection that we had that we met and conferred about, from my records.  We expanded this Exhibit, which is B-414-H.  We had requested, and the government had agreed, to include the later message where Ms. Ventura writes "I love our FO's when we both want it."  Our revised version has that.  It was not read into the record.  We need to read that into the record right after this break.

MS. JOHNSON:  I need a moment to look back through all the 106 objections.  The version I have does not have that text, but I need a moment to look at that.  In addition, 106 is to the admissibility of evidence.  If Ms. Geragos wants to read this in her case in chief, that's fine, but it does not need to be read into the record on our case.

MS. GERAGOS:  Your Honor, they chose to read this in after their summary witness got off the stand.  106 is not just

P6KQcom3

when -- it's not as a matter of when the government feels that we can put in a message.  We are asking under 106 for the entirety of a message to have it be understood properly, which is what 106 requires, to have the jury see the next page of this, which is Ms. Ventura saying, "I love our FO's when we both want it."  To have to wait till our case in chief to read the next page would be highly prejudicial and not in keeping with 106.

THE COURT:  Let me ask, Ms. Johnson, and make sure I understand the issue.  This is B-414 in evidence?

MS. GERAGOS:  Yes.  This is what we have -- what the defense has was revised after our conferrals with the government because we had requested these last two pages.  They are important to understanding the entire communication.

THE COURT:  I understand that.  So this is all in evidence.  And for some reason everyone is reading stuff that's already in evidence to the jury, okay?  And there was no objection from the defense as to Ms. Smyser and Ms. Johnson doing that.  You're saying you'd like to read it, but what's the basis for that?  Because I think Ms. Johnson is saying this is all in evidence, and so Rule 106 just relates to the introduction of statements into evidence.

And so what she's saying is, in terms of the reading of things, like, you can read whatever you want that's in evidence on your case, but on what basis do you get to read it

on the government's case based on what the government put forth?

MS. GERAGOS:  The government put on a summary witness, had this evidence in their chart for the summary witness.  I would have read it on cross-examination if I knew they were going to do this after.  Once they did it after, I didn't object because I thought they would read the entire exhibit because that leaves a prejudicial impressions for the jury to not have the communications two messages after that says "I love our FO's" and to do it after the witness is off the stand and say that then I can't put in these messages because I have to wait until the case in chief is highly prejudicial to the defendant.

THE COURT:  What's the basis for doing what you want to do?  If you've got a basis for doing what you want to do, I'm all ears.

MS. GERAGOS:  It's misleading, your Honor.  It is misleading.  We didn't object to them reading things in evidence because we didn't understand that they were going to only read portions.  And so that's the basis, it leaves a misleading effect on the jury.

THE COURT:  Like literally what you want to do is read these four text messages?

MS. GERAGOS:  These all I'm asking to do.  I'm not going to read the defense exhibits that we put in after these

P6KQcom3

messages.  But there was a time and place for Ms. Johnson to do this.  It was with Special Agent Penland.  I went through the messages in detail, in detail, and they did not do that.  And so now they're doing that at this point, but then I should be able to read what I had asked for at 106 -- and let me just back up, your Honor.

We went through this exhaustive process with Ms. Ventura when she went on her direct to introduce a lot of messages for the sake of efficiency, for the Court, the parties, and the jury, so that she wouldn't have to be on the stand for longer than she had to.  So this was introduced at that time, and I wasn't expecting that because it was introduced at that time, at a later point I wouldn't be able to read the revised messages because at the time of introduction they decided not to ask Ms. Ventura about this.  So it's prejudicial and misleading.

THE COURT:  Hold on.  Is there anything else other than these four --

MS. GERAGOS:  No, that's it.

THE COURT:  Here is how I would resolve that.

I think as a technical matter, Ms. Johnson, you're correct 106 relates to the introduction of evidence, meaning the admission of certain evidence.  However, looking at the Advisory Committee Notes, the way in which this is supposed to work, or what it's supposed to apply to, is when there's

P6KQcom3

actually a witness on the stand or evidence being presented to the jury that would be misleading and create a misimpression if certain other completing statements were not also shared with the jury at the exact same time. That's the reason for the rule. Those are the examples that are given in the rule.

So while the parties through agreement have introduced these exhibits into evidence, when the government is reading certain exhibits into evidence, I think it's fair at that time to have the completing statements also read because for the same reason as the rule contemplates, that failure to do so would leave a misimpression in the jury's mind potentially.

So since there's no objection, this is already all in evidence, and we're talking about four messages that are coming right after the messages the government read to the jury. I think it's fair for the defense to read those without any further comment with what they have to do with anything.

MS. JOHNSON: Your Honor, I would ask two things of the Court. I certainly did not intend to be misleading here. As the Court may remember, Ms. Ventura's exhibits were not a straightforward process. I thought that the exhibit that was admitted did not have the last two pages. I was not trying to be misleading to the jury. So if the Court will allow these four text messages to be read, I would like to read them because I don't want to leave them with a misimpression.

THE COURT: That's fair.

MS. JOHNSON:  If that is the standard, I will say that we don't stand up on cross and ask for other portions to be read.  106 is about admissibility of a document, not about what comes in when either side presents it.

THE COURT:  I didn't understand the last point you're making.  You're saying that when you have a witness on the stand and you go through a message, you obviously don't go through everything, right?

MS. JOHNSON:  Exactly.

THE COURT:  Right, but that's because in cross-examination the defense can come back and complete anything they want.  So there could be an objection raised, I suppose, given the nature of the statements and what you're actually eliciting.  But the way the parties have handled it, and, Ms. Geragos, you can correct me, but the way it's been handled to date is the government asks whatever they want on direct, and on cross you then ask about the different other statements that are made.  That's just how it's been handled.

Here, there is no witness on the stand, and so you're reading things into the record.  So if you're reading things into the record, then I'm not sure that it should be treated in any different way; meaning, we could do it with Ms. Geragos completing the statements, but, Ms. Johnson, you say you'll do it.  There's no objection to that.  So you can go ahead and do it.  But this is an atypical circumstance because we haven't

P6KQcom3

had that many circumstances where anything has been read into the record that's already in evidence in the way the government just did. It's happened a couple times without any dispute or objections from the defense. The defense has an objection in this particular instance. I think it may have more to do with just the number of documents and exhibits that overlap with each other, and that's why it happened this time. But it's easy enough to clean up so that there is no even potential prejudice.

MS. GERAGOS: That's right. And also when they have a witness on direct and skip ahead, we don't object to that either because that's what direct and cross are for, they can go back to any messages that are not read out loud. This is just in this particular circumstance that there is no misleading impression left with the jury.

THE COURT: Understood.

Anything to address before we take a now 12-minute break?

MS. GERAGOS: Not from us, your Honor.

THE COURT: We'll come back in 12 minutes.

(Recess)

(Continued on next page)

P6KQcom3

(Jury present)

THE COURT:  Please be seated.  Anything from the government before it calls its next witness?

MS. JOHNSON:  Yes, your Honor.  We'd like to finish reading one of the chats into the record.

THE COURT:  All right.

MS. JOHNSON:  Ms. Becker, can you please pull up Government Exhibit B-414?

And, with apologies, I read the long version last time.  Can you go to page 2 please, Ms. Becker.  Can you zoom in on the top?

Starting from the beginning, Ms. Ventura to Mr. Combs: On March 18, 2017 at 5:35 p.m. UTC.

At this point you've been telling me and I'm listening.  You're at a point in your life where you want to party and have a good time, and I'm at a point where I have to focus or I'll never become anything.  I'm not saying I can't ever party.  I had so much fun in Miami, but then I realized doing that opened the door to that being my sole purpose in seeing you.  I knew if I said no to it in New York, it would have been a problem.  Those were my last nights with you.  You only see me one way.  You treat me like a hooker, to be honest. You always want to call one so bad, and you have one.  This hooker has been here for ten years.

Mr. Combs:  Wow.

Going to the next page.

Ms. Ventura to Mr. Combs:  Please don't play victim.  If you can, go to our last messages.  That's all you wanted, and that's why I was upset.

I love our FO's -- go to the last page -- when we both want it.

THE COURT:  With that, the government may call its next witness.

MS. COMEY:  Your Honor, the government calls Joseph Cerciello.

JOSEPH CERCIELLO,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DEPUTY CLERK:  Please give the Court your first and last name, and spell your first and last name.

THE WITNESS:  Joseph Cerciello.  J-O-S-E-P-H; C-E-R-C-E-I-L-L-O.

THE COURT:  Ms. Comey, you may proceed.

MS. COMEY:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS COMEY:

Q.  Good morning.

A.  Good morning.

Q.  Where do you work?

A.  I'm currently a special agent with the United States

P6KQcom3                              Cerciello - Direct

Department of Homeland Security, Homeland Security

Investigations.

Q.  Is that also known as HSI?

A.  Yes, it is.

Q.  How long have you been a special agent with HSI?

A.  Approximately 18 and a half years.

Q.  What is your current assignment?

A.  I'm currently assigned to the New York Joint Terrorism Task

Force, also referred to as the JTTF.

Q.  How long has that been your assignment?

A.  I was assigned to the JTTF in early 2010.

Q.  Generally, what are your duties and responsibilities as a

special agent?

A.  At the JTTF, my responsibilities are to investigate

terrorist attacks or terrorist threats emanating from ISIS or

home-grown violent extremists to New York City.

Q.  I want to be clear here.  Did you have any involvement in

the investigation of this case?

A.  I did not.

Q.  Did the Joint Terrorism Task Force have anything to do with

the investigation of this case?

A.  No, it didn't.

Q.  Approximately when did you get involved in this case?

A.  Approximately two and a half weeks ago.

Q.  And what were you asked to do?

A.   I was asked to review charts that were put together by the prosecution team and the corresponding government exhibits to those charts.

Q.   Were your asked to verify that the information in those charts accurately reflected information in the exhibits you reviewed?

A.   Yes, ma'am.

Q.   So can you explain at a high level generally what you did to verify the accuracy of the charts you were provided?

A.   With the charts, I would read the charts, and, as I stated before, the charts had corresponding government exhibit numbers.  I would then go to those government exhibits and look through the voluminous paperwork to make sure that the charts were accurate as possible.

Q.   What are some of the types of exhibits you reviewed when verifying the accuracy of charts for this case?

A.   Bank records, so financial statements, cellphone records, text messages, photos, airline records, ground transportation records.

Q.   Collectively in total, how many pages were the text messages you reviewed?

A.   That would be in the thousands.

Q.   How many pages were the financial records you reviewed?

A.   Also in the thousands.

Q.   How about the phone records you reviewed?

P6KQcom3                        Cerciello - Direct

A.   Again, also in the thousands.

Q.   Who decided what exhibits you would review?

A.   The prosecution team.

Q.   Now, do you believe you have reviewed all of the documents gathered in this investigation?

A.   No.

Q.   Do you believe you have reviewed all of the exhibits an admitted at this trial?

A.   No.

Q.   Who decided what exhibits would be referenced in the charts you reviewed?

A.   Again, that would be the prosecution team.

Q.   And who decided what information would be contained in those charts?

A.   The prosecution team.

Q.   So what was your only role with respect to these charts?

A.   My only role was to read the charts, the Government Exhibits that were given to me, and just marry them up with the charts.

Q.   And make sure they were accurate?

A.   Yes, ma'am.

Q.   I'd like you to take a look at the documents to your left, please.  They should be what's been marked for identification as Government Exhibits 1406, 1408 and 1409.  Do you have those?

A.   Yes.

Q.  Do you recognize those?

A.  I do.

Q.  Are those three of the charts that you verified at the request of the prosecution team in this case?

A.  Yes.

Q.  Did you verify that the information in those charts is all drawn from Government Exhibits cited in those documents?

A.  Yes.

MS. COMEY:  Your Honor, the government offers these three exhibits in evidence.

THE COURT:  Any objection that hasn't been raised before?

MS. GERAGOS:  That's correct, no objection other than that.

THE COURT:  Then they will be admitted.

(Government's Exhibits 1406, 1408 and 1409 received in evidence)

Q.  I'd like to start with Government Exhibit 1406.

MS COMEY:  Could we publish that, please?  Now that that's up on the screen, your Honor, I'm going to be walking through some of the underlying exhibits.  So in a moment I'm going to ask that the public screens be turned off because they have some identifying information for Jane.  This chart does not so we can leave it up for now.

Q.  Agent Cerciello, generally what is contained in this chart?

P6KQcom3                        Cerciello - Direct

A.  This chart has a list of date range, locations, names of
individuals, flight records or transportation records and
financial records.

Q.  What is the only female name in the names column of this
chart?

A.  Jane.

Q.  Without saying it out loud, do you know Jane's true name?

A.  I do.

Q.  Did the prosecution team provide you with her true name and
a photograph of her?

A.  Yes.

Q.  When checking this chart for accuracy, did you confirm that
the records referencing Jane either cited her true name or her
photos and videos had her likeness?

A.  Yes.

Q.  I want to walk through the columns of this chart.  Starting
with the first one, what does date show?  And I'm going to ask
you to pull the microphone to your mouth and make sure that
you're speaking into the microphone, please.

        What does date show?

A.  Date shows a specific date range.

Q.  And what does the location column show?

A.  Location would be either a city or a hotel in a specific
city.

Q.  What is the government or the GX number in italics

underneath the information in the location column?

A.   That would reference the government exhibit number.

Q.   What is contained in the names column?

A.   Names is just that:  Names of individuals as it pertains to that date range.

Q.   What are the GX numbers referenced under each name?

A.   Again, those would be Government Exhibits as they pertain to that individual.

Q.   What types of evidence did you check to confirm that each person named in this column has a government exhibit that corresponds with the date range for each row?

A.   It would be phone records, text message records.

Q.   Were there some also videos and photographs of individuals?

A.   Yes, ma'am.

Q.   With metadata lining up with the date range?

A.   Yes.

Q.   What is contained in the flight records column?

A.   Flight records would be flight manifests or flight reservations.

Q.   Are those flights around the beginning and/or end of the time range for each row?

A.   Yes.

Q.   What is contained in the finances column?

A.   Those would be financial transactions.

Q.   Are those financial transactions that took place either

during or after the date range listed in each row?

A.  Yes.

Q.  Are there several rows with no entry in the financials column?

A.  Yes.

Q.  Does that necessarily mean there was no money exchanged by the names in the row during that time period?

A.  No.

Q.  Why not?

A.  It could have been a cash transaction.

Q.  So does the financials column only reflect transactions that were in the documents you were provided to review?

A.  Yes.

Q.  Now that we've gone through the columns, I want to take a look at the rows.  How many rows in total are in this chart? And if you want to look at the hard copy, you're welcome to.

A.  In total there's 46 rows.

Q.  What's the first date of the first row?

A.  May 22, 2021 to May 23, 2021.

Q.  Let's go to the last page.  That's page 17, please.  What is the last date in the last row?

A.  August 8, 2024.

Q.  In what order are these dates or date ranges listed?

A.  From earliest to latest.

Q.  I'd like to go now, please, to page 15, row 39.  What is in

row 39?

A.   Row 39 is a lawsuit *Ventura v. Combs* filed 11/16/2023.

Q.   How many rows are in this chart before the date that that lawsuit was filed?

A.   38.

Q.   Are all of the rows before that date in row 39 dates associated with locations?

A.   Yes.

Q.   And what are the majority of the locations in the rows before this lawsuit was filed?

A.   Those would be hotels.

Q.   After that row, do any more locations include hotels?

A.   No.

Q.   I'd like to go now please to page 16, row 43.  What's in this row?

A.   That states:  Combs posts IG or Instagram video 5/19/2024.

Q.   How many more dates are in this chart after the posting of that video?  We can go to the last page if you want to take a look.

A.   That would be three.

Q.   In total, how many dates are shown in this chart?

A.   44.

Q.   Does this chart necessarily list out every time that Jane, Sean Combs, and a third party were ever at the same location?

             MS. GERAGOS:  Objection.

P6KQcom3                              Cerciello - Direct

THE COURT:  Sustained.

Q.  Does this chart necessarily list out every single time that Jane was at a particular location?

A.  No.

Q.  Does this chart necessarily list out every time that Sean Combs was at a particular location?

A.  No.

Q.  So does it only list the locations and dates that appear in the documents you've been provided?

A.  Yes.

Q.  Did you rely at all on any witnesses' testimony when you were checking this chart?

A.  No.

Q.  Have you reviewed any of Jane's testimony at this trial?

A.  No.

Q.  Do you know what Jane testified about at this trial?

A.  I do not.

Q.  So did you check this chart using only documents separate and apart from her testimony?

A.  Yes.

Q.  I want to look at an example to see how this works.  Let's start with page 1, row 1, please.

MS COMEY:  At this point, your Honor, may I ask, please, that the public screens be turned off so we can look at underlying documents?

THE COURT:  I'll ask the deputy to confirm when that has been done.

BY MS. COMEY:

Q.  While that's happening, I can ask you a few questions about this row.  Focusing on row 1, what is the date range in this row?

A.  5/22/2021 to 5/23/2021.

Q.  Before we look at the underlying documents, I want to be clear.  Do you know whether or not Jane testified about anything happening in May of 2021?

A.  I do not.

Q.  So this row is just based on what the records show only?

A.  Yes.

Q.  So I want to start with the location column.  What was the location for this row?

A.  The location was 1 Hotel, Miami, Florida.

Q.  What is the Government Exhibit cited for that location?

A.  Government Exhibit 7A-132.

Q.  Let's take a look at that.

MS COMEY:  Ms. Becker, would you please pull up Government Exhibit 7A-132.  And can we zoom in at the top, please.

Q.  What's the name of this hotel?

A.  1 Hotel and Homes South Beach.

Q.  Is this a 1 Hotel record?

A.  Yes, ma'am.

Q.  Let's look at the name below.  What is the name right underneath the hotel name?

A.  Mr. Phil Pines.

        MS COMEY:  And can we look now a little lower, please, Ms. Becker, at the arrival date.

Q.  What's the arrival date?

A.  Arrival 5/22/2021.

Q.  What's the departure date?

A.  Departure 5/23/2021.

Q.  Down at the bottom, what was the total cost for this one-night stay at 1 Hotel?

A.  Total payment $3,050.90.

Q.  Let's go back to now 1406, please, page 1, line 1.

        Let's skip over the names column for now and go to the flight records column.  What's in the flight records column for this first row?

A.  It would be a flight record for Jane on 5/21 Jet Blue flight from Newark to Miami.

Q.  I want to look at some of the exhibits cited for this so we can see how you put this chart together.

        Let's pull up Government Exhibit 6L-101, and I'd like to zoom in at the top of page 1 when we get there, please.

        MS COMEY:  Actually, are the screens off before we do that?  Thank you, Mr. Deputy.

So, once again, 6L-101.  I want to zoom in at the top of page 1, please, just the header information.

Q.  What kind of record is this?

A.  This is a record from a travel agency.

Q.  What is the name to the left underneath client summary?

A.  Combs Enterprises Corporate.

MS COMEY:  Let's go to page 2, please.  I'd like to go to the entry dated 5/20/2021 on the bam half of the page.  Can we zoom in on that, please.

Q.  Without saying it out loud, is this an entry relating to Jane's true name?

A.  Yes.

Q.  Would you please read the flight information, not her name, but the flight information below Jane's name?

A.  It's a Jet Blue flight on 5/21/2021, from Newark to Miami, Florida.

MS COMEY:  Next, I want to pull up Government Exhibit 6B-108, page 45, please.  I'd like to zoom in on the passenger information and the flight information, please.

Q.  Is the passenger information Jane's name?

A.  Yes.

Q.  And is the flight -- can you read us just the date and the departure and arrival for flight information?

A.  The date is 5/21/2021.  Departing Newark Airport, arriving in Miami.

MS COMEY:  Let's go now, please, to Government Exhibits E-168 and E-168-M.  Let's take this exhibit down, please.  And take a look at stipulation 1301, page 5 before we go to the next exhibits.  Let's look at paragraph 32, please.

Q.  Agent Cerciello, underneath the flight records column in row 1, is there a reference to E-168 and E-168-M?

A.  Yes.

MS COMEY:  I want to read this stipulation. Government Exhibits E-101 through E-333 and EX-101 through EX-185, including the subdivisions thereof, are true and accurate excerpts of data extracted from an iCloud account for a iCloud account used by Jane.  We can take this down.

Now I want to take a look at those exhibits.  Can we please pull up E-168 and E-168-M side by side.

Q.  What are we seeing here?

A.  This is a screenshot of a Jet Blue boarding pass.

Q.  Is it in Jane's true name?

A.  Yes.

Q.  And over on E-168-M, does that have the metadata for that screenshot?

A.  Yes.

Q.  Looking at the last modified date and time, what's the date of that last modified date?

A.  5/21/2021.

MS COMEY:  Let's take this down, please, and go back

Case 1:24-cr-00542-AS    Document 598    Filed 12/19/25    Page 145 of 199    6922

P6KQcom3                        Cerciello - Direct

to Government Exhibit 1406, page 1.  And I want to talk through the names column now.

Q.  Starting with Jane, are the same records we just saw reflecting her boarding pass for the flight to Miami included here?

A.  Yes.

Q.  Do the remaining exhibits also come from her iCloud that are part of that E series?

A.  Yes.

Q.  And looking at Combs' name, are those same photographs or the same exhibits from Jane's iCloud also listed under Combs' name?

A.  Yes.

        MS COMEY:  I want to look at some of those.  Let's start, please, with Government Exhibit E-103.  That's a video, and I'd like to play it, please.

        (Video played)

        MS COMEY:  Let's look at the metadata.  Can we pull up E-103-M, please.

Q.  Is this the metadata for that video we just watched?

A.  Yes.

Q.  Let's look at the last modified date and time up above for the earliest one, the third line down.  What is that last modified date and time?

A.  5/22/2021.

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

P6KQcom3                          Cerciello - Direct

Q.  Is that in UTC time?

A.  Yes.

Q.  What is the time in UTC time?

A.  UTC time 2:07:50 a.m.

Q.  So would this be actually on May 21, 2021 at around 10:00 p.m. on the same day as Jane's flight to Miami?

A.  Yes.

MS COMEY:  Let's now play E-105, please, Ms. Becker.

(Video played)

MS COMEY:  Let's now go to E-105-M, please.

Q.  Is this the metadata for that video we just watched?

A.  Yes.

MS COMEY:  Can we zoom in, please, on just the first few rows below that screenshot, please.

Q.  Is the last modified date and time approximately two minutes after the metadata we saw for the video we just watched before this one?

A.  Yes, that's correct.

MS COMEY:  Let's now pull up E-106-M and E-108-M side by side.

Q.  Are these two more videos that are cited under Jane and Combs' names in the row we were looking at?

A.  Yes.

Q.  Are they similar videos to the two we just watched?

A.  Yes.

Q.  Looking at their last modified dates and time, were they taken at about the same time?

A.  Yes.

MS COMEY:  We can take that down.  Thank you, Ms. Becker.

Let's go back to page 1 of Exhibit 1406.

Q.  Now, are the last two exhibits under Combs' name the same as the two exhibits under the name Don?

A.  Yes.

MS COMEY:  I want to take a look at those.  Let's start with Government Exhibit 5A-204-1, please.

Q.  What types of records are these?

A.  These are AT&T telephone records.

MS COMEY:  Let's zoom in on voice usage 4 at the top left, please.

Q.  What phone number -- what are the last four digits of the phone number that these records are for?

A.  9922.

MS COMEY:  Let's now pull up Government Exhibit 1312, page 3, please.

Q.  And looking at the entry next to the same number ending 9922 close to the bottom of the chart, who is the individual user of that 9922 number?

A.  Sean Combs.

MS COMEY:  So let's go back to Government

Exhibit 5A-204-1, please.

Q.   While we're pulling that up, Agent Cerciello, based on your experience as a special agent, including working with phone records, what types of information do phone records typically include?

A.   Typically include the originating number and the number dialed or the number that would call your phone, the date, and also the duration of the phone call.

Q.   Do phone company records typically reflect video calls that call over FaceTime in your experience?

A.   No, not in my experience.

Q.   And do phone company records usually reflect messages sent by Wi-Fi or data such as iMessages or WhatsApp messages in your experience?

A.   No.

Q.   And if the duration time in a phone company record is just a few seconds, in your experience, what does that usually indicate?

A.   In my experience with phone companies, the clock starts once the phone starts ringing, not necessarily when the phone call actually connects.

Q.   In other words, if a phone record reflects just a few seconds, is it possible that the call was never answered, and that was just time when the phone was ringing?

A.   That's possible.

Q.  Is it also possible that the call was answered right away, and a two or three-second phone call took place?

A.  That's also possible.

        MS COMEY:  Looking back now at 5A-204-1, I'd like to take a look at rows 26944 through 26946, Ms. Becker, if you could pull those up for us please at 1403.

Q.  What's the date of these rows?

A.  The date is 5/22/2021.

Q.  Is the time looking up at the top of the chart in UTC time?

A.  Yes, it is.

Q.  So what's the time in UTC of these calls?

A.  UTC time is 15:34:48.

Q.  So would that be four hours earlier in Miami?

A.  Yes.

Q.  So in Miami, would that be about 11:30 or so in the morning on May 22?

A.  Correct.

Q.  Is that the same day as the check-in date we saw in the hotel record under the name Phil Pines at the 1 Hotel?

A.  Yes, it is.

Q.  What number is Combs' 9922 phone connecting with on these three entries?

A.  Phone number would be 404-268-0305.

        MS COMEY:  Let's go back now, please, to Government Exhibit 1312, page 2 and look at that number.

P6KQcom3                         Cerciello - Direct

Q.  Do you see it around the middle of the page?

A.  Yes.

Q.  Who is the individual user for that number?

A.  The name is Donald James.

MS COMEY:  Now row 1 of 1406 also cites to another exhibit that I want to take a look at.  That's Government Exhibit A-513.  Could we pull that up, please, and just look at the header information.  Sorry.  That whole gray box, please.  Thank you.

Q.  Is this a text chain between that 9922 number and that 0305 number we just saw in those phone records?

A.  Yes.

Q.  Is this from the 992 -- an extraction of the 9922 number?

A.  Yes.

Q.  What contact name was Donald James' number saved under in the 9922 phone?

A.  Donald Cow James.

MS COMEY:  We can take that down.  Thank you.

And let's go back to 1406, row 1, page 1, please.

Q.  What is the date in the next row of this chart?

A.  Row 2?

Q.  Yes.

A.  Would be 10/29/2021 to 10/31/2021.

Q.  Does that necessarily mean there were no more communications among Jane, Combs, and any third parties between

May of 2021 and October of 2021?

A.   No.

Q.   Or is it just that there were none indicated in the records you received?

A.   Correct.

Q.   Now, in your experience as a special agent, do different companies have different record retention policies?

A.   They do.

Q.   How does that impact investigations into events that happened years earlier?

A.   It affects investigations if a company does not have a retention period that expands beyond what you want to obtain. So you can try to receive records from a company, but they just don't retain them, so there's just no way of getting those records.

Q.   Before we move on to other rows, I want to take a look at those travel records we saw one more time.

          MS COMEY:  Can we pull up Government Exhibit 6L-101, page 2, please:

Q.   Looking at the entry next to 6/2/2021, does this show that Jane traveled to Miami again during a date between rows 1 and 2 of the chart we were just looking at?

A.   Yes.

Q.   What's the date when Jane flew to Miami here?  Looking down at the bottom row.

A.   6/3/2021.

          MS COMEY:  I just want to highlight that down there.
Thank you.

          Let's take a look now at those phone records we were
just looking at, Government Exhibit 5A-204-1.  This time let's
go to page 1420, please, and let's look at row 27282.

Q.   What's the date and time of this record?

A.   The date is 6/4/2021, and the time is 2:24:17.

Q.   Is that UTC time?

A.   Yes.

Q.   So that would have been about 10:24 p.m. Miami time on
June 3, 2021?

A.   Correct.

Q.   Is this call made the same day that Jane flew to Miami?

A.   Yes.

Q.   Who was Mr. Combs calling?

A.   Again, that would be the same number for Donald Cow James.

Q.   In other words, are there instances of other contact
between Don and Mr. Combs that are not in the chart that we're
looking at, at 1406?

A.   Yes.

          MS COMEY:  We can take this down.  Thank you.  Let's
go back now to 1406, and I want to turn to page 2, and look at
a couple more examples of how this chart works.

Q.   What's the another date range of row 5?

A.   12/3/21 to 12/6/2021.

Q.   What's in the location column?

A.   Location is the St. Regis Bal Harbour Resort in Miami, Florida.

          MS COMEY:  Let's take a look at the records there. Can we please pull up Government Exhibit 7L-101.  Can we look under profile data, at the top box.

Q.   What's the name under profile data?

A.   Jessica Ruiz.

Q.   And then a little lower on the page under check-in date.

A.   For which date?

Q.   Do you see the 12/3/2021 at the bottom half of this?

A.   Sorry.  Jessica Ruiz.

Q.   Looking at check-in date, do you see the 12/23/2021 that's reflected at row 5 of Government Exhibit 1406?

A.   Yes.

Q.   And what's the check-out date?

A.   Check-out date is 12/6/2021.

Q.   What's the hotel information?

A.   Bal Harbour Resort.

Q.   What's the total cost of that stay?

A.   Total cost was $11,756.

          MS COMEY:  Let's go now, please, to Government Exhibit 7L-102.

Q.   What's the name under account?

A.   Jessica Ruiz.

MS COMEY:  We can zoom back out, please.

Q.   Looking down at the bottom, the second to last entry next to 12/6/2021, do you see where it says losses and damages?

A.   Yes.

Q.   What was the cost for losses and damages?

A.   $6,000.

MS COMEY:  Let's go back, please, to Government Exhibit 1406, page 2, line 5 and look at the flight records column.

Q.   What information is contained here?

A.   It's flight records for Jane and an individual by the name of Kabrale.

MS COMEY:  For Jane's flight, let's pull up Government Exhibit 6L-101, page 3, please.  And let's zoom in on the part between 12/1/2021 and 12/7/2021.

Q.   Can you just read us the flights underneath Jane's true name, please?

A.   12/2/2021, Los Angeles to Miami Florida.  12/6/2021, Miami Florida to LAX Los Angeles.

MS COMEY:  Let's take a look at Kabrale's travel.  Can we pull up Government Exhibit 6B-110, page 6, please.

Q.   Is this a flight record regarding Kabrale?

A.   Yes, it is.

Q.   What does it say in the name next to passenger information?

A.   Williams/Kabrale.

Q.   Next to flight information, can you tell us the date departure and arrival, please?

A.   Date was 12/6/2021 departing Miami, arriving in Atlanta.

          MS COMEY:  Let's go back to the chart please, 1406, page 2, line 5.  And let's look at the financials column.

Q.   What do we see in the financials column?

A.   Financials column is dated 12/5.  It's a $350 Cash App block payment from Donald James to C4A for Mr. Star.

          MS COMEY:  Let's pull up that record.  Can we pull up Government Exhibit 4B-103.  I want to look at row 442, but, Ms. Becker, I'd ask you to hide all of the rows between -- you've already done it.  Thank you.

Q.   So looking at row 442, what kind of record is this, Agent Cerciello?

A.   This is a financial payment record.

Q.   Is it for Cash App?

A.   Yes.

Q.   Looking at row 442, what's the date of that record?

A.   The date is 12/5/2021.

Q.   What is the amount if we could scroll over to the right, please?

A.   $350.

          MS COMEY:  And now let's go over to the subject.

Q.   What is the subject?

A.   Subject is Mr. Star.

Q.   Who is the sender?

A.   Donald.

Q.   Let's go over to see who is the recipient?

A.   C4A.

          MS COMEY:  We can take this down.  Thank you.

          Let's go back now to 1406, page 2 and look at names column.

Q.   What names are listed here?

A.   Jane, Combs, Don, Chase Watkins and Kabrale.

Q.   Let's start with Jane and Combs.  Is the first exhibit for both of them the same?

A.   Yes.

          MS COMEY:  Let's pull that Exhibit up, please.  Can we pull up Government Exhibit A-104-9, pages 2 and 3 side by side.

Q.   Are these text messages between Jane and Mr. Combs?

A.   Yes.

Q.   What's the date of these messages?

A.   12/2/2021.

Q.   I'd like to read through these.  Would you please read Mr. Combs' messages in the green, and I'll read Jane's messages in the blue.  You can go ahead and begin?

A.   Can you get on a red eye.

Q.   Ah my baby, is there even any flights?  Let me ask KK.  So far they found 230P landing at 1030P TMW night.  Let me text

KK.

A.   Okay, I'll wait.

          MS COMEY:  We can take that down.  Thank you.

          Let's go back please to 1406 page 2.

Q.   Is the next cite for Jane the same cite under Kabrale?

A.   Yes.

          MS COMEY:  I'd like to take a look at part of that.
Let's pull up Government Exhibit F-101.  Let's just look at
pages 88 and 89 side by side, please.

Q.   Are these text message between Jane and Kabrale?

A.   Yes, they are.

Q.   What's the date?

A.   12/5/2021.

Q.   I'd like to read through these.  I'll ask you to read
Kabrale's green messages.  I'll read Jane's blue messages.
Could you start, please, with the second message down on the
left?

A.   Good morning.  I'm at the airport now waiting for my
flight.

Q.   Good morning, babe.  Have a safe flight.  When you land,
just text me.  I'll call you an Uber to the hotel.

A.   Okay.  Bet love just landed.  I'll let you know when I'm
off.

Q.   Have you landed?  Sorry, I missed your call

A.   Yes, I'm here.

Q.  Got your bags?

A.  Have the Uber pick up now.

MS COMEY:  We can take that down.  Thank you.

Let's go back to Government Exhibit 1406, page 2.

Q.  Then is the next government exhibit under Mr. Combs' name, the same exhibit that's cited under Chase Watkins' name?

A.  Yes.  There's actually a purple line through my screen.  Is there a way I could clear that out?

Q.  Why don't I have you take a look at the hard copy.  So we've got the hard copy, page 2, line 5.

Is the next Exhibit under Mr. Combs' name the same as the exhibit under Chase Watkins' name?

A.  Yes.

MS COMEY:  Let's go ahead and take a look at that. Please pull up Government Exhibit A-407.  Let's zoom in on the information in the gray box at the top, please.

Q.  Now is this a text exchange between Mr. Combs' 9922 phone and another number?

A.  Yes.

Q.  Could you read the other number for us, please?

A.  601-503-6336.

MS COMEY:  Let's pull up Government Exhibit 1312, page 2, please and find that number ending in 6336 up at the top.

Q.  Who is the individual user of that phone number?

A.  Chase Watkins.

MS COMEY:  Let's go back please to Government Exhibit A-407 and pull up pages 1 and 2 next to each other.

Q.  I'll ask you to read Mr. Combs' messages in green, and I'll read Chase Watkins' messages in blue.

So can you go ahead and read -- first, can you tell us the date of these messages, please?

A.  12/4/2021.

Q.  Would you please read the first message from Mr. Combs?

A.  Hey, are still on for 10.

Q.  Yes, I am.  I'm on my way now.  See you soon.  I'll be there just before 10.

A.  Okay.  Just have them call up.

MS COMEY:  We can take that down.  Thank you.

Let's go back to 1406, page 2, row 5.

Q.  Is the first entry under Don the same Cash App entry we just looked at?

A.  Yes.

Q.  Then the next exhibit under Don is AX-103-A.  What does the X in that prefix mean?

A.  That these are explicit exhibits.

Q.  Are there multiple explicit exhibits throughout the -- referenced throughout the chart in 1406?

A.  Yes.

Q.  We're not going to watch it now, but can you tell us generally what kinds of explicit exhibits are cited in these

are chart?

A.   These explicit exhibits are sexual encounters.

Q.   Who is visible in all of those sexual encounters?

A.   Jane.

        MS COMEY:  So for now I want to move on to another example.  Let's go to page 9, please, and look at row 23.

Q.   Looking at row 23, what's the date of this entry?

A.   1/20/2023 to 1/22/2023.

Q.   What's the location?

A.   The London Hotel in Los Angeles, California.

Q.   Why is the word damage in parentheses next to the room number?

A.   There was a damage report and damage sustained to that hotel room.

        MS COMEY:  Let's take a look at the hotel records. Would you please pull up, Ms. Becker, Government Exhibit 7J-117, page 1.

Q.   What is the name of the hotel that this record is for?

A.   The London, West Hollywood.

Q.   What name is to the left right under the hotel?

A.   Joseph Chavez.

Q.   Looking over to the right, what's the arrival date?

A.   Arrival 1/20/2023.

Q.   What's the departure date?

A.   1/22/2023.

MS COMEY:  Let's go now to page 3, please.

Q.  At the end right above the words American Express, what is the charge on this bill?

A.  Damaged furnished $3,750.

Q.  What was the total charge for this stay?

A.  Total charge $7,577.24.

MS COMEY:  Let's pull up now Government Exhibit 7J-117-B, please, pages 1 and 2 side by side.

Q.  What type of record is this?

A.  This is a security damage report issued by the London West Hollywood.

Q.  What is written in this report under the box that says hotel guest?

A.  Host guest Chavez Joseph and then it says VIP Diddy.

Q.  What's the date of this report?

A.  The date of this report is 1/22/2023.

Q.  Would you please read what's written in the box below the header, please?

A.  On Sunday, January 22, 2023 at approximately 12:30 p.m., SO Tello dispatched to room 229 with MOD Erik Carpio in regards to possible damaged room by recent checked-out guest.  Upon arriving to the room, you can see bodily fluids stained on the wood floor, spread across the entire room in sections, as well as a couch inside the room.  You will also see a lot of used linen in various sections of the room as well.  Pictures

attached as evidence.

MS COMEY:  We can take that down.  Thank you.  And go back to 1406, page 9, row 23.

Q.  I want to take a look at the names column now.  What names are in this column?

A.  Jane, Combs, Paul, Reggie and Kabrale.

Q.  Starting with Jane and Combs, is the first exhibit for both of them the same?

A.  Yes.

MS COMEY:  Let's take a look.  Can we please pull up Government Exhibit A-104-40, pages 2 and 3 side by side.  Can you zoom in on the bottom left green text?

Q.  What's the date of this text?

A.  1/20/2023.

Q.  Is this a text from Sean Combs to Jane?

A.  Yes, it is.

Q.  Would you read it, please?

A.  The flights is $420, and this is an overnight rate.  You can Cash App $420 for the flights and the $680 deposit.  Total $1,100, $Cowboys4Angels.

Q.  How did Jane respond?  Let's look at the next page.

A.  She liked that message.

MS COMEY:  We can take this down.  Thank you.

Actually, I'm sorry, can we go back to that exhibit and go to page 5, Ms. Becker.

Q.   Could you just read the bottom text and tell us the date and time of it.

A.   Date and time is 1/21/2023, UTC time is 2:26:47, and the message reads:  Paul gonna meet us at 9:30.

Q.   Is that from Mr. Combs to Jane?

A.   Yes.

        MS COMEY:  Now let's go back to Government Exhibit 1406, page 9, row 23, and I want to look at the rest of the exhibits under Jane's name.

Q.   Is the rest of these with the prefix E references to materials from her iCloud?

A.   Yes.

        MS COMEY:  Let's pull up E-129-M and E-130-M side by side, please.  Could you pull up the M so we could look at the metadata, Ms. Becker?

Q.   While she's pulling that up, are these pictures of lingerie?

A.   Yes.

Q.   Let's look at the metadata.  Can you tell us, please, the dates when these were taken?

A.   Last modified date 1/21/2023.

Q.   For both of those?

A.   Yes.

        MS COMEY:  Let's go now please to Government Exhibit E-133-M.

Q.   What is this?

A.   It's a picture of Sean Combs.

Q.   What does the metadata show for when this was taken?

A.   Last modified date 1/21/2023.

        MS COMEY:  Let's go back to Government Exhibit 1406, page 9, row 23.

Q.   Looking at the next two exhibits cited underneath Jane's name, are they also cited under Kabrale's name and Paul's name, respectively?

A.   Yes.

Q.   And looking at the rest of the exhibits under Combs' name, are they also cited under Reggie's name and Paul's name, respectively?

A.   Yes.

Q.   We're going to walk through those now.  Let's start with Paul.

        MS COMEY:  Can we please pull up Government Exhibit G-102, pages 52 and 53.

Q.   Looking at the second message down on left, what's the date of that message?

A.   1/20/2023.

Q.   Are these text message between Sean Combs and Paul Arthur?

A.   Yes.

Q.   I want to read through these.  I will read Paul Arthur's texts in blue.  You please read -- or excuse me -- I will read

P6KQcom3                        Cerciello - Direct

Paul Arthur's texts in green, and you please read Mr. Combs'

texts in blue, starting with the second one on the left,

please?

A.  You in LA?

Q.  Yes.

A.  Cool.  Ima hit you later.

Q.  Cool.

A.  Yo.

MS COMEY:  Let's go now, please, to Government

Exhibit G-101, pages 8 and 9.

Q.  Looking at the top of this page, are these more text

messages between Paul Arthur and a different phone number for

Mr. Combs?

A.  Yes.

Q.  What's the date of these messages?

A.  The date is 1/21/2023.

Q.  I'll read Mr. Arthur.  You read Mr. Combs.

Which spot?

A.  The London.

Q.  Okay.

A.  How far are you?

Q.  15 mins.  Five mins away.

MS COMEY:  We can take that down, and now, please, go

to Government Exhibit G-103, pages 68 and 69.

Q.  Now are these messages between Paul Arthur and Jane?

P6KQcom3                          Cerciello - Direct

A.   Yes.

Q.   I'd like to look at the bottom left.  Is this from the same date as the messages we were just looking at between Mr. Arthur and Mr. Combs?

A.   Yes.  1/21/2023.

Q.   I'll have you read the blue messages, and I'll read the green messages.

A.   Hey P.  Just wondering if you were here yet.  If not, it's okay.  I need an sec anyways.

Q.   I'll be there in 25 mins.

A.   Okay.  Sure.

        MS COMEY:  We can take that down, and go to Government Exhibit 1406, please, page 9, row 23.

        Now let's look at what's cited for Reggie.  Let's go to Government Exhibit A-102, page 1.  If we could pull that up side by side with stipulation 1312, please.

        Looking first at the phone numbers at the top, let's find those numbers on the stipulation, please.  So if we could go looking at the number 954-234-7456.

Q.   Who is the individual user of that number?

A.   The name is Bridget Kreshover.

        MS COMEY:  Now let's go to the next page, please, and look at the user of the number ending in 3286.

Q.   Down close to the bottom.

A.   3286 is Sean Combs.

Q.  You said the first name was associated with Bridget
Kreshover?

A.  Yes.

MS COMEY:  Could we now please pull up, instead of the
stipulation on the right, Government Exhibit 3P-100.

Q.  What is this?

A.  This is a declaration of custodian of records.

Q.  What's the name of the declarant?

A.  Declarant is Bridget Kreshover.

Q.  Is that the same name we just looked at associated with the
phone number we were talking about?

A.  Yes.

MS COMEY:  Can you zoom out of that, please,
Ms. Becker.  Down at the bottom right, I'd like to zoom in on
the lines on the bottom right, please.

Q.  Could you read the name and title of declarant?

A.  Name is Brigitte Kreshover a/k/a Bridget Collins, sole
owner, CEO and manager.

Q.  Could you read the name of business, please?

A.  Cowboys4Angels as registered fictitious names of Collins
Productions LLC.

MS COMEY:  Let's go now to Government Exhibit 3P-120.

Q.  What's the title of this document?

A.  This is the application for registration of fictitious
name.

Q.   What is the fictitious name to be registered?

A.   Cowboys4Angels.

Q.   What is the owner of the fictitious name?

A.   The owner is Collins Production LLC.

Q.   Down at the bottom, can we see who signed this, please?

A.   Signed by Bridget Collins.

        MS COMEY:  Let's go back and look at the texts between Bridget and Mr. Combs in A-102 and start at pages 1 and 2 side by side, please.

Q.   What's the date of these texts?

A.   1/20/2023.

Q.   I'd like to read through these.  I'll read Bridget's and you read Mr. Combs.

        "He's available.  Three exclamation points with screenshots below.  Does this timeframe work for you?"

A.   "Great.  So can he be here by 9?"

        MS COMEY:  Let's go to pages 3 and 4, please.

Q.   "He's land at 11:25."

A.   "Can it be earlier?"

Q.   "He has a client earlier today."

A.   "LOL.  Damn, we don't want a tired situation.  LOL.  Feel me?"

Q.   Laughed at the previous text.  "Reggie is never tired."

        MS COMEY:  Let's go to pages 5 and 6, please.

Q.   Can you keep reading, please.

P6KQcom3                              Cerciello - Direct

A.  "Okay.  So how do we get it done?"

Q.  "The flights is $420, and this is an overnight rate.  You can CashApp the $420 for the flight, and the $680 deposit. Total $1,100.  $Cowboys4Angels.  Let me know when you sent it so I can verifies."

          MS COMEY:  Let's go now to pages 7 and 8, please.

Q.  Edited to "let me know when you have sent it, so I can verify.  I received the payment.  Flights are getting booked. The remaining balance is $2,720.  Where should he meet you when he arrives?"

A.  "What's that for?"

Q.  "Reggie.  Where should he arrive once he lands?  "

          MS COMEY:  Let's go to pages 9 and 10, please.

A.  "Is that the rate?"

Q.  "His overnight rate its $3,400.  You pay the 20 percent deposit so the remaining balance is $2,720.  If you want to Cash APP that too, you can, or cash is always great."

A.  "Okay.  What time does he land?"

          (Continued on next page)

BY MS. COMEY:

Q.  "He's landing at 11:25."

A.  "I'm pretty sure we're at the London, so what time would he be getting to us?"

MS. COMEY:  Let's go to pages 11 and 12.

Q.  "In West Hollywood, he would be there about 12:30."

A.  "OK.  Send me his number.  We're going to go out, so like 2 a.m."

Q.  "He's reaching out."

A.  "OK."

Q.  Now, Agent Cerciello, is the reference to the name Reggie that we saw in this text exchange the reason that it is cited under the name Reggie in the chart?

A.  Yes.

MS. COMEY:  Let's go back to the chart, please, back to 1406, page 9, row 23.

In row 23 the last name is Kabrale.  Let's take a look at what's cited underneath there.  Can we please up Government Exhibit F-101, and we'll just look at pages 222 and 223 side by side, please.

Q.  Are these texts between Jane and Kabrale?

A.  Yes.

Q.  I'll ask you to read Kabrale's messages, and I'll read Jane's messages.  But first, would you please tell us the date?

A.  Date is 1/20, 2023.

Q.   Would you please read the green messages?

A.   "What's up beautiful?  I'm in L.A. until the 24th."

Q.   "Hey, good morning," smiley face.  You're in town...are you awake?  London hotel.  LMK when you're on the way.  I'll give you the info."

A.   "OK.  Bet, love.  I'll be OTW in about 30 minutes."

Q.   "Sounds good," smiley face.

A.   "Just ordered my Uber, love."

        MS. COMEY:  We can take that down and go back to Government Exhibit 1406, row 23, please.

        Now let's look at flight records.

Q.   What is in flight records here?

A.   There's a flight record for Paul on January 19, American Air Lines.

Q.   And then what's the next entry?

A.   It's a text about Reggie from Combs to Jane.

Q.   And is that quoted there?

A.   Yes.

Q.   And then what about Kabrale?

A.   And then Kabrale has a Spirit Airlines flight dated 1/18.

        MS. COMEY:  All right.  Now let's go to financial, please.

Q.   What's in the financials column for this row?

A.   Financial record for Paul, 1/24, $900 cash deposit.

     On 1/25 a $600 cash deposit.

For Reggie, there are CashApp screenshots.  And no records for Kabrale.

MS. COMEY:  And let's take a look at Paul's.  Can we please pull up Government Exhibit 4E-101, page 1336 and 1335.

Sorry.  Can we get 1335 on the left and 1336 on the right.

Q.  What kind of record is this?

A.  These are bank records from Chase -- J.P. Morgan Chase bank.

Q.  And what name is the account, if you look at the top left?

A.  Arthur Fitness LLC.

MS. COMEY:  Now I want to look at the right, and I want to look under deposits and additions.  Can we zoom in there, please.

Q.  Can you tell us what deposits were made into this account on January 24 and January 25?

A.  January 24, there was an ATM cash deposit in Los Angeles in the amount of $900.

On January 25, there was a ATM cash deposit in Los Angeles in the amount of $600.

Q.  Now, to be clear, do these records tell you where this cash came from?

A.  No.

Q.  So all you can say is cash was deposited into this account days after the date range indicated in row 23 of 1406?

A.   Yes.

MS. COMEY:  Let's go back to Government Exhibit 1406, page 9, row 23, please.  The last in financials with records referenced is Reggie.  Let's take a look at the screenshot. Can we pull up Government Exhibit A-104-40B.

Q.   And can you just read for us what it says in the middle underneath the green check?

A.   "You sent $1,100 to C4A."

MS. COMEY:  Now let's go back to Government Exhibit 1406, page 9.

Q.   For Kabrale it says no records located.  Does that necessarily mean Kabrale received no money in this date range, or does it just mean the records you reviewed showed no indication of him receiving money?

A.   It just means that I wasn't provided records that showed a financial transaction.

MS. COMEY:  I want to look at one more example here. Let's go to 1406, page 11, row 29, please.

Q.   Looking at row 29, what's the date?

A.   4/24, 2023, to 4/25, 2023.

Q.   What's the location?

A.   The London hotel, Los Angeles, California.

Q.   And what does it say underneath the room number?

A.   Frank Black, room 917, damage.

MS. COMEY:  Let's look at Government Exhibit 7J-118,

P6kWcom4                          Cerciello - Direct

pages 1 and 2 side by side, please.

Q.   What's the name of the hotel?

A.   The London West Hollywood.

Q.   What's the guest name?

A.   Frank Black.

Q.   What's the arrival and departure date?

A.   Arrival 4/24, 2023, departure 4/25, 2023.

          MS. COMEY:  Now if we could zoom back out, please, I want to look at the right-hand side.

Q.   What charge was added on April 26, 2023?

A.   April 26, 2023, damaged linen.

Q.   How much was that charge?

A.   $1,261.

Q.   And what charge was added the next day, on April 27?

A.   April 27, 2023, damaged furniture.

Q.   For how much?

A.   $1,800.

Q.   What was the total charge for this stay?

A.   $5,564.46.

          MS. COMEY:  Let's go now, please, to 7J-118-A, pages 1 and 2 side by side, please.

          I may have given you the wrong cite.  I apologize.

          Go ahead and take that down.  And let's go to 7J-118B. And can you pull up pages 1 and 2 side by side.

Q.   What kind of report is this?

P6kWcom4                        Cerciello - Direct

A.   This is a security incident report from the London hotel.

Q.   And when it says type of report, what does it say?

A.   Damage report.

Q.   What's the date of the incident report?

A.   4/24, 2023.

Q.   And what's the guest's name?

A.   Sean Combs.

Q.   Would you please read what's written in the report?

A.   "Room 917, linens, and smoking in the room.  The towels in room 917 appear to have been soaked in baby oil.  The towels have permanent stains on them.  The baby oil is on the carpet as well.  There is also evidence of smoking in the room."

        MS. COMEY:  Let's go now, please, back to Government Exhibit 1406, page 11, row 29, and I want to look at the names column.

Q.   What names are in this column?

A.   Jane, Combs, Paul.

        MS. COMEY:  Let's read through the exhibits cited.  Can we please pull up Government Exhibit A-442-12, pages 58 and 59.

Q.   What's the date of these texts?

A.   4/25, 2023.

Q.   Are these texts between Mr. Combs and Jane?

A.   Yes.

Q.   I'd like to read through them, please.  Would you please

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

read Mr. Combs's green bubbles.  I'll read Jane's blue bubbles.

A.  "I'm on way up.  What's number."

Q.  "IDK.  Have us now.  I should have washed them, but we were at house.  OK.  I'm CHA space N 917 Chavez."

MS. COMEY:  We can take that down.  And back to Government Exhibit 1406, page 11, row 29, please.

Q.  Is the next entry under Combs's name the same entry under Paul's name?

A.  Yes.

MS. COMEY:  Let's take a look.

Please pull up Government Exhibit G-102, and we'll go to pages 91 and 92 side by side, please.

Q.  Are these more text messages between Paul Arthur and Sean Combs?

A.  Yes.

Q.  OK.  I will read Paul Arthur in the green bubbles and you read Mr. Combs in the blue bubbles.  But, first, what's the date?

A.  Date is 4/25, 2023.

Q.  Paul Arthur says:  "OK."

A.  "We're at the London."

Q.  "OK."

A.  "How long?"

Q.  "20 mins."

A.  "RM 917, Chavez."

P6kWcom4                          Cerciello - Direct

MS. COMEY:  We can take that down.  Thank you.  And let's go back, please, to Government Exhibit 1406, page 11, row 29.

Q.  What is in the financials column?

A.  Says Combs, 5,000 PD personal 4/24 London, Faheem.

MS. COMEY:  Let's pull up --

Q.  Well, first, what is the government exhibit cite?

A.  Government Exhibit J-141, page 1.

MS. COMEY:  Can we please pull up Government Exhibit stipulation 1301, page 4, and I'd like to look at paragraphs 24 and 25, please.

"On or about September 17, 2024, in the vicinity of Atlanta, Georgia, HSI seized the GX J100, a cell phone from Faheem Muhammad's person.

"Government Exhibits GX J100-A through J143, including the subdivisions thereof, are true and accurate excerpts of data extracted from GXJ100."

Let's go to Government Exhibit J-141, please, just page 1.  And can we zoom in on that box, please.  Just the first two.  That's fine.

Q.  What's the created date?

A.  4/25, 2023.

Q.  And what's the source in the second column?

A.  Notes.

Q.  And would you please read the second line down under body?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6kWcom4                         Cerciello - Direct

MS. GERAGOS:  Your Honor, can we please have a sidebar and take this down, please?

THE COURT:  Let's take it down for a second.

(Continued on next page)

(At sidebar)

MS. GERAGOS:  I have to take some personal responsibility here because this was on the list Ms. Comey had sent me the past two days, but I missed that your Honor sustained our objection, I believe, to the specific exhibit.

MS. SLAVIK:  If I recall correctly, your Honor, the exhibit that was offered as J141 is, like, a 25-page-exhibit of several different Notes from Faheem's phone.  And so my understanding was what this was an excerpt of is just one note that Ms. Comey is trying to offer.

THE COURT:  What's the objection?

MR. DRISCOLL:  Still have lack of foundation objection.

THE COURT:  When does this objection come up?  This is something that has to be raised in advance, because we're at a sidebar.  I don't recall this specific --

MR. DRISCOLL:  It was at the end of the day on the 12th, your Honor.

THE COURT:  OK.

MR. DRISCOLL:  To J141.

MS. SLAVIK:  Your Honor, I believe the foundation has been laid.  The stipulation that Ms. Comey read indicates that the note was taken from Faheem's phone, stipulated to be a true and accurate record from Faheem's phone.  So I think the foundation has been laid, and it is an authentic document from

Faheem's phone.  And I think the testimony from other witnesses, including just now, Brendan Paul, indicate that Faheem was in charge of distributing Mr. Combs's cash and often brought cash to Mr. Combs.

THE COURT:  Let me ask you this question.  Whether or not there was a sustained objection before, what is the objection now, given what Ms. Slavik just said?

MR. DRISCOLL:  Hearsay, your Honor.

THE COURT:  OK.  Why wouldn't it fall into the, why is it not hearsay because of 801(d)(2)(D)?

MR. DRISCOLL:  Because we haven't heard any testimony as to what these notes are or why they were made.  So for the government to argue that they're just statements of an agent, that foundation hasn't been laid.

THE COURT:  Why wasn't this identified when the summary chart that has been admitted into evidence references this specific exhibit?

MS. GERAGOS:  That was my fault, your Honor.  This is why I started this objection by saying that I missed this.  I completely missed this.

MR. DRISCOLL:  Your Honor, I also think at the time of your ruling on Thursday we didn't have the final version of the chart --

THE COURT:  That would have been several days --

MR. DRISCOLL:  -- rulings that have been incorporated

P6kWcom4                          Cerciello - Direct

into the chart.

MS. SLAVIK:  Your Honor, I think it clearly comes in as an agent statement, at the very least.  There's been plenty of testimony that Faheem worked as Mr. Combs's agent, and he was responsible for maintaining Mr. Combs's cash.

THE COURT:  And what is the document.

MS. SLAVIK:  The document is a note from Faheem's phone indicating that he delivered cash to Mr. Combs at the London hotel on the date of this hotel night with Jane.

MS. COMEY:  And the specific entry, your Honor, is $5,000, PD personal, 4-24 (London-Faheem).  That and the date are all I'm putting in.  That's it.

THE COURT:  That's all you're putting in.

MS. COMEY:  That's all I'm putting in.  I will redact everything else if the defense wants me to.

THE COURT:  All right.  So I think that for the reasons stated by Ms. Slavik, the objection is overruled as to that specific portion.  In any event, I think at this point it's been waived.

MS. COMEY:  And your Honor, I will not pull the exhibit back up, given that I've agreed to redact, and we'll just pull it up for the witness and have him read that portion.

THE COURT:  All right.  Very good.

(Continued on next page)

(In open court)

THE COURT:  Ms. Comey, you may proceed.

MS. COMEY:  Thank you.

Ms. Becker, can you please just pull up for the witness the exhibit we were just looking at so that we can just focus in on the one specific line that is cited in the chart.

And if you could, for the witness, zoom in.

Q.  And so you had said that this was dated April 25, 2023, is that right, Agent Cerciello?

A.  Correct.

Q.  And is the source Notes?

A.  Yes.

Q.  And the only thing I'd like you to read, please, is the second line, nothing else, under body, starting with $5,000.

MS. COMEY:  No, no, no.  The one right above the one that just got highlighted.  Thank you.

A.  "$5,000, PD, personal, 4/24, London-Faheem."

MS. COMEY:  Thank you.  We can take that down.

And now I'd like to take a look at an example of a row that does not have a hotel listed.  Let's go to Government Exhibit 1406, page 16, row 44, please.

Q.  What is the date of this row?

A.  6/18, 2024, to 6/19, 2024.

Q.  What is the location?

A.  Location is Jane residence, California.

MS. COMEY:  I want to look at the cite for that.  Can we please pull up Government Exhibit J-124-D, page 4.

Q.  Are these text messages between Jonathan and Faheem?

A.  Yes.

Q.  What is the date?

A.  6/18, 2024.

Q.  And I'm going to read the second text message.  Does it read:  "Hi, Fah.  We need $600 for Phil ASAP, please.  We are out, and PD is about to go to Jane's house"?

A.  Yes.

Q.  And did Jonathan send that?

A.  Yes.

Q.  And who did he send that to?

A.  Faheem Muhammad.

Q.  And what date and time did he send that?

A.  That was on 6/18, 2024, 9:35:32 p.m. UTC time.

Q.  So would that be approximately 2:35 p.m. California time on June 18?

A.  Correct.

MS. COMEY:  Let's look now at Government Exhibit J-122, page 1, please.

Q.  Now, without reading it, can you tell us, please, who are the participants in this text chain?  Without reading the texts, just tell us who the participants are.

A.  K.K. and Faheem Muhammad.

Q.   And then in between those two, is there also jperezmpr@gmail.com?

A.   Yes, there's an email address.

          MS. COMEY:  Let's take that down, and let me look at the top text here.

Q.   What's the date and time of this text?

A.   6/19, 2024.

Q.   What time?

A.   Sorry.  1:13:15 a.m.

Q.   In what time zone?

A.   UTC.

Q.   So would that be about 6:13 p.m. California time on June 18?

A.   Yes.

Q.   I'll read this.  And is this from JPérez to Faheem?

A.   Yes.

Q.   So JPérez writes:  "Me and PD en route to," and then he writes a location.  Do you see that?

A.   Yes.

          MS. COMEY:  Let's go now, please, to Government Exhibit 3R-121.

Q.   Is this Jane's identification?

A.   Yes, it is.

Q.   And looking under her true name, do you see an address?

A.   Yes.

Q.  And does that address include the language of the location that we just saw in the text that JPérez sent to Faheem on June 18?

A.  Yes, it does.

MS. COMEY:  OK.  We can take that down.  Thank you.

And let's go back to Government Exhibit 1406, page 16, row 44.  I'd like to look at the next column.

Q.  Are the texts that we just looked at from the J series cited underneath Jane's name?

A.  Yes.

Q.  And are they also cited under Combs's name?

A.  Yes.

Q.  And are there also images and videos from Jane's iCloud cited underneath both of Jane and Combs's names?

A.  Yes.

MS. COMEY:  Let's look at a couple examples.

Ms. Becker, would you please pull up side by side Government Exhibit E-249-M and E-253-M.  And can we zoom in on the times, please.

Q.  So what date was this taken?

A.  Last modified date 6/18, 2024.

Q.  And on the other side?

A.  Last modified 6/18, 2024.

Q.  Is that time in UTC?

A.  Yes.

P6kWcom4                          Cerciello - Direct

Q.   And if we take that down and just look at the photos, does it look like the sun's still out in those photos?

A.   Yes, it does.

MS. COMEY:  Let's go back to Government Exhibit 1406, page 16, row 44, please.

Q.   Who is the third name --

MS. COMEY:  On page 44 -- excuse me.  Page 16, line 44.  My apologies, Ms. Becker.

Q.   In line 44, who is the last name?

A.   Antoine.

MS. COMEY:  Let's take a look at what's cited here.

Let's start with Government Exhibit 3R-123, please, and put it side by side with Government Exhibit 1312.

Q.   On the left, does that appear to be a screenshot of a contact?

A.   Yes, it does.

Q.   And does that have a phone number ending in 1143?

A.   Yes.

MS. COMEY:  On the right, let's look in the stipulation for that same phone number.  Go to the next page, please.

Q.   Now, down at the bottom, third from the bottom, is that the same phone number in the contact?

A.   Yes.

Q.   What's the name associated with the user of that phone

number?

A.   Shamel Douglas, a/k/a Antoine.

          MS. COMEY:  And now let's go to the third record cited under Antoine's name.  Let's go, please, to Government Exhibit 5C-361, and I'd ask, Ms. Becker, that you sort this record by date.

Q.   What type of record is this?

     Is it a phone record?

A.   Yes.

Q.   And for which phone number?

A.   213-776-1143.

Q.   And is that the same number that we just saw associated with Shamel Douglas, a/k/a Antoine?

A.   Yes.

          MS. COMEY:  And I'd like to go now down, please, to rows 127 through 129.  Can we highlight those row, please.

          Ms. Becker, is this sorted by date?  Sorry.  Can we unhighlight those, and Ms. Becker, would you mind, please, sorting this by date.

          OK.  Now we've highlighted rows 127 through 129.

Q.   What is the date of these entries in these phone records?

A.   6/19, 2024.

Q.   And is the time Pacific Coast time?

A.   GMT time.

Q.   GMT minus 7?

P6kWcom4                         Cerciello - Direct

A.  Yes.

Q.  So California time?

A.  Yes, ma'am.

Q.  And what is the time entry for rows 127, 128 and 129?

A.  For 127, the time is 4:17:19.

    For 128, it's 4:26:33.

    And for 129, it's 5:19:42.

Q.  And without saying the number out loud, do you see the number that Antoine's phone is in touch with for each of those calls?

A.  Yes.

        MS. COMEY:  Let's take a look at that number and then go back, please, to Government Exhibit 1312.  And I'd like to look for Jane's name, please.

Q.  Do you see at the bottom of the second page Jane's name?

A.  Yes.

Q.  Is that the same phone number we just saw in the records in the early morning hours of June 19, 2024?

A.  Yes, it is.

        MS. COMEY:  We can go back now to Government Exhibit 1406, page 16, row 44, please.

        And this is the last thing I'll ask you to do for the day, Agent Cerciello.  Let's take a look at the financials column.

Q.  Can you tell us what you see in the financials column?

A.   Under the name Combs, on 6/19, Jonathan Pérez texts Faheem Muhammad:  "Fah, he's asking me to bring him his cash.  He wasn't sure how much you were holding for him.  He said he thinks 10."

On 6/20, Jonathan Pérez texts Faheem Muhammad:  "Hi, Fah. Putting PD on this text with us.  Need $3,500 cash ASAP for his guest.  I'm going to take it to her."

MS. COMEY:  Let's just take a look at those exhibits.

Could you please pull up Government Exhibit J-144, pages 1 and 2.

Q.   Starting in that gray box on the left, who are the participants in this conversation?

A.   Participants are, an email for Faheem; phone number for Jonathan, assistant; K.K.; and a phone number for Faheem Muhammad.

Q.   And what's the date of these messages?

A.   6/19, 2024.

Q.   And who sends this first message?

A.   That would be K.K.

Q.   To who?

A.   Faheem Muhammad.

Q.   And what does K.K. write?

A.   "Hi.  Can someone go pick up PD ASAP, please."

Q.   What's the date and time of that message?

A.   Date is 6/19, 2024, at 4:22:26 p.m. UTC.

Q.   So would that have been the morning on June 19 in California?

A.   Yes.

          MS. COMEY:   Let's go to the next page.

Q.   Does Jonathan then like that message from K.K.?

A.   Yes, he does.

Q.   And then what does Jonathan write next?

A.   "Fah, he's asking me to bring him his cash.  Is at house?  He wasn't sure how much you were holding for him.  Said he thinks 10.  Let me know.  I'm going to head out shortly."

Q.   And was that text also sent in approximately the morning of June 19, 2024?

A.   Yes.

Q.   And how did Faheem respond in the next green bubble?

A.   "Robin never gave us the cash.  She said it was too late.  We left that day but will get more dropped off today.  We don't have more on hand but trying to get more now."

          MS. COMEY:   And finally, let's please pull up Government Exhibit J-120, pages 1 and 2.

Q.   Who are the participants in this?

A.   It's a email for Faheem; a phone number ending in 2133; an email for JPérez; and a phone number for Faheem Muhammad.

Q.   And what's the date of the first text?

A.   6/20, 2024.

Q.   At what time?

P6kWcom4                    Cerciello - Direct

A.   11:36:44 p.m. UTC.

Q.   So would this have been the afternoon of June 20 in California?

A.   Yes.

Q.   What did JPérez write to Faheem?

A.   "Hi, Fah.  Putting PD on this text with us.  Need $3,500 cash ASAP for his guest.  I'm going to take it to her.  Let me know how to get it."

Q.   And then on the next page -- excuse me.

     At the bottom of that page, how does Faheem respond?

A.   "Copy.  I can give it to you now."

Q.   And then how does Pérez respond?

A.   "Can you leave it in an envelope with security, and I'll come grab it in a little and take to her.  Thank you."

Q.   And then what does Faheem say?

A.   "OK."

          MS. COMEY:  Your Honor, I think this is a good stopping point, since we're ending early today.

          THE COURT:  All right.  Very good.

          Thank you, members of the jury.  Have a great weekend.

          I'm going to give you the same instructions that I always give, which is do not speak with each other about the case.  Do not speak with anybody else about anything having to do with the case, and do not look up or watch anything or read anything concerning this case or anything about it.

Case 1:24-cr-00542-AS   Document 598   Filed 12/19/25   Page 192 of 199   6969

P6kWcom4                    Cerciello - Direct

With that, have a fantastic weekend.  We'll see you here on Monday.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6kWcom4

(Jury not present)

THE COURT:  Thank you very much.  We'll see you here on Monday.

(Witness not present)

THE COURT:  Please be seated.

All right.  Anything further before we adjourn?

Well, let me ask, Ms. Comey.  How much left do you have on direct?

MS. COMEY:  Your Honor, I have one very big chart to go through after this that might take a couple hours.  So I think I might take up to the lunch break on Monday.  And having conferred with Ms. Geragos, she might take us through the end of the day.  So I think we'll hopefully rest at the end of the day on Monday.

THE COURT:  Then we can plan to go through the rest of the government's case on Monday and then have Rule 29 arguments after that, and we can hopefully knock those out on Monday.

MS. COMEY:  That's right, your Honor.

It would be helpful for us to have a sense of what's coming in the defense case so that we can raise any issues for your Honor over the weekend.

THE COURT:  All right.

Mr. Agnifilo.

MR. AGNIFILO:  Yes, Judge.

I expect our defense case is going to be on the

shorter side even than what I estimated earlier in the week. So what we will do is, we have the weekend, we'll solidify a few things we have to discuss internally, and I think we can give the government probably a 100 percent, you know, view, you know, sometime over the weekend.  And we will.

And we will -- one of the things, just looking forward to what the Court has to do, I think that by, if we end the government's case and we have the Rule 29 on Monday, I think we would be fully rested Tuesday or Wednesday.  So I'm giving that sort of hedge room.  As that becomes clear to us, we'll tell the government.  We'll also tell your Honor, because I know your Honor's working on -- you said you were going to start drinking Celsius to try and get the jury charge in.

THE COURT:  I'm going to give you back the charge today.

MR. AGNIFILO:  Right.

THE COURT:  The question is how much time the parties will need to review that.

MR. AGNIFILO:  Right.  Right.

So once we sit with that and we sit with a few other issues, we'll be back in touch with the government and the Court, and I think we'll be able to be more specific even than we have been about what the Court and the government can expect from us next week.

THE COURT:  Yeah.  And just to put on your radar,

P6kWcom4

you'll see this in an email that you'll get maybe in a couple of hours, but my thought was if I send you the proposed charge right now, today at some point, then if the parties could get me back the charge with their edits by Tuesday evening, then we would be in a position to have our charge conference Wednesday after we adjourn for the day.

Does that seem to fit with your thinking currently about the length of the case?

MR. AGNIFILO:  Yes, it does.

THE COURT:  All right.  And then we would have closing arguments on Thursday, potentially.

MR. AGNIFILO:  Yes.  And if there's any shifting in that, I'll let everyone know immediately.

THE COURT:  All right.  Very good.

Then we'll proceed on that basis.  That's very helpful.

Ms. Comey, anything else before we adjourn?

MS. COMEY:  No.  Thank you, your Honor.

THE COURT:  Mr. Agnifilo.

MR. AGNIFILO:  I'm not sure.  I can ask the marshals. I don't know if we had any success with the favor I asked of the Court.

THE COURT:  Yes.  I think you are OK to use the courtroom until 2:30.

MR. AGNIFILO:  That's great.

P6kWcom4

THE COURT:  All right.

MR. AGNIFILO:  Thank you so much.

THE COURT:  All right.

MR. AGNIFILO:  Really appreciate it.

THE COURT:  Very good.

Mr. Donaldson, I've made an inquiry with the MDC to see what the situation is with the minutes, but you should keep asking on your end.

MR. DONALDSON:  Yes.

THE COURT:  And if it becomes immediate, put in a letter application, and if we haven't received an answer and it becomes an urgent situation, then I'll order what I need to.

MR. DONALDSON:  I appreciate it.  Thank you.

THE COURT:  All right.

With that, have a great weekend, everybody.

MR. AGNIFILO:  Thank you, Judge.

THE COURT:  Were you going to jump up to say something else, Mr. Donaldson?

MR. DONALDSON:  No.  I'm just stretching.

THE COURT:  All right.

OK.  Have a great weekend, everybody.

(Adjourned to June 23, 2024, at 8:30 a.m.)

INDEX OF EXAMINATION

Examination  of:                                        Page

BRENDAN PAUL

Direct By Ms. Slavik . . . . . 6792
Cross By Mr. Steel . . . . . . 6854
Redirect By Ms. Slavik . . . . 6882

JOSEPH CERCIELLO

Direct By Ms Comey . . . . . . 6908

GOVERNMENT EXHIBITS

Exhibit No.                                          Received

 3D-118-A, 3D-120-B, 3D-130-AR,  . . . . . . .6789
          5A-204-3, 6G-116 SEALED,
          6G-117 SEALED, 6K-101, 6L-102,
          A-102, A-103, A-103-A,
          A-103-B, A-104-35 SEALED,
          A-104-5-A, A-106-A, A-111,
          A-112, A-112-A, A-112-B,
          A-112-C, A-112-D, A-112-E,
          A-112-F, A-116-A SEALED,
          A-116-A1, A-116-A2, A-116-A3,
          A-120-A, A-121-A, A-121-A1,
          A-121-A2, A-121-A3, A-121-A4,
          A-121-A5, A-121-A6, A-122,
          A-124, A-138-41, A-141
          (excerpted p. 41, 56-76,
          234-38, 242-43) SEALED,
          A-141-A, A-141-B, A-141-C,
          A-141-D, A-141-E, A-141-F,
          A-141-G, A-141-H, A-141-I,
          A-141-J, A-141-K, A-141-L,
          A-141-M, A-141-N, A-141-O,
          A-141-P, A-141-Q, A-141-R,
          A-141-S, A-159 (excerpted to
          p. 5-12, 32, 34-40, 43, 47-52,
          56-61, 75-77, 82, 86) SEALED,
          A-159-B, A-159-C, A-159-D,
          A-159-E, A-159-F, A-159-G,
          A-159-H, A-159-I, A-159-K,
          A-159-L, A-159-M, A-159-N,
          A-159-O, A-159-P, A-159-Q,
          A-159-R, A-159-S, A-159-T,
          A-159-U, A-159-V, A-159-W,

A-159-X, A-166 (excerpted to p. 2, 9-10, 52-55, 59-64, 86) SEALED, A-166-F, A-166-G, A-166-H, A-166-I, A-166-J, A-166-K, A-168 (excerpted to p. 5, 63, 66-67, 71, 79-87, 117-23, 134-35) SEALED, A-168-A, A-168-B, A-168-C, A-205, A-205-A, A-207-D SEALED, A-207-E SEALED, A-207-G SEALED, A-209-B, A-209-B1, A-210-A, A-210-A1, A-210-A2, A-210-A3, A-210-A4, A-210-A5, A-210-B, A-210-B1, A-301-L SEALED, A-407, A-426, A-430-A, A-510-A SEALED, A-510-F SEALED, A-513 SEALED, AX-102-G SEALED, AX-102-S SEALED, AX-701-114 SEALED, AX-701-145 SEALED, C-229 (excerpted to p. 6) SEALED, C-231 (excerpted to p. 20-21) SEALED, C-621, C-621-A, C-621-B, C-621-C, C-621-D, C-622-2, C-627-1, C-647, C-648-1 SEALED, C-648-2 SEALED, E-334 SEALED, EX-173 SEALED, EX-173-M SEALED, EX-176 SEALED, EX-176-M SEALED, F-101-A SEALED, G-101-AF, G-104 SEALED, G-106, G-107, J-106-L, J-106-O, J-106-P, J-108-I, J-110-B, J-110-B1, J-112-A, J-112-B, J-112-K, J-112-L, J-112-M, J-113, J-114, J-116, J-118-A, J-120, J-123, J-124-B, J-124-D, J-141-A (only p. 1), J-304-A, J-307 (only p. 129-130), J-314 (only p. 75-78), J-314-A

3D-126 (sealed) 3D-126-R . . . . . . . . . .6791
3D-107-B, 3D-108-A, 3D-112-A, 3d-114-A, . . .6792 3D-123-A, 3D-123-B, 3D-129-B, 3D-130-A
J-122 and J-122R . . . . . . . . . . . . . .6792
3G-105; 3G-107; 3G-108; 3G-111; . . . . . .6805 3G-112, sealed; 3G-112-R; 3G-113; 3G-116; 3G-118, sealed; 3G-118-R; 3G-119;

3G-123; 3G-126; 3G-127;
3G-129; 3G-133; 3G-135;
3G-136, sealed; 3G-136-R;
3G-137; 3G-142; 3G-149;
3G-149; 3G-154, and 3G-157

3A-158   . . . . . . . . . . . . . . . . . .6808

1B-288 and 1B-289   . . . . . . . . . . . . . .6809

2A-508   . . . . . . . . . . . . . . . . . .6823

1C109   . . . . . . . . . . . . . . . . . .6851

A-134; A-134-A; A-134-B; A-134-C;  . . . . . .6889
A-137; A-137-A; A-137-B;
A-137-C; A-415; A-416-A;
A-416-B; A-416-C; A-430-E;
A-430-E1; A-430-E2; A-432;
A-515-A; A-515-A1; A-515-A2;
A-515-A3; A-516-A; A-551;
A-926; C-271-A, sealed;
C-271-A-R; C-271-A1, sealed;
C-271-A2, sealed; C-271-A3,
sealed; C-271-A4, sealed;
C-271-A5, sealed; C-271-A6,
sealed; C-271-A7, sealed;
C-271-A8, sealed; C-271-A9,
sealed; C-271-A10, sealed;
C-626-5, sealed; C-626-5-R;
C-626-7 and H-110
1406, 1408 and 1409   . . . . . . . . . . . .6912

DEFENDANT EXHIBITS

Exhibit No.                                  Received

3330, 1748 (sealed) 1748-R, 1794  . . . . . .6791
(sealed), 1794-R, 3080-R,
3082, 3083, 3084, 3088-A,
3093, 3094, 3100, 3106,
3106-A, 3127, 3130, 3136,
3137, 3145, 3152, 3171,
3171-A, 3172, 3191, 3206-B,
3288, 3306-M, 3311, 3311-M,
3328