UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

v.                          24 Cr. 542 (AS)

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

                Defendant.            Trial

------------------------------x

                                      New York, N.Y.
                                      June 24, 2025
                                      8:45 a.m.

Before:

                HON. ARUN SUBRAMANIAN,

                                      District Judge
                                      -and a Jury-

                      APPEARANCES


JAY CLAYTON
        Interim United States Attorney for the
        Southern District of New York
BY:  MADISON R. SMYSER
        EMILY A. JOHNSON
        MAURENE R. COMEY
        MEREDITH FOSTER
        MITZI STEINER
        MARY C. SLAVIK
        Assistant United States Attorneys

APPEARANCES CONTINUED

AGNIFILO INTRATER LLP
     Attorneys for Defendant
BY:  MARC A. AGNIFILO
     TENY R. GERAGOS
     -and-
HARRIS TRZASKOMA LLP
BY:  ANNA M. ESTEVAO
     -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
     JASON A. DRISCOLL
     -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:  Lucy Gavin
               Shannon Becker
               Paralegal Specialists
               Raymond McLeod, Paralegal

(Trial continued; jury not present)

THE COURT:  Are there any pending objections or have the parties worked them out?

MS. JOHNSON:  Your Honor, the parties do have objections to raise to the documents that Ms. Estavao sent to the Court last night.  There is one we are still discussing, but I would suggest that we start with 1054, 1136-R --

THE COURT:  With 1026, is there any objection?

MS. JOHNSON:  Yes.

THE COURT:  To which part?

MS. JOHNSON:  Give me one moment.  I sorted them in order of objections.

THE COURT:  We can do it in a different order if that's easier.  You said 1054?

MS. JOHNSON:  Yes 1054, 1136-R and 1149 all have the same type of objections, so I thought it might be easier to address them together.

THE COURT:  All right.

MS. JOHNSON:  These are explicit messages sent from Ms. Ventura to Mr. Combs about wanting to engage in sex acts with Mr. Combs.  The government objects on the basis that these are cumulative.  There is ample evidence in the record, and undisputed at that, that Ms. Ventura wanted to have sex with Mr. Combs.  There have been many messages of the same ilk read into the record already, some more than once, and additional

number of messages with the same type of texting.

It's cumulative, and I don't think it's probative particularly on an issue that is not in dispute. And I note that I think the defense will say that these are before alleged freak-offs, but I don't think that's clear from the face of these documents, and the chart that the government put in is, you know, was severely restrained to be just a list of names and places and cities at which people might have been together. So that is the nature of the objection on these three documents.

THE COURT: On a prior evidentiary dispute, I remember that the government's position was that the intent or mindset of the alleged victims was relevant to, among other things, the issue of coercion. If that's true, then why wouldn't messages from the alleged victims that, in the defense's view at least, indicate voluntary sexual conduct or desire, why wouldn't that be relevant for the same reasons; meaning, that goes to the probative issue. I understand what you're saying on whether it's cumulative or not.

MS. JOHNSON: These are all about Ms. Ventura sending explicit messages to Mr. Combs about sex acts she wants to perform with Mr. Combs. That is an issue that is just not in dispute. She testified to that multiple times on direct examination. She testified that the only thing she looked -- the only part of this event that she liked was being able to

see her boyfriend and being able to be intimate with her boyfriend, just as Jane testified.

THE COURT:  Understood.  Why don't we start with 1054, Ms. Estavao.  You're addressing these or Ms. Geragos?

MS. ESTAVAO:  With respect to 1054, this was the day before a freak-off that's listed in the government's summary chart, row 42.  So the idea that it's somehow disconnected from a freak-off is incorrect.  And so the fact that she is engaging in this kind of sexually explicit communications right before they have a freak-off the day before, or day of in some of these instances, is highly probative.  And obviously the issue of force, fraud, or coercion is highly contested and in dispute.  And the fact that Mr. Combs was receiving these messages and these sexts from her the day before in close relation bears on his mental state.

MS. JOHNSON:  Your Honor, there is nothing about these messages that makes it more likely than not that Ms. Ventura wanted to have sex with another man other than Mr. Combs.  They are explicit on their face that that is what they are limited to.

THE COURT:  Well, Ms. Estavao, can you provide the context here.  So you indicated there was one of the alleged sex trafficking incidents that followed these messages.  Just remind me of the date on the government's view of that incident.

MS. ESTAVAO:  I don't think every single date on the government's chart has been fully fleshed out.  However, the obvious implication from the chart is that these are all sex trafficking events.  So row 22 is the government cited evidence of communications between Ms. Ventura and one of these entertainers on that date -- I'm sorry, I'm going to row 42 on February 26 of 2014 and Exhibit 1054 is on February 25 of 2014, the day before, and the government is free to make the argument to the jury in summation that these kinds of messages were supposed to indicate to Mr. Combs that in fact she only wanted to have sex with him and did not want to have sex in the manner in which they consistently had sex over the years, and they can do that.  However, we're entitled to argue that Mr. Combs heard these messages in the context of their sexual relationship and took that to mean that she was voluntarily participating and excited about it.

THE COURT:  Well, I mean, I'm looking at the message, and the message from Mr. Combs which is on 1054.2 is about having a sexual encounter in his office.  So how could that be connected to any of the sex trafficking incidents that are at issue, and then the ensuing conversation is about having that encounter with Mr. Combs which does not appear to be connected to any sex trafficking incident or any freak-off, hotel night, king night, anything like that.  So on the face of the message, it's clear what it refers to, which is the message on 1054.2,

and then there's an ensuing conversation about that.

MS. ESTAVAO:  The time period alone suggests that they're related.  They obviously -- or not obviously -- but according to the government's chart, there was a hotel that was procured the day afterwards so they're connected in that way.

THE COURT:  And the time Ms. Johnson has indicated here is in UTC time, is that right?

MS. JOHNSON:  It is in UTC time, your Honor, and -- I'm trying to find -- yes, it is in UTC time.  So this would be roughly starting at 11:00 a.m. the day before, and the other two messages I will note are not nearly as close in time to any dates on the government's chart, which I also note the government does not intend to argue that every entry on this chart is an instance of alleged trafficking.  The chart, as the Court well knows, has been limited to rows of dates where people may have been in a particular location and may have met, although, you know, may not have met as I think the testimony was clear.

THE COURT:  All right.  The government's objection to 1054 is sustained.  On the face of this message, as reflected on 1054.2, there is a specific sexual encounter between Ms. Ventura and Mr. Combs that is indicated and that does not refer to one of the sex trafficking incidents alleged by the government or anything related to such an incident.

In fact, it's very clearly related to a one-on-one

encounter in Mr. Combs' office.  And based on the evidence in the record, there's no indication of any kind that any of these incidents occurred in the office.  There's no subsequent reference to any other incident that would make this relevant or probative to the issues in this case.

So the government's objection is sustained as to 1054.

Let's go to 1135, you indicated, Ms. Johnson?

MS. JOHNSON:  1136-R is the same type of document. And that is dated April 5, 2017.  And the dates on the chart that are around that are March 21, 2017 and April 27, 2017 so it's just nowhere near anything on the chart.

MS. ESTAVAO:  Your Honor, this one is slightly different from the others in that in 1136-R, Ms. Ventura says to Mr. Combs, or Mr. Combs asks Ms. Ventura: "So what you gonna do?"  And Ms. Ventura says,"Be your little freak."

The government decided to elicit from Ms. Ventura a number of details about their sexual activity that were kinky in nature, and the fact that she's telling Mr. Combs that she will be his little freak is probative as to his state of mind as to whether or not she was willing to engage in this kind of sexual activity.

THE COURT:  So, Ms. Estevao, based on the dates in question, are these communications close in time to one of the alleged sex trafficking incidents?

MS. ESTAVAO:  Not to one of the instances on the

government's chart, although I will note that the government has suggested that they will argue to the jury that this chart does not represent all of the instances of the times that they engaged in this activity, so the defense should be permitted some leeway with respect to eliciting evidence that at other times they had sex that are perhaps not captured in the chart. So to the extent the government is going to make that argument, then we shouldn't be limited in the evidence that we get to present as to these kind of sexual messages.

THE COURT:  When you say "these kinds of sexual messages," here you're making a more particular argument that it's not just sexual talk.  It's that in response to Mr. Combs' inquiry of what Ms. Ventura was going to do, she says "be your little freak," and if these incidents were happening around that time period, that could bear potentially on Mr. Combs' intent that Ms. Ventura was interested in that kind of freaky lifestyle.

MS. ESTAVAO:  Yes.  And I don't think Ms. Ventura was specific as to the times that those particular instances happened.  It was pretty vague as to when they did, and she didn't recall.  So the fact that this happened on a particular date shouldn't preclude us from introducing it.

THE COURT:  Ms. Johnson, your objections here are the same as to 402-403 objection?

MS. JOHNSON:  Exactly.  I will note that this, again,

on its face appears to be about an encounter between Ms. Ventura and Mr. Combs. She's asking him for a photograph of an explicit photograph of him. She's saying "I miss you." And then she said, I'll be -- it says: "Be your little freak." I think that this is clearly on its face about the thing that is not in dispute: That she wanted to have consensual sex with her boyfriend.

THE COURT: I think this document presents a closer call than the last one which on its face referred to a one-on-one encounter between Mr. Combs and Ms. Ventura.

So I'll overrule the government's objection as to 1136-R.

What is next?

MS. JOHNSON: 1149 is of the same nature.

MS. ESTAVAO: With respect to this one, your Honor, on the third page, Ms. Ventura says, "LOL. I just bought baby oil at the store because I couldn't help myself," which suggests that she was independently buying baby oil for herself and has independent probative value.

MS. JOHNSON: And I am fairly confident that I think that part of the message is already in evidence. Our objections start at page 5 of the document.

THE COURT: So let me make sure I'm looking at the right document. We're on 1149, and your objection begins at 1149.5 to the end of the exhibit.

MS. JOHNSON:  Very specifically page 5, the messages that start at 1:35 a.m. through the end of the next page.

THE COURT:  All right.  Ms. Estavao, as to these six messages.

MS. ESTAVAO:  I think, again, the argument that the government wants to make that Mr. Combs should have drawn from these messages that Ms. Ventura only wanted to have sex with him and not have sex in the way that they consistently had sex over the years is an argument that they can make to the jury, and we should be permitted to make the opposite argument; that he understood it to mean that she wanted to have sex in the way that they consistently had sex, and it's probative for that reason regardless of whether or not it's directly connected to a freak-off date.

THE COURT:  Ms. Johnson, you indicated that this exhibit, at least the first four pages, were in evidence.  So does this correspond to one of the alleged sex trafficking incidents?

MS. ESTAVAO:  And Ms. Geragos is telling me that she does not have it marked as a Government Exhibit.

MS. JOHNSON:  I thought that we had displayed the baby oil text before.  It would take me some further time to find that.  I don't know that it's a Government Exhibit.  But I thought that we had displayed a similar message before.  This chat is not connected to anything on the chart, which, again, I

stress is, you know, not necessarily representing alleged freak-offs.  These are dated May 14.  The next date on the chart is May 25.  These messages are clearly about sex acts between Ms. Ventura and Mr. Combs.  On their face, they are talking about things they would do to each other.

MS. ESTAVAO:  I would also just add that the date of this message, May 14, 2017, is two weeks after a physical altercation that the government elicited lots of evidence about, the May 2, 2017 fight.  So the fact that two weeks later Ms. Ventura is willingly engaging in this kind of sexual activity and then on May 25 engages in a freak-off which is on the government's chart.

MS. JOHNSON:  Again, Ms. Ventura wanting to engage in sexual activity with the person she was in a relationship with is entirely undisputed, and she said it many times during her testimony.

THE COURT:  No, I understand that point.  That's why I sustained the objection to 1054.  The problem is that given the nature of the government's allegations and the testimony of Ms. Ventura, it is often difficult to know based on these messages whether they are referring to one of the alleged incidents or are relating to separate incidents, so much so that even when we began discussing this exhibit there was some uncertainty as to whether this exhibit was in evidence because on page 3 it refers to Ms. Ventura purchasing baby oil at the

store, which makes it -- at least makes it potentially the case that it was relating to one of these incidents. There's also a reference to a hotel that has been procured.

And so it may be the case that this is referring to a one-on-one encounter that is not connected to any hotel night, but the defense would be permitted, for the reasons Ms. Estevao has given, to connect the dots between the communications here and not solely a consensual encounter between Ms. Ventura and Mr. Combs but to one of the alleged incidents. Ms. Estevao also notes it's close in time to these incidents. Unlike 1054, the government's objections I think are on lesser footing here.

So I'll overrule the objection to 1149.

What's next?

MS. JOHNSON: 1026. The objection on 1026 is to the long chat on the second page that begins "I took that piece of Adderall before I left. My high is kicking back in."

You know, I understand that this will be offered for Ms. Ventura's state of mind, and it says on its face that she has just taken drugs and her high is kicking in. I don't think this is accurate as to -- I don't think that whatever she says after that is necessarily accurate as to her state of mind.

MS. ESTAVAO: Your Honor, this was on December 20, 2012, which corresponds with a freak-off in the government's chart of December 20, 2012 so it is that date. And even if the Court accepts the government's argument that it doesn't reflect

her actual state of mind at the time, this is clearly admissible for the effect on the listener because Mr. Combs read this message where she says, "I know it was crazy but even when it's not super hot, I always have fun. The last round was pretty hot to me though." She's talking about the freak-off that they just had.

THE COURT: So, Ms. Johnson, as I understand the objection, it is again a 403 objection. So it would, technically speaking, fall into an exception. But you're saying that given the reference to Ms. Ventura taking drugs, it would be unfairly prejudicial because it doesn't --

MS. JOHNSON: Exactly.

THE COURT: It shouldn't go to her state of mind.

MS. JOHNSON: Correct.

THE COURT: Now I think that particular argument is one the government could argue, but, as Ms. Estavao notes, even if it was irrelevant to Ms. Ventura's state of mind, and given that the drug that she says she's taken is Adderall and indicates that she is focused in the message. But even putting that to the side, Ms. Estavao said it would go to the effect on the listener, meaning that if the key question on the 5091 charges turns on, among other things, Mr. Combs' intent, what would be the response there? So he sees this, and it's close in time to the incidents that are in question.

MS. JOHNSON: I still would say it's prejudicial

because it doesn't necessarily reflect an accurate statement given that she said on her face that she is using drugs while she writes this. I think she is clear in her testimony about how the use of drugs affected her willingness to engage in this kind of activity.

THE COURT: Would that be true for Adderall? Is there any evidence in the record that Adderall would effect?

MS. JOHNSON: There's no evidence in the record about Adderall whatsoever, as far as I recall.

THE COURT: The government's objection to that message in Exhibit 1054 is overruled.

MS. GERAGOS: Your Honor, it's 1026.

MS. ESTAVAO: The exhibit was 1026.

THE COURT: Sorry, 1026.

MS. JOHNSON: 1126.

THE COURT: All right. What is the objection?

MS. JOHNSON: So this one, there is -- the first few pages, again, are an objection on the same nature of sexting and cumulativeness. I understand the defense wants to use this message to suggest that there was some sort of freak-off planned that Mr. Combs then canceled because Ms. Ventura wasn't feeling well.

I don't think any of that is even remotely clear on the face of this message. I think that the use of this text message entire thread to achieve that purpose is hearsay. And

this is sort of the nature of the objection of the text that would follow is that Ms. Ventura was not shown this message when she testified.  She is the one who would be able to explain what this message is about.  She was not shown this, and to be able to admit this message and make arguments about assuming what it is referring to when it is very vague and confusing, I think that's a 403 issue.  And I also think that the use of the message to suggest that Mr. Combs in fact canceled this event is hearsay.

THE COURT:  All right.  So as to this exhibit, as opposed to the others, you're making a hearsay objection here.

MS. JOHNSON:  Yes, and 403, and also the sexting part of the beginning.

THE COURT:  Ms. Estavao.

MS. ESTAVAO:  Your Honor, the communications back and forth regarding logistics are not hearsay and clearly suggest that by virtue of the initial text messages about sexting that the government objects to, then Mr. Combs says, "I canceled stuff for tonight.  You need rest."  And Ms. Ventura is upset about this and continues to try to push for a freak-off, saying "I want to be with you tonight.  I need you.  What am I to do?"  Then she says, "I'm not swaying.  I'm not loopy."

The idea is not that Ms. Ventura was not feeling well.  It's that she was too high to engage in the freak-off.  Mr. Combs recognized this and canceled the freak-off.  That's

highly probative of his state of mind.  The government suggested that he used coercive tactics making people take drugs in order to engage in the freak-off, and here Ms. Ventura is too high.  Mr. Combs recognizes that and cancels stuff for tonight.

So it's highly probative and Ms. Ventura would not have likely remembered this exchange, as she didn't remember many of the exchanges we showed her when she testified, especially when this one suggests she was high at the time of the writing of these messages and Mr. Combs was not and was receiving this information from her that regardless of whether or not she was so high, she still wanted to engage in the freak-off.

THE COURT:  How are you connecting this message to one of the alleged freak-off incidents?

MS. ESTAVAO:  We're not because he canceled the freak-off.

THE COURT:  No.  How are you going to establish -- is there any other basis --

MS. ESTAVAO:  The fact that he says, "I canceled stuff for tonight" clearly suggests there was a freak-off being planned.  That was the nature of their sexual activity when they got a hotel and engaged with someone else.  That's the stuff that he is canceling.

THE COURT:  Where is the stuff that you just said

about the hotel and someone else.

MS. ESTAVAO:  It doesn't explain that in particular, but by virtue of the earlier text message where they're sending sexually explicit messages back and forth to each other, and then he says, "When you wanna start drinking?"  And I'll skip over some of the explicit ones, and then he says, "I canceled stuff for tonight.  You need rest."

THE COURT:  When is the defense planning to put this exhibit in?  You're going to put this in as part of your case in chief?

MS. ESTAVAO:  We're planning on reading this as well as a number of other exhibits all at the same time.

MS. JOHNSON:  Your Honor, the message "I canceled stuff for tonight, you need rest" is being offered for its truth.  It's also being offered in a very confusing and misleading way because there is nothing in this message that suggests that canceling "stuff" is canceling a freak-off.

As you saw in 1054, Ms. Ventura and Mr. Combs were talking there about having a sexual encounter between the two of them at his office.  Like the fact that she is sending sexually explicit messages to him in no way indicates that this is linked to a freak-off because, again, she wanted to have sex with her boyfriend.

THE COURT:  All right.  Let's hold off on this one. What's the next exhibit?

MS. JOHNSON: 1131. The objection is on page 4. Mr. Combs asks Ms. Ventura: "You think you can FO without getting high? LOL."

And Ms. Ventura answers: "Yeah."

That is being offered for its truth. We object on hearsay grounds to this. Ms. Ventura testified quite clearly that she never did a freak-off without using drugs. And this message is being used to suggest that she did at some point in time, and it's being offered for its truth. It could have been showed to her during cross-examination.

She could have been allowed to see this and comment on it, and she was not.

MS. ESTAVAO: Your Honor, this is being offered for the effect on the listener.

THE COURT: What bearing does it have on the listener? Can you explain that?

MS. ESTAVAO: Mr. Combs received -- he was told by her that she could freak-off without getting high; that she didn't need to be high in order to freak-off. That bears on whether or not he understood that she was being forced, defrauded or coerced in engaging in sexual activity. She's saying I can do this without getting high, and he's hearing that from her directly. So whether or not she actually could or not is beside the point. Ms. Ventura testified about how she actually felt, but in many ways that doesn't bear on the ultimate issue,

which is what was in Mr. Combs' mind.

THE COURT:  So it's just these two messages, is that right?

MS. JOHNSON:  I object to these two messages, and I think the third one wouldn't make any sense without --

THE COURT:  Without the first two.

MS. JOHNSON:  Actually, this page.

THE COURT:  Given Mr. Combs' inquiry is "You think you could FO without getting high," wouldn't Ms. Ventura's response "Yeah" not go to the truth of whether in fact she could do it without getting high, but rather that at that time she thought that she could given that that's what was asked.

So that would go to her then existing state of mind. And then for the reasons Ms. Estavao gave, if her response of "yeah," whether it was true or not would go to Mr. Combs' knowledge and intent regarding the elements of coercion, et cetera.

MS. JOHNSON:  That is a plausible reading of this message, but another plausible reading of this message is him asking her if she can freak-off without getting high, and her saying yes, and that being "Yes, I can do it.  Yes, I don't need drugs."  And this is the kind of message that she should have been crossed about and asked about on the stand because it is different in kind than what she said in her testimony.  And it is prejudicial to offer something like this without asking

the witness about it.

THE COURT:  Meaning, if it was coming in -- well, wouldn't that only matter if it was coming in as some sort of impeachment or prior consistent statement.  If it goes to her existing state of mind, why would she need to be crossed on it?

MS. JOHNSON:  I mean, I think they could have used it as impeachment material as well if they thought that based on her testimony that she never did this without being high.

THE COURT:  I'm going to overrule the government's objection to these mention in 1131.

What's next?

MS. JOHNSON:  1135.  This is another one -- the objection starts on the bottom of the first page where he says: "What do you want -- what you want?"

And she says: "Bank account need to be right, the right team."  We have a hearsay objection to that statement.  I think it's being offered for the truth that she wants her bank account to be right, whatever that means.  I'm not sure what that means because it's also confusing.

She follows it up with "The right team."  I don't know what that means.  And the rest of the message doesn't clarify anything about what that statement means.  Ms. Ventura has been crossed extensively on financial motivations.  I think the purpose of this message is to argue that Ms. Ventura is seemingly demanding money, but it is not at all clear based on

the face of the document what her statement means at all.  So I object to hearsay and 403.

THE COURT:  Ms. Estavao.

MS. ESTAVAO:  I think the suggestion is clearer than the government says.  "Bank account need to be right."  I read as a demand for money, and it's different in kind from the cross-examination in that this is Ms. Ventura demanding money in April of 2017.  And it's a command of sorts, not hearsay.

THE COURT:  What's the relevance?

MS. ESTAVAO:  It goes to financial motive.

THE COURT:  Whose financial motive?

MS. ESTAVAO:  Ms. Ventura's.

THE COURT:  Why does that matter?  Financial motive to do what?

MS. ESTAVAO:  It suggests that she's had a long-standing financial motive.

THE COURT:  From 2017?

MS. ESTAVAO:  If you read down in the messages, Ms. Ventura says:  "All I'm trying to do is keep up with you, stay feeling and looking like your woman."

THE COURT:  When you say "financial motive," you're saying that in 2017, Ms. Ventura had a motive to fabricate her texts to Mr. Combs?

MS. ESTAVAO:  It's different from the financial motive that has been explored in other parts of the proceedings with

respect to her later financial motive. This just suggests that she's demanding money from Mr. Combs at the time.

THE COURT: All right. I'm going to sustain the government's objection to 1135 on hearsay grounds and on Rule 403 grounds.

MS. JOHNSON: Just two more, your Honor. We are still discussing 1264, so we don't need to take that up at this time.

1154-A is the next one. My objection in this document is to Mr. Combs' statement, repeated statements about seeking couples counseling. I think it's offered for the truth that he was trying to seek couples counseling and repair the relationship. I don't think it goes -- I think it's hearsay.

THE COURT: Ms. Estavao?

MS. ESTAVAO: The fact that Mr. Combs was suggesting to Ms. Ventura to go to couples counseling and Ms. Ventura's refusal to engage in couples counseling undermines the government's theory as to coercion to --

THE COURT: To go to couples therapy?

MS. ESTAVAO: Well, that he's suggesting in the context of an argument about all of their -- about their issues and their jealousy and issues with their relationship, that they engage in couples counseling, and her refusal to engage in couples counseling.

THE COURT: Ms. Johnson, can you remind me what was the last exhibit that I sustained the government's objection

to?

MS. JOHNSON:  That one was 1135.

THE COURT:  1135.  All right.  Give me one second.

What's the response on the hearsay objection?

MS. ESTAVAO:  The fact that she's refusing to engage in couples counseling, and Mr. Combs hears that from her goes to the effect on him and his state of mind -- not his state of mind.  The effect on the listener.

THE COURT:  And, again, relevance is what?

MS. ESTAVAO:  It undermines the government's theory as to coercion, and this is them in the context of --

THE COURT:  Just explain, connect the dots for me.  Ms. Ventura doesn't want to go to couples therapy or at least that's the suggestion in the text message.

MS. ESTAVAO:  In the text message, it also shows that they're in an argument with each other.  They're in the process of breaking up one of several times, and they're arguing about her not feeling appreciated and jealousy, and the fact that he's not supporting her lifestyle financially enough.  And the fact that he is suggesting that they get in the room with a counselor undermines the government's theory that in fact the whole time he was in the process of sex trafficking her, and the fact that he's receiving information from her that she does not want to go to counseling, she wants to work it out between the two of them undermines the government's this theory of

coercion.

THE COURT:  And, again, the financial motive is relevant why?

MS. ESTAVAO:  It's just the context of their relationship which -- instead of being upset and -- about their sex life, what she's upset about and what they're arguing about and what the source of all their fights are about is her -- the her perception that she doesn't have enough financial support, jealousy, and her feeling unappreciated and comparing herself to other women in his life.

THE COURT:  So are you saying that because Ms. Ventura in the defense's view had financial motivations during this time period, that's why she engaged in these incidents and not because of any kind of coercion?  I think the government might suggest that financial pressure and career issues, et cetera, were part of the serious harm that Ms. Ventura was concerned about that led her to engage in the sex trafficking incidents.

MS. ESTAVAO:  The argument is slightly different in that these issues explain the source of the other -- the fights in their relationship and the physical aspect of the fights. So it explains that whole context of their relationship.

The defense is that these issues -- they have many issues in their relationship, and those issues of jealousy and financial issues all tie to each other and the physical fights in their relationship, the domestic violence in their

relationship, which is completely separate from their sex life which was entirely consensual, and that was not a source of distress for Ms. Ventura.

THE COURT:  All right.  Now I've asked a few times, and I think that the relationship, the nexus to the issues in this case as to 1154 and 1135 is attenuated.  And as to both of those exhibits, there is a hearsay objection.  I don't see a plausible basis to overcome that objection.

In addition, the Rule 403 issues are profound, especially because there is a very minimal, if any, probative value to these two communications, but there is the potential for significant unfair prejudice given Ms. Ventura's text messages concerning financial issues that have — at least on the face of these documents, and I've not heard a good explanation otherwise — no relationship to the alleged sex trafficking incidents alleged by the government.

So the objection is sustained as to 1154 as well.

What is next?

MS. JOHNSON:  Your Honor, just to confirm on the last exhibit, it was 1154-A.

THE COURT:  1154-A.  Thank you.

MS. JOHNSON:  The last one is 1417.

This is a thread that if we were to go message by message, there is some, you know, just things that are obviously not being offered for their truth.  But the entire

thread is about Ms. Ventura's decorating a hotel room and getting a bouquet for Valentine's Day. It's hearsay, and, you know, I do not see an exception, because I think the argument here will be that for the truth of her decorating the hotel room on Valentine's Day wanting to make it a romantic night, et cetera.

MS. ESTAVAO: I will note that this is a freak-off in the government's chart on February 14 of 2017. This is a sex trafficking event as alleged by the government, and this chat shows that Ms. Ventura was actively involved in setting up this hotel room, not at the direction of Mr. Combs but as a surprise to him, getting these giant bouquets of flowers.

THE COURT: Perhaps you could overcome the 403 objection. How do you get over the hearsay objection?

MS. ESTAVAO: These are logistics and photos.

THE COURT: Is that one of the exceptions in 403 - logistics?

You're putting these in. Your arguments on relevance is that if you took these messages for their truth, they show that Ms. Ventura was engaged in preparations that would undermine any inference of being coerced into the incident. So it would appear that you're putting these messages in for the truth. So on that ground, on that basis, what would the exception be that you could get these in under the hearsay rules?

MS. ESTAVAO:  I mean, I'm happy to work with the government in chopping up the messages a little bit more to reduce any hearsay problems, but some of these messages are not hearsay, and the photos, for example, are not hearsay.

THE COURT:  Ms. Johnson, is there some portion of these messages that the government would agree they could come in because they would exclude the hearsay or do you think it's all hearsay?

MS. JOHNSON:  I think there may be -- I think that the defense would want the photos and sort of the back and forth about, you know, picking the decorations and stuff because that's a -- I don't see a way to chop this up that makes it understandable, put it that way.  The photos in and of themselves I agree are not hearsay.  If they want to admit the photos divorced from the messages, that's fine.  But like the photos with the messages are being offered for their truth to show that she wanted to set up this room.  And Cassie is the only person who could have authenticated these photos.

MS. ESTAVAO:  We have an authenticity stipulation that's being worked out with respect to all of these.  They were found on Ms. Ventura's devices.  I don't think that will be a problem.  I mean, there's no -- this exhibit could be made so that there's no assertion that's being made for its truth.  I mean, for example, after receiving the photos of the assistant setting up the flowers, she says:  "OMG.  Thank you

so much."  The fact that she's having this communication with assistants and exchanging photos back and forth --

THE COURT:  Why don't you just do that?  Why don't you start with Violet's messages sending the photos, and then you have the message from Ms. Ventura and the two messages from Violet, none of which have any assertions that would be going to the truth because Ms. Ventura is saying, "Oh my God.  Thank you so much."  What you do have is the date, which is critical in the defense's view, because this relates to an alleged sex trafficking incident.  And so for the reasons you explained, you could put it in as evidence that there was a setup and that Ms. Ventura was working with Violet to have this set up done, but you wouldn't be running into any of the hearsay issues by the government.

(Continued on next page)

MS. ESTEVAO:  We would also propose including the bubble at the top of the second page.  It says:  I kind of wanted to go a little over the top.  And her message suggests that it's her state of mind at the time; she wants to create a romantic experience.  And it shows that it's at a hotel.  She's thinking a hotel would be best.  She's planning it out.  This is not backward-looking.  It's forward-looking.

MS. JOHNSON:  The planning is what we object to, because that's being offered for the truth of the fact that she planned this.

THE COURT:  All right.  I'm going to sustain the government's objection.  However, if the defense wants to put in these last messages, I think they get the defense where it wants to go.  The only issue that would not be covered by these messages would be the fact that Ms. Ventura planned this event.  But that is clearly hearsay, going to the truth of the matter, would not be admissible, and I'm not hearing a reason why it would be admissible over a hearsay objection.

However, these last messages get the defense pretty much where it wants to go, which is she is presented with the layout of the room on the date of the alleged sex trafficking incident with a heart spread on the bed and on the table and flowers everywhere, and she expresses her satisfaction with the layout to Violet, and there's an exchange with Violet.  So that part of the message can be used by the defense, and I'm not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

hearing that the government has an objection to that portion of the message.  So it is overruled to that extent.

MS. JOHNSON:  And just for clarity, that's the photos that start on page 9.

THE COURT:  Right.  So it would be the last message on eight that has the photos that go on to nine and ten and then the three messages that follow.

MS. JOHNSON:  OK.

MS. ESTEVAO:  Your Honor, we would also propose including the photo that Ms. Ventura sends on page 3.

MS. JOHNSON:  Again, I think that goes to planning, which is --

MS. ESTEVAO:  Your Honor, it's a photograph.

THE COURT:  I'll overrule the government's objection. There's not really an assertion of anything other than this is a picture that Ms. Ventura pulled.  So I'm going to overrule the objection.

You want to put in that photo and you'll redact the other messages and then put in the other messages.

MS. ESTEVAO:  Yes, and we will mark this as 1417A.

THE COURT:  1417A, assuming it follows those parameters, will be admitted.

(Defendant's Exhibit 1417A received in evidence)

THE COURT:  All right.  So then let's go back to the long one, and can someone remind me what the number is.

MS. JOHNSON: Sure. 1126.

THE COURT: All right. Ms. Johnson, is the government just making a 403 objection here, or is there a hearsay objection as well?

MS. JOHNSON: I think there's a hearsay objection as well. There are a lot of different parts to the message, but to the extent that this is being offered for the truth that Mr. Combs canceled something because Ms. Ventura was too drunk, I object to that on hearsay grounds. I also have just a 403 -- I think it's confusing, and it's far from clear what this message is about. It's far from clear that this relates to, that this could potentially relate to a freak-off.

He says I canceled stuff. We have no idea what stuff is, and there are many, many instances where Mr. Combs and Ms. Ventura had plans that were just the two of them that did not involve the male escorts, and I don't think there's anything on the face of this chat that makes that clear. In that case, it has, as far as I can tell, almost no probative value.

THE COURT: All right.

Ms. Estevao, the government is saying if the defense is planning to use 1126 to demonstrate that Mr. Combs canceled a freak-off and he understood Ms. Ventura to be either sick or on drugs or anything else, then that goes to the truth of the matter. So there's a hearsay issue. You can address that.

Second, they say that there is nothing in the message,

at least, that connects this to an actual incident of sex trafficking, and if there's no connection somewhere to an actual incident or hotel night, anything in that range, then there's no relevance or probative value to this communication and it's obvious in that context there would be unfair prejudice because of the nature of the communication.

So why don't you start with the hearsay issue.

MS. ESTEVAO:  May I have one moment to consult with counsel?

THE COURT:  Yes.

MS. ESTEVAO:  The defense is willing to withdraw this exhibit.  Thank you, your Honor.

THE COURT:  All right.

And that is it, right?

MS. JOHNSON:  That is.  There's one more exhibit we've been talking about, but we may be able to reach an agreement without your Honor's intervention.

THE COURT:  All right.  Very good.

With that, anything further from the government?

MS. COMEY:  Just one clarification of the record from yesterday, your Honor.  In reviewing the transcript, we realized it was not clear whether your Honor had received in evidence Government Exhibit 1407 under seal and 1407R publicly.

Would your Honor mind confirming that so we have it for the transcript, please?

THE COURT:  Confirmed.

(Government Exhibits 1407, sealed; and 1407-R received in evidence)

MS. COMEY:  Thank you, your Honor.

THE COURT:  Anything from the defense before we get started?

All right.  Very good.

MR. AGNIFILO:  Could we get three minutes just for a restroom break, your Honor?

THE COURT:  Yes.  That's fine.

(Recess)

MS. GERAGOS:  Your Honor, Ms. Becker just told me that all of the Listen Talks turned off because we took so long in our argument.  So if your Honor would like to instruct the jury to turn them back on, or I can, whatever you prefer.

THE COURT:  You mean you have to hold down the button.

MS. GERAGOS:  Yes, that's right.

(Continued on next page)

(Jury present)

THE COURT:  All right.

Please be seated.

Welcome back, members of the jury.

Agent Cerciello, you understand you're still under oath.

THE WITNESS:  Yes, your Honor.

JOSEPH CERCIELLO, resumed.

THE COURT:  Ms. Geragos, you may proceed when ready.

MS. GERAGOS:  Thank you, your Honor.

Could we pull up what's already in evidence as Government Exhibit 1406, please, and go to page 3.

CROSS-EXAMINATION CONTINUED

BY MS. GERAGOS:

Q.  OK.  Just to orient ourselves, we were looking, do you recall looking at row 6, which was December 17 to December 21, 2021, when we broke yesterday?

A.  Yes.

Q.  OK.  And the names in this row correspond; they say Jane, Combs, Don and Kabrale, right?

A.  Yes.

Q.  OK.  So we are -- and do you see, under Jane, there's several AX explicit videos here?

A.  Yes, I do.

Q.  Do you see that there's AX701, and that corresponds to the

metadata, right?

A.  Correct.

Q.  And then AX701- and then 65, and then all of the numbers after that correspond to a video, right?

A.  Yes.

Q.  OK.  And so then there's a 701-114.  Do you see that?

We highlighted it, but it would be the row right below it --

A.  Yes.

Q.  -- 114.

And then 145 is right next to 114?

A.  Correct.

MS. GERAGOS:  OK.  So I will ask that we turn off the attorney screens and the public screens and we start our morning with some videos.  If everybody could use their audio Listen Talk machines, and Ms. Becker will test them to see whether we can hear the music.

OK.  Perfect.  So everybody can hear the music.

With your Honor's permission, could I please walk to Ms. Becker?

THE COURT:  You may.

BY MS. GERAGOS:

Q.  But first we will play as AX701-114, which as you just testified is -- you checked the metadata; it corresponds to that date range, correct?

A.   Correct.

MS. GERAGOS:  OK.  Ms. Becker, can you please play from the beginning until two minutes and 26 seconds, please, whenever you get a chance.

There's an issue.  One moment.

MS. SLAVIK:  Your Honor, I believe there's an issue with one of the jurors.

THE COURT:  Oh.  Sorry.  It's not working?  It may have been that it just turned off.

JUROR:  It says low battery.

THE COURT:  It says low battery.  OK.  We need another one.

MS. GERAGOS:  We're also having an issue on our end, so with your Honor's permission, we just need a minute to charge.

Your Honor, what we'll do is we'll charge the ones that are dead, and we'll come back to them at a later point in the examination so that we don't have to waste everybody's time right now, if that makes sense.

THE COURT:  That's fine.

MS. GERAGOS:  OK.  So everybody can put the Listen Talk machine to the side.

Let me just confer one more moment with Ms. Becker -- or Ms. Comey.

Your Honor, may I ask that the deputy take any from

the jurors that are currently out of battery; that way we can charge while the examination goes?

THE COURT:  Very good.

Let me ask the jurors to take a look at your device. If you press the button, you should see a battery meter, and if you have no battery, could you raise your hand and we'll charge it for you.

Anybody?

Looks like everybody has --

MS. GERAGOS:  OK.  All right.  So it's just on our end.  So ours will be charging then.

All right.  So we'll just go back to this exhibit.  We can turn the screens on.  Wonderful.

Between December 17 and December 21 of 2021, could we please bring up the corresponding exhibit to the government exhibit here, which is -- and we'd have to turn off the screens for this now, Defense Exhibit 3034, which is in evidence.  And I just want to confirm that the overflow screen is also off, which I've confirmed with the deputy.

All right.  Good.  OK.  If we could go to page 30 of this exhibit, please, and 31, next to each other.

Q.  All right.  These are from -- do you see that these are from December 24 of 2021?

A.  Yes.

Q.  OK.  And the 3286 number you've testified is Mr. Combs,

right?

A.  Correct.

Q.  OK.  And December 24, he writes:  "You're so sweet."  And she responds with several emojis.  Right?

A.  Correct.

Q.  OK.  And what is his response there?

A.  "That shit was so fucking sexy the other night.  Damn."

Q.  All right.  And she emphasizes that message and says: "Phew.  I haven't stopped thinking about all of it.  Just keeps getting better and better."  Right?

A.  Yes.

Q.  And what does he respond with?

A.  "What part you been thinking about."

Q.  And she says:  "Just how sexy the room was..so much sexual tension.  It was all just making me wet, see it."  And "the way you made me come I've never came like that in my life," with several emojis.  Right?

A.  Yes.

Q.  OK.  And below she says:  "Did you love it, baby?"  And he says:  "Loved it."  Right?

A.  Yes.

Q.  And she responds with several heart eyes emojis and says "sheesh."  Right?

A.  Yes.

Q.  And you can look, if you have the binder in front of you,

at 1406, the next event -- we could pull it up, I suppose, on page 3. The next event listed or the next date range listed is December 31, 2021, to January 3 of 2022. Do you see that?

A. Yes.

Q. OK. And one of the names listed here under Jane, Combs, Paul, is Kabrale. Do you see that there?

A. Yes.

Q. You don't list any of the Kabrale messages with Jane in this chart.

Is there a reason that you didn't include those?

A. Anything that's included in this chart is what was provided to me.

Q. OK.

A. So if it wasn't provided to me, it wouldn't be in the chart.

MS. GERAGOS: OK. Why don't we go to Defense Exhibit 3328, page 103.

Q. All right. These messages start from the previous date range, which is December 20 of 2021. Do you see that?

A. Yes.

Q. OK. And at the bottom of the page, on the left, which is page 103, he writes to -- Kabrale writes to Jane: "We had a pretty intense night. Yes, focusing on my last minute fix this weekend and cooking for my family." Right?

A. Yes.

Q.   OK.   And then on the next page, which is 104, she writes: "Elaborate on intense haha.   Send me a reminder."   Do you see that?

A.   Yes.

Q.   All right.   And what does he respond with?

A.   "LOL, that was, like, the roughest sex we ever had.   You were talking so dirty to me and taking me so deep, I loved it."

          MS. GERAGOS:   Could we go to the next two pages.

Q.   And she writes:   "Haha, LOL," with several emojis and mind-blown emoji; "def one for the books," one of the monkey emojis, "send me something."

     And what does he respond with?

A.   "Most definitely, just keeps getting better and better." And that looks like a smirking emoji.

          MS. GERAGOS:   OK.   Great.

          Could we go to the next two pages, please.   Thank you.

Q.   And then on December 21, UTC time, at 12:26 a.m., Jane writes:   "Damn, baby.   You got me so hot.   You want to come back tonight or tmw morning," with several heart-face emojis. Right?

A.   Yes.

Q.   "How come I can't make you come that fast," with a wondering emoji.   "You holding out on me."   And then five minutes later:   "Wake up," with several emojis.   Right?

A.   Yes.

Q.   And how does he respond?

A.   "Baby, I would love to, but I'm a little busy this week with this Christmas shit, and I scheduled content."

Q.   And she says:  "Quick trip tmw morning, back by 3."

And the next page, on page 108, she has eye emojis and says "pls."  Right?

A.   Yes.

MS. GERAGOS:  If we could go to the next two pages, please, 109 and 110.  All right.

Q.   And these are December -- these now, starting at page 109, are December 31 of 2021, UTC time, 7:04 p.m., right?

A.   Yes.

Q.   OK.  And here, she reaches out to Kabrale and says:  "Happy new years," with a celebration emoji and a heart-face emoji, and says:  "I'm in Miami.  LMK if you want to come tonight," the heart face and kiss, the lips emoji.  Right?

A.   Yes.

Q.   OK.  What does he respond with?

A.   "Happy new year, love.  I'm supposed to be cooking for my family today."

Q.   OK.  And she loves that message and says:  "Oh, love that. You want to try to come TMW..?  Morning?"

How does he respond?

A.   "Yes, I'm definitely down for that."

MS. GERAGOS:  Could we go to page 113, please.

Q.   OK.  And then January 1 of 2022, at 7:50 p.m., UTC time Jane writes:  "Are you free to travel today?  Would love to have you," with four heart emojis.  Right?

A.   Yes.

Q.   OK.  And then there's an attachment missing, but I think you testified yesterday that .JPEG indicates it's probably a photo, right?

A.   Most likely, yes.

Q.   OK.  And she says:  "Here's your flight info," exclamation point; "I'll have hotel info later tonight, excited to see you."

     And how does he respond?

A.   "Excited to see you as well, love," and two heart kissing emojis.

         MS. GERAGOS:  OK.  Could we go to page 119, please.

Q.   OK.  And this is January 2, 2022, 4:55 a.m. UTC time --
5:08 a.m., I apologize, UTC time:  "Hey, babe.  You OK?  How far are you?  Keep me posted.  Really want you here already," with three hearts.  Right?

A.   Correct.

Q.   OK.  How does he respond?

A.   "OK, baby.  Imma just wait out these seven mins.  He'll be here soon.  It's busy on Uber, rn, so I don't want to risk waiting for another."

         MS. GERAGOS:  OK.  If we could skip ahead to page 121,

please. All right.

Q. And she writes, down below, January 2, 2022, 5:22 a.m., UTC time: "Can't wait to see you," exclamation point. Right?

A. Yes.

Q. OK. And how does he respond?

A. "OTW, baby. Likewise," and another heart kissing emoji.

MS. GERAGOS: OK. We can take this down.

We can go back to 1406. All right.

Q. And so those correspond with the date ranges here, which is December 31, 2021, to January 3 of 2022. Do you see that?

A. Yes.

Q. But none of the messages between Kabrale and Jane from that date range were included here on this chart, right?

A. That's correct.

MS. GERAGOS: OK. If we could go to next page, page -- well, let's skip ahead to page 5 -- well, let's go to page 4.

Q. On page 4, there's two more date ranges here. We have February 8, 2022, to February 12, 2022. Do you see that?

A. Yes.

Q. And then you have one right after that, which is February 14, 2022, to February 16 of 2022, right?

A. Yes.

MS. GERAGOS: OK. And then let's go to the next page.

Q. And then the next one is March 4 of 2022 to March 7 of

2022, right?

A. Yes.

Q. OK. And now, line 11 lists April 4 of 2022 to April 6 of 2022, right?

A. Yes.

Q. All right. And then under names here, you write Jane, Combs and Italian. Do you see that?

A. Yes.

Q. Under Italian, the corresponding government exhibit cited is A104-25, right?

A. Correct.

MS. GERAGOS: OK. So I'm just going to bring up the defense corresponding exhibit to that government exhibit, which is Defense Exhibit 3050, please.

All right. Could we go to pages 2 and 3 side by side.

Q. You see how these are the same date, April 4 of 2022?

A. Yes.

Q. OK. All right. So this is a message between Mr. Combs and Jane, and the top message is her loving a message, which is a message from Mr. Combs saying: "So what you want to do? I'm horny as fuck." Do you see that?

A. Yes.

Q. All right. Could you read Mr. Combs's response?

A. First response is four question marks. "I've been having crazy fantasies about Leo, you and Leo, LOL."

Q. OK. And then the next page, at the top left -- I'll just skip ahead for efficiency purposes -- she writes: "Baby, I want to make love to you. I haven't selfishly had you to myself for five months. I'm fine w the other stuff, but.....I really just need you right now." Right?

A. Yes.

Q. And how does he respond?

A. "OK. Whatever you want. Are you horny, or is it just me? What have you been thinking about?"

Q. And she laughs at the "are you horny or is it just me" message and says: "It's me too." Right?

A. Yes.

MS. GERAGOS: Can we please go to page 4. All right.

Q. And then down below, he writes: "See if the Italian is free at alls today after we spend some one-on-one time. How many you got for me." Right?

A. Yes.

Q. And how does she respond?

A. "Like 100."

MS. GERAGOS: OK. So if we could skip ahead to page 8, please. All right.

Q. And in this message, on April 4, 2022, at 10:30 p.m. UTC, she says: "See you around 6:30 P, 7P, baby. Want to go to dinner first or anything..? That would be nice. As far as hotel... L'Ermitage? Waldorf...either one is nice. One is

private.  The other a little sexier."

And how does he respond?

A.  "Where you want to eat at?"

Q.  She says:  "Ocean Prime was nice.  The same place for my b'day?"  Do you see that?

A.  Yes.

MS. GERAGOS:  OK.  Can we take that down, please?

MS. COMEY:  Your Honor, for the record, I'm not sure that was in evidence, but I have no objection to it being in evidence.  So I just want to make sure the record is clear that it's been admitted.

MS. GERAGOS:  I believe it was in evidence, but I truly apologize if it was not.  And I formally offer 3050, which I had written there was no objection.

MS. COMEY:  No objection.  It just wasn't on our list of admitted exhibits, so I wanted the record to be clear.

THE COURT:  Defense Exhibit 3050 will be admitted to the extent it was not.

MS. GERAGOS:  Under seal.

THE COURT:  Under seal.

MS. GERAGOS:  Thank you.

(Defendant's Exhibit 3050, sealed, received in evidence)

MS. GERAGOS:  All right.  Could we please go to Defense Exhibit 3051, please, which is the corresponding

exhibit to Government Exhibit A10426, and put pages 1 and 2 side by side.  All right.

Q.  These messages are dated April 5 of 2022, right?

A.  Yes.

Q.  And that falls within the date range of row 11?

A.  Yes.

Q.  OK.  All right.  Do you see on page 1, Mr. Combs's initial text to Jane, he says:  "I got some new tricks for you.  Imma bend them legs all the way back and do all types of acrobatics. LOL."  Right?

A.  Yes.

Q.  All right.  And do you see -- if you skip to the next page, on page 2, at the top, she says:  "Your dick is the only dick that can make me come."  Right?

A.  Yes.

Q.  And then what is his response, those next two messages?

A.  First message is an audio message, and then he follows up with two texts:  "I saw the Italian stallion make you have multiple orgasms.  I'm on my way."

Q.  And she responds:  OK, baby.  I'm leaving in five mins," with a -- I guess that's a kiss emoji.  Right?

A.  Yeah, looks like lips.

MS. GERAGOS:  All right.  Could we go to pages 4 to 5 of this same exhibit, please.  All right.

Q.  Do you see that we've now jumped ahead to April 7 of 2022?

A. Yes.

Q. UTC time?

A. Yes.

Q. And this is the date after the date range on row 11, right?

A. Yes.

Q. OK. And do you see, do you see, he starts and says: "How you, baby," and she responds: "Hey, baby. I'm good. How about you"?

A. Yes.

Q. And what does he say in response?

A. "Great. Checking on you. Adderall is the greatest, LOL."

Q. OK. Do you see on the next page, April 7, 10:11 p.m., she writes to him: "Still thinking about you loving all over me," with a drool face emoji and a kiss emoji?

A. Yes.

Q. OK. And that's the day after; that's the day after row 11, right?

A. Yes.

Q. All right. So the next line here in 14 -- make sure I have the exhibit right, 1406, is April 13 of 2022 to April 14 of 2022, right?

A. Correct.

Q. If we go to the next page, on page 6, the next date is July 18 of 2022, right?

A. Yes.

Q. So there's several months in between line 12 and line 13, right?

A. Yes.

Q. And as you mentioned, you only reviewed the exhibits that the government gave you; you didn't review anything else related to times they were seeing each other between -- times that Jane and Mr. Combs may have seen each other that were not on this chart, right?

A. Correct. Whatever was given to me is what I reviewed.

Q. OK. So you didn't review any other exhibits between that time period where they were communicating with each other or talking about seeing each other, right?

A. No.

Q. OK. And that's why it skips from April of 2022 to July of 2022, right?

A. Yes.

Q. OK. All right. If we then skip ahead to row 15, the next -- that date is August 25 of 2022 to August 27 of 2022, right?

A. Correct.

Q. All right. And the names listed there are Jane, Combs and Paul, right?

A. Yes.

MS. GERAGOS: OK. Under Jane, you have several photo exhibits, Government Exhibit E306, E307. Could we bring those

two exhibits up, please, and side by side.

Q. All right. And these are photographs that you checked were from that date range, right?

A. Yes.

Q. And does it reflect they're at a dinner table here?

A. Yes.

Q. All right. They're eating?

A. Yes.

Q. Mr. Combs has food in front of him?

A. Yes.

Q. And a drink in front of him?

A. Yes.

MS. GERAGOS: All right. If we could go back to the chart. OK.

Q. And then, under Jane, you list Government Exhibit A-510-F, right?

A. Yes.

MS. GERAGOS: All right. So if we could bring up Defense Exhibit 3070, which is the corresponding defense exhibit to A-510-F, and go to page 8 and 9, please. All right.

Q. Do you see that these are from August 27 of 2022, UTC time?

A. Yes.

Q. OK. And Jane writes: "Home, baby. I love you." Right?

A. Yes.

Q. How does he respond?

A.   "Mad.  I feel mangled.  I can barely keep my eyes open at this game.  Fucked.  LOL."  And it looks like a laughing-crying emoji.

Q.   OK.  She writes:  "OMG, baby, proud of you for pushing through," with tear emojis; "please get some food in your system," pray emoji; "I feel mangled too.  I'm beat," with a laughing emoji; "I took a shower sitting down.  LOL."

How does he respond?

A.   "How you feel."

Q.   "Mangled, LOL."

How does he respond?

A.   "Something was off in that batch."

Q.   "You took a lot, baby," smiley face emoji; "making love to you is one of the best feelings," with a smile -- tear emoji and several hearts.  Right?

A.   Correct.

MS. GERAGOS:  OK.  Could we go to page 10, next page.

Q.   And then he just responds with a heart face, right?

A.   Yes.

MS. GERAGOS:  Could we please go back to 1406, please.  All right.

Q.   And you see how under -- we're on line 15 right now -- under both Combs and Paul, you cite to Government Exhibit G-102, pages 10 to 16?

A.   Yes.

MS. GERAGOS: OK. Could we pull up G-102, page 16 and 17, please. All right.

Could we just zoom. Perfect. All right.

Q. These are from -- the message on the left is page 16, which you included in the chart, right?

A. Yes.

Q. OK. And these are messages between Mr. Combs and Paul Arthur, and that's why you included them under Combs and Paul, right?

A. Correct.

Q. And Combs writes to Paul: "Come over." Right?

A. Yes.

Q. And Paul -- how does Paul respond?

A. "OK."

Q. What does he say after that?

A. "Ran into security/driver."

Q. And then the next page, which is page 17, which is on the right, you did not include on the chart, right?

A. That's 17? No.

Q. Yes. OK.

And Mr. Combs writes: "damn. What they say?" And then: "All good. Happy b'day." Right?

A. Correct.

MS. GERAGOS: OK. We can take that down and bring 1406 back up. All right.

Q.  Next entry is August 30 of 2022 to August 31 of 2022, right?

A.  Yes.

Q.  OK.  And the names listed there are Jane, Combs and Paul?

A.  Yes.

Q.  OK.  And listed under Combs is a government exhibit, A-510-H.  Do you see that?

A.  Yes.

MS. GERAGOS:  OK.  So I'd like to bring up Defense Exhibit 3071-R, which is the corresponding defense exhibit to A-510-H, and if we could please go to page 8, please.  All right.  And page 9, both next to each other, make things easier.

Q.  All right.  And in this message Jane writes:  "My place is free tonight."  Right?

A.  Yes.

Q.  OK.  And then he just responds:  "Call me"?

A.  Yes.

Q.  See that?

MS. GERAGOS:  OK.  If we could just skip ahead to page 15, please.  All right.

Q.  And these messages are from UTC time, August 31, 2022.  Do you see that?

A.  Yes.

Q.  All right.  And that corresponds to the ending date range

of row 16, right, which is August 30 to August 31?

A.   Yes.

Q.   OK.  And here Jane writes to Mr. Combs:  "Stroking me to heaven tonight.  I'm a little mind blown.  LOL.  Had so much fun, baby.  I'll be waiting for you.  Love you."

And then about an hour and 45 minutes later, she writes: "Baby love, heart, before you lose service..I just genuinely wanted to tell you how much I appreciate your love and care for me.  I got on my knees and had a heartfelt thank you to God for my healthy child and for our genuine friendship.  I'll never take you for granted and will always make sure you always feel loved and supported by me.  My love for you is unconditional and for life.  Wishing you the most beautiful eye-opening heart chakra spiritual journey loving trip.  Love you so much," with a, I describe this emoji heart and fire.  Right?

A.   Yes.

MS. GERAGOS:  OK.  And if we could unzoom it.

Q.   And he responds with -- I think those are called bit emojis, but I'm not exactly sure, with the face and some hearts, right?

A.   Yes.

MS. GERAGOS:  OK.  Why don't we go to, back to 1406, page 7, please.  All right.

Q.   So the next entry here is approximately a month later, right?  We were just looking at August 30th to 31st, and now we

are looking at the next entry, which is September 24th to 25th of 2022?

A.  Yes.

Q.  OK.  And we looked a little bit at this on direct yesterday.  You said the location here is 200 South Mapleton and Las Vegas, right?

A.  Yes.

Q.  OK.  In the flight records you had -- and I'll just correct you; it's Van Nuys.

     In the flight records, you had Van Nuys to Las Vegas and Las Vegas to Van Nuys, right?

A.  Yes.

Q.  Is there a reason why you put Las Vegas as the location here also, in addition to 200 South Mapleton?

A.  Those were the exhibits that were given to me to add to the chart.

Q.  OK.  But you didn't have any evidence of Paul being in Las Vegas, right?

A.  Unless it was given to me, no.

          MS. GERAGOS:  OK.  Why don't we just pull it up, just to confirm.  If we could go to --

Q.  Under Paul you have written GXG102 pages 31 to 35, right?

A.  Yes.

          MS. GERAGOS:  OK.  So let's pull that up.  All right.

Q.  And looking at these messages, these are messages between

Paul and Mr. Combs, right?

A. Correct.

Q. All right. And they're talking about meeting in Burbank, right?

A. Yes.

MS. GERAGOS: All right. Let's go to the next two pages. All right.

Q. And then they switch and Mr. Combs says to Paul: "Actually 200 South Mapleton." Right?

A. Yes.

Q. And he says -- Mr. Arthur says, on page 34: "On my way. 15 minutes away." Right?

A. Correct.

MS. GERAGOS: And let's just go, to make sure we look at everything, to page 35.

Q. And then here, again, they talk more about going to Burbank; that's the same address in Burbank, right?

A. Yes.

Q. All right. And this is September 24 of 2022?

A. The top message?

Q. Sorry. I'm sorry. That's the October 1 of 2022. But the top one, it says "three minutes away" and refers to the 200 South Mapleton message, right?

A. Yes.

Q. OK. So that's why you have -- if we could go back to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1406 -- you have 200 South Mapleton there and it corresponds to that government exhibit, correct?

A. Correct.

Q. But Las Vegas, there's nothing that you reviewed that indicates Paul was in Las Vegas, right?

A. No. Just the flight records for Jane.

MS. GERAGOS: OK. Let's just quickly check the flight records. If we could pull up six -- under Jane it lists 6G-116. Let's go to the next page.

Q. This shows -- VNY is the airport code for Van Nuys, right?

A. Yes.

MS. GERAGOS: OK. Let's go to next page. All right.

Q. And if you look at the passengers, without saying everybody's names, Paul Arthur is not listed as a passenger here on this flight manifest, right?

A. No.

MS. GERAGOS: OK. And if we could go to, I think, the next page -- all right.

Q. And if we look at the passengers on the leg 2 -- so leg 1 is Van Nuys to Las Vegas. Do you see that on the left side of the screen?

A. Yes.

Q. Saturday, September 24?

A. Yes.

Q. All right. And then the next page, which is Sunday,

September 25, that's leg 2.  They're returning back into Van Nuys, right?

A.  Yes.

Q.  All right.  And Paul Arthur isn't listed as a passenger on that leg of the flight either, right?

A.  Correct.

MS. GERAGOS:  OK.  So if we could go back to 1406, please.

Q.  So what is the reason then for listing Las Vegas in row 17?

A.  Because at that date range, I was given exhibits that show that there were people traveling to and from Vegas at that time.

Q.  OK.  So this is just to show that both Jane and Combs went to Las Vegas?

A.  Yes.

Q.  OK.  OK.

Next, next line here is about five days later.  It's October 1 of 2022, in Burbank, California, right?

A.  Yes.

Q.  All right.  And we just looked at that one message in G102 that showed Burbank, right?

A.  Yes.

MS. GERAGOS:  OK.  So why don't we then go to --

Q.  See under Jane, you have listed here G103, pages 43 to 47. That's a conversation between Jane and Paul, right?

A.   I don't have that memorized.

          MS. GERAGOS:  No problem.  Let's bring it up.  G103, page 43 to 44.  Perfect.

Q.   Do you see that this is, without saying her number, this is a message between Jane and Paul?

A.   Yes.

Q.   OK.  And here, this is a reach-out from Jane to Paul on October 1 of 2022, right?

A.   Correct.

Q.   And she says:  "Hey, hey.  Ready for some fun tonight." Right?

A.   Yes.

Q.   OK.  And what does he respond with?

A.   "Absolutely."

Q.   And next page?

A.   There's no message in the first one.

     "How you feeling?"

Q.   She responds:  "Great."  Right?

A.   Yes.

Q.   Next two pages.  And she says:  "The butlers are meeting to help for about 30 minutes, 30 to 45 minutes, so I was saying about an hour or so.  What time did he tell you to come?"

     What does he respond with?

A.   "1:30."

Q.   She says:  "Maybe 1:45."

How does he respond?

A. "OK."

Q. "There's a lobby if you are early, but I just asked guys your ETA. I think ten mins so add 15 to that." Right?

A. Yes.

MS. GERAGOS: All right. So if you could go to G102, pages 37 and 38, please. All right.

Q. And this is a message between Mr. Arthur and Mr. Combs, right; same day?

A. Yes.

Q. OK. And Mr. Combs writes to Paul: "We in a serious vibe. How you feeling." Right?

A. Yes.

Q. All right. How does Paul respond?

A. "I'm feeling good."

Q. And Mr. Combs writes: "LMG." Right?

A. Yes.

MS. GERAGOS: OK. If we could go to, next page, please. All right.

Q. And then on the left side of the screen, on page 39, Mr. Combs writes to Paul: "Hold up. The staff is outside. They leave now. Hang tight." Right?

A. Yes.

MS. GERAGOS: All right. Let's go back to 1406, please. All right.

Q.   So looking at this page, and this is page 7, the first time you see Antoine show up in your chart, 1406, is item -- row 19, right?

A.   Yes.

Q.   Because if you look, it's in front of you.  We could go through all the pages, but if you look at pages 1 through 6, there's no mention in the names column anywhere of Antoine, right?

A.   Correct.

Q.   He first shows up October 8 of 2022?

A.   He shows up within that time frame, yes.

Q.   OK.  And that's 19 time periods into your chart, right?

A.   Row 19?

Q.   Yup.

A.   Yes.

        MS. GERAGOS:  OK.  If we could, if you look under, let me check.

Q.   If you look under Jane and also under Paul, you cite to G103, page 48 to 51.  Do you see that?

A.   Yes.

        MS. GERAGOS:  All right.  Could we go to G103 and just put up pages 49 and 50 next to each other.  All right.

Q.   And you see that -- and again, this is 103, which is a message chain between Jane and Paul, right?

A.   Yes.

Q.   All right.  And this is October 8 of 2022, UTC time, Jane writes:  "OK.  Cool.  Not sure what the vibe is today, but will def hit you up and see where you're at and all that."  Right?

A.   Yes.

Q.   How does he respond?

A.   "OK.  Sounds good."

Q.   Next page, she writes:  "What's your availability today?  We're trying to meet in the BH, if trying to meet in the BH or Burbank area?"

And what does he respond?

A.   "I'm available after eight."

Q.   And she says:  "OK.  Great.  Keep me posted," exclamation point.  Right?

A.   Yes.

Q.   Now, that is again on October 8 of 2022, right, UTC time?

A.   Yes.

MS. GERAGOS:  All right.  So let's go to G-102 at pages 41 and 42, which you have listed under Combs.

Q.   All right.  And these are messages between Combs and Paul, right?

A.   Yes.

Q.   All right.  And on the left-hand side, these are the ones we were just looking at, the middle text message is afterwards; it's October 9 of 2022 at 2:09 p.m. UTC time, right?

A.   Correct.

Q.   OK.   And Mr. Combs writes to Paul the address in Burbank, right?

A.   Yes.

MS. GERAGOS:   OK.   And all right.   Let's head back to 1406.   All right.

Q.   So we're leaving off, and again, this is the first time Antoine appears on your chart, and that's row 19 on page 7, and we're on October 8th to 9th of 2022, right?

A.   Yes.

Q.   All right.   So next page is page 8, and that next date is about a month later, on November 6 of 2022, right?

A.   Yes.

Q.   All right.   And the names listed here are Jane, Combs and Paul, right?

A.   Correct.

Q.   All right.   So under Jane you have listed G103, pages 51 to 65, right?

A.   Yes.

Q.   And then, and then also under Jane is Government Exhibit A-104-35, right?

A.   Yes.

MS. GERAGOS:   Let's just take those in turn.   If we could pull up G103, 51 and 52 side by side.   All right.

Q.   And this is again a message between Paul and Jane, and you see the message on the left-hand side, that's Jane to Paul on

November 5, so one day earlier, 10:55 p.m. UTC time, right?

A.   Yes.

Q.   And she writes:  "Hey, P.  Hope you're well.  Are you possibly free this evening?  It's for his b'day."  Right?

A.   Yes.

Q.   And what does he respond with?

A.   "I'll be back in town tomorrow morning."

Q.   She says:  "Oh, OK.  What time do you land?"

          MS. GERAGOS:  Next two pages.

Q.   What does he say?

A.   "6:30 a.m."

Q.   OK.  She says, on the next page, skipping some messages:  "LOL.  Safe travels."  Right?

A.   Yes.

          MS. GERAGOS:  OK.  Let's go to the next two pages.

Q.   And she says:  "No way you can arrive late tonight."  Right?

     How does he respond?

A.   "I can't."

Q.   She says:  "OK.  Darn.  See you bright and early in Burbank.  Haha."

     How does he respond?

A.   "LOL, OK."

Q.   She says:  "Hey, P.  Have you landed yet?  Do you need addy here?"  And she gives him the address in Burbank, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.  Yes.

MS. GERAGOS:  We can go to the next two pages.

Q.  And then she responds again:  "LMK when you land," exclamation point.

And how does he respond?

A.  "Just landed."

Q.  "OK.  Great," exclamation, exclamation, "come," exclamation, exclamation.  Right?

A.  Yes.

Q.  Next page.  And then he says:  "Five mins away," and she says:  "Hi.  OK," right?

A.  Yes.

MS. GERAGOS:  All right.  So now let's look at Government Exhibit A-104-35, if we could go to page 4.

Q.  This is the messages between the two of them that you have listed under her name in the chart, right?

Do you recall citing to A-104-35?

A.  Yes.

Q.  OK.  And if you see on the last message, which is November 10 of 2022, she says:  "Baby, just settled in.  Love and appreciate you..here if you need me," with two hearts.  Right?

A.  Yes.

MS. GERAGOS:  OK.  Let's go back to our chart.  So the next entry we have is December 18, yes, to December 20 of 2022.  The jury's seen that.

Q.  So we'll skip ahead to the next entry, which is row 22, January 9 of 2023, right?

A.  Yes.

Q.  All right.  And you have several photos under Jane, the GX E281 to E283.  Do you see that?

A.  Yes.

Q.  And we also have E285?

A.  Yes.

        MS. GERAGOS:  All right.  Could we take those in turn. If we could go to E281 and then two put them side by side.

Q.  Those are photos of the two of them that you determined to be during that date range?

A.  Correct.

        (Continued on next page)

BY MS. GERAGOS:

Q.   If we could go to 283 and 285 -- sorry E-283 and E-285. That's another photo of them that you determined to be from that date range, right?

A.   Yes.

Q.   Do you see that bracelet there that she's wearing?

A.   I do.

Q.   And then E-285 is on the right side of the screen, right?

A.   I can't see the exhibit number.  It says Menu.

Q.   Why don't we just have E-285 up and take down E-283.  You see E-285?

A.   Yes.

Q.   This was found on her phone?

A.   I believe the iCloud, yes.

Q.   The iCloud, I apologize.  You're right, the iCloud.

A.   Yes.

Q.   There's several heels here, several female outfits.  Do you see that?

A.   Yes.

Q.   Do you see on the bottom part of the -- middle part of the screen, I should say, the boxer briefs that are -- there's two of them there.  Do you see those?

A.   I can't decipher what those are.  Not on this screen, no.

Q.   Yeah, this screen is a little hard to see at times.  Okay. No problem.

Could we bring up Defense Exhibit 3080-R, page 3.

Do you see that this is January 12, 2023 at 5:16 a.m. that's UTC time?

A.   Yes.

Q.   And this is two days-ish, maybe one day, after the entry at line 22, which is January 9, 2023 to January 10, 2023, right?

A.   Yes.

Q.   All right.  And she writes to him: "Love you baby.  Hope you have a good night.  I'm gonna sleep early.  I loved every minute WU," right?

A.   Right.

MS. GERAGOS:  If we could take that down.  If we go to the next page, which is page 9.

Q.   The next entry there is January 20, 2023 to January 22, 2023, right?

A.   Correct.

MS. GERAGOS:  And this is -- I think we could just turn the screen back on and put up 1407-R, and go to page 30. We can turn on the screens very briefly.  We don't do it in detail since we've already done it in detail on direct examination.

Q.   Starting at page 30 here, this corresponds to generally to line 23 of 1406, right?

A.   Yes.

Q.   And the first record here listed at line 337 is a travel

record from Las Vegas to SNA for Kabrale Williams.  Do you see that?

A.  Yes.

Q.  And you didn't have any -- you didn't review any exhibits that showed that either Jane or anybody affiliated with Mr. Combs booked that travel record, right?

A.  Booked that Spirit Airlines travel record?

Q.  Yeah?

A.  I don't remember I would have to see that exhibit.

Q.  Okay.  We could -- I think we can bring up 6J-104.

We're having trouble bringing it up.

Can we go quickly to page 32 here?  The last two lines, lines 359 and 360, are messages from Jane to Combs and Combs to Jane, right?

A.  Correct.

Q.  Jane says:  "Want to send one of the guys here to drop everything off?"  Do you see that?

A.  Yes.

Q.  And how does he respond?

A.  "I don't want them to know."

Q.  If we could skip ahead to page 37.  And then Combs writes to Jane on line 413: "Paul gonna meet us at 9:30," right?

A.  Yes.

MS. GERAGOS:  If you could go to the next page.  And the next page.

Actually, what we should do -- I'm so sorry to do this Mr. Deputy. Can we turn off the screens again? Am I good to proceed? Can we pull up DX-3083 which is the corresponding Defense Exhibit to those and go to page 13, please and page 14.

If we could actually go to page 12 and 13 next to each other.

Q. You see that message from Mr. Combs, he says: "Paul gonna meet us at 9:30," right?

A. Yes.

Q. And her response on the next page is: "Okay baby. All sounds good," with a winky face and a tongue-out face emoji, right?

A. Yes.

Q. If we could go to -- then below on the last two messages on page 13, she writes: "Everything is going to be lovely when we see each other. I'll text as soon as I am in the car, okay. Okay. Perfect. I'm rushing. No worries. I'll be fast," right?

A. Yes.

MS. GERAGOS: And then if we could go to 14 and 15, please.

Q. And he says: "Can I walk in on you and Paul? I would like that, WYD," right?

A. Yes.

Q. And she says: "Yes."

And he says: "Okay. So what time should I tell him?"

And how does she respond?

A. "Maybe 9:30 so he doesn't run into anyone?"

MS. GERAGOS: If we could go back to 1407-R. If we could go to page 43.

We could very briefly I think turn back on the public screen

THE COURT: Are the screens back on?

MS. GERAGOS: They're back on.

Q. At this point now we're at page 43 on January 21 of 2023, she writes to him: "Good morning" smiley face. UR in town. Are you awake," right?

A. Yes.

Q. At this point we looked at these messages at length yesterday, so I don't want to go one by one, but at this point she already sent money to Cowboys4Angels, do you remember that, the day before?

A. I'd have to review that.

MS. GERAGOS: We could go -- let's turn the screens off then.

THE COURT: Let's turn the screens off.

MS. GERAGOS: We could go back to 1406 page 9. Do.

Q. You remember this text where Combs sends to Jane the flight -- if you look under Reggie, "The flight is $420. And this is an overnight rate. You can Cash App the $420 for the

flights and the $680.  Total $1100.  $Cowboys4Angels," right?

A.  Yes.

Q.  Do you recall that?

A.  Yes, I do.

Q.  At this point, she has also communicated with Paul, do you recall that?

Jane had communicated with Paul by this point?  If not, we can pull up the exhibit.

A.  Yeah, I don't remember every interaction.

Q.  I understand.

MS. GERAGOS:  Why don't we go to G-103, page 68.

Q.  Do you see how the bottom message here, she reaches out to Paul and says: "Hey P!"?

A.  Yes.

MS. GERAGOS:  Let's go to the next two pages, please.

Q.  And she says: "Just wondering if you were here yet.  If not, it's okay.  I need a sec anyway," right?

A.  Yes.

Q.  The next page, she says: "Okay, let me make sure the coast is clear," right?

A.  Yes.

Q.  And then do you remember looking at the messages from these times where -- I mean, from the day before where she told Mr. Combs that it was a thumbs up for debauchery night?

A.  I remember generally, yes.

Q.   And then we just looked at 1407-R where she then texts Kabrale, where she says, "Hey, good morning.  UR in town.  Are you awake?"  Right, the one we just looked at?

A.   Yes.

MS. GERAGOS:  Could we pull up Defense Exhibit 3084, page 3, please.  Let's go to page 1 so we could see the participants.

Q.   This is between Mr. Combs and Jane, right?

A.   Correct.

Q.   And these are from January 24, 2023, 4:00 a.m., UTC time though, right?

A.   Yes.

Q.   So this is directly after the line item in 23 which is January 20, 2023 to January 22, 2023?

A.   Yes.

MS. GERAGOS:  So can we please now go to page 3.  We could zoom in on the bottom two messages.

Q.   And she says, "I'm home baby.  Thank you for prioritizing our dinner.  Means a lot to me.  Safe travels to you, the fam, and the team.  I love you," right?

A.   Yes.

MS. GERAGOS:  If we could go back to 1406 -- this is 1407.  We could go back to 1406.  Sorry.  Government Exhibit 1406.  There we go, page 9.

Q.   So we just finished briefly reviewing what we've already

extensively reviewed which is January 20, 2023 to 22 of 2023, right?

A. Yes.

Q. All right. And now the jury has seen a lot on item 24, but the item 24 is February 7, 2023 to February 10 of 2023, right?

A. Yes.

Q. That's at the Nobu Hotel?

A. Yes.

MS. GERAGOS: Let's go to the next page.

Q. These two date ranges cover March of 2023, right?

A. Yes.

Q. So there's a date in March 15 of 2023, that's Miami, Florida. And then Turks and Caicos is the 16th to the 19th, right?

A. Yes.

MS. GERAGOS: If we could pull up -- then if we could just go to the next page, which is page 10 -- I mean, 11. Thank you.

Q. Then right after Turks and Caicos, you list Four Seasons, Miami, Florida, March 21 of 2023 to March 23 of 2023, right?

A. Correct.

Q. Could we go to -- and Kabrale is listed there?

A. Yes.

Q. And then the conversations between Kabrale and Jane are GX-F-101, do you recall that?

A.   Yes.

MS. GERAGOS:   So we could just go to the corresponding Defense Exhibit, which is 3328, please, and go to page -- start at page 171.

Q.   This is the corresponding exhibit.   These start at March 16 of 2023, right?

A.   Yes.

Q.   And Jane here writes:   "Hey, how are you?   Hope all is well.   Sorry haven't been in touch.   Just been busy W life.   I was wondering I had some time off this Friday-Saturday.   Would you be able to come to Turks by any chance?   You would need a passport, and I think vaccination card.   LMK what you think."

What does he respond with?

A.   "Wassup lovely.   You're good.   Yes, I will be available I. definitely have my passport.   I don't have a vaccination card though."

Q.   She says: "Hi.   Okay.   Hmm.   I'll see if we have any connections to make one or would you have any in ATL?"

What does he say?

A.   "I'll ask around."

Q.   She responds: "Yes" with a hands up emoji.   And she says down below, "Hey, good morning.   Okay.   Great.   I'll ask.   I tried asking if a photo proof was enough or if it needed to be hard copy.   I'll re-ask again.   Didn't hear back!   But yes LMK," right?

A.   Yes.

MS. GERAGOS:   All right.   Then if you could go to 175 to 176, please.

Q.   And now this is a few days later.   This is March 21 of 2023, right?

A.   Yes.

Q.   This is a date that corresponds to row 27 on page 11 of 1406?

A.   Yes.

Q.   She reaches out to him and says:   "Hey, how are you?   Would you happen to be available tonight for this 10:59 flight to Miami, by any chance?"

And how does he respond?

A.   "Wassup beautiful.   Yes, I could make it."

Q.   "Okay, Let me try to work this out" with a fairy emoji and more emojis."

He loves that message, right?

A.   Yes.

Q.   She says:   "Okay.   I'm organizing it now.   It should take about an hour to get this flight.   There's only one left.   Hope I can get it in time," right?

A.   Yes.

Q.   Next page, she says:   "Hi.   You're all set!   Don't miss your flight.   LOL! I'll let you know hotel to meet up once I have it," right?

A.   Yes.

Q.   How does he respond?

A.   "Bet it up lovely" with a smiley emoji "Excited to see you as always.  I'll let you know when I'm at the airport."

Q.   She says:  "Me too."  She says:  "Okay.  Cool."  Smiley face, right?

A.   Yes.

        MS. GERAGOS:  Could we go to 179 to 180?

Q.   All right.  Now, do you see her message at the bottom there on March 22, 10:13 p.m. UTC time?

        She says:  "Tonight was amazing.  Thank you for always bringing that good energy.  I can't find my gold bracelet.  If you remember where I put it, LMK" with prayer hands "TYSM," right?

A.   Yes.

Q.   What does he respond with?

A.   "Wassup lovely.  No problem, and it should be on the sheets on the floor by the couch last place I seen it."

        MS. GERAGOS:  Could we go to page 182.  All right.

Q.   She says:  LOL!!  OMGGGG.  Okay.  I'm glad you got some. I'm about to sleep now.  Tonight was fun!Text me when you land."

        And what does he say?

A.   "Good night lovely.  Definitely had a great time with you baby," with a smiling emoji.

MS. GERAGOS:  Okay.  We can take that down.

Q.  The next date listed here on row 28 is April 19 of 2023 to April 20 of 2023, right?

A.  Yes.

Q.  And the names listed are Jane, Combs, and Paul?

A.  Correct.

Q.  Under Paul, it says G-103, pages 102 to 113?

A.  Yes.

MS. GERAGOS:  Could we go to G-103 but start earlier at page 87, please.

Q.  Do you see that these are messages between Jane and Paul?

A.  Yes.

Q.  All right.  And these start on page 87 a little bit earlier than April 19, right?  They start on April 14, 2023 UTC time?

A.  Yes.

Q.  And these pages 87 and 88, these are not included in your chart, right?

A.  No.

Q.  And Jane writes here: "Hey, Paul.  Hope you're well.  I'm trying to organize a welcome home evening for Sean.  I don't think it will be this weekend but I'm not too sure ...  Either way just wanted to know your schedule this weekend and 17th week?  Thank you!" right?

A.  Yes.

Q.  And he responds saying:  "Hey" and Jane's true name "I'm

available 17th to the 20th," right?

A.  Yes.

Q.  She says:  "Okay, those dates are perfect.  We'll all be in LA.  Okay, those dates are perfect.  We'll all be in LA," right?

A.  Yes.

Q.  I guess it's edited.  It's an edited message.  The label says edited?

A.  Yes.

Q.  And he loves that message?

A.  Yes.

         MS. GERAGOS:  Then if we could go to the next two pages.

Q.  She says: "I'm thinking 18th, but keep you posted," right?

A.  Yes.

Q.  He responds:  "Okay"?

A.  Yes.

Q.  And she says:  "You're free Thursday the 20th and unavailable Friday the 21st," right?

A.  Yes.

Q.  How does he respond?

A.  "Right."

Q.  And then two text below, she says to him -- and this is the 15th now, April 15, 2023 at 3:47 p.m. UTC?

A.  Yes.

Q. She says: "Hey P. Good morning. Sean's schedule is more flexible for today. Are you possibly also available too? Thank you," right?

A. Yes.

MS. GERAGOS: Next page.

Q. And then she says: "NVM. It might be for Tuesday," right?

A. Yes.

Q. Two texts below, she says: "Hey Paul" -- and this is the 17th now, April 17, 5:38 p.m., page 91, right?

A. Yes.

Q. This still -- page 91 and page 92 are still not what's listed in your chart on line 28, right?

A. No.

Q. And she says: "Hey Paul. Good morning! Sean just texted me Thursday .... And you have to leave at what time Friday? Thank you."

And what does he say?

A. "7:00 a.m."

Q. She says: "Oh boy LOL."

What does he say?

A. "LOL I know."

Q. So she says: "Okay. Cool we'll see you for sure Thursday. Maybe we'll link earlier," right?

A. Yes.

Q. She says: "Okay. And so you have to be out at 7:00 a.m.

or like 6:00 a.m."?

And what does he say?

A.   "Out at 7."

Q.   She says:  "Okay.  Got it.  Thanks P.  Keep you posted,"
right?

A.   Yes.

MS. GERAGOS:  Go to the next two pages.

Q.   She asks again on the 17th, "Are you also available
Wednesday," right?

A.   Yes.

Q.   And the next page she says:  "Okay, perf.  Then try and
organize," right?

A.   Yes.

Q.   And then at the bottom, she says:  "Hi.  When are you back
FR UR trip," right?

A.   Yes.

MS. GERAGOS:  Next two pages.  Thank you.  All right.

Q.   And if you look at page 98, she writes him:  "What time do
you land the 22nd?  That might actually work a lot better for
us," right?

A.   Yes.

Q.   "I'll relay message.  I think Saturday is best," right?

A.   Yes.

MS. GERAGOS:  Okay.  If we could keep going.

Q.   Pages 99 and 100 are more messages with them organizing,

correct?  Do you see that?

A.  Yes.

MS. GERAGOS:  Okay.  We could go to the next two pages.

Q.  And then at 102, which is the page on the right, she writes: "Hey, did he give you a time for today?  It's around 6," right

A.  Yes.

Q.  And that's when you start -- in the chart, that's when you start the government exhibit for this time period, right?

A.  Yes.

Q.  Which is April 19, is that right?

A.  Yes.

MS. GERAGOS:  Okay.  If we do just go one -- sorry, I wanted to go back to that exhibit and go a few more pages.  If we could go to the next two pages.  And then if we could --

Q.  Paul says:  "He didn't give me a time," right?

MS. GERAGOS:  And if we could just zoom in -- I'm not sure it will show up.  If we could zoom in on the attachment on page 104.

Q.  Do you see how that says:  "L'Ermitage Beverly Hills"?

A.  It appears that way, yes.

Q.  And Jane is sending that to Paul, right?

A.  Yes.

Q.  And that's what you determined to be -- to fall in the date

range on row 28, right?

If you look at row 28, you list location as the L'Ermitage Hotel?

A. Yes.

MS. GERAGOS: Could we go to the next two pages?

Q. So he -- and then if you look at her message on the bottom on the left: "He just 445. So give it a beat for security and drop off," right?

A. Yes.

Q. Then the next page, she says: "Running a little behind. I think it's going to be closer to 6 honestly." You see that?

A. Yes.

MS. GERAGOS: Okay. If you go to the next two pages.

Q. And she says: "He just pulled up so give it a beat," right?

A. Yes.

Q. And the next page, on page 108, she says: "He's still making sure everyone's gone outside," right?

A. Yes.

Q. How does he respond?

A. "25 mins."

Q. "Okay, that's perfect" is her response, right?

A. Yes.

MS. GERAGOS: Next two pages.

Q. And then if you look at the page 110, she says: "OMG P!

You should have been here.  Come!  How long," right?

A.  Yes.

MS. GERAGOS:  All right.  Next page.

Q.  And then if you look at page 112, she says:  OMG.  Okay. Hurry.  I thought you meant you were 25 min away."

"Paul how far are you," right?

A.  Yes.

Q.  And then she gives him the room number on page 113.  Do you see that?

A.  Yes.

MS. GERAGOS:  Let's go back to 1406.  Perfect.  All right.

Q.  And then the next row is row 29.  Do you see that?

A.  Yes.

Q.  The names listed there are the same Jane, Combs, and Paul, right?

A.  Yes.

Q.  And under Jane, you list Government Exhibit A-442-12.  Do you see that?

A.  Yes.

MS. GERAGOS:  All right.  If we could pull up the corresponding Defense Exhibit to that Government Exhibit, which is 3127, please, and go to pages 1 and 2.

Q.  Here he writes at the bottom on April 24, 2023, "Can we have a party at your house later?  I'll set up.  Let me know.

Or tomorrow?"  Right?

A.  Yes.

Q.  The next he writes four question marks, right?

A.  Yes.

Q.  She responds:  "Hey baby, call me back"?

A.  Yes.

Q.  How does he respond?

A.  "In booth.  Can you tonight?  What's your vibe?  I still got some freak in me."

Q.  She loves that message.  And says:  "You want me baby.  Yes. tonight works" kissy face, wink with tongue out face "Give me my dick."

And how does he respond?

A.  "Yeah, I think the party could have been better.  No fault of yours."

MS. GERAGOS:  If we could go to the next two pages.

Q.  He says:  "Reach out" -- that's your line.  How does he respond?

A.  "Reach out to the Italian."

Q.  She says:  "My house isn't free because there's open boxes and clothes everywhere."  And emphasizes, "Yeah, I think the party could have been better," right?

A.  Yes.

Q.  And he how does he respond?

A.  "Damn."

Q. She says: "The party could have been better, really? Why..."

And how does he respond?

A. "Okay. Where. You find place. I can't have KK know. Damn."

Q. She says: "Okay" -- sorry -- "I'll reach out. How about P?"

How does he respond?

A. "Imma reach out."

Q. And she says on page 4: "Italian is avail. I said I'd confirm time and location once I have it."

How does he respond?

A. "Okay. Can you find location PLS."

MS. GERAGOS: Can we skip ahead to page 24 of this and 25.

Q. She writes on April 25, 12:14 a.m. UTC time, so that's the 24th: "Should we postpone TMW. I need to find the card and try and book the room on our own and organize a few things on my end."

And how does he respond?

A. "No, I'll handle. No stress. Just fine for me."

Q. Then if you look at page 25, halfway down the page starting with: "You okay?"

How does he respond?

A. "You okay? If you ain't in the mood. You in the mood?"

Q.   She says:  "Yes.  Just wanting to feel prepared," right?

A.   Yes.

Q.   If we could go to -- perfect.

She says:  "didn't know you were unsatisfied."

And how did he respond?

A.   "So will you be parpared by 11?"

Q.   Then if you look at the next page, page 27, she says:  "I stopped to got a couple more outfits N stuff."

What does he respond with?

A.   "I booked already."

Q.   Then she responds:  "Okay, baby.  Just tidying up here and ordering dinner and then getting ready.  Should I tell Italian 11:30 and then just LMK where."

And what does he say?

A.   "11."

Q.   Next page, she writes to him:  "Hustler is on the way there.  If there's anything last minute we need, just LMK babe," right?

A.   Yes.

Q.   What does he respond?

A.   "Whatever you think."

Q.   She says okay with a -- I suppose that's a thinking emoji and says:  "Joey just called me.  Are him and I supposed to talk about anything," right?

A.   Yes.

MS. GERAGOS: So if we could go to page 34 and 35, please.

Q. At the bottom of this page, he writes: "Did you get pill? Hit me when coast clear. Hey," right?

A. Yes.

Q. What does she respond with?

A. "Hey babe, yeah. Joey is gone I hope and Italian is pulling up."

MS. GERAGOS: If we could now go to 37 or -- 37 -- page 37. All right.

Q. So do you see the bottom of this page is April 25, 2023 at 11:38 p.m. UTC time?

A. Yes.

Q. She writes: "You dicked me down so amazing baby. You had this pussy so juicy all night. Damn," right?

A. Yes.

MS. GERAGOS: Can we go to next page?

Q. She says: "I love you loving on me n me you," right?

A. Yes.

MS. GERAGOS: And that is if you look at -- if we go back to 1406, row 29 of page 11. No. No. Government Exhibit 1406. Thank you. And page 11.

Q. And that is -- that corresponded to the end of the date range here in row 29, right?

A. Correct.

Q.   And if we go to the next page, it's about three weeks later, May 15 to May 16 of 2023, right?

A.   Yes.

Q.   All right.  And there are no -- you list several Government Exhibits under Jane, Combs, Paul and Kabrale.  Do you see that?

A.   Yes.

Q.   You don't list any communications between Jane and Combs for this date range.

     Is there a reason why you didn't list any communications between the two of them that correspond to this date range?

A.   Again, if it's not listed on the chart, it's because they weren't provided to me as an exhibit to review.

     MS. GERAGOS:  Okay.  Could we pull up --

Q.   Let me ask you this way:  Do you remember reviewing Government Exhibit A-442-15 or do you not know either way?

A.   I would have to see the exhibit.

     MS. GERAGOS:  Could we pull it up just for the witness and the parties only A-442-15.

Q.   Do you see in the -- the question is only whether --

     MS. GERAGOS:  We could go to the next page, you could see the dates.

Q.   -- whether you reviewed this exhibit when preparing the chart?

A.   If this exhibit is listed in the chart, anywhere in the

chart, then yes, I reviewed it.  I just --

Q.  Okay, but it doesn't refresh your recollection looking at it as to whether you reviewed it?

A.  No.  I've seen a lot of exhibits that look like this, and I just don't have it memorized.

Q.  Okay.  Understood.

MS. GERAGOS:  Pull up Defense Exhibit 3130.  This is in evidence so it can be for the jury as well.

Q.  Do you see that this is May 12 of 2023?

A.  Yes.

Q.  And this is just a few days before for the entry listed on row 30 which is May 15, 2023 to May 16 of 2023, right?

A.  Yes.

MS. GERAGOS:  Could we go to page 3 and 4, please.

Q.  And do you see that Jane writes here:  "I know what you like daddy," right?

A.  Yes.

Q.  What does he respond?

A.  "The last time with chef or time after."

Q.  She says: "You gotta delete our texts after.  LOLLLL" with many L's.  "The last time at The London when I was super hot, you were like" and then multiple emojis, right?

A.  Yes.

Q.  She says:  "At the London before you left for NYC, we didn't film.  You forgot it."  With an emoji.  "You promised

you wouldn't forget," right?

A. Yes.

MS. GERAGOS: Can we go to page 5, please?

Q. How does he respond?

A. "Can't nobody fuck with you. Come get all this nasty kinky loving."

Q. All right. And she loved both of those messages and then sends several emojis: The smirk face we've talked about, the kissy face, devil face, eggplant emoji, several kiss faces and tongue-out emojis, right?

A. Yes.

Q. She says: "I hear you daddy n I'm coming baby. Nasty kinky good loving."

On the next page on page 6, she says: "Baby can you send me something TMW so I can arrange it and get a few things? Baby I love you. I'm message you as soon as I wake up. That video you sent me was hot" with like the sweat emoji, the smirk emoji and several others, and then says: "Can't wait," right?

A. Yes.

MS. GERAGOS: If we could go to page 8, please.

Q. She writes May 12, 4:14 p.m.: "Chef's avail Monday. Hi babe. Trying to reach you," right?

A. Yes.

Q. She says: "Baby, was just needing you to help me arrange a couple things and get a few things today for the trip but can't

reach you.  Think we won't make the cutoff time."

Then a few hours later:  "Baby all is set" with hearts, right?

A.  Yes.

Q.  If we could go to -- if you look at your 1406 at line 30, under Kabrale, you list the Government Exhibit F-101 there, right?  Do you see that?

A.  Yes.

MS. GERAGOS:  Could we just go to the corresponding Defense Exhibit, which is 3328, and go to page 189.  If we could go pages side by side, that would be helpful.

Q.  These are the same date, May 12 of 2023.  Do you see that?  And then on the right side, it's May 13 of 2023, but all in UTC time, do you see that?

A.  Yes.

Q.  She says:  "Hey good morning.  Happy Friday" smiley face.  "Was just wondering your availability this Monday, the 15th to fly into Miami," right?

A.  Yes.

Q.  On the next page, skipping ahead in some text message, she says:  "Hey so would you be able to come to Miami maybe early evening this Monday.  I'll do the flights now and figure out the hotel maybe the night before or day of once I know," right?

A.  Yes.

Q.  We could go to next page.  If you look at page 191, are

they texting there to coordinate flights?

A. It appears that way, yes.

MS. GERAGOS: Could we skip ahead to page 195 and 196, please.

Q. This is May 15, right, which is the date listed on your chart?

A. Yes.

Q. And she says: "I'm just setting up the hotel now, and I'll send to you shortly," right?

And then do you see on page 196, he says: "just boarded love."

She loves that message. And she says: "okay yay" with several celebration emojis?

A. Yes.

Q. Let's go to the next two.

She says: "Text me when you land safely."

What does he respond with?

A. "I landed baby. Just called my Uber to the hotel."

Q. She says: "Okay" with a -- I guess a celebration emoji.

"Text me when you check in and rush over" with a smiley face, right?

A. Yes.

Q. The next page she sends him: "You okay?"

And that is about 20 minutes later, right?

A. About, yes.

Q.   And sends him several more emojis, right?

A.   Yes.

MS. GERAGOS:   If we could go to page 199.  All.

Q.   She says here on May 16, 3:05 a.m. UTC time:  "Give me a sec.  Clearing out the assistant.  They had to stop by to drop off stuff.  Can you wait in lobby for an SEC," right?

A.   Yes.

Q.   How does he respond?

A.   "Yes baby."

Q.   She says:  "Give me like ten more mins.  I'm trying to rush them out.  Hi.  Can you call 640 Chavez," right?

A.   Yes.

Q.   Then this is several hours later:  "Hey hon.  Hope you're resting well.  We just wanted to say thanks for coming out and always bringing your good energy" heart.  "Also do you have Zelle I can send you payment through there," right?

A.   Yes.

MS. GERAGOS:   If we could go back to 1406. Government Exhibit 1406, page 12.

Q.   There's several E series exhibits on Jane's name here, right?

A.   Yes.

MS. GERAGOS:   Could we just pull up -- just we'll review just a few of them, E-278 and E-279.

Q.   These were photos from Jane's iCloud account, right?

A.   Yes.

Q.   And you reviewed these.  They were taken at approximately this time period, right?

A.   Yes.

MS. GERAGOS:  Could we pull up E-287 and E-288 side by side.

Q.   These are two photos taken also from her iCloud account, right?

A.   Yes.

MS. GERAGOS:  And if we could then pull up E-289 and E-292 side by side.  Actually, I don't think we need E-289.  We could pull up E-292.

Q.   Do you see that, that's a photo of Jane from her iCloud?

A.   Yes.

MS. GERAGOS:  And then E-293 and E-295.

Q.   These are also two photos of them taken from her iCloud account?

A.   Yes.

Q.   From that same date range, right?

A.   Yes.

MS. GERAGOS:  All right.  If we go back to Government Exhibit 1406.

Q.   Listed under Paul is G-101, pages 16 to 26, right?

A.   Yes.

MS. GERAGOS:  Could we pull up G-101 and go to page

23, please.  Let's do 22 and 23 side by side.

Q.  Paul writes to Mr. Combs:  "Just got my food.  I'll be there in 30 minutes," right?

A.  Yes.

Q.  He says:  "All good."

On the next page, he says:  "you don't have to king. for real you good," right?

A.  Yes.

Q.  And Paul says:  "Yeah.  Just needed some food.  Other than that, I'm good," right?

A.  Yes.

MS. GERAGOS:  And then if we could look at what's already in evidence as Government Exhibit A-442-16.  Go to pages 7 and 8.

Q.  These are from approximately the same time period, right, May 15?

A.  Yes.

Q.  Do you see that?

A.  Yeah.

Q.  And if you look at your chart, you have it in front of you, this was not -- A-442-16 was not included in your chart, right?

A.  For row 30?

Q.  For row 30.

A.  No, it's not listed.

Q.  This is a message you see between Jane and Combs?

A.  Yes.

Q.  And she writes:  "I'm just here baby.  I'm showering now," right?

A.  Yes.

Q.  What does he respond with?

A.  "What you want me to do.  Me and Paul gonna finish a workout.  Then we're coming over."

Q.  And it continues?

A.  "Do you wanna make love or you wanna lay out?  What's your vibe?"

Q.  She says:  "Can you bring me some positive energy tea when you come.  Forgot my pack."

    What does he say?

A.  "What's your vibe?"

Q.  She says:  "Can you and I see each other a sec?  I haven't seen u."

    Next page?

A.  "Wanna come here?"

Q.  "Okay.  Sure."

    What does he say?

A.  "Imma come over there.  I want you.  I'm sorry."

Q.  She says:  "After I get dressed, I'll text you.  You can just come here.  It's fine.  I just want to see you.  Haha, jinx," right?

A.  Yes.

MS. GERAGOS:  We can now go back to Government Exhibit 1406, page 12.

Q.  So we reviewed several Government Exhibits and a Defense Exhibit from row 30.  And then the next entry date is May 19, 2023 to May 20 of 2023.  Do you see that?

A.  Yes.

Q.  Listed there is Jane, Combs, Paul and Kabrale, right?

A.  Yes.

MS. GERAGOS:  Could we look at AH-442-17, and go to page 12.

Actually, if we could go back to the chart.

Q.  Do you see that under Jane and under Combs, you didn't list an A-442-17?

A.  Correct.

MS. GERAGOS:  Can we pull it up, please, and go to page 12.

Q.  Do you see that this is from the same approximate date range of May 19 of 2023?

A.  Yes.

Q.  This is a message between Mr. Combs and Jane?

A.  Yes.

Q.  What does Mr. Combs write?

A.  "Is chef still here?"

Q.  She says:  "No.  JK."

Then she says:  "Yes.  LOL."

He says:  "Where is he?"

She says:  "Out here," right?

A.   Yes.

Q.   This was not included in the chart, right?

A.   No.

MS. GERAGOS:  You also listed in the chart 3D-114-A-R. So if we could pull that up, that first page.

Q.   Do you see these are text message between several of the personal assistants?

A.   I don't know if they are.

Q.   You don't know.  Okay.  No problem.

Do you see then the message, it lists May 19 of 2023 at 8:48 p.m.  Do you see that?

A.   Yes.

Q.   Do you see Kristina Khorram at the bottom says:  "List of what Jane wants for hotel.  Maybe new outfits.  Shorts for him size large.  Fruits.  Shakes.  Juices," right?

A.   Yes.

Q.   And the response is:  "Copy.  We got fruits, shakes, and juices.  I'm about to run to store quick and send her outfit options," right?

A.   Yes.

Q.   Ms. Khorram responds:  "Just send to me, and I'll send to her for now," right?

A.   Yes.

MS. GERAGOS:  We just saw a message from Kabrale.  So if we could bring up the corresponding Defense Exhibit to Government Exhibit F-101, which is 3328, and go to pages 205 to 206.

Q.  These messages begin on May 20, 2023 at 1:25 a.m. UTC time. So it would be May 19, East Coast time, right?

A.  Yes.

Q.  And she reaches out to him and says:  "Hey, what are you doing tonight," right?

A.  Yes.

Q.  And she says -- if you go to the next page on 206 -- "Okay, did you eat and everything?  Feel hydrated and everything?  I'll be at 1 Hotel residential side," right?

A.  Yes.

MS. GERAGOS:  If we could skip ahead to 207 and 208. If you look at 208 on the right side of the page, I'm skipping ahead.

Q.  She writes to him on May to, 2023, this is -- now it's 6:27 p.m. UTC time.  "Hey hun! I had a great time WU as usual! Just forward your Addy.  Have a safe flight and we'll talk soon."  Do you see that?

A.  Yes.

MS. GERAGOS:  If we could pull up Defense Exhibit 3136, please.

Q.  Do you see this is a message from Jane to Mr. Combs on

May 22 of 2023?

A. Yes.

Q. This is a couple days after the entry we just looked at in row 31?

A. Yes.

Q. She writes to him: I love you baby. I thank God for you every day. You are so special to me. I love every single moment WU. Congrats on your interview today! Can't wait to see you" with several heart emojis, right?

A. Yes.

MS. GERAGOS: And just a few more from this date. If we could bring up Government Exhibit E-113.

Q. We looked at that. And that is something that you put in, if you look at your chart, under Combs for that date range, right?

A. Yes.

Q. And then you also under Jane put E-297.

MS. GERAGOS: So could we bring up E-297 and E-298, which were also under Jane and Combs in your chart.

Q. These are also several photos from that date range?

A. Yes.

MS. GERAGOS: Let's pull up Government Exhibit 1407.

Q. So we just finished looking at row 31. That's May 19 to the 20th of 2023, right?

A. Yes.

Q. So the next row is a month after that. If you go to the next page on page 13, do you see that it's June 16 to 17th?

A. Yes.

Q. So the next exhibits that you looked at were a month after the May 2023, right?

A. Yes.

Q. Okay. And you list here Jane, Combs, and Paul, right?

A. Yes.

Q. All right. There's no Kabrale listed there, right?

A. No.

MS. GERAGOS: Can we bring up the messages with Kabrale, which is 3328 and go to 210 to 211, please.

Q. Do you see that this is from a few days earlier June 13 of 2023?

A. Yes.

Q. She writes here June 13, 2023 at 2:02 a.m.: "I was just wondering your schedule for this coming Friday, the 16th for LA," right?

A. Yes.

Q. And she -- he responds. And then she says: "Okay," smiley face. "I'll know for sure by TMW and keep you posted," right?

A. Yes.

Q. Then the next page is a message that begins on June 14 of 2023 at 11:07 p.m. UTC time, right?

A. Yes.

Q.   And she says:  "Hey" with multiple Y's, smiley.  "Hope you're having a good day!  Just wanted to update you that the schedule keeps changing a little bit.  So hard for me to plan it.  Going to try my best to let you know as soon as I get a solid plan," right?

A.   Yes.

Q.   If we could go back to the chart, please.  All right.  And you list under Jane A-442-19 here, right?

A.   Yes.

MS. GERAGOS:  So I just want to pull up the corresponding Defense Exhibit, which is Defense Exhibit 3145.  If we could bring that up and go to page 8, please.  And this is from June 16 -- if we could go page 8 and 9 next to each other.  Perfect.

Q.   This is June 16, 2023 at 4:00 a.m., which is UTC time.  And he writes:  "Friday 2:00 a.m. I land," right?

A.   Yes.

Q.   And she says:  "Okay.  Straight to hotel or home.  LMK what you want me to do BC Imma little confused," right?

A.   Yes.

Q.   If we could go to 10 and 11, please.

She writes to him:  "I really don't like how you spoke to me.  Felt really passive aggressive and weird.  You had zero complaints about the last time.  Why would you say you had complaints?  You said it was the most rejuvenating trip we've

ever had together and we had such a loving time.  You hardly called or FaceTimed me, and a lot was going on.  I've been chill, sweet, loving, not pressing you about anything.  I operate better feeling loved and appreciated.  Positive reinforcement.  Let's be positive and happy.  Remember that bad stressful Friday you had last time?  Nobu night?  And how I turned your entire day around?  We took it back to your place and then the at 1Star ... I just got like you called and gave me a rundown of all the things I'm doing wrong.  Imma little confused by it ...  But ...  Have a good night and sweet dreams."

And then the next morning, she says:  "Good morning and happy happy happy, it's Friday," right?

A.  Yes.

Q.  Could we go to 12 and 13, please.

She says -- and then he responds:  "P not free tonight," right?

A.  Yes.

Q.  She says:  "Really ...  I thought he was WU," right?

A.  Yes.

Q.  And he says:  "No."

She says:  "Don't worry.  I'm waiting to hear back FR chef and Italian.  It's still early.  Both their schedules were tight, so I'm just trying to see again," right?

A.  Yes.

Q.   What does he respond with?

A.   "No need.  I just wanna see you.  I'm tiger anyway."

Q.   What does he say after that?

A.   "May later."

Q.   She says:  "Okay baby.  We're going to have a great time together regardless.  I always just want you."

What does he respond with?

A.   "Party back on."

Q.   And if we go to -- that was about four hours later -- if we could go back.

Okay, that "Party back on" is about four hours after "I always just want you"?

A.   Yes.

MS. GERAGOS:  If we could go to 14 and 15.

Q.   All right.  And he says:  "Man what's up with my party? Get creative."

And she responds with:  "Drink lots of water and vitamins" heart.

"Do you want me to tell you who I got or?"

And what does he say?

A.   "No N but I have a surprise too."

Q.   She says:  "Okay baby" with several emojis and a heart, right?

A.   Yes.

Q.   What does he say?

A.   "Who's first?"

Q.   "Maybe Italian at 2:00 a.m.   What time is your surprise coming?"

What does he say?

A.   He says:   "I'll keep you posted."

Q.   If we could go to page 17, please.

He says:   "You got chef?"

And she says:   "We were trying so hard to make it work with the flight times and hours that he was free, but it wasn't working.   He had a really big chef gig he couldn't get out of. You know I was trying for my cheffy poo," right?

A.   Yes.

Q.   He says -- what does he say in response?

A.   "LOL.   Okay.   I'm headed to airport in like an hour."

MS. GERAGOS:   Could we just go to Defense Exhibit 3328, pages 209 to 210.

Q.   These are messages -- we've seen this exhibit before between Jane and Kabrale, right?

A.   Yes.

Q.   And this is the same time period -- approximate time period of June 13, right?

A.   Yes.

Q.   And she says to him June 13:   "Hey, hope you're well.   How have you been," right?

A.   Yes.

Q.  If you look at the next page, she writes:  "I was just wondering your schedule for this coming Friday the 16th for LA," right?

A.  Yes.

Q.  And she says later in the message:  "Okay, I'll know for sure by TMW and keep you posted.  Enjoy Florida," right?

A.  Yes.

MS. GERAGOS:  Let's go to the next two pages.

Q.  On June 14, she writes to him:  "Hey, hope you're having a good day!  Just wanted to update you that the schedule keeps changing a little, so hard for me to plan it.  Gonna try my best to let you know as soon as I get a solid plan," right?

A.  Yes.

Q.  Next two pages, she writes on June 16 here:  "Hi, sorry for this late text.  It's no rush.  Let me know if you possibly be up for coming to LA Saturday early morning or maybe late Friday night, but IDK how your schedule is.  Night." Smiley face, right?

A.  Yes.

MS. GERAGOS:  If we could go to the next two pages, please.  All right.

Q.  If you look at page 216, she says:  "Okay so ... how much would it need to be compensated if you did miss chef gig." Surprise face. "Just out of curiosity, not me trying to see if it can still work."

What does he respond?

A. "Sorry love. Will definitely make it happen next time. I could have did it if I had more of a heads up to move things around."

MS. GERAGOS: Could we go back then to Defense Exhibit 3145, and go to page 20.

Q. Then she says: "I want you to break me in" -- this is back between Combs and Jane.

She says: "I want you to break me in first though. It's been three weeks. Are you horny for me?"

What does he say?

A. "I wanted to watch you on FaceTime being bad. Am I gonna get to see that?"

Q. She says: "I think so baby. W timing, yeah. I'm gonna sort it out," right?

A. Yes.

Q. If we could go to page 29. All right.

Then they just say "love you" to each other, right?

A. Yes.

MS. GERAGOS: If we could go back now to 3228 pages, 213 and 214 side by side. Actually, we just looked at those, sorry. Go to G-103 page 116.

Q. These are messages between Paul and Jane, right?

A. Yes.

Q. These are from the date range that we're looking at in line

32, which is June 16 to 17, right?

A.   Yes.

Q.   But these G-103 -- this exhibit, I don't see it listed here in your chart?

A.   No.

Q.   So you didn't -- did you review these part of the messages or you don't recall?

A.   Not for that particular row.  If it shows up somewhere else, then yes, but not that particular row.

Q.   For this particular row, let's run through it quickly.

Here on the 16th, she writes:  "Hey Paul.  Hope you've been doing well.  I was just wondering, Sean told me you're not available tonight.  Are you available or are you not?  LOL."

And what does he say?

A.   "I can't make it tonight."

Q.   And she says:  "Boo LOL," right?

A.   Yes.

MS. GERAGOS:  And then if you go to G-102, can we go to that and go to page 124.

Q.   And you see these were included in your chart, right?  Do you have it in front of you do you see?

A.   Yes.

Q.   And this is between Paul and Mr. Combs, right?

A.   Yes.

Q.   And Mr. Combs writes:  Hotel.  Hurry.  She horny as fuck.

I need help," right?

A.   Yes.

Q.   Then he responds later, and says:  "Help," right?

A.   Yes.

Q.   Then he says:  "How long?  This is the 911 freak emergency. LOL," right?

A.   Yes.

Q.   If we could go to the next page.  And then, sorry, next page.  And he says -- Paul responds "LOL," right?

A.   Yes.

Q.   If we zoom in on that photo on the top left.  You see that?

A.   Yes.

Q.   It's an image that Mr. Combs sends to Paul?

A.   Yes.

Q.   Does that look like Shaq?

A.   It does.

          MS. GERAGOS:  All right.  Could we go back to our chart, 1406, Government Exhibit 1406?

          THE COURT:  Could we have a brief sidebar?

          (Continued on next page)

(At the sidebar)

THE COURT:  I mainly did that to give the jurors a little break, but also get a time check.

MS. GERAGOS:  I'm taking longer than I expected.  I still have to play about four videos and approximately just a few, not going to go through all of 1407, but maybe I would say I guess half an hour to 45 minutes?

THE COURT:  Half hour to 45 minutes.  Is there an appropriate time for a break that you would suggest?  It's now 11:35 are.

MS. GERAGOS:  We could break now because we'll still be done by lunch.

THE COURT:  If we took a break now, we'll come back at 11:50.  And then you're saying from that point you would have about 30 to 45 minutes?

MR. AGNIFILO:  Do you think that's right?

THE COURT:  We would go to 12:30, is what you're saying?

MS. GERAGOS:  Or go to 12:45.

THE COURT:  Either way, you'll be done.

MS. GERAGOS:  I hope I'll be done.  I have cut it shorter than Ms. Comey, and I'm really trying.

THE COURT:  You go as long as you want.  I'm trying to understand the schedule because I'm trying to make sure that we're doing things in the right cadence.  Does that make sense?

So to go to lunch, we can take that at 12:45.  I don't see an issue for that.  If we go to 12:45, I'd be inclined to take a break now.  And if you can finish after lunch, that's fine with me.

MS. GERAGOS:  Okay, that's fine with me.

MS. COMEY:  Your Honor, to be honest, I have no objection to the length of are cross.  I think issue was just that the prediction was an hour or an hour and a half, which we're now at three hours.

MS. GERAGOS:  My prediction was obviously off.

THE COURT:  I have no issues with the time of anything.  I'm just trying to make the schedule work for everybody.

Ms. Comey do you have a sense of what your redirect would look like?

MS. COMEY:  Two to three minutes.

THE COURT:  You'll go as long as you need to.  The plan would be in the afternoon to have this witness off the stand?

MS. GERAGOS:  Yes.

THE COURT:  Very good.  Then we'll break.

(Continued on next page)

(In open court)

THE COURT: Thank you, members of the jury. We're going to take a break. Just a spoiler alert. We're going to take a break and come back at 11:50.

Thank you.

(Jury not present)

THE COURT: We'll see you back here 11:50.

(Witness not present)

THE COURT: All right.

(Recess)

THE COURT: Welcome back.

Please be seated.

Let's bring back the witness.

(Jury present)

THE COURT: Please be seated.

Ms. Geragos, you may proceed when ready.

MS. GERAGOS: Thank you, your Honor.

Can we please bring up Government Exhibit 1406 again, please, and go to page 13. Page 13, please. All right.

Q. Special Agent, we just finished reviewing records from row 32 before the break. Do you recall that?

A. Yes.

Q. OK. And so the next row is July 4 of 2023, right?

A. Yes.

Q. All right. And underneath Combs and under Paul, who are

two of the names listed there?  You have Government Exhibit 101, pages 27 to 33.  Do you see that?

A.  Yes.

MS. GERAGOS:  Could we just bring that up, pull up pages 30 to 31.

Q.  And you list the location as Los Angeles, right?

A.  Yes.

Q.  All right.  And here, Mr. Combs writes to Paul:  "Security knows to let you in the back."  Right?

A.  Yes.

MS. GERAGOS:  All right.  If we could go to the next page, page 33.

Q.  At the bottom of the page, on the left-hand side, on page 32, he writes to Paul:  "Just say P, not Paul.  OK?"

And Paul writes:  "OK."  Do you see that?

A.  Yes.

Q.  He says:  "They're waiting."  Right?

A.  Yes.

MS. GERAGOS:  All right.  Could we bring up --

Q.  And these correspond to July 4, 2023, approximately 11 a.m. UTC time, right?

A.  Yes.

MS. GERAGOS:  OK.  Could we go to defense exhibit admitted 3152, please.

Q.  And this is July 7 of 2023, 4:40 a.m. UTC time, right?

A. Yes.

Q. And here Jane writes: "Just wanted to say you make me smile. I loved living in the moment w u just spending time in the sunshine and laughing, listening to your music and making love to you. It was our little partay, soirée, all day, rosé. LOL. Love you to the moon emoji and back." Right?

A. Yes.

MS. GERAGOS: Could we go back to 1406.

Q. Next row is 34, and the date that corresponds there is August 12 of 2023, right?

A. Yes.

Q. OK. And the government exhibit that you listed under Jane and Combs is A442-33. Do you see that?

A. Yes.

MS. GERAGOS: OK. Could we go to -- could we go to that exhibit, A442-33 and go to pages 5 and 6, please.

Q. And he writes, down below, on the first part of the page: "Movie night was off the chain. You tell me." Right?

A. Yes.

Q. And she responds: "Delicious. When are you free?" Right?

A. Yes.

MS. GERAGOS: OK. If we could go to the next two pages.

Q. And he says: "I'll let you know," and they continue corresponding, right?

A.   Yes.

MS. GERAGOS:  All right.  Could we go to Defense Exhibit 3172, which is the corresponding defense exhibit to this exhibit and go to page -- pages 1 to 4.

Q.   Do you see that there?

A.   Yes.

Q.   All right.  And this is from August 11, 2023, UTC time.  Do you see that?

A.   Yes.

Q.   OK.  And she writes -- he writes to her:  "What you feel" and "I'm working out with Paul now."  Right?

A.   Yes.

Q.   And she responds:  "Baby, can you have one of the guys print an NDA, or do you want me to text them?"  Right?

A.   Yes.

Q.   And what does he respond?

A.   "What did you say about the new guy?  What's your vibe?"

Q.   And then what is his next two text messages?

A.   "What does tomorrow look like?"  And "how can we pull that off without me killing myself?  LOL.  I'm working out with Paul now."

Q.   And she responds:  "Yeah, he seems cool, babe.  Hopefully he doesn't know anybody we know.  LOL.  So I'm just going to make sure he signs the paper and stuff.  Basically tomorrow I believe Paul lands around 2 p.m., and then you have your

concert." And "do you have going on after the concert? Paul leaves tonight for Vegas at 6 p.m. and comes back tomorrow at 2 p.m." And then if we, 0and then there's some, two text messages after that, right?

A. Yes.

MS. GERAGOS: If we go to the next two page.

Q. And he says -- how does he respond at the top of the page?

A. "Paul is here with me now."

Q. She says: "Yes, I know, but he has to leave at 6 p.m. for the airport, and I'm not free yet until 8:30 p.m./9 p.m."

How does he respond?

A. "Gotcha."

Q. And she says: "Trust me, I was texting him all morning. I was drilling every hour of his day. I was trying to find some sort of loophole." And she laughed at the "gotcha" message, right?

A. Yes.

Q. And he says: "So we try something new to night or we wait until after the concert tomorrow? What you want to do?" And then: "Maybe if you ask Paul to cancel his night, his answer will be different." Right?

A. Yes.

MS. GERAGOS: Could we go to pages 8 and 9, please. All right.

Q. And she says, in these messages: "How about Edition?

Yeah, I loved the One. It was a nice vibe," exclamation. "But we weren't sure how you were feeling. So no dinner, right..just trying to figure out a drink spot with K.K. now."

And what does he say?

A. "Call Italian."

Q. And what does he say after that?

A. "I'm a little hungry. Where you want to go and will you be on time?"

Q. And she says: "OK. Let's circle back to Baltaire. What do you think? Baltaire, great food and drinks. Hariettes, One hotel rooftop, mostly good for drinks and light bites. Yes, I'll be on time. OK on Italian. I'll send text."

And what does he respond?

A. "Whatever makes my baby happy."

Q. OK. And she says -- it has a smiley face and then his face, right?

A. Yes.

MS. GERAGOS: All right. Could we go to pages 13 and 14. OK.

Q. Then she says to him: "I'm in a good mood, baby. Sorry. Just rushing and feeling pressure. See you soon."

And how does he respond?

A. "OK, please, baby because I'm stressed out, I'm not rushing nothing."

Q. On the next page he asks her: "Hey, you have the NDA?"

And she responds with an NDA doc.  Do you see that?

A.  Yes.

MS. GERAGOS:  OK.  And can you now go to page 18 of this exhibit, please.  All right.

Q.  So this is August 13, 2023, at approximately 3:54 a.m. UTC time, right?

A.  Yes.

Q.  And they're sending several messages to each other here?

A.  Yes.

Q.  All right.  And at the bottom, on August 13, 2023, at 10:58 p.m., that's several hours after, right?

A.  Yes.

Q.  OK.  And she writes:  "Daddy love you," exclamation point; "sheesh," exclamation, exclamation, exclamation.  That dick had me sloppy all night," with many exclamation points and one, two -- 13 emojis with hearts.  Right?

A.  Yes.

Q.  With different kiss emojis, cat with heart-face emojis and tongue-out emojis, right?

A.  Yes.

Q.  She says:  "I'm back in mommy mode.  Back to school shopping now for my child.  First day of school's tomorrow. Hope you have fun cooking dinner tonight w the family," with several hearts.  Right?

A.  Yes.

Q.  See that?

A.  Yes.

Q.  OK.  And that is, again, August 13, which is a day after the line item 34 on page 13, right?

A.  Yes.

MS. GERAGOS:  OK.  And if we go back to 1406, please. Great.  That's 34, so that's August 12, 2023.

If we go to the next page, row 35, which is September 17, 2023, to September 19 of 2023, that corresponds to many, many chats that are within 1407, which we looked at extensively yesterday.

Q.  Do you remember that?  Do you remember looking at 1407?

A.  I remember looking at 1407, yes.

MS. GERAGOS:  OK.  So if we could pull up 1407 and go --

Q.  We're not going to look through it one by one, but do you recall looking at 1407, if we could go to page 48?

Do you see how, starting at page 48, there are several messages that begin in the middle of September here?

A.  Yes.

Q.  And so this, these messages that are in this chart correspond with line item 35, right?

A.  Yes.

MS. GERAGOS:  OK.  And if we go to -- I just want to highlight a few messages that I don't think were in the chart.

If we go to page 82 here.  All right.

Q.  There's several records here from September 21 of 2023, hotel records and travel records.  Do you see that, on lines 823 to 824?

A.  Yes.

MS. GERAGOS:  OK.  Could we pull up Defense Exhibit 3187, please, which is already in evidence.

Q.  All right.  And this is from the same date, right, September 21 of 2023?

A.  Yes.

MS. GERAGOS:  All right.  If we could go to --

Q.  And then at the bottom, Mr. Combs writes:  "Yes, headed to ATL.  I feel so bad."  Right?

A.  Yes.

Q.  And she responds:  "It's OK, baby.  We really wanted to see each other.  Still happy we did.  I'm just going to stock up on my sick stuff and take it easy."  Right?

A.  Yes.

MS. GERAGOS:  Could we go to pages 3 and 4.

Q.  And here, she sends him several messages, again, on September 21 of 2023, right?

A.  Yes.

Q.  All right.  And the first thing is a payment detail to Bridget Collins of a thousand dollars, right?

A.  Yes.

Q.   And it says:  "Payment sent on Venmo.  Here's the receipt. You can forward to her for her bum ass cowboy.  LOL."  Right?

A.   Yes.

Q.   And then she says:  "Thank you for sending me money, baby. I love you.  I'm heading home now."  Right?

A.   Yes.

Q.   And none of these messages were included in 1407, right?

MS. GERAGOS:  Go back to 1407, go to page 82.

Q.   If you look at September 21 of 2023, those were not included, right?

A.   No.

Q.   Have you seen that message before, the bum ass cowboy message?

A.   No, I don't recall that.

MS. GERAGOS:  OK.  And if we could go to Defense Exhibit 3327, which is in evidence, and go to pages 4 and 5 next to each other.  All right.

Q.   And this is from September 18, 2023, right?

A.   Yes.

Q.   All right.  And she writes to him:  "Hey, baby.  The guys are done."  And he says "OK."  Right?

A.   Yes.

Q.   And she writes:  "Should I invite Chef over or wait until you're back."  Right?

A.   Yes.

MS. GERAGOS:  OK.  Let's go to, back to 1406, please, Government Exhibit 1406, page 14.

All right.  So, we've looked through those messages extensively.  I'll spare everyone from speed-reading through them.

Q.  Our next row is 36, right?  And this is just a few days after row 35, right?

A.  Yes.

Q.  Just about five days?

A.  About, yup.

Q.  And the location here is Miami, Florida, right?

A.  Yes.

MS. GERAGOS:  OK.  And if we go to Defense Exhibit 3191, which is the corresponding exhibit, and go to pages 4 to 6.  All right.

Q.  And do you see that these are from the approximate date September 24 of 2023?

A.  Yes.

Q.  All right.  And here, Jane writes to Combs:  "I was just looking at weather in Bahamas.  LOL," with the eye emoji.  "You did promise me that quick Miami to island yacht trip that we haven't got to do yet.  You're ready to lock me in a hotel.  I already know you.  LOL," with the crying face.  Right?

A.  Yes.

Q.  And she says:  "Baby, I can more than likely come.  We can

figure out plans when we're both up.  If you're serious, just have someone text me in the morning about travel in case you're asleep or anything.  Love you, baby."  Right?

A.  Yes.

Q.  And he says, on the next page:  "Where are my phones?"  Right?

A.  Yes.

Q.  And she says:  "I gave our phone to John.  The morning I left I handed it to him.  Can you make sure and LMK when you have it."  Right?

A.  Yes.

Q.  And he responds later in a message:  "He has it.  Don't worry"?

A.  Yes.

MS. GERAGOS:  Could we go to 5 and 6.  All right.

Q.  And then he says:  "I can't even look.  It will drive me crazy."  Right?

Do you see that on the right side?

A.  On the right side, yes.

Q.  All right.  And she laughs at those messages -- laughs at that message, and says:  "You might blow up, daddy, like a locomotive," with a train and smoke and a shocked face and more smoke, and says "muy caliente," with a sweating face.  "That shit was different.  All of it.  Gonna close by eyes.  Message me when you're up."  Right?

A.  Yes.

Q.  All right.  And do you see that "that shit was different, all of it" was sent September 24, 2023, at 9:37 a.m. UTC time?

A.  Yes.

MS. GERAGOS:  All right.  Could we go to Defense Exhibit 3328, page 258, please.  All right.

Q.  And you see this is a message between Jane and Kabrale on September 24, that same day?

A.  Yes.

Q.  All right.  And do you see that this first message is from three minutes later, at 9:40 a.m.?

A.  Three minutes later from?

Q.  From 9:37 a.m., that we just looked at.

A.  Yes.

Q.  OK.  And she writes to Kabrale:  "Hey, hun.  Sorry for the late message.  Just text me in the morning.  Just wanted to see your availability for possibly Sunday evening and also Monday, Tuesday.  It won't be all those days.  Just wanted to see your schedule.  Thank you," exclamation point, "speak soon," with smiley face.  Right?

A.  Yes.

Q.  All right.  And then he responds much later, at 2:05 p.m., the next day, right?

A.  Yes.

MS. GERAGOS:  All right.  So let's go back to 3191,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

defense exhibit, and go to pages 7 and 8.

Q. OK. And he -- Combs responds to close my eyes message: "Wow. This is crazy. I'm mad we didn't have a second round. We shouldn't have went for a walk." Do you see that?

A. Yes.

Q. Do you remember the messages we reviewed yesterday where Jane had said that we went out for a walk? Do you recall those?

A. I don't recall.

MS. GERAGOS: No problem.

Q. All right. "Get to the airport, baby. Wake up. I need you," with a prayer emojis, "I'm going to withdraw." Right?

A. Yes.

Q. All right. And then the next page, she writes: "Baby, just opening my eyes. It's OK, baby. It's best we walked BC we probably would have gotten more sick we already been up so long that night. It was perfect how it all played out. OK, babe. Just waiting for flight options." Right?

And then the next message, she writes: "Also at the end remember I came twice w u, and we came together same time. It was incredible, babe. Don't regret anything because everything felt right." right?

A. Yes.

Q. And how does he respond?

A. "I want to spend this beautiful daw with you, baby. I'm

greedy.  LOL."

          MS. GERAGOS:  Go to the next page, please, next two.
All right.

Q.   And they're, just at the end of page 10, she writes to
him -- I'm skipping many messages.  She writes:  "Baby, I know
OMGGG," exclamation, "I never want to get to that point again.
LOL.  It's OK.  We left the party hot," in capital letters.
Right?

A.   Yes.

Q.   All right.  So now if we go back -- this is at 2:10 p.m.,
do you see that?

A.   Yes.

          MS. GERAGOS:  Now if we go back to Defense Exhibit
3328, page 258 and 259.  All right.

Q.   All right.  So if you look, then that message from Kabrale
is at 2:05 p.m., about five minutes before that message we just
saw, right?

     Do you see 2:05:46?

A.   Yes.

Q.   OK.  With the message we just saw about leaving the party
hot was at 2:10 p.m.?

A.   Yes.

Q.   OK.  And then she responds:  "Hey, good morning.  OK.  So
possibly this evening to Monday evening works for you?  I think
that would be best, and just in case what time Tuesday do you

need to return, at least by morning, right?"  Right?

A.  Yes.

Q.  OK.  And then the next page, on 259 -- I'm skipping ahead -- she writes:  "OK.  Cool.  That might be good so doesn't feel too rushed."  Right?

A.  Yes.

MS. GERAGOS:  OK.  And if we go to the next page, to 260.  All right.

Q.  And here it's just more messages, if you see this page coordinating with him.  Do you see that?

A.  Yes.

MS. GERAGOS:  All right.  Let's go back to 3191 to pages 15 and 16, please.  OK.

Q.  And this is now back to the messages between Combs and Jane, right?

A.  Yes.

Q.  OK.  And she writes, in the middle, on the left side:  "The flight sold super fast for the ones I was searching for Chef, and I'm on this flight searching everywhere and nothing for tonight, but for TMW morning is available."  Right?

A.  Yes.

MS. GERAGOS:  Let's skip ahead two pages -- I mean to 17 and 18.  Thank you.

Q.  And he says:  "Want me to look?"

She says:  "No.  We already left an envelope for Williams

last time."  right?

A.  Yes.

Q.  OK.  And if we go to those two messages on the right side of the page, he writes:  "I'm on way to Miami.  I'm good.  I'm not rushing.  We have a great movie notebwarmup.  What you in the mood to do."  Right?

A.  Yes.

MS. GERAGOS:  OK.  If we could go to 19.

Q.  "Dinner?  Or do you just want to ravish me?"  Do you see that?

A.  Yes.

MS. GERAGOS:  All right.  Let's go to page 22.  We'll skip ahead some messages.  All right.  And she -- actually, just go 21 and 22.  Sorry.

Q.  And she writes:  "Ravish you in the middle of a restaurant."  Right?  And he had sent her several flights, right?

A.  Before that, yes.

Q.  Before that, yeah.

And then he says:  "What should I say?"  Do you see that?

A.  Yes.

Q.  And she writes:  "They're going to be googling this ninja," with several emojis.  Right?

A.  Yes.

MS. GERAGOS:  Could we go to 24 and 25, please.  OK.

Q. And at the bottom of the page, he says -- she says: "Send me Chef flight when you have." Right?

A. Yes.

Q. OK. And the next page he says: "OK. On it. Don't wear too much makeup pls. You're in your bag right now." Right?

A. Yes.

Q. OK. What does she say?

A. "OK, I won't. I'm not too tan rn because I've been inside."

Q. All right. And he says: "All good."

And she writes: "Daddy want to see mommy be bad tonight." Right?

A. Yes.

MS. GERAGOS: Could we please go to 26 and 27, please. All right.

Q. And these are more messages between the two of them?

A. Yes.

Q. She says: "Excited to see you. Slide that dick in me at the restaurant, no panties," with water emojis. Right?

A. Yes.

MS. GERAGOS: All right. Could we please go to 30 to 31.

Q. All right. And she writes: "I love" -- and halfway down the page: "I love making your dick rock hard. I'm going to blow your mind tonight, baby. I'll get ready fast and bring

this wet wet right to you.  Can't wait to lick your nipples while you stroke me."  Right?

A.  Yes.

Q.  And what does he respond with?

A.  "You betta -- we betta go back to where we stopped right from that point."

Q.  And she says:  "OK, so drool," with a tongue out.  Right?

A.  Yes.

Q.  And:  "Hmmmmm.  I got the same outfit and horny pussy," and loved his message and says:  "I'm about to jump off the screen right on to you."  Right?

A.  Yes.

MS. GERAGOS:  And if we go to pages 32 to 33.  All right.

Q.  And then she says, halfway down the page:  "I probably would have jumped back into what we were doing."  Right?

A.  Yes.

Q.  And he said:  "Thank God for today."  Right?

A.  Yes.

Q.  And the next page she said:  "Yes, I did, daddy.  I love being kinky for you.  I love driving you wild.  I want to feel everything."  Right?

A.  Yes.

Q.  OK.  And then she sends him more emojis with the drool and writes:  "I'm begging you."  Right?

A.  Yes.

MS. GERAGOS:  OK.  Can we go to page 34, please.  All right.

Q.  And now they're just sending more messages to each other on this day, right?

A.  Yes.

MS. GERAGOS:  All right.  Let's go to page 40.  All right.

Q.  She sends him a photo here.  Do you see that on the left side of your page?

A.  I do.

Q.  All right.  Is this the same dress that we looked at yesterday that was in 1407?

A.  It appears quite similar, yes.

MS. GERAGOS:  OK.  Could we go to pages 51 to 52.  All right.

Q.  And she writes:  "It's sexy here in the hotel," and then later writes:  "I'll see you, love you, nasty boy."  Right?

A.  Yes.

Q.  OK.  And then later, on the next page, on 52, writes:  "OK, baby.  I'm here getting ready.  Yeah, we need to run to the fruit store."  Right?

A.  Yes.

Q.  And he asks what she needs, and she says:  "Heels size 9 and outfits, baby, pls.  Thank you.  I didn't bring anything.

Just that one outfit."  Right?

A.  Yes.

MS. GERAGOS:  Could we just skip ahead to 55.  All right.

Q.  And he just sends -- she sends him:  "Baby, you know I'm still getting over being sick.  I didn't have time to do my nails.  I'm pale and all that.  Just letting you know."

And how does he respond?

A.  "I fucking love it."

Q.  All right.  And she sends him a love emoji, right?

A.  Yes.

MS. GERAGOS:  All right.  If we could just go quickly back to 3328 to page 269 and 270.  All right.  Actually, just -- sorry.  I meant to go to 276 to 277.  All right.

Q.  And she writes to him:  "I hope you make it.  Hi."

Do you see that?

A.  Yes.

Q.  All right.  And then on the next page, she says:  "I was shouting all sorts of positive energy in the air, hahahaha. It's a special night.  We are celebrating," exclamation point, it's meant to be," exclamation, exclamation.  Right?

A.  Yes.

MS. GERAGOS:  If we could go to the next page, page 278.  All right.

Q.  And do you see here she writes:  "Don't tell Alex you're

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

seeing me PS, LOL. That's the main driver." Right?

A. Yes.

MS. GERAGOS: OK. If we could go to page 282. OK.

Q. And you see on, this message, which is September 25, 2023, 9:07 UTC time -- do you see that?

A. Yes.

Q. She says: "Hey, hun. Here's your travel back info. Tonight was amazing as per usual." Right?

A. Yes.

Q. And how does he respond?

A. "Thanks, beautiful. Yes indeed. Always enjoy your company."

MS. GERAGOS: OK. Great. Could we go back to 1406, please, page 14. All right.

Q. And then the next -- we were just looking at messages that correspond to September 24 to September 26, right?

A. Yes.

Q. All right. And then the next message -- and then the next line relates to September 30 of 2023, which you detail in your -- in 1407. Do you recall that?

A. Yes.

MS. GERAGOS: OK. Let's just quickly look at -- I think we talked about this just a little bit yesterday.

Q. There's no other third party in the names column of 37, right; just Jane and Combs?

A.   Correct.

MS. GERAGOS:   All right.   So if we just go to page 88 of 1407.   All right.

Q.   And line 913, she writes to Combs -- and this is September 30:   "You were in a deep sleep.   I didn't want to wake you. Thank you for loving on me fr head to toe, cuddles, slow dancing and kissing me in the rain.   I desire you.   I always want you all the time.   I enjoyed our time together so much.   I love you baby.   Have a great show."   Right?

A.   Yes.

MS. GERAGOS:   All right.   Let's go back to 1406, please.   All right.   And the next page.   All right.

Q.   And then row 38 we looked extensively at yesterday with the messages at 1407.   Do you recall that?

A.   Yes.

Q.   All right.   So I won't repeat it here, and -- but after October 17, 2023, to October 18 of 2023, there's no entries from October 17, 2023 -- there's no location entries, I should say, until February 8 of 2024, right?

A.   Yes.

Q.   All right.   And did you review records that showed they saw each other between that time period?

A.   I did not.

Q.   OK.   So you don't know either way whether they saw each other between that time period?

A.   I don't.

Q.   OK.  But the next entry you have after October 17 is the Ventura v. Combs lawsuit, filed November 16 of 2023, right?

A.   Yes.

Q.   And line 40 is -- row 40 corresponds to February 8 to February 9 of 2024, and you have Don listed as another name in that column there.  Do you see that?

A.   Yes.

Q.   And it corresponds to A513.  Do you see that?

A.   Yes.

     MS. GERAGOS:  All right.  Could we pull up A513.  All right.  If we could pull pages 1 and 2 next to each other.  All right.

Q.   Do you see the dates on A513 on March 5 of 2022?

A.   Yes.

     MS. GERAGOS:  All right.  Could we go to the next two pages.  All right.

Q.   Do you see here these are also sent March 5 of 2022?

A.   Yes.

Q.   All right.  And are there any more pages?  These also were sent March 5 of 2022?

A.   Yes.

     MS. GERAGOS:  All right.  And March 5.  All right.

Q.   And then on page 8, it says July 23 of 2022?

A.   Yes.

MS. GERAGOS:  All right.  Next few.  All right.

Q.  And then the ending text is July 23 of 2022?

A.  Yes.

Q.  OK.  So why did you list -- if we could go back to 1406 to page 15.  Why did you list Don, page 15; why did you list A513 under Don there?

A.  Can you go back to A513, first page?

Q.  Yes.

A.  Thank you.

Can you zoom in?

Thank you.

Q.  Do you see how the start time here was March 5 of 2022?

A.  Yes.  So, for that, it was to show, in Mr. Combs's phone, how the name that Don was saved as.

Q.  Oh --

A.  In his contacts.

Q.  -- just to show the phone number?

A.  That it was Donald James, yes.

Q.  OK.

A.  Associated with that phone number.

Q.  Understood, because then if you go under Don on 1406 at line 40, there's 5A-204-3, and then these are phone records?

A.  I -- they might be.  Again, I don't remember what every exhibit is.

Q.  OK.

A.   I would have to see that.

MS. GERAGOS:  Let's try to bring up 5A-204-3.

Q.   Safe to say you don't remember reviewing any messages between Combs and Don or Jane and Don from this time period of February 8 to February 9?

A.   Again, if they're not listed on the chart, then I didn't review --

Q.   Then you didn't review --

A.   Right.

MS. GERAGOS:  OK.  Then we can take that down.  Thank you.

Q.   Then the next line here from between 40 and 41 is March 10 of 2024, right?

A.   Yes.

Q.   It's about a month after?

A.   Yes.

MS. GERAGOS:  OK.  Can we please bring up, and we could turn on the screen for this, 14 -- Government Exhibit 1411-R.  And go to page 31.  All right.

Q.   Do you see starting at line 398 of this chart begins on February 18 of 2024 at 3:42 GMT?

A.   Yes.

Q.   All right.  And this date of February 18 of 2024, that's not listed anywhere on your chart at 1406, right?

A.   Correct.

Q.   OK.   And then line 399, says, is a message from Kristina Khorram to Brendan Paul that says, she liked it, saying: "About to head to Jane's.   He's on a call."   Right?

A.   Yes.

Q.   And at lines 404 to 405, Kristina writes to Brendan: "They're just chilling at her house?"

And Brendan responds:   "yeah, he said he's going with the flow, LOL."   right?

A.   Yes.

Q.   And then if we could go to page 32, and Kristina writes: "LOL.   So basically he's lit?"   Do you see that?

A.   Yes.

Q.   And Brendan responds:   "Isn't lit lit.   I just spoke to him over the phone.   Maybe a little but seemed totally fine." Right?

A.   Yes.

Q.   Then there's more messages from lines 409 to 414.   Do you see that?

A.   Yes.

Q.   All right.   And those are between Brendan Paul and Kristina Khorram; do you see that in the "from" and "to" columns?

A.   Yes.

Q.   And again, February 19, 2024, is not listed on your chart, right?

A.   No.

Q.  You didn't review any messages or phone calls between Mr. Combs and a third party or Jane and a third party from either February 18 of 2024 or February 19 of 2024, right?

A.  Not -- not -- if those exhibits were not provided to me for the sole purpose of chart 1406, then no.

Q.  OK.  And then if we go to -- if you go a little bit lower, starting at line 416, do you see there are more messages here between Brendan Paul and Kristina Khorram?

A.  Yes.

Q.  All right.  And he -- and this message from Brendan Paul, on February 24, 2024, he writes:  "Hey, B.  So tmw he's coming to visit me.  He told me to text you in regards to just have everything set up here."

And then a little bit later, he says:  "Just got this from Jane."  Right?

A.  Yes.

Q.  OK.  And February 24, 2024, is not listed on 1406, right?

A.  Correct.

Q.  And you didn't review any messages between either Jane and a third party or Mr. Combs and a third party related to February 24 of 2024, right?

A.  If it wasn't for 1406, then no.

Q.  All right.  And if you could, on lines 429 and 430, at the bottom, Kristina Khorram texts Jonathan Pérez and says:  "How does he look?"

And Jonathan says:  "Shockingly OK.  Way better than usual."  Right?

A.  Yes.

Q.  OK.  Next page.  All right.  And line 432, Jonathan writes to Kristina:  "I don't know mood yet but he physically looks fine if you had to put him in front of someone today.  But he did just take a full bar so I think he'll be asleep soon."  Right?

A.  Yes.

MS. GERAGOS:  All right.  Let's go back to 1406.

Q.  And the messages we just looked at were February 26 of 2024.  Do you recall that?

A.  Yes.

Q.  All right.  And just to ask again, there's no messages here -- there's no entry here for February 26 of 2024, right?

A.  Correct.

Q.  All right.

A.  There's not.

Q.  All right.  And now, line -- row 41 lists Jane, Combs and Paul, right?

A.  Yes.

MS. GERAGOS:  All right.  Could we go to A207D, which you have listed under Jane.  And go to the next page.  All right.

Q.  And this is -- this is between Combs and Jane, right?

A. Yes.

Q. All right. And she says on the second page: "I just have to get us ready here and I can come. I just have a spray tan and can't shower until 9 p.m., so I may come to you a bit frumpy at first."

MS. GERAGOS: Could we put it down, please. Sorry. All right. Could we turn off the public screen.

All right. Now we can put up G103, page 152 and 153.

Q. And you see on your chart, under Jane -- I think you have it in front of you -- you list G103, right?

A. Yes.

Q. OK. And this is a message from Jane to Paul. Do you see that?

A. Yes.

Q. OK. And she writes: "Hey, P. Hope all is well," exclamation point, "Are you in town and free this evening?" Do you see that?

A. Yes.

Q. And he writes yes, right?

A. Yes.

Q. And on the right side of the page, she writes: "OK, great. I'll get info to you ASAP." Right?

A. Yes.

MS. GERAGOS: OK. Let's go to the next two pages. Next two pages.

Q.  Do you see -- what two pages do you see in front of you?

A.  154 and 155.

MS. GERAGOS:  OK.  There we go.  OK.

Q.  And see the bottom, now we're at 156 and 157, right?

A.  Yes.

Q.  All right.  And she writes:  "Hey, P.  We're going to reschedule more than likely for tomorrow," exclamation point.  Right?

A.  Yes.

Q.  And then the next page, she says:  "Hey, P.  Good morning, how's your schedule today/tonight?"  Right?

A.  Yes.

MS. GERAGOS:  And if we go to the next two pages.

Q.  And you see how she writes:  "Good morning.  Haha.  OK.  Great.  Trying to organize.  Keep your phone on you you you."  Right?

A.  Yes.

MS. GERAGOS:  Now could we go to A207-E, which you had listed under Jane.  Page 4, please.  All right.

Q.  And this is a message between Jane and Combs?

A.  Yes.

Q.  All right.  And she writes:  "Baby, he said 11:02 a.m."  Right?

A.  Yes.

Q.  And he says:  "That was so good" -- and this is several

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

hour -- almost 12 hours later, right?  "That was so good, I want more," his response?

A.  Yes.

Q.  OK.  And she loved that message, right?

A.  Yes.

MS. GERAGOS:  OK.  Could we go back to G103 to page 167.  All right.  And do you see these messages, 167 starts with -- actually, let's go 166 and 167.  All right.

Q.  And do you see that Paul writes to Jane, at the bottom, on the left-hand side of the screen:  "At the residence entrance"?

A.  Yes.

Q.  All right. And she responds:  "Stay really tight behind me for the gate.  And then I'm going to pull up into my driveway and you're going to turn right into my garage."  Right?

A.  Yes.

Q.  And that's on the 12th?

A.  Of March, yes.

Q.  Of March.  OK.

And then do you see right after that, on March 15, she writes to him:  "Hey, P.  Sorry for the late text.  Had a great time with you the other night.  Just curious, what's your day like tomorrow maybe around 1 or 2 p.m. just for a short while?  LMK when you can.  Thanks."  right?

A.  Yes.

Q.  And he says:  "I'm out of town until Thursday"?

A.   Yes.

MS. GERAGOS:  All right.  Could we go to the next two pages, please.

Q.   And then on the 19th, she writes:  "Hey, P.  Hope all is well.  Just curious what time you land in L.A. on Thursday and if you're available when you land?"  Right?

A.   Yes.

Q.   And he says:  "I'm back."  And she responds:  "Fish," exclamation, exclamation, "And you ain't seen nothing, you def this."  Right?

A.   Yes.

Q.   And this on the 19th?

A.   Of March, yes.

MS. GERAGOS:  Of March.  OK.  And if we could go to the next two pages.

Q.   And he says:  "I literally landed an hour ago.  Let me know what works for you."  Right?

A.   Yes.

Q.   She says:  "LMAO, no way," exclamation, exclamation, "That's crazy.  Let Paul into my house.  OK.  Maybe TMW.  Just hold it for us, pls.  I don't want to time you.  Maybe early evening or evening time."  Right?

A.   Yes.

MS. GERAGOS:  Let's go to next two pages.

Q.   And she, skipping ahead, says:  "Hi.  Hopefully you are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

free late night." And this is March 20 at 9:42 p.m.?

A. Yes.

Q. OK. And the next page, skipping ahead a bit, she says: "Hey, P. Him and I just got together now." Right?

A. Yes.

MS. GERAGOS: All right. Next two pages.

Q. And then she says, on the 21st at 3:14 p.m. UTC time: "LMK your ETA when you have it." Right?

A. Yes.

MS. GERAGOS: Could we please go back to 1406.

Q. That was the 21st of March that we just looked at. All right. And if we could -- so we just looked at messages spanning from row 41, which was March 10, 2024, and then if we could go to 22, to March 21 of 2024. Do you recall that?

A. Yes.

Q. And those messages are 103 that we just reviewed, between 167 and 176, are contained within March 21 of 2024, right; under Paul, it says G103?

A. Yes.

Q. OK. And then the next entry that you have here is Combs posts IG video, right?

A. Yes.

Q. And here, the name here is Combs. Do you see that?

A. Yes.

Q. And you have flight records for Jane?

A.   Yes.

Q.   And so you had flight records for Jane going from LAX to Miami on May 14, right?

A.   Yes.

Q.   And that's five days before Combs posts IG video?

A.   Yes.

Q.   All right.  And there's no other records for any third party from that line, in that line item, right?

A.   No.

Q.   OK.  And she leaves on the day before the IG video.  She leaves on May 18.  Do you see that on the flight records?

A.   Yes.

Q.   All right.  And then item -- row 44, we looked at that yesterday in your chart on 1407, right?

A.   Yes.

Q.   OK.  The timeline for June 18 to June 19 is in your timeline?

A.   Yes.

        MS. GERAGOS:  OK.  Could we just go -- we'll just review a couple of those line items.  If we could go to 1407, page 120.  All right.  And this shows -- actually, let's go to 119, please.

Q.   Line 1220 is Jonathan Pérez to Faheem and Kristina saying: "Just the normal her being jealous over other women and yelling at him."  Do you see that?

A.   Yes.

          MS. GERAGOS:   All right.   Next page.   And 1221, Jonathan writes again:   "Just heard from him and he said not to come.   All good."   Right?

A.   Yes.

Q.   And then about six hours after that, you write the first phone call from Jane to Antoine.   Do you see that, in 1222?

A.   Yes.

Q.   And that's two seconds?

A.   Yes.

Q.   All right.   And then about ten minutes after that is a second phone call, and that's from Antoine to Jane, right?

A.   Yes.

Q.   And that's zero seconds?

A.   Correct.

Q.   Does that mean -- do you know, does that mean it connected? What does zero seconds mean?

A.   So, in my experience dealing with investigations and telephone companies -- I think I said this earlier -- the telephone companies start the clock of a phone call when it starts ringing.   It doesn't necessarily mean that the phone call between the two parties connected.   It's when you start hearing the dial -- the ringing on the phone.   That's when their clock starts.

Q.   OK.   Got it.

And then about 45 minutes later, Antoine calls Jane again, and that's 43 seconds, right?

A. Yes.

Q. And then about four hours after that, Kristina writes: "Hi. Can someone go pick up PD ASAP, please." Right?

A. Yes.

MS. GERAGOS: OK. And then if we could then go to page 124.

Q. These ones are redacted, but do you recall seeing a video, E273?

MS. GERAGOS: And that's in lines 1247. We don't have the public screens on, so we could bring it up.

THE WITNESS: I see --

MS. GERAGOS: You see it. OK. Could we bring up E273.

And if we could play the video.

(Media played)

BY MS. GERAGOS:

Q. All right. And the date for that was June 22 of 2024, right?

A. Yes.

MS. GERAGOS: OK. If we go back to 1406, please, and to page 17. All right.

Q. You don't have any flight records for row 45, right?

A. No.

Q.   OK.  So you list here July 31, 2024, but it doesn't list that she arrived in Miami several days earlier, right?

A.   If I wasn't provided those records, I don't have them.

Q.   OK.  And it doesn't show -- you list the location as Miami, Florida, right?

A.   Yes.

Q.   You don't show that she's staying at the Four Seasons?

A.   No.

MS. GERAGOS:  OK.  At this time, your Honor, we could play -- we have two videos to play, if we could turn off the attorney screens.  Actually -- sorry.  I should pull up again just to establish it, 1406, page 17.  OK.

Q.   The names under item 45 are Jane, Combs and Paul, right?

A.   Correct.

Q.   OK.  And the videos here, the explicit, two of the explicit videos here under Jane are EX173 and EX176, right?

A.   Two of the three, yes.

Q.   Two of the three.

And then there's some, 177, it's under both Jane and Paul, right?

A.   Yes.

Q.   And the dates for these are July 31, 2024, right?

A.   Through August 1.

Q.   To August 1?

A.   Yes.

Q.  OK.  And you reviewed the metadata of these, right?

A.  Yes.

MS. GERAGOS:  OK.  So we are going to turn off the attorney screens, and I think Ms. Becker has them ready to go. But if we could first test to make sure that everybody's video -- I mean audio's working -- or sound, I should say.

OK.  Seems everybody's sound is working.  So with your Honor's permission -- hold on.

We have one, two, three, four.  We're out of sound. Mr. Deputy?

THE COURT:  All right.  Raise your hand if your device is not working.  All right.  So that's three, four -- it's working now?  I think three.

Do we have three extra devices?

MS. GERAGOS:  These devices were actually on before we replaced them.

THE COURT:  Yes.  So one thing is let's make sure that you press the power button.

MS. GERAGOS:  OK.  Once we try that, let's see if it works.

THE COURT:  All right.  Now I'm getting thumbs up.

Raise your hand at this point if you don't have a working device.

All right.  I think we have working devices for everybody.

MS. GERAGOS:  We're all hearing music.  I don't know if anybody has a microphone they could put to the side.

All right.  I think it's good.

May I go to Ms. Becker?

THE COURT:  You may.

MS. GERAGOS:  Thank you.

Q.  Agent, we are first going to watch Government Exhibit EX173, which Ms. Becker will play that entire video.

(Media played)

MS. GERAGOS:  OK.  We just watched EX173, and Ms. Becker is going to pull up EX176 and start at the beginning until one minute and 30 seconds.

(Media played)

MS. GERAGOS:  I'll just ask everybody at the attorneys' tables to move their microphone.

All right.  We will resume it now.

(Media played)

THE COURT:  Are we getting some interference?

MS. GERAGOS:  I think she could hear it through the microphones.

THE COURT:  All right.  So let's do this.  I'll ask the deputy to mute out the microphones.

THE DEPUTY CLERK:  Yes, your Honor.  One moment.

OK.

(Media played)

MS. GERAGOS:  Your Honor, can you hear it without your headphones on?  Because I think -- (inaudible)

THE COURT:  First of all -- so, let me ask the deputy.  Did we mute out the microphones?

THE DEPUTY CLERK:  I did, your Honor.

THE COURT:  All right.  So I'm going to ask the jurors, if you can, look at your devices and I'll ask everyone to do this and reduce the volume if you can.  I have it at 20 percent.  You should be able to hear it, but let's reduce it, because I think the default volume on these devices is at the upper end.  So if we reduce the volume, we should still be able to hear it, but it should not be able to be heard in the courtroom.

MS. GERAGOS:  OK.  We're going to start it again at one minute and -- right now we're at one minute and 30 seconds.  We're going to start it again at about 59 seconds.

THE COURT:  All right.

MS. GERAGOS:  Thank you.

(Media played)

MS. GERAGOS:  OK.  We're going to skip ahead to two minutes and 30 seconds and play until three minutes and ten seconds.

(Media played)

MS. GERAGOS:  OK.  We just paused it at three minutes and ten seconds, and we're going to skip ahead to seven minutes

and ten seconds and pause at eight minutes and 20 seconds.

(Media played)

MS. GERAGOS:  OK.  And then skipping ahead to eight minutes and 35 seconds and we'll pause at nine minutes and 46 seconds.

(Media played)

MS. GERAGOS:  OK.  We'll skip ahead about ten minutes in the video and watch from 19 minutes and five seconds to 19 minutes and 47 seconds.

(Media played)

MS. GERAGOS:  If we could turn the screens back on and the microphone back on.

I'll just put the attorney screens back on, not the public screens.

All right.  Could we pull up -- almost done -- Defense Exhibit 3306, and go to ten minutes and 38 seconds, please.

Stop it here.

Q.  And do you see in the message here, at the bottom, Jane writes:  "Thank you again for a beautiful time.  I have the best memories w u"?  Do you see that?

A.  Yes.

MS. GERAGOS:  All right.  We'll take that down.  I just have a few things, more things to ask about 1409.

Could I just bring up 1408, which we looked at yesterday, and could I have that side by side with --

Q.  Do you remember looking at 1408 yesterday and going through that?

A.  Yes.

        MS. GERAGOS:  And then side by side with 4H141.  All right.

Q.  And this invoice we looked at yesterday, 4H141, and it was an invoice to Sean Combs for various expenses paid by CE Opco for Sean Combs.  Do you recall that?

A.  Yes, I do.

Q.  And we looked at several of the amounts, and they correspond with the invoice within this.  Do you recall that?

A.  Yes.

Q.  And the amount here is listed $22,825.73, right?

A.  Yes.

        MS. GERAGOS:  OK.  Could we pull up --

Q.  And the invoice date is 9/30, 2023, and the due date is October 30, 2023?

A.  Yes.

        MS. GERAGOS:  All right.  Could we go to 4D131, government exhibit, page 91.  All right.

        Page 91, please.

Q.  Do you see that same amount, if we could -- do you see this is Sean Combs; this is a bank account for Sean Combs --

A.  Yes.

Q.  -- at the top?

And it lists October 31, 2023?

A.   Yes.

MS. GERAGOS:  All right.  And could we go to October 10.

Q.   And it says account transfer to account CE Opco LLC.  Do you see that?

A.   I do.

Q.   And it lists that exact same amount, $22,825.73?

A.   Yes.

MS. GERAGOS:  All right.  Could we pull up 1409, please.  Government Exhibit 1409.  We didn't go through this one yesterday on cross, so I just want to do it now.

Q.   Do you see how, with the first name listed here is Brendan Paul and the amount listed is $11,734.42 at the Miami Beach Edition?

A.   Yes.

MS. GERAGOS:  All right.  Could we go to Government Exhibit 4H-129 and go to page 2.  All right.  And if we could do our best to blow that up.  All right.  Can we highlight -- perfect.

Q.   Do you see that there is an $11,734 charge there, Miami Beach Edition?  Do you see that?

A.   I do.

Q.   All right.  And that corresponds to what we just looked at with Brendan Paul --

A.   Yes.

Q.   Do you see that?

MS. GERAGOS:   Can we just bring the first page up of this exhibit, 4H129.  All right.

Q.   This is another invoice, invoice 1640.  Do you see that?

A.   I do.

Q.   And it's billed to Sean Combs accounts payable?

A.   Yes.

Q.   And again, this is various expenses paid by CE Opco for Sean Combs from August 2023 to October 2023, right?

A.   Yes.

Q.   In the amount of $58,338.64?

A.   Yes.

Q.   All right.  And listed in 1409, it was listed Jessica Ruiz as the account holder, right?

A.   Yes.

MS. GERAGOS:   OK.  So if we could go back to 1409. All right.

Q.   And if we look at line 3, it lists Jane with an American Air Lines flight LAX to Miami, right?

A.   Yes.

Q.   In the amount of $3,026.90?

A.   Yes.

MS. GERAGOS:   All right.  Could we bring up Government Exhibit 4H141, please.

Q. Do you see this is another invoice we just looked at; it's the CE Opco invoice?

A. Yes.

MS. GERAGOS: All right. Let's go to page 2, please. All right. And if we go to the bottom of the page, if we could zoom in on that.

Q. There's a corresponding charge here, $3,026 for Jane, airfare. Do you see that?

A. I do.

Q. All right. And we just looked at the fact that Sean Combs's bank account reimburses CE Opco for this entire invoice, right?

A. Yes.

MS. GERAGOS: OK. Let's go back to 1409, please. All right.

Q. And No. 4 listed Jane, Fuentes Transportation. The account holder is Jessica Ruiz?

A. Yes.

Q. And the amount is $155.99?

A. Yes.

MS. GERAGOS: All right. Could we please go back to 4H141 that we were just looking at. All right.

Q. And do you see that about two items below it, it has one -- 155.99. Do you see that also for Jane?

A. Yes.

Q.   And right below that it also has Kabrale Williams, 187.18?

A.   Yes.

MS. GERAGOS:   OK.   And if we could go back -- if we could to 1409.   All right.

Q.   And do you see that 5 and 6 have Cardinal Valet LLC for Jane?

A.   Yes.

MS. GERAGOS:   Let's go to 4H130, please.

Q.   Do you see that this is another CE Opco invoice for various expenses paid by CE Opco for Sean Combs from January until November of 2023?

A.   Yes.

Q.   And this is in the amount of $74,788.69.   Do you see that?

A.   Yes.

Q.   The date is November 30, 2023; due date is the next day, 2023, right?

A.   Yes.

(Continued on next page)

Q.   And this is a bill to Sean Combs for those various expenses, right?

A.   Yes.

Q.   It says the respective break down and backups are attached, right?

A.   Yes.

Q.   If we could please go to the next page, please.  If we could go to the bottom of the page, do you see that it lists Jane's true name there, airfare is $948?

A.   Yes.

Q.   If you go to the next page, page 3, if we could go down a little bit further down below, it's hard for me to see the lines.  Do you see Cardinal Valet right above where the cursor just was, Cardinal Valet, there's two expenses.

A.   It's hard to see.

Q.   If we could move the cursor up slightly?

A.   I see it.

Q.   Cardinal Valet, you see Jane's true name, you see Los Angeles-Miami?

A.   Yes.

Q.   9/24, if we could highlight?

A.   Yes, I see it.

Q.   I know it would be great if we could highlight it for the jury.

          Then there are two charges $324.50, right?

A.   Yes.

Q.   And $768.25?

A.   Yes.

Q.   All right.  And then if we could go back to 1409, and lines 11 and 12 have Kabrale Williams there, right?

A.   Yes.

Q.   There's a $420 charge and a $187.18 charge, right?

A.   Yes.

        MS. GERAGOS:  If we could go to 4H-130, which we were just looking at.

Q.   That's what I cite to in this chart, right?  So you looked at this chart before?

A.   Go back to the exhibit?

Q.   We can go back to 1409.  Line 11 cites to 4H-130, right?

A.   Yes.

Q.   You looked at 4H-130 while putting together this chart?

A.   Yes.

        MS. GERAGOS:  If we could go back to 4H-130 at page 2. And I think I meant to say actually page 3.  Then if you could go down below.  Perfect.

Q.   Do you see how it says airport concierge Williams K, in the amount of $420.

A.   Yes.

Q.   And in your chart in 1409, you wrote the account holder as

Jess Ruiz and CE Opco, but you didn't write that Mr. Combs personally paid for these, right?

A.   No, I didn't.

Q.   Even though you had reviewed 4H-130?

A.   Yes.

MS. GERAGOS:   Let's pull up 4H-130 and put it side by side with 4D-131.   If we could go to page 96 of 4D-131.

Q.   This is again Sean Combs' personal bank account records, right?

A.   Yes.

Q.   And this date on this record is November 30 of 2023, right?

A.   On the one to the right.

Q.   The one to the right, Sean Combs.   Underneath Sean Combs it, says November 30, 2023, right?

A.   Yes.

Q.   All right.   And if you look here on the invoice on the left, which is 4H-130, the total due is $74,000.   Do you see that?

A.   Yes.

Q.   And 788.69, right?

A.   Yes.

Q.   Do you see on the right in Sean Combs' personal bank records, there's an account transfer from his personal bank account to CE Opco LLC in the amount of $74,788.69, right?

A.   Yes.

MS. GERAGOS:  And if we could go to the one, which I haven't showed the payment out yet.  Go to 4H-129, please.  And have that on the left.  And pull up 4D-131, page 95 on the left -- I mean on the right.  I apologize.

Q.  Again, this is Mr. Combs' personal bank account records, right?

A.  Yes.

Q.  And the date here is November 30, of 2023?

A.  Yes.

Q.  The amount of the invoice for various expenses paid by CE Opco for Sean Combs is $58,338.64, right?

A.  Yes.

Q.  And then if you go on the right on November 15, there's an account from his personal bank account to CE Opco LLC in the amount of $58,338.64, right?

A.  Yes.

MS. GERAGOS:  If we could take that down, please?  Your Honor, may I have one moment?

THE COURT:  You may.

MS. GERAGOS:  We have one more video, and then we're done.  The one that wasn't working this morning.  If we could pull up -- turn the attorneys' screens off.

Q.  And do you remember this morning, Special Agent, when we were looking at December 17, 2021, and you had looked at and this is page 3 of your chart, if you just want to reorient

yourself, 701-114.  You had confirmed the metadata was from that month, right?

A.  Which chart?

Q.  That's a great question.  1406, page 3. You had reviewed the metadata, and it related to this event, right?  I mean, this time period?

A.  Yes.

MS. GERAGOS:  So why don't we just play, if Ms. Becker can turn off the attorneys' screens and everybody can put in their headphones, and we can play 701-45, please.

(Media played)

MS. GERAGOS:  We're playing the wrong video.  We're going to play 701-45.

For the record, that was 701-114, which is in evidence from the same time period.

(Media played)

MS. GERAGOS:  Thank you so much, Agent.

Please go back to investigating threats to New York City.  I appreciate it.

THE COURT:  All right.  Redirect.

REDIRECT EXAMINATION

MS. COMEY:  Thank you, your Honor.  I'll be brief.

Q.  Agent, do you remember looking at financial records just now?

A.  Yes.

Q.  In essence, do they show that Sean Combs paid to transport Kabrale Williams across state lines?

MS. GERAGOS:  Objection.

THE COURT:  Sustained.

Q.  Do those financial records show that Sean Combs paid for transportation bills for Kabrale Williams in September of 2024?

MS. GERAGOS:  Objection.

THE COURT:  That's sustained.  Rephrase.

Q.  Did we just look at financial records from September of 2024?

A.  Yes.

Q.  Did they show that Sean Combs paid for a number of different travel services?

A.  Yes.

Q.  Were those travels services for Kabrale Williams?

A.  Yes.

Q.  Did those travel records result Kabrale Williams crossing state lines?

MS. GERAGOS:  Objection.

THE COURT:  Sustained.

Q.  Did they reflect that Kabrale Williams was traveling from Atlanta to Florida?

A.  Yes.

Q.  Do you remember watching videos from July 31, 2024 and August 1, 2024 just a few moments ago?

A.  Yes.

Q.  Do you know one way or the other what, if any, drugs Jane had taken before she was filmed on those videos?

MS. GERAGOS:  Objection.

THE COURT:  Sustained.

Q.  Do you recall being asked about dates that were not on your chart in 1406 on cross-examination?

A.  Yes.

Q.  Is the chart meant to show every single time that Jane and Sean Combs met with a third party, or just the times that are reflected in the records that were provided to you?

A.  Just the times in the records that were given to me.

Q.  And do you recall being shown text messages that were not cited in the chart that you reviewed for this case?

A.  Yes.

Q.  Is it your understanding that the charts are meant to reflect every single message in this case or just the subset you were shown?

A.  Just the records that I was shown.

Q.  Do you remember being shown a variety of text messages from a few days before or a few days after some of the entries in Government Exhibit 1406?

A.  Yes.

MS. COMEY:  I'd like to pull up Government Exhibit 1406, please, and let's turn to page 15 -- no -- 16.

I'm sorry, 15.  I was right the first time.  1406, page 15 please:

Q.  Could you tell us the dates on row 38, please?

A.  Row 38, 10/17/2023 to 10/18/2023.

Q.  What is the next entry of after that?

A.  Location.

Q.  What about the next entry in row 39?

A.  I'm sorry.  *Ventura v. Combs* filed 11/16/2023.

MS. COMEY:  I'd like to pull up some messages from just a few days before and after those events.  Let's pull up Government Exhibit A-

MS. GERAGOS:  Objection.  Beyond the scope.

MS. COMEY:  Your Honor, it's directly responsive to the extensive cross-examination we just heard.

THE COURT:  Are these exhibits that the witness has reviewed in preparing the charts?

MS. COMEY:  No, your Honor.  But they're from the time period, and similar to the way Ms. Geragos just showed a number of different exhibits that are in evidence from around the time period, I think it's perfectly appropriate for me to do the same thing on redirect.

MS. GERAGOS:  It's beyond the scope.

THE COURT:  Let's have a side bar very briefly.

(Continued on next page)

(At the sidebar)

MS. COMEY:  May I?

THE COURT:  Yes.

MS. COMEY:  Ms. Geragos spent multiple hours pulling you up text messages that are not cited in the chart implying they should have been or implying they apply context to the date.  Me pulling up two exhibits, two pages from two exhibits around these dates that show it was a whole bunch of different context that's not captured in the chart.  It's not always favorable to the defense.  Some of it is favorable to the prosecution.

I think that is perfectly appropriate in response to the hours of cross-examination we just sat through where Ms. Geragos pulled up exhibit after exhibit after exhibit that is not cited in the chart and that this agent did not review.

I will be very brief.

MS. GERAGOS:  I believe it's beyond the scope.  I didn't ask anything about messages around *Ventura v. Combs*, and I did not go through because we spent hours of it on direct, well, spent an hour of it on direct examination from October 17 to October 18 of 2023.  I didn't do that because the jury already heard it.  I went through events that the jury had not seen the text messages about before, either on my cross-examination Jane or on direct examination of this witness.  My objection is based in scope and relevance to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

examination.

MS. COMEY:  Your Honor, the examination --

THE COURT:  Look, here's the deal.  You can obviously show the jury those exhibits which are in evidence, right?

MS. COMEY:  Yes, your Honor.

THE COURT:  You can show the jury those exhibits during your closing argument.  This witness was put on for the purpose of establishing a foundation and presenting the summary charts that are now in evidence.  And in cross-examination Ms. Geragos was permitted to show the limited extent of those charts by pointing to communications outside of those charts.

However, this witness has nothing to say about other exhibits that are corroborative of what's in the chart that you never reviewed.  That would be the proper subject of the closing argument and you can present those very same exhibits in two days when you have closings.

MS. COMEY:  I understand, your Honor, but my point is the cross-examination, which just went on for many hours was suggesting to the jury that this chart is misleading because it was leaving out messages and didn't cite messages.  Ms. Geragos made this point multiple times.  The chart doesn't cite messages that are favorable to the defense.  That was the point, and I would just like to make this one response, one response that shows that we were not cherrypicking within that chart only messages that were favorable to the government

because that's the impression that this jury has been left with. So even if I could just show one message to make clear that it's not a cherrypicked chart where we just put in and cited the messages that are favorable to us. We left out messages that were favorable to us.

THE COURT: This witness had nothing to do with the selection of messages for the chart, so for that reason, the objection is sustained.

(Continued on next page)

(In open court)

MS. COMEY:  Ms. Becker, please pull up 1406, page 16.

Q.  Agent, do you remember being asked about June 18, 2024 and June 19, 2024?

A.  I do.

Q.  In the records that you reviewed, did you see any text messages between Jane and Combs that were sexual in nature?

A.  I did not.

Q.  Did you see any messages between Jane and Mr. Combs that were loving or affectionate in nature?

A.  No, I did not.

MS. COMEY:  I have no further questions.

THE COURT:  Nothing further, Ms. Geragos.

MS. GERAGOS:  Nothing further.

THE COURT:  Thank you very much, Agent Cerciello.

(Witness excused)

THE COURT:  Does the government have any further witnesses?

MS. JOHNSON:  No, your Honor.  At this time, subject to confirming that all of the Government Exhibits are accurately reflected in the record, the government rests.

THE COURT:  Well, have you confirmed that?

MS. JOHNSON:  We will review the transcript to confirm that.

THE COURT:  Very good.  Thank you, members of the

jury, and thank you for your patience.

I know that we've gone past the usual lunch break here. What we are going to do at this point is that we are going to take a lunch break, and we will make sure you have time to have lunch, and then we'll bring you back. But we'll give you some time to have your lunch and take a break from the proceedings, and we'll tend to some matters here in court.

So thank you very much. As I always tell you, do not speak with each other about the case. Do not talk to anybody else about the case or look up anything about the case.

With that, have a great lunch. All rise.

(Continued on next page)

(Jury not present)

THE COURT:  Please be seated.

Ms. Johnson, did you need some time to confirm that or can we --

MS. COMEY:  Your Honor, I think the government has formally rested.  It's really just to check the transcript and to make sure that if there are mistyped numbers that we may need to come to your Honor with the consent.  I imagine the defense will consent.  We've noticed some errors in the transcripts.  We didn't want to delay the case by having to go through all of them, but the reason that Ms. Johnson caveated the way she did was to make sure if we find an error, we may need to come with an application to your Honor to correct, for example, an error in the transcript.

THE COURT:  With that qualification, Mr. Agnifilo, are we prepared to proceed to motions?

MR. AGNIFILO:  We are.

THE COURT:  All right.

MS. SHAPIRO:  Your Honor, may I go to the podium?

THE COURT:  You may.

MS. SHAPIRO:  Your Honor, the defense moves for a judgment of acquittal on all counts pursuant to Rule 29.  The government has failed to meet its burden to prove each element of Counts One through Five, and no reasonable juror could find him guilty of any of the counts beyond a reasonable doubt.

And although we recognize that the Court must view the evidence in the light most favorable to the government and draw all reasonable inferences in the government's favor, I just want to emphasize that it's not enough that the inferences in the government's favorable are permissible.

As the Second Circuit explained in many cases, including *United States v. Pauling*, 924 F.3d 649, 657 (2019), "An inference is not a suspicion or a guess.  It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist.  It is not speculation.  Indeed, even reasonable speculation is insufficient."

And I just wanted to highlight one other principle that the Second Circuit has repeatedly articulated, which is that in cases where the evidence, at best, gives equal or nearly equal circumstantial support to a theory of guilt or innocence, and a theory of innocence, a reasonable jury must necessarily as a matter of law entertain a reasonable doubt. And that principle is articulated in a number of cases, including *United States v. Valle*, 807 F.3d, 508, 515 (2015); *United States v. Coplan*, 703 F.3d 46, 69 (2012) and many others.

And while preserving that general Rule 29 motion, I do want to highlight some specific deficiencies as to each count.

So starting with Count One:  Mr. Combs is entitled to

a judgment of acquittal on Count One because the government has failed to prove the elements of the racketeering conspiracy charged in the indictment.

To engage in a RICO conspiracy, the government must prove that the defendant agreed with others to further and endeavor, which, if completed, would satisfy all the elements of a substantive RICO offense. And that's from *United States v. Kane,* 671 F.3d 271, 291 (2d Cir. 2012).

And, thus, what that means is that the government has to prove that in the words of the statute, Mr. Combs agreed to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity.

The government has failed to prove at least three of the elements of this offense.

First, the agreement to violate RICO.

Second, that the defendant knowingly and willfully joined any such agreement, and

Third, that he agreed that he or another member of the alleged conspiracy would commit two racketeering acts.

So let me start with the first element and why there is insufficient evidence of the existence of the conspiracy that was charged in the indictment.

The government alleged that the object was to conduct the affairs of the Combs Enterprise through a pattern of

racketeering activity, including eight types of racketeering acts over the course of 20 years, from 2004 to 2024. And in order to satisfy this element, the government has to show that there was an agreement to form the alleged enterprise and conduct its affairs through a pattern of racketeering acts evidencing the required relatedness and continuity required in the case law, as an example, *United States v. Kane*, which I cited earlier at page 284. There are several ways in which the proof is deficient on that score.

First, the enterprise here is not distinct from the pattern of racketeering activity. And it's well-settled that the existence of an enterprise is a separate element from the pattern as cases like *Boyle v. United States* 556 U.S. 938, 947 (2009) or *U.S. v. Turkette*, 452 U.S. 576, 583 (1981) state. The enterprise must be more than a group of people who get together to commit a pattern of racketeering activity. The enterprise can't be just a name for the crimes committed or the agreement to commit the crimes, otherwise it wouldn't be an enterprise.

And here, the enterprise's purposes as alleged in the indictment essentially map onto and are virtually identical to the alleged racketeering acts. If you take a look at paragraph 11(f) and 11(h) of the indictment, the purposes alleged there to engage in unlawful acts of violence, including sexual violence, sex trafficking, forced labor, et cetera, essentially

are identical to the alleged racketeering acts in paragraphs 13(a) to 13(h).  So they can't separately suffice to establish the requisite unified enterprise under *Boyle* and *Turkette*.

In addition, the Supreme Court has held that one necessary structural feature of a RICO enterprise is the existence of relationships among those associated with the enterprise.  The *Boyle* case says that, among others.  And the relationships have to tie the enterprise together as a whole.  They cannot be separate relations that run through the defendant alone.

So, for instance, a valid hub-and-spoke structure for an enterprise, or a conspiracy, exists only where one entity or individual (the hub) transacts with several other individuals (the spokes) and are connected by a unifying scheme common to all (the rim).  But here, the government's theory per its opening and its proof only show at best a rimless hub-and-spoke structure.  The only common link here is Mr. Combs himself, and alleged crimes that the government claims were committed by him related to his personal life and his girlfriend's.  Their sexual activity and other alleged crimes related to their relationships.

And courts have repeatedly rebuffed attempts to predicate RICO liability on allegations of nothing more than a rimless hub-and-spoke relationship along these lines.  See, for example, *D'Addario v. D'Addario*, 901 F.3d 80, 101 (2d Cir.

2018) that collects other cases to the same effect.  So that's point number one.

Point number two, there is insufficient proof here to establish the single RICO conspiracy charged in the indictment, even apart from those other deficiencies.  The government has alleged this 20-year long conspiracy to violate RICO, but, in fact, the evidence does not establish that Mr. Combs conspired with any other person to violate the RICO statute at all.

The government said in the opening that its theory is that Combs conspired with an inner circle of body guards and high-ranking employees who comprised the enterprise, but they failed to show that any other individual actually conspired with him to conduct the affairs of this purported 20-year racketeering enterprise.  Indeed, there is at best thin proof that any of the other employees knowingly participated in crimes with or for Mr. Combs other than things like picking up or helping Mr. Combs procure personal use quantities of drugs for himself.

Most of the testimony about the employees shows that they ran errands related to his personal life, made travel arrangements for him and his girlfriends and the like, but there really is no evidence that they are -- that any were aware of or believed that he was sex trafficking his girlfriends or coercing them into sex or violating the Mann Act.

The assistants set up and cleaned hotel rooms, but they didn't know much, if anything, about what went on between Mr. Combs and his girlfriends in the hotel rooms, other than they used a lot of baby oil and Astroglide and drank alcohol and perhaps used drugs.

For instance, the government called a number of Mr. Combs' former assistants, and their testimony bears that out. Just as a couple of examples. Jonathan Perez testified that it was his understanding, and the way he viewed this was that these hotel nights were Mr. Combs' personal time or private time with a female. (Tr. 6117 and 6173). Brendan Paul testified that Mr. Combs and a significant other were going to a hotel for the night. That was sort of his understanding of what was happening in these hotel rooms. (Tr. 6834). And when one of the witnesses who was a former assistant, David James, did at one point testify that he once saw a naked man in a hotel room, but he said, "I didn't really think it was my business. I mean, I thought they were doing some personal things, and that was just part of the day, part of the job." (Tr. 1769).

What's more, the evidence shows that Mr. Combs actually took steps to conceal the nature of the sexual activity he was engaging in with his girlfriends from his employees, and in particular the fact, for instance, that the sexual activity with Cassie Ventura and Jane sometimes involved

third parties.  For example, the escorts and entertainers were booked by Mr. Combs or Cassie and Jane.  He did not involve staff in booking them or their travel.  Cassie and Jane both testified that they thought that what they were doing with these men was a secret that Combs shared only with them, and, indeed, that it brought them closer to Combs.  And there are also many text messages and other documents that confirm that Combs himself sought to conceal the involvement of the escorts from his employees.

For instance, we saw a couple just earlier today. Defense Exhibit 3127 had an entry on I think it's -- I can't read my handwriting, but I think it's April 24, 2023, where Mr. Combs is talking to Jane, and he says, "I can't let KK know about the arrangement for the hotel night."

Another example is Government Exhibit 1407, line 17, where Mr. Combs says to Jane on November 8, 2021, "I can't have Paul at my house."

And then in that same exhibit 1407, at line 784, Jane says to Kabrale Williams on September 19, 2023, "LMK when you head out because team might be there soon.  Don't want them to intercept you."

And there's another example from earlier today Defense Exhibit 3328, May 16, 2023 where Jane is talking to Kabrale Williams and is talking about how she has to wait to make sure the assistants are cleared out.  So those are just a few

examples.

In addition, even when, for instance, KK and some of the security guards in the earlier period learned of Mr. Combs' violence with respect to Cassie Ventura, which is not racketeering activity anyway, they did not help Mr. Combs perpetrate any further violence. Instead, there were numerous examples in the evidence where they actually tried to help Cassie in various ways and tried to deter Mr. Combs from engaging in further violence.

For example, after the InterContinental incident, Cassie spoke to D-Roc and went to his house because "D-Roc and his wife were just always there for me, so I ended up going over there to feel safe." (Tr. 645).

Cassie also testified that she was very close to Mr. Combs' security guards and felt safe with D-Roc and April. (Tr. 1052).

And, similarly, with respect to KK, there are examples in the evidence where KK is actually trying to help Cassie Ventura and protect her from Mr. Combs' anger. One example of that is in one of the government's summary charts GX-1411, lines 76 to 89, which is a series of texts between KK and Cassie.

With respect to the security guards, I also wanted to add that there is no evidence that they knew of any sex crimes or believed that Cassie or Jane were coerced into any sexual

activity with Mr. Combs, although, as I mentioned earlier, some of them did witness the domestic violence against Cassie.  And there is certainly no evidence that any of them — because there is no evidence of this at all — that any of them believed that this violence was being used to coerce Ms. Ventura to engage in sex that she didn't want to engage in with Mr. Combs or others.

Then with respect to KK, and I think the government's case really seems to hinge largely on their allegations about KK in their chart, reflecting her communications with others. There are a couple of points to emphasize.  First of all, even with respect to KK, there really is no evidence that she ever thought or believed that Mr. Combs' girlfriends were being coerced against their will into any sexual activity.  She didn't participate in any crimes with respect to Mr. Combs except, again, arguably, the drugs for personal use.

And in addition to what I pointed out earlier with regard to Cassie and her efforts actually to deter Mr. Combs from engaging in any violence and other damage control that she engaged in, there is also evidence that Mr. Combs was lying to her, even though she was supposed to be his co-conspirator. For instance, in Government Exhibit 1411, lines 368 and 370, in texts between KK and Mr. Combs, she says: "If you cannot be honest with me" — this is shortly after the Ventura lawsuit — "This doesn't work.  We just went through you choosing to keep things to yourself and hide them.  And we know this put us

where we are now."

Then he says: "You can take my phone."

And she says:  "this has nothing to do with taking your phone.  If you're starting to lie about anything to me, I'm saying that will break me, and I just feel like we are about to live this shit all over again."  So that's not the way co-conspirators act with one another.

But, at bottom, I think the gist of the evidence here about these other employees is that they ran personal errands, they engaged in damage control for Mr. Combs, and there is no evidence on the other hand that any of them were agreeing to form a RICO enterprise that would engage in a pattern of racketeering acts with Mr. Combs.

Then on this point, the final point I want to make on this is that, at worst, even if one were to take the view that the evidence could support one or more small one-off conspiracies at different times, such as, for example, with respect to the drugs for personal use, that does not prove the single charged conspiracy to violate RICO or the necessary continuity as charged in the indictment.

So one other thing to point out in that regard is that although the conspiracy is alleged to have begun in 2004, again, KK is supposed to be the main co-conspirator, and she doesn't really even appear in the evidence in any significant way until March of 2016, which is 12 years into this purported

20-year conspiracy.

And I recognize that they don't have to prove specific dates, but I don't think that the government can charge a 20-year conspiracy, introduce evidence of purported racketeering acts over the first 12 years, and then say, oh well, we're done here because all we really have to prove is that there was a conspiracy between 2016 and 2024.  That would clearly be a prejudicial variance and would knock out at least half of the racketeering acts.

In addition to that point about continuity, there is also no evidence of any criminal activity or conspiratorial activity relating to the supposed enterprise between the time that Mr. Combs breaks up with Cassie in 2018 and when he starts the relationship with Jane in 2021.

So in order to prove a single conspiracy, rather than multiple conspiracies, the government has to show that each alleged member agreed to participate in the collective venture towards a common goal.  And so even for a RICO conspiracy, if there are separate conspiracies proven as part of the pattern, the government still has to prove the single agreement to conduct or participate in the conduct of the charged enterprise, and that hasn't been done here.  I'm just going to cite one or two cases for this multiple conspiracies point. *United States v. Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008) and *United States v. Pizzonia*, 577, F.3d 455, 464 (2d Cir. 2009).

Before I move on, just one last thing.  Just for preservation purposes, I want to note that the Supreme Court held in *Sedrick Kushner Promotions Ltd. v. King,* 533 U.S. 158, 161 (2001), that a defendant charged on a RICO has to be distinct from the enterprise such that the entity is not simply same person by a different name.  And under that principle, the evidence here is insufficient because the enterprise that the conspirators allegedly agreed to form and conduct affairs of is indistinguishable from Sean Combs, the person.  Its purposes and goals simply involved promoting things that he wanted to do in carrying out aspects of his personal life and his private sex life, and there is no distinct enterprise.

Now, I recognize that *United States v. Kelly,* the Second Circuit decision from earlier this year rejects this argument, but we're preserving it for further review if necessary.

The second element requires the government to prove knowing and willful membership in the conspiracy.  We think that Mr. Combs' own conduct belies any argument that he did so, and the evidence on that is insufficient.

And now I want to spend some time on the element regarding the requirement that the government prove that Mr. Combs agreed that he or a co-conspirator would commit at least two racketeering acts.

I'm going go through certain racketeering acts which

we believe even if the Court denies the Rule 29 motion, at a minimum, shouldn't be charged to the jury.  So I'm going to start with the bribery racketeering act.  So the charge is bribery under California Penal Code Section 137(a).  And as the Court will recall from the litigation we had over the crime fraud motion, this section requires the government to prove that the defendant gave or offered or promised to give to any witness, person about to be called as a witness, or person about to give material information pertaining to a crime to a law enforcement official, any bribe upon any understanding or agreement that the testimony of the witness or information given by the person shall be thereby influenced.

So there are two elements to this.  The first one is that the person has to offer or promise or give a bribe to a person who is about to give material information to a law enforcement official.  And then, in addition, the conspirator has to act with corrupt intent to persuade the person to agree that the bribe would unlawfully influence the testimony.

What's particularly significant in terms of the record that we have here is that under California law, the government has to prove that Mr. Combs bribed an individual who was about to give material information pertaining to a crime to law enforcement.  Among other cases, *People v. Fernandez*, 106 Cal. App.4th 943, 948 (2003).  And that case also holds that the statute is narrowly construed to require an understanding that

testimony or law enforcement report will be given with the perpetrator intending to influence the contents of the testimony or report.

And when we had this other litigation pretrial, this Court found, as your Honor will recall, in April 11 transcript, pages 2 to 3, that the government with the evidence it presented in connection with that motion had failed to establish even probable cause that the particular communications in dispute were in furtherance of specified crimes.  And, here, I submit that the government's case at trial includes no additional evidence that changes this analysis, much less establishes this crime beyond a reasonable doubt.

If anything, the trial confirmed that there is no evidence that Mr. Combs had any intent to bribe any witness to withhold material information from the police as opposed to seeking to avoid reputational harm and negative publicity surrounding the incident for both himself and Ms. Ventura. First of all, there was no police involvement in the wake of the InterContinental incident, and all of the witnesses stated that Ms. Ventura did not want the police involved.  So, for instance, Israel Florez, the security guard from the hotel, testified that Ms. Ventura refused to call the police when he asked her if she wanted to, and that she just wanted to leave. (Tr. 207).  Mr. Florez also confirmed that there was no

"victim" and "obviously nobody was pressing charges." (Tr. 207).

In addition, his incident report, Government Exhibit 7 R-141, states that Mr. Combs was then told no one was recording him; that the safety and the privacy of the guest is important to the hotel; and if he tried to do something like that, he would get kicked out and escorted out of the property by the police.

Ms. Ventura testified that she didn't want to report Mr. Combs and wanted to protect him. (Tr. 642-43). Kerry Morgan testified that the police showed up at Ms. Ventura's apartment because of a noise complaint by a neighbor, not because she or Ms. Ventura had called them. (Tr. 1665).

Second, Eddy Garcia testified that law enforcement was never involved, even in the days after the incident. (Tr. 3902-03).  That the money was for the video and nothing else. (Tr. 3923).  And that prior to accepting the money, he specifically confirmed with both Mr. Combs and Ms. Ventura that no police report would be filed.  (Tr. 3933-34).

Ms. Ventura also appeared on FaceTime during the alleged bribery and stated to Mr. Garcia "that she had a movie coming out, and it wasn't a good time for this to come out, and that she wanted it to go away" all in a "normal demeanor." (Tr. 3933-34).

In addition, Mr. Garcia signed an NDA (Gov. Ex. C-111)

that specifically permitted him to report information to law

enforcement as required by law.  So that's the bribery.

Next, I want to talk about the obstruction

racketeering act.  And there are two statutes that are

principally at issue here:  18 U.S.C. 1512(b) -- sorry, (b)(3)

and (c).  they have similar elements, and I think the same

analysis applies to both.  There is also a dispute about

whether 1591(d) is also in play.  I'll get to that later, but

the 1512(b) offense requires the government to prove that the

defendant knowingly used intimidation, threats or corruptly

persuaded another person or attempted to do so or engaged in

misleading conduct with intent to hinder, delay or prevent

communication with a law enforcement officer or judge of the

United States of information relating to the commission or

possible commission of a federal offense.

Just to highlight a couple of important legal

principles here, corrupt persuasion requires proof that the

persuasion was motivated by an improper purpose, and the term

"corruptly" clarifies that the statutory prohibition is limited

to constitute unprotected and purportedly illicit activity.

*United States v. Velez*, 800 F.3d 63, 70-71 (2d Cir. 2015).  In

addition, *Arthur Andersen v. United States*, 544 U.S. 696 (2005)

also makes clear that the defendant has to have consciousness

of wrongdoing for that statute.  there is also a nexus

requirement for both statutes, which requires although the

government doesn't have to prove that a particular proceeding is pending or about to be instituted, the Supreme Court has held that the defendant has to have in contemplation a particular official proceeding. That's also in the *Arthur Andersen* case, at page 742.

So here, the allegations principally appear to involve two incidents: One involving Mia and one involving Jane, and neither of them satisfies these elements.

First, with respect to Mia, there is no evidence that supports the *actus reus*, the *mens rea* or the federal nexus requirements. Mia testified that when she received the initial -- and this relates to these texts she had with D-Roc in November of 2023, when Mr. Combs was trying to arrange a phone call with her. And she testified that when she received the initial text from D-Roc on November 20, 2023, she was "so excited to hear from him." (Tr. 3430). And she replied that "she missed you so F'ing much, Ahh." That's Government Exhibit 1410, row 17.

She then answered a call from him and had what sounded like, as she described it, a normal conversation. And then she says it ended when her radar went off because D-Roc started talking about how Puff and Cas would just fight like a normal couple (Tr. 3431-32), but no threats were communicated whatsoever. All D-Roc said was that Puff really wanted to talk to Mia and that he planned to call her, which she said she

understood to mean "They wanted her to say something publicly." (Tr. 34-35); in other words, a public relations thing.

Mia responded, according to her testimony, by pretending, like, yeah, of course, I will.  No problem.  And then although she testified that she was terrified and threatened and scared, she did not communicate those feelings at any time to D-Roc, and there's no evidence that her reaction would have been foreseeable to Mr. Combs or D-Roc in any way. She didn't even answer Mr. Combs' calls that same day, and then she eventually responds to D-Roc's later messages on February 2, 2024, because she wanted to keep him calm and wanted to play neutral.

And then D-Roc offers to send something, but the offer that he made, which she had termed it as money, but he didn't bring that up.  Actually, Mia is the one.  It was in response to a message that she was out of skrilla dollars (Government Exhibit 1410, row 41).  And Mia immediately refused the offer, and D-Roc never acted on it (Tr. 3439-40), which is clearly insufficient to demonstrate any corrupt persuasion.  She has not talked to D-Roc or Mr. Combs since.  She continued to ignore Mr. Combs' efforts to call her, and he eventually texted her a completely benign text that doesn't evince any corruption or threats or satisfy any of those other elements.

He says:  "Hey, I don't want to be blowing up your phone.  Just needed to talk to you for ten minutes.  Just

needed my memory jogged on some things. You were my right hand for years, so I just speak to you to know who was even around me, and it would be good to hear your voice. But if you don't want to, all good. Just let me know. Love. Hope you're well," heart hands emoji, prayer hands emoji. (Government Exhibit 410, row 68). Mia did not receive any additional correspondence from Mr. Combs, and that was his only message to her, according to her testimony. (Tr. 34-44).

Indeed, the prosecutors, in their questioning of Mia, characterized the messages, the ones with D-Roc and the one with Combs, as "nice messages." (Tr. 343-44). Nor was there any evidence whatsoever that either D-Roc or Mr. Combs had any knowledge that Mia supposedly felt threatened or intimidated. And her own subjective feelings, even if true, can't suffice to establish the witness tampering in the absence of actual evidence that either D-Roc or Mr. Combs knew that their conduct was threatening. Indeed, Mia testified that she played it cool supposedly to deceive them and replied lovingly to D-Roc's messages, even volunteering to D-Roc that she had tried to call Mr. Combs. (Tr. 3438-39).

As to the federal nexus requirement, there has to be proof that the victim plausibly might have turned to federal officials and either that there was proof of a federal investigation in progress at the time of the purported witness tampering or that the defendant had actual knowledge of the

federal nature of the offense.  That's the *Velez* case I cited earlier, at page 74.  And here there's no evidence that Mr. Combs at this time was aware of any federal investigation, much less that that was the purpose of this outreach as opposed to Mia's understanding that it was attempt to get her to say something publicly, which I mentioned earlier.

So that's Mia.

With respect to Jane, a similar conclusion follows. The government's allegations about Jane apparently center around text messages in November of 2023 after Cassie's lawsuit.  Jane sends Mr. Combs a text message on November 19, 2023, regarding the lawsuit.  And then she speaks on the phone with Mr. Combs 40 minutes later, and apparently the phone call was recorded, but Jane testified that she didn't know anyone else was listening and she wasn't aware that it was recorded and she didn't understand why Combs asked her if she was recording the call.  But basically all he said on this conversation -- there's nothing in this conversation to evince any kind of corrupt persuasion or threats or anything clearly related to any contemplated federal proceeding.  Mr. Combs makes statements like:  What do you want me to do to make you feel better, baby -- because Jane's upset after reading the lawsuit -- and this is when I need you to be there for me. That's Exhibit C-348-RT.  He said:  I'm just trying to just know mother F'ing stop all this madness.  I'm here to help you.

You know what I'm saying?  Try and breathe.  Okay.  How can I be there for you?  I need your support.  Please, as a friend, for the good times we been through.  Please.  I need your support.

Then Jane says:  Who's there for me?  And she testified that Sean was not wanting to hear it, and this was usually how our conversations go.  (Tr. 5082).  In other words, from her viewpoint, the conversation was no different than normal conversations on this subject.  She claims he was dismissive and tried to get her to move on.  She didn't claim there were any threats or intimidation.  And she testified that Mr. Combs acted this way all the time.  (Tr. 5082).

Then 22 minutes after this call, they have another call, which is also being recorded.  And on this one Mr. Combs states:  "I just need to tell you that I need your friendship.  You know what I'm saying?  And if you need me too, you know what I'm saying?  Whatever.  You know you ain't got to worry about nothing else though.  You feel me."

Regarding this statement, Jane says she believed he was talking about the rent, but Mr. Combs was already paying her rent, and there was nothing in the call about the rent.  And his statements were clearly in response to her on the earlier call.  That is not an evidence of corrupt persuasion or on conscious wrongdoing or intent to improperly influence any investigation.  There are no threats or intimidation, and,

again, there's no federal nexus.  These calls take place right after Ms. Ventura's lawsuit, and there's no proof or suggestion that Jane was going to report Mr. Combs to law enforcement or even that he was aware at this early period of any federal investigation.  So for the same reasons with regard to -- that there's not sufficient evidence under either of the two federal statutes.

I would note that, as your Honor is aware from the pending disputes about the jury instructions, that the government, even though it's not identified in the indictment, apparently wants to argue that there was a violation of statute of limitations U.S.C. 1591(d), which is a subsection of the sex trafficking statute.  And even apart from the constructive amendment argument which we made earlier, and will repeat at the charge conference, I think there's a more fundamental problem with this statute, which is that unlike the 1512 statute, it is constitutionally overbroad, and the statute has no *mens rea* element.  Read literally, it penalizes merely interfering with or preventing the enforcement of the sex trafficking statute in any way.  And so I think read literally, it would violate the due process clause, and be unconstitutionally vague.  It raises First Amendment problems.  It raises Sixth Amendment problems.

For instance, if an alleged sex trafficking victim seeks advice from a friend about whether to press charges

against her significant other and ultimately decides against doing so, then either she or the friend the victim consulted could certainly be regarded as having prevented the enforcement of a sex trafficking statute in some way.

Similarly, a lawyer who counseled the alleged victim or witness not to talk to the government or to assert the Fifth Amendment would be violating the statute as written. So we submit that that statute shouldn't even be charged at all because it's unconstitutional. But, in any event, for some of the other reasons that I just discussed about these facts, we don't think the proof would be sufficient even if your Honor disagreed with that.

It's a bit longer than I originally anticipated, your Honor.

The forced labor racketeering act is also insufficient. That statute penalizes knowingly providing or obtaining the labor or services of a person by anyone, or a combination of various means, such as force, the use of force, threats of force, physical restraint, threats of physical restraint, or serious harm or threats of serious harm. I think those are the provisions that are relevant to this case.

And in order to satisfy the statute, the government has to show that the defendant knowingly or intentionally engaged in one of those means that were sufficiently serious to compel a reasonable person in the workers' position to remain

in the defendant's employ against their will and in order to avoid, for instance, such threats of harm when they otherwise would have left.  That's a quote from *United States v. Zong*, 26 F.4th 536, 560 (2d Cir. 2022). and it's quoting a case called *Muchira v. al-Rawaf,* 850 F.3d 605, 620 (2017).  And one thing to emphasize here is that this case is radically different from the mine run of typical forced labor cases.

This statute was enacted by Congress to enforce the Thirteenth Amendment, and it is typically used against, for instance, domestic household employees who are immigrants, whether legal or otherwise, who don't speak English.  Their passports are taken.  They're typically physically restricted. Often the workers have squalid or otherwise intolerable living conditions.  The *Muchira* case describes this in some detail. The *Zong* case is a good example.  It's not even at the extreme end, but there the case involved Chinese laborers who came to the United States under very restrictive contracts with the Chinese government that required them to put up all this collateral, and then they had to surrender their passports to the employer.  They lived in dormitories.  Most of them didn't speak English.  They were in the United States on special visas, so they really couldn't leave their employer if they wanted.

The case law is pretty clear that not all bad employer-employee relationships or even employer-immigrant

relationships, which obviously this case doesn't, involve will constitute forced labor. And, again, the *Muchira* case discusses that. But, basically, what's important here is that the harm or threat of harm to the employee considered from the vantage point after reasonable person in the place of the victim has to be sufficiently serious to compel the person to remain in the job when they otherwise would have left.

And here, that isn't remotely satisfied. The government theory relates to four alleged victims: Capricorn Clark, Mia, Cassie, and Jane. With respect to the two employees, Clark and Mia, the evidence is plainly insufficient. Even if you credit their testimony, as of course you must in considering this motion, as to the threats or harm, because it doesn't show that Mr. Combs used any threats or harm to procure their labor or that they would have stayed to avoid those threats or harm when they otherwise would have left.

On the contrary, these are able-bodied, well-educated United States citizens, perfectly capable of leaving to avoid what they described as an abusive employer.

(Continued on next page)

MS. SHAPIRO:  The evidence shows, in fact, that when they wanted to, they did leave the job.  And when they stayed, it was because they wanted to stay, despite the abusive behavior, not because of it.  Indeed, it appears, with respect to both of them, that what they were most afraid of was losing their jobs with Mr. Combs and his businesses.

With respect to Capricorn Clark, she described this purported lie detector incident that she claimed went on for five days after she was accused of stealing jewelry from Mr. Combs, and she testified that she continued to work for him not because of any threats or harm but because she felt that if she had left, that it would have been written off as I stole it anyway.  That's at transcript 2555.  And she testified that she worked very long hours but that the only consequence if she had refused would have been the loss of her job.  But at transcript 2556, she's asked:

"Q.  What, if anything, would Mr. Combs tell you if you failed to accomplish a task?

"A.  You would lose your job.

"Q.  Is that what he would say?

"A.  Yes."

She testified that she wasn't paid overtime, but that's not enough to show forced labor.  If it were, virtually any violation of labor laws would be criminal.

She also described an incident in which she claims

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

that Mr. Combs pushed her at his house in Florida and then told her to get the fuck out of my house. This is at transcript 2577. And she said that after that incident, she left her employment because "that was crossing my boundary." Tr. 2577. And she took another job where she made $25,000 more than she was making in her job with Mr. Combs. Tr. 2663-64.

So again, her response to the violence and the conditions that she's complaining about is not that she continues to work there. It's that she leaves, and she was able to leave. There was no problem.

And then there's another incident where she claims she was threatened by Mr. Combs in 2012 and then terminated, and she alleges wrongful termination. And presumably she's alleging wrongful termination because she wanted to stay. She's complaining not that she was forced to work but that she was terminated because she took a vacation. And also, after that happened, she had no problem finding another job. She was hired to be 50 Cent's manager at Primary Wave. And the transcript cites for that are 2634, 2754 and 2755.

With respect to Mia and the forced labor allegation, she testified that she worked very, very long hours; that she got little sleep; that she suffered both verbal and physical abuse and threats from Mr. Combs; that he assaulted her. But she could have quit any time. And instead, she complains repeatedly about having been suspended multiple times, by her

account, without any valid reason.  For example, Tr. 3259-60; 3308-09; 3406-09; 3411-12.  And she talked about how one of the things that she was most scared about was that Mr. Combs was, quote, threatening her job.  Tr. 3390.  And then she complained that after she had gotten her quote/unquote dream job at Revolt Film, Tr. 3232, she was upset later when she learned that Mr. Combs didn't want to be involved in her film anymore.  Tr. 3421.  And she complained a great deal about how she didn't want to leave the company.  She wanted to continue to work with Mr. Combs in his businesses.  For example, Tr. 3588 and 3793.

And again, like Ms. Clark, she could have left and gotten another job.  She had a bachelor's degree from James Madison with a high GPA and an impressive résumé.  And in fact, she did later get a job working for Madonna for some period of time.  Tr. 3779.  So the elements just simply weren't met with either of those two.

With regard to Cassie and Jane, it appears that the government is relying on the sex trafficking allegations for the forced labor charges relating to those two individuals, and so I'll get to that.  I think if the evidence is insufficient as to sex trafficking, then by definition, it has to be insufficient as to forced labor.  I assume their theory is that, which strains credulity, but I assume their theory is that the sexual activity was a service that was work covered by the forced labor statute.  But I'll come back to that.

Next, I want to address the kidnapping racketeering act.

Here, I submit that, at a minimum, there's insufficient evidence of two of the three allegations even if you credit the government's witnesses. The first incident is as to Capricorn Clark. Under New York law, she told the story about the lie detector test and how, according to her testimony, for five days straight she was transported by Paul Offord to a building in Manhattan that was going to be the new office for Mr. Combs's businesses. And this does not satisfy the requirements under New York law. If she was ever restrained without her consent at all, most importantly, there's no evidence in the record that Mr. Combs knew that this was happening or agreed that a co-conspirator should kidnap her.

At most, the evidence showed that he knew his jewelry was missing and that she was one of the employees being investigated for the possible theft of the jewelry. But her alleged interactions were entirely with Mr. Offord and the person she claims administers the lie detector test. There's no evidence whatsoever that if this occurred, that Mr. Combs had any idea it was going on. And speculation, obviously, can't fill the gap.

In addition, there are serious questions about whether the government could prove that this was without her consent

under New York law.  She went willingly every day.  She didn't claim she was forced to go at gunpoint or otherwise coerced or threatened when Mr. Offord came to pick her up, according to her story, each of the five days, and she testified that she went because she wanted to "prove her innocence" and "wanted to get through it."  Tr. 2553.  And she said she kept taking the test and going back each day, on her account, because I felt like it was the only way to prove that I had nothing to do with it.

Then the other incident, kidnapping, as to which the evidence is legally insufficient, is the Cassie London hotel incident.  That was the incident where Ms. Ventura testified that she was taken to this London hotel and held there for several days after a violent incident in which she had been injured.  And here, California law, Penal Code Section 207(a) has four elements.

The government has to prove that a conspirator took, held or detained another person by using force or instilling reasonable fear and that using that force or fear the conspirator moved the person a substantial distance; the other person didn't consent to the movement and that the conspirator did not actually and reasonably believe the other person consented.  And here, I think the key is really the first two elements.  And this is borne out by the California case law, but the focus is on the transportation and whether the person

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

was moved by using force or instilling fear.  The statute doesn't cover sort of what happens after they're moved.  Maybe there's a different statute that does, but they didn't charge that.

There's no evidence that she was actually taken to the hotel through force or instilling reasonable fear.  There's no evidence that anyone used any force or threatened force or displayed a weapon when she went from the hotel to Mr. Combs's home.  She vaguely testified that Combs "had security bring me to the hotel and like sneak me into the hotel."  Tr. 766.  And she claims she was "not allowed to stay at his house."  Tr. 767.  But there was no testimony that anyone held her at gunpoint or otherwise used force or instilled fear in her to take her to the hotel.

Indeed, it's notable that she testified that she preferred to stay at his house because if she was so scared of him, why did she want to stay at his house?  So she clearly wasn't moved due to any fear of Combs, and that's insufficient to prove the kidnapping under the California statute.

The other racketeering act I wanted to talk about before I get to the sex trafficking is, very briefly, the arson of Mr. Kid Cudi's car, Scott Mescudi.  There's no evidence that Mr. Combs was involved in that arson.  Neither Capricorn Clark nor Cassie Ventura nor Mr. Mescudi witnessed the arson or put Mr. Combs at Mr. Cudi's residence at the relevant time, and

there was female DNA found on the Molotov cocktail bottle.

Then finally, I'd just note that although Mr. Cudi was permitted to testify that he thought Mr. Combs was lying when they met at the SoHo House and Combs said he didn't know what happened to the car, that is not sufficient evidence, because it was clearly just based on his own speculation and not based on anything he had seen or his personal observations relating to the arson.

Now I'm going to turn to Count Two, and the sex trafficking racketeering act as to Ms. Ventura.

The evidence is insufficient to show that Mr. Combs knew or recklessly disregarded that threats, fraud or coercion were used to induce Ms. Ventura to commit a commercial sex act, as required by the statute. And I really want to focus here on Mr. Combs's *mens rea*. I think that's the critical element here. The government has failed to prove that Mr. Combs had that *mens rea*. And the key inquiry really is what he understood and not the alleged victim's viewpoint.

Even her own testimony, though, I would note, doesn't establish that Combs would have known or recklessly disregarded the fact that she was somehow coerced or didn't want to participate in the freak-offs. The upshot of her testimony was that she did the freak-offs to make Mr. Combs happy even if she testified to this Court and the jury that she didn't really want to do them. She didn't communicate that reluctance at the

time to Mr. Combs.

On the contrary, the many text messages that she sent to him during the entire period of their relationship wouldn't have given -- they created a lot of dissent in the relationship and it was toxic for many reasons, but there really aren't text messages to Mr. Combs that would have given him reason to believe that she didn't want to participate in the freak-offs in particular. There were many explicit messages that a person in Mr. Combs's position clearly would have understood as indicating on the contrary: that she enjoyed the sexual activity and did not feel coerced. And although he was, regrettably, violent towards her at times, and we've heard a lot of evidence about that, domestic violence is not sex trafficking, and the evidence didn't show that she engaged in any sexual activity because of violence or the threat of violence.

Indeed, the evidence showed that when they did have a fight during a freak-off, she left. The InterContinental is actually an example of that. The fight started not before the freak-off but following a night of consensual sex during a freak-off, and then there was no sex after the fight. Moreover, there's no evidence in the record that the violence was to try to get her to continue engaging in any sex that may have been going on in the hotel room. That was not her testimony. And indeed, the video seems to show that after the

violence, Mr. Combs, when he gets the cell phone, ceases the violence and just sits in the chair in the elevator lobby.

So we submit under all the evidence that has come in that the government has not met its burden of proving the *mens rea* element as to the Cassie Ventura Count Two or the racketeering act.

With respect to Count Four and the racketeering act related to Jane, similarly, the evidence is insufficient to show that Mr. Combs knew or recklessly disregarded that threats, fraud or coercion were used to induce Jane to commit a commercial sex act.  Mr. Combs could not possibly have known that Jane did not voluntarily engage in the hotel nights.

Like Cassie, Jane testified that she loved Mr. Combs. She participated in the hotel nights to make him happy and because she enjoyed their time together afterwards, and it brought her closer to him and made her feel like she was the only one who could make him happy in this way.  There are many text messages bearing this out, including some of the ones we heard earlier today during the cross-examination of the summary witness.

The evidence also showed that Jane was willing to engage in the hotel nights, even on her own account, in part, because of the economic benefits that she gained from the relationship, such as the house and various gifts and financial support and the love contract that she talked about.  And

unlike with Ms. Ventura, there's no evidence whatsoever except for one incident, which I'll come to in a minute, of any violence towards Jane during the course of their three-year relationship.

For most of that period, it seems like the government relies on their fraud theory. And at the very least, if the Court doesn't grant an acquittal on this count and racketeering act, the government should not be permitted to argue the fraud theory to the jury because it's deficient as a matter of law. They apparently intend to argue that Mr. Combs defrauded Jane by making some promises about plans that may not have ultimately transpired, things like the Turks trip that didn't happen initially when she wanted it to but later did occur. She testified that she wanted more dinners out or quality time that she saw other girlfriends getting, and that this didn't happen as often as she wanted it to, often, because they were too tired after the hotel nights. And the government was sort of characterizing and clearly intends to argue that this is fraud because it's a false promise and that she did the hotel nights in reliance on this false promise.

That is not legally sufficient fraud to count as a means of coercion under the sex trafficking act. As the government apparently conceded in its request to charge, and the Court recognized when we had the dispute over certain of Jane's notes and we had the evidentiary argument, the fraud

standard under the sex trafficking statute is consistent with fraud's well-settled meaning, and it contemplates that any alleged misrepresentations have to be material.  And that's an objective standard.  And the types of statements that Jane claimed that Mr. Combs made to her about upcoming plans and so forth simply don't qualify.

Even if Jane may have subjectively believed what Mr. Combs said about these activities was important to her, that's not what matters.  What matters is what a reasonable person objectively would have thought and whether they would have had the same view.  And the answer is clearly no.  And indeed, a different, more capacious view of materiality would sweep in a broad range of everyday behavior between romantic partners and pose serious vagueness concerns, because this just happens every day in people's relationships.  Someone promises to do something nice and then it doesn't end up happening, it would just sweep in all kinds of things that people do all the time, and no one says that it's fraud.

Now, in connection with the evidentiary ruling, your Honor will recall, I know that the Court invoked *United States v. Litvak*, the Second Circuit case from 2015, for the point that evidence that the alleged victim believed they were duped and duped as to an important matter is relevant to materiality.  But the question of whether it's relevant and whether it's sufficient are two different questions, and *Litvak* did

repeatedly emphasize that the inquiry is an objective one.  The difference between *Litvak* and here is, there, the court merely said the views of the allegedly defrauded parties are relevant to whether the statements were material.  But here, the government is claiming not that -- what I should say is that they're relevant but not sufficient.  Right?

And so here, the point is Jane's subjective beliefs is really all that the government is relying on, and they're simply not sufficient to transform Combs's denying statements into criminally fraudulent misrepresentations.

The Court also posed a hypothetical during our discussion about the evidentiary issue relating to a human trafficking situation in which immigrants were duped into brothel work by the promise of green cards, and I respectfully submit I think that that's a very different situation.  That's sort of an elaborate, calculated plan to trick vulnerable individuals into committing commercial sex acts.  And that's very different from the scenario where you're talking about a boyfriend and girlfriend and it's a wealthy individual and they have a relationship where he's paying her rent, they have a romantic relationship, and she's disappointed that he won't take her on as many trips or go on a yacht, like she sees he's doing with other girlfriends.  That's worlds apart from tricking immigrants into coming into the United States with a false promise about immigration papers.

The last thing I'll note on that is that the theory is so weak that it's notable that the government, despite having three superseders, three indictments, rather, two superseders before the current one, they never charged sex trafficking of Jane as a separate count until they found out that she was alleging a single instance of an assault by Mr. Combs.  That's the incident that she talked about which occurred, by her account, on Jun 18th and 19th of 2024.  So I think that's very telling, and it shows that this theory of fraud is incredibly weak to nonexistent and can't support the count.

With regard to the fight on Jun 18th and 19th at Jane's house in Los Angeles, we submit that this single act by itself is not sufficient to constitute a commercial sex act under the statute.  They haven't proven that a reasonable person in her shoes couldn't have left or refused to bring the escort into her house.  There's also no effect of that single incident on interstate commerce.  There's no evidence that the escort came from outside California or even from far away. There's no other evidence of commerce.

Then lastly, with respect to Counts Three and Five and the Mann Act, racketeering act, there's no sufficient evidence that the escorts and entertainers in question were paid for prostitution as opposed to their time, as required by the statute.  The government only called two witnesses, two escort witnesses, and they both testified that they were not

prostitutes and not paid for sex. That was Daniel Phillip and Sharay Hayes. They also didn't travel, and there was also evidence in the record of payments to escorts when there was no sex with Mr. Combs's girlfriends. Cassie Ventura and Jane also didn't testify that the men were prostitutes. Indeed, the words they used for them -- "escorts," "entertainers" -- belie that conclusion.

So in sum, we move to dismiss all five counts.

Thank you, your Honor.

THE COURT: Thank you.

Does the government wish to respond?

MS. SLAVIK: Your Honor, the government respectfully submits that the record developed at trial, viewed in the light most favorable to the government, more than establishes a sufficient basis for the case to be presented to the jury.

I think on this record, the Court can deny or defer the defendant's motion at this time. I'm happy to respond to any of the arguments if your Honor would like that. But if your Honor would like that, I would ask for a bathroom break, please.

THE COURT: OK. Well, we're going to reserve decision on the motion under Rule 29(b), and so that will take care of the motion for the moment.

With that, what else do we need to take care of before we take a break?

MS. COMEY:  I don't believe there's anything from us, your Honor.  I've just sent back what I hope is a final version of a stipulation that the parties have reached for the defense to put in on their case.  Assuming there are no issues with that, I think we're all set.  I'm looking at my team to confirm.

But at some point your Honor needs to allocute the defendant.

THE COURT:  Mr. Agnifilo, have you had an opportunity to discuss with Mr. Combs whether he intends to testify in his defense?

MR. AGNIFILO:  I have had that discussion with him at great length.

THE COURT:  Is it an appropriate time now to allocute Mr. Combs on his decision?

MR. AGNIFILO:  That is fine.  If you could just give me 30 seconds so he understands what's about to happen.

THE COURT:  Take as much time as you need.

MR. AGNIFILO:  We're ready, Judge.

Thank you.

THE COURT:  OK.  The Court will now allocute Mr. Combs on his right to testify on his own behalf.

Is the defense ready for the Court to proceed?

MR. AGNIFILO:  We are.  Thank you, your Honor.

THE COURT:  Mr. Combs, how are you feeling today?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE DEFENDANT:  I'm doing great.  How are you, your Honor?

THE COURT:  Good.

THE DEFENDANT:  I want to tell you thank you.  You're doing an excellent job.

THE COURT:  OK.  I appreciate that.

In the last 48 hours, have you taken any drugs, medicine, pills or had any alcohol?

THE DEFENDANT:  No, I have not.

THE COURT:  Is your mind clear today?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you understand what is happening here in the courtroom?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you understand that as a defendant in a criminal case, you have the right to testify on your own behalf if you wish to testify?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Do you understand that you also have the right not to testify?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Do you understand that if you decide not to testify, that no one, including the jury, could draw any inference or suggestion of your guilt from the fact that you did not testify?

THE DEFENDANT:  I understand, your Honor.

THE COURT:  Do you understand that whether you testify or not is a decision for you to make, with the assistance of your lawyers, but ultimately that it is your decision to make and not your lawyers' decision to make?

Do you understand that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Now, without telling me what you may have discussed with your lawyer, have you discussed with your lawyers whether you should or should not testify in this case?

THE DEFENDANT:  Yes, thoroughly.

THE COURT:  Have you had enough time to talk with your lawyers and to think about whether to testify and the advantages and disadvantages of that decision?

THE DEFENDANT:  Yes, we have discussed it.

THE COURT:  Is it your decision not to testify in this case?

THE DEFENDANT:  That is my decision, your Honor.

THE COURT:  Is that your decision?  Now, it could be --

THE DEFENDANT:  That is solely -- that is solely my decision.

THE COURT:  Solely your decision.  OK.

Is there any further questions --

THE DEFENDANT:  I mean it's my decision but with my --

with my lawyer.

THE COURT:  All right.  Just to clarify, do you understand that it is your decision to make?

THE DEFENDANT:  Yes, my decision to make.  I'm making the decision.

THE COURT:  And you've made the decision freely and voluntarily on your own behalf?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  All right.

Ms. Comey, any further questions that you would request that I ask?

MS. COMEY:  No.  Thank you, your Honor.

THE COURT:  Mr. Agnifilo.

MR. AGNIFILO:  Nothing further.  Thank you, Judge.

THE COURT:  All right.

Thank you, Mr. Combs.

THE DEFENDANT:  Thank you.

THE COURT:  With that, I think we can take a break and come back for what I anticipate will be some exhibits coming in.

MR. AGNIFILO:  Yes, your Honor.

THE COURT:  So how much time would people like?

MR. AGNIFILO:  I want to make sure the stipulation's all squared away.  It should not take a great deal of time; 15 minutes, figure.

THE COURT:  All right.  So let's take 15 minutes.

Now, no one's had lunch.  I think that we're going to be able to finish this and then people will be excused for the day, which is probably everyone's preference.

MR. AGNIFILO:  That's perfect.

THE COURT:  All right.  Let's take 15 minutes and come back.

(Recess)

THE COURT:  OK.  Let's come back.

(Continued on next page)

(Jury present)

THE COURT:  Please be seated.

All right.  Welcome back, members of the jury.

Mr. Agnifilo, the defense may proceed with its case.

MR. AGNIFILO:  Thank you, your Honor.

MS. ESTEVAO:  Your Honor, we'd like to begin by reading a stipulation.

Mr. McLeod, could you please pull up what's been marked as Defense Exhibit 2000, and please highlight the first three paragraphs, first three numbered paragraphs.

I offer Defense Exhibit 2000.  Thank you.

MS. JOHNSON:  No objection.

THE COURT:  All right.  Defense Exhibit 2000 will be admitted.

(Defendant's Exhibit 2000 received in evidence)

MS. ESTEVAO:  I'm reading from paragraph 1, if you could please highlight it.

Defense Exhibits 1001, 1008 and 1026 are true and accurate records from GX B300, a device that Casandra Ventura provided to the government.

Defense Exhibits 1036, 1049, 1225 and 1422 are true and accurate records from GX B200, a device that Casandra Ventura provided to the government.

Defense Exhibits 1068, 1091, 1092 and 1099 are true and accurate records from GX B600, a device that Casandra

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ventura provided to the government.

Can you please go to the next page.

Defense Exhibits 1131, 1136R, 1149, 1151 and 1155 are true and accurate records from GX B400, a device that Casandra Ventura provided to the government.

Defense Exhibit 1417A is a true and accurate record from GX B500, a device that Casandra Ventura provided to the government.

And at this time I would like to offer a number of exhibits for admission -- Defense Exhibits 1001, 1008, 1026, 1036, 1049, 1068, 1091, 1092, 1099, 1131, 1136R, 1149, 1151, 1155, 1225, 1417A, 1422 and 1428.

THE COURT:  Any objections other than those that the Court has previously ruled on?

MS. JOHNSON:  No objections.

THE COURT:  All right.  Those exhibits will be admitted.

(Defendant's Exhibits 1001, 1008, 1026, 1036, 1049, 1068, 1091, 1092, 1099, 1131, 1136R, 1149, 1151, 1155, 1225, 1417A, 1422 and 1428 received in evidence)

MS. ESTEVAO:  Thank you.

Mr. McLeod, can you please pull up Government Exhibit 1402, page 2.  This is Government Exhibit 1402.  And please highlight row 5, the date on row 5, Jun 29, 2012.

Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Can you please pull up Defense Exhibit 1001 and highlight the second bubble -- or, I'm sorry.  Can you go to the next page.  And the following page.  And the first gray bubble and the second blue bubble.

Mr. Combs:  "We're gonna have so much fun today," on Jun 29, 2012.

Local user:  "I know," with two exclamation points; "I'm on my way home."

Can we please pull up Government Exhibit 1312, page 2. And the second line, please highlight local user MacBook Pro A1278, of Casandra Ventura.

Thank you.

And please go to Government Exhibit 1402 again, page 2, row 5.  And please highlight under Casandra Ventura Government Exhibit B325.

Thank you.

Can we please pull up Government Exhibit B325, please, at page 2.  And please highlight, at 1:02 p.m., local user asks:  "Hey, are you working today?"

Thank you.

Can you please pull up Defense Exhibit 1008, please. And please go to the next page.  And please highlight local user August 19, 2012, at 10:53 p.m.:  "I'm the luckiest woman in the world.  I'll get all the pics together this week.  So many good ones."

Thank you.

Please pull up Government Exhibit 1402 at page 4.  And highlight row 10, which is August 17, 2012, to August 19, 2012.

Thank you.

Can you please now go to 1402, page 8, row 22.  And highlight the date of December 20, 2012.

Thank you.

Can you now please pull up Defense Exhibit 1026 at page 2, and highlight the bubble, the large bubble.

Local user writes:  "LOL.  I took that piece of Adderall before I left.  My high is kicking back in.  But I am focused as fuck.  LOLOL.  I know it was crazy but even when it's not super hot, I always have fun.  The last round was pretty hot to me, though.  If you want to do another party before we leave with new people, LMK so I can hit the guy.  I really owe you like an entire fun night.  I'm down for whatever.  I love you, and I'm sorry I've been mean.  You're right.  I need to treat my Pop Pop better and give him love.  I love being in love with you, so I would never want that to fade or the affectionate part of us to just become absent because we're too comfortable.  You give me so much love and you take care of me and you rock with me even when I'm crazy.  I know, like, really crazy.  I promise I will be better.  If for whatever reason I don't, you can leave me.  That won't happen, though.  I will not let you down.  I know you and I both know

that we aren't perfect, but if we just show our love when we feel it, we can change our path together and make our relationship evolve organically.  I'm sorry I've been sounding so forceful.  It's a projection of what I think should be by now my life, but at some point down the line, not right now. Sorry I'm babbling.  Bottom line, I love you.  You are important to me, and I know that I will never have love like this in this lifetime again.  It isn't possible.  I don't want to lose my chance.  You have my heart.  You believe in me and you love me.  I always feel your love.  That's all I need.  I can't wait to start the year fresh with you.  I can't wait until you get to Jamaica and we just hang and talk.  Besides making love, talking to you is favorite thing.  You open my eyes.  Even when you think I'm not communicating or I'm quiet, I'm just listening and really thinking about what you said. Anyway, all that to say I love you and thank you for always trying with me.  I know I haven't been easy, and I'm getting better.  By the time you see me after the 1st, I will be a new woman, above all a woman, not a child, and a new attitude as well," smiley face.

And this was at 10:08 p.m. on December 20, 2012.

Can we please pull up Government Exhibit 1420, on page 22 -- sorry, 1402.  Yes.  And highlight row 66, the date of February 14, 2017, to February 16, 2017.

And now please pull up Defense Exhibit 1417A.  And

please go to the next page.  And this is a February 14, 2017, message from Violet.

Please go to the next page.

Casandra Ventura writes:  "OMG.  Thank you so much," with two exclamation points, and lots of rows.

Violet writes:  "Teamwork makes the dream work.  Happy Valentine's Day."

Can you please pull up Defense Exhibit 1131, please.  On page 2, pop Pop iPhone writes:  "I want to fuck form 48 hours," on March 8, 2017.

Casandra Ventura:  "I think my stamina is going to be crazy.  I passed out before Darla left me and she said I was so peaceful, no snoring and I actually woke up so early and refreshed."

Pop Pop iPhone writes:  "Great."

Ms. Ventura writes:  "LOL.  I thought you might like that, but back to that, how you want to do it?"

Please go to the next page.

Mr. Combs writes:  "You think you can FO without getting high?  LOL."

Ms. Ventura:  "Yeah.  I'll just have to be at my level and what is good for me," smiley face.

(Continued on next page)

MS. ESTAVAO:  Can we please pull up Defense Exhibit 1136-R.  And blow up the first couple of bubbles.

On April 5, 2017 Ms. Ventura writes: "Dope send me a dick pic.  Hello".

Can you go to the next page?

And the following page.

And the next page.

Ms. Ventura writes:  "I miss you."

Mr. Combs writes:  "So what you gonna do?"

Ms. Ventura writes:  "Be your lil freak."

Can you please pull up Defense Exhibit 1149, page 3, and highlight the first bubble.

On May 14, 2017, Casandra Ventura writes: "LOL.  I just bought baby oil at the store because I couldn't help myself."

Can you please pull up Defense Exhibit 1151 and highlight the bubble at the bottom.

Casandra Ventura writes:  "About to pass out.  I just wanted to let you know that I'm really happy and I'm proud of us.  We've been together for a long time and I feel like we're finally starting to understand each other.  We might drive each other crazy sometimes, but baby you really do make me happy. I'm far from perfect, but I hope that I make you happy even a fraction of the way you make me feel.  I just looked down at my bracelet, and it made my smile.  I know that you feel that

there's a lot to learn about me, but I think it's solely because we've both grown.  I think we're both changing in the best ways, and I thank God that we grew together and not apart. I think as long as we continue to communicate, stay faithful, honest, real, and above all just be nice to each other, we can keep it sexy and try new things because that trust will be there.  No one understands me the way you do.  No one gets to see the beautiful man that I'm in love with the way I do. You're my best friend.  There isn't a person in the world I love the way I love you.  Love always CC."

And this message was sent on May 30, 2017.

Can you please pull up Government Exhibit 1402 at page 23.  And highlight the last row, the date, yeah, of June 9, 2017 to June 11, 2017.  Thank you.

Last exhibit to pull up Defense Exhibit 1155.  Please go to the next page.

Casandra Ventura writes: "And I love you, and I'm in love with you.  I want you to be happy too."

Can I have one moment, your Honor?

THE COURT:  You may.

MS. ESTAVAO:  Please take this down.

MS. GERAGOS:  At this time, we'd like to admit a stipulation between the parties, which is Exhibit 2001.

MS. COMEY:  No objection, your Honor.

MS. GERAGOS:  We are going to bring it up on the

screen.  I will note for the record that it is unsigned on the

screen, but I have the signed copy with me.  If we could go

to --

THE COURT:  Let me admit it first.  2001 is admitted.

(Defendant's Exhibit 2001 received in evidence)

THE COURT:  Now you can proceed.

**MS. GERAGOS:**  Thank you.

Highlight the first paragraph, please.

This is a stipulation between the parties.

### Daniel Phillip

On or about December 18, 2023, Daniel Phillip met with one or more law enforcement agents, one of whom drafted a report of the meeting after it concluded.  According to the report, Mr. Phillip stated at the meeting, among other things, that "Phillip spoke on the phone to the client, a woman, and was told to report to the Gramercy Park Hotel at 3:00 a.m. and tell the front desk that he was there to see 'Mr. Black.'  The woman stated to Phillip that her husband had asked her what she wanted, to which she said she wanted to be rubbed down in oil by another man."

Please go to the next paragraph.

2. On or about October 7, 2024, Daniel Phillip met with one or more law enforcement agents and Assistant United States Attorneys, one of whom took notes during the meeting.  According to the notes, Phillip stated at the meeting, among

other things, that "Sean Combs would occasionally tell Daniel Phillip, go sit on the couch, it's my turn, and then start having sex with Cassie Ventura, Daniel Phillip would feel jealous as Daniel Phillip liked Cassie Ventura romantically."

3. On or about December 18, 2023, Daniel Phillip met with one or more law enforcement agents, one of whom drafted a report of the meeting after it concluded. According to the report, Phillip stated at the meeting, among other things, the following: "In approximately 2013, Phillip saw Ventura get physically assaulted by Combs at her 10 W. 11th Avenue apartment." After the assault, "Combs eventually came back and told Phillip, 'Yo man, gonna have to deal with this, need you to get the fuck out.' Phillip left."

Dawn Richard

4. On or about March 18, 2025, Dawn Richard met with one or more law enforcement agents and Assistant United States Attorneys, one of whom took notes during the meeting. According to the notes, Richard stated at the meeting, among other things, that "Sean Combs threw eggs at Cassie Ventura from a skillet, which hit her. Put the pan back down," and the notes continue describing the incident thereafter.

5. On or about October 31, 2024, March 18, 2025, April 8, 2025, April 29, 2025, May 10, 2025, May 15, 2025 and May 16, 2025, Dawn Richard met with one or more law enforcement agents and Assistant United States Attorneys, one of whom took

notes during or drafted a report after each meeting.  The reports and notes from the first four of those seven meetings do not reflect that Ms. Richard stating that Mr. Combs told her "Where he comes from, people go missing if they say things like that, like, if people talk."

Sharay Hayes

6. On or about May 9, 2024, Sharay Hayes met with one or more law enforcement agents, one of whom drafted a report of the meeting after it concluded.  According to the report, Hayes stated at the meeting, among other things, that "he began to have feelings for Ventura."

Capricorn Clark

7.  On or about June 21, 2024, October 18, 2024, March 21, 2025, April 3, 2025, April 4, 2025, April 11, 2025, April 18, 2025, April 24, 2025, May 2, 2025, May 3, 2025, May 9, 2025, May 25, 2025 and May 26, 2025, Capricorn Clark met with one or more law enforcement agents and Assistant United States Attorneys, one of whom took notes during or drafted a report after each meeting.  The notes and report from the first eleven of those thirteen meetings do not reflect Clark stating that she called Lauren London while in Mr. Combs' car outside of Scott Mescudi's house in December 2011.

Mia

8.  On or about January 5, 2024, January 8, 2024, March 19, 2024, June 18, 2024, September 24, 2024, February 18,

2025, February 25, 2025, March 3, 2025, March 13, 2025, March 21, 2025, March 27, 2025, March 28, 2025, April 3, 2025, April 4, 2025, April 10, 2025, April 11, 2025, April 17, 2025, April 18, 2025, April 23, 2025, April 24, 2025, April 30, 2025, May 2, 2025, May 6, 2025, May 8, 2025, May 17, 2025, May 18, 2025, May 23, 2025, May 24, 2025, May 26, 2025, May 27, 2025 and May 30, 2025, Mia met with one or more law enforcement agents and Assistant United States Attorneys, one of whom took notes during or drafted a report after each meeting.  The notes and reports from the first three of those thirty-one meetings do not reflect Mia stating that Combs initiated sexual contact with Mia.  The notes and report from the first two of those thirty-one meetings do not indicate Mia had an attorney present.  The notes and errors from the remaining meetings indicate that Mia had an attorney present at the third meeting on March 19, 2024 and at all subsequent meetings.

Bryana Bongolan

9.  On or about January 18 of 2024, Bryana Bongolan met with one or more law enforcement agents and Assistant United States Attorneys, one of whom wrote a report of the meeting after it concluded.  The report does not reflect Ms. Bongolan stating that Mr. Combs told her "I can kill you" at a photo shoot.

Finally, your Honor, the transcript lists at pages 6791 that we offered 3171.  That was already admitted and we

request that it be corrected to state 3171-A.  That is our first request.

Our second request is a transcript lists 3228 as admitted.  This should instead be 3288, which was an exhibit we looked substantially at today.  There may be other Defense Exhibit numbers to correct which we have consent of the government to do at a later time.

But at this time the defense rests.

THE COURT:  Very good.  So we will make those adjustments that you indicate.  I'm not hearing an objection.  And the same qualification that if there are other errors in the transcript, then you will be permitted to correct those.

MS. GERAGOS:  Thank you.

THE COURT:  Thank you, members of the jury.  At this time -- well, anything further from the government?

MS. COMEY:  No, your Honor.  The government does not intend to present a rebuttal case.

THE COURT:  With that, members of the jury, we will proceed in this fashion:  We are going to be off tomorrow and we will return on Thursday.  You should be here at 8:45 so we could get started at 9:00 a.m. for closing arguments.

Since we're having a day of break, I'll give you the same usual weekend instructions that I give you, which is, do not speak with each other about the case.  Do not speak with anyone else about the case.  If someone else tries to talk to

you about the case, do not engage in that conversation.  If there is anything that comes up that you believe is improper or trying to get you to break the Court's rules, please contact the Court so we can address it.  Do not read anything about the case, watch anything about the case.  I've already told you to turn off your alerts, so I'm sure you've done that.  But do not look at anything on your phone about the case, and do not research the case.

With that, we'll see you here to get started on Thursday at 9:00 a.m.  Thank you very much.  All rise.

(Continued on next page)

(Jury not present)

THE COURT:  Please be seated.  Have the parties discussed the logistics for Thursday in terms of timing?  I think that had come up yesterday, and the parties were going to discuss whether the jury should be kept longer than 3:00 p.m., like to 5:00 p.m., or other mechanics.

MS. SLAVIK:  Your Honor, Mr. Agnifilo will tell me if I'm totally off base, but it's the government's view that we should go till 5:00 p.m. both Thursday and Friday.

THE COURT:  We will go from 9:00 a.m. to 5:00 p.m. on both Thursday and Friday?

MR. AGNIFILO:  Yes, your Honor.

THE COURT:  Anything else in terms of the mechanics on Thursday and Friday that the parties wanted to raise?

MS. GERAGOS:  No, your Honor, not from the defense.

MS. SLAVIK:  Nothing from the government.  Thank you.

THE COURT:  In terms of the proposed charge, are the parties prepared to get their edits back this evening.  If so, what time?

MS. SHAPIRO:  Can we have a minute to confer with the government?

THE COURT:  Yes.

MS. COMEY:  While they're conferring, can I correct a clerical error that the parties found?

THE COURT:  Yes.

MS. COMEY:  Government Exhibit A-442-43 does not exist.  So there is a range that admitted -- that was admitted that ended at A-442-43.  It should end at dash 42, so I wanted to withdraw the nonexistent Government Exhibit A-442-43, so no one tries to find it one day.

Also, we've gone through and figuring out what can be released publicly.  And in doing so, we realize there are a number of exhibits we can release without further redactions.  We've put them on demonstrative Government Exhibit 1512, which I will provide to the court and to the court reporter.  So we'd ask the exhibits on this list may be unsealed, so we may release them to the public without redactions.

THE COURT:  Very good.

MS. GERAGOS:  We reviewed demonstrative 1512, and we have no issues with those being unsealed.

THE COURT:  So the exhibits on Government Exhibit 1512 will be unsealed.

MS. COMEY:  I'll hand up a copy to your Honor's deputy, your Honor, so you have it for the Court file.

(Government's Exhibits 7A-132, 7A-133, 7A-134, 7A-136, 7A-135, 7A-137, 7F-104, 7F-105, 7F-106, 7G-103, 7G-103-A, 7H-179, 7H-180, 7H-181, 7H-182, 7H-183, 7H-184, 7H-185, 7H-186, 7H-187, 7J-104, 7J-106, 7J-106-A, 7J-106-B, 7J-107, 7J-107-A, 7J-107-B, 7J-108-A, 7J-109, 7J-109-A, 7J-109-B, 7J-110, 7J-110-A, 7J-110-B, 7J-111, 7J-111-A, 7J-112, 7J-113, 7J-114,

7J-114-A, 7J-114-B, 7J-115, A-104-40A, A-104-40B, A-442-35A, A-442-35B, E-103, E-117, E-118, E-119, E-120, E-121, E-122, E-123, E-124, E-125, E-126, E-127, E-128, E-129, E-130, E-133, E-136, E-138, E-146, E-147, E-149, E-152, E-156, E-160, E-185, E-190, E-193, E-194, E-195, E-206, E-207, E-209, E-210, E-213, E-238, E-266, E-285, E-306, E-306-M, E-307, E-307-M, 7J-115-A, 7J-115-C, 7J-116, 7J-116-A, 7J-116-B, 7J-117, 7J-117-A, 7J-117-B, 7J-118, 7J-118-A, 7J-118-B, 7J-119, 7J-119-A, 7J-119-B, 7P-103, 7P-103-A, 7P-104, 7P-104-A, 7X-150, 7Y-120, 7Y-120-A, 7Y-120-B, 7Y-120-C, 7Y-121, 7Y-121-A, 7Y-121-B and 7Y-121-C received in evidence)

THE COURT:  Very good.  Thank you.

I take it, Ms. Comey, that the parties are working on the laptop and the transcripts in case the jury requests them?

MS. COMEY:  Yes, your Honor.  I think we've made very good progress on the laptop and the transcripts.  Given that we don't expect the jury will be able to deliberate until Monday, I think we will be able to make great progress before they actually begin deliberations.

THE COURT:  All right.  So this is helpful.  When you said 9:00 a.m. to 5:00 p.m. on Thursday and Friday, you really meant 9:00 a.m. to 5:00 p.m. on Thursday and Friday.

MS. COMEY:  I'm hopeful that it will be less than that, your Honor.  It would be wonderful if the jury could start deliberating on Friday, but I think there is going to be

a lot of argument, and then I expect your Honor's instructions will take a bit.

THE COURT:  That's fair.  Very good.

Anything further from the government?

MS. SMYSER:  Your Honor, in terms of the jury charge, we are prepared to get it to you this evening.  We will aim for 7:30 if that works for you.  We are just conferring on some topics.

THE COURT:  I think the time that you have with it is probably time well spent because you can probably work out some of the issues that you might have, so 7:30 works.  And then why don't we come in tomorrow for the charge conference at 10:00 a.m. so I will have time to look at what I've been given.  So we'll do 10:00 a.m. tomorrow.

As I said, if anyone who's handling the closings would like to excuse themselves from that proceeding, that's your choice, and I won't hold it against anybody.

Anything further?  Ms. Shapiro?

MS. SHAPIRO:  A quick question.  Does your Honor contemplate giving us the new draft before 10:00 a.m. or just --

THE COURT:  That's what I'm going to try to do, but we'll see.  It might be right before the conference.

MS. SHAPIRO:  Okay, that's fine.

THE COURT:  And, I mean, normally what I would do is

have the charge conference in the afternoon, but my understanding is that the lawyers who are presenting closing arguments wanted some time to have those and be able to integrate those into their closings.

If it would be more helpful for the parties for the Court to be able to get you responses to whatever you submit at 7:30 p.m., I'm going to need some time in the morning. On that view, we can start at noon, and I probably would be able to get you the draft a little bit earlier.

MS. SHAPIRO: I think we can -- I think 10 is fine. If your Honor decides after seeing what we submit that you need more time, you can let the parties know.

THE COURT: I'm going to go ahead and call an audible and just say noon. Because I can already tell by what you're saying that there are going to be a lot of issues presented. So I'm going to do myself a favor by saying noon. So we'll do it at noon tomorrow. Charge conference.

Anything else from the government.

MS. COMEY: Yes, your Honor.

Given that the attorneys who will be giving summations won't be here tomorrow, I wanted to put something on the record that I hope will not be necessary, but my hope is that we don't have to object during defense summation. I really don't want to do that. So I just wanted to put on the record that we think it would be objectionable and crossing a line for any

summation to bring up politics or current events or the propriety of this prosecution and the use of government resources.  I would hope that Mr. Agnifilo would not cross over those lines, but I just wanted to say that if he did, I would object in the middle of his summation and ask the Court to instruct the jury to disregard any comments like that.  So I just wanted to state that in advance of summations and the hope that it's not necessary.

THE COURT:  And that was the subject of one of the government's motions in limine.

MS. COMEY:  Indeed, your Honor.  Yes.

THE COURT:  I believe at that time there was an agreement by the defense not to engage in any of that type of argument.  But, Mr. Agnifilo, anything to worry about here?

MR. AGNIFILO:  Nothing to worry about, Judge.

THE COURT:  There you go.

Which raises another question.  In terms of:  Have the parties discussed demonstratives or anything that might be used in terms of closings and how those would be handled?

MS. COMEY:  We have not discussed, your Honor.  But we will confer and given that we've been able to confer on similar matters, I'm sure we will be able to reach an agreement.

THE COURT:  All right.  Thank you.

Anything else from the government?  And then I'll turn to Mr. Agnifilo.

MS. COMEY:  No Thank you, your Honor.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  Nothing more.  Thank you, Judge.

THE COURT:  We will see some of you or maybe all of you tomorrow at 12:00 p.m. and we will see all of you on Thursday at 8:30 a.m. just in case there are any issues to address.  Thank you very much.  We are adjourned.

**(Trial continued March 25, 2025 at 12:00 p.m.)**

INDEX OF EXAMINATION

Examination of:                                          Page

 JOSEPH CERCIELLO

Cross By Ms. Geragos . . . . . . . . . . . . . .7213
Redirect Ms. Comey . . . . . . . . . . . . . .7343

GOVERNMENT EXHIBITS

Exhibit No.                                          Received

 1407, sealed; and 1407-R  . . . . . . . . . .7212
 7A-132, 7A-133, 7A-134, 7A-136, 7A-135, . . .7412
            7A-137, 7F-104, 7F-105,
            7F-106, 7G-103, 7G-103-A,
            7H-179, 7H-180, 7H-181,
            7H-182, 7H-183, 7H-184,
            7H-185, 7H-186, 7H-187,
            7J-104, 7J-106, 7J-106-A,
            7J-106-B, 7J-107, 7J-107-A,
            7J-107-B, 7J-108-A, 7J-109,
            7J-109-A, 7J-109-B, 7J-110,
            7J-110-A, 7J-110-B, 7J-111,
            7J-111-A, 7J-112, 7J-113,
            7J-114, 7J-114-A, 7J-114-B,
            7J-115, A-104-40A, A-104-40B,
            A-442-35A, A-442-35B, E-103,
            E-117, E-118, E-119, E-120,
            E-121, E-122, E-123, E-124,
            E-125, E-126, E-127, E-128,
            E-129, E-130, E-133, E-136,
            E-138, E-146, E-147, E-149,
            E-152, E-156, E-160, E-185,
            E-190, E-193, E-194, E-195,
            E-206, E-207, E-209, E-210,
            E-213, E-238, E-266, E-285,
            E-306, E-306-M, E-307,
            E-307-M, 7J-115-A, 7J-115-C,
            7J-116, 7J-116-A, 7J-116-B,
            7J-117, 7J-117-A, 7J-117-B,
            7J-118, 7J-118-A, 7J-118-B,
            7J-119, 7J-119-A, 7J-119-B,
            7P-103, 7P-103-A, 7P-104,
            7P-104-A, 7X-150, 7Y-120,
            7Y-120-A, 7Y-120-B, 7Y-120-C,
            7Y-121, 7Y-121-A, 7Y-121-B and
            7Y-121-C

DEFENDANT EXHIBITS

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
Exhibit No.                              Received

 1417A     . . . . . . . . . . . . . . . . . . .7209

 3050, sealed,   . . . . . . . . . . . . . . .7225

 2000     . . . . . . . . . . . . . . . . . . .7397

 1001, 1008, 1026, 1036, 1049, 1068, . . . . .7398
            1091, 1092, 1099, 1131, 1136R,
            1149, 1151, 1155, 1225, 1417A,
            1422 and 1428
 2001     . . . . . . . . . . . . . . . . . . .7405
```