P6qWcom1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
UNITED STATES OF AMERICA,

                 v.                        24 Cr. 542 (AS)

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

                  Defendant.              Trial
-------------------------------x
                                          New York, N.Y.
                                          June 26, 2025
                                          9:30 a.m.
Before:

                    HON. ARUN SUBRAMANIAN,

                                          District Judge
                                          -and a Jury-

                         APPEARANCES

JAY CLAYTON
     Interim United States Attorney for the
     Southern District of New York
BY:  MADISON R. SMYSER
     EMILY A. JOHNSON
     MAURENE R. COMEY
     MEREDITH FOSTER
     MITZI STEINER
     MARY C. SLAVIK
     Assistant United States Attorneys

P6qWcom1

APPEARANCES CONTINUED

AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:   MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
HARRIS TRZASKOMA LLP
BY:   ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:   ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:   Lucy Gavin
                Shannon Becker
                Paralegal Specialists

                Raymond McLeod, Paralegal

(Trial resumed)

THE COURT:  Good morning, everyone.

First thing, on the jury charge, we emailed out a copy of the charge after the conference yesterday.

The one thing -- well, two things.

I think that there were a couple instances where the government was still capitalized, so we will make those changes.

And then I don't believe we fully implemented the changes to the immunized witnesses' instruction consistent with what we discussed at yesterday's conference.  So we'll make those changes, as we discussed yesterday, and then send the revised version out to the parties.  We'll do that in the next couple of minutes.

Anything further with respect to the jury charge?

Ms. Smyser.

MS. SMYSER:  Yes, your Honor.

One additional thing we noticed just reading through is I discussed the buyer-seller exception yesterday, which was the conspiracy charge, as your Honor knows, and I think when the conspiracy charge was moved to the bottom of the drug charge, that paragraph remained in the 841 section, which we don't think makes a lot of sense, unless it comes after the conspiracy charge or in the conspiracy charge.

THE COURT:  Want to move that.

P6qWcom1

MS. SMYSER:  So if we could just move that down.  I'm happy to send the Court line numbers if that's helpful, but that's the general request.

THE COURT:  Is there any issue with that movement?

MS. SHAPIRO:  No, your Honor.

THE COURT:  All right.  I'll ask the government -- do you have the line -- well, what's the best way to do this?

The best way is for you to send around the proposed redline, and then we'll make that change.

MS. SMYSER:  We can do that, your Honor.

THE COURT:  Very good.  Thank you.

So we have the verdict charge.  We have the charge, which we will deliver tomorrow after closing argument.

Just one note about closing arguments, there should be no disruptions in the courtroom during closings.  So unlike how we've been handling, where people have been going out and in, please wait for a break for any people in the gallery to leave the courtroom.  And turn your cell phones off, all the things that I'm sure you will do.

When the jury comes in, I plan to fill them in on the upcoming schedule, so we'll have the government's closing today.  We'll have the defense's closing tomorrow at 9 a.m., followed by the government's rebuttal, jury instructions and deliberations.  So it will be a shorter day today and a longer day tomorrow.

Once deliberations begin, the jurors who are deliberating will decide their schedule, and I'll give them guidance on that tomorrow.  But generally, they'll be here at the usual time, at 9 a.m.

Is there anything else that the parties want me to communicate to the jury or that the parties need to address before we bring the jurors in?

MS. COMEY:  No, your Honor, although I'll note Ms. Slavik will be here at ten, as your Honor said was all right.

THE COURT:  That's fine.  In fact, yesterday, I realized that I told you to be here at nine and we were starting at ten, but it was late.  It was, like, 8 p.m., and so I apologize for getting everyone here that early.  But that's perfectly fine.

MS. COMEY:  That's fine.  Thank you, your Honor.

Otherwise, nothing from us.

MR. AGNIFILO:  Nothing from us either, Judge -- oh, something from us.

MS. SHAPIRO:  I apologize, Judge.

I just noticed this, and I don't know if it was deliberate or inadvertent, but on page 3 of the charge, the paragraph from lines 5 to 8, there are a bunch of italicized words and we would prefer that those words not be italicized.

THE COURT:  That's easy enough.  We'll unitalicize;

P6qWcom1

we'll take those out.

That is good.  We'll be back here to start promptly at 10 a.m.

Thank you very much.  We'll take a brief break.

(Recess)

P6qWcom1

THE COURT:  Please be seated.

While we have a minute, Ms. Comey, do we have the laptop ready for deliberations, or are the parties still working on that?

MS. COMEY:  I will defer to Ms. Geragos, who I believe has been reviewing the laptop.

MS. GERAGOS:  Yes.  We are going to review it again after court.  I expect by tomorrow we'll have it ready for deliberations.

THE COURT:  Very good.

So at the beginning of the day tomorrow, I'll inquire to make sure that we have a laptop that everyone has reviewed and that has only the admitted exhibits.

MS. GERAGOS:  Perfect.  Thank you.

THE COURT:  Great.

All right.  I'll ask the deputy to get our jury.

THE DEPUTY CLERK:  Yes, your Honor.

(Jury present)

THE COURT:  Please be seated.

Welcome back, members of the jury.  I hope you had a great day off yesterday.

Just to give you an update on the schedule, we have reached the time of closing arguments, so I'll ask you to give your close attention to the parties' arguments, as you've been doing through the entirety of this trial.  And I thank you for

all of the hard work and attention that you've given.

In terms of the schedule --

We're going to fix that issue first.

And then second, today is going to be a shorter day. We're going to hear the government's closing argument. And tomorrow's going to be a bit of a longer day. We're going to hear the defense's closing as well as the government's rebuttal, and I will give you my instructions on the law and the jurors who will be deliberating will commence their deliberations. I'll have some further instructions for you tomorrow on how that's going to work and then the schedule.

For now, I'll ask you to give your close attention as we proceed with closing arguments.

Is the government prepared to proceed?

MS. SLAVIK: Yes, your Honor.

THE COURT: Ms. Slavik, you may proceed.

MS. SLAVIK: Over the last several weeks, you've learned a lot about Sean Combs. He's the leader of a criminal enterprise. He doesn't take no for an answer. And now you know about many crimes the defendant committed with members of his enterprise: Kidnapping of one of the defendant's employees; arson by trying to blow up a car; forced labor, including of an employee the defendant repeatedly sexually assaulted; bribery of a security officer to keep damning evidence against the defendant buried; and of course, the

P6qWcom1                      Summation - Ms. Slavik

brutal crimes at the heart of this case -- sex trafficking.

You heard all about how the defendant again and again forced, threatened and manipulated Cassie and Jane into having sex with escorts for his own entertainment. Across all these crimes, the same thing was true. The defendant used power, violence and fear to get what he wanted. Dozens of witnesses agreed. He doesn't take no for an answer.

For now, I want to focus on two specific moments that we're going to come back to in detail later, two moments eight years apart but shockingly similar.

The first, March 2016, at the InterContinental Hotel, during a freak-off with Cassie and an escort, the defendant got violent with Cassie. Cassie tried to flee. She ran out of the hotel room without shoes on. You saw what happened. The defendant threw her to the ground. He dragged her back to the freak-off.

The second, 2024, at Jane's house.

The defendant and Jane got into a fight. It got physical. The defendant kicked, choked and slapped Jane. She ran away from him into her backyard. She couldn't get away. He dragged her back to the house by her hair, and then he forced her into a freak-off.

He wouldn't take no for an answer.

These two incidents are separated by eight years, but they're not separate stories. They're chapters in the same

book, the story of Sean Combs and the criminal enterprise he led made up of his inner circle.  Again and again, that criminal enterprise serviced the defendant's every desire through a methodical pattern of violence, coercion and manipulation.  The defendant counted on silence and shame to keep his crimes hidden.  He thought that his fame, wealth and power put him above the law.  But over the course of this trial, his crimes have been exposed.

Over the last seven weeks, you've realized how he managed to do this all -- the members of his close inner circle and a small army of personal staff, who made it their mission to meet the defendant's every desire, promote his power and protect his reputation at all costs.  No one could stop him. And he managed to do this for two decades, because he used his inner circle, his money and his influence to cover up his crimes.

He wouldn't take no for an answer.

This summation is the government's chance to explain how all the evidence that came in, sometimes in bits and pieces and sometimes out of order, to explain how this evidence connects to show beyond a reasonable doubt that the defendant is guilty of each of the five counts charged in this case.

I'm going to be speaking with you for a while.  Over the last seven weeks, there's been a lot of evidence, and we have a lot to talk about, so let me give you a road map of what

I'm going to cover with you today.

First, I'm going to talk about the crimes that the defendant is charged with, and second, I'm going to talk about how the evidence fits together and shows that the defendant is guilty of those crimes.

Before I start talking about the charges, though, let me be clear on a very important point. Judge Subramanian will instruct you on the law. He is the authority on the law, and you must follow his instructions. But as I go through the evidence, I'm going to talk about some of the instructions on the law that I expect the judge will give to you.

I'm going to start with the racketeering conspiracy charged in Count One. That's about the defendant and his inner circle, who committed crimes with and for the defendant. We'll talk about the crimes that they agreed to commit: Drug distribution; kidnapping; bribery; arson; forced labor; obstruction and witness tampering; sex trafficking; and transportation for prostitution. Those last two categories, sex trafficking and transportation for prostitution, those are charged as standalone counts too.

Count Two and Count Four charge the defendant with using force, threats of force, fraud and coercion to cause both Cassie and Jane to have sex with male escorts.

Counts Three and Five charge the defendant with transportation across state lines for the purposes of

P6qWcom1                    Summation - Ms. Slavik

prostitution.

We'll talk about all of these counts in detail.

And just one more point before we get into it.  There is a lot of evidence in this case.  I'm going to use these slides to go over that evidence with you this morning.  And on the slides and as I speak, I'll sometimes refer to exhibits or portions of the transcript.  You should feel free to write any of these down in case you want to review any of the evidence later as you're deliberating.

So let's start by talking about Count One, the racketeering conspiracy.

You may have heard the term "racketeering" before in the context of mafia or organized crime, but the concept is simple.  The law recognizes that when someone commits a crime as a part of a group, what the law calls an enterprise, they're more powerful and more dangerous.

That's what happened here.  The defendant was a very powerful man, but he became more powerful and more dangerous because of the support of his inner circle and his businesses -- the enterprise.

So what is an enterprise?

It's not a complicated or special thing.  As I expect the judge will tell you later, under the law, an enterprise is just a group of people who come together for a common purpose of engaging in a common course of conduct.  And that's exactly

P6qWcom1                        Summation - Ms. Slavik

what happened here -- a group of people whose common purpose was to serve and protect the defendant.

The defendant was at the top of this enterprise. Remember, it's his kingdom. Everyone was there to serve him.

So what did serving him mean?

Promoting and protecting the defendant's power, reputation and brand. It meant fulfilling all of the defendant's personal desires, including his sexual desires. It meant enabling the defendant and his inner circle to commit crimes. And it meant protecting and preserving the enterprise, including its leader, the defendant, from law enforcement detection.

You'll be asked to determine whether the government has proved each element of Count One beyond a reasonable doubt, so let me set out for you the elements, or the components, of the racketeering conspiracy charged in Count One.

As I expect Judge Subramanian will instruct you, there are four elements to this charge:

First, that there was a conspiracy or an agreement to participate in the enterprise;

Second, that the enterprise affected interstate or foreign commerce;

Third, that the defendant knowingly and willfully became a member of that agreement; and

Fourth, that the defendant knowingly and willfully

agreed that he or another member of the conspiracy would commit two racketeering acts.

That just means that the defendant agreed that he or someone else in his enterprise would commit at least two different racketeering crimes, which we'll get into.

We're going to talk about each element in detail, but let's start first with the enterprise.

The first element is that there was a conspiracy, or an agreement, between two or more people to participate in the enterprise. I'm going to call it the Combs Enterprise, because as I said a moment ago, the defendant was the leader. I want to be clear, though. When I say Combs Enterprise, I'm not talking about the name of the defendant's company, Combs Enterprises. We'll talk about his companies in a moment, but when I say the Combs Enterprise, I'm talking about the group I mentioned earlier, the defendant and his trusted inner circle.

The defendant was the head of the Combs Enterprise. It existed to serve his needs, and what he said went. The other members of the conspiracy in the Combs Enterprise were the defendant's inner circle. That inner circle was made up of his loyal lieutenants, his chief of staff and his bodyguards, who helped him satisfy his every desire, promote his power and control and protect his reputation. Together with the defendant, this inner circle made up the Combs Enterprise.

Of course, over the course of two decades, the names

of some of these individuals changed, but their roles remained the same.

First, you have the defendant's chief of staff, K.K. You've heard about K.K. from the very first week of this trial. One witness described K.K. as the defendant's right brain. K.K. was one of the defendant's most loyal lieutenants. She lived in his home in Miami. She knew where the defendant was and what he was doing at all times. She even responded to messages from the defendant's phone. She made the defendant's life her life.

As the chief of staff, she also had a lot of control over the defendant's other staff, and she communicated on his behalf, including with assistants, security and even the defendant's girlfriends.

Members of the defendant's security team were also part of that inner circle, the people who were around him virtually 24/7. You heard their names repeatedly throughout this trial: D-Roc, Faheem, Uncle Paulie, Bonds, Rube. Some of them, like D-Roc and Uncle Paulie, had been in his life for a very long time. Those lieutenants were particularly loyal, and they were armed and ready. They were at the defendant's side for some of the defendant's most violent and threatening acts.

For instance, remember the incident at Mel's Diner involving Suge Knight, the defendant's rival. After David James and D-Roc saw Suge Knight at that diner, they immediately

drove home, and D-Roc told the defendant.  And then D-Roc and the defendant changed their clothes and armed themselves with guns.  They jumped back into the car with David James in the driver's seat and told him to drive back to the diner.  The defendant rode in the back seat with three guns in his lap.

Remember, David James told you about that.  Suge Knight was gone by the time that they got back to the diner, but that incident made clear this was not a regular job.  This was not a regular security detail.

That remained the case up and until law enforcement searched the defendant's homes in March 2024.  By then, Faheem Muhammad had taken over as the head of the defendant's security.  During the searches, law enforcement recovered multiple guns.  Some of these were registered firearms found in a locked safe in the security office.  But other guns had no explanation -- a rifle with the serial number defaced in the security office in the Los Angeles home; two AR-15 rifles with their serial numbers cut out found in the Miami house, disassembled and wrapped in towels in the defendant's closet, the types of weapons that just aren't necessary for a professional security detail.

In addition to K.K. and security, you have the rotating cast of assistants and other staff who were given instructions by K.K. and security and who were paid by the defendant's businesses.  They didn't know the full scope of

what was going on within the inner circle, and they may not have known about all the crimes that the defendant was committing.  But they played an important role in helping the criminal scheme.  They were the foot soldiers.  These assistants were young and eager.  They didn't blink an eye when they were instructed by the defendant or K.K. or security to do whatever it took to make the defendant happy, even when it meant facilitating crimes.

The defendant also used his businesses to help the Combs Enterprise.  Each of the members of the defendant's inner circle that I just talked about were paid by the defendant's companies, and you remember Brendan Paul testifying that he made $100,000 per year as the defendant's assistant.  Well, K.K. made six times that, $600,000 a year.  But besides keeping the people who helped him commit crimes on payroll, the defendant used the money and the gravitas from his businesses to facilitate the crimes that he and his inner circle committed.

Now, defense counsel suggested to you in opening statements that there was no criminal enterprise because no one testified that they were part of a criminal enterprise.  But members of the jury, use your common sense and look at the evidence.  Whether you're receiving a paycheck from a lawful business or not, when you direct other people to get or transport drugs for your boss, you're committing a crime.  When

your boss asks you to buy and bring him drugs and you do it, you're agreeing to commit a crime.  When you go with your boss to kidnap another employee and make her take you to someone's house, you are agreeing to commit a crime.  And when you lock your boss's girlfriend in a hotel room after your boss stomped on her face and won't let her leave, you're agreeing to commit a crime.

And what the evidence shows is that over and over, the defendant and his inner circle agreed to commit crimes together.  That's what a racketeering conspiracy is.

The defendant and his co-conspirators agreed to participate in the Combs Enterprise.  So the first element has been met.

Now, let me just pause here for a moment.

What I said doesn't necessarily mean that all the members of the Combs Enterprise liked committing crimes at the behest of the defendant.  It doesn't mean that they were happy when those crimes were committed.  But that's not what the law requires.  As you saw and heard throughout this trial, the defendant and his trusted inner circle carried out the defendant's directives time and time again.

For example, you saw K.K. chiding the defendant at times, trying to stop him from being so reckless.  But at the end of the day, when the defendant told K.K. to set up a drug pickup or book travel and a hotel or get cash to a hotel room,

P6qWcom1                    Summation - Ms. Slavik

she did it.  She may not have been happy about it, but she agreed to do it.  She was a member of the enterprise.

Let's quickly run through the second and third elements.

The second element is also clear.  The Combs Enterprise affected interstate commerce.

Under the law, this can be a minimal effect.  You'll be instructed on this by the judge, but it's pretty simple. Here are just a few examples.

The defendant caused people, both girlfriends and male commercial sex workers, to travel across state lines and internationally.  The defendant and members of his inner circle communicated using cell phones and emails across state lines. The defendant distributed and caused others to distribute drugs and transport them across state lines.

All of these examples show how the Combs Enterprise affected interstate commerce.  The second element is met.

As for the third element, there can be no question that the defendant knowingly and willfully became a member of the racketeering conspiracy.  The only reason the Combs Enterprise existed was because of the defendant.  He was the boss of every member of his inner circle, and he was in charge.

Now, as you've seen, the members of the Combs Enterprise changed a bit over time.  It started with Uncle Paulie and Rube and D-Roc, and K.K. overlapped with D-Roc, and

P6qWcom1                         Summation - Ms. Slavik

then Faheem overlapped with K.K.  But since the beginning, the defendant has been the leader of the Combs Enterprise.  He was the through line, and the other members worked with each other and with him throughout the entire conspiracy.  So the third element is met.

The last element is that the defendant knowingly and willfully agreed that he or another member of the conspiracy would commit two racketeering acts.

These racketeering acts are part of a pattern of racketeering, the various categories of crimes that the members of the Combs Enterprise agreed with each other to commit.  So in other words, a racketeering act is just a particular type of crime.  To satisfy this fourth element, the defendant must have agreed that he or someone else in the enterprise would commit two crimes.

Here, the members of the Combs Enterprise agreed with each other to commit a number of different crimes.  They agreed to distribute drugs.  They engaged in kidnapping.  They committed arson.  They bribed people who witnessed the defendant's crimes.  They facilitated the defendant sex trafficking Cassie and Jane.  They assisted the defendant obtaining labor by force and threats.  They helped the defendant arrange travel for the defendant's girlfriends and male escorts for the purpose of commercial sex, and they helped the defendant cover up his crimes.

P6qWcom1                         Summation - Ms. Slavik

All of these categories of crimes were part of the racketeering activity, but I want to make one thing clear up front.

To convict on Count One, you do not need to find that the defendant agreed that all or even most of these racketeering activities would occur.  As I expect the judge will tell you, to find the defendant guilty, you only need to find that he agreed with another member of the conspiracy that someone in the conspiracy would commit two individual acts in any of these categories.  They can be the same kind of act or different acts.  So it could be two acts of drug distribution, meaning giving drugs to another person on just two occasions. It could be two kidnappings or one of each, one drug distribution and one kidnapping.  That's all the law requires.

Here, though, you have far more than two acts.  We're going to walk through some of these categories now, so let's start with something clear-cut -- drugs, an essential ingredient of every freak-off, the way the defendant kept Cassie and Jane awake and compliant in rooms for days.  He fed them drugs for years, and you know he didn't get those drugs on his own.  He used his enterprise to make sure he had a constant supply of any drug he wanted for himself and his victims.

One of the racketeering activities that the Combs Enterprise engaged in was distributing drugs, possessing with intent to distribute drugs and conspiring to distribute those

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6qWcom1                        Summation - Ms. Slavik

drugs.

So who are the participants here?

The most involved from the inner circle were D-Roc, K.K. and Faheem.  But you heard that virtually all of the defendant's foot soldier assistants helped keep the drug supply high.

Before I talk about the evidence, let's go over the elements.

For drug distribution, for the distribution of drugs, there are two elements:

One, that the co-conspirator distributed drugs; and

Two, that the co-conspirator distributed the drugs knowingly.

Distribution here doesn't mean anything special.  It's just the act of passing drugs from one person to another.  And let's be clear about what drugs we're talking about.  We're not talking about marijuana.  We're talking about what Brendan Paul last week called hard drugs, the kind of drugs that the defendant fed to Cassie and Jane.

Take a look at Government Exhibits 1305 and 1306; that's the little stickers on the slide.  These are stipulations, or agreements, between the parties about drugs that were recovered from the defendant's residences during the searches that you heard about.

You have cocaine;

Methamphetamine -- methamphetamine was found in drugs seized from the Gucci pouch recovered from the defendant's Miami residence.

We're talking about ketamine; that's something that you heard witnesses tell you is a dissociative drug.

Oxycodone; that's an opiate painkiller that Cassie Ventura testified about.  Oxycodone is the active ingredient in Percocet.

Alprazolam; that's the active ingredient in Xanax.

I'm not going to try to say the next name.  It's a long chemical name, but it means MDMA, which is also what ecstasy and molly are referred to.

Then we have GHB.

Psilocyn; that just means mushrooms.

And you've also heard at this trial about a drug called Tusi.  Witnesses told you that Tusi is a combination of the drugs that I've already listed that's just dyed pink.

You can refer to the stipulations at Government Exhibits 1305 and 1306.  Those are the documents that telling you what the drugs are and where they were seized from during the searches.

And let me say a couple more things about the law before we talk about the evidence.

First, the quantities of drugs involved in this courtroom are not relevant.  It doesn't matter if the Combs

P6qWcom1                         Summation - Ms. Slavik

Enterprise distributed one ecstasy pill or a hundred ecstasy pills.  The quantity of drugs is not an element of this crime, so you don't need to be concerned about that.

And second, like I just said, when we talk about drug distribution, that doesn't require a sale.  In the drug context, as in all other contexts, distributing just means delivering, passing on or handing over.  Giving drugs to someone else is distribution, period.

Now let's talk about the evidence.

You know about all of the drugs that the defendant took.  They're all the ones that I just mentioned -- cocaine, molly, ecstasy, ketamine, Tusi, oxycodone.  And you know how he got them.  He enlisted his assistants and his security staff to buy, pick up drugs and give the drugs to him.  You know the drug dealers' names by now, Guido, One Stop, Baby Girl.  And you know what the defendant did with at least some of those drugs.  After they were delivered to him by security or assistants, he gave them to Cassie and Jane.  This is drug distribution, plain and simple.

Let's look at an example involving Jane.

Jane told you that on two occasions the defendant instructed her to bring drugs with her when she flew to see him.  You remember her testimony here on the screen.  Jane coordinated with K.K. to pick up the defendant's drugs.  And Jane's testimony was corroborated by text messages.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6qWcom1                    Summation - Ms. Slavik

In this text exchange, on December 30, 2021, K.K. tells Jane that the defendant is going to have her pick up a package. Members of the jury, you know what's inside that package -- drugs, ecstasy, ecstasy that was used by the defendant and Jane during a hotel night. And K.K. knew what was in that package too.

Recall what Jane told you about her conversation with K.K. Jane didn't feel safe traveling with a package of drugs, so she reached out to K.K. and asked K.K. is this safe, is this OK? And what was K.K.'s response? It's fine. I do it all the time. K.K. knew exactly what was in that package, and by coordinating with Jane to pick up the package of drugs, K.K. knew that she was helping the defendant transport drugs that he was going to give and give Jane to use. This is an agreement to distribute drugs.

The next time the defendant told Jane to bring him drugs, in March 2022, K.K. told Jane, swing by Mapleton on your way to the airport to pick up the Guido package. Now, we all know who Guido is. You heard Jane and the defendant's most recent assistants identify him as one of the defendant's drug dealers. Remember, Jane told you that Guido would be called during hotel nights to supply the defendant with additional drugs. You've seen his face. It's there on the screen. So when K.K. called it a Guido package, there's only one thing in that package -- more ecstasy that the defendant made Jane bring

P6qWcom1                         Summation - Ms. Slavik

to him.

And when Jane picked up the Guido package from the defendant's security team, you know that the security team knew she was picking up drugs. Multiple witnesses testified about security's involvement in delivering drugs to the defendant and providing cash to the assistants so that they could buy drugs for the defendant.

Take a look at the chat between Faheem and Guido just a few months after Jane picked up that Guido package.

Faheem, here on the right, was the head of the defendant's security team at the time, and he and Guido are texting so that Faheem can pay the defendant's drug debts -- here, $450. So K.K. and security know full well that the drugs that are in the Guido package are drugs. Jane picks them up and travels with them. This is also an agreement to distribute drugs.

So let me pause right there.

As I just mentioned, to show a pattern of racketeering activity, the government must prove that the defendant agreed with other members of the enterprise that two crimes would be committed. These two instances that I just mentioned where the defendant tells Jane to transport drugs with the help of K.K. and security, those are two crimes -- two racketeering activities. This is all you need to find the defendant guilty of Count One.

P6qWcom1                        Summation - Ms. Slavik

But there are so many more examples of the defendant working with members of the Combs Enterprise to get and distribute drugs.

Here's Brendan Paul telling Faheem that K.K. told him to ask for reimbursement for purchasing drugs. He says K.K. is aware and wanted me to make this thread. And then he asks for $780 for what he calls personal Gucci items.

You know what that means. Brendan Paul told you what that means. It means hard drugs. K.K. and Faheem, who were on this chat, they know exactly what's going on. They're in the inner circle. They're part of the agreement. When Brendan got the drugs, as instructed, he gave them to the defendant. Drugs were distributed.

It doesn't matter that the defendant wasn't buying kilos of drugs or selling drugs himself. It doesn't matter that the quantities were small and fit inside his Gucci pouch. You heard the defense asking witnesses about whether the drug amounts were for personal use, meaning the defendant's personal use. But that's just a distraction. The defendant and his staff were all involved in buying and distributing drugs.

In any event, the defendant wasn't just buying drugs for himself. Throughout the conspiracy, he distributed drugs to people around him, including employees, including friends, including girlfriends. And of course, drugs were an essential part of the freak-offs. Combs had to keep up a constant supply

to give to Cassie and Jane for the freak-offs.

Remember, Cassie used drugs provided by the defendant at every single freak-off. She used ketamine, GHB, mushrooms, ecstasy, MDMA, all provided by the defendant. And if they ran out of drugs, the defendant's security or staff dropped off more to the hotel room.

The defendant also introduced Jane to drugs -- ecstasy, molly, cocaine, ketamine, Tusi. The defendant gave her these drugs at all but one hotel night. And when the defendant ran out of drugs during hotel nights, he had assistants or his security, Faheem or J9, drop off more.

But the defendant didn't limit his distribution of drugs to girlfriends. Kerry Morgan testified that the defendant provided her and Cassie with ecstasy and molly. And Bana Bongolan said that the defendant provided her with ecstasy, cocaine, ketamine and GHB.

The defendant even made his assistants do drugs that he distributed to them. Mia testified about a guessing game, where the defendant gave her, pulled out three plates and there was white powder on each plate. And it was presented as some sort of game. He said one was molly, one was cocaine and one was ketamine. And he made her take it even though she didn't want to.

Brendan Paul testified that the defendant made him try Tusi to see if it was good.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6qWcom1                          Summation - Ms. Slavik

All of the evidence shows you that getting drugs for the defendant was a group effort.  Virtually every assistant who testified at this trial admitted to buying drugs for the defendant.  And look at the records.  Even D-Roc would text One Stop himself.  One Stop, of course, is one of the defendant's drug dealers.  And look at what D-Roc says:  "Need to see someone for bro."

Who's bro?  The defendant.  And as you saw, Faheem texted drug dealers.  You saw a text with Guido.  This is another text with Guido.  In this one, Guido's asking Faheem to cover the defendant's drug debt, this is time $1,000 and almost $3,000.  And the defendant himself texted One Stop and Guido about members of his security team picking up drugs.

K.K. was clearly aware that the defendant was getting drugs for himself, but she also knew that the defendant was distributing drugs to women.  She knew that drugs were part of the freak-offs or, as she called them, wild king nights.  And she knew that Jane was using the drugs.  K.K. helped Jane the first time she tried ecstasy, when she had a bad reaction in Turkos & Caicos in 2021 that led Jane to convulsing on the sand.  K.K. was the one who helped her.  And of course, K.K. knew that Jane continued using ecstasy with the defendant.  They even texted about it.

This is a conversation between Jane and K.K.  In the top message Jane is telling K.K. that she's having a bad

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6qWcom1                        Summation - Ms. Slavik

comedown from the week.  K.K. doesn't act surprised.  Instead, she gives pro tips to Jane for how to deal with a bad comedown from the drugs that the defendant was giving her.

Plain and simple, this is all evidence of drug distribution.  Each time K.K., D-Roc, Faheem or an assistant got drugs from Guido or One Stop or anyone else and gave them to the defendant, it's drug distribution.  And each time the defendant gave those drugs to Cassie or Jane during a freak-off or to anyone else, that's distribution and part of an agreement to distribute drugs.

The evidence you've seen and heard over the last several weeks tells you that the defendant and other members of the Combs Enterprise participated in hundreds of acts of drug distribution; in other words, that the defendant and his inner circle committed hundreds of racketeering acts.  Based on these acts of drug distribution alone, the defendant is guilty of Count One.

But the defendant and his inner circle committed many more crimes.  Let's look at another category of racketeering activity -- kidnapping.

The Combs Enterprise committed kidnappings in violation of both California and New York law.  We're going to talk about three kidnappings that you heard about during this trial.

So let's start with the kidnapping of Cassie in

January 2009, after the defendant stomped on Cassie's face and made her hide in a hotel while her injuries healed.  This time from the inner circle, we have Bonds working with the defendant to make sure Cassie stayed put until her injuries healed, and a handful of foot soldiers helped bring her clothes and food when she wasn't allowed to leave the hotel.  I expect that Judge Subramanian will instruct you that to prove a person guilty of kidnapping under California law, the government must prove three elements:

That the person took, held or detained a victim by using force or instilling reasonable fear;

Second, that using that force or fear, the person moved the victim a substantial dance; and

Third, that the victim did not consent to the movement.

Here, with respect to the second element, a substantial distance just means more than a trivial distance.

Cassie told you that as they were leaving the Ace of Diamonds club in Los Angeles, the defendant called her a bitch or a slut because Cassie had been speaking to a producer at a party.  Cassie drunkenly punched the defendant in the face, and the defendant attacked Cassie.  She fell to the floor of the SUV, and as she covered her face, the defendant stomped on it with his foot.  The beating continued for ten minutes.  It disfigured her face with knots and bleeding.  She was vomiting.

When the SUV finally arrived at the defendant's house, Cassie tried to flee. She took off running, but Roger Bonds, a member of the defendant's security team, caught up to her and brought her back to the house.

When the defendant saw Cassie's face, he made her leave his house. He made her go to the London hotel on Sunset so that no one would see her. Cassie didn't want to go, but the defendant made her go to the hotel and stay there for about a week so that her injuries could heal without anyone seeing her. And Cassie couldn't leave. She wanted to. She wanted to go home to her mom, but she wasn't allowed to. Bonds wouldn't let her. Bonds wouldn't let her leave because he had instructions from the defendant.

And when Cassie told the defendant that she wanted to leave, he said absolutely not. It's clear that Cassie did not consent to staying at the London hotel, but she had no choice. The defendant told her she couldn't leave. He had his security team telling her she couldn't leave.

And Cassie knew what happened when people said no to the defendant. Even at that early point in their relationship, in 2009, she had experienced his violence firsthand. She had seen him with guns. She heard and believed the threats he made. She didn't feel like she would be able to get out of the hotel safely. She understood his capabilities, his access to guns, the threats he had made. The defendant had instilled

reasonable fear.  Cassie was trapped against her will in that hotel room for days.  This is kidnapping.

And you know that this happened because the defendant's former assistant, David James, remembered this same incident.  David wasn't there at the club, but he remembered the defendant bursting in one night and demanding to see his search history, his internet search history, to see if David had posted on a blog that the defendant had hit Cassie at the club.  David remembered delivering food to Cassie at the London hotel where Bonds or another member of the defendant's staff answered the door.  That stood out to him as odd, but it wasn't just odd.  It was criminal.

The second kidnapping I want to talk about involved Capricorn Clark, the defendant's former assistant.  This was when the defendant made Capricorn take a lie detector test in an abandoned building in Manhattan for several days.

Uncle Paulie was a main participant here.  Remember, he was the defendant's head of security at the time, and he took lead in this incident.

The incident took place in New York, so we look at the elements of kidnapping under New York law.  They're very similar to the elements under California:

The first is that a person restricted a victim's movements by confining her to a place;

Second, the person did so without the consent of the

individual;

Third, the person did so intentionally;

Fourth, the restriction was unlawful; and

Fifth, the person restrained the victim with the intent to prevent her liberation by secreting her in a place where she was not likely to be found.

Now, this incident with Capricorn took place in 2004, shortly after Capricorn had started working as the defendant's assistant. Capricorn had been holding expensive jewelry that went missing, so the defendant instructed Capricorn to stay in New York with Uncle Paulie, the head of security. Uncle Paulie took Capricorn to an empty building under construction, the future headquarters of Bad Boy. Security locked Capricorn in the building and made her take lie detector tests over and over again for five days. Capricorn was petrified. The man administering the tests told her that if she failed, they're going to throw you in the East river.

You know that she didn't consent to this. She didn't want to be in that building taking those tests, but what choice did she have? Uncle Paulie told her that she wasn't allowed to leave. And she was afraid of what would happen if she said no. Because remember, right before this kidnapping, the defendant and Uncle Paulie had taken Capricorn to Central Park, where the defendant told her that if anything happened he would have to kill her. Capricorn knew that the defendant's security team

was always around him.  She had heard the defendant talking about guns, and so she believed that she would be killed if she refused to take these tests.

And you know that Capricorn was telling you the truth because David James remembers this.  Another member of the Combs Enterprise, Roger Bonds, told David James about Capricorn having to take the lie detector tests.  And actually, the defendant even made David James take lie detector tests himself.  The defendant said he wanted to get the rat out of the team.  This was a tactic that the defendant and his enterprise used to maintain control within the organization. They were willing to kidnap their own employees to keep that control.

But of course, that's not the only kidnapping involving Capricorn.  You also heard from Capricorn about a kidnapping that happened in December 2011, when the defendant woke her up looking for Kid Cudi.

For this incident, Rube was the defendant's main helper within the defendant's inner circle.  He drove the defendant to each location.  He broke into Kid Cudi's house, and he stood guard when the defendant attacked Cassie at the end of that night.

The kidnapping started in early morning hours of December 22, 2011.  The defendant was banging on Capricorn's apartment door.  He was furious, and he had a gun.  He had

found out that Cassie was seeing Kid Cudi and that Capricorn, his employee, knew about it.  The defendant was enraged and out for revenge.  He barked an order at Capricorn.  He said get dressed.  We're going to kill Cudi.

When Capricorn told the defendant that she didn't want to go with him, he told her I don't give a fuck what you want to do.  Go get dressed.

He didn't take no for an answer.

Capricorn didn't have an option.  The defendant had a gun.  He was livid, furious, mad at her, and the way he was acting that night, she was afraid.  She testified that she felt like anything could happen.  So she did what the defendant told her to do.  She went with the defendant, who still had the gun, to the black Cadillac Escalade driven by Rube, part of the defendant's security team.  The defendant got into the back seat of the car with Capricorn, gun in his lap, and the three of them drove to Kid Cudi's house in the Hollywood Hills about 20 minutes away.

In this incident, the defendant took Capricorn by instilling reasonable fear, this time with a gun, and using that fear, moved her a substantial distance, to Kid Cudi's house, to which Capricorn did not consent.  This incident, too, is kidnapping.

And you know what happened after the defendant and Rube broke into Kid Cudi's house that night.  The defendant

P6qWcom1                        Summation - Ms. Slavik

told Capricorn that he wouldn't let her go until she brought him Cassie. And when Capricorn brought him Cassie, he did what he'd done many other times. He attacked Cassie. He kicked her with 100 percent full force. He repeatedly kicked her, and she just kept lying there in a fetal position.

When Capricorn left Cassie, Cassie was lying in the street outside the defendant's house, crying silently, as the defendant continued to kick her. This happened right in front of Capricorn, and it happened right in front of Rube. Capricorn called D-Roc to get Rube to help, to get him to help Rube, to make him stop. But no one would. The enterprise's purpose was to protect its leader, not to protect Cassie. Not to protect Capricorn.

Capricorn's kidnapping is corroborated by multiple witnesses. For example, Scott Mescudi, or Kid Cudi, testified that he spoke to Capricorn on speakerphone early that morning. He said that Capricorn sounded scared, and she told him that the defendant and an affiliate were in Kid Cudi's house and that she had been forced to go over there with them.

Cassie, who was with Kid Cudi that morning, remembered Capricorn bringing her to the defendant's house, just like Capricorn told you that the defendant ordered her to do. And you heard from Officer Ignacio, who has no connection to any of these people, that when he responded to a 911 call reporting a burglary at Kid Cudi's house, he saw a black Escalade pass by

P6qWcom1                    Summation - Ms. Slavik

the house twice.  That black Escalade had plates registered to Bad Boy.

This is the defendant's home address at the time.  And you know who was in that car -- Rube, the defendant and Capricorn.

There's no question that this happened.  You heard about it from the perspective of Capricorn, Kid Cudi and Cassie.  The defendant and Rube kidnapped Capricorn.  They broke into Kid Cudi's home, and then the defendant brutally attacked Cassie.  Rube was in lockstep with the defendant at each step of the way.

These are the three kidnappings that you heard about during this trial, three more racketeering acts.  And just like I told you before, if you find that the defendant agreed that he or another co-conspirator would commit any two racketeering acts, that is enough to find him guilty of Count One.

So now let's move on to what happened only a couple weeks after the defendant broke into Kid Cudi's house.

On January 9, 2012, the defendant had Kid Cudi's car set on fire.  This is the arson.  For this incident, Rube and D-Roc were the key members of the inner circle.  Remember, Rube was the one who was with the defendant when they first scouted out this mission, and D-Roc set up this sitdown with Kid Cudi that happened after the arson.

So let's start with the elements of arson under

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6qWcom1                            Summation - Ms. Slavik

California law:

First, a person set fire to or burned any property; and

Second, that the person acted willfully and maliciously.

So let's just start with the obvious.

This was arson.  Someone cut a hole in the roof of Kid Cudi's car -- that's the photo that you see on the left -- and dropped a Molotov cocktail into it.  That's the photo on the right.  You saw the evidence collected at the scene.  You saw the damage to the Porsche.  This is very clearly arson.  The only question is whether the defendant or his co-conspirators were responsible for the arson.  And of course, the defendant was behind this.

Now, it shouldn't come as a surprise to you that we're not suggesting that the defendant personally cut the hole in Kid Cudi's Porsche.  You heard the audio notes.  The defendant didn't even buy his own soup.  He didn't cut the hole in this Porsche.  But let's be clear.  He was 100 percent behind Kid Cudi's car blowing up.

The defense has tried to suggest to you that there's nothing tying the defendant to this arson, but the evidence and basic logic suggest otherwise.  For starters, he literally said he was going to blow up Kid Cudi's car.  Remember, Cassie told you that he was going to have Kid Cudi's car blown up when the

P6qWcom1                           Summation - Ms. Slavik

defendant was out of the country.

Here, you see it on the screen.  The defendant said when we were out of the country, that Scott's car would be blown up.  Scott, of course, is Kid Cudi.  And that the defendant wanted Kid Cudi's friends to be there to see the car get blown up in the driveway.

Now, this is quite a coincidence.  What are the odds that the car the defendant just said he was going to blow up actually blows up?  And the coincidences keep coming.

Turns out Cassie actually wrote some of the defendant's threats about Kid Cudi at the time.  Here's an email that she sent about two weeks before the arson.  The defendant told her that he would have someone hurt her and Scott Mescudi, but he made a point that it wouldn't be by his hands.  He actually said that he'd be out of the country when it happened.  Such a coincidence that the man Sean Combs hated and wanted to hurt had his car lit on fire just two weeks after this email was sent.

And what a coincidence that the defendant and Rube just happened to be at Kid Cudi's house with Capricorn only a few weeks before the fire.  Here's Capricorn's testimony reminding you that she was kidnapped by Rube and taken to Kid Cudi's house.

And here's another coincidence.  Kid Cudi was driving the exact same Porsche when he drove by the defendant that

P6qWcom1                         Summation - Ms. Slavik

night of the trespass.  Quite a coincidence that whoever lit this fire decided to go into Kid Cudi's quiet residential neighborhood, find this nearly hidden driveway, ignore the other cars in the driveway and target that specific Porsche just a few weeks later.

What are the odds that someone, as Arson Investigator Jimenez put it, targeted that very same Porsche right after the defendant broke into Kid Cudi's house, saw Kid Cudi driving the Porsche and threatened to blow up his car?  Can't be a wild coincidence, especially when Kid Cudi didn't have conflicts with anyone else.  The only person he had a conflict with was the defendant, because Kid Cudi was seeing Cassie.

After the car blew up, what a coincidence that the defendant behaved just like someone who had had Kid Cudi's car blown up.  Remember, after the arson, Kid Cudi finally agreed to meet the defendant, because in Kid Cudi's words, this was getting out of hand.

So how did the defendant act at this meeting?  Well, D-Roc escorted Kid Cudi to a room where the defendant was standing at the wall, looking out the window, with his hands behind his back, looking like a Marvel super villain.  And what are the odds that after that meeting where Cudi agreed to stop seeing Cassie, nothing else happens.  No more break-ins, no more Molotov cocktails.  And then years later, the defendant apologizes to Kid Cudi.

That is quite a collection of coincidences.  But of course, you know this is not a coincidence.  You know what happened here.  Kid Cudi was targeted by Cassie's insanely jealous and abusive boyfriend, the defendant, the only person with any motive who was powerful enough and vicious enough to light another man's car on fire.  And you know why he did it -- Cassie.

This was a continuation of the extreme measures the defendant took to control Cassie and to keep anyone who might interfere with that control away.  The meeting, just like the arson, was designed specifically to intimidate Cudi, to show Kid Cudi and Cassie that no one who crosses the defendant gets away with it.  So whether it was Rube, who was there the night of the break-in, or D-Roc, who was there for the meeting at the SoHo House with Kid Cudi, or both, there's no reasonable doubt that the defendant used his enterprise to commit this arson.

The Combs Enterprise also agreed to commit bribery. You all remember the video of the defendant's attack on Cassie at the InterContinental Hotel in 2016.  You saw that video repeatedly during this trial.  The key players here were K.K. and D-Roc.  The defendant brought them in as soon as Cassie left the hotel, and they were in lockstep with him until Eddy Garcia finally handed over the video and left with a bag of cash.

Let's talk about the elements of bribery under

California law:

First, that a person gave or offered a bribe to a witness or an individual about to be called as a witness; and

Second, that the person acted with the corrupt intent to persuade the witness or individual to agree that the bribe would unlawfully influence the testimony or information that the witness or individual would give.

You know what happened that day.  The defendant was having a freak-off with Cassie and one of their regular escorts, Jules.  The defendant hit Cassie in the hotel room. She tried to run away, and he hunted her down, attacked her again and tried to drag her back to the room.

We're going to talk about all of that in much more detail later, but for now, while we're talking about the bribery, I want to talk about what happened after the events in this video.

You heard detailed testimony about this incident from multiple witnesses, multiple security guards at the InterContinental.

Israel Florez responded to the sixth floor after Cassie called for help.  He found the defendant, wearing only a towel, sitting in a chair near the elevator with what he called a devilish stare on his face.  Cassie was visibly shaken and wanted to leave.  Officer Florez walked the defendant back to the room, saw another man in the room and waited for Cassie to

get her things to go.

As Officer Florez was following Cassie out of the hotel room, the defendant approached Officer Florez.  He tried to hand Officer Florez a stack of money.  The defendant called to Officer Florez, hey.  Officer Florez turned around.  And as he testified, he was pretty much holding, like, a stack of money.  And when the defendant handed Officer Florez that stack of money, he said don't tell anyone.

At this point Officer Florez hadn't watched the video. He didn't know that the defendant had just beaten Cassie in a public area of the hotel.  But the defendant knew what he did. The defendant handing a fistful of cash to Israel Florez was his first attempt at a bribe that day.

After that, Cassie left the hotel with a black eye and a busted lip, declining Officer Florez's invitations to call the cops.  And just as Cassie leaves, Combs starts damage control.  He calls Cassie over --

THE COURT:  We have a little power issue.  Is your mike working?

MS. SLAVIK:  Hello.

THE COURT:  There you go.

(Continued on next page)

MS. SLAVIK:  (Continued) As Cassie left the hotel with a black eye and a busted lip, Combs started damage control.  He called Cassie over a dozen times.  And when she didn't pick up, he started texting her.  Here's what he said.  "Call now.  Call me now.  Call me.  Cops are here.  Call me.  Help.  I'm about to be arrested."  And finally, "I'm getting arrested."

Now, to be clear, the defendant was never arrested for this assault.  You heard from Israel Florez that no one called the cops.  So when the defendant was texting Cassie about the cops being there and about getting arrested, he was just manipulating her.  But these text messages show something important.  The defendant knew what he had done, and he knew the potential consequences.  He knew that he could be arrested if the police knew about what he did to Cassie at that hotel.

And the defendant was right to be worried.  The hotel had video surveillance of his attack on Cassie — the very video that you saw during this trial, the video that you know is powerful evidence of the defendant's guilt.

And there was more reason for the defendant to be worried.  The defendant showed up at Cassie's apartment banging on her front door with a hammer, demanding to be let in.  Cassie texted KK, here on the left, that neighbors were going to call the police.  And D-Roc texted KK the same thing.  And the police actually did go to Cassie's apartment.  Kerry Morgan, Cassie's friend, who was staying at Cassie's apartment

P6QQcom2                        Summation - Ms. Slavik

sent KK this photo of the LAPD sergeant's business card that you see on the right.

It is absolutely clear that the defendant knew that his criminal conduct, whether it was assaulting Cassie in the hotel lobby or showing up unannounced and screaming and banging on the door with a hammer, could lead to police involvement. And the defendant's inner circle knew that too. And, of course, police involvement would be bad for the defendant. He would be arrested. That would be bad for his career, bad for his image.

So KK and D-Roc, the defendant's most trusted loyal protectors, swing into action. Over the next few hours, KK and D-Roc did everything they could to cover the defendant's tracks. Within those very first hours, KK started trying to get that video surveillance at all costs.

She and Elie Maroun, another one of the defendant's assistants, talk about getting information from the guard. KK tells Elie, "I'm just going to ask to cover damages."

Elie responds, "He wants to speak to Spanish security guard."

KK suggests saying they had a fun drunk night to try to get some more info. But as Elie informs her, they're not playing nice.

So KK makes the call herself. And she eventually reaches Eddy Garcia. But after KK asks if there was any

P6QQcom2                        Summation - Ms. Slavik

possible way to get the video or even see the video, Eddy **says** no.  So she showed up to the hotel in person trying to persuade Eddy to show her the video.  Eddy again refused to show her the video, but he told her off the record, "It's bad."  KK knew that this video had to disappear.

Then the defendant got involved.  KK called the security office, asked to speak with Eddy and put the defendant on the phone.  The defendant told Eddy, "You know how things are with women," and asked Eddy for the video.  And for the third time Eddy refused.

So KK got Eddy's personal cellphone number, and both she and the defendant started calling Eddy on his personal cellphone.  They're desperate for this video.  Why?  Because they know that if it were released, the defendant could be arrested.  It could ruin his career.  They can't take no for an answer.

So the defendant tells Eddy that he'd take care of Eddy, a very clear offer to bribe Eddy for this video.  So when Eddy finally tells the defendant and KK that his boss will do it for $50,000, the defendant is overjoyed, and he calls Eddy, Eddy My Angel.  In fact, you see there at the bottom, that's how Eddy's phone number is saved in KK's phone, as Eddy My Angel.

The defendant told Eddy that he wanted this done as quickly as possible.  So Eddy's boss downloaded the video, put

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

it on a USB drive and gave it to Eddy to get it to Combs.  You see all of the calls that the defendant makes to Eddy Garcia to coordinate this drop off.

So then on March 7, 2016, only 48 hours after the defendant assaulted Cassie at the Intercontinental Hotel, Eddy Garcia went to the defendant's office to deliver his end of the bargain - the video footage.  This was a crucial moment for the defendant.  He needed that video file.  So he involved the most trusted members of his inner circle:  KK and D-Roc.

Eddy remembered KK being at the office.  She took his driver's license.  She got him tea.  She was there at the defendant counted out dollar by dollar the bribe that went to Eddy.  And when Eddy arrived at the defendant's office, he was greeted by a man who introduced himself as the defendant's bodyguard.  The man told Eddy that he'd known the defendant for a long time; that they'd come up together.  He encouraged Eddy, telling him he was doing a good thing.  And you know who that was; that was D-Roc.

D-Roc was involved in the coverup of this incident immediately.  Cassie went to his house after the defendant beat her up.  And look here at these text messages.  The next morning Combs texted D-Roc.  That's the blue on the left.

"How is she?"

D-Roc says, "She's okay.  She's eating breakfast.  Her face don't look bad."

D-Roc knows exactly what happened.

By the time the Garcia is in the defendant's office, the defendant is so close to getting what he wants, that video, but Eddy raises a concern. "What if Cassie filed a police report?" You remember his testimony. He said if there was to be a police report made about the incident, at a later time that would affect me. He brought it to the defendant's attention.

In case it wasn't already crystal clear to the defendant, which it was, Eddy bringing this to the defendant's attention that his assault of Cassie could prompt law enforcement response, he now knows, but the defendant assured Eddy that he had nothing to worry about. He even got Cassie on a FaceTime call and told Cassie let him know that you want this to go away too.

The defendant asks for ID of each of the hotel security guards involved. So Eddy sends his own ID to KK and gets photos of the ID for his boss and a stand-in for Israel Florez and Eddy sends these photos to KK too.

Then the defendant makes Eddy sign an NDA on Combs Enterprises letterhead, as you can see. This sent a clear message to Eddy that he was not to speak about this incident with anyone. If he did, under the NDA he would oh the defendant a million dollars.

KK took a photo of the signed NDA, and then the

P6QQcom2                    Summation - Ms. Slavik

defendant brought out stacks of cash and started feeding it through a money counter: A hundred thousand dollars. The defendant puts that hundred thousand dollars in a brown paper bag and hands it to Eddy. The bribe is now complete. On their way out, the defendant tells Eddy not to make any big purchases.

That moment tells you everything you need to know about the defendant's purpose in paying this bribe. Think about why the defendant said that. Who would pay attention to big purchases from a hotel security guard? Not the press. TMZ doesn't care what Eddy Garcia bought. But if law enforcement got tipped off about a vicious assault in a hotel hallway, and found out about the surveillance video going missing, they would look into security guards with access to that video. And if any of the security guards were making big purchases, that would be a big red flag to law enforcement. So the defendant warned Eddy so that he wouldn't get on law enforcement's radar, so that the cops wouldn't find the video and arrest the defendant for what he did. Sure, it would be bad press for the defendant, but the defendant's main concern was keeping that video out of law enforcement's hands.

This is a perfect illustration of the Combs Enterprise at work: The defendant's assault of Cassie during a freak-off, and members of the Combs Enterprise not stopping at anything to ensure that the video wouldn't fall into the hand of law

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6QQcom2                         Summation - Ms. Slavik

enforcement.  They won't take no for an answer.

So let's break it down.  Under California law, the defendant had to give or offer a bribe to a witness.  Is Eddy Garcia a witness?  Yes.  Under this law, a witness means someone who knows about the existence of facts related to a crime.  Eddy knew facts about the defendant's assault of Cassie.  That is a crime.  So Eddy is a witness.  But Eddy is also an individual about to be called as a witness.  That just means someone who knows material information relating to the issues in a case that may be filed.  There's no requirement that a case was actually filed.  And here there was no case.

And why was there no criminal case or law enforcement report?  Because the defendant paid the hotel security guards for their silence.  He bought the evidence.  And he knew that Cassie was too terrified to ever go to the police herself, so there was no way that charges could be brought because the defendant made sure of it.

The money the defendant paid to buy their silence was a bribe.  Everybody has heard that word before, but under the California statute, it has a specific meaning.  A bribe under the statute means something of value that's given with the corrupt intent to unlawfully influence the testimony or information of the bribe recipient.  Paying for silence is influencing testimony.  Destroying video evidence is influencing testimony.  It's common sense.

P6QQcom2                          Summation - Ms. Slavik

In their opening the defense suggested that this $100,000 wasn't a bribe because it was just about bad publicity. But you know that that's not the full story. Sure, the defendant didn't want the public to see this video, but he understood full well what was depicted in the video, and he knew the police involvement would ruin him.

The two things are linked, of course. A police investigation and criminal charges are potentially ruinous on their own and reason enough to bribe the Intercontinental security guards, and a criminal case, of course, would mean bad publicity. So sure he didn't want the public to see the video, but he also didn't want the police to see the video. It's not an either/or - it's both.

Think about all the different points that show the defendant knew the police could get involved: Remember Israel Florez's testimony and his incident report. That's at Government Exhibit 7R-141, and in it Israel Florez recounts that he took the hotel manager up to see the defendant, and the defendant put his hands on the hotel manager. And Israel Florez said to the defendant that LAPD would escort the defendant off the property if he didn't stop.

And then, of course, the defendant's own words indicate that he knew the cops could get involved. You saw those text message. "the cops are here. I'm getting arrested."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

He was lying about the police being there to arrest him but he knew that that was a possibility.  And in fact that's exactly why he thought Cassie would believe him.  And the cops actually were involved.  They showed up to Cassie's house when Kerry Morgan was there, and they asked Cassie questions.  And, of course, in the middle of the bribe transaction Eddy expressed concern to the defendant that Cassie could call the police.  The defendant downplayed that concern but at the same time he paid a hundred thousand dollars to bury this video.

Finally, the defendant told Eddy to be smart about the money.  The only reason to say that is if you're worried about the cops.  This is overwhelming evidence proving that the defendant agreed to commit bribery as part of the racketeering conspiracy, and he used his inner circle to get it done.

The next racketeering predicate is sex trafficking.  This relates to the freak-offs, as Cassie called them, and the hotel nights, as Jane called them, where the defendant used force, threats of force, fraud and coercion to cause both Cassie and Jane to participate in those nights.

Sex trafficking is charged as a racketeering activity because the defendant's inner circle assisted the defendant in sex trafficking Cassie and Jane.  Like I said earlier, this doesn't mean these people were pleased to do it or were pleased it was happening, but they did it.

P6QQcom2                          Summation - Ms. Slavik

But separate and apart from the racketeering conspiracy, the defendant himself is charged with sex trafficking Cassie and Jane. Those are Counts Two and Four like we talked about before. I want to talk about those counts now.

I expect that Judge Subramanian will instruct you that sex trafficking has three elements:

First, that the defendant knowingly recruited, enticed, harbored, transported, provided or maintained the victim. These words have their ordinary meaning. So when the defendant persuaded Cassie or Jane to have a freak-off, he recruited and enticed them. When he paid for hotel rooms for freak-offs, he harbored and maintained them. When he purchased their flights to travel to freak-offs, he transported them.

The second element, that the defendant knew or recklessly disregarded that force, threats of force, fraud, or coercion or any combination of those things would be used to cause the victim to engage in a commercial sex act. The judge is going to instruct you on these terms, but let me just define a couple of them now.

Reckless disregard in this context means deliberate indifference to facts that if considered in a reasonable manner would indicate the highest probability that force, threats of force, fraud or coercion or any combination of those things would be used to cause the victim to engage in a commercial sex

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6QQcom2                        Summation - Ms. Slavik

act.

You know what force means.  That has its normal meaning.  And you know what fraud means.  The defendant knowingly made a misstatement or omitted a material fact.  A material fact just means a fact that would reasonably be expected to be of concern to the person making the decision.

Coercion is a little bit more complicated.  I expect the judge will instruct you that there are two ways to show coercion:

First, it can be a threat of serious harm or physical restraint.  Serious harm can include both physical and non-physical harm, like psychological or financial or reputational harm.

Second, coercion can also be proved if the defendant engaged in a scheme, plan or pattern intended to cause the victim to believe that if she didn't engage in a commercial sex act, that the victim would suffer serious harm.

Third, and finally, interstate or foreign commerce were affected.  Interstate commerce is just the movement of goods, services, money, and individuals between two or more states or between the U.S. and another country.  The defendant doesn't need to know or intend that his conduct would affect interstate commerce, and the effect of interstate commerce can be minor.

The sex trafficking charges in this case are based on

the defendant's illegal actions over the course of his relationships with Cassie and Jane:  Threats, drugs, lies, manipulation, and violence, the illegal actions that caused Cassie and Jane to have sex with paid escorts in front of the defendant, the illegal actions that made Cassie and Jane believe that they had no choice but to do the freak-offs and the hotel nights even when they didn't want to.

Now, let me repeat this.  The charge is about the defendant's use of illegal action to get Cassie and Jane to say yes.  It doesn't require them to say no.  It doesn't require them to try to run away.  It just requires that the defendant knew or recklessly disregarded that they were saying yes to a commercial sex act because of the force, fraud or coercion that he used against them.

So as we talk about these charges, make no mistake, this is not an attempt to criminalize dysfunctional relationships or unconventional sexual preferences.  It's about how the defendant's conduct broke federal law.  These charges are not about adults freely engaging in a sexual preference of their choice.  It's not about free choices at all.  As you heard both Cassie and Jane testify, at many points throughout the relationship with the defendant, Cassie and Jane did not want to have sex with escorts, while the defendant watched, masturbated and filmed.

Remember what we're talking about here.  This slide

shows you just a subset of the strangers who had sex with Jane and Cassie in these rooms for hours and days on end, drugged, covered in oil, sore, exhausted, over and over again.  The sex trafficking charge is about the multiple occasions when the defendant made Cassie and Jane have sex when they didn't want to by threatening them, drugging them, lying to them, and being violent with them

I want to be clear about another thing.  We're not asking you to find that every single freak-off or every single hotel night was sex trafficking.  Cassie and Jane both have long relationships with the defendant that had ups and downs. They both told you that they were willing to try freak-offs at the beginning and were open to possibly doing them again.  And even though they both repeatedly testified about not wanting to have freak-offs, there may have been some instances where the elements of sex trafficking aren't met, but to convict the defendant of sex trafficking, you do not need to find that all of the freak-offs or even the majority of the freak-offs that he had with Cassie or Jane were the product of force, fraud or coercion.

As I expect the Judge will instruct you, you only need to find that the elements of sex trafficking are met on one occasion during the period charged in the indictment.  So if there was one time, one single freak-off when the defendant knew, or recklessly disregarded that Cassie or Jane was

P6QQcom2                         Summation - Ms. Slavik

participating because of his lies, his threats, or his violence, then that's it, he's guilty.  Here, of course, that happened way more than once for each victim, and we'll walk through some of the clearest examples.

Let's get to the evidence.  Let's start with Jane.  At this point, I'll ask the deputy to turn off the monitors in the gallery and the overflow room.

The sex trafficking count related to Jane — that's Count Four — is based on the defendant's years' long pattern of fraud, coercion and ultimately force to get Jane to do hotel nights with escorts that the defendant paid for for sex.

Jane described these nights in detail, and they all generally went the same way, the way the defendant directed them:  An outfit, lingerie and high heels, lubricant, drugs, lighting; often a recording device in the defendant's hand; at least one escort, sometimes more; a slow progression from masturbating and touching to oral sex to intercourse; sometimes hours, sometimes days, often in multiple rounds or sessions. They were done whenever the defendant said they were done and not any sooner than that.

In a bit I am going to walk through three specific hotel nights that are clear-cut examples of sex trafficking. Those are Jane's September 2023 trip to New York City, the October 2023 sobriety party, as Jane called it, and the June 2024 hotel night at Jane's house after the defendant

P6QQcom2                          Summation - Ms. Slavik

kicked down doors in her house and beat her up.

But there are many other hotel nights that Jane agreed to because of the defendant's pattern of coercion:  His lies, his threats to withhold rent, the drugs.  And that's sex trafficking too.

Understanding how the defendant's actions constitute coercion requires some background and understanding of the stages of their relationship.  Those stages are the love-bombing stage, the introduction of hotel nights, the defendant starting to use rent as leverage, and the aftermath of Cassie's lawsuit.

Let's start with the first stage:  The love-bombing stage.  Jane started dating the defendant in January 2021 and continued dating him until he was arrested in September 2024. Pretty quickly after she met him, Jane was head-over-heels for him.  She described him as larger than life, a very big personality, super charming, very, very passionate, overall really charming.

They walked on the beach together.  They traveled to the Caribbean together, and they talked, texted and FaceTimed to get to know each other.  The defendant gave her gifts and money.  Over the next few months, the defendant would fly Jane to see him, and he showered her with attention and affection.

The beginning of their relationship is a classic example of love bombing, something that Dr. Hughes, remember,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

the expert psychiatrist who testified, she talked about that. Dr. Hughes had never met any witnesses from this case, but it's like she described the victims' experiences.  She explained that love bombing is when an abuser showers a victim with love and affection as a tactic to bring the victim into the relationship or back into the relationship.  The defendant is love bombing Jane in the beginning of their relationship to prime her to do exactly what he wants her to do.  And she spends the rest of their relationship chasing that intense feeling of love that she experienced during this first part of the relationship.

And at the same time the defendant started grooming Jane, slowly introducing her to the different elements of freak-offs, or, as Jane called them, hotel nights.  Remember, Jane testified that early on she learned about how the defendant liked to have pornography playing during sex.  She learned how he preferred her to dress.  She just learned all the things he liked sexually.  He began giving Jane drugs and, in particular, every time they would have sex, he gave her drugs.  Jane had only used drugs a few times before she met the defendant, and the first time he gave her ecstasy, she fell to the ground convulsing.  That's that incident KK helped with. But the defendant kept giving her drugs, and the defendant began introducing her to his other preferences:  Lingerie, very high heels, baby oil, pornography, red lights.  Jane loved the

defendant, and she loved their sex life.  And for a few months she was happy.

Then it was time for the defendant to introduce the second stage of their relationship after she'd gotten used to the drugs and the outfits and the baby oil.  One night in May 2021 when the defendant initiated fantasy talk about Jane being with other men when they were both high, she didn't think anything of it.  She wanted to please her partner, and when the defendant told her that he could make it happen, she said okay. She wanted to please her partner, she was high, and as far as she knew, this was just fantasy talk.  What Jane didn't know though was that the defendant could make it happen immediately.

He had a freak-off set up that very night.  He secured a hotel room.  He had his assistant set up the room, and he arranged for an escort to come to that hotel room.  When Jane got to that hotel room that night, she did for the first time what she did dozens of times over the course of their relationship:  She and the escort touched each other, rubbed oil on each other, performed oral sex on each other, and then had intercourse, all while the defendant watched and masturbated.

Now, you heard Jane testify that she was actually excited by that first experience.  She thought it was a one-time thing; that they did something crazy, taboo, fun and sexy.  But, as you heard, Jane didn't realize that she had

opened Pandora's box.  She told you later that that first hotel night set the tone for the rest of their relationship.  Jane didn't want to have sex with other men, but having sex with escorts while the defendant watched became 90 percent of their relationship.  These hotel nights formed the basis of the sex trafficking count in Count Four.

After the first hotel night, there were many.  For awhile Jane went along with them.  She loved the defendant, and she wanted to make him happy.  But she did not want to have sex with anyone other than the defendant.  A few months in, Jane started resisting the hotel nights.  She testified that she told him in person that she wanted it to stop, but she also put it in writing.

Here are a couple of texts a year apart, both right after Jane's birthday when, instead of celebrating the way Jane wanted to, the defendant made her do hotel nights.

The first text from 2022, Jane says, "I don't ever want to do another hotel entertainment night with you.  I don't even want to do those things with you on my birthday, but I wanted to make sure we had fun.  I feel so cheap once again."

Another text a year later, Jane says, "I didn't want to do that on my birthday."

She says it again, "I don't throw sex in your face constantly, but the type of nights we have are nights that require everything out of me for 30 to 40 hours straight.  I

figured on my birthday you would switch it up for me."

And finally she says, "All I wanted to do was travel with you, spend more quality time together, go eat, make love, be closer, and do things outside these rooms, but it's all you showed me over and over."

She's telling the defendant that it's been two years of feeling frustrated and feeling used. The defendant ignored Jane's discomfort. He kept pushing hotel nights, and Jane kept doing them to make him happy. But as time went on, she became more resistant, and the defendant had to resort to more and more manipulative and coercive tactics to keep her in those hotel rooms. That's because those hotel nights weren't about what Jane wanted; they were about what the defendant wanted. He told her what he wanted to see, and he gave her very specific instructions about what to do with the escorts and when to do it. He decided how long hotel nights would last, sometimes days. And to ensure that Jane could get through these nights, the defendant plied her with drugs. Jane told you that she felt like she had to take the drugs, otherwise it was just too real.

Here is her testimony where she says, "It would just feel too real, like the atmosphere, and I didn't want it to feel too real. It just made things easier."

Sometimes Jane tried to have a say and that had mixed results. For example, Jane figured that if she had to have sex

with strange men, she could at least pick strangers that she would have sex with to try to maintain some control.  The defendant went along with her choices.  They were generally men that Jane and the defendant watched in pornography together, but the defendant still controlled when and how Jane communicated with them.  He made her screen share and have nude FaceTimes with them.  He made her ask them for explicit photos.  He made her sext with them.

These photos and these communications, they weren't for Jane's benefit.  She made it clear she didn't want to have sex with anyone other than the defendant.  And when Jane asked to use condoms, the defendant wasn't happy because these nights, again, were not about what Jane wanted.  They were about creating the fantasy that the defendant wanted, and that fantasy didn't involve condoms.

He was dismissive and condescending, and the second time, he outright refused.  Remember, you heard that in the recording.  The transcript is here where the defendant asked Jane what she's looking for and says, "Ain't no condoms around here.  There's no condoms in there."  The defendant tells her, "Baby, you can't tell me that dick gets just.  You were just taking that dick."

Jane says, "You promised me."

And the defendant said, "I don't like to do it with all that shit."  So they didn't.

Sometimes Jane tried to speed things up.  She tries to get to intercourse with the escorts faster so that the nights would be done, but the defendant didn't like that either, and he would tell Jane to slow down.  He was never satisfied.  He was always pushing Jane to do more, just like what Jane tells him in this text message.  Because, again, these nights were not about what Jane wanted; they were about what the defendant wanted.

Throughout these months, the defendant dangled different carrots to make Jane continue doing hotel nights.  He gave her gifts, he gave her money, and he made promises that he never intended to keep.  You know that because Jane testified about that, and she put it in writing.  He lied to her repeatedly.

Here is Jane's text to him in 2023.  She asked him, "When are we having a getaway?  You've promised me this for years.  All we do is hotel, and it's sad.  It's just not fair to me."

He told her that they would go on trips; that they'd go shopping; that they'd go on a yacht, but only after she did a hotel night with him.  Jane believed him because after the first hotel night, he had taken her on a yacht the very next day.  But each time after that, the defendant failed to deliver.  They were just lies he told Jane to make her keep participating in these hotels nights.

P6QQcom2                        Summation - Ms. Slavik

Here she is in November 2022 writing in her notes app:

"I've just been waiting for you to do all the things you promised me, and nothing.  You hurt my feelings every time.  You dismiss me.  It's belittling.  You always ask of me, and when I ask of you, it's a problem or I'm made to feel weird about it.  We both deserve love and to feel valued, and I don't feel that here."

Then she goes on to say, "I don't know what you're calling me for, but I'm so sorry, I don't want to do drugs for days and days and have you use me to fulfill your freaky, wild desires in hotel rooms."

So this brings us to the third stage of their relationship:  When the defendant started using his payment of Jane's rent as leverage.  In April 2023, the defendant gave Jane another carrot that quickly turned into a stick.  He started paying her rent.  The agreement was that the defendant would pay her rent for two years to match the two years that Jane had spent without working while she was in a relationship with him.  This was after Jane felt lied to and tricked into hotel nights multiple times.  But she didn't get the security that she was expecting.  Instead, the defendant used the rent as a way to control Jane.

After this, Jane told you that she started to feel obligated to have hotel nights because the defendant was paying her rent and threatening to stop.  Now, up until this point the

defendant's lies and manipulation had been building, but this is the moment when things changed.

Remember how I mentioned that coercion can be a pattern or scheme over time? When the defendant started paying Jane's rent, that coercive pattern picked up steam. When Jane tried to tell the defendant how she felt about hotel nights or when she tried to avoid having one, he held that rent over her head. He threatened to cut off her rent along with their relationship.

Jane told you about that, but she also put it in her notes app. She says, "You have made me feel so worried since day one over this place. The threats and innuendo that you're going to take it away have been non-stop since May." That's in October of 2023.

And here, on August 4, 2023, only a few months after the defendant started paying her rent, he's upset that Jane didn't seem excited for a hotel night. He tells her, "Well, get over it please. Look at the roof over your head and that pretty smile."

The roof over her head is obviously a reference to her home, and the pretty smile is a reference to him paying for her veneers because he didn't like her teeth. He's reminding her that she owes him, and that he can take things away from her if she doesn't give him what he wants.

Then later in August 2023, after Jane told the

defendant that she didn't want to do this all-star party —
this was the party where there would be three escorts — she
didn't want to do the all-star party, the defendant sent her a
string of angry messages.  Jane became so desperate responding
to those messages that she sent the defendant a picture of her
period, blood in the toilet to explain why she didn't want to
have this all-star party having sex with three men.

But even after that, the defendant kept threatening
her because he didn't get what he wanted.  Jane wrote to him,
she said, "You basically told me to take a fucking Adderall,
called me a bitch, a liar, and a fake because you couldn't bust
a nut.  Then it turned out my body was really shutting down on
me in real life."

And then he sent her this voice note in response on
August 27, 2023.

(Audio played)

MS. SLAVIK:  The beginning of this message when the
defendant says, "I'm about to really disappear on you," he
meant that he was about to stop paying her rent if she didn't
get back to hotel nights.  Then he tells her to get back on her
job because he had been on his job, and you know what that
means, and Jane did too.  He's telling her, "I'm paying your
rent, so you better have whatever hotel nights I want."  He may
say it's not a threat, but the message couldn't be clearer.
He's not going to take no for an answer.

P6QQcom2                         Summation - Ms. Slavik

And then the text Jane sends the defendant in September 2023, she says, "One night of fun turned into the entirety of our relationship, and now it's all I'm expected to do and get called for.  It's hurting me because I'm so much more than being loved in the dark in hotel rooms doing things that make me feel disgusted with myself.  I'm confusing your love for me as real love.  My heart is really in this, and it's breaking.  I don't want to play this role in your life any more.  It's dark, sleazy, and makes me feel disgusted with myself.  I feel like it's the only reason you have me around and why you pay for the house.  I don't want to feel obligated to perform these nights with you in fear of losing the roof over my head.  I don't want to keep feeling like that any more."

And, again, in October 2023 when Jane is voicing her anguish about these hotel nights, the defendant uses rent as leverage again.  In response during a phone call, the defendant threatened to stop paying her rent.  And you know that because Jane told you about it when she testified on the stand, and she put it in text messages and in her notes.

So why did the defendant make those threats?  He knew that Jane was dependent on that rent for the home where she lived with her child.  That's a serious harm.  He knew that threatening to take away her home could turn a no into a yes.  That's coercion.  And it worked.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Although the defendant brushed off Jane's feelings about hotel nights and pretended that he had no idea that she didn't want to do them any more, Jane's anguish was finally validated in the fall of 2023 when Cassie's lawsuit came out. Jane read the entire complaint. She said it was like reading her own story. She was in shock. She told you that Cassie's lawsuit had three specific pages that were a harrowing resemblance to what she was experiencing.

Now, to be clear, Jane had already been saying the same thing for months. Every single text and every single note that we've looked at so far was written before Cassie filed her lawsuit. So you know that Jane is telling the truth when she says that she didn't want to do hotel nights, but she felt forced by the defendant's threats about her rent. She's not copying Cassie. She had no idea that Cassie went through the same thing that she did until November of 2023 when Cassie filed a lawsuit. And the text that she wrote to the defendant after reading Cassie's lawsuit spoke volumes.

Here, she tells the defendant that she's been crying for three days and under stress from reading all of this. She keeps having nightmares about forced nights and "all the times I felt like I couldn't say no. I feel like I'm reading my own sexual trauma, and it makes me sick, how three solid pages word for word is exactly my experiences and my anguish. Even two of my own birthdays you forced men on me for days and had me

perform so many countless drug-filled days and nights in the span of our toxic years together. Even recently throwing up at the hotel in LA because I was finally sober and disgusted and felt so forced to perform back to back and just wanting it all to end.  God finally woke me up out of this sick cycle and validated me again with all of this.  The sick part is that you knew this was coming, and you gaslit me and made me feel crazy about the sex trauma I was developing.  Knowing you've been here before and this is just a sick game that you do, I feel played.  It's all so clear that it was sexual exploitation that you framed as love for your sick fetishes."

She said the same thing when the defendant called her in a bungled attempt to trick her into saying that she'd been a willing participant all along.  He knew that she'd been texting him and telling him no for months.  He knew that she was over the hotel nights, and that she didn't want to do them any more, and he knew that that could be a big problem for him because he might be under criminal investigation after Cassie's lawsuit came out.  So he tried to feed Jane a false narrative.  We're going to talk about this call more later, but for now just listen to this clip.

(Audio played)

MS. SLAVIK:  In that recording -- we'll hear more later, but in this recording you can hear for yourself exactly how the defendant would gaslight, interrupt, and talk over

P6QQcom2                          Summation - Ms. Slavik

Jane. He even tried to provide a version of events that was not reality and interrupts her when she tries to articulate her own experiences. He knows he's being recorded, and so he's being very careful on this call. But he also knows that he's been coercing Jane into hotel nights, and so when his gaslighting doesn't work right away, and when he hears Jane start to tell the truth about these nights, he interrupts her. But Jane, who doesn't know that she's being recorded, she says the unvarnished truth. She says the three pages of Cassie's lawsuit about forced sex with male prostitutes matched Jane's experience word for word.

After Cassie's lawsuit, the relationship between Jane and the defendant entered a new phase. Jane refused to see the defendant for several months, although she continued to speak to the defendant. She had big feelings, and he was the only person that she could vent to.

Dr. Hughes talked about this phenomenon as well when a victim is trauma bonded to her abuser. The person who is the victim often turns to the abuser because that's the person who knows what's happened, and that's the person that they can talk to about it. And that makes it even harder for a victim to leave an abusive relationship.

Jane often felt that the defendant didn't listen to her truth or would give her a different version of it. Here is her testimony.

She says, "Every time I would speak my truth or how I would be really feeling, Sean would just give me a different version of it and say it wasn't this or it wasn't that, or just to move on from what I was talking about."

And for his part, the defendant continued to speak to Jane even when they were on this break because he was still trying to ensure Jane's silence or in his words "tie up loose ends."  He even tried to get her to reach some sort of financial agreement with him.  He told her to charge him, and he said that lawyers would be involved.  He was basically trying to buy her silence.

So here in this text message, Jane did what he asked. She says, "I was confused and couldn't concentrate for three years and feel extremely exploited, heartbroken and manipulated by you.  I lost many opportunities.  I feel sexually exploited, mentally damaged, and emotionally drained by you.  I want my wasted three years of time reimbursed and given back to me in the monetary amount of $100,000 per year and 15 months left of our two-year agreement of rents."

She says that is what it will take for her to move on from the resentment of feeling exploited, manipulated, heartbroken, drugged and all the loss of potential income.  So she told him her feelings.  She sent him what she thought was a reasonable amount of money for the settlement that he asked her to provide him — which is, by the way, far less than what

P6QQcom2                        Summation - Ms. Slavik

Cassie's settlement was — and the defendant went ballistic.

Why did he get so angry?  Because Jane refused to adopt his false narrative.  She wrote the truth about why she thought the amount that she chose was reasonable.  She was high and coerced.  She felt sexually exploited.  This was the opposite of what the defendant wanted.  This was another text documenting the defendant's crimes.  So the defendant went on the attack.

You can read the text messages here clearly.  He is livid.  And in the heat of his anger, the defendant called Jane and told her that he would release hundreds of videos he had of her having sex with escorts to the father of her child.  Jane was beside herself at the thought of this.

So she reached out to the person closest to the defendant, KK.  She told KK about the defendant's threat.  She says, "Now he is threatening me and saying he would call the police and expose my tapes and send them to my child's father. Mind you, these are sex tapes where I'm heavily drugged and doing things that he asked of me for the past three years that I'm currently recovering from."

KK didn't seem surprised by this.  She told Jane that she didn't think the defendant would actually release the sex tapes, and she told Jane that she would talk to the defendant.

But Jane told you exactly what KK said.  That's at the transcript at page 5114.  KK said, "I always tell him all the

P6QQcom2                      Summation - Ms. Slavik

time just to give these things space, otherwise we end up in a situation like we're in now."

And you know what situation she's talking about: She's talking about Cassie's lawsuit. After this, Jane didn't see or speak to the defendant for two months. So she thought she'd had enough time to get past her anguish when he reached out in February and invited Jane to come see him in Miami. Here Jane makes clear she is a little traumatized from her past birthdays and what they ultimately led to at the end of the night.

She says to the defendant, she's just being honest, she makes it clear that she doesn't want a hotel night, and so the defendant responds. He says, "We can just have a wholesome, beautiful evening celebrating the beautiful you." That's what Jane had wanted from the defendant for years. So she went to Miami. And despite his promises, despite Jane telling him for months how she felt about hotel nights, when she got there, the defendant gave her ecstasy and called an escort. And for the third year in a row on her birthday, Jane had sex with another man while the defendant watched and masturbated.

From that point, Jane fell back into the same pattern with the defendant, and they were back together. And the defendant continued to do exactly what he had done throughout the entirety of their relationship.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6QQcom2                    Summation - Ms. Slavik

Here, you can see Jane is talking about more threats about the rent.  She says, "You're not having your way, so you immediately threaten me with rent.  I'm tired of the rent threats.  I hate living like this.  I hate living in fear."  These are from March of 2024.  The defendant is pressuring her into hotel nights.  He's using carrots and sticks.  He's coercing her.

All of this finally culminates in June 2024 when the defendant assaulted Jane, forced her to take drugs and forced her to perform oral sex on an escort.  We're going to talk about that in a few minutes.

But these phases of the relationship between Jane and the defendant that we've just gone over, these track the defendant's coercion, the love bombing, the manipulation, the drugs, the threats to withhold rent, his the threats to release sex tapes, the violence.  The defendant's conduct had one purpose:  To get Jane to agree to do hotel nights.  And because the defendant knew exactly what he was doing, this is sex trafficking.

Let me pause and go back to the elements of sex trafficking.  There really isn't any dispute about the first and third element.  So let's go through those quickly.

First, as you know, the defendant recruited and enticed Jane to participate in hotel nights.  He did this throughout their relation.  Take the very first hotel night

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

between Jane and the defendant when after they'd been using drugs and having sex for hours, he brought up this idea seemingly out of nowhere of bringing another man into their sex life. Jane wanting to make him happy, agreed. But what she didn't realize is that this wasn't some spur-of-the-moment idea. The defendant already had an escort on speed dial. And within hours, Jane was having sex with that escort in front of the defendant. And throughout their entire relationship, the defendant continued to entice Jane into hotel nights. He maintained and harbored her at hotels and later, after Cassie's lawsuit, at Jane's home that he paid for for these hotel nights. And the defendant frequently transported Jane for the hotel nights from New Jersey and California to different locations including New York City, Miami, Las Vegas and Turks.

So the first element of Count Four is met. There is really no dispute that the sex trafficking was in or affecting interstate commerce. As we just talked about, the defendant flew Jane across state lines to come to hotel nights. He flew escorts across state lines too. We'll talk about that later. Jane, the defendant, and escorts, and others also communicated across state lines about hotel nights using cellphones and emails.

You heard Jane talk about having FaceTime and sexting with Kabrale, who lived in Atlanta. So every time she did that from Los Angeles or from Miami, that was a communication in

interstate commerce.  Products in or affecting interstate commerce were also used during every single hotel night.  You can check the labels of the bottles of baby oil, which is distributed by a New Jersey company, and Astroglide, which is actually made in New York, but it necessarily crosses state lines when it was used in California or Florida.  Those products are in evidence.  You can look at them.

And the defendant got drugs, which I expect the Judge will tell you necessarily affect interstate commerce, and he gave Jane those drugs all but 1 Hotel night.

So the third element is also met.

So what I want to focus on now is the second element: That the defendant knew or recklessly disregarded that force, threats of force, fraud or coercion, or any combination of those means would be used to cause Jane to participate in the hotel nights.

As I mentioned earlier, I expect that the Judge will tell you that you don't need to find all of these things.  You don't have to find that all force, threats of force, coercion or fraud were used.  It can be any of these illegal means alone, and it can be any of these illegal means in combination. And this is an obvious point, but the fact that a victim consents once to a commercial sex act, that doesn't mean that she consented every time.  You only need to find that one of these hotel nights meets the elements of sex trafficking here.

P6QQcom2                          Summation - Ms. Slavik

And let's talk about how you know that this element is met. We have already walked through a lot of evidence that proves this element, but right now I'm going to focus on a couple of specific instances where the evidence is crystal clear that the defendant caused Jane to have sex with an escort by force, threats of force, fraud, being coercion or some combination of those things. For even just one of those occasions the defendant is guilty of Count Four.

So let's walk through the examples.

We talked about how things changed after the defendant started paying Jane's rent. That was in April of 2023. The rent became just another way that the defendant caused Jane to keep doing hotel nights, even when she told him that she didn't want to do them any more.

Let's talk about Jane's trip to New York City in September of 2023. This is where the defendant tricks Jane into thinking that she'll have a proper New York City weekend, but instead made her do a hotel night when she arrived.

Here is a text communication between Jane and the defendant. Jane had found out that the defendant went on another trip with another woman and she was upset. So she makes clear to the defendant that she doesn't want to go to New York with him just to do another hotel night.

She says, "As much as I want to see you, I just know what you want me out there for. It doesn't make me feel about

good.  You got other women in line to do that."

The defendant responds, "Bye.  Always tripping on me."

She sends him another message.  We looked at this one before where she said, "I don't want to play this role in your life any more.  It's dark, sleazy, and makes me feel disgusted with myself."  She says, "I don't want to feel obligated to perform these nights with you in fear of losing the roof over my head."

She sends this same message to both the defendant's phones.  She makes it totally clear that she didn't want to do another hotel night.  She's making it clear that she doesn't want to do this, and that she's feeling obligated because the defendant pays her rent.

And after Jane pours her heart out to the defendant, his response, "Girl stop."

But then the defendant FaceTimed Jane and told her all the things that she wanted to hear.  He told her that they would have time alone that; that they'd go to dinner; that they'd go shopping; and that they'd have a proper New York trip.  He led her to believe that there would not be a hotel night.  And why did he do that?  Because he knew that Jane wouldn't come to New York for a hotel night.  She told him that.  But if he was going to get a hotel night, he had to make sure that she came.  So he led her to believe that there wouldn't be one.

P6QQcom2                        Summation - Ms. Slavik

He lied.  You know that he lied because of his communication.  Look at the very top of this screen, this is from the summary chart of Government Exhibit 1407, the defendant continues to lie to her.

He continues to say, "We're going to dinner.  I'm going to have you do a little shopping.  Miss you.  Can't wait to see you."

He even asked her if she had her passport, suggesting that they might take an impromptu trip abroad, but as he's making these promises, look at who else he's texting.  He's texting Paul Arthur, an escort.  And when Paul Arthur isn't in town, he starts texting the owner of Cowboys4Angels to set up an escort.

Look at all these messages.  They're all lined up.  As he's telling Jane that there won't be a hotel night, he's setting up a hotel night.  Then when Jane was in midair and couldn't turn the plane around, he pulled the rug out from under her.  He told Jane that he had a surprise for her; that surprise, of course, being the escort from Cowboys4Angels.

Jane did not want to do a hotel night in New York City.  She told him that multiple times.  He knew that, but he wouldn't take no for an answer.  He had lied to her so that she would come to New York, and instead of doing the things that he promised — dinner, shopping — he hired a new escort, a stranger to have sex with her in a hotel room while he watched and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6QQcom2                         Summation - Ms. Slavik

masturbated.

That right there before the plane even lands, that is a completed act of sex trafficking. The defendant enticed and transported Jane to get on that plane by telling her a material lie; that there would be no entertainment in New York, only things like dinner and shopping. And when he did that, he knew that the only way of getting Jane to have a hotel night was by tricking her, lying to her, and by coercing her, threatening her rent, which she mentioned earlier that same day, and giving her drugs, which he did that night.

**This is a blatant example of the defendant using fraud and coercion to get Jane to come to New York City for a hotel night; in other words, to trick Jane into coming. Based on this alone, you know that the defendant is guilty of Count Four.**

And it continues after she lands in New York. The defendant follows through. She pushes back. She tells him in person she doesn't want to do a hotel night. You can look at the transcript. The defendant says that she doesn't have to, but you know that he's lying because you know what he's done. He's set up this appointment with the Cowboys4Angels.

In the car on the way back to the hotel, the defendant gives her an ecstasy pill, and when they get to the hotel, the Cowboy escort meets them there. The defendant spends about two hours trying to get Jane to have sex with that Cowboy, but it

doesn't work. There she is high with the defendant pushing her to get another entertainer. And, remember, by this point the defendant has been threatening her rent for months. This is the first time she's been seeing him that since we listened to that audio message; that "Get back on your job," that voicemail. He talked about the threats in his text message the day before, the day before she came to New York.

So between the threats, the drugs, and the lies, she gives in. He texts Kabrale, and she books his flight right there to that room with the defendant, and they have a hotel night with Kabrale instead of the Cowboy. And you know how Jane ultimately felt about this night. She wrote it down in a text to the defendant.

The first text: She said, "I'm having real life-triggering PTSD from these sex nights and feeling extremely violated. I need a therapist to get out of my head. I opened up to you about that, and you gave me a fake apology to smoothly insert about threatening me once again about the house. I'm beyond hurt."

In the next text, she says, "Even in NYC, when I said I did not want to go because I knew you would pair me up with a random person, and I was anxious and anxiety-filled, and you did still pair me up with some random man, and you emotionally manipulate me for years if you're not happy with certain sex performances."

P6QQcom2                      Summation - Ms. Slavik

The hotel night on this trip was the result of that combined fraud and coercion.  This trip alone makes the defendant guilty of Count Four.

Let's talk about another example, what Jane referred to as the sobriety party.  This one took place in October 2023, after the New York City trip.  It's the hotel night where Jane tried to do it without drugs.  But she becomes so disgusted that she vomits between the second and third escort the defendant makes her have sex with.

Now, at this point you know Jane has told the defendant multiple times, repeatedly, that she doesn't want to keep doing these hotel nights.  So let's look at the message that she sends to the defendant.

She says, "I don't want to be fucked and mistreated. I'm not a porn star.  I'm not a animal.  I need a break."

The defendant responds.  He says, "Let's spend the day, just me and you, no strangers."

But Jane continues to push back.  She does not want a hotel night.  She does not want to do drugs.  She says, "You're going to spend the day love bombing me so you can get what you want?  It's not genuine."

Jane sees through the defendant's false promises.  She understands that he's not being genuine when he tells her that they will have alone time together, when he makes promises that there won't be entertainment.

P6QQcom2                    Summation - Ms. Slavik

The love bombing was how the defendant had gotten Jane to stay with him after exploiting her over and over, but it didn't work this time. Jane continues to resist. So the defendant changes tactics. He switches from carrot to stick. The stick is Jane's house that he's paying for, and look would he says to Jane. This is from Government Exhibit 1407.

He says, "Are you going to let me in or not?" Then eight times he says, "Are you gonna let me into our house?" Eight times.

So then with all of his other tactics having failed, the defendant told her that he was sick, and he needed Jane to take care of him, and finally the defendant's tactics worked. A day later Jane found herself in a hotel room having sex with three different men for hours at a time without taking drugs. This was the only time that she did a hotel night without drugs, and it went very badly. Jane was so overwhelmed by the experience that she vomited between the second and third men. And even when she vomited, the defendant wouldn't let her stop. He told her to get back out there, to keep it going.

He said, "Get back out there because the guy's out there." And this was months after the defendant started threatening Jane's rent. He had been threatening her rent for months.

The defendant knew that Jane didn't want a hotel night that night. She told him that repeatedly. Look through her

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6QQcom2                    Summation - Ms. Slavik

text message.  Look back at her testimony.  She did not want to have sex with strangers.  But the defendant refused to take no for an answer.  He did whatever he had to do to make Jane say yes to the hotel night.  And even when she vomited after having sex with strangers for hours, the defendant told her to keep going.  That night the defendant used coercion to make Jane have a hotel night with three different men and to make her keep going even when she wanted to stop.  This incident is yet another reason that the defendant is guilty of Count Four.

The last night that I want to talk about is June 18, 2024.  You probably remember this one.  We touched on it very early in this presentation.  This incident took place at Jane's house.  To put it in perspective, June 18, 2024 was less than three months after Homeland Security agents searched the defendant's home in Los Angeles and Miami.  There is no question at this point in June 2024 that the defendant knew he was under federal investigation.  So he stopped doing hotel nights at hotels.  Instead, they used Jane's house.

Jane described this day as a very terrible day.  On that day, the defendant came to Jane's house.  Jane didn't think that they were going to have a hotel night.  They were supposed to just have a fun date night.  After a few drinks, Jane and the defendant started arguing about another woman.  Jane was very upset.  She told you that this was a build up of resentment over the way that she'd been treated for the past

P6QQcom2                         Summation - Ms. Slavik

three years, and it was finally boiling over.  She called the defendant names.  She pushed his head into the counter.  She threw candles and a wine glass at him.

Jane told you that she started the argument, but after it started, things escalated.  The defendant yelled back at Jane.  He called her crazy, and at this point Jane told the defendant to leave.  She told him that she hated him, and that he should leave.  He didn't listen.

She ran to the master bedroom and locked the door. The defendant kicked it open.  She ran to the master bathroom and locked the door.  The defendant kicked it open.  She ran to her closet and locked the door.  The defendant kicked it open. The defendant kicked down three doors as Jane was pleading for him to leave.

You saw the pictures of the doors.  This is one of them on the screen.  Splintered wood.  Broken handle.  He wouldn't take no for an answer.  When Jane tried to leave the house, the defendant kicked her legs out from under her and picked her up in a chokehold.  She couldn't breathe.

Somehow she managed to squirm out of the defendant's grip and run away out of the house.  She ran to a wall in the neighborhood far away from her house and she hid.  She had no shoes.  No phone.  No way of calling for help.  No way of knowing how much time had passed.  She thought that if she had hid for long enough, the defendant would leave.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

But as she returned to her house she saw him.  The defendant was waiting for her.  She was scared, but she stayed quiet, kept walking.  She didn't want to make a scene.  She went back to the house and tried to hide between a locked guest bedroom door, but that didn't stop the defendant.  He kicked that door open too.

Jane and the defendant went out to the patio of her house and the argument continued.  Jane hit the defendant.  He responded by punching her twice in the face - in her eye and on her forehead - injuries that were still visible even under makeup days later, injuries that you can see in the photos here days later, days after the assault.

Jane ran deep into the yard behind the house.  Then she dropped to the ground and curled up in a ball to protect her face and body.  The defendant kept attacking her.  He punched her head.  He kicked her.  Unlike Jane, the defendant was wearing shoes.  And then he took her by the arm, he took her by the hair, and he dragged her back into the house.

When they were back in the house, they continued arguing.  Jane took his phone.  She called the other woman that they had been arguing about.  And while Jane was on the phone with the woman, the defendant held her down on the ground and Jane yelled out that he was beating her.

The defendant also FaceTimed his assistant.  That assistant, Jonathan Perez, told you about that FaceTime call on

P6QQcom2                         Summation - Ms. Slavik

the witness stand.

Jane left the room to shower.  When she got to the bathroom, she caught a glance of herself in the mirror.  She saw that she had a black eye.  She saw that she had two golf ball-size lumps on her head where the defendant had punched her.

The defendant followed her into the shower and Jane called him more names.  He started slapping her.  He smacked her in the face three times.  She lost her balance, and she finally fell to the floor of her shower.

Up until this point, the defendant's assault was a brutal incident of domestic violence, the first time that he had physically struck Jane, but he didn't stop there.  After the beating stopped, he told her you're not going to ruin my night like this.  He told her to put ice on her face, to put on an outfit, lingerie, high heels.  He turned on pornography, and he texted an escort, Antoine, someone that he paid for sex.

After brutally assaulting Jane over the course of hours, the defendant had decided that it was time for her to have sex with an escort.  After the defendant texted Antoine, Jane put on makeup to hide her injuries.  She cleaned up the broken glass.

By the time Antoine arrived and called Jane to have her come open the gate, several hours had passed since that FaceTime with Jonathan Perez, the defendant's assistant.  In

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6QQcom2                        Summation - Ms. Slavik

those hours, the defendant slapped Jane in the shower.  He yelled and ranted at her.  He called her names.  He put on pornography, and he had Jane clean up herself and the mess in the house.

When Antoine the escort arrived, the defendant brought Jane into the bathroom.  He gave her a pill.  He said, "Take this fucking pill.  Take this fucking pill.  You're not going to ruin my fucking night.  You better go out there.  You're not going to ruin my fucking night.  Get out there.  Suck his dick. Fuck him.  I don't care.  You're just not going to ruin my fucking night."

Jane's response?  "I don't want to.  I don't want to. I don't want to."

The defendant's response?  He put his face inches from her and he said forcefully, "Is this coercion?"  He used that very specific word because, remember, at this time he knew that he was under investigation, and he obviously knew what crimes the feds were investigating, the same ones that we're talking about right here today:  Sex trafficking by force, fraud and coercion.

In that moment, when the defendant taunted Jane asking her if it was coercion, he was brazenly acknowledging that he was breaking the very same law, the very same law that he'd broken repeatedly before.

So was this coercion, the defendant's question?  The

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6QQcom2                    Summation - Ms. Slavik

answer couldn't be clearer.  Jane did not want to have sex with the escort that night.  Jane and the defendant had had a terrible fight.  The defendant had attacked her.  He made her take drugs.  Her face was bruised and swollen.  She was scared.  She said no.  But the defendant wouldn't take no for an answer.  So Jane, having been punched, slapped, kicked, and dragged by the defendant hours before, performed oral sex on the escort at the defendant's direction.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MS. SLAVIK:  There's no question why Jane engaged in a commercial sex act that night.  You know why she did it.  She was afraid of the defendant because the defendant had just shown her, in no uncertain terms, what he was capable of.  So Jane did what the defendant told her to do.  She performed oral sex until Antoine ejaculated.  Antoine left.  The defendant sent his security back to Jane's house with cash to pay Antoine.  And you saw that he asked them to bring cash, and they didn't have it, so the defendant delivered it to Jane a day later.

That same day, Jane sent the money to Antoine in an Uber.  The bag on the left is what she put the money in, and the Uber on the right is how she sent it to Antoine.

Finally, the incident was over.

That night, the defendant committed sex trafficking. He harbored and maintained Jane.  He paid Antoine for sex.  He gave Jane drugs, and he used force, threats and coercion to make Jane go along with it.  Remember, under the law, coercion includes threats of serious physical or nonphysical harm that would compel a person to perform sex acts.  So when the defendant asks Jane is this coercion, the same night that he beat her and told her you'd better go out there and suck his dick, the answer to that question is yes.  There's no credible argument that the defendant can make that he didn't know.  He even used the word "coercion."  It doesn't matter that Jane

started the fight.  It doesn't matter that Jane hit him too or called him mean names.  What matters is what caused Jane to have sex with the escort and whether the defendant understood that.

Members of the jury, you know the answer to those questions.  The defendant's assault and Jane's fear of further violence is the reason that Jane had sex with the escort that night.  And the defendant knew that he had coerced her.  So on this basis too, the defendant is guilty of Count Four.

Now that we've spoken about some of the specific examples that prove that the defendant is guilty of Count Four, I want to go back where we started.

THE COURT:  Ms. Slavik, at the appropriate time, I think we could take our break for lunch.

MS. SLAVIK:  This would be an appropriate time, your Honor.

THE COURT:  All right.  Very good.

Thank you, members of the jury.  I'll remind you again not to speak to each other about the case and not talk to anyone else about the case or look up anything about the case.

With that, we'll take a break and be back at 1:15.

(Jury not present)

THE COURT:  Please be seated.

Anything to address before we take our lunch break?

MS. COMEY:  Nothing from us, your Honor.

P6qWcom3                    Summation - Ms. Slavik

MR. AGNIFILO:  Nothing, Judge.

THE COURT:  All right.  We'll be back at 1:15.

(Luncheon recess)

P6qWcom3                          Summation - Ms. Slavik

AFTERNOON SESSION

1:15 p.m.

THE COURT:  Please be seated.

Ms. Slavik, are you ready to go in terms of the issues?

MS. SLAVIK:  Yes, we are, your Honor.

THE COURT:  OK.  Very good.

MS. SLAVIK:  Sorry, your Honor.

Just to flag for the Court, we will have to switch PowerPoints.  We have two volumes, and we'll have to switch from volume 1 to volume 2.  That will coincide with the deputy turning back on the monitors in the gallery and the overflow room.

THE COURT:  All right.  That's fine.  Do you need us to do anything in connection --

MS. SLAVIK:  No, no.  Just flagging that there will be a brief pause.

(Jury present)

THE COURT:  Please be seated.

Welcome back, members of the jury.

Ms. Slavik, you may proceed when ready.

MS. SLAVIK:  Before the break, we were talking about three specific examples that showed that the defendant sex trafficked Jane, three specific examples that the defendant is guilty of Count Four.

I want to go back to where we started, though, because none of those three nights, none of the three nights that we walked through in detail, happened in isolation.  They were part of a yearslong buildup, all during which the defendant used fraud, coercion and, finally, physical force to get Jane to do what he wanted her to do -- to have sex with strangers in front of him.

This pattern involved many aspects of the relationship between the defendant and Jane.

Excuse me.

I apologize.

THE COURT:  Do you need a second --

MS. SLAVIK:  I do, your Honor.

THE COURT:  -- to change out the batteries?

MS. SLAVIK:  One moment.

All right.  We're going to try to get it to come up.

THE DEPUTY CLERK:  Ms. Slavik, do you need batteries?

MS. SLAVIK:  Perhaps.

Oh.

THE COURT:  All right.  Looks like we're back.

MS. SLAVIK:  Thank you, your Honor.

Thank you for your patience.

I want to go back to talking about the larger relationship between the defendant and Jane, because as I mentioned, the three incidents that prove Count Four, they

P6qWcom3                          Summation - Ms. Slavik

didn't happen in isolation, and they involved many aspects of the relationship between the defendant and Jane.

Starting, first, with the defendant paying rent for Jane's house.  Now, we've already talked about this, but this is just an example of the defendant's financial coercion of Jane.  As you remember from Jane's testimony, after the defendant started paying her rent, in April of 2023, she felt completely obligated to continue these hotel nights.  This is, as I said, an example of the defendant's financial coercion of Jane.  His threats to withhold her rent are examples of threats of nonphysical harm that compelled Jane to perform in these hotel nights.  So I'm not going to go over the examples that we just looked at, but you've heard her testimony.  You've read her text messages, some of which we read today.  The defendant's threats to stop paying her rent made her feel obligated to do what he wanted her to do.

Another important part of the pattern of the defendant's coercion was drugs.  Before meeting the defendant, Jane only used drugs a handful of times, but they became a necessary part of her sex life with the defendant, because they made it easier for her to get through these hotel nights.

You see in the testimony she says that she feels like she has to take them.  It made it easier; it made the hotel nights not feel too real.  The defendant gave her ecstasy and molly that made her feel sexually aroused and willing to try

P6qWcom3                    Summation - Ms. Slavik

new things, to make her agree to the hotel nights.  If she was high on a drug that made her feel sexually aroused, she wouldn't refuse.  The drugs were just another way that the defendant made sure that he got Jane to say yes, to ensure that she wouldn't say no.

Now, you heard about the effects of these drugs.  And remember, Jane told you about a hotel night that took place in July of 2024.  This was after the violent hotel night in June of 2024.  The defendant had gotten her back after that incident of violence with more love bombing.  And in Miami, in July 2024, the defendant gave Jane a new sort of drug -- liquid molly, she called it.  And that gave her a super-intense, high sexual energy, unlike anything she'd ever experienced.

The defense showed you clips of movies from that hotel night, and I expect that they'll argue that those videos -- you watched them earlier this week -- that those videos show that Jane was into it.  But what those videos really show you is that she was super, super high, just like she told you.  She was different in those videos than the videos that you've seen.  And that's because she was high on a different drug during those videos.

The defendant's coercion of Jane also involved other serious threats, including threats to release tapes of her having sex with escorts in hotel rooms, when she didn't behave the way the defendant wanted her to.

P6qWcom3                         Summation - Ms. Slavik

Again, here's Jane's text to K.K. telling K.K. that the defendant had threatened to release her sex tapes, where she's heavily drugged and just doing the things that he asked her to do, things that she's still trying to recover from.

Now, at this point you have seen multiple videos of these hotel nights.  They're some of the most private, intimate, embarrassing moments of Jane's life.  The defendant knows how powerful they are as leverage.  So the defendant, who had a library of videos and photos of Jane from those hotel nights, he threatened to expose her and send the sex tapes to her child's father.  This threat is another effort to control Jane, another effort to coerce her.

All of these factors, in combination, show the defendant's course of conduct that's meant to control, manipulate and coerce Jane into engaging in commercial sex acts.  These factors lurking in the background of their relationship meant that Jane couldn't say no to hotel nights without risking the rent payments, without risking violent outbursts, without risking the release of her sex tapes.

The defense has suggested several times that Jane agreed to these hotel nights, both in their opening statement and in cross-examination of Jane.  But let's talk about what agreeing means in the context of coercion.

At this point, you know what coercion is.  It's threatening physical or nonphysical harm, which, of course,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6qWcom3                          Summation - Ms. Slavik

includes reputational and financial harm, to compel someone to perform a commercial sex act to avoid incurring that harm. In other words, coercion means getting someone to agree to a commercial sex act because they're afraid of the consequences if they disagree.

So when the defense is suggesting that Jane agreed to hotel nights, it's an incomplete picture. You have to look at the full relationship. You have to look at the defendant love bombing her, lashing out at her, providing her with drugs, paying her rent and then threatening to stop paying her rent, making false promises to her, threatening to release her sex tapes. This is not an adult woman making a free choice, as the defense has suggested. It's a woman who's told the defendant that she doesn't want to do hotel nights but has relented to avoid any number of bad things happening to her.

Your Honor, at this time I'd like to ask that the public screens and the overflow room to be turned back on, and we'll switch to volume 2.

THE COURT:  All right.  Very good.

I'll ask the deputy to confirm when they're back on.

THE DEPUTY CLERK:  Yes, your Honor.

Confirmed.

MS. SLAVIK:  Let's turn to Cassie, because before Jane, there was Cassie. And we already talked about some of the defendant's criminal acts involving Cassie. But now we're

going to turn to the defendant's sex trafficking of Cassie. That's charged in Count Two and also part of the racketeering conspiracy.

You've heard the elements already, and just like with Jane, there's really no dispute as to the first or third elements of sex trafficking.

Just like with Jane, the defendant recruited and enticed Cassie into participating in freak-offs. He transported her across the country and internationally for the same reason. The defendant also maintained and harbored Cassie at residences he paid for and at hotels where freak-offs were held.

And there's also no serious dispute that freak-offs affected interstate commerce. Just like he did with Jane, the defendant flew Cassie and male escorts across the country to New York, L.A., Miami and other countries, like Turks and Spain, for freak-offs.

You've seen the communications exchanged between Cassie and others about setting up freak-offs. These included interstate calls and messages. And there were other goods that moved in interstate commerce at the freak-offs. That's the lubricant, baby oil, condoms, alcohol.

And finally, Cassie told you that she never did a freak-off without drugs. And if there are drugs, there's an effect on interstate commerce.

That means that the issue in dispute is whether the defendant knew or recklessly disregarded that force, fraud or coercion, or any combination of those means, would be used to cause Cassie to engage in freak-offs.

Now, remember that you don't have to find that all of those things were used. It can be any one of those illegal means alone, and it can be any combination of those illegal means.

So just like Jane, we're going to talk through a few specific incidents where it's crystal clear that all the elements of sex trafficking are met.

First, we'll talk about the freak-off at the InterContinental Hotel in March 2016.

Then we'll talk about a freak-off at Cassie's Manhattan apartment with an escort named Daniel Phillip around 2013.

And finally, we'll talk about a freak-off in 2012 after the Cannes Film Festival.

We're going to talk about all of these examples in just a few minutes, but you know from sitting through this trial that force and coercion that the defendant used against Cassie was not limited to a couple of days. We have to zoom out and look at her decade-long relationship with the defendant. And I'm going to do this in four parts.

First, we'll talk about the early relationship between

P6qWcom3                        Summation - Ms. Slavik

the defendant and Cassie.

Then we'll talk about the abuse.

We'll move to the end of their relationship.

And then we'll talk about the freak-offs.

We're going to talk about the freak-offs last, but just keep in mind that they were going on throughout the entire relationship, from the beginning to near the end.  Throughout all of the abuse that we're going to be talking about, freak-offs were taking place.  And as we talk about these aspects of their relationship, keep the elements of sex trafficking in mind.  In particular, remember what I said about coercion.  It can be proved if the defendant engaged in a scheme, plan or pattern intended to cause the victim to believe that if she didn't engage in a commercial sex act she would suffer serious harm.

Cassie Ventura and Sean Combs were in a relationship for about a decade and had an intense bond.  But as you heard many witnesses talk about, their relationship was not normal. Throughout the decade that they were together, the defendant regularly threatened and beat Cassie.  He plied her with drugs, and at some point she became reliant on them.  And while she was on drugs, the defendant forced and coerced her to perform sex with escorts in front of him.  Like with Jane, it became her job.  It became her shame.

When Cassie met the defendant, she was an unknown

19-year-old aspiring singer.  He was a 37-year-old established record executive at the top of the game.  The defendant signed Cassie to a ten-album deal with his record label, Bad Boy.  And Cassie put out her first album in August of 2006.  Not long after he signed Cassie to his label, the defendant made it clear that he wanted more.  They started spending time together, and then their relationship became sexual.

On a weekend getaway in Miami, the defendant took Cassie on a yacht and gave her ecstasy for the first time.  The drugs made Cassie feel euphoric and sexual.  During that trip, Cassie and the defendant had sex for the first time.  And after that trip, Cassie and the defendant were in a relationship.

Cassie told you about this time.  She said she couldn't say naïve enough to describe herself at the time.  She had just turned 21.

The defendant was her boss, a person who called all the shots and chose what was next for Cassie's career, a man almost 20 years older than her.  She described him as larger than life.  He was worldly.  He introduced her to drugs and taught her different ways to have sex.  The age difference, the power inequality, Cassie's naïveté, those dynamics drove the defendant's relationship with Cassie.  And that was intentional.

Remember, David James, the defendant's former assistant, overheard the defendant describe his relationship

P6qWcom3                          Summation - Ms. Slavik

with Cassie to a colleague.  The defendant said that he had Cassie right where he wanted her.  She was young, and here, on the slide, he remembers the defendant saying she was very moldable.  And that's exactly what the defendant did.  He molded her.

Capricorn told a story that really illustrates this.

The defendant told Capricorn, let me show you something, and he called Cassie into the room.  When Cassie got there, the defendant told her to sit down, stand up, turn around, turn the other way, walk over there, grab that, hand me that, walk back, turn around, go back to the other room.  And Cassie did exactly what he told her to do.  And that's exactly what he wanted from her -- total compliance.

You've heard it many times now.  The defendant didn't take no for an answer, and with Cassie, he thought he'd found someone who wouldn't even try.

The defendant's efforts to control Cassie defined their relationship.  He was abusive -- physical, emotional, psychological and sexual abuse.  The defendant doesn't deny the abuse.  They just want you to call it domestic violence and to believe that it has nothing to do with the crimes charged here. But that misses the point.

Just like the abuse lasted for the whole relationship, the defendant was having freak-offs with Cassie during the whole relationship.  The freak-offs happened before, after and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6qWcom3                              Summation - Ms. Slavik

sometimes during the defendant's violent episodes.  They were intertwined.  The cloud of the defendant's abuse was hanging over Cassie's head, always hovering.

Cassie described the defendant's control over her life as an all-around thing, from where she lived to what she looked like to what she worked on to who show spoke to.  Here, in the testimony, she said control was everything from the way that I looked to what I was working on that day to who I was speaking to.  It was an all-around thing.

The defendant controlled how Cassie looked.  He demanded that her nails be done a certain way, that her hair was done a certain way.  Multiple witnesses told you how the defendant had the final say on Cassie's clothes and look for music videos, red carpets and modeling shoots.

The Vanity Fair party in 2014 that Deonte Nash told you about is just one example.  In that story, the defendant grabbed Deonte by his jacket, lifted him up and shouted, I thought I fucking told y'all that she needed to wear her hair up.

Cassie's career was no different.  The defendant was in control.  He kept her occupied with busy work, spending hours and hours in the studio, recording songs that no one would listen to.  The defendant would check in constantly, calling or texting until he reached Cassie, and sending staff to find her if he couldn't.  But even though she recorded

P6qWcom3                        Summation - Ms. Slavik

hundreds of songs, the defendant never let her release another album. She was allowed to put out a mixed tape in 2013, but at the defendant's insistence, it was free. Despite her ten-album deal, the defendant wouldn't allow her to make money from her music.

She tried to make money other ways, through club hostings or modeling, but the defendant often wouldn't let her take those opportunities either.

Here, in this conversation, she's offered the opportunity to do a Common video. She can't do it because Puff said no to vid.

The defendant made it so that it didn't matter if Cassie was earning money through her music or not. He paid for her cars, clothing, phones and vacations. He made her dependent on him. And when he wanted to, he took those things away or had security take it away, do it for him. Cassie said that that happened all the time. And here's a message recounting one such incident.

After the defendant accused her of dancing with someone else, he took her phone. Then he took her laptops. Then he took her car and everything. And he did it to her family too. After the defendant found out about Cassie seeing Kid Cudi in December 2011, he demanded that Cassie's parents pay him back $20,000 that he had given Cassie earlier that month, or else he'd release sex tapes.

You heard Regina Ventura, Cassie's mother.  You heard her testify about that, and you saw it in the bank records that are here excerpted on the screen.  Cassie's parents had to take out a home equity line to pay the defendant.  That's the $20,000, the transaction that you see in the middle of the screen on December 23.

Meanwhile, in the defendant's bank account, just that month, $3.4 million came into it and $3.2 million went out of it.  That's the line at the top, the credits and debits.  And this was just one of the defendant's bank accounts.  He had several, as you heard.

This wasn't about the $20,000.  This was about control.

The defendant also paid for Cassie's homes and showed up unannounced.  She never knew when it would happen, and it left her stomach in knots.  And it's no wonder why.  Look at this text message between D-Roc and Cassie in January of 2017.  She tells D-Roc that the defendant had kicked down three of her doors.  She tells D-Roc:  He has my key so I'm leaving.  I do not feel safe.  Three of my doors are now broken.

Cassie asks D-Roc to take her house key away from the defendant, and D-Roc's response:  You know I can't take your keys from him.

Cassie never knew what to expect or who the defendant would be when he woke up that day.  Some days he was explosive

P6qWcom3                          Summation - Ms. Slavik

and violent.  This kept Cassie on uncertain footing and left her feeling trapped.

Now, remember what Dr. Hughes said about this.  When a victim is on unstable footing, they don't know how and when the abuser is going to abuse them.  They feel more trapped, and they can't get out of that dynamic.  But that's what the defendant wanted.  It gave him control.

Within the first year of their relationship, the defendant started physically abusing Cassie.  He punched her, kicked her, dragged her.  He left her with black eyes, bruises, busted lips.  When it was bad, the defendant hid her away in hotels until she healed enough that the injuries weren't noticeable, like the incident that we talked about earlier, when the defendant stomped on her face.

And you didn't just hear about the abuse from Cassie.

You saw text messages, photos, video.  And multiple witnesses at this trial saw firsthand the defendant physically abuse Cassie.  It wasn't a secret to anyone who was around the defendant and Cassie regularly.  People like D-Roc, Faheem, Rube, Paulie, they all saw it happen.  They saw the injuries.  Sometimes they even got ice.

We don't have time to talk about all of those violent incidents now.  There are too many.  Let's just touch upon some, and remember, throughout all of these years, throughout all of these incidents of violence that are listed on the

P6qWcom3                    Summation - Ms. Slavik

screen and that we'll walk through, the whole time the defendant was physically abusing Cassie, they were also having freak-offs.  That's why this is important.

In 2007 or 2008, the defendant hit Cassie after a dinner in New York City.  He hit her in the side of the head, causing her to fall to the floor of the car.  She was shocked.  She didn't understand what made him so angry.

In 2010, the defendant attacked Cassie twice after she went to a Prince party without checking with him.  He chased her out of the party and attacked her until Prince's security intervened.  Then at the hotel, where Cassie was staying, he attacked her again.  She ended up with a swollen eye, busted lip and knots on her head.  Both Mia and Mylah Morales told you about this incident as well.

Sometimes the defendant himself connected the physical abuse to the freak-offs.  In 2011, the defendant attacked Cassie after finding out that she was seeing Kid Cudi.  We talked about this.

Cassie also told you about this.  When she got to the house and went to talk to the defendant, he was irate.  He threatened to release the sex tapes, the tapes of her doing freak-offs.  He said he was going to hurt her and Kid Cudi.  We saw those messages.  And then, when she tried to leave, he kicked her, knocked her to the ground.  Capricorn told you about this too.  And her mom took a photo of the bruises.

P6qWcom3                        Summation - Ms. Slavik

In 2013, the defendant attacked Cassie in her apartment while she was with Mia and Deonte. Cassie, Mia and Deonte all told you about this incident. Cassie was sleeping and the defendant burst in, yelling. He threw her down, and her head smashed into the bed frame in her bedroom, resulting in the eyebrow. Mia and Deonte tried to stop him, but they threw him off, and he hurt them too.

Afterward, the defendant had D-Roc take Cassie to a plastic surgeon in Beverly Hills to sew her up. Around that same year, the defendant assaulted Cassie in Jamaica on vacation, giving her yet another black eye. You can see it in the photo on the right. The reason? Cassie was taking too long in the bathroom.

Kerry Morgan described what happened. She saw the defendant drag Cassie down the hallway by her hair while Cassie screamed. Kerry described the sound of Cassie's screams as guttural and terrifying. They got outside, and Kerry saw the defendant push Cassie to the ground, causing her to hit her head on a brick, knocking her out cold.

In 2015, in Las Vegas, the defendant beat up Cassie during a party he was throwing in his hotel suite. The defendant punched and kicked Cassie, who was curled up underneath the bathroom toilet. Remember, she told you that when D-Roc saw her, he started to cry. She told you about the injuries, the black eyes, the golf ball-sized knot, the busted

lip.

Finally, there was the defendant's shocking assault on Cassie during a freak-off at the InterContinental Hotel that was caught on tape. We're going to talk more about that later.

Any one of these attacks would have been terrifying, life-changing. But for Cassie, it became her normal. And because the defendant's violence was so unpredictable, so random, it was even more destabilizing. As Cassie told you, "make the wrong face, the next thing I know, I was getting hit in the face."

And in case all this violence against her wasn't enough, Cassie also saw and was told about the defendant attacking her friends. She was there when he attacked Mia, when he attacked Deonte. She was at her apartment when the defendant attacked Bana on her balcony. Bana may have gotten the day wrong, but you know that the attack happened. Cassie texted about it. She texted K.K. about it in 2016. You saw this screenshot, where Cassie describes the incident. And you saw the metadata showing you that K.K. took that screenshot in September 2016.

And Cassie was there when the defendant attacked Kerry Morgan by throwing a wooden hanger, like a boomerang, at Kerry's head. Both Kerry and Bana were seriously hurt. Kerry had a concussion and was vomiting, and Bana had injuries to her neck and legs.

P6qWcom3                          Summation - Ms. Slavik

Cassie also knew that the defendant had ready access to guns.  She saw them at his homes.  One time he made her carry his gun in her purse into a club.  She described the defendant using guns as a scare tactic.  And remember that incident at Mel's Diner that we talked about this morning?  Cassie was at the house that night.  She saw the defendant and D-Roc put on black clothes, cover their heads and grab guns from the defendant's safe to go confront Suge Knight.

The defense has asked during this trial why, if the violence was so bad, if Cassie was unhappy, why she didn't leave.

But you know why.

Dr. Hughes explained that when you're beat up or hit, the normal human emotion that arises is fear.  And it's very hard to take that away once you've been hit.  The victim starts walking on eggshells, trying not to do something to get hit.  Their resources are devoted to how to stay safe, not how to figure out how to get things in order to leave.

And of course, there were times that Cassie tried to leave.  But what happened?  When Cassie tried to run away or leave after the defendant was violent with her, the defendant or members of the defendant's inner circle went after her and brought her back.  You heard many examples of this too -- the example that we talked about earlier this morning, when Cassie tried to run away from the car after the defendant stomped on

P6qWcom3                    Summation - Ms. Slavik

her face.  Remember, it was Roger Bonds who went after her and brought her back to the house and then to the hotel.

Kerry Morgan and Cassie ran away from the defendant multiple times.  One time, after the defendant pushed, hit and kicked Cassie, Kerry begged Rube to intervene.  Rube refused.  Instead, Cassie and Kerry ran away, and Rube helped the defendant look for them.

Even when Cassie was a world away from the defendant, in South Africa, and had blocked the defendant from calling her, she couldn't get away.  K.K., the defendant's right hand, a member of his enterprise, did the defendant's bidding and pulled her back into the defendant's orbit.

The same thing happened to D-Roc.  Cassie thought that he was her friend.  But he wasn't.  D-Roc was loyal only to the defendant.  After the InterContinental incident in March 2016, D-Roc helped the defendant keep tabs on Cassie.  But months before that, in a text exchange, D-Roc was doing the same thing.  D-Roc says:  Cas is calling the studio looking for you.

The defendant says:  It's time for the ice.  What's Cassie doing?

You know what he's saying here.  D-Roc is responsible for making sure that Cassie is icing the injuries from the defendant's most recent attack.

D-Roc says:  I don't know what's going on but was just checking on her.

This is D-Roc playing both sides. He's telling Cassie one thing, acting like he's her friend, but reporting it back to the defendant at every step.

The defendant says: What she say?

D-Roc says: Cas was eating. She about to ice up. She kept asking for you, telling me she wants to go to the studio. I told her to chill out and you are feeling bad about what happened.

The defendant says: Stay on top of Cassie.

D-Roc says: I am. Talking to Cas. I just gave her an ice pack.

In case it wasn't clear what the ice pack was for, the defendant says: Does the eye look better? How is she holding up.

D-Roc responds that Rio and Justin saw her eye. We said a fight broke out in the club.

The defendant says: Why did she not have herself in hiding?

That right there speaks volumes. D-Roc is responsible for keeping Cassie hidden, to make sure that no one, not even people in the defendant's home, learned of the defendant's violence.

D-Roc says: It wasn't nobody here for a while. But she ain't tripping. She ain't tell nobody. I'm about to call you.

And there, in that message, D-Roc assures the defendant that he's got the situation under control, that Cassie won't tell anyone about the defendant's violence. This chat proves how D-Roc and the enterprise enabled and assisted the defendant's abuse.

One thing was clear. There was no safe space for Cassie. Everything that we discussed -- all the violence, the threats of violence, the other ways in which the defendant controlled Cassie, they were all part of the same pattern or scheme of coercion. The pattern lasted as long as their relationship did.

The end of their relationship was no different. The defendant demanded control until the very end.

In 2018, Cassie was finally able to permanently end the relationship. She learned the defendant's relationship with another woman, Gina, was still going on. And she started seeing her now-husband, which the defendant was furious about.

At the end of the summer, Cassie and the defendant met up for dinner in Malibu. They had a nice dinner. Things seemed good. Then, when the defendant brought Cassie back to her house, he came in and raped her on the living room floor. Cassie told you his eyes went black. She said no. She cried. But he didn't take no for an answer. He didn't stop.

And you know that she was telling the truth about that because the defendant essentially admitted it in the text

message.

The defendant followed up with Cassie afterwards.  The exhibit's here on the screen.  It's a text message from the defendant that says:  I know I look bad to you.  I could tell I didn't turn you on yesterday.  I fell off, but I'm about to get my shit together.

This is his way of saying I know I raped you.  He's downplaying it, but he knows what he did was wrong.  And what happened after shows you how powerful Cassie's trauma bond with the defendant was.  Like Jane, Cassie went back after the violence because of that bond.  Even after he raped her, she didn't hate him.  She saw him at a friend's birthday party, and she went to his house after and they had sex, consensually. Like she told you, they were still very connected.

I want to talk now about the freak-offs, the commercial acts underlying Count Two.

Remember that these did not occur in isolation.  The defendant wanted them all the time.  They were as regular as his abuse of Cassie.  And just like the abuse, the freak-offs started early in the relationship.  Freak-offs weren't something that the defendant and Cassie came up with together. The defendant had a set playbook, book a hotel room, hire an escort, set up the lights, drinks, towels, sheets, bring drugs, take drugs and then direct Cassie through an orchestrated, hourslong sexual performance with the escort while he

masturbated, watched and often filmed.

Sounds familiar?  Sounds just like the hotel nights that Jane endured.

Like Jane, Cassie agreed to the first freak-off but pretty quickly realized that it wasn't something she wanted to be doing.  Now, this shouldn't be a surprise, think about how she described them, hours and hours long, covered in baby oil, wearing uncomfortable outfits, sometimes when Cassie had her period and when she had UTIs.  Sometimes the defendant told the escorts to urinate on her, and sometimes he did too.  Why?  Because it was a turn-on for him -- and humiliating for her.  But she kept doing them for ten years.

Drugs were a big part of that.  The defendant gave Cassie drugs at every freak-off.  She took them and she performed.  She took drugs with the defendant not at freak-offs.  Eventually she became addicted and started using drugs on her own.  After never taking drugs before she was with the defendant, she ended up with a severe addiction.

Drugs weren't all of it, to be sure.

Cassie also told you that she did freak-offs because she was in love with the defendant and wanted to make him happy.  You've seen plenty of exhibits showing that Cassie told you that herself.  She also told you that over the course of her relationship with the defendant, there were hundreds of freak-offs.  And even if Cassie didn't want to do a freak-off,

there were times when she went along with it, or pretended to. You've seen messages like that, like this one. She says: I love our FO's, when we both want it.

I want to be clear. We're not asking you to find that every freak-off was an instance of sex trafficking. This is not an all-or-nothing situation. But there were many freak-offs that Cassie participated in because of the defendant's force, threats of force or coercion, and where the defendant knew that Cassie was only participating in those freak-offs because of his force, threats of force and coercion.

That conduct is illegal. That conduct is sex trafficking.

And of course, the defendant knew exactly what he was doing, because Cassie obviously didn't want to be having sex with strangers for days on end. She obviously didn't want to have sex with painful UTIs. She obviously didn't want an escort urinating in her mouth while she lay on the floor. And the defendant knew that. He was so sure that Cassie didn't want to do freak-offs that he held the sex tapes over her head as collateral. The freak-offs themselves became a way to coerce her into doing freak-offs.

You saw this email before. This is showing that the defendant threatened Cassie, threatened to release Cassie's sex tapes.

Before we get into some of the specific examples of

sex trafficking with Cassie, let's just pause for a moment and talk about the videos themselves.  You've seen clips of some of them, and some of them are in evidence.  And in them, you don't see weapons.  You don't see the defendant hitting Cassie.  Of course, he probably wouldn't hold onto a video like that.  You know about how much work he did to get rid of the InterContinental video.

You see Cassie chatting, masturbating, having sex.  She's following the defendant's directions, just like Jane did in Jane's videos.  She's performing, just like Jane.  Don't be fooled into thinking that it's anything more than that -- a performance.  If you look closely, you'll see that everything Cassie told you about freak-offs is true.  They're orchestrated.  They're directed.  The defendant is moving the camera around himself, at times focused on the escort and not on Cassie at all, very similar to the Jane videos.  It's clear that this was his fantasy, not Cassie's.

Like with Jane, there are a few specific examples where the evidence is crystal clear that the defendant caused Cassie to have sex with an escort by force, threats of force, coercion or some combination of those things.  Based on any of these incidents alone, the defendant is guilty of Count Two.  So let's walk through those examples.

We're going to start with the InterContinental Hotel.  The freak-off there took place on March 5, 2016.  You've seen a

P6qWcom3                        Summation - Ms. Slavik

lot of evidence about this incident.  Multiple witnesses testified about it.  You saw text messages, reports, photos and, of course, the video.  Because there's a lot to cover on this topic, I'm going to break it down into three parts -- before the freak-off, during the freak-off and when Cassie tries to leave in the middle of the freak-off.

So before this freak-off, Cassie was preparing for her first big movie premier.  This was an incredibly important moment for her.  So when the defendant texted Cassie two days before her premier, what you gonna do so I can plan the rest of my night, Cassie understood that the defendant was looking to have a freak-off.

She decided to play ball.  She was worried that the defendant would ruin her big night, and she thought if she gave him what he wanted, a freak-off, then maybe he wouldn't ruin it for her.  She said she was doing damage control.  You've seen the texts.  Cassie said:  Baby, I want to FO so bad, but I don't want to fuck myself up.  What am I to do?

And then the bottom text, she says:  We can have fun. I don't want you thinking I don't want to.

The defense has read this first message multiple times.  They're telling you that it shows that she was into freak-offs.  But of course, one message isn't the full story, and the defendant knows she doesn't want to.  He especially knows this later on when she tries to leave the freak-off.

Look at the second message and focus on the last part: I don't want you thinking I don't want to.  This part of the message is key.  Cassie knows what happens when she says no. She knows that the defendant won't take no for an answer.

From there, the defendant repeatedly asks her what she wants to do.  This a signal to her -- the freak-off is happening.  And then the defendant puts Cassie to work setting it up.  He gets the hotel room, but he tells her to call Garren -- that's the owner of Cowboys 4 Angels -- for an escort.  He tells her this four times.  You see it on the screen.  He's determined.

They end up bringing Jules to the hotel, one of the defendant's regular escorts.  And that brings us to during the freak-off.  There's a gap in the text and phone records, when you know that the freak-off is happening.  Jules, the defendant and Cassie are at the hotel.  And you know what happens.  An argument starts.  The defendant hits Cassie in the face.  All she can think about is her premier, so she decides to get out of there before the defendant can mess up her face even more.

(Media played)

MS. SLAVIK:  Cassie takes off so fast she doesn't even have time to put her shoes on.

(Media played)

MS. SLAVIK:  The defendant chases after Cassie.  As you can see, he didn't have time to get dressed.  He's naked,

in a towel, except for socks.

(Media played)

MS. SLAVIK:  He attacks her.  He throws her to the ground.  He kicks her repeatedly.  She doesn't fight back.

(Media played)

MS. SLAVIK:  And then the defendant tries to drag her back to the room, where Jules is waiting.

(Media played)

MS. SLAVIK:  Now, why is it relevant that the defendant is trying to drag her back to the room?

Because Jules is there.  Remember, there's a freak-off taking place.  Freak-offs have multiple sessions, and remember, Cassie said that at this particular freak-off, they were between sessions.  The defendant's not going to let her go. The freak-off's not over.

(Media played)

MS. SLAVIK:  As she wriggles away from his grip, the defendant makes a decision.  He leaves her, but he takes her bags.  He knows that she can't leave without her things.  But as he walks down the hallway, he looks back.  He was expecting her to follow him.  He's surprised that she's not.

(Media played)

MS. SLAVIK:  The defendant is making a conscious decision at this time.  He comes back for Cassie.  He tries to get her back to the room.  But Cassie won't do it.  Instead,

P6qWcom3                        Summation - Ms. Slavik

she's using the phone in the elevator lobby.

(Media played)

MS. SLAVIK:  The defendant's making another conscious decision here.  He decides to bring the bags back to the room and come back for Cassie with his hands free.

(Media played)

MS. SLAVIK:  When he comes back for her for a third time, he makes another decision.  He grabs Cassie's phone out of her hands.  He knows that she can't leave without her phone. But now that Cassie's called for security, the defendant has to make another decision.  Does he drag her back to the room?

If he does that, security could see him dragging her down the hallway, and they could call the cops.  Or they could come into the room, and they could see Jules.  But if he leaves Cassie in the lobby, then there's no chance that Cassie will go back to the room and finish the freak-off.  And if he leaves Cassie alone, he can't control what she'll say to security.  He knows she won't do anything if he's there.  So he makes the decision to stay.  Even though he's in a towel and looks ridiculous, he makes the decision to stay there with Cassie. He's mad that she ruined the freak-off, so he throws the vase at her.

(Media played)

MS. SLAVIK:  But as soon as Israel Florez shows up, the defendant switches into damage control mode.  He stays

calm.  He speaks to Officer Florez.  Looks like he's even making Officer Florez laugh.  He tells Cassie that she can't leave, and he stalls in the hallway.  Watch this.

(Media played)

MS. SLAVIK:  He knows that Jules is still in the room, possibly naked, so he stalls in the hallway.  He's in total control of himself.

(Media played)

MS. SLAVIK:  In their opening statement, the defense told you that the defendant had taken bad drugs that day.  But you can see it with your own eyes.  The defendant isn't out of his mind on drugs.  He's in complete control, and he's still trying to get what he wants.  He wants Cassie to come back to the freak-off, and he doesn't want Officer Florez to see Jules.

So when they get to the room, the defendant tried to close the door, such that Cassie would be shut in the room, and Officer Florez doesn't see Jules.  This is a man in control of himself.

But it didn't work.  Officer Florez stuck his foot in the door, and it wouldn't close.  Cassie just wanted to get her bag and phone and leave.  So Officer Florez helped her do that. Officer Florez saw Jules.  Cassie left and the defendant offered Officer Florez that stack of cash, that attempted bribe.  We talked about that.

Cassie managed to get out of the hotel and back to her

P6qWcom3                        Summation - Ms. Slavik

apartment.  And look at the photo.  This is her in the back of the car on her way back to her apartment.  She's covering her black eye with sunglasses, but you can see her swollen lip. And from there, the defendant enlisted K.K. and D-Roc to help with damage control.  We've talked about that too.

But of course, the defendant stayed focused on Cassie. He needed to keep her under control, and he was livid that she had disobeyed him and dared to call for help.  He showed up at her apartment, banging on the door with a hammer.  Even when she left, she couldn't get away.

This incident should leave no doubt in your mind that the defendant committed trafficking.  When he chased Cassie, beat her and tried to drag her back to the hotel room, where an escort was waiting, he was using force to cause Cassie to continue engaging in the freak-off, a commercial sex act.  And at every step, he was in complete control of himself -- angry, but in control.  He knew exactly what he was doing.  That is sex trafficking.

It doesn't matter that Officer Florez kept the freak-off from continuing.  It doesn't matter that Cassie managed to get away and avoided having sex with Jules.  The law does not require that a commercial sex act actually take place. What matters is that the defendant was knowingly using force and coercion to get Cassie back to that room where the escort was waiting.  That is sex trafficking.

Like they did in opening statements, the defense may tell you that the violence was not connected to the sex. But that's wrong too. The defendant was dragging her back to the hotel room, where an escort was waiting, so that they could finish the freak-off that the defendant wanted. Besides, the sex trafficking statute doesn't require that force be used during the commercial sex act. This is what happened when Cassie said no, this video. She was hit in the face, thrown to the ground, kicked and dragged back by the defendant.

Cassie couldn't forget this, and she didn't. Days later, she reminded the defendant. This was on March 10, five days after the incident: When you get fucked up the wrong way, you always want to show me that you have the power and you knock me around. I'm not a rag doll. I'm someone's child.

The InterContinental wasn't the only time that the defendant was violent with Cassie during a freak-off. You heard about two more in Manhattan, involving the escort Daniel Phillip, who testified during the trial.

I'm going to focus on one of those two freak-offs. Again, the sex trafficking statute doesn't require that force be used during the commercial sex act, but that's what you have in both of these situations.

Between approximately 2012 and 2014, the defendant paid Daniel Phillip to have sex with Cassie during freak-offs in New York City, usually in hotels, but sometimes at Cassie's

apartment on the Upper West Side of Manhattan.  He testified that each time he had a freak-off with the defendant and Cassie, he was paid between 700 and $6,000.  He was not paid for his time.

I'm going to spend no more than ten seconds on this ridiculous argument, because you know why Daniel and all of the other escorts were paid.  They were paid for sex.  So every time they had sex with Cassie in front of the defendant, that's a commercial sex act.

At one of these freak-offs, in Cassie's apartment, Daniel and Cassie were in the living room between sessions. The defendant told Cassie to come to him in the bedroom. Cassie was on her computer, and she told the defendant that she needed a minute.  The next thing that Daniel saw was a liquor bottle fly past Cassie's head and hit a wall.  Then the defendant stormed out of the bedroom, grabbed Cassie by the hair and started dragging her back by her hair into the bedroom.

Daniel heard what sounded like slapping while Cassie screamed, I'm sorry, I'm sorry.  And the defendant told her: Bitch, when I tell you to come here, you come now, not later.

The defendant said this to Cassie four years before the InterContinental incident.  He's training her to obey him.

And when Cassie and the defendant came out of the bedroom, Daniel said that Cassie looked afraid, upset.  He

P6qWcom3                          Summation - Ms. Slavik

testified that Cassie didn't look like she wanted to continue the freak-off.  But the defendant didn't care.  He was ready for another session.  The defendant told Daniel and Cassie: Y'all ready to continue now.  He meant that Daniel should start having sex with Cassie again.

Members of the jury, there's no question about this. This is coercion.

The force and the coercion worked in this instance. Cassie started to initiate the defendant's usual routine for every freak-off.  She started touching Daniel, which usually led to rubbing with baby oil and usually led to sex.  What the defendant couldn't control, though, was Daniel.  He couldn't perform.  The defendant cut the freak-off short.  And again, it doesn't matter that the freak-off was cut short.  The defendant knew what he was doing when he told Cassie and Daniel to continue.  He was demanding that Cassie have sex with a paid escort.  That's sex trafficking.

There's one more example that I want to talk about.

This one started when the defendant kicked Cassie off his boat in Cannes, France, and then threatened her on their flight back to New York.  It ended with a freak-off in New York.

Cassie and the defendant were in Cannes for the film festival.  You can see Cassie on the red carpet here.  She looks happy, radiant.  The picture doesn't tell the full story,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

though.  The night before, Cassie and the defendant got in a fight after the defendant accused her of stealing his drugs. He kicked her off the boat that they were staying on without anything, without her shoes, without her passport.

Mia remembered that Cassie had injuries from this fight.  And she also remembered that Cassie had made an audio recording.  Mia listened to that.  She recognized the voices of both Cassie and the defendant.  In this audio recording, she remembered Cassie sounding panicked, and she remembered the defendant sounding very angry.  She heard the sound of someone being hit in this recording.

Cassie and the defendant still went to the movie premier together, but in the theater, the defendant grabbed Cassie's leg, squeezing her beaded dress into her thigh as tightly as he could.  And Mia remembered this too.  She saw the defendant digging his nails into Cassie's arm at the premier and clenching his teeth as he spoke to her.

After the premier, Cassie and the defendant flew back to New York City.  Cassie didn't want to sit with the defendant, so she traded seats with someone else on the plane. But he traded his own seat so he could sit next to her.  And in case it wasn't totally clear to Cassie yet that the defendant had the power, he spent the entire flight holding Cassie captive and making her watch videos that he had recorded of freak-offs and threatening to release them.

P6qWcom3                        Summation - Ms. Slavik

Cassie told you how she felt.  She said she couldn't have felt worse.  She felt scared.  She felt trapped.

It's no surprise that when the plane landed in New York, the defendant demanded a freak-off.  Cassie complied.  She didn't believe that she had a choice.  He had just threatened her about blackmail tapes, some of the most humiliating moments of her life.  And he had proven to her that he had them at his fingerprints.  They were on the laptop that he had on the plane.  Those tapes would have done serious damage to Cassie's career, and they would have caused her huge personal harm.

This is another example of clear-cut coercion.

Remember, serious harm includes nonphysical harm, including reputational harm.  And here, the defendant had spent days making it so that Cassie couldn't do anything but go along with what he wanted.  He threw her off the boat in a foreign country without a passport.  He threatened her physical safety inside a crowded movie theater, and then he played blackmail tapes of her on an airplane, threatening to release them.  All of this was designed to do one thing -- to make Cassie afraid to say no to him.

These three examples are far from the only times that you know that Cassie was forced or coerced into a freak-off.  You've heard weeks worth of testimony proving to you just how little agency, how little control Cassie had.  You should

consider that full picture of the defendant's coercive scheme in looking at the freak-offs that you heard about. His violence, his threats -- it was all intended to cause Cassie to believe at various points in her relationship that failure to perform freak-offs or do whatever else the defendant demanded would result in serious harm. The defendant created a climate of fear that can't be isolated to one moment in time.

Dr. Hughes also told you about how this works. The abuse doesn't have to happen all the time for that link to be forged. Once someone has shown us not only the ability but the willingness to use violence, your brain doesn't forget. That's what Dr. Hughes said.

Cassie repeatedly told you that the defendant's violence was in the back of her mind whenever he proposed a freak-off. The whole point was to control Cassie, to make her afraid to say no to the defendant. And it worked.

Cassie told you that she continued to engage in freak-offs with the defendant because she didn't feel like she had much of a choice. In her words, she said: I didn't really know what no would be or what no could turn into.

You know what this means. She was afraid of his violence.

She said this repeatedly. She said that she didn't want to make the defendant angry, because when he was angry, he would be violent. When he was upset the defendant would be a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6qWcom3                         Summation - Ms. Slavik

scary person.  He could be violent.  She said:  His temper, if it's something that he wanted, Sean wanted to happen, that's what was going to happen.  There wasn't another way around it.

In their opening statement, the defense emphasized that Cassie made a choice every single day for years to stay with the defendant, that it was a voluntary, adult choice; in other words, that she could have said no to the relationship, that she could have said no to the freak-offs.

But let's step back.

Imagine what it would be like to have the person closest to you hit you, throw you to the ground, kick you, drag you by your hair, all at seemingly random times -- for saying the wrong thing, for not answering the phone quickly enough, for taking too long in the bathroom.

(Continued on next page)

MS. SLAVIK:  (Continued)

Imagine that this person is much bigger and stronger than you are, twice your age, and your body size.  Imagine the terror of never knowing when the next hit might come, not knowing what might set that person off.  Now imagine trying to say no to that person.  The possibility of getting hit was constantly in the back of Cassie's mind.  This was the force.

So were the threats.  This was parts of the coercion as well.

Here in this text message, Cassie is telling the defendant about the threat he made to release her video.  She says, and, "Oh, and you know what sick and disgusting shit I was reminded of the other day?  You forcing me to tell my mom about a threesome or you were going to leak some FO shit."

Cassie's testimony confirmed that.  She said, "I mean, the leverage of having an incriminating or derogatory humiliating video of somebody, telling them that they're going to release it if you don't behave the way they want you to or whatever the case may be, it was just always like that, it was a big part of our relationship."

The other part of the coercion was the drugs.  Just like with Jane, the drugs the defendant gave Cassie for freak-offs were an important part of the coercive scheme.  For Cassie, drugs were dissociative and numbing.  She needed them because she couldn't imagine herself doing it without them.

P6QQcom4                         Summation - Ms. Slavik

She needed that buffer.

Together with the control the defendant exercised over so many aspects of Cassie's life:  Her livelihood, her appearance, her home, the defendant's coercive schemes ran through every part of Cassie's life.  It made it so that Cassie believed that she would suffer serious harm if she didn't do what the defendant wanted her to.

During this trial, the defense has pointed to Cassie's text messages to say that the defendant couldn't possibly have known that Cassie didn't want to participate in freak-offs, in part because of texts where Cassie seems excited for freak-offs or engages in explicit messages with the defendant, and in part in others because she doesn't affirmatively say no.

You've seen enough now to know that that's not true.  Your common sense and common experiences tell you that in any long-term relationship, there's subtleties in how partners communicate.  Cassie talked about this too.

So looking only at the texts without any context, without considering the circumstances in which they were sent, that only tells part of the story.  And yes, some of the messages are explicit.  They're between Cassie and a person that she loved.  Cassie was clear in her testimony that there was one part of the freak-offs that she liked - getting to spend time with the defendant.  There was one person that she wanted to have sex with at this time:  Her boyfriend, the

defendant.

You heard the exact same thing from Jane.  So sending explicit messages to her boyfriend, that doesn't mean that Cassie wanted to have sex with escorts at freak-offs, and it doesn't mean that her boyfriend didn't understand that she didn't want to.

Cassie also engaged in explicit messages with the defendant because that's what he wanted her to do.  All the way back in 2009 in this message, he says, "You're supposed to be seducing me all day."  He told her this throughout the relationship.

So what did Cassie do?  She talked about the freak-offs and the things she knew would turn on the defendant because she knew that when he was happy, she was safe.

And Cassie did tell the defendant that she didn't want to do freak-offs at various points during their relationship. She told you, she said, "I brought it up, but gently.  I said it more than once, more than a handful of times."

She said that she told the defendant more than once prior to July 15, 2013 that she didn't want to do freak-offs.

And take her 29th birthday as just an example.  Cassie Deonte, Bana, they all testified about this night.  After the defendant let her know that he wanted an freak-off on her 29th birthday, Cassie told him that she didn't want to.  It was her birthday, and she wanted to stay out with her friends.

She told her friends the same thing.  She said, the defendant had already let me know that he wanted to have a freak-off, "And I was like, okay, not right now.  Like I really want to celebrate my birthday.  I told him that I wanted to stay out and celebrate with my friends."

Deonte told you how Cassie said that the defendant was angry because she did not want to go to the hotel and freak-off with him.

And what happened?  Despite saying no, despite not wanting to do it, Cassie left her own birthday party with the defendant for a freak-off.  That right there is another clear-cut example of sex trafficking.  The point was if the defendant wanted a freak-off, it was going to happen.

You know why by now.  He didn't take no for an answer.

Like Cassie said, if that is something that he wanted, Sean wanted to happen, that's what was going to happen.  There wasn't another way around it.

It all comes down to this:  What choice did Cassie have in the end?  Through the entire context of the relationship, Cassie did not have the freedom to make voluntary adult choices the defense told you about.  She told you in excruciating detail how her relationship with the defendant robbed her of her self-confidence and her self-worth and how the freak-offs took her agency and her autonomy.  You've seen the video of the defendant dragging Cassie Ventura back to the

Intercontinental Hotel room.  Imagine living that.

Going back to Count One briefly, this is the pattern of racketeering activity that the defendant agreed to involved sex trafficking.  Now only the defendant was in the hotel rooms with Cassie and Jane and the escorts, but just like with everything else, he didn't do it alone.

He needed help getting drugs for the freak-off, getting cash to pay the escorts, and he needed help keeping Cassie and Jane in line.  For those things, he turned again to his most loyal lieutenants like KK, D-Roc, and Faheem.  Maybe they didn't like it.  Maybe they weren't happy about it.  But they helped him carry it out anyway, knowing full well that what they were doing was wrong.

Let's look at some of the examples of how members of the defendant's inner circle facilitated the defendant's sex trafficking.  KK got strange men access to rooms that the defendant and his girlfriends were sharing at all hours of the night.

This is summary Government Exhibit 1411 that shows one of the defendant's assistants seeking access for Clayton Howard.  Remember, that's an escort that the defendant and Cassie called Dave.  Clayton Howard needs access to the hotel room.  And KK saw what the defendant's girlfriends were doing in these hotel rooms.  Remember, KK saw that video of Jane having sex with an escort that somehow wound up on a staff

P6QQcom4                         Summation - Ms. Slavik

iPad.  You heard Jonathan Perez, one of the defendant's former assistants, testify about that.  So she knew that freak-offs or wild king nights, as she called them, involved the defendant's girlfriends having sex with escorts.  KK knew that what was happening in those videos was wrong.

But she did damage control.  She interrogated Jonathan Perez about it.  And you know who else knew about that video that Jonathan Perez saw?  Faheem.  He mentioned it to Jonathan Perez later.  Of course Faheem knew.  He was in the inner circle.  He was part of the need-to-know.

Faheem also bought drugs -- Faheem also brought drugs that the defendant needed for freak-offs.  Sometimes he got it to the defendant in advance.  Sometimes he got them to the defendant after, and sometimes he got them to the defendant during the freak-off when the defendant needed drugs between sessions.

And at least for KK, she knew explicitly that Jane didn't want to do hotel nights.  Remember this message after the defendant threatened to release Jane's sex tapes.  Jane texted KK.  She told KK that she was heavily drugged and "doing things he asked of me the past three years that I'm currently recovering from."  This was in December of 2023.  But even after receiving that text, KK kept setting up hotel nights for the defendant.  This is again an excerpt from the chart at Government Exhibit 1411, and it shows that on February 18,

P6QQcom4                          Summation - Ms. Slavik

2024, two months after Jane texted KK, KK here is telling Brendan Paul to bring king stuff.  The next week she instructed Brendan to send wild king stuff to Jane.

And as for D-Roc, there's absolutely no doubt that he's involved in the defendant's pattern of coercion.  He took away Cassie's phone, computers, cars.  He brought Cassie back to the defendant after the defendant assaulted her.  He took her to the plastic surgeon when the defendant split her eyebrow.  He brought Cassie back to his house after the Intercontinental.  He saw the Intercontinental video.  He iced Cassie's black eye.

Given how close D-Roc was with the defendant and how intimately involved he was in the defendant's relationship with Cassie, it would be absurd to think he didn't know what Cassie and the defendant were doing for days at a time over and over again.  Of course, he knew.

I expect that the defense is going to tell you these members of the defendant's inner circle couldn't have known that the defendant was sex trafficking because the defendant made efforts to hide what was happening in hotel rooms.

But it wasn't a very well-kept secret.  They knew about all the people outside the inner circle who saw random men in these hotel rooms with the defendant and his girlfriends.

David James saw a naked stranger, completely naked

P6QQcom4                         Summation - Ms. Slavik

about five-eight, long hair, large endowment, and he had a condom on.

Deonte Nash saw a stranger knocking on Puff and Cassie's door.  Someone opened the door, and he went in.

And Jonathan Perez saw Jane and another man engaging in sexual activity while the defendant looked on, in the video that was on the staff iPad.

If all of these people figured it out, it defies logic to think that the members of the defendant's inner circle, his most trusted lieutenants, were totally in the dark.  They weren't.  They knew what was happening, and they helped him do it.

Moving on to the next count:  Interstate transportation for prostitution.  Those are the charges in Counts Three and Five.

To engage in freak-offs, or hotel nights, we know now the defendant paid escorts.  You heard both Cassie and Jane testify that after every freak-off or hotel night, the escorts were paid with the defendant's money, usually thousands of dollars.  On top of that, the defendant caused interstate and international travel for the freak-offs and the hotel nights. The defendant himself often arranged and paid for travel for these escorts.  And throughout their relationship, Jane consistently traveled at the defendant's request to meet the defendant and the escort for hotel nights.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

This conduct violates federal law.  It forms the basis of one of the categories of racketeering activity charged in Count One, and the defendant is separately charged for this conduct in Counts Three and Five.

I want to be clear, although the transportation counts also relate to the freak-offs and hotel nights, these counts are totally separate from the sex trafficking counts.  The law at issue here simply addresses transporting people across state lines or internationally for the purposes of prostitution; in other words, this charge does not require force, fraud or coercion.  So even if all the participants enthusiastically consented here, which for the reasons that we've been talking about we know that that's not the case, it doesn't matter. It's still a crime.

To prove the defendant guilty of transporting an individual for the purpose of prostitution, the government has to prove two elements:  First, that the defendant knowingly transported an individual in interstate or foreign commerce. Here, it's not necessary that the defendant personally transported the individual.  To meet this element, the defendant could have simply purchased or caused the purchased of tickets or accommodations.

And, second, that the defendant intended that that individual would engage in an act of prostitution.

Prostitution means engaging in sexual activity for

P6QQcom4                    Summation - Ms. Slavik

money.  So a freak-off, where a male escort is paid for sex, is an act of prostitution.

Now, keep in mind that, as I expect the Judge will instruct you, the government doesn't need to prove that engaging in acts of prostitution was the defendant's sole purpose in transporting an individual across state lines.  It just has to be a significant or motivating purpose.

Like we talked about earlier with sex trafficking, you've heard about many instances when the defendant flew in escorts from across the country so that he could pay them to watch them have sex in front of him.  Each and every one of the times he did that is a violation of this statute.  I expect the Judge will instruct you though that to find the defendant guilty, you must agree as to the particular instance where all of the elements of the crime were met, not necessarily on the exact date or how the defendant caused the person to be transported on that occasion, but you must agree that the elements were met as to the same instance.

So let's start with Count Three.  The defendant is charged in Count Three with interstate transportation for the purpose of prostitution related to freak-offs involving Cassie. Now, Cassie told you about escorts traveling for the purpose of freak-offs.  The escort's travel was paid for by the defendant and often booked by a travel agent who worked for the defendant's company.  Cassie talked about having conversations

P6QQcom4                      Summation - Ms. Slavik

with the defendant about flying escorts in for freak-offs.  She said, "He would ask me, like, what we were doing, if we're flying somebody in, who's available, who's available. And from there talk about how to get them there if they weren't in the town or if they weren't in the city."

She also told you that it was at the direction of the defendant that the transportation was settled.  She specifically remembered using an escort that they called Dave.  This is Clayton Howard.  Cassie remembered that Clayton Howard would travel from New York City to Miami and Los Angeles for freak-offs.  One escort even traveled to Ibiza for a freak-off with the defendant and Cassie.

And the records show multiple examples.  Special Agent Penland walked you through several examples in one of the summary charts.  That's at Government Exhibit 14002.  I want to talk to you about a couple of examples.

From Government Exhibit 1402, line 2, this is about a freak-off that took place on August 26 through 28 of 2009 in New York City at the London Hotel with an escort named Jules Theodore.  Now, you know who Jules is.  He was a regular escort.  He was the escort at the Intercontinental.  This was someone that the defendant regularly paid for sex.

And you can see here that the defendant personally coordinated with Jules about travel.  Here, the defendant is asking for Jules' name for the ticket, and then giving Jules

P6QQcom4                        Summation - Ms. Slavik

the flight detail.  And you can see here, the defendant's American Express statement shows that he in fact paid for Jules' travel from Los Angeles to New York City.  The defendant's Amex statement shows that he had a car take Jules from the airport to the London Hotel.  That's the second line.  And then finally, the defendant's Amex shows the $2,000 bill from the London Hotel in Manhattan.

Now, the only reason to fly in Jules Theodore to New York City was so that Jules would be paid to participate in a freak-off; in other words, for the purpose of prostitution.  And in case it wasn't totally clear, look at the defendant's text messages to Jules.

First the defendant says, "And FYI because it's so last minute.  If you can make it happen, the tip will reflect that.  Just let me know.  Thanks.  And sorry for the late notice."

So clearly the defendant is planning to pay Jules.  That's what he means by "the tip."  And for what?  For sex.  When the defendant says, "20 minutes, come to room 4901," there's no other conclusion to draw.

This example shows you that the defendant directly coordinated with Jules to arrange his travel, pay for his travel, and then pay Jules to have sex with Cassie while he watched and masturbated.  For this incident alone, the defendant is guilty of Count Three.  But you have more.

Here is another example, also involving Jules Theodore, just a few months later. This is Government Exhibit 1402, line 3 relating to a freak-off that took place December 11 through 13, 2009, again at the London Hotel. Again, the defendant reaches out directly to Jules to tell him that the party is going to start on Saturday morning at 7:00 a.m. so he should take a flight on Friday. And the defendant sends Jules an itinerary showing that he'd be taken to the London Hotel in Manhattan. And, again, the defendant's American Express statement shows that he paid for Jules to travel from Los Angeles to New York City, and the charge to the defendant's American Express, the London Hotel are exactly the dates of Jules' travel. This is another example of the defendant paying for an escort to travel across state lines for the purpose of a freak-off. The defendant is guilty of Count Three.

If you want to see more, there are plenty more examples. Just look at the chart on 1402.

Let's look at line 46. This involves Clayton Howard, another regular escort that the defendant paid for freak-offs. This Amex record shows that the defendant paid for Clayton's flight from New York City to Los Angeles from September 15, 2014 to September 17, 2014, the exact same time that the defendant paid for a hotel stay at the Four Seasons. You know from Cassie the only reason to meet Clayton Howard at a hotel

P6QQcom4                        Summation - Ms. Slavik

room was for a freak-off.

Let's look at one more example for Cassie, line 64. This is another entry reflecting travel for Clayton Howard. It shows he traveled from New York City to Miami in the middle of the defendant's stay at the 1 Hotel. And this record shows that the day after Clayton's travels to Miami, he deposits $3,000 into his bank account, the proceeds of the money that the defendant paid him for a freak-off.

All of the examples that I just went over showed the defendant caused commercial sex workers to travel across state lines for freak-offs. The defendant is guilty of Count Three based on any single one of these instances.

Let's move to Count Five. This relates to Jane. For the defendant's hotel nights with Jane, there are also many examples of the defendant transporting escorts or arranging for Jane to coordinate travel with escort across state lines for the purpose of engaging in acts of prostitution.

Jane told you about escorts traveling for the purpose of hotel nights. Like with Cassie, the escort's travel was paid for by the defendant and often booked by Jess Ruiz. That's the defendant's travel agent.

For instance, Kabrale. Kabrale participated in hotel nights in Los Angeles, Miami, and New York City, each time traveling from Atlanta. Jane and the defendant even referred to Kabrale as ATL. They knew that's where he was coming from

P6QQcom4                    Summation - Ms. Slavik

every time that they flew him in.  Kabrale was paid several thousand dollars after he had sex with Jane during hotel nights; in other words, an act of prostitution.  And sometimes Jane booked Kabrale's flights and was later reimbursed by the defendant.  Sometimes the defendant's travel agent, Jess Ruiz, booked Kabrale flights.  You saw that in detail in the charts, another summary chart at Government Exhibit 1407.

In one example, from November 9, 2021, the defendant had Jessica Ruiz book Kabrale's travel to Miami.  And you saw in the financial chart at Government Exhibit 1409 for September 4, 2023, the defendant paid for Kabrale to fly from Atlanta to Florida.  This is the defendant causing Kabrale's travel for the purpose of commercial sex.

Paul Arthur is another example.  Jane testified that Paul Arthur also traveled for hotel nights and was then paid for sex.  As just one example, the defendant had Paul fly into Turks in March 2023.  Here are text messages showing that.

The defendant says, "Damn, we on the way to Turks."

Paul says, "I can be out there by Friday."

The defendant responds, "Let me know how to make that happen."

This is in March 2023.

And then at the end of that trip -- the previous messages were from March 16, three days later, the defendant asks Paul, "How you want me to handle payment?"  He says,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

"Thanks again for coming over last night."  It had been -- excuse me, this is from Jane the following message, but from the same date as the defendant's message to Paul.  Jane says, "Thanks again for coming over last night.  It had been 24 hours with no breaks for me, and at first I was going with the flow for the second linkup, but I had warned him that I just felt overwhelmed to over perform a moment I'd never done before."

So this message from Jane shows you coercion, but the message from the defendant shows you that he orchestrated and paid for Paul's travel to Turks for the purpose of a hotel night.

Let's look at a couple of other specific examples where escorts and Jane travel.  Special Agent Cerciello walked through multiple hotel nights in one of the other summary exhibits, Government Exhibit 1406, and you should refer to that chart.  It has a lot of information in it.

Here is one entry.  This is reflecting a hotel night in January 2023 at the London Hotel in Los Angeles.  This was a hotel night that involved at least three escorts:  Paul, the guy we just saw on the last screen; Reggie, from the Cowboys4Angels escort service; and Kabrale.  As you can see from this hotel night, all three escorts traveled.

But I want to just focus on Reggie's travel.  Here, the defendant coordinates with the owner of the Cowboys4Angels about booking the escort named Reggie.  After he learns that

P6QQcom4                          Summation - Ms. Slavik

Reggie had a client earlier that day, the defendant says, "Damn, we don't want a tired situation."

Bridget, the owner of Cowboys4Angels, assured the defendant that Reggie is never tired and makes it clear to the defendant that Reggie is flying from Las Vegas to Los Angeles. The defendant books Reggie and tells him to go the London Hotel.

And here, the defendant texts Jane saying that he sent her $15,000. And then Jane texts the defendant showing him that she sent $1,100 to Cowboys4Angels via Cash App. This is the hotel folio for that stay. The defendant incurred a damaged furniture fee of almost $4,000, and the hotel cleaning staff found bodily fluid stains on the floor.

Here, it couldn't be clearer that the defendant is paying Reggie to fly to Los Angeles for the purpose of paying him for sex. For this act the defendant is guilty of Count Five.

But there's more. This is the hotel night in New York City that we already talked about, the one where the defendant tricked Jane into coming. This is a different time that the defendant caused someone to travel interstate for the purpose of prostitution.

Here, Jane tells the defendant that she doesn't want to come to New York. The previous messages she had been talking to Jess Ruiz, the defendant's travel agent, about

P6QQcom4                        Summation - Ms. Slavik

booking that travel, but, of course, as you know, the defendant and Jane got into an argument, and Jane told defendant she didn't want to do a hotel night.  As you know, she ends up coming to New York because the defendant tricks her, and at this point you know exactly how that happened.

And then when Jane didn't like the Cowboy that the defendant booked for her as a surprise, she made it up to the defendant.  At the defendant's behest, she booked Kabrale's flight from Atlanta to New York when she was right there in the hotel room with the defendant.  He reimburses her for it afterwards with a wire transfer.  So the defendant the transported Kabrale across state lines for this commercial sex in Manhattan.  This is another way that he's guilty of Count Five.

Stepping back for a moment though, transportation for prostitution is also charged as a racketeering act here in Count One, so is the separate crime of inducement for the purposes of prosecution.  That just means that members of the Combs Enterprise agreed that the transportation for prostitution or inducement for travel for prostitution would be committed as part of the racketeering conspiracy.

We've already gone over the elements for transportation for the purpose of prostitution, so let's talk about the elements for inducement to travel.  It's similar to transportation.  The conspirator has to persuade, induce, or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

coerce an individual to travel in interstate or foreign commerce with the intent that the individual would engage in prostitution, and the individual must have actually traveled. The same evidence applies to both of these categories of racketeering activity.

And here, there is so much evidence that KK knew that commercial sex or acts of prostitution were taking place during freak-offs or hotel nights or, as she called them, wild king nights. We just talked about some of that evidence.

So every time she helped the defendant coordinate travel for a girlfriend or an escort, she was agreeing that these crimes would be committed. She may not have liked it, and in fact at times it seems like KK was disapproving. But that doesn't matter. She knew exactly what was happening, and like with everything else she did for the defendant, she made sure that he had everything he needed.

Jane testified that she traveled to hotel nights with the defendant by plane, and she talked to KK and Jess Ruiz about arranging that travel. She also talked to KK and Jess Ruiz for arranging other travel.

In this specific example, KK set up travel for a wild king night in Las Vegas with the defendant. The defendant tells KK that Jane will be going to Las Vegas with him.

Listen to what the defendant tells KK to set up for.

(Audio played)

MS. SLAVIK:  The sexiest, most unapologetic wild king sex room in Las Vegas.

KK's response is telling.  She asks him, "Is Paul coming to Vegas too?"  She knows exactly what the purpose of this trip is.  She knows that Paul is an escort, and she knows that when the defendant is having a wild king night with Jane, an escort will be there too.

There are plenty of other texts from KK.  You saw her texting about Paul coming up to a hotel room for a different wild king night in 2021.  You saw Dave Shirley texting her about Clayton Howard accessing a hotel room for a freak-off with Cassie.  Here, again in the summary exhibit, she helped Kabrale book his travel in November of 2009.  And the defendant routinely asks her for thousands of dollars in cash during these hotel nights.  KK knows exactly what's going on.

Time and time again, KK facilitates travel for the escorts, knowing full well what's going on during freak-offs. You can look at the charts for examples of KK doing that. Every time she did, that's another example of a racketeering act in the charged racketeering conspiracy.

At beginning of this presentation, I told you that you only have to find that the defendant and his co-conspirators agreed to commit two racketeering acts.  Here, there are dozens more.

Your Honor, this would be a good time for an afternoon

break if you intend to take one.

THE COURT:  That's fine.  We'll take a break come back in 15 minutes.

All rise.

(Jury not present)

THE COURT:  Please be seated.  About how much longer do you have?

MS. SLAVIK:  I think probably about an hour, your Honor.

THE COURT:  One hour?  Okay.  Anything further before we take our break from the government?

MS. COMEY:  No, your Honor.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  No.  Thank you, Judge.

THE COURT:  All right.  Come back in 15.

(Recess)

THE COURT:  Let's get the jury back.

(Jury present)

THE COURT:  Ms. Slavik, you may proceed when ready.

MS. SLAVIK:  Thank you, your Honor.

The next Racketeering Act that I want to focus on, forced labor, also relates in part to freak-offs.

I expect the judge will instruct you that there are three elements to forced labor:

A conspirator must obtain the labor or services of

another individual, first;

Second, force, threats of force or threats of physical restraint to that individual or any other individual, serious harm or other threats of serious harm to that individual; or

A scheme, plan or pattern intended to cause that individual to believe that not performing would result in serious harm or physical restraint against that person or any other individual, and do so knowingly.

For this crime, labor means the expenditure of physical or mental effort, especially when fatiguing, difficult or compulsory.  And services means the performance of work commanded or paid for by another.  This can include sexual services, and the victim doesn't have to be paid for the labor or services.

During this trial, you heard about how the defendant, helped by members of his inner circle, obtained the labor and services of at least four individuals using force, serious harm and threats of force and serious harm.  Those individuals were Cassie, Jane, Mia and Capricorn.  The facts supporting forced labor for each of these three women are different, so I'm going to take them in turn.  Starting with Cassie and Jane, since we've been talking about them,

so the first element of forced labor requires that Cassie and Jane provided the defendant with labor and services when they engaged in hours and hours of grueling sexual

P6QQcom4                         Summation - Ms. Slavik

activities with escorts during freak-offs or hotel nights. This element isn't in dispute. And these are the defendant's co-conspirators that assisted him and agreed with him to commit this crime.

Cassie testified that freak-offs were grueling. She said that they ranged anywhere from 36, 48 to 72 hours. She said that the longest one was four days, maybe even more.

Jane said the same thing. On average, hotel nights lasted 24 to 30 hours, with the longest being three or three and a half days. And this is corroborated by hotel reservations that spanned days.

This reservation that we're looking at on the screen we've seen before. This is from a 48-hour hotel night that the defendant had with Jane in January 2023. And this is the one that resulted in thousands of dollars worth of damage to the room.

You can see more records like this, more hotel records associated with freak-off dates. Those are in the exhibits, excuse me, the summary charts at Government Exhibits 1402 and 1406.

Now, as you know, over the course of these multi-day freak-offs, the defendant didn't let Cassie or Jane sleep. Here, you can see their testimony.

Instead, the defendant gave them drugs to make them stay awake -- ecstasy, molly, sometimes cocaine. Use of drugs

P6QQcom4                         Summation - Ms. Slavik

enabled Cassie and Jane to do what the defendant wanted and directed -- to have sex with multiple men multiple times over multiple days.  He told them to keep going and to finish strong, even when they were tired.  But these nights took a physical toll on Cassie and Jane's bodies.  Their bodies were store for staying for hours in uncomfortable sex positions that the defendant liked.  They got sores.  They got sick.  They got infections.  Both testified that they frequently got urinary tract infections, or UTIs.

Cassie described how painful it is.  She said she had so many UTIs that antibiotics stopped working to cure them. Jane said that she got UTIs almost every week after hotel nights.

And the defendant made Cassie and Jane have freak-offs even when they hadn't yet recovered from a UTI.  Cassie said that having sex while having a UTI was horrible and the most uncomfortable burning.

This was not for Cassie's pleasure.  This was work. And Cassie was explicit about this point.  She told you that freak-offs became a job.  And Jane wrote something similar in her notes.  She wrote:  "I'm the one putting all the mental and physical work in ... for 48 hours straight.  Asking anyone to perform with all the different elements throughout the night is a lot, and that's an understatement."

Cassie and Jane were on call to perform hotel nights

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6QQcom4                         Summation - Ms. Slavik

for the defendant whenever he wanted -- wherever he wanted and whenever he wanted.  And after each freak-off, Cassie and Jane were so exhausted that they had to take days to sleep and recover, leaving little to no time for other professional pursuits.

These nights were labor and services.  The first element is met.

So let's move to the second element.

The defendant used force or serious harm or threats of force or serious harm to get Cassie and Jane to engage in that labor.  As with the sex trafficking charge, I expect that the judge will instruct you that serious harm in the forced labor context is very broad.  It includes physical or non-physical harm, including financial, psychological or reputational harm.

Here, the same violence and coercion, including the defendant's threats of force and threats to Cassie and Jane's reputations and livelihoods that the defendant used to get those women to engage in the freak-offs, the same thing that we've been talking about all day, that makes him guilty of the forced labor.

So the second element is met.

So now with the third and last element -- did the defendant act knowingly?  Again, you know that the answer is yes.  And let's just talk about a few reasons why.

The defendant knew that hotel nights were grueling and

physically exhausting.  Cassie and Jane told the defendant that they were tired.  They told him that they didn't feel well. They told him that they had UTIs, and he told them to keep going.  He wouldn't take no for an answer.

Jane testified that the defendant would say things like:  You're not getting tired on me, are you?  Let's finish strong.  Let's end on a high note.  Just push through.  One more round.

Jane wasn't the only one who told the defendant that she didn't want to be used for hotel nights.  Cassie said the same thing here, but just like Jane, he didn't listen to Cassie.  Here's a text from Cassie saying:  "I told you I feel like this is all I'm used for and that's done."

And here, she says:  "I'm losing another week of my life to recover.  That's why nothing gets done.  Always healing."

But did the freak-offs stop after this?  No, you know that they didn't.

Government Exhibit 1402 makes clear that, just like Jane, the defendant made Cassie engage in at least six more freak-offs after she said that she didn't want to be used.  She loses weeks of her life recovering afterwards.  That's forced labor.

There's just one more point that I want to address for Cassie and Jane on this topic.

Just like with the sex trafficking predicate, the defendant was aided and enabled by his inner circumstancing. Take KK as an example. She knows that Jane is being threatened by the defendant with videos of her performance being leaked, and she knows that Jane is drugged during these nights and is traumatized by these nights. But does KK stop setting up hotels and flights for king nights with the defendant and Jane after this? No, of course not. KK keeps enabling and aiding the defendant.

I want to turn to a different forced labor victim -- Mia. And the relevant players here are D-Roc, KK, Toni Fletcher and Vashta Wilson.

With respect to Mia, there's really not a meaningful dispute as to the first element -- that Mia performed labor or services for the defendant. Mia explained that she worked for the defendant for approximately eight years -- first, as his chief of staff, then for his film company, Revolt Film. She was paid a salary by the defendant, which started at $50,000 and increased over time to $100,000. Mia was required to go without sleep all the time. The longest she went without sleep was five days, which led to a mental and physical breakdown.

Now, during this trial you've heard from a lot of former personal assistants. They've all said that they worked hard for the defendant, and Mia was no exception. But it should be clear to you from Mia's testimony that the defendant

treated Mia differently than many of the other personal assistants.  He demanded more, and he abused her.

Before I talk about that abuse, I want to note that the labor that the defendant got from Mia wasn't just standard personal assistant stuff.  Mia was also required to provide sexual services to the defendant.  He sexually assaulted Mia when Cassie and his other girlfriends were not around.  In other words, when the defendant didn't have someone there to satisfy his sexual desires, he turned to Mia, an employee that he had complete control over.

Mia detailed for you several of these assaults, which began just a few months into her employment.  The defendant kissed her and put his hand up her skirt at his 40th birthday party, when she was just 26 years old.  The defendant woke her up in her bedroom when she was sleeping in his Los Angeles home and penetrated her.  The defendant came up behind her in his closet in that same house and forced her to perform oral sex on him.

As Mia explained to you, the defendant sexually assaulted her on other occasions, like when he cornered her in the bathroom of a private plane, but she can't remember the details.  Nor does she want to.  These sexual assaults were the most traumatic thing that ever happened to her, so much so that she planned to die with that secret.  When the defendant sexually assaulted her, Mia didn't dwell on it.  She just kept

P6QQcom4                          Summation - Ms. Slavik

things moving, as defendant told her to do, and hoped each assault would be the last.

You know from Dr. Hughes that people who have experienced trauma, as Mia did, often have memories that lack detail. Dr. Hughes also explained that where there are repeated traumatic events, as was the case for Mia, it's common for memories to blend together, such that a victim knows that they've been assaulted many times but can't say when those assaults happened or the details of them. But Dr. Hughes explained, even if victims do not recall each instance of abuse, they don't lose the core gist of what happened to them -- that they were being abused or that they were being sexually assaulted. That doesn't go away.

And you watched Mia on the stand. You saw her relive the trauma as she told you what the defendant did to her. She couldn't look up. She was whispering, but she was clear as a bell, even after being questioned again and again on cross-examination, that the defendant repeatedly had sex with her without her consent. She didn't forget that.

So returning to the elements of forced labor, the first element is satisfied. Mia performed labor and service services, including sexual services, for the defendant.

For the second element, you know that the defendant used a pattern of force and threats of serious harm which caused Mia to believe that she would be harmed if she didn't do

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6QQcom4                          Summation - Ms. Slavik

what the defendant wanted.

Let's start with force.

When Mia was working for the defendant, he was often violent with her when she didn't do exactly what he wanted. For example, he threw things at her when she didn't immediately follow his orders. He threw her against a wall in Cassie's apartment. He slammed her arm into a door repeatedly. And if that weren't enough, Mia also witnessed the defendant's violence towards Cassie, her close friend, over and over -- at Prince's party, in Cassie's apartment, in Turks.

And I just want to pause for a moment on the incident at Cassie's apartment. You know from watching Mia testify that that was a really traumatic moment for her, one in which she truly believed that the defendant could seriously harm her, Deonte and Cassie. When the defendant threw Mia against the wall, in her words, so quickly, so easily, she realized that they were in real danger. And when she watched the defendant pick up Cassie to slam her head into the corner of the bed frame, Mia thought he's actually going kill her. This is all to say that Mia saw and experienced extreme violence at her boss' hands. It's no wonder that she was always worried about her physical safety if she were to tell the defendant no.

And you also know that the defendant encouraged Mia to blame herself and worked to paper over his blowups. And he didn't do it alone. Mia told you that after the defendant was

P6QQcom4                        Summation - Ms. Slavik

violent, he would then enlist HR or chiefs of staff to suspend her, like in March 2011. The defendant didn't like the workout clothes that Mia had picked out, so he cursed, became violent and threatened to fire her. And the defendant followed through on the threat. He suspended her.

Here's a memo that Mia got from Vashta in HR. The memo says that Mia was suspended for five days, but it doesn't say why, stating only that we spoke verbally to document the reasons of why you were being relieved of your duties.

These memos struck fear in Mia's heart. She explained that when she got notices like these, she thought her job was over. She thought that she was terrible.

The defendant often threatened Mia's job, which was her livelihood and, at the time, her whole world. And again, he didn't do this by himself. Take October 2015, for example, when Mia was in South Africa with Cassie, who was shooting a movie. The defendant used KK to demand that Mia, his employee, get Cassie on the phone. Both the defendant and KK were incessant. They wouldn't take no for an answer.

Here, on the screen, are just some of the times that they called Mia when she was in South Africa. When Mia wasn't answering, KK took it to the extreme. She said that the defendant just told me that you if you don't call him in the next two minutes, you don't have a job.

Because of the violence and because of these threats,

P6QQcom4                          Summation - Ms. Slavik

threats of serious harm to her job, Mia told you what happened. She told you that she couldn't tell him no. She couldn't tell him no about a sandwich: I couldn't tell him no about anything.

The defendant capitalized on this dynamic when it came to sex. He had all the power and control over Mia. So even though she never wanted to have sex with him, he knew that she couldn't say know and he knew that she wouldn't say no.

Dr. Hughes also explained to you why these fears were reasonable. She told you that victims can't say no to little things, so it's hard to imagine victims having the agency to say no to something so sensitive and so personal as that.

And Mia knew that her job was to protect the defendant. She even included protect him at all times, like you see here on the screen, in her list of job responsibilities. She knew that the defendant was powerful and thought at the time that no one would believe her if she reported it. She couldn't go to HR. They were only there to protect the defendant, not her. And she couldn't go to the police. She'd seen several times that the defendant was above the police.

Mia saw what happened to another assistant, Kayla, who told the chief of staff that the defendant physically abused Cassie in August 2013. Kayla was fired, and the defendant told Mia that she would have to testify against Kayla and say

everything he told her to say.

So just like with Cassie and Jane, the environment of coercion, violence and serious harm, the defendant had made Mia feel like she had no options.  And that satisfies elements two and three.

Before we get to the last forced labor victim, I want to pause on something.

I expect that you're going to hear in the defendant's summation that you shouldn't believe Mia because she didn't leave, just like Jane and Cassie.  And it's true that at times Mia loved her job.  It was her dream.  There were times that Mia told the defendant that she loved him, both during and after her employment.  Mia pulled no punches on this.  She said that sometimes the defendant treated her like a best friend and a working partner, acted like her protecter.  But other times, he treated her like she was worthless, humiliating her, cursing at her, threatening her, the high highs and low lows that Mia described were a cycle of abuse that created a trauma bond.  In the moment, Mia couldn't see it for what it was, like she said in her testimony.  In hindsight, it was fantastic that she lost her job, but at the time it was the worst thing ever.

That brings us to our last forced labor victim, Capricorn.

Like Mia, there's really no dispute that Capricorn provided labor and services to the defendant.  She began as his

personal assistant in 2004 and worked a variety of roles on and off until 2012.  Capricorn had an issue with overtime.  She wasn't being paid for the hours that she was working, which were extensive.  She tried to take the issue of her hours to Vashta Wilson, head of HR.  But like with Mia, it was clear that HR was simply the defendant's puppet.

When Vashta handed the defendant a piece of paper laying out the $80,000 in overtime that Capricorn was owed, the defendant ripped up the paper and refused to pay Capricorn. And that was that.  So whether or not Capricorn was properly paid for all the hours, it is clear that she performed labor and services.  So element one is met.

And you've already heard about some of the ways in which the defendant used force and threats against Capricorn. The defendant and Uncle Paulie threatened her in Central Park from the start of her job.  And then there was the kidnapping with the lie detector test.  Those days of polygraph tests under threat are examples of forced labor.

And like Mia, Capricorn saw and experienced other instances of the defendant's violence, like the night that she was kidnapped again in December of 2011 and taken to Kid Cudi's home.  Capricorn, like Mia, also experienced the defendant's threats regarding her job.  When the defendant didn't get what he wanted, he told Capricorn that she was going to lose her job.

So given the force, physical restraint and threats of serious harm, the defendant and his co-conspirators forced Capricorn to work, satisfying the remaining elements.

Now, the defense may argue that Capricorn was not forced to work because she continued to could come back to the defendant for jobs. But that doesn't erase the forced labor that she already performed, and you know exactly why Capricorn came back. She had a son to provide for, and she a needed a job. But the defendant, with all his power in the industry, made sure that she wouldn't get one unless it was with him. He even told her that she would never work again. That's serious harm.

For all these reasons, you know that the defendant agreed that he or a co-conspirator would commit forced labor of Cassie, Jane, Mia and Capricorn.

The last racketeering activity I want to talk to you about today is witness tampering and obstruction. This relates to the defendant's actions after Cassie filed her lawsuit against the defendant in November 2023.

In many ways, the defendant's actions after Cassie's lawsuit weave this whole story together. As we've discussed over the last couple of hours, for years the defendant took great pains to prevent his criminal conduct from being exposed. But many of the crimes that we've been speaking about were made public when Cassie filed her lawsuit. The public reaction was

swift, but the defendant knew that it could get worse.

(Continued on next page)

P6qWcom5                    Summation - Ms. Slavik

MS. SLAVIK:  He knew that Cassie's allegations could lead to a criminal investigation.  So just as he'd done before, the defendant worked to neutralize two of the people who could damage him the most -- Jane and Mia.  To do that, the defendant turned to his most trusted advisers of his inner circle, K.K. and D-Roc.  But this time, with the likelihood of a criminal investigation drawing nearer and nearer, paying people off with a hundred thousand dollars in a brown paper bag wasn't an option.  He needed to stay under the radar.

Let's talk briefly about the law, which we'll circle back to.  There are two relevant laws here -- the first, witness tampering, which has two elements:

First, that the conspirator knowingly used intimidation, threatened or corruptly persuaded an individual or attempted to do so or engaged in misleading conduct.

Now, to corruptly persuade here means to act knowingly with an improper purpose and consciousness of wrongdoing to convince another person to engage in certain conduct.  The judge will instruct you on this later.

And second, that the conspirator acted knowingly and with the intent to hinder, delay or prevent the communication to a law enforcement officer of information relating to the commission of a federal offense.

Here, if there's a reasonable likelihood that the

P6qWcom5                          Summation - Ms. Slavik

witness or victim had spoken to law enforcement, that they would have spoken to federal law enforcement, the element has been met.

The second law is obstruction of the sex trafficking statute and has two elements:

First, that the conspirator obstructed, attempted to obstruct or in any way interfered with or prevented the enforcement of the sex trafficking statute; and

Second, that the conspirator acted knowingly.

For this statute, a conspirator attempts to commit obstruction if a substantial step, something more than mere preparation, is taken with the intent to obstruct.

So now the facts.

Let's start with Jane.

We already talked about Jane's reaction to Cassie's lawsuit. Remember, she almost fainted. She was stunned by what she called a harrowing resemblance to what she was experiencing. And she told the defendant exactly that.

Here, you see a message between the defendant and Jane just days after Cassie's lawsuit was filed publicly. Jane told the defendant exactly how she felt. She said: I just woke up because I'm nauseous. I've been crying for three days and under stress from reading all of this. I keep having nightmares about forced nights and all the times I felt like I couldn't say no. I feel like I'm reading my own sexual trauma,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6qWcom5                          Summation - Ms. Slavik

and it makes me sick, how three solid pages, word for word, is exactly my experiences and my nightmare.

She says:  God finally woke me up out of this sick cycle and validated me again with all of this.  The sick part is you knew it was coming and you gaslit me and made me feel crazy about the sex trauma I was developing.

Now, Jane posed a major problem for the defendant.  He couldn't run the risk of Jane turning against him and saying these sorts of things that are in the text message on the screen to law enforcement.  So minutes after he received the text message, the defendant called Jane, and then shortly after he called her again.

Now, you don't have to guess what happened on these two calls or rely on what Jane told you, because they were both recorded on K.K.'s phone.  And you heard these recordings -- the defendant's own words, in his own voice.  Those calls are in evidence as Government Exhibits C348A and B, and I urge you to listen to them again.

Because they're in evidence, I'm not going to play the full calls now, but I do want to go through parts of the calls with you and let you know how the defendant was attempting to engage in witness tampering through these calls, how he's attempting to corruptly persuade Jane to keep quiet.

Now, remember, at this point, on November 19, 2023, Cassie's lawsuit has already been settled.  Cassie told you on

the stand that her lawsuit was settled within 24 hours.

So the only reason the defendant is doing this, is reaching out to Jane, is for fear of a criminal investigation. There's no more pending civil lawsuit from Cassie. He's concerned about a criminal investigation.

So starting with the first call that the defendant makes to Jane, which is about ten minutes long, in it, the defendant starts by asking Jane what he can do to make her feel better. He knows she's upset. But what he's really after soon becomes clear. He's trying to get a recording of Jane saying that she was a willing participant in hotel nights. He's trying to neutralize the threat of what Jane could reveal.

To do that, the defendant tries to feed Jane a false narrative of the events of the last three years. What he says to her he knows isn't true. It's what he wants her to say to protect him. That's witness tampering. That's obstruction, and here's how you know.

First, the defendant told Jane over and over again that he couldn't be on these phones. He says it six times in that one call. You see it here.

And why does he keep saying he can't be talking on the phone? Because he's worried about law enforcement tapping his phone. He's worried about law enforcement getting a hold of those text messages with Jane, three years of text messages where Jane repeatedly told the defendant that she didn't want

P6qWcom5                          Summation - Ms. Slavik

to do hotel nights and where the defendant gaslit her and threatened her into doing them anyway.  That's why the defendant is warning Jane not to talk on the phone -- because he thinks law enforcement could be listening, and he doesn't want law enforcement to get a hold of those communications.

Second, while he's recording the call, the defendant tries to convince Jane that she was a willing participant in these hotel nights.  He wants her to agree to that false statement on the tape.  He wants to record her saying that.  He first tells her:  We just did some kinky shit that I thought we both enjoyed, things like that.  He tries repeatedly to get Jane to agree with him that she was a willing participant in these hotel nights.

But she won't say it.  It's not the truth.  And when she pushes back, he cuts her off.

Let's listen to this clip.

(Media played)

MS. SLAVIK:  I want to draw your attention to two things about that clip.

First, did you hear how the defendant cut off Jane when she says things that were inconsistent with his lies, when she starts to tell her truth?  He's trying to get her to stop listening to herself and instead to adopt his fake story.  He figures that if he talks over her enough, she'll eventually go along with him, something that's worked in the past.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

And second, listen to that noise in the background. It's the sound of someone writing notes in Sharpie pen.

Now, Jane thinks that it's just her and the defendant having a private conversation.  But K.K.'s there, and she's listening.  Remember, these calls were on K.K.'s phone.  Now, K.K. can't speak because Jane doesn't know that she's there. But K.K. and the defendant can write notes to each other to try to get Jane to say what they want her to say.  You've seen the same sort of thing happen right here in this trial, when lawyers on both sides passed notes to each other, to other members of the team.  K.K. and the defendant were doing that. They were working together as a team.

Now, the defendant becomes worried when he doesn't get what he wants from the first call.  So he calls Jane back, and he takes a different approach.  He tells Jane explicitly not to text him messages that could be damaging.

Let's listen.

(Media played)

MS. SLAVIK:  And then the defendant dangles a carrot, just like he did to get Jane to do hotel nights.  He tells her that Jane won't have to worry as long as she's on his side.

(Media played)

MS. SLAVIK:  Now, this right there is the third reason that you know that the defendant is engaging in witness tampering.  He's telling Jane that if she tells him what he

P6qWcom5                            Summation - Ms. Slavik

wants to hear, if she stays quiet, he'll keep taking care of her. He'll keep paying her rent. That's the friendship that the defendant is telling Jane he needs. And you know that's what he means, because two days later, the defendant instructs K.K. in a text to make sure that Robin's not doing anything dumb like having that rent paid on time.

K.K., the loyal lieutenant, takes care of it. She responds: Robin said her rent was paid.

K.K. knew that it was important that Jane's rent was paid on time. She knew the reason that it was important, because she knew what a threat Jane could be to the defendant. Like we talked about before, she was well aware that Jane didn't want to do hotel nights and that she'd been threatened by the defendant.

That's why K.K. did what she'd done years before with InterContinental. She helped the defendant cover up his crime. She made sure Jane was paid, and she helped the defendant record these calls with Jane to fabricate evidence. There's no question that the defendant reaching out to Jane is attempted witness tampering. He tried to corruptly persuade her to adopt his lies.

And as for the requirement of the reasonable likelihood that Jane would have spoken to a federal law enforcement officer, this element is met too. Remember who shows up at Jane's door just a few months later, in March 2024?

P6qWcom5                         Summation - Ms. Slavik

Federal law enforcement officers.

And it's obstruction too, because as we've discussed, Jane was a victim of sex trafficking. The defendant feeding Jane lies would prevent enforcement of the sex trafficking laws. That's obstruction.

You also heard that right around this same time the defendant tried to do the same thing with Mia, who had witnessed his abuse of Cassie and was a victim of the defendant's abuse herself. The defendant knew what Mia had seen and what she'd experienced, so he needed to make sure that she was in his corner and that she would stay silent.

But the defendant couldn't reach out to Mia himself. After all, for years, when Mia was his employee, he abused her. So he listed the assistance of another trusted member of his inner circle -- D-Roc.

In the weeks after Cassie's lawsuit, on November 29, 2023, D-Roc went to Miami to help the defendant. You saw the messages -- they're right here on the screen -- showing that D-Roc was heading to the house.

Then, not even 24 hours later, D-Roc texted Mia for the first time in over two years. Because she was excited to hear from D-Roc, Mia responded, asking how he was and saying that she missed him. Those texts look innocent enough at first, but you know that D-Roc wasn't just trying to catch up with an old friend. He had a mission to accomplish for the

P6qWcom5                          Summation - Ms. Slavik

defendant, and so D-Roc called Mia later that day.

Mia told you that during that call, D-Roc sounded nervous and kept saying things like Puff and Cas would just fight like a normal couple. Alarm bells went off for Mia for two reasons. One, she knew that D-Roc didn't talk like that. And two, she knew that D-Roc saw the defendant abuse Cassie just like she did. Mia knew that something was up. D-Roc was talking in circles, she said. He started talking about other people who were around when Mia was working for the defendant, suggesting that they all agreed that Puff and Cas were just like a normal couple that fought.

Mia didn't say anything back to this, and at the end of the call, D-Roc told Mia that the defendant really wanted to talk to her. He said that the defendant was going to call her, and he suggested that maybe Mia could say something.

Mia told you her reaction to this call. Based on all the things that she had seen with her own two eyes, the defendant and Cassie did not fight like a normal couple. She saw the defendant drag, hit and kick Cassie. She saw him bash in her head against a bed frame.

And D-Roc saw violence like that too. So when D-Roc kept pressing that Puff and Cas were a normal couple, he was asking her to agree with a lie. She told you how terrified and threatened and scared she felt on this call, knowing that the defendant wanted to speak with her. So Mia didn't answer when

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

the defendant called her.

But the defendant couldn't risk Mia telling the truth. So the defendant didn't stop when Mia didn't answer.

Over the next few months, as the criminal investigation relating to Cassie's lawsuit became more and more real, the defendant and D-Roc repeatedly reached out to Mia. In one of those texts, D-Roc offered to give Mia money. And you know why D-Roc reached out to Mia. Each time he did it was at the defendant's direction.

On another occasion, the defendant calls Mia five times in a row at 6 a.m. You can see that here. It's pulled from one of the summary exhibits at 1410. And when Mia doesn't answer, the defendant sends her a text asking to jog his memory.

Now, the chart that Ms. Sankar walked you through at Government Exhibit 1410 marries up the text messages and calls between D-Roc and Mia with the text message and calls between D-Roc and the defendant. It shows that as D-Roc reached out to Mia, he updated the defendant about their communications. And sometimes D-Roc copied and sent Mia's texts back to the defendant. Sometimes the defendant did the same thing. He updated D-Roc about the status of his efforts to reach Mia and copied the texts that he sent to her, just like D-Roc did for him.

The text about jogging his memory, the defendant

P6qWcom5                        Summation - Ms. Slavik

copied that same message and sent it to D-Roc.  You see that here in the chart.  D-Roc and the defendant were working together to neutralize the Mia threat.  Mia knew too much about the defendant's decades of abuse.

And to be clear, Mia was a threat to the criminal case as well.  As I said, Cassie's lawsuit was already settled.  It was done.  And in fact, Mia was already meeting with federal prosecutors at this time.  So what the defendant was worried about is the very situation that we're in here today -- a criminal case.

Now, I anticipate that the defense will argue that the defendant's purpose in reaching out to Mia was totally innocent, that it was just friendly, that you should interpret the words of the text messages literally.  But like with Jane, the defendant is careful with the words he uses.  But make no mistake.  What he was communicating was clear.  You have to look at the context.  The defendant used D-Roc to make the initial outreach to Mia.  D-Roc gave Mia a false version of the events and tried to convince her that everyone else accepted that story, and then he continued to reach out, even offering her money.

The defendant doesn't just want his memory jogged.  He wants to make sure that Mia adopts his false version of events and stays silent about what she witnessed.  The defendant's conduct towards Mia is also witness tampering and obstruction.

P6qWcom5                         Summation - Ms. Slavik

The defendant is attempting to corruptly persuade Mia to lie or stay silent while fully aware of the likelihood of a criminal investigation.  And because the defendant was attempting to ensure Mia's silence with respect to the defendant's relationship with Cassie, it's obstruction as well, because as we've discussed, Cassie is a victim of sex trafficking.

There's one last act of sex trafficking obstruction that I want to talk about -- the InterContinental incident from March 2016.

Now, as we talked about -- we don't have to rehash it -- this is a sex trafficking incident, and the defendant's efforts, aided by members of his inner circle, to bury the evidence related to this is bribery.  But it's also sex trafficking obstruction.

So returning to the fourth element of Count One, racketeering conspiracy, as we've just discussed, the defendant knowingly and willfully agreed that he or another member of the conspiracy would commit at least two racketeering acts.

The fourth element is satisfied.

The last thing that I want to talk to you about, very briefly, is venue.

To convict the defendant, you must find, for each count, all five counts, that at least one act in furtherance of the crime occurred in the Southern District of New York.

I expect that the judge will instruct you that an act

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6qWcom5                         Summation - Ms. Slavik

in furtherance of the crime simply means that some act constituting an essential conduct element of the charged offense occurred in this district.  The act doesn't have to be a criminal act, and it doesn't need to be an act taken by the defendant, so long as the act was part of the crime that you find that the defendant committed.

The Southern District of New York includes Manhattan and the Bronx.

In this case, venue is easily met for all the counts.

I'm going to start with Count Two, sex trafficking of Cassie Ventura.

You heard about multiple freak-offs that occurred in Manhattan, including at Cassie's Manhattan apartment, like the one dealing with Daniel Phillip, where he heard the defendant beating Cassie.

Count Three, transportation for prostitution, also relating to Cassie, is also straightforward.  As just one example, you saw the records relating to two freak-offs in 2009, where Jules was flown from L.A. to meet the defendant and Cassie in Manhattan for freak-offs at the London hotel.

For Count Four, sex trafficking of Jane, you have the hotel night in Manhattan in September 2023.  We talked about that one earlier.  That's the trip where the defendant promised that they would only spend quality time, and Jane agreed to fly to New York, and then when Jane was mid-flight he surprised her

P6qWcom5                          Summation - Ms. Slavik

with an escort.

That same trip also establishes venue for Count Five. That's the transportation for prostitution related to Jane. The defendant and Jane ended up flying Kabrale from Atlanta to New York and paid him for sex in Manhattan.

And finally, for Count One, you have plenty of acts in furtherance of the racketeering conspiracy. Everything I just talked about for Counts Two through Five establishes venue for Count One, because those crimes, in Counts Two through Five, are also part of the pattern of racketeering activity for Count One. But of course, you have far more than that.

Capricorn was kidnapped in New York.

The defendant sexually assaulted Mia for the first time in New York.

There were many other freak-offs that happened in New York, both at hotels and in Cassie's apartment.

The defendant lived in New York for part of the time period included in Count One and continued to come to New York frequently up until he was arrested here in New York in September 2024. At the time of his arrest, he was staying at the Park Hyatt in Midtown Manhattan, and law enforcement recovered illegal drugs from his hotel room.

In short, there are many ways that you can find venue for Count One.

Members of the jury, I'm about to sit down. Before I

P6qWcom5                        Summation - Ms. Slavik

do, I want to thank you for your attention, your focus, your dedication. You've spent the last seven weeks listening carefully to witnesses and reviewing hundreds of exhibits. A lot of that evidence was hard to hear, hard to see. And now it's all before you. You heard the testimony of three victims who the defendant manipulated, controlled and forced into sex acts they didn't want -- Cassie, Jane, Mia.

You heard from Kid Cudi, whose house the defendant broke into and whose car he had set on fire.

You heard from Capricorn, who was kidnapped not once but twice.

You heard from Regina Ventura, who took out a line of credit on her house when the defendant demanded that she repay money that he had given to her daughter.

You heard from people who witnessed and experienced his violence, like Kerry Morgan and Deonte Nash.

And you heard from multiple assistants who worked for him, bought drugs for him and did whatever he asked of them.

You heard how the defendant ran his criminal enterprise with total control and with the loyal assistance of his inner circle, his chief of staff, who was his right hand, and security team, whose names changed over time. But their M.O.s didn't.

The defendant used foot soldiers, the personal assistants and other employees who always didn't see the full

P6qWcom5                        Summation - Ms. Slavik

picture but knew that their one job was to say yes to the defendant.  You've seen plenty of other evidence that backs up the accounts of witnesses.  You've seen text messages, travel records, bank records, photos, audio recordings, videos.  All of this evidence paints a clear picture of how the defendant committed crime after crime for two decades, how he didn't take no for an answer.  The evidence showed you how he and his inner circle helped him carry out these crimes and how far they would go to cover them up.

That evidence proves to you that the defendant is guilty beyond a reasonable doubt.  Up until today, the defendant was able to get away with these crimes -- because of his money, his power, his influence.  That stops now.  It's time to hold him accountable.  It's time for justice.

It's time to find the defendant guilty.

THE COURT:  Thank you, Ms. Slavik.

And thank you, members of the jury.  At this time we will adjourn and you will be back here to get started at 9 a.m. So you're always diligent so I don't need to tell you to get here a little bit in advance of nine.  I'll give you the same instructions that I always do.

Do not speak with each other about the case.  Do not speak with anybody else about the case.  And do not watch and look up or read anything about the case.

I'll see you here tomorrow morning at nine.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6qWcom5                        Summation - Ms. Slavik

Thank you very much.

(Jury not present)

THE COURT:  Please be seated.

Anything that we need to address before we come back tomorrow, Ms. Comey?

MS. COMEY:  No, your Honor.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  No.  No.  Thank you.

THE COURT:  All right.  Very good.

So we'll be here -- I'm not going to make you come here at 8:30, because there's nothing to address.  So let's say by 7 p.m. tonight, if there happens to be an issue that the parties want to address, then we'll be here at 8:30.  Otherwise, we'll be here to start at 9 a.m.

All right.  Very good.

We're adjourned.

(Adjourned to June 27, 2025, at 8:30 a.m.)