P6rWcom1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

                    v.                    24 Cr. 542 (AS)

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

                    Defendant.            Trial
------------------------------x

                                        New York, N.Y.
                                        June 27, 2025
                                        9:00 a.m.

Before:

                    HON. ARUN SUBRAMANIAN,

                                        District Judge
                                        -and a Jury-

                         APPEARANCES

JAY CLAYTON
        Interim United States Attorney for the
        Southern District of New York
BY:  MADISON R. SMYSER
     EMILY A. JOHNSON
     MAURENE R. COMEY
     MEREDITH FOSTER
     MITZI STEINER
     MARY C. SLAVIK
     Assistant United States Attorneys

P6rWcom1

APPEARANCES CONTINUED


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:   MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
HARRIS TRZASKOMA LLP
BY:   ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:   ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        JONATHAN BACH
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:   Lucy Gavin
                Shannon Becker
                Paralegal Specialists
                Raymond McLeod, Evidence Specialist

P6rWcom1

(Trial resumed)

THE COURT:  Good morning, everyone.

Please be seated.

Mr. Agnifilo, are you ready to go?

MR. AGNIFILO:  Ready to go, Judge.

THE COURT:  All right.

So, before we get started and bring the jury in, I'm going to ask the same question as yesterday.  Exhibit list and laptop, are we ready with those materials?

MS. GERAGOS:  I'm going to put something on the record, and then I'm going to let Ms. Estevao put the rest.

We sent several corrections this morning, after reviewing it again last night, about 20 corrections.

THE COURT:  To the laptop.

MS. GERAGOS:  To the laptop.

THE COURT:  OK.

MS. GERAGOS:  There's a lot of exhibits.

I imagine that the government will correct those issues today, and then we'll review it again over the lunch break and will be able to provide your Honor with another update once we've reviewed that those corrections were made.

And Ms. Estevao wants to put an additional thing on the record about it.

MS. ESTEVAO:  Just given the volume of exhibits and the amount of time that we've had, it's impossible to check

every page of every single exhibit.  We have been extremely diligent in attempting to check all the exhibits and prioritize the exhibits that we've been conferring with the government about, about various issue, like 106 issues, and we feel comfortable with the state of the laptop as it is and getting it to the jury in time for deliberations.  But I just wanted to put on the record that we have not reviewed every single page of every exhibit, given the volume.

THE COURT:  Well, isn't the easy solution to give the jury the laptop on Monday?  Because I'm just thinking about the logistics and the timing today, which is that we have the defense closing, we have the government's rebuttal, we have my rendition of the jury instructions, which is going to take a while, and at that point it's going to be fairly late in the day.  And so the jury could begin its deliberations and we could provide them with the laptop on Monday.

Anybody see a reason why that wouldn't work?  And that will make sure that we will have time if there was some mistake on the laptop.

MS. ESTEVAO:  That makes good sense.

MS. COMEY:  I agree, your Honor.

THE COURT:  All right.

So then we'll handle it that way, and that way we can make sure that what we're providing the jury is correct in all respects.

P6rWcom1

MS. ESTEVAO:  And your Honor, could we also provide the exhibit list to the jury on Monday?

THE COURT:  I think that's fine.  OK.

MS. ESTEVAO:  Thank you.

THE COURT:  Very good.

MS. COMEY:  Your Honor, I have one clerical correction to make to a handful of exhibits.

As we previewed, we were going to check them all, and we found some very many minor errors that we've conferred with Ms. Geragos about that we're going to correct.

For the record, this relates to Government Exhibits A-166, A-168, A-210A, A-515-A, A-159.  The issue is that in pulling out pages to which the defense had objections in these longer exhibits, we accidentally pulled out pages that just had the date, time and file name of audio messages that were in evidence.  So we're adding back in just the portions of those pages that have date, time and file name of the audio messages. Otherwise, those exhibits are unchanged.

So those are the versions of the exhibits that will go to the jury, and I understand Ms. Geragos has reviewed those and has no objection.

MS. GERAGOS:  That's right.

THE COURT:  All right.  Very good.

MS. COMEY:  I apologize.  Also, A159 is the other exhibit for which that applies -- not 519.  I misspoke.  It's

P6rWcom1

not A519.  It's A159.  And that should complete our corrections.

THE COURT:  Ms. Geragos.

MS. GERAGOS:  No issues with that.  We reviewed those last night, and we think it makes sense to have the corrected exhibits for the jury.

THE COURT:  All right.  Very good.

And we sent the parties the jury instructions and the verdict form and we will have those printed during the lunch break.  And to confirm as to the verdict sheet, the parties have each reviewed it, and there are no objections.

From the government.

MS. COMEY:  That's correct, your Honor.

THE COURT:  Ms. Geragos, from the defense.

MS. GERAGOS:  That's correct.

THE COURT:  All right.  Very good.

MS. GERAGOS:  May I just consult with Mr. Agnifilo very briefly on one potential issue?

THE COURT:  Yes.

MS. GERAGOS:  Could we confer with the government on one issue?

THE COURT:  Of course.

MS. GERAGOS:  During Mia's testimony, we introduced Defense Exhibit 1727.  During Mia's testimony, we had turned off the -- we had turned off -- no.  What did we do?  We gave

P6rWcom1

the jurors a binder -- just trying to remember -- a binder of unredacted photos, and for the gallery we put up redacted photos.

Mr. Agnifilo would like to show just one of those exhibits during his summation, which is, as you can see on this board, 1727.  We blew it up into a big poster board so that the jury would be able to see it on the easel.  We've positioned the easel right there, which is pretty much exactly where she sat for everybody in the gallery to be able to see her face during her testimony.  We redacted her name on the poster board so that nobody from the gallery could see her true name, but her face is obviously unredacted in the poster board.

It is our strong preference that we be able to use the poster board.  The jury has seen her face.  Everybody here who would be able to see this has seen her face, and it would reduce the amount of disruptions to Mr. Agnifilo's summation.

The government has an objection and would like to put a Post-it over her profile photo in the poster board.

We would like to be able to talk about Mia using this poster board with the jury seeing her face.

So that is what the issue is, and we think that that is the only issue before the summation.

THE COURT:  And I take it that -- how are you -- can you just show me how you're going to place it.

MR. AGNIFILO:  I'm going to endeavor to put it up

P6rWcom1

here, Judge.

It's going to fall down anyway.

THE COURT:  This is good for you to test it out.

MS. GERAGOS:  Just to note for your Honor, as you can see, the camera does not show that.  The camera for the overflow seating faces us.  It does not show the poster board, so the concern of overflow being able to see it, there's no concern, because they can't see it from the camera.

MR. AGNIFILO:  What I also could do is I could just hold it up for the jury.  I want the jury to be able to see it.

THE COURT:  Hold on.  Hold on.

If you're presenting it and if -- I'm looking at the camera for the overflow room, but if that's the only -- this is the only demonstrative --

MR. AGNIFILO:  Yes.

THE COURT:  -- that involves this issue.

MR. AGNIFILO:  That's right.

THE COURT:  You're going to either put it up there on the easel, or you're just going to show it to the jury.

MR. AGNIFILO:  Yes.

THE COURT:  One of those two ways.

MR. AGNIFILO:  That's correct.

THE COURT:  All right.  That's fine.

MS. GERAGOS:  With that, we have no issues on the defense side.

THE COURT:  All right.  Let's bring in the jury.

THE DEPUTY CLERK:  My apologies, your Honor.

Just to provide an update, there was another juror who was having transit issues, and they're working on inquiring what's the status, how long they'll be here.

THE COURT:  All right.  Please be seated.

All right.  So we have all our jurors, and so we'll get started in five minutes.

All right.  We're about to get started.

(Jury present)

THE COURT:  Please be seated.

Welcome back, members of the jury.

Mr. Agnifilo, are you prepared to proceed with the defense's closing?

MR. AGNIFILO:  I am, Judge.  Thank you.

Good morning, everybody.

This is a test as much as it is anything else.  I'm passing so far.

I move around.  I can't stay in one place.  That could get me yelled at today, but I'll do the best I can.

This trial is a tale of two trials.  It is a trial told from the mouths of witnesses.  It is a trial told from the text messages.  There's the trial told from the videos.  In a word, there's a trial that's told in the evidence.  That's one trial.

The second trial is a very different trial.  The second trial is the trial as told from the mouths of the prosecutors.  And the trial told from the mouths of the prosecutors is very different, nothing like the trial told from the evidence.

Now that you've heard the evidence, I'm going to ask you to reach certain conclusions, and I'm going to back them up over the next few hours.

The first conclusion I'm going to ask you to reach is that this case is badly, badly exaggerated.  It's made up, in a word.  From the mouths of the witnesses, from the evidence, from the text message, what do you see?  What is that trial?  What's the trial of the evidence?

It's personal-use drugs.  That's what it is.  That's just what it is.  It's nothing else.

What's the trial of the evidence?  The trial of the evidence is a lifestyle.  You want to call it swingers, you want to call it threesomes, whatever you want to call it, that's what it is.  That's what the evidence shows.  That is not what the prosecutors are saying to you.

The prosecutors have charged one of the most serious, complicated, comprehensive statutes on the books.  They have charged personal-use drugs and threesomes as racketeering.  That is the other trial.  That, I submit to you, is the false trial.  That is the exaggerated trial.  That is not the real

P6rWcom1                        Summation - Mr. Agnifilo

trial.

And you have sat here for a long time, and I want to start by saying I have done this -- you can tell, this is not my first one of these.  I rarely have seen a group of people as dedicated, diligent, prompt, paying attention, and as a credit -- I mean a credit to the jury system, to jury service and to our country.  And so I want to start, before I say anything else, by thanking you.  I want to thank you.  And I'm going to try and put that thankfulness into action.

I would love to speak to you for days.  I would.  I'm not going to.  You wouldn't love that.  I'm not going to do that.  I'm not going to do that.  It's Friday.  All right?

So I'm going to try to be efficient with my time with you.  I am.  I have to cover a lot of ground.  I do.  But I'm going to be efficient with my time with you, and I'm going to talk to you not about all the evidence, because I can't possibly do that.  But I'm going to talk to you about the most important parts.  And the most important part is Sean Combs.

Let's talk for a second about what the evidence shows about Sean Combs.

Sean Combs has become something that is very, very hard to become, very hard to be.  He is a self-made, successful Black entrepreneur.  I don't know how many there are.  I hope there are tens of thousands.  I don't think there are, but he's one of them.  He's one of them.

And he's done something that's very, very hard to do. He has built wonderful, sophisticated, real businesses that have stood the test of time, businesses that are so outstanding that other, larger, more established businesses create business relationships with them.  We heard that from Derek Ferguson when he testified -- wonderful businesses that employ people, that give people livelihoods and then make people part of a family.  That brings me to something that's even harder.

How many of the government witnesses came in here and said to you that they were moved?

I'm going to use the word "love" in a second.  I'm going to tell you what I mean by love.  They were moved by Sean Combs.  They were moved by Sean Combs.

What does that mean?

Each of them put it in their own words.  You heard some of the personal assistants, what they said.  Being with him was like going to Harvard Business School, one of them said.  Being with him from a business standpoint was like drinking from a firehose, one of them said.  Being with him was the single greatest experience of my life, one of them said. He made my world so much bigger, someone said.  He taught me to have a work ethic, someone said.  He did things in business that I found absolutely fascinating, someone said.  I learned so much from him, someone said.  He pushed me harder than I thought I could push myself, someone said.

Did they always like him?

No way.  Let's not even go there.  Did they always like him?  They didn't always like him, but they loved him.  They loved him.  Even the ones who are suing him, and I'll get to this in a minute -- you know I will -- because this case is a lot about money.  But I'm talking about love for now.

They loved him.  They didn't want to leave him.  When they had to leave him, they talked about being suicidal.  That's what the woman who testified in this courtroom as Mia said.

And just by the way, I'm not going to call her Mia because her name's not Mia.  I'm going to call her the woman who testified as Mia, because that's what it is.  She was suicidal when she had to leave.  K.K. had to talk her down.

They loved him.  But there's more.  There's more, and everybody knew it.  And you know who told you about it?  Derek Ferguson told you about it.

Remember Derek Ferguson?  Handsome Black gentleman from the Bronx, came into this courtroom, went to Stuyvesant High School, went to University of Pennsylvania, went to Harvard Business School.  I stood right over here, and he was sitting right over there, and I said to him, you could go anywhere in the world.  You could probably have any job you want.  Why did you want to go to Bad Boy Records?  Why did you want to go there of every place in the world?

You know what he said?  Because there weren't a lot of places hiring people like me, from my neighborhood, and so I went to Bad Boy Records.  That was his answer.  And he was there for 19 productive, wonderful years.  And when he left, as he told you on the witness stand, he was thankful for everything that he learned.  And this is a smart man.  To teach this man something, I submit to you, you yourself have to be something special.  And he was very clear.  He learned a lot.  He learned a lot.  He had a world of knowledge and experience from being with Sean Combs.

There's something more to these businesses than that they're just successful, that people loved being there.  And I submit to you there's not a single person -- was it always easy?  No.  Did they always like him?  No.  It was hard.

Sometimes the real things in life are hard.  The lesson that you learn in life is that the lessons in life come from showing that you can do something hard.  No one remembers the easy days.  Maybe a vacation here and there.  But other than that, you remember the hard things.  You remember when it was hard:  I can't do that.  And then you do it, and you know you can do it again.  And then you do it again.  And that is how you build character.  That's how you have a real life.

These people didn't always like him, but they grew, and he was important to them.  And it was real and it was diversity.

We're trying now to do something that we've given a label to -- diversity, equity and inclusion.  He was doing this in 1993 as a 24-year-old, by himself.  Not because some government told him to, because that's who he was.  That's who he was.  That's who he is.  That's what his businesses are.  That's what the evidence shows you his businesses are.  That's not what the government says his businesses are.

What did the government said his businesses are?

Racketeering enterprise.

Are you kidding me?  Are you kidding me?

You heard -- did any witness get on that witness stand and say yes, I was part of a racketeering enterprise; I engaged in racketeering as part of an enterprise?  You didn't hear that from the evidence.  You didn't hear that from a witness.  You heard that from the prosecutors alone.  That's the fake trial I'm telling you about.  That's the fake trial.

So what happens?

He gets arrested, as you heard.  They do these search warrants for parts of some of them.  They destroy his property.  They run these special -- SRT, special response team.  Remember those guys?  SRT.  They move so clandestinely, you can't even follow them with a camera.  Remember when the agent said that?  How come you can't tell us that the guns were in the safe, oh, you know, those SRT guys, can't even follow them with a camera.

SRT guys run rampant on his properties, where his

children live, one of the agents said that.

By the way, second row, six of his seven children, the seventh being an infant, and his mother, here today. And you should know that. And the reason you should know that is because you should know who he is. Not who the government says he is, who he is. And you are starting to see that even in the evidence, even without me pointing out who's in the courtroom.

Let me show you some things already that you know already about this man's character.

Jane has a beautiful house. She has a beautiful house for her child, who I am sure loves and deserves the beautiful house. That's the evidence from the trial, the real trial.

What's the evidence from the fake trial?

That's coercion. Come on, please. The man takes care of people. That's what's in the evidence. Jane came up here and testified against him. I don't know what she's doing today. I hope she's having a nice day. But you know where she's doing it? In a house he's paying for. And I hope they're having a nice Friday.

His family's here because he took care of them too, because he takes care of people. He takes care of people. That's who he is. But the government executes these search warrants, hundreds of agents, special response team, and I guess it's all worth it because they found the Astroglide. They found it in boxes, boxes of Astroglide taken off the

streets.  Whew, I feel better already.  Artificial lubricant, not for me.  Boxes of Astroglide, in the garage, I think.  I think that's where he was keeping it.  But they got it.  The streets of America are safe from the Astroglide.  You know they are.  And they got the baby oil, and they found the personal-use drugs.  They did it.  It's all worth it.

Thank goodness for the special response team.  They found the Astroglide.  They found the baby oil.  They got, like, what, five Valium pills.  Way to go, fellas.  Photographing you, I understand why you can't do that.  When you're doing work like that, whoa.  You guys just do you.

They took Astroglide and they took baby oil, and that ends up being the evidence in this case, because his businesses are outstanding.  There's nothing about the businesses to find.  There's nothing about the businesses to make into a criminal case.

So what do they do?

They take yellow crime scene tape, figuratively, and they wrap it around his bedroom.  Crime scene -- your bedroom, your hotel rooms, where you go with your girlfriends.  Crime scenes.  A lot of yellow tape.  Every one of these hotels where he went with one of his girlfriends is a possible racketeering act.  Hundreds?  How many?  200?  300?  Racketeering acts.  That's a lot of crimes.

I know it's the 50th anniversary of jaws.  We need a

bigger roll of crime scene tape, because that's just not going to be enough.  So that's what they do.

They go into the man's bedroom.  They go into the man's most private life.  Where is the crime scene?  The crime scene is your private sex life.  That's the crime scene.  And keep in mind something else -- nobody invited the government. Nobody went to the police.  Every phone that I know of has a 9 and a 1 and a second 1.  Nobody calls 911.  Nobody calls the FBI.  No one calls Department of Homeland Security.  Nobody calls anybody.

They do call somebody, though.  They call civil plaintiffs' lawyers.  That's who they call, because this isn't about justice.  This isn't about a crime.  This is about money. It's about money.  And that's another part of the big themes in this case -- money.  Money.

Cassie Ventura sued Sean Combs for $30 million because Sean Combs had $30 million.  If he doesn't have $30 million, there's no lawsuit.  She sues him for $30 million because he had $30 million.  And you heard that this investigation, this very investigation, came out of that civil case.

No $30 million, no lawsuit.  No $30 million, no lawsuit, no criminal case.  That's why we're here.

We're here because of money.  It's really true, and I want to make this point to you time and again, and you'll see that I'm right.

This case is about five things, I submit to you, none of which is racketeering, none of which is sex trafficking, none of which is conspiracy.  Five things.

It's about love.  I know you guys are keeping, like, notes in your pad.  If you're keeping really, really good notes, you will know that the word "love" has been spoken at this trial 881 times.  881 times the word "love" appears in the transcript of this trial.  You know it's not about, like, stock fraud.

This trial is about love.  The trial's about jealousy, so much about jealousy, so much about jealousy.  It's about infidelity, related to jealousy, but maybe a different angle of jealousy.

It's about money, as I've said, and it's about a third thing that I want to say right off the bat, because it's one of the things we led with in the openings, and it's one of the things I want to say to you now.  Because one of the things my colleague, Ms. Geragos, has said -- she said it in the opening -- is we own -- we own -- the domestic violence.  We own it.

I hope you guys know this, and I'm sure you do.  When Ms. Ventura testified, I don't think we asked her a single question to challenge anything she said about being hit, being kicked, being dragged.  And the government's going to say, well, that's because it's a video.  It's not all on video.  You

P6rWcom1                      Summation - Mr. Agnifilo

see how this works.  Witness gets on the stand, talks on direct testimony, the defense gets up:  Oh, you're exaggerating; you didn't do this; you didn't see that; this was a different date; you know, this didn't really happen.

We didn't do that.  We just did not do that with her, period.  We didn't do it with Jane either.  I mean are we, do we have an obligation?  Can't be ineffective.  Do we have an obligation to put things in the right context?  Yes, we do.  But in terms of owning just as a matter of personal responsibility, matter of personal responsibility and accountability, owning the domestic violence, we own it.  It happened.  That's not charged.  That's the part of the false trial.

As we said in the opening, if he was charged with domestic violence we wouldn't all be here having a trial because he would have pled guilty -- because he did that.  He did not do the things he's charged with.  He didn't commit racketeering.  He just didn't.  He didn't commit racketeering conspiracy or sex trafficking.  He didn't kidnap anybody.  He didn't obstruct justice.  He didn't bribe anyone.

I'll tell you why in about, like, an hour he didn't do these things.  He did what he did, but he's going to fight to the death to defend himself on what he didn't do.  And that's what this trial is about.

So the issue for Cassie was domestic violence, and I'm

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

not the first person to say that to you in this courtroom.  The first person to say that the issue is domestic violence was Cassie Ventura.  A long time ago, you might not remember it all, but if you remember, she made an Instagram post.  Right around the time that -- so, that the video, sort of a version of the video that we call the CNN video, kind of came out, you know, in the spring of last year.  She makes an Instagram.  She testified about it.

She makes an Instagram post, and what she says is -- I want to get my words exactly right -- thank you for your love and support.  She thanks people for loving and supporting her.  The domestic violence is the issue.  The domestic violence is the issue.

She could have said anything.  She was sitting at her computer or on her phone or on her tablet, wherever she's writing.  She could have said anything.  It's about the video that the government showed you yesterday and that I'm going to show you a little bit about in a little while.  She could have said anything about the video.  She could have said sex trafficking is the issue.  She could have said having coerced sex with men is the issue.  She could have said running away from freak-offs is the issue.

She was very precise and very clear about what the issue was for her -- her, who was there.  The prosecutors weren't there.  The issue for her, who was there, domestic

P6rWcom1                    Summation - Mr. Agnifilo

violence is the issue -- her words to the world in an Instagram post. And as they say, and as I ask you to do as well, believe her. Believe Cassie. Believe her. What she says to you, domestic violence is the issue, I am asking you to believe her. And I'm asking you to believe her when, in that moment, in that context, watching that video on TV, watching herself -- and let's just, let's look at the world from her perspective for a second.

Imagine what that's like. Because it's horrible. It's just -- we're going to be real today. That's horrible for her and her parents. This video comes out all over the world, and there she is. It's a terrible moment. It's a terrible moment, and she could have said anything. I'm glad she said something, but what she said rings true not only for her but for this trial, and I most respectfully submit, for all of you. Domestic violence is the issue, is what she said.

Let's talk about Sean Combs and Cassie for a second.

To see their relationship is to see everything that a racketeering enterprise, everything that a racketeering conspiracy is not. It's a relationship. I don't expect to see you guys -- you know, don't feel disappointed. I am not going to go through a ton of text messages with you. I am not going to show you any charts. You guys have seen charts. You have seen the text messages. I've seen the close attention you're paying. You don't need me to do that.

P6rWcom1                        Summation - Mr. Agnifilo

There's a couple of points I want to make. I'm going to make them and I'm going get out. I'm not going to put up charts. We're not going to have a lot of screen time. Screen time is unhealthy anyway, I'm told. No. We are just going to talk. I am going to talk to you guys, and I'm going to tell you guys the story of this case.

If there's one thing you see in the evidence, Sean Combs and Cassie Ventura have a relationship. It's a relationship, and they are in love. It's a real relationship, and they are in love. And so let's talk about parts of it.

You remember how it started. They meet each other. Cassie has a boyfriend. She's had a boyfriend for three years; he's ten years older than her. But she meets Combs and he meets her, and they're off to the races. She has to sneak away from her boyfriend, so she comes up with a ruse, and the ruse is I'm hosting a party in Miami. But there's no party in Miami. But she comes up with a flier. Hey, I'm -- flier -- Cassie hosting a party in Miami. And it works. Gets on a plane. She goes to Florida. She hangs out with Mr. Combs. Mr. Combs rents a boat, she said. They go out in the ocean, or at least not too far. And they make love for the first time.

And they're in a really intense, highs are high, lows are low, loving, beautiful relationship for 11 years.

Now, I say it's a relationship because the government, I think, is trying to get you to believe this is some

one-sided, oppressive thing.  And we're going to talk a lot about Cassie.  Cassie is nobody's fool.  She is sitting somewhere in the world with $30 million.  All right?  So if you had to pick a winner in this whole thing, it's hard not to pick Cassie.  Cassie, at a certain point, just flat won.  And Cassie flat won.

No secret.  He's in jail.  You guys probably know that.  The handsome gentlemen behind him, members of the United States Marshals Service, wonderful, wonderful people.  And they've certainly done a good job of keeping him safe.  But they are keeping him safe in jail.

Cassie won.  It's like a slaughter.  It's not even close.  It's a hundred and up.  So anyone who's telling you: Yeah, Cassie, she's a victim; Cassie, she's naïve; Cassie, she couldn't see what was coming -- let's look at the facts.

That's why he loved her.  That's why he loved her. Cassie's no joke, and that's why he loved her.  She matched him.  She was like him.  He was at a certain level.  Cassie was at a certain level.  They're in love with each other, and in my opinion, it's one of -- it's kind of a great modern love story. They didn't write love stories like this in the 1800s because they didn't have a lot of these problems.

He has six kids at the time.  Most of the time he's with Cassie he has six kids.  He has women, you know, at the time that he's taking care of, and so it's complicated, as they

P6rWcom1                              Summation - Mr. Agnifilo

say.  And it's complicated, but they are truly in love with each other.  They're truly in love with each other.  And that is what defines their relationship more than anything else.

It's a relationship based on love and intensity.  I think at one point Cassie was talking about herself, I think she said she was young and insanely jealous.  You know what? That's exactly how you should be.  You want to love somebody? You love them.

And they loved.  They loved out loud.  At one point when they're breaking up, and I don't know that they help your deliberation process that much, but if you want to read some beautiful, beautiful language, if you're just kicking back in the jury room, nothing to do, don't want to go home, read the text messages around their breakup.  You'll cry.  You will cry. You will read evidence with an exhibit sticker on it and you will cry.  They're some of the most beautiful things I've ever read, and you will feel the same way, because it's truly, deeply tragic.  They really loved each other.  And that's not irrelevant to the charges.  And I'll tell you why in a little while.

They truly, truly loved each other.  They were truly looking to be as selfless as they could with each other.  And when at some point it just wasn't going to work, it wasn't going to work for all of the sort of original sins of their whole relationship -- Mr. Combs had other women; he just wasn't

going to give them up, and you heard that in the evidence from, like, five different witnesses. Gina, wouldn't quit Gina. Just wouldn't quit her. Add Gina. Didn't come here, but she's out there, and she wouldn't quit. Gina wouldn't quit. And all these other women, and it was just too much. And at one point she just had her last straw.

And then, Kim Porter passes away, and she goes to the memorial service. They're broken up. They're broken up. They're not together. She's with her now husband. She went to the memorial service, and Sean Combs says that Kim Porter was a saint.

(Continued on next page)

MR. AGNIFILO:  (Continued)

And that was the bridge too far.  Between that and Gina who wouldn't quit, Cassie made an adult choice.  She made the right choice for Cassie probably.  Who's to say?  But she made a choice.  She made a definite choice.  She said, you know what?  I just can't do this any more, and I'm not going to do this any more, and she left.  Like she could always leave.

And ask yourself, what happened?  Cassie leaves.  I've had enough.  Does anything happen to her?  No.  Every witness here, you know, if I would have done something, something could have happened.  Something would have happened to me.  I was afraid that something would happen.  Did anything in this case happen ever?  Was there one thing that ever happened?  She was always free to leave.  She chose to stay because she was in love with him, and he was in love with her.

And if you have any doubt, just pick a random -- pick a random message from August, September, October 2018 and just read it.  And you will see these two people loved each other.  They were deeply in love, and there was nothing -- if racketeering conspiracy had an opposite, it would be their relationship.  They are truly, deeply in love with each other, for real.

And they met.  They were their best selves when it came to sex.  They fought when it came to other women.  There were times Sean Combs was impatient.  There was times Sean

Combs was proud. I think that's probably the right word for what I'm trying to convey. He was proud. I don't like the way you spoke to me. You're not treating me with enough respect. You hurt my feelings. He gets his feelings hurt because he feels disrespected, but the thing they really argue about, what they tend to fight about is jealousy and infidelity. That's where they were not so good.

But where they're really, really together, they're together when it comes to sex. They just are. They just found each other's match. You know, and that's a beautiful thing when it happens. And it happened to them. There is not -- I submit to you there is not -- I don't know how many text messages there are between Cassie and Sean Combs in this case, maybe thousands. You won't find one, you won't find one where she is like, I didn't like that sex. I am not attracted to you. I don't like our sex life. I don't like -- it's just not for me.

Now, it's an eleven-year relationship, and sex is important in any relationship. So is it perfect? It's not perfect, but if you look at the text messages, you see what the issues are. And the issues are jealousy, other women. They are together. They match up when it comes to sex. And I guess if you had to sort of give their sex life a label, I guess you could call them swingers? I guess you could call it a lifestyle? What do you see in the evidence? You see a lot of

P6RQcom2                        Summation - Mr. Agnifilo

things in the evidence.  You see Cassie reaching out to Garrett from Cowboys4Angels saying:  Do you know of any swingers clubs?  I mean, this was their life.  No one is forcing her to do this.  She is a woman who actually likes sex.  Good for her.  She is beautiful.  She should.  She is intense.  She's unafraid.  I mean, if you had to give Cassie one word, the word that comes to my mind, unafraid.  She's unafraid.  I'm unafraid.  I'm just going for it.  And she is unafraid about everything.

Let's talk for a minute about Kid Cudi, and it's important that you understand that Cassie is unafraid.  Kid Cudi came in here -- and, by the way, I'm going to tell you guys a story.  This is not -- I'm not meaning to be judge-y or -- but I'm trying to give you guys facts.  I'm trying to give you guys respect.

Cudi comes in here, gets on witness stands and says: "Cassie played me."  She played him.  She played him good too.  She played him good too.  She played them both.  And that's just not something anyone can do.  Think about the Kid Cudi situation for a second.  They're together -- they're not broke -- Cassie, oh yeah, we're broke -- that's not what anyone else says.  They're together.  She's like, you know what?  I met this guy.  Sean put with him.  We're going to make some records together.  Hey, no ring on my finger, I'm going for it.  She goes for it.  The government wants you to believe, I'm scared.  She's scared to death of Sean.  Scared to death of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom2                    Summation - Mr. Agnifilo

Sean Combs.  Scared to death of Sean Combs.  Afraid of his temper.  Afraid of what he might do.  She lied to him for a long time over and over and over as she had a relationship with another singer-songwriter under his nose.

She's not afraid of him because you know why?  I can handle it.  She can handle it.  She could handle it.  Was there anything in evidence that led you to believe that she was about to tell one of them on the other?  Nothing.  Nothing.  Cassie is keeping it gangster.  Cassie is like I'm -- I'm going to pull this off.  I'm going to lie to him.  And I'm going to lie to him.  And not only that, I'm so in this for the long haul, I'm getting myself a burner phone.  Woa.  A burner phone.  Finally.  It sounds like what you would expect in a criminal trial.  Someone got a burner phone.  She got a burner phone because she is leaning into the deception.

She is not -- Cassie Ventura is not afraid, not afraid.  How am I going to pull this off?  I can't do it with my normal phone.  He might go through my phone, and he'll find messages with Cudi about hiking.  I think they went hiking.  Cudi said they went hiking.  I think they went hiking, that's why I say it.

I need a burner phone.  That is just not a decision that everyone makes.  Your average person, if you need a burner phone, maybe you shouldn't do it.  Maybe that's where the line is.  If I need a burner phone, maybe this is not a great idea.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom2                          Summation - Mr. Agnifilo

Not Cassie:  Burner phone.  She's nobody's fool.

Let's go one step further.  We'll get to this in a minute.  The morning, the morning of December 22, 2011, the whole thing was like Cudi and all that stuff.  Remember what Cassie told you?  You might have forgotten.  This was a long time ago.  I had two hotel rooms.  Woa.  She has two hotel rooms:  One where she's having a freak-off with him.  What's in the other hotel room?  The burner phone.  The burner phone.  She got a second hotel room for the burner phone.  She never really made clear what the second hotel room was about, or why the burner phone was in the second hotel room, but she said it.

So if any of you think for a second -- I think the word yesterday from the prosecutors was naïve.  She's naïve.  Come on.  She got a second hotel room to hold her burner phone.  She can handle it.  And had he not gone through her phone that morning, she was not going to tell anybody nothing.  She had this covered.  He goes in her phone, and he finds out.

All right.  We're going to start talking about racketeering acts now.  So the way -- and the judge is going to give you a legal charge later today, assuming after I finish my summation.  So the racketeering conspiracy charge has a number of its own predicate acts to it.  And the first one is the 2004 kidnapping of Capricorn Clark.  And I really can't wait to talk to you about this one.  Let's talk about Capricorn Clark for a second, because Capricorn relates to two of the racketeering

acts:  The 2004 kidnapping and 2011 kidnapping.  So let's talk about Capricorn Clark for a minute.

Capricorn Clark said something, I don't know what it was, five or six times, might have been a little more.  When she was on the stand, she said:  I just wanted to get my life back.  Remember that?  I just wanted to get my life back.  And she said it enough times that I said, what does she mean?  What does that mean, and is it relevant for her testimony?  I wanted to get my life back, and she told -- so let's unpack that, as they say.

What's something else that she said?  She said tragically — and I say this with the utmost respect — her parents passed away when she was young, okay?  She said that.  We didn't hear about any of the other witnesses parents.  Why?  Because this is important to her.  This is defining stuff.  And so for you to understand who she is, she felt the need.  And I'm glad she said it because you need to understand who she is.  You know, my parents passed away before I was fully grown up.  She didn't give an age, but at a point that was young and significant enough for her that she felt the need.  And I'm happy she did to talk about it at the trial.

So what did she say?  She said, I moved to the Bronx.  I moved to New York, and I meet Sean Combs, and he's a friend.  We're hanging out.  This is before I worked for him -- with him.  You know, it's me, him, and there's another girlfriend,

and we're hanging out.  And she says, oh, he -- I asked her what her relationship was.  And she goes, we're super platonic friends.  Now, I don't know what super platonic means.  But what I think it means is we're way more platonic than I want.  That's what super -- and I think she said it three or four times.  She said it on direct and cross:  We were super platonic friends.

What's the significance?  She likes him.  I mean, he's -- he's up and coming.  It's 2002, 2003, he's making a mark in the world.  And Capricorn -- I mean, listen you guys have to size her up for yourself.  And I'm going to say something, and you tell me if you think this is right:  She's a little -- there's something a little off kilter about Capricorn.  I think she's fundamentally a good person, but she's a little out there.  And we'll talk about why; you can see that in the evidence.

Super platonic friends.  She goes on later, at one point she was trying to get back with Sean Combs, and she says in a text message from June 15, 2021, and so she's talking about what was going on like 20 years earlier.  You know I had the biggest crush on you.  I think we misused our dope chemistry.  All right.  The first one is pretty self-explanatory.  She had the biggest crush on him.

The second one is more than that.  We misused our dope chemistry.  The way that I really stay close to you, I didn't

do it.  It didn't work.  I see how it goes.  Your close long term with the women that you're with in that way; the women you have a romantic relationship with in that way, and the misusing of the dope chemistry is that just didn't happen for her that way.  She was a great worker, and she kept coming back over and over, and we'll talk about that.  But she didn't stay in his life long term.

So when she is saying on the stand, I just wanted to my life back, she's talking about him.  Not him maybe as a person, but the world that Sean Combs created and is at the center of.  That's the life she wants back.  Because mostly when she said it, it was when I said, well, why -- you got kidnapped twice, once at gunpoint, like, come on, the really fat guy, the five-time wider than you guy was going to throw you in the East River.  It's terrifying.  Then you got kidnapped at gunpoint.  Why do you want to go back and work for him?  And what she said was:  I wanted my life back.  So there's two things related to that.  We're going to talk about both of them.  One:  That other stuff didn't just happen, at least not the way she's saying it.  And the second is that's the life she wants back.

So with that, let's go to the 2004 kidnapping.  So the way she says it is that she and Mike B, she and Mike B, who's working, I think she might have been a stylist, she said back at the time are getting like their nails done.  I don't know.

They're doing something.  They're doing something.  And she has jewelry in her backpack.  And then the jewelry is gone.  And so what she does — this is a very important part — what she does and I want to get it because I want to get it exactly right. When she realizes the jewelry is gone, this is a quote, "I called everybody at 1440 and I told them to lock everybody in and search them."  That's what she says:  That she calls 1440, their main office, I said, "Lock everybody in and search them," Capricorn said.

What goes on to happen is lie detector tests. Polygraph examinations are administered.  And she says she got one.  And we'll talk about hers in a second.  And Mike B got another.  And what she says about hers is that it lasted all day long for five days.  And the polygraph examiner who is this humongous man, five times wider than her threatened to throw her in the East River, okay.

A couple of things about this -- this is a kidnapping. She's not like that she was like harassed or that, you know, she was inconvenienced:  She was kidnapped.  She went home every day.  So what is the government alleging?  Is the government alleging five consecutive kidnappings?  Here's the Monday kidnapping.  Here's the Tuesday kidnapping.  The Wednesday kidnapping.  The Thursday kidnapping.  And finally the Friday kidnapping.  They just allege one kidnapping.

So was she kidnapped when she was home by herself?

P6RQcom2                         Summation - Mr. Agnifilo

She said Paul Arthur drove her home. A door-to-door kidnapping. That's great. This is charged. The U.S. Attorney's Office for the Southern District of New York is charging this as a kidnapping. A polygraph examination from 21 years ago where she goes home every day.

That's just not a kidnapping. She is going home. So whatever happens, even if the building locks from the outside, even if a New York City building locks from the outside and she is locked up there in the sixth floor getting a lie detector test for ten hours a day for five consecutive days, she's going home. It's just not a kidnapping.

And what did she say? She said: I kept doing it because I wanted to pass. And get back to my job. Now, I have no doubt that a lie detector test is unsettling. It's the most -- that's the whole reason investigators use it, it's unsettling. So I have no doubt that she was unsettled. She was not kidnapped. Of course she was not kidnapped because the kidnapper doesn't drive you -- so how does it work?

I mean, let's be honest for a second. You guys are stuck in here for long hours. At one point, the day ends, you go home, you come back. Anyone feel kidnapped? You are not kidnapped. You're about as kidnapped as she was kidnapped. She wasn't kidnapped, and neither are you. So that's just silly.

But even aside from that, she said Combs had nothing

P6RQcom2                          Summation - Mr. Agnifilo

to do with it.  He didn't even know about it.  Did she speak to Sean Combs at the end of this?  No, never came up.  He's charged -- he's charged with kidnapping.  That's real.  The government wants you to go in the jury room and sit around the table and go, well, I wonder if he kidnapped her.  We're going to have to think about this.  I'm going to spend a lot of time trying to figure out if he kidnapped her in 2004 when she went home and see if he knew anything about it.  That's a charge in a racketeering case.  It doesn't get more serious.

Now a couple of things — and this is important — Capricorn Clark says when she got to the office and she met Sean Combs in 2004, he was starring on Broadway in the play *Raisin in the Sun*, played the starring role of this seminal, seminal play.  And she had some involvement in this.  She was involved along with him in the Vote or Die campaign in advance of the 2004 presidential election.  He was also running several multimillion dollar businesses, so the idea that he would take time away from starring on Broadway -- you know, some people just star on Broadway and don't do much else.  That happens in the world.  He's starring on Broadway.  He is involved in the middle of a very significant voter drive campaign called Vote or Die.  He is running all these companies.  Do you really think he is waiting on the edge of his seat:  How's that lie detector test coming back?  I can't wait to see if she passes it.  He couldn't care less.  He had nothing to do with this

P6RQcom2                    Summation - Mr. Agnifilo

because he is plainly doing other things.

Now, David James testified as well.  He was given two lie detector tests; not kidnapped, but he did get lie detector tests.  And he was very clear, the lie detector examiner was a former FBI agent.  He was from the FBI, that's what he said:  A former FBI agent.  There's no reason to think that they have multiple polygraph examiners.  He had no problem with the -- he said it was unsettling.  They put stuff on my chest.  They wanted to see how I was breathing.  It's unnerving because that's the whole point of it.  The point is it's just not kidnapping.  They charged it as kidnapping.  And you know what you guys have the right to do?  You guys have the right to say, huh, that seems like a stretch.  I wonder why they're doing that.  I wonder why they're making such a stretch.  Why charge a kidnapping where the evidence is that he didn't have anything to do with it, where the witness says I never spoke to him about it, where he's doing 15 other major things and where the witness goes home every night?  Why charge him?  You are allowed to ask that question.  And you can come to whatever answer you think is the right answer.

She leaves -- Capricorn leaves for awhile.  She leaves for about a year because she makes more money, and then she comes back.  And now let's talk about the December 22, 2011, the morning of that day.

So who are the players?  The players are we have Sean

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

and Cassie, okay.  They're in a hotel room having a freak-off, okay.  We have Kid Cudi.  We don't know where Cudi is.  Cudi doesn't say where he was in the morning.  It probably doesn't matter all that much.  We have Capricorn, who is presumably in her apartment.  And we have Police Officer Ignacio.  Police Officer Ignacio, a 17-year LAPD officer, patrolling the beat that he's familiar with.  So let's take a look at the morning of December 11 -- I keep saying December 11 -- December 22, 2011.

As I say, Cassie has two hotel rooms.  She has her burner phone in one of the hotel rooms.  Combs goes and gets access to her non-burner phone, looks in it, and sees messages with Capricorn about Cudi.  Might have been called Scott in the message, it's hard to know, and possible hiking.  Next thing we know, it's 5:30 in the morning, according to Capricorn, and Sean Combs is at her door, okay?  Never been there before.  She says, he's never been to my house before.  5:30 in the morning he's at her house, and he has a gun.

I'm going to go through five reasons why he didn't have a gun.  Five reasons why he did not have a gun.

Reason number one, why would he have a gun?  Let's start with that one first.  Why would he have a gun?  Capricorn loves this man.  She probably been waiting for him to come over at 5:30 for years.  Finally.  Finally came over at 5:30.  If he asked her to take a trip to the moon, she'd go, and he knows

P6RQcom2                          Summation - Mr. Agnifilo

that.  He doesn't need a gun.  He needs to put a gun against Capricorn to get Capricorn do anything?  She's so honored that he came over.  He doesn't need a gun.  He doesn't think he needs a gun.  He doesn't need a gun.  He didn't have a gun.

Second, Capricorn says he wanted to know where Cudi's house was.  Here's why it doesn't make sense.  Because Cudi said Cassie told Cudi that Cassie already told Combs. Okay.  So you following that?  I know it was a couple of steps. Let's go through it again.  Cudi testified that when Cassie called him, Cassie said, "I'm worried I gave Sean your address. I think he might go to your house."  That's something that's going to stay in Cudi's mind.  I submit to you, that's an important piece of information.  It's early in the morning, presumably being woken up.  He's being told, "I gave Sean your address and he might go to your house."  So let's say that's true.  He doesn't need the address from Capricorn.

Third reason, Sean Combs has everything to lose and virtually nothing to gain from having a gun.  I mean, it's 2011.  He's already Sean Combs.  He's going to an apartment building that has security guards.  He's going to have to get out in the street.  Capricorn says he's sort of disheveled. It's not like he has a holster.  He shoves a gun down the front of his pants.  I submit to you, there is no way on God's green earth that he is going to take a gun out of a car, walk through the streets, get through security guards, and go see Capricorn

P6RQcom2                    Summation - Mr. Agnifilo

with a gun.  It's just not going to happen.

Number four:  Capricorn would not have stayed employed had he really pulled a gun on her.  That's just -- it just didn't happen.  There's no way that Capricorn -- you know, I want my life back is one thing.  You pulled a gun on me, and I'm the victim of an armed kidnapping?  Just didn't happen -- there was no gun.  He didn't have a gun.

And the fifth, and the best reason why he didn't have a gun, is because Cudi and Cassie say that Capricorn never said gun.  All right?  So let's break this down.  This is important. I really want -- you guys need to understand this.

Capricorn says:  I wanted to warn Cassie and Cudi, and so I called Cassie.  She says she called her on her burner phone.  I don't know that's possible, and I'll tell you why in a minute, but she says:  I called Cassie.  I want to make sure I get the statements exactly right.

Okay.  What she says is: "Puff came, got me with a gun.  Brought me to Cudi's house to kill him."

So Capricorn when she testified said: I made a phone call.  I said:  Puff came, got me with a gun.  Brought me to Cudi's house to kill him.  That was her statement.

Cudi got on the stand and said what Capricorn said was:  Sean Combs and an affiliate were in my house.  She was in the car.  All right.  No gun.  All right?  Had Capricorn said gun, Cudi would have remembered gun.  You're not going to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom2                        Summation - Mr. Agnifilo

forget gun.  Gun is one of the clearer words in our language. You say gun, you're going to remember gun.  Had Capricorn said to Cudi what Capricorn says she said to Cudi, Cudi would have remembered gun.  He would also have remembered kill.  Another really clear, single syllable word that you tend to remember. Cudi didn't say that.  Cudi didn't say that Capricorn said that because Capricorn didn't say that.  And there is no reason if Capricorn sees a gun, and if the whole point of calling Cudi and Cassie is to warn them about danger, I'm warning you about danger, she is going to say gun.  But Cudi and Cassie don't hear gun because gun was never said.

So working backwards, they didn't hear gun.  When Cudi speaks to the police officer, he doesn't tell the police officer anything about a gun, doesn't say anything about gun to Officer Ignacio.  Didn't say Combs had a gun because no one told him Combs had a gun because Combs didn't have a gun.  It works backwards.

So when Capricorn says that Combs had a gun, that's not possible because if he would have had a gun, she would have said gun, Cudi would have said gun, Police Officer Ignacio would have written gun in his report, and he wouldn't have written it up as a trespass, which is what he did.  He writes it up as a trespass.  Had he believed that Sean Combs had a gun, he wouldn't be writing this up as a trespass.  So there's no gun.  Capricorn didn't say gun because she didn't see a gun

because there was no gun.

Okay. A few more reasons why her story falls apart. The times don't line up. She says Combs come to him at 5:30, and then she says she makes the call at 6:15. 6:15 a.m. Capricorn says: I make the call to Cassie at 6:15. Cassie and Cudi at 6:15. What do we know from Police Officer Ignacio? He gets the call at 8:20. He gets the call at 8:20. And when he gets there, the Escalade is in front of the house, so it's just not 61:5. And that's literally the difference between night and day. I mean, it's not like she's off by 15 minutes or 20 minutes. I mean, one is 6:15 and one is 8:20. So it can't be both, and she's clear as a bell that she called at 6:15.

One other thing she says, it was a car chase. Let me read to you her testimony about the car chase.

"A. We heard a very fast-moving engine coming up the hill.

"Q. What happened next?

"A. Out of the corner of my eye, I could see that it was Cudi. Puff looked at my face. I guess I gave him a visual cue that it was him. And he goes, There's that N-word right there.

"Q. What happened next?

"A. Cudi pulled up next to the Cadillac Escalade, came to a complete stop, looked, and then took off and sped up the hill. Puff and Rube jumped in the car and we started chasing him.

"Q. How long was this chase?

"A. It felt like forever, but couldn't have been longer than a

minute.

"Q.  What, if any, other cars did you observe while you were driving at this time?

"A.  Cudi lost us.  We turned south, down Laurel Canyon.  We heard sirens and we passed the police.

"Q.  In what direction were the police headed?

"A.  They were headed north on Laurel Canyon.  We were headed south on Laurel Canyon."

Do you think Cudi forgot he was in a car chase?  He seems like a pretty together guy.  Do you think he was in a car chase where he whizzed by police, and he just forgot to mention that to you?

Officer Ignacio had enough wherewithal to get the license plate; missed the car chase.

There was no car chase.  There was no car chase.  She is giving vivid detail about a car chase that didn't happen, and you guys have to keep that in mind about all of her testimony.  The Judge is going to give you instructions, give you a lot of instructions.  One of the instructions I think he's going to give you is if you find that a witness lied in regard to some material aspect of their testimony, you are free, if you think it's appropriate to do so, to disregard all of the witness's testimony.  All of it.  You goes don't have to.  You guys can do whatever you want, but it's going to be one of the instructions the Court gives you about how you can,

if you see fit, look at a witness's credibility.  And that's all you really need.  I mean, she is saying -- her sworn testimony is that she saw a car chase, and there objectively, conclusively was no car chase.  There just wasn't because we have a police officer saying there was no car chase, and we have Cudi saying there was no car chase.

A few other things small things, but maybe it's not so small.  She says, yeah, from where I could see when the gate was open, I could see into the house.  Okay.  Police Officer Ignacio says you can't.  My money is on Police Officer Ignacio.  Between Capricorn and Police Officer Ignacio, I'm going with Police Officer Ignacio.  You cannot see into that house.  As I said, the statements are different.

And the final thing.  What's up with this call to Lauren London?  Remember this?  She mentioned this for the first time on the stand.  She says:  A matter of life and death, I have to warn Cudi and Cassie that Puff's here with a gun.  And then I started asking her:  Well, did you call Lauren London?  Yes?  No?  Maybe?

Yes, I called Lauren London.

Was Lauren London on the phone when you were talking to Cassie and Cudi?

Her answer was it's possible.  It's possible.

Man, you are -- it seems like everything is possible with you.  That there was a third person on the call?  She was

P6RQcom2                         Summation - Mr. Agnifilo

clear as a bell.  She is clear as a bell on the stand.  She called Lauren London.

And I asked her:  Tell me exactly, exactly what you said to Lauren London.

And her answer was: "I came up here with Puff.  I want to run away."  Who remembers what she was afraid of?  Mountain lions.  I'm afraid of the mountain lions.  That's what she said.  Puff brought me up here.  I want to run away.  But I'm afraid of the mountain lions.

Now I'm not saying mountain lions are not scary.  But if you were just kidnapped at gunpoint, you wouldn't be talking about the mountain lions.  You just wouldn't.  I'm afraid of Sean Combs with a gun.  I'm afraid because I just got kidnapped at gunpoint.  What she said, what she said she said, I'm afraid of the mountain lions.

I think we're done with this.  There was no kidnapping.  Can I tell you what I think probably happened based on the evidence?  Combs comes to her house, it's early.  They talk.  If he gets there at 5:30, they're probably in her apartment for -- because they have to be there at 8:20 because Ignacio is right, Ignacio is right, so they are there at 8:20.

So if Combs comes to her house, apartment at the time she says, and we don't know that that's right either, say, at 5:30.  They're hanging out for two hours, and then they go over.  That's the only thing makes sense because what we know

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

is true, what we know for a fact is true because Ignacio got the license plate, so we know that's right, we know the Escalade was there at 8:20.  She doesn't give any explanation for how the Escalade is there at 8:20, but we know it's there. So what I submit to you makes sense is that this is not a kidnapping, but she doesn't want to give the impression that she is like part of this volitionally.

He pulled a gun.  He pulled gun on me because the only way to make this against her will is to go gun because anything short of gun, she went on her own volition, which is actually what happened, but she doesn't want to say that.  Maybe it's loyalty to Cassie.  Maybe it's loyalty to Cudi.  I have no idea.  But she doesn't want to say I went there of my own volition, so she makes up gun, because if you say a gun, I got to go, not my choice any more.  I got to go if there's gun. There was no gun.  She went on her own.

And, listen, and I'm not the man telling you that the rest of it's wrong.  You following me?  He went there.  He went there.  He was mad at Cudi.  He wanted to fight him.  Because that's who he is.  He wanted to fight Cudi, and Cudi wanted to fight him.  Remember what Cudi said?  I'm going to say it: Motherfucker, you're in my house, right?  And these are two grown men who are going to have a fistfight because he's not a coward.  He's not afraid to fight.  And Cudi for his credit, he's not a coward.  He's not afraid to fight either.  So at the

P6RQcom2                           Summation - Mr. Agnifilo

risk of sounding sexist, they're going to do what men do:  They are going to have a good, old-fashioned fistfight, which is why you know he didn't do anything to that man's car because that's not his style.  He's a fighter.  He's a fighter.  You have a problem with me, I'm coming to your house.  I'm coming to your -- you're messing with my girl, I'm coming to your house, and we're going to fight.  No weapons.  We're going to fight.  One of us is going to punch the other in the nose and get punched in the nose, and we're going to have a good old-fashioned John Wayne 8:00 in the morning Hollywood Hills fight.  That's who he is.  He went there to fight.

Now let's talk about this nonsense with the Porsche.

There is no evidence.  I mean no evidence that he had anything to do with the Porsche.  Nothing.  Let me tell you what evidence is.  DNA is evidence.  Fingerprints are evidence.  Credible eyewitnesses - evidence.  Who else would do it?  Not evidence.  Because he wouldn't do it.  He would affirmatively not do it.  If he wanted to fight Cudi, they would fight.  Blowing up a man's car or what happened with that Old English bottle is cowardly.  It's a coward's way out.  I'm afraid to fight him so I'm to blow up his car.  Come on.  Be a man and fight him.  That's who he is.  He's going to fight him.  He's not going to blow up his car.

So let's talk about the Porsche.  You saw the pictures -- I swear on myself, I'm going to show you little as

little stuff as possible.  There's two things in that Porsche, only two.  Two things are in that Porsche:  There's a Molotov cocktail, and there's a single glove.  Now, Cudi keeps a neat car.  There are no bubblegum wrappers.  There's no Easy Pass receipts.  I don't know if Easy Pass gives receipts, they probably don't.  There's nothing.  No trash in the car.  Take a look at the car.  It's crystal clean.  There's two things in it:  The Molotov cocktail that didn't work out, and there's that one glove.

And remember Lance Jimenez was his name.  He testified as expert witness in fire science or whatever he testified as an expert in.  Remember what he said to you?  He showed you a bunch of pictures.

Recognize what these pictures are?  I think there was 38 of them.

Yeah, these are the pictures that my partners took that day.

These are all the pictures?

Well, it's not all of them because we had to show you the picture of the glove.  I know what you're thinking, incident in California involving a glove?  Really?  But it's true.  We had to show you a glove.  Why would he withhold the picture of the glove?  Is there a good reason to not show the glove?  They're showing you 38 pictures.  Why not show you the picture of the glove?  Why take the picture of the glove and

P6RQcom2                     Summation - Mr. Agnifilo

say, you know what?  They won't notice.  Yeah, these are the pictures blah, blah, blah, blah, blah.  Not all of them.  They plucked the glove from the pictures.

Now, am I suggesting something?  I'm suggesting the investigation stunk.  That's what I'm suggesting.  It's a terrible investigation.  Let me tell you why it's terrible.  He told you, he says, we recovered two fingerprints.

Well, what happened to them?

I don't know.

Okay.  He's charged with arson.  That's real.  You're going to go in the jury room, and you're going to determine his fate on arson charge.  And Investigator Jimenez told you:  I don't know what happened to those two prints.  No idea.  I can't give you any help at all.  Two prints.  No idea.

Okay.  There was a what he called a hit, his words.  There was a DNA hit.  That's what he said.  That's what he testified to.  There was a DNA hit.  Now it wasn't enough DNA to indicate a person but it was consistent with a female contributor.  So let's keep our definitions nice and tight, okay.

Partial DNA profile, meaning we don't have a person.  Consistent with a female contributor.  Looking back trying to remember what he was like on the stand, did you find him kind of unhelpful?  Did you think he was just not real -- he wasn't really helping the process that you guys have to do?  You would

think this man never heard of the letters D and N and A being in the same sentence. I have no idea. I don't do it myself.

No one thinks you do it. You send it out to a laboratory like every police department in America. Of course you don't do it.

My partner sent it out.

Where did you sent it out to?

I don't know.

Can you imagine what his testimony would have been if it came back with his DNA? Do you think it would have been like that? He would have known everything about DNA. DNA is my middle name. But partial female contributor, I don't even know when the results came back. Sent it out to a laboratory. I have no idea. DNA, finally in this case there's evidence of something. And Investigator Jimenez couldn't care less. Never followed up on the fingerprints. Never followed up on the DNA.

But he did two things, and I wonder if it's a coincidence. He tried to track down Cassie. He tried to track down Capricorn. Are they men or are they women? Huh. I wonder if that's a coincidence. Now, naturally, because he's a man, he's like, yeah, you know, I -- but remember what he said about Capricorn? He said: I spoke to her brother, and he fought with me. He says: He obstructed my investigation. That's what he said. He said: Capricorn's brother obstructed my investigation by being whatever -- however difficult

P6RQcom2                        Summation - Mr. Agnifilo

Capricorn's brother was.  Now I'm not saying Capricorn -- please, when I tell you I think something, I'll tell you.  I don't think Capricorn did it.  I don't think Cassie did it.  I just think the investigation doesn't reveal to you who did it.  That's all we're here to do.  We're not here to solve a world crime.  You guys look at evidence, okay?

Now, another thing he's trying to track down Cassie, he goes to the point of calling her father.  Remember that?  He called her father, who's a fireman, and they kind of had a fireman-to-fireman talk.  Hey, can you get your daughter to call me?  Nobody ever called him.  Maybe that's why he was so upset.  He seemed upset on the stand.  I'll let you guys figure it out.  No one called him back.  Capricorn's brother obstructs the investigation.  He speaks to another fireman.  Can't get the daughter to call him.  The one thing is very clear, he had nothing to do with anything.

Now, I have heard at this trial they keep saying that Sean Combs said he was going to do it.  He was going to like blow up the car, and what they're talking about is this.  They're talking about this; they're talking about this email.  This email is B like boy 315.  It's a Government Exhibit.  They're talking about this email.  Let's read this very important email and see if it says anything about I'm going to blow up a car.

It's from Veronica Bang, which is, I don't know,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Cassie's name to Capricorn and to her mother.

"The threats that have been made toward me by Sean Puffy Combs." Let's stop right there. What's going on there? Why is she calling him Sean Puffy Combs? She knows who he is. Capricorn works for him. She doesn't have to say Sean Puffy Combs like she is memorializing something for some future reason perhaps. You know, Sean Puffy Combs, I'm surprised she didn't put his social security number, last known address.

"Are that he is going to release two explicit sex tapes of me." Now that was part of the evidence. I think that was said. I think he was angry, and I think he said it. He didn't do it. He would never do it. But let's say he said it.

"One on Christmas Day, maybe before or right after, and another one sometimes soon after that."

This is the important part. "He has also said that he will be having someone hurt me and Scott Mescudi physically. He made a point that it wouldn't be by his hands. He actually said he'd be out of the country when it happened."

I'm a little more dubious on that one because I don't think he would pass up the opportunity, if he had the opportunity to beat up Scott Mescudi himself. But there is nothing about a car. So this is what they're talking about. He didn't say he was going to do anything with a car. He's saying he was going to -- what that says, he was going to hurt them. Nothing about a car. So this whole notion that somehow

he confessed before the point is ridiculous.  It just didn't happen.

We're going to talk about a -- there's an allegation that Cassie was kidnapped and was kept in the London Hotel. Okay?  She never talks about the force.  She never talks that somehow she was taken to the London Hotel by some forcible means.  What she actually says was what she wanted was she wanted to stay at Sean's house.

Here we have another one for the ages:  Kidnapping, where rather than staying at Sean's house, she has to stay at the London Hotel.  Let's look at the testimony on this.  It's from page 769, line 16.

I'm going to read it to you, but you can read it yourself.

"Q.  You mentioned that you said you wanted to stay at the house?

"A.  Um-hmm.

"Q.  Who didn't allow you to stay at the house?

"A.  Sean didn't."

Here's the weird thing about this.  Each kidnapping is a little weird.  The first gets to go home at night, and now she's like I want to escape the London Hotel to go to his house.  I mean, it's just not a kidnapping.  It's not a kid -- when you want to go to the house of the guy charged with the kidnapping, you know what that means?  It means it's not a

kidnapping.  And she doesn't say anything about force.  She doesn't say anything about that.  And I submit to you that, listen -- and we're going to take the domestic violence, let's take the domestic violence.  Obviously, something happened.  Obviously, there was some physical event, and she had injuries, okay?  So she goes to the hotel as much for her own good as anyone else's.  She doesn't -- they don't want this in the press.  They're public people.

Something has gone on at this trial that really is unfair, which is that every like event that could be sort of scandalous or bad press is only about Combs.  That's just not true though.  Cassie is a public persona as well.  And when we get to what happens with the videotape, you're really going to see that because Cassie says something that's very important, which is:  I don't want that videotape in public.  I have a movie coming out.  So let's balance this out and see it for what it is.  They don't want bad press.  This would be bad press.  I submit to you, listen, she probably would rather be at his house, but that doesn't make it a kidnapping.  so this is not a kidnapping because what she really wanted was to go to his house.  Okay.

Bribery of the security guard at the Intercontinental.  Let me read you the jury charge on this.

This is the charge at page of 26.

1.  The conspirator gave or offered or promised a

bribe to a witness, or a person about to be called as a witness, or a person about to give material information to a law enforcement official about a crime.

A law enforcement official about a crime.

2.   The conspirator acted with the corrupt intent to persuade the witness or person to agree that the bribe would unlawfully influence the testimony or information that the witness or person would give.

This is about law enforcement.  This is about influencing law enforcement.  This is not about making sure you don't get bad publicity, okay.  And that was everybody's motive that day.  Everybody was moved to make sure we don't get bad publicity.

Now I want to read -- before I go any further, I want to read you guys something that was testified to by Mr. Kaplan.

And I'm looking now at page 2332, line 19.

"Q.  So you had some measure of distrust for the hotel staff that they might release something?

"A.  A large measure.

"Q.  A large measure of distrust for the hotel staff?

"A.  Mmm.

"Q.  And why did you have this large measure of distrust for the hotel staff?

"A.  Because money's involved and people want a payday.  If they steal security footage or if there's a security guard who

leaks footage or any number of permutations, that could be like that would have been severely compromised, and it would have been a terrible look on me, and it's not what I wanted.  I didn't want his reputation to be compromised.

"Q.  You think that would be unfair?

"A.  I think that's the way the world works.

"Q.  I mean, you used the word payday?

"A.  To, like, sell the video or the imagery to a news outlet in exchange for money as a hotel employee."

That's what they're worried about.  He testified to it.  That's what they're worried about.  They're worried not about the police.  They're not worried about the police.  I mean, listen, it's a horrible video.  It's a misdemeanor.  They're worried about terrible publicity.  And that's what he says.  That's what he says.

And guess what happened?  Footage never made it quite to the trial.  He's right.  He was right to be worried.  He was right to be worried that people are going to get a payday.  He's right to be worried that if the hotel -- if a hotel employee, you know, gets something that could get him some money or her money, that they might do it.  It happens.  And it happened.  So that's what they're worried about.  They're not worried about the police.

The police are nowhere near this situation.  There's no -- the police are not called.  Cassie doesn't want the

police called.  Mr. Combs obviously doesn't want the police called.  No one calls the police.  There's no police.

Now, is Combs acting — I'm going to say it; be mad at me when I say it — kind of like a fool when he's calling Cassie, "Oh, they're about to arrest me."  He's just trying to get her attention because she's angry.  Damn straight she's angry.  She should be angry.  There would be something wrong if she wasn't angry.  You saw that video.  She's angry, and he's calling her, and she's freezing him out, as she should.  And he's just trying to get her attention.  But there is no police.

Now, at one point he leaves and he goes to her apartment and he's banging on the door, maybe with a hammer, maybe -- let's say it's a hammer, all right.  He's back banging on the door with a hammer.  It's very clear, I think it was Kerry Morgan who said one of the neighbors called the police.  That's why the police come.  The police come because he's banging on the door.  It's like 6:00 at night.  It's four hours later, she testified.  We're going to go through this in detail.  They come four hours later because of what happened at the apartment.  The police aren't investigating what happened at the Intercontinental.  No one called the police.  There were no police involved.  But when he's banging on the door, Kerry Morgan says a neighbor called the police, so that's why the police are there.  Don't mix this.  It's apples and oranges.  The police have nothing to do with Intercontinental.

The Intercontinental had no police, period.  And if there's no police, period, I submit to you he cannot be guilty of bribery under California law, as the Judge will read it to you.

One other thing.  Yesterday when the government was summing up, they put up a slide.  And the slide I think looks something like this.  It had the top of this, and it had the bottom of this, okay?  I can see you guys remember, okay.  And what they said when they showed you part of this and part of this is that this agreement said that no one can tell anybody.  No one can tell anybody about like what happened.

If they would have showed you both pages of this, which they didn't, you would know that's not true.  Because of let's read the second page.  It wasn't on the slide which they didn't tell you about.  This is going to be a theme.  We're going to see about a dozen of these over the next few hours.  What does this say on the second page?

A disclosure of any confidential information in response to a valid order by a court or other governmental body, or as otherwise required by law, will not be a breach of this agreement or a waiver of confidentiality for other purposes, provided, however, that the recipient provides prompt prior written notice thereof to company and enable company to seek a protective order or otherwise prevent the disclosure.

What this says is they can very much tell the police.  They can very much do whatever the law requires, but we want an

P6RQcom2                        Summation - Mr. Agnifilo

opportunity to go to the court and say maybe this still shouldn't be in public.  Maybe they go to a court, and they win.  Maybe they go before a court, and they lose.  But that's very different than what the government told you that agreement says yesterday.

Why didn't they show you that part?  Why didn't they tell you what it said?  I mean, they want you to convict him of bribery.  And they weren't straight with you.  And that's a big deal.  And we're going to come back to this a few times.  Why don't they show you what the second page said?  Yes, it's in evidence.  I get it.  You can go back and dig up this stuff on your own, but they didn't show it to you in summation.  In the summation they said it wasn't true.  They said you can't tell anybody.  That's just not right.  It's not right, and it's not true.

Here's another thing.  Witness tampering.  The woman who came into this courtroom and testified under the false name Mia, okay?  They say I think that D-Roc was trying to pay Mia.  D-Roc was trying to give Mia money, and in the context of things, that's tampering with a witness.  Here's what they didn't tell you.  And, yeah, I know it's in evidence, and you can dig it up and find it, but they didn't tell you about it.

I'm going to read the whole message to you because part of the reason I'll read the whole message to you is there's this notion that the government is that she's like

somehow scared and battening down the hatches and all this stuff, but listen to this message to D-Roc.

Aww D, miss you so much.  I know how much shit you deal with from all over and in every direction and staying in your bubble is super smart to protect your mentality from any more bullshit than you need.  We've all got our own bullshit to take care of, right?  And sometimes when we are natural caretakers, we tend to ignore our own needs and everyone assumes we're okay, but we need help, love, and empathy too. So just know it's okay or not to be" -- you know what?  I'm not going to read the whole thing.  It's just too damn long.

I'll read the second to last paragraph.

But I do chartable shit here, like helping out local families grow small business, building their little houses, whatever they need, et cetera.  That I ask physically do because I'm out of skrillo money.

I'm out of skrillo money.  Why does D-Roc offer her money — which we'll get to in a minute — because she's telling him "I'm out of it."  Do you remember them telling you that yesterday?  They didn't tell you that yesterday.  Yes, I know. They can come up on rebuttal and say, yeah, it's in the evidence, but they didn't tell you.  They want you to go back and deliberate about witness tampering, and they didn't put it right in front of your face, right in front your face, that she says "I'm out of skrillo money."

P6RQcom2                    Summation - Mr. Agnifilo

What does D-Roc say back?  I'm so proud of you.
You're my sister for real.  If you need anything, I can help.
I'm not rich, but I'm not broke either.  I love you, let's talk
sometime tomorrow.

Come on.  You guys have got to decide this case on the
actual evidence, and you guys know that.  They should make that
job easy for you.  They shouldn't make you have to go find
things in the evidence.  They should have showed you that.
They should have showed that you she said I'm out of skrillo
money.

All right.  The other witness tampering that they say
happened is with Jane.  This is in regard to those two recorded
phone calls.  So let's talk about that.  This is right on the
heels of the Cassie lawsuit.  And I submit to you, the big
issue at the time was I'm going to -- holy shit, are we going
to get sued again?  Are we going to get sued again?  What the
heck.  From six years earlier, Cassie comes back and sues me
for our life together, you know, for our life together.  Is
this happening again?  He's not thinking -- first of all,
there's no evidence in the record that there's a federal
investigation at the time of these recordings.  None.  There's
no evidence in the record that there's a federal investigation,
and there's certainly no evidence that he thinks there's a
federal investigation at this early stage.

I think it's November 19.  I think the Cassie lawsuit

had come out like two days earlier.  And the Judge is going to tell that, you know, it's obstructing a federal investigation. And I submit to you there's nothing in the record to indicate (A) that there is one or (B) that he is even thinking that way. But what there's every indication to believe, what there's every reason to believe is that he's afraid of getting sued. And so, listen, is it, you know -- those recordings sound terrible in my opinion because he's trying to stave off a lawsuit, but that's what it is.  He's trying to stave off a lawsuit.  He's not trying to do anything with a criminal investigation because there is no criminal investigation.  But he's worried that he might get sued.  And guess what?  When it comes to Jane, he still might.  We'll talk that in a minute.

Forced labor.  Capricorn and Mia.  Capricorn.

THE COURT:  Mr. Agnifilo, before you -- in terms of when an appropriate break time.

MR. AGNIFILO:  This would be fine.

THE COURT:  This would be good.

MR. AGNIFILO:  Yes, Judge.

THE COURT:  Let's take a break.  Come back in 15 minutes.

(Jury not present)

THE COURT:  We'll come back in 15 minutes.

MS. COMEY:  Your Honor, I will have an issue to raise. We can do it now or after the break.

THE COURT:  Let's do it now.  Please be seated.

MS. COMEY:  Your Honor, I really did not want to object in the middle of counsel's summation, which is why I've held my objection till this break.  There were three categories of deeply objectionable commentary that we think require a curative instruction.

The first is Mr. Agnifilo's suggestion that the jury should consider why the government charged a particular racketeering predicate.  That's wholly inappropriate.  That crosses the line that we discussed the other day.  It is not proper to invite the jury to consider the reasons why prosecutors brought a charge, and that is word for word what Mr. Agnifilo just told the jury they should do.  We need a curative instruction instructing the jury that reasons for charges and prosecutors' charging decisions are not the province of the jury and not something the jury should be considering, and we need that after we come back from the break, your Honor.

The other two categories are:  One, Mr. Agnifilo told the jury that what happened on the Intercontinental video is assault, and that is a misdemeanor.  Number one, there is nothing in the record to tell anyone what kind of crime assault is.  And, number two, it's a wholly inappropriate legal instruction that he just gave the jury.  So, similarly, we would ask for a curative instruction on that point.

Third, Mr. Agnifilo has repeatedly suggested that the government has charged Mr. Combs with kidnapping, arson, bribery and witness tampering.  We have not.  We are not asking the jury to find those charges.  They are part of racketeering activity, and that is a misstatement of the charges and a misstatement of the law.  And so we need that corrected as well, your Honor.

Those are the three things that are legally incorrect and legally improper for this jury to hear in this summation.

THE COURT:  Mr. Agnifilo.

MR. AGNIFILO:  Yes, Judge.

I plan on getting to the RICO conspiracy in a little while in my summations.  I was going to make that clear.

I don't think it's an unfair way to put it.  I mean, I didn't say he was indicted with those as counts, but he is charged with the racketeering activity, and I'll make it clear when I get to that part of my summation.  I want it to be clear to the jury as well.

THE COURT:  What about the other two issues?

MR. AGNIFILO:  I think it's fair comment.  I think that if the jury thinks that a charge is wholly unfounded with no evidence, they can consider that in any way they see fit.  I'm not asking the jury to question why the government made charging decisions.  That's not what it is.

THE COURT:  Well, I mean, this is what you said.

"Why charge a kidnapping where the evidence is that he didn't have anything to do with it?  Why charge him?  You are allowed to ask that question, and you can come to whatever answer you think is the right answer."

MR. AGNIFILO:  What I'm saying is that in my view --

THE COURT:  Well, let me just -- what I just read to you, which is what you said, you'd agree that that is not appropriate.

MR. AGNIFILO:  I don't know that I agree, Judge, most respectfully.  I want to agree with your Honor, and I think I mostly do.  I think I'm allowed to be sarcastic.  I think that if a charge is beyond the pale, I can make that point, and that's what I was doing there.

THE COURT:  And what about the third point, which is the issue concerning the Intercontinental video?

MR. AGNIFILO:  The government is claiming that they were motivated by law enforcement concerns, and it's a -- it's a matter that is, you know, a state matter.  There's no reason anyone would think of this that it should be a federal, you know, what happened at Intercontinental would ever be charged as a federal crime, and I think it's fair comment.

THE COURT:  All right.  What does the government propose is a -- do you want to take a couple minutes and come up with what you --

MS. COMEY:  Yes, your Honor.  We would propose

P6RQcom2                    Summation - Mr. Agnifilo

instructions for all three, and after the break, we'll come back with them.  Thank you, your Honor.

THE COURT:  All right.  Let's break.

(Recess)

(Continued on next page)

P6rWcom3

THE COURT:  Please be seated.

Ms. Comey, did you have something?

MS. COMEY:  Yes, your Honor.

Ms. Steiner emailed, cc'ing defense counsel, to chambers our three proposed curative instructions.

THE COURT:  All right.

Mr. Agnifilo.

MR. AGNIFILO:  I'm going to rely on counsel, Judge --

THE COURT:  Well, I --

MR. AGNIFILO:  -- unless you want me to do it.

THE COURT:  For you.

MR. AGNIFILO:  Yes.

THE COURT:  Please don't do it again, because as to the three issues that were identified, I think the government validly has indicated that those would be grossly improper. All right, just to be blunt about it?  Especially the issue concerning considering the propriety of charging decisions and why certain things were charged and inviting the jurors to consider those things, which are not evidence in this case.

The jury is required to follow the instructions on law that I give and to consider the evidence that has been presented in the case, not to speculate about the nature of the charges or why certain things were charged.

In fact, speculating about the nature of the charges is one of the agreed-upon instructions that the parties

P6rWcom3

proposed that I give to the jury, that they not speculate about the nature of the charge, which is exactly what you invited the jury to do.  So the instruction that I would give to the jury will be as follows:

There was a suggestion during the defense closing that you should consider the charging decisions made by the prosecutors in this case.  It would be improper for you to consider such matters in your deliberations, and you should disregard those comments.

I will also remind you that I will be instructing you on the law in this case, and what I instruct you, and not anything that the lawyers have said about the law, are the proper instructions here.

And I think that does the trick in terms of the various issues that the government has raised.

MS. SHAPIRO:  Your Honor, I would like to put something on the record about this.

I understand the ruling, but first of all, what Mr. Agnifilo did with respect to the matter of the charging was not improper at all.  His point was simply there's no evidence here, and the jury is entitled to consider why the case was charged when there's no evidence.  That's the first thing.

The second, I just want to point out, and we didn't object yesterday, did not interrupt, because Mr. Agnifilo can respond to these things in his summation and the jury

P6rWcom3

instructions will make clear.  But I do want to note for the record, since you've called out Mr. Agnifilo, that Ms. Slavik --

THE COURT:  Well, let me stop you there, because I didn't call out anything.  There was an objection made during Mr. Agnifilo's closing.  Ms. Comey articulated the basis for her objections, and she requested a curative instruction.  That was not done as to any aspect of the government closing.

MS. SHAPIRO:  I understand, your Honor, but you said that what Mr. Agnifilo did was grossly improper.  And we disagree with that, but I just want to make the record clear.  We didn't object because we're not interrupting people and we're going to respond.  But the government misstated the law on at least two occasions with regard to the drug charge and the third element of the RICO charge.

And most disturbingly, Ms. Slavik told the jury that there might have been guns at freak-offs.  There was absolutely zero evidence to support that.  It was, quite frankly, short of outrageous.  So I just want the record to be clear, because the tone of the remarks here has been some suggestion that defense counsel is doing something improper.

People are making vigorous arguments in this case on both sides.  That's what's going on here, and no one is doing anything intentionally improper.

THE COURT:  All right.  Well, no record was made

P6rWcom3                          Summation - Mr. Agnifilo

during the entire government closing, including at any of the

various breaks that we had as to any of those issues.  But that

being said, as to this particular issue, as you may have noted,

I am not giving the multiple curative instructions that the

government asked for.  Instead, I'm addressing what I think is

one issue that the government has raised that I think is valid,

meaning the consideration of charging decisions, because what

Mr. Agnifilo asked of the jury was not simply to evaluate the

lack of evidence.  But Mr. Agnifilo specifically said:  Why

charge him?  You are allowed to ask that question, and you can

come to whatever answer you think is the right answer.

        That is the bridge too far.  There is no basis for

that kind of suggestion, and so that is being addressed.

        As to the other instruction, it is a neutral

instruction that simply says that I'll be instructing the jury

on the law in the case and that not anything that the lawyers

have said about the law are proper considerations, which is a

neutral instruction that seems appropriate, given the various

issues that have been raised.

        MS. SHAPIRO:  Your Honor, I take it you're going to do

that at the end of the closing.  Correct?

        THE COURT:  No.  I'm going to do it when they come

out.

        MS. SHAPIRO:  We would ask that you do it at the end,

because it's going to seem like it's a response, it's going to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

suggest that Mr. Agnifilo did something improper, which could be highly prejudicial.

MS. COMEY:  Your Honor, I had every to object in the moment.  I didn't so that I didn't disrupt his flow, but it would have been entirely proper to give that instruction in that moment as soon as he said it, because I think we have the right to have the instruction given as close in time as possible, the same way that your Honor would strike testimony as close in time as possible and instruct jurors to disregard it -- as soon as possible.  So I think we are absolutely entitled to that instruction now.

THE COURT:  All right.  Very good.

We will proceed.  Let's get our jury.

Let me ask the deputy to get our jury.

(Jury present)

THE COURT:  Please be seated.

Welcome back, members of the jury.

Before the break, there was a suggestion during the defense closing that you should consider the charging decisions made by prosecutors in this case.

It would be improper for you to consider such matters in your deliberations, and you should disregard those comments.

I will also remind you that I will be instructing you on the law in this case and what I instruct you and not anything that the lawyers have said about the law are the

P6rWcom3                    Summation - Mr. Agnifilo

proper instructions for you to consider.

With that, Mr. Agnifilo, you may proceed.

MR. AGNIFILO:  Thank you, Judge.

All right.  So we were talking about forced labor, and we already talked about Capricorn.

Now we're going to talk about Mia.

Every indication -- and this is where sort of love and money come together.  There is every indication that Mia loved working at this company, working with Mr. Combs, loved the work she did.  And so this forced labor is -- force labored, you wouldn't think of forced labor when someone is crestfallen and even suicidal that they've been fired.  Right?  I mean if it's forced labor you want to get out of there any means possible.

But what you remember from the testimony -- and I'm not going to belabor it, because I think you remember a lot of it -- is that Mia seemed to express great love and admiration for Mr. Combs at every step of the way.  She was enthusiastic. I'm not going to show you the video clip -- I think you probably remember it -- for his birthday.  You know, pop in. Remember all that stuff?  That's the real her.

What I submit to you -- and listen, you guys, what I say about this doesn't matter.  It's what you guys think.

I think you have every reason to conclude that she took on a false persona in the courtroom.  That's just not what you saw on the video, and I felt like maybe I need to play it

again, but I don't think -- I think you guys probably remember it. She was bubbly. She was outspoken. She was happy.

I know the government's position is, well, because she wasn't talking about something, you know, traumatic. But listen, I think the evidence is pretty clear. I'm going to go through it, not in tremendous detail but at least enough, that this was not unwanted sexual contact. And I say that because of a few reasons. But one of the reasons I say it is at one point there was a text exchange between Combs and Mia, and Combs says: I'm going to tell Cassie about us.

Do you remember that? I'm going to tell Cassie about us.

Now, if he sexually assaulted Mia, why would he kind of stir that pot? Right? I mean if it's, like, I did something to you that's a crime or that is improper or something that I should never ever have done, why am I going to say I'm going to tell Cassie about us? Because what he's inviting, at a minimum, is for Mia to say, well, then I'm going to tell her what really happened. But the problem is there is no what really happened. What happened is something consensual happened. It happened, and Mia and Cassie are friends. Cassie doesn't know about it. Mia doesn't want Cassie to know about it, and so the pressure point that Mr. Combs uses in that instance is, yeah, I'm going to tell Cassie about us.

What that basically should say to you is this was

P6rWcom3                          Summation - Mr. Agnifilo

eminently and undoubtedly a consensual thing, or series of things.  When she says that she didn't want to do it, that it was done without her consent, that's just false.  And certainly Mr. Combs knows it's false, which is why he's handling this the way he's handling it and sort of saying, all right, so tell her.

What she says is that I was going to take this to my grave.  Well, when one person is, like, I'm going to tell Cassie and one person's, like, I'm not going to tell anybody ever, maybe the one sort of shining the light on this event is the one telling the truth.  And I submit to you that's the situation here.  There was not any unwanted sexual contact between Mr. Combs and Mia.

Now, I know it's absolutely possible -- we heard platonic love from Capricorn -- to have platonic love and admiration for someone.  No doubt about that, of course.  But I submit to you that the feelings that Mia had for Mr. Combs went way beyond that.  And I don't know.  Mr. Steel, when he was doing his cross-examination of Mia, showed you all these Instagram postings.  I think they're Instagram postings, some pictures and stuff.  Right?

One is just more positive than the next, more positive than the next, more positive than the next.  There's wonderful pictures and wonderful sort of slogans.  And I know the government says, well, that was kind of her job, so you know --

P6rWcom3                          Summation - Mr. Agnifilo

but it's hard to be effusive and loving and leaning into sort of good times and things artificially. So I submit to you that's how she really felt. But if you have any doubt, if you have any doubt about all of those postings that Mr. Steel took you through one after the next after the next after the next, you can't have any doubt about this.

This isn't in evidence. This was given to you as what's known as a demonstrative. So you can't take it back into the jury room, because it's not a piece of evidence. But what you can see it is is something really remarkable, really, really remarkable. And this is not part of her job. This is not -- you know, this is something she did. If there was ever an act of love, really an act of love -- if there was ever an act of love, this is an act of love. This is -- I can't imagine, I can't imagine how long this took. I mean it's just article after article. Here he is, a young man, has his whole life ahead of him. Article after article after article. It's remarkable.

And you know what? What she wrote is remarkable, and that is in evidence. And you can take that back with you. And it's so remarkable that I'm going to read it to you. It won't take too long:

"Happy 45th birthday, Puff Daddy. Puff sometimes life goes by at catastrophic speeds, where you never get to live in and enjoy the now. Things that used to feel unattainable and

P6rWcom3                    Summation - Mr. Agnifilo

symbolic of success can become the norm and lose all of the adrenaline and excitement it used to stir up.  And life keeps going and going and each new height reached is a celebration moment in the world of getting to that next goal -- all of this to say that I hope on this day that you get to sit back and actually take it all in of how much you've accomplished, how far you have gone and are still going.  So I put together this book of magazine articles from 1991 to 1999" -- this is from 1991 to 1999 -- "that I hope will stir up nostalgic feelings of when you got started and how you felt and what a dream to you, then that's an everyday reality so yourself can tell your younger self how great you've become.  Not that you'll ever forget your past, but I hope it reminds you of when this world made your eyes light up.

          "Happy, happy birthday."

          She loves him.  She loves him.  You can't fake that.  You can't act that.  I think there's every reason to think that what she did in this courtroom with you was acting.  That's real.

          I'm going to go one step further.  I think she loves him so -- I don't necessarily mean romantic.  I mean like almost something purer than that, like, he is people's worlds.  Don't lose sight of that.  He makes people's worlds.  It's not just business.  He gives people a home.  These things, the businesses that he built, forget the business part.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

I want to show you a picture.  I wasn't going to do this until later, but I'm going to do it now.  I'm going to show it to you.  I want you to read -- I want you to look at that picture.  I want you to look at that picture.  And I want you to think of a word or phrase.  I'm not going to ask you what it is because we're not in school.  I want you to think of a word or phrase that's come to mind, that comes to your mind.  Just look at it and think of a word or phrase that comes to mind.

Joy?  Family?  Home?  Belonging?  Diversity?

Racketeering enterprise?

This -- this -- is your racketeering enterprise, folks.  This is your racketeering enterprise.  There's K.K.  There's D-Roc.  You have Faheem.  That's your racketeering enterprise.  So whatever word you thought, whatever phrase you thought, that's not what the government thinks, because this is the inner circle we've now heard so much about.  This is the racketeering enterprise.  And I'm quite sure that that is not the phrase you came up with.

The real trial, the trial based on the evidence, is that he created a remarkably special place.  He moved people.  He moved them in their hearts, in their souls, and they wanted to stay -- not because it was easy, because it wasn't easy, but because it was worth it.  And that's what we want.  We want something that's worth it.  We want something that's

meaningful.  And that's what he gave everybody.  And it's all been taken away.

So, when Mia is told that she's going to be fired -- this is Defense Exhibit 1728 -- and she's going to leave this special place, she's going to leave the place that Sean Combs built for her and everyone, she had the following text exchange with K.K.  This is racketeering co-conspirator K.K.  OK?

Mia:  I'm going to kill myself.  My life is over.

Racketeering co-conspirator K.K.:  OMG.  WTF, Mia? That's not funny.

Mia:  I don't think so either.

Mia:  Literally over.

Racketeering co-conspirator K.K.:  What is wrong and don't say that.  Take it back.

Mia:  Watch your back here, my love.

Racketeering co-conspirator K.K.:  Answer your phone, Mia.  This is serious.

Racketeering co-conspirator K.K.:  Mia, you can't make a statement like the first thing you said and then not answer your phone.

Racketeering co-conspirator K.K.:  I'm serious. Please answer your phone.

Racketeering co-conspirator K.K.:  I'm going to call Yaya if you don't call me back right now, please.

Racketeering co-conspirator K.K.:  Mia, I'm serious.

P6rWcom3                    Summation - Mr. Agnifilo

Racketeering co-conspirator K.K.:  Mia, WTF?  You cannot say that and not answer your phone.  Mia, I'm serious. You know I just went through this.  You need to call me back now or I'm calling your parents.

Racketeering co-conspirator K.K.:  Mia, can you please answer your phone.

Mia:  Fuck.  I'm so sorry.  I completely forgot.  I'm so sorry.  I'm with Flora Gomez.  I'll call you soon.

The last thing she wanted to do was leave.  The last thing she wanted to do was leave, and she's charged with forced labor.  And there's just no evidence of in.

Let's talk about drug distribution, and where we're going to start is I'm going to read something that the government said yesterday -- I'm sorry.

The government, in summation, yesterday said to you:

You heard the defense asking witnesses about whether the drug amounts were for personal use, meaning the defendant's personal use.  But that's just a distraction.  OK?

That's what the government said yesterday.  Here is the charge, and let me reiterate -- what the judge charges you at the end of the case is the charge.  I'm going to read what I think the charge is going to be.  But the charge is not the charge until the judge gives the charge:

If a person possessed drugs solely for his personal use, rather than for the purpose of distributing them to anyone

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6rWcom3                        Summation - Mr. Agnifilo

else, then the person did not intend to distribute the drugs.

It's not a distraction.  That's the charge.

A small quantity of drugs standing alone is insufficient to prove intent to distribute.

Let's go to the next paragraph:

An individual's agreement to buy controlled substances from a seller does not establish that the buyer joined with the seller in a conspiracy to distribute or possess with intent to distribute those controlled substances, and the buyer's contact with drug traffickers, without more, is not sufficient to prove that the buyer participated in such a conspiracy.  In other words, the agreement to distribute from one alleged co -- from one alleged conspirator to another cannot also be the agreement that forms the conspiracy.

So here's what I think the evidence shows you. There's not been one single witness in this case -- and the government called many, many witnesses -- who's gotten on that stand and said I knew I was committing a crime and I was committing a crime intentionally and I was committing a crime for Mr. Combs when I was bringing these drugs, because I thought they were for personal use.

And really on this point, Brendan Paul, who only testified a couple of days ago, was clear as a bell on this. He said that these were personal-use drugs, and he told you I didn't think they were criminal.  And then he says I forgot to

take the cocaine out of my bag, and when -- and on March 25, when, you know, the search was done, they found the cocaine in my bag in Florida.  And he says I got the best lawyer in the world, and my charges were dismissed.  OK.  So let's look at the three things that he says.

I moved drugs.  I brought drugs from point A to point B.  I did all that.  I didn't it was breaking the law because it was personal-use drugs.  That's what he said.  They found the personal-use drugs in my possession, and my case got dismissed.

Now, that's the evidence in the case, but what I want you all to consider as the evidence in the case is this is -- there's no allegation, and the government's going to say there doesn't have to be.  But let's show what the evidence shows and what the evidence doesn't show.

There's no allegation that Sean Combs is selling drugs.  OK?  He's made however much money he's made from music and fashion and all the different businesses he had.  There's no allegation in this case that he's selling drugs.

What Cassie Ventura said, I'm probably, maybe, the person who knows him -- maybe not the best but knows him well, is that she considered him at one point a drug addict.  She testified to that.  Well, where are drug addicts going to get -- unless you're going to grow your own Xanax, unless you're going to somehow grow poppy seeds -- I don't know where

this stuff comes from -- you're going to get it from somewhere. He obviously has a drug problem.  He has a drug problem. There's no question.  So many of the different witnesses said this, and Cassie said that.

And the government's charged him not with possession of drugs, not just with distribution of drugs but distribution of drugs as a racketeering act, as part of a racketeering conspiracy.  And there's just no evidence of that.

Is there evidence that he had drugs?  Of course. There's no doubt that he had personal-use drugs.  I mean they found some of it in his house.  The witnesses are testifying, there's personal-use drugs around.  But was he using his enterprise?  Is this really a part of a racketeering conspiracy, where he's using his enterprise to sell drugs, move drugs, have drug, possess drugs, possess with intent to distribute drugs?

I submit to you the answer is no.

But you're going to have to give -- I'm going to be straight with you.  You're going to have to give this one thought.  You have to really think through this, because he had drugs.  OK?

Now, what drugs did he have?  There's Xanax.  There's painkillers, and I think he was addicted to painkillers so he's obviously going to have possessed painkillers.  There's ecstasy.  But what's the evidence that he had any interest in

distributing this or in possessing these with the intent to distribute?  These are things that he did with his girlfriends. They did them together.  There's no indication that he's, you know, getting this stuff so that he could either sell it to Cassie or Jane or somehow, you know, move the drugs, distribute the drugs.  That's just not what the evidence is, I submit to you.

So what I submit to you, though, is that this is personal-use drugs.  That's what it is.  And I submit to you that it's very clear that the purpose of these businesses -- now, the government said yesterday that the enterprise is kind of larger than, like, Combs Enterprise, the business -- that the purpose of these businesses and the enterprise has nothing to do -- nothing, nothing, nothing to do -- with getting him drugs.

I mean, it is not unusual -- one thing I want you guys to keep in mind, and the personal assistants all testified to this.  The personal assistants basically said to you, one of them said my advice was get in, get out.  Because once you're in, once you're in that sort of celebrity kind of whatever it is, clique, just celebrities.  You're in the world of celebrities, right?  Wasn't it Mia who went and worked for Madonna?  Like, you're in, you're in.  OK?

So what Mr. Combs is doing isn't really that different, I submit to you, than what a lot of other people are

doing when it comes to the use of your personal assistants. Right?  You have personal assistants.  You know, I don't expect that we're going to see Beyoncé in CVS.  She has someone to go there.  So people have personal assistants to do these things, and that the personal assistants also, as a small, 1 percent, I think was the testimony, part of their job do truly personal things for Mr. Combs, whether it be buy condoms, buy Astroglide, buy baby oil, you know, or even get drugs for him, doesn't somehow transform that minuscule part of their job into what the companies do collectively as part of the enterprise that is alleged as the racketeering enterprise in this case.

So you have to separate it all out.  It's not enough to sort of say, oh, he had personal-use drug, he's guilty of this racketeering act or that he committed this racketeering act and he conspired to commit this racketeering act.

You have to also find that this was how he participated in the conspiracy.  I'm going to get to the RICO -- this is not easy, by the way.  You're all looking at me like I was with you for a while.

So this is really complicated, and so I'm going to go to the RICO part, but you're really going to understand it much better when the judge gives you the law on RICO and breaks it down for you.  But it's not self-evident.  It all involved participating in an enterprise.  So what you have to find is that Mr. Combs conspired to participate in the enterprise

through -- when it comes to the drug racketeering predicate, through the possession with intent to distribute drugs.  And there's just not evidence of that.  It's not a drug charge.  He's not charged with drugs.  He's charged with participating in the enterprise through the distribution with intent to sell -- I'm sorry, the possession with intent to distribute drugs.  And there's just no evidence of that.

Let me show you an example of what I submit to you is an entirely different kind of drug transaction, and it comes from David James.  And if you remember, David James says that he's in Saint-Tropez.  Right?  And David James says that someone, not Mr. Combs, someone else there asks him to get an eight ball of cocaine.  OK?  And he goes and gets the eight ball of cocaine.  That's eight ounces of cocaine, a fair amount of cocaine.

And I asked him, does that have anything to do with Sean Combs?  Nope, nothing, didn't even tell him.  OK?  Didn't even tell him.  So it's an interesting little anecdote, because if Combs -- and I think I even went further than that:  You kept it from him, not only did you not tell him, you didn't happen to tell him, you kept it from him.  So that's an interesting anecdote for the way to look at the drugs in the context of the RICO.  OK?  And let me tell you why.  Because if, if it was really the enterprise's business, OK, to move drugs or to get drugs and move them from one point to another,

why would he hide it from the head of the enterprise?  He'd be like, hey, doing the enterprise's work.  Got an eight ball for -- I think it was some woman.  Anyway, I got an eight ball for so-and-so.  Aren't you happy I'm doing the stuff that our criminal enterprise is supposed to be doing?

But he's keeping it from him, because that's not what they do.

Also, I don't want you to sort of lose sight of the fact that, you know, I mean Cassie's doing lots of drugs.  Cassie's getting drugs from Bana.  Bana testified to that.  Cassie testified to that.  And I'm not justifying it, but it's people in kind of creative fields, and they're just kind of doing -- I'm not in the creative field, so I wouldn't know.  But they seem to be doing what people in creative fields do.  All of a sudden, it's part of a racketeering conspiracy?  That's just -- there's just no evidence that this has anything to do with a racketeering conspiracy.

OK.  I want to talk about Cassie, and I'm going to talk about the sex trafficking count and racketeering act.

So let's talk first in general, and at one point -- you'll be happy to know at one point I was going to show you text message after text message after text message.

Look -- I can't say the word.  She wants to do it.  She likes it.  She's talking -- a lot of dirty talk in this case, probably more than dirty talk in this case than your

average federal criminal case by a long shot.  But you guys remember this.  You guys remember this, I know you do, and you don't want me to do that.  That's not going to be helpful to you.

What's helpful to you, I think, is to tell you very quickly, the story, very quickly, the story of Cassie and Sean Combs and then put their sex life into a context where you will see it's just not -- it's just not sex trafficking.

I mean, first of all, let's start with the lowest hanging fruit imaginable.  It's his girlfriend.  I suppose you can sex traffic your girlfriend.  If you sell her into prostitution, I think you've done it.  I mean I'm not saying that a boyfriend can't -- I'm not saying that -- I think probably husbands and wives, doesn't matter, sisters and brothers, God forbid, my client sometimes says.  I'm not saying that, but I am saying it's the sex that they are having.

I mean there's no suggestion that Sean Combs is making money from it.  I mean you guys know that.  Right?  He's not making money from this.  This is his personal life.  They are swingers.  They are validly swingers.  This is their lifestyle. He wouldn't think in a million years that there's anything wrong with it.  And it was fine.  If you go through all of the text messages, hundreds, thousands, how ever many there are -- now, they're a couple and they're fighting about a lot of things, but you're not seeing -- and we're going to talk about

Jane in a second.  Jane has a couple of text messages that are very anti (inaudible).  Not so with Cassie, because they're not.  They're different that way.  And I suggest to you, and part of the reason, I submit to you, that RICO doesn't fit the charges is because of what I'm going to say to you now.

All right.  So people are in love.  People are having sex.  What does it mean -- like, if your partner really likes anything, all right, and you really don't like the anything, but they really love it, they really -- it makes them happy, do you still not want to do it?  Where does that land on the "I want to do it, I don't want to do it" spectrum even.

And I'm not even saying that's where you are with Cassie.  I am saying the evidence, I think, is overwhelming that Cassie wanted to do this.  But part of the reason she wants to do this, I suppose, and I think that's true for any intimate partner, is this is how they're close.  This is how they're close.  If you're close by drinking lemonade with, you know, strawberries in it, lemonade with strawberries has great memories for me.  I'm close with you because we go to the beach.  I view the beach as differently.  My wife's from Los Angeles.  I hated Los Angeles.  I love Los Angeles.  Los Angeles is a great city.  Sorry.

That's how it happens.  Like, your likes and their likes become one.  That's actually what love is.  And that is what is going to with Cassie.  Would this have been her choice?

P6rWcom3                         Summation - Mr. Agnifilo

I don't know.  Maybe it would have.  I mean she's obviously -- you know, if she could kind of like keep Kid Cudi on one side and Combs on the other, she's -- she's ready to go.  I mean she is -- like I said, God bless her.  She's a beautiful, sexy woman, and that's what she deserves to be if that's what she wants to be.  And that's what she wants to be.

I mean when she wasn't with Sean Combs, she was with Michael B. Jordan, like the most handsome man in the world.  No offense.  I mean, you know, she's not messing around.

Do you remember when Capricorn -- I think Capricorn testified to this, said, you know, you should just break up with Sean.  You know what she said?  Jay-Z is taken.  Who am I going to date?  OK?  She's at a high level.  She has sexual confidence.  Good for her.  So I submit to you she is not clutching her pearls.  I don't think Cassie Ventura has a bunch of pearls in her hand, clutching them.  That's just not who she is.

And so my first argument to you is that this was her lifestyle choice also.  But a second argument, and it's not inconsistent with the first, is this is how I am intimate with the man I love.  And you can want that.  If you didn't innately want it in the beginning, you could come to want that, and the result is the same.  You want it because you want to be close.

Now, a couple of specific things.

I think the government talked about -- so it's hard to

P6rWcom3                         Summation - Mr. Agnifilo

necessarily follow where they're coming from, but I'm going to try.

I thought what they said yesterday -- well, they clearly said we're not saying all the freak-offs were nonconsensual.  No, they're not.  We think that she wanted to do some of them.

All right.  Now where are we?  Which ones?  Like, is it that she wanted to do 110 and she didn't want to do three.  Did she want to do 70 and not do 50?  Like, once you open that door, where do we go now?  OK?  But the government focused on three.  Three.  They said there's one at Cannes, I think, was one that they mentioned; one in regard to Daniel Phillip, and we'll talk about that one; and then the InterContinental.  OK.  So we'll talk about all three.

The Cannes one, I don't know that there's any evidence of that one way or the other.  I mean it's just one that they kind of, like, threw into the mix.  You know?  But think about it for a second.  If what the government is saying is they're not saying that she -- that they're all sex trafficking, some were OK, you know, then you have to ask, well, how is he supposed to know the difference?  I mean if we're at freak-off No. 75 and 75 of them have been consensual, what momentous thing would have to happen in freak-off No. 76 to sort of say, man, now it's sex trafficking.  Zero to 60.  Now it's sex trafficking.

And none of that happens.  I mean none of that happens.  There's no time where, you know, she says in a text message, you know -- I mean she gets mad at him sometimes.  He gets mad at her sometimes.  He sometimes speaks vulgar to him.  She speaks vulgar to him.  But there's nothing that would say to him, oh, I get it, she doesn't ever want to do these again.  You know, she doesn't want ever to do these again.  Nothing.  And so I submit to you that there's nothing that would ever indicate to him that, you know, this was something that was against her will.

Let's talk about the Daniel Phillip one.

So, from cross-examination, I think we established when Mr. Donaldson was cross-examining Mr. Phillip, and I think it might have been on recross, that this might have happened on July the 30th, 2012.  And there's been some evidence of that in the record, and this is when Mr. Donaldson is recrossing the witness.

Let's look very quickly at the texts leading up to that date.  This is exhibit B, like boy, 346.  On the bottom, Sean Combs writes to Cassie:  Good, are you horny?

She says yes.

He says:  How horny?

He says:  What you be thinking about when you're horny?

She says:  I think about you on top of me and inside

P6rWcom3                      Summation - Mr. Agnifilo

of me, the way you look at me and talk to me like that.  I love looking up at you and hearing you moan.

And at the bottom of the page, he says:  One of my favorite times is when we FOed and then we made love after.  I also liked when we make love before and then Jules is in the next room.  Then he came in and I blindfolded you.

And she says:  Yes, I like those times.  I love when we make love.  The last time was so good when we were at my place.  I came so hard for so long.

Then a few pages in, he says:  I want you to tell me a fantasy of how you want it next time.

And then he says:  Would Dave turn you on?

She says:  I don't know.  I haven't even had time to think about it.  I've been trying to think about you with a girl to get into it, and I think I'm starting to fantasize about that.

All right.  Here's the point.  First of all, if we're leading up to this particular date, 7/30, there's obviously nothing in that series of text messages to indicates that she doesn't want to do that.  And I think even more than that, it shows the nature of their lifestyle.  That's just the commitment that they've made as a couple.  You know, my fantasy is to have you with a girl.  That might not be for everybody, but it is for them.  And that's their avowed, committed lifestyle.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

All right.  Let's talk about the InterContinental.  So we're going to start with exhibit 1088, which is from 3/4/16.

And Cassie writes -- and I'm not going to do that many of these:  I know you're sick, but I have to tell you this, and maybe you can read this later and enjoy it.

My mother is so happy I became a lawyer.

My pussy has been so hot since we've been making love this past week.  For the past two days I'll just think about it and my pussy will cream.

That's what she says.

She goes on.  She says: So let's do it.  Can you set it up, though, so I can just run home and grab stuff?

And you guys have seen this.

And Combs says:  I think if we start at seven or eight maybe four at the latest, take a Xanax or Ambien, and go to sleep, we'll be OK.

Because she has her big premier coming up.  But they're going through this together.  They're sort of thinking through this together.

You know, there was some suggestion made yesterday that somehow Combs imposed this on her and then she agreed only because otherwise, like, he would ruin the premier.  But I really encourage you to look at exhibit 1088, because the lead-up text messages to the InterContinental freak-off show that they're kind of workshopping this together, very much as a

couple.  You know, if we do it quickly, if don't stay out too late.  They're trying to find a way to make it work.

All right.  I am now going to play part of the video, and here's the point I want to make in the video.  The video is not sex trafficking.  OK?  The video is very much -- very much -- domestic violence.  And there's two reasons why I say to you that it's not sex trafficking.

First, I say it to you because it seems to all be about a phone.  This entire situation's about a phone, and I'm going to show you a few snippets.  I'm not going to play the whole thing.  I'm going to show you a few snippets as to why I'm saying that to you and why I think it's true, that it's all about a phone.

Now, is it crystal clear whether it's Cassie's phone or Mr. Combs's phone?  It's not crystal clear.  More likely than not it's Combs's phone, and I'll show you some snippets and then we can kind of think through it together.

Let's do this.  Let's start it and go to :13.

(Media played)

MR. AGNIFILO:  And then stop it when we get to 13.  OK.  Stop it now.

OK.  All right.  Look at her right hand.  See you can see the right hand in the mirror.  You can also see without the mirror.  One thing that's clear, she's carrying two bags in her left hand.  And it seems that she has something -- you can't

tell what, you can't tell what, but it seems she has something in her right hand.

OK.  Let's run it to 1:29.

(Media played)

MR. AGNIFILO:  You can't tell from that.

(Media played)

MR. AGNIFILO:  Stop it now.  All right.  See something, looks like something in her right hand?  I'm not telling you I know what it is, but it looks like there's something in her right hand.  OK.  Now, you've seen -- so I'm not trying to keep it from you, because you've seen it.  You've seen when he comes in, grabs her hoodie, throws her on the ground and kicks her twice and I'm not not showing it to you because it's terrible, you know what it is.

Let's go to 3:42.

(Media played)

MR. AGNIFILO:  All right.  Stop it there for a second.

Nothing is in Mr. Combs's hands.  You can see it pretty quickly.

Start it at 3:55.

(Media played)

MR. AGNIFILO:  Stop right there.  You see there's nothing in his hands, but now there's a phone in his right hand.  OK.  So he went to get the phone.  He got her on the corner.  Her back was against the corner.  He went in.  He sort

of reached down, and he now has the phone in his right hand.

Now kind of run it now until 4:21.

(Media played)

MR. AGNIFILO:  OK.  Stop it for a second.

All right.  Just so it's clear, the government said yesterday he threw the vase, and maybe that's what they saw. But you saw the vase fall on the floor.  There's no doubt about it.  He throws the contents of the vase, the flowers.

Let's show it again so it's crystal clear.  Let's back it up for a few seconds.

(Media played)

MR. AGNIFILO:  OK.  See the vase breaks, he throws the flowers.  I'm not saying it's good.  I'm just saying he doesn't throw the vase.

OK.  Let's go to 4:47.

(Media played)

MR. AGNIFILO:  OK.  Still has the phone.  OK.  Run it.

(Media played)

MR. AGNIFILO:  Let's stop there for a second.

Let's just call it all for what it is.  Cassie's afraid.  He just hit her.  He just beat her up.  Cassie's obviously afraid of him.  She has her hand out.

Run it again.

(Media played)

MR. AGNIFILO:  OK.  All right.  And so that's when

P6rWcom3                    Summation - Mr. Agnifilo

Israel Florez shows up.  And here's what I -- we're not going to do it just yet.  We're going to run it until 6:03, and I want you to pay attention to how Israel Florez reacts.  OK?  Because there's a suggestion that, you know, Cassie has a black eye or the makings of a black eye.  And listen, maybe it didn't come in yet, and it's hard to know.  But certainly Israel Florez is not reacting, and he's very close to Cassie.  He's not reacting like there's any kind of physical injury, at least that he can see at that time.  So let's run it.

(Media played)

MR. AGNIFILO:  Stop for a second.

All right.  So he's directing them both back to their room, which makes a lot of sense because a pretty well-known man is sitting there in a towel and socks, OK, in the middle of the day and in a hotel in Los Angeles.

OK.  Run it again.

(Media played)

MR. AGNIFILO:  Stop for a second.

Looks to me that Cassie's saying:  Go back to your room.  Go back.  Go back to the room.

He's saying go back to the room.  Cassie's like you're being a fool.  You're sitting here in a towel and socks.  Go back to the room.

OK.  Run it.

(Media played)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MR. AGNIFILO:  Stop it.

All right.  Cassie's talking to him.  She seems to be talking.  You can't really see what she's saying, but it looks like she's giving him, like she's speaking with certain authority, certain, like, intensity, as though, like, get out of the place where the cameras are and go back to the room.

OK.  Run it again.

(Media played)

MR. AGNIFILO:  Stop it.  All right.

Looked to me -- I'm no lip reader.  Looked to me like she said, go back to the fucking room.  That's what it looks like.  Lord knows I've watched it enough times.  You guys, it's up to you.  But it looked to me like she said go back to the fucking room.  And if she said go back to the fucking room, and if she's motioning back to the room, I suggest to you there's nothing scary in the room.

I don't know if Jules is still in the room or Jules is not in the room.  But by this point they know Jules really, really well.  But there's nothing scary in the room.  The room is not a scary place for her, because she is saying -- what's a scary place is for him to be out there with the cameras on him by the elevator bank.  That's what's scary.  The room is not scary.

OK.  Run it.

(Media played)

P6rWcom3                        Summation - Mr. Agnifilo

MR. AGNIFILO:  Real quick.  I'm sorry.

So Cassie's speaking to him.  Florez goes like this to her, like, whoa, bring it down.  Bring it down a little. Right?  And I suggest to you that Cassie is saying go back to the room, you know, like yelling at him, go back to the room, and Florez has to kind of like calm them down.

Let's run it from 6:45 to 6:57.

(Media played)

MR. AGNIFILO:  You can just -- that's all right.  Just run it through.

And the other guy, focuses on his shoes, shiny.

All right.  Cassie goes the other way.  That's not the direction of the room.  She goes the other way, and Florez says that he told her to go that way.

(Media played)

MR. AGNIFILO:  Florez is obviously calling someone in the building.  Now look how he reacts.

All right.  Stop it there.

(Media played)

MR. AGNIFILO:  He's certainly not reacting like he thinks there's been a crime committed.  He's jovial.  He seems to be laughing.

All right.  Let's go to 9:21.  We're going to play 9:21 to 9:59.

(Media played)

P6rWcom3                        Summation - Mr. Agnifilo

MR. AGNIFILO:  9:15 is fine.

See, this is why I don't use technology.  I just talk.

(Media played)

MR. AGNIFILO:  All right.  There we go.

(Media played)

THE DEPUTY CLERK:  It might be that red recording button you have enabled.

MR. AGNIFILO:  I'll give you a spoiler alert.  OK?  Here's what you're going to see.  At 9:21, on the counter, Cassie goes to the room.  Cassie comes out at 9:59, but because the camera is motion censored, that dot plays no role in the scenario here.  Because the camera's motion censored, what, on the counter is, you know, whatever that is, 9:21 to 9:59, if you look at the actual time, it goes from 11:26:02 -- this is time of day, 11:26:02 to 11:29:44, meaning that Cassie was in the room for three minutes and 42 seconds with Combs.  OK?

And so again, and that's presumably when Israel Florez was there too.  So the point is the room is not a scary place.  This was a fight about a phone.  Still not clear that it's his phone or Cassie's phone.  But nothing -- if you go back and look at this, which you can, it's totally up to you, I think you'll see there's no clear point where he relinquishes the phone back to Cassie, which is why I think reasonably it might be his phone.

One interesting thing is that at 11:27, and I think

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6rWcom3                          Summation - Mr. Agnifilo

this time on the upper left is close to accurate.  And I say that to you because there's a government chart where there's a bunch of phone calls that Combs is making to Cassie, one after the next after the next after the next.  And the times on the chart coincide with the times here.  You know, it's, like, between, say, like 11:30 and 11:38 or so.  So -- and that's when, that's when he's calling and trying to get her attention and she left and he's upset and he's saying, you know, the police arrested me and all this other stuff.

All right.  Let's go back to -- and then we're going to be very tech-free the rest of the time.

OK.  All right.  B631.  B631 is a bunch of text messages from five days after the InterContinental.  OK?  And Sean Combs says:  Baby, I can't say it enough.  I'm so sorry.

She says:  LOL.  That's funny I'm listening to sorry on the radio.  It always automatically makes me think of you singing it.

They're obviously getting past this as a couple.  She says:  And thank you.

All right.  Then we're going to go to 1434, which a few pages in.  And this is an important -- I submit to you this is a very important text message, which is why I'm showing it to you.  Cassie writes to Sean, in the middle there:  How would I know if the drugs are going to be bad or that you won't drink too much?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6rWcom3                         Summation - Mr. Agnifilo

OK.  They're still talking about what happened five days earlier, and I submit to you that that remark of how would I know if the drugs are going to be bad -- there's been some issue at the trial, I think you know we've been maintaining that part of what was off is that the drugs were different. The drugs were off.  The drugs were bad.  And we actually have evidence of that in this text message.  And you have Cassie saying:  How would I know if the drugs are going to be bad or that you won't drink too much?

There seem to be two possibilities -- one, that the drugs are bad, or two, that he drank too much.  And I submit to you that it's interesting, if we played the whole thing through, he stays in a towel in a public hallway way too long. I mean way too long.  Like, what's up with -- you are Sean Combs.  You know, if you went to Tokyo, a thousand people would recognize you, and you are walking around in the middle of the day in a hotel in a towel and socks.  So what gives?  What gives?

And I think Cassie's text message is part of what's telling you what gives.

OK.  We're looking now at 1091, 1436.  And they're still going through it.  And so Combs, on the top, says:  You wanna act like I'm not sorry.  You want me to keep punishing myself and I am.  You want me to not forget and I won't.  You want me to know that I should feel extra sorry.  And I do.

P6rWcom3                         Summation - Mr. Agnifilo

It's just best that I get myself together.  I'm not going this year, and I'm not talking about it anymore.  Have a good day.

She writes back, and she's trying to make him feel better:  Baby, I'm not trying to make you feel worse than you already do.  I know you feel sad and are sorry.  Did you tell them what really happened?

Then on the next page, she says:  I'm really not trying to make you feel bad.  I want you to take care of yourself and not mask the sad stuff with partying.  It's OK to miss out sometimes.  I know we would have to plan it, but let's just talk about it when we see each other this weekend or next week.  I hope you know that I only want what's best for you.  If we have to fight to get right, we have to fight to get right.  If we give up, then you should be able to do whatever you want.

So the video's terrible.  It's nothing but terrible.  It's bad.  It's a crime.  It's illegal.  It's unforgivable.  They're trying to pass it as a couple, and that's why I submit to you there's nothing about their relationship that is, you know, him -- it's not one way.  They get through it together.  I mean, you know, when Cassie was on the stand, she was very clear, I'm not -- sometimes I hit him first, sometimes he hit me first, sometimes I hit him first and then he hit me worse.  You know, but they're doing this.  They're in this together.

All right.  One thing I want to talk about, and it's

interesting because it's not charged.  OK?

Cassie says that there was a rape, that Sean Combs rapes her.  I'm going to show you why that didn't happen.  OK?  But also equally important, it's not charged.  It's just not part of the sex trafficking.  It's not a commercial sex act.  It's not an alleged act of prostitution.  It's a horrible, horrible thing if it happened.  But let me show you why it didn't happen.

This other transcript, and this is at page 850, at the bottom:

"Q.  Can you describe how Sean was acting at the dinner?

"A.  Um, he was just being really nice, playful, laughing, kind of romantic vibe, sort of.  But we just were normal, laughing.

"Q.  How did the dinner end?

"A.  Um, it ended with him bringing me home and, yeah, that was it."

OK.  Let's just stop right there for a second.  This is the night she was supposedly raped.  OK?  And her first answer, her first answer right here in this courtroom to you was, um, it ended with me bringing him home and, yeah, that was it.

Like, did she miss a prompt?  Was she supposed to talk about it and she didn't?

Let's see what happens next.

"Q.  And can you remind the jury which residence you lived in

P6rWcom3                         Summation - Mr. Agnifilo

around this time?

"A.   Harold Way, where you saw the door with the knife.

"Q.   When you arrived at your home in Harold Way, what happened?

"A.   Um, I went inside, went in the living room.  He came in, pretty usual, nothing weird, and then he raped me in my living room."

        Oh, OK.  That's a pretty -- there's just not a lot of kind of lead-up.  Like it just happened, you know.  And so I suggest to you maybe it didn't happen.  Maybe it didn't happen, and I'll show you why conclusively it didn't happen -- because of this.

        Initially, this is -- the question was that it happened in August.  OK?  Her initial statements about the rape is that it happened in September.  And she said that to you. She said that in her civil suit, alleged that it happened in September, and then she told the government it happened in September, and we have transcript along these lines.

        Page 1231, line 3:

"Q.   And on that date you told the government that this incident occurred when Mr. Combs returned from Burning Man in September 2018, right?

"A.   Yup.

"Q.   So you told the government essentially the same thing that was in your civil lawsuit, that it was in September 2018,

P6rWcom3                        Summation - Mr. Agnifilo

right?

"A.  OK, right.

So now it's September.  But let me show you what happens.  Cassie she goes in and meets with the government, and she's shown a bunch of text messages.  And let me show you one of the text messages that she's shown, and it's 1376, and it's from September 27, 2018:  I had a lot of fun with you.  Thank you for the night.  I told myself I didn't want anything to happen and I'm not tripping on it.  I know you aren't either. I'll let you know what I talk about with my publicist, and I'll keep you posted on that.  Love you.

OK.  You really can no longer maintain that a rape took place and then send this text message right after it.  But let's delve into this text message a little more deeply, because I think just from this text message alone you can figure out a lot of what's going on.

All right.  Cassie is now with her current husband. She's no longer with Combs.  All right?  She agrees to meet with Combs, but she tells herself nothing's going to happen. They meet and something happens, and you know that's true because she says that.  She says:  I had a lot of fun with you. Thanks for the night.  I told myself I didn't want anything to happen.

I'm sure she did.

And I'm not tripping on it.

P6rWcom3                        Summation - Mr. Agnifilo

Because something happened, but she's not tripping on it.

I know you aren't either.

OK.  So here's what happened, and you know this from the next text message.

While they're together, she gets a FaceTime, and she gets a FaceTime from something, Boogie Bat Phone.  FaceTime.  All right?  So let's go to the next series of messages, and let me just do a spoiler alert.  Boogie Bat Phone is her current husband.  So while she's actually with Combs, her current husband calls on Boogie Bat Phone.  So let's go to the next page.

Combs says:  So you going to ignore the fact that whoever was FaceTime you while I'm making love to you, you worrying about me having friends, and it's apparent you have friends.  Crazy.  Then you want to act.

OK.  So he's basically saying what happened.  We're making love, you get a call on Boogie Bat Phone.

So what does she say?  I really don't know who that was.

Oh, Cassie.  Cassie.  Oh, I don't really know who that was.  I looked at it this morning, and I still don't know so I dropped it.  I get weird calls often, even if they're locked in.  I know you do too, and I'm not acting like it didn't happen.  I remember.  I had a really good time with you.

P6rWcom3                         Summation - Mr. Agnifilo

OK. Next page. Combs says: It's always been fucking up our shit, always. You act like this brokenhearted angel and you're just not. The question is who are you. For one second I thought love affection us, but as usual there's another end, and you question me about girls that I'm FaceTimeing me at 3 a.m. After all this time, you still lying. You need to stop living your lie.

What does she say?

You're taking this way too far. That's not true at all. I can't even be defensive with it because there's nothing to defend. I don't know who that was. I don't have Ns at all. And I was saying thank you for last night, because I enjoyed it.

All right. So she's in a bind. She's in a bind because she got a call from her now-husband on the Boogie Bat Phone while she's with Combs. And she has to do the oldest trick in the book. I don't know how Alex found out, but he found out, and she has to say he raped me, because it's better than the alternative for her, because it's better than saying, yeah, I slipped. I told you I was going to see him, I thought nothing was going to happen and then something happened and I slipped.

So she lies. She lies and says that she was raped. The problem is that because of all these I really enjoyed you emails, she can't say that it is September. She doesn't want

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6rWcom3                        Summation - Mr. Agnifilo

to give up on the rape because she already told that to her husband.  So I submit to you that she sees a text, A441-I.  And you were shown this yesterday.

The government showed you this yesterday and said that this bottom text was -- I think we could just blow that up. This bottom text, what the prosecutor said to you yesterday, was Combs's way of apologizing for a rape that happened in August.  OK.  So now we're off September.  She's no longer claiming anything happened in September.  But she's claiming that something happened in August.  And the evidence, what it is, that something happened in August, is this text.

And here's the text:  I know I look bad to you.  I could tell I didn't turn you on yesterday.  I fell off but I'm about to get my shit together.

Now what the prosecutor said to you yesterday is that is evidence of, like, a confession.  Like, that's his way of saying that he raped her.  That's what the prosecutor said to you yesterday.  That is just ridiculous.  I mean that could mean many things, but it certainly doesn't mean that.  So she says rape because she's sideways with her now-husband.  She says September because that's when she got the call from the Boogie Bat Phone.  She couldn't maintain September because of the text message of "I really had a good time with you last night."  So she changes it to August and says, well, look, this is the evidence that it happened in August.

P6rWcom3                              Summation - Mr. Agnifilo

But at the end of the day, this isn't evidence of anything. And I submit to you there's no evidence of a rape. And what she goes on to say is -- she then has consensual sex with Combs, she says, in October. So I suggest to you if there was really a rape in August, she wouldn't not have gone back and had consensual sex with him. So there's no rape. At the end of the day, you don't even have to decide. I mean it's called rape, so I have to defend the rape. I can't let you think that it was a rape. It's not charged. It's just not charged. It's in the case, and it's not charged.

All right. I want to kind of give you guys a feel of kind of the nature of the relationship that Combs had with Cassie and with Jane. And I'm going to do it by reading one question -- I've been struck by this answer since she gave it. And I almost told myself I wouldn't share it with you.

This is page 825:

"Q.  What kind of pain did Sean put you through?"

I was gripping my chair. Whoa. What is she going to say? What kind of pain did Sean put you through? No one objected. You know, she's just going to answer the question, right here in public in front of everybody. And I think her answer is remarkable. And her answer is this:

"A.  I think bigger, more than anything, it was his own personal shame in having to carry the things that were shameful to him."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

So, you know, we use words like love, you know, kind of generically. But here's what she's saying, and this is a thoughtful answer -- more than thoughtful -- she felt he had shame. She felt he carried shame, and the most painful -- in a sex trafficking case, the most painful thing for her was to unburden him of his shame and carry around his shame.

That's what that answer -- she could have answered that question any one of a million ways. She could have said he made me a prostitute. He ruined me. He did all these things, and that that's her answer, and the reason it's beautiful is the only person who could answer a question that way is someone who's truly, truly in love with the other person. And all you need to know is that answer. Because she could have said anything, and that's what she says. He felt shame and it was most painful to me, was carrying around his shame.

What's even more fascinating? Jane says almost exactly the same thing. Line 23, at the bottom:
"A.   In the context of these rooms, I felt that my partner was trusting me in a very vulnerable moment and -- well, so he made me believe that this was something really special, that this was something that him and I only did. And I really took that on very strongly and I really wanted to just go along with these things because I felt like if I can be my partner's escape, then I would be. And I didn't want to judge him for

P6rWcom3                          Summation - Mr. Agnifilo

the things I noticed in these rooms about his behavior and the things that he liked.  And I just would kind of put blinders on and just go along with what he was telling me to do.  But deep down in my heart, with what I could assess in the situation, I didn't want him to feel that eyes were on him while he was in this vulnerable state."

So you have both Cassie and Jane basically saying this was this essential, vulnerable, deep part of himself and he trusted me to go there with him.

And remember one of the things that Jane said?  Jane said:  I knew he had other women, but I also knew that the other women weren't doing this with him.

So that was her testimony.  I knew these other women weren't doing this with him.  And so I think one of the things that you could glean from Jane's testimony, what hurt her so much was not so much that she minded, minded the hotel nights.  She was basically saying, listen, I am going to a very vulnerable, special place for you, and I'm doing it because I love you.  So I don't want to see Yung Miami on a plane with you.  I don't want to see another girl on a, you know, bigger yacht than you took me on.  I don't want to see another girl have a nicer handbag than the handbag I have.  If I'm going to go here with you, you put me first, because I don't want to be put second.

And that's many, many things.  It's just not sex

trafficking, though.  And so there's so much about this case.
And when I say to you if you really get deep, and you have to.
If you really get deep into these very fascinating,
complicated, intimate sexual relationships -- but forget sex.
Sex is almost a distraction.  Like, intimate.  Like, man,
there's this deep self in all of this and here is where I am my
realest self, and I'm doing it with you.  That's just not --
when you think of sex trafficking, is that what you think of?
I mean it's just people in love being vulnerable and intimate
and real with each other.

THE COURT:  I was planning on 1 p.m.

MR. AGNIFILO:  OK.

THE COURT:  If you need that adjusted because you want
to get to a particular place, that's fine as well.

MR. AGNIFILO:  I was going to move to Jane now.

THE COURT:  This would be a good time.

MR. AGNIFILO:  Yes.

THE COURT:  All right.

Let's take a break for lunch.  We'll come back at
1:45.

(Jury not present)

THE COURT:  Please be seated.

Mr. Agnifilo, do you have a sense of how much longer

P6rWcom3

you have?

MR. AGNIFILO:  Yeah.  And let me just say I've gone a little slower than I thought, but I'm going to make some adjustments over the lunch hour.  I think I probably have an hour.

THE COURT:  All right.  Take the time that you need. I'm just looking for an estimate.

MR. AGNIFILO:  Yes.

THE COURT:  All right.

And then Ms. Comey, you obviously won't know this until the defense closing is done, but do you have a general sense of the timing?

MS. COMEY:  So, I was hoping to keep it to an hour.  I think it may go a little longer than that.  Certainly no more than an hour and a half, your Honor.

THE COURT:  All right.  So we're looking at charging the jury around four.

MS. COMEY:  If Mr. Agnifilo keeps to the amount that he's just predicted, which I won't hold him to, then yes.

THE COURT:  All right.

And so just for the sake of argument, if we go later than that and it becomes 5 p.m., my intent would be to deliver the charge at that time, and I'm just letting the parties know that that was what I was planning to do.  That wouldn't really give the jury that much time to deliberate today.  But rather,

P6rWcom3

I think it makes sense to move forward with that process now as opposed to waiting to charge the jury on Monday. And I just want to give everybody a forecast so that we're all on the same page or if anyone has any issues with that --

MS. COMEY: If the jury's willing to stay, your Honor, we have no objection. I would defer to defense counsel, who's raised issues with time in the past. So I defer to them on whether they'd like the jury to be asked to stay past 5 p.m. or wait and have the charge on Monday.

MR. AGNIFILO: I'm fine keeping them as long as they're --

THE COURT: And I will tell the jury that once they're in the room once the 12 jurors are prepared to deliberate, they can make the decisions on timing that they make. And so if they want to stay longer, they can. If they don't want to, then they can leave and come back on Monday.

With that, we'll come back at 1:45.

(Luncheon recess)

P6RQcom4                        Summation - Mr. Agnifilo

AFTERNOON SESSION

1:45 p.m.

(In open court)

THE COURT:  Please be seated.  We will check on our jury and bring them out.  The only thing is after just thinking about the timing a little bit, I think it makes sense to charge the jury first thing on Monday because of just where we are.

I think that it's going to alleviate some of the time pressure, Mr. Agnifilo, on you.  Do what you need to do.  We'll have the rebuttal.  At that point, even if I did charge the jury, it would be, first of all, very late for the jury to absorb the charge, and what would happen right after that is just sending the jury home for them to come back on Monday.  Given that, I think it makes sense for the jury to come back fresh on Monday morning, have the charge, and have them start deliberations.

MS. GERAGOS:  Your Honor, I sent an email asking if I could be excused for the first part of Monday morning, based on the email I sent you.

THE COURT:  Yes.  Thank you for reminding me.  Given the timing, that's not an issue.

MS. GERAGOS:  Not at all.  I want to know the Court is okay with --

THE COURT:  I'm okay with that.  Thank you for advising the Court.  And assuming that's not an issue, we can

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom4                        Summation - Mr. Agnifilo

proceed on that basis.

With that, let's bring our jury out.

(Jury present)

THE COURT:  Welcome back, members of the jury.

Mr. Agnifilo, you may continue when ready.

MR. AGNIFILO:  Thank you very much.

Thank you all for working so hard today and paying such close attention.  I have one last couple of things about Cassie, and then I'll move on to Jane, that I neglected to say.

There was some suggestion at this trial that somehow like Cassie didn't get the support and attention as an artist that other artists at Bad Boy got.  And while I think Capricorn is imperfect witness, in some ways I think one of the things she does know about is what she said about Cassie, is that in 2007 to 2010, I think she said that Cassie got the lion's share, is the way she put it, of the resources and the attention from the production company, from Bad Boy.  And that after that, other artists came on, joined Bad Boy, and then she sort of had to share the support and attention with other artists.  But there was no perception from her part, and she would know because she was hands-on with Cassie, that she was somehow, you know, being given less resources than other people or that, you know, her music wasn't being supported.

I think if you listen to Capricorn's take on this, I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom4                        Summation - Mr. Agnifilo

think she was looking to be appropriately polite about it.  She said Cassie is a studio musician.  And remember, I tried, I asked her what does that mean.  And so she said she's not like Beyonce or someone like that.  She's talented, but she's not one of these great natural talents with a microphone that work the magic like some of the great artists that we know of.  So I think there is really nothing to all of that.

I don't think there's really any suggestion in the evidence that's credible that sort of Mr. Combs was holding her back.  You see quite the opposite.  You know, she obviously did movies.  She went to South Africa and did movies.  She was busy.  She was active.  She put out, you know, a tape.  Maybe it didn't make a lot of money, but there's really nothing -- I think she rose and fell on her own merits.

I think when she testified, I don't know that she's really done anything since meaningful, so it's not as though that she left Bad Boy and had top records, and, you know, changed the scope of her career so you could really say wow, if we look at the whole arc of her career, it really took off after she left Mr. Combs and Bad Boy.  There's just no evidence of that whatsoever.

The evidence is what I think she said, is that she was going to do a tour.  I think she was going to go to New Zealand and Australia in the fall of 20 -- around time that she filed the lawsuit, so 2023.  And when she got the lawsuit proceeds,

she canceled the tour.  So $20 million will do that, I guess. So, you know, I think that's a fair read on it.

Also, there's really nothing meaningful, I submit, to this bit like I had the freak-offs because I was afraid of him being violent.  He was violent at times.  I don't think there's anything really in the credible evidence to link the two.  You know, they were together.  Their problems weren't about violence.  You'll see some text message where she's angry when he would hit her, and they would be violent, and of course she would be.  But I really think that she spent most of her time, you know, on jealousy, on that, on Mr. Combs being with other women, you know, at the same time that she was being with other men.

So with that, we can move on to Jane.

I want to start with the recordings.  And you guys noticed this, so I might be stating the obvious:  Neither side played any of the videos for the witnesses.  You know, we didn't play them for Cassie.  We didn't play them for Jane. And I'm sure the government probably feels the same way.  I think that's probably the parties' way of being as respectful about this sensitive evidence as we can be.

But what you guys have to keep in mind is it's evidence.  I mean, so what I'm asking you to do is feel free to watch the videos.  Videos are important evidence.  They're sensitive, but they're important.  So you almost have to take

P6RQcom4                        Summation - Mr. Agnifilo

on the role of like a doctor and just say, all right, I'm going to sort of divorce myself, which is hard to do — and I'll tell you why in a minute — I'm going to divorce myself from the fact that I was never meant to see these.  I was never meant to see these videos, and yet -- and, you know, there are many of the ones from Cassie were on her device; not an irrelevant fact, I submit.  They were on her device.  She kept them on her device for six years.  And one thing she said, and I think it's interesting, she was like, well, it didn't work.  You know, it was on my iPad or laptop or one of those things, but it didn't work.  It was damaged by the rain.

But when the card examiner from the Department of Homeland Security examined it, he said it worked fine.  So I don't think it's really true that it didn't work because the expert was able to open it and was able to look into it.

Why am I saying that?  Listen, I don't know what role these videos played, if any, in Cassie's life after she left Mr. Combs, but she certainly didn't go in to delete them.  She certainly didn't throw that device away.  And what we know for a fact is that they were on her device, which was working, and which was then examined by the folks at Department of Homeland Security, and they extracted the videos from there.  So that's just, you know, part of the things to consider.

But let's talk about the videos generally for a second.  They are essentially, I submit to you, a date night.

P6RQcom4                        Summation - Mr. Agnifilo

That's all it is.  I mean, sometimes we have -- they've given them racy names like freak-offs or hotel or king nights, but it's really a date night.  And if you end up watching the videos, if that's what you choose to do, and you guys can handle your deliberation any way you want.

There are certain things that I -- and you've probably seen them, so I'm not saying this so you have to see them again.  The hotel rooms are beautiful.  The music is nice.  I think there's Bryson Tiller and Usher, and the music is beautiful.  It's a nice mood.  You know, when you watch these videos for the first time, you have no idea you know you're in a federal courthouse and in a racketeering sex trafficking trial.  Man, now they're going to make me watch videos?  Like what am I going to see, you know?  And what you see is certainly something that you're not meant to see, and I think that could be a little jarring.  You know, it could be I'm not meant to see this and it's because you weren't.  You guys were never meant to see it.  And if the circumstances didn't happen the way they were, no one would ever have seen it.

And one thing I want to make a point since we're on this point is there were times, you know, I'm going to release the videos, I'm going to release the videos, that's like saying I'm going to kill you.  You know, that's just I'm angry.  There is no way on God's green earth Sean Combs is going to release one of these videos.  Zero.  Zero.  Zero percent chance.

P6RQcom4                          Summation - Mr. Agnifilo

Never.  He was worried about the Intercontinental video being released.  He would be very worried about these videos being released.  I think everybody knew that

sometimes he talks, you know, he might have said that from time to time, but there's no way, no way that he's going to release any of these videos.  And I submit to you, there's no way anyone thinks that he will.  But looking at the videos, it's, you know, I mean you've heard some of the testimony, mostly from Jane.  There is a nice dinner before.  They go to a nice hotel.  I mean, these are lovely.  You know, take the part out that is inconsistent or not inconsistent with how, you know, many people choose to be intimate, and what you really have left is kind of this beautiful evening.  You know, the music is nice.  The mood seems, you know, friendly and easy-going, and everyone is smiling and laughing.  Forget the sex part.  I mean, they're hanging out.  They're eating food.  At one point Cassie is eating watermelon.  People are hanging out, having a nice time, listening to music.  And that was the escape as much as the physical intimacy.

And I think what, you know, the two escorts that were called to testify at the trial said is, you know, there's a lot of talking.  There's a lot of hanging out.  I mean, one of the things that's interesting is, you know, Phillips and I always call all him the Punisher.  That's not the name his mother gave him.  He got the name playing basketball.  Sharay Hayes.  They

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom4                          Summation - Mr. Agnifilo

both really thought that like Cassie was into them, you know. Like, oh yeah, that Cassie.  I'm special to Cassie.  I didn't know, like, you know, exotic dancers could be so naïve.  But they were.

So there's a real genuine intimacy, and just nice quality to these evenings.  They're not aggressive.  They're not -- you know, I submit to you that the physical intimacy is not aggressive.  You've seen it.  It's very standard.  It's very, you know, sort of typical, you know, homemade porn. That's really what it is.  And I don't think by any stretch of the imagination this is the only man in America making homemade porn.  I'm under the impression that this is a pretty popular thing nowadays.  So let's look at it in the context in which it is in.

So let's get to Jane now.

Jane is a little different than Cassie.  Jane, if you had to kind of like really get to the essence of it, I think what Jane is about is she really likes the trappings, you know, put it that way.  How many times did she say, I didn't get anything postable.  She was in -- she wanted stuff she could post, I guess, on Instagram.  I didn't get anything postable. She wants beautiful trips because I think she likes beautiful trips.  But, you know, there's nothing like posting a villa, you know, in Turks.  There's nothing like posting a yacht, you know, and so that's what is -- that's what she's into, and I

think she really did love Sean Combs, and I think Sean Combs loved her too, but she's a little bit more, I would call like, you know, focused on what am I getting out of it that the world can see. You know, I want great. I want images. I want to take great pictures. I want nice things. I want to have nice bags. I want to have nice just stuff. So that's a lot of what motivated her, I think.

And listen, you guys, you guys know who her baby father is. You guys know. And you guys also know when she was in Vegas, you know who she was with in Vegas. You guys know that. So she is comfortable being in that sort of strata, like this isn't -- you know, he's special in a lot of ways. He's not really special like that to her. That's just how she moves, you know, and he just kind of fits in like that.

So let's look at a couple of things. So first the government said the same thing about Jane that they said about Cassie. They're not saying that every single hotel night was sex trafficking, so it raises the exact same question. Well, then which ones and how Sean Combs is supposed to know the difference? And they did isolate a couple. And the first one I remember that they isolated was September 2023. So let's look -- and if I remember right, this is all like jealousy over a yacht. I think someone went on a yacht, and she didn't go on the same yacht, and she's sort of jealous over the same yacht.

Let's do the lead-up to it. This is Defense Exhibit

P6RQcom4                          Summation - Mr. Agnifilo

3327.  She's on a plane.  If I remember her testimony right, she's on a plane, and she gets a text of Cowboys4Angels.  So what you're seeing here on top is that she is liking a message Cowboys4Angels.  Combs sents a message Cowboys4Angels, and she likes it.  I think this is from the plane.  What is he to think?  What he's to think is that he sends out a, you know, a message Cowboys4Angels, and she likes it, so we go forward and we try to make that happen.

Next message is 3187.  Cowboy comes, and she doesn't like the guy.  And this happened quite a few times, handful of times.  More than once or twice where Jane just didn't like the guy, and every time she didn't like the guy, the guy had to go.  There was one guy she said she just didn't like how he looked.  I think she said he smelled.  She said another guy she wasn't attracted to.  And when that happens, you know, the guy is sent packing.

So 3187, what we see is Cowboy gets sent over.  Cowboy gets sent packing.  Why does he get sent packing?  It says on the bottom for "her bum ass cowboy."  She doesn't like the cowboy.  But guess what?  They paid.  They paid a thousand dollars for a bum ass cowboy and no sex.  So we'll get to this in a minute.  But this whole notion of like paying for sex, paying for time.  Got paid.  No sex.  What gives?  Paying for time.  I know the government yesterday, the way that they handled the paying for time thing was to just literally not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom4                          Summation - Mr. Agnifilo

talk about it at all and be dismissive, but that's what just happened.  That's what just happened here.  Bum ass cowboy.  Pay a thousand dollars for a bum ass cowboy with no sex.

All right.  What she then does, if you remember, is she calls Kabrale.  And they sometimes call Kabrale chef because Kabrale's a chef.  And so Kabrale comes.  And I think you can see from the evidence that Jane likes Kabrale.  They just -- they just get along, you know, and then we have texts from a week later 3191.  And what they're talking about is they're looking at the videos from the time with Kabrale and saying:  I can't even look.  It will drive me crazy.  You might blow up, daddy, like a locomotive, muy caliente.

I don't see how the government says that this is sex trafficking, but they say it, and this is one of the three that they're saying is sex trafficking.  You know, she wanted it to happen.  She called her guy.  She called Kabrale.  It happened they made videos.  They watch it a week later and talk of muy caliente and locomotives and all the like.

Next one is so-called sobriety party, October 2023.  And at this point jane really wants Combs to be healthier and, you know, you've got to drink less.  You've got to do less drugs.  You have to eat better food.  And so they have this sobriety party.  And what's happened is she's angry at the end at this point over Gina.  That's what she's angry about.  She's angry over Gina.  And she's angry over Gina a lot.  She

P6RQcom4                          Summation - Mr. Agnifilo

basically told you guys when she testified, I didn't really want to do it. I didn't really want to do it. But I want to focus you on one part of her cross-examination. It's page 5643. It's questioning by Ms. Geragos and the question is:

"Q. And you had agreed to do it, right?

"A. Unfortunately, yes.

"Q. You keep saying unfortunately, but you had agreed to do it, right?

"A. Yes.

"Q. You regret now that you agreed to do it; is that fair?

"A. I resent him for knowing how much I loved him and knowing I couldn't say no to him.

"Q. My question is, you regret that now, right?

"A. I resent him for it, yes.

"Q. You resent him for the fact that you did the sobriety party?

"A. I resent him for all of it.

"Q. And you regret it, right?

"A. I believe resent and regret lie in the same feelings."

Here is why I'm reading this to you because I think you could really see this as a very, very, very important dynamic in this case. People do things because they wanted to at the time. And when she said, you know, when Ms. Geragos said: Did you agree to do it, she says, unfortunately, yes. She's regretting that she made a choice; that maybe years later

P6RQcom4                         Summation - Mr. Agnifilo

she would have made a different choice.  Or maybe she wouldn't.  Maybe she just regrets it.  But we can't look at things, like, you know, criminal conduct looking backwards.  You know, it's going on at the time.  What's going on at the time.  She's agreeing to it.  He is hearing her agree to it.  That's it, really.  That's really it.  She's agreeing to it.  He sees her agree to it.  She regrets it.  She resents him for it.  That all comes later.

Regret is not the same as intent at the time.  It doesn't work that way.  You can regret things later, and I think typically you regret things that you wanted to do.  I think that's just a very human nature sort of response; that you don't -- you don't regret things when someone truly made you do it.  There's nothing to regret.  It had nothing to do with it.  When you made choices, when you made choices as a matter of your personal responsibility, and then later you wish you made a different choice, that's called regret.  And that's what she said, resentment, regret, as she said, it's basically the same thing.  So, bottom line is, she agreed to it.  That's all you need to know.  We can be done with it.

A few other things I'm going to talk about, a few other things then I'm going to talk about June 18-19 of 2024.  I touched on the house.  You know, talk about dammed if you do, dammed if you don't, and no good deed goes unpunished.

She has a crappy, crap -- I mean, we heard someone

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom4                        Summation - Mr. Agnifilo

come in here and say he had the world's best lawyer.  I think she had the world's worst lawyer.  I mean she had a back lawyer.  I don't know whoever cut the deal with her child's father.  That's a pretty crappy child support deal in my opinion.  She probably deserves more, and guess who's giving her more?  The one who has no responsibility for that woman's child at all.  So you had talked about like who's doing the right thing, and who's doing the wrong thing?  There is only one way to look at the house that he is paying for, is that he is doing the right thing.  He is picking up the ball for someone who seems to have dropped the ball with his own kid.  Okay?

So the house -- forget the house.  The house is a gesture of kindness and decency and niceness.  And as to his credit, when she was on the stand, he hasn't changed it.  He hasn't changed it.  Oh, you're going to come testify at my racketeering trial?  You know what?  He made a deal and he kept it.  Good for him.  There should be more people like that.  So forget the house.  If they are going to get up here on rebuttal and say the house leads to sex trafficking, just don't go that way because that's not right.

One other thing that we see with Jane that we didn't see with Cassie, I don't think, certainly not as much.  So Jane and Mr. Combs watched a lot of pornography, and I think Jane said they watched something called Black on You Porn or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom4                          Summation - Mr. Agnifilo

something.  I want to pretend like I never heard of these things.  I don't know what they're called.  So, you know, and they found Kabrale.  They found Kabrale.  And they also found Antoine, okay?  And that became their thing.  They were a little bit more, like, into the porn scene, you know, really directly, like, as a commitment that they made.  They were going to watch porn.  They were going to watch porn actors.

And Jane was very clear.  She was the one who kind of found and really reached out and made this sort of a reality for, as she kept saying, my lover and my partner, who she really does seem very consumed to try and take care of that way, you know, to her credit.  But she would sort of reach out to Kabrale.  Kabrale would come over.  They would be with Kabrale.

Antoine, she met Antoine the same way.  Antoine would come over, and they had a real strong kind of homemade porn bent in the way that they got along.  She got him a screen for his birthday one year so that, you know, she says so he can watch more porn and make less porn.  I think that's one of the things she said.  I'm not sure it really works like that.  You know, I think once you've made the homemade porn commitment, I wouldn't know, you're there.  You're there, right?  Okay.  So I think that is just -- but that's like their thing.

Let's talk about June 18, June 19.  This is a very, very important incident, so I'm going to go through it in a lot

P6RQcom4                        Summation - Mr. Agnifilo

more details.  There are a lot of pictures, a lot of things to show you.  You've seen them all.  I'm not going to do it that way.  I'm going to give you a timeline because it's important.

There's a photograph.  I'm sure you remember there's a photograph of eight glasses on a table; two sets of four glasses.  There's like a big wine glass, kind of like a champagne flute, champagne wine glass, and two shot glasses.  She takes that picture at 7:01 p.m., the picture on her counter.  At 7:03, she takes a selfie of herself.  At 7:35, there's a picture of Sean Combs sitting on a chair, and he has the big wine glass, the glass that holds the most liquid.  I would say it's more than half full of wine.  There's a couple like strawberries in there too, but it's a lot of wine.  It's not like, you know, a little, cheap pour at a nice restaurant.  It's a really good heaping pour of wine, and he's sitting on this chair with this glass of wine.  Then at 8:31, you probably remember this, Combs is standing and the room already has a red light in it and Combs is sort of standing in the corner of the room.

Then at 8:34, and this is going to be significant, I'll tell you why, 8:34 p.m. Combs is standing near a window, and what's important about that is you could see out the window that it's twilight.  So the times seem accurate, you know what I mean?  Sometimes UTC time, what time is it, it's the way Los Angeles would look on June 18 at 8:34 at night.  So you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom4                        Summation - Mr. Agnifilo

know the times are right just from that alone.

And what does Jane say?  Jane says that about half hour after she took that picture, something really, really inapplicable happens.  And I really want to focus on the inexplicable part because when something is inexplicable, you have to ask yourself why, because most things aren't inexplicable.  Most things are explainable.  Truly nothing happened.  I mean, so many times Jane gets upset because, you know, Combs posts or somehow gets in the news that he's somewhere with Gina or he's somewhere with Yung Miami, somewhere with someone else.  Nothing happens this night. They've never been physical a day in their lives.  Nothing happens.  And what does she do?

He's tying his shoe.  So he's bending over, and she takes the back of his head and slams it into the counter.  She doesn't really give an explanation for doing this.  And I think all of this is significant.  Why did she do this?  She doesn't say she saw something.  She doesn't say he said something.  She said he was tying his shoe, so his head was forward, and she took this as an occasion to take the back of his head and slam it into the counter without any explanation at all.  She then says she starts throwing glasses at him.  She's throwing glasses at him.  She throws a candle at him.  She says the candle wax gets on him.  The best she said was "I was just resentful," but a half hour earlier you're taking this sort of

beautiful picture of him against sort the twilight sky, and a half hour later you're waging holy war on the guy.

I mean, slamming someone's face into a -- it doesn't get much more aggressive than that. And then doing these things, and she starts saying: I hate you. She starts calling him a pedophile. And, you know, so what she's mad about is this woman named @Olie. And the government is very clear, and she was very clear, she's not underage. She's just younger than Jane is. I don't know what 21, 22, something like that, but Jane was 36, 37? Olie is younger than Jane, so she's using this word, and there are some words, I submit to you, that like, you know, water off a duck's back. You know, I'm a jerk, whatever. You start calling someone that word, that's why is she doing that? Is she looking to get a rise out of him? Is she looking -- I mean, she slams his head on the counter, throws glasses at him, throws candles at him, and now is calling him this word over and over and over and over.

And then she retreats into the bedroom. He kicks the door open. Goes into the bathroom; kicks the door open. Goes into the closet; kicks the door open. Doesn't hit her. I'm not saying he should. I'm saying he doesn't. He doesn't. I mean, I don't know what we kicks the doors in but he doesn't hit her. That's what she says: Didn't hit me. Didn't hit me. She gets to the front, she goes out, okay. And so I submit to you she's right, that's a half hour after the photograph at

P6RQcom4                          Summation - Mr. Agnifilo

8:34.  We're in the neighborhood of 9:00, 9:05, 9:10 if her timing is right.

Here is what we do know.  We see a text message from Jonathan Perez at 9:46.  So now it's 9:46 and the text message is that they're fighting.  Okay?  So obviously probably Combs, I can't imagine who else it would have been, Combs must have called somebody or called Perez directly to say we're fighting.  That's 9:46.

10:14.  Another text message from Perez.  Just normal being jealous.  So now he's gotten some more information, and someone has told him Jane is just normal being jealous.  10:24, heard from PD; don't come all good.  Okay.  Let's look at this timing for a second.

Let's look at the timing that is sort of documented in the timing of text message.  9:46 Perez says they're fighting 10:24 literally the all good sign.  So there's a fight that happens, if Jane is right, somewhere around 9:00, 905, that ends, ends at 10:24.  At 10:24 we get the all good sign from Jonathan Perez.

So let's go through the actions.  What Jane says is after the doors are kicked in, she is in the closet and she takes this opportunity to change.  Now -- but she doesn't change -- she changes into another dress.  I mean, you know, I don't know.  You know, we know she's an active person.  Ms. Geragos brought out she's active.  She works out.  She's in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

her closet. No sweats? She's really planning on running, but she has a different dress. It doesn't make -- there is so much about this evening that makes no sense. And I'm not able to make sense out of any of it. It's going to make no sense when I'm done too, I have news for you. So she says she changes into another dress, and she runs out. Combs stops her. I think he kicks her, she falls. He gets her in some kind of around the neck, he pulls her up. But then she leaves. He doesn't strike her, he doesn't do any of that.

She leaves. She says she goes and hides behind a wall. She doesn't have a phone or shoes. She goes and hides behind a wall for two hours, but she doesn't have a phone, so she doesn't know how long it is. I submit to you, that's not possible. It's not possible given the timeline that we see from the text message. I submit to you, it's much quicker than that. It's not two hours. She's wrong or lying. I don't know why she would lie about it, honestly. I think she's just wrong. I think that's not an accurate fact.

She says she comes back. And when she comes back, Combs is sort of in the street and kind of like intercepts her before she gets into the house, but there's no violence then either. So look at all that's happened. I mean, I told you everything that happened. She runs out, comes back, still no violence. They go up to the patio. They're in the patio, and she's very clear, she punches him in the face or in the head,

P6RQcom4                        Summation - Mr. Agnifilo

and I think -- and let's just put it out there the way it is. She has you look at that picture of her from the video.  She has something going on with her left eye.  She has something going on with her left eye, it looks likes she got hit in the left eye and something up here.  What it looks like is she got hit twice, okay?  I don't know.  I mean, he's a strong guy.  If he hauls off, I don't -- I think it might look worse than that, but that's what's there.  There's obvious physical contact, and if we're going to keep true to what we said in the opening, there's physical contact, clear as a bell.  He hit her twice, okay.  She hit him.  He hit her twice.  And then she says that he drags her into the yard and keeps hitting her.  I don't know if the injuries look like that.

You know, I mean, what you see, and you can play, you know, the best, bestie, bestie.  I mean, you know, she's like, no, I wasn't doing, like bestie, bestie.  I mean, you know what that was.  She was documenting her injuries because she has injuries.  So that all happens.

So now it is seven hours from the all good message from Jonathan Perez.  It's 5:19 a.m., and there's a 43 second call between Jane and Antoine.  Now there were calls made before that that didn't seem to go through because I think they come up as zero in the sort of timeline, but this one is 43 seconds long, and it's at 5:19.  So you have seven hours from the all good signal, the all good message at 10:24 until 5:19

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom4                          Summation - Mr. Agnifilo

when she calls Antoine or Antoine calls her.  Okay.

So there's a lot about this night that just doesn't make sense.  It doesn't make sense how things escalated so badly.  It doesn't make sense why she decided to be so physical in such an extreme way.  And the Antoine thing is interesting because let's talk about Antoine for a second.

Antoine is a porn star.  She found Antoine.  She brings Antoine in.  Okay?  Over January of 2024, Combs and her are not really seeing each other, and she goes to Las Vegas, and she told you about this.  And she's in Vegas with someone who you guys know who it is, you know, a rapper of some prominence, and his wife or girlfriend.  And lo and behold, who is in the hotel room having sex?  Antoine.  Antoine is in the hotel room, the same Antoine she knows, the same Antoine she brought into their life happens -- coincidence of all coincidences is in the hotel room in Vegas, okay?  So here is what she says she does, and we didn't question her.  And we didn't question her more than a couple questions, and that's because I guess it matters and it doesn't matter, but let's look at what the evidence was.

She says she's in a hotel room with, I don't know, about six, seven people.  Antoine is there.  Antoine is having sex with somebody.  She's watching this with the other people the question is:  What did you do?  And she said I showed my breasts.  I mean, it sounds like spring break, you know; not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom4                          Summation - Mr. Agnifilo

that I would know.  But so what does that mean?  What's going on here?  Like why is Antoine there?  She showed her breasts?  Is she worried there's like a photo of it?  Why would she even say that?  And then something really interesting happens.  And it's not for the reasons I say that she says it.  The rapper and his wife go up to her and ask her questions about kind of the swingers lifestyle, and she gives them Kabrale's phone number.  She gives them Kabrale's phone number.  So if we take all of these events, and we package them together -- I know what happens in Vegas stays in Vegas, and it certainly did here, but what happened in Vegas?  And you're not going to really -- you're just not going to know because I don't think any of you thinks this story makes sense.

So let's say this didn't happen, and something else happened in Vegas, something else happened with Antoine in Vegas that she's not saying.  Is it just a coincidence that the Antoine from Vegas is the one who comes to the apartment later that morning, because he does, of all people?  Antoine?  The same one that she met in Vegas?  That's just -- coincidences sometimes do happen, but usually it's not -- a lot of people say I don't believe in coincidences, and I don't think you should believe in this coincidence.  You guys, there's something she didn't say about Vegas that you would need to know to make more sense out of what happened on June 18 and June 19 because it doesn't make sense that that happens to be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom4                        Summation - Mr. Agnifilo

the same person that she saw in Vegas and that Combs didn't know about.  I mean, this is all stuff he didn't know.

Remember, you saw in the text messages.  You know he keeps saying:  You went to another's freak-off.  You went to another man's freak-off.  That's what he kept saying.  So he didn't know about this.  This is something she did in secret and kept the secret from him, but the one that shows up at her house is Antoine.

Now, I submit to you that what she says about the events of that morning after Antoine gets there makes no sense.  Antoine comes -- she calls -- she knows he's coming.  If Antoine is coming over, it's for one reason, and one reason alone.  Antoine is someone that she found as a porn star.  And if Antoine is coming over to the house, you've got to believe it's probably to have sex.  And so knowing that, she puts on clothes, she gets in her car, she drives to the back gate, she goes, and she lets Antoine in.  She makes that choice.  There's no force.

You know, I think they had a fight.  I think there's a lot of ways you could look at this.  I think one of the ways you could look at this is, you know, by this point it's June of 2024.  She knows there's an investigation into Sean Combs.  Did she do this?  Did she prompt this?  Did she want this to happen?  She doesn't say that.  And why would she?  Maybe she would.  Maybe she has designs on something in the future.  But

the one thing that you really are just left with is that her story -- and you all need to go further than this maybe, her story makes no sense.  The whole night makes no sense of why she was so violent and sort of so persistently violent and so extremely violent.  And you know what I submit makes no sense?  Is she says:  I didn't -- I didn't want to do it, but she went and let Antoine in.

So I submit to you, they were trying to get past the evening.  There was a fight.  There was some kind of fight.  A long time passed, and they were trying to get past the evening.  And what she says is there was oral sex.  There wasn't penetrative sex, and, you know, but I think one of the things that you'll see is that Combs leaves early.  And what she must have said a hundred times on the stand is, part of what I really liked, what I liked most of all, she would say, from these nights, from these hotel nights, which then became nights in her home, is that I would get to snuggle with him afterwards.  We know he left early because at 9:22 there's a message to pick him up, and presumably he was picked up.

So that's the problem.  You know she's upset about it.  I get it.  But at the end of the day, her story has such, such holes.  I mean, the role of Antoine is just a mystery, and it's still a mystery, and it just makes no sense.  So I think where you settle in, there's some things you can't answer.  I think there's a view of these facts you take away and say, you know

what?  I think she prompted it.  I think she maybe wants something in her pocket.  You know, I think -- he gives money to other people.  I wasn't getting what I wanted, what I needed from a financial standpoint, and I'm just going to have something -- maybe I'll never use it.  Maybe I'll never use it, but I'm going to have it because that -- to a certain extent, that's the only way the unprovoked extreme violence makes sense.  It's the only way it makes sense.

And she doesn't explain it.  She doesn't.  She doesn't try to.  There's nothing even coming close to an explanation.  So it doesn't really matter though.  It really doesn't.  What really matters, I submit to you, is they had a fight.  They had a physical altercation, one that she really started.  They had a breathing space of seven hours, and they wanted to get past it, and that's, what I submit to you, the evidence shows about that.

I want to talk to you for a minute, not longer than that, about dawn Hughes, the expert, okay?

You guys are here because you're perceptive about human nature.  You guys are here because you have life experience.  You guys are here because you've lived full lives. You're here because you have friends or kids or parents who have lived full lives.  So you guys are here because you know how people work.  That's why you're here.  You're chosen on this jury because you are good judges of people.  And we

P6RQcom4                    Summation - Mr. Agnifilo

obviously both thought so because you're all here.  So you can look at the witness stand, and you could see a witness testify, and you could use all of your tools to determine:  I think this is true.  I think this is false.  I think this is an exaggeration.  I think this person has an agenda.  I think this person has a bias.  I think this person seems to favor the prosecution and not the defense.  I think this person seems to favor the defense and not the prosecution.

You don't need any help.  You do not need any help. And you certainly do not need a hired gun to come in here, whose job it is to basically tell the same story at every trial.  The cross-examination was a little bit long ago because it was a little bit in the early middle part of the trial, but, just remember, that's all I need you to do, just remember the cross-examination and what the cross-examination really showed you is that she is just -- she just tells the same story.  She doesn't interview anybody.  She doesn't know anything.  And one of the things that was very clear from her testimony is that when she has to give actual advice and help to real live human beings, she meets them, she talks to them, she listens to them, she understands their story.  She understands the details. She'll know whether someone went to a plaintiff's lawyer or called the cops or didn't do anything at all.  She would see how people react.  She would do all the things you guys do sizing up a witness, but she would do that in a more intense

degree because she has more interaction with them.  And in her clinical life, that's what she does.

But when she comes in here at a matter of grave importance like a trial and speaks to a jury, she doesn't do any of that.  What I am asking you to do is trust yourselves. You don't need her.  She doesn't help you.  You use your own eyes and ears and experience, and you determine yourself by whatever metric and what you think is appropriate about what the witnesses are saying and importance of it.

I'm going to talk about the Mann Act transportation for prostitution.

The government put up a poster.  I couldn't count all the guys in it, but it was likes 30 something, something, a lot of guys, okay?  They called two.  They called two.  Now, they prove their case, they don't prove their case any way they want.  They called two.  And the two that they called were Daniel Phillips and Sharay Hayes.  They could have called everybody.  They could have called anyone they wanted.

And you see how this works.  If they want to give a witness immunity, you've see that happen in this court.  It happened more than a few times.  I don't want to testify. Well, too bad. We're giving you immunity.  Get on the stand, and you're going to testify.  Okay?  They called two people. Here is the fascinating thing about the two people that they chose to call.  Neither of them -- both of them utterly

disavowed being a prostitute.  Both of them utterly disavowed having sex for money.  So when the company gets up here and says not sex for money, bah, I'm not even going to talk about it.  They chose those witnesses.  They put those witnesses on the stand.  Those witnesses said:  I'm not a prostitute.  I'm not engaged in prostitution.  I don't have sex for money.  That's a government witness.  And you didn't hear any examination of that.  That's ridiculous.  Of course, that's what you are.  They called these witnesses as government witnesses.  They got on the stand.  They told you that story, and they got off the stand and left.  And didn't hug anybody.  Only one person did that.

So now they say -- they're walk -- and so when I said at the trial of two trials, this is a perfect example.  This is the best example I think I've got in the whole case of the trial of two trials.  They call witnesses who get on the stand and say I'm not a prostitute.  I don't have sex for money.  They let him walk out that door, and then they say, everybody's having sex for money.  Well, you need evidence.  You need witnesses to say that.  Were these the two best of the 30?  27?  39?  These were the two best.  The two guys who (A) didn't travel anywhere, and (B) were not prostitutes and did not have sex for money.  They were very clear.  There was no discussion of sex for money.  There was no negotiation of sex for money.  There was no agreement of sex for money.  Phillips said:  I

never asked for a dollar. That was his testimony. I never asked for a dollar. He said: I wouldn't have thought twice that this was prostitution. This is a government witness. Didn't cross my mind that this was prostitution. So is it supposed to cross his?

I mean, there are three people in this room: There's Cassie or Jane, there's one of these guys, and there's him. And no one is saying it's prostitution. No one. It's almost like saying, we want to put on all this evidence but maybe we really don't because if we say too much, then they're going to ruin our second trial, the fake one, the one where we just want to say stuff to the jury without evidence because what their witnesses said is that they're not prostitutes.

Sharay Hayes said the same thing. He says: I come to create a sexy screen. That's what he said. I'm not involved in prostitution. Hunk-O-Mania is not involved in prostitution. I am not involved in prostitution. One of the things he says that's interesting is that one time he came, he got $500, and he left and there was no sex. And this happens quite a bit. There's a lot -- there's a fair amount of evidence of that. And so this ridiculous notion of money for time that they wouldn't even talk to you guys about yesterday, that's what their witnesses are saying. That's what their witnesses are saying. If you get paid because you did spend some time and you didn't have sex, what are you getting paid for? You're

getting paid for your time.

Now, let's talk about Cowboys4Angels. Cowboys4Angels, there's documents and evidence. There's text messages between Bridget Collins and Mr. Combs. It is an ongoing successful thriving business, okay? It's been around for awhile. It's around today. And if anybody wanted to order a cowboy tonight, operators will take your call. Okay? They are open for business. They are doing fine. They don't seem to be going anywhere. Okay. Why is he supposed to know more than them?

Why is -- if they're in business, and they are sending escorts, do a lot of the escorts have sex? I think so. I don't know. I wouldn't know. I think so. But if it's that you're paying for time, and if the two adults meet because you're paying for time, and they choose to have sex, it looks like that's not illegal because there are all these companies around the world doing this, and Cowboys4Angels is one of them. How is he supposed to be the only one in the room knowing, oh my goodness, this is prostitution. Well, if it's prostitution, how are they in business? How are they around? Their very existence is actual evidence in his mind, in his mind — and that's the mind we're talking about — in his mind that this is okay, all right?

And at one point there's this text message exchange with him and Bridget, and he's mad that the cowboy couldn't perform and he complains. I'm a long-time user. You know, I'm

P6RQcom4                         Summation - Mr. Agnifilo

a frequent flier.  I'm not getting the treatment I want, all right?  Sean Combs, okay not getting the treatment I want, all right?  And she's like, dude — she didn't call him dude — you're paying for time.  What you do is on you.  You want to go skydiving, go skydiving; that's on you.  That is like the CEO of the company.  How is he supposed to know that's somehow not right?  He's not supposed to know.

There is no evidence, evidence from a human being witness that there was negotiation of sex for money.  There is literally none.  There is no evidence of that.  Think about what a different case this would be if someone got on that witness stand said:  Hi I'm a male prostitute.  I had a conversation with Sean Combs that I was going to come over and have sex with his girlfriend for money, and he said that sounds good to me.  That's very different evidence than the evidence we have.  And one of the things that will be in the judge's instructions is that you are to decide this case based on the evidence and the lack of evidence.  And there is just lack of evidence that there was a negotiation of sex for money.  There is just nothing about it in the entire case.  They could have proven their case any way they wanted, and this is how they chose to do it.

One other thing on this is homemade pornography.  So much of this, I think it was Sharay Hayes who said:  I felt like I was an actor.  I think on one of the videos, if not more

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom4                        Summation - Mr. Agnifilo

than one, Jane is saying to Kabrale, asking:  How do you do it on set?  It's homemade porn.  And in every porn movie I'm assuming that the actors get paid to have sex.  Or else it wouldn't be a good porn movie.  How is that not prostitution? I don't know.  And he doesn't either.  And you don't either. So there's just no actual evidence of prostitution.  There's no actual evidence of sex for money.

All right.  We're going to talk about the racketeering count.  And I'm going to read something to you.  The Judge is going to read you a lot more when the Judge gets to the charge. Enterprise, very important concept.  The judge will tell you how it works.  One part from page 14 of what I think the charge is going to be:  An enterprise is a group of people or entities that have associated together for a common purpose of engaging in a course of conduct.  This group, in addition to having a common purpose, must have an ongoing organization, either formal or informal, and structure, and it must have a core of personnel who function as a continuing unit.

You're going to get this.  You don't have to write it down.

That is what an enterprise is.  Now, let's look at what we know.  What we know is that Sean Combs was indicted by himself.  No one else was charged.  He's indicted by himself. There's no one else on the indictment.  Here is what else we know.  Nobody came into this courtroom.  No one came into this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom4                         Summation - Mr. Agnifilo

courtroom and said:  I was a member of an enterprise, and let me tell you how it worked.  Lack of evidence.  You decide the case based on the evidence or lack of evidence.  Imagine how different it would be if someone gets on that witness stands says:  Hi, my name is so and so.  I was the number two person at Combs Enterprises, but I'm a criminal.  And while it looks like my job was to make records and apparel and run these businesses, what I actually did each and every day is I made sure that Mr. Combs was able to sex traffic.  I made sure that Mr. Combs was able to commit kidnapping.  I made sure every day that Mr. Combs was able to obstruct justice and commit bribery.

The only issue then would be is that person telling the truth.  No one -- there's no -- there's a lacking in the evidence.  They don't have that person.  So who do they have?  They called a bunch of witnesses.  Do any of the witnesses say anything about committing crimes for Mr. Combs?  None of them do.  This is the greatest divide in the tale between -- of the two trials because they don't have a single witness.  They don't have a single witness who says, yes, there was an enterprise.  I was a member of an enterprise.  Here is how the enterprise worked.  This is what the enterprise did.  This is how the enterprise made money.  This is how the enterprise maintained itself.  Here is how the personnel of the enterprise worked.  Here's what the racketeering acts were that we all engaged in together as a group.  They don't have it.

And when the judge charges you that you make your decision based on the evidence or the lack of evidence, there is a gaping lack of evidence of anything to do with the racketeering charge, the racketeering conspiracy charge.  So let me tell you in a nutshell how it works.  I'm going to try and do it more from the evidence standpoint, but the Court is going to give you the instruction.

I read what I think the Court is going to say about enterprise.  The enterprise is this ongoing organization and the enterprise exists through the commission of racketeering acts.  And the racketeering acts are a lot of things that we've been discussing at this trial.  It's the arson.  It's the kidnappings.  It's the forced labor.  It's the drugs.  It's the sex trafficking.  It's the prostitution.  So what the government is basically charging is that this enterprise existed and continued to exist through the commission of these racketeering acts, and I'm going to get to the conspiracy part in a minute because.  For the moment I'm still talking about the racketeering part of the enterprise.

Is that what the evidence in this case remotely sounds like?  I mean, doesn't it seem to you that this is a concept from a different case?  Like who, where's the evidence of any of that?  Where is the evidence that Sean Combs was trying to maintain an enterprise through what?  Through having sex with his girlfriend in a hotel?  I mean, it's his personal life, and

there was always this tension, I submit to you, when the personal assistants were on the stand.  The government was saying, well, you know, you get paid this way, and you get paid this way, and maybe the company paid for the baby oil, maybe it paid for the Astroglide.  And they're like, you don't understand.  This is one percent of my job.  The rest of my job is doing all these things actually in the furtherance of the business.  This is one percent of my job, they would say.  So what the government is trying to do, they're just trying to change everything -- but the government's changing it.  They don't have evidence.  They don't have evidence that any of these things are true.  This is his personal lie.

I mean, listen, this is supposed to be simple.  And if you find that you're in the weeds of this great complexity, maybe it's because it just isn't there.  And what's there is, you know, he's -- this is the sex he has.  He uses drugs.  He does these things, you know, and it is what it seems to be.  You know, most things in life are really what they appear to be.  And this is one of those things that really are what they appear to be.  It's his personal life.  It's not about an enterprise.  And there is no witness who says it is.  It's not about racketeering activity in the furtherance of an enterprise.  And there's no witness to say that there is.

All right.  Now, they didn't charge racketeering.  They charged racketeering conspiracy, okay?  So they need a

racketeering co-conspirator.  And they just don't have one.

They need somebody — and the Judge is going to charge you on

this — who has conspired with others to operate the affairs of

the enterprise by committing at least two acts of racketeering,

not like -- assault is not an act of racketeering.

(Continued on next page)

MR. AGNIFILO:  The acts of racketeering are the things that are charged in the indictment as acts of racketeering. It's the kidnapping.  It's the arson.  It's the sex trafficking.  Those things are actually charged.  So it's not just any one.  You know, domestic violence is not an act of racketeering.  Assault is not an act of racketeering.  It has to be an act of racketeering.

So what co-conspirator would they possibly be able to put up to say there's the co-conspirator who's agreed with others to commit two acts of racketeering in furtherance of the enterprise.  And the one that they keep kind of coming up with is K.K.

OK.  K.K.  The evidence at this trial, the actual evidence at this trial is not what the government says to you but what the witnesses say to you.  K.K. is, like, the singlemost helpful person.  Everyone should have a K.K.  All right?  K.K. is, like, the singlemost helpful person anyone's ever met.  Everybody loves K.K.  They love K.K.  I just think that K.K. thought Jane was bad for business (inaudible). Everybody else loves K.K.  They love K.K.

Remember something, because this is important, because things get spun and they shouldn't get spun.  When Combs goes to Cassie's house and he's beating on the door with a hammer, Cassie and Kerry Morgan call two people.  And the two people that the government's really most focused on is

co-conspirators.  But let's look at the number that she calls.  This is Kerry Morgan.  And Cassie.  Kerry Morgan testified that she called it.  Cassie, we can see from the phone records that she made the calls.  So both of them presumably made calls.  They call K.K. and they called D-Roc.

Now, a co-conspirator would kick the door in.  Right?  I mean if, God forbid, if John Gotti was at your door, would you call Sammy the Bull Gravano to get rid of him?  No, because they're actually racketeering co-conspirators.  OK?  So they call.  They call K.K. and D-Roc because K.K. and D-Roc would help them out.  And that's exactly what happened.  You'll see this in the text messages.  The government has a chart with all the texts in it.

D-Roc says:  I'm on my way.

K.K.'s like:  I'm going to get him.

K.K. gets there first, and I think at 2:30 p.m., K.K. says:  I got him.  We're in the elevator going down.

Problem alleviated.  It worked, not because they're co-conspirators.  They're just nice and friendly and helpful.  The only -- and, did anybody come in this courtroom and say, other than someone who works at the United States Attorney's Office, and say that K.K.'s a co-conspirator, D-Roc's a co-conspirator?  Of course not.

Tale of two trials, people.  Didn't happen.  And I think one of most important things that the judge said, he

P6rWcom5                          Summation - Mr. Agnifilo

said, I think, before we actually started the trial, what the lawyers say is not evidence.  What the lawyers say is not evidence.  So you know what?  There's only one trial.  There's not any other trial.  The trial is the witnesses.  The trial is the evidence.

You show me a single piece of evidence.  You show me a single piece of testimony that K.K. is a co-conspirator.  You heard her with Mia in that text.  She's worried about Mia.  That's just who she is.  She's a very, very nice person.  That's what the testimony has been.

D-Roc is a very, very nice person.  And the government, I submit, makes it sort of sinister that he has security.  Of course he has security.  Who, at his level, who doesn't have security?  So is it a surprise that he has security?  None of the personal assistants thought so.  They thought it was absolutely necessary for the safe functioning of him and his family and his property.  So of course, he has security.

Pay attention.  The witnesses and the evidence will give you everything you need to know.  Don't listen to the other trial, which is the fake trial.  Listen to the real trial.

All right.  Real quick.  Just a couple of things on D-Roc.  I didn't speak as much about D-Roc as I did about K.K. This is Cassie's testimony from page 645:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

"Q.  You mentioned you went to D-Roc's house later that day.
Can you explain to the jury why you went to D-Roc's house?
"A.  Well, living in L.A., I really didn't have a whole lot of
people, especially family, and D-Roc and his wife were just
always there for me, so I ended up going over there to feel
safe."

I think the prosecutor said yesterday something like
D-Roc was hiding her or taking her or some -- they're friends.
She's going there because they're friends.  She says that a few
times.

1349:
"Q.  D-Roc was like a member of your family, right?
"A.  Like a big brother.
"Q.  You were very close with D-Roc?
"A.  Yes.
"Q.  In fact, you had a conversation with D-Roc that was
completely independent of Mr. Combs?
"A.  Yeah."

OK.  So there's just there are just no co-conspirators
co-conspirators require evidence, and there's just no evidence
that anyone is a co-conspirator.

All right.  A number of things are not charged.  This
is very, very important.  A number of things are not charged.
The firearms are not charged.  He's not charged with gun
possession, and that's a good thing, because homeland security

could not tell you where the guns were found.  OK?  So it's good that he's not charged with it, because they don't know where it was.

Whatever happened with Suge Knight, not charged.  Just not charged.  Something interesting to think about.  I wonder if that young man really did drive that car with guns to go get Suge Knight.  I don't know about that so much.  You don't have to think about it too much because it's not charged.

Anything concerning Dawn Richard -- remember her?  Ms. Westmoreland cross-examined her.  Not charged.  None of it's charged.  Nothing about that is charged.

Kerry Morgan coat hanger incident.  Not charged.  Just not charged.

The violence, now I understand the government's theory is that the violence on Cassie played a role in the sex trafficking, and that's their theory.  The violence as a standalone assault count or something like that, not charged.  Not racketeering activity.

I'm getting there.  I'm almost done.

Couple of things.  I want to make a few comments about the government's summation yesterday.

The government yesterday in its summation said the following, 7674:

Let's just pause for a moment and talk about the videos themselves.  You've seen clips of some of them and some

P6rWcom5                         Summation - Mr. Agnifilo

of them are in evidence.  And in them you don't see weapons.
You don't see the defendant hitting Cassie.  Of course, he
probably wouldn't hold on to a video like that.

Do you think that's fair?  What are they doing?
They're putting a little seed in your head based on no evidence
at all.  That what?  Mr. Combs had weapons at a freak-off?
That Mr. Combs hit Cassie in the middle of sex in a freak-off
and then destroyed the tape?

Why did they do that?  Do you think that's a fair
argument?  Do you think that's evidence?  Because what they're
trying to do is they're trying to get you thinking.  This is
what they said to you.  They're trying to get you to convict
Sean Combs based on "you don't see weapons, but that doesn't
mean there weren't weapons."

That's a little sinister.  Why are they doing that?
You absolutely have the right to ask yourselves that question.
Why did they say that?

Another thing they said, in summation, 7667, talking
about Mr. Combs:

One time he made her carry his gun in her purse to a
club.  She described the defendant using guns as a scare
tactic.

Well, there's actual testimony about this, and let me
read that to you.  Question of Cassie:
"Q.  Who handed you a gun?  Who handed a gun to you?

"A.  I don't know specifically who, but it was some security in the car."

Whoa.  Glad I caught it.  What's up with that?  Is that on the level?  Maybe it's a mistake.  First one mistake?

Let's go to the next one, 7672:

Sometimes the defendant called the escorts to urinate on her and sometimes he did too.  Sometimes the defendant told escorts to urinate on her.

Question of Mr. Phillips on page 269:

"Q.  Other than oral sex and intercourse, what other acts, if any, do you remember Mr. Combs asking you to perform on Ms. Ventura?

"A.  I don't -- I don't recall anything else.

"Q.  How many times, if any, were you asked to urinate on Ms. Ventura?

"Q.  What, if any, bodily fluids other than ejaculate do you remember there being in these rooms?

"A.  So, Cassie was actually the one that asked me to urinate on her."

Another mistake?  Huh?

You know, at some point, you can ask yourself the question, when am I going to stop trusting them?  Same goes for us.  You can ask yourself when I do I stop trusting the defense.  But you can ask yourself when do I stop trusting the government?  And I think you have reason to seriously consider

P6rWcom5                           Summation - Mr. Agnifilo

not trusting the government.

Do you think it's really an honest answer that that Department of Homeland Security can't possibly know where the guns were found?  This is a serious case.  He's charged with racketeering and sex trafficking.  Is that really the best that the government could do?  They could -- they're searching Sean Combs's house, and they can't put a witness on the witness stand who can tell you, yeah, the guns were all safely locked in a safe, or the guns were under the kids' bed.

Where were the guns?  How is it that we had a trial -- they brought out a big nasty, scary gun to show you.  For what purpose?  To make you think he's a bad person, who has big scary guns.  And if they're going to do that, don't you think they have an obligation to put a witness on the stand to tell you where they were?  Rather than a witness, we can't possibly know, we can't know.  The SRT team -- I don't think they're nuts.  We don't control them.  I asked him, couldn't you have followed them with a -- no, you can't follow SRT with a camera.

So does this really mean that every time the SRT is involved no one is able to tell an American jury where the stuff was found?  That can't possibly be true.  So is that them doing their best?  It's not, and that could be reflected in how much you trust them.

Did you hear anybody yesterday mention DNA?  Yeah, I know it's a partial sample.  I know it's consistent with a

female contributor. It's DNA consistent with a female having DNA material on the glass bottle in the Porsche. Don't you think that's important for you guys to have in the front of your minds? Yeah, they knew I was going to bring it up. They're the government. They're the United States government, and you should have -- you should trust them. They should want you to trust them.

Do you really think it's OK that the fire examiner got prints and doesn't know anything to do with them, doesn't know where they came from? Is that really them doing their best? Is that them being trustworthy?

And I'm not picking on them personally. I'm talking about the quality of the evidence. That's what matters. The quality of the evidence matters, and if you start thinking I can't really, really trust the people who gathered this evidence and who presented it to me, that is a very serious thing that you have to think about, because you should be confident. This is a very, very -- every case is important. And this one is too. And so my question to you is at what point do you stop trusting the government?

I'm going to talk to you for about another five minutes and then I'm never going to speak to any of you again. Not personal.

So here's what I want to say to you.

It takes a lot of courage to acquit. It takes A lot

P6rWcom5                          Summation - Mr. Agnifilo

of courage to get a jury summons and come into a United States courtroom, where one side is the government of the United States and the other side is some person, and listen to the evidence, especially in a long trial, and acquit.  It takes a lot of courage to acquit.

This trial is like any other trial and very different from any other trial.  I think that the evidence shows, and you can conclude, that the government targeted Sean Combs.  I think you can see that in the evidence, and let me show you why.

Nobody came to law enforcement.  I wouldn't be able to say that to you if Cassie came to the Department of Homeland Security and said I am the victim of sex trafficking, or if Jane came to the Department of Homeland Security and said I'm the victim of sex trafficking.  But that's not what happened.

The Cassie lawsuit comes out and these guys went and wanted to make a case because it's Sean Combs.  It's not like -- it's not like every other case.  It's not like every other case.  And you are a critical part, you are such a critical part of this process.  This is not -- one of the great things that America's done really, really right is they have, between every single person and the consequences of a criminal conviction, a jury of his or her peers.  It's one of the great things we have done as a country.

And today, you guys are the United States of America. This is your courtroom.  This is your house.  You should feel

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

bold. You should feel the courage that you will need to call this as you see it. And I am asking you to summon that courage and to do what needs to be done and to do the right thing. And I'm asking you to acquit Sean Combs of all the counts in this indictment. He is not a racketeer. He is not a conspirator to commit racketeering. He is none of these things. He is innocent. He sits there innocent. Return him to his family, who have been waiting for him.

I thank each and every one of you from the bottom of my heart.

THE COURT: All right. Ms. Comey, would you like a break before the rebuttal?

MS. COMEY: I believe we need one, your Honor, to address an issue.

THE COURT: Yes.

MS. COMEY: Thank you.

THE COURT: We'll take 15 minutes and come back.

Thank you, members of the jury.

(Jury not present)

THE COURT: Please be seated.

MS. COMEY: Ms. Slavik will address this issue, your Honor.

THE COURT: That's fine.

Yes, Ms. Slavik.

MS. SLAVIK: Your Honor, there were a couple of things

P6rWcom5                         Summation - Mr. Agnifilo

that came up in Mr. Agnifilo's closing after the break,
specifically, comments about who has been charged or not
charged in this case; again, conduct that hasn't been charged;
and the third thing is the defendant being targeted by the
government.

The government's view is that the prosecution's
motives and views and decisions underlying the charges are
absolutely improper subjects for argument, and we'd request a
curative instruction.

THE COURT:  Mr. Agnifilo.

MR. AGNIFILO:  Yes.

THE COURT:  Let's focus on the second thing.

As to the initial comment about Mr. Combs being the
only one charged here, I understood when you had said that to
be a precursor to your argument that there wasn't a conspiracy,
and you went into the evidence after that.

MR. AGNIFILO:  That's correct.

THE COURT:  You should have phrased it differently,
but we're going to have the jury instructed on the proper law.
They're going to follow my instructions.  And from that point
forward you focused on the lack of evidence in the conspiracy
and the lack of co-conspirators proven by the evidence in this
case, which were proper subjects of inquiry.

But what about the second issue?

MR. AGNIFILO:  Targeting?

P6rWcom5                          Summation - Mr. Agnifilo

THE COURT:  Which is targeting of the defendant by the government, meaning focusing on the motivations of the prosecution.  And you did that twice.  It's not only in the last portion of your closing, in which you directly questioned the motivations of the prosecution.  You also did that previously when you questioned whether the government should be trusted as opposed to focusing on the evidence presented by the government.  You ultimately tried to tie that back in, but the initial suggestion was that you can't trust the government and that the government was doing something for an improper purpose.  And to the extent that you cleaned it up by focusing on the quality of the evidence, you then concluded by directly indicating that the government had targeted the defendant.

And so why isn't that improper?

MR. AGNIFILO:  It's not improper.  Your Honor, I think, summed up exactly what my motivation was, is that there were tangible things in the evidence that I believe impacts on the quality of the evidence, and the jury has the right to not trust the remaining evidence in light of that.

In terms of the targeting, my point was nobody went to law enforcement.  It's not like someone complained.  It's not like there was a complainant that went to law enforcement and started an investigation.  Law enforcement decided to start the investigation after the Ventura complaint.  And I think that is different.  I think it's a fair comment that they didn't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6rWcom5                          Summation - Mr. Agnifilo

receive a complaint from a live complainant.  And that's, I think, fair comment.  And I think in the context of the things that the government did in the evidence that impact the quality of the evidence, I think, in context, it's fair comment, Judge.

And so it's pointed out that the government misrepresented the evidence in the summation, and I certainly have to point that out.

MS. SLAVIK:  Your Honor, regardless of Mr. Agnifilo's motivations, he said what he said.  And I want to point out that we put this on the record, that we would object if Mr. Agnifilo made arguments related to the propriety of this prosecution.  That's exactly what he did by suggesting the government has targeted the defendant.  Regardless of Mr. Agnifilo's motivations, regardless of the purpose of him asking these sorts of questions, they're improper questions. The jury has now heard him say that, and a curative instruction is required.

THE COURT:  Mr. Agnifilo, I'm not hearing any basis for why the -- the argument about targeting is an argument about selective prosecution.  There's no other basis to make that charge.  That is not an appropriate subject for the jury to consider.  That is the subject of either a pretrial or posttrial motion, and so it's not something that should be directly argued to the jury.

Is there some other basis for making that claim?

MR. AGNIFILO:  I think I'm certainly permitted to attack the integrity of the investigation, which in context, I have the absolute right to do.  I mean one of the things I have the right to do is to say that they cut corners and that the jury should view the quality of the evidence in light of the corners that were cut.  I think it's appropriate to point out to the jury that they didn't have a live complainant and that yet, you know, the government, you know, started an investigation without a live complainant.  I didn't say selective prosecution, and I stayed away from it.

What the government said they were worried about is that I would say something about the waste of resources and things like that.  What I believe that I did is I confined my observations to evidence that was linked to specific things in the record.  It was linked to specific things that were said yesterday.  It was linked to specific what I consider failures to develop evidence in a more sound, more trustworthy way.  And that was the basis for my statement.

THE COURT:  Ms. Slavik.

MS. SLAVIK:  Your Honor, Mr. Agnifilo is free to discuss the evidence in any way he sees fit.  This is not evidence.  It's a selective prosecution argument.  They made that pretrial.  They lost.  He's not entitled.  It's completely improper to make that argument to the jury.

THE COURT:  Here's what I plan to do.

P6rWcom5                          Summation - Mr. Agnifilo

I'm going to -- I hear your point, Ms. Slavik; I want to take a look at the transcript, all I have is the rough -- and also craft an appropriate instruction, but my intent at this time is to add an additional instruction to the charge that would be, that would inform the jury that the decision of the government to investigate an individual or the decision of the grand jury to indict is none of the jury's concern.  The only concern the jury has is whether or not the government has or has not proven each element of the crimes charged beyond a reasonable doubt, which I think would neutralize any suggestion that the jury should consider in its deliberations the targeting argument that Mr. Agnifilo made.

MS. SLAVIK:  Your Honor, I think your proposed instruction is fine.  I think that would address the issue.  We would just ask that you provide the jury with that instruction now.  With the jury charge being read on Monday, that lets this inference that Mr. Agnifilo has asked the jury to draw -- that the prosecution targeted this defendant specifically, it lets the jury sit with that through the weekend.  And I think there's great prejudice to that.

THE COURT:  Mr. Agnifilo, that is fair.  I mean there's no possible, plausible argument for why that assertion was proper.  And there's authorities that make clear that those types of suggestions are improper.  And this has been the subject of back-and-forth between the parties.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

There was the comment made by Ms. Comey prior to closings to try to make sure that this wouldn't happen, and then there were pretrial motions *in limine*.  But even if none of that had happened, it is bedrock law that these types of arguments are not appropriate subjects of argument to the jury. And so the instruction that I just read is from *United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011).  So I'm either going to give that now or I'm going to give it on Monday.  And Ms. Slavik's point is that especially that we're going to have to at this point break before the jury instructions, I'm going to give that now.

MR. AGNIFILO:  I would ask your Honor to do it on Monday.  I don't think there's anything critical.  The jury's going to make a decision after your Honor charges them on the law.  And the last word for today is the government's word anyway.  So it's not as though the jury's leaving today with that in the forefront of their minds.

THE COURT:  Right.  But, however, and I think this is probably a larger concern and more to make sure that fairness is preserved from the defense's perspective, if I don't cure that issue now, then the government, who is about to put on their rebuttal, would be forced to address that, in fairness. And I think the defense would not want that to happen, because they should not, and you should not have been able to address the issue in the first place.  And for that reason, I think

it's in everyone's best interests to give that instruction now.

So I'll give that instruction, and we'll move to rebuttal.

We'll take five minutes and come back.

MR. AGNIFILO:  Thank you.

(Recess)

THE COURT:  Ms. Slavik, we're just waiting for Ms. Comey.

MS. SLAVIK:  Yes, your Honor.  Apologies.

THE COURT:  That's OK.

All right.  Let's bring back the jury.

(Jury present)

THE COURT:  Be seated.

Members of the jury, prior to the break, on the defense's closing, there was discussion about the targeting of the defendant.

The decision of the government to investigate an individual or the decision of a grand jury to indict an individual is none of your concern.  The only concern this jury has is whether or not the government has or has not proven each element of the crimes charged beyond a reasonable doubt.

With that, Ms. Comey.

MS. COMEY:  Thank you, your Honor.

We're almost done.

The defense just spent a whole lot of energy trying to

blame his victims and the U.S. government for his lies, his threats, and his violence.  He's tossing up excuse after excuse for inexcusable criminal behavior, trying to explain away the devastating evidence that Ms. Slavik walked you through yesterday.

Make no mistake.  This trial was about how, in Sean Combs's world, no was never an option.  That is the central theme that you heard from witness after witness at this trial. The defendant did not take no for an answer, not from his assistants, not from his other employees, and certainly not from his girlfriends.  Whether he had to lie to, threaten, or beat them, the defendant got what he wanted, when he wanted it.

Now, the defense has no obligation to do anything at all at this trial.  As you heard from the judge, the burden of proof beyond a reasonable doubt rests with the government.  We embrace that burden, and we have met it here.  But when the defense makes arguments like they just did, it is perfectly appropriate for you to think about whether what they said makes any sense at all.  And it is also appropriate for the government to respond.

Here, the defense's arguments just do not hold up. I'm not going to address all of the stuff you just heard over the last five or so hours.  I don't need to, and I don't have time.  Instead, I'm going to focus on the defense's three core arguments:

First, the suggestion that the defendant didn't pay for sex;

Second, the suggestion that he didn't commit any racketeering acts, and if he did, he certainly didn't do it with an enterprise; and

Third, that Cassie, Jane and Mia lied to you.

Let's start with the payment for sex.

The defendant here tries to wiggle out of the transportation charges by claiming he never intended to pay anyone for sex. Sure, he flew escorts across the country; he had them have sex in front of him while he masturbated; and then he handed them wads of cash. Those things have nothing to do with each other at all. Totally unrelated. It doesn't even pass the laugh test. Common sense alone tells you that when the defendant flew those escorts out and paid them, it was not for their scintillating conversation. It was for sex.

And you also know that because the defendant said so in the text Mr. Agnifilo talked about during his closing. Remember his texts with Bridget from Cowboys4Angels. His response, when she says he has to pay full price for that escort who got sent away from the Trump in New York, "He couldn't even perform. He's lucky he got anything."

That right there tells you exactly what was in the defendant's mind when he is hiring and flying out an escort. His money is for sex, the sexual performance; not for time,

that's prostitution.

Now, of course, he had to follow Bridget's rules in that case and pay up, because otherwise, he might lose his steady supply of cowboys.  He was a repeat customer.  He didn't want to piss her off.

But the thing that tells you that he definitely was only paying for sex is how he treated an escort who was not a cowboy.  Remember, Daniel Phillip, at the very beginning of his testimony, one of the very first questions I asked him was what he got paid for.  And you can look back at the transcript.  He said for sex.  He told you, remember, he got paid when he could perform, but that when he had performance issues, after he witnessed the violence in those rooms and couldn't perform anymore, he stopped getting paid.  That tells you the money was for sex.  And the same thing for Sharay Hayes.  He only got $500 when no sex happened, but when sex did happen, he got thousands of dollars because the money was for sex.

Now, the defense asks where are all the other escorts, why didn't they come here?

I expect that the judge will instruct you that uncalled witnesses were equally available or unavailable to both sides, the prosecutors and the defense.  So that argument is just a distraction.

And I expect that you will hear nothing in the judge's instructions suggesting that anyone who is being paid for sex

P6rWcom5                            Rebuttal - Ms. Comey

has to call themselves a prostitute or use the word prostitute in order to violate the statute. There is no requirement that they label themselves that way. The requirement is that they are being paid for sex. That is obviously met here.

Now, the defense suggests that none of this matters because the escorts would have done it for free and they didn't call themselves prostitutes. But even if that were true, there are two arguments, two problems with that argument.

First, as I've already mentioned, what matters under the law is what was in the defendant's mind when he caused escorts to cross state lines. It doesn't matter what Jules Theodore or Kabrale Williams thought. The law does not require them to reach an agreement. What matters is that the defendant intended to pay them for sex when he transported them.

And second, there are certainly people who love their jobs enough that they might say they would do them for free. But when they collect their paycheck, they are getting paid for the work that they have done. Same thing here. Maybe some of these men might have been willing to for free have sex in front of a masked masturbating celebrity. Maybe. But when they collected the cash at the end of the night, they were getting paid for sex.

And here's another way you know that the defendant knew that he was engaging in prostitution. He told Cassie to be careful to make sure none of the escorts were undercover

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

cops.  Remember that?  She testified about it and you saw some texts about it, too.  That also tells you what was in his mind.  He knows he's hiring people for prostitution.  That's why he even texted one of the escorts asking, hey, are you a cop?  The only reason to worry about undercover cops is if you know what you're doing is against the law.  The defendant is guilty of Counts Three and Five.

Now let's talk about Count One, the racketeering charge.

There can't seriously be a dispute that the defendant had an inner circle.  The witnesses and the text messages make crystal clear that the defendant's security team and K.K., his chief of staff, served as his most trusted advisers.  And there was a structure.  The defendant at the top, security and his chief of staff right below him, and then the army of assistants below him.  They were loyal to him for years and they had two goals.  Get the defendant whatever he wants when he wants it and protect the defendant's reputation at all costs.

Now, the defense suggests that there couldn't have been an enterprise because they didn't only have unlawful purposes, but an enterprise can have lawful and unlawful purposes.  An enterprise is just a group of people who get together for a common purpose.  It doesn't have to be an illegal purpose.  Any purpose is enough.  And here, you obviously have that.

P6rWcom5                                      Rebuttal - Ms. Comey

And they also asked you, where are K.K. and D-Roc and the others, and why didn't they come up here, and why didn't they testify and tell you that they were co-conspirators?

Well, again, the judge is going to instruct you that uncalled witnesses are equally available to both sides. That is a distraction. You should focus on the evidence that is in front of you. And the evidence that is in front of you is that K.K. and D-Roc maybe didn't agree with everything that the defendant did, but they certainly played both sides. Mr. Agnifilo focused on Cassie calling K.K. and D-Roc after the InterContinental, and sure, they played both sides. They were friendly to Cassie, because that helped them get her back for the defendant. That helped them serve the defendant. But then look at what they did after Cassie called them. They start orchestrating the bribe payment to Eddy Garcia. They go right into helping the defendant commit another crime. They played both sides.

You have an enterprise here, a core group of people, over a sustained period of time, with a common purpose and structure. Done. That is an enterprise. The law does not require anyone in that group to use the words racketeering enterprise or to walk around saying we're in a racketeering enterprise. They don't have to use any words at all. And they used money from his companies to help further their purposes. They used money from the companies to pay for some of the

escorts' travel.  They used it for some of the supplies.  We're not saying that the companies are illegal themselves.  We agree with Mr. Agnifilo.  Those were lawful companies.  But they used some of the money to further the enterprise.  No matter how much the defense tries to twist themselves in knots, there is no escaping that the defendant actually had an inner circle for years, the enterprise.

So then the question is:  Did the defendant agree with at least one member of that inner circle that they or someone else in that group would commit at least two of the crimes Ms. Slavik walked you through yesterday?  And of course they did.  I'm going to do some quick hits to go through what Mr. Agnifilo talked to you about earlier.

Let's start with the kidnapping of Capricorn.  First of all, she is corroborated by the testimony of Cassie and Kid Cudi.  Let's look at what Kid Cudi said.

Can you pull up transcript page 2350, please.

I'm going to walk over here.

He's talking about the call that Capricorn made from the car outside of his house.  And he's asked:

"Q.  What, if anything, did Capricorn say to you and Ms. Ventura on that phone call about what was happening at that moment for her?

"A.  That Sean Combs and an affiliate were in my house, and she was in a car.  She was forced to go along with them over

there."

Forced to go over there.

Kid Cudi backs up what Capricorn told you. You don't need a gun to have a kidnapping. Here he did. Capricorn told you about it. I'll get to it in a minute. What you need is force. And Kid Cudi confirms that Capricorn said to him in that moment that she had been forced.

And it makes sense that she had been forced because the idea that Capricorn went along with this scheme and was trying to help out the defendant in breaking into Kid Cudi's house is laughable. Because if that were true, then why on earth would she be calling the target of the break-in, the target of the attack to warn him? She's calling him because she's not going along with it. Because she wants to warn him, and she wants help for herself. She was kidnapped.

And just because she didn't say the word "gun" doesn't mean the defendant didn't have a gun that night. Mr. Agnifilo said that Sean Combs is a hands-and-fists guy, something like that. Sure, with his girlfriends. But with men, like Suge Knight, you heard from Cassie and David James, he gets guns when he's dealing with men. You saw that he still had guns all the way up until his home was searched in March of 2024. So it makes total sense that when he's going to kill Kid Cudi, kill another man, he's bringing a gun. When he's beating up a woman who's half his size, he doesn't need the gun. But when he's

going after a man who can actually match him physically, he's going to bring a weapon.  So it makes total sense that he had a gun that night.

Next, the London hotel kidnapping with Cassie.  The suggestion that she wanted to stay at Combs's home and not go to the hotel is not a defense.  The point is she didn't want to go and he made her.  And of course she felt forced.  He had just stomped on her face for ten full minutes with a shoe on in the car.  Her face was mangled.  She wanted to go in the house and stay there.  She didn't want to have to get in a car with Bonds, go all the way to a hotel and then stay in the hotel.  And then she wasn't allowed to leave when she wanted to go home to her mom.  She didn't want to go back to Sean Combs's house after that.  She wanted to go see her mom, and they wouldn't let her because Sean Combs said no, and his security team, a member of his enterprise, wouldn't let her.  That is a kidnapping.

Next, the arson.

Can we please pull up transcript page 792.

Mr. Agnifilo suggested there's no evidence that the defendant said he was going to blow up Kid Cudi's car.  I'll direct you to Cassie's testimony.

"Q.  Did there come a time after this when Sean mentions Scott's car?

"A.  Yes.  He mentioned that when we were out of the country,

P6rWcom5                          Rebuttal - Ms. Comey

that Scott's car would be blown up."

Cassie heard the defendant say it and then it happened.  Don't let this attempt to raise some mystery glove distract you from that fact.

And just briefly on this glove idea.  So, as I understand it, what the defense is saying is that someone, unrelated to Sean Combs, coincidentally put a Molotov cocktail into Kid Cudi's car, but wore a glove that must have been way too big for their childlike hand because it fell off the roof and then fell into the seat, and then Kid Cudi lied to the people investigating the arson of his car and said, oh, yeah, that's my glove, even though it's not.  It doesn't make sense because the defense made it up.  The glove was Cudi's.  The Molotov cocktail came from Sean Combs's direction.  He obviously didn't put it in himself, but he said he was going to blow up the car, and lo and behold it blew up.

Next, bribery.  The bribery of Eddy Garcia.

So, first, that agreement that Mr. Agnifilo highlighted for you and read for you is actually the whole point.  The point of that passage that Mr. Agnifilo highlighted for you is that Eddy Garcia was contractually bound not to voluntarily report this crime to the police.  If you read those words, what they say is, if he gets a court order, if there's a subpoena, if someone comes to him, then he can comply with that court order.  But it doesn't allow him to go to a police

station and just report it.  And if he gets a court order, if he gets a subpoena, what does he have to do before he complies with it?  He has to go tell Sean Combs.  All that provision in the agreement tells you is that Sean Combs was worried about law enforcement when he was bribing Eddy Garcia.

And the big problem with Mr. Agnifilo's suggestion that all that was on Combs's mind was publicity and the press is what he says to Eddy Garcia when he hands over the cash and walks him out.  Don't make any big purchases.  The only reason to say that to Eddy Garcia is if you're worried that the cops might come looking for that video, find that it's missing, and then try to figure out how it went missing.  So if a security guard with access to it is making big purchases, that raises red flags.  Of course, the police and an investigation were on Sean Combs's mind and K.K.'s mind and D-Roc's mind when they arranged for this bribe.  This is bribery.

And finally, the witness tampering involving Jane on that phone call.  Mr. Agnifilo was trying to suggest that Sean Combs was worried about another civil lawsuit.  Here's the problem with that.  Plaintiff's lawyers don't get to tap phones.  Remember how many times Sean Combs on that recording says, I can't be on these phones, I can't be on these phones, I can't be talking on these phones?  What he means is somebody could be listening to my conversation.  Somebody might be tapping my phone.  Who taps phones?  The feds.  Who taps

phones?  Law enforcement.  What he's doing on that call is tampering with a witness for a crime.

All of those, plus all of the other crimes that Ms. Slavik walked you through yesterday, are crimes that the defendant and his inner circle agreed to commit.  They did plenty of other lawful stuff too.  We're not denying that. They had dual purposes, lawful and unlawful.  And that is racketeering.

And did he commit these crimes alone?  Obviously not. This is a guy who can't get himself his own water bottle or plug in his own phone charger.  How is he going to maintain a steady supply of drugs for himself and his girlfriends on his own; or kidnap Capricorn on his own; or keep Cassie locked in a hotel on his own; or bribe security guards on his own; or fly escorts across the country, and keep thousands of dollars in cash handy to pay them on his own?  He's the general.  Not a foot soldier, not a lieutenant.  He delegated.  And his inner circle handled the dirty work for him.

Now, speaking of that inner circle.  The defense spent time trying to suggest that K.K. was not a co-conspirator.  I guess the suggestion is she had no idea what was going on around her, no idea that her actions were helping the defendant break the law.  The evidence and your common sense tell you that is nonsense.  Witness after witness told you that K.K. was the defendant's right-hand woman.  She lived in his home.  She

P6rWcom5                        Rebuttal - Ms. Comey

read his texts.  She texted on his behalf from his phones and knew every detail of his life.  And when you read K.K.'s texts, it is clear she knows exactly what the defendant was all about, including his crimes.  She is arranging drug transports with Jane.  She is sending Paul up to the hotel room.  She is orchestrating the bribe payment to Eddy Garcia.  And make no mistake, she knows wild king nights involve escorts.  As early as 2019, she knows about the cowboy escorts.

Let's take a look at Government Exhibit C-366, pages 2 and 3, please.

You saw this text during the trial.  One of the assistants, Ryan Lopez, says:  LOL.  I think I saw one of the cowboys today.  You can spot them in a lobby like an escort.  I forgot to tell you about it.

And how does K.K. respond?  Does she say what are you talking about?  Cowboys?  Escorts?  I don't understand.  No. She sends laughing emojis, because this is so well-known by now that it's a joke to her.  And there's even more.

You can take that down.  Thanks.

In 2022, she knows that if Sean Combs is bringing Jane for a wild king night in Vegas, he's going to want to bring Paul too.  She knows that the defendant needs thousands of dollars in cash for wild king nights with Jane.  You heard a voice mail from Combs to her asking for thousands of dollars in cash when we were walking through the chart with Agent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Cerciello.  And she also knows that her team will bring the defendant anything he could possibly need, including drugs, to his hotel room.  So the only reason he needs thousands of dollars in cash in a hotel room is to pay an escort.  So of course, she knows how to help the defendant transport cocaine and escorts for wild king nights.

And by November 2023, she knows Jane does not want to be having sex with those escorts.  Remember, K.K. uses her phone to record the conversation where Jane tells him she feels exactly the way Cassie described in her lawsuit.  K.K. heard Jane crying on that call just like you did.

And then in December 2023, Jane texts K.K. about the defendant's threats to release her videos.  And in that text she talks about how coercive those nights were.  K.K.'s response tells you she already knew about that.  And of course she did.  Remember, she reads the defendant's texts.  So all those texts you saw where Jane keeps saying I don't want to do this, I need a break, I can't keep feeling threatened about the roof over my head, K.K. had access to those too.  So of course, she already knew how Jane felt about these nights, and she knew that Jane was being coerced when she kept facilitating more wild king nights in 2024.

And by the way, you also know that she and defendant knew those things were illegal, because after Cassie's lawsuit, after there was attention on them, they stopped doing them in

hotels. They only did them in homes. K.K. is a co-conspirator. Even if you only find her as a co-conspirator -- you have others, obviously, the security members -- but K.K. alone makes the defendant guilty of Count One.

Now, you have another racketeering predicate that, as Ms. Slavik pointed out, is the most obvious one of all and that the defense tries very hard to wave away. And that is the drugs. He tries to say it was all just for personal use, so it doesn't count. But there's no requirement that drugs be distributed for profit or in large quantities to be illegal.

And I want to say you're going to learn when you hear the judge's instructions that there are three ways that the defendant could have agreed to violate the drug laws that would be a predicate. Mr. Agnifilo showed you two of them. He showed you possession with intent to distribute and conspiracy to distribute. What he didn't show you is just plain old distribution, just giving a drug to another person. When you hear the judge's instructions, you will see that that is one of the ways that you can agree to violate the drug laws. Listen carefully to those instructions. Distribution just means giving drugs to another person. That's it.

Giving ecstasy to Cassie and Jane is distribution, end up. Here, that happened over and over again for years. D-Roc coordinated with One Stop to get drugs for Combs and Cassie.

K.K. coordinated with Guido and other assistants to get drugs for Combs and Jane.  And remember, you know that K.K. knew Jane was using drugs because she saw her having OD'd on them on the beach in Turks and talking to her about how to handle the aftereffects in their texts.

Faheem brought drugs for Combs and Jane in the hotel rooms.  Those drugs were an essential ingredient of the hotel nights.  It doesn't matter that Combs gave them to Cassie and Jane for free.  He distributed them, and he did it with help from his inner circle.  The defendant is guilty of the racketeering conspiracy.

So that brings us to the argument the defense spent most of their time on -- that Cassie, Jane and Mia are liars. And they're liars, first and foremost, because they wanted it. Of course, they wanted it.  Cassie wanted an escort to urinate in her mouth.

And by the way, can we pull up transcript page 514, please.  Mr. Agnifilo suggested to you that we didn't have any support in the record for what Ms. Slavik said to you yesterday.

Can we pull up this transcript page, please.
"Q.  Who directed an escort to urinate on you?
"A.  Sean."

The defense's theory is that Cassie wanted that.  The defense's theory is also that Jane wanted to have sex with

P6rWcom5                         Rebuttal - Ms. Comey

Antoine when she was bruised and beaten, that Mia wanted her boss coming into her room at night and penetrating her.  And with respect to what Cassie and Jane were doing, what we're talking about here is not preferences for lemonade.  Or preferences for the beach.  What we're talking about is being in a dark hotel room, awake for days, covered in oil, wearing eight-inch heels, often with a UTI, having your pelvic area sore, sitting in the same position for hours, performing oral sex for hours, having sex for hours, including with strangers; having unprotected sex with stranger after stranger, a rotation of men for days.

The defense wants you to believe that Cassie and Jane wanted that -- or were willing to go along with it, like somebody might go along with lemonade.  That's ridiculous on its face.

Almost as ridiculous is the suggestion that the defendant had absolutely no clue that Cassie, Jane and Mia did not want all of the sex that you've heard about at this trial.  What the defense is suggesting is that these women lied to you repeatedly.  They lied throughout all of their testimony, including when they told you about times they resisted sex.

Remember, Mia told you that she told the defendant no on a plane.  Cassie told you that she told him no on her 29th birthday.  Jane told you that she told him no in June 2024.  So what the defense is saying here is that these women all lied;

P6rWcom5                              Rebuttal - Ms. Comey

they all wanted every single sex act you heard about, and they certainly never told the defendant they didn't want to do it.

For the defense to be right, that means that three witnesses came here and committed perjury in front of you.  But there's a problem with that.  These three women have no reason to lie.  None.  They don't get anything out of lying at this trial.  If you take a step back and think about their incentives in this courtroom, it is obvious they have no motive to lie at all.  So let's talk about their incentives, starting with Cassie.

The defense talked a lot about her lawsuit, the settlement she's gotten, basically suggesting she's made up her testimony for money.  There's a big problem with that argument.  She already got paid.  Remember, the defendant paid her $20 million the day after she filed her lawsuit in 2023, more than a year ago.  And she reached her settlement with the InterContinental before she ever testified in this case.  So before she took that witness stand, she had already been paid.  She is not expecting or trying to get a dollar more.

And you've heard Cassie's lawsuit caused a media firestorm targeting the defendant.  So Cassie had money.  She had the media on her side.  She was already a famous celebrity.  If she'd made up a lie to get all of that, then why would she risk it all by perjuring herself at a federal trial?  Common sense tells you she would never do that.  If Cassie was just

P6rWcom5                           Rebuttal - Ms. Comey

after money, if she made up a story to get paid, she never would have testified at this trial. She would have cashed her check and ridden the wave of positive press coming her way. Mission accomplished. She certainly wouldn't have sat through four days of grueling testimony, having to read out her old sexts in open court. If it was all a lie for money, she would not have come here in front of you to talk to you about the most intimate, humiliating and traumatic details of her life.

So why did she come here? Why did she sit through that cross-examination? Why did she hand over the freak-off videos to be played in front of you? So the truth would come out. This is not a woman out for vengeance or money. This is a woman standing up for what is right.

Same thing with Mia. Remember, she already got paid. She settled with the defendant in mediation years ago for a few hundred thousand bucks. Mia is not part of some money grab. She's got no lawsuits, no payday coming. She's not expecting a single cent from testifying here. So same thing. If her only goal was money, if she made up a lie about the defendant's abuse, why would she testify here? She already got paid. There's nothing more to gain, and she's certainly not doing it for fame or attention. Remember, she asked to testify under a pseudonym for her privacy.

You know why she came here. She told you why -- because she felt it was the right thing to do. And on Mia,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6rWcom5                          Rebuttal - Ms. Comey

Mr. Agnifilo mentioned the threat that Mr. Combs made to tell Cassie. You know that Mr. Combs was never going to tell Cassie about what he was doing to Mia. That was a lie, a lie he was telling to Mia to manipulate and control her. He hid all of his other women, including Gina, from Cassie. He's not going to tell her about Mia. But he is going to lie to Mia to try to keep Mia under control. That was a lie, just like all the other lies you heard about the defendant telling to his victims throughout this trial.

Mia came here to tell the truth no matter how terrifying it was for her. And let's be clear here -- it was terrifying for her. We all saw how she physically shrank when she described those sexual assaults. That's not acting. That was Mia reliving the most traumatic experiences of her life in front of you. Her voice shrank each time they came up involuntarily. She physically folded into herself because that was her genuine reaction to reliving those horrible experiences. Mia is not some trained actor putting on a performance. No one's handing out Oscars or Tonys for performances in this courtroom. There's no reason for her to put on a show for you. She was here to tell you what happened to her.

And same thing with Jane. She's never sued the defendant. She doesn't plan to. But the defense is desperate to try to convince you she's out to copy Cassie. The theory

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

goes Jane was totally fine with hotel nights, and then she saw Cassie get a payday through her lawsuit and she saw an opportunity for a money grab herself.  But the idea that Jane started making up her feelings of coercion after reading Cassie's lawsuit falls apart for two reasons:

No. 1, you know she started saying those things before the lawsuit.  You saw all of those text messages from August through October of 2023.  And she doesn't even know Cassie.  Remember, they briefly crossed paths years earlier, but they haven't spoken since.

(Continued on next page)

P6RQcom6                                Rebuttal - Ms. Comey

MS. COMEY:  (Continued)

But she's described a stunningly similar experience in her texts and to you.

The second problem, she never sued.  If the only reason she came here and told you about feeling coerced, if the only reason she wrote that in her text was because she was hoping to get some payday, then where's the lawsuit?  If she made up a story or -- I'm not sure what Mr. Agnifilo's theory is about June 2024, but if she tried to get herself beat up so that she could get a payday, where's the lawsuit?  Where's the demand for money after June of 2024?  There is none, because she was never trying to copy Cassie.  She was just telling you the truth.  The money theory is the defense grasping at straws trying desperately to give you a reason to think these women were lying.  But there's no support for it.

But if you think a little more deeply about the incentives here, you'll realize Jane does have a financial incentive.  But it's to lie in favor of the defendant, to help him.  Remember, the defendant is still paying her rent.  The defendant is still paying for her lawyer.  So if Jane was going to come here and lie to help herself financially, she's going to do it in a way that helps the defendant, not in a way that makes him guilty of sex trafficking.  She has no incentive to help prosecutors in this case at all.  That makes her testimony about his coercion, including June of 2024, so powerful.

P6RQcom6                        Rebuttal - Ms. Comey

There's no way she's making that up given her incentives here.

And even apart from their incentives, the substance of what these three women told you shows you they're telling the truth. All three of them were careful to tell you what they remembered as accurately as they could. They didn't exaggerate. They all told you they loved the defendant. They went through a cycle of happy times followed by abusive times over and over and over again. And they described for you, all three of them, how confusing that experience was, how they're still grappling with that mix of love and abuse. They may each be in different phases of untangling their experiences, but they're all trying to clear their minds of the brainwashing, thinking that their defendant's behavior was somehow normal or okay. So when they struggle to explain why they took certain actions, it's not because they're lying. It's because they're doing their best to tell you about their experiences of psychological, physical and sexual abuse perpetrated by a man they all worshiped.

Now, on this point, the defense tried to suggest that because these women managed to find joy in their lives, and were happy during the years they were also abused, they must be lying. But finding meaning and happiness despite trauma does not mean the trauma never happened. Too many people in this world carry pain and loss, but they don't let it define them. They still hang out with their friends, go on trips, even post

on social media.  Refusing to let trauma swallow up everything else in life doesn't erase what happened.  It's just part of healing.  And that's what you saw in this courtroom: three women struggling to process what happened to them and heal from it.  That struggle plus the logic of their incentives tells you these women told you the truth.  What you saw on that witness stand was three women who did what once felt impossible to them.  They broke free of the defendant's manipulation.  They sat there, looked back at what they endured, and told you what they remember.  Think about how hard that must have been for them.  How much courage it must have taken to walk to that witness stand.  But they endured it, and they told you what happened.

But despite all this, the defense throws out a bunch of claims about why Cassie and Jane must be lying or the defendant didn't know they felt forced.  I'm going to walk through a few of these now.  As I do, I want you to keep in mind what I said about their incentives.  Remember, these women have no reason to lie.

Let's start with an easy one.  The defense talked about their jealousy as a theme here.  Jealousy is not a defense to sex trafficking.  It's not relevant to commercial sex.  It's not relevant to the defendant's knowledge.  It's a distraction.  Yes, these women were jealous when their boyfriend was with other women.  Yes, he was jealous when they

were with other men.  So what?  It tells you nothing about the crimes that were committed here.  Jane told you that the contrast between her experience and what she saw the other women in the defendant's lives experienced made her see how abusive her situation was.  So yes, that contrast was starkest when she saw posts of him not making other women be in hotel rooms for days on drugs having sex with strangers.  And when she saw that, she was able to see her situation more clearly and articulate it more clearly.  When she wrote:  I never want to do another hotel night, whether she was saying it after also being jealous about another woman or not, there's no ambiguity about that sentence.

Now, the defense suggests that if Cassie and Jane hated freak-offs so much, why they did seek out escorts and set them up?  The simple answer is the defendant told them to, but let's dig into it a little more, starting with Jane.  You know picking out Kabrale and Antoine was her way of taking back some control over what was happening to her body.  She didn't want to have sex with other men, but if she had to, she'd rather it be someone she new and liked.  So that's why she reached out to repeat players like Kabrale and Paul, and that's why she was nice to them.  She wanted them to come back so she didn't get stuck with some stranger.  And yes, she texted escorts to set up hotel nights.  Sometimes the defendant told her to.  Sometimes she knew he was about to ask for it or want it,

because his desire for these nights was predictable and insatiable.

And look, in the first year or two, that might not have always been because of coercion or fraud. Sometimes it was, but not always. But by the time he's paying her rent in 2023, she is doing it out of obligation. Fear she'll lose her home if she doesn't. You saw the texts. She said it herself way back then; she felt she had no choice, so she kept doing the same thing she had been, setting up repeat players so she didn't get stuck with a stranger. That's coercion. When she was afraid she would lose her home if she didn't, that's coercion.

For Cassie, the violence and the control came much earlier, when she was only 21 years old. From the start, the defendant had the power to ruin her. He could take away her home, her car, and her career at any moment. He could release her sex tapes. And on top of that, he beat her.

In a case like this, when there is so much violence, sometimes you can lose sight of just how awful it is each individual time. The physical pain of being kicked or hit by someone you love, the anguish mentally of having someone who's supposed to love you hurt you. The fear of never knowing what might set him off, when he might lash out again. So when the defendant told Cassie to set up a freak-off, what choice did she have? This was a man who could and would take away her

livelihood and her home, who could and would extort her parents, who could and would beat her.

And you know that happened repeatedly just by seeing how Cassie reacted in that Intercontinental video. She falls to the ground, and she lays still, covering her head. She doesn't try to get up. She doesn't try to fight back. That is the reaction of someone with a lot of practice getting beat, who knows the safest way to endure the beating is not to fight back but wait for it to end. He trained her not to fight back. No was never an option for Cassie. No could mean losing her career, her livelihood, her home, her physical safety. Those fears are not the kind of thing that just slip someone's mind. The defendant didn't need to threaten Cassie each time to get her to comply, to get her to set up a freak-off and act like she was happy to do it. He had trained her; taught her that disobeying him was not an option. Pleasing him was the way to stay safe.

The defense has tried desperately from the beginning of this trial to separate the violence from the sex. Being a domestic abuser is not a defense to sex trafficking. If part of the abuse is making your partner participate in a commercial sex act, you're guilty of sex trafficking. And no matter how hard they tried, the defense can't change the facts. The defendant did hit Cassie during freak-offs. She told you that. And Daniel Phillip confirmed it. And in case there was still

any question, it's on video.  The defense tried to make up some nonsense about how the Intercontinental beating was about a phone, had nothing to do with a freak-off, that's preposterous on its face.  The defendant is in a towel.  He isn't even wearing pants.  The freak-off is still going on.  The escort was still in the room.  Jules hadn't been dismissed because the sex was not done.  If the sex was done, there's no reason for the defendant to care if Cassie is leaving.  The defendant was furious because the freak-off was not done.  He had not gotten everything he wanted yet.  There's no separating the violence from the sex.

But make no mistake, the violence that happened away from hotels and away from freak-offs were about keeping Cassie obedient, controlling her.  That control did not just disappear when she walked into a hotel room.  If anything, that grip tightened when she was high, naked, and vulnerable.  No was never an option.

But the defense tries to suggest that even if Cassie and Jane didn't want these nights, the defendant had no idea; no clue his girlfriend didn't want endless sex with male escorts.  To push that narrative, the defense talked about texts that Cassie and Jane sent to Combs, talked about freak-offs and other men, and they point to videos where Cassie and Jane act enthusiastic or smile, and they describe the videos as a date night or a beautiful evening.  If you want to

watch them all, you can, they're in evidence. You'll see a pattern. These are not beautiful evenings. They are the same thing over and over set up for one man's pleasure. One man's enjoyment. Not for Jane. Not for Cassie. They follow the same pattern over and over and over again. It's the same performance. And remember, those clips of videos are just a tiny fraction of the days on days on days in total that Cassie and Jane spent in those rooms covered in oil, high on drugs, having sex over and over and over again.

The videos only tell you part of the story. Take a step back and think about the context that the defendant had when reading texts or watching sexual performances, and it's clear he knew what was really going on. Yes, there were times when Cassie and Jane sent texts suggesting they were open to or excited about freak-offs. They both told you the defendant wanted dirty talk, wanted them to send those texts. And in their early years of the relationship especially, they went along with it. But when they started trying to resist that, the defendant reacted angrily. And I want to show you one example of where you see this.

Can we pull up Government Exhibit A-442-9, page 12 and 13, the redacted version, please. This is a text from August 4, 2023, between Combs and Jane.

The defendant asks Jane: Are we getting freaky tonight?

And Jane puts a heart on the message, and responds: yeah, of course.  Just haven't seen you.

Now, on its face, that would seem to be a positive reaction.  But Jane told you this is how she would try to resist hotel nights by subtly signaling that she wanted to be alone with the defendant, not have escorts.

The defendant's response here tells you he understood that completely because he gets pissed.  He responds:  Wow.  For real?  Well, get over it please.  Look at the roof over your head and that pretty smile.  I don't want to do anything if that's still an issue.  Let it go.  Love you.

That's a threat.  Jane subtly resists the hotel night, so Combs says I don't want to do anything.  I don't want to pay your rent if I don't get these nights.

And you see that pattern play out again and again across Cassie and Jane's texts.  If they don't respond with total enthusiasm, the defendant knows it, and he's pissed.  He knew these women weren't actually excited to have sex with other men.  He just wanted them to pretend they did by sending him dirty texts.  And he got mad when they didn't stick to the script.

Just like you saw the defendant get upset with Cassie in the texts leading up to the Intercontinental, remember?  Cassie texts:  I want a FO soooooo bad.  What am I to do?

And the defendant gets annoyed at her, remember?

P6RQcom6                              Rebuttal - Ms. Comey

Because that's a way of her subtly trying to get out of a freak-off.

And then he pressures her four different times to text Garrett, the guy who ran Cowboys before Bridget.

Someone reading those texts, without the context that the defendant had, knowing what had happened before and after might think there was no coercion here.  But the defendant knew.  He knew he'd been beating and controlling Cassie for years.  And he knew that after those texts, he ends up at the Intercontinental.  And we all saw what happened there.

The texts in isolation do not tell the whole story because in between them is violence and coercion.  That's how he got Cassie and Jane to stay on script.  And in those rooms for those videos, the defendant expected a specific performance.  This was not about their pleasure.  It was about pleasing the defendant.  He gave them drugs to keep them awake, compliant, and euphoric.  He taught them to what to do in those rooms, trained them with himself first, and then with escorts.  And by the end, they knew if they didn't perform the way he wanted, there would be consequences.

For Cassie, it included physical beatings and the release of those videos.  For Jane, it was losing her home, and then in June of 2024 it was physical violence.  But even with those threats, they tried to tell him they wanted to stop, and you know he understood them.  This is a very smart, very

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

perceptive man.  You can see it in his texts that he knows when Cassie or Jane is resisting.  Like the example we just saw, he was good at reading between the lines.

And the same thing would happen in those rooms, remember?  Cassie and Jane would signal to the defendant when they wanted to stop.  And he understood what they were saying because he would respond by telling them to finish strong, you're not getting tired on me, are you?

Here, the defense said, Mr. Agnifilo said, that if all of the freak-offs here weren't sex trafficking, then how could Mr. Combs know when any of them crossed the line?  It's preposterous.  They didn't need to tell him outright they wanted to stop.  He knew.  Cassie didn't need to tell the defendant she wanted an escort to stop urinating in her mouth.  He knew that.  Cassie didn't need to tell him she didn't want to have sex after he beat her in front of Daniel Phillip.  And Cassie didn't need to tell him that she wanted to stop when she had an open wound on her face and overdosed in a Long Island hotel.  You may have forgotten about that one.  Cassie's testimony was a few weeks ago.

Remember, she still had that gash in her head from the time with Mia and Deonte in her bedroom.  She OD'd in a hotel days later in Long Island.  And then after the defendant and the escort got her to wake up, they still had the freak-off after her overdose and with an open wound on her face.  She

didn't have to tell him she didn't want that.  It's obvious.

But Cassie and Jane did try to tell him directly that they wanted to stop.  In person, he would talk over them, dismiss them.  And you also know that that's why Jane put it in writing, over and over again in words no one could mistake.  I didn't hear Mr. Agnifilo have an explanation for how the defendant could read those texts that we all saw and think anything other than this woman wants out.  This woman does not want these nights.

The defense says, and said in their opening and has suggested to you, that these were strong women.  And you know what?  They're right about that.  They were strong enough to survive what the defendant put them through and testify at this trial.  But when they tried to show that strength to the defendant, the consequences were swift and serious.  For Cassie, it was beatings, threats to release those videos.  For Jane, it was threats to take away her home, threats to release her videos, and then in June 2024, a beating.  Just because someone is strong does not mean they can't also be abused.

And to take that to a larger point:  Sex trafficking does not require overcoming a no.  It is about getting someone to say yes through illegal means.  So when Jane said yes because she believed the defendant's lies, that was trafficking.  When Jane said yes because she was afraid that she would lose her home if she didn't, that was trafficking.

And when Jane performed oral sex on Antoine because the defendant had beaten her that same night, which we'll talk about in a little bit, that was trafficking.

When you're getting manipulated or threatened or abused into saying yes, you do not have to say no.  Sometimes these women did say no.  But they didn't need to for this to be trafficking.  You don't need to find that all of the freak-offs were sex trafficking.  We've talked about that.

Mr. Agnifilo asked you to draw the line at a number.  Is it the 75th freak-off?  Was it the 50th?  That's not the question before of you.  The only question that matters here is whether there was one.  That is the only number you need to care about.  One freak-off where the defendant knew that force, fraud or coercion, or any combination thereof was used to get Cassie and Jane to a yes.  Of course there was one.  You know you have many, many more than that, but that's all you need.

There is a huge difference between what Cassie and Jane were willing to do early on:  Try a freak-off once, maybe on a special occasion, and what happened here.  The defendant took these nights to an extreme point that crossed far over into trafficking.  By the time he got to the Intercontinental with Cassie in June of 2024 with Jane, he was so far passed the line, he couldn't even see it.

So the defense asks:  If it was so bad, if they didn't want it, then why didn't they just leave?  I think Mr. Agnifilo

P6RQcom6                         Rebuttal - Ms. Comey

even said, she could always leave.  Did anything in this case ever actually happen, ever?  The answer is they tried to leave. Cassie literally ran away, and she's on video being beaten and dragged back.  She told you about other times that the defendant or his inner circle went and got him.  She tried to leave.

And the suggestion that Cassie was unafraid -- remember when Mr. Agnifilo said that?  He had to backtrack on that when he was playing the video for you and you literally see Cassie cowering.  The suggestion that she was unafraid of this man who beat her brutally at random times is ridiculous.

And on that note, Mr. Agnifilo suggested that Cassie was the winner of a prize.  What prize is that?  What was her prize?  Black eyes?  A gash in her head?  Sex for days while you have a UTI?  Getting urinated in your mouth?  She told you she'd give back every dollar if she didn't have to have those experiences.  And how -- how could anyone think of what she experienced as a prize?  As something she'd won?  It's ridiculous.

Cassie and Jane both tried to leave the defendant to break up with him multiple times, and both times, each time he would suck them back in.  And you know why they found it so hard.  They had a trauma bond with him, that cycle of love and abuse, and love and abuse, made them feel trapped.  They were trapped emotionally, physically and financially for all the

P6RQcom6                         Rebuttal - Ms. Comey

reasons we've talked about.

Now, finally the defense points to the loving and sometimes sexual messages that Cassie and Jane sent to the defendant. The argument goes essentially, how could a real victim love her trafficker? But none of the loving texts that Cassie and Jane sent should come as a surprise. They both loved the defendant very, very much. That was what kept them stuck for so long.

Remember, Dr. Hughes told you love is what keeps a victim in an abusive relationship. If it was all bad, if it was all awful, it would be so much easier to leave. Cassie and Jane stayed because the defendant mixed his abuse and his exploitation with intense love and affection. So yes, they wanted to have sex with their boyfriend. But let's be clear, the texts where they're talking about have sex with the defendant tell you nothing about whether they wanted to have sex with other men.

Now, the defense tried to suggest that Cassie and Jane accepted freak-offs as the price they had to pay for the lifestyle that they wanted to be in a relationship with Sean Combs, get career opportunities, money, homes, they were willing to have the kind of sex that he wanted. But it was actually the exact opposite. The money, the career, the house were all tools that the defendant used to control Cassie and Jane. Sure, at first those may have been things that Cassie

and Jane wanted or were excited about.  But by the end, those supposed benefits, their homes, the money, kept them trapped.  And you know the defendant did that on purpose.  Remember, he used that $20,000 payment to force Cassie's parents to take a loan out on their home.  And that 20K was pennies for the defendant.  And remember, you saw him make Jane beg for money as she told you she was falling into debt.

So even if Cassie started out excited for the career opportunities, and even if Jane was thrilled at first that her wealthy boyfriend would randomly send her money and got her this really nice house, that supposed generosity lulled them into becoming dependent on the defendant.  It trapped them.  That gave him the leverage to coerce them into more hotel nights long after they stopped being willing to do them.

And the cost of doing that was just a drop in the bucket for Mr. Number One on the Forbes list, as you heard during this trial.  $10- or $20,000 was everything to Cassie, Jane and their families.  Losing that or having to pay that would spin them into crisis.

But the defendant would spend that much on a single freak-off.  You saw the bills.  The hotel bills would cost several thousand dollars.  And when he's hiring multiple escorts, he's handing them about $5,000 each.  He's spending that night on one hotel night.  To him, that money was nothing.  He was more than willing to spend it to trap Cassie and Jane.

But let's just say the defense is right.  Let's say Cassie and Jane decided, yeah, I'll accept these sexual experiences as the cost of the lifestyle I want from Sean Combs.  That does not excuse the times they told the defendant they did not want to, and he made them anyway.  Like Cassie's 29th birthday, and when Cassie tried to leave hotel rooms, including at the Intercontinental.  Like when Jane told him before New York that she did not want to come if he was only going to use her for a hotel night.  And on that point, Mr. Agnifilo focused on Jane putting a thumbs up on the Cowboy's text in the air.  Remember on the stand, she was letting him know she'd seen it because it hadn't been loading earlier.  What Mr. Agnifilo did not talk about is all the stuff Ms. Slavik walked you through yesterday:  How Jane sent him that long texts to both of his phones saying:  I don't want to come to New York if you're going to put me in a room with a stranger.  I'm tired of feeling obligated to do these nights for fear of losing the roof over my head.  That text message is crucial context to the defendant's mindset when he gets her on that plane with his lies.  It's just going to be us, baby. We'll go shopping.  We'll go to dinner, just us.

And when he's doing that, he's texting Paul Arthur and Bridget from Cowboys.  He's lying to Jane to get another hotel night.  And when he pulls the rug out from under her when she's midair, that is a completed act of sex trafficking because at

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

that point he knows he has defrauded her into getting on that plane and is intending to cause her to perform a commercial sex act through that fraud. And then when she gets there, and he attempts to carry it out after she tells him again in person, I don't want to do this. It's another attempted act of sex trafficking. It doesn't end up working out over the two hours he's pressuring her, pressuring her to try to have sex with him. And then again, when she's high on ecstasy, it's the day after she sent that text about fearing that she's going to lose the roof over her head when he's there with her saying how are you going to make this up to me? And she texts Kabrale, and they fly him in for sex there, that's another completed act of sex trafficking.

What is also inexcusable is when Jane told the defendant in October of 2023 that she hit a wall. I need a break. He pushed her to keep going even when she vomited. At that point, she'd been telling him for months, months that she was terrified of losing the roof over her head and feeling obligated to do these nights because of it. He knew she was doing it because of coercion. And like in June of 2024, when Jane told the defendant she did not want to have sex with Antoine and he made her. Each of those times so obviously over the line, it's all you need to convict. You don't even have to decide whether the earlier ones were trafficking, even though there were many more.

And because the defense knows that some of these incidents are so far over the line, they have tried desperately to spin them.  They've contorted the facts endlessly here around what happened, particularly at the Intercontinental and in June of 2024.

So I'm going to end by talking about those two.

Starting with the Intercontinental.  The defense has thrown up everything it can think of to squirm out of this one. The defendant was too drunk or high to know what was happening. This was a fight over a phone.  It was domestic violence, not trafficking.  But as you know by now, when violence is paired with unwanted commercial sex, that is exactly when it turns into trafficking, and that's what happened here.

The video alone shows you that the defendant knew perfectly well what he was doing the whole time.  First, he throws her to the ground to stop her from leaving.  Then he kicks her to remind her he has the power.  Then later on he sees she's on the phone with security.  So he makes a calculated decision to stay.  He doesn't drag her back to the room.  That would lead security to Jules.  But he doesn't leave Cassie alone there either, because he needs to keep control over her, keep her from leaving.  So he decides better to stay there in a towel than risk either losing control over Cassie or leading security back to the room where Jules is.

The defense tried to suggest to you that this was all

P6RQcom6                          Rebuttal - Ms. Comey

over a phone, and that the defendant was trying to get his phone back from Cassie. But remember what Israel Florez told you is that throughout this interaction Cassie was saying: I want my phone. That's what Israel Florez heard Cassie saying. What you see the defendant do in that video is take Cassie's phone because he knows she won't leave if he has her phone. And then when they go into the room, Israel Florez told you he made the defendant give Cassie her phone. So at that point the next phone he has when he comes out of the room is his phone, which he had left in the room when he first came out to chase after her. So that's the deal with the phone.

This fight was not about a phone. This fight was about the fact that the defendant's goal was to get Cassie back into the freak-off. You know Jules was there. Cassie texted about it. Florez saw him. This was a freak-off. You know Combs hit Cassie during the freak-off. Remember Kerry and Deonte both saw the black eye afterwards. In the video you can see her kind of grabbing at her eye. And in the video, the defendant doesn't hit her in the face. So the black eye must have happened in the room before she left. And you know the defendant was trying to drag her back to continue the freak-off. He literally drags her back there. And what does he say throughout the time Florez is there? You're not leaving. Because the freak-off is not done yet. Just like the other times Cassie testified about leaving hotel rooms and

P6RQcom6                              Rebuttal - Ms. Comey

getting brought back to continue the freak-off, the defendant had every intention of finishing that one.  Until Florez finally helps Cassie to escape, the defendant is still trying to carry out commercial sex by force.

When he grabs her, he is obtaining her, knowing that his force will cause her to engage in a commercial sex act with Jules when the freak-off resumes.  And he's also attempting to maintain her; he's trying to force her back to the room to have sex with an escort.  This is a culmination of the ongoing coercive scheme the defendant had been carrying out for years, including all the freak-offs and abuse from Turks, to Spain, to Vegas, to New York, to Miami, to LA.  That culmination of that ongoing scheme that went through all of those places, that incident alone makes him guilty of Count Two.

And with June of 2024, Mr. Agnifilo threw up just about any excuse he could think of.  Jane started it.  She could have left.  The timeline is off.  There's some weird conspiracy with Antoine that has no possible motive.

Why are they doing that?  Well, that is obvious.  This is the most clear-cut example of sex trafficking in this case.  Like the Intercontinental, it meets all the elements, and like the Intercontinental, it is a culmination of a persistent, coercive scheme spanning Turks, Vegas, New York, Miami and LA that the defendant carried out with Jane culminating in June of 2024.  That incident alone, as the culmination of that ongoing

P6RQcom6                          Rebuttal - Ms. Comey

scheme, makes him guilty of Count Five.

So the defense is throwing anything they can think of at the wall hoping something will stick.  The defense suggests Jane must somehow be lying because her description of how quickly things happened or how long things took doesn't precisely match the records.  But it makes sense that Jane would have experienced such extreme violence in slow motion; the same for when she was hiding without her phone.  Have you ever tried to sit in the dark for 30 minutes and figure out how long time is passing?  Of course it felt like hours to her. She had no sense of time.  Those are terrifying, traumatic memories when she would have been hyperfocused, and things would have moved in slow motion.  Does the fact that she got that timing off mean she's lying?  Of course not.

And when you think about what Jane remembers happening with that call between Jonathan Perez and Antoine arriving, it actually makes sense.  After the FaceTime call, Jane takes a shower where the defendant slaps her again.  Jane sits on the bathroom floor while the defendant rants at her for who knows how long.  Jane gets dressed in an outfit.  The defendant gets the phone set up and starts playing porn -- or the defendant starts playing porn.  The defendant reads through Jane's texts with Antoine.  He has Jane ice the welts on her face.  Jane puts on makeup, styles her hair to cover her bruises.  At some point she also has to clean up all the broken glass, all the

candles, the splintered wood from the doors.  There's a lot to do in that time.  All of that would have taken time.  The independent evidence corroborates Jane's account from that night, including her black eye and welts days later.

And I want to be clear here, the reason they called Antoine is because by that point the defendant had stopped using the Cowboys.  Remember, after Cassie's lawsuit, he starts trying to be much more under the radar.  He knows the feds are investigating him by that point.  He's not going to hotels.  He's not hiring Cowboys.  He's using repeat players, and the only ones at that point that they have in LA — because, remember, Kabrale they stopped using after he extorted Jane — are Paul, who travels a lot, and Antoine.  So it's not that surprising at all that they used Antoine for this time.  Jane told you in her testimony they used Antoine a couple other times before June of 2024 at her house.  It is not surprising that they used Antoine.

And whatever words Mr. Agnifilo threw at you about some supposed conspiracy that Antoine and Jane may have come up with, there's no basis for that in the record.  There's not a shred of evidence at all that Jane lied to you about anything like that or that she and Antoine had any sort of conspiracy to frame the defendant to get money that they never asked for, to get a lawsuit that they didn't file.  It makes absolutely no sense because it's just not true.

P6RQcom6                    Rebuttal - Ms. Comey

What makes sense is that the defendant went nuts that night. And by that, I mean he went very, very violent at Jane, an overreaction for the books. The defense tries to suggest that Jane is somehow to blame for what happened that night. Let me be very clear here. Nothing Jane did that night justifies the defendant's actions. Nothing.

Should she have hit him? Of course not. Should she have thrown things at him? No. But does that give him the right to kick down four of her doors? Does that give him the right kick her to the ground, put her in a chokehold, punch her in the face, kick her while she's on the ground? And, by the way, Jane testified that she was being kicked in her body and her legs, not her face at that point. So it makes sense you did not see extra injuries. Does it give him the right to drag her by her hair and slap her so hard in the shower that she collapses? The answer to that question is so obviously no, it is almost insulting to speak it out loud. Jane may have started that fight, but he finished it with a vengeance. By the time Jane collapses to her bathroom floor, the defendant has literally beat her into submission. By the time Antoine shows up, he has given her no choice. Sean Combs won that fight, and he made Jane pay by performing with Antoine. As I said to you earlier, she has no reason to lie about that.

But really, even all of that lead up is a distraction. Because what matter most is the moment when the defendant

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom6                         Rebuttal - Ms. Comey

stands inches from Jane's face, when Antoine is already in the house, and Jane is talking with the defendant in the bathroom. At that moment, did Jane want to have sex with Antoine?  Of course not.  She was bruised with welts after being chased and beaten.  She was sore and tired.  She obviously did not want to perform oral sex on an escort for hours.  And she told the defendant that.  We've talked about how trafficking can be about getting to a yes through illegal means and doesn't require overcoming a no.  Here you have a no, and here's the bottom line:  How did the defendant respond?  When Jane told him in his face "I don't want to do this," how did he respond? He gets up in her face and says, "Is this coercion?"  And then he forces her to take an ecstasy pill and told her to get back out there and suck some dick.  In that moment, the defendant fully understood what was happening was coercion, was sex trafficking, and he made a conscious decision to do it anyway.

         The law does not require a defendant to know what specific statute he's violating, but in that moment he did because he was under investigation for that very same crime. He knew that.  By then his homes had already been searched by the feds, and he made a conscious decision to break the law again because in that moment, what choice did Jane have?  She was bruised with welts.  Her doors were broken.  She'd been choked, dragged by her hair, kicked and slapped.  She had no choice, and the defendant knew that.

P6RQcom6                    Rebuttal - Ms. Comey

Why was the defendant so brazen that night?  Why was he willing to force Jane into commercial sex while under investigation for that very same crime?  The same reason he didn't stop distributing drugs to her or flying her across the country for nights with escorts until his arrest.  The defendant thought he was above the law.

Think about it.  Over the past 20 years he had gotten away with crime after a crime, refusing to take no for an answer without facing a single consequence.  He kidnapped Capricorn at gunpoint, broke into Cudi's home, and beat Cassie mercilessly in front of Capricorn and Rube, and nothing happened.  He crisscrossed the country with ecstasy, cocaine and ketamine, giving it out like candy, and nothing happened. He flew escorts across the country and overseas to have paid sex with his girlfriends countless times, and nothing happened. He coerced first Cassie and then Jane into freak-offs, and nothing happened.  He forced Mia to sleep in a room with no lock, screamed at her, threw things at her, forced her to work days on end, raped her, and nothing happened.  He beat Cassie in front of his employees, in front of her friends, even in front of escorts at freak-offs, and nothing happened.  He attacked Cassie in a hotel hallway, it was caught on video, he bribed security guards to cover it up, and nothing happened. So of course the defendant was brazen enough to think he could get away with more crimes even while under federal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6RQcom6

investigation.

In his mind he was untouchable.  A God among men, as George Kaplan put it.  And who would ever stand up to a God?  The defendant never thought that the women he abused would have the courage to speak out loud what he had done to them.  He didn't think that Cassie, Jane, or Mia or any of the other women that you heard from at this trial would dare to face his wrath, and he certainly didn't think men like Kid Cudi, Deonte Nash, Daniel Phillip, Israel Florez or David James would take the stand and back those women up.  But he was wrong.

For 20 years, the defendant got away with his crimes.  That ends in this courtroom.  The defendant is not a God.  He is a person.  And in this courtroom, he stands equal before the law.  Overwhelming evidence proves his guilt.  It is time to hold him accountable.  Find him guilty.

THE COURT:  Thank you, members of the jury.  For all your hard work and consideration here today.  We've reached 5:00.  So I am not going to hold you will here for another few hours to hear jury instructions today.  Instead, we'll come back Monday morning, I'll provide my instructions on the law, and you'll begin deliberations.

In the meantime, I will give you some instructions:  The first one is:  You've heard the closing arguments, but I will ask you to continue to keep an open mind about the case.  The instructions I will provide you about the law are very

P6RQcom6

important, and you should be prepared being fresh in the morning on Monday to hear them and consider them.  Then you will have deliberations.  And you should keep an open mind through that process as well.

I will also repeat some of the instructions I've previously given you.  Do not speak with each other about the case.  Do not speak with anyone else about the case.  Do not read or research or look up anything about the case.  And we will see you here early to get started at 9:00 a.m. on Monday with instructions.

Thank you so much for your time.  Have an excellent weekend.  All rise.

(Jury not present)

THE COURT:  Please be seated.

Ms. Estavao, you'll have time now over the weekend to make sure you've reviewed the laptop and the exhibit list so that should be ready to go Monday morning.  Any issues there?

MS. ESTEVAO:  I don't expect any.

THE COURT:  Anything further from the government before we adjourn?

MS. COMEY:  No, your Honor.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  No.  Thank you, Judge.

THE COURT:  We'll see you here 9:00 a.m. on Monday.

(Trial continued June 30, 2025 at 9:00 a.m.)