UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

                    v.                        24 Cr. 542 (AS)

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

                    Defendant.                Trial
------------------------------x
                                              New York, N.Y.
                                              May 9, 2025
                                              9:44 a.m.
Before:

                    HON. ARUN SUBRAMANIAN,

                                              District Judge
                                              -and a Jury-

                              APPEARANCES

JAY CLAYTON
        United States Attorney for the
        Southern District of New York
BY:   MADISON R. SMYSER
        EMILY A. JOHNSON
        MAURENE R. COMEY
        MEREDITH FOSTER
        MITZI STEINER
        MARY C. SLAVIK
        Assistant United States Attorneys

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
      Attorneys for Defendant
BY:  MARC A. AGNIFILO
      TENY R. GERAGOS
      -and-
SHER TREMONTE
BY:  ANNA M. ESTEVAO
      -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
      JASON A. DRISCOLL
      -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND

ALSO PRESENT:
PAULETTE TAYLOR, USAO Jury Consultant
LINDA MORENO, Defense Jury Consultant

(Trial resumed; in open court)

THE COURT:  Let's move to the issue of the pseudonym for victim 5.  That application is denied for the reasons set forth in the defendant's submission.

As to the issue concerning victim 3, has the government heard anything concerning victim number 3?

MS. COMEY:  I expect to have an answer, a final answer, by the end of the day today, your Honor, on whether or not we will call her.

THE COURT:  Okay.  And I take it that your argument -- well, your position was, look, in any case, it may turn out for any number of reasons that a particular witness can't testify or that the government chooses not to put on that witness.  And that doesn't mean that, well, we need to know it in advance and if we don't know it in advance, then we're precluded from putting on that witness.  And there's no rule or authority to suggest otherwise.

MS. COMEY:  That is precisely our position, your Honor, but we do also recognize that we have -- we have a very professional and courteous relationship with opposing counsel. So that was why we wanted to raise this issue in advance to them because we thought it might impact their thinking about opening statements.

So, as a courtesy, we wanted to raise it.  But I agree with your Honor for all the reasons you just set forth, there's

no obligation to do so.

THE COURT:  I agree with that, and I appreciate you're trying to work with the defense to make their lives easier.  So I appreciate that.  So I don't think there's anything further to address along those lines.

As to the exhibit objections, the -- let me make sure I have the right exhibit numbers here.

As to Exhibits 3Q-105 and B-105, those exhibits are excluded under Rule 403.

MS. JOHNSON:  Your Honor, may I be heard briefly on that?

THE COURT:  Of course.

MS. JOHNSON:  Thank you.  With respect to B-105 in particular, the government submits this photograph is not more prejudicial than probative.  It's a photograph of Victim-1 and another witness who are testifying at this trial.  They are embracing.  It does not have any of the concerns highlighted by the defense with respect to 3Q-105.

The photograph in B-105 was taken on May 19th, 2005.  That's a time period squarely within this indictment.  That is a time period in which Victim-1 will testify that she was living in New York and it's a time period in which she was sort of immediately before she met the defendant.  It's with an individual who was her best friend at the time.  It establishes their relationship.  It establishes what Ms. -- what victim 1

was doing at the time before she met the defendant. And I do not think it raises any of the concerns that this is more prejudicial than probative.

THE COURT: Well, it doesn't really establish anything because the defense says that it is undisputed that the two individuals were friends, that you will have the two witnesses testify. They will testify that they were fast friends. And the defense isn't going to question that. So what does this picture establish? Meaning if it has -- it may be relevant for the reasons that you're saying. But if it has no probative value, wouldn't -- the defense's argument is it may have some unfair prejudice in its depiction of these individuals. And I take your point that the issues are not as pronounced as with the other photo, but there's at least a question as to why this is coming in as an exhibit anyway. It seems more like a demonstrative, if anything.

Would the government -- I mean, the government doesn't need this to go into evidence, right?

MS. JOHNSON: I mean, the government thinks that this is a relevant photograph. It provides background information. It sets a context for victim 1's life and what victim 1 was doing immediately prior to meeting the defendant. It shows a close relationship with another witness who will testify at this trial about things that she observed between the defendant and victim 1. It provides, you know, it shows that from the

very beginning, those two had a very close relationship. It's a photograph of two people embracing. I don't see that there's any prejudice to this photograph. And I do think there's probative value for the reasons I've stated.

THE COURT: All right. Fair enough.

Who would like to address any issue with respect to Exhibit B-105, if anyone?

So 3Q-105 is out. So the government is saying, look at B-105, it really doesn't say much of anything, and there's going to be testimony about this friendship, and it's just a picture of the two individuals.

MS. SHAPIRO: I understand, your Honor, but I think as your Honor's questions to Ms. Johnson earlier illustrate, we're not saying it's not relevant at all. We're just saying it has low probative value compared to the potential unfair prejudice --

THE COURT: Yeah. Tell me what's the unfair prejudice.

MS. SHAPIRO: The unfair prejudice is that victim 1 is extremely young in the picture. And I submit that, although it's not as bad as the one the Court excluded, the prejudice is still trying to create a suggestion that Mr. Combs is engaging in sexual conduct with an underage person. And the government doesn't need this. You know, they're going to call both witnesses. There's no additional importance to it. The only

real reason they want it in, is because it shows victim 1 when she's extremely young and for the impact that's likely to have.

And I would say, even as a demonstrative, it has the same problem because it's going to be shown to the jury and they're going to see how young she looks in this picture, and assume that that's the timeframe, you know, that the defendant is engaging in a sexual relationship, and, you know, he hadn't even met victim 1 at the time of this photograph.

THE COURT:  Ms. Johnson, can you remind me of the timeframe that's at issue with respect to the charges relating to victim 1?

MS. JOHNSON:  Just the charges with respect to victim 1 are charged I believe from 2009 to present.  But victim 1 will testify about when she met the defendant.  Victim 1 attended a party that the defendant was at in 2004, which is a year before this photograph was taken.  This photograph was taken on May 19th, 2005, when victim 1 was 19 years old, which was the age she was when she met the defendant.

She signed with the defendant's record label at the beginning of 2006, which is six months after this photograph is taken.

THE COURT:  She had met the defendant prior to this photo being taken.  She signed with the defendant's record label shortly after this picture was taken.  And the charges at issue are not charges from 2024, but the charges go all the way

back to 2009?

MS. JOHNSON:  Absolutely, your Honor.

THE COURT:  Okay.

MS. JOHNSON:  And with respect to probative value, a visual speaks way -- speaks a thousand words as compared to a witness testifying that they were friends.

This is what these individuals looked like when -- shortly before victim 1 met the defendant.  Shortly after, I'm sorry, your Honor.  And shortly before she signed with his record label.

We are not suggesting through this photograph any of the things Ms. Shapiro is raising.  This is simply what victim 1 looked like, establishes the friendship with this other witness, and sets a visual of what was happening in 2005 when she was of age, which is something we would draw out on the record.

THE COURT:  All right.  For the reasons stated by the government, I will not exclude B-105 under Rule 403.  I don't, believe based on what I've heard today, that the probative value would be substantially outweighed by the danger of unfair prejudice given the picture is minimal.

All right.  So that takes care of those two exhibits.  Now we have --

MR. AGNIFILO:  Your Honor, before we move away from this, I'm imagining the government is not going to suggest when

they put this picture into evidence that victim 1 and the defendant were together.  I would hope that it's going to be very clear the relevant time period that the picture -- I'm sure the government will do that.  I just want to ask that that be done.

THE COURT:  In my periphery, I'm seeing nodding, so...

MS. JOHNSON:  It will be, your Honor.

MR. AGNIFILO:  Nodding is noted.  Thanks, Judge.

THE COURT:  All right.  So let's go to the prior consistent statements and the statements under statements of an opposing party.

So as to the prior consistent statements, maybe the government could help me out.  The defense says, look, a generalized attack on credibility does not open the door to all prior consistent statements.  And I take it that the government would agree with that, because if that were true, then any time any witness was possibly subject to cross-examination at which their credibility was attacked, that would open the door to the admission of any hearsay statements from that witness, which I don't believe is the rule, and I don't believe it's consistent with the text of what the rule says.

And so wouldn't we have to take a wait-and-see approach to see if there's any cross-examination or any intent to attack credibility as to the statements that are at issue to determine whether these prior consistent

statements would be admissible.

MS. JOHNSON:  Your Honor, I want to qualify the Court's observations slightly.  I submit that the Second Circuit has been clear that a credibility attack can also occur in opening statements.

THE COURT:  That's absolutely true.  I agree with that.

MS. JOHNSON:  And it need only be clear that the witness will be subject to cross-examination.

THE COURT:  Yes.  I don't even think the defense takes issue with that.  I think they're saying, in this circumstance, this is not a case where there is one statement at issue.  And so you would imagine that the defense in this hypothetical case could come up in opening statements and say, this person says -- is going to say that she observed a crime, but we're going to show that this witness was lying.

All right.  Now, they've done it in opening statements.  Now, you, in direct, could use those prior consistent statements, and it wouldn't be improper bolstering. It would be consistent with the rule.  Right?

I'm not sure that that's going to happen.  If it does happen in opening statements, if the defense says as to one of these statements, you know, for instance, the statement concerning a potential release of a video, right?  That's one example.  If they say you're going to hear some testimony about

threats to potentially release videotapes, and this you got to take that with a grain of salt because that witness is lying, well, then at that point, the government would be able to bring in text messages or e-mails that support that contemporaneously the witness was talking about those threats. Right? I think that's how you're seeing it coming in. So maybe we're all on the same page.

MS. JOHNSON: I think we are on the same page. And perhaps the wisest course is to address this at side bar after opening, but I envision consistent with some of the briefing in this case that there will be sort of broad credibility attacks in the opening. That I think we will need to address --

THE COURT: So that's the point that I would appreciate your response. Because in their letter, the defense says a generalized attack on credibility does not open the door to particular prior consistent statements. And there's a case cited for that proposition. You might say, they've got that case wrong, or there are other cases that say different things, but that's what I'm trying to figure out.

MS. JOHNSON: Right. And the case -- part of the difficulty in answering your Honor's question, is that the law has shifted a bit on this with the change of rule. And that quote, a generalized attack on credibility, is coming from a 1986 case that the Second Circuit decided when the rule was different.

So I think that was sort of -- and then the case that cited quoting it, the Eastern District case from 2023, is just sort of covering in that discussion, you know, the general state of the law and commenting on that it is a bit confusing.

THE COURT:  You may be right, but my understanding based on the government's briefing was that the change in the rule was to expand the ways in which you would attack the credibility of a statement, such that you would open the door to admission of a prior consistent statement.  So without sub two, there would have to be an attack on kind of recent fabrication grounds, right?  So they were saying, well, that's too narrow so we're going to expand that.  But the rule has always said that the declarant testifies and is subject to cross-examination about a prior statement.  And I think that's the issue that I'm trying to understand, is does it have to be about the prior statement?

MS. JOHNSON:  Right.  And I think that what we just spoke about, your Honor, is that we agree that subject to cross-examination, means that that -- that decision can occur before the witness is actually cross-examined.

THE COURT:  The timing, I'm with you.

MS. JOHNSON:  Right.

THE COURT:  It's the "about a prior statement" seems to suggest that the inquiry is at the level of the statement.  And, again, I give the same example, which is in opening

statements they say, you're going to hear -- I don't want to repeat myself. But you're going to hear testimony about threats that videos would be released, and that's a lie.

All right. If the defense were to do that in opening statements, then I agree with you, I don't think it would be a close question. That would come in. You can do that in direct, in direct examination.

If they just say you're going to hear from witnesses and you should not believe them, as a general matter, then I'm not sure that that just opens the door to you putting in all of victim 1's text messages to show the jury that she is in fact credible.

MS. JOHNSON: Your Honor, with respect to how the rule was broadened in point 2 of 801(d)(1)(B), it says that prior consistent statements are admissible to rehabilitate the declarant's credibility as a witness when attacked on another ground.

So I think that does, in fact, broaden the bases on which the statement becomes admissible. I think it isn't quite as narrow as the Court is articulating with respect to the video example that you provided.

THE COURT: All right. Can you -- and there's nothing to rule on really right now. So can you see if you can find a case.

MS. JOHNSON: Absolutely.

THE COURT:  That kind of shows this.

MS. JOHNSON:  Of course.

THE COURT:  Just to make sure that we're not sort of opening the flood gates.  And to put this all in perspective, this is really a question of whether you're permitted to do this on direct examination or on rebuttal, right?  Because if they do the cross-examination and say you were lying about X, Y or Z, the event that occurred, and then you have text messages that show that those things did occur, or at least that the witness said that they occurred, then on rebuttal, you're going to put those in.  And not only that, you're going to put those in and undermine, at the cross-examination that just happened where there was a suggestion that these things never happened and the witness was lying.

So, really, it's just a timing concern.  But, you know, that being said, we like to get things right, so if you a case or authority that you can share in response to the defense's letter, which just came in yesterday, I'll review it and I agree with you, we can handle this at a side bar after opening statements.

MS. JOHNSON:  Great.  Thank you, your Honor.

(Continued on next page)

THE COURT:  Now, that's just prior consistent statements.

I didn't give the defense a chance to chime in, so I'm happy to hear you on the prior consistent statement issue.  And I think the only thing remaining is the opposing party statement issue.

MR. AGNIFILO:  I think the way your Honor is handling it is exactly right.  We do have a good working relationship with the government.

What I would like to see happen, and I think that it can, is as we are seeing weighty evidentiary issues coming down the pike, we can do the best that we can to tip the Court to the fact that they are coming so that your Honor doesn't have to make a significant issue on evidence issues which sometimes are a little tricky off the cuff.

And the way that I see this particular issue is, I'm glad the government raised it.  I think they might, not in a bad way, but sort of jumped the gun just because we don't have a context for it yet.

I also note -- and I'm not here to help them do their job.  They are perfectly good at doing that.  I don't know that a lot of the statements -- not a lot, but quite a few are hearsay statements because I don't know that a lot of them are assertions being offered for the truth of the assertion.  I don't know that they even need an exception for some of them,

but all the more reason why, for weighty evidence issues, we are going to endeavor to give the Court a preview of them as early as we can.

I think it's too early.  I don't think we have the context for a ruling on anything in the government's proposed list of statements.  I think that they are all interesting evidence issues, but I don't know that we have enough of a record and anything that's happened in terms of the prior consistent statements or the interrelation between parties and what scopes of agencies might exist for the agency admissions. I just don't think we know enough at this point.

All this to say, what I'm asking is that your Honor don't rule on anything in the list, but that we all know that as these things come closer to actual offers of admissibility, we will do the best we can to give your Honor a heads-up.

THE COURT:  Fair enough.  I appreciate the heads-up.

My real question is, do you care about any of these statements that are left?  Because I got a long spreadsheet with a bunch of different text messages, most of which were not objected to, so that's why I'm asking you the question, which is, are these ones that the defense actually -- like, for instance, on the highlighted entries, as to which there is an objection on prior consistent statement grounds, are you going to try to cross-examine the witness on those issues?  Right. Because if you're saying, yeah, we are, and we are going to try

to show that the witness is not credible on the things that are at issue, then it would be nice for me to know that because then it fleshes out the evidentiary issue.  That's just to give you an example.  Or for the people who are identified as being agents of Mr. Combs, are they agents?  I don't know what the dispute is at this point.

MR. AGNIFILO:  I know that there are 106 completeness issues with many of these text messages.

THE COURT:  We are going to get there right after this.

MR. AGNIFILO:  Right.

And that, honestly, is probably a more important issue to us --

THE COURT:  I sensed that from the letter.

MR. AGNIFILO:  Right -- than this.

And I think the completeness issue will put things in the proper kind of perspective for us.

What we are trying to avoid, what we are trying to avoid is things being taken out of context and being examined either as a piece of evidence in terms of relevance or piece of evidence in terms of admissibility without the overall context. The 106 issue is a much more important issue.

THE COURT:  Fair enough.

Moving to that issue, and you previewed this, basically you said, look, maybe none of this is really hearsay

or being brought in for the truth of the matter, so it should come in.  But if that's true, then your point is, the full story should also come in, meaning your -- Mr. Combs' own communications, etc., right?

MR. AGNIFILO:  That's correct.

THE COURT:  Your point is, well, look if we are getting into these text messages, especially text messages between victim number 1, for instance, and Mr. Combs, then let's just have the full story.

And you frame it as rule of completeness, but really what you're saying is is that the issue here is not whether these things were true or not.  It's showing the nature of the relationship.  It's being brought in for a different purpose.

MR. AGNIFILO:  Precisely.

THE COURT:  Those are your two arguments.

One, it's not really being brought in for the truth of the matter.  It's just showing the context.  They are putting in statements.  It's just for like the context of the discussion.

Two, on rule of completeness grounds, if they are putting in, for instance, a text thread, then you should be able to complete that with the remainder of the text thread.

MR. AGNIFILO:  That's right.

THE COURT:  I understand that.

Does the government -- you can respond, but I think

the defense's point is, we can do this as things are coming in, and I can rule on it swiftly, but now I have the context, which is very helpful, and we can deal with it as it comes.

But do you have a general response to the Rule 106, or none of this is really being brought in for the truth of the matter, which I think the government itself said in its briefing on the motion *in limine* that some of these text messages, and there are a lot more, may not be being brought in for the truth of the matter anyway.

MS. JOHNSON:  I think, first, to address your Honor's last point, I think whether it's being brought in for the truth or not brought in for the truth, I think that's a message-by-message question.

In terms of 106, we are working through with the defense their 106 issues on the government's marked exhibits. I expect we will likely be able to reach resolution on those.

Just to flag for the Court, it's not so simple as to say like, if this piece comes in, everything else comes in, because these are threads that are thousands of pages long.

THE COURT:  Absolutely agree.  I don't believe that the rule of completeness can be stretched that broadly.

MS. JOHNSON:  I imagine we will be able to reach a resolution on most, if not all, of those issues.  If we can, we will tee them up for the Court.

THE COURT:  Am I missing anything, Ms. Comey or

Ms. Johnson, that we can productively do right now, or is there anything I can help with?

MS. COMEY:  I don't know whether your Honor wanted to discuss the employee statements, there were two that had been teed up, or whether these fall into the, we will take these as they come category.

THE COURT:  I think, Mr. Agnifilo, I think this is what he was talking about, that we probably should do it on a message-by-message basis because -- I take it that they might challenge the satisfaction of some of the agency criteria.

MS. COMEY:  Understood, your Honor.

As to one statement, though, we expect it will be the witness' testimony about a statement made by one of the defendant's employees to her orally and not in writing.

THE COURT:  Which is that on the list?

MS. COMEY:  It's on the top of the second page of the printout for me.  It's the one without an exhibit number, your Honor.

THE COURT:  Yes, I see it.  The declarant is Cruz, right?

MS. COMEY:  Yes, your Honor.

That would be someone who worked for Bad Boy Records and worked as a manager for victim 1 in that capacity working for the defendant's record label Bad Boy Records and, in the course of that employment, was discussing victim 1's career and

attempts to further that career and difficulties that he was having furthering that career, and we think that falls squarely within the heartland of an employee of Bad Boy's employment.

THE COURT:  Response.

MR. AGNIFILO:  I don't believe that's right.  I don't believe that would have been something that Mr. Combs would have authorized.  It seems to be sort of an *ultra vires*, on his own type statement if it was made.  Unless there can be something in the record that would show that this person was speaking on behalf of Mr. Combs, with his authority, I don't know that this is -- I don't think this fits the parameters of the rule on this.  I'm not saying it can't.  I just think without a factual proffer as to the context of the conversation, that Cruz was specifically somehow authorized to have these kinds of discussions --

THE COURT:  They are not seeking admission under 801(d)(2)(C).  They are seeking an admission under 801(d)(2)(D).  They are saying it was made by a party's agent or employee.  You're not challenging that, right?

MR. AGNIFILO:  That part is correct.

THE COURT:  On a matter within the scope of that relationship, and this was about the music -- an artist under the Bad Boy label and how that artist would be -- what the trajectory was within the company.

So you're not objecting to that, right?

MR. AGNIFILO:  What I'm objecting to is --

THE COURT:  Are you objecting to that?  Let's just make sure -- there are three things.  We know it's an agent or employee.

MR. AGNIFILO:  Correct.

THE COURT:  And it was done while the agency relationship existed.

MR. AGNIFILO:  Temporally, correct.

THE COURT:  Then there is only one thing left.  Was it on a matter within the scope of that relationship?

MR. AGNIFILO:  That's where I object.  I think this could have been a very personal statement made by this person for reasons totally related to whatever this person's relationship was with the other individual.  We don't know that, and that's one of the things that we'd have to explore.  That would have to be established in the examination of the witness testifying.

In other words, there could be a personal relationship where, I don't know, maybe he is trying to get on her good side.  Maybe he is trying to do something by way of friendship or by way of a personal relationship having nothing to do with the agency relationship.

That's my point.  We don't know enough to make the decision as to that particular element of the evidence rule.

THE COURT:  I don't understand how it wouldn't be on a

matter within the scope of that relationship, but --

MR. AGNIFILO:  Can I give a suggestion?

THE COURT:  Ms. Comey, let me just ask you a question. Mr. Cruz was victim number 1's manager.

MS. COMEY:  Correct, your Honor, employed by Bad Boy.

THE COURT:  He was a manager.

MS. COMEY:  Of her career, and she was discussing her career and the issues he was having advancing her career.  It falls within the heartland of his obligations as an employee.

I would point your Honor to the *Pappas* case that we cite on page 11 of our motion which says that liberal admissibility of this sort of proof is warranted because an employee is usually the person best informed about certain acts committed in the course of his employment.  And while still employed, an employee is unlikely to make damaging statements about his employer unless those statements are true.  I think that this statement falls within the heartland of what *Pappas* was talking about.  He is unlikely to say something negative about his boss unless it is true.

THE COURT:  The objection is overruled.

Next, or is there anything else, Ms. Comey?

MS. COMEY:  Not on that topic, your Honor.

MR. AGNIFILO:  Your Honor, what I think the evidence is going to show is that the relationship between these two parties was primarily personal.  Let's just see if that comes

out in the evidence.  Because if that comes out in the evidence, it defeats the admissibility of this.

THE COURT:  I don't think it does, so the objection is overruled.

Ms. Comey, anything else that we can productively do here before we come in on Monday?

MS. COMEY:  There were a few things that we wanted to put on the record, if that's all right, your Honor, about things that the parties have conferred about and reached agreement about.

The first is, the parties have conferred about opening statements.  Neither party will be using any demonstratives, so there is no need to exchange those or review those.

We have also discussed potential topics of cross-examination with respect to the government's first three witnesses, and the defense has agreed not to cross-examine those three witnesses on certain topics that were raised in our briefing.  So with respect to the escort, they have agreed not to cross-examine him about the past allegations and certain domestic issues that were raised in the redacted portion of that brief.

With respect to the individual number, I think it was three or four -- I'm sorry.  I can't remember the number, but with respect to that first witness, they agree not to cross-examine that witness with respect to the one issue we had

flagged in our footnote.

And with respect to victim 1, I will turn to Ms. Johnson to put on the record what the agreement is.

MS. JOHNSON:  With respect to victim 1, we agreed with counsel not to -- they will not cross-examine on certain medical-related topics.  But they have not agreed not to cross-examine on the item we moved on in our motions *in limine*.  It's on page 68 in footnote 18.

THE COURT:  Give me one second.

MS. JOHNSON:  Sure.

THE COURT:  You said page 68?

MS. JOHNSON:  68, footnote 18, number 6.

THE COURT:  OK.

MS. JOHNSON:  The government would respectfully request a ruling from the Court as to whether the defense will be permitted to cross-examine on this.  I think it's squarely incidents that do not go to credibility and should be precluded on cross-examination.

THE COURT:  Is there a response?

By the way, why is this redacted?  Why are we speaking in riddles here?

MS. COMEY:  Your Honor, it's redacted because if the motion is granted, then this potentially embarrassing material wouldn't become public at trial.

THE COURT:  Well, the question is whether it's

admissible as evidence and will be presented to the jury, right. You're just saying, as a general matter, as a matter of prudence, if it's not going to come in in evidence, you would prefer it not be public.

MS. COMEY: Yes, your Honor. There are some more inflammatory allegations and issues raised in those footnotes as well. So if your Honor wanted us to go piece by piece, we could do that.

THE COURT: No. Right now I'm not so concerned about the redactions, although I am somewhat concerned about them. Right now I am concerned about being able to address things like this in open court without having to speak in ways that would prevent us from effectively communicating.

MS. COMEY: That is fair, your Honor.

THE COURT: We are not going to do that. So we are going to talk about it however we are going to talk about it so we can get to the right answer.

MS. COMEY: That is fair, your Honor.

THE COURT: Who from the defense would like to address that?

MR. AGNIFILO: I'll handle it, Judge.

I think all we want is, we want to have that decision made both by us, and in terms of any ruling from your Honor, after the direct. If the witness testifies to certain things about herself and how she is and how she isn't, these things

could be relevant.  If the witness characterizes certain interactions a certain way and says certain things about her own nature, they could be relevant, and we could want to ask about them.  We may make the decision not to ask about them.  But without the direct examination we can't possibly know the answer to that question.

THE COURT:  Help me out.  In terms of item 6, which seems to be the only thing at issue --

MR. AGNIFILO:  Yes.

THE COURT:  -- on what grounds are you suggesting that questions and answers on this particular topic would be admissible?  What is the argument?

MR. AGNIFILO:  If she were to say, I'm a peaceful person, I'm not violent, I'm not the kind of person to engage in hurtful conduct or some form of violence or to be aggressive in any way, that would be relevant.

THE COURT:  But, otherwise you're not going to ask about it?

MR. AGNIFILO:  No.  I'm not hemming myself in --

THE COURT:  I am not trying to hem you in.

MR. AGNIFILO:  I'm not suggesting that.

There are different variants of that kind of testimony that I think would make this relevant.

THE COURT:  Fair enough.

Ms. Johnson.

MS. JOHNSON:  Your Honor, respectfully, we do need a ruling on this because --

THE COURT:  Why?

MS. JOHNSON:  We need a ruling because we can't leave it open.  If the defendant is going to cross on this particular topic, which these are two completely unrelated incidents to everything else she will be testifying about, the government is able to draw the sting on direct, and we would do so.  So we cannot save this until after her direct examination and make this decision in cross-examination.

The question is whether this is an appropriate topic for cross, and it simply does not go to her credibility.  She will not be testifying that she is a peaceful person.  If she does, then I would agree with Mr. Agnifilo that that could potentially open the door.  But absent that, this conduct just simply doesn't go to her character for truthfulness and should be precluded.

THE COURT:  I can't preclude it, not having heard the direct.  I think that's Mr. Agnifilo's argument, is that we don't know what the direct is going to be.  There are some versions of the direct where if victim number 1 testifies that in general terms she has been a peaceful person, maybe that comes out and the government doesn't correct that impression with questions about instances of violence.

Then you'd agree, under those circumstances, the

defense would be able to ask questions about this, right?

MS. JOHNSON:  Your Honor, I think the government would agree that absent door opening, like -- put another way, if the door -- if the door is open on direct, I think that is a different question.

THE COURT:  So maybe we have an agreement.

Mr. Agnifilo, you're just saying that if the door is open, if at the time that you start cross-examination the door is open, you are going to walk through it.  Am I right about that?

MR. AGNIFILO:  I'm not viewing it as a door open issue.  I'm not limiting it as to credibility.  I don't know that any of these things relate to credibility.  I think they very much relate to the nature of this person, and the nature of this person is directly relevant to the issues that she is going to testify about.  We are not going to say, you did this; therefore, you lack credibility.  We are going to say, you did this and that is in your nature.

And so I don't see this as a door opening issue.  I see this as a wholesale relevant matter that becomes far more relevant based on how they handle her direct and what she testifies to.

I think some of these issues are right in the heartland of some of the big issues in this case, and so I think what -- my proposal is, we wait for the direct, we see

what the relevant issues are, not so much to credibility,

although credibility is also an issue, but also to how she

depicts herself and her nature for peacefulness or nature for

getting in physical altercations with other people, and we see

where we are after that happens, and your Honor makes a

decision at that point.

THE COURT:  That's what Ms. Johnson just said.  If

they open the door, then you can walk through it.  That's why I

asked you the question.  I am trying to understand, and you're

not really helping me, what the independent ground of

admissibility of the type of testimony you're pointing to is.

Meaning, regardless of what the government does, are you saying

that it's admissible, that you can definitely ask her about it,

or are you saying the government has to -- depends on what the

government does on direct?  Because Ms. Johnson is spotting you

that you can listen to the direct and then say, well, they

opened the door and they said X, Y, and Z, and now this comes

in.  They understand that you are going to take that position.

MR. AGNIFILO:  I think it's independently relevant to

show that she is a strong, capable individual who does not shy

away from confrontations.  My point, and I apologize if I

didn't come across as helpful, I don't think the door opening

analogy is a useful one here because I think it's independently

relevant, and I think it becomes more relevant depending on

what her testimony is.

That all being said, I think it's relevant to her nature, her nature for peacefulness, the fact that she is a strong person who is capable of starting physical confrontations, and I think that it's independently relevant. I think it becomes possibly more relevant based on the direct, but I think there is independent relevance to these things.

MS. JOHNSON:  Your Honor, if I may respond to Mr. Agnifilo?

THE COURT:  Just hold on for one second.

Mr. Agnifilo, in responding to the government's argument, so this is on page 23 of your brief, the only issue -- this is what you say.  You say:  The motion focuses on rule 608(b) and it is true, as the government argues, that rule 608(b) only permits questions on cross that relate to an act of dishonesty.  So it is thus true that, without more, rule 608(b) would not perform a cross-examiner to ask a question about a witness' prior instance of domestic violence, for instance.

You indicate that there are other methods of impeachment, but none of those issues would be presented as to the specific instance that we are talking about.  So it seems like maybe we are in agreement that the only reason that would come up would be if the government made an issue that would go to credibility.

And you can let me know if I'm missing something.  I want to think about it and make sure I have heard all the

defense's arguments.

MS. JOHNSON:  Your Honor, may I respond?

THE COURT:  Yes.  Now you may respond.

MS. JOHNSON:  Thank you.

THE COURT:  And then Mr. Agnifilo will respond to what I just raised.

MS. JOHNSON:  Thank you.

The argument that Mr. Agnifilo just made is squarely prohibited by 404(a).  He has just asserted that they want to use this testimony to suggest other traits, other character traits about victim 1, that she is a strong, capable individual, capable of starting physical violence.  That is squarely inadmissible.  That is why we need a ruling on this because the only thing that they can cross-examine on is character for truthfulness, and these incidents do not go to character for truthfulness.

MS. SHAPIRO:  May I respond?

THE COURT:  Yes.

MS. SHAPIRO:  I was actually just going to raise 404 because it actually falls under one of the exceptions, which is (a)(2)(B), which a defendant may offer evidence of an alleged victim's pertinent trait.

And the reason it's relevant is that this -- the sex trafficking charges, one of the elements is coercion and whether -- how a reasonable person in the victim's position

would respond.  And her character for -- it's not about her character for truthfulness.  Whether these incidents occurred may become relevant to rebutting the government's argument that she was coerced because she is a strong person, etc.

And so it's highly relevant, the whole dynamic between these two individuals is at the very heart of this case and at the very heart of whether or not the government can sustain its burden to prove the coercion element of the sex trafficking charge.

THE COURT:  Your point is, under normal circumstances, the government is correct that you would proceed under rule 608, but in the context of an alleged victim, then rule 404(a)(2)(B) applies, and, for that reason, you can bring in this evidence of an alleged victim's pertinent trait without regard to any issue of credibility, and this doesn't run into any issue with rule 412, so there is no issue there.

MS. SHAPIRO:  Correct, your Honor.

THE COURT:  In fairness, that was not raised in the defendant's response to the government's motion *in limine*.

MS. SHAPIRO:  I understand, your Honor.

THE COURT:  There was a lot --

MS. SHAPIRO:  There was a lot going on, and there were many statements and many witnesses, and we tried to be brief in that particular response since our main point was that these issues should be deferred for trial.

THE COURT:  Ms. Johnson, do you have a response to that argument based on 404(a)(2)(B)?

MS. JOHNSON:  Well, first, these incidents have nothing to do with victim 1 and the defendant, so I submit that they are irrelevant to coercion.

But I do think this is a new argument that the just been raised now.  The government would appreciate a chance to review some of the cases and to get back to the Court, as this was not raised earlier.

THE COURT:  That's fine.

Ms. Shapiro, what is the pertinent trait again?  Can you just explain what the trait would be?  Why would the victim's propensity for violence be relevant -- be a pertinent trait?

MS. SHAPIRO:  I would argue that it goes beyond that. That's part of it, but also it goes to whether she is a strong or weak person who could be coerced in the manner required by the statute.

THE COURT:  The idea is that if there are instances of violence that she perpetrated, that would undermine --

MS. SHAPIRO:  It would undermine the idea that her will is being overborne by the defendant because she is too weak to fight back or stand up for herself.  And the government will argue that she was coerced into the sexual activity because of violence by the defendant against her, and it is

highly relevant to illustrating that, because of her character, that is not accurate.

THE COURT:  I can't hear.  What were you saying?

MS. SHAPIRO:  What I was saying was that the evidence -- the government is going to argue that because of the violence committed by the defendant against her that she was coerced into the sexual activity.  That's going to be part of their argument in the case.

And to the extent that she indicates -- and evidence that in other instances she has been aggressive and violent is relevant to her strength, whether her will would have been overborne, whether violence by the defendant in fact establishes what the government is trying to say.

THE COURT:  That is a stretch.  I'm not seeing the connection.  That is highly attenuated.  The idea is that someone who has committed an act of violence in the past can't be subject to coercion?  I'm not even sure that that would be relevant to coercion in a particular separate instance.

I think the government's point is, even if, generally speaking, it is correct that victim number 1's -- evidence could be brought in as to a pertinent trait, I think they are saying, this is not in any way, shape, or form pertinent or relevant to a pertinent trait.

MS. SHAPIRO:  I think the jury instructions that we have submitted, and they are based largely on the *Sand*

treatise, I think it's pretty clear that the element of coercion provides that the jury, in determining whether the defendant made a threat of serious harm, that could reasonably be believed by the victim was a threat of serious harm, that the jury is supposed to take into account various particular traits of the victim, including the victim's physical and mental condition, etc., and so it's all relevant to that. Her nature as a peaceful person, whether she is a strong or weak person, all of those things are relevant to determining whether a person in her position would reasonably believe that the defendant was coercing her.

THE COURT: On your argument, based on the allegation of coercion, any history of violence involving the victim is fair game under this rule.

MS. SHAPIRO: It could be. As Mr. Agnifilo indicated, we are not saying that we are necessarily going to go into this, but -- it may depend on the nature of how the direct goes.

THE COURT: You already won on that issue.

MS. SHAPIRO: We want to reserve the right, if it becomes relevant during the direct, to raise this, and we believe we are entitled to do so, not just on credibility, but because it relates to pertinent character traits that are going to be relevant to the analysis of whether or not she was coerced by Mr. Combs.

THE COURT:  If that's what you're saying, then I don't know that the government disagrees with you because they are just saying -- you're giving a new door to be opened.  You're saying that if the government were to open the door, either as to rule 404 or rule 608, then you are going to walk through that door.  I think the government says, yes, we understand that.

But I don't hear you saying that, independent of anything the government does, this evidence would come in because a history of violence of the victim -- I'm not seeing the connection between that and coercion because strong people can be coerced just like weak people, right?  Even if that were relevant, the strength or weakness of a person is not the issue.  We are talking about a prior unrelated instance of violence against a third party.  So there is like a series of linkages that you have to make to get to something that was probative.

MR. AGNIFILO:  Your Honor, can I add one thing to the mix?

THE COURT:  Sure.

MR. AGNIFILO:  These are things that the defendant was aware of.  And the relevance there is, we are going to take the position that there was mutual violence in their relationship.  We are absolutely 100 percent going to take that position, that there was hitting on both sides, there was that kind of

behavior on both sides.  I think we are probably going to refer to it as domestic violence.

And it's relevant in terms of the coercive aspect. What would have to happen in Combs' mind for domestic violence, which we are absolutely admitting, and we are going to admit it in the opening, and we are probably going to admit it for every witness where it's relevant.  Worse than that, it becomes coercive.

So it's relevant that Combs knows that victim 1 has engaged in this behavior and has this nature, not just because he knows it innately, but because there is actual activity that he is aware of that would cause him to think, while we have domestic violence in our relationship, it's not coercing her to do anything because of what I have seen and what I have come to understand is the way that she is around some of these issues. And so --

THE COURT:  You're saying that it's not -- your argument will be, there is not coercion.  They are just violent.  She was violent.  And if the government is saying that he was violent, they can take that position, but we are entitled to show that there was mutual violence, so it wasn't coercion.  So when you show evidence that the government says goes to coercion, the jury should understand that there was -- if they are showing violence on one side and you can show, well, there was violence on the other side, so you have to

understand that dimension of the relationship.

MR. AGNIFILO: Correct. Not so much that it couldn't be coercion; that it's relevant. It's relevant. We are not saying it's dispositive. We are saying it's relevant.

THE COURT: Ms. Johnson, anything, last words?

MS. JOHNSON: Yes, your Honor.

Mutual violence is not what these two incidents are about.

Mr. Combs is not present, I know for certain, at one of them. I'm not positive of the other, but I don't believe he is. So I don't understand how either of those could feasibly establish his knowledge of these incidents.

But stepping back, we would push back on the idea that any evidence of coercion opens the door to this kind of character evidence, and we would request an opportunity to look into this new argument that was raised today further and submit a letter on that to the Court.

THE COURT: That's fair. I'm trying to get as much information as I can because I understand the government's concern is that this is going to happen on Monday. So I will be prepared to give you a ruling right when we start on Monday so you can know what's coming.

MS. JOHNSON: Thank you, your Honor.

THE COURT: If anyone wants to submit a letter on that over the weekend, I'll be here to read it.

Thank you for that.

Any other issues that the government would like to raise or put on the Court's radar?

MS. JOHNSON:  Just one other item I believe to put on the record, your Honor, with respect to the videos related to the Intercontinental Hotel.  We discussed this with defense counsel, and we intend to offer -- just to advise the Court that we intend to offer the two videos that were recorded by one of the guards on his cell phone, and we intend to offer three of the videos from the CNN broadcasts that were corrected by our expert.  We understand that the defense has no objection to that, as long as we later call our expert to testify.

THE COURT:  That resolves the issue concerning the video.

MR. AGNIFILO:  Yes.

Just so your Honor understands, we don't need it being subject to connection.  I think that's sort of what's happening.  Because what the government has assured us that they are going to do, and we rely on them, is they are going to call Mr. Piazza, their expert.  And so long as we do get a chance to ask Mr. Piazza a few questions, I don't think it's going to be a long cross-examination, we have no problem because I understand they want to get to the third witness as quickly as possible.  So we kind of forewent, I think, something that we could have done, which is to say, you have to

call Piazza first.  We are not doing that, as long as they agree to call Piazza at some point.

THE COURT:  I am hearing that there is no dispute.

MR. AGNIFILO:  Yes, Judge.

THE COURT:  There is an agreement on what's going into evidence.  So ordered.  That sounds good.

On that note, does the Court have the government exhibits and 3500 material, or is that coming in today?

MS. JOHNSON:  Your Honor, that will be coming in today.  We will be able to transmit the vast majority of it in our file-sharing platform.  We do have a drive that we will drop off to your Honor's chambers that contains the more sensitive material that will be encrypted.

THE COURT:  Anything further?

MS. COMEY:  We have one last issue to put on the record, your Honor.

Mr. Agnifilo and I were conferring, because our goal is not to raise objections in the middle of opening statements, so I flagged for him a concern that I had, and I think we have reached agreement on it.

Revisiting the subject of other people who may have paid for escorts and Mr. Combs' knowledge of that, Mr. Agnifilo and I discussed the potential relevance of that kind of evidence, and I think we have reached the understanding that to the extent there will be argument or evidence that Mr. Combs

was aware of other people paying for time and thinking that paying for someone's time was different than paying for sex, I think that that's an argument that they can make.

But to the extent that the argument will cross the line over into suggesting that Mr. Combs was aware that other people were paying for sex and therefore thought it was OK for him to do the same thing, we think that would be objectionable because knowledge of its illegality or intent to break the law is not an element of the Mann Act charge. The intent is to pay for sex.

As long as the arguments and the evidence go to that intent, we don't plan to object, and we just wanted to put that on the record.

THE COURT: Mr. Agnifilo, are you planning to go there?

MR. AGNIFILO: No, I don't think we are planning to go there.

All we are talking about -- what Ms. Comey came to me, and I appreciate it, was, she said, if you do this, I would probably object during the opening, so we had a discussion about that.

I am not taking a position on any legal matter at this point. What we have agreed to do is to phrase that part of the opening to avoid an objection, just so we could not have to deal with that.

THE COURT:  I would like there not to be any objections during openings, so I appreciate the parties having addressed these things.

MR. AGNIFILO:  Yes, Judge.

THE COURT:  We will have that.

Ms. Johnson.

MS. JOHNSON:  I'm so sorry, your Honor.  I remembered one more thing I just wanted to flag for the Court.

I believe the Court is sitting a slightly different day next week, at the government's request, to accommodate our timing issue.  We just wanted to flag for your Honor that we may need to take slightly more frequent breaks to accommodate the witness, and the witness or the government will flag that for the Court.

THE COURT:  Do you have an interval?

MS. JOHNSON:  I would hope every 90 minutes.

THE COURT:  Every 90 minutes.  What I'd like to do is just do it myself, without having an inquiry in front of the jury about the reasons for a break.  I'd rather it be on me that I'm taking a lot of breaks --

MS. JOHNSON:  Sure.

THE COURT:  -- so that there is not any issue of the jury thinking one thing or another about the reason.

And so if it's 90 minutes, then I'll take 90 minutes.  But then if you see something and you feel like you need a

recess, I don't think you need to ask the witness.  I think you can just request a brief recess, and we will take it.

MS. JOHNSON:  Understood, your Honor.  We will take it.

THE COURT:  To the defense, anything, Mr. Agnifilo, to raise on your side?

MS. GERAGOS:  Just one thing, your Honor.

We received your Honor's May 12 introduction remarks, which we really appreciate you sending.  We spoke with the government.  We'd ask that your Honor include something about pseudonyms because we will be doing openings right afterwards.  We would request the opportunity to confer with the government on maybe what that would be.

THE COURT:  Yes.  If there is an agreed-upon modification to that, that's the reason why we sent it out, just so the parties could talk, anything you want to add by mutual agreement, let me know.  If there is a disagreement, then I'll look at it, and we will make a decision, but I'm happy to do that.

MS. GERAGOS:  Thank you.

MS. COMEY:  I'm confident we can agree to that, your Honor.

THE COURT:  Anything more?

MS. GERAGOS:  Not from us.  Thank you.

THE COURT:  Thanks to everyone.

We will be looking for any letters over the weekend. If there are further submissions today, we will take a look at it. Otherwise, get some rest and see everyone here on Monday morning.

MS. COMEY: What time should we arrive on Monday for the peremptories, your Honor?

THE COURT: We will have the jury in by 8:30. Everyone should be here by 8:30. I'm sure there be issues for the Court to address with the parties. If the jury is not fully assembled at 8:30, we will make good use of that time, and we will try to get started as soon as we can so we can really get started with the instructions and openings at 9:30.

MS. COMEY: Thank you, your Honor.

THE COURT: Thank you very much.

(Adjourned to May 12, 2025, at 8:30 a.m.)