P63Ccom1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
UNITED STATES OF AMERICA,

      v.                              24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

         Defendant.                  Trial
-------------------------------x
                         New York, N.Y.
                         June 3, 2025
                         8:45 a.m.
Before:

              HON. ARUN SUBRAMANIAN,

                         District Judge
                         -and a Jury-

                 APPEARANCES

JAY CLAYTON
    Interim United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
    EMILY A. JOHNSON
    MAURENE R. COMEY
    MEREDITH FOSTER
    MITZI STEINER
    MARY C. SLAVIK
    Assistant United States Attorneys

P63Ccom1

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
      Attorneys for Defendant
BY:  MARC A. AGNIFILO
      TENY R. GERAGOS
      -and-
HARRIS TRZASKOMA LLP
BY:  ANNA M. ESTEVAO
      -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
      JASON A. DRISCOLL
      -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:   Lucy Gavin
                Shannon Becker
                Paralegal Specialists

                Raymond McLeod, Paralegal

(Trial resumed; jury not present)

THE COURT:  Let's start with GX 10C-114.  Yesterday, I asked the government how does this get into evidence, and in response I received this letter, which just cites to a bunch of cases.  But let's try to work this out and figure out if the government can get this into evidence.

As I understand it, the starting place would be Rule 1002, which says an original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise.  So that's the default rule that, under normal circumstances, you would have the original.  We don't have the original here as we addressed previously.  So under Rule 1004, an original is not required and other evidence of the content of a writing, recording, or photograph is admissible if... and there are various provisions, which the Court has previously held apply in this circumstance.

So given that, Ms. Johnson, I take it that the government's submission is the original in this context was not snippets of video taken out of context, but instead the original would have been the uninterrupted surveillance video, which would have gone from time 1 to time 2, and for that reason, under Rule 1004, the properly admissible other evidence would be the compilation of the videos showing the sequence, which approximates the original, which the government does not

P63Ccom1

have anymore; is that all true?

MS. JOHNSON:  Yes, your Honor, that's true.  And I think that's true in this case.  In some other cases, there are some different bases for admitting videos of this sort, but I agree with your analysis here.

THE COURT:  In this case, that's the most straightforward way to explain why this would be admissible under the rules, and then the only, I suppose, missing link would be some evidence under Rule 1004, preponderance of the evidence to just explain that the original would have been an uninterrupted cut.

Let me ask you, is Mr. Garcia competent to address that question, given his role in working in the security department?

MS. JOHNSON:  I defer to Ms. Steiner on that issue.

MS. STEINER:  Your Honor, I had not intended to inquire of this witness about that.  He has knowledge generally of where the video surveillance was located and when it was running.  I'm not sure whether he had knowledge about the continuous nature.

THE COURT:  You can ask him about that?

MS. STEINER:  Yes.

THE COURT:  I'm not saying it's necessary to meet the government's burden under the preponderance standard because I think we've had some testimony about this and I'm not sure it's

really disputed that if the original surveillance cut had been pulled, it's not just five seconds of video out of order, it's you get the cut of whatever time period you're looking at and you pull it off. And there might be testimony already in the record about that. But I think that's the most straightforward way to get that into evidence. And given the adjustments we've already made, that we're not using the corrected cellphone video, there wouldn't be a 403 problem since we're talking about videos that are in evidence as to which the parties have had discussions and we're just sequencing them in the way that would be other evidence of what the original would have showed if it existed.

So I think the sequence here is to have Mr. Garcia testify and then you can make an application to admit this exhibit and then I'll consider it at that juncture.

Of course I'll hear Ms. Geragos, from you, in response.

MS. GERAGOS: Thank you, your Honor. I just want to address what you said this morning. I think you stated, if I have it right, that the original would have been the uninterrupted surveillance video, which would have gone from time 1 to time 2, and maybe I'm not understanding this properly, but the original surveillance footage would not have been cut the way that it's cut in the compilation video in 114. 114 combines the corrected surveillance footage in a way that

P63Ccom1

does not mirror what the original would have been --

THE COURT:  In what way?  Can you help me out with that.

MS. GERAGOS:  Yes, because if you have it in front of you, and maybe we can pull it up, it's taking it from several different camera angles.  So the original video footage would have had the several different camera angles we have now, it just would have been slower in the way that it has been corrected.  So it would not have shown this kind of, you know, from the hallway, then from the elevator bank, then from the other side of the hallway, then from this part of the hallway. It would not have been in the way that it is currently presented in 114.

And the additional problems with 114 is that it doesn't --

THE COURT:  You're not disputing that it is in chronological order, right?

MS. GERAGOS:  I guess I'm not disputing it, but I think what your Honor will see from Piazza's testimony is that the hallway footage has different timestamps than the elevator footage.  So the hallway footage looking at where I guess Mr. Combs's room would have been is at a different timestamp than the elevator bank footage.  And so we can guess and assume that it is in chronological order, but just based on the timestamps themselves, they're not in chronological order in

P63Ccom1

terms of what the timestamp is.  And so it's misleading.

THE COURT:  In what way is it misleading?

MS. GERAGOS:  Because of the timestamps.  And so it's misleading --

THE COURT:  I asked you if you you're disputing that it's in chronological order and you said, I guess I'm not disputing it.

MS. GERAGOS:  The cameras are on two separate systems. I think that's what Mr. Flores testified to.  And so I suppose it's -- it might be in chronological order, but then we don't know how many minutes are actually missing.  And so it will leave the jury with the misimpression that this is all happening very quickly, when it's actually not, because of the timestamps, and all of the footage that's missing because of the motion sensor.  It's just a misleading video and there's no reason for it to be admitted.  We have no issue with it being a demonstrative.  But the time, the chronology here is not what's at issue.  And so I don't understand the case that the government cited to.  I'm blanking on the name at the moment. It seemed like the chronology of the videos were the issue at the trial.  And so that's why the compilation was admitted into evidence.  Here, that's not the issue at the trial.  And so --

THE COURT:  The way the compilation -- now you viewed this exhibit, Ms. Geragos?

MS. GERAGOS:  I haven't viewed the updated, but --

THE COURT:  Do we have the exhibit?

MS. GERAGOS:  I believe.  We can play it right now. If your Honor sees here, this is what I'm talking about in terms of these videos, the hallway footage looking at what would have been Mr. Combs's and Ms. Ventura's room, that footage starts at 11:16.  It's a different timestamp because it's on a different system of the other footage, which you'll see right now, and that's at 11:10.  We assume, right, but we don't know for certain, I suppose, that it's at the same time. Then it shows her coming out.  That's at 11:10.  So those two systems have it at 11:10.  The other hallway footage, as you see, has it at 11:16 multiple seconds later, but you don't know that with the compilation because you don't see that -- if you could just pause it really quickly.  You don't see the time period in between those, you know, how long she is in the elevator bank before Mr. Combs comes running.  That is itself, what we just watched, is unduly prejudicial.  It makes it seem like he's coming immediately right after her — if you could pause it — when that's not the case.

THE COURT:  So, first of all, let me ask you a question.  So Mr. Piazza, is he going to engage with this exhibit?  Right now it's in as a demonstrative to be used.  Is he going to explain what's going on here, like the different vantage points and the different videos that were used, is that part of his testimony or no?

P63Ccom1

MS. JOHNSON:  Yes, that is part of his testimony.  At a convenient time, I would like to address Ms. Geragos's point about the timestamps, but I defer to your Honor's questions for now.

THE COURT:  Is he going to explain the timestamps?

MS. JOHNSON:  I don't know what he can say about the timestamps.  I defer to Ms. Smyser on that.  But I will say that timestamps on surveillance video are routinely inaccurate.  This is not a surprise.

THE COURT:  I was asking a slightly different question.  You have different cameras that have timestamps that may not accurately reflect the time, but within each camera, the timestamp is running.  So you can tell, when you're using a particular view of the camera, what happened in what sequence and how quickly it happened after the last take from that camera, right?

MS. JOHNSON:  Yes, that is absolutely correct.  In this system, I believe Officer Flores already testified that it is one system with multiple cameras and the timestamps for each camera are consistent.

THE COURT:  You just want this to be in evidence because this is the proper sequence of events.  You're not trying to exaggerate the proximity of different views or anything like that?

MS. JOHNSON:  That's absolutely correct.  We think it

P63Ccom1

is incredibly helpful to the jury to put the sequence in correct order and I don't hear there's any reasonable dispute that this is not the correct sequence.

THE COURT:  Why don't you, just in between each cut, put in a few seconds of black screen so that the concern that Ms. Geragos has concerning things happening right after each other that may not have happened right after each other is not presented, but you'll have the sequence so that if the jury wants to see the chronological sequence of events, then they can look for this exhibit as opposed to the government having to send back 20 different exhibits.

MS. JOHNSON:  Just to be clear with your Honor's suggestion, is that just sort of when there's a jump in time, because some of the angle, like some of the timestamps are continuous.  So, for example, we switch angles and there's a different timestamp, your Honor would be suggesting to put a black screen there?

THE COURT:  I think that's right, if I'm understanding you.

But Ms. Geragos, you're standing up.

MS. GERAGOS:  Sorry.  I don't want to interrupt her.

THE COURT:  This is the kind of thing the parties can work out under that framework because I'm not hearing a dispute that the chronology is wrong, I'm hearing now that the dispute is that because of some of the jumping timestamps, you can't

string them together with no break between different cuts, there needs to be at least some break.

MS. JOHNSON:  Just as a practical matter, Mr. Piazza could not practically do that this morning and also testify.

THE COURT:  Practically do what?

MS. JOHNSON:  Practically insert the screens your Honor suggests.

THE COURT:  That's okay because the underlying exhibits are already in evidence, right?

MS. JOHNSON:  They are, but we would need to put this compilation in through him as the person who created this compilation.

THE COURT:  He created it?

MS. JOHNSON:  Correct.

THE COURT:  But he could put it in and then it would be subject to the introduction of the black space, right?  What would be the problem with that?

MS. JOHNSON:  May I just confer with Ms. Smyser, who is putting on Mr. Piazza.

MS. SMYSER:  Sorry for jumping around here, your Honor, but I may be able to more easily address these technical questions.

I think, first of all, technically, we would need to introduce this with Mr. Piazza and I with would want him to explain why those black screens exist while he is on the stand.

P63Ccom1

He is prepared to testify right after Mr. Garcia, so making those corrections practically is impossible.

I also don't think that they're necessary here. It doesn't seem like Ms. Geragos is raising a real issue with the sequence of events, and how Mr. Piazza has strung this together is not to do so in a misleading way. He has strung together the video footage that exists, and then at certain points when different angles show the same thing, he has inserted those different angles in, but he is not shortening the footage that exists from the continuous sequence of events here. I really don't think that there is some misimpression created by the compilation, that there's skipping in the video. There are certain times when the timestamp does skip because of the motion sensor camera, but Mr. Piazza is going to explain that while he's on the stand. It's not him who is taking things out of the video, that's just simply the video that exists because the camera --

THE COURT: You're saying that at no point in this video is there a clip that is shown as happening right after the last clip, but in fact did not happen right after that last clip?

MS. SMYSER: Not to my knowledge, your Honor. If the defense is seeing something different, I would love to know, but that's not my understanding as to what is happening in this video.

THE COURT:  So you're going to explore that with Mr. Piazza, you're going to go through this with him?

MS. SMYSER:  Yes.

THE COURT:  And the defense can cross examine him on those same issues?

MS. SMYSER:  Of course.

THE COURT:  And there would be no issue on offering this into evidence on his redirect examination because I said that it could be used as a demonstrative, so you can use it with him as a demonstrative, we could get the full record based on the direct and the cross, and then you could put it in on redirect if there's a sufficient basis to put it in.  Is there any reason not to do it that way?  Because right now, if we do it on your direct, to the extent the defense has some issue they want to raise on cross and they can only do it by asking Mr. Piazza exactly what he did, then we'd have to wait until the cross, unless you wanted him to be able to -- I mean, if you want to on this phase of the direct allow the defense to interrupt your direct to ask those questions, I'm happy to allow that, as well.  But it seems just easier for you to, on redirect, say, you remember we talked about this video and address anything that came up in the cross, and then offer into evidence at that point.

MS. SMYSER:  Sure, your Honor, we're happy to do it that way.  If the defense doesn't raise any issues with the

P63Ccom1

sequence of events or the compilation, I would still ask permission to offer it.

THE COURT:  Maybe you don't have any redirect and you just get up and offer it into evidence.

MS. SMYSER:  Understood.  Thank you.

THE COURT:  Let's handle that that way.

Next issue is GX A-905-A.  Let me hear from the defense.  The government has raised multiple bases to admit this exhibit under the hearsay rules.  If it's not hearsay or if it fits into an exception to the hearsay rules, then their point is that, yes, this exhibit may be prejudicial, but it's not unfairly prejudicial because it is highly probative.  To the extent it is prejudicial, it's only because it is highly probative.  So, really, from the defense's perspective, it seems like you need to make a good argument for why this either isn't hearsay or it is hearsay and it does not fall into any exception.

MS. GERAGOS:  Could you give us one moment, please?

THE COURT:  Yes.

MS. GERAGOS:  Thank you.

(Pause)

Our argument, I believe, is that it is hearsay.  I think there are multiple issues with this document.

THE COURT:  First, you don't dispute that Mr. Combs's statements would be admissible, correct?

P63Ccom1

MS. GERAGOS:  No, I don't dispute that, your Honor.

Has this been revised?  I'm looking at page 4 --

THE COURT:  I hope I have the right one.

MS. FOSTER:  Your Honor, the only part of this that was revised, and we did this in order to potentially resolve any issues, was we just redacted some of the personal conversations that involved some of the personal --

THE COURT:  I saw that.  I was going to ask you about that.

MS. GERAGOS:  Yes.  So that was one of my biggest concerns was, Ms. Johnson and I had actually, during Ms. Ventura's testimony, kept a lot of that out with respect to this specific individual.

THE COURT:  Ms. Geragos do you want to take a minute or two?

MS. GERAGOS:  Yes.  Thank you.

(Pause)

Your Honor, to streamline things, would you mind if we took this up at the break or is this something that needs to come in before Mr. Garcia, if I could just review the revised one and we just address it at the break, that way this can be streamlined and not waste any more time.

THE COURT:  Ms. Foster.

MS. FOSTER:  That's fine.

THE COURT:  So with that, any further issues to

address before we bring the jury out?

MS. SLAVIK:  Your Honor, there's just one thing that I wanted to flag for the Court.  To be clear, this is not something that needs to be resolved immediately.  I just wanted to flag for the Court and for defense that after the cross-examination of Mia, which, over the course of two days, involved a very significant amount of time reviewing social media posts and inferring that Mia must be lying about the assaults she endured if she posted celebratory birthday messages for the defendant.

Given that extensive line of cross-examination, the government is considering offering excerpts from the defendant's recorded jail calls.  Your Honor might remember that this came up to a certain extent in November of last year in which the defendant has extensive discussion about planning a social media campaign around his birthday.  We would propose offering certain excerpts of those calls.  Our plan is to mark and produce those excerpts this evening to defense counsel and --

THE COURT:  What's the basis for admission?

MS. SLAVIK:  Your Honor, these are the defendant's statements.

THE COURT:  Understand.

MS. SLAVIK:  And they're relevant because we would be offering these calls both to corroborate Mia's testimony and --

THE COURT:  On what issue?

MS. SLAVIK:  On the fact that Mia felt compelled to post these birthday messages, that she would be in trouble if she didn't.  And also to rebut the really inescapable inference that the defense was asking the jury to draw, that she must be lying about the assaults because she posted these birthday messages.  I think the messages the government plans to excerpt will show that the defendant views his birthday and social media around his birthday as a marketing opportunity, as an opportunity to change the narrative, as an opportunity to shape public perception and to generate publicity about both him and his businesses, and for those reasons, we think the jail calls are both admissible and probative here.  We'll explain further in a letter to the Court.  There's nothing that we're asking you to do now.  I'm just flagging this issue for the Court.

THE COURT:  Understood.  Thank you.

MS. JOHNSON:  Sorry, your Honor.  One additional issue we just wanted to put on the Court's radar.  The government has become aware of an individual who has broken the Court's pseudonym order with respect to Mia.  That individual was present in the courtroom yesterday and the government saw that individual outside of the courtroom at the end of the court day, broadcasting her name in a public square right outside the courthouse.  We don't see that individual here today, but if we do, we plan to alert the CSOs and the Court and would ask that

she would be excluded.

THE COURT:  In terms of the individual, I take it that you don't have a name, you just have seen -- there was an observation of this person?

MS. JOHNSON:  Right, we do not have his name.  We have seen his YouTube channel in which he says Mia's true name, and we saw that same individual in the courtroom yesterday, and we saw him in Foley Square after court had let out for the day yesterday, appearing to be broadcasting and stating her true name into his phone.  So if we see that individual again today either in this courtroom or in the courthouse, we would alert the Court and the CSOs.

THE COURT:  You can do this in an email, that's fine, copy the defense, submit that to the Court that way we can provide notification to the court security and the marshals and they can be on the lookout now so if this person reenters the courtroom, especially that we have another witness testifying under a pseudonym, we can be ready for that kind of thing happening.  And I'll give another instruction when we get to that point just so everyone is again aware of this.

MS. JOHNSON:  Of course.  We appreciate that, your Honor.

THE COURT:  The separate issue, and I'll check on this, is to make sure in the overflow room the same instructions and oversight is being provided.  I just want to

make sure that that's happening, and I'll do that on my end.

MS. JOHNSON:  Thank you very much.

THE COURT:  Anything else from the government?

MS. SMYSER:  Your Honor, there's one final issue related to Mr. Piazza, and the government and the defense have been in discussions about the cellphone videos.  And so we just wanted to put a few things on the record for your Honor.

So we understand the Court's ruling yesterday that the government in the first instance was not going to introduce the corrected cellphone videos.  I understand that the defense would like to have brought out kind of what happens when you have a cellphone video taken of another video.  So I'm intending to ask Mr. Piazza that question on his direct examination.  I expect he will say that there is some distortion when that occurs, there's some issue with the aspect ratio.

I understand from the defense that they don't intend to make any bigger issue of that on cross-examination, and they don't intend in their closing argument to make any argument that the original cellphone videos, which are in evidence, aren't accurate or aren't a reliable representation of what happened because of those issues.  And they also — correct me if I'm wrong, Ms. Geragos — wouldn't then call Mr. McCourt.

And so, given all of those parameters, the government wouldn't seek to introduce the corrected cellphone videos.  But

if the defense goes into any more detail on cross-examination, then we would.  But we wanted to put this on the record because it involves potential arguments in summation and a concession the government would be making by not seeking to introduce the corrected cellphone videos again.

So Ms. Geragos, please correct me if I've gotten anything wrong about our discussions.

MS. GERAGOS:  That's right, your Honor.  We just want to put that on the record so that you know and that you feel comfortable, the government feels comfortable.  We just want to elicit it if the government asks it on direct, we're not going to cross examine on that point at all, and then we will not be making the argument in summation that there's distortion or he looks more domineering, the aspect ratio is off.  We really just want the jury to understand, as I said yesterday, how we got here.  And the government intends to now bring this out after our discussions and our conferrals on direct examination, so we will not bring it up on cross.  So I just want to make that commitment to your Honor, and then we are not going to argue about it at summation.

But I do want to make it clear, we may call Mr. McCourt in terms of if we need to enhance any audio or video from other aspects of this case.  So I don't want to tell you right now we are not calling him at all — we might.  It's just in terms of this issue we are not going, unless Piazza --

and Mr. Agnifilo would like to --

MR. AGNIFILO:  It's a separate issue, so I don't think we have the two-lawyer-on-one issue.

THE COURT:  It's a loophole.

MR. AGNIFILO:  One of the things I suppose could happen is if your Honor let in the compilation video as a piece of evidence, our issue with it is that it's not faithful to the actual amount of time passing from beginning to end.  And so what I could see doing, if that was a piece of evidence, is having Mr. McCourt, and he's already done this quite frankly, kind of fill in the blank spots and sort of say the camera here, 20 seconds passes and, you know, 20 seconds passes because of the timestamp, but 20 seconds doesn't pass in like stopwatch time if you're watching the video.

So as I was hearing your Honor sort of try to figure out a way to handle this, I think there are a lot of ways to handle this, and I really don't think this is a tremendous issue of dispute.  I think both sides agree that while the video that's being proposed — and that we agree could be a demonstrative — is accurate in terms of then this happened, then this happened, then this happened, then this happened, it's not accurate in terms of the amount of time passing between all those things that happened.

THE COURT:  That has become clear this morning.  And so the time on the video said 10 minutes and 58 seconds.  Do

you know, just offhand, what the actual duration of time is? You told me that it was actually like 40 minutes.  That would be a pretty strong Rule 403 argument.

MR. AGNIFILO:  It's not that long, it's not quite that long.  What I did a few months ago is I actually sat there with my iPhone as a stopwatch and compared it, but I don't have those notes in front of me.

I think this is a relatively easy fix.  I think the thing working against us is Mr. Piazza is going to be on the stand in two hours.  In the meantime, I'm going to be talking with my colleagues to see if there's a way to make this be easier on everybody.

THE COURT:  Where does Mr. Piazza reside?  I mean, is he in New York?

MS. SMYSER:  No, he's in Florida.

THE COURT:  Understood.

MR. AGNIFILO:  We'll keep talking.

THE COURT:  Anything, Ms. Steiner?

MS. STEINER:  Yes, your Honor.  I wanted to flag with the Court, there was an issue with Mr. Garcia's anticipated testimony that we actually included in our letter from June 1. I don't believe it was addressed by the Court yesterday.  This is with respect to statements that I expect Mr. Garcia will testify about from his direct supervisor at the hotel.  I understood when I conferred with the defense that they intended

to raise hearsay objections.  As we noted in our submission, many of these statements are directives and therefore non-hearsay on that basis.  Even when they're not directives, we would be introducing them not for their truth, but to establish their effect on the listener.  Given, again, that this is his direct supervisor, he's acting at his direction and he's going to testify about actions he took in the immediate aftermath of those conversations.

THE COURT:  Just give me one second.

MS. STEINER:  And this is on page --

THE COURT:  I have it here.  Thank you.

Understood.  Does the defense have a response?

MR. STEEL:  Good morning, your Honor.  I don't know if you see the conversation that we're talking about, if you have it in front of you, the exhibit.  But I just believe that it is hearsay, it is not.  I thought the government was saying that it's agency exception, an agent, an employee --

THE COURT:  No, they're saying two things.  One, they're saying that they are commands or directives.  And so under the case that we previously discussed, the *Bellomo* case from the Second Circuit, those are not being offered for the truth of the matter asserted and are not hearsay.  And second, they say that the communications between Mr. Garcia and Mr. Medrano are not for their truth, but rather their effect on the listener and Mr. Garcia, because then he testifies that he

did certain things based on having these conversations with Mr. Medrano. So there are two bases they say overcome the hearsay rule.

MR. STEEL: My position is contrary. I do not believe that these are just directives, these are communications about what to do and how to accumulate the money and the requests for money from Mr. Combs to give him the final copy of the video, one; and two, we don't need Mr. Medrano's statements to explain the conduct. The witness, Mr. Garcia, is here. He can say, this is what I did. So I don't think we need background, I did this because of being directed to do it. That would be my --

THE COURT: That being the case, what's the prejudice?

MR. STEEL: Your Honor, it's just unnecessary --

THE COURT: The record should reflect a pause in response.

Because if I'm hearing you, you're saying what's the point of having these back-channel communications in, but then that could be easily flipped around and say what's the prejudice if the government has offered two independent bases for admission and ways in which this would overcome the hearsay rule.

Now, I haven't heard the testimony, so I only have these representations of what Mr. Garcia is going to testify to. It's going to depend on what the nature of the testimony is.

P63Ccom1

Ms. Steiner, you're putting Mr. Garcia on?

MS. STEINER:  Yes, I am, your Honor.

THE COURT:  It's your understanding that what Mr. Garcia is going to say is going to fit into one of these two things, is he's going to testify he had orders from Mr. Medrano, and if that's it, then that's going to fit under *Bellomo*, and otherwise, he's not going to say, Mr. Medrano said this was happening and this was why we were doing it.  He's not going to say any of that stuff.  He's just going to say, yeah, go do this, go do this.

MS. STEINER:  That's right.

THE COURT:  And tell us the story of what Mr. Garcia was then going to do.

MS. STEINER:  Exactly, your Honor.  So, for example, he would say, Mr. Medrano told me X, I conveyed that message immediately thereafter to Mr. Combs.

THE COURT:  Understood.  On that basis, you can proceed.

If there are objections, Mr. Steel, if it doesn't go that way, then you'll raise objections at the appropriate time.

MR. STEEL:  My understanding is I preserved it, but I'm going to make contemporaneous objections your Honor.

THE COURT:  Good.  Anything further, Ms. Steiner?

MS. STEINER:  No.  Thank you, your Honor.

THE COURT:  Anything from the defense before we bring

P63Ccom1

in our jury?

MR. AGNIFILO:  Nothing from us.  Thank you, Judge.

THE COURT:  Let's get our jury.

One last one.

MS. GERAGOS:  I'm sorry.  I'm not doing Mr. Garcia, but I am conferring with Ms. Comey on Jane exhibits.  And so I would like to be able to leave the courtroom to make sure that gets done so if there are any issues, we can address it at the end of the day.

THE COURT:  Of course.

MS. GERAGOS:  Thank you.

THE COURT:  Let's get our jury.

(Continued on next page)

(Jury present)

THE COURT:  Welcome back, members of the jury.

Before we get started, just a few adjustments to our schedule looking forward that I'd like you to just note down to accommodate some matters in this case.

First, on this Thursday, June 5th, we're going to have a late start.  We're going to start at 11:00 a.m., give you a little extra time in the morning, and we're going to go to 4:00 p.m., just a little bit later.  So that's June 5th.  On June 11th, we're going to not be here in the morning.  We're going to start at 1:00 p.m. and then go to 5:00 p.m.  So we'll have a half day, give you some extra time in the morning and go a little bit later in the afternoon.  On June 20th, so this is after the Juneteenth holiday, we'll be back, we'll start at 9:00 a.m. as usual and we'll go to 1:00 p.m. to accommodate some scheduling issues that have come up.  So you'll have a short day.  It's a Friday, though, so that should be good news for everyone.

With that, the government may call its next witness.

MS. STEINER:  Your Honor, the government calls Eddy Garcia.

EDDY GARCIA,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Mr. Garcia can you give the Court

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P63Ccom1                    Garcia - Direct

your first and last name and spell your first and last name into that microphone, please.

THE WITNESS:  Eddy Garcia, E-D-D-Y G-A-R-C-I-A.

THE COURT:  Ms. Steiner, you may proceed.

MS. STEINER:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. STEINER:

Q.  Good morning, Mr. Garcia.

A.  Good morning.

Q.  How old are you?

A.  I'm 33.

Q.  Are you employed?

A.  Yes.

Q.  What do you do?

A.  Private security.

Q.  Approximately how long have you worked in private security?

A.  About 13 years.

Q.  Directing your attention to March of 2016, who was your employer at that time?

A.  Securitas.

Q.  What, generally, is Securitas?

A.  Security company.

Q.  During what time period did you work for Securitas?

A.  From 2011 to late March, May of 2025.

Q.  Were you working for Securitas in March of 2016?

A.   Yes.

Q.   And where were you assigned to work in March of 2016?

A.   I was assigned at the Intercontinental Hotel.

Q.   Is that in Los Angeles?

A.   Yes.

        MS. STEINER:  Ms. Gavin, if you could please put up what's in evidence as Government Exhibit 2B-124.

Q.   Mr. Garcia, what is this?

A.   That is the Intercontinental Hotel.

Q.   Is that where you were working in March of 2016?

A.   Yes.

        MS. STEINER:  We can take that down.

Q.   In 2016, what was your position for Securitas?

A.   I was a security officer.

Q.   And what were your responsibilities as a security officer?

A.   My responsibilities included watching the cameras, patrolling the hotel.

Q.   I want to direct your attention to March 5th of 2016.  Were you working at the Intercontinental on that day?

A.   Yes.

Q.   What happened during your shift on March 5th of 2016?

A.   I arrived for swing shift and I was notified that there had been an incident.

Q.   What had you been notified specifically?

A.   I was told that there was a domestic dispute earlier that

day.

Q. Did you come to learn who was involved in the domestic dispute?

A. Yes.

Q. Who was that?

A. Sean Combs.

Q. And sitting here today, Mr. Garcia, do you see Mr. Combs in the courtroom?

A. Yes.

Q. And can you please identify him by an article of clothing that he is wearing?

MR. STEEL:  Your Honor, we'll stipulate Mr. Garcia can identify Mr. Combs.

THE COURT:  So stipulated.

Ms. Steiner, you may proceed.

MS. STEINER:  Thank you.

Q. Mr. Garcia, did you receive a subpoena requiring you to testify at this trial?

A. Yes.

Q. And is there also an order compelling you to testify, even if your testimony might incriminate you?

A. Yes.

Q. And what is your understanding of what that order requires you to do?

MR. STEEL:  Objection.

THE COURT:  Overruled.

A.  It requires me to be truthful.

Q.  And if you do that and if you are truthful, what is your understanding of the protections that this order gives you?

MR. STEEL:  Same objection.

THE COURT:  Overruled.

A.  As long as I am truthful, I can't be prosecuted for my testimony.

Q.  Does this order protect you from prosecution for any crimes you're not testifying about here today?

A.  No.

Q.  Does this order protect you if you lie today?

A.  No.

Q.  In other words, could you still be prosecuted for perjury if you lie?

MR. STEEL:  Objection.

THE COURT:  It's overruled.

A.  Yes.

Q.  In March of 2016, about how long had you been working as a security officer at the Intercontinental Hotel?

A.  For a few months.

Q.  And approximately how old were you at that time?

A.  I was 24.

Q.  At that time, who were your immediate supervisors?

A.  The director of security was Bill Medrano, and the

P63Ccom1                    Garcia - Direct

assistant director was Israel Florez.

Q.   What, generally, was your understanding of Mr. Medrano's duties as the director of security?

A.   He was in charge of the security team and letting us know what the hotel policies and how we should go about them.

Q.   What was your understanding of Mr. Florez's duties as the assistant director of security?

A.   He assisted Bill Medrano on anything that needed to be done with the officers.

Q.   Mr. Garcia, do you have a personal relationship with Mr. Florez?

A.   Yes.

Q.   What's the nature of your relationship?

A.   Friendship.

                 (Continued on next page)

BY MS. STEINER:

Q.  Do you still work together?

A.  No.

Q.  When's the last time that you saw Mr. Florez socially?

A.  A couple weeks ago.

Q.  Are you aware of whether Mr. Florez is testifying at this trial?

A.  I was aware he was testifying.

Q.  How are you aware?

A.  I saw a TikTok video that stated he testified.

Q.  You saw something somebody had posted about the fact that Mr. Florez had testified?

        MR. STEEL:  Objection.

A.  Yes.

        THE COURT:  Overruled.

BY MS. STEINER:

Q.  Did seeing that online affect -- will seeing that online affect your testimony here today in any way?

A.  No.

Q.  Did you ever on any occasion discuss any of the substance of your testimony here today with Mr. Florez?

A.  No.

Q.  And did Mr. Florez ever on any occasion discuss any substance of anything he may testify about with you?

A.  No.

Q.  Turning back to March 5 of 2016, what was your shift on that day?  I believe you said it was a swing shift.

A.  Yes, that would be a 2 p.m. to 10 p.m. shift.

MS. STEINER:  Ms. Gavin, can we please bring up for the parties, witness and the Court only what has been marked for identification as Government Exhibit 8E-104.

Q.  Mr. Garcia, do you recognize this?

A.  Yes.

Q.  Generally, what is it?

A.  It's an employee sign-in sheet.

Q.  And did you -- well, for what week is this employee sign-in sheet?

A.  For the week ending in March 10, 2016.

Q.  And did you sign this employee sign-in sheet?

A.  Yes.

Q.  Did you enter information on this sheet at or near the time of your employment that week?

A.  Yes.

Q.  And did you complete the sign-in sheet, like these, in the course of your duties as a security officer at the InterContinental Hotel?

A.  Yes.

Q.  And was entering your hours and time sheets like these a regular practice while you were a security officer at the InterContinental?

P63Wcom2                        Garcia - Direct

A.   Yes.

        MS. STEINER:  The government now offers Government
Exhibit 8E-104.

        MR. STEEL:  No opposition.

        THE COURT:  8E-104 will be admitted.

        (Government Exhibit 8E-104 received in evidence)

        MS. STEINER:  Ms. Gavin, if we could please publish
that for the jury, page 1.

Q.   Mr. Garcia, can you please explain to the jury generally
what this document shows?

A.   It's shows the post, the address, the officers, and their
times in and out of work.

Q.   And is this a time sheet of that work?

A.   Yes.

Q.   I want to direct your attention to the top right-hand
corner.  You mentioned the post.  Can you please read what the
post is here?

A.   InterContinental Hotel.

Q.   This is the sign-in sheet for security officers at the
InterContinental Hotel?

A.   Correct.

Q.   And looking at the top middle of the page for week ending
date, can you please read the week ending date?

A.   Yes.  March 10, 2016.

Q.   And looking at the first column on the left-hand side,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P63Wcom2                     Garcia - Direct

what's included under employee name?

A.   The officer signature.

Q.   Is that also names of officers that were on duty?

A.   Correct.

Q.   And looking at the remainder of the columns to the right of that, what's included under each date?

A.   The time in and time out.

Q.   And is this the dates for that full workweek?

A.   Yes.

Q.   OK.  Do you see where your name has been highlighted on this page?

A.   Yes.

Q.   Can you please read, looking at the second column, when you signed in and out on March 5 of 2016?

A.   Yes.  Signed in at 1400 and signed out at 2200.

Q.   And did you sign under your name to indicate that?

A.   Yes.

        MS. STEINER:  And if we could turn to page 3, Ms. Gavin.

        And if we could highlight Mr. Garcia's name, please.

Q.   What generally is reflected on this page, Mr. Garcia?

A.   My name.

Q.   And what hours are indicated?

A.   2200 to 0000 and 0000 to 1:30.

Q.   And what are those hours for this -- first of all, are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

these hours for March 5 of 2016?

A.   Yes.

Q.   From that shift?

A.   Correct.

Q.   And what do these additional hours indicate?

A.   It's -- it meant I stayed past 10 p.m.  I worked until 1:30 a.m. that morning.

Q.   Was this overtime that you worked?

A.   Yes.

          MS. STEINER:  If we could turn back, Ms. Gavin, to page 1.

Q.   Mr. Garcia, who worked the shift before you on March 5 of 2016?

A.   Israel Florez and Henry Elias.

Q.   And do you see Mr. Florez's name that's been highlighted?

A.   Yes.

Q.   Is that the assistant director you testified about earlier?

A.   Correct.

Q.   What shift did Mr. Florez work on March 5 of 2016?

A.   He signed in for 6 a.m. to 2 p.m.

Q.   And do you see the name Henry Elias that's been highlighted above it?

A.   Yes.

Q.   What shift did Mr. Elias work on March 5 of 2016?

A.   He worked from 7 a.m. to 3 p.m.

MS. STEINER:  We can take this down.

Q.  Mr. Garcia, when you arrived at work, you testified that you were informed about an incident.  Who did you receive that information from?

A.  It would have been from the previous officers, either Israel Florez, Henry Elias or both.

Q.  And during -- well, what specifically were you informed when you had this discussion with either Mr. Elias or Mr. Florez?

MR. STEEL:  Objection.

THE COURT:  That's overruled.

A.  As mentioned, I was informed of the incident, and I was showed a video.

Q.  And is that surveillance footage?

A.  Correct.

Q.  And I just want to ask you a few questions about surveillance footage generally at the InterContinental Hotel at that time.

Were you aware of where cameras were generally located at the hotel?

A.  Yes.

Q.  And where were they located generally?

A.  All the egress points, all the areas that has high foot traffic.

Q.  Were they also located on the floors where individuals

P63Wcom2                         Garcia - Direct

would stay as guests?

A.   Yes.  They were located on every elevator landing and parts of the hallway.

Q.   And as a security officer, could you monitor these cameras?

A.   Yes.

Q.   Where were you able to monitor them?

A.   From the security base.

Q.   Could you monitor all of the cameras at once?

A.   There's a lot of cameras, so we can't look at them all at once.

Q.   About how many could you look at at a time?

A.   Depending what's up on the screen, if I'm looking at something specifically or if I have -- depending on the layout that's put up on the screen.

Q.   Could you observe more than one camera at once?

A.   Yes.

Q.   OK.

     Now, when an incident was reported, such as this one, at a particular location in the hotel, as a security officer, would you be required to check the monitors?

A.   Yes.  If we knew there was an incident at a specific location, we would bring up the cameras for that location.

Q.   When you say you would bring up the cameras for that location, what specifically would you be observing on the monitor screen?

A.   Any cameras that are in that general area.

Q.   If you have an incident that starts at one location but you can observe on a monitor screen is moving to another, nearby location, what would you do?

A.   You pull up the area where they're moving to.

Q.   And why is that?

A.   If you're monitoring an incident or following an incident, you want to follow that individual or that situation wherever it's moving to.

Q.   And would you bring up both the original camera and the camera to which the individual moves to at the same time?

A.   Yeah, that's possible.

Q.   And would you monitor them at the same time?

A.   Yes.

        MS. STEINER:  Ms. Gavin, can you please put up what has been marked as Government Exhibit 10C-103.

        And if we could put it up at 20 seconds.

        Perfect.

Q.   Mr. Garcia, have you reviewed this video in preparing to testify today?

A.   Yes.

Q.   And does this video accurately depict the surveillance footage that you observed when you arrived for your shift on March 5 of 2016?

A.   Yes.

Q.   And directing your attention to the top left-hand corner, can you read the date on this video?

A.   March 5, 2016.

          MS. STEINER:  Ms. Gavin, if we could please play from 20 seconds to 36 seconds.

          (Media played)

          MS. STEINER:  And if we could play just a few more seconds, actually.

          (Media played)

BY MS. STEINER:

Q.   When you watched this video, Mr. Garcia, did you initially recognize the individuals in the video?

A.   Not initially.

Q.   Did you later recognize who the male individual was?

A.   Yes.  After watching it and taking a closer look again, I was able to recognize Mr. Combs.

Q.   And did you come to learn who the other individual in this video was?

A.   Yes.  I learned that that was Cassie Ventura.

Q.   And how did you learn that?

A.   I was notified that it was his girlfriend, and his girlfriend at the time was Cassie Ventura.

          MS. STEINER:  We can take this down.

Q.   Mr. Garcia, did you learn when you arrived for your shift that day whether law enforcement had been contacted following

this incident?

A.   From my understanding of the incident when I arrived, no, they had not been contacted.

Q.   Why is that?

          MR. STEEL:  Objection.

          THE COURT:  Hold on.

          If you could rephrase the question to make it a little bit clearer.

          MS. STEINER:  Yes, your Honor.

Q.   Did you have an understanding of why law enforcement was not contacted after this incident?

          MR. STEEL:  Same objection, your Honor.

          THE COURT:  You're just asking for a yes or no there?

          MS. STEINER:  Yes.

          THE COURT:  All right.  That's overruled.

          You can answer.

A.   Yes.

Q.   And what was that understanding based on?

          MR. STEEL:  Objection.

          THE COURT:  Overruled.

A.   I was told that Ms. Ventura did not request the presence of police or medical attention.

Q.   Mr. Garcia, did you review an incident report about the incident that you've just described when you arrived at the hotel on March 5 of 2016?

A.   Yes.

Q.   Can you remind the jury what an incident report is?

A.   Incident report is a, a factual report of who, what, when and where of the event that transpired.

Q.   Why did you review the incident report for this incident when you arrived for your shift?

A.   It was a common practice.  Whoever was writing the incident report, they would always run it through somebody to read just to see if it sounded right or if there are any grammatical or any errors that could be corrected.

Q.   And did Mr. Florez run this report by you?

A.   Yes.

        MS. STEINER:  Ms. Gavin, could you please put up what's in evidence as Government Exhibit 7R-141.

Q.   Mr. Garcia, is this the incident report that you reviewed on March 5 of 2016?

A.   Yes.

Q.   And again, when did you review it?

A.   That day.

Q.   Where did you review it?

A.   In the office.

Q.   Was anything saved along with this incident report?

A.   Yes.  Incident report is saved along with videos or photos pertaining to the incident.

Q.   And so what do you recall being saved with this document?

A.   There were attachments.  I didn't open the attachments from the computer, but it was a video file that was in that report -- that was in that file.

Q.   And where was this incident report and video file accompanying it saved?

A.   On the computer.

MS. STEINER:  We can take this down.

Q.   Mr. Garcia, did you receive a call during your shift on March 5 of 2016?

A.   Yes.

Q.   Approximately when during your shift were you first contacted?

A.   About an hour, hour and a half after my shift had started.

Q.   How were you contacted?

A.   Via phone to the security desk.

Q.   Do you recall the phone number that contacted the security desk?

A.   Not in its entirety.  I recall the area code.

Q.   And what do you recall about the area code?

A.   After -- one, it wasn't a -- didn't look like a local area code.  And I answered the call, but after the call, I googled the area code and it was a New York area code.

Q.   How did the caller introduce themselves?

A.   The caller introduced themselves as a personal assistant to Mr. Combs, followed by her name, Kristina Khorram.

Q.  Did you provide your name to Kristina Khorram?

A.  Yes.  When I answered I answered with InterContinental Hotel.  This is Eddy speaking.

Q.  What, if anything, did she Kristina you during this call?

A.  She asked if I was familiar about an incident that occurred earlier that day.

Q.  How did you respond?

A.  I said yes.

Q.  What, if anything, did she request?

A.  She said if there was any possible way to get a copy of the video or see the video.

Q.  Did she say why she wanted to see the video?

A.  Yes.  She stated that Mr. Combs had been intoxicated and didn't remember exactly --

        MR. STEEL:  Objection, your Honor.

        THE COURT:  Hold on.

A.  -- exactly what --

        THE COURT:  Hold on.  Hold on.

        That's sustained.

        Ms. Steiner.

        MS. STEINER:  Your Honor, could we have a brief sidebar on this issue?

        THE COURT:  Yes.

        MS. STEINER:  Thank you.

        (Continued on next page)

P63Wcom2                    Garcia - Direct

(At sidebar)

THE COURT:  Counsel.

First, explain the objection.

MR. STEEL:  Objection is hearsay, your Honor.

THE COURT:  Hearsay?  OK.

Response.

MS. STEINER:  Your Honor, there's two bases for the admission to enter these from Ms. Khorram.  There's going to be, I expect, this call but also a series of calls from Ms. Khorram, and each time she makes a call to Mr. Garcia, she introduces herself as being his personal assistant and implying that she's acting at Mr. Combs's direction.  So under 801(d)(2)(D), she's clearly acting in the scope of her employment, and as part of her employment, she is engaging in this activity with Mr. Garcia.

In addition, as is going to become clear through his testimony, Ms. Khorram is present when Mr. Garcia receives a bribe from Mr. Combs, and therefore, this would also fall under the co-conspirator statement.  She's acting in furtherance of the conspiracy, and so under 801(d)(2)(E), it would also come in.

THE COURT:  OK.

Response.

MR. STEEL:  I do not believe that this furthers any conspiracy.  There's no law enforcement involved whatsoever.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P63Wcom2                        Garcia - Direct

It is simply buying a video so it doesn't go into the public domain, not the law enforcement domain.

THE COURT:  Sure, but I think that Ms. Steiner's point is that whether it's benign or not, it gets in because either it would be a statement of Mr. Combs's agent within the scope of her responsibility, saying that they were just looking for a video, but that was what she was asked to do.  And if not, if they were actually trying to illegally bribe the witness, then that would fall under the co-conspirator exception.

MR. STEEL:  I don't believe that there's any type of furtherance of the conspiracy, so that was one.  And then as far as the agency, I believe that it's been taken too far.  If you want to say which statements Mr. Combs made, I will not probably have any objection, but I believe that they need to put up the witness and not get it through this person under agency theory.

THE COURT:  All right.  I think that --

MS. STEINER:  Your Honor, of course --

THE COURT:  -- proffer of what you expect the witness to say.

MS. STEINER:  Yes, your Honor.

So I expect Mr. Garcia will say that Ms. Khorram told him, at least in this call, that she wants to see the video. Ms. Khorram then comes to the hotel, has another session with Mr. Garcia, says, you know, again, I represent Mr. Combs, I

P63Wcom2                      Garcia - Direct

would like to see the video.  He says I can't show you the video.

There's a subsequent call in which Ms. Khorram gets on the line and actually puts Mr. Combs on the line.  So she's facilitating calls with Mr. Combs.  That's the nature of her discussions with him.

THE COURT:  Can you narrow the questioning to focus on -- what I understand what you're trying to get in is Ms. Khorram's requests or instructions, whatever they are, and I think one concern that the defense might have is that if it's broadened to just what did she say, then he could relate things that aren't, technically speaking, part of the request that would be within the scope of her relationship -- for instance, that Mr. Combs was intoxicated, things like that.  But I think if you narrowed the questioning, you could get what you want, which is just that Ms. Khorram made the request on Mr. Combs's behalf.

MS. SMYSER:  With respect to the fact that he was intoxicated, we have communications between Ms. Khorram and other employees saying that they're going to try and get additional information from the hotel by claiming that Mr. Combs was intoxicated, implying that he was not.  This was a way that they were trying to get additional information from the hotel, and that is reflected on the text message --

THE COURT:  These are messages that are going to come

into evidence?

MS. SMYSER:  Yes, your Honor.

THE COURT:  All right.  OK.

The objection is overruled.

MR. STEEL:  Your Honor, can I add one more thing?

THE COURT:  Yes.

MR. STEEL:  Also, at some point 403, because we're not objecting at all to the fact that Mr. Combs -- called a bribe by the government, we don't call it a bribe, but paid money for this video to go into his hands and be erased from the computers, all of this other evidence is just respectfully a waste of time.  It's just adding just the same sequence with more, multiple phone calls to get to the same place -- that this gentleman can say he was paid money -- I think $50,000. He split it with coworkers.  Mr. Combs paid him the money directly.  I would like to get there.  That's my --

THE COURT:  I understand.

MS. SMYSER:  If I can respond to that, your Honor?

California bribery is a predicate of the racketeering offense in Count One.  We have to establish that this is not just Mr. Combs but there's also other individuals involved, and as defense just noted, they are contesting that this was a bribery.  So these details about how this transaction went down are highly relevant and probative to the government's case.

THE COURT:  Understood.

P63Wcom2                        Garcia - Direct

MS. SHAPIRO:  Your Honor, can I just add --

THE COURT:  And on the wasting time --

MS. STEINER:  Yes, I will.  Understood.

THE COURT:  Very good.

MS. STEINER:  Thank you, your Honor.

THE COURT:  All right.  Thank you.

(Continued on next page)

P63Wcom2                       Garcia - Direct

          (In open court)

          THE COURT:  Ms. Steiner, you may proceed.

          MS. SMYSER:  Thank you, your Honor.

Q.  Mr. Garcia, what, if anything, did you tell Ms. Khorram

when she asked to see the video on this call?

A.  I told her that she would have to reach out to hotel

management or get a subpoena.

Q.  When did you next encounter Ms. Khorram?

A.  Later that day.

Q.  Approximately how long after that call?

A.  About an hour, hour and a half after.

Q.  And what happened at that time?

A.  I received a call from hotel operator that there was

someone looking for me in the lobby.

Q.  What did you do next?

A.  I walked out to the lobby.

Q.  Who was in the lobby?

A.  It was a woman.  She introduced herself as Kristina

Khorram.

Q.  Did Ms. Khorram indicate why she was there?

A.  Yes.  She was asking about --

          MR. STEEL:  Your Honor, objection.

          THE COURT:  That's overruled.

          MS. STEINER:  Mr. Garcia, if there's an objection,

just wait and let the judge rule, and you can continue.

Thank you.

THE WITNESS:  OK.

BY MS. STEINER:

Q.  You can continue.

A.  Yeah.  She was, again, asking about the video and if there was any way she could see it.

Q.  Can you describe her general appearance?

A.  Female Caucasian.  I would say about five eight, five nine, mid-20s to probably mid to late 30s.

Q.  Did Ms. Khorram indicate why she wanted to see the video at that time?

A.  Yes.  She said that she was -- they were unaware of -- her and Mr. Combs of what exactly was on the video and didn't recall exactly what happened.  And she wanted to know what they were dealing with.

Q.  How did you respond?

A.  I apologized and said I was sorry but I couldn't show her the video and that she could talk to hotel management or follow up with a subpoena.

Q.  Did you tell her anything about what you had observed on the video?

A.  Yes.  I did mention to her that, said off the record, it's bad.

Q.  Where did you go after the lobby?

A.  I went back to the security desk.

P63Wcom2                    Garcia - Direct

Q.   And did you receive any additional calls at the security

desk that day?

A.   Yes.  Later that evening.

Q.   How were you contacted?

A.   Again, to the security desk phone.

Q.   Do you recall the number that contacted you on the security

desk phone?

A.   Not in its entirety.  I always just -- I remember the New

York, New York area code.

Q.   Who was on the line?

A.   It was Ms. Kristina Khorram.

Q.   And what did Ms. Khorram say when she got on the line?

A.   She said someone wanted to speak with me.

Q.   Did someone else come on the phone?

A.   Yes.

Q.   And who was that?

A.   Mr. Combs.

Q.   How did Mr. Combs introduce himself to you on this call?

A.   He asked me if I knew who he was.

Q.   How did you respond?

A.   I said yes.

Q.   And how did you know who Mr. Combs was on the call?

A.   I recognized his voice.

Q.   How did you recognize his voice?

A.   He's a public figure.  He's -- I heard his voice a lot

P63Wcom2                          Garcia - Direct

throughout the years, so I recognized his voice.

Q.   What did Mr. Combs tell you on this call?

A.   Mr. Combs sounded very nervous, just was talking really fast but was just saying that he had a little too much to drink and that, you know, I knew how things was, you know, with women; one thing led to another and if this got out it could ruin him.

Q.   What, if anything, did he ask for you to do?

A.   He asked if, if I could provide the video.

Q.   How did you respond?

A.   Again, I apologized and told him I wish I could help; it's just I couldn't help; he would have to reach out to hotel management or get a subpoena.

Q.   You testified that Mr. Combs sounded nervous on this call, is that correct?

A.   Yes.

Q.   Can you describe his tone on the call?

A.   Again --

          MR. STEEL:  Objection.

          THE COURT:  That's overruled.

A.   Again, he was talking really fast.  A lot of stuttering. Just from my perception, he sounded very nervous.

Q.   Later on March 5 of 2016, did you inform anyone about your discussion with Mr. Combs?

A.   I sent out an email to the general manager and the

P63Wcom2                    Garcia - Direct

director, Bill Medrano.

Q.   The director of security?

A.   Correct.

Q.   Why did you send out an email to the hotel's general manager and the head of security?

A.   At that point I had already received a few calls, and being the nature of the celebrity status I wanted to send them an email to let them know exactly what was going an.

Q.   Approximately when did you send this email?

A.   About -- that night, about -- past 10 p.m.

Q.   Was it before the end of your shift?

A.   Yes.

Q.   Mr. Garcia, as part of your regular duties for Securitas as a security officer, were you required to inform your supervisors of security issues at the hotel?

A.   Yes.

Q.   What types of issues?

A.   Any incidents, safety concerns or anything just that may affect the hotel.

Q.   And typically, how would you provide that information?

A.   Via email.

Q.   And what information were you required to include in your emails?

A.   As much as factual information as possible, who, what, when, where.

MS. STEINER:  Ms. Gavin, can we please bring up for the parties, the Court and the witness what has been marked for identification as Government Exhibit 7R-149.

Q.  Mr. Garcia, do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It is the email I sent that night.

Q.  Did you draft this email at or near the time of your calls with Mr. Combs and Ms. Khorram?

A.  Yes.  I drafted it that night.

Q.  And did you draft and send emails like this in the course of your duties as a security officer at the InterContinental Hotel?

A.  Yes.

Q.  Was drafting and sending emails like this a regular practice when you were a security officer?

A.  Yes.

MS. STEINER:  The government offers Government Exhibit 7R-149.

MR. STEEL:  Objection.

THE COURT:  On what basis?

MR. STEEL:  He testified to it (inaudible).

THE COURT:  That is overruled.

7R-149 will be admitted.

(Government Exhibit 7R-149 received in evidence)

MS. SMYSER:  Ms. Gavin, would you please publish that for the jury.

Q.  Mr. Garcia, who sent this email?

A.  I did.

Q.  And from what email account?

A.  Security had a general security account that we all used.

Q.  And is that the L.A. security email at the top of this page?

A.  Yes.

Q.  What was the email account that you sent this email to?

A.  The person it was going to was the general manager, Steve Choe, and cc was the director of security, Bill Medrano.

Q.  Can you please read the subject line of this email?

A.  Sean Combs, room 602.

Q.  Can you please read the date of this email?

A.  March 5, 2016.

Q.  And can you please read the first paragraph?

A.  "Mr. Sean Combs, a/k/a P. Diddy, who was staying in room 602, requests to have a sit-down meeting with you with in regards to an incident that occurred with the woman guest of his and himself earlier today.  Mr. Combs mentioned that his lawyer had notified him that there was a thumb drive and a video of the incident, and he was really concerned.  I notified Mr. Combs that we take all of our guests' privacy really serious and did not leak videos of him.  Mr. Combs mentioned he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

is a patron of the hotel and would like to speak to you and talk about the incident.  He provided his assistant's information."

Q.  Can you please read that information?

A.  Ms. Kristina Khorram, followed by her phone number.

Q.  And this phone number ending in 2886, is that the phone number that had contacted you at the security office earlier that day?

A.  Yes, that was the phone number that was in the caller ID and had been contacting me.

MS. STEINER:  We can take this down.

Q.  Mr. Garcia, you testified that you received calls from Ms. Khorram and Mr. Combs in your office.

Did you receive any additional calls from Ms. Khorram or Mr. Combs after you left the office on March 5?

A.  Yes.

Q.  Do you recall how many times you were contacted by them in total?

A.  I would not have a number.

Q.  Do a few calls stand out in your mind?

A.  Yes.

Q.  Each time you were contacted, who would initially be on the phone?

A.  It would always, it would always be Kristina.

Q.  Did she introduce herself when she would get on the line?

P63Wcom2                      Garcia - Direct

A.   Yeah, typically she would say:  Hey, this is Kristina.

Q.   And would she provide a title to you?

A.   Yes.  Mr. Combs's personal assistant.

Q.   Where were you located when you next received a call from Ms. Khorram?

A.   I was at home.

Q.   How were you contacted?

A.   Via cell phone.

Q.   Your personal phone number?

A.   Yes.

Q.   And do you recall the first digits of that personal phone number?

A.   Of mine?

Q.   Yes.

A.   It was a 323 area code, and I recall it started with 246.

Q.   Had you provided your personal phone number to either Ms. Khorram or Mr. Combs?

A.   No.

Q.   How did you react when you were contacted on your personal number by Ms. Khorram?

           MR. STEEL:  Objection.

           THE COURT:  Hold on for just a second.

           That's overruled.

BY MS. STEINER:

Q.   You can answer.

A.  Nervous.

Q.  Why were you nervous?

A.  Nervous, scared, that I was getting calls to my cell phone.

Q.  Who was on the line when you answered the phone?

A.  Kristina.

Q.  And what did Kristina say at that time?

A.  Again, she introduced herself and she passed the phone over --

        MR. STEEL:  Objection.

        THE COURT:  That's overruled.

A.  -- to Mr. Combs.

Q.  Who came on the line after Kristina?

A.  Mr. Combs.

Q.  Did you recognize his voice?

A.  Yes.

Q.  What did Mr. Combs tell you during this call?

A.  He stated that, that I sounded like a good guy, that I sounded like I wanted to help and that something like this can -- can ruin him.  And again, he kept repeating that I sounded like a good guy and he believed I could help.

Q.  How did he want you to help him?

A.  With video, with the video footage.

Q.  With getting a copy of the video?

A.  Correct.

Q.  And what, if any, concerns did Mr. Combs express to you

during this call?

A.  Again, he was concerned that this video would get out and that it would ruin his career.

Q.  How did you respond to Mr. Combs when he said this video could ruin his career?

A.  I apologized and told him I was only a security officer and that I didn't have access to that.

Q.  Didn't have access to what, Mr. Garcia?

A.  To provide him with the video.

Q.  And why did you not have access to provide the video?

A.  One, it's against policy, and two, I was just a guard; I didn't have enough credentials to get to the server room or remove the video.

Q.  Was the video on the server?

A.  Yeah.  The original would be on the server.

Q.  Were you aware if anyone else from Securitas did have access to the server?

A.  Yes.

Q.  Who was that?

A.  Bill Medrano.

Q.  How did Mr. Combs respond when you said you did not have access to the server?

A.  He -- he again stated that, that I sounded like I wanted to help and he believed I could make it happen.

Q.  And what, if anything, did Mr. Combs offer you at that

P63Wcom2                          Garcia - Direct

time?

A.  He would -- he said he would take care of me.

Q.  Based on this discussion, did you have an understanding of what Mr. Combs was offering you?

A.  I understood it to mean financially.

Q.  And if you said financially, what would the money be for?

A.  For the video.

Q.  After your call with Mr. Combs and Kristina, what did you do next?

A.  Went to work.

Q.  And who, if anyone, did you contact at work?

A.  While I was at work, I gave Bill Medrano a call.

Q.  Why did you reach out to Bill Medrano?

A.  To just notify him of everything that was going on.

Q.  And again, was he your direct supervisor at that time?

A.  Yes.

Q.  What specifically do you recall informing Mr. Medrano?

A.  I informed him I had gotten a few calls already and that Mr. Combs was offering to pay for the video.

Q.  How did Mr. Medrano respond when you said that Mr. Combs was offering to pay for the video?

A.  There was a pause, and then he stated that he would do it for 50.

Q.  When he said -- when Mr. Medrano said he would do it for 50, what did you understand that to mean?

A.   I understood it to mean 50,000.

Q.   What did you do after Mr. Medrano told you that he would do it for 50?

A.   I told him that I would communicate that to Mr. Combs.

Q.   What did you do next?

A.   I called that same number.

Q.   The New York number?

A.   Correct.

Q.   And who did you reach when you called the New York number?

A.   Kristina answered and again gave the phone to Mr. Combs.

Q.   What did you tell Mr. Combs when he came on the line?

A.   I told him that I talked to my boss and that he was willing to do it for 50,000.

Q.   How did Mr. Combs respond when you said that your boss was willing to sell the video for $50,000?

A.   He sounded excited.

Q.   And how, if at all, did Mr. Combs refer to you during that call?

A.   He referred to me as Eddy, my angel.

Q.   Was that after you told him that you would be willing to give him the video for $50,000?

A.   Correct.

Q.   Can you describe what you recall him saying, to the best of your ability?

A.   Just --

P63Wcom2                      Garcia - Direct

MR. STEEL:  Objection.

THE COURT:  That's overruled.

A.  He was excited, said:  Eddy, my angel, I knew you could
help.  I knew you could do it.

Q.  What did you do after this call with Kristina and
Mr. Combs?

A.  I contacted Bill Medrano again.

Q.  Why did you contact him?

A.  To let him know that, that it was agreed, that it was, it
was a go.

Q.  And just to take a step back for a moment, what had
Mr. Combs told you that made you think that it was agreed at
that point?

A.  That he wanted it done as soon as possible.

Q.  How did Mr. Medrano respond when you told him that it was a
go?

A.  He said OK.

Q.  What happened next?

A.  He showed up to work that day.

Q.  To the hotel?

A.  Correct.

Q.  And what did Mr. Medrano do when he arrived at the hotel?

A.  He came into the security base, went into his office and
shortly after came out of his office and made his way to the
server.

Q.  Did you accompany him into the server room?

A.  No.  I was monitoring cameras in the station at the time.

Q.  What did Mr. Medrano do when he returned from the server room?

A.  He handed me a black USB.

Q.  Did he say anything to you at that time?

A.  Yes, he said done.

Q.  And what did you understand Mr. Medrano to mean when he said done?

A.  That the video was in the USB.

Q.  I want to direct your attention now, Mr. Garcia, to the following day, so March 7 of 2016.

When do you next recall contacting either Kristina or Mr. Combs?

A.  So, I went to work that morning, and when I was at work, I let them know -- I contacted them and let them know I had the USB.

Q.  And when you say them, who are you referring to?

A.  To Kristina, who answered, but I spoke to Mr. Combs.

Q.  And what did you inform Kristina when you contacted her?

A.  I said I had -- that I had it.

Q.  And what happened after you told Kristina that you had it?

A.  Mr. Combs came on the line.

Q.  What happened next?

A.  I let him know I had the USB with the video on it.

P63Wcom2                           Garcia - Direct

Q.   How did Mr. Combs respond?

A.   He was happy, sounded excited and said when -- how fast I could get it to him.

Q.   Did Mr. Combs say where he wanted to meet for purposes of getting the video?

A.   Yes, he did provide me with an address.

Q.   And generally, where was that address located?

A.   It was -- after mapping it, it was, I believe, a 15 or 20-minute drive from the hotel in the West L.A. area.

Q.   And you said he wanted to meet as soon as possible, is that correct?

A.   Correct.

Q.   How did Mr. Combs refer to you during this call?

A.   Again, the theme was Eddy, my angel.

Q.   And again, can you describe what you recall him saying with respect to that during this call?

A.   After providing the address, it was more of a, you know, let's get this done, you know, wanted -- wanted to have the video as soon as possible.

Q.   What did you do after that call?

A.   I notified Bill Medrano that he had provided me with an address to drop off the USB.

Q.   And how did Mr. Medrano respond?

A.   He said I'll let the other officers know that you're running an errand for me so you can go.

Q.  Did he direct you to drop off the USB?

A.  Yes.

Q.  Were you on duty at this time?

A.  Correct.

Q.  You said that he told the other officers you were running an errand.  Is that how you were able to leave your shift that day?

A.  He said if they asked he would tell them that I was running an errand for them.

        MS. STEINER:  If we could bring up what's in evidence now as Government Exhibit 8E-104.

Q.  And looking towards your name, Mr. Garcia, for the date we're now discussing, March 7 of 2016, can you read what hours you listed that day?

A.  Yes.  10 to 1800.

Q.  Did you, in fact, stay at the hotel from 10 to 1800?

A.  No.

Q.  And why not?

A.  I was dropping off the USB.

Q.  And when did you write down these hours for your shift?

A.  When I came in that morning, I signed in and signed out for my shift.

Q.  But before you were directed by Mr. Medrano to drop off the USB?

A.  Correct.

MS. STEINER:  We can take that down.

Q. Mr. Garcia, after your conversation with Mr. Medrano, did you go to the location that Mr. Combs had provided to you?

A. Yes.

Q. What type of location was this?

A. It was big high-rise building.

Q. Who did you contact when you arrived at this high-rise building?

A. When I arrived and I was in the lobby, I again called that same number again.

Q. The same New York number?

A. Correct.

Q. And what happened next?

A. I was told that somebody would come down and get me.

Q. Do you recall who you spoke to at that time?

A. I believe it was Kristina.

Q. And what happened after that call?

A. I waited in the lobby for -- for not too long.  Then someone came up, introduced their self as Mr. Combs's bodyguard.

Q. Do you recall the name of this bodyguard for Mr. Combs?

A. He did introduce himself at the time.  I do not recall the name.

Q. Can you describe his general appearance?

A. Yes.  He was African American.  Older gentleman, maybe in

his mid to late 50s.  Tall, a little heavyset, about maybe six three to six five, in between there.  Definitely taller than me.

Q.  What did this security officer tell you after he introduced himself?

A.  We walked over to the elevator, and in our conversation from the elevator to the suite we were going to, he was just saying that -- that he knew Mr. Combs for a long time, that they kind of came up together and that he was a good guy and I was doing a good thing.

Q.  What happened after you rode the elevator with the bodyguard?

A.  I don't recall what floor we got off on, but we walked over to one of the units and we entered.

Q.  And can you describe the suite or unit that you entered?

A.  Upon entering, there -- it was a smaller room.  There was a couch, a coffee table.  I didn't go past that room.

Q.  Who was present in the room when you arrived?

A.  Mr. Combs and Ms. Khorram, along with the bodyguard.

Q.  Can you please describe Mr. Combs's demeanor when you arrived?

A.  He was smiling, excited.  Just looked happy.

Q.  What did Mr. Combs tell you when you first arrived?

A.  Again, Eddy, my angel.  He was smiling.  He said come in. I believe he -- you know, he was making me feel comfortable.

Q.   What are the types of things he said to make you feel comfortable, if you recall?

A.   He was asking me if I was OK.  How you doing?  At the time I was very nervous, so my voice kept cracking.

Q.   And how did Mr. Combs respond when your voice kept cracking because you were nervous?

A.   He asked me if I was OK.  I said I thought I was coming down with something, and he asked his assistant to bring me a tea.

Q.   Which assistant?

A.   Ms. Khorram.

Q.   And did Ms. Khorram follow his instructions to get you a tea?

A.   When he told her bring me a tea, before she could go, he looked back at me and asked me if I liked tea.  I didn't grow up drinking tea, so I said I didn't know.  And he turned back to her and said go get him that tea I like.

Q.   Did Ms. Khorram do it at that time?

A.   Yes.

Q.   What did Mr. Combs ask you next?

A.   He asked me if I -- if I had it.

Q.   And how did you respond when Mr. Combs asked if you had it?

A.   I handed over the USB.

Q.   Who was present in the room when you handed over the UBS?

A.   The bodyguard was present for the entirety of the meeting.

P63Wcom2                      Garcia - Direct

I don't recall if Ms. Khorram was present during that time.

Q. Was Mr. Combs present?

A. Yes.  I handed it to him, yes.

Q. What did Mr. Combs do after you handed him the UBS?

A. He left the room and came back shortly after.

Q. How long approximately was he out of the room?

A. A few minutes.

Q. And did he state why he was leaving the room?

A. No.  He just said he would be back.

Q. What did Mr. Combs ask when he returned?

A. He asked if -- if it was the only copy.

Q. How did you respond?

A. I said I believe so.

Q. And what, if any, concerns did Mr. Combs tell you at that time about there possibly being other copies of the video?

A. He said it had to be the only copy and that he didn't want it getting out and that if -- if I was sure there was nothing on, on the cloud.

Q. He asked you if there was anything on the cloud, is that right?

A. Correct.

Q. What did you do after Mr. Combs said that it needed to be the only copy and to confirm whether it's not on the cloud?

A. I contacted Bill via cell phone.

Q. Bill Medrano?

A.   Correct.

     And I asked him if it was the only copy.

Q.   How did Mr. Medrano respond?

A.   He said that it was; that's why he had pulled it from the server.

Q.   After the call with Mr. Medrano, did you inform Mr. Combs that this was the only copy?

A.   Yes.

Q.   Of the video?

A.   Correct.

Q.   And what, if any, concerns did you, Mr. Garcia, express to Mr. Combs after you gave him the USB with the video?

A.   I told him that -- that I did have a concern that if there -- if there was to be a police report made about the incident at a later time, that it would affect me.

Q.   Who were you concerned might make a police report?

A.   Cassie.

Q.   How did Mr. Combs respond when you said you had this concern that Cassie might still file a police report?

A.   He said I didn't have to worry about that, that she knew about it and that she wanted the video gone too.

Q.   And what did Mr. Combs do next?

A.   He contacted Ms. Ventura with his phone via FaceTime.

Q.   Did you recognize the person on the FaceTime call?

A.   Yes, I recognized her as Cassie Ventura.

P63Wcom2                      Garcia - Direct

Q.   Were you able to see Cassie on this call?

A.   I was able to see enough to think it was Cassie.  She was wearing a hoodie, and the lighting wasn't that great.

Q.   And approximately how long was this FaceTime call?

A.   It was short.

Q.   What, if anything, did Mr. Combs tell Cassie during this call?

A.   Before he passed the phone over to me, he said let him know that you want this to go away too.

Q.   And when Mr. Combs said -- just to make sure I understand, Mr. Combs told Cassie to let him know?

A.   To let me know, yes.

Q.   To let you know that she wanted it to go away too?

A.   Correct.

Q.   And how did Cassie respond when Mr. Combs directed her to let her know that she wanted this to go away too?

A.   When I got passed the phone, I said hi.  She said hi.  And she said that -- that she had a movie coming out and that it wasn't a good time for this to come out and that she wanted it to go away.

Q.   What was her demeanor?

A.   I would just say normal.

Q.   After this call with Cassie, what, if any, documents did Mr. Combs request from you?

A.   He requested my ID and the ID of Bill Medrano and the ID of

P63Wcom2                    Garcia - Direct

the officer that had responded to the call.

Q.  Did Mr. Combs say why he needed the IDs for each of you, you and Mr. Medrano and the responding officer?

A.  Yes.  He just said it -- this only worked if we're all on the same page.

Q.  What, if anything, did Mr. Combs say he would do if you did provide him each of these identifications?

A.  He said he would take care of us.

Q.  And again, what did you understand him to mean by that?

A.  I understood it to mean financially.

Q.  When Mr. Combs referred to the responding officer, that he needed the ID from the responding officer as well, who did you understand him to be referring to?

A.  Israel Florez.

Q.  And how did you react when Mr. Combs requested Mr. Florez's identification?

A.  Nervous.  I just did not think that he would go for it.

Q.  Why is that?

A.  Again, just knowing Mr. Florez and who he was, very by-the-book guy, that's just not something he would -- he would do.

Q.  What did you do after Mr. Combs requested identification from you and these other officers?

A.  I contacted Bill Medrano.

Q.  What did you tell Mr. Medrano?

A.  Told him that he needed his ID and that he was requesting the responding officer's ID as well.

Q.  Did he indicate that that was Mr. Florez?

A.  Yes.

Q.  And how did Mr. Medrano respond when you said that Mr. Combs needed Mr. Medrano's ID and Mr. Florez's ID?

A.  I did mention to Bill that I did not think Florez would go for it.  He paused, and he said Henry would do it.

Q.  And who was Henry?

A.  Henry Elias.

Q.  And was that the other officer that had been on duty that day?

A.  Correct.

Q.  On March 5?

A.  Correct.

Q.  Did you receive IDs or copies of IDs from Henry Elias and Bill Medrano?

A.  Yes.

Q.  What did you do with these identifications after you received copies of them?

A.  Provided them to Mr. Combs.

Q.  How did you provide them to Mr. Combs?

A.  Forwarded them via text.

Q.  Text message?

A.  Yes.

P63Wcom2                        Garcia - Direct

Q.   To which number, if you recall?

A.   Just the number I had, the same number I had that I was contacting back and forth with, New York.

Q.   The New York number?

A.   Yes.

Q.   Did Mr. Combs acknowledge whether he had received the IDs from you?

A.   Yes.

Q.   Did he receive them?

A.   Yes.

Q.   How did Mr. Combs respond when he received the IDs of Mr. Medrano and Mr. Elias?

A.   He looked at them.  And when he looked at Henry's, he said, yes, that's him.

Q.   Did you provide your own ID to Mr. Combs?

A.   Yes.

Q.   And what did Mr. Combs do with your ID?

A.   I handed it to him.  He left the room as though -- but he took it with him.

          MS. STEINER:  Ms. Gavin, can you please bring up for the parties, the witness and the Court what has been marked for identification as Government Exhibit C-364-6A and -5A and -5B. And if it's possible could you put them up next to each other.

          Not possible.  OK.

Q.   Do you recognize each of these images?

P63Wcom2                    Garcia - Direct

A.   Yes.

Q.   And what are they?

A.   They were the IDs that I had provided to Mr. Combs that day.

Q.   Are they fair and accurate copies of the IDs you provided to Mr. Combs?

A.   Yes.

        MS. STEINER:  At this time, the government offers Government Exhibits C-364-6A, C-364-5A and C-364-5B.

        THE COURT:  Any objection?

        MR. STEEL:  No opposition.

        THE COURT:  Those exhibits will be admitted.

        (Government Exhibits C-364-5A, C-364-5B and C-364-6A received in evidence).

        MS. STEINER:  Ms. Gavin, if you could start by putting up -- let's look at this one first.

Q.   This is an identification, is that correct, Mr. Garcia?

A.   Yes.

Q.   And what does that identification show?

A.   That is my California ID.

Q.   Is this the ID that you provided to Mr. Combs on March 7 of 2016?

A.   Yes.

        MS. STEINER:  Ms. Gavin, can you take this down and put up next to each other 364-5A and -5B.

Thank you.

Q. And looking at the image that's on the screen on the right, Mr. Garcia, what's depicted there?

A. The IDs provided to me of -- from Henry Elias and Bill Medrano.

Q. And the image on the right, whose identification is that?

A. That is Bill Medrano.

Q. And the identification on the left?

A. Henry Elias.

Q. And are these copies of the IDs you provided to Mr. Combs?

A. Yes.

MS. STEINER: You can take that down.

Q. After you gave Mr. Combs copies of these three IDs, what, if anything, did he ask you to sign?

A. He brought out papers and said -- he said they were NDAs, and it was also saying that I was -- saying that it was the only copy of the video.

Q. And when you say an NDA, can you explain what you mean by that?

A. That I wouldn't speak about that situation or anything that pertained to it.

Q. Is that a nondisclosure agreement?

A. Yes.

MS. STEINER: Ms. Gavin, can you please bring up for the parties, the witness and the Court what has been marked for

identification as Government Exhibit C-106.

Q.   Mr. Garcia, do you recognize this document?

A.   Yes.

Q.   And generally what is it?

A.   This is a document stating that I had provided the only copy of the video.

Q.   Did you review it in preparing to testify?

A.   Yes.

        MS. STEINER:   And if we could turn to page 2, Ms. Gavin.

Q.   Mr. Garcia, does this document also bear your signature?

A.   Yes.

        MS. STEINER:   The government offers Government Exhibit C-106.

        MR. STEEL:   No opposition, your Honor.

        THE COURT:   C-106 will be admitted.

        (Government Exhibit C-106 received in evidence)

BY MS. STEINER:

Q.   Mr. Garcia, would you look at the top of the first page.

     Can you please read the first line?

A.   "Eddy Yobani Garcia Solis declares."

Q.   Is that your full name?

A.   My middle name is misspelled, but yes.

        MS. STEINER:   If we could zoom out and zoom in to paragraph 2.

A.   Would you like me to read that?

Q.   Yes, if you could, please read that.

A.   "I represent and warrant that I have delivered all evidence giving rise to or in any way related to the surveillance video recording that is the subject of this declaration."

Q.   And when the declaration refers to you delivering evidence to Mr. Combs, what have you delivered to Mr. Combs?

A.   USB with the video of the incident.

          MS. STEINER:  And if you could please zoom out of that, Ms. Gavin, and zoom in to paragraph 3.

Q.   If you could please read paragraph 3, Mr. Garcia.

A.   "I represent and warrant that no evidence, including, but not limited, to photographs, videos, digital files and any other documents and electronically stored information have been shared with any third party."

          MS. STEINER:  And if we could zoom in to paragraph 5.

A.   "I represent and warrant that there are no duplicates, backups, stored drives, including, but not limited to, cloud-based storage of or relating to evidence, documents and/or electronically stored information provided.  I further represent and warrant that upon turning over all evidence and documents, I have permanently deleted all emails, communications, text messages and any other digital and/or non-digital files, records or logs of any other document referencing this matter.  The facts giving rise to this

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

P63Wcom2                        Garcia - Direct

declaration that none of the information is susceptible to data

recovery at a later date."

(Continued on next page)

Q.   Did you sign this document, Mr. Garcia, after you had confirmed with Mr. Medrano that this video was -- that you provided to Mr. Combs was the only copy?

A.   Correct.

Q.   And it didn't exist on any other servers?

A.   Correct.

Q.   Had you told that to Mr. Combs before signing this?

A.   Correct.

          MS. STEINER:  If we could turn to the second page.

Q.   Can you please read the end of the document.

A.   I declare under penalty of perjury that foregoing is true and correct, and that this declaration was executed in March 7th, 2016.

Q.   And there's a signature below that.  Whose signature is that?

A.   That's my signature.

          MS. STEINER:  We can take this down.

Q.   Mr. Garcia, did you read this document fully before signing it?

A.   No.

Q.   Why not?

A.   I was nervous, I was in a rush to get out of there.

Q.   Did you receive a copy of that document?

A.   No.

          MS. STEINER:  Ms. Gavin, could you please put up just

P63Ccom3                        Garcia - Direct

for the parties, the witness, and the Court what has been marked for identification as Government Exhibit C-111.

Q.   Mr. Garcia, generally, what is this document?

A.   That is a nondisclosure agreement.

Q.   Does it have your name on it?

A.   Yes.

Q.   Was this given to you by Mr. Combs on March 7th of 2016?

A.   Yes.

            MS. STEINER:  Government offers Government Exhibit C-111.

            MR. STEEL:  Your Honor, we have no opposition.

            THE COURT:  C-111 will be admitted.

            (Government's Exhibit C-111 received in evidence).

            MS. STEINER:  Can we please publish that for the jury, Ms. Gavin.  Thank you.

Q.   Mr. Garcia, you testified that Mr. Combs had required that you sign an NDA, or nondisclosure agreement; is that correct?

A.   Correct.

Q.   Looking at the top of this document, if we could zoom in on that, can you please read the first line.

A.   Confidentiality and nondisclosure agreement.

Q.   And below that, can you read who this agreement is between.

A.   The agreement is made and entered into of November 6th, 2015, and in between CE&LP CO LLC, with address at 1440 Broadway, 3rd floor, New York, New York 10018, and any of its

affiliates, and Eddy Garcia.

Q.   It says this is dated November 6th of 2015.   Was that the correct date?

A.   No.

Q.   What was the correct date?

A.   March 7th, 2016.

Q.   And the name Eddy Garcia is handwritten onto this document. Whose handwriting is that?

A.   That's my handwriting.

MS. STEINER:   If we could zoom out and zoom in to paragraph 2.2.

Q.   Mr. Garcia, if you could please read the first sentence of paragraph 2.2.

A.   Recipients understand that Combs is a highly prevalent recording artist, entertainer, and entrepreneur, and his privacy and the confidentiality of the confidential information of this material concern to company.

MS. STEINER:   If we could zoom out and turn to page 2, please, Ms. Gavin.   If we could zoom in to paragraph 10.   If you could please highlight, Ms. Gavin, the sentence starting with accordingly.

Q.   Mr. Garcia, can you please read the highlighted sentence of this paragraph.

A.   Accordingly, without limitation of company and/or Combs rights as they relate to injunctive relief detailed above,

recipient agrees to pay company a sum of $1 million as liquidated damages in the event of breach of this agreement.

Q.  Mr. Garcia, how much were you making as a security officer in March of 2016?

A.  About $10.50 an hour.

        MS. STEINER:  If we could turn to page 3.

Q.  Mr. Garcia, directing your attention to the bottom of the page, is that your name and signature?

A.  Correct.

Q.  And can you please read the date.

A.  March 7th, 2016.

Q.  And is that the correct date of the signing of this agreement?

A.  Yes.

        MS. STEINER:  You can take that down.

Q.  Again, Mr. Garcia, did you read this second document, this NDA before signing it?

A.  No.  I looked at it and signed it.  Again, the goal was to get out of there as soon as possible.

Q.  Did you receive a copy of the NDA?

A.  No.

        MS. STEINER:  You can take this down.

Q.  Mr. Garcia, what happened after you signed these two documents?

A.  I turned them over to Mr. Combs, he grabbed them and left

P63Ccom3                     Garcia - Direct

the room.

Q. Did Mr. Combs return to the room after that?

A. Yes.

Q. And what happened when he returned to the room?

A. He returned with a brown bag and a money counter.

Q. Can you describe what the money counter that Mr. Combs had looked like?

A. Rectangular shape.  Kind of like an off-white color.

Q. Did Mr. Combs take anything out of the brown paper bag?

A. Yes, money.

Q. What did Mr. Combs do with the money and the money counter?

A. He was putting the money through the counter.

Q. Who was putting the money through the counter?

A. Mr. Combs.

Q. And based on your observations of Mr. Combs, did he know how to operate this money counter?

A. Yes.

Q. How much money did Mr. Combs put through the money counter?

A. In total, at the end, it was $100,000.

Q. Can you describe how Mr. Combs went through the process of feeding money into the money counter?

A. Yeah, through -- there were stacks of money being put through it, stacks of $10,000 at a time.

Q. Who was putting the money through it?

A. Mr. Combs.

Q.   You said that you observed $100,000 being put through the machine.  How do you know it was $100,000?

A.   That's what it displayed in the end, the machine.

Q.   The machine displayed that amount?

A.   Yes.

Q.   You testified earlier, Mr. Garcia, that you had informed Mr. Combs that your boss, Mr. Medrano, was willing to sell the video for $50,000; is that right?

A.   Yes.

Q.   And when you initially informed Mr. Combs you could give him the video for $50,000, did you tell him who that money would be for?

A.   Yes.  My words were, my boss would do it for 50.

Q.   Later at the office during this meeting, Mr. Combs gives you $100,000; is that right?

A.   Correct.

Q.   That's $50,000 more?

A.   Yes.

Q.   Did you have an understanding of what that additional $50,000 was for?

A.   Yes, he mentioned he would take care of us financially.  So the additional, it was my understanding, was for me and what he thought was Israel Florez.

Q.   The responding officer?

A.   Correct.

Q.   We've been speaking a lot about your interactions with

Mr. Combs during this meeting.  You mentioned that Mr. Combs's

bodyguard had brought you up to the meeting.  Was Mr. Combs's

bodyguard present throughout this meeting?

A.   Yes.

Q.   Was he also present when Mr. Combs counted the $100,000?

A.   Yes.

Q.   Did Mr. Combs hand you that $100,000?

A.   Yes.

Q.   How did he do that?

A.   Back in that same brown paper bag.

Q.   Was Mr. Combs's bodyguard present when Mr. Combs handed you

the $100,000 in a brown paper bag?

A.   Yes.

Q.   You testified earlier that Ms. Khorram had swept through at

one point get you tea; is that right?

A.   Correct.

Q.   Did she later return to the room?

A.   Yes.  She was in and out of the room.

Q.   If you recall, was Ms. Khorram present at any point during

the counting of the $100,000?

A.   At some point, I would say yes.

Q.   What did Mr. Combs do after he counted the $100,000?

A.   After, he asked me if I wanted to count it.

Q.   How did you respond?

P63Ccom3                        Garcia - Direct

A.   I said I trusted the machine.

Q.   What did you do next?

A.   After being handed the money, I stood up.

Q.   Why did you stand up?

A.   To indicate that I'd be leaving.

Q.   What did Mr. Combs tell you when you got up to leave?

A.   He said he would walk me out.

Q.   Who accompanied you out of that suite?

A.   Mr. Combs and his bodyguard.

Q.   How did you react when Mr. Combs said that he would walk you out?

A.   I got nervous.

Q.   Why is that?

A.   Just my thought in my head was, I already handed --

         THE COURT:   Hold on.  Hold on.  Grounds.

         MR. STEEL:   403, 404(a).

         THE COURT:   That's sustained.  Ms. Steiner, let's move on.

Q.   What happened when Mr. Combs escorted you out of that suite?

A.   We walked down to the valet area where my vehicle was.

Q.   What, if anything, did Mr. Combs tell you at that time?

A.   He had asked me how I would be spending the money, and I said I didn't know.

Q.   How did Mr. Combs respond when you said you didn't now how

you'd be spending the money?

A.  He said not to make any big purchases.

Q.  Did he say why?

A.  No, but I understood it as it would draw attention --

MR. STEEL:  Objection.

THE COURT:  Hold on.  Mr. Steel, can you make sure if you're objecting, that you're speaking into a microphone, because it's not coming out on the --

MR. STEEL:  Yes, sir.

THE COURT:  That's sustained.  The jury should disregard the witness's last answer.

Ms. Steiner.

Q.  What happened after Mr. Combs walked you down to the valet area?

A.  He signed my valet ticket so I wouldn't be charged, and he requested his vehicle.

Q.  What did you do after you got your vehicle?

A.  I got in the vehicle and I drove off.

Q.  What did you do after you drove off?

A.  For a few minutes I was looking back because he had also requested his vehicle.  So I was just looking back to see if I was being followed.

Q.  When you said he had also requested his vehicle, who are you referring to?

A.  Mr. Combs.

Q.   Were you being followed?

A.   Not that I saw.

Q.   What did you do next?

A.   I contacted Bill Medrano.

Q.   And what did you inform Mr. Medrano?

A.   That I had the money.

Q.   After this meeting, did you provide a portion of this $100,000 to anyone else?

A.   Yes.  I provided money to Bill Medrano and Henry Elias.

Q.   How much money did you give to Bill Medrano?

A.   $50,000.

Q.   Is that the amount he initially requested?

A.   Yes.

Q.   How much money did you give to Mr. Elias?

A.   $20,000.

Q.   How much money did you keep for yourself?

A.   $30,000.

Q.   What did you do with the $30,000 that you kept for yourself?

A.   I bought a used vehicle.

Q.   You paid for it in cash?

A.   Yes.

Q.   Did you deposit any of the cash in a bank account?

A.   No.

Q.   Why not?

MR. STEEL:  Objection.

THE COURT:  Sustained.  Let's move on.

Q.  Did you report the money on your taxes?

A.  No.

MR. STEEL:  Objection.

THE COURT:  That's overruled.

Q.  You testified earlier, Mr. Garcia, that you had reviewed an incident report on March 5th of 2016.  Do you recall that?

A.  Yes.

Q.  That was a couple days prior to this meeting, correct?

A.  Correct.

Q.  Where was that incident report saved again?

A.  There was an incident report folder on the computer.

Q.  In the security office?

A.  Correct.

Q.  Did you go back into the folder where the incident report had been saved after this meeting with Mr. Combs?

A.  Yes.

Q.  Approximately, when was that?

A.  About a week or two later.

Q.  What did you notice at that time?

A.  That the video -- or the incident report on the Mr. Combs incident was not there.

Q.  Was the video there?

A.  No.

Q.   Did you report to anyone that the video or incident report was missing from that folder?

A.   No.

Q.   Why not?

A.   Because being that I had sold the video, it would just draw more attention to the situation.

Q.   Did you have any further contact with Mr. Combs after he gave you the $100,000 in cash?

A.   Yes.

Q.   Approximately, when was that?

A.   Easter, a few weeks after.

Q.   Did he reach out to you?

A.   Yes.

Q.   What did Mr. Combs tell you on this call?

A.   He said happy Easter.  Eddy, my angel, God is good, God put you in my way for a reason, and then proceeded to ask if anybody had asked about the incident or the video.

Q.   And how did you respond when Mr. Combs asked you if anyone had inquired about the video or the incident?

A.   I said I hadn't heard anything.

Q.   How did Mr. Combs respond?

A.   He just said, okay.

Q.   What, if anything, did Mr. Combs offer you during this call around Easter?

A.   He ended the call with just saying if I needed anything,

just to let him know.

Q.  Can you repeat that.

A.  He ended the call with just saying that if I ever needed anything, just to let him know.

Q.  What did you understand that to mean?

A.  At the time --

MR. STEEL:  Objection.

THE COURT:  Sustained.

Q.  After Easter, did you make any attempts to communicate with Mr. Combs?

A.  Yeah, about a year or two later.

Q.  So is that 2017 or 2018?

A.  Around that time.

Q.  What did you tell Mr. Combs at that time?

A.  I sent him a message just asking if there's any opportunities for working when he was in town.

Q.  How did you contact him to request work?

A.  I had sent him a message via Instagram.

Q.  And did he respond to this message?

A.  No, I never received a reply.

Q.  Why did you specifically reach out to Mr. Combs to request work?

A.  Just I was always looking to work, make extra money.  So based on him saying on the last phone call if I ever needed anything, I just thought there were maybe some employment

opportunities there.

Q.   Is that the Easter call you're referring to?

A.   Correct.

          MS. STEINER:  Your Honor, before I continue with
Mr. Garcia, can we have a brief sidebar?

          THE COURT:  Yes.

          (Continued on next page)

(At the sidebar)

THE COURT:  Ms. Steiner.

MS. STEINER:  Thank you, your Honor.

Earlier, when I inquired of the witness about what he had done with the money, I followed it by a question -- he had explained that, and before that Mr. Combs had -- he had testified that Mr. Combs had directed him about what he should or should not do with the money, in essence being smart with the money.  I tried to ask him what he understood by that and there was the sustained objection at that point in time, although, he testified what he did with the money.

Our concern with that objection is that it's the government's burden to establish here a meeting of the minds between Mr. Combs and Mr. Garcia as to what's to be done with the money.  Here, we have to establish that it was a bribe, and the fact that Mr. Combs is providing instructions to Mr. Garcia about what to do and Mr. Garcia's of those instructions is very relevant and probative of what we're required to establish for the bribery predicate.

THE COURT:  Is the defense contesting that it was a bribe?

MS. SHAPIRO:  Your Honor, we're contesting that it was a bribe within the meaning of California law, but that's because the purpose wasn't to suppress a report to law enforcement, as your Honor will recall from the crime fraud

P63Ccom3                        Garcia - Direct

litigation.

THE COURT:  Maybe I'm not understanding.  You've established through Mr. Garcia's testimony that there was a payment in exchange for the video.

MS. STEINER:  Correct.

THE COURT:  So it is a bribe in that sense, it is a payment for the video.  You'll also seek to establish that the real purpose and intent was to prevent this video from falling into law enforcement hands to make sure that there was no testimony concerning the video, right?

MS. STEINER:  Correct.

THE COURT:  So then what in that context, what is the purpose of having testimony concerning the reasons why, for instance, money should not be deposited into a bank account?

MS. STEINER:  That's exactly the right inquiry, your Honor.  Here, I think Mr. Garcia would understand that when Mr. Combs told him to be smart with the money, he understood that he was to not draw attention to it so that law enforcement would not have any reason to become aware of this transaction. And similarly, he kept the money in cash, did not deposit it into a bank account, so there would be no record of the transaction for the same purpose, so that law enforcement wouldn't have any understanding about the money that he had received, given Mr. Combs's directions to him about how to use the money.

MS. SHAPIRO:  Your Honor, the issue is what was Mr. Combs's intent.  This witness's own opinion or speculation --

THE COURT:  You're saying it calls for speculation?

MS. SHAPIRO:  It calls for speculation.  It's 403.  It's really got nothing to do with -- and as your Honor -- as we indicated, there's no dispute that the money was paid for the video and with the expectation that other copies wouldn't exist.  That's not what's disputed.  This witness's own beliefs or fears or whatever are completely irrelevant and is speculation to the extent about what was in Mr. Combs's mind is irrelevant.

MS. COMEY:  Your Honor, if I may, if it's all right.  That conversation is some of the most probative piece of evidence about what the agreement was about who would not be informed about this bribe and about this video.

THE COURT:  You got the conversation in.

MS. COMEY:  But the meeting of the minds about the understanding of what to do and what not to do and why really is the core of the agreement.  The agreement is we will not tell law enforcement.

THE COURT:  Under the bribery statute?

MS. COMEY:  Yes, your Honor, that is the agreement that we understand is being reached and is culminated at the point of that conversation, at the end of getting the money, at

P63Ccom3                         Garcia - Direct

the end of giving the video, what Mr. Combs says is, don't go making any big purchases, be smart with the money.  And the only reason to say that is if he's concerned about law enforcement.  And the fact that the bribe recipient understands what he's telling him is, don't do anything that will draw law enforcement's attention is probative of the agreement that the money is being paid not just to prevent the press from finding out, but from law enforcement from finding out.

THE COURT:  My understanding of the bribery statute is that there's no element that requires a meeting of the minds or agreement.  It requires evidence of the defendant's intent, meaning if your intent is to bribe someone, to impair a governmental investigation, that would be sufficient to satisfy the elements of bribery, correct, Ms. Shapiro?

MS. SHAPIRO:  I believe that's correct, your Honor. As your Honor pointed out, the conversation is out, Mr. Combs's words are in the record.  They have been testified to.  This witness's idea about the purpose is irrelevant and speculation.

THE COURT:  Well, the reason I raised that issue is because I don't think you have the burden of showing a meeting of the minds.  It all goes to the defendant's intent.  If that's the case, this witness's understanding of what the defendant meant would be either an opinion or improper speculation.

MS. COMEY:  So I think you're right, your Honor, that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

we don't have to prove meeting of the mind, but a meeting of the minds is probative of the intent and of the violation. Maybe we could go back and lay a foundation, because I think if Ms. Steiner asked this witness based on all of your conversations with Mr. Combs, all of your interactions, and his demeanor and tone of voice when having this conversation with you, what did you understand he was directing you to do, I think she could lay a proper foundation.

THE COURT:  Here's what we're going to do:  I will maintain the ruling on the objection.  However, we're about to have cross-examination, and if I'm remembering the back and forth on this, when there was pretrial motion practice on this, the defense had indicated in some ways how they were going to cross examine this witness.  So let's see what happens, because they may open the door to further questioning on this on redirect.  So let's handle it that way.

(Continued on next page)

(In open court)

THE COURT:  Ms. Steiner, any further inquiry?

MS. STEINER:  Yes, briefly, your Honor.

Q.  Mr. Garcia, did you see a video of the March 5th incident again after March of 2016?

A.  Yes.

Q.  And under what circumstances?

A.  On a news outlet when it was released.

Q.  Approximately, when was that?

A.  2024, I believe.

Q.  And at the time that you had given the USB to Mr. Combs, were you aware of any other copies of the video?

A.  No.

Q.  Aside from the video that you observed on the news, did you later learn about any other copies of the video?

A.  Yes.

Q.  From who?

A.  Israel Florez.

Q.  And what did Mr. Florez show or tell you?

A.  It was a text message just with a standstill of the video of Mr. Combs in the sixth floor elevator landing.

Q.  When you say a standstill, are you referring to a screenshot?

A.  A screenshot.

Q.  To be clear, did you see another copy of the video or just

P63Ccom3                    Garcia - Direct

the screenshot that Mr. Florez provided to you?

A.  The screenshot.

Q.  Did you keep the screenshot and the text messages between yourself and Mr. Florez?

A.  No.

Q.  What did you do to them?

A.  I deleted them.

Q.  Why did you delete the messages?

A.  At the time I wanted nothing to do with the incident or anything pertaining to it, so I deleted the messages.

Q.  Did you delete any other messages about this incident?

A.  Yes.

Q.  What messages are those?

A.  Messages with Henry Elias that made reference to either the video or the incident.

Q.  Do you recall approximately when you deleted them?

A.  Late -- it was in 2024, after June.

Q.  Did there come a time in June of 2024 where you were contacted by law enforcement in connection with this case?

A.  Yes.

Q.  And did you meet with law enforcement and prosecutors around that time?

A.  Yes.

Q.  Were you fully truthful in that initial discussion with law enforcement?

P63Ccom3                    Garcia - Direct

A.   No.

Q.   Why not?

A.   Again, I didn't want to be part of any of this and wanted to stay away from it.

Q.   What were you not honest about?

A.   My involvement in selling of the video.

Q.   And you testified a moment ago that you deleted messages with Mr. Florez and Mr. Elias, correct?

A.   Correct.

Q.   Did you delete them after this initial meeting in June of 2024?

A.   Yes.

Q.   Shortly after that meeting?

A.   Yes.

Q.   Were you represented by an attorney at that time?

A.   I was.

Q.   And who did that attorney also represent?

A.   It represented Securitas.

Q.   Was that the company that had employed you at the time, in March of 2016?

A.   Correct.

Q.   Were you subsequently appointed your own counsel?

A.   Yes.

Q.   Did you meet with the government again after you were appointed your own attorney?

P63Ccom3                         Garcia - Cross

A.  Yes, later that year.

Q.  In that second meeting, did you disclose to the government that Mr. Combs had paid you for the video?

A.  Yes.

Q.  Did you have subsequent meetings with the government after that second meeting?

A.  Yes.

Q.  And were you truthful in each of those meetings?

A.  Yes.

Q.  And has your testimony here today before the jury been truthful to the best of your ability?

A.  Yes.

        MS. STEINER:  No further questions, your Honor.

        THE COURT:  Mr. Steel.

        MR. STEEL:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. STEEL:

Q.  Good morning, sir.

A.  Good morning.

Q.  Sir, you're in the apartment with -- or condominium with Mr. Combs, his security personnel, and at times his personal assistant, do you remember that day?

A.  Yes.

Q.  March 7th, 2016; fair to say?

A.  Yes.

P63Ccom3                          Garcia - Cross

Q.  When you're there, you receive double the amount of money that your co-worker or your boss was anticipating, true?

A.  Correct.

Q.  And you were honest enough to go back and tell your coworkers that, actually, you have $100,000, not 50, fair?

A.  Yes.

Q.  Because you wanted to be honest, right?

A.  Yes.

Q.  Because that's your nature, right?

A.  Yes.

Q.  And Mr. Combs, you look in the rearview mirror to see if you're being followed, but you got a good feeling about him, he was professional with you, true?

A.  Yes.

Q.  And, in fact, a couple years later, maybe not a couple years later, but two and a half years later, somewhere in there, you actually reached out to Mr. Combs just to say, you know, if you need work, whatever type of work that I can assist you with, I'd appreciate the thought, right?

A.  Incorrect.  Not any type of work.  Security work.

Q.  I apologize.

And I know that message may not have gotten through or did get through, but there was no more contact; fair to say?

A.  Correct.

Q.  I want to ask you, if you don't mind, looking at a document

that I don't think that you read, you said, you made that pretty clear, do you mind doing it with the jurors now?

MR. STEEL:  Your Honor, with the Court's permission, it's already in evidence, C-111, if that can be displayed.

THE COURT:  It may.

Q.  You've seen it since, though, to testify today, you've gone over this document with the prosecutors, right?

A.  Correct.

Q.  And if you need to read everything, you can.  I'd like to focus you on paragraph 4, if you don't mind, and then we're going to talk about paragraph 3; is that okay?

A.  Yup.

Q.  Do you mind if I just read this and just make sure I'm reading it correctly, and I want to ask you a couple things. Is that okay?

A.  Okay.

Q.  This is paragraph 4 from the document we just said that's in evidence.  It says, exclusions from nondisclosure or non-use obligations, meaning you can disclose this; is that your understanding?

A.  My understanding of NDA is that you don't speak about it.

Q.  Okay.  And this part, though, says, exclusions from nondisclosure, meaning you can -- we'll keep reading.  Okay?

A.  Okay.

Q.  Recipient obligations under Section 2 and 3 do not apply to

any confidential information that recipient can document, A, was in the public domain at or subsequent — meaning after — to the time the confidential information was communicated to recipient by company through no-fault of recipient.  Okay, true, that's what it says?

A.   That's what it says.

Q.   B, was rightfully in recipient's possession free of any obligation of confidence at or subsequent to the time the confidential information was communicated to recipient by the company; or C, was independently developed by employee's contractors, or agents of recipient without use of, or reference to, any confidential information.  A disclosure of any confidential information, A -- and this is what I'm stressing, okay, Mr. Garcia?

A.   Okay.

Q.   In response to a valid order by a court or other governmental body; or B, as otherwise required by law, will not be a breach of this agreement or a waiver of the confidentiality for other purposes.  Do you see that?

A.   Yes.

Q.   And you understand what that means, correct?

A.   Not in its entirety.  Maybe you can explain it.

Q.   Tell me if this makes sense to you, and we'll continue reading it thereafter.  If the court, like the honorable Court that's sitting above us all, orders you or other people to

P63Ccom3                         Garcia - Cross

divulge this information, you can divulge the information; is that what that says?

A.   Sounds right.

Q.   And then it says it doesn't really have to be a court, another governmental body can do the same.  Do you understand that?

A.   Yes.

Q.   And then it says, or B, or otherwise required by law.  That means any other legal matter will not be a breach.  A breach means you would not violate this agreement, right?

A.   Correct.

Q.   I'm going to continue where we stopped.

     Provided, however, that the recipient provides prompt written notice thereof to company and enable company to seek a protective order or otherwise prevent the disclosure.  That means you'd have to notify the company, true?

A.   That's what it says.

Q.   No. 5, if you could look at that paragraph, if you don't mind, in the same document.  This says non-disparagement. Without limiting the foregoing, recipient agrees that recipient shall not at any time use, disclose, disseminate or confirm, directly or indirectly, to anyone any information or material, confidential or otherwise, whether or not acquired by recipient in the course of, or in connection with, the purpose which may harm, disparage, demean, or reflect negatively or poorly upon,

P63Ccom3                          Garcia - Cross

or cause injury to the reputation, character, or career of
Combs, or Combs parties, right?

A.   Right.

Q.   And that's what the genesis of what you understood this to
be, Mr. Combs was a public figure you said, right?

A.   Correct.

Q.   I think your word was an extremely well known public
figure, I think you said something like that.

A.   I don't recall my exact words, but something along the line
of that.

Q.   And you've known him for years before this, you recognize
his voice?

A.   Correct.

Q.   And you called him, I believe, a celebrity.  If you didn't
that's fine.  These are my notes, so it may be wrong.

A.   I believe I said celebrity.

Q.   I'm just going to continue just to finish it.

     However, nothing in this agreement is intended to prevent
recipient from making any truthful statements in any legal
proceeding or other required by law, right?

A.   Right.

Q.   Now, you're not law enforcement?

A.   No.

Q.   At this time, are you?

A.   No.

MR. STEEL:  And you could take down the exhibit, if you don't mind.

Q.  And you weren't law enforcement when you were 26 years old, right?

A.  The incident occurred when I was 24, but no, I've never been law enforcement.

MR. STEEL:  I think I have no other questions, your Honor.  May I have just one second?

THE COURT:  All right.

MR. STEEL:  Thank you, your Honor.

THE COURT:  Ms. Steiner.

MS. STEINER:  Ms. Gavin, could we please bring back up for the jury Government Exhibit C-111.  We can look at paragraph 4.  You can zoom in to that.

REDIRECT EXAMINATION

BY MS. STEINER:

Q.  Mr. Garcia, you were asked on cross-examination about this paragraph.  Do you recall that?

A.  Yes.

Q.  Can you please read the last sentence of this paragraph.  Actually, let me direct you even more specifically.  After however.

A.  However, that a recipient provides prompt prior written notice thereof to company to enable company to seek a protective order or otherwise prevent the disclosure.

Q.  This paragraph was about disclosing to, among others, law enforcement; is that right?

A.  Correct.

Q.  If you were to disclose to law enforcement, would you have to notify the company under this provision?

A.  I'm not sure how that works, but I know that I did inform law enforcement.

Q.  Do you know who this company is referring to?

A.  I would not know directly the company, but I would assume, because it --

Q.  Was this company referring to Mr. Combs's company?

A.  Yes, that's what I would assume, that it's referring to Mr. Combs's company.

Q.  And this is a nondisclosure agreement, correct?

A.  Correct.

Q.  When you signed this agreement and you took $100,000 from Mr. Combs, what was your understanding about whether you could report that you had received that money to law enforcement?

            MR. STEEL:  Your Honor, I'm objecting.  Same basis.

            MS. STEINER:  Your Honor, I think the door was opened on this.

            THE COURT:  That objection is overruled.

            MR. STEEL:  Your Honor, can we have a sidebar?

            THE COURT:  You may.

            (Continued on next page)

(At the sidebar)

THE COURT:  All right.

MS. SHAPIRO:  Your Honor, the door was not opened.  In fact, Mr. Steel deliberately stayed away from this issue because of the prior sidebar.

In addition, I just want to point out that the elements of bribery really do not involve this witness's understanding.  The California bribery statute makes it a crime, has elements.  The elements only require that the conspirator had to act with the corrupt intent to persuade the witness or person to agree that the bribe would unlawfully influence the testimony or information the witness or person would give, and the corrupt intent --

And so there's a requirement that goes to Mr. Combs's state of mind.  This witness's understanding is irrelevant. All Mr. Steel did on cross, and deliberately so, was to simply have the witness read a provision of the document that's already in evidence.  The government has redirected on that precise paragraph.  It's going beyond the scope.  No door was opened.  This is incredibly unfairly prejudicial and in violation of 403.  There is no basis whatsoever.  If we're going to go down this path, we might as well open this up on recross to extensive additional questions that Mr. Steel deliberately refrained from engaging in precisely because of the last sidebar.

THE COURT:  The issue here is a little bit different, because on direct, there was questioning about statements that Mr. Combs made to the witness and what the witness's understanding of those statements were.  So I thought the objection was well taken there, that to the extent the witness would testify as to what his understanding of what Mr. Combs had said, that would be speculating on Mr. Combs's state of mind or calling for an opinion, that would be impermissible. Here, there was an agreement that was introduced on cross-examination --

MS. SHAPIRO:  No, it was introduced on direct.

THE COURT:  Whether it was on direct, there was questioning on cross-examination about particular statements. And so I think the only question that Ms. Steiner was really asking is, when you signed this agreement, what was your personal understanding of what you could or could not do.  So what's the problem?

MS. SHAPIRO:  He testified on direct that he didn't read it before he signed it.  So this is just a subterfuge to get in what she was trying to get in at the end of the direct when the Court sustained our objection for purposes of the direct.

THE COURT:  That's fair enough.

MS. SHAPIRO:  Because he did testify on direct that he didn't read these agreements.  This is speculation given that

he didn't read it at the time.  They're just asking him what was in his head previously.

THE COURT:  That's why it's not speculation, because he's being asked what was his understanding of what he was allowed -- certainly not --

MS. SHAPIRO:  We are getting sandbagged here.

THE COURT:  Hold on.  It's not speculation in the way that the prior questions that were objected to would elicit potential speculation.  You would agree that this one is not asking for speculation, it's asking about his understanding.

MS. SHAPIRO:  It's asking about his understanding, your Honor, but they put in the document, which he signed, they elicited on direct that he didn't read it before he signed it.  The document is in evidence.  Mr. Steel's questions were simply reading the provision and asking him about what it says today.  To go beyond that and ask him, even though he didn't read it, what his understanding was is unfairly prejudicial, and it doesn't go to --

THE COURT:  That's the one part of the objection that is well taken, that is on direct, he said that -- hold on.  Let me see if I can figure this out.  So there was testimony that he did not read the agreement.  So having not read the agreement, how can you now ask him what was his understanding based on an agreement he did not read?

MS. COMEY:  That's totally fair, your Honor.  So I

think it is responsive to Mr. Steel's questioning, which if Mr. Steel had just had him read the statement and not asked him what does it mean, and then asked a series of questions about Mr. Garcia's interpretation of that paragraph, I think that point would be well taken, but that's not what Mr. Steel did. Mr. Steel did not just pull up the text and say, read this out loud, and put it back down. He pulled up the text, said read this out loud, and then interpreted a text with Mr. Garcia and asked what Mr. Garcia's understanding was about what that provision meant. I think it left a misimpression with this jury about what this witness's understanding was of his obligations under this agreement. I think we're allowed to correct that misunderstanding with a single question, single question with what his understanding was after signing this agreement about whether he could report to the police. That's all.

THE COURT: Understood.

MS. SHAPIRO: Your Honor, if they want to correct an alleged misunderstanding, the proper question is to simply reinforce that he didn't read the agreement, and so wasn't aware that it said that at the time. But the idea that you go beyond that to what his general understanding was apart from the agreement is unfairly prejudicial and goes beyond the scope of what the cross was about, and the cross was deliberately incredibly targeted and tailored to avoid exactly this type of

P63Ccom3                        Garcia - Redirect

thing.  And if we hadn't had the prior sidebar, Mr. Steel had a

bunch of other questions he would have asked, but we

deliberately tried to avoid opening this door.  And it was

extremely limited questioning.  And the only response to any

alleged misimpression, not to repeat myself, is to simply

reinforce that he didn't read the agreement and didn't have

that understanding at the time.

            THE COURT:  I understand the parties' positions.  I

need to take a quick look at the transcript.

            (Continued on next page)

(In open court)

THE COURT:  The prior objection made by the defense is sustained.

Any further questions, Ms. Steiner?

MS. STEINER:  Yes, briefly, your Honor.

Q.  Mr. Garcia, a moment ago, you said you did inform law enforcement about this incident.  Do you recall saying that on my redirect?

A.  Yes.

Q.  When you said that you informed law enforcement, were you referring to your conversations with federal law enforcement in 2024?

A.  Yes.

Q.  So not in March of 2016?

A.  No.

MS. STEINER:  No further questions.

THE COURT:  Thank you, Ms. Steiner.

Anything further, Mr. Steel?

MR. STEEL:  No.  Thank you, sir.

THE COURT:  Thank you very much.  You may leave the stand.

(Witness excused)

This will be a good time for a break.  Thank you, members of the jury.  We'll be back in 15 minutes.  We'll come back at 11:30.

(Jury not present)

THE COURT:  Please be seated.  Ms. Geragos, did you have a chance to look at the exhibit we were previously discussing or would you like to pick that up before the lunch break?

MS. GERAGOS:  I'm happy to do it now, your Honor.  I do think, though, if I can speak to Ms. Foster, we may be able to confer about specific redactions, but I'm happy to also address it on the record now.  So either way.

THE COURT:  I'm always happy for the parties to meet and confer if you think it can resolve the objection.  But a general issue has been raised where multiple bases for admission of the conversation were offered by the government. And so if you're saying you don't have a general objection, but you have some redactions that you would propose, then that's fine.  But if you are still objecting to the entirety of the conversation, then I'd like to hear the conversation either now or at the beginning of the lunch break.

MS. GERAGOS:  I will tell your Honor that I have an objection to many text messages within the exhibits as hearsay within hearsay.  So if those specific parts are redacted, I think it would give the ability -- the point of the exhibit, I think it's important for the government to have this conversation with Mr. Combs and this other individual about Ms. Ventura to be in there, and I think those parts of the

conversation we don't have the hearsay within hearsay problems that we do in other parts of the conversation.  So I think redacting the hearsay within hearsay parts of the conversation about this other individual allows the jury to -- they won't be confused, it will give the government what it needs in terms of Mr. Combs's part of the conversation and then we don't have the hearsay concerns.

THE COURT:  In particular, are you talking about the particular text concerning telling two other individuals that what transpired happened at the club as opposed to some other explanation, is that what you're referring to or something else?

MS. GERAGOS:  No, I'm referring to when D-Roc talks about what another individual says.  I think that's hearsay within hearsay.  But I think that the parts of the conversation where Mr. Combs is saying --

THE COURT:  Let me make this simple.  Any time Mr. Combs is speaking or D-Roc is speaking, you're saying that may be fine, but we would need to redact instances where other individuals' statements are referenced in these text messages, and perhaps the government would say, well, we don't care about those anyway?

MS. GERAGOS:  I think, although I'd have to talk to Ms. Foster, I think because the parts that D-Roc would be talking about what another individual is saying doesn't take

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

away from the Ventura part of the conversation, which is I think the import of the conversation, why they --

THE COURT:  Why don't you speak with Ms. Foster and we can pick this up at the beginning or end of the lunch break, assuming this will not come up before then.

And Ms. Smyser, Mr. Piazza will be our next witness?

MS. SMYSER:  That's what I wanted to address with the Court.  So given the conversation this morning, Mr. Piazza has been doing a little work on the compilations to ensure that essentially no time is dropped from the compilation to address the defense's concerns that were raised this morning.

I will just note for the record that we have turned over this compilation two weeks ago, but we're trying to address those issues now while Mr. Piazza is here.

Because of that, we are going to call Derek Ferguson before Mr. Piazza in order to give him a little bit more time to address the compilations, in order to give the defense time to review after he is done so we can hopefully finish this up today.  I would just, if we can have an extra five minutes on this break so Ms. Slavik can be prepared to put on Mr. Ferguson right after.

THE COURT:  That's fine.  So we'll come back at 11:35.

(Recess)

(Continued on next page)

P63Wcom4

THE COURT:  Please be seated.

Anything to address before we bring the jury back out?

MS. STEINER:  Your Honor, I'll just note that the government intends to put up a few exhibits for the jury before its next witness.

THE COURT:  Understood.  Let's bring our jury back out.

(Continued on next page)

P63Wcom4

(Jury present)

THE COURT:  Please be seated.

Ms. Steiner.

MS. STEINER:  Thank you, your Honor.

Ms. Gavin, could you please bring up what's in evidence as Government Exhibit 1301, which is a stipulation.

I'm going to read portions of this into the record. If you could please highlight paragraph 1 and subpart (b).

"On or about March 25 of 2024, at the Miami Opa-Locka Airport in Opa-Locka, Florida, law enforcement agents from Homeland Security Investigations ('HSI') seized the following devices;

"(b) Government Exhibit C200 and Government Exhibit C300, two cell phones from Kristina Khorram's person."

And if we could put up, next to page 1, page 2.

If we could please highlight paragraph 4:

"Government Exhibits C300A through C364, including the subdivisions thereof, are true and accurate excerpts of data extracted from GXC300," which is Kristina Khorram's device.

At this time the government offers Government Exhibit C360.

THE COURT:  Any objection?

All right.  Hearing nothing, exhibit 360 will be admitted.

(Government Exhibit C360 received in evidence)

P63Wcom4

MS. STEINER:  Thank you.  If we could please publish that for the jury.

Ms. Gavin, if you could turn to page 2 of Government Exhibit 360 and just highlight the top.

I'm going to read portions of this document into the record.  It reads:  "Contents and contacts."  There are 24 contacts.

And if we could turn now to page 3, and if we could highlight line 7 and line 8.

And I'll read these into the record:  "Contact Eddy, my angel, phone number 323-246-5240.

"Contact Eddy (InterContinental) phone number 323-246-5240."

I want to bring up a few additional exhibits from this device.

Ms. Gavin, can you please bring up what's in evidence as Government Exhibits C-364-5A.  And 5B.  And 6A.

You can take that down and keep up the stipulation.

And if we could turn to the second page of the stipulation and highlight the top of the page.

"(d) Government Exhibit C100 is a laptop from Khorram's suitcase."

And if we could now also bring up Government Exhibit 111, and I'll read also from paragraph 6 in the stipulation:

"Government Exhibits C101 through C113, including the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P63Wcom4

subdivisions thereof, are true and accurate excerpts extracted from Government Exhibit C100, which is the laptop from Khorram's suitcase."

And under that we have Government Exhibit C111.

And if we could replace that with Government Exhibit 106 -- C106.

And if we could highlight the top of that document.

Thank you, Ms. Gavin.

THE COURT:  All right.  The government may call its next witness.

MS. SLAVIK:  Your Honor, before the government calls its next witness, the government will offer business records from Signature Bank pursuant to the stipulation between the parties at Government Exhibit 1304.  So let me read those exhibits that the government is offering:  Government Exhibits 4G110, 4G111, 4G120, 4G121, 4G122, 4G130, 4G140, 4G141, 4G150, 4G151, 4G160, 4G161, 4G170, 4G171, 4G180, and 4G190, 191 and 192.

The government also offers Government Exhibit 4G131.

THE COURT:  Any objections?

MR. AGNIFILO:  No, Judge.

THE COURT:  All right.  Those exhibits will be admitted.

(Government Exhibits 4G110, 4G111, 4G120, 4G121, 4G122, 4G130, 4G140, 4G141, 4G150, 4G151, 4G160, 4G161, 4G170,

P63Wcom4                          Ferguson - Direct

4G171, 4G180, and 4G190, 4G191, 4G192 and 4G131 received in evidence)

MS. SLAVIK:  With that, the government calls Derek Ferguson.

DEREK FERGUSON,

called as a witness by the government,

having been duly sworn, testified as follows:

THE COURT:  Ms. Slavik, you may proceed.

DIRECT EXAMINATION

BY MS. SLAVIK:

Q.  Good morning, Mr. Ferguson.

A.  Good morning.

Q.  Mr. Ferguson, why are you testifying here today?

A.  I received a subpoena.

Q.  What does that subpoena obligate you to do here today?

A.  Testify truthfully and honestly.

MS. SLAVIK:  Ms. Gavin, could you publish what's in evidence as Government Exhibit 2A-101.

Q.  Mr. Ferguson, do you recognize the individual in this photo?

A.  Yes.

Q.  Who is it?

A.  Sean Combs.

Q.  How do you know Mr. Combs?

A.  I worked for Mr. Combs and his various companies from 1998

through 2017.

Q. How many different roles did you hold from 1998 until 2017?

A. Three roles: chief financial officer, chief growth officer and chief operating officer of one of the subsidiaries, Revolt Media and TV.

Q. Focusing on your CFO role, what company did you work for as CFO?

A. The company was Bad Boy Entertainment.

Q. And you said that your position was CFO?

A. CFO, yes.

Q. Can you explain to the jury what CFO stands for?

A. Chief financial officer.

Q. And at a high level, what does a CFO do?

A. Chief financial officer oversees all of the finances of a company, starting with financial budgeting for that company, understanding the inflows and the outflows of that company, arranges for any financing needs of the company, collects accounts receivable, pays accounts payable, is responsible for the accounting and recordkeeping.

     In my role I also was responsible for managing some of the joint venture businesses, doing some of the deal making, whether it was joint ventures or partnerships or strategic relationships, divestitures.

Q. We'll get back to your role as CFO at Bad Boy, but first I just want to ask you a couple of questions about Bad Boy.

P63Wcom4                    Ferguson - Direct

Can you explain what sort of company Bad Boy was?

A.  Well, Bad Boy really was a collection of companies individually, either -- either individually held by Mr. Combs or joint ventures.

Q.  Who owned Bad Boy?

A.  Each company would have their own ownership.  A number of the companies would be owned by Mr. Combs, and there were a few joint ventures.

Q.  Did Bad Boy have offices?

A.  Yes.

Q.  Where were they?

A.  During my tenure, New York City.

Q.  Anywhere else during your tenure?

A.  I think there may have been -- L.A. may have came about toward the end of my tenure.

Q.  And can you just remind the jury when, what time period you were CFO for?

A.  CFO 1998 through 2012.

Q.  And during that time period, you said that there were offices in New York City?

A.  Yes.

Q.  Where exactly in New York City?

A.  Three locations I remember: 1440 Broadway, 1540 Broadway and 1710 Broadway.

Q.  Where did you work as CFO?

A.   I worked in all three of those offices at different points in time.

Q.   All three New York City offices?

A.   Yes.

Q.   As the CFO of Bad Boy, did you work within a specific department?

A.   Yeah.  Our department would be considered the finance department, finance and accounting.

Q.   When you started as CFO, how many other employees were there in the finance department?

A.   I would say three or four.

Q.   Did that change over time?

A.   It did.

Q.   And how did that change?

A.   It grew to about, maybe, ten.

Q.   Were you paid by salary as CFO?

A.   Yes.

Q.   Were you also paid in bonuses?

A.   Yes.

Q.   How were those bonuses determined?

A.   Usually by my immediate boss.

Q.   And what factors went into determining your bonus, if you know?

A.   Overall company results and my performance.

Q.   Were you paid by Bad Boy?

P63Wcom4                        Ferguson - Direct

A.  Yes.

Q.  Now, you described some of the responsibilities of a CFO generally.  I'd like to focus on your duties and responsibilities as the CFO of Bad Boy.

Can you explain what your duties and responsibilities were?

A.  Very similar to the earlier description, really setting the budgets for the companies, managing the actuals versus budget, so what's actually happening versus what we planned; accounts receivable; accounts payable; accounting; recordkeeping.

As I mentioned, I was also involved in some of the deal making, whether it be joint ventures, strategic partnerships, buying and selling companies.

Q.  As CFO at Bad Boy, were you responsible for managing Mr. Combs's personal finances?

A.  During different periods of time throughout my tenure, his personal finances did fall under my responsibility.

Q.  We'll come back to that.

You said that you were responsible for accounts payable and accounts receivable.

Do you remember just saying that?

A.  Yes.

Q.  Can you explain to the jury what accounts payable are?

A.  Accounts payable are if you incur, if you incur a debt or if you secure a service and you have to pay for it within 30, 45 days, it would sit as an accounts payable until you pay it.

Q.  In other words, that's money going out of the company?

A.  Money going out of the company, yes.

Q.  What about accounts receivable; what is accounts receivable?

A.  Accounts receivable, if you make a sale, if you, if you're engaged for a service and you're collecting the money that you earn from that sale or service.

Q.  In other words, that's money coming in?

A.  Money coming in.

Q.  Who was your supervisor when you were CFO?

A.  It varied over my tenure.

Q.  Can you explain how that varied?

A.  At certain points in time, there was a president role at Bad Boy, and that president would be who I directly reported to.  Other times there was no president, and I would report directly to Mr. Combs.

Q.  When you first started as CFO, how often did you interact with Mr. Combs?

A.  Pretty regularly.  A couple of times a week, I would say.

Q.  Did that change over time?

A.  Over time, I think as more professional management was added to run the companies, you know, he -- he really became more of a chairman versus running the companies on a day-to-day basis.  So I would say yes, it did change over time.

Q.  In other words, your contact with Mr. Combs decreased over

time, is that fair to say?

A.  That's fair to say.

Q.  How did you communicate with Mr. Combs?

A.  In person.  Back then we had two-way pagers.  Telephone.
Email.

Q.  During your tenure as CFO, did Mr. Combs have staff?

A.  Yes.

Q.  Did that include security personnel and personal
assistants?

A.  Yes.

Q.  How often were personal assistants or members of
Mr. Combs's security staff with him in person?

A.  Quite often.

        MS. SLAVIK:  Ms. Gavin, could you please publish
what's in evidence as Government Exhibit 2A-204.

Q.  Mr. Ferguson, do you recognize this individual on the
screen?

A.  Yes.

Q.  Who is that?

A.  Paul Offord.

Q.  Do you know him by any other names?

A.  No.

Q.  What was Paul Offord's job?

A.  He was basically our chief security officer.

Q.  How frequently did you interact with Mr. Offord?

P63Wcom4                    Ferguson - Direct

A.   Pretty regularly.  I would say every other week or so.  He would handle all of the security budgets, and we would correspond regarding that.

MS. SLAVIK:  You can take this down, Ms. Gavin.

And if you could publish side by side what's in evidence as Government Exhibits 2A-201 and 202.

Q.   Mr. Ferguson, do you recognize the individuals on the screen here?

A.   I do.

Q.   Who are they?

A.   Bonds, Roger Bonds and D-Roc.

Q.   Looking at the photo on the left, that's Government Exhibit 2A-201, who is that?

A.   Bonds.

Q.   And the one on the right; that's Government Exhibit 2A-202?

A.   D-Roc.

Q.   Who are Bonds and D-Roc?

A.   They were security as well and probably later in my tenure came on board.

Q.   How frequently did you interact with them?

A.   Not really frequently.  You know, I would see them and greet them, but not -- I didn't have frequent interactions with them.

MS. SLAVIK:  Thank you, Ms. Gavin.  You can take that down.

Q.   You mentioned that Mr. Combs had assistants on staff as well, is that right?

A.   Yes.

Q.   Did you interact with those assistants?

A.   Depending.  Some of them, on occasion, yes.

Q.   In what contexts?

A.   Maybe a scheduling question or they may have a question for me.

Q.   Were these assistants and security staff folks employed by Mr. Combs?

A.   Yes.

Q.   Were they paid by Mr. Combs's corporate entities?

A.   Depends on who we're referring to, but many of them were.

Q.   Are you aware of anyone who was not?

A.   There would -- there could be, in this definition of assistant, people that worked just at the homes or were not related to business, which would not have been in the business entities.

Q.   In other words, household staff?

A.   I would say broadly, yes, household staff.

Q.   OK.  I want to talk a little bit more about Bad Boy, which you described as a collection of companies.

     Do you remember that?

A.   Yes.

Q.   Was Mr. Combs the sole owner of any of these companies?

P63Wcom4                         Ferguson - Direct

A.   Yes.

Q.   What does it mean to be the sole owner?

A.   That means you own 100 percent of the company.

Q.   Can you name a few of the companies that Mr. Combs solely owned?

A.   Bad Boy Productions, Bad Boy Marketing, Bad Boy Films.

Q.   What were those -- what was the purpose of those companies?

A.   Pretty much follows the description.

So Bad Boy Productions would be a company that furnishes his services as a producer primarily.

Bad Boy Films was a television film company, which produced television and film projects.

Bad Boy Marketing was a marketing company that engaged with brands and provided marketing services to various brands.

Q.   When you first started, what was Mr. Combs's level of involvement in these companies?

A.   Well, he always drove the creative and product development and marketing for -- for all of the companies.

Q.   Did that change over time?

A.   That really didn't change.

Q.   Did his day-to-day involvement change over time with respect to these companies?

A.   It depends on which company you're referring to, but I would say, in general, as I mentioned, more management was hired, so there were more heads of companies that were engaged

P63Wcom4                          Ferguson - Direct

to handle the day-to-day business.

Q. Was Mr. Combs involved in any business ventures that had partners?

A. Yes.

Q. Just briefly, what sort of partnerships was Mr. Combs involved in?

A. So, the record companies were partnerships in some cases. So the -- Bad Boy Records was a partnership between Bad Boy and Arista Records.

Warner Music was a joint venture between Warner and Bad Boy. And those, those would be two of the prominent joint ventures.

The clothing company, Sean John clothing, was -- also had a partner as well.

Q. How was the ownership structure different from the partnerships that you just described versus the solely owned companies that you talked about a second ago?

A. So, the ownership structure would be different in that there would be joint ownership in each case versus 100 percent ownership.

Q. In other words, Mr. Combs owned the venture with partners as opposed to just himself?

A. Yes.

Q. Now, you just described a couple of businesses and partnerships that Mr. Combs was involved in.

P63Wcom4                          Ferguson - Direct

At a high level, what was your role with respect to these businesses and partnerships?

A.   So, in some cases, maybe it actually started with, if it was a joint venture deal started with the deal itself and structuring that.  But then it would, it would then, then go to the things I described previously, which would be budgeting, annual budgeting, tracking budget versus actual, try to make sure that we hit our numbers, hit our plan.  It would be, you know, expense management; financing, if required; managing the financing of the company; and really just managing the results, the financial results of the company and also responsibility for accounting and recordkeeping.

Q.   Were these businesses and partnerships profitable?

A.   Majority of these businesses were profitable.

Q.   And in terms of profits, are we talking millions, tens of millions?  Give us a sense of the scale.

A.   Depends on the company, but --

Q.   Overall, how profitable were Mr. Combs's companies?

A.   Overall, very profitable.

Q.   How was Mr. Combs paid?

A.   He was either paid -- couple ways.  Paid via salaries in some cases and also distributions from his companies.

Q.   Focusing on salaries, from what entities did Mr. Combs draw a salary?

A.   I mean I remember them all, but you know, and this is

P63Wcom4                           Ferguson - Direct

different during the course of my tenure.  So at some point through -- excuse me.  At some point through the record company, he drew a salary.  Through the clothing line, Sean John clothing, he drew a salary at some point.  I believe Revolt as well.

Q.  And how was his salary determined by these companies?

A.  Well, these companies I just mentioned are -- were all with partners, so they would have to be agreed upon with partners, probably, probably dictated by the operating agreement between the partners.

Q.  And you mentioned that Mr. Combs was paid by distribution as well.  What is a distribution?

A.  Distribution -- so, when you have a solely owned company or a company that is what I would define as a pass-through entity, like an S corp. or an LLC, you -- your profits sit in that company until you decide to distribute them.  So a distribution is taking profits that were earned and distributing them to the owners.

Q.  And the owner in this case was Mr. Combs?

A.  Yes.

Q.  Who determined when Mr. Combs would receive a distribution?

A.  In joint venture deals, that would be usually dictated by an operating agreement and -- or decided by the partners.  And in his wholly owned companies, he could decide that on his own.

Q.  And who determined the amount of the distribution?

P63Wcom4                          Ferguson - Direct

A.  The amount of the distribution would be based on the profits, so you generally would not distribute more than the profits of the company.  So that would be -- the finance department would, would basically determine what numbers were, were the recommended numbers to distribute.

Q.  I want to move to banking and finances.

Did the businesses and partnerships that we've just been talking about have bank accounts?

A.  Yes.

Q.  Did they all share one bank account?

A.  No.  They, they all had individual bank accounts.

Q.  What was the purpose of each entity having its own bank account?

A.  Pretty standard for each company to have their own account so you can track funds of that company, not have cross-liabilities between the companies.  So a standard structure would be for each company, each entity to have their own bank account.

Q.  Who oversaw these bank accounts?

A.  The finance team would oversee the bank accounts.

Q.  Who had access to the bank accounts?

A.  Myself, Mr. Combs.  Several members on the finance team would have certain levels of access as well.

Q.  Who had signature authority?

A.  Usually for the wholly owned companies, myself and

Mr. Combs.

Q.  And can you just explain what signature authority means?

A.  It meant that either of us would be able to sign checks on the account.

Q.  Either of us being you or Mr. Combs?

A.  Yes.

Q.  Where did Bad Boy have banking relationships during your tenure?

A.  It changed over time as well, but I would say three banks that come to mind are Citibank, HSBC, Signature Bank.

MS. SLAVIK:  Focusing on Signature Bank, I want to walk through a couple of documents with you.

Ms. Gavin, could you please publish what's in evidence as Government Exhibit 4G-140.

Q.  Mr. Ferguson, do you recognize this document?

A.  Yes.

Q.  What type of document is this?

A.  This is a bank-opening document, bank application.

Q.  And focusing on the top portion of this document, do you see the account title here?

A.  Yes.

Q.  What is it?

A.  Janice Combs Music Inc.

Q.  What is Janice Combs Music Inc.?

A.  Was an entity, one of Mr. Combs's entities.  This entity

pretty much furnished his name and likeness, was the primary use of this entity.

Q. And was this entity a partnership, or was it solely owned by Mr. Combs?

A. This, during my tenure, was 100 percent owned by Mr. Combs.

Q. What is the mailing address of this account?

A. 1710 Broadway.

Q. And is that one of the Bad Boy offices that you mentioned a moment ago?

A. Yes.

Q. Looking at section 1(a), what type of account is this?

A. This is a monogram business checking account.

Q. And focusing on section 4, towards the bottom of the page here, Mr. Ferguson, are these your initials in section 4?

A. Yes.

Q. Turning to page 2 in section 4(a), Mr. Ferguson, do you see this authorized signer section?

A. Yes.

Q. What is an authorized signer?

A. Those -- the signers, authorized signers are those who have signing authority on the bank account.

Q. In other words, those who have control over the bank account?

A. Signing authority, yes.

Q. Whose names do you see here?

P63Wcom4                    Ferguson - Direct

A.    Sean Combs.  Derek Ferguson.

Q.    And whose signatures do you see here?

A.    Sean Combs and Derek Ferguson.

Q.    What about the dates of those signatures?

A.    9/21/09.

          MS. SLAVIK:  Thank you.

          Ms. Gavin, could you focus on section 5.

Q.    Do you see the account number here, Mr. Ferguson?

A.    Yes.

Q.    Is that the number ending in 9635?

A.    Yes.

          MS. SLAVIK:  Thank you.

          You can take this down, Ms. Gavin.

Q.    This Janice Combs Publishing account that we've just been speaking of, do you remember what this account was used for?

A.    That was Janice Combs Music.

Q.    So for business -- a business-related account for that company?

A.    Sorry.  You said Janice Combs Publishing.  The account we just looked at was Janice Combs Music.

Q.    I'm sorry.

A.    Yes.

Q.    For Janice Combs Music, what was that account that we just looked at, what was that account used for?

A.    That account was used, primarily used as a, for providing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P63Wcom4                         Ferguson - Direct

his name and likeness.  So in deals where we provided his name
and likeness, that entity would be used as the, as the source
of that name and likeness.

Q.  How was this bank account funded?

A.  This bank account was self-funded in that the revenues
exceeded the expenses so really didn't require funding.

Q.  In other words, this was one of the profitable companies
that you just mentioned a moment ago?

A.  Yes.

        MS. SLAVIK:  Ms. Gavin, could you please publish
what's in evidence as Government Exhibit 4G-131.

Q.  And looking at section 1, Mr. Ferguson, do you see the
account title of this document?

A.  Yes.

Q.  And again, this is another application for a bank account?

A.  Yes.

Q.  What is the account title for this account?

A.  Combs Enterprises LLC.

Q.  What is Combs Enterprises LLC?

A.  It's an entity formed to do business -- yeah, just -- this
is a business entity, yes.

Q.  The mailing address for this account is also 1710 Broadway?

A.  Yes.

Q.  And looking at section 1(a) of this document, is this also
a business checking account?

A.  Yes.

MS. SLAVIK:  Ms. Gavin, could you focus on section 4.

Q.  Mr. Ferguson, are these your initials here in this agreements and acknowledgements box?

A.  Yes.

Q.  And moving to section 4(a), on page 2, whose names and signatures are in this authorized signer's box?

A.  Sean Combs and Derek Ferguson.

Q.  And the dates of these signatures?

A.  9/21/09.

Q.  So you and Mr. Combs had signature authority over this account as well?

A.  Yes.

Q.  In section 5 of this document, do you see the account number?

A.  Yes.

Q.  Is that the number ended in 9619?

A.  Yes.

Q.  Do you remember what this account was used for?

A.  I believe this account was used initially as the account that was the partner or the entity which had the strategic relationship with Diageo regarding the Ciroc brand.

Q.  And did that change over time, the use of this bank account?

A.  I'm -- I'm not sure.  I think -- I'm not sure.

P63Wcom4                    Ferguson - Direct

Q.   How was this bank account funded?

A.   This bank account also was -- really didn't require

funding, because it had inflows that exceeded the expenses.

Q.   Another profitable company, in other words?

A.   Yes.

          MS. SLAVIK:   Thank you.

          Ms. Gavin, you can take this down.

Q.   Mr. Ferguson, the two bank accounts that we just looked at,

those are bank accounts associated with companies or entities

controlled by Mr. Combs?

A.   Yes.

Q.   And Mr. Combs had authority over these accounts, is that

right?

A.   Yes.

Q.   What about credit cards; what financial entity did Bad Boy

use for credit card services?

A.   Primary entity would be American Express.

Q.   Who at Bad Boy had American Express cards?

A.   Mostly senior executives.

Q.   How were those American Express invoices paid for?

A.   The American Express invoices for most executives were paid

as expense reimbursements.

Q.   In other words, paid by the company?

A.   With -- after submitting expense, expense forms.  The

individuals would receive payments and then be responsible for

P63Wcom4                         Ferguson - Direct

paying their cards.

Q. Did Mr. Combs have an American Express card?

A. He did.

Q. Did Mr. Combs pay for both business and personal expenses with his American Express card?

A. From time to time, yes.

Q. And were Mr. Combs's American Express invoices paid by the company as well?

A. Yes.

Q. What methods of payment were used to pay Mr. Combs's American Express invoices?

A. Checks or wires usually.

Q. From what accounts did those checks or wires come from?

A. So, the process of reconciling the American Express statements would identify which entities any of the charges related to and try to match up the payments with that related entity.

Q. You described reconciling. Can you explain what you mean by that?

A. Well, reconciling would just be going through the full statement and understanding what, you know, what category you would put every -- every charge in and trying to line that up appropriately.

Q. And after you lined it up appropriately, what determined which account paid for which expense?

P63Wcom4                         Ferguson - Direct

A.   If you were able to identify a charge that related to a business, you would line that up with the -- you would line that up with that account to pay for it.

Q.   Who was responsible for this process?

A.   I had members of my team, the finance team, would be responsible for that.

Q.   Focusing now on cash, did the finance department handle incoming and outgoing cash?

A.   Yes.

Q.   What would be an example of incoming cash?

A.   Incoming cash would be in -- in many cases and kind of industry standard, people would pay -- performers, artists were paid in cash, especially going back, you know, 20 years or so, because there just weren't other forms of payment.  And at 9 o'clock at night, at night performers needed to get paid and get paid in cash.  So that was one way you would see cash as an inflow.

Q.   What about outgoing cash; can you give an example of outgoing cash?

A.   Outgoing cash, again, not everybody had American Express cards or CashApp or things like that, so, you know, there was a thing maybe people are familiar with called a per diem.  So many, you know, people working on projects or videos, etc., would receive a cash per diem for every day they worked.  And that would be one use of cash that you would need to use quite

often.

Q.  Were there processes for handling incoming and outgoing cash?

A.  Yes.

Q.  What was the process for handling incoming cash?

A.  Incoming cash was handled basically through a cash receipts form, which would detail, you know, what was received, if anything was paid out of that money received, and then what the net amount would be.  Yeah.

Q.  So who actually handed the cash to someone in the finance department?

A.  It varied.  Usually it would be the artist, the manager.

Q.  And what did -- once the finance department received the cash, what happened to it?

A.  Whatever the net remaining cash that was kind of given to the finance department would be deposited.

Q.  How often did the finance department handle incoming cash in this regard?

A.  I would say it varied over the years, so it was no kind of standard pattern.  And some years where there was more activity, more, like, touring and more, you know, performances, etc., would be higher and then in some years would be very little because it would be very few performances, etc.

Q.  And what about the process for handling outgoing cash; what was the process for that?

P63Wcom4                        Ferguson - Direct

A.   Generally, that was handled through -- several ways.  One is just through a petty cash account or, you know, reconciliation.  So you'd have -- petty cash would be issued and then reconciled once used through the actual receipts of what was spent.  So petty cash would be one way.

Cash advances were used as well for those traveling that didn't have American Express cards.  So those cash advances would, again, be reconciled once the money was spent.

So, those are some of the ways that cash was reconciled. So any cash that was outlaid, the finance department would be looking for the receipts and the accounting of how that cash was used.

Q.   So in the case of either incoming or outgoing cash, the finance department kept receipts of these transactions, is that right?

A.   Yes.

Q.   Were you aware of Mr. Combs being paid in cash for professional obligations at any point?

A.   The -- there were professional obligations that would pay in cash.  I don't know that he would have received the money or not, but that -- there would be obligations that would be paid in cash.

And usually our process was we really operated wanting to have a contract up front, so that contract would spell out when the payments were going to be made, how they were going to be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

made, and that's what really governed everything.

Q.   And in those cases where Mr. Combs was paid in cash, what was the process for handling cash in those circumstances?

A.   So, same process with the cash receipt form.  Whatever was received would be noted.  We matched that to make sure, you know, where there was a contract, we'd match that with the contract and make sure it matched up.  If there were any expenses or distributions made out of that cash, that would be noted.  And then the net amount, if there was any, would be deposited.

Q.   Were you aware of cash transactions being handled outside the procedures that you just described?

A.   No.  Because if I was aware of it, we would have processed them through the procedures.  So -- yeah.

Q.   Were you aware of Mr. Combs's security staff carrying cash for him?

A.   Not something I was aware of.  Not something I paid any attention to, no.

Q.   Now, you testified, Mr. Ferguson, that at times you managed Mr. Combs's personal finances when you were the CFO.

     Do you remember that?

A.   Yes.

Q.   How, if at all, did that responsibility change over time?

A.   Well, there were times when third parties, we would -- third parties were engaged to handle specifically his personal

P63Wcom4                        Ferguson - Direct

spending.  So throughout my tenure, that changed a couple of times.

Q.  So it varied from third party to internal management of Mr. Combs's finances, is that right?

A.  Yes.

Q.  When you were responsible for managing Mr. Combs's personal finances, just generally speaking, what did that entail?

A.  It really entailed kind of similar, like, what was the plan for the year and managing kind of, like, an overall budget for the year and then managing budget versus actual throughout the year.

Q.  Were you involved in managing Mr. Combs's properties?

A.  I didn't manage the properties themselves, but -- but the inflows and outflows of the properties would be handled through the finance department.

Q.  In other words, the financial management of these properties?

A.  Yes.

Q.  What properties did Mr. Combs own while you were CFO?

A.  I'll do my best.  Property, there was a property in the Hamptons; in New York City; Miami.  I think -- Hamptons, yep. Those were ones during my tenure as CFO.

Q.  And what was the ownership structure of the properties that Mr. Combs owned?

A.  These properties were held in LLCs, corporations.

Q.  What is the purpose of setting up the ownership structure in that way?

A.  Well, for high-value properties, with celebrities, it's pretty common to use this type of structure for anonymity, for liability, for reduction and for some tax planning as well.

Q.  So is this sort of ownership structure common, in your experience?

A.  Yes.

Q.  Were you involved in the financial management of Mr. Combs's properties?

A.  Over, just understanding the ins and outs of the properties' spending, yes.

Q.  What sort of -- what did that entail with respect to financially managing the properties?

A.  Generally, it was -- there were kind of expected and known expenses that would be incurred throughout the year.  So just, you know, making sure that those expenses were in line with what was expected.  And if they got out of line, somebody on the team, you know, would identify that.

Q.  Did you actually make payments for expenses?

A.  Me personally, no, but the finance department would, yes.

Q.  And what sort of payments did the finance department make with respect to Mr. Combs's properties?

A.  Mortgage payments, where there was mortgages; you know, real estate taxes, maintenance, all of the standard expenses

P63Wcom4                           Ferguson - Direct

for a home.

Q.  How did the finance department make those payments?

A.  Check, wire transfer usually.

Q.  From what bank accounts were those payments made?

A.  The LLCs that held the properties would be the source of the payments for, for the related property.

Q.  Did the LLCs that owned the property have their own bank accounts?

A.  Yes.

Q.  How were those bank accounts funded?

A.  Those bank accounts were generally funded through Mr. Combs's earnings.  So either through his salaries or distributions.

Q.  And where did the salaries and distributions come from?

A.  Came from his, his businesses, from the businesses that he owned or joint ventures.

Q.  Were the bank accounts that were kept for the LLCs, were those kept at the same banks where business bank accounts were kept?

A.  Usually.

Q.  Who oversaw the bank accounts for Mr. Combs's properties?

A.  So, when -- when these were being managed internally, that would be me and my department.

Q.  Did Mr. Combs have personal bank accounts separate and apart from the accounts for his properties?

P63Wcom4                         Ferguson - Direct

A.   I do believe at certain points he did, but I don't -- I don't really recall.

                    (Continued on next page)

BY MS. SLAVIK:

Q.  And when you were responsible for managing Mr. Combs's finances, did you oversee those other personal accounts held by Mr. Combs?

A.  If he had them, yes.

Q.  During your tenure as CFO, were you aware of Mr. Combs providing financial support to friends and family?

A.  Yes.

Q.  Where did that money come from?

A.  Came from his personal earnings.

Q.  Did you discuss Mr. Combs's personal finances with Mr. Combs?

A.  I did.

Q.  How frequently?

A.  At least once a year we would kind of review what happened throughout the year, how everything turned out versus what was planned and, you know, discussed the upcoming year.

        MS. SLAVIK:  Your Honor, this may be a good breaking spot.

        THE COURT:  Very good.  Thank you, members of the jury.  We'll take our lunch break at this time.  We'll be back at 1:15.

        All rise for the jury.

        (Continued on next page)

P63Ccom5                        Ferguson - Direct

(Jury not present)

THE COURT:  Thank you, Mr. Ferguson.  We'll see you back here at 1:15.

(Witness not present)

Please be seated.

Ms. Slavik, how much time do you anticipate you have left on direct?

MS. SLAVIK:  I think about 20 minutes, your Honor.

THE COURT:  Anything the government would like to raise before we take our lunch break?

MS. SLAVIK:  No, your Honor, not at this time.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  Nothing from us, Judge.  Thank you.

THE COURT:  I think the only outstanding issue, which I take it we'll pick up when we come back is the issue of the one exhibit.

Ms. Geragos, is that right, are you working on potential redactions?

MS. GERAGOS:  We discussed potential redactions. They're going to speak internally, we're going to speak internally, and then we'll discuss at the start of the afternoon.

THE COURT:  I'll be back here at 1:10 so we can pick up any issues relating to that exhibit, and then we'll proceed at that time.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MS. GERAGOS:  At that time, I don't know, but I may have issues with the revised Piazza exhibit --

THE COURT:  I'm sorry.  I missed that last part.

MS. GERAGOS:  At that time, we may bring up the revised Piazza exhibit 114, but I don't think I received it yet.  I hope to receive it over the lunch break and be able to review it and be able to bring to the Court any objections I have to it.

THE COURT:  Do me a favor, if you receive it and you need a few extra minutes and you need any additional time, let the courtroom deputy know, that way we can give you some extra time, because I know Mr. Piazza is going to be the next witness up.

MS. GERAGOS:  Yes, thank you.

MS. COMEY:  I'll note, your Honor, the file is uploading right now, so Ms. Geragos will have it over the lunch break.  We were wondering given that some of the time when we expect Jane will be on the stand, we're now going to lose a few hours, if it would be okay to stay a little late today.  We're very cognizant of making sure she can make that flight next week.

THE COURT:  Can you just give me the anticipated length of her testimony so I can have some sense.

MS. COMEY:  Yes, your Honor.  Her direct will be at least two days, could go as long as three.  There is quite a

lot to cover with her.  I expect her cross would be at least two days and could be longer.

THE COURT:  She's coming up after Mr. Piazza?

MS. COMEY:  Right after Ms. Bangolan, who traveled in from out of state.  Part of what is pushing us back is the unexpected length of the Mia cross, but our expectation is that Jane will get on the stand at the end of the day tomorrow.

THE COURT:  So you want to complete Mr. Ferguson's testimony, Mr. Piazza's testimony.  That would be today --

MS. COMEY:  Oh, no, your Honor.  Just Mr. Ferguson's testimony today.  If Mr. Agnifilo's cross ends up pushing us past 3:00, we ask to keep going to get him off the stand.  If we have to put Mr. Piazza on tomorrow morning, I think we'll still get to Jane tomorrow.

THE COURT:  Tomorrow, that would give you a few days then next week, and then her flight is on Thursday?

MS. COMEY:  In the evening, so she could be here all day Thursday.

THE COURT:  I'll advise the jury that they should expect that on some of these upcoming days, they may need to stay a little bit longer.

MS. COMEY:  Thank you, your Honor.

THE COURT:  Very good.  We'll be back at 1:10.

(Luncheon recess)

AFTERNOON SESSION

1:17 p.m.

THE COURT:  Ms. Geragos, have we resolved the issues?

MS. GERAGOS:  I'm going to let Mr. Driscoll take on the issue of the exhibit.  As I was dealing with the video, he briefed the issue, I want him to have his chance.

THE COURT:  Very good.  Mr. Driscoll.

MR. DRISCOLL:  Yes, Judge.  So in case the record wasn't clear, we do maintain a hearsay objection to the entire exhibit as well as hearsay within hearsay.  I just point out that the vast majority of the messages in this chain do not actually relate to Ms. Ventura.  So we also have relevance objections and objections under Rule 403.

THE COURT:  Good.  So there were some discussions concerning redactions?

MR. DRISCOLL:  Yes.  Those were not fruitful.

THE COURT:  But do you have redactions to present?

MR. DRISCOLL:  I could propose redactions, yes.  It wouldn't solve the hearsay issues.

THE COURT:  I understand that.  But are you able to put those on the screen?

While you are doing that, Ms. Foster, what is the purpose of the exhibit?  Just so I can understand the objection.  I think what Mr. Driscoll is saying is, he's saying that it doesn't fit within these hearsay exceptions, but I'm

not hearing a reason why it doesn't fit into one of the pathways that you outlined in your email.  So given that, I think he's making the further objection that, as to some of this, it's just not relevant to anything that's at issue in this case.  And so it would not survive 403 scrutiny.  So just what's the point of this exhibit coming in?

            MS. FOSTER:  So my understanding is there's not a question about the relevancy of the part of the communication that's about the icing of the face, because that is corroborative and also sort of rounds out the context of testimony that we heard from Ms. Ventura.

            THE COURT:  Agreed.

            MS. FOSTER:  My understanding is that, and you can tell this, there is a simultaneous conversation that seems to be going on here.  The government is not offering any of that simultaneous conversation for its truth.  Part of the reason, my understanding had been maybe that there would be sort of more targeted redactions that the defense had specific objections to.  My understanding is that they want to just redact that entire sort of simultaneous conversation.  That, I think, is difficult, one, just administratively because you could even tell from this conversation that the other participant doesn't really know what messages are being directed to one conversation versus the other.  And so if we were to redact some of them and not others, it would sort of,

P63Ccom5                          Ferguson - Direct

like, we would almost be agreeing to a position that certain of these messages relate to one conversation and certain relate to another, when it's really very difficult to tell from this conversation, the vast majority of the messages, what they relate to.

I would also say that there's very little, one, it rounds out the context for this conversation. There's very little prejudicial value, if any, or prejudice, if any, from keeping that context in. The jury has heard much testimony, and a lot of that testimony was elicited by the defense about the fact that Mr. Combs has other relationships with other women, and he did so at the same time that he was in a relationship with Ms. Ventura. So that prejudice really doesn't exist here.

There's also some probative value towards the other part of that conversation, which is that it shows the relationship and sort of the role that D-Roc had in Mr. Combs's relationships. And the defense has made the argument, tried to make the argument through cross-examination that D-Roc was sort of a friend to a number of these women, and you can see how Mr. Combs is operating on the backhand and instructing him to sort of say comments to women to make them feel comfortable opening up and really back-channeling through him.

So there's little prejudice. It's extremely difficult to figure out which messages should be redacted, and there is

some probative value to this.  It also I would say sort of gives context to the context in which he is talking about an assault that occurred and having her hide and ice her face, and at the same time he's having a conversation about sort of mundane relationship issues.  And so I think it also gives context to the jury about sort of how he views this communication and sort of how casual it is.

THE COURT:  Understood.  So Mr. Driscoll, where is the hearsay within hearsay, just so I can find this.

MR. DRISCOLL:  Sure, Judge.  I'm just going to point your Honor to the messages that I think --

THE COURT:  Well, I have the exhibit.  So if you just point me to a page number.  I see the pages on the bottom right.

MR. DRISCOLL:  Yes, so 10, in the lower-right corner, page 10, Cassie was eating.  She about to ice up.  She keep asking for you telling me she wants to go to the studio.  I told her to chill out and said your feelings about what happened.

THE COURT:  Anything else?

MR. DRISCOLL:  On the next page, yeah, she wants to see you, but you not fucking with her.  On the next page, she looking for you crazy, blowing everybody up, she killing Faheem.  On the next page, Rio and Justin saw her eye and we said a fight broke out last night in the club.

THE COURT:  How is that hearsay within hearsay?  Which part of that?

MR. DRISCOLL:  It's narrating a different statement that was said to other third parties.

THE COURT:  Okay.

MR. DRISCOLL:  On page 7, Cass is calling studios looking for you.  On page 6, the first message, yeah, we in the security room talking now, she wants you to come hug her and lay down, she didn't sleep yet.

THE COURT:  I understand.  I got the general gist.

And Ms. Foster, I take it your response is none of those statements are coming in for the truth of the matter asserted.  So, at most, they just provide context for the remaining discussion, which is admissible in one of the two ways that you laid out in your email.

MS. FOSTER:  That's correct.  Certain of them maybe, but they're all sort of present sense impressions, they go to her state of mind.  I mean, Cass was eating, she was about to ice up.  There's multiple reasons why this is not excludable hearsay.  And a number of these statements, like the ones that they just highlighted where he says a fight broke out in the club, it's clear from the context of the message that that is not a truthful statement, that that is a statement that he is making to cover up the assault.

THE COURT:  So it's coming just for the fact of the

communication.

MS. FOSTER:  Exactly, yes, your Honor.

MR. DRISCOLL:  Judge, that's just a second level of hearsay.  We haven't resolved the first level of hearsay.  I think what Foster said was it's not even clear to the speakers whom they're talking about, what they're talking about.  There's been no foundation laid that this is a proper agency statement or a statement of furtherance of any conspiracy.  Without that foundation, it's just not clear, and it's not going to be clear to the jury either.

MS. FOSTER:  Your Honor, we cited in our email to you --

THE COURT:  I'm just looking at -- Mr. Driscoll, I'm looking at the email that Ms. Foster submitted, and as a general matter and not taking into account any of these specific conversations, they say either it's a coconspirator statement or it's an agent statement, and they provide evidence that was previously elicited during the trial, explaining the breadth of D-Roc's job, and the reason why, on a preponderance standard, these types of statements, meaning attending to these various affairs happening on Mr. Combs's behalf would count as, at the very least, agent statements within the scope of the employment of D-Roc.  And remember, that's only D-Roc's statements, right, because I think I heard earlier the defense does not object to Mr. Combs's statements.

MR. DRISCOLL:  That's correct.

THE COURT:  So as to Mr. Combs's statements, there's no objection those coming in.  Really, D-Roc's statements on one level could be considered necessary context to provide an understanding of what Mr. Combs was saying.

Putting that to the side, they've offered a number of independent bases for overcoming any hearsay objection, and that's why I've been focusing on the hearsay within hearsay.  As to that, Ms. Foster says it's not coming in.  It either fits in an exception or it's not coming in for the truth of the matter asserted.  The principle example given is the statements made to the two other individuals concerning the fact that the injuries occurred in the context of a club fight.

MR. DRISCOLL:  Yes, your Honor.  So I would just refer the Court back to our May 21st letter concerning Government Exhibit A-629-A.  That letter concerned the scope of the agency exception.  What Ms. Foster just said is this is a conversation between D-Roc and Mr. Combs interspersing personal musings with things that might tangentally be related to things he observed.  That doesn't satisfy the exception.  And the Court excluded GX A-629-A for that reason.  We don't view this message as any different.

MS. FOSTER:  Your Honor, I believe at that time you had based your decision on the fact that there hadn't really been a foundation laid with respect to the participants in that

conversation as to the fact that he was acting as an agent at that time and that this was in the scope of his relationship to Mr. Combs as an agent.  Here, as we have detailed in this email to your Honor, there has been a number of statements as to D-Roc and his role, and that clearly demonstrate that what he is speaking about in this message falls within that agent relationship.

THE COURT:  Very good.  How are we doing on the compilation?

MS. GERAGOS:  We still object, your Honor.

THE COURT:  But is the compilation complete?

MS. SMYSER:  Yes.

THE COURT:  Very good.  As to Government Exhibit 905-A, the objection is overruled.

With that, let's bring back --

MS. JOHNSON:  Your Honor, if I may put one additional item on the record related to the pseudonym order.  The government has learned of an additional media outlet reporting Mia's true identity.  We'll send that to the Court.  It was reported on X yesterday with reference to the birthday video exhibit that was admitted, containing a link to that exhibit online showing that witness's true identity.

THE COURT:  Is there a proposal as to what to do about that?  And the reason why I ask this is because this came up when we were discussing the propriety of the pseudonym order

itself.  At that time, I think it's fair to say the parties understood that while we could prevent a disclosure originating from this courtroom, because of the issues at stake and the public profile of a lot of these individuals, it would be very easy for the media and the public at large to discern who these individuals were.  So I don't know that there's further relief that you're seeking, but I'm happy to hear if there is any step that you'd like the Court to take.

MS. JOHNSON:  The government would respectfully request that the Court consider directing that outlet to remove the post and consider whether any further additional steps should be taken, such as barring individuals who break the Court's order from attending this trial either in this courtroom or in other courtrooms.

THE COURT:  Do you want to put in a submission along those lines?  I'll certainly consider it.

MS. JOHNSON:  Sure, we can.

THE COURT:  I'll do that.

Also, given that Jane is going to testify, if there is a proposed instruction that might be fortified that you would like me to provide at the beginning of each trial day, then I'm happy to consider that.  I don't imagine that there'll be opposition from the defense, but it might be helpful along those lines.

MS. JOHNSON:  Certainly.  We'll include that in the

submission, your Honor.

THE COURT:  Very good.  Let's have Mr. Ferguson back.

MS. GERAGOS:  I want to let the Court know, I sent the email with an additional individual that has been attending that I believe also disclosed Mia's identity.  So I just wanted to make sure that that's clear for the record, as well.

THE COURT:  Meaning you disclosed that to the government?

MS. GERAGOS:  I disclosed it to the government and I believe your Honor was copied on it.

THE COURT:  Okay.  We'll take a look at that.

MS. SLAVIK:  Your Honor, the parties are ready.

THE COURT:  Let's bring Mr. Ferguson back.

(Witness present)

Welcome back.

(Continued on next page)

(Jury present)

THE COURT:  Mr. Ferguson, you understand that you are still under oath?

THE WITNESS:  Yes.

THE COURT:  Ms. Slavik, you may proceed when ready.

BY MS. SLAVIK:

Q.  Mr. Ferguson, before the break, we were looking at bank documents.  I want to continue that conversation.

MS. SLAVIK:  Ms. Gavin, could you please publish what's in evidence as Government Exhibit 4G-150.

Q.  Mr. Ferguson, is this document the same sort of bank account application that we were looking at previously?

A.  Yes.

Q.  Do you see the account title in Section 1?

A.  Yes.

Q.  What is it?

A.  207 Anderson LLC.

Q.  What is 207 Anderson LLC?

A.  An entity that held property located at 207 Anderson in Alpine, New Jersey.

Q.  And that was a property owned by Mr. Combs?

A.  Yes.

Q.  So this bank account was used for a property owned by Mr. Combs; is that right?

A.  Yes.

Q.   What is the account mailing address?

A.   1710 Broadway.

Q.   And that was the Bad Boy headquarters at the time?

A.   Yes.

Q.   Looking at Section 4, Mr. Ferguson, again, these are your initials at the bottom of the page?

A.   Yes.

Q.   And on page 2 in Section 4A, whose names and signatures appear in this agreements and acknowledgements box?

A.   Sean Combs and Derek Ferguson.

Q.   And what about the dates of the signatures?

A.   9/21/09.

Q.   So does this mean that you and Mr. Combs were the authorizes signatories of the account?

A.   Yes.

Q.   Looking at section 5, what is the account number of this bank account?

A.   I'm not sure which one it is, but --

Q.   Looking at the top bank account number, does that end in 9686?

A.   Yes.

          MS. SLAVIK:  Thank you.  You can take this down.

Q.   Mr. Ferguson, I want to talk about how this 207 Anderson account was funded.

          MS. SLAVIK:  Ms. Gavin, could you please publish

P63Ccom5                         Ferguson - Direct

what's in evidence as Government Exhibit 4G-151.

Q.  Do you recognize this type of document, Mr. Ferguson?

A.  It's not a document that I looked at often, but I know what it is.

Q.  What is it?

A.  It looks like a bank -- a document from the bank.

Q.  A bank account statement?

A.  Yes.

Q.  And looking at the primary account number, do you see that account number?

A.  Yes.

Q.  Does that account number end in 9686?

A.  Yes.

Q.  Is that the same account number that we just saw with the 207 Anderson account document?

A.  Yes.

Q.  And do you see the address box at the top left?

A.  Yes.

Q.  Who is it addressed to, who is this statement addressed to?

A.  Bad Boy Entertainment Worldwide.

Q.  And in relation to what account name?

A.  Oh, sorry.  207 Anderson LLC.

Q.  When you were the CFO at Bad Boy, did the finance department receive statements for the bank accounts that we've just been discussing?

P63Ccom5                        Ferguson - Direct

A.  Yes.

Q.  Including bank accounts for this 207 Anderson account?

A.  Yes.

        MS. SLAVIK:  Ms. Gavin, could you please turn to page 263 of this document.

Q.  Focusing, Mr. Ferguson, on the top-right portion, do you see what time period this statement is for?

A.  Yes.

Q.  What time period?

A.  December 1, 2011 to December 31, 2011.

Q.  You were CFO at this time?

A.  Yes.

        MS. SLAVIK:  Ms. Gavin, maybe you could take this -- thank you.

Q.  I want to focus first on the summary portion of this statement.

        MS. SLAVIK:  Ms. Gavin, could you highlight the summary portion.

Q.  Mr. Ferguson, what does this summary portion show?

A.  Shows the beginning balance, credits, debits, and ending balance.

Q.  Can you explain what credits and debits are?

A.  Credits are increases to the account and debits are reductions to the account.

Q.  So just roughly, does this summary portion show that a

little over $3.4 million came into the account as a little over $3.2 million went out of the account in December of 2011?

A.   Yes.

Q.   Looking at the deposits and other credits section right below this summary, what are deposits and credits?

A.   Deposits and credits are money coming into the account.

Q.   I want to focus on internal transfers.  Do you see a series of internal transfers here?

A.   Yes.

Q.   What are internal transfers?

A.   Internal transfers are transfers from one of the accounts linked to this overall set of accounts from one account to another.

Q.   Now focusing on the internal transfers on December 1st and December 2nd, do you see those transactions?

A.   Yes.

Q.   What accounts were funds transferred from?

A.   Last four 9635, 9635, and 7899.

Q.   So focusing on the first two internal transfers in the account ending in 9635.  For those first two transfers, how much were those transfers?

A.   $200,000 and $50,000.

Q.   And that 9635 account --

        MS. SLAVIK:  Ms. Gavin, maybe you could pull up side by side with this exhibit page 2 of Government Exhibit 4G-140.

P63Ccom5                        Ferguson - Direct

Q.  Looking towards the middle of the page, Mr. Ferguson, you see that account number?

A.  Yes.

Q.  Is this the 9635 account?

A.  Yes.

Q.  And this 9635 account is an account associated with Janice Combs Music; is that right?

A.  Yes.

Q.  In other words, looking at the document on the left, does this show that Janice Combs Music transferred $250,000 into this 207 Anderson account in December 2011?

A.  Yes.

        MS. SLAVIK:  Thank you.  You can take the second document down, Ms. Gavin.

Q.  And now looking, Mr. Ferguson, at the internal transfers on December 5th, 6th, and 9th, do you see those transfers, Mr. Ferguson?

A.  Yes.

Q.  From what account were funds transferred on those dates?

A.  Last four, 9619.

Q.  In what amount?

A.  $190,000; $100,000; $575,000.

Q.  In other words, the 9619 account transferred roughly $865,000 into this 207 Anderson account in December 2011?

A.  Yes.

P63Ccom5                    Ferguson - Direct

MS. SLAVIK:  Ms. Gavin, could you publish side by side page 2 of Government Exhibit 4G-131.

Q.  Mr. Ferguson, do you see the account number on this document?

A.  Yes.

Q.  That's the 9619 account?

A.  Yes.

Q.  And this 9619 account is associated with Combs Enterprises?

A.  Yes.

Q.  In other words, an account from Combs Enterprises transferred over $800,000 into the 207 Anderson account in December 2011?

A.  Yes.

MS. SLAVIK:  Thank you.  You can take the second document down.

Q.  Mr. Ferguson, just to be clear, were internal transfers the only way that this 207 Anderson account was funded?

A.  Not necessarily, but it would be a primary way.

Q.  Who, generally speaking, who decided whether to initiate an internal transfer?

A.  Usually it was based on the controller recognizing need for cash, and then identifying where there were profit distributions available.

Q.  Did the controller decide what amount?

A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.   And the controller was someone who worked for Bad Boy; is that right?

A.   Yes.

Q.   Generally speaking, were all of Mr. Combs's personal accounts funded in this way with internal transfers?

A.   Generally speaking, yes.

Q.   Just to be clear, do you remember these particular internal transfers in December 2011?

A.   No.

        MS. SLAVIK:  Ms. Gavin, could you please turn to page 265 of this document.

Q.   Mr. Ferguson, just looking at the top right of the page, again, what is the statement period here?

A.   December 1 through December 31.

Q.   So same time period?

A.   Yes.

        MS. SLAVIK:  Ms. Gavin, could you focus on the wire transfer on December 14th.  Excuse me, the outgoing wire transfer on December 14th.

Q.   Mr. Ferguson, looking at that first outgoing wire transfer, what is the date of that transaction?

A.   December 14th.

Q.   And what is the description of the transaction?

A.   Outgoing wire transfer.

Q.   In other words, money is coming out of the 207 Anderson

account and going to a different account?

A.   Yes.

Q.   Who is the wire transfer directed to?

A.   Casandra Ventura.

Q.   Do you know who Casandra Ventura is?

A.   Yes.

Q.   Who is she?

A.   An artist also known as Cassie.

Q.   Did you meet Cassie when you worked at Bad Boy?

A.   I did.

Q.   What is the amount of the wire transfer?

A.   $20,000.

Q.   Do you remember being involved in this payment in any way, Mr. Ferguson?

A.   I don't.

Q.   And what was your relationship with Cassie?

A.   Really same as anybody else, any other artist that would be on our label.

Q.   Did you interact with her frequently?

A.   No.

        MS. SLAVIK:  Thank you, Ms. Gavin, you can take this down.  And can you turn to page 264 of this document.

Q.   Mr. Ferguson, this is still part of the December 2011 statement?

A.   Oh, yes.

Q.  Directing your attention to a transaction on December 23rd towards the top of the page, do you see that?

A.  Yes.

Q.  What is the description of this transaction?

A.  Incoming wire transfer.

Q.  In other words, this is a payment that's coming into the 207 Anderson account?

A.  Yes.

Q.  Who was the payment from?

A.  Roderick Ventura.

Q.  In what amount?

A.  $20,000.

Q.  Mr. Ferguson, do you remember being involved in this transaction in any way?

A.  No.

          MS. SLAVIK:  Ms. Gavin, could you please turn to page 267 of this document.

Q.  Again, Mr. Ferguson, this is still part of the December 2011 statement?

A.  Yes.

Q.  Directing your attention to a transaction on December 27th, do you see the description of the outgoing wire transaction on December 27th?

A.  Outgoing wire transfer.

Q.  So, just again, this is a payment that's going out of the

P63Ccom5                          Ferguson - Direct

207 Anderson account?

A.  Appears that way.

Q.  Who is the wire transfer directed to?

A.  Previous days, returner funds, I don't know if that's a person or an entity.  I don't know what that is.

Q.  What bank is this payment being directed to?

A.  Charter Oak Groton.

Q.  In what amount?

A.  $20,000.

Q.  Do you remember being involved in this payment, Mr. Ferguson?

A.  No.

       MS. SLAVIK:  Thank you, Ms. Gavin.  You can take this down.

Q.  I just want to ask you a couple of questions to wrap up, Mr. Ferguson.

    When did you leave the CFO position?

A.  Sometime end of 2012, if I recall.

Q.  Did you continue working for Mr. Combs?

A.  Yes.

Q.  In what capacity?

A.  Chief growth officer for the next few years.

Q.  And did you have another position after that?

A.  Yes.

Q.  What was that position?

A.   Chief operating officer of Revolt Media and TV.

Q.   When did you leave Mr. Combs' employ?

A.   2017, November of 2017.

Q.   How often did you communicate with Mr. Combs after you left?

A.   Not that often.  Right after maybe a few times, just some odds and ends regarding my departure.  But other than that, just holidays, Father's Day, birthdays.

Q.   When was the last time that Mr. Combs reached out to you?

A.   I received a text from him in September of '24.

Q.   So September of last year?

A.   Yes.

Q.   Do you remember what day specifically?

A.   I don't.

Q.   Is there anything that I can show you to refresh your recollection?

A.   Sure.

         MS. SLAVIK:  Ms. Gavin, could you please publish for the witness, the Court, and the parties 3536-10, and I believe it's page 6 of that document.

Q.   Mr. Ferguson, this is rather small, but can you read this?

A.   Yeah.

Q.   Take a second and read that, and just look up when you've finished.

A.   Okay.

MS. SLAVIK:  You can take that down.  Thank you, Ms. Gavin.

Q.  Did that refresh your recollection about the date on which Mr. Combs last reached out to you?

A.  Yes.

Q.  What date was that?

A.  September 16th.

Q.  How did he reach out?

A.  Text.

Q.  What did he say initially?

A.  I don't remember exactly, but it just came up, it was just like hello or -- yeah, the first message I see there is, hello, maybe give me a call, I think.  Something like that.

Q.  Did he send another text after that first text?

A.  Yes.

Q.  How soon after?

A.  I didn't see the times, but I think they were shortly thereafter.

Q.  What did he say in the second text?

A.  He was in New York City, wanted to know if I had some time to get together.  Wanted something, wanted to talk, get some advice.

Q.  What was your reaction when he reached out?

A.  I actually was on a plane to Charlotte, so didn't really get to focus on that, on the text, until I landed.  My first

P63Ccom5                         Ferguson - Cross

reaction was -- and I wasn't in New York and I wasn't going to be able to see him, and I was thinking about how I was going to respond.

Q.  What were you thinking about when you were thinking about how to respond?

A.  One, just making sure this was really him because this was kind of a weird time and lots of different, you know, fake texts and stuff were being sent around.  So making sure it was really him.  And then, yeah, I was gearing up to respond.

Q.  Did you respond?

A.  I did not.

        MS. SLAVIK:  Nothing further at the moment, your Honor.

        THE COURT:  Thank you, Ms. Slavik.

        Mr. Agnifilo.

        MR. AGNIFILO:  Yes.  Thank you, Judge.

CROSS-EXAMINATION

BY MR. AGNIFILO:

Q.  Good afternoon, Mr. Ferguson.

A.  Good afternoon.

Q.  My name is Marc Agnifilo.  We've never met, have we?

A.  No.

Q.  I was scared to death you were going to say you don't remember, but we never did.

    I'm one of Mr. Combs's lawyers.  I'm going to ask you some

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P63Ccom5                         Ferguson - Cross

questions.  If I ask you a question that you don't understand or you want me to rephrase it, all you need to do is ask and I'll do that.  Okay?

A.   Sure.

Q.   You grew up in the Bronx?

A.   Yes.

Q.   And where did you go to high school?

A.   I went to Stuyvesant High School.

Q.   And then you went to the University of Pennsylvania undergrad?

A.   Yes.

Q.   When did you graduate from the University of Pennsylvania?

A.   1985.

Q.   And then you worked, you went to an accounting firm?

A.   Yes.

Q.   Which one?

A.   Coopers and Lybrand.

Q.   So you graduate, U-Penn and you work at Coopers and Lybrand, and how long do you work at Coopers?

A.   About three years.

Q.   And then you left Coopers, and tell the jury where you went then.

A.   I went to business school, Harvard Business School.

Q.   You could have said the Harvard part first.  Okay.  You went to Harvard Business School.

P63Ccom5                         Ferguson - Cross

A.   Yes.

Q.   And you took what kind of degree from Harvard Business School?

A.   A master's in business administration.

Q.   When did you leave Harvard Business School with a master's in business administration?

A.   1990.

Q.   What did you do for work in 1990?

A.   1990, actually, when I left school, I was running a magazine that I spent my full time on for some time after graduating.

Q.   And where was the magazine?

A.   The magazine, we were based out of Baltimore.  Originally, it was launched out of New York, but based out of Baltimore.

Q.   You worked there for how long?

A.   That would have been through about '91.

Q.   And then at some point, were you working at BMG Entertainment?

A.   Yes.

Q.   Is that Bertelsmann Music Group?

A.   Yes.

Q.   Tell the jury, what's Bertelsmann Music Group?

A.   Bertelsmann Music Group is a music company that owns probably over 100 music labels worldwide.

Q.   And do they have a relationship with Bad Boy?

A.   Bertelsmann Music Group owned Arista Records, which owned 50 percent of Bad Boy Records.

Q.   What time period are we talking now?

A.   This is now 1996.

Q.   So you worked for Bertelsmann, and Bertelsmann owns Arista?

A.   Yes.

Q.   Tell the jury, what's Arista Records?

A.   Arista Records is a record label known for artists like Whitney Houston, other major artists, Clyde Davis was another CEO, well known CEO.

Q.   Big, well established, well known, highly regarded record company; am I right?

A.   Yes.

Q.   Tell us again, what's the relation between Arista and Bad Boy at this point in time?

A.   Arista, at a certain point in time, owned 50 percent of Bad Boy Records.

Q.   How does that work, I mean, we don't need the Harvard Business School answer, but how does that kind of work in summary, if there's 50-percent relationship, what do each of the parties do *vis-à-vis* each other?

A.   Right.  So it's governed by an operating agreement essentially, and in this case, Arista funded the record company essentially and handled certain functions such as distribution of the product, some aspects of radio promotion.  So each side

kind of had the set of responsibilities they were responsible for.

Q.   This is all governed by an operating agreement, in this case, that would be between Bad Boy on the one hand and Arista Records on the other hand?

A.   Yes.

Q.   And this operating agreement would dictate in writing what each of those parties are empowered to do and what each of those parties are obligated to do?

A.   Yes.

Q.   So if Mr. Combs is the head of Bad Boy, can he do whatever he wants in terms of budgets and money outflows and money inflows when he's a 50-percent partner with Arista?

A.   No.

Q.   Why would that be?

A.   Well, they only -- the funding was predetermined.  So therefore they were not funded above a certain amount for certain categories.  For each record released, there was an agreement around budgets and spending, and Arista funded that, but also controlled and managed to make sure that those budgets were in line.

Q.   Understood.  And I would imagine that these operating agreements are written by lawyers?

A.   Yes.

Q.   And I would imagine that this financial relationship

between Arista and Bad Boy has accountants involved in every step of the way?

A. Yes.

Q. Now, at some point, tell me if this is right, you develop an interest in possibly working for Bad Boy and with Bad Boy; am I right?

A. Yes.

Q. And why?

Let me ask a broader question.

You have a master's in business from Harvard Business School, you're working for a very prominent, Bertelsmann Music is a very prominent company; am I right?

A. Yes.

Q. What was it about Bad Boy that you wanted to work there?

A. Well, first and foremost, for me, coming from the Bronx, we needed more companies that really would hire people from the communities I grew up in that would give people opportunities. And also I was, like, very entrepreneurial. So my father was an entrepreneur. I grew up with a trucking company -- my father had a trucking company in the Bronx. So entrepreneurship was very important to me.

So what I observed with Bad Boy at the time and Sean Combs was a company that was really giving a lot of young executives opportunities, especially from areas that I grew up in, and I thought there was a lot of opportunity to have a lot of impact

P63Ccom5                          Ferguson - Cross

with a company that could focus on helping those in the communities I came from.

Q.  And what was the interview or on-boarding process to Bad Boy, as far as you can recall, from -- we're almost talking 30 years ago, but --

A.  Interview?

Q.  Whatever you remember.

A.  Yeah, I mean, pretty normal, you know, fairly normal I guess for a smaller company.  We had an interview, had a number of interviews and got hired, and was on-boarded by multiple members of the team, met with some of the partners at Arista. So I would say normal on-boarding.

Q.  So comes to a couple of questions.  So part of the interview process is you had to interview with people from Arista because they were 50-percent partner?

A.  I actually didn't interview with them prior to getting the job.

Q.  Let me ask you some specific questions.  Do you remember someone named Vashta Dunlap?

A.  Yes.

Q.  Tell us who Vashta is.

A.  Vashta was leading human resources at the time.

Q.  Was she at Bad Boy before you or after you, if you remember?

A.  I think she was there before I got there.

P63Ccom5                           Ferguson - Cross

Q.   Do you remember if you interviewed with Vashta?

A.   I don't think I did.

Q.   You said there were certain members of the team you
interviewed with.  Tell us if you remember who they were and
what those interviews were like.

A.   Yeah, members of the team, there was a president at the
time that I interviewed with, general manager --

           (Continued on next page)

BY MR. AGNIFILO:

Q.  Is that Benny Medina?

A.  Yeah.

Q.  OK.  I cut you off.  I'm sorry.

Benny Medina is the president?

A.  Yeah.

Q.  And then there's the general manager?

A.  General manager.  And I met with other related parties or people that Mr. Combs trusted to, to interview people like myself, his attorney, and other kind of key advisers of his.

Q.  OK.  So it's not as though that you met Mr. Combs and got a job; it was much more involved than that?

A.  Yes.

Q.  OK.  Now, did you know -- did you know Mr. Combs personally?  When you decided I want to work with Bad Boy, did you grow up with Mr. Combs, know Mr. Combs?  Had you ever set eyes on Mr. Combs in public?

A.  I did not know him.

Q.  OK.  And so you wanted to work at Bad Boy because of the reasons you just gave this jury a few minutes ago, about what you believed Bad Boy stood for, am I right?

A.  Yes.

Q.  OK.  And you were the CFO from, starting about 1998?

A.  Yes.

Q.  All right.  And when did you leave the CFO position?

A.  Again, end of 2012, roughly.

Q.  All right.  And then you were the chief growth officer?

A.  Yes.

Q.  All right.  And this is -- I know it's a big period of time.  Between 1998 and 2012, how did Bad Boy change?

A.  Well, it changed from being primarily record, a record company to adding other businesses, which ended up growing.  As the record industry became more competitive, at that time, there was a big move to, away from physical records to digital music.  So there was more pressure on record companies.  Other companies in the Combs group of companies started growing and being more the major focus of the enterprise.

Q.  OK.  So tell me if this is right.  From what you could see, being on the inside as an executive, part of the thing that caused the change in Bad Boy is the nature of how people listen to music; people don't go to record stores and buy records anymore, they listen to music in other ways?

A.  Yes.

Q.  And what, if anything, from what you could see, what effect did that have on Bad Boy, the record company?

A.  The record company shrunk in terms of revenues and profits.

Q.  OK.  So you talked about a number of other companies, and you talked about some of them on direct examination, and I want to go through just a few.  I think you talked about a company called Janice Combs Music?

A.  Yes.

Q.  And Janice Combs is who?

A.  Sean's mom.

Q.  OK.  And then there was Janice Combs Publishing?

A.  Yeah.  The -- I didn't mention it, but it was mentioned.

Q.  OK.

A.  Yes.

Q.  All right.  Janice Combs Management -- and I'm not saying you mentioned all these on direct.

A.  Right.

Q.  I'm just going through a list of companies.
    -- that was another company?

A.  Yes.

Q.  OK.  You mentioned something about Bad Boy Touring?

A.  Yes.

Q.  OK.  And what was Bad Boy Touring?

A.  A touring company.  It was a company that was used for most of the major tours managed by the company.

Q.  OK.  So when shows were on the road, Bad Boy Touring would kind of take the lead with that kind of stuff?

A.  Yes.

Q.  All right.  Then there was Sean John clothing at one point, right?

A.  Yes.

Q.  OK.  And then there was -- do you remember a company called

P63Wcom6                        Ferguson - Cross

Notorious LLC?

A.  Yes.

Q.  And tell the jury what that is.

A.  That was a magazine named Notorious.

Q.  OK.  Blue Flame?

A.  Blue Flame's a marketing company.

Q.  OK.  And what things did it market?

A.  It varied over time, but generally marketed brands.  Brands would engage Blue Flame to do their marketing campaigns for them.

Q.  All right.

A.  But --

Q.  Now, some of these companies -- I think you named some of them -- were solely owned by Mr. Combs, am I right?

A.  Yes.

Q.  And then some of them had partnerships with other companies, am I right?

A.  Yes.

Q.  And is this -- are these partnerships along the same lines of what you described with Bad Boy and Arista?

A.  Yes.

Q.  OK.  Meaning that there's an operating agreement that governs the activity between the two companies, correct?

A.  Yes.

Q.  All right.  And that this operating agreement basically is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P63Wcom6                        Ferguson - Cross

sort of the bible about kind of what these companies can do and can't do and how they can do it, am I right?

A.  Yes.

Q.  And these -- so, when there were these companies --

MR. AGNIFILO:  And feel free to have some water.  Go ahead.

Q.  All right.  So, I want to make sure I understand this right.  So let's talk about, in the first instance, about companies that are solely owned by Mr. Combs.  So we're not talking about companies that have a partner.  All right?  I think the government asked you with those types of solely owned companies, what control -- what can Mr. Combs do by way of taking a salary, and so I want to ask you a couple questions about that.

Those companies all had finance departments, right?

A.  Or they shared a finance department.

Q.  OK.  So that's a great point.  Tell us how that worked.  So you were always -- when you were the CFO -- just tell us what a CFO is.

A.  Chief financial officer.

Q.  OK.  So you're the head of the finance department.  OK?  Now, I think what you just said is the company shared a finance department, right?

A.  Some of the companies.

Q.  OK.  So when you were CFO, which companies shared the

P63Wcom6                          Ferguson - Cross

financial department that you were the head of?

A.   Yeah.  I don't know if I can name them all.

Q.   Whatever you remember.

A.   There were a lot of -- a lot of the companies shared the financial office.  Then there were some companies that were big enough that had their own kind of finance office.

Q.   OK.  So for these companies that are solely owned by Mr. Combs, if Mr. Combs said hey, I've been working hard, I want to take some of the profits, that's a matter for the finance company, correct?

A.   For the finance department.

Q.   For the finance department.  I'm sorry.

A.   Right.

Q.   And how would that work?  Would what would the finance department look at?  How would it make its decision as to whether Mr. Combs would be able to take some salary?

A.   Again -- well, a couple things I'll just say.  It wouldn't necessarily have to be salary, because it just would be distributions of his profits so it wasn't necessarily categorized as salary, but as long as the company was profitable, again that's all -- he's entitled to all his profits.

Q.   OK.  But that would be run through the finance department?

A.   Yes.

Q.   OK.  All right.

P63Wcom6                           Ferguson - Cross

Now, let's talk about Bad Boy Records for a second. Established in 1993, am I right?  I know that was before you got there.

A.  Right.  Bad Boy Records, no, I don't think it was in '93, but --

Q.  OK.  Well, tell me what you remember.

A.  Yeah.  I think that Bad Boy Records, which is the joint venture between Arista and Bad Boy, was formed, I'm going to say maybe in '96.

Q.  OK.  All right.

And basically, it was an R & B and contemporary, contemporary R & B label, right, and hip-hop?

A.  Yes.

Q.  OK.  Now, are you familiar with the artists that Bad Boy had at the time, or is that not your end of the business?

A.  I'm familiar with them.  Familiar with them.  I don't know if I could name them all --

Q.  That's all right.

A.  -- but I'm familiar with them.

Q.  That's all right.

Now, in addition to Arista, did Bad Boy have other relationships with other record companies?  And I'll give you a few names, and you tell me if you remember one way or the other.  Epic Records?

A.  Nothing directly that I remember.

Q.   OK.  Interscope?

A.   Interscope, yes, at some point.

Q.   OK.  Was that later?

A.   Yes.

Q.   OK.  Atlantic Records?

A.   Yes.

Q.   Vinyl Records?

A.   Don't remember.

Q.   No problem.  Universal.  Universal Media?

A.   Yes, Universal.  Interscope is part of the Universal --

Q.   OK.  And I think you talked about Warner Music?

A.   Yes.

Q.   OK.  So at one point in time, Bad Boy had partnerships or relationships with each of the companies that you, that you remember them having a relationship, right?

A.   Yes.

Q.   OK.  And each of those relationships would be basically governed the same way; there'd be an agreement, an operating agreement in effect between Bad Boy and the other company, and the business would proceed according to that operating agreement, am I right?

A.   Not exactly.

Q.   Tell me.  Tell me.  Go ahead.

A.   So, the main difference would be whether it's a distribution agreement or a joint venture agreement.  So a

P63Wcom6                          Ferguson - Cross

distribution agreement would be structured differently than a
joint venture agreement, but those that were joint venture
agreements would be governed by this operating agreement.

Q.   Got it.  OK.

     So you start in 1998.  I think you said that Benny Medina
was the president of Bad Boy at the time, correct?

A.   Yes.

Q.   All right.  And from what you can remember and what you
saw, what was the role of the president of Bad Boy back then?
What did Benny Medina do?

A.   He basically oversaw all of the companies and, you know,
tried to drive growth within all of the companies and also
pursuing other, new ventures and new ideas and new
opportunities.

Q.   So when you started as the CFO, am I right that you
actually reported to Benny Medina?

A.   Yes.

Q.   OK.  So, because he was the president, he was your direct
superior, am I right?

A.   Yes.

Q.   OK.  And then there was someone named Jeff Burroughs, am I
right?

A.   Yes.

Q.   And he was the general manager?

A.   Yes.

P63Wcom6                         Ferguson - Cross

Q.   All right.  And tell us what Jeff Burroughs did.

A.   Jeff Burroughs was the general manager of the record company itself, so he focused on really all aspects of running the record company.

Q.   OK.  And then there was -- André Harrell was also president?  Do you know that name?

A.   Yeah.  That came later.

Q.   OK.  Who was André Harrell?

A.   André Harrell is a legendary music executive that founded Uptown Records and then eventually ran Motown Records and came back to work at Bad Boy Records.

Q.   And you're familiar with Mr. Combs's background from before he was at Bad Boy, right?

A.   Yes.

Q.   OK.  And Mr. Combs worked for André Harrell at Uptown, am I right?

A.   Yes.

Q.   OK.  And then either he was fired or something else happened, but he left.  He left Uptown, and then André Harrell -- Mr. Combs took André Harrell back and made him the president of Bad Boy, am I right?

A.   Yes.

Q.   OK.  And then I think you talked about Vashta Dunlap in this case, and she was human resources, am I right?

A.   Yes.

P63Wcom6                        Ferguson - Cross

Q.  OK.  And what kind of interaction did you have with Vashta?

A.  Vashta -- in the early days I had quite a, quite a frequent interaction with her, yep.

Q.  OK.  And what do you remember about the human resources department, you know, from those early years?  Talking about, like, '98 to, maybe, I don't know, 2006, 2007.  What was human resources like, to the best of your recollection?

A.  I just -- I would say it pretty much ran like any company you would think in terms of a human resources department, following all the laws of -- that governed, you know, governed our company, governed, you know, state law, etc., regarding employees.

Q.  Right.  OK.  But there was a human resources department headed by Vashta, right?

A.  Yes.

Q.  All right.  Now, I think you mentioned briefly that there was a spirits business that Mr. Combs had, correct?

A.  Yes.

Q.  OK.  And what was that called?

A.  The spirits business eventually was called Combs Wines and Spirits.

Q.  OK.  And tell us about that.  What, if any, connection did you have with that?

A.  Well, Combs Wines and Spirits -- well, I don't know exactly when that entity was formed, but the -- so, if I go back to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P63Wcom6                          Ferguson - Cross

spirits business and the original deal with Diageo, I would

have been involved in the completion of the deal and initial

execution of the deal and the rollout of how we were going to

execute against that deal.

Q.  OK.  And Diageo is partnered with who, with which Combs

entity?

A.  I think originally it was Combs Enterprises.

Q.  OK.  So it's Combs Enterprises and Diageo.  And you said

you were familiar with that deal?

A.  Yes.

Q.  OK.  What was your connection to that deal?

A.  I was involved in actually -- I was involved in negotiating

the deal.

Q.  All right.  What did the deal involve?  What did Diageo

have to do?  What did Combs Enterprises have to do?

A.  Well, Diageo really financed the majority of the activity,

and Combs was mostly responsible for creative and marketing and

product.

Q.  OK.  And did issues develop at some point between Combs and

Diageo?

          MS. SLAVIK:  Objection.

          THE COURT:  Can you rephrase?

          MR. AGNIFILO:  Sure.

Q.  After you put the deal together and were involved in the

deal, how did the relationship between Diageo and Combs

P63Wcom6                        Ferguson - Cross

Enterprises proceed from what you could see?

A.  Well, the business very quickly was very successful, and I think there was always a constant conversation around improving the balance of trade, of the deal, and making sure that the deal was fair on both sides.

Q.  Meaning what?

A.  Meaning just making sure that given the incredible success, probably exceeding expectations, that the view of that success would lead to just continuously making sure the economics was, was fair and equitable, equitable to both parties.

Q.  And did anything -- in addition to the economics, what, if anything, else did you notice about kind of how the relationship between Diageo and Combs Enterprises progressed?

        MS. SLAVIK:  Objection.

        THE COURT:  That's overruled.

BY MR. AGNIFILO:

Q.  Is that question -- was that question too convoluted for you?

A.  Yeah.

        MR. AGNIFILO:  OK.  That's fine.  Fair enough.

        THE COURT:  Can you rephrase?

        MR. AGNIFILO:  I will.  I will absolutely.  Thank you.

Q.  As time went on, what, if any, issues did you see between Diageo and Combs Enterprises?

        MS. SLAVIK:  Objection.  Can we get a time frame?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

P63Wcom6                        Ferguson - Cross

MR. AGNIFILO:  Maybe, maybe, you know, four years in, five years in, after you made the deal.

MS. SLAVIK:  Objection.  Do we know when --

MR. AGNIFILO:  Let me ask this.  I'm not going to --

THE COURT:  There you go.

BY MR. AGNIFILO:

Q.  OK.  All right.  Were there issues that you could see about how Diageo was marketing liquor from the Combs business?

MS. SLAVIK:  Objection.

THE COURT:  That's overruled.

A.  Yeah.  I think with any successful brand -- the push from our side was always to grow the brand as quickly as possible in as many markets as possible.  So I think that was always the tension, you know, driving the execution from Diageo's standpoint -- of growing the brand in as many markets as possible.

Q.  And did you have a perception that that was not happening on Diageo's end?

A.  I think we had -- we wanted a -- we wanted more.  We wanted -- you know, we had conversations about how do we drive more and conversations about was the brand everywhere where the competitive brands were.

Q.  OK.

A.  So that was a constant analysis being done, like, is it everywhere it should be?

P63Wcom6                    Ferguson - Cross

Q.   OK.   Was there a concern on your part that the Combs brands were only being marketed in certain areas and to certain people?

          MS. SLAVIK:   Objection.   Could we have a sidebar on this, your Honor?

          THE COURT:   Yes.

          (Continued on next page)

(At sidebar)

THE COURT:  Relevance.

MR. AGNIFILO:  So, Diageo came up on direct, and I'm just trying to understand -- the relationship breaks down. They have a great relationship.  They make a lot of money, and it breaks down, and the reason it breaks down is because there's a perception on the part, I think, of this witness and Mr. Combs that Diageo was keeping the Combs brands in, you know, as -- like the urban brands.

THE COURT:  I understand that argument.  What's the relevance of that to this case?

MR. AGNIFILO:  Well, I think it's relevant -- so, one of the things that may come out in the evidence and possibly in our case is at the time of the Ventura lawsuit, there was negotiations going on between Mr. Combs and Diageo, and one of the impetuses to settle quickly, to settle the Cassie lawsuit quickly was because it was going to topple this already somewhat tenuous relationship.  So I sort of agree with your Honor that it hasn't been terribly relevant to the evidence to date, but we're only halfway through the trial.

THE COURT:  You're saying the relevance will become apparent --

MR. AGNIFILO:  Yes.

THE COURT:  -- and you're only going to ask one more question on this?

MR. AGNIFILO:  That's all I'm going --

MS. SLAVIK:  Your Honor, could I just state --

THE COURT:  Of course.  Of course.

MS. SLAVIK:  My understanding is that that breakdown of the relationship between Mr. Combs and Diageo did take place just before the Ventura lawsuit.  If you recall, that was November of 2023.  We just heard this witness testify that he stopped being CFO in November of 2012.  He left Mr. Combs's employ in 2017.  This witness is not the appropriate person to get into these matters.  Frankly, they shouldn't be gotten into at all, but in particular through this witness, because he has no personal knowledge.  He cannot establish anything that happened in November of 2023.

THE COURT:  And maybe I misunderstood, but I understood what you were saying is you were just going to ask one question to establish that there were these issues back when --

MR. AGNIFILO:  Correct.  That's right.

THE COURT:  -- when he was CFO.

MR. AGNIFILO:  Correct.

THE COURT:  And through other evidence or other witnesses --

(Indiscernible overlap)

THE COURT:  All right.

MS. SLAVIK:  Your Honor, I still object to the

P63Wcom6                      Ferguson - Cross

relevance.

            THE COURT:  Understood.

            MR. AGNIFILO:  One question.

            THE COURT:  One question.

            MR. AGNIFILO:  Yes, Judge.

            (Continued on next page)

(In open court)

THE COURT:  Go ahead.

MR. AGNIFILO:  Thank you.

Q.  In your experience -- and you left Mr. Combs's employ in 2017, am I right?

A.  Yes.

Q.  OK.  Were -- did you observe or were you concerned that Diageo was marketing the Combs liquor brands in primarily Black areas?

MS. SLAVIK:  Objection.

THE COURT:  Overruled.

A.  Can you rephrase?

Q.  Sure.

Were you concerned or did you observe that Diageo was marketing the Combs liquor brands -- and I won't use any other -- to certain people and in certain areas?  And/or marketing or selling.

A.  Yeah.  I think, again, if -- what I just am trying to get clear about, like, my opinion, or --

Q.  What was -- you were in this company?

A.  Yeah.

Q.  You were working with Mr. Combs at the time, in 2017, at least, and so rather than your opinion, what was -- what was discussed?  What was -- what was, you know, the discussions within the company that you were privy to on that point?

P63Wcom6                         Ferguson - Cross

A.   Yep.  I think the facts were that the distribution was concentrated and the opportunity was how do you expand that distribution?  And that was the push with Diageo.  And I think the assessment, which went on, I think, even beyond my time when I was there, was what was --

MS. SLAVIK:  Objection, your Honor.

THE COURT:  Mr. Ferguson, just speak about the time that you were working at the company.

THE WITNESS:  OK.

All right.

THE COURT:  If that was your answer, then we'll get another question.

BY MR. AGNIFILO:

Q.   So, I'm only going to ask you based on your personal knowledge.

A.   Yeah.

Q.   Yeah.  What's your personal -- answer that last question based on your personal knowledge.

A.   My personal knowledge was that, the facts were that, that the distribution was highly concentrated, and I think the open analysis to be done on it was why.

Q.   And what do you mean by -- concentrated on what?  That's what I'm asking --

MS. SLAVIK:  Objection.

THE COURT:  That's overruled.

P63Wcom6                          Ferguson - Cross

BY MR. AGNIFILO:

Q.  When you say concentrated, what does that mean?  Just tell us --

A.  When you look at the map of where the product was distributed, it was concentrated in -- more so in urban areas versus broader, broader -- broader distributions.

Q.  Got it.  We're going to move on.

Revolt Television, what is Revolt Television?

A.  Revolt Television's a cable network nationally distributed.

Q.  All right.  And what was your connection to Revolt?

A.  So, Revolt -- I was involved from the beginning, when it was launched through a, through a competitive process held by Comcast to award four networks, and Revolt was one of the four networks they awarded distribution to.

Q.  And tell me if this is right.  Revolt was owned by a number of -- excuse me, of different parties.  It was owned by a Combs trust, am I right?

A.  Yes.

Q.  OK.  It was owned by Bad Boy Films, am I right?

A.  Yes.

Q.  And it was owned by Highbridge Capital Management, am I right?

A.  Yes.

Q.  OK.  Now, Highbridge Capital Management was purchased by J.P. Morgan Chase, am I right?  In 2004.

A. Let me back up.

Q. Yeah, please. Please.

A. There was -- I don't know that those are the same exact entities but maybe related entities, but --

Q. OK.

A. Yeah.

Q. OK. So, I just want to make sure the jury understands how this works, because we've heard a lot about Revolt at the trial, but this company called Highbridge Capital Management -- tell me if this is right -- had two seats on the Revolt board. Does that sound right?

A. At least two, yes.

Q. OK. At least two.

A. Yeah.

Q. OK. And tell the jury what that means, that we have Highbridge Capital Management -- let me take a step back. I'm going too far ahead.

    What is Highbridge Capital Management?

A. Yeah. And just to be clear, I'm not certain what the entity was, but this is a professional investment firm that invested in Revolt.

Q. OK. So -- and to your knowledge, was this company purchased by J.P. Morgan at the time that these board seats were controlled by this company?

A. I'm sorry.

Q. Let me ask a different question.

What, if any, involvement did J.P. Morgan Chase have in Revolt?

A. No direct involvement.

Q. OK.

A. Yeah.

Q. So, let's talk about Highbridge Capital Management for a second. You said they had at least two seats on the board?

A. Yes.

Q. OK. And so what does that mean? How many board seats were there, if you remember?

A. Yeah. I'm just trying to remember exactly how many board seats, but I think if they had two out of five would be -- they would have had 40 percent of the board seats.

Q. OK.

A. Yeah.

Q. So 40 percent of the board seats of Revolt were held by this capital management company, right?

A. Yes.

Q. OK. And so what does that mean in terms of the type of input, the type of say that this management company would have over the business of Revolt?

A. They had -- they had a say in a lot of different areas of the enterprise. So any major actions that would be taken by the -- by Revolt would need approval from them, like Revolt

couldn't be sold without their consent, and other kind of major activities would require consent.

Q. And I think you said that they were a professional investment company, is that right?

A. Yes.

Q. OK. And what does that mean? Just tell the jury what that means.

A. It means that, you know, this is what this group or the individuals that make up this group, this is what they do for a living. They invest in companies, and you know, they hold their investment for a certain period of time and they hope to sell that investment for a profit down the road.

MR. AGNIFILO: OK. So, we're going to look at some organization charts.

Q. Your connection to Revolt was what exactly, just so we have it clear?

A. I was the chief operating officer from 2015 through 2017.

MR. AGNIFILO: All right. So, we're going to look at some Revolt organization charts from July of 2016, and we're going to show them, for the moment, for the witness, the Court and the parties. And this is Defense Exhibit 1900, and it's a series of charts.

And so what I'm going to ask you to do, I'm going to show you a bunch of charts. I don't want you to read from them. I'm just going to ask you generally what they are, and

then we'll kind of take things from there.  All right.  So this is the cover sheet.  Let's go to the next page.

You know what I'm going to do, Judge?  I have them here.  I think it's probably quicker to give him the binder.

THE COURT:  OK.

MR. AGNIFILO:  Can I approach?

Here you go.  Start with 1900.

Mr. Ferguson, I've given you a binder, and there's a tab there that says 1900.  Do me a favor and just thumb through those charts, and then look up at me when you've done that.

Thank you, sir.

Q.  Have you had a chance to look through those?

A.  Yes.

Q.  OK.  Those are organization charts for Revolt, am I right?

A.  Yes.

MR. AGNIFILO:  OK.  We offer them as 1900, Judge.

MS. SLAVIK:  No objection.

THE COURT:  Defense Exhibit 1900 will be admitted.

MR. AGNIFILO:  Thank you.

(Defendant's Exhibit 1900 received in evidence)

MR. AGNIFILO:  All right.  Let's put them up for the jury and the folks in the gallery, Defense Exhibit 1900.

All right.  So this says Revolt organizational charts for July of 2016.

Let's go to the next page.  OK.  We're going to go

down memory lane.

Q. Who's the -- the chief executive officer is who?

A. Keith Clinkscales.

Q. OK. And then you have -- Christine Higley is executive assistant. See that?

A. Yes.

Q. Melissa -- can you say that last name?

A. I think it's a misspelling.

Q. OK. Great. All right.

Then we see you, Derek Ferguson. There we go.

A. Yes.

Q. Mike Roche, James JB Brown, Eugene Caldwell, Jaunice Sills, Kelly Griffin and Rahman Dukes. Do you see all of that there?

A. Yes.

Q. And that's the executive bunch for Revolt, correct?

A. Yes.

Q. All right. And as chief operating officer -- I know you talked generally about being the COO. What did you do as the chief operating officer for Revolt?

A. Well, I had several areas reporting in to me, including finance and, I believe, production at that time. And -- yeah, so my role as chief operating officer was really overseeing the operations of the cable network.

Q. OK. And then you see that Sean Combs isn't on -- at least in this chart of the executive office, am I right?

A. Correct.

Q. And that the CEO is Keith Clinkscales, right?

A. Yes.

Q. And so -- just tell the jury, what does a CEO do of any company, including this one?

A. CEO oversees the company, really all aspects of the company.

          MR. AGNIFILO:  OK.  Let's go to the next chart.

Q. All right.  Now we have operations, and we see you on the top of that because you're the chief operating officer, correct?

A. Yes.

Q. All right.  And then you have Emily Gray; that's your assistant?

A. Yes.

Q. OK.  And then we have a bunch of folks here at the bottom. I guess the person in the middle is to be determined, but the other four are identified people, and they all worked at Revolt in the operations department, correct?

A. Yes.

          MR. AGNIFILO:  OK.  Let's go to the next chart.

Q. OK.  Ad -- what's ad sales?

A. Those are the -- that's advertising that we sold on the network.

Q. OK.  And we see all these people in the ad sales.  Would

this be a department, a division?  What would you have called this?

A.   Department.

Q.   OK.  Ad sales department, right?  All these people work at Revolt, correct?

A.   Yes.

         MR. AGNIFILO:  OK.  Let's go to the next chart.

Q.   Then we have pricing/planning/traffic.  That's another department?

A.   This is a, it's a department, still within the ad sales department.

         MR. AGNIFILO:  Got it.  Got it.

         OK.  Next chart.

Q.   What's integrated marketing?

A.   Integrated marketing -- again, another part of ad sales -- creates programs that would integrate content with, with marketing, another way to drive ad revenue.

         MR. AGNIFILO:  Next chart.

Q.   Distribution, affiliate, consumer marketing, just tell us what that is.

A.   Distribution is really relationships with all of the cable networks; it distributed the television network.  And affiliate and consumer marketing are the joint marketing programs that were coordinated with the cable networks.

         MR. AGNIFILO:  Understood.  Let's go to the next

chart.

Q.  Production.  What do the production folks do?

A.  Production, this is the organization that actually controlled production of content for the Revolt channel.

MR. AGNIFILO:  OK.  Let's go to the next chart.

Q.  Creative production?

A.  Yeah.  This is also underneath the production banner, and these were just the leaders, the creative heads.

MR. AGNIFILO:  Yep.  OK.  Next chart.

Q.  Post production.

A.  Post production, this is really what happens after, after content is made.  This is the editing and formatting, etc., so that you can get the content actually on to the channel.

Q.  OK.  And there are a number of other charts; we don't need to go through them all, but these were all corporate charts that were made and kept in the ordinary course of the business of Revolt, am I right?

A.  Yes.

Q.  OK.  Let's go -- so now there's Combs Enterprise.  You were affiliated with Combs Enterprise as well, correct?

A.  Yes.

MR. AGNIFILO:  OK.  Let's look at 1901 for the witness and the parties and the Court.  OK?  And do me a favor.  I think in the book there, the second tab is 1901, and I'd ask you to look through it, and just take a look at those charts

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

and then when you've looked at them, look up at me and I'll

know that you're done.

THE WITNESS:  OK.

MR. AGNIFILO:  OK.  Thank you, sir.

Q.  These are all organization charts for Combs Enterprises?

A.  Yes.

MR. AGNIFILO:  OK.  We offer them as 1901 under seal,

Judge, and the document that we'll offer for all of us to look

at is 1901R.

MS. SLAVIK:  No objection.

THE COURT:  All right.  1901 will be admitted under

seal, and 1901R will be admitted.

(Defendant's Exhibit 1901R received in evidence)

MR. AGNIFILO:  OK.  Can we look at the first chart,

and for the jury.

There you go.

Q.  OK.  All right.  So, here it says who we are, and this is

Combs Enterprises, an org chart for Combs Enterprises, am I

right?

A.  Yes.

Q.  OK.  And can you just tell us who everybody is?  On top of

we see Sean Combs.  He's the CEO.

A.  Yes.

Q.  Brian Offord.  Tell us about Brian Offord.  What did he do?

A.  He was the chief operating officer of Combs Enterprises.

Q.  Then we have -- is it Hal Kravitz?

A.  Yes.

Q.  He's the CEO of AQUAhydrate?

A.  Yes.

Q.  And tell us about AQUAhydrate real quick.  What did AQUAhydrate do?

A.  Water brand that was launched by Sean and Mark Wahlberg.

Q.  OK.  Then we have Jeff Tweedy, president of Sean John, am I right?

A.  Yes.

Q.  OK.  Then we have Keith Clinkscales.  We just talked about him as the CEO of Revolt.

A.  Yes.

Q.  See that?

A.  Yes.

Q.  OK.  We have Michelle Williams and Keisha Combs; they don't get photographs.  And then at the bottom, we have Tony Abrahams, chief financial officer, right?

A.  Yes.

Q.  OK.  Harve Pierre, president of Bad Boy, am I right?

A.  Yes.

Q.  Nat Moore is communications?

A.  Yes.

Q.  Then we have James Cruz, president, artist management and creative partnership.  See that?

P63Wcom6                        Ferguson - Cross

A.   Yes.

Q.   And Dia Simms?

A.   Yes.

Q.   She's with Combs Wines and Spirits?

A.   Yes.

Q.   Sandy Humphrey, chief human resources officer.  See that?

A.   Yes.

Q.   And was that after Vashta was no longer in that position?

A.   I don't know --

Q.   No problem.

A.   -- exactly --

Q.   That's OK.

A.   -- when.  Yeah.

        MR. AGNIFILO:  And we have Aubrey Flynn, vice president of digital; Ericka Pittman; André Harrell, who we talked about before, and yourself, Derek Ferguson.  And you look every bit as good now as you did then.

Q.   OK.  So, what are we looking at here.  You say who we are.  What is this assembly of people?

A.   This is essentially the legal team -- I mean leadership team.  I'm sorry.

        MR. AGNIFILO:  OK.  That's fine.  OK.  Let's go to the next page.

Q.   OK.  Finance and administration.  Now, when you left -- tell me if this is right -- Tony Abrahams came in, correct?

P63Wcom6                    Ferguson - Cross

A.   Yeah, he came in at some point after I moved to --

Q.   Right.  When you left the CFO position --

A.   Yes.

Q.   -- Tony Abrahams became the CFO, went into the CFO position, is that right?

A.   Yeah.  I think actually there was somebody there in the interim for --

Q.   OK.

A.   -- maybe 12 months.

Q.   Now, did you know Tony Abrahams from Harvard Business School?

A.   I did.

Q.   OK.  And so he went to Harvard Business School too?

A.   Yeah.

Q.   All right.  And did you also work with Tony Abrahams in the accounting firm?

A.   At Coopers & Lybrand, yes.

Q.   OK.  So, did you recruit Tony as your, you know, old friend from Harvard Business School?

A.   I would say I brought him to the table as a candidate.

Q.   OK.  All right.  So what we're seeing is we are seeing two people heading this organization, both of whom went to Harvard Business School, yourself and Tony, right, as the CFO?

A.   Yes.

Q.   OK.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   Yeah.

Q.   OK.  And so this is -- when it says finance and administration, just tell us briefly.  What are all these people doing?

A.   Yeah.  I mean this was not my organization, but -- so I can tell you what I, what I, what I would -- how I would interpret --

Q.   If you don't know firsthand --

A.   Yes.

Q.   -- then I'm not going to ask you that question.

        MR. AGNIFILO:  Let's go to the next chart.

        OK.  This is human resources.

        OK.  Go to the next chart.

Q.   Now, what's digital?

A.   I --

Q.   That's all right.  Your pause says enough.

A.   OK.

        MR. AGNIFILO:  Let's go to the next one.

        Communications, public relations, right?

        OK.  Next chart.

Q.   OK.  Bad Boy Records, Harve Pierre was the president of Bad Boy Records?

A.   Yeah.

        MR. AGNIFILO:  OK.  We don't need to go through all the charts.

Q. These are charts of different people who worked for Combs Enterprises, correct?

A. Yes.

MR. AGNIFILO: All right. Now, I want to talk to you a little bit about personal versus business expenses. You talked about that a little bit when you were on direct examination.

Q. Fair to say -- now, what's your accounting background?

A. What's my accounting background?

Q. Yeah.

A. I studied accounting, and at one point I held a CPA.

Q. OK. So that was my question.

A. Yeah.

Q. You were a CPA for a while?

A. Yeah.

Q. OK. And just tell the -- I think you're the first CPA we're meeting. Tell the jury what a CPA is.

A. A certified public accountant, means you've worked in public accounting for a number of years and also passed an exam to obtain that certificate.

Q. OK. So you studied accounting, and you were a CPA for a while?

A. Yes.

Q. All right. OK.

So, fair to say personal expenses cannot be taken as

P63Wcom6                        Ferguson - Cross

business expenses, correct?

A.   Correct.

Q.   The two are totally separate, right?

A.   Yes.

Q.   Now, tell me if this is right.  To make sure that the personal expenses were not taken as business expenses, there was line item reconciliation for all business expenses -- for all expenses, am I right?

A.   Yes.

Q.   OK.  So, now, what that means -- tell me if this is right. If you have a credit card, a corporate credit card and people using it for business things and for personal things, at some point the credit card statement comes back to the company, correct?

A.   Yes.

Q.   And someone is going to go through that credit card statement and divide out, OK, this is a valid business expense, this doesn't seem like a valid business expense, this seems like a personal expense to me, right?

A.   Yes.

Q.   OK.  And that person was not you individually, am I right?

A.   Right.

Q.   OK.  That was someone who worked in the finance department, in your department, but it wasn't you, correct?

A.   Correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P63Wcom6                           Ferguson - Cross

Q.   And it certainly wasn't Mr. Combs?

A.   Correct.

Q.   OK.  You never saw Mr. Combs, you know, sitting with the credit card statement, circling what's business and what's personal, am I right?

A.   Correct.

Q.   OK.  Those would be people in the finance department whose job that was, correct?

A.   Yes.

Q.   OK.  And so if -- tell me -- and this is under your finance department when you were the chief financial officer, if it was a business expense, it was categorized as a business expense, correct?

A.   Yes.

Q.   Didn't matter who incurred it, correct?

A.   Correct.

Q.   So if it was Mr. Combs incurring it or another, you know, person incurring it, if it was a business expense, it was categorized as a business expense because that's what it was, right?

A.   Yes.

Q.   OK.  And if it was a personal expense, it was categorized as a personal expense because that's what it was, right?

A.   Yes.

Q.   OK.  And this is a very important function of the finance

P63Wcom6                          Ferguson - Cross

department, because you want to make sure you get this right for a host of reasons, am I right?

A.  Yes.

Q.  One of the reasons is taxes, correct?

A.  Yes.

Q.  OK.  Because if it's a business expense, there could be tax ramifications for the business, for it being a business expense, correct?

A.  Yes.

Q.  And if it's a personal expense, you can't claim it on your taxes as a business expense because it's not a business expense, correct?

A.  Yes.

Q.  All right.  So to your knowledge, did people, every month, go through these credit card statements and determine this is business, this is personal?

A.  Yes.

Q.  Now, you talked about income tax returns.  You yourself signed off on which corporate returns, to the best of your recollection -- you signed off on certain corporate return, am I right?

A.  Yes.

Q.  OK.  Which corporate returns -- as the CFO, when you were the CFO, which corporate returns do you recall signing off on? I know we're going back a long time.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   Yeah.  I mean I don't have a list, but --

Q.   OK.

A.   Maybe, you know, quite -- a number of the corporate returns.

Q.   OK.  So when -- so the different corporations file tax returns, right?

A.   Yes.

Q.   And if you're the CFO, if you're in the CFO role of those corporations, you're actually the one signing off as the corporate officer on behalf of that corporation, correct?

A.   Yes.

Q.   OK.  And for what -- and you did that -- did you do that every year that you were the CFO, if you remember?

A.   Yes.

Q.   OK.  That would be a heartland CFO responsibility, correct?

A.   Yes.

Q.   OK.  And on those occasions when the Combs-related business had a partnership with another company, fair to say that both companies would be looking at the books, not just you and your folks at the Combs company; but if you were with Arista, they're going to look at the books as well, correct?

A.   Yes.  Their -- their -- Arista's, the joint venture books would be really mostly controlled by the partner, the joint venture books.

Q.   OK.  So not by you?

P63Wcom6                         Ferguson - Cross

A.   In that case, yeah.

Q.   Right.  So if you were in a joint venture with Arista or another record company or, you know, you've talked about some other partners that you guys have been with, those partners would look at the books very closely as well?

A.   Yes.  They may even maintain the books.

Q.   Got it.

A.   Yeah.

Q.   And is that sometimes what the operating agreement provides for?

A.   Yes.

Q.   OK.  So one of the things that the operating agreement could provide for in certain circumstances is that the partner actually is in possession of the books, right?

A.   For that joint venture, yes.

Q.   For that joint venture.

A.   Right.

Q.   And what that means is that the partner would see the income and the expenses and all the money outflows and inflows of the joint venture?

A.   Yes.

Q.   OK.  Are you familiar with the role of personal assistants?

A.   Generally.

Q.   OK.  In your experience, is it common for people in the entertainment industry to employ personal assistants?

P63Wcom6                      Ferguson - Cross

A.   Yes.

Q.   OK.  And to your knowledge, did Mr. Combs employ personal assistants?

A.   Yeah.  I mean I think the assistants and the titles varied, but I think some people categorized it as personal assistant.

Q.   OK.  And tell me, these are people who take care of scheduling and travel arrangements and if, you know, if Mr. Combs had to be in one place or another, would make those arrangements and take care of his needs in those places, correct, if you know?

A.   Yeah.  I think there's a whole laundry list of things possibly that they could, that they would be involved in.  I don't know that that captures it or not, but --

Q.   OK.  Now, you talked about security personnel.  And security personnel played an important role in the business, am I right?

A.   They were -- yeah, they were part of the business, yes.

Q.   OK.  And their role, and tell me if this is your understanding, is they had to keep Mr. Combs safe, they had to keep his family safe and they had to keep his property safe.  That was primarily what they did, correct?

A.   Yes.

Q.   OK.  And from what you could see and what you understood, the way they did that is that if he wasn't in the house, they tended to be around him, correct?

A. Restate that, please.

Q. Sure. Of course.

So, in order to keep him safe, and we'll stick with that for a moment. In order to keep him safe, we're talking physically safe, correct?

A. Yes.

Q. That was their job?

A. Yes.

Q. They would be with him, they would physically be in his close proximity, if he went someplace, they would go with him?

A. Personal protection --

Q. Yeah, personal protection.

A. Right.

Q. OK. And they were paid by the company, correct?

A. Generally, yes.

Q. OK. All right. And the service that they provided was to make sure that Mr. Combs wasn't injured or no one did something to him to impair his health and well-being, correct?

MS. SLAVIK: Objection.

MR. AGNIFILO: If you know.

THE COURT: Hold on.

That's overruled.

A. Can you restate?

Q. Of course I can.

And their job, from what you understood, was to be in close

P63Wcom6                        Ferguson - Cross

proximity with Mr. Combs so that no one would do anything to him of a dangerous nature?

A.   Yes.

Q.   OK.   Now, you said that you had some oversight of Mr. Combs's personal finances, am I right?

A.   Yes.

Q.   OK.   And I think the prosecutor asked you what homes he had at the time, and you said he had a house in the Hamptons, he had a house in New York City and he had a residence in Miami.

     Do you remember that?

A.   Yes.

Q.   OK.   And I think that the prosecutor also asked you what form he held those properties in, and you said it was an LLC?

A.   Yes.

Q.   OK.   And just tell -- first, what's an LLC?   Just tell the jury what that is.

A.   A limited liability corporation.   It's a -- it's incorporated so therefore gives you the protections of a corporation, but could be a single-member corporation, which would mean that it could be owned 100 percent by someone -- like, in this case, of these homes -- or it could be a partnership and have several members and owners.

Q.   And I think you said, in your experience, it's very common; that's a very common way for certain people to own their houses, correct?

P63Wcom6                         Ferguson - Cross

A.   Yes.

Q.   OK.  And that's for the sake of anonymity, right?

A.   Yes.

Q.   And -- liability and, you know, individual liability, right?

A.   Yes.

Q.   And also, you said there's some appropriate tax benefits that could come with that, correct?

A.   Possibly, yes.

Q.   OK.  All right.  And let me just take a step back for a second.  Everything that you saw, for your entire time -- 19 years you were working with Mr. Combs, right?

     OK.  Did anyone ever not pay the taxes they were supposed to pay or do something they weren't supposed to do of a financial nature, as far as you ever saw?

          MS. SLAVIK:  Objection.

          THE COURT:  You've got to rephrase that.

          MR. AGNIFILO:  Yes, of course.  OK.

          MS. SLAVIK:  Your Honor, could I confer with defense counsel for a moment?

          THE COURT:  You may.

BY MR. AGNIFILO:

Q.   So let's talk about these taxes for a second.  Taxes and corporations is a very big, important and complex issue, correct?

A.  Yes.

Q.  OK.  And from what you saw, in terms of your hands-on, direct involvement, that was always done correctly at each and every year, am I right?

A.  Yes.

Q.  OK.  And fair to say you would never let there be financial impropriety on your watch in that company, am I right?

A.  I would do everything I could to not have that happen, of course.

Q.  And that's not why you were there; you were there -- you told the jury why you went there, of all places.  You were there to do a good job and to help the company fly right and be utterly legal in your --

          MS. SLAVIK:  Objection.

          THE COURT:  That's sustained.

BY MR. AGNIFILO:

Q.  You were there to do a good job and make sure that the company was financially appropriate, correct?

A.  Yes.

Q.  OK.  Now, you talked about cash on direct examination, and you said that there are times when cash is paid because of performances or things like that.  Am I right?

A.  Yes.

Q.  OK.  Tell the jury a little bit more about that.

A.  About, like, what?

P63Wcom6                    Ferguson - Cross

MR. AGNIFILO:  OK.  Let me ask a more specific question.  OK.

Q.  So there are times when Mr. Combs would be, would be paid in cash, am I right?

A.  Yes.

Q.  OK.  And the cash -- how was the cash put into the company?

A.  I don't understand the question.  Sorry.

Q.  All right.  Incoming cash, you said there was a cash receipt form.

A.  Yes.

Q.  Tell us what a cash receipt form is.

A.  Cash receipt form was a form which documented how much cash was received, if any cash payments, for what purposes, if there were any cash payments that flowed out of that in cash and then what was net and what was being submitted for deposit.

Q.  OK.  And so when would a cash receipt form be used?

A.  When there was a -- some sort of engagement that involved cash.  So, when you -- we -- when you think about touring, especially in those early days, there was a lot of cash involved.  And you had to collect cash basically at the venues you toured at.  And so it was a very cash-oriented activity when you did touring.  So that really required regular reconciliation of cash receipts.  That would be handled by the tour managers and the finance managers on the tour.

Q.  OK.  And so that cash, there would be a cash receipt form

P63Wcom6                        Ferguson - Cross

filled out and that cash would be, would be booked on the
company's books, correct?

A. Yes.

Q. OK. And I think you said and deposited?

A. Yes. To -- yeah, whatever net amount came to the company.

Q. OK.

A. Yeah.

Q. In getting cash out of the company, you said there was
petty cash, right?

A. Yes.

Q. OK. Just describe to the jury, what's petty cash?

A. Yeah, petty cash is just a rolling amount of cash where you
have a certain amount of cash set aside for various things that
would need to be or would best be taken care of via cash, and
that amount of cash would be replenished as receipts came in
documenting what the money was spent on. Then that cash would
be replenished and again, once again, used as needed.

MR. AGNIFILO: Your Honor, could we have a quick
sidebar on something before I ask a question?

THE COURT: You may.

(Continued on next page)

(At sidebar)

MR. AGNIFILO:  The indictment contains a number of factual allegations that I think this witness will say are untrue, and I want to ask him -- I want to put these in the forms of questions and ask him, you know, is it true that in your experience the purpose of these companies was X.  And I think he's going to say no.  And there are factual allegations.  They're in the indictment.  I can break them into questions, and he'll give an answer and the answer will be what his answer is.

THE COURT:  All right.

MR. AGNIFILO:  I didn't want to surprise anybody with that, so I'm bringing it up to you.  I'm bringing it up.

MS. SLAVIK:  I think I want to look at the language of the indictment.  My recollection is that the indictment alleges that the enterprise had certain purposes and means and methods.  I don't remember the specific citations.

If you can provide those --

MR. AGNIFILO:  So the enterprise, the way you guys defined it, is all of the companies and their employees.  So I will make that very clear to him, but I want to be able to ask him the question.  He was the CFO for all this time, and so I want to -- I've created these questions based on the allegations in the indictment, and I'll try and make it as clear as I can, but --

THE COURT:  Well, so let's address -- let's break down the issues.  You're not going to be referring to the enterprise when you're asking him questions because he doesn't have any understanding --

MR. AGNIFILO:  I'm going to talk about the companies and their employees.  That's all.

THE COURT:  All right.  Ms. Slavik.

How many questions are we talking about?

MR. AGNIFILO:  Seven or eight.

THE COURT:  Is there any objection?  I guess --

MS. SLAVIK:  No.  I would like to look at the indictment to see specifically what Mr. Agnifilo's --

THE COURT:  Well, can we get a copy of the indictment?

MS. SLAVIK:  Yeah, we have one here.

THE COURT:  While we're doing that, how much longer do you have?

MR. AGNIFILO:  I could do it in 20 minutes.

THE COURT:  Perfect.

MS. SLAVIK:  I'll just have five minutes for redirect.

THE COURT:  OK.  Great.

MS. SLAVIK:  You want a break?

THE COURT:  No.  I said that's great.

MS. SLAVIK:  I guess I heard what I wanted to hear.

MR. AGNIFILO:  I'll show you guys exactly what I'm going to do.

MS. SLAVIK:  I think what we're looking at is paragraph 7 here.

MR. AGNIFILO:  Let me see.  I know exactly what it is.

MS. SLAVIK:  OK.

MR. AGNIFILO:  It's really here.  It's really the purposes part, and I'm not looking at A and B.  OK.  C --

MS. SLAVIK:  That's the enterprises, so I think you have to look to the definition of what the enterprise is.

MR. AGNIFILO:  No.  I'm going to say it's the companies and employees.

MS. SLAVIK:  I don't think that's the correct --

MR. AGNIFILO:  But I don't think it has to parrot the indictment.

MS. SLAVIK:  Maybe -- what is your questioning?

MR. AGNIFILO:  I'll ask questions.

THE COURT:  Here's my understanding of what he's going to ask.  Without referring to the enterprise, because this witness would have no understanding of what that is, he's going to ask during the time that you were working at these companies, did the companies have a purpose of -- answer.

MS. SLAVIK:  I just don't think that's relevant.  I don't think that the companies writ large are alleged to be part of the enterprise.  As defined, the enterprise is defined Sean Combs, entities within the Combs business, including, but not limited to, Bad Boy Entertainment, Combs Enterprises and

Combs Global.  That's the entities within those companies.

Individuals employed by and associated and others known and

unknown.  I don't think there's any allegation that Bad Boy as

a corporate entity is part of the enterprise.  It's entities

within Bad Boy.

MR. AGNIFILO:  I'll ask the companies and their

employees.  What I was going to ask is the companies and their

employees.

MS. COMEY:  Your Honor, if I may?

We have alleged an enterprise in fact and association

in fact.  What the indictment does not allege is that any

actual association, like a corporation or like a company, is

itself the enterprise.  Instead, it alleges an association in

fact.  And as Ms. Johnson laid out in her opening statement,

the government's theory of that association in fact is that the

defendant and certain high-ranking employees, including chiefs

of staff and members of the security team, worked together as a

unit over a course of many years to fulfill multiple different

purposes, some of which included illegal purposes.

What it does not allege, the indictment does not

allege and our theory has not been at this trial -- is not --

that any specific corporation had the purpose of committing

crimes.

MR. AGNIFILO:  (inaudible)

THE COURT:  Hold on.

All right.  So, I hear what you're saying.

In paragraph 2, the indictment defines as the Combs business Bad Boy Entertainment, Combs Enterprises and Combs Global.

And then in paragraph 7, in defining the enterprise, it says the Combs enterprise consisted of entities within the Combs business, including, but not limited to, Bad Boy Entertainment, Combs Enterprises and Combs Global.  But that is part of the definition.  I think what Mr. Agnifilo is just saying is that since that's defined as part of the enterprise, he is going to establish just the limited point that those entities and the individuals employed by those entities did not have the purposes associated with the enterprise, nothing broader than that.

MS. COMEY:  I just want to make clear, your Honor, that that subdivision of paragraph 7 says entities within those businesses.  So I think in particular, if you went to the next slide --

THE COURT:  No.  It says entities within the Combs business, including, but not limited -- maybe it's --

MS. COMEY:  It may be poor drafting, your Honor.

THE COURT:  Yeah.

MS. COMEY:  But our theory has never been that a business's purpose was to commit crimes.  Our theory has been that people within and portions within those businesses.

THE COURT:  Well, let's say that I -- even if you're right, then wouldn't the defense be able to establish, again, the limited point that the businesses themselves did not have that purpose that you might attribute to --

MS. COMEY:  I understand that, but that is not -- so we are not disputing that the businesses themselves only were incorporated for lawful purposes, and my concern is, of course, a concern that it would confuse the jury by suggesting that that is our theory through the questioning.  It's fighting a straw man, in essence, through the questions, and it's a straw man that could confuse the jury because it's not an argument or a theory we're articulating.

THE COURT:  What is the question?

MS. SHAPIRO:  Can I just add one thing?

I think one of the issues --

THE COURT:  Let me hear the question first.

MS. SHAPIRO:  Sorry.

THE COURT:  I want to see --

MS. SHAPIRO:  It's relevant to this.

MR. AGNIFILO:  So, the question would be has it been yourself experience that the purpose of the businesses and its employees would be to enhance the power of Sean Combs through violence?  And he's going to say violence, of course not.  Or through the use of firearms.  You know, and so, and those are the questions, you know, as someone who's been the CFO of all

P63Wcom6                    Ferguson - Cross

these businesses, is that the purpose of the businesses and their employees?

MS. COMEY:  Your Honor, I think --

I'm so sorry.

THE COURT:  You don't have a problem asking in a more colloquial sense whether during any time that he was working at these companies he had anything -- any knowledge of any use of firearms or any violence or anything, and you can just list them off.

MR. AGNIFILO:  OK.

THE COURT:  But I think the problem is parroting the language of the indictment --

MR. AGNIFILO:  Fine.  I get it.  I get it.

THE COURT:  OK.

MS. COMEY:  We agree, your Honor.  Thank you.

(Continued on next page)

(In open court)

THE COURT:  Mr. Agnifilo.

MR. AGNIFILO:  Yes.  Thank you.

Q.  In your 19 years working with various of the Combs businesses and working alongside the various Combs employees, I'm going to ask you a few questions.

Did you see anyone help Sean Combs commit crimes?

A.  No.

Q.  Did you see anyone commit acts of violence?

A.  No.

Q.  Did you see anyone make the company stronger through threats of violence?

A.  No.

Q.  Did you see anyone make the company or Mr. Combs stronger through coercion or threats of coercion?

A.  Can you explain that one a little bit more?

Q.  Sure.  Did you see anyone, in your 19 years with Mr. Combs, make Mr. Combs reputation enhanced or the companies more powerful through the use of coercion or threats of coercion?

MS. SLAVIK:  Objection.

THE COURT:  That's fair.  Can you break that down a little bit.

MR. AGNIFILO:  Sure.

Q.  Did you see anyone use coercion either to enhance Mr. Combs' reputation or those of the businesses?

A.  I want to understand your definition of the word coercion. It seems like a word that specifically means something to you that it might not mean to me.

MR. AGNIFILO:  Fair enough.  I'm going to withdraw that question and ask a different question.

Q.  Did you see anyone enhance Mr. Combs' reputation or the reputation of any business through emotional, physical, or sexual abuse?

A.  I did not.

Q.  Did you see anyone enhance Mr. Combs' reputation or the reputation of the businesses through sex trafficking or forced labor?

MS. SLAVIK:  Objection.

THE COURT:  That's sustained.

Q.  Did you see anyone enhance Mr. Combs' reputation or the reputation of the business through acts of prostitution?

MS. SLAVIK:  Objection.

THE COURT:  That's overruled.

A.  No.

Q.  So you worked with Mr. Combs for 19 years.  Tell us, was it hard work?

A.  Yes.

Q.  Tell us how hard it was.

A.  You know, we were -- the company was building businesses from scratch.  So probably in business, that's the hardest

thing to do.  So just long hours, lots of diligent effort, lots of talented people, and, you know, completing difficult tasks of startup businesses and making them successful.

Q.  Did you feel that you and the company had a mission?

A.  We all felt the mission, we all felt that there was a mission to be great, to represent ourselves in a certain way.

Q.  And did you feel that you and the other colleagues you worked with were part of a family?

A.  Very close-knit group, especially at the beginning.  I think companies got bigger and that was harder to maintain.  It was a small business, so everyone knew each other pretty well.

Q.  Do you recall sending Mr. Combs a text in November of 2017?

A.  I don't.

MR. AGNIFILO:  I think it's quicker to do it this way, Judge, and I'm going to show it to the government, too.  We're going to mark it just for identification 1908.

Q.  I'm going to ask you if this refreshes your recollection. Do you recall telling Mr. Combs, on November 29th, 2017, that you learned so much from him in a text?

A.  I just don't recall the text, but yeah, I mean, I don't deny I said it, but I just don't recall the text.

Q.  Did you learn so much from him?

A.  I did learn a lot from him.

Q.  Tell us what you learned.

A.  He had a great business mind and I think, you know, he put

his mind to something and set a really high, aggressive goal,
and was not afraid of that goal.  That was something I think
that you could learn from, that the goals that I may have set
of just being successful versus the goal of being No. 1, and
the fact that you could be No. 1 was, you know, that was
something to be learned.  I think there was some business
learnings that I derived from working with him.

Q.  Do you feel that he pushed you?

A.  Yes.

Q.  Tell us how he pushed you.

A.  He just worked constantly.  I mean, he was, like, he was
always -- he, you know, his passion for what he did was really
high.  So his work ethic and the number of hours he put in was
something that really pushed, you know, the entire team.

Q.  And do you remember writing to him that the difference
between being great and being the greatest is caring more?  And
do you think that's true?

            MS. SLAVIK:  Objection.

            MR. AGNIFILO:  Let me ask a different question.

Q.  Do you remember writing that in a text, that the difference
between being great and being the greatest is caring more?

A.  Yeah, I don't remember the text, but one of his mantras was
you do your best work if you care about the outcomes.

Q.  Do you remember discussing with him the fact you were able
to bring your faith into the workplace?

P63Ccom7                      Ferguson - Cross

A.   Again, don't remember it, but I could -- yeah, I can -- I wouldn't -- wouldn't surprise me if I said that.

Q.   Would it have been true?

A.   Yes.

Q.   Tell us what you meant.

          MS. SLAVIK:  Objection.

          THE COURT:  Sustained.

Q.   Did he allow you to bring your faith into the workplace?

          MS. SLAVIK:  Objection.

          THE COURT:  Sustained.

Q.   And I'm not going to ask a personal question.  You're a religious man?

          MS. SLAVIK:  Objection.

          THE COURT:  That's sustained.

Q.   I want to ask you a few questions about Capital Prep Harlem Charter School.  You're on the board of directors?

A.   Yes.

Q.   Who started that school?

A.   That was started by Steve Perry and Sean Combs.

Q.   And what is it?

A.   It's a charter school, originally started out in the Bronx, ages -- grades 6 through 12.  There's now a second school -- I'm sorry.  Started out in Harlem.  There's a second school in the Bronx, also grades 6 through 12.

Q.   And Mr. Combs was one of the two people who started that

P63Ccom7                    Ferguson - Cross

school?

A.   Yes.

Q.   How long have you been on the board of directors at the school?

A.   Over 10 years I would say.

Q.   And the school, tell me if this is right, the school tries to work with at-risk children?

          MS. SLAVIK:  Objection, your Honor.  403.

          THE COURT:  That's sustained.

Q.   Tell us a little bit about the school.

          MS. SLAVIK:  Objection.

          THE COURT:  The objection is sustained.  Let's move on.

Q.   You're testifying at his criminal trial today, right?  Do you think highly of Mr. Combs as you're sitting in the witness box?

A.   I don't know how to respond to that.

Q.   Talking about your personal experience, that's what I'm talking about, your personal experience, is there anything in your personal experience that causes you not to think highly of Mr. Combs?

          MS. SLAVIK:  Your Honor, could we have a sidebar, please?

          MR. AGNIFILO:  I can withdraw the question, Judge.

          THE COURT:  Anything further, Mr. Agnifilo?

MR. AGNIFILO:  No.  Thank you, Judge.

THE COURT:  Ms. Slavik.

MS. SLAVIK:  Very briefly, your Honor.

REDIRECT EXAMINATION

BY MS. SLAVIK:

Q.  Mr. Ferguson, Mr. Agnifilo asked you several questions about Revolt during cross-examination.  Do you remember that?

A.  Yes.

Q.  And you were speaking about Revolt TV; is that correct?

A.  Yes.

Q.  Are you familiar with Revolt Films?

A.  I have some familiarity with them.

Q.  Is that something that's distinct from Revolt TV?

A.  Yes.

Q.  Who is the head of Revolt Films?

A.  I don't recall.

Q.  That Revolt Films was a completely separate entity from Revolt TV, though?

A.  Yes.

Q.  You were asked about your observations of violence and other conduct when you worked at Bad Boy.  Do you remember that?

A.  Yes.

Q.  Where did you work physically when you worked at Bad Boy?

A.  In the New York office.

Q.  You were based in New York?

A.  Yes.

Q.  At any time were you based out of Mr. Combs's homes?

A.  No.

Q.  Did you ever stay in a hotel room with Mr. Combs?

A.  No.

Q.  Do you remember walking through the org chart at Defendant's Exhibit 1901-R?

        MS. SLAVIK:  And if we could pull that up, that would be helpful, Ms. Gavin.  Thank you.

Q.  Do you remember walking through this org chart with Mr. Agnifilo?

A.  Yes.

Q.  I want to look at a chart that Mr. Agnifilo did not walk through with you.

        MS. SLAVIK:  Could you turn to page 8, please, Ms. Gavin.  Excuse me.  The next page.

Q.  What does this org chart show, Mr. Ferguson?

A.  It says chairman's office.

Q.  Who is the chairman?

A.  Based on this org chart, it was Sean Combs.

Q.  And I just want to walk through a couple of the folks on this org chart.  Do you see the name Kristina Khorram?

A.  Yes.

Q.  What was her title?

A.   Per this chart, director office of the chairman.

Q.   And below that, Dave Shirley, what was his role?

A.   Per this chart, personal assistant.

Q.   What about moving to the right, Derek Roche, what was his title?

A.   Stylist.

Q.   And to the right, Paul Offord, what was his title?

A.   Head of security.

Q.   Below that, Faheem Muhammad, what was his title?

A.   Fleet manager.

Q.   And at the bottom, Damion Butler, what was his title?

A.   Security project manager.

Q.   And finally, just to the right, do you see the name Mia?

A.   Yes.

Q.   What was her title?

A.   Director development and acquisitions.

         MS. SLAVIK:  Just a moment, your Honor.

         Nothing further.

         MR. AGNIFILO:  I have one question.

RECROSS EXAMINATION

BY MR. AGNIFILO:

Q.   You never went to Mr. Combs' house or his hotel room because that's his personal life, right?

         MS. SLAVIK:  Objection.

         THE COURT:  You can rephrase the question.

Q.   The CFO doesn't need to go to the hotel, doesn't need to go to his home because he gets a personal life, right?  He's not always at work, correct?

MS. SLAVIK:  Objection.

THE COURT:  That's sustained.

MR. AGNIFILO:  Thank you.

THE COURT:  Thank you very much, Mr. Ferguson.

(Witness excused)

Thank you very much, members of the jury.  We'll be back here tomorrow to start at 9:00 a.m.  Thank you for all your close consideration today.  Again, do not speak with each other about the case, don't look up anything about the case, don't talk to anyone else about the case, and we'll see you here to start at 9:00 a.m. tomorrow.

All rise for the jury.

(Continued on next page)

P63Ccom7                        Ferguson - Recross

(Jury not present)

THE COURT:  Anything to address from the government before we adjourn?

MS. COMEY:  Just in anticipation of Jane's testimony tomorrow, your Honor.  Ms. Geragos and I have been working collaboratively to deal with any exhibit issues, but I expect there will be a letter tonight or an email tonight reflecting issues that we may need to resolve tomorrow morning.  So just wanted to put that on your Honor's radar.

In addition, I wanted to flag for your Honor in addition to proposing an instruction to courtroom observers about the pseudonym order, we would propose that for Jane's testimony that the public screens and the overflow screens showing exhibits be turned off throughout.  And there's a couple of reasons for that.  Number one is, in contrast with Mia, Jane, in her testimony on direct and cross will involve a large volume of exhibits, including text messages with her name, her child's name, nicknames for her, her phone number, her address throughout hundreds of pages of exhibits, and it is not feasible for us to carefully redact all of those, given the back and forth the parties are having right now.  And so to avoid the kind of accident that happened with Mia of accidentally putting up identifying information, we'd ask for the Court's permission, just during her testimony, have the public screens turned off, and then the parties will work

diligently and quickly to review exhibits on a rolling basis and release them to the press and the public with full redactions made promptly after her testimony. We just want to avoid a situation where accidentally an unredacted version gets put up on the public screen. So that would be our proposal for your Honor to protect her identity.

THE COURT: So in the overflow rooms, I mean, I'll figure this out, but is there a separate screen showing the courtroom and then a screen for the exhibits? And your proposal is not to shut off all the screens?

MS. COMEY: No, your Honor.

THE COURT: Only the screen-displaying exhibits?

MS. COMEY: Exactly, your Honor.

THE COURT: I don't have any issue with that. So we'll go ahead and implement that for Jane's testimony.

MS. COMEY: Thank you, your Honor.

THE COURT: Who do we have next, just to remind me.

MS. COMEY: So we have Mr. Piazza and Bryana Bangolan, and then if there's time, we'd like to squeeze in Enrique Santos, who's a very short witness who will just provide context for how to read the text messages that are coming up with Jane. If we're running late, we'll probably just skip it, but if there's time, we'd like to get him on so that the jury has the context for how we're reading these text messages during her testimony.

THE COURT:  So worst case scenario, we'd be starting with Jane on Thursday?

MS. COMEY:  Exactly, your Honor.

THE COURT:  And if we start with Jane on Thursday, then we should be able to complete Jane's testimony before the following Thursday?

MS. COMEY:  That would be the goal, your Honor, yes.

THE COURT:  Anything further from the government?

MS. SMYSER:  Your Honor, I just wanted to briefly address the new compilation the government put together, which we would plan to use during Mr. Piazza's testimony.  The new compilation adds in some time that Mr. Piazza had taken out of the video when nothing was happening, just to avoid any appearance that we were taking things out of the video.  And it is also inserted into the video at your Honor's suggestion, black screens between every change and camera angle.  He has tried to line them up so time's not missing, but the black screens also function, show a few seconds or a short time is missing.  There's nothing misleading for the jury there. That's what the government has done and what the government would plan to use during Mr. Piazza's testimony tomorrow and to offer into evidence.

I understand that the defense still has an objection to this video.  I quite frankly don't know the source of that objection.  So I think that would be helpful to have it stated

so we can address it tomorrow morning.

THE COURT:  I don't think I need any further argument on it.  So could you send that to the Court.  You may have already done this, but --

MS. SMYSER:  Yes, we can provide it to your Honor.

THE COURT:  I'll take a look and we can address it briefly in the morning tomorrow before we get started.

Anything from the defense?

MS. GERAGOS:  Yes, just two things to respond to both, your Honor.  I note, yes, no further argument.

With respect to Ms. Comey, we had conferred about this.  The one thing we would want our client obviously be able to see the exhibits as they're being shown to Jane.  And so I guess I would just ask your Honor to tell the marshals that it's okay for him to have the computer in front of him so that he is able to look at the exhibits.

MS. COMEY:  If I may, your Honor, my proposal would be for anything, except nude images, that the attorney screens remain on just with the screen covers.

THE COURT:  I understood you just to say that we were going to turn off the screen in the back and the overflow rooms.

MS. COMEY:  Exactly, your Honor.  The only situation which Ms. Geragos' situation would become relevant is I do expect to show Jane, as Ms. Johnson did with Ms. Ventura, a few

shots of explicit videos so that she can identify the people in those screenshots. I would propose to turn off the attorney screens for that and then hand hard copies of the exhibits to defense counsel and the defendant so that as I read out the exhibit number, they will know what exhibit is being pulled up for the witness. And the idea there is even with the screen protectors, the gallery can, especially when it's a large image up on such a large screen, can see the nude images, and they're explicit and I think we've already talked about how sensitive letting the public see those would be.

THE COURT: Ms. Geragos, I think what you're hearing is that one way or the other, Mr. Combs absolutely will be able to see all the exhibits. It's just a question of the mechanics.

MR. AGNIFILO: We have a different variation of the same issue on one thing. Mr. Combs is prevented from possessing or looking without us being present any of the text messages of Jane. And it's now, she's going to be on the stand tomorrow. And here's the ask: We need to be able to be with our client in a place that doesn't have a screen between -- you can't show text messages through the screen. And so we really absolutely need to be able to sit in a place with a desk with him, with no separation between us, so that we can go through these text messages. This is now kind of crystalized to this moment in time where this very, very important witness is going

to get on the stand.  The reason her examination is going to be so long is because there's many, many text messages, even more than the first witnesses in the case.  What we absolutely require is to be able to sit with him with these text messages and go through them back and forth --

THE COURT:  Are you able to do that at the MDC?

MR. AGNIFILO:  We can do that at the MDC on the weekends.

THE COURT:  Why can't you do it if you just left right now?

MR. AGNIFILO:  We would maybe see him for an hour and a half and it's just not enough time.  I'm going to make another request.  I don't know if we can use the courtroom, but we need more time than we have.  The 6:00 p.m. deadline just isn't enough time.

THE COURT:  How long do you want to use the courtroom for?

MR. AGNIFILO:  As late as we can have it.

THE COURT:  But if you're here in the courtroom, then there's going to be marshals here.

MR. AGNIFILO:  I don't mind that.  I'm very happy to have the marshals.  I have no issues with the marshals.  The marshals are wonderful and help us.  We need to spend time with him, our client, and to sit with these emails.  If we can do that in the courtroom, if that's something the marshals would

allow, I have no idea if they're going to allow it, but the current situation just, most respectfully, doesn't work because there isn't enough time and we're separated by the screen. And our client's inability to have the texts -- it's not as though we could give it to him and say read these 500 pages and talk to us tomorrow, he can't have them. He can only look at them if he's with us and it's just not working. And now we're at this stage where we have this kind of combination of factors. And what we really need is we need more time and we need more time to be not separated by a screen with our client. And we don't we think it's been at a point where it's a Sixth Amendment right to access issue, but it's a very important issue. And I know I've been beating this drum. And your Honor I have no doubt has done everything that the Court can do, and I know the Court has on all these different fronts that we keep raising, but we have now more of a more specified problem, which is we need to go through these texts with him, he needs to be able to read them. And so I will -- I'm pleading my case to your Honor, and I'll plead my case to the marshal service and we'll see if something can work out.

I spoke with the government, not that the government has -- they have say on a lot of things, I don't know that they have much say here. All the parties want this to happen because nobody wants to be in a position where this hasn't happened and then, you know, some lawyers two years from now

are looking back at this situation.  We really have to work this out.  It's just absolutely imperative.

MS. COMEY:  Your Honor, if I may make a bit of a record, given the implication of the Sixth Amendment in Mr. Agnifilo's comments.

The text messages that we're discussing were produced in Rule 16 discovery.  So Mr. Combs and his counsel have had them for many, many months.  They are rather long, but it's very easy to see what the relevant messages are given that they were cited as early as bail arguments and bail letters, and the parties have discussed them in some detail.  So the defense and the defendant have known the significance of these messages for many months.  They've also been receiving 3500 from our meetings with Jane since we started meeting with her in January of this year, which has attached to each of those notes any text messages that we reviewed with her or has noted the Government Exhibit that we reviewed with her.  So they have known from their receipt of 3500 which exhibits we have actually gone through, which text messages we've actually looked at with her.  So they've had all of that for weeks in advance of trial and they've had the full text messages for many months.  So there has been ample time for the defendant and his counsel to review those items.

In addition, given the length of direct, I don't expect to finish direct before Monday morning.  And so the

P63Ccom7                        Ferguson - Recross

defense will not need to begin their cross-examination until after the weekend. So they will have two full weekend days to meet with their client in person at the MDC to review these messages.

That said, subject to the marshals, because we defer to the marshals with respect to the use of the courthouse, we have no objection outside of what the marshals say is feasible to the defense meeting in the courtroom and the government not being in the courtroom while this witness is on the stand so that they can, at the end of or the beginning of each trial day, go through with their client any text messages they need to discuss.

THE COURT: Can you remind me, Ms. Comey, in terms of Mr. Combs having the text messages to review on his own, that's a result of the protective order?

MS. COMEY: Exactly, your Honor. There's a lot of sensitive information in there, there's contact information, there's nudity in some of the messages, there's a variety of sensitive information, there's her contact information, her personal information. And so that is why it is covered under the protective order, and defense counsel has been very diligent in following that.

I will note though, my understanding of the protective order is it doesn't require Mr. Agnifilo himself to sit with the defendant. It could be a paralegal, it could be someone

who is an agent of the defense team who sits with Mr. Combs at the MDC so that he has a chaperone essentially while he is with these exhibits.

THE COURT:  Understood.

MR. AGNIFILO:  I don't think I could underscore it, and I know that the Court hears us, and I'm mostly grateful, and I know that your Honor's trying.  We're at a point where we just need a solution.  I'll take anything that I can get as long as I can sit with him and go through these text messages.

THE COURT:  And tell me, why does the screen prevent you from talking about particular messages?  Paint a picture. You're so good at this, paint a picture for me.  What does this screen look like?

MR. AGNIFILO:  So the screen, it's thick.

THE DEFENDANT:  Mesh.

MR. AGNIFILO:  It's thick mesh, so you can't really see through it.

THE COURT:  Yeah, but you can talk through a text message.  You can say here's the text message and here's what people say.

MR. AGNIFILO:  You want to sit with your client and have a highlighter and say this and this, and you want to go through it.  I mean, it just doesn't work the same way.  And the time at the MDC, I mean, we're only going to get two days of about 6 hours each day.  We have 12 hours of weekend MDC

time before we go on cross, and it's just not enough time.

THE COURT:  See, the thing is that there is time here in the courthouse because, as I think I told you before, we get started at 8:30, so you have from 7:00 to 8:30 in the morning, and you have from 3:00 or 3:30 until 6:00 p.m. here in the courthouse.

Now, the easiest place to accommodate your discussions would be in the screened-off room.  There are two other options that have been raised.  One would be the skiff.  That presents its separate set of issues because only classified personnel apparently are able to use that room, and you would need various approvals that are difficult to obtain.  You can use the courtroom, but we need to figure out staffing.  And again, you're going to be limited because of some of the marshal service issues.  And so you would get until 6 o'clock.  Now, put that together, that's an additional three or four hours every day.

MR. AGNIFILO:  So the courtroom would be preferable to the room with the screen for sure.  I mean, if that's what's available at the moment, we'll take it.  We'll push the chairs in when we're done and we'd be honored to be here.  And we're very happy to have the marshal service with us.  That will not impede our discussions.  So that is a better option than what we have right now.  We've been availing ourselves, the marshal service has had Mr. Combs here 7 o'clock or soon after every

day and I've been there with him a couple of times.

THE COURT:  I take it that you want to do this today?

MR. AGNIFILO:  I would love to do it today, Judge.

THE COURT:  Is there someone from the marshal service here who could just join me in the back for a second?

THE MARSHAL:  Your Honor, we're going to defer to senior management for this issue.  My partner just went out to make a phone call, so we should be able to get an answer hopefully soon.

MS. GERAGOS:  Can I use this time to make a record on the video, your Honor?

THE COURT:  Which video?

MS. GERAGOS:  115.

THE COURT:  114?

MS. GERAGOS:  Well, now it's 115.

THE COURT:  Okay, 115.

MS. GERAGOS:  I just would like to make my record of why it's still misleading, if your Honor would allow me.  115, though it has several black screens, it still does not account for the time that the motion-activated cameras are not recording, which was our biggest problem if this gets admitted and goes back in the jury room.  As a result, the assembled compilation gives the false impression to the viewer that the actions are taking closer in time to one another than is actually in fact the case.  So the black screens or boxes — I

don't know the best way to describe it — does not satisfy our concerns with the video. And it's cumulative of the exhibits that are already in evidence. And so it does not correct that issue. It's not separately probative for the government. And it's essentially repetitive and cumulative evidence. The same dynamics exist here than does the original video, but the difference here is the way this Government Exhibit is compiled is it intentionally makes it appear that the sequence of events that took place over a longer period of time actually happened in a much shorter period of time. That is a big problem for us if it were to go back in the jury room. It will lead to a tremendous amount of cross-examination on this issue.

And in terms of the sequence, I just wanted to address that point because I think this morning I said I didn't have a problem with the chronological sequence. And so with respect to 115, I want to -- and I'm sorry, my computer died, so I'm going to read my notes that I took off of my phone. It goes back and forth in time. So if you look at, for example, there's a part of the video where Ms. Ventura is getting something from her purse, and then it cuts back in time for a few seconds and we see Combs running down the hallway. That was the portion of the video that we saw earlier this morning. That would imply to the viewer that the sequence ended essentially, that she was in her -- like in her purse at the time that he is coming down the hallway, and then next actual

time event happening is him running down, but it's not.  It's actually rewound about 30 seconds, and that is of course not going to be something that is -- that the jury is readily going to be able to figure out because the timestamps from the hallway video are vastly different by about five minutes than the timestamps of the elevator footage.

There's also a sequence in the right hallway footage at about 1 minute and 56 seconds that shows Combs entering the lobby area, and the next scene is her in the lobby.  And it's just actually confusing because, in reality, it seems that he enters the lobby about 20 seconds later.

And so these are just two examples of why they're not in perfect chronological order.  Again, we understand that the government wants to use this as a demonstrative, we understand it might be easier during his testimony to play this for them, but in terms of the prejudicial value to the defense to have this go back to the jury room, it's extremely prejudicial in terms of sequence, it's cumulative, and there's just no probative value for the government and it's outweighed by the prejudice to the defendant.

So that is my record that I wanted to make on that.  I don't know if Ms. Smyser wanted to respond.  And we have only one brief other issue.

THE COURT:  In a perfect world, to avoid these issues that you've raised, we would simply play the original video,

right?

MS. GERAGOS:  That's what we understood, your Honor, and I understand they gave it to us 10 days ago.  We didn't understand they would frankly put it in through Mr. Piazza until I believe Sunday night.

THE COURT:  I mean to avoid all these things we're talking about, we would use the original surveillance video, right?

MS. GERAGOS:  Correct, yes.

THE COURT:  But we don't have it.

MS. GERAGOS:  That's why we moved to preclude it, but your Honor ruled the corrected video should come in, and there was tremendous amount of motion practice on that.  And so we had understood that the corrected video comes in, our objection is preserved, and now we not only have the corrected video, but now we have some other video that's been pulled together by a fourth generation video that doesn't even show things in complete sequences, and it's misleading, and it's cumulative. We have the other videos.  We have 103, 104, 105, 101, 3B-101, and 3B-102.

THE COURT:  I understand.  I don't think you're understanding exactly what the point I was trying to figure out to get to the bottom of here.  I mean, let me just end here, I don't think we need further argument.  Where I began in the morning, which is if we had the original original, the

generation 1 surveillance video and that existed, that, you would agree, is what the government would seek to introduce, fair?

MS. GERAGOS:  Fair.

THE COURT:  We don't have it, right?

MS. GERAGOS:  Fair.

THE COURT:  Why do we not have it?

MS. GERAGOS:  Well, we don't have it because someone took it off the system.  However, if Piazza hadn't taken it off the system, it also still wouldn't exist because it would have been deleted in 10 days anyway.  So we have it actually -- we only have this version because of the circumstances of this case, otherwise we really wouldn't have any of it because it would have been taken off the system in 10 days.

THE COURT:  All right.  If we go to Rule 1004, they can put in other evidence that goes to originally what was in existence, and that's what this was attempting to do because the original evidence --

MS. GERAGOS:  That's --

THE COURT:  I hear you on the points that you're making.  I'm just saying it is a compilation, the government agrees on that.  They've made adjustments to reduce the unfair prejudice or cumulative nature of any of this, and I'm going to take a look at it.  But I hear your arguments on why it is deceptive in certain ways, you've made those points, and let me

take a look at the video and see what it looks like, because the only one I saw was the prior version.

MS. GERAGOS:  Understood.  I will not argue anymore on this.  I think your Honor's allowed me to make a record.

THE COURT:  If there's further argument, if there's further points you want to make, if you want to put in something overnight, you can, but I think you've probably made the points you need to make, but I'm always open to further submissions.

MS. GERAGOS:  We appreciate that, your Honor, we really do.

The last point is with respect to two defense exhibits that we had understood that your Honor admitted yesterday, but we wanted to check with your Honor, for lack of a better term, because we believed that they were in, the government was not exactly sure, we wanted to bring this to your Honor's attention --

THE COURT:  Do we have a written record of these types of things?

MS. GERAGOS:  Your Honor says it will be admitted, and it notes they're admitted into evidence, and then we didn't do that in front of the jury.  And so I just want -- I guess we are trying to make sure -- both parties are trying to make sure they're actually exhibits.  Defense exhibit 1748, that's the first one, and then defense exhibit 1794 is the second one.

Just for the parties, please.  It's not on our screen, but I'm not sure if it's on the Court's screen.  There it is.

So if your Honor recalls, we had oral argument on this yesterday.  I believe Mr. Steel argued it.  I apologize, my computer died, so I don't have the transcript cite. Ms. Johnson may.  She's always on top of these things.

THE COURT:  I remember the text messages.  Did you not attempt to introduce these during Mia's testimony?

MS. GERAGOS:  I think on the defense side we had understood that your Honor noted they were admitted, and so Mr. Steel then didn't admit them during the testimony.  I don't think there's an authentication issue --

THE COURT:  Wait, we've done this now for 19 days, and we have these objections that are raised, the objections are overruled.  I typically say they will be admitted, and then during the testimony they are authenticated and then the communications are put into evidence.  That's how we've done it every other time.

Now, is there an objection from the government on the admission of these particular messages, given the overruling, I take it, of the objections?  And I'm not looking at the transcript, but I take it that what happened, I remember the messages, I take it the objections were overruled?

MS. JOHNSON:  That's right.

THE COURT:  And the defense simply did not introduce

these during Mia's testimony?

MS. JOHNSON:  Yes.

THE COURT:  However, given the nature of these communications, it may be they were produced by the government?

MS. JOHNSON:  That's right.

THE COURT:  And so there wouldn't be an authentication objection that would be necessarily heard, but I'll hear from the government to just see what their position is.

MS. GERAGOS:  And just so your Honor is aware, these are from Ms. Khorram's devices, and when we produced them back with stamps to the government, we told them which device it came from, which is a device that we agreed upon was authentic, but I can't find in the transcript where Mr. Steel had her look at them and authentic them, but we don't think there is a broader authentication issue because these came from extracts that the government did.

MS. COMEY:  Your Honor, I think our ongoing objection would be our understanding of the reason your Honor overruled the objection and admitted these was that they would have some sort of impeachment value, and the way to establish that impeachment value would be to introduce them through the witness and ask the witness about them, and that way the witness also has the opportunity to explain them.  And we had taken it as a strategic decision by the defense not to ask about these, particularly because I think they would have been

cumulative of other similar types of messages that they put in. So we assumed it was a strategic decision that the defense made not to show these to Mia and not to ask her about them and not to put them in.

MS. GERAGOS:  I don't recall the basis of admissibility to these being impeachment exhibits.  I think we had understood, based on the transcript, that your Honor ruled that they would be admitted.  So now that is why we're bringing this to the Court's attention.

THE COURT:  I didn't say that they are admitted, I said they will be admitted.

MS. JOHNSON:  Your Honor, I would just point out directly before these particular exhibits were discussed in the morning argument, defense exhibit 1750 was discussed and your Honor used the same phrasing in overruling the government's objection to defense exhibit 1750.  That exhibit was then shown to the witness, authenticated through the witness, and then admitted through the witness.  So it's that contrast by which it's our view that these are not in evidence.

MS. GERAGOS:  I think the difference between 1750 and 48 and 94 is that 1750 was not produced, as your Honor knows, because it's multiple days of argument over 1750, that was something found on YouTube that she had to authenticate in person on the witness stand whereas these messages came from extracts of Ms. Khorram's phone.  We have had these in

discovery since December 31st, and so we know that they are authentic.

MS. SHAPIRO:  I'm sorry.  May I jump in?

THE COURT:  No.  No.  No.  Hold on.

So let me try to get to the bottom of this.  We don't need further argument on it.  Evidence can go to impeachment if it's not used with a witness, technically speaking, right?  It doesn't have to be used with a witness to undermine testimony in that direct way.

MS. COMEY:  It depends on the type of impeachment, your Honor.  If this is meant to be prior inconsistent statement, I think the rule requires the witness be shown the statement and have the opportunity to address it and explain it.  I may be misquoting the rule, but my understanding of impeachment by a prior inconsistent prior statement, if that's what this was, would be that the witness needs to have the opportunity to see the statement and address the statement. But if that's not the -- if there are other bases of impeachment such as bias, I agree with your Honor that it doesn't necessarily have to come in through the witness.

THE COURT:  As I understood it, the upshot of these messages is simply that she didn't refer to the kinds of sexual abuse that she had testified to, and that was why the defense thought that it was relevant to impeachment.  If that's true, then it becomes an authentication issue, and the government

isn't hanging its hat on authentication, right?

MS. COMEY:  No, your Honor.  I do think that these messages have a bit of an issue that we had flagged the other day, which is that, as you'll see, the green messages don't say who is sending them.  So that was part of the issue with these messages.  We don't dispute that they came from the device the defense says they came from, though.  And so I think part of the confusion is that, as your Honor pointed out, the way we proceeded through trial is we have these arguments and then the foundation is laid, the exhibit is shown to the witness, and then the parties -- the proponent offers it, and most of the time, your Honor then admits it, but sometimes your Honor has not admitted the exhibits depending on how the questioning happened.  Sometimes it's reargued.

THE COURT:  Let's get real here.  That is how everyone understood it happening.  There may have been an oversight here.  I have a copy of the transcript up.  There's a parens in there, I don't know where that came from because I didn't say something in a parens, but under these circumstances, if you look right above that, I did ask Mr. Steel exactly what the basis was for putting this in, and he did in fact say the reason why it was relevant here was that she was showing -- she was airing her grievances and showing her state of mind, and what she did not say is that Mr. Combs did all these bad things to me previously.  So it is what we were discussing.

MS. COMEY:  I think that's right, your Honor.

I will just note then, I agree with your Honor that if that is the basis of admitting it, it's admitting it under 803.3, showing state of mind.  There's no right to have her on the stand.

I would just note that the defense has in other contexts suggested otherwise when we have, for example, attempted to offer statements of Ms. Ventura after she left the stand for her state of mind, they have suggested that they have some right to have those messages shown to Ms. Ventura, and I just want to make --

THE COURT:  I'm pretty sure I rejected that.

MS. COMEY:  I think that's right.  I just want to put out there that we're getting some inconsistent arguments from the defense.

THE COURT:  We may be getting inconsistent arguments, bust as long as I'm inconsistent, then we're okay.

MS. COMEY:  I agree, your Honor, and I appreciate your consistency.

THE COURT:  Okay.  Hearing there's no authentication objection, when we start tomorrow at some appropriate juncture, you should just make a record that you're introducing those into evidence and they'll be admitted.

MS. GERAGOS:  I will.  Thank you, your Honor.

THE COURT:  Anything else?

P63Ccom7                    Ferguson - Recross

Is there someone from the marshal service that can join me briefly in the robing room.

Just hold here for a second.

(Pause)

So for the reasons that Ms. Comey expressed, I don't believe that there's any kind of Sixth Amendment issue. However, I do want to furnish the defense with access.  And so for today, at the very least, you can use this courtroom until 6:00 p.m.  The marshal service will be here, but I take it, Mr. Agnifilo, you said that that won't be an issue?

MR. AGNIFILO:  Not an issue.

THE COURT:  So that's what we'll do today.  I'm going to keep trying to figure out what we can do at least for the remainder of the week, because I think that's the primary issue, is that we have remaining three days of this week where you'd like some more time.

MR. AGNIFILO:  I would love more time.  Anything your Honor could get, we would treasure.

THE COURT:  So we will do that for today.  So everyone else should get out of the courtroom, as will the Court.

(Adjourned to June 4, 2025, at 8:30 a.m.)

                         INDEX OF EXAMINATION

Examination of:                                        Page

 EDDY GARCIA

Direct By Ms. Steiner . . . . . . . . . . . . .3889

Cross By Mr. Steel . . . . . . . . . . . . . . .3965

Redirect By Ms. Steiner . . . . . . . . . . . .3971

 DEREK FERGUSON

Direct By Ms. Slavik . . . . . . . . . . . . . .3986

Cross By Mr. Agnifilo . . . . . . . . . . . . .4042

Redirect By Ms. Slavik . . . . . . . . . . . .4110

Recross By Mr. Agnifilo . . . . . . . . . . . .4112

                        GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 8E-104    . . . . . . . . . . . . . . . . . . .3896

 7R-149    . . . . . . . . . . . . . . . . . . .3917

 C-364-5A, C-364-5B and C-364-6A    . . . . . .3938

 C-106    . . . . . . . . . . . . . . . . . . .3940

 C-111    . . . . . . . . . . . . . . . . . . .3944

 C360    . . . . . . . . . . . . . . . . . . . .3983

 4G110, 4G111, 4G120, 4G121, 4G122,    . . . . .3985

          4G130, 4G140, 4G141, 4G150,

          4G151, 4G160, 4G161, 4G170,

          4G171, 4G180, and 4G190,

          4G191, 4G192 and 4G131

DEFENDANT EXHIBITS

Exhibit No.                                            Received

 1900    . . . . . . . . . . . . . . . . . . .4074

 1901R   . . . . . . . . . . . . . . . . . . .4079