P64ACom1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
UNITED STATES OF AMERICA,

            v.                          24 Cr. 542 (AS)

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

            Defendant.                  Trial
-------------------------------x
                                        New York, N.Y.
                                        June 4, 2025
                                        8:37 a.m.
Before:

                HON. ARUN SUBRAMANIAN,

                                        District Judge
                                        -and a Jury-

                        APPEARANCES

JAY CLAYTON
    Interim United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
     EMILY A. JOHNSON
     MAURENE R. COMEY
     MEREDITH FOSTER
     MITZI STEINER
     MARY C. SLAVIK
     Assistant United States Attorneys

SOUTHERN DISTRICT REPORTERS, P.C.
        (212) 805-0300

P64ACom1

                              APPEARANCES
                              (Continued)


AGNIFILO INTRATER LLP
        Attorneys for Defendant
BY:  MARC A. AGNIFILO
        TENY R. GERAGOS
        -and-
HARRIS TRZASKOMA LLP
BY:  ANNA M. ESTEVAO
        -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
        JASON A. DRISCOLL
        JONATHAN P. BACH
        -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:  Lucy Gavin
               Shannon Becker
               Paralegal Specialists

               Raymond McLeod, Paralegal

(Trial resumed; jury not present)

THE COURT:  Please be seated.

Ms. Geragos, I'm correct that your objection to GX 115 is based solely on rule 403, right?

MS. GERAGOS:  Yes.

THE COURT:  So, on that basis, the objection is overruled.

First off, the Government Exhibit 115 is simply a compilation of exhibits that are already in evidence.

Second, the defense does not object to the use of GX 115 as an illustrative aid under rule 107.  So they concede for that purpose, any unfair prejudice would not substantially outweigh the exhibit's ability to assist the jury's understanding of the evidence or argument.

Third, the Court has reviewed GX 115, and especially given the modifications made to the exhibit, including breaks in the video to eliminate any concern that the timing of clips was being presented in a deceptive way, the unfair prejudice does not substantially outweigh the probative value here.  The Court notes that the video compilation reflects the government's best effort to accurately depict the timing of events.  And even if there were fair or certain issues that the defense wished to raise, those arguments would go to the weight to be given to the evidence and not to its admissibility.

The Court also notes what it's previously raised that

there's an absence of certain evidence in the case because certain of the original videos on the server were made unavailable, and the Court notes that in making this ruling.

So the defense's rule 403 objection is overruled. The Court also notes and refers to the cases cited in the government's brief that suggests that numerous courts in this district have omitted these types of video compilations to come into evidence, including *United States v. Powell*, 18 Cr. 287.

With that, let's move to other exhibit issues in the order that we should address them given how they're going to come up. So I think there are various issues raised with respect to Ms. Bongolan's testimony and the exhibits. So why don't we first address objections to the testimony, and then we can talk about the particular exhibits that are going to come up.

So I understand the government has an objection to an anticipated line of the defense cross here; is that correct?

MS. SMYSER: That is correct, your Honor.

THE COURT: Now, in general terms, what is the possible relevance in this case to Ms. Bongolan's prior assaults or disputes with romantic partners?

MS. SMYSER: Your Honor, can I just clarify one factual thing. The last incident was with an ex-colleague and not an ex-girlfriend. I don't think that changes the analysis here.

THE COURT:  All right.

MS. SHAPIRO:  So, good morning, your Honor.

THE COURT:  Good morning.

MS. SHAPIRO:  I'll be addressing this.

Let me just say this, we anticipate that if we need to get into this, it will be extremely limited and it will be directed to impeaching the testimony about a particular incident Ms. Bongolan claims occurred.  And if the Court needs more details, I understand the Court may not want to take it *ex parte*, but I had another suggestion, which would be that after the direct or right when the direct appears to be over, if Ms. Smyser asks for a sidebar, we could then provide a little more information, but --

THE COURT:  Well, I understand the concern that was raised in the defense's letter, but the way I would treat this is like a motion *in limine*, which is, it's granted, meaning the government's objection is sustained.  However, just as with any motion *in limine*, when you get to the point where you would like to get into testimony about this fact, the defense can call for a sidebar and approach and explain what they intend to do and the reasons why they should be permitted to do it.  I think that's how we usually handle these types of issues.  It's essentially what you're suggesting.

MS. SHAPIRO:  Yes.

THE COURT:  It's flipping the burden to the defense,

which I think is fair.  Because if you're at the point where you think you've laid the foundation to get into certain issues, then that's the point where you should call for a sidebar to come up.  I think before then, the government doesn't know exactly what the defense is seeking to elicit or why.  So I think it would be unfair to ask the government to ask for that sidebar.

MS. SHAPIRO:  That's fair, your Honor, and we're happy to do that.

And just so you know, to avoid wasting time on this, we are withdrawing our objections to the two Government Exhibits, GX 3S-105 and 106, just so the Court is aware.

THE COURT:  Very good.  Making progress again.

MS. SMYSER:  Your Honor, can I just say one thing on this particular topic?

THE COURT:  Yes.

MS. SMYSER:  You know, I understand and appreciate the Court's ruling, but it would be very helpful to have a final ruling on this before the direct examination, because these are the kinds of things that we would want to draw the sting out on direct examination if the defense is going to be able to ask about them.

For all the reasons stated in our letter, I think it's wholly irrelevant, not proper impeachment, unduly prejudicial and they shouldn't be able to.  But in the event that they did,

this is something we would want to address on direct.

MS. SHAPIRO:  Well, your Honor, that's actually -- I thought the government would say that and that's why I originally suggested that we have the sidebar right where the direct would otherwise conclude so that if the Court ruled that it could come in and Ms. Smyser wanted to --

THE COURT:  But if we're doing that, then why don't we just resolve it now?  That's what I don't understand.

MS. SHAPIRO:  Because --

THE COURT:  The defense's response was that we don't want to tell the government exactly what we're doing.  So let's deal with this later.

MS. SHAPIRO:  Because, your Honor --

THE COURT:  Which I was happy to do.  But even if the defense -- hold on.

MS. SHAPIRO:  Sorry.

THE COURT:  If the defense doesn't think that makes sense because of the government's concern, then wouldn't the appropriate time to address this be right now?

MS. SHAPIRO:  No, your Honor.  Because the reason we would be willing to do that is that the direct would essentially be concluded except that she could ask, you know, these questions about it.  But if we explain --

THE COURT:  No, we're not doing it that way.  Either we address it right now or we do it in stride on cross.  But I

think Ms. Smyser has raised a fair issue that if it's going to be somehow permitted in the cross, then it would be unfair to the government to deprive them of the opportunity to address it in their direct.  And I'm not understanding what's like state secret.

MS. SHAPIRO:  Let me --

THE COURT:  What's like the secret here.

MS. SHAPIRO:  Let me try to lay -- explain that a little bit without disclosing the facts that will create the problem and the unfairness for the defense.

So what's going to happen if we tell the government now before the witness takes the stand the precise purpose of this is that they will change the direct not just to include some disclosure of that there have been fights in the past, but in a substantive way that will undermine our ability to show that the incidents didn't happen.  That's what I'm talking about.  And so -- and we've seen -- and I just want to note, like, that kind of thing has happened several times in this case already.  And we appreciate the reasons for the Court's trial procedures and the efficiencies that have -- those have produced.  And so we understand that.

But in this particular case, there's very strong reason for us to believe that if we explain this, we would be prejudiced because the direct would be changed in a way to make it seem that testimony about a certain incident is truthful,

when in fact we can show that it's not. And so, you know, I think, as I said earlier, this questioning, if it's permitted, would be highly general and very brief. It's not going to get into -- and I can consult with Ms. Westmoreland to the firmness -- but I believe it's not going to get into any chapter and verse or details. At a very high level of generality.

THE COURT: Let me make sure I understand the back and forth between the parties that led up to this. I take it that the defense told the government that as part of their cross-examination, they intended to cross-examine Ms. Bongolan on these prior assaults or issues with colleagues and romantic partners. Is that fair?

MS. SHAPIRO: Yes, except what I would say is the government asked us were we planning to do this or were we going to waive that, and we said, no, we were going to reserve the right to do it.

THE COURT: All right. So you told the government you were planning to do it. So in a generalized way, what is the proffer of relevance?

MS. SHAPIRO: Can I consult with Ms. Westmoreland?

THE COURT: Yes.

MS. SHAPIRO: Your Honor, we think that your first idea is the best way to deal with this. And if we were to make -- say anything more now in front of the government, it

P64ACom1

would severely compromise our ability to use this to any effect in the cross.

THE COURT:  Give me a rule.  How are you going to get this, under which rule would this be admissible?

MS. SHAPIRO:  It's impeachment.

THE COURT:  How could it possibly be impeachment if what you're talking about are assaults under rule 608(b) --

MS. SHAPIRO:  It has to do --

THE COURT:  Let me take a step back.  I asked for a rule.  The rule would be 608(b).  You think this would be consistent with 608(b).  Is that fair?

MS. SHAPIRO:  It's not 608(b).  Your Honor, I'll just -- we're happy to provide the proffer *ex parte*.  And I think if we did, you would understand why it's difficult to -- I would have to explain the facts so you would understand it.

THE COURT:  Does the government have an objection to an *ex parte* proffer?  I think that's irregular.

MS. SMYSER:  Yes, your Honor, I think that's entirely inappropriate.

THE COURT:  Okay.  Here's how we're going to resolve this.  I'm not hearing, as you can tell perhaps from my questioning, I'm not understanding either the relevance on a 401, 403 basis, or the particular avenue that this type of testimony would be introduced.  The government points to 608(b).  That would seem to be the way in which you would be

able to explore this on cross-examination if there is any way. And I'm not hearing any justification for doing that.

So it's out, and that's how you should proceed on your direct examination. And I'll have to hear some compelling justification depending how the cross develops in order for this to be in. I'm not seeing it and I'm not hearing it. So that's the comfort I can give the government at this point while they're doing their direct.

MS. SMYSER: Thank you, your Honor.

THE COURT: All right. So we have four exhibits that are being objected to. Seven really.

And, Ms. Smyser, are you handling the presentation of this witness?

MS. SMYSER: Yes, your Honor.

THE COURT: All right. So as to the three exhibits, 1851, 1854, and 1858, have those objections been resolved or not?

MS. SMYSER: I honestly don't know, your Honor. I haven't heard back.

THE COURT: Means have not.

MS. SHAPIRO: It doesn't, your Honor. I think there might have been some kind of misunderstanding. The only exhibits we're object -- that they -- I'm sorry.

I think the only exhibits that the government is objecting to that we still plan to use for purposes other than,

P64ACom1

if necessary, refreshing, are the ones identified in my letter. So I think the government's letter mentioned DX 1851, 1854, and 1858, and we've withdrawn our -- we don't plan to introduce those into evidence.

THE COURT:  Very good.  Even more progress.

So then we have four exhibits left.  Let's start with DX 652 and 1875.  Why do we need these?  What's the purpose of putting these in as exhibits?

MS. SHAPIRO:  So as we've discussed previously, the government's -- one of the government's principal arguments about coercion with regard to Ms. Ventura is they are arguing that Mr. Combs controlled her career and prevented her from pursuing her career in various ways.  And these exhibits rebut that claim.

The first one, DX 652, which we also had addressed in one of our earlier letters and we had previously attempted to introduce and there was a 412 objection is album art from her song Love a Loser that she designed together with Ms. Bongolan, we think the evidence will show, and this art was designed by Ms. Ventura herself to promote the song.

DX 1875 is a flyer that Ms. Ventura posed for and helped create working with Ms. Bongolan.  And this one relates to a business that she and Ms. Bongolan had that was completely independent of Mr. Combs.  Mr. Combs had nothing to do with this.  And she chose that -- Ms. Ventura chose how to present

herself on the flyer.  It was used to promote the brand and it was handed out to people for marketing.  It shows Ms. Ventura has engaged in business activities independent of Mr. Combs on her own contrary to the government's narrative.  And the reason, I know the Court is probably going to ask, well, why do you need these photographs.

THE COURT:  That is, in fact, what I was going to ask.

MS. SHAPIRO:  For the same reasons we've articulated before and for the same reasons the Court has allowed the government to introduce many, many photographs when they could have just elicited testimony.

The pictures are relevant to showing how Ms. Ventura presented herself, how she was marketing herself independent of Mr. Combs or without his objection in the case of the song, which she, the song cover, which she designed herself together with Ms. Bongolan.

So, you know, like all the other photographs in this case introduced by both sides, the visual expresses a meaning and provides evidence that is independent of and amplifies anything coming out of testimony in a way that brings things to life for the jury in a way that simply someone talking about an event does not.

THE COURT:  Does someone have 1875 that they can put up?  We've seen 652 before.

MS. SHAPIRO:  Sure.

THE COURT:  All right.  So for the reasons that I've previously expressed with respect to certain of the Instagram posts, I don't see the probative value of either DX 652 or DX 1875.  The defense is free to question the witness concerning these two projects and explore all of the issues that Ms. Shapiro just referred to.  If necessary, you can also use these two exhibits to either refresh the witness's recollection or if they deny -- if she denies involvement in those affairs, then at the appropriate juncture you could seek to admit them if there was a real need to get these particular exhibits before the jury.  But I don't see the basis under rule 403 for admission of these two exhibits into evidence.

I agree with the government that there are substantial 403 and potentially 412 issues that are raised by both of these exhibits.  But mainly, it's the a 403 issue given what the government notes, the content of these two exhibits balanced against their probative value, which the Court's view is that essentially nil given the testimony that can be freely elicited from the witness concerning those two events.

So DX 1652 and 1875 are excluded.

MS. SHAPIRO:  Can I ask a question?

THE COURT:  Yes.

MS. SHAPIRO:  With regard to DX 1875, to the extent the photograph is just used with the witness but not admitted, can we inquire about some of the writing on it, for instance,

that, you know, it talks about an in-store signing and that it was a flyer, that it was distributed, etc.?  Even though the document is not going to be admitted.

THE COURT:  I don't think that there's an objection to using these documents in that way.

Is that correct, Ms. Smyser?

MS. SMYSER:  That's correct, your Honor.

THE COURT:  So you can use them in that way.

MS. SHAPIRO:  Thank you.

THE COURT:  Let's see 1855.  Ms. Smyser, what's your response to the defense's argument that these would be admissible under 803(3).

MS. SMYSER:  Your Honor, I don't know that this is really a statement of future intent here.  I think this is an implied assertion that Ms. Bongolan is getting drugs and she's going to provide them or going to tell Ms. Ventura about them.  And so that the underlying premise here is that she's going to learn about the drugs and she's going to get them.  And I think that that presents a hearsay problem in addition to a 403 problem in that it's both unduly prejudicial and it's going to be cumulative given the testimony that we expect Ms. Bongolan to give about providing drugs to Ms. Ventura.

THE COURT:  Ms. Shapiro, what is the probative value of DX 1855?

MS. SHAPIRO:  Well, your Honor, I think putting in an

P64ACom1

actual text is corroborative and probative of what was going on at the particular time period. And, in addition, I would note, and we cited this case in our letter, later in our letter, but the fact that there may arguably be an implied assertion doesn't take this out of 803(3) certainly, and that's not really a basis to say that it's inadmissible hearsay.

THE COURT: All right. I agree with the defense that this would be admissible under rule 803(3) and that the unfair prejudice or cumulative nature of this particular exhibit would not substantially outweigh its probative value. So on that basis, at the appropriate juncture, if it is offered into evidence, it will be admitted.

As to 1856, does someone have 1856 that they could put up?

And, Ms. Shapiro, what's the point of this exhibit? What are you trying to get at?

MS. SHAPIRO: The point of this exhibit is to show that Mr. Combs -- as to Mr. Combs' state of mind, that he's unhappy with the fact that Ms. Bongolan and Ms. Ventura are taking ketamine together and he's trying to direct Ms. Bongolan, you know, not to do that and at least to have her back.

And it's very important because the government has been suggesting throughout this trial that to the extent Ms. Ventura was using drugs, it was all at the hands of

Mr. Combs and it's all caused by the fact that he is encouraging that. And this shows to the contrary that he was upset that she was taking drugs and Ms. Bongolan, I think the evidence will show, was providing drugs to her and that is why it's relevant and important to the defense case. And I think the letter makes clear why it's not inadmissible hearsay.

THE COURT: Ms. Smyser, what's the response? There's not really -- this isn't being admitted for the truth of any matter. To the extent it's being admitted for the truth of something, it's just for Mr. Combs' state of mind at the time that Ms. Bongolan is wack for doing ketamine with Ms. Ventura.

MS. SMYSER: Your Honor, I respectfully disagree. I think why the defense is using this is for the truth that Ms. Bongolan was doing drugs with Ms. Ventura. Ms. Ventura was doing drugs with Ms. Bongolan and that was unconnected to Mr. Combs. That is the assertion that they want in here.

The defense has said that this is a statement of Mr. Combs' state of mind because he's unhappy. But those aren't the words on the page. So it is not an existing state of mind statement as to Mr. Combs.

Instead, what he says is that like he's talking about friends getting high with each other, and you're not supposed to let friends fuck up and not stop them, and you're wack, and if you're going to do K at least have her back.

So the assertion here, your Honor, is that they're

P64ACom1

doing ketamine together, which is inadmissible hearsay.

THE COURT: Based on what you said previously, Ms. Smyser, I take it that on direct examination you are going to elicit that Ms. Bongolan and Ms. Ventura did drugs together.

MS. SMYSER: Absolutely.

THE COURT: So that's not going to be a disputed point?

MS. SMYSER: No.

THE COURT: So 803(3) is -- the only real additional purpose of this is to demonstrate that Mr. Combs, during this period in time, had the mental state that he disapproved of that drug use. And if that were all that this said, you wouldn't have a problem with that. Right? If he said I don't like it when you and Ms. Ventura do drugs.

MS. SMYSER: If he phrased it that way, your Honor, then yes, we wouldn't have a problem.

THE COURT: Well, isn't that what he means when he says you're real wack for doing this, real wack.

MS. SMYSER: Your Honor, respectfully, I think it is an implied assertion that they are doing drugs together. But it is also not just him saying you're real wack, there's a lot of context here that I think is being offered for its truth.

THE COURT: I agree with the defense this would be admissible under 803(3) and that the unfair prejudice or cumulative nature of this exhibit would not substantially

outweigh its probative value.  So, again, at the appropriate juncture if it is offered into evidence, it will be admitted.

Anything further, Ms. Shapiro?

MS. SHAPIRO:  Not on Ms. Bongolan, no.  Thank you.

THE COURT:  Anything further from the government before we bring in our jury?

Well, let me take a step back.  So the government did put in a submission relating to Dr. Hughes.  The defense, I take it, would like an opportunity to respond to that letter?

MS. SHAPIRO:  Yes, your Honor, we vigorously object to that.  We have not -- I have barely had time to read it.  And we actually would like as much time as -- we would like, if possible, until Monday to respond.  But we certainly also would ask that -- we don't believe that if the Court is going to allow this, which we think it shouldn't for a variety of reasons which I can get into now briefly, but we really need to address it in a letter because we think it is very important and it would be very unfair to the defense.

We think that if the Court is even remotely inclined to allow this, it should not occur until after Jane, and if the other alleged victim who its unclear whether the government still intends to call, but until after any alleged victims have testified.  So we would ask if the Court will indulge us to give us until Monday or late in the weekend to respond to this.

THE COURT:  Does the government have any objection to

P64ACom1

that timing?  It's the government's case.

MS. COMEY:  No, your Honor.

THE COURT:  So if the government intended to introduce this testimony earlier, then I'll certainly accommodate that.

MS. COMEY:  No, your Honor.  We were not planning to seek to offer this additional brief testimony until after Jane finishes her testimony anyway.

THE COURT:  All right.  Very briefly, is the testimony that you would seek to elicit within the coercive control section of Dr. Hughes's disclosure?  Is that the real point that I excluded that testimony and you now want to get into that given what the Second Circuit said in *Ray*?

MS. COMEY:  I'll let Ms. Steiner respond.

MS. STEINER:  Your Honor, that is correct that there are very select portions that were previously in the notice under the section of coercive control that we would seek to elicit.  We wouldn't be seeking to elicit that entire section. We would just be seeking to introduce those limited portions of it.  And, yes, we would be seeking to do so both under the Second Circuit's recent decision in *Ray*, as well as the reasons we expounded upon in our letter given the cross-examination that the defense has put forth for Mia, which the government anticipates may be put forth with Jane as well.

THE COURT:  So, Ms. Shapiro, you had asked for?

MS. SHAPIRO:  Until Monday.

THE COURT:  Okay.  And the government doesn't seem to object to that so you'll have until Monday to put in your response.

MS. SHAPIRO:  Thank you very much, your Honor.

THE COURT:  Let's bring in our jury --

MS. JOHNSON:  Your Honor, sorry, just one additional thing to flag for the Court.

We're conferring with the defense, but we anticipate at least the government would ask for a slightly different instruction before Jane takes the stand on the pseudonym issue. We still want to continue our conferrals with the defense and will propose something to the Court hopefully by the next break.

THE COURT:  Yes.  You can just give it to me on a piece of paper if there's agreement and I will read it.

MS. JOHNSON:  Absolutely.

THE COURT:  Very good.

MS. SMYSER:  One final thing, your Honor.  Apologies. Ms. Bongolan does intend to invoke her Fifth Amendment right, and we'll ask the Court to enter an immunity order.  We can either do that now or take a short break before her testimony, whatever the Court prefers.

THE COURT:  Let's do it now.

Do you have the order?

MS. SMYSER:  I do.

P64ACom1                      Bongolan - Direct

THE COURT:  Welcome.  You can come right up here.
Come on up.  And just stay standing.

THE DEPUTY CLERK:  Raise your right hand.

BRYANA BONGOLAN, Sworn

DIRECT EXAMINATION

BY MS. SMYSER:

Q.  If you just pull the mic toward you.  Good morning,
Ms. Bongolan.

A.  Good morning.

Q.  Did you receive a subpoena requiring you to testify at this
trial?

A.  Yes.

Q.  Do you have an attorney who represents you in connection
with this case?

A.  Yes.

Q.  And based on your discussions with your attorney, do you
intend to invoke your Constitutional right not to testify on
the grounds of potential self-incrimination?

A.  Yes.

Q.  And do you understand that if the Court enters an order of
immunity, that you'll be required to answer all questions
truthfully here today?

A.  Yes.

Q.  And do you understand that the order will not protect you
from prosecution for perjury if you intentionally make a false

P64ACom1                      Bongolan - Direct

statement today?

A.   Yes.

        MS. SMYSER:  Your Honor, the government asks based on the witness's answers that the Court enter the proposed order of immunity.

        THE COURT:  I will enter the order now.  And we'll make it a court exhibit.

        Is there anything further, Ms. Smyser?

        MS. SMYSER:  No, your Honor.  Thank you.

        THE COURT:  Thank you, Ms. Bongolan.  You can leave the stand at this point.

        (Witness temporarily excused)

        I'll ask the courtroom deputy to check on our jury.

        THE DEPUTY CLERK:  Yes, your Honor.

        (Continued on next page)

P64ACom1

(In open court; jury present)

THE COURT:  Welcome back, members of the jury.

The government may call its next witness.

MS. FOSTER:  Government calls --

MS. COMEY:  No, no.

MS. FOSTER:  The government plans to briefly offer and publish for the jury a few exhibits.

THE COURT:  Very good.

MS. FOSTER:  Ms. Gavin, could you please first pull up Government Exhibit 1301 or the stipulation between the parties. This is stipulation between the parties.  And could you please turn to page three and highlight paragraph 11c.

On or about March 25th, 2024, as part of a search of the residence located at 2 Star Island, Miami Beach, Florida, HSI seized the following electronic devices:

Paragraph C, Government Exhibit A900, a cell phone from a bedroom on the second floor of 2 Star Island.

And, Ms. Gavin, could you please highlight paragraph 14.

Government Exhibits A900-A through A926 and AX 901, including the subdivisions thereof, are true and accurate excerpts of data extracted from Government Exhibit A900.

Pursuant to that stipulation, the government now offers Government Exhibit A900-A, and Government Exhibit A-905-A.

THE COURT:  Any objection?

MR. AGNIFILO:  No, your Honor.

MS. GERAGOS:  Our previously stated objection, your Honor.  Thank you.

THE COURT:  Understood.  Government Exhibit A900-A and A-905-A will be admitted.

(Government's Exhibits A900-A & A-905-A received in evidence)

MS. FOSTER:  Thank you.

Ms. Gavin, can you please publish these for the jury.

Starting with Government Exhibit A-900-A, this is a, it states, preliminary device report.  And could you please highlight the apple IDs for this device.

It states fb@combsenterprises.com, sc@badboyworldwide.com.

Ms. Gavin, could you now turn to the second page of this preliminary device report and highlight the bottom few rows starting with Twitter.

Twitter, Diddy; Snapchat, Puff Daddy.

Ms. Gavin, you can take that document down and just focus on A-905-A.  And turn to the second page.

I'll now read this chat.

Owner:  Hit my shorty and ask her what is going on. Tell her that you just left me and you asked about her and all I said was I want to talk about it right now.  Asking what's

P64ACom1

going on.

And the date of this is 9/13/2015.

From D-Roc cell:  Okay.

Owner:  Also be like, I thought you was coming to the big concert this weekend.  Say he told me you were last week.

Owner:  Next weekend I mean.

D-Roc cell:  Okay.

Owner:  Call me.

D-Roc cell:  Yeah, we in the security room talking now.  She wants you to come hug her and lay down.  She didn't sleep yet.

Owner:  What did shorty say?

D-Roc cell:  Said she thinks she's suppose to see but you said no.

Sorry, I skipped one.

Before that message owner writes:  G.

D-Roc cell:  Cass is calling studios looking for you.

Owner:  What did she say about the other questions?

Owner:  Ask her are we broken up?  And ask why I said I don't fuck with her.

D-Roc cell:  G right?

Owner:  Yeah.  You have to act like I said I'm not fucking with her and you're wondering what's going on.

D-Roc cell:  Okay.

D-Roc cell:  She saying you don't want to talk to her

P64ACom1

no more and she wants to see you.

Owner:  Its time for the ice.

D-Roc cell:  Okay.

Owner:  So what you going to tell her?

Owner:  What's Cass doing?

D-Roc cell:  I told her I don't know what's going on, but was just checking on her.

Owner:  What she say?

D-Roc cell:  Cass was eating.  She about to ice up. She keep asking for you, telling me she wants to go to the studio.  I told her to chill out and said you are feeling bad about what happen.

Owner: I spoke to Yum Yum, I will call you in 30 minutes.  Stay on top of Cassie.

D-Roc cell:  I am.

Owner:  So she didn't say what's going on.  G.

D-Roc cell:  Yeah, she wants to see you but you not fucking with her.

D-Roc cell:  Talking to Cass.  I just gave her an ice pack.

Owner:  She didn't get into anymore detail.

Owner:  G.

D-Roc cell:  Not really.  She just want to see you and she think you not going to fuck with her.

Owner:  Does the eye look better?  How is she holding

P64ACom1

up?

D-Roc cell: She looking for you crazy, blowing everybody up. She feeling Faheem. Are you coming back?

D-Roc cell: Rio and Justin saw her eye. We said I fight broke out last night in the club.

Owner: Why did she not have herself hiding?

Owner: Can walk away and call me?

D-Roc cell: It wasn't nobody here for a while. But she ain't tripping. She ain't tell nobody. I'm about to call you.

That's it, your Honor.

THE COURT: Thank you. The government may call its next witness.

MS. SMYSER: The government calls Frank Piazza.

THE COURT: Welcome. You can come up here.

THE DEPUTY CLERK: Remain standing for one moment and raise your right hand.

FRANK PIAZZA,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE DEPUTY CLERK: Can I please ask you to give the Court your first and last name and spell your first and last name into the microphone, please.

THE WITNESS: Frank Piazza. That's F-R-A-N-K, P-I-A-Z-Z-A.

P64ACom1                        Piazza - Direct

THE COURT:  Ms. Smyser, you may proceed.

MS. SMYSER:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. SMYSER:

Q.  Good morning, Mr. Piazza.

A.  Pardon me.  Good morning.

Q.  What do you do for a living?

A.  I am a forensic audio and video editor.

Q.  And what is a forensic audio and video editor?

A.  I provide audio and video forensic services for legal
matters.

Q.  Where do you work?

A.  I work for Legal Audio Video.

Q.  What is your role there?

A.  I'm the president.

Q.  And at a high level, what kinds of services do you provide
at Legal Audio Video?

A.  Legal Audio provides analysis services of both audio and
video, authentication services for both audio and video,
enhancement services, consultation, creating trial exhibits,
and testimony.

Q.  And you mentioned authentication services, could you just
explain a little more what you mean by that?

A.  Authentication is the process of determining through
examinations whether or not a file might have been edited or

P64ACom1                           Piazza - Direct

tampered, and trying to place that file to the device that recorded it.

Q.   How long have you worked with Legal Audio Video?

A.   Legal Audio Video started in the year 2000.  At that time it was named Legal Audio, and then soon after as video became a large component of many legal matters, the name was changed.

Q.   Before working for Legal Audio Video, where did you work?

A.   I was the owner of a recording and video production studio called Audio Paint.

Q.   And who were your clients generally at Audio Paint?

A.   It was a variety of clients spanning everyone from the music world through ad agencies, pharmaceutical agencies, book publishers, you know, mainly private corporations and private individuals.

Q.   And were you providing audio services there as well?

A.   That's correct.

Q.   When did you begin working as an audio and video editor?

A.   I began that work easily in 1995, if not sooner, but the company was formed in roughly 1995.

Q.   Are there professional certifications for video editors?

A.   Yes, there are.

Q.   Do you hold any?

A.   I do.  I'm a certified video technician.

Q.   And from what organization do you have that certification?

A.   The name of the organization is LEVA and that stands for

P64ACom1                      Piazza - Direct

Law Enforcement Video Association International.

Q.  Can you describe what goes into the process of being certified by LEVA?

A.  LEVA has four certification training courses offered over -- you can do them quickly but they don't offer them more than I don't think once or twice a year.  And they cover a variety of issues someone might expect when handling both video and digital files.

Q.  Are you a member of any professional organizations besides LEVA?

A.  I am, yes.

Q.  What are some of those organizations?

A.  One is the Audio Engineering Society.  They have a forensic audio division.  Another one would be the National Association of Criminal Defense Lawyers.  While I'm not a lawyer myself, it is a membership that I have had for years.

Q.  Do you attend trainings with regard to your work as a video editor?

A.  Yes, I do.

Q.  And what are some of the trainings you attend?

A.  Those training events happen -- I try to -- to at least five a year.  They usually can be as few as three days at a time.  There might be a week at a time.  There might be webinars.  And different organizations will offer those opportunities.

P64ACom1                         Piazza - Direct

Q.   And how do you stay up to date with the current
technologies for video analysis and enhancement?

A.   Well, absolutely through the training that takes place each
year.  And just my -- the hours I spend working in peer groups,
things like that.

Q.   Do you do forensic video enhancement?

A.   Yes, I do.

Q.   What does that mean?

A.   Forensic video enhancement is taking what might be a video
file that has been poorly recorded, let's say for example, and
trying to enhance it by improving its clarity so the visual
experience is the best it can be.

Q.   Approximately how many times have you performed forensic
video enhancement?

A.   I would say approximately thousands of hours.

Q.   And how often were those enhancements in the context of
legal cases?

A.   Mainly 95, 99 percent.

Q.   Do you also perform forensic video analysis?

A.   Yes, I have.

Q.   As part of that analysis, do you ever determine whether a
particular video has been edited or tampered with?

A.   Yes.

Q.   What kinds of things do you look for when you're doing that
analysis?

P64ACom1                          Piazza - Direct

A.   Well, if it's a video file, there are a lot of components that make up a video file.  You would be very surprised how much information and data is in digital video.  So that area has to be examined.

You might have heard the term metadata, that has to be confirmed and examined.  When it comes to audio, especially a digital file, it shares a lot of the same data properties that have to be examined.

Additionally, your eyes or your experience visually, video will show its thoroughness when you view it on a screen, or not, and there might be anomalies or things going on that you need explanations about.

So the analysis helps to determine if there are parts of the video that can be improved or not.  And with audio, we have software and other tools to help us examine the audio, not just hearing it, but getting a visual of it as well.

Q.   Approximately how many times have you analyzed videos to determine if they were edited?

A.   Again, I would say thousands of hours.

Q.   Generally, in what contexts?

A.   Mainly for legal matters.  And, yeah, I would just say for the legal, that would be the reason why I would be doing this work.

Q.   And have you testified before?

A.   Yes, I have.

Q.  In what kinds of cases?

A.  The cases are, for testimony, mostly criminal matters.  I have done civil matters as well.  And I've also performed depositions.

Q.  And are you typically testifying about video and audio enhancement and analysis?

A.  Yes.

Q.  Have you been qualified as an expert in forensic video enhancement or analysis before?

A.  Yes. I have.

Q.  Approximately how many times?

A.  I would say approximately 50 times.

Q.  In state court, federal court, or both?

A.  Both.

        MS. SMYSER:  Your Honor, the government offers Mr. Piazza as an expert witness in forensic video enhancement and analysis.

        MS. GERAGOS:  No objection.

        THE COURT:  The witness will be accepted on that basis.  You may proceed.

BY MS. SMYSER:

Q.  Mr. Piazza, were you retained as a witness in this case?

A.  Yes.

Q.  Who retained you?

A.  Your offices.

P64Acom1                          Piazza - Direct

Q.  And did you analyze video?

A.  I did.

Q.  At a high level, what kinds of videos were you asked to analyze?

A.  There were three categories of video.  One being cell phone video, video that was taken using a cell phone; another category was surveillance footage, footage that might have been taken by a camera security system or CCC -- CCTV system; and a third category, which were videos taken, we'll refer to them as sex videos.

Q.  And did you in fact examine each of those kinds of videos?

A.  Yes.

Q.  Who provided you with the videos you analyzed in this case?

A.  Your offices.

Q.  Have you worked with the Southern District of New York's U.S. Attorney's Office on any other occasions?

A.  Yes, I have.

Q.  Approximately how many times?

A.  I would say anywhere between 50 and 100 times.

Q.  Is that just for testimony or is that just for assisting in other parts of cases?

A.  Other parts, you know, all, all.

Q.  And has your engagement with the government in any way effected your analysis of the videos in this case?

A.  No.

P64ACom1                        Piazza - Direct

Q.  Have you been retained in other cases by defense attorneys?

A.  Yes, I have.

Q.  What percentage of your work is for defense attorneys as compared to for the government?

A.  I would say most of my work is done for defense.  If there was a percentage, I probably would say 75 percent.

Q.  And are you being paid for your work and time in this case?

A.  Yes.

Q.  What is your hourly rate?

A.  My hourly rate is 295.

Q.  Dollars?

A.  Dollars.  Sorry.

Q.  Does the amount you get paid in any way depend on the outcome of this trial?

A.  No.

Q.  Do you have any personal knowledge of the facts of this case?

A.  I do not.

Q.  And do you have any familiarity with the government's proof in this case aside from the videos that you've analyzed?

A.  No.

Q.  I want to start talking about some of those videos and specifically looking for the cell phone videos you mentioned and the surveillance videos that you mentioned.

          How many of those videos did you analyze in total?

A.   The total of the cell phone videos and the surveillance videos would be five.

Q.   And could you describe the cell phone videos at a high level?

A.   The cell phone videos I mentioned earlier are videos that were taken and recorded with a cell phone and the cell phone is actually recording the computer monitor like this in front of me of events playing off of a security system.  So it acts as a video of a video.  But that kind of -- that's the synopsis of what's happening there.

Q.   And what about the surveillance videos; could you describe those at a high level?

A.   The surveillance videos are videos that were taken by that system that I just mentioned.  And they are three different camera angles.  Whereas, the cell phone only focuses on only one camera angle.

Q.   And how many cell phone videos were there that you analyzed?

A.   There were two.

Q.   And how many surveillance videos were there?

A.   Three.

Q.   I want to direct your attention to some of the disks that are next to you on your left.  So the one closest to you, furthest away from me, should contain a disk that contains Government Exhibits 3B-101 and 3B-102 as well as what's been

P64ACom1                        Piazza - Direct

marked for identification as Government Exhibit AF-101, AF-102, and AF-103.

Do you recognize this disk?

A.   I do.

Q.   And have you reviewed the contents of the disk?

A.   Yes.

Q.   What does the disk contain?

A.   This disk contains the five files that we've been talking about.  The cell phone files, and the surveillance video files.

Q.   The originals that you analyzed?

A.   Yes, the originals.

Q.   Okay.  So how do you know that's what the CD contains?

A.   In addition to viewing them, my initials are on this disk.  On these disks, plural.

Q.   So I want to talk about each category of these videos and starting with the cell phone videos.

So you mentioned the cell phone videos record a surveillance system; is that right?

A.   Yes.

Q.   What kind of cell phone recorded this video?

A.   The cell phone was an iPhone 6.

Q.   What do you generally expect to see in a video where a cell phone takes a video of another video?

A.   Yeah.  So while all different versions -- I'm sorry, like -- there might be different things that might occur, not

always the same.  But you might have distortion issues.  There might be shaky or movement because the person holding the phone might be shaking.  It's not a static system.  There might be color issues, lighting issues, reflection issues.

Q.  And are these issues common when there's a video of a video?

A.  They can be, depending on how much time went into how it was taken.

Q.  Do they prevent a cell phone from recording all of the events present in the underlying video?

A.  No.  The cell phone finishes its task of recording.

Q.  Do you know when the specific cell phone videos at issue here were recorded?

A.  Yes.  I was able to read in the metadata, they were on March 5, 2016.

Q.  Okay.  So I want to look at one of these.

        MS. SMYSER:  Ms. Gavin, can you please pull up what's in evidence as Government Exhibit 3B-101.  Could you display it for the jury.

Q.  Mr. Piazza, is this one of the cell phone videos you were talking about?

A.  Yes.

        MS. SMYSER:  So I just want to play the first 30 seconds of this clip.

        (Video played)

Q.  Mr. Piazza, are you familiar with the term frame rate?

A.  Yes.

Q.  And what generally is a frame rate?

A.  In video, digital video, we refer to frames per second.  So with -- in every second of video, there are a number of frames.  So that would be the rate that's happening within that one second.

Q.  And how does frame rate relate to the speed of a video?

A.  Frame rate can either cause a video to have more information taking place within that one second.  So if I were to give you an example, 30 frames will give you more information than 10 frames per second.  You're seeing more of a smoother -- you have an opportunity to see more of a smoother play back.

        The speed, depending on if it is exported and it goes to a standard player, will or will not scan and play properly.  If you put 30 frames next to 10 frames, they'll be a difference in the speed because the 10 will get through it faster.

Q.  And what is the frame rate of the cell phone videos Government Exhibit 3B-101 and 3B-102?

A.  That is a 30 frames per second.

        MS. SMYSER:  You can take that down, Ms. Gavin.

Q.  Mr. Piazza, after examining the cell phone videos, did you come to a conclusion as to whether they were manually altered or not?

P64ACom1                        Piazza - Direct

A.   Yes, my conclusion was that they were not manually altered.

Q.   And what were some of the reasons for that conclusion?

A.   Although they had issues, as we talked about a little bit before, coloring and contrast issues, and shakiness, the cell phone was recording the -- the video surveillance playing off of the native system, which is playing in a stable fashion.

And the cell phone itself was not edited or tampered in any way.  So it cleanly captured the clean play back of the surveillance system.

Q.   And after watching the cell phone videos, did you come to a conclusion about whether they reliably represented the underlying surveillance footage or not?

A.   Yes.

Q.   And what was your conclusion there?

A.   They do.

Q.   Is that for the same reasons that you described?

A.   Correct.

Q.   Next I want to talk about the surveillance videos that you mentioned earlier.

Without getting into the details, could you just list any technical issues that you noticed about the videos?

A.   Yes.  These videos had a speed play back issue.  They played faster than normal real time.  And there were some artifacts or distortions happening throughout the video, and there were areas of motion activity that was taking place as

well.

Q.   And were there some issues with the time stamps?

A.   Yes.  The time stamps were also behaving the same exact way that the video was behaving.

Q.   And were you able to correct any of these issues?

A.   I was able to correct the speed issue.  The distortions, the -- the motion activity, that's all embedded into the file itself.  That cannot be changed.  And what I mean by embedded, that is what the camera captured and what the system recorded.  So it's just a copy of what the system recorded.

Q.   So I wanted to look at each of these issues you've identified individually.

     But first, I want to direct your attention to a CD in front of you which contains what's in evidence as Government Exhibit 10C-103, 10C-104, and 10C-105.  Do you see that?

A.   Yeah.  Yes.  Sorry.

Q.   Do you recognize the disk?

A.   Yes, I do.

Q.   And have you reviewed the contents of the disk?

A.   Yes, I have.

Q.   What does the disk contain?

A.   These contain the corrected surveillance videos.

Q.   And how do you know that's what they contain?

A.   I reviewed the disk and my initials are on the disk.

Q.   So you said that the speed of the surveillance videos you

examined was fast, correct?

A.  Yes.

Q.  How did the speed compare to the speed of the cell phone videos?

A.  So the simple answer would be that the play back was playing 21 frames at a time, and the clock was set to play 30 frames, as a standard kind of clock that might be in typical software you might use.  And therefore, it played much faster.  So it was counting seconds, but missing nine frames.  So we had to account for that difference.

Q.  And so how did you address the fact that the surveillance videos were faster?

A.  Well, there were a few ways.  Obviously, just watching them.  Another way was counting the frames manually, and then having the ability to use software to correct the timing.

Q.  So you were able to slow down the videos?

A.  Yes.

Q.  At their reduced speed, how does the speed of the surveillance videos compare to the speed of the cell phone videos?

A.  The speed is now in sync with it, so it's playing back at the same exact speed as the cell phone and the surveillance are now in sync.

Q.  And the cell phone videos that you looked at, when corrected, how does their speed compare to the speed of the

P64ACom1                          Piazza - Direct

underlying surveillance system?

A.  Would you ask that question again, please.

Q.  Yes.  The surveillance videos you original -- you analyzed and then corrected to slow it down, how did the slowed down version speed compare to the speed of the play back on the original surveillance system?

A.  Yes.  It is now synchronized.  It's playing at true, real time.

Q.  And based on your experience with videos, are you aware of any reason that surveillance footage might end up being sped up?

A.  There could be multiple reasons, but what can occur is there is a process that the original system records in a proprietary or a native format.  And you have the ability to export out duplicates of what was recorded in the native format because you can't use the native format until you have the native software that plays it.  So you would convert it or transcode the file.  In that process of transcoding is where these errors can take place.

Q.  And does transcoding cause a video to from one file type to another file type?

A.  Yes.  Typically, yes.

Q.  And how common is it to convert a video from one file type to another file type?

A.  In my business, it's very common.

P64ACom1                    Piazza - Direct

Q.   Does this kind of conversion indicate to you any human alteration or tampering with the file?

A.   No.

Q.   Earlier you mentioned that there were some other visual artifacts, I think is how you phrased it, in the surveillance videos; is that right?

A.   Yes.

Q.   I think you said you weren't able to correct those; is that correct?

A.   Yes.

          (Continued on next page)

P64Qcom2

BY MS. SMYSER:  (Continued)

Q.  After watching the surveillance videos and examining them, did you come to a conclusion as to whether the surveillance videos had been manually altered in any way?

A.  Yes.  I came to the conclusion that they were not manually altered.

Q.  What was your -- your conclusion was that they were not manually altered?

A.  That's correct.

Q.  What were some of the reasons for that?

A.  Well, there are a few reasons.  One reason is that after identifying the frame issue in the speed, being able to correct it and make it play back in true time, having the cellphone video also that we were certain that it played in real-time when the comparison is made of both, you can see that the footage plays exactly in sync.  So there's like nothing missing.  There are no anomalies going on in the file that would indicate that it had been manually altered.

Q.  And after examining the surveillance videos, did you come to a conclusion about whether they reliably represented the underlying surveillance footage?

A.  Yes.

Q.  And what was your opinion?

A.  They accurately play back as the underlying footage.

Q.  And what were some of the reasons for that opinion?

A.   Well, being able to correct some of the errors, in this case the speed errors, which is the -- it seems to be one of the -- in the list of errors that we could correct but a very vital piece to having insight to now see what a corrected file would look like and play like, and we can confirm that now.

Q.   I want to take a look at some of the corrected videos.

MS. SMYSER:   So, Ms. Gavin, could you please pull up what's in evidence as Government Exhibit 10C-103.

Q.   Is this one of the corrected surveillance videos that you mentioned?

A.   Yes.

MS. SMYSER:   Ms. Gavin, could you just play the first 15 seconds.

(Video played)

Q.   Mr. Piazza, does this video display generally the same events that are present in the cellphone videos we looked at?

A.   Yes.

Q.   Did you see the pixelation that just occurred on the screen?

A.   Yes.

Q.   Is that one of the visual issues that you were discussing earlier?

A.   Yes.

Q.   What are some of the reasons that that kind of pixelation can occur?

A.   So this is a case of the file became corrupted.  The video stream itself is corrupted.  And this you will notice happens multiple, many times throughout the playback of the surveillance videos.  And the corrupted files in the stream have caused that distortion or that pixelation or that blocking effect.

Q.   And is the whole file corrupted or just these small pieces?

A.   So the corruption lies in the video stream.

     May I explain how we know that it is only in parts of the video and not the full video?

Q.   Sure.

A.   So there's a structure in digital video called a GOP; it's a group of pictures.  And what is happening is that we have P frames; they're predictive frames which are only showing you -- and this is very common with a static camera, a fixed-mounted camera.  You don't know this but you're seeing the walls and everything that doesn't move is just repeated.  It's not re-recorded; it's just repeated.  But where there's movement, that gets a fresh video file.

     So you're really seeing these inner frames, that's why you don't see distortion over the entire screen.  It is not affecting what is called the I frame, which is the important frame, to set it up; it's a new fresh frame.  You're seeing only the frames within that group of pictures.  So that's how we know that that stream is corrupted on those P frames.  Thank

P64Qcom2

you.

MS. SMYSER:  Let's continue playing the video.  Let's play through about 55 seconds.

(Video played)

Q.  Did you see pixelation several more times in this portion of the clip?

A.  Yes.

Q.  Is the pixelation any indication of human alteration or tampering?

A.  No.

Q.  And does it change your opinion that the video accurately represents the underlying surveillance footage?

A.  No, it does not change my opinion.

Q.  I think you also mentioned there were some timestamp issues in these videos, is that right?

A.  Yes.

Q.  Are there times the timestamp skips?

A.  Yes.

Q.  At a basic level, what are some of the reasons that can happen?

A.  Just like visual that you're seeing, the events taking place, the timestamp is also recorded by the same system, and typically with this kind of surveillance system, the timestamp is being affected the same way that these pixelations are happening to the actual visuals.

So, for example, there might be times where the video will jump ahead.  That could be motion activity which we can explain.  There might be times when the timestamp might go backwards because it's searching for its next information to display properly.  The timestamp does suffer from the export process that has also caused the problems that you're seeing in the visual.

Q.  You mentioned that some of these timestamp issues can be caused by the motion activity cameras, is that right?

A.  Yes.

Q.  Can you just explain how that is?

A.  Maybe you've heard the term, or not, but a lot of surveillance systems, not just this hotel's one, you know, your private home system if you have one, you have the option of applying a feature called motion activity.  And what its role is to tell the system to turn on and off when there's no motion for a certain period of time; it stops recording.  And then when there's motion again, the sensor sees it, and then the system turns back on, and it records the video again.  And the timestamp will be reflected by whether or not motion activity took place.

Q.  So if there's no motion, then what happens to the timestamp?

A.  So if there's no motion, the timestamp will either remain where it left off or when there is motion and it picks up

again, if it's a minute later, it will be reflected in the timestamp.

Q.  So the timestamp can jump forward when there is motion?

A.  Yes.

Q.  Were you able to make any adjustments to the time stamps in these videos?

A.  No.  Again, these were embedded into the actual file as like one file.  If we had the native file, we would be able to separate them, but we don't so we have this embedded one file.

Q.  Would you rely on the timestamp for the accurate time of day?

A.  No, I would not.

Q.  And even without adjusting the timestamp, does this change your opinion that the videos accurately represent the underlying surveillance footage?

A.  No.  My opinion is the same.

        MS. SMYSER:  All right.  Ms. Gavin, I want to look at an example of this.  So could you please skip to one minute and 43?  Seconds.  We are going to play through 2:10, and then we're going to pause right before there's a timestamp skip.

        (Video played).

        MS. SMYSER:  Could you just pause here?

Q.  Mr. Piazza, could you take a look at the timestamp and let's play forward through 2 minutes and 16 seconds.

        (Video played)

Q.  What happened to the timestamp in those few seconds?

A.  Could you play that again, please?

Q.  Sure.

MS. SMYSER:  Ms. Gavin, could you go back to 2:10 and just play forward six seconds.

(Video played).

Q.  What happened to the timestamp in that clip?

A.  So the timestamp actually corrected itself and displayed what appeared to be going backwards, but it was filled with errors, and there also seems to be motion activity occurring that is causing it to jump ahead by I believe it's 20 or so seconds.

Q.  How does the motion relate to the change in the timestamp?

A.  So if we could do this -- if you would just go back frame by frame, I want to point out something that's worth seeing.

Go backwards.  Stop.  That's perfect.  Let's stop right there.

So you can see the timestamp, it's down at 13:11.  Go back another frame.  Okay.  We've gone backwards, yet the timestamp went forward.  So now go forward one frame, and I'll explain what I want to explain.

This seems to be kind of a collision of two things happening.  If you look at the far end of the video, you can see it's a wall of mirrors, and that reflection is being recorded in the camera.  And if you look to the left side of

P64Qcom2

the mirror across from the male sitting down, you see what looks like an outline or a ghost of a person, and that is the motion activity actually getting ready to sense that we have new motion.  That's correct.  Thank you.

So at that point, you will see the full figure appear. If you go ahead a frame again, maybe a couple.  Just go one at a time.  Again, please.  Okay.  So if you see now it's a full figure in the frame.  And importantly you should notice at the bottom left-hand corner, that is the full body of the person that the sensor is fully getting.  Okay, let's turn it on for sure, we know we have motion.  So that causes the jump.

The backwards part I can't really say other than that file is corrupted and -- because, as we talked about before, we're going to see this many times in the video.  The file is corrupted in a way where it struggles to give the full accuracy.  Just like when you see the figures and the blocking, the same sort of concept is happening to that file.  So this is just an opportunity for it to try and correct itself.  And it just so happens motion activity was happening at the same time.

I'm sorry if that was confusing, but that's the best I can do.

Q.  Did the timestamp ultimately correct itself after the motion occurred?

A.  Yes.

Q.  And in your opinion, are these surveillance videos still

accurately capturing the events that were happening?

A.   Yes.

MS. SMYSER:  You can take that down, Ms. Gavin.

Q.   Mr. Piazza, in connection with this case, did you create a compilation of video footage?

A.   I did, yes.

Q.   Who asked you to make that compilation?

A.   It was your offices.

Q.   What does that compilation generally consist of?

A.   The compilation are all three surveillance videos.  We've only been seeing one camera angle, and there are two other camera angles up hallways, and it is a timeline of events as they took place, as events took place, and they're edited in a way to track the movement of individuals inside that -- inside the events.

Q.   Is one of the cellphone videos also included in that compilation?

A.   That's correct.

Q.   Does the compilation have different camera angles in it?

A.   Yes, it does.

Q.   When you created the compilation, how did you indicate that the video was going to change between camera angles?

A.   So within each camera, there was overlap of the footage, so you knew from one camera by comparing it to another camera that a certain event was taking place.  So we refer to that as an

P64Qcom2

anchor point, so we knew where we were at that point.

So using the first camera as our starting place, meaning the one that we just saw outside the elevator in that landing area, everything evolved from there moving forward that enabled us to have a chronological compilation of the playback.

Q.   How did you indicate visually in the file that a change in angle was about to occur?

A.   A black screen was placed in between each time the camera was changed or there was a switch to a different portion.

Q.   I want to direct your attention to another CD in front of you which contains what has been marked for identification as Government Exhibit 10C-115.  Do you recognize this disk?

A.   Yes.

Q.   What is it?

A.   This is the compilation I prepared.

Q.   Did you review the contents of the disk before you testified today?

A.   Yes.

Q.   How do you know?

A.   These are my initials on the disk itself.

MS. SMYSER:  Your Honor, the government offers Government Exhibit 10C-115.

THE COURT:  10C-115 will be admitted.

(Government's Exhibit 10C-115 received in evidence)

MS. SMYSER:  Ms. Gavin, can you please display

P64Qcom2

Government Exhibit 10C-115.

Q.   Mr. Piazza, is this the compilation you created?

A.   Yes.

MS. SMYSER:   So I want to play through the first about ten seconds of this clip, Ms. Gavin.

(Video played)

Q.   What angle are we looking at here?

A.   We're looking at a camera that was mounted in the hallway of the hotel showing what I'll refer to as the right portion of the hallway right outside of the entryway to the elevators.

Q.   And what is happening in the video?

A.   The woman is walking down the hallway in the direction of the camera.

Q.   So I want to focus on the timestamp for just a second. What is the timestamp here?

A.   The timestamp says it's 11:16:15.

Q.   You mentioned there were various camera angles in this compilation, is this right?

A.   Yes.

Q.   Do the camera angles have different time stamps?

A.   They do.

Q.   How common is it for the timestamp of different cameras to be offset rather than identical?

A.   It's a very common occurrence.

Q.   And why might that happen?

A.   It can happen for numerous reasons.  The three video files might not be connected to the same exact system, so they're not using the master clock from that system to then give it to them.

It could be that the cameras themselves are generating the time code as opposed to the system, and there is a calibration issue.

There can be maintenance that could have happened on one camera but not another, but someone in that process didn't update the offset.  And there would be lots of other reasons, but that would be likely some of the reasons here.

MS. SMYSER:  Ms. Gavin, let's play through until 30 seconds on the video.

(Video played)

Q.   Did we just see multiple angles of the same event?

A.   That's correct.

Q.   How does the timestamp of this lobby camera here generally compare to that of the hallway cameras?

A.   So there seems to be an offset, I can't tell you which the name of the file is in the compilation, but the offset is anywhere from five seconds to five minutes and 55 seconds, and then others are -- one other one I believe is synced with it. Depending on which one you're looking at or using as your reference, it's going to change.

Q.   How did you know just how to string the videos together if

the time stamps on the different cameras were different?

A.   I relied on what I mentioned before, the anchor point, meaning the overlap of the video you can see visually is taking place so you know where you are in the video.  And the videos do play forward, chronologically forward, so we have a reference there as well.

Q.   How many video compilations have you done in your career?

A.   Hundreds.

Q.   Do you typically focus on the content rather than the time stamps when putting together those compilations?

A.   Typically that would be the case, unless there was a different request made.

        MS. SMYSER:  Ms. Gavin, we're going to continue playing through this clip till about 4 minutes and 5 seconds.

Q.   And I'll ask you some questions as we go along, Mr. Piazza.

        (Video played)

Q.   Who emerges from the hallway?

A.   The male is running down the hallway in the direction of the camera, and then we're catching different angles as this next angle is present.

        (Video played)

Q.   What did the man just do in the video?

A.   The man was dragging the woman across the carpet out of the elevator area into the hallway.

Q.   Does the man appear to have anything in his hands?

A.   Yes.   He seems to be carrying a duffle bag or luggage of sorts.

(Video played)

Q.   What is the woman doing?

A.   She picked up a handset that was mounted on the wall to her left.

(Video continued playing)

Q.   Where does the man appear to be going?

A.   The man seems to be walking down the hallway that he initially had walked toward the camera, he's now walked away and disappeared to the right.

Q.   Is he re-emerging?

A.   Yes.

Q.   Does there appear to be anything in his hands?

A.   No, his hands appear to be empty.

(Video continued playing)

Q.   Is there anything in his hand now?

A.   It appears to be a cellphone.   It's glowing.

MS. SMYSER:   Could you pause the video here, Ms. Gavin?

Q.   You mentioned earlier that at the back of this room is mirrors, is that correct?

A.   Yes.

Q.   So I just want to focus on what happens in the mirror over the course of the next five seconds or so.

MS. SMYSER:  Ms. Gavin, could you play that.

(Video played)

Q.  What appeared to happen there?

A.  The male picked up an object on the small table right beside the chair and what appears to be a vase and threw it across the room in the direction where the woman was.  And in that process, it appears that the vase itself fell to the ground but the object that was in the vase was released.

MS. SMYSER:  Ms. Gavin, could you continue playing through about 5 minutes and 12 seconds.

(Video played)

Q.  What just happened with the video, Mr. Piazza?

A.  So the surveillance video that we were just watching had ended at that point, and now the cellphone video is now continuing the next portion or so in the video.  So this will appear a little differently, but it is the cellphone recording of the same footage.

Q.  Who appears to have emerged from the elevator?

A.  That is a security person.

MS. SMYSER:  Let's continue watching through approximately 6 minutes and 10 seconds on the timestamp.

(Video played)

Q.  What do the security guard and woman appear to be doing here?

A.  They appear to be having a conversation of sorts.

P64Qcom2

Q.   What is the woman wearing?

A.   A dark oversized hoodie.

Q.   Is the hood pulled up?

A.   Yes.

Q.   Did you just see a zoom in the video?

A.   Yes.

Q.   Did you add that zoom?

A.   No, I did not.  That was done by the person who made the recording with the cellphone.

         MS. SMYSER:  Let's continue playing through 6 minutes and 59 seconds.

         (Video played)

Q.   Where does the woman appear to go?

A.   She appears to go down the hallway to the left side of the elevator landing area.

Q.   And what does the security guard appear to be doing?

A.   He picks up the handset that was on the wall and is speaking into it.

         MS. SMYSER:  Let's pause here.

Q.   Did the footage just skip from the man and security man being in the lobby to them being in the hallway?

A.   Yes.

Q.   Did you have any available footage that showed them walking out of the lobby?

A.   No, none existed.

Q.   Was that the end of the cellphone video file?

A.   That's correct.

Q.   And in this frame, what is the man doing?

A.   The man seems to be examining his hand or his wrist or his fingers.  Hard to exactly know.

          MS. SMYSER:  Let's continue playing through approximately 7 minutes and 20 seconds.

          (Video played)

Q.   What do the hotel security guard and man appear to be doing?

A.   They appear to be having a discussion.

Q.   Does that conversation appear to continue on the video?

A.   Yes.

          MS. SMYSER:  Let's skip forward to 8:45.

Q.   Does it appear that they're still talking in this clip?

A.   It does.

          MS. SMYSER:  Let's play from here, Ms. Gavin.

          (Video played)

Q.   Who emerges now?

A.   The female is now walking in the direction of where the -- we just saw the conversation taking place, and this is the same direction, and it's from the rear point of view, a different camera angle.

          (Video continues)

          MS. SMYSER:  Let's pause here.

P64Qcom2

Q.   Are all three individuals now off the screen?

A.   That's correct.

        MS. SMYSER:  Let's fast forward to 9 minutes and 53 seconds.

Q.   In those 30 seconds, did the three individuals emerge?

A.   No.

        MS. SMYSER:  So let's continue playing.

        (Video played)

Q.   Who is emerging now?

A.   This is the female.

Q.   And what does she appear to be carrying?

A.   She is carrying looks like a duffle or her luggage.

        (Video continues)

Q.   And who appears now?

A.   This is the security person.

        (Video continues)

Q.   What is he doing now?

A.   Appears to be inspecting the floor.

        (Video continues)

Q.   And who emerges next?

A.   The male is walking towards the camera down the hallway.

        (Video continues)

Q.   Does he appear to be holding anything?

A.   Yeah, there seems to be a cellphone in his hand.

        (Video continues)

Q.   What did he appear to be doing at the end of the clip?

A.   He's either receiving a call or making a call, and then putting the cellphone to his ear.

          MS. SMYSER:  Ms. Gavin, you can take that down.

Q.   Just to sum up, Mr. Piazza, you put these videos in chronological order in this compilation?

A.   Yes.

Q.   And you found that all the videos that you put in the compilation did not have signs of tampering?

A.   That's correct.

Q.   And you found them to be reliable depictions of what the hotel surveillance system captured, correct?

A.   Correct.

Q.   Were there any events depicted after what we just saw or was that all the footage that you had?

A.   That was all the footage I had.

Q.   And does the compilation show all the content that was available to you from the videos?

A.   Yes, it does.

Q.   Now, I want to turn to a different topic, Mr. Piazza.

          At the beginning of your testimony, you also mentioned that you enhanced sex videos, is that right?

A.   Yes.

Q.   How many videos did you work with?

A.   Initially, it was ten.

Q.   So let's focus on those ten videos first.

MS. SMYSER:   Your Honor, at this point the government would offer Government Exhibit 1307, which is a stipulation between the parties.

THE COURT:   All right 1307 will be admitted.

(Government's Exhibit 1307 received in evidence)

MS. SMYSER:   Ms. Gavin, will you please display that for the jury.

Q.   I'm going to read this in a second, Mr. Piazza, but before I do, I want to direct your attention to the drive next to you, which contains Government Exhibit BX-201 through BX-210.  Do you recognize that drive?

A.   I do.

Q.   What is it?

A.   This is a flash drive containing those sex videos.

Q.   Does it contain the videos that you enhanced?

A.   Yes.

Q.   Did you review the drive in advance of your testimony?

A.   Yes.

MS. SMYSER:   Your Honor, the government offers Government Exhibits BX-201 through BX-210?

MS. GERAGOS:   No objection.

THE COURT:   Those videos will be admitted.

(Government's Exhibits BX-201 through BX-210 under seal received in evidence)

P64Qcom2

MS. SMYSER:  I want to read the stipulation, so, Ms. Gavin, could you please zoom in on paragraphs one and two.

Before we move on, your Honor, I want to clarify I'm offering those exhibits under seal.

THE COURT:  They will be admitted under seal.

Q.  Thank you.

Paragraph one is Government Exhibit exhibits BX-201A, BX-202A, BX-203A, BX-204A, BX-205A, BX-206A, BX-207A, BX-208A, BX-209A and BX-210A are video files that recovered from the Frank Black user file on Government Exhibit BX-200, a device that Casandra Ventura provided to the government.

Government Exhibit BX-201 is an enhanced version of Government Exhibit BX-201A, an original video that was created on October 8, 2014.

MS. SMYSER:  Can we go to the next page, please.  Can you zoom in on the paragraphs?

Government Exhibit BX-202 is an enhanced version of Government Exhibit BX-202A, an original video that was created on October 8, 2014.

Government Exhibit BX-203 is an enhanced version of Government Exhibit BX-203A, an original video that was created on December 4, 2014.

Government Exhibit BX-204 is an enhanced version of Government Exhibit BX-204A, an original video that was created on October 14, 2012.

P64Qcom2

Government Exhibit BX-205 is an enhanced version of Government Exhibit BX-205A, an original video that was created on October 20, 2012.

Government Exhibit BX-206 is an enhanced version of Government Exhibit BX-206A, an original video that was created on October 14, 2012.

Government Exhibit BX-207 is an enhanced version of Government Exhibit BX-207A, an original video that was created on October 14, 2012.

Government Exhibit BX-208 is an enhanced version of Government Exhibit BX-208A, an original video that was created on December 4, 2014.

Government Exhibit BX-209 is an enhanced version of Government Exhibit BX-209A, an original video that was created on December 4, 2014.

And Government Exhibit BX-210 is an enhanced version of Government Exhibit BX-210A, an original video that was created on October 20, 2012.

And you can take that down, Ms. Gavin.

Q.   Finally, Mr. Piazza, were you asked to examine one additional sexually explicit video?

A.   Yes.

Q.   And what were you asked to do with regard to that video?

A.   I was asked to enhance the sound portion.

Q.   So I want to direct your attention to a final CD, the CD

P64Qcom2

containing Government Exhibit AX-701-79 and Government Exhibits

AX-701-79-B and those are marked for identification purposes.

Do you recognize the CD?

A.   Yes.

Q.   Did you review it in advance of your testimony?

A.   Yes.

Q.   What does it contain?

A.   This contains the enhanced audio exhibit.

Q.   How do you know that?

A.   I initialed the disk.

Q.   And is Government Exhibit AX-701-79-B the audio enhanced

Government Exhibit 701-79?

A.   That would be the original video.

Q.   701-79 is the original, correct?

A.   Yes.

          MS. SMYSER:   Your Honor, the government offers

Government Exhibit AX-701-79-B under seal.

          THE COURT:   That exhibit will be admitted under seal.

          (Government's Exhibit AX-701-79-B under seal received

in evidence)

          MS. SMYSER:   No further questions, your Honor.

          THE COURT:   Thank you, Ms. Smyser.

          Ms. Geragos?

          MS. GERAGOS:   Your Honor, can we take a two-minute

bathroom break.

THE COURT:  Of course.  Let's take ten minutes and come back at 10:40.  Thank you.

Members of the jury, all rise.

(Jury not present)

THE COURT:  Mr. Piazza, we will be back in ten minutes.

(Witness not present)

THE COURT:  We will be back in ten minutes.

(Recess)

(Witness present)

(Jury present)

THE COURT:  Please be seated.

Mr. Piazza, you understand you're still under oath.

THE WITNESS:  I do.

THE COURT:  Ms. Geragos, you may proceed when ready.

MS. GERAGOS:  Thank you, your Honor.

CROSS-EXAMINATION

BY MS. GERAGOS:

Q.  Good morning, Mr. Piazza.

A.  Good morning.

Q.  My name is Teny Geragos.  I'll just be asking you a few questions.

A.  Sure.

Q.  We talked about three sets of videos that you analyzed in connection with this case, right?

A.  Yes.

Q.  We talked about the cellphone videos which you said came from a cellphone, right?  And then we talked about the surveillance videos, and we looked at those at length on your direct, right?

A.  Yes.

Q.  What is your understanding of the source of those surveillance videos?

A.  The original source?

Q.  That's right.

A.  Yeah, that would be the native system that created it.

Q.  Okay.  And then how is your understanding that the native -- the -- how they came into your possession after the native system was recording them?

A.  The videos were exported from that system and at some point were also transcoded in that process, and with the cellphone video we were able to determine that it plays back accurately because we know the cellphone video is demonstrating the accurate playback coming from that direct native system that the surveillance files were exported from.

Q.  And then who gave you the surveillance footage?

A.  That I received from the U.S. Attorneys.

Q.  And where did you -- if you have an understanding, where did the U.S. Attorney's Office receive those videos?

A.  I don't know.  I don't have that information.

P64Qcom2                        Piazza - Cross

Q.  Okay.  And I'm not sure if you talked about this on direct, but did you make a determination that the surveillance footage was perhaps older and cheaper, a surveillance video that was or surveillance system that was kind of old or cheap?

A.  I never used those words.

Q.  Can I just -- would it help you if I show you something to refresh your recollection?

A.  Yes, please.

Q.  Can we just put up 3571-009 at page 1.  Would you please just take a look at underneath where the second?

MS. SMYSER:  Just let me verify this is just for the witness.

MS. GERAGOS:  Just for the witness and the parties.

If you could just go out.  Sorry.  That's not it.

Q.  Underneath, where it says the second dash.  Do you see halfway down the page where it says -- did you research -- let me ask this way:  Did you research the system?

THE COURT:  Well, hold on.  Do you want him to review the document?

Q.  That's right.

Have you reviewed the document, Mr. Piazza?

A.  No, I believe this is the first time I'm seeing this document.

THE COURT:  Mr. Piazza, the only thing Ms. Geragos is asking you to do is to just read it to yourself.  So if you

want to focus the witness on a particular portion, you're free to do so.

Q.  Mr. Piazza, could you go to exactly where the cursor is on that screen and please review those bullet points.  Please let me know when you're done.

A.  Okay.

Q.  You've reviewed it.  We could take it down.

Does that refresh your recollection that you researched the video system and you thought it was a cheap system?

A.  First off, I don't know when this document was created --

Q.  I'm -- no problem there.  I'm just asking you if it refreshes your recollection --

A.  Yeah.

Q.  -- that you researched the system and you thought it was a cheap system?

A.  It's potentially, yeah.

Q.  Because when we looked at videos on direct, there were, I think you described, multiple different issues with them based on the native system, is that right, and how they were transcoded?

A.  Yes.

Q.  All right.  So I want to show you, and I hope to do this streamlined, but I want to show you 10C-103 which we looked at on direct as well.

P64Qcom2                      Piazza - Cross

MS. GERAGOS:  If we could just press play and pause there.  Perfect.

(Video played)

Q.  This is the elevator bank part of the video footage, is that right?

A.  Yes.

Q.  And when you look at the top left-hand corner and there's a timestamp there portraying 11:10:19, right?

A.  Yes.

Q.  I think you said you're not sure if that's actually the real-time or if it actually syncs with what was real-time, but that's the time that was being shown, correct?

A.  Yes.

Q.  And that's why we've seen multiple different video angles that show multiple different timestamps because they may not always be synced with each other, right?

A.  Yes.

Q.  This video starts at 11:10:19.  I think you see on the bottom right-hand corner, it's a 3 minute and 13 second video, right?

A.  Correct.

MS. GERAGOS:  If we could just go to the end of the video, if you could go to the very last frame.

Q.  The timestamp on the upper left-hand corner is 11:15:17, right?

P64Qcom2                         Piazza - Cross

A.   Yes.

Q.   But the video itself only plays for 3 minutes and 13 seconds, right?

A.   That's correct.

Q.   So there is about, and my math may not be great, but about 2 minutes 12-ish seconds of real-time that's not captured?

A.   Yes.

Q.   And that is because -- if you could just explain to the jury what the reason for that is, I know you talked a little bit about motion sensor.

A.   So, first of all, if this is 10C, this is something that I created.

Q.   Right.

A.   So this would be the corrected version.

      Could I ask you to play it just for a few ten or so seconds so I can just make sure?

      MS. GERAGOS:  Can we go to the beginning?  Why don't we just start at 19 seconds.

      (Video played)

      MS. GERAGOS:  Go back a little.  Go back ten seconds.

      (Video played)

      MS. GERAGOS:  Could we pause it there, actually.

Q.   Okay, go ahead.

A.   So taking place within this footage, there are a few issues that we cannot correct, one of them being that this system is

buffering some of that time.  In that process, sometimes time is dropped.  We also know, as I pointed out earlier, there were some portions that were motion activated, and that took out the time.  I have not gone through this clip and added up all the individual times I see that to give you your rough estimate of 2 minutes and 12 seconds.

Q.  Understood.  But if we could just go back two seconds, I think you were talking about motion activated.  Maybe we could see how that worked.  If we go right there.

(Video played)

Q.  You see it's at 11:10:44 and you play --

(Video played)

Q.  Do you see if you just pause it, how it jumped ahead to 11:10:46?

A.  Yeah.

Q.  Is that an example of some of the time, I guess, not being captured properly?

A.  Well, what appears to be happening based on some of the artifacts that we've seen, that the delivery of what we refer to as packets in video, somehow they're corrupted.  So the video doesn't know what to refer to to make the correction or make it look accurate, or it misses it.

I talked a little bit before about a GOP, which is a group of pictures, and there are critical times of certain critical frames that are missed.  It's either going to hold on

P64Qcom2                        Piazza - Cross

to those numbers longer than necessary or it could have the issue of trying to find the right packet, but since it's corrupted, it will just throw anything in there.

That is not always what happens, but there are some errors going on here that we know what is causing it.  The visual that you're seeing would change in digits.  We don't know why that's doing what it's doing, but we do know that there is a delivery packet issue, and there are at times buffering issues going on.

Q.  Thank you so much for that, but I just want to take us through a few examples of that, and you can kind of show us those delivery issues I think are the words you used.

If we could jump ahead -- well, let's just play from here.  If you see we're starting at 11:10:48.  Then it's 11:10:50.  It stopped right there.  It jumped ahead again to 11:10:56, right?

A.  Could you show me that again.

Q.  Yeah, let's do that again.  Just back up three seconds or so.

(Video played)

Q.  Did you see that?  Why don't we start?

A.  One more time?  Can you go frame by frame, please.  And could you continue to play it?

Q.  Can you please continue to play it?

(Video played)

P64Qcom2                      Piazza - Cross

MS. GERAGOS:  Stop it right there.

Q.  Do you see that it went from 10:10:50 to 10 -- it went from 11:10:50 to 11:10:56, so six seconds on the timestamp jumped in the few seconds we just watched.

A.  Yeah, I did see that.  And I need you to just replay that again.

(Continued on next page)

BY MS. GERAGOS:

Q.  Okay.  And right before we do that -- and we will replay it because I want you to just address two things.  And then right here we see 11:10:99 when you see the male come into the elevator bank.

Okay.  I just want to draw your attention to those two things.

MS. GERAGOS:  If we could back up 10 seconds and show it again for the witness.

A.  Are you able to play it frame by frame?  Can that be done?

Q.  When you say frame by frame, do you mean second by second, Mr. Piazza?  I'm not an audio-visual expert, so if you can explain exactly what you would like, we will do that for you.

A.  The person playing this back has the ability to just tap on a key.

Q.  Okay.

A.  And have it go -- so when you mentioned I said frames per second.

Q.  Yes, of course.

A.  In between all -- you know, each frame is a thirtieth of a second.

Q.  All right.  So I believe the government's paralegal just told ours how to do that.  But let's see if we can get that done.

If we start right there at 24 seconds, and then play

P64ACom3                        Piazza - Cross

frame by frame.

          (Video played)

          Is this what you're asking for?

A.   Yes.

Q.   Great.

A.   I would like to just stop there.  I would like you just to see that we have the pixilation or the blocking starting to occur.

Q.   That was one of the examples of what you were saying, part of the corruption --

A.   But it actually is related to why the time code is doing that.

Q.   Got it.  Okay.

A.   So if you please, go ahead.

          (Video played)

Q.   So we just --

A.   Okay.

Q.   Just so I can put on the record to make it clear, from 11:10:50 and then you saw the boxes for lack of a better term.

A.   Yep.

Q.   And then it went to 11:10:56.

A.   Okay.

Q.   And we don't see any of those gray boxes right now on the screen, right?

A.   That's correct.  It has, in fact, corrected itself.

Q.  Okay.

A.  Because it couldn't prior to that.  And for how many frames that it was having an issue, that's where it couldn't get its next information to play properly.  So it struggled.

         Okay.  The time code was struggling also because it was -- you could see that they're related.  Although the time code doesn't have the pixilation, it has a different issue.  Which is it's giving random numbers for a little bit of a time, so that's how the time code is showing its error.  This is how the time -- the visual is showing its error.

Q.  So you just said it's giving random numbers.  It said before 11:10:50, right?

A.  Well, chronologically --

Q.  If you just --

A.  -- a random number, because the time code is only choosing from a bank of numbers.  Whereas, the visual is choosing from colors and light and, you know, the information it's getting.  So in the packets that exist in the time code, it's different than the packets that exist for the visual.  There are two different files.

Q.  Right.  And that's what you have been talking about.  But I just want to ask about simply the timestamp, which is the frame right before it says 11:10:50, we saw that was pixilated.  The next one is 11:10:56.  That's the time code the system chose, right?

A.   Right.  But what makes this frustrating for anybody to watch this or follow what we're talking about here, is that the system, the rate is an averaged rate over time.  So, for example, as part of my work, I manually, in this section, exactly what you demonstrated, I manually counted out all of the frames over a 10-second period, and then a 20-second period, and I averaged out how many frames were displayed.

So over a 10-second period, it gave me roughly 21.3 frames.  I'm using the original video not the corrected video.

Q.   Okay.

A.   Because that is the more --

Q.   And then you added frames?

A.   And then I said by 10 seconds at 21 frames per 10, 2,100 just as a round number.  That told me that over each second, some seconds only gave me two frames.  But then the next one gave me 27 frames.  I'm throwing numbers out.  The average is really what we have to pay attention to.  It's having trouble, the system is not able to produce the smooth motion you would hope to get.

So you have --

Q.   In other words, the system is taxed, correct?

A.   Look at -- point by point.

Q.   Sorry.  One question at a time.

A.   Sure.

THE COURT:  Ms. Geragos.

P64ACom3                       Piazza - Cross

MS. GERAGOS:  Yes.  Thank you, your Honor.

Q.  The system is taxed, in other words, right?  I think that was --

A.  Again, there were multiple stages of my analysis, which brought me to where I'm speaking about today.

Q.  Okay.

A.  So the system has the potential of being taxed, yes.

Q.  Understood.  Thank you.

MS. GERAGOS:  Why don't we play for a few seconds so you can illustrate again for the timestamp issues for me again once we view the male coming into the elevator bank.  Can we just play.  Can we play, please.

(Video played)

So we see him coming into the elevator bank at 11:11:02.  You can play, please.  Thank you.

(Video played)

If you could pause there.

Q.  Is that another example of the timestamps kind of jumping around because of the taxed system?

A.  No.  I didn't say taxed system.  You said that.

Q.  Okay.  But it's another example of the timestamps jumping around while there's movement on the screen, right?

A.  Yes.  So, again, this is exactly what I just said a moment ago.  If you were to count the frames in each second in that portion right there, if you started at 11:10 you would see some

of them only have a couple frames happening.  But then it gets made up again later in the later frame.

It's constantly playing catch up.  And to accept it second by second or frame by frame is, you know --

Q.  It's difficult, right?

A.  It's difficult, of course it is.

Q.  That's difficult of course.  So let's --

A.  You know --

Q.  Understood.  I'm just trying to do one question at a time. We have a lot of videos.

A.  Sure.

Q.  So if we can just move it along.

MS. GERAGOS:  If we could play ahead to about -- yeah, just play ahead.

(Video played)

Just for the record's sake, we're at 11:11.  You can play.  11:11:28.

Q.  In this scene, do you see the female going to the phone at the wall?

A.  Yes.

Q.  Okay.  And you see the male coming back into the elevator bank?

A.  Yes.

MS. GERAGOS:  Now, can we pause there.

Q.  Did you see the timestamp just jump from 11:11:57 to

11:12:08, and there seems to be some sort of a cut for lack of a better term?

A.   Yeah.

Q.   Can you please explain that for the jury?

A.   Sure.  Would you mind backing it up again and giving it to me frame by frame?

Q.   Let's do that.  So in that, we are going to start at 11:11:50.

Just for the record, is the female on the left hand on the phone that was attached to the wall?

A.   Yes.

Q.   And at that point is the male separated from her at the -- over there on the right-hand side in the middle of the screen, yes?

A.   Yes.

Q.   So let's go frame by frame and observe the timestamp.

(Video played)

Next frame.

So it just jumped about five seconds timestamp wise, right?

A.   Yes.  Continue to push.

Q.   Okay.  So in those two frames that we just saw, it went from 11:11:57, and we saw there was a phone in the female's hand, correct?

A.   Yes.

Q.  And then it jumped just in one frame and to 11:12:07; is that correct?

A.  Yes.

Q.  All right.  And in that time period, the bags were then put -- are now on the ground I should say, right?

A.  Yes.

Q.  So could you please explain those 10 seconds of missing time or whatever that was, if you could explain that?

A.  Yeah, I can.  So you have to go back in the video.

Q.  Okay.

A.  If you would go back roughly 20 seconds or so.

        (Video played)

Q.  Right there.

A.  Okay.  You can play it at normal speed.  I wish I could do that.  I don't want to make it cumbersome, but I will tell you what I'm doing here.

Q.  So just for the record sake we just played it back.  We're now at a minute and 28 seconds into the video, timestamp being 11:12:11.  We just saw, again, the timestamp from 11:11:57 to what it is now.

        So now I pose my question again, could you please explain what exactly happened in that time period?

A.  Okay.  Before 11:57, before it jumps to that.  Let's go back to that, please.

        A little before that.

Q.   Okay.  Perfect.

A.   Okay.

Q.   So we will start, I just want to make it clear for the record, at one minute and 19 seconds into the video.

          (Video played)

A.   Okay.  So we talked before about motion activation.

Q.   Yes.

A.   It's not uncommon for security systems to give you the ability to have the sensitivity of that motion activation guide, whether it's triggered or not.

          If it's motion that it's clearly getting, then it will make its change.  You might see someone in the corner.  In this case, a female is there.  And while she's standing in the corner, there's not much movement really going on.  There's a tiny bit of movement, but the sensitivity -- this is a possible scenario -- has not been triggered, because it doesn't think anything is moving there.

          Same with the individual, the male across the way.  He is remaining -- he's just standing there.  And the sensitivity is seeing him as a nonmoving object until you get a distinct piece of movement is where you start to see your jumps and the bag drop.  That's when you know it's been triggered.

Q.   Well, we didn't see the bag drop, right?  We saw --

A.   The bag -- I'm sorry.

Q.   No problem.  I just want to make it clear.

P64ACom3                            Piazza - Cross

              We saw him holding the bags, correct?

A.   Yes.

Q.   And then we saw an image of him with the bags on the

ground, correct?

A.   Right.

Q.   And I, just for the record, there was about 10 seconds of

timestamp footage difference in those two images, right?

A.   From 50 --

Q.   It was about 57 to 12:07?

A.   I'm really not counting the 57 because what it really did,

what it did was just flew through from 51 to 52 right to 12:07,

which is giving us a block of almost -- almost 15 seconds.

Q.   Fifteen seconds that were not -- that we were --

A.   Right.  Did not --

Q.   Did not appear to be captured on this video?

A.   That's right.  That's right.

Q.   Okay.  All right.

         MS. GERAGOS:  Let's go to -- if we could go --

actually let's just play again right now right here.

         (Video played)

Q.   Here at 11 minutes -- or 11:12 if we could go back two

seconds, we saw it jump again.  11:12.

         Did you see about a 20 second jump again?

A.   Would you do that again?

Q.   Yep.  We'll go back three seconds.

So here, if I could just make it clear for the record, one minute, 36 seconds on the video.  The timestamp is 11:12:18.  On the lower left-hand corner you see the female putting on lip gloss, correct?

A.  Yeah.

Q.  And you don't see the male in this frame.

MS. GERAGOS:  So let's play.

(Video played)

And pause.

Q.  So did we see it jump from 11:12:21 to 11:12:25, and now where we are at one minute, 40 seconds into the video, is 11:12:46?

A.  Right.  Again, it is the same --

Q.  That's the -- what I was just going to say is that's the same issue is someone is at the lower left-hand part of the screen and the system is not really capturing the movement because there is no movement?

A.  I would like to point out, if you could go back just a few seconds, maybe to 145.

THE COURT:  I'm going to stop you for a second, Mr. Piazza.

THE WITNESS:  Yes.

THE COURT:  For the court reporter's benefit, we have to have a question and an answer.  Now, if you get a question that is a yes, no question, your answer should be yes, no.  And

P64ACom3                        Piazza - Cross

if you can't answer the question, you can say that too.  And then we will have a chance for redirect examination.

THE WITNESS:  I see.

THE COURT:  If you need to clarify.  Okay?

THE WITNESS:  Yes.

THE COURT:  Ms. Geragos.

MS. GERAGOS:  Thank you, your Honor.

THE WITNESS:  Sorry.

MS. GERAGOS:  No problem.

Q.  Why don't we go back two seconds and you can explain what you would like to explain, which I would like to put right here is the exact place we started.

A.  Okay.

Q.  She is in the lower left-hand screen?

A.  And if you could please play it by frame.

Q.  Frame by frame.  The question I have is do you view this as the same issue we've been talking about where the motion activated cameras do not necessarily register somebody in that lower part of the screen as movement?

That's the only question.  We will go frame by frame starting at one minute 37 seconds.

(Video played)

Now, the next, we're at one minute, 39 seconds.  We see the blurring on the left-hand side of the screen, correct?

A.  That's correct.

P64ACom3                        Piazza - Cross

Q.   And then it jumped.  During the blur it jumped ahead to 25 seconds --

A.   Yes.

Q.   And that's the same type of artifact issue that you have been testifying about, right?

A.   I'm going to say yes, but I still need a few more frames.

Q.   All right.  Let's see a few more frames because we're going to jump ahead in the timestamp.

          (Video played)

A.   Okay.

Q.   So there we go.  The next frame shows we are one minute, 40 seconds at 11:12:45, right?

A.   Yes.

Q.   So now that you've seen I would say at least five frames but I am not the expert, I don't know how many that was.  We've seen a few seconds.

          That is a perfect example of what you were just talking about in terms of the artifacts and the system not properly calibrating with the motion sensored activity, right?

A.   Yes, the motion activity.

Q.   Okay.  Great.

          MS. GERAGOS:  So if we could -- now that I've just looked at that.  If we could go to the compilation video, which we looked at on direct, which is 10C-115.

Q.   This is about a 12-minute video you put together, right?

A.   Yes.

Q.   We're just going to start here because we didn't look at this section on my cross.

          If you would just explain -- and I know you explained it on direct but explain it again because we've been looking at 11:10, 11:11.  Why is this showing 11:16:06, this different view of the hotel?

A.   Because the time code is offset.

Q.   And because they're just different systems; would you say that?  They're on different cameras?

A.   They could be different cameras.

Q.   And they're not synced, right?

A.   That's right.

Q.   So this shows the hallway, the left hand, I think you called it the left-hand view of the hallway?

A.   Yeah.  That's correct.

Q.   Okay.  So let's start here.

          And you see -- if you can pause it -- four seconds into the video, the female coming around the corner or wherever she's coming from, she's at 11:16:09 right now.  Right?

A.   Yes.

          MS. GERAGOS:  If we could play.

          (Video played)

          MS. GERAGOS:  Pause it.

Q.   This shows a different timestamp, right, because it's a

different camera view so it's not synced?

A.  That's right.

Q.  But you knew because of -- you tell the jury why you knew that this was the same portion of the video or same time period?

A.  Because as she is walking in this particular section we're seeing, she is holding the bag, her hoodie is up.  She's using both hands.  I think it's both hands.  You know, if I had to watch it again.  And that same movement is taking place, that we just saw in the other camera angle.

Q.  All right.  Perfect.

A.  So that tells us we're at a certain point in the video --

Q.  Even though the time --

A.  -- with both videos.

Q.  Even though the timestamps are different?

A.  Yeah.  The timestamps are just off.

        MS. GERAGOS:  No problem.  Let's play.

        (Video played)

        If we could pause there.

Q.  You see the male coming down the hallway.  The timestamp is 11:16:52?

A.  Yes.

Q.  So when we saw the female, it was 11:16:09, right?

A.  I don't remember, but if that's what it is, yes.

Q.  Okay.

P64AСom3                        Piazza - Cross

A.   It would make sense it's earlier.

Q.   So it's about a 30-second difference, right?

A.   Sure.

Q.   Okay.  You would agree with me that it's about a 30-second difference?

A.   Yes.

Q.   All right.  Thank you.

          MS. GERAGOS:  Let's play.

          (Video played)

          Can you pause it there.

Q.   Can you just explain the timestamp, what happened?  It showed 10:10:99.  Can you explain that?

A.   If you could back up a few frames, yes, I can.

Q.   Let's do it.

          MS. GERAGOS:  Let's back up a few frames if we can try.

Q.   So right now we're at 46 seconds.  It's at 11:10:59, right?

A.   Yeah.

Q.   Let's go next frame.

          All right.  The next frame shows 11:10:99 when you see the male coming into the screen, correct?

A.   Yes.

Q.   And can you please explain that for the jury?

A.   The time code is having the same corrupt frames packet delivery issues, and this is what it's displaying.

MS. GERAGOS:  Okay.  If we can press play.

(Video played)

Pause.

Q.  Did we see it jump about 10 seconds on the timestamp?

MS. GERAGOS:  Could we go back about three seconds to show Mr. Piazza that?  Just a couple seconds before that. There we go.

Q.  So right now we're at one minute, 27 seconds on the video, correct?

A.  Yeah.

Q.  And the timestamp shows 11:11:26, right?

A.  Uh...

Q.  Twenty-four, I'm sorry.  Twenty-four, right?

A.  Yes.

Q.  So if we press play, it goes to 26 and then 36; did you see that?

A.  Yes.

Q.  So did that indicate about a 10-second jump in the timestamp?

A.  Yes.

Q.  Okay.  Great.

MS. GERAGOS:  If we could keep playing.

(Video played)

Q.  We're at about one minute, 42 seconds on the video and you see the male walking away with two bags in the right hand,

right?

A. Yes.

Q. And then he turns around at about one minute, 52 seconds in the video with both bags again, right?

A. Yes.

Q. Okay.

MS. GERAGOS: And if you pause it.

Q. At what point is this from what you can tell? At what point, from what we just watched, when he was walking back, when he was walking to the room, if you know?

A. This was prior to him dragging the female.

Q. This is, right now?

A. This is a continuation now of a few seconds in the video. Not a few seconds, maybe a little time in the video just picking up the last time we saw her dragged across the carpet.

Q. It's a continuation from the elevator footage, but you don't know exactly -- you don't know whether this is at the point where he was walking towards the room or away from the room, right?

A. At this point -- well, we saw what is happening.

Q. Right. I'm asking where --

A. At this point, even at this point, yeah, we can't see what's going on behind -- I'm not following you. I apologize.

Q. We just watched --

A. This is just picking up where we left off last time.

P64ACom3                         Piazza - Cross

Q.   Okay.

A.   And then we're back in the elevator area.

Q.   Okay.

A.   So going on down the hallway, the male is walking.

Q.   The male was walking back --

A.   Away, then back.

Q.   Away from the camera and then towards the camera?

A.   Yes.

Q.   And at a timestamp that indicated a very different timestamp than right here, correct?  It was like an 11:16 and this is an 11:11, right?

A.   Okay.  Okay.  You want me to focus on timestamps.

Q.   All I'm asking -- all I'm asking is you don't know where this is in relation to him walking away and towards -- that's really all that I'm asking.

A.   Well, I mentioned earlier there was an offset of five seconds between two of the files, and you just illustrated a five-second difference.  So I believe that's what you're talking about.

Q.   Okay.  So it's a five-second difference?

A.   Between this file and one of the hallway cameras.

Q.   Okay.  All right.

          MS. GERAGOS:  Let's play.

          (Video played)

Q.   And this is basically what we just watched in the other

P64ACom3                         Piazza - Cross

video.  This is part of 10C-103, and you see her on the phone, correct?

A.  Yes.

Q.  Which then he is at the other end of the elevator bank.  We just saw the bags drop.  We've already gone through that.

MS. GERAGOS:  Pause it.

Q.  So we just saw the female on the phone and hang up the phone, right?

A.  Yes.

Q.  And you see the male walk away after that incident, right?  Or after her being on the phone?

A.  Yes.

MS. GERAGOS:  And if we could start again, please.

(Video played)

Q.  And is that him walking away after she was just on the phone?

A.  Yes.

Q.  So he walks away from her after she hung up the phone?

A.  Yes.

Q.  Okay.  All right.

MS. GERAGOS:  If we could play it.

(Video played)

Q.  So we saw him leave the screen.  We're at about three minutes and 23 seconds.

And if we could play again.

The timestamp is 11:18:35. We see him come back at 11:18:37. He comes back from which he came, correct? And he has no bags in his hands now, right?

A.  Yes.

Q.  All right. And the female is in the same position that she was before?

A.  Yes.

Q.  Okay. And he -- do you see, if we pause it here, the male, he's kind of crouching down; is that how you would describe it? How would you describe -- crouching, he's bent over perhaps?

A.  Yeah, as part of whatevers happening there.

Q.  He's bent down?

A.  He's bent down.

Q.  Okay. We're at about three minutes and 48 seconds.

        MS. GERAGOS:  Okay. If you could play.

        (Video played)

Q.  All right. Now he has what you described as a phone in his hand, right?

A.  Yes.

Q.  And he's looking at the phone?

A.  Yes.

Q.  Okay. Now he's walking back and he goes to the chair area -- if we could pause it -- right?

A.  Yes.

Q.  So you saw him crouch down on the left-hand side of the

P64ACom3                        Piazza - Cross

screen kind of in the reflection of the mirror, right?

A.   Yes.

Q.   All right.  And then he got what you described as a phone within his hand, and he walked away, correct?

A.   Yes.

Q.   And then he came back and he sat on that chair on what we looked -- we're looking at the mirror reflection, but he sits on a chair in kind of the middle area of the screen at about four minutes and seven seconds, right?

A.   Yes.

Q.   And the timestamp there is 11:13:15, right?

A.   Yes.

Q.   Okay.  And I would like you -- I'm going to play again, but I would like you to pay attention to kind of timestamp skipping that's about to come up.  So if you could just pay close attention to that and then we can rewind and look at frames again as we've been doing.

          MS. GERAGOS:  If you could play again.

          (Video played)

          If you could stop there.

Q.   Do you see how it went back to 11:13:11?

A.   Yes.

Q.   And then you saw what you described as I think -- I think you say ghost, but a translucent-like figure there in the left-hand part of the mirror?

P64ACom3                          Piazza - Cross

A.  I see that.

Q.  Okay.  And you said that this was an example of a visual artifact?

A.  Why not.  Sure.

Q.  Okay.  That's what I had written down, but you tell me what is this an example of?

A.  Well, the camera or the sensor is now seeing something that it's going to give a message to.

Q.  Okay.  Did you see this translucent or ghost-like figure in the cell phone videos that you reviewed, or is it only present in this one?

A.  The cell phone video does not show it because the quality of the footage didn't allow that kind of detail as I remember it.

Q.  Okay.  So that was the determination you made as to why it's only present in the surveillance videos?

A.  I am saying, as we're discussing it, I only see it in the surveillance videos.

Q.  Okay.  So you agree with me it's not in the cell phone?

A.  Yes.

Q.  Okay.

        MS. GERAGOS:  If we could play again.

        (Video played)

        Pause it.

Q.  It jumped ahead to 11:14:33, right?

A.   Yes.

Q.   So approximately one minute and 16 seconds just passed?

         Should we back it up?

A.   Yes, back it up.

Q.   All right.  Back it up.

A.   And if you would also just play it and don't stop where it changes, just go beyond it.

         MS. GERAGOS:  For the record, we're starting at four minutes, eight seconds.  If we could play it starting now.

         (Video played)

         So we saw the vase drop.  We see the translucent figure and we see it jump ahead in timestamp by about a minute and 16 seconds, right?

A.   Yes.

Q.   And do you see the male walk away from the chair with the phone in his hand?

A.   Yes.

Q.   At this point, is the male standing in the hallway area of the hotel?

A.   Yes.

Q.   Okay.

         MS. GERAGOS:  And can we back up just 10 seconds, sorry.  Let's play.

         (Video played)

Q.   The phone is to the female's left?

P64ACom3                    Piazza - Cross

A.  Yes.

Q.  The left of the female I should say.

Does the male come sit again on the chair he was just sitting on?

A.  Yes.

MS. GERAGOS:  If we could pause here.

Q.  Now you switch to the cell phone video.  Could you please tell the jury why you do that?

A.  That was the end of the surveillance video.  So the cell phone video is a bridge of time that was recorded that was not recorded at the surveillance.  So this is added to connect the next time period to the next surveillance video.

Q.  Because we don't have the surveillance video in the system we were just looking at that depicts this time period, right?

A.  That's right.

Q.  And we see kind of the cursor on the screen because this is a video of a video, right?

A.  Yes.

MS. GERAGOS:  If we could play.

(Video played)

Q.  Is the male, from what you can see, still sitting?

A.  Yeah.

Q.  And what does it appear that the female is doing?

A.  Appears to be talking with the security person.

Q.  Okay.

P64ACom3                        Piazza - Cross

A.  I'm not sure.

Q.  And the security person is talking as well?

A.  Yeah, making gestures.

Q.  And the female is making gestures?

A.  Yes.

Q.  Okay.

        Do you see -- pause it right there.  Did you see the female saying something and pointing with her finger?

A.  No.  But you can play it back if you want.

        MS. GERAGOS:  Why don't we go back about three seconds.  For the record, we should go back to five minutes, 53 seconds.  All right.  If we play it.

        (Video played)

Q.  Did you see the female just say something and point?

A.  It could have been pointing or just her hand holding something made her finger go that way.

Q.  Okay.

A.  I honestly --

Q.  Did you see her saying -- could you tell if she was saying something?

A.  It looked like she was speaking.

Q.  Okay.  And this, we're at six minutes and 30 seconds.  The male is still seated on the chair, correct?

A.  Yes.

Q.  He's still in his towel?

A.  Yes.

Q.  All right.  And he has not gotten up.  He's still seated?

A.  Yes.

          MS. GERAGOS:  Okay.  Let's play.

             (Video played)

Q.  And you see the security person using that same phone that you saw the female use, right?

A.  Yes.

Q.  And the male is still seated when he's using that phone, right?

A.  Yes.

Q.  The security person is laughing.  Does he appear to be smiling?

A.  Yes.

Q.  All right.  We didn't see him get up.  But we are now looking at the footage to see him in the hallway, right?

A.  Yes.

          MS. GERAGOS:  All right.  Pause.  Or play.

             (Video played)

Q.  This we're at seven minutes, 22 seconds.  The two males are talking to each other.  There's one security person, right?

A.  Yes.

Q.  We don't see anybody else with him, right?

A.  That's right.

Q.  And then we see the male we saw sitting down on the chair

P64ACom3                        Piazza - Cross

kind of against the wall in the hallway, right?

A.   Yes.  Prior to this.

Q.   Okay.  Prior to this, we saw him on the chair.  Now we see him against the wall in the hallway, right?

A.   Yes.

Q.   Okay.

         (Video played)

Q.   We're at eight minutes, 19 seconds in the video.  The timestamp shows 11:25:16, and you see the male going back down that hallway, right?

A.   Yes.

Q.   So we see him disappear around the corner at 11:25:56; does that make sense?

A.   Yeah.

Q.   Okay.  And now it's 11:25:48 and the female walks down the hallway as well, right?  Just about two seconds after we see him turn the corner.

A.   Yeah.

Q.   And we just see her turn the corner.  We are at -- if we could pause it -- 11:26:03, and the nine minutes and 22 seconds in the video, right?

A.   Yes.

         MS. GERAGOS:  Okay.  If we could play it.

         (Video played)

         If we could pause this, and if we could jump ahead to

about 10 minutes.  If we could go back a little bit more.

Yeah.  We will start there.

Q.  The timestamp is 11:29:44, right?

A.  Play it.  Yes.

Q.  Okay.  So we play it.  So she emerges back into the frame about four minutes after she had walked down the hallway, right, based on the timestamp?

A.  I didn't do the counting, but there was a longer chunk of time missing, yes.

Q.  Because we saw her go down the hallway 11:26 and then emerge from the hallway 11:29:44 approximately, right?

A.  Yes.

          MS. GERAGOS:  Okay.  We can keep playing.

          (Video played)

Q.  Then we see the security guard come down at 11:30:31, right?  And that's at 10 minutes, 29 seconds in the video.

          And he's still the only security guard you see, right?

A.  Yes.

Q.  If we could press play.

          So this is about a minute after you saw the female walk down the hallway, right?

A.  Yes.

Q.  Even though less than a minute went by in this video.

          MS. SMYSER:  Your Honor, objection.  This appears to just be a statement in the record rather than a question.

P64ACom3                        Piazza - Cross

MS. GERAGOS:  I was waiting for a response but I didn't get it.

So even though one minute went by.  All right.

THE COURT:  The objection is overruled.  But let's keep it going.  Ms. Geragos.

MS. GERAGOS:  We're almost done, your Honor.

Q.  And then we see the male again in the hallway, correct?

A.  Yes.

Q.  We're at 11:32:41, right?

A.  Yes.

Q.  So that is three minutes, according to the timestamp, after the female leaves the room, right?

A.  You said 29, what was your --

Q.  Did we see the female leave the room at around approximately 11:29:44?

A.  Okay.

Q.  And now we're looking at the timestamp and it's 11:32:41.

A.  Mm-hmm.

Q.  So approximately three minutes, probably a little bit less than three minutes; does that sound right?

A.  Yes.

Q.  Okay.  And is he still in a towel?

A.  Yes.

Q.  Okay.  And if we play, I think you said on direct that he appeared to be holding a cell phone?

P64ACom3                         Piazza - Redirect

A.  Yes.

Q.  Okay.  You saw him then turn around, and I think you said on direct that then he either made a call or just put the phone to his ear; you weren't sure which of course, right?

A.  Yes.

Q.  Okay.  And then he walks back.  And we don't see any other security guard at that point either, right?

A.  That's correct.

Q.  Okay.

        MS. GERAGOS:  Your Honor, may I have a moment?

        THE COURT:  You may.

        MS. GERAGOS:  Thank you so much for coming, Mr. Piazza, and explaining that.  We have no further questions for you.

        THE COURT:  All right.  Ms. Smyser.

        MS. SMYSER:  Very briefly, your Honor.

REDIRECT EXAMINATION

BY MS. SMYSER:

Q.  Mr. Piazza, you were asked on cross-examination a lot about timestamps; do you remember that?

A.  I do.

Q.  So, just to be clear, is the lobby video timestamp approximately five minutes different than the hallway to the right of the lobby where the man in the towel was?

A.  Okay, I am working off of memory.  I have this written

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

down.  But my notes told me there was a five minute, 55 second difference with video -- with the elevator video and one of the hallway videos, and I can't remember which one.

There is another offset of five seconds with the elevator video and another one.

And then one of them is in sync with each other and I can't remember which one that is.

Q.  Okay.  So there are different amounts?

A.  There are different amounts, yes.

Q.  One is about five seconds, right?

A.  Yes.

Q.  And one is about five minutes and 50 seconds approximately?

A.  Yes, approximately, yes.

Q.  So, Mr. Piazza, I just want to take a step back.

Based on your decades of experience looking at videos, did you conclude that the videos we've watched today reliably and accurately depicted what happened?

A.  Yes.

MS. SMYSER:  No further questions, your Honor.

THE COURT:  All right.  Thank you very much.

Thank you, Mr. Piazza.

THE WITNESS:  Thank you.

THE COURT:  You're done.  Before the government calls its next witness, let's have a very brief sidebar.

(Continued on next page)

(At sidebar)

THE COURT:  Thank you.  Just for time purposes, what is the anticipated length of Ms. Bongolan's direct?

MS. SMYSER:  I think it's about an hour.

THE COURT: An hour.  Okay.  Good.

This is something -- I wanted to raise this.  I forgot to in the morning.  The defense has sent a couple of *ex parte* messages to the Court that contain exhibits.  Apparently for -- because they are planning to use these exhibits for impeachment purposes.

The Court has not reviewed those e-mails, and unless I'm missing something and everyone is comfortable with *ex parte* messages about exhibits coming to the Court, this is not something that I believe is appropriate.  But if the parties have no objection to it and if the defense is doing it so that the Court has some advanced notice of what is coming up, then I will review those e-mails.  However, I am not going to do so unless the government consents to the Court doing that.  Because I think as is generally the practice, there are no *ex parte* communications with the Court.

So maybe the government can tell me, is this something that happens and you're comfortable with it, or is it not something you've encountered before?  Because it is not something that the Court is comfortable with.  And if the government doesn't object, then we can deal with that.  But if

the government does object, then I am going to continue to not review these e-mails.

MS. SMYSER:  Thank you, your Honor.  We would object. I have not encountered that before.

THE COURT:  All right.  So the way we will handle these issues is just the way we've been handling them.  Meaning if there's an exhibit that is being used for impeachment purposes that has not been previously disclosed to the government, you can try to offer it into evidence and I will make the call at that time.  Okay.

MR. AGNIFILO:  Okay.

THE COURT:  I wanted to make sure everyone had full notice and there wasn't any confusion.

MR. AGNIFILO:  Thank you, Judge.

THE COURT:  Good.  Let's proceed.

(Continued on next page)

(In open court; jury present)

THE COURT:  The government may call its next witness.

MS. SMYSER:  The government calls Bryana Bongolan.

THE DEPUTY CLERK:  Remain standing and raise your right hand.

BRYANA BONGOLAN,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Can I please have you give the Court your first and last name and spell your first and last name.

THE WITNESS:  Yes.  My first name is Bryana, and my last name is Bongolan.  It is B-R-Y-A-N-A, and then B-O-N-G-O-L-A-N.

THE COURT:  Ms. Smyser, you may proceed when ready.

MS. SMYSER:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. SMYSER:

Q.  Good morning, Ms. Bongolan.

     You mentioned your name was Bryana.  Do you go by any other names?

A.  Yes, Bana.

Q.  How old are you?

A.  I am 33 years old.

Q.  What is your profession?

A.  I'm a creative and marketing director for my own art
agency.

Q.  What kinds of work do you do for your art agency?

A.  Everything from like package design, to fashion design, to
marketing.

Q.  How long have you been doing design work?

A.  About 16 years.

MS. SMYSER:  Ms. Gavin, could you please pull up
what's in evidence as Government Exhibit 2A-101.

Q.  Do you recognize this person?

A.  Yes.

Q.  Who is it?

A.  Sean Combs.

Q.  Do you know Sean Combs by any other names?

A.  Puff.

Q.  I want to direct your attention to late September 2016.
Around that time, did you have any interactions with Mr. Combs?

A.  Yes.

Q.  What did Mr. Combs do to you?

A.  I was held over a 17-story balcony.

Q.  What did Mr. Combs do after he held you up on that 17-story
balcony?

A.  Threw me onto the balcony furniture.

Q.  And were you injured?

A.  Yes.

P64ACom3                    Bongolan - Direct

Q.   How so?

A.   I had a bruise on the back of my leg, and back and neck pain.

Q.   Did you have any mental effects from that?

A.   Yes. I have like -- like night-terrors and paranoia and I, like, scream in my sleep at times.

Q.   We're going to talk more about that later in your testimony.

        MS. SMYSER:  First, Ms. Gavin, could you please pull up what's in evidence as Government Exhibit 2A-401.

Q.   Do you recognize the person depicted here?

A.   Yes.

Q.   Who is this?

A.   Casandra Ventura.

Q.   And do you know Ms. Ventura by any other names?

A.   Yes.  Cassie and Cass.

Q.   And how do you know Cassie?

A.   She's one of my close friends.

Q.   Are you still friends today?

A.   Yes.

        MS. SMYSER:  You can take that down, Ms. Gavin.

Q.   When did you first cross paths with Cassie?

A.   Probably around like 2023, 2024 at a company called Young & Reckless.

Q.   Okay.  You said 2023, 2024, do you mean --

A.  Sorry.

Q.  Why don't you clarify what you mean?

A.  I'm so sorry.  2013, 2014.

Q.  And you mentioned that was at Young & Reckless?

A.  Yes.

Q.  What is Young & Reckless?

A.  A streetwear company.

Q.  Were you working there at the time?

A.  Yes.

Q.  In what role?

A.  As a graphic designer.

Q.  Did you have any personal interactions with Cassie while you were at Young & Reckless?

A.  No.

Q.  Did there come a time when you did interact personally with Cassie?

A.  Yes.

Q.  Approximately when was that?

A.  Around 2014, 2015.

Q.  And what were the circumstances of those first interactions with Cassie?

A.  It was at a company called Diamond Supply Co.

Q.  What is Diamond Supply Co.?

A.  Another streetwear company.

Q.  What did you do at Diamond Supply Co.?

P64ACom3                        Bongolan - Direct

A.   I was the head women's designer.

Q.   How did Cassie come into the picture here?

A.   We hired her as like the co-designer.

Q.   So what did you do with Cassie at Diamond Supply?

A.   My job was to pull out like designs and her thoughts in her head to create clothing collections with her.

Q.   When you first met Cassie, was she in a relationship with anyone?

A.   Yes.

Q.   With whom?

A.   Puff.

Q.   Did you meet Cassie or Mr. Combs first?

A.   Cassie.

Q.   And from what you saw, how would you describe their relationship?

A.   Volatile.

Q.   What do you mean by that?

A.   Like a lot of ups and downs.

Q.   At some point did your relationship with Cassie become a personal one and not just a professional one?

A.   Yes.

Q.   About how long after meeting Cassie did you meet Mr. Combs?

A.   About a year.

Q.   Why did you not meet him earlier than that?

A.   I just didn't -- I wasn't really fond of what I was, like,

seeing, so I wasn't really wanting to meet him right away.

Q. And just generally, what had you seen?

A. Just like, like, phone calls, like she seemed upset, or like a black eye.

Q. So who seemed upset on the phone?

A. Cassie.

Q. Who did you understand she was talking to?

A. Puff.

Q. And who had a black eye?

A. Cassie.

Q. We'll talk more about that black eye later in your testimony.

Why did you finally agree to meet Mr. Combs?

A. She basically kind of, like, begged me.

Q. Who begged you?

A. Cassie.

Q. And after meeting Mr. Combs, how often did you see him with Cassie?

A. Sporadically.

Q. Did you do any design work for Mr. Combs?

A. Yes.

Q. On approximately how many occasions?

A. Just a few.

Q. I want to talk more, Ms. Bongolan, about the time you were spending with Cassie.

Q.    Where would you two typically hang out?

A.    Her apartment in Los Angeles.

Q.    Where was her apartment?

A.    In Los Angeles.

Q.    Was it on a particular street in Los Angeles?

A.    Yes, on Comstock.

Q.    Where was Mr. Combs living at the time?

A.    I believe on Mapleton.

         MS. WESTMORELAND:  Objection.  Speculation.

         THE COURT:  Ms. Smyser, if you want to ask some questions to lay a foundation.

Q.    Were you aware of where Mr. Combs was living at that time?

A.    Not right away.

Q.    Did there come a point in time where you learned where Mr. Combs was living?

A.    Yes.

Q.    How did you know where he was living?

A.    I got invited there.

Q.    And so where was Mr. Combs living at the time?

A.    Mapleton I believe in like Beverly Hills.

Q.    And where was Cassie's Comstock apartment in relation to Mr. Combs' Mapleton home?

A.    Pretty close by.

Q.    What kinds of things would you and Cassie do when you were hanging out at her home?

P64AdCom3                   Bongolan - Direct

A.  We would work on designs.  We would talk about things we liked doing.  And get high.

Q.  So you would do drugs?

A.  Yes.

Q.  What kinds of drugs would you and Cassie do together?

A.  A lot of marijuana.  Occasionally cocaine, ketamine, stuff like that.

Q.  And how if at all did your drug use with Cassie change over time?

A.  It definitely created, like, a habit.

Q.  Would any other friends regularly hang out with you and Cassie?

A.  Yes.

Q.  And who are some of those people?

A.  In the beginning, there was Mia.  And then if Kerry was in town, Kerry would be there.  Deonte and Rob Holladay.

Q.  So I want to talk a little bit more about Rob Holladay.

         When did you first meet Rob?

A.  A while ago.  Even before Cassie.

Q.  And what is his profession?

A.  He's a producer.

Q.  And what was your relationship with Rob?

A.  He was one of my best friends.

Q.  We'll come back to Rob later.

         Were there times when you and Cassie were hanging out

P64AСom3                        Bongolan - Direct

that you went shopping?

A.  Yes.

        MS. SMYSER:  Ms. Gavin, could you please display for the witness, the Court, and the parties what's been marked for identification as Government Exhibit 3S-106.

Q.  Ms. Bongolan, do you recognize this?

A.  Yes.

Q.  What is it?

A.  It's a picture from shopping together at a place called Church.

Q.  How do you know that?

A.  Because I took this picture.

Q.  Is it a fair and accurate representation of you and Cassie on a shopping trip together?

A.  Yes.

        MS. SMYSER:  Your Honor, the government offers Government Exhibit 3S-106.

        MS. WESTMORELAND:  No objection.

        THE COURT:  3S-106 will be admitted.

        (Government's Exhibit 3S-106 received in evidence)

        MS. SMYSER:  Ms. Gavin, would you please publish this for the jury.

Q.  Ms. Bongolan, could you tell the jury who is in this photograph?

A.  Cassie and myself.

P64ACom3                          Bongolan - Direct

Q.   Approximately when was this taken?

A.   Early 2016.

Q.   And this, the date on this photograph is April 30th, 2016.
Was it sometime around that time?

A.   Yes.

Q.   What were you and Cassie doing this day?

A.   Getting nails done, going shopping, stuff like that.

          (Continued on next page)

BY MS. SMYSER:  (Continued)

Q.  Was Mr. Combs with you?

A.  No.

Q.  Are you aware of any communication between Mr. Combs and Cassie during that shopping trip?

A.  Yes.

Q.  How do you know about that communication?

A.  Cassie showed me.

Q.  What was the general nature of the communication?

A.  Where she was.

Q.  And what, if anything, did Mr. Combs say about where Cassie was?

A.  It had like listed all the places we had been to.

Q.  Mr. Combs sent a list of all the places you and Cassie had been?

MS. GERAGOS:  Objection.

THE COURT:  The question needs to be rephrased.

Q.  Just repeat again exactly what Mr. Combs sent to Cassie?

A.  She had shown me her phone, and there was a list of places.

Q.  And what were those places?

A.  All the places we had been to that day.

Q.  As far as you were aware, had either you or Cassie told Mr. Combs where you were that afternoon?

A.  No.

Q.  How did it make you feel when you got this list of places?

MS. WESTMORELAND:  Objection.

THE COURT:  Overruled.

A.  Oh, man.  Like oh, wow, like, he really knows where we're at.

Q.  And what did you and Cassie do after you got this list from Mr. Combs?

A.  We went home shortly to her place.

MS. SMYSER:  You can take that down, Ms. Gavin.

Q.  Were there times that you stayed over at Cassie's apartment?

A.  Yes.

Q.  How often?

A.  Pretty often.

Q.  Where would you sleep when you stayed over at Cassie's?

A.  Anywhere from the couch, the balcony, or her bed.

Q.  Were there times when Mr. Combs came over to Cassie's apartment when you were there?

A.  Yes.

Q.  When typically would he come over?

A.  In the middle of the night.

Q.  What did Mr. Combs do when he would come over in the middle of the night?

A.  He would bang on the door.

Q.  How loudly?

A.  Pretty loud.

Q.   Would he get inside the apartment?

A.   Yes.

Q.   How?

A.   Honestly, I don't know.

Q.   How did Cassie react when Mr. Combs would come over in the middle of the night and bang on the door?

A.   Sometimes surprised, and sometimes it just seemed like it was normal.

Q.   Did you ever witness violence between Mr. Combs and Cassie when Mr. Combs came over in the middle of the night?

A.   Yes.

Q.   Once or more than once?

A.   I can only really remember one time.

Q.   So let's talk about that time.  Do you remember when that was?

A.   I don't remember the time.

Q.   What were you doing before Mr. Combs got to the apartment?

A.   I was sleeping.

Q.   Did there come a time when you were woken up?

A.   Yes.

Q.   How were you woken up?

A.   By the banging.

Q.   And who was banging?

A.   Puff was banging the door.

Q.   Where was Cassie at this time?

P64Qcom4                    Bongolan - Direct

A.   Her bedroom.

Q.   What, if anything, did Cassie do in response to the banging?

A.   Came out of her bedroom.

Q.   Did Mr. Combs get into the apartment?

A.   Yes.

Q.   Do you know how?

A.   No.

Q.   What, if anything, was Mr. Combs saying when he got into the apartment?

A.   I don't know what he was saying.

Q.   What was his tone of voice?

A.   Upset.

Q.   And after Mr. Combs got into the apartment, what do you remember him doing?

A.   I just remember seeing a knife get thrown in her direction.

Q.   And where -- from what direction did the knife come?

A.   He was standing by the entry door.

Q.   Okay.  So was the knife thrown from the entry door?

        MS. WESTMORELAND:  Objection.

        THE COURT:  That's overruled.

Q.   You can answer.

A.   The -- he threw the knife in Cassie's direction.

Q.   And where was Cassie at the time that Mr. Combs threw the knife?

P64Qcom4                        Bongolan - Direct

A.   In the hallway that leads to her room.

Q.   How close was that to where Mr. Combs was standing?

A.   I would say pretty close.

Q.   How did Cassie react when a knife was thrown in her direction?

A.   She threw the knife back.

Q.   And did the knife hit Mr. Combs?

A.   No.

Q.   Do you remember how this incident ended?

A.   He left swiftly.

Q.   Who left swiftly?

A.   Puff.

Q.   Were you doing drugs that night?

A.   I don't remember.

Q.   Do you remember all the details of this incident?

A.   No.

Q.   Did you call the police?

A.   No.

Q.   Why not?

A.   Because I was scared.

Q.   And why were you scared?

A.   I was just scared of Puff.

Q.   And why were you scared of Mr. Combs at this time?

A.   Everything I was seeing.

Q.   Do the things that you've described from this night,

P64Qcom4                          Bongolan - Direct

Mr. Combs throwing the knife, do those stick out in your mind?

A.  Yes.

Q.  Did you see any injuries on Cassie this night?

A.  No.

Q.  Were there any other times you saw injuries on her?

A.  Yes.

Q.  What was Cassie doing the first time you saw an injury on her?

A.  She was FaceTiming me.

Q.  And what was she doing on the FaceTime?

A.  She was -- I believe she was about to get ready for makeup.

Q.  Makeup for what?

A.  To get ready for a movie premier.

Q.  What movie premier?

A.  *The Perfect Match*.

Q.  So you were communicating with her over FaceTime?

A.  Yes.

Q.  What did you see on the FaceTime?

A.  She just panned from one side of her face to the other.

Q.  Cassie did?

A.  Yes.

Q.  And what did you see when Cassie panned from one side of her face to the other?

A.  Her black eye.

Q.  How did you react when you saw the black eye on Cassie's

P64Qcom4                         Bongolan - Direct

face?

A.   I was a little quiet, and I remember saying I'm sorry.

Q.   What, if anything, did Cassie do in response?

A.   She was also pretty quiet.

Q.   Was this the only time you saw injuries on Cassie?

A.   No.

Q.   What other kinds of injuries did you see?

A.   Just bruises randomly.

Q.   Ms. Bangolan, next I want to direct your attention to one of Cassie's birthday parties.  Did you attend her 29th birthday party?

A.   Yes.

Q.   Where was the party?

A.   At a place called Blind Dragon.

Q.   What is Blind Dragon?

A.   It's a karaoke nightclub.

Q.   In what city?

A.   It's in West Hollywood.

Q.   Who were some of the people who were at the party?

A.   I know that Deonte was there, Tiffany Red, Puff, security guards, and maybe Carrie if she was in town.

Q.   Did you see any interactions between Cassie and Mr. Combs at the karaoke bar?

A.   Yes.

Q.   Were they getting along?

A.  In the beginning.

Q.  Did that change?

A.  Yes.

Q.  What did you observe?

A.  They were fighting.

Q.  Who was with them at the time?

A.  Just them and the security guards.

Q.  Did you see Cassie during this fight?

A.  When I -- I couldn't see a lot, but in between the security guards occasionally.

Q.  And how did Cassie appear from what you could see?

A.  She just seemed upset.

Q.  Where did you go after the karaoke bar?

A.  To her apartment on Comstock.

Q.  To whose apartment?

A.  Cassie's.

Q.  What, if anything, did Cassie do at her apartment?

A.  She was just getting ready with Deonte to leave.

Q.  And what were she and Deonte doing?

A.  Just packing her bag.

Q.  What did Cassie do after her bag was packed?

A.  She left.

Q.  Did you see where she went?

A.  I did not see where she went.

Q.  Ms. Bongolan, before we move on, did you receive a subpoena

P64Qcom4                        Bongolan - Direct

requiring you to testify at this trial?

A. Yes.

Q. And is there also an order compelling you to testify even though your testimony might incriminate yourself?

A. Yes.

Q. What is your understanding of what that order requires you to do?

A. To just be truthful.

Q. And what is your understanding of the protections you get under this order if you are truthful?

A. That I won't get in trouble.

Q. Does this order protect you if you intentionally make false statements today?

A. No.

Q. In other words, can you still be prosecuted for perjury if you lie?

A. Yes.

Q. Next I want to talk about some of your interactions with Mr. Combs. Were there ever times that Mr. Combs provided you with drugs?

A. Yes.

Q. About how many times?

A. A few, maybe like three or four.

Q. What drugs did he provide you?

A. Ecstasy, cocaine, ketamine and G.

Q.  You mentioned G.  What is that?

A.  I don't know completely because I'm not like an avid user, but I believe it stems from like GHB.

Q.  Were there any drugs that you had not done before Mr. Combs provided them to you?

A.  G.

Q.  Did you see Mr. Combs do any drugs himself?

A.  Yes.

Q.  Approximately how many times?

A.  Just a few.

Q.  What drugs did you see him do?

A.  Marijuana, ketamine, and cocaine.

Q.  Were there ever times that you did drugs with Cassie when Mr. Combs was not present?

A.  Yes.

Q.  How frequently did that happen?

A.  Pretty often.

Q.  How often, say, per month?

A.  I would say weekly.

Q.  Did the frequency change over time at all?

A.  Yes.

Q.  How did it change?

A.  Just when we were around each other.

Q.  Did it become more or less over time?

A.  More.

Q. And what kinds of drugs did you and Cassie use together?

A. Marijuana, cocaine, ketamine.

Q. Where did those drugs come from?

A. I would have them.  She would have them.

Q. How often did you get drugs for Cassie?

A. Often.

Q. What kinds of drugs did you get for her?

A. Those oxy pills and cocaine and sometimes ketamine.

Q. Did Cassie pay you for these drugs?

A. Yes.

Q. Did you ever get drugs for Mr. Combs?

A. Yes.

Q. How many times?

A. Just a few.

Q. What did you get?

A. Ecstasy and ketamine and G.

Q. Is that what you got for Mr. Combs?

A. No.

Q. Was there ever a time where you got drugs for Mr. Combs?

A. Just one time.

Q. What did you get him on that occasion?

A. Cocaine.

Q. You had just mentioned a few other drugs:  Ketamine, G, ecstasy.  Were those drugs that Mr. Combs had given you?

A. Yes.

Q.   Were you selling drugs to other people?

A.   Not often, but yes.

Q.   Were there ever times that you and Cassie tried to stop doing drugs?

A.   Yes.

Q.   Why did you want to stop doing drugs?

A.   Because we wanted to do better.

Q.   What would you do together instead of doing drugs?

A.   We would try to cook.

Q.   You would try to cook?

A.   Yeah.

Q.   Would these periods of sobriety ever last?

A.   No.

Q.   Why not?

A.   It was hard to get sober if, you know, there's a lot of drugs around.

Q.   I want to shift topics now, Ms. Bongolan.

        Has Mr. Combs ever threatened you?

A.   Yes.

        MS. SMYSER:  Ms. Gavin, could you please pull up what is marked for identification as Government Exhibit 3S-105.  Do you recognize this?

A.   Yes.

Q.   What is it?

A.   A picture of took of a best friend I had at the time, and

Cassie.

Q. And how do you know?

A. Because I took the picture.

Q. Is it a fair and accurate representation from the photo shoot?

A. Yes.

MS. SMYSER: Your Honor, the government offers Government Exhibit 3S-105.

MS. WESTMORELAND: No objection.

THE COURT: 3S-105 will be admitted.

(Government's Exhibit 3S-105 received in evidence)

MS. SMYSER: Ms. Gavin, could you please display this for the jury?

Q. Ms. Bongolan could you explain where this photo is from?

A. Yes, it's in Malibu.

Q. Approximately when was this photo taken?

A. Early 2016.

Q. And the date here is April 24, 2016. Is that approximately correct?

A. Yes.

Q. You said you took the photo?

A. Yes.

Q. Who is in the photo?

A. This photographer that goes by Bad Boi, but with a I, and Cassie.

P64Qcom4                      Bongolan - Direct

Q.  So this photographer Bad Boi, do you know if he has any

relation to Bad Boy Records or Bad Boy Entertainment?

A.  No.  It was just his name.

Q.  And why were you all on the beach that day?

A.  Well, we just thought it was cool his name was Bad Boi, and

he happened to be a good friend of mine and just make some art.

Q.  Was Mr. Combs there?

A.  Not at the photo shoot but in the house.

Q.  And where is the house located?

A.  Like -- you could say that's the back yard but it's just

the beach, so in front of it.

Q.  So is the house close to the beach?

A.  Yes.

Q.  In what city is this house?

A.  Malibu, California.

Q.  What, if any, interaction did you have with Mr. Combs on

the day of this shoot?

A.  He came up to me and said some stuff.

Q.  What did he say to you?

A.  He came up really close to my face and said something on

the lines like "I'm the devil and I could kill you."

Q.  Had Mr. Combs ever said anything like that to you before?

A.  No.

Q.  Did you have any understanding of why he was saying that?

A.  No.

P64Qcom4                         Bongolan - Direct

Q.  Did Mr. Combs appear high to you?

A.  I -- I couldn't tell.

Q.  Were you taking drugs that day?

A.  I probably was.

Q.  And what would -- what were you likely taking?

A.  Cocaine.

Q.  How did you react to this threat?

A.  I was terrified but because of the cocaine, I had a little confidence to just brush it off.

Q.  And did you continue to see Mr. Combs after that?

A.  Yes.

Q.  Why?

A.  Honestly, I don't know.

Q.  Did you continue to hang out with Cassie after Mr. Combs made that threat?

A.  Yes.

Q.  Why?

A.  Our friendship, but I don't know.

Q.  Ms. Bongolan, before your testimony today, have you met with the government?

A.  Yes.

Q.  Do you remember if you told the prosecutors about this threat in your first meeting?

A.  I don't remember.

Q.  If you didn't tell them, why would that have been?

P64Qcom4                        Bongolan - Direct

MS. WESTMORELAND:  Objection?

THE COURT:  Sustained.

Q.  Ms. Bongolan, does this threat stick out in your mind?

A.  Yes.

Q.  What were the circumstances of your first meeting with the government?

A.  Could you explain that?

Q.  Yes.  What was your understanding of what the purpose of your first meeting with the government would be?

A.  I just thought it would be like a meet and greet, like, hey, like.

Q.  Did you understand you'd have to talk about the details of every event?

A.  Not fully.

MS. SMYSER:  Your Honor, I'm about to enter a new topic.  We could stop here or I could continue going.

THE COURT:  Let's take our break for lunch.

Thank you, members of the jury.  I will give you the same instructions I always do.  Don't speak with each other about the case.  Don't look up anything about the case.  And don't talk to anyone about the case.  With that, enjoy your lunch, and we'll be back a little after 1:00, like 1:05, 1:10.

All rise for the jury.

(Jury not present)

THE COURT:  Ms. Bongolan you can leave the stand now.

P64Qcom4                        Bongolan - Direct

We'll call you back a little after 1:00 p.m.  Thank you very much.

            (Witness not present)

            THE COURT:  Please be seated.

            Anything to address before we take our lunch break? Anything from the government?

            MS. SMYSER:  No, your Honor.

            THE COURT:  Anything from the defense?

            MR. AGNIFILO:  One second, Judge.  Nothing.  Nothing Judge.

            THE COURT:  So we will try to be back at 1:00 p.m. so we can get started shortly after 1:00 p.m.

            MR. AGNIFILO:  Thank you, Judge.

            (Luncheon recess)

            (Continued on next page)

P64Qcom4

AFTERNOON SESSION

1:00 p.m.

(Jury not present)

THE COURT:  Anything to address before we bring back the witness and the jury?

MS. COMEY:  No disputes I'm aware of, knock on wood.

A few things logistically to put on your Honor's radar.  Given the timing today, we think it's unlikely we'll get to Jane.  She's here.  She'll be ready to go on if we go much more quickly than expected this afternoon.  We think it's unlikely we'll get to her today.

We would though, if Ms. Bongolan's testimony pushes up against the 3:00 end time, we would like the Court's indulgence to call Enrique Santos at the end of the day because his testimony will be about 15 or 20 minutes, and it will help explain how to read some of the reports that contain text messages that the jury will see a lot of during Jane's testimony.  So our hope is, if the Court is all right with it, that we could put Mr. Santos on the stand at the end of the day.

THE COURT:  That's fine.

MS. COMEY:  Great.  Thank you, your Honor.

The only thing I think the parties have been conferring about a proposed instruction about the pseudonym order before Jane's testimony.  Given we don't think she'll

P64Qcom4

take the stand until tomorrow, we'll send it shortly, and I don't think we need to discuss it until after the end of the day.

THE COURT:  Very good.

MS. COMEY:  Thank you, your Honor.

THE COURT:  Anything from the defense?

MR. AGNIFILO:  Nothing, Judge.  Thank you.

THE COURT:  Let's bring the witness back out.

MS. SMYSER:  Your Honor, we're just having some tech issues, so IT is here to fix them, which hopefully they'll be resolved very quickly.

THE COURT:  Do you need a couple minutes?

MS. SMYSER:  Just a few minutes I think would be great, your Honor.

THE COURT:  I see that there is a work in progress.

(Continued on next page)

(Jury present)

THE COURT:  Welcome back, members of the jury.

We're trying to fix a tech issue here.  Just give us a second, and we'll see if we can get it resolved.  As you can see, we have some real cooperation between the parties here.  So it's always good to see.

MS. COMEY:  Your Honor, in case we can't solve this, I'm going to go print some paper copies so we can at least try and move it along.

THE COURT:  Members of the jury, we've got to do some work under the table and look at the wires, so it should be done in a few minutes.  I'm going to ask you to retire to the jury room for your comfort and we'll call you back out in a few minutes.

(Jury not present)

THE COURT:  With that, we will bring back our jury.

(Jury present)

THE COURT:  Thank you, members of the jury.  And apologies for having to make you come back in and out.  The good news is every time you come in, everyone stands, so good for you.

Ms. Bongolan, do you understand you are still under oath?

THE WITNESS:  Yes.

THE COURT:  Ms. Smyser, you may proceed when ready.

MS. SMYSER:  Thank you, your Honor.

DIRECT EXAMINATION CONTINUED

BY MS. SMYSER:

Q.  Ms. Bongolan, earlier today you testified about an incident with Mr. Combs on a balcony, do you remember that?

A.  Yes.

Q.  I want to walk through the details of that incident with you.

A.  Okay.

Q.  Approximately when did this take place?

A.  Early in the morning.

Q.  Around what month and year?

A.  Like September 2016.

Q.  Where were you when this happened?

A.  On the balcony.

Q.  Of whose apartment?

A.  Cassie's apartment on Comstock.

MS. SMYSER:  Mr. McCleod, can you please pull up what's in evidence as Government Exhibit 2B-107.  We can display it for the jury too.

Q.  Ms. Bongolan, do you recognize this?

A.  Yes.

Q.  What is it?

A.  Cassie's condo.

Q.  Where was Cassie's apartment located in this building?

P64Qcom4

A.  On the 17th story.

MS. SMYSER:  You can take that down.

Q.  Who else was in Cassie's apartment that night?

A.  Cassie herself and my ex-girlfriend at the time.

Q.  Where was Cassie?

A.  In her bedroom.

Q.  What were you doing that night?

A.  Sleeping.

Q.  Where were you sleeping?

A.  On the couch.

Q.  Was there anyone with you?

A.  Yes, my ex.

Q.  Had you been doing drugs that night?

A.  I don't recall.

Q.  Did there come a time when Mr. Combs came to the apartment that night?

A.  Yes.

Q.  What did Mr. Combs do when he got to the door?

A.  Bang on the door.

Q.  How loud was the banging?

A.  Very loud.

Q.  Did you wake up?

A.  Yes.

Q.  At that time that Mr. Combs was banging on the door, how were you feeling?

P64Qcom4

A.   Stressed out.

Q.   What did you do when he banged on the door?

A.   I woke up, and my ex was awake.  And I like rushed her right to the guest bathroom.

Q.   And what did you do with your ex in the bathroom?

A.   I went like this (indicating) and said shhh.

Q.   Are you putting your finger in front of your mouth?

A.   Yes.  And then I closed the door, and then I ran to the balcony.

Q.   Why did you hide your ex-girlfriend in the bathroom?

A.   Because I didn't want to expose her to things that I see.

Q.   Why -- you said you went out to the balcony?

A.   Yeah.

Q.   Why did you go out on the balcony?

A.   To act casual, look for a blunt.

Q.   What were you doing on the balcony at this time?

A.   I was it either -- I either lit the blunt or I was about to light it.

        MS. SMYSER:  Mr. McCleod, can you please pull up what is marked for identification just for the witness, the Court and the parties as Government Exhibit 3S-104.

Q.   Ms. Bongolan, do you recognize this?

A.   Yes.

Q.   What is it?

A.   The balcony, Cassie's balcony.

P64Qcom4

Q.   How do you know that?

A.   Because I've been there.

Q.   And is it a fair and accurate depiction of what that balcony looks like?

A.   Yes.

          MS. SMYSER:  Your Honor, the government offers Government Exhibit 3S-104.

          THE COURT:  3S-104 will be admitted.

          (Government's Exhibit 3S-104 received in evidence)

          MS. SMYSER:  Could you please display that for the jury.

Q.   Ms. Bongolan, could you just explain to the jury where you were on the balcony when Mr. Combs was banging on the door.

A.   Close to the edge, somewhere in the middle.

Q.   And do you see that ledge on the balcony?

A.   Yes.

Q.   About how high is that?

A.   Not that high.  Like I could lean over it and smoke.

Q.   And about how tall are you?

A.   About five-one.

Q.   And how high up on you does it come?

A.   Like my waist.

Q.   Did Mr. Combs get inside the apartment?

A.   Yes.

Q.   Do you know how he got in?

P64Qcom4

A.   No.

Q.   What did he do after he got in the apartment from what you could see?

A.   Well, I couldn't see because I was facing the view, but he basically came up from behind me.

Q.   Mr. Combs was behind you on the balcony?

A.   Yes.

Q.   And what -- what's the first thing he did when he was behind you on the balcony?

A.   He lifted me up, and then put me on top of the rail.

Q.   Could you just explain what his hands did when he lifted you up?

A.   Like to myself?

Q.   Yeah, just walk us through it.

A.   All right.  So he came up from behind and then into my armpit and then up.  Yeah.

Q.   Before he did -- before he lifted you up, did he do anything with his hands?

A.   It just came up on my chest, and it came down.

Q.   You said he held you up on the balcony, is that right?

A.   Yes.

Q.   Approximately how much did you weigh around this time?

A.   I can't like pinpoint a number because of the drugs, but I know I was probably around 100 to 115 pounds.

Q.   How much bigger is Mr. Combs than you?

P64Qcom4

A.  Bigger.

Q.  What did you say?

A.  Bigger.

Q.  When Mr. Combs held you up, where were your feet?

A.  They were on the rail.

Q.  And what were you doing with your body when your feet were on the rail?

A.  I was trying not to slip and pushing back on him.

Q.  Why were you pushing back on Mr. Combs?

A.  Because I was scared to fall.

Q.  And what were you thinking when Mr. Combs was holding you up on that 17th floor balcony?

          MS. WESTMORELAND:  Objection.

          THE COURT:  Overruled.

Q.  You can answer.

A.  For a split second I was thinking about if I was going to fall, but for the most part he was yelling at me so I was trying to answer him.

Q.  Let's talk about that.  What was Mr. Combs saying to you on the balcony?

A.  He kept repeating like "You know what the fuck you did."

Q.  Did you know what he was talking about?

A.  I have no idea.

Q.  Sitting here today, do you have any idea what he was talking about?

P64Qcom4

A.  I still have no idea.

Q.  What, if anything, did you say back?

A.  Like, around like "I don't know what the fuck I did."

Q.  And what was Mr. Combs' tone of voice when he was talking to you?

A.  He was yelling at me.

Q.  Was it loud?

A.  Yes.

Q.  How long was Mr. Combs holding you on the balcony?

A.  I don't know, but if you repeat the words a few times over and over again, it's like, you know, over 10, 15 seconds.

Q.  And what words are you talking about?

A.  "You know what the fuck you did."

Q.  Did Mr. Combs say that one time or multiple times?

A.  Multiple times.

Q.  When Mr. Combs is holding you up, where are you facing?

A.  I'm facing the view.

Q.  What did Mr. Combs do after he held you up on the balcony?

A.  He threw me on the balcony furniture.

Q.  Was that furniture outside?

A.  Yes.

Q.  How did it feel when he threw you on the balcony furniture?

A.  It definitely hurt, but I think all the adrenaline, I just got up.

Q.  So at that time when Mr. Combs threw you on the furniture,

P64Qcom4

did you know if you were injured or not?

A.   Not right away.

Q.   Where was Cassie at this time?

A.   She was in her bedroom.

Q.   Did there come a time she came out to the balcony?

A.   Yeah.  Not on the balcony, but right by the door, and as I'm like falling, I hear her voice.

Q.   What was her tone of voice?

A.   Kind of like umm -- like in disbelief a little bit.

Q.   And what was she saying?

          MS. WESTMORELAND:  Objection.

          THE COURT:  The basis for eliciting that testimony?

          MS. SMYSER:  Your Honor, it's to Cassie's reaction; it's not hearsay.

          THE COURT:  It's overruled.

          Why don't you ask the question again.

Q.   Ms. Bongolan, when you were on the balcony, what did you hear Cassie say?

A.   Around the lines of "Did you just hang her over the balcony?"

Q.   What did Mr. Combs do after Cassie asked did you just hang her over the balcony?

A.   They were like talking together, and then I heard something like "her girlfriend is in like the house."

Q.   And what happened after that?

P64Qcom4

A. He swiftly left.

Q. Who swiftly left?

A. Puff.

Q. What did you do after Mr. Combs left the apartment?

A. I don't remember exactly what I did right away, but I ended up leaving.

Q. Where did you go after you left Cassie's apartment?

A. I went to my apartment.

Q. What did you do at your apartment?

A. I was shaking a lot, and then I -- I wanted to take a shower because I felt disgusted, and then I look over behind my leg, and I see a huge bruise.

Q. We'll talk about the bruise in just a moment.

Ms. Bongolan, do you remember all the details of the incident that night?

A. No.

Q. Do the details that you've talked about stick out in your mind?

A. Yes.

Q. What, if any, physical injuries did you have as a result of that night?

A. I had a -- that big bruise with like a -- it was like a piercing in the middle of it, and then I had back and neck pain, and --

MS. SMYSER: And Mr. McCleod, can you please pull up

P64Qcom4

what has now been marked for identification as Government
Exhibit 3S-102 for the witness, the Court, and the parties.

Q.   Ms. Bongolan, do you recognize this?

A.   Yes.

Q.   What is it?

A.   The back of my leg with a bruise.

Q.   And how do you know?

A.   Because I took the picture.

Q.   When did you take it?

A.   The same day.

Q.   Is it a fair and accurate depiction of your leg that day?

A.   Yes.

        MS. SMYSER:  Your Honor, the government offers
Government Exhibit 3S-102.

        MS. WESTMORELAND:  No objection.

        THE COURT:  3S-102 will be admitted.

        (Government's Exhibit 3S-102 received in evidence) are

        MS. SMYSER:  Could you please display that for the
jury.

Q.   Ms. Bongolan, could you just explain to the jury what
they're looking at.

A.   That would be my leg with the bruise and the piercing in
the middle.

Q.   How did you get that injury?

A.   From being thrown on to the balcony furniture.

P64Qcom4

MS. SMYSER:  And Mr. McCleod, could you now display for the Court, the witness, and the parties what has been marked for identification as Government Exhibit 3S-102A.

Q.  Ms. Bongolan, do you recognize this?

A.  Yes.

Q.  What is it?

A.  It's just another picture, but it shows the data behind it.

Q.  Is it from the same time as the earlier picture?

A.  Yes.

Q.  Is it a fair and accurate representation of your leg?

A.  Yes.

MS. SMYSER:  Your Honor, the government offers Government Exhibit 3S-102A.

MS. WESTMORELAND:  No objection.

THE COURT:  3S-102A will be admitted.

(Government's Exhibit 3S-102A received in evidence)

MS. SMYSER:  Could you please display that for the jury?

Q.  Is this also a photograph of your leg?

A.  Yes.

Q.  The date here is September 26, 2016 at 9:45 a.m.  Is that around the time the photograph was taken?

A.  Yes.

Q.  Who took the photograph?

A.  I did.

P64Qcom4

Q. Where did you take the photograph?

A. My bathroom.

Q. Does the map at the bottom reflect where you were living at the time?

A. Yes.

MS. SMYSER: You can take that down.

Q. Ms. Bongolan, what, if any, medical care did you seek after this incident?

A. I just went to the chiropractor.

Q. How soon after did you go to the chiropractor?

A. The same day.

Q. Why did you go to the chiropractor?

A. Because I was freaked out, and I called my managers at the time and asked them what I should do.

Q. And what did they tell you?

A. One of them told me to go to the chiropractor if I was too scared to do anything else.

Q. Were you in pain at that time?

A. Yes.

Q. What, if anything, did the chiropractor ask you?

A. Who did this to you?

Q. How did you respond?

A. I was freaked out, and I just --

MS. WESTMORELAND: Objection.

THE COURT: Overruled.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P64Qcom4

Q.   You can continue.

A.   I was freaked out, and then I just paid, and I took the neck brace and left.

Q.   Did you tell the chiropractor who had done this to you?

A.   No.

Q.   Why not?

A.   Because I was scared.

MS. SMYSER:  Mr. McCleod, if you can, could you pull up what's been marked for identification as Government Exhibit 3S-101 side by side with 3S-101A.  This is just for the Court, the witness, and the parties.

Q.   Ms. Bongolan, do you recognize these?

A.   Yeah.

Q.   What are they?

A.   It's a picture of my back.

Q.   And how do you know that?

A.   Because my ex-girlfriend took it.

Q.   Are these fair and accurate representations of your back?

A.   Yes.

MS. SMYSER:  Your Honor, the government offers Government Exhibit 3S-101 and 3S-101A?

MS. WESTMORELAND:  No objection.

THE COURT:  3S-101 and 101A will be admitted.

(Government's Exhibits 3S-101 and 3S-101A received in evidence)

P64Qcom4

MS. SMYSER:  Could you please display these for the jury.

Q.  Looking here on the left side of the screen, Ms. Bongolan, what are we looking at?

A.  You said the one on the left?

Q.  Mmm-hmm.

A.  I was taking a picture of my phone because it was an older phone, and I was struggling with air dropping it to my new phone.

Q.  What does the photograph show?

A.  My back and my neck.

Q.  Are there bandages on your back?

A.  Yes.

Q.  Who put those bandages there?

A.  I believe my ex-girlfriend.

Q.  Why?

A.  Because I was showing her where the pain was, and she put the Band-Aids where it hurt.

Q.  What are you wearing on your neck?

A.  A neck brace.

Q.  Where did that come from?

A.  The chiropractor.

Q.  Did you have neck pain at this time?

A.  Yes.

Q.  And what caused your neck pain?

A.  Being slammed into the patio furniture.  The balcony furniture, sorry.

MS. SMYSER:  I just want to focus now on the right side of the screen.  Mr. McCleod, if you could zoom in on the date in the middle of the right side of the screen.

Q.  Ms. Bongolan, do you see this says September 30, 2016?

A.  Yes.

Q.  Do you know if this is when this photo was taken?

A.  Yes, around then.

Q.  You said around that time?

A.  Yes.

Q.  Why do you say around that time?

A.  Because I didn't take the picture, so ...

Q.  Was it sent to you?

A.  Yes.

MS. SMYSER:  You can take that down.  Thank you.

Q.  Did you seek any additional medical care at this time?

A.  Not right away.

Q.  And why didn't you seek more medical care at this time?

A.  For two reasons:  I was scared, and the other one, to be honest, all the drugs pumped in me, you know, you don't really feel a lot of the pain right away.

Q.  Was there a time later in which you did feel the pain?

A.  Yeah, when I decided to get sober.

Q.  Did you ever talk to Mr. Combs about this incident?

P64Qcom4

A.   Yes.

Q.   How did you have that conversation with him?

A.   Him or someone on his team FaceTimed me like a day or two later.

Q.   A day or two after what?

A.   The balcony incident.

Q.   And from what you could see, was anyone else present for this conversation?

A.   No.

Q.   What did you say to Mr. Combs during the conversation?

A.   I remember saying a couple times "I don't want any problems with you."

Q.   How did he respond?

A.   I don't remember him saying much but putting his hands over his head and then breathing and like looking back into the camera and then doing that again.

Q.   Did you report this incident to the police?

A.   No.

Q.   Why not?

A.   Because I was scared.

Q.   Why?

A.   Because of everything I've seen and had gone through at that point.

Q.   Who were you scared of?

A.   Puff.

P64Qcom4

Q.   After the balcony incident, what was your relationship like with Mr. Combs?

A.   Like we tried to be cool.

Q.   Did you hang out with him some after that?

A.   Yes.

Q.   What was your relationship like with Cassie?

A.   We were still friends.

Q.   Did you still hang out with her?

A.   Yes.

Q.   When was the last time you spent time together with Cassie and Mr. Combs?

A.   January 2, 2018.

Q.   How do you know that precise date?

A.   Because I tattooed it on my neck.

Q.   Why did you tattoo it on your neck?

A.   To make a commitment to get sober and not go back.

Q.   What happened the day that you decided to leave?

A.   Well, it was -- it was like a New Year's Eve party in Miami.

Q.   What happened at that New Year's Eve party?

A.   I'd like -- after I got invited back to a like penthouse suite at the 1 Hotel.

Q.   And what city were you in at the time?

A.   Miami.

Q.   Did you go to the 1 Hotel?

P64Qcom4

A.  Yes.

Q.  Who was at the 1 Hotel?

A.  It was me, Cassie, and Puff.

Q.  And what did you, Cassie and Puff or Mr. Combs do at the 1 Hotel?

A.  We did eight hours of ketamine together.

Q.  What did you decide to do after doing ketamine for eight hours with him?

A.  I couldn't do this any more, and I left.

Q.  After you left, were you able to get sober?

A.  Not right away.

Q.  Did you get sober after some point in time?

A.  Yes.

Q.  Are you sober now?

A.  Yes.

Q.  How, if at all, did your relationship with Cassie change after you left?

A.  It also became sporadic.

Q.  What is it like today?

A.  Cool.

Q.  Ms. Bongolan, are you aware of a lawsuit that Cassie filed?

A.  Yes.

Q.  When did she file that suit?

A.  November 2023.

Q.  Did that suit mention Mr. Combs hanging you over a balcony?

P64Qcom4

A.   Yes.

Q.   Did you talk with Cassie about her suit?

A.   Yes, right after she filed it.

Q.   What did you say?

MS. WESTMORELAND:  Objection.

THE COURT:  That's overruled.

Q.   You can answer.

A.   I was like, "Girl, you got some of that information wrong."

Q.   And what did you mean by that?

A.   It wasn't at a hotel, and the date is incorrect, and Tiffany wasn't there.

Q.   And were those the facts in her complaint?

A.   Sorry.  Could you say that again.

Q.   Is that how the balcony incident was described in Cassie's complaint?

A.   Yes.

Q.   And how did Cassie react when you told her that some of the details were wrong?

A.   Kind of like -- not like she knew, but like, you know, she was on drugs, so she had the information wrong.

Q.   When are you saying that she was on drugs?

A.   Like back in the day.

Q.   When the balcony incident was happening?

A.   Yeah.

Q.   Ms. Bongolan, I think you mentioned earlier that you met

P64Qcom4

with the government prior to your testimony today, is that right?

A.   Yes.

Q.   And once you began meeting with the government, did you have any additional conversations with Cassie about the balcony incident?

A.   Just one other time.

Q.   What did you talk about?

A.   She just said that she had told her lawyers what I said.

Q.   Have you talked with Cassie about the substance of your testimony here today?

A.   No.

Q.   What about the substance of her testimony?

A.   No.

Q.   Ms. Bongolan, have you had any lasting effects from when Mr. Combs held you up on the balcony?

A.   Yeah -- yes.

Q.   And what are those effects?

A.   I have nightmares, and I have a lot of paranoia, and I used to scream a lot in my sleep, but it's dissipated a little bit.

Q.   Did you do those things before the balcony incident?

A.   No.

Q.   When you say you have paranoia, what do you mean?

A.   Like if I go home to my apartment, I'll like unlock it, and I'll like kick the door open and kind of peek my head in to see

P64Qcom4

if everything's clear.

Q. When was the last time you had nightmares?

A. The other day.

Q. Have you hired a lawyer to represent you in connection with the balcony incident?

A. Yes.

Q. And approximately when did you first hire an attorney?

A. January 2024.

Q. Do you still have that same attorney that you hired in January 2024?

A. No.

Q. Did that first attorney represent you in your first meeting with the government?

A. Yes.

Q. In that first meeting with the government, did you talk about every single detail that you've talked about in your testimony today?

A. No.

Q. Why not?

MS. WESTMORELAND: Objection.

THE COURT: Sustained.

Q. What were your expectations of that meeting?

A. I just thought I was going to meet you guys.

Q. Did you meet with the government after that first meeting?

A. Yes.

Q.  Over the next few meetings with the government, did you talk to the government about the topics that you've testified about here today?

A.  Yes.

Q.  Were you able to cover every single topic in each meeting or only some topics in each meeting?

A.  Just some topics in each meeting.

Q.  Did your first attorney send a demand letter to Mr. Combs?

A.  Yes.

Q.  One or multiple?

A.  I believe multiple.

Q.  At a high level, what is your understanding of what a demand letter is?

A.  Asking for compensation for damages.

Q.  Do you know how much money was demanded in that letter?

A.  Not exactly.  I just know it was pretty high.

Q.  Did you pick the amount or did your attorney pick the amount?

A.  He picked the amount.

Q.  At the time the letter or letters were sent, did you know exactly what was in those letters?

A.  No.

Q.  Did you approve the letters before they were sent?

A.  No.

Q.  Do you know if everything in those letters was correct?

P64Qcom4

A.  They were incorrect.

Q.  What did you do after you learned that the information in the letters was incorrect?

A.  I let him go.

Q.  You let who go?

A.  Tyrone Blackburn.

Q.  Your first lawyer?

A.  Yes.

Q.  Did you end up hiring a new lawyer?

A.  Yes.

Q.  Were you contemplating a lawsuit against Mr. Combs?

A.  Yes.

Q.  And when you were contemplating that lawsuit, did you hear from any friends you used to have during the time you hung out with Mr. Combs and Cassie?

A.  Yes.

Q.  Who did you hear from?

A.  Tiffany Red.

Q.  And did you hear from any other friend?

A.  Cassie.

Q.  And did you hear from a producer?

A.  Yes, Rob Holladay.

Q.  Was he one of your friends?

A.  He was one of my best friends.

Q.  Did he reach out to you or did you reach out to him?

P64Qcom4

A.   He reached out to me.

Q.   And before this reach-out, what was your relationship with Rob like?

A.   We were cool.  We would hang out all the time.  I'd listen to him make music.  He'd watch me make graphics and art.

Q.   How long had you been friends?

A.   Before Cassie.

Q.   Was Rob also friends with Mr. Combs?

A.   Yes.

Q.   Approximately when was this reach-out from Rob?

A.   Early 2024.

Q.   How did Rob reach out to you?

A.   FaceTime.

Q.   Where was Rob when he FaceTimed you?

A.   It looked like Puff's back yard.

Q.   In what city?

A.   Beverly Hills, California.

Q.   What is the first thing you remember Rob saying to you on the FaceTime?

A.   He said -- he said -- he makes this noise.  He was like "dooooooooo."  He was like "you didn't tell me."

MS. WESTMORELAND:  Objection.  Your Honor, may we have a sidebar?

THE COURT:  You may.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

(At the sidebar)

MS. WESTMORELAND:  Your Honor, I'm going to object on hearsay grounds.  There has been no foundation that Rob called her on behalf of Mr. Combs.  She says Rob Holladay was her friend.  She knew Mr. Holladay before Mr. Combs, and he was one of her best friends.  I believe the prosecutor is about to elicit hearsay of Rob Holladay and her speaking about her lawsuit or any particular complaint or things of that nature, and that Rob Holladay said some things to her, but I don't think the prosecutor laid a foundation that Mr. Holladay was calling as an agent or on behalf of Mr. Combs.  They have their own relationship.

THE COURT:  So it's one objection?  Hearsay.

MS. WESTMORELAND:  Yes.

THE COURT:  So the objection was not previously raised when the question was asked, but it is now being raised.

Ms. Smyser, what is your response?

MS. SMYSER:  Your Honor, I think this is a co-conspirator statement in relation to the hearsay objection. I think she has already talked about Mr. Holladay being friends with Mr. Combs and calling her from Mr. Combs' home.  And what I expect that she is going to say is that we -- she is going to say that he didn't tell me that you were going to sue him, and she understood that to be Mr. Combs, and she is also going to say like what if we can get this done, we can figure this out.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Mr. Combs could essentially pay you a million dollars if we keep the lawyers out of it, and Bana is going to say no, lawyers have to be a part of this. And that after that she never spoke to Rob Holladay again.

So I think that given the content of her statements and that Rob Holladay is speaking about Mr. Combs and the suit and a potential settlement without lawyers, I think it's clear that he is a co-conspirator. But I think separate and apart from that, this also has an effect on the listener and an effect on Bana and her fear of Mr. Combs.

THE COURT: I'm not understanding the co-conspirator basis because at that time there was a civil lawsuit, right?

MS. SMYSER: Yes.

THE COURT: And Mr. Holladay is calling with respect to the civil lawsuit, and essentially asking Bana if she will consider resolving that without lawyers for an amount of a million dollars, right? So how does that fit under the co-conspirator exception?

MS. SMYSER: So, your Honor, obstruction is part of this case, and we expect there to be more evidence in this case about Mr. Combs' awareness of potentially being investigated and not wanting to talk on the phone, for example, not wanting to put things in writing, even before the January call from Mr. Holladay. And so this is an example of the kind of thing that Mr. Combs was doing; he was having his agents reach out to

P64Qcom4

people who would have information on him like Ms. Bongolan and offering to pay them off.  This goes directly to obstruction, and he's a co-conspirator in that respect.

THE COURT:  Even though it's a civil lawsuit?  I mean, you would agree if it was just a communication with respect to the civil lawsuit, then that would not be plausibly linked to the obstruction basis that you're pointing to.

MS. SMYSER:  Correct, but I think all of the circumstances here in which there will be evidence about is that the investigation like was going on at that time.  But I will also say separate and apart.

THE COURT:  Can I stop you just for a second because I think Ms. Westmoreland's point is that that's the foundation that that has not been elicited and put into the record at this point.  Right now all the jury is hearing is that there was a call from Mr. Holladay, and that he was in Mr. Combs' back yard, based on Bana's understanding.  But that's all that has been put into the record.  So the other context -- there may be other context, but that simply has not been admitted.  It may be this witness can furnish some of that background, but you would perhaps have to do it.

What was the second thing you wanted to say?

MS. SMYSER:  I think another basis for admitting this is that Mr. Holladay is acting as an agent of Mr. Combs under 801(d)(2)(D), not simply as a co-conspirator.  I think that

comes out in the conversation between Bana and Mr. Holladay that I just proffered.

THE COURT:  Can you ask some -- without talking about the actual substance of the communication, can you ask some questions to see if the witness can establish a basis on that exception?

MS. SMYSER:  Yes.

THE COURT:  All right.

And by the way, Ms. Westmoreland, you don't have an objection -- even if the communication doesn't come into the extent Ms. Smyser asks the witness about her under -- like her state of mind after the call because if a communication goes to the effect on the listener, to the extent it does, she should be able to elicit testimony about the effect that the communication had on the listener without revealing its substance.

MS. WESTMORELAND:  Your Honor, I would object to it. I don't know why her state of mind would be relevant to a call with Rob Holladay.  And I thought -- I was pretty shocked that the government even went the co-conspirator route.  So I anticipated she was going to try to say agent, which is why I started explaining the whole agent problem from the very beginning.  I don't think she is going to be able to lay the foundation.  We both had 3500, and it says nothing that Mr. Holladay was asking on behalf of Mr. Combs.  She fully

P64Qcom4

established that she has her own relationship with him outside of Mr. Combs.  She knew him before Mr. Combs, and he's one of her best friends.

MS. SHAPIRO:  I thought it was going the one lawyer rule.

THE COURT:  Let's sequence this.

Ms. Smyser, do you have an understanding if you were to ask those threshold questions what the witness would say?

MS. SMYSER:  I think I would need to lead her some, but I think I could establish more about the relationship between Rob Holladay and Mr. Combs and how much she had seen the two of them together.  Obviously, he's at Mr. Combs home that day making the call.

THE COURT:  I don't think it's permissible for you to lead her in that respect.  I think it's just a simple question: What is your understanding of the relationship, if any, between Mr. Holladay and Mr. Combs?  And we'll see what she says.

MS. WESTMORELAND:  Can I say something before you allow her to ask that question?  That's not the problem. Mr. Holladay and Mr. Combs -- she can say he was working with Mr. Combs.  It still has nothing to do with the fact that she has her own relationship, and she testified, hey, I didn't know you filed a lawsuit.  These are two friends talking.  Even if he was employed with Mr. Combs, that doesn't meet the threshold, that doesn't connect that his conversation is on

P64Qcom4

behalf of Mr. Combs.

THE COURT:  I understand that.  Let's see where we get to next, and I'll take it from there.

(Continued on next page)

P64ACom5                        Bongolan - Direct

(In open court; jury present)

THE COURT:  Ms. Smyser, you may proceed when ready.

MS. SMYSER:  Thank you, your Honor.

Q.  Ms. Bongolan, without telling me what Rob said to you, what if anything did Mr. Holladay say about who he was calling on behalf of?

A.  Puff.

Q.  And what if any topic did Mr. Holladay say he was authorized to talk about?

A.  He was trying to talk about settling with me.

Q.  And what if any offer was he authorized to talk to you about?

MS. WESTMORELAND:  Objection.

THE COURT:  That's sustained.

MS. SMYSER:  All right.

Q.  What did Rob say about what he could talk with you about on behalf of Mr. Combs?

MS. WESTMORELAND:  Objection.

THE COURT:  Sustained.

Q.  Ms. Bongolan, how did -- what if any offer from Mr. Combs did Mr. Holladay convey to you?

MS. WESTMORELAND:  Objection.

THE COURT:  That's sustained.

Q.  And how did you feel during the call?

A.  I declined what was offered to me because I felt like --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MS. WESTMORELAND:  Objection.  Nonresponsive.

THE COURT:  That's sustained.

Q.  After the call was done, how did you react?

THE COURT:  Ms. Smyser, I'm going to ask you to move on at this point unless you're prepared to ask some of the foundational questions that we had discussed at sidebar.

MS. SMYSER:  Thank you, your Honor.

Q.  When was the next time you spoke to Mr. Holladay after the phone call?

A.  We never talked again.

Q.  Are you friends anymore?

A.  No.

Q.  At some point after talking to Rob, did the attorney you have now assist you in filing a lawsuit against Mr. Combs?

A.  Sorry.  Could you say that again?

Q.  At some point after talking to Rob, did the attorney you have now assist you in filing another -- assist you in filing a lawsuit against Mr. Combs?

A.  Yes.

Q.  Approximately how long after?

A.  Maybe like month or two.

Q.  What was your lawsuit based on?

A.  The balcony incident.

MS. SMYSER:  Your Honor, could we have another brief sidebar, please.

THE COURT:  Yes.

(Continued on next page)

(At sidebar)

MS. COMEY:  So, your Honor, I think the foundation has been laid for 801(d)(2)(C).  A statement that was made by a person, whom the party authorized to make a statement on the subject.

This witness has now testified that Mr. Holladay told her on the phone that he was calling on behalf of Mr. Combs in order to discuss an offer to settle her case.  He has thus said that he is authorized by the defendant to make a statement on this specific subject.

I think that is sufficient to lay the foundation that this comes in under 801(d)(2)(C).

THE COURT:  Ms. Westmoreland.

MS. COMEY:  And I'll note that your Honor can consider hearsay when deciding whether or not that rule has been satisfied and that threshold has been met.

MS. WESTMORELAND:  You took the words out of my mouth.  That's hearsay.  That's not enough for the foundation.

MS. COMEY:  Your Honor, when deciding whether the preponderance standard has been met under rule 104, you may consider hearsay.

MS. WESTMORELAND:  Your Honor, I would ask you to decide the preponderance standard hasn't been met --

THE COURT:  Hold on.  Without objection, there was testimony that Mr. Holladay called on behalf of Puff.  Right?

MS. WESTMORELAND:  Well, I objected up here to that question being asked, and I thought you gave her permission for her to ask the question anyway.  So I thought I was overruled on that note.  But if I'm wrong, then I'm wrong.

THE COURT:  I don't believe I overruled any objection you made during the last five minutes.

MS. WESTMORELAND:  No, no, no, I wasn't -- I don't mean that --

THE COURT:  No, I'm saying that there was no objection to that specific question that was asked.  So whether it is hearsay or not, there simply wasn't any objection to that question when it was asked and the answer was elicited.

But let's assume for the moment that whether it's hearsay or not, okay.

MS. WESTMORELAND:  Yes, your Honor.

THE COURT:  On that basis, you would agree that the exception that Ms. Comey points to would apply, right?

MS. WESTMORELAND:  I don't --

MS. SHAPIRO:  Your Honor, I don't think we heard the same thing.  I don't think that testimony was elicited.

THE COURT:  Okay.  I'll take a look.  But I understand the exception.

MS. SHAPIRO:  Need to take a look at the --

THE COURT:  Ms. Shapiro, you would agree that to the extent that was hearsay that would be properly admissible, then

that can be considered in determining whether the exception has been satisfied.

MS. SHAPIRO:  If the hearsay was properly elicited, but if it was hearsay, it wasn't properly elicited because we're in front of the jury.  So I don't agree with that.

MS. COMEY:  Your Honor, if I may note.

MS. SHAPIRO:  This isn't a 104 here.

MS. COMEY:  In rule 104(a), the Court must decide any preliminary question about whether a witness is qualified, a privilege exists or evidence is admissible -- that's the question here -- in so deciding, the Court is not bound by evidence rules except those on privilege.  In other words, it doesn't matter whether --

THE COURT:  You don't need to say any other words.  I got you.

MS. SHAPIRO:  But that's for a 104 determination. It's not -- it doesn't mean it's proper to elicit hearsay in front of the jury and then make a determination based on that.

THE COURT:  That's a separate issue whether there was an objection leveled to that question, which there was not because I was there and there was no objection leveled as to that question.  And that's a separate issue because there was no objection raised.

MS. SHAPIRO:  Our recollection differs.

THE COURT:  Let me take a look at the transcript.  I

understand --

MS. WESTMORELAND:  Your Honor, when you look at the transcript, can you go back to when we were here?  Because what I was saying was that when she asked if she could ask the type of questions she could ask, and what she could ask, and she was asking that.  And I was saying, your Honor, I object.  Because you asked me, Ms. Westmoreland, would that question be okay.  And I was like, your Honor, no, I object to that line of questioning.

So I thought you decided what kind of questions she could ask and she went and asked it anyway, but that was over my objection standing here is what I was trying to say.  Which is what I was trying to say, which was the only reason didn't object here.

MS. COMEY:  A couple things, your Honor, my understanding --

THE COURT:  We don't need to have further argument.  I understand the objection.

(Continued on next page)

P64ACom5                        Bongolan - Direct

(In open court; jury present)

THE COURT:  We will spare you from the white noise for a second.  If you hold on one moment, I will review something very quickly and will proceed in a couple of moments.

The objection raised at the sidebar continues to be sustained.

Ms. Smyser, you can move on.

BY MS. SMYSER:

Q.  So, Ms. Bongolan, I think we were just discussing the lawsuit that you filed against Mr. Combs; do you remember that?

A.  Yes.

Q.  And why did you file your suit?

A.  Because I wanted to seek justice for what happened to me.

Q.  And what do you mean when you say what happened to you?

A.  On the balcony.

Q.  Did you write your complaint --

A.  No.

Q.  -- for your lawsuit?

A.  Sorry.  No.

Q.  Who wrote it?

A.  My lawyer.

Q.  And are the words in that complaint, are they the exact same as what you've testified about today?

A.  No.

Q.  Was your testimony today truthful to the best of your

P64AC om5                        Bongolan - Direct

recollection?

A.  Yes.

Q.  Are you aware of how much money is being requested in the suit?

A.  Yes.

Q.  How much?

A.  10 million.

Q.  Did you come up with that number or did your lawyer?

A.  My lawyer.

Q.  Do you expect to receive any money from testifying here in this criminal trial today?

A.  No.

Q.  Would you give any potential money back if it meant that Mr. Combs had never held you up on that 17th floor balcony?

            MS. WESTMORELAND:  Objection.

            THE COURT:  That's overruled.

A.  Yes.

            MS. SMYSER:  Your Honor, may I have just one moment?

            THE COURT:  You may.

            MS. SMYSER:  No further questions.

            THE COURT:  Thank you.  Cross-examination.

            MS. WESTMORELAND:  Yes, your Honor.

            Can you pass one to the prosecution and one to the witness, please.

            MR. DONALDSON:  Your Honor, may I approach the witness

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

box?

            THE COURT:  You may.

CROSS-EXAMINATION

BY MS. WESTMORELAND:

Q.  Good afternoon.

            My name is Nicole Westmoreland and I represent
Mr. Combs.  I need to ask you some questions.  Okay?

            Now, on direct, the prosecutor asked you some
questions regarding immunity.

A.  Yes.

Q.  Okay.  And you testified that it's your understanding that
you have immunity right now for your testimony, true?

A.  Yes, ma'am.

Q.  Okay.  And you testified that from your understanding, what
that means is that you can't be prosecuted for anything that
you testify to today as long as it's the truth; is that
correct?

A.  Could you rephrase that, please.

Q.  Sure.  You testified that you understand that what immunity
means is that you cannot be prosecuted for any crimes that you
discuss or testify to today?

A.  Yes.

Q.  That's your understanding?

A.  Yes.

Q.  And that the only way you lose that protection is if you

P64ACom5                        Bongolan - Cross

lie?

A.  Yes.

Q.  Tell me your understanding who gets to decide if you're lying?

A.  The prosecutor.

Q.  The prosecutors.  All right.

Ms. Bongolan, I want to go back, all right, in time to when you first met Ms. Cassie Ventura.  Okay?

A.  Okay.

Q.  All right.  So you explained that you were working at Young & Reckless?

A.  Young & Reckless, yes.

Q.  Young & Reckless, and that's where you first initially met Cassie, true?

A.  We didn't exactly meet.  We were just in the same facility.

Q.  Right.  So you met her, but you didn't start a relationship yet?

A.  Yes.

Q.  Okay.  And you were a graphic designer there?

A.  Yes.

Q.  And at the time Cassie was a music artist?

A.  I believe so.

Q.  All right.  And after Young & Reckless, that's when you started working with Diamond Supply Company?

A.  Yes, ma'am.

P64ACom5                    Bongolan - Cross

Q.  And would I be accurate to say you started working with Diamond Supply Company in 2015?

A.  Yes.

Q.  Okay.  And I believe you testified that once you started working at Diamond Supply Company, that's where you and Cassie really met?

A.  Yes.

Q.  Okay.  And you were a graphic designer there?

A.  I was the head women's designer.

Q.  You were the head designer.  And Cassie was brought on to the company to co-design?

A.  Yes.

Q.  Okay.  And your job was to get creative ideas out of Cassie's head?

A.  Yes.

Q.  Okay.  And at the time you were paid about $75,000 for that position; is that true?

A.  Yeah.

Q.  And it's your understanding that Cassie was paid more than you?

A.  Just a little bit more.

Q.  Okay.  And at this time Cassie is a music artist, true?

A.  I would say so.

Q.  You would say so; you're not sure?

A.  I wasn't like involved in her world at that time to know.

P64AcOm5                      Bongolan - Cross

Q.  Okay.  So at some time working at Diamonds, it's your understanding that Cassie was a music artist, right?

A.  Yes.

Q.  Okay.  So you also understood at some point that she was signed to Bad Boy, right?

A.  Yes.

Q.  So working and coming up with the design with Diamond, that was a second venture for Cassie, true?

You want me to rephrase it?

A.  Yeah.

Q.  Okay.  Cassie was a music artist, true?

A.  Yes.

Q.  Okay.  And Cassie was doing a design company or doing a design trying to do a clothing line and she was doing that with you, right?

A.  Yes.

Q.  Okay.  So you would agree with me or it would be fair to categorize this as Cassie had two ventures going on at the same time?

A.  Yes.

Q.  Okay.  Now, you and Cassie, you're doing this with Diamond Supply Company, right, the line, the clothing line?

A.  Yes.

Q.  Okay.  And your employer at the clothing line, he made you pretty much the head to deal with everything Cassie, agree?

P64AACom5                       Bongolan - Cross

A.  Yes.

Q.  Okay.  So in order to start getting ideas out of Cassie's head, you needed to spend some time with her, true?

A.  Yes.

Q.  Okay.  And so Ms. Ventura would come up to the office to work and you guys would work on designs, true?

A.  Yes.

Q.  And you would go to Ms. Ventura's house to work on designs, true?

A.  Yes.

Q.  All right.  I want to talk about the first time that you went to Ms. Ventura's apartment, okay?

        I can't hear you.

A.  Yes.

Q.  All right.  So you and Cassie, you were focused on a t-shirt design, right?

A.  There was a lot of things.  Not just t-shirts.

Q.  Were you focused on a t-shirt design?

A.  I mean, there was a shirt.

Q.  Okay.  All right.  So you recall that the first night that you spent the night at Cassie's house, that she called you and asked you to come over; do you remember that?

A.  Yes.

Q.  Okay.  And this was at her Studio City apartment?

A.  Yes.

P64ACom5                      Bongolan - Cross

Q.  Okay.  And that apartment had a pool, true?

A.  Yes, it did.

Q.  Okay.  And once you arrived to Cassie's house -- or apartment, excuse me, you and her decide to do, like, a photo shoot, right?

A.  Yes.  It was a house.

Q.  Okay.  And you suggested to Cassie that she did a photo shoot in the pool, right?

A.  Yeah.  It was like the one area that looked, like, clear.

Q.  The one area that was clear.  In the pool, right?

A.  Yes.

Q.  And you asked Cassie to do this photo shoot in just a t-shirt, true?

A.  That wasn't the first idea, but yes.

Q.  And she did it for you, right?

A.  Yes.

Q.  And it was at that moment that you believed you and Cassie were comfortable with each other?

A.  I mean, could you explain that?

Q.  It's actually your words -- let me ask you.

    Do you recall telling the government that it was at this very moment that I knew me and Cassie was comfortable with each other?

A.  I don't recall, but, yeah.

Q.  Okay.  I'm sorry.  You don't recall, but would you like me

P64ACom5                        Bongolan - Cross

to refresh your memory or that sounds like what you said?

A.   It sounds around it.

Q.   And you spent the night with Cassie that night, right?

A.   Yes.

Q.   And after that night, Cassie would often ask you to spend the night at her apartment, right?

A.   It wasn't right away, but eventually it got there, yeah.

Q.   Okay.  Well, you spent a lot of time at that apartment with Cassie and then later on you ended up spending a lot of time at Comstock, right?

A.   First the house, then Comstock, yes.

Q.   Yes.  That's what I'm asking you.  True?

A.   Yes.

Q.   Okay.  And it got to a point where you were regular spend the night over there; that's fair, right?

A.   Yes.

Q.   And you and Cassie would spend time together doing things, like, you would obviously spend time together designing, true?

A.   Yes.

Q.   And you and Cassie would go shopping?

A.   Occasionally.

Q.   And you and Cassie would go get your nails done?

A.   Occasionally.

Q.   And you and Cassie would go party?

A.   Like, go to parties -- hang out with -- not like go to

parties, but like we would hang out with our friends.

Q. Okay. Do you recall telling the government that you and Cassie would go to a lot of parties?

A. No, I don't recall.

Q. Okay. Let me see if I can refresh your memory.

MS. WESTMORELAND: Can you please pull up, Rob, just for the parties, can you pull up 3508-004, page three.

Please read the highlighted -- please read the area, and when you're finished, just look up at me.

Q. Does that refresh your memory?

A. To some extent.

Q. So you and Cassie would go to a lot of parties together, true?

A. I just feel like it's a little vague.

Q. What's a little vague?

A. The word parties.

Q. Okay. So are you denying that you and Cassie did a lot of partying together?

A. We partied. But going to parties, I didn't go to a lot of parties with her, but we partied.

Q. Okay. Let's word it completely how you're comfortable answering the question.

You and Cassie partied together, right?

A. Yes, ma'am.

Q. Great. Now, you and Cassie would do a lot of drugs

together?

A.  Yes.

Q.  Let's talk about the first time that you and Cassie did drugs together, okay?

A.  Okay.

Q.  All right.  Do you recall at that same photo shoot, the one in the pool in the t-shirt that I just asked you about?

A.  Yes.

Q.  And Cassie asked you that day, it was the first night you were spending the night, and Cassie asked you if you liked to get high; do you remember that?

A.  Yes, ma'am.

Q.  And you liked to get high, so you told her yes?

A.  Yes.

Q.  And you guys got high together, right?

A.  Yes.

Q.  First night?

A.  First night.

Q.  Okay.  And after getting high together for the first night, you would agree with me that you and Cassie started doing a lot of drugs after that, true?

A.  It wasn't right away.

Q.  Okay.  At some point you and Cassie would spend most of your time together getting high; can you agree with that?

A.  Yes.

P64ACom5                          Bongolan - Cross

Q.   Okay.  I want to discuss the drug usage between you and Cassie in a little bit more detail.  Okay?

A.   Okay.

Q.   Now, you recall the government asking you the questions before I came up here, right?

A.   Yes.

Q.   And you listed a few drugs that you and Cassie would do, true?

A.   Yes.

Q.   Okay.  I want to ask you about more.  All right?

A.   Okay.

Q.   You and Cassie would do marijuana together?

A.   Yes.

Q.   Please explain to us how marijuana made you feel?

A.   Fun, happy, sometimes energic, sometimes tired, sometimes hungry.

Q.   Thanks.  You and Cassie would do edibles together?

A.   Occasionally.

Q.   Did you do edibles together or not?

A.   We did.

Q.   Okay.  How did that make you feel?

A.   The same.

Q.   You and Cassie would do cocaine together?

A.   Yes.

Q.   And I think you've already explained to us that cocaine

P64ACom5                      Bongolan - Cross

makes you feel like you have confidence?

A.  Yes.

Q.  All right.  You and Cassie would do ketamine together?

A.  Yes.

Q.  And tell us how ketamine makes you feel?

A.  My opinion, it like opens your mind.

Q.  Opens your mind?

A.  Yes.

Q.  You ever been stuck in a k-hole?

A.  Yes.

Q.  All right.  You and Cassie would do ecstasy together, true?

A.  Randomly.  Not a lot.

Q.  Okay.  How does ecstasy -- how does ecstasy make you feel, Ms. Bongolan?

A.  Like, to say, like, loose, uplifted.

Q.  All right.  You and Cassie did Molly together, true?

A.  Oh, I don't know.

Q.  Would you like -- can I show you something to refresh your memory?

A.  I mean, I'm sure.  But I -- wasn't like an everyday thing.

Q.  All right.  I'm not asking if you did it every day.  I'm just asking if you and Cassie did Molly together?

A.  Yes.

Q.  All right.  And you and Cassie did G together?

A.  One time, yes.

P64AСom5                    Bongolan - Cross

Q.  All right.  Tell us how G makes you feel?

A.  It's hard to recall, because I did it once.  But I feel like it's kind of like being on alcohol without all the, like, negative parts of alcohol.

Q.  Okay.  Do you recall explaining to the government that it makes you feel like you're on alcohol and horny?

A.  Yes, ma'am.

Q.  All right.  You and Cassie did acid together?

A.  Yes.

Q.  All right.  Tell us about that.  How did that make you feel?

A.  That one I don't remember.  It was one time.

Q.  All right.  Percocet?

A.  I did that one time and I threw up and I didn't like it.

Q.  Vicodin?

A.  I mean, that one is like, what, like a pain reliever?

Q.  I'm asking if you and Cassie would do Vicodin together?

A.  Oh, I don't know if we did that together --

Q.  You want me to refresh your memory?

A.  -- we did it.

Q.  I'm sorry.  I didn't hear you?

A.  Like, I did it.  I don't know about her.

Q.  Okay, you and Cassie would do cocoa puff?

A.  Yeah.

Q.  Turn to the ladies and gentlemen of the jury and explain to

SOUTHERN DISTRICT REPORTERS, P.C.

all of us what cocoa puff is?

A.   It's when you take a blunt and you open the blunt and you put weed in there and then you sprinkle cocaine in it.

Q.   Okay.  That was one of your favs, favorites?

A.   Yes.

Q.   Okay.  Cassie liked cocoa puffs too, didn't she, from your understanding?

A.   Yes.

Q.   How does cocoa puff make you feel?

A.   It's like add all the weed feelings and then a little, like, sharp feeling because of the coke.

Q.   Okay.  You would agree with me that you and Cassie had a serious drug problem?

A.   Yeah, we had a problem.

Q.   Okay.  Now, you and Cassie would do drugs together before you met Mr. Combs, true?

A.   Yes.

Q.   And you would sell Cassie drugs, true?

A.   Yes.

Q.   You often sold Cassie drugs?

A.   Yes.

Q.   Well, let's put a timeframe on it.

     You would agree with me that you sold Cassie drugs on at least a weekly basis?

A.   Yes.

P64ACom5                    Bongolan - Cross

Q.  You understood or you were aware that Cassie was also on pills?

A.  Yes.

Q.  All right.  And you did pills with Cassie, true?

A.  No.

Q.  You've seen Cassie do pills?

A.  Yes.

Q.  All right.  And do you recall on an occasion going to get some pills for Cassie; you remember -- well, strike that.

You recall on an occasion going to get hundreds of pills for Cassie at one time; do you remember that?

A.  Yes.

Q.  And you remember that because it was so many pills you were scared, true?

A.  Yeah.

Q.  And you gave them to Cassie?

A.  They were her's.

Q.  They were her's.  And she was happy with you that you brought them for her, right?

A.  I couldn't tell.

Q.  Okay.  Now, the time that you brought Cassie hundreds of pills, you would agree with me that was early on in your friendship, right?

A.  Yes.

Q.  Okay.  So you would give drugs to Cassie, true?

P64ACom5                      Bongolan - Cross

A.   Yes.

Q.   You would sell drugs to Cassie, true?

A.   Yes.

Q.   Sometimes you would just be nice and do drugs with Cassie for free, true?

A.   Could you rephrase the last part.

Q.   Would you sometimes do drugs with Cassie for free? Meaning, she didn't have to buy the drugs from you, you shared?

A.   Yes.

Q.   Okay.  Ms. Bongolan, if you always made Cassie pay for her drugs, you can answer in the negative.  You can say no.

A.   Could you resay that, please.

Q.   You explained to us that you sold drugs to Cassie.  All I asked you is if you ever did drugs with Cassie without making her pay for them?

A.   Yes.

Q.   You often had drug dealers deliver to Cassie, true?

A.   Yes.

Q.   Can you please tell us the drug dealers' names that you had deliver to Cassie?

A.   I can't remember their names.  It was a long time ago.

Q.   Would documents help refresh your memory?

A.   Guess so.

Q.   Do you remember drug dealer Ray J?

A.   I don't know if that's his name.

P64ACom5                      Bongolan - Cross

Q.  Do you remember a drug dealer that you would send to Cassie often by the name of Ray J?

A.  I don't remember that name.

Q.  Okay.  So you have no idea who Ray J is?

A.  I mean, he sounds like that singer, but I don't think it's him.

Q.  Okay.  So let me ask you, at the end of the day, in reference to drugs with Cassie, you would agree with me that you and Cassie did drugs every day?

A.  Not every day.

Q.  Do you remember telling the government, admitting to the government that you and Cassie did drugs every day?

        If you don't, I'll refresh your memory.

A.  I don't remember.

Q.  All right.  Let's refresh it?

        MS. WESTMORELAND:  Can you pull 3508-029, page 29 -- I mean, sorry.  029, page three, second dash.

        Please read that, and once you're done, please look up at me.

Q.  I'll ask you the question again.  Did you and Cassie do drugs every day?

A.  Again, I don't know.  I don't think we did drugs every day.

Q.  Okay.  Did you tell the government you did drugs every day?

A.  I don't remember if I told the government.

Q.  Okay.  You do understand that when you sit down and you

speak with the government, that they're there taking notes?

A.  I understand that.

Q.  Okay.  All right.  So if -- so what's your answer, that you don't recall saying that or you didn't say it?

A.  I don't remember.

Q.  Okay.  So besides you and Cassie getting high daily or weekly, you and Cassie -- you guys were still trying to put out that clothing line together, right?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.  You can rephrase.

MS. WESTMORELAND:  Sure.

Q.  All right.  You and Cassie were trying to put out a clothing line together, true?

A.  I don't know.  Which clothing line?

Q.  I'm talking about the t-shirt clothing line with Diamond Supply Company.

A.  Yes.

Q.  Okay.  And you would agree with me that over a two-year period, you and Cassie finally did get a few clothing lines or t-shirts out, true?

A.  Yes.  We got some collections out.

Q.  All right.  And you would also agree with me that those lines didn't work out, right?

A.  They didn't work out for, like, internal Diamond reasons.

Q.  I understand.  I'm asking you -- and we'll talk about that.

But you agree with me that they did not work out, true?

A. Yes.

Q. And you agree with me that they didn't work out because you and Cassie were competing against people like Beyoncé?

A. Yeah.

Q. And you were competing against people like Rihanna?

A. Yes.

Q. And you would also agree with me that you and Cassie were experiencing a lot of difficulties with Nickey?

A. I don't think it was Nickey himself that was the problem.

Q. Okay. You don't think it was Nickey his self that was the problem. Explain?

A. Well, it was a skate company and we were designing great womens clothes, to be frank, and it was a bunch of skater guys holding up women's clothing, so it wasn't working out internally.

Q. Thank you for explaining that.

So you would agree with me that who did not hold you back is Mr. Combs; that it was the skater mentality at the company, true?

MS. SMYSER: Objection.

MS. WESTMORELAND: I'll rephrase.

Q. You've explained to us that the clothing line didn't work out, true?

A. Yes.

Q.  And you had fierce competitors like Rihanna and Beyoncé, true?

A.  Yes.

Q.  And you had some issues within Diamond Supply Company because they weren't seeing your vision, true?

A.  No.

Q.  Okay.  You had issues with Diamond Supply Company because they were a bunch of skateboarders and you and Cassie was making great female design clothing and they just couldn't see it, true?

A.  I believe they believed in the vision and saw it.  It's just not the -- I don't know how to explain it.

Q.  It just didn't work out?

A.  Yes, ma'am.

Q.  Okay.  But it didn't work out with you and Cassie and the Diamond Supply Company though, true?

        MS. SMYSER:  Objection.

        THE COURT:  It's overruled.

A.  Could you resay that question, please.

Q.  It didn't work out because of issues with Diamond Supply Company, whatever the issues were, true?

A.  Yes.

Q.  And you agree that while you were trying to do this business -- while you and Cassie were trying to do this business, that you guys were having a lot of other

P64ACom5                        Bongolan - Cross

extracurricular activities, right?

A.   Could you explain, please.

Q.   Getting high?

A.   Could you rephrase the whole question, please.

Q.   It's hard to be pretty productive in business getting high every day; you agree with me?

          MS. SMYSER:  Objection.

          THE COURT:  That's sustained.

Q.   All right.  Let me ask you this:  You and Cassie, you would agree with me, that you and Cassie had your own relationship, right, like a friendship?

A.   Yes.

Q.   And you believed you were one of Cassie's best friends, true?

A.   We were close.

Q.   Okay.  You would agree with me that Cassie made you feel like that you and her were really close?

A.   Yes.

Q.   Okay.  And you would agree with me that you explained to us that you didn't even meet Mr. Combs for at least a year later after you first started hanging with Cassie, true?

A.   True.

Q.   Okay.  And although you didn't meet Mr. Combs for a solid year, you and Cassie still hung out pretty often, true?

A.   Yes.

Q.   Okay.  All right.  I want to shift to you actually meeting
Mr. Combs, okay?

A.   Okay.

Q.   All right.  You met Mr. Combs some time in 2016, true?

A.   I don't remember, but probably, yes, around there.

Q.   Okay.  And the first time that you met Mr. Combs was at a
dinner at his house?

A.   Yes.

Q.   And you would agree with me that you came there with
Cassie, right?

A.   Yes.

Q.   And you would agree with me that Mr. Combs was very
standoffish with you, true?

A.   Yeah.

Q.   And you were there, but you were there as Cassie's friend,
right?

A.   Yes.

Q.   Okay.  And, in fact, you just explained to us that you're
still friends with Cassie, right?

A.   Yes.

Q.   I want to ask you about a few of your other friends real
quick.

     You're still friends with Deonte Nash?

A.   Yes.

Q.   And you speak to Deonte Nash?

A. Yes.

Q. When's the last time you spoke to him?

A. He texted me today, but I didn't answer.

Q. Okay. What did he say?

A. I think he was asking what my girl's number was.

Q. Okay. And before today's text, when is the last time that you spoke to Mr. Nash?

A. I want to say after he got off the stand.

Q. Okay.

A. Like not directly after, but around then.

Q. All right. And you guys didn't talk about his testimony?

A. No.

Q. Just avoided that subject?

A. Yeah, we knew, you know, what was going on.

Q. All right. You don't need to talk about it, you know what's going on?

        MS. SMYSER: Objection.

        THE COURT: Sustained.

Q. All right. Well, let me ask you this: You've spoken to Cassie during this trial, true?

A. I haven't talked to her in a couple weeks.

Q. Okay. So you -- have you spoke to Cassie since the trial started?

A. She did text me today, but I did not answer.

Q. Okay. Didn't answer Cassie either?

A.  No.

Q.  What about before today.  I want to know if you spoke to Ms. Ventura while we've been on trial?

A.  Yes.

Q.  Okay.  All right.  And your testimony is that you and Ms. Ventura didn't speak about the testimony either, right?

A.  I just asked how she was doing and I sent her a bathtub she might like.

Q.  Okay.  All right.  Let's talk about your civil lawsuit, okay?

A.  Okay.

Q.  All right.  So in 2023, late 2023, you spoke to Ms. Ventura, and she told you she was about to file a lawsuit against Mr. Combs, true?

A.  Yes.

Q.  Okay.  And you are aware that she did in fact file that lawsuit, true?

A.  Yes.

Q.  And you're aware because you read the lawsuit, true?

A.  Yes, I did.

Q.  And after you read Cassie's lawsuit, you spoke to Cassie, true?

A.  Yes, I did.

Q.  And you spoke to Cassie about her lawsuit, true?

A.  Yes, I did.

P64ACom5                    Bongolan - Cross

Q.  And after you spoke to Cassie about her lawsuit, you went out and you hired yourself a lawyer, true?

A.  Yes.  Yes.

Q.  And you hired Tyrone Blackburn, true?

A.  Yes.

Q.  Okay.  And then you already explained that after Tyrone, you then hired another lawyer, right?

A.  Yes.

Q.  Okay.  And the purpose of you hiring Tyrone Blackburn and the next lawyer was to sue Mr. Combs, true?

A.  It was to seek justice.

Q.  It was what?

A.  To seek justice.

Q.  And your definition of seeking justice was to sue Mr. Combs, right?

A.  Could you explain that further?

Q.  You hired lawyers to sue Mr. Combs; isn't that true?

A.  I did hire a lawyer.

Q.  Okay.  To sue Mr. Combs?

A.  To sue Mr. Combs.

Q.  Okay.  And like Cassie did, true?

A.  For different intentions I would say, but yes.

Q.  Okay.  We'll get to that.

Now, in order for you to -- for these lawyers to represent you, you had to speak to them, right?

A. Yes.

Q. Okay. And without telling me what you told them, you had to explain to them what your allegations were, true?

MS. SMYSER: Objection.

THE COURT: That's sustained.

MS. WESTMORELAND: Okay. I'll try the...

Q. At a high level, you had to explain to these civil lawyers what your issue was, true?

MS. SMYSER: Objection.

THE COURT: Sustained.

MS. WESTMORELAND: Okay.

Q. In order to hire civil lawyers, you had to talk to them, right?

A. Yes.

Q. And these lawyers became your representatives; you hired them, true?

A. Yes.

Q. And you're aware that they acted on your behalf, true?

A. Yes.

Q. And your first lawyer, Mr. Tyrone, he was present in your first interview with the government, true?

A. Yes.

Q. Now, on direct, you were asked about that first interview; do you remember that line of questioning?

A. I remember some, yes.

Q.  Yes.  And you explained to us that you thought it was a meet and greet, right?

A.  Yes.

Q.  And that you didn't know it was what it turned out to be, right?

A.  Yes.

Q.  But when you sat down with the government, they asked you what happened, if anything, true?

A.  Yes.

Q.  And you did a full interview with them, right?

A.  Yes, I did.

Q.  And although you didn't know you were about to do an interview, you still told them whatever -- you answered their questions, true?

A.  Yes.

Q.  And you don't have to practice the truth, right?

A.  No.

Q.  Okay.  So I want to make sure that we understand the timeline.

    November 2023, you're aware that Ms. Ventura filed a lawsuit, true?

A.  Yes.

Q.  And in November in 2023, you were actually working for Cassie during that time, weren't you?

A.  Yeah, for like a month or two.

P64AcCom5                          Bongolan - Cross

Q.  Yeah.  November 2023 and December 2024, true?

A.  Yes.

Q.  So you and Cassie had hooked back up?

A.  Yeah, she wanted to do music or something.

Q.  All right.  You and Cassie hooked back up, true?

        MS. SMYSER:  Objection.

        THE COURT:  That's overruled.

A.  Could you resay the question.

Q.  You and Cassie got back together in November and
December 2023?

A.  Yes.

        MS. SMYSER:  Objection.

        THE COURT:  That's overruled.

        MS. SMYSER:  Your Honor, can we have a sidebar,
please.

        THE COURT:  You may.

        (Continued on next page)

(At sidebar)

THE COURT:  Ms. Smyser.

MS. SMYSER:  Ms. Westmoreland has been implying improper sexual innuendo between Ms. Bongolan and Ms. Ventura throughout this testimony, including based on their first photo shoot in that Ms. Bongolan would sleep over at Ms. Ventura's house a lot.  And there were several questions about that in the beginning of her testimony.

Here, she continues to use the words "hook up" when she could ask if they -- which is why I objected, your Honor. And they "got back together," which is again why I objected.

I think it's perfectly proper to ask Ms. Bongolan if they were working together or if they were talking.  But I think Ms. Westmoreland should stay away from that sexual innuendo.

MS. WESTMORELAND:  It definitely was not an innuendo for sexual contact at all.  If you don't want me to use the word "hook up," I take no issue with it.  But I wasn't trying to infer anything.

THE COURT:  I didn't understand you to be making any sexual innuendo.  However, let's see if we can reformulate some of these questions.

MS. WESTMORELAND:  Sure.

THE COURT:  To make it a little bit easier.

MS. WESTMORELAND:  Sure.

THE COURT:  So there's no misimpression to what you're asking.

MS. WESTMORELAND:  Your Honor, I do want you to know that a lot of times, a lot of the phrases I'm using is her words, and I'm making sure I'm using her words so she has to answer the question in the affirmative.

THE COURT:  We don't need to do that.

MS. WESTMORELAND:  Okay.

THE COURT:  Ask them in a way there won't be any misimpression by the jury as to what you're asking.  If you have an exhibit that you're using and it uses particular language, that's obviously fair game.  But other than that, let's try to -- the only other thing I will say is we have a very soft spoken witness.  If at any time you would like the witness to speak up or anything like that, just ask me and that way I can provide an appropriate instruction to the witness.

MS. WESTMORELAND:  Thank you.  I appreciate it because I am having trouble hearing her.

THE COURT:  And what I want to avoid is the questioning attorney giving any kind of instruction to the witness, because I would like it just to be formal through me.

MS. WESTMORELAND:  Thank you.

THE COURT:  Okay.

(Continued on next page)

P64AСom5                        Bongolan - Cross

(In open court; jury present)

MS. WESTMORELAND:  Thank you.

BY MS. WESTMORELAND:

Q.  So you and Cassie, I'm in November and December 2023.
Okay?

At this point, you and Cassie are talking to each
other again, true?

A.  Yes.

Q.  Because you and her are working with each other again,
right?

A.  Yes.

Q.  And you and Cassie, you're discussing lawsuits, true?

A.  Not while we were working.

Q.  Okay.  So you remember I just asked you a little bit ago if
Cassie called you at the end of 2023 right before filing her
lawsuit and you said yes?

A.  Yes.

Q.  All right.  And you are aware that Cassie filed her lawsuit
November 2023, true?

A.  Yes.

Q.  And you were working with Cassie in November 2023, true?

A.  Yes.

Q.  And you spoke to Cassie right before she filed her lawsuit
and right after she filed her lawsuit, true?

A.  Yes.

P64ACom5                        Bongolan - Cross

Q. When you and Cassie were speaking, you were speaking about her lawsuit, true?

A. True.

Q. And you and her were discussing claims, past potential claims against Mr. Combs, true?

A. Could you explain that more.

Q. You and Ms. Ventura was discussing what you guys can maybe sue -- that you and Ms. Ventura could sue Mr. Combs?

A. I kept my matter very private.

Q. So you didn't tell Ms. Ventura why -- you didn't tell Ms. Ventura you were going to sue Mr. Combs; is that what you're saying?

A. I didn't tell any of my friends.

Q. Okay. Let's talk about that. When you and Cassie spoke before she filed her lawsuit, did you and Cassie speak anything in reference to some balcony incident?

A. She had asked for my permission to put my name in her lawsuit.

Q. And you said no?

A. And I said no.

Q. All right. And then Cassie filed a suit, right?

A. Yes.

Q. And then right after Cassie filed a suit, you filed a suit, true?

A. Not right after.

Q.   Okay.  You filed -- you hired lawyers in January, true?

A.   True.

Q.   But isn't it true that before you filed your suit, you and Cassie spoke right there at the end of the year; that's where I am, okay?  Yes?

A.   Yes.

Q.   And you guys talked about this balcony story, true?

A.   Yes.

Q.   And Cassie said, hey, this happened at a hotel, right?

A.   She didn't say it like that.

Q.   Right.  She said something about a hotel, true?

A.   Yes.

Q.   And you said, no, what about your apartment?

            MS. SMYSER:  Objection.

            THE COURT:  Hold on.

            Ms. Westmoreland, I think you need to rephrase that question.

            MS. WESTMORELAND:  Yes.

            THE COURT:  Re-ask it.

            MS. WESTMORELAND:  Yes.

Q.   You mentioned a -- you told Cassie -- you and Cassie discussed locations of where you would say this happened, true?

            MS. SMYSER:  Objection.

            THE COURT:  That's overruled.

A.   Yes.  Sorry.

P64ACom5                        Bongolan - Cross

Q.  Cassie was saying hotel, you were saying your apartment has a balcony, true?

A.  I didn't say it like that.

Q.  Okay.  Cassie said hotel, you said apartment?

A.  Yes.

Q.  And Cassie's apartment had a balcony, true?

A.  Yes.

Q.  And you and Cassie were discussing potential dates, true?

A.  Yes.  But just the way you say it...

Q.  Well, you said, you suggested one date, she suggested another, true?

A.  Yes.

        MS. SMYSER:  Objection.

        THE COURT:  Grounds?

        MS. SMYSER:  Form, your Honor.

        THE COURT:  That's overruled.

Q.  True?

A.  Resay the question again.

Q.  You answered it already.

        All right.  You and Cassie were discussing who you would say was there?

        MS. SMYSER:  Objection.

        THE COURT:  It's overruled.

A.  Yes.

Q.  Cassie suggested Tiffany Red, true?

A.   Yes.

Q.   You said no, your ex-girlfriend, true?

A.   True.

Q.   You and Cassie discussed on whether you would say whether Cassie saw it or not, true?

A.   I don't remember.

Q.   You don't remember?

A.   No.

Q.   All right.  Cassie told you she never saw you get hung over a balcony, true?

A.   She did tell me she saw me.

Q.   She told you she did?

A.   Yes, ma'am.

Q.   Okay.  Didn't you tell the government that you had to tell Cassie that she saw you over a balcony?

A.   I don't remember what I told them.

Q.   I'm sorry.

        MS. WESTMORELAND:  Your Honor, I'm sorry.  I can't hear the witness.

A.   I do not remember what I said.

Q.   Okay.  Well, I'll refresh your memory.  But let me ask you, did you and Cassie have a conversation and Cassie told you she did not see you get hung over a balcony?

A.   I don't remember.

        MS. WESTMORELAND:  All right.  Let's pull up 350-8021.

Mr. Rob, please go to page nine for us.  This is just for the parties and the witness, please.  Right here.  Let's make that big for the witness, please.

Q.  Please read this page and when you're finished, just look up at me.

All right.

THE COURT:  Ms. Westmoreland, can you also put up page eight.

MS. WESTMORELAND:  Sure.  Can you please put up page eight.

Q.  You done?

A.  Yes.

MS. WESTMORELAND:  Mr. Rob, you can take it down.

Q.  You told Ms. Ventura she was there?

A.  She was there.

Q.  But you told her that; she didn't recall that, true?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

Q.  And you Cassie had all of these conversations in November and December of 2023, true?

A.  We had conversations.

Q.  The conversations I just asked you about?

A.  I don't know if they were all the conversations you were asking about.

Q.  I'm sorry.  I didn't understand.

A.  I don't know if it was all the conversations you were asking about.

Q.  Okay.  Well, let me ask you this:  You and Ms. Ventura had the conversation in reference to dates, potential locations, individuals there, and who saw or did not see what all in the months of November and December, true?

MS. SMYSER:  Objection.

THE COURT:  On form grounds or something else?

MS. SMYSER:  Yes, your Honor.

THE COURT:  Ms. Westmoreland, can you rephrase the question.

MS. WESTMORELAND:  Absolutely, Judge.

Q.  You and Cassie had a conversation in reference to the questions that I just asked you about; you had these conversations in November and December of 2023, true?

MS. SMYSER:  Objection.

THE COURT:  Overruled.

A.  I don't know if I had all the conversations you were asking for.

Q.  All right.  Let me see if I can refresh your memory a little bit.  Okay?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

Q.  All right.  May I show you something to refresh your memory.

MS. SMYSER:  Objection.

THE COURT:  Why don't we put up -- if you want to do something, just do it.

MS. WESTMORELAND:  Sure.

Can you please pull the document, Mr. Rob, that you just had up.

Q.  Can you look at that, and then when you're finished, let me know.

Isn't it true that -- you can take it down.

Isn't it true that you told the government that you spoke to Ms. Ventura before she filed her lawsuit and pretty quickly after she filed her lawsuit, true?

MS. SMYSER:  Objection, your Honor.

THE COURT:  Needs to be rephrased.

MS. WESTMORELAND:  All right.

Q.  You spoke to Ms. Ventura before she filed her lawsuit, true?

A.  Yes.

Q.  Ms. Ventura told you she was going to file a lawsuit, true?

A.  Yes.

Q.  Ms. Ventura filed that lawsuit in November 2023, true?

A.  Yes.

Q.  You and Ms. Ventura discussed the details of the lawsuit, true?

A.  Can you explain that one again?

P64ACom5                        Bongolan - Cross

Q.  I asked you the question:  You and Ms. Ventura spoke about this alleged balcony incident, true?

A.  Yes.

Q.  And you discussed things like dates?

A.  Yes.

Q.  Locations?

A.  Yes.

Q.  Who was there or not there?

A.  Yes.

Q.  And then you went out and you hired a civil lawyer in January 2024, true?

A.  Yes.

Q.  All right.  Now, you've agreed with me that you saw this case, this case meaning Mr. Sean Combs' case, on the news, right?

A.  Yeah.  It's everywhere.

        MS. WESTMORELAND:  I'm sorry.  I can't hear her, Judge.

A.  Yes.  It's everywhere.

Q.  It's everywhere.  All right.

        So you agree with me that you're watching this case on the news and you are communicating with individuals that's testified at this trial, true?

        MS. SMYSER:  Objection.

        THE COURT:  That's sustained.

Q.  All right.  I want to talk to you about some of the things you testified to today.  Okay?

A.  Okay.

Q.  All right.  I think the first thing that you told us about was that you were on FaceTime with Ms. Ventura, true?  And that you saw that Ms. Ventura had a black eye?

A.  Yes.

Q.  Okay.  And you said that this was the first time you ever seen any sign of violence, true?

A.  Yes.

Q.  Okay.  All right.  And you weren't there when Ms. Ventura received this black eye, right?

A.  I was not there.

Q.  I'm sorry, what?

A.  I was not there.

Q.  Okay.  All right.  So you were with Ms. Ventura for 2015 and some of 2016 and you didn't see any signs of violence with Ms. Ventura, true?

A.  Could you explain that?

Q.  Sure.  You've already explained to us that you were around Ms. Ventura for over a year before you even met Mr. Combs, true?

A.  Yes.  Yes.

Q.  All right.  You saw -- when are you claiming to see -- when are you claiming that you had the FaceTime that you saw the

P64ACom5                         Bongolan - Cross

black eye?

A.    Like around The Perfect Match time.

Q.    Which was when?

A.    I don't -- I don't know the exact date.

Q.    All right.  Do you remember telling the government you saw this around May 2016?

A.    I don't remember.

Q.    Okay.  You agree that it was some time -- you agree that movie was 2016?

A.    I don't remember the date of the movie.

Q.    I'm not asking the date.  I'm just asking the year.

A.    Yeah.  Like, I mean, I don't know the exact year.

Q.    Okay.  You would agree that you and Cassie were around each other for at least a year or better before this happened, true?

A.    I don't know if it was a full year.  Maybe.

Q.    Significant amount of time?

A.    Yeah.  I don't know the dates, so.  But, yeah, we were around each other.

Q.    Okay.  All right.  And then you talked to us about Cassie's 29th birthday party?

A.    Yes.

Q.    Now, on direct -- well, let me ask you this:  You understood this was a surprise birthday party?

A.    I don't remember.

Q.    Okay.  You remember going to a restaurant?

P64ACom5                     Bongolan - Cross

A.   I don't remember.

Q.   You remember going to karaoke?

A.   That I do remember.

Q.   Okay.  What drugs were you doing that night?

A.   I don't remember.

Q.   Okay.  You testified on direct that you saw or maybe kind of saw Mr. Combs and Ms. Ventura fighting.  It would be more accurate to say arguing, true?

          MS. SMYSER:  Objection.

          THE COURT:  That needs to be rephrased.

Q.   You didn't see Ms. Ventura and Mr. Combs physically fighting at the birthday party, did you?

A.   I did not see them physically fighting.

          (Continued on next page)

P64Qcom6                       Bongolan - Cross

BY MS. WESTMORELAND:  (Continued)

Q.  And then you testified about a knife situation, do you remember that?

A.  Yes.

Q.  Okay.  And you said that Cassie was in the hallway?

A.  Yes.

Q.  And that -- you said that Mr. Combs came in, you were sleeping?

A.  Yes.

Q.  Okay.  All right.  So you say you were sleeping.  Mr. Combs came in.  And that Cassie was in the hallway, right?

A.  Yes.

Q.  Where was Mr. Combs?

A.  I only remember him around the entrance of the door.

Q.  All right.  So he came in entrance of the door, Ms. Ventura is in the hallway, and he threw a knife at her?

A.  Yes.

Q.  So he just walked in the door with a knife?

A.  I don't know.

Q.  You're not sure?

A.  I'm not sure.

Q.  You telling the truth?

A.  Yes, ma'am.

Q.  You remember telling this story before?

         MS. SMYSER:  Objection.

P64Qcom6                    Bongolan - Cross

THE COURT:  Sustained.

Q.  Are you being honest?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

Q.  Okay.  Your testimony is that -- is what you just told us; that Ms. Ventura was in the hallway.  Mr. Combs was at the entrance front door, and that he just came in, threw a knife, true?

MS. SMYSER:  Objection.

THE COURT:  That's overruled.  You can answer.

A.  I don't know like the -- like -- like the -- how it happened.  I just saw what I saw.

Q.  Okay.  You've talked about this story before, true?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

Q.  You talked about this allegation before, true?

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

Ms. Westmoreland can we be a little more specific about what we're talking about here?

MS. WESTMORELAND:  Sure.

Q.  You have spoken with the government about this alleged knife throwing incident, true?

A.  Yes.

Q.  Now, the first time that you spoke with the government,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P64Qcom6                         Bongolan - Cross

isn't it true that you told the government that Ms. Ventura and

Mr. Combs would get in knife fights, plural, sometimes, isn't

that true?

A.   I don't know that.

Q.   Okay.  All right.  Let me show you.

        MS. WESTMORELAND:  Mr. Rob, can you pull up 3508-003,

page 3, paragraph 3, second sentence.  It's the first sentence

right here.  Thank you -- second sentence.

Q.   Please read that to yourself and then look up when you're

finished.  All right.  Now can you answer my question?

A.   Can you restate the question, please?

Q.   Sure.

        You told the government in the first interview that

Mr. Combs and Ms. Ventura would just throw knives at each

other, plural, sometimes in fights.  You said it like it

happens all the time?

        MS. SMYSER:  Objection.

        THE COURT:  That's sustained.

Q.   You told the government that sometimes Mr. Combs and

Ms. Ventura would have knife fights, plural, true?

A.   I don't remember.

Q.   All right.  You do understand that someone is there to --

that when you meet with the government, do you recall someone

there taking notes?

A.   Yes.

Q. So they ask questions. You give answers, true?

A. Yes.

Q. Okay. Regardless, you're now saying that you saw it happen one time, right?

MS. SMYSER: Objection.

Q. Okay. You testified today you saw it once, true?

A. Yes.

Q. Okay. And when you said that -- when you met with the government on a different occasion, didn't you explain that this happened in the kitchen?

A. I was like suggesting maybe where the knife came from because I don't know where it came from.

Q. Because it wouldn't make sense for Mr. Combs to walk in the front door and just throw a knife. Do you agree with that?

MS. SMYSER: Objection.

THE COURT: That's sustained.

Q. So you told the government that the -- probably the kitchen because 0not because that's what you saw but because that made sense to you?

A. Because I didn't remember.

Q. Okay. So you really don't remember this incident, true?

MS. SMYSER: Objection.

THE COURT: That's overruled.

A. Could you restate the question, please?

Q. You really don't remember this?

P64Qcom6                         Bongolan - Cross

A.  I just saw the knife get thrown, and the knife get thrown back.

Q.  Okay.  All right.  So you saw a knife get thrown.  You didn't call the police, right?

A.  Nope.

Q.  You didn't immediately leave the house?

A.  No.  He left.

Q.  Okay.  You weren't worried that he could come back?

A.  I guess not.

Q.  And you testified that Mr. Combs would just come over, and he would just get in the house and you didn't even know how, true?

A.  Yes.

Q.  So you saw this person come in, get in the door, you don't know how he gets in, he throws a knife, and once he left, you just were no longer worried?

        MS. SMYSER:  Objection.

        THE COURT:  Overruled.

A.  I don't remember how I felt then.

Q.  Okay.  All right.  Let's talk about you told us that Mr. Combs threatened -- well, you told us that Mr. Combs said at a photo shoot, "I can kill you."  Do you remember that?

A.  Yes.

Q.  The government showed you that picture.  Do you remember that exhibit they showed you?

A.   Yes.

Q.   And it was a photo shoot, right?  Do you remember?

A.   Yes.

Q.   I could show it to you.  It had a date on it.  Do you remember that?

A.   Yes.

Q.   Now, you told the photo shoot allegations before, true, when you were speaking -- when you spoke to the government, you told them about that, right?

A.   Yes.

Q.   Did you realize that you told the government that this happened at a party, not a photo shoot?

          MS. SMYSER:  Objection.

          THE COURT:  Sustained.  That needs to be rephrased.

Q.   All right.  Did you tell the government that this happened at a party, that Mr. Combs said, "I'm going to kill you" at a party or "I could kill you" at a party?

A.   I don't remember.

Q.   Okay.  All right.  Let me ask you this:  You met with the government -- the first time you met with the government was January 18, 2024.  Do you recall that?

A.   I don't remember.

Q.   Okay.  Let me show you.

          MS. WESTMORELAND:  Please pull 3508-003 and go to the date, please.  It should be -- no, go to page 2, and go to the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

first paragraph, first sentence, first line, please.  You can highlight the date, please.

Q.  Ma'am, when you finish, please look up at me.  You done?  All right.

You spoke with the government on January 18, 2024, true?

A.  True.

Q.  And, ma'am, you didn't tell the government that Mr. Combs told you he could kill you?

A.  I don't remember.

Q.  You don't remember?  I can let you read your document and see --

THE COURT:  That's sustained.

MS. SMYSER:  Objection.

Q.  Let me ask you this:  Mr. Combs saying "I can kill you," that would be something really important to tell the government.  Do you agree with that?

A.  Yes.

Q.  Okay.  And I just want to make sure I'm clear, you don't remember if you told the government that or not?

A.  I remember telling them.  Just I don't remember when we met.

Q.  So you agree with me that you may have done your first interview and didn't mention that at all to the government?

A.  Could you explain that question again?

Q.  All right.  You agree with me that you could have had an interview, the first interview with the government and for some reason did not mention that Mr. Combs said, "I could kill you"?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

Q.  All right.  Let me ask you this:  Your lawyers filed a civil lawsuit, true?

A.  Yes.

Q.  Okay.  And you had a lawyer -- you also had a lawyer that sent out some demand letters.  You told us about that, true?

A.  Yes.

Q.  And isn't it true that in your first demand letter dated January 31, 2024, you said it was alleged that Mr. Combs said "I can kill you" while you were hanging over the balcony, true?

A.  My lawyer said that.

Q.  And that was not true, was it?

A.  Those are not my words.

Q.  Those are not your words because Mr. Combs, he didn't do that, right?

A.  He did.

Q.  He did?

A.  Just not at the same time.

Q.  Right.  And although you knew that wasn't true, from -- what your lawyer put, you knew that was a lie, but you repeated that lie about "I'm going to kill you," true?

P64Qcom6                        Bongolan - Cross

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

Q.  All right.  Ma'am, you didn't -- let's do some timelines.

You met with the government January 18, 2024, true?

A.  True.

Q.  Okay.  And your demand letter went out January 31, 2024, true?  I can show it to you?

MS. SMYSER:  Objection.

Q.  Your demand letter went out on -- are you aware that your demand letter went out January 31, 2024?

A.  I'm not aware.

Q.  All right.  Let me see if I can show you.

MS. WESTMORELAND:  Can you please pull --

MS. SMYSER:  Objection, your Honor.

THE COURT:  Let's have a very brief sidebar.

(Continued on next page)

(At the sidebar)

THE COURT:  Ms. Westmoreland --

MS. WESTMORELAND:  Yes.

THE COURT:  -- do you have an anticipated ballpark estimate on timing on this cross?

MS. WESTMORELAND:  Umm...

THE COURT:  Is it more or less than 15 minutes?

MS. WESTMORELAND:  It's more.

THE COURT:  Is it more or less than 45 minutes?

MS. WESTMORELAND:  Mmm, probably right around that time.  I'm not good at this, but I know I'm over halfway.  I don't even know how long I've been doing it here.

THE COURT:  Ms. Comey, there was an issue raced about Mr. Santos.  If it was with scheduling him, is that the issue?

MS. COMEY:  No.  Mr. Santos is local.  It is not a travel issue.  We were hoping to get him on the stand today. I realize that's not possible, but if we can stay a little later today to try to move this along so that we can get to Jane as quickly as possible.

THE COURT:  Yes.  As to the objections, here's the deal:  The areas of inquiry that you are focusing on are proper and in fact were anticipated by the government in their direct examination.

The mode of questioning is what the government is objecting to.  And so if you could help me out and just try to

clean the questions up a little bit so that there is not any lack of understanding on the witness's part, that would be much appreciated because I think that's where the objections are coming from, and that's causing this to kind of go a little longer because I'm having to ask for the question to be rephrased, and I would like to avoid that moving forward.  Is that fair?

MS. WESTMORELAND:  Yes, your Honor, I would absolutely try.  But I would ask your Honor, as far as this line of questioning, to let her read her first interview because she can't answer the questions because I'm not allowed to refresh her.

THE COURT:  No one said you don't -- you can't refresh the witness's recollection.  I think it's the preambles, the questions that the witness may not be telling the truth.  Those things are improper.  If it continues, I'm going to ask you to move on from lines of questioning that you otherwise would be able to go into.  Okay?  Is that fair?

MS. WESTMORELAND:  Okay.

MS. SMYSER:  Your Honor, just one note, if I may, on the refreshing.  I did object to the refreshment here because the witness said I don't know.  There has been some refreshing that has taken place after the witness said I don't remember.  That is what needs to happen before Ms. Westmoreland refreshes her recollection with the notes.

THE COURT:  That's fair.  Do you understand the objection?  The objection is that you first need to ask the questions to establish that the witness does not have a recollection of things.  And then if that is true, you can show the witness a document and attempt to refresh her recollection, all right?  That was the objection.  All right?

Is there anything are further

MS. SHAPIRO:  Yes, your Honor.  Just for clarification, I don't know if it was the form.  I think it's perfectly proper as long as the form is simple, clear, for the cross-examiner to ask the witness simply, you, know are you lying here today, or you're lying here today, aren't you?  That's perfectly proper question during cross-examination as long as it's not convoluted by other things that make the question complex or compound or something like that.

THE COURT:  Well, I think that there's a way to ask that question that would be proper, but it's the way in which these questions are being asked that I think has an argumentative tone, and I'm understanding that's the reason for the objection, not necessarily the inquiry as to whether the witness is telling the truth or not, which I agree with you, you can confirm that the witness is in fact telling the truth because that's what we're here to do.

MS. SHAPIRO:  So just to be clear, you're just talking about tone.

P64Qcom6                         Bongolan - Cross

MS. WESTMORELAND:  I got it.

MS. COMEY:  I was going to say, our objection is both: The argumentative nature of the questions and also the injection of counsel's commentary and times almost testifying about what's in documents or what documents say and what happened at events.

THE COURT:  It's both.  We're going to avoid that.  I agree with what you are saying, and you can proceed on these areas of inquiry.

(Continued on next page)

P64Qcom6                      Bongolan - Cross

(In open court)

THE COURT:  Ms. Westmoreland, you may proceed.

Q.  You agree with me that you met with the government on January 18, 2024, true?

A.  Yes.

Q.  And you agree with me that the first time you made the allegation of Mr. Combs saying he could kill you was in your demand letter dated January 31, 2024, true?

A.  Could you rephrase that question again?

Q.  Yes.  You didn't tell that to the government, but your lawyer said that in his demand letter, true?

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

A.  Could you say the question again?

Q.  Yes.  Isn't it true that the first time that you alleged that Mr. Combs said he could kill you was by way of your lawyers in a demand letter on January 31, 2024, true?

A.  It was in a demand letter.

Q.  Yes.  And that demand letter was dated after your interview with the government January 18, 2024, true?

A.  I don't know.

Q.  May I -- I'm going to show you a document.

A.  Okay.

Q.  All right.

MS. SMYSER:  Objection, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P64Qcom6                    Bongolan - Cross

THE COURT:  Is there an objection?

MS. SMYSER:  Yes.

THE COURT:  That's overruled.

MS. WESTMORELAND:  Will you please pull 005, page 1. Take me to paragraph two.  Can you please go to like third sentence from the bottom.  Actually, you can just let her read that.

Q.  Ma'am, when you finish reading, just look up at me.

A.  The whole thing?

Q.  Sure.

A.  Or the highlighted part?

Q.  Why don't you read the -- you can read the paragraph?

THE COURT:  Ms. Bongolan, you should read as much as you feel you need to read.  Then just look up when you're done.

THE WITNESS:  Thank you.

MS. WESTMORELAND:  All right.  You can take it down, Mr. Rob.

Q.  Isn't it true that in your lawyer's demand letter, it was alleged that Mr. Combs said he could kill you while hanging you over a balcony?

A.  In this letter, it says it.

Q.  Yeah.  And you knew that wasn't true?

A.  I know it's not true.

Q.  Okay.  And you had met with the government before this demand letter went out, true?

A.   Yes.

Q.   You didn't tell them anything about Mr. Combs said that he could kill you, true?

A.   I don't know.

Q.   Okay.  And Mr. Tyrone -- that lawyer, he was at that first interview, true?

A.   Yes, he was there.

Q.   Okay.  And after that -- after that letter -- that demand letter went out with those untruths, did you do anything to try to fix that?

A.   I let him go.

Q.   Okay.  Now, you knew that what was in that demand letter was not true, but isn't it true that after that demand letter, that's when you told the government that Mr. Combs said he could kill you?

         MS. SMYSER:  Objection, your Honor.

         THE COURT:  Overruled.

A.   I don't remember when I told them.

Q.   Okay.  You'd agree with me that Mr. Combs told you that you were giving Ms. Ventura too much drugs, right?

A.   Could you restate that question, please?

Q.   Mr. Combs told you that you were giving Ms. Ventura too much drugs, true?

A.   I don't remember when he said that.

Q.   Okay.  Mr. Combs asked you to stop giving Ms. Ventura

drugs?

A.  I don't remember him saying that.

Q.  Okay.  Well, let me ask you this:  Drugs were expensive weren't they?

A.  They are expensive.

Q.  They were expensive then too, right?

A.  Yes.

Q.  Now, you said they are expensive, meaning currently?

A.  I don't know.

Q.  Okay.  All right.  So when you were doing drugs, oftentimes you would run out of money for drugs, true?

A.  I don't know if I looked at it like that.

Q.  Okay.  Do you recall telling the government that oftentimes you'd run out of money for drugs?

A.  I don't remember.

Q.  Okay.  Let me see if I can show you something.

        MS. WESTMORELAND:  Will you please pull 3508-023, Mr. Rob?  Let's go to page 6.  I think the first dash.

Q.  When you're finished, look up at me.

        Isn't it true that you previously told the government you couldn't afford your drug habit?

A.  Yes.

Q.  And Cassie would cover the money that you needed to buy drugs, true?

A.  Yes.

P64Qcom6                    Bongolan - Cross

Q.   You and Cassie had a drug partnership?

A.   Could you rephrase that?

Q.   Sure.  Drug partnership, meaning you would get the drugs, Cassie would pay for the drugs?

A.   Yes.

Q.   And part of your income, how you supported yourself was Cassie buying drugs from you, true?

A.   It was not my full income.

Q.   I asked you if part of your income was from Cassie buying drugs from you, true?

A.   A part of my income, yes.

Q.   Okay.  And so it was hard for you to stop this drug partnership with Ms. Ventura because you were financially dependent on it, true?

        MS. SMYSER:  Objection.

        THE COURT:  That's sustained.  Can you rephrase?

Q.   Let's discuss this balcony allegation, okay?

A.   Okay.

Q.   All right.  Now, before testifying today, you've spoken about this allegation several times, true?

A.   Yes.

Q.   Okay.  And I want to make sure that I'm right.  You had an interview with the government.  We spoke considerably about your first interview that was January 18, 2024, okay, true?

A.   Yes.

P64Qcom6                       Bongolan - Cross

Q.  And then you met with the government again on March 27, 2025, true?

A.  I don't remember the date, but I met with them.

Q.  Okay.  And you met with the government again on 4/9/2025, true?

A.  Yes, I don't remember the date, but I met with them.

Q.  All right.  What about recent dates, do you recall meeting with the government on 5/25/2025?

A.  That wasn't that long ago.  Yeah, I met with them.

Q.  Okay.  Well, do you recall meeting with the government on June 2, 2025?

A.  Yeah, that was not that long ago.

Q.  Do you recall meeting with the government on June 3, 2025?

A.  Yes.

Q.  Do you recall meeting with the government June 4, 2025?

A.  Yes.

Q.  Today?

A.  I'm sorry, saying dates are hard.  I mean, I'm with them right now.

Q.  Okay.  All right.  And your -- you agree that you spoke about these -- the alleged balcony incident with the government during those interviews, true?

A.  Yes.

Q.  All right.  And we've spoken about your civil lawsuit, true?

P64Qcom6                    Bongolan - Cross

A.   Yes.

Q.   And you would agree with me that the letter that -- one demand letter went out January 31, 2024?

A.   Yeah, one demand letter went out.

Q.   Do you remember -- do you recall -- you're aware a second letter went out on February 21, 2022?

          (Reporter inquires)

Q.   2024.

A.   Could you say all that again?

Q.   That a second letter from your lawyer went out on February 21, 2024?

A.   I don't recall.  I do know a letter went out.

Q.   Okay.  And you recall that you actually filed a civil lawsuit, you recall that, right?

A.   Yes, ma'am.

Q.   And you filed that in November of '24, true?

A.   True.

Q.   And you would agree with me that allegations of this balcony situation were in your civil documents, true?

A.   Yes.

Q.   All right.  Today you testified that you were sleeping at Ms. Ventura's house, right?

A.   Yes.

Q.   And that Mr. Combs came over, true?

A.   Yes.

Q.  Started banging at the door?

A.  Yes.

Q.  Started yelling from the door -- from outside the door?

A.  I don't remember.

Q.  Isn't it true in your first interview that you told the government this was a party, not that you were sleeping?

A.  I don't recall that.

Q.  Okay.  Let me show you something.

        MS. WESTMORELAND:  Can you please pull up document 004, page 4, paragraph three.  I'm on the third line.  Can you highlight the third line?

        THE COURT:  Ms. Bongolan, read what you need to read, and when you're ready, just look up, okay?

        MS. WESTMORELAND:  Thank you, your Honor.

Q.  You ready?  Okay.

        You recall telling the government that this was a party, and you guys were just hanging out?

A.  It sounds like two different things.  I don't remember saying a party.  I remember hanging out.

Q.  Okay.  What you -- when you say you remember it, what you just read does not refresh your memory?

A.  No.

Q.  And you do understand that when you were doing that interview and every other interview that the government is taking notes of what you say, right?  You understand that?

A.  Yes.

Q.  Okay.  All right.  Now, isn't it true that you didn't say that you were in the house sleeping until your civil complaint filed in November of 2024, true?

A.  I don't remember.

Q.  You agree with me that at a party and sleeping at Ms. Ventura's house is two different claims?  They're different.  You agree with that, right?

A.  Yeah, they sound different.

Q.  Okay.  All right.  You agree with me that in your first interview with the government, you told them that your girlfriend was just in the bathroom, not that you told your girlfriend to go hide in the bathroom.  Do you recall that?

A.  My ex-girlfriend.  And I don't remember.

Q.  Okay.  Do you recall not telling the government that you told your girlfriend shhh?

A.  I don't remember.

Q.  Well, isn't it true that the first time you spoke with the government, you made this balcony allegation, you spoke to them about this, true?

A.  Yes.

Q.  And isn't it true that in that interview you never said that Mr. Combs came over, banging and yelling at the front door, isn't that true?

A.  That I never said it?

P64Qcom6                    Bongolan - Cross

Q.  You never -- yes, isn't it true that you never said that?

A.  I don't remember.

MS. WESTMORELAND:  All right.  Let's pull 003, page 3, please.  I'm going to show you something?  Okay, paragraph three.  It might be the next line.  Can you do the next two paragraphs.  You can take it down.  I'll rephrase my question.

Q.  Ma'am, isn't it true that you didn't tell the government that you told your girlfriend to go hide in the bathroom in your first interview?

A.  I don't remember.

Q.  Okay.  Well, would you agree that the allegation that Mr. Combs was banging on the outside of the door, that the first time that allegation was made was by your civil lawyer in your complaint.  Do you agree with that?

A.  Could you rephrase the question?

Q.  That the first time you made the allegation that Mr. Combs was banging outside of the door yelling to get in was in your civil complaint?

A.  That it was in my civil complaint?

Q.  Yes.

A.  It was in my civil complaint.

Q.  Let me ask you this:  Let's talk about what you testified that you were doing while you were out on the balcony, okay?

A.  Okay.

Q.  You would agree with me that you've told very different

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

stories about that, true?

A.  I believe I told one story, and ...

Q.  Which one was that?  What you were doing on the balcony?

A.  Could you rephrase that?

Q.  All right.  Isn't it true that one -- in one interview with the government, you told them that you were smoking weed on the balcony.  Do you remember that?

A.  Yes.

Q.  And then isn't it true that in your civil demand letter, you said you were on the balcony smoking a cigarette, not marijuana, true?

A.  That's the one I don't agree with.

Q.  So you didn't agree with that.  Isn't it true that after your demand letter, you met with the government again, true?

A.  Yeah, I met with them.

Q.  And then this time you told the government that you were actually pretending to smoke weed?

A.  I don't remember.

Q.  You agree with me that those are three different things, right?

A.  Those are three different things.

Q.  Okay.  All right.  You recall that today you testified that you saw -- that you were facing -- that your back was at the patio; that you were facing out.  Do you recall that?  That's what you testified to today.  Do you recall that?

P64Qcom6                    Bongolan - Cross

A.  My back was at the patio?

Q.  Yes, the door?

A.  Oh, yes.

Q.  That your back was at the patio door, so you were looking outward?

A.  Yeah, I was looking at the view.

Q.  You sure?

A.  Yeah.

Q.  Do you recall telling the government in your first interview that you were actually looking inward, and that you saw Mr. Combs charging directly at you from across the room?

A.  I don't remember.

Q.  Okay.

        MS. WESTMORELAND:  Can you pull up 00 -- I'm going to show you something.  Can you pull up 003 for me?  Can you go to the next paragraph also, please.  Come out of the paragraph. Okay.  Please, the third paragraph.  Can you please highlight the first three lines?  Thank you.

Q.  When you're finished, just look up at me.

        Isn't it true you were very detailed when you spoke about this to the government the first time, true?

A.  I don't remember.

Q.  Okay.  Did you tell the government that you particularly recalled looking right at him, and he was charging at you from across the room?  Do you recall telling the government that?

P64Qcom6                      Bongolan - Cross

A.   I don't remember.

Q.   Okay.  All right.  Let's talk about today.  You said Mr. Combs picked you up, right?

A.   Yes.

Q.   And you said he had his arms down like this?

A.   Yes.

Q.   And isn't it true that the first time that you made this allegation with the government, you said Mr. Combs picked you up by -- you said he put his hands by your arms and your ribs, do you recall that?

A.   I don't remember.

Q.   Okay.  Isn't it true that in your civil demand letter sent on the 31st, you said that Mr. Combs sexually assaulted you on that balcony?

        MS. SMYSER:  Objection.

        THE COURT:  Overruled.

A.   Could you restate that question, please?

Q.   Didn't you accuse Mr. Combs of actually sexually assaulting you on that balcony?

A.   I don't remember.

Q.   You don't remember that?

A.   I don't remember the first interview.

Q.   Okay.  Did you tell the government that Mr. Combs sexually assaulted you?

A.   I told them where the hands were at.

Q.  Okay.  Did you tell the government that Mr. Combs put his hands and groped you on your breast?

A.  I showed them where the hands were placed on my body.

Q.  Okay.  Did you take it as an intentional groping?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

Q.  You agree with me that in your demand letter to Mr. Combs, you said that he groped your breast sexually assaulting you?

MS. SMYSER:  Objection.

THE COURT:  Sustained.  The question needs to be rephrased.

Q.  Okay.  You're aware that in your demand letter, you allege Mr. Combs -- that he came out on the balcony and started groping your breast?

MS. SMYSER:  Objection.

THE COURT:  Sustained.

Q.  Did you accuse Mr. Combs of groping your breast in that demand letter?

THE COURT:  I think it's the "you" that --

Q.  Your lawyers on your behalf, are you aware that they accused Mr. Combs of groping your breast?

A.  Yes.

Q.  Yes?

A.  Yes.

Q.  And are you aware that in your second demand letter that

P64Qcom6                        Bongolan - Cross

you accuse Mr. Combs of groping your -- of squeezing your

breasts so hard that your breasts had bruises on them?

            MS. SMYSER:  Objection.

            THE COURT:  Same ruling, and same instruction if you

want to ask that question.

            MS. WESTMORELAND:  Okay.  I will, your Honor.

Q.   Let me ask you this:  When you sat down with the government

the first time, you didn't say anything to the government

accusing Mr. Combs of touching your breast, did you?

A.   I don't remember.

Q.   All right.  Well, let me show you something, 003, same

paragraph.  Ma'am, you didn't tell the government that

Mr. Combs tried to grope you on your breast, did you?

A.   I don't remember.

Q.   Okay.

            All right.  So let's go to today -- let's go to how

you said you were hung over the balcony, okay?

A.   Okay.

Q.   So -- and you agree with me that in your first interview --

scratch.  Withdraw.

            You agree with me that sometimes you tell this story,

Ms. Ventura saw you getting hung over the balcony, and

sometimes you told this story she did not.  Do you agree with

me?

            MS. SMYSER:  Objection.

P64Qcom6                          Bongolan - Cross

THE COURT:  That's sustained.

Q.  You agree that in your first interview with the government, you said that you were thrown into the balcony furniture and then Ms. Ventura came out.  Do you agree with that?

A.  I don't remember.

Q.  Okay.  Do you agree that in the civil demand letter, it was alleged that Mr. Combs said he would kill you -- could kill you, and then while you were hanging over the balcony, do you recall that?

MS. SMYSER:  Objection.

Q.  Okay.

THE COURT:  Does the "okay" mean that you're going to rephrase or ...

MS. WESTMORELAND:  Yes.

THE COURT:  Okay.

Q.  Let me ask you this:  Your civil complaint, let's go November 27, 2024, okay?

A.  Okay.

Q.  All right.  You agree that in your civil complaint, your lawyers on your behalf said that Ms. Ventura came out and witnessed you over the balcony, right?

A.  Could you say that again?

Q.  In your civil complaint, your lawyers on your behalf allege that Ms. Ventura saw you, witnessed you hanging over the balcony?

A.   Yes.

Q.   It's the same thing you said today, right?

A.   I had said yes.

Q.   Okay.  Isn't it true that in your -- that in your fourth interview with the government, you said that Mr. Combs threw you into the furniture, you landed, and then Ms. Ventura came out?

A.   I don't remember.

          MS. WESTMORELAND:  Okay.  Can you pull 023.  Go to page 7.

          THE COURT:  Ms. Westmoreland, are you showing the witness a document to refresh her recollection?

          MS. WESTMORELAND:  Yes, I am.

          This is just for the witness and the parties in an attempt to refresh her recollection.

          Can you please go to under the second dash?  And it's about midway through.

          THE COURT:  Hold on.  Let's take the second dash, that entire part.  Let's blow it up for the witness for her convenience.

          Ms. Bongolan, read as much as you need to, and when you're done, if you'd look up, we'd appreciate it.

Q.   Ma'am, did that refresh your memory?

A.   To some extent.

Q.   Isn't it true in your fourth interview with the government,

you said Ms. Ventura came out after you landed. You landed, and then Ms. Ventura came out?

A. I see the notes, but I don't remember.

Q. You do agree with me that there's a big difference between you saying Ms. Ventura seeing you hanging over a balcony or Ms. Ventura came out and saw you once you were already hanging over the balcony. You agree that's a big difference, right?

MS. SMYSER: Objection.

THE COURT: Overruled.

A. Could you say the question again?

Q. You agree that's two different stories?

MS. SMYSER: Objection.

THE COURT: That's sustained. It needs to be rephrased.

Q. Ma'am, you agree that alleging Ms. Ventura saw you hanging over the balcony like with her own two eyes is different than saying once you were on the ground, Ms. Ventura came in. You agree that's two different allegations. There's two different -- that's different?

MS. SMYSER: Objection.

THE COURT: That's overruled. You can answer.

A. They are two different statements.

Q. All right. Let's talk about how you say Mr. Combs lifted you over. You would agree with me that in your civil lawsuit that was alleged on your behalf, that Mr. Combs put you over

P64Qcom6                          Bongolan - Cross

the bannister; that you got yourself back over the bannister, and then he put you over again.  Do you agree with that?

A.   Which civil complaint?

Q.   Yours.

A.   There's like two.

Q.   You have more than one civil complaint?

A.   I had two lawyers.

Q.   I'm talking about your civil complaint filed on November 27, not demand letters.  When you actually filed the suit.

A.   Could you say the question again?

Q.   Isn't it true that in your civil complaint that you allege that Mr. Combs put you over the balcony, over the bannister, that you were able to get yourself back over the bannister, and that he put you over the bannister higher, so he put you over again.  So this didn't happen once but twice?

          MS. SMYSER:  Objection.

          THE COURT:  Grounds?  Form?

          MS. SMYSER:  Form.

          THE COURT:  Rephrase the question.

Q.   Did you allege in your civil complaint that you got yourself over the bannister, and then he put you back over the bannister?

A.   Can you say the question again?

Q.   Let me ask you this:  Would that statement be true that

Mr. Combs hung you over the bannister twice?

A.   I was struggling with my feet.

Q.   Okay.  Let's talk about your next interview with the government, okay?  That was on 4/9/2025, all right?  Now I want to put time-wise, this is 15 months after your first interview, okay?

         MS. WESTMORELAND:  I'm sorry, Judge.  I can't hear.

A.   I was just agreeing like with your time line.

Q.   Okay.  And you agree with me that in between your interviews, you've spoken with Cassie, right, you agree with that, over a 15-month period?

A.   That I spoke to her?

Q.   Yes.

A.   Like just in general?

Q.   Yes.

A.   Yes.

Q.   All right.  Isn't it true that in your third interview, you told the government not that you were hung over a balcony, but that your feet were on the rail?

         MS. SMYSER:  Objection.

Q.   Did you tell the government on 4/9/2025 that Mr. Combs -- that your feet was on the rail, then on and off again, the rail?

A.   Could you say that again?

Q.   Instead of alleging that Mr. Combs hung you over a balcony,

P64Qcom6                    Bongolan - Cross

did you tell the government on 4/9/2025 that your feet did an on-and-off the rail?

MS. SMYSER:  Objection.

THE COURT:  That needs to be rephrased.  I think you had --

MS. WESTMORELAND:  Had it the second time?

THE COURT:  A couple times.

Q.  All right.  Ma'am, on 4/9/2025, did you tell the government that instead of being hung over the rail, that your feet were on the rail?

MS. SMYSER:  Objection, your Honor.

THE COURT:  Sustained.

Q.  All right.  Let me ask you this:  You met with the government two days ago?

A.  Yeah.

Q.  You can remember your interview from two days ago, right?

A.  Yes.

Q.  And isn't it true in your interview two days ago, you said -- the government asked you about this balcony situation again, right?

A.  Yes.

Q.  And you told them you couldn't recall, you couldn't recall the details?

MS. SMYSER:  Objection.

THE COURT:  Is there a question there?

P64Qcom6                     Bongolan - Cross

Q.  Yes, isn't it true you told the government just two days ago you couldn't recall the details of what happened on the balcony?

MS. SMYSER:  Objection, your Honor.

THE COURT:  That's overruled.

A.  Can you say the question again?

Q.  Isn't it true that just two days ago, you told the prosecution you just don't recall the details of the balcony allegation?

A.  I don't remember.

Q.  Ms. Bongolan, what drugs were you on that night that you said this balcony situation happened?

A.  I don't remember.

Q.  Let me see if I can show you a document to help refresh your memory.  Okay.  Mr. Rob, can you please pull 004, page 5, middle of the page.  It is about middle of the page before the space, but she can look up at me when you're finished reading whatever you need to read.

You can take it down, Mr. Roy.

Q.  Ms. Bongolan, do you remember what drugs you were on?

A.  No.

Q.  Didn't you tell the government that you were on Molly, G, and cocaine?

MS. SMYSER:  Objection.

THE COURT:  Grounds?

MS. SMYSER: It's inaccurate and misleading, your Honor.

THE COURT: All right. Do you want to rephrase the question?

Q. Sure. Did you tell the government that you were on Molly, G, and cocaine on the day of the alleged balcony incident?

MS. SMYSER: Objection.

THE COURT: Overruled.

A. I didn't say those drugs on the night of the balcony.

Q. Okay. Do you deny being on those drugs that night?

A. That's a lot of drugs. I didn't do those.

Q. You said that's a lot of drugs, you didn't do those?

A. Not that night.

Q. Today you testified about your alleged injuries. Do you remember that testimony on direct?

A. Yes, ma'am.

Q. I want to talk about that for a moment, okay?

A. Okay.

Q. All right. Now, isn't it true the first time you met with the government, you said your injuries were dislocated jaw, bruised ribs, and spine issues.

A. Those are some of the problems I had.

Q. You didn't tell the government about any other problems in your first interview, did you?

A. I don't remember.

Q.  Isn't it true that you told the government that your jaw issues really may be because of your drug issues?

A.  I don't remember.

Q.  Isn't it true that you told the government that your spine issue may have been balcony related?

A.  It could have, but I don't remember.

Q.  Okay.  Since it could have, Ms. Bongolan, what else could it be?  How else could you have hurt your spine?

A.  At that time, that was the only one.

Q.  When you told the government it may be spine related, that maybe means maybe or maybe not?

A.  I don't know.

Q.  Isn't it true that two weeks after you told the government jaw, ribs, spine, that in your demand letter, your lawyer allegedly added your head and your neck?

          MS. SMYSER:  Objection.

          THE COURT:  That's overruled.

A.  Which demand letter?

Q.  The first one.

A.  He may have added that, but I didn't agree with him with a lot of things.

Q.  You didn't agree with him.  You didn't agree with him that your neck was hurt because of the balcony incident?

A.  That one, yes.

Q.  Okay.  So you didn't tell the government in your first

P64Qcom6                         Bongolan - Cross

interview anything about your neck was hurt for the balcony incident, true?

A.   Again, I don't remember that interview.

Q.   Okay.  All right.  Let's go with -- you said you didn't remember the first demand letter.  I want to talk about the second one, okay?

THE COURT:  Let me stop you there for a moment.

Ms. Westmoreland, how much time do you have left anticipated?

MS. WESTMORELAND:  How much time were you giving because I would like to finish today.

THE COURT:  I asked you how much time you had.

MS. WESTMORELAND:  One moment.

(Pause)

MS. WESTMORELAND:  Your Honor, it's going to be awhile.

THE COURT:  All right.  At this time, we're at 4:00.

So, members of the jury, I'm going to allow you to proceed home.  You can go elsewhere, but you don't need to stay here.

Same instructions as usual:  Do not speak with each other about the case.  Don't speak with anybody else about the case.  Don't look up or investigate anything related to the case.  We'll see you here tomorrow at 10:45 to be here to start at 11:00 a.m.  All rise for the jury.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P64ACom7

(In open court; jury not present)

THE COURT:  Ms. Bongolan, we will see you here tomorrow morning.  And the government knows this, but you're not to have any discussions with the government.

Okay.  With that, have a great evening.

THE WITNESS:  Thank you.

(Witness temporarily excused)

THE COURT:  Please be seated.

Ms. Westmoreland, how much time left?  I mean, we need to know because we need to be able --

MS. WESTMORELAND:  I understand.

THE COURT:  -- to handle the scheduling here and make sure we're handling things in an expeditious manner.

MS. WESTMORELAND:  Your Honor, I doubt it will take over another hour.  Forty-five minutes.  I mean, I think 30 but I'm worried to say that and then I go to 45 and, you know.

THE COURT:  All right.

MS. WESTMORELAND:  And it also depends on if the questions are being answered.  So --

THE COURT:  Well, I think the questions are being answered.  I think that, again, I would just use the evening to help everyone out and just see if there's a way to streamline the questioning.  And you've heard the objections.  You understand the nature of them.  So there's probably a way for you to ask the questions you want to ask without drawing some

of the objections.  That will help us move forward I think maybe closer to 30 minutes as opposed to 40 minutes.  So thank you for doing that.

Anything from the government before we adjourn?

MS. JOHNSON:  Your Honor, I think just this evening or tomorrow before Jane testifies we'll want to discuss the pseudonym instruction with the Court, whatever your preference is.

THE COURT:  So, sorry, I missed the first part of that.

MS. JOHNSON:  Sure.  Either this evening or tomorrow before court starts, we'll want to discuss the government's proposed instruction on pseudonyms.

THE COURT:  So we can do that at 10:30.  Is there a dispute brewing?

MS. JOHNSON:  There is.  I e-mailed the Court.  I understand you might not have had a chance to review during the afternoon testimony.  I e-mailed the Court what the government's position and the defense position on the proposed instruction.

THE COURT:  The only dispute is over the bolded language?

MS. JOHNSON:  I don't want to speak for Ms. Shapiro. I think the defense doesn't want the instruction given again, period.  But the bolded language is also certainly in dispute.

P64ACom7

THE COURT:  What's the defense's position?  I might understand the objection to the double emphasis as reflected in the bolded text, but the other portion of that instruction is what I -- essentially what I told the gallery the first time around, without objection from either side.

MS. SHAPIRO:  Yes, your Honor.  We believe it's unnecessary to repeat the instruction and we're concerned that doing so will exacerbate the Constitutional problems with pseudonymity that we have raised in the past that I understand the Court has overruled relating to both Mr. Combs' Constitutional due process confrontation clause and right to public trial, as well as the public and the press's right to a public trial and to free speech in part of --

THE COURT:  And in what way are you saying that people in the gallery, from the sketch artists down, should feel free to document the appearance of the witness?  Because that's all that that text really talks about.

MS. SHAPIRO:  I think --

THE COURT:  Ms. Shapiro, can you please just pull the microphone.

MS. SHAPIRO:  I'm sorry, your Honor.

I think we're concerned that the way it's phrased that it has chilled efforts to even describe the witness's demeanor, for instance.  And we're just concerned that saying it yet again is going to deter accurate -- not descriptions of what

the person looks like, but vaguer descriptions that may reflect people's observations of the witness's demeanor.  So that's really the issue with repeating it.

And as I indicated in -- or I think Ms. Johnson accurately represented our position in the e-mail, that if the bolded language -- we object to the bolded language for those additional reasons and would -- so if the Court is not inclined to give the bolded language, that's great, I'll stop talking about that.

THE COURT:  Okay.  Well, I think that the other language likely does the trick.  And in terms of the issues that were raised, there were a couple of issues that came up, but, by and large, I don't think that the people who are in this courtroom or in the overflow rooms, in any way, were trying to violate the Court's order.  I think that they were trying to stay true to the order.

In terms of demeanor and those types of depictions of the attitude or the tone or the nature of the testimony, I believe that that was fully reported by the press.  And so I don't think that there was any inhibition nor was any sort of inhibition reflected in the instructions that I gave to the gallery.

MS. SHAPIRO:  I think there's --

THE COURT:  The thing that was important was that based on the appearance of the witness, there was a concern

that people in the gallery might describe that appearance in a way that might lead to a violation of some of the victim witnesses' rights, and we've already gone over that in some of the pretrial motion practice. And I'm pretty sure that everyone stuck true to that.

So the point here was to remind people that, not only in this courtroom but also in the overflow rooms, that they are required to adhere to those rules. I may not have been that clear about that particular fact the first time we had the instruction. This is to make sure that there's no mistake about that particular issue moving forward this time around.

MS. SHAPIRO: I understand. I'll just note for the record, that at least from what I saw of the mainstream press, as opposed to other media, I disagree with the Court's observation, but I'll leave it at that.

THE COURT: All right. So I'm likely to give the instruction without the bolded language. But this looks as if it's very similar to what I said the first time around. It might be a cut and paste.

MS. JOHNSON: It's a cut and paste.

THE COURT: Yeah. I know I didn't say it as like artfully as I would have liked to. So I'm likely to do that so I don't think we need to address it again in the morning.

The only other thing I will say is just on -- I'll say this because it came up during the direct examination.

At the end of Mr. Bongolan's direct examination, there was a sidebar about a conversation that Ms. Bongolan had with Mr. Holladay, and the government urged that the statement was admissible principally under 801(d)(2)(C), and the Court offered the government a chance to lay a foundation for that or another exception in particular, the exception under (d)(2)(D). And the government did so not by eliciting any facts or knowledge of the witness concerning the nature of the relationship between Mr. Holladay and Mr. Combs, but rather to ask further questions about the statement made by Mr. Holladay.

And there was a suggestion that that would be permissible under rule 104, which is in general true. However, rule 801(d)(2) makes clear that the statement itself does not by itself establish the declarant's authority under subsection (C), the existence or scope of the relationship under subsection (D), or the existence of the conspiracy or participation in it under subsection (E). Those are the three exceptions that the government had urged.

Further, courts have made clear that to fit even under the exception under subsection (C) courts generally require that a person making a statement be an agent of the party opponent. That's from *Penguin Books v. New Christian Church*, 262 F.Supp 2d 251 at page 260(S.D.N.Y. 2003) and that the individual must have had specific permission to speak on a subject such as a contract, as opposed to rule 801(D)(2)(D)

where the individual only had to have general authority of the business area the contract falls under.

Based solely on what Ms. Bongolan had had a conversation with Mr. Holladay about, the government failed to establish those requirements considering the limitations of rule 802 -- 801, excuse me, (d)(2). So that was the reason why, when I reviewed the transcript, I sustained the objection and I just wanted to make sure that was clear on the record.

Anything further from the government?

MS. COMEY: No, your Honor. As I think we flagged for your Honor, we plan to raise some issues that the parties have not agreed on with respect to exhibits for Jane, and we will be ready to discuss those at 10:30 tomorrow morning.

THE COURT: So we'll be here at 10:30. Is Mr. Santos going to be presented before Jane?

MS. COMEY: I don't know, your Honor. We're now behind schedule for Jane, and it looks like we're going to be behind schedule for her, and I really don't want her to miss her flight. So I don't know. I need to discuss with the team. But the defense has been on notice of Mr. Santos and Jane possibly testifying as soon as today, so I imagine there's no prejudice to them if we make the decision later tonight.

THE COURT: And if we needed to, and if I made everyone, we could go late the Thursday or Friday I guess. We're going a little bit later on Thursday. We could go later

P64ACom7

on Friday and we could go later on Monday, Tuesday, and Wednesday, and but not Thursday because that's when the flight would be.

MS. COMEY:  She has to make the flight, yes, your Honor.

THE COURT:  We can add some time on those days.

MS. COMEY:  I appreciate that, your Honor.

MS. SHAPIRO:  Your Honor, I'm sorry.  I want to ask the Court, if you do that, if you could not go later tomorrow. If it was any other witness, I would say it's fine --

THE COURT:  We are not going later tomorrow because we have a sentencing proceeding in another case.

MS. SHAPIRO:  So you're going to end at 4:00 tomorrow.

THE COURT:  We are going to end at 4:00 tomorrow.

MS. SHAPIRO:  Thank you.

THE COURT:  Anything further from the government?

MS. COMEY:  No, your Honor.

THE COURT:  Anything from the defense?

MR. DONALDSON:  Yes, Judge.  Just briefly.  I want to bring up just a small matter.  Or big to us, but small maybe.

We have -- Mr. Agnifilo has been discussing quite often Mr. Combs' inability for us to meet with him, what we think, in a necessary fashion to continue our effective representation.  But now we have a, I think, more urgent matter in that he can't call us.  And I'm saying that because I --

he's supposed to have a certain amount of minutes.  I've been speaking with the legal department from MDC quite often.  They have always been, in my opinion, very responsive to me and my inquiries and they have tried to resolve this problem.

It's my understanding that he has 300 minutes right now to use.  And he hasn't used any of them according to legal over at MDC.  However, for some reason, Mr. Combs has not been able to make a phone call to us at all in the last three or four days.  That's problematic because of course we have to communicate with him sometimes when he's gone or whatever.

And so if we can't communicate with him at all via phone --

THE COURT:  And you raised this with MDC and legal and what did they say?

MR. DONALDSON:  They have communicated with me several times yesterday, and I think as late as last night that the matter has been resolved.  I'm reading an e-mail right now where it says that he has used zero of 300 minutes.  But he is not able to make a phone call because when he picks up the phone, they're telling him he has no minutes.

So that's a problem because we can't communicate with him at all.  So if we can't communicate with him at all, again, it causes us a significant problem with our effective representation of him during this trial.  So we can't -- we have short time in the courthouse that you gracefully let us do

yesterday.  But now once he gets back, we can't communicate with him at all between the time he gets back and the next morning, which is really unacceptable.  I'm not blaming legal at MDC because they have been extremely responsive to me.

But for some reason, Mr. Combs can't make the necessary phone calls to communicate with us, and that is quite frankly, unacceptable at this point while we're on trial. Particularly, when we have to make decisions about various substantive things during the evening between 7:00 and 10:00 or whatever.  We just can't do it effectively.

Now, generally I would say the ask is to ask the Court to pick up the phone and call somebody and say make the phone calls available right now or it's going to be a problem.  I don't know if the Court would do that, but that's normally what we would ask.  Or the government someone to intervene, because we can't continue without the appropriate communication with Mr. Combs for this trial.  Just can't do it.

THE COURT:  Well, I've inquired several times on this very issue.  It appears that you've inquired several times on this very issue.  So I'm going to issue an appropriate order today.  I'll convey that to the parties, and you can convey that to MDC legal and hopefully that will do the trick.

MR. DONALDSON:  I appreciate that.

MS. COMEY:  Your Honor, may I just ask for the record, Mr. Donaldson said that the defendant has not been able to

communicate at all with his counsel.  My understanding was, setting aside the phones, which are obviously an issue that should be addressed, that there's an e-mail or a text system that should still be available to inmates at the MDC.  So I just wanted to check and see whether the defendant is actually able to communicate over CorrLinks, I think is what it's called, or if that is also an issue.

THE COURT:  That's a good clarification.  I understood Mr. Donaldson only to be speaking about the phone, but are you able to use the CorrLinks system?

MR. DONALDSON:  Well --

MS. GERAGOS:  I'm so sorry to come in with the assist.

THE COURT:  That's fine.

MS. GERAGOS:  If I may just because I communicate with Mr. Combs on CorrLinks, I wanted to answer this question and make sure the record is totally accurate.

On CorrLinks, yes, we are able to communicate.  However, there are times where there's 24 to 48-hour delays, so it's not -- CorrLinks does not operate the way like texting does from your phone.  CorrLinks operates, it goes through somebody at BOP who has to clear it, and then it goes through.  So it does operate on a delay.

I just wanted to make that clear that it's not immediate, certainly not at night.

MR. DONALDSON:  Right.  So that assist was correct.

It's not real time.  So if he sends an e-mail to us at 9:00 or 8:00, we may not see that until we're here in court the next day, which would not be helpful to us.  So it's not real time.  It goes to a third party and sometimes, quite frankly, we don't get noticed of the CorrLinks messages.

So I don't think that's an appropriate remedy.  I think we have to be able to communicate with Mr. Combs via phone as quickly as possible.  Just this is not what proves to be an effective way to represent Mr. Combs.

THE COURT:  All right.  We will be on it.

Anything further from the defense before we adjourn?

MR. DONALDSON:  No.  Thank you very much.

THE COURT:  We'll see everyone here at 10:30 tomorrow.

(Adjourned to June 5, 2025, at 10:30 a.m.)

INDEX OF EXAMINATION

Examination  of:                                        Page

FRANK PIAZZA

Direct By Ms. Smyser . . . . . . . . . . . . .4168
Cross By Ms. Geragos . . . . . . . . . . . . .4208
Redirect By Ms. Smyser . . . . . . . . . . . .4247

BRYANA BONGOLAN

Direct By Ms. Smyser . . . . . . . . . . . . .4251
Cross By Ms. Westmoreland . . . . . . . . . .4320

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 A900-A & A-905-A . . . . . . . . . . . . . .4164

 10C-115   . . . . . . . . . . . . . . . . . .4194

 1307    . . . . . . . . . . . . . . . . . . .4204

 BX-201 through BX-210 under seal    . . . . .4204

 AX-701-79-B under seal    . . . . . . . . . .4207

 3S-106    . . . . . . . . . . . . . . . . . .4259

 3S-105    . . . . . . . . . . . . . . . . . .4273

 3S-104    . . . . . . . . . . . . . . . . . .4284

 3S-102    . . . . . . . . . . . . . . . . . .4290

 3S-102A    . . . . . . . . . . . . . . . . . .4291

 3S-101 and 3S-101A    . . . . . . . . . . . .4293