P65ACom1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

       v.                          24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

          Defendant.              Trial
------------------------------x

                          New York, N.Y.
                          June 5, 2025
                          10:40 a.m.
Before:

               HON. ARUN SUBRAMANIAN,

                          District Judge
                          -and a Jury-

                   APPEARANCES

JAY CLAYTON
    Interim United States Attorney for the
    Southern District of New York
BY:  MADISON R. SMYSER
    EMILY A. JOHNSON
    MAURENE R. COMEY
    MEREDITH FOSTER
    MITZI STEINER
    MARY C. SLAVIK
    Assistant United States Attorneys

P65ACom1

APPEARANCES
(Continued)


AGNIFILO INTRATER LLP
      Attorneys for Defendant
BY:  MARC A. AGNIFILO
      TENY R. GERAGOS
      -and-
HARRIS TRZASKOMA LLP
BY:  ANNA M. ESTEVAO
      -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
      JASON A. DRISCOLL
      JONATHAN P. BACH
      -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:  Lucy Gavin
                Shannon Becker
                Paralegal Specialists

                Raymond McLeod, Paralegal

(Trial resumed; jury not present)

THE COURT:  Good morning, everyone.

MR. AGNIFILO:  Good morning, your Honor.

THE COURT:  Can you all hear me?

MR. DONALDSON:  Don't have a deputy.

THE COURT:  All right.  Now you can hear me.  Good morning, everyone.

First, just really a reminder to the parties and to everyone who is here in court, while this is a large courtroom, we are all packed in here and we have a lot of jurors.  So I just want to remind everyone to make sure that you are minding your facial expressions and there should be no attempts from anyone here to interact with, communicate with, or influence the jury.  And I've reminded and asked the security here that's in the courtroom as well as the Court staff to monitor this conduct and report on any violations.  If there are violations, the Court will take swift action.

Now, while we are all here, I want to remind everyone in this courtroom, as well as in the overflow courtrooms, that they are not to, in any way, shape, or form, document the witness who will be testifying after Ms. Bongolan, Jane, in any notes or in any sketches or in anything of that kind.  The courtrooms will be monitored by court security.  Any use of devices or other documenting of the witness's appearance or anything of that nature will result in severe consequences,

P65ACom1

including possible sanctions.

And while I am speaking to the people in the overflow room, it's a good time to remind them that the overflow courtrooms are an extension of this courtroom.  So everyone who is in the overflow courtrooms should act as if they are here, present in front of the Court in this courtroom.  And that means acting with appropriate decorum.  Should be quiet while there's testimony being given and court is in session, and there should be no conduct that would be inappropriate if you were sitting here in courtroom 26A.

The next issue is the testimony concerning the conversation between Mr. Holladay and Ms. Bongolan that the Court addressed at the close of the session yesterday.  The Court agrees with the defense that further questioning on that conversation would be improper.

One, the government had the opportunity to establish a foundation for the questions that they wanted to ask and the testimony they wanted to elicit, and they declined to do so except by asking about the statement.  It would be improper to permit the government to now try again on redirect examination.

But more importantly, the defense, in its response, makes a fair argument, a good argument, based on rule 403, that the relevance to this criminal case of statements that Mr. Holladay may have made about compromising a civil claim that Ms. Bongolan had contemplated is tenuous at best and

P65AComl

inconsistent with what rule 408 contemplates.

And so based both on the failure to establish a foundation under the hearsay exceptions advocated by the government on direct as well as rule 403, the Court will not permit further questioning on that conversation.

Now let's turn to the Jane exhibits.  The first issue is a letter from the press concerning the sealing of exhibits.  My understanding, Ms. Comey, is that these exhibits will not be shown in real time to the gallery or to the overflow courtrooms, but that they will be redacted and then provided to everyone who is requesting them.  Is that fair?

MS. COMEY:  That is exactly right.  And that is the same process that Judge Nathan allowed us to follow in *United States v. Maxwell*.

THE COURT:  Now, can you do that -- well, not you personally, but can your staff do that same day?  Because I understand the press's concern is they are aware and they understand the concerns, but they are also the press and they need to report on these things as they're happening.  And so if the timing is such that they only receive the exhibits a week later or even more, that would be inappropriate, they say.

MS. COMEY:  So, your Honor, what we can do for certain is release any photos or videos that do not depict Jane same day.  That is easy because there are going to be photos and videos shown during her testimony that will depict, for

example, a scene or just the defendant. And those we can easily release.

The text messages will take quite a bit of time because there is so much individual personal information in them. And I actually do feel an obligation to personally read them before they're released to the press given the sensitivities with this witness. So I will be personally reviewing them.

But what I will say is in terms of the press and the public's access, I'm going to have Jane read out loud any text messages that I want the jury to draw their attention to. So the press and the public will hear them in real time and then will have the transcript of them.

There are a couple of exceptions when there are sexually explicit messages. Instead of making her read them, I will ask her a general question of are you texting him about a sex act here. I don't think there's a real public interest in having to get those sexual messages same day.

So I think that would vindicate the interests, and we would make our best efforts to redact these and produce them as quickly as possible. The process we're setting up is to have a team of paralegals who are not assigned to this case have an initial run at the redactions, and then I will review them to make sure nothing is missing. That may take more than same day, your Honor.

THE COURT:  Do you have a -- I'm not holding you to this, but just a general timeframe?  Because I think the press really said, well, we've done this one time already and it just took too long.  That was their concern.

Do you have a ballpark sense of how long this would take?

MS. COMEY:  Your Honor, if I could get Thursday's out by the end of the day Friday.  If I could get Friday's out by the end of the day Saturday.  If I could get Monday's out by the end of the day Tuesday.

THE COURT:  You've got a lot going on.  So you can understand that I -- there's some flexibility there, but...

MS. COMEY:  I appreciate your Honor giving me more time than I was willing to -- than I was giving myself.

THE COURT:  To put it bluntly, don't kill yourself.

MS. COMEY:  Thank you, your Honor.

THE COURT:  Do the best that you can.

But with that understanding, there may be someone who is representing the news organizations that filed the application.  You've heard what Ms. Comey said, and if anyone wishes to be heard here, they can raise their hand and we'll hear you.

Ma'am, you can come up and just come to the lectern and please identify yourself and then you can explain any contrary position you have or maybe you say that that sounds

good and we can move forward.

MS. EVERDELL:  Yes, your Honor, Abigail Everdell, Davis Wright Tremaine, for the news organization.

THE COURT:  Okay.

MS. EVERDELL:  So the government's request yesterday, which I appreciate has been somewhat narrowed today.  But not enough unfortunately, is to have public display of all of Jane's testimony, which we understand will last five days turned off.  So the press and public cannot view these exhibits as they're being introduced.  This goes too far.

We are asking the Court to deny this request and ask the government to redact its exhibits before they are introduced into evidence so the public and press can adequately follow what's going on and exercise the full extent of the First Amendment right to observe this criminal trial.

To be clear, we are not asking to be shown un-redacted exhibits.  But what the government is proposing is to prevent contemporaneous, real-time access to the entirety, public and private portions of these exhibits.  Because, after months of preparing for this trial, they have not had time to redact them.

The Court has already heard from my colleague, Rob Balin, last month on the importance of preserving the press and public's First Amendment right of access to criminal trials.  I am not going to rehash that.  Suffice to say, there are core

Constitutional principles at stake hear.

The news organizations recognize that in cases like this one, the need to preserve the anonymity of victims of sexual violence can justify limited, narrowly tailored impingements on that right.  But what the government is asking for is not sufficiently narrowly tailored.

The government's narrowly tailored relief is being allowed to redact these exhibits at all.  And now the government is trying to use that as a springboard, and asking not only for redactions, but also for the concededly public portions of these exhibits to not be shown to the press and public as they are admitted into evidence across, again, what we understand to be five days of testimony.  This is not a short amount of testimony.

This would enormously burden the press's ability to report on this trial and the public's ability to understand it. Reporters at news organizations cannot be expected to understand or timely report on testimony concerning exhibits they cannot see.  And I appreciate the government's proposed solution of having Jane read into evidence certain portions of the exhibits that they're asking her about, but that is not the full context.  Both sides of the conversations are part of these exhibits.  There's visuals that are parts of these exhibits to the extent they wouldn't otherwise be redacted. There is a full context that is exactly what the press needs to

P65Acom1

see in order to accurately report on what's going on.  And the proposed solution of releasing these exhibits, the releasing of the redacted copies on a rolling basis some time after Jane's testimony, that's no solution at all.

And in our letter, we noted that the Second Circuit has repeatedly emphasized in *Lugosch*, in *In re NBC*, in *ABC v. Stewart*, just to name a few, in matters of news coverage delayed access is not effective access.  And in *In re NBC*, for example, your Honor, there was a delay of a single day, and the Court said that that was not enough.  You needed to have contemporaneous presence at proceedings to fully understand what's going on.

THE COURT:  So if I can ask you just a quick question.

MS. EVERDELL:  Please.

THE COURT:  There was a prior application that was made by your clients, and in that application, they suggested a potential compromise that, I think, three designated news organizations would have access to un-redacted exhibits with the understanding that they would not disclose the information that Ms. Comey had indicated.  Meaning personally identifiable information, things of that nature, that would compromise the victim witness's anonymity.

Is that part of this application as well?  Meaning, that you raise a timing concern and wouldn't that be addressed and eliminated if three news organizations were able to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

contemporaneously report on the exhibits having viewed them with that understanding that they would not report on the material that is -- that would be redacted, and properly so given the Crime Victims' Rights Act and the other concerns that have been raised in this case.

MS. EVERDELL:  Your Honor, I will point out that the previous application was for access for materials that would have otherwise been redacted entirely, as we understand it. Things that were not going to be released from the public, but that the press wanted to understand despite their context.

THE COURT:  Exactly.  I'm saying exactly the same thing.  You would get the exhibits.  They would be un-redacted, but it would be with that understanding.  The three news organizations who had access to those would not report on or further disclose any of the material that would be redacted. So in all ways, it's the same as the original application.

MS. EVERDELL:  So, yes, your Honor.  I don't want to reject that option outright.  I would say that the understanding --

THE COURT:  I heard the first part where you said yes. So I heard that part.  But with that, Ms. Comey, let me just get your reaction just to that because I know we also have timing issues and I want to --

MS. COMEY:  Yes.

THE COURT:  And that may be easy and maybe we have

P65ACom1

some faith in our news organizations that they will stick to their promises given that they have tried to do so from the inception of this trial to this time.

MS. COMEY:  So, your Honor, I have a few reactions to that.  While at first blush that might seem like a workable solution, the problem is that within Jane's text messages, there are references to identifying information that would not be apparent to someone who does not know her and her background and her personal life.  So references to her child and her child's name, references to other family members and close people, including some references to issues that were raised in the defense's under seal letter to your Honor in which they explained why they were not objecting to this witness testifying under a pseudonym.

And those, and that content, which is interspersed throughout some of these text messages, is why I am going to be personally reviewing them to make sure that that information is redacted.  And even if these reporters, who are not officers of the Court and would not be taking any sort of oath, even if they were to agree not to reveal her name, or her phone number, they would not know looking at the face of some of these messages that I'm going to be going through that there's identifying information within some of these messages that I'm not going to have Jane read out loud.

I will also note, your Honor, that the cases that

counsel just referenced, as I understand it, all refer to access to the testimony, access to the courtroom. And that those cases were cases where courts rejected the proposition that the press could be kept out of the courtroom and then just read the transcript the next day. So the one-day delay that was talked about in those cases was a one-day delay in hearing about what happened in the courtroom at all.

That's not what we're talking about here. I'm not aware of a case and I have not seen one cited by the press that requires contemporaneous review of exhibits. Indeed, before we had all of these screens and all of this technology, the way cases were tried was that a piece of paper would be handed to a witness, a piece of paper handed to the jury. The press wouldn't be able to see it at all. So I can't see how the common law or the interpretation of the First Amendment since our founding would possibly contemplate contemporaneous review of exhibits when that's only been possible in very recent years.

So I don't think there's a real Constitutional issue here when the press will be able to hear in real time the descriptions of and the text of whatever exhibits are being discussed, and then in very short order will have access to those exhibits. And especially when weighed against the very serious privacy issues that this witness has, so serious that the defense consented to her pseudonym. I just do not think

P65AComl

that the relief the press is seeking is warranted.

MS. EVERDELL:  Your Honor, if I could just address a few things.

THE COURT:  Let me ask you one thing in particular.

MS. EVERDELL:  Of course.

THE COURT:  Which is do you have a case that says the press must have contemporaneous access to exhibits?

MS. EVERDELL:  To exhibits as they're presented at trial?

THE COURT:  Yes.

MS. EVERDELL:  Your Honor, I'm not sure the situation has ever come up before.  But I will say the idea that we should be sticking to the methods that happened during the past when the technology wasn't in place, that there's a case that says that since we have been able to copy exhibits from the point at which it's been possible to copy exhibits, exhibits must be made available to the press for copying.  The principle of openness expands as our technology expands.  And what the press wants is to have a full and complete and accurate understanding of what's going on.  We're not asking for access to sensitive information that would be otherwise redacted.  We are not asking for Jane's identity.  And we understand the government's position here.  We truly do.

THE COURT:  So you would agree that the type of information that Ms. Comey is talking about that would be

properly redacted and you would not have an objection to that not being made available to the public and press; is that fair?

MS. EVERDELL:  Not having seen the redactions themselves, we do not object to reasonable redactions necessary to preserve Jane's anonymity.

THE COURT:  So then your objection is really one of timing.

MS. EVERDELL:  Yes, your Honor.

THE COURT:  And your proposal is that we adjourn for the day and potentially for several days while the government redacts these documents and then come back so that they can be shown to the public in real time in redacted form.  And you're saying that that's the narrow tailoring that would be required to accommodate and live up to the qualified First Amendment right of access.

MS. EVERDELL:  Your Honor, we appreciate how hard it is to keep the wheels turning on a trial like this.  And we're not here intending to gum things up.  But what we're talking about is not a minor, small right.  We're talking about a right that Justice Brennan described as "essential to the objective of maintaining public confidence in the administration of justice."  And in *ABC v. Stewart*, the Second Circuit said the ability to see and hear a proceeding as it unfolds is a vital component of the First Amendment right of access, not an incremental benefit.  And if what's necessary to preserve that

right is reordering the witnesses somewhat, even briefly delaying the trial to allow the government time to redact its exhibits before they are introduced, then, yes, your Honor, we think that would be warranted.

THE COURT:  All right.  The application will be denied for the reasons stated by the government as well as the accommodations that are being made.  And when I say accommodations, I mean that as Ms. Comey had noted, the testimony given by Jane will be available in real time to the press and public.  And as Ms. Comey indicated as to these text messages, the actual exhibits that the press is interested in receiving, those will be read out loud by Jane where the government seeks to introduce those messages.  So the public will have the actual content of what is being presented in court to report on in real time.

The only solution as to the actual access to exhibits in real time that I'm hearing is to delay these proceedings, which I don't think is consistent with what the First Amendment requires.  I believe that we do have a narrowly tailored solution to the issue, and to balance the defendant's right to have this trial move forward, the rights of the witnesses to testify, and the right of the government to proceed with this case, which has been pending now for several weeks, I think override any qualified First Amendment interest that the news organizations have with respect to the real-time access to

redacted exhibits right now.  And so for that reason, the application is denied.

THE COURT:  Ms. Comey, since we are running short on time, as we have a shortened day.

MS. COMEY:  Yes, your Honor, we won't get to any of the other exhibits before lunch.

THE COURT:  That's what I was going to ask you.

MS. COMEY:  Thank you, your Honor.

THE COURT:  Thank you so much.  I really appreciate it.

MS. EVERDELL:  Thank you, your Honor.

THE COURT:  With that.

MS. SLAVIK:  Your Honor, before we bring in the jury, I just wanted to flag one thing briefly for the Court.

Following Ms. Bongolan's testimony, the government intends to offer a couple of exhibits.  These exhibits are all related to a screenshot of a conversation between Kristina Khorram and Casandra Ventura in which Ms. Ventura tells Ms. Khorram about this balcony incident that Ms. Bongolan has testified about.  This particular exhibit, the actual screenshot was marked as a Defense Exhibit and was shown to Ms. Ventura on cross-examination, it was not offered into evidence.  The government plans to admit that screenshot as well as metadata and another related exhibit after Ms. Bongolan's testimony.

I understand that the defense will object to that, so in an effort not to delay anything today, the government will e-mail what it intends to offer to the Court and maybe we can take it up on the next break.

THE COURT:  What's the nature of the objection?

MS. SLAVIK:  My understand being -- I won't speak --

MS. SHAPIRO:  Your Honor, I would be happy to address it.  Can we put --

MS. SLAVIK:  We can...

MS. SHAPIRO:  Put a version of one of the texts on the screen.  So, your Honor --

THE COURT:  Well, first, let me hear the basis for admission.  This is under 801(d)(1)(B) or?

MS. SLAVIK:  Your Honor, I think there are multiple bases for admission.  First, as your Honor pointed out, this is a prior consistent of Ms. Ventura.  The declarant, Ms. Ventura, testified and was in fact subject to cross-examination on this very statement.  The defense crossed Ms. Ventura on this statement.

THE COURT:  So this addresses the requirement in *Caracappa*?

MS. SLAVIK:  Exactly.  Exactly.  It's also admissible, your Honor, under 803(3) to show Ms. Ventura's state of mind.

As your Honor can see with the exhibit on the screen, Ms. Ventura recounts the incident.  She says he came into my

house when my friends were here and we were all sleeping.  They woke me up because he was ringing the bell crazy at 3:00 a.m.  And when he came in, I went to my room and he went at Bana and choked her and then dangled her feet off the balcony.  This is crazy.  I have to stay away.

So, your Honor, I think this is important in that it shows Ms. Ventura's state of mind.  The content of this message, it not only relays the incident, but it immediately provides Ms. Ventura's reaction to the incident.  In other words, this is crazy, I have to stay away.

I think this is heartland 803(3) state of mind evidence.  It's also important here I think that Ms. Ventura is expressing her fear of Mr. Combs to Ms. Khorram, who is an agent and a co-conspirator of Mr. Combs.  This message shows Ms. Khorram's knowledge of Ms. Ventura's fear.  In other words, this message is used to show the effect on the listener, Ms. Khorram.  And under those several bases, the government's position is that this screenshot is admissible.

THE COURT:  Can you situate the balcony incident in terms of what's alleged in the indictment?  Like, can you connect the dots between the balcony incident and the government's case?  Why is it relevant?

MS. SLAVIK:  Your Honor, the relevance of this incident, which took place squarely in the middle of the conspiracy, is that it shows Mr. Combs' violence directed not

P65ACom1

only to Ms. Ventura, but to other people around Ms. Ventura. She is aware of this violence, and because of her awareness, I think that contributes to the coercive atmosphere.

THE COURT:  So it goes to coercion because it's evidence --

MS. SLAVIK:  Goes to coercion.

THE COURT:  Sorry, not to interrupt.

MS. SLAVIK:  Of course.

THE COURT:  Goes to psychological coercion because she's aware there is violence being perpetrated not only against her, but people in her orbit.

MS. SLAVIK:  Correct.

THE COURT:  During the time period of the conspiracy. So that's relevant to the substantive 1591 count.  It's also relevant to the alleged conspiracy because it also encompasses the acts that are separately changed under the 1591 count.

MS. SLAVIK:  That's exactly right.  And on that point, I will note this is one of the speaking allegations in the indictment.

THE COURT:  All right.  Now Ms. Shapiro.

MS. SHAPIRO:  Yes, your Honor.  First of all, I would like to give the Court a little more context than the government provided.

What happened was that, on direct, Ms. Ventura testified that she personally observed this alleged balcony

P65ACom1

incident and the cross-examination was designed to impeach that testimony because in fact she did not observe it as this -- if this text even relates to it, this text makes clear, the text is hearsay within hearsay.  She says, and these are parts that, interestingly, the government chose not to read to your Honor at the beginning.

Hey, I just found out some crazy shit.  And then she describes the things the government wants in.  And then at the end she says, I'm just finding out right now.

And we also don't know when this text was sent.  But, most importantly, she is reporting what someone else told her. We don't even know who told her because she says he came into my house while my friends were here and we were all sleeping. So it's hearsay within hearsay.  Because, at best, at best for the government, she's potentially reporting what Ms. Bongolan told her, and so that in itself is a hearsay problem.

To the extent the government is now apparently I think if I heard them correctly saying it's a prior consistent statement by Ms. Ventura, we attempted to impeach her with this document.  And what she testified to was -- and this is at page -- this part of the cross-examination is at transcript 1069 to 1071 for the full context, but we put the text up to try to get her to admit that she had not observed the incident contrary to her testimony, which she did not.  And then, you know, we asked her:  Did you tell Ms. Khorram that you had just

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

learned something crazy.  And then she says:  Well, now it's taken down, but I saw that.  I did text that.  I don't know if that's what I'm referring to because a lot of crazy things happening.

And then if you follow it down, she tries to refresh her recollection:  Isn't it true that you learned about this incident after the fact.  I saw what I saw.  I don't know.

So they just can't overcome the hearsay within hearsay problem presented by this.  And if they wanted to introduce this text, the time would have been on the redirect of Ms. Ventura.  But instead, they liked her testimony that she claimed to have observed the incident and she, you know, testified on cross she didn't remember, she didn't know what the text was referring to.

And so to the extent the government is claiming this is in for Ms. Ventura's state of mind, you know, it just doesn't make any sense because what they're really trying to get in is this hearsay within hearsay about what someone else told Ms. Ventura about this alleged incident.

I mean, it's a backward looking statement.

THE COURT:  No, I understand.

All right.  Let's do this.  So this is something, Ms. Slavik, that you would seek to introduce after Ms. Bongolan's testimony?

MS. SLAVIK:  That's right, your Honor.  And just to be

clear, I think, you know, having heard Ms. Westmoreland's cross of Ms. Bongolan, I think the very clear suggestion from cross-examination is defense's suggestion that this event never happened at all, that Ms. Ventura and Ms. Bongolan are somehow making up this event.

So I think that's important context to consider --

THE COURT:  So let's say that Ms. Shapiro is right. So you're saying the top level hearsay is either Ms. Ventura's state of mind or the effect on Ms. Khorram of hearing that this event actually happened.  And then to the extent that Ms. Ventura heard what she reported from Ms. Bongolan, then that would go under 801(d)(1)(B) because it would be a statement by Ms. Bongolan that is consistent with her testimony that has now been subject to cross-examination.

MS. SLAVIK:  Exactly right, your Honor.  I think that solves the hearsay within hearsay issue.  But the effect on listener and the state of mind, the government is offering --

THE COURT:  Does it matter that she didn't remember the text message when she was asked about it?

MS. SLAVIK:  Absolutely not, your Honor.  And let me just point out that the metadata of this text message, which has been provided to defense counsel, which the government intends to offer along with the screenshot, shows the screenshot, the exhibit we're looking at on the screen, was captured on September 30th, 2016, so very shortly after the

incident at issue.

THE COURT:  All right.

MS. SHAPIRO:  Your Honor, two things.  First of all, contrary to the government's points, we don't know from this text message who told Ms. Ventura whatever she heard.  And 801(d)(1) only applies to declarant witness's prior statement.

The text message on its face doesn't say how she heard about this.  It could have been from one of the other friends who were in the apartment.  In addition, it's a backward looking statement and it's -- there's a reference to she could press charges.  And under *Tome* that it wouldn't come in even if the prerequisites were satisfied, which they're not, because the text on its face doesn't make clear who told her this and she testified that she didn't remember this.

THE COURT:  Understood.

Let me ask, Ms. Slavik, just a logistical question, which is, you're not planning to use this with Ms. Bongolan?

MS. SLAVIK:  No, we're not planning to show it to Ms. Bongolan.  What we would propose is after Ms. Bongolan leaves the stand, we would offer this screenshot as well as the metadata and as well as a capture of Ms. Khorram's contact for Ms. Ventura into evidence and then read the screenshot.

THE COURT:  So we can do this at -- I understand you want to do it close in time to Ms. Bongolan's testimony, but if we needed to do this tomorrow so I could take a look at the

actual document, that would not do great violence to the government's agenda in terms of presenting this evidence.

MS. SLAVIK:  Your Honor, your Honor is right that the purpose of this screenshot is its relevance to Ms. Bongolan's testimony.  So the government would strongly prefer to present it at that time.  But should the Court need more time to consider these issues, I don't think it would be great violence.  Maybe a little bit of violence.

THE COURT:  Okay.  Fair enough.

So we'll pick this up at the next break.  With that, nothing further?  I'm getting a note.

MS. SHAPIRO:  Your Honor, just I think it would be helpful to us on the cross-examination if the Court issued its ruling now if it's at all possible so we know whether this is going to come in or not.

THE COURT:  But it's not going to be used.

MS. SHAPIRO:  We're not going to use it.

THE COURT:  You want to ask questions about it.

MS. SHAPIRO:  We're not going to use it obviously.

THE COURT:  So what's the purpose of having a definitive ruling now?

MS. SHAPIRO:  We'll just need to know, you know, whether -- it would effect the cross.

THE COURT:  In what way?

MS. SHAPIRO:  Well, we need to know if the Court is --

notwithstanding the fact that the text doesn't say and there's no foundation laid, that a declarant witness's prior statement is contained in the text, we need to know if the Court's view is otherwise. I mean, I don't want to pressure your Honor. I'm just asking, obviously.

THE COURT: All right. Well, let me think about that for a second, because I am being told that the overflow rooms were muted when I gave them at least the initial part of the instruction that I gave to everybody.

So let me take this opportunity while everyone is listening and not muted to remind everyone in the overflow rooms that they are not to, in any way, shape, or form, document the witness who is testifying next, Jane, in any notes or sketches or anything of that kind.

I think that's the part of my instruction that was muted in the overflow room. So now I have provided it to the overflow room.

As to Defense Exhibit 1340, give me one second.

MS. SHAPIRO: That's the one on the screen, but obviously --

MS. SLAVIK: Yes. To be clear, the government would be offering the same substantive exhibit, but with the government's sticker.

THE COURT: Of course.

MS. SHAPIRO: Yeah. The reason, your Honor, is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ms. Westmoreland may choose to question her about it now if they're going to be allowed to put it in.

It's just, you know, we didn't want them putting it in after she's off the stand and we never got a chance to -- but we don't think it's admissible, to be clear. But if the Court is going to allow it in, we do not want to be deprived of the opportunity while the witness is on the stand of questioning her about this document.

We don't think it should come in, so all of that time should not be --

THE COURT: No, I understand.

MS. SLAVIK: We have no objection to the witness being asked along the lines of what Ms. Shapiro suggested.

THE COURT: All right. So having taken a close look at the text message exchange and hearing the arguments from the government, I do think that this exhibit, restamped with the Government Exhibit number, would be properly admissible for the reasons stated by Ms. Slavik and as reflected in our colloquy, given that on the first level of hearsay, it would be properly admissible as either a statement of Ms. Ventura's state of mind shortly after the incident in question, and it also is being introduced for a non-hearsay purpose of showing that it was communicated to Ms. Khorram, who is an alleged member of the conspiracy charged in Count One. So that's that level.

To the extent that there's a second level of hearsay

given that the remaining portion of the text message exchange, that would be admissible under 801(d)(1)(B) given the nature of the cross-examination that we have heard to date.  In terms of it being ambiguous in the message itself, who Ms. Ventura, if she heard this from someone else, the other person would have been, the Court finds that applying the standard in rule 104 and looking at the context of the text message and having heard Ms. Bongolan's testimony concerning the incident in question as well as Ms. Ventura's testimony, the person I believe who would have relayed that information to Ms. Ventura would have been Ms. Bongolan.  And I think that that is an inference that the jury could reasonably draw and that is supported by a preponderance of the information that has been presented to the Court.

So for those reasons, this exhibit will be admitted when the government offers it into evidence.

So to the extent there is cross-examination that the defense would like to engage in related to this exhibit, they should go ahead and do so.  And the government has indicated they have no objection to the defense doing that.

With that, let's bring in --

MS. SHAPIRO:  I'm sorry.  I just want to put -- I understand you've ruled, but to preserve the objection, I just want to make clear we also object to the Court's finding on the coconspirator.  We don't think a sufficient foundation has been

laid in the testimony thus far establishing that Ms. Khorram is a co-conspirator to the RICO count. So for those reasons, as well as the reasons in 403.

THE COURT: Ms. Slavik, very briefly, do you want to address that specific point about Ms. Khorram?

MS. SLAVIK: To be clear, this is not being offered as a co-conspirator statement.

THE COURT: No. I think she's saying Ms. Khorram is not involved in the conspiracy, so...

MS. SLAVIK: Your Honor, I think the evidence that's been offered to date suggests strongly that Ms. Khorram is part of the enterprise. And I think that the evidence that will continue to be presented will confirm that. Eddy Garcia's testimony is just one example of Ms. Khorram being part of the conspiracy here.

THE COURT: Understood.

MS. SHAPIRO: Just one last point that the conspiracy, I just want to emphasize, is a racketeering conspiracy. So to establish that someone is a co-conspirator, there has to be evidence that they agreed with Mr. Combs and/or others to engage in a racketeering enterprise that had as its goal committing two predicate acts. And I don't think they're remotely close to that. So I just want to make that record.

THE COURT: Well, for admissibility purposes, the question is whether it's relevant evidence that would be

P65ACom1

probative of an element that the government has to show.  So you may be right that this particular text message doesn't go to like every element that would be needed to prove up the RICO conspiracy count, but it is relevant for the reasons stated by Ms. Slavik.  But you have made your record.  I've heard you and you've made your objection.

Now, after with long last, let's bring in Ms. Bongolan.

Welcome back.  You can be seated.  We are going to bring in the jury so you will have to stand up in a couple minutes, but...

THE WITNESS:  Thank you.

(Continued on next page)

(In open court; jury present)

THE COURT:  Please be seated.  Welcome back, members of the jury.  Just to give you a heads up, and thank you for accommodating the time change today.  We do have, I believe, a lunch coming in for you.  We're going to take a later and shorter lunch break.  But I wanted to make sure that you had some food back there while you're waiting.  So just a heads up for you there.

With that, Ms. Bongolan, you understand you're still under oath?

THE WITNESS:  Yes.

THE COURT:  With that, Ms. Westmoreland, you may proceed.

MS. WESTMORELAND:  Thank you, your Honor.

BRYANA BONGOLAN, resumed.

CROSS-EXAMINATION, continued

BY MS. WESTMORELAND:

Q.  Good morning.

A.  Good morning.

MS. WESTMORELAND:  Your Honor, first I would like to offer governments Exhibit 7Y-111 into evidence pursuant to stipulation, Government Exhibit 1304, paragraph 60.

Please do not publish, just show it to the parties.

THE COURT:  All right.  7Y-111 will be admitted.

(Government's Exhibit 7Y-111 received in evidence)

MS. WESTMORELAND:  Thank you, your Honor.

Could you please publish Government Exhibits 3S-105.

Thank you.

Q.  Ms. Bongolan.

A.  Yes.

Q.  You remember when the government showed you this photo on direct yesterday, true?

A.  Yes.

Q.  And this photo was the photo shoot where you said that Mr. Combs threatened you, true?

A.  Yes, ma'am.

Q.  And the date of this photo shoot is April 24th, 2016; you agree?

A.  It could be on or around.

Q.  Okay.  So close in that time?

A.  Yes.

Q.  Okay.

MS. WESTMORELAND:  All right.  You can take that down.

Can you please pull up Exhibit 1281 for the parties, Defense Exhibit 1281.

Q.  Ms. Bongolan, is that in front of you; can you see it?

A.  Yes, ma'am.

Q.  Just one page at a time, please.

All right.  I want you to look up at the top.  You recognize your number there?

A.   Yes.

Q.   And you recognize the other number there?

A.   I understand who it is, but I don't remember the number.

        MS. WESTMORELAND:  Your Honor, I would like to offer Defense Exhibit 1281 into evidence.

        MS. SMYSER:  No objection.

        THE COURT:  Defense Exhibit 1281 will be admitted.

        (Defendant's Exhibit 1281 received in evidence)

        MS. WESTMORELAND:  Can you please publish.

Q.   All right.  Ma'am, you see here it says two participants at the top, true?

A.   Yes.

Q.   And the first participant, Cass; you see that, true?

A.   Yes, ma'am.

Q.   And that's Cassie, right?

A.   I would assume it is, right?

Q.   And you see the second person, Bana; that's you, true?

A.   Yes, ma'am.

Q.   And you see this date is May 10th, 2016?

A.   Yes.

Q.   What is this?

A.   I don't remember, but it looks like drugs.

Q.   What kind of drugs?

A.   I wouldn't know at the moment.  But some type of drug.

Q.   Okay.  And you see that at the top of the screen it says

P65ACom1                    Bongolan - Cross

Bana at the top of the picture; so this text would be from you, true?

A.  Yes.

Q.  So you're sending Ms. Ventura this text?

A.  Yes.

Q.  And this is about ten days, between a week or two right after allegedly Mr. Combs, you said, that he made those statements to you at that photo shoot?  You would agree with that, true?

A.  Yes.

Q.  Okay.  All right.  So Mr. Combs, you said, that he made those threats at the end of April, but you continued -- and Ms. Ventura was his girlfriend at the time, right?

A.  Yes, ma'am.

Q.  Okay.  But you just continued keeping your friendship with Ms. Ventura business as usual, true?

A.  Could you explain that, please.

Q.  This is a week later.  You're still dealing with Ms. Ventura, right?

          MS. SMYSER:  Objection.

          THE COURT:  It's overruled.

Q.  True?

A.  Yes.

Q.  Okay.

          MS. WESTMORELAND:  You can take that down.

P65ACom1                    Bongolan - Cross

Q.  I want to show you another document.

        MS. WESTMORELAND:  Can you please pull up exhibit --
Defense Exhibit 1287 just for the parties.

Q.  Ma'am, you see your phone number up at the top?  You
recognize your number?

A.  Yes, ma'am.

Q.  All right.  And you see the other number up at the top
also.  You recognize that?

A.  Yes.

        MS. WESTMORELAND:  Your Honor, I move to admit Defense
Exhibit 1287.

        MS. SMYSER:  No objection.

        THE COURT:  Defense Exhibit 1287 will be admitted.

        (Defendant's Exhibit 1287 received in evidence)

        MS. WESTMORELAND:  Thank you.  Please publish.

Q.  Let's discuss this text.

    You see at the top two participants?

A.  Yes.

Q.  And those participants would be yourself and Cassie?

A.  Yes.

Q.  And you see the date is May 31st, 2016, true?

A.  Yes, ma'am.

Q.  Okay.  And what's this picture?

A.  It looks like some type of drug again.

Q.  Well, some type or several?

A.   Looks like a few drugs, yeah.

Q.   Can you please tell us what drugs those are?

A.   I can't tell by the picture.

Q.   Okay.

A.   Yeah.

Q.   But this text message would be from you, true?

A.   Yes.

Q.   Okay.  To Cassie?

A.   Yes.

Q.   Okay.  And so you're still doing drugs with Cassie or texting Cassie about drugs on May the 31st, 2016, right?

A.   Yes.

        MS. WESTMORELAND:  You can take that down.

Q.   Now, you're telling us that, according to you, that Mr. Combs threatened your life a few weeks before that post, right?

        MS. SMYSER:  Objection.

        THE COURT:  Hold on for a second.

        It's overruled.

A.   Could you say the question again.

Q.   Yes.  I mean, you told all of us that at the end of April 2016, that Mr. Combs threatened your life; that's what you said, right?

A.   Yes, ma'am.

Q.   So in the weeks to follow you were just continuing on

dealing with Cassie, right?

A. Yes.

Q. Weren't you scared to do that?

A. I guess not. I guess not.

Q. Okay. I want to go back to where we left off yesterday in reference to the balcony, okay?

A. Okay.

Q. All right. Now, you testified that Mr. Combs hung you over the balcony, right?

A. Yes. He held me over the balcony.

Q. Okay. He held you over the balcony and then he threw you into some furniture, true?

A. Yes.

Q. And you said that Cassie Ventura witnessed this?

A. I said I heard her voice as I was getting thrown.

Q. Okay. Wait, I want to make sure we're clear.

You're not saying that Cassie Ventura saw this?

A. I don't know.

Q. You don't know?

A. I can't speak for her.

Q. Okay. Isn't it true that you told the government on several different occasions that Ms. Ventura saw this?

A. I spoke to them, but again, I don't recall.

Q. You don't recall?

A. No, ma'am.

P65ACom1                        Bongolan - Cross

Q.  Okay.  All right.  And you said that as a result of Mr. Combs and what happened on that balcony incident that you hurt your leg, right?

A.  Yes, ma'am.

Q.  Okay.  And you said that you hurt your back, true?

A.  Yes.

Q.  You said you hurt your neck?

A.  Yes.

Q.  Okay.  And you said, you testified yesterday, you had night-terrors, true?

A.  Yes.

Q.  And that you suffer from nightmares?

A.  Yes.

Q.  And that you recently, I mean as of days ago, was having nightmares about this, right?

A.  Yes.

Q.  About the balcony incident?

A.  Just in general.

Q.  In general, okay.

    And you testified that the attorney, attorney Tyrone -- you remember him?

A.  I remember him.

Q.  And you explained to us yesterday that some of the things, some of the injuries in his demand letter, that you knew they weren't accurate, true?

A.   I know that things aren't accurate.  I just don't know exactly which ones you're talking about.

Q.   Okay.  Well, yesterday I asked you some questions about some claims that was made on your behalf in that lawsuit, true?

A.   Yes.

Q.   And one of the claims that I asked you questions about was that the demand alleged that Mr. Combs grabbed -- groped your breast.  Do you remember when I asked you about that yesterday?

        MS. SMYSER:  Objection, your Honor.

        THE COURT:  Yeah.  I think you need to rephrase the question.  Maybe take a step back.

        MS. WESTMORELAND:  Okay.

        THE COURT:  There might be some confusion what you're asking about.

        MS. WESTMORELAND:  Sure.

Q.   So Mr. Tyrone was your lawyer, right?

A.   Yes.

Q.   Okay.  And you're aware that in one of his demand letters sent on your behalf, that he alleged that Mr. Combs grabbed and squeezed your breasts so hard that you had bruises?

A.   I don't remember.

Q.   Okay.  You don't remember what exactly?

A.   I don't remember all the context in his -- in his, like, claims, writings, papers.

Q.   Okay.  So are you saying -- well, let me just ask you now.

P65ACom1                         Bongolan - Cross

Are you saying that that's true or not?

A.   I'm saying that many of the things he said was incorrect.

Q.   I'm asking you about that one.

A.   The bruises on my chest?

Q.   That Mr. Combs squeezed your breasts so hard that it left bruises on your breasts; is that true or not?

A.   That's incorrect.

Q.   That's incorrect.  Okay.

     And because of claims like that, you testified yesterday that's why you fired Mr. Tyrone, true?

A.   Yes.

Q.   Okay.  And you hired new civil lawyers, right?

A.   Yes.

Q.   Okay.  And they drafted a lawsuit for you, true?

A.   Yes.

Q.   And you reviewed that lawsuit, correct?

A.   To the best of my ability, yes.

Q.   And so you are aware that in that lawsuit with your new civil lawyers, that they still claim sexual assault on your behalf; you're aware of that, true?

          MS. SMYSER:  Objection.

          THE COURT:  It's overruled.

A.   I'm aware.

Q.   Okay.  And you spoke to the government after that civil lawsuit, you spoke to the government on April 9th, 2025, true?

P65ACom1                    Bongolan - Cross

A.   I don't remember the date, but yes, I spoke to them.

                (Continued on next page)

Q. OK. And when you spoke to the government, you told them that Mr. Combs grabbed your breasts, right?

A. I told them where he placed his hands.

Q. So the first time you spoke to the government, before the demand letter went out, before a lawsuit was filed, you never alleged that Mr. Combs grabbed your breasts. Isn't that true?

A. Again, I don't remember.

MS. WESTMORELAND: OK. Let me see if I can refresh your memory.

Can you please pull doc 003. On the phone part.

Please go to the next page.

Q. All right. You can look at the whole page, but you can look at paragraph 3. And I will show you paragraph 4.

A. I was just --

OK. Next paragraph.

OK.

Q. All right. So would you like me to repeat my question?

A. Yes, please.

Q. When you met with the government, your first time, January 18, 2024, you spoke about this a balcony incident, true?

A. Yes, from what I've seen.

Q. And you never told the government, you never claimed that Mr. Combs grabbed your breasts in any shape, form or fashion, did you?

A. I don't remember.

Q.  OK.  Well, you are -- you don't deny that you did an interview in January, true?

A.  Yes.

Q.  And you had your lawyer there with you, right?

A.  Yes.

Q.  As a matter of fact, Mr. Tyrone was there, wasn't he?

A.  Yes, he was.

MS. SMYSER:  Objection.

THE COURT:  Hold on.

The objection is overruled, and you got an answer.

So, Ms. Westmoreland.

MS. WESTMORELAND:  Thank you, your Honor.

Q.  And the prosecution was there, right, the prosecutors?

A.  Yes.

Q.  The same prosecutor that did your direct?

A.  Yes.

Q.  OK.  And you understand that there was someone there taking notes; you understand that, right?

A.  Yes, ma'am.

Q.  OK.  And you would agree with me that making a claim of that nature would be a pretty big deal, pretty important?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

MS. WESTMORELAND:  OK.

Q.  Ma'am, isn't it true that your lawyer, Mr. Tyrone, alleged

for the first time sexual assault, and although you knew that wasn't true, you started repeating that story?

MS. SMYSER:  Objection.

THE COURT:  Overruled.

A.  Can you say that again, please?

Q.  Ma'am, isn't it true that although your lawyer, Mr. Tyrone, started that story about the sexual assault and even though you knew it wasn't true, you started repeating it?

A.  Sorry.  Can you rephrase that?

Q.  OK.  Isn't it true that although your lawyer, Mr. Tyrone, started that story, that sexual allegation, and you knew it wasn't true, you fired him, but then you kept that lie?  Isn't that true?

MS. SMYSER:  Objection, your Honor.

MS. WESTMORELAND:  I'll rephrase it.

THE COURT:  Let me see if I can help.

MS. WESTMORELAND:  All right.

THE COURT:  Maybe if you break it down, then I think you can ask the questions that you're trying to ask.

MS. WESTMORELAND:  Absolutely, Judge.

Q.  After your first interview with the government, you're aware that attorney Tyrone sent a letter on your behalf, isn't that true?

A.  Yes.

Q.  And you're aware that he put multiple claims in that demand

letter that just wasn't true, right?

A.   Yes, ma'am.

Q.   And you fired him because of that, true?

A.   Yes.

Q.   And he -- Mr. Blackburn, Tyrone Blackburn, he's the one who alleged on your behalf that Mr. Combs sexually assaulted you, true?

A.   I just don't -- I can't speak for him, so I'm having a hard time answering the question.

Q.   Don't worry.  I want you to speak for -- I want you to speak for you.  OK?

A.   Yeah.

Q.   All right.  Your attorney, Tyrone, he started that sexual assault story, but you kept that even though you knew it was a lie, true?

        MS. SMYSER:  Objection.

        THE COURT:  That's overruled.

A.   The word "started," it's hard to agree with the whole thing you're saying.

Q.   After that demand letter, you kept repeating that lie?

        MS. SMYSER:  Objection.

        THE COURT:  You need to maybe specify what you're talking about a little bit.

BY MS. WESTMORELAND:

Q.   The lie about grabbing your breast.

A.   Can you resay it?

Q.   OK.  Ma'am --

A.   I'm listening.

Q.   -- although you knew that Mr. Combs did not sexually assault you, after your demand letter, you started repeating that lie?

A.   Again, it's --

        MS. SMYSER:  Objection, your Honor.

        THE COURT:  That's overruled.

A.   That word "started," it's hard to agree with everything you're saying.

Q.   All right.  Please take "start" out of it.  Whatever started it, you continued to accuse Mr. Combs of sexually assaulting you even though you knew that wasn't true?

A.   Sorry.  It's really hard to commit to the whole sentence because those parts that are true, but the way that you're asking the question, it's hard to answer, because I don't -- I don't agree with all of it.

Q.   OK.  Ma'am, was it your understanding that claiming sexual assault was the only way you could file a lawsuit?

        MS. SMYSER:  Objection.

        THE COURT:  That needs to be rephrased if you want to ask a question along these lines.

BY MS. WESTMORELAND:

Q.   Ma'am, did you believe -- did you believe -- that the only

way for you to file a lawsuit was to say that Mr. Combs sexually assaulted you?

MS. SMYSER:  Objection.

THE COURT:  Overruled.

A.  I don't recall.

Q.  OK.  Let's go back to the balcony.  All right?

A.  OK.

Q.  You didn't make a police report, did you?

A.  No.

Q.  You didn't call the police?

A.  No, I did not.

Q.  Well, you were -- according to you, you were hung over the balcony and you were screaming for dear life, right?

MS. SMYSER:  Objection.

THE COURT:  That's sustained.

BY MS. WESTMORELAND:

Q.  You were screaming?

A.  Can you resay that?

Q.  Were you screaming?

A.  Yes, I was screaming back.

Q.  OK.  Are you aware of anyone else calling the police?

A.  I have no idea.

Q.  OK.  Now, this was a building; you were at Cassie Ventura's home, right?  This happened there, right?

A.  Yes.

Q.   And this place is a building, true?

A.   Yes.

Q.   Other tenants there, you're aware?

A.   I suppose, I guess.

Q.   OK.  You didn't go to the hospital, did you?

A.   No.

Q.   What about -- you didn't go to an urgent care?

A.   No, ma'am.

Q.   OK.  And you testified at some point you went to a chiropractor?

A.   Yes, I went.

Q.   And you didn't tell the chiropractor what happened?

A.   No.  I was scared.

Q.   You were scared?

A.   Yes, ma'am.

Q.   OK.  And you testified that your girlfriend put those bandages on you, true?

A.   Yes.

Q.   OK.  And when you went to the chiropractor, they didn't professionally put bandages on you or anything?

A.   No.  I hurried out.

Q.   You hurried out?

A.   Yes, ma'am.

Q.   With a neck brace?

A.   It was given to me.

Q.   OK.  All right.  You were hurt?

A.   Yes.

Q.   Really hurt?

A.   Yes.

Q.   OK.  And you took that neck brace, you put it on?

A.   The chiropractor showed me how to put it on.

Q.   OK.  And the girlfriend that you said put the bandages on you --

A.   Yes.

Q.   -- and that was the same girlfriend that was there?

A.   The night of the incident?

Q.   Yes.

A.   Yes.

Q.   What's her name?

A.   She goes by Sarah or Friday.

Q.   Ma'am, not what she goes by.  Can you please provide her first and last name?

A.   I believe it's, like, Sarah Siddell.  It was a while ago.

Q.   And you didn't tell -- this night of, that you said this happened, you didn't tell Ms. Sarah about it?

A.   No.  Again, I didn't want her involved.

Q.   OK.  And isn't it true when you met with the government that you warned them that the girlfriend that you said was there, that she wouldn't know about anything about you being hurt or injured by Mr. Combs?  Right?

P65Wcom2                      Bongolan - Cross

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

A.  Could you say that question again?

Q.  Sure.

When you interviewed with the government, you warned them that the girlfriend you claimed was there, she wouldn't know anything about any injuries that you said that Mr. Combs did to you?

MS. SMYSER:  Your Honor, objection to warned.

THE COURT:  Yes.  Can you rephrase.

BY MS. WESTMORELAND:

Q.  You told the government -- well, I'll back up a little bit. The government asked you who was there, right?

A.  Yes, ma'am.

Q.  And you told them that a girl named Friday was there, right?

A.  Yes.

Q.  OK.  Not Tiffany Red, like with Ms. Ventura?

A.  Not her.

Q.  All right.  And you told the government in advance that the girlfriend, Friday, that she didn't know about the allegations you were making, true?

A.  I don't remember.

Q.  OK.

All right.  So after you claim that Mr. Combs caused you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

all this, the injuries, you continued to go around him?

A. Yeah, when he was -- when we were around. It wasn't often.

Q. You said yes -- I'm sorry?

A. Yeah. It was sporadic when I hung out with him, so it wasn't often, but I was around him.

Q. It wasn't often but -- you what?

A. I was around him.

Q. So you weren't too scared to go around him?

A. I kept my distance.

Q. You kept your distance? OK. Well --

MS. SMYSER: Objection to the commentary, your Honor.

MS. WESTMORELAND: Apologies, your Honor.

THE COURT: All right.

BY MS. WESTMORELAND:

Q. You told us yesterday about your eight-hour ketamine day, right?

A. Yes.

Q. And you told us that was after the injuries that you showed us, right?

A. Yes.

Q. OK. And that was around Mr. Combs, right?

A. Yes.

Q. You kept your distance during this eight-hour ketamine fest?

A. Like I was saying yesterday, I felt like we were trying to

get along, so I picked and choose.

Q.   OK.   Well, isn't it true that you told the government that after doing eight hours of ketamine, that you and Mr. Combs sat down and shared a blunt together?

A.   I do remember that.

Q.   OK.   So it's your testimony that Mr. Combs did these horrific things to you and then you later sat down and shared a blunt with him, true?

A.   Yeah, it was sometime later.

Q.   It was sometime later?

A.   Yeah.

Q.   All right.   I want to ask you some questions about some other times.   OK?

A.   OK.

Q.   I want to take you back to October 4, 2016.   OK?

A.   Yes.

Q.   And you would agree that October 4, 2016, is just eight days after September 26?

A.   Yeah, I agree.

Q.   OK.   Isn't it true that on October 4 of 2016, that you went to Mr. Combs's concert?

A.   I don't know the date, but I did attend a concert.

          MS. WESTMORELAND:   OK.   Let me see if showing you a document will refresh your memory in reference to the date.

          For the parties only, can we please pull up Defense

Exhibit 1887.

Q.  Please review that and look up at me when you're finished.

          MS. WESTMORELAND:  All right.  You can take that down.

Q.  Does this refresh your memory that you went to Mr. Combs's concert on October 4, 2016?

A.  The texts don't really remind me that I went, but I know I went.

Q.  You did?

A.  Yeah.

Q.  All right.  Did you sit on the front row, go backstage?

A.  Kind of everywhere, yeah.

Q.  Kind of everywhere?  Everywhere at Mr. Combs's concert?

A.  Yes, ma'am.

Q.  Weren't too scared to do that?

A.  No.  I was helping as much as I could.

Q.  You were helping?

A.  Yeah.

Q.  OK.  Close proximity to Mr. Combs?

A.  I don't think I was around him most of the time, but yeah.

Q.  Watched him perform?

A.  What was that?

Q.  Did you watch him perform?

A.  I don't know if I watched him perform.

Q.  OK.  All right.  Let's discuss October 5.  Now we're a few days past a week of when you said this happened to you.  OK?

P65Wcom2                      Bongolan - Cross

A.   OK.

Q.   And you went to a club, Bootsy Bellows, true?

A.   I don't know.  But I've been to that club.

Q.   OK.  Well, you recall that October 5, that was a private party that you attended; do you recall that?

A.   I don't know if it was a private party, but I remember attending something at Bootsy Bellows.

Q.   OK.  Let me show you something to see if it would refresh your memory.

A.   OK.

        MS. WESTMORELAND:  Can you please pull doc 021 for the parties only, page 8, and sent dash.

Q.   Please look up at me when you're done.

A.   Yes, I see --

Q.   You see it?

A.   I'm there.

Q.   All right.  Please turn to the ladies and gentlemen of the jury and tell them who rented out the club that night.

A.   Oh -- I mean, it's Sean Combs.

Q.   Mr. Combs?

A.   Yeah.

Q.   All right.  So you're testifying that Mr. Combs caused you significant injuries, right?

     I'm sorry.

A.   I'm listening.

Q.   I'm saying true?

A.   Yes.

Q.   All right.  And about a week or so later, you go to Mr. Combs's private party, true?

A.   Yes.

Q.   OK.  And you club with him?

          MS. SMYSER:  Objection.

          THE COURT:  Overruled.

A.   I attended the club, but I'm pretty sure it wasn't, like -- I mean I really don't remember.  I know going, I know attending.  I went to his event, but yeah.

Q.   OK.  You weren't too fearful enough to not go to Mr. Combs's event, were you?

A.   I know I always had, like, a feeling inside, but, yeah, so I went.

Q.   OK.  You have that neck brace on?

A.   Probably not.

Q.   You're not sure?

A.   I'm not sure.

Q.   So you may have had the neck brace on that night?

A.   Yeah.  Probably not there, but I don't think I would want to be seen with a neck brace.

Q.   OK.  So your neck wasn't so hurt that you needed to have your neck brace on when you attended Mr. Combs's private party about a week or so later?

P65Wcom2                         Bongolan - Cross

MS. SMYSER:  Objection.

THE COURT:  That's overruled.

A.  Could you resay that?

Q.  Sure.

Your neck was not so hurt where you needed to wear that neck brace when you were going to Mr. Combs's private party a little -- a week or so later, after this alleged incident, true?

A.  I probably should have and didn't.

Q.  OK.  You probably should have because your neck was still hurt?

A.  I can't recall.

Q.  OK.  All right.  So you took a picture -- you would agree with me you took a picture in that neck brace, and then you took it off?

A.  Yes.

Q.  All right.  And you would agree with me that you went back to partying with Mr. Combs?

A.  I partied, I mean, not with him.

Q.  OK.

A.  That incident, yes.

Q.  And while you were at the club, you were drinking?

A.  I don't remember.

Q.  You told your drug dealer Ray Jay to bring some drugs to the club, do you remember that?

P65Wcom2                     Bongolan - Cross

A.   I don't know what happened -- I don't, I don't know why --
his name is Ray Jay, but I don't remember.

          MS. WESTMORELAND:  OK.  All right.  Can you please
pull doc 1852, page 1 and 2, please.

          All right.  One page at a time, Mr. McLeod.

          Thank you.

Q.   All right.  Can you look at the top, and you recognize your
number?

A.   Yes.

Q.   At the top?

A.   Yes.

Q.   And you recognize the other numbers or some of the other
numbers listed at the top?

A.   I know the names.

Q.   OK.

A.   Numbers I can't remember.

          MS. WESTMORELAND:  Your Honor, I move to admit Defense
Exhibit 1852.

          MS. SMYSER:  No objection.

          THE COURT:  1852 will be admitted.

          (Defendant's Exhibit 1852 received in evidence)

BY MS. WESTMORELAND:

Q.   I'd like to read this out loud.  I'll be the green.  You
can be the blue.  OK?

A.   OK.

Q. All right.  All right.  So the green says: "Cassie: Hola, you ladies want to come" -- excuse me.  "You ladies wanna have a wine smoke cooking catch up sleep over?"

A. "I was just about to hit you.

"LOL."

MS. WESTMORELAND:  OK.

MS. SMYSER:  Objection, your Honor.  I think it's misleading.

MS. WESTMORELAND:  OK.

MS. SMYSER:  Text.

BY MS. WESTMORELAND:

Q. I'll read Cas, and you read yourself.  Is that OK?

You're not on this page.  Let me get to the next page.

A. OK.

Q. All right.

THE COURT:  Why don't we do this.  Look, Ms. Westmoreland, why don't you ask this witness the questions you want to ask her.  You have this in evidence.  If you need to read something from the document, you can.

MS. WESTMORELAND:  OK.

Can you go to the next page, please.

Q. And your response on page 2 is: "Yea, we can at like 8." Do you agree?

A. Yes, that's all there.

MS. WESTMORELAND:  All right.  You can take it down.

Q.  So Cassie is asking you if you want to come over and have a sleep-over?

A.  Asking Yonce and I, yes.

Q.  OK.  And did you see that date was October 9?

MS. WESTMORELAND:  I'm sorry.  Can you please publish it back and show the date, please.

A.  I see the date.

MS. WESTMORELAND:  OK.  You can take it back down.

Q.  So on October 9, less than two weeks after you allege that Mr. Combs caused you significant injuries and terror, you were willing to go back to the exact same place, the apartment, to spend the night?

A.  Yeah.  That's -- yeah.

Q.  You said yes?

A.  Yes.

MS. WESTMORELAND:  OK.

Can you please pull exhibit, Defense Exhibit 1853, page 1 and 11.

Q.  All right.  I'm going to focus on the top.  Do you see your phone number there; do you recognize that?

A.  Yes, ma'am.

Q.  OK.  And you see the other number at the top, true?

A.  Yes.

MS. WESTMORELAND:  OK.

All right.  Your Honor, I move Defense Exhibit 1853

into evidence.

MS. SMYSER:  No objection.

THE COURT:  1853 will be admitted.

(Defendant's Exhibit 1853 received in evidence)

MS. WESTMORELAND:  Your Honor, since this is just two parties, can we read the text?

MS. SMYSER:  No objection to that, your Honor.

THE COURT:  All right.  You may proceed.

MS. WESTMORELAND:  Thank you.

Q.  Ma'am, will you please read Bana and I'll read Cas.

A.  Yes, I could do that.

Q.  All righty.

A.  I don't really know what I wrote, to be honest, maybe it says 15mgees Roxane's.

Q.  Roxane's.  OK.  Do you know what that is?

A.  No, ma'am.

Q.  "coolio.

"What are you and Friday hungry for?

"And you won't be here until 8?"

A.  "Let me think.

"And 7/8 ish.  Still here.  Almost done designing.

"KK.  Hit me later.  luh ya.  Thank you for yesterday."

Q.  "Luv ya."

A.  "Oh Ima go grab you newborn and raised soon.

"P want some?"

P65Wcom2                        Bongolan - Cross

Q.   "Question mark, question mark."

A.   OK.   "The hoodies you like."

Q.   "Ya."

     Ma'am, isn't P Mr. Combs?

A.   Yes.

Q.   So you're asking here --

          MS. WESTMORELAND:   You can take that down.

Q.   You're asking Cassie if P -- for Puffy, right?

A.   Yes.

Q.   You're asking if he would like a sweatshirt?

A.   Yes, I did.

Q.   OK.   And you're alleging that Mr. Combs, just two weeks
prior to this, hung you over a balcony, threw you into
furniture, you sustained severe injuries and now you're asking
if he'd like a T-shirt?

          MS. SMYSER:   Objection.

          THE COURT:   Overruled.

A.   Yeah, like I said, I -- we had that FaceTime call.  We were
trying to be cool.

Q.   OK.

     Wait.  Can you repeat that again?

A.   Which part?

Q.   What you just said.  Your explanation on why you did this.

A.   We had the FaceTime call after the incident, right?  And I
believe I stated, like, I don't want any problems, and this

P65Wcom2                    Bongolan - Cross

shows me that I was trying to be cool.

Q.   Ma'am, isn't it true that you told the government that in a FaceTime call after this alleged balcony incident, that you and Mr. Combs didn't even discuss the balcony?

A.   I don't remember.

Q.   OK.   Ma'am, isn't it true that you continued to hang around Mr. Combs and spend the night at Cassie Ventura's house because Mr. Combs did not cause you those injuries?   Isn't that true?

          MS. SMYSER:   Objection.

          THE COURT:   Overruled.

A.   Could you rephrase that?

Q.   Ma'am, isn't it true that you continued to hang out with Mr. Combs and you continued to spend the night at Ms. Ventura's house because Mr. Combs did not cause you those injuries? Isn't that true?

A.   Part of that statement is correct and part of that statement I don't -- I can't agree with.

          MS. WESTMORELAND:   OK.   I'd like to show you -- can you please pull up Defense Exhibit 1856.

Q.   All right.   You recognize your phone number up at the top?

A.   Yes.

Q.   And you see the number and email address behind yours?

A.   Yes.

          MS. WESTMORELAND:   Your Honor, I move to admit Defense Exhibit 1856.

THE COURT:  All right.  Defense Exhibit 1856 will be admitted.

(Defendant's Exhibit 1856 received in evidence)

MS. WESTMORELAND:  Thank you.

Can you put it a little bigger for me, Mr. McLeod, so I can read it.

Thank you.

Q.  All right.  This text message, you agree that it's from October 15, 2016?

A.  Yes, ma'am.

Q.  OK.  And this message is from Mr. Combs to you?

A.  That's what it seems like.

Q.  OK.  And I'll read it:  "When friends get high with each other there not supposed to let there friends fuck up and not try to stop them.  Your real wack to me for that.  If you gonna do K with her, at least have her back.

"Real wack."

Do you remember receiving this text message?

A.  I remember receiving them.

MS. WESTMORELAND:  OK.  We can take that down.

Q.  You were under the impression that Mr. Combs really wanted you to stop doing so much drugs with Cassie, isn't that true?

A.  I can't speak for him.

Q.  I asked you if you were under the impression.

A.  Can you rephrase that?

Q.   Did you feel like, that Mr. Combs really wanted you to stop doing so much drugs with Cassie?

A.   It was confusing because of everything going on.

Q.   All right.  Let's talk about the photos of your injuries. OK?

A.   OK.

Q.   OK.  Now, one photo -- you turned over these photos to the government, true?

A.   True.

Q.   All right.  And one photo was a picture of your leg, right?

A.   Yes.

Q.   OK.  And you described that picture as being on the back of your thigh, true?

A.   Somewhere back of my leg, yes.

Q.   And you described it as deep cut with some bruising around it, true?

A.   I said it was a big bruise with, like, a -- I can't remember exactly what I said, but, like, some type of piercing.

Q.   OK.  And you told the government that this balcony incident happened early in the morning, true?

A.   Yes, ma'am.

Q.   OK.  And that the photo was taken later that day at your apartment, true?

A.   Yes, ma'am.

Q.   And that you were alone when you took the photo, right?

A.   Yes, ma'am.

Q.   OK.   And then you provided another photo, you know, the one with you in the neck brace, right?

A.   Yes, ma'am.

Q.   The bandages.

     And you explained that that photo was airdropped or texted to you, true?

A.   I explained that because I couldn't remember, so --

Q.   But that's what you said?

A.   Yes, ma'am.

Q.   OK.   And you told the government that during an interview, right?

A.   Sorry.   Say that again?

Q.   You told the government that during an interview, that it was airdropped or texted to you, true?

A.   Yes.

Q.   And you testified to that yesterday, right?

A.   Yes.

Q.   And you testified yesterday that both of those injuries happened on the same day, true?

A.   Sorry.   Say that again?

Q.   You testified yesterday on direct -- you were shown both of your photos, right?

A.   Yes, ma'am.

Q.   And madam prosecutor asked you about the second photo; that

P65Wcom2                      Bongolan - Cross

was the one with your back and your neck.  You remember that, right?

A.  Yes.

Q.  And she asked you if both of those injuries happened on the same day, and you testified it did, true?

A.  Yes.

MS. WESTMORELAND:  OK.  Can you please publish Government Exhibit 3S102A.

Q.  This is the picture of your leg, right?

A.  Yes.

MS. WESTMORELAND:  And can you please make the date big for us.  Enlarge it.

Thank you.

Q.  All right.  And you agree with me that this is Monday, September 26, 2016, true?

A.  Yes.

Q.  At 9:45 a.m., true?

A.  Yes.

Q.  And this is the metadata from your phone, right?

A.  Yes, ma'am.

MS. WESTMORELAND:  OK.  Can you remove that part and keep the exhibit up.

Q.  And at the bottom of this exhibit it shows that this is your phone, Apple phone 7, right?

A.  Yes.

Q.   And it shows your location, true?

A.   Yeah.

Q.   OK.  And this is the metadata from your phone, right?

A.   Yes, ma'am.

          MS. WESTMORELAND:  OK.  You can take that down.

Q.   Ma'am, are you familiar with the Bad Boy Reunion Tour, aren't you?

A.   Yeah.

Q.   Because you worked on that tour, on a portion of it, true?

A.   I worked on it unofficially.

Q.   OK.  But you worked on it, right?

A.   Yeah.

Q.   OK.  And you started it but you didn't finish the tour, right?

A.   Could you explain further?

Q.   You told the government you started on the tour but you didn't finish it, true?

A.   I don't really understand what you're saying.

Q.   OK.  You worked on some portion of the Bad Boy tour, true?

A.   Like, I didn't attend certain dates?

Q.   Right.  But you attended some of them?

A.   Maybe, like, one.

Q.   OK.

A.   Two, maybe one.

Q.   Do you remember Cassie's travel schedule during the month

of September?

A.  No.

Q.  Do you remember Mr. Combs's travel schedule during the month of September?

A.  No.

MS. WESTMORELAND:  I'd like to show you some documents to see if it would refresh your memory.

Can you please show to the parties only --

MS. SMYSER:  Objection, your Honor.  There's no failure of memory here.

MS. WESTMORELAND:  Your Honor, she said she didn't remember.

MS. SMYSER:  No.

THE COURT:  Ms. Westmoreland, you may proceed.  You're going to put a document in front of the witness.

MS. WESTMORELAND:  I'm sorry, your Honor.  I'm so sorry.

THE COURT:  That's OK.  You're going to put a document to refresh the witness's recollection.

MS. WESTMORELAND:  Just to refresh the witness, yes.

THE COURT:  All right.

MS. WESTMORELAND:  I'm going to do a few documents.

Can you please show to the parties only 1879.

Can you please enlarge the bottom.

After you finish reviewing, please look up at me.

All right.  Please take that down.

Can you please pull up Defense Exhibit 1881 just for the parties.

After you finish reviewing that, please look at me.

All right.  Can you please pull up just for the parties 1884.

Can you make that a little larger.

When you're done, just look up at me.

OK.  One more.  Can you please pull up doc 1886 just for the parties.

When you're done looking at this one, please let me know.

Thank you.

Q.  Ms. Bongolan, you know that Mr. Combs performed at the Prudential Center in Newark, New Jersey, September 25, true -- 2016?  True?

A.  I don't know personally, but I see.

Q.  And you're aware that Mr. Combs and Cassie were in New Jersey on September 25, 2016, true?

MS. SMYSER:  Objection.

THE COURT:  Overruled.

A.  I'm not aware.

Q.  All right.  You're aware that the Bad Boy Reunion Tour was going on in September of 2016, true?

A.  I know it was going on, but I'm not for sure on dates.

P65Wcom2                      Bongolan - Cross

Q.  Ma'am, you're aware that Mr. Combs was on stage on the night of the 25th at the Bad Boys Reunion Tour performing alongside with Lil' Kim?

MS. SMYSER:  Objection.

THE COURT:  Is there a question?

BY MS. WESTMORELAND:

Q.  True?

A.  Can you resay that?

Q.  Ma'am, you're aware that Mr. Combs, on September 25, was performing on stage, Bad Boy Reunion Tour, with artist Lil' Kim?

A.  I can't recall.

Q.  In New Jersey, you can't recall?

A.  No, ma'am.

Q.  All right.  Well, are you aware that on September 26, Mr. Combs and Cassie was in New York at the Boys & Girls Harbor Salute to Achievement benefit?  Are you aware of that?

MS. SMYSER:  Objection.

THE COURT:  Let's have a very brief sidebar.

(Continued on next page)

(At sidebar)

THE COURT:  Ms. Westmoreland, I'm going to ask you to please speak to your defense team and make sure that they are, understand the instruction that I gave to the parties at the beginning of our session today.

MS. WESTMORELAND:  OK.

THE COURT:  I just want to make sure -- and Ms. Shapiro, you can do it if you want to do it, but you understand what I'm talking about.

MS. SHAPIRO:  Yes, I understand what you're talking about.  I understand, your Honor.

THE COURT:  Ms. Smyser, now, let's talk about what we were just discussing.

You raised an objection.  What's the objection?

MS. SMYSER:  Your Honor, counsel's essentially testifying here.  She put several documents in front of the witness.  They're all hearsay.  She tried to refresh her recollection, but it hasn't worked.  But she continues to testify about what is in those documents.

THE COURT:  Well, I think she's asking them in a proper way, which is to ask the witness if she has an understanding, given that she was aware of the tour, of Mr. Combs's whereabouts.  And she's permitted to ask it in a leading way.  And she hasn't referenced the content of any of the documents that were put in front of the witness.  So I

haven't seen yet any attempt to improperly, as you say, testify in front of the jury.  But I'll be watching.

THE COURT:  Ms. Westmoreland, do you have any further questions along these lines?

MS. WESTMORELAND:  I think maybe one.

THE COURT:  All right.

MS. WESTMORELAND:  But she's answered that one, and I may have one more.

THE COURT:  All right.

Ms. Smyser.

MS. SMYSER:  I don't have anything more to say on that, but I do want to put on the record, your Honor, that we understand the defendant was nodding furiously in response to some of the questioning, and so we just wanted to make that clear on the record.

THE COURT:  Outside the presence of the jury?

MS. SMYSER:  No, not -- in the presence of the jury, in response to Ms. Westmoreland's questioning.

MS. SHAPIRO:  I think that's what your Honor was asking us to take care of -- that was my interpretation -- to remind Mr. Combs of the Court's instruction.

THE COURT:  Well, I'm concerned.  I'm concerned in both directions of improperly influencing the jury, so what would you propose to put on the record that's in the presence of the jury?

P65Wcom2                    Bongolan - Cross

MS. SMYSER:  Well, I'm not saying that we need to put on the record that Mr. Combs is nodding furiously in front of the jury.  I just wanted to put it on the record.  General reminder.

THE COURT:  Yes, please make your record.

Is there anything further you'd like to add?

Ms. Comey.

MS. COMEY:  Thank you, your Honor.

The reason the two are related is that Ms. Westmoreland is asking these questions, and then the defendant is testifying from counsel table by nodding his head vigorously yes in response to Ms. Westmoreland's questions.  So that is the issue we have.  And the jury is seeing it, and then we see them writing down.  So our concern is the defendant is testifying by nodding affirmatively in response to Ms. Westmoreland's questions.

THE COURT:  I was very clear in my instructions this morning, and everyone understood what I meant because there was an email chain about this between the parties and I saw it myself, so I called a sidebar.  I did not see it -- I was focused on the questions and the answers during the actual testimony, but I take it the government observed this during the questioning.

MS. COMEY:  Yes, your Honor.

MS. WESTMORELAND:  I'll talk to him, but I'm looking

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P65Wcom2                    Bongolan - Cross

straight ahead at the witness.

MS. COMEY:  I'm not suggesting that Ms. Westmoreland is intentionally trying to do this.  I'm suggesting that the defendant is himself trying to take advantage of the leading questions without Ms. Westmoreland's knowledge to testify by nodding vigorously yes in response to her questions.

MS. SHAPIRO:  Your Honor, I don't think that's fair, but I will -- since I'm sitting at the counsel table, I will go over to him before the questioning resumes and re-warn him of your Honor's admonition.

THE COURT:  All right.  Let's proceed.

(Continued on next page)

P65Wcom2                     Bongolan - Cross

(In open court)

THE COURT:  Ms. Westmoreland, you may proceed when ready.

MS. WESTMORELAND:  Yes.

Q.  I don't believe that you had the opportunity to answer the question that I just asked you.  I'll repeat it for you.  OK?

A.  Please.

Q.  All right.  Are you aware that on September 26, Mr. Combs and Ms. Cassie was at New York at the Boys & Girls Harbor Salute to Achievement benefit award?

A.  Not aware.

Q.  Are you aware that on September 26, Mr. Combs, with the Bad Boy Reunion Tour, was also doing a signing at Macy's?

A.  Not aware.

MS. WESTMORELAND:  I'd like to publish -- can you please publish Government Exhibit 7Y111.

Thank you.

Can you please go up to the top and highlight the name a little bit for us.

Q.  Ma'am, do you see at the top of this document that it says Mr. Frank Black?

A.  I see it.

Q.  OK.  Do you know -- do you know who that is?

A.  No.

Q.  No?

All right.  You see at the top it says Trump International Hotel and Tower, New York?  You see that?

A.  Yeah.

MS. WESTMORELAND:  All right.  Can you please go to arrival and departure.

Q.  Do you see that this says arrival, 9/24, 2016, with the departure of 9/29, 2016?

A.  I see that.

MS. WESTMORELAND:  You see that?

All right.  Let's go up the page a little bit.  All righty.  Let's go to 9/25, breakfast.

Thank you.

Q.  Do you see on here room charged breakfast on 9/25, 2016?

A.  I see it.

MS. WESTMORELAND:  OK.  Can we go down to -- I'm sorry, 9/26, and let's just highlight all of 9/26, please.

All right.  Thank you.

Q.  Do you see something at the top, 9/26, 2016, runners fee, $5?

A.  Yes, ma'am.

Q.  All right.  Do you see 9/26, 2016, in-room dining breakfast, $210.31?

A.  I see that.

MS. WESTMORELAND:  You see that?  OK.

Let's go down.

Q.  Do you see 9/26, 2016, in-room dining, $107.84?  Do you see that?

A.  Yes, I do.

Q.  OK.  And then below that, we have another in-room dining charge, same date, 9/26, 2016, $102.77.  You see that?

A.  Yes, ma'am.

Q.  All righty.  9/26, 2016, next line, $344.65, another in-room dining charge.  Do you see that?

A.  Yes, I do.

        MS. WESTMORELAND:  All righty.

        Can you take that down -- I mean go back in.

        Let's go down to 9/27, last line on this page, please.

Q.  All right.  Do you see 9/27, 2016, in-room dining, $21.57?

A.  Yes, I do.

        MS. WESTMORELAND:  OK.  Please take that down.

Q.  Ma'am, Ms. Bongolan, you agree that one person can't be in two places at the same time?

A.  In, like, theory, yeah.

Q.  You're not sure?

A.  Hard to answer that one.

Q.  Ms. Bongolan, you told us that -- you testified that Mr. Combs, on September 26, 2016, came in Cassie Ventura's house, hung you over the balcony, threw you into some furniture and that you sustained several injuries; that's what you testified to the ladies and gentlemen of this jury, did you

P65Wcom2                         Bongolan - Cross

not?

A.   Yes.

          MS. SMYSER:  Objection.

          THE COURT:  Hold on.

          Ms. Westmoreland, can we get a new question?

          MS. WESTMORELAND:  Yes.

Q.   Ma'am, you testified that Mr. Combs caused you the injuries that you showed the ladies and gentlemen of this jury on September 26, 2016; that's what you testified to, right?

          MS. SMYSER:  Objection.

          MS. WESTMORELAND:  I'll rephrase the question, your Honor.

          THE COURT:  All right.

BY MS. WESTMORELAND:

Q.   Ma'am, you testified that Mr. Combs caused you the injuries on your leg, the neck and your back on September 26, 2016, isn't that true?

          MS. SMYSER:  Objection, your Honor.  May we have a sidebar?

          THE COURT:  Yes, you may.

          (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P65Wcom2                    Bongolan - Cross

(At sidebar)

THE COURT:  Ms. Smyser.

MS. SMYSER:  Your Honor, Ms. Westmoreland is misstating the testimony here.  Ms. Bongolan never testified that on September 26 the defendant hung her over the balcony. We looked at photographs with metadata.  She said that photograph was taken around the time of September 26, but I do not believe that Ms. Bongolan has said affirmatively that September 26 was the date that this happened.

MS. WESTMORELAND:  That's not true, and I went over it with her.

THE COURT:  Hold on, Ms. Westmoreland.

All right.  So just to make sure I understand, if we went back and looked at the testimony, it indicated that the photograph was taken on that date.  That's indicated with the metadata and the documents that Ms. Westmoreland used, but Ms. Bongolan did not testify that the actual incident occurred on that date.

MS. SMYSER:  She did not, and she said the photograph was taken around that date.

THE COURT:  Around that date.

MS. WESTMORELAND:  No, that's not true.

She said it when you were questioning her and when I was questioning her.  And this morning I waited, because I knew it was coming, and I said -- I asked her about the photo.  I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

said you also interviewed with the government.  You told them that this situation happened that early in the morning --

MS. SMYSER:  She said early in the morning --

MS. WESTMORELAND:  -- September 26.  I'll do it again. I'll be happy to.

MS. SMYSER:  That's fine.

THE COURT:  Well, I heard agreement on something, so -- you don't have a problem with Ms. Westmoreland just asking her whether the incident occurred on September 26, right?

MS. SMYSER:  That's a fine question.

THE COURT:  And we'll get to the bottom of it.

MS. SMYSER:  Yes.

THE COURT:  All right.

MS. WESTMORELAND:  I already did.

MS. SHAPIRO:  Your Honor, we've already laid the foundation.  The testimony repeatedly, both on direct and cross, was that the picture was taken the date of the metadata and that those injuries were caused by the incident.

THE COURT:  Hold on.  I don't know that what the government just agreed to was any different than what, Ms. Westmoreland, you were actually asking in that last question. I think you asked her in a leading fashion, isn't it true that the balcony incident that caused all these injuries occurred on September 26.  I believe that's pretty close to what your last

question is.  And I'm not hearing from Ms. Smyser that she has an objection to you asking that question.

Correct?

MS. SMYSER:  Correct.

THE COURT:  Maybe I'm not seeing what the dispute is.

MS. WESTMORELAND:  Your Honor, I believe I've already asked it, and I think that now we've come to sidebar, she's going to know.  I've already asked the question.

You asked her yesterday if it happened on the same date as the photo.

THE COURT:  You do not have to ask a further question, but Ms. Smyser is entitled to ask for a sidebar, because --

MS. WESTMORELAND:  No, no, no.  Of course.  100 percent.  100 percent.  I'm just saying I'm not going to ask her again.  She's already committed to it.  I'm sure she'll do whatever she needs to do on redirect.

THE COURT:  OK.  Then it's resolved.

(Continued on next page)

(In open court; jury present)

THE COURT:  Ms. Westmoreland, you may proceed when ready.

MS. WESTMORELAND:  Thank you, your Honor.

Q.  Ma'am.

A.  Yes.

Q.  Mr. Combs did not cause you the injuries that you showed us that we saw on your phone with the metadata from September 26, 2026, did he?

A.  I can't agree with you.

Q.  You do agree with me that you gave the photo --

MS. WESTMORELAND:  Can you pull the photo up one more time.  Thank you.

Zoom out, let her see the full photo, please.

Q.  Ma'am, you provided this photo to the government, didn't you?

A.  Yes.

Q.  Okay.  And you understand that metadata -- you didn't create the metadata, did you?

A.  No.

Q.  No.  So you gave this photo to the government with the metadata showing that this picture was taken on September 26th, 2016, true?

A.  Yes.

Q.  And you would agree with me that one person cannot be in

P65ACom3                    Bongolan - Cross

California and in New York at the same time?

A.  My answer is still the same, in theory, yes.

Q.  Ma'am, you came in here and you lied to the ladies and gentlemen of this jury; isn't that true?

A.  I can't agree with you.

        MS. WESTMORELAND:  I have no further questions, your Honor.

        THE COURT:  All right.  Redirect examination.

        MS. SHAPIRO:  Your Honor, may we have a sidebar before the redirect?

        THE COURT:  All right.

        (Continued on next page)

(At sidebar)

MS. SHAPIRO:  I apologize, your Honor, but given that everything is happening in real time, since your Honor admitted the text messages with Ms. Khorram that we had the dispute about, we have discovered that we have two text message chains that we believe under rule 106 should, in fairness, be considered at the same time.  So I just wanted to raise that. I don't know if the government was planning to introduce these right after the redirect, but I want to --

THE COURT:  Oh.

MS. SHAPIRO:  -- make sure we get a ruling on that before they're admitted because they're supposed to be admitted at the same time.

THE COURT:  Given how much time this is taking, we'll take a short break before so we can address this issue.

MS. SHAPIRO:  Okay.  Or if they weren't going to do it until after the redirect, we can do it after the redirect.

THE COURT:  I don't know what document you're talking about.

MS. COMEY:  Your Honor, if counsel sends it to us, we can take a look, we might agree.  I don't know what Ms. Shapiro is talking about.

THE COURT:  Do you have the completing statements?

MS. SHAPIRO:  Yes, they're on my screen.

MS. GERAGOS:  Your Honor, I just marked it as an

P65ACom3                     Bongolan - Cross

exhibit and I will send it to everybody, including the Court.

THE COURT:  And is this coming up on the redirect?

MS. COMEY:  No, it would be right after.

THE COURT:  Then we do not need to address it right now.

(Continued on next page)

(In open court; jury present)

THE COURT:  Ms. Smyser, you may proceed.

REDIRECT EXAMINATION

BY MS. SMYSER:

Q.  Ms. Bongolan, do you remember being shown certain notes during your cross-examination?

A.  Yes, ma'am.

Q.  Before defense counsel showed you those notes, had you ever seen them before?

A.  No.

Q.  And do you know whether those notes are supposed to be an exact transcript of everything that happened at the meetings?

A.  I wouldn't know.

Q.  Had you ever been asked to review them?

A.  Never.

Q.  Had you ever been asked to check them for accuracy?

A.  Never been asked.

Q.  Do you remember being asked on cross-examination about talking to Cassie around the time of her lawsuit?

A.  Yes.

Q.  So before Cassie filed her lawsuit in November of 2023, did you have a conversation with her about that lawsuit?

A.  Yes, I did.

Q.  Did you have one conversation or multiple conversations before she filed the lawsuit?

A.   Just one.

Q.   And in that one conversation, what did Cassie ask you?

A.   My permission to use my name.

Q.   And to use your name about what?

A.   The incident, to put in her lawsuit.

Q.   And what did you say in response?

A.   I said no.

Q.   Before you saw Cassie's lawsuit, did you know what information was going to be in her complaint?

A.   Not at all.

Q.   Did you know whether the complaint would include an account of what happened on the balcony?

A.   Sorry.  Could you say that again.

Q.   Sorry.  What did you say?

A.   Could you say that again.

Q.   Yeah.  Did you know whether Cassie's complaint, before it was filed, was going to include statements about what happened on a balcony?

A.   I had an idea because she asked for my name.

Q.   But you told her not to include it in her complaint, right?

          MS. WESTMORELAND:  Objection.  Leading.

          THE COURT:  Sustained.

Q.   What did you tell Cassie in response to her asking if she could include that in her complaint?

A.   To please not put my name.

Q.   Did you end up reading the complaint after it was filed?

A.   Yes.

Q.   And what did you do when you read the -- after you read the complaint?

A.   At -- sorry.  At some point, I hit her up to tell her that it was incorrect.

Q.   And what were you telling her was incorrect?

A.   Like, it wasn't at a hotel, and Tiffany wasn't there.

Q.   So, to be clear, in that conversation after the complaint had been filed, were you and Cassie trying to make up a story or were you telling Cassie what actually happened to you?

         MS. WESTMORELAND:  Objection.  Leading.

         THE COURT:  Sustained.

Q.   Were you telling Cassie what happened to you?

         MS. WESTMORELAND:  Objection.

         THE COURT:  That's sustained.

Q.   What were you telling Cassie about?

A.   Exactly what happened to me.

Q.   And do you have any doubt that Mr. Combs held you up on a balcony?

A.   Could you rephrase that, please?

Q.   Do you have any doubt that Mr. Combs held you up on a balcony?

A.   I have no doubt.

Q.   When Cassie filed her lawsuit in November of 2023, had you

told her that you were going to sue Mr. Combs?

A.  No.

Q.  And, in fact, in November of 2023 when Cassie filed her lawsuit, had you even decided to file your own lawsuit yet?

A.  Not at all.

Q.  You didn't even -- did you hire a lawyer then or was it a few months later?

A.  A few months later.

Q.  And when you filed your lawsuit, was what you said about the balcony incident the same or different from what was in Cassie's lawsuit?

A.  It was different.

Q.  And are you getting any money from testifying here today?

A.  Not at all.

Q.  Why are you here today?

A.  To seek justice.

Q.  Ms. Bongolan, do you remember -- do you remember talking about the balcony incident on your cross-examination?

A.  Yes.

Q.  And is everything you said today truthful regarding your best recollection of what happened on the balcony that night?

A.  Yes.

Q.  Do you remember every single detail of what happened?

A.  Not every single detail.

Q.  Are there certain details that you will never forget?

A.   100 percent.

Q.   Will you never forget Mr. Combs holding you up on the 17th floor balcony?

            MS. WESTMORELAND:  Objection.  Leading.

            THE COURT:  That's sustained.

Q.   What will you not forget?

A.   I will never forget him holding me on that balcony.

Q.   How did you feel when he was holding you on that balcony?

A.   Terrified.

Q.   Ms. Bongolan, do you remember being asked about what you told the government in certain meetings?

A.   Could you explain that?

Q.   Do you remember being asked on cross-examination about what you told the government in various meetings?

A.   Yes.

Q.   And in those meetings, did you answer the questions that the government asked?

A.   Yes.

Q.   And over the course of those meetings, did the government ask you about every topic that you've talked about today?

A.   Not every topic.

Q.   Every time you were asked about the balcony incident, did you tell the government that Mr. Combs held you up on the balcony?

A.   Sorry.  Could you say that again?

Q.  Every time you were asked in those meetings about the balcony incident, did you tell the government that Mr. Combs held you up on the balcony?

A.  100 percent.

Q.  And every time you were asked about the balcony incident, did you tell the government that Mr. Combs was screaming at you, you know what the fuck you did?

            MS. WESTMORELAND:  Objection.

            THE COURT:  That's overruled.

A.  Yes, ma'am.

Q.  And every time you were asked about the balcony incident, did you tell the government that Mr. Combs threw you onto the balcony furniture?

A.  Yes.

Q.  Ms. Bongolan, on cross-examination you were asked some questions about you and Cassie partying; do you remember that?

A.  Yes, I do.

Q.  When you say party, do you mean using drugs?

A.  It could mean multiple things.

Q.  In some context, do you mean using drugs?

A.  Yes.

Q.  Ms. Bongolan, do you remember being asked on cross-examination about demand letters that your first lawyer sent?

A.  Yeah.

Q.   Did you write those demand letters or did your lawyer?

A.   The lawyer wrote them.

Q.   Did you review the demand letters before they were sent?

A.   Not all of them.

Q.   After they were sent, did you at some point find out what they said?

A.   Yes.

Q.   And were those accurate?

A.   No.

Q.   And when you learned they were inaccurate, what did you do?

A.   Fired him.

Q.   Do you remember being asked on cross-examination about the demand letters saying that Mr. Combs squeezed your breasts so hard that you had bruises?

A.   I remember.

Q.   And was that what you had said?

A.   No, ma'am.

Q.   And do you remember being asked on cross-examination about your complaint alleging sexual assault?

A.   Yes. I remember.

Q.   Ms. Bongolan, when you describe what Mr. Combs did, when he came up behind you on the balcony, do you use hand motions to explain?

A.   Yes.

Q.   And did you do that in your first meeting with the

government?

A.   I don't remember.

Q.   Have you done that in other meetings with the government?

A.   Yes.

Q.   Could you please use your hands to explain what Mr. Combs did when he came up behind you?

A.   First, they came up like this.

Q.   Is that under your armpit?

A.   Right here.

Q.   And then what did he do?

A.   Came down, and I can't put my hands back, but then he lifted me up.

Q.   And so when he was moving his hands up and down your body, where did his hands go?

A.   Came down this way.

Q.   So were they on your breasts?

A.   Yes.

Q.   And, Ms. Bongolan, are you a lawyer?

A.   No, ma'am.

Q.   Did your lawyers hear those facts and draft a complaint on your behalf?

A.   Yes.

Q.   Ms. Bongolan, do you remember Ms. Westmoreland asking you about a photo with -- your photo with your neck brace?

A.   Yes.

P65ACom3                        Bongolan - Redirect

Q.   Why were you wearing that neck brace?

A.   Because my neck hurt and the chiropractor showed me what to do.

Q.   And did you wear that neck brace more, on more occasions than just when you took that photo?

A.   Yes.

Q.   Why did your neck hurt, Ms. Bongolan?

A.   Because I got slammed into the furniture.

Q.   By whom?

A.   By Puff.

Q.   Ms. Bongolan, do you remember being asked about the date of the balcony incident?

A.   Yes, I do.

Q.   Do you have an independent memory of that exact date, aside from relying on metadata in your phone?

A.   Yes.

Q.   You do?

A.   Could you explain independent?

Q.   Yeah.  Do you, setting aside your phone, know what date, exact date, that happened, or do you just know around when that happened?

          MS. WESTMORELAND:  Objection.

          THE COURT:  Sustained.

Q.   Ms. Bongolan, do you yourself know the exact date of when the balcony incident occurred?

A.   No.

Q.   Regardless of -- and why do you not know that exact date?

A.   Because it was a while ago.

Q.   Regardless of that exact date, do you have any doubt that Mr. Combs held you up on the 17th floor balcony?

A.   I have no doubt.

          MS. SMYSER:  No further questions, your Honor.

          THE COURT:  Thank you, Ms. Smyser.

          Anything further, Ms. Westmoreland?

          MS. WESTMORELAND:  Yes, your Honor.

RECROSS EXAMINATION

BY MS. WESTMORELAND:

Q.   Ma'am, after your new lawyers filed a lawsuit on your behalf claiming sexual assault, you didn't fire them, did you?

A.   No.

Q.   Ma'am, you had multiple interviews with the government about the alleged balcony situation, true?

A.   Yes.

Q.   And you gave the government the pictures of the -- the picture of your leg injury, true?

A.   Yes. I gave it.

Q.   And in a follow-up interview, you gave the government the picture of your leg injury with your metadata, true?

          MS. SMYSER:  Objection.

          THE COURT:  Grounds?

            I think the objection is overruled.

            Ms. Westmoreland, why don't you re-ask the question.

            MS. WESTMORELAND:  Thank you your Honor.

Q.  In a follow-up interview with the government, you gave the government a picture of your leg injury with your metadata, true?

A.  I gave them pictures.

Q.  Okay.  And you testified that all of your injuries happened on the same day, true?

A.  Yes.

Q.  Okay.  Ma'am, when you filed a lawsuit against Mr. Combs, you weren't rich, were you?

A.  No.

Q.  You suing Mr. Combs is your opportunity to become a millionaire; isn't that true?

A.  I can't agree with that.

Q.  You can't?

A.  No, ma'am.

Q.  Okay.  As you testify today, you don't want to say anything to mess up your lawsuit, true?

A.  Could you rephrase that, please?

Q.  As you testify here today, you don't want to say anything to mess up your lawsuit; isn't that true?

A.  I'm only speaking on what I know, ma'am.

Q.  Okay.  Ma'am, as you testified today, you're seeking

$10 million; isn't that true?

A.   I'm seeking whatever the judge finds is correct.

Q.   And you are asking hey, judge, or a court, to find in your favor for $10 million; isn't that true?

A.   My lawyer wrote that number down.

Q.   And you reviewed your complaint, I asked you that earlier; isn't that true?

A.   Yes, I did.

Q.   So you know that that's what's being asked for on your behalf, true?

A.   I understand what's being asked.

Q.   It means a lot to you to hope to become a ten -- a millionaire soon, true?

A.   Not at all.

Q.   You don't care about becoming a millionaire?

A.   I care about justice.

Q.   And justice for you?

A.   Justice to be served.

Q.   And justice for you is money?

A.   No, ma'am.

Q.   10 million to be exact?

A.   No, ma'am.

        MS. WESTMORELAND:  I have no further questions, Judge.

        THE COURT:  Anything further, Ms. Smyser?

        MS. SMYSER:  No, your Honor.

THE COURT:  Thank you, Ms. Bongolan.

(Witness excused)

All right.  I think this is an appropriate time for a short break.  Unless the government would like to introduce that exhibit now.

MS. SLAVIK:  Yes, your Honor.  The government offers Government Exhibit C-361-C as well as C-361-CM, and C-360-A.

THE COURT:  You said 360-A?

MS. SLAVIK:  Yes, that's the third exhibit.

THE COURT:  All right.  Those exhibits will be admitted.

(Government's Exhibits C-361-C, C-361-CM, C-360-A received in evidence)

MS. SLAVIK:  Your Honor, I would like to publish.  We can do that now or after the break, whatever your Honor prefers.

THE COURT:  Why don't we publish it right now.

MS. SLAVIK:  Okay.

MS. SHAPIRO:  Your Honor, we object to that on the grounds stated under the previous sidebar.  Under rule 106, it should be --

THE COURT:  This is what we were talking about?

MS. SHAPIRO:  Yes, your Honor.

THE COURT:  So we will do it after the break.  Thank you, Ms. Shapiro.

MS. SHAPIRO:  Thank you, your Honor.

THE COURT:  We are going to take a shortened midday break.  You came in late.  But I believe that there will be food available for you.  So please take your break and we'll be back here at 1:30 p.m.

All rise for the jury.

(Continued on next page)

(In open court; jury not present)

THE COURT:  Apologies for that, Ms. Shapiro.  There's a lot of numbers on the exhibits.

MS. SHAPIRO:  Yes, I apologize, your Honor.

THE COURT:  I wasn't clear on exactly which one you had issues with on sidebar.  We can address that now.  I don't know if you've had a chance to send the completing statements to the government.

MS. SHAPIRO:  Yes, your Honor.  Ms. Geragos sent it to the government and chambers, and I think we have a paper copy as well.  And she's going to, if your Honor has questions, she will address them.

MS. GERAGOS:  Yes, your Honor.

THE COURT:  Let me ask first, has the government had a chance to review these?

MS. SLAVIK:  Yes, your Honor.  The government just received those two text message chains I believe.

MS. GERAGOS:  We put it into one for ease, but, yes, it's two text message chains.

MS. SLAVIK:  Two text message chains.

MS. GERAGOS:  From the same device.  We have a printed copy for the government and your Honor if you would like it.

MS. SLAVIK:  That would actually be really helpful.

MS. GERAGOS:  Yes.

If your Honor would like a printed copy, I can bring

one up to the deputy.

THE COURT:  Yes, you may.

And, Ms. Slavik, can you put the actual exhibit that you were going to introduce on the screen?

MS. SLAVIK:  Yes, your Honor.

THE COURT:  So I have printed copy of what the defense offers as a completing statement.  Let's see what the government would seek to admit.  Or has admitted.

Let me see the metadata, if we can.

MS. SLAVIK:  Your Honor, I may have a hard copy.

THE COURT:  Ms. Slavik, can you help me?  Can you walk me through the metadata?

MS. SLAVIK:  Yes.  I apologize.  I think we're having some tech issues.  I apologize.

So, your Honor, the screenshot on the left, Ms. Becker, maybe you could take --

THE COURT:  I can see that.  I've seen the text message.

MS. SLAVIK:  Thank you.  There we go.  The screenshot text message on the left of the screen is a screenshot of a -- excuse me.  Of a text message exchange between Ms. Ventura and Ms. Khorram.  Ms. Khorram has a series of screenshot messages between herself and Ms. Ventura that appear to be taken, you know, of this same conversation.

This screenshot is just one of those.  I will note for

your Honor that the prior screenshots of the conversation refer to Ms. Ventura looking for her phone saying that the defendant threw her phone off the balcony and now she can't find it.

So the bulk of the conversation between Ms. Ventura and Ms. Khorram is about Ms. Ventura finding the phone. However, this screenshot, as you can see, recounts the incident on the balcony with Ms. Bongolan.

The metadata that is highlighted on the right of the screen shows that this screenshot was captured on September 30th, 2016, at 3:47 p.m.

It's not clear if that coincides with the messages exactly, but that's when the screenshot itself was taken.

The messages that the defense is proposing to get in, starting with the first message between Ms. Ventura and Ms. Khorram, it appears to be a message from Ms. Khorram saying:  He said that didn't happen and said you can talk to him real quick because he's about to leave and needs to talk to you first.

So I don't believe this is a rule of completeness issue.  The rule of completeness issue, if anything, would suggest that additional text messages or additional screenshots could be added.  But I don't think that this completely separate message about the -- what the defendant said, I don't believe that's a rule of completeness issue.

The other issue is that this is -- this is just

complete self-serving hearsay.  There's no exception for this statement to come in.  It is clearly being offered for its truth and there's simply no exception.  This is self-serving, a self-serving statement, to which there's no hearsay exception.

The final thing I will point out is that it's unclear he said that didn't happen.  I assume the defense is trying to get that in because they're saying he said it didn't happen, the balcony incident.  But, as I mentioned, the bulk of the conversation between Ms. Ventura and Ms. Khorram up to this point is about Ms. Ventura's phone and Ms. Ventura's belief that the defendant threw the phone over the balcony.  So I don't think that this message is probative.  I think it's barred by hearsay.  And I don't think there's a rule of completeness issue.  I think the same issues are true of the following conversation that takes place on October 1st with Ms. Ventura saying I'm just seeing this message, he's saying it didn't happen.

I think the exact same -- the same issues apply.

THE COURT:  For the reasons stated by the government, these are not even close to being proper completing statements under rule 106, and would not be independently admittable. Even if they were, they would be offered by the defense separate and apart from the message that has been admitted.

So the objection and the application to have these introduced at the same time as C-361-C as completing statements

is denied.

MS. GERAGOS:  Your Honor, may I just make a quick, quick, quick record.

THE COURT:  Yes.

MS. GERAGOS:  Which is the main part or thrust from what I understood of Ms. Slavik's argument was this -- A, it's not rule of completeness.  But even if it was, it would be hearsay, rule 106 does not find that a completing statement is admissible over a hearsay objection.  So I want to make that -- I know your Honor knows that.  I want to make that clear for the record.

THE COURT:  Yes.  And I understood Ms. Slavik to be saying that it wouldn't come in under rule 106.  And even if the defense separately tried to admit these statements, they would be inadmissible.  So separate and apart from rule 106, it's not as if the defense could at a later juncture at this trial or with some other witness seek to admit those statements because of the hearsay issues she identified.

MS. GERAGOS:  We just want to make clear for the record, we do believe this is completing and necessary to understand the full context under 106.  We preserve our objection to this.  Thank you.

THE COURT:  Understood.  And, again, not coming in under rule 106 and would not -- I'm not seeing a separate basis for the admission of those messages.

Let me make a record.  Mr. Agnifilo.

MR. AGNIFILO:  Yes, Judge.

THE COURT:  I was very clear this morning that there were not to be any facial expressions, other attempts to have any interaction with the jury whatsoever, any influence on the jury whatsoever.  And I could not have been clearer in terms of what I said.  You heard me, right?

MR. AGNIFILO:  I did.

THE COURT:  Well, there was a line of questioning where your client was nodding vigorously and looking at the jury.  And there was a subsequent moment, we had a sidebar, and I looked and I saw your client looking at the jury and nodding vigorously during that line of questioning.  That is absolutely unacceptable.

Is it going to happen again, Mr. Agnifilo?

MR. AGNIFILO:  It's not going to happen again, Judge.

THE COURT:  It cannot happen again.  If it happens again, if it happens even once, I will hear an application from the government to give a curative instruction to the jury, which you do not want.  Or I will consider taking further measures, which could result in the exclusion of your client from the courtroom.

Do you understand that?

MR. AGNIFILO:  I understand, Judge.

THE COURT:  All right.  So I want you to have a

conversation with your client to make sure that he understands, and everyone should understand, that I really meant it.  That there should be no efforts whatsoever to have any interaction with this jury.

MR. AGNIFILO:  Understood, Judge.

THE COURT:  Let's have the questioning, let's have the applications on legal issues, and let's proceed on that basis.

Ms. Comey, I think you said that you're not planning to get into the 106 and non-106 exhibits with Jane in the afternoon session; is that still correct?

MS. COMEY:  That's right, your Honor.  At this point, I doubt I'll have time to get anywhere near that in my direct. So we could do that at the end of the day or we could do that tomorrow morning.

THE COURT:  And I think that's fine.  Here's what I'll say.

MS. COMEY:  Yes, your Honor.

THE COURT:  As to the completeness objections, I don't know that I see the relevance of these text messages coming in. But unlike the completeness issue that was raised where there was a long gap in time between the communications and there was a question as to what they pertain to, the completeness objections that were raised by the defense as to these exhibits seemed fairer because they were close in time with the conversation that was happening.  And I could understand the

defense's argument that they were necessary context to just understand the ongoing conversation that was happening in real time.

So I'll just leave you with that.

MS. COMEY:  Thank you, your Honor.

THE COURT:  With that point.  Because that's what I saw having looked at all of the completeness objections that had been raised.

The sole exception perhaps is in DX 3239, where there is some completeness additions that have been made, and then there's one at the very end of the communication, and that was the only one that I thought may not -- may have crossed the line and would not be proper completion.

So that's what I'll just observe for your benefit so that when you're addressing these --

MS. COMEY:  Yes.

THE COURT:  -- you know what I'm thinking.

MS. COMEY:  I appreciate that, your Honor.  And I think Ms. Geragos and I have made great progress in resolving a number of these, and I think we can work out even more having heard your Honor's initial thoughts on this.

THE COURT:  All right.  And then as to the other objections, as to C-251, I do, you know, my view at this point is that they, the conversation, would be offered for a non-hearsay purpose.  It goes to the knowledge of Ms. Khorram

and the effect on the listener.  So my current view is that C-251 would be admissible.

As to E-171, the headline, I don't know that you need that to establish that Jane viewed the headline.  You can even elicit testimony concerning what the headline said in general terms, but having that headline in as exhibit evidence that would go back with the jury, would be out of bounds.

MS. COMEY:  I understand, your Honor.  Understood. I'll remove it from my outline.

THE COURT:  The bigger issue is the notes.  And there are two categories, as I see it, of notes.  There is E-178, 179, and 182.  And then in the same category, 331-K through P.

These are, as I understand it, notes or memos that relate to a time period after Ms. Ventura's lawsuit.  And I think that's in one category.  Then there are the preceding communications, which are very lengthy.

MS. COMEY:  Yes.

THE COURT:  But I understand they're coming in for, principally, under 801(d)(1)(B).  Right?

MS. COMEY:  Principally, your Honor.  And if your Honor had not found that we laid the appropriate foundation for that, I would want to at least include some excerpts, which I tried to provide quotes, under state of mind.  I understand that not all of those would come in under state of mind.  And with respect to prior consistent statements, I would also

understand if, given the length, we needed to excerpt them.

THE COURT:  That's exactly what I was going to suggest.  As to the other category, meaning the pre-Ms. Ventura lawsuit notes.

MS. COMEY:  Yes, your Honor.

THE COURT:  I do agree with you that there's probably some portion of those that would either be admissible as state of mind, or as a prior consistent statement, given what was said in opening, and given -- and if it's not that, then we'll see what the cross-examination is going to be.  But likely some portion of it would be able to be offered on redirect examination.

So zooming out, the question really is, after Ms. Ventura's lawsuit.

MS. COMEY:  Yes, your Honor.

THE COURT:  I think the problem there is that the rule says recently fabricated.  And I think the defense's argument has been that it's really Ms. Ventura's lawsuit, that after that time with several of the witnesses, their inquiry has been, well, you saw Ms. Ventura's lawsuit and then you said X, Y, and Z.

So that's my concern is that to the extent something has been written and noted down after Ms. Ventura's lawsuit, that seems to be a tougher call in terms of the admission of those documents.  You may have another basis for those.  But

that's how I'm seeing it right now.

MS. COMEY:  Yes, your Honor.  With respect to the state of mind, I guess it's prior consistent that you're thinking about there?

THE COURT:  That's really what I'm thinking about.

MS. COMEY:  With respect to state of mind, I want to be clear that the trafficking of Jane continued through the defendant's arrest, and there will be a lot of testimony about significant trafficking incidents in 2024.

THE COURT:  You're saying it doesn't really matter, because even if it comes after Ms. Ventura's lawsuit, the incidents that you're talking about happened after that?

MS. COMEY:  That's exactly right, your Honor.

THE COURT:  Doesn't matter what informs her state of mind, it really is irrelevant because the acts actually happened after that.

MS. COMEY:  That's exactly right, your Honor.  I think the key incident that will be very significant of the trafficking charge of this victim took place on June 18th and 19th of 2024.  That is one of the most important incidents.  That is one of the clearest cut incidents of trafficking.  And it well post-dates Ms. Ventura's lawsuit.

So Jane's state of mind about what these -- she calls hotel nights.  She doesn't call them freak-offs.  She calls them hotel nights.  Jane's state of mind about these hotel

nights before June 2024 is essential to proving Count Four.

THE COURT:  Understood.  So I'm happy to hear from the defense if they have anything that they would like to offer at this time.  But I am really just offering this so that when we have this addressed, you'll have some sense of how I'm thinking about these issues.  That's very helpful and we can pick it up in the morning if we need to have further argument on this.

Mr. Driscoll.

MR. DRISCOLL:  Yes, judge, I just want to clarify your current thoughts.  It wasn't exactly clear to me.

So the statements post-dating Ms. Ventura's lawsuit, your view is that they are not prior consistent statements for the reasons outlined in our letter?

THE COURT:  Right now what I related is that if they are being offered as prior consistent statements, then I'm not seeing the basis for their admission under that rule.  But they might be admissible under the state of mind exception.

MR. DRISCOLL:  Understood.  In which case we would have, perhaps, specific objections to specific statements in the notes.

THE COURT:  And then as to the prior consistent statement exception, given I think Ms. Comey's response is that actually some of these incidents happened after the lawsuit.  So the mere fact of the lawsuit would not be relevant as to at least those incidents.  Meaning, if there's an incident that

happened after Ms. Ventura's lawsuit, and there are statements that are made by Jane pertaining -- that would reasonably pertain to those post-Ventura lawsuit incidents, then that could be a basis for admission under 801(d)(1)(B).

MR. DRISCOLL:  I think the problem with that, your Honor, is the government is trying to use these to prove Jane's state of mind.  They're not trying to use these to prove that an incident actually occurred.  That would be improper under the hearsay rules.

THE COURT:  Why would that be improper if she says, on June 18th I was coerced into having sex with hookers with Mr. Combs.

If she said that, then wouldn't that overcome the hearsay objection?

MR. DRISCOLL:  No.  Because that is hearsay, and it's not being offered to prove her state of mind.  It's being offered for the truth.  That's precisely what the rule does not allow.  And because they're using this to prove state of mind, I think *Tome* does apply.  Because, at that point, her state of mind is -- it's being expressed after there's an incentive to fabricate.

THE COURT:  No.  Under 801(d)(1)(B), it's just not hearsay.  It doesn't matter what purpose it's being put in for. In fact, it is in fact being put in to rehabilitate the witness as to the credibility on those incidents.  Meaning, it is like

her -- that's the reason for the rule.  If you attack the witness's credibility that something happened on June 18th, 2024, this happened, then the government can then put in extrinsic evidence of a hearsay, normally hearsay statement that rehabilitates the witness as to the occurrence of that event.

But --

MR. DRISCOLL:  But our position would be because --

THE COURT:  You'll check the case law and make sure I'm not saying something that's wrong.  But that's my understanding of how this works.

MR. DRISCOLL:  Right.  Our position is just that she has an incentive to fabricate or exaggerate once Ms. Ventura's lawsuit is filed.  So under *Tome*, understanding their position is the incident may have happened after that point, there's still an improper incentive to fabricate or exaggerate, so I think the *Tome* rule still applies.

THE COURT:  Well, I think if the incident happened after the event, I don't think you can get out of the rule just based on that.  Because if something happened after the lawsuit and then contemporaneous or close in time with that event, there's a statement from Jane that it actually happened, I don't think -- and again you'll check me on the case law, but I don't think that that would get you the mere fact that it's close in time to this trial and this case and everything else

would get you out of the rule.

MR. DRISCOLL:  And with respect to the particular events in June that Ms. Comey eluded to, those took place after the government's investigation had already begun, and Jane was aware of that fact.  So that's another reason under *Tome*, it's just inappropriate to rely on the prior consistent statement exception.

THE COURT:  So, I am hearing the arguments, but is the argument really grounded in rule 403, meaning you might concede under the -- it would fall in, technically speaking, to 801(d)(1)(B).  But you would say under rule 403, it should just not be admitted because there was so much going on at that time that the reliability of these statements and their probative value versus unfair prejudice would counsel exclusion of the documents.

I mean, isn't that really what you're arguing?

MR. DRISCOLL:  Our objection is on both grounds.

THE COURT:  Okay.  Anything?  Last words?

MS. COMEY:  Just to clarify, your Honor.  I want to take a look, but I think what may end up making sense is I may try to use some of the pre-lawsuit notes during my direct, and for the post lawsuit notes, I might wait to see what happens on cross, because I suspect that the cross-examination may challenge her credibility on other grounds than just you're trying to match what you saw in Cassie's lawsuit.

I suspect there may be suggestions that other motives or other reasons that she might have fabricated or exaggerated may have come up later in 2024 or 2025.  And if that happens, I think that changes the analysis.

So I want to take a closer look, but I think that may make sense.

THE COURT:  Understood.

Anything to address before we have our 10-minute break?  Ms. Comey?

MS. COMEY:  I don't believe so, your Honor.  I just wanted to flag that, with thanks to Ms. Geragos, I'm going to admit a large number of exhibits right before Jane takes the stand using a demonstrative the way Ms. Johnson did to save us all time.  So I wanted to let your Honor know I'll be doing that right before Jane takes the stand.

THE COURT:  Very good.  We'll see everybody in a few minutes.

(Recess)

P65Wcom4

THE COURT:  Please be seated.

Just to understand, I think, Ms. Shapiro, you raised a scheduling issue.  The proceeding that I had starting at four has been adjourned, so I can stay later and I can instruct the jury that they'd be staying a little bit later today, but I understood that there was a conflict on your side.

MS. SHAPIRO:  Yes, your Honor.

Normally if it was any other witness, I would say I'll just leave and the rest of the team -- but this is really one of the most important witnesses in the case, so if -- I'll leave it to your Honor, but I have a prescheduled meeting that involves numerous other lawyers in another matter at the U.S. Attorney's Office across the street at 4:30, and I would like to be here for all of Jane's testimony.

THE COURT:  I meant for -- we previously discussed today, but tomorrow I'm going to tell the jury that we're going to be doing a long day.  We're going to start at nine and then we're going to go to five and try to do as much as we can.

MS. COMEY:  I appreciate that, your Honor.  Thank you. I know Jane and her counsel will too.

In terms of today, we've conferred with the defense and we've agreed we will weed out the message that was discussed before the break.  We are going to call Enrique Santos for what we think is ten minutes of testimony just to explain how to read the Cellebrite report, and then we will

Jane to the stand.

THE COURT: All right.

Let's bring our jury back.

MS. SHAPIRO: Your Honor, could I put one thing on the record with relation to the defense exhibit that we offer under the rule of completeness that the Court excluded?

I'll ask the Court to reconsider on this basis, but when the Court ruled that the government's exhibit was admissible, the Court said that it would be properly admissible as either a statement of Ms. Khorram's state of mind shortly after the incident and also for a nonhearsay purpose of showing that it was communicated to Ms. Khorram, who was an alleged member of the conspiracy.

The statements that we argue are appropriate under the rule of completeness show that to the extent the Court was admitting it for the effect on the listener, Ms. Khorram, in fact, it shows that Ms. Khorram was then told that actually the incident didn't happen. And therefore, for those reasons as well as the ones we've stated earlier, it should have been admitted together with the government's exhibit.

THE COURT: Understood. I hear the defense's position, and the ruling stands, as given.

With that, I'll ask the courtroom deputy to get our jury.

(Continued on next page)

(Jury present)

THE COURT:  Please be seated.

The government may call its next witness.

MS. SLAVIK:  Your Honor, before the government calls its next witness, we'd like to walk through an exhibit that's in evidence.

THE COURT:  Proceed.

MS. SLAVIK:  Ms. Becker, could you please publish Government Exhibit 1301 with pages 1 and 2 side by side.

Reading from the first paragraph:

"On or about March 25, 2024, at the Miami Opa-Locka Airport in Opa-Locka, Florida, law enforcement agents from Homeland Security Investigations seized Government Exhibit C300, a cell phone from Kristina Khorram's person."

Paragraph 4 states that "Government Exhibits C300A through C364, including the subdivisions thereof, are true and accurate excerpts of data extracted from Government Exhibit C300."

Ms. Becker, could you please take this down and publish what's in evidence as Government Exhibit C361C.

This is the screenshot with Cassie Ventura at the top, and I'm going to read from this exhibit:

"Cassie:  Hey, I just found out some crazy shit.

"Ms. Khorram:  Yeah, we are here and I don't think it did.

"Cassie:  He came into my house while my friends were here, and we were all sleeping.  They woke me up because he was ringing the bell crazy at 3 a.m.  And when he came in, I went to my room and he went to Bana and choked her, then dangled her feet off of the balcony.  This is crazy.

"Ms. Khorram:  What?

"Cassie:  I have to stay away."

Ms. Becker, could you please put up side by side with this exhibit page 2 of Government Exhibit C361CM and highlight the portion in the middle.

Focusing on the metadata entry, could you highlight that, please.

Metadata, capture time, September 30, 2016, 3:47:46 -- excuse me, 3:47:42 p.m.

You can take this down.  Thank you.

MS. JOHNSON:  At this time the government calls Enrique Santos.

Your Honor, may I place a Redweld for Mr. Santos on the witness stand?

THE COURT:  You may.

ENRIQUE SANTOS,

    called as a witness by the government,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. JOHNSON:

P65Wcom4                        Santos - Direct

Q.  Good afternoon, Mr. Santos.

A.  Good afternoon.

Q.  Where do you work?

A.  The U.S. Attorney's Office for the Southern District of New York.

Q.  What's your title there?

A.  I'm an investigative analyst.

Q.  And how long have you worked as an investigative analyst at the U.S. Attorney's Office for the Southern District of New York?

A.  As an analyst for about 11 years, but I've been at the office for 17.

Q.  What are some of your duties and responsibilities as an analyst?

A.  I perform forensic examinations of electronic devices, such as cell phone, tablets and GPS devices.

Q.  Have you received training in the analysis of electronic evidence and forensic examinations?

A.  Yes.

Q.  And have you performed extractions of electronic devices in your job at the Southern District of New York?

A.  Yes.

Q.  And approximately how many cell-phone extractions have you performed?

A.  Close to 3,000.

Q.   At a high level, what does it mean to forensically examine a cell phone?

A.   It means we preserve, extract and analyze electronic data.

Q.   And again, at a high level, can you please outline the general steps that you take when you extract data from a cell phone?

A.   Generally, when we receive a device at the lab, we will review our search authority, so usually that comes in the form of a search warrant or a signed consent form from the owner of the device.

We will try to isolate the phone from any sort of external networks to try to prevent the phone from being wiped.  So we'll put the phone in either airplane mode or remove the SIM card, or we'll put it in a Faraday box, which blocks all sort of external signals.

We will do some quick research on the device and see what level of support is available for that device.  We'll try to use whatever tool will result in the most complete extraction of that device.

Q.   So pausing you there, what tools do you use for extraction of electronic devices such as cell phones?

A.   For cell phones, it's usually either Cellebrite Premium or GrayKey.

Q.   And did you use GrayKey in this case?

A.   Yes, we did.

Q.   And after you use GrayKey to extract the data from the cell phone, what do you do after that?

A.   Once we have an extraction of the device, we'll validate that the extraction is in good condition.  We do that by verifying the hash value that's produced when the device is extracted.  We'll verify the hash value with a third-party tool and make sure that the integrity of the file's been -- is still intact.

     Once we have that extraction, we'll load it into another tool that will then parse that data and make it so that we can review the data.  We'll be able to do key word searches, filter data, sort data, things like that, make the data more useable.

Q.   And when you say you use a second tool to make the data more useable, what's that second tool that you use?

A.   There are various tools, but for this case, we used Cellebrite Physical Analyzer.

Q.   And what is the end result when you process data through Cellebrite Physical Analyzer?

A.   Our end result is usually a report that we generate.  It's available in different formats, but generally we'll produce something called a Cellebrite reader report that we turn over to the case agents and the prosecution.

Q.   And is the Cellebrite reader report sort of the more user-friendly, searchable item that you spoke about a few minutes ago?

A.   Yes.

Q.   And during this process, how, if at all, do you confirm that the data extracted and processed correctly?

A.   So, usually we'll just reference that hash value that was initially produced.  That will give us an indication whether the extraction was intact.  In rare circumstances, we will go back to the device itself, but those circumstances are pretty rare.

Q.   Were you asked to extract electronic devices for this case?

A.   Yes.

Q.   And in particular, were you asked to extract three iPhones?

A.   Yes.

Q.   OK.  I'm going to direct your attention to the Redweld sitting next to you.

     Were you aware of the source of the iPhones that you were asked to extract?

A.   At the time of -- that I received the device, I didn't know who they were, but later on I found out who they belonged to.

Q.   And who did those three iPhones belong to?

A.   Casandra Ventura.

Q.   And for each of those three iPhones, did you follow a similar process for the extraction and processing of the data?

A.   Yes.

Q.   Can you please look at the three iPhones in the Redweld and let me know how you know if you performed extraction on these

devices?

A.   Sure.

     OK.  I'm ready.

Q.   Did you perform an extraction on those three devices?

A.   Yes.

Q.   How do you know that?

A.   Before I came to court today, I had a chance to review these phones and I was able to confirm against the paperwork that I produced for this case that these are the phones that I indeed searched.  And I initialed them so that I could recognize them in court today.  So there's three of them.

Q.   And those are Government Exhibit B400, Government Exhibit B500 and Government Exhibit B600?

A.   Correct.

Q.   And you see your initials on the exhibit stickers?

A.   Yes.

Q.   And for each of those three extractions, you previously testified you followed a similar process, is that right?

A.   Correct.

Q.   And what kind of extraction were you able to obtain using the GrayKey tool for those three phones?

A.   There are different levels of extractions.  We were able to achieve something called a full file system extraction for each of these devices.

Q.   And what is a full file system extraction?

P65Wcom4                         Santos - Direct

A.  For an iOS device, such as these three, it's the most complete form of extraction we can perform on a digital device.

Q.  Is iOS the operating system for Apple iPhone?

A.  Correct.

Q.  During your extraction of these three devices, were there any indications of errors during those extractions?

A.  Not that I remember.

Q.  When you received the phones, at a high level, what condition were they in?

A.  They were in generally fine shape.  I mean there's -- some of the devices are cracked, but it didn't affect the operability of the devices.

Q.  And what, if any, indication of previous repairs did you observe on one of the devices?

A.  There was one device for which the IMEI number printed externally on the device did not match the, what the internal iOS setting was in the system settings menu.

Q.  And what could that indicate?

A.  That that specific phone had been previously repaired.

Q.  And what's an IMEI number?

A.  It's an acronym that stands for International Mobile Equipment Identifier, and it's a number that's usually assigned to a device when it's manufactured.

Q.  Does each device have a unique IMEI number?

A.  Yes.

Q.   Are forensic tools like the ones that we've discussed able to extract data from electronic devices where that data has been deleted from the device itself?

A.   The IMEI number?

Q.   No.  I'm sorry.  Let me back up.

Do forensic tools offer the capability to recover deleted data from an electronic device like a cell phone?

A.   Yes.

Q.   OK.  And what, if anything, did you observe in this case regarding the extraction of deleted items in the three iPhones that you examined?

A.   We recovered several deleted records.

Q.   Were you asked to view some select text message threads from the Cellebrite reader reports in this case?

A.   Yes.

Q.   And can you explain what effect, if any, the recovery of deleted data has on how the deleted data appears in the Cellebrite report?

A.   Yes.  The messages that I was given to review, I was able to confirm that those -- that at least a good portion of those messages were deleted.  And the effect that it had was that those messages were in various states of deletion.  So what you would see is that certain fields were missing or corrupted. So, for example, there might have been a contact whose name was missing or they were, like, weird characters that you wouldn't

normally associate with someone's name.

Q.  OK.  And what effect, if any, does Cellebrite's decoding have on the message threads that would appear in the Cellebrite reader platform?

A.  There was -- there were a couple messages where the name of one of the participants in a message thread was missing.  I mean we were able to figure out who it was, and I think in -- in most, if not all, cases, the participant's name was Casandra.

Q.  And can the way that cell-phone data appears on the Cellebrite reader platform look different if it's taken out of the Cellebrite platform and put into a different tool?

A.  Yes.

        MS. JOHNSON:  Ms. Becker, could you please pull up what's in evidence and publish Government Exhibit B-504.

Q.  Mr. Santos, is this an example of a Cellebrite reader report?

A.  Yes.  This is a PDF version of the report.

Q.  OK.  And I want to just direct your attention to the green bubble.

        MS. JOHNSON:  And in particular, Ms. Becker, if you could blow up the time stamp at the bottom of that bubble.

Q.  Looking at that time stamp, what does UTC plus zero mean?

A.  So, UTC is an acronym that stands for Universal Coordinated Time, and it's also known as, like, Greenwich time.  It's

basically like the referenced time zone by which the rest of the world sets its clocks to.

Q.  And when it says UTC plus zero, does that mean that the time stamp is in UTC?

A.  Correct.  This hasn't been adjusted to New York or whatever time zone.

Q.  If it had been adjusted to, for example, East Coast time in New York, how, if at all, would it look different in the Cellebrite report?

A.  The time would be adjusted by either four or five hours to reflect the Eastern time zone, depending on whether you're in Daylight or Standard time.

Q.  And specifically as to how the report would look, would that be reflected as UTC minus four or UTC minus five on the time stamp?

A.  Correct.

        MS. JOHNSON:  You can take that down now, Ms. Becker.

        And the government would offer at this time Government Exhibit 1310, which is a stipulation related to UTC.

        THE COURT:  1310 will be admitted.

        (Government Exhibit 1310 received in evidence)

BY MS. JOHNSON:

Q.  Mr. Santos, a few more questions about Cellebrite reader reports.

    For chat threads that contain audio messages, how do the

audio messages appear in a PDF Cellebrite report?

A.  You would see the name of the file, and then you would have a link that, if clicked, would open up the actual audio file within a media player.

Q.  And are the audio files extracted separately as standalone audio files?

A.  Correct.  If you export a PDF version of the report, any media files would exist within a different directory.

Q.  And is the link that's within the PDF the same name as the audio file that's exported?

A.  Yes.

Q.  And again, focusing on PDF exports, are emojis always visible in chat threads in the PDF exports?

A.  No.

Q.  And why is that?

A.  So, PDFs only support a specific set of characters.  They don't quite support every single emoji that's available on your cell phone.  So Adobe, for example, may encounter a certain emoji that it doesn't recognize and can't interpret it accurately, so it might appear as, like, a weird character.

Q.  Turning to screenshots, if a user takes a screenshot on a cell phone, what type of file is created when a screenshot is made?

A.  Usually it's an image.

Q.  And what, if any, metadata is associated with an image

file, with a screenshot image file?

A.  Normally you would expect to see something like a creation date, a modified date.  You would see the name of the file, and in addition to that, you will see the location where that file is stored within the phone's folder structure.

Q.  And is that metadata preserved when an image, the screenshot is forensically extracted from the phone?

A.  Yes.

        MS. JOHNSON:  Ms. Becker, can you please pull up and publish what's in evidence as Government Exhibit C-361-C-M, page 2, please.

        And if you could zoom in on the middle.

Q.  Mr. Santos, is this another extraction from a Cellebrite report?

A.  Yes.

Q.  And I just want to direct your attention to the middle box with the created, modified, access and capture time information and then walk through those.

    What does the created time stamp -- what could that reflect?

A.  For an iOS device, it usually reflects the time and date that the file was created on that specific device.

Q.  And could that be a time and date that a file was transferred to that device, for example?

A.  Correct.

Q.  And what does the modified date typically reflect?

A.  There may be some cases where you may modify an image by editing it.  In this case, it doesn't seem like that happened, so the modified date is the same date and time as the created date.

Q.  And what about the access date?

A.  Just what it implies, the last date and time that the file was accessed.

Q.  And then looking at the bottom, where it says capture time, what does capture time reflect?

A.  So, this is probably the most accurate reflection of when that file was captured.

Q.  OK.  And then just directing your attention to the last on the file path, the embedded part of the file path that says CPL assets, are you aware what that refers to?

A.  Yes.  That's a known directory where photos from Apple iCloud are usually stored.

        MS. JOHNSON:  No further questions at this time.

        THE COURT:  All right.  Thank you, Ms. Johnson.

        MS. GERAGOS:  Just a few, your Honor.

CROSS-EXAMINATION

BY MS. GERAGOS:

Q.  Mr. Santos, I just have a few questions.

    You testified that you extracted devices that you learned belonged to Ms. Ventura, correct?

A.   Yes.

Q.   And there were multiple different phones, right?

A.   Yes.

Q.   And we talked a little bit about deleting messages, but if you could just -- if I could ask a few questions about that.

Is it true that there were many deleted messages on those iPhones?

A.   Yes.

Q.   And about two-thirds of the messages were deleted -- I should say two-thirds of the messages provided to you to review you had found were deleted messages on those devices?

A.   Yes.

Q.   OK.   And can you just explain to us, like, when a message is deleted, how are you able to then recover it within -- when you do the extraction?

A.   So, just because you mark a file for deletion doesn't mean it goes all the way -- goes away, you know, instantly, at least not always.   I mean that could be a scenario for certain applications.

I believe most of these messages were WhatsApp, and it just so happened that for -- in these cases the messages were marked for deletion and although they're not accessible to the user, they still exist within the phone's operating system.   They're just hidden.   And what happens is that over time, as the phone creates new records and needs space to store the new records,

it will start to overwrite older data.  So that's what happened

for some of these messages that I had a chance to review, is

that certain tables where this data was kept started to go

away.

Q.  Understood.

All right.  And then we talked a little bit about emojis

and Cellebrite reports and Adobe and PDFs, so I want to ask you

questions about that.

When you do a forensic extraction, you save that extraction

and it's accessible, I think, you said in Cellebrite, right?

A.  Yes.

Q.  But you can also -- an individual looking at your

extraction can also put those extractions in a different

platform, right?

A.  That's right.  There's several different tools that are

available to parse and analyze data.

Q.  But when you do the extraction, emojis and messages that

are sent within it, those are preserved within the extraction,

so even though it might not show up in Adobe, it may show up in

another platform, right?

A.  Yes.

Q.  OK.  Thank you.

We just looked at C-361-C-M, and you talked about the

capture date.

MS. GERAGOS:  If we could bring that up really

quickly, and just look at my last question, page 2.

Q.  You said that the capture date -- while we bring this up, the capture date is probably the most accurate as to when a file was captured.  But it's probably or it is?  If you could just look at that capture date, September 30, your testimony said it's probably the most accurate, because we're looking at one, two, three different dates here at the top.  Right?

A.  So, when it comes to trying to determine the source of a picture or when something was taken, as an examiner we don't like to speak in absolute terms.  We speak in, like, probability, because even -- unless I was there to witness the picture being taken, we speak to the likelihood of, you know, this was captured at this time and date.  But in my experience and from what I get from my training is that the capture date is the most accurate reflection of when that picture was taken or screenshotted.

Q.  And it's just -- the capture date is an accurate reflection of the screenshot but not of the conversation itself, right?

A.  That would be my understanding.

          MS. GERAGOS:  OK.  Great.

          One moment, your Honor?

          All right.  Thank you so much, Mr. Santos.

          THE COURT:  Ms. Johnson, anything further?

          MS. JOHNSON:  No, your Honor.

          THE COURT:  Thank you very much, Mr. Santos.

P65Wcom4

THE WITNESS:  Thank you.

(Witness excused)

MS. FOSTER:  Your Honor, before the next witness, the government would offer a stipulation between the parties, which has been marked Government Exhibit 1309.

THE COURT:  All right.  Government Exhibit 1309 will be admitted.

(Government Exhibit 1309 received in evidence)

MS. FOSTER:  Ms. Gavin, could we just briefly publish it.

MS. COMEY:  While that's being pulled up, your Honor, I'll also -- oh, there it is.

MS. FOSTER:  And the next page as well.

And then one more.

OK.  Thank you.  You can take that down.

MS. COMEY:  Your Honor, I've marked for identification a document as Government Exhibit 1503.  It contains three different lists of exhibits that the government is going to offer before the next witness's testimony.  The exhibits listed under the header "sealed GX" are exhibits we are offering under seal pursuant to your Honor's pseudonym order to protect a witness's identity.  The exhibits offered under the header "sealed X series" are exhibits that we offer both under the pseudonym order and because they contain sexually explicit material.  And the remaining exhibits are not offered under

P65Wcom4

seal.

And so with your Honor's permission, I will offer all of those exhibits now in evidence, and I will hand Government Exhibit 1503 as a demonstrative to the court reporter to note those exhibits in the transcript.

THE COURT:  All right.  Any objection?

MS. GERAGOS:  No, your Honor.

THE COURT:  All right.  The exhibits in Government Exhibit 1503 will be admitted on the basis specified.

(Government Exhibits 3R-101, 3R-121, 3R-122, 3R-123, 4H-122, A-104-1 through A-104-12, A-104-16, A-104-17, A-104-19 through A-104-29, A-104-34, A-104-37, A-104-40, A-104-40A, A-104-40B, A-104-41, A-104-42, A-104-44, A-104-46, A-104-48, A-104-49, A-104-53, A-104-54, A-104-55, A-104-59, A-104-61 through A-104-71, A-104-74, A-104-75, A-207-A, A-207-B, A-301-B, A-301-C, A-301-G ,A-301-H, A-301-I, A-301-J, A-301-N, A-301-P, A-442-1, A-442-3, A-442-4, A-442-5, A-442-11, A-442-12, A-442-13, A-442-16, A-442-17, A-442-18, A-442-19, A-442-20, A-442-22 ,A-442-29, A-442-30, A-442-34, A-442-35, A-442-35A, A-442-35B, A-442-37 through A-442-43, A-510-B, A-510-C, A-510-D, A-510-E, A-510-G, A-510-H, A-906, A-1202-A, C-348-A, C-348-B, C-261, E-103, E-103-M, E-105, E-105-M, E-108, E-108-M, E-110 through E-131, E-110-M through E-131-M, E-133 through E-138, E-133-M through E-138-M, E-141, E-141-M, E-144 through E-150, E-144-M though E-150-M, E-152, E-152-M, E-156,

P65Wcom4

E-156-M, E-160, E-160-M, E-168, E-168-M, E-169, E-169-M, E-185, E-185-M, E-186, E-186-M, E-188 through E-196, E-188-M through E-196-M, E-198, E-198-M, E-206, E-206-M, E-207, E-207-M, E-209 through E-213, E-209-M through E-213-M, E-238, E-238-M, E-248, E-248-M, E-252, E-252-M, E-253, E-253-M, E-255 through E-257, E-255-M through E-257-M, E-259, E-259-M, E-260 through E-268, E-260-M through E-268-M, E-271, E-271-M, E-272, E-272-M, E-273, E-273-M, E-278, E-278-M, E-279, E-279-M, E-281, E-281-M, E-282, E-282-M, E-283, E-283-M, E-285, E-285-M, E-286, E-286-M, E-287, E-287-M, E-288, E-288-M, E-289, E-289-M, E-292 through E-298, E-292-M through E-298-M, E-306, E-306-M, E-307, E-307-M, E-321, E-321-M, E-332, E-332-M, E-333, E-333-M, F-101, G-101, G-102, G-103, G-203, G-213, G-214, J-107-A and J-107-B, sealed, received in evidence)

(Government Exhibits AX-101, AX-101-A, AX-101-B, AX-101-B1, AX-101-C, AX-102, AX-102-A, AX-102-B, AX-102-C, AX-102-D, AX-102-D1, AX-102-E, AX-103, AX-103-A, AX-104, AX-104-A, AX-105, AX-105-C, AX-105-C1, AX-105-D, AX-105-E, AX-108, AX-701, AX-701-65, AX-701-65A, AX-701-71, AX-701-73, AX-701-77, AX-701-79, AX-701-79-A, AX-701-79-B, AX-701-79-BT (aid), AX-701-81, AX-702, AX-702-F, AX-702-F1, GX AX-703, AX-703-33, AX-703-35, AX-703-42, AX-703-42A, AX-703-90, AX-703-91, AX-703-91A, AX-1102, AX-1102-A, AX-1102-A1, EX-101 through EX-121, EX-165, EX-165-A, EX-165-M, EX-166, EX-166-A, EX-166-M, EX-167, EX-167-A, EX-167-M, EX-170, EX-170-M, EX-177,

P65Wcom4

EX-177-M, EX-178, EX-178-M, EX-179, EX-179-A, EX-179-M, EX-180, EX-180-M, EX-181, EX-181-A, EX-181-M, EX-182, EX-182-M, EX-184, EX-184-A, EX-184-M, EX-185 and EX-185-M, X-series, received in evidence)

(Government Exhibits 3R-103 through 3R-120, 9A-101, 9A-102, 9S-101, C-348, E-102, E-102-M, E-106, E-106-M, E-139, E-139-M, E-163, E-163-M, E-177, E-177-M ,E-260, E-260-M, E-265, E-265-M, E-266, E-266-M, E-267, E-267-M, E-268, E-268-M, E-290, E-290-M, E-303, E-303-M, E-304, E-304-M, E-305, E-305-M, E-183, E-183-M, E-184, E-184-M, E-221, E-221-M, E-222, E-222-M, E-223, E-223-M, E-247, E-247-M, E-249, E-249-M, E-250, E-250-M, E-251, E-251-M, E-258 and E-258-M, public, received in evidence)

MS. COMEY:  Thank you, your Honor.

At this time the government calls the witness testifying under the pseudonym Jane.

THE COURT:  OK.

Members of the jury, I will remind you of the instruction that I gave previously, which is you are about to hear from a witness testifying under a pseudonym; that is, not using her real name.  The government, the defense, the Court and you, the jury, will know her real name.  Her name will not be used in open court solely to protect her privacy from disclosure to persons who are not parties to this case.

The fact that this witness is testifying using a pseudonym does not mean that her testimony is deserving of

greater or lesser weight than that of any other witness.

          With that, Ms. Comey, we'll bring the witness in.

          MS. COMEY:  Thank you.

          And while she's coming in, could I please ask your deputy to confirm that the exhibit screens in the overflow have been turned off and that the public screen in this courtroom has also been turned off?

          THE DEPUTY CLERK:  Confirmed.  I cannot see the monitor from here, but I'm sure it has happened as well.

          MS. COMEY:  Thank you very much.

 JANE,

     called as a witness by the government,

      having been duly sworn, testified as follows:

          THE COURT:  Ms. Comey, you may proceed when ready.

          MS. COMEY:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. COMEY:

Q.  Would you please state and spell the first name under which you are currently testifying?

A.  Jane, J-A-N-E.

Q.  Good afternoon, Jane.

A.  Good afternoon.

Q.  Have you asked to testify here today under a pseudonym to protect your privacy?

A.  Yes.

MS. COMEY:  At this time, I would like to pull up what was just admitted in evidence as Government Exhibit 3R-121 just for the jury and the parties and not for the public, as it is a sealed exhibit, please.

Q.  Jane, do you recognize this?

A.  Yes.

MS. COMEY:  I think we lost it.

Q.  Do you still see that in front of you?

A.  I do.

Q.  What is it?

A.  My driver's license.

Q.  Without saying it out loud, is the last name next to the line LN your true last name?

A.  Yes.

Q.  And is the first and middle name next to FN your true first and middle name?

A.  Yes.

Q.  And is the address below that your true address?

A.  Yes.

Q.  Do you currently live at that address?

A.  I do.

Q.  How long have you lived there?

A.  About three years now.

Q.  When did you move in there?

A.  April 2022.

Q.   Are you estimating?

A.   Yes.

Q.   And the date of birth there, is that your true date of birth?

A.   Yes.

          MS. COMEY:  We can take that down.  Thank you very much, Ms. Becker.

          I'd like to now please pull up what is not in evidence, so just for the witness, Government Exhibit 2A-402, please.

Q.   Jane, do you recognize that?

A.   Yes.

Q.   What is it?

A.   A photo of myself.

          MS. COMEY:  Your Honor, the government offers this exhibit in evidence.

          THE COURT:  All right.  It will be admitted.

          (Government Exhibit 2A-402 received in evidence)

          MS. COMEY:  Could we please just show that to the jury.

          THE COURT:  OK.

BY MS. COMEY:

Q.   Jane, generally, where did you grow up?

A.   In California.

          MS. COMEY:  We can take that down.  Thank you,

Ms. Becker.

Your Honor, I failed to note that that prior exhibit I'm offering under seal, given that it shows the likeness of Jane.

THE COURT:  Understood.

MS. COMEY:  Thank you, your Honor.

Q.  How far did you go in school, Jane?

A.  I did about half a semester, so in junior college.

Q.  What kind of work did you do after leaving junior college?

A.  I worked in restaurants.  I was modeling, various modeling job.

Q.  I'd like to direct your attention now to the period between 2021 and 2024.

Who, if anyone, were you in a relationship with over those years?

A.  Sean Combs.

MS. COMEY:  Ms. Becker, would you please pull up what is in evidence as Government Exhibit 2A-101.

Q.  Jane, do you recognize the person in that photograph?

A.  Yes.

Q.  Who is that?

A.  Sean Combs.

Q.  Do you know him by any other names?

A.  Yes.

Q.  What names did you call him when you were in a relationship

with him?

A.   Sean, Baby, Ernie, Snookums.

Q.   Why did you call him Ernie?

A.   Because that was our nickname for one another.

Q.   So who were you?

A.   Bert.

Q.   And who was he?

A.   Ernie.

Q.   Like from Sesame Street?

A.   Yes.

         MS. COMEY:  We can take that down.  Thank you.

Q.   How did you first meet Sean?

A.   I first met Sean at a, on a girls' trip to Miami.

Q.   And about what year was that?

A.   Late 2020.

Q.   And how did that girls' trip to Miami lead to you meeting Sean?

A.   At the time Sean was romantically involved with one of my girlfriends.

Q.   And was that girlfriend one of the girls who you went on this trip with to Miami?

A.   Yes.

Q.   Who paid for that girls' trip you took?

A.   Sean.

Q.   Where were you all staying?

A.   In Miami.

Q.   And how did you first meet Sean on that girls' trip?

A.   He had invited us all over for dinner and, like, a thing at night, and I remember we went all over there as a group to his residence in Miami.

Q.   What residence is that?

A.   The one on Star Island.

Q.   Do you remember the address by any chance?

A.   Two Star Island.

Q.   Before going to Two Star Island in 2020, had you met Sean in passing before?

A.   I had, yes.

Q.   About how long before 2020 had you met Sean in passing?

A.   I would say five years prior.

Q.   And at what type of event did you meet Sean in passing?

A.   It was, like, a Father's Day celebration.

Q.   And were there a lot of people there?

A.   There were.

Q.   Other than that meeting in passing, a Father's Day celebration, had you had any other in-person interactions with Sean before that Miami trip in 2020?

A.   No.

Q.   How long were you in Miami during that 2020 trip?

A.   We were there for about five days.

Q.   And on how many of those days did you see Sean?

A.   About three or so.

Q.   What do you remember doing with Sean and your girlfriends on the first day when you saw him?

A.   I remember it was at night, we went over there and I just saw Sean and he was really charming, really nice.  And I was already drawn to him, like, pretty instantly.  And he was really hospitable, really sweet, really friendly.  We had a nice night altogether.

Q.   You said that night started out at Two Star, is that right?

A.   Yes.

Q.   Where did you all go from Two Star?

A.   We all went on a yacht.

Q.   What happened on the yacht?

A.   We were just having drinks, partying, being friendly. There was a little bit of flirting going on.  Just a nice night altogether.

Q.   And when you say a little bit of flirting, between who?

A.   Between Sean and I.

Q.   And you said partying.  Were you using drugs that night?

A.   No.

Q.   What, if any, private conversations did you have with Sean on that yacht?

A.   At one point I had to use the restroom and he happened to be there as well, and that's when we bumped into each other and he was, like, take down my number, let me get your number.  And

P65Wcom4                    Jane - Direct

we exchanged numbers then, and that's when we decided we should have a nickname.  And he said Bert and I said Ernie.  And then, you know -- yeah.

Q.  And so did you exchange phone numbers?

A.  Yes.

Q.  And after that, were you in contact over the phone?

A.  We would text message, yes.

Q.  During that same trip to Miami, what, if any, drugs do you remember seeing?

A.  I remember seeing a pink powder substance.

Q.  And on which day, if you can remember, do you remember seeing those drugs?

A.  That first night.

Q.  What do you remember about that?

A.  I remember after the yacht we all went to the pool, and one of the girls had requested that she wanted some drugs.  And I guess while we were in the pool --

Q.  I don't want you to guess, so -- one of your girlfriends requested drugs.  And how did Sean respond?

A.  He said OK.

Q.  And then what did you see happen a little while later?

A.  That somebody came to bring the drugs.

Q.  Where did you go with Sean at that point?

A.  At the studio and, inside the property Two Star.

Q.  Did you and Sean go alone to the studio?

P65Wcom4                        Jane - Direct

A.   Yes.

Q.   What did you see happen in the studio?

A.   I saw this man pull out this pink powder.

Q.   And what, if anything, did that man say?

A.   Well, I remember I was, like, is this safe?  And I remember both of them looking at me like, kind of just gave me just, like, a look, yeah, it's the best.

Q.   Who did you see that man give the pink powder to?

A.   Sean.

Q.   And then what did you see Sean do with it?

A.   Just take it to the girl, and I believe he used it as well.

Q.   And he took it back to the pool?

A.   Around us, yeah.

Q.   And gave it to one of your girlfriends?

A.   Yes.

Q.   And what do you remember happening after that?

A.   I remember my girlfriend was pretty upset.  I think she assumed that there was something going on with Sean and I at that moment, and we then left the party pretty abruptly.

Q.   You said your girlfriend was upset.  Is this the girlfriend who was in a relationship with Sean?

A.   Yes.

Q.   What other activities do you remember doing with your girlfriends and Sean on that first trip?

A.   I remember we -- the next day we just had a pool party and

he just hosted a pool party, just for us, and we were just having drinks and having lunch by the pool.  It was a nice day.

Q.  And then what do you remember from your last day in Miami?

A.  I remember he invited us all over for a movie night, and we were in the theater and all watching a movie.

Q.  Where was the theater?

A.  Inside of his residence.

Q.  What do you remember happening while you were watching the movie with Sean and your girlfriends?

A.  I remember he text me, and he was like:  Are you OK?  I'd like to take you out.  And I was just saying to him that it just felt a little complicated in the moment, but, like, we'll be in touch.

Q.  So you were texting during the movie?

A.  Yes.

Q.  And was the girlfriend of yours who was seeing Sean in a relationship with him there as well?

A.  Yes.

Q.  After that movie night, where did you go?

A.  I went back home.

Q.  And at the time, where were you living, generally?

A.  On the East Coast.

Q.  And after that trip, how, if at all, did you remain in contact with Sean?

A.  Just through text message, phone calls.

Q. And what do you remember about those communications in the weeks after that first Miami trip in 2020?

A. I remember he was flirtatious. He was inviting me to Miami. Like that, generally.

MS. COMEY: Ms. Becker, could we please pull up what is in evidence as Government Exhibit A-906.

And could you please pull up pages 1 and 2 side by side.

Q. Jane, do you recognize this?

A. Yes. Yes.

Q. And what is this?

A. It's a text message between myself and Sean.

Q. Could you please tell us the very first text that you sent to Sean?

A. "Bert."

Q. And how did he respond?

A. "Ernie."

Q. And then can we go to the next page and look at what Sean sent you after that. What did he send you after that?

A. He says: "Call me, Ernie. How are you?"

Q. What are the dates of these messages?

A. November 30, 2020.

Q. And were the first two November 29, 2020?

A. Yes.

Q. Over the course of your texting relationship and

P65Wcom4                      Jane - Direct

communications after that Miami trip, who pursued whom?

A.   Sean.

Q.   Sean pursued who?

A.   Me.

Q.   And what was Sean asking you to do over those messages and phone calls?

A.   He was just asking if he could see me, if I would be interested to come to Miami.

Q.   And at first how did you respond?

A.   At first I was still a little hesitant.

Q.   Why were you hesitant at first?

A.   Because I was still being considerate of my girlfriend, who still had feelings for him and -- yeah.

Q.   What, if anything, changed?

A.   My girlfriend ended up getting engaged and she moved overseas and became a fiancée, and so I felt that she was OK and that I could potentially entertain this Sean thing.

Q.   And about how long after that Miami trip in November of 2020 did your girlfriend get engaged to someone else?

A.   Fairly quickly.

Q.   So was she seeing her soon-to-be fiancé at the same time she was seeing Sean?

A.   Yes.

Q.   And after she moved overseas, how did you feel about possibly seeing Sean?

A.  I felt more open to it.

Q.  After that, what did you discuss with Sean?

A.  I told him that I would actually be in Miami already for an event and that I would like to see him.

Q.  So when were you going to Miami already for an event?

A.  Late January of 2021.

Q.  And did you, in fact, go to Miami in January of 2021?

A.  I did.

Q.  And what did you and Sean agree to do when you went down to Miami then?

A.  He asked if he could get me a hotel for my stay, and I said sure and that we would meet.

Q.  What do you remember about the first time you saw Sean on that January 2021 trip?

A.  I remember when I first saw Sean, he walks in the door of the hotel room and he was just, like, larger than life.  He had a very big personality, super charming, very, very passionate, even just in how he speaks, and just overall really charming. And he was just immediately immersed in conversation with me.

Q.  Where did you spend that first date with Sean?

A.  We spent it at the InterContinental Hotel, in a room.  We had dinner there on the balcony.

Q.  And how long did your first date with Sean end up lasting?

A.  I would say five days.

Q.  I want to focus on the beginning of that first date.

At the beginning of that first date, what, if any, past relationships did you discuss with Sean?

A.  I was very open with him that I had previously dated somebody who he was really close to and that my -- I understood that my child's father and him had dislikes with one another. And he was very, very vocal that he didn't care, not about my past girlfriend, not about my child's father.  And then the only thing maybe he had concerns about was the person that he was really close to --

Q.  I want to make sure we understand that.  So first you said you'd been in a relationship with someone who was really close to Sean, is that right?

A.  Yes.

Q.  How long before this first date in 2021 had that relationship with someone Sean was close to ended?

A.  I would say 2015.

Q.  Are you estimating?

A.  Yes.

Q.  And then you mentioned that your child's father was someone who did not get along with Sean, is that right?

A.  Yes.

Q.  And how many children do you have?

A.  One.

Q.  And did you and Sean talk about those two relationships on your first date?

A.  Yes.

Q.  And generally, what did Sean say about them?

A.  Generally, he just said that he didn't mind and he was OK, it didn't matter.

Q.  What, if any, past relationships with Sean did you talk about during that first date?

A.  Just the relationship with my girlfriend at the time.

Q.  And what did you discuss about that?

A.  That he just said that that was really more like a friendship more than anything, that it wasn't really as romantic as maybe she had assumed it was.

Q.  And so after you cleared the air about your past relationships, what happened on the rest of your -- that first night with Sean?

A.  We made lots of love.  I remember it was just amazing.  And I remember it was, like, morning time and then we just decided to go for a walk on the beach.

Q.  So where did you see the sun rise that morning?

A.  On the balcony.

Q.  With whom?

A.  Sean.

Q.  And then after that what did you two do for the rest of your trip in Miami?

A.  After that we went to a proper date night.  We went to a restaurant.  We got dressed up and we had more of a mellow,

P65Wcom4                        Jane - Direct

like, one-on-one sitting and properly dating.  Date night.

Q.  And then did you spend the next couple days together too?

A.  Yes.

Q.  Over that first date, what kinds of things did you and Sean talk about?

A.  We just were getting to know one another.  Just getting to know one another.

Q.  When you left Miami after that trip in January of 2021, how did you feel about Sean?

A.  I was pretty head over heels for Sean.

Q.  After you left Miami in January of 2021, how did you and Sean keep communicating?

A.  Over text, FaceTime, phone calls.

Q.  After that January '21 trip, 2021 trip, what, if any, trips did you take in February of 2021?

A.  We went to Turkos and Caicos and also the Bahamas.

Q.  Who's we?

A.  Sean and I.

Q.  How did you end up on that trip?

A.  I told him that my birthday was coming up, and he was super excited and said we should go on an island getaway.  And I was super excited as well because I had never been to Turks.  And so he took me there and it was amazing.

Q.  How did you get to Turks?

A.  I flew to Miami first, and then we took his plane to Turks.
                    (Continued on next page)

BY MS. COMEY:

Q.  When you say his plane, what are you referencing?

A.  I'm referencing Sean's private jet.

Q.  And who do you remember going to Turks with you on that trip?

A.  I remember his assistant K.K. was there.  The chef, the butler, photographer.  At some point there was a barber.

MS. COMEY:  Ms. Becker, would you please pull up what's in evidence as Government Exhibit 2A-301.

Q.  Do you recognize the person in that photograph?

A.  I do.

Q.  Who is that?

A.  K.K.

Q.  Do you know her full name?

A.  Kristina Khorram.

Q.  And do you know what her role was for Sean?

A.  She was his chief of staff and like main assistant.

MS. COMEY:  We can take that down.  Thank you, Ms. Becker.

Q.  How long did you stay in Turks on that trip in February 2021?

A.  I would say we stayed about nine days in Turks and then like six days in the Bahamas.

Q.  So you went from Turks to the Bahamas?

A.  Yes.  Yes.

Q.   What do you remember from the time you spent in Turks in February 2021?

A.   I remember so many lovely things.  It was just really us and so we just had a lot of connection and a lot of time together.  As you would assume, just really passionate about one another, lots of attraction.  It was very lust filled.

Q.   Were you getting a lot of alone time with Sean?

A.   Yes.

          MS. COMEY:  Can we please pull up what's in evidence as Government Exhibit E-163.

          Before we play this video, can you tell us if you recognize this, Jane?

A.   Yes.  This is the villa that we stayed in at Turks.

Q.   And do you know who took this video?

A.   Myself.

          MS. COMEY:  Can we go ahead and play this video, please.

          (Video played)

Q.   Who did we see at the end of this video?

A.   Sean.

Q.   And where are you?  What are we seeing in this video?

A.   We are at the villa pool and I am just taking a video of the ambience and Sean and just the weather and the vibe.

Q.   And you said the villa.  Had Sean rented out a whole villa just for you two for your trip?

A.   Yes, he did.

         MS. COMEY:  We can take that down.  Thank you,
Ms. Becker.

Q.   During your trip to Turks, what if anything did you tell
Sean about your own life and personal circumstances?

A.   I was very open about just that I was a single mother and
for work I was just on social media.  I would say -- I would
call myself a content creator, influencer.  And that's pretty
much it.

Q.   So what kind of work were you doing at the time?

A.   I was advertising brands on my social media.

Q.   During that same trip, what if any gifts do you remember
Sean giving you?

A.   I remember it was actually when I first met him in Miami,
that first trip, he had given me a love bracelet that said
L-O-V-E on it.  So I got that pretty early on.  And, oh, at the
end of the trip, I do remember he said that he was going to
send me some money and that he knew that he had taken me out
for many days.  And I really appreciated that gesture because
it was many days away.

Q.   So at what point did Sean offer to send you money?

A.   At the very end of the trip.

Q.   The trip to where?

A.   Turks.

Q.   And had you asked him for money?

A.   No.

Q.   How much money did he tell you he would send you?

A.   $10,000.

Q.   And what did he say when he told you he was sending you $10,000?

A.   Just to have it because he knew that I was away for a while, and just, here.

Q.   So during that trip, were you able to do any of the work you would normally do?

A.   No.

Q.   During that same Turks trip, what if any drugs did you use?

A.   Ecstasy.

Q.   Now, before that trip, had you used drugs?

A.   Yes.

Q.   How many times had you used drugs in your life before that trip to Turks?

A.   Twice.

Q.   What drugs had you used twice?

A.   Ecstasy.

Q.   And on what occasions had you used ecstasy twice?

A.   On New Years Eve on two occasions.

Q.   And about how long before this 2021 trip was that?

A.   I would say 2014 and 2015, something like that.

Q.   Are you estimating?

A.   Yes.

P65ACom5                      Jane - Direct

Q.  Whose idea was it for you to use ecstasy in Turks?

A.  Sean's.

Q.  And how many times did Sean suggest you take ecstasy at Turks?

A.  Just at various points in the trip.

Q.  So about how many times do you remember Sean giving you ecstasy to use in Turks?

A.  I would say maybe like ten times.

Q.  And you said you were there for about nine days?

A.  Yes, in Turks.

Q.  How did drugs first come up with Sean?

A.  I remember we were inside the pool and we were drinking and just having a good time.  And he opens his hand with a pill and he's like, here, take this, it will just be more fun or something like that.  And so I ended up taking the whole thing.

Q.  What happened after you took the whole pill Sean handed to you?

A.  I was walking down the beach with him and then it just hit me, and I just remember I fell to the ground and I started grabbing the sand and throwing the sand, and my body was just like almost like convulsing and I was -- I think I was screaming a little.

Q.  What do you remember after you fell to the sand?

A.  I remember that his butler and K.K. tried to help me and they were trying to figure out what was wrong or what they

could do.  And then they eventually put me in a shower, like a lukewarm shower, just to kind of calm my senses.

Q.  How did you feel after the shower?

A.  It started to subside after that.

Q.  And about how long after that did you take another ecstasy pill?

A.  Throughout the trip, I remember every other day we would take it.  And this time, I would just take them in really small pieces.

Q.  Who decided how big a dose of ecstasy you would get?

A.  Sean.

Q.  And who gave you all the ecstasy you took on that trip?

A.  Sean.

Q.  When you took a smaller dose of ecstasy from Sean, how did that smaller dose make you feel?

A.  It made me feel relaxed, euphoric, sexual.  It just enhanced touch and sense and made me feel even more loving and flirtatious with him.

Q.  About how long did those effects last each time you took ecstasy from Sean?

A.  I feel that they could last about 12 hours or so.

Q.  And then what was the experience like after those 12 hours?

A.  I would say either we would keep going or we would take something to just relax and then go to bed.

Q.  So when you say we would keep going, does that mean take

more ecstasy?

A.   Yes.

Q.   Could you describe the experience of coming down from ecstasy?

A.   Yes.   In my first experience, when I was with Sean, it was like your mind was kind of readjusting to the environment. Like it was coming down from a high.   And you're just tired and want to go to sleep.

Q.   When you went to the Bahamas with Sean, did you continue using drugs with him?

A.   Yes.

Q.   What drugs?

A.   Ecstasy.

Q.   Who gave you the ecstasy?

A.   Sean.

Q.   About how much ecstasy or how many times do you remember Sean giving you ecstasy on that trip?

A.   I would say just two more times then.

Q.   And at the end of the trip, what money did Sean ultimately send to you?

A.   He sent me a wire for 10,000.

Q.   And did he send that to your bank account?

A.   Yes.

Q.   How much was $10,000 to you at that time in your life?

A.   It was a lot of money for me.

P65ACom5                         Jane - Direct

Q.   After the end of that trip, how did you feel about Sean?

A.   I was even deeper in my feelings for Sean.  I want to say we even started using the L word.  And I was really deep in it.  I really fell head over heels for him.

Q.   What was your understanding of the status of your relationship with Sean at the end of that trip?

A.   He had made it really clear to me that he really liked me, but that he was seeing multiple women.

Q.   So he was open about that with you?

A.   Yes.

Q.   And how did you react to hearing that?

A.   I was okay with it.

Q.   Why were you okay with it?

A.   Because I liked him, and so I was okay with it.

Q.   Did you have the sense that you had the option of a monogamous relationship with him?

A.   No, I didn't have that sense.

Q.   So what was your understanding of whether Sean would be seeing other people romantically while you were in a relationship with him?

A.   I understood that on his end, it was an open relationship.

Q.   And what was your understanding of whether you should see other people while you were in a relationship with Sean?

A.   In my heart, I just wanted to see Sean.  So I was monogamous.

Q.   How long did your dating relationship with Sean last?

A.   Until his arrest.

Q.   Do you know when he was arrested?

A.   I think it was August of 2024.

Q.   Are you estimating?

A.   Yes.

Q.   But did your relationship last through 2024?

A.   Yes.

Q.   At some point during the period between 2021 and 2024, did you and Sean take any breaks from your relationship?

A.   Yes.

Q.   How many do you remember?

A.   I think maybe two.

Q.   About when was the first one?

A.   I can't remember at the moment.

Q.   Okay.  And was the first one short?

A.   Yes.

Q.   Was the second one longer?

A.   Yes.

Q.   About when was the second one?

A.   October of 2023.

Q.   And how long were you on a break from Sean starting from October 2023?

A.   About four months.

Q.   When did you get back together with Sean after you took

that break in October 2023?

A.   February 2023 -- or no, I'm sorry.  October --
February 2024.

Q.   Okay.  So you were on a break, in your mind, from
October 2023 through February 2024?

A.   Yes.

Q.   Okay.  We'll talk about that more later.  Okay?

A.   Mm-hmm.

Q.   Over the years you were with him, how public was your
relationship with Sean?

A.   It was private.

Q.   And what if anything did Sean say to you about keeping your
relationship out of the public eye?

A.   I think we just both agreed and knew that we would have to
keep it private.

Q.   So did you post about him on your social media accounts?

A.   Maybe just one time.  But other than that, no.

Q.   Over the course of your relationship with Sean, where were
you living?

A.   I was living in -- sometimes, some portion of it in the
East Coast, and then majority of it in the West Coast in
California.

Q.   When did you move from the East Coast to California?

A.   June 2021.

Q.   And what city did you move to in California?

P65ACom5                        Jane - Direct

A.   Los Angeles.

Q.   What if anything did Sean give you to help you move to Los Angeles?

A.   He gave me money for my move.  He gave me $6,000 for a moving truck.

Q.   I want to focus now on your relationship between the end of the Turks trip in February of 2021 and May of 2021.  Okay?

A.   Okay.

Q.   Over those approximately three months, how often did you see Sean in person?

A.   I would say every other week or so.

Q.   And how would you see him in person every other week or?

A.   So he would fly me to him.

Q.   You say he would fly you to him.  Would he pay for you to fly?

A.   Yes.

Q.   Commercially?

A.   Yes.

Q.   And to what city did you fly to see him?

A.   I would fly to Miami.

Q.   During that same time in between seeing him in person, how did you communicate with Sean?

A.   Through text, phone call, FaceTime.

Q.   Over those three months, what if anything do you remember Sean giving you?

A.  As far as?

Q.  What if any money do you remember him giving you?

A.  I just remember he was sweet.  He would give me money here and there.

Q.  In cash or wires?

A.  A mix of both.

Q.  And what would he say when he gave you money?

A.  Just because.

Q.  Over those approximately three months between February and May of 2021, how often did you use drugs?

A.  Every time I saw him.

Q.  Every time you saw who?

A.  Sean.

Q.  And who gave you the drugs you used every time you saw Sean?

A.  Sean.

Q.  What drugs did Sean give you during that period?

A.  Ecstasy, Molly, sometimes there was cocaine.  Sometimes there was something called K, which was ketamine.

Q.  I want to talk about each of those.  You've already talked about ecstasy.  Could you explain how Molly made you feel when you took it?

A.  Molly I would say just kind of enhanced the same feelings as ecstasy.  It just made you sexual and promiscuous and like horny and, yeah.

Q.   And then you mentioned cocaine.  How did you feel when you took cocaine?

A.   It wasn't often I used this drug, but when I did, I would just feel really alert and awake.

Q.   And then you mentioned K, ketamine?

A.   Yes.

Q.   How did you feel when you took that?

A.   The one time that I did it, I felt not so good on it.  It's more of like a -- like a hallucinogen, like the floor was coming down and the walls were -- it was just kind of weird.

Q.   Now, focusing again on those three months between February and May of 2021.  In what context did Sean give you drugs?

A.   Whenever we would start having sex.

Q.   During that same period, what did you learn about how Sean preferred to have sex?

A.   I learned so many things.  I learned how he liked to have pornography playing.  I learned how he preferred me to dress. And I just learned the things that he liked sexually.

Q.   How did Sean tell you he preferred you to dress?

A.   He preferred me to dress in provocative lingerie and really high, like, stripper shoes.

Q.   And about how long did he want you to be in these outfits while you were using drugs?

A.   The whole time.

Q.   And how long would that last usually?

P65ACom5                      Jane - Direct

A.   At first it would be like 12 to 24 hours.

Q.   And what if any substances did Sean want you to use on your own body during sex?

A.   Baby oil.

Q.   And what did Sean tell you to do with it?

A.   To just have it all over my body and his.

Q.   In what types of rooms between February and May of 2021 would you have this kind of sex with Sean?

A.   At his residence, in his bedroom.

Q.   And how was his bedroom lit when you would have these interactions?

A.   We would have red lights on.

Q.   Now, during those first three months, how did you feel about these long lasting sexual sessions with Sean?

A.   I loved them.  I really love my partner and I was just having -- making love with my partner like the whole time and lots of affection and kisses and love making and it was really wonderful.  I had a really nice...

Q.   How intense did your relationship feel during this early phase?

A.   It felt really intense.

Q.   Could you explain that?

A.   I felt like Sean was really passionate, and he brought out a lot of passion out of me too.  And the way he would compliment me and be so into me and just really like enjoying

one another, like it made me feel really good inside.

Q.  So over those three months between February and May of 2021, how did you feel about Sean?

A.  I loved him very much.

Q.  I want to talk now about May of 2021.

What do you remember happening in your relationship with Sean in May of 2021?

A.  I remember that just when we would watch pornography, we just started to have a lot more of fantasy conversation.

Q.  Do you need to take a break, Jane?

A.  No.

Q.  Who initiated the fantasy conversation you're describing?

A.  Sean.

Q.  And can you explain to us how he initiated that conversation?

A.  Just we would just search specific things on these websites.  And just in the middle of, like, being high, like, he just really wanted me to fantasize or kind of really talk about other men and this type of role play about other men.

Q.  You mentioned you would search on these websites.  Are you talking about pornography websites?

A.  Yes.

Q.  So would you be watching pornography?

A.  Yes.

Q.  And you said that he would want you to talk about other

men.  What did he tell you he wanted you to say about other men?

A.  It was more like a question.  Like, do you like what you see there?  Do you like that?  Do you want that?  Can you imagine that?  Pretend that that's here and I'm that person.

Q.  Now, in May of 2025, is there a particular night when you remember him introducing this fantasy talk?

A.  Yes.

Q.  At the point where he brought it up --

MS. GERAGOS:  Objection to the time period.

MS. COMEY:  May of 2021.  I'm so sorry.

Q.  In May of 2021, was there a time when Sean initiated this fantasy talk?

A.  Yes.

Q.  And at that point when he referenced it, where were you?

A.  We were in his bedroom watching pornography.

Q.  In what city?

A.  Miami.

Q.  And how long had you been awake at that point?

A.  Around I would say 12 or 15 hours.

Q.  Into the night?

A.  From the evening until the morning.

Q.  So had you been awake the whole prior day, too?

A.  Yes.

Q.  So had you been awake for a total of about 24 hours?

P65ACom5                    Jane - Direct

A.   Yes.

Q.   And what, if any, drugs had you been using for the last 12 to 15 hours?

A.   A mix of ecstasy and Molly.

Q.   And what had you and Sean been doing for the last 12 and 15 hours?

A.   Having sex.

Q.   In the way you described?

A.   Yes.

Q.   So then what did Sean start to say to you after you had been doing that for 12 to 15 hours?

A.   He started saying I can make this fantasy a reality.  If you'd like to have that happen, I can make that happen.

Q.   And how did you react?

A.   I said okay.

Q.   Why did you say okay?

A.   Because seemed like he wanted that and it was turning him on and I was really into my partner and I said okay.

Q.   Now, when you said okay, did you think that was going to happen that night?

A.   No.

Q.   When you said okay, did you want to be having sex with someone other than Sean?

A.   No.

Q.   So what did you think you were doing when you said okay to

P65ACom5                        Jane - Direct

him?

A.  Playing into the fantasy.

Q.  So did you just think this was a fantasy?

A.  Yes.

Q.  How did Sean respond when you said okay?

A.  I remember I went to the restroom.  And when I came back out, Sean was in a robe and staring at his phone like really seriously.

Q.  How if at all had his demeanor changed?

A.  He just looked really serious in his phone.

Q.  And what did Sean say to you when you came out of the bathroom?

A.  He said we can make that happen tonight.

Q.  How did you react when Sean told you we can make that happen tonight?

A.  I was like, tonight, like, okay.  I was taken back, a bit surprised, but like, okay.

Q.  Why did you say okay?

A.  Because my partner was excited, and it was already happening, and this was something we were going to do.

Q.  Were you still high at this point?

A.  Yes.

Q.  What do you remember happening next?

A.  I remember being in a hotel room.

Q.  Do you remember how quickly you got to that hotel room

after you saw Sean on his phone?

A.   Just within a couple hours.

Q.   Do you remember what hotel you went to?

A.   A hotel in Miami.

Q.   And when you got to the hotel room a couple hours after Sean had been on his phone, what did you see in the hotel room?

A.   I saw the assistants setting up this room.  There was beverages.  The lights were already red.  There was just kind of like a bustle of getting this room ready.

Q.   Do you remember what assistants were setting up the room?

A.   I don't.

Q.   After the assistants set up the room, who was left in the room?

A.   It was me and Sean in the bedroom talking.

Q.   And what did Sean say to you in the bedroom?

A.   He just told me that there's somebody coming, and just to relax, and that this would be something fun, and he knows the guy, and he's a really nice guy.  And I was just super nervous and just listening to him.

Q.   When Sean said that he knows the guy, what guy did you understand Sean was referring to?

A.   I figured he was referring to this fantasy guy that was coming.

Q.   So what did you understand Sean was telling you was about to happen?

P65ACom5                         Jane - Direct

A.   That sexual things were going to start happening.

Q.   Between who?

A.   Myself and this guy.

Q.   Had you met this guy before?

A.   No.

Q.   Did you even know his name at this point?

A.   No.

Q.   What do you -- and did Sean tell you where he knew this guy from?

A.   No.

Q.   But did he tell you he already knew the guy?

A.   Yes.

Q.   What do you remember happening next?

A.   I remember I was in the room by myself for a little bit, and he walks out and greets the guy.  And I can hear them talking and I eventually --

Q.   Let me just pause you and ask you, I forgot to ask you, what kind of a hotel room, was this a regular room or a suite?

A.   A suite.

Q.   So you said he walked out.  Who walked out of the bedroom?

A.   Sean.

Q.   And then who did you hear Sean talking with?

A.   The man.

Q.   Another guy?

A.   Yes.

P65ACom5                          Jane - Direct

Q.   And then after you heard those -- Sean and this other man talking, what happened next?

A.   He called me to come outside.

Q.   Who called you to come outside?

A.   Sean.

Q.   At this point, what were you wearing?

A.   I was wearing lingerie underneath a robe.

Q.   And what shoes were you wearing?

A.   I was wearing the big stripper heels.

Q.   And who had picked out your outfit and your heels?

A.   Myself and Sean.

Q.   Together?

A.   Yes.

Q.   And when Sean called you out into the other room, what did you do?

A.   I said hello to everyone.

Q.   And who did you see with Sean when you walked into the living room of the hotel suite?

A.   I saw Don.

Q.   Who is Don?

A.   Don is one of the entertainers.

          MS. COMEY:  Ms. Becker, would you please pull up what's been marked for identification as Government Exhibit 2A-614 just for the witness and the parties.

Q.   Jane, do you recognize the person in that photograph?

P65ACom5                        Jane - Direct

A.   Yes.

Q.   Who is that?

A.   Don.

Q.   Is that the same Don you just told us you met in May of 2021?

A.   Yes.

          MS. COMEY:  Your Honor, the government offers this in evidence.

          MS. GERAGOS:  No objection.

          THE COURT:  All right go A-614 will be admitted.

          (Government's Exhibit 2A-614 received in evidence)

          MS. COMEY:  May we please publish that to the jury.

Q.   Do you know Don's last name?

A.   I don't.

          MS. COMEY:  We can take that down.  Thank you.

Q.   Now, that night when you first met Don, what did Sean tell you about how Sean knew Don?

A.   Not much really.  I just could feel a sense that they had known each other and that he had some familiarity.  But he didn't really specify exactly how they knew one another.

Q.   At a later time did Sean later tell you how he knew Don?

A.   Yes.

Q.   What did Sean tell you later about how he knew Don?

A.   That he was from Cowboys & Angels.

Q.   What's Cowboys & Angels?

P65ACom5                      Jane - Direct

A.   It's an escort website.

Q.   And who first told you about Cowboys & Angels?

A.   Sean.

Q.   Now, at the time you met Don in this hotel room, were the drugs you had taken that night still effecting you?

A.   Yes.

Q.   So how did you feel?

A.   I was high.

Q.   Can you tell us what happened after you first walked into the room, into the living room where Don and Sean were?

A.   I -- I remember I was just sitting on the couch with my robe on, and Sean was just telling me to relax and that it was okay, and same with Don.

Q.   How was your body positioned as Sean was telling you to relax?

A.   My legs were crossed.  My arms were crossed.  I had the robe on.  I was nervous.

Q.   What happened next?

A.   Sean was, like, just stand up.  Like, and so I stood up and I started to just kind of dance, just to kind of get my nerves away.

Q.   Did you take off the robe?

A.   Yes.

Q.   Who suggested you take off your robe?

A.   I think it was just a mix of me and Sean.

P65ACom5                         Jane - Direct

Q.   While you started dancing, what did you see Don do?

A.   Getting turned on.

Q.   What was Don wearing at this point?

A.   Shorts.

Q.   What kind of shorts?

A.   I think his underwear.

Q.   What do you remember happening next?

A.   I remember Don came closer to me and started touching me, touching my leg, and just trying to make me feel comfortable. And I started touching him and just trying to -- I don't know.

Q.   What was Sean doing while you and Don started touching each other?

A.   He was watching and touching himself.

Q.   What was Sean wearing at this point?

A.   Nothing.

Q.   And you say he was touching himself, was he masturbating?

A.   Yes.

Q.   What do you remember happening next?

A.   I remember things got a little more hot and heavy with me and Don and we started doing like foreplay on one another.

Q.   Now, as that went on, who if anyone suggested that you perform oral sex on Don?

A.   Sean.

Q.   And what did you do in response?

A.   I did that.

Q.   About how long did that last?

A.   Quite a while.

Q.   And what was Sean doing in the meantime?

A.   Watching, talking.

Q.   What was he saying, if you can remember?

A.   I remember he was in a positive mood, just like being encouraging and sweet.

Q.   Who if anyone suggested moving to the bedroom?

        MS. GERAGOS:  Objection, your Honor.

        THE COURT:  Overruled.

Q.   You can answer.

A.   I remember it was me who started going to the bedroom.

Q.   Why did you do that?

A.   I was kind of ready to kind of speed things up a bit.

Q.   When you say speed things up a bit, what do you mean?

A.   Just to get it going.

Q.   What happened next?

A.   It was time for sex.

Q.   What did you ask for before having sex with Don?

A.   A condom.

Q.   How did Sean react when you asked that Don wear a condom?

A.   He said like he didn't want -- he didn't want that.  He just said why, just these guys are safe.  They get tested all the time, and they're some of the cleanest people, and he can show you his papers, and you don't have to do that.

P65ACom5                    Jane - Direct

Q.  What did you understand Sean was referring to when he said these guys get tested all the time?

A.  At the time, I don't know, but I assumed --

Q.  I don't want you to assume.

At the time, did you know what he was talking about?

A.  No.

Q.  How did you react after Sean told you, you didn't need a condom?

A.  I was nervous at first.  But then at the very last moment, Sean gives Don a condom.

Q.  And so then did you have sex with Don?

A.  Yes.

Q.  And did he wear a condom?

A.  Yes.

Q.  For about how long did that last?

A.  A little while.

Q.  And how did that end?

A.  Don taking the condom off and finishing on me.

Q.  What was Sean doing while you were having sex with Don?

A.  Watching.

Q.  Was he saying anything, or was he quiet, or can you remember?

A.  I can't remember.

Q.  Now, after you had sex with Don, did Don leave?

A.  Yes.

Q.   And then what did you and Sean end up doing?

A.   We were in a really good mood and we just started making love and he was really, really happy.

Q.   How did that night ultimately end with Sean after Don left?

A.   I can't totally remember, but we were together and we were happy.

Q.   The next day do you remember where you went?

A.   I went home.

Q.   Now, before you went home, what if any boat trips do you remember taking on that same trip to Miami?

A.   Oh, yes.  After, after that, we actually went on a really nice yacht boat day with him and his friends.

Q.   So was that the day after you had first met Don?

A.   Yes.

Q.   And what do you remember about that boat day?

A.   It was a lot of fun.  We -- we were just all together as a group.

Q.   And then did you go home?

A.   Yes.

Q.   Now, immediately after that night when you got home, how did you feel?

A.   I felt exhilarated from that experience.

Q.   Can you explain why?

A.   I felt that I had did something -- done something that I had never done before.  I felt excited.  I was happy.  It was

taboo.  It was fun.  I had a good time with my partner.

Q.  What did you think that night represented in your relationship with Sean?

A.  I just took that as a night that we just did something so crazy, taboo, and fun, and sexy.

Q.  What did you think about whether you would do that again?

A.  I didn't think we would be doing that again like that.

Q.  What do you mean?

A.  I mean that after that night, I figured it was just something that we did that one time, and maybe on a random other night, maybe we would do it again, just something taboo.

Q.  How if at all did your relationship with Sean change after that?

A.  After that night, I truly felt that that night just opened like a Pandora's box in our relationship.  It just completely set the tone for our relationship moving forward.

Q.  What do you mean by opening a Pandora's box?

A.  I meant that it was just a door that like I was unable to shut for the remainder of the relationship.

Q.  If you were exhilarated by the first time and were open to possibly doing it again, why did you feel like this was a door you wanted to shut?

A.  Because it was so much of it after and it was too much of it.

Q.  How much of your relationship did nights where you had sex

with other men become with Sean after May of 2021?

MS. GERAGOS:  Objection.

MS. COMEY:  I'll rephrase.

THE COURT:  Can you rephrase.

MS. COMEY:  I'll rephrase.

Q.  After that night in May of 2021, about what percentage of the time that you saw Sean did you end up having sex with another man in front of him?

A.  90 percent.

Q.  Did you want that?

A.  No.

Q.  Did you want to have sex with other men?

A.  No.

Q.  Who did you want to have sex with?

A.  Just Sean.

Q.  Throughout your relationship with Sean, what did you want more than anything?

A.  Just to be with Sean.

Q.  What kinds of things did you want to do with Sean during your relationship with him?

A.  I just wanted, as much as I could, just have like an old-fashioned type of relationship where it was just me and him, like how I met him, like how it was.

Q.  Like how it was in the beginning of 2021?

A.  Yes.

P65ACom5                        Jane - Direct

Q.  Did you ever get back the feeling you had had in the beginning of 2021?

A.  No.

Q.  Now, at first -- well, after that first night in 20 -- in May of 2021, about how long after that did Sean suggest you do that again?

A.  I would say probably pretty quickly after.

Q.  Was it the next time you saw him?

A.  Yes.

Q.  And how did you react when Sean suggested doing it again?

A.  I was agreeable.

Q.  And why were you agreeable?

A.  Because my partner wanted that and I just wanted to make him really happy and I knew it turned him on and I just wanted to satisfy my partner.

Q.  So, at first, over the next few months of 2021, about how often did Sean suggest one of these nights where you have sex with another man?

A.  All the time.

Q.  And at first in the rest of 2021, did you go along with it?

A.  Yes.

Q.  Why?

A.  Because I just really loved him at this point and I just wanted to make him happy and I feared losing him.  I just wanted to be everything that he wanted and I wanted our time to

P65ACom5                        Jane - Direct

be special every single time.  And if that made him happy, I was willing to make him happy.

Q.  After a few months of having sex with other men in front of Sean, did you start to tell Sean that you did not want to have sex with other men?

A.  Yes.

Q.  And over the rest of the nearly three years of your relationship, did you tell Sean you did not want to have sex with other men?

A.  Yes.

Q.  Did you tell him that once or more than once?

A.  More than once.

Q.  Did you tell him that in writing or verbally?

A.  Both.

Q.  Did you tell him that once or more than once in writing?

        MS. GERAGOS:  Objection.  Time period, Judge.

        THE COURT:  All right.

BY MS. COMEY:

Q.  Over the rest of the three years of your relationship, so between the end of 2021 and his arrest in 2024, can you estimate how many times you told Sean in writing and verbally that you did not want to have sex with other men.

A.  Many times in our relationship.

Q.  Was it throughout the period I've just set out between the end of 2021 and 2024?

P65ACom5                    Jane - Direct

A.   Yes.

Q.   Verbally and in writing?

A.   Mostly writing.

Q.   Did you try to tell him in person as well?

A.   Yes.

Q.   When you tried to tell Sean in person that you did not want to have sex with other men, how did he react?

A.   I feel like whenever this topic would come up, it would be -- it would start off really uncomfortable, and I could just feel that the tension was building, and I would just kind of push down what I was really wanting to say.  And he just was dismissive or just wanted me to move on from the subject.

Q.   So what would he say to convey to you that he wanted you to move on from the subject?

        MS. GERAGOS:  Objection, your Honor.  Time period, please.

Q.   Jane, you've talked about a number of different conversations you've had with Sean, right?

A.   Yes.

Q.   Can you remember during those conversations would he say essentially the same thing each time or different things?

A.   Essentially the same thing.

Q.   And when he said essentially the same thing, what are the things that you remember him saying?

A.   Just like we don't have to, or that's fine, or just move on

from it, or what are you talking about, you're crazy, what are you even saying right now, then we don't have to do it. And, I don't know. It was just like rushing me away from this topic.

Q. And after he would say then we don't have to do it, what would happen next?

A. We would still do it.

Q. Later on in your relationship -- well, let me back up.

Do you remember the address that we saw on your license earlier?

A. Yes.

Q. Did you move into that home when you were still in a relationship with Sean?

A. Yes.

Q. And who paid for your rent when you moved to that home?

A. Sean.

Q. And after Sean started paying for your rent in that home, what if any threats did he make to you about that rent when you tried to tell him you did not want to have sex with other men?

MS. GERAGOS: Objection, your Honor.

THE COURT: Is it the same objection?

MS. GERAGOS: The word "threats."

THE COURT: Can you rephrase.

Q. What did Sean say to you about your rent when you tried to tell him that you did not want to have sex with other men?

A. He would just start saying things like if you want to break

up, that's fine.  Do you need, like, what, three more months in the house, because I'm not about to be paying for a woman's rent that I'm not even seeing.

Q.  Now, in those conversations were you trying to break up with Sean?

A.  No.

Q.  What were you trying to stop doing?

A.  I was trying to stop doing these nights.

Q.  When you say "these nights," do you mean the nights you had sex with other men?

A.  Yes.

Q.  How did Sean saying those things about ending his payment of your rent make you feel in those moments?

A.  I felt frustrated.  I felt just obligated.

Q.  What did you feel obligated to do?

A.  Perform.

Q.  Perform -- I'm sorry.  Go ahead.

A.  Just perform these nights with him.

Q.  When you say "these nights," do you mean the nights when you had sex with other men?

MS. GERAGOS:  Objection.  Time period, Judge.

Can we have a quick sidebar, please.

THE COURT:  You may.

(Continued on next page)

(At sidebar)

MR. AGNIFILO:  There's constant leading of the witness through critical testimony that's charged conduct.  This witness is capable of telling the story.  And Ms. Comey is using words like "threats" when this witness didn't use threats.  And that's a signal to this witness to say something that sounds like threats.

This witness should tell her story her way.  And we are now -- it's fine in the beginning.  This is now leading through charged conduct.  And it's wrong and it's systemic through the entire part of the examination.  And it's very serious.

This witness wants to say things, let her say them -- not -- you're the judge.  She should say them.  She should say what she wants to say her way without threats being interposed or about the type of leading that's going on because it's very prejudicial and we want to hear what this witness has to say of her own volition and of her own story.

THE COURT:  All right.  Well, I've been watching the testimony closely.  I haven't seen any improper leading.  And the extent to which there was one question in which the word "threat" was used, I think it was not used to suggest anything to the witness.  I think it was just the context of what was being discussed.

There was an objection and then the question was

P65ACom5                          Jane - Direct

rephrased.  So I haven't seen that, but I will watch the questioning closely.  And you've now articulated your objection and Ms. Comey has now heard the objection.

MS. GERAGOS:  May I just add one more thing.  It would be really great if we could have time period.  I know she's saying after the house.  But after the house is a year and a half.  If we could just make the time periods a little bit more clear for the record, that's more helpful.

THE COURT:  Now, that particular objection, when you raised, and Ms. Comey adjusted her question, I think is a fair one.  So when we get to things like conversations or different events that happened over a period of time, if you just add some questions to establish the context, that would be appreciated.

MS. COMEY:  Yes, your Honor.  If I may, I do not intend to be leading this witness.  I have rephrased any time there's an objection.  And if I hear more leading objections, I will obviously rephrase.

With respect to the time period, I'm about to move on, but I will just note what I'm trying to do right now is give an overarching sense of the timeline.  And what I'm trying -- what I'm about to ask her about is whether from the period when she moved into this home until the end of her relationship with Mr. Combs, why she felt obligated.  Because she just used the word "obligated."

P65ACom5                         Jane - Direct

And I expect what she will say is throughout that whole period she felt obligated each time because of the rent. And I think it is fair for me to elicit that as opposed to having to go through each individual hotel night.

THE COURT:  As to the last question that was asked, I would have overruled the objection.  So I think that point is well taken, but you've heard Ms. Geragos' objection.

MS. COMEY:  Yes, your Honor.

THE COURT:  In terms of time frame, let's try to...

MS. COMEY:  Yes, your Honor.  Thank you.

(Continued on next page)

(In open court; jury present)

THE COURT:  Ms. Comey, you may proceed.

MS. COMEY:  Thank you, your Honor.

BY MS. COMEY:

Q.  Jane, a moment ago you used the word "obligated."  I want to focus on the period between 2023 and Sean's arrest in 2024.

Who was paying your rent between approximately April of 2023 and Sean's arrest in 2024?

A.  Sean.

Q.  And throughout that same period, between spring of 2023 and Sean's arrest in 2024, what if anything made you feel obligated to have sex with other men in front of Sean?

A.  My feeling of obligation really started to stem from the fact that my partner was paying my rent.

Q.  I want to talk a little bit more about these nights with other men.  Okay?

A.  Okay.

Q.  What words would you and Sean use to refer to these encounters where you would have sex with other men?

A.  We would call them debauchery or hotel nights.

Q.  I'm going to call them hotel nights.  Okay?

A.  Okay.

Q.  Would you understand what I mean if I use that term?

A.  Yes.

Q.  Between the first time in May of 2021 and your longer

P65ACom5                        Jane - Direct

breakup starting around October of 2023, about how often did you see Sean in person?

A.  Often.

Q.  And did the frequency vary over time during those about two years?

A.  Yes.

Q.  Were there sometimes longer gaps where you didn't see Sean?

A.  Yes.

Q.  And sometimes shorter gaps where you saw him more often?

A.  Yes.

Q.  About how many of those times that you saw Sean in person between May of 2021 and October of 2023 did you end up having a hotel night?

A.  Every single time I saw Sean.

Q.  Now, were there some times when you visited him and got to be alone with him?

A.  Yes.

Q.  About what percentage of the time you spent together with Sean did you get to be alone with him?

A.  I would say 30 percent.

Q.  How can it be that it was about 30 percent if just about every time you saw him you had one of these hotel nights?

A.  Because after hotel nights, we would have a couple days or so together alone, but it still felt, to me, like a hotel night the whole time.

Q.  Why did the whole time feel like a hotel night if you had a couple days just alone with Sean afterwards?

A.  Because I would have rather and preferred that it was just 100 percent me and him.

Q.  Was there a set schedule of the times you would see Sean in person or was the timing unpredictable?

A.  It was unpredictable.

Q.  Who decided when you would see Sean in person?

A.  Sean.

Q.  About how much notice did you usually get before Sean asked to see you in person?

A.  Not that much notice.

Q.  Can you give us an estimate of how much notice you would usually get?

A.  It could vary between the night before, the day of, a couple days before.

Q.  What if anything did you do in your life during your relationship with Sean to make sure you were available to see him whenever he asked?

A.  I just always made sure that I had proper child care in place in the event that he would call me.  I would make sure that I was always put together and ready.  And just ready for Sean.

Q.  What do you mean when you say you would make sure you were always put together and ready?

P65ACom5                        Jane - Direct

A.   I always made sure that my nails were done, my hair was done, my glam, my tan.

Q.   Why did you do that?

A.   I just liked being beautiful for Sean, and I know he liked me looking beautiful for him.

Q.   Now, during your relationship with Sean, how many trips did you go on with friends or for yourself?

A.   Hardly much.

Q.   Why?

A.   Because I knew Sean wouldn't like that.

Q.   How did you first learn that Sean wouldn't like you taking a trip by yourself or with friends?

A.   I finally had taken a trip, and he was on my phone really just disappointed, really upset, was just condescending, and he was like in disapproval.

Q.   Do you remember when this trip was?

A.   I would say maybe the summer of '22.  I'm not sure.

Q.   Are you estimating?

A.   Yes.

Q.   Was it earlier in your relationship?

A.   Earlier.

Q.   What if any trips did you take to France in the summer of 2021?

A.   Yes, I went to the South of France.

Q.   And who did you go with?

P65AcOM5                        Jane - Direct

A.   A group of girlfriends.

Q.   And did you tell Sean before you left?

A.   No.

Q.   And what ended up happening after you went on that trip with a group of girlfriends to the South of France without telling Sean?

A.   I remember he was just really mean on the voice notes, really disappointed.  He used the word disappointed I remember.  And just made me feel really bad.

Q.   So what did you feel bad about?

A.   I felt bad for making him feel bad.

Q.   Now, what if anything did Sean tell you about what he wanted you to look like when you were with him?

A.   He liked me having straight hair.  Or when it was time for us to be together intimately, he liked my hair in a ponytail.  He wanted me to have light colored nails, mostly like a creamy white.  And later in our relationship, he was wanting me to get piercings.

Q.   Where did Sean tell you he wanted you to get piercings?

A.   My nipples.

          (Continued on next page)

BY MS. COMEY:

Q.  We'll talk about that in a little bit.  OK?

How much time and money did it take for you to look this way for Sean?

A.  Looking nice and presentable took a lot of time of my life, a lot of time in my life.  It was kind of like almost every day.

Q.  And why was it almost every day?

A.  Because I wanted to, like, stay ready, and it almost became, like a -- I don't know, like a habit.

Q.  So what would you do every day to make sure you were ready to see Sean?

A.  I would work out.  I would always have my nails done, my lashes, my hair.  I just always wanted to stay ready and look really nice for him.

Q.  How much did that cost?

A.  A lot.

Q.  How did being available for Sean at a moment's notice impact your ability to work and make income during your relationship with him?

A.  It impacted it a lot.  I was -- I would say when I was with Sean, I was really consumed by him.  I was really consumed by Sean.

Q.  What income did you make, focusing on the period between the beginning of your relationship in 2021 and that break in

October of 2023?

A.  In the beginning, I was doing some social media posts, but that started to dwindle down because my presence on social media really declined after I prioritized this relationship.

Q.  So during your relationship with Sean, what sources of income did you have?

A.  Sean and my child support.

Q.  And how would Sean support you?

A.  He would give me money here and there.

Q.  About how often did Sean give you money during your relationship?

A.  It was random.

Q.  What's the most you remember him giving you?

A.  Like 20,000.

Q.  How did he give you that?

A.  Wire.

Q.  What's the average you remember him usually giving you?

A.  I would say if it was cash, like five, ten.  If it was a bit more than that, it would be in a wire.

Q.  Five, ten thousand?

A.  Yes.

Q.  In cash?

A.  Yes.

Q.  And what would Sean say when he would give you this money?

            MS. GERAGOS:  Objection, your Honor.  Time period,

please.

THE COURT: That's fair.

MS. COMEY: I can focus it.

Q. Let's focus on the $20,000 wire. What do you remember Sean saying when he gave you $20,000?

A. Around this time, I remember mostly, like, the big wires were, because we had moved in to the place, the new house and I expressed that we needed furniture.

Q. And how about the cash; do you remember the first time Sean gave you a few thousand dollars in cash?

A. Yes.

Q. Do you remember about when that was?

A. When we first, first started dating.

Q. And what did he say to you when he gave you a few thousand dollars in cash?

A. It was just because.

Q. Over the course of your relationship, what, if any, conversations did you have with Sean about how you wanted to make your own money?

A. I remember at the time that was when OnlyFans really started to emerge.

Q. Let me, so that we can make it clear, about what time are we talking about?

A. I would say early on in the relationship, maybe 2021.

Q. Approximately?

A.   Yes.

Q.   And did you have a conversation with Sean around that time about wanting to make your own money?

A.   Yes.

Q.   What did you tell Sean?

A.   I told Sean that one of the, one of my model girlfriends had been really lucrative on this website, and once I started saying OnlyFans, I remember he was, like, giving me this kind of energy that was, like, hesitant, like, and, like, no.

Q.   What is OnlyFans?

A.   Only OnlyFans is a membership, subscriber website where you can subscribe to models or content creators, anybody, really.

Q.   And what kind of content were you suggesting to Sean you would make on only OnlyFans?

A.   Bikini, lingerie, some nudity.

Q.   But would it be sex acts?

A.   No.

Q.   And how much money did you tell Sean you understood you could make if you created an account on only OnlyFans?

A.   I just remember my girlfriend; she told me that she had made 4 million that year.  And I just knew that if I had joined at that time, that it would have been lucrative for me.

Q.   Did you tell Sean that?

A.   No.

Q.   What did you tell Sean?

P65Wcom6                          Jane - Direct

A.  I just said that I'm getting proposed this thing about OnlyFans, and then he would just say, like, let's just give it time and let's think about this.  I don't know.

Q.  When you said let's just give it time and let's think about this, who did you understand was the let's?

A.  Him and I.

Q.  Why did you feel like you needed Sean's permission to get your own income?

A.  Because I felt like, in my heart he was my boyfriend, my significant other, and I wanted his approval.

Q.  And you mentioned that Sean ended up paying for your rent, is that right?

A.  Yes.

        MS. COMEY:  I want to pull up now what's in evidence as Government Exhibit 4H-122 under seal, please.

Q.  Do you recognize this document?

A.  Yes.

Q.  What is it?

A.  A lease.

        MS. COMEY:  Could we please zoom in on the top quarter of this page, Ms. Becker.

        Thank you.

Q.  Could you just read for us the date next to the date line?  I'm not going to have you read anything else.  Just the date.

A.  April 4, 2023.

Q.   And is that approximately when you moved into the home that Sean paid the rent for?

A.   Yes.

Q.   And the name in the line that has tenant next to it, without saying it out loud, is that your true name?

A.   Yes.

Q.   And the name next to the words "rental property owner," is that your landlord?

A.   Yes.

Q.   And then the address on the next line, below, next to the word "premises," is that the address of the home?

A.   Yes.

          MS. COMEY:  We can take that down.  Thank you.

          I'd like to now --

Q.   And I don't think I highlighted it, but how much was the rent on this property?

A.   10,000.

Q.   $10,000 a month?

A.   Yes.

Q.   Could you afford that much rent on your own?

A.   No.

Q.   And how did you end up deciding to move into a home that had rent of $10,000 a month?

A.   I remember Sean and I had a break.  We had a fight, and when we got back together, Sean said, let's do a love contract.

P65Wcom6                     Jane - Direct

And it wasn't like a physical contract.  It was just a verbal, flirty thing that we were talking about, and he said that -- when he asked me how much allowance do I want a month moving forward, and I said 15, and then he said 10.

Q.  When you said 15 and he said 10, did you mean thousand?

A.  Yes.

Q.  What did Sean say next?

A.  Said OK, ten.

Q.  So how did that $10,000 end up getting given to you?

A.  So, from that number I -- at that time just really wanted a bigger space, a bigger yard, just a beautiful home.  I just wanted to experience something that was nice just so I could feel some sort of balance in our relationship, and I used that whole allowance for just a comfortable living space.

Q.  And so did Sean agree that instead of giving you $10,000, say, in a wire or cash, he would instead pay the rent?

A.  Yes.

        MS. COMEY:  Can we please now pull up what's in evidence as Government Exhibit E-289 under seal.

Q.  Can you tell us what we're seeing here?

A.  Yes.  This is an email between myself, the landlord and Sean's accountant.

Q.  Which name on here is Sean's accountant?

A.  Robin.

Q.  What's her last name?

A.   Greenhill.

Q.   And she's sending this email to, you said, you and your landlord?

A.   Yes.

Q.   And would you please read -- below hi and the name of you and your landlord, would you please read out loud what Robin wrote.

        MS. COMEY:  Actually, I'll read it to make sure you don't accidentally say a name.

        So she writes:  "Please find the bank account information and highlighted dates on 5/11/2023 for Jane's rent. I have also highlighted the bank confirmation number.  Please let us know if you do not see the deposit on your side so we can track it ASAP."

Q.   Did I read that correctly?

A.   Yes.

        MS. COMEY:  And if we can zoom in on the bottom of this, please, Ms. Becker.

Q.   Do you have an understanding of what this is?

A.   It's a -- looks like a, a wire transfer -- oh, yes.  It's a wire transfer.

Q.   For what?

A.   The deposit.

Q.   To pay your rent?

A.   Yes.

MS. COMEY:  We can take this down.  Thank you, Ms. Becker.

Q.  I want to focus again on the period between May of 2021 and your first break with Sean, your break with Sean in October of 2023.  Over that period, in what cities or countries did you see Sean in person?

A.  In Turkos and Caicos.  I saw him in Miami, Los Angeles, New York.

Q.  And what, if any, trips did you take -- well, actually, withdrawn.

At how many of those locations did you and Sean have a hotel night?

A.  All of them.

Q.  How did you travel to those places outside of Los Angeles?

A.  I would take a plane.

Q.  Who arranged your travel?

A.  Sean.

Q.  Did Sean himself arrange the travel?

A.  No.  His travel agent, Jess.

Q.  Who else on Sean's staff would you have conversations with about your travel plans?

A.  It would vary between the assistants, KK, Jess.

Q.  Do you know Jess's last name?

A.  I don't.

Q.  Who paid for your travel?

A.  Sean.

Q.  Did each of these hotel nights with Sean typically follow the same pattern, or were they different each time?

A.  They typically followed the same pattern.

Q.  Focusing on the period between May of 2021 and November of 20 -- October of 2023, in what type of building did most of these hotel nights take place?

A.  Hotels.

Q.  In what types of rooms were these nights, regular hotel rooms or suites?

A.  Suites.

Q.  How were the suites decorated?

A.  They had red lights, music, beverages -- red lights, music, alcohol.

Q.  What, if any, coverings would there be on the furniture?

A.  There would be, there would be bedsheets covering everything, blankets, towels.

Q.  Why were there bedsheet, blankets and towels?

A.  For the excessive use of baby oil everywhere.

Q.  About how many bottles of baby oil would you use in a single hotel night?

        MS. GERAGOS:  Objection, your Honor.

        THE COURT:  Sustained.

        You can rephrase.

BY MS. COMEY:

Q.   How often would you use baby oil on one of these hotel nights?

A.   Often, all the time.

Q.   Were there any hotel nights that you didn't use baby oil?

A.   No.

Q.   About how much baby oil do you remember using during each of these hotel nights?

A.   I would say, like, two dozen or more.

Q.   Two dozen or more what?

A.   Bottles of baby oil.

          MS. COMEY:  I'd like to now pull up what is in evidence as Government Exhibit A510-H, and pull up pages 14 and 15, please, side by side.

Q.   So Jane, we can -- can you see that on the screen?

A.   Yes.

Q.   Do you recognize this?  Do you know what this is?

A.   Yes.

Q.   What is this?

A.   It's a text conversation between Sean and I, and he's --

Q.   And what's the date of the text conversation?

A.   This is on August 31, 2022.

          MS. COMEY:  Ms. Becker, can we just zoom in on the bottom two messages on the left, please.

Q.   And Jane, would you read, please, what you wrote to Sean in these two messages?

P65Wcom6                       Jane - Direct

A.  I said:  "When you pull up have security or whoever catch the bag with the keys.  I have to throw it down."

Q.  Would you please read the next text?

A.  "Then give them their own set."

Q.  And then on the next page --

        MS. COMEY:  If we could zoom in on the top two, on the next page.

Q.  -- Sean responds:  OK.  What's the address?"  And without reading it out loud, in your response, do you then provide your address at the time?

A.  Yes.

Q.  Why were you giving Sean your address at the time, on August 31, 2022?

A.  Because he was coming over.

Q.  And do you remember what he was coming over for?

A.  I remember he was coming over to visit me and do one of these nights, but at my residence at the time and not a hotel.

Q.  About how many of these nights with other men do you remember having with Sean at this location, this residence?

A.  I would say a handful of times.

Q.  And what kind of home was this?

A.  An apartment.

        MS. COMEY:  You can take this down.  Thank you, Ms. Becker.

Q.  Now, Jane, did the sexual activity during hotel nights

P65Wcom6                    Jane - Direct

generally follow the same pattern or routine, or was it different each time?

A.  It generally followed the same pattern.

Q.  And how did you learn that pattern?

A.  Within time I just realized how he liked things.  He would tell me what he liked, what he wanted to see.  He would just, even from the very beginning, tell me what he wanted to see. And during them he would suggest what I would do next or what I would do and encourage more or less of whatever he wanted to see.

Q.  You used the word "he" a lot in that answer.  Who is he?

A.  Sean.

Q.  What did you wear during these hotel nights?

A.  I wore provocative lingerie and really high stripper shoes.

Q.  Where did the lingerie come from?

A.  They came from sex stores.

Q.  Excuse me?

A.  They came from sex stores.

Q.  OK.  And who would typically buy the lingerie from sex stores?

A.  Typically me.

Q.  And who would pick which lingerie you would wear during a hotel night?

A.  I would buy them myself, and then I would show him what I had.

P65Wcom6                         Jane - Direct

Q.  Show who what you had?

A.  Sean.

Q.  And then what would Sean say?

A.  He would choose which outfit he liked.

Q.  Now, during a typical hotel night, usually what would you and the other man do first?

        MS. GERAGOS:  Objection, your Honor.

        THE COURT:  Rephrase.

BY MS. COMEY:

Q.  Jane, you said that the hotel nights generally followed the same pattern or routine of sexual activity.  Do I have that right?

A.  Yes.

Q.  I'd like to walk through what that typical pattern or routine was across hotel nights.  OK?

A.  OK.

Q.  So could you tell us in that typical routine or pattern, how did it usually begin?

A.  I would greet the person and I would say hello and just be really nice and sweet and kind of make small talk and --

Q.  Make small talk with who?

A.  Whoever the entertainer was.

Q.  And when you say the entertainer, what are you referring to?

A.  An escort.

Q.  And after you had small talk and greeted the entertainer, in a typical night following the pattern or routine that we've discussed, what would happen next?

A.  They would be undressed, in shorts, and I would come out in a robe.  Music would be playing, and I would start to already be high or have drugs in my system.  And I would start dancing and slow dancing, just to kind of get my nerves out and kind of start the night, for energy of that, and de-robe, and things would escalate to foreplay between me and the man.  Actually --

Q.  Throughout that --

I'm sorry.  Go ahead.

A.  Actually, that's -- a few steps before that is typically the oral would start happening, when I would start dancing and I would put oil on the man and things like that.

Q.  You said the oil.  What oil are you referring to?

A.  Baby oil.

Q.  And why were you using baby oil?

A.  Because that's what Sean really liked.

Q.  How did you learn that?

A.  From the very beginning of our sex life, that's what he liked to introduce before sex.

Q.  So focusing again on the pattern or routine of these nights, as you go through that first phase, pouring oil on the man or yourself, dancing, what would Sean typically be doing?

A.  Masturbating.

Q.   And then what is the next part of the typical routine or pattern of these nights, in your experience?

A.   In my experience it would be just a really long and prolonged foreplay moment between me and this guy, and I would just sit there and he wanted me to touch myself while I was touching the other man.

Q.   You said he wanted you to touch yourself.  Who is he?

A.   Sean.

Q.   How did you know -- how would you know when he wanted you to touch yourself?

A.   He would tell me.

Q.   You said that this period would be long.  About how long in a typical hotel night would that period last?

A.   Those moments would last a very long time.  I can't really think of hours or -- I don't know.  Just really long.

Q.   Why would they last so long?

A.   Because he really enjoyed watching me pour oil all over myself, all over the man, have the man stand and just watch these, like, really erotic moments happening between me and the man.

Q.   You said he.  Who is he?

A.   Sean.

Q.   And how would you know that that's what he wanted?

A.   Because he would tell me.

Q.   After that first phase, again, in a typical pattern of one

of these hotel nights, what would typically happen next?

A.   Typically, after that it would be time for sex.

Q.   And what kind of sex would typically happen first?

A.   Sex between me and the other man.

Q.   And forgive me for asking this, but oral sex or intercourse first?

A.   Oral sex.

Q.   And you said it would be time for that.  How would you know it would be time for oral sex?

A.   It varied between Sean telling me or me just starting it.

Q.   Why would you just start it?

A.   Because I knew that it would arouse the man more and kind of speed things up.

Q.   Why did you want to speed things up?

A.   Because I just wanted to speed things up.

Q.   About how long would the oral sex last typically in a usual hotel night?

A.   Long time.  Like many hours.

Q.   Why would it last so long?

A.   Because that's what Sean preferred to see.

Q.   How did you know that?

A.   Because that's what he would tell me.  That's what he would like to watch.  He says it from the very beginning, that that's what he wants to see more of, is me playing with myself and play with the other man.

Q.   Over these hours, who would perform oral sex on whom?

A.   I would perform oral sex on the man.

Q.   And in the typical pattern of one of these hotel nights, what would typically happen after those hours of oral sex?

A.   Then we would move into the bedroom to have sex.

Q.   Who would usually suggest moving into the bedroom to have sex?

A.   Me.

Q.   Why you?

A.   Because I just really wanted to be done so I could just be with my partner.

Q.   And why would moving to the bedroom help you be done?

A.   Because then that would mean that they would finish and then I could just be with my partner.

Q.   When you say finish, do you mean ejaculate?

A.   Yes.

Q.   And you would move into the bedroom on a typical hotel night following through the pattern and routine we're talking about, what would typically happen next?

A.   After the man would finish, then Sean would come in.  The man would be excused.

Q.   While you were having sex with the man, what would Sean typically do?

A.   Masturbate, watch.

Q.   And what, if anything, would he say?  Would he say

P65Wcom6                        Jane - Direct

something, or no?

A.   Are you talking about sexually?

Q.   I'm asking typically.  Walking through the routine of a typical hotel night, would Sean usually talk or say something while you were having sex with the other man, or no?

A.   Yes.  He would say, do you want to feel some of that, and just let him, like, finish and do something.

Q.   When Sean would say let him finish, what did you understand Sean was saying to you?

A.   That he wanted this man to ejaculate on me.

Q.   About how long would the sexual intercourse typically last during one of these nights?

A.   It could last quite a while.

Q.   And how would it end each time?

A.   With the man finishing just right outside of me.

Q.   You mean ejaculating?

A.   Yes.

Q.   And when you say right outside of you, do you mean right outside of your genitals?

A.   Yes.

Q.   After the man finished, you said he would be excused.  Who would excuse him?

A.   Sean.

Q.   And after the man was excused, what would you and Sean do?

A.   That's when me and Sean would begin to make love.

Q.   Would you clean up the ejaculate in between?

A.   No.

Q.   Is what we just walked through a typical single round of a sexual encounter with an entertainer during a hotel night?

A.   Yes.

Q.   How many of those rounds that you just described would you typically have in a single hotel night with Sean?

A.   I -- if it was --

          MS. GERAGOS:  Objection, your Honor.

A.   You mean like --

          THE COURT:  Hold on.

          Grounds.

          MS. GERAGOS:  Time period.

          THE COURT:  OK.  Ms. Comey, can you rephrase the question.

BY MS. COMEY:

Q.   Jane, in a typical hotel night, you said that these nights followed a typical pattern.  Do I have that right?

A.   Yes.

Q.   And a typical routine.  Do I have that right?

A.   Yes.

Q.   In that pattern and routine, the sexual activity that you described for us, going from foreplay to oral sex to intercourse to sex with Sean, how many times would you repeat that pattern; would you only do it once, or would you do it

P65Wcom6                      Jane - Direct

more than once in a single hotel night?

A.   In a single hotel night, sometimes it would happen more than once with one person, and then maybe more than once with another person.

Q.   In total, how long did a typical hotel night last?

A.   Like 24 to 30 hours or more.

Q.   Were you able to sleep at all during that time?

A.   No.

MS. COMEY:  Your Honor, I think this is a good place to break for the day.

THE COURT:  All right.  Very good.

Members of the jury, we'll be back here tomorrow at 9 a.m.  Now, I'm going to ask you for some assistance to the Court.  We need to pick up some time, and so tomorrow and potentially on Monday, Tuesday and next Thursday, we may stay later.  Tomorrow I know that we're going to stay until 5 p.m., and the following days we may also stay til 5 p.m.  I'm just putting that on your radar so that you know so we can pick up some time.  That's going to help us move in an expeditious way with the trial.

With that, I'll give you the same instructions I've given you before.  Do not speak with each other about the case. Do not speak with anybody else about the case.  And please don't look up or investigate the case in any way.

With that, we'll see you here for 9 a.m. tomorrow.
(Continued on next page)

P65Wcom6

(Jury not present)

THE COURT:  We'll see you tomorrow at 9 a.m.  You can leave the stand.

(Witness not present)

THE COURT:  All right.  Please be seated.

Anything that we need to raise before we adjourn?

From the government.

MS. COMEY:  Your Honor, I learned that Jane's counsel would ask that your Honor remind everyone in the gallery that to the extent they could see any personal identifying information on the screens of the attorneys during the examination, that they are not to report on it or record it.

THE COURT:  All right.  You've now said it.

MS. COMEY:  Thank you, your Honor.

THE COURT:  And people should not take anything from any of the attorneys' screens, to the extent that they could see them, and reproduce them or note them down or distribute them in any way.

Anything further from the government?

MS. COMEY:  Nothing from the government, your Honor.  Thank you.

THE COURT:  Can you give me a rough estimate --

MS. COMEY:  Yes, your Honor.

THE COURT:  -- now that we're in the examination?

MS. COMEY:  I will definitely not be done by the end

P65Wcom6

of day tomorrow.  I am going to work very hard to streamline so that I am done on Monday.

THE COURT:  Very good.

Anything from the defense?

MR. AGNIFILO:  Yes, your Honor.

First, I want to publicly thank the marshals service. They've been wonderful to us, and they've been letting us stay in the courtroom until 6 o'clock.  It's been a tremendous help. We have been able to look at the materials, and I really want to thank them personally on the record.

One thing that I'm working through is I do believe that there's a way of crafting an order which, if your Honor signs it -- and I would make sure that I was working on the other end of it, where I think we'd be able to use the SCIF. What I don't want to do is I don't want to set the Court up to sign an order that's going to cause the Court problems.  So the time that this is going to take is to craft on an order that gives us what we need and then work with the marshals service, so that if I ask your Honor for an order, it's actually something where I've kind of paved the way ahead of time.  And so I don't -- I can't do that right now, because I haven't run the other side to ground yet, but I might be submitting something later tonight.

THE COURT:  Any application you have, I'll consider it, but I don't have anything right now.

P65Wcom6

MR. AGNIFILO:  No, you don't.

THE COURT:  On that note, I did issue the order, Mr. Donaldson, concerning the minutes at the MDC.  I've been separately informed by the MDC that they had a team there, I think, restart the lines or just make sure that the minutes were available.  They say that from a technical standpoint the minutes are available to Mr. Combs.

Have you, Mr. Donaldson, figured out whether that is accurate?  Have you gone back and checked?

MR. DONALDSON:  I do know that his minutes are there.

First, thank you very much for the order.

I do know that the minutes are there.  I do know that Mr. Combs tried last night to call.  It did not work.  He was not able to try to call this morning before he was brought over, so I did want to make a representation about that.  So I'm hopeful that it works when he gets back today.

That's what I have.

THE COURT:  OK.

All right.  Anything else from the defense before we adjourn?

MR. AGNIFILO:  Nothing from us.  Thank you, Judge.

MR. DONALDSON:  No, your Honor.  Thank you.

THE COURT:  All right.  We will see everyone back here at 8:30 tomorrow.

(Adjourned to June 6, 2025, at 8:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                      Page

BRYANA BONGOLAN

Cross By Ms. Westmoreland . . . . . . . . . .4442

Redirect By Ms. Smyser . . . . . . . . . . . .4497

Recross By Ms. Westmoreland . . . . . . . . .4506

ENRIQUE SANTOS

Direct By Ms. Johnson . . . . . . . . . . . .4530

Cross By Ms. Geragos . . . . . . . . . . . . .4542

 JANE

Direct By Ms. Comey . . . . . . . . . . . . .4550

GOVERNMENT EXHIBITS

Exhibit No.                                      Received

 7Y-111   . . . . . . . . . . . . . . . . . .4442

 C-361-C, C-361-CM, C-360-A . . . . . . . . .4509

 1310   . . . . . . . . . . . . . . . . . . .4539

 1309   . . . . . . . . . . . . . . . . . . .4546

 3R-101,                          . . . . . .4547

         3R-121, 3R-122, 3R-123,

         4H-122,

         A-104-1 through A-104-12,

         A-104-16,

         A-104-17,

         A-104-19 through A-104-29,

         A-104-34, A-104-37,

A-104-40,

A-104-40A,

A-104-40B,

A-104-41,

A-104-42,

A-104-44,

A-104-46,

A-104-48,

A-104-49,

A-104-53, A-104-54,

A-104-55,

A-104-59,

A-104-61 through A-104-71,

A-104-74,

A-104-75,

A-207-A,

A-207-B,

A-301-B,

A-301-C,

A-301-G ,

A-301-H,

A-301-I,

A-301-J,

A-301-N,

A-301-P,

A-442-1,

A-442-3,

A-442-4,

A-442-5,

A-442-11,

A-442-12,

A-442-13,

A-442-16,

A-442-17,

A-442-18,

A-442-19,

A-442-20,

A-442-22 ,

A-442-29,

A-442-30,

A-442-34,

A-442-35,

A-442-35A,

A-442-35B,

A-442-37 through A-442-43,

A-510-B,

A-510-C,

A-510-D,

A-510-E,

A-510-G,

4635

A-510-H,

A-906,

A-1202-A,

C-348-A,

C-348-B,

C-261,

E-103,

E-103-M,

E-105,

E-105-M,

E-108,

E-108-M,                    E-110

through E-131,

E-110-M through E-131-M, E-133

through E-138,

E-133-M through E-138-M,

E-141,

E-141-M,                    E-144

through E-150,

E-144-M though E-150-M,

E-152,

E-152-M,

E-156,

E-156-M,

E-160,

E-160-M,

E-168,

E-168-M,

E-169,

E-169-M,

E-185,

E-185-M,

E-186,

E-186-M,                         E-188

through E-196,

E-188-M through E-196-M,

E-198,

E-198-M,

E-206,

E-206-M,

E-207,

E-207-M,                         E-209

through E-213,

E-209-M through E-213-M,

E-238,

E-238-M,

E-248,

E-248-M,

E-252,

E-252-M,

E-253,

E-253-M,                    E-255

through E-257,

E-255-M through E-257-M,

E-259,

E-259-M,                    E-260

through E-268,

E-260-M through E-268-M,

E-271,

E-271-M,

E-272,

E-272-M,

E-273,

E-273-M,

E-278,

E-278-M,

E-279,

E-279-M,

E-281,

E-281-M,

E-282,

E-282-M,

E-283,

E-283-M,

E-285,

E-285-M,

E-286,

E-286-M,

E-287,

E-287-M,

E-288,

E-288-M,

E-289,

E-289-M,                          E-292

through E-298,

E-292-M through E-298-M,

E-306,

E-306-M,

E-307,

E-307-M,

E-321,

E-321-M, E-332,

E-332-M,

E-333,

E-333-M,

F-101,

G-101,

G-102,

G-103,

G-203,

G-213,

G-214,

J-107-A and

J-107-B, sealed,

AX-101, AX-101-A, AX-101-B, AX-101-B1,  . . .4548

AX-101-C, AX-102, AX-102-A,

AX-102-B, AX-102-C, AX-102-D,

AX-102-D1, AX-102-E, AX-103,

AX-103-A, AX-104, AX-104-A,

AX-105, AX-105-C, AX-105-C1,

AX-105-D, AX-105-E, AX-108,

AX-701, AX-701-65, AX-701-65A,

AX-701-71, AX-701-73,

AX-701-77, AX-701-79,

AX-701-79-A, AX-701-79-B,

AX-701-79-BT (aid), AX-701-81,

AX-702, AX-702-F, AX-702-F1,

GX AX-703, AX-703-33,

AX-703-35, AX-703-42,

AX-703-42A, AX-703-90,

AX-703-91, AX-703-91A,

AX-1102, AX-1102-A,

AX-1102-A1, EX-101 through

EX-121, EX-165, EX-165-A,

EX-165-M, EX-166, EX-166-A,

EX-166-M, EX-167, EX-167-A,
EX-167-M, EX-170, EX-170-M,
EX-177, EX-177-M, EX-178,
EX-178-M, EX-179, EX-179-A,
EX-179-M, EX-180, EX-180-M,
EX-181, EX-181-A, EX-181-M,
EX-182, EX-182-M, EX-184,
EX-184-A, EX-184-M, EX-185 and
EX-185-M, X-series,

. . . . . .4549

3R-103 through 3R-120,
9A-101,
9A-102, 9S-101,
C-348,
E-102,
E-102-M,
E-106,
E-106-M,
E-139, E-139-M,
E-163,
E-163-M,
E-177,
E-177-M                ,
E-260,
E-260-M,

E-265,

E-265-M,

E-266,

E-266-M,

E-267,

E-267-M,

E-268,

E-268-M,

E-290,

E-290-M,

E-303,

E-303-M,

E-304,

E-304-M,

E-305,

E-305-M,

E-183,

E-183-M,

E-184,

E-184-M,

E-221,

E-221-M,

E-222,

E-222-M,

E-223,

E-223-M,

E-247,

E-247-M,

E-249,

E-249-M,

E-250,

E-250-M,

E-251,

E-251-M,                                E-258

and

E-258-M, public,

2A-402   . . . . . . . . . . . . . . . . . . .4552

2A-614   . . . . . . . . . . . . . . . . . . .4587

DEFENDANT EXHIBITS

Exhibit No.                                Received

1281    . . . . . . . . . . . . . . . . . . .4444

1287    . . . . . . . . . . . . . . . . . . .4446

1852    . . . . . . . . . . . . . . . . . . .4468

1853    . . . . . . . . . . . . . . . . . . .4471

1856    . . . . . . . . . . . . . . . . . . .4474